IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, JARRETT
LOFTON, REV. CLEE EARNEST LOWE, DR.
ALICE WASHINGTON, STEVEN HARRIS,
ALEXIS CALHOUN, BLACK VOTERS
MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

                    *Plaintiffs*,

   v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State of Louisiana

                    *Defendant*.

CIVIL ACTION NO. 3:22-cv000178
SDD-SDJ

**AMENDED COMPLAINT FOR
DECLARATORY JUDGMENT AND
INJUNCTIVE RELIEF**

## INTRODUCTION

1.    The 2021 redistricting cycle presents the State of Louisiana with an opportunity to rectify its long, ugly history of denying Black Louisianans a meaningful opportunity to participate in the State's political life through the election of candidates of their choice. Unfortunately, the 2022 redistricting plans for the Louisiana House of Representatives and State Senate (the "State Maps" or "State Legislative Maps"), passed by the State legislature and adopted into Louisiana law pursuant to Revised Statute § 24:35.1 ("S.B. 1"), the Senate map, and Revised Statute § 24:35.3 ("H.B. 14"), the House map, continue that shameful record. Defendants violate the mandates of Section 2 of the Voting Rights Act of 1965, as amended 52 U.S.C. § 10301 ("Section 2"), by enacting maps that unlawfully deprive Louisiana's Black voters of a meaningful opportunity to elect candidates of their choice to the State Senate and House of Representatives.

2.    Plaintiffs—Black Louisiana voters whose votes are diluted by the challenged districts and Louisiana nonprofit organizations promoting civic engagement and social equality on

behalf of Black voters—seek a judgment (i) declaring that Louisiana's 2022 State Legislative Maps violate Section 2, (ii) enjoining Defendant from conducting State legislative elections in accordance with the State Legislative Maps, and (iii) setting a reasonable deadline for State authorities to enact or adopt redistricting plans for the Louisiana State Senate and the Louisiana State House that do not abridge or dilute the ability of Black voters to elect candidates of choice. If State authorities fail to enact or adopt valid redistricting plans by the Court's deadline, Plaintiffs further seek an order of the adoption of remedial redistricting plans that comply with Section 2, including by providing for fourteen Senate districts in which Black voters comprise the majority of the voting age population and thirty-five to thirty-nine House districts in which Black voters comprise the majority of the voting age population ("opportunity districts"), to provide Black voters with an equal opportunity to participate in the political process and elect candidates of their choice. Section 2 requires the redistricting body to ensure that voters of color have an equal opportunity "to participate in the political process and to elect candidates of their choice." *Thornburg v. Gingles*, 478 U.S. 30, 34 (1986) (quoting 52 U.S.C. § 10301(b)).

3.      Louisiana's newly-adopted legislative maps—which, the Legislature determined became law on March 9, 2022—violate Section 2 by diluting the voting strength of Black voters in the State and denying Black voters in Louisiana an equal opportunity to participate in the political process. The State Legislative Maps are dilutive under the test outlined by the Supreme Court in *Gingles* because (1) the Black Population in Louisiana is "sufficiently large and geographically compact to constitute a majority" in six to nine additional single-majority House districts and three additional single-member Senate districts; (2) voting in Louisiana is highly polarized along racial lines, and (3) under the State Legislative Maps, racially polarized voting will usually result in the defeat of Black Louisianans' preferred candidates in majority-white

districts.  *Gingles*, 478 U.S.

4.     Black voters in Louisiana are politically cohesive, while the white majority in Louisiana routinely votes as a bloc to defeat Black voters' candidates of choice.

5.     Courts have repeatedly found—most recently in 2020—that racially polarized voting is a feature of Louisiana's political landscape which prevents Black voters from fairly and equally participating in elections.  As a result, despite comprising nearly one-third of Louisiana's voting age population, Black voters have long been denied an equal opportunity to elect their preferred candidates.  The new maps maintain the discriminatory status quo.  Under the 2022 State Legislative Maps, white voters, who only comprise only 58% of the voting-age population, will control election outcomes in over 70% of the seats in the State Senate and State House of Representatives.

6.     The State Legislative Maps embody Louisiana's legacy of discrimination, including de jure discrimination, against its Black citizens, and the ongoing, accumulated effects of that legacy.  Black voters from Louisiana were excluded from the political process through poll taxes, voter roll purges, and state-sanctioned violence.  Black voter's strength was also suppressed and diluted through the redistricting process.  Explicit or implicit racial appeals have been a routine feature of State and local elections into the present day.  The pernicious effects of de jure and de facto segregation have also resulted in deep and ongoing disparities in housing access, health outcomes, incarceration rates, educational opportunities, and economic security between white and Black Louisianans.

7.     Since the Voting Rights Act was signed into law in 1965, courts have repeatedly struck down efforts by the State of Louisiana to deny, dilute, or otherwise harm minority voting access and strength by a wide variety of means, including redistricting for both federal and State

elections.  Between 1965 and 2013 (when the Supreme Court immobilized the preclearance requirement under the VRA), the United States Department of Justice ("DOJ") blocked or demanded alterations to nearly 150 voting-related changes in Louisiana pursuant to Section 5 of the VRA, with many of those objections aimed at attempts to dilute minority voting strength through redistricting or electoral methods.  The DOJ also objected to changes, in most cases related to redistricting, in over two-thirds of Louisiana's 64 parishes.

8.      In the face of the demographics, voting patterns, and other conditions in the State, as well as demands for VRA-compliant maps (which were offered to the legislature), the Louisiana Legislature offered only one additional majority-Black opportunity district in S.B. 1 and H.B. 14, and that one additional district is an area where the Black candidate of choice is already being elected.  Defendants do nothing to substantively increase the ability of Black voters to elect candidates of their choice.  As a result, S.B. 1 and H.B. 14 harm Black voters by diluting Black political power in the State.  The Governor himself has stated, "I don't believe the legislature did what the law requires," and has pointed out that "just in the last 10 years the percentage of African Americans actually increased in Louisiana, and yet the maps don't reflect any increase anywhere, . . . [including] not [in] the House and Senate maps . . . ."  Sabrina Wilson, *Gov. Edwards Calls Redistricting Maps Disappointing; Explores Possible Veto*, WVUE New Orleans (Feb. 21, 2022), https://www.msn.com/en-us/news/politics/gov-edwards-calls-redistricting-maps-disappointing-explores-possible-veto/ar-AAU8QW4?ocid=winp-st.

9.      Until Louisiana complies with Section 2, it is incumbent on this Court to remedy the harms to Black Louisianans caused by the State's manipulation of the redistricting process.  In doing so, the Court will ensure that all voters in Louisiana are afforded the opportunity to exercise their democratic voice with equal dignity and equal opportunity under a fair and legal plan.

4

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under federal law.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. §§ 1343(a)(4) and 1357 because this is a civil action to secure equitable relief under Section 2 of the Voting Rights Act, which is an Act of Congress that protects the right to vote, and arises under 42 U.S.C. § 1983.

11.     Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202, and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12.     This Court has personal jurisdiction over Defendant, who is a citizen of the State of Louisiana and works in his professional capacity as Secretary of State in this District.

13.     Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claim occurred in the Middle District of Louisiana, as the Louisiana State Legislature sits within this District.

## PARTIES

14.     Plaintiff Dr. Dorothy Nairne is a 55-year-old Louisiana citizen who lives in and is registered to vote at her home in Assumption Parish.  She is Black, a U.S. citizen, and is a lawfully registered voter at her current address in Louisiana.  Dr. Nairne is a dues-paying member of the Assumption Parish Branch of the NAACP.

15.     Under H.B. 14, Dr. Nairne lives in what will be House District 60.  This is a region where Black Louisiana voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute the majority in an appropriately configured district, which, if established, would remedy

the Section 2 violation alleged herein.  However, under the State Legislative House Map, Dr. Nairne's candidate of choice will typically be outvoted by the white majority in the Senate district in which she resides.  The State's new Legislative Map dilutes Dr. Nairne's voting power and denies her an equal opportunity to elect a candidate of her choosing to the Louisiana State Legislature.

16.    Plaintiff Jarrett Lofton is a 28-year-old Louisiana citizen who lives in Caddo Parish. He is Black, a U.S. citizen, and is a lawfully registered voter at his current address in Louisiana.

17.    Under S.B.1, Mr. Lofton lives in what will be Senate District 38.  Mr. Lofton lives in a region where Black Louisiana voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority in an appropriately configured district, which, if established, would remedy the Section 2 violation alleged herein.  However, under the State's Legislative Senate Map, Mr. Lofton's candidate of choice will typically be outvoted by the white majority in the districts in which he now resides.  The State's new Map dilutes Mr. Lofton's voting power and denies him an equal opportunity to elect candidates of his choosing to the Louisiana State Legislature.

18.    Plaintiff Rev. Clee Earnest Lowe a 70-year-old Louisiana citizen who lives in and is registered to vote at his home in East Baton Rouge Parish.  He is Black, a U.S. citizen, and is a lawfully registered voter at his current address in Louisiana.

19.    Under H.B. 14, Rev. Lowe lives in what will be House District 69.  This is a region where Black Louisiana voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute the majority in an appropriately configured district, which, if established, would remedy

the Section 2 violation alleged herein.  However, under the State Legislative House Map, Rev. Lowe's candidate of choice will typically be outvoted by the white majority in the Senate district in which he resides.  The State's new Legislative Map dilutes Rev. Lowe's voting power and denies him an equal opportunity to elect a candidate of his choosing to the Louisiana State Legislature.

20.    Plaintiff Dr. Alice Washington is a 74-year-old Louisiana citizen who lives in and is registered to vote at her home in East Baton Rouge Parish.  She is Black, a U.S. citizen, and is a lawfully registered voter at her current address in Louisiana.

21.    Under H.B. 14, Dr. Washington lives in what will be House District 66.  This is a region where Black Louisiana voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute the majority in an appropriately configured district, which, if established, would remedy the Section 2 violation alleged herein.  However, under the State Legislative House Map, Dr. Washington's candidate of choice will typically be outvoted by the white majority in the Senate district in which she resides.  The State's new Legislative Map dilutes Dr. Washington's voting power and denies her an equal opportunity to elect a candidate of her choosing to the Louisiana State Legislature.

22.    Plaintiff Rev. Steven Harris is a 55-year-old Louisiana citizen who lives in and is registered to vote at his residence in Natchitoches Parish.  He is Black, a U.S. citizen, and is a lawfully registered voter at his current address in Louisiana.  Rev. Harris is a dues-paying member of the Natchitoches Parish Branch of the NAACP.

23.    Under H.B. 14, Rev. Harris lives in what will be House District 25.  This is a region where Black Louisiana voters form a cohesive political community and tend to support the same

candidates, and where the Black community is sufficiently large and geographically compact to constitute the majority in an appropriately configured district, which, if established, would remedy the Section 2 violation alleged herein. However, under the State Legislative House Map, Rev. Harris' candidate of choice will typically be outvoted by the white majority in the Senate district in which he resides. The State's new Legislative Map dilutes Rev Harris' voting power and denies him an equal opportunity to elect a candidate of his choosing to the Louisiana State Legislature.

24.    Plaintiff Alexis Calhoun is a 28-year-old Louisiana citizen who lives in and is registered to vote at her residence in Natchitoches Parish. She is Black, a U.S. citizen, and is a lawfully registered voter at her current address in Louisiana.

25.    Under H.B. 14, Ms. Calhoun lives in what will be House District 25. This is a region where Black Louisiana voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute the majority in an appropriately configured district, which, if established, would remedy the Section 2 violation alleged herein. However, under the State Legislative House Map, Ms. Calhoun's candidate of choice will typically be outvoted by the white majority in the Senate district in which she resides. The State's new Legislative Maps dilute Ms. Calhoun's voting power and deny her an equal opportunity to elect a candidate of her choosing to the Louisiana State Legislature.

