IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana, <br><br> *Defendant.* | Civil Action No. 3:22-cv-00178-SDD-SDJ <br><br> Chief Judge Shelly D. Dick <br><br> Magistrate Judge Scott D. Johnson |

**JOINT MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE DR. LISA HANDLEY'S TESTIMONY AND REPORTS**

Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, and Intervenor-Defendant the State of Louisiana, through Louisiana Attorney General Jeff Landry (collectively, "Defendants"), pursuant to Rules 702 and 703 of the Federal Rules of Evidence and Local Civil Rule 7, files this Memorandum in Support of Defendant's Motion to Exclude Dr. Lisa Handley's ("Dr. Handley") testimony and reports.

**INTRODUCTION AND BACKGROUND**

The introduction of expert testimony is governed by Federal Rules of Evidence 702, 703 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, which require expert testimony to be qualified, reliable, and relevant. While one of Plaintiffs' experts, Dr. Lisa Handley, is qualified in racially polarized voting ("RPV") analysis, the reports she authored in this case and the methodology she used here are neither reliable nor entirely relevant. In order to conduct a RPV analysis, Dr. Handley was required to aggregate a significant amount of election precinct data to create a database on which to run her

statistical techniques. (Ex. 1 – Handley Report[1] 3; Ex. 2 - Handley Depo. Tr.[2] 13:8-19). But Dr. Handley did not assemble this data herself, relying instead upon other largely unidentified individuals, whose credentials are not known to Defendants, and who were not disclosed in Dr. Handley's reports. (Ex. 1 - Handley Report 5; Ex. 2 - Handley Depo. Tr. 13:21-15:15). The backup data also reveals a faulty allocation method, not subject to peer review, used to allocate the large percentage of Louisiana's voters who vote early or absentee back to the voter precincts within the parishes. (Ex. 2 - Handley Depo. Tr. 161:9-162:3). The misallocation of candidate vote shares to precincts spans Dr. Handley's entire underlying database upon which she then runs her statistical analyses. Despite being aware of the issue, Dr. Handley made no attempt to cure the faults of the allocation method.

Lastly, Dr. Handley did not perform a district-specific RPV analysis as is required under binding U.S. Supreme Court precedent, focusing only on seven "areas of interest" within the state. The only district-specific information reported by Dr. Handley classifies districts as either "effective" or not, without opining as to the level of Black Voting Age Population ("BVAP") needed to be effective. This analysis has limited value because it does not inform the court whether a majority-minority district is actually necessary in order for the black-preferred candidate to be elected. Moreover Dr. Handley has made no attempt to account for how her faulty allocation method would impact a district-specific RPV analysis, or even her own effectiveness scores, especially in populous parishes with more than one legislative district.

---

[1] Dr. Handley's June 30, 2023 "Expert Report on the Enacted Louisiana State House and Senate Plans" is attached hereto as Exhibit 1. Citations to this report will be designated as "Ex. 1 – Handley Report ___". As noted by counsel in Dr. Handley's deposition, the signed page of Dr. Handley's report contains a typo stating the year signed was 2022. The correct date of Dr. Handley's report is June 30, 2023. (Ex. 2 - Handley Depo. Tr. 8:8-:22).

[2] Attached as Exhibit 2 are pertinent excerpts from the Dr. Handley's September 26, 2023 Deposition Transcript. Citations to these transcript excerpts will be designated as "Ex. 2 – Handley Depo Tr. ___".

# ARGUMENT

## I. Legal standard.

Disqualification of an expert is governed by Rule 702 of the Federal Rules of Evidence which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Additionally, the United States Supreme Court adopted proposed amendments to Rule 702[3], which will go into effect on December 1, 2023, so long as Congress does not modify or reject the changes, *see Al Qari v. American Steamship Co.*, No. 21-cv-10650, 20230 WL 5628583, at *3 (E.D. Mich. Aug. 31, 2023). The new Rule 702 will read as follows, with the struck-through language indicating deletions and the underlined language indicating additions:

> A witness who is qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise if <u>the proponent has demonstrated by a preponderance of the evidence that</u>:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and

---

[3] April 24, 2023 Order on Rules of Evidence, Unites States Supreme Court, https://www.supremecourt.gov/orders/courtorders/frev23_5468.pdf.

