## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, JARRETT
LOFTON, REV. CLEE EARNEST LOWE, DR.
ALICE WASHINGTON, STEVEN HARRIS,
ALEXIS CALHOUN, BLACK VOTERS
MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

     *Plaintiffs*,

  v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State of Louisiana,

     *Defendant*.

CIVIL ACTION NO. 3:22-cv-00178
SDD-SDJ

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
## <u>MOTION TO EXCLUDE PROPOSED EXPERT TESTIMONY</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD........................................................................................................... 1

ARGUMENT........................................................................................................................ 2

I.   Sean Trende's testimony is unreliable and irrelevant to *Gingles* I. .................................. 2

    A. Trende's method is unreliable............................................................................... 3

    B. Trende's testimony is irrelevant............................................................................ 6

    C. Trende is not qualified to offer his opinion........................................................... 8

II.  Dr. Douglas Johnson's purported racial predominance analysis of Mr. Cooper's illustrative maps is both irrelevant to Section 2's legal requirements and unreliable. .............. 9

    A. Dr. Johnson's opinions are irrelevant under the *Gingles* framework that the Supreme Court recently reaffirmed in *Milligan*. ............................................................. 10

    B. Dr. Johnson's methodology is just as unreliable as it was the last time(s) it was rejected by a court.................................................................................................... 14

III. Dr. Solanky's analyses are irrelevant under *Gingles* and are otherwise unreliable.......... 18

    A. Dr. Solanky's opinions are the product of unreliable methodological application and must be excluded.................................................................................................. 19

       1. Dr. Solanky's statewide analysis of voter partisan preference is mere *ipse dixit*. .... 20

       2. Dr. Solanky's parish-level analysis is not reliable because there was no reproducible methodology in the selection of parishes or elections considered. .............................. 21

       3. Dr. Solanky's failure to consider sufficient precincts to support his precinct-level density analysis renders it unreliable. ......................................................................... 22

       4. Dr. Solanky's rebuttal of Dr. Handley must be excluded because it is unsubstantiated.......................................................................................................... 25

    B. Dr. Solanky's analyses of voting patterns have no bearing on a *Gingles* II or III inquiry and are therefore not relevant. ................................................................................. 27

       1. Dr. Solanky admittedly offers no conclusions related to racially polarized voting. ....................................................................................................................... 27

       2. Dr. Solanky's proffered analysis does not otherwise support conclusions related to racially polarized voting. ...................................................................................... 29

CONCLUSION.................................................................................................................... 34

## TABLE OF AUTHORITIES

**Cases**

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4669854
(E.D. Tex. Sept. 15, 2009) ................................................................. 14

*Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254 (2015) ........................................... 7

*Allen v. Milligan*, 599 U.S. 1 (2023) .......................................................... *passim*

*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5674599
(N.D. Ga. July 17, 2023) ................................................................... 6

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ........................................................ 12, 13

*Bush v. Vera*, 517 U.S. 952 (1996) ............................................................. 7, 12

*Clark v. Calhoun Cnty.*, 88 F.3d 1393 (5th Cir. 1996) ............................................... 11

*Cooper v. Harris*, 581 U.S. 285 (2017) ............................................................ 2

*Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661 (5th Cir. 1999) ...................................... 26

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) ........................... 1, 6, 19, 26

*Daubert v. Merrell-Dow Pharms., Inc.*, 43 F.3d 1311 (9th Cir. 1995) ............................... 19

*DePaepe v. Gen. Motors Corp.*, 141 F.3d 715 (7th Cir. 1998) ...................................... 14

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .................................................. 2, 6, 19

*Growe v. Emison*, 507 U.S. 25 (1993) ............................................................. 7, 13

*Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) ................................................. 17

*In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d
911 (D.S.C. 2016) .......................................................................... 18

*In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717 (3d Cir. 1994) ..................................... 22

*In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004) ............................ 14

*In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256 (5th Cir. 2022) ..................... 6

*Johnson v. Arkema, Inc.*, 685 F.3d 452 (5th Cir. 2012) ............................................ 5

*Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347 (5th Cir. 2007) ................................ 26

*Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477 (S.D.N.Y. 2000) ...................... 9

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ............................................... 1

*LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94 (5th Cir. 2010) ........... 5

*League of United Latin American Citizens v. Perry*, 548 U.S. 399 (2006) ........................... 7

*Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534 (5th Cir. 2007) .............................. 14

*Matosky v. Manning*, 428 F. App'x 293 (5th Cir. 2011) ......................................... 6, 20

*Miller v. Johnson*, 515 U.S. 900 (1995) .......................................................... 12

*Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir. 1991) .................. 29

*Moore v. Ashland Chem. Inc.*, 151 F.3d 269 (5th Cir. 1998) ......................................... 2, 3, 19, 22

*Perez v. Texas*, No. 11-CA-360-OLG-JES-XR, 2014 WL 12480146
    (W.D. Tex. July 9, 2014) ............................................................................................... 15

*Puga v. RCX Sols., Inc.*, 922 F.3d 285 (5th Cir. 2019) .................................................... 6

*Rink v. Cheminova, Inc.*, 400 F.3d 1286 (11th Cir. 2005) .............................................. 22

*Robinson v. Ardoin*, 37 F.4th 208 (5th Cir. 2022) .................................................... 7, 11

*Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. 2023) ..................................... 2, 8, 9

*Shaw v. Reno*, 509 U.S. 630 (1993) ............................................................................ 12, 33

*Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393 (5th Cir. 2016) ...................................... 2

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218 (11th Cir. 2000) .......................... 28

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ............................................................ *passim*

*Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201 (5th Cir. 1989) ........... 31

**Other Authorities**

Fed. R. Ev. 702 ............................................................................................................. 1

Henry F. Kaiser, *An Objective Method for Establishing Legislative Districts*, 10 Midwest J. Pol.
    Sci. 200 (1966) ............................................................................................................ 3

Isobel M.L. Robertson, *The Delimitation of Local Government Electoral Areas in Scotland*, 33 J.
    Operational Rsch. Soc. 51 (1982) ............................................................................... 3

James B. Weaver & Sidney W. Hess, *A Procedure for Nonpartisan Districting: Development of
    Computer Techniques*, 73 Yale L. J. 228 (1963) ........................................................ 3

Jowei Chen & Jonathan Rodden, *Unintentional Gerrymandering: Political Geography and
    Electoral Bias in Legislatures*, 8 Q.J. Poli. Sci. 239 (2013) ........................................ 4

Micah Altman, *Modeling the Effect of Mandatory District Compactness on Partisan
    Gerrymanders*, 17 Pol. Geog. 989 (1998) ................................................................. 3

S.W. Hess, et al., *Nonpartisan Political Redistricting by Computer*,
    13 Operations Rsch. (1965) ....................................................................................... 3

## INTRODUCTION

Only months ago, in *Allen v. Milligan*, the Supreme Court declined to "remake [its] § 2 [of the Voting Rights Act] jurisprudence anew." 599 U.S. 1, 23 (2023). That jurisprudence includes the familiar *Gingles* pre-conditions—(1) a minority group must be sufficiently large and geographically compact to constitute the majority in a single district; (2) the minority group must be politically cohesive; and (3) white majority voters vote sufficiently as a bloc to enable it to defeat the minority group's preferred candidate—and a totality of the circumstances analysis. *Id.* at 18; *see also Thornburg v. Gingles*, 478 U.S. 30, 36, 51 (1986). Plaintiffs have offered experts to prove that each of these pre-conditions and the totality of the circumstances demonstrate that Louisiana's state legislative maps violate Section 2.

Undeterred by *Milligan* and unable to rebut Plaintiffs' showing of the *Gingles* preconditions, Defendants instead seek to muddle this case by asking this Court to stray from the clear tests set out to meet each of the three preconditions in defiance of the Supreme Court's clear directives. Specifically, their experts—Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky—offer testimony that has no bearing on the prevailing Section 2 inquiry and is based on unreliable methodology and expertise. The Court should exclude their testimony, in accordance with the requirements of Federal Rule of Evidence 702.

## LEGAL STANDARD

Expert testimony must be qualified, reliable, and relevant to be admissible. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); Fed. R. Ev. 702. Courts act as gatekeepers to ensure expert testimony meets these requirements. The "Federal Rules of Evidence 'assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert*, 509 U.S. at 597). "The proponent of expert testimony bears the burden of establishing

the reliability of the expert's testimony." *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016). A court may exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Courts apply a "five-factor, non-exclusive, flexible test" to determine reliability under *Daubert*: (1) whether the theory has been tested; (2) whether it has been subject to peer review and publication; (3) its known or potential rate of error; (4) the existence and maintenance of standards and controls; and (5) the degree to which the theory has been generally accepted in the scientific community. *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 275 (5th Cir. 1998) (en banc). The testimony offered by Mr. Trende, Dr. Johnson, and Dr. Solanky fails this test.

## ARGUMENT

### I. Sean Trende's testimony is unreliable and irrelevant to *Gingles* I.

Defendants offer Sean Trende as a rebuttal expert to Plaintiffs' *Gingles* I expert, William Cooper. As required by *Gingles* I, Mr. Cooper has created illustrative House and Senate plans that include additional Black-majority districts to "establish that Black voters as a group are 'sufficiently large and geographically compact to constitute a majority in some reasonably configured legislative district.'" *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 778 (M.D. La. 2023) (subsequent history omitted) (quoting *Cooper v. Harris*, 581 U.S. 285, 301 (2017)).

Mr. Trende uses two algorithms "to identify compact population clusters" and find "the most compact Black population" *within* each of Mr. Cooper's illustrative districts—purporting to focus on the compactness of the Black community, rather than the whole district Mr. Cooper has drawn. *See* Ex. A, Trende Report at 15–16. Trende's first algorithm uses the moment of inertia ("MOI") algorithmic method to draw what he considers "the most compact" groupings of the Black voting age population ("BVAP") that can constitute a majority within a district, based on the smallest population distribution. *Id*. at 15. He does this by weighting BVAP, combining

neighboring precincts into clusters, and having the algorithm stop once a BVAP sufficient to meet the number necessary for 50%-plus-one BVAP is reached. *Id*. at 15–16. His second algorithm, purportedly derived from the method used by Professors Jowei Chen and Jonathan Rodden (the "Chen and Rodden" method, discussed in more detail below), is similar to the first, but weights precinct size instead of BVAP. *Id*. at 16. These algorithms do not create whole districts, but rather draw shapes that group together a threshold number of Black adults; once the shape includes enough Black adults to constitute a majority in a whole district, the algorithm goes no further. *Id*. at 16–17. Trende then opines whether the Black population within Mr. Cooper's illustrative districts is compact based on his subjective visual inspection. Ex. B, Trende Dep. Tr. 88:4. His novel approach finds no support in peer-reviewed literature and seeks to redefine the Court's *Gingles* I inquiry.

### A.    Trende's method is unreliable.

Trende's analysis fails *Daubert*'s reliability test because it is untested and has no identifiable support in political science literature or by courts. *See Moore*, 151 F.3d at 275; *see also* Ex. B, Trende Dep. Tr. 66:10–67:1. As indicated above, Trende uses two algorithms to draw BVAP groupings within a district, stopping once the algorithm has grouped together enough BVAP to constitute a majority within a district. Trende references several papers to bolster his first algorithm, in which he uses a MOI method based on BVAP. Ex. A, Trende Report at 14–15. But all of those cited papers focus on generating or measuring *whole districts*[1]—something

---

[1] *See* Micah Altman, *Modeling the Effect of Mandatory District Compactness on Partisan Gerrymanders*, 17 Pol. Geog. 989, 990 (1998) (using MOI to draw "thousands of compact district plans"); James B. Weaver & Sidney W. Hess, *A Procedure for Nonpartisan Districting: Development of Computer Techniques*, 73 Yale L. J. 228, 304–05 (1963) (drawing districting proposals in Delaware); Isobel M.L. Robertson, *The Delimitation of Local Government Electoral Areas in Scotland*, 33 J. Operational Rsch. Soc. 51, 517 (1982) (districting proposals in Scotland); S.W. Hess, et al., *Nonpartisan Political Redistricting by Computer*, 13 Operations Rsch. 998, 1001–03 (1965) (drawing whole districts for New Castle County Council, Delaware Legislature, and Connecticut Legislature); Henry F. Kaiser, *An Objective Method for Establishing Legislative Districts*, 10 Midwest J. Pol. Sci. 200, 208 (1966) (using MOI to generate compactness scores of existing Illinois districts).

Trende does not do. Instead, his algorithm draws the most compact BVAP grouping within an area using only BVAP, with a control to combine nearby precincts that have high Black populations. This method ignores other redistricting criteria that might inform a whole district, such as equal population, contiguity, communities of interest, and others. Ex. B, Trende Dep. Tr. 59:4–9; *see also* Ex. A, Trende Report at 15–17 (drawing BVAP configuration using MOI method that is non-contiguous). Trende concedes that his approach does not generate viable districts, let alone whole maps, and draws shapes that are neither contiguous nor equal in population. Ex. B, Trende Dep. Tr. 84:18–19 ("[T]he point here is not to the draw the district.").

Similarly, Trende's second method stands in contrast to the Chen and Rodden method he invokes. Unlike Trende, Chen and Rodden focus on *whole* districts and create statewide maps, using an algorithm to simulate hundreds of maps. *See* Ex. C, Jowei Chen & Jonathan Rodden, *Unintentional Gerrymandering: Political Geography and Electoral Bias in Legislatures*, 8 Q.J. Poli. Sci. 239 (2013). And unlike Trende's, Chen and Rodden's algorithm controls for both equal population and contiguity. *Compare id.* at 249 ("Our challenge is to guarantee equal apportionment of population while requiring geographic contiguity for all simulated districts."), *with* Ex. A, Trende Report at 17, 107, 116 (images where BVAP groupings have holes); *id.* at 117 (image where BVAP grouping includes noncontiguous islands); Ex. B, Trende Dep. Tr. 83:4–84:18 (Trende conceding non-contiguous shapes); *id.* at 100:16–19 (Trende conceding his algorithm does not equalize population). Trende further deviates from Chen and Rodden's methodologies by *altering* factors in the analysis, namely weights for district size and population; this causes his analysis to more heavily favor the packing of urban populations than the Chen and Rodden method. *See* Ex. B, Trende Dep. Tr. 109:4–109; 110:21–24; 113:16–18. At best, the existing literature "only provide[s] an arguable inferential starting point" for using an MOI-based algorithm in the way

Trende does, casting doubts on his method's reliability. *LeBlanc ex rel. Est. of LeBlanc v. Chevron USA, Inc.*, 396 F. App'x 94, 99 (5th Cir. 2010); *see also Johnson v. Arkema, Inc.*, 685 F.3d 452, 459, 467 (5th Cir. 2012) (absence of testing in peer-reviewed publication makes method less reliable); Ex. B, Trende Dep. Tr. 66:6–24.

Even worse, no court has ever used or credited Trende's modified methods. Trende admitted that he has never before used MOI to assess compactness, even though he has previously served as an expert in redistricting cases, advised independent redistricting commissions, and drawn statewide district maps.[2] *See* Ex. B, Trende Dep. Tr. 54:23–55:11; 75:18–76:15. While Trende attempted to argue in rebuttal that, until recently, his novel methodology employed here was "impractical" due to "technological constraints," Ex. D, Trende Reply at 2; *see also* Ex. B, Trende Dep. Tr. 74:20–21, he admitted at deposition that the necessary technology has existed for *twenty (20) years*, *id.* at 74:22–75:1. Despite this, Trende cannot point to any court cases where this methodology was utilized, let alone credited, to assess compactness. *Id.* at 75:2–11. Trende admitted in his deposition that he has only employed the methodology here, as opposed to his other redistricting work, at the request of counsel to meet their new legal theory. *Id.* at 73:6–19; 75:2–11.

Trende's unreliable and untested methodology culminates in his *ipse dixit* opinion. Once his algorithm has generated a shape, Trende deems population clusters non-compact, based only on "[l]ooking at the map." Ex. B, Trende Dep. Tr. 88:4. The Court should exclude this "opinion

---

[2] In his prior redistricting work, Trende has most often used Reock and Polsby-Popper as metrics of compactness. Ex. B, Trende Dep. Tr. 62:25–64:18, 125:22–130:21; *see also, e.g.,* Ariz. Indep. Redistricting Comm'n, *Overview of Decennial Redistricting Process and Maps*, Appendix B at 12–13 (Jan. 2022), https://rb.gy/vp2rr (Reock and Polsby-Popper) (acting as Voting Rights Act expert); Expert Report of Sean P. Trende at 17, *Harkenrider v. Hochul*, 38 N.Y.3d 494 (2022) (Polsby-Popper), https://rb.gy/4h6a1; Report of the Special Magistrate at 25, In the Matter of the 2022 Legislative Districting of the state, 481 Md. 507 (Md. 2022) https://rb.gy/r5cnq, (Reock, Polsby-Popper, Schwartzberg, and Convex Hull); Memo from Bernard Grofman and Sean Trende to the Supreme Court of Virginia (Dec. 27, 2021), https://rb.gy/xvuqz (Reock and Polsby-Popper).

evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146; *see also Matosky v. Manning*, 428 F. App'x 293, 298 (5th Cir. 2011) (opinion properly excluded when based on "conclusory assertion"). Further, Trende's conclusory opinion encroaches on the Court's role. "The use of any eyeball test to assess irregularities . . . is necessarily a matter for the factfinder." *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5674599, at *11 (N.D. Ga. July 17, 2023) (internal quotations omitted); *see also* Ex. B, Trende Dep. Tr. 87:13–24 ("[T]he finder of fact is going to have to decide whether it is reasonable or not. In my opinion . . . that's not compact under any reasonable definition of the term. The fact finder might ultimately disagree with that though.").

In short, Trende's modified methods to assess compactness are untested, lack peer review, and have never been used by Trende, other experts in this field, or by fellow courts. They culminate in a conclusory say-so based on subjective visual assessments. Trende's testimony should be precluded.

### B.    Trende's testimony is irrelevant.

Even if Trende's testimony were reliable (it is not), it is plainly irrelevant. Rule 702 requires expert testimony to be relevant. Fed. R. Civ. P. 702(a); *see also Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." (citation omitted)); *In re: Taxotere (Docetaxel) Prod. Liab. Litig.*, 26 F.4th 256, 268 (5th Cir. 2022) ("To be relevant, the expert's reasoning or methodology [must] be properly applied to the facts in issue." (citing *Puga v. RCX Sols., Inc.*, 922 F.3d 285, 293 (5th Cir. 2019))).

Trende's testimony does not speak to the *Gingles* I question before the Court. The first *Gingles* precondition "focuse[s] on geographical compactness and numerosity, [and] is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Milligan*, 599 U.S. at 18 (quoting *Growe v. Emison*, 507 U.S. 25, 40

(1993)). This precondition is satisfied by showing that "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id*. "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Id.* at 18, 20 (citing *Ala. Legis. Black Caucus v. Alabama*, 575 U.S. 254, 272 (2015)); *see also Bush v. Vera*, 517 U.S. 952, 977 (1996). In other words, this inquiry requires showing that a *Gingles* I illustrative majority-minority *district* is compact. *See, e.g.*, *Milligan*, 599 U.S. at 20 (accepting the district court's factual finding that the plaintiffs' "eleven illustrative maps—that is, example districting maps that Alabama could enact" were sufficiently compact); *Robinson v. Ardoin*, 37 F.4th 208, 217 (5th Cir. 2022) (accepting the district court's "holding that the plaintiffs satisfied *Gingles*'s compactness requirement" with their "new majority-minority district"). Plaintiffs make this showing through drawing a district that is 50% plus one in minority population, in accordance with the traditional redistricting criteria, and then running standard compactness measures to score the district. *See, e.g.*, *Milligan*, 599 U.S. at 20 (favorably citing William Cooper's illustrative plans).

Bucking this question, Defendants seemingly seek to invoke *League of United Latin American Citizens v. Perry* ("*LULAC*"), 548 U.S. 399 (2006), as prohibiting illustrative districts that draw different minority communities together when the distance between them exceeds some unspecified threshold, or when there is a white population interspersed between them. *LULAC* does no such thing: the Court "accept[ed] that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *Id*. at 435. Just recently, *Milligan* held that an illustrative district joining an urban city with a rural community was

reasonably configured. 599 U.S. at 19–21. Notwithstanding the Supreme Court's recent reaffirmation of the familiar *Gingles* framework, Defendants seek to use Trende's testimony to upend it.

Trende's testimony does not reference data applicable to the recently reaffirmed *Gingles* I test—*i.e.*, assessing whether *districts* are sufficiently compact. Ex. B, Trende Dep. Tr. 128:20–22 ("I haven't done any work one way or the other on the district level compactness of the maps."). Instead, Trende assesses the compactness of the minority population, generally. *See* Ex. A, Trende Report 14 ("I utilize the moment of inertia method of calculating the compactness *of a population*."). Trende acknowledges that his approach reflects a novel legal theory offered by Defendants. Ex. B, Trende Dep. Tr. 73:17–19 ("[M]y understanding is that the legal theory being propounded here isn't one that's been thoroughly explored."). Trende further acknowledges—as he must—that *Gingles* I centers on *district* compactness, not the compactness of the minority population. *Id.* at 62:25–63:2 ("I'm not really aware of cases where people have tried to quantify the compactness of the population."); Ex. D, Trende Reply at 2 ("It's true that most litigation focuses on the compactness of the district shape."). Indeed, Trende himself has conducted analyses of district compactness in connection with Section 2 claims in the past. *See supra* n.2.

By failing to analyze compactness in the ways courts do, Trende's analysis—which ignores district compactness and offers no assessment of the compactness of Plaintiffs' illustrative districts—bears no relevance to Plaintiffs' Section 2 claims. The Court should preclude it.

C.    **Trende is not qualified to offer his opinion.**

Finally, Trende is not qualified to provide the opinions offered. He lacks "experience, skill, training or specialized knowledge in the simulation analysis methodology that he employed to reach his conclusions." *Robinson*, 605 F. Supp. 3d at 825. While Plaintiffs acknowledge that Trende has served as an expert in similar cases previously, Trende admits he has never used his

*novel* method for assessing compactness before now, has never published peer reviewed articles on MOI or other algorithmic computation, and has never used the algorithms used here in his prior academic work. Ex. B, Trende Dep. Tr. 72:13– 73:5; 40:7–41:22. This Court has rejected the conclusions of experts with similarly "novice" level experience with simulations. *Robinson*, 605 F. Supp. 3d at 825. And Trende's inexperience is all the more concerning because of the novel, population-level assessment he uses here. Accordingly, Trende lacks the expertise and experience to offer a novel methodology unmoored from the *Gingles* preconditions, and his opinion should be precluded. *See Koppell v. N.Y. State Bd. of Elections*, 97 F. Supp. 2d 477, 481–82 (S.D.N.Y. 2000) (excluding testimony of political scientist who had "significant political experience," but "lack[ed] any particular expertise" on the election practices at issue, and whose work in the area "has neither been tested nor subject to peer review").

## II.    Dr. Douglas Johnson's purported racial predominance analysis of Mr. Cooper's illustrative maps is both irrelevant to Section 2's legal requirements and unreliable.

Dr. Johnson describes his "primary opinion" as the conclusion that "race was the predominant factor in the changes" that Mr. Cooper made to his illustrative maps. Ex. E, Johnson Surrebuttal at 2. His report (Ex. F at 2) indicates that he was asked to analyze "whether race appears to be the predominate consideration used in drawing" Mr. Cooper's illustrative maps in this case, and he devotes 17 pages in his initial report (Ex. F at 26–42) and nearly half of his surrebuttal report (Ex. E at 2–3, 6–10) to his purported conclusions that race "drove" the district boundaries that Mr. Cooper drew. Ex. F, Johnson Report at 26, 35.

Rather than making an actual showing that race predominated, Dr. Johnson's reports merely indicate that Mr. Cooper intentionally drew districts that are "majority-Black," Ex. F, Johnson Report at 26, and that those districts were drawn to (a) exceed 50% BVAP, *id.* at 37–42; and (b) "perform[] for black preferred candidates," Ex. E, Johnson Surrebuttal at 2. Dr. Johnson

then asserts that these facts on their own would amount to proof that "race was the predominant factor" in drawing Mr. Cooper's illustrative maps. *Id.*

To the extent that Defendants offer Dr. Johnson's opinions to support the proposition that an intentional effort to satisfy the *Gingles* preconditions renders the illustrative maps unlawful, then Dr. Johnson's opinions are irrelevant to the current *Gingles* inquiry. His opinions would only be relevant if this Court were to overrule *Gingles*. That is what Alabama asked the Supreme Court to do in *Milligan*, and the Supreme Court declined the invitation. 599 U.S. at 30; *id.* at 42 (Kavanaugh, J., concurring). Accordingly, the Court should preclude Dr. Johnson's testimony as irrelevant to the actual legal standard that governs Section 2 claims.

Even if Dr. Johnson's conclusions were relevant (and they are not), they are unhelpful and unreliable. Dr. Johnson has no specialized knowledge that would permit him to opine as to Mr. Cooper's subjective motivations in drawing the illustrative maps. Indeed, Plaintiffs have not identified a single court that has accepted Dr. Johnson's racial predominance analysis. In contrast, courts have repeatedly rejected Dr. Johnson's opinions, and he has done nothing in this case to assuage the specific concerns that prior courts have enumerated about his methodology and conclusions about the intent of other mapdrawers. This Court should likewise reject his speculative opinions.

A.    **Dr. Johnson's opinions are irrelevant under the *Gingles* framework that the Supreme Court recently reaffirmed in *Milligan*.**

Dr. Johnson's "primary opinion" (Ex. E, Johnson Surrebuttal at 2)—that "race was the predominant factor in the changes [Mr. Cooper] made" between his 2022 and 2023 illustrative maps2F2F2F[3]—has no bearing on the legal analysis in a Section 2 claim.

---

[3] It is worth emphasizing the limited scope of Dr. Johnson's testimony: his conclusions address the changes between the illustrative maps Mr. Cooper submitted in 2022 and the revised illustrative maps Mr. Cooper submitted in 2023.

As an initial matter: *Milligan* reaffirms that it is permissible to consider race when developing illustrative maps to satisfy the first *Gingles* precondition. Indeed, as the majority stressed, "[t]he very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." 599 U.S. 1, 34 n.7 (emphasis in original); *see also id.* at 41 ("[T]his Court and the lower federal courts . . . have authorized race-based redistricting as a remedy for state districting maps that violate § 2."). In holding that the consideration of race does not preclude satisfying *Gingles* I, the Supreme Court rejected the argument that the *Milligan* plaintiffs' illustrative plans failed *Gingles* I because race was a consideration in their design. *See Milligan*, 599 U.S. at 24 (rejecting argument that "the illustrative plan that plaintiffs adduce for the first *Gingles* precondition cannot have been 'based' on race").

Because the *Milligan* majority never reached the question of whether illustrative maps developed to satisfy the first *Gingles* precondition must survive the racial predominance analysis discussed in racial gerrymandering cases brought under the Equal Protection Clause of the Fourteenth Amendment,[4] Fifth Circuit precedent establishing that a racial predominance analysis is not necessary at *Gingles* I remains controlling. *See Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1406–07 (5th Cir. 1996) (racial predominance analysis is not necessary at *Gingles* I); *see also Robinson*, 37 F.4th at 223 (citing *Clark* and holding that this Circuit has "rejected the

---

As a result, Dr. Johnson's report zooms in on a series of minor changes: as Dr. Johnson admitted in his deposition, Mr. Cooper's changes between the 2022 and 2023 illustrative House plans affected less than 2% of the Louisiana population, and his changes between the 2022 and 2023 illustrative Senate plans affected less than 1% of the Louisiana population. Ex. G, Johnson Dep. Tr. 90:11–91:17. In discussing compactness, communities of interest, and race predominance, Dr. Johnson does not compare either set of illustrative maps to the enacted plan. *See generally* Exs. H & I; Ex. G, Johnson Dep. Tr. 56:15–19, 57:14–58:7.

[4] The plurality concluded that race had not predominated in the plaintiffs' illustrative plans, and therefore did not need to resolve the question of how to apply *Gingles* I if race does predominate in the creation of an illustrative map. *See Milligan*, 599 U.S. at 30–33 (plurality opinion). Justice Kavanaugh also did not address the point directly, but he voted to affirm the district court's finding that *Gingles* I was satisfied notwithstanding the acknowledgment of the plaintiffs' experts that they considered race as a factor in developing their illustrative plans. *See id.* at 31 (describing testimony of demographer Bill Cooper, the same mapdrawer used in this case).

proposition that a plaintiff's attempt to satisfy the first *Gingles* precondition is invalid if the plaintiff acts with a racial purpose.").

Even in racial gerrymandering cases brought under the Fourteenth Amendment, the Supreme Court has never precluded an illustrative plan from satisfying *Gingles* I based on a finding that race predominated. Rather, in such cases, the Supreme Court has focused its *Gingles* I inquiry into the map drawing process on questions of whether the map has concluded that the districts at issue in those cases did not satisfy traditional redistricting principles. *See Milligan*, 599 U.S. at 27 (in *Shaw v. Reno*, 509 U.S. 630 (1993), Section 2 did not justify "proposed district [that] was not reasonably compact"); *id.* at 27–28 (in *Miller v. Johnson*, 515 U.S. 900 (1995), VRA provided no justification for districts that "flout[ed] traditional criteria"); *id.* at 28 (in *Bush v. Vera*, 517 U.S. 952 (1996), Section 2 did not provide justification for districts that did not adhere to traditional redistricting criteria). Put another way, no Supreme Court cases hold that *Gingles* I cannot be satisfied where, as here, Plaintiffs' illustrative map is reasonably configured because it does comply with traditional redistricting principles.

What's more, even assuming *arguendo* that Dr. Johnson's assertions about Mr. Cooper's subjective motivations in drawing district lines are correct (*but see infra* at Section II.B), longstanding precedent precludes this Court from holding that the particular bases on which Dr. Johnson critiques Mr. Cooper for considering race are examples of impermissible race predominance. For example, Dr. Johnson fixates on Mr. Cooper's efforts to create districts that are majority-Black (Ex. F, Johnson Report at 26), or that have a BVAP exceeding 50% (*id.* at 27, 32)—as the Supreme Court requires in a Section 2 case, *see Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009)—as support for his conclusion about Mr. Cooper's "predominate consideration of race in drawing the illustrative map." As a matter of law, such a position is foreclosed by Supreme

Court precedent. In *Milligan*, the majority recognized that the "very reason a plaintiff adduces a map at the first step of *Gingles* is precisely *because of* its racial composition—that is, because it creates an additional majority-minority district that does not then exist." 599 U.S. at 34 n.7. This is what *Gingles* I, as construed in *Bartlett*, 556 U.S. at 19–20, demands, and *Milligan* makes clear that attempting to make the required showing does not amount to racial gerrymandering.[5]

Dr. Johnson's call-out of Mr. Cooper's alteration of districts to ensure that they perform to enable Black voters to elect the candidates of their choice (Ex. E, Johnson Surrebuttal at 2) is similarly irrelevant to the legal analysis of Section 2 claims. The *Gingles* preconditions *require* plaintiffs "to establish that the minority has the potential to elect a representative of its own choice in some single-member district." *Growe*, 507 U.S. at 40. In fact, Dr. Johnson himself admits this factor is critical for mapdrawers to consider. His own report includes conclusions about the importance of considering the "sensitivity" of a district, which measures its "likel[ihood] to elect the candidate preferred by Black voters." Ex. F, Johnson Report at 38. Dr. Johnson acknowledged that, when he draws maps, he tries to consider whether a district is likely to elect the candidate preferred by Black voters. Ex. G, Johnson Dep. Tr. 258:24–259:2; *id.* at 259:3–7 ("If we're trying to [e]mpower a region that has historically been underrepresented, we want to be sure that we get the right share of the voters to actually [e]mpower them."). When asked if he thinks it is important to consider "how to [e]mpower voters and make sure their districts are effective" in drawing maps, Dr. Johnson responded: "You know, that is very roughly speaking the definition of Section 2 of the Vot[ing] Rights Act. It's definitely important." *Id.* at 259:8–14. Both the relevant legal

---

[5] *See* 143 S. Ct. at 1512 (plurality) (rejecting the argument that racial predominance invalidates illustrative maps created with goal of satisfying *Gingles*); *id.* at 1518–19 (Kavanaugh, J., concurring) (explaining that in certain circumstances, "*Gingles* requires the creation of a majority-minority district" and that the Constitution does permit "race-based redistricting").

framework and Dr. Johnson's own concessions confirm that whether Mr. Cooper considered this "definitely important" factor is not relevant to whether race impermissibly predominated.

> **B.      Dr. Johnson's methodology is just as unreliable as it was the last time(s) it was rejected by a court.**

Dr. Johnson purports to offer expert conclusions that race was the predominant factor animating Mr. Cooper's changes between his 2022 and 2023 maps. Dr. Johnson's assertions about Mr. Cooper's motivations stand in express contradiction to Mr. Cooper's explanation that, while he "was aware of race, given that the purpose of the *Gingles I* analysis is to see if additional compact majority minority districts can be drawn," he "drew the maps based on traditional redistricting criteria," and not predominantly "based on race." Ex. H, Cooper Rebuttal at 8. But Dr. Johnson has "no special knowledge that allows [him] to opine as to [Mr. Cooper's] subjective intent" when he drew the illustrative maps, *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 2:07-CV-468, 2009 WL 4669854, at *5 (E.D. Tex. Sept. 15, 2009), and he did not employ any statistical analysis or review all available evidence to rule out the other non-discriminatory alternative criteria that Mr. Cooper considered. Because Rule 702's use of the word "knowledge" to describe an expert's qualifications "connotes more than subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, Dr. Johnson's testimony should be excluded.

As a general matter, "[i]nferences about the intent or motive of parties or others lie outside the bounds of expert testimony," because "[t]he question of intent is a classic jury question and not one for the experts."[6] Even in redistricting cases that allege an intentional gerrymander, where legislative intent is an element of the claim and experts are called upon to analyze evidence

---

[6] *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 546–47 (S.D.N.Y. 2004) (internal citations and quotation marks omitted); *see also Marlin v. Moody Nat. Bank, N.A.*, 248 F. App'x 534, 541 (5th Cir. 2007) ("an expert's conclusory assertions regarding a defendant's state of mind are not helpful or admissible"); *DePaepe v. Gen. Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998) (holding expert "could not testify *as an expert* that [a party] had a particular motive") (emphasis in original).

for the purpose of inferring "the reasons behind the State's actions," courts have "caution[ed] the experts not to . . . comment on the subjective intent of any individual legislator or staff member." *Perez v. Texas*, No. 11-CA-360-OLG-JES-XR, 2014 WL 12480146, at *3 (W.D. Tex. July 9, 2014). Here—where no intent claim is at issue, and without the benefit of the "testimonial and documentary evidence on legislative process, procedure, and tradition" that forms the core basis for expert testimony on legislative intent, *id.* at *3—Dr. Johnson purports to identify the motivations of one individual mapdrawer. Such "interpretations of conduct or views as to the motivation of parties" are classically excluded as improper expert testimony. *In re Rezulin*, 309 F. Supp. 2d at 541.

Unsurprisingly, then, courts have not accepted Dr. Johnson's purported expert opinions on the motivation of other mapdrawers. In *Common Cause v. Lewis* (opinion attached as Ex. I), for instance, a court rejected Dr. Johnson's opinions about, among other things, the intent of another mapdrawer. There, Dr. Johnson opined that one senate district was "drawn to capture as much of" the Charlotte suburbs as possible into a single district, and that another Senate District similarly reflected an effort to "unite[] the southern suburbs" of Charlotte. Ex. I at 112. In a 2019 decision in that case, the court "reject[ed] Dr. Johnson's explanations" as they "appear[ed[ to be purely speculative, and in any event his speculation d[id] not withstand minimal scrutiny." *Id.* at 112. That court also noted that, at that time, "Dr. Johnson ha[d] testified as a live expert witness in four cases previously, and the courts in all four cases ha[d] rejected his analysis,"6F6F6F[7] and it "join[ed] these other courts in rejecting Dr. Johnson's methodologies, analyses, and conclusions." *Id.* at 270.

---

[7] *Id.* at 270 (collecting cases that called Dr. Johnson's expert testimony "unreliable and not persuasive," and his analysis or methodology as "unsuitable," "troubling," "lack[ing] merit" or "inappropriate").

In *Covington v. North Carolina* (opinion attached as Ex. J), the court rejected Dr. Johnson's race predominance analysis specifically. There, "Dr. Johnson opined as to the Special Master's '[a]pparent [p]redominant [u]se of [r]ace [d]ata' and that 'certain racial quotas were targeted by the Special Master when drawing the districts' or 'dictated the configuration' of the districts." Ex. J at 74 (noting that Dr. Johnson also "opin[ed] as to the Special Master's 'apparent quota of the African-American percentage of the voting-age population'"). There, too, Dr. Johnson had highlighted "the remarkable similarity in the African-American percentages of the Voting Age Population in the districts." *Id.* at 74–75. And the court found "Dr. Johnson's analysis and opinion as to the alleged racial targeting in the Recommended Plans unreliable and not persuasive." *Id.* The court emphasized that "Dr. Johnson conceded that the fact that several districts' BVAPs fall in a particular range does not prove that a racial quota was being employed," and that "correlation [is] not evidence of causation." *Id.* at 75 (internal quotation marks omitted). The court also explained that Dr. Johnson had neither provided any "basis for determining whether the BVAPs of the districts are 'similar' from a statistical perspective," nor offered "any controlled statistical analysis ruling out non-discriminatory explanations for the [similar] BVAPs," and that "any such similarity may be attributable to the underlying demographic make-up of the geographic areas in which the districts are drawn or other nondiscriminatory districting considerations, not racial targeting." *Id.* at 75–76. Finally, the Court noted that "Dr. Johnson conceded that minor differences between two proposed maps do not signal that one version is legally unacceptable or better achieves traditional redistricting goals." *Id.* at 77.

These same flaws in Dr. Johnson's methodology persist. Dr. Johnson admitted that he did not "provide any empirical basis for comparing the BVAPs in these districts from a statistical perspective," and that he had not "offered any controlled statistical analysis ruling out

nondiscriminatory explanations for the BVAP percentages" in his report. Ex. G, Johnson Dep. Tr. 234:1–236:6. Instead, he resorted to the conclusory assertion that "[i]t just doesn't happen." *Id.* at 235:24–25. "[T]he existence of sufficient facts and a reliable methodology is in all instances mandatory. [W]ithout more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) (citation and quotation marks omitted).

Dr. Johnson's unsupported speculation about what must have happened is especially unreliable because he plainly did not rule out all other nondiscriminatory explanations. Indeed, in his deposition, Dr. Johnson conceded that he is "not contending that Mr. Cooper didn't rely on anything other than race in drawing lines in this map," and admits that "[t]here are a number of factors he cited, and there are a number of districts that follow those factor[s]." Ex. G, Johnson Dep. Tr. 214:22–215:3.

Worse yet, Dr. Johnson did not even review all of the evidence supporting other non-discriminatory explanations. Dr. Johnson explained in his deposition that, because "correlation, itself, does not indicate causation," "it's so important to have the other explanation" for "why that line is somewhere for a reason other than race." Ex. G, Johnson Dep. Tr. 207:8–19. Conversely, Dr. Johnson agreed that, "generally speaking," "the existence of some other reason for a line" that the mapdrawer drew "is a cut against the argument that the predominant factor is race." *Id.* at 208:20–24. But Dr. Johnson didn't consider all of the other available explanations, including (but not limited to7F7F7F[8]) an expert report about communities of interest that specifically responded

---

[8] Dr. Johnson's report also failed to rule out other factors that Mr. Cooper expressly mentions in his report, such as Mr. Cooper's "least change method," which aims to preserve the core of districts and to minimize disruption to incumbents where possible. Ex. H, Cooper Rebuttal at 7; *see* Ex. L, Cooper Report at 8 n.14 (noting that Cooper "relied on incumbent addresses of legislators"); Ex. G, Johnson Dep. Tr. 265:2–5 (didn't consider incumbent addresses).

to Dr. Johnson's critiques and explained why Mr. Cooper's illustrative maps were consistent with communities of interest in Louisiana. *See* Ex. K, Colten Rebuttal Report.

This omission is especially glaring in light of Mr. Cooper's explanation in his reports that the changes made between the 2022 and 2023 illustrative plans he drew were made "to better reflect communities of interest and include other technical changes," Ex. L, Cooper Report at 5, and that the changes "reflect conversations I had with the attorneys for the Plaintiffs, who in turn had requested commentary about the 2022 Illustrative Plan from the Plaintiffs and other experts for the Plaintiffs," Ex. H, Cooper Rebuttal at 3; *see also id.* at 8 ("As stated in my July 2023 report, the changes between my 2022 Illustrative Plan and the now-current Illustrative Plan were primarily made to better respect communities of interest.").

 Dr. Johnson seemed to agree that, if the districts complied with communities of interest in Louisiana, that "would make it difficult to conclude that the predominant factor was race"8F8F8F[9]—but he has not even reviewed the available evidence that would undermine his conclusion. Because Dr. Johnson's methodology "fail[s] to adequately account for contrary evidence," it is "not reliable or scientifically sound." *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prod. Liab. Litig.*, 174 F. Supp. 3d 911, 932 (D.S.C. 2016) (collecting cases).

Absent a reliable methodology or consideration of all relevant facts, Dr. Johnson's opinions are not helpful to this Court, and should therefore be excluded.

**III. Dr. Solanky's analyses are irrelevant under *Gingles* and are otherwise unreliable.**

Defendants also offer Dr. Solanky—a mathematician with no training or experience on redistricting, political science, or the Voting Rights Act—to "statistically study the voting patterns

---

[9] Ex. G, Johnson Dep. Tr. 219:18–220:7 ("Q. [If] the districts did comply with communities of interest in Louisiana in a way that was describable in a report, where you could explain which communities were kept together by the individual districts that you're challenging. Do you agree that would make it difficult to conclude that the predominant factor was race? … THE WITNESS: That's exactly the kind of report I would have issued with the map if I [had] drawn it.").

and the composition of the enacted state house (H.B. 14) and senate (S.B.1)" and to rebut the opinions of Plaintiffs' experts, Dr. Lisa Handley and William Cooper.9F9F9F[10] Ex. N, Solanky Report at 3. But Dr. Solanky's methodology amounts to nothing more than unreliable *ipse dixit* and the few conclusions Dr. Solanky renders are irrelevant to the effects-based racially polarized voting analysis required by *Gingles* II and III.

### A.    Dr. Solanky's opinions are the product of unreliable methodological application and must be excluded.

"Rule 104(a) requires the judge to conduct preliminary fact-finding and to make a 'preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Moore*, 151 F.3d at 276 (quoting *Daubert*, 509 U.S. at 592–93). "[T]he party seeking to have the district court admit expert testimony must demonstrate that the expert's findings and conclusions are based on the scientific method, and, therefore, are reliable. This requires some independent validation of the expert's methodology." *Id.* However, "[t]he expert's assurance[] that he has utilized generally accepted scientific methodology is insufficient" by itself to establish that the expert's testimony is reliable. *Id.* (citing *Daubert v. Merrell-Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*")). Moreover, a court may exclude "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Joiner*, 522 U.S. at 146.

In his report, Dr. Solanky conducts three analyses to identify "trends" in voting across Louisiana. *First*, Dr. Solanky conducts a statewide analysis to get an "overall picture" of voter

---

[10] Dr. Solanky acknowledged that he did not render an opinion on Cooper's report, despite being retained to do so. Ex. M, Solanky Dep. Tr. 21:17–22:22. Accordingly, this Court should exclude any testimony Dr. Solanky purports to offer on Cooper's report.

partisan preference. *Second*, Dr. Solanky conducts a parish-wide analysis to assess the voting trends within five self-selected parishes in Louisiana (some of which have no bearing on Plaintiffs' claims). And *third*, Dr. Solanky conducts a precinct-level analysis to assess how changes in population density impact voting trends in four self-selected parishes in Louisiana. In rendering these analyses, Dr. Solanky either failed to disclose what methodology he used to structure his analyses or applied his methodology in an unreliable manner, and the conclusions based on those unreliable methodologies should accordingly be excluded.

  1. **Dr. Solanky's statewide analysis of voter partisan preference is mere *ipse dixit*.**

Dr. Solanky opines that the proper starting point for a statistical analysis of racially polarized voting is examining statewide trends in voter partisan preference. Ex. M, Solanky Dep. Tr. 50:24–52:22. But Dr. Solanky does not cite any peer-reviewed literature for this assertion, and does not draw on his past experience in conducting statistical analysis under the Voting Rights Act because he has none. Instead, Dr. Solanky justifies his analysis with his own say-so, testifying that examining statewide trends was important because "as a scientist, before we look into anything in particular, you cannot ignore the overall picture, and this gives you an overall picture." Ex. M, Solanky Dep. Tr. 51:24–52:2.

Further, Dr. Solanky does now explain *how* he drew any conclusions about racially polarized voting in the challenged districts from his analysis of "the overall picture." Dr. Solanky testified that, "[t]he overall picture is always relevant, because all the parishes' precincts, you're looking at it are subset of this data." Ex. M, Solanky Dep. Tr. 52:5–7. But other than his personal belief that it does, Dr. Solanky does not communicate how statewide trends impact an analysis of racially polarized voting, generally, let alone in the challenged districts. *See Matosky*, 428 F. App'x at 298 (upholding exclusion of expert opinion who failed to explain how the expert reached a

conclusion other than based on the expert's "conclusory assertion"). Nor does Dr. Solanky analyze how statewide trends impact an analysis of racially polarized voting, generally (let alone in the challenged districts). *See* Ex. N, Solanky Report at 4–10; Ex. M, Solanky Dep. Tr. 52:8–22, 57:16–22, 62:2–10.

Accordingly, any conclusions rendered by Dr. Solanky rooted in his statewide analysis— or any efforts to connect his statewide analysis to conclusions related to racially polarized voting— are *ipse dixit* and insufficient, and should be excluded. *See Joiner*, 522 U.S. at 146.

### 2. Dr. Solanky's parish-level analysis is not reliable because there was no reproducible methodology in the selection of parishes or elections considered.

Dr. Solanky next conducts a parish-level analysis of voting patterns by race. *See* Ex. N, Solanky Report at 11–17. In Section III of his report, Dr. Solanky examines voting patterns in five parishes—East Baton Rouge, East Carroll, Natchitoches, Orleans, and West Baton Rouge—to support his conclusion that "there is significant variation in the percentage of white voters voting for a democrat," particularly in Orleans Parish. *Id.* at 17, 29. Dr. Solanky did not implement any methodology in picking these parishes for analysis. Indeed, Dr. Solanky acknowledges that he selected these parishes to prove his *pre-determined conclusion* about inter-parish variance, not based on an objective sampling criteria. Initially, Dr. Solanky claimed that he chose these parishes because "they seemed [] to be part of the analysis which was presented in the other expert reports." Ex. M, Solanky Dep. Tr. 113:20–114:1. But when Dr. Solanky realized that Dr. Handley did not consider Orleans or East Carroll parishes because neither parishes are included within the challenged districts, Dr. Solanky changed his rationale, testifying that "[y]ou know, one of the basic ideas was to show that all of Louisiana doesn't vote similarly, and Orleans Parish happens to be one such illustration." *Id.* at 114:22–115:2.

Dr. Solanky's choice of elections was equally arbitrary. Dr. Solanky admits to having no objective parish selection criteria, stating simply that he wanted a "good mixture" of elections "where more voters are turning out," "some overlap with Dr. Handley's elections," and "some elections . . . when there is no [B]lack candidate . . . to get a . . . more clearer picture." Ex. M, Solanky Dep. Tr. 84:22–85:21. Nowhere does Dr. Solanky define what constitutes a "good mixture," what threshold meant "more voters are turning out," or why considering some elections with no Black candidates offered a "clearer picture." Dr. Solanky's failure to adopt a reproducible methodology prevents any assessment of whether he selected elections in a reliable manner.

Accordingly, Dr. Solanky's selection of parishes and elections is supported by no discernible, reproducible methodology, and the conclusions rooted in that analysis should be excluded. *See, e.g.*, *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005) ("In evaluating the reliability of an expert's method, however, a district court may properly consider whether the expert's methodology has been contrived to reach a particular result."); *Moore*, 151 F.3d at 278 n.10 ("Under Daubert, 'any step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. This is true whether the step completely changes a reliable methodology or merely misapplies that methodology.'" (quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994))).

### 3. Dr. Solanky's failure to consider sufficient precincts to support his precinct-level density analysis renders it unreliable.

Dr. Solanky's final analysis purports to examine trends in voting at the precinct-level by assessing whether voting trends change as population density increases. But Dr. Solanky's analysis relies on an unreliable application of ecological inference ("EI").

For this analysis, Dr. Solanky used the census bureau population data to determine which voting tabulation districts ("VTDs") in the parishes studied had higher population density, Ex. M,

Solanky Dep. Tr. 167:20–25, and then he had to match election precincts (which are products of election administrators) with VTDs (which are the Bureau of the Census's geographic equivalent of a precinct)10F10F10F[11] to use the voter level data available from the SOS. Ex. N, Solanky Report at 20, n.10. He then performed EI analysis on this data.

As Dr. Solanky explained, as he increased the "population density" considered, he considered fewer and fewer VTDs, which meant that he considered fewer and fewer election precincts. Ex. M, Solanky Dep. Tr. 175:6–18, 178:8–14, 181:3–16, 183:5–184:2, 184:21–185:16. And as Dr. Solanky himself admits, EI analysis becomes less reliable when dealing with a smaller sampling of data. *Id.* at 178:3–179:15. But the "high density" areas of the parishes that Dr. Solanky chose to consider contained *less than ten* and sometimes as *few as two* precincts. Ex. N, Solanky Report at 26 n.11; Ex. O, Handley Rebuttal at 7 n.11; Ex. M, Solanky Dep. Tr. 178:8–14, 181:3–16, 183:5–17, 183:22–184:2, 184:21–25, 185:1–13. The unreliability of this analysis is reflected in the sheer size of Dr. Solanky's confidence intervals, which became so wide that it was possible nearly **no** white voters supported Democrats or Republicans or nearly **most** white voters supported Democrats or Republicans. *See* Ex. N, Solanky Report at 53–54. For example, in the "most dense" areas of East Baton Rouge, Dr. Solanky estimated that *somewhere between* 18.4% and 60.7% of white voters voted for a Republican in the 2022 Senate election. *Id.* at 53. Indeed, Dr. Solanky acknowledged that these wide confidence intervals meant his estimates were "non-informative." Ex. M, Solanky Dep. Tr. 179:6–15, 186:14–25. Notwithstanding that, Dr. Solanky reaches a

---

[11]    *See* Voting Districts, Glossary, Bureau of the Census, https://www.census.gov/programs-surveys/geography/about/glossary.html#par_textimage_31 (last visited Oct. 3, 2023). The primary difference being that VTDs are based on the precincts at the time of census. Precincts can then change in the 10 years between censuses whereas VTDs remain constant until the next census.

definitive conclusion that his estimates "reflect a negative polarization by white voters to defeat the republican candidates" based on this data. *Id.* at 20, 21, 30.[11][12]

Moreover, Dr. Solanky ran his density analysis using only two elections, the 2020 Presidential and 2022 Senate elections,[13] because he lacked the experience necessary to analyze more. As explained, in order to conduct his precinct-level analysis, Dr. Solanky had to match VTDs with election precinct. *See* Ex. N, Solanky Report at 20 n.10. Dr. Solanky admits that he had *never conducted this task* prior to writing this report, and found the task "laborsome." Ex. M, Solanky Dep. Tr. 203:9–20. Indeed, Dr. Solanky found the task so "laborsome" that he limited his density analysis to just the 2020 Presidential and 2022 Senate elections because those VTDs and elections precincts were easy to match, and Dr. Solanky acknowledged that the "tedious effort" of matching VTDs and precincts was "the reason [he] did not look at even more elections." *Id.* at 170:15–24.[14] But Dr. Solanky *needed* to evaluate more elections for his conclusions to have any reliability here. The results from only one to two individual elections do not support or negate a conclusion about whether there is legally significant bloc voting. *Gingles*, 478 U.S. at 57.

---

[12] Tellingly, other experts proffered by Plaintiffs and Defendants have been more careful in conducting EI analysis. Defense expert Dr. Jeffrey Lewis noted in his report in this matter that he considered no "fewer than 10 voting precincts" in his analysis, *see* Ex. Q, Lewis Report at 4 n.2; *see also* Ex. O, Handley Rebuttal at 6. Dr. Solanky thus knew his analysis produced uncertain estimates, yet described his results as "drastic difference in voting patterns." Ex. N, Solanky Report at 29. Such a definitive opinion does not flow from Dr. Solanky's data, meaning he only reached the conclusion through *ipse dixit*. *See Joiner*, 522 U.S. at 146. Dr. Solanky's density analysis—unreliable in its design and conclusion—should be excluded.

[13] *See generally* Ex. N, Solanky Report at 17–28.

[14] It is not surprising that Dr Solanky struggled with this process. Dr. Solanky is not a political scientist. *See* Ex. N, Solanky Report at 32–43 (CV). He has no experience in analyzing voting patterns or election data. *Id.* Nor does Dr. Solanky have specialized training on racially polarized voting analyses under the Voting Rights Act. *Id.* Rather, Dr. Solanky has a general training in statistics and teaches courses on mathematics and statistical methods. Ex. M, Solanky Dep. Tr. 12:12–15:20. Dr. Solanky's training and coursework has never involved application of statistical methods (including the methods he applied in this case) to study voting patterns or election data. *See* Ex. N, Solanky Report at 32–43 (CV); Ex. M, Solanky Dep. Tr. 14:2–15:20. Dr. Solanky has never published an article or other scholarly work on political science, voting patterns, redistricting, or the Voting Rights Act. Ex. M, Solanky Dep. Tr. 14:2–11. In fact, this Court has previously recognized in *Robinson*, "there is little, if any, connection between [Dr. Solanky's] expertise and his opinions." 605 F. Supp. 3d at 841.

And, notably, all other experts proffered by Defendants looked at many more in support of their conclusions. *See* Ex. P, Alford Report at 4–14; Ex. Q, Lewis Report at 2.

Dr. Solanky's density analysis—unreliable in its design and conclusion and conducted on just two elections—should accordingly be excluded.

### 4. Dr. Solanky's rebuttal of Dr. Handley must be excluded because it is unsubstantiated.

Dr. Solanky offers a singular critique of Dr. Handley's report: he contends that Dr. Handley's allocation of early and absentee votes "biased" Dr. Handley's results. *See* Ex. N, Solanky Report at 29; Ex. R, Solanky Rebuttal at 2–8. It is undisputed that, in Louisiana, early and absentee votes are reported at the parish level, not by precinct. To overcome this issue, Dr. Handley deployed a method to allocate early and absentee votes from the parish level to precinct level based on each candidate's proportional election-day vote share by precinct. *See* Ex. S, Handley Report at 6 n.5. Dr. Solanky asserts that there is some uncertainty caused by this allocation method, and he alleges that it impacted the accuracy of Dr. Handley's EI results. Ex. N, Solanky Report at 12. But Dr. Solanky did not provide any information as to how he knew Dr. Handley's results were "biased," nor did he provide an opinion as to what the bias actually is.14F14F14F14F[15]

Dr. Solanky's report also did not propose an alternative allocation methodology to be used to account for early and absentee votes. But during his deposition, Dr. Solanky offered, for the first time, a new methodology to allocate early and absentee votes. Dr. Solanky's new methodology involved starting with total voter turnout in a precinct, subtracting the total votes cast on Election Day in each precinct, and noting the remainder as the likely total number of early and absentee votes to allocate to that precinct. Ex. M, Solanky Dep. Tr. 216:7–217:13. Dr. Solanky

---

[15] On September 29, 2023, Plaintiffs served a supplemental report in which Dr. Handley summarized the results of diagnostic tests that confirmed her allocation method did not bias her results.

then proposes to allocate the early votes for each precinct using the proportions of early and absentee votes that each candidate got from the entire parish, where the early and absentee candidate vote totals are available. Ex. M, Solanky Dep. Tr. 217:14-20. But Dr. Solanky provides no explanation for why this allocation process is better than the allocation Dr. Handley used for creating the database necessary for the EI analysis. And Dr. Solanky acknowledged that he did not perform an analysis using his proposed allocation method in his rebuttal report even though he had Dr. Handley's data for over a year. Ex. M, Solanky Dep. Tr. 220:25–221:4.

Critically, Dr. Solanky also fails to explain how this alleged "bias" impacted or influenced Dr. Handley's results. Ex. M, Solanky Dep. Tr. 222:20–223:2 (Q: "[Y]ou didn't conduct any alternative analysis with respect to the early and absentee data in your report, or in your Rebuttal Report; is that right?" A: "That is right. So in my report, I followed what she had, but in order to understand that this has created bias, I have constantly mentioned that these numbers are biased."). Yet Dr. Solanky claimed—without supporting facts or analysis—that the alleged "bias" created by Dr. Handley's allocation methodology tainted Dr. Handley's analysis of all 16 elections she studied. Ex. R, Solanky Rebuttal at 4–7; Ex. M, Solanky Dep. Tr. 242:23–243:9, 249:16–21. Without revealing how he reached his conclusion about Dr. Handley's analysis, Dr. Solanky has given this Court no basis to conclude that he applied a reliable methodology at "each and every step" in forming his opinion on Dr. Handley's allocation method. *See Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007) ("The expert's testimony must be reliable at each and every step or else it is inadmissible."). This Court should therefore exclude Dr. Solanky's rebuttal of Dr. Handley's report.

**B.    Dr. Solanky's analyses of voting patterns have no bearing on a *Gingles* II or III inquiry and are therefore not relevant.**

*Daubert* instructs district courts to ensure expert testimony is "both reliable and relevant."

*Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at

597). Even if the expert's methodology for developing an opinion is reliable, that methodology

must also have been correctly applied to the facts in order for the testimony to be relevant. *See*

*Daubert*, 509 U.S. at 593. Dr. Solanky admittedly offers no conclusions regarding racially

polarized voting as required by *Gingles* II and III, and his analysis as designed fails to support any

conclusions related to racially polarized voting as required by *Gingles* II and III, rendering his

opinions irrelevant and inadmissible.

**1.    Dr. Solanky admittedly offers no conclusions related to racially polarized voting.**

*Gingles* II and III call for a results-based analysis of racially polarized voting in the

challenged districts. *See Gingles*, 478 U.S. at 62 ("For purposes of § 2, the legal concept of racially

polarized voting incorporates neither causation nor intent. It means simply that the race of voters

correlates with the selection of a certain candidate or candidates; that is, it refers to the situation

where different races (or minority language groups) vote in blocs for different candidates."). To

carry their burden under the second and third *Gingles* preconditions, Plaintiffs must establish

through a racial bloc voting analysis that (1) "the minority group . . . is politically cohesive" and

(2) "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred

candidate." *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51).

Dr. Solanky disclaims any opinion on the presence or absence of racially polarized voting.

Instead, Dr. Solanky made clear that his analyses were intended to observe "trends" in party

affiliation, voter turnout, and intra-parish differences in partisan preference. He testified that his

opinions make ***no assessment*** of racially polarized voting in the challenged districts. Ex. M,

Solanky Dep. Tr. 41:19–24, 52:11–22, 57:16–22; 62:2–10; 201:4–15. Indeed, Dr. Solanky stated that he is "not making any opinion on what is cohesive, what is not." *Id.* at 41:22–24. And by his own admission, Dr. Solanky "would rather not characterize" his own opinion as one on racially polarized voting. *Id.* at 41:5–24; *see also id.* at 201:4–15 (admitting that does not state in his report that voting in Louisiana is not racially polarized). Dr. Solanky's testimony, therefore, has no bearing on whether Plaintiffs can sustain their *Gingles* II and III burden. *See Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1226 n.7 (11th Cir. 2000) (explaining that evidence in a vote dilution case is relevant if it would "allow the trier of fact reasonably to infer anything about whether or not the voting strength of the minority group has been impermissibly diluted").15F15F15F[16]

Dr. Solanky did not design his analyses to detect the presence or absence of racially polarized voting in the challenged districts. Dr. Solanky explained, instead, that he intended to document (1) trends in statewide party registration and voter turnout by party and race; (2) that "different parishes vote differently"; and (3) that "different precincts within parishes vote differently." Ex. M, Solanky Dep. Tr. 97:7–100:25, 117:1–4. But even as to these observations, Dr. Solanky stressed that he neither considered the possibility of statewide racially polarized voting nor intended to analyze racial bloc voting in parishes within the challenged districts. *Id.* at 41:19–24, 67:5–14,70:3–24, 114:22–115:8. The content of Dr. Solanky's analyses, therefore, is not relevant to rebutting Plaintiffs' showing of racially polarized voting in the challenged districts.

---

[16] This Court has already acknowledged the "limited utility" of similar expert testimony offered by Dr. Solanky related to *Gingles* II and III. As here, Dr. Solanky's prior opinion before this Court "d[id] not offer any opinion about majority bloc voting in any [legislative] district under the enacted or illustrative plans," and his conclusions were reached with a "narrow data set" about "outlier" parishes not "probative of voting patterns districtwide." *Robinson*, 605 F. Supp. 3d at 841. This Court can and should exclude Dr. Solanky's instant report for the same reasons.

**2. Dr. Solanky's proffered analysis does not otherwise support conclusions related to racially polarized voting.**

Dr. Solanky conducts three analyses to identify "trends" in voting in Louisiana. *First*, Dr. Solanky conducts a statewide analysis to get an "overall picture" of party affiliation and voter turnout. *Second*, Dr. Solanky conducts a parish-wide analysis to assess the voting trends within five self-selected parishes in Louisiana, some of which have no bearing on Plaintiffs' claims. And *third*, Dr. Solanky conducts a precinct-level analysis to assess how changes in population density impact voting trends in four parishes in Louisiana. For the reasons laid out below, Dr. Solanky's analyses are fundamentally flawed and bear no relevance to whether voting in Louisiana is racially polarized. These opinions should be excluded.

**a. Dr. Solanky's analysis of party affiliation and voter turnout have no bearing on racially polarized voting in the challenged districts.**

Dr. Solanky testified that he conducted a statewide analysis to get an "overall picture" of party affiliation and turnout in Louisiana. Ex. M, Solanky Dep. Tr. 50:15–23. But Dr. Solanky clarified that he performed no analysis to determine relationship between his "overall picture" of statewide trends and parish- or precinct-level racially polarized voting in the challenged districts. *Id.* at 64:17–65:9. In *Gingles*, the Court found that the District Court had applied the correct standard because it "relied on data that were specific to each individual district in concluding that each district experienced legally significant racially polarized voting." *Gingles*, 478 U.S. at 59 n.28; *Miss. State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400, 410 (5th Cir. 1991) ("In *Gingles*, statistical proof of racially polarized voting in other districts was not relevant to the issue of vote dilution in the specific challenged district."). Dr. Solanky's "overall picture," therefore, is irrelevant to a racially polarized voting analysis without some analysis linking his statewide observations to voting patterns in the challenged districts, which Dr. Solanky does not provide. Ex. M, Solanky Dep. Tr. 64:17–65:25.

Nor can the data Dr. Solanky gathered on statewide trends in party affiliation and turnout be repurposed into a racially polarized voting analysis. For instance, Table 4 of Section II Dr. Solanky's report, sums the total number of white voters registered as Democrats and white voters registered as Republicans who turned out to vote, as well as the total number of Black voters registered as Democrats and Black voters registered as Republicans who turned out to vote. Ex. N, Solanky Report at 10. To calculate the percentages cited, Dr. Solanky did not compare, for example, the number of Black voters registered as Democrats who voted against the total number of Black voters who voted. Instead, Dr. Solanky used as his denominator the total number of **all** voters who voted on that election day. Ex. M, Solanky Dep. Tr. 79:14–80:23. Table 4, columns 7–10 thus present a picture of the statewide electorate by race and party on a given election day. But Dr. Solanky's observations in Table 4 have no bearing on whether the statewide electorate exhibited racially polarized voting.16F16F16F[17]

The remainder of Dr. Solanky's statewide analyses party affiliation and turnout are similarly unhelpful to an analysis of racially polarized voting. Each measure party **affiliation**, not whether race has an impact on election **results**, even at a statewide level. *See Gingles*, 478 U.S. at 62 (racially polarized voting "means simply that the race of voters correlates with the **selection of a certain candidate or candidates**; that is, it refers to the situation where different races (or minority language groups) vote in blocs for different candidates" (emphasis added)). This Court should thus exclude Dr. Solanky's testimony on his statewide analyses of party affiliation and

---

[17] As explained *infra*, when Dr. Solanky compared the number of Black voters who voted for Democratic candidates against the total number of Black voters who voted in certain parishes, he discovered that Black voters tended to vote cohesively. *See* Ex. N, Solanky Report at 46–47. Dr. Solanky also observed that white voters tended to vote as a bloc for Republican candidates within those parishes. *See id.* at 48–51; *see also* Ex. M, Solanky Dep. Tr. 72:11–73:8 (clarifying that Appendix 4 measures the number of white voters voting for Republican candidates).

turnout because it is not relevant to assessing whether Plaintiffs carried their burden to demonstrate racially polarized voting under *Gingles*.

> **b.   Dr. Solanky's parish-level analysis only focused on party preference and depends on consideration of an irrelevant parish.**

Dr. Solanky testified that he examined voting patterns in certain parishes to examine inter-parish differences in ***party preference***, not whether Black voters and white voters consistently preferred different ***candidates***. Ex. M, Solanky Dep. Tr. 97:7–16, 103:17–24, 106:9–107:13, 107:22–108:2, 110:17–111:6. While examining whether Black voters preferred Black candidates "sounded meaningless to" Dr. Solanky because that question was not probative of party preference, *id.* at 101:20–102:1, 109:11–21, that precise assessment is key when examining voting data under *Gingles* II and III. *See, e.g.*, *Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1208 n.7 (5th Cir. 1989) ("[E]vidence most probative of racially polarized voting must be drawn from elections including both black and white candidates."). For instance, the 2022 Senate election featured two Democratic candidates who received more than 3% of the vote: Gary Chambers, Jr., who is Black, and Luke Mixon, who is white. Instead of analyzing whether Black voters preferred Chambers, Jr. and white voters preferred Mixon, Dr. Solanky pooled all the votes cast for a Democrat in the 2022 Senate election into one Democratic "candidate." Ex. M, Solanky Dep. Tr., 97:7–15. Dr. Solanky found it "meaningless" to assess whether Black voters preferred a Black Democratic candidate and white voters preferred a white Democratic candidate because Dr. Solanky was concerned with examining racial trends in ***party*** preference, not ***candidate*** preference. *Id.* at 100:15–102:1. In other words, Dr. Solanky's parish-level analysis avoided assessing racially

polarized voting at the parish level and as such, is not relevant to the required *Gingles* analysis.17F17F17F17F[18] This testimony should be excluded.

Furthermore, this analysis included parishes which are not relevant to the challenged districts in this matter, including Orleans Parish. There is no overlap between Orleans Parish and the challenged districts in this case. Analysis of racially polarized voting required by *Gingles* must be specific to each individual district at issue in the Section 2 claim. *Gingles*, 478 U.S. at 59 n.28. Dr. Solanky evaluated voting patterns in Orleans Parish as part of supporting his observation that "different parishes vote differently." Ex. M, Solanky Dep. Tr. 114:22–115:8, 117:1–7. Orleans, in Dr. Solanky's view, displayed greater variance in the number of white voters who voted for Democrat and white voters who voted for a Republican compared to the other parishes Dr. Solanky studied. *Id.* Dr. Solanky studied Orleans because, as he explained, he did not conduct his analysis to study parishes in the challenged districts; he simply wanted to show how a sampling of parishes across Louisiana proved his point about inter-parish variance. Ex. M, Solanky Dep. Tr. 114:22–115:8, 117:1–7. But the conclusion he draws about Orleans Parish compared to other parishes is irrelevant to a racially polarized voting assessment in the challenged districts, and Dr. Solanky's testimony on this opinion should be excluded *Cf. Gingles*, 478 U.S. at 64 (rejecting the state's attempt to inject "irrelevant variables" into the racially polarized voting analysis because doing so

---

[18] In any event, Dr. Solanky's parish-level analyses **confirm** the existence of racially polarized voting in parishes containing challenged districts. In Appendix 3 to his report, Dr. Solanky's calculated the percentage of Black voters who voted for a Democratic candidate in five self-selected parishes, including some within the challenged districts. In the 2015 Lieutenant Governor's race, for example, Dr. Solanky observed that 96.3% of Black voters in Natchitoches Parish voted for the Democratic candidate. Ex. N, Solanky Report at 46-47; Ex. M, Solanky Dep. Tr. 132:3–5. Dr. Solanky confirmed that White voters in Natchitoches were similarly polarized in the 2015 Lieutenant Governor's election: according to Dr. Solanky, 78.8% of White voters voted for the Republican candidate and 21.2% of White voters voted for the Democratic candidate. Ex. N, Solanky Report at 48–51; Ex. M, Solanky Dep. Tr. 132:20–22. Dr. Solanky agreed his analysis similarly demonstrated racially polarized voting in Natchitoches for *every* election Dr. Solanky studied. *See* Ex. N, Solanky Report at 46–51; Ex. M, Solanky Dep. Tr. 133:5–137:8. Natchitoches is not a one-off; Dr. Solanky's data reveals a consistent pattern of racial bloc voting in parishes containing challenged districts in each election Dr. Solanky studied. *See* Ex. N, Solanky Report at 46–51.

"distorts the equation and yields results that are indisputably incorrect under § 2 and the Senate Report").

### c.  Dr. Solanky's density analysis provides no insight on racially polarized voting in the challenged districts.

Dr. Solanky also conducted a density analysis assessing voting patterns in a small collection of precincts in Caddo Parish. *See* Ex. N, Solanky Report at 18—19. From this analysis, Dr. Solanky observed that, as population density of the precinct increases (*i.e.*, in looking at the City of Shreveport), more white voters tend to vote for Democratic candidates compared to white voters in less dense areas. Dr. Solanky also conducted similar EI analyses of the voting patterns of areas with more population density in East Baton Rouge Parish; Iberville Parish, and Point Coupee. *See* Ex. N, Solanky Report at 20–28. But again, Dr. Solanky testified that he did not draw any conclusions about racially polarized voting from this analysis; he simply showed that "different parishes vote differently" and "different precincts within parishes vote differently." Ex. M, Solanky Dep. Tr. 157:6–17.

Moreover, Dr. Solanky's observations do not and cannot tend to prove or disprove the existence of racially polarized voting in the challenged districts. *Gingles* assumed there will always be some level of "crossover" voting, *Gingles*, 478 U.S. at 56, and accordingly defines "legally significant white bloc voting" as "a white bloc vote that normally will ***defeat*** the combined strength of minority support ***plus*** white 'crossover' votes." *Id.* (emphasis added). Dr. Solanky's density analysis makes no effort to determine whether the increase in Democratic votes from white voters is sufficient to disprove the existence of white bloc voting in those precincts and areas he examined. *See* Ex. N, Solanky Report at 18–28.

Nor could a fact finder extrapolate Dr. Solanky's density analysis into a conclusion about the impact of crossover voting on election results *in the challenged districts* because Dr. Solanky

does not provide the data needed to do so. Dr. Solanky did not analyze what (if any) portions or proportions of those areas with more population density he examined fell within the challenged districts. Ex. M, Solanky Dep. Tr. 168:13–19; 182:24–183:4. Without linking the areas considered with the challenged districts, neither Dr. Solanky nor this Court can determine the effect that an alleged increase in white voting for Democratic candidates would have on the majority bloc that indisputably exists in the challenged districts.

Accordingly, Dr. Solanky's analyses and opinions have no bearing on Plaintiffs' burden of proof under the second and third *Gingles* preconditions. And in the instances where Dr. Solanky analyzes racially polarized voting, he confirms, not rebuts, Plaintiffs' claim that Black voters and white voters in the challenged districts vote in blocs. This Court should therefore exclude Dr. Solanky's testimony as irrelevant.

## **CONCLUSION**

This Court should exclude the proposed testimony of Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky.

DATED: October 6, 2023

Respectfully submitted,

*/s/ Sarah Brannon*

Leah Aden*
Stuart Naifeh*
Victoria Wenger*
NAACP Legal Defense & Educational Fund
40 Rector Street, 5th Floor
New York, NY 10006
laden@naacpldf.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

I. Sara Rohani*
NAACP Legal Defense & Educational Fund
700 14th Street, Suite 600

Sarah Brannon*
Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005
sbrannon@aclu.org
mkeenan@aclu.org

Sophia Lin Lakin*
Dayton Campbell-Harris*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

Washington, DC 20005
srohani@naacpldf.org

John Adcock (La. Bar No. 30372)
Adcock Law LLC
Louisiana Bar No. 30372
3110 Canal Street
New Orleans, LA 701119
jnadcock@gmail.com

Michael de Leeuw*
Amanda Giglio*
Cozen O'Connor
3 WTC, 175 Greenwich St.,
55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn**
Cozen O'Connor
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

slakin@aclu.org
dcampbell-harris@aclu.org
lroman@aclu.org

T. Alora Thomas-Lundborg*
Daniel J. Hessel*
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

Nora Ahmed (N.Y. Bar. No. 5092374)
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70112
NAhmed@laaclu.org

Ron Wilson (La. Bar No. 13575)
701 Poydras Street, Suite 4100
New Orleans, LA 70139
cabral2@aol.com

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice
**Pro Hac Vice Motion Forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that on October 6, 2023, a copy of the foregoing memorandum was filed electronically with the Clerk of Court via the CM/ECF system.  Notice of this filing will be sent to all counsel of record by operation of the court's electronic filing system.

*/s/ Sarah Brannon*
Sarah Brannon*
