## Page 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE,
JARRETT LOFTON, REV.
CLEE EARNEST LOWE, DR,
ALICE WASHINGTON,
STEVEN HARRIS, ALEXIS
CALHOUN, BLACK VOTERS
MATTER CAPACITY
BUILDING INSTITUTE,
AND THE LOUISIANA
STATE CONFERENCE OF
THE NAACP
         CIVIL ACTION
         NO. 3:22-cv-00178
VERSUS
         SSD-SDJ

R. KYLE ARDOIN, IN HIS
OFFICIAL CAPACITY AS
SECRETARY OF STATE OF
LOUISIANA


      Deposition of DR. DOUGLAS
JOHNSON, taken on September 27, 2023, via Zoom
Videoconference, commencing 10:12 A.M. Eastern
Standard Time.

## Page 2

1  APPEARANCES (ALL PARTICIPATING BY ZOOM):
2  REPRESENTING THE PLAINTIFFS:
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
3  BY: MEGAN C. KEENAN, ESQ.
   AND SARAH BRANNON, ESQ.
4  915  15th Street NW
   Washington, DC 20005
5  Phone: (202)457-0800
   Email: mkeenan@aclu.org
6
7  COZEN O'CONNOR
   BY:  DAKOTA KNEHANS, ESQ.
8  The Promenade
   1230 Peachtree Street NE
9  Suite 400
   Atlanta, Georgia
10 Phone: (404)572-2081
   Email: knehans@aclu.com
11
12 REPRESENTING THE LEGISLATIVE INTERVENORS
   BAKER HOSTETLER
13 BY:  PATRICK T. LEWIS, ESQ.
   127 Public Square
14 Suite 2000
   Cleveland, Ohio  44114
15 Phone: (216)861-7096
   Email: plewis@bakerlaw.com
16
17 SHOWS, CALI & WALSH
   JOHN C. CONINE, JR. ESQ.
18 628 St. Louis Street
   Baton Rouge, Louisiana  70821
19 Phone: (225) 346-1461
   Email: coninejc@gmail.com
20
21 NELSON, MULLINS
   BY: JOHN BRANCH, ESQ.
22 301 Hilsborough Street
   Suite 1400
23 Raleigh, North Carolina  27603
24
25

## Page 3

1  APPEARANCES (CONTINUED):
2  OFFICE OF ATTORNEY GENERAL
   LOUISIANA DEPARTMENT OF JUSTICE
3  BY: CAREY T. JONES,
   1885 N. Third Street
4  Baton Rough, Louisiana  70804
   Phone: (225)975-2410
5  Email: JonesCar@ag.louisiana.gov
6
   ALSO PRESENT:
7
   Garrett Muscatel
8
9  REPORTED BY:
10 Cecilia M. Henderson
   Certified Court Reporter
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1        EXAMINATION INDEX
2              Page
3
4  MS. KEENAN ................................6
5
6    E X H I B I T   I N D E X
7              Page
8  Exhibit 1 .....................9
9  Exhibit 2 ...................38
   Exhibit 3 ...................38
   Exhibit 4 ...................38
10 Exhibit 5 ...................42
   Exhibit 6 ...................43
11 Exhibit 7 ...................64
   Exhibit 8 ...................65
12 Exhibit 9 ...................66
   Exhibit 10 .................94
13 Exhibit 11 ................126
   Exhibit 12 ................126
14 Exhibit 13 ................126
   Exhibit 14 ................126
15 Exhibit 15 ................159
   Exhibit 16 ................184
16 Exhibit 17 ................248
   Exhibit 18 ................248
17 Exhibit 19 ................248
   Exhibit 20 ................248
18 Exhibit 21 ................252
19
20
21
22
23
24
25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 5

```
 1        S T I P U L A T I O N
 2
 3        It is stipulated and agreed by and
 4   between counsel that the deposition of DOUGLAS
 5   M. JOHNSON, PH.D is hereby being taken under
 6   Federal Rules of Civil Procedure for all
 7   purposes in accordance with law;
 8        That the formalities of filing and
 9   certification are hereby waived; that the
10   formalities of reading and signing are hereby
11   specifically not waived;
12        That all objections, except those as
13   to the form of the question and/or
14   responsiveness of the answer, are hereby
15   reserved until such time as this deposition or
16   any part thereof may be used in evidence.
17        * * * * * * * *
18        CECILIA M. HENDERSON, Certified Court
19   Reporter, in and for the State of Louisiana,
20   officiated in administering the oath to the
21   witness.
22
23
24
25
```

Page 6

```
 1        DOUGLAS M. JOHNSON, PH.D, 1520
 2   N. PACIFIC AVENUE, GLENDALE, CALIFORNIA
 3   91202, AFTER FIRST BEING DULY SWORN IN THE
 4   ABOVE-ENTITLED MATTER, DID TESTIFY AS FOLLOWS:
 5        EXAMINATION
 6   BY MS. KEENAN:
 7        Q   Good morning.  We're now on the
 8   record.  It's September 27th, 2023.  Thank you
 9   for being here today.  Could you please state
10   your name one more time for the record?
11        A   Douglas Mark Johnson.
12        Q   Great.  How many times have you been
13   deposed before, Mr. Johnson -- or Dr. Johnson?
14   I'm sorry.
15        A   I don't know, eight or ten, something
16   like that.
17        Q   I'm sure you're generally familiar,
18   but I'm going to walk us through a few ground
19   rules just as a reminder of today's
20   deposition.  Everything, as you know, is being
21   transcribed.  We have a court reporter here,
22   and so we all need to speak clearly and avoid
23   speaking over each other.  Is that okay with
24   you?
25        A   Yes.
```

Page 7

```
 1        Q   We have a court reporter
 2   participating today and so we need to make
 3   sure your responses are verbal, because the
 4   court reporter can't take down gestures, nods
 5   or grunts.  There's also going to be lawyers
 6   here attending for other parties, including
 7   the defense counsel who retained you.  They
 8   have the right to object to my questions as we
 9   go, so if defense counsel or others on the
10   Zoom call start speaking when I complete a
11   question, please give them a moment to get any
12   of their objections on the record.  Does that
13   make sense?
14        A   Of course.
15        Q   Once the objections are stated, you
16   should typically answer the question I pose,
17   unless either I withdraw it or your counsel
18   specifically instructs you not to answer the
19   question.  Does that work for you?
20        A   Yes.
21        Q   If at any point you don't understand
22   a question that I ask, I'd ask that you please
23   tell me, and I'll try to explain it or
24   otherwise rephrase the question.  Is that
25   okay?
```

Page 8

```
 1        A   Yes.
 2        Q   All right.  And if you need a break
 3   at any time, please just tell me.  We're going
 4   to do our best to accommodate that, as long as
 5   there's not a question outstanding.
 6        Can I ask -- based on this being a
 7   Zoom deposition -- is anyone else in the room
 8   with you?
 9        A   No.
10        Q   Okay.  And, obviously, you are on a
11   computer that linked into this Zoom.  Can you
12   tell me how many screens you have up in front
13   of you?
14        A   Just the Zoom screen.
15        Q   Nothing opened on your computer,
16   other than the computer Zoom screen; is that
17   right?
18        A   I have some of the marked deposition
19   exhibits open.
20        Q   Okay.  I'm going to ask that you
21   leave your email and chat or other messaging
22   programs aside during the deposition.  Is that
23   okay with you?
24        A   Sure, of course.
25        Q   And same thing with a smart phone or
```

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 9

1    any phone that you might be using just that
2    you keep it on the side while we're on the
3    record.  Can you agree to that for the day?
4        A    Yes.
5        Q    Can you think of any reason why you
6    might not be able to understand or respond
7    accurately and truthfully to my questions
8    today?
9        A    No.
10       Q    The last note, just in light of this
11   being a virtual deposition, if for any reason
12   our internet connection breaks up or if it
13   becomes hard to hear you or if there's any
14   freezing, we're just going to go off the
15   record until we figure out what the problem is
16   and then we'll get everyone here back in the
17   session.  Does that sound okay?
18       A    Yes.
19       Q    I'm going to start by sharing an
20   exhibit, which has been premarked as be
21   Exhibit 1.
22            Hold on one second while I get that
23   pulled up.  Are you able to see what I'm
24   sharing on my screen?
25       A    Yes.

Page 10

1        Q    You agree this is the deposition
2    notice that you received in this case?
3        A    Yes.
4        Q    Did you do anything when you were
5    preparing for today's deposition?
6        A    Just reviewed the various reports
7    that Mr. Cooper had written.
8        Q    Did you speak with defense counsel in
9    advance of the deposition?
10       A    Of course.
11       Q    How many times?
12       A    Two, maybe three.
13       Q    Do you know how long in total you met
14   with defense counsel?
15       A    No.  Maybe an hour, maybe two.
16       Q    Okay.  And who was present for that
17   meeting, or those meetings, rather?
18       A    Mr. Lewis certainly was.  I don't
19   recall if anyone else was.
20       Q    Okay.  How often did you stay in
21   touch with defendant's counsel while you were
22   drafting your report?
23       A    We spoke a couple of times.
24       Q    Okay.  Was that also Mr. Lewis?
25       A    Yes.

Page 11

1        Q    Anyone else on the counsel team you
2    remember while you were drafting your report?
3        A    Not that I recall.  It's possible.  I
4    don't remember those specific calls.
5        Q    Did you review any particular
6    documents in advance of this deposition?  You
7    mentioned a couple of reports.  It would help
8    to spell them out, just so I know which ones
9    you've looked at.
10       A    Mr. Cooper's reports.
11       Q    Did you review both of your own
12   reports you submitted, as well?
13       A    Yes.
14       Q    Which of Mr. Cooper's reports did you
15   review in advance of the deposition?
16       A    He had his -- all of them that I had.
17   So his original report, his -- I don't know
18   the titles of all of them.  His amended report
19   and his rebuttal report.
20       Q    Okay.  So in particular, have you
21   reviewed the corrected initial 2023 report,
22   the amended one that was attached to the
23   rebuttal?
24       A    Yes.
25       Q    And you reviewed the rebuttal report

Page 12

1    itself?
2        A    Yes.
3        Q    Any other reports of plaintiffs' or
4    defendants' experts that you reviewed in
5    advance of this deposition?
6        A    Not that come to mind.  This case has
7    been going on a long time, so it's possibly I
8    did some time ago.  But to prepare for this, I
9    did not.
10       Q    Okay.  And did you review any of the
11   deposition testimony that has already taken
12   place in this case in preparing for your own
13   deposition?
14       A    No.
15       Q    Other than Mr. Lewis and the counsel
16   we've already discussed, have you spoken with
17   anyone else about today's deposition?
18       A    I mean, people that make logistical
19   arrangements, travel and how to get the Zoom
20   address and those kind of things.  I don't
21   remember if there were other people on the
22   calls with Mr. Lewis.  There may have been.
23   There may not have been.  I just don't
24   remember.
25       Q    Did you speak with anyone other than

3 (Pages 9 to 12)

Page 13

1  Mr. Lewis or counsel team about the substance
2  of what we might discuss in the deposition
3  today?
4      A   Only if they were on the call with
5  Mr. Lewis.  I don't remember.
6      Q   Since writing your report, have you
7  done any independent research or other work
8  involving this case?
9      MR. LEWIS:
10         Objection; vague.  You may
11     answer.
12     THE WITNESS:
13         No, just what's in my reports.
14  BY MS. KEENAN:
15     Q   And how many total hours do you think
16  you've spent working on this case?
17     A   I would have to look that up in my
18  time sheets.  I don't know off the top of my
19  head.
20     Q   Have you submitted time sheets in
21  this case?
22     A   Not yet, but I have them tallied.
23     Q   We may reserve the right to request
24  the time sheets, but we can let Mr. Lewis know
25  about that later.

Page 14

1         So you don't have any ballpark amount
2  of time that you've spent preparing the report
3  in this case?
4      A   I would rather just send you the
5  actual numbers than take a wild guess.
6      Q   Have you received any compensation
7  yet related to this case?
8      A   No.
9      Q   Okay.  How did you first learn about
10  this case?
11     A   It's so long ago, I don't recall.
12  Somebody called me and asked me to help, I'm
13  sure.
14     Q   And do you remember when you were
15  first contacted by the defendants' legal team
16  about being a potential expert?
17     A   No --
18     Q   I'm sorry.  Go ahead, finish your
19  answer.
20     A   No, it was a long time ago.
21     Q   Do you recall if it was back in 2022,
22  at least the year, you were first contacted by
23  them?
24     A   Probably.
25     Q   Is it possible that it was earlier

Page 15

1  than 2022, back in 2021?
2      A   It's possible.  I have no idea.
3      Q   Had you ever worked with any members
4  of the defendants' legal team before your
5  involvement in this case?
6      A   Yes.
7      Q   About how many times, to your
8  knowledge?
9      A   I don't know.  Three, four, probably.
10  Somewhere around there.
11     Q   Okay.  And do you know if that's how
12  the lawyers for the legislative intervenor
13  defendants came to contact you based on that
14  prior relationship?
15     A   I have no idea.  I try not to guess
16  what lawyers are thinking.
17     Q   Okay.  How long have you been doing
18  work as an expert witness?
19     A   Oh, back since the 2001 redistricting
20  cycle.  I don't know exactly when that first
21  case would have been.  Probably the Arizona
22  2001 case, which -- filed in 2001, but really
23  went to court in 2002.  I started as an expert
24  witness, although I didn't end up as an expert
25  witness.  They changed my status to a funky

Page 16

1  Arizona option instead.  But somewhere around
2  there.
3      Q   In your time doing work as an expert
4  witness, have you ever been an expert for a
5  plaintiff in a redistricting case?
6      A   Yes.
7      Q   Were those plaintiffs political
8  parties or government entities?
9      A   It was the Harris versus The Arizona
10  Independent Redistricting Commission.  So I
11  guess, technically, it was an individual.
12     Q   What percentage of the time do you
13  think you worked for plaintiffs in
14  redistricting cases?
15     A   Out of what?
16     Q   Out of the total number of times
17  you've worked in redistricting cases as an
18  expert?
19     A   Okay.  Litigations are a very tiny
20  part of my work.  Most of them, certainly.
21     Q   And would you say most of your work
22  is for government entities or political
23  parties?
24     A   We usually don't work for political
25  parties.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 17

1       Q   Okay.  So just for government
2   entities, then?
3       A   The overwhelming majority of it, yes.
4       Q   Just focusing on the litigation work
5   you do for a minute.  Do all of your
6   litigation cases involve redistricting?
7       A   No.
8       Q   About how many of the litigation
9   cases you've worked on have involved
10  redistricting?
11      A   Most of them.
12      Q   And is that -- I'm just trying to get
13  a sense of the numbers here.  Is that most of
14  the eight to twelve cases you mentioned
15  earlier or all of the eight to twelve cases
16  that you mentioned earlier are redistricting
17  cases.
18      A   Most of the eight to twelve cases I
19  worked on are redistricting-related there was
20  a Redondo Beach case where it was not
21  redistricting-related, off the top of my head.
22      Q   So somewhere in the ballpark of
23  ten redistricting cases is your guess?
24      A   Somewhere in that ballpark, yeah.
25      Q   Do you have --

Page 18

1       A   Just to clarify, you meant as an
2   expert witness, right?
3       Q   Yes, as an expert witness in those
4   cases, yes.
5       A   Yes.
6       Q   Does that number expand when we're
7   not just talking about witnesses expert work
8   in those cases?
9       A   Sorry.  Can you clarify that
10  question?
11      Q   Sure.  You specified, just as an
12  expert witness.  I'm wondering why you made
13  that specification.  Does the number get
14  bigger or smaller, based on whether I wasn't
15  just asking about your time as an expert
16  witness in those cases?
17      A   Oh, I've also done consulting work
18  with legal teams where I wasn't an expert
19  witness.
20      Q   I won't ask you too many details
21  about the consulting work that you've done.
22  When I'm asking you questions, I want you to
23  assume -- unless I state otherwise -- that I'm
24  asking about your litigation experience.  Is
25  that okay with you?

Page 19

1       A   Yes.
2       Q   So in your work as an expert in
3   redistricting litigation, do you have a
4   standard methodology that you would use?
5       A   It depends on what question is being
6   asked.
7       Q   Does that mean that your methodology
8   across the various redistricting cases that
9   you've worked on is different, depending on
10  the question that's asked of you?
11      A   Some of it is probably similar and
12  some of it is probably different.  It depends
13  on what I'm looking at.
14      Q   Is there any methodology that you
15  have used consistently across all of your past
16  cases as an expert in redistricting
17  litigation?
18      A   It depends on how broad a scope you
19  want to throw on under the rubric of
20  methodology.
21      Q   What's the narrowest answer you can
22  provide to that question where it would be
23  consistent across all of your cases?  If there
24  isn't one, that's okay.  I just want to make
25  sure I understand the answer you're providing.

Page 20

1       A   I mean -- I would say probably all of
2   them involved using Maptitude for
3   redistricting and a wide array of demographic
4   data.
5       Q   And is Maptitude your platform that
6   you use consistently in redistricting
7   litigation work?
8       A   Almost all the time, yes.
9       Q   Did you use Maptitude for your work
10  in this case?
11      A   Yes.
12      Q   Now, you told us you've been deposed
13  eight to ten times.  How many times have you
14  testified at trial as an expert in
15  redistricting cases?
16      A   Slightly fewer than eight to ten.
17      Q   Okay.  Were any of your -- were any
18  parts of your prior testimony or reports ever
19  limited by a court, to your knowledge?
20      A   Yes.
21      Q   And when was that, to the best of
22  your recollection?
23      A   So, in Arizona, I started and went
24  through disclosure as an expert and then got
25  reclassified through various motions and

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 21

```
 1    debates as -- I think the phrase was a 306(b),
 2    which was a person most knowledgeable about
 3    the process, rather than an expert.  And then
 4    in North Carolina, in the Covington case,
 5    there was a programming error that was found
 6    in one section of my report, so that section
 7    was stricken, but the rest of the report
 8    stayed in.
 9        Q    And are those the only two cases
10    where you recall your testimony or reports
11    being limited by a court?
12        A    Yes.
13        Q    Just to clarify for the record, is it
14    possible that in the Arizona case, you were
15    used as a 30(b)6 witness on behalf of the
16    Commission?
17        A    Yeah.  The exact number, I certainly
18    could have wrong.  But it's primarily the
19    person most knowledgeable about the process.
20        Q    That's okay.  I just want to make
21    sure the record is straight.  I think we're on
22    the same page.  We may talk a little bit more
23    about the Covington case in a minute.  But has
24    your testimony ever been excluded for any
25    other reason, to your recollection?
```

Page 22

```
 1        A    No.
 2        Q    What about, has your testimony ever
 3    been criticized in a judicial decision, if not
 4    outright excluded?  Do you have any
 5    recollection of that?
 6        A    Oh, sure.
 7        Q    Do you remember any particular cases
 8    in which that may have happened?
 9        A    Oh, Palmdale is the obvious one.
10        Q    Is it the only one?
11        A    It's the only one that comes to mind.
12        Q    Do you recall offering expert
13    opinions in a case called, Common Cause versus
14    Lewis?
15        A    Is that the other North Carolina
16    case?
17        Q    It is.
18        A    Is it the one in the federal court?
19        Q    No, this one, I believe, is in the
20    state court in that case.
21        A    It's possible.  The name doesn't
22    trigger the specifics for me.
23        Q    That's okay.  I'm going to share an
24    exhibit on my screen.  This one has been
25    premarked as Exhibit 10.  This was not in the
```

Page 23

```
 1    set list that I knew I was going to talk
 2    about.  So there's going to be a couple that
 3    we'll handle just electronically today.  But
 4    I'll share on my screen -- that I'm happy to
 5    send you a copy, it that will be helpful.
 6    Give me one second to share the screen.  Can
 7    you see my screen now?
 8        A    Yes.
 9        Q    Can you see this is a case called,
10    "Common Cause versus David R. Lewis," based on
11    the case caption here?
12        A    Yes.
13        Q    And this is in the State of North
14    Carolina, like you said, right?
15        A    Yes.
16        Q    You can see it's a Superior Court
17    Division case, so it's a state court, rather
18    than federal court.
19        A    Yes.
20        Q    I'm going to flip to page 112 of this
21    decision.  You see in Paragraph 249 they talk
22    about "Legislative Defendants' expert
23    Dr. Johnson."  Do you believe that to be you?
24        A    I'll take your word for it.
25        Q    In this case, do you recall offering
```

Page 24

```
 1    opinions about -- among other things -- the
 2    intent of another map drawer?
 3        A    I mean, I don't recall the specifics
 4    of it.  I can see what's written there.
 5        Q    But in 249, you can see that you
 6    stated that "A senate district was drawn to
 7    capture as much of the Charlotte suburbs as
 8    possible into a single district and that
 9    another senate district reflected an effort to
10    unite the southern suburbs of Charlotte,"
11    right?
12        A    Yes.
13        Q    Paragraph 250 of this opinion says:
14    "The Court rejects Dr. Johnson's explanations
15    as it appears to be purely speculative and in
16    any event his speculation does not withstand
17    minimal scrutiny."  Did I read that correctly?
18        A    Yes.
19        Q    Would you agree that -- looking ahead
20    to page 270 of this same opinion, looking at
21    Paragraph 647, again, the Court writes:  "The
22    Court finds Dr. Johnson's analysis
23    unpersuasive and gives his opinions little
24    weight."  Did I read that correctly?
25        A    Yes.
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 25

1    Q    It then goes on to say that:
2    "Dr. Johnson has testified as a live expert
3    witness in four cases previously and the
4    courts in all four cases have rejected his
5    analysis."  Did I read that directly?
6        A    Yes.
7        Q    I see four cases cited here.  One is
8    Covington and one is Palmdale, which you
9    mentioned earlier.  Is that the same two cases
10   you were referring to?
11       A    Yes.
12       Q    But I also see a case called, "Luna
13   versus County of Kern" and "Garret versus City
14   of Highland."  Do you see those cases cited
15   here?
16       A    Yes.
17       Q    Do you agree that the Court in those
18   cases found that your analysis, quote, "Lacks
19   merits" or that your methodology was, quote,
20   "Inappropriate," or did you dispute what the
21   Court held here?
22       A    I would -- I mean, I would say yes to
23   both.  I think you're reading them correctly,
24   but I would dispute both of those findings --
25   actually, dispute both those quotes as being

Page 26

1    somewhat taken out of context.
2        Q    Are you disputing the
3    characterization by the underlying court or
4    are you saying this court was wrong that those
5    courts rejected your testimony?
6        A    Saying that, for example, the
7    inappropriate methodology is not that it was
8    inappropriate for the situation, but was not
9    what the judge felt was the ideal remedy.
10       Q    But you're not saying that any of the
11   quotes here are incorrect, right?
12       A    I'm saying they're taken out of
13   context.
14       Q    Okay.  In any event, you'd agree that
15   at the bottom of Paragraph 648, the Court
16   wrote: "This Court joins these other courts
17   in rejecting Dr. Johnson's methodologies,
18   analyses and conclusions."  Did I read that
19   correctly?
20       A    Yes.
21       Q    I'm going to stop sharing the screen
22   now.  Am I right that you've also drawn maps
23   in the redistricting context?
24       A    Yes.
25       Q    Are you including that in your

Page 27

1    litigation experience as we've already
2    discussed or do you view that work as
3    separate?
4        A    I mean, it's all part of my
5    experience.
6        Q    Sure.  Let me ask a clearer question.
7    In any of the eight to ten redistricting cases
8    that we've talked about here, were you
9    retained to draw the map for a governmental
10   entity in question or are you always called in
11   to criticize the map that somebody else has
12   drawn?
13       A    It's a mix.
14       Q    About how many maps have you drawn in
15   the redistricting context, both in litigation
16   and outside of the litigation context?
17       A    Thousands.
18       Q    And do you know how many of those
19   maps led to litigation?
20       A    Five -- four or five.
21       Q    Okay.  Have any of those maps in the
22   subject of Voting Rights Act challenged?
23       A    Yes.
24       Q    Given the thousands of maps that
25   you've drawn, would it be fair to assume that

Page 28

1    over the course of your career, you've had
2    lawyers or other experts come in after the
3    fact that point out different ways to make
4    your maps a little bit better?
5        A    I don't have lawyers that -- it
6    probably happened once or twice, but typically
7    lawyers would raise legal issues and I could
8    adjust them from the mapmaker side.  It
9    wouldn't be really how to make them better.
10       Q    Sure.  But there might be -- whether
11   it's a legal issue or traditional
12   redistricting factor that they think you could
13   adjust and you'll try to make that adjustment;
14   is that what you're describing?
15           MR. LEWIS:
16               Objection; you may answer.
17           THE WITNESS:
18               I'm not sure what the question
19           was.
20   BY MS. KEENAN:
21       Q    Let me try it another way.  Would you
22   agree there is virtually always more than one
23   way to draw a map?
24       A    Most of the time.
25       Q    And do you think that the fact that a

7 (Pages 25 to 28)

Page 29

1  map could be drawn in more than one way
2  inherently suggests that there's something
3  wrong with any one version of the maps that
4  could be drawn?
5         MR. LEWIS:
6             Objection.  It calls for
7         speculation.  Go ahead.
8         THE WITNESS:
9             I think it's way too vague.  I'm
10        not sure I can answer that.
11 BY MS. KEENAN:
12     Q   Sure.  Maybe I'll be a little
13 narrower.  Does the fact that a district could
14 be drawn in two different ways in a state,
15 does that mean that one of those two ways must
16 be illegal?
17        MR. LEWIS:
18            Objection.
19        THE WITNESS:
20            Not by definition.
21 BY MS. KEENAN:
22     Q   Okay.  I'm going to go back to the
23 maps you've drawn for a minute.  Has a court
24 ever rejected one of the maps that you drew in
25 the redistricting context?

Page 30

1      A   Yes.
2      Q   And when was that?
3      A   In Jacksonville and in Morgan Hill.
4  And it should be noted, in Morgan Hill, we
5  told the client the map was illegal.  And,
6  actually, the City Attorney in open session
7  told the client the map they wanted was
8  illegal, but they adopted it anyways.  And
9  then it was overturned.
10     Q   And you put that map forward with the
11 understanding that it was illegal; is that
12 what you mean?
13     A   No, it was a map that had been
14 requested to be drawn, so we drew it to
15 illustrate the problems with it.
16     Q   In Morgan Hill, the client requested
17 that you draw a map, and you followed those
18 instructions, right?
19     A   Yes.
20     Q   And that map was illegal; is that
21 right?
22        MR. LEWIS:
23            Objection; calls for legal --
24        THE WITNESS:
25            That was our opinion --

Page 31

1         MR. LEWIS:
2             Sorry.  I'm trying to get the
3         objection on the record.  It calls
4         for a legal conclusion.  Go ahead.
5         THE WITNESS:
6             That was what we shared with the
7         client, was our fear and that a judge
8         ultimately had found, yes.  The map
9         in Morgan Hill was not contiguous.
10 BY MS. KEENAN:
11     Q   I see.
12     A   So it was pretty straight forward.
13     Q   And when you submitted that map to
14 the Court, did you provide any sort of expert
15 analysis along with it or did you just provide
16 the map itself?
17     A   I didn't provide anything, the City
18 brought in a special counsel who submitted the
19 City records to the Court.  That case took
20 about 20 minutes.
21     Q   Did you submit any opinions or
22 testimony in that case about whether that map
23 was illegal or were you just the map drawer in
24 that context?
25     A   Well, the map in the City records had

Page 32

1  a big stamp that I and my team had put on it,
2  saying, "Not contiguous."  That was our
3  opinion.  But there was no expert -- there
4  were no declaration or any formal filing.
5      Q   Okay.  Got it.  What about in
6  Jacksonville?  Do you recall what the basis
7  for rejecting the map was in that case?
8      A   Yes.  It was a Voting Rights based
9  challenge.
10     Q   Okay.  And did the Court conclude
11 that your map didn't provide adequate
12 opportunities to for minorites to elect the
13 candidates of their choice?
14        MR. LEWIS:
15            Objection; vague.
16        THE WITNESS:
17            Yeah.  I don't believe that was
18        actually the finding.
19 BY MS. KEENAN:
20     Q   Do you remember what the finding was?
21 I'm not familiar with that case, so I'm just
22 trying to get a sense of what happened there.
23     A   Yeah.  They actually wanted the
24 downtown core of Jacksonville divided up.
25 They wanted fewer majority Black districts.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 33

1    Q   What about -- shifting gears a little
2  bit -- what about the Department of Justice
3  back when preclearance was still in place
4  under the Section 5 of the Voting Rights Act?
5  Did you have the Department of Justice object
6  to any map that you drew?
7    A   Yes.
8    Q   Was that in Arizona, as well, that we
9  talked about earlier?
10    A   It was the Arizona Legislative Map,
11  yes.
12    Q   You drew that map on behalf of the
13  Arizona Independent Redistricting Commission;
14  is that correct?
15    A   Yes.
16    Q   Do you recall if the Department of
17  Justice determined that the Commission had not
18  met its burden of establishing the minority
19  voters will continue to be able to elect
20  candidates of their choice?
21    A   I don't know the exact wording of the
22  Department's letter. It was a very unusual
23  letter, but it was expected. We had gone into
24  it knowing that it required -- getting that
25  through the Department of Justice would have

Page 34

1  required the endorsement of the Arizona
2  Minority Coalition, which we had at the time
3  it was adopted, and they thanked us for
4  adopting, and then the Arizona Minority
5  Coalition changed their mind. After adoption,
6  they then objected to the map that they
7  thanked the Commission for adopting. As we
8  warned the Commission, without that
9  endorsement, it was rejected.
10    Q   So you're saying this DOJ objection
11  was expected because of the objection by the
12  Minority Coalition, just so I'm understanding
13  what you're saying here?
14    A   Even at the time it was adopted, the
15  Commission was warned that it was, what you
16  might call, a stretch map for looking for
17  empowerment, which was the big Latino group
18  that was involved in the process had asked
19  for. And then after it was adopted, the big
20  Latino group changed their mind and wanted a
21  different map.
22    Q   And you'd agree that's not just that
23  the Coalition changed its mind. The Justice
24  Department actually reached findings about
25  this map, not establishing that minority

Page 35

1  voters could elect candidates of their choice,
2  right?
3    A   Based on Latino Coalition's changed
4  opinion.
5    Q   I'm going to share my screen again
6  for a moment here. Are you able to see what's
7  on my screen?
8    A   Yes.
9    Q   Okay. And this is the Voting
10  Determination Letter filed by the Department
11  of Justice in that case; is that right?
12    A   I'll take your word for it. I never
13  saw the actual letter.
14    Q   I'm going to apologize, because I
15  think that I've not been asking the court
16  reporter to mark some of these exhibits, so I
17  go back in a minute and just through each of
18  these to make sure we have them all in the
19  record correctly.
20       Just while we're on this letter, I'm
21  going to go to page 2. And looking at the
22  third whole paragraph here, the first sentence
23  is: "According to your submission, AIRC
24  claims the proposed plan contains ten
25  districts, Districts 2, 13-16, 23-25, 27 and

Page 36

1  29, in which minority voters will be able to
2  elect candidates of their choice."
3       Did I read that first sentence
4  correctly?
5    A   Yes.
6    Q   The next sentence says: "However,
7  based on the information provided, we have
8  determined that the AIRC has not met its
9  burden of establishing that minority voters
10  will continue to be able to elect candidates
11  of their choice in five districts."
12       Did I read that correctly?
13    A   Yes.
14    Q   The next sentence also explains that
15  the proposed plan results in a net loss of
16  three districts from the benchmark plan in
17  which minority voters can effectively exercise
18  their electoral franchise. Did I read those
19  words correctly?
20    A   Yes.
21    Q   And the letter, as a result, called
22  the proposed plan, quote, "Retrogressive."
23  Did I read that correctly?
24    A   I mean, it does have the word
25  "Retrogressive," yes.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 37

1    MS. KEENAN:
2        Just to clean up the record
3    here, I'm going to ask the court
4    reporter to mark each of the exhibits
5    we've go gone through so far. The
6    first, the deposition notice for Dr.
7    Douglas M. Johnson should be marked
8    as Exhibit 1. The second, the CV --
9    I don't think we've talked about the
10   CV. We just talked about it in
11   advance of the deposition; is that
12   right? I'll move that, just so we're
13   going in the right order. The second
14   is the -- sorry. My screen is not
15   allowing me to move with the exhibit
16   screen happening. Give me one
17   second.
18        Again, the deposition notice
19   will be marked as Exhibit 1. The
20   Common Cause versus Lewis decision
21   will be marked as Exhibit 2. And
22   then the Voting Determination Letter
23   will be marked as Exhibit 3, just for
24   the record. Thanks with your
25   patience with all of that.

Page 38

1    BY MS. KEENAN:
2        Q   I'm not going to move on to what's
3    been premarked as Exhibit 2, but what I'll ask
4    the court reporter to mark for the record as
5    Exhibit 4, and that's the CV that we talked
6    about before the deposition began. Do you
7    recognize this CV, Dr. Johnson?
8        A   Yes.
9        Q   Did you review the CV before your
10   deposition today?
11       A   I mean, long ago.
12       Q   And so do you know if this still
13   accurately summarizes your education, work
14   experience and qualifications?
15       A   Up to the time in which it was
16   printed, yes.
17       Q   Okay. Do you recall when this CV was
18   last revised? I don't think there's a date
19   included on the CV that you submitted.
20       A   Yeah. I don't -- I know -- I think
21   the client list -- this is just the pre-2021
22   client list.
23       Q   Uh-huh.
24       A   Yeah, so I had 215 clients in the
25   2021-2022 redistricting cycle.

Page 39

1        Q   And that client list you're talking
2    about is starting on page 5 of the CV; is that
3    right?
4        A   Yes, this is prior to 2021. It's got
5    the 2021 states on it, not -- and it's got the
6    note in here about how many we had in 2021 and
7    2022, but not the list.
8        Q   Do you recall whether you've taken on
9    additional clients since the time that this CV
10   was prepared in addition to the ones mentioned
11   in the note here?
12       A   Sure. I've got about 25 active
13   clients right know.
14       Q   Okay. Give me one second. Sometimes
15   your CV specifies that work was done by NDC,
16   which I take to be the corporation that you
17   work for; is that right?
18       A   Yes, and I'm the president of.
19       Q   So, for example, at the bottom of --
20   I'm sorry. At the bottom of page 4 here under
21   "Voting Rights Act and Racial Bloc Voting
22   Analysis," you say: "NDC has performed racial
23   bloc voting analysis for the clients of the
24   following law firms."
25        Do you see where I'm reading from in

Page 40

1    your CV?
2        A   Yes.
3        Q   When you say NDC has performed
4    certain work, did you have a role in each of
5    those analyses that NDC worked on?
6        A   Yes. At a minimum, I oversee and
7    supervise the work. Sometimes some of the
8    actual JS work or statistical runs are done by
9    people on my team, but I'm always overseeing
10   and involved in those.
11       Q   In your CV when you talk about things
12   that NDC has done, rather than work that just
13   you, yourself, have done, is it safe to assume
14   that others have assisted with that work?
15       A   In some of it, yes.
16       Q   Do you know -- if I look at page 5
17   where you say your firm, NDC, has 21
18   redistricting clients in the 2021-2022
19   redistricting cycle, did you have a role in
20   each of those 225 client cases, as well?
21       A   They're not cases, just to be sure.
22   They're projects. But, yes, I'm always, you
23   know, supervising and getting status reports.
24   The degree of hands-on I get with each project
25   varies widely. Everyone is always giving me

10 (Pages 37 to 40)

Page 41

1  status reports and telling me how things are
2  going and raising concerns, so that I'm aware.
3      Q   In some of these 225 projects, you're
4  not the person doing the line analysis that
5  the client is requesting; is that right?
6      A   By "Line analysis," what do you mean?
7      Q   Sorry. I'm using "Line" as term of
8  art. Sort of the actual analysis that they've
9  requested of NDC, you're not the person
10  running through the analysis that they've
11  requested for each of those 225 clients,
12  right?
13      A   In most of these projects, we're
14  drawing maps and running demographics on those
15  maps and then presenting them in forms. So on
16  some of them, I am; some of them, I'm not.
17      Q   In each of the sections of your CV,
18  though, are you representing that you had at
19  least a role, even if not the first level
20  role, in each of the cases that you represent
21  in your CV?
22      A   On the case work, that's me.
23      Q   Okay. I think that's all I have on
24  the CV.
25          You've written an expert report in

Page 42

1  this case, correct?
2      A   Yes.
3      Q   And then also sort of a rebuttal
4  report in this case?
5      A   Correct.
6      Q   I'm now going to share what's been
7  premarked as Exhibit Number 3. Give me one
8  second to get it up on my screen.
9          Can you see what I'm showing on my
10  screen is the declaration of Douglas Johnson,
11  Ph.D?
12      A   Yes.
13      Q   This is the initial report that you
14  authored in this case?
15      A   Yes.
16      MS. KEENAN:
17          For the record, I'm going to ask
18      the court reporter to mark this as
19      Exhibit 5.
20  BY MS. KEENAN:
21      Q   I'm now going to share on my screen
22  what was premarked as Exhibit 4. This is the
23  Surrebuttal Declaration that you submitted; is
24  that correct?
25      A   Yes.

Page 43

1      MS. KEENAN:
2          I'm going to ask the court
3      reporter to mark this as Exhibit 6.
4  BY MS. KEENAN:
5      Q   You've seen both of these reports
6  before I take it?
7      A   I wrote them, yes.
8      Q   And you stand by all of the opinions
9  in each of these reports?
10      A   Yes.
11      Q   Do you recall when you did the work
12  necessary to form the opinions in your initial
13  report?
14      A   Not off of the top of my head, no.
15      Q   How did you identify the sources that
16  you've relied upon in your initial report?
17      A   What do you mean by, how I identified
18  the sources?
19      Q   So how did you determine which
20  sources to consider in writing this report?
21      A   The ones relevant to the questions I
22  was addressing.
23      Q   Did counsel provide with you any
24  specific sources that they wanted you to
25  review in coming to your conclusions in this

Page 44

1  case?
2      MR. LEWIS:
3          Objection. I instruct the
4      witness not to answer beyond any
5      facts or data that were, you know,
6      incorporated into your report.
7      THE WITNESS:
8          Sure. I received Mr. Cooper's
9      reports from legal counsel. I don't
10      remember if legal counsel told me
11      where with website was with the
12      public state data or if I found that
13      on my own.
14  BY MS. KEENAN:
15      Q   Okay. Did you work with anybody,
16  other than legal counsel, in the identifying
17  and reviewing the sources that you relied on
18  in your report?
19      A   Not that I recall.
20      Q   Did anyone else at NDC helped you
21  with reviewing the sources that you worked on
22  in your report?
23      A   No.
24      Q   No outside sort of consulting firms
25  or other individuals other than counsel,

11 (Pages 41 to 44)

Page 45

```
1   right?
2       A   Not that I recall.
3       Q   Were there ever any documents or
4   other information that you asked counsel to
5   see that you did not get to see?
6       A   Just so I understand, are you asking
7   if there's anything I asked legal counsel to
8   share with me that they didn't give me?
9       Q   Sure.  For example, are there any
10  expert reports from other defense experts or
11  plaintiff experts that you asked to review but
12  you weren't given an opportunity to see?
13      A   No.
14      Q   Is there any other document or
15  information you would have wanted to review to
16  help form your opinions or prepare your
17  reports?
18      A   As I mentioned many times, there's
19  quite a bit of data for Mr. Cooper that I
20  would have liked him to turn over that he did
21  not.
22      Q   Are you aware of the other defense
23  experts who are involved in this case?
24      A   I probably heard their names, but I
25  couldn't tell them to you off the top of my
```

Page 46

```
1   head.
2       Q   And have you reviewed any of their
3   work in this case?
4       A   No.
5       Q   And other than Mr. Cooper, have you
6   reviewed any of the plaintiffs' experts'
7   reports in coming to your opinions in this
8   case?
9       A   No.  Everything I reviewed is mention
10  in the report.
11      Q   In your report, though, you do
12  mention -- give me one second.  I'm going to
13  pull it up on the screen.  I'm on page 2 of
14  your report, which we've marked as Exhibit 5.
15  Do you see where I am on Subsection D on
16  page 2 of your report?
17      A   Yes.
18      Q   It says you were asked -- this is the
19  "Scope of Work."  It says:  "Counsel asked me
20  to undertake the following tasks."  And
21  Subsection D says:  "Review the other sections
22  of plaintiffs' expert reports and comment on
23  any areas I viewed as noteworthy or
24  questionable."
25          In undertaking that task, did you
```

Page 47

```
1   review any expert reports other than those
2   prepared by Mr. Cooper?
3       A   I think there was just a reference to
4   Mr. Cooper had -- his original line is --
5   amended reports at that time.  I haven't
6   looked at any others.  Keep in mind, there's
7   multiple cases going on right here in the
8   state, so that's why I'm not crystal clear on
9   it.  But I don't recall reviewing anything
10  else for this case.
11      Q   I just wanted to clarify it.  So to
12  the best of your recollection, you didn't
13  offer any opinions regarding any of the other
14  plaintiffs' experts in this case, right?
15      A   Right.  I only offered the opinions
16  that are actually in the reports.
17      Q   And you don't remember any of the
18  other reports from Dr. Handley or Dr. Colton
19  or any of the other experts that plaintiffs
20  have offered in this case; is that right?
21      A   Yeah.  Again, only in this case
22  covering the things I cover in my report.
23          MS. KEENAN:
24          Okay.  We're at about an hour
25  now.  I think it's a good time to
```

Page 48

```
1   take about a five-minute break.  Is
2   that okay with counsel?
3       MR. LEWIS:
4           Sure.
5       MS. KEENAN:
6           Okay.  We can go off the record,
7   then and we'll come back around
8   11:07.
9   (BRIEF RECESS 11:02 A.M. TO 11:07 A.M. EST)
10      MS. KEENAN:
11          We can go back on the record.
12  BY MS. KEENAN:
13      Q   Dr. Johnson, what's your
14  understanding of your assignment in this
15  litigation?
16      A   I mean, as laid out in my report
17  briefly, to review Mr. Cooper's report and
18  respond to it.
19      Q   Okay.  I'm going to pull the report
20  back up, just so we can walk through each of
21  the tasks that you were asked to perform.  So
22  we're back to Exhibit 5.  Starting on page 2,
23  again, under "Scope of Work," you say:
24  "Counsel asked me to perform the following
25  tasks."  Can you review A and B, just so we
```

12 (Pages 45 to 48)

Page 49

1    have everything in precise terms and just let
2    me know when you're done reading it?
3        A    Okay.
4        Q    So to complete these first two tasks,
5    you looked at the illustrative maps that
6    Mr. Cooper provided in 2022, right?
7        A    Yes.
8        Q    And you also looked at the
9    illustrative maps that Mr. Cooper provided in
10   2023, right?
11       A    Yes.
12       Q    You also studied Mr. Cooper's
13   reports, as you've mentioned a couple of times
14   now?
15       A    Yes.
16       Q    Are you familiar with the term,
17   "Enacted Map"?
18       A    Of course.
19       Q    What is it, to your knowledge?
20       A    The map that was adopted into law by
21   the legislature.
22       Q    Did you analyze the enacted maps as
23   part of your assignment in this case?
24       A    It's part of the report, yes.
25       Q    What all did you do in analyzing the

Page 50

1    enacted map for the purposes of this report?
2        A    The primary focus was in looking
3    at -- as is documented extensively in the
4    report -- looking at how the enacted map in
5    reality is different than what Mr. Cooper
6    repeatedly discussed as the enacted map.
7        Q    Sure.  And that's the error
8    Mr. Cooper corrected in the exhibit attached
9    to his rebuttal report, right?
10       A    Yes.  He acknowledged the mistake
11   later on.  I don't know exactly which report
12   it was, off the top of my ahead.
13       Q    Sure.  Are you aware of which parts
14   of the illustrative map tracked the enacted
15   map?
16           MR. LEWIS:
17               Objection; vague.  You may
18   answer?
19           THE WITNESS:
20               Patrick, did you say something?
21           MR. LEWIS:
22               I said:  "Objection; vague."
23           THE WITNESS:
24               I have overlaid and looked at
25           the two maps quite a bit.

Page 51

1    BY MS. KEENAN:
2        Q    Is it your testimony that you are
3    aware of where the illustrative map and the
4    enacted map have the same borders?
5        A    Off the top of my head, no.  But,
6    yes, in my analysis, I did look at that in
7    many places?
8        Q    Okay.  So you did analysis of where
9    Mr. Cooper's boundaries are the same as the
10   boundaries in the enacted map; is that your
11   recollection?
12       A    It wasn't something I was
13   specifically analyzing.  It is something I
14   would have seen as I was doing analysis.
15       Q    Okay.  But you didn't reach any
16   opinions about where Mr. Cooper's boundaries
17   overlapped with the boundaries in the enacted
18   map, right?
19       A    That wouldn't be an opinion.  That
20   would be facts.
21       Q    Did you analyze whether Mr. Cooper's
22   illustrative maps performed better than the
23   enacted maps on any traditional redistricting
24   criteria?
25       A    I talk in many places in the report

Page 52

1    about compactness and communities of interest
2    and things like that that would be traditional
3    redistricting principles.
4        Q    I want to be specific, though.  I'm
5    asking whether you analyze those traditional
6    redistricting criteria as compared between the
7    illustrative maps and the enacted map.  Did
8    you do any of those types of analysis across
9    the illustrative and the enacted map?
10       A    Separate from what I write up in the
11   report?  No.
12       Q    Just to be clear, your report is
13   analyzing how the two sets of the illustrative
14   maps compare to each other, correct?
15       A    And there are some references to the
16   enacted map, as well.
17       Q    But other than what you write in your
18   report, you didn't any analysis or how Mr.
19   Cooper's illustrative maps compared to the
20   enacted maps, right?
21       A    Sorry.  Could you restate that?
22       Q    Sure.  Other than what's in your
23   report, you didn't do any analysis of how
24   Mr. Cooper's illustrative maps compared to the
25   enacted maps, right?

13 (Pages 49 to 52)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 53

1    A   Correct.
2    Q   Are you aware of whether Mr. Cooper's
3  illustrative maps performed better than the
4  enacted maps when it comes to compactness?
5    A   In some districts, they do; and in
6  some districts, they don't.
7    Q   What's the basis for that conclusion?
8    A   Mr. Cooper's own compactness numbers.
9    Q   Okay.  So you're relying on the
10  numbers that Mr. Cooper published in this
11  report, right?
12    A   Yeah.  I think I -- I also looked at
13  the maps, and as there are illustrations in my
14  report, illustrated how some districts are
15  less compact.
16    Q   Where in your report do you talk
17  about how the illustrative districts are more
18  or less packed than the enacted districts?
19    A   Not in the enacted districts, I mean,
20  compared to his earlier maps.
21    Q   Right.  And so for now, I'm just
22  asking about the comparison between the
23  illustrative and the enacted maps.  We'll talk
24  about the illustrative to illustrative
25  comparisons a little later.  But you'd agree,

Page 54

1  you didn't reach any conclusions about the
2  compactness of Mr. Cooper's illustrative maps
3  as compared to the enacted maps, right?
4    A   I don't think I'd agree with that
5  characterization.
6    Q   Can you show me where in your report
7  you do reach such conclusions?
8    A   Yeah.  There are points where
9  Mr. Cooper claims improved compactness scores,
10  and I rebut those claims.
11    Q   Can you show me where -- you have a
12  copy of your report with you, right?
13    A   Yes.
14    Q   Can you show me where in your report
15  that you do that?
16    A   Sure.  I think it's in the
17  surrebuttal, the one that's coming to mind.
18    Q   Sure.
19    A   Yes.  It's actually in my original
20  report, starting at Paragraph 15 going through
21  Paragraph 21.  It's talking about rebutting
22  his claims to being more compact districts.
23    Q   I'm going to share my screen.  We're
24  talking about Paragraphs 15 to 21 in your
25  original report, right?

Page 55

1    A   Yes.
2    Q   Do you see that on the screen now?
3    A   Yes.
4    Q   Okay.  This section is entitled
5  "Illustrative House and Senate Map Revisions
6  Resulted in Less Compact 2023 Maps," right?
7    A   Yes.
8    Q   Paragraph 15 reads: "Oddly enough,
9  the twenty-one districts changed between the
10  2022 House Illustrative Map and the 2023 House
11  Illustrative Map made the 2023 map even less
12  compact that the 2022 House Illustrative Map."
13  Did I read that correctly?
14    A   Yes.
15    Q   Where in this section do you compare
16  either the 2023 map or the 2022 illustrative
17  map to the enacted districts?
18    A   I am rebutting Mr. Cooper's claims
19  where he is comparing his map to the enacted
20  map.
21    Q   But in rebutting those claims, do you
22  say anything about the compactness of the
23  enacted map itself?
24    A   No.
25    Q   Okay.  So in what sense, are you

Page 56

1  rebutting his claims about the compactness of
2  the illustrative map as compared to the
3  enacted map?
4    A   He's making claims that his regional
5  map was more compact in other cases and that
6  his revised map is even more compact, and I'm
7  rebutting those claims.
8    Q   But you did not -- in looking at
9  either of those maps, the 2022 or the 2023,
10  and comparing the compactness measured across
11  them, that is what you did in your report,
12  right?
13    A   And just looking at the districts,
14  you can -- as in Figure 3, you can look at it.
15    Q   Right.  But nothing in your report
16  compares either the 2022 or the 2023
17  illustrative maps to the compactness measures
18  of the enacted map, correct?
19    A   Correct.
20    Q   And did you run any of the numbers on
21  the compactness measures to compare the 2022
22  or the 2023 illustrative maps to the
23  compactness measures of the enacted maps?
24    A   I mean, when you run compactness
25  measures, you just run them on one map, and

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 57

1  then you compare the results.  You don't run
2  one map versus the other map.
3      Q    Did you run them for the enacted map?
4      A    It's possible I did, just to confirm
5  what Mr. Cooper provided.
6      Q    But you certainly didn't include any
7  of those numbers or any opinions about
8  compactness measures of the enacted map in
9  your report, did you?
10      A    I'm not sure if yes or no is
11  confirming what you said.  But, no, I did not
12  compare -- I did not opine on the compactness
13  measures of the enacted map.
14      Q    Moving on to compactness.  Did you do
15  anything to assess the communities of
16  interests as reflected in the enacted map?
17      A    No.
18      Q    And so you did not compare how
19  communities of interests are treated from the
20  enacted map to any of Mr. Cooper's
21  illustrative maps, right?
22      A    Well, arguably, most of my report is
23  about how communities of interest are treated
24  in the illustrative maps.
25      Q    Right.  But I'm not just asking about

Page 58

1  how they're treated in the illustrative maps.
2  I'm asking about how the illustrative maps
3  compare to the enacted maps, and you didn't
4  make that comparison to the enacted maps when
5  it comes to how they treat Communities of
6  interest; is that right?
7      A    Correct.
8      Q    I'm going to move on the next task in
9  your report.  It's going to be back up on
10  page 2.
11      A    Let me just cover one thing.  There
12  is the discussion about the one county split
13  that's in Mr. Cooper's report and in my report
14  that does go back to the enacted map.  But
15  that would be the only example of that, the
16  peninsula down in the south.
17      Q    Sure.  I think we'll talk about that
18  a little bit later.  Thanks for raising that.
19  The next task in Part C says:  "To review the
20  'Key Regions' referenced by plaintiff's
21  expert, Mr. Cooper, to identity whether there
22  is sufficient evidence provided to support
23  such designations and examine the degree to
24  which the 2023 House and Senate Illustrative
25  Maps follow and respect those 'Key Regions'

Page 59

1  boundaries."  Did I read that correctly?
2      A    Yes.
3      Q    I want to focus on the first half of
4  that sentence when you were asked to identify
5  whether there is sufficient evidence provided
6  to support such designations.  Do you recall
7  doing work to assess whether there was
8  sufficient evidence provided to support the
9  "Key Regions" designations referenced in
10  Mr. Cooper's report?
11      A    Yes.
12      Q    Is that something you've been asked
13  to do in other cases where you've served as an
14  expert?
15      A    Sort of.
16      Q    Can you explain?
17      A    Communities of interests are often a
18  significant factor in districting,
19  redistricting and in the related litigation.
20  So how those are defined often comes up.
21      Q    But in terms whether there was
22  sufficient evidence provided to support the
23  designations as "Key Regions" referenced in
24  Mr. Cooper's report, is there any sort of
25  standard methodology for identifying which

Page 60

1  regions in a state are considered "Key
2  Regions"?
3      A    Sure.  You look at the traditional
4  redistricting definitions of -- and court
5  definitions of communities of interest and see
6  if those apply.
7      Q    Did you do that in this case?
8      A    I wasn't attempting to create key
9  regions, so, no, I didn't.  I was simply
10  looking at whether the provided definitions
11  stood up to that bar, and Wikipedia is not
12  that bar.
13      Q    But when you were -- let me ask in a
14  different way.  Are you reaching any
15  conclusions about whether the "Key Regions"
16  defined in Mr. Cooper's report are in fact key
17  regions in the State of Louisiana?
18      A    Yes.  As Mr. Cooper defines them, I
19  don't think they measure up to what he's
20  claiming their role -- well, he doesn't then
21  use them in that role, but what he claims
22  should be the role, his definition does not
23  support.
24      Q    We'll talk about the way he used them
25  a little bit later.  In terms of what the key

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 61

1  regions are in Louisiana, you didn't do any
2  affirmative work to identify what key regions
3  or communities of interest might exist in
4  Louisiana; is that right?
5      A   Correct. Other than review what
6  Mr. Cooper had written and the support he
7  cited for it -- the sources that he cited to
8  support that opinion.
9      Q   I know you don't remember for sure
10  whether you reviewed any other plaintiffs'
11  expert reports. But you would agree that you
12  don't mention Dr. Colton's report in either
13  your report or your rebuttal?
14      A   Correct.
15      Q   You don't offer any opinions about
16  the regions referenced in Dr. Colton's report,
17  then, right?
18      A   Yeah, if it's not mentioned in my
19  reports -- I think Dr. Colton is also an
20  expert in the other case, so that's why I'm
21  hesitating. But, no, if it's not mentioned in
22  my reports, no, I'm not offering an opinion on
23  that. And he's not mentioned, either, in his
24  report.
25      Q   I think I'm ready to move into the

Page 62

1  "Data Used" section of your report. When you
2  discuss the data that you used, you reference
3  the Louisiana State redistricting geography
4  and data from Caliper Corporation. Can you
5  describe a little bit about what kinds of
6  information that includes?
7      A   It's actually the same data that
8  Mr. Cooper had where it's the geographic
9  shapes of all the census blocks and other
10  levels of geography in the state and then
11  it's -- what's cited as the PL 94-171 census
12  data on Total Population and Voting Age
13  Population by race and ethnicity for each of
14  those units of geography.
15      Q   You also say that you used the
16  Enacted House and Senate Map, geographic
17  shapefile from the state's redistricting data
18  website. Does that shapefile just include the
19  enacted maps district lines or does it include
20  any additional information?
21      A   Just the lines and identifying
22  information for which district was which.
23      Q   So it doesn't include any additional
24  demographic or socioeconomic information,
25  right?

Page 63

1      A   No. Certainly not that I recall, as
2  I sit here.
3      Q   Okay. You say you've used the 2022
4  and 2023 Illustrative House and Senate Plan
5  files. Again, does that just include the
6  lines or does that include any demographic or
7  other information?
8      A   Everything that was provided by
9  Mr. Cooper.
10      Q   You also say you used other data from
11  plaintiffs' expert witness disclosures in this
12  case. Does that also just include the data
13  relied on by Mr. Cooper or what other data are
14  you referencing here?
15      A   Yes, Mr. Cooper's files that he
16  turned over.
17      Q   Okay. And does Paragraph 5 provide a
18  complete list of the data on which you relied
19  in coming to your conclusions in this case?
20      A   Yes. I would -- implied in there,
21  hopefully, is when Mr. Cooper footnoted
22  something, I would look at that footnote
23  source.
24      Q   In comparing the two sets of
25  illustrative maps, you used Maptitude industry

Page 64

1  standard GIS software for redistricting and
2  other software tools. That's in Paragraph 8
3  of your report. Is that right?
4      A   Yes.
5      Q   What GIS software did you use?
6      A   Industry standard GIS software for
7  redistricting is a reference to Maptitude.
8      Q   Got it. And which other software
9  tools did you use?
10      A   Mostly Microsoft Excel.
11      MS. KEENAN:
12          I guess I haven't introduced
13      Mr. Cooper's reports yet, so I'm
14      going to go ahead and do that and
15      some of his exhibits in his reports,
16      as well. First, I'm going to share
17      on my screen the "Declaration of
18      William S. Cooper," his initial
19      report, which I'll ask the court
20      reporter to mark as Exhibit 7.
21  BY MS. KEENAN:
22      Q   Are you familiar with this
23  declaration?
24      A   Yes.
25      Q   And then next I'm going to share --

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 65

1  this one is, although titled "Declaration of
2  William S. Cooper," but you can see that this
3  says, "This is an additional expert
4  declaration to provide analysis and expert
5  opinion relating to the July 28, 2023 expert
6  reports of certain experts, including Douglas
7  Johnson."  Do you see that here in Paragraph
8  2?
9      A  Yes.
10      Q  So you would agree this is the
11  rebuttal report that Mr. Cooper submitted?
12      A  Yes.
13          MS. KEENAN:
14              We'll go ahead and mark that
15          rebuttal report as Exhibit 8 for the
16          record.
17  BY MS. KEENAN:
18      Q  Are you familiar with any of the
19  exhibits attached to Mr. Cooper's reports; did
20  you have a chance to review those, as well?
21      A  Yes.
22          MS. KEENAN:
23              I am going to share on my screen
24          Exhibit B to Mr. Cooper's report,
25          which I'll ask the court reporter to

Page 66

1          mark as Exhibit 9.
2  BY MS. KEENAN:
3      Q  Have you reviewed this exhibit titled
4  "Exhibit B-Methodology and Sources"?
5      A  Yes.
6      Q  I want to walk through each of these
7  sources and get an understanding of the extent
8  on which you relied on the information in
9  here.  So first, Mr. Cooper talks about
10  analyzing population or geographic data from
11  the 1990 to 2020 Decennial Census.  Did you
12  review that population or geographic data?
13      A  Only his references to it.  I didn't
14  go and get it myself.
15      Q  So when you were reviewing this work
16  in Maptitude, was any information from the
17  Decennial Census included in the software you
18  were using?  Can you explain a little bit
19  about what you mean about how that impacted
20  your work?
21      A  So the PL 94-171 data that I
22  referenced is in the 2020 Decennial Census.
23      Q  Right.
24      A  So that was in the Maptitude database
25  and GIS.  The 1990 and other data was not.

Page 67

1      Q  Okay.  But you did review that PL
2  94-171 redistricting data file in Maptitude
3  while reviewing Mr. Cooper's maps; is that
4  right?
5      A  I guess you could say that.  I'm not
6  double checking it or otherwise reviewing it.
7  I'm just using it.
8      Q  How would you describe the difference
9  between checking or reviewing or using in the
10  way that you just now gave that answer?
11      A  When you draw a district, the
12  software adds all the block level data to give
13  you the totals for the district.  The data is
14  intimately involved in that process,
15  obviously, and gives you the resulting
16  numbers.  I didn't go back and compare the
17  2020 Census data that I got from Maptitude or
18  that I got from -- I got from Caliper --
19  sorry -- or that I got from Mr. Cooper to
20  check it and see if it matches with what's
21  actually on the Census website as the 2020
22  Census data.
23      Q  Okay.  I understand.  Next Mr. Cooper
24  talks about using data from the one-year 2019
25  American Community Survey and the 2015-2019

Page 68

1  and 2017-2021 American Community Survey
2  published by the U.S. Census Bureau.  Did you
3  examine those sources?
4      A  No, I did not go back and check any
5  of the original source data.  I just used --
6  just looked at what Mr. Cooper provided.
7      Q  When you say you looked at what
8  Mr. Cooper provided, do you mean the
9  conclusions in his report or do you mean
10  something else about what he provided?
11      A  I also looked at the files, the
12  actual data files he provided, to see --
13  primarily to see what level of geography they
14  were compiled at, if they were at the Census
15  block level or something larger.
16      Q  What about the other charts and other
17  tables that he provided compiling information
18  from the various sources, did you review those
19  or just the reports and the underlying data
20  files?
21      A  I read through them and looked at
22  them.  I did not doublecheck their math.
23      Q  When you say you went through and
24  looked at them, did they impact the
25  conclusions that you offered about

Page 69

1    Mr. Cooper's districts in any way?
2        A   To the degree I cited them in the
3    report, yes.
4        Q   Okay.  But did you assess the
5    districts to see whether they were consistent
6    with any of the data in the ACS surveys?
7        MR. LEWIS:
8            Objection; vague.  You may
9        answer.
10       THE WITNESS:
11           There wasn't any relationship
12       between his socioeconomic section of
13       his report and the districts he drew.
14       So I don't think there was any
15       connection, like you're describing,
16       for me to review.
17   BY MS. KEENAN:
18       Q   We can talk more about socioeconomic
19   data in a little bit.  I'm going to move on to
20   Number 2 up on the screen here.  This says
21   that he -- for his redistricting analysis, he
22   used a GIS software package called Maptitude
23   for Redistricting developed by the Caliper
24   Corporation.  Is this the same software
25   package you used?

Page 70

1        A   Yes.
2        Q   Next he says, the geographic boundary
3    files he used with Maptitude are created from
4    the U.S. 2020 TIGER files and versions from
5    earlier decades, 1990, 2000 2010.  Did you
6    review these boundary files, as well?
7        A   I looked at the ones for the
8    Illustrative Maps and what he said for the
9    Enacted Map, I did not review any earlier
10   decade ones.
11       Q   We've already talked about the
12   PL 94-171 data files, right?
13       A   Yes.
14       Q   He talks about how the software
15   merges the demographic data from the PL 94-171
16   files to match the relevant Decennial Census
17   geography.  Is that true of the software you
18   were using, as well?
19       A   Yes.
20       Q   For the socioeconomic analysis, he
21   used the one-year 2019 ACS and the five-year
22   2015-2019 ACS data files published by the
23   Census Bureau.  He used charts and tables
24   produced by Microsoft Excel and Microsoft
25   Access.  Did you review those?

Page 71

1        A   Just the ones that were in his
2    report.
3        Q   What about the additional charts and
4    tables that he provided in his files.  Did you
5    review those or just the ones in the report
6    itself?
7        A   If they were just in the files, I
8    didn't take care and find every one of them.
9    I just looked at the ones in this report.
10       Q   What about Paragraph Number 7 where
11   he says:  "I obtained and relied on July 2021
12   voter registration data, Louisiana state
13   produced data for Census 2020 redistricting,
14   as well as the 2016-2020 American Community
15   Survey disaggregated Citizen VAP data from the
16   non-partisan redistricting data website called
17   Redistricting Data Hub."
18           Did you review any of the voter
19   registration data?  Let's just start with
20   that.
21       A   Just what was in the State's files.
22   I didn't open Mr. Cooper's files.
23       Q   And by the State files, you mean the
24   ones on the public State website that we
25   talked about earlier?

Page 72

1        A   Correct.
2        Q   What about this 2017-2020 ACS
3    disaggregated Citizen VAP data?  Did you
4    review any of that data from the Redistricting
5    Data Hub?
6        A   Yes, I did open that up, those files
7    up to see what level of geography they were
8    at.  I was curious if they were at the block
9    level or at a larger geography.
10       Q   Do you recall whether they are at a
11   the block level?
12       A   They were not.
13       Q   Why are you focused on the block
14   level analysis throughout your report?
15       A   Because when you're drawing
16   districts, Maptitude gives you the numbers and
17   the data for those districts so that you can
18   analyze whatever demographic or socioeconomic
19   factors you want to analyze and see if the
20   districts you're drawing achieve that.  And to
21   do that, Maptitude has to have the data at the
22   block level.  If the data is not the block
23   level, Maptitude can't compile the data.  So
24   one of the key things to doing redistricting
25   is to get all of the data down to the block

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 73

1    level, such the registration data and any
2    socioeconomic data you want to use in drawing
3    maps. And once you do that, then Maptitude
4    very easily, on the fly, gives you updates on
5    whatever data you have at the block level. So
6    without it at the block level, you're not --
7    you're clearly -- nothing a really basic thing
8    that would give you that socioeconomic date as
9    you worked and it would compile it district by
10   district. Any data that you're using in your
11   mapping process that can be at the block
12   level, the standard practice is to put it in
13   the block level, so you can see the results as
14   you work.
15        Q   Is it your understanding that if
16   something isn't disaggregated down to the
17   block level, you are unable to consider it in
18   drawing districts?
19        A   It depends on what you mean by
20   consider.
21        Q   Can you explain?
22        A   You can -- normally, we would use a
23   more colorful term. You can guess at it by
24   having a paper map next to you or map on
25   another screen that you just kind of wing it

Page 74

1    and say: Oh, I think this sort of follows
2    that, or you can have the actual specific
3    numbers and details generated live as you draw
4    your map. So if having a map next to you and
5    saying: Oh, I kind of looked at that map and
6    sort of tried to follow it, just eyeball, is
7    considering it, well, then, yeah, that's
8    possible. But why would you do that when you
9    can simply just aggregate it and use it.
10        Q   Are you aware that in Louisiana maps
11   are generally drawn at the precinct or VTD
12   level, rather than at the block level?
13        A   Yes.
14        Q   And are you familiar with Joint Rule
15   21 in Louisiana?
16        A   I can't cite it off the top of my
17   head.
18        Q   Are you familiar with redistricting
19   criteria in Louisiana that prioritizes keeping
20   VTDs whole?
21        A   Yes.
22        Q   You'd agree that VTDs are
23   significantly larger than Census blocks,
24   right?
25        A   Often, yes.

Page 75

1        Q   Census blocks are the building blocks
2    for VTDs, typically, as you're building them,
3    based on Census data?
4        MR. LEWIS:
5            Objection. You can answer.
6        THE WITNESS:
7            There's a lot more to it.
8        Sometimes they follow; sometimes they
9        don't. But VTDs, yes, come from
10       blocks. Precincts sometimes don't.
11   BY MS. KEENAN:
12        Q   Just focusing on VTDs. VTDs are
13   composed as Census blocks, right?
14        A   Yes.
15        Q   You can agree that moving one
16   precinct or one VTD can result in moving
17   upwards of 50 Census blocks, right?
18        A   I don't know the specific numbers for
19   VTD, but there may be a bunch, yes.
20        Q   And so if you weren't drawing maps at
21   the block level, you were drawing them using a
22   larger metric, do you agree that it would be
23   less important to have the data disaggregated
24   down to the individual block?
25        A   You would want it at the lowest level

Page 76

1    of geography that your Maptitude software is
2    using. So Maptitude, you can have everything
3    at the block level and then just tell it, just
4    move VTDs, don't move individual blocks, and
5    that would be the natural way of doing it. If
6    you want to draw the data, you could set up
7    Maptitude to only work at the VTD level, and
8    then that would be your base level of
9    geography. And then you'd want the
10   socioeconomic data in there by VTD, but the
11   standard way to get it there would be to break
12   it down to block level and then aggregated it
13   back up into the VTDs.
14        Q   When you talking about getting it
15   there or getting it into Maptitude, the way
16   you were talking about viewing it is the sort
17   of pop-up window in Maptitude that explains
18   the different metrics as you draw the
19   different lines; is that right?
20        MR. LEWIS:
21            Objection. It mischaracterizes
22        the report. You may answer.
23        THE WITNESS:
24            I would say roughly speaking,
25        yes.

19 (Pages 73 to 76)

Page 77

1   BY MS. KEENAN:
2       Q   And there's the window that you've
3   talked about a little bit here today that
4   shows you the data as you're drawing.  That's
5   a window that's in Maptitude, right?
6       A   Yes.  It's in Figure 4 of my report.
7       Q   Are you aware that window can be
8   disabled in Maptitude?
9       A   Well, there's two windows.  One of
10  them is kind of the district summary window
11  and the other is kind of the area you're
12  working in at the time window.  You can
13  disable the area you're working in, the second
14  window.  The first window, you cannot.
15      Q   Is the first window the one with the
16  demographic information or is it a different
17  one?
18      A   They both have demographic
19  information.
20      Q   Is that demographic window or windows
21  in Maptitude the primary way that you are able
22  to view the block level data that you're
23  discussing?
24      A   No.
25      Q   What is the way that you review block

Page 78

1   level data in Maptitude if not in those
2   windows that display demographic information?
3       A   You can either open -- well, there's
4   really three ways.  Maptitude is an info tool
5   there's button in.  When you turn it on, you
6   click on a block and it pops up a special
7   window for that block.  You can also open an
8   additional data window that would just be all
9   the Census block data, block by block.  But
10  that would be -- you'd have to know the
11  15-digit number identifying the block you're
12  looking at.  So that's not very useful.  The
13  other is, you just put a -- what we call a
14  thematic coloring scheme on your screen so
15  that you can -- there are software colors in
16  the blocks that tell you key data points.
17      Q   But if somebody wasn't using the
18  coloring scheme and wasn't looking at either
19  of those two windows that you described,
20  either the pop-up that contains the whole set
21  or the individual block level district, then
22  none of the data that you're describing would
23  be available on their screen as they were
24  drawing the individual districts; is that
25  right?

Page 79

1       A   The data for the districts is always
2   there.  You can resize your map to cover it
3   and hide it, but you can't turn that screen
4   off in Maptitude.
5       Q   Okay.  Which version of Maptitude are
6   you using, like which software?
7       A   Maptitude for Redistricting.
8       Q   Do you know which year?
9       A   I've used every year since 2001.
10      Q   And you would --
11      A   Go ahead.
12      Q   Do you know if all of those years
13  have the windows functioning in the way that
14  you've described them?
15      A   Yes, they do.
16      Q   I'm going to pull back up Exhibit 7,
17  Mr. Cooper's report.  On page 27 of this
18  report, there's a Section called,
19  "Redistricting Guidelines."  Do you see that?
20      A   Yes.
21      Q   In Paragraph 69, Mr. Cooper says that
22  he applied traditional redistricting
23  principles; one-person/one-vote, compactness,
24  contiguity, the non-dilution of minority
25  voting strength and the preservation of

Page 80

1   communities of interest when he was drawing
2   the illustrative plans.  Did you assess each
3   of these metrics when you were comparing the
4   2022 and the 2023 Illustrative Plans to each
5   other?
6       A   Yes.
7       Q   I'm going to walk through each of
8   them and ask you a little about how you
9   considered them.  How did you consider
10  one-person/one-vote in comparing the 2022 and
11  2023 Illustrative Plans?
12      A   I looked at the numbers he provided
13  for the total population for each district.
14  Obviously, that one-person/one-vote is a
15  comparison of that to the ideal for each
16  district and confirming the numbers matched
17  with what he had provided.
18      Q   Okay.  And you didn't reach any
19  conclusions about how the 2022 and 2023
20  Illustrative Plans compare from the
21  one-person/one-vote perspective, right?
22      A   Yes.
23      Q   I'm going to skip compactness.  We'll
24  talk a little bit more about that later on.
25  How did you consider contiguity?

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 81

1     A   I just looked to see if the districts
2  were contiguous.
3     Q   So is that sort of an eyeball test
4  rather than any sort of statistical
5  comparison?
6     A   The computer actually has a check.
7  You just have a check for non-contiguous
8  districts, and it comes back and tells you if
9  there are any.
10    Q   How did you consider the non-dilution
11 of minority voting strength in comparing the
12 2022 and 2023 Illustrative Maps?
13    A   I reviewed, as I discussed in my
14 report, his claims -- various of his claims
15 about those numbers.
16    Q   Can you elaborate a little bit?
17    A   It's a large part of the report,
18 right, citing which districts -- he had some
19 districts that he had claimed he had switch to
20 make them into majority Black districts that
21 actual were already majority Black and things
22 like that.  Essentially, I'd be reading my
23 report, which you've read.
24    Q   We'll get to those sections later.
25 Thanks for clarifying which sections you

Page 82

1  meant.  How do you consider the preservation
2  of communities of interest?
3     A   Mr. Cooper claimed to have guided his
4  map in using these and key regions and
5  planning districts and things like that.  So I
6  reviewed whether his illustrative maps
7  actually followed and respected those key
8  region in planning region boundaries or not
9  and found that they did not.
10    Q   Did you consider incumbent addresses
11 in analyzing Mr. Cooper's map?
12    A   No, I do not.
13    Q   So that's not data that you
14 considered in Maptitude when you were looking
15 at the boundaries that Mr. Cooper drew; is
16 that right?
17    A   Correct.
18    Q   Do you agree that when you're drawing
19 maps, all of these traditional redistricting
20 principles are overlapping considerations
21 about where to draw a line?
22        MR. LEWIS:
23            Objection; vague.  You may
24        answer.
25        THE WITNESS:

Page 83

1            What do you mean by,
2        "Overlapping"?
3  BY MS. KEENAN:
4     Q   Would you agree that, if you look at
5  any of these factors in isolation, you might
6  run into a problem with one of the other
7  factors?
8     A   It's possible.
9     Q   So just as an example, if I draw one
10 line differently to make a district more
11 compact, I may then have had to draw another
12 line differently to comply with
13 one-person/one-vote, right?
14    A   It's possible.
15    Q   In that sense, some of these factors
16 may not stand alone; they might be considered
17 in conjunction with other traditional
18 redistricting factors, right?
19    A   You mean separate from this list?
20    Q   No.  I'm sorry.  I mean the ones in
21 this list.  That's what I mean by they're
22 overlapping.
23    A   I'm sorry.  I'm not following the
24 question.
25    Q   Yeah.  So I guess, maybe, to put it

Page 84

1  another way would you agree that considering
2  each of the traditional redistricting factors
3  we've just gone through, but disaggregated,
4  might not be the full picture of what someone
5  considers when they draw each individual line
6  or district?
7        MR. LEWIS:
8            Objection; vague.  It calls for
9        speculation.  You may answer.
10       THE WITNESS:
11           It's a really vague question.
12       Yes, you could just draw a map.  I
13       mean, there are many, many maps you
14       can draw that are purely equal
15       population, you know, that are purely
16       compact.
17 BY MS. KEENAN:
18    Q   Right.  But often that's to consider
19 both of those factors the same time in
20 determining whether to draw a line in a
21 certain place, right?
22    A   I guess so.
23    Q   We'll talk a little bit later about
24 the maps that you've drawn.  Maybe that will
25 help be a little more specific.  Now I want to

21 (Pages 81 to 84)

Page 85

1    switch over to the part of your report, going
2    back to Exhibit 5, about the scope of the
3    changes from 2022 to 2023 Illustrative Maps.
4    Illustrative House Map makes change to 21
5    House districts; is that right?
6        A    Compared to the original Illustrative
7    House Map, yes.
8        Q    We talked earlier about how you
9    looked at the Census block level data.  So you
10   also said that 2,464 Census blocks changed
11   from the 2022 to the 2023 Illustrative House
12   Map; is that right?
13       A    Yes.
14       Q    Like I said earlier, that's a
15   significantly smaller number when it comes to
16   the number of VTDs or precincts that were
17   moved, right?
18       A    I don't know the actual number.
19       Q    You agree it's not 2000 precincts
20   that were moved?
21       A    Yes.
22       Q    Do you know whether all of that 2,464
23   Census blocks are populated?
24       A    Do I know?  Yes, I know.
25       Q    And you know that they aren't all

Page 86

1    populated, right?
2        A    Correct.
3        Q    It's true that some of those Census
4    blocks have zero people in them, right?
5        A    Yes.
6        Q    Some may have a really small number
7    of folks in the Census block?
8        A    Yes.
9        Q    Do you know how many of the Census
10   blocks that you've calculated here have zero
11   people?
12       A    No.
13       Q    In your opinion, is there any
14   significance in moving a Census block that has
15   zero people in it?
16       A    There can be.
17       Q    Can you explain what it would be?
18       A    I mean, for example, there's one
19   district where Mr. Cooper just moved one block
20   that was zero population.  That was the only
21   change that he made.
22       Q    Can you explain why that's
23   significant?
24       A    I think he was trying to juice the
25   compactness numbers by moving be what was

Page 87

1    essentially the dirt between a freeway on-ramp
2    and the freeway -- or might have been highway.
3    But, yeah, that's what -- Mr. Cooper would
4    have to say why he did that.
5        Q    So you don't know why Mr. Cooper
6    moved that Census block, right?
7        A    Right.
8        Q    What's the basis for you -- are you
9    offering the opinion that he moved it to
10   "Juice the compactness measures," in your
11   words, or is that just your guess?
12       A    That was my guess.
13       Q    So you're not offering that as an
14   opinion in this case?
15       A    No.  I don't know what's in his mind.
16       Q    But you do -- in Paragraph 10 here,
17   you do criticize him for not highlighting HD-1
18   and HD-2, even though the only reassignment
19   was a single zero population Census block,
20   right?
21       A    Correct.
22       Q    Is there any reason why that critique
23   matters to your opinions in this case?
24       A    Yes.  He said, here's a list of all
25   the changed districts, and it was not an

Page 88

1    accurate list.
2        Q    Right.  But if the change is moving a
3    Census block with zero people in it, why does
4    that matter?
5        A    It can be significant.  It can have
6    -- it can change the compactness scores.  It
7    could be a politically significant spot on the
8    map.  It could be an important building to a
9    community of interest.  There are lots of
10   reasons that a zero population block can be
11   significant in the characteristics of a
12   district.
13       Q    But just to be clear, you're not
14   suggesting that any of those reasons are
15   actually true in these two districts in
16   Louisiana, right?
17       A    I do not know why Mr. Cooper moved
18   that block and why he did not make clear in
19   his list of changed districts that he had
20   moved that block.
21       Q    It sounds a little bit like you're
22   suggesting there's something nefarious about
23   including a zero population Census block to
24   make a district more compact.  Am I
25   understanding that correctly?  Or is there

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 89

1    some problem with moving a zero population
2    Census block to make a district more compact?
3        MR. LEWIS:
4            Objection; mischaracterizes the
5        testimony.  You may answer.
6        THE WITNESS:
7            It can -- as you were just
8        describing -- disrupt some other
9        considerations, such as keeping
10       community of interest together or
11       following a -- Mr. Cooper didn't
12       mention this, but often a traditional
13       redistricting principles to follow a
14       major physical feature.  So it can
15       disrupt other traditional principles.
16   BY MS. KEENAN:
17       Q   How can you explain how a single
18   zero -- a zero-person Census block would
19   impact a community of interests?
20       A   Sure.  Many communities of interest
21   are often -- community around a church or
22   around an elementary school, you know, it
23   could be a downtown area.  And in those cases,
24   just going through that list, where the church
25   is or where the school is would be significant

Page 90

1    if you kept the elementary school attendance
2    families together but took the school out.
3    Sometimes politicians --
4        Q   And what -- sorry.  Go ahead.
5        A   Sometimes politicians will do that
6    when there's big, you know,
7    fundraising-related building, such as a port
8    or a major office building.  There can
9    definitely can be zero population blocks that
10   are relevant to a community of interest.
11       Q   You also mentioned that there are --
12   in your report, going back up -- 83,489 people
13   in the Census blocks that Mr. Cooper moved in
14   the House Map.  Is that right?
15       A   Yes.
16       Q   Is that all residents or is that CVAP
17   population only?
18       A   That's total population.
19       Q   Do you know how many Louisiana
20   residents there are in total?
21       A   Not off the top of my head.
22       Q   Would you be surprised to learn there
23   are more than 4.6 million or is that
24   consistent with your understanding of the
25   state?

Page 91

1        A   I wouldn't be surprised.
2        Q   And even by your math, you state that
3    this is, quote, "Nearly the population
4    equivalent of two entire House districts,"
5    right?
6        A   Yes.
7        Q   So 83,489 is less than the population
8    of two House districts, right?
9        A   Yes.
10       Q   There are over a hundred House
11   districts in the State of Louisiana, right?
12       A   Yes.
13       Q   So you would agree this is less than
14   two percent of the population of Louisiana
15   that was moved in Mr. Cooper's illustrative
16   maps?
17       A   Yes.
18       Q   I'm going to move down to Paragraph
19   12 here, where you say that:  "Mr. Cooper's
20   Exhibit B-2 does not highlight as changed
21   HD-69, but both in comparison with his
22   original July 22, 2022 report, Exhibit I-1 and
23   a look at the map reveals HD-69 is
24   significantly changed."  Did I read that
25   correctly?

Page 92

1        A   Yes.
2        Q   I just want to understand what your
3    criticism is here is.  So I'm going to put on
4    my screen a new exhibit.  This one was
5    premarked as Exhibit 7, but I'm going to ask
6    the court reporter to mark it as Exhibit 9.
7            I'm going to represent that this is
8    Exhibit B-2 from Mr. Cooper's report, which
9    you referenced in Paragraph 12 of your own
10   report.  Does that seem fair to you, based on
11   your understanding of where Mr. Cooper
12   highlighted the various districts that he
13   changed?
14       A   Yes.
15       Q   I'm going to go down to 69.  Are you
16   able to see up here?
17       A   Yes.
18       Q   Am I understanding correctly that the
19   problem is that Mr. Cooper didn't mark this in
20   red text?
21       A   That is the result of the problem.
22       Q   What do you mean, that's the result
23   of the problem?
24       A   The problem is that he changed it and
25   then in his list of:  These are the districts

23 (Pages 89 to 92)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 93

1    I changed, he did not include it.
2        Q   Okay.  But are you asserting that any
3    of the data about District 69 that's included
4    in this Exhibit B-2 is incorrect?
5        A   I take that back.  None of the
6    numbers are incorrect.  Obviously, the data
7    includes the fact that he's shading the
8    districts that are changed in red, and he did
9    not do so.  The claim that this exhibit
10   reports which districted changed is inaccurate
11   data in this report.
12       Q   Sure.  But the only mistake in this
13   exhibit is that it's not in red texts and not
14   any of the numbers that he includes, right?
15       A   Correct.
16       Q   You'd agree this exhibit does show
17   that Exhibit 69 -- HD-69 is a
18   majority/minority district, right?
19       A   Just barely.
20       Q   It lists it 50.20 percent BVAP,
21   right?
22       A   Yes.
23       MS. KEENAN:
24           I'm now going to put up on my
25       screen the other exhibit that you

Page 94

1        mentioned, Exhibit I-1, which was
2        premarked as Exhibit 8 that will now
3        be -- I'm going to ask the court
4        reporter to mark it Exhibit 10.
5    BY MS. KEENAN:
6        Q   There is the same Population Summary
7    Report, but as it relates to the 2022
8    Illustrative Plan that Mr. Cooper provided,
9    right?
10       A   Yes.
11       Q   I'm going to go back down to HD-69.
12   You would agree that this report shows HD-69
13   as 23.75 percent BVAP, right?
14       A   Yes.
15       Q   So you would agree that the
16   population numbers that Mr. Cooper provided
17   across the two reports do show that Mr. Cooper
18   made a change to that district as well, right?
19       A   Yes.
20       Q   And you also are asserting that
21   Mr. Cooper's maps depicted Illustrative HD-69
22   as unchanged from 2022 to 2023, right?
23       A   His maps did not indicate which
24   districts changed and did not change.
25       Q   But the boundaries of HD-69 did

Page 95

1    change from the first 2022 Illustrative Map
2    that he submitted to the second illustrative
3    2023 districts that he submitted, right?
4        A   Yes.
5        Q   In reviewing the maps, you can see
6    that those boundaries had changed, right?
7        A   Once I zoomed in on them and looked
8    at them, yes.
9        Q   Okay.  That's helpful.  I want to go
10   to the next page of your report, back over to
11   Exhibit 5.  Are you able to see Figure 2 on
12   your screen?
13       A   Yes.
14       Q   Does Figure 2 show all of the changes
15   across the 2022 and 2023 Illustrative Plans?
16       A   Across the region that's shown in the
17   figure, yes.
18       Q   But there are -- are you suggesting
19   there are also additional districts that
20   changed that are not depicted in Figure 2?
21       A   I don't recall off the top of my
22   head.
23       Q   Why did you include this figure or
24   this specific region; do you remember?
25       A   Because the -- number one, this

Page 96

1    region is so densely populated and has so many
2    small House Districts that you can't really
3    see it well on a statewide map.  And because
4    just the scope of the changes you can see even
5    just on this region belies Mr. Cooper's claim
6    that the changes are minor.
7        Q   So I guess a couple of questions from
8    that.  The crosshatching here in Figure 2 that
9    you see in various places, that indicates
10   which Census Blocks were changed, right?
11       A   It indicates the whole area that was
12   changed, yes.
13       Q   Does this map indicate how many
14   people are in any of the areas that were
15   changed here?
16       A   No.  I'd go through those numbers.  I
17   handled the illustrative samples separately.
18       Q   But we can't tell how many, if any,
19   people are any of these areas that are
20   crosshatched in this Figure 2, right?
21       A   Not specific numbers.  But,
22   obviously, we know -- if you spend enough time
23   knowing the population centers, you know which
24   areas are populated and which ones are more
25   rural.

24 (Pages 93 to 96)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 97

1     Q   Is it possible that any of these
2  areas of crosshatching have zero people in
3  them?
4     A   It's possible.
5     Q   I'm going to move on to Paragraph 14
6  just below that figure.  Here you explain that
7  the changes of the Illustrative Senate Map
8  moved 35,276 people in the new districts,
9  right?
10    A   Yes.
11    Q   Again, that's all people, not just
12 CVAP population?
13    A   Yes.
14    Q   And so here, based on the math we did
15 earlier, we're talking about less than
16 one percent of the Louisiana's overall
17 population, right?
18    A   I don't know the exact percentage.
19 Somewhere around there.
20    Q   If 86,000 was less than -- sorry.  If
21 83,000 was less than two percent, than 35,000
22 is less than one percent, right, just basic
23 math?
24    A   Yes.
25       MS. KEENAN:

Page 98

1          I see we've reached another hour
2  mark and I'm about to start at the
3  next section of my outline here.  Do
4  we want to take another five-minute
5  break, or are we thinking -- do you
6  need a longer break than that?  I'm
7  just curious how you're feeling?
8       THE WITNESS:
9          It depends on how long a day --
10 you think we still have multiple
11 hours to go?
12      MS. KEENAN:
13         I think we still do have
14 multiple hours to go.  I'm happy to
15 either, you know, take a short break
16 and do the next session or take a
17 slightly longer break and then
18 continue ahead from there.  Whatever
19 you're more comfortable with is fine
20 with me.
21      THE WITNESS:
22         I'm flexible, as long as we
23 don't go -- take lunch in an hour or
24 take lunch in a half an hour or
25 whatever makes more sense to you.

Page 99

1       MS. KEENAN:
2          Patrick, do you have a
3  preference?
4       MR. LEWIS:
5          Yeah, I think either we take the
6  lunch now or we take it at the next
7  break in one hour from now.
8       MS. KEENAN:
9          Either is fine with me, whatever
10 you guys prefer.
11      MR. LEWIS:
12         Madam Court Reporter, do you
13 have a preference?
14      THE COURT REPORTER:
15         I do not.
16      MS. KEENAN:
17         Sounds like no one is super
18 hungry yet.  Let's take a quick break
19 now and we can back for lunch after
20 afterwards.  All right?
21      MR. LEWIS:
22         Sounds good.
23      MS. KEENAN:
24         We can go back on the record
25 around 12:18.

Page 100

1          (BRIEF RECESS 12:13 P.M  to 12:21 EST)
2  BY MS. KEENAN:
3     Q   I am going to share my screen again,
4  because I want to talk a little about your
5  opinions regarding compactness.
6          Is it your opinion that the 2023
7  House Illustrative Map is less compact than
8  the 2022 House Illustrative Map?
9     A   As I state here, the districts change
10 became less compact.
11    Q   What is your basis of your
12 conclusions that the districts -- the change
13 became less compact?
14    A   As described here, looking at both
15 the numbers from Maptitude and actually just
16 looking at the district shapes.
17    Q   So I want to talk about the measure
18 of compactness first.  Paragraph 16 here says
19 that you use Maptitude to compute the ten
20 measures of compactness built into the
21 software.  Did I read that correctly?
22    A   Yes.
23    Q   Paragraph 18 refers to eleven
24 compactness scores built into Maptitude in the
25 last line there.  Am I reading that correctly?

Page 101

1      A   Yes.
2      Q   Do you know which of those statements
3  about the number of measure of compactness
4  built into Maptitude is correct?
5      A   Well, both of them.  There are ten
6  that measure each district's compactness and
7  then one that only gives a plan-wide
8  compactness measure.
9      Q   Okay.  Great.  So there are eleven
10  total, but ten that operate at the district
11  level.  Is that what I'm understanding?
12      A   Yes.
13      Q   Thank you for clarifying.  So of the
14  ten district level measures that you
15  considered, two of them actually improved
16  across the districts; is that right?
17      A   Yes, as described there.
18      Q   And that's the Ehrenburg and the
19  Length-Width measures, right?
20      A   Yes.
21      Q   Are you offering any opinion about
22  whether these are legitimate measures of
23  compactness?
24      A   All these measures are legitimate in
25  their own way.

Page 102

1      Q   Okay.  You also concluded that the
2  average score remained constant, or
3  essentially constant, at .01 difference
4  between 2022 and 2023 maps under eight
5  additional compactness scores built into
6  Maptitude, right?
7      A   Are you reading from the report?
8      Q   Yes, Paragraph 18, the second
9  sentence there.
10      A   Yes.
11      Q   One of those eight measures, though,
12  that you list in the footnote to Paragraph 18
13  is Ehrenburg.  That's one of the measures you
14  agree showed improvement in the least compact
15  district, right?
16      A   Yes.
17      Q   And in Paragraphs 16 and 17, there is
18  a greater than .01 percent improvement in the
19  Ehrenburg score, right?
20      A   Different scores.
21      Q   So even the Ehrenburg metric, or the
22  ten metrics, can be scored differently,
23  depending on whether you're looking at the
24  district level or the full plan level, right?
25      MR. LEWIS:

Page 103

1      Objection.  You may answer.
2      THE WITNESS:
3          The individual district scores
4      will definitely be different than the
5      overall plan score.
6  BY MS. KEENAN:
7      Q   Does that mean that the measure is
8  applied the same way, just in a different
9  level or are they actually two different
10  tests?  I'm just trying to understand the
11  difference between how the metrics work at the
12  district level and the plan level.
13      A   I mean, it's just as described there.
14  The report gives a district by district score.
15  And then it offers the median score for the
16  whole plan.  And it offers minimum and maximum
17  scores.  It also offers a standard deviation,
18  but that's rarely referenced.
19      Q   So based on Paragraph 18, am I
20  understanding that the median score under
21  Ehrenburg is .36, but the mean or the average
22  is .01?
23      MR. LEWIS:
24          Objection.  It mischaracterizes
25      the report.  You may answer.

Page 104

1      THE WITNESS:
2          No.
3  BY MS. KEENAN:
4      Q   So can you explain what you're saying
5  here.  It looks like the numbers are
6  different.  I might just be misreading.  I'm
7  just trying to understand what I'm not
8  understanding about the numbers here.
9      A   It's the difference between median,
10  average and least, the three numbers, three
11  different numbers.  Do you need me -- I can
12  explain that, if you want me to.
13      Q   No, I've got that.  Are you saying
14  that both of the maps, the 2022 and the 2023
15  maps, have the same median of .36?
16      A   Under Ehrenburg, yes.
17      Q   Got it.  So it's an essentially
18  constant Ehrenburg score across the two maps
19  when evaluated at the full plan level?
20      A   No.
21      Q   Okay.  Can you explain, then, what is
22  staying constant about the Ehrenburg score
23  between the 2022 and 2023 maps?
24      A   The median score stays constant.
25      Q   Okay.  I thought that's what I said.

26 (Pages 101 to 104)

Page 105

```
 1    I must have misstated it.  I'm sorry.
 2         But the median score, as it relates
 3  to the overall map and not the individual
 4  districts; is that right?
 5    A   I'm sorry.  What's the question
 6  there?
 7    Q   So the median score remains constant
 8  across the two maps at the plan-wide level
 9  rather than at the district specific level; is
10  that what you mean?  Or is this the district
11  specific measure?
12    A   Median, by definition, means half the
13  districts are above it and half the districts
14  are below it.
15    Q   Right.  I think I understand.  Give
16  me one second to just look at this for a
17  minute to make sure there's nothing else I
18  have a question on this.
19         Can I ask -- when you say there's a
20  .01 difference between the 2022 and '23 maps
21  under certain compactness scores, does that
22  mean the scores actually got slightly better
23  under any of those tests?
24    A   Under some tests, they may have
25  gotten 0.01 better, and then there's some that
```

Page 106

```
 1  might have gotten 0.01 worse.  But that's such
 2  a tiny difference that -- on a statewide
 3  average that can't be a policy consideration,
 4  making one map better than another.  It's that
 5  tiny of a difference.
 6    Q   Do you know how many of eight got
 7  better as compared to stayed constant or
 8  worse, even at a small level?
 9    A   No, because -- no.
10    Q   Okay.
11    A   I didn't dig into the mathematical
12  irrelevant level of how many were better,
13  worse.  It's all mathematically irrelevant.
14    Q   So the scores for the other three
15  compactness measures built into Maptitude, you
16  concluded that less compact from the 2023
17  House Illustrative Map than the 2022 House
18  Illustrative Map, right?
19    A   Yes.
20    Q   The three measures where you say the
21  scores became less compact are cut edges,
22  perimeter and length-width?
23    A   I can't see the footnote, but, yeah,
24  they're cited there in the footnote.
25    Q   You can see that now?  That is at the
```

Page 107

```
 1  -- I guess this is what I'm trying to ask.  In
 2  Paragraph 18, you refer to the overall map
 3  score, right?
 4    A   Yes.
 5    Q   Is Paragraph 19 also operating at the
 6  overall map score level?
 7    A   Yes.
 8    Q   Because at the district level, you
 9  agree length-width was one of the measures
10  that actually improved, right?
11    A   At the lowest score -- as described
12  there, focusing on the least compact district
13  in each map.
14    Q   Right.  And so in that sense, at the
15  district level, the length-width score
16  improved.  But in Paragraph 19, you're saying
17  that at the overall map level, the
18  length-width score decreased, right?
19    A   Go back up.
20    Q   Sure.
21    A   So for the least compact district,
22  the length-width score is higher or better in
23  the new plan than the old plan.
24    Q   Right.
25    A   Yes.
```

Page 108

```
 1    Q   So it's the overall map score that
 2  you say became less compact in the 2023 plan,
 3  right?  Down here, in Paragraph 19?
 4    A   Yes, uh-huh.
 5    Q   How much less compact under the
 6  length-width score was the overall map in
 7  2023?
 8    A   I'd have to pull it from the files.
 9  I don't know off the top of my head.
10    Q   You don't offer a number for how much
11  less compact you think the map became in 2023,
12  right?
13    A   I mean, it's there in my supporting
14  documents.
15    Q   Okay.  But the report doesn't explain
16  the numbers for the cut edges, the perimeter
17  or the length-width measure?
18    A   I mean, it explains them, because
19  Paragraph 19 is talking about them.
20    Q   But in Paragraphs 16, 17 and 18, you
21  provide specific numbers that each metric
22  produces when you're comparing the 2022-2023
23  reports, right?
24    A   Eighteen only does that for
25  Ehrenburg.
```

27 (Pages 105 to 108)

Page 109

1    Q    And it provides the change is either
2    zero or .01 for the remaining numbers, right?
3    A    Right.
4    Q    But we don't have any sense from this
5    report -- or at least Paragraph 19 in this
6    report, as a numerical difference in the
7    compactness measures for cut edges, perimeter
8    or length-width, right?
9    A    No.  It's obviously bigger than 0.01.
10   Q    When you say it's obviously bigger,
11   do you know how much bigger?
12   A    Not off the top of my head, but it's
13   in the supporting documents.
14   Q    And in your opinion, is it bigger
15   than the point at which it's -- what you just
16   called mathematically relevant?
17   A    Yes.
18   Q    And you can be sure of that --
19   A    Yes.
20   Q    -- looking at the numbers?  Okay.
21        Now, I'm going to take a look at
22   Paragraph 20, where you talk about the changes
23   of HD-50 and 96.  First I just have a question
24   about the way you describe HD-96 as it existed
25   in the 2022 Illustrative Map.  I'm reading it

Page 110

1    from this paragraph here.  You say: "Taking
2    HD-96 from being" -- then you proceed here to
3    describe former HD-96 in the 2022 House
4    Illustrative Map, right?  Is that what this
5    highlighted portion is purporting to do?
6    A    I'm sorry.  I didn't follow that
7    question.
8    Q    Sure.  So the full paragraph in 20
9    explains that the 2023 map changes the 2022
10   map by taking HD-96 from being one thing to
11   then adding other areas to it, right?  That's
12   the general structure of this sentence?
13   A    Yes.
14   Q    So what I have highlighted right
15   here -- can you see the highlighting on your
16   screen?
17   A    Yes.
18   Q    Starting with, "By taking," ending
19   "In the 2022 map," right before Footnote 3.
20   That is the description of what HD-96 was in
21   the 2022 House Illustrative Map; is that
22   right?
23   A    Yes.
24   Q    And am I understanding that you say
25   HD-96 in the 2022 House Illustrative Map

Page 111

1    included as much of St. Mary Parish as
2    possible within the equal population
3    requirements in the 2022 map?
4    A    Was that a question?
5    Q    Yes.  Am I reading that correctly?
6    A    Yes.
7    Q    So I'm going to zoom in here for a
8    minute.  You are saying that in this 2022
9    House Illustrative Map, HD-96 already includes
10   a portion of St. Mary Parish.  Is that what
11   you're saying there?
12   A    That's what I say.  That may be a
13   typo.  I may have meant St. Martin, obviously.
14   Q    Okay.  So it's possible you meant a
15   combination of the southern non-contiguous
16   portion of St. Martin Parish and as much of
17   St. Martin Parish as possible within the equal
18   population requirements?
19   A    Yes, just like the map.
20   Q    Okay.  And so you're not saying that
21   HD-96 included any portion of St. Mary in the
22   2022 House Illustrative Map; is that right?
23   A    Right.
24   Q    I just wanted to make sure that I
25   understood that.  Do you agree that Figure 3

Page 112

1    does not depict waterways in this map?
2    A    I mean, you can make out the river
3    curling around in St. Mary's there, but it
4    doesn't have a water layer.
5    Q    Why did you choose -- did you create
6    these photos?
7    A    Yes.
8    Q    And where did you pull them from?
9    A    From the Maptitude mapping software.
10   Q    Why did you choose not to display the
11   waterways in this image?
12   A    It wasn't a conscious choice to do it
13   or not.  I was looking at the district
14   configurations.
15   Q    Does that mean that you, as a default
16   matter, do not display the waterways when
17   you're reviewing Maptitude; is that just the
18   way that it was configured in your computer?
19   A    Depending on what I'm doing.  I look
20   at it sometimes and don't look at it at other
21   times.  I mean, when we're looking at
22   compactness, I usually don't look at water.
23   Q    Okay.  Do you agree that rivers,
24   lakes and other waterways can be geographical
25   features that shape communities?

28 (Pages 109 to 112)

Page 113

1    A   They can be.
2    Q   And are waterways something that you
3  ever consider in drawing maps?
4    A   Sure.
5    Q   But not at the compactness level?
6        MR. LEWIS:
7           Objection; vague.  You may
8  answer.
9        THE WITNESS:
10          The map in compactness analysis,
11       when you're doing the formulas, does
12       not treat water geography as special
13       compared to any other geography.
14   BY MS. KEENAN:
15     Q   Okay.  And so do you think displaying
16   the water feature in an image will alter the
17   way a district meets the eye test about
18   compactness or contiguity any other
19   traditional redistricting principle?
20       MR. LEWIS:
21          Objection; you may answer.
22       THE WITNESS:
23          I'm not sure I follow the
24       question.
25

Page 114

1   BY MS. KEENAN:
2     Q   Okay.  Do you think that being able
3  to see a water feature on a map could change
4  the way you perceive whether it complies with
5  any traditional redistricting principles?
6       MR. LEWIS:
7          Objection; you may answer.
8       THE WITNESS:
9          Sure.
10   BY MS. KEENAN:
11     Q   Before I move on to the Senate, I
12   just have another couple questions about the
13   House here.  Would you agree that Paragraph 16
14   and 17 here talk about measures of compactness
15   as applied to the individual changed districts
16   in the 2022 and 2023 Illustrative Maps?
17     A   Sorry.  Can you ask that again?
18     Q   Sure.  So Paragraphs 16 and 17, they
19   refer to changes to in compactness in the
20   individual changed districts between the 2022
21   and 2023 Illustrative Maps, right?
22     A   Yes.
23     Q   And Paragraphs 18 and 19 focus on
24   overall map score changes across the 2022 and
25   2023 districts, right?

Page 115

1    A   Yes.
2    Q   Is it typical for you to assess
3  compactness on both the district-by-district
4  basis and on a plan-wide basis?
5    A   Depends on the law in a given
6  jurisdiction when I'm drawing the maps.  And
7  when I'm looking at another expert's claims
8  about compactness, it depends on what they're
9  claiming, and would probably look at both.
10     Q   Did law in Louisiana or in federal
11   court influence your decision to look at
12   either plan-wide basis or district-by-district
13   basis?
14     A   No.
15     Q   I'm going to move on to the Senate.
16   Is it your opinion that the 2023 Senate
17   Illustrative Map is less compact that the 2022
18   House Illustrative Map?
19     A   As written right there in Paragraph
20   21, it does under the average scores.
21     Q   And is that under --
22     A   I should get a full -- as noted there
23   on the average scores of the eight of the
24   eleven compactness measures.
25     Q   Is this assessing on both the

Page 116

1   district-by-district and a plan-wide basis as
2  well, or is this focusing on one or the other?
3    A   That paragraph is focusing on the
4  average score -- I'm sorry.  That sentence is
5  focusing on the average score.  And the next
6  sentence is focusing on the least compactness
7  district score.
8    Q   On the eight measures that you say
9  are less compact at the average score level,
10   those are listed in Footnote 4 here, right?
11     A   Yes.
12     Q   Do you know how big the difference is
13   between the scores on these eight measures?
14     A   Not off the top of my head.  It's in
15   is the supporting documents.
16     Q   But you say that, in Paragraph 20 --
17   sorry -- Paragraph 21 has the footnote about
18   the eight of the eleven Maptitude compactness
19   measures.  You say in Footnote 4 to that
20   paragraph that the 2023 Senate Map was more
21   compact by the absolute minimum change
22   possible of .01 in each case under the
23   remaining three measures.  Is that right?
24     A   Yes.
25     Q   So, again, are you certain that the

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 117

1    other eight measures are not by that same
2    minimum change possible of .01?
3        A    We can just pull up the document and
4    see for certain.
5        Q    And do you know where in your file
6    that document is?
7        A    It should be a file called,
8    "Compactness Scores."
9        Q    We can take a look after the next
10   break, if we need to.  But you don't know,
11   sitting here today, whether the difference in
12   the scores that became less compact were
13   bigger than .01 difference or are you sure?
14       A    I'm not certain off the top of my
15   head.
16       Q    And you would agree the map does
17   improve, even if slightly, on those remaining
18   three measures, right?
19       A    I wouldn't consider 0.01 change an
20   improvement.
21       Q    It is literally more compact by .01,
22   using that score?
23       A    It's essentially random noise.
24       Q    But that is what the metric says,
25   yes?

Page 118

1        A    Yes.  The measure says that it's
2    changed by 0.01, yes.
3        Q    Your report also says in Paragraph 21
4    that the least compact district is less
5    compact in the 2023 Senate Illustrative Map
6    than the least compact district in the 2022
7    Senate Illustrative Map, according to two
8    Maptitude compactness measures, right?
9        A    Yes.
10       Q    But you agree it's unchanged by the
11   other seven district specific measures, right?
12       A    The least compact district is
13   unchanged?  Yes.
14       Q    So on the majority of the compactness
15   measures, the least compacts in a district
16   actually doesn't fair differently across the
17   two maps, right?
18       A    Sure.
19       Q    Hopefully, my last question about the
20   numbers or measure of compactness.  But here
21   you say there are two Maptitude compactness
22   measures where the least compact district is
23   less compact and there are seven other ones,
24   which adds up to nine.  Why is that nine,
25   rather than ten?  You told us there were ten

Page 119

1    that operated at the district level?
2        A    Yeah.  I don't know off the top of my
3    head.
4        Q    Okay.  So it's possible there's one
5    more measure that's not included in here?
6        A    Yes.
7        Q    All of these compactness measures
8    that we've discussed measure the compactness
9    scores of the 2022 Illustrative Map and the
10   2023 Illustrative Map, correct?
11       A    Yes.
12       Q    None of these compactness scores that
13   we've just discussed measure the compactness
14   of the Enacted map, right?
15       A    Correct.
16       MS. KEENAN:
17            I have one more short section
18       that I think I can get through
19       relatively quickly or we can break
20       here, because I'm at a section break
21       for lunch.  Do you all have a
22       preference for doing that?
23       MR. LEWIS:
24            How short is the short segment,
25       15, 20 minutes?

Page 120

1        MS. KEENAN:
2            I think it's probably about 15
3        or 20 minutes.  Actually, it might
4        not be.  We can do the break now.
5        MR. LEWIS:
6            How much time do we need?  I'm
7        easy.  I run across the hall to our
8        office kitchen, but I think for
9        others, it may take some more time.
10       MS. KEENAN:
11           I think 30 minutes to an hour is
12       standard.  I'm really open to either.
13           So, Dr. Johnson, what do you
14       think?
15       THE WITNESS:
16           Probably an hour is better.
17       MR. LEWIS:
18           Just to be clear, we're talking
19       about 1:50 p.m. Eastern Time?
20       MS. KEENAN:
21           Yeah.  That's sounds great.
22       MR. LEWIS:
23           Fabulous.
24   (LUNCH BREAK FROM 12:50 P.M. TO 1:50 P.M. EST)
25

30  (Pages 117 to 120)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 121

1  BY MS. KEENAN:
2      Q   So before we move on to compactness,
3  I want to make sure I want to understand some
4  of the limitations you were just drawing
5  before we went off the record.  When you say
6  that a .1 change is -- I think you said
7  mathematically irrelevant.  What are you --
8  what's the basis for that kind of conclusion?
9      A   It's .01 changes.
10     Q   Sorry, .01, of course, yes.
11     A   It's such a tiny change that it has
12  no significant difference in the compactness
13  of one versus another.
14     Q   Is there any accepted statistical
15  significance measure for compactness measures;
16  is there, like -- is there a threshold that
17  you have to cross for the change to be
18  statistically significant, in your opinion?
19     MR. LEWIS:
20         Objection.  You may answer.
21     THE WITNESS:
22         I mean, you could get into the
23     standard air stuff, but that all
24     assumes that the average is relevant
25     at all.  So compactness is much more

Page 122

1      a case of avoiding significantly
2   non-compact districts than it is, is
3   this district an 80 percent perfectly
4   compact district or is this district
5   a 90 percent perfectly compact
6   district?  So some states have
7   compactness written in their
8   constitution.  I don't know that any
9   actually put a mathematical measure
10  into their constitution or into their
11  state laws.  Some state legislatures
12  adopt their local rules and will
13  adopt a measure in -- a specific
14  named measure in a value that
15  matters, but there's no accepted --
16  nationally accepted or universally
17  accepted value.
18  BY MS. KEENAN:
19     Q   Just so I understand sort of the
20  reach of your opinion about the .01 being
21  mathematically irrelevant.  What if a change
22  was -- I don't know, .05 in the compactness
23  measure; still mathematically irrelevant?
24     A   We'd have to be more situation
25  specific, as you start to get bigger.

Page 123

1      Q   Okay.  What about, like, .03; is that
2   mathematically relevant, if .01 is
3   mathematically irrelevant?
4      A   Again, you would have to be more
5   specific to a given situation.
6      Q   When you say .01 is mathematically
7   irrelevant, is that also specific to a
8   situation or is that just, like, true across
9   the board, .01 definitely insignificant?
10     A   Yeah.  I can't imagine a situation
11  where .01 would be significant.  I mean,
12  especially given that these numbers are
13  reported to two decimals.  So .01 could be
14  .005.  These are just tiny, tiny differences
15  in fairly abstract measuring tools.
16     Q   So I found the backup file that you
17  mentioned.  I'm going to pull it up, just so
18  we can look at it together.  I'm going to
19  share my screen for a moment.  Are you able to
20  see what I'm sharing on my screen?
21     A   Yes.
22     Q   Okay.  I'm going to show you two
23  different -- these are from your backup file.
24  I think the subfolder is "Plans" and then the
25  subfolder "Stats," and then you have a series

Page 124

1   of compactness reports.  Does sound familiar
2   to you, based on the files you submitted with
3   your report?
4      A   Yes.
5      Q   So this is the measures of
6   compactness report that you have titled,
7   "Illustrative Senate Measures of Compactness
8   Report."  And then the next document I'm
9   showing on my screen is titled in your file,
10  "Illustrative Map 2023 Senate Measures of
11  Compactness Report."  Do you recall putting
12  those in the backup file?
13     A   It was a long time ago.  I don't
14  recall.  It certainly seems like something I
15  would do to.
16     Q   These look like the standard exports
17  from Maptitude for the two Illustrative Senate
18  Plans, right?
19     A   Yes.
20     MR. LEWIS:
21         Before you get to your next
22     question, are you going to mark these
23     as exhibits?
24     MS. KEENAN:
25         I was planning to mark this

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 125

1     third document as an exhibit instead,
2     just to make sure that he could
3     confirm this was an accurate
4     demonstrative of those two together,
5     just to make it a little easier for
6     the questioning. Let me ask
7     Dr. Johnson first.
8  BY MS. KEENAN:
9     Q   Can you tell that these two tables
10 are the same as the ones that we've just
11 reviewed? This one is for the Illustrative
12 Senate at the top here. And then the one on
13 the bottom of this document you have in front
14 of you, it has, "Plan Name Ales_2023_Senate in
15 the same way your document Ales_2023_Senate
16 says that? Does that look right to you?
17    A   Short of going through each
18 individual number, yes, they all look correct.
19    MS. KEENAN:
20       Let's mark them all as exhibits
21    just to be safe for the record. I
22    think we were up to 11. So we'll
23    mark the file reflecting the Measures
24    of Compactness for the Illustrative
25    2022 Senate as Exhibit 12. We'll

Page 126

1     mark the file that shows the Measures
2     of Compactness Report for the
3     Illustrative 2023 Senate as Exhibit
4     13. And we will mark this to
5     demonstrative showing the Measures of
6     Compactness Report for both the 2022
7     and 2023 Illustrative Senate Maps as
8     Exhibit 14.
9        I realized I was talking a
10    little quickly. Did the court
11    reporter catch those? And I will, of
12    course, send over marked exhibits for
13    afterwards.
14    THE COURT REPORTER:
15       Yes, I did.
16 BY MS. KEENAN:
17    Q   So, Dr. Johnson, I want to talk about
18 the differences in the senate measures that we
19 were discussing shortly before the break.
20 When you talk about the average score, you're
21 looking at the mean number, right?
22    A   Yes.
23    Q   So would you agree that the Reock
24 score on the Measure of Compactness Report
25 from the 2022 Senate Plan on the top, 2023

Page 127

1  Senate Plan on the bottom. Would you agree
2  that the difference in the average Reock score
3  is .01?
4     A   Yes.
5     Q   The Schwartzberg score is be next
6  one. That looks likes a 1.96 mean in the 2022
7  Illustrative Plan, right?
8     A   Yes.
9     Q   1.99 in the 2023 Illustrative Plan?
10    A   Yes.
11    Q   So that's .03 as the difference,
12 right?
13    A   Yes.
14    Q   I'm going to go to Alternate
15 Schwartzberg. This is 2.17 in the 2022 Senate
16 Plan to 2.22 in the 2023 Senate Plan; is that
17 right?
18    A   Yes.
19    Q   So that's .04 for the Alt Swartzberg,
20 right?
21    A   .05.
22    Q   .05, that's right. Polsby-Popper is
23 next. That one, the mean goes from .24 to
24 .22. Did I read that right?
25    A   Yes.

Page 128

1     Q   So the change between the 2022 to
2  2023 plan is .02, right?
3     A   Yes.
4     Q   I think the Population Polygon and
5  the Population Circle, you did discuss the
6  numbers in your report, right? You can see
7  the difference in the mean for those two is
8  both .01 across the 2022 and 2023 maps, right?
9     A   Yes. And same for Area Convex/Hull.
10    Q   That's right. I do want to talk
11 about that one, because that's not highlighted
12 in the report. The 2022 Senate measure is .71
13 and the 2023 Illustrative Senate measure is
14 .70; is that right?
15    A   Yes.
16    Q   So that's a .01 change, as well?
17    A   Yes.
18    Q   And for then Length-Width, we go from
19 -- I'm sorry. For Ehrenburg, first -- we go
20 from .34 to .32, which is a .02 change from
21 the 2022 and the 2023 maps, right?
22    A   Yes.
23    Q   My other question on the Senate Map
24 is -- I'm going back to your report, again,
25 which is marked Exhibit 5. The Perimeter

32 (Pages 125 to 128)

Page 129

1    Plan -- sorry.  Give me one second.  So in
2    Paragraph 21 is where you're talking about the
3    scores on the Senate measures, right?
4        A    Yes.
5        Q    And Footnote Number 4 attached to 21
6    mentions that the Senate Map became more
7    compact by the absolute minimal change
8    possible of .01 in each case in the Population
9    Polygon and population Circle, along with the
10    perimeter measure.  Did I read that correctly?
11       A    I think so.  I didn't follow the
12    first part of it.
13       Q    I'm sorry.  This last sentence in
14    Footnote 4 says it became more compact by the
15    absolute minimal change possible of 0.01 in
16    each case.  And then it lists the three
17    measures, Population Polygon, Population
18    Circle, along with the Perimeter measure,
19    right?
20       A    Yes.
21       Q    I just want to go back to this chart,
22    again, for a second.  You agree that perimeter
23    measure is not measured by mean like the other
24    ones we've talked about so far, right?
25       A    Right.

Page 130

1        Q    So that change from the 2022 to 2023
2    Senate Map; actually jumps from 9,672.35 down
3    to 9,625.98, right?
4        A    Yes.
5        Q    And the lower perimeter score, the
6    better; is that right?
7        A    Depending on what you're comparing.
8    The total number per perimeter is not --
9    perimeter is very quirky measure.
10       Q    Okay.  But this is one that you had
11    listed as -- that you listed in your report as
12    becoming more compact, right, in the 2023?
13       A    Technically, yes.
14       Q    Why do you say, "Technically, yes"?
15       A    Well, because perimeter is driven
16    really by how many rural districts there are.
17    Because that's where the perimeter comes from.
18    It's just measuring the perimeter of every
19    district.  So it really is more of a regional
20    comparison.  It really only becomes useful if
21    you compare a district or a group of districts
22    in one map to a district or group of districts
23    in the same area in another map.  It's a very
24    limited usefulness measure.  But it gets cited
25    all the time because it's really easy and fast

Page 131

1    derived.
2        Q    Okay.  So is it your opinion that
3    perimeter is not a very important measure in
4    compactness?
5        A    No.  It can be useful if you're
6    looking within the perimeters in which it is
7    useful, such as I just described.
8        Q    Okay.  Is the jump here from -- you
9    know, the dropoff from 9,672 to 9,625, is not
10    statistically significant or mathematically
11    relevant, in your view?
12       A    It depends on how that was achieved.
13       Q    So the metric itself doesn't tell you
14    whether there's been a statistically
15    significant change in the perimeter category
16    for comparison; is that what you're saying?
17       A    Speaking out of context of the map
18    itself?  I guess I would agree with that.
19       Q    Okay.  Give one second to see if I
20    have any more questions on this.  Just to go
21    back to your report, Exhibit 5, again, for a
22    second.  You would agree that in Paragraph 19,
23    you say:  "The scores for the three other
24    compactness measures built into Maptitude
25    became less compact for the 2023 House

Page 132

1    Illustrative Map than in the 2022 House
2    Illustrative Map," right?
3        A    Yes.
4        Q    So that would be the House, not the
5    Senate now?
6        A    Yes.
7        Q    But you'd agree, based on this
8    footnote, that one of those three measures is
9    actually perimeter, right?
10       A    Yes.
11       Q    Okay.  I think I'm done with
12    compactness.  I will move on now to the
13    section of your report about socioeconomic
14    data beginning at Paragraph 22.  So in
15    Paragraph 22, you state that the data used in
16    Mr. Cooper's redistricting system do not
17    include socioeconomic data; is that right?
18       A    Yes.
19       Q    Can you describe the basis for that
20    conclusion?
21       A    The data that Mr. Cooper turned over
22    and represented as the data from his
23    redistricting system does not include the
24    socioeconomic data.
25       Q    A couple of times in the report you

33 (Pages 129 to 132)

Page 133

1    talked about CVAP datasets and socioeconomic
2    data together. Do you consider CVAP data to
3    be socioeconomic data or is that separate?
4         A   CVAP could be a subset of
5    socioeconomic data.
6         Q   And you told us earlier you had an
7    opportunity to review the Redistricting Data
8    Hug CVAP dataset that Mr. Cooper provided to
9    defendants, right?
10        A   Yes.
11        Q   Do you agree that disaggregated block
12   level CVAP data is available in that dataset?
13        A   The file he provided was not at the
14   block level.
15        Q   How did you determine that?
16        A   I opened it up and looked at it.
17        Q   Do you agree that publically
18   available ACS data on the U.S. Census Bureau
19   website contains socioeconomic data at the
20   municipal and parish level?
21        A   Yes.
22        Q   But you didn't analysis that data
23   like you told us earlier, right?
24        A   I'm sorry. Which of my earlier
25   comments you're referring to?

Page 134

1         Q   I think earlier when we looked at
2    Mr. Cooper's Exhibit B, which -- I'll pull it
3    back up. This is Exhibit 9, for the purposes
4    of the deposition. We got to Paragraph 6 we
5    talk about these charts and tables that
6    Mr. Cooper had pulled together, and you said
7    you didn't look at those specific charts and
8    tables. Do you recall that?
9         A   I didn't go back and look at the
10   original files on the Census website.
11        Q   So is it your testimony that, apart
12   from what was in Mr. Cooper's report, you did
13   look at the charts and tables that were
14   attached as exhibits to his report regarding
15   the socioeconomic data?
16        A   And the GIS files, yes.
17        Q   You would degree that the ACS data
18   includes information about income?
19        A   You mean Mr. Cooper's or on the
20   Census website?
21        Q   Well, the ACS data on the census
22   website -- I guess both -- also the charts and
23   the tables that Mr. Cooper created. Would you
24   agree that those included information about
25   income?

Page 135

1         A   Certainly, the -- I mean, the Census
2    website has thousands, if not tens of
3    thousands of variables in it. Mr. Cooper had
4    his socioeconomic section of his report that I
5    read through.
6         Q   Right. And he -- in Mr. Cooper's
7    report -- give me one minute to get to it.
8    I'm going to stop sharing the screen for just
9    a moment while I find the relevant section.
10   I'm going to share my screen again. We are
11   back in Exhibit Number 7, Mr. Cooper's initial
12   report. Can you see this on my screen?
13        A   Yes.
14        Q   Okay. You agree Mr. Cooper had a
15   section of his report called "Socioeconomic
16   Profile of Louisiana," like we discussed,
17   right?
18        A   Yes.
19        Q   But you'd agree that he also says
20   that he depicts some of the information in
21   this section, quote, "With further detail in
22   charts in Exhibit E-1 and table in Exhibit
23   E-2." Do you see where he says that?
24        A   Yes.
25        Q   Throughout his reference he makes

Page 136

1    reference to Exhibit E-1 and Exhibit E-2,
2    correct?
3         A   Yes.
4         Q   He also depicts charts with
5    socioeconomic disparities in Exhibit F and
6    Exhibit G, right?
7         A   Yes.
8         Q   And additional socioeconomic contrast
9    charts that he provides a link to in Paragraph
10   51; is that right?
11        A   Is what right?
12        Q   Is it right that he prepared
13   socioeconomic contrast charts and provided a
14   link to that in Paragraph 51?
15        A   Yes.
16        Q   Did you review the Exhibits E, F and
17   G in reaching your conclusions in this case?
18        A   Briefly, yes.
19        Q   What about the link at 51?
20        A   I did click on it and looked at the
21   data there. I didn't spend much time with it.
22        Q   Okay. But these -- you didn't spend
23   a lot of time studying these exhibits in
24   conducting your analysis in this case; is that
25   fair to say?

34 (Pages 133 to 136)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 137

1    A   As a very general statement,
2   probably.
3    Q   What do you mean when you say,
4   "Briefly"?  I want to make sure we're using
5   your words?
6    A   Mainly, I was looking for any
7   connection between these data tables and these
8   data charts and his actual mapping work.  So I
9   and wasn't looking to prove the data or double
10   check the data or anything like that.  I was
11   trying to figure out any sign that he actually
12   used in any of these data or let any of these
13   data drive any of his mapping decisions.
14    Q   I think you said earlier that you
15   thought there was no connection between the
16   socioeconomic data and the maps that
17   Mr. Cooper drew.  Can I understand you
18   correctly when you said that?
19    A   Other than the discussion I had
20   about, maybe, he had a map next to him that he
21   kind of eyeballed and ball-parked.  From the
22   files that he provided that he said were his
23   mapping system files, there's no socioeconomic
24   data in them.
25    Q   So I think I want to break apart the

Page 138

1   two things that are being conflated here.
2   You're talking about the data that is entered
3   into Maptitude at the block level when you say
4   there's no socioeconomic data in his
5   Maptitude software; is that right?
6    A   Yes, because that is the data that is
7   compiled into districts and that Maptitude
8   tells you what's changing as you make
9   decisions in the map, and that you can map and
10   overlay thematics as you're mapping.
11    Q   And that is because that is the way
12   that you assess various metrics while you're
13   drawing maps, right?
14    A   It's the only way to assess metrics
15   as would you're drawing maps.
16    Q   Right.  But is it possible for
17   someone to draw a district line without
18   eyeballing those metrics at every step of the
19   way?
20    A   Sure.  If they're not using those
21   factors as decision points.  If they're
22   ignoring the socioeconomic factors as reasons
23   to draw the lines, sure.
24    Q   I'm not specifically asking about the
25   socioeconomic metrics in that question.  I'm

Page 139

1   asking if it's possible for someone to draw a
2   district without eyeballing the metrics that
3   are displayed in Maptitude?  Would you agree
4   that's possible that they're not eyeballing
5   those metrics as they're drawing every line in
6   their map?
7    A   Yes.
8    Q   And you would agree that someone
9   instead could be eyeballing the types of
10   tables or charts or other maps that Mr. Cooper
11   has provided that he did not input at the
12   block level in Maptitude, right?
13    A   I suppose, but that would be really
14   weird and unspecific and a horrible way to
15   actually try to follow that data when you're
16   drawing lines.
17    Q   Okay.  I just want to make sure I
18   understood.  You agree that it's possible to
19   do it without looking at those metrics.  And
20   you agree that it is -- I guess let me ask it
21   a different way.  Do you have any basis to
22   conclude that Mr. Cooper did not consider any
23   of the sources that we've just discussed when
24   drawing his maps?
25    A   Yes.

Page 140

1    Q   And what's your basis for that
2   conclusion?
3    A   None of the lines reflect any
4   considerations of those factors in any
5   significant way as he claim that they used.
6   So where he said he was improving the map to
7   follow the key regions, he didn't follow the
8   key regions.  Where he said he was following
9   various socioeconomic factors, he didn't --
10   the lines don't actually follow socioeconomic
11   factors.  The lines follow race.
12    Q   How do you know that the lines don't
13   follow socioeconomic factors?
14    A   All the maps in my reports.  We
15   have --
16    Q   Are you -- yo go ahead.
17    A   We have his maps of the socioeconomic
18   factors and we have his actual maps drawn, and
19   they don't connect.
20    Q   But you'd agree that some of the
21   socioeconomic factors that Mr. Cooper
22   considered were not entered into Maptitude at
23   the block level, right?
24    A   That's part of my whole point.
25    Q   So the maps that you are showing and

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 141

1 the various shading, and things like that,
2 don't reflect all of the data that Mr. Cooper
3 considered, right?
4     A   You're saying that -- is it possible
5 that -- rather than put the actual data into
6 the Maptitude and use it to actually guide
7 your mapping, instead he chose to have an
8 eight and a half by eleven printout of the
9 state and just guesstimated the lines from
10 that eight and a half by eleven printout next
11 to him.  I guess that's possible.  But then
12 that would not -- the map he's looking at
13 would be nowhere near specific enough to
14 actually make detailed line decisions, which
15 would explain why he then ended up seeming to
16 follow race in his lines.
17     Q   But you would agree that the data
18 that you look at to say Mr. Cooper's lines are
19 not consistent with the socioeconomic shading
20 that you put in your report, that does not
21 include all of the socioeconomic data that
22 Mr. Cooper purports to have relied upon in
23 this report, right?
24     A   It also doesn't follow those lines in
25 the maps that he provided in his report.

Page 142

1     Q   Doesn't follow which lines?
2     A   The maps you were just referring to.
3 The district lines are not drawn to follow
4 those, either.
5     Q   And how do you know that?
6     A   Because you can look at them.  And
7 there are lines in the maps he generates and
8 there are lines in the district map, and they
9 don't match.
10     Q   Do you agree that it's possible for a
11 demographer to become sufficiently familiar
12 with a region to have a general understanding
13 of socioeconomic information in that region?
14     A   Yes.
15     Q   How long have you been working on
16 redistricting maps in California?
17     A   1990.
18     Q   Are there places in California where
19 you have a decent understanding of the
20 communities that live there?
21     A   Sure.
22     Q   So you agree it's possible for a
23 demographer to become familiar with a place
24 over decades of working there?
25     A   Yes.

Page 143

1     Q   If you were drawing a map in
2 California -- let's say you weren't looking at
3 any metrics at all.  You're drawing a map.
4 You're covering up those metrics in Maptitude
5 in a way -- you said hide someone could hind
6 behind the map itself.  Do you recall saying
7 that earlier?
8     A   Yes.
9     Q   Are there certain places where you
10 would know information about the socioeconomic
11 information of the community without looking
12 at those metrics?
13     A   In general, in terms of, like, the
14 community level or the city level?  Sure.  But
15 even in my home town, if I was trying to
16 isolate or divide areas along socioeconomic
17 lines, I would want the data live, so that I
18 could be sure I was getting it in the right
19 spot and able to actually attribute it to the
20 data as opposed to -- you know, socioeconomics
21 change.  Things are different now than they
22 were years ago.
23     Q   I understand that.  But you agree
24 that without that sort of gut check, without
25 looking at numbers, there are areas in the

Page 144

1 place where you live and places you're
2 familiar with where you would have a sense of
3 the socioeconomic information without looking
4 at that table; is that right?
5     A   In general, yes, in terms of where
6 those socioeconomics split at the level you
7 would want to see them to draw actual lines, I
8 would always prefer to actually have the data
9 live so I could be sure I was being precise
10 and up-to-date.
11     Q   Have you done work in Louisiana
12 before?
13     A   Just on other cases that are going
14 on.
15     Q   How many?
16     A   Well, there's the Robinson case going
17 on and then done some preliminary work -- it's
18 consulting work on another project a couple of
19 years ago.
20     Q   Okay.  How many times have you been
21 in the State of Louisiana, physically?
22     A   Three or four.
23     Q   And what would you say is your level
24 of familiarity with communities in Louisiana?
25     A   You mean in terms of socioeconomic

36 (Pages 141 to 144)

Page 145

1   data?
2       Q   Sure.
3       A   Relatively basic from my own personal
4   observation, obviously.  I would have to look
5   at the data.
6       Q   Certainly less familiar than you are
7   in a state, like California, where you've been
8   working since the '90s, right?
9       A   Of course.
10      Q   I do want to share my screen again to
11  talk about Mr. Cooper's rebuttal report.
12  That's Exhibit 6 -- sorry -- Exhibit 8.  Under
13  Paragraph 19 -- where Mr. Cooper writes in
14  Paragraph 26:  "Dr. Johnson claims that I did
15  not import CVAP data into Maptitude.  This is
16  not true.  Disaggregated block-level CVAP data
17  is available in Maptitude running on my
18  desktop computer.  I referenced the source in
19  my declaration, the Redistricting Data Hub.
20  As Dr. Johnson notes in Paragraph 27, I
21  provided the block-level Redistricting Data
22  Hub CVAP dataset to the defendants."  Did I
23  read that correctly?
24      A   Yes.
25      Q   Are you contending that's false?

Page 146

1       A   Yes.  The Redistricting Hub Data that
2   was provided was at the block group or tract
3   level.  It wasn't at the block level.
4       Q   It what was at the what level?  I'm
5   sorry.
6       A   It was at the block group or tract
7   level.  I don't recall which, but it was not
8   at the block level.
9       Q   How would you describe the difference
10  between the block tract group and the block
11  level?
12      A   Well, block group level data is the
13  level at which the data comes from the Census
14  Bureau for the special tabulation.  And the
15  tract level is which -- it the level at which
16  the data comes from the Census Bureau for the
17  regular ACS data and to get those into
18  redistricting, we have to break them down or
19  disaggregate them to the block level.
20      Q   How many -- if it works this way --
21  how many blocks are in a tract?
22      A   It varies wildly from-- I don't
23  know -- ten to a hundred.  I don't know the
24  exact number -- to lots.
25      Q   And do the tracts have any

Page 147

1   relationship to VTDs?
2       A   I don't think so.  Actually, no.  I'm
3   sure they don't, actually.  They do not.
4       Q   Okay.  When you're analyzing
5   Mr. Cooper's maps, did you have any
6   disaggregated block-level CVAP data in
7   Maptitude?
8       A   No.
9       Q   In the next section of your report
10  called, "Black Population Change from 2000 to
11  2020," I want to look at Paragraph 27.  Oops,
12  I'm so sorry.  I'm in the wrong report.  In
13  your report, which is Exhibit 5.  It's called,
14  "Population Change 2000 (1991 lines) to 2022."
15  Do you see where I am now?
16      A   Yes.
17      Q   Sorry for the confusion there.  In
18  Paragraph 27, you state that:  "Plaintiffs'
19  expert's discussion of the changes in the
20  state's Black population between 2000 and 2020
21  seems to undermine the claim that the 2022
22  enacted plans undermine Black representation."
23  Did I read that directly?
24      A   Yes.
25      Q   Am I understanding from your report

Page 148

1   that the basis for that statement is that --
2   I'm reading again from the end of this
3   paragraph -- "The Black majority number of
4   House seats increased more than twice as fast
5   as the Black share of the state's Voting Age
6   Population from 2000 to 2022"?
7       A   Yes.
8       Q   Are you offering any opinion that the
9   maps enacted in 2001 following the 2000 Census
10  fairly represented Black voters in Louisiana?
11      A   No.
12      Q   Is it possible that Black voters were
13  underrepresented in the 2001 maps in
14  Louisiana?
15          MR. LEWIS:
16              Objection; you may answer.
17          THE WITNESS:
18              It's possible.  I did not look
19          at that.
20  BY MS. KEENAN:
21      Q   Would that affect the baseline for
22  your assessment of whether the 2022 Enacted
23  Maps undermine the Black representation?
24      A   If the 2001 Map undermine the Black
25  representation?

37 (Pages 145 to 148)

Page 149

1    Q   Yes.
2    A   That would actually strengthen my
3 point.
4    Q   How so?
5    A   Because if the 2001 map undermined
6 Black representation and the overall state
7 from 2000 to 2020 has growth in representation
8 more than twice the growth rate, that means
9 there's been even stronger improvement in the
10 maps since 2001 than the percentages would
11 indicate.
12    Q   I'm not sure I follow.  Give me one
13 second.  By underrepresented, I mean that the
14 Black population should have had more
15 districts in the map than they actually did.
16 Are we understanding underrepresented the same
17 way?
18    A   Okay.
19    Q   Is that how you were understanding it
20 when you said that would make your argument
21 stronger, or were you understanding it the
22 opposite way?
23    A   No, that's my understanding.
24    Q   So when you say the Black majority
25 number of House seats increased more than

Page 150

1 twice as fast as the Black share of the
2 state's Voting Age Population, if it turns out
3 that that increase in number of House seats is
4 artificially large because they were starting
5 from the baseline of having too few seats, how
6 does that help your claim?
7    A   Keep in mind, the 2001 Map is not the
8 baseline.  So that may be part of the source
9 of confusion.
10    Q   What's the baseline?
11    A   His comparison was between
12 representation in 2000, which would be the
13 1991 lines.
14    Q   I guess I could ask the same
15 question, then, about 1991.  Are you offering
16 any opinion that those maps fairly represented
17 Black voters in Louisiana?
18       MR. LEWIS:
19         Objection. He may answer.
20       THE WITNESS:
21         I'm not offering opinion either
22       way about those lines.
23 BY MS. KEENAN:
24    Q   I think we can move on from this line
25 of questioning.  We may just be understanding

Page 151

1 the data differently here.
2       In Paragraph 29 -- I want to discuss
3 next.  You claim that Mr. Cooper's "Statement
4 in his Paragraph 58 is simply false, even
5 according to his own math."  You say that "His
6 Figure shows three, not two, Black majority
7 House districts have been added between the
8 map in place in 2000 and the 2022 Enacted
9 House Map."  Did I read that correctly?
10    A   Yes.
11    Q   I'm going to pull Mr. Cooper's report
12 back up, and we're going to go to Figure 11.
13 There we go.  And you were talking about
14 Paragraph 58 in Mr. Cooper's report.  The
15 relevant part of that paragraph reads: "All
16 told, since 2000 one majority Black Senate
17 District, compared to the 1990 Senate Plan,
18 and two majority Black House districts,
19 compared to the 2000 House Plan Have been
20 added."  Did I read that sentence correctly?
21    A   Yes.
22    Q   You agree that Mr. Cooper
23 differentiates in this sentence between the
24 1990 Senate Plan and the 2000 House Plan,
25 right?

Page 152

1    A   Yes.
2    Q   I'm going to go up to Figure 11
3 again.  The first two rows in this figure -- I
4 guess the second and third row, if you include
5 the title rows -- relate to the 2000 Decennial
6 Census, right?
7    A   Yes.
8    Q   And there are two sets of plans that
9 he assessing in these rows, right?
10    A   You mean, where he says 1990 versus
11 2001?
12    Q   Right.  The second column shows that
13 he looked at the 1990 Legislative Plan and
14 2001 Legislative Plan, right?
15    A   Yes.
16    Q   In 1990 plan, there's 26 majority
17 Black House districts, right?
18    A   Yes.
19    Q   That's the number that shows there
20 are three -- that's the number you're using to
21 say that there were three new districts added,
22 right?
23    A   Yes.
24    Q   Okay.  But you'd agree the second row
25 focuses on the plan passed after the 2000

38 (Pages 149 to 152)

Page 153

1    Decennial Census, which is the 2001 plan,
2    right?
3        A   I mean, it is the 2001, yes.
4        Q   Right.  And in that one, there's 27
5    majority Black House districts, right?
6        A   Yes.
7        Q   And so Mr. Cooper talks about the
8    2000 plan as distinct from the 1990 plan.  Are
9    you disputing that he's just talking about
10   this plan that's passed after the 2000 Census,
11   the order referring to in this row where
12   there's a 27 instead of a 26?
13       A   I mean, I took him at his word that,
14   when he said 2000, he meant the House Plan
15   that was in place in 2000.
16       Q   Okay.  But if he's talking about the
17   2001 Plan that was passed after the 2000
18   Decennial Census, then you'd agree that,
19   according to his own math, he's right, there's
20   a two-district increase from 27 to 29, right?
21       A   True.  It could be that the reference
22   in his paragraph is wrong.  If he meant the
23   comparison to a different year than 2000, then
24   the comparison would be different.
25       Q   Right.  So if he's calculating the

Page 154

1    difference between these two plans, he is
2    right to the say the difference between 27 and
3    29 is two, right?
4        A   But that's not the calculation he
5    said he was making.
6        Q   You would agree that he's assessing
7    the change in the Black population from 2000
8    to 2022, right?  That's what the report is
9    focused on?
10       A   Well, in this case, he's just saying
11   he's comparing the 2022 map to the 2000 House
12   Plan.  In 2000, there were 26 majority Black
13   seats.
14       Q   But you would agree that the data --
15   the map in 2001 is based on the Census data in
16   2000, right?
17       A   I would assume so.
18       Q   And the 1990 plan could not have been
19   based on the population data that came out in
20   2000, right?
21       A   Well, it was still in place in 2000.
22   When you start the 2001 cycle, you begin by
23   looking at the 1990 seats with 2000 data in
24   them.
25       Q   Okay.  I think that's all I have on

Page 155

1    this section.  I'm going to go back to your
2    report now.  So we're on Exhibit 5.
3        Your next section is about the
4    communities of interest splits report.  Do you
5    see where I am on page 11?
6        A   Yes.
7        Q   Is it still your opinion that
8    Mr. Cooper's list of municipality splits is
9    misleading?
10       A   In his followup report, he talked
11   about he had -- rather than using the Census
12   Places level, he had selected out just the
13   incorporated municipalities --
14       Q   Right.
15       A   -- which would -- yes, that was my
16   concern is that he was including the Census
17   designated places in it.  If he selected those
18   out without saying so, then that would be
19   better.
20       Q   Okay.  And do you have any basis to
21   rebut Mr. Cooper's statement in his subsequent
22   I report that he did remove unincorporated
23   places and so his split count includes only
24   municipalities?
25       A   No, it would have been -- I would

Page 156

1    have expected him to provide that layer as a
2    layer of geography, but I can see there are
3    ways he would have done it without separating
4    that layer.  It would odd, but he could have
5    done it.
6        Q   And if he only counted the
7    municipalities in his split count, that
8    wouldn't be misleading, right?
9        A   Well, it's a little misleading in
10   that municipalities are just one kind of
11   community of interest.  So it should have been
12   labeled a municipalities list report, not a
13   community of interest split report.
14       Q   Do you offer that opinion in your
15   report anywhere?
16       A   I mean, it's as all part of this
17   misleading piece of this report.  As I say
18   right here in this in the Paragraph in front
19   of is: "Census Places are not the same as
20   municipalities or communities of interest."
21       Q   Right.  But you don't offer any
22   opinion that just the use of municipalities is
23   misleading in this report, do you?
24       A   Labeling it community of interests
25   split when it's actually a municipalities

39 (Pages 153 to 156)

Page 157

1  split is a somewhat misleading labeling. It's
2  not as bad as what I thought it was, but it's
3  still misleading.
4      Q  And you told us that you haven't
5  personally analyzed or come to have any
6  conclusions about which regions are
7  communities of interests in Louisiana, right?
8      A  Correct.
9      Q  Your report does take issue with
10  treating, quote, "Randomly Designated Census
11  Places as communities of interests for the
12  consideration" -- that's in paragraph 32,
13  here, right?
14      A  More or less, yes.
15      Q  But you do agree that municipality
16  boundaries themselves are worthy of
17  consideration, right?
18      A  Yes.
19      Q  You talked a little about how
20  municipalities are different from communities
21  of interest.  How would you define the term,
22  "Community of Interest"?
23      A  I think typically a lot of this is
24  jurisdiction-specific.  But typically
25  municipalities would be one piece of the

Page 158

1  communities of interest puzzle.  There are
2  other pieces.  School districts could be
3  communities of interest.  Counties or
4  parishes, in this case, could be communities
5  of interest.  Other areas that have policy
6  links could be communities of interest.  So
7  municipalities are a subset -- are typically a
8  subset of communities of interest.
9      Q  Would you agree that you previously
10  run into some trouble when it comes to drawing
11  maps that foster certain communities of
12  interest that you've identified?
13      A  It's always difficult to draw maps to
14  achieve every community of interest's goal,
15  certainly.  That's why this work is always
16  hard.
17      Q  Do you recall testifying in a case
18  called, "Jauregui versus The City Palmdale,"
19  which I think you mentioned earlier?
20      A  Yes.
21      Q  I'm going to share my screen again.
22  This will be Exhibit -- I think the numbers
23  are off now.  We've added three more.  So I
24  Think this is Exhibit 15 now.  I'm sorry.  Are
25  you able to see the decision from --

Page 159

1      A  Yes.
2      Q  I'm going to go down do page 4.  In
3  this case, you testified that you, quote --
4  this is a quote from the opinion -- "Attempted
5  to create districts that maximum the number of
6  council districts that contain a substantial
7  population on both sides of Highway 14, which
8  runs north/south and bisects the City of
9  Palmdale."  Is that right?
10      A  Yes.
11      Q  Would you agree that the Court
12  concluded that that highway actually served as
13  a physical, social and psychological divide of
14  the city?
15      A  Yes.
16      Q  In the case, they thought that trying
17  to join two parts of the city across the clear
18  division was not an appropriate factor to
19  consider.  That's the quote from their
20  decision; is that right?
21      A  Yes.
22      Q  More specific to Louisiana, do you
23  consider yourself an expert in historical ties
24  between communities in Louisiana?
25      A  No.

Page 160

1      Q  What about settlement history in
2  Louisiana?
3      A  No.
4      Q  Cultural or religious ties in
5  Louisiana?
6      A  No.  I mean, I know what the average
7  Joe knows about a lot of this, and I visited
8  Lafayette, but I'm no expert, that's for sure.
9      Q  What about shared industry in
10  Louisiana, same thing?
11      A  Yeah.  Again, I have some loose
12  familiarity, but I'm no expert.
13      Q  Would any of those factors be worthy
14  of consideration in considering communities of
15  interest, in your opinion?
16      A  They could be.  Depending on the
17  circumstances on what you're doing with them.
18      Q  Now, your report talks a bit about
19  the key cultural regions that are identified
20  in Mr. Cooper's report, right?
21      A  Yes.
22      Q  Are you aware of whether Mr. Cooper's
23  illustrative maps split those cultural regions
24  more or less often than then the Enacted Map?
25      A  No, I didn't look at Enacted Map

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 161

1    splits. I just know that Mr. Cooper did map
2    splits in a lot.
3        Q    Do you agree some cultural
4    communities do not have rigid boundaries?
5            MR. LEWIS:
6                Objection. You may answer.
7            THE WITNESS:
8                I'm sure there are some, yes.
9    BY MS. KEENAN:
10       Q    They might have more general
11   contours, for example, than a political
12   boundary, like a municipality order, right?
13           MR. LEWIS:
14               Objection. You may answer.
15           THE WITNESS:
16               What do you mean by that
17           question?
18   BY MS. KEENAN:
19       Q    Do you think that every community of
20   interest can be drawn up in precise's lines in
21   the way that a city can be drawn up with a
22   boundary with precise lines?
23       A    When you're mapping, you have to draw
24   precise lines. You either have to figure it
25   out or not follow that.

Page 162

1        Q    So is it your testimony that in order
2    to consider a community of interest for the
3    purpose every redistricting, you have to
4    either capture that community exactly, or you
5    are not considering that community at all?
6        A    No.
7        Q    Right. There's some play of the
8    margins, right, in terms of how you capture
9    community of interests?
10       A    I would not describe it that way.
11       Q    How would you describe it, in terms
12   of the level of specificity?
13       A    I mean, there are many communities
14   that are larger than a district. And by
15   federal population requirements, you can't put
16   them all in one district. The number
17   scenarios are huge.
18       Q    Okay. Relatedly to that point about
19   how communities of interest can be larger than
20   a district, do you have any critiques about
21   the number of times Mr. Cooper splits these
22   cultural regions internally, for example,
23   creating multiple districts within Acadiana?
24       A    In discussing the report, that he's
25   dividing them more than they need to be

Page 163

1    divided.
2        Q    And when you criticize the divisions,
3    do you mean even the ones that are only
4    encompassed within the cultural regions that
5    he's working within or only the ones that
6    split across two different cultural regions?
7            MR. LEWIS:
8                Object to form. You can answer.
9            THE WITNESS:
10               If a district is entirely within
11           a cultural region, then you're
12           drawing all the lines of that
13           district based on factors other than
14           the cultural region, because it's
15           entirely within. So that region
16           boundary has no role in where those
17           lines go. It's only when you get
18           close to the edge of the region that
19           the region would be a factor in how
20           the lines are drawn. If you follow
21           the region boundary, then you're
22           respecting it. If you cross it, then
23           you'd be disrespecting that community
24           of interest. You might have to do
25           that once or twice for population

Page 164

1            reasons. But when you do it eight
2            times, you're making it obvious that
3            that region is not a serious
4            consideration for mapping.
5    BY MS. KEENAN:
6        Q    I want to talk about a specific one
7    of the cultural regions that comes up in the
8    report about Acadiana. Are you familiar with
9    that region at all?
10       A    Yes.
11       Q    Do you know about how many people
12   live in Acadiana?
13       A    Not off the top of my ahead.
14       Q    If I represented to you that it was
15   over 600,000 people, would you have any basis
16   to dispute that?
17       A    No.
18       Q    So if more than 600,000 people live
19   in Acadiana, then you have to split that
20   region, at least internally, many times to
21   create appropriately sized State/House
22   districts, right?
23       A    Yes.
24       Q    And are you taking issue with that?
25       A    With what?

41 (Pages 161 to 164)

Page 165

```
 1       Q   With dividing Acadiana internally to
 2   comply with population equality?
 3           MR. LEWIS:
 4               Object to form.  You may answer.
 5           THE WITNESS:
 6               No.  You have to follow federal
 7           law.
 8   BY MS. KEENAN:
 9       Q   And your critiques are just about the
10   crossing of the -- from Acadiana into a
11   different cultural region that Mr. Cooper
12   identifies?
13           MR. LEWIS:
14               Objection; mischaracterizes the
15           report.  You may answer.
16           THE WITNESS:
17               My opinion is that because he
18           was crossing those lines almost willy
19           nilly, they clearly were not driving
20           his mapping decisions.
21   BY MS. KEENAN:
22       Q   Do you have any opinion about whether
23   the size of a community affects whether it
24   needs to be preserved in whole in order for
25   that community to achieve effective political
```

Page 166

```
 1   representation?
 2       A   Sure.  It's a topic that comes up all
 3   the time in my work.
 4       Q   Do you believe that the smaller the
 5   community, the more important that it is
 6   preserved in whole in order for it to be able to
 7   achieve political representation?
 8       A   Sometimes; sometimes not.
 9       Q   Would you agree that sometimes larger
10   communities might not need to be preserved in
11   whole in order for them to achieve political
12   representation?
13       A   That can be true.
14       Q   Do you know whether the instances in
15   which Mr. Cooper crosses the regional
16   districts that you focused on are ever the
17   result of tracking a different boundary line?
18       A   What do you mean by, "A different
19   boundary line"?
20       Q   For example, did you assess whether
21   any of the times that Mr. Cooper crosses a key
22   regional district line whether he is tracking
23   a city or municipality line?
24       A   Well, that would kind of undermine
25   his whole claim to those being key cultural
```

Page 167

```
 1   regions if he's saying part of a city is in a
 2   key cultural region and part of it is not.
 3       Q   Do you agree that every city is
 4   comprised of a model of the community of
 5   interest?
 6       A   No.
 7       Q   So you would agree that parts of
 8   cities can be a part of a different community
 9   of interest than other parts of a city, right?
10       A   They could be, but that would be
11   really, really super bazaar to have part of
12   the city in and out of a community of interest
13   that's charge large as communities of interest
14   that he's claiming in these regions.
15       Q   What about geographical features.  Do
16   you know whether any of the instances where
17   Mr. Cooper crosses one of these key regions is
18   tracking, for example, a river or another
19   geographic feature instead of the boundary
20   line?
21       A   I mean, he crosses them so many
22   times, I'm sure some of them do.
23       Q   What is the basis for your conclusion
24   that equal population requirements do not
25   require more than two boundary crossings?
```

Page 168

```
 1       A   Math.
 2       Q   Can you explain it a little bit, just
 3   to make sure I understand it?
 4       A   Sure.  If you have the state divided
 5   in large regions and you say that your goal is
 6   to respect and represent those regions and
 7   those communities of interest regions are
 8   driving their map, then you want to follow
 9   their boundaries to the greatest degree
10   possible.
11           Now, you will get population
12   imbalances.  And so to make those work, you
13   know -- unless you get a miracle region that
14   exactly divides into the number of people
15   needed for a district, then you would have to
16   have one district cross in order to make a
17   shortage or offset an overage.  Physically, in
18   terms of mapping, usually will take two,
19   because you'll have to balance the districts
20   on one side of you and the districts on the
21   other -- in the region on one side of you and
22   the districts in the region on the other side
23   of you.  But that's it.  You can meet all the
24   population requirements and respect the
25   community of interest and treat that as a
```

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 169

1 guide to your mapping with one or, at most,
2 two crossings of that boundary.
3    Q    What if there are multiple
4 communities of interest that you're trying to
5 represent and those borders overlap? Let me
6 give you an example. Let's say there's a
7 school district that you might consider a
8 community of interest, so that has a sort of
9 boundary where you can say, people that live
10 here, send their children to this school. Are
11 you following me so far?
12    A    Yes.
13    Q    Next to that school district on
14 either side are two churches of different
15 denominations. And so people within the
16 school district might be go to one church and
17 some people in the school district might go to
18 the other church. Are you still following me
19 so are?
20    A    Sure.
21    Q    You agree that a line can either
22 respect the community of interest that affects
23 the school or, in that example, the community
24 of interest can respect the two faith
25 communities, right?

Page 170

1        MR. LEWIS:
2            Objection. Incomplete
3        hypothetical. You can answer.
4        THE WITNESS:
5            Yeah. I mean, ideally you would
6        respect all of them, but the
7        population numbers may not allow
8        that.
9 BY MS. KEENAN:
10    Q    Right. Especially if the community
11 of interest within the school system is itself
12 divided in two faith communities, you would
13 agree there may not be a way to respect both
14 those communities completely, right?
15    A    Hypothetically? Correct.
16    Q    If I make a choice between one or the
17 other -- let's say I choose in a specific
18 instance to draw a line that leans more toward
19 faith community than the school community, but
20 I've been looking at them in drawing my maps.
21 I consider both factors. Is it your belief
22 that that choice between the two means I just
23 not consider the other one?
24    A    It's explicitly clear that you are
25 choosing to ignore one in order to follow the

Page 171

1 other one. If you know you're violating a
2 community of interest, I guess that counts as
3 considering it, but you're not -- you're line
4 is not justified based on that community of
5 interest if you intentionally divide it.
6    Q    But you would agree that the district
7 -- I'm trying to think of the clearest way to
8 explain this. Let's say, in the hypothetical
9 that I've given, we've got one school
10 district, two faith communities, and I'm
11 trying to draw districts that respect all of
12 those things. I split the school district,
13 but now the two groups that I have have two
14 factors in common. They share their faith and
15 they share their school system in each of the
16 districts. Haven't I considered both
17 communities of interest in drawing those maps?
18    A    If the school district is divided
19 between two election districts, then it's
20 divided, if you're just drawing two districts.
21    Q    Yes. But I thought we talked earlier
22 about how some communities don't need to be
23 preserved whole in order for them to have
24 representation, right?
25    A    In which case, you're not basing your

Page 172

1 lines on those communities.
2    Q    So you would say in the situation
3 that I just described that I'm not considering
4 that educational community at all; is that way
5 how you perceive that hypothetical?
6        MR. LEWIS:
7            Objection. You may answer it.
8        THE WITNESS:
9            As you described it in the
10        hypothetical, you're subdividing the
11        school district. There's only two
12        districts.
13 BY MS. KEENAN:
14    Q    Okay. I think we can move on from
15 here. I want to go to Paragraph 37 in your
16 report. Give me one second to pull that up.
17 In Paragraph 37, you call attention to the
18 shape of HD-54; is that right?
19    A    Yes.
20    Q    Are you offering any opinion that
21 that district is problematic?
22    A    According to Mr. Cooper's regions, it
23 is problematic. It's dividing a region
24 boundary and it's also dividing a parish. He
25 talks at length about his view minimizing

43 (Pages 169 to 172)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 173

1  parish splits is one of the strengths of his
2  map. One of his points is that his map
3  divides fewer parishes.
4      Q   You talk about this part that crosses
5  the Parish line and what you call the
6  community of interest or the key cultural
7  region line.
8      A   I don't call it that. He does.
9      Q   Right. He calls it a key cultural
10  region, I believe, right?
11      A   Yes.
12      Q   You call this part that crosses that
13  border a finger, right?
14      A   Yes.
15      Q   You actually call attention to that
16  same finger again in Paragraph 39 of your
17  report; is that right?
18      A   Yes.
19      Q   You're saying SD-20 contains that
20  same crossing from Lafourche Parish into
21  Jefferson Parish, right?
22      A   Yes.
23      Q   Are you now aware that the crossing
24  from Lafourche Parish into Jefferson Parish
25  that you call a finger represents an island?

Page 174

1      A   I was at the time.
2      Q   And are you aware that the only way
3  to get to that island in Jefferson Parish is
4  by land through Lafourche Parish?
5      A   Yes.
6      Q   Again, this figure, Figure 7, doesn't
7  display waterways in the city, right?
8      A   Correct.
9      Q   Do you agree this is an example where
10  seeing the water feature might explain why a
11  district is drawn the way that it is?
12      A   I suppose, but that doesn't change my
13  point.
14      Q   Would you agree this an example of
15  how competing considerations can justify
16  drawing lines that might not comply with the
17  Parish or community of interest boundaries
18  that you focused on?
19      A   I didn't focus on them. Mr. Cooper
20  did.
21      Q   But do you think there's something
22  wrong with having drawn a district to
23  encompass a community that can only be reached
24  by land in the parish that it's now
25  represented with?

Page 175

1      A   Not necessarily.
2      Q   Okay. Do you think that somebody who
3  respects -- do you think that somebody who
4  draws a line to bring that island into the
5  community that it's accessible by necessarily
6  does not respect parish boundaries?
7      A   They're certainly choosing that
8  something is more important than parish
9  boundaries.
10      Q   Do you think that the person who
11  draws a map to capture an island that can be
12  accessed by land with the district that's now
13  joined within the map, do you think that
14  person necessarily doesn't respect key
15  cultural regions?
16      A   I think more likely it's evidence
17  that definition of your key region is flawed.
18      Q   Are you aware that HD-54 is the same
19  in both the Enacted and the Illustrative maps?
20      A   Yes.
21      Q   Are you aware that Mr. Cooper
22  employed a least changed principle in drawing
23  his maps?
24      A   He makes reference to such an
25  approach.

Page 176

1      Q   Do you agree that's another approach
2  that could conflict with something like a
3  cultural region or a parish boundary that a
4  map drawer has to balance when they're
5  considering how to draw a region?
6      A   I would be very surprised if that
7  island's only connection is by a bridge to the
8  west if it was a different cultural region
9  than the area to the west.
10      Q   Do you agree with the rest of the
11  question as I asked it? Can you the court
12  reporter read back the question?
13      (WHEREUPON THE REQUESTED MATERIAL WAS READ
14  BY THE COURT REPORTER)
15  BY MS. KEENAN:
16      Q   Do you agree that the least changed
17  principal that Mr. Cooper employed is
18  something that could conflict with parish
19  lines, for example, which Mr. Cooper generally
20  tried to follow?
21      A   That would kind of internally
22  conflict with itself.
23      Q   Well, literally in Figure 7, the
24  enacted map crosses the parish line, right?
25      A   Yes.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

1    Q   So if Mr. Cooper is trying to employ
2   a least changed method, where he's trying to
3   keep districts in place as much as possible,
4   but he's also trying to prioritize keeping
5   parishes a whole -- that's another example
6   where he's considering two factors, but he's
7   just going to have to make a choice about how
8   to best draw the district while trying to
9   respect them both as much as possible, right?
10   A   Those two factors would be pretty
11   clear to either do or not do.  It would be
12   very strange to have that decision made on a
13   case-by-case basis.
14   Q   Why?
15   A   Because you're either going to keep
16   all the parish crossings that are in the
17   enacted map and thus have a least changed map
18   or you're going to say your map is better on
19   dividing fewer parishes, and anywhere you run
20   into just a few people, be better on dividing
21   parishes.
22   Q   But you would agree that least change
23   doesn't imply all of the districts are the
24   same, right?  The whole point was that
25   Mr. Cooper was redrawing certain districts.

1    A   So you're saying he randomly made a
2   choice whether to keep a parish split or not?
3    Q   I'm saying that in deciding whether
4   to keep a district that was in the enacted map
5   or trying to keep parishes together, you might
6   have to make a decision about which of those
7   two factors that matter to your analysis to
8   follow in an instant case, right?
9    A   You would make that as a universal
10   decision.
11    Q   Okay.  Just so I'm clear, are you
12   offering any opinion that something is wrong
13   with the configuration of HD-54 or just that
14   it calls into question the key cultural
15   regions that Mr. Cooper has identified in his
16   report?
17    A   The latter.  And the same thing that
18   his claims of focusing on parish unification.
19    Q   We are now -- I have two question in
20   this next section, and then we can take our
21   next break, if that's okay with you.  The next
22   section that starts on page 16 here called,
23   "Plaintiffs' Expert's Enacted Maps and Not the
24   Actual Enacted Maps."  Do you see where I am
25   in your report?

1    A   Yes.
2    Q   That is calling attention
3   Mr. Cooper's use of the enrolled rather than
4   the enacted maps in this initial report; is
5   that right?
6    A   He didn't provide the data files, so
7   I couldn't confirm what map he was actually
8   using.  I just know it was not the enacted
9   map.
10    Q   Do you agree that Mr. Cooper's
11   rebuttal report uses the enacted map as a
12   basis for comparison?
13    A   Yes.
14    Q   So do any of the critiques
15   articulated in this section apply to the
16   illustrative map included in Mr. Cooper's
17   rebuttal report?
18       MR. LEWIS:
19          Object to form.  You may answer.
20       THE WITNESS:
21          Everything is addressed except
22       his continuing lack of providing
23       data.
24       MS. KEENAN:
25          Okay.  I think now is a good

1   time for a break before I start into
2   the next section.  I can do five or
3   ten minutes.  Do you have a
4   preference?
5   MR. LEWIS:
6       From my perspective, ten
7   minutes.  I don't know about others.
8   MS. KEENAN:
9       Ten works for me.  So we'll come
10   back at 3:19.
11   MR. LEWIS:
12       Fabulous.  All right.  Thank
13   you.  Off the record.
14   (BRIEF RECESS 3:09 P.M. TO 3:21 P.M. EST)
15   BY MS. KEENAN:
16    Q   So I am going to go back to your
17   report, Dr. Johnson.
18    A   If you could -- before you start your
19   next section of questions, I just want to
20   clarify one thing.  Earlier we were talking
21   about cases where my testimony was limited.  I
22   mentioned Covington.  I had the right state,
23   but the wrong case name.  It was the Lewis
24   case rather than the Covington case.
25    Q   I see.  Okay.  Thank you for

45 (Pages 177 to 180)

Page 181

1    clarifying.
2        A   I have in my mind North Carolina, but
3    I said the wrong case name.  Sorry about that.
4        Q   That's okay.  I'm going to go to the
5    next section of your report.  I'm going to
6    share my screen in just a second.  You're able
7    to see your report on your screen now?
8        A   Yes.
9        Q   I'm going into the next section.  I'm
10   getting past the enrolled/enacted distinction.
11   Okay.  This section is called "Correlation of
12   Race and the Illustrative Plan District
13   Lines," right?
14       A   Yes.
15       Q   In Paragraph 68, you say that you
16   "Analyze Plaintiffs' experts' 2022 and 2023
17   House and Senate Illustrative Plans to access
18   the degree to which the racial characteristics
19   of the plan correlated to and drove the
20   district boundaries employed in those plans."
21   Am I reading that correctly?
22       A   Yes.
23       Q   In Paragraph 68, do you say:  "As a
24   professional political scientist and
25   demographer, I have created or analyzed many

Page 182

1    hundreds of districting plans in my career in
2    jurisdictions throughout the county,
3    including in jurisdictions with significant
4    minority Voting Age Populations," right?
5        A   Yes.
6        Q   You also state that you leverage this
7    training and experience to access how much
8    race correlated to and drove the boundaries in
9    Mr. Cooper's maps, right?
10       A   Yes.
11       Q   I want to dive into that a little
12   bit.  So you told us earlier you testified as
13   an expert in slightly fewer than ten
14   redistricting cases in the past, right?
15       A   Somewhere around that number.  I
16   don't remember the exact number.
17       Q   In terms of your expertise in
18   litigation, how many of those cases involved
19   racial predominance analysis in a Section 2
20   case like what you're doing in these next two
21   sections of your reports?
22       A   Certainly a majority of them;
23   probably most of them.
24       Q   Do you recall, if at all, how many
25   times a court has relied on that type of

Page 183

1    racial predominance analysis that you've done?
2        A   No.
3        Q   Do you recall anytime that a court
4    has relied on or accepted the racial
5    predominance analysis that you have done?
6        A   Sure.
7        Q   When?
8        A   There have been a couple of cases
9    where they didn't cite me explicitly, but the
10   same thoughts that I had written appeared in
11   the Court's opinion.
12       Q   Do you remember which cases or
13   projects those were?
14       A   Off the top of my head, no.
15       Q   So you can't point to any
16   specific case where that's happened?
17       A   It's definitely happened.  I just
18   don't have it straight off the top of my head.
19       Q   You know, you just mentioned
20   testifying in a case called, "Covington versus
21   North Carolina," and you said you meant,
22   "Common Cause versus Lewis" earlier, right?
23       A   Right.  I testified in both cases.
24       Q   Right.  But you do recall testifying
25   as an expert in a case called, "Covington

Page 184

1    versus North Carolina," right?
2        A   Yes.
3        Q   I'm going to share my screen with an
4    opinion if that case next.  Give me one
5    second.  Let me get that pulled up.  Are you
6    able to see my screen?
7        A   Yes.
8        Q   This is the Memorandum Opinion and
9    Order as Amended in Covington versus North
10   Carolina.  You can see from the caption up
11   top?
12       A   Yes.
13           MS. KEENAN:
14               I'm going to have the court
15           reporter mark this as Exhibit 16.
16   BY MS. KEENAN:
17       Q   So in this report -- I'm going to
18   stop sharing for one second while I get to the
19   relevant portion.  So we're at page -- sorry.
20   It's not sharing.  Give me one second.  We're
21   at page 74 of that decision now.  Do you see
22   your name here in the decision?
23       A   Yes.
24       Q   I'm going to read a couple of
25   portions of this, and you can tell me if I've

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 185

1  read it correctly.  I'll highlight along, just
2  so you can see where I'm reading.  Here the
3  Court said:  "Dr. Johnson opined as to the
4  Special Master's apparent predominant use of
5  race data and that certain racial quotas were
6  targeted by the Special Master when drawing
7  the districts or dictated the configuration of
8  the districts."  Did I read that correctly?
9      A    Yes.
10     Q    And next paragraph, the Court says:
11 "For several reasons, we find Dr. Johnson's
12 analysis and opinion as to the alleged racial
13 targeting in the recommended plans unreliable
14 and not persuasive."  Did I read that correct
15 correctly?
16     A    Yes.
17     Q    In the next paragraph at the end
18 here, it says:  "Dr. Johnson conceded the fact
19 that several districts BVAPs fall in a
20 particular range does not prove that a racial
21 quota was being employed."  Did I read that
22 correctly?
23     A    Yes.
24     Q    Going on to the next paragraph, the
25 Court says:  "Correlation is not evidence of

Page 186

1  causation."  Did I read that correctly?
2      A    Yes.
3      Q    In that same paragraph, it says:
4  "Dr. Johnson provides no basis for determining
5  whether the BVAPs of the districts are similar
6  from a statistical perspective and that any
7  such similarity may be attributable to the
8  underlying demographic makeup of the
9  geographic areas in which the districts are
10 drawn or other nondiscriminatory districting
11 considerations, not racial targeting."  Did I
12 read that correctly?
13     A    Yes.
14     Q    It also says that "Neither
15 legislative defendants nor Dr. Johnson offer
16 any controlled statistical analysis ruling out
17 the nondiscriminatory explanations for the
18 four district BVAPs."  Did I read that
19 correctly?
20     A    Yes.
21     Q    They call it the Special Master in
22 that case.  In the next paragraph as saying:
23 "The fact that the districts happen to reduce
24 the BVAP in the redrawn districts while
25 increasing it in adjourning districts is to be

Page 187

1  expected whenever a plan replaces racial
2  predominance with other redistricting
3  principles."  Did I read that correctly?
4      A    Yes.
5      Q    The Court thought that explanation
6  was credible, right?
7      A    Their own Special Master, yes.
8      Q    And then in the next paragraph, it
9  says:  "Dr. Johnson conceded that minor
10 differences between two proposed maps do not
11 signal that one version is legally
12 unacceptable or better achieves traditional
13 redistricting goals."  Did I read that
14 correctly?
15     A    Yes.
16     Q    So is it fair to say that at least
17 some courts have not accepted your racial
18 predominance analyses in redistricting cases;
19 is that right?
20     A    Sure.
21     Q    You've explained that you've drawn
22 maps -- I think you said thousands of times in
23 the redistricting context before, right?
24     A    Yes.  Thousands of maps, yes.
25     Q    Do you have a sense of how many of

Page 188

1  those maps were state legislative maps?
2      A    There would have been the two rounds
3  of Arizona maps.  So for those, 50 to 70,
4  maybe.
5      Q    Okay.  Are you familiar in general
6  with the -- I'm sorry.  One more question
7  before I get to that.  When you are drawing
8  those state legislative maps, did you use
9  Maptitude in those cases?
10     A    Most of the time, yes.
11     Q    Are you familiar, in general, with
12 the Gingles framework?
13     A    Of course.
14     Q    Would you agree that the purpose of
15 the Gingles 1 analysis is to see if additional
16 compact majority/minority districts can be
17 drawn that comply with traditional
18 redistricting factors?
19         MR. LEWIS:
20             Objection; calls for legal
21         conclusion.  You may answer.
22         THE WITNESS:
23             Generally speaking, yes.
24 BY MS. KEENAN:
25     Q    Have you ever drawn maps that sought

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 189

1    to comply with the Gingles 1 requirement?
2        A    As part of the mix, yes. Obviously,
3    it's federal law, and we want all of our maps
4    to comply with federal law.
5        Q    In trying to comply with federal law,
6    in your experience drawing maps, do you agree
7    it's common to be aware of race data when
8    you're drawing those maps?
9        A    Sure.
10        Q    When you were drawing you were maps,
11    did you strive to ensure that race wasn't the
12    predominantly factor in the maps that you
13    draw?
14        A    Definitely.
15        Q    But was race a factor you considered
16    at all when drawing those maps?
17            MR. LEWIS:
18                Objection; vague. Go ahead and
19            answer.
20            THE WITNESS:
21                Sometimes.
22    BY MS. KEENAN:
23        Q    When you're looking at race when you
24    draw a maps, are you looking at any part Black
25    or Black alone or some other measure?

Page 190

1        A    It varies based on the jurisdiction.
2        Q    Does that distinction impact anything
3    about whether race was a predominant factor?
4        A    I've not thought through that
5    question detail. I don't think so, but --
6        Q    Okay. That's not an opinion you're
7    offering in this case?
8        A    Correct.
9        Q    How do you go about ensuring that
10    race isn't a predominant factor when you draw
11    a map?
12        A    I make sure to be able to draw the
13    lines and to be able to explain how I drew the
14    lines to follow precise other factors, often
15    community or county or city lines or something
16    like that.
17        Q    And why do you do that?
18        A    To protect against a potential
19    challenge to the map.
20        Q    So in your view, does the fact that
21    another factor besides race can explain a
22    line, does that help protect against the
23    challenge of race predominance?
24            MR. LEWIS:
25                Objection; mischaracterizes the

Page 191

1    testimony. You may answer.
2            THE WITNESS:
3                When I do it, it certainly does,
4            because it very clearly explains why
5            the lines are where they are, and we
6            can tie the precise lines to the
7            precise community or neighborhood or
8            jurisdiction boundary.
9    BY MS. KEENAN:
10        Q    How would you draw the line between
11    racial predominance and race just being a
12    factor in redistricting?
13            MR. LEWIS:
14                Objection; calls for a legal
15            conclusion. You may answer.
16            THE WITNESS:
17                The way we explain it -- I and
18            my team, when we -- the public
19            processes is to say, we want to look
20            at neighborhoods and communities that
21            are a heavily given protected class
22            and keep them together. So that the
23            building block is the neighborhood or
24            community of interest. It's not the
25            Census blocks that contain the

Page 192

1            protected class.
2    BY MS. KEENAN:
3        Q    If something else is the building
4    block that you use, like a community or a
5    neighborhood, is there ever a case where race
6    might be, say, a tiebreaker in choosing
7    between two Census blocks or precincts that
8    follow your community building block?
9        A    I strongly try to avoid that, because
10    that would be arguably jumping race to be
11    predominant factor.
12        Q    So let's say you've got a
13    neighborhood that you're using as building
14    block, and because of a population of quality
15    reason, you can't keep the neighborhood
16    entirely whole and you've got to choose which
17    of two precincts to include with the district.
18    It's your belief that using race as a factor
19    to help decide which of two precincts to
20    include in that context would be race
21    predominance?
22        A    It would certainly be dangerously
23    close. Because it certainly could fall into
24    that category.
25        Q    Is there any circumstance where race

48 (Pages 189 to 192)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 193

1  might be able to be, you know, a tiebreaker
2  or, you know, might merit additional weight in
3  your consideration?
4      A   Well, back when Section 4 of the
5  Voting Rights Act was still in effect, we had
6  our benchmark numbers we had to meet for
7  Section 4 and 5 compliance.  So back in those
8  days, you would have talked about numbers a
9  lot.  Nowadays, they really make every effort
10  to avoid that, because it does veer into
11  territory to get our map sued, and we prefer
12  not to get our maps sued.
13      Q   Back when Section 4 and Section 5
14  were in effect, why were you using numbers all
15  the time then?  Can you explain a little bit
16  the use of those numbers?
17      A   Sure, because Section 5 of the Voting
18  Rights Act has a retrogression standard.  And
19  so the Department of Justice would closely
20  look at the numbers and make sure that the
21  actual percentages themselves have not gone
22  down.  And there were other complicated
23  factors that could justify it going down, but
24  certainly the thing best for you to get
25  preclearance and get your map approved was to

Page 194

1  make sure those numbers did not go down.  In
2  that case, yes, you're looking at race, but
3  you're looking at it in the context of
4  compliance with Section 5 of the Voting Rights
5  Act, not as race on its own as a
6  nonconstitutional predominant factor.
7      Q   Do you believe there is any way to
8  look at race as a matter of compliance with
9  Section 2 of the Voting Rights Act and not
10  just race as its own for the sake of race
11  factor?
12      MR. LEWIS:
13          Objection; vague.  It calls for
14      a legal conclusion.  You may answer.
15      THE WITNESS:
16          There's a whole realm of the
17      law -- I think it's referred to as
18      strict scrutiny or something, that I
19      know this come into the context of.
20      And I do not claim to be an expert in
21      the ins and outs of strict scrutiny
22      versus other levels of scrutiny and
23      when predominance might become okay.
24  BY MS. KEENAN:
25      Q   I should be clear.  I don't want to

Page 195

1  ask you for a legal opinion about strict
2  scrutiny or anything like that.  I just
3  need -- as you're drawing maps that are trying
4  to comply with federal law, like you said
5  earlier, is there any way that you think it's
6  important to consider race just for the
7  purpose of complying with Section 2 or you
8  don't think that's true, now that Section 4
9  and Section 5 are gone?
10      MR. LEWIS:
11          Objection; vague.  It calls for
12      a legal conclusion.  You may answer.
13      THE WITNESS:
14          As we started this discussion,
15      we start our process by looking at
16      neighborhoods and communities of
17      interest that are a heavily protected
18      class, and that is both -- in their
19      interest and the interest of ensuring
20      compliance with Section 2.
21      Certainly, race is a factor that gets
22      looked at a lot.  But if we're going
23      into get into a scenario where
24      arguably it's becoming a
25      predominantly factor, we get a lot of

Page 196

1      lawyers involved before doing any of
2      that.
3  BY MS. KEENAN:
4      Q   When you say neighborhoods -- can you
5  repeat that phrase that you've been using with
6  protected class?
7      A   Neighborhoods or communities of
8  interest that are heavily made up of one
9  protected class.
10      Q   And so do you mean Black
11  neighborhoods; is that what you're trying to
12  talk about or can you explain in a little more
13  specifics what you're talking about?
14      A   Well, keep in mind, most of my work
15  is California.  So we have Black
16  neighborhoods, Latino neighborhoods,
17  Asian-American neighborhoods.  I do a lot of
18  work in Arizona where's a lot of Native
19  American neighborhoods.  That's why I use the
20  more universal "Protected Class" rather than a
21  specific ethnic group.
22      Q   And so you're starting in those cases
23  by identifying and neighborhoods or
24  communities that are heavily represented by
25  Black or Latino populations; is that what

49 (Pages 193 to 196)

Page 197

1 you're saying?
2    A   No.
3    Q   Can you explain it, then?
4    A   Yeah.  We're starting by identifying
5 neighborhoods and communities of interest
6 universally -- hopefully, across the whole
7 jurisdiction.  Once we have a map made of up
8 be neighborhoods and communities of interest,
9 then we're flagging which ones of those
10 predefine neighborhoods and communities of
11 interest happen to have a large percentage of
12 their population be a protected class.
13    Q   Okay.  So your testimony is that you
14 just start with neighborhoods or communities.
15 And only after you've drawn the map, do you
16 consider the race data surrounding the
17 communities or neighborhoods that you use as
18 the building blocks; is that that you saying?
19    A   No.
20    Q   Could you explain it, then?  Where am
21 I going wrong?
22    A   So we start by identifying
23 neighborhoods and communities of interest
24 across the whole map.  We're not drawing any
25 districts at that point.  We're just

Page 198

1 identifying neighborhoods and communities of
2 interest across the whole jurisdiction.  And
3 then we're determining which of those
4 predefined neighborhoods and communities of
5 interest also happen to be made of up a large
6 percentage of the population are a protected
7 class.
8    Q   And then once you make that
9 determination, what do you do with it?
10    A   We make sure that when we have to
11 divide a neighborhood or community of interest
12 for population reasons or to bring a different
13 neighborhood or community of interest
14 together, the one we're dividing is not one of
15 the ones that's heavily made up of protected
16 class.
17    Q   So in that instance, you have to make
18 a decision about which communities to divide,
19 is what you just said, right?
20    A   Sometimes, yes.
21    Q   And the way you're deciding which
22 ones not to divide is based on which ones have
23 members of protected classes?  That's what you
24 just said, right?
25    A   It's one of the factors.

Page 199

1    Q   Okay.  But don't think that that kind
2 of a decision is race predominance, right?
3       MR. LEWIS:
4          Objection.  You may answer.
5       THE WITNESS:
6          Correct, because the predominant
7       factor is the neighborhood or
8       community of interest.
9 BY MS. KEENAN:
10    Q   Right.  And so what would you say is
11 the role of race; is it sort of a protected
12 class?  Is it sort of a tiebreaker in that
13 instance?
14    A   I suppose when the federal equal
15 population requirement dictates something be
16 split, then, yeah, maybe race can be described
17 as a tiebreaker in addition to other
18 tiebreakers.  There also is, if dividing one
19 neighborhood allows me to unify three others,
20 that's better than dividing one neighborhood
21 that only allows me to unify two others.  So
22 there's lots of factors.  It's still not
23 predominant, but it's one of the factors.
24    Q   Right.  In those circumstances, you
25 know, race may be a factor that you consider,

Page 200

1 but you wouldn't consider that to be using
2 race as the predominant factor, right?
3    A   It definitely is not.
4    Q   And so for that reason, you would
5 agree that having you know, awareness of race
6 as you're drawing the map doesn't mean that
7 race is the number one factor as you're
8 drawing, right?
9    A   I don't know what you mean by,
10 "Awareness."
11    Q   Being aware that a community is
12 comprised of people in a protective class or
13 being aware that the Census block you're
14 moving has a protected class inside of it,
15 that doesn't mean that drawing a map to
16 include that Census block is done for the
17 number one reason based on race, is it?
18       MR. LEWIS:
19          Object to form.  You may answer.
20       THE WITNESS:
21          That's where we're always clear
22       to have another predominant
23       justification that is clearly and
24       visibly on the map guiding our
25       decision and predominant to race.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

BY MS. KEENAN:
1. Q   Have you ever been asked to draw a
2. minority/majority district, by which I mean a
3. district with more than 50 percent BVAP?
4. A   Sure.
5. Q   Does your process change at all, the
6. one that you just described to me when you're
7. trying to draw a majority/minority district or
8. same process?
9. A   Well, it depends on the purpose.
10. Q   What if the purpose is to draw a
11. majority/minority district that's compliant
12. with federal law?
13. MR. LEWIS:
14.     Objection; calls for legal
15.     conclusion.  You may answer.
16. THE WITNESS:
17.     Then we follow our same process
18.     that we just discussed.
19. BY MS. KEENAN:
20. Q   Okay.  In that process we just
21. discussed, you know, you've identified the
22. communities of interest in the neighborhoods.
23. You figured out which of them have protected
24. classes.  Now you're starting to draw the

1. lines.  When you're drawing the districts, is
2. racial data on the screen in Maptitude?
3. A   Sometimes.
4. Q   When is it and when isn't it?
5. A   Part of it can depend on how well we
6. know the area.  Part of it can depend on what
7. stage in the mapping process we're looking at.
8. You know, if we're early on and just focusing
9. on neighborhoods and communities of interest
10. in building the overall map, then, no, it's
11. not.  If we're at that stage of: Okay.  Some
12. community of interest or neighborhood has to
13. be split, so let's make sure we don't randomly
14. pick one that is a heavily protected class.
15. It could get us into Section 2 trouble, and it
16. might be on there.
17. Q   When you say, it might be on there,
18. it might not, is that a choice you're making
19. or how -- what determines whether race is or
20. is not shown on your screen?
21. A   I feel like I needed to make a
22. mapping decision and be sure I'm not getting
23. in trouble with Section 2.
24. Q   I'm sorry.  I guess, I mean -- so it
25. is a function, like, you can turn on and off,

1. or is it something you have to seek out?  How
2. do you make the racial data show up or not
3. show up on your screen?
4. A   Anyone that's using Maptitude,
5. there's a little click box in the bottom
6. corner that has whole bunch of thematic maps.
7. You know, Caliper comes -- when they give you
8. the data, it's built in with total population
9. and voting age population.  We actually
10. changed that for our projects that we're doing
11. to make it a whole range of socioeconomic
12. factors.  Because we have -- with one click,
13. you can switch between race to renters to
14. income to child at home to multifamily versus
15. owner-occupied family.  That's all one click
16. in Maptitude.
17. Q   Got it.  So you can select a view
18. that does show the race data or doesn't show
19. the race data, depending on whether you think
20. it's necessary based on, you know, what stage
21. you're in on the map drawing?
22. A   More or less.
23. Q   When you choose to show the racial
24. data on your screen, does that data show the
25. racial breakdown of whatever subdivision, you

1. know, city, neighborhood, precinct, Census
2. block that you're looking at, or is it only a
3. specific unit that the racial data is
4. available at?
5. A   I'm not sure.  What do you mean by
6. "Unit"?
7. Q   I guess I mean, are you able to
8. review the racial breakdown of a district --
9. let me stop here.  You're able to view the
10. racial breakdown of just the district that
11. you're drawing, right?
12. A   Sure.  When we're doing all of these
13. projects, all of those demographics I just
14. described are all in the data table and live
15. and active.
16. Q   Got it.  Can you also see the
17. breakdown of various subcomponents of the
18. district; so, for example, of a VTD or of a
19. Census block or of a municipality, or is it
20. just at the district level?  I'm just trying
21. to figure out how granular the data is.
22. A   This is why the system requires it be
23. the block level, as it can flip from level to
24. level.  So as you're changing what unit of
25. geography you're picking at, the socioeconomic

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 205

1   data is changing at the same time.
2       Q   Got it.  And that's true of the race
3   data, as well?
4       A   Yes.
5       Q   So you mentioned that it sort of
6   depends on what stage you're at in the map
7   drawing process in terms of how often you're
8   turning race on versus off in terms of what
9   you can view on the screen; is that right?
10      A   In terms of what we call a thematic
11  map, what coloring scheme is being used on the
12  map, yes.
13      Q   How often would you say you look at
14  that race data when you're drawing maps?
15          MR. LEWIS:
16              Objection; vague.  You may
17          answer.
18          THE WITNESS:
19              Not very often.
20  BY MS. KEENAN:
21      Q   Okay.  And what are the circumstances
22  that you think call for looking at it?
23      A   That we're looking at racial data?
24      Q   Yes.
25      A   Whether we're concerned with Section

Page 206

1   2 compliance or -- well, I should say Section
2   2 compliance and ensuring we're not doing any
3   intentional discrimination of dividing up an
4   area, even if it's not going to be 50 percent.
5       Q   Of course.  So we talked a lot about
6   how you draw maps.  I want to talk about now
7   the considerations when you're evaluating a
8   map that someone else has drawn, rather than
9   drawing your own map.  How do you go about
10  conducting racial predominance analysis of a
11  map someone else has drawn?
12      A   It can vary from situation to
13  situation, but the primary goal is to take the
14  explanation that that map drawer provided for
15  how they decided where the line should go and
16  how they ensure that race is not the
17  predominant factor, and see if those
18  explanations actually match where the lines
19  are drawn.
20      Q   Okay.  And are you offering the
21  conclusion that race was the predominant
22  factor in Mr. Cooper's drawing of specific
23  districts or the entire map?
24      A   That may be a legal question more
25  than an expert question.  But I would say

Page 207

1   there are -- I'm offering the opinion that
2   there are multiple places throughout the map
3   where none of Mr. Cooper's other explanations
4   explain why the line is drawn where it is and
5   race is -- and the line closely correlates
6   with race, leaving race the only remaining
7   explanation.
8       Q   Okay.  You would agree, though, that
9   correlation, itself, does not indicate
10  causation, right?
11      A   Yes.  That's why it's so important to
12  have the other explanation, to be able to say:
13  Yes, this line perfectly follows the protected
14  class coloring on the map because that's the
15  edge of the city and the city had exclusionary
16  zoning until the '90s.  You need to be able to
17  explain why that line is somewhere for a
18  reason other than race, and then give that
19  explanation.
20      Q   And so from your line of work, trying
21  to reverse engineer it, it's important to rule
22  out other possibilities, right?
23      A   Yes.  I mean, Mr. Cooper goes through
24  all these different sections of his report,
25  trying to say what -- he claims were the

Page 208

1   reasons why he drew the lines where they were
2   drawn, claiming that those explanations don't
3   explain.
4       Q   Right.  I'm sorry.  I keep thinking
5   you're done.  Go ahead.
6       A   No, that's all.
7       Q   Okay.  And so if there is another
8   reason that supports the maps that Mr. Cooper
9   drew that you haven't ruled out, that makes it
10  harder for you to conclude that race was the
11  predominant factor in drawing the district; is
12  that right?
13      A   I'm not sure I follow that question.
14      Q   Sure.  So you said earlier that when
15  you're drawing a map, it's important for you
16  that there's some other explanation than race
17  to explain the lines that you draw.  Do I have
18  that right?
19      A   Yes.
20      Q   So the existence of some other reason
21  for a line that somebody drew, that is a cut
22  against the argument that the predominant
23  factor is race, right?
24      A   Generally speaking, yes.
25      Q   Okay.  So you talked about a number

Page 209

1    of districts in your report, and I want to
2    just walk through to make sure I understand
3    your conclusions about them. I'm going to
4    share my screen now, just to show Exhibit 5
5    again, your report. Okay. Are you able to
6    see it?
7        A   Yes.
8        Q   So Paragraph 69 here talks about
9    SD-38 of the illustrative map; is that right?
10       A   Yes.
11       Q   Are you offering the conclusion that
12   race was the predominant factor in
13   Mr. Cooper's drawing of SD-38?
14       A   Yes.
15       Q   I'm going down to Paragraph 70. Here
16   you mentioned SD-17. Are you offering the
17   conclusion that race was the predominant
18   factor in Mr. Cooper's drawing of SD-17?
19       A   In both these cases, all the reasons
20   he cite in his report where lines are drawn
21   don't explain these lines, so that only leaves
22   race.
23       Q   We'll get back to the reasons why.
24   Right now I just want to confirm which
25   districts are the focus on your conclusions

Page 210

1    that race was the predominant factor. So
2    going down here to 71, now you talk about --
3    I'm sorry -- to 72.
4            I can't remember if I asked you about
5    that on. Did I ask about Senate District 19
6    whether you opined that race was a predominant
7    factor?
8        A   You did not ask it yet, but, yes, I
9    do.
10       Q   What about HD-1, are you offering
11   that race is the predominant factor for HD-1?
12       A   Yes.
13       Q   Same with HD-23, are you offering the
14   conclusion that race was a predominant factor?
15       A   Given the lack of -- in all of these
16   cases, given the lack of applicability of all
17   other Mr. Cooper's claim motivations for where
18   he drew lines, that only leaves race.
19       Q   Okay. Going down next to HD-38, same
20   conclusion, that race was a predominant
21   factor?
22       A   You can scroll down a little more.
23   It's just the way --
24       Q   To this (Indicating).
25       A   Oh, yeah, yeah.

Page 211

1        Q   And then in 75 and 76, you talk about
2    a number of different districts, so I'm just
3    going to go down to the figure here to get the
4    numbers. I can see them a little bit because
5    I see that's not fully on your screen.
6        A   It's fine.
7        Q   You can? Okay. I see HD-29, 61, 63,
8    65, 67, 68, 69 and 101. Are you offering the
9    conclusion that race was the predominant
10   factor in his drawing all of these districts?
11       A   In how those lines were drawn, yes.
12       Q   Are those the only districts you are
13   offering the conclusion that race was the
14   predominant factor for?
15       A   Yes, those are the clearest examples
16   I found and the ones I called out in my
17   report.
18       Q   When you say, "Clearest examples,"
19   are you offering an opinion that any other
20   districts use race as the predominant factor?
21       A   Yes, ma'am. I'm not identifying any
22   other districts that I think he used race as a
23   predominant factor. I think given the trend,
24   it's pretty clear this was a significant
25   factor everywhere, that there were racial

Page 212

1    concentrations in the map. But these are the
2    ones I'm specifically pointing to as examples
3    of what he was using as he drew the map, as a
4    whole.
5        Q   Going back to Paragraph 70 now. You
6    actually go farther, saying race was the
7    predominant factor. Here in Paragraph 70, for
8    example, you state that, quote: "The only
9    explanation is race." Do I see that correctly
10   here?
11       A   Out of his list of the
12   justifications, none of them apply to the
13   lines that he's drawn out.
14       Q   So you -- go ahead.
15       A   We all know the vulnerability -- all
16   of us are drawing maps know the vulnerability
17   of a map is -- one potential of vulnerability
18   is that race is a predominant factor. So we
19   give our explanations and are careful to use
20   other reasons and save them, which points a
21   pretty big spotlight. If the other reasons
22   don't explain a line, then race is probably
23   the predominant factor.
24       Q   I'm focusing on the word, "Only" in
25   Paragraph 70, which I think goes even further

53 (Pages 209 to 212)

Page 213

1  than predominate.  Do you agree that "Only" is
2  an even bigger claim than predominant factor,
3  or to you view those two things as the same?
4       MR. LEWIS:
5          Objection.  It calls for a legal
6       conclusion.  You may answer.  Sorry.
7       THE WITNESS:
8          Yeah, in this context, I'm using
9       it interchangeably that none of
10      Mr. Cooper's offered explanations
11      explain the line, which then leaves
12      race as the standing predominant
13      consideration, given that the data
14      and the map show a high relationship
15      between where the line is drawn and
16      race.
17  BY MS. KEENAN:
18      Q   I want to make sure I parse that.  So
19  the lines show a high relationship between
20  where they were drawn in race, right?  Is what
21  you just said?
22      A   Yes.
23      Q   But a high relationship can be
24  correlation as well as causation.  Would you
25  agree with that?

Page 214

1       A   Yes.
2       Q   And so are you actually offering the
3  opinion that Mr. Cooper relied on race and
4  nothing else when we drew the lines in his
5  illustrative maps that you're challenging?
6       MR. LEWIS:
7          Objection.  You may answer.
8       THE WITNESS:
9          No, I'm offering the example
10      that Mr. Cooper -- I'm sorry.  I'm
11      offering the opinion that Mr. Cooper
12      provided a list of explanations for
13      where he drew the lines, and none of
14      those explanations explain any of
15      these lines.  So it's the -- as you
16      say -- correlation between the racial
17      data and where the lines ended up
18      combined with his lack of any other
19      explanation and being able to rule
20      out all of his other explanations.
21  BY MS. KEENAN:
22      Q   I want to make sure I have that
23  clear.  You're not contending that Mr. Cooper
24  didn't rely on anything other than race in
25  drawing lines in this map, or are you?

Page 215

1       A   No.  There are a number of factors he
2  cited, and there are a number of districts
3  that follow those factoring.
4       Q   But when you say in Paragraph 70 --
5  and I'm going to highlight a couple of other
6  examples.  In Paragraph 69, you say: "The
7  only reason that Mr. Cooper provides for
8  drawing the line where he drew it is race."
9  Do you see that?
10      A   Yes.
11      Q   And 72 as well.  Here, again, you
12  say:  "The only reason plaintiffs' experts
13  provides for drawing the lines where he drew
14  it is race."  Am I reading that correctly?
15      A   Yes.
16      Q   Can you tell me one more time what
17  you mean when you say, "The only reason he
18  provided for drawing the lines is race."
19      A   So as he showed in the data he turned
20  over -- he had racial data, and then he talked
21  all about all of these communities of interest
22  and least change, parishes and compactness and
23  all of those factors they use in drawing the
24  lines.  All of those other factors don't
25  explain why these lines are where they are and

Page 216

1  how the numbers ended up so precisely at 50.1
2  and 50.2 and 50.3 percent.  The only factor in
3  data -- in his dataset that explains where
4  these lines are drawn is race.
5       Q   You would agree, though that Mr.
6  Cooper does offer other reasons as bases for
7  as the lines, right?
8       A   In general reference to the maps, he
9  does offer other reasons.  They just don't
10  hold up in these cases.
11      Q   And how did you determine that those
12  other reasons didn't hold up?
13      A   Because when he says he followed his
14  key regions, the lines don't follow key
15  regions.  When he says he followed
16  socioeconomic data, the lines don't follow the
17  socioeconomic data.  When he says he followed
18  jurisdictions boundaries, the lines don't
19  follow judicial boundaries.  The one thing the
20  lines do do is just barely make it over
21  50 percent.
22      Q   You talk about socioeconomic lines.
23  You talk about how the lines don't track
24  socioeconomic characteristics that Mr. Cooper
25  reviewed.  How are you able to make that

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 217

1  determination about the socioeconomic data
2  that Mr. Cooper referenced in his report?
3      A    All I can rely on is what Mr. Cooper
4  provided as what he said he was looking at.
5      Q    Would you agree that some of
6  Mr. Cooper's data was not in map format -- or
7  not the Maptitude format?  I'm sorry.
8          MR. LEWIS:
9              Objection; vague.  You may
10 answer.
11         THE WITNESS:
12             Yes.
13 BY MS. KEENAN:
14     Q    You told us that in particular that
15 some of this socioeconomic data was not
16 uploaded into Maptitude, right?
17     A    Right.
18     Q    So how are you able to determine that
19 the lines don't follow data that is not in
20 Maptitude?
21     A    Because I did everything that he says
22 he did.  You know, if he held a map, you
23 know -- if he has a statewide map that he
24 created, I was looking at the statewide map.
25 If it's just an Excel table, well, then, he

Page 218

1  couldn't have used it, either.
2      Q    Why couldn't somebody use information
3  in a chart or an Excel table to help make
4  decisions about where to draw lines on map?
5      A    Because these lines going through the
6  jurisdictions that are in the tables as
7  totals.  So when a line is going through the
8  middle of Shreveport, you can't use data from
9  an Excel table that just has the total for
10 Shreveport, for example.  Because that doesn't
11 tell you anything about where to draw the line
12 through the jurisdiction.
13     Q    Is that true of every single line
14 that you criticized?
15     A    What true?
16     Q    That it  doesn't run along any sort
17 of other boundary where you could have
18 assessed the sociological characteristics of
19 the region?
20         MR. LEWIS:
21             Objection; mischaracterizes the
22 testimony.  You may answer.
23         THE WITNESS:
24             If you can scroll back through,
25 I think most of these are sub-parish

Page 219

1  lines and sub-municipality lines.
2  Yeah.  So these are all being drawn
3  through jurisdictions that are
4  smaller than the data that are in his
5  Excel table.
6  BY MS. KEENAN:
7      Q    What about the general familiarity
8  that we talked about earlier, that you can
9  gain with a region over decades of experience
10 working there?  Are you able to asses that
11 sort of a thing based on the report that you
12 provided in this case?
13     A    No.  If the legal standard is that
14 anyone who knows the area really, really well
15 can say they didn't consider race and that
16 passes legal muster, then these cases all get
17 a lot easier.
18     Q    Would you agree that the districts
19 did comply with communities of interest in
20 Louisiana in a way that was describable in a
21 report where you could explain which
22 communities were kept together by the
23 individual districts that you're challenging.
24 Do you agree that would make it difficult to
25 conclude that the predominant factor was race?

Page 220

1          MR. LEWIS:
2              Objection; calls for legal
3  conclusion and speculation.
4          THE WITNESS:
5              That's exactly the kind of
6  report I would have issued with the
7  map if I drawn it.  I know judges --
8  in my experience, judges tend to be
9  reluctant to look at post -- what do
10 you call it, post facto
11 justifications?
12 BY MS. KEENAN:
13     Q    Okay.  Can you rule out the least
14 change principle that Mr. Cooper followed as a
15 basis for drawing any of these lines that you
16 criticize in his report?
17     A    I think all of these maps are -- I
18 think all these maps are in areas where
19 there's brand new districts drawn and the
20 existing districts are fairly massively
21 redrawn.
22     Q    I'm going to take you down to a
23 specific example that I have in mind.  I'm
24 looking at Paragraph 73 about HD-23, in
25 particular.  Are you aware of whether HD-23 in

55 (Pages 217 to 220)

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 221

1    Mr. Cooper's Illustrative Plan actually tracks
2    the HD-23 that formerly existed in the 2010
3    Enacted Plan?
4        A    Not off the top of my head, but that
5    would have been in his table that we looked in
6    earlier.
7        Q    Sure.  And do you know if the Enacted
8    Map 2022 eliminated the House district that
9    spanned this territory in Natchitoches that
10   you see here?
11       A    I believe Mr. Cooper made a reference
12   to something like that in his report.
13       Q    Do you agree that retaining district
14   from a former map is consistent with incumbent
15   protection?
16           MR. LEWIS:
17               Objection; vague and calls for
18           legal conclusion.  You may answer.
19           THE WITNESS:
20               There's a lot.  There is more
21           that goes into it than just that.
22   BY MS. KEENAN:
23       Q    Would you agree that keeping a
24   district where an incumbent lives is more
25   consistent with incumbent protection than

Page 222

1    completely dismantling that district and
2    moving it across the state?
3        A    As a hypothetical, that's probably a
4    reasonable conclusion, but there's a lot --
5    it's a very limited hypothetical.
6        Q    Sure.  Are you aware that Mr. Cooper
7    did consider incumbent addresses in drawing
8    his districts?
9        A    He didn't provide that data, I don't
10   think.
11       Q    But are you aware of whether he
12   considered it in his report?
13       A    We're back to my usual frustration
14   of -- I don't recall off the top of my head
15   whether he mentioned it.  I presume, if he was
16   looking at that, he would have provided the
17   data in his dataset.
18       Q    Okay.  If Mr. Cooper considered
19   incumbent addresses and he drew a line that
20   better preserved an incumbent's district --
21   let's just say hypothetically, because I
22   understand you were saying you didn't review
23   that data.  Would you agree that sort of
24   line-drawing decision is a reason other than
25   race?

Page 223

1            MR. LEWIS:
2                Objection.  It assumes facts not
3            in evidence.  You may answer.
4            THE WITNESS:
5                I would say both could be true
6            in the process of recreating a
7            district for an incumbent, race could
8            be predominant in how that recreated
9            district is drawn.
10   BY MS. KEENAN:
11       Q    I want to go to something in
12   Mr. Cooper's report for a moment.  That's in
13   Exhibit 7.  Going up to Paragraph -- Paragraph
14   11 of Mr. Cooper's report.  He says: "The
15   Illustrative Plans presented this declaration
16   update the illustrative plans described in my
17   July 22, 2022 declaration to better reflect
18   communities of interest and include other
19   technical changes." Did I read that
20   correctly?
21       A    Yes.
22       Q    I understand that in attacking his
23   communities of interest, you focused on those
24   key cultural regions and on the Census
25   designated places in your report; is that

Page 224

1    correct?
2        A    I focused on the communities of
3    interest that he described in his report.
4        Q    Sure.  I am now in Exhibit 8, which
5    is Mr. Cooper's rebuttal report.  I'm going to
6    stop sharing my screen to find the line that
7    I'm looking for.  Give me one second.
8            This is Paragraph 30 of Exhibit 8.
9    Again, Mr. Cooper states that the changes
10   between his 2022 Illustrative Plan and now
11   current Illustrative Plan were primarily made
12   to better respect communities of interest.  Am
13   I reading that correctly?
14       A    Yes.
15       Q    I know you focused on a couple of
16   regions that are highlighted in Mr. Cooper's
17   report.  Did you happen to rule out a
18   communities of interest as a different expert
19   named Dr. Colton has defined them?
20       A    No.
21       Q    Are you even aware that Dr. Colton
22   actually offered a district level response to
23   your conclusions about race predominance in a
24   report he offered in this case?
25       A    I don't know if I read his rebuttal

56 (Pages 221 to 224)

Page 225

1  report or not.
2      Q  You didn't offer any responses to his
3  critiques in your surrebuttal report, right?
4      A  Right.
5      Q  So if those communities of interest
6  were something that Mr. Cooper considered in
7  drawing the maps, you haven't offered any sort
8  of response to those communities of interest
9  in your report, have you?
10     A  I've only focused on things that
11 Mr. Cooper said he focused on.
12     MR. LEWIS:
13         I'm going about an hour.  Is
14     this a good time for a five-minute
15     break?
16     MS. KEENAN:
17         I think I'm actually wrapping up
18     this section as well.  So now is a
19     good time for a five to ten-minute
20     break for me.
21     MR. LEWIS:
22         Perfect.
23     MS. KEENAN:
24         You want to do five or you want
25     to do ten?  What's your preference?

Page 226

1      I know we're getting toward the
2  longer end.
3      MR. LEWIS:
4          Why don't we do ten, just to be
5      on the safe side.
6      MS. KEENAN:
7          That's good.
8      MR. LEWIS:
9          Thanks so much.
10     MS. KEENAN:
11         Okay, 4:28 Eastern, we'll be
12     back on the record.
13     (BRIEF RECESS FROM 4:18 P.M. TO 4:28 EST)
14 BY MS. KEENAN:
15     Q  I have one more question about
16 Mr. Cooper's rebuttal report.  I'm going to
17 share my screen on that again.  Do you see
18 Paragraph 7 from Mr. Cooper's rebuttal report,
19 which I believe is Exhibit 8?
20     A  Yes.
21     Q  In the second sentence there, he's
22 referring to the changes he made between the
23 2022 Illustrative Plan and the now current
24 Illustrate Plan.  He said those changes,
25 quote, "Reflect conversations I had with the

Page 227

1  attorneys for the plaintiffs who in turn had
2  requested commentary about the 2022
3  Illustrative Plan from the plaintiffs and
4  other experts for the plaintiffs."  Did I read
5  that correctly?
6      A  Yes.
7      Q  In response to that paragraph in the
8  rebuttal report, which I know you had before
9  your surrebuttal report, did you ask defense
10 counsel to review the reports of any of the
11 other experts?
12     MR. LEWIS:
13         I'm going to object to that on
14     the ground of privilege and instruct
15     the witness not to answer.
16 BY MS. KEENAN:
17     Q  Okay.  I can move on from this, then.
18 I'm going to go back over your report.  So the
19 next section of the report is called, "Racial
20 Percentage Targets Drove the Drawing of the
21 New Illustrative Districts."  That's on page
22 35.  Am I reading that correctly?
23     A  Yes.
24     Q  The first three paragraphs -- I'll
25 give you a chance to read them.  But they seem

Page 228

1  to be about what you contend is a counting
2  error, so I'm a little confused about what
3  with 78 through 80 have to do with the title.
4  Can you take a second to review those and then
5  let me know how they relate to the title of
6  this section?
7      A  Well, it's just part of a larger
8  section of this report.  That title isn't
9  specific to just those two paragraphs.
10     Q  Sure.  But are you contending that
11 the counting error has anything to do with
12 racial percentage targets driving the drawing
13 of the new illustrative districts, or is that
14 just in this section but not related to the
15 title?
16     A  It's all part of the topic.  His
17 discussion of majority Black seats is part of
18 the reflection his focus was on, getting in
19 more just barely majority seats.  As part of
20 that discussion, he also refers to the wrong
21 districts.
22     Q  Okay.  I think I see how you're
23 trying to draw the connection.  Thanks for
24 explaining that.  I want to talk a little bit
25 about those paragraphs, though.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 229

1    In Paragraph 79, you said that HD-23
2  is already majority Black in the Enacted Map,
3  right?
4    A    Yes.
5    Q    Would you agree that HD-23 is in a
6  completely different location than the Enacted
7  Map?
8    A    I don't have it right in front of me.
9  I would need to look at that.
10    Q    If I represented to you that HD-23
11  was in Orleans Parish in the Enacted Map
12  rather than in Natchitoches, does that ring
13  any bells for you or you're just not --
14    A    I know where those two areas are, but
15  I would --
16    Q    Sure. I'm sorry. I meant the
17  location of the district.
18    A    I'd be more comfortable looking at
19  the two maps, if you're asking me about where
20  the district is on the two maps than trying to
21  pull it from memory.
22    Q    I'm going to go to Mr. Cooper's
23  report for a minute, because I believe he
24  discusses this point. Do you see Mr. -- this
25  is Exhibit 8, Mr. Cooper's rebuttal report.

Page 230

1  Do you see this sentence that says: "The
2  Enacted House Plan" in Paragraph 36 -- "HD-23
3  is eliminated as a majority Black House
4  District in northwest Louisiana and shifted to
5  New Orleans." Do you see that sentence?
6    A    Yes.
7    Q    Do you have any basis to dispute
8  that? I don't have a copy of the Enacted Map
9  on me. I can try to find it on the next
10  break. But do you disagree that HD-23 is in
11  Orleans Parish in the new map? In the enacted
12  Map? Sorry.
13    A    I don't have an opinion about where
14  it is or where it isn't.
15    Q    Let's just assume for the moment
16  that -- and I can confirm this before we close
17  the deposition. Assume with me for a second
18  that HD-23 is in Orleans Parish in the Enacted
19  Map. You're familiar with the two locations
20  that I'm talking about, Natchitoches and
21  Orleans, right?
22    A    Yes.
23    Q    You would agree that if the Enacted
24  Map moves HD-23 to Orleans Parish, then HD-23
25  in the Illustrative Map does create a distinct

Page 231

1  majority Black district in northwest
2  Louisiana, right?
3    A    If that's what the numbers show,
4  that's what it does.
5    Q    Right. And are you aware of whether
6  the Illustrative Map also leaves in place the
7  majority Black district that's in Orleans
8  Parish?
9        MR. LEWIS:
10        Objection; vague. You may
11    answer.
12        THE WITNESS:
13        Yeah. Sorry. Can you be more
14    specific?
15  BY MS. KEENAN:
16    Q    Sure. This might be easier if I have
17  a copy of the Enacted Map, which I'll try to
18  get. But do you agree there is a majority
19  Black district in Orleans Parish in the
20  Illustrative Map.
21    A    Isn't that one of the maps that we
22  were just looking at? Are you as racially
23  driven?
24    Q    I believe that is one of the areas
25  you talked about in your report, as we

Page 232

1  discussed. Give me one second. I'll show
2  you.
3    A    Yeah, right there.
4    Q    So you would agree there is a
5  majority Black district in Orleans, right?
6    A    Yeah. I would need to compare the
7  numbers of the maps to see. I'd be surprised
8  if there's just one, but there might be just
9  one.
10    Q    I think it will be helpful to get a
11  copy. I'll handle that on the next break.
12  You also say that 2023 -- I'm going back to
13  your report and to Paragraphs 80 now. So I'll
14  just scroll back down there. Here you say
15  that the 2023 House Illustrative Map
16  eliminates a majority Black VAP district
17  HD-62?
18    A    Yes.
19    Q    Are you unfamiliar with where HD-62
20  is in the Enacted Map?
21    A    Off the top of my head, yes. I've
22  looked at it many times. I just don't know
23  off the top of my head.
24    Q    I'll ask these questions in a
25  separate section when I have a copy of both in

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 233

1  front of me. I'll return to that later.
2      Moving down to Paragraph 83, you say:
3  "Plaintiffs' expert uses race as a predominant
4  factor to draw the lines that create these
5  districts." Am I reading that correctly?
6      A   Yes.
7      Q   And then you say: "It's worth noting
8  how precisely race has been used in the 2023
9  Illustrative Map, eleven majority AP Black VAP
10  House districts are less than 53 percent AP
11  Black VAP." You also state that "Eleven of
12  the Senate maps, 16 majority AP Black VAP
13  districts are just barely majority AP Black
14  VAP at less than 53 percent, AP Black VAP."
15  Did I read all of that correctly?
16      A   Yes.
17      Q   And then, again, down in Paragraph
18  91, you also state that: "The way the
19  majority AP Black VAP districts were drawn to
20  just barely cross the 50 percent line is clear
21  as the grouping of districts precisely above
22  50 percent makes clear the predominant
23  consideration of race in drawing the
24  illustrative map." Did I read that correctly?
25      A   Yes.

Page 234

1      Q   How did you distinguish between
2  correlation and causation here?
3      A   The fact that you don't precisely end
4  up just over 50 percent. And if you scroll to
5  the next page, it shows -- you don't end up
6  just over 50 percent with nothing just below
7  50 percent randomly.
8      Q   Other than just providing the BVAP
9  percentages like you do in Figure 27, which
10  you just referenced, did you provide any
11  empirical basis for comparing the BVAPs in
12  these districts from a statistical
13  perspective?
14      A   No.
15      Q   Do you have any empirical basis to
16  say that certain districts are so close to
17  50 percent that they must be caused by race?
18      A   Just the reality is that you would
19  never end up with this many seats precisely
20  over 50 percent and nothing just under
21  50 percent, unless you were intentionally
22  targeting over 50 percent. It just --
23  it's not --
24      Q   Again, that's just your assertion;
25  there is no empirical basis for that, right?

Page 235

1      A   It's based on my experience drawing
2  thousands of these maps.
3      Q   But not on any statistical or
4  empirical analysis?
5      A   I think it's so obvious that I don't
6  even know how you would test that.
7      Q   Have you offered any controlled
8  statistical analysis ruling out
9  nondiscriminatory explanations for the BVAP
10  percentages you highlight in your report?
11      A   I only analyze the explanations
12  Mr. Cooper offered. I didn't think or try to
13  guess or come up with other justifications for
14  this map.
15      Q   I'm definitely not asking you to
16  guess. I'm asking you if you've offered any
17  controlled statistical analysis ruling out
18  nondiscriminatory explanations for the BVAP
19  percentages you highlight in your report?
20      MR. LEWIS:
21          Objection; vague. You may
22      answer.
23      THE WITNESS:
24          I go back to the answer: It
25      just doesn't happen.

Page 236

1  BY MS. KEENAN:
2      Q   But that's a no?
3      A   That's --
4      Q   That's a no whether you've offered
5  controlled statistical analysis in ruling out
6  those alternatives?
7      MR. LEWIS:
8          Objection; vague. You may
9      answer.
10      THE WITNESS:
11          No, I do not.
12  BY MS. KEENAN:
13      Q   And have you ruled out whether any
14  similarity in the BVAPs across these
15  communities could be attributable to be
16  underlying demographic makeup of the
17  geographic areas where those districts are
18  drawn?
19      A   Yes. That's obvious from the maps
20  shown earlier in the report.
21      Q   How so?
22      A   If you scroll up to any of those maps
23  that we were looking at in the last
24  discussion, Baton Rouge or any of those -- if
25  you go to the Baton Rouge map is probably the

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 237

1    best.
2        Q   Here (Indicating)?
3        A   Yes, exactly.  What you're talking
4    about would be -- would make sense if the
5    whole region was right about 50 percent.  So
6    however you divided up the districts, they're
7    going to come out right about 50 percent.  But
8    in reality, you can see in this map, each of
9    these districts puts together areas that are
10   red are well over -- 75 percent and over.  And
11   in areas that are purple, it's below
12   25 percent.  So it's definitely not as you
13   were describing just coincidence.  They're
14   carefully balanced between heavily Black and
15   very, very low Black in order to arrive at
16   that just barely majority Black number.
17       Q   Okay.  I'm not sure I have any other
18   questions on that.  Give me one second.  I
19   know you're looking at the individual shaded
20   areas, but does your -- does the analysis you
21   just gave me account for sort of the average
22   BVAP across this area?  Like if I took this
23   entire shape and removed all of the lines
24   dividing it up, have you figured out what the
25   average BVAP would be in that larger shape?

Page 238

1        MR. LEWIS:
2            Objection; vague.
3        THE WITNESS:
4            I have not calculated, but you
5        can just look, if you took those
6        eight numbers and averaged them,
7        since they're all right about equal
8        population, you'd be around 53,
9        55 percent.
10   BY MS. KEENAN:
11       Q   Okay.  So before I switch topics, I
12   want to try to go back to this enacted map
13   issue.  Give me one moment to handle that.  So
14   I think we can make this work, but we'll see
15   if we run into any issues.
16           I'm going to share my screen now.  So
17   this is the Enacted House Map as depicted in
18   Exhibit I-2 in the corrected version of Bill
19   Cooper's report.  Can you see this map okay?
20       A   Yes.
21       MS. KEENAN:
22           This is too small.  Can I ask
23       for three minutes off the record just
24       to sort this out, and then I can be a
25       little clearer in my presentation of

Page 239

1    this.
2        MR. LEWIS:
3            Sure.
4        MS. KEENAN:
5            We'll be back -- let's say at
6        4:50.  And then I'll be right back.
7        MR. LEWIS:
8            Okay.
9        (BRIEF RECESS FROM 4:46 TO 4:50 EST)
10       MS. KEENAN:
11           I think I've got it.  I may have
12       to take screenshots to use as
13       exhibits.  We need to mark these.
14       But what I'm going to use for now is
15       a link that's provided in Paragraph
16       109 of Bill Cooper's report.  I'll
17       show you that first, just so you can
18       see that you have access to this.
19   BY MS. KEENAN:
20       Q   Do you see Paragraph 109 in Exhibit
21   7, Mr. Cooper's report, where it shows that
22   there's a statewide interactive map depicting
23   the House Illustrative Map, and it shows the
24   House Plan can be turned on and off to the
25   Enacted Map using that link.  Are you familiar

Page 240

1    with that link?
2        A   Yes.
3        Q   Did you use that link at all or did
4    you review it in preparing your report?
5        A   I probably clicked on it, but I
6    didn't use it to any significant extent.
7        Q   I'm going to pull it up, and I'm just
8    going to show you two areas.  I'll zoom all
9    the way out first, and I'll take a screenshot
10   of this, so we can mark it as an exhibit.  But
11   do you see House District 62 in purple here?
12       A   Yes.
13       Q   And I'm going to zoom in now.  I'll
14   take a screenshot of the region.  Would you
15   agree this is in East Feliciana, part of East
16   Baton Rouge in terms of where it's located in
17   the map of Louisiana?
18       A   Generally speaking, yes.
19       Q   Are you aware of whether this
20   district was created in an area where the
21   Black candidate of choice was already being
22   elected under the 2010 maps?
23       A   I did not look at the information of
24   where Black candidates of choice were being
25   elected or not.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 241

1     Q    Are you aware that Districts 65 and
2   68, also shown in this same region, are new
3   majority Black districts in the Illustrative
4   Map?
5     A    The number being shown are the
6   Enacted Map numbers.  I don't know what the --
7     Q    I'm sorry.  The red borders show 65
8   and 68 as they're drawn in the Illustrative
9   Map.
10    A    Okay.
11    Q    Does that makes sense?
12    A    Sure.
13    Q    I'm just going to make sure I have
14  the reference exactly right.  I'll go back to
15  the way he describes it in his report.  What
16  he says is the purple line overlay shows the
17  boundaries that can be clicked on and off.  So
18  I'll  back and I'll show you the purple
19  ones, just to make sure we have the right
20  boundaries here.  So when I click Illustrative
21  House on and off, you can see that's where the
22  boundaries are.  For the illustrative ones, it
23  may be easier to go back to your report where
24  you can see the 65 and 68 are among the
25  districts you've discussed here in Figure 22

Page 242

1   of your report, right?
2     A    Yes.
3     Q    And so those are both new majority
4   Black districts in the Illustrative Plan, to
5   your knowledge, right?
6     A    As he's describing them, yes.
7     Q    I'm going to go back to the link
8   again.  And now I'm going to scroll over to
9   Orleans.  Can you tell we're in Orleans Parish
10  now?
11    A    Yes, the river is very distinct.
12    Q    Okay, great.  Can you tell that HD-23
13  in the -- as labeled in the Enacted Map -- is
14  in Orleans Parish?
15    A    Yes.
16    Q    Okay.  And like I said, these purple
17  borders -- not the red ones.  I apologize for
18  that -- are the Illustrative House district
19  borders that you can click on and offer.  Do
20  you can see that?
21    A    Yes.
22    Q    As you can see, the Illustrative
23  House District that Mr. Cooper proposes also
24  keeps the district that is labeled HD-23 in
25  the Enacted Map.  That district is preserved

Page 243

1   in Mr. Cooper's district, as well, right?
2     A    Yes.  It looks like it's got the same
3   borders in his map.
4     Q    So when Mr. Cooper says that he
5   creates an additional majority Black district
6   in northwest Louisiana with Illustrative
7   HD-23, you would agree that's not the same as
8   the majority Black district in Enacted HD-23,
9   right?
10            MR. LEWIS:
11              Object to form.
12            THE WITNESS:
13              Go ahead, Patrick.
14            MR. LEWIS:
15              Object to form.
16  BY MS. KEENAN:
17    Q    I'll go back here to clear it up.  So
18  in 79, you say HD-23 is already majority Black
19  in the Enacted Map, right?
20    A    Yes.
21    Q    But in your images, you show how
22  HD-23 in the Illustrative Map is actually up
23  in Natchitoches, right?
24    A    Yes.
25    Q    So you would agree that when you say

Page 244

1   in Paragraph 79, HD-23 is already majority
2   Black in the Enacted Map, we're talking about
3   two totally different districts, right?
4     A    They have the same number.
5     Q    Correct.  They have the same number.
6   But Cooper's Illustrative District 23 is an
7   additional majority Black district additional
8   to -- I'm going back to the link -- the
9   Enacted HD-23, which takes on a different
10  number in the Illustrative Map, right?
11    A    What number does it take on?  Does
12  this give it?
13    Q    I'll slow you.  I think it's in your
14  report.  Give me one second.  We'll go back to
15  the Orleans part.  I'm not sure yours does
16  have the number, actually.
17         I'll ask just one more question on
18  this.  Would you agree that the district that
19  is currently -- it's labeled as HD-23 on this
20  map, the Enacted version of the map.  If you
21  agree that it's preserved in the Illustrative
22  Map, then do you agree that that district plus
23  the Illustrative District 23 represent two
24  different majority Black districts that are
25  present in the illustrative map?

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 245

1    A   There's a lot of ifs.
2    Q   Sure. I believe it's HD-5 in the
3  Cooper Illustrative Map, if that is helpful.
4  So if you replace this 23 with a 5 -- because
5  that's what it's labeled in Illustrative
6  Map -- would you agree that Illustrative 5 in
7  Orleans and Illustrative District 23 in
8  Natchitoches are both majority Black districts
9  in Cooper's Illustrative Map?
10    A   I agree with the percentages he shows
11  in his chart.
12    Q   Okay. Thank you. I'm going to move
13  on. You mentioned a concept of Differential
14  Privacy in your report. Can you explain that
15  concept to me as you understand it?
16    A   That's opening a bag of worms. The
17  Census Bureau has done hours and hours on
18  Differential Privacy. But essentially, the
19  Decennial Census data used to be taken as an
20  absolute number. It is a head count; no
21  surveys, no sampling. It was just a number.
22  And we, of course, treat it as a number. The
23  Census Bureau began to get concerned that
24  marketers and others could kind of reverse
25  engineer the block level data to identify the

Page 246

1  Census response of an individual. And so they
2  went through years of development to come up
3  with a method of adding -- essentially, noise
4  to the block level data to make it much harder
5  for marketers and others to reverse engineer
6  and know exactly what an individual responded
7  to their Decennial Census form. So that noise
8  is essentially a block-by-block error factor
9  that has never been intentional induced in the
10  Census data before but now is a decently
11  significant percentage difference when you
12  start looking at state legislative and smaller
13  jurisdiction numbers.
14    Q   So you mentioned Differential Privacy
15  in your report. Really just in one paragraph
16  substantively. Do you agree with that? I can
17  show it to you.
18    A   I'll take your word for it.
19    Q   I'm just going do show my screen to
20  be safe. We're back to Exhibit 5. We're at
21  Paragraph 84. Sorry. I'm just getting it
22  to -- I know I just saw it. Do you see
23  Paragraph 84 here?
24    A   Yes.
25    Q   Did you do anything to analyze the

Page 247

1  impact of Differential Privacy or are you just
2  flagging it as a potential concern?
3    A   At the time I was working on this,
4  the data wasn't out, and I don't think the
5  data is out yet, where it would be possible to
6  do a mathematical measure of the level -- of
7  the likely level of noise in the data. But
8  the Bureau has said that at a congressional
9  district level, it's plus or minus
10  one percent. And that as your level of
11  geography gets smaller, the error goes up.
12  It's somewhere higher than one percent margin
13  of error in the data.
14    Q   In this -- the end of this paragraph,
15  you say: "With plaintiffs' experts carefully
16  tailored razor-thin majority Black
17  percentages, there is a statistically
18  significant chance that some or even many of
19  those districts are in fact not 50 percent
20  Black." If the math isn't there yet, what's
21  the basis for your opinion that the chance is
22  statistically significant?
23    A   Because we know that the error factor
24  is more than one percent. We just don't know
25  how much more than one percent. These numbers

Page 248

1  are all two and three times of a percent down.
2  That's definitely statistically significant.
3    Q   How do you know it's greater than
4  one percent? Do you take any steps to
5  calculate the standard of error or how did you
6  get that number?
7    A   The Census Bureau did it.
8    Q   You provided a link in your footnote
9  to the Census Bureau's explanation of
10  Differential Privacy, right?
11    A   Yes.
12    Q   I'm going to share that link for just
13  a moment here. I am going to mark and send
14  over those three different screenshots I
15  showed you, just for the records purpose, the
16  full Enacted Map, the zoom-in on 62 and the
17  zoom-in on Orleans at 23 will be three
18  exhibits, those three different views I gave
19  you, which I think will be Exhibits 17, 18 and
20  19 respectively. I will mark this as Exhibit
21  20. This is the Census Bureau's paper on
22  Differential Privacy that I'm about to share.
23  Are you able to see that on your screen?
24    A   Yes.
25    Q   Now, I'm going to scroll down to page

62 (Pages 245 to 248)

Page 249

1    6. So the first bullet in this first column
2  of this paper that the Census Bureau put out
3  says: "Data for very small demographic groups
4  and geographic areas, such as census blocks,
5  may be too noisy for a particular use and
6  should be aggregated into larger geographic
7  areas before use." Did I read that correctly?
8      A  Yes.
9      Q  We chat a lot about this today. But
10  a Census block is a pretty small unit of
11  measurement, right?
12      A  Yes.
13      Q  As we discussed earlier, there could
14  be upwards of 50 Census blocks in one
15  precinct?
16      A  Yes.
17      Q  And there can be tons of precincts or
18  or VTDs in any given district, right?
19      A  Yes.
20      Q  Are you offering an opinion that
21  looking at the district level is inconsistent
22  with the Census Bureau's guidance to aggregate
23  Census blocks into larger geographic areas
24  before use?
25      A  No.

Page 250

1      Q  So it's possible that aggregating the
2  Census blocks up to the district level reduces
3  the risk that this noise will cause a
4  statistically significant difference in
5  assessing the BVAP in a given district; is
6  that right?
7      A  No.
8        MR. LEWIS:
9          Objection.
10  BY MS. KEENAN:
11      Q  Why is that not right?
12      A  A statistically significant
13  difference is a very different concept in what
14  they say here, which is, don't use it at all.
15  This is something we run into all the time
16  with the Census Bureau, conflict between the
17  Census Bureau advice and Department of Justice
18  advice.
19      Q  I'm going to stop sharing my screen
20  with this. Are you aware of whether the
21  Differential Privacy process is more likely to
22  result of overestimating or underestimating
23  the number of majority BVAP districts in a
24  plan?
25      A  Well, in this case, it's definitely

Page 251

1  more likely to result in estimating.
2      Q  Why do you say that?
3      A  Because the number of districts that
4  are just barely over 50 percent is barely
5  significant. So a half of a percent there in
6  data will drop a whole bunch of seats under.
7  And the number of seats that are just under
8  50 percent is essentially zero. Where a half
9  a percent there would drop a whole bunch of
10  seats below 50, you need something -- you can
11  bring up my chart -- but it's something like a
12  10 percent there do you get one seat
13  moving up into to the majority Black range.
14      Q  But you are basing that likelihood on
15  the numbers in the Illustrative plan, right,
16  not on how the Differential Privacy process
17  works?
18      A  The whole basis of the question is to
19  compare the likely marginal of error with
20  Differential Privacy data with the number of
21  districts that can be impacted, so it has to
22  be a plan-specific analysis.
23      Q  Are you aware, though, that studies
24  have concluded that is Differential Privacy is
25  more likely to underestimate the number of

Page 252

1  majorities BVAP districts in a plan?
2      A  That's probably mischaracterizing
3  those studies.
4      Q  I'm going to share on my screen what
5  I'll ask the court reporter to mark as Exhibit
6  18. Are you able to see this study?
7      A  It's tiny, but I can see it.
8      Q  I agree. I'm going to try to get it
9  to zoom in a little bit.
10      A  You can get rid of the bookmarks.
11      Q  Good point. How's that? Is that any
12  better?
13      A  That's better.
14      Q  I'm going to go to page 14 of this
15  report.
16      A  Just before you do that, is this
17  published?
18      Q  This is the report as I have it.
19  I'll make sure I send it over to your counsel
20  afterwards for your review. I'm just asking
21  you to tell me if I've misrepresented the
22  question I've read. And if you can't answer
23  that, that's totally fine. But I'll read you
24  the part that I'm quoting from, so you'll have
25  it. So the bottom paragraph here on page 14

63 (Pages 249 to 252)

Page 253

1  talks about how the paper is attempting to
2  examine how the predictions of individual race
3  and ethnicity based on the 2010 Census and DAS
4  12.2 data result in different districting
5  outcomes. Did I read that correctly?
6      A  Yes.
7      Q  And the sentence here says: "We find
8  that the predictions based on the DAS 12.2
9  tend to produce blocks with more White voters
10  than those based on the original Census data.
11  As a consequence, the predicted proportions of
12  Black and Hispanic registrants are much
13  smaller, especially in the blocks where they
14  form a majority group." Did I read that
15  correctly?
16     A  Yes.
17     Q  It says: "The precise reasons for
18  these biases is unclear." Did I read that
19  correctly?
20     A  Yes.
21     Q  And then this paragraph here, which
22  I'm highlighting, it says, after simulating
23  10,000 redistricting plans using DAS 12.2
24  population and a 5 percent population parity
25  tolerance, we find that the systematic

Page 254

1  differences and racial prediction identified
2  above results in the underestimation of the
3  number of MMD in these plans as in the
4  original court case. An MMD is defined as a
5  district in which more than 50 percent of its
6  registered voters are either Black or
7  Hispanic. Did I read that correctly?
8      A  Yes.
9      Q  Are you also aware of any studies
10  regarding the estimated percentage change in a
11  district's percentages of the Black Voting Age
12  Population, that results in the Differential
13  Privacy Process?
14     A  Can you restate that?
15     Q  Sure. I think earlier you talk about
16  how the Census Bureau may have been put out a
17  paper or a guidance -- you didn't really say
18  the source -- but about a one percent change
19  in the congressional districts. Do you recall
20  that?
21     A  Yes.
22     Q  And what is the one percent change
23  in? Like, what does it represent? A change
24  for what?
25     A  Total population.

Page 255

1      Q  Are you aware of any studies
2  regarding the estimated percentage change as
3  it relates to the percentage of the Black
4  Voting Age Population as a result of the
5  Differential Privacy process?
6      A  You just showed me one.
7      Q  Are you aware of others?
8      A  There have been a lot of attempts to
9  use some data on the formula that the Census
10  Bureau put out in 2010 Census data to predict
11  the likely impact on 2020 Census data, but
12  it's all -- difficult to figure out until the
13  Bureau gives more specifics.
14     Q  Sure. Are you aware of any studies
15  showing that state House District level the
16  bias in percentage BVAP can average to be less
17  than .2 percent?
18     A  The bias in what?
19     Q  The percentage of the BVAP -- the
20  effect on the percentage of the BVAP, in other
21  words, is less than .2 percent.
22     A  If I read it, I don't recall it.
23     Q  When you said earlier that this
24  percentage change is likely to be greater than
25  one percent, would that be inconsistent with

Page 256

1  studies showing that effect on the BVAP may
2  actually be less than .2 percent or do you
3  think those two things are consistent?
4      MR. LEWIS:
5          Objection. You may answer.
6      THE WITNESS:
7          If what you're describing is the
8      average impact on the BVAP is .2
9      percent, then considering that the
10     average BVAP nationwide is what,
11     10 percent? And you get an average
12     .2 variation, then, yeah, if you get
13     up to a 50 percent BVAP district,
14     you're going to be up around a full
15     percent error margin.
16  BY MS. KEENAN:
17     Q  Okay. But you haven't performed any
18  sort of analysis as to the specific margin of
19  error that the Differential Privacy Analysis
20  may introduce as it relates to this map; is
21  that right?
22     A  Like I said, the data is not out from
23  the Bureau that would enable that study. What
24  we do know is that the percentage is going to
25  be at least one percent.

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 257

1    Q   Okay. I want to move on to the
2  opinions you offer about what you call
3  sensitivity or robustness of the districts.
4  Do you recall that section of your report?
5    A   Sure.
6    Q   I'm going to share my screen again
7  while we're discussing it. Starting at
8  Paragraph 85, you say: "There is also
9  sensitivity analysis to consider. Plaintiffs'
10 expert uses 50 percent AP Black VAP at his
11 target for a district likely to elect the
12 candidate preferred by Black voters without
13 citing support for that number. Even if 50
14 percent is a statistically estimated figure,
15 any polarized voting analysis used to
16 calculate that likely to elect percentage is a
17 statistical analysis with a margin of error
18 and a chance of mischaracterizing the data."
19 And then in the next paragraph you say: "As a
20 simple illustration of this concept, suppose
21 that the true effective percentage is 53
22 percent AP Black VAP for all the districts in
23 the state." Have a read those correctly?
24   A   Yes.
25   Q   And then you go on to compare whether

Page 258

1  the Enacted or Illustrative Maps would elect
2  more Black preferred candidates, assuming the
3  effectiveness percentage is 53 percent AP
4  BVAP. Is that right?
5    A   Yes.
6    Q   That 53 percent number that you use
7  to assess the sensitivity or robustness of the
8  districts, that's hypothetical, right?
9    A   Yes.
10   Q   And so is the 45 percent number that
11 you later use in Paragraph 89?
12   A   Yes.
13   Q   Would you agree that in real life,
14 there's not one effectiveness number, of
15 course, that applies to every district?
16   A   In all likelihood, it varies by
17 region of the state, yes.
18   Q   It's likely depending on the district
19 or the region or the people that live there,
20 right?
21   A   Yes. Generally -- as a general
22 summary of it. It's a very complicated
23 analysis.
24   Q   Sure. When you talk about the
25 sensitivity analysis, is that something that

Page 259

1  you try to consider when you're drawing maps?
2    A   Yes.
3    Q   In what way?
4    A   If we're trying to impower a region
5  that has historically been underrepresented,
6  we want to be sure that we get the right share
7  of the voters to actually impower them.
8    Q   You think that's important to
9  consider when you're drawing a map is how to
10 impower voters and make sure their districts
11 are effective?
12   A   You know, that is very roughly
13 speaking the definition of Section 2 of the
14 Voters Rights Act. It's definitely important.
15   Q   How do you try to account for
16 sensitivity or robustness when you're drawing
17 maps?
18   A   Usually -- it's a combination of
19 data, community factors and community input.
20   Q   And what do the combination of those
21 factors try to tell you?
22   A   How to bring representation to a
23 history unrepresented area.
24   Q   Do they generate a percentage, like
25 the 53 or the 45 percent that you're listing

Page 260

1  here, or what's the format of the way that you
2  receive that data?
3    A   Sometimes if we're in a highly, like,
4  sensitive legalistic formula or situation, we
5  can, you know -- the lawyers will want to know
6  the percentages. We do report the
7  percentages, but it also is important to look
8  at the makeup of the area, the age of
9  residents, things like that.
10   Q   Okay. I take it, based on your other
11 answers, that you're not familiar with Lisa
12 Handley's report in this case?
13   A   I know she wrote one. I may have
14 skimmed through it long ago. I don't recall.
15 I worked with her all of the time. I've seen
16 lots of reports. I don't recall if I saw this
17 one.
18   Q   Sure. And we already also talked
19 about how Mr. Cooper, in this rebuttal report,
20 explained that you received feedback from
21 plaintiffs based on communications they had
22 had with other experts; is that right?
23   A   You've read that line out of his
24 report, yes.
25   Q   Do you know whether Mr. Cooper

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

Page 261

1  received feedback about the effectiveness of
2  his districts from Lisa Handley?
3      A   I believe he said he strengthened the
4  Black percentages of this district based on
5  direction from counsel if -- I don't recall
6  the word-for-word quote, but they were words
7  to that effect.
8      Q   Sure.  But you don't know whether he
9  received information from counsel about the
10  type of effectiveness of the districts that
11  Lisa Handley analyzed, do you?
12     A   All I know is what Mr. Cooper wrote
13  in his report.
14     Q   So you don't know whether
15  effectiveness or sensitivity or robustness
16  analysis that you're discussing here is part
17  of what factored into his line drawing?
18     A   All he reported is all I know, which
19  is that he increased the racial performance of
20  his districts based on direction from counsel.
21     Q   I'm going to go page 30 of his
22  rebuttal -- I'm sorry.  His -- I think it's
23  his initial report.  I'm going to stop sharing
24  my screen.  I haven't found it just yet.  I'm
25  going back to Exhibit 8 now.  I lost it on my

Page 262

1  screen.  I'm going to share it with you.
2  Paragraph 30 of Exhibit 8, which is
3  Mr. Cooper's rebuttal report.  We've read his
4  first line, "As stated in my July 2023 report,
5  the changes between my 2022 Illustrative Plan
6  and the now current Illustrative Plan were
7  primarily made to better respect communities
8  of interest."  Second sentence says: "I also
9  made changes to improve the performance of the
10  districts for Black preferred candidates based
11  on the feedback counsel received from
12  Dr. Handley."  Did I read that right?
13     A   Yes.
14     Q   Are you able to rule out that
15  performance or effectiveness analysis as a
16  basis for where Mr. Cooper drew certain lines
17  in his report?
18     A   He says that he changed the Black
19  percentages to increase the numbers, so I'll
20  take him at his word.
21     Q   If a line is drawn to make a district
22  effective or to improve its performance, is it
23  your conclusion that that line is drawn on the
24  basis of race?
25     A   A highly polarized voting situation,

Page 263

1  yes.
2      Q   You did just testify a few moments
3  ago that trying to make a district effective
4  is literally the point of the Gingles
5  framework, in your understanding, right?
6      A   No.
7          MR. LEWIS:
8              Objection; misstates the
9          testimony.  You may answer.
10         MS. KEENAN:
11             We can rely on the testimony
12         that was given.  I don't need to ask
13         it again.  I'll withdraw the
14         question.
15             I think I'm ready to go off the
16         record for, let's say, ten minutes,
17         just to be safe, and hopefully just
18         clean up with any the final questions
19         here.
20         MR. LEWIS:
21             Okay.
22         MS. KEENAN:
23             Thank you.
24  (BRIEF RECESS FROM 5:24 TO 5:30 P.M. EST)
25         MS. KEENAN:

Page 264

1              So I have a handful of
2          additional questions to run through.
3          I did want to note for the record
4          that the paper we've marked as an
5          exhibit regarding Differential
6          Privacy was published in "Science
7          Advances" in October of 2021.
8  BY MS. KEENAN:
9      Q   I want to go back to something we
10  talked about a little bit earlier about
11  Mr. Cooper's use of incumbency addresses.  You
12  mentioned that you didn't think that you had
13  seen that information; is that right?
14     A   Correct.  I don't recall seeing it.
15     Q   Do you recall if you ever asked for
16  that information?
17     A   Good, Lord.  I don't think I ever
18  did.
19     Q   So you don't think there's any
20  outstanding asked for that incumbency
21  information that plaintiffs' counsel didn't
22  comply with; is that right?
23     A   I'll leave to y'all to decide.  My
24  understanding of what you need to turn over is
25  all the data you used to compile your map and

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 265

1    report.
2        Q    So you didn't consider the incumbent
3    addresses as you were reviewing Mr. Cooper's
4    maps, right?
5        A    Correct.
6        Q    I want to confirm that you aren't
7    offering any opinions that we haven't
8    discussed today or that aren't offered in your
9    report.  Can you confirm that for me?
10       A    Correct.
11       Q    Do your reports offer any opinion
12   about the concept of natural packing?
13       A    I don't use that term, but I suppose
14   some of the description included in my report
15   could be considered related to that.
16       Q    What sorts of descriptions might be
17   related to the concept of natural packing, as
18   you understand it?
19       A    I wouldn't bring it up, myself, as an
20   idea.  But if asked about it, I think in
21   natural packing is kind of historical patterns
22   that have led to concentrations of given
23   protected class populations, and that would
24   relate to many things like the maps we were
25   looking at of Baton Rouge, where some parts

Page 266

1    are 75 percent and other parts are under
2    25 percent.
3        Q    But just to be clear, your opinions
4    don't offer -- like you said, you didn't offer
5    any opinions proactively about the historical
6    formation of black communities of Louisiana,
7    right?
8        A    Correct.
9        Q    Or about the movement of black
10   populations in Louisiana?
11       A    Right.  I'm fascinated by demographic
12   trends and movements in different areas, but
13   certainly not an expert in the historical
14   trends and movements in Louisiana.
15       Q    So it's safe to say, you might have a
16   reaction to the phrase, "Natural packing," if
17   asked about it, but you didn't offer natural
18   packing conclusions in your expert opinion,
19   right?
20       A    I certainly didn't bring them up,
21   myself.  To the degree my report is relevant
22   to a discussion of natural packing, then it
23   would be.
24           MS. KEENAN:
25           Okay.  I'm double checking

Page 267

1    everything.  Okay, I think we're
2    ready to close the deposition.
3    Thanks you so much for your time
4    today.  I don't know if Mr. Lewis has
5    any question, but that's all for
6    plaintiffs' counsel.
7        MR. LEWIS:
8            No questions for us, and we will
9        read and sign.
10   (AT THIS TIME, 5:35 P.M., TESTIMONY WAS
11   CONCLUDED AND THE RECORD WAS CLOSED.)
12               *  *  *
13
14           *    *    *
15
16
17
18
19
20
21
22
23
24
25

Page 268

1            WITNESS' CERTIFICATE
2
3        I, DOUGLAS M. JOHNSON, PH.D, do
4    hereby certify that the foregoing testimony
5    was given by me, and that the transcription of
6    said testimony, with corrections and/or
7    changes, if any, is true and correct as given
8    by me on the aforementioned date.
9
10
11   Dated: _____ Signed:_____
12               DOUGLAS M. JOHNSON, PH.D
13
14
15   _____  Signed with corrections as noted.
16
17   _____  Signed with no corrections noted.
18
19
20
21   DATE TAKEN: September 27, 2023
22
23
24
25

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

Page 269

```
 1        C E R T I F I C A T E
 2
 3        I, CECILIA M. HENDERSON, Certified
    Court Reporter, in and for the State of
 4  Louisiana, as the officer before whom this
    testimony was taken, do hereby certify that
 5  DOUGLAS JOHNSON, PH.D  after having been duly
    sworn by me upon authority of R.S. 37:2554,
 6  did testify as hereinbefore set forth in the
    foregoing 268 pages; that this testimony was
 7  reported by me in the stenotype reporting
    method, was prepared and transcribed by me or
 8  under my personal direction and supervision,
    and is a true and correct transcript to the
 9  best of my ability and understanding; that the
    transcript has been prepared in compliance
10  with transcript format guidelines required by
    statute or by rules of the board, that I have
11  acted in compliance with the prohibition on
    contractual relationships, as defined by
12  Louisiana Code of Civil Procedure Article 1434
    and in rules and advisory opinions of the
13  board; that I am not related to counsel or to
    the parties herein, nor am I otherwise
14  interested in the outcome of this matter.
15
16      Dated this 3rd day of October, 2023
17
18
19
20      CECILIA M. HENDERSON, CCR
        CCR #84099
21      STATE OF LOUISIANA
22
23
24
25
```

68 (Page 269)

| A | | | | |
|---|---|---|---|---|
| **A.M** 1:20 | 121:14 | 259:14 | 82:10 | 150:2 | 117:16 |
| 48:9,9 | 122:15,16 | **acted** 269:11 | 222:7,19 | 182:4 | 118:10 |
| **ability** 269:9 | 122:17 | **ACTION** 1:9 | 264:11 | 203:9 | 126:23 |
| **able** 9:6,23 | 183:4 | **active** 39:12 | 265:3 | 254:11 | 127:1 |
| 33:19 35:6 | 187:17 | 204:15 | **addressing** | 255:4 | 129:22 |
| 36:1,10 | **access** 70:25 | **actual** 14:5 | 43:22 | 260:8 | 131:18,22 |
| 77:21 | 181:17 | 35:13 40:8 | **adds** 67:12 | **aggregate** | 132:7 |
| 92:16 | 182:7 | 41:8 68:12 | 118:24 | 74:9 | 133:11,17 |
| 95:11 | 239:18 | 74:2 81:21 | **adequate** | 249:22 | 134:24 |
| 114:2 | **accessed** | 85:18 | 32:11 | **aggregated** | 135:14,19 |
| 123:19 | 175:12 | 137:8 | **adjourning** | 76:12 | 139:3,8,18 |
| 143:19 | **accessible** | 140:18 | 186:25 | 249:6 | 139:20 |
| 158:25 | 175:5 | 141:5 | **adjust** 28:8 | **aggregating** | 140:20 |
| 166:6 | **accommod...** | 144:7 | 28:13 | 250:1 | 141:17 |
| 181:6 | 8:4 | 178:24 | **adjustment** | **ago** 12:8 | 142:10,22 |
| 184:6 | **account** | 193:21 | 28:13 | 14:11,20 | 143:23 |
| 190:12,13 | 237:21 | **added** 151:7 | **administer...** | 38:11 | 151:22 |
| 193:1 | 259:15 | 151:20 | 5:20 | 124:13 | 152:24 |
| 204:7,9 | **accurate** | 152:21 | **adopt** 122:12 | 143:22 | 153:18 |
| 207:12,16 | 88:1 125:3 | 158:23 | 122:13 | 144:19 | 154:6,14 |
| 209:5 | **accurately** | **adding** | **adopted** 30:8 | 260:14 | 157:15 |
| 214:19 | 9:7 38:13 | 110:11 | 34:3,14,19 | 263:3 | 158:9 |
| 216:25 | **achieve** | 246:3 | 49:20 | **agree** 9:3 | 159:11 |
| 217:18 | 72:20 | **addition** | **adopting** | 10:1 24:19 | 161:3 |
| 219:10 | 158:14 | 39:10 | 34:4,7 | 25:17 | 166:9 |
| 248:23 | 165:25 | 199:17 | **adoption** | 26:14 | 167:3,7 |
| 252:6 | 166:7,11 | **additional** | 34:5 | 28:22 | 169:21 |
| 262:14 | **achieved** | 39:9 62:20 | **advance** 10:9 | 34:22 | 170:13 |
| **ABOVE-E...** | 131:12 | 62:23 65:3 | 11:6,15 | 53:25 54:4 | 171:6 |
| 6:4 | **achieves** | 71:3 78:8 | 12:5 37:11 | 61:11 | 174:9,14 |
| **absolute** | 187:12 | 95:19 | **Advances** | 65:10 | 176:1,10,16 |
| 116:21 | **acknowled...** | 102:5 | 264:7 | 74:22 | 177:22 |
| 129:7,15 | 50:10 | 136:8 | **advice** | 75:15,22 | 179:10 |
| 245:20 | **ACS** 69:6 | 188:15 | 250:17,18 | 82:18 83:4 | 188:14 |
| **abstract** | 70:21,22 | 193:2 | **advisory** | 84:1 85:19 | 189:6 |
| 123:15 | 72:2 | 243:5 | 269:12 | 91:13 | 200:5 |
| **Acadiana** | 133:18 | 244:7,7 | **affect** 148:21 | 93:16 | 207:8 |
| 162:23 | 134:17,21 | 264:2 | **affirmative** | 94:12,15 | 213:1,25 |
| 164:8,12,19 | 146:17 | **address** | 61:2 | 102:14 | 216:5 |
| 165:1,10 | **Act** 27:22 | 12:20 | **aforementi...** | 107:9 | 217:5 |
| **accepted** | 33:4 39:21 | **addressed** | 268:8 | 111:25 | 219:18,24 |
| | 193:5,18 | 179:21 | **age** 62:12 | 112:23 | 221:13,23 |
| | 194:5,9 | **addresses** | 148:5 | 114:13 | 222:23 |

229:5
230:23
231:18
232:4
240:15
243:7,25
244:18,21
244:22
245:6,10
246:16
252:8
258:13
**agreed** 5:3
**ahead** 14:18
24:19 29:7
31:4 50:12
64:14
65:14
79:11 90:4
98:18
140:16
164:13
189:18
208:5
212:14
243:13
**air** 121:23
**AIRC** 35:23
36:8
**Ales_2023...**
125:14,15
**ALEXIS** 1:6
**ALICE** 1:5
**alleged**
185:12
**allow** 170:7
**allowing**
37:15
**allows**
199:19,21
**Alt** 127:19
**alter** 113:16
**Alternate**

127:14
**alternatives**
236:6
**amended**
11:18,22
47:5 184:9
**American**
2:2 67:25
68:1 71:14
196:19
**amount** 14:1
**analyses**
26:18 40:5
187:18
**analysis**
24:22 25:5
25:18
31:15
39:22,23
41:4,6,8,10
51:6,8,14
52:8,18,23
65:4 69:21
70:20
72:14
113:10
133:22
136:24
178:7
182:19
183:1,5
185:12
186:16
188:15
206:10
235:4,8,17
236:5
237:20
251:22
256:18,19
257:9,15,17
258:23,25
261:16

262:15
**analyze**
49:22
51:21 52:5
72:18,19
181:16
235:11
246:25
**analyzed**
157:5
181:25
261:11
**analyzing**
49:25
51:13
52:13
66:10
82:11
147:4
**and/or** 5:13
268:6
**answer** 5:14
7:16,18
13:11
14:19
19:21,25
28:16
29:10 44:4
50:18
67:10 69:9
75:5 76:22
82:24 84:9
89:5 103:1
103:25
113:8,21
114:7
121:20
148:16
150:19
161:6,14
163:8
165:4,15
170:3

172:7
179:19
188:21
189:19
191:1,15
194:14
195:12
199:4
200:19
201:16
205:17
213:6
214:7
217:10
218:22
221:18
223:3
227:15
231:11
235:22,24
236:9
252:22
256:5
263:9
**answers**
260:11
**anybody**
44:15
**anytime**
183:3
**anyways**
30:8
**AP** 233:9,10
233:12,13
233:14,19
257:10,22
258:3
**apart** 134:11
137:25
**apologize**
35:14
242:17
**apparent**

185:4
**APPEARA...**
2:1 3:1
**appeared**
183:10
**appears**
24:15
**applicability**
210:16
**applied**
79:22
103:8
114:15
**applies**
258:15
**apply** 60:6
179:15
212:12
**approach**
175:25
176:1
**appropriate**
159:18
**appropriat...**
164:21
**approved**
193:25
**ARDOIN**
1:13
**area** 77:11
77:13
89:23
96:11
128:9
130:23
176:9
202:6
206:4
219:14
237:22
240:20
259:23
260:8

**areas** 46:23
96:14,19,24
97:2
110:11
143:16,25
158:5
186:9
220:18
229:14
231:24
236:17
237:9,11,20
240:8
249:4,7,23
266:12
**arguably**
57:22
192:10
195:24
**argument**
149:20
208:22
**Arizona**
15:21 16:1
16:9 20:23
21:14 33:8
33:10,13
34:1,4
188:3
196:18
**arrangeme...**
12:19
**array** 20:3
**arrive** 237:15
**art** 41:8
**Article**
269:12
**articulated**
179:15
**artificially**
150:4
**Asian-Ame...**
196:17

**aside** 8:22
**asked** 14:12
  19:6,10
  34:18 45:4
  45:7,11
  46:18,19
  48:21,24
  59:4,12
  176:11
  201:2
  210:4
  264:15,20
  265:20
  266:17
**asking** 18:15
  18:22,24
  35:15 45:6
  52:5 53:22
  57:25 58:2
  138:24
  139:1
  229:19
  235:15,16
  252:20
**asserting**
  93:2 94:20
**assertion**
  234:24
**asses** 219:10
**assess** 57:15
  59:7 69:4
  80:2 115:2
  138:12,14
  166:20
  258:7
**assessed**
  218:18
**assessing**
  115:25
  152:9
  154:6
  250:5
**assessment**

  148:22
**assignment**
  48:14
  49:23
**assisted**
  40:14
**assume** 18:23
  27:25
  40:13
  154:17
  230:15,17
**assumes**
  121:24
  223:2
**assuming**
  258:2
**Atlanta** 2:9
**attached**
  11:22 50:8
  65:19
  129:5
  134:14
**attacking**
  223:22
**Attempted**
  159:4
**attempting**
  60:8 253:1
**attempts**
  255:8
**attendance**
  90:1
**attending** 7:6
**attention**
  172:17
  173:15
  179:2
**Attorney** 3:2
  30:6
**attorneys**
  227:1
**attributable**
  186:7

  236:15
**attribute**
  143:19
**authored**
  42:14
**authority**
  269:5
**available**
  78:23
  133:12,18
  138:4
  145:17
  204:4
**AVENUE**
  6:2
**average**
  102:2
  103:21
  104:10
  106:3
  115:20,23
  116:4,5,9
  121:24
  126:20
  127:2
  160:6
  237:21,25
  255:16
  256:8,10,11
**averaged**
  238:6
**avoid** 6:22
  192:9
  193:10
**avoiding**
  122:1
**aware** 41:2
  45:22
  50:13 51:3
  53:2 74:10
  77:7
  160:22
  173:23

  174:2
  175:18,21
  189:7
  200:11,13
  220:25
  222:6,11
  224:21
  231:5
  240:19
  241:1
  250:20
  251:23
  254:9
  255:1,7,14
**awareness**
  200:5,10

**B**

**B** 4:6 48:25
  65:24
  134:2
**B-2** 91:20
  92:8 93:4
**B-Method...**
  66:4
**back** 9:16
  14:21 15:1
  15:19
  29:22 33:3
  35:17 48:7
  48:11,20,22
  58:9,14
  67:16 68:4
  76:13
  79:16 81:8
  85:2 90:12
  93:5 94:11
  95:10
  99:19,24
  107:19
  128:24
  129:21
  131:21

  134:3,9
  135:11
  151:12
  155:1
  176:12
  180:10,16
  193:4,7,13
  209:23
  212:5
  218:24
  222:13
  226:12
  227:18
  232:12,14
  235:24
  238:12
  239:5,6
  241:14,18
  241:23
  242:7
  243:17
  244:8,14
  246:20
  261:25
  264:9
**backup**
  123:16,23
  124:12
**bad** 157:2
**bag** 245:16
**BAKER** 2:12
**balance**
  168:19
  176:4
**balanced**
  237:14
**ball-parked**
  137:21
**ballpark**
  14:1 17:22
  17:24
**bar** 60:11,12
**barely** 93:19

  216:20
  228:19
  233:13,20
  237:16
  251:4,4
**base** 76:8
**based** 8:6
  15:13
  18:14
  23:10 32:8
  35:3 36:7
  75:3 92:10
  97:14
  103:19
  124:2
  132:7
  154:15,19
  163:13
  171:4
  190:1
  198:22
  200:17
  203:20
  219:11
  235:1
  253:3,8,10
  260:10,21
  261:4,20
  262:10
**baseline**
  148:21
  150:5,8,10
**bases** 216:6
**basic** 73:7
  97:22
  145:3
**basing**
  171:25
  251:14
**basis** 32:6
  53:7 87:8
  100:11
  115:4,4,12

115:13
116:1
121:8
132:19
139:21
140:1
148:1
155:20
164:15
167:23
177:13
179:12
186:4
220:15
230:7
234:11,15
234:25
247:21
251:18
262:16,24
**Baton** 2:18
3:4 236:24
236:25
240:16
265:25
**bazaar**
167:11
**Beach** 17:20
**becoming**
130:12
195:24
**began** 38:6
245:23
**beginning**
132:14
**behalf** 21:15
33:12
**belief** 170:21
192:18
**belies** 96:5
**believe** 22:19
23:23
32:17

166:4
173:10
194:7
221:11
226:19
229:23
231:24
245:2
261:3
**bells** 229:13
**benchmark**
36:16
193:6
**best** 8:4
20:21
47:12
177:8
193:24
237:1
269:9
**better** 28:4,9
51:22 53:3
105:22,25
106:4,7,12
107:22
120:16
130:6
155:19
177:18,20
187:12
199:20
222:20
223:17
224:12
252:12,13
262:7
**beyond** 44:4
**bias** 255:16
255:18
**biases** 253:18
**big** 32:1
34:17,19
90:6

116:12
212:21
**bigger** 18:14
109:9,10,11
109:14
117:13
122:25
213:2
**Bill** 238:18
239:16
**bisects** 159:8
**bit** 21:22
28:4 33:2
45:19
50:25
58:18
60:25 62:5
66:18
69:19 77:3
80:24
81:16
84:23
88:21
160:18
168:2
182:12
193:15
211:4
228:24
252:9
264:10
**black** 1:6
32:25
81:20,21
147:10,20
147:22
148:3,5,10
148:12,23
148:24
149:6,14,24
150:1,17
151:6,16,18
152:17

153:5
154:7,12
189:24,25
196:10,15
196:25
228:17
229:2
230:3
231:1,7,19
232:5,16
233:9,11,12
233:13,14
233:19
237:14,15
237:16
240:21,24
241:3
242:4
243:5,8,18
244:2,7,24
245:8
247:16,20
251:13
253:12
254:6,11
255:3
257:10,12
257:22
258:2
261:4
262:10,18
266:6,9
**bloc** 39:21,23
**block** 67:12
68:15 72:8
72:11,13,22
72:22,25
73:5,6,11
73:13,17
74:12
75:21,24
76:3,12
77:22,25

78:6,7,9,9
78:9,11,21
85:9 86:7
86:14,19
87:6,19
88:3,10,18
88:20,23
89:2,18
133:11,14
138:3
139:12
140:23
146:2,3,6,8
146:10,10
146:12,19
191:23
192:4,8,14
200:13,16
204:2,19,23
245:25
246:4
249:10
**block-by-b...**
246:8
**block-level**
145:16,21
147:6
**blocks** 62:9
74:23 75:1
75:1,10,13
75:17 76:4
78:16
85:10,23
86:4,10
90:9,13
96:10
146:21
191:25
192:7
197:18
249:4,14,23
250:2
253:9,13

**board** 123:9
269:10,13
**bookmarks**
252:10
**border**
173:13
**borders** 51:4
169:5
241:7
242:17,19
243:3
**bottom** 26:15
39:19,20
125:13
127:1
203:5
252:25
**boundaries**
51:9,10,16
51:17 59:1
82:8,15
94:25 95:6
157:16
161:4
168:9
174:17
175:6,9
181:20
182:8
216:18,19
241:17,20
241:22
**boundary**
70:2,6
161:12,22
163:16,21
166:17,19
167:19,25
169:2,9
172:24
176:3
191:8
218:17

box 203:5
BRANCH
   2:21
brand
   220:19
BRANNON
   2:3
break 8:2
   48:1 76:11
   98:5,6,15
   98:17 99:7
   99:18
   117:10
   119:19,20
   120:4,24
   126:19
   137:25
   146:18
   178:21
   180:1
   225:15,20
   230:10
   232:11
breakdown
   203:25
   204:8,10,17
breaks 9:12
bridge 176:7
BRIEF 48:9
   100:1
   180:14
   226:13
   239:9
   263:24
briefly 48:17
   136:18
   137:4
bring 175:4
   198:12
   251:11
   259:22
   265:19
   266:20

broad 19:18
brought
   31:18
building 1:7
   75:1,2 88:8
   90:7,8
   191:23
   192:3,8,13
   197:18
   202:10
built 100:20
   100:24
   101:4
   102:5
   106:15
   131:24
   203:8
bullet 249:1
bunch 75:19
   203:6
   251:6,9
burden
   33:18 36:9
Bureau 68:2
   70:23
   133:18
   146:14,16
   245:17,23
   247:8
   248:7
   249:2
   250:16,17
   254:16
   255:10,13
   256:23
Bureau's
   248:9,21
   249:22
button 78:5
BVAP 93:20
   94:13
   186:24
   201:4

234:8
235:9,18
237:22,25
250:5,23
252:1
255:16,19
255:20
256:1,8,10
256:13
258:4
BVAPs
   185:19
   186:5,18
   234:11
   236:14

———————
        C
———————
C 2:3,17
   58:19
   269:1,1
calculate
   248:5
   257:16
calculated
   86:10
   238:4
calculating
   153:25
calculation
   154:4
CALHOUN
   1:6
CALI 2:17
California
   6:2 142:16
   142:18
   143:2
   145:7
   196:15
Caliper 62:4
   67:18
   69:23
   203:7

call 7:10 13:4
   34:16
   78:13
   172:17
   173:5,8,12
   173:15,25
   186:21
   205:10,22
   220:10
   257:2
called 14:12
   22:13 23:9
   25:12
   27:10
   36:21
   69:22
   71:16
   79:18
   109:16
   117:7
   135:15
   147:10,13
   158:18
   178:22
   181:11
   183:20,25
   211:16
   227:19
calling 179:2
calls 11:4
   12:22 29:6
   30:23 31:3
   84:8 173:9
   178:14
   188:20
   191:14
   194:13
   195:11
   201:15
   213:5
   220:2
   221:17
candidate

240:21
257:12
candidates
   32:13
   33:20 35:1
   36:2,10
   240:24
   258:2
   262:10
CAPACITY
   1:7,13
caption
   23:11
   184:10
capture 24:7
   162:4,8
   175:11
care 71:8
career 28:1
   182:1
careful
   212:19
carefully
   237:14
   247:15
CAREY 3:3
Carolina
   2:23 21:4
   22:15
   23:14
   181:2
   183:21
   184:1,10
case 10:2
   12:6,12
   13:8,16,21
   14:3,7,10
   15:5,21,22
   16:5 17:20
   20:10 21:4
   21:14,23
   22:13,16,20
   23:9,11,17

23:25
25:12
31:19,22
32:7,21
35:11
41:22 42:1
42:4,14
44:1 45:23
46:3,8
47:10,14,20
47:21
49:23 60:7
61:20
63:12,19
87:14,23
116:22
122:1
129:8,16
136:17,24
144:16
154:10
158:4,17
159:3,16
171:25
178:8
180:23,24
180:24
181:3
182:20
183:16,20
183:25
184:4
184:8
186:22
190:7
192:5
194:2
219:12
224:24
250:25
254:4
260:12
case-by-case
   177:13

| | | | | | |
|---|---|---|---|---|---|
| cases 16:14 | Cecilia 3:10 | 249:23 | 32:9 | 88:19 | 218:3 |
| 16:17 17:6 | 5:18 269:3 | 250:2,16,17 | 190:19,23 | 91:20,24 | 245:11 |
| 17:9,14,15 | 269:20 | 253:3,10 | challenged | 92:13,24 | 251:11 |
| 17:17,18,23 | census 62:9 | 254:16 | 27:22 | 93:1,8,10 | charts 68:16 |
| 18:4,8,16 | 62:11 | 255:9,10,11 | challenging | 94:24 95:6 | 70:23 71:3 |
| 19:8,16,23 | 66:11,17,22 | centers 96:23 | 214:5 | 95:20 | 134:5,7,13 |
| 20:15 21:9 | 67:17,21,22 | certain 40:4 | 219:23 | 96:10,12,15 | 134:22 |
| 22:7 25:3,4 | 68:2,14 | 65:6 84:21 | chance 65:20 | 114:15,20 | 135:22 |
| 25:7,9,14 | 70:16,23 | 105:21 | 227:25 | 118:2 | 136:4,9,13 |
| 25:18 27:7 | 71:13 | 116:25 | 247:18,21 | 175:22 | 137:8 |
| 40:20,21 | 74:23 75:1 | 117:4,14 | 257:18 | 176:16 | 139:10 |
| 41:20 47:7 | 75:3,13,17 | 143:9 | change 85:4 | 177:2,17 | chat 8:21 |
| 56:5 59:13 | 78:9 85:9 | 158:11 | 86:21 88:2 | 203:10 | 249:9 |
| 89:23 | 85:10,23 | 177:25 | 88:6 94:18 | 262:18 | check 67:20 |
| 144:13 | 86:3,7,9,14 | 185:5 | 94:24 95:1 | changes 85:3 | 68:4 81:6,7 |
| 180:21 | 87:6,19 | 234:16 | 100:9,12 | 95:14 96:4 | 137:10 |
| 182:14,18 | 88:3,23 | 262:16 | 109:1 | 96:6 97:7 | 143:24 |
| 183:8,12,23 | 89:2,18 | certainly | 114:3 | 109:22 | checking |
| 187:18 | 90:13 | 10:18 | 116:21 | 110:9 | 67:6,9 |
| 188:9 | 96:10 | 16:20 | 117:2,19 | 114:19,24 | 266:25 |
| 196:22 | 133:18 | 21:17 57:6 | 121:6,11,17 | 121:9 | child 203:14 |
| 209:19 | 134:10,20 | 63:1 | 122:21 | 147:19 | children |
| 210:16 | 134:21 | 124:14 | 128:1,16,20 | 223:19 | 169:10 |
| 216:10 | 135:1 | 135:1 | 129:7,15 | 224:9 | choice 32:13 |
| 219:16 | 146:13,16 | 145:6 | 130:1 | 226:22,24 | 33:20 35:1 |
| catch 126:11 | 148:9 | 158:15 | 131:15 | 262:5,9 | 36:2,11 |
| category | 152:6 | 175:7 | 143:21 | 268:7 | 112:12 |
| 131:15 | 153:1,10,18 | 182:22 | 147:10,14 | changing | 170:16,22 |
| 192:24 | 154:15 | 191:3 | 154:7 | 138:8 | 177:7 |
| causation | 155:11,16 | 192:22,23 | 174:12 | 204:24 | 178:2 |
| 186:1 | 156:19 | 193:24 | 177:22 | 205:1 | 202:18 |
| 207:10 | 157:10 | 195:21 | 201:6 | characteris... | 240:21,24 |
| 213:24 | 191:25 | 266:13,20 | 215:22 | 88:11 | choose 112:5 |
| 234:2 | 192:7 | CERTIFI... | 220:14 | 181:18 | 112:10 |
| cause 22:13 | 200:13,16 | 268:1 | 254:10,18 | 216:24 | 170:17 |
| 23:10 | 204:1,19 | certification | 254:22,23 | 218:18 | 192:16 |
| 37:20 | 223:24 | 5:9 | 255:2,24 | characteriz... | 203:23 |
| 183:22 | 245:17,19 | Certified | changed | 26:3 54:5 | choosing |
| 250:3 | 245:23 | 3:10 5:18 | 15:25 34:5 | charge | 170:25 |
| caused | 246:1,7,10 | 269:3 | 34:20,23 | 167:13 | 175:7 |
| 234:17 | 248:7,9,21 | certify 268:4 | 35:3 55:9 | Charlotte | 192:6 |
| CCR 269:20 | 249:2,4,10 | 269:4 | 85:10 | 24:7,10 | chose 141:7 |
| 269:20 | 249:14,22 | challenge | 87:25 | chart 129:21 | church 89:21 |

89:24
169:16,18
**churches**
169:14
**Circle** 128:5
129:9,18
**circumstan...**
192:25
**circumstan...**
160:17
199:24
205:21
**cite** 74:16
183:9
209:20
**cited** 25:7,14
61:7,7
62:11 69:2
106:24
130:24
215:2
**cities** 167:8
**citing** 81:18
257:13
**Citizen** 71:15
72:3
**city** 25:13
30:6 31:17
31:19,25
143:14
158:18
159:8,14,17
161:21
166:23
167:1,3,9
167:12
174:7
190:15
204:1
207:15,15
**Civil** 1:9 2:2
5:6 269:12
**claim** 93:9

96:5 140:5
147:21
150:6
151:3
166:25
194:20
210:17
213:2
**claimed**
81:19 82:3
**claiming**
60:20
115:9
167:14
208:2
**claims** 35:24
54:9,10,22
55:18,21
56:1,4,7
60:21
81:14,14
115:7
145:14
178:18
207:25
**clarify** 18:1,9
21:13
47:11
180:20
**clarifying**
81:25
101:13
181:1
**class** 191:21
192:1
195:18
196:6,9,20
197:12
198:7,16
199:12
200:12,14
202:14
207:14

265:23
**classes**
198:23
201:25
**clean** 37:2
263:18
**clear** 47:8
52:12
88:13,18
120:18
159:17
170:24
177:11
178:11
194:25
200:21
211:24
214:23
233:20,22
243:17
266:3
**clearer** 27:6
238:25
**clearest**
171:7
211:15,18
**clearly** 6:22
73:7
165:19
191:4
200:23
**CLEE** 1:5
**Cleveland**
2:14
**click** 78:6
136:20
203:5,12,15
241:20
242:19
**clicked** 240:5
241:17
**client** 30:5,7
30:16 31:7

38:21,22
39:1 40:20
41:5
**clients** 38:24
39:9,13,23
40:18
41:11
**close** 163:18
192:23
230:16
234:16
267:2
**CLOSED**
267:11
**closely**
193:19
207:5
**Coalition**
34:2,5,12
34:23
**Coalition's**
35:3
**Code** 269:12
**coincidence**
237:13
**colorful**
73:23
**coloring**
78:14,18
205:11
207:14
**colors** 78:15
**Colton** 47:18
61:19
224:19,21
**Colton's**
61:12,16
**column**
152:12
249:1
**combination**
111:15
259:18,20

**combined**
214:18
**come** 12:6
28:2 48:7
75:9 157:5
180:9
194:19
235:13
237:7
246:2
**comes** 22:11
53:4 58:5
59:20 81:8
85:15
130:17
146:13,16
158:10
164:7
166:2
203:7
**comfortable**
98:19
229:18
**coming**
43:25 46:7
54:17
63:19
**commencing**
1:20
**comment**
46:22
**commentary**
227:2
**comments**
133:25
**Commission**
16:10
21:16
33:13,17
34:7,8,15
**common**
22:13
23:10

37:20
171:14
183:22
189:7
**communic...**
260:21
**communities**
52:1 57:15
57:19,23
58:5 59:17
60:5 61:3
80:1 82:2
89:20
112:25
142:20
144:24
155:4
156:20
157:7,11,20
158:1,3,4,6
158:8,11
159:24
160:14
161:4
162:13,19
166:10
167:13
168:7
169:4,25
170:12,14
171:10,17
171:22
172:1
191:20
195:16
196:7,24
197:5,8,10
197:14,17
197:23
198:1,4,18
201:23
202:9
215:21

219:19,22
223:18,23
224:2,12,18
225:5,8
236:15
262:7
266:6
**community**
67:25 68:1
71:14 88:9
89:10,19,21
90:10
143:11,14
156:11,13
156:24
157:22
158:14
161:19
162:2,4,5,9
163:23
165:23,25
166:5
167:4,8,12
168:25
169:8,22,23
170:10,19
170:19
171:2,4
172:4
173:6
174:17,23
175:5
190:15
191:7,24
192:4,8
198:11,13
199:8
200:11
202:12
259:19,19
**compact**
53:15
54:22 55:6

55:12 56:5
56:6 83:11
84:16
88:24 89:2
100:7,10,13
102:14
106:16,21
107:12,21
108:2,5,11
115:17
116:9,21
117:12,21
118:4,5,6
118:12,22
118:23
122:4,5
129:7,14
130:12
131:25
188:16
**compactness**
52:1 53:4,8
54:2,9
55:22 56:1
56:10,17,21
56:23,24
57:8,12,14
79:23
80:23
86:25
87:10 88:6
100:5,18,20
100:24
101:3,6,8
101:23
102:5
105:21
106:15
109:7
112:22
113:5,10,18
114:14,19
115:3,8,24

116:6,18
117:8
118:8,14,20
118:21
119:7,8,12
119:13
121:2,12,15
121:25
122:7,22
124:1,6,7
124:11
125:24
126:2,6,24
131:4,24
132:12
215:22
**compacts**
118:15
**compare**
52:14
55:15
56:21 57:1
57:12,18
58:3 67:16
80:20
130:21
232:6
251:19
257:25
**compared**
52:6,19,24
53:20 54:3
56:2 85:6
106:7
113:13
151:17,19
**compares**
56:16
**comparing**
55:19
56:10
63:24 80:3
80:10

81:11
108:22
130:7
154:11
234:11
**comparison**
53:22 58:4
80:15 81:5
91:21
130:20
131:16
150:11
153:23,24
179:12
**comparisons**
53:25
**compensat...**
14:6
**competing**
174:15
**compile**
72:23 73:9
264:25
**compiled**
68:14
138:7
**compiling**
68:17
**complete**
7:10 49:4
63:18
**completely**
170:14
222:1
229:6
**compliance**
193:7
194:4,8
195:20
206:1,2
269:9,11
**compliant**
201:12

**complicated**
193:22
258:22
**complies**
114:4
**comply** 83:12
165:2
174:16
188:17
189:1,4,5
195:4
219:19
264:22
**complying**
195:7
**composed**
75:13
**comprised**
167:4
200:12
**compute**
100:19
**computer**
8:11,15,16
81:6
112:18
145:18
**conceded**
185:18
187:9
**concentrat...**
212:1
265:22
**concept**
245:13,15
250:13
257:20
265:12,17
**concern**
155:16
247:2
**concerned**
205:25

245:23
**concerns**
41:2
**conclude**
32:10
139:22
208:10
219:25
**concluded**
102:1
106:16
159:12
251:24
267:11
**conclusion**
31:4 53:7
121:8
132:20
140:2
167:23
188:21
191:15
194:14
195:12
201:16
206:21
209:11,17
210:14,20
211:9,13
213:6
220:3
221:18
222:4
262:23
**conclusions**
26:18
43:25 54:1
54:7 60:15
63:19 68:9
68:25
80:19
100:12
136:17

| | | | | | |
|---|---|---|---|---|---|
| 157:6 | 83:17 | 233:23 | 106:7 | 33:19 | 133:8 |
| 209:3,25 | **connect** | **considerati...** | **constitution** | 36:10 | 134:6,23 |
| 224:23 | 140:19 | 82:20 89:9 | 122:8,10 | 98:18 | 135:3,14 |
| 266:18 | **connection** | 140:4 | **consulting** | **CONTINU...** | 137:17 |
| **conducting** | 9:12 69:15 | 174:15 | 18:17,21 | 3:1 | 139:10,22 |
| 136:24 | 137:7,15 | 186:11 | 44:24 | **continuing** | 140:21 |
| 206:10 | 176:7 | 206:7 | 144:18 | 179:22 | 141:2,22 |
| **CONFER...** | 228:23 | **considered** | **contact** | **contours** | 145:13 |
| 1:8 | **conscious** | 60:1 80:9 | 15:13 | 161:11 | 151:22 |
| **configurati...** | 112:12 | 82:14 | **contacted** | **contractual** | 153:7 |
| 178:13 | **consequence** | 83:16 | 14:15,22 | 269:11 | 161:1 |
| 185:7 | 253:11 | 101:15 | **contain** | **contrast** | 162:21 |
| **configurati...** | **consider** | 140:22 | 159:6 | 136:8,13 | 165:11 |
| 112:14 | 43:20 | 141:3 | 191:25 | **controlled** | 166:15,21 |
| **configured** | 73:17,20 | 171:16 | **contains** | 186:16 | 167:17 |
| 112:18 | 80:9,25 | 189:15 | 35:24 | 235:7,17 | 174:19 |
| **confirm** 57:4 | 81:10 82:1 | 222:12,18 | 78:20 | 236:5 | 175:21 |
| 125:3 | 82:10 | 225:6 | 133:19 | **conversati...** | 176:17,19 |
| 179:7 | 84:18 | 265:15 | 173:19 | 226:25 | 177:1,25 |
| 209:24 | 113:3 | **considering** | **contend** | **Convex/Hull** | 178:15 |
| 230:16 | 117:19 | 74:7 84:1 | 228:1 | 128:9 | 207:23 |
| 265:6,9 | 133:2 | 160:14 | **contending** | **Cooper** 10:7 | 208:8 |
| **confirming** | 139:22 | 162:5 | 145:25 | 45:19 46:5 | 214:3,10,11 |
| 57:11 | 159:19,23 | 171:3 | 214:23 | 47:2,4 49:6 | 214:23 |
| 80:16 | 162:2 | 172:3 | 228:10 | 49:9 50:5,8 | 215:7 |
| **conflated** | 169:7 | 176:5 | **context** 26:1 | 53:10 54:9 | 216:6,24 |
| 138:1 | 170:21,23 | 177:6 | 26:13,23 | 57:5 58:21 | 217:2,3 |
| **conflict** | 195:6 | 256:9 | 27:15,16 | 60:18 61:6 | 220:14 |
| 176:2,18,22 | 197:16 | **considers** | 29:25 | 62:8 63:9 | 221:11 |
| 250:16 | 199:25 | 84:5 | 31:24 | 63:13,21 | 222:6,18 |
| **confused** | 200:1 | **consistent** | 131:17 | 64:18 65:2 | 224:9 |
| 228:2 | 219:15 | 19:23 69:5 | 187:23 | 65:11 66:9 | 225:6,11 |
| **confusion** | 222:7 | 90:24 | 192:20 | 67:19,23 | 235:12 |
| 147:17 | 257:9 | 141:19 | 194:3,19 | 68:6,8 | 242:23 |
| 150:9 | 259:1,9 | 221:14,25 | 213:8 | 79:21 82:3 | 243:4 |
| **congressio...** | 265:2 | 256:3 | **contiguity** | 82:15 | 245:3 |
| 247:8 | **considerati...** | **consistently** | 79:24 | 86:19 87:3 | 260:19,25 |
| 254:19 | 106:3 | 19:15 20:6 | 80:25 | 87:5 88:17 | 261:12 |
| **CONINE** | 157:12,17 | **constant** | 113:18 | 89:11 | 262:16 |
| 2:17 | 160:14 | 102:2,3 | **contiguous** | 90:13 | **Cooper's** |
| **coninejc@...** | 164:4 | 104:18,22 | 31:9 32:2 | 92:11,19 | 11:10,14 |
| 2:19 | 193:3 | 104:24 | 81:2 | 94:8,16,17 | 44:8 48:17 |
| **conjunction** | 213:13 | 105:7 | **continue** | 132:21 | 49:12 51:9 |

51:16,21
52:19,24
53:2,8 54:2
55:18
57:20
58:13
59:10,24
60:16
63:15
64:13
65:19,24
67:3 69:1
71:22
79:17
82:11
91:15,19
92:8 94:21
96:5
132:16
134:2,12,19
135:6,11
141:18
145:11
147:5
151:3,11,14
155:8,21
160:20,22
172:22
179:3,10,16
182:9
206:22
207:3
209:13,18
210:17
213:10
217:6
221:1
223:12,14
224:5,16
226:16,18
229:22,25
238:19
239:16,21

243:1
244:6
245:9
262:3
264:11
265:3
**copy** 23:5
54:12
230:8
231:17
232:11,25
**core** 32:24
**corner** 203:6
**corporation**
39:16 62:4
69:24
**correct** 33:14
42:1,5,24
52:14 53:1
56:18,19
58:7 61:5
61:14 72:1
82:17 86:2
87:21
93:15
101:4
119:10,15
125:18
136:2
157:8
170:15
174:8
185:14
190:8
199:6
224:1
244:5
264:14
265:5,10
266:8
268:7
269:8
**corrected**

11:21 50:8
238:18
**corrections**
268:6,15,17
**correctly**
24:17,24
25:23
26:19
35:19 36:4
36:12,19,23
55:13 59:1
88:25
91:25
92:18
100:21,25
111:5
129:10
137:18
145:23
151:9,20
181:21
185:1,8,15
185:22
186:1,12,19
187:3,14
212:9
215:14
223:20
224:13
227:5,22
233:5,15,24
249:7
253:5,15,19
254:7
257:23
**correlated**
181:19
182:8
**correlates**
207:5
**correlation**
181:11
185:25

207:9
213:24
214:16
234:2
**council** 159:6
**counsel** 5:4
7:7,9,17
10:8,14,21
11:1 12:15
13:1 31:18
43:23 44:9
44:10,16,25
45:4,7
46:19 48:2
48:24
227:10
252:19
261:5,9,20
262:11
264:21
267:6
269:13
**count** 155:23
156:7
245:20
**counted**
156:6
**Counties**
158:3
**counting**
228:1,11
**country**
182:2
**counts** 171:2
**county** 25:13
58:12
190:15
**couple** 10:23
11:7 23:2
49:13 96:7
114:12
132:25
144:18

183:8
184:24
215:5
224:15
**course** 7:14
8:24 10:10
28:1 49:18
121:10
126:12
145:9
188:13
206:5
245:22
258:15
**court** 1:1
3:10 5:18
6:21 7:1,4
15:23
20:19
21:11
22:18,20
23:16,17,18
24:14,21,22
25:17,21
26:3,4,15
26:16
29:23
31:14,19
32:10
35:15 37:3
38:4 42:18
43:2 60:4
64:19
65:25 92:6
94:3 99:12
99:14
115:11
126:10,14
159:11
176:11,14
182:25
183:3
184:14

185:3,10,25
187:5
252:5
254:4
269:3
**Court's**
183:11
**courts** 25:4
26:5,16
187:17
**cover** 47:22
58:11 79:2
**covering**
47:22
143:4
**Covington**
21:4,23
25:8
180:22,24
183:20,25
184:9
**COZEN** 2:7
**create** 60:8
112:5
159:5
164:21
230:25
233:4
**created** 70:3
134:23
181:25
217:24
240:20
**creates** 243:5
**creating**
162:23
**credible**
187:6
**criteria**
51:24 52:6
74:19
**criticism**
92:3

| | | | | | |
|---|---|---|---|---|---|
| **criticize** | 165:11 | 2:7 | 137:13,16 | 253:4,10 | 192:19 |
| 27:11 | 166:25 | **dangerously** | 137:24 | 255:9,10,11 | 264:23 |
| 87:17 | 167:2 | 192:22 | 138:2,4,6 | 256:22 | **decided** |
| 163:2 | 173:6,9 | **DAS** 253:3,8 | 139:15 | 257:18 | 206:15 |
| 220:16 | 175:15 | 253:23 | 141:2,5,17 | 259:19 | **deciding** |
| **criticized** | 176:3,8 | **data** 20:4 | 141:21 | 260:2 | 178:3 |
| 22:3 | 178:14 | 44:5,12 | 143:17,20 | 264:25 | 198:21 |
| 218:14 | 223:24 | 45:19 62:1 | 144:8 | **database** | **decimals** |
| **critique** | **curious** 72:8 | 62:2,4,7,12 | 145:1,5,15 | 66:24 | 123:13 |
| 87:22 | 98:7 | 62:17 | 145:16,19 | **dataset** 133:8 | **decision** 22:3 |
| **critiques** | **curling** 112:3 | 63:10,12,13 | 145:21 | 133:12 | 23:21 |
| 162:20 | **current** | 63:18 | 146:1,12,13 | 145:22 | 37:20 |
| 165:9 | 224:11 | 66:10,12,21 | 146:16,17 | 216:3 | 115:11 |
| 179:14 | 226:23 | 66:25 67:2 | 147:6 | 222:17 | 138:21 |
| 225:3 | 262:6 | 67:12,13,17 | 151:1 | **datasets** | 158:25 |
| **cross** 121:17 | **currently** | 67:22,24 | 154:14,15 | 133:1 | 159:20 |
| 163:22 | 244:19 | 68:5,12,19 | 154:19,23 | **date** 38:18 | 177:12 |
| 168:16 | **cut** 106:21 | 69:6,19 | 179:6,23 | 73:8 268:8 | 178:6,10 |
| 233:20 | 108:16 | 70:12,15,22 | 185:5 | 268:21 | 184:21,22 |
| **crosses** | 109:7 | 71:12,13,15 | 189:7 | **Dated** 268:11 | 198:18 |
| 166:15,21 | 208:21 | 71:16,17,19 | 197:16 | 269:16 | 199:2 |
| 167:17,21 | **CV** 37:8,10 | 72:3,4,5,17 | 202:2 | **David** 23:10 | 200:25 |
| 173:4,12 | 38:5,7,9,17 | 72:21,22,23 | 203:2,8,18 | **day** 9:3 98:9 | 202:22 |
| 176:24 | 38:19 39:2 | 72:25 73:1 | 203:19,24 | 269:16 | 222:24 |
| **crosshatched** | 39:9,15 | 73:2,5,10 | 203:24 | **days** 193:8 | **decisions** |
| 96:20 | 40:1,11 | 75:3,23 | 204:3,14,21 | **DC** 2:4 | 137:13 |
| **crosshatch...** | 41:17,21,24 | 76:6,10 | 205:1,3,14 | **debates** 21:1 | 138:9 |
| 96:8 97:2 | **CVAP** 90:16 | 77:4,22 | 205:23 | **decade** 70:10 | 141:14 |
| **crossing** | 97:12 | 78:1,8,9,16 | 213:13 | **decades** 70:5 | 165:20 |
| 165:10,18 | 133:1,2,4,8 | 78:22 79:1 | 214:17 | 142:24 | 218:4 |
| 173:20,23 | 133:12 | 82:13 85:9 | 215:19,20 | 219:9 | **declaration** |
| **crossings** | 145:15,16 | 93:3,6,11 | 216:3,16,17 | **Decennial** | 32:4 42:10 |
| 167:25 | 145:22 | 132:14,15 | 217:1,6,15 | 66:11,17,22 | 42:23 |
| 169:2 | 147:6 | 132:17,21 | 217:19 | 70:16 | 64:17,23 |
| 177:16 | **cycle** 15:20 | 132:22,24 | 218:8 | 152:5 | 65:1,4 |
| **crystal** 47:8 | 38:25 | 133:2,2,3,5 | 219:4 | 153:1,18 | 145:19 |
| **cultural** | 40:19 | 133:7,12,18 | 222:9,17,23 | 245:19 | 223:15,17 |
| 160:4,19,23 | 154:22 | 133:19,22 | 245:19,25 | 246:7 | **decreased** |
| 161:3 | _____ | 134:15,17 | 246:4,10 | **decent** | 107:18 |
| 162:22 | **D** | 134:21 | 247:4,5,7 | 142:19 | **default** |
| 163:4,6,11 | **D** 4:6 46:15 | 136:21 | 247:13 | **decently** | 112:15 |
| 163:14 | 46:21 | 137:7,8,9 | 249:3 | 246:10 | **defendant's** |
| 164:7 | **DAKOTA** | 137:10,12 | 251:6,20 | **decide** | 10:21 |

defendants
  15:13
  133:9
  145:22
  186:15
defendants'
  12:4 14:15
  15:4 23:22
defense 7:7,9
  10:8,14
  45:10,22
  227:9
define
  157:21
defined
  59:20
  60:16
  224:19
  254:4
  269:11
defines 60:18
definitely
  90:9 103:4
  123:9
  183:17
  189:14
  200:3
  235:15
  237:12
  248:2
  250:25
  259:14
definition
  29:20
  60:22
  105:12
  175:17
  259:13
definitions
  60:4,5,10
degree 40:24
  58:23 69:2
  134:17

168:9
181:18
266:21
demograp...
  142:11,23
  181:25
demograp...
  20:3 62:24
  63:6 70:15
  72:18
  77:16,18,20
  78:2 186:8
  236:16
  249:3
  266:11
demograp...
  41:14
  204:13
demonstra...
  125:4
  126:5
denominat...
  169:15
densely 96:1
Department
  3:2 33:2,5
  33:16,25
  34:24
  35:10
  193:19
  250:17
Departme...
  33:22
depend
  202:5,6
depending
  19:9
  102:23
  112:19
  130:7
  160:16
  203:19
  258:18

depends 19:5
  19:12,18
  73:19 98:9
  115:5,8
  131:12
  201:10
  205:6
depict 112:1
depicted
  94:21
  95:20
  238:17
depicting
  239:22
depicts
  135:20
  136:4
deposed 6:13
  20:12
deposition
  1:18 5:4,15
  6:20 8:7,18
  8:22 9:11
  10:1,5,9
  11:6,15
  12:5,11,13
  12:17 13:2
  37:6,11,18
  38:6,10
  134:4
  230:17
  267:2
derived
  131:1
describable
  219:20
describe 62:5
  67:8
  109:24
  110:3
  132:19
  146:9
  162:10,11

described
  78:19
  79:14
  100:14
  101:17
  103:13
  107:11
  131:7
  172:3,9
  199:16
  201:7
  204:14
  223:16
  224:3
describes
  241:15
describing
  28:14
  69:15
  78:22 89:8
  237:13
  242:6
  256:7
description
  110:20
  265:14
descriptions
  265:16
designated
  155:17
  157:10
  223:25
designations
  58:23 59:6
  59:9,23
desktop
  145:18
detail 135:21
  190:5
detailed
  141:14
details 18:20
  74:3

determinat...
  35:10
  37:22
  198:9
  217:1
determine
  43:19
  133:15
  216:11
  217:18
determined
  33:17 36:8
determines
  202:19
determining
  84:20
  186:4
  198:3
developed
  69:23
development
  246:2
deviation
  103:17
dictated
  185:7
dictates
  199:15
difference
  67:8 102:3
  103:11
  104:9
  105:20
  106:2,5
  109:6
  116:12
  117:11,13
  121:12
  127:2,11
  128:7
  146:9
  154:1,2
  246:11

250:4,13
differences
  123:14
  126:18
  187:10
  254:1
different
  19:9,12
  28:3 29:14
  34:21 50:5
  60:14
  76:18,19
  77:16
  102:20
  103:4,8,9
  104:6,11
  123:23
  139:21
  143:21
  153:23,24
  157:20
  163:6
  165:11
  166:17,18
  167:8
  169:14
  176:8
  198:12
  207:24
  211:2
  224:18
  229:6
  244:3,9,24
  248:14,18
  250:13
  253:4
  266:12
Differential
  245:13,18
  246:14
  247:1
  248:10,22
  250:21

251:16,20
251:24
254:12
255:5
256:19
264:5
**differentia...**
151:23
**differently**
83:10,12
102:22
118:16
151:1
**difficult**
158:13
219:24
255:12
**dig** 106:11
**direction**
261:5,20
269:8
**directly** 25:5
147:23
**dirt** 87:1
**disable** 77:13
**disabled** 77:8
**disaggregate**
146:19
**disaggrega...**
71:15 72:3
73:16
75:23 84:3
133:11
145:16
147:6
**disagree**
230:10
**disclosure**
20:24
**disclosures**
63:11
**discrimina...**
206:3

**discuss** 13:2
62:2 128:5
151:2
**discussed**
12:16 27:2
50:6 81:13
119:8,13
135:16
139:23
201:19,22
232:1
241:25
249:13
265:8
**discusses**
229:24
**discussing**
77:23
126:19
162:24
257:7
261:16
**discussion**
58:12
137:19
147:19
195:14
228:17,20
236:24
266:22
**dismantling**
222:1
**disparities**
136:5
**display** 78:2
112:10,16
174:7
**displayed**
139:3
**displaying**
113:15
**dispute**
25:20,24,25

164:16
230:7
**disputing**
26:2 153:9
118:22
**disrespecti...**
163:23
**disrupt** 89:8
89:15
**distinct**
153:8
230:25
242:11
**distinction**
181:10
190:2
**distinguish**
234:1
**district** 1:1,2
24:6,8,9
29:13
62:19,22
67:11,13
73:9,10
77:10
78:21
80:13,16
83:10 84:6
86:19
88:12,24
89:2 93:3
93:18
94:18
100:16
101:10,14
102:15,24
103:3,12,14
103:14
105:9,10
107:8,12,15
107:21
112:13
113:17
116:7

118:4,6,11
118:12,15
118:22
119:1
122:3,4,4,6
130:19,21
130:22
138:17
139:2
142:3,8
151:17
162:14,16
162:20
163:10,13
166:22
168:15,16
169:7,13,16
169:17
171:6,10,12
171:18
172:11,21
174:11,22
175:12
177:8
178:4
181:12,20
186:18
192:17
201:3,4,8
201:12
204:8,10,18
204:20
208:11
210:5
221:8,13,24
222:1,20
223:7,9
224:22
229:17,20
230:4
231:1,7,19
232:5,16
240:11,20

242:18,23
242:24,25
243:1,5,8
244:6,7,18
244:22,23
245:7
247:9
249:18,21
250:2,5
254:5
255:15
256:13
257:11
258:15,18
261:4
262:21
263:3
**district's**
101:6
254:11
**district-by...**
115:3,12
116:1
**districted**
93:10
**districting**
59:18
182:1
186:10
253:4
**districts**
32:25
35:25,25
36:11,16
53:5,6,14
53:17,18,19
54:22 55:9
55:17
56:13 69:1
69:5,13
72:16,17,20
73:18
78:24 79:1

81:1,8,18
81:19,20
82:5 85:5
87:25
88:15,19
91:4,8,11
92:12,25
93:8 94:24
95:3,19
96:2 97:8
100:9,12
101:16
105:4,13,13
114:15,20
114:25
122:2
130:16,21
130:22
138:7
149:15
151:7,18
152:17,21
153:5
158:2
159:5,6
162:23
164:22
166:16
168:19,20
168:22
171:11,16
171:19,20
172:12
177:3,23,25
185:7,8,19
186:5,9,23
186:24,25
188:16
197:25
202:1
206:23
209:1,25
211:2,10,12

| | | | | | |
|---|---|---|---|---|---|
| 211:20,22 | **dividing** | 137:9 | 144:7 | 189:16 | 207:4 |
| 215:2 | 162:25 | 266:25 | 158:13 | 195:3 | 208:2 |
| 219:18,23 | 165:1 | **doublecheck** | 161:23 | 197:24 | 209:20 |
| 220:19,20 | 172:23,24 | 68:22 | 170:18 | 200:6,8,15 | 211:11 |
| 222:8 | 177:19,20 | **Douglas** 1:18 | 171:11 | 202:1 | 212:13 |
| 227:21 | 198:14 | 5:4 6:1,11 | 176:5 | 203:21 | 213:15,20 |
| 228:13,21 | 199:18,20 | 37:7 42:10 | 177:8 | 204:11 | 216:4 |
| 233:5,10,13 | 206:3 | 65:6 268:3 | 189:13,24 | 205:7,14 | 219:2 |
| 233:19,21 | 237:24 | 268:12 | 190:10,12 | 206:9,22 | 220:7,19 |
| 234:12,16 | **division** | 269:5 | 191:10 | 208:11,15 | 223:9 |
| 236:17 | 23:17 | **downtown** | 201:2,8,11 | 209:13,18 | 233:19 |
| 237:6,9 | 159:18 | 32:24 | 201:25 | 211:10 | 236:18 |
| 241:1,3,25 | **divisions** | 89:23 | 206:6 | 212:16 | 241:8 |
| 242:4 | 163:2 | **Dr** 1:4,5,18 | 208:17 | 214:25 | 262:21,23 |
| 244:3,24 | **document** | 6:13 23:23 | 218:4,11 | 215:8,13,18 | **draws** 175:4 |
| 245:8 | 45:14 | 24:14,22 | 228:23 | 215:23 | 175:11 |
| 247:19 | 117:3,6 | 25:2 26:17 | 233:4 | 220:15 | **drew** 29:24 |
| 250:23 | 124:8 | 37:6 38:7 | **drawer** 24:2 | 222:7 | 30:14 33:6 |
| 251:3,21 | 125:1,13,15 | 47:18,18 | 31:23 | 225:7 | 33:12 |
| 252:1 | **documented** | 48:13 | 176:4 | 227:20 | 69:13 |
| 254:19 | 50:3 | 61:12,16,19 | 206:14 | 228:12 | 82:15 |
| 257:3,22 | **documents** | 120:13 | **drawing** | 233:23 | 137:17 |
| 258:8 | 11:6 45:3 | 125:7 | 41:14 | 235:1 | 190:13 |
| 259:10 | 108:14 | 126:17 | 72:15,20 | 259:1,9,16 | 208:1,9,21 |
| 261:2,10,20 | 109:13 | 145:14,20 | 73:2,18 | 261:17 | 210:18 |
| 262:10 | 116:15 | 180:17 | 75:20,21 | **drawn** 24:6 | 212:3 |
| **dive** 182:11 | **doing** 15:17 | 185:3,11,18 | 77:4 78:24 | 26:22 | 214:4,13 |
| **divide** | 16:3 41:4 | 186:4,15 | 80:1 82:18 | 27:12,14,25 | 215:8,13 |
| 143:16 | 51:14 59:7 | 187:9 | 113:3 | 29:1,4,14 | 222:19 |
| 159:13 | 72:24 76:5 | 224:19,21 | 115:6 | 29:23 | 262:16 |
| 171:5 | 112:19 | 262:12 | 121:4 | 30:14 | **drive** 137:13 |
| 198:11,18 | 113:11 | **drafting** | 138:13,15 | 74:11 | **driven** |
| 198:22 | 119:22 | 10:22 11:2 | 139:5,16,24 | 84:24 | 130:15 |
| **divided** | 160:17 | **draw** 27:9 | 143:1,3 | 140:18 | 231:23 |
| 32:24 | 182:20 | 28:23 | 158:10 | 142:3 | **driving** |
| 163:1 | 196:1 | 30:17 | 163:12 | 161:20,21 | 165:19 |
| 168:4 | 203:10 | 67:11 74:3 | 170:20 | 163:20 | 168:8 |
| 170:12 | 204:12 | 76:6,18 | 171:17,20 | 174:11,22 | 228:12 |
| 171:18,20 | 206:2 | 82:21 83:9 | 174:16 | 186:10 | **drop** 251:6,9 |
| 237:6 | **DOJ** 34:10 | 83:11 84:5 | 175:22 | 187:21 | **dropoff** |
| **divides** | **DOROTHY** | 84:12,14,20 | 185:6 | 188:17,25 | 131:9 |
| 168:14 | 1:4 | 138:17,23 | 188:7 | 197:15 | **drove** 181:19 |
| 173:3 | **double** 67:6 | 139:1 | 189:6,8,10 | 206:8,11,19 | 182:8 |

227:20
**duly** 6:3
269:5

**E**

**E** 4:6,6
136:16
269:1,1
**E-1** 135:22
136:1
**E-2** 135:23
136:1
**earlier** 14:25
17:15,16
25:9 33:9
53:20 70:5
70:9 71:25
85:8,14
97:15
133:6,23,24
134:1
137:14
143:7
158:19
171:21
180:20
182:12
183:22
195:5
208:14
219:8
221:6
236:20
249:13
254:15
255:23
264:10
**early** 202:8
**EARNEST**
1:5
**easier** 125:5
219:17
231:16

241:23
**easily** 73:4
**East** 240:15
240:15
**Eastern** 1:20
120:19
226:11
**easy** 120:7
130:25
**edge** 163:18
207:15
**edges** 106:21
108:16
109:7
**education**
38:13
**educational**
172:4
**effect** 193:5
193:14
255:20
256:1
261:7
**effective**
165:25
257:21
259:11
262:22
263:3
**effectively**
36:17
**effectiveness**
258:3,14
261:1,10,15
262:15
**effort** 24:9
193:9
**Ehrenburg**
101:18
102:13,19
102:21
103:21
104:16,18

104:22
108:25
128:19
**eight** 6:15
17:14,15,18
20:13,16
27:7 102:4
102:11
106:6
115:23
116:8,13,18
117:1
141:8,10
164:1
238:6
**Eighteen**
108:24
**either** 7:17
55:16 56:9
56:16
61:12,23
78:3,18,20
98:15 99:5
99:9 109:1
115:12
120:12
142:4
150:21
161:24
162:4
169:14,21
177:11,15
218:1
254:6
**elaborate**
81:16
**elect** 32:12
33:19 35:1
36:2,10
257:11,16
258:1
**elected**
240:22,25

**election**
171:19
**electoral**
36:18
**electronica...**
23:3
**elementary**
89:22 90:1
**eleven**
100:23
101:9
115:24
116:18
141:8,10
233:9,11
**eliminated**
221:8
230:3
**eliminates**
232:16
**email** 2:5,10
2:15,19 3:5
8:21
**empirical**
234:11,15
234:25
235:4
**employ** 177:1
**employed**
175:22
176:17
181:20
185:21
**empowerm...**
34:17
**enable**
256:23
**enacted**
49:17,22
50:1,4,6,14
51:4,10,17
51:23 52:7
52:9,16,20

52:25 53:4
53:18,19,23
54:3 55:17
55:19,23
56:3,18,23
57:3,8,13
57:16,20
58:3,4,14
62:16,19
70:9
119:14
147:22
148:9,22
151:8
160:24,25
175:19
176:24
177:17
178:4,23,24
179:4,8,11
221:3,7
229:2,6,11
230:2,8,11
230:18,23
231:17
232:20
238:12,17
239:25
241:6
242:13,25
243:8,19
244:2,9,20
248:16
258:1
**encompass**
174:23
**encompass...**
163:4
**ended** 141:15
214:17
216:1
**endorsement**
34:1,9

**engineer**
207:21
245:25
246:5
**enrolled**
179:3
**enrolled/en...**
181:10
**ensure**
189:11
206:16
**ensuring**
190:9
195:19
206:2
**entered**
138:2
140:22
**entire** 91:4
206:23
237:23
**entirely**
163:10,15
192:16
**entities** 16:8
16:22 17:2
**entitled** 55:4
**entity** 27:10
**equal** 84:14
111:2,17
167:24
199:14
238:7
**equality**
165:2
**equivalent**
91:4
**error** 21:5
50:7 228:2
228:11
246:8
247:11,13
247:23

248:5
251:19
256:15,19
257:17
**especially**
123:12
170:10
253:13
**ESQ** 2:3,3,7
2:13,17,21
**essentially**
81:22 87:1
102:3
104:17
117:23
245:18
246:3,8
251:8
**EST** 48:9
100:1
120:24
180:14
226:13
239:9
263:24
**establishing**
33:18
34:25 36:9
**estimated**
254:10
255:2
257:14
**estimating**
251:1
**ethnic**
196:21
**ethnicity**
62:13
253:3
**evaluated**
104:19
**evaluating**
206:7

**event** 24:16
26:14
**evidence**
5:16 58:22
59:5,8,22
175:16
185:25
223:3
**exact** 21:17
33:21
97:18
146:24
182:16
**exactly** 15:20
50:11
162:4
168:14
220:5
237:3
241:14
246:6
**EXAMIN...**
4:1 6:5
**examine**
58:23 68:3
253:2
**example** 26:6
39:19 45:9
58:15 83:9
86:18
161:11
162:22
166:20
167:18
169:6,23
174:9,14
176:19
177:5
204:18
212:8
214:9
218:10
220:23

**examples**
211:15,18
212:2
215:6
**Excel** 64:10
70:24
217:25
218:3,9
219:5
**excluded**
21:24 22:4
**exclusionary**
207:15
**exercise**
36:17
**exhibit** 4:8,8
4:9,9,10,10
4:11,11,12
4:12,13,13
4:14,14,15
4:15,16,16
4:17,17,18
9:20,21
22:24,25
37:8,15,19
37:21,23
38:3,5 42:7
42:19,22
43:3 46:14
48:22 50:8
64:20
65:15,24
66:1,3,4
79:16 85:2
91:20,22
92:4,5,6,8
93:4,9,13
93:16,17,25
94:1,2,4
95:11
125:1,25
126:3,8
128:25

131:21
134:2,3
135:11,22
135:22
136:1,1,5,6
145:12,12
147:13
155:2
158:22,24
184:15
209:4
223:13
224:4,8
226:19
229:25
238:18
239:20
240:10
246:20
248:20
252:5
261:25
262:2
264:5
**exhibits** 8:19
35:16 37:4
64:15
65:19
124:23
125:20
126:12
134:14
136:16,23
239:13
248:18,19
**exist** 61:3
**existed**
109:24
221:2
**existence**
208:20
**existing**
220:20

**expand** 18:6
**expected**
33:23
34:11
156:1
187:1
**experience**
18:24 27:1
27:5 38:14
182:7
189:6
219:9
220:8
235:1
**expert** 14:16
15:18,23,24
16:3,4,18
18:2,3,7,12
18:15,18
19:2,16
20:14,24
21:3 22:12
23:22 25:2
31:14 32:3
41:25
45:10
46:22 47:1
58:21
59:14
61:11,20
63:11 65:3
65:4,5
159:23
160:8,12
182:13
183:25
194:20
206:25
224:18
233:3
257:10
266:13,18
**expert's**

115:7
147:19
178:23
**expertise**
182:17
**experts** 12:4
28:2 45:10
45:11,23
47:14,19
65:6
215:12
227:4,11
247:15
260:22
**experts'** 46:6
181:16
**explain** 7:23
59:16
66:18
73:21
86:17,22
89:17 97:6
104:4,12,21
108:15
141:15
168:2
171:8
174:10
190:13,21
191:17
193:15
196:12
197:3,20
207:4,17
208:3,17
209:21
212:22
213:11
214:14
215:25
219:21
245:14
**explained**

187:21
260:20
**explaining**
228:24
**explains**
36:14
76:17
108:18
110:9
191:4
216:3
**explanation**
187:5
206:14
207:7,12,19
208:16
212:9
214:19
248:9
**explanations**
24:14
186:17
206:18
207:3
208:2
212:19
213:10
214:12,14
214:20
235:9,11,18
**explicitly**
170:24
183:9
**exports**
124:16
**extensively**
50:3
**extent** 66:7
240:6
**eye** 113:17
**eyeball** 74:6
81:3
**eyeballed**

137:21
**eyeballing**
138:18
139:2,4,9
——————
**F**
**F** 136:5,16
269:1
**Fabulous**
120:23
180:12
**fact** 28:3,25
29:13
60:16 93:7
185:18
186:23
190:20
234:3
247:19
**facto** 220:10
**factor** 28:12
59:18
159:18
163:19
189:12,15
190:3,10,21
191:12
192:11,18
194:6,11
195:21,25
199:7,25
200:2,7
206:17,22
208:11,23
209:12,18
210:1,7,11
210:14,21
211:10,14
211:20,23
211:25
212:7,18,23
213:2
216:2

219:25
233:4
246:8
247:23
**factored**
261:17
**factoring**
215:3
**factors** 72:19
83:5,7,15
83:18 84:2
84:19
138:21,22
140:4,9,11
140:13,18
140:21
160:13
163:13
170:21
171:14
177:6,10
178:7
188:18
190:14
193:23
198:25
199:22,23
203:12
215:1,23,24
259:19,21
**facts** 44:5
51:20
223:2
**fair** 27:25
92:10
118:16
136:25
187:16
**fairly** 123:15
148:10
150:16
220:20
**faith** 169:24

170:12,19
171:10,14
**fall** 185:19
192:23
**false** 145:25
151:4
**familiar** 6:17
32:21
49:16
64:22
65:18
74:14,18
124:1
142:11,23
144:2
145:6
164:8
188:5,11
230:19
239:25
260:11
**familiarity**
144:24
160:12
219:7
**families** 90:2
**family**
203:15
**far** 37:5
129:24
169:11
**farther** 212:6
**fascinated**
266:11
**fast** 130:25
148:4
150:1
**fear** 31:7
**feature** 89:14
113:16
114:3
167:19
174:10

**features**
112:25
167:15
**federal** 5:6
22:18
23:18
115:10
162:15
165:6
189:3,4,5
195:4
199:14
201:13
**feedback**
260:20
261:1
262:11
**feel** 202:21
**feeling** 98:7
**Feliciana**
240:15
**felt** 26:9
**fewer** 20:16
32:25
173:3
177:19
182:13
**figure** 9:15
56:14 77:6
95:11,14,17
95:20,23
96:8,20
97:6
111:25
137:11
151:6,12
152:2,3
161:24
174:6,6
176:23
204:21
211:3
234:9

241:25
255:12
257:14
**figured**
201:24
237:24
**file** 67:2
117:5,7
123:16,23
124:9,12
125:23
126:1
133:13
**filed** 15:22
35:10
**files** 63:5,15
68:11,12,20
70:3,4,6,12
70:16,22
71:4,7,21
71:22,23
72:6 108:8
124:2
134:10,16
137:22,23
179:6
**filing** 5:8
32:4
**final** 263:18
**find** 71:8
135:9
185:11
224:6
230:9
253:7,25
**finding** 32:18
32:20
**findings**
25:24
34:24
**finds** 24:22
**fine** 98:19
99:9 211:6

**finger** 173:13
  173:16,25
**finish** 14:18
**firm** 40:17
**firms** 39:24
  44:24
**first** 6:3 14:9
  14:15,22
  15:20
  35:22 36:3
  37:6 41:19
  49:4 59:3
  64:16 66:9
  77:14,15
  95:1
  100:18
  109:23
  125:7
  128:19
  129:12
  152:3
  227:24
  239:17
  240:9
  249:1,1
  262:4
**five** 27:20,20
  36:11
  180:2
  225:19,24
**five-minute**
  48:1 98:4
  225:14
**five-year**
  70:21
**flagging**
  197:9
  247:2
**flawed**
  175:17
**flexible** 98:22
**flip** 23:20
  204:23

**fly** 73:4
**focus** 50:2
  59:3
  114:23
  174:19
  209:25
  228:18
**focused**
  72:13
  154:9
  166:16
  174:18
  223:23
  224:2,15
  225:10,11
**focuses**
  152:25
**focusing** 17:4
  75:12
  107:12
  116:2,3,5,6
  178:18
  202:8
  212:24
**folks** 86:7
**follow** 58:25
  74:6 75:8
  89:13
  110:6
  113:23
  129:11
  139:15
  140:7,7,10
  140:11,13
  141:16,24
  142:1,3
  149:12
  161:25
  163:20
  165:6
  168:8
  170:25
  176:20

  178:8
  190:14
  192:8
  201:18
  208:13
  215:3
  216:14,16
  216:19
  217:19
**followed**
  30:17 82:7
  216:13,15
  216:17
  220:14
**following**
  39:24
  46:20
  48:24
  83:23
  89:11
  140:8
  148:9
  169:11,18
**follows** 6:4
  74:1
  207:13
**followup**
  155:10
**footnote**
  63:22
  102:12
  106:23,24
  110:19
  116:10,17
  116:19
  129:5,14
  132:8
  248:8
**footnoted**
  63:21
**foregoing**
  268:4
  269:6

**form** 5:13
  43:12
  45:16
  163:8
  165:4
  179:19
  200:19
  243:11,15
  246:7
  253:14
**formal** 32:4
**formalities**
  5:8,10
**format** 217:6
  217:7
  260:1
  269:10
**formation**
  266:6
**former** 110:3
  221:14
**formerly**
  221:2
**forms** 41:15
**formula**
  255:9
  260:4
**formulas**
  113:11
**forth** 269:6
**forward**
  30:10
  31:12
**foster** 158:11
**found** 21:5
  25:18 31:8
  44:12 82:9
  123:16
  211:16
  261:24
**FOUNDA...**
  2:2
**four** 15:9

  25:3,4,7
  27:20
  144:22
  186:18
**framework**
  188:12
  263:5
**franchise**
  36:18
**freeway** 87:1
  87:2
**freezing** 9:14
**from--**
  146:22
**front** 8:12
  125:13
  156:18
  229:8
  233:1
**frustration**
  222:13
**full** 84:4
  102:24
  104:19
  110:8
  115:22
  248:16
  256:14
**fully** 211:5
**function**
  202:25
**functioning**
  79:13
**fundraisin...**
  90:7
**funky** 15:25
**further**
  135:21
  212:25

———————
**G**
———————
**G** 136:6,17
**gain** 219:9

**Garret** 25:13
**Garrett** 3:7
**gears** 33:1
**general** 3:2
  110:12
  137:1
  142:12
  143:13
  144:5
  161:10
  188:5,11
  216:8
  219:7
  258:21
**generally**
  6:17 74:11
  176:19
  188:23
  208:24
  240:18
  258:21
**generate**
  259:24
**generated**
  74:3
**generates**
  142:7
**geographic**
  62:8,16
  66:10,12
  70:2
  167:19
  186:9
  236:17
  249:4,6,23
**geographical**
  112:24
  167:15
**geography**
  62:3,10,14
  68:13
  70:17 72:7
  72:9 76:1,9

113:12,13
156:2
204:25
247:11
**Georgia** 2:9
**gestures** 7:4
**getting** 33:24
40:23
76:14,15
143:18
181:10
202:22
226:1
228:18
246:21
**Gingles**
188:12,15
189:1
263:4
**GIS** 64:1,5,6
66:25
69:22
134:16
**give** 7:11
23:6 37:16
39:14 42:7
45:8 46:12
67:12 73:8
105:15
129:1
131:19
135:7
149:12
169:6
172:16
184:4,20
203:7
207:18
212:19
224:7
227:25
232:1
237:18

238:13
244:12,14
**given** 27:24
45:12
115:5
123:5,12
171:9
191:21
210:15,16
211:23
213:13
249:18
250:5
263:12
265:22
268:5,7
**gives** 24:23
67:15
72:16 73:4
101:7
103:14
255:13
**giving** 40:25
**GLENDA...**
6:2
**go** 7:9 9:14
14:18 29:7
29:22 31:4
35:17,21
37:5 48:6
48:11
58:14
64:14
65:14
66:14
67:16 68:4
79:11 90:4
92:15
94:11 95:9
96:16
98:11,14,23
99:24
107:19

127:14
128:18,19
129:21
131:20
134:9
140:16
151:12,13
152:2
155:1
159:2
163:17
169:16,17
172:15
180:16
181:4
189:18
190:9
194:1
206:9,15
208:5
211:3
212:6,14
223:11
227:18
229:22
235:24
236:25
238:12
241:14,18
241:23
242:7
243:13,17
244:14
252:14
257:25
261:21
263:15
264:9
**goal** 158:14
168:5
206:13
**goals** 187:13
**goes** 25:1

127:23
207:23
212:25
221:21
247:11
**going** 6:18
7:5 8:3,20
9:14,19
12:7 22:23
23:1,2,20
26:21
29:22 35:5
35:14,21
37:3,13
38:2 41:2
42:6,17,21
43:2 46:12
47:7 48:19
54:20,23
58:8,9
64:14,16,25
65:23
69:19
79:16 80:7
80:23 85:1
89:24
90:12
91:18 92:3
92:5,7,15
93:24 94:3
94:11 97:5
100:3
109:21
111:7
115:15
123:17,18
123:22
124:22
125:17
127:14
128:24
135:8,10
144:13,16

151:11,12
152:2
155:1
158:21
159:2
177:7,15,18
180:16
181:4,5,9
184:3,14,17
184:24
185:24
193:23
195:22
197:21
206:4
209:3,15
210:2,19
211:3
212:5
215:5
218:5,7
220:22
223:13
224:5
225:13
226:16
227:13,18
229:22
232:12
237:7
238:16
239:14
240:7,8,13
241:13
242:7,8
244:8
245:12
246:19
248:12,13
248:25
250:19
252:4,8,14
256:14,24

257:6
261:21,23
261:25
262:1
**good** 6:7
47:25
99:22
179:25
225:14,19
226:7
252:11
264:17
**gotten**
105:25
106:1
**government**
16:8,22
17:1
**governmen...**
27:9
**granular**
204:21
**great** 6:12
101:9
120:21
242:12
**greater**
102:18
248:3
255:24
**greatest**
168:9
**ground** 6:18
227:14
**group** 34:17
34:20
130:21,22
146:2,6,10
146:12
196:21
253:14
**grouping**
233:21

| | | | | | |
|---|---|---|---|---|---|
| groups | H 4:6 | HD-1 87:17 | 109:12 | 213:19,23 | home 143:15 |
| 171:13 | half 59:3 | 210:10,11 | 116:14 | higher | 203:14 |
| 249:3 | 98:24 | HD-2 87:18 | 117:15 | 107:22 | hopefully |
| growth 149:7 | 105:12,13 | HD-23 | 119:3 | 247:12 | 63:21 |
| 149:8 | 141:8,10 | 210:13 | 183:14,18 | Highland | 118:19 |
| grunts 7:5 | 251:5,8 | 220:24,25 | 221:4 | 25:14 | 197:6 |
| guess 14:5 | hall 120:7 | 221:2 | 222:14 | highlight | 263:17 |
| 15:15 | handful | 229:1,5,10 | 232:21,23 | 91:20 | horrible |
| 16:11 | 264:1 | 230:2,10,18 | 245:20 | 185:1 | 139:14 |
| 17:23 | handle 23:3 | 230:24,24 | hear 9:13 | 215:5 | HOSTETL... |
| 64:12 67:5 | 232:11 | 242:12,24 | heard 45:24 | 235:10,19 | 2:12 |
| 73:23 | 238:13 | 243:7,8,18 | heavily | highlighted | hour 10:15 |
| 83:25 | handled | 243:22 | 191:21 | 92:12 | 47:24 98:1 |
| 84:22 | 96:17 | 244:1,9,19 | 195:17 | 110:5,14 | 98:23,24 |
| 87:11,12 | Handley | HD-29 211:7 | 196:8,24 | 128:11 | 99:7 |
| 96:7 107:1 | 47:18 | HD-38 | 198:15 | 224:16 | 120:11,16 |
| 131:18 | 261:2,11 | 210:19 | 202:14 | highlighting | 225:13 |
| 134:22 | 262:12 | HD-5 245:2 | 237:14 | 87:17 | hours 13:15 |
| 139:20 | Handley's | HD-50 | held 25:21 | 110:15 | 98:11,14 |
| 141:11 | 260:12 | 109:23 | 217:22 | 253:22 | 245:17,17 |
| 150:14 | hands-on | HD-54 | help 11:7 | highly 260:3 | House 55:5 |
| 152:4 | 40:24 | 172:18 | 14:12 | 262:25 | 55:10,10,12 |
| 171:2 | happen | 175:18 | 45:16 | highway | 58:24 |
| 202:24 | 186:23 | 178:13 | 84:25 | 87:2 159:7 | 62:16 63:4 |
| 204:7 | 197:11 | HD-62 | 150:6 | 159:12 | 85:4,5,7,11 |
| 235:13,16 | 198:5 | 232:17,19 | 190:22 | Hill 30:3,4 | 90:14 91:4 |
| guesstimated | 224:17 | HD-69 91:21 | 192:19 | 30:16 31:9 | 91:8,10 |
| 141:9 | 235:25 | 91:23 | 218:3 | Hilsborough | 96:2 100:7 |
| guidance | happened | 93:17 | helped 44:20 | 2:22 | 100:8 |
| 249:22 | 22:8 28:6 | 94:11,12,21 | helpful 23:5 | hind 143:5 | 106:17,17 |
| 254:17 | 32:22 | 94:25 | 95:9 | Hispanic | 110:3,21,25 |
| guide 141:6 | 183:16,17 | HD-96 | 232:10 | 253:12 | 111:9,22 |
| 169:1 | happening | 109:24 | 245:3 | 254:7 | 114:13 |
| guided 82:3 | 37:16 | 110:2,3,10 | Henderson | historical | 115:18 |
| guidelines | happy 23:4 | 110:20,25 | 3:10 5:18 | 159:23 | 131:25 |
| 79:19 | 98:14 | 111:9,21 | 269:3,20 | 265:21 | 132:1,4 |
| 269:10 | hard 9:13 | head 13:19 | hereinbefore | 266:5,13 | 148:4 |
| guiding | 158:16 | 17:21 | 269:6 | historically | 149:25 |
| 200:24 | harder | 43:14 46:1 | hesitating | 259:5 | 150:3 |
| gut 143:24 | 208:10 | 51:5 74:17 | 61:21 | history 160:1 | 151:7,9,18 |
| guys 99:10 | 246:4 | 90:21 | hide 79:3 | 259:23 | 151:19,24 |
| | Harris 1:6 | 95:22 | 143:5 | hold 9:22 | 152:17 |
| H | 16:9 | 108:9 | high 213:14 | 216:10,12 | 153:5,14 |

154:11
181:17
221:8
230:2,3
232:15
233:10
238:17
239:23,24
240:11
241:21
242:18,23
255:15
**How's**
252:11
**Hub** 71:17
72:5
145:19,22
146:1
**Hug** 133:8
**huge** 162:17
**hundred**
91:10
146:23
**hundreds**
182:1
**hungry**
99:18
**hypothetical**
170:3
171:8
172:5,10
222:3,5
258:8
**hypothetic...**
170:15
222:21

——— **I** ———
**I-1** 91:22
94:1
**I-2** 238:18
**idea** 15:2,15
265:20

**ideal** 26:9
80:15
**ideally** 170:5
**identified**
43:17
158:12
160:19
178:15
201:22
254:1
**identifies**
165:12
**identify**
43:15 59:4
61:2
245:25
**identifying**
44:16
59:25
62:21
78:11
196:23
197:4,22
198:1
211:21
**identity**
58:21
**ifs** 245:1
**ignore**
170:25
**ignoring**
138:22
**illegal** 29:16
30:5,8,11
30:20
31:23
**illustrate**
30:15
226:24
**illustrated**
53:14
**illustration**
257:20

**illustrations**
53:13
**illustrative**
49:5,9
50:14 51:3
51:22 52:7
52:9,13,19
52:24 53:3
53:17,23,24
53:24 54:2
55:5,10,11
55:12,16
56:2,17,22
57:21,24
58:1,2,24
63:4,25
70:8 80:2,4
80:11,20
81:12 82:6
85:3,4,6,11
91:15 94:8
94:21 95:1
95:2,15
96:17 97:7
100:7,8
106:17,18
109:25
110:4,21,25
111:9,22
114:16,21
115:17,18
118:5,7
119:9,10
124:7,10,17
125:11,24
126:3,7
127:7,9
128:13
132:1,2
160:23
175:19
179:16
181:12,17

209:9
214:5
221:1
223:15,16
224:10,11
226:23
227:3,21
228:13
230:25
231:6,20
232:15
233:9,24
239:23
241:3,8,20
241:22
242:4,18,22
243:6,22
244:6,10,21
244:23,25
245:3,5,6,7
245:9
251:15
258:1
262:5,6
**image** 112:11
113:16
**images**
243:21
**imagine**
123:10
**imbalances**
168:12
**impact** 68:24
89:19
190:2
247:1
255:11
256:8
**impacted**
66:19
251:21
**implied**
63:20

**imply** 177:23
**import**
145:15
**important**
75:23 88:8
131:3
166:5
175:8
195:6
207:11,21
208:15
259:8,14
260:7
**impower**
259:4,7,10
**improve**
117:17
262:9,22
**improved**
54:9
101:15
107:10,16
**improvem...**
102:14,18
117:20
149:9
**improving**
140:6
**inaccurate**
93:10
**inappropri...**
25:20 26:7
26:8
**include** 57:6
62:18,19,23
63:5,6,12
93:1 95:23
132:17,23
141:21
152:4
192:17,20
200:16
223:18

**included**
38:19
66:17 93:3
111:1,21
119:5
134:24
179:16
265:14
**includes** 62:6
93:7,14
111:9
134:18
155:23
**including** 7:6
26:25 65:6
88:23
155:16
182:3
**income**
134:18,25
203:14
**Incomplete**
170:2
**inconsistent**
249:21
255:25
**incorporated**
44:6
155:13
**incorrect**
26:11 93:4
93:6
**increase**
150:3
153:20
262:19
**increased**
148:4
149:25
261:19
**increasing**
186:25
**incumbency**

264:11,20
**incumbent**
82:10
221:14,24
221:25
222:7,19
223:7
265:2
**incumbent's**
222:20
**independent**
13:7 16:10
33:13
**INDEX** 4:1
**indicate**
94:23
96:13
149:11
207:9
**indicates**
96:9,11
**Indicating**
210:24
237:2
**individual**
16:11
75:24 76:4
78:21,24
84:5 103:3
105:3
114:15,20
125:18
219:23
237:19
246:1,6
253:2
**individuals**
44:25
**induced**
246:9
**industry**
63:25 64:6
160:9

**influence**
115:11
**info** 78:4
**information**
36:7 45:4
45:15 62:6
62:20,22,24
63:7 66:8
66:16
68:17
77:16,19
78:2
134:18,24
135:20
142:13
143:10,11
144:3
218:2
240:23
261:9
264:13,16
264:21
**inherently**
29:2
**initial** 11:21
42:13
43:12,16
64:18
135:11
179:4
261:23
**input** 139:11
259:19
**ins** 194:21
**inside** 200:14
**insignificant**
123:9
**instance**
170:18
198:17
199:13
**instances**
166:14

167:16
**instant** 178:8
**INSTITUTE**
1:7
**instruct** 44:3
227:14
**instructions**
30:18
**instructs**
7:18
**intent** 24:2
**intentional**
206:3
246:9
**intentionally**
171:5
234:21
**interactive**
239:22
**interchang...**
213:9
**interest** 52:1
57:23 58:6
60:5 61:3
80:1 82:2
88:9 89:10
89:20
90:10
155:4
156:11,13
156:20
157:21,22
158:1,3,5,6
158:8,12
160:15
161:20
162:2,19
163:24
167:5,9,12
167:13
168:7,25
169:4,8,22
169:24

170:11
171:2,5,17
173:6
174:17
191:24
195:17,19
195:19
196:8
197:5,8,11
197:23
198:2,5,11
198:13
199:8
201:23
202:9,12
215:21
219:19
223:18,23
224:3,12,18
225:5,8
262:8
**interest's**
158:14
**interested**
269:14
**interests**
57:16,19
59:17
89:19
156:24
157:7,11
162:9
**internally**
162:22
164:20
165:1
176:21
**internet** 9:12
**intervenor**
15:12
**INTERVE...**
2:12
**intimately**

67:14
**introduce**
256:20
**introduced**
64:12
**involve** 17:6
**involved**
17:9 20:2
34:18
40:10
45:23
67:14
182:18
196:1
**involvement**
15:5
**involving**
13:8
**irrelevant**
106:12,13
121:7
122:21,23
123:3,7
**island** 173:25
174:3
175:4,11
**island's**
176:7
**isolate**
143:16
**isolation**
83:5
**issue** 28:11
157:9
164:24
238:13
**issued** 220:6
**issues** 28:7
238:15

_____
**J**
_____
**Jacksonville**
30:3 32:6

32:24
**JARRETT**
1:4
**Jauregui**
158:18
**Jefferson**
173:21,24
174:3
**Joe** 160:7
**JOHN** 2:17
2:21
**Johnson** 1:19
5:5 6:1,11
6:13,13
23:23 25:2
37:7 38:7
42:10
48:13 65:7
120:13
125:7
126:17
145:14,20
180:17
185:3,18
186:4,15
187:9
268:3,12
269:5
**Johnson's**
24:14,22
26:17
185:11
**join** 159:17
**joined**
175:13
**joins** 26:16
**Joint** 74:14
**JONES** 3:3
**JonesCar...**
3:5
**JR** 2:17
**JS** 40:8
**judge** 26:9

| | | | | | |
|---|---|---|---|---|---|
| **judges** 220:7 | **justified** | 150:23 | 178:2,4,5 | 120:8 | 143:10,20 |
| 220:8 | 171:4 | 161:9,18 | 191:22 | **KNEHANS** | 146:23,23 |
| **judicial** 22:3 | **justify** | 164:5 | 192:15 | 2:7 | 160:6 |
| 216:19 | 174:15 | 165:8,21 | 196:14 | knehans@... | 161:1 |
| **juice** 86:24 | 193:23 | 170:9 | 208:4 | 2:10 | 164:11 |
| 87:10 | | 172:13 | **keeping** | **knew** 23:1 | 166:14 |
| **July** 65:5 | **K** | 176:15 | 74:19 89:9 | **know** 6:15,20 | 167:16 |
| 71:11 | **KEENAN** | 179:24 | 177:4 | 10:13 11:8 | 168:13 |
| 91:22 | 2:3 4:4 6:6 | 180:8,15 | 221:23 | 11:17 | 171:1 |
| 223:17 | 13:14 | 184:13,16 | **keeps** 242:24 | 13:18,24 | 179:8 |
| 262:4 | 28:20 | 188:24 | **kept** 90:1 | 15:9,11,20 | 180:7 |
| **jump** 131:8 | 29:11,21 | 189:22 | 219:22 | 27:18 | 183:19 |
| **jumping** | 31:10 | 191:9 | **Kern** 25:13 | 33:21 | 193:1,2 |
| 192:10 | 32:19 37:1 | 192:2 | **key** 58:20,25 | 38:12,20 | 194:19 |
| **jumps** 130:2 | 38:1 42:16 | 194:24 | 59:9,23 | 39:13 | 199:25 |
| **jurisdiction** | 42:20 43:1 | 196:3 | 60:1,8,15 | 40:16,23 | 200:5,9 |
| 115:6 | 43:4 44:14 | 199:9 | 60:16,25 | 44:5 49:2 | 201:22 |
| 190:1 | 47:23 48:5 | 201:1,20 | 61:2 72:24 | 50:11 61:9 | 202:6,8 |
| 191:8 | 48:10,12 | 205:20 | 78:16 82:4 | 75:18 | 203:7,20 |
| 197:7 | 51:1 64:11 | 213:17 | 82:7 140:7 | 78:10 79:8 | 204:1 |
| 198:2 | 64:21 | 214:21 | 140:8 | 79:12 | 212:15,16 |
| 218:12 | 65:13,17,22 | 217:13 | 160:19 | 84:15 | 217:22,23 |
| 246:13 | 66:2 69:17 | 219:6 | 166:21,25 | 85:18,22,24 | 220:7 |
| **jurisdictio...** | 75:11 77:1 | 220:12 | 167:2,17 | 85:24,25 | 221:7 |
| 157:24 | 83:3 84:17 | 221:22 | 173:6,9 | 86:9 87:5 | 224:15,25 |
| **jurisdictions** | 89:16 | 223:10 | 175:14,17 | 87:15 | 226:1 |
| 182:2,3 | 93:23 94:5 | 225:16,23 | 178:14 | 88:17 | 227:8 |
| 216:18 | 97:25 | 226:6,10,14 | 216:14,14 | 89:22 90:6 | 228:5 |
| 218:6 | 98:12 99:1 | 227:16 | 223:24 | 90:19 | 229:14 |
| 219:3 | 99:8,16,23 | 231:15 | **kind** 12:20 | 96:22,23 | 232:22 |
| **Justice** 3:2 | 100:2 | 236:1,12 | 73:25 74:5 | 97:18 | 235:6 |
| 33:2,5,17 | 103:6 | 238:10,21 | 77:10,11 | 98:15 | 237:19 |
| 33:25 | 104:3 | 239:4,10,19 | 121:8 | 101:2 | 241:6 |
| 34:23 | 113:14 | 243:16 | 137:21 | 106:6 | 246:6,22 |
| 35:11 | 114:1,10 | 250:10 | 156:10 | 108:9 | 247:23,24 |
| 193:19 | 119:16 | 256:16 | 166:24 | 109:11 | 248:3 |
| 250:17 | 120:1,10,20 | 263:10,22 | 176:21 | 116:12 | 256:24 |
| **justification** | 121:1 | 263:25 | 199:1 | 117:5,10 | 259:12 |
| 200:23 | 122:18 | 264:8 | 220:5 | 119:2 | 260:5,5,13 |
| **justifications** | 124:24 | 266:24 | 245:24 | 122:8,22 | 260:25 |
| 212:12 | 125:8,19 | **keep** 9:2 47:6 | 265:21 | 131:9 | 261:8,12,14 |
| 220:11 | 126:16 | 150:7 | **kinds** 62:5 | 140:12 | 261:18 |
| 235:13 | 148:20 | 177:3,15 | **kitchen** | 142:5 | 267:4 |

| | | | | | |
|---|---|---|---|---|---|
| **knowing** 33:24 96:23 | **larger** 68:15 72:9 74:23 75:22 162:14,19 166:9 228:7 237:25 249:6,23 | 44:9,10,16 45:7 188:20 191:14 194:14 195:1,12 201:15 206:24 213:5 | 143:2 169:6 170:17 171:8 192:12 202:13 222:21 239:5 263:16 | 143:14,14 144:6,23 146:3,3,4,7 146:8,11,12 146:13,15 146:15,19 155:12 162:12 204:20,23 | 119:23 120:5,17,22 121:19 124:20 148:15 150:18 161:5,13 163:7 165:3,13 |
| **knowledge** 15:8 20:19 49:19 242:5 | | | | | |
| **knowledge...** 21:2,19 | | | | | |
| **knows** 160:7 219:14 | **Latino** 34:17 34:20 35:3 196:16,25 | 219:13,16 220:2 221:18 | **letter** 33:22 33:23 35:10,13,20 | 204:23,24 224:22 245:25 | 170:1 172:6 179:18 |
| **KYLE** 1:13 | **law** 5:7 39:24 49:20 115:5,10 165:7 189:3,4,5 194:17 195:4 201:13 | **legalistic** 260:4 **legally** 187:11 **legislative** 2:12 15:12 23:22 33:10 | 36:21 37:22 **level** 41:19 67:12 68:13,15 72:7,9,11 72:14,22,23 | 246:4 247:6,7,9 247:10 249:21 250:2 255:15 **levels** 62:10 | 180:5,11,23 183:22 188:19 189:17 190:24 191:13 194:12 |
| **L** | | | | | |
| **L** 5:1 | | | | | |
| **labeled** 156:12 242:13,24 244:19 245:5 | | | | 194:22 | 195:10 |
| **labeling** 156:24 157:1 | **laws** 122:11 **lawyers** 7:5 15:12,16 28:2,5,7 196:1 260:5 | 152:13,14 186:15 188:1,8 246:12 **legislature** | 73:1,5,6,12 73:13,17 74:12,12 75:21,25 76:3,7,8,12 | **leverage** 182:6 **Lewis** 2:13 10:18,24 12:15,22 | 199:3 200:18 201:14 205:15 213:4 |
| **lack** 179:22 210:15,16 214:18 | **layer** 112:4 156:1,2,4 **leans** 170:18 **learn** 14:9 90:22 | 49:21 **legislatures** 122:11 **legitimate** 101:22,24 | 77:22 78:1 78:21 85:9 101:11,14 102:24,24 103:9,12,12 | 13:1,5,9,24 22:14 23:10 28:15 29:5 29:17 | 214:6 217:8 218:20 220:1 221:16 |
| **Lacks** 25:18 | | | | | |
| **Lafayette** 160:8 | | | | | |
| **Lafourche** 173:20,24 174:4 | **leave** 8:21 264:23 **leaves** 209:21 210:18 213:11 231:6 | **length** 172:25 **length-width** 101:19 106:22 107:9,15,18 | 104:19 105:8,9 106:8,12 107:6,8,15 107:17 113:5 | 30:22 31:1 32:14 37:20 44:2 48:3 50:16 50:21 69:7 | 223:1 225:12,21 226:3,8 227:12 231:9 |
| **laid** 48:16 | | | | | |
| **lakes** 112:24 | | | | | |
| **land** 174:4 174:24 175:12 | **leaving** 207:6 **led** 27:19 265:22 | 107:22 108:6,17 109:8 128:18 | 116:9 119:1 133:12,14 133:20 | 75:4 76:20 82:22 84:7 89:3 99:4 99:11,21 | 235:20 236:7 238:1 239:2,7 |
| **large** 81:17 150:4 167:13 168:5 197:11 198:5 | **legal** 14:15 15:4 18:18 28:7,11 30:23 31:4 | **let's** 71:19 99:18 125:20 | 138:3 139:12 140:23 | 102:25 103:23 113:6,20 114:6 | 243:10,14 250:8 256:4 263:7,20 |

267:4,7
**LIBERTIES**
2:2
**life** 258:13
**light** 9:10
**liked** 45:20
**likelihood**
251:14
258:16
**likes** 127:6
**limitations**
121:4
**limited** 20:19
21:11
130:24
180:21
222:5
**line** 41:4,6,7
47:4 82:21
83:10,12
84:5,20
100:25
138:17
139:5
141:14
150:24
166:17,19
166:22,23
167:20
169:21
170:18
171:3
173:5,7
175:4
176:24
190:22
191:10
206:15
207:4,5,13
207:17,20
208:21
212:22
213:11,15

215:8
218:7,11,13
222:19
224:6
233:20
241:16
260:23
261:17
262:4,21,23
**line-drawing**
222:24
**lines** 62:19
62:21 63:6
76:19
138:23
139:16
140:3,10,11
140:12
141:9,16,18
141:24
142:1,3,7,8
143:17
144:7
147:14
150:13,22
161:20,22
161:24
163:12,17
163:20
165:18
172:1
174:16
176:19
181:13
190:13,14
190:15
191:5,6
202:1
206:18
208:1,17
209:20,21
210:18
211:11

212:13
213:19
214:4,13,15
214:17,25
215:13,18
215:24,25
216:4,7,14
216:16,18
216:20,22
216:23
217:19
218:4,5
219:1,1
220:15
233:4
237:23
262:16
**link** 136:9,14
136:19
239:15,25
240:1,3
242:7
244:8
248:8,12
**linked** 8:11
**links** 158:6
**Lisa** 260:11
261:2,11
**list** 23:1
38:21,22
39:1,7
63:18
83:19,21
87:24 88:1
88:19
89:24
92:25
102:12
155:8
156:12
212:11
214:12
**listed** 116:10

130:11,11
**listing**
259:25
**lists** 93:20
129:16
**literally**
117:21
176:23
263:4
**litigation**
17:4,6,8
18:24 19:3
19:17 20:7
27:1,15,16
27:19
48:15
59:19
182:18
**Litigations**
16:19
**little** 21:22
24:23 28:4
29:12 33:1
53:25
58:18
60:25 62:5
66:18
69:19 77:3
80:8,24
81:16
84:23,25
88:21
100:4
125:5
126:10
156:9
157:19
168:2
182:11
193:15
196:12
203:5
210:22

211:4
228:2,24
238:25
252:9
264:10
**live** 25:2 74:3
142:20
143:17
144:1,9
164:12,18
169:9
204:14
258:19
**lives** 221:24
**local** 122:12
**located**
240:16
**location**
229:6,17
**locations**
230:19
**LOFTON**
1:4
**logistical**
12:18
**long** 8:4
10:13 12:7
14:11,20
15:17
38:11 98:9
98:22
124:13
142:15
260:14
**longer** 98:6
98:17
226:2
**look** 13:17
40:16 51:6
56:14 60:3
63:22 83:4
91:23
105:16

109:21
112:19,20
112:22
115:9,11
117:9
123:18
124:16
125:16,18
134:7,9,13
141:18
142:6
145:4
147:11
148:18
160:25
191:19
193:20
194:8
205:13
220:9
229:9
238:5
240:23
260:7
**looked** 11:9
47:6 49:5,8
50:24
53:12 68:6
68:7,11,21
68:24 70:7
71:9 74:5
80:12 81:1
85:9 95:7
133:16
134:1
136:20
152:13
195:22
221:5
232:22
**looking**
19:13
24:19,20

Case 3:22-cv-00178-SDD-SDJ    Document 150-9    10/06/23   Page 94 of 121

Page 295

34:16
35:21 50:2
50:4 56:8
56:13
60:10
78:12,18
82:14
100:14,16
102:23
109:20
112:13,21
115:7
126:21
131:6
137:6,9
139:19
141:12
143:2,11,25
144:3
154:23
170:20
189:23,24
194:2,3
195:15
202:7
204:2
205:22,23
217:4,24
220:24
222:16
224:7
229:18
231:22
236:23
237:19
246:12
249:21
265:25
**looks** 104:5
127:6
243:2
**loose** 160:11
**Lord** 264:17

**loss** 36:15
**lost** 261:25
**lot** 75:7
136:23
157:23
160:7
161:2
193:9
195:22,25
196:17,18
206:5
219:17
221:20
222:4
245:1
249:9
255:8
**lots** 88:9
146:24
199:22
260:16
**Louis** 2:18
**Louisiana**
1:2,8,14
2:18 3:2,4
5:19 60:17
61:1,4 62:3
71:12
74:10,15,19
88:16
90:19
91:11,14
115:10
135:16
144:11,21
144:24
148:10,14
150:17
157:7
159:22,24
160:2,5,10
219:20
230:4

231:2
240:17
243:6
266:6,10,14
269:4,12,21
**Louisiana's**
97:16
**low** 237:15
**LOWE** 1:5
**lower** 130:5
**lowest** 75:25
107:11
**Luna** 25:12
**lunch** 98:23
98:24 99:6
99:19
119:21
120:24

_____
**M**
**M** 3:10 5:5
5:18 6:1
37:7 268:3
268:12
269:3,20
**ma'am**
211:21
**Madam**
99:12
**major** 89:14
90:8
**majorities**
252:1
**majority**
17:3 32:25
81:20,21
118:14
148:3
149:24
151:6,16,18
152:16
153:5
154:12

182:22
228:17,19
229:2
230:3
231:1,7,18
232:5,16
233:9,12,13
233:19
237:16
241:3
242:3
243:5,8,18
244:1,7,24
245:8
247:16
250:23
251:13
253:14
**majority/...**
93:18
188:16
201:8,12
**makeup**
186:8
236:16
260:8
**making** 56:4
106:4
154:5
164:2
202:18
**map** 24:2
27:9,11
28:23 29:1
30:5,7,10
30:13,17,20
31:8,13,16
31:22,23,25
32:7,11
33:6,10,12
34:6,16,21
34:25
49:17,20

50:1,4,6,14
50:15 51:3
51:4,10,18
52:7,9,16
55:5,10,11
55:11,12,16
55:17,19,20
55:23 56:2
56:3,5,6,18
56:25 57:2
57:2,3,8,13
57:16,20
58:14
62:16 70:9
73:24,24
74:4,4,5
79:2 82:4
82:11
84:12 85:4
85:7,12
88:8 90:14
91:23 95:1
96:3,13
97:7 100:7
100:8
105:3
106:4,17,18
107:2,6,13
107:17
108:1,6,11
109:25
110:4,9,10
110:19,21
110:25
111:3,9,19
111:22
112:1
113:10
114:3,24
115:17,18
116:20
117:16
118:5,7

119:9,10,14
124:10
128:23
129:6
130:2,22,23
131:17
132:1,2
137:20
138:9,9
139:6
140:6
141:12
142:8
143:1,3,6
148:24
149:5,15
150:7
151:8,9
154:11,15
160:24,25
161:1
168:8
173:2,2
175:11,13
176:4,24
177:17,17
177:18
178:4
179:7,9,11
179:16
190:11,19
193:11,25
197:7,15,24
200:6,15,24
202:10
203:21
205:6,11,12
206:8,9,11
206:14,23
207:2,14
208:15
209:9
212:1,3,17

**SOUTHERN COURT REPORTERS, INC.**
**(504)488-1112**

| | | | | | |
|---|---|---|---|---|---|
| 213:14 | 165:20 | 138:13,15 | 258:1 | **margins** | **matched** |
| 214:25 | 168:18 | 139:10,24 | 259:1,17 | 162:8 | 80:16 |
| 217:6,22,23 | 169:1 | 140:14,17 | 265:4,24 | **mark** 6:11 | **matches** |
| 217:24 | 202:7,22 | 140:18,25 | **Maptitude** | 35:16 37:4 | 67:20 |
| 218:4 | **maps** 26:22 | 141:25 | 20:2,5,9 | 38:4 42:18 | **MATERIAL** |
| 220:7 | 27:14,19,21 | 142:2,7,16 | 63:25 64:7 | 43:3 64:20 | 176:13 |
| 221:8,14 | 27:24 28:4 | 147:5 | 66:16,24 | 65:14 66:1 | **math** 68:22 |
| 229:2,7,11 | 29:3,23,24 | 148:9,13,23 | 67:2,17 | 92:6,19 | 91:2 97:14 |
| 230:8,11,12 | 41:14,15 | 149:10 | 69:22 70:3 | 94:4 98:2 | 97:23 |
| 230:19,24 | 49:5,9,22 | 150:16 | 72:16,21,23 | 124:22,25 | 151:5 |
| 230:25 | 50:25 | 158:11,13 | 73:3 76:1,2 | 125:20,23 | 153:19 |
| 231:6,17,20 | 51:22,23 | 160:23 | 76:7,15,17 | 126:1,4 | 168:1 |
| 232:15,20 | 52:7,14,19 | 170:20 | 77:5,8,21 | 184:15 | 247:20 |
| 233:9,24 | 52:20,24,25 | 171:17 | 78:1,4 79:4 | 239:13 | **mathemati...** |
| 235:14 | 53:3,4,13 | 175:19,23 | 79:5,7 | 240:10 | 106:11 |
| 236:25 | 53:20,23 | 178:23,24 | 82:14 | 248:13,20 | 122:9 |
| 237:8 | 54:2,3 55:6 | 179:4 | 100:15,19 | 252:5 | 247:6 |
| 238:12,17 | 56:9,17,22 | 182:9 | 100:24 | **marked** 8:18 | **mathemati...** |
| 238:19 | 56:23 | 187:10,22 | 101:4 | 37:7,19,21 | 106:13 |
| 239:22,23 | 57:21,24 | 187:24 | 102:6 | 37:23 | 109:16 |
| 239:25 | 58:1,2,3,4 | 188:1,1,3,8 | 106:15 | 46:14 | 121:7 |
| 240:17 | 58:25 | 188:25 | 112:9,17 | 126:12 | 122:21,23 |
| 241:4,6,9 | 62:19 | 189:3,6,8 | 116:18 | 128:25 | 123:2,3,6 |
| 242:13,25 | 63:25 67:3 | 189:10,12 | 118:8,21 | 264:4 | 131:10 |
| 243:3,19,22 | 70:8 73:3 | 189:16,24 | 124:17 | **marketers** | **matter** 1:7 |
| 244:2,10,20 | 74:10 | 193:12 | 131:24 | 245:24 | 6:4 88:4 |
| 244:20,22 | 75:20 | 195:3 | 138:3,5,7 | 246:5 | 112:16 |
| 244:25 | 81:12 82:6 | 203:6 | 139:3,12 | **Martin** | 178:7 |
| 245:3,6,9 | 82:19 | 205:14 | 140:22 | 111:13,16 | 194:8 |
| 248:16 | 84:13,24 | 206:6 | 141:6 | 111:17 | 269:14 |
| 256:20 | 85:3 91:16 | 208:8 | 143:4 | **Mary** 111:1 | **matters** |
| 259:9 | 94:21,23 | 212:16 | 145:15,17 | 111:10,21 | 87:23 |
| 264:25 | 95:5 102:4 | 214:5 | 147:7 | **Mary's** 112:3 | 122:15 |
| **mapmaker** | 104:14,15 | 216:8 | 188:9 | **massively** | **maximum** |
| 28:8 | 104:18,23 | 220:17,18 | 202:2 | 220:20 | 103:16 |
| **mapping** | 105:8,20 | 225:7 | 203:4,16 | **Master** 185:6 | 159:5 |
| 73:11 | 113:3 | 229:19,20 | 217:7,16,20 | 186:21 | **mean** 12:18 |
| 112:9 | 114:16,21 | 231:21 | **margin** | 187:7 | 19:7 20:1 |
| 137:8,13,23 | 115:6 | 232:7 | 247:12 | **Master's** | 24:3 25:22 |
| 138:10 | 118:17 | 233:12 | 256:15,18 | 185:4 | 27:4 29:15 |
| 141:7 | 126:7 | 235:2 | 257:17 | **match** 70:16 | 30:12 |
| 161:23 | 128:8,21 | 236:19,22 | **marginal** | 142:9 | 36:24 |
| 164:4 | 137:16 | 240:22 | 251:19 | 206:18 | 38:11 41:6 |

43:17
48:16
53:19
56:24
66:19 68:8
68:9 71:23
73:19 83:1
83:19,20,21
84:13
86:18
92:22
103:7,13,21
105:10,22
108:13,18
112:2,15,21
121:22
123:11
126:21
127:6,23
128:7
129:23
134:19
135:1
137:3
144:25
149:13
152:10
153:3,13
156:16
160:6
161:16
162:13
163:3
166:18
167:21
170:5
196:10
200:6,9,15
201:3
202:24
204:5,7
207:23
215:17

**means**
105:12
149:8
170:22
**meant** 18:1
82:1
111:13,14
153:14,22
183:21
229:16
**measure**
60:19
100:17
101:3,6,8
103:7
105:11
108:17
118:1,20
119:5,8,13
121:15
122:9,13,14
122:23
126:24
128:12,13
129:10,18
129:23
130:9,24
131:3
189:25
247:6
**measured**
56:10
129:23
**measurem...**
249:11
**measures**
56:17,21,23
56:25 57:8
57:13
87:10
100:20
101:14,19
101:22,24

102:11,13
106:15,20
107:9
107:17
114:14
115:24
116:8,13,19
116:23
117:1,18
118:8,11,15
118:22
119:7
121:15
124:5,7,10
125:23
126:1,5,18
129:3,17
131:24
132:8
**measuring**
123:15
130:18
**median**
103:15,20
104:9,15,24
105:2,7,12
**meet** 168:23
193:6
**meeting**
10:17
**meetings**
10:17
**meets** 113:17
**MEGAN** 2:3
**members**
15:3
198:23
**Memorand...**
184:8
**memory**
229:21
**mention** 46:9
46:12

61:12
89:12
**mentioned**
11:7 17:14
17:16 25:9
39:10
45:18
49:13
61:18,21,23
90:11 94:1
123:17
158:19
180:22
183:19
205:5
209:16
222:15
245:13
246:14
264:12
**mentions**
129:6
**merges** 70:15
**merit** 193:2
**merits** 25:19
**messaging**
8:21
**met** 10:13
33:18 36:8
**method**
177:2
246:3
269:7
**methodolo...**
26:17
**methodology**
19:4,7,14
19:20
25:19 26:7
59:25
**metric** 75:22
102:21
108:21

117:24
131:13
**metrics**
76:18 80:3
102:22
103:11
138:12,14
138:18,25
139:2,5,15
143:3,4,12
**Microsoft**
64:10
70:24,24
**middle** 1:2
218:8
**million** 90:23
**mind** 12:6
22:11 34:5
34:20,23
47:6 54:17
87:15
150:7
181:2
196:14
220:23
**minimal**
24:17
129:7,15
**minimizing**
172:25
**minimum**
40:6
103:16
116:21
117:2
**minor** 96:6
187:9
**minorites**
32:12
**minority**
33:18 34:2
34:4,12,25
36:1,9,17

79:24
81:11
182:4
**minority/...**
201:3
**minus** 247:9
**minute** 17:5
21:23
29:23
35:17
105:17
111:8
135:7
229:23
**minutes**
31:20
119:25
120:3,11
180:3,7
238:23
263:16
**miracle**
168:13
**mischaract...**
76:21 89:4
103:24
165:14
190:25
218:21
**mischaract...**
252:2
257:18
**misleading**
155:9
156:8,9,17
156:23
157:1,3
**misreading**
104:6
**misreprese...**
252:21
**misstated**
105:1

misstates
263:8
mistake
50:10
93:12
mix 27:13
189:2
mkeenan...
2:5
MMD 254:3
254:4
model 167:4
moment 7:11
35:6
123:19
135:9
223:12
230:15
238:13
248:13
moments
263:2
Morgan 30:3
30:4,16
31:9
morning 6:7
motions
20:25
motivations
210:17
move 37:12
37:15 38:2
58:8 61:25
69:19 76:4
76:4 91:18
97:5
114:11
115:15
121:2
132:12
150:24
172:14
227:17

245:12
257:1
moved 85:17
85:20
86:19 87:6
87:9 88:17
88:20
90:13
91:15 97:8
movement
266:9
movements
266:12,14
moves
230:24
moving
57:14
75:15,16
86:14,25
88:2 89:1
200:14
222:2
233:2
251:13
MULLINS
2:21
multifamily
203:14
multiple 47:7
98:10,14
162:23
169:3
207:2
municipal
133:20
municipali...
155:13,24
156:7,10,12
156:20,22
156:25
157:20,25
158:7
municipality

155:8
157:15
161:12
166:23
204:19
Muscatel 3:7
muster
219:16

N
N 3:3 4:6 5:1
6:2
NAACP 1:9
NAIRNE 1:4
name 6:10
22:21
125:14
180:23
181:3
184:22
named
122:14
224:19
names 45:24
narrower
29:13
narrowest
19:21
Natchitoches
221:9
229:12
230:20
243:23
245:8
nationally
122:16
nationwide
256:10
Native
196:18
natural 76:5
265:12,17
265:21

266:16,17
266:22
NDC 39:15
39:22 40:3
40:5,12,17
41:9 44:20
NE 2:8
near 141:13
Nearly 91:3
necessarily
175:1,5,14
necessary
43:12
203:20
need 6:22 7:2
8:2 98:6
104:11
117:10
120:6
162:25
166:10
171:22
195:3
207:16
229:9
232:6
239:13
251:10
263:12
264:24
needed
168:15
202:21
needs 165:24
nefarious
88:22
neighborh...
191:7,23
192:5,13,15
198:11,13
199:7,19,20
202:12
204:1

neighborh...
191:20
195:16
196:4,7,11
196:16,16
196:17,19
196:23
197:5,8,10
197:14,17
197:23
198:1,4
201:23
202:9
Neither
186:14
NELSON
2:21
net 36:15
never 35:12
234:19
246:9
new 92:4
97:8
107:23
152:21
220:19
227:21
228:13
230:5,11
241:2
242:3
nilly 165:19
nine 118:24
118:24
nods 7:4
noise 117:23
246:3,7
247:7
250:3
noisy 249:5
non-comp...
122:2
non-contig...

81:7
111:15
non-dilution
79:24
81:10
non-partisan
71:16
nonconstit...
194:6
nondiscri...
186:10,17
235:9,18
normally
73:22
North 2:23
21:4 22:15
23:13
181:2
183:21
184:1,9
north/south
159:8
northwest
230:4
231:1
243:6
note 9:10
39:6,11
264:3
noted 30:4
115:22
268:15,17
notes 145:20
noteworthy
46:23
notice 10:2
37:6,18
noting 233:7
Nowadays
193:9
number
16:16 18:6
18:13

| | | | | | |
|---|---|---|---|---|---|
| 21:17 42:7 | 67:16 | 33:5 163:8 | 220:2 | 265:11 | 210:25 |
| 69:20 | 72:16 74:3 | 165:4 | 221:17 | 266:4,4,17 | **Ohio** 2:14 |
| 71:10 | 75:18 | 179:19 | 223:2 | **offered** 47:15 | **okay** 6:23 |
| 78:11 | 80:12,16 | 200:19 | 231:10 | 47:20 | 7:25 8:10 |
| 85:15,16,18 | 81:15 | 227:13 | 235:21 | 68:25 | 8:20,23 |
| 86:6 95:25 | 86:25 93:6 | 243:11,15 | 236:8 | 213:10 | 9:17 10:16 |
| 101:3 | 93:14 | **objected** | 238:2 | 224:22,24 | 10:20,24 |
| 108:10 | 94:16 | 34:6 | 250:9 | 225:7 | 11:20 |
| 125:18 | 96:16,21 | **objection** | 256:5 | 235:7,12,16 | 12:10 14:9 |
| 126:21 | 100:15 | 13:10 | 263:8 | 236:4 | 15:11,17 |
| 129:5 | 104:5,8,10 | 28:16 29:6 | **objections** | 265:8 | 16:19 17:1 |
| 130:8 | 104:11 | 29:18 | 5:12 7:12 | **offering** | 18:25 |
| 135:11 | 108:16,21 | 30:23 31:3 | 7:15 | 22:12 | 19:24 |
| 146:24 | 109:2,20 | 32:15 | **observation** | 23:25 | 20:17 |
| 148:3 | 118:20 | 34:10,11 | 145:4 | 61:22 87:9 | 21:20 |
| 149:25 | 123:12 | 44:3 50:17 | **obtained** | 87:13 | 22:23 |
| 150:3 | 128:6 | 50:22 69:8 | 71:11 | 101:21 | 26:14 |
| 152:19,20 | 143:25 | 75:5 76:21 | **obvious** 22:9 | 148:8 | 27:21 |
| 159:5 | 158:22 | 82:23 84:8 | 164:2 | 150:15,21 | 29:22 32:5 |
| 162:16,21 | 170:7 | 89:4 103:1 | 235:5 | 172:20 | 32:10 35:9 |
| 168:14 | 193:6,8,14 | 103:24 | 236:19 | 178:12 | 38:17 |
| 182:15,16 | 193:16,20 | 113:7,21 | **obviously** | 190:7 | 39:14 |
| 200:7,17 | 194:1 | 114:7 | 8:10 67:15 | 206:20 | 41:23 |
| 208:25 | 211:4 | 121:20 | 80:14 93:6 | 207:1 | 44:15 |
| 211:2 | 216:1 | 148:16 | 96:22 | 209:11,16 | 47:24 48:2 |
| 215:1,2 | 231:3 | 150:19 | 109:9,10 | 210:10,13 | 48:6,19 |
| 237:16 | 232:7 | 161:6,14 | 111:13 | 211:8,13,19 | 49:3 51:8 |
| 241:5 | 238:6 | 165:14 | 145:4 | 214:2,9,11 | 51:15 53:9 |
| 244:4,5,10 | 241:6 | 170:2 | 189:2 | 249:20 | 55:4,25 |
| 244:11,16 | 246:13 | 172:7 | **October** | 265:7 | 63:3,17 |
| 245:20,21 | 247:25 | 188:20 | 264:7 | **offers** 103:15 | 67:1,23 |
| 245:22 | 251:15 | 189:18 | 269:16 | 103:16,17 | 69:4 79:5 |
| 248:6 | 262:19 | 190:25 | **odd** 156:4 | **office** 3:2 | 80:18 93:2 |
| 250:23 | **numerical** | 191:14 | **Oddly** 55:8 | 90:8 120:8 | 95:9 101:9 |
| 251:3,7,20 | 109:6 | 194:13 | **offer** 47:13 | **officer** 269:4 | 102:1 |
| 251:25 | **NW** 2:4 | 195:11 | 61:15 | **OFFICIAL** | 104:21,25 |
| 254:3 | —————— | 199:4 | 108:10 | 1:13 | 106:10 |
| 257:13 | **O** | 201:15 | 156:14,21 | **officiated** | 108:15 |
| 258:6,10,14 | **O** 5:1 | 205:16 | 186:15 | 5:20 | 109:20 |
| **numbers** | **O'CONNOR** | 213:5 | 216:6,9 | **offset** 168:17 | 111:14,20 |
| 14:5 17:13 | 2:7 | 214:7 | 225:2 | **Oh** 15:19 | 112:23 |
| 53:8,10 | **oath** 5:20 | 217:9 | 242:19 | 18:17 22:6 | 113:15 |
| 56:20 57:7 | **object** 7:8 | 218:21 | 257:2 | 22:9 74:1,5 | 114:2 |

119:4
123:1,22
130:10
131:2,8,19
132:11
135:14
136:22
139:17
144:20
147:4
149:18
152:24
153:16
154:25
155:20
162:18
172:14
175:2
178:11,21
179:25
180:25
181:4,11
188:5
190:6
194:23
197:13
199:1
201:21
202:11
205:21
206:20
207:8
208:7,25
209:5
210:19
211:7
220:13
222:18
226:11
227:17
228:22
237:17
238:11,19

239:8
241:10
242:12,16
245:12
256:17
257:1
260:10
263:21
266:25
267:1
**old** 107:23
**on-ramp**
87:1
**once** 7:15
28:6 73:3
95:7
163:25
197:7
198:8
**one-person...**
79:23
80:10,14,21
83:13
**one-year**
67:24
70:21
**ones** 11:8
39:10
43:21 70:7
70:10 71:1
71:5,9,24
83:20
96:24
118:23
125:10
129:24
163:3,5
197:9
198:15,22
198:22
211:16
212:2
241:19,22

242:17
**Oops** 147:11
**open** 8:19
30:6 71:22
72:6 78:3,7
120:12
**opened** 8:15
133:16
**opening**
245:16
**operate**
101:10
**operated**
119:1
**operating**
107:5
**opine** 57:12
**opined** 185:3
210:6
**opinion**
24:13,20
30:25 32:3
35:4 51:19
61:8,22
65:5 86:13
87:9,14
100:6
101:21
109:14
115:16
121:18
122:20
131:2
148:8
150:16,21
155:7
156:14,22
159:4
160:15
165:17,22
172:20
178:12
183:11

184:4,8
185:12
190:6
195:1
207:1
211:19
214:3,11
230:13
247:21
249:20
265:11
266:18
**opinions**
22:13 24:1
24:23
31:21 43:8
43:12
45:16 46:7
47:13,15
51:16 57:7
61:15
87:23
100:5
257:2
265:7
266:3,5
269:12
**opportunit...**
32:12
**opportunity**
45:12
133:7
**opposed**
143:20
**opposite**
149:22
**option** 16:1
**order** 37:13
153:11
161:12
162:1
165:24
166:6,11

168:16
170:25
171:23
184:9
237:15
**original**
11:17 47:4
54:19,25
68:5 85:6
91:22
134:10
253:10
254:4
**Orleans**
229:11
230:5,11,18
230:21,24
231:7,19
232:5
242:9,9,14
244:15
245:7
248:17
**outcome**
269:14
**outcomes**
253:5
**outline** 98:3
**outright** 22:4
**outs** 194:21
**outside** 27:16
44:24
**outstanding**
8:5 264:20
**overage**
168:17
**overall** 97:16
103:5
105:3
107:2,6,17
108:1,6
114:24
149:6

202:10
**overestima...**
250:22
**overlaid**
50:24
**overlap**
169:5
**overlapped**
51:17
**overlapping**
82:20 83:2
83:22
**overlay**
138:10
241:16
**oversee** 40:6
**overseeing**
40:9
**overturned**
30:9
**overwhelm...**
17:3
**owner-occ...**
203:15

**P**

**P** 5:1
**p.m** 100:1
120:19,24
120:24
180:14,14
226:13
263:24
267:10
**PACIFIC**
6:2
**package**
69:22,25
**packed** 53:18
**packing**
265:12,17
265:21
266:16,18

266:22
**page** 4:2,7
21:22
23:20
24:20
35:21 39:2
39:20
40:16
46:13,16
48:22
58:10
79:17
95:10
155:5
159:2
178:22
184:19,21
227:21
234:5
248:25
252:14,25
261:21
**pages** 269:6
**Palmdale**
22:9 25:8
158:18
159:9
**paper** 73:24
248:21
249:2
253:1
254:17
264:4
**paragraph**
23:21
24:13,21
26:15
35:22
54:20,21
55:8 63:17
64:2 65:7
71:10
79:21

87:16
91:18 92:9
97:5
100:18,23
102:8,12
103:19
107:2,5,16
108:3,19
109:5,22
110:1,8
114:13
115:19
116:3,16,17
116:20
118:3
129:2
131:22
132:14,15
134:4
136:9,14
145:13,14
145:20
147:11,18
148:3
151:2,4,14
151:15
153:22
156:18
157:12
172:15,17
173:16
181:15,23
185:10,17
185:24
186:3,22
187:8
209:8,15
212:5,7,25
215:4,6
220:24
223:13,13
224:8
226:18

227:7
229:1
230:2
233:2,17
239:15,20
244:1
246:15,21
246:23
247:14
252:25
253:21
257:8,19
258:11
262:2
**paragraphs**
54:24
102:17
108:20
114:18,23
227:24
228:9,25
232:13
**parish** 111:1
111:10,16
111:17
133:20
172:24
173:1,5,20
173:21,24
173:24
174:3,4,17
174:24
175:6,8
176:3,18,24
177:16
178:2,18
229:11
230:11,18
230:24
231:8,19
242:9,14
**parishes**
158:4

173:3
177:5,19,21
178:5
215:22
**parity**
253:24
**parse** 213:18
**part** 5:16
16:20 27:4
49:23,24
58:19
81:17 85:1
129:12
140:24
150:8
151:15
156:16
167:1,2,8
167:11
173:4,12
189:2,24
202:5,6
228:7,16,17
228:19
240:15
244:15
252:24
261:16
**participati...**
2:1 7:2
**particular**
11:5,20
22:7
185:20
217:14
220:25
249:5
**parties** 7:6
16:8,23,25
269:13
**parts** 20:18
50:13
159:17

167:7,9
265:25
266:1
**passed**
152:25
153:10,17
**passes**
219:16
**patience**
37:25
**Patrick** 2:13
50:20 99:2
243:13
**patterns**
265:21
**Peachtree**
2:8
**peninsula**
58:16
**people** 12:18
12:21 40:9
86:4,11,15
88:3 90:12
96:14,19
97:2,8,11
164:11,15
164:18
168:14
169:9,15,17
177:20
200:12
258:19
**perceive**
114:4
172:5
**percent**
91:14
93:20
94:13
97:16,21,22
102:18
122:3,5
201:4

206:4
216:2,21
233:10,14
233:20,22
234:4,6,7
234:17,20
234:21,22
237:5,7,10
237:12
238:9
247:10,12
247:19,24
247:25
248:1,4
251:4,5,8,9
251:12
253:24
254:5,18,22
255:17,21
255:25
256:2,9,11
256:13,15
256:25
257:10,14
257:22
258:3,6,10
259:25
266:1,2
**percentage**
16:12
97:18
197:11
198:6
227:20
228:12
246:11
254:10
255:2,3,16
255:19,20
255:24
256:24
257:16,21
258:3

259:24
percentages
149:10
193:21
234:9
235:10,19
245:10
247:17
254:11
260:6,7
261:4
262:19
Perfect
225:22
perfectly
122:3,5
207:13
perform
48:21,24
performance
261:19
262:9,15,22
performed
39:22 40:3
51:22 53:3
256:17
perimeter
106:22
108:16
109:7
128:25
129:10,18
129:22
130:5,8,9
130:15,17
130:18
131:3,15
132:9
perimeters
131:6
person 21:2
21:19 41:4
41:9

175:10,14
personal
145:3
269:8
personally
157:5
perspective
80:21
180:6
186:6
234:13
persuasive
185:14
Ph.D 5:5 6:1
42:11
268:3,12
269:5
phone 2:5,10
2:15,19 3:4
8:25 9:1
photos 112:6
phrase 21:1
196:5
266:16
physical
89:14
159:13
physically
144:21
168:17
pick 202:14
picking
204:25
picture 84:4
piece 156:17
157:25
pieces 158:2
PL 62:11
66:21 67:1
70:12,15
place 12:12
33:3 84:21
142:23

144:1
151:8
153:15
154:21
177:3
231:6
places 51:7
51:25 96:9
142:18
143:9
144:1
155:12,17
155:23
156:19
157:11
207:2
223:25
plaintiff 16:5
45:11
plaintiff's
58:20
plaintiffs 2:2
16:7,13
47:19
227:1,3,4
260:21
plaintiffs'
12:3 46:6
46:22
47:14
61:10
63:11
147:18
178:23
181:16
215:12
233:3
247:15
257:9
264:21
267:6
plan 35:24
36:15,16,22

63:4 94:8
102:24
103:5,12,16
104:19
107:23,23
108:2
125:14
126:25
127:1,7,9
127:16,16
128:2
129:1
151:17,19
151:24,24
152:13,14
152:16,25
153:1,8,8
153:10,14
153:17
154:12,18
181:12,19
187:1
221:1,3
224:10,11
226:23,24
227:3
230:2
239:24
242:4
250:24
251:15
252:1
262:5,6
plan-specific
251:22
plan-wide
101:7
105:8
115:4,12
116:1
planning
82:5,8
124:25

plans 80:2,4
80:11,20
95:15
123:24
124:18
147:22
152:8
154:1
181:17,20
182:1
185:13
223:15,16
253:23
254:3
platform
20:5
play 162:7
please 6:9
7:11,22 8:3
plewis@ba...
2:15
plus 244:22
247:9
point 7:21
28:3
109:15
140:24
149:3
162:18
174:13
177:24
183:15
197:25
229:24
252:11
263:4
pointing
212:2
points 54:8
78:16
138:21
173:2
212:20

polarized
257:15
262:25
policy 106:3
158:5
political 16:7
16:22,24
161:11
165:25
166:7,11
181:24
politically
88:7
politicians
90:3,5
Polsby-Po...
127:22
Polygon
128:4
129:9,17
pop-up 76:17
78:20
pops 78:6
populated
85:23 86:1
96:1,24
population
62:12,13
66:10,12
80:13
84:15
86:20
87:19
88:10,23
89:1 90:9
90:17,18
91:3,7,14
94:6,16
96:23
97:12,17
111:2,18
128:4,5
129:8,9,17

| | | | | | |
|---|---|---|---|---|---|
| 129:17 | 57:4 74:8 | 253:17 | 210:1,6,11 | 10:16 | 52:3 79:23 |
| 147:10,14 | 83:8,14 | **precise's** | 210:14,20 | 244:25 | 82:20 |
| 147:20 | 97:1,4 | 161:20 | 211:9,14,20 | **presentation** | 89:13,15 |
| 148:6 | 111:2,14,17 | **precisely** | 211:23 | 238:25 | 114:5 |
| 149:14 | 116:22 | 216:1 | 212:7,18,23 | **presented** | 187:3 |
| 150:2 | 117:2 | 233:8,21 | 213:2,12 | 223:15 | **printed** |
| 154:7,19 | 119:4 | 234:3,19 | 219:25 | **presenting** | 38:16 |
| 159:7 | 129:8,15 | **preclearance** | 223:8 | 41:15 | **printout** |
| 162:15 | 138:16 | 33:3 | 233:3,22 | **preservation** | 141:8,10 |
| 163:25 | 139:1,4,18 | 193:25 | **predomina...** | 79:25 82:1 | **prior** 15:14 |
| 165:2 | 141:4,11 | **predefine** | 189:12 | **preserved** | 20:18 39:4 |
| 167:24 | 142:10,22 | 197:10 | 195:25 | 165:24 | **prioritize** |
| 168:11,24 | 148:12,18 | **predefined** | **predominate** | 166:6,10 | 177:4 |
| 170:7 | 168:10 | 198:4 | 213:1 | 171:23 | **prioritizes** |
| 192:14 | 177:3,9 | **predict** | **prefer** 99:10 | 222:20 | 74:19 |
| 197:12 | 247:5 | 255:10 | 144:8 | 242:25 | **Privacy** |
| 198:6,12 | 250:1 | **predicted** | 193:11 | 244:21 | 245:14,18 |
| 199:15 | **possibly** 12:7 | 253:11 | **preference** | **president** | 246:14 |
| 203:8,9 | **post** 220:9,10 | **prediction** | 99:3,13 | 39:18 | 247:1 |
| 238:8 | **potential** | 254:1 | 119:22 | **presume** | 248:10,22 |
| 253:24,24 | 14:16 | **predictions** | 180:4 | 222:15 | 250:21 |
| 254:12,25 | 190:18 | 253:2,8 | 225:25 | **pretty** 31:12 | 251:16,20 |
| 255:4 | 212:17 | **predomina...** | **preferred** | 177:10 | 251:24 |
| **populations** | 247:2 | 182:19 | 257:12 | 211:24 | 254:13 |
| 182:4 | **practice** | 183:1,5 | 258:2 | 212:21 | 255:5 |
| 196:25 | 73:12 | 187:2,18 | 262:10 | 249:10 | 256:19 |
| 265:23 | **pre-2021** | 190:23 | **preliminary** | **previously** | 264:6 |
| 266:10 | 38:21 | 191:11 | 144:17 | 25:3 158:9 | **privilege** |
| **port** 90:7 | **precinct** | 192:21 | **premarked** | **primarily** | 227:14 |
| **portion** | 74:11 | 194:23 | 9:20 22:25 | 21:18 | **proactively** |
| 110:5 | 75:16 | 199:2 | 38:3 42:7 | 68:13 | 266:5 |
| 111:10,16 | 204:1 | 206:10 | 42:22 92:5 | 224:11 | **probably** |
| 111:21 | 249:15 | 224:23 | 94:2 | 262:7 | 14:24 15:9 |
| 184:19 | **precincts** | **predominant** | **prepare** 12:8 | **primary** 50:2 | 15:21 |
| **portions** | 75:10 | 185:4 | 45:16 | 77:21 | 19:11,12 |
| 184:25 | 85:16,19 | 190:3,10 | **prepared** | 206:13 | 20:1 28:6 |
| **pose** 7:16 | 192:7,17,19 | 192:11 | 39:10 47:2 | **principal** | 45:24 |
| **possibilities** | 249:17 | 194:6 | 136:12 | 176:17 | 115:9 |
| 207:22 | **precise** 49:1 | 199:6,23 | 269:7,9 | **principle** | 120:2,16 |
| **possible** 11:3 | 144:9 | 200:2,22,25 | **preparing** | 113:19 | 137:2 |
| 14:25 15:2 | 161:22,24 | 206:17,21 | 10:5 12:12 | 175:22 | 182:23 |
| 21:14 | 190:14 | 208:11,22 | 14:2 240:4 | 220:14 | 212:22 |
| 22:21 24:8 | 191:6,7 | 209:12,17 | **present** 3:6 | **principles** | 222:3 |

236:25
240:5
252:2
**problem** 9:15
83:6 89:1
92:19,21,23
92:24
**problematic**
172:21,23
**problems**
30:15
**Procedure**
5:6 269:12
**proceed**
110:2
**process** 21:3
21:19
34:18
67:14
73:11
195:15
201:6,9,18
201:21
202:7
205:7
223:6
250:21
251:16
254:13
255:5
**processes**
191:19
**produce**
253:9
**produced**
70:24
71:13
**produces**
108:22
**professional**
181:24
**Profile**
135:16

**programm...**
21:5
**programs**
8:22
**prohibition**
269:11
**project** 40:24
144:18
**projects**
40:22 41:3
41:13
183:13
203:10
204:13
**Promenade**
2:8
**proportions**
253:11
**proposed**
35:24
36:15,22
187:10
**proposes**
242:23
**protect**
190:18,22
**protected**
191:21
192:1
195:17
196:6,9,20
197:12
198:6,15,23
199:11
200:14
201:24
202:14
207:13
265:23
**protection**
221:15,25
**protective**
200:12

**prove** 137:9
185:20
**provide**
19:22
31:14,15,17
32:11
43:23
63:17 65:4
108:21
156:1
179:6
222:9
234:10
**provided**
36:7 49:6,9
57:5 58:22
59:5,8,22
60:10 63:8
68:6,8,10
68:12,17
71:4 80:12
80:17 94:8
94:16
133:8,13
136:13
137:22
139:11
141:25
145:21
146:2
206:14
214:12
215:18
217:4
219:12
222:16
239:15
248:8
**provides**
109:1
136:9
186:4
215:7,13

**providing**
19:25
179:22
234:8
**psychologi...**
159:13
**public** 2:13
44:12
71:24
191:18
**publically**
133:17
**published**
53:10 68:2
70:22
252:17
264:6
**pull** 46:13
48:19
79:16
108:8
112:8
117:3
123:17
134:2
151:11
172:16
229:21
240:7
**pulled** 9:23
134:6
184:5
**purely** 24:15
84:14,15
**purple**
237:11
240:11
241:16,18
242:16
**purporting**
110:5
**purports**
141:22

**purpose**
162:3
188:14
195:7
201:10,11
248:15
**purposes** 5:7
50:1 134:3
**put** 30:10
32:1 73:12
78:13
83:25 92:3
93:24
122:9
141:5,20
162:15
249:2
254:16
255:10
**puts** 237:9
**putting**
124:11
**puzzle** 158:1

**Q**

**qualificati...**
38:14
**quality**
192:14
**question**
5:13 7:11
7:16,19,22
7:24 8:5
18:10 19:5
19:10,22
27:6,10
28:18
83:24
84:11
105:5,18
109:23
110:7
111:4

113:24
118:19
124:22
128:23
138:25
150:15
161:17
176:11,12
178:14,19
188:6
190:5
206:24,25
208:13
226:15
244:17
251:18
252:22
263:14
267:5
**questionable**
46:24
**questioning**
125:6
150:25
**questions** 7:8
9:7 18:22
43:21 96:7
114:12
131:20
180:19
232:24
237:18
263:18
264:2
267:8
**quick** 99:18
**quickly**
119:19
126:10
**quirky** 130:9
**quite** 45:19
50:25
**quota** 185:21

quotas 185:5
quote 25:18
 25:19
 36:22 91:3
 135:21
 157:10
 159:3,4,19
 212:8
 226:25
 261:6
quotes 25:25
 26:11
quoting
 252:24

**R**

**R** 1:13 23:10
 269:1
**R.S** 269:5
race 62:13
 140:11
 141:16
 181:12
 182:8
 185:5
 189:7,11,15
 189:23
 190:3,10,21
 190:23
 191:11
 192:5,10,18
 192:20,25
 194:2,5,8
 194:10,10
 195:6,21
 197:16
 199:2,11,16
 199:25
 200:2,5,7
 200:17,25
 202:19
 203:13,18
 203:19

205:2,8,14
206:16,21
207:5,6,6
207:18
208:10,16
208:23
209:12,17
209:22
210:1,6,11
210:14,18
210:20
211:9,13,20
211:22
212:6,9,18
212:22
213:12,16
213:20
214:3,24
215:8,14,18
216:4
219:15,25
222:25
223:7
224:23
233:3,8,23
234:17
253:2
262:24
racial 39:21
 39:22
 181:18
 182:19
 183:1,4
 185:5,12,20
 186:11
 187:1,17
 191:11
 202:2
 203:2,23,25
 204:3,8,10
 205:23
 206:10
 211:25

214:16
215:20
227:19
228:12
254:1
261:19
racially
 231:22
raise 28:7
raising 41:2
 58:18
Raleigh 2:23
random
 117:23
randomly
 157:10
 178:1
 202:13
 234:7
range 185:20
 203:11
 251:13
rarely 103:18
rate 149:8
razor-thin
 247:16
reach 51:15
 54:1,7
 80:18
 122:20
reached
 34:24 98:1
 174:23
reaching
 60:14
 136:17
reaction
 266:16
read 24:17
 24:24 25:5
 26:18 36:3
 36:12,18,23
 55:13 59:1

68:21
81:23
91:24
100:21
127:24
129:10
135:5
145:23
147:23
151:9,20
176:12,13
184:24
185:1,8,14
185:21
186:1,12,18
187:3,13
223:19
224:25
227:4,25
233:15,24
249:7
252:22,23
253:5,14,18
254:7
255:22
257:23
260:23
262:3,12
267:9
reading 5:10
 25:23
 39:25 49:2
 81:22
 100:25
 102:7
 109:25
 111:5
 148:2
 181:21
 185:2
 215:14
 224:13
 227:22

233:5
reads 55:8
 151:15
ready 61:25
 263:15
 267:2
real 258:13
reality 50:5
 234:18
 237:8
realized
 126:9
really 15:22
 28:9 73:7
 78:4 84:11
 86:6 96:2
 120:12
 130:16,19
 130:20,25
 139:13
 167:11,11
 193:9
 219:14,14
 246:15
 254:17
realm 194:16
reason 9:5,11
 21:25
 87:22
 192:15
 200:4,17
 207:18
 208:8,20
 215:7,12,17
 222:24
reasonable
 222:4
reasons
 88:10,14
 138:22
 164:1
 185:11
 198:12

208:1
209:19,23
212:20,21
216:6,9,12
253:17
reassignme...
 87:18
rebut 54:10
 155:21
rebuttal
 11:19,23,25
 42:3 50:9
 61:13
 65:11,15
 145:11
 179:11,17
 224:5,25
 226:16,18
 227:8
 229:25
 260:19
 261:22
 262:3
rebutting
 54:21
 55:18,21
 56:1,7
recall 10:19
 11:3 14:11
 14:21
 21:10
 22:12
 23:25 24:3
 32:6 33:16
 38:17 39:8
 43:11
 44:19 45:2
 47:9 59:6
 63:1 72:10
 95:21
 124:11,14
 134:8
 143:6

| | | | | | |
|---|---|---|---|---|---|
| 146:7 | 121:5 | 79:19,22 | **referenced** | 96:1,5 | 224:16 |
| 158:17 | 125:21 | 82:19 | 58:20 59:9 | 142:12,13 | **Regions'** |
| 182:24 | 180:13 | 83:18 84:2 | 59:23 | 163:11,14 | 58:20,25 |
| 183:3,24 | 226:12 | 89:13 | 61:16 | 163:15,18 | **registered** |
| 222:14 | 238:23 | 113:19 | 66:22 92:9 | 163:19,21 | 254:6 |
| 254:19 | 263:16 | 114:5 | 103:18 | 164:3,9,20 | **registrants** |
| 255:22 | 264:3 | 132:16,23 | 145:18 | 165:11 | 253:12 |
| 257:4 | 267:11 | 133:7 | 217:2 | 167:2 | **registration** |
| 260:14,16 | **records** | 142:16 | 234:10 | 168:13,21 | 71:12,19 |
| 261:5 | 31:19,25 | 145:19,21 | **references** | 168:22 | 73:1 |
| 264:14,15 | 248:15 | 146:1,18 | 52:15 | 172:23 | **regular** |
| **receive** 260:2 | **recreated** | 162:3 | 66:13 | 173:7,10 | 146:17 |
| **received** 10:2 | 223:8 | 182:14 | **referencing** | 175:17 | **rejected** 25:4 |
| 14:6 44:8 | **recreating** | 187:2,13,18 | 63:14 | 176:3,5,8 | 26:5 29:24 |
| 260:20 | 223:6 | 187:23 | **referred** | 218:19 | 34:9 |
| 261:1,9 | **red** 92:20 | 188:18 | 194:17 | 219:9 | **rejecting** |
| 262:11 | 93:8,13 | 191:12 | **referring** | 237:5 | 26:17 32:7 |
| **RECESS** | 237:10 | 253:23 | 25:10 | 240:14 | **rejects** 24:14 |
| 48:9 100:1 | 241:7 | **redistrictin...** | 133:25 | 241:2 | **relate** 152:5 |
| 180:14 | 242:17 | 17:19,21 | 142:2 | 258:17,19 | 228:5 |
| 226:13 | **redistricting** | **Redondo** | 153:11 | 259:4 | 265:24 |
| 239:9 | 15:19 16:5 | 17:20 | 226:22 | **regional** 56:4 | **related** 14:7 |
| 263:24 | 16:10,14,17 | **redrawing** | **refers** 100:23 | 130:19 | 59:19 |
| **reclassified** | 17:6,10,16 | 177:25 | 228:20 | 166:15,22 | 228:14 |
| 20:25 | 17:23 19:3 | **redrawn** | **reflect** 140:3 | **regions** 59:9 | 265:15,17 |
| **recognize** | 19:8,16 | 186:24 | 141:2 | 59:23 60:1 | 269:13 |
| 38:7 | 20:3,6,15 | 220:21 | 223:17 | 60:2,9,15 | **Relatedly** |
| **recollection** | 26:23 27:7 | **reduce** | 226:25 | 60:17 61:1 | 162:18 |
| 20:22 | 27:15 | 186:23 | **reflected** | 61:2,16 | **relates** 94:7 |
| 21:25 22:5 | 28:12 | **reduces** | 24:9 57:16 | 82:4 140:7 | 105:2 |
| 47:12 | 29:25 | 250:2 | **reflecting** | 140:8 | 255:3 |
| 51:11 | 33:13 | **refer** 107:2 | 125:23 | 157:6 | 256:20 |
| **recommen...** | 38:25 | 114:19 | **reflection** | 160:19,23 | **relating** 65:5 |
| 185:13 | 40:18,19 | **reference** | 228:18 | 162:22 | **relationship** |
| **record** 6:8,10 | 51:23 52:3 | 47:3 62:2 | **regarding** | 163:4,6 | 15:14 |
| 7:12 9:3,15 | 52:6 59:19 | 64:7 | 47:13 | 164:7 | 69:11 |
| 21:13,21 | 60:4 62:3 | 135:25 | 100:5 | 167:1,14,17 | 147:1 |
| 31:3 35:19 | 62:17 64:1 | 136:1 | 134:14 | 168:5,6,7 | 213:14,19 |
| 37:2,24 | 64:7 67:2 | 153:21 | 254:10 | 172:22 | 213:23 |
| 38:4 42:17 | 69:21,23 | 175:24 | 255:2 | 175:15 | **relationships** |
| 48:6,11 | 71:13,16,17 | 216:8 | 264:5 | 178:15 | 269:11 |
| 65:16 | 72:4,24 | 221:11 | **region** 82:8,8 | 216:14,15 | **relatively** |
| 99:24 | 74:18 79:7 | 241:14 | 95:16,24 | 223:24 | 119:19 |

| | | | | | |
|---|---|---|---|---|---|
| 145:3 | 22:7 32:20 | 52:23 | 145:11 | 236:20 | 40:23 41:1 |
| **relevant** | 44:10 | 53:11,14,16 | 147:9,12,13 | 238:19 | 43:5,9 44:9 |
| 43:21 | 47:17 61:9 | 54:6,12,14 | 147:25 | 239:16,21 | 45:10,17 |
| 70:16 | 95:24 | 54:20,25 | 151:11,14 | 240:4 | 46:7,22 |
| 90:10 | 182:16 | 56:11,15 | 154:8 | 241:15,23 | 47:1,5,16 |
| 109:16 | 183:12 | 57:9,22 | 155:2,4,10 | 242:1 | 47:18 |
| 121:24 | 210:4 | 58:9,13,13 | 155:22 | 244:14 | 49:13 |
| 123:2 | **reminder** | 59:10,24 | 156:12,13 | 245:14 | 61:11,19,22 |
| 131:11 | 6:19 | 60:16 | 156:15,17 | 246:15 | 64:13,15 |
| 135:9 | **remove** | 61:12,13,16 | 156:23 | 252:15,18 | 65:6,19 |
| 151:15 | 155:22 | 61:24 62:1 | 157:9 | 257:4 | 68:19 |
| 184:19 | **removed** | 64:3,19 | 160:18,20 | 260:6,12,19 | 93:10 |
| 266:21 | 237:23 | 65:11,15,24 | 162:24 | 260:24 | 94:17 |
| **relied** 43:16 | **renters** | 68:9 69:3 | 164:8 | 261:13,23 | 108:23 |
| 44:17 | 203:13 | 69:13 71:2 | 165:15 | 262:3,4,17 | 124:1 |
| 63:13,18 | **Reock** | 71:5,9 | 172:16 | 265:1,9,14 | 140:14 |
| 66:8 71:11 | 126:23 | 72:14 | 173:17 | 266:21 | 182:21 |
| 141:22 | 127:2 | 76:22 77:6 | 178:16,25 | **reported** 3:9 | 227:10 |
| 182:25 | **repeat** 196:5 | 79:17,18 | 179:4,11,17 | 123:13 | 260:16 |
| 183:4 | **repeatedly** | 81:14,17,23 | 180:17 | 261:18 | 265:11 |
| 214:3 | 50:6 | 85:1 90:12 | 181:5,7 | 269:7 | **represent** |
| **religious** | **rephrase** | 91:22 92:8 | 184:17 | **reporter** 3:10 | 41:20 92:7 |
| 160:4 | 7:24 | 92:10 | 207:24 | 5:19 6:21 | 168:6 |
| **reluctant** | **replace** 245:4 | 93:11 94:7 | 209:1,5,20 | 7:1,4 35:16 | 169:5 |
| 220:9 | **replaces** | 94:12 | 211:17 | 37:4 38:4 | 244:23 |
| **rely** 214:24 | 187:1 | 95:10 | 217:2 | 42:18 43:3 | 254:23 |
| 217:3 | **report** 10:22 | 102:7 | 219:11,21 | 64:20 | **representa...** |
| 263:11 | 11:2,17,18 | 103:14,25 | 220:6,16 | 65:25 92:6 | 147:22 |
| **relying** 53:9 | 11:19,21,25 | 108:15 | 221:12 | 94:4 99:12 | 148:23,25 |
| **remained** | 13:6 14:2 | 109:5,6 | 222:12 | 99:14 | 149:6,7 |
| 102:2 | 21:6,7 | 118:3 | 223:12,14 | 126:11,14 | 150:12 |
| **remaining** | 41:25 42:4 | 124:3,6,8 | 223:25 | 176:12,14 | 166:1,7,12 |
| 109:2 | 42:13 | 124:11 | 224:3,5,17 | 184:15 | 171:24 |
| 116:23 | 43:13,16,20 | 126:2,6,24 | 224:24 | 252:5 | 259:22 |
| 117:17 | 44:6,18,22 | 128:6,12,24 | 225:1,3,9 | 269:3 | **represented** |
| 207:6 | 46:10,11,14 | 130:11 | 226:16,18 | **reporting** | 132:22 |
| **remains** | 46:16 | 131:21 | 227:8,9,18 | 269:7 | 148:10 |
| 105:7 | 47:22 | 132:13,25 | 227:19 | **reports** 10:6 | 150:16 |
| **remedy** 26:9 | 48:16,17,19 | 134:12,14 | 228:8 | 11:7,10,12 | 164:14 |
| **remember** | 49:24 50:1 | 135:4,7,12 | 229:23,25 | 11:14 12:3 | 174:25 |
| 11:2,4 | 50:4,9,11 | 135:15 | 231:25 | 13:13 | 196:24 |
| 12:21,24 | 51:25 | 141:20,23 | 232:13 | 20:18 | 229:10 |
| 13:5 14:14 | 52:11,12,18 | 141:25 | 235:10,19 | 21:10 | **representing** |

| | | | | | |
|---|---|---|---|---|---|
| 2:2,12 | 177:9 | **retained** 7:7 | 81:13 82:6 | 78:25 | 128:2,6,8 |
| 41:18 | 224:12 | 27:9 | 125:11 | 80:21 | 128:10,14 |
| **represents** | 262:7 | **retaining** | 216:25 | 81:18 | 128:21 |
| 173:25 | **respected** | 221:13 | **reviewing** | 82:16 | 129:3,19,24 |
| **request** | 82:7 | **retrogressi...** | 44:17,21 | 83:13,18 | 129:25 |
| 13:23 | **respecting** | 193:18 | 47:9 66:15 | 84:18,21 | 130:3,6,12 |
| **requested** | 163:22 | **Retrogress...** | 67:3,6,9 | 85:5,12,17 | 132:2,9,17 |
| 30:14,16 | **respectively** | 36:22,25 | 95:5 | 86:1,4 87:6 | 133:9,23 |
| 41:9,11 | 248:20 | **return** 233:1 | 112:17 | 87:7,20 | 135:6,17 |
| 176:13 | **respects** | **REV** 1:4 | 265:3 | 88:2,16 | 136:6,10,11 |
| 227:2 | 175:3 | **reveals** 91:23 | **revised** 38:18 | 90:14 91:5 | 136:12 |
| **requesting** | **respond** 9:6 | **reverse** | 56:6 | 91:8,11 | 138:5,13,16 |
| 41:5 | 48:18 | 207:21 | **Revisions** | 93:14,18,21 | 139:12 |
| **require** | **responded** | 245:24 | 55:5 | 94:9,13,18 | 140:23 |
| 167:25 | 246:6 | 246:5 | **rid** 252:10 | 94:22 95:3 | 141:3,23 |
| **required** | **response** | **review** 11:5 | **right** 7:8 8:2 | 95:6 96:10 | 143:18 |
| 33:24 34:1 | 224:22 | 11:11,15 | 8:17 13:23 | 96:20 97:9 | 144:4 |
| 269:10 | 225:8 | 12:10 38:9 | 18:2 23:14 | 97:17,22 | 145:8 |
| **requirement** | 227:7 | 43:25 | 24:11 | 99:20 | 151:25 |
| 189:1 | 246:1 | 45:11,15 | 26:11,22 | 101:16,19 | 152:6,9,12 |
| 199:15 | **responses** 7:3 | 46:21 47:1 | 30:18,21 | 102:6,15,19 | 152:14,17 |
| **requireme...** | 225:2 | 48:17,25 | 35:2,11 | 102:24 | 152:22 |
| 111:3,18 | **responsive...** | 58:19 61:5 | 37:12,13 | 105:4,15 | 153:2,4,5 |
| 162:15 | 5:14 | 65:20 | 39:3,13,17 | 106:18 | 153:19,20 |
| 167:24 | **rest** 21:7 | 66:12 67:1 | 41:5,12 | 107:3,10,14 | 153:25 |
| 168:24 | 176:10 | 68:18 | 45:1 47:7 | 107:18,24 | 154:2,3,8 |
| **requires** | **restate** 52:21 | 69:16 70:6 | 47:14,15,20 | 108:3,12,23 | 154:16,20 |
| 204:22 | 254:14 | 70:9,25 | 49:6,10 | 109:2,3,8 | 155:14 |
| **research** | **result** 36:21 | 71:5,18 | 50:9 51:18 | 110:4,11,14 | 156:8,18,21 |
| 13:7 | 75:16 | 72:4 77:25 | 52:20,25 | 110:19,22 | 157:7,13,17 |
| **reserve** 13:23 | 92:21,22 | 133:7 | 53:11,21 | 111:22,23 | 159:9,20 |
| **reserved** | 166:17 | 136:16 | 54:3,12,25 | 114:21,25 | 160:20 |
| 5:15 | 250:22 | 204:8 | 55:6 56:12 | 115:19 | 161:12 |
| **residents** | 251:1 | 222:22 | 56:15 | 116:10,23 | 162:7,8 |
| 90:16,20 | 253:4 | 227:10 | 57:21,25 | 117:18 | 164:22 |
| 260:9 | 255:4 | 228:4 | 58:6 61:4 | 118:8,11,17 | 167:9 |
| **resize** 79:2 | **Resulted** | 240:4 | 61:17 | 119:14 | 169:25 |
| **respect** 58:25 | 55:6 | 252:20 | 62:25 64:3 | 124:18 | 170:10,14 |
| 168:6,24 | **resulting** | **reviewed** | 66:23 67:4 | 125:16 | 171:24 |
| 169:22,24 | 67:15 | 10:6 11:21 | 70:12 | 126:21 | 172:18 |
| 170:6,13 | **results** 36:15 | 11:25 12:4 | 74:24 | 127:7,12,17 | 173:9,10,13 |
| 171:11 | 57:1 73:13 | 46:2,6,9 | 75:13,17 | 127:20,22 | 173:17,21 |
| 175:6,14 | 254:2,12 | 61:10 66:3 | 76:19 77:5 | 127:24 | 174:7 |

177:9,24
178:8
179:5
180:12,22
181:13
182:4,9,14
183:22,23
183:24
184:1
187:6,19,23
198:19,24
199:2,10,24
200:2,8
204:11
205:9
207:10,22
208:4,12,18
208:23
209:9,24
213:20
216:7
217:16,17
225:3,4
229:3,8
230:21
231:2,5
232:3,5
234:25
237:5,7
238:7
239:6
241:14,19
242:1,5
243:1,9,19
243:23
244:3,10
248:10
249:11,18
250:6,11
251:15
256:21
258:4,8,20
259:6

260:22
262:12
263:5
264:13,22
265:4
266:7,11,19
**Rights** 27:22
32:8 33:4
39:21
193:5,18
194:4,9
259:14
**rigid** 161:4
**ring** 229:12
**risk** 250:3
**river** 112:2
167:18
242:11
**rivers** 112:23
**Robinson**
144:16
**robustness**
257:3
258:7
259:16
261:15
**role** 40:4,19
41:19,20
60:20,21,22
163:16
199:11
**room** 8:7
**Rouge** 2:18
236:24,25
240:16
265:25
**Rough** 3:4
**roughly**
76:24
259:12
**rounds** 188:2
**row** 152:4,24
153:11

**rows** 152:3,5
152:9
**rubric** 19:19
**rule** 74:14
207:21
214:19
220:13
224:17
262:14
**ruled** 208:9
236:13
**rules** 5:6
6:19
122:12
269:10,12
**ruling** 186:16
235:8,17
236:5
**run** 56:20,24
56:25 57:1
57:3 83:6
120:7
158:10
177:19
218:16
238:15
250:15
264:2
**running**
41:10,14
145:17
**runs** 40:8
159:8
**rural** 96:25
130:16

_____

S

**S** 5:1 64:18
65:2
**safe** 40:13
125:21
226:5
246:20

263:17
266:15
**sake** 194:10
**samples**
96:17
**sampling**
245:21
**SARAH** 2:3
**save** 212:20
**saw** 35:13
246:22
260:16
**saying** 26:4,6
26:10,12
32:2 34:10
34:13 74:5
104:4,13
107:16
111:8,11,20
131:16
141:4
143:6
154:10
155:18
167:1
173:19
178:1,3
186:22
197:1,18
212:6
222:22
**says** 24:13
36:6 46:18
46:19,21
58:19 65:3
69:20 70:2
71:11
79:21
100:18
117:24
118:1,3
125:16
129:14

135:19,23
152:10
185:10,18
185:25
186:3,14
187:9
216:13,15
216:17
217:21
223:14
230:1
241:16
243:4
249:3
253:7,17,22
262:8,18
**scenario**
195:23
**scenarios**
162:17
**scheme** 78:14
78:18
205:11
**school** 89:22
89:25 90:1
90:2 158:2
169:7,10,13
169:16,17
169:23
170:11,19
171:9,12,15
171:18
172:11
**Schwartzb...**
127:5,15
**Science**
264:6
**scientist**
181:24
**scope** 19:18
46:19
48:23 85:2
96:4

**score** 102:2
102:19
103:5,14,15
103:20
104:18,22
104:24
105:2,7
107:3,6,11
107:15,18
107:22
108:1,6
114:24
116:4,5,7,9
117:22
126:20,24
127:2,5
130:5
**scored**
102:22
**scores** 54:9
88:6
100:24
102:5,20
103:3,17
105:21,22
106:14,21
115:20,23
116:13
117:8,12
119:9,12
129:3
131:23
**screen** 8:14
8:16 9:24
22:24 23:4
23:6,7
26:21 35:5
35:7 37:14
37:16 42:8
42:10,21
46:13
54:23 55:2
64:17

65:23
69:20
73:25
78:14,23
79:3 92:4
93:25
95:12
100:3
110:16
123:19,20
124:9
135:8,10,12
145:10
158:21
181:6,7
184:3,6
202:2,20
203:3,24
205:9
209:4
211:5
224:6
226:17
238:16
246:19
248:23
250:19
252:4
257:6
261:24
262:1
**screens** 8:12
**screenshot**
240:9,14
**screenshots**
239:12
248:14
**scroll** 210:22
218:24
232:14
234:4
236:22
242:8

248:25
**scrutiny**
24:17
194:18,21
194:22
195:2
**SD-17**
209:16,18
**SD-20**
173:19
**SD-38** 209:9
209:13
**seat** 251:12
**seats** 148:4
149:25
150:3,5
154:13,23
228:17,19
234:19
251:6,7,10
**second** 9:22
23:6 37:8
37:13,17
39:14 42:8
46:12
77:13 95:2
102:8
105:16
129:1,22
131:19,22
149:13
152:4,12,24
172:16
181:6
184:5,18,20
224:7
226:21
228:4
230:17
232:1
237:18
244:14
262:8

**SECRETA...**
1:14
**section** 21:6
21:6 33:4
55:4,15
62:1 69:12
79:18 98:3
119:17,20
132:13
135:4,9,15
135:21
147:9
155:1,3
178:20,22
179:15
180:2,19
181:5,9,11
182:19
193:4,7,13
193:13,17
194:4,9
195:7,8,9
195:20
202:15,23
205:25
206:1
225:18
227:19
228:6,8,14
232:25
257:4
259:13
**sections**
41:17
46:21
81:24,25
182:21
207:24
**see** 9:23 23:7
23:9,16,21
24:4,5 25:7
25:12,14
31:11 35:6

39:25 42:9
45:5,5,12
46:15 55:2
60:5 65:2,7
67:20
68:12,13
69:5 72:7
72:19
73:13
79:19 81:1
92:16 95:5
95:11 96:3
96:4,9 98:1
106:23,25
110:15
114:3
117:4
123:20
128:6
131:19
135:12,23
144:7
147:15
155:5
156:2
158:25
178:24
180:25
181:7
184:6,10,21
185:2
188:15
204:16
206:17
209:6
211:4,5,7
212:9
215:9
221:10
226:17
228:22
229:24
230:1,5

232:7
237:8
238:14,19
239:18,20
240:11
241:21,24
242:20,22
246:22
248:23
252:6,7
**seeing**
174:10
264:14
**seek** 203:1
**seen** 43:5
51:14
260:15
264:13
**segment**
119:24
**select** 203:17
**selected**
155:12,17
**senate** 24:6,9
55:5 58:24
62:16 63:4
97:7
114:11
115:15,16
116:20
118:5,7
124:7,10,17
125:12,25
126:3,7,18
126:25
127:1,15,16
128:12,13
128:23
129:3,6
130:2
132:5
151:16,17
151:24

181:17
210:5
233:12
**send** 14:4
23:5
126:12
169:10
248:13
252:19
**sense** 7:13
17:13
32:22
55:25
83:15
98:25
107:14
109:4
144:2
187:25
237:4
241:11
**sensitive**
260:4
**sensitivity**
257:3,9
258:7,25
259:16
261:15
**sentence**
35:22 36:3
36:6,14
59:4 102:9
110:12
116:4,6
129:13
151:20,23
226:21
230:1,5
253:7
262:8
**separate** 27:3
52:10
83:19

133:3
232:25
**separately**
96:17
**separating**
156:3
**September**
1:19 6:8
268:21
**series** 123:25
**serious** 164:3
**served** 59:13
159:12
**session** 9:17
30:6 98:16
**set** 23:1 76:6
78:20
269:6
**sets** 52:13
63:24
152:8
**settlement**
160:1
**seven** 118:11
118:23
**shaded**
237:19
**shading** 93:7
141:1,19
**shape** 112:25
172:18
237:23,25
**shapefile**
62:17,18
**shapes** 62:9
100:16
**share** 22:23
23:4,6 35:5
42:6,21
45:8 54:23
64:16,25
65:23
100:3

123:19
135:10
145:10
148:5
150:1
158:21
171:14,15
181:6
184:3
209:4
226:17
238:16
248:12,22
252:4
257:6
259:6
262:1
**shared** 31:6
160:9
**sharing** 9:19
9:24 26:21
123:20
135:8
184:18,20
224:6
250:19
261:23
**sheets** 13:18
13:20,24
**shifted** 230:4
**shifting** 33:1
**short** 98:15
119:17,24
119:24
125:17
**shortage**
168:17
**shortly**
126:19
**show** 54:6,11
54:14
93:16
94:17

95:14
123:22
203:2,3,18
203:18,23
203:24
209:4
213:14,19
231:3
232:1
239:17
240:8
241:7,18
243:21
246:17,19
**showed**
102:14
215:19
248:15
255:6
**showing** 42:9
124:9
126:5
140:25
255:15
256:1
**shown** 95:16
202:20
236:20
241:2,5
**shows** 2:17
77:4 94:12
126:1
151:6
152:12,19
234:5
239:21,23
241:16
245:10
**Shreveport**
218:8,10
**side** 9:2 28:8
168:20,21
168:22

169:14
226:5
**sides** 159:7
**sign** 137:11
267:9
**signal** 187:11
**Signed**
268:11,15
268:17
**significance**
86:14
121:15
**significant**
59:18
86:23 88:5
88:7,11
89:25
121:12,18
123:11
131:10,15
140:5
182:3
211:24
240:6
246:11
247:18,22
248:2
250:4,12
251:5
**significantly**
74:23
85:15
91:24
122:1
**signing** 5:10
**similar** 19:11
186:5
**similarity**
186:7
236:14
**simple**
257:20
**simply** 60:9

74:9 151:4
**simulating**
253:22
**single** 24:8
87:19
89:17
218:13
**sit** 63:2
**sitting**
117:11
**situation**
26:8
122:24
123:5,8,10
172:2
206:12,13
260:4
262:25
**size** 165:23
**sized** 164:21
**skimmed**
260:14
**skip** 80:23
**slightly** 20:16
98:17
105:22
117:17
182:13
**slow** 244:13
**small** 86:6
96:2 106:8
238:22
249:3,10
**smaller** 18:14
85:15
166:4
219:4
246:12
247:11
253:13
**smart** 8:25
**social** 159:13
**socioecono...**

62:24
69:12,18
70:20
72:18 73:2
73:8 76:10
132:13,17
132:24
133:1,3,5
133:19
134:15
135:4,15
136:5,8,13
137:16,23
138:4,22,25
140:9,10,13
140:17,21
141:19,21
142:13
143:10,16
144:3,25
203:11
204:25
216:16,17
216:22,24
217:1,15
**socioecono...**
143:20
144:6
**sociological**
218:18
**software**
64:1,2,5,6
64:8 66:17
67:12
69:22,24
70:14,17
76:1 78:15
79:6
100:21
112:9
138:5
**somebody**
14:12

27:11
78:17
175:2,3
208:21
218:2
**somewhat**
26:1 157:1
**sorry** 6:14
14:18 18:9
31:2 37:14
39:20 41:7
52:21
67:19
83:20,23
90:4 97:20
105:1,5
110:6
114:17
116:4,17
121:10
128:19
129:1,13
133:24
145:12
146:5
147:12,17
158:24
181:3
184:19
188:6
202:24
208:4
210:3
213:6
214:10
217:7
229:16
230:12
231:13
241:7
246:21
261:22
**sort** 31:14

41:8 42:3
44:24
59:15,24
74:1,6
76:16 81:3
81:4
122:19
143:24
169:8
199:11,12
205:5
218:16
219:11
222:23
225:7
237:21
238:24
256:18
**sorts** 265:16
**sought**
188:25
**sound** 9:17
124:1
**sounds** 88:21
99:17,22
120:21
**source** 63:23
68:5
145:18
150:8
254:18
**sources**
43:15,18,20
43:24
44:17,21
61:7 66:4,7
68:3,18
139:23
**south** 58:16
**southern**
24:10
111:15
**spanned**

221:9
**speak** 6:22
10:8 12:25
**speaking**
6:23 7:10
76:24
131:17
188:23
208:24
240:18
259:13
**special** 31:18
78:6
113:12
146:14
185:4,6
186:21
187:7
**specific** 11:4
43:24 52:4
74:2 75:18
84:25
95:24
96:21
105:9,11
108:21
118:11
122:13,25
123:5,7
134:7
141:13
159:22
164:6
170:17
183:16
196:21
204:3
206:22
220:23
228:9
231:14
256:18
**specifically**

5:11 7:18
51:13
138:24
212:2
**specification**
18:13
**specificity**
162:12
**specifics**
22:22 24:3
196:13
255:13
**specified**
18:11
**specifies**
39:15
**speculation**
24:16 29:7
84:9 220:3
**speculative**
24:15
**spell** 11:8
**spend** 96:22
136:21,22
**spent** 13:16
14:2
**split** 58:12
144:6
155:23
156:7,13,25
157:1
160:23
163:6
164:19
171:12
178:2
199:16
202:13
**splits** 155:4,8
161:1,2
162:21
173:1
**spoke** 10:23

**spoken** 12:16
**spot** 88:7
143:19
**spotlight**
212:21
**Square** 2:13
**SSD-SDJ**
1:11
**St** 2:18 111:1
111:10,13
111:16,17
111:21
112:3
**stage** 202:7
202:11
203:20
205:6
**stamp** 32:1
**stand** 43:8
83:16
**standard**
1:21 19:4
59:25 64:1
64:6 73:12
76:11
103:17
120:12
121:23
124:16
193:18
219:13
248:5
**standing**
213:12
**start** 7:10
9:19 71:19
98:2
122:25
154:22
180:1,18
195:15
197:14,22
246:12

**started** 15:23
20:23
195:14
**starting** 39:2
48:22
54:20
110:18
150:4
196:22
197:4
201:25
257:7
**starts** 178:22
**state** 1:8,14
5:19 6:9
18:23
22:20
23:13,17
29:14
44:12 47:8
60:1,17
62:3,10
71:12,23,24
90:25 91:2
91:11
100:9
122:11,11
132:15
141:9
144:21
145:7
147:18
149:6
168:4
180:22
182:6
188:1,8
212:8
222:2
233:11,18
246:12
255:15
257:23

258:17
269:3,21
**state's** 62:17
71:21
147:20
148:5
150:2
**State/House**
164:21
**stated** 7:15
24:6 262:4
**statement**
137:1
148:1
151:3
155:21
**statements**
101:2
**states** 1:1
39:5 122:6
224:9
**statewide**
96:3 106:2
217:23,24
239:22
**statistical**
40:8 81:4
121:14
186:6,16
234:12
235:3,8,17
236:5
257:17
**statistically**
121:18
131:10,14
247:17,22
248:2
250:4,12
257:14
**Stats** 123:25
**status** 15:25
40:23 41:1

**statute**
269:10
**stay** 10:20
**stayed** 21:8
106:7
**staying**
104:22
**stays** 104:24
**stenotype**
269:7
**step** 138:18
**steps** 248:4
**STEVEN** 1:6
**stipulated**
5:3
**stood** 60:11
**stop** 26:21
135:8
184:18
204:9
224:6
250:19
261:23
**straight**
21:21
31:12
183:18
**strange**
177:12
**Street** 2:4,8
2:18,22 3:3
**strength**
79:25
81:11
**strengthen**
149:2
**strengthened**
261:3
**strengths**
173:1
**stretch** 34:16
**stricken** 21:7
**strict** 194:18

194:21
195:1
**strive** 189:11
**stronger**
149:9,21
**strongly**
192:9
**structure**
110:12
**studied**
49:12
**studies**
251:23
252:3
254:9
255:1,14
256:1
**study** 252:6
256:23
**studying**
136:23
**stuff** 121:23
**sub-munic...**
219:1
**sub-parish**
218:25
**subcompo...**
204:17
**subdividing**
172:10
**subdivision**
203:25
**subfolder**
123:24,25
**subject** 27:22
**submission**
35:23
**submit** 31:21
**submitted**
11:12
13:20
31:13,18
38:19

42:23
65:11 95:2
95:3 124:2
**Subsection**
46:15,21
**subsequent**
155:21
**subset** 133:4
158:7,8
**substance**
13:1
**substantial**
159:6
**substantiv...**
246:16
**suburbs** 24:7
24:10
**sued** 193:11
193:12
**sufficient**
58:22 59:5
59:8,22
**sufficiently**
142:11
**suggesting**
88:14,22
95:18
**suggests** 29:2
**Suite** 2:9,14
2:22
**summarizes**
38:13
**summary**
77:10 94:6
258:22
**super** 99:17
167:11
**Superior**
23:16
**supervise**
40:7
**supervising**
40:23

**supervision**
269:8
**support**
58:22 59:6
59:8,22
60:23 61:6
61:8
257:13
**supporting**
108:13
109:13
116:15
**supports**
208:8
**suppose**
139:13
174:12
199:14
257:20
265:13
**sure** 6:17 7:3
8:24 14:13
18:11
19:25
21:21 22:6
27:6 28:10
28:18
29:10,12
35:18
39:12
40:21 44:8
45:9 48:4
50:7,13
52:22
54:16,18
57:10
58:17 60:3
61:9 89:20
93:12
105:17
107:20
109:18
110:8

111:24
113:4,23
114:9,18
117:13
118:18
121:3
125:2
137:4
138:20,23
139:17
142:21
143:14,18
144:9
145:2
147:3
149:12
160:8
161:8
166:2
167:22
168:3,4
169:20
183:6
187:20
189:9
190:12
193:17,20
194:1
198:10
201:5
202:13,22
204:5,12
208:13,14
209:2
213:18
214:22
221:7
222:6
224:4
228:10
229:16
231:16
237:17

239:3
241:12,13
241:19
244:15
245:2
252:19
254:15
255:14
257:5
258:24
259:6,10
260:18
261:8
**surprised**
90:22 91:1
176:6
232:7
**surrebuttal**
42:23
54:17
225:3
227:9
**surrounding**
197:16
**Survey** 67:25
68:1 71:15
**surveys** 69:6
245:21
**Swartzberg**
127:19
**switch** 81:19
85:1
203:13
238:11
**sworn** 6:3
269:5
**system**
132:16,23
137:23
170:11
171:15
204:22
**systematic**

253:25

**T**

**T** 2:13 3:3
4:6 5:1,1
269:1,1
**table** 135:22
144:4
204:14
217:25
218:3,9
219:5
221:5
**tables** 68:17
70:23 71:4
125:9
134:5,8,13
134:23
137:7
139:10
218:6
**tabulation**
146:14
**tailored**
247:16
**take** 7:4 14:5
23:24
35:12
39:16 43:6
48:1 71:8
93:5 98:4
98:15,16,23
98:24 99:5
99:6,18
109:21
117:9
120:9
157:9
168:18
178:20
206:13
220:22
228:4

239:12
240:9,14
244:11
246:18
248:4
260:10
262:20
**taken** 1:19
5:5 12:11
26:1,12
39:8
245:19
268:21
269:4
**takes** 244:9
**talk** 21:22
23:1,21
40:11
51:25
53:16,23
58:17
60:24
69:18
80:24
84:23
100:4,17
109:22
114:14
126:17,20
128:10
134:5
145:11
164:6
173:4
196:12
206:6
210:2
211:1
216:22,23
228:24
254:15
258:24
**talked** 27:8

33:9 37:9
37:10 38:5
70:11
71:25 77:3
85:8
129:24
133:1
155:10
157:19
171:21
193:8
206:5
208:25
215:20
219:8
231:25
260:18
264:10
**talking** 18:7
39:1 54:21
54:24
76:14,16
97:15
108:19
120:18
126:9
129:2
138:2
151:13
153:9,16
180:20
196:13
230:20
237:3
244:2
**talks** 66:9
67:24
70:14
153:7
160:18
172:25
209:8
253:1

**tallied** 13:22
**target** 257:11
**targeted**
185:6
**targeting**
185:13
186:11
234:22
**targets**
227:20
228:12
**task** 46:25
58:8,19
**tasks** 46:20
48:21,25
49:4
**team** 11:1
13:1 14:15
15:4 32:1
40:9
191:18
**teams** 18:18
**technical**
223:19
**technically**
16:11
130:13,14
**tell** 7:23 8:3
8:12 45:25
76:3 78:16
96:18
125:9
131:13
184:25
215:16
218:11
242:9,12
252:21
259:21
**telling** 41:1
**tells** 81:8
138:8
**ten** 6:15

17:23
20:13,16
27:7 35:24
100:19
101:5,10,14
102:22
118:25,25
146:23
180:3,6,9
182:13
225:25
226:4
263:16
**ten-minute**
225:19
**tend** 220:8
253:9
**tens** 135:2
**term** 41:7
49:16
73:23
157:21
265:13
**terms** 49:1
59:21
60:25
143:13
144:5,25
162:8,11
168:18
182:17
205:7,8,10
240:16
**territory**
193:11
221:9
**test** 81:3
113:17
235:6
**testified**
20:14 25:2
159:3
182:12

| | | | | | |
|---|---|---|---|---|---|
| 183:23 | 78:14 | 60:19 | 218:25 | **three** 10:12 | 77:12 |
| **testify** 6:4 | 203:6 | 61:19,25 | 220:17,18 | 15:9 36:16 | 84:19 |
| 263:2 | 205:10 | 69:14 74:1 | 222:10 | 78:4 | 96:22 |
| 269:6 | **thematics** | 86:24 | 225:17 | 104:10,10 | 120:6,9,19 |
| **testifying** | 138:10 | 98:10,13 | 228:22 | 106:14,20 | 124:13 |
| 158:17 | **thereof** 5:16 | 99:5 | 232:10 | 116:23 | 130:25 |
| 183:20,24 | **thing** 8:25 | 105:15 | 235:5,12 | 117:18 | 136:21,23 |
| **testimony** | 58:11 73:7 | 108:11 | 238:14 | 129:16 | 166:3 |
| 12:11 | 110:10 | 113:15 | 239:11 | 131:23 | 174:1 |
| 20:18 | 160:10 | 114:2 | 244:13 | 132:8 | 180:1 |
| 21:10,24 | 178:17 | 119:18 | 247:4 | 144:22 | 188:10 |
| 22:2 26:5 | 180:20 | 120:2,8,11 | 248:19 | 151:6 | 193:15 |
| 31:22 51:2 | 193:24 | 120:14 | 254:15 | 152:20,21 | 205:1 |
| 89:5 | 216:19 | 121:6 | 256:3 | 158:23 | 215:16 |
| 134:11 | 219:11 | 123:24 | 259:8 | 199:19 | 225:14,19 |
| 162:1 | **things** 12:20 | 125:22 | 261:22 | 227:24 | 247:3 |
| 180:21 | 24:1 40:11 | 128:4 | 263:15 | 238:23 | 250:15 |
| 191:1 | 41:1 47:22 | 129:11 | 264:12,17 | 248:1,14,17 | 260:15 |
| 197:13 | 52:2 72:24 | 132:11 | 264:19 | 248:18 | 267:3,10 |
| 218:22 | 81:21 82:5 | 134:1 | 265:20 | **threshold** | **times** 6:12 |
| 263:9,11 | 138:1 | 137:14,25 | 267:1 | 121:16 | 10:11,23 |
| 267:10 | 141:1 | 147:2 | **thinking** | **throw** 19:19 | 15:7 16:16 |
| 268:4,6 | 143:21 | 150:24 | 15:16 98:5 | **tie** 191:6 | 20:13,13 |
| 269:4,6 | 171:12 | 154:25 | 208:4 | **tiebreaker** | 45:18 |
| **tests** 103:10 | 213:3 | 157:23 | **third** 3:3 | 192:6 | 49:13 |
| 105:23,24 | 225:10 | 158:19,22 | 35:22 | 193:1 | 112:21 |
| **text** 92:20 | 256:3 | 158:24 | 125:1 | 199:12,17 | 132:25 |
| **texts** 93:13 | 260:9 | 161:19 | 152:4 | **tiebreakers** | 144:20 |
| **Thank** 6:8 | 265:24 | 171:7 | **thought** | 199:18 | 162:21 |
| 101:13 | **think** 9:5 | 172:14 | 104:25 | **ties** 159:23 | 164:2,20 |
| 180:12,25 | 13:15 | 174:21 | 137:15 | 160:4 | 166:21 |
| 245:12 | 16:13 21:1 | 175:2,3,10 | 157:2 | **TIGER** 70:4 | 167:22 |
| 263:23 | 21:21 | 175:13,16 | 159:16 | **time** 1:21 | 182:25 |
| **thanked** 34:3 | 25:23 | 179:25 | 171:21 | 5:15 6:10 | 187:22 |
| 34:7 | 28:12,25 | 187:22 | 187:5 | 8:3 12:7,8 | 232:22 |
| **Thanks** | 29:9 35:15 | 190:5 | 190:4 | 13:18,20,24 | 248:1 |
| 37:24 | 37:9 38:18 | 194:17 | **thoughts** | 14:2,20 | **tiny** 16:19 |
| 58:18 | 38:20 | 195:5,8 | 183:10 | 16:3,12 | 106:2,5 |
| 81:25 | 41:23 47:3 | 199:1 | **thousands** | 18:15 20:8 | 121:11 |
| 226:9 | 47:25 | 203:19 | 27:17,24 | 28:24 34:2 | 123:14,14 |
| 228:23 | 53:12 54:4 | 205:22 | 135:2,3 | 34:14 | 252:7 |
| 267:3 | 54:16 | 211:22,23 | 187:22,24 | 38:15 39:9 | **title** 152:5 |
| **thematic** | 58:17 | 212:25 | 235:2 | 47:5,25 | 228:3,5,8 |

228:15
**titled** 65:1
  66:3 124:6
  124:9
**titles** 11:18
**today** 6:9 7:2
  9:8 13:3
  23:3 38:10
  77:3
  117:11
  249:9
  265:8
  267:4
**today's** 6:19
  10:5 12:17
**told** 20:12
  30:5,7
  44:10
  118:25
  133:6,23
  151:16
  157:4
  182:12
  217:14
**tolerance**
  253:25
**tons** 249:17
**tool** 78:4
**tools** 64:2,9
  123:15
**top** 13:18
  17:21
  43:14
  45:25
  50:12 51:5
  74:16
  90:21
  95:21
  108:9
  109:12
  116:14
  117:14
  119:2

125:12
126:25
164:13
183:14,18
184:11
221:4
222:14
232:21,23
**topic** 166:2
  228:16
**topics** 238:11
**total** 10:13
  13:15
  16:16
  62:12
  80:13
  90:18,20
  101:10
  130:8
  203:8
  218:9
  254:25
**totally** 244:3
  252:23
**totals** 67:13
  218:7
**touch** 10:21
**town** 143:15
**track** 216:23
**tracked**
  50:14
**tracking**
  166:17,22
  167:18
**tracks** 221:1
**tract** 146:2,6
  146:10,15
  146:21
**tracts** 146:25
**traditional**
  28:11
  51:23 52:2
  52:5 60:3

79:22
82:19
83:17 84:2
89:12,15
113:19
114:5
187:12
188:17
**training**
  182:7
**transcribed**
  6:21 269:7
**transcript**
  269:8,9,10
  268:5
**travel** 12:19
**treat** 58:5
  113:12
  168:25
  245:22
**treated** 57:19
  57:23 58:1
**treating**
  157:10
**trend** 211:23
**trends**
  266:12,14
**trial** 20:14
**tried** 74:6
  176:20
**trigger** 22:22
**trouble**
  158:10
  202:15,23
**true** 70:17
  86:3 88:15
  123:8
  145:16
  153:21
  166:13
  195:8
  205:2

218:13,15
223:5
257:21
268:7
269:8
**truthfully**
  9:7
**try** 7:23
  15:15
  28:13,21
  139:15
  192:9
  230:9
  231:17
  235:12
  238:12
  252:8
  259:1,15,21
**trying** 17:12
  31:2 32:22
  86:24
  103:10
  104:7
  107:1
  137:11
  143:15
  159:16
  169:4
  171:7,11
  177:1,2,4,8
  178:5
  189:5
  195:3
  196:11
  201:8
  204:20
  207:20,25
  228:23
  229:20
  259:4
  263:3
**turn** 45:20
  78:5 79:3

202:25
227:1
264:24
**turned** 63:16
  132:21
  215:19
  239:24
**turning**
  205:8
**turns** 150:2
**twelve** 17:14
  17:15,18
**twenty-one**
  55:9
**twice** 28:6
  148:4
  149:8
  150:1
  163:25
**two** 10:12,15
  21:9 25:9
  29:14,15
  49:4 50:25
  52:13
  63:24 77:9
  78:19
  88:15 91:4
  91:8,14
  94:17
  97:21
  101:15
  103:9
  104:18
  105:8
  118:7,17,21
  123:13,22
  124:17
  125:4,9
  128:7
  138:1
  151:6,18
  152:3,8
  154:1,3

159:17
163:6
167:25
168:18
169:2,14,24
170:12,22
171:10,13
171:13,19
171:20
172:11
177:6,10
178:7,19
182:20
187:10
188:2
192:7,17,19
199:21
213:3
228:9
229:14,19
229:20
230:19
240:8
244:3,23
248:1
256:3
**two-district**
  153:20
**type** 182:25
  261:10
**types** 52:8
  139:9
**typical** 115:2
**typically**
  7:16 28:6
  75:2
  157:23,24
  158:7
**typo** 111:13

----

**U**

**U** 5:1
**U.S** 68:2 70:4

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

133:18
uh-huh
  38:23
  108:4
ultimately
  31:8
unable 73:17
unaccepta...
  187:12
unchanged
  94:22
  118:10,13
unclear
  253:18
underesti...
  251:25
underesti...
  250:22
underesti...
  254:2
underlying
  26:3 68:19
  186:8
  236:16
undermine
  147:21,22
  148:23,24
  166:24
undermined
  149:5
underrepr...
  148:13
  149:13,16
  259:5
understand
  7:21 9:6
  19:25 45:6
  67:23 92:2
  103:10
  104:7
  105:15
  121:3
  122:19

137:17
143:23
168:3
209:2
222:22
223:22
245:15
265:18
understan...
  30:11
  34:12
  48:14 66:7
  73:15
  88:25
  90:24
  92:11,18
  101:11
  103:20
  104:8
  110:24
  142:12,19
  147:25
  149:16,19
  149:21,23
  150:25
  263:5
  264:24
  269:9
understood
  111:25
  139:18
undertake
  46:20
undertaking
  46:25
unfamiliar
  232:19
unification
  178:18
unify 199:19
  199:21
unincorpo...
  155:22

UNION 2:2
unit 204:3,6
  204:24
  249:10
unite 24:10
UNITED 1:1
units 62:14
universal
  178:9
  196:20
universally
  122:16
  197:6
unpersuasi...
  24:23
unreliable
  185:13
unrepresе...
  259:23
unspecific
  139:14
unusual
  33:22
up-to-date
  144:10
update
  223:16
updates 73:4
uploaded
  217:16
upwards
  75:17
  249:14
use 19:4 20:6
  20:9 60:21
  64:5,9 73:2
  73:22 74:9
  100:19
  141:6
  156:22
  179:3
  185:4
  188:8

192:4
193:16
196:19
197:17
211:20
212:19
215:23
218:2,8
239:12,14
240:3,6
249:5,7,24
250:14
255:9
258:6,11
264:11
265:13
useful 78:12
  130:20
  131:5,7
usefulness
  130:24
uses 179:11
  233:3
  257:10
usual 222:13
usually 16:24
  112:22
  168:18
  259:18

―――――――
        V
―――――――
vague 13:10
  29:9 32:15
  50:17,22
  69:8 82:23
  84:8,11
  113:7
  189:18
  194:13
  195:11
  205:16
  217:9
  221:17

231:10
235:21
236:8
238:2
value 122:14
  122:17
VAP 71:15
  72:3
  232:16
  233:9,11,12
  233:14,14
  233:19
  257:10,22
variables
  135:3
variation
  256:12
varies 40:25
  146:22
  190:1
  258:16
various 10:6
  19:8 20:25
  68:18
  81:14
  92:12 96:9
  138:12
  140:9
  141:1
  204:17
vary 206:12
veer 193:10
verbal 7:3
version 29:3
  79:5
  187:11
  238:18
  244:20
versions 70:4
versus 1:11
  16:9 22:13
  23:10
  25:13,13

37:20 57:2
121:13
152:10
158:18
183:20,22
184:1,9
194:22
203:14
205:8
Videoconfe...
  1:20
view 27:2
  77:22
  131:11
  172:25
  190:20
  203:17
  204:9
  205:9
  213:3
viewed 46:23
viewing
  76:16
views 248:18
violating
  171:1
virtual 9:11
virtually
  28:22
visibly
  200:24
visited 160:7
voter 71:12
  71:18
voters 1:6
  33:19 35:1
  36:1,9,17
  148:10,12
  150:17
  253:9
  254:6
  257:12
  259:7,10,14

SOUTHERN COURT REPORTERS, INC.
(504)488-1112

| | | | | | |
|---|---|---|---|---|---|
| **voting** 27:22 | 59:3 66:6 | 43:24 | 138:19 | **we're** 6:7 8:3 | 139:23 |
| 32:8 33:4 | 72:19 73:2 | 45:15 | 139:14,21 | 9:2,14 18:6 | 158:23 |
| 35:9 37:22 | 75:25 76:6 | 47:11 | 140:5 | 21:21 | 171:9 |
| 39:21,21,23 | 76:9 84:25 | 111:24 | 143:5 | 35:20 | 262:3 |
| 62:12 | 92:2 95:9 | **warned** 34:8 | 146:20 | 37:12 | 264:4 |
| 79:25 | 98:4 100:4 | 34:15 | 149:17,22 | 41:13 | **website** |
| 81:11 | 100:17 | **Washington** | 150:22 | 47:24 | 44:11 |
| 148:5 | 104:12 | 1:5 2:4 | 161:21 | 48:22 | 62:18 |
| 150:2 | 121:3,3 | **wasn't** 18:14 | 162:10 | 54:23 | 67:21 |
| 182:4 | 126:17 | 18:18 | 170:13 | 97:15 | 71:16,24 |
| 193:5,17 | 128:10 | 51:12 60:8 | 171:7 | 112:21 | 133:19 |
| 194:4,9 | 129:21 | 69:11 | 172:4 | 120:18 | 134:10,20 |
| 203:9 | 137:4,25 | 78:17,18 | 174:2,11 | 137:4 | 134:22 |
| 254:11 | 139:17 | 112:12 | 191:17 | 151:12 | 135:2 |
| 255:4 | 143:17 | 137:9 | 194:7 | 155:2 | **weight** 24:24 |
| 257:15 | 144:7 | 146:3 | 195:5 | 184:19,20 | 193:2 |
| 262:25 | 145:10 | 189:11 | 198:21 | 195:22 | **weird** 139:14 |
| **VTD** 74:11 | 147:11 | 247:4 | 210:23 | 197:4,9,24 | **went** 15:23 |
| 75:16,19 | 151:2 | **water** 112:4 | 219:20 | 197:25 | 20:23 |
| 76:7,10 | 164:6 | 112:22 | 233:18 | 198:3,14 | 68:23 |
| 204:18 | 168:8 | 113:12,16 | 240:9 | 200:21 | 121:5 |
| **VTDs** 74:20 | 172:15 | 114:3 | 241:15 | 202:7,8,11 | 246:2 |
| 74:22 75:2 | 180:19 | 174:10 | 259:3 | 203:10 | **weren't** |
| 75:9,12,12 | 182:11 | **waterways** | 260:1 | 204:12 | 45:12 |
| 76:4,13 | 189:3 | 112:1,11,16 | **ways** 28:3 | 205:23,25 | 75:20 |
| 85:16 | 191:19 | 112:24 | 29:14,15 | 206:2 | 143:2 |
| 147:1 | 194:25 | 113:2 | 78:4 156:3 | 222:13 | **west** 176:8,9 |
| 249:18 | 206:6 | 174:7 | **we'll** 9:16 | 226:1 | **White** 253:9 |
| **vulnerability** | 209:1,24 | **way** 28:21,23 | 23:3 48:7 | 242:9 | **wide** 20:3 |
| 212:15,16 | 213:18 | 29:1,9 | 53:23 | 244:2 | **widely** 40:25 |
| 212:17 | 214:22 | 60:14,24 | 58:17 | 246:20,20 | **Wikipedia** |
| | 223:11 | 67:10 69:1 | 60:24 | 257:7 | 60:11 |
| **W** | 225:24,24 | 76:5,11,15 | 65:14 | 259:4 | **wild** 14:5 |
| **waived** 5:9 | 228:24 | 77:21,25 | 80:23 | 260:3 | **wildly** 146:22 |
| 5:11 | 238:12 | 79:13 84:1 | 81:24 | 267:1 | **William** |
| **walk** 6:18 | 257:1 | 101:25 | 84:23 | **we've** 12:16 | 64:18 65:2 |
| 48:20 66:6 | 259:6 | 103:8 | 125:22,25 | 27:1,8 37:5 | **willy** 165:18 |
| 80:7 209:2 | 260:5 | 109:24 | 180:9 | 37:9 46:14 | **window** |
| **WALSH** | 264:3,9 | 112:18 | 209:23 | 70:11 84:3 | 76:17 77:2 |
| 2:17 | 265:6 | 113:17 | 226:11 | 98:1 119:8 | 77:5,7,10 |
| **want** 18:22 | **wanted** 30:7 | 114:4 | 238:14 | 119:13 | 77:12,14,14 |
| 19:19,24 | 32:23,25 | 125:15 | 239:5 | 125:10 | 77:15,20 |
| 21:20 52:4 | 34:20 | 138:11,14 | 244:14 | 129:24 | 78:7,8 |

| | | | | | |
|---|---|---|---|---|---|
| **windows** | 189:20 | 261:6 | **works** 146:20 | 43:7 | 87:19 88:3 |
| 77:9,20 | 191:2,16 | **work** 7:19 | 180:9 | 260:13 | 88:10,23 |
| 78:2,19 | 194:15 | 13:7 15:18 | 251:17 | 261:12 | 89:1,18 |
| 79:13 | 195:13 | 16:3,20,21 | **worms** | | 90:9 97:2 |
| **wing** 73:25 | 199:5 | 16:24 17:4 | 245:16 | **X** | 109:2 |
| **withdraw** | 200:20 | 18:7,17,21 | **worse** 106:1 | **X** 4:6,6 | 251:8 |
| 7:17 | 201:17 | 19:2 20:7,9 | 106:8,13 | | **zero-person** |
| 263:13 | 205:18 | 27:2 38:13 | **worth** 233:7 | **Y** | 89:18 |
| **withstand** | 213:7 | 39:15,17 | **worthy** | **y'all** 264:23 | **zoning** |
| 24:16 | 214:8 | 40:4,7,8,12 | 157:16 | **yeah** 17:24 | 207:16 |
| **witness** 5:21 | 217:11 | 40:14 | 160:13 | 21:17 | **zoom** 1:19 |
| 13:12 | 218:23 | 41:22 | **wouldn't** | 32:17,23 | 2:1 7:10 |
| 15:18,24,25 | 220:4 | 43:11 | 28:9 51:19 | 38:20,24 | 8:7,11,14 |
| 16:4 18:2,3 | 221:19 | 44:15 46:3 | 91:1 | 47:21 | 8:16 12:19 |
| 18:12,16,19 | 223:4 | 46:19 | 117:19 | 53:12 54:8 | 111:7 |
| 21:15 25:3 | 227:15 | 48:23 59:7 | 156:8 | 61:18 74:7 | 240:8,13 |
| 28:17 29:8 | 231:12 | 61:2 66:15 | 200:1 | 83:25 87:3 | 252:9 |
| 29:19 | 235:23 | 66:20 | 265:19 | 99:5 | **zoom-in** |
| 30:24 31:5 | 236:10 | 73:14 76:7 | **wrapping** | 106:23 | 248:16,17 |
| 32:16 44:4 | 238:3 | 103:11 | 225:17 | 119:2 | **zoomed** 95:7 |
| 44:7 50:19 | 243:12 | 137:8 | **write** 52:10 | 120:21 | |
| 50:23 | 256:6 | 144:11,17 | 52:17 | 123:10 | **0** |
| 63:11 | **WITNESS'** | 144:18 | **writes** 24:21 | 160:11 | **0.01** 105:25 |
| 69:10 75:6 | 268:1 | 158:15 | 145:13 | 170:5 | 106:1 |
| 76:23 | **witnesses** | 166:3 | **writing** 13:6 | 197:4 | 109:9 |
| 82:25 | 18:7 | 168:12 | 43:20 | 199:16 | 117:19 |
| 84:10 89:6 | **wondering** | 196:14,18 | **written** 10:7 | 210:25,25 | 118:2 |
| 98:8,21 | 18:12 | 207:20 | 24:4 41:25 | 213:8 | 129:15 |
| 103:2 | **word** 23:24 | 238:14 | 61:6 | 219:2 | **005** 123:14 |
| 104:1 | 35:12 | **worked** 15:3 | 115:19 | 231:13 | **01** 102:3,18 |
| 113:9,22 | 36:24 | 16:13,17 | 122:7 | 232:3,6 | 103:22 |
| 114:8 | 153:13 | 17:9,19 | 183:10 | 256:12 | 105:20 |
| 120:15 | 212:24 | 19:9 40:5 | **wrong** 21:18 | **year** 14:22 | 109:2 |
| 121:21 | 246:18 | 44:21 73:9 | 26:4 29:3 | 79:8,9 | 116:22 |
| 148:17 | 262:20 | 260:15 | 147:12 | 153:23 | 117:2,13,21 |
| 150:20 | **word-for-...** | **working** | 153:22 | **years** 79:12 | 121:9,10 |
| 161:7,15 | 261:6 | 13:16 | 174:22 | 143:22 | 122:20 |
| 163:9 | **wording** | 77:12,13 | 178:12 | 144:19 | 123:2,6,9 |
| 165:5,16 | 33:21 | 142:15,24 | 180:23 | 246:2 | 123:11,13 |
| 170:4 | **words** 36:19 | 145:8 | 181:3 | | 127:3 |
| 172:8 | 87:11 | 163:5 | 197:21 | **Z** | 128:8,16 |
| 179:20 | 137:5 | 219:10 | 228:20 | **zero** 86:4,10 | 129:8 |
| 188:22 | 255:21 | 247:3 | **wrote** 26:16 | 86:15,20 | **02** 128:2,20 |

**03** 123:1
127:11
**04** 127:19
**05** 122:22
127:21,22

——————
**1**
**1** 4:8 9:21
37:8,19
121:6
188:15
189:1
**1.96** 127:6
**1.99** 127:9
**1:50** 120:19
120:24
**10** 4:12 22:25
87:16 94:4
251:12
256:11
**10,000**
253:23
**10:12** 1:20
**101** 211:8
**109** 239:16
239:20
**11** 4:13
125:22
151:12
152:2
155:5
223:14
**11:02** 48:9
**11:07** 48:8,9
**112** 23:20
**12** 4:13 91:19
92:9
125:25
**12.2** 253:4,8
253:23
**12:13** 100:1
**12:18** 99:25
**12:21** 100:1

**12:50** 120:24
**1230** 2:8
**126** 4:13,13
4:14,14
**127** 2:13
**13** 4:14 126:4
**13-16** 35:25
**14** 4:14 97:5
126:8
159:7
252:14,25
**1400** 2:22
**1434** 269:12
**15** 4:15 54:20
54:24 55:8
119:25
120:2
158:24
**15-digit**
78:11
**1520** 6:1
**159** 4:15
**15th** 2:4
**16** 4:15
100:18
102:17
108:20
114:13,18
178:22
184:15
233:12
**17** 4:16
102:17
108:20
114:14,18
248:19
**18** 4:16
100:23
102:8,12
103:19
107:2
108:20
114:23

248:19
252:6
**184** 4:15
**1885** 3:3
**19** 4:17 107:5
107:16
108:3,19
109:5
114:23
131:22
145:13
210:5
248:20
**1990** 66:11
66:25 70:5
142:17
151:17,24
152:10,13
152:16
153:8
154:18,23
**1991** 147:14
150:13,15

——————
**2**
**2** 4:8 35:21
35:25
37:21 38:3
46:13,16
48:22
58:10 65:8
69:20
95:11,14,20
96:8,20
182:19
194:9
195:7,20
202:15,23
206:1,2
255:17,21
256:2,8,12
259:13
**2,464** 85:10

85:22
**2.17** 127:15
**2.22** 127:16
**20** 4:17 31:20
109:22
110:8
116:16
119:25
120:3
248:21
**2000** 2:14
70:5 85:19
147:10,14
147:20
148:6,9
149:7
150:12
151:8,16,19
151:24
152:5,25
153:8,10,14
153:15,17
153:23
154:7,11,12
154:16,20
154:21,23
**20005** 2:4
**2001** 15:19
15:22,22
79:9 148:9
148:13,24
149:5,10
150:7
152:11,14
153:1,3,17
154:15,22
**2002** 15:23
**2010** 70:5
221:2
240:22
253:3
255:10
**2015-2019**

67:25
70:22
**2016-2020**
71:14
**2017-2020**
72:2
**2017-2021**
68:1
**2019** 67:24
70:21
**202)457-08...**
2:5
**2020** 66:11
66:22
67:17,21
70:4 71:13
147:11,20
149:7
255:11
**2021** 15:1
39:4,5,6
71:11
264:7
**2021-2022**
38:25
40:18
**2022** 14:21
15:1 39:7
49:6 55:10
55:12,16
56:9,16,21
63:3 80:4
80:10,19
81:12 85:3
85:11
91:22 94:7
94:22 95:1
95:15
100:8
102:4
104:14,23
105:20
106:17

109:25
110:3,9,19
110:21,25
111:3,8,22
114:16,20
114:24
115:17
118:6
119:9
125:25
126:6,25
127:6,15
128:1,8,12
128:21
130:1
132:1
147:14,21
148:6,22
151:8
154:8,11
181:16
221:8
223:17
224:10
226:23
227:2
262:5
**2022-2023**
108:22
**2023** 1:19 6:8
11:21
49:10 55:6
55:10,11,16
56:9,16,22
58:24 63:4
65:5 80:4
80:11,19
81:12 85:3
85:11
94:22 95:3
95:15
100:6
102:4

104:14,23
106:16
108:2,7,11
110:9
114:16,21
114:25
115:16
116:20
118:5
119:10
124:10
126:3,7,25
127:9,16
128:2,8,13
128:21
130:1,12
131:25
181:16
232:12,15
233:8
262:4
268:21
269:16
**21** 4:18 40:17
54:21,24
74:15 85:4
115:20
116:17
118:3
129:2,5
**215** 38:24
**216)861-70...**
2:15
**22** 91:22
127:24
132:14,15
223:17
241:25
**225** 2:19
40:20 41:3
41:11
**225)975-24...**
3:4

**23** 105:20
244:6,23
245:4,7
248:17
**23-25** 35:25
**23.75** 94:13
**24** 127:23
**248** 4:16,16
4:17,17
**249** 23:21
24:5
**25** 39:12
237:12
266:2
**250** 24:13
**252** 4:18
**26** 145:14
152:16
153:12
154:12
**268** 269:6
**27** 1:19 35:25
79:17
145:20
147:11,18
153:4,12,20
154:2
234:9
268:21
**270** 24:20
**27603** 2:23
**27th** 6:8
**28** 65:5
**29** 36:1 151:2
153:20
154:3

_____

**3**

**3** 4:9 37:23
42:7 56:14
110:19
111:25
**3:09** 180:14

**3:19** 180:10
**3:21** 180:14
**3:22-cv-00...**
1:10
**30** 120:11
224:8
261:21
262:2
**30(b)6** 21:15
**301** 2:22
**306(b)** 21:1
**32** 128:20
157:12
**34** 128:20
**346-1461**
2:19
**35** 227:22
**35,000** 97:21
**35,276** 97:8
**36** 103:21
104:15
230:2
**37** 172:15,17
**37:2554**
269:5
**38** 4:8,9,9
**39** 173:16
**3rd** 269:16

_____

**4**

**4** 4:9 38:5
39:20
42:22 77:6
116:10,19
129:5,14
159:2
193:4,7,13
195:8
**4.6** 90:23
**4:18** 226:13
**4:28** 226:11
226:13
**4:46** 239:9

**4:50** 239:6,9
**400** 2:9
**404)572-20...**
2:10
**42** 4:10
**43** 4:10
**44114** 2:14
**45** 258:10
259:25

_____

**5**

**5** 4:10 33:4
39:2 40:16
42:19
46:14
48:22
63:17 85:2
95:11
128:25
131:21
147:13
155:2
193:7,13,17
194:4
195:9
209:4
245:4,6
246:20
253:24
**5:24** 263:24
**5:30** 263:24
**5:35** 267:10
**50** 75:17
188:3
201:4
206:4
216:21
233:20,22
234:4,6,7
234:17,20
234:21,22
237:5,7
247:19

249:14
251:4,8,10
254:5
256:13
257:10,13
**50.1** 216:1
**50.2** 216:2
**50.20** 93:20
**50.3** 216:2
**51** 136:10,14
136:19
**53** 233:10,14
238:8
257:21
258:3,6
259:25
**55** 238:9
**58** 151:4,14

_____

**6**

**6** 4:4,10 43:3
134:4
145:12
249:1
**600,000**
164:15,18
**61** 211:7
**62** 240:11
248:16
**628** 2:18
**63** 211:7
**64** 4:11
**647** 24:21
**648** 26:15
**65** 4:11 211:8
241:1,7,24
**66** 4:12
**67** 211:8
**68** 181:15,23
211:8
241:2,8,24
**69** 79:21
92:15 93:3

93:17
209:8
211:8
215:6

_____

**7**

**7** 4:11 64:20
71:10
79:16 92:5
135:11
174:6
176:23
223:13
226:18
239:21
**70** 128:14
188:3
209:15
212:5,7,25
215:4
**70804** 3:4
**70821** 2:18
**71** 128:12
210:2
**72** 210:3
215:11
**73** 220:24
**74** 184:21
**75** 211:1
237:10
266:1
**76** 211:1
**78** 228:3
**79** 229:1
243:18
244:1

_____

**8**

**8** 4:11 64:2
65:15 94:2
145:12
224:4,8
226:19

229:25
261:25
262:2
**80** 122:3
228:3
232:13
**83** 233:2
**83,000** 97:21
**83,489** 90:12
91:7
**84** 246:21,23
**84099** 269:20
**85** 257:8
**86,000** 97:20
**89** 258:11

_____
**9**
**9** 4:8,12 66:1
92:6 134:3
**9,625** 131:9
**9,625.98**
130:3
**9,672** 131:9
**9,672.35**
130:2
**90** 122:5
**90s** 145:8
207:16
**91** 233:18
**91202** 6:3
**915** 2:4
**94** 4:12
**94-171** 62:11
66:21 67:2
70:12,15
**96** 109:23