**Page 1**

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

CIVIL ACTION NO. 3:22-cv-00178 SDD-SDJ

DR. DOROTHY NAIRNE, JARRETT LOFTON, REV. CLEE
EARNEST LOWE, DR. ALICE WASHINGTON, STEVEN
HARRIS, ALEXIS CALHOUN, BLACK VOTERS MATTER
CAPACITY BUILDING INSTITUTE, AND THE LOUISIANA
STATE CONFERENCE OF THE NAACP
                    Plaintiffs,
                       vs.
R. KYLE ARDOIN, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF STATE OF LOUISIANA

                    Defendant.

        Deposition of SEAN P. TRENDE, given
the above-entitled cause, pursuant to the
following stipulation, before Lori L. Marino,
Certified Shorthand Reporter, in and for the
State of Louisiana, via Zoom videoconference
on Tuesday, September 26, 2023, commencing at
8:05 AM.

REPORTED BY:
Lori L. Marino
Certified Court Reporter

**Page 2**

1  APPEARANCES:
2  (ALL PARTICIPANTS PRESENT VIA ZOOM
   VIDEOCONFERENCE:)
3
4  HARVARD LAW SCHOOL
   ELECTION LAW CLINIC
5  4105 WASSERSTEIN HALL (WCC)
   6 EVERETT STREET
6  CAMBRIDGE, MASSACHUSETTS  02138
   TELEPHONE:  (617)998-1582
7
   BY:  T. ALORA THOMAS-LUNDBORG, ESQ.
8  tthomaslundborg@law.harvard.edu
9  AND
10 BY:  DANIEL HESSEL, ESQ.
   dhessel@law.harvard.edu
11 REPRESENTING THE PLAINTIFF
12
13 NELSON MULLINS
   301 HILLSBOROUGH STREET, SUITE 1400
14 RALEIGH, NORTH CAROLINA  27602
   TELEPHONE:  (919) 329-3800
15
   BY:  PHILLIP J. STRACH, ESQ.
16 phil.strach@nelsonmullins.com
   REPRESENTING THE DEFENDANTS
17
18 ELIAS LAW GROUP, LLP
   250 MASSACHUSETTS AVENUE, NW SUITE 400
19 WASHINGTON, D.C.  20001
   TELEPHONE:  (202) 968-4490
20
   BY:  DANIEL COHEN, ESQ.
21 dcohen@elias.law
   REPRESENTING THE GALMON PLAINTIFFS
22
23
24
25

**Page 3**

1  APPEARANCES (CONTINUED):
2  AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   915 15TH STREET LAKESHORE DRIVE
3  WASHINGTON, DC  20005
   TELEPHONE:  (202) 457-0800
4
   BY:  DAKOTA KNEHANS, ESQ.
5  dknehans@aclu.com
   REPRESENTING THE PLAINTIFF
6
7  LOUISIANA DEPARTMENT OF JUSTICE
   1885 3RD STREET
8  BATON ROUGE, LOUISIANA  70802
   TELEPHONE:  (225) 326-6005
9
   BY:  AMANDA M. LAGROUE, ESQ.
10 lagrouea@ag.louisiana.gov
   REPRESENTING ATTORNEY GENERAL
11
12 SHOWS, CALI & WALSH, LLP
   628 ST. LOUIS STREET
13 BATON ROUGE, LOUISIANA  70802
   TELEPHONE:  (225) 346-1461
14
   BY:  JOHN C. WALSH, ESQ.
15 john@scwllp.com
   REPRESENTING:  SECRETARY OF STATE
16
17 ALSO PRESENT:
18 CHRISTINA WILLIAMS
   MARISA WRIGHT
19 NITHIN VENKATRAMAN
   ELIZA ESTRELLA
20 JASON KURTYKA
21
22
23
24
25

**Page 4**

1            I N D E X
2
   SEAN P. TRENDE
3  1146 ELDERBERRY LOOP
   DELAWARE, OHIO  43015
4
5
6  TITLE                              1
7  APPEARANCES                     2-3
8  WITNESS INDEX                     4
9  EXHIBIT INDEX                     5
10 AGREEMENT OF COUNSEL                6
11 EXAMINATION BY MS. THOMAS-LUNDBORG   7
12 WITNESS'S CERTIFICATE           133
13 REPORTER'S CERTIFICATE          134
14
15
16
17
18
19
20
21
22
23
24
25

5

1       E X H I B I T    I N D E X
2    EXHIBIT 1 -           13
3    EXHIBIT 2 -           13
4    EXHIBIT 3 -           14
5    EXHIBIT 4 -           16
6    EXHIBIT 5 -           17
7    EXHIBIT 6 -           18
8    EXHIBIT 7 -           18
9    EXHIBIT 8 -           18
10   EXHIBIT 9 -           19
11   EXHIBIT 10 -          20
12   EXHIBIT 11 -          20
13   EXHIBIT 12 -          20
14   EXHIBIT 13 -          20
15   EXHIBIT 14 -          36
16   EXHIBIT 15 -          59
17   EXHIBIT 16 -          90
18   EXHIBIT 17 -          97
19   EXHIBIT 18 -          106
20
21
22
23
24
25

6

1        S T I P U L A T I O N
2        It is stipulated and agreed by and
3    between Counsel for the parties hereto that
4    the deposition of SEAN P. TRENDE, is hereby
5    being taken pursuant to the Federal Rules of
6    Civil Procedure for all purposes in accordance
7    with law;
8        That the formalities of
9    certification and filing are specifically
10   waived;
11       That the formalities of reading and
12   signing are specifically not waived.
13       That all objections, save those as
14   to the form of the question and/or
15   responsiveness of the answer, are hereby
16   reserved until such time as this deposition or
17   any part thereof is used or sought to be used
18   in evidence.
19          * * * * * * * *
20       LORI L. MARINO, Certified Court
21   Reporter, in and for the State of Louisiana,
22   officiated in administering the oath to the
23   witness.
24
25

7

1            SEAN P. TRENDE, having been
2        first duly sworn was examined and
3        testified on his oath as follows:
4                EXAMINATION
5    BY MS. THOMAS-LUNDBORG:
6        Q    Good morning, Mr. Trende.  If you
7    could, please, state your full name and
8    address for the record.
9        A    Sean, S-E-A-N, Patrick Trende
10   T-R-E-N-D-E.  It's 1146 Elderberry Loop,
11   Delaware, Ohio  43015.
12       Q    And you understand that you're under
13   oath today, correct?
14       A    Yes.
15       Q    You understand that it's the same
16   oath that you would take in a court of law?
17       A    Yes.
18       Q    Is there anything that would prevent
19   you from answering my questions truthfully
20   today?
21       A    No.
22       Q    You're not taking any medications or
23   other substances that might impede your
24   ability to answer truthfully?
25       A    No.

8

1        Q    Nice to meet you again.  We met once
2    five years ago now, but my name is Alora
3    Thomas-Lundborg.  I am an attorney for the
4    plaintiffs currently at Harvard Law Election
5    Clinic.
6        A    Nice to meet you again, as well.
7        Q    I know others have put their
8    representations in the chat.  So I will not go
9    through those right now on the record.  I've
10   deposed you before.  So I know you've been
11   deposed before.  Have you done a Zoom
12   deposition before?
13       A    Yes.
14       Q    So I'm just going to remind you of
15   some very quick ground rules that I'm sure you
16   know very well.  The first is to have verbal
17   responses to all of my questions.  Do you
18   understand that?
19       A    Yes.
20       Q    And so that the record is clear, it's
21   important that we do not talk over one
22   another.  You understand that?
23       A    Yes.
24       Q    If you don't understand a question of
25   mine, please, ask me to repeat it or to

9

1  rephrase.
2      A   Yes.
3      Q   If you want to take a break, that's
4  fine.  I will be taking periodic breaks.  If
5  in a time crunch, I think we're going to try
6  to power through as much as possible and take
7  shorter breaks, but if you need to take a
8  break for some reason, just let me know, and
9  the only thing I ask is not to take a break
10  while a question is pending.  Do you
11  understand that?
12      A   Yes.
13      Q   So counsel may object to certain
14  questions I ask today.  Unless you're
15  instructed not to answer, you shall answer all
16  the questions whether or not they're objected
17  to.  Do you understand that?
18      A   Yes.
19      Q   Where are you located today?  Since
20  this is Zoom deposition, we're all in
21  different locations.
22      A   I'm located at the law office of
23  BakerHostetler here in Columbus, Ohio.
24      Q   And who else is present in the room
25  with you?

10

1      A   Phil Strach.
2      Q   Do you have any documents in front of
3  you?
4      A   I do not.
5      Q   Okay.  Were you able to download the
6  exhibits to see today?
7      A   I did look at them, yes.  I'm sorry.
8  Do you want me to open them on my laptop or
9  something to that effect?
10      Q   I think when I will be putting
11  documents on the screen, I find that it's
12  helpful if you have your own version as I'm
13  putting on Zoom a version of the document in
14  case you want to look at sections that I will
15  not be pointing you to when I'm sharing my
16  screen.
17      A   I may do that at the break then.  I'm
18  assuming -- well, we'll see how it goes.  I
19  might ask to take a quick break to do that
20  depending which documents you're pulling up.
21      Q   So we're going to use some terms of
22  art today, and I'd like to go over those just
23  briefly.  The first term of art that I'll be
24  using is the "enacted map," and when I say
25  enacted map, I may be referring to the

11

1  Louisiana House or the Louisiana Senate map
2  that was passed by the Louisiana Legislature
3  in 2021.  Do you understand that?
4      A   Yes.
5      Q   And then, I will also be using the
6  term "illustrative map."  When I say
7  illustrative map, I'll be referring to the
8  maps drawn as a part of the Gingles 1 inquiry
9  by Mr. Bill Cooper.  Do you understand that?
10      A   Yes.
11      Q   Did you do anything to prepare for
12  today's deposition?
13      A   Yes.
14      Q   What did you do?
15      A   I spoke briefly with counsel and
16  spent some time looking over my report and
17  reply.
18      Q   You said you met with counsel.  How
19  many meetings did you have with counsel?
20      A   In preparation for this deposition,
21  one.
22      Q   How long was that meeting?
23      A   Maybe a half hour.
24      Q   And by counsel, do you mean
25  Mr. Strach, or do you mean someone else?

12

1      A   I think Mr. Strach was present.
2  Yeah, I was with Mr. Strach actually.  Yeah.
3      Q   Was anyone else present?
4      A   I believe Mr. Farr was on the call,
5  as well, and Ms. Riggins, R-I-G-G-I-N-S,
6  joined intermittently.
7      MS. THOMAS-LUNDBORG:
8          So, I'm going to enter the first
9      exhibit, just give me one second.
10      One thing about Zoom depositions,
11      they should be faster but they tend
12      to be much slower, I find.  So your
13      screen now should be deposition
14      notice of Sean Trende, and I will
15      scroll through.  This deposition
16      notice is dated yesterday
17      September 25, 2023.  Were you given a
18      copy of this -- actually.  Sorry
19      strike that.  I'm going to do it in
20      the reverse order.  I'm going to
21      actually show you something first,
22      another document first.
23          So now, I've put on the screen a
24      document entitled "Deposition Notice
25      of Sean P. Trende," dated

13

1    August 23, 2023.  Do you see that?
2    THE WITNESS:
3        Yes.
4    MS. THOMAS-LUNDBORG:
5        I'm going to have this document
6    marked as Exhibit 1.  This is the
7    initial notice of your deposition
8    that plaintiffs served on defense
9    counsel.
10   BY MS. THOMAS-LUNDBORG:
11   Q    Did you so see a copy of this
12   deposition notice?
13   A    Yes.
14   Q    We should be able to do the rest of
15   this fairly quickly.
16   MS. THOMAS-LUNDBORG:
17       Now, I'm going to show you what
18   I'm going to have marked as
19   Exhibit 2.  This is the deposition
20   notice of Sean P. Trende dated
21   yesterday, September 25th.  Do you
22   see that?
23   THE WITNESS:
24       Yes.
25   BY MS. THOMAS-LUNDBORG:

14

1    Q    We revised your deposition notice and
2    served it on counsel to accommodate for
3    another case beginning sometime with you
4    today.  Are you aware of that?
5    A    Yeah.  I have to testify in New
6    Mexico tomorrow morning, and so I have to fly
7    out tonight.  I don't know that they'll get
8    time for me, because I typically don't bill
9    travel, but yeah.
10   Q    Yes.  I think I'm talking about our
11   deposition, assuming there is time, there will
12   be another deposition in the Louisiana
13   Congressional case.  Are you aware of that?
14   A    Yeah, I knew that both were going to
15   be covered today.
16   Q    Okay.  So I'm going to stop sharing
17   what I'm going to have marked as Exhibit 2,
18   which is the revised deposition notice, and
19   move on.  Now, you said that you reviewed your
20   reports, correct, --
21   A    Correct.
22   Q    -- as part of your deposition prep.
23   MS. THOMAS-LUNDBORG:
24       So I am now going to share the
25       screen what I'm going to have marked

15

1    as Exhibit 3.
2    BY MS. THOMAS-LUNDBORG:
3    Q    Here you see there is a cover page
4    titled "Expert report of Sean P. Trende in the
5    Nairne, et al v. Ardion, et al" from July 28,
6    2023, and I'm going to quickly scroll through,
7    hopefully, quickly scroll through.
8    A    And I believe I'm now in receipt of
9    hard copies of the exhibits.
10   Q    Oh, great.
11   A    This is my report.
12   MR. STRACH:
13       From July 18th?
14   THE WITNESS:
15       Yeah.
16   MR. STRACH:
17       July 28th, I mean.
18   THE WITNESS:
19       Yeah.
20   BY MS. THOMAS-LUNDBORG:
21   Q    You'll see on the last page is your
22   signature.
23   A    Yes.
24   Q    And I have it pulled up on the
25   screen, and you say you have it in front of

16

1    you.  Do you recognize this as a true and
2    accurate copy of your expert report for this
3    case?
4    A    As far as I can tell, yes.
5    MS. THOMAS-LUNDBORG:
6        I find it helpful if you just
7        mark a bunch of exhibits at the
8        start.  So we're going to do a few
9        more.  I have now put on the screen
10       what I will have marked as Exhibit 4,
11       and if you look at the cover page, it
12       is the rebuttal report of Sean P.
13       Trende in Nairne, et al v. Ardoin, et
14       al.  This one should be easier to
15       scroll all the way through.
16   BY MS. THOMAS-LUNDBORG:
17   Q    You'll see that your signature is on
18   the final page, do you see that?
19   A    Yes.
20   Q    Does this appear to be a true and
21   accurate copy of your rebuttal report in this
22   case?
23   A    Yes.
24   Q    As part of your deposition prep, did
25   you review the expert report written by Bill

17

1  Cooper in June 2023?
2      A   No.
3      Q   Did you review the expert report of
4  Bill Cooper from June 2023 in writing your
5  expert report?
6      A   Yes.
7          MS. THOMAS-LUNDBORG:
8          I am now sharing my screen, and
9      I'm going to have marked as Exhibit 5
10     the declaration of William S. Cooper.
11     We'll briefly scroll through it.  His
12     signature is on page 60, with the
13     date of June 29, 2023.
14  BY MS. THOMAS-LUNDBORG:
15     Q   Does this appear to be a copy of the
16  expert report of Bill Cooper that you reviewed
17  in writing your expert report?
18     A   Yes.
19     Q   Do you recall that Mr. Cooper's
20  expert report included exhibits to his
21  declaration?
22     A   I don't, but I believe that's right.
23         MS. THOMAS-LUNDBORG:  So I'm now
24     going to introduce two of the exhibits to
25     the June report.  I'll do them together.

18

1          We'll have marked as Exhibit 6, Bill
2      Cooper's Exhibit K-1.  As Exhibit 7, Bill
3      Cooper's exhibit to his expert report
4      K-2.
5  BY MS. THOMAS-LUNDBORG:
6      Q   Did you rereview the rebuttal report
7  of Mr. Bill Cooper?
8      A   Not for this deposition.
9      Q   Did you do review it in your work for
10  this case in writing your reply or your
11  rebuttal report?
12     A   Yes.
13         MS. THOMAS-LUNDBORG:
14         I'm going to have marked as
15     Exhibit 8. I've now put on the
16     screen what I'm going to have marked
17     as Bill Cooper's rebuttal Exhibit 8.
18     Quickly scrolling through it, you'll
19     see on page 14 was executed on
20     August 11, 2023, and it has
21     Mr. Cooper's signature.
22  BY MS. THOMAS-LUNDBORG:
23     Q   Do you see that?
24     A   I do.
25     Q   As part of Mr. Cooper's rebuttal

19

1  report, he included exhibits.  Do you recall
2  that?
3      A   No.
4      Q   So I'm going to put on the screen
5  what I will represent to you are accurate
6  copies of the exhibits attached to
7  Mr. Cooper's rebuttal report, at least a
8  selection of the exhibits, and I think once we
9  go through these, we'll have marked the first
10  set of exhibits.  We can go into some
11  substantive questions.
12     A   I don't know I kind of like this easy
13  part.
14         MS. THOMAS-LUNDBORG:
15         So I'm having marked as Exhibit
16     9 to your deposition what was Exhibit
17     A to Mr. Cooper's rebuttal report it
18     is Mr. Cooper's revised initial
19     report, and I believe he revised his
20     report after several of defense
21     experts noted that Mr. Cooper had
22     used a map that was not, in fact, the
23     enacted map in doing some of his
24     analysis.  So the revised report is
25     the same as the initial report that

20

1      we discussed earlier except it
2      updates all the tables with the
3      enacted map.  Did you understand that
4      prior to today?
5  THE WITNESS:
6      No.
7  MS. THOMAS-LUNDBORG:
8      I have -- I'm going to actually
9  go through them all together so we
10  can go through them quickly.  So I'm
11  now going to share my screen, and I'm
12  going to have marked as I just wanted
13  to make sure I have the right thing
14  on the screen.  One second.  I'm
15  going to have marked as Exhibit 10,
16  Exhibit B-1 to Bill Cooper's rebuttal
17  report.  I'm going to have marked as
18  Exhibit 11, Exhibit B-2 to
19  Mr. Cooper's rebuttal report.  I'm
20  going to have marked as Exhibit 12,
21  Exhibit C-1 to Mr. Cooper's rebuttal
22  report, and then, I'm going to have
23  marked as Exhibit 13, Exhibit C-2 to
24  Mr. Cooper's rebuttal report.  So
25  that the record is clear, we'll be

21

1    spending more time with these
2    exhibits later in the deposition, but
3    exhibits B-1, B-2, C-1 and C-2 are
4    Mr. Cooper's comparative compactness
5    measures for the illustrative map and
6    the enacted map. I'm going to stop
7    sharing.
8  BY MS. THOMAS-LUNDBORG:
9    Q   I'd like to go back -- now that we
10 have entered a bunch of exhibits that we will
11 come back to later in this deposition, I'd
12 like go back to your deposition prep. Did you
13 review the deposition transcript of Mr. Bill
14 Cooper in your prep for today?
15   A   No.
16   Q   Were you aware that he had been
17 deposed?
18   A   Yes.
19   Q   Did knowledge of his deposition play
20 any role in your prep today?
21   A   No.
22   Q   Did you review any of the other
23 expert reports in this case?
24   A   I might have early on in the case,
25 and I think I saw the report of McCartan when

22

1  it was filed, but other than that, no. I
2  don't think so.
3    Q   You said that you saw -- you may have
4  seen the report of Dr. McCartan. Do you
5  intend to render any opinions on his report?
6    A   I don't know if counsel will ask me
7  at trial, but I don't have anything prepared
8  or in my reports on him.
9    Q   Do you intend to render opinions on
10 any of the other experts in this case?
11   A   Yeah, it's the same basic answer. I
12 don't really know what I'm going to testify to
13 at trial. I'll answer the questions that I'm
14 asked, you know, that aren't objected to and
15 sustained, but to my recollection, I haven't
16 seen the reports. I would imagine the only
17 relevance of my reports to theirs would be in
18 direct.
19   Q   Did you render any opinions about
20 other experts in the two reports that you
21 submitted thus far?
22   A   I don't believe so. Without knowing
23 the substance of what their reports are about,
24 there may be things in my report that are
25 applicable to them, but I don't know.

23

1    Q   Did you review other documents in
2  preparation for your deposition?
3    A   Not to my recollection.
4    Q   I'm now going to shift gears a little
5  bit and ask you some questions about your
6  involvement in this case. When were you
7  officially retained as an expert in this case?
8    A   Gosh, I don't know. Probably before
9  the stay was put into place.
10   Q   So that would have been in 2022?
11   A   Yeah. I want to say June of 2022,
12 but I'm not entirely sure.
13   Q   And when did you begin work on this
14 case?
15   A   It would probably have been around
16 that time.
17   Q   When you joined the case, what were
18 you told the subject matter was?
19   A   I believe -- I mean, this is trying
20 to remember more than a year ago, but my
21 understanding of this case all along has been
22 that it was a Section 2 case.
23   Q   And what was your understanding of
24 what the main issues were in the case?
25   A   Well, as a Section 2 case, you know,

24

1  my understanding is always that it's going to
2  be about Gingles prongs one to three and then
3  the totality of the circumstances. I knew
4  that my involvement was going to be limited
5  probably to Gingles prong one.
6    Q   Then, you anticipated my next
7  question, which is what were you asked to do
8  when you were retained in this case?
9    A   I honestly -- I don't remember,
10 because I believe when I was retained, it was
11 in a sort of -- real professional term, a fire
12 drill trying to get ready for a hearing when
13 everything was on fast tracks back then; and
14 then, when the stay was put into place, things
15 calmed down. So I don't remember initially
16 exactly what my marching orders were.
17   Q   What were your marching orders before
18 you submitted what we have marked as Exhibit
19 3, which is your initial report in this case?
20   A   It was to examine the districts drawn
21 by Mr. Cooper to determine -- first to
22 illustrate the location of the black
23 population of voting age in the districts, and
24 second, to render an opinion as to whether
25 they were reasonably compact.

25

1   Q   Sorry.  I'm just taking some notes.
2 And we've spent some time just now referencing
3 Gingles.  Are you familiar with the Gingles
4 preconditions?
5   A   Yes.
6   Q   And what is your understanding of
7 what the Gingles preconditions are?
8   A   The first precondition, numerosity
9 and compactness.  You have a reasonably
10 compact -- well, I guess the nature of what
11 the group has to be is the prime legal issue
12 you all will be fighting over, but it's a
13 reasonably compact minority group sufficient
14 to be a majority in a reasonably configured
15 district.  The second prong is whether the
16 minority group posed as a block -- shows
17 cohesion in it's voting, and then, the third
18 prong is whether the majority votes as a block
19 sufficient such that the minority group
20 typically wouldn't be able to elect its
21 candidate of choice.
22   Q   Did you, when you were retained,
23 understand that Mr. Cooper is a Gingles 1
24 expert for the plaintiffs?
25   A   That's my understanding, yes.

26

1   Q   Was it your understanding that you
2 would be a rebuttal Gingles 1 expert for the
3 defendants or for defendant Secretary of
4 State?
5   A   Yes, that's right.
6   Q   Do you intend to render any opinions
7 on Gingles 2 and 3?
8   A   No.
9   Q   Outside of counsel, did you discuss
10 the case with anyone else?
11   A   My wife.
12   Q   Did you have any discussions with any
13 of the defense side experts in this case?
14   A   I don't think so, no.  I assume -- I
15 understand that question to ask if I have had
16 discussion with defense side experts about the
17 subject matter of this case.
18   Q   That is correct.  Not -- I'm sure
19 folks meet casually and have all kinds of
20 discussions not relevant to today.
21   A   Yes, that's right.
22   Q   So we've spent sometime talking about
23 your preparation for the deposition.  I'd like
24 to ask you about your preparation for writing
25 your expert report.  Aside from reading the

27

1 reports of Mr. Cooper, did you do any other
2 research to prepare for the expert reports
3 that you submitted in this case?
4   A   So as I was writing this report, I'd
5 also done the research for my dissertation.
6 My third paper in my dissertation deals with
7 redistricting simulations.  So I had done a
8 lot of work on different ways to execute
9 simulations, and part of that is different
10 measures of compactness; and a lot of that
11 research was directly relevant to my
12 engagement in this matter.  So it's kind of a
13 tricky question to answer, because in a sense
14 the answer is no, because most of the research
15 that I utilized here came out of work for a
16 separate project, but it's not really no,
17 because there is other research that is
18 relevant to this report.
19   Q   Okay, we will spend some time
20 discussing your dissertation a little bit
21 later, but just focusing in on the work you
22 did for this report, was there any research
23 that you did for the report that did not
24 coincide with the research that you were doing
25 for your dissertation?

28

1   A   If we -- I don't remember any.  If as
2 we go through the report, I spot things that I
3 need to update this answer, I'll do it, but I
4 don't remember any.
5   Q   Now, you said -- I believe you
6 answered yes, that you did review Mr. Cooper's
7 expert reports.  Did you receive Mr. Cooper's
8 shape files and block equivalency files for
9 his illustrative maps?
10   A   Yes.
11   Q   Did you upload these files into a GIS
12 system?
13   A   I would have read them in R.
14   Q   So did you not upload his map files
15 into a GIS system to actually see the output?
16   A   Well, you can see the output in R.
17 That's how all the maps in my report are
18 generated.
19   Q   Then, when you uploaded them into R,
20 did you use any other program to see the maps
21 or simply used your R code and had them
22 displayed through R?
23   A   My R code.  I may have put them in
24 today's redistricting, as well, but it was
25 mostly my R code, if not exclusively.

29

1    Q   Have you set up your R code to have
2 outputs of visual maps that can be looked at?
3    A   Yes.  That's how all the maps in my
4 report were generated.
5    Q   I would like to go back to the
6 sources of your report versus the sources of
7 your dissertation.  Were there any sources
8 that you have used in your dissertation that
9 you did not cite in your expert report or your
10 expert reports for this case?  So I'm now
11 referencing Exhibit 3 and 4.
12    A   The bibliography to my dissertation
13 is something like 10 pages long.  So yeah,
14 there are a lot of things that I cite to in my
15 dissertation that I don't cite to here.
16    Q   How did you decide which literature
17 review to cite in your expert report and which
18 to leave out?
19    A   Well, so the first dissertation paper
20 is about the Supreme Court.  So all those
21 cites are irrelevant and the second
22 dissertation is about paper was about
23 integrated nested Laplace approximations --
24 the second paper is about integrated nested
25 Laplace approximations in spatial modeling of

30

1 elections data.  So that stuff wasn't
2 relevant.  And then, the third paper, which is
3 the one on redistricting, has some things,
4 such as different redistricting, simulations
5 that have been proposed over the years that
6 just weren't relevant.  So I tried to pull out
7 the relevant pieces of information or
8 citations.
9    Q   Then, how did you determine whether
10 the literature from this third simulations
11 chapter was relevant for not relevant.
12    A   Well, if related to population
13 compactness, which is what my report is about,
14 that's the first cut on what's relevant.  I am
15 not aware of any, as you might call it,
16 negative authority on the citations that I've
17 put in.  So to the extent I didn't include
18 citations, it was just because I figured I had
19 proved the point sufficiently and didn't need
20 to list every single possible citation the way
21 you might in a dissertation.  Just like in
22 writing a legal brief, you might not cite
23 every single piece of authority for a
24 proposition.
25    Q   In addition to the work that

31

1 coincided with your expert report -- with your
2 dissertation, did you write any new code for
3 the expert report in this case?
4    A   Yes.
5    Q   Can you explain that process to us?
6    A   Well, you open up the R programming
7 environment in a program called RStudio, and
8 you begin -- you think about what it is that
9 you need your code to do, what it is you're
10 trying to accomplish, and you write a series
11 of commands that R will execute to carry out
12 those tasks.
13    Q   And this process was separate from
14 the process that you used in your
15 dissertation; meaning, you went into RStudio
16 and wrote brand new code for your report work
17 in this case?
18    A   I mean, you never write brand new
19 code.  I shouldn't say never.  You rarely
20 write brand new code, because there might be
21 snippets you've used before rather that
22 reinvent the wheel you can use.  So the
23 template for drawing these maps, I've used
24 probably for about a year now.  So I'm sure
25 that language is reused, but in terms of, you

32

1 know, making sure that everything does what it
2 needed to do here, it was all examined and
3 executed on my computer.
4    Q   You said that you may have used
5 snippets in your code that you've used before,
6 and one example you gave is the template for
7 actually drawing the maps.  Are there other
8 examples of snippets of the codes that you
9 used in this case that you have used
10 previously?
11    A   I'm sure there are.  I just -- I'd
12 have to think.  I'm kind of trying to think
13 through the code.  You know, the dot plots --
14 well, that's part of the maps.  The dot plots,
15 I've used the code before.  The call to pull
16 up the open street map background, I've used
17 before.  I think those are the main things
18 that would have been important, but gosh,
19 there's just stuff that like -- well, there's
20 a couple of -- in the R code at the very top,
21 there's called source get packages and then,
22 source -- there's another source command that
23 will pull up the census data or ways to
24 interpret the census data.  So that would have
25 been used before, and I'm sure there are other

33

1  things here and there that rather than try to
2  reinvent the wheel, you would just import the
3  code from a previous application, but those
4  are the main ones that I can recall.
5      Q   When you say you've used these
6  snippets before, is that in other expert work,
7  or is that in your other either academic work
8  or professional work?
9      A   I mean, probably both.  So now,
10  whenever I open up R, I always just execute
11  that get packages command, because it imports
12  all the packages that I typically use, because
13  it's really frustrating to write a bunch of
14  code and then execute it and have it crash,
15  because you forgot to load the geomander
16  G-E-O-M-A-N-D-E-R, package.  So there's really
17  not a clean delineation that this line of
18  questioning might suggest.
19      Q   How have you used this code -- let's
20  focus on the academic work.  How have you used
21  this code in your academic work?
22      A   Well, like I said, I tend to use the
23  get packages command just as a matter of
24  course.  To pull up the background for the
25  maps, the stuff that's borrowed from open

34

1  street maps, there's a script called gets the
2  tiles that anytime I'm making a map, I'll use
3  that script.  So yeah.
4      Q   I'm going back to your preparation
5  for your expert report.  Did you read the
6  pleadings in this case?
7      A   No.
8      Q   Did you read any of the intervention
9  papers in this case?
10      A   No.
11      Q   How many hours did you put into
12  research and writing for this case?
13      A   I don't know.
14      Q   Do you have a ballpark estimate?
15      A   No.
16      Q   Would you say it was less than 20
17  hours?
18      A   I honestly don't even have a
19  ballpark.  And I'm sorry, but this is just a
20  process that's gone on, you know, over the
21  course of a year.  So I definitely couldn't do
22  it that way.
23      Q   Have you billed any time on this case
24  yet?
25      A   Yes.

35

1      Q   Do you know how much time you've
2  billed on this case so far?
3      A   No.
4      Q   Did you send the bill to counsel?
5      A   Yes.
6      Q   Okay, and you have a record of that
7  time?
8      A   Yes.
9      Q   Do you recall when you last sent a
10  bill to counsel?
11      A   Probably August.
12      Q   Do you recall what time you included
13  in your August bill?
14      A   I think it went back to November.
15      Q   Do you recall how much time you
16  billed for in your August bill?
17      A   I want to say it was in the
18  neighborhood of 120 hours.
19      Q   All right, so we actually are going
20  to open another exhibit.  Give me one second.
21  I've seen various versions of these, but this
22  was the version that was submitted with what
23  is Exhibit 3 in this case, so with your
24  initial report, and this is your CV.  It was
25  from this summer.  So this is your CV as of

36

1  this summer that we received.  I'm just going
2  to scroll through.
3          MS. THOMAS-LUNDBORG:
4             I'm going to have this exhibit
5          marked as Exhibit 14.
6  BY MS. THOMAS-LUNDBORG:
7      Q   Do you recognize Exhibit 14 as a true
8  and accurate copy of your CV?
9      A   Yes.
10      Q   I think you said you have it in front
11  of you, but I can also scroll on the screen.
12  Are there any updates to this version of your
13  CV?
14      A   Let's see.  Yeah.  The New Mexico
15  redistricting case, I've been deposed in now
16  and will be testifying tomorrow or Thursday.
17      Q   Anything else?
18      A   I guess the report in the
19  Congressional case here.
20      Q   Is there anything else?
21      A   I don't believe so.
22      Q   Could you give me a brief overview of
23  your educational background?
24      A   Sure.  I graduated Yale University in
25  1995 with a double major in history and

37

1  political science.  In 2001, I graduated from
2  Duke Law School.  While I was at Duke, I also
3  earned my master's degree in political
4  science.  In 2016, and -- I apologize for
5  having to say it this way, but I matriculated
6  at the Ohio State University.  I earned a
7  Master's of Applied Statistics from OSU in
8  2019, and I should earn my -- have my Ph.D. in
9  December, December 17th to be exact.
10     Q    So I'd like to just ask you a couple
11  of follow-up questions.  You have a JD.  Do
12  you intend to render any legal opinions in
13  this case?
14     A    I won't be acting in any capacity as
15  a lawyer, and I'm going to try to avoid legal
16  opinions.
17     Q    Then, you mentioned your Ph.D.
18  graduation date.  Do you recall being deposed
19  in South Carolina?
20     A    Yes.
21     Q    Okay.  In April of 2022.  At that
22  time, you testified that your expected
23  graduation date for your Ph.D. program was May
24  of 2022.  Do you recall that?
25     A    Yes.

38

1     Q    What happened regarding your
2  graduation?
3     A    I wasn't able to complete the third
4  paper as quickly as I'd like, and things got
5  incredibly busy on the work front.
6     Q    I believe when you and I met back
7  in -- well, forever ago in 2018, your third
8  paper was on the efficiency gap.  When did you
9  change your third dissertation topic?
10     A    I believe I changed it after the
11  Rucho opinion came down.  It might be after
12  Gill v. Whitford, but I think it was after
13  Rucho.
14     Q    I believe you defended your
15  dissertation yesterday; is that correct?
16     A    That's correct.
17     Q    How did that go?
18     A    Great.  I passed or completed it or
19  however you want to word it.
20     Q    Congratulations.
21     A    Thank you.
22     Q    Who was on your committee?
23     A    My adviser is Greg Caldeira
24  C-A-L-D-E-I-R-A, and then, the committee is
25  Alex Acs, A-C-S, Tom Wood and Jim Gimpel,

39

1  G-I-M-P-E-L.
2     Q    When did you formally form this
3  current iteration of your committee?
4     A    Oh, gosh, the current iteration was
5  about two weeks ago.  Jim came onboard -- we
6  had -- it was Greg, Tom and Jim.  So the
7  original committee that was formed was Greg,
8  Tom and -- Skyler Cranmer agreed to only do it
9  for purposes of the prospectus; and if I'm
10  getting my timeline right, because it's been a
11  long strange trip, he was replaced by a guy
12  named Bryce Acree, A-C-R-E-E, and then, Bryce
13  committed suicide in December of 2019, and so
14  it took awhile to find someone to replace him,
15  and that's how Jim came on; and then, Alex
16  came on a few weeks ago, because it turned
17  out, you need three Ohio State faculty members
18  on your committee.  There was some confusion
19  on reading the rules on external faculty
20  members, and so he was added.  I guess it was
21  over Labor Day that he came on.  So yeah, that
22  would be about three weeks ago.
23     Q    Sorry to hear about Professor Acree.
24     A    Thank you.
25     Q    I think we've already gone over the

40

1  chapters of your dissertation.  I believe when
2  I deposed you five years ago, your plan was to
3  publish your chapters.  Have any of those
4  chapters been published in any peer-reviewed
5  publication?
6     A    No, I haven't submitted any of them.
7     Q    Have you submitted any work for peer
8  review.
9     A    Yeah.  Two papers.
10     Q    And what's the status of those
11  papers?
12     A    One of them is on my CV -- when you
13  say papers, do you mean the papers from the
14  dissertation or just in general?
15     Q    In general.
16     A    Yeah.  So one of them is on my CV,
17  and one of them was a piece on COVID that I
18  did with a couple of public health
19  professionals that sat on a desk until someone
20  else published the same research, at which
21  point, it was pretty much moot.
22     Q    You said one of them is on your CV.
23  That is the -- on page six with James Gimbel
24  and Reeves and yourself, "Reconsidering
25  Bellwether Locations in U.S. Presidential

41

1   Elections." Is that what you're discussing?
2      A   Correct.
3      Q   On your CV, it says that it's
4   forthcoming, but it also has a 2022 date.
5   What is the status of this publication?
6      A   I'll have to check to see if that
7   should be updated. Yeah, it should have been
8   published by now.
9      Q   Are you aware of whether it's been
10  published?
11     A   No. I have to check the status of
12  it.
13     Q   What's the subject matter of this
14  publication?
15     A   Bellwether locations. Counties that
16  predict presidential elections well.
17     Q   Does this publication involve
18  compactness?
19     A   No.
20     Q   Do you have any other publications
21  currently pending publication?
22     A   No.
23     Q   Now, I believe you said that the code
24  you used is R, correct?
25     A   That's correct.

42

1      Q   Do you write code in any other
2   languages?
3      A   I've done some coding in Stata
4   S-T-A-T-A. Or Stata if you prefer. Those are
5   the main languages for coding.
6      Q   That you coded?
7      A   That I coded, yes, sorry.
8      Q   Because there's also Java,
9   C-plus-plus?
10     A   Correct. Python.
11     Q   Have you written any code as part of
12  your Ph.D. dissertation?
13     A   Yes.
14     Q   And what code is that?
15     A   That was in R.
16     Q   Was it this map code that we
17  discussed earlier, or did you write different
18  code for your Ph.D. dissertation?
19     A   Different code.
20     Q   As part of your Ph.D. dissertation,
21  did you write any algorithms that are similar
22  to the algorithms that you used in this
23  report?
24     A   Yes.
25     Q   And what was that?

43

1      A   So for the third chapter on
2   communities of interest and redistricting, I
3   wrote code for constructive Monte Carlo
4   simulations. So when you're trying to
5   generate compact districts with a constructive
6   Monte Carlo simulation, you build the
7   districts out by finding precincts that have
8   centroids that are close to the centroids of
9   the main district. So that's similar to one
10  of the approaches utilized in finding a
11  population compactness.
12     Q   But it sounds like in your
13  dissertation, you're actually running
14  simulations. Do those simulations create
15  maps?
16     A   Yes.
17     Q   Do they create maps for whole sets of
18  geography? So what I mean is if, for example,
19  your simulation would be run in this case, you
20  would have created a whole map for the
21  Louisiana Senate.
22     A   Yes. It could be used to generate
23  map -- whole maps for the Louisiana Senate.
24     Q   And the same thing for the Louisiana
25  House?

44

1      A   Correct.
2      Q   And as part of your dissertation, you
3   are, in fact, running simulations to create
4   whole maps; is that right?
5      A   Correct.
6      Q   Have you ever presented at an
7   academic conference regarding redistricting?
8      A   No.
9      Q   Have you ever presented at an
10  academic conference regarding voting rights?
11     A   No.
12     Q   I think you just mentioned that the
13  algorithm you used is based on MCMC, which is
14  Markov Chain Monte Carlo, right?
15     A   It's a constructive Monte Carlo.
16  When people talk about Markov, MCMC
17  approaches, I usually think of the kind of the
18  flip programs where you iterate through the
19  map and flip precincts in and out. It's a
20  constructive Monte Carlo approach.
21     Q   If I use MCMC, will you understand
22  that to be constructive MCMC? Will you
23  understand that to be the same thing we were
24  just discussing?
25     A   Yeah, as long as you get the word

**45**

1  "constructive" in, I'll know what you're
2  talking about.
3      Q   Have you taught constructive MCMC?
4      A   Yes.
5      Q   And in which course was that?
6      A   My voting rights -- my voter turnout
7  and participation class.
8      Q   How do you teach it in that class?
9      A   We talk about -- well, a good portion
10 of that class covers gerrymandering.  So we
11 talk about redistricting simulations and the
12 various approaches that have been taken.  I
13 usually demonstrate the constructive Monte
14 Carlo since you can actually put it up on the
15 screen and draw a map every time a district
16 flips so they can see how the algorithm works.
17 I always think it's way more interesting than
18 they do, but --
19     Q   Do you teach students to run
20 constructive MCMC, or do you just demonstrate
21 it?
22     A   No.  I teach how it works and
23 demonstrate it.
24     Q   You teach students to write their own
25 constructive MCMC codes?

**46**

1      A   No.
2      Q   Have any of your courses taught
3  coding as part of the course?
4      A   Yeah.  So the -- there is one other
5  update that should be on this as I look this
6  over, which is -- so the political
7  participation and voting behavior I taught in
8  springs of 2022 and 2023, as well; and in the
9  fall of 2022, I taught a course -- I can't
10 remember the name, but the gist of it is
11 survey methodology; and in both of those
12 courses, students have to do a fair amount of
13 R coding to be able to pass.
14     Q   Now, I'm going to shift gears
15 slightly.  Can you give us a brief overview of
16 your professional background?
17     A   Starting when?  I'm old now.
18     Q   Well, that's why I said brief.  So I
19 know that you were a lawyer prior to your
20 current kind of iteration.  So just a summary
21 of the facets of your professional life.
22     A   Yeah, I practiced law until 2009,
23 when I switched over to RealClearPolitics.
24 I've been writing full-time at
25 RealClearPolitics -- I guess it was 2010 I

**47**

1  switched over formally.  I been writing
2  full-time for them since then.  You know, I've
3  always had side projects, which
4  RealClearPolitics has been fine with along the
5  way, but that's been my main employer.  RCP
6  has been the only employer I've had a W-2 from
7  since 2010 is perhaps the cleanest way to do
8  that.
9      Q   What is RealClearPolitics?
10     A   RealClearPolitics is a company of
11 about 50 people that produces a website that
12 publishes daily.
13     Q   And how would you describe the nature
14 of the content on RealClearPolitics?
15     A   Well, most of what we do is
16 aggregation.  So we'll aggregate poles.  We
17 aggregate articles from across the political
18 spectrum.  We do produce some original
19 content, which is part of what I do, but it's
20 mostly polling and elections focused.
21     Q   And then, when you say you produced
22 original contents, would that content be
23 considered peer-reviewed?
24     A   No.
25     Q   And is your work at RealClearPolitics

**48**

1  still considered full-time?
2      A   Yes.
3      Q   I'd like to, if you have the time,
4  just go through a couple more questions about
5  your background, about prior testimony and
6  then, we can take a short break.
7      A   Sure.
8      Q   So staying on Exhibit 14, your resume
9  pages four through six lists the cases that
10 you've served as an expert witness; is that
11 correct?
12     A   Yeah, with a couple of additions we
13 discussed earlier.
14     Q   Okay.  Do you have a process for
15 updating this list in your resume?
16     A   Usually, when I'm getting ready to
17 submit the report, I'll add new cases on.
18 That's usually how I do it.  And then, this
19 resume just kind of gets cut and pasted from
20 report to report with the updated cases on it.
21     Q   I see that you have some demarcations
22 of the subject matter of the expert testimony.
23 Do you distinguish between cases where you
24 wrote reports and cases where you testified
25 live in court?

49

1    A   I think this is all the cases where I
2  wrote reports, but there may be other ones
3  that I missed.  I know the rule is cases where
4  you've been deposed or testified, but I don't
5  know.  I just put it all on there.  It's also,
6  I guess, only the last four years, but that's
7  a pain to keep up with too.
8    Q   Do you know how many of these cases
9  you've actually testified in court?
10   A   Most of them.
11   Q   But there are examples here like, I
12 believe you did not testify in court in the
13 Philip Randolph Institute v. Smith case?
14   A   That's correct.
15   Q   Are there other examples that you can
16 recall?
17   A   I didn't testify in court in Dixon v.
18 Rucho, and I guess I would say in both of
19 those cases, I wasn't called.  I didn't
20 testify in Carter v. Chapman because we were
21 just amicus there.  Didn't testify in NAACP v.
22 McMaster because the case settled before we
23 went to trial.  I haven't testified yet in
24 LULAC v. Abbott because that case hasn't gone
25 to trial yet and the same is true of Agee v.

50

1  Benson. You know there is another case which
2  is a Dodge City case.  I think Coca is the
3  name of it that I put a report in and been
4  deposed on.
5    Q   Are you familiar with the term
6  "Daubert motion"?
7    A   Yes.
8    Q   Have you ever been the subject of a
9  Daubert motion?
10   A   Yes.
11   Q   Do you recall which of these cases
12 you may have been the subject of a Daubert
13 motion?
14   A   I mean, most of the early cases, it
15 was at least -- I had Daubert motions filed
16 against me.  I don't think there was one in
17 Feldman. I'm not sure there was one in Hobbs
18 or Mecinas.  Wasn't one in possibly Yaqui
19 Tribe v. Rodriguez, and that's become less
20 common in the more recent cases but every now
21 and again.
22   Q   Do you remember the case where you
23 may have been the most -- let me strike that.
24 Let me rephrase.  Do you recall which case is
25 your most recent Daubert motion?

51

1    A   I can't remember if they filed one in
2  the McMaster case or in the state racial
3  gerrymandering case in South Carolina.  I
4  can't remember if they filed one in Jacobson.
5  Well, I guess Montana, that case would be
6  state court.  So it wouldn't be Daubert, but
7  so yes, if there's one in either of the South
8  Carolina cases, that would probably be the
9  most recent.
10   Q   In the cases where you've testified
11 in court, do you ever -- strike that.  In
12 cases where you've testified in court, has the
13 court ever found your testimony unpersuasive
14 to your knowledge?
15   A   Yes.
16   Q   And in which instances was that?
17   A   So in the a -- in Feldman, the judge
18 didn't seem to like any of the expert
19 testimony.  It wasn't struck, but he didn't
20 find it terribly persuasive.  The recent
21 South Carolina case, the judges didn't find it
22 persuasive.  I'm sure there's others.
23   Q   Now, looking at your resume, you
24 again demarcated the subject matter generally
25 of each case.  How many of your prior cases

52

1  have been Section 2 Voting Rights Act cases?
2    A   Well, the Dodge City case is a
3  Section 2 case.  The Agee v. Benson case is a
4  Voting Rights Act case.  The LULAC v. Abbott
5  is a Voting Rights Act case, at least in part.
6    Q   Sorry.  Go ahead.
7    A   I'll just say I can't remember if
8  McMaster had a VRA component or either Rucho
9  or the Covington cases had VRA components.  I
10 assume when we say Section 2, you mean Section
11 2 redistricting cases.
12   Q   I think for the general question, you
13 can tell me all Section 2 cases, and then, we
14 can drill down on which of those were vote
15 denial versus votes dilution.  Are there any
16 cases that we haven't mentioned that would
17 have been vote denial?
18   A   NAACP versus McCrory, the two
19 Southern District of Ohio cases, Lee versus
20 Board of Elections, Feldman, which eventually
21 became Brnovich.  Mecinas v. Hobbs.  The
22 Rodriguez case in Arizona, I think was a
23 Section 2 case.
24   Q   Then, you said of the vote dilution
25 cases, I count three Dodge City, LULAC and

53

1  then, Acee v. Benson, I'm probably pronouncing
2  that incorrectly.
3      A   Agee.
4      Q   Agee?
5      A   I think the "G" is soft, but for the
6  court reporter, it's A-G-E-E.
7      Q   And have any of these cases proceeded
8  to a final judgment?
9      A   No. The trial in Agee is in
10  November, but it hasn't gone to final judgment
11  yet, and we're still kind of waiting in LULAC.
12     Q   And what is the timing on the Dodge
13  City case?
14     A   Oh, yeah, the Dodge City case, I
15  think, goes to trial in February.
16     MS. THOMAS-LUNDBORG:
17         All right. I think with that,
18     we can take a five-minute break.
19     Thank you for powering through this
20     kind of first hour and 15 minutes.
21     Thank you for bearing with us.
22     THE WITNESS:
23         Thank you.
24         (Recess taken.)
25  BY MS. THOMAS-LUNDBORG:

54

1      Q   I'd like to just ask you one
2  follow-up question about your background. Is
3  there anything else that you need to do to
4  meet your December 17th graduation date?
5      A   My committee members need to sign the
6  form, and -- if they haven't already done so.
7  I didn't check this morning. File my
8  application to graduate and application for
9  exam. There may be like some more paperwork,
10  but I don't think so.
11     Q   You said file your application for
12  exam. What is that?
13     A   I filed it. I'm sorry.
14     Q   Oh, you filed it.
15     A   Yeah.
16     Q   So it's just a form by your committee
17  members is all that's needed?
18     A   That's my understanding. Like I
19  said, there may be some other paperworks, but
20  there's no revisions that have to be made to
21  the dissertation or anything like that. It
22  wasn't a conditional pass.
23     Q   So I'd like to go back to your work
24  in this case. We spent sometime just before
25  break discussing Section 2 and Gingles, and we

55

1  have discussed your case law related to
2  Section 2. Sorry. Have you ever used the
3  exact analysis you're proffering here in
4  another case?
5      A   No.
6      Q   Are you aware of any court accepting
7  the exact analysis that you are proffering
8  here in another case?
9      A   No. I'm not aware of other cases
10  where the lawyers have wanted to argue about
11  population compactness.
12     Q   I think we spent some time earlier
13  discussing the fact that you were critiquing a
14  Gingles 1 expert; is that correct?
15     A   That's my understanding, yes.
16     Q   Is it your understanding that a
17  Gingles 1 expert must draw a whole map?
18     A   I don't -- I actually don't know the
19  exact answer to that. I thought I did once,
20  and then, there was that 2018 Supreme Court
21  decision that was in the Fourteenth Amendment
22  context, but I don't know if it has any
23  implications for Gingles 1.
24     Q   So just to be clear, you're not sure
25  that whether a Gingles 1 expert must show that

56

1  a majority-minority district can be drawn
2  within the whole configuration of the state or
3  not?
4      A   I'm not sure.
5      Q   Are you familiar with the term
6  "traditional redistricting criteria"?
7      A   Yes.
8      Q   What are traditional redistricting
9  criteria?
10     A   Well, if you ask different people,
11  you'll get different answers, but they are
12  qualitative factors that people have
13  traditionally -- I hate to make an ipse dixit,
14  but that people have traditionally used to
15  evaluate districting maps. I guess
16  theoretically to draw them, as well. So
17  things such as compactness and contiguity and
18  so forth.
19     Q   Can you name other traditional
20  redistricting criteria? I think you just
21  named contiguity and compactness?
22     A   Yeah. I mean so equal population --
23  the way it's understood today isn't
24  necessarily traditional criteria, but some
25  degree of ethnic population is. Communities

57

1  of interest, some states -- I know Dr. Chen
2  has suggested that that shouldn't be
3  considered one, or at least that's my
4  understanding of his article on the subject
5  matter. I don't know that the Voting Rights
6  Act is a traditional redistricting criteria.
7  I'd probably put it in that bucket now since
8  it effects all the redistricting decisions
9  but, obviously, you know, not before 1965 or
10  '82.
11     Q   What about respect for county and
12  municipal lines?
13     A   Yeah, yes, respect for county and
14  municipal lines.
15     Q   You said that One Person One Vote
16  could be one. Are you aware of -- could you
17  expound upon what One Person One Vote means?
18     A   This is a legislative case. So the
19  maps have to be drawn within plus or minus
20  five percent. Even that's not quite
21  necessarily a safe harbor. There's that case
22  out of Georgia -- I'm blanking on the name
23  right now -- that struck down a map that still
24  fell within those numbers, but basically, you
25  can feel pretty good about your math if you're

58

1  within plus or minus five percent, and you're
2  probably going to get struck down if you go
3  outside of that.
4     Q   I'm sorry. I'm just going to grab my
5  charger. So we're not taking a five minute
6  break. I just need one second to plug in my
7  computer.
8         So going back to traditional
9  redistricting criteria, would you agree that
10  there is a tension between meeting the various
11  traditional redistricting criteria?
12     A   There can be, yeah. Frequently is.
13     Q   Would you also agree that in drawing
14  maps, tradeoffs are simply inevitable between
15  traditional redistricting criteria?
16     A   Yes.
17     Q   When you began your expert work in
18  this case, was your goal to capture
19  compactness only or other traditional
20  redistricting criteria in your analysis?
21     A   My goal was -- well, like I said, I
22  honestly don't remember what I was doing at
23  the very beginning, because that was a fire
24  drill situation; but at least once the dust
25  settled and the stay was in place, my job was

59

1  to determine whether the populations in the
2  districts were compact -- the minority
3  populations in the districts were compact.
4     Q   Did you consider other traditional
5  redistricting criteria in answering this
6  question?
7     A   No. I just looked at each district
8  that was drawn and the minority population
9  within it.
10     Q   Do you know whether Louisiana has
11  mandated through legislation that traditional
12  redistricting criteria be used when drawing
13  maps?
14     A   There is certainly a list of factors
15  that have to be examined. I don't know or
16  recall exactly which factors are on it.
17     Q   Okay.
18        MS. THOMAS-LUNDBORG:
19           I'm going to introduce another
20        exhibit. I am going to have this
21        mark as Exhibit 15. So what I've put
22        on the screen and what I'm having
23        marked as Exhibit 15 is Joint Rule
24        21. As you see the top, I downloaded
25        this directly from the Louisiana

60

1        laws, Louisiana State Legislature
2        website we all have been using, and
3        you can see the web address at the
4        bottom of the exhibit. We all have
5        been using this version throughout
6        deposition. I'd like to look at some
7        of the traditional redistricting
8        criteria here briefly.
9  BY MS. THOMAS-LUNDBORG:
10     Q   Actually for a second, I'd like to go
11  back to Cooper's July 23 report. So this is
12  Exhibit 5.
13     A   Is this the first or second report?
14     Q   Technically, it's his second report
15  in that he has a June report, a June 2022
16  report, but I am going to just focus on the
17  2023 reports for the purpose of your
18  deposition.
19     A   Okay.
20     Q   I'm now going to page eight,
21  paragraph -- no, I think I'm in the wrong --
22  well, it's page seven spilling over to page
23  eight. So at the top -- bottom of page seven,
24  beginning in paragraph eight, he states, "I
25  drew the Illustrative Legislative Plan based

61

1  on traditional redistricting principles,
2  including population equality, compactness,
3  contiguity, respect for communities of
4  interest, and the non-dilution of minority
5  voting strength. I followed the guidelines
6  spelled out by the Legislature in Joint Rule
7  21, the legislative guidelines for the 2022
8  map," and then, there's citation. Do you see
9  that?
10     A  Yes.
11     Q  When you were conducting your
12  analysis, were you aware that Mr. Cooper -- do
13  you recall reading this paragraph?
14     A  I don't recall it, but I'm sure I
15  did.
16     Q  Were you generally aware that
17  Mr. Cooper was using Joint Rule 21 when
18  drawing his map?
19     A  I don't know if I was aware of that,
20  because I wasn't really looking at his
21  compliance with state law.
22     Q  Do you know what effect incorporating
23  traditional redistricting criteria would have
24  had on your analysis if you would have
25  included it?

62

1     A  None.
2     Q  I think we'll explore that answer
3  some more. I'll stop the share now. Now, you
4  said that you were asked to look at the
5  compactness of the minority community; is that
6  correct?
7     A  Yes, of the minority voting age
8  population.
9     Q  How did you define compactness when
10  beginning your work?
11     A  So for the population, you can't
12  really use the Reock or Polsby-Popper, because
13  those types of measures -- Reock is R-E-O-C-K.
14  Polsby-Popper is two hyphenated names --
15  because those deal with the shape of the
16  district, not with the shape or density of
17  populations within the district. So I used
18  the only approach to population compactness
19  I'm aware of, which is this moment of inertia
20  approach.
21     Q  And I think you testified no in the
22  past, but are you aware of any other expert in
23  a Gingles 1 case using this moment of inertia
24  analysis when looking at compactness?
25     A  No, I'm not really aware of cases

63

1  where people have tried to quantify the
2  compactness of the population, but this is the
3  only measure of population compactness I'm
4  aware of.
5     Q  Are you aware of cases where -- I
6  think you just mentioned Reock and
7  Polsby-Popper -- where Reock and Polsby-Popper
8  have been used in a Gingles 1 analysis?
9     A  Yeah. So you'll frequently use Reock
10  or Polsby-Popper to measure the analogies,
11  Reock and Polsby-Popper, convex hull, to
12  measure the compactness of the district lines
13  themselves, but I'm not aware of them being
14  used to measure the compactness of
15  populations.
16     Q  You've used Polsby-Popper, convex
17  hull and Reock in cases -- in instances where
18  Section 2 compliance is important?
19     MR. STRACH:
20        Objection. Go ahead.
21     THE WITNESS:
22        Yeah. I think that's right but
23     only to measure the compactness of
24     the district.
25  BY MS. THOMAS-LUNDBORG:

64

1     Q  Would one of those instances be your
2  work in Virginia?
3     A  So we never did a full Gingles
4  analysis in Virginia. So I'm -- I have to be
5  careful what I say, because I know there's a
6  published report on that, but I did also sign
7  a confidentiality order. So I can't stipulate
8  that the Voting Rights Act is important,
9  because I don't know whether Section 2 is
10  triggered. I assume at least in some places
11  it is, but we did use, I think, Reock and
12  Polsby-Popper there, maybe, convex hull if
13  we're looking at the compactness of districts
14  to comply with the state law mandating compact
15  districts.
16     Q  What about in Arizona?
17     A  Yeah. In Arizona, we used Reock and
18  Polsby-Popper. There may have been a third
19  metric there to measure the compactness of
20  districts.
21     Q  And Section 2 compliance was at issue
22  in Arizona?
23     A  Yes.
24     Q  I have a question about how you
25  conceptually approached this idea of

65

1  compactness of the minority population. When
2  looking at your figures, I noticed at multiple
3  times you used the term "most compact," and
4  actually, rather than speaking from memory,
5  let's get an example up.
6      A   I can stipulate to that.
7      Q   Okay. You recall that without me
8  needing to put it in front of you. What did
9  you mean by most compact?
10     A   Within a district, it is the group of
11 minority voters who could constitute 50
12 percent plus one of the district's voting age
13 population, and it's the group that had the
14 smallest moment of inertia metric.
15     Q   Is it your understanding that the
16 Voting Rights Act requires districts to be
17 drawn at their most compact level?
18     A   No. The question is if you're going
19 to make a determination about -- let me step
20 back. Within a district, there may only be
21 one group, because some districts, you need
22 every black individual of voting age that
23 Cooper identified to meet the threshold in the
24 district; but in a district like the far
25 northwest of Louisiana, north of Shreveport,

66

1  where I think the BVAP was around 55 percent,
2  there are multiple ways you might describe the
3  group within the district that gets you to 50
4  percent plus one. So the question in my mind
5  was okay, what's the best case scenario for
6  Mr. Cooper? What's the most compact cluster
7  of minority voters that could constitute 50
8  percent plus one of the district's voting age
9  population?
10     Q   Is there any peer-reviewed local
11 science literature on this most compact
12 concept?
13     A   Well, yeah, the point of the
14 redistricting simulations that I cite to that
15 were using population compactness was to draw
16 an optimized plan that minimized compactness,
17 and so they were trying to draw using the
18 moment of inertia method, the most compact
19 districts they could.
20     Q   Is it your testimony that those
21 articles -- and I can look at one of them --
22 uses most compact concept in the exact same
23 way that you do?
24     A   Well -- no, they weren't using it for
25 Section 2 compliance, but they were using it

67

1  to identify compact populations.
2      Q   So let's spend some time talking
3  about moment of inertia, which you previewed
4  for us, and I do want to get your report up.
5  So give me one second to pull it up. Let me
6  share my screen. So I'm going to go to page
7  15 of your report. I want to make sure that
8  we're looking at the right thing. Give me one
9  second. This first full paragraph of the
10 moment of inertia approach, I think this is
11 where you preview what you've described as the
12 moment of inertia. Could you just tell us now
13 in your own words what the moment of inertia
14 approach is that you use here?
15     A   Sure. If you have like a bike tire
16 and you want to spin it, you spin it right on
17 the center of the tire, and the reason is that
18 the bike tires are perfectly balanced, and so
19 the place that spins is in the middle. Let's
20 say the top half for whatever reason of the
21 bike tire gets -- it's made of lead. It's no
22 longer going to spin around that center axle,
23 right. You're going to spin it once, and the
24 lead part is going to drop to the bottom. The
25 reason is the mass isn't equally distributed

68

1  anymore. So the centroid, the physical center
2  of the tire is no longer the spinning point.
3  The spinning point is going to be much lower
4  down in the area of the bike tire. So that's,
5  basically, what the moment of inertia is
6  trying to find. It's the point that the --
7  it's the center of the mass in some ways of
8  the object. So the way you calculate it is
9  you find the sum of square distances to the
10 district center and go from there.
11     Q   Okay.
12     A   So it punishes outliers, right,
13 because you're squaring the distance as you
14 even square there a loss. So that's a portion
15 of it, but it, basically, a way to use the
16 weighted square distances from the center.
17     Q   I noticed that in your report, you've
18 referred to the moment of inertia as a metric
19 and also as a method. Is there a difference
20 between a method and a metric?
21     A   You know, when I used them -- I guess
22 when I used it, I probably had in mind the
23 method being the algorithm to calculate it,
24 and the metric as the actual output, but I
25 don't think -- there's no great importance to

69

1  the difference when I used them.
2    Q   Well, what in way is moment of
3  inertia a metric?
4    A   Because it will give you the sum of
5  squared distances of individuals from the
6  district center, which is the moment of
7  inertia, and you can use it to compare across
8  different iterations to see which has more a
9  compact population.
10   Q   Now, you said it gives you the sum
11 squared of districts.  How is that output
12 actually relayed in your report?  Is it
13 relayed through a number?
14   A   It's some squared distances.  No,
15 it's stored in R.
16   Q   So then, how do you relay the final
17 metric in your report?
18   A   It's the district -- it's relayed
19 with a map.  It's the district with -- it's
20 the group of black voters of voting age within
21 the district with the smallest moment of
22 inertia, and it can be recalculated through
23 the R code that I provided.
24   Q   You said you linked through map and
25 the purpose was to compare across districts;

71

1    A   It would be -- I believe it's stored
2  in memory.
3    Q   Right, but what's stored in memory?
4  Is it visual depiction of the map, or is there
5  an actual number that could be used to compare
6  across districts?
7    A   The number is calculated at some
8  point, and I think it's stored.  You might
9  have to edit one of the functions to return
10 the moment of inertia value instead of the
11 map, but it gets calculated over the course of
12 the -- actually no, you could just run the
13 function by itself and not with the function
14 call, and it would give you the value.
15   Q   If I wanted to compare two moment of
16 inertia values, how would I do that?  How
17 would I know which value was giving me a more
18 compact value and which value was giving me a
19 less compact value?
20   A   The smaller value is more compact.
21   Q   Did you for any of these simulations
22 that you've read here report the moment of
23 inertia values?
24   A   No, because I wasn't doing cross
25 district comparisons I was just looking for

70

1  is that correct?
2    A   Within districts across clusters.
3    Q   Within districts across clusters.  Is
4  there a way to compare across districts using
5  this metric?
6    A   I'm sure you could, but I didn't do
7  that.
8    Q   How would you do that if you wanted
9  to compare across districts?
10   A   You could look at the moment of
11 inertia for District A for the most compact
12 block of black population and then look at it
13 for District B.  If someone wanted to do that,
14 the code is there for them to extract those
15 particular numbers, but I was not doing
16 comparisons across district.  I was just
17 identifying the most compact black populations
18 sufficient to constitute 50 percent plus one
19 of the district's voting age population in
20 each district.
21   Q   Okay, and if I want to compare across
22 districts, in your code, would it spit out a
23 numerical output that I could compare, or
24 would I have to look visually at the two maps
25 to do that comparison?

72

1  the most compact population within each
2  district.
3    Q   Right.
4    A   What's the best case scenario for
5  Mr. Cooper's maps.
6    Q   Right.  Did you do any comparison of
7  Mr. Cooper's map and values to the enacted map
8  on the moment of inertia method?
9    A   No.  I don't know whether any of the
10 districts in the enacted map are VRA
11 compliant.  So I don't even have that baseline
12 to go off of.
13   Q   Do you use the moment of inertia
14 metric or method as you have described here
15 today in your dissertation in that Chapter 3?
16   A   No, because the dissertation
17 Chapter 3 isn't dealing with the Voting Rights
18 Act.
19   Q   Have you published any peer-reviewed
20 academic research on the moment of inertia
21 method or metric as you've described here
22 today?
23   A   No.  The moment of inertia method
24 slash metric is one of the oldest in the
25 compactness literature for determining the

73

1  compactness of a population. I haven't
2  published my own peer-reviewed literature, and
3  I doubt it would be publishable since this is
4  such a venerable method for evaluating
5  population compactness.
6      Q   You say it's one of the oldest, but
7  has it appeared in any of the many Gingles's
8  cases that you're aware of?
9      A   No, because from my understanding,
10 the legal approach hasn't really been to
11 explore population compactness. As I
12 explained in my rebuttal report, up until
13 fairly recently, it would have been
14 extraordinarily computationally demanding to
15 the point where it probably would have been
16 infeasible to do it until fairly recently. So
17 no, because my understanding is that the legal
18 theory being propounded here isn't one that's
19 been thoroughly explored.
20     Q   Great. So just picking up on the
21 last thing that you said, how long has --
22 well, let me ask a different question. Did
23 your algorithm calculate moment of inertia for
24 the whole map or just for the selected
25 districts that you were asked to study?

74

1      A   I only calculated the moment of
2  inertia for minority populations within the
3  remedial maps that -- or within the
4  demonstration maps that would have been new
5  VRA compliance suggested new VRA districts.
6      Q   And how long have experts had access
7  to computers that could calculate the moment
8  of inertia for a handful of districts?
9      A   Well, I have a pretty
10 state-of-the-art computer, and for a state
11 Senate district to iterate through the
12 different precinct's starting points, probably
13 takes a half hour. So I guess it depends how
14 big your districts are and how much time you
15 have, but the first redistricting simulation
16 to do -- the first published redistricting
17 simulations over statewide maps were in the
18 1990s. When you go back to like the 70s and
19 80s, they're only doing it on 40 precinct
20 blocks. So it would be fairly recently that
21 you would realistically be able to do this.
22     Q   What do you mean by fairly recently?
23 Are we talking the last 10 years?
24     A   No. I assume you could have done in
25 on a state district in maybe, the last 20,

75

1  done it efficiently.
2      Q   Are you aware of any cases in the
3  last 20 years where the moment of inertia was
4  calculated in the way that you've calculated
5  it here?
6      A   Well, again, I'm not the lawyer in
7  this case, and I haven't done the thorough
8  legal research that I'm sure the lawyers here
9  have done. To my understanding, this is not a
10 legal approach that's been explored at least
11 recently. So no, I'm not aware of any, --
12     Q   Okay.
13     A   -- but that's something I would have
14 left the lawyers to research. All I knew is
15 that when you're trying to measure the
16 compactness of a population, this is the way
17 to do it.
18     Q   Great, but even in your own
19 redistricting work in which Section 2
20 compliance may have been at issue, you have
21 not run moment of inertia in other instances?
22     A   Well, when I did the work for the
23 Arizona case, I wouldn't have been familiar
24 with the moment of inertia approach yet; and
25 in the other cases, I wasn't asked to look at

76

1  population compactness.
2      Q   Okay.
3      A   It was hinted at in the Texas case,
4  and in that -- as I talk it through, in that
5  Kansas case. In that Kansas case, -- well, I
6  can't get into why we made choices that we did
7  in that case; and in the Michigan case, we're
8  plaintiffs. So, obviously, we think our
9  demonstration maps have compact minority
10 populations, and the segregation in Michigan
11 is so stark, it's almost impossible not to.
12     Q   So you said in Texas, it was hinted
13 at, but you didn't actually run the moment of
14 inertia analysis that you ran here in Texas?
15     A   No. No, that was a 200 plus page
16 report and a lot of issues to cover, and so
17 population compactness -- I got pressed in my
18 deposition about ways to measure population
19 compactness, metrics for it, but I didn't have
20 time to actually run it.
21     Q   So I think you've mentioned that you
22 partly came up with this moment of inertia
23 approach based on what you were asked to do by
24 counsel; is that correct?
25     A   Counsel asked me to explore

77

1  population compactness, because their
2  interpretation of the Voting Rights Act is
3  that it requires compact minority groups. I'm
4  guessing defense disagrees with that. I was
5  asked how would you do it, and I, in the
6  course of doing research for my dissertation,
7  had come across the moment of inertia
8  approach, because that's the metric that the
9  earliest redistricting simulations were using.
10 So I was familiar with it. So I didn't come
11 up with it at the invitation of counsel. It's
12 a question I was asked, and I at least had
13 some sense of what the answer was from my
14 outside research.
15     Q   You said you came across this
16 research in your research for your
17 dissertation, but did you actually use the
18 algorithms that you're using here in your
19 dissertation?
20     A   No. No. I was aware of how you
21 would measure population compactness, because
22 the articles that I cite here are all articles
23 that I came across in the course of my
24 dissertation research, and so the algorithms
25 are described within the articles, or at least

78

1  how to calculate the moment of inertia. So
2  after being asked well, how would you find a
3  compact population, it was a matter of going
4  back to the articles, seeing the metric and
5  then coding the metrics up.
6      Q   Now, in your report -- and I can put
7  it back up if it's helpful -- you discussed
8  two separate algorithms; is that correct?
9      A   That's correct. I have a hard copy
10 in front of me now. So I can flip back and
11 forth as need be.
12     Q   I believe the first algorithm, you
13 said weights BVAP, and you're seeking to
14 pair -- use the moment of inertia to pair
15 clusters until you reach a 50 percent BVAP; is
16 that correct?
17     A   Fifty percent plus one, yeah.
18     Q   Fifty percent plus one, yeah. Does
19 this method, the first method, have any
20 limitations?
21     A   Yes. So one limitation of it that's
22 discussed in the literature is that it will
23 tend to avoid -- if you have one densely
24 populated area, it will tend to avoid other
25 densely populated areas and skirt them,

79

1  because going into these other densely
2  populated areas will move your moment of
3  inertia substantially. So that's a known
4  issue with it.
5      Q   Are there any other limitations?
6      A   Not that I can recall sitting here.
7      Q   I'd like to -- and maybe, this will
8  jog our memory about what potential
9  limitations could be. I've put your report
10 back up. I'm going to move to page 17. This
11 is Figure 6. Let me zoom in a little bit, but
12 you have in front of you. So maybe, we're
13 fine. That seems to be the whole figure. So
14 this is -- I believe, your testimony was the
15 output of your moment of inertia were these
16 maps; is that correct?
17     A   Yes.
18     Q   And Figure 6 is the output of your
19 first algorithm, which weighed BVAP; is that
20 correct?
21     A   That's correct.
22     Q   And the black lines, it's my
23 understanding, that was the district that
24 Mr. Cooper drew?
25     A   Yes.

80

1      Q   And then, the dotted line is -- the
2  dotted lines -- are the lines that your
3  algorithm determined was the most compact area
4  within that district?
5      A   That's right.
6      Q   And then, there are other blue dots.
7  What are those other blue dots represent?
8      A   Every blue dot represents, I believe,
9  10 black residents of voting age.
10     Q   Is it exactly 10? Do you know?
11     A   No. No. It wouldn't work that way.
12 Most of them would be exactly 10, but because
13 you have to round, the last one -- if there's
14 only one in a precinct -- or the last one in
15 the precinct may not be 10.
16     Q   And the orange, what does that
17 represent?
18     A   White residents of voting age, 10 as
19 well, with the caveat that the last one may be
20 rounded.
21     Q   Looking at the blue and orange, the
22 orange just visually looks larger to me, but
23 do the blue and orange dots represent the same
24 population size?
25     A   They represent the same population

81

1    size.  The reason that the orange is larger is
2    because the blue is overlaid -- when you draw
3    these maps, you draw them in layers, and since
4    we're mostly interested in the black voting
5    age population, that's layered on top of the
6    white population; and so to minimize the
7    effect of overplotting, you make the orange
8    dots a little bit larger, or the orange "X"s a
9    little larger, and that allows them to stick
10   through and avoid some of the overplotting
11   concerns.
12       Q   So you said you made the orange dots
13   a little larger.  I think that means -- or at
14   least my understanding is in your code, you
15   set the alpha code, the orange process to one
16   and then the blue dot to point five.  Does
17   that sound correct?
18       A   The alpha in the code determines the
19   transparency, not the size.
20       Q   Okay.  But is it correct that in
21   addition to the sizing that you just
22   mentioned, the color and the transparency is one
23   for the orange and point five for the blue?
24       A   That's right, because you're layering
25   the blue on top of the orange, making the blue

82

1    somewhat transparent.  All it does is lighten
2    the color a bit, but it also allows some of
3    the orange to show through.  Again, if you
4    have a blue dot and an orange "X" that are the
5    exact same size and the blue dot has the same
6    transparent as -- is opaque, which is the
7    alpha one, that orange "X" will be completely
8    covered.  So these differences are to allow
9    you to understand that yes, there are still
10   some white individuals that live in these
11   heavily black areas that you would not
12   otherwise be able to see.
13       Q   So looking at this visual depiction
14   of moment of inertia through your code, do you
15   know what the total population is within the
16   blue dots, the blue dotted line?
17       A   Can you ask that again?
18       Q   Do you know what the total population
19   is?  Not just the black population.  I know
20   that you set the algorithm to meet black
21   population threshold.  Do you know what the
22   total population is in this part of the map?
23       A   No.  I don't really know how that
24   would be relevant.
25       Q   Okay.  Do you know -- looking at what

83

1    has been drawn, the figure itself does not
2    appear to be contiguous; is that right?
3        A   The cluster is contiguous.
4        Q   Right, but they don't -- it looks
5    like there are two doughnut holes in there.
6    So it looks like at least the visual depiction
7    seems to be an non-contiguous space.
8        A   The group is contiguous.  There's one
9    doughnut hole in the group, because the idea
10   isn't to -- you could include that grouping
11   there, north of I think that's -- well, --
12   it's not Caddo Lake.  I can't remember what
13   the name of that lake is, but just to the
14   north of the lake, you can include it, and
15   that would make the moment of inertia method
16   even less compact.
17       Q   You asked me --
18       A   I'm sorry.  I'm sorry.  I don't know
19   where that second doughnut hole you referred
20   to is.
21       Q   Well, it looks like there are two
22   right next to each other, and it probably just
23   depending on the Zoom, there's like -- it
24   looks like there's a closed hole, and then,
25   above that is like another hole.  So they're

84

1    right on top of each other, but that's the
2    reference of two doughnut holes.
3        A   So the one -- I guess, are you saying
4    so -- I think we agree where that first one is
5    just to the north of that lake.  Are you
6    saying there's another one to north?
7        Q   They're right on top of each other,
8    and it appears, when I zoom in, there's a
9    closed hole, and on top of it, there's like a
10   little triangle?
11       A   I think that's just the boundary
12   zigging and zagging.
13       Q   I don't know that material, whether
14   it's one or two visually -- to me, it appears
15   to be two.  Your testimony is that it's one.
16   Regardless, it seems to be a non-contiguous
17   space within the depiction, correct?
18       A   Right.  So the point here is not to
19   draw the district.  The point is to find the
20   most compact black population.  Perhaps, you'd
21   need to make it even less compact.  If you
22   wanted to -- why would you even ever draw it
23   as the group by itself, because that
24   population is insufficient to maintain the
25   population of a district?  So this isn't

85

1  redistricting directly. It's a way of
2  identifying a compact population within a
3  district that's already been drawn.
4      Q   I think you anticipated where I'm
5  going here. This visual depiction would not,
6  in fact, tell someone here's the most compact
7  district, because it doesn't account for
8  contiguity or One Person One Vote, and we
9  don't know how many people you'd need to add
10  have a full population of a district.
11      MR. STRACH:
12          Objection. Go ahead.
13      THE WITNESS:
14          Yeah. This isn't a metric for
15      determining the district's
16      compactness. It's a metric for
17      determining the population
18      compactness; and since you're only
19      looking for 50 percent plus one BVAP,
20      generally speaking, you're going to
21      need to add additional population to
22      fill out an entire district, but the
23      whole point of this is, you know, I
24      didn't just want to just look at
25      where the black population of the

86

1      district is residing, because you can
2      have a circumstance where, you know,
3      you draw a district -- there are
4      actually of couple of examples in
5      here of this -- where you can draw a
6      district that has a very compact
7      black population that's capable of
8      being 50 percent plus one of the
9      district's population; and then, you
10      just kind of go out into other areas,
11      because you need One Person One Vote
12      and there just happened to be black
13      residents of voting age in that area
14      that you go out into, and that's not
15      something that is -- you know, that
16      would want to follow the Voting
17      Rights Act or would fail to satisfy
18      the Voting Rights Act. So that's
19      what this exercise is meant to do.
20      You have this district that's drawn,
21      and the district itself sprawls a
22      bit, but we don't really care about
23      that. We care about knowing if the
24      black population that reaches -- if
25      there is a black cluster that reaches

87

1          50 percent plus one of the voting age
2          population that's reasonably compact.
3  BY MS. THOMAS-LUNDBORG:
4      Q   I think you testified earlier that
5  this is both a method and a metric. Using the
6  metric portion of the moment of inertia
7  displayed here, what numbers were you using to
8  determine whether or not a population was
9  sufficiently compact to pass your metric?
10      A   Well, as I understand it, and it's
11  admittedly been awhile since I practiced law,
12  but reasonability is a question ultimately for
13  the finder of fact to determine. So the
14  finder of fact is going to have to decide
15  whether it is reasonable or not. In my
16  opinion, when you have a district that the
17  most compact black population sprawls over
18  heavily white suburbs, places where there
19  appear not to be black residents and goes out
20  into rural areas, where it picks up isolated
21  pockets here and there, that's not compact
22  under any reasonable definition of the term.
23  The fact finder might ultimately disagree with
24  that though.
25      Q   But did you have a numerical metric

88

1      that you were using when making this
2      determination, or were you looking at the map
3      as we're doing here today?
4      A   Looking at the map. You know, as
5  Justice O'Connor wrote in Shaw, redistricting
6  is an area where appearances do matter, and I
7  don't think there's anyway you can look at
8  this and say that is a reasonably compact
9  population, but the fact finder might
10  disagree. It's just the same way that a
11  Polsby-Popper of point two or .21 or.22 is
12  ultimately meaningless. You know, there's
13  ultimately a question of reasonability when
14  the court in Allen v. Milligan was talking
15  about the demonstration districts there. They
16  said we don't see strange appendages. It
17  doesn't seem to be extremely distended.
18  There's, obviously, judgment calls being made
19  there that the court is comfortable with.
20      Q   But Polsby-Popper and Reock, I think
21  as you just mentioned, do give a numerical
22  output that can be used by the court and
23  compared across this district and the old
24  district or this district and other
25  configurations, correct?

89

1    A    This gives a numerical output if you
2  really wanted to go down that road, but at the
3  end of the day, all the Reock score is telling
4  you is what percentage of the area of the
5  minimum bounding circle is being filled.  I
6  mean, okay, why point to or not point to .21
7  or .22?  It all requires some degree of
8  judgment call.
9    Q    But again, the Polsby-Popper and
10  Reock produced scores that are frequently
11  actually recorded, and while your testimony
12  today is that there is a recorded number for
13  the moment of inertia, you did not provide
14  those numbers in this report?
15    A    No, but if you wanted to do a
16  cross-district comparison, it would be easy do
17  to do from my code.  If you wanted to run it
18  under any other district, all you would have
19  to do is go into my code and change the
20  district number that you're drawing the map
21  for, but population compactness is one of
22  those things, especially in the context of the
23  Voting Rights Act, that's tricky to do across
24  districts, because for example, some districts
25  don't have -- most of the districts don't have

90

1  a 50 percent plus one black population.  So
2  you'd never be able to -- the process would
3  run infinitely had that happened once or
4  twice.  So it's a different approach than you
5  would get with something like Polsby-Popper,
6  but at the end of the day, they all involve
7  some degree of judgment call.
8    Q    I'm going to put something else on
9  the screen.  I just want to make sure I get
10  the right exhibit number.  So I think you just
11  testified that it would be easy to run your
12  analysis on another district using your code
13  and we did just that.
14        MS. THOMAS-LUNDBORG:
15          I am now sharing on the screen
16        what I am going to have marked as
17        Exhibit 16.  This is a demonstrative
18        exhibit where we did, in fact, run
19        your code on one of the enacted map's
20        districts.  This is House District
21        62.
22  BY MS. THOMAS-LUNDBORG:
23    Q    In your report, you spent some time
24  talking about the changes that Mr. Cooper made
25  in the Baton Rouge area.  District 62 is one

91

1  of those changes, and I believe you also
2  criticized the fact that Mr. Cooper redrew
3  this district, District 62.  Do you remember
4  the part of your report where you discussed
5  the Baton Rouge area?
6    A    I remember the part of my report with
7  the Baton Rouge area, but I don't remember
8  what I said about District 62.
9    Q    We can probably pull that up.  Just
10  give me one second.  I am just getting myself
11  organized.  So I'm going to stop my share for
12  a second, and we'll go back.  I'm going to go
13  back to your report.  Just give me one second
14  while I go to page 54.  I'm on page 54 of your
15  initial report, and I'll just read the first
16  two sentences: "Mr. Cooper draws new black
17  majority districts in the Baton Rouge area
18  with Illustrative Districts 60, 65, 68 and 69.
19  He then removes a minority-majority district
20  that exists in the Enacted Plan:  District
21  62."  Do you see that?
22    A    Yes, and so now, I can answer your
23  previous question unless you had some
24  follow-up you wanted to do before I get there.
25    Q    You can go ahead.

92

1    A    That's not a criticism of
2  Dr. Cooper -- or Mr. Cooper.  What's going on
3  here is I was trying to figure out what the
4  new districts were, and so there were to my
5  view four new districts, but there were really
6  only three additional minority-majority
7  districts in the region.
8    Q    In one of the districts that you note
9  was changed in the Baton Rouge area was this
10  district District 62, which I've now put back
11  up on the screen.  Do you see that?
12    A    Yes.
13    Q    Do you know, just going back to
14  District 62, whether District 62 existed in
15  its current configuration in the 2010 map?
16    A    I don't.
17    Q    Do you know whether District 62
18  crosses from an urban to suburban and rural
19  population?
20    A    It certainly does.
21    Q    Does it surprise you that we were
22  able to find in the enacted map a district
23  like 62, which based on the eyeball test seems
24  to fail your moment of inertia method?
25    A    I think it clearly fails.  Does it

93

1  surprise me?  Kind of indifferent one way or
2  the other, because there's lots of district I
3  didn't look at.  But I wouldn't defend this as
4  a VRA district.
5      MS. THOMAS-LUNDBORG:
6          You know, I think we can take
7      another five-minute break.  I just --
8      so everyone on the phone is aware, if
9      we keep going at this rate, I think I
10     have another couple of hours, but I
11     should be done after lunch.  So my
12     idea would be let's take a
13     five-minute break now, and then, take
14     a lunch break at 12:40ish for maybe,
15     half an hour or so; and then, I would
16     come back on the record, and maybe,
17     only have an hour of time left, and
18     then, I could turn it over to the
19     Congressional folks.  Now, that's
20     assuming we're going at this rate.
21     I'm assuming we're not going to get
22     bogged down in this kind of next
23     portion.
24         We can go off the record if
25     we're not already off the record.

94

1          (Recess taken.)
2  BY MS. THOMAS-LUNDBORG:
3      Q   So I'd like to shift back to your
4  second algorithm.  We spent some time before
5  the break dealing with the first.  So let me
6  pull up your report again.  In efficient use
7  of my break, I did order lunch though.  Okay,
8  let's get this going.
9          So this is just by reference, I'm
10  sure you recall, but on page 16, you claim
11  that your second algorithm is based on a Chen
12  & Rodden method; is that right?
13     A   Yes.
14     Q   In support of this second algorithm,
15  you cite an article from Chen & Rodden from
16  2013 titled "Unintentional Gerrymandering:
17  Political Geography in Electorial Bias and
18  Legislatures" from the Quarterly Journal of
19  Political Science; is that right?
20     A   Oh, yes.  It's similar to the
21  algorithm outlined by Chen & Rodden, yeah.
22     Q   And this is the primary article that
23  you cite in support of this second algorithm;
24  is that right?
25     A   Correct.

95

1      Q   Did you consult with any other
2  sources to help you in your implementation of
3  the Chen & Rodden method?
4      A   No.  This is the basic method that I
5  used for compactness in my dissertation.  So
6  it was familiar to me from that.
7      Q   Okay.
8      A   It's useful, because rather than
9  defining compactness by the district shape, it
10  defines compactness by the distance between
11  centroids; and while populations are point
12  reference data and don't really have shapes,
13  they do have centroids.
14     Q   When thinking about how to implement
15  the Chen & Rodden method for this litigation,
16  did you discuss implementation with anyone?
17     A   No.  Other than the attorneys.
18     Q   And I asked you this about the first
19  algorithm, I'll ask it here.  Have you written
20  any peer-reviewed articles on the
21  implementation of this second method?
22     A   No.
23     Q   Now, you write that your algorithm is
24  similar to the Chen & Rodden method.  Why
25  didn't you use the Chen & Rodden method

96

1  itself?
2      A   Because the Chen & Rodden method is
3  used for drawing compact districts as such,
4  and here, we're not interested in the district
5  shape.  We're interested in the population.
6  So rather than using the centroid of the
7  precinct, it uses the centroid of the
8  population, because we're dealing with point
9  reference data in trying to find the centroids
10  there, not with areal data, A-R-E-A-L.
11     Q   So to rephrase, you can tell me if I
12  got this correct.  The Chen & Rodden method
13  draws actual districts where your method is
14  not drawing districts in and of itself.
15     A   That's right.  We're both trying to
16  find compact groupings by comparing distances
17  between centroids, which is the basic
18  approach.  It's just a different application
19  of how to do that.  They're trying to draw
20  districts.  I'm trying to find compact
21  populations.  It's aeral units versus point
22  reference units.
23     Q   So let me just get that article up on
24  the screen.
25     MS. THOMAS-LUNDBORG:

97

1        I'm going to have marked as
2   Exhibit 17 the Chen & Rodden article
3   that we were just discussing
4   "Unintentional Gerrymandering
5   "Political Geography and Electorial
6   Bias in Legislatures," and I will
7   scroll quickly through it for
8   identification purposes.
9   BY MS. THOMAS-LUNDBORG:
10      Q   The only one difference is I have
11  highlighted in my version some phrases that we
12  may have discussed together, but otherwise, do
13  you recognize this as the Chen & Rodden
14  article that you cite?
15      A   Yes.
16      Q   Okay.  Now, this method is similar to
17  the algorithm that we were discussing prior to
18  the break.  I think the main difference is
19  that in the first algorithm, you weight BVAP,
20  but in this algorithm, you're weighting the
21  precinct size; is that correct?
22      A   Let me just --
23      Q   If you're looking at your report, I
24  believe you describe the differences between
25  the two on pages 15 and 16 of your report.

98

1       A   Right, I'm looking at page 16.  I
2   just take this to be an important point, so I
3   want to make sure I get it right.  (Witness
4   peruses document.)  Yeah, that's right.
5       Q   Okay, all right.  So focusing on
6   precincts for a minute, why did you decide to
7   weight precinct size?
8       A   Well, because, I have the lengthy
9   definition beforehand of compact from around
10  the time that the amendments to the Voting
11  Rights Act were passed, talking about it being
12  closely and firmly united, taking little
13  space, relatively little, small, light
14  economical model of the automobile not as
15  relevant, but the idea being that compact
16  means small areas, and so that was the
17  weighting here.
18      Q   But why is precinct versus some other
19  form of geography percent?
20      A   Well, you could run it off blocks,
21  but it would take forever.
22      Q   Do you understand precincts to be a
23  static form of geography, meaning a form of
24  geography that doesn't change?
25      A   No, they change over time, but this

99

1   is how most maps are drawn is at the precinct
2   level.  I don't know if there's split
3   precincts within districts in this map.  So
4   they're a good unit of mapping, almost
5   certainly what Mr. Cooper was using when he
6   drew his map; but if someone really wanted to
7   challenge it and they had say a super
8   computer, you could conceivably run it at the
9   block level.  I tried, and after a day, I gave
10  up on the endeavor.
11      Q   You said that precincts can change
12  over time.  Is it your understanding that they
13  do change over time in Louisiana?
14      A   Yes.
15      Q   Do you know who's responsible for
16  precinct changes in Louisiana?
17      A   I don't.
18      Q   And to go over some of the aspects we
19  discussed in the first method, like the first
20  method, the second method does not necessarily
21  fully populate districts; is that right?
22      A   Right, because the point isn't to
23  draw a district.  The point is to identify the
24  compact population that could be 50 percent
25  plus one.

100

1       Q   We talked about the ways in which
2   your method might be related to what Chen &
3   Rodden did.  I'd like to look at page 249 of
4   their report of their article.  So I'm on page
5   249, and I'll just read for the record the
6   first highlighted part of this article.  It
7   says, "Our goal is to design a districting
8   algorithm that uses only traditional
9   geographic criteria of the kind favored by
10  reform advocates.  Our challenge is to
11  guarantee equal apportionment of population
12  while requiring geographic contiguity for all
13  simulated districts, paying no attention to
14  either voter partisanship or any demographic
15  information other than simple population
16  counts.  Another concern is geographic
17  compactness."  Do you see that?
18      A   Yes.
19      Q   Based on their description of what
20  they were doing here, it seems that there are
21  a few key differences between your approaches
22  there.  Is that fair to say?
23      A   There are a few differences, but I
24  don't think they're key.
25      Q   Well, one difference is they sought

101

1 to guarantee equal apportionment of
2 population, and you did not.
3     A   Well, they're applying it in a
4 different way.  They're applying it to draw
5 district maps.  What I'm taking is their
6 concept of compactness.
7     Q   Right, but they said that they sought
8 to guarantee equal apportionment, and your
9 algorithm did not.
10    A   Right, because it's the concept of
11 compactness that I'm borrowing from them, not
12 the exact application, because they're using
13 it to run redistricting simulations, but the
14 compactness conception is still the same.
15    Q   They also say that they are required
16 geographic contiguity, and we at least saw the
17 last algorithm.  Your algorithm does not
18 necessarily require contiguity; is that right?
19    A   First off, the minority population is
20 compact in the last map.  Secondly, that's
21 using a different algorithm than this one.
22    Q   Do you know if this algorithm that
23 the Chen & Rodden, your version of Chen &
24 Rodden would guarantee contiguity?
25    A   The minority group should be -- or

102

1 the most compact minority group should be
2 contiguous.
3     Q   Do you know that whether the output
4 of your algorithm would guarantee a contiguous
5 shape?  We saw in the moment of what you're
6 calling your moment of inertia algorithm, it
7 did not guarantee a contiguous shape.  Do you
8 know if this algorithm would?
9     A   Well, it does produce a contiguous
10 shape.  It can render other portions of the
11 district noncontiguous that will have to be
12 filled in when you actually draw the district;
13 but as far as the most compact population
14 cluster, that which is what we're interested
15 in, that would be contiguous.
16    Q   But would the output have
17 noncontiguous shapes as we saw in the last
18 algorithm?
19    A   The area that's not necessary to
20 constitute 50 percent of the population may be
21 noncontiguous.
22    Q   Okay.
23    A   -- but the shape of the unit of
24 interest, which is the most compact population
25 of black residents of voting age sufficient to

103

1 be 50 percent plus one of the districts should
2 be contiguous.
3     Q   They also say that they did not pay
4 attention to any demographic information,
5 which I take to mean race included, but your
6 algorithm did, in fact, take demography into
7 account, correct?
8     A   So in a sense.  The algorithm that I
9 have, when it's selecting precincts, isn't
10 looking at race here.  It's tallying race as
11 it goes, because that's how the algorithm
12 knows when to stop, but for this particular
13 algorithm being an aeral-based metric, it's
14 going to pay attention to, you know, making
15 the district compact or the grouping compact
16 as it builds out.
17    Q   Okay.  What role does increase in the
18 weighting of precincts size play in your
19 compactness algorithms?
20    A   Well, since this looking is at
21 compactness as a closely grouped area, it's
22 trying to avoid sprawling precincts when it
23 builds out the districts.  Or not the
24 districts.  The clusters.
25    Q   Have you ever been an expert witness

104

1 on the other side of Chen?
2     A   Yes.
3     Q   Have you ever in that expert work
4 criticized the use of the Chen & Rodden
5 method?
6     A   So certainly for trying to enumerate
7 the possible maps on top of a map where it
8 hasn't been enumerated, you can't do that, but
9 you can enumerate the possibilities here; and
10 so the traditional challenge that's been
11 lodged against the Chen & Rodden method that
12 you don't know the target distribution would
13 be completely inapplicable here, because this
14 isn't sampling.  This is enumeration.
15    Q   Have you had any other criticisms of
16 the Chen & Rodden method?
17    A   Gosh, I've been doing this such a
18 long-time, as you said way back when, when we
19 first met, I don't remember; but that's my
20 main criticism today is that for sampling,
21 producing an unbiased sample, there's good
22 evidence it won't -- if left to run an
23 infinite number of times, it wouldn't produce
24 every map, but it will produce every compact
25 cluster here.

105

1    Q    I believe you said you're going to
2  testify in New Mexico, and New Mexico is one
3  of those instances where Chen is on the other
4  side of you?
5    A    Correct.
6    Q    Do you have any other criticisms of
7  Chen in the New Mexico case?
8    A    Well, Dr. Chen -- Dr. Chen filed his
9  rebuttal report and I don't think we got a
10  reply there.  So I'm not sure even how much
11  I'm even going to be allowed to testify
12  against him, if at all.  You know, I think
13  there -- at the deposition, their counsel
14  asked me about criticisms that I had, but I
15  don't know how much of that is going to come
16  out.  I don't know if we're even going to get
17  to do rebuttal testimony there.
18    Q    Do you recall being deposed in
19  New Mexico?
20    A    Yes.
21    Q    Do you recall in that deposition in
22  New Mexico criticizing the Chen method as a
23  method to capture compactness?
24    A    Actually, no, but I think --
25    Q    Okay.

106

1    A    I will take from the phrasing of your
2  question that I did.
3    Q    Give me one second.
4        MS. THOMAS-LUNDBORG:
5            I'm going to have marked as
6        Exhibit 18 just for deposition
7        purposes, your testimony in New
8        Mexico.
9  BY MS. THOMAS-LUNDBORG:
10    Q    I've put on the screen -- it was
11  previously sent to your counsel -- your
12  testimony in what is Republican Party of New
13  Mexico, et al versus Oliver, and it's a
14  deposition from September 6, 2023, and I'm
15  just going to have you read your testimony on
16  page 113, lines four through 22.  It's long so
17  I'm not going to read it all into the record.
18  I would ask that you read it to yourself, and
19  we can see if it refreshes your recollection
20  about whether you've had any criticisms of
21  Dr. Chen's method as a method to capture
22  compactness.
23    A    Counsel, I apologize, I left my
24  readers in the car.  Is there any way you can
25  zoom in on that, because the print on there is

107

1  tiny, as well?  Oh, that's perfect.
2    Q    Wait.  Wait.  Cutting off some of the
3  lines.  If you need me to scroll down, let me
4  know, because I'd like you to go to line 22.
5  Okay.
6    A    Okay.
7    Q    So does this refresh your
8  recollection about whether you've had any
9  criticisms about the use of Dr. Chen's method
10  and compactness?
11    A    So Dr. Chen was pretty emphatic that
12  in this case, he wasn't using the Chen &
13  Rodden method from the 2013 article, and I was
14  able to see from the code that there was at
15  the very least an add-on to the end of it that
16  uses a MCMC flip thing to try to smooth out
17  the edges, but yeah, I agree with this; that
18  when these the districts are being drawn, they
19  don't use Polsby-Popper or Reock as the
20  metric.  So if you're trying to compare
21  district compactness, they won't map well
22  necessarily onto Polsby-Popper or Reock,
23  because it's a different concept of what
24  compactness is.
25    Q    I'd like to go back to the Chen &

108

1  Rodden method itself, and I'm going to go back
2  to their article, which is Exhibit 17.  Okay.
3  So now I'm back on page 249, and I'm going to
4  ask you a question about this second
5  highlighted portion.  In it, they say "A
6  procedure for simulating compact district" --
7  oh, wait.  Sorry.  I want to ask you a
8  different question.  Let me just find where it
9  is and highlight that part.  I'm going to find
10  the exact place where they discuss it.  It's
11  right above.  Let me see if I can highlight it
12  in realtime probably.  Here we go.  So I'm now
13  going to read what is now the highlighted
14  portion in which they say, "Our approach is to
15  experiment with alternative algorithms that
16  approach compactness in different ways or
17  ignore it altogether.  Due to space
18  constraints, we focus on two algorithms:  One
19  that aims for compactness, and one that does
20  not."  Do you know which of the two algorithms
21  your method is based upon, the compact
22  algorithm or the non-compact algorithm?
23    A    The one that aims for compactness.
24    Q    And then, so now, that we're on the
25  same page about which algorithm you used, they

109

1  go on to describe their compact algorithm.
2  They state, "Our procedure for simulating
3  compact districts is as follows," and then,
4  they list steps that they used.  They refer
5  step one through 2c and then on the following
6  page, they have 3a, 3b, 3c, 3d.  Out of all
7  the steps that they used, do they weight
8  precinct size in any of their steps?
9     A   No.  They're weighting distances from
10 centroids.
11    Q   Why wouldn't you use the same
12 weighting approach that they used?
13    A   Because the question that I was asked
14 to answer was to look at the area of the
15 districts that are drawn.
16    Q   Why wouldn't it be weighted districts
17 between centroids look at the area?
18       THE COURT REPORTER:
19       Can you repeat the question?
20 BY MS. THOMAS-LUNDBORG:
21    Q   Why wouldn't the weighted districts
22 between centroid answer the area of question?
23    A   Because you may end up bringing in a
24 massive precinct that inflates the size of the
25 district, and since this is looking for a

110

1  small -- districts that are a small area,
2  using a definition of compactness that focuses
3  on area, that was the more appropriate
4  application.
5     Q   So by weighting the district size,
6  and I think this is what your answer was just
7  now, your algorithm favored smaller precincts?
8     A   Right.  When given a choice, it will
9  choose a smaller precinct by area.
10    Q   And precincts should have a similar
11 number of individuals in them, correct?
12    A   No.
13    Q   Do they tend to?
14    A   Oh, I haven't looked at that, but I
15 don't think I'm going to testify to that,
16 because I don't think it's probably true.
17    Q   Okay.  Do you know if it's more
18 likely to find smaller precincts in urban
19 geography?
20    A   Yes.
21    Q   So by favoring smaller precincts,
22 your algorithm would favor urban geography
23 over rural geography?
24    A   Right.
25    Q   Since the Chen & Rodden method

111

1  doesn't weight districts, they wouldn't
2  necessarily have the same favoritism.  I mean,
3  instead of weight -- sorry -- precincts sizes.
4     A   Well, indirectly, because their
5  weighting the distances between centroids, and
6  larger precincts are going to have larger
7  distances between the centroids.
8     Q   Though I believe your testimony was
9  that it is less likely to happen in your
10 methodology, which is partly why you changed
11 your methodology from what they did, correct?
12    A   I don't know if I -- I'm not trying
13 to be obstreperous, but I don't know if I
14 would put it in exactly those words.  The
15 reason that I used this methodology is that
16 there was a different definition of
17 compactness that was relying on area.
18    Q   Well, right, and so I previously
19 asked you why their weighting of the distances
20 between centroids wouldn't answer the area
21 question, and I believe your answer was about
22 precinct size.  So if the record is unclear
23 here, I think this is the time to make it
24 clear what the differences were between your
25 weighting of precincts sizes and their

112

1  weighting of distances between centroids?
2     A   Yeah, I think the confusion or
3  disagreement is in the way that the question
4  was proposed the second time.  It's not that
5  the centroid distances are going to have
6  nothing to do with precinct size, because
7  larger precincts are going to tend to have
8  centroids that are further from the
9  boundaries, but not necessarily.  You could
10 have like a long, skinny district, where
11 coming at it from a certain angle, the
12 centroid is very close to the boundary.  So
13 the area is a more direct way of getting at
14 the precinct area, but there's still going to
15 be a relationship between the size of the
16 precinct favored and the location of precinct
17 centroid.
18    Q   So then, why not again use the Chen &
19 Rodden centroid district approach versus your
20 weighted precinct approach?
21    A   I suppose you could use the centroid,
22 and someone could check to see if it got a
23 different answer.  I used area because rather
24 than using their centroid method to try to
25 approximate area, you could just use area.

113

1    Q   I'd like to just focus for a second
2  on their steps 3a through 3d, and I'm going to
3  start reading the paragraph that begins with
4  "Steps 2a through 2c are repeated until the
5  total number of districts is exactly d.  At
6  this point in the procedure, these d districts
7  are geographically contiguous and reasonably
8  compact, due to the nearest distant criteria
9  employed in step 2b.  However, the districts
10  are not guaranteed to be equally populated.
11  Hence, repeated iterations of steps 3a through
12  3c are designed to achieve an equitable
13  distribution of population across the
14  simulated districts."  Do you see that?
15    A   Yes.
16    Q   And you did not run steps 3a through
17  3c in your algorithm, correct?
18    A   Oh, that's right, because we're not
19  trying to sample whole district maps.  The
20  borrowing doesn't come from a way to draw full
21  district maps, which isn't something I was
22  looking into.  The borrowing was the concept
23  of geography as something unrelated to the
24  shape of the district, Polsby-Popper or Reock.
25  Or compactness, not geography.

114

1    Q   So getting back to this question of
2  precinct size and the favoring of smaller
3  precincts, how would your approach work in a
4  primarily suburban district?
5    A   Well, since the idea of compactness
6  that this is trying to explore is compact as
7  in taking in little area, it will start with
8  the precincts, and it will continue to pick up
9  suburban precincts, which will tend to be
10  smaller until you reach whatever 50 percent
11  plus one of the population is for that
12  clusters BVAP.
13    Q   Okay.  What about a rural area?
14  Same?
15    A   It will go through the precincts that
16  it can find that are the smallest.
17    Q   Okay.
18    A   But part of the reason that you run
19  this algorithm with every precinct in the
20  House -- or in the district as a starting
21  point is to ensure that every precinct is
22  selected at least once.  So it controls to a
23  certain degree for that precinct size issue by
24  starting in every precinct in the district.
25    Q   But, I think we saw in the visual

115

1  that I can put back up on the screen, not
2  every precinct is in the end going to be
3  depicted in your analysis; and in fact, I
4  don't think we put up the Chen & Rodden
5  version.  So it probably helps ground our
6  discussion.  Let me just put up the right
7  exhibit.  So I'm back to Exhibit 3.  I believe
8  this is Figure 7 on page 18, which is that
9  Chen & Rodden version of this particular
10  district.  Do you see that?
11    A   Yes.
12    Q   So I think you just testified that
13  your method wouldn't necessarily select all of
14  the precincts, but in the output, there is a
15  kind of dotted line around the precincts that
16  are eventually selected; is that correct?
17    A   Right.  So it tries out every
18  precinct as a starting point in the district
19  and takes the one that leads to the most
20  compact area as defined by area.
21    Q   Okay.
22    A   And I think maybe, part of where
23  we're getting wrapped around the axle here is
24  just remembering that this analysis is
25  starting with the definition of compact as

116

1  being a small area.  Maybe, that's not a good
2  definition to use.  That's something the court
3  will have to decide, but if we were to use an
4  understanding of compact as being a small
5  dense area, this is the way of approaching it.
6    Q   Could I ask a question about how this
7  approach would work in a scenario where a town
8  or municipality on its own would never be
9  large enough to constitute a full district,
10  and you would necessarily -- whether the
11  district is majority-minority or majority --
12  majority have to draw from the suburban and
13  rural areas?
14    A   Well, if it's majority-majority, it's
15  not going to work, because you're never going
16  to find that 50 percent plus one compact
17  population.  The algorithm will run infinitely
18  and never converge.  If you are running it on
19  a small town -- I mean, that's the whole point
20  of this is that that cluster up south of -- I
21  think that's Caddo Lake.  It might be Cross
22  Lake up in the top -- yeah.  I remember I used
23  to fish on Caddo Lake with my dad, and I think
24  that's what that one is.  That small town to
25  the south of it has a cluster of black

117

1  individuals of voting age, but they aren't
2  sufficient to constitute 50 percent plus one
3  of the district. So the question would be can
4  you ground a VRA compliant district based on
5  that population, and the answer would appear
6  to be no. You know, in Shreveport, if that
7  district had a little bit more of the black
8  population of Shreveport in it, you would
9  probably have a compact 50 percent plus one
10 district, but nevertheless sprawled out into
11 rural Louisiana, and that would be fine,
12 because you would have that compact population
13 that's 50 percent plus one as the grounding
14 for the district.
15     Q   Yeah. I mean -- so let me rephrase
16 my question. This is a hypothetical that I
17 would pose to you, and I'm curious to know how
18 your analysis would deal with it. You have a
19 town that on its own is not sufficient to
20 constitute a district and will need to go out
21 into the suburban and rural population no
22 matter what. The map drawer has a choice. It
23 could go west or east. To the west, there
24 would be minority population. To the east,
25 there would be majority population. Under

118

1  that scenario, would your analysis ever find
2  that the compactness requirement had been met
3  by going west and picking up the majority
4  population versus going east and picking up
5  the white population?
6      MR. STRACH:
7          Objection.
8      THE WITNESS:
9          So that's a bit of a lengthy
10 hypothetical, and I tried to ground
11 it in this map we have in front of
12 us, the House District 1. The answer
13 is that that cluster in the small
14 town probably isn't sufficient to
15 sustain a minority-majority district.
16 Now, as far as what this approach
17 would detect, it's going to -- the
18 first approach would look for the
19 most compact cluster of black
20 residents. This metric is going to
21 look for the smallest area. So
22 depending on how the precincts are
23 laid out, just how much pop -- but
24 it's going to keep adding area until
25 it gets to 50 percent plus one black

119

1  population. So depending on how the
2  districts and the precincts are laid
3  out, it probably will favor the
4  population, the suburban population
5  to the west for exploring, but it
6  still has to reach 50 percent plus
7  one of the black population or the
8  population of the district. So if
9  it's not going to get that in the
10 suburban area to the west, it's still
11 going to have to explore the area to
12 the east.
13 BY MS. THOMAS-LUNDBORG:
14     Q   Are you familiar with the --
15     A   And on subsequent runs of the
16 district, it's going to start out in that --
17 in the rural area to the east. So if there
18 was ultimately a very compact black population
19 to be discovered out east, it would do so when
20 it uses those precincts as it's starting
21 point.
22     Q   Right, but then, there is the method,
23 which is drawing the line, and then, there is
24 the then visual analysis, and sometimes,
25 numerical, though, we don't have the numbers

120

1  here that happens as a second step. In this
2  hypothetical, assuming we did, in fact, pick
3  up on the west, my understanding is the
4  visuals might fail your test still.
5      A   Well, yeah. You might end up with --
6  I guess I'm a little confused about this
7  hypothetical and the questions we're running
8  through. It's going to look at compact
9  population from an areal perspective in rural,
10 Louisiana, and it's going to look to compact
11 population from an areal perspective in
12 suburban and urban Louisiana. If area -- when
13 Congress passed the Voting Rights Act, if it
14 understood compactness -- or I'm sorry. The
15 1982 amendments to the Voting Rights Act, it
16 understood compactness to be defined in terms
17 of area. Then, this is going to explore what
18 Congress was getting at when it passed the
19 Voting Rights Act and when the Gingles's
20 factors were later announced. If that's a bad
21 definition of compactness, if that's not what
22 the words meant in the 1980s, well, then, you
23 would use a different technique to explore it,
24 but it is what it is. It's looking for the
25 smallest area that can be 50 percent plus one

121

1 under the assumption that that's what compact
2 means.
3    Q   Right. I'm not trying to hide the
4 ball here with my hypothetical. So I'll give
5 the game away. What I'm really trying to
6 figure out is are there circumstances under
7 your analysis in which a combination of an
8 urban, suburban and rural area would meet your
9 test, and the underlying assumption here is
10 that they're going to be times in which you
11 will have to combine urban, suburban and
12 perhaps, even rural areas to meet the equal
13 population requirements.
14    A   Well, it doesn't matter what you're
15 doing to meet the equal population
16 requirements. It only matters -- this
17 analysis only tells us where the most compact
18 black population is. If there is a compact
19 black population that can be 50 percent plus
20 one of the district, you can do whatever you
21 want with the rest of the district, at least
22 from my analysis. So like I said, if this
23 district had taken in a little bit more of the
24 black population of Shreveport, so it wouldn't
25 have had to reach out halfway to the Arkansas

122

1 border to get it's sufficient black
2 population, we probably are having a very
3 different discussion here even though the
4 district would still sprawl over a large area
5 to meet the equal population requirement.
6    Q   Right, and that would be true if the
7 black population in your answer was
8 concentrated in a particular area. I think
9 you said multiple times that it is area that
10 you're looking at, correct?
11    A   With this metric, it's measuring
12 area, correct.
13    Q   And are you familiar with the term
14 packing?
15    A   Yes.
16    Q   What is packing?
17    A   Packing is when you intentionally
18 place partisans within a district to reduce
19 their impact, I guess, on elections.
20    Q   Are you familiar with the term
21 "packing in a racial context"?
22    A   Yeah. So if you intentionally draw a
23 district using race as a predominant factor to
24 reduce the ability or to separate people in
25 our context, I guess black individuals on the

123

1 basis of their race, that's packing. It could
2 be packing in a Voting Rights Act context if
3 there were, in fact, more districts that could
4 be drawn that would elect the minority
5 candidate of choice under the -- and also meet
6 the Gingles's preconditions, but that's the
7 question here is whether this district is
8 meeting the Gingles's preconditions.
9    Q   You are familiar with the idea of
10 packing in a racial context where a minority
11 would be concentrated into a certain number of
12 districts?
13    A   Yes.
14    Q   Okay.
15    A   They're concentrated into a certain
16 number of districts here.
17    MS. THOMAS-LUNDBORG:
18        I actually think we're at a good
19    place to take a lunch break. I think
20    after lunch I'm going to circle up,
21    but I probably have a half an hour to
22    an hour of questions. Then, I can
23    turn it over to the Congressional
24    folks.
25        We can go off the record.

124

1        (Lunch recess taken.)
2 BY MS. THOMAS-LUNDBORG:
3    Q   So I have just a few more questions
4 for you, and I can turn you over. I think
5 though, I probably will in case -- well, let's
6 get there when we get there.
7        You would agree that there are a
8 varying waves of statistical measures of
9 compactness that have been accepted by the
10 courts in redistricting cases?
11    A   Yes.
12    Q   So I'd like to go through some of the
13 measures of compactness that have been
14 accepted by the court. Well, I'll ask one
15 more question. The measures that have been
16 accepted by the courts today are expressed as
17 mathematical formulas, correct?
18    A   Yes, as mathematical output, I guess.
19 Sure.
20    Q   Which measures have been the most
21 prominent that you are aware of?
22    A   Probably Reock and Polsby-Popper.
23    Q   You just mentioned the Reock measure,
24 and I think we've talked about it a bunch
25 today. Do you know who the person is who's

125

1  credited with coming up with the Reock score?
2      A    Ernest Reock.
3      Q    Who is he?
4      A    He was someone who published in 1961,
5  well before I was learning who professors
6  were. I just know he wrote the article.
7      Q    Did you ever write an expert report
8  in a case where you credited Professor Reock
9  with the Reock method?
10      A    I believe so, yes.
11      Q    Do you recall whether in that expert
12  report you also listed Professor Reock's
13  university affiliations?
14      A    I don't know.
15      Q    Does it sound familiar to that
16  Professor Reock may have been the director of
17  Rutgers University's Center for Government
18  Service?
19      A    I have no reason to believe you would
20  make something like that up. So I can go
21  along with that.
22      Q    Okay. How does Reock measure
23  compactness?
24      A    It takes the district, and it draws
25  the smallest circle around the district that

126

1  it can without cutting the district edge. So
2  it's the minimum bounding circle, and
3  effectively, it's the percentage of that
4  circle that the district fills. It's the area
5  of the district over the area of the minimum
6  bounding circle.
7      Q    And do you know who Reock was scored?
8      A    It's on a range from zero to one.
9      Q    And is it your opinion that the
10  moment of inertia and Chet & Rodden method
11  that you describe in your report is superior
12  for measuring compactness for real?
13          MR. STRACH:
14              Objection. Go ahead.
15          THE WITNESS:
16              To measure the compactness of
17          the population, yeah, because you're
18          dealing with points, not district
19          boundaries.
20  BY MS. THOMAS-LUNDBORG:
21      Q    Okay, and for measuring the
22  compactness of a district?
23      A    If you're looking to measure the
24  compactness of a district boundary, you would
25  use something like Reock or Polsby-Popper or

127

1  something of that nature.
2      Q    I think we've discussed this a little
3  bit in the morning. Have you ever run the
4  Reock measure score?
5      A    Yes.
6      Q    Have you done so in your expert
7  redistricting work?
8      A    Yes.
9      Q    And I believe you ran the Reock
10  measure for the Louisiana Congressional case;
11  is that correct?
12      A    If I don't remember, I should
13  probably remember quickly. I think that's
14  right.
15      Q    Why did you run it there?
16      A    I think because I was asked to find
17  the compactness of the district.
18      Q    Are you aware of whether courts have
19  ever credited the use of the Reock score in an
20  expert's Gingles 1 analysis?
21      A    As I understand it, most of these
22  cases are tried using district compactness as
23  the theory. So yeah, you would -- it's been
24  credited, and you would use Reock or
25  Polsby-Popper for district compactness. My

128

1  understanding is that defense has a district
2  different theory.
3      Q    Do you recall that Mr. Cooper ran the
4  Reock scores on both his illustrative map and
5  the enacted map?
6      A    Yes.
7      Q    Do you recall what his results found?
8      A    No. I wasn't interested in district
9  compactness. I was interested in population
10  compactness.
11      Q    Would it surprise you that district
12  compactness, that Mr. Cooper's maps either met
13  or beat the enacted maps?
14      A    On average, it would not surprise me.
15      Q    Do you have any reason as you sit
16  here today to -- strike that. Is it your
17  opinion as you sit here today that
18  Mr. Cooper's maps are non-compact on a
19  district compactness basis?
20      A    I haven't done any work one way or
21  the other on the district level compactness of
22  the maps.
23      Q    I think I have just a few follow-up
24  questions. You mentioned Reock, and you have
25  run Reock in your redistricting work. I think

129

1  you've also mentioned Polsby-Popper; is that
2  right?
3      A   That's right.
4      Q   And generally, what is the
5  Polsby-Popper method?
6      A   The Polsby-Popper method takes --
7  instead of the minimum bounding circle, it
8  takes the perimeter of the district and looks
9  at the area of the circle with the same
10 perimeter as the district and asks what
11 percentage, and then, it's the ratio of the
12 area of that district to the area of the
13 circle with the same perimeter.
14     Q   You've also run Polsby-Popper in the
15 past?
16     A   Yes.
17     Q   And you've done that in your expert
18 redistricting work?
19     A   Yes.
20     Q   And Mr. Cooper did it here on his
21 maps and the enacted maps?
22     A   I will certainly accept your
23 representation on that.
24     Q   Okay, and I'm going to ask the same
25 questions about convex hull.  Are you familiar

131

1      A   After Dr. Duchin pointed out that
2  it's just the square route of Polsby-Popper.
3      Q   Do you recall when that was?
4      A   I believe it was during the Texas
5  litigation before it got stayed.  So sometime
6  last year.
7      Q   Let  me just check quickly.
8      MS. THOMAS-LUNDBORG:
9          Let me just check quickly.  I
10 think I'm done.  Just in case
11 anything else comes up, I will close
12 out your deposition by the end of the
13 day, but I am going to turn it over
14 to the Congressional case, and just
15 leave it open for a second if
16 anything comes up, but we will at
17 least close out my deposition by the
18 end of today, but I'll close it out
19 to Dan in the Congressional case
20 before doing that.
21         I think we're in a different
22 zoom room.  Do we want to go off the
23 record and rejoin the others in Link
24 with the other one?
25         (Whereupon, the deposition was

130

1  with convex hull metric?
2      A   Yes.
3      Q   Have you run the convex hull metric
4  in your prior redistricting work?
5      A   I have.
6      Q   I don't think I asked this question
7  about Polsby-Popper.  So let me go back
8  quickly.  Does Polsby-Popper give a score?
9      A   Yes.
10     Q   Does convex hull give a score?
11     A   Yes.
12     Q   And did you run convex hull in this
13 case?
14     A   No, because I wasn't interested in
15 district compactness.
16     Q   And then, a similar question about
17 the Schwartzberg metric.  Are you familiar
18 with the Scwartzberg metric?
19     A   I am.
20     Q   Have you run that metric before?
21     A   I have.  Though, I don't anymore.
22     Q   You said you don't anymore?
23     A   I don't.
24     Q   When did you stop running that
25 metric?

132

1  concluded at 12:24 PM.)

133

1          WITNESS CERTIFICATE
2
3
4          I, SEAN P. TRENDE, do hereby certify
5    that the foregoing testimony was given by me,
6    and that the transcription of said testimony,
7    with corrections and/or changes, if any, is
8    true and correct as given by me on the
9    aforementioned date.
10
11
12
13
DATE SIGNED          SEAN P. TRENDE
14
15
16
17          Signed with corrections as noted.
18
19          Signed with no corrections noted.
20
21
22
23
24
25

134

1          C E R T I F I C A T E
2
3          I, LORI L. MARINO, Certified Court
     Reporter, in and for the State of Louisiana,
4    as the officer before whom this testimony was
     taken, do hereby certify that SEAN P. TRENDE,
5    after having been duly sworn by me upon
     authority of R.S. 37:2554, did testify as
6    hereinbefore set forth in the foregoing 133
     pages; that this testimony was reported by me
7    in the stenotype reporting method, was
     prepared and transcribed by me or under my
8    personal direction and supervision, and is a
     true and correct transcript to the best of my
9    ability and understanding; that the transcript
     has been prepared in compliance with
10   transcript format guidelines required by
     statute or by rules of the board, that I have
11   acted in compliance with the prohibition on
     contractual relationships, as defined by
12   Louisiana Code of Civil Procedure Article 1434
     and in rules and advisory opinions of the
13   board; that I am not related to counsel or to
     the parties herein, nor am I otherwise
14   interested in the outcome of this matter.
15
16   Dated this 2nd day of October, 2023.
17
18
19
20
21   LORI L. MARINO, CCR
     CCR #87069
22   STATE OF LOUISIANA
23
24
25

| A | | | | | |
|---|---|---|---|---|---|
| **A-C-R-E-E** 39:12 | 19:5 36:8 | **advisory** 134:12 | 126:14 | **Allen** 88:14 | **announced** 120:20 |
| **A-C-S** 38:25 | **Acee** 53:1 | **advocates** 100:10 | **aims** 108:19 108:23 | **allow** 82:8 | **answer** 6:15 7:24 9:15 |
| **A-G-E-E** 53:6 | **achieve** 113:12 | **aeral** 96:21 | **al** 15:5,5 16:13,14 | **allowed** 105:11 | 9:15 22:11 22:13 |
| **A-R-E-A-L** 96:10 | **Acree** 39:12 39:23 | **aeral-based** 103:13 | 106:13 | **allows** 81:9 82:2 | 27:13,14 28:3 55:19 |
| **Abbott** 49:24 52:4 | **Acs** 38:25 | **affiliations** 125:13 | **Alex** 38:25 39:15 | **Alora** 2:7 8:2 | 62:2 77:13 91:22 |
| **ability** 7:24 122:24 134:9 | **Act** 52:1,4,5 57:6 64:8 65:16 | **aforementi...** 133:9 | **ALEXIS** 1:7 | **alpha** 81:15 81:18 82:7 | 109:14,22 110:6 |
| **able** 10:5 13:14 | 72:18 77:2 86:17,18 | **age** 24:23 62:7 65:12 | **algorithm** 44:13 45:16 | **alternative** 108:15 | 111:20,21 112:23 |
| 25:20 38:3 46:13 | 89:23 98:11 | 65:22 66:8 69:20 | 68:23 73:23 | **altogether** 108:17 | 117:5 118:12 |
| 74:21 82:12 90:2 | 120:13,15 120:19 | 70:19 80:9 80:18 81:5 | 78:12 79:19 80:3 | **AMANDA** 3:9 | 122:7 |
| 92:22 107:14 | 123:2 | 86:13 87:1 102:25 | 82:20 94:4 94:11,14,21 | **Amendment** 55:21 | **answered** 28:6 |
| **above-enti...** 1:15 | **acted** 134:11 **acting** 37:14 | 117:1 | 94:23 95:19,23 | **amendments** 98:10 | **answering** 7:19 59:5 |
| **academic** 33:7,20,21 | **ACTION** 1:4 **actual** 68:24 | **Agee** 49:25 52:3 53:3,4 | 97:17,19,20 100:8 | 120:15 | **answers** 56:11 |
| 44:7,10 72:20 | 71:5 96:13 **add** 48:17 | 53:9 | 101:9,17,17 101:21,22 | **AMERIC...** 3:2 | **anticipated** 24:6 85:4 |
| **accept** 129:22 | 85:9,21 **add-on** | **aggregate** 47:16,17 | 102:4,6,8 102:18 | **amicus** 49:21 | **anymore** 68:1 |
| **accepted** 124:9,14,16 | 107:15 **added** 39:20 | **aggregation** 47:16 | 103:6,8,11 103:13 | **amount** 46:12 | 130:21,22 |
| **accepting** 55:6 | **adding** 118:24 | **ago** 8:2 23:20 38:7 39:5 | 108:22,22 108:25 | **analogies** 63:10 | **anytime** 34:2 **anyway** 88:7 |
| **access** 74:6 | **addition** 30:25 | 39:16,22 40:2 | 109:1 110:7,22 | **analysis** 19:24 55:3 | **apologize** 37:4 |
| **accommod...** 14:2 | 81:21 **additional** | **agree** 58:9,13 84:4 | 113:17 114:19 | 55:7 58:20 61:12,24 | 106:23 |
| **accomplish** 31:10 | 85:21 92:6 **additions** | 107:17 124:7 | 116:17 | 62:24 63:8 64:4 76:14 | **appear** 16:20 17:15 83:2 |
| **account** 85:7 103:7 | 48:12 **address** 7:8 | **agreed** 6:2 39:8 | **algorithms** 42:21,22 | 90:12 115:3,24 | 87:19 117:5 |
| **accurate** 16:2,21 | 60:3 **administer...** 6:22 | **AGREEM...** 4:10 | 77:18,24 78:8 | 117:18 118:1 | **appearances** 2:1 3:1 4:7 |
| | **admittedly** 87:11 | **ahead** 52:6 63:20 | 103:19 108:15,18 | 119:24 121:7,17,22 | 88:6 |
| | **adviser** 38:23 | 85:12 91:25 | 108:20 | 127:20 | **appeared** 73:7 |
| | | | **ALICE** 1:6 | **and/or** 6:14 133:7 | **appears** 84:8 |
| | | | | **angle** 112:11 | |

84:14
**appendages**
88:16
**applicable**
22:25
**application**
33:3 54:8,8
54:11
96:18
101:12
110:4
**Applied** 37:7
**applying**
101:3,4
**apportion...**
100:11
101:1,8
**approach**
44:20
62:18,20
67:10,14
73:10
75:10,24
76:23 77:8
90:4 96:18
108:14,16
109:12
112:19,20
114:3
116:7
118:16,18
**approached**
64:25
**approaches**
43:10
44:17
45:12
100:21
**approaching**
116:5
**appropriate**
110:3
**approximate**

112:25
**approxima...**
29:23,25
**April** 37:21
**Ardion** 15:5
**Ardoin** 1:11
16:13
**area** 68:4
78:24 80:3
86:13 88:6
89:4 90:25
91:5,7,17
92:9
102:19
103:21
109:14,17
109:22
110:1,3,9
111:17,20
112:13,14
112:23,25
112:25
114:7,13
115:20,20
116:1,5
118:21,24
119:10,11
119:17
120:12,17
120:25
121:8
122:4,8,9
122:12
126:4,5
129:9,12,12
**areal** 96:10
120:9,11
**areas** 78:25
79:2 82:11
86:10
87:20
98:16
116:13

121:12
**argue** 55:10
**Arizona**
52:22
54:16,17,22
75:23
**Arkansas**
121:25
**art** 10:22,23
**article** 57:4
94:15,22
96:23 97:2
97:14
100:4,6
107:13
108:2
125:6
134:12
**articles** 47:17
66:21
77:22,22,25
78:4 95:20
**Aside** 26:25
**asked** 22:14
24:7 62:4
73:25
75:25
76:23,25
77:5,12
78:2 83:17
95:18
105:14
109:13
111:19
127:16
130:6
**asks** 129:10
**aspects** 99:18
**assume** 26:14
52:10
64:10
74:24
**assuming**

10:18
14:11
93:20,21
120:2
**assumption**
121:1,9
**attached**
19:6
**attention**
100:13
103:4,14
**attorney**
3:10 8:3
**attorneys**
95:17
**August** 13:1
18:20
35:11,13,16
**authority**
30:16,23
134:5
**automobile**
98:14
**AVENUE**
2:18
**average**
128:14
**avoid** 37:15
78:23,24
81:10
103:22
**aware** 14:4
14:13
21:16
30:15 41:9
55:6,9
57:16
61:12,16,19
62:19,22,25
63:4,5,13
73:8 75:2
75:11
77:20 93:8

124:21
127:18
**awhile** 39:14
87:11
**axle** 67:22
115:23

———————
**B**
**B** 5:1 70:13
**B-1** 20:16
21:3
**B-2** 20:18
21:3
**back** 21:9,11
21:12
24:13 29:5
34:4 35:14
38:6 54:23
58:8 60:11
65:20
74:18 78:4
78:7,10
79:10
91:12,13
92:10,13
93:16 94:3
104:18
107:25
108:1,3
114:1
115:1,7
130:7
**background**
32:16
33:24
36:23
46:16 48:5
54:2
**bad** 120:20
**BakerHost...**
9:23
**balanced**
67:18

**ball** 121:4
**ballpark**
34:14,19
**based** 44:13
60:25
76:23
92:23
94:11
100:19
108:21
117:4
**baseline**
72:11
**basic** 22:11
95:4 96:17
**basically**
57:24 68:5
68:15
**basis** 123:1
128:19
**Baton** 3:8,13
90:25 91:5
91:7,17
92:9
**bearing**
53:21
**beat** 128:13
**began** 58:17
**beginning**
14:3 58:23
60:24
62:10
**begins** 113:3
**behavior**
46:7
**believe** 12:4
15:8 17:22
19:19
22:22
23:19
24:10 28:5
36:21 38:6
38:10,14

40:1 41:23
49:12 71:1
78:12
79:14 80:8
91:1 97:24
105:1
111:8,21
115:7
125:10,19
127:9
131:4
**Bellwether**
40:25
41:15
**Benson** 50:1
52:3 53:1
**best** 66:5
72:4 134:8
**Bias** 94:17
97:6
**bibliography**
29:12
**big** 74:14
**bike** 67:15,18
67:21 68:4
**bill** 11:9 14:8
16:25 17:4
17:16 18:1
18:2,7,17
20:16
21:13 35:4
35:10,13,16
**billed** 34:23
35:2,16
**bit** 23:5
27:20
79:11 81:8
82:2 86:22
117:7
118:9
121:23
127:3
**black** 1:7

24:22
65:22
69:20
70:12,17
79:22 80:9
81:4 82:11
82:19,20
84:20
85:25 86:7
86:12,24,25
87:17,19
90:1 91:16
102:25
116:25
117:7
118:19,25
119:7,18
121:18,19
121:24
122:1,7,25
**blanking**
57:22
**block** 25:16
25:18 28:8
70:12 99:9
**blocks** 74:20
98:20
**blue** 80:6,7,8
80:21,23
81:2,16,23
81:25,25
82:4,5,16
82:16
**board** 52:20
134:10,13
**bogged** 93:22
**border** 122:1
**borrowed**
33:25
**borrowing**
101:11
113:20,22
**bottom** 60:4

60:23
67:24
**boundaries**
112:9
126:19
**boundary**
84:11
112:12
126:24
**bounding**
89:5 126:2
126:6
129:7
**brand** 31:16
31:18,20
**break** 9:3,8,9
10:17,19
48:6 53:18
54:25 58:6
93:7,13,14
94:5,7
97:18
123:19
**breaks** 9:4,7
**brief** 30:22
36:22
46:15,18
**briefly** 10:23
11:15
17:11 60:8
**bringing**
109:23
**Brnovich**
52:21
**Bryce** 39:12
39:12
**bucket** 57:7
**build** 43:6
**BUILDING**
1:7
**builds**
103:16,23
**bunch** 16:7

21:10
33:13
124:24
**busy** 38:5
**BVAP** 66:1
78:13,15
79:19
85:19
97:19
114:12

---
**C**
---
**C** 3:14 134:1
134:1
**C-1** 20:21
21:3
**C-2** 20:23
21:3
**C-A-L-D-...**
38:24
**C-plus-plus**
42:9
**Caddo** 83:12
116:21,23
**calculate**
68:8,23
73:23 74:7
78:1
**calculated**
71:7,11
74:1 75:4,4
**Caldeira**
38:23
**CALHOUN**
1:7
**CALI** 3:12
**call** 12:4
30:15
32:15
71:14 89:8
90:7
**called** 31:7
32:21 34:1

49:19
**calling** 102:6
**calls** 88:18
**calmed** 24:15
**CAMBRI...**
2:6
**candidate**
25:21
123:5
**capable** 86:7
**capacity** 1:7
1:11 37:14
**capture**
58:18
105:23
106:21
**car** 106:24
**care** 86:22,23
**careful** 64:5
**Carlo** 43:3,6
44:14,15,20
45:14
**Carolina**
2:14 37:19
51:3,8,21
**carry** 31:11
**Carter** 49:20
**case** 10:14
14:3,13
16:3,22
18:10
21:23,24
22:10 23:6
23:7,14,17
23:21,22,24
23:25 24:8
24:19
26:10,13,17
27:3 29:10
31:3,17
32:9 34:6,9
34:12,23
35:2,23

36:15,19
37:13
43:19
49:13,22,24
50:1,2,22
50:24 51:2
51:3,5,21
51:25 52:2
52:3,3,4,5
52:22,23
53:13,14
54:24 55:1
55:4,8
57:18,21
58:18
62:23 66:5
72:4 75:7
75:23 76:3
76:5,5,7,7
105:7
107:12
124:5
125:8
127:10
130:13
131:10,14
131:19
**cases** 48:9,17
48:20,23,24
49:1,3,8,19
50:11,14,20
51:8,10,12
51:25 52:1
52:9,11,13
52:16,19,25
53:7 55:9
62:25 63:5
63:17 73:8
75:2,25
124:10
127:22
**casually**
26:19

cause 1:15
caveat 80:19
CCR 134:21
134:21
census 32:23
32:24
center 67:17
67:22 68:1
68:7,10,16
69:6
125:17
centroid 68:1
96:6,7
109:22
112:5,12,17
112:19,21
112:24
centroids
43:8,8
95:11,13
96:9,17
109:10,17
111:5,7,20
112:1,8
certain 9:13
112:11
114:23
123:11,15
certainly
59:14
92:20 99:5
104:6
129:22
CERTIFI...
4:12,13
133:1
certification
6:9
Certified
1:17,23
6:20 134:3
certify 133:4
134:4

Chain 44:14
challenge
99:7
100:10
104:10
change 38:9
89:19
98:24,25
99:11,13
changed
38:10 92:9
111:10
changes
90:24 91:1
99:16
133:7
Chapman
49:20
chapter
30:11 43:1
72:15,17
chapters
40:1,3,4
charger 58:5
chat 8:8
check 41:6
41:11 54:7
112:22
131:7,9
Chen 57:1
94:11,15,21
95:3,15,24
95:25 96:2
96:12 97:2
97:13
100:2
101:23,23
104:1,4,11
104:16
105:3,7,8,8
105:22
107:11,12
107:25

110:25
112:18
115:4,9
Chen's
106:21
107:9
Chet 126:10
choice 25:21
110:8
117:22
123:5
choices 76:6
choose 110:9
CHRISTI...
3:18
circle 89:5
123:20
125:25
126:2,4,6
129:7,9,13
circumstan...
86:2
circumstan...
24:3 121:6
citation
30:20 61:8
citations
30:8,16,18
cite 29:9,14
29:15,17
30:22
66:14
77:22
94:15,23
97:14
cites 29:21
City 50:2
52:2,25
53:13,14
Civil 1:4 3:2
6:6 134:12
claim 94:10
class 45:7,8

45:10
clean 33:17
cleanest 47:7
clear 8:20
20:25
55:24
111:24
clearly 92:25
CLEE 1:6
Clinic 2:4 8:5
close 43:8
112:12
131:11,17
131:18
closed 83:24
84:9
closely 98:12
103:21
cluster 66:6
83:3 86:25
102:14
104:25
116:20,25
118:13,19
clusters 70:2
70:3 78:15
103:24
114:12
Coca 50:2
code 28:21
28:23,25
29:1 31:2,9
31:16,19,20
32:5,13,15
32:20 33:3
33:14,19,21
41:23 42:1
42:11,14,16
42:18,19
43:3 69:23
70:14,22
81:14,15,18
82:14

89:17,19
90:12,19
107:14
134:12
coded 42:6,7
codes 32:8
45:25
coding 42:3
42:5 46:3
46:13 78:5
COHEN
2:20
cohesion
25:17
coincide
27:24
coincided
31:1
color 81:22
82:2
Columbus
9:23
combination
121:7
combine
121:11
come 21:11
77:7,10
93:16
105:15
113:20
comes 131:11
131:16
comfortable
88:19
coming
112:11
125:1
command
32:22
33:11,23
commands
31:11

commencing
1:19
committed
39:13
committee
38:22,24
39:3,7,18
54:5,16
common
50:20
communities
43:2 56:25
61:3
community
62:5
compact
24:25
25:10,13
43:5 59:2,3
64:14 65:3
65:9,17
66:6,11,18
66:22 67:1
69:9 70:11
70:17
71:18,19,20
72:1 76:9
77:3 78:3
80:3 83:16
84:20,21
85:2,6 86:6
87:2,9,17
87:21 88:8
96:3,16,20
98:9,15
99:24
101:20
102:1,13,24
103:15,15
104:24
108:6,21
109:1,3
113:8

114:6
115:20,25
116:4,16
117:9,12
118:19
119:18
120:8,10
121:1,17,18
**compactness**
21:4 25:9
27:10
30:13
41:18
43:11
55:11
56:17,21
58:19 61:2
62:5,9,18
62:24 63:2
63:3,12,14
63:23
64:13,19
65:1 66:15
66:16
72:25 73:1
73:5,11
75:16 76:1
76:17,19
77:1,21
85:16,18
89:21 95:5
95:9,10
100:17
101:6,11,14
103:19,21
105:23
106:22
107:10,21
107:24
108:16,19
108:23
110:2
111:17

113:25
114:5
118:2
120:14,16
120:21
124:9,13
125:23
126:12,16
126:22,24
127:17,22
127:25
128:9,10,12
128:19,21
130:15
**company**
47:10
**comparative**
21:4
**compare**
69:7,25
70:4,9,21
70:23 71:5
71:15
107:20
**compared**
88:23
**comparing**
96:16
**comparison**
70:25 72:6
89:16
**comparisons**
70:16
71:25
**complete**
38:3
**completed**
38:18
**completely**
82:7
104:13
**compliance**
61:21

63:18
64:21
66:25 74:5
75:20
134:9,11
**compliant**
72:11
117:4
**comply** 64:14
**component**
52:8
**components**
52:9
**computati...**
73:14
**computer**
32:3 58:7
74:10 99:8
**computers**
74:7
**conceivably**
99:8
**concentrated**
122:8
123:11,15
**concept**
66:12,22
101:6,10
107:23
113:22
**conception**
101:14
**conceptually**
64:25
**concern**
100:16
**concerns**
81:11
**concluded**
132:1
**conditional**
54:22
**conducting**

61:11
**conference**
1:8 44:7,10
**confidenti...**
64:7
**configurati...**
56:2 92:15
**configurati...**
88:25
**configured**
25:14
**confused**
120:6
**confusion**
39:18
112:2
**Congratul...**
38:20
**Congress**
120:13,18
**Congressio...**
14:13
36:19
93:19
123:23
127:10
131:14,19
**consider** 59:4
**considered**
47:23 48:1
57:3
**constitute**
65:11 66:7
70:18
102:20
116:9
117:2,20
**constraints**
108:18
**constructive**
43:3,5
44:15,20,22
45:1,3,13

45:20,25
**consult** 95:1
**content**
47:14,19,22
**contents**
47:22
**context**
55:22
89:22
122:21,25
123:2,10
**contiguity**
56:17,21
61:3 85:8
100:12
101:16,18
101:24
**contiguous**
83:2,3,8
102:2,4,7,9
102:15
103:2
113:7
**continue**
114:8
**CONTINU...**
3:1
**contractual**
134:11
**controls**
114:22
**converge**
116:18
**convex** 63:11
63:16
64:12
129:25
130:1,3,10
130:12
**Cooper** 11:9
17:1,4,10
17:16 18:7
19:21

21:14
24:21
25:23 27:1
61:12,17
65:23 66:6
79:24
90:24 91:2
91:16 92:2
92:2 99:5
128:3
129:20
**Cooper's**
17:19 18:2
18:3,17,21
18:25 19:7
19:17,18
20:16,19,21
20:24 21:4
28:6,7
60:11 72:5
72:7
128:12,18
**copies** 15:9
19:6
**copy** 12:18
13:11 16:2
16:21
17:15 36:8
78:9
**correct** 7:13
14:20,21
26:18
38:15,16
41:2,24,25
42:10 44:1
44:5 48:11
49:14
55:14 62:6
70:1 76:24
78:8,9,16
79:16,20,21
81:17,20
84:17

88:25
94:25
96:12
97:21
103:7
105:5
110:11
111:11
113:17
115:16
122:10,12
124:17
127:11
133:8
134:8
**corrections**
133:7,17,19
**counsel** 4:10
6:3 9:13
11:15,18,19
11:24 13:9
14:2 22:6
26:9 35:4
35:10
76:24,25
77:11
105:13
106:11,23
134:13
**count** 52:25
**Counties**
41:15
**counts**
100:16
**county** 57:11
57:13
**couple** 32:20
37:10
40:18 48:4
48:12 86:4
93:10
**course** 33:24
34:21 45:5

46:3,9
71:11 77:6
77:23
**courses** 46:2
46:12
**court** 1:1,23
6:20 7:16
29:20
48:25 49:9
49:12,17
51:6,11,12
51:13 53:6
55:6,20
88:14,19,22
109:18
116:2
124:14
134:3
**courts**
124:10,16
127:18
**cover** 15:3
16:11
76:16
**covered**
14:15 82:8
**covers** 45:10
**COVID**
40:17
**Covington**
52:9
**Cranmer**
39:8
**crash** 33:14
**create** 43:14
43:17 44:3
**created**
43:20
**credited**
125:1,8
127:19,24
**criteria** 56:6
56:9,20,24

57:6 58:9
58:11,15,20
59:5,12
60:8 61:23
100:9
113:8
**criticism**
92:1
104:20
**criticisms**
104:15
105:6,14
106:20
107:9
**criticized**
91:2 104:4
**criticizing**
105:22
**critiquing**
55:13
**cross** 71:24
116:21
**cross-district**
89:16
**crosses** 92:18
**crunch** 9:5
**curious**
117:17
**current** 39:3
39:4 46:20
92:15
**currently** 8:4
41:21
**cut** 30:14
48:19
**cutting** 107:2
126:1
**CV** 35:24,25
36:8,13
40:12,16,22
41:3

_____ D _____

**d** 4:1 5:1
113:5,6
**D.C** 2:19
**dad** 116:23
**daily** 47:12
**DAKOTA**
3:4
**Dan** 131:19
**DANIEL**
2:10,20
**data** 30:1
32:23,24
95:12 96:9
96:10
**date** 17:13
37:18,23
41:4 54:4
133:9,13
**dated** 12:16
12:25
13:20
134:16
**Daubert** 50:6
50:9,12,15
50:25 51:6
**day** 39:21
89:3 90:6
99:9
131:13
134:16
**DC** 3:3
**dcohen@el...**
2:21
**deal** 62:15
117:18
**dealing**
72:17 94:5
96:8
126:18
**deals** 27:6
**December**
37:9,9
39:13 54:4

**decide** 29:16
87:14 98:6
116:3
**decision**
55:21
**decisions**
57:8
**declaration**
17:10,21
**defend** 93:3
**defendant**
1:12 26:3
**defendants**
2:16 26:3
**defended**
38:14
**defense** 13:8
19:20
26:13,16
77:4 128:1
**define** 62:9
**defined**
115:20
120:16
134:11
**defines** 95:10
**defining** 95:9
**definitely**
34:21
**definition**
87:22 98:9
110:2
111:16
115:25
116:2
120:21
**degree** 37:3
56:25 89:7
90:7
114:23
**Delaware** 4:3
7:11
**delineation**

33:17
**demanding**
73:14
**demarcated**
51:24
**demarcati...**
48:21
**demograp...**
100:14
103:4
**demography**
103:6
**demonstrate**
45:13,20,23
**demonstra...**
74:4 76:9
88:15
**demonstra...**
90:17
**denial** 52:15
52:17
**dense** 116:5
**densely**
78:23,25
79:1
**density** 62:16
**DEPART...**
3:7
**depending**
10:20
83:23
118:22
119:1
**depends**
74:13
**depicted**
115:3
**depiction**
71:4 82:13
83:6 84:17
85:5
**deposed** 8:10
8:11 21:17

| | | | | | |
|---|---|---|---|---|---|
| 36:15 | **determine** | 134:8 | 29:19,22 | 70:20 | 126:18,22 |
| 37:18 40:2 | 24:21 30:9 | **directly** | 30:21 31:2 | 71:25 72:2 | 126:24 |
| 49:4 50:4 | 59:1 87:8 | 27:11 | 31:15 38:9 | 74:11,25 | 127:17,22 |
| 105:18 | 87:13 | 59:25 85:1 | 38:15 40:1 | 79:23 80:4 | 127:25 |
| **deposition** | **determined** | **director** | 40:14 | 84:19,25 | 128:1,8,11 |
| 1:14 6:4,16 | 80:3 | 125:16 | 42:12,18,20 | 85:3,7,10 | 128:19,21 |
| 8:12 9:20 | **determines** | **disagree** | 43:13 44:2 | 85:22 86:1 | 129:8,10,12 |
| 11:12,20 | 81:18 | 87:23 | 54:21 | 86:3,6,20 | 130:15 |
| 12:13,15,24 | **determining** | 88:10 | 72:15,16 | 86:21 | **district's** |
| 13:7,12,19 | 72:25 | **disagreem...** | 77:6,17,19 | 87:16 | 65:12 66:8 |
| 14:1,11,12 | 85:15,17 | 112:3 | 77:24 95:5 | 88:23,24,24 | 70:19 |
| 14:18,22 | **dhessel@la...** | **disagrees** | **distance** | 89:18,20 | 85:15 86:9 |
| 16:24 18:8 | 2:10 | 77:4 | 68:13 | 90:12,20,25 | **districting** |
| 19:16 21:2 | **difference** | **discovered** | 95:10 | 91:3,3,8,19 | 56:15 |
| 21:11,12,13 | 68:19 69:1 | 119:19 | **distances** | 91:20 | 100:7 |
| 21:19 23:2 | 97:10,18 | **discuss** 26:9 | 68:9,16 | 92:10,10,14 | **districts** |
| 26:23 60:6 | 100:25 | 95:16 | 69:5,14 | 92:14,17,22 | 24:20,23 |
| 60:18 | **differences** | 108:10 | 96:16 | 93:2,4 95:9 | 43:5,7 59:2 |
| 76:18 | 82:8 97:24 | **discussed** | 109:9 | 96:4 99:23 | 59:3 64:13 |
| 105:13,21 | 100:21,23 | 20:1 42:17 | 111:5,7,19 | 101:5 | 64:15,20 |
| 106:6,14 | 111:24 | 48:13 55:1 | 112:1,5 | 102:11,12 | 65:16,21 |
| 131:12,17 | **different** | 78:7,22 | **distant** 113:8 | 103:15 | 66:19 |
| 131:25 | 9:21 27:8,9 | 91:4 97:12 | **distended** | 107:21 | 69:11,25 |
| **depositions** | 30:4 42:17 | 99:19 | 88:17 | 108:6 | 70:2,3,4,9 |
| 12:10 | 42:19 | 127:2 | **distinguish** | 109:25 | 70:22 71:6 |
| **describe** | 56:10,11 | **discussing** | 48:23 | 110:5 | 72:10 |
| 47:13 66:2 | 69:8 73:22 | 27:20 41:1 | **distributed** | 112:10,19 | 73:25 74:5 |
| 97:24 | 74:12 90:4 | 44:24 | 67:25 | 113:19,21 | 74:8,14 |
| 109:1 | 96:18 | 54:25 | **distribution** | 113:24 | 88:15 |
| 126:11 | 101:4,21 | 55:13 97:3 | 104:12 | 114:4,20,24 | 89:24,24,25 |
| **described** | 107:23 | 97:17 | 113:13 | 115:10,18 | 90:20 |
| 67:11 | 108:8,16 | **discussion** | **district** 1:1,2 | 116:9,11 | 91:17,18 |
| 72:14,21 | 111:16 | 26:16 | 25:15 43:9 | 117:3,4,7 | 92:4,5,7,8 |
| 77:25 | 112:23 | 115:6 | 45:15 | 117:10,14 | 96:3,13,14 |
| **description** | 120:23 | 122:3 | 52:19 56:1 | 117:20 | 96:20 99:3 |
| 100:19 | 122:3 | **discussions** | 59:7 62:16 | 118:12,15 | 99:21 |
| **design** 100:7 | 128:2 | 26:12,20 | 62:17 | 119:8,16 | 100:13 |
| **designed** | 131:21 | **displayed** | 63:12,24 | 121:20,21 | 103:1,23,24 |
| 113:12 | **dilution** | 28:22 87:7 | 65:10,20,24 | 121:23 | 107:18 |
| **desk** 40:19 | 52:15,24 | **dissertation** | 65:24 66:3 | 122:4,18,23 | 109:3,15,16 |
| **detect** 118:17 | **direct** 22:18 | 27:5,6,20 | 68:10 69:6 | 123:7 | 109:21 |
| **determinat...** | 112:13 | 27:25 29:7 | 69:18,19,21 | 125:24,25 | 110:1 |
| 65:19 88:2 | **direction** | 29:8,12,15 | 70:11,13,16 | 126:1,4,5 | 111:1 |

113:5,6,9
113:14
119:2
123:3,12,16
**dixit** 56:13
**Dixon** 49:17
**dknehans...**
3:5
**document**
10:13
12:22,24
13:5 98:4
**documents**
10:2,11,20
23:1
**Dodge** 50:2
52:2,25
53:12,14
**doing** 19:23
27:24
58:22
70:15
71:24
74:19 77:6
88:3
100:20
104:17
121:15
131:20
**DOROTHY**
1:6
**dot** 32:13,14
80:8 81:16
82:4,5
**dots** 80:6,7
80:23 81:8
81:12
82:16
**dotted** 80:1,2
82:16
115:15
**double** 36:25
**doubt** 73:3

**doughnut**
83:5,9,19
84:2
**download**
10:5
**downloaded**
59:24
**Dr** 1:6,6 22:4
57:1 92:2
105:8,8
106:21
107:9,11
131:1
**draw** 45:15
55:17
56:16
66:15,17
81:2,3
84:19,22
86:3,5
96:19
99:23
101:4
102:12
113:20
116:12
122:22
**drawer**
117:22
**drawing**
31:23 32:7
58:13
59:12
61:18
89:20 96:3
96:14
119:23
**drawn** 11:8
24:20 56:1
57:19 59:8
65:17 83:1
85:3 86:20
99:1

107:18
109:15
123:4
**draws** 91:16
96:13
125:24
**drew** 60:25
79:24 99:6
**drill** 24:12
52:14
58:24
**DRIVE** 3:2
**drop** 67:24
**Duchin**
131:1
**due** 108:17
113:8
**Duke** 37:2,2
**duly** 7:2
134:5
**dust** 58:24

———————
**E**
**E** 4:1 5:1,1
134:1,1
**earlier** 20:1
42:17
48:13
55:12 87:4
**earliest** 77:9
**early** 21:24
50:14
**earn** 37:8
**earned** 37:3
37:6
**EARNEST**
1:6
**easier** 16:14
**east** 117:23
117:24
118:4
119:12,17
119:19

**easy** 19:12
89:16
90:11
**economical**
98:14
**edge** 126:1
**edges** 107:17
**edit** 71:9
**educational**
36:23
**effect** 10:9
61:22 81:7
**effectively**
126:3
**effects** 57:8
**efficiency**
38:8
**efficient** 94:6
**efficiently**
75:1
**eight** 60:20
60:23,24
**either** 33:7
51:7 52:8
100:14
128:12
**Elderberry**
4:3 7:10
**elect** 25:20
123:4
**Election** 2:4
8:4
**elections**
30:1 41:1
41:16
47:20
52:20
122:19
**Electorial**
94:17 97:5
**ELIAS** 2:18
**ELIZA** 3:19
**emphatic**

107:11
**employed**
113:9
**employer**
47:5,6
**enacted**
10:24,25
19:23 20:3
21:6 72:7
72:10
90:19
91:20
92:22
128:5,13
129:21
**endeavor**
99:10
**engagement**
27:12
**ensure**
114:21
**enter** 12:8
**entered**
21:10
**entire** 85:22
**entirely**
23:12
**entitled**
12:24
**enumerate**
104:6,9
**enumerated**
104:8
**enumeration**
104:14
**environment**
31:7
**equal** 56:22
100:11
101:1,8
121:12,15
122:5
**equality** 61:2

**equally** 67:25
113:10
**equitable**
113:12
**equivalency**
28:8
**Ernest** 125:2
**especially**
89:22
**ESQ** 2:7,10
2:15,20 3:4
3:9,14
**estimate**
34:14
**ESTRELLA**
3:19
**et** 15:5,5
16:13,13
106:13
**ethnic** 56:25
**evaluate**
56:15
**evaluating**
73:4
**eventually**
52:20
115:16
**EVERETT**
2:5
**evidence**
6:18
104:22
**exact** 37:9
55:3,7,19
66:22 82:5
101:12
108:10
**exactly** 24:16
59:16
80:10,12
111:14
113:5
**exam** 54:9,12

EXAMIN...
4:11 7:4
examine
24:20
examined 7:2
32:2 59:15
example 32:6
43:18 65:5
89:24
examples
32:8 49:11
49:15 86:4
exclusively
28:25
execute 27:8
31:11
33:10,14
executed
18:19 32:3
exercise
86:19
exhibit 4:9
5:2,3,4,5,6
5:7,8,9,10
5:11,12,13
5:14,15,16
5:17,18,19
12:9 13:6
13:19
14:17 15:1
16:10 17:9
18:1,2,2,3
18:15,17
19:15,16
20:15,16,18
20:18,20,21
20:23,23
24:18
29:11
35:20,23
36:4,5,7
48:8 59:20
59:21,23

60:4,12
90:10,17,18
97:2 106:6
108:2
115:7,7
exhibits 10:6
15:9 16:7
17:20,24
19:1,6,8,10
21:2,3,10
existed 92:14
exists 91:20
expected
37:22
experiment
108:15
expert 15:4
16:2,25
17:3,5,16
17:17,20
18:3 21:23
23:7 25:24
26:2,25
27:2 28:7
29:9,10,17
31:1,3 33:6
34:5 48:10
48:22
51:18
55:14,17,25
58:17
62:22
103:25
104:3
125:7,11
127:6
129:17
expert's
127:20
experts 19:21
22:10,20
26:13,16
74:6

explain 31:5
explained
73:12
explore 62:2
73:11
76:25
114:6
119:11
120:17,23
explored
73:19
75:10
exploring
119:5
expound
57:17
expressed
124:16
extent 30:17
external
39:19
extract 70:14
extraordin...
73:14
extremely
88:17
eyeball 92:23

————
F

F 134:1
facets 46:21
fact 19:22
44:3 55:13
85:6 87:13
87:14,23
88:9 90:18
91:2 103:6
115:3
120:2
123:3
factor 122:23
factors 56:12
59:14,16

120:20
faculty 39:17
39:19
fail 86:17
92:24
120:4
fails 92:25
fair 46:12
100:22
fairly 13:15
73:13,16
74:20,22
fall 46:9
familiar 25:3
50:5 56:5
75:23
77:10 95:6
119:14
122:13,20
123:9
125:15
129:25
130:17
far 16:4
22:21 35:2
65:24
102:13
118:16
Farr 12:4
fast 24:13
faster 12:11
favor 110:22
119:3
favored
100:9
110:7
112:16
favoring
110:21
114:2
favoritism
111:2
February

53:15
Federal 6:5
feel 57:25
Feldman
50:17
51:17
52:20
fell 57:24
Fifty 78:17
78:18
fighting
25:12
figure 79:11
79:13,18
83:1 92:3
115:8
121:6
figured 30:18
figures 65:2
file 54:7,11
54:14
105:8
files 28:8,8
28:11,14
filing 6:9
fill 85:22
filled 89:5
102:12
fills 126:4
final 16:18
53:8,10
69:16
find 10:11
12:12 16:6
39:14
51:20,21
68:6,9 78:2
84:19
92:22 96:9
96:16,20

108:8,9
110:18
114:16
116:16
118:1
127:16
finder 87:13
87:14,23
88:9
finding 43:7
43:10
fine 9:4 47:4
79:13
117:11
fire 24:11
58:23
firmly 98:12
first 7:2 8:16
10:23 12:8
12:21,22
19:9 24:21
25:8 29:19
30:14
53:20
60:13 67:9
74:15,16
78:12,19
79:19 84:4
91:15 94:5
95:18
97:19
99:19,19
100:6
101:19
104:19
118:18
fish 116:23
five 8:2 40:2
57:20 58:1
58:5 81:16
81:23
five-minute
53:18 93:7

93:13
flip 44:18,19
78:10
107:16
flips 45:16
fly 14:6
focus 33:20
60:16
108:18
113:1
focused
47:20
focuses 110:2
focusing
27:21 98:5
folks 26:19
93:19
123:24
follow 86:16
follow-up
37:11 54:2
91:24
128:23
followed 61:5
following
1:16 109:5
follows 7:3
109:3
foregoing
133:5
134:6
forever 38:7
98:21
forgot 33:15
form 6:14
39:2 54:6
54:16
98:19,23,23
formalities
6:8,11
formally 39:2
47:1
format

134:10
formed 39:7
formulas
124:17
forth 56:18
78:11
134:6
forthcoming
41:4
found 51:13
128:7
FOUNDA...
3:2
four 48:9
49:6 92:5
106:16
Fourteenth
55:21
frequently
58:12 63:9
89:10
front 10:2
15:25
36:10 38:5
65:8 78:10
79:12
118:11
frustrating
33:13
full 7:7 64:3
67:9 85:10
113:20
116:9
full-time
46:24 47:2
48:1
fully 99:21
function
71:13,13
functions
71:9
further 112:8

G

G 53:5
G-E-O-M-...
33:16
G-I-M-P-E...
39:1
GALMON
2:21
game 121:5
gap 38:8
gears 23:4
46:14
general 3:10
40:14,15
52:12
generally
51:24
61:16
85:20
129:4
generate
43:5,22
generated
28:18 29:4
geographic
100:9,12,16
101:16
geographic...
113:7
geography
43:18
94:17 97:5
98:19,23,24
110:19,22
110:23
113:23,25
geomander
33:15
Georgia
57:22
gerrymand...
45:10 51:3

94:16 97:4
getting 39:10
48:16
91:10
112:13
114:1
115:23
120:18
Gill 38:12
Gimbel
40:23
Gimpel
38:25
Gingles 11:8
24:2,5 25:3
25:3,7,23
26:2,7
54:25
55:14,17,23
55:25
62:23 63:8
64:3
127:20
Gingles's
73:7
120:19
123:6,8
GIS 28:11,15
gist 46:10
give 12:9
35:20
36:22
46:15 67:5
67:8 69:4
71:14
88:21
91:10,13
106:3
121:4
130:8,10
given 1:14
12:17
110:8

133:5,8
gives 69:10
89:1
giving 71:17
71:18
go 8:8 10:22
19:9,10
20:9,10
21:9,12
28:2 29:5
38:17 48:4
52:6 54:23
58:2 60:10
63:20 67:6
68:10
72:12
74:18
85:12
86:10,14
89:2,19
91:12,12,14
91:25
93:24
99:18
107:4,25
108:1,12
109:1
114:15
117:20,23
123:25
124:12
125:20
126:14
130:7
131:22
goal 58:18,21
100:7
goes 10:18
53:15
87:19
103:11
going 8:14
9:5 10:21

12:8,19,20
13:5,17,18
14:14,16,17
14:24,25
15:6 16:8
17:9,24
18:14,16
19:4 20:8
20:11,12,15
20:17,20,22
21:6 22:12
23:4 24:1,4
34:4 35:19
36:1,4
37:15
46:14 58:2
58:4,8
59:19,20
60:16,20
65:18 67:6
67:22,23,24
68:3 78:3
79:1,10
85:5,20
87:14 90:8
90:16
91:11,12
92:2,13
93:9,20,21
94:8 97:1
103:14
105:1,11,15
105:16
106:5,15,17
108:1,3,9
108:13
110:15
111:6
112:5,7,14
113:2
115:2
116:15,15
118:3,4,17

118:20,24
119:9,11,16
120:8,10,17
121:10
123:20
129:24
131:13
**good** 7:6
45:9 57:25
99:4
104:21
116:1
123:18
**gosh** 23:8
32:18 39:4
104:17
**Government**
125:17
**grab** 58:4
**graduate**
54:8
**graduated**
36:24 37:1
**graduation**
37:18,23
38:2 54:4
**great** 15:10
38:18
68:25
73:20
75:18
**Greg** 38:23
39:6,7
**ground** 8:15
115:5
117:4
118:10
**grounding**
117:13
**group** 2:18
25:11,13,16
25:19
65:10,13,21

66:3 69:20
83:8,9
84:23
101:25
102:1
**grouped**
103:21
**grouping**
83:10
103:15
**groupings**
96:16
**groups** 77:3
**guarantee**
100:11
101:1,8,24
102:4,7
**guaranteed**
113:10
**guess** 25:10
36:18
39:20
46:25 49:6
49:18 51:5
56:15
68:21
74:13 84:3
120:6
122:19,25
124:18
**guessing**
77:4
**guidelines**
61:5,7
134:10
**guy** 39:11

——— **H** ———

**H** 5:1
**half** 11:23
67:20
74:13
93:15

123:21
**halfway**
121:25
**HALL** 2:5
**handful** 74:8
**happen**
111:9
**happened**
38:1 86:12
90:3
**happens**
120:1
**harbor** 57:21
**hard** 15:9
78:9
**HARRIS** 1:7
**Harvard** 2:4
8:4
**hate** 56:13
**health** 40:18
**hear** 39:23
**hearing**
24:12
**heavily** 82:11
87:18
**help** 95:2
**helpful** 10:12
16:6 78:7
**helps** 115:5
**hereinbefore**
134:6
**hereto** 6:3
**HESSEL**
2:10
**hide** 121:3
**highlight**
108:9,11
**highlighted**
97:11
100:6
108:5,13
**HILLSBO...**
2:13

**hinted** 76:3
76:12
**history** 36:25
**Hobbs** 50:17
52:21
**hole** 83:9,19
83:24,25
84:9
**holes** 83:5
84:2
**honestly** 24:9
34:18
58:22
**hopefully**
15:7
**hour** 11:23
53:20
74:13
93:15,17
123:21,22
**hours** 34:11
34:17
35:18
93:10
**House** 11:1
43:25
90:20
114:20
118:12
**hull** 63:11,17
64:12
129:25
130:1,3,10
130:12
**hyphenated**
62:14
**hypothetical**
117:16
118:10
120:2,7
121:4

——— **I** ———

**idea** 64:25
83:9 93:12
98:15
114:5
123:9
**identificati...**
97:8
**identified**
65:23
**identify** 67:1
99:23
**identifying**
70:17 85:2
**ignore**
108:17
**illustrate**
24:22
**illustrative**
11:6,7 21:5
28:9 60:25
91:18
128:4
**imagine**
22:16
**impact**
122:19
**impede** 7:23
**implement**
95:14
**implement...**
95:2,16,21
**implications**
55:23
**import** 33:2
**importance**
68:25
**important**
8:21 32:18
63:18 64:8
98:2
**imports**
33:11
**impossible**

76:11
**inapplicable**
104:13
**include**
30:17
83:10,14
**included**
17:20 19:1
35:12
61:25
103:5
**including**
61:2
**incorporat...**
61:22
**incorrectly**
53:2
**increase**
103:17
**incredibly**
38:5
**INDEX** 4:8,9
**indifferent**
93:1
**indirectly**
111:4
**individual**
65:22
**individuals**
69:5 82:10
110:11
117:1
122:25
**inertia** 62:19
62:23
65:14
66:18 67:3
67:10,12,13
68:5,18
69:3,7,22
70:11
71:10,16,23
72:8,13,20

72:23
73:23 74:2
74:8 75:3
75:21,24
76:14,22
77:7 78:1
78:14 79:3
79:15
82:14
83:15 87:6
89:13
92:24
102:6
126:10
**inevitable**
58:14
**infeasible**
73:16
**infinite**
104:23
**infinitely**
90:3
116:17
**inflates**
109:24
**information**
30:7
100:15
103:4
**initial** 13:7
19:18,25
24:19
35:24
91:15
**initially**
24:15
**inquiry** 11:8
**instances**
51:16
63:17 64:1
75:21
105:3
**Institute** 1:7

49:13
**instructed**
9:15
**insufficient**
84:24
**integrated**
29:23,24
**intend** 22:5,9
26:6 37:12
**intentionally**
122:17,22
**interest** 43:2
57:1 61:4
102:24
**interested**
81:4 96:4,5
102:14
128:8,9
130:14
134:14
**interesting**
45:17
**intermitte...**
12:6
**interpret**
32:24
**interpretat...**
77:2
**intervention**
34:8
**introduce**
17:24
59:19
**invitation**
77:11
**involve** 41:17
90:6
**involvement**
23:6 24:4
**ipse** 56:13
**irrelevant**
29:21
**isolated**

87:20
**issue** 25:11
64:21
75:20 79:4
114:23
**issues** 23:24
76:16
**iterate** 44:18
74:11
**iteration**
39:3,4
46:20
**iterations**
69:8
113:11

___

**J**

**J** 2:15
**Jacobson**
51:4
**James** 40:23
**JARRETT**
1:6
**JASON** 3:20
**Java** 42:8
**JD** 37:11
**Jim** 38:25
39:5,6,15
**job** 58:25
**jog** 79:8
**JOHN** 3:14
**john@scwl...**
3:15
**joined** 12:6
23:17
**Joint** 59:23
61:6,17
**Journal**
94:18
**judge** 51:17
**judges** 51:21
**judgment**
53:8,10

88:18 89:8
90:7
**July** 15:5,13
15:17
60:11
**June** 17:1,4
17:13,25
23:11
60:15,15
**Justice** 3:7
88:5

___

**K**

**K-1** 18:2
**K-2** 18:4
**Kansas** 76:5
76:5
**keep** 49:7
93:9
118:24
**key** 100:21
100:24
**kind** 19:12
27:12
32:12
44:17
46:20
48:19
53:11,20
86:10 93:1
93:22
100:9
115:15
**kinds** 26:19
**KNEHANS**
3:4
**knew** 14:14
24:3 75:14
**know** 8:7,10
8:16 9:8
14:7 19:12
22:6,12,14
22:25 23:8

23:25 32:1
32:13
34:13,20
35:1 45:1
46:19 47:2
49:3,5,8
50:1 55:18
55:22 57:1
57:5,9
59:10,15
61:19,22
64:5,9
68:21
71:17 72:9
80:10
82:15,18,19
82:21,23,25
83:18
84:13 85:9
85:23 86:2
86:15 88:4
88:12
92:13,17
93:6 99:2
99:15
101:22
102:3,8
103:14
104:12
105:12,15
105:16
107:4
108:20
110:17
111:12,13
117:6,17
124:25
125:6,14
126:7
**knowing**
22:22
86:23
**knowledge**

21:19
51:14
**known** 79:3
**knows**
103:12
**KURTYKA**
3:20
**KYLE** 1:11

___

**L**

**L** 1:16,23 6:1
6:20 134:3
134:21
**Labor** 39:21
**LAGROUE**
3:9
**lagrouea@...**
3:10
**laid** 118:23
119:2
**lake** 83:12,13
83:14 84:5
116:21,22
116:23
**LAKESH...**
3:2
**language**
31:25
**languages**
42:2,5
**Laplace**
29:23,25
**laptop** 10:8
**large** 116:9
122:4
**larger** 80:22
81:1,8,9,13
111:6,6
112:7
**law** 2:4,4,18
6:7 7:16
8:4 9:22
37:2 46:22

55:1 61:21
64:14
87:11
**laws** 60:1
**lawyer** 37:15
46:19 75:6
**lawyers**
55:10 75:8
75:14
**layered** 81:5
**layering**
81:24
**layers** 81:3
**lead** 67:21,24
**leads** 115:19
**learning**
125:5
**leave** 29:18
131:15
**Lee** 52:19
**left** 75:14
93:17
104:22
106:23
**legal** 25:11
30:22
37:12,15
73:10,17
75:8,10
**legislation**
59:11
**legislative**
57:18
60:25 61:7
**Legislature**
11:2 60:1
61:6
**Legislatures**
94:18 97:6
**lengthy** 98:8
118:9
**let's** 33:19
36:14 65:5

67:2,19
93:12 94:8
124:5
**level** 65:17
99:2,9
128:21
**LIBERTIES**
3:2
**life** 46:21
**light** 98:13
**lighten** 82:1
**limitation**
78:21
**limitations**
78:20 79:5
79:9
**limited** 24:4
**line** 33:17
80:1 82:16
107:4
115:15
119:23
**lines** 57:12
57:14
63:12
79:22 80:2
80:2
106:16
107:3
**Link** 131:23
**linked** 69:24
**list** 30:20
48:15
59:14
109:4
**listed** 125:12
**lists** 48:9
**literature**
29:16
30:10
66:11
72:25 73:2
78:22

**litigation**
95:15
131:5
**little** 23:4
27:20
79:11 81:8
81:9,13
84:10
98:12,13
114:7
117:7
120:6
121:23
127:2
**live** 48:25
82:10
**LLP** 2:18
3:12
**load** 33:15
**local** 66:10
**located** 9:19
9:22
**location**
24:22
112:16
**locations**
9:21 40:25
41:15
**lodged**
104:11
**LOFTON**
1:6
**long** 11:22
29:13
39:11
44:25
73:21 74:6
106:16
112:10
**long-time**
104:18
**longer** 67:22
68:2

**look** 10:7,14
16:11 46:5
60:6 62:4
66:21
70:10,12,24
75:25
85:24 88:7
93:3 100:3
109:14,17
118:18,21
120:8,10
**looked** 29:2
59:7
110:14
**looking**
11:16
51:23
61:20
62:24
64:13 65:2
67:8 71:25
80:21
82:13,25
85:19 88:2
88:4 97:23
98:1
103:10,20
109:25
113:22
120:24
122:10
126:23
**looks** 80:22
83:4,6,21
83:24
129:8
**Loop** 4:3
7:10
**Lori** 1:16,23
6:20 134:3
134:21
**loss** 68:14
**lot** 27:8,10

29:14
76:16
**lots** 93:2
**LOUIS** 3:12
**Louisiana**
1:2,7,11,18
3:7,8,13
6:21 11:1,1
11:2 14:12
43:21,23,24
59:10,25
60:1 65:25
99:13,16
117:11
120:10,12
127:10
134:3,12,22
**LOWE** 1:6
**lower** 68:3
**LULAC**
49:24 52:4
52:25
53:11
**lunch** 93:11
93:14 94:7
123:19,20
124:1

———————
**M**
**M** 3:9
**main** 23:24
32:17 33:4
42:5 43:9
47:5 97:18
104:20
**maintain**
84:24
**major** 36:25
**majority**
25:14,18
91:17
116:11,12
117:25

118:3
**majority-...**
116:14
**majority-...**
56:1
116:11
**making** 32:1
34:2 81:25
88:1
103:14
**mandated**
59:11
**mandating**
64:14
**map** 10:24
10:25 11:1
11:6,7
19:22,23
20:3 21:5,6
28:14
32:16 34:2
42:16
43:20,23
44:19
45:15
55:17
57:23 61:8
61:18
69:19,24
71:4,11
72:7,7,10
73:24
82:22 88:2
88:4 89:20
92:15,22
99:3,6
101:20
104:7,24
107:21
117:22
118:11
128:4,5
**map's** 90:19

mapping
99:4
maps 11:8
28:9,17,20
29:2,3
31:23 32:7
32:14
33:25 34:1
43:15,17,23
44:4 56:15
57:19
58:14
59:13
70:24 72:5
74:3,4,17
76:9 79:16
81:3 99:1
101:5
104:7
113:19,21
128:12,13
128:18,22
129:21,21
marching
24:16,17
**Marino** 1:16
1:23 6:20
134:3,21
**MARISA**
3:18
**mark** 16:7
59:21
**marked** 13:6
13:18
14:17,25
16:10 17:9
18:1,14,16
19:9,15
20:12,15,17
20:20,23
24:18 36:5
59:23
90:16 97:1

106:5
**Markov**
44:14,16
**mass** 67:25
68:7
**MASSAC...**
2:6,18
**massive**
109:24
**master's** 37:3
37:7
**material**
84:13
**math** 57:25
**mathemati...**
124:17,18
**matriculated**
37:5
**matter** 1:7
23:18
26:17
27:12
33:23
41:13
48:22
51:24 57:5
78:3 88:6
117:22
121:14
134:14
**matters**
121:16
**McCartan**
21:25 22:4
**McCrory**
52:18
**McMaster**
49:22 51:2
52:8
**MCMC**
44:13,16,21
44:22 45:3
45:20,25

107:16
**mean** 11:24
11:25
15:17
23:19
31:18 33:9
40:13
43:18
50:14
52:10
56:22 65:9
74:22 89:6
103:5
111:2
116:19
117:15
**meaning**
31:15
98:23
**meaningless**
88:12
**means** 57:17
81:13
98:16
121:2
**meant** 86:19
120:22
**measure** 63:3
63:10,12,14
63:23
64:19
75:15
76:18
77:21
124:23
125:22
126:16,23
127:4,10
**measures**
21:5 27:10
62:13
124:8,13,15
124:20

**measuring**
122:11
126:12,21
**Mecinas**
50:18
52:21
**medications**
7:22
**meet** 8:1,6
26:19 54:4
65:23
82:20
121:8,12,15
122:5
123:5
**meeting**
11:22
58:10
123:8
**meetings**
11:19
**members**
39:17,20
54:5,17
**memory** 65:4
71:2,3 79:8
**mentioned**
37:17
44:12
52:16 63:6
76:21
81:22
88:21
124:23
128:24
129:1
**met** 8:1
11:18 38:6
104:19
118:2
128:12
**method**
66:18

68:19,20,23
72:8,14,21
72:23 73:4
78:19,19
83:15 87:5
92:24
94:12 95:3
95:4,15,21
95:24,25
96:2,12,13
97:16
99:19,20,20
100:2
104:5,11,16
105:22,23
106:21,21
107:9,13
108:1,21
110:25
112:24
115:13
119:22
125:9
126:10
129:5,6
134:7
**methodology**
46:11
111:10,11
111:15
**metric** 64:19
65:14
68:18,20,24
69:3,17
70:5 72:14
72:21,24
77:8 78:4
85:14,16
87:5,6,9,25
103:13
107:20
118:20
122:11

130:1,3,17
130:18,20
130:25
**metrics**
76:19 78:5
36:14
**Mexico** 14:6
105:2,2,7
105:19,22
106:8,13
**Michigan**
76:7,10
**middle** 1:2
67:19
**Milligan**
88:14
**mind** 66:4
68:22
**mine** 8:25
**minimize**
81:6
**minimized**
66:16
**minimum**
89:5 126:2
126:5
129:7
**minority**
25:13,16,19
59:2,8 61:4
62:5,7 65:1
65:11 66:7
74:2 76:9
77:3
101:19,25
102:1
117:24
123:4,10
**minority-...**
91:19 92:6
118:15
**minus** 57:19
58:1

minute 58:5
98:6
minutes
53:20
missed 49:3
model 98:14
modeling
29:25
moment
62:19,23
65:14
66:18 67:3
67:10,12,13
68:5,18
69:2,6,21
70:10
71:10,15,22
72:8,13,20
72:23
73:23 74:1
74:7 75:3
75:21,24
76:13,22
77:7 78:1
78:14 79:2
79:15
82:14
83:15 87:6
89:13
92:24
102:5,6
126:10
Montana
51:5
Monte 43:3,6
44:14,15,20
45:13
moot 40:21
morning 7:6
14:6 54:7
127:3
motion 50:6
50:9,13,25

motions
50:15
move 14:19
79:2,10
MULLINS
2:13
multiple 65:2
66:2 122:9
municipal
57:12,14
municipality
116:8

___ N ___

N 4:1 5:1 6:1
NAACP 1:8
49:21
52:18
Nairne 1:6
15:5 16:13
name 7:7 8:2
46:10 50:3
56:19
57:22
83:13
named 39:12
56:21
names 62:14
nature 25:10
47:13
127:1
nearest 113:8
necessarily
56:24
57:21
99:20
101:18
107:22
111:2
112:9
115:13
116:10
necessary

102:19
need 9:7 28:3
30:19 31:9
39:17 54:3
54:5 58:6
65:21
78:11
84:21 85:9
85:21
86:11
107:3
117:20
needed 32:2
54:17
needing 65:8
negative
30:16
neighborh...
35:18
NELSON
2:13
nested 29:23
29:24
never 31:18
31:19 64:3
90:2 116:8
116:15,18
nevertheless
117:10
new 14:5
31:2,16,18
31:20
36:14
48:17 74:4
74:5 91:16
92:4,5
105:2,2,7
105:19,22
106:7,12
Nice 8:1,6
NITHIN
3:19
non-comp...

108:22
128:18
non-contig...
83:7 84:16
non-dilution
61:4
noncontig...
102:11,17
102:21
north 2:14
65:25
83:11,14
84:5,6
northwest
65:25
note 92:8
noted 19:21
133:17,19
notes 25:1
notice 12:14
12:16,24
13:7,12,20
14:1,18
noticed 65:2
68:17
November
35:14
53:10
number
69:13 71:5
71:7 89:12
89:20
90:10
104:23
110:11
113:5
123:11,16
numbers
57:24
70:15 87:7
89:14
119:25
numerical

70:23
87:25
88:21 89:1
119:25
numerosity
25:8
NW 2:18

___ O ___

O 6:1
O'Connor
88:5
oath 6:22 7:3
7:13,16
object 9:13
68:8
objected
9:16 22:14
Objection
63:20
85:12
118:7
126:14
objections
6:13
obstreperous
111:13
obviously
57:9 76:8
88:18
October
134:16
office 9:22
officer 134:4
OFFICIAL
1:11
officially
23:7
officiated
6:22
oh 15:10
39:4 53:14
54:14

94:20
107:1
108:7
110:14
113:18
Ohio 4:3
7:11 9:23
37:6 39:17
52:19
okay 10:5
14:16
27:19 35:6
37:21
48:14
59:17
60:19 65:7
66:5 68:11
70:21
75:12 76:2
81:20
82:25 89:6
94:7 95:7
97:16 98:5
102:22
103:17
105:25
107:5,6
108:2
110:17
114:13,17
115:21
123:14
125:22
126:21
129:24
old 46:17
88:23
oldest 72:24
73:6
Oliver
106:13
onboard
39:5

once 8:1 19:8
55:19
58:24
67:23 90:3
114:22
ones 33:4
49:2
opaque 82:6
open 10:8
31:6 32:16
33:10,25
35:20
131:15
opinion
24:24
38:11
87:16
126:9
128:17
opinions
22:5,9,19
26:6 37:12
37:16
134:12
optimized
66:16
or.22 88:11
orange 80:16
80:21,22,23
81:1,7,8,12
81:15,23,25
82:3,4,7
order 12:20
64:7 94:7
orders 24:16
24:17
organized
91:11
original 39:7
47:18,22
OSU 37:7
outcome
134:14

outliers
68:12
outlined
94:21
output 28:15
28:16
68:24
69:11
70:23
79:15,18
88:22 89:1
102:3,16
115:14
124:18
outputs 29:2
outside 26:9
58:3 77:14
overlaid 81:2
overplotting
81:7,10
overview
36:22
46:15

---
**P**
---

P 1:14 4:2
6:1,4 7:1
12:25
13:20 15:4
16:12
133:4,13
134:4
package
33:16
packages
32:21
33:11,12,23
packing
122:14,16
122:17,21
123:1,2,10
page 15:3,21
16:11,18

17:12
18:19
40:23
60:20,22,22
60:23 67:6
76:15
79:10
91:14,14
94:10 98:1
100:3,4
106:16
108:3,25
109:6
115:8
pages 29:13
48:9 97:25
134:6
pain 49:7
pair 78:14,14
paper 27:6
29:19,22,24
30:2 38:4,8
papers 34:9
40:9,11,13
40:13
paperwork
54:9
paperworks
54:19
paragraph
60:21,24
61:13 67:9
113:3
part 6:17
11:8 14:22
16:24
18:25
19:13 27:9
32:14
42:11,20
44:2 46:3
47:19 52:5
67:24

82:22 91:4
91:6 100:6
108:9
114:18
115:22
PARTICI...
2:2
participati...
45:7 46:7
particular
70:15
103:12
115:9
122:8
parties 6:3
134:13
partisans
122:18
partisanship
100:14
partly 76:22
111:10
Party 106:12
pass 46:13
54:22 87:9
passed 11:2
38:18
98:11
120:13,18
pasted 48:19
Patrick 7:9
pay 103:3,14
paying
100:13
peer 40:7
peer-revie...
40:4 47:23
66:10
72:19 73:2
95:20
pending 9:10
41:21
people 44:16

47:11
56:10,12,14
63:1 85:9
122:24
percent
57:20 58:1
65:12 66:1
66:4,8
70:18
78:15,17,18
85:19 86:8
87:1 90:1
98:19
99:24
102:20
103:1
114:10
116:16
117:2,9,13
118:25
119:6
120:25
121:19
percentage
89:4 126:3
129:11
perfect 107:1
perfectly
67:18
perimeter
129:8,10,13
periodic 9:4
person 57:15
57:17 85:8
86:11
124:25
personal
134:8
perspective
120:9,11
persuasive
51:20,22
peruses 98:4

Ph.D 37:8,17
37:23
42:12,18,20
Phil 10:1
phil.strach...
2:16
Philip 49:13
PHILLIP
2:15
phone 93:8
phrases
97:11
phrasing
106:1
physical 68:1
pick 114:8
120:2
picking
73:20
118:3,4
picks 87:20
piece 30:23
40:17
pieces 30:7
place 23:9
24:14
58:25
67:19
108:10
122:18
123:19
places 64:10
87:18
PLAINTIFF
2:11 3:5
plaintiffs 1:9
2:21 8:4
13:8 25:24
76:8
plan 40:2
60:25
66:16
91:20

**play** 21:19
103:18
**pleadings**
34:6
**please** 7:7
8:25
**plots** 32:13
32:14
**plug** 58:6
**plus** 57:19
58:1 65:12
66:4,8
70:18
76:15
78:17,18
85:19 86:8
87:1 90:1
99:25
103:1
114:11
116:16
117:2,9,13
118:25
119:6
120:25
121:19
**PM** 132:1
**pockets**
87:21
**point** 30:19
40:21
66:13 68:2
68:3,6 71:8
73:15
81:16,23
84:18,19
85:23
88:11 89:6
89:6 95:11
96:8,21
98:2 99:22
99:23
113:6

114:21
115:18
116:19
119:21
**pointed**
131:1
**pointing**
10:15
**points** 74:12
126:18
**poles** 47:16
**political** 37:1
37:3 46:6
47:17
94:17,19
97:5
**polling** 47:20
**Polsby-Po...**
62:12,14
63:7,7,10
63:11,16
64:12,18
88:11,20
89:9 90:5
107:19,22
113:24
124:22
126:25
127:25
129:1,5,6
129:14
130:7,8
131:2
**pop** 118:23
**populate**
99:21
**populated**
78:24,25
79:2
113:10
**population**
24:23
30:12

43:11
55:11
56:22,25
59:8 61:2
62:8,11,18
63:2,3 65:1
65:13 66:9
66:15 69:9
70:12,19
72:1 73:1,5
73:11
75:16 76:1
76:17,18
77:1,21
78:3 80:24
80:25 81:5
81:6 82:15
82:18,19,21
82:22
84:20,24,25
85:2,10,17
85:21,25
86:7,9,24
87:2,8,17
88:9 89:21
90:1 92:19
96:5,8
99:24
100:11,15
101:2,19
102:13,20
102:24
113:13
114:11
116:17
117:5,8,12
117:21,24
117:25
118:4,5
119:1,4,4,7
119:8,18
120:9,11
121:13,15

121:18,19
121:24
122:2,5,7
126:17
128:9
**populations**
59:1,3
62:17
63:15 67:1
70:17 74:2
76:10
95:11
96:21
**portion** 45:9
68:14 87:6
93:23
108:5,14
**portions**
102:10
**pose** 117:17
**posed** 25:16
**possibilities**
104:9
**possible** 9:6
30:20
104:7
**possibly**
50:18
**potential**
79:8
**power** 9:6
**powering**
53:19
**practiced**
46:22
87:11
**precinct**
74:19
80:14,15
96:7 97:21
98:7,18
99:1,16
109:8,24

110:9
111:22
112:6,14,16
112:16,20
114:2,19,21
114:23,24
115:2,18
**precinct's**
74:12
**precincts**
43:7 44:19
98:6,22
99:3,11
103:9,18,22
110:7,10,18
110:21
111:3,6,25
112:7
114:3,8,9
114:15
115:14,15
118:22
119:2,20
**precondition**
25:8
**preconditi...**
25:4,7
123:6,8
**predict** 41:16
**predominant**
122:23
**prefer** 42:4
**prep** 14:22
16:24
21:12,14,20
**preparation**
11:20 23:2
26:23,24
34:4
**prepare**
11:11 27:2
**prepared**
22:7 134:7

134:9
**present** 2:2
3:17 9:24
12:1,3
**presented**
44:6,9
**presidential**
40:25
41:16
**pressed**
76:17
**pretty** 40:21
57:25 74:9
107:11
**prevent** 7:18
**preview**
67:11
**previewed**
67:3
**previous**
33:3 91:23
**previously**
32:10
106:11
111:18
**primarily**
114:4
**primary**
94:22
**prime** 25:11
**principles**
61:1
**print** 106:25
**prior** 20:4
46:19 48:5
51:25
97:17
130:4
**probably**
23:8,15
24:5 31:24
33:9 35:11
51:8 53:1

57:7 58:2
68:22
73:15
74:12
83:22 91:9
108:12
110:16
115:5
117:9
118:14
119:3
122:2
123:21
124:5,22
127:13
**procedure**
6:6 108:6
109:2
113:6
134:12
**proceeded**
53:7
**process** 31:5
31:13,14
34:20
48:14
81:15 90:2
**produce**
47:18
102:9
104:23,24
**produced**
47:21
89:10
**produces**
47:11
**producing**
104:21
**professional**
24:11 33:8
46:16,21
**professionals**
40:19

**Professor**
39:23
125:8,12,16
**professors**
125:5
**proffering**
55:3,7
**program**
28:20 31:7
37:23
**programm...**
31:6
**programs**
44:18
**prohibition**
134:11
**project** 27:16
**projects** 47:3
**prominent**
124:21
**prong** 24:5
25:15,18
**prongs** 24:2
**pronouncing**
53:1
**proposed**
30:5 112:4
**proposition**
30:24
**propounded**
73:18
**prospectus**
39:9
**proved** 30:19
**provide**
89:13
**provided**
69:23
**public** 40:18
**publication**
40:5 41:5
41:14,17,21
**publications**

41:20
**publish** 40:3
**publishable**
73:3
**published**
40:4,20
41:8,10
64:6 72:19
73:2 74:16
125:4
**publishes**
47:12
**pull** 30:6
32:15,23
33:24 67:5
91:9 94:6
**pulled** 15:24
**pulling** 10:20
**punishes**
68:12
**purpose**
60:17
69:25
**purposes** 6:6
39:9 97:8
106:7
**pursuant**
1:15 6:5
**put** 8:7 12:23
16:9 18:15
19:4 23:9
24:14
28:23
30:17
34:11
45:14 49:5
50:3 57:7
59:21 65:8
78:6 79:9
90:8 92:10
106:10
111:14
115:1,4,6

**putting**
10:10,13
**Python** 42:10

**Q**

**qualitative**
56:12
**quantify**
63:1
**Quarterly**
94:18
**question**
6:14 8:24
9:10 24:7
26:15
27:13
52:12 54:2
59:6 64:24
65:18 66:4
73:22
77:12
87:12
88:13
91:23
106:2
108:4,8
109:13,19
109:22
111:21
112:3
114:1
116:6
117:3,16
123:7
124:15
130:6,16
**questioning**
33:18
**questions**
7:19 8:17
9:14,16
19:11
22:13 23:5

37:11 48:4
120:7
123:22
124:3
128:24
129:25
**quick** 8:15
10:19
**quickly**
13:15 15:6
15:7 18:18
20:10 38:4
97:7
127:13
130:8
131:7,9
**quite** 57:20

**R**

**R** 1:11 28:13
28:16,19,21
28:22,23,25
29:1 31:6
31:11
32:20
33:10
41:24
42:15
46:13
69:15,23
134:1
**R-E-O-C-K**
62:13
**R-I-G-G-I-...**
12:5
**R.S** 134:5
**race** 103:5,10
103:10
122:23
123:1
**racial** 51:2
122:21
123:10

**RALEIGH**
2:14
**ran** 76:14
127:9
128:3
**Randolph**
49:13
**range** 126:8
**rarely** 31:19
**rate** 93:9,20
**ratio** 129:11
**RCP** 47:5
**reach** 78:15
114:10
119:6
121:25
**reaches**
86:24,25
**read** 28:13
34:5,8
71:22
91:15
100:5
106:15,17
106:18
108:13
**readers**
106:24
**reading** 6:11
26:25
39:19
61:13
113:3
**ready** 24:12
48:16
**real** 24:11
126:12
**RealClear...**
46:23,25
47:4,9,10
47:14,25
**realistically**
74:21

**really** 22:12
27:16
33:13,16
61:20
62:12,25
73:10
82:23
86:22 89:2
92:5 95:12
99:6 121:5
**realtime**
108:12
**reason** 9:8
67:17,20,25
81:1
111:15
114:18
125:19
128:15
**reasonability**
87:12
88:13
**reasonable**
87:15,22
**reasonably**
24:25 25:9
25:13,14
87:2 88:8
113:7
**rebuttal**
16:12,21
18:6,11,17
18:25 19:7
19:17
20:16,19,21
20:24 26:2
73:12
105:9,17
**recalculated**
69:22
**recall** 17:19
19:1 33:4
35:9,12,15

37:18,24
49:16
50:11,24
59:16
61:13,14
65:7 79:6
94:10
105:18,21
125:11
128:3,7
131:3
**receipt** 15:8
**receive** 28:7
**received** 36:1
**recess** 53:24
94:1 124:1
**recognize**
16:1 36:7
97:13
**recollection**
22:15 23:3
106:19
107:8
**Reconsider...**
40:24
**record** 7:8
8:9,20
20:25 35:6
93:16,24,25
100:5
106:17
111:22
123:25
131:23
**recorded**
89:11,12
**redistricting**
27:7 28:24
30:3,4
36:15 43:2
44:7 45:11
52:11 56:6
56:8,20

57:6,8 58:9
58:11,15,20
59:5,12
60:7 61:1
61:23
66:14
74:15,16
75:19 77:9
85:1 88:5
101:13
124:10
127:7
128:25
129:18
130:4
**redrew** 91:2
**reduce**
122:18,24
**Reeves** 40:24
**refer** 109:4
**reference**
84:2 94:9
95:12 96:9
96:22
**referencing**
25:2 29:11
**referred**
68:18
83:19
**referring**
10:25 11:7
**reform**
100:10
**refresh** 107:7
**refreshes**
106:19
**regarding**
38:1 44:7
44:10
**Regardless**
84:16
**region** 92:7
**reinvent**

31:22 33:2
**rejoin** 131:23
**related** 30:12
55:1 100:2
134:13
**relationship**
112:15
**relationships**
134:11
**relatively**
98:13
**relay** 69:16
**relayed**
69:12,13,18
**relevance**
22:17
**relevant**
26:20
27:11,18
30:2,6,7,11
30:11,14
82:24
98:15
**relying**
111:17
**remedial**
74:3
**remember**
23:20 24:9
24:15 28:1
28:4 46:10
50:22 51:1
51:4 52:7
58:22
83:12 91:3
91:6,7
104:19
116:22
127:12,13
**rememberi...**
115:24
**remind** 8:14
**removes**

91:19
**render** 22:5
22:9,19
24:24 26:6
37:12
102:10
**Reock** 62:12
62:13 63:6
63:7,9,11
63:17
64:11,17
88:20 89:3
89:10
107:19,22
113:24
124:22,23
125:1,2,8,9
125:16,22
126:7,25
127:4,9,19
127:24
128:4,24,25
**Reock's**
125:12
**repeat** 8:25
109:19
**repeated**
113:4,11
**rephrase** 9:1
50:24
96:11
117:15
**replace** 39:14
**replaced**
39:11
**reply** 11:17
18:10
105:10
**report** 11:16
15:4,11
16:2,12,21
16:25 17:3
17:5,16,17

17:20,25
18:3,6,11
19:1,7,17
19:19,20,24
19:25
20:17,19,22
20:24
21:25 22:4
22:5,24
24:19
26:25 27:4
27:18,22,23
28:2,17
29:4,6,9,17
30:13 31:1
31:3,16
34:5 35:24
36:18
42:23
48:17,20,20
50:3 60:11
60:13,14,15
60:16 64:6
67:4,7
68:17
69:12,17
71:22
73:12
76:16 78:6
79:9 89:14
90:23 91:4
91:6,13,15
94:6 97:23
97:25
100:4
105:9
125:7,12
126:11
**reported**
1:22 134:6
**reporter** 1:17
1:23 6:21
53:6

109:18
134:3
**REPORT...**
4:13
**reporting**
134:7
**reports** 14:20
21:23 22:8
22:16,17,20
22:23 27:1
27:2 28:7
29:10
48:24 49:2
60:17
**represent**
19:5 80:7
80:17,23,25
**representa...**
129:23
**representa...**
8:8
**REPRESE...**
2:11,16,21
3:5,10,15
**represents**
80:8
**Republican**
106:12
**require**
101:18
**required**
101:15
134:10
**requirement**
118:2
122:5
**requireme...**
121:13,16
**requires**
65:16 77:3
89:7
**requiring**
100:12

**rereview**
18:6
**research**
27:2,5,11
27:14,17,22
27:24
34:12
40:20
72:20 75:8
75:14 77:6
77:14,16,16
77:24
**reserved**
6:16
**residents**
80:9,18
86:13
87:19
102:25
118:20
**residing** 86:1
**respect** 57:11
57:13 61:3
**responses**
8:17
**responsible**
99:15
**responsive...**
6:15
**rest** 13:14
121:21
**results** 128:7
**resume** 48:8
48:15,19
51:23
**retained** 23:7
24:8,10
25:22
**return** 71:9
**reused** 31:25
**REV** 1:6
**reverse** 12:20
**review** 16:25

17:3 18:9
21:13,22
23:1 28:6
29:17 40:8
**reviewed**
14:19
17:16
**revised** 14:1
14:18
19:18,19,24
**revisions**
54:20
**Riggins** 12:5
**right** 8:9
17:22
**Rodden**
94:12,15,21
95:3,15,24
95:25 96:2
96:12 97:2
97:13
100:3
101:23,24
104:4,11,16
107:13
108:1
110:25
112:19
115:4,9
126:10
**Rodriguez**
50:19
52:22
**role** 21:20
103:17
**room** 9:24
131:22
**Rouge** 3:8,13
90:25 91:5
91:7,17
92:9
**round** 80:13
**rounded**
80:20

127:14
129:2,3
**rights** 44:10
45:6 52:1,4
52:5 57:5
64:8 65:16
72:17 77:2
86:17,18
89:23
98:11
120:13,15
120:19
123:2
**road** 89:2
**Rodden**
94:12,15,21
95:3,15,24
95:25 96:2
96:12 97:2
97:13
100:3
101:23,24
104:4,11,16
107:13
108:1
110:25
112:19
115:4,9
126:10
**Rodriguez**
50:19
52:22
**role** 21:20
103:17
**room** 9:24
131:22
**Rouge** 3:8,13
90:25 91:5
91:7,17
92:9
**round** 80:13
**rounded**
80:20

**route** 131:2
**RStudio** 31:7
31:15
**Rucho** 38:11
38:13
49:18 52:8
**rule** 49:3
59:23 61:6
61:17
**rules** 6:5
8:15 39:19
134:10,12
**run** 43:19
45:19
71:12
75:21
76:13,20
89:17 90:3
90:11,18
98:20 99:8
101:13
104:22
113:16
114:18
116:17
127:3,15
128:25
129:14
130:3,12,20
**running**
43:13 44:3
116:18
120:7
130:24
**runs** 119:15
**rural** 87:20
92:18
110:23
114:13
116:13
117:11,21
119:17
120:9

121:8,12
**Rutgers**
125:17

**S**

**S** 6:1 17:10
**S-E-A-N** 7:9
**S-T-A-T-A**
42:4
**safe** 57:21
**sample**
104:21
113:19
**sampling**
104:14,20
**sat** 40:19
**satisfy** 86:17
**save** 6:13
**saw** 21:25
22:3
101:16
102:5,17
114:25
**saying** 84:3,6
**says** 41:3
100:7
**scenario** 66:5
72:4 116:7
118:1
**School** 2:4
37:2
**Schwartzb...**
130:17
**science** 37:1
37:4 66:11
94:19
**score** 89:3
125:1
127:4,19
130:8,10
**scored** 126:7
**scores** 89:10
128:4

**screen** 10:11
10:16
12:13,23
14:25
15:25 16:9
17:8 18:16
19:4 20:11
20:14
36:11
45:15
59:22 67:6
90:9,15
92:11
96:24
106:10
115:1
**script** 34:1,3
**scroll** 12:15
15:6,7
16:15
17:11 36:2
36:11 97:7
107:3
**scrolling**
18:18
**Scwartzberg**
130:18
**SDD-SDJ**
1:4
**Sean** 1:14
4:2 6:4 7:1
7:9 12:14
12:25
13:20 15:4
16:12
133:4,13
134:4
**second** 12:9
20:14
24:24
25:15
29:21,24
35:20 58:6

60:10,13,14
67:5,9
83:19
91:10,12,13
94:4,11,14
94:23
95:21
99:20
106:3
108:4
112:4
113:1
120:1
131:15
**Secondly**
101:20
**Secretary**
1:11 3:15
26:3
**Section**
23:22,25
52:1,3,10
52:10,13,23
54:25 55:2
63:18 64:9
64:21
66:25
75:19
**sections**
10:14
**see** 10:6,18
13:1,11,22
15:3,21
16:17,18
18:19,23
28:15,16,20
36:14 41:6
45:16
48:21
59:24 60:3
61:8 69:8
82:12
88:16

91:21
92:11
100:17
106:19
107:14
108:11
112:22
113:14
115:10
**seeing** 78:4
**seeking**
78:13
**seen** 22:4,16
35:21
**segregation**
76:10
**select** 115:13
**selected**
73:24
114:22
115:16
**selecting**
103:9
**selection**
19:8
**Senate** 11:1
43:21,23
74:11
**send** 35:4
**sense** 27:13
77:13
103:8
**sent** 35:9
106:11
**sentences**
91:16
**separate**
27:16
31:13 78:8
122:24
**September**
1:19 12:17
13:21

106:14
**series** 31:10
**served** 13:8
14:2 48:10
**Service**
125:18
**set** 19:10
29:1 81:15
82:20
134:6
**sets** 43:17
**settled** 49:22
58:25
**seven** 60:22
60:23
**shape** 28:8
62:15,16
95:9 96:5
102:5,7,10
102:23
113:24
**shapes** 95:12
102:17
**share** 14:24
20:11 62:3
67:6 91:11
**sharing**
10:15
14:16 17:8
21:7 90:15
**Shaw** 88:5
**shift** 23:4
46:14 94:3
**short** 48:6
**shorter** 9:7
**Shorthand**
1:17
**show** 12:21
13:17
55:25 82:3
**shows** 3:12
25:16
**Shreveport**

65:25
117:6,8
121:24
**side** 26:13,16
47:3 104:1
105:4
**sign** 54:5
64:6
**signature**
15:22
16:17
17:12
18:21
**Signed**
133:13,17
133:19
**signing** 6:12
**similar** 42:21
43:9 94:20
95:24
97:16
110:10
130:16
**simple**
100:15
**simply** 28:21
58:14
**simulated**
100:13
113:14
**simulating**
108:6
109:2
**simulation**
43:6,19
74:15
**simulations**
27:7,9 30:4
30:10 43:4
43:14,14
44:3 45:11
66:14
71:21

74:17 77:9
101:13
**single** 30:20
30:23
**sit** 128:15,17
**sitting** 79:6
**situation**
58:24
**six** 40:23
48:9
**size** 80:24
81:1,19
82:5 97:21
98:7
103:18
109:8,24
110:5
111:22
112:6,15
114:2,23
**sizes** 111:3
111:25
**sizing** 81:21
**skinny**
112:10
**skirt** 78:25
**Skyler** 39:8
**slash** 72:24
**slightly** 46:15
**slower** 12:12
**small** 98:13
98:16
110:1,1
116:1,4,19
116:24
118:13
**smaller** 71:20
110:7,9,18
110:21
114:2,10
**smallest**
65:14
69:21

114:16
118:21
120:25
125:25
**Smith** 49:13
**smooth**
107:16
**snippets**
31:21 32:5
32:8 33:6
**soft** 53:5
**somewhat**
82:1
**sorry** 10:7
12:18 25:1
34:19
39:23 42:7
52:6 54:13
55:2 58:4
83:18,18
108:7
111:3
120:14
**sort** 24:11
**sought** 6:17
100:25
101:7
**sound** 81:17
125:15
**sounds** 43:12
**source** 32:21
32:22,22
**sources** 29:6
29:6,7 95:2
**south** 37:19
51:3,7,21
116:20,25
**Southern**
52:19
**space** 83:7
84:17
98:13
108:17

**spatial** 29:25
**speaking**
65:4 85:20
**specifically**
6:9,12
**spectrum**
47:18
**spelled** 61:6
**spend** 27:19
67:2
**spending**
21:1
**spent** 11:2
25:2 26:22
54:24
55:12
90:23 94:4
**spilling** 60:22
**spin** 67:16,16
67:22,23
**spinning**
68:2,3
**spins** 67:19
**spit** 70:22
**split** 99:2
**spoke** 11:15
**spot** 28:2
**sprawl** 122:4
**sprawled**
117:10
**sprawling**
103:22
**sprawls**
86:21
87:17
**springs** 46:8
**square** 68:9
68:14,16
131:2
**squared** 69:5
69:11,14
**squaring**
68:13

**ST** 3:12
**stark** 76:11
**start** 16:8
113:3
114:7
119:16
**starting**
46:17
74:12
114:20,24
115:18,25
119:20
**Stata** 42:3,4
**state** 1:8,11
1:18 3:15
6:21 7:7
26:4 37:6
39:17 51:2
51:6 56:2
60:1 61:21
64:14
74:10,25
109:2
134:3,22
**state-of-th...**
74:10
**states** 1:1
57:1 60:24
**statewide**
74:17
**static** 98:23
**statistical**
124:8
**Statistics**
37:7
**status** 40:10
41:5,11
**statute**
134:10
**stay** 23:9
24:14
58:25
**stayed** 131:5

**staying** 48:8
**stenotype**
134:7
**step** 65:19
109:5
113:9
120:1
**steps** 109:4,7
109:8
113:2,4,11
113:16
**STEVEN** 1:6
**stick** 81:9
**stipulate**
64:7 65:6
**stipulated**
6:2
**stipulation**
1:16
**stop** 14:16
21:6 62:3
91:11
103:12
130:24
**stored** 69:15
71:1,3,8
**Strach** 2:15
10:1 11:25
12:1,2
15:12,16
63:19
85:11
118:6
126:13
**strange**
39:11
88:16
**street** 2:5,13
3:2,7,12
32:16 34:1
**strength** 61:5
**strike** 12:19
50:23

51:11
128:16
**struck** 51:19
57:23 58:2
**students**
45:19,24
46:12
**study** 73:25
**stuff** 30:1
32:19
33:25
**subject** 23:18
26:17
41:13
48:22 50:8
50:12
51:24 57:4
**submit** 48:17
**submitted**
22:21
24:18 27:3
35:22 40:6
40:7
**subsequent**
119:15
**substance**
22:23
**substances**
7:23
**substantially**
79:3
**substantive**
19:11
**suburban**
92:18
114:4,9
116:12
117:21
119:4,10
120:12
121:8,11
**suburbs**
87:18

**sufficient**
25:13,19
70:18
102:25
117:2,19
118:14
122:1
**sufficiently**
30:19 87:9
**suggest**
33:18
**suggested**
57:2 74:5
**suicide** 39:13
**SUITE** 2:13
2:18
**sum** 68:9
69:4,10
**summary**
46:20
**summer**
35:25 36:1
**super** 99:7
**superior**
126:11
**supervision**
134:8
**support**
94:14,23
**suppose**
112:21
**Supreme**
29:20
55:20
**sure** 8:15
20:13
23:12
26:18
31:24 32:1
32:11,25
36:24 48:7
50:17
51:22

55:24 56:4
61:14 67:7
67:15 70:6
75:8 90:9
94:10 98:3
105:10
124:19
**surprise**
92:21 93:1
128:11,14
**survey** 46:11
**sustain**
118:15
**sustained**
22:15
**switched**
46:23 47:1
**sworn** 7:2
134:5
**system** 28:12
28:15

———————
**T**
**T** 2:7 5:1 6:1
6:1 134:1,1
**T-R-E-N-...**
7:10
**tables** 20:2
**take** 7:16 9:3
9:6,7,9
10:19 48:6
53:18 93:6
93:12,13
98:2,21
103:5,6
106:1
123:19
**taken** 6:5
45:12
53:24 94:1
121:23
124:1
134:4

**takes** 74:13
115:19
125:24
129:6,8
**talk** 8:21
44:16 45:9
45:11 76:4
**talked** 100:1
124:24
**talking** 14:10
26:22 45:2
67:2 74:23
88:14
90:24
98:11
**tallying**
103:10
**target** 104:12
**tasks** 31:12
**taught** 45:3
46:2,7,9
**teach** 45:8,19
45:22,24
**Technically**
60:14
**technique**
120:23
**TELEPH...**
2:6,14,19
3:3,8,13
**tell** 16:4
52:13
67:12 85:6
96:11
**telling** 89:3
**tells** 121:17
**template**
31:23 32:6
**tend** 12:11
33:22
78:23,24
110:13
112:7

114:9
**tension** 58:10
**term** 10:23
11:6 24:11
50:5 56:5
65:3 87:22
122:13,20
**terms** 10:21
31:25
120:16
**terribly**
51:20
**test** 92:23
120:4
121:9
**testified** 7:3
37:22
48:24 49:4
49:9,23
51:10,12
62:21 87:4
90:11
115:12
**testify** 14:5
22:12
49:12,17,20
49:21
105:2,11
110:15
134:5
**testifying**
36:16
**testimony**
48:5,22
51:13,19
66:20
79:14
84:15
89:11
105:17
106:7,12,15
111:8
133:5,6

134:4,6
**Texas** 76:3
76:12,14
131:4
**Thank** 38:21
39:24
53:19,21,23
**theirs** 22:17
**theoretically**
56:16
**theory** 73:18
127:23
128:2
**thereof** 6:17
**thing** 9:9
12:10
20:13
43:24
44:23 67:8
73:21
107:16
**things** 22:24
24:14 28:2
29:14 30:3
32:17 33:1
38:4 56:17
89:22
**think** 9:5
10:10 12:1
14:10 19:8
21:25 22:2
26:14 31:8
32:12,12,17
35:14
36:10
38:12
39:25
44:12,17
45:17 49:1
50:2,16
52:12,22
53:5,15,17
54:10

55:12
56:20
60:21 62:2
62:21 63:6
63:22
64:11 66:1
67:10
68:25 71:8
76:8,21
81:13
83:11 84:4
84:11 85:4
87:4 88:7
88:20
90:10
92:25 93:6
93:9 97:18
100:24
105:9,12,24
110:6,15,16
111:23
112:2
114:25
115:4,12,22
116:21,23
122:8
123:18,19
124:4,24
127:2,13,16
128:23,25
130:6
131:10,21
**thinking**
95:14
**third** 25:17
27:6 30:2
30:10 38:3
38:7,9 43:1
64:18
**Thomas-L...**
2:7 4:11
7:5 8:3
12:7 13:4

13:10,16,25
14:23 15:2
15:20 16:5
16:16 17:7
17:14,23
18:5,13,22
19:14 20:7
21:8 36:3,6
53:16,25
59:18 60:9
63:25 87:3
90:14,22
93:5 94:2
96:25 97:9
106:4,9
109:20
119:13
123:17
124:2
126:20
131:8
**thorough**
75:7
**thoroughly**
73:19
**thought**
55:19
**three** 24:2
39:17,22
52:25 92:6
**threshold**
65:23
82:21
**Thursday**
36:16
**tiles** 34:2
**time** 6:16 9:5
11:16 14:8
14:11 21:1
23:16 25:2
27:19
34:23 35:1
35:7,12,15

37:22
45:15 48:3
55:12 67:2
74:14
76:20
90:23
93:17 94:4
98:10,25
99:12,13
111:23
112:4
**timeline**
39:10
**times** 65:3
104:23
121:10
122:9
**timing** 53:12
**tiny** 107:1
**tire** 67:15,17
67:21 68:2
68:4
**tires** 67:18
**TITLE** 4:6
**titled** 15:4
94:16
**today** 7:13
7:20 9:14
9:19 10:6
10:22 14:4
14:15 20:4
21:14,20
26:20
56:23
72:15,22
88:3 89:12
104:20
124:16,25
128:16,17
131:18
**today's** 11:12
28:24
**told** 23:18

**Tom** 38:25
39:6,8
**tomorrow**
14:6 36:16
**tonight** 14:7
**top** 32:20
59:24
60:23
67:20 81:5
81:25 84:1
84:7,9
104:7
116:22
**topic** 38:9
**total** 82:15
82:18,22
113:5
**totality** 24:3
**town** 116:7
116:19,24
117:19
118:14
**tracks** 24:13
**tradeoffs**
58:14
**traditional**
56:6,8,19
56:24 57:6
58:8,11,15
58:19 59:4
59:11 60:7
61:1,23
100:8
104:10
**traditionally**
56:13,14
**transcribed**
134:7
**transcript**
21:13
134:8,9,10
**transcripti...**
133:6

**transparen...**
81:19,22
**transparent**
82:1,6
**travel** 14:9
**Trende** 1:14
4:2 6:4 7:1
7:6,9 12:14
12:25
13:20 15:4
16:13
133:4,13
134:4
**trial** 22:7,13
49:23,25
53:9,15
**triangle**
84:10
**Tribe** 50:19
**tricky** 27:13
89:23
**tried** 30:6
63:1 99:9
118:10
127:22
**tries** 115:17
**triggered**
64:10
**trip** 39:11
**true** 16:1,20
36:7 49:25
110:16
122:6
133:8
134:8
**truthfully**
7:19,24
**try** 9:5 33:1
37:15
107:16
112:24
**trying** 23:19
24:12

31:10
32:12 43:4
66:17 68:6
75:15 92:3
96:9,15,19
96:20
103:22
104:6
107:20
111:12
113:19
114:6
121:3,5
**tthomaslu...**
2:8
**Tuesday**
1:19
**turn** 93:18
123:23
124:4
131:13
**turned** 39:16
**turnout** 45:6
**twice** 90:4
**two** 17:24
22:20 39:5
40:9 52:18
62:14
70:24
71:15 78:8
83:5,21
84:2,14,15
88:11
91:16
97:25
108:18,20
**types** 62:13
**typically**
14:8 25:20
33:12

————————
**U**
————————
**U** 6:1

**U.S** 40:25
**ultimately**
87:12,23
88:12,13
119:18
**unbiased**
104:21
**unclear**
111:22
**underlying**
121:9
**understand**
7:12,15
8:18,22,24
9:11,17
11:3,9 20:3
25:23
26:15
44:21,23
82:9 87:10
98:22
127:21
**understan...**
23:21,23
24:1 25:6
25:25 26:1
54:18
55:15,16
57:4 65:15
73:9,17
75:9 79:23
81:14
99:12
116:4
120:3
128:1
134:9
**understood**
56:23
120:14,16
**Unintentio...**
94:16 97:4
**UNION** 3:2

**unit** 99:4
102:23
**united** 1:1
98:12
**units** 96:21
96:22
**university**
36:24 37:6
125:13
**University's**
125:17
**unpersuasi...**
51:13
**unrelated**
113:23
**update** 28:3
46:5
**updated** 41:7
48:20
**updates** 20:2
36:12
**updating**
48:15
**upload** 28:11
28:14
**uploaded**
28:19
**urban** 92:18
110:18,22
120:12
121:8,11
**use** 10:21
28:20
31:22
33:12,22
34:2 44:21
62:12 63:9
64:11
67:14
68:15 69:7
72:13
77:17
78:14 94:6

95:25
104:4
107:9,19
109:11
112:18,21
112:25
116:2,3
120:23
126:25
127:19,24
**useful** 95:8
**uses** 66:22
  96:7 100:8
  107:16
  119:20
**usually** 44:17
  45:13
  48:16,18
**utilized**
  27:15
  43:10

___

**V**

**v** 15:5 16:13
  38:12
  49:13,17,20
  49:21,24,25
  50:19 52:3
  52:4,21
  53:1 88:14
**value** 71:10
  71:14,17,18
  71:18,19,20
**values** 71:16
  71:23 72:7
**various**
  35:21
  45:12
  58:10
**varying**
  124:8
**venerable**
  73:4

**VENKAT...**
  3:19
**verbal** 8:16
**version** 10:12
  10:13
  35:22
  36:12 60:5
  97:11
  101:23
  115:5,9
**versions**
  35:21
**versus** 29:6
  52:15,18,19
  96:21
  98:18
  106:13
  112:19
  118:4
**videoconfe...**
  1:18 2:2
**view** 92:5
**Virginia** 64:2
  64:4
**visual** 29:2
  71:4 82:13
  83:6 85:5
  114:25
  119:24
**visually**
  70:24
  80:22
  84:14
**visuals** 120:4
**vote** 52:14,17
  52:24
  57:15,17
  85:8 86:11
**voter** 45:6
  100:14
**voters** 1:7
  65:11 66:7
  69:20

**votes** 25:18
  52:15
**voting** 24:23
  25:17
  44:10 45:6
  46:7 52:1,4
  52:5 57:5
  61:5 62:7
  64:8 65:12
  65:16,22
  66:8 69:20
  70:19
  72:17 77:2
  80:9,18
  81:4 86:13
  86:16,18
  87:1 89:23
  98:10
  102:25
  117:1
  120:13,15
  120:19
  123:2
**VRA** 52:8,9
  72:10 74:5
  74:5 93:4
  117:4
**vs** 1:10

___

**W**

**W-2** 47:6
**wait** 107:2,2
  108:7
**waiting**
  53:11
**waived** 6:10
  6:12
**WALSH**
  3:12,14
**want** 9:3
  10:8,14
  23:11
  35:17

38:19 67:4
67:7,16
70:21
85:24
86:16 90:9
98:3 108:7
121:21
131:22
**wanted**
  20:12
  55:10 70:8
  70:13
  71:15
  84:22 89:2
  89:15,17
  91:24 99:6
**WASHIN...**
  1:6 2:19
  3:3
**wasn't** 30:1
  38:3 49:19
  50:18
  51:19
  54:22
  61:20
  71:24
  75:25
  107:12
  128:8
  130:14
**WASSER...**
  2:5
**waves** 124:8
**way** 16:15
  30:20
  34:22 37:5
  45:17 47:5
  47:7 56:23
  66:23 68:8
  68:15 69:2
  70:4 75:4
  75:16
  80:11 85:1

88:10 93:1
101:4
104:18
106:24
112:3,13
113:20
116:5
128:20
**ways** 27:8
  32:23 66:2
  68:7 76:18
  100:1
  108:16
**WCC** 2:5
**we'll** 10:18
  17:11 18:1
  19:9 20:25
  47:16 62:2
  91:12
**we're** 9:5,20
  10:21 16:8
  53:11 58:5
  64:13 67:8
  76:7 79:12
  81:4 88:3
  93:20,21,25
  96:4,5,8,15
  102:14
  105:16
  108:24
  113:18
  115:23
  120:7
  123:18
  131:21
**we've** 25:2
  26:22
  39:25
  124:24
  127:2
**web** 60:3
**website**
  47:11 60:2

**weeks** 39:5
  39:16,22
**weighed**
  79:19
**weight** 97:19
  98:7 109:7
  111:1,3
**weighted**
  68:16
  109:16,21
  112:20
**weighting**
  97:20
  98:17
  103:18
  109:9,12
  110:5
  111:5,19,25
  112:1
**weights**
  78:13
**went** 31:15
  35:14
  49:23
**weren't** 30:6
  66:24
**west** 117:23
  117:23
  118:3
  119:5,10
  120:3
**wheel** 31:22
  33:2
**white** 80:18
  81:6 82:10
  87:18
  118:5
**Whitford**
  38:12
**wife** 26:11
**William**
  17:10
**WILLIAMS**

3:18
witness 4:8
6:23 13:2
13:23
15:14,18
20:5 48:10
53:22
63:21
85:13 98:3
103:25
118:8
126:15
133:1
WITNESS'S
4:12
Wood 38:25
word 38:19
44:25
words 67:13
111:14
120:22
work 18:9
23:13 27:8
27:15,21
30:25
31:16 33:6
33:7,8,20
33:21 38:5
40:7 47:25
54:23
58:17
62:10 64:2
75:19,22
80:11
104:3
114:3
116:7,15
127:7
128:20,25
129:18
130:4
works 45:16
45:22

wouldn't
25:20 51:6
75:23
80:11 93:3
104:23
109:11,16
109:21
111:1,20
115:13
121:24
wrapped
115:23
WRIGHT
3:18
write 31:2,10
31:18,20
33:13 42:1
42:17,21
45:24
95:23
125:7
writing 17:4
17:17
18:10
26:24 27:4
30:22
34:12
46:24 47:1
written
16:25
42:11
95:19
wrong 60:21
wrote 31:16
43:3 48:24
49:2 88:5
125:6

X
X 4:1 5:1,1
82:4,7
X"s 81:8

Y
Yale 36:24
Yaqui 50:18
yeah 12:2,2
14:5,9,14
15:15,19
22:11
23:11
29:13 34:3
36:14
39:21 40:9
40:16 41:7
44:25 46:4
46:22
48:12
53:14
54:15
56:22
57:13
58:12 63:9
63:22
64:17
66:13
78:17,18
85:14
94:21 98:4
107:17
112:2
116:22
117:15
120:5
122:22
126:17
127:23
year 23:20
31:24
34:21
131:6
years 8:2
30:5 40:2
49:6 74:23
75:3

yesterday
12:16
13:21
38:15

Z
zagging
84:12
zero 126:8
zigging 84:12
zoom 1:18
2:2 8:11
9:20 10:13
12:10
79:11
83:23 84:8
106:25
131:22

0
02138 2:6

1
1 4:6 5:2 11:8
13:6 25:23
26:2 55:14
55:17,23,25
62:23 63:8
118:12
127:20
10 5:11 20:15
29:13
74:23 80:9
80:10,12,15
80:18
106 5:19
11 5:12 18:20
20:18
113 106:16
1146 4:3 7:10
12 5:13 20:20
12:24 132:1
12:40ish

93:14
120 35:18
13 5:2,3,14
20:23
133 4:12
134:6
134 4:13
14 5:4,15
18:19 36:5
36:7 48:8
1400 2:13
1434 134:12
15 5:16 53:20
59:21,23
67:7 97:25
15TH 3:2
16 5:5,17
90:17
94:10
97:25 98:1
17 5:6,18
79:10 97:2
108:2
17th 37:9
54:4
18 5:7,8,9,19
106:6
115:8
1885 3:7
18th 15:13
19 5:10
1961 125:4
1965 57:9
1980s 120:22
1982 120:15
1990s 74:18
1995 36:25

2
2 5:3 13:19
14:17
23:22,25
26:7 52:1,3

52:10,11,13
52:23
54:25 55:2
63:18 64:9
64:21
66:25
75:19
2-3 4:7
20 5:11,12,13
5:14 34:16
74:25 75:3
200 76:15
20001 2:19
20005 3:3
2001 37:1
2009 46:22
2010 46:25
47:7 92:15
2013 94:16
107:13
2016 37:4
2018 38:7
55:20
2019 37:8
39:13
202 2:19 3:3
2021 11:3
2022 23:10
23:11
37:21,24
41:4 46:8,9
60:15 61:7
2023 1:19
12:17 13:1
15:6 17:1,4
17:13
18:20 46:8
60:17
106:14
134:16
21 59:24 61:7
61:17
88:11 89:6

107:4
**225** 3:8,13
**23** 13:1 60:11
**249** 100:3,5
108:3
**25** 12:17
**250** 2:18
**25th** 13:21
**26** 1:19
**27602** 2:14
**28** 15:5
**28th** 15:17
**29** 17:13
**2a** 113:4
**2b** 113:9
**2c** 109:5
113:4
**2nd** 134:16

**3**

**3** 5:4 15:1
24:19 26:7
29:11
35:23
72:15,17
115:7
**3:22-cv-00...**
1:4
**301** 2:13
**326-6005** 3:8
**329-3800**
2:14
**346-1461**
3:13
**36** 5:15
**37:2554**
134:5
**3a** 109:6
113:2,11,16
**3b** 109:6
**3c** 109:6
113:12,17
**3d** 109:6

113:2
**3RD** 3:7

**4**

**4** 4:8 5:5
16:10
29:11
**40** 74:19
**400** 2:18
**4105** 2:5
**43015** 4:3
7:11
**457-0800** 3:3

**5**

**5** 4:9 5:6 17:9
60:12
**50** 47:11
65:11 66:3
66:7 70:18
78:15
85:19 86:8
87:1 90:1
99:24
102:20
103:1
114:10
116:16
117:2,9,13
118:25
119:6
120:25
121:19
**54** 91:14,14
**55** 66:1
**59** 5:16

**6**

**6** 2:5 4:10 5:7
18:1 79:11
79:18
106:14
**60** 17:12

91:18
**617)998-15...**
2:6
**62** 90:21,25
91:3,8,21
92:10,14,14
92:17,23
**628** 3:12
**65** 91:18
**68** 91:18
**69** 91:18

**7**

**7** 4:11 5:8
18:2 115:8
**70802** 3:8,13
**70s** 74:18

**8**

**8** 5:9 18:15
18:17
**8:05** 1:20
**80s** 74:19
**82** 57:10
**87069** 134:21

**9**

**9** 5:10 19:16
**90** 5:17
**915** 3:2
**919** 2:14
**968-4490**
2:19
**97** 5:18