# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, JARRETT
LOFTON, REV. CLEE EARNEST LOWE, DR.
ALICE WASHINGTON, STEVEN HARRIS,
ALEXIS CALHOUN, BLACK VOTERS
MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

     Plaintiffs,

v.

R. KYLE ARDOIN, in his capacity as Secretary of
State of Louisiana,

     Defendant.

Case No. 3:22-cv-00178-SDD-SDJ

## DECLARATION OF DOUGLAS JOHNSON, PH.D.

1.    I am over the age of eighteen (18) and am competent to testify to the matters set forth herein. The following is true of my own personal knowledge and I otherwise believe it to be true.

2.    I am the President of National Demographics Corporation ("NDC") and have consulted on over 400 redistricting projects across the country. A copy of my current CV is attached. My CV lists my history of redistricting and related expert-witness experience.

3.    I have been retained by counsel for the Legislative Intervenors, the Honorable Clay Schexnayder, in his official capacity as Speaker of the Louisiana House of Representatives, and the Honorable Patrick Page Cortez, in his official capacity as President of the Louisiana Senate. My compensation is $300 per hour for my work on this case and is not contingent upon the outcome of the case.

**Scope of Work**

4.      Counsel asked me to undertake the following tasks:

a.      Analyze plaintiffs' illustrative State House and State Senate plans for Louisiana served with plaintiffs' July 22, 2022, report of William Cooper (the "Illustrative Maps" or "2022 Illustrative Plans"), and the illustrative State House and Senate maps served with Plaintiffs' June 30, 2023, report of William Cooper (the "2023 Illustrative Plans") to analyze, among other things, whether race appears to be the predominate consideration used in drawing those maps;

b.      Compare the 2022 Illustrative Maps and the 2023 Illustrative Maps to identify the scope of changes between the two sets of maps;

c.      Review the "Key Regions" referenced by Plaintiffs' expert, Mr. Cooper, to identify whether there is sufficient evidence provided to support such designations and examine the degree to which the 2023 House and Senate Illustrative Maps follow and respect those "Key Regions" boundaries.

d.      Review the other sections of plaintiffs' expert reports and comment on any areas I viewed as noteworthy or questionable.

**Data Used**

5.      For my analysis, I acquired and loaded into my computer the Louisiana state redistricting geography and data from Caliper Corporation, the Enacted House and Senate map geographic shapefile from the state's redistricting data website, and the 2022 and 2023 Illustrative House and Senate Plan files and other data from Plaintiffs' expert-witness disclosures in this case.

**Scope of Changes from 2022 to 2023 Illustrative Maps**

7.  On June 30, 2023, Mr. Cooper served a supplemental expert report that included his 2023 Illustrative Plans. Mr. Cooper asserted (in paragraph 11 of his supplemental report) that his new plans "update the illustrative plans described in [his] July 22, 2022, declaration to better reflect communities of interest and include other technical changes."

8.  Using Maptitude, industry-standard GIS software for redistricting, and other software tools, I analyzed the four maps to determine the number of Census Blocks and population counts that were changed between the 2022 and 2023 State House illustrative maps, and between the 2022 and 2023 State Senate illustrative maps.

9.  The Illustrative 2 House map makes changes to 21 House Districts (20.0% of the 105 total House Districts) from the Illustrative House map. The changed House Districts are Districts 1, 2, 18, 29, 48, 49, 50, 51, 56, 57, 58, 60, 62, 63, 65, 69, 72, 73, 86, 96, 101. In total, 2,464 Census Blocks change House district assignments. These Census Blocks contain 83,489 people, of whom 44.6% (37,238) are Any Part Black. In other words, Illustrative House Map 2 changes the district assignments of 83,489 Louisiana residents (nearly the population equivalent of two entire House districts).

10. Mr. Cooper's Exhibit B-2 from his June 30, 2023, report purports to highlight in red the changed districts. It does not highlight HD1 and HD2, even though there was a change made to those districts—one that involved the reassignment of a single zero-population Census Block.

11. Mr. Cooper's Exhibit B-2 highlights as changed HD8, but in fact HD8 is unchanged, as can be confirmed by comparing this Exhibit B-2 from his June 30, 2023, report with Exhibit I-1 from his original July 22, 2022, report.

12. Mr. Cooper's Exhibit B-2 does not highlight as changed HD69, but both a comparison with his original July 22, 2022, report's Exhibit I-1 and a look at the map reveals HD69 is significantly changed. In the image below, the colored areas are the Illustrative 2 House Districts. The black lines are the Illustrative House Districts. And the Census Blocks with the black cross-hatching are the Blocks that changed assignments between plaintiff's expert's Illustrative map and his Illustrative 2 map. The numbers shown are the total population of each Census Block:

**Figure 1**



13. The changed House Districts stretch across Southern Louisiana from Lafayette to Baton Rouge and south to the border of the St Charles and Lafourche Parishes:

**Figure 2**



14. Turning to the State Senate maps, I have determined that 665 Census Blocks were moved from one Senate District in the Illustrative Senate map to a different Senate District in the Illustrative 2 Senate map. These Census Blocks contain 35,276 people, of whom 49.5% (17,467) are Any Part Black. The Census Blocks assigned to new Senate Districts in the Illustrative 2 Senate map change seven Senate Districts: SD7, SD8, SD14, SD15, SD17, SD19 and SD20 (18 % of the 39 total Senate districts).

**Illustrative House and Senate Map Revisions Resulted in Less-Compact 2023 Maps**

15.    Oddly enough, the twenty-one districts changed between the 2022 House Illustrative Map and the 2023 House Illustrative Map made the 2023 map even *less* compact than the 2022 House Illustrative Map.

16.    Both plaintiff's expert and I use the Maptitude for Redistricting software. I used Maptitude to compute the ten measures of compactness built into the software. The results are attached as an appendix to this report. The results show that only two compactness measures that improved were the Ehrenburg and Length-Width measures (focusing on the "minimum," or least-compact, district by each measure). HD96, which was the least-compact district in the 2022 House Illustrative Map, improved from a 0.12 Ehrenburg score to a 0.18 Ehrenburg score in the 2023 House Illustrative Map – still an extremely non-compact district by that measure, but no longer the least-compact district in the map.

17.    The 0.06 improvement in HD96's Ehrenburg score was accompanied by a 0.09 improvement in neighboring HD48's Ehrenburg score. But those improvements were more than offset by the combination of a newly-added extra split of the St. Mary Parish, a 0.04 decrease in neighboring HD18's Ehrenburg score, and a significant 0.22 drop in neighboring HD50's Ehrenburg score.

18.    But the Ehrenburg improvement in HD96 did not improve the overall map score, which remained a median 0.36 under Ehrenburg. Similarly, the average score remained constant or essentially constant at a 0.01 difference between the 2022 and 2023 maps under eight of the eleven compactness scores built into Maptitude.[1]

---

[1] The eight constant or 0.01 change compactness measures are Reock, Schwartzberg, alternate Schwartzberg, Polsby-Popper, Population Polygon, Area/Convex Hull/ Population Circle, and Ehrenburg.

19.    The scores for the three other compactness measures built into Maptitude[2] became less compact for the 2023 House Illustrative Map than they were in the 2022 House Illustrative Map.

20.    The changes to HD50 between the 2022 and 2023 Illustrative Maps further violate traditional redistricting principles by taking HD96 from being a simple combination of the southern non-contiguous portion of St Martin Parish and as much of St. Mary Parish as possible within the equal population requirements in the 2022 map[3], to now adding a 5,000-person piece of Assumption Parish into HD50 and having HD96 become a third district dividing up St Mary Parish.

**Figure 3**



2022 House Illustrative Map          2023 House Illustrative Map

21.    The changes from the 2022 Senate Illustrative Map to the 2023 Senate Illustrative Map similarly make the 2023 Senate Illustrative map less-compact than the 2022 Senate

---

[2] Cut Edges, Perimeter, and Length-Width.
[3] HD50 in the 2022 House Illustrative Map is identical to HD50 in the Enacted Map.

Page 7

Illustrative according to the average score on eight of the eleven Maptitude compactness measures[4]. The least-compact district is less compact in the 2023 Senate Illustrative Map than the least-compact district in the 2022 Senate Illustrative Map according to two Maptitude compactness measures[5] and unchanged by the other seven district-specific measures[6].

### Maptitude Data Does Not Corroborate The Claim That Plaintiffs' Expert Used Socio-Economic Data When Mapping

22.    Despite plaintiffs' expert's claims to have used "socio-economic characteristics" and data when drawing his maps (e.g., Cooper June 30, 2023, supplemental report in paragraphs 10, 75, and 105–106), the data used in his redistricting system do not include socio-economic data. To understand how clear this fact is, one must understand a little bit about how the Maptitude for Redistricting software (which both plaintiffs' expert and I use for most of our work) operates.

23.    Maptitude stores data at the Census Block level and reports that data at the District level by aggregating all the Block-level data in a given District. The data and potential changes are displayed live in real time. But only data available in the Block level of geography can be calculated at the District level.

24.    For illustrative purposes, below is a screen shot of my Maptitude window with the Enacted Senate map visible. In the image below, the area marked "1" is the list of layers available in the map (those with the green check mark are currently showing in the map, while those

---

[4] Less-compact: Reock, Schwartzberg, Alternate Schwartzberg, Polsby-Popper, Area/Convex Hull, Ehrenburg, Length-Width and Cut Edges. More-compact (by the absolute minimum change possible of 0.01 in each case): Population Polygon and Population Circle, along with the Perimeter measure.

[5] Reock and Population Polygon

[6] The "cut edges" and Perimeter tests do not give useful individual district scores – they are only useful as whole-map measurements – so they are not included in this count.

with an "x" in a red circle are currently hidden). While the other layers are available as overlays, Maptitude does its calculations using only the data available in the Census Block layer. The area marked "2" are the demographics for each district as drawn in the map at the time the screen shot was taken. And the area marked "3" is a "Pending Changes" window that currently shows no pending changes, but where the demographics of any impacted district(s) would be shown live corresponding to every mouse click in the map.

**Figure 4**



25. The Census Block data provided by Mr. Cooper contains only (1) the total population by race and ethnicity and (2) the voting age population by race and ethnicity that come standard from Caliper Corporation. Those are the full contents of the Census Bureau's PL94-171 redistricting data file, released after each decennial Census. No Citizen Voting Age Population data nor any other socio-economic data are included in the Maptitude Census Block data file provided by Mr. Cooper as the file he used for drawing his map.

26.   Separately Mr. Cooper provided the Citizen Voting Age Population (CVAP) data compiled by HaystaqDNA (which he footnotes as coming from the "Redistricting Data Hub"). But he did not merge that into the Census Block file he claims was used while drawing his maps. He did not provide any socio-economic data compiled at the Census Block level. So the CVAP and socio-economic data would not have been compiled by, nor reported in, the Maptitude software as he drew the map and as he made decisions regarding where to place his illustrative map lines.

### Population Change, 2000 (1991 lines) to 2022

27.   Plaintiffs' expert's discussion of the changes in the state's Black population between 2000 and 2020 seems to undermine the claim that the 2022 enacted plans undermine Black representation. As Mr. Cooper notes in his June 30, 2023, report (at paragraph 34), from 2000 to 2020 the state's "Any Party Black Voting Age Population" increased from 29.95% to 31.25% -- an increase of 1.3%. And from 2000 to the enacted 2022 House map, the number of majority-Black seats increased from 26 (24.8% of 105) to 29 (27.6% of 105) majority-Black House seats, according to plaintiffs' expert's Paragraphs 53, 54 and 55 – a 2.8% increase. In other words, the Black-majority number of House seats increased more than twice as fast as the Black share of the state's Voting Age Population (2.8% versus 1.3%).

28.   Similarly, as plaintiffs' expert notes in his June 30, 2023, report's paragraphs 53, 54 and 56, the number of majority-Black Senate seats increased from 10 in 2000 (25.6% of 39) to 11 (28.2% of 39) – an increase of 2.6%, or exactly double the increase in the Black share of the state's Voting Age Population.

**Figure 5**

|  | **2000** | **2020/2022 with % increase** |
|---|---|---|
| **Black % of Voting Age Population** | 29.95% | (2020 Census)<br>31.25%<br>**+1.3%** |
| **Majority-Black % of House Districts** | 26 | (2022 Enacted Map)<br>29<br>**+2.8%** |
| **Majority-Black % of Senate Districts** | 10 | (2022 Enacted Map)<br>11<br>**+2.6%** |

29.    It is also worth noting that plaintiffs' expert's statement in his paragraph 58 is simply false, even according to his own math. His Figure 11 shows that three, not two, Black-majority House districts have been added between the map in place in 2000 and the 2022 enacted House map.

**Communities of Interest splits report (Exhibits L-1 and P-1)**

30.    In Exhibits L-1 and P-1 of his June 30, 2023, report, Mr. Cooper provides his list of "municipalities" split by the 2023 Illustrative Plans. These reports are misleading, however, as Census Places are not the same thing as municipalities or communities of interest. In fact, Census Places consist of incorporated towns and cities PLUS unofficial areas designated near-randomly by someone either in the Parish (possibly decades ago) or by someone in Washington DC.

31.    As one example that I am personally very familiar with, my (unincorporated) community of Aptos, California, self-identifies as one community called "Aptos" and shares one high school, one primary shopping area, and is geographically isolated – all classic indications of a "community of interest." But the Census Bureau subdivides even our small 27,000-resident unincorporated community into six different CDP's:

**Figure 6**



32.     Plaintiffs' expert has not provided any support or explanation for his claims that such randomly-designated Census Designated Places – not recognized by state or local governments – constitute communities of interest worthy of consideration (in his view) in redistricting.

**Wikipedia Is Not A Reliable Source For Defining "Key Multi-Parish Community Regions"**

33. Plaintiffs' expert identifies, in paragraph 27 and Figure 2 of the Cooper June 30, 2023, report, what he terms "key multi-parish cultural regions." In my view, however, the sources of evidence he uses to define these "key multi-parish cultural" regions are not sufficiently reliable to be used for such a political-science analysis or when mapping.

34. While the "Acadiana" region's 22 parishes are sourced to the Legislative website (see plaintiffs' expert's footnote 17) or a geography quiz from the state's Common Core curriculum asking students to identify the 12 delta parishes (footnote 19), his other regions are sourced to either an academic website that lists no shared characteristics since Louisiana achieved statehood in 1812 (footnote 18), or, even worse, uses Wikipedia as the source of a "key multi-parish community regions" (footnote 20). I am unconvinced that either Wikipedia or five pre-1812 characteristics are sufficiently accurate and reliable to allow plaintiffs' expert to accurately identify "key" communities of interest relevant to redistricting in 2023.

**Plaintiffs' Expert's Map Repeatedly Divides His Own "Key Regions"**

35. Mr. Cooper's June 20, 2023, report's Figure 2 shows the state divided into "key multi-parish cultural regions"; his Figure 3 shows the state divided into eight "Planning Districts" that he analyzes by race and ethnicity; and Figure 9 shows the Census-drawn Metropolitan Statistical Areas, or MSA's, which he also analyzes by race and ethnicity.

36. If plaintiffs' expert actually considered any of these true "key regions" in the state, the illustrative map would cross the region boundaries no more than twice (as one entry split and one exit split might be necessary to balance populations in a given region and the bordering region).

37.    Plaintiff's 2023 Illustrative House map, to its credit, does unite the southeastern "PD-1 New Orleans Area" Planning District as much as possible, crossing its border only once (though even that crossing is notable, as it is the 1,005-person 'finger' extending east out of HD 54 along the shoreline highlighted by the arrow in the following figure):

**Figure 7**



38.    Returning to the question of plaintiffs' "Key Regions," every other Planning District boundary is crossed by anywhere from three to seven House districts. If someone drawing a map truly considered Planning Districts as key communities of interest, that person would not draw a map in that way.

39.     The 2023 Illustrative Senate map (where SD20 shares the same "finger" into Jefferson Parish shown above for HD54) pays even less attention to Planning Districts. PD-5, Imperial Calcasieu, is crossed by only two districts, but every other Planning District border is crossed by three to eight times.

40.     The 2023 House and Senate Illustrative maps clearly show that plaintiffs' expert did not consider Planning Districts to be important when drawing maps.

41.     Mr. Cooper's June 30, 2023, report's Figure 2 shows the state divided into eight "Key Cultural Regions."

42.     But, again, if plaintiffs' expert actually considered these true "key regions," the illustrative map would cross the region boundaries no more than twice (as one entry split and one exit split might be necessary to balance populations in a given region and the bordering region).

43.     Analysis of the 2023 Illustrative House Map shows that each "Cultural Region" border is crossed once (the unnamed Southeast Cultural Region), twice (Ark-La-Tex and Florida Parishes), three (Delta), five (unnamed area between Ark-La-Tex and Acadiana), or seven (Acadiana) times.

44.     Analysis of the 2023 Illustrative Senate Map shows that each "Cultural Region" border is crossed three (Ark-La-Tex, Delta, and Florida), four (unnamed southeast region), five (unnamed area between Ark-La-Tex and Acadiana), or eight (Acadiana) times.

45.     Again, one or two districts crossing can be explained by the need to equalize populations, but five or eight crossings prove even plaintiffs' expert did not consider these to actually be "key regions" for redistricting.

46.    Similarly, plaintiffs' expert's 2023 Illustrative Maps do not respect or follow Metropolitan Statistical Area, or MSA, boundaries[7] – the other geographic regions for which plaintiffs' expert provides racial and ethnic data in his discussion of key regions. As with "Key Cultural Regions" and Planning Districts, in the 2023 Senate Illustrative Map only one MSA has just the one or two border crossings arguably required for population balancing (Lake Charles, with two border crossings). The other eight MSA borders are crossed three, four, five and even six times by districts in the 2023 Senate Illustrative Map. In the 2023 House Illustrative Map, the Baton Rouge MSA border is crossed by eight different districts, while the Lafayette MSA border is crossed in seven places by six different districts (HD50 crosses the Lafayette MSA border twice). Clearly, the 2023 House and Senate Illustrative Maps do not consider MSA boundaries communities of interest whose boundaries should be respected.

### Plaintiffs' Expert's "Enacted Maps" are not the Actual Enacted Maps

47.    A comparison of the official House and Senate enacted map population figures to the population figures plaintiffs' expert says are from the "official" enacted maps reveals that he has misdrawn or miscounted numerous House and Senate districts in the maps he claims are the enacted maps. Mr. Cooper's reported population totals do not match the actual population totals in all of the following districts:

   a.   House: HDs 19, 21, 24, 30, 32, 35, 37, 48 and 49

   b.   Senate: SDs 6, 17, 22, 23, 24, 28, 30 and 37

---

[7] Plaintiff's expert did not provide any MSA geographic file. I downloaded the national Core Based Statistical Areas shapefile from Data.gov and exported the Louisiana MSAs out of that file: https://catalog.data.gov/dataset/tiger-line-shapefile-2020-nation-u-s-core-based-statistical-areas-cbsa

48.    In the Senate maps, the population differences range from 33 to 1,428. In the House maps, the population differences range from 113 to 697. Those population differences flag where there are problems, but they do not indicate the scale of the problem. For example, as shown in Figure 8 below, plaintiff's expert's Figure 34 clearly shows the wrong lines for House Districts 36 and 37. on the left is a cropped screen shot of plaintiff's expert's Figure 34. On the right is an image I prepared showing the actual enacted border between House Districts 35 and 37. The clearly visible error is highlighted by the blue arrow, which is placed in the same spot over both images:

**Figure 8**



49.    The blue arrow indicates the region plaintiffs' expert thinks is part of the enacted House District 35 (purple-colored in his map), but this area is actually in House District 37.

50.    There are 805 people in the erroneously-assigned area. plaintiffs' expert's version of the "enacted" map draws 805 more people into House District 35 than are there in the actual

enacted map. But the population numbers in Mr. Cooper's June 30, 2023, Exhibit I-1 report that House District 35 is over by only 113 people (compared to the actual enacted map). The population differences prove that somewhere else in his map is one or more additional errors in the boundaries of these districts, though those errors cannot be seen in the cropped view of the District he included in his Figure 34.

51.    Normally identifying all the differences between two maps in the Maptitude software is easy, using the Maptitude files for each plan. But in this project I cannot run that analysis because plaintiffs' expert did not provide the computer files that he used to draw what he erroneously called the "enacted" maps. In the absence of those computer files any analysis is limited to just what can be seen in the blurry enlargements of the statewide PDF-format maps provided in plaintiff's expert's exhibits.

52.    Looking at plaintiffs' expert's statewide map of House Districts (Mr. Cooper's June 30, 2023, report's Exhibit I-2) does provide a bit more insight, as in the area at the north end of House District 35 and around House District 30 there are at least six errors visible in plaintiff's expert's version of the "enacted" map, again with blue arrows highlighting the visible errors:

**Figure 9**



53.    Here are the similar errors between House Districts 19 and 21, showing the incorrect assignment nearly half the territory of East Carroll County:

**Figure 10**

**Mr. Cooper's Exhibit I-2**    **Actual Enacted House Districts Map**

    

54.    Finally (for the House map), here are the visible errors between House Districts 48 and 49:

**Figure 11**



Mr. Cooper's Exhibit I-2
(HD49 is shown in pink)

Actual Enacted House Districts Map





55.    This area is another good example of how those numbers fail to capture the scale of the error: while the <u>net</u> difference between the official populations of HD48 and 49 and plaintiff's expert's version of these two districts is only 697 people, plaintiff's expert's map of HD48 and HD49 has 6,700 people assigned to the wrong districts. The area indicated by the northwesternmost arrow in Figure 11, which plaintiffs' expert assigns to HD48 but is officially in HD49, mistakenly shifts over 3,000 people from HD49 to HD48. The yellow "foot" of HD48 indicated by the southernmost arrow is an area of 1,700 people mistakenly shifted by plaintiff's expert from HD48 to HD49. And the middle arrow highlights an area right along the border of the St. Martin and Iberia Parishes that is mistakenly assigned to HD49 instead of HD48. This area includes over 2,000 people. While the total district population numbers report a net error of 697 between these two House Districts, in fact the

errors involve the erroneous assignment of 6,700 Louisiana residents – fifteen percent (15%) of the population of a full House District.

**Figure 12**

| District | Cooper Ex. I-1 2020 Pop. | NDC Fields Official Pop | Net Diff. |
|---|---|---|---|
| 19 | 42,717 | 43,183 | 466 |
| 21 | 44,795 | 44,329 | -466 |
| 24 | 42,460 | 42,692 | 232 |
| 30 | 42,952 | 42,313 | -639 |
| 32 | 42,415 | 42,409 | -6 |
| 35 | 46,088 | 45,975 | -113 |
| 37 | 45,146 | 45,672 | 526 |
| 48 | 44,642 | 45,339 | 697 |
| 49 | 46,367 | 45,670 | -697 |

56.  Plaintiffs' expert's exhibits and data related to what he calls the Enacted Senate map are similarly erroneous. The following images show zoomed-in details of Mr. Cooper's Exhibit H-2, which he claims show the 2022 Enacted Senate Districts, compared to the actual 2022 Enacted Senate Districts. The images are followed by a table showing the population differences between his erroneously labeled "Enacted" Senate Districts and the actual Enacted Senate Districts, similar to the table above for House Districts. The errors among the Senate Districts are larger than, and represent an even higher percentage of the total number of Senate Districts than, his errors in the House Districts.

57.  The map below shows the clear visible errors between what plaintiffs' expert presents as the Enacted Senate map of Senate Districts 6 and 37 and the actual Enacted Senate map of Senate Districts 6 and 37:

## Figure 13

| Mr. Cooper's Exhibit H-2 | Actual Enacted Senate Districts Map |




58.  Plaintiffs' expert's portrayal of the eastern end of SD6 bears very little resemblance to the actual eastern end of Enacted SD6: where plaintiffs' expert shows SD6 going into Tangipahoa Parish with a small piece of Livingston Parish, the actual enacted SD6 never enters Tangipahoa Parish and travels all the way through Livingston County to the St. John the Baptist Parish border.

59.  Plaintiffs' expert also shows what he says is Enacted SD37 with a major portion of Livingston Parish, a narrow arm into St Tammany Parish, and not including the southwestern and southeastern corners of Tangipahoa Parish, while the actual Enacted SD37 has only a geographically small piece of Livingston Parish, covering the entire southern end of Tangipahoa Parish, and with a much geographically larger pieces of St. Tammany Parish.

60.  Mr. Cooper's  map of what he says are the Enacted Senate Districts around Lafayette show

even larger errors:

**Figure 14**

**Mr. Cooper's Exhibit H-2**
(SD17 is shown in pink, SD22 in Grey)            **Actual Enacted Senate Districts Map**

61.  On the smaller scale of errors, the population numbers (shown below) reflect an error in

SD30 that Mr. Cooper's Exhibit H-1 does not contain enough detail to identify. Had

plaintiffs' expert provided his computer files for what he claims are the Enacted Senate

Districts that error could be identified, but he did not provide those files.

62.  The next-smallest error is the visibly clear differences in the borders of SD24 and 28 at the

western end of SD24 in St. Landry Parish.

63.  Plaintiffs' expert claimed "Enacted SD" map also fails to reflect the actual Enacted SD17's

inclusion of territory and population from the north edge of Lafayette Parish, which

plaintiffs' expert's map erroneously shows as being entirely in SD24.

64.   Getting into much geographically larger errors, plaintiffs' expert's map shows the entire northern section of St. Martin Parish inside SD17 (the pink SD in his Exhibit H-2 map shown on the left in the side-by-side image above), but in reality SD22 goes all the way north to the St. Landry Parish border east of the BYU Portage and Henderson Levee Road.

65.   Finally, and most significantly from a 'wrong population' perspective, plaintiffs' expert's version of the Senate District borders between SD23 and SD22 in Lafayette are off by tens of thousands of people. Again, exact numbers are impossible to calculate in the absence of plaintiffs' expert's computer file for whatever he thought was the Enacted map, but it appears that he has nearly 30,000 Lafayette Parish residents in SD23 who actually reside in SD22, and vice versa.

66.   So where the table below shows the total population of SD23 in plaintiffs' expert's version of the map varies from the actual enacted map by only -33 people, that is a NET error – in reality tens of thousands of people are in his version of SD23 who do not belong there, while tens of thousands of people who do belong there are not included – nearly half of the actual population of Enacted SDs 22 and 23 are not in plaintiffs' expert's versions of SD22 and 23.

67.   As a result of these foregoing errors, the figures, data, and analysis of the 2022 enacted plans that are reported in plaintiffs' expert's two expert reports are unreliable.

**Figure 15**

| District | Cooper H-1 2020 Pop. | NDC Data | |
|---|---|---|---|
| | | Official Pop | # Diff |
| 6 | 116,653 | 117,595 | 942 |
| 17 | 113,778 | 114,040 | 262 |
| 22 | 123,858 | 125,286 | 1428 |
| 23 | 125,047 | 125,014 | -33 |
| 24 | 125,094 | 124,799 | -295 |
| 28 | 115,710 | 114,358 | -1352 |
| 30 | 113,747 | 113,737 | -10 |
| 37 | 114,442 | 113,500 | -942 |

**Correlation of Race and the Illustrative Plan District Lines**

68.    As a professional political scientist and demographer, I have created or analyzed many hundreds of districting plans in my career in jurisdictions throughout the country, including in jurisdictions with significant minority voting-age populations. Leveraging this training and experience, I analyzed plaintiffs' expert's 2022 and 2023 House and Senate Illustrative Plans to assess the degree to which the racial characteristics of the plan correlated to, and drove, the district boundaries employed in those plans.

69.    Plaintiffs' expert clearly drew his "new" majority-Black SD38 by precisely dividing the Black population of Shreveport along lines that provide the precise racial percentages needed to make Senate Districts 38 and 39 majority-Black – without any reference to compactness, major roads, communities, neighborhoods, clear visible features or any other traditional redistricting principle. The only reason Mr. Cooper provides for drawing the line where he drew it is race:

**Figure 16**



70.     Similarly, plaintiffs' expert carves the southern portion of Iberville Parish out of illustrative

Senate District 17 with no explanation and following no traditional redistricting principle

– the only explanation is race, as this change carves a region with few Blacks out of his majority-Black illustrative District 17:[8]

**Figure 17**



Southern Ibetville Parish area and population that the illustrative map removes from SD17.

71.   Plaintiffs' expert's third and final new majority-Black Senate District in his illustrative plan (Senate District 19) also has no explanation except a predominate reliance on race in deciding where to draw the District's boundary lines. Of particular note is the use of the Mississippi River as the District's northern border – except where concentrations of Black population on the north side of the river lead plaintiffs' expert to subordinate following the river to his predominate consideration (race). With no explanation other than race, plaintiffs' expert draws the district line across the river to precisely follow the Census Blocks containing higher densities of Black voters.

---

[8] Of the 1,727 total population in the highlighted area (which is removed from SD17 in the illustrative map), only 2.52% is AP Blk VAP.

Figure 18



72.     Plaintiffs' expert drew his "new" majority-Black HD1 by precisely dividing the Black

population of Shreveport along lines that provide the precise racial percentages needed to

make Senate Districts 38 and 39 majority-Black – without any reference to compactness,

major roads, communities, neighborhoods, clear visible features or any other traditional

redistricting principle. The only reason plaintiffs' expert provides for drawing the line

where he drew it is race, with the majority-Black area carefully carved up to ensure both

HD1 and HD2 end up as majority-Black, as a simple look at the map disproves any claim

that the boundaries follow major roads, rivers, city borders, parish borders and even the

socio-economic data plaintiff's expert spends so much time discussing (but did not provide

in his disclosures, since they were not in his redistricting database):

**Figure 19**



73.     Just to the south, in Natchitoches, HD23 similarly wanders across City and community

boundaries, ignoring the freeway and other major roads, to focus on including majority-

Black Census Blocks:

**Figure 20**



74.   In Lake Charles Parish, Illustrative HD38 sweeps west to carve the majority-Black Census

Blocks out of Westlake, sweeps south out of Lake Charles to pull in a few majority-Black

Census Blocks, again ignoring City borders, freeways, communities, and even socio-

economic data, and then carefully carves through the city to ensure that both HD38 and

HD34 end up just barely majority-Black at 50.8% and 50.3% AP Black18+, respectively:

**Figure 21**



75. The 2023 Illustrative House Plan's divisions of the East Baton Rouge Parish starkly illustrates the blatant use of race as the predominate factor when carving up the region in a "pinwheel" fashion to maximize the number of House Districts that are just barely over 50% AP Black18+%. The following map shows each Illustrative House District's number and its AP Black18+%. Each district clearly carves into the most-Black areas of East Baton Rouge without regard to city borders, community boundaries, major roads, socio-economic areas or community boundaries – clearly only the careful division of the Black population

to get as many districts as possible just over 50% drove the decisions on where to draw the lines.[9]

76.    With only 29,565 residents, Central is only two-thirds the size of a single House district. Population density is just one of the differences between relatively rural Central and nearby Baton Rouge, as Central has 472 residents per square mile while Baton Rouge has 2,567. The Enacted House Map leaves Central intact, entirely in HD65, while Mr. Cooper's Illustrative 2023 House map splits it into three districts (HD62, 63 and 65). Two of the Illustrative Districts each combine just roughly one-third of Central with the much more densely populated Baton Rouge or Baker (population density: 1,481 per square mile) across the Comite River (the Comite River is the western border of Central). The lack of attention paid to any consideration other than race is clearly illustrated by the fate of the City of Central in plaintiffs' expert's 2023 Illustrative House map:

---

[9] As will be discussed below, with the new "differential privacy" introducing margins of error into the 2020 Census data, there is a good chance these carefully-fine-tuned districts are not actually over 50% AP Black VAP.

**Figure 22**



77.    While this report highlights how racial considerations predominated in the drawing of the

illustrative maps' claimed new majority-Black districts, those new districts are only the

beginning of plaintiffs' expert's reliance on race as his predominate factor. It is logically

obvious that if plaintiffs' expert is using race as the predominate factor when drawing the

new districts, by definition plaintiffs' expert is also using race as the predominate facor in

drawing the (many more) districts surrounding the "new" districts.

**Racial Percentage Targets Drove the Drawing of the New Illustrative Districts**

78.    Plaintiffs' expert claims the 2023 Illustrative Plans shows the Legislature could have drawn three more majority-Black Senate Districts (Mr. Cooper's June 30, 2023, report at paragraph 73, claiming new majority-AP Black VAP SDs 17, 19 and 38) and six more majority-Black House Districts (paragraph 103, claiming new majority-AP Black VAP HDs 1, 23, 38, 60, 65 and 68).

79.    Unfortunately, plaintiffs' expert's data are incorrect. As his own June 30, 2023, report's Exhibit N-1 shows, HD23 is already majority-Black in the Enacted Map:

**Figure 23**

**Population Summary Report**
**Louisiana State House -- Illustrative Plan**

| District | 2020 Pop. | % Deviation | 18+ Pop | 18+ AP Black | % 18+ AP Black | 18+_NH White | % 18+ NH White | 18+ Latino | % 18+ Latino | 2016-2020 NH SR BCVAP | July 2021 Registered Black Voters |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 01 | 44473 | 0.25% | 33473 | 18520 | 55.33% | 13,247 | 39.58% | 873 | 2.61% | 58.65% | 57.09% |
| 02 | 42776 | -3.57% | 32912 | 22164 | 67.34% | 8,142 | 24.74% | 1,717 | 5.22% | 67.78% | 71.86% |
| 03 | 45006 | 1.46% | 33115 | 19487 | 58.85% | 11,725 | 35.41% | 938 | 2.83% | 61.40% | 58.46% |
| 04 | 46232 | 4.22% | 35104 | 20197 | 57.53% | 12,928 | 36.83% | 1,052 | 3.00% | 55.16% | 57.10% |
| 05 | 42708 | -3.72% | 35751 | 18183 | 50.86% | 12,647 | 35.38% | 4,012 | 11.22% | 59.90% | 53.59% |
| 06 | 46262 | 4.29% | 36840 | 5889 | 15.99% | 27,343 | 74.22% | 1,390 | 3.77% | 17.10% | 13.48% |
| 07 | 43102 | -2.84% | 33286 | 5987 | 17.99% | 23,596 | 70.89% | 1,014 | 3.05% | 15.48% | 17.93% |
| 08 | 45325 | 2.18% | 33068 | 6571 | 19.87% | 22,697 | 68.64% | 1,875 | 5.67% | 20.59% | 17.31% |
| 09 | 43401 | -2.16% | 31974 | 6742 | 21.09% | 20,834 | 65.16% | 2,669 | 8.35% | 20.82% | 20.81% |
| 10 | 44137 | -0.50% | 34617 | 11395 | 32.92% | 21,696 | 62.67% | 557 | 1.61% | 33.15% | 31.75% |
| 11 | 43867 | -1.11% | 35553 | 19749 | 55.55% | 14,068 | 39.57% | 980 | 2.76% | 59.48% | 57.66% |
| 12 | 45007 | 1.46% | 35392 | 6685 | 18.89% | 26,166 | 73.93% | 1,393 | 3.94% | 20.26% | 18.58% |
| 13 | 44864 | 1.14% | 35197 | 8507 | 24.17% | 23,649 | 67.19% | 2,017 | 5.73% | 28.74% | 25.44% |
| 14 | 42319 | -4.60% | 32389 | 12217 | 37.72% | 18,584 | 57.38% | 798 | 2.46% | 39.40% | 38.10% |
| 15 | 43211 | -2.59% | 32579 | 2695 | 8.27% | 27,392 | 84.08% | 1,003 | 3.08% | 7.95% | 6.82% |
| 16 | 42314 | -4.61% | 32063 | 19160 | 59.76% | 11,021 | 34.37% | 678 | 2.11% | 56.47% | 62.64% |
| 17 | 43007 | -3.05% | 31497 | 17158 | 54.48% | 11,636 | 36.94% | 1,765 | 5.60% | 57.80% | 61.13% |
| 18 | 46417 | 4.64% | 35794 | 7310 | 20.42% | 26,708 | 74.62% | 1,047 | 2.93% | 20.24% | 21.16% |
| 19 | 42229 | -4.80% | 32254 | 4250 | 13.18% | 26,052 | 80.77% | 642 | 1.99% | 12.58% | 11.68% |
| 20 | 43964 | -0.89% | 33646 | 12053 | 35.82% | 20,538 | 61.04% | 522 | 1.55% | 33.94% | 36.03% |
| 21 | 42463 | -4.28% | 32737 | 17771 | 54.28% | 13,990 | 42.73% | 571 | 1.74% | 54.32% | 57.40% |

80.    And plaintiffs' expert also fails to mention that his 2023 House Illustrative Map eliminates a majority-Black VAP district: HD62, as shown in his June 30, 2023, report's own Exhibit I-1 and N-1:

**Figure 24**

**Population Summary Report**

**Louisiana State House -- Illustrative Plan**

| District | 2020 Pop. | % Deviation | 18+ Pop | 18+ AP Black | % 18+ AP Black | 18+_NH White | % 18+ NH White | 18+ Latino | % 18+ Latino | 2016-2020 NH SR BCVAP | July 2021 Registered Black Voters |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | 43938 | -0.95% | 35532 | 17836 | 50.20% | 15,550 | 43.76% | 1,204 | 3.39% | 50.47% | 55.95% |
| 62 | 45595 | 2.78% | 37162 | 10271 | 27.64% | 24,940 | 67.11% | 1,125 | 3.03% | 38.89% | 30.43% |
| 63 | 43863 | -1.12% | 32530 | 18656 | 57.35% | 12,270 | 37.72% | 904 | 2.78% | 58.90% | 57.31% |

**Population Summary Report**

**Louisiana State House -- 2022 Plan**

| District | 2020 Pop. | % Deviation | 18+ Pop | 18+ AP Black | % 18+ AP Black | 18+_NH White | % 18+ NH White | 18+ Latino | % 18+ Latino | 2016-2020 NH SR BCVAP | July 2021 Registered Black Voters |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 61 | 44049 | -0.70% | 33624 | 25314 | 75.29% | 6,273 | 18.66% | 1,531 | 4.55% | 72.11% | 75.90% |
| 62 | 42969 | -3.14% | 33763 | 18597 | 55.08% | 13,972 | 41.38% | 634 | 1.88% | 57.12% | 56.01% |
| 63 | 44638 | 0.63% | 33586 | 23394 | 69.65% | 8,793 | 26.18% | 875 | 2.61% | 72.13% | 69.53% |

81. In summary, plaintiffs' expert's claimed list of "six additional majority-Black districts" incorrectly includes HD23 as an "additional" district, when HD23 was already majority-AP Black VAP in the enacted map. And plaintiffs' expert's claimed list also fails to acknowledge that the 2023 House Illustrative Map also eliminates majority-AP Black VAP HD62.

82. Plaintiffs' expert also fails to note that a portion of the AP Black VAP used to create the "new" majority-AP Black VAP House Districts were taken out of some already-narrowly-majority districts. In fact, there are seven House Districts that (1) were already majority-AP Black VAP in the enacted map and (2) are between 50% and 53% AP Black VAP in the 2023 House Illustrative Map, and all seven had their AP Black share of Voting Age Population reduced. The smallest reductions were tiny 0.3% reductions in HD67 (now 51.6% AP Black VAP in the 2023 House Illustrative Map) and in HD23 (now 50.6% AP

Black VAP in the 2023 House Illustrative Map). But the other reductions were significant: already-borderline HD72 went from just 52.7% AP Black VAP in the Enacted Map to just 50.6% AP Black VAP in the 2023 House Illustrative Map. And HD58, HD101, HD34, and HD61 all went from solidly majority-AP Black VAP to well within the margin-of-error of no longer being majority-AP Black VAP:

**Figure 25**

| % AP Black VAP | | | |
|---|---|---|---|
| HD | Enacted | 2023 Illust. | Change |
| 67 | 51.9% | 51.6% | -0.3% |
| 23 | 50.9% | 50.6% | -0.3% |
| 72 | 52.7% | 50.6% | -2.1% |
| 58 | 56.8% | 51.3% | -5.5% |
| 101 | 60.2% | 50.8% | -9.5% |
| 34 | 72.6% | 50.0% | -22.5% |
| 61 | 75.3% | 50.2% | -25.1% |

83.    As shown in the maps shown earlier in this report, plaintiffs' expert uses race as a predominate factor to draw the lines that create these districts. It is worth noting how precisely race has been used: In the 2023 Illustrative Map, eleven majority-AP Black VAP House Districts are less than 53% AP Black VAP. That is 8 more than the 3 such borderline House Districts in the Enacted Map. The 2023 Senate Illustrative Map is even more extreme: eleven of the Senate map's sixteen majority-AP Black VAP districts are just barely majority-AP Black VAP at less than 53% AP Black VAP.

84.    One significant risk associated with drawing districts so close to the 50% "line" as plaintiffs' expert does is the impact of a new statistical method employed in 2020 by the Census Bureau called "differential privacy." This policy was intended to protect

respondent privacy.[10] The methodology adds noise, or "blurring," to the Census data, which means that Census data now has a "margin of error" in its population counts. The Census Bureau estimates the margin of error to be very roughly 1% for total population counts at the Congressional level, with higher margins of error in smaller geographic areas (such as legislative districts) and for racial or ethnic counts within that total population figure. And the margin of error grows significantly for sub-groups within a geographic area, such as the ethnic breakdowns within each district. With plaintiffs' expert's carefully tailored razor-thin majority-Black percentages, there is a statistically significant chance that some or even many of those districts are in fact <u>not</u> 50% Black.

85.    There is also the sensitivity analysis to consider. Plaintiffs' expert uses 50% AP Black VAP as his target for a district likely to elect the candidate preferred by Black voters, without citing any support for that number. Even if 50% is a statistically-estimated figure, any polarized voting analysis used to calculate that "likely to elect" percentage is a statistical analysis with a margin of error and chance of mischaracterizing the data.[11]

86.    As a simple illustration of this concept, suppose that the true "effective" percentage is 53% AP Black VAP for all the districts in the State. In that hypothetical example, the enacted Senate map would elect more Black-preferred candidates (10) than the 2022 and 2023 Senate Illustrative plans (6 and 5, respectively).

87.    In Mr. Cooper's 2023 Illustrative House plan, nearly one-third – 11 of his 35 claimed "majority-Black" districts – are less than 53% AP Black VAP. So, if 53% is the real-world

---

[10] For the Census Bureau's explanation of differential privacy, see https://www.census.gov/programs-surveys/decennial-census/decade/2020/planning-management/process/disclosure-avoidance/differential-privacy.html (last accessed May 29, 2023).

[11] One proof of this is the result of the *LULAC* case in Texas, where a Section 2 case ordered a Congressional District redrawn to elect a Latino-preferred (Democratic) candidate, and a Republican won the redrawn district.

"effective" percentage, the Enacted Senate Map would elect 26 Black-voter-preferred candidates, compared to only 22 in the 2022 House Illustrative Map and only 24 in the 2023 House Illustrative Map.

88. Given the margin of error in the Census's "differential privacy" 2020 Census data, the AP Black VAP Census data could easily be off by at least one to three percent, and the statistical margin of error in any polarized voting analysis could easily be 3% or more.

89. A sensitivity analysis in the other direction – asking how many districts would elect the Black-preferred candidate if the true effectiveness percentage is 45% AP Black VAP instead of 50% – finds that there are no districts where the AP Black VAP percentage is between 41 and 50 percent in the Enacted Map, in the 2022 Illustrative Map, or in the 2023 Illustrative Map. This means that, as noted above, a Census or polarized voting error that under-estimates the "effective" percentage could have a major impact on the number of effective districts in the 2022 and 2023 Illustrative House Maps and leave the House and Senate Illustrative Maps with fewer effective districts than the Enacted Maps. But a Census or polarized voting error that over-estimates the "effective" percentage would have to be larger than a 9% error before it changed the number of "effective" districts in any of the Enacted or Illustrative maps.

90. The chart below shows the AP Black VAP percentage of all House districts in the enacted (blue bars) and illustrative (orange bars) plans.

**Figure 26**



91.    The chart below shows the same data, but has been simplified to show only the districts that are majority-AP Black VAP in either plan. The way the majority-AP Black VAP districts were drawn to just-barely cross the 50% line is clear, as the grouping of districts precisely above 50% makes clear the predominate consideration of race in drawing the illustrative map:

**Figure 27**



92.    The same precision targeting on 50% AP Black VAP occurs in the illustrative Senate map. If anything the illustrative Senate map is even more racially focused than the illustrative House map, as the illustrative Senate map are even more precisely drawn just above 50% AP Black than the illustrative House districts (and thus are even more vulnerable to inaccuracies in the Census data resulting from the differential privacy "noise" in the data).

93.    The enacted map performs much better in a sensitivity / robustness test. In the hypothetical case where the true effectiveness level is 53% AP Black VAP, only 5 districts in the 2023 Illustrative Senate Plan would elect the Black-preferred candidate, compared to 10 Senate districts in the Enacted Map that would elect the Black-preferred candidate in that hypothetical case.

**Figure 28**



94. As the full chart above and the more focused chart below reveal, the illustrative districts are drawn to just barely exceed the 50 percent line.

**Figure 29**



All opinions in this report are subject to amendment in the event additional relevant information is received.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 28th day of July, 2023.

_____
Douglas Johnson, Ph.D.