IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, JARRETT LOFTON, REV. CLEE EARNEST LOWE, DR. ALICE WASHINGTON, STEVEN HARRIS, ALEXIS CALHOUN, BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, and THE LOUISIANA STATE CONFERENCE OF THE NAACP,<br><br>*Plaintiffs*,<br><br>v.<br><br>R. YLE ARDOIN, in his official capacity as Secretary of State of Louisiana<br><br>*Defendant*. | CIVIL NO. 3:22-cv-00178 |

## DECLARATION OF WILLIAM S. COOPER

WILLIAM S. COOPER, acting in accordance with 28 U.S.C. § 1746, Federal Rule of Civil Procedure 26(a)(2)(B), and Federal Rules of Evidence 702 and 703, does hereby declare and say:

I. **INTRODUCTION**

1. I serve as a demographic and redistricting expert for the Plaintiffs for the above-captioned case and submitted declarations in this lawsuit on July 22, 2022 and June 29, 2023.

2. I submit this additional expert declaration to provide analysis and expert opinion relating to the July 28, 2023 expert reports of Dr. Douglas Johnson, Dr. Allan Murray, and Mr. Sean Trende ("experts for the Defendants").

3. As all three experts for the Defendants have noted, my initial declarations mistakenly relied on plans that were developed in legislative committees during the 2022 redistricting process rather than the final plans enacted by the Legislature and signed into law by Governor Edwards. I have updated my June 29, 2023 Declaration to accurately reflect the Enacted Plan.

4. The opinions expressed by the experts for the Defendants do not change my conclusions in the July 22, 2022 Declaration and the June 29, 2023 Declaration. There were minor differences in some of the metrics but none sufficient enough to change my assessment of the illustrative plans that I presented to the Court. However, given that there were slight changes, I have updated my prior report to reflect the Enacted Plan and attached it as my **Rebuttal Exhibit A** declaration (signed on August 11, 2023). **Rebuttal Exhibit A** analyzes the same Illustrative Legislative Plan as presented in my June 29, 2023 Declaration. The only difference is that it is now compared to the Enacted Plan.

5. In my opinion, both the Illustrative Legislative Plan presented in my July 22, 2022 Declaration ("2022 Illustrative Plan") and the Illustrative Legislative Plan ("Illustrative Plan") presented in my June 29, 2023 Declaration adhere to traditional redistricting principles – including

population equality, compactness, contiguity, respect for communities of interest, and the non-dilution of minority voting strength.

6. The fact that there are differences between the two illustrative plans that I have prepared underscores that there are a variety of different ways to draw legislative plans that adhere to traditional redistricting principles and protect the voting rights of the African American community in Louisiana.

7. The changes I made between the 2022 Illustrative Plan and the now-current Illustrative Plan are minor. They reflect conversations I had with the attorneys for the Plaintiffs, who in turn had requested commentary about the 2022 Illustrative Plan from the Plaintiffs and other experts for the Plaintiffs.

8. The Illustrative Plan is designed to fit into the Enacted Plan. The Illustrative House Plan contains 40 House districts as drawn in the Enacted House Plan. The Illustrative Senate Plan contains 21 Senate districts as drawn in the Enacted Senate Plan. Thus, at the outset, there are built-in biases against the Illustrative Plan that are reflected in how the additional majority-Black districts can be drawn absent a complete statewide redraw from scratch.

## II. ANALYSIS OF DEFENDANTS' EXPERT REPORTS

9. The reports of the experts for the Defendants contain errors, inaccuracies, and methodological flaws. All three experts critique majority-Black districts in the Illustrative Plan and its 2022 predecessor but fail to rigorously examine districts in the Enacted Plan – a critical omission.

10. The Illustrative Plan is superior to or on par with the Enacted Plan across almost every metric used to assess the extent to which an election plan adheres to traditional redistricting

principles – compactness, communities of interest, political subdivision splits, and the non-dilution of minority voting strength.

11. In the sections below, I highlight some of the most glaring problems associated with the analyses conducted by the three experts beginning, in alphabetical order, with Dr. Johnson.

**A. Expert Report of Dr. Douglas Johnson**

12. I agree with ¶¶ 7-14, which describe changes between the 2022 Illustrative Plan and the Illustrative Plan.

**(a) Compactness Scores – Enacted Plans vs. Illustrative Plans**

13. I have prepared additional exhibits to counter Dr. Johnson's claims in ¶¶ 15-29 that the majority Black districts in the Illustrative Plan are not compact.

14. According to all 12 compactness measures available in the Maptitude for Redistricting software, the Illustrative Senate Plan is more compact than the Enacted Senate Plan. **Rebuttal Exhibit B-3** contains information about these measures as detailed in the Maptitude software documentation.

15. **Rebuttal Exhibit B-1** presents compactness scores for the Enacted Senate Plan. **Rebuttal Exhibit B-2** presents the same information for the Illustrative Senate Plan.

16. All told, the Illustrative House Plan is slightly more compact than the Enacted House Plan. According to five compactness measures, the Illustrative House Plan is as compact as the Enacted House Plan. According to four compactness measures, the Illustrative House Plan is more compact than the Enacted House Plan. According to three compactness measures, the Illustrative House Plan is less compact than the Enacted House Plan.

17. **Rebuttal Exhibit C-1** presents compactness scores for the Enacted House Plan, as reported by Maptitude for Redistricting. **Rebuttal Exhibit C-2** presents the same information for the Illustrative House.

(b) <u>ACS – Socio-economic Characteristics and Citizen Voting Age</u>

18. In ¶¶ 22-25, Dr. Johnson erroneously implies that I had to use disaggregated block-level socio-economic data from the American Community Survey ("ACS") when drawing the Illustrative Plans in order to consider socio-economic information as part of my map drawing process. This is not true. As I explain in ¶ 75 and ¶ 105 in **Rebuttal Exhibit A**, I considered and reviewed socio-economic data (in tabular and chart format) at the municipal and parish level in order to gain some perspective on the underlying communities. I prepared the socio-economic charts and tables from publicly available ACS data found on the U.S. Census Bureau website. Thus, while map drawing, I was generally aware of socio-economic information for the regions when deciding where to draw my lines.

19. In ¶ 26, Dr. Johnson claims that I did not import CVAP data into Maptitude. This is not true. Disaggregated block-level CVAP data is available in Maptitude running on my desktop computer. I referenced the source in my declaration: the Redistricting Data Hub[1]. As Dr. Johnson notes in ¶ 27, I provided the block-level Redistricting Data Hub CVAP dataset to the Defendants.[2] I only examined CVAP by district at the summary level as I drew the plans.

(c) <u>Black Population Change from 2000 to 2020</u>

20. Dr. Johnson's analysis in ¶¶ 27-28 regarding percentage changes in the Black population assumes that Black voters were not under-represented in prior plans. The Black-White

---

[1] https://redistrictingdatahub.org/state/louisiana/
[2] https://redistrictingdatahub.org/dataset/louisiana-cvap-data-disaggregated-to-the-2020-block-level-2021/

5

representation gap only narrows if the number of majority-Black districts outpaces Black population growth for a period of time. The gap has barely nudged this century.

21. Dr. Johnson's claim that ¶ 58 in my declaration is false is incorrect. In ¶ 58, I state that since the 2000 Census redistricting cycle (*i.e.*, the 2001 Plan), just two House districts have been added – from 27 to 29 – or a total of two House districts over the past 22 years. As I explain in my declaration, during this two-decade period, the Black population grew in urban areas and declined in rural areas, making it possible to draw majority-Black districts in and around several of the metropolitan statistical areas ("MSAs") in Louisiana.

**(d) Municipal Split Analysis**

22. In ¶¶ 30-32, Dr. Johnson claims that my analysis of municipal splits by plan is based on all Census Designated Places in Louisiana (304 municipalities and 184 unincorporated communities). This is not true. The municipal split counts in the Maptitude-generated reports (Exhibits H-5, I-5, J-5 and N-5 attached to **Rebuttal Exhibit A**) are based solely on 304 municipalities (cities, towns, and villages) as identified by the U.S. Census Bureau. Maptitude allows you to remove 184 unincorporated places by creating a selection set, which I did to make sure that I only included split counts for municipalities as required by the Legislature's Joint Rule No. 21 "Redistricting criteria" ("JR 21").[3]

**(e) Louisiana Regional Split Analysis**

23. Contrary to Dr. Johnson's claim in ¶¶ 36-37, I was aware of cultural regions, MSAs, and Planning Districts as I developed the Illustrative Plans. Of course, there is no way to avoid multiple regional splits and comply with one-person, one-vote and the Voting Rights Act.

---

[3] *See* Joint Rule No. 21, https://www.legis.la.gov/Legis/Law.aspx?d=1238755.

24. Nonetheless, the Illustrative Plan contains fewer splits of Planning Districts (**Rebuttal Exhibits D-1** and **D-2**) than the Enacted Plan (**Rebuttal Exhibits D-3** and **D-4**). Likewise, the Illustrative Plan contains fewer splits of MSAs (**Rebuttal Exhibits E-1** and **E-2**) than the Enacted Plan (**Rebuttal Exhibits E-3** and **E-4**).

### (f) Enacted and Illustrative House District 54

25. In ¶ 37, Dr. Johnson critiques the manner in which HD 54 was drawn. HD 54 is the same in both the Enacted Plan and in the Illustrative Plan. Where possible, I used a least change method when drawing the Illustrative Plan in order to preserve the core of districts and to minimize disruption to incumbents.

26. Even assuming I had changed the district, Dr. Johnson fails to account for an important geographic feature of the district. HD 54 includes all of Lafourche Parish and the Grand Isle portion of Jefferson Parish. This makes perfect sense because the only way to get to Grand Isle from Jefferson Parish is by land through Lafourche Parish.

27. Dr. Johnson's failure to show water features on his maps of Louisiana is a major oversight. Figure 7 on page 14 of his report would look entirely different with the Gulf Coast and marshland of Lafourche Parish. The "finger", as Dr. Johnson characterizes it, is Grand Isle (a beautiful barrier island – not a finger).

### (g) Not the Actual Enacted Maps

28. With respect to ¶¶ 47-67 in Dr. Johnson's report, I have explained *supra* that by mistake I did not use the final Enacted Plan as a comparator. This mistake has been corrected in **Rebuttal Exhibit A.** The committee maps I analyzed in my previous declarations are substantially similar to the Enacted Plan.

### (h) Block-level Maps and Analysis

29. In ¶¶ 68-77, Dr. Johnson implies that I made certain line drawing decisions based on race. However, as discussed in my initial report, I drew the maps based on traditional redistricting criteria and at the VTD level. While I was aware of race, given that the purpose of the *Gingles I* analysis is to see if additional compact majority minority districts can be drawn, I did not shade or color-code census blocks by race percentages, nor did I know the exact racial percentage of any VTD while I was drawing the map. The color-coded block level maps as depicted in Figures 16 to 22 of Dr. Johnson's report are foreign to me. Those maps completely misrepresent my VTD-level approach to plan drawing. (The same holds true for the block-level maps prepared by Dr. Murray and Mr. Trende. All three experts misunderstand how I draw legislative voting plans.)

30. As stated in my July 2023 report, the changes between my 2022 Illustrative Plan and the now-current Illustrative Plan were primarily made to better respect communities of interest. I also made changes to improve the performance of the districts for black preferred candidates based on the feedback counsel received from Dr. Handley.

31. I incorporated traditional redistricting principles throughout the Illustrative Plan. As revealed in Figures 14 and 25 of **Rebuttal Exhibit A**, the majority-Black legislative districts (14 in the Illustrative Senate Plan and 35 in the Illustrative House Plan) are, on balance, more compact than those in the Enacted Senate Plan (11) and Enacted House Plan (29).

32. For example, in the Shreveport area, new majority-Black Illustrative SD 38 (Reock .37 and Polsby-Popper .17) scores slightly lower than majority-White Enacted SD 38 (Reock .39 and Polsby-Popper .23) but within the norm, and about the same as majority-Black Enacted SD 39

(Reock .31 and Polsby-Popper .19). About two-thirds of the population in Illustrative SD 38 comes from Enacted SDs 38 and 39.

33. Also, in the Shreveport area, new majority-Black Illustrative HD 1 (Reock .36 and Polsby-Popper .26) is clearly within the norm and scores higher than majority-White Enacted HD 1 (Reock .26 and Polsby-Popper .21) but lower than majority-White Enacted HD 4 (Reock .45 and Polsby-Popper .28). Nearly three-quarters of the population in Illustrative HD 1 comes from majority-White Enacted HDs 1 and 4.

34. This same pattern of on-par or superior compactness scores for the new majority-Black Illustrative districts vis-a-vis their Enacted Plan counterparts is for the most part replicated throughout the Illustrative Plan.

### (i) The Number of Additional Majority-Black Districts – HD 23 and HD 62

35. In ¶¶ 78-81, Dr. Johnson makes additional false claims that I overcounted the number of additional majority-Black districts in the Illustrative Plan. In fact, the Illustrative Plan contains six additional majority-Black House districts and three additional majority-Black Senate districts. This can easily be determined by doing a manual count comparing the district-level percentages in exhibits attached to **Rebuttal Exhibit A** (H-1, I-1, J-1 and N-1).

36. Compared to the Enacted Plan, some district numbers and geographic locations do change under the Illustrative Plan. For example, Illustrative HD 23 would be a new majority-Black House district in northwest Louisiana. In the Enacted House Plan, HD 23 is eliminated as a majority-Black House district in northwest Louisiana and shifted to New Orleans. Majority-Black Enacted HD 62 in East Feliciana Parish and part of East Baton Rouge becomes a majority-White district under the Illustrative House Plan. It is replaced with two new majority-Black districts in East Baton Rouge Parish – Illustrative HD 65 and Illustrative HD 68.

**B. Expert Report of Dr. Allan Murray**

 (a) <u>Split Counts</u>

 **37.** In ¶ 8, Dr. Murray fails to make a distinction between "split parishes" and "parish splits." "Split parishes" are the total number of parishes that are split. Those parishes may be split one time, two times, etc. The sum total for split parishes plus parishes not split, as shown in the Maptitude reports which I have included as exhibits, always adds up to the total number of parishes in Louisiana (*i.e.*, 64). This is not the case for parish splits, which represent unique parish/district combinations. Parishes can be split into pieces of districts in any number of ways. There is no "nuanced accounting" as described by Dr. Murray in ¶ 8. As shown in Exhibit I-4 attached to **Rebuttal Exhibit A**, there are 116 populated parish splits in the Enacted House Plan versus 113 in the Illustrative House Plan (Exhibit N-4).

 (b) <u>Compactness Measures</u>

 **38.** With respect to ¶¶ 14-15, Dr. Murray is stating the obvious. The Reock score is an area-based measure and the Polsby-Popper measure is perimeter-based. One would not necessarily expect a high correlation between the two measures. This is why more than one compactness measure should be reported.

 **39.** In ¶¶ 21-22, Dr. Murray repeats the same obvious points he made with respect to correlation between the Reock and Polsby-Popper scores in reference to the House Plans.

 (c) <u>Municipal Splits</u>

 **40.** Like Dr. Johnson, Dr. Murray claims in ¶ 17 that I reported splits for all 488 Census Designated Places in the state. This is not true. I report splits only for the 304 municipalities – excluding the 184 unincorporated communities.

**(d) Same-race VAP-majority Districts**

41.     Dr. Murray's claims in ¶ 18 are incorrect. He misunderstands the point of Figure 16 in my declaration. The percentages in Figure 16 do not represent a <u>mean average</u> of the Black VAP percentages for the majority-Black districts in the Enacted Senate Plan (11) and Illustrative Senate Plan (14). Nor do the percentages in Figure 16 represent a <u>mean average</u> of the NH White VAP percentages for the majority-White districts in the Enacted Senate Plan (28) and Illustrative Senate Plan (25).

42.     Figure 16 in **Rebuttal Exhibit A** is correct. For the Enacted Senate Plan, it reveals the percentage of the total statewide Black VAP residing in majority-Black Senate districts (53.6%) vs. the percentage of the total statewide NH White VAP residing in majority-White Senate districts (84.4%). The Black-White gap narrows under the Illustrative Senate Plan.

43.     In ¶ 24, Dr. Murray repeats the same mistake for House districts that he made for Senate districts.

44.     Figure 27 in **Rebuttal Exhibit A** is correct. It reveals the percentage of the total statewide Black VAP residing in majority-Black House districts (55.6%) vs. the percentage of the total statewide NH White VAP residing in majority-White Senate districts (83.4%). The Black-White gap narrows under the Illustrative House Plan.

**(e) Neighborhood Splits**

45.     In ¶ 28, Dr. Murray claims that the Enacted Senate Plan contains 375 block group splits. This is an undercount. Statewide, there are a total of 433 populated block group splits in the Enacted Senate Plan (**Rebuttal Exhibit F-1**), as compared to 337 in the Illustrative Senate Plan (**Rebuttal Exhibit F-2**).

11

46.     In ¶ 29, Dr. Murray also undercounts the number of split block groups in the Enacted House Plan. Statewide, there are a total of 490 populated block group splits in the Enacted House Plan (**Rebuttal Exhibit F-3**), as compared to 507 in the Illustrative House Plan (**Rebuttal Exhibit F-4**).

47.     In response to ¶¶ 27-30 in Dr. Murray's report, I have prepared a set of map exhibits which demonstrate that the additional majority-Black districts in the Illustrative Plan generally keep together low- and moderate-income neighborhoods – independent of race.

48.     **Rebuttal Exhibits G-1 to G-3** (Illustrative Senate Plan) and **Rebuttal Exhibits H-1 to H-6** (Illustrative House Plan) zoom in on the additional majority-Black districts. For perspective, black lines show boundaries for the Enacted Plan. Diagonal shading identifies block groups[4] that qualify for Fiscal Year 2023 USDA subsides provided to local governments, school districts, and non-profits under the Summer Meals Program and Child and Adult Care Food Programs.[5] The shaded block groups qualify as eligible for subsidies as individual 50%+ block groups or block groups within or adjacent to census tracts that contain 50% or more of the under-19 population living below 185% of the poverty line.[6]

---

[4] The U.S. Census Bureau defines "Block Groups" as "statistical divisions of census tracts and are generally defined to contain between 600 and 3,000 people."
See https://www.census.gov/programs-surveys/geography/about/glossary.html#par_textimage_4.

[5] The specific factors of eligibility in this program can be found at https://www.fns.usda.gov/area-eligibility.

[6] These maps are part of a nationwide mapping project that I conduct on an annual basis for the Food Research and Action Center. A statewide block group map for Louisiana in a color-coded format is accessible via: https://frac.org/research/resource-library/summer-food-mapper

**(e) One-Person One-Vote Deviation Calculation**

49. In ¶ 30, Dr. Murray fails Redistricting 101. As every plan drawer knows, an overall deviation percentage is calculated by summing the absolute value of the district with the largest negative deviation with the percentage deviation of the district with the highest positive deviation. An overall deviation that is under 10% would comply with one-person, one-vote requirements for the Louisiana Legislative Plan. The overall deviation I report for the Illustrative Senate Plan in Exhibit J-1 is correct – 9.78%.

**C. Expert Report of Mr. Sean Trende**

50. Mr. Trende's compactness analysis is unorthodox. In a Section 2 redistricting lawsuit, compactness is not measured by where part of a minority population is located in a district. Rather, it is measured based on the distribution of the entire population of the district and the district shape.

51. I have testified in over 55 Section 2 redistricting cases. To my knowledge, the moment of inertia compactness measure has never been reported by the *Gingles I* experts in any of the 55. Generally, two compactness measures are reported by *Gingles I* experts – Reock and Polsby-Popper. As I noted *supra,* 12 compactness measures can now be calculated using Maptitude for Redistricting software – the premier redistricting software used by most state legislatures and consultants. The moment of inertia measure is not included in the Maptitude software.

52. Mr. Trende's analysis is one-sided and incomplete. He fails to conduct a similar analysis for <u>both</u> the White population and the Black population in all of the Enacted districts that overlay onto the additional Illustrative majority-Black districts. This would be a monumental project, perhaps worthy of an extensive analysis in a peer-reviewed academic journal if carried to its logical endpoint – *i.e.*, a statewide two-sided analysis of all districts under the Illustrative and

Enacted Plans. Because of this gaping analytic hole, Mr. Trende's report is topological gobbledygook.

# # #

**53.** I reserve the right to continue to supplement my reports in light of additional facts, testimony, and/or materials that may come to light during the pendency of the above-captioned case.

<u>Executed on</u>: August 11, 2023

*William S Cooper* (signature)

WILLIAM S COOPER