DR. DOROTHY NAIRNE, JARRETT LOFTON, REV. CLEE EARNEST LOWE, DR. ALICE WASHINGTON, STEVEN HARRIS, ALEXIS CALHOUN, BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, and THE LOUISIANA STATE CONFERENCE OF THE NAACP,

*Plaintiffs*,

v.

R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana

*Defendant*.

CIVIL ACTION NO. 3:22-cv-00178 SDD-SDJ

Dr. Handley Rebuttal Report

**Rebuttal Expert Report of Dr. Lisa Handley**

I have been asked by plaintiffs in this case to review the reports of defendant experts Dr. Lewis, Dr. Solanky, and Dr. Alford. The following are my comments on these reports.

**Section I. Comments on the Expert Report of Dr. Lewis**

While Dr. Lewis has carried out an impressive amount of statistical analyses, much of what he relays in his report is irrelevant or misleading in the context of this case. For example, many of the state legislative districts he examines are not located in the areas relevant to this legal challenge. More importantly, the Black voting age population (BVAP) needed to win calculations – the focus of much of his report – are misleading for a number of reasons.

> **A. Dr. Lewis's BVAP needed to win calculations in contests with three or more candidates are misleading (Tables 1 and 3)**

In contests with three or more candidates (which are addressed in Tables 1 and 3), rather than calculate the percent needed to actually win the contest (50% of the vote is required to win the contest outright), Dr. Lewis redefines winning as "candidates who gained over 50 percent of the vote or *were among the top two vote-getters who moved on to a general election runoff* [emphasis added] under Louisiana's top-two primary system." This redefinition has the effect of dramatically reducing the BVAP needed to win. For example, compare H21-004 in Table 1 (election contests with three or more candidates) and Table 2 (contests with just two candidates). In both instances the Black share of the vote is approximately 70% (70% in Table 1, 71% in Table 2). However, in Table 2, the cohesion among Black voters is higher (95%) than in Table 1 (82%), and the percentage of White voters crossing over to vote for the Black-preferred candidate is also higher (17% compared to 12%). Higher White crossover voting and higher Black cohesion should produce a lower BVAP needed to win but the percent BVAP needed to win calculated by Dr. Lewis for H21-004 is considerably higher – 39% – in Table 2 than in Table 1 – 24%. Including candidates who make it into the runoff in the calculation as Dr. Lewis has done it in Tables 1 and 3 makes his calculations in those tables misleading.[1] Had Dr. Lewis calculated the percent BVAP needed to win 50% of the vote (and not just advance out of the primary) for H21-004 in Table 1, he would have arrived at a much higher BVAP needed to win (over 54% BVAP).

Here is another example of the difference between the calculations in Table 1 and 2. According to Table 1, the BVAP needed to win in H21-060 is 19%. This enacted district has a BVAP of 37.7%. Dr. Lewis reports that the win rate for Black-preferred candidates in contests with three

---

[1] The reason I have calculated two effectiveness scores (effectiveness score #1 and #2) in my report is a recognition that making it into a runoff is by no means a guarantee that the Black-preferred candidate will ultimately win the seat. A comparison of effectiveness scores #1 and #2 in my report makes this quite clear (Dr. Lisa Handley, "Expert Report on the Enacted Louisiana State House and Senate Plans," June 30, 2023, comparison tables, pages 17-31).

1

or more candidates in this district is 77%.[2] But this percentage must reflect simply making it to the runoff because when only two-candidate contests are considered (Table 2), the percent needed to win climbs to 35%. And, although the BVAP in this district exceeds 35% (let alone 19%), the win rate for Black-preferred candidates shown in Table 2 for when there are only two candidates in this district is only 36%.

For this reason, I believe the BVAP needed to win percentages in Tables 1 and 3 are misleading.

### B. Including contests in which White candidates are the candidates of choice of Black voters when calculating the BVAP needed to win is misleading (Tables 1 and 2)

The reason the courts have specified that contests that include Black candidates are more probative than contests that do not is that Black voters must be able to elect their candidates of choice even if those candidates are Black candidates – they should not be consigned to being able to elect only the White candidates they prefer. My review of Dr. Alford's report, which includes the results of all election contests – not simply those contests that include Black candidates – makes it quite clear that White voters support Black-preferred White candidates at higher percentages than Black-preferred Black candidates. By including contests with higher White crossover than would be expected for Black-preferred Black candidates, Dr. Lewis produces lower BVAP needed to win percentages than would be the case if contests with only Black-preferred Black candidates are considered.

Going back to our example of the difference between the calculations, compare the results for HD21-060 in Tables 2 and 4. The percent BVAP needed presented by Dr. Lewis is 35% in all two-candidate contests (Table 2) and, although the BVAP in this district exceeds 35%, the win rate for this district is only 36%. But far more striking, in Table 4, which considers two-candidate contests that include a Black candidate, the percent BVAP needed to win again climbs, this time to 41%. The win rate for Black-preferred Black candidates in this district is only 14%.

Therefore, the resulting percentages of the BVAP needed to win in Table 2 (as well as Table 1) are also misleading.

### C. Dr. Lewis's practice of averaging the BVAP needed to win across multiple contests is misleading (Tables 1-4)

Dr. Lewis averages the BVAP percent needed across all of the contests analyzed to produce a single BVAP percentage needed to win for a given district. But an average is only meaningful if

---

[2] The win rate is the percentage of the Black-preferred candidates in the elections examined who would have *won* if the contest had been held only in the given district (Lewis Report, page 5) (emphasis added). However, in contests with three or more candidates, the Black-preferred candidate merely has to be "among the top two vote-getters who moved on to a general election run-off" to be considered a winner and be included in the win rate (Lewis Report, page 6). The "Black-preferred win rate" is listed in column 7 in Lewis Tables 1-4.

2

each of the individual contest percentages are distributed symmetrically about the median BVAP needed to win percentage. If the distribution is skewed and the mean and the median are not the same, producing an average obscures the likelihood of winning individual contests. The following is a hypothetical example of nine two-candidate contests that included a Black candidate analyzed within the bounds of a single hypothetical state house district:

| Column #1 | Column #2 | Column #3 | Column #4 | Column #5 | Column #6 | Column #7 | Column #8 | Column #10 |
|---|---|---|---|---|---|---|---|---|
| | Percent Black turnout of BVAP | Percent Black Vote for Black-preferred Candidate (Cohesion) | Percent White turnout of WVAP | Percent White Vote for Black-preferred Candidate (Crossover) | Percent Black VAP Needed for Black-preferred Candidate to Receive 50% of the Vote | Percent of Vote Black-preferred Candidate would Receive in 55% BVAP district | Percent of Vote Black-preferred Candidate would Receive in 50% BVAP district | Percent of Vote Black-preferred Candidate would Receive in 45% BVAP district |
| contest 1 | 58.8 | 92.6 | 64.9 | 8.0 | 52.1 | 52.5 | 48.2 | 44.0 |
| contest 2 | 38.9 | 98.8 | 45.2 | 10.0 | 48.8 | 55.5 | **51.1** | 46.7 |
| contest 3 | 38.9 | 90.9 | 45.2 | 9.7 | 53.4 | 51.3 | 47.3 | 43.3 |
| contest 4 | 38.9 | 94.4 | 45.2 | 11.0 | 50.5 | 53.8 | 49.6 | 45.5 |
| contest 5 | 48.3 | 96.8 | 51.3 | 12.5 | 46.0 | 57.6 | **53.4** | 49.2 |
| contest 6 | 17.4 | 96.9 | 24.2 | 9.1 | 54.8 | 50.2 | 45.8 | 41.6 |
| contest 7 | 7.7 | 98.5 | 10.1 | 6.8 | 53.9 | 51.0 | 46.5 | 42.0 |
| contest 8 | 34.3 | 94.4 | 39.4 | 9.1 | 51.4 | 53.1 | 48.8 | 44.6 |
| contest 9 | 46.4 | 97.5 | 42.8 | 16.5 | 39.4 | 62.7 | **58.6** | 54.6 |
| | | | | | | | | |
| **Average** | **36.6** | **95.6** | **40.9** | **10.3** | **50.0** | | | |

Columns 2 and 4 report the participation rates of the age-eligible Black and White population, respectively. Column 3 indicates the percentage of the Black vote that the candidate preferred by Black voters received (that is, the degree of Black cohesion) and Column 5 reports the percentage of White crossover vote for the Black-preferred candidate. Column 6 reports the BVAP needed for the Black-preferred candidate to obtain 50% of the vote given the participation rates and voting patterns reported in columns 2-5.[3] The last row in the table provides the averages for each of these columns. When the percent BVAP needed for the Black-preferred candidate to win is averaged across all nine contests, the result for this hypothetical district is 50%.

---

[3] The average percent BVAP needed was calculated by averaging the nine separate percent BVAP needed to win calculations. If the average participation rates, average Black cohesion percentage and average White crossover percentage is used to calculate a single percent BVAP needed to win, the result is a slightly lower 49.3% BVAP.

3

The last three columns in the table indicate the percentage of the vote the Black-preferred candidate would receive <u>in each</u> of the nine contests individually in the district if the BVAP in the district was 55%, 50% and 45%, given the participation rates and voting patterns for each given contest.

When the nine contests are considered separately, the Black-preferred candidate only wins three of the contests (33%) when the district has a BVAP of 50%. The Black-preferred candidate does not win a majority (five) of the nine contests until the BVAP exceeds 51.4%. And the Black-preferred candidate does not win all nine contests until the district has a BVAP of 55%. Although averaging the percent needed to win for these nine contests suggests that a BVAP of 50% would be sufficient for the Black-preferred candidates to win half of the election contests, this is not an accurate reflection of voting in this hypothetical because the Black-preferred candidate would only win a third of the contests in the district if it had a BVAP of 50%.

Returning once again to our example of the difference between the calculations, the percent BVAP needed to win for HD21-060 in Table 2 is 35% for all two-candidate contests. Although the BVAP in this district actually exceeds 35% (the district has BVAP of 37.7%), the actual win rate for Black-preferred candidates is only 36%. In other words, the Black-preferred candidate does not actually win half of the contests considered despite exceeding the BVAP needed to win calculation for this district.

Therefore, the resulting percentages of the BVAP needed to win in all four of these tables is potentially misleading because the use of averages can obscure the actual BVAP needed to win.

*Conclusion:* In my expert opinion, only Table 4 in Dr. Lewis's report could be potentially meaningful in the context of this case (and many of the districts included in the table are not, in fact, in areas relevant to this case). I have reservations about averaging the BVAP percentages needed to win across the election contests considered – when I conduct this analysis, I list each contest, and the resulting BVAP needed to win, separately in order to (1) account for the possibility of a skewed distribution in the percentages and (2) more importantly, to be able to shift the percent needed to win to a point where the Black-preferred candidate wins more than only half of the contests being examined. However, I do think the <u>Black-preferred win rate</u> reported by Dr. Lewis in column 7 of Table 4 is both relevant and useful. For example, I note that the Black-preferred win rate in Table 4 does not reach 50% for any non-majority Black districts included in the table except for H21-091, a district that does not fall in an area of interest in this case and was referenced as an exception to the rule that only majority Black districts were effective in my report (Handley Report, page 15).[4]

---

[4] In my report I state that "Proposed State House District 91 in both the Illustrative and Enacted State House Plans (the district boundaries are identical in the two plans) is not majority BVAP in composition but has a sizeable BVAP (40.7%) and is an effective Black opportunity district according to the effectiveness scores. While not a majority Black district, this district is a majority minority district, with a

**Section II. Comments on the Expert Report of Dr. Solanky**

I have reviewed Dr. Solanky's expert report filed in this case and have several criticisms of it, which I outline in this section.

    A. **Dr. Solanky's arbitrary choice of parishes and elections to study**

*Parishes* In Sections I and II, Dr. Solanky provides data related to registered voters and turnout by party affiliation. Leaving aside the relevance of this data, he presents the information only at the statewide level – he does not examine it at a level relevant to the specific areas of interest in this case. In Section III (Figures 6, 7, and 8), Dr. Solanky provides the results of his analysis of Black and White voting patterns in 12 elections statewide and for five parishes: East and West Baton Rouge, East Carroll, Natchitoches, and Orleans. He does not tell us why he has selected these five parishes. There are no challenged state legislative districts in Orleans or East Carroll Parishes so the voting patterns in these two parishes are irrelevant. In Section IV, Dr. Solanky selects a different set of parishes in which to analyze voting patterns – again with no explanation as to why: Caddo, East Baton Rouge, Iberville, and Point Coupee Parishes.

*Elections* In Table 5, Dr. Solanky lists the 12 election contests held between 2012 and 2022 that he analyzed for the purposes of Sections I, II, and III. Dr. Solanky has chosen a subset of the 32 statewide election contests during that period,[5] but if Dr. Solanky had a criterion for selecting these 12 contests, he does not reveal it.[6] More importantly, his selection of contests ignores a number of probative contests that included Black candidates: the October 2015 contests for Lieutenant Governor, Attorney General and Secretary of State; the October 2017 contest for Treasurer; the November 2018 contest for Secretary of State; the October 2019 election contests for Secretary of State and Treasurer; and the 2020 contest for US Senate. In addition, while he analyzes the 2022 U.S. Senate contest, Dr. Solanky actually combines the vote totals of the Black Democrat (Gary Chambers, Jr.) with that of the White Democrat (Luke Mixon) to produce a single "Democrat" candidate.

The number of election contests analyzed drops precipitously in Section IV. Only two election contests are analyzed when examining voting patterns in East Baton Rouge and Caddo Parishes in this section: the 2020 presidential election contest and the 2022 U.S. Senate contest. Considering Dr. Solanky's concern over the allocation of early and absentee ballots, the presidential contest is an especially odd choice given the abnormally high number of early and

---

Hispanic VAP of 8.1% and an Asian VAP of 3.0%. The non-Hispanic White VAP is 47.5%" (Handley Report, page 15).

[5] In addition to analyzing only an unexplained subset of <u>election contests</u>, he reports voter data by race and party for only a subset of the elections in his specified time period. Tables 1-4 report registration and turnout data associated with "the 12 statewide elections held from 2012 to 2022." In fact, there were 15 <u>statewide election dates</u> during that period. The missing statewide elections are November 2014, October 2017 and November 2018.

[6] For example, I reported that I analyzed the 16 statewide election contests that included Black candidates between 2015 and 2022.

5

absentee ballots cast in this election – as Dr. Solanky notes in his report, 45.6% of the ballots cast in this election were not cast on election day and thus were reported only at the parish level (Solanky Report, page 12). The number of contests analyzed drops even more to only one (the 2022 U.S. Senate contest in which he combines the votes cast for the Black Democrat and the White Democrat) when analyzing voting patterns in Iberville and Point Coupee Parishes. Again, there is no explanation as to why the number of election contests analyzed decreases over the course of the report.[7]

### B. Dr. Solanky's introduction of "population density" as a variable to include in the analysis of voting patterns by race

In Section IV of his report, Dr. Solanky introduces the variable "population density" into his analysis of voting patterns of four parishes: East Baton Rouge, Caddo, Iberville, and Point Coupee. It is not clear what relevance there is in looking at population density when evaluating whether voting is racially polarized.

Dr. Solanky takes population density into account by estimating White voting behavior in an ever-narrowing set of precincts falling within each set of his minimum population density categories, beginning with "0" – which includes all precincts in the parish – and gradually winnowing out precincts until he hits what he defines as the most densely populated precincts. The highest density precincts vary – in fact, the density ranges in general, vary – depending on the parish he is examining.[8] According to Dr. Solanky, high density precincts in East Baton Rouge are those with a minimum population of 5000 (Solanky Report, page 20); in Caddo, they are precincts with a minimum density of 4700 (page 22); in Iberville, high density precincts are those with a minimum density of 3300 (page 24); and in Point Coupee Parish, a high density precinct has a minimum population of 800.

Regardless of what Dr. Solanky considered dense, with each increase in minimum density, the number of precincts remaining in the parish analyses declines. However, Dr. Solanky fails to report how many precincts fall into each of his density ranges. This is important because experts in the area of redistricting and voting rights typically do not conduct a racial bloc voting analysis when there are less than ten or so precincts.[9] Dr. Solanky does admit that there were only two VTDs with a density of over 800 in Point Coupee (Solanky Report, footnote 11, page 26), but despite this, he conducted a statistical analysis and reports estimates for the two minimum 800

---

[7] Dr. Solanky offers time constraints as a reason for not analyzing more election contests (Solanky Report, page 30), but he has had the database I used for my analyses for over a year.

[8] Not only do his population categories change depending on the parish (Figures 12-19), but the graphs reporting his results are visually misleading. The horizontal axis scales on the figures are not proportionate across figures nor even within a single figure. For example, in Figure 12, he allots the same spacing between 0-300 as between 500-3000 and 5500 to 7000.

[9] For example, Dr. Lewis indicates that he does not produce estimates for "contest-district combinations that include fewer than 10 voting precincts" (Lewis Report, footnote 2, page 4).

density precincts.[10] A review of his density database suggests that this is not the only instance of conducting a statistical analysis with an extremely limited number of precincts.[11]

On the basis of his analysis of voting patterns, Dr. Solanky concludes that there is "a rather drastic difference in voting patterns of white voters in voting for a republican or a democrat candidate as the population density in the VTD increases" (Solanky Report, page 29). He does not explain why he believes this is relevant. Moreover, he draws this conclusion on (1) at best, two elections (both of which are problematic, as explained above), and (2) EI estimates that are suspect, at least at higher density levels because of the very limited number of precincts included in the statistical analysis. And, finally, he fails to acknowledge that, regardless of the density range, the one or two contests he examined were polarized in Caddo, Iberville and Point Coupee Parishes and the majority of the density ranges he analyzed were polarized in East Baton Rouge Parish.[12]

---

[10] While the confidence intervals associated with the estimates increase as the minimum density ranges increase (and the number of precincts included in the analysis decrease) to the point of covering the entire range of possibilities from virtually no White voters supporting Republicans or Democrats to virtually all White voters supporting Republicans or Democrats (for example, see the confidence intervals for the highest density precinct analyses in Iberville and Point Coupee Parishes in Appendices 9 and 10), without having his backup data (a merged database that combine precinct population density, turnout by race, and votes cast for each of the candidates in the contests examined), I cannot recreate his analyses to determine the reliability of his estimates. This criticism also holds true for his estimates of (1) Black voters voting Republican in Section III – the lack of information about the variation in the Black percentages across the parish precincts leaves me skeptical about the reliability of his estimates in a couple of parishes, particularly East Carroll and West Baton Rouge and (2) Black voters voting Republican in precincts he has deemed as outside of the city of Shreveport in Caddo Parish. My attempt at replicating his analysis of Black voters in precincts falling outside of Shreveport – albeit with my data and not his – did not produce anywhere near such a high percentage of Black voters supporting the Republican candidate in the 2020 presidential contest. (My EI estimate for the percent of Black voters supporting Trump in 2020 is 19.6%, Dr. Solanky estimates that 60.6% of Black voters supported Trump.)

[11] Using the density database supplied by Dr. Solanky, I ascertained that Dr. Solanky also had only two precincts over 3400 in Iberville Parish, and only three over 3300. In Caddo Parish there are only six precincts with densities over 4500 and only five with densities over 4700 – in other words, he conducted the analysis with six precincts, then removed one precinct and repeated the analysis with only five precincts. Finally, with respect to East Baton Rouge, it appears he had 10 precincts with a density over 5200, then removed two precincts and produced estimates for the eight precincts with densities over 5300, removed another precinct and produced estimates for the seven precincts with densities greater than 5500, and then finally removed an additional three precincts and conducted a statistical analysis of the remaining three precincts with densities of 7000 or more. The same high density precincts are included in every analysis he undertakes – he does not divide precincts into high density and low density (as he divides precincts in Caddo into those in Shreveport and those outside of Shreveport) and conduct an analysis on the two groups separately.

[12] One or two contests is simply not sufficient to draw any conclusions regarding voting patterns or the degree of polarization in a parish (or among a small group of precincts within a parish). I am simply extending Dr. Solanky's analyses to what would presumably have to be his logical conclusion if he agrees that voting is racially polarized if Black and White voters would have elected different candidates.

7

### C. Dr. Solanky's criticism relating to my allocation of early and absentee votes

Dr. Solanky indicates that he disagrees with the methodology I adopted to allocate early and absentee votes reported only at the parish level to the precincts within the parish (Solanky Report, page 13).[13] Faced with the question of whether to ignore early and absentee votes or allocate the parish level results to the precinct level using some algorithm, I chose to allocate the parish level early and absentee voters based on each candidate's precinct votes on Election Day. In my expert opinion, this is the best available allocation method for these votes.

Dr. Solanky mistakenly believes that "the flaw" in my parish-wide distribution of absentee and early votes is there is an underlying assumption that "all absentee and early voters are homogenous" (Solanky Report, page 19). In fact, the allocation methodology does not assume this – it recognizes the heterogeneity of precinct-level voters by allocating votes differently depending on how voters in the precincts voted on election day.

Dr. Solanky offers no alternative approach when expressing his disagreement with my allocation methodology. However, he does adopt an allocation method when faced with a similar situation, that is, how to allocate votes reported at a higher than precinct level to individual component precincts. Footnote 10 in his report (Solanky Report, page 20) describes the situation and his solution:

> For Caddo parish's 2022 senate elections, precinct 159 was absorbed by precincts 122, 163, and 165. In order, to match the VTDs for the 2020 and 2022 elections in Caddo parish, the precinct-level votes for the 2020 election have been equally divided into these three precincts.

In other words, Dr. Solanky simply divided the votes for each of the candidates across the three precincts equally – paying no attention to the populations of the three component pieces of the precinct as divided. If a larger portion of precinct 159 was allocated to, say, precinct 122 as opposed to precinct 163 or 165 in 2022, then a larger portion of the votes for each of the candidates should also have been allocated to precinct 122. But this is not what he did.

### D. Dr. Solanky's contention that I made no attempt to investigate Black and White voting behavior except on a parish or regional basis

Dr. Solanky's contention that I did not investigate Black and White voting behavior other than at the parish or regional level is not correct. My report reflects extensive district-level analyses of

---

[13] Despite disagreeing with my methodology, Dr. Solanky indicates that he followed my allocation methodology "in order to verify the EI results presented in Dr. Handley's report" (Solanky Report, page 13). He does not, in fact, conduct the same analysis and therefore does nothing to verify my EI results. However, Dr. Alford does conduct the same analyses and does verify my EI results.

8

the voting patterns of Black and White voters residing in the specific state legislative districts at issue in this case.

The effectiveness analysis that I conducted takes into account the participation rates and voting patterns of only those Black and White voters who reside in a given enacted or illustrative district. If a district is deemed ineffective, this means that Black and White district residents' voting patterns are sufficiently racially polarized to result in the consistent defeat of the candidates of choice of Black voters in that district. If the district is deemed effective it usually means that, despite the existence of racially polarized voting, there are a sufficient number of Black voters in the district to ensure the success of Black-preferred candidates.[14]

While Dr. Solanky contends that he has shown that Black and White voters have different voting patterns across parishes, and "sometimes different areas within the same parish" (Solanky Report, page 29), he fails to relate this to any way to specific enacted or illustrative state legislative districts at issue in this litigation. Moreover, his notion that he has captured different "areas" of the parish is likely to be inaccurate as he provides no reason to believe that his grouping of "dense" precincts produces contiguous precincts that form a specifically defined area in the parish.

**III. Comments on the Expert Report of Dr. Alford**

Dr. Alford contends that party, not race, accounts for the very different vote choices of Black and White voters in recent Louisiana elections. He supports this argument with the contention that because White voters support White and Black Democrats at comparable rates, the vote choices of Black and White voters can best be explained by party rather than race. This claim is flawed for at least two reasons. First, it is not the race of the candidates, but rather the race of the voters that matters in a vote dilution claim. And, in any case, it is not true that White voters support Black and White Democrats equally. Second, and more importantly, this argument suggests that the two variables – race and party – are competing options when, in fact, they are highly correlated explanations for the voting patterns found in recent Louisiana elections.[15]

### A. Dr. Alford incorrectly focuses on the race of the candidates rather than race of the voters

Dr. Alford argues that because Black and White voters support Black and White Democratic candidates at comparable rates, the polarization is partisan rather than racial.

Dr. Alford's contention regarding partisanship rests on the race of the **candidates** rather than on the vote choices based on the race of the **voters** and is incorrect. First, in the context of a vote

---

[14] While it could mean that voting is not polarized in that particular district, the fact that voting is starkly polarized in the general area of interest makes this proposition unlikely.

[15] Racially polarized voting patterns that rest on the alignment of race, party and ideology has been referred to as *conjoined polarization*. Bruce Cain and Emily Zhang, "Blurred Lines: Conjoined Polarization and Voting Rights," *Ohio State Law Journal*, vol. 77 (4): 2016.

9

dilution claim, the relevant inquiry is whether Black and White voters consistently support different candidates – with Black voters cohesive in their support of their candidates of choice – and whether the candidates supported by Black voters are usually defeated by the candidates supported by White voters.

Second, White voters do not, in fact, support Black and White Democratic candidates at comparable rates in any of the seven areas of interest. It is no surprise that the only Democrat to win statewide office recently was a White Democrat. Dr. Alford acknowledges that "John Bel Edwards was able to draw a somewhat larger than typical share of the White vote in his two 2015 and two 2019 gubernatorial contests" (Alford Report, page 12). While this is true, what is also true is that White voters consistently provide more support for White Democrats than Black Democrats in general.

Using the EI estimates provided by Dr. Alford in the Appendix to his report, I calculated the average percentage of Black and White votes for Black and White Democrats in the election contests he analyzed.[16] The results can be found in Table 1 at the end of this report. What is apparent looking at the averages in this table is that, while White voters do not provide much support to either White or Black Democratic candidates, White voters consistently provide more support to White Democrats than they do to Black Democrats. This is true for all seven areas of interest and it is true whether there are only two candidates or more than two candidates in the contest.

Another approach to testing the claim that White voters support Democratic candidates similarly regardless of whether the candidates are Black or White Democrats is to examine contests that included both a White Democrat and a Black Democrat. Two contests that satisfied these criteria are the November 2022 U.S. Senate contest and the November 2018 Secretary of State contest.[17] In both contests, White support for the White Democrat was higher than support for the Black Democrat in the same contest. These percentages, which are also drawn from Dr. Alford's Appendix, are included in Table 2 at the end of this report.

Because Louisiana does not conduct separate Democratic and Republican primaries, the voting patterns of Black and White voters that choose to vote in discrete Democratic primaries cannot be ascertained. The reason that this would be of interest is that it removes party from the

---

[16] I did not include in this calculation three candidates who were not supported by either Black or White voters and received only a tiny portion of the total votes cast: Oscar Dantzler, a Black Democrat who received only .82% of the statewide vote in the October 2019 gubernatorial contest; and Cary Deaton (White Democrat) and S.L. Simpson (Black Democrat) who received 1.06% and .67% of the statewide votes cast in the October 2015 gubernatorial race. I have also not included the 2020 presidential election in the list of contests I averaged as I was uncertain which category to place the contest – Dr. Alford has included this contest in a middle ground between the 2012 and 2016 election because it included a Black candidate, but this candidates was only as a running mate.

[17] There were three other contests that included both Black and White Democrats that I have not compared here. Two contests included very minor candidates and are listed in footnote 2, above. The third contest, an October 2019 election for Commissioner of Agriculture, included two White Democrats and a Black Democrat. In this contest Black and White voters both supported one of the White Democrats over the other White Democrat and the Black Democrat. However, the pattern of more Black voter support than White voter support for the sole Black Democrat is also present in this election contest.

10

equation – all of the voters in the primary are presumably Democrats. One proxy to this is to compare the voting patterns of White voters who have registered as Democrats and Black voters who have registered as Democrats. There are two runoff elections that featured contests that included a White Democrat and a Black Democrat on the ballot. In November 2015, John Bel Edwards, a White Democrat, ran in the gubernatorial race against a White Republican (David Vitter) and Kip Holden, a Black Democrat, ran for lieutenant governor against a White Republican (Billy Nungesser).  In November 2019, John Bel Edwards ran for re-election in the gubernatorial race against Eddie Rispone, a White Republican, and Gwen Collins-Greenup, a Black Democrat, ran for Secretary of State against Kyle Ardoin, a White Republican. In both instances, the White Democrat won but the Black Democrat was defeated.

My analysis of voting patterns in these contests, found in Table 3 at the end of this report, indicate that, while Black Democrats supported both the White and the Black Democrats candidates approximately equally in both the 2015 and 2019 runoff elections, White Democrats strongly and consistently favored the White Democratic candidate over the Black Democratic candidate in both the 2015 and 2019 runoff elections.[18]

## B. Dr. Alford erroneously assumes that race and party are competing explanations for the voting patterns of Black and White voters

By positing race or party as an either-or proposition to explain the voting patterns of Black and White voters, Dr. Alford suggests that the two variables – race and party – are competing options when, in fact, they are highly correlated explanations for the voting patterns found.[19]

Arguing that the roles of race and party in vote choice can be evaluated separately by simply showing that Black and White voters support candidates from different parties ignores the role that race plays in explaining a voter's support for one party's candidates over the other party's candidates. The outlined arrows in the diagram below illustrate the argument being made; the solid arrow indicates the relationship being ignored in the contention that party, not race, explains vote choices.

---

[18] While the confidence intervals for some of the estimates of the percentage of White Democrats supporting the candidates are wide, I am not presenting this information to support the contention that voting is polarized. I merely intend this as some rebuttal evidence to Dr. Alford's argument that Black and White voters support Black and White Democratic candidates at a comparable rate.

[19] Racially polarized voting patterns that rest on the alignment of race, party and ideology has been referred to *conjoined polarization*. Bruce Cain and Emily Zhang, "Blurred Lines: Conjoined Polarization and Voting Rights," *Ohio State Law Journal*, vol. 77(4): 2016.

11



Social science research reveals the significant role that race, racial attitudes and racial policy preferences play in dictating individuals' partisan preferences.[20] The relationship between racial attitudes and partisan affiliation is especially strong in the South, where the partisan affiliations of White voters and Black voters have fluctuated directly with the racial policies embraced by the Democratic and Republican parties. Researchers have traced Southern realignment – the shift of White voters from overwhelming support for the Democratic party to nearly equally strong support for the Republican party – to the Democratic party's support for civil rights legislation beginning in the 1960s.[21] The differences in attitudes on racial issues between Republican and Democrats persist today.[22]

---

[20] See, for example, Edward Carmines and James Stimson, *Issue Evolution: Race and the Transformation of American Politics.* Princeton, NJ: Princeton University Press, 1989; Maruice Mangum, "The Racial Underpinnings of Party Identification and Political Ideology." *Social Science Quarterly* 94 (5): 2013; Carlos Algara and Isaac Hale, "Racial Attitudes and Political Cross-Pressures in Nationalized Elections: The Case of the Republican Coalition in the Trump Era," *Electoral Studies*, 68: December 2020.

[21] See, for example, Edward Carmines and James Stimson, *Issue Evolution: Race and the Transformation of American Politics.* Princeton, NJ: Princeton University Press, 1989; Morgan Kousser, "The Immutability of Categories and the Reshaping of Southern Politics," *Annual Review of Political Science* vol. 13, 2010; Ilyana Kuziemko and Ebonya Washington, "Why did the Democrats Lose the South? Bringing New Data to an Old Debate," *American Economic Review,* vol.108(10): 2018. According to Kuziemko and Washington, "[D]efection among racially conservative whites just after Democrats introduced sweeping Civil Rights legislation explains virtually all of the party's losses in the region" (page 2865).

[22] The gap is actually increasing, but primarily due to the more liberal attitudes of Democrats related to race. Robert Griffin, Mayesha Quasem, John Sides, and Michael Tesler, "Racing Apart: Partisan Shifts on Racial Attitudes Over the Last Decade," A Research Report from the Democracy Fund Voter Study Group, October 2021. A recently published study of racial attitudes by the Pew Research Center reports several examples of differences in racial attitudes between Democrats and Republicans, including: (1) the need for increased attention to history of slavery and racism (Republicans are far more likely than Democrats to say increased attention to the issues is bad for the country); (2) the need to ensure equal rights for all Americans (Republicans overwhelmingly think only a little (47%) or nothing (30%) needs to e done to ensure equal rights for all Americans; Democrats (74%) agree that a lot more needs to be done

Dr. Alford does not conduct any analyses to attempt to assess the relative roles of race and party in explaining vote choice in Louisiana. By treating the variables as competing explanations for vote choice, he ignores the interrelationship between these factors: race has both a direct effect and an indirect effect on vote choice, with party playing a mediating role between race and vote choice. Social scientists have long been aware that failing to account for the possibility of mediation can produce biased conclusions about causation, and they have begun to develop statistical techniques to reduce or eliminate this bias under certain conditions.[23] Dr. Alford does no statistical analysis at all to determine the relative roles of the two variables and their interaction, let alone attempt any of these corrective techniques.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed August 11, 2023.

*Lisa Handley*

_____

Lisa Handley, Ph. D

---

to achieve racial equality; and (3) the progress made thus far towards racial equality (Republicans (71%) are much more likely than Democrats (29%) to say the nation has made a lot of progress toward racial equality over the past half-century). *See* "Deep Divisions in Americans' Views of Nation's Racial History – and How to Address It," Report of the Pew Research Center, August 12, 2021. Similarly, a Harvard political economist and his colleagues recently reported finding "a stark partisan gap among white respondents, particularly in the perceived causes of racial inequities and what should be done about them. White Democrats and Black respondents are much more likely to attribute racial inequities to adverse past and present circumstances and want to act on them with race-targeted and general redistribution policies. White Republicans are more likely to attribute racial gaps to individual actions." lberto Alesina, Matteo Ferroni, and Stephanie Stantcheva, "Perceptions of racial gaps, their causes, and ways to reduce them," National Bureau of Economic Research Working Papers Series, October 2021.

[23] See, for example, Avidit Acharya, Matthew Blackwell, and Maya Sen, "Explaining causal findings without bias: Detecting and assessing direct effects," *American Political Science Review* 110 (3): 2016.

13

## TABLE 1

Average Percentage of Votes From Black and White Voters for Black and White Democrats

| | Area 1 | | Area 2 | | Area 3 | | Area 4 | | Area 5 | | Area 6 | | Area 7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters | Average Percent Support from Black Voters | Average Percent Support from White Voters |
| Black Democrats in all contests in which they ran | 73.3 | 7.6 | 74.3 | 9.8 | 74.5 | 12.7 | 73.6 | 7.9 | 74.6 | 9.8 | 73.8 | 10.0 | 74.6 | 13.1 |
| White Democrats in all contests in which they ran | 65.6 | 11.3 | 64.1 | 16.1 | 64.3 | 17.3 | 65.0 | 12.8 | 66.7 | 15.9 | 63.3 | 15.4 | 64.5 | 17.3 |
| Black Democrats who ran in contests with only 2 candidates | 93.0 | 10.6 | 94.1 | 14.2 | 93.1 | 18.5 | 95.1 | 11.3 | 95.2 | 15.0 | 93.6 | 14.0 | 93.0 | 18.8 |
| White Democrats who ran in contests with only 2 candidates | 98.7 | 21.5 | 98.0 | 35.0 | 98.8 | 38.0 | 97.9 | 25.3 | 98.3 | 35.3 | 97.6 | 34.2 | 98.8 | 37.8 |
| Black Democrats who ran in contests with 3 or more candidates | 61.9 | 5.8 | 62.8 | 7.3 | 63.6 | 9.3 | 61.1 | 5.9 | 62.5 | 6.7 | 62.3 | 7.6 | 63.8 | 9.7 |
| White Democrats who ran in contests with 3 or more candidates | 59.0 | 9.3 | 57.4 | 12.3 | 57.4 | 13.1 | 58.4 | 10.4 | 60.4 | 12.0 | 56.4 | 11.6 | 57.7 | 13.3 |

## TABLE 2

Percentage of Votes From Black and White Voters for the Black and White Democrats in the Election Contest

| | Area 1 | | Area 2 | | Area 3 | | Area 4 | | Area 5 | | Area 6 | | Area 7 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters | Percent Support from Black Voters | Percent Support from White Voters |
| **November 2022 US Senate** | | | | | | | | | | | | | | |
| Black Democrat | 51.5 | 4.9 | 51.5 | 5.2 | 65.0 | 5.4 | 45.4 | 2.7 | 56.8 | 3.0 | 62.8 | 3.2 | 65.1 | 5.9 |
| White Democrat | 26.3 | 6.9 | 22.2 | 12.8 | 22.5 | 12.9 | 30.4 | 3.3 | 22.3 | 6.4 | 19.7 | 6.7 | 23.5 | 14.0 |
| **November 2018 Secretary of State** | | | | | | | | | | | | | | |
| Black Democrat | 53.5 | 4.5 | 61.1 | 7.0 | 58.6 | 4.8 | 51.2 | 6.0 | 54.3 | 4.9 | 54.4 | 4.9 | 60.8 | 5.6 |
| White Democrat | 35.1 | 8.7 | 24.4 | 8.8 | 29.7 | 13.1 | 33.6 | 6.9 | 34.6 | 9.9 | 31.8 | 8.0 | 28.4 | 12.8 |

Table 3

Estimates of Black and White Registered Democrats Support for Candidates Competing in the 2015 and 2019 Statewide Runoff Elections

| Nov 2015 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | | Nov 2019 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals | | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals |
| **Area 1** | | | | | **Area 1** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 98.7 | 98.0, 99.2 | 59.2 | 46.5, 71.3 | Edwards | 98.3 | 97.5, 98.9 | 57.5 | 46.4, 67.5 |
| Vitter | 1.3 | .8, 2.0 | 40.8 | 28.7, 53.4 | Respone | 1.7 | 1.1, 2.5 | 42.5 | 32.5, 53.6 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 98.5 | 97.9, 99.0 | 41.6 | 27.9, 52.7 | Collins-Greenup | 97.5 | 96.6, 98.2 | 35.1 | 25.1, 44.4 |
| Nungesser | 1.5 | 1.0, 2.1 | 58.4 | 47.3, 72.1 | Ardoin | 2.5 | 1.8, 3.4 | 64.9 | 55.6, 74.9 |
| **Area 2** | | | | | **Area 2** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 97.9 | 96.9, 98.7 | 48.6 | 41.9, 57.6 | Edwards | 97.3 | 96.0, 98.3 | 43.5 | 29.5, 59.2 |
| Vitter | 2.1 | 1.3, 3.1 | 51.4 | 42.4, 58.1 | Respone | 2.7 | 1.7, 4.0 | 56.5 | 40.8, 70.5 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 95.9 | 94.0, 97.3 | 5.0 | 3.1, 8.0 | Collins-Greenup | 96.4 | 94.9, 97.7 | 12.4 | 5.8, 23.8 |
| Nungesser | 4.1 | 2.7, 6.0 | 95.0 | 92.0, 96.9 | Ardoin | 3.6 | 2.3, 5.1 | 87.6 | 76.2, 94.2 |
| **Area 3** | | | | | **Area 3** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 98.7 | 98.2, 99.1 | 62.0 | 56.3, 67.2 | Edwards | 98.5 | 97.9, 99.0 | 51.7 | 46.2, 57.7 |
| Vitter | 1.3 | .9, 1.8 | 38.0 | 32.8, 43.7 | Respone | 1.5 | 1.0, 2.1 | 48.3 | 42.3, 53.8 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 98.3 | 97.6, 98.8 | 45.0 | 38.5, 51.6 | Collins-Greenup | 97.3 | 96.4, 98.0 | 26.2 | 19.9, 32.8 |
| Nungesser | 1.7 | 1.2, 2.4 | 55.0 | 48.4, 61.5 | Ardoin | 2.7 | 2.0, 3.6 | 73.8 | 67.2, 80.1 |

| Nov 2015 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | | Nov 2019 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals | | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals |
| **Area 4** | | | | | **Area 4** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 98.0 | 96.6, 99.0 | 52.7 | 38.6, 65.0 | Edwards | 98.2 | 96.9, 99.2 | 39.8 | 26.1, 52.0 |
| Vitter | 2.0 | 1.0, 3.4 | 47.3 | 35.0, 61.4 | Respone | 1.8 | .8, 3.1 | 60.2 | 48.0, 73.9 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 97.6 | 96.1, 98.7 | 35.0 | 24.3, 44.3 | Collins-Greenup | 97.3 | 95.7, 98.5 | 20.7 | 11.2, 30.2 |
| Nungesser | 2.4 | 1.3, 3.9 | 65.0 | 55.7, 75.7 | Ardoin | 2.7 | 1.5, 4.3 | 79.3 | 69.8, 88.8 |
| **Area 5** | | | | | **Area 5** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 98.3 | 97.2, 99.0 | 77.1 | 66.0, 87.3 | Edwards | 98.3 | 97.1, 99.1 | 53.7 | 37.5, 68.8 |
| Vitter | 1.7 | 1.0, 2.8 | 22.9 | 12.7, 34.0 | Respone | 1.7 | .9, 2.9 | 46.3 | 31.2, 62.5 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 97.7 | 96.4, 98.7 | 44.0 | 31.7, 51.7 | Collins-Greenup | 97.0 | 95.4, 98.2 | 25.3 | 14.2, 33.8 |
| Nungesser | 2.3 | 1.3, 3.6 | 56.0 | 48.3, 68.3 | Ardoin | 3.0 | 1.8, 4.6 | 74.7 | 66.2, 85.8 |
| **Area 6** | | | | | **Area 6** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 97.9 | 96.6, 98.9 | 63.2 | 53.9, 72.0 | Edwards | 97.9 | 96.3, 99.0 | 41.5 | 29.8, 53.7 |
| Vitter | 2.1 | 1.1, 3.4 | 36.8 | 28.0, 46.1 | Respone | 2.1 | 1.0, 3.7 | 58.5 | 46.3, 70.2 |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 98.0 | 96.7, 99.0 | 46.5 | 38.4, 56.0 | Collins-Greenup | 96.4 | 94.4, 98.0 | 18.3 | 8.5, 28.6 |
| Nungesser | 2.0 | 1.0, 3.3 | 53.5 | 44.0, 61.6 | Ardoin | 3.6 | 2.0, 5.6 | 81.7 | 71.4, 91.5 |
| **Area 7** | | | | | **Area 7** | | | | |
| **Governor** | | | | | **Governor** | | | | |
| Edwards | 98.5 | 97.8, 99.0 | 73.9 | 66.7, 81.2 | Edwards | 98.2 | 97.4, 98.9 | 67.5 | 60.1, 76.4 |
| Vitter | 1.5 | 1.0, 2.2 | 26.1 | 18.8, 33.3 | Respone | 1.8 | 1.1, 2.6 | 32.5 | 23.6, 39.9 |

| Nov 2015 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | | Nov 2019 Runoff Elections | EI RxC Estimates of the Percentage of Black and White Registered Democrats Voting for Each of the Candidates | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals | | Black Voters Registered as Democrats | Confidence Intervals | White Voters Registered as Democrats | Confidence Intervals |
| **Lt Governor** | | | | | **Secretary of State** | | | | |
| Holden | 98.2 | 97.4, 98.8 | 60.4 | 51.0, 69.1 | Collins-Greenup | 97.3 | 96.3, 98.2 | 39.8 | 29.0, 50.6 |
| Nungesser | 1.8 | 1.2, 2.6 | 39.6 | 30.9, 49.0 | Ardoin | 2.7 | 1.8, 3.7 | 60.2 | 49.4, 71.0 |