## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, REV. CLEE
EARNEST LOWE, DR. ALICE
WASHINGTON, STEVEN HARRIS, BLACK
VOTERS MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

                           *Plaintiffs*,

v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State of Louisiana,

                           *Defendant*.

Civil Action No. 3:22-cv-00178
SDD-SDJ

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE TO EXCLUDE DR. LISA HANDLEY'S TESTIMONY AND REPORTS

Plaintiffs, Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris, Black Voters Matter Capacity Building Institute, and the Louisiana State Conference of the NAACP, by and through undersigned counsel, respectfully submit this Opposition to Defendants' Motion in Limine to Exclude Dr. Lisa Handley's Testimony and Reports.

## INTRODUCTION

Dr. Lisa Handley was retained by Plaintiffs to provide opinions about whether voting in the areas of Louisiana where Plaintiffs bring vote dilution claims is racially polarized. An analysis of racially polarized voting ("RPV") is required to satisfy the *Gingles* II and III preconditions. *See Thornburg v. Gingles*, 478 U.S. 30, 55-56 (1986); *Allen v. Milligan*, 599 U.S. 1, 22-23 (2023).

Defendants seek to completely exclude Dr. Handley from testifying about any of the issues discussed in her reports. Def. Mem. to Exclude, Doc. 148-1, at 15. Defendants' motion raises several incorrect and baseless arguments as to why Dr. Handley should be entirely excluded as an expert in this matter, each of which is addressed below. None of these arguments raise any concerns about Dr. Handley's testimony in this matter, whether applying the new or old language from Rule 702 of the Federal Rules of Evidence. Similarly, none of these arguments raise any concerns under the standard laid out by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny—that expert testimony must be qualified, reliable, and relevant. There is no question that Dr. Handley is a qualified expert,[1] who has provided reliable and relevant testimony in this matter.

**ARGUMENT**

**I.      Dr. Handley's Allocation of the Early and Absentee Votes is Appropriate.**

While Defendants' motion to exclude Dr. Handley from testifying presents multiple different angles, almost all their points essentially boil down to one central objection: Defendants seek to exclude Dr. Handley because of concerns raised by Dr. Solanky—an expert who has never conducted an RPV analysis like this before now—about the method Dr. Handley used to allocate early and absentee votes. But these concerns are baseless and should be disregarded.

As background, to analyze whether voting in Louisiana is racially polarized in the areas of the state where Plaintiffs bring vote dilution claims, experts like Dr. Handley conduct an ecological

---

[1] Dr. Handley has over thirty-five years of experience as a voting rights and redistricting expert. She has advised numerous clients on redistricting and has served as an expert in dozens of redistricting and voting rights cases. Dr. Handley has been actively involved in research, writing, and teaching redistricting and voting rights, publishing multiple books and appearing in several peer-reviewed journals, law reviews, and edited books. She has taught political science undergraduate and graduate courses related to these subjects at several universities, including the University of Virginia and George Washington University. *See* Handley Initial Report, June 30, 2023, at 2-3, attached hereto as Exhibit 1.

inference ("EI") analysis using a version of EI called "EI RxC." *See Terry Petteway v. Galveston County,* No. 3:22-CV-57, 2023 WL 6786025, at *47 (S.D. Tex. Oct. 13, 2023), amended sub nom. Petteway v. Galveston Cnty., Texas, No. 3:22-CV-57, 2023 WL 6812289 (S.D. Tex. Oct. 15, 2023) (noting that all experts in the case agreed that "RxC ecological inference is an appropriate method for analyzing the voting patterns of different demographic groups."). To conduct an EI analysis, it is necessary to create a database with the relevant election data, which should be constructed using election precincts as the unit of analysis. *See* Handley Initial Report, June 30, 2023, at 5, attached hereto as Exhibit 1.

The database for an EI analysis must include precinct-level election returns (*i.e.*, the total votes each candidate received at the precinct) and turnout of voters by race as reported by the Louisiana Secretary of State. *Id.* This presents a challenge in Louisiana, because while it is possible from the Secretary of State election data to know the candidate vote totals by precinct on Election Day—*i.e.*, how many actual votes each candidate received in that precinct in an election on Election Day—it is not possible to know how many votes each candidate received from early or absentee voting at the precinct level. The Secretary of State only collects and reports aggregate candidate vote totals for the early voting at the parish level. In some recent elections in Louisiana, the number of votes cast through early and absentee voting is significant, and as such, any reliable EI analysis must account for those votes. And because EI analysis is conducted with precinct-level data, this means that it is necessary to develop a methodology to allocate those early and absentee candidate votes totals reported only at the parish level down to the precinct level. (It should be noted that this challenge does not arise often in Section 2 vote dilution cases because in many states election officials report early and absentee candidate vote totals at the precinct level.)

As explained in her initial report, Dr. Handley ensured that the early and absentee votes were appropriately included in the database created for her EI analysis by allocating each candidate's vote totals from early and absentee votes reported at the parish level down to the precincts within that parish proportionally, based on the percentage of Election Day votes the candidates received from each precinct. *See* Handley Initial Report, at 6 & n.8, Ex.1. Because this allocation is done proportionally, the candidate vote total numbers for some precincts within Dr. Handley's database do not always align with the total voter turnout numbers for the precinct, and in some precincts, the proportional allocation of the early and absentee votes led to a higher number of total candidate votes than turnout. Defendants rely on the opinion of only one of their experts, Dr. Tumulesh K. S. Solanky, for the proposition that these discrepancies provide a reason to exclude Dr. Handley's testimony. But contrary to Dr Solanky's assertions Dr. Handley's EI analysis is not "biased" and "unreliable". Solanky Initial Report, July 28, 2023, at 12, attached hereto as Exhibit 2.

Indeed, Dr. Handley is confident that this allocation method does not bias the estimates provided by her EI analysis in any way that impacts her conclusions finding racially polarized voting. *See* Handley September 26, 2023 Deposition at 162:11-17, 181:22-183:19, excerpts attached hereto as Exhibit 3. As Dr. Handley explained, EI analysis is done using proportions of the vote share that each candidate received, and it is these proportions and not raw total numbers that are input into the EI algorithm. *Id*. at 176:11-176:22, 184:10-24, 188:21-189:7, Ex. 3. Because Dr. Handley conducted the EI analysis using proportions rather than raw numbers (*i.e.*, the proportion of votes cast for each of the candidates and the proportion of turnout that was Black or white), the actual number of early votes allocated to each precinct is irrelevant; what matters is the candidate breakdown of these numbers once they are allocated. Therefore, any under or over

votes at the precinct level are not a methodological problem for the EI algorithm—these discrepancies do not impact the ability of EI to generate estimates of voting patterns by race. Dr. Handley is confident that the allocation method she used is the best method for generating unbiased EI estimates and is confident in her conclusions made based on these EI estimates. *See* Handley Dep., at 161:9-162:17, 181:22-183:19, Ex. 3.

A. **Defendants' Expert Opinions Do Not Support the Exclusion of Dr. Handley's Testimony.**

Initially, it is very telling that *all* of Defendants' experts who conducted EI analysis in this case used the database that Dr. Handley created incorporating her allocation method for early and absentee votes. This includes Dr. John Alford, Dr. Jeffery B. Lewis, and even Dr. Solanky. *See* Alford Initial Report, July 28, 2023, at 3; Lewis Initial Report, July 28, 2023, at 4-5; Solanky Initial Report, at 13, Ex. 2. In fact, Dr. Alford specifically stated at his deposition that he had no concerns about any of the EI analysis that Dr. Handley performed. Alford September 18, 2023 Deposition, at 82:15-85:5, attached hereto as Exhibit 4. Only Secretary of State's expert Dr. Solanky raised any concerns about Dr. Handley's allocation method. None of the other experts flagged any problems. And despite his concerns, Dr. Solanky also did a significant amount of EI analysis in his initial report relying completely on Dr. Handley's database where the early and absentee votes had been allocated per her method. Solanky Initial Report, at 16-28, Ex. 2.

Moreover, while Dr. Solanky asserted in his reports and Defendants repeatedly assert in their motion that Dr. Handley's method for allocation of early and absentee votes is "biased," at no point do Defendants articulate *what* bias this allocation method is producing with regard to the EI analysis. Def. Mem. to Exclude, Doc. 148-1, at 11-12. Defendants never attempt to explain what impact this allocation method has on the percentages generated by the EI analysis done by all experts in this case. In order to credibly argue that this allocation method was sufficiently

biased so as to impact the accuracy of the estimates generated by the EI analyses and warrant

exclusion of all Dr. Handley's opinions, Defendants need to explain what that impact is and why

it makes the EI general estimate unreliable.[2]  Defendants do not provide any such explanation.

Dr. Solanky did not suggest another method for how to allocate the early and absentee until

his deposition.[3]  Although he testified in his deposition that there is a different method he deemed

to be better, he made no effort to implement any such alternative method in his report, and instead

conducted a significant amount of EI analysis relying on Dr. Handley's database and the

allocations of early and absentee votes within that database.

After learning about the alternative method that Dr. Solanky disclosed for the first time in

his deposition, Dr. Handley further reviewed the analyses provided in her initial reports, and

performed two additional evaluations, described in her supplemental rebuttal report.[4]  *See* Handley

---

[2] At no point did Dr. Solanky propose that the absentee and early votes should not be included in the EI analyses—he acknowledges that, in some election years included in the analyses, there were substantial early votes.  *See* Solanky Initial Report, at 12, Ex. 2.

[3] Dr. Solanky's proposed methodology has limitations as well.  While it might be possible to determine the *total number of early votes* cast by registered voters from each precinct, as explained, the data available from the Secretary of State does not include *candidate vote totals* for the early votes available at the precinct level.  Dr. Solanky proposes that the proper method would be to first determine the total number of early votes cast by voters in each precinct, and then to allocate that number of early votes to the precinct candidate vote totals proportionally by the breakdown of candidate votes for the parish.  *See* Solanky Dep., Sept. 22, 2023, at 231:21-25, attached hereto as Exhibit 5.  He proposes that "whatever happened in the entire parish, you assume it would happen in each precinct." *Id.* at 249:4-6.  But this proposal requires assuming that the votes from the early voting are homogenous throughout the parish.  This is an odd proposal from an expert who has also objected to Dr. Handley's cluster analysis on the basis that she has not properly accounted for the difference among precincts within a parish.  Presumably, if there are differences between the voters living in different precincts within the parish, there would be differences in the votes those voters cast during early and absentee voting.  Dr. Handley's method better accounts for this as she is allocating the candidate vote totals from early voting based on the Election Day voting at the precinct level, assuming that early voters are more likely to follow the voting patterns of their neighbors living in their precinct than all the voters within their parish.

[4] In a footnote, Defendants make a passing assertion that Dr. Handley's Supplemental Rebuttal Report is untimely.  Def. Mem. to Exclude, Doc. 148-1, at n.12.  It is not appropriate to raise a discovery dispute within a Daubert Motion related to Dr. Handley's qualifications to provide expert testimony in this matter.  If Defendants believe this Court should exclude Dr. Handley's Supplemental Rebuttal Report from being admitted into evidence because it was

September 29, 2023 Supplemental Rebuttal Report, attached hereto as Exhibit 6. First, Dr.

Handley reviewed the political parties of early and absentee votes to determine if there are any

consistent differences in the percentages of Democrats and Republicans who vote early or

---

produced untimely, Defendants need to file a motion to strike that report on the basis of that alleged discovery violation. Plaintiffs reserve the right to fully address this discovery issue if Defendants file such a motion.

However, Dr. Handley's supplemental report was timely under this Court's scheduling orders and the Federal Rules of Civil Procedure. Dr. Handley's supplemental rebuttal report was timely under the Scheduling orders on this matter because it was produced before the close of expert discovery on September 29, 2023 and well before the October 27, 2023 pre-trial disclosure deadline. *See* Scheduling Order, July 17, 2023, Doc. 110 and Order Granting Consent Motion to Amend Scheduling Order, September 17, 2023, Doc. 157.

Further, Federal Rule of Civil Procedure 26(e) allows parties to supplement previous expert disclosures when they learn new information. *See also In re Complaint of C.F. Bean L.L.C.*, 841 F.3d 365, 371 (5th Cir. 2016). In his deposition, which took place on September 22, 2023 (after Dr. Handley submitted her initial rebuttal report), Dr. Solanky provided new evidence addressing the methodology for allocating early and absentee votes. While both of Dr. Solanky's reports raised concerns about Dr. Handley's allocation method for early and absentee ballots, Dr. Solanky did not provide any explanation for what allocation method for early and absentee votes might be better. During his deposition, Dr. Solanky revealed for the first time an alternative methodology to account for the early votes. *See* Solanky Dep., at 231:21-234:15; 248:10-249:6, Ex.5. In response to Dr. Solanky's testimony, Dr. Handley determined that it was necessary to further address why her methodology is the preferred approach, and that it does not have any impact on her EI analysis that could change the outcome of that analysis. While the information used by Dr. Handley was technically always available, Dr. Solanky gave no indication that he would present an alternative allocation method until his deposition. Dr. Handley could not have known that she would need to further demonstrate the reliability of her preferred allocation method when no alternative method had been presented.

A supplement to a previous expert report should particularly be allowed if it only "add[s] to a previously-served report without going beyond the opinions expressed in the report." *CEATS, Inc. v. TicketNetwork, Inc.*, No. 215CV01470JRGRSP, 2018 WL 453732, at *3 (E.D. Tex. Jan. 17, 2018); *see also Gibson Brands, Inc. v. Armadillo Distribution Enterprises, Inc.*, No. 4:19-CV-00358, 2020 WL 6581868, at *3 (E.D. Tex. Nov. 10, 2020) (allowing admission of a supplemental expert report when it was "consistent with the Initial Report and merely updates the same theory"). Dr. Handley's supplemental report does not employ any new theories or methodologies; it merely supplements her initial report by further explaining the allocation method used in her initial report.

Moreover, courts can allow parties to rely upon information at trial even if it was not produced consistent with the scheduling order if the additional information is "substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Dr. Handley's supplement was produced months before the pre-trial conference in this case, and as such, Defendants "[had ample] time to review" the "relatively brief" supplemental report and cannot demonstrate that they "[will] suffer any lasting burden." *Sportspower Ltd. v. Crowntec Fitness Mfg. Ltd.*, No. 4:19-CV-66, 2021 WL 111508, at *3 (E.D. Tex. Jan. 12, 2021). And the information in Dr. Handley's Supplemental Rebuttal Report is substantially justified because it "provides important information that relates directly to several elements of Plaintiff's … case." *Moore v. Hernandez*, No. 2:17-CV-00531-JRG, 2018 WL 2670403, at *3 (E.D. Tex. Mar. 6, 2018).

absentee. Dr. Handley found that in the elections she examined, the percentage of Republican and Democratic voters who cast early and absentee votes was very similar, with the exception of the 2020 elections. *See* Handley Supplemental Rebuttal Report, at 3, Ex. 5. Second, Dr. Handley conducted a racial block voting analysis of early and Election Day voters separately to determine if the degree of racial polarization varied between early voters and Election Day voters. She found that the voting patterns were very similar, and that voting was quite polarized for both early voters and Election Day voters. *See id.* This additional analysis supports Dr. Handley's original opinion that there is no bias caused by her allocation method that would create any uncertainty in the results of her EI analysis.

**B. The Fifth Circuit's Decision in *Overton* Does Not Support Excluding Dr. Handley's Testimony.**

As noted, because Dr. Handley's method of allocating the early and absentee votes reported at the parish level down to the precincts within that parish is proportionally based on the votes received by each candidate on Election Day, the vote totals for the candidates sometimes exceed the voter turnout numbers. Relying solely on *Overton v. City of Austin,* 871 F.2d 529, 539 (5th Cir. 1989) (per curiam), Defendants argue that this is the kind of imperfection that should not be ignored. Def. Mem. to Exclude, Doc. 148-1, at 8. But the holding in *Overton* is clearly distinguishable from this current case.

First, *Overton* was a Texas redistricting case from the 1980s that concerned limited data available at the time, including an RPV analysis using "differing measures" for "the ethnic composition of precincts," meaning the use of different data sets to determine the race and ethnicity of different groups of voters. *Id.* at 539. The expert in *Overton* used two different data sets to extrapolate the number of voters in each precinct: using census data for Black voters, and Spanish surnames on precinct voter registration lists for Hispanic voters. *Id.* The *Overton* expert also

"failed to take into account the difference in population sizes of voting precincts" and "failed to establish a confidence level for the results of his regression analysis." *Id.* at 537. None of these criticisms apply to Dr. Handley's allocation of early and absentee votes specifically or generally to any of Dr. Handley's analysis in this case.

Unlike the *Overton* expert, Dr. Handley did not use different data sets to measure different groups of voters. Instead, Dr. Handley used the same data sets to measure polarization between Black and white voters. *See* Handley Initial Report, at 5-6, Ex.1. The Louisiana election officials collect race data with voter registration data, *see id.* at 5, so it is possible to use the same data source to determine the race of all voters. This criticism is thus inapplicable to the present case.

The *Overton* expert's other deficiencies also lack any correlation to Dr. Handley's analysis. The expert in *Overton* did not account for different precinct sizes and populations. 871 F.2d at 537. As part of their critique of Dr. Handley's allocation of the early and absentee votes, Defendants assert that Dr. Handley made a similar mistake—asserting that Dr. Handley assumes that all precincts vote homogenously. Def. Mem. to Exclude, Doc. 148-1, at 12. Defendants provide no explanation for how Dr. Handley's analysis assumes that all precincts vote homogenously.[5]

---

[5] Defendants only note that Dr. Handley did not duplicate Dr. Solanky's irrelevant analysis comparing the voting pattern of precincts in Caddo Parish in and out of the City of Shreveport. Def. Mem. to Exclude, Doc. 148-1, at 12. Defendants state that "the performance of districts within Caddo Parish or containing portions of Caddo Parish *could* be disproportionally impacted" because some of these precincts within and out of Shreveport show different voting patterns. *Id.* (emphasis added). But this analysis is irrelevant, because Dr. Solanky provides no evidence to show how the different precincts he evaluated in Caddo Parish relate to any actual legislative districts at issue in this case. He has not shown any geographic overlap between those precincts and any legislative districts. It is of little relevance to speculate about a hypothetical impact of different voting patterns without establishing a connection to the specific districts at issue in the case.

But more importantly, Dr. Handley's analysis does not assume that all precincts vote homogenously. As explained, all of Dr. Handley's EI analysis in her initial report was done with election data that has been organized at the precinct level. *See* Handley Initial Report, at 5, Ex.1. As such, the differences among precincts are inherently included as part of the estimates produced by the EI analysis. Furthermore, Dr. Handley's allocation of the early and absentee votes proportionally based on vote totals (voting patterns) at the different precincts on Election Day actually accounts for the differences in the precincts, because it does not assume that all early and absentee voters are the same throughout the parish; rather, it assumes that early and absentee voters are more likely to vote like the other people in their neighborhood who voted on Election Day than they are to vote like other people parish-wide.

Additionally, Dr. Handley "include[d] confidence intervals" in her report produced by her ecological inference analysis of EI RxC, *see* Handley Initial Report, at App. A1 through App. B2, Ex.1, which the expert in *Overton* did not deploy. 871 F.2d at 537.[6] Taken collectively, Dr.

---

[6] Defendants' request that some of the additional analysis Dr. Handley did, the EI 2x2 and ecological regression analysis, be excluded because she did not provide confidence intervals for those additional analysis reflects a fundamental misunderstanding of the different types of analysis Dr. Handley presented. As stated above, Dr. Handley's primary analysis is EI RxC analysis, the methodology that Courts have accepted as the best for establishing the *Gingles* II and III requirements. *See Terry Petteway,* 2023 WL 6786025. This is the methodology used by Defendant's expert, Dr. Alford, and in his report explains why EI RxC is the preferred method of political scientists. Alford Report, July 28, 2023, at 3-4. Dr. Handley provided confidential intervals for her EI RxC. *See* Handley Initial Report, at App. A1 through App. B2, Ex.1. Dr. Handley relied primarily on her RxC estimates to conclude that voting is racially polarized. The other methods she employs, including EI 2x2 and a more basic ecological regression analysis, were essentially checks on her EI RxC to demonstrate that, regardless of the statistical analysis conducted, the areas of interest in this case are racially polarized. To exclude Dr. Handley's EI 2x2 analysis or her ecological regression analysis would merely be excluding an additional double check—it would not have any impact on Dr. Handley's opinions about racially polarized voting in disputed areas of Louisiana. Also, it is not currently possible to produce confidence intervals for EI 2x2 or a more basic ecological regression analysis that social science experts have found generally acceptable in the context of analyzing voting patterns by race. *See* Handley Dep. at 30:21-32:6, Ex. 3.

Handley's analysis relied on accepted data sets for RPV analyses, voter registration data, is supported by confidence intervals and did not assume that all precincts vote homogenously.

Finally, Defendants also incorrectly assert that Dr. Handley's early and absentee early vote allocation method has not been peer reviewed. But Dr. Handley testified at her deposition that other experts use the same methodology for allocation of early and absentee voting. Handley Dep. at 161:9-162:17, Ex. 3. For example, the Voting and Election Science Team ("VEST")—a well-respected source for election data, based out of the University of Florida and Wichita State University—uses this allocation methodology for the Louisiana election data. *See* Voting and Election Science Team, "Documentation.txt," *Harvard Dataverse*, available at https://dataverse.harvard.edu/file.xhtml?fileId=5206372&version=21.0 (last accessed Oct. 26, 2023) (explaining how VEST compiled Louisiana election data), attached hereto as Exhibit 7. Moreover, VEST election data, including from Louisiana elections with early and absentee votes allocated using the same method as Dr. Handley, has been used in many peer-reviewed articles.[7] VEST election data with this same allocation method for the Louisiana early and absentee votes, is also used another well-respected source—the Redistricting Data Hub. *See* "2020 Louisiana precinct and election results shapefile," *Redistricting Data Hub*, available at https://redistrictingdatahub.org/wp-content/uploads/2021/06/readme_la_vest_20.txt (last accessed Oct. 26, 2023). Given that Dr. Handley's methodology has been adopted by other experts in the field and that data implementing this same methodology has been used widely by other

---

[7] *See, e.g.*, Charles Stewart, III et al., *American Election Results at the Precinct Level*, 9 Scientific Data 651 (Nov. 3, 2022), available at https://www.nature.com/articles/s41597-022-01745-0; Cory McCartan, Kosuke Imai, et al., *Simulated Redistricting Plans for the Analysis and Evaluation of Redistricting in the United States*, 9 Scientific Data 689 (Nov. 2022), available at https://www.nature.com/articles/s41597-022-01808-2; C. Kenny, C. McCarten, T. Simko, K. Imai, *Widespread Partisan Gerrymandering Mostly Cancel Nationally, But Reduces Electoral Competition*, 120 Proceedings of the National Academy of Sciences 25 (June 13, 2023), available at https://doi.org/10.1073/pnas.2217322120.

political scientist experts as part of analysis included in peer-reviewed articles, this methodology is clearly reliable. This Court should accept Dr. Handley's expert opinion that the approach she used to allocate the early and absentee votes in Louisiana is the best approach.

\*   \*   \*

Defendants have not raised any valid concerns about Dr. Handley's allocation method, and therefore, none of Dr. Handley's testimony should be excluded because of her early and absentee allocation method.[8]

## II.    Dr. Handley's Database is from a Known Source and Is Reliable.

As noted, in order to conduct an ecological inference, it is necessary to create a database with relevant election data. *See* Handley Initial Report, at 5, Ex.1. Defendants assert that the database Dr. Handley had created for her EI analysis in this case—the same database used by all their own experts—came from unknown or undisclosed sources, and that her expert disclosures are somehow flawed because she did not disclose who assisted her with creating this database. Defendants claim that this alleged omission is problematic because the persons who provided her with assistance "exercise[d] some form of judgement in the assembly process" (particularly in the process for allocating the early and absentee votes). Def. Mem. to Exclude, Doc. 148-1, at 6-7.

As an initial matter, Dr. Handley revealed in her initial expert report all the sources of the election data that went into the creation of her database. *See* Handley Initial Report, at 5, Ex.1.

_____

[8] Defendants also alleged that Dr. Handley's allocation method was not disclosed. Def. Mem. to Exclude, Doc. 148-1, at 11. This is not accurate. First, Dr. Handley explained her process for allocation of early and absentee votes in her initial report. *See* Handley Initial Report, at 6, Ex.1. Second, Dr. Handley's database contains the early and absentee votes allocated down proportionally to the precinct level, and the impact that method had on the candidate vote totals is clearly shown by simply looking at the data in her database. Dr. Handley's database was produced in this case in a timely manner; in fact, the database was supplied to Defendants and their experts over a year ago, as it was initially created and relied upon by Dr. Handley and other experts in *Robinson v. Ardoin*. Handley Dep. at 15:16-24, Ex. 3. The table from Dr. Solanky's report reproduced in Defendant's Motion reflects data taken directly from Dr. Handley's database. Def. Mem. to Exclude, Doc. 148-1, at p.10.

This included data from reliable sources known to Defendants, because it is mostly data from the Secretary of State, who is a Defendant in this case. *See id.* Dr. Handley also identified that some data came from well-known sources for election data, such as OpenElections. *See id.* And Dr. Handley also disclosed the database itself—which Defendants' experts reviewed and relied upon, as explained above.

Defendants incorrectly claim that, during her deposition, Dr. Handley stated that VEST "assisted" her with shapefiles. Def. Mem. to Exclude, Doc. 148-1, at 7. But at no point did Dr. Handley say that she received any "assistance" from Voting and Elections Science Team. Dr. Handley testified only that some of the data included in her database may have come from VEST. *See* Handley Dep. at 18:12-13, Ex. 3 ("It's possible that some shape files came from VEST."). And Dr. Handley disclosed in her initial report that VEST was a potential source of information included in her database. *See* Handley Initial Report, at 6, Ex. 1 ("The precinct shapefiles were obtained either directly from the Secretary of State website or from the Voting and Election Science TEAM (VEST) website.").

Dr. Handley also testified during her deposition that the ACLU analytics department had helped her prepare the database she used for her EI analysis. *See* Handley Dep. at 19:3-20:18, Ex. 3. Although Dr. Handley's report does not state that she relied upon the ACLU analytics department for assistance to prepare her database, Defendants received notice that Dr. Handley had this assistance by virtue of the deposition testimony.

It is not clear how Defendants could be prejudiced by the fact that Dr. Handley did not disclose the name or names of the people in the ACLU analytics department who assisted with pulling this data together. Defendants note that expert testimony based solely or primarily on the opinions of another expert is unreliable. *See Hunt v. McNeil Consumer Healthcare*, 297 F.R.D.

268, 275 (E.D. La. 2014). But Dr. Handley did not rely upon the opinions of any other experts in reaching any of her opinions. Her reports demonstrate that she performed the analyses herself and relied on her own analyses to reach her conclusions. *See, e.g.,* Handley Initial Report, Ex. 1. And there is no concern about the reliability of an expert's opinions simply because they relied upon others for assistance. Dr. Handley only relied on the assistance of others in compiling the election data that went into the database she used for analysis—she did not rely upon anyone else to conduct her analysis. Moreover, Dr. Handley was clear that the database in this case was created at her direction, and that she verified that all the data in the database was accurate. *See* Handley Dep. at 20:14-21:10, 90:10-13, Ex. 3.

Defendants assert that this assistance in compiling the database was problematic because the person assisting Dr. Handley allegedly was exercising some judgment. But the only case Defendants cite to support this position is *Dura Auto. Sys. Of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613–14 (7th Cir. 2002), which is unanalogous here (and is non-binding on this Court, in any event). The district court in *Dura* disqualified a party's sole expert witness after he admitted that he was not an expert in mathematical models of groundwater flow—the issue relevant to the litigation—and after admitting the modeling he relied on to reach his conclusions was not done by him. *Dura*, 285 F.3d at 611–12. This is not the case with Dr. Handley, a well-qualified expert in EI analysis who has repeatedly conducted and testified about this analysis, and conducted all of the analysis included in her reports. *See* Handley Initial Report, at 2-3, Ex.1. Moreover, Defendants have provided no evidence that any person at the ACLU analytics department provided any substantive expert opinions in this matter or exercised any judgment in the creation of the database. When asked about a spreadsheet that was produced as part of Dr. Handley's back-up materials, *see* Def. Mem. to Exclude, Doc. 148-1, at Defendants' Exhibit. 3, Dr. Handley testified

that she "directed it to be compiled." Handley Dep. at 165:1-8, Ex.3. Indeed, *Dura* distinguishes this situation from the one before that court: "Analysis becomes more complicated if the assistants aren't merely *gofers or data gathers* but exercise professional judgment." 285 F.3d at 613 (emphasis added). The role of the ACLU analytics department was as "gofers" who pulled Dr. Handley's data together—nothing more.

III.   **Dr. Handley's Effectiveness Analysis Is Relevant and Defendants Have No Basis for Their Assertion that Dr. Handley Should Have Provided an Additional Threshold Analysis.**

Defendants also argue that Dr. Handley's effectiveness scores analysis should be excluded because she has not provided "corresponding analysis of the threshold level of BVAP required for when the district provides a realistic opportunity for black voters to elect their candidate of choice." Def. Mem. to Exclude, Doc. 148-1, at 14.

First, this is not an appropriate argument for a *Daubert* motion. The purpose of a *Daubert* motion is to raise objections about whether expert testimony is coming from a qualified expert, who is presenting evidence that is reliable and relevant. *See Daubert*, 509 U.S. 579. Asserting that Dr. Handley should have done some additional analysis does not speak to the reliability or relevance of the analysis she actually did. There is no reason why a relevant part of an experts' report or testimony should be excluded simply because they failed to provide some other additional unrelated analysis. And Defendants do not raise any objections to the reliability or relevance of the effectiveness scores analysis that Dr. Handley did in her initial report.

Dr. Handley's effectiveness scores are clearly relevant. This analysis demonstrates that, at the actual BVAP levels in the enacted plans, the challenged districts do not provide an opportunity for Black voters to elect their candidates of choice. *See* Handley Initial Report, at 12-33, Ex.1. In contrast, the BVAP levels of districts in the illustrative plans do provide such opportunities. *Id*. While her report does not specify any exact threshold BVAP level, her analysis demonstrates that

white bloc voting prevents Black voters from electing their candidates of choice when BVAPs are as low as the districts in the enacted plans. *Id*. This analysis is clearly relevant to and useful for establishing Plaintiffs' Section 2 vote dilution claims.

Second, there is no requirement to demonstrate a threshold level of BVAP. None of the cases the Defendants have cited support their assertion that such an analysis is required. *See Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254, 257 (2015) (criticizing the legislature's failure to conduct any analysis to justify their "mechanical[ly] numerical view" of what would constitute retrogression under Section 5); *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 186, 195–96 (2017) (upholding a legislative determination that a 55% BVAP was necessary to avoid retrogression where drafter examined turnout rates, considered the district's prison population, and voting patterns in the contested 2005 primary and general elections); *Covington v. North Carolina*, 316 F.R.D. 117, 169 (M.D.N.C. 2016) (criticizing the legislature's failure to conduct any analysis to justify a 50% BVAP requirement under Section 2). Moreover, two of these cases concern Section 5's retrogression standard, not the Section 2 standard before the Court.

Additionally, the court in *Bethune-Hill* found a simple analysis looking at turnout rates and personal knowledge of the area was narrowly tailored to comply with the Voting Rights Act. *Bethune-Hill*, 580 U.S. at 195–96. The court never required an analysis of exactly what BVAP level would be required to provide an opportunity for minority voters to elect their candidate of choice. And Dr. Handley's analysis goes far beyond what the court accepted as sufficient in *Bethune-Hill*. *See* Handley Initial Report, at 12-33, at Ex.1.

In the only Section 2 case cited by Defendants, the court credits exactly the type of analysis done by Dr. Handley as the proper effectiveness analysis under Section 2. In *Covington*, legislators

did not just fail to do an effectiveness analysis; they failed to conduct any analysis at all. 316 F.R.D. at 169. In finding that the districts at issue had higher BVAPs than necessary to comply with the Voting Rights Act, the court credited Dr. Allan Lichtman "district effectiveness analysis", *id.* at 169 and n.46, which used "actual results of elections" to calculate a "win rate" for Black candidates of choice in districts with less than 50% BVAP. Report of Dr. Allan Lichtman at 2, attached hereto as Exhibit 8. Dr. Lichtman did not provide any hypothetical BVAP thresholds, but instead provided evaluation of actual election results within relevant districts. Similarly, Dr. Handley's effectiveness scores compare win rates for Black candidates of choice from actual elections in the enacted and illustrative plans. *See* Handley Initial Report, at. 12-33, Ex.1. Dr. Handley did exactly the same type of "effectiveness analysis" the court contemplated and accepted in *Covington*. 316 F.R.D. at 168 n.46. Unlike in *Covington*, Dr. Handley found that no "districts with less than 50% BVAP" in any of the areas of interest provided an effective opportunity for Black voters to elect their candidate of choice. Handley Report at 16, Ex. 1. Defendants' attempts to misconstrue the relevant evidentiary requirement should be rejected.

## IV. Dr. Handley's RPV Analysis Is District-Specific.

Defendants both assert that Dr. Handley did not conduct the district-specific RPV analysis required by *Gingles*, *see* Def. Mem. to Exclude, Doc. 148-1, p.2, and critique Dr. Handley because she did not conduct more statewide EI analysis. *See* Def. Mem. to Exclude, Doc. 148-1, at p.14. Neither concern is valid.

### A. Plaintiffs are not challenging the statewide map.

Defendants take issue with Dr. Handley producing EI analyses for parishes in seven regions of Louisiana, suggesting "Plaintiffs [] challenged the entire statewide legislative plan for Louisiana," so Dr. Handley should have produced EI analyses for all regions of the state. Def. Mem. to Exclude, Doc. 148-1, at p.14. This argument misunderstands Plaintiffs' Section 2 claims.

Plaintiffs' Amended Complaint explicitly explains "[t]he State Legislative Maps are dilutive" in part because "the Black Population in Louisiana is sufficiently large and geographically compact to constitute a majority in *six to nine* additional single-majority House districts and *three* additional single-member Senate districts." Pls. Amend. Comp., April 4, 2022, Doc. 14, at 2. As demonstrated by the reports that Bill Cooper provided in this case, those additional single-majority districts can be drawn in seven regions of the state, and this is where Dr. Handley focused her EI analyses. *See* Handley Initial Report, at 8-9, Ex.1. Dr. Handley had no reason to produce EI analyses in regions of Louisiana not subject to this suit. Nor do Defendants present any legal basis for a statewide EI analysis requirement. Because Plaintiffs challenge specific districts and not the legislative maps at large, this argument fails.

### B.    Dr. Handley's cluster analysis is district-specific.

Vote dilution claims are "district-specific," *Gingles*, 478 U.S. at 103. This means that the RVP analysis must be specific to the areas of the state where the vote dilution claims are made. And parties cannot "rely on *statewide* voting statistics to establish legally significant white bloc voting." *Magnolia Bar Ass'n, Inc. v. Lee*, 994 F.2d 1143, 1151 (5th Cir. 1993). Instead, Section 2 claims require a local appraisal of the challenged district. *Id.* Defendants argue Dr. Handley's cluster analysis is not "district-specific," which, in their view, "render[s] Dr. Handley's work irrelevant to the analysis at hand." Def. Mem. to Exclude, Doc. 148-1, at 15.

Dr. Handley relied upon data from statewide elections, but she used that data to conduct a local appraisal of the geographic areas where the challenged districts are located. Dr. Handley created seven areas of interest by looking at the new Black-majority districts created by Mr. Cooper's illustrative plans. *See* Handley Initial Report, at 8-9, Ex.1. These areas include the parishes that overlap geographically with each of the new Black-majority districts, as these are the areas where the potential voters for the new districts live. *See id.* And then she conducted EI

analysis with data from the statewide elections recompiled into the boundaries of those seven areas, so she was evaluating only election data specifically from those areas. *Id.*

While these areas of interest are not specific election districts, in *Westwego Citizens for Better Gov't v. City of Westwego*, the Fifth Circuit acknowledged that *Gingles* suggests some flexibility in the type and nature of the RPV analysis that must be provided in the face of sparse data. 872 F.2d 1201, 1209 n.11 (5th Cir. 1989) (citing *Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502-3 (5th Cir. 1987)). Under Section 2's flexible standard, "a court may consider other relevant factors" when "elections from the challenged district do not provide sufficient evidence to determine if polarized voting exists." *See E. Jefferson Coal. for Leadership and Dev. v. Jefferson Par.*, 691 F. Supp. 991, 999 (E.D. La. 1988); *see also Citizens for a Better Gretna v. City of Gretna*, 834 F.2d 496, 502–03 (5th Cir. 1987). Courts have relied on this exact type of analysis from Dr. Handley in Section 2 cases. *See Alpha Phi Alpha v. Raffensperger*, 1:21-cv-05339-SCJ, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023), Opinion and Memorandum of Decision, at *145–51, *411–13.

Here, Dr. Handley was facing sparse data because, at the time she did her analysis and wrote her report, no state legislative elections with the new adopted districts had yet taken place for her to analyze. This is why she created seven areas of interest to evaluate for racially polarized voting. This is precisely the type of case where the flexible option envisioned by the *Gingles* Court is necessary.

Moreover, Dr. Handley did not "rely on data aggregated from all the challenged districts," *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 776 (5th Cir. 1993). Dr. Handley used the election results from 16 different statewide elections, but she only included in her EI algorithms the election data for the voters who live within each of these seven different areas, and she looked

at each different area separately. *See* Handley Initial Report, at 8-9, Ex.1. As a method for evaluating racially polarized voting, this analysis balances the "intensely local appraisal" of the districts, *see, e.g., White v. Regester*, 412 U.S. 755, 769–70 (1973), with "the Senate Report's []" flexible, fact-intensive test" acknowledged by the Supreme Court in *Gingles. Gingles*, 478 U.S. at 46. Dr. Handley performed a sufficiently local analysis of the specific districts challenged.

### C. Dr. Handley conducted additional district-specific EI analysis on multiple elections in state legislative districts.

In addition to her analysis of voting patterns in the clusters, Dr. Handley also completed an extensive analysis of state legislative elections. Plaintiffs' vote dilution claims are about districts within the state legislative maps—these elections are the exact same elections at issue in this case and are referred to as endogenous elections. Courts have consistently held that endogenous elections, as elections for the same office within the same area, are more probative than exogenous elections. *Magnolia Bar Ass'n v. Lee,* 994 F.2d 1143, 1149 (5th Cir. 1993), cert. denied, 510 U.S. 994 (1993). RPV analysis of past elections in the same areas for the same elected offices are more probative for determining whether racially polarized voting actually exists in those relevant areas. *See Clark v. Calhoun Cnty., Miss.*, 21 F.3d 92, 97 (5th Cir. 1994) (reversing the district court for, in part, failing to give greater weight to endogenous elections than exogenous elections). This is because actual past performance in earlier elections for the same type of districts and in the same areas are the best predictions of whether majority candidates have the opportunity to be elected in those areas without opportunity districts. *See Rangel v. Morales*, 8 F.3d 242, 245–46 (5th Cir. 1993) (explaining that the failure of a Latino candidate of choice to win the exact seat at issue was "obviously" probative).

Dr. Handley's report provided a summary of the results of the RPV analysis she did of 21 state legislative elections. She looked at all bi-racial[9] state house or senate contests since 2011 for state legislative districts where: (a) 60% of the district fell within Dr. Handley's identified areas of interest (*i.e.*, the areas of the state where Plaintiffs are alleging vote dilution), or (b) the district overlapped in any way with one of the new BVAP districts in the illustrative map. *See* Handley Initial Report, at 1 & n. 14, Ex.1. The results of this RVP analysis are found in Appendix B1 and B2 of Dr. Handley's report. *See* id at App. B1 & App. B2. This analysis was done using the accepted EI RxC analysis. *See id.* And as she was evaluating elections in the same type of districts in the same geographic areas that the Plaintiffs are making vote dilution claims, the analysis of these elections provide the district-specific analysis courts have required as evidence of racially polarized voting. *See, e.g.*, *Magnolia Bar Ass'n v. Lee*, 994 F.2d 1143. Dr. Handley's report, therefore, clearly provides analysis that helps inform the Court that there is vote dilution in state legislative elections in Louisiana in the areas of the state at issue in this case. In their motion to exclude Dr. Handley's testimony, Defendants do not even mention the analysis that Dr. Handley did of these endogenous elections, which courts have found to be the most probative when evaluating claims of racially polarized voting as part of the required *Gingles* preconditions.

### D. Dr. Handley's effectiveness scores are also a relevant form of a district-specific analysis.

Dr. Handley's effectiveness scores are district-specific analysis that take into account voting patterns of only the voters that reside in the specific districts being evaluated. Dr. Handley

---

[9] Courts have consistently found that bi-racial elections—those involving both white candidates and minority candidates—are the most probative as to whether voting is racially polarized. *See, e.g., Magnolia Bar Ass'n, Inc.*, 994 F.2d at 1149; *E. Jefferson Coal. for Leadership & Dev. v. Par. of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991); *Citizens for a Better Gretna*, 834 F.2d at 504; *see also Gingles*, 478 U.S. at 80–82 (relying exclusively on bi-racial legislative contests to determine whether a legislative redistricting plan diluted the Black vote).

has done an evaluation of the win rate for every enacted district in the areas of the state where Plaintiffs are asserting vote dilution is occurring. *See* Handley Initial Report, at 12-33, Ex.1. Dr. Handley looked at eight specific Senate districts that are not Black-majority districts in the Senate plan in three of her identified areas of interest and found that none of these districts would allow Black voters to elect their candidate of choice. *See id.* Similarly, Dr. Handley looked at 19 specific House districts that are not Black-majority districts in the House plan in five of her identified areas of interest and found that none of these districts would allow Black voters to elect their candidate of choice. *See id.* Reviewing the recompiled election results within those districts from 16 past elections, Dr. Handley was able to provide very probative evidence about the Black preferred candidate ability to prevail in the actual enacted districts being challenged in this case. This is clearly a district-specific analysis and, as noted, courts have endorsed relying on this exact type of analysis in other Section 2 cases. *Covington*, 316 F.R.D. at 168 n.46.

## CONCLUSION

Plaintiffs respectfully ask the Court to deny Defendants' Motion in Limine to Exclude Dr. Lisa Handley's Testimony and Reports, and allow Dr. Handley to testify in full about all the content in her initial report, rebuttal report, and supplemental rebuttal report.

Date: October 27, 2023

Respectfully submitted,

/s/ John Adcock

Sarah Brannon*
Megan C. Keenan*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005
sbrannon@aclu.org
mkeenan@aclu.org

John Adcock (La. Bar No. 30372)
Adcock Law LLC
Louisiana Bar No. 30372
3110 Canal Street
New Orleans, LA 701119
jnadcock@gmail.com

Sophia Lin Lakin*
Dayton Campbell-Harris*

Ron Wilson (La. Bar No. 13575)
701 Poydras Street, Suite 4100
New Orleans, LA 70139

Luis Manuel Rico Román*
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
dcampbell-harris@aclu.org
lroman@aclu.org

T. Alora Thomas-Lundborg
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu

Nora Ahmed (N.Y. Bar. No. 5092374)
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70112
NAhmed@laaclu.org

Michael de Leeuw*
Amanda Giglio*
Cozen O'Connor
3 WTC, 175 Greenwich St.,
55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Tel: (504) 525-4361
Fax: (504) 525-4380
cabral2@aol.com

Leah Aden*
Stuart Naifeh*
Victoria Wenger*
NAACP Legal Defense & Educational Fund
40 Rector Street, 5th Floor
New York, NY 10006
laden@naacpldf.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

I. Sara Rohani*
NAACP Legal Defense & Educational Fund
700 14th Street, Suite 600
Washington, DC 20005
(929) 536-3943
srohani@naacpldf.org

Josephine Bahn**
Cozen O'Connor
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

*Attorneys for Plaintiffs*

*Admitted Pro Hac Vice
**Pro Hac Vice Motion Pending

**CERTIFICATE OF SERVICE**

I certify that on October 27, 2023 this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system.

*/s/ Sarah Brannon*