26.    Plaintiff Black Voters Matter Capacity Building Institute ("BVM") is a nonprofit organization organized under Section 501(c)(3) of the Internal Revenue Code. BVM's goal and mission are to empower voters and improve voting efficacy in marginalized communities of color. BVM mainly works in Black communities and with other communities of color who face barriers

to voting that other communities do not.  BVM focuses on removing those barriers with several core beliefs as guidance.  These core beliefs include understanding, respecting, and supporting local infrastructure in pursuing civic engagement and community empowerment; supporting individuals and organizations that strive for social justice throughout the year and not just on Election Day; and ensuring that Black voters and communities of color in rural counties and smaller cities and towns—who are often ignored—have their voices heard.  BVM works to increase voter registration and turnout and advocates for policies to expand voting rights and access.

27.     While BVM seeks to empower voters and improve the voting efficacy of Black communities nationally, it focuses most of its work on a handful of states, including Louisiana.  BVM focuses its efforts on Louisiana because it contains some of the most under-resourced and neglected communities in the country.

28.     BVM has a significant constituency of individuals and organizations in Louisiana's Black communities who are the primary beneficiaries of BVM's activities including Black voters in many Parishes where the State Maps dilute the voting strength of Black voters, such as Caddo, Bossier, Red River, Rapides, Calcasieu, Concordia, Catahoula, Ouachita, Lincoln, Desoto, Lafayette, Acadia, Iberia, E. Baton Rouge, W. Baton Rouge, Jefferson, Plaquemines, and Orleans.  These individuals and organizations help inform the issues BVM seeks to address, assist with local organizational strategy, participate in BVM-organized efforts like text-message voter mobilization, and volunteer at these events.  BVM also partners with approximately 57 local organizations in Louisiana.  Many of these local organizational partners are membership organizations comprised of individuals residing in parishes across the State who are directly affected by Louisiana's proposed maps for the election of the Louisiana State Legislature.  BVM

works on behalf of its constituents and partners.

29.     One of BVM's key priorities in advancing its mission is leading and supporting efforts to expand voting rights and access and to ensure equal representation.  BVM engages with its communities in multiple ways to ensure equal access to the franchise.  First, BVM focuses on voter education and encourages voter turnout by providing voting guidance and encouraging Black voters to participate in the political process.

30.     Second, BVM supports voter education and mobilization by providing assistance and financial grants to its partner organizations, working with and helping them engage in voter education and on-the-ground efforts to increase voter participation.  Additionally, during the current redistricting cycle, BVM is hosting trainings and community meetings to raise awareness about the redistricting process during this redistricting cycle and advocating for maps that more accurately represent the State's Black population.  This effort on redistricting included one training conducted entirely by BVM and three others who worked to convene its partners and members, and partner organizations delivered the content.  *See, e.g.*, Ashley White, *Want to Learn More About Redistricting?  Black Voters Matter, Other Groups Host Meeting*, Lafayette Daily Advertiser (Jan. 25, 2022), https://www.theadvertiser.com/story/news/2022/01/25/lafayette-groups-offer-information-louisiana-redistricting/9212785002/.

31.     BVM regularly provides mini-grants to its partners, who themselves engage in voter education and on-the-ground efforts to increase voter participation.  BVM carries out much of its work through and in coordination with community partners.  BVM believes it is more effective and efficient to invest in community groups to engage in voter education and turnout efforts because those groups are familiar to and trusted by local voters.  Further, providing grants to partner organizations helps increase partner organizations' long-term capacity to serve their

communities in the region.

32.     In addition to providing grants, BVM regularly communicates with its community partners, including through regular monthly calls, to coordinate with and train their leadership and members.  Specifically, in Louisiana, BVM has provided training for its partners on redistricting, digital organizing, and other capacity-building tools.  BVM also operates a regular bus tour to help its constituents and partners to raise awareness about voting issues.  In the last two years, the BVM bus has held six tours that included stops in Louisiana.

33.     BVM also provides technical support, including with social media, and other support to community partners on an as-needed basis.

34.     Louisiana's unfair and discriminatory redistricting frustrates and impedes BVM's organizational priorities by diminishing the voices and diluting the voting strength of Black Louisianans, who BVM works to empower and to engage in greater civic and political participation.  If the new maps take effect, they will inhibit the ability of BVM to achieve its organizational goals and mission because they will limit BVM's ability to achieve voting efficacy for Black voters in Louisiana.

35.     Moreover, with the passage of the unlawful maps, BVM has been required to divert resources from their regular get-out-the-vote and election education work for the upcoming elections to advocate against these maps in the Legislature and to advocate that the Governor veto these unlawful maps.  If the new maps remain in effect, BVM will continue to be injured because it will be forced to divert resources from its broader voter registration and community empowerment initiatives to the affected districts in order to protect the representation and interests of its members and to try to counteract the negative effects of vote dilution.  BVM will be required to divert organizational resources to address the ill effects of the vote dilution caused by these

unlawful maps.  For example, instead of expending its limited resources on canvassing for bills that are important to Black voters in Louisiana, it will be forced to divert resources toward voter education and related activities in districts where Black voters have been denied political power as a result of the enacted maps.  The unlawful districts will require more resources to help promote voter participation.  BVM's goal is to encourage increased participation by Black voters in all elections, regardless of the potential outcomes.  And in these unlawful districts, more resources will be required to encourage participation when voters know the challenges that Black candidates of choice face in the unlawful districts.  Additionally, more resources will be required when advocating for their preferred positions with elected officials who are not the Black candidate of choice.

36.     The State's maps also dilute votes of individuals who are constituents and supporters of BVM, and who are members of the organizations in BVM's network.  These individuals reside throughout Louisiana, including in most House and Senate Districts at issue here.  This includes individuals who live in areas of Louisiana where Black voters form a cohesive political community and tend to support the same candidates, and where the Black community is sufficiently large and geographically compact to constitute a majority of the eligible voters in additional single-member legislative districts, but who will not be able to elect their candidate of choice under the State's redistricting plan because their candidate of choice will typically be outvoted by the white majority.

37.     These individuals have been and, if the State's maps are not enjoined, will continue to be harmed by the State's maps as the State's maps impermissibly dilute their votes.

38.     BVM's constituents and supporters, and BVM's community partners and their members, include registered voters in the State of Louisiana who plan to vote in future State House

and Senate elections.

39.    Plaintiff the Louisiana State Conference of the National Association for the Advancement of Colored People ("Louisiana NAACP") is a state subsidiary of the National Association for the Advancement of Colored People, Inc.  It is one of the oldest and most significant civil rights organizations in Louisiana.  Since its founding in 1943, the Louisiana NAACP has worked toward its mission to ensure the political, educational, social, and economic equality of all persons and to eliminate race-based discrimination.  Among the Louisiana NAACP's central objectives and mission are ensuring the protection of voting rights and equitable political representation and eliminating racial discrimination in the democratic process.  Its work includes efforts to register, educate, and advocate on behalf of Black voters throughout Louisiana. Perpetuating unlawful maps will impede the Louisiana NAACP's mission to achieve equitable political representation.

40.    To achieve its goals, the Louisiana NAACP regularly engages in efforts to register and educate Black voters, and encourages Black Louisianans to engage in the political process by turning out to vote on Election Day.

41.    The Louisiana NAACP has approximately 5,000 members throughout Louisiana, including Black Louisianans who are registered voters.  The Louisiana NAACP has over 40 branches comprised of adult members and 16 youth and college chapters across the State. Members live in nearly every parish in Louisiana.

42.    The State's maps dilute votes of members of the Louisiana NAACP.  The NAACP has members who reside throughout Louisiana, including in most House and Senate Districts at issue here.  This includes members who live in areas of Louisiana where Black voters form a cohesive political community and tend to support the same candidates, and where the Black

13

community is sufficiently large and geographically compact to constitute a majority of the eligible voter population in additional single-member House and Senate districts—the remedy sought here—but whose votes will be diluted under the State Legislative Maps because their candidates of choice will typically be outvoted by the white majority.

43.     These members have been and, if the State Maps are not enjoined, will continue to be harmed by the State Maps as the State Maps impermissibly dilute their votes.

44.     Additionally, Louisiana's unfair and discriminatory redistricting frustrates and impedes the Louisiana NAACP's organizational priorities by diminishing the voices and diluting the voting strength of Black Louisianans, who the Louisiana NAACP works to empower and engage in greater civic and political participation.  The mission of the Louisiana NAACP will be frustrated if the unlawful districts remain in effect because this will inhibit the organization's ability to fulfill its objective, including the promotion of the political equality for Black voters in Louisiana, and to eliminate racial discrimination in the democratic process.

45.     Furthermore, with the passage of the unlawful maps, the Louisiana NAACP has been required to divert resources from their regular get-out-the-vote and election education work for the upcoming elections to advocate against these maps in the Legislature during the past legislative session and to advocate that the Governor veto these unlawful maps.  If the new maps take effect, the Louisiana NAACP will continue to be injured because it will be forced to divert resources from its broader voter registration and community empowerment initiatives to the affected districts in order to protect the representation and interests of its members and constituents, as well as to try to counteract the negative effects of vote dilution. The unlawful districts will require more resources to help promote voter participation.  Louisiana NAACP's goal is to encourage increased participation by Black voters in all elections, regardless of the potential

outcomes.  And in these unlawful districts, more resources will be required to encourage participation when voters know the challenges that Black candidates of choice face in the unlawful districts.  Additionally, more resources will be required when advocating for their preferred positions with elected officials who are not the Black candidate of choice.

## LEGAL BACKGROUND

46.    Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301(a), prohibits any "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color[.]"  A Section 2 violation is established if "it is shown that the political processes leading to nomination or election" in the jurisdiction "are not equally open to participation by members of a [minority group] in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Id.*  § 10301(b).  Section 2 prohibits any redistricting scheme in which members of a racial minority group "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  *Id.*

47.    The Voting Rights Act of 1965 (the "VRA") was a critical result of the Civil Rights Movement—a hard won and sweeping national reform that sought to replace the disenfranchisement and racial discrimination that characterized the Jim Crow era with a true multi-racial democracy.  Both Democratic and Republican members of Congress as well as U.S. Presidents have reauthorized and expanded the VRA, including most recently in 2006, when the statute was reauthorized by a massive, bipartisan majority in the U.S. House of Representatives, a unanimous U.S. Senate, and the "proud" signature of then-President George W. Bush.

48.    As Congress made clear through its reauthorization of and amendments to the VRA

in 1982, a Section 2 claim may be established based on discriminatory results and does not require discerning or ferreting out any particular intent on the part of state lawmakers or white voters. *See*, *e.g.*, *Gingles*, 478 U.S. at 47. The VRA operates as a powerful tool for uprooting and ameliorating "the accumulation of discrimination" that can stymie political participation and access among racial minority groups. *Id.* at 44 n.9.

49.     The dilution of Black voting strength in violation of the VRA "may be caused by the dispersal of black[ voters] into districts in which they constitute an ineffective minority of voters or from the concentration of black[ voters] into districts where they constitute an excessive majority." *Id.* at 46 n.11. These means of diluting Black voting strength are referred to respectively as "cracking" and "packing."

50.     The U.S. Supreme Court has identified three necessary pre-conditions for a claim of vote dilution under Section 2: (1) the minority group must be "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) members of the minority group must be "politically cohesive" in their support of particular candidates; and (3) the majority must vote "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50–51.

51.     Beyond those preconditions, vote dilution claims under Section 2 are subject to "[a] totality of circumstances" review, guided by factors enumerated by Congress in the Senate Report that accompanied the 1982 amendment to the VRA.

52.     These non-exhaustive factors include: (1) the extent of any history of official discrimination that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; (2) the extent to which voting is racially polarized; (3) the extent to which the State has voting practices or procedures that may enhance

the opportunity for discrimination against the minority group; (4) whether the members of the minority group have been denied access to a candidate slating process, if any; (5) the extent to which members of the minority group in the State bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process; (6) whether political campaigns have been characterized by overt or subtle racial appeals; and (7) the extent to which members of the minority group have been elected to public office in the jurisdiction.  *See* S. Rep. No. 97-417, at 28–29 (1982).

53.    Courts have also considered two additional factors: (8) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and (9) whether the policy underlying the State's use of the challenged standard, practice, or procedure is tenuous—that is, whether  the state's proffered interests for a challenged voting plan are tenuous when analyzing the totality of circumstances, *see*, *e.g.*, *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 870 (5th Cir. 1993); S. Rep. No. 97-417, at 29 (1982) (totality of the circumstances may be informed by "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous").

54.    The Senate Report itself, along with the cases interpreting it, have made clear that these factors are non-exhaustive and that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other."  *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1566 n.33 (11th Cir. 1984) (quoting S. Rep. 97-417, at 29 (1982)). The ultimate question is the one posed by Section 2 itself, i.e., whether minority voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).  While Section 2 does not establish a right

to have members of a protected class elected in numbers equal to their proportion in the population, the Supreme Court has held that "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area" is a "relevant consideration" in assessing whether Section 2 has been violated.  *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006); *see also Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994).

55.    The Fifth Circuit has held that it will be "only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."  *Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (quoting *Jenkins v. Red Clay Consol. Sch. Dist. Bd. of Educ.*, 4 F.3d 1103, 1135 (3d Cir. 1993).

## STATEMENT OF FACTS

### A.    State Enacted Legislative Maps

56.    Under the current State Legislative Maps, Black voters in Louisiana have less opportunity to elect candidates of their choice than white voters.  Despite Louisiana's sizeable Black voting population, only 25.69% of the members of the Louisiana State Legislature are Black.  And all but one of those members were elected from majority-Black districts.  This is a direct consequence of the configuration of Louisiana's legislative districts, which afford Black voters in Louisiana less opportunity to elect candidates of their choice than white voters.

57.    Instead of using the redistricting process as an opportunity to correct the long-standing dilution of Black voting strength in Louisiana, the State Legislature passed H.B. 14 (the "House map") and S.B. 1. (the "Senate Map"), which will further entrench and exacerbate the dilution of Black voting strength in Louisiana over the next decade.  H.B. 14 does not provide any

new additional majority-Black opportunity districts in the House.  The only change in S.B. 1 to majority-Black opportunity districts is the increase of the Black Voting Age Population ("BVAP") to over 50% in one Senate district that is already electing a Black-preferred candidate.  The Legislature failed to add additional representation despite a growing minority electorate and diminishing white electorate in the State.  This does nothing to rectify the existing packing and cracking of Black voters so far described or offer Black voters a new opportunity to elect candidates of their choice. Instead, the new House map serves only to re-entrench the dilutive effects of Louisiana's existing maps and substantially limit the ability of Black voters to participate equally in Louisiana's democracy.

58.     As discussed in detail below, Louisiana's Black population is sufficiently numerous and geographically compact to comprise the majority of the voting-age population ("VAP") in three new Black majority-minority opportunity districts in the State Senate that the State failed to draw.  *See* Exhibits A[1] and B.

59.     Louisiana's Black population is also sufficiently numerous and geographically compact to comprise the majority of the voting age population in between six and nine additional Black opportunity House districts that the State failed to draw.  *See* Exhibits C[2] and D.

**B.     Louisiana State Legislative Redistricting Process and Criteria**

60.     In tandem with the decennial U.S. Census, the Louisiana State Legislature is responsible for establishing new plans for the districts for the Louisiana State Legislature.  La. Const. art. III, § 6.  The boundaries for the State legislative districts are drawn by the Legislature.

---

[1] *See* Testimony of Chris Kaiser & ACLU, January 20, 2022 at 1:02:54–1:03:08 ("[A coalition of over a dozen civil and human rights organization has] provided two illustrative plans that show how the legislature can comply with section two, by adding nine additional majority minority opportunity districts in the house.").  *See also* https://redist.legis.la.gov/default_PlanSubmissions (last visited March 13, 2022).

[2] *See id.*

The maps must be approved by the House and Governmental Affairs Committee ("HGA") and the Senate and Governmental Affairs Committee ("SGA") and ultimately be approved by the full House and Senate by majority votes.  When, as was the case here, maps are passed and delivered to the Governor close to the end of the legislative session, the Governor has 20 days to sign the bill into law or veto the maps.  La. Const. art. III, § 18.  If the Governor fails to take any action, the bill becomes law.  H.B. 14 and S.B. 1 were passed and then sent to the Governor on February 21, 2022.  The Governor failed to sign or veto either bill.  The Legislature decided that the laws were effective on March 9, 2022, after the Governor indicated that he would not sign or veto either one.       *See*       https://www.legis.la.gov/legis/BillInfo.aspx?s=221ES&b=SB1&sbi=y; https://www.legis.la.gov/legis/BillInfo.aspx?s=221ES&b=HB14&sbi=y.

61.    The number of districts in the Legislature is set by the Louisiana State Constitution. There are 39 State Senate districts and 105 State House districts.  La. Const. art. III, § 3.

62.    On June 11, 2021, the Legislature adopted Joint Rule 21, which sets forth the criteria any redistricting plan submitted for consideration by the Legislature must satisfy.  Pursuant to Joint Rule 21, each redistricting plan must comply with the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution; Section 2 of the Voting Rights Act of 1965, as amended; and all other applicable federal and State laws.  Each legislative redistricting plan must also (1) provide for single-member districts; (2) be comprised of districts that have a population as nearly equal to the ideal district population as practicable; and (3) be a whole plan which assigns all of the geography of the State.  And further, "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to *the extent practicable*."  Joint Rule No. 21.

Redistricting Criteria, ¶ H, *available at* https://www.legis.la.gov/Legis/Law.aspx?d=1238755 (last visited March 10, 2022) (emphasis added).

### C.    Louisiana's Growing Black Population

63.    The failures of the maps in H.B. 14 and S.B. 1 are particularly concerning because of the changes in Louisiana's population over the last ten years.

64.    According to the 2020 Census data, Black Louisianans comprise nearly one-third of Louisiana's residents, making Louisiana home to the second highest percentage of Black citizens of any state in the United States.  Louisiana has a VAP of 3,570,548, with a non-Hispanic Black VAP of 1,100,695 (30.8%), a Hispanic/Latino VAP of 223,662 (6.3%), and a non-Hispanic Asian American VAP of 67,983 (1.9%).  People of color in Louisiana now make up 42% of the total VAP.  Furthermore, per the 2020 census, the VAP for individuals in Louisiana who identify as any part Black is 1,115,769 (31.2%).

65.    Additionally, according to the 2020 Census data, when looking at Louisiana's population of individuals who identify as any part Black, the population has increased by 3.78% over the last decade, and the total number of Black Louisiana residents over the age of 18 (i.e., the Black Voting Age Population) increased by 7.22%.  Indeed, Louisiana's population growth over the last decade was driven entirely by growth in minority populations.  The State's white population decreased by 6.3%.  The minority population growth had a particularly significant impact in certain areas of the State, such as Lake Charles, Jefferson Parish, Shreveport, and Baton Rouge.

For example, according to the 2020 Census data, in the Shreveport area of Louisiana (which includes Bossier, Caddo, and De Soto Parishes), the overall population decreased by 1.3%, but the region's Black population *grew* by 2.14%.  Similarly, in the Lake Charles area (including the

Calcasieu and Cameron Parishes), the overall population decreased by 11.42%, but the Black population *grew* by 19.12%.  Yet, Black Louisianans have not seen their community's growth reflected in their access to political institutions.

### D.    The Process Leading to Enactment of New Plan for the State Legislative Districts

#### 1.    Roadshows

66.    From late October 2021 through January 2022, the Louisiana House Committee on House and Governmental Affairs and the Senate Committee on Senate and Governmental Affairs held a series of joint public meetings (commonly called "roadshows") across the state during which Louisianans could make suggestions and recommendations regarding the redistricting process and the new maps.  These roadshows took place on October 20, 2021 in Monroe; October 21, 2021 in Shreveport; October 26, 2021 in Lafayette; November 9, 2021 in Alexandria; November 16, 2021 in Capitol Area/Baton Rouge; November 30, 2021 in Northshore/Covington; December 15, 2021 in Southwest Louisiana/ Lake Charles; January 5, 2022 in Orleans Metro/New Orleans; January 11, 2022 in Bayou Region/Thibodaux; and January 20, 2022 in Baton Rouge.  The Legislature represents that it intended to provide, through the roadshows, a "full opportunity for citizens to make suggestions and recommendations to the legislature."  *See Redistricting*, State of Louisiana, https://redist.legis.la.gov/ (last visited March 10, 2022).

67.    Defendants were alerted early in the redistricting process (if they were not already aware) of the importance of developing maps that ensure the ability of Black Louisianans to elect candidates of their choice.  On October 18, 2021, a coalition of well over a dozen civil and human rights organizations submitted a letter to the House and Senate Governmental Affairs Committees providing an overview of Section 2 and the preconditions set out by the Supreme Court in *Thornburg v. Gingles*.  The next day, October 19, 2021, the ACLU submitted data demonstrating

that the Black population in the State had grown since the last decennial Census and notifying the House and Senate Governmental Affairs Committee that legislative maps "that unnecessarily divide minority voters or artificially concentrate them into a single district may dilute their voting strength, depriving them of a fair opportunity to elect candidates who align with their policy preferences."  Email Testimony of Chris Kaiser & ACLU, October 19, 2021 at 4:34 PM (on file).

68.    Voters from across the State attended the redistricting roadshows in person to offer live testimony in support of the need for equitable and fair representation in general, and more majority-Black opportunity districts in particular.  *See, e.g*., Testimony of Brenda Shepard Nelson at Monroe Roadshow at 1:48–49 ("My parents understood the importance of voting. For you see they lived at a time where they could not vote. During my mother's last days she insisted in going to the polls and voting for the person she felt would best represent our community. . . . I have never missed an opportunity to vote, and I do not want my options to vote to be hampered by unfair drawing of district lines."); Testimony of Angelle Bradford at Baton Rouge Roadshow, November 16, 2021 at 2:24–26 ("I'm just asking you to listen to everyone tonight and really invest your time in racial proportionality and competitiveness."); Testimony of Sharon Smith LaHoste at New Orleans Roadshow, January 5, 2022 at 2:15–16 ("Minorities have a community of interest in that the State's past practices have resulted in the problems they disproportionately face every day . . . but for far too long minorities have been deprived of a fair opportunity to participate in developing the laws and policies that affect their own futures."); Testimony by Frankie Robertson, reading a prepared statement by Raymond A. Jetson, January 20, 2022, at 50:50–51:14 ("The solution is drawing fair maps . . . maps that support equitable majority-minority districts and maps that are absent of vote dilution. Maps that provide opportunities for minorities in majority white districts to have an influential voice in expressing their needs and concerns in the community.").

They also provided email testimony alerting legislators to demographic shifts warranting additional majority-minority districts and demonstrating broad support for additional opportunity districts for Black voters. *See, e.g.,* Email Testimony of Betty DiMarco, January 19, 2022 at 10:03 AM ("Districts should be fair and give proportional voice to minority and geographic communities of interest.") (on file); Email Testimony of Jodie Manale, January 18, 2022 at 3:41 PM ("For State Legislative Districts, the representation of the Jefferson Parish delegation has not given voice to the numbers of minority citizens in the parish – and that number is growing. Over a third of the parish is Black, Latino, or some other combination other than White.") (on file).

69.     Throughout live and email testimony, members of the public consistently reminded Legislators of their mandate to enact State legislative districts that comply with Section 2 of the Voting Rights Act. *See, e.g.*, Testimony by Chris Kaiser, January 20, 2022 at 1:02:44–1:03:08 ("[A]head of this meeting, [Legislators] received a letter from our coalition of [well over a dozen] civil and human rights organizations that detail . . . your obligations under the VRA in Section 2."); Email Testimony by Lorenzo Lee, October 20, 2021 at 3:48 PM ("Please be fair, equitable and transparent in your rational for designating districts and utilize this data (Secretary of State & Census) objectively, so the districts accurately reflects the State's voters by party and by race as per the Voting Rights Act.") (on file).

70.     The Legislature held the final roadshow on January 20, 2022, in Baton Rouge.  At that time, Chris Kaiser from the ACLU of Louisiana discussed two illustrative maps demonstrating how the legislature could comply with Section 2.  Testimony by Chris Kaiser, January 20, 2022 at 1:02:54–1:03:08 ("[A coalition of over a dozen civil and human rights organization has] provided two illustrative plans that show how the legislature can comply with Section 2, by adding nine additional majority-minority opportunity districts in the House.").

71.     Despite extensive effort on the part of the public to engage with legislators, the Baton Rouge roadshow marked the only time individual legislators engaged in dialogue with the public and engaged with community input.  Though it scrutinized maps submitted during the roadshows for the first time on the last day, at no point during the months-long process did the Legislature provide the public with any opportunity to review any of its district map drafts.

### 2.     2022 Special Legislative Session

72.     Following the conclusion of the roadshows, the Legislature convened the 2022 First Extraordinary Session (the "Special Session") to consider and enact plans.

73.     During the Special Session, members of the Senate and House Governmental Affairs Committees ultimately introduced nine bills proposing State legislative maps.  *See* S.B. 1 (La. 2022), S.B. 17 (La. 2022), H.B. 11 (La. 2022), H.B. 14 (La. 2022), H.B. 15 (La. 2022), H.B. 16 (La. 2022), H.B. 21 (La. 2022), H.B. 23 (La. 2022), and H.B. 24 (La. 2022).  Several of these maps, and amendments to, them provide more substantive representation for Black communities.  All such maps and amendments were rejected, in favor of both Senate and House maps that dilute Black voting strength.

### a.     Senate Map

74.     The Senate Governmental Affairs Committee ("SGA") convened for the first time on February 2, 2022.  Several individuals gave public testimony that echoed the comments of voters who spoke at and submitted written testimony during the roadshows, demanding maps that would provide Black Louisianans an opportunity to elect candidates of their choice at all levels of government.

75.     On February 3, 2022, SGA held a hearing to discuss a proposed State Senate Map.  At the hearing, it discussed S.B. 1, introduced by Senator Patrick Page Cortez, who is white.  As

Senator Cortez explained, S.B. 1 was designed to maintain the status quo to the extent possible. Testimony of Sen. Cortez, February 3, 2022 at 37:53–38:06.

76.     SGA also considered S.B. 17, which was proposed by Senator Ed Price, who is Black.  Very little floor time was dedicated to this bill, and on February 4, 2022, S.B. 17 was briefly considered and ultimately deferred.  The bill would have "create[d] two new minority districts."  *See* Testimony of Sen. Price, February 4, 2022 at 38:44–39:08 ("I traveled throughout this state with the chairman.  I think we both made all of the hearings, and I heard the people.  I heard their wishes also, and of course, they talked about two minority districts at every, creating two new minority districts at every stop.  I wanted to provide that opportunity.").

77.     On February 8, 2022, the Senate convened to discuss to S.B. 1.  Senator Peterson, who is Black, opposed S.B. 1 because of, among other things, its lack of representation of Black voters and its failure to account for demographic shifts.  She pointed out that despite the fact that the New Orleans Metro area's minority population grew significantly while several parishes saw steep declines in their white populations, no new minority districts were created.  *See* Testimony of Sen. Peterson, February 8, 2022 at 1:48:48–1:49:44 ("One of the most important considerations when we redraw these districts every ten years is to account for the changes in our state's demographics in racial diversity.  In fact, the Voting Rights Act requires us to draw new minority districts when population changes make it possible. . . .  If we just keep maintaining the status quo, that doesn't permit for more opportunity when the population is obviously shifting.  This amendment further packs Black residents into Senate District 5, mine, . . .  and unnecessarily gerrymanders Jefferson Parish.").

78.     On February 14, 2022, the Senate passed S.B. 1 by a vote of 27 to 12 and the House passed H.B. 14 by a vote of 82 to 21, with one member absent.  Notably, 9 of the 12 Senators who

voted against S.B. 1 and 18 of the 21 Representatives who voted against H.B. 14 were Members of the Black Caucus.

79.    On February 18, 2022, the House passed S.B. 1 by a vote of 65 to 31, with 8 members absent.  Of the 31 Representatives who opposed S.B. 1, 21 were Members of the Black Caucus.

### b.    House Map

80.    On February 4, 2022, Speaker Clay Schexnayder, who is white, introduced H.B. 14, a map for Louisiana's State House, in the House Governmental Affairs Committee ("HGA").  On February 7, 2022, Representative Stefanski, who is white and the Chair of HGA, explained that the proposed map would create only 29 minority-majority districts.  This maintained the status quo as the current House of Representatives has only 29 majority-Black districts.

81.    On February 10, 2022, Representative Jenkins, who is Black, introduced H.B. 15, a bill adding one new majority-Black district.  Testimony of Rep. Jenkins, February 10, 2022, at 4:10–4:28 ("One of the amendments is an amendment to House District 62.  What we've done with House District 62 is effectively make that a majority-minority district voting age population, white 45, black 51.").  Representative Jenkins underscored that his proposal did not suggest that *only* one additional majority-minority district was possible, but rather underscored that it posed one of many options for ensuring more equal representation for minority voters.  *Id.*  ("Let's not just say that [H.B. 15's proposed district lines] is to some exclusion of [proposals for] other areas where some minority-majority districts can be created.").  The Legislature voluntarily deferred the bill.

82.    On February 11, 2022, Representative Glover, who is Black, filed H.B. 21, unpacking several majority-Black districts in the Shreveport area to create a new majority-Black

seat there.  Testifying that H.B. 14 is not legal because it "did not unpack districts," Representative Glover explained that his intent in filing H.B. 21 was to avoid the current map's "extreme packing" of Black voters.  Testimony of Rep. Glover, February 11, 2022, 55:14.  *See also id.* at 20:06 ("[H.B. 14, by contrast to H.B. 21,] maintains the status quo in the State of Louisiana—which overall has seen a decrease in overall white population and an increase in its Black population—[by] maintain[ing] the current number of minority districts at 29 and does so by creating districts that are 70 plus percent one race or the other within my home region [in and around Shreveport].").  By drawing House District 5 as majority-Black while migrating House District 23 into New Orleans in H.B. 21, Representative Glover demonstrated how an unpacking effort could create additional representation for Black voters.  *Id.* at 1:00:04–1:05:04 ("[T]here is certainly a community of folks who are people of color in [proposed House District 23] that I think deserve to be a substantial, if not deciding factor, in selecting a member of this body.").  H.B. 21 was deferred in committee on Friday, February 11.

83.    H.B. 14 was debated on the House floor the following Monday, February 14. During that floor debate, Representative Glover offered three floor amendments—amendments 62, 90, and 113—to provide "multiple options in terms of how to unpack [legislative districts in Shreveport-Bossier and Northwest Louisiana]" and "to effectively illustrate that the objective of drawing fair, unpacked districts is more than possible."  Testimony of Rep. Glover, February 14, 2022, at 1:39:04–2:14.  In support of the amendments, Representative Larvadain, who is Black, warned that "[i]f we pass [H.B. 14], then we are okay with the status quo," which youth groups had spoken in opposition of.  Testimony of Rep. Larvadain, February 14, 2022, at 2:12:04 ("If we keep doing the same thing, we'll continue to get the same results. We have to grow our state, and we have to show our young people that we are going to do something different.").

28

84.    All proposed amendments were rejected, with 31 representatives voting in favor of Amendments 62 and 113 and with 71 representatives voting against; additionally, 32 representatives voted in favor of Amendment 90 and 70 members voted against.  Twenty-one representatives—the vast majority—who voted for Rep. Glover's amendments were members of the Black Caucus who, as Representative Pierre noted, had sought to improve H.B. 14 to better reflect the demographics of the State:

> Unfortunately, the maps that the Black Caucus has proposed to reflect the demographics realities of right now and not ten years ago have failed to get the committee in favor of other maps that make no attempt to increase [Black] representation for Louisiana.  One third Black population.  We have proposed countless amendments in committee and on the floor to right the wrongs of these status quo maps.  Despite the fact that all of our amendments have been rejected, we remain undeterred in our fight for fair representative maps.  Testimony of Rep. Pierre, February 14, 2022, at 02:21:09.

85.    Representative Glover additionally proposed H.B. 23 and H.B. 24 "to pursue the objectives of House Bill 21" of "creat[ing] a fourth majority Black district" by migrating House District 23 from Northwest Louisiana to Orleans.  Testimony of Rep. Glover, February 16, 2022 at 2:25:14–2:25:21, 2:37:03–2:37:07.  Noting that districts in Shreveport are packed with "a low of 69% and a high of almost 75%" Black populations, Representative Glover asked "the entirety of the Legislature to at least allow [the State] to be at a place where [it is] not sending people [to the Legislature] from racially extreme districts."  *Id*. at 2:40:09–2:40:14, 2:41:36–2:41:47.  Both H.B. 23 and H.B. 24 were ultimately deferred.

86.    On February 18, 2022, the Senate passed H.B. 14 by a vote of 25 to 11, with 3 senators absent.  The House passed H.B. 14 by a vote of 82 to 21, with one member absent.  Notably, 9 of the 11 senators who opposed the bill were Members of the Black Caucus and 18 of the 21 Representatives who voted against H.B. 14 were Members of the Black Caucus.

### c.    Governor and the State Legislative Maps

87.    The 2022 State Maps were transmitted to Governor John Bel Edwards on February 21, 2022.  The Governor failed to sign or veto either bill.  The Legislature decided that the laws were effective on March 9, 2022, after the Governor indicated that he would neither sign nor veto the bills.

### E.    The Newly Enacted Legislative Maps Dilute Black Voting Power in the Face of an Increasingly Diverse Louisiana

88.    Instead of using the redistricting process as an opportunity to correct the long-standing dilution of Black voting strength in Louisiana, something the State has been routinely asked to do by concerned community members, the State enacted State Legislative Maps further entrenching and exacerbating the vote dilution of Black voters in Louisiana for at least the next ten years.  The State enacted these maps despite the growth in the Black population in Louisiana over the last ten years, particularly in the western parts of the State and in the Baton Rouge area.

89.    Instead of enacting districts reflecting that approximately one-third of Louisiana's population is Black, the State opted to enact more concentrated Black-majority districts, "packing" Black voters in some districts and "cracking" the other cohesive Black populations, effectively diluting their strength in numerous areas of the State.  The State's effort to dilute the voting strength of Black voters in multiple parts of the State is in clear violation of Section 2 and must be remedied.

90.    Louisiana's Black population is sufficiently numerous and geographically compact to comprise the majority of the voting age population in three new Senate majority-minority Black opportunity districts that the State failed to draw.  Three new districts could have been drawn in Baton Rouge, in Shreveport, and in Jefferson Parish.  S.B. 1 falls woefully short—creating only one new majority-Black district, and in a Senate district *that is already* electing a Black preferred candidate.

91.     That single new majority-Black opportunity district is in Senate District 5, a district located in Orleans Parish that is already represented by Senator Karen Carter Peterson, who is Black.   Increasing the BVAP in this district, which was already electing a Black-preferred candidate, will have no impact on the overall opportunities of Black voters in Louisiana to select the candidates of their choice.

92.     Legislators were well aware that the State Map packs Black voters into Senate District 5 and cracks the remaining Black population in Jefferson Parish.   They were aware that in enacting S.B. 1, they would exacerbate the dilution of Black voters in Jefferson Parish, and harm their ability to elect candidates responsive to their interests. *See, e.g.*, Testimony of Sen. Carter and Sen. Peterson, February 8, 2022 at 1:35:48–1:38:25 (In response to Senator Peterson's testimony that Senator Carter's proposed fixes would "shore[] up [Senate] District 5 East Bank district with Black voters on the West Bank by pulling Black voters on the West Bank [in a way that cracks the Black voting population of Jefferson Parish,] Senator Carter explained that S.B. 1 does no better: "It is my understanding the current version of Senate District 5 [in S.B. 1] does exactly what it is [that Senator Peterson testified] that [Senator Carter's amendment] does.").

93.     Furthermore, Legislators were also aware that S.B. 1 would exacerbate the dilution of Black voters in the Baton Rouge area.   For example, when Senator Price introduced S.B. 17, he explained that it was possible to create two minority-majority opportunity districts in the West Baton Rouge area by unpacking adjacent districts.   Testimony of Sen. Price, February 4, 2022 at 38:32–38:43 ("[Regarding] Senate District 17, which is the West Baton Rouge Area . . . [S.B. 17] makes that district a minority district for plus of two new minority district[s].").   Legislators turned down this option, opting instead to keep Senate Districts 14 and 15 packed.

94.    Legislators were additionally on notice of concerns about vote dilution of Black citizens in the Shreveport area, including in Bossier, Caddo, and De Soto Parishes. *See, e.g.*, Testimony of Senator Tarver, February 4 at 10:23–10:40 ("[M]y district [in Shreveport and Caddo Parish] was something like 80% minority, and I told you to reduce it because . . . we need to work across racial lines and work together as one to make things happen [to ensure fair maps]."); Testimony of Chris Kaiser, Shreveport Roadshow, October 21, 2021 at 1:44:02–1:44:48 ("[T]otal population [across Shreveport] fell by about 2%. . . . [A]t the same time, the voting age population among people of color increased by 11%, while the white voting age population decreased by 9.5%. . . . [T]here are cohesive and sometimes growing Black communities in this region, and they deserve fair representation in this process."); Testimony of Demetrius Norman, Shreveport Roadshow, October 21, 2021 at 2:08:50–2:09:29 ("[E]ven though racism [isn't] brought up in a lot of the political meetings, it's obvious to the citizens and it's obvious to the people that live in our communities [in the Shreveport area] that one community has a louder voice than others . . . [I]t's hard to convince the rest of my community [to vote] when they see these unfair practices of one community being given leverage over another . . . So I'm here to demand fair maps."); Email Testimony of Lorenzo Lee, October 20, 2021 at 3:48 PM ("Census Data for the Greater Shreveport area (Caddo, Bossier, DeSoto and Webster Parishes) indicates the area had an overall decrease in population, facilitated by the same decline in the White population and increases in the same populations: Black, Asian, Hispanic and other people of color.  Based on this data, there is no justification for adding more majority-white districts; however, there is justification for additional [B]lack, and 'minority' districts.") (on file).

95.    Similarly, Legislators were aware that H.B. 14 would exacerbate the dilution of Black voters in the northwest of the State. *See, e.g.*, Testimony of Rep. Glover, February 14, 2022,

at 1:06:12–1:06:18 ("the demographics of northwest Louisiana and the demographics of the state as well justify additional majority-minority districts."); Testimony of Rep. Cox, February 9, 2022 at 1:15:25–1:15:53 ("So, we go from slavery, to freedom, to Jim Crow, to the civil rights movement so we can actually vote.  And now, we're being channeled out. . . . And, as I said before, it's like you threw a land mine in [District 23] and it went all different directions.  And my people are dispersed and all.")

96.    Louisiana's Black population is sufficiently numerous and geographically compact to comprise the majority of the voting age population in six to nine new House majority-minority opportunity districts that the State failed to draw.  Among other areas, new districts could have been drawn in Baton Rouge, in Shreveport and in Lake Charles.  H.B. 14 provides only 29 majority-minority Black opportunity districts, the exact same as in the current map.  It also falls woefully short.

97.    The Legislature was acutely aware of this failing.  *See, e.g.*, Testimony of Rep. Glover, February 14, 2022 at 57:46–58:13 ("[D]espite the fact that both Shreveport and Bossier, Caddo and Bossier, as well as DeSoto, as well as Webster are Blacker [than they were a decade ago, the] number [of majority-minority Black opportunity districts in H.B. 14] is still at 29. And [the Legislature] only keeps it at 29 by creating districts that are more than 72% Black or white.").

**F.    The Redistricting Plan Illegally Dilutes Black Voting Strength**

98.    As applied here, the three preconditions outlined by the Supreme Court in *Thornburg v. Gingles*—the size and geographic compactness of Black voters in Louisiana; their political cohesiveness, and bloc voting by the white majority sufficient to usually defeat candidates "preferred by" Black voters—are readily satisfied here, and strongly support the finding that the 2022 State Legislative Maps violate Section 2.

### 1.    The Redistricting Plan Satisfies the First *Gingles* Precondition.

99.    The first "*Gingles* precondition" asks whether an alternative districting plan can be drawn that includes additional single-member districts in which the minority community is sufficiently large and geographically compact to constitute a majority in the district.

100.    As the Black population in Louisiana is of sufficient size and geographic compactness to create more majority-Black districts than the enacted map, the first *Gingles* precondition is satisfied.

101.    Illustrative Louisiana State Senate and Louisiana State House maps that accomplish this goal are attached as Exhibits A-D.  These proposed maps illustrate two possible ways of many to draw the Senate and House maps that follow traditional redistricting principles (e.g., population equality, compactness, and contiguity of districts) and expand the number of majority-minority opportunity districts.  Indeed, there are countless other potential district configurations of both the Louisiana State Senate and the Louisiana State House of Representatives that would add a significant number of new majority-minority opportunity districts where the BVAP is the numerical majority, the Black voting community is geographically compact, and the share of Black majority-minority opportunity districts would fairly reflect the State's population and demographics.

### a.    Senate

102.    The illustrative Senate maps, attached as Exhibit A and B, demonstrate that it is possible to draw a State Senate plan with 14 districts in which Black voters comprise a majority of the voting age population, adding three new majority-Black opportunity districts not present in the State Map.  In these illustrative plans, the BVAP within each of the three new majority-Black districts is sufficiently large and geographically compact to satisfy *Gingles'* first precondition.

103.    Furthermore, the illustrative map provided as Ex B has significantly few parishes splits than S.B. 1 and only 4 precinct splits, just a few more than in S.B. 1. Additionally, when looking at the overall scores of the widely recognized statistical measures of compactness of the illustrative Senate maps are essentially the same or better than those of the current map and S.B. 1.

104.    Instead of passing a Senate map that fairly reflects the State's population and demographics, the Legislature enacted S.B. 1, which falls far short of doing so.

105.    First, S.B.1 packs a large proportion of the Black population in Jefferson Parish into Senate District 5, contributing to the dilution of Black voters in adjacent districts.   Under S.B. 1, Senate District 5 is no longer as compact, extending into Jefferson Parish in the middle of Senate District 8.   Jefferson Parish has become significantly more diverse in the last ten years. The white voting age population ("WVAP") in 2010 was 62.9%, and per the 2020 census, it is now 50.1%.  But instead of drawing a new majority-Black opportunity district in Jefferson Parish to reflect the growth of the Black population in the last ten years, S.B. 1 distorts the shape of Senate District 5, which was previously contained mostly in Orleans Parish, to include additional portions of Jefferson County with significant Black populations.

106.    Black voters are sufficiently numerous in Jefferson Parish so that instead of packing Black voters into Senate District 5, the boundaries of District 8 could have been drawn to create an additional majority-Black opportunity district.  The Legislators were well aware that the Black population in Jefferson Parish is large and growing.  *See, e.g.*, Representative Lyons, February 16, 2022, at 31:29–31:33 ("I know we have enormous percentage growth of minorities on the west bank, in Jefferson Parish.").

107.    S.B. 1 also dilutes Black voting strength in the Shreveport area, including in Bossier, Caddo, and De Soto Parishes.  Currently, Senate District 39 in the Shreveport area is very packed, with a BVAP of more than 66%, while adjacent Senate Direct 37 has a BVAP of less than 27%.  Instead of unpacking Senate District 39 to make Senate District 37 an additional majority-Black opportunity district, S.B. 1 moves Senate District 37 to Tangipahoa Parish, on the other side of the State. [3]   And this move was made despite the fact that the population in existing Senate District 37 has grown, and overall the Black Population in the Shreveport area has also increased since 2010.  Black voters are sufficiently numerous in the Shreveport area so that, for example, the boundaries of Senate District 37 or Senate District 38 could have been drawn to create an additional majority-Black district instead of packing Black voters into Senate District 39.

108.    It is similarly possible to draw an additional opportunity district in the Baton Rouge area.  Senate District 14 and Senate District 15 are currently both packed—particularly Senate District 15, which currently has a BVAP of over 74%—thereby unfairly diluting Black voting strength and denying Black voters an opportunity to elect candidates of choice in neighboring districts.  Though Senate Districts 14 and 15 can be unpacked to create a reasonably compact additional majority-Black opportunity district in the north of East Baton Rouge Parish, S.B. 1, makes no attempt to unpack either district.   Black voters are sufficiently numerous and geographically compact in East Baton Rouge Parish and West Feliciana Parish, for example, to create a new additional majority-Black opportunity district in Senate District 17, unpacking Senate District 14 and Senate District 15 in the process.

---

[3] The Louisiana Constitution sets the specific number of House and Senate seats, La. Const. art. III, § 3, so it is not possible to add additional seats without a constitutional amendment.  Therefore, to accommodate population changes and shifts, it is sometimes necessary in redistricting to move entire districts from areas with population decreases to areas with population growth.  The voters in the area the districts are moved from are disbursed throughout the remaining districts in the area.  The process in itself does not violate Section 2 but it should not be used to further dilute Black voting power, as is the case with the decision in S.B. 1 to move Senate District 37 and, as discussed *infra*, the decision in H.B. 14 to move House District 23.

### b.  House

109.    The illustrative House maps, attached as Exhibits C and D, also demonstrate that it is possible to draw a State House plan with between 35 and 38 districts in which Black voters form a majority of the voting age population, adding up to nine new majority-Black districts that are not present in the H.B. 14.  Within each of the new majority-minority opportunity districts in the illustrative maps, the BVAP is sufficiently large and geographically compact to satisfy *Gingles'* first precondition.

110.    Furthermore, the illustrative map attached as Exhibit D has the same number of parish splits as H.B. 14, and also like H.B. 14 has only a few precinct splits, all of which do not involve any splits in population.  Additionally, when looking at the overall scores of the widely recognized statistical measures of compactness of the illustrative House maps are better than the current map and H.B. 14.

111.    Instead of passing a House map that fairly reflects the State's population and demographics, the Legislature enacted H.B. 14, which substantively limits the political voice of Black voters across the state.  Louisiana's Black population is sufficiently numerous and geographically compact to comprise the majority of the VAP in between six and nine additional Black opportunity House districts across the State, including notably in Lake Charles, Shreveport, New Orleans, and Baton Rouge.

112.    For example, in the Lake Charles area (Calcasieu Parish and surrounding area), currently much of the Black population is packed into House District 34 and the remaining Black population is cracked across several surrounding House Districts.  The current BVAP of House District 34 is over 71%.  H.B. 14 made no attempt to correct this vote dilution and in fact makes it worse in light of the growing Black population in the Lake Charles area.  While the overall

population in the Lake Charles area decreased by over 11% since 2010, the Black population of the area grew by over 19% since 2010.  Given these population shifts, Black voters are clearly sufficiently numerous and geographically compact to comprise the majority in an additional majority-minority opportunity district in the Lake Charles area.  An additional majority-Black district could be added to the Lake Charles area, for example, by unpacking House District 34 and creating a new additional majority-minority Black opportunity district in House District 38 in Calcasieu Parish.  H.B. 14 makes no attempt to remedy the packing of House District 34, opting instead to dilute Black voting strength and increasingly limit the ability of Black voters to equally elect candidates of their choice.

113.    As another example, H.B. 14 made no attempt to increase the number of majority-minority Black opportunity districts in the area around Shreveport despite the fact that, while the overall population in the area (consisting of Bossier, Caddo and De Soto Parishes) decreased by 1.3%, the Black population *grew* by 2.14%.  Several of the House Districts in the Shreveport area are packed with Black voters.  Currently, House Districts 2, 3, and 4 have very high BVAP populations, with District 3 having a BVAP over 90%.  Black voters are sufficiently numerous and geographically compact in this area to create a new additional majority-Black opportunity district, for example by unpacking District 2, 3, and 4 and creating additional majority-Black opportunity district for District 1.

114.    In addition to failing to create an opportunity district in the Shreveport area, H.B. 14 actually decreases the total number of majority-minority Black districts in northwestern Louisiana because it moves House District 23 in the Natchitoches area, which is currently a majority-Black district with a BVAP of approximately 57%, to Orleans Parish.  Black voters are sufficiently numerous and geographically compact in this area to keep the boundaries of House District 23

relatively similar to its current configuration, and keep it a majority-minority Black opportunity district.  The illustrative map, attached as Exhibit D, does this—and it does this while still addressing the need to move one of the House districts from the Northwestern part of the State to Orleans Parish to account for the increase in population there. Specifically, this illustrative plan demonstrates it is possible to address these population changes by moving House District 5 to Orleans Parish, and that it is completely unnecessary to move House District 23 to Orleans Parish and thereby deprive Black voters in the Natchitoches area of the electoral opportunities they currently have.

115.    As another example, H.B. 14 does not add any new majority-Black districts in the Baton Rouge area even though the Black population is sufficiently numerous and geographically compact to comprise the majority of the VAP in several additional new majority-Black districts in this area.  The districts around the city of Baton Rouge have unnecessarily high BVAPs—House District 29 and House District 63 each have a BVAP of approximately 80%; the BVAP of House District 61 is currently approximately 77%; and for House District 101, it is currently 73%. Additional majority-Black districts could be added in the Baton Rouge area by unpacking these districts and creating new additional majority-Black opportunity districts House Districts within this area—for example with House Districts 60, 65, 68, and 69.

116.    In sum, it is clearly possible to enact additional single-member districts in which the minority community is sufficiently large and geographically compact to constitute a majority in the district.  The first "*Gingles* precondition" is met here.

  **2.**   **The State Legislative Maps Satisfy the Second and Third *Gingles* Preconditions.**

117.    The second and third *Gingles* preconditions—politically cohesive minority group and white majority bloc voting that usually defeats that minority group's preferred candidate—are likewise satisfied due to persistent racially polarized voting in elections across the State.

118.    Over the past three decades, numerous federal courts have found that racially polarized voting pervades Louisiana in statewide and local elections.  In the past two decades, the DOJ has sued local parishes under Section 2 three times; in each case, the DOJ identified racially polarized voting patterns within the parish.

119.    Voting patterns in Louisiana clearly establish that Black voters in Louisiana are politically cohesive in their support of the same candidates, and that they overwhelmingly vote for different candidates than those supported by white voters.

120.    Voting patterns also establish that white voters usually vote as a bloc to defeat the Black voters' preferred candidates in majority-white districts.

121.    For example, the 2020 congressional elections reflected racially polarized voting patterns.  In the five districts comprised of a majority of white voters, there were three contests in which voters had a choice between Black and white congressional candidates.  In each, the white majority elected white candidates, defeating the Black-preferred candidates.  Furthermore, currently only one of the 37 Black members of the Louisiana Legislature is from a district that is *not* a single-member majority-minority district, and that single district has a BVAP close to 50%, high enough to allow Black voters usually to elect their candidates of choice.

122.    Numerous other examples of racially polarized voting abound.  For instance, in the 2017 general run-off election for State Treasury, Derrick Edwards, who is Black, ran against John Schroder, who is white, and lost.  Mr. Edwards received support from approximately 96% of Black voters statewide, while Mr. Schroder received 79.3% of white voter support.  In the 2018 special

election for Secretary of State, Gwen Collins-Greenup ran against Kyle Ardoin and lost.  Ms. Collins-Greenup is Black and statewide she received approximately 95% of Black voter support, while Mr. Ardoin, who is white, received approximately 84% of white voter support.  In 2019, Ms. Collins-Greenup again faced Mr. Ardoin in a regular general election for Secretary of State.  In the 2019 election, Ms. Collins-Greenup again lost the election, receiving approximately 96% of Black voter support, while Mr. Ardoin received approximately 86.4% of white voter support.

> ### 3.    Under the "Totality of the Circumstances," the State Legislative Plans Fail to Ensure that the Electoral Process is Equally Open to Black Louisianans.

123.    In addition to the facts satisfying the three *Gingles* preconditions, the totality of the circumstances in this case confirms that Black voters in Louisiana have less opportunity than white voters to participate in the political process and elect representatives of their choice.[4]

124.    Several of the Senate Factors, discussed *supra*, strongly indicate that vote dilution is occurring and will persist, including:

- the extent of the history of voting discrimination in Louisiana (Senate Factor 1);

- the extent of racially polarized voting in Louisiana (Senate Factor 2);

- the extent to which Louisiana has used various voting practices that may enhance the opportunity for discrimination against Black voters (Senate Factor 3);

- the extent to which Black voters bear the effects of discrimination in a variety of areas of life (Senate Factor 5);

- whether political campaigns in Louisiana have been characterized by overt or subtle racial appeals (Senate Factor 6);

---

[4] As noted above, courts determining whether a challenged districting scheme unlawfully dilutes Black voting strength must look to the "totality of the circumstances," and account for the non-exhaustive set of historical and contextual factors—colloquially known as the "Senate Factors"—laid out in S. Rep. No. 97-417, at 28–29 (1982).

- the extent to which Black candidates have been elected to public office in Louisiana (Senate Factor 7), and

- whether the justification for the practice or policy is tenuous (Senate Factor 9).

As indicated above, no set number of these factors need to be established to demonstrate vote dilution, but Senate Factors 2 and 7 are the most significant. *Gingles*, 478 U.S. at 48 n.15. The evidence of Senate Factors 2 and 7 weighing in Plaintiffs' favor in Louisiana is indisputable.

### a.    Senate Factor 1: History of Official Voting-Related Discrimination

125.    The State of Louisiana has an extensive history and ongoing record of voting discrimination that has made it difficult if not impossible for Black and other minority voters to register to vote, to vote, or to otherwise to participate in the political process.  From Reconstruction to present day, Louisiana has passed countless laws to deny Black democratic participation, including grandfather clauses, poll taxes, and educational and property qualifications.

126.    Throughout Louisiana's long history of chattel slavery, only white people possessed the right to vote.  "Disenfranchisement of [B]lack[ people] as an acknowledged state policy pre-dates the Civil War.  Even free [B]lack[ individuals] who were property owners, were denied the right to vote.  Most [B]lack[ people], consequently, even while ostensibly 'free,' remained enslaved, bereft of one of the most basic of human rights—the right to vote." *Citizens for a Better Gretna v. City of Gretna, La.*, 636 F. Supp. 1113 (E.D. La. 1986), *aff'd*, 834 F.2d 496 (5th Cir. 1987).

127.    Even after the changes wrought by the Civil War and Reconstruction, Black people were systematically denied the right to vote in the decades that followed.  Although the emancipation of enslaved Black people and the post-Civil Reconstruction period brought change—including the first Black people elected to State office—that initial progress was swiftly reversed

after the federal government ceased to monitor State government starting in 1877.  Black people's efforts to vote in the nineteenth and twentieth centuries were suppressed through violence, including through the New Orleans Massacre (1866), Opelousas Massacre (1868), and Colfax Massacre (1873), as well as targeted State actions, such as the enactment of a poll tax, literacy tests, voter roll purges, and discriminatory changes to State and local maps during redistricting.

128.    In the twentieth century, the State continued to develop ways to discourage Black Louisianans' participation in the political process and to suppress their effective voting power.  It implemented an "understanding" clause requiring citizens to "give a reasonable interpretation of any section of the federal or state constitution in order to vote." *Bossier Par. Sch. Bd. v. Reno*, 907 F. Supp. 434, 455 (D.D.C. 1995) (Kessler, J., concurring in part and dissenting in part) (internal quotation marks and citation omitted), *vacated on other grounds*, 520 U.S. 471 (1997).  It levied poll taxes and purged Black voters from registration rolls.  In 1923, the State authorized an all-white Democratic Primary, which "functioned to deny [Black voters] access to the determinative elections . . . ." *Major v. Treen*, 574 F. Supp. 325, 339–40 (E.D. La. 1983).  In the 1950s, Louisiana implemented citizenship and "morals" tests, and anti-single shot voting provisions (the latter designed to minimize the ability of minority voters to effectively marshal their voting power in multimember districts).  In 1959, the Legislature established a majority-vote requirement for election to party committees that impeded minorities from obtaining fair representation on those committees.

129.    Louisiana's voting restrictions achieved their intended effect.  The restrictions imposed in the late nineteenth century, including the grandfather clause, "reduce[d] [B]lack voter registration [in the State] from approximately 135,000 in 1896 to less than 1,000 in 1907." *Major*, 574 F. Supp. at 340.  From 1910 until 1944, less than 1% of Louisiana's voting-age Black

population was registered to vote.  By 1948, the percentage of Black registered voters stood at 5%.  By 1964—nearly a century after Black people received the right to vote—only about a third of Louisiana's Black voting-age population was registered to vote, compared with the overwhelming majority of the white voting-age population.

130.    In 1965, Congress passed the Voting Rights Act, and Louisiana, as a result of its history of disenfranchising Black voters, was declared a "covered" jurisdiction under Section 4(b) of the Voting Rights Act.  *See South Carolina v. Katzenbach*, 383 U.S. 301, 312–13 (1966).  As a covered jurisdiction, Louisiana was required under Section 5 of the VRA to have any changes to its election practices or procedures precleared by the DOJ or a federal court.

131.    Even after the passage of the Voting Rights Act, Louisiana made repeated efforts to discourage Black political participation and dilute Black voting strength.  These efforts are reflected in the large number of instances in which changes it sought were blocked or altered by the DOJ and many judicial decisions finding the State and jurisdictions within the State in violation of Section 2.

132.    Between 1965 and 2013, when the Supreme Court suspended the preclearance provision under Section 5, the DOJ blocked or altered nearly 150 voting-related changes in Louisiana, with many of those objections aimed at attempts to dilute minority voting strength.  *See Voting Determination Letters for La.*, U.S. Dep't of Just., Civ. Rts. Div., Voting Section, https://www.justice.gov/crt/voting-determination-letters-louisiana (last updated Aug. 7, 2015).

133.    Courts have also repeatedly struck down efforts in Louisiana to dilute, limit, or otherwise adversely impact minority voting access and strength, including as recently as in 2021.  These efforts have included attempts to discriminate against Black voters through at-large voting schemes.  *See, e.g., United States v. City of West Monroe*, No. 21-cv-0988 (W.D. La.

Apr. 14, 2021); *Citizens for a Better Gretna v. City of Gretna, La.*, 834 F.2d 496, 504 (5th Cir. 1987); *Ausberry v. City of Monroe, La.*, 456 F. Supp. 460, 467 (W.D. La. 1978); *Wallace v. House*, 538 F.2d 1138, 1141 (5th Cir. 1976).

134.    Louisiana's statewide district maps have been successfully challenged under the Voting Rights Act in numerous reapportionment cycles since 1965. In 1981, the State implemented a congressional redistricting plan that "cracked" the Black majority in Orleans Parish between two congressional districts. Plaintiffs alleged—and a federal court agreed—that the proposed map improperly diluted Black voting power. The court required that a new map be drawn, which resulted in what is today Louisiana's only majority-minority congressional district. *Major*, 574 F. Supp. at 355–56.

135.    That same year, the Legislature also attempted to limit Black influence at the state level by approving a plan to reduce the number of majority-minority State House of Representatives districts throughout the State, including Orleans Parish and East Baton Rouge Parish. The DOJ objected to the plan, noting that it had an adverse impact upon black voting strength. As a result of the Department's objection, the plan did not become effective.

136.    In 1991, the DOJ objected to a subsequent State House redistricting plan, noting that in at least seven areas the proposed plan minimized Black voting strength. In 2001, the Legislature sought to eliminate an opportunity district in Orleans Parish. The Legislature sought preclearance in the D.C. District Court. *Louisiana House of Representatives v. Ashcroft*, No. 1:02-cv-00062 (D.D.C. Jan. 14, 2002). Both the DOJ and the NAACP Legal Defense Fund opposed Louisiana's preclearance submission. The case settled on the eve of trial, with the State withdrawing the plan and restoring the opportunity district.

137.    The State has similarly been found to have violated the VRA and forced to redraw districts for state court judges and school board.  No fewer than six times between 1969 and 1994, Louisiana attempted to add at-large or multimember judicial seats, over the objections of the DOJ. *See, e.g.*, *Clark v. Roemer*, 777 F. Supp. 445 (M.D. La. 1990).  The consent decree in the *Clark v. Roemer* line of cases entered pursuant to the Voting Rights Act ultimately established majority-minority subdistricts in nine district courts, a family court, and a court of appeal circuit, and required the Legislature to create such subdistricts in another court of appeal circuit and several other district courts.  A separate line of cases challenging the election system for the Louisiana Supreme Court under Section 2 resulted in the *Chisom* decree, a Consent Decree that calls for the creation (and retention) of a majority-minority judicial district to ensure that Black voters in Louisiana had the opportunity to elect their preferred candidates to the Louisiana Supreme Court. The *Chisom* decree led to the election of the first Black justice to the Louisiana Supreme Court and, later, the first Black Chief Justice of the Louisiana Supreme Court.  *See In re Off. of Chief Just., La. Sup. Ct.*, 2012-1342, 101 So. 3d 9, 21 (La. Oct. 16, 2012).  Tellingly, in December 2021, the State moved to dissolve the *Chisom* decree, arguing that it "has accomplished its objectives." Def.'s Mot. to Dissolve Consent Decree at 1, *Chisom v. Jindal*, No. 2:86−cv−04075, ECF No. 257 (E.D. La. Dec. 2, 2021).  Plaintiffs filed an objection to the motion in February 2022, claiming the State had "not come close" to demonstrating that dissolution of the *Chisom* decree—which could threaten the "effectiveness" or "existence" of the lone majority-Black district—was warranted. Pls.' Opp'n to Def.'s Mot. to Dissolve Consent Decree at 2, 12, *Chisom v. Jindal*, No. 2:86−cv−04075, ECF No. 284 (E.D. La. Feb. 8, 2022).  Although the court has not yet ruled, the State's motion makes clear that Louisiana is making efforts to tear down measures put in place

to prevent the impermissible dilution of Black voters to pave the way for its renewed efforts to do so.

138.   Louisiana localities have also repeatedly changed their electoral systems to exclude Black voters and prevent the election of Black-preferred representatives.  Over 67% of Louisiana's parishes received objections from the DOJ during the time that Louisiana was a covered jurisdiction, and the majority of the objections have been for redistricting changes.

139.   Louisiana has also failed in recent years to comply with public assistance agency voter registration requirements under the National Voter Registration Act (NVRA), a failure that disproportionately impacts minorities.  *See Scott v. Schedler*, No. 11–926, 2013 WL 264603, at *18 (E.D. La. Jan. 23, 2013) *aff'd in part, vacated in part on other grounds*, No. 13–30185, 2014 WL 5801354 (5th Cir. Nov. 5, 2014).

### b.   Senate Factor 2: The Extent of Racial Polarization

140.   As discussed *supra*, there are indicia of stark racially polarized voting throughout Louisiana.

141.   The voting patterns in Louisiana establish the strong nature of the racial polarization in Louisiana.  In 2020, Louisiana's most recent congressional elections, voters in four of the five white-majority districts had a choice between Black and white candidates and in each of these instances, the white candidate prevailed.  Moreover, the consistent gap between Black and white support for Black-preferred candidates is significant and consistent across elections at every level of government.

142.   This extreme racial polarization is equally true at the local level—particularly in the areas where illustrative maps, *see* Exhibits A–D, show that new additional majority-minority Black districts can be drawn, such as in the Baton Rouge and the Shreveport areas.  For example,

the statewide elections for Treasurer in 2017 and for Secretary of State in 2018 and 2019 were even more polarized in Caddo and Jefferson Parishes than in the State as a whole.  In the 2017 general run-off election, Derrick Edwards, who is Black, ran for State Treasurer against John Schroder, who is white, and lost.  In Caddo and Jefferson Parish, Mr. Edwards received approximately 97% and 98.6% of Black voter support respectively, while Mr. Schroder received, respectively, approximately 87% and 84% of white voter support, compared to 96% Black support for Mr. Edwards, and 79.3% white support for Mr. Schroder statewide.  In the 2018 special run-off elections for Secretary of State, Gwen Collins-Greenup, who is Black, ran against Kyle Ardoin, who is white, and lost.  In Caddo Parish, Ms. Collins-Greenup received 96.8% of Black voter support, while Mr. Ardoin received approximately 82% of white voter support, and in Jefferson Parish, Ms. Collins-Greenup received 98% of Black voter support, while Mr. Ardoin received approximately 84% of white voter support.  In the 2019 Secretary of State election, Ms. Collins-Greenup again lost the election to Mr. Ardoin, receiving approximately 98% of Black voter support in both Caddo and Jefferson Parishes, while Mr. Ardoin received approximately 89% of white voter support in Caddo Parish and 83% in Jefferson Parish.

### c.   Senate Factor 5: Effects of Louisiana's History of Discrimination.

143.   Louisiana's history of discrimination has not been limited to the obstacles it has deliberately placed in the way of Black citizens attempting to exercise their right to vote.  As in many other states, Louisiana enacted "Black Codes" and Jim Crow laws starting in the late nineteenth century.  These laws enforced a regime of state-sanctioned segregation in nearly every sphere of life including transportation, housing, education, business ownership, contracting, criminal justice, and public accommodations.  *See, e.g.*, *Plessy v. Ferguson*, 163 U.S. 537, 540

(1896). The legacy of the Black codes lives on and Black Louisianan continue to experience the brunt of racial discrimination in every sector of public life today.

144.    Other forms of discrimination severely limit the ability of Black voters to fully and equally participate in democratic institutions.  "The courts have recognized that disproportionate educational[,] employment, income level[,] and living conditions arising from past discrimination tend to depress minority political participation." *St. Bernard Citizens For Better Gov't v. St. Bernard Par. Sch. Bd.*, No. CIV.A. 02–2209, 2002 WL 2022589, at *9 (E.D. La. Aug. 26, 2002) (quoting S. Rep. No. 97-417, at 29 n.114 (1982)).

145.    Racial segregation persists in the State's educational system.  As of 2018, 23 of Louisiana's 69 traditional school districts remain under a desegregation order, meaning that no court has found that they have achieved unitary status.  Fifty-six of Louisiana's 69 traditional school districts (81%) are rated high or medium on the "dissimilarity index," a formula used to evaluate school district segregation, while just four districts were rated low.

146.    Black students in Louisiana also face disparities in both school discipline and lack of academic opportunities.  In highly segregated districts, Black students were nearly four times more likely to be suspended or expelled than their white counterparts.  Meanwhile, white students in highly segregated districts are slightly over three times more likely to be enrolled in at least one Advanced Placement course.

147.    Black Louisianans experience higher unemployment rates than white Louisianans. Unemployment data from early 2021 shows that Black people were unemployed at a rate of 9%, while white people were unemployed at a rate of 4.6%.  According to the U.S. Equal Employment Opportunity Commission, for the 2011 fiscal year, Louisiana accounted for 3% of all U.S. race-based employment discrimination charges filed in the United States and 6.1% of all charges of

discrimination based on color, even though according to the 2010 U.S. Census, Louisiana comprises only 1.5% of the U.S. population and 1.6% of the U.S. minority population.

148.    Health disparities also persist among Black Louisianans as compared to white Louisianans.  Although only one-third of Louisiana's population, Black people accounted for more than 70% of Louisianans who died of COVID-19.  According to the Louisiana Department of Health and Hospitals, "[f]rom 2000–2005, Black or African American Louisiana residents had the highest death rate from all causes, approximately 1-2 times higher than White residents." *Eliminating Health Disparities – 'From a Grass Roots Perspective'*, La. Dep't of Health & Hosps. 2 (2009), https://ldh.la.gov/assets/docs/GovCouncil/MinHealth/HealthDisparitiesReport2 00809.pdf.  As COVID-19 continues to be a part of everyday American life, in-person voting, by far the dominant way to vote in the U.S., carries particular risks for Black voters.  Moreover, from 2016–2018, the infant mortality rate in Louisiana was 10.9 per 1,000 live births for Black infants and 5.4 per 1,000 live births for white infants.

149.    Black Louisianans also experience other disparities in public life that impact their ability to access the franchise as easily as white voters.  In 2019, for example, 29.4% of Black people lived below the poverty line, compared to 12.5% of white people.  Nearly half of Louisiana's Black children live in poverty.  Unemployment data as of November 2021 shows that Black people were unemployed at around twice the rate of white people—9.0% compared to 4.6%. As of 2010, white citizens in Louisiana were also more than three times more likely than Black citizens to own a home.  The economic disparities make it harder for Black Louisianans to vote— for example, individuals with low incomes are less likely to have access to the internet and therefore less likely to be able to access Louisiana's online voter registration system. Additionally, disparities in rates of incarceration also exist along racial lines.  Despite constituting 33% of State

residents, Black Louisianans represent 52% of the jail population and 67% of the prison population in the State.  In Louisiana, incarcerated individuals are prohibited from voting until after any sentence has been fully completed.  For those who maintain their eligibility while incarcerated on misdemeanor convictions, few meaningful opportunities are actually offered to cast a ballot.  As a result, the substantially racialized impacts of Louisiana's criminal legal system, as well as the other significant disparities listed above, directly limit Black voting strength across the state.

### d.    Senate Factor 6: Presence of Racial Campaign Appeals

150.    Louisiana political campaigns have frequently featured subtle and overt racial appeals impacting the political process.  David Duke, the former grand wizard of the Ku Klux Klan, has run for public office in Louisiana several times with race as a central part of his campaigns. Most recently, in 2016, Duke unsuccessfully ran for U.S. Senate to "defend the heritage of European American people."  Even with his explicit ties to white supremacy, Duke received over 58,000 votes, demonstrating that, for many of Louisiana's voters, race plays a substantial role in how they cast their vote.

151.    In 2001, the St. Bernard Parish School Board was sued under Section 2 of the Voting Rights Act for its redistricting plan, which eliminated the only district where Black voters had an opportunity to elect a candidate of choice.  Lynn Dean, a white State senator involved in the redistricting plan and the highest-ranking public official in the Parish, testified that he used the "n-word" and "ha[d] done so recently . . . ."

152.    Current U.S. Representative for Louisiana's first congressional district, Steve Scalise, spoke to a white supremacist group in 2002 while serving as a Louisiana State legislator.

153.    In 2012, a candidate for Louisiana Supreme Court District 5, Justice Jeff Hughes, darkened the image of his Black opponent John Guidry in some of his campaign materials, and referred to Guidry as an "affirmative action Democrat."

154.    In 2018, a white Tangipahoa School Board Member and candidate for reelection posted a picture of a noose on Facebook with the caption "IF WE WANT TO MAKE AMERICA GREAT AGAIN WE WILL HAVE TO MAKE EVIL PEOPLE FEAR PUNISHMENT AGAIN."

155.    In 2019, Gary Landrieu, an independent candidate running for governor in Louisiana, used a racial slur in a radio interview when detailing how he had been called a "n*****-lover[]."

156.    Taken together, these instances clearly indicate that racial discrimination and racist thinking is alive and well in Louisiana's democratic institutions and embodied by Louisiana's elected officials and their campaigns.

> **e.    Senate Factor 7: Extent to Which Black Louisianans Have Been Elected to Public Office.**

157.    Black people have been and continue to be largely underrepresented in Louisiana public office, particularly outside of the few majority-Black districts that currently exist. Louisiana has never had a Black U.S. Senator and has not had a Black governor since Reconstruction. Louisianans rarely elect Black candidates to Congress; the State has had only five Black Congresspeople since Reconstruction.

158.    Louisiana's first Black chief Justice of the State Supreme Court was appointed following a consent decree that was entered in a case challenging the use of at-large judicial districts. As part of the consent decree, the court created a majority-minority judicial district that has continued to elect the only Black member of the State Supreme Court. Black judges have also been "underrepresented in the trial and appellate courts. While the [B]lack population comprises

about 30.5% of the voting age population in Louisiana, [B]lack people only account for about 17.5% of the judges in Louisiana." *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 445 (M.D. La. 2017), *rev'd on other grounds sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020).

### f.      Senate Factor 9: Tenuousness

159.    It is also probative if the reasons put forth by the State for its redistricting decisions are pretextual and tenuous. *See, e.g.*, *Clark v. Calhoun County, Miss.*, 88 F. 3d 1393, 1401 (5th Cir. 1996). The reasons offered by the State Legislature for why S.B. 1 and H.B. 14 do not have additional new majority-minority Black opportunity districts are pretextual and tenuous.

160.    For example, many Legislators, including the Chairman of HGA John Stefanski, testified that the Legislature could not increase minority representation because it is necessary to preserve as many of the existing precinct boundary lines as possible, and it was not possible to draw additional majority-Black opportunity districts while avoiding splitting up precincts. Testimony of Chairman Stefanski, February 7, 2022 at 14:48–15:28. This justification is pretextual and tenuous. The current maps that have been in place for ten years have significant numbers of precinct splits, so it is unclear why the current Legislature is concerned about this issue now, given past practice. Moreover, it is not true. The illustrative map provided here as Exhibit B provides three new additional majority-minority Black opportunity districts in the Senate and has less parish splits than S.B. 1 and just a few precinct splits. Additionally, the illustrative map provided at Exhibit D provides seven new additional majority-Black opportunity districts in the House and has the same number of parish slips as H.B. 14, and like H.B. 14 only has a few precinct splits where there is no impacted population.

161.    Another tenuous justification offered for failing to add majority-Black districts in the Senate map was the assertion by Senate President Cortez and other Senators that it was allegedly a challenge to maintain the existing majority-Black districts in New Orleans because of the increase in the white population in the New Orleans area; and that because of this increase it was necessary to increase the percentage of the Black population in these districts to ensure that they continued to elect Black voters' candidates of choice.  This was presented as a justification for expanding Senate District 5 into Jefferson Parish—why it was necessary to "go across to the West Bank" to pick-up Black population for Senate District 5.  Testimony of Sen. Cortez, February 3, 2022 at 31:26–31:30 (discussing proposed Amendment 53).  This justification is tenuous because it was not supported by any analysis of voting patterns to determine how high the Black population needed to be in Senate District 5 to afford Black voters an equal opportunity to elect their candidates of choice.

162.    While the white population in New Orleans has increased, it was not necessary to place Black individuals who reside in Jefferson Parish into Senate District 5 to maintain the existing majority-minority Black districts in the New Orleans area.  The existing majority-minority Black districts in the Orleans area are Senate District 3, Senate District 4, and Senate District 7.  Both of the illustrative maps provided here, *see* Exhibit A and B, provide configurations of Senate District 3, Senate District 4 and Senate District 7 that have BVAP over 50%, and that are mostly within Orleans Parish and similar to the configuration of those districts in the current map.  The illustrative maps do not contain any more population splits among parishes than does S.B. 1.  Furthermore, both illustrative maps were able to increase the BVAP for Senate District 5 to over 50% without including population from areas outside of Orleans Parish.  Senate District 5 has historically been mostly located within Orleans Parish.  S.B. 1, however, creates a Senate District

5 that includes a meaningful area from Jefferson Parish in Senate District 5. By enacting these district lines, Defendants precluded the possibility of creating a new majority-minority Black opportunity district mostly within Jefferson Parish, which would otherwise have been possible.

163.    Moreover, there is no evidence that a BVAP significantly higher than 50% is needed to ensure that Senate District 3, Senate District 4, Senate District 5, and Senate District 7 will allow Black voters the opportunity to elect their candidates of choice. The Legislature did not provide an analysis of the voting patterns in the New Orleans area. There is not the same white crossover voting in Jefferson Parish as there is in Orleans Parish. Voting in Jefferson Parish is highly racial polarized. For this reason, the only way for the Black population in Jefferson Parish—which has grown significantly in the last ten years and is populous and cohesive—to elect a candidate of their choice is to create a new a new majority-Black district within Jefferson Parish.

### g.    Other Relevant Factors

164.    Looking outside the Senate Factors, another important factor in evaluating the "totality of the circumstances" is whether there is rough proportionality between the number of majority-minority voting districts and the minority members' share of the relevant population. As noted, Black individuals are currently underrepresented in the Louisiana State Legislature. Currently, just 37 out of the 144 members of the Louisiana Legislature (approximately 25%) are Black, and there are no other members of color. This means that approximately 75% of the members of the Louisiana Legislature are white. However, according to the 2020 Census data, Black people make up 33.1% of the total population and 31.2% of the voting age population in Louisiana (and that number is steadily growing), and people of color now make-up 42% of the total voting age population in Louisiana. Therefore, the white VAP is only 58% of the population even though 75% of the Legislature is white.

165.    This lack of proportionality is not happenstance; it is the result of the structure of the legislative districts in the State Maps. There has never been proportionality between the State Legislature and the Black population in Louisiana in the past, and the redistricting plan ensures that maps will continue to dilute Black voting strength unless action is taken.

## CLAIM FOR RELIEF

### Count 1: Section 2 of the Voting Rights Act and 42 U.S.C. § 1983

1.    The allegations contained in the preceding paragraphs 1 through 165 are re-alleged as if fully set forth herein.

2.    Section 2 of the Voting Rights Act prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that results in the denial or abridgement of the right of any U.S. citizen to vote on account of race, color, or membership in a language minority group.  52 U.S.C. § 10301(a).

3.    Black voters are sufficiently numerous and geographically compact in a number of areas in the State to allow for the creation a number of new additional majority-minority opportunity districts.  However, S.B. 1 and H.B. 14 include only one new Black majority-minority opportunity district even though it is possible to draw many new opportunity districts.  S.B. 1 and H.B. 14 therefore dilute the voting strength of Black voters in many areas of Louisiana. By enacting State Maps, Defendants fail to provide new opportunity districts even though the BVAP in Louisiana has increased by 7.22%.

4.    Instead of addressing Louisiana's long history of discrimination and enacting districts reflecting that approximately one-third of Louisiana's population is Black, the State opted to enact more concentrated Black-majority districts, "packing" Black voters in some districts and "cracking" the other cohesive Black populations, effectively diluting their strength in the regions

at issue.

5.      S.B. 1 violates Section 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301.

6.      S.B. 1 denies or abridges the Plaintiffs' and/or their members' right to vote on account of their race and color by diluting their voting strength as Black citizens in Louisiana.  It does not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice and denies Plaintiffs the right to vote in elections without discrimination on account of their race and color, all in violation of 52 U.S.C. § 10301.

7.      H.B. 14 also violates Section 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301.

8.      H.B. 14 denies or abridges the Plaintiffs' and/or their members' right to vote on account of their race and color by diluting their voting strength as Black citizens in Louisiana.  It does not afford Plaintiffs an equal opportunity to participate in the political process and to elect representatives of their choice and denies Plaintiffs the right to vote in elections without discrimination on account of their race and color, all in violation of 52 U.S.C. § 10301.

9.      Moreover, considering the totality of the circumstances in Louisiana, Plaintiffs, Black Louisianans and organizations of which they are a part, have less opportunity than other members of the Louisiana electorate to participate in the political process and to elect representatives of their choice to the State Senate and House of Representatives.

10.      Plaintiffs will be irreparably harmed if this Court fails to temporarily and permanently enjoin Defendants from conducting State legislative elections under S.B. 1 and H.B. 14 in that, among other things, they would be subject to racial vote dilution.

11.      By engaging in the acts and omissions alleged herein, Defendant has acted and continues to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act.

Defendant will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.    Declare S.B. 1 and H.B. 14 to be in violation of Section 2 of the Voting Rights Act, as amended, 52 U.S.C. § 10301;

B.    Permanently enjoin the Defendant and his agents from holding elections under S.B. 1 and H.B. 14;

C.    Set a reasonable deadline for State authorities to enact or adopt redistricting plans for the Louisiana State Senate and the Louisiana State House that do not abridge or dilute the ability of Black voters to elect candidates of choice and, if State authorities fail to enact or adopt valid redistricting plans by the Court's deadline, order the adoption of remedial redistricting plans that do not abridge or dilute the ability of Black voters to elect candidates of choice;

D.    Order hearings and briefing, consider evidence, and take any other action necessary for the Court to order a VRA-compliant plan for new State Senate and House districts in Louisiana;

E.    Award Plaintiffs their costs, expenses, and disbursements, and reasonable attorneys' fees incurred in bringing this suit pursuant to and in accordance with 52 U.S.C § 10310(e) and 42 U.S.C. § 1988;

F.    Retain jurisdiction over this matter until Defendant has complied with all orders and mandates of this Court; and

G.    Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted,


  _/s/ John Adcock_____
JOHN ADCOCK
Adcock Law LLC
Louisiana Bar No. 30372
3110 Canal Street, New Orleans, LA 701119
Tel: (504) 233-3125
Fax: (504) 308-1266
Email:  jnadcock@gmail.com


_/s/ Ron Wilson_
Louisiana Bar No. 13575
701 Poydras Street, Ste. 4100, New Orleans, LA
70139
Tel: (504) 525-4361
Fax: (504) 525-4380
Email: cabral2@aol.com

  _/s/ Sarah Brannon_
Sarah Brannon*
American Civil Liberties Union Foundation
915 15th St., NW
Washington, DC 20005
sbrannon@aclu.org


Sophia Lin Lakin*
T. Alora Thomas*
Samantha Osaki*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
athomas@aclu.org
sosaki@aclu.org

/s/ *Nora Ahmed*
Nora Ahmed*
N.Y. Bar. No. 5092374
Megan E. Snider
LA. Bar No. 33392
ACLU Foundation of Louisiana
1340 Poydras St.
St. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
msnider@laaclu.org
NAhmed@laaclu.org

*/s/ Leah Aden*
Leah Aden*
Stuart Naifeh*
Victoria Wenger*
NAACP LEGAL DEFENSE &.
EDUCATIONAL FUND, INC.
40 Rector Street
5th Floor
New York, NY 10006
(212) 965-2200
laden@naacpldf.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

/s/ *Michael de Leeuw*
Michael de Leeuw*
Amanda Giglio*
Jacqueline Green**
Cozen O'Connor
3 WTC, 175 Greenwich St.
55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com
JGreen@cozen.com

Andrew H. Stanko*
Daniel Brobst*
Cozen O'Connor
Liberty Place, 1650 Market St.
Suite 2800
Philadelphia, PA 19103
AStanko@cozen.com
DBrobst@cozen.com

**Attorneys for Plaintiffs**

Janette Louard*
Anthony Ashton*
Anna Kathryn Barnes*
NATIONAL ASSOCIATION FOR
THE ADVANCEMENT OF COLORED PEOPLE (NAACP)
4805 Mount Hope Drive
 Baltimore, MD 21215
(410) 580-5777
jlouard@naacpnet.org
aashton@naacpnet.org
barnes@naacpnet.org

**Attorneys for Plaintiff Louisiana State Conference of the NAACP**

\*Pro hac vice motions forthcoming
\*\*Bar admission forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on April 4, 2022, a copy of Plaintiffs' *Amended Complaint For Declaratory Judgment and Injunctive Relief* was filed electronically with the Clerk of Court via the CM/ECF system and served on opposing counsel by electronic mail at FreelA@ag.louisiana.gov.

_/s/John Adcock_____
John Adcock