3

> (d) the ~~expert has reliably applied~~ <u>expert's opinion reflects a reliable application of</u> the principles and methods to the facts of the case.

*Id.* (quoting Fed. R. Evid. 702 (as proposed)); *see also Saradis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021)).

The Advisory Committee Notes for the 2023 amendments make clear that the amended language was not intended to change Rule 702, but "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Advisory Committee Notes state that courts have incorrectly applied Rule 702 by finding questions regarding the sufficiency of an expert's basis and the application of the expert's methodology are questions of weight to be decided by a fact finder instead of questions of admissibility that the courts must determine. *Id.*

Therefore, under both versions of Rule 702, a court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). This gatekeeping function is meant to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) (citation and internal quotation marks omitted).

"The reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (internal quotation marks omitted). Indeed, "an

4

opinion based on 'insufficient, erroneous information,' fails the reliability standard." *Moore v. Int'l Paint, LLC*, 547 Fed. Appx. 513, 515, 516 (5th Cir. 2013) (quoting *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 389 (5th Cir. 2009)); *see Paz*, 555 F.3d at 388-89 (affirming exclusion of expert testimony that was based on a false assumption and insufficient information). Nor may experts rely on assumptions to overcome facts not in the record which are necessary to the expert's analysis when such assumptions "differ[] frequently and substantially from the undisputed record evidence" and the expert has not identified an "underlying rationale" for the assumptions. *Moore*, 547 Fed. Appx. at 516. Furthermore, analyses that contain "factual deficiencies" that indicate "faulty methods and lack of investigation" should lead to an exclusion of an expert. *EEOC v. Freeman*, 778 F.3d 463, 470 (4th Cir. 2015) (Agee, J., concurring) (internal quotation marks and citation omitted); *see also Dart v. Kitchens Bros. Mfg. Co.*, 253 Fed. Appx. 395, 398-99 (5th Cir. 2007) (stating the "basic mathematical errors and flaws in methodology" in the underlying calculations made "any calculation of damages . . . unreliable").

In addition to assessing whether factual deficiencies resulted in unreliable expert opinions, courts also "consider the following non-exclusive list of factors when conducting the reliability inquiry: (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). Plaintiffs bear the burden to establish the admissibility of Dr. Handley's testimony by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10.

    **II.**    **Dr. Handley's database fails the reliability prong.**

5

Dr. Handley was retained by Plaintiffs to analyze "voting patterns by race" to lay "the foundation of two of the three elements of the 'results test' as outlined in *Thornburg v. Gingles*: a racial bloc voting analysis . . . to determine whether the minority group is politically cohesive; and . . . to determine if whites are voting sufficiently as a bloc to usually defeat the candidates preferred by minority voters." (Ex. 1 - Handley Report 3). The main statistical technique that Dr. Handley relies on to do this is ecological inference RxC, which uses voter data points at the precinct level to estimate voting patterns based upon race. (*Id.* at 4). Dr. Handley was required to aggregate a significant amount of election precinct data to create a database on which to run her statistical techniques. (*Id.* at 5; Ex. 2 - Handley Depo. Tr. 13:8-:19). As described herein, Dr. Handley's database is derived from unknown sources and relies upon a flawed allocation method that renders her entire RPV analyses unreliable.

### a. Dr. Handley's database is derived from unknown data sources.

"As many courts have recognized, expert testimony based solely or primarily on the opinions of other experts is inherently unreliable." *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 275 (E.D. La. 2014) (citations omitted) (surveying and collecting cases in other jurisdictions). While the modern view of Rule 703 of the Federal Rules of Evidence has generally liberalized the ability of expert witnesses to base their testimony and reports on data and opinions generated by third parties, courts repeatedly reaffirm the fundamental requirement that even the data and opinions of third parties must be "of a type reasonably relied upon by experts in the particular field." *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Smith Tank & Steel, Inc.*, No. 3:11-CV-00830, 2014 WL 12690177, at *5 (M.D. La. Nov. 6, 2014) (quoting Fed. R. Evid 703). Along these lines, while experts may use assistants to collect underlying data upon which an expert relies, those experts must be disclosed—especially if the persons who collected the data had to

exercise some form of judgement in the assembly process. *See Dura Automotive Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 611–12, 616 (7th Cir. 2002) (affirming district court's sanctions against plaintiff for failing to timely disclose expert witness "assistants" who actually performed the groundwater modeling on which he relied); *see also* Fed. R. Civ. P. 26(a)(2)(B)(ii) (requiring that an expert's written report contain, among other things, "the facts or data considered by the witness in forming them").

Dr. Handley did not disclose who created the underlying database that she used for all of her RPV analyses in any of her expert reports. And though Dr. Handley did disclose that certain data points were obtained "from the Secretary of State website or from OpenElections," Dr. Handley could not articulate which data points came from which sources during her September 26, 2023 deposition. (Ex. 2 – Handley Depo. Tr. 13:21–17:1). Dr. Handley's deposition testimony also revealed two previously undisclosed sources assisted her with compiling her database: the Voting and Elections Science Team assisted with shapefiles and the "data analytics department at [the] ACLU" assisted with aggregating all of the data sources together to form the database.[4] (*Id.* at 18:8–:10). Dr. Handley could not name the specific persons in the ACLU analytics department who helped her compile the database and, even if she could have, counsel for Plaintiffs objected to the specifics of Dr. Handley's conversations with the ACLU analytics department, saying it was "all done under the direction of counsel" and thus was privileged. (*Id.* at 19:16-20:18).

Dr. Handley's reliance on undisclosed persons to compile her database is unreasonable under the circumstances of this case. As shown *infra,* a simple review of the backup data for just one precinct in one election shows that the allocation method applied by the ACLU data analytics

---

[4] These two vague disclosures on September 26, 2023 amount to untimely expert disclosures under Rule 26(a)(B)(2) of the Federal Rules of Civil Procedure and the scheduling order in this case, which required all experts for all parties to be disclosed by August 15, 2023 at the latest, Rec. Doc. 110.

department created impossible results.[5] Dr. Handley testified unequivocally that this allocation method formed the basis for the database that her entire RPV analysis relies upon. (*Id.* at 13:9-:19, 161:9-:21). While relying on others to assemble data is not a fatal flaw in and of itself, the reliance on undisclosed persons with unknown credentials to process data is unreliable when the results of the data compilation clearly show that the number of votes allocated to candidates in precincts is extremely overestimated and/or underestimated in comparison to the actual number of voters who turned out to vote at those precincts. (*Id.* at 13:21-15:15; Ex. 1 - Handley Report 5). *See Dura Automotive Sys. of Indiana, Inc.*, 285 F.2d at 613-14.

### b. Dr. Handley's allocation of early and absentee votes was biased.

In the context of measuring racially polarized voting specifically, while "absolute perfection in the base statistical data is not to be expected, a trial court should not ignore the imperfections of the data used nor the limitations of statistical analysis." *Overton v. City of Austin*, 871 F.2d 529, 539 (5th Cir. 1989) (per curiam). In *Overton*, the United States Court of Appeals for the Fifth Circuit affirmed a trial court's determination that an expert's RPV analysis was unreliable and "seriously flawed." *Id.* Specifically, the expert (1) "used different measures to determine Black and Mexican–American voting strength[;]" (2) "failed to take into account the difference in population sizes of voting precincts[;]" (3) "[h]is analysis resulted in impossible results [in some instances]....[;]" and (4) "he completely failed to establish a confidence level for the results of his regression analysis." *Id.* at 537. Many of the same deficiencies in the expert's analysis in *Overton* are present in Dr. Handley's analysis here. Namely, Dr. Handley's allocation

---

[5] The metadata for Dr. Handley's backup called "caddo_precincts" spreadsheet shows that ACLU data analyst Devin McCarthy created the spreadsheet. A true and correct copy of the metadata view of Dr. Handley's caddo_precincts spreadsheet is attached hereto as Exhibit 3. Arguably the faulty allocation method could be entirely designed and implemented by Mr. McCarthy as he appears to control the precinct-level data.

method for early and absentee voters failed to accurately take into account the different population sizes of voting precincts, which led to impossible results.[6]

In Louisiana, approximately 30% of voters voted early and absentee in statewide elections since 2012. For example, in the November 2020 elections, 45.6% of the total votes cast were early or absentee. (*See* Ex. 4 – Solanky Report[7] ¶ 20). Similarly, 33.7% of the overall votes cast in the November 2019 and 26.9% of the overall votes cast in the November 2022 elections were early and absentee. (Ex. 4 – Solanky Report 13, Table 5). Because the Louisiana Secretary of State website only reports candidate-specific early and absentee votes at the parish-wide level, Dr. Handley had to disaggregate the data down to the precinct level to perform her RPV analysis. To do this, Dr. Handley used a non-peer reviewed allocation method to assign the early and absentee votes to particular precincts within a parish "proportionally based on the votes received by each of the candidates on Election Day" in each area she studied. (Ex. 1 – Handley Report 6, n. 8; Ex. 2 – Handley Depo. Tr. 161:9-162:3).

Dr. Handley's allocation method did not cap the number of early or absentee votes assigned to each precinct by the total number of voters who turned out in a particular election. As a result, her allocation method created impossible results where the total votes for certain candidates were significantly overestimated in some precincts while significantly underestimated in others. By failing to cap the votes allocated to precincts to the actual voter turnout, the underlying database Dr. Handley used to run her RPV analysis is unreliable.

---

[6] Like the excluded expert in *Overton,* Dr. Handley also failed to provide confidence intervals for her ecological regression analysis or her EI 2x2 analysis. Based on the binding precedent of *Overton,* the Court at a minimum should issue an order excluding testimony or reliance on these methodologies.

[7] Attached as Exhibit 4 is Dr. Solanky's July 28, 2023 Expert Report in this case. Citations to this report will be designated as "Ex. 4 – Solanky Report ___".

Dr. Solanky summarized how Dr. Handley's allocation method introduced bias in her analysis of the 2020 presidential election in Caddo Parish in his Rebuttal Report, by providing the following table:

| Parish | Precinct | Total Candidate Votes | Total Voter Turnout | More Votes than Voters? |
|---|---|---|---|---|
| Caddo Parish | 1 | 199.73 | 182 | Yes, 17.73 Votes Surplus |
| Caddo Parish | 2 | 800.86 | 948 | No, 147.14 Votes Fewer |
| Caddo Parish | 3 | 507.32 | 471 | Yes, 36.32 Votes Surplus |
| Caddo Parish | 4 | 922.47 | 868 | Yes, 54.47 Votes Surplus |
| Caddo Parish | 5 | 1584.25 | 1427 | Yes, 157.26 Votes Surplus |

(Ex. 4 – Solanky Rebuttal Report[8] ¶ 8, Table 3). As shown above, Dr. Handley's data, which she confirmed she relied upon during her deposition, reported 191 votes for President Biden in Caddo Precinct 1 for the 2020 Presidential election, where the entire voter turnout for the November 2020 election in that precinct was only 182 voters. (Ex. 2 – Handley Depo. Tr. 164:19-165:8, 169:10-172:23, 174:8-:17, 175:8-:17). And that one example is just the beginning. Indeed, when reviewing Dr. Handley's supporting data provided in her rebuttal report regarding Caddo Parrish, Dr. Solanky concluded that Dr. Handley allocated more total candidate votes than the total voter turnout for 81 out of 145 precincts in Caddo Parish. (*See* Ex. 5 – Solanky Rebuttal Report ¶ 8, Remark 5). The remaining precincts, with the exception of Precinct 102 had votes deflated. This includes Caddo Precinct 116, which had its voter turnout deflated by 300 votes. (*Id.* at Appendix 1). Only Caddo Precinct 102, had a voter allocation within 1 vote difference of the total turnout. (*Id.*).[9]

When confronted with the stark fact that candidates should not receive more votes than voters in the election, Dr. Handley commented simply that she was aware of this issue well before

---

[8] Attached as Exhibit 5 is Dr. Solanky's August 8, 2023, Expert Rebuttal Report in this case. Citations to this report will be designated as "Ex. 5 – Solanky Rebuttal Report ___".
[9] In addition, Dr. Handley did not even report the votes for all candidates, omitting the 13th candidate and the 37 votes he received parish wide.

it was raised in Dr. Solanky's reports. (Ex. 2 – Handley Depo Tr. 176:1-:7). To be clear, Dr. Handley knew her allocation resulted in both severe overestimates and underestimates of support for candidates, depending on the precinct, and (1) failed to disclose it; (2) failed to correct it.[10] (*Id*.). As observed by Dr. Solanky—and to which any reasonable person can deduce—because you cannot have more votes cast in a precinct than the total number of voters who turned out and voted in that precinct, Dr. Handley's allocation of early and absentee votes was biased and resulted in an unreliable analysis. (*See* Ex. 5 – Solanky Rebuttal Report ¶ 8). Indeed, a reliable ecological inference ("EI") analysis of voting patterns by race would need the total votes of candidates and the total turnout by race to be equal. (*See id.* at ¶ 8, Remark 2, n. 12). Moreover, deflation of votes in other precincts, caused by her over allocation in others, can create as much bias as the surplus/inflation of votes. (*See id.* at ¶ 8, Remark 4).

When confronted with this evidence, Dr. Handley testified that she examined the potential bias and was confident that it did not impact her analysis, and any issues were limited solely to the November 2020 presidential election where 45% of Louisianans voted early.[11] (Ex. 2 – Handley Depo. Tr. 179:8-180:7). But, Defendants, and this Court, apparently must take Dr. Handley's word that her allocation caused no bias, since she did not include any bias analysis with her properly submitted reports.[12] Moreover, Dr. Handley's conclusion that any potential bias must be limited

---

[10] In her deposition, Dr. Handley attempted to explain away this flaw in her database, stating that she did not "use the number of votes" in her analysis, she used "proportions." However, this argument wholly misses the point. By overestimating and underestimating the votes candidates received in precincts, Dr. Handley created a database that relied upon an impossible presumption. The amount of total candidate votes cannot exceed the total number of voter turnout in any reliable EI analysis. (*See* Ex. 5 - Solanky Rebuttal Report ¶ 8, Remark 2, n. 12). This renders any "proportion" unreliable.

[11] The fact that Dr. Handley knew that her allocation method caused issues with the 2020 elections, and she continued to rely upon not one, but two elections from the November 2020 election day without notation is misleading at best, and unscientific at worst. In the event that the Court declines to grant this motion in its entirety, the Court in the alternative should exclude evidence based on the November 2020 elections, which Dr. Handley admitted were problematic.(Ex. 2 - Handley Depo. Tr. 34:20-:24).

[12] Several days after her deposition, and approximately 45 minutes prior to the midnight close of expert discovery on Friday, September 29, 2023, Plaintiffs served a second "supplemental" expert report of Dr.

to the 2020 presidential election is unsupported. In fact, this assertion is entirely contradicted by Dr. Handley's own backup data on the 2022 U.S. Senate election which revealed that Dr. Handley allocated a higher number of voters per precinct than the voter turnout in over 50% of precincts, deflating a corresponding number of precincts. (Ex. 5 – Solanky Rebuttal Report ¶ 11). When calculating the bias rate for both the 2020 presidential and 2022 U.S. Senate elections, Dr. Solanky found that the bias rate was approximately 80% for both elections. (*Id.* at ¶ 8, ¶ 12).

While the impossible over and under-estimates of votes per precinct alone are enough to exclude Dr. Handley's analysis, *Overton,* 871 F.2d at 539, the allocation method reinforces Dr. Handley's assumption that all precincts within a parish vote homogenously. But such an assumption is not true. For example, Dr. Solanky found that "white voters vote for a democrat candidate in significantly larger percentages for Shreveport city-limit precincts compared to non-Shreveport precincts in Caddo parish." (*See* Ex. 4 – Solanky Report ¶ 34). Dr. Solanky also found that "black voters vote for republican candidates in much larger percentages for non Shreveport precincts compared to Shreveport city-limit precincts in Caddo Parish." (*See id.* at ¶ 33).

Thus, given the differences in voting patterns based on precincts in Caddo Parish, the performance of districts *within* Caddo Parish or containing portions of Caddo Parish could be disproportionately impacted. This is especially true, when the margin of black voters in a majority district, is razor thin, as in many of Mr. Cooper's illustrative districts. But, Dr. Handley admits she did not examine this issue. (Ex. 2- Handley Depo. Tr. 84:9–14). In other words—Dr. Handley did

---

Handley. Defendants object to this report as untimely and improper. In any event, the second supplemental report does not remedy the issues with Dr. Handley's allocation method, or explain it, with any degree of scientific certainty. Dr. Handley does not provide any citations to suggest that her allocation method has been peer reviewed or accepted in the field, and her explanation fails to address the issues with her database as a whole.

nothing to test whether the assumptions she made about voter patterns were supported, and whether her allocation method supported her assumptions or were defensible.

It is clear that Dr. Handley's allocation is riddled with both mathematical errors, and errors of common sense which allowed votes for candidates to be drastically over or under reported per precinct. This, coupled with Dr. Handley's untested assumption that voters behave the same parish wide, render her EI analysis unreliable, because it is based on erroneous information or assumptions that have no basis in the record. *See Moore,* 547 Fed. Appx at 515-16 (excluding opinion based on erroneous evidence); *Pax,* 555 F.3d at 389 (excluding expert testimony where the expert made assumptions that had no basis in the record, even though it was not inconsistent with other evidence); *EEOC v. Freeman*, 778 F.3d at 470 (analyses that contain "faulty methods and lack of investigation" must be excluded); *Dart*, 253 Fed. Appx. at 398-99 (basic mathematical errors and methodological flaws render expert opinions unreliable). Because Dr. Handley applied these allocation methods in all areas she studied, and she relied upon this data to make her findings, she should be excluded from testifying and her reports should be stricken.

### III. Dr. Handley's effectiveness scores lack relevance.

"Determining what minority population percentage will satisfy [the Voting Rights Act] is a difficult task requiring, in the view of the Department of Justice, a 'functional analysis of the electoral behavior within the particular ... election district.'" *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 194 (2017); *see also Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 275–76, 135 S. Ct. 1257, 1272–73, 191 L. Ed. 2d 314 (2015) (citing 76 Fed. Reg. 7471 (2011)) (reaffirming the need for a district-specific functional analysis in reviewing challenges to a proposed electoral map). More specifically, the correct analysis to satisfy the third *Gingles* prong as the court in *Covington v. North Carolina* observed, is a "district effectiveness analysis" which

13

is "used to determine the minority voting-age population level at which a district becomes effective in providing a realistic opportunity for voters of that minority group to elect candidates of their choice." 316 F.R.D. at 169, n.46 (alteration and quotation marks omitted) *affirmed North Carolina v. Covington,* 581 U.S. 1015, 137 S. Ct. 2211, 198 L. Ed. 2d 655 (2017).

Dr. Handley's RPV analysis fails to determine what minority voting age population percentage will allow the district to become effective. Instead, Dr. Handley produced only "effectiveness" scores where she simply opines whether the district *as drawn* would be effective or not. (Ex. 2 – Handley Depo Tr. 79:20-84:21). There is no corresponding analysis of the threshold level of BVAP required for when the district provides a realistic opportunity for black voters to elect their candidate of choice.[13] Moreover, Dr. Handley provided no full backup data with corresponding EI calculations of her "effectiveness score" work. (*Id.* at 84:2-:21). This is because Dr. Handley only produced EI estimates for parishes combined for the seven regions of the state that she studied in her report.[14]

But the combination of looking at voting patterns parish wide, and indeed, combining whole parishes together, regardless of what portions of parishes are combined in districts, only bakes in the assumption (and corresponding bias) that Dr. Handley makes that voters in each precinct in a parish vote similarly. As demonstrated by Dr. Solanky's analysis of 12 parishes in his report, this is an incorrect assumption, as there is significant variation from parish to parish of the percentage of white and black voters voting for a democrat or republican candidate. (*See* Ex.

---

[13] Dr. Handley's decision not to perform this analysis is especially curious given that she was one of the individuals who pioneered this methodology. *See, e.g.*, Bernard Grofman, Lisa Handley & David Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N.C. L. Rev. 1384 (2001).

[14] In her deposition, Dr. Handley was unaware that Plaintiffs had challenged the entire statewide legislative plan for Louisiana, and instead thought Plaintiffs were only challenging certain regions. (*Compare* Ex. 2 – Handley Depo. Tr. 145:20-146:13 *with* Rec. Doc. 14 p 58).

4 – Solanky Report ¶¶ 23-31). This sort of natural variation between urban and rural voters, or voters separated by natural geography like the Mississippi River, is precisely the reason that the Supreme Court has cautioned Plaintiffs that a district-specific analysis is necessary. *See Thornburg v. Gingles,* 478 U.S. 30, 59, n.28 (1986). ("[w]hen considering several separate vote dilution claims in a single case, courts must not rely on data aggregated from all the challenged districts in concluding that racially polarized voting exists in each district."); *Bethune-Hill*, 580 U.S. at 194. Here, Dr. Handley simply aggregated the data from the challenged districts in various regions in spite of the Supreme Court's warnings that a district-specific analysis is necessary. This choice, while curious, was Plaintiffs' own choice, as Dr. Handley admits that she studied only the regions dictated to her by Plaintiffs' counsel. (Ex. 2 – Handley Depo. Tr. 146:10–146:13). However, as *Gingles* warns, the Court may not rely upon this aggregated method, rendering Dr. Handley's work irrelevant to the analysis at hand.

## CONCLUSION

For the foregoing reasons, Dr. Handley's testimony and reports in this case should be excluded in their entirety.

Respectfully submitted, this the 6th day of October, 2023.

| | |
|---|---|
| Jeff Landry<br>Louisiana Attorney General<br><br>*/s/ Jeffrey M. Wale*<br>Elizabeth B. Murrill (LSBA No. 20685)<br>Solicitor General<br>Shae McPhee (LSBA No. 38565)<br>Angelique Duhon Freel (LSBA No. 28561)<br>Carey Tom Jones (LSBA No. 07474)<br>Amanda M. LaGroue (LSBA No. 35509)<br>Jeffrey M. Wale (LSBA No. 36070)<br>OFFICE OF THE ATTORNEY GENERAL | */s/ Phillip J. Strach*<br>Phillip J. Strach*<br>    *Lead Counsel*<br>Thomas A. Farr*<br>John E. Branch, III*<br>Alyssa M. Riggins*<br>Cassie A. Holt*<br>**NELSON MULLINS RILEY &**<br>**SCARBOROUGH LLP**<br>301 Hillsborough Street, Suite 1400<br>Raleigh, North Carolina 27603<br>Ph: (919) 329-3800<br>phil.strach@nelsonmullins.com |

15

LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov
walej@ag.louisiana.gov


Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com


Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com

*Admitted pro hac vice

tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

/s/ John C. Walsh
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
**SHOWS, CALL & WALSH, L.L.P.**
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com

* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana*