# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

DOROTHY NAIRNE, *et al*

*versus*

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

CIVIL ACTION

22-178-SDD-SDJ

## RULING

Before the Court is Plaintiffs' *Omnibus Motion in Limine* to exclude opinion testimony from Sean Trende, Dr. Douglas Johnson, and Dr. Tumulesh K.S. Solanky.[1] Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, and Intervenor-Defendants, the State of Louisiana, through Louisiana Attorney General Jeff Landry, and Patrick Page Cortez and Clay Schexnayder, in their respective official capacities as President of the Louisiana Senate and Speaker of the Louisiana House of Representatives ("Legislative Defendant-Intervenors") (collectively, "Defendants") jointly oppose the Motion.[2]

## LAW AND ANALYSIS

The Court's analysis is guided by Federal Rules of Evidence 702 and 703, as well as *Daubert*[3] and its progeny. *Daubert* instructs district courts to ensure expert testimony is "both reliable and relevant."[4] Even if the expert's methodology for developing an opinion is reliable, that methodology must also have been correctly applied to the facts in order for the testimony to be relevant.[5] The Court incorporates by reference its discussion of

---

[1] Rec. Doc. 156.
[2] Rec. Doc. 160.
[3] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).
[4] *Curtis v. M & S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999) (citing *Daubert*, 509 U.S. at 597).
[5] *See Daubert*, 509 U.S. at 593.

1

the applicable legal framework in its *Ruling* denying the *Motion in Limine* as to Dr. Lisa Handley.[6]

I.  **MOTION TO EXCLUDE SEAN TRENDE**

Defendant Ardoin engaged Mr. Trende to provide opinion testimony on the compactness of the minority populations within Mr. Cooper's illustrative majority-minority districts. Trende used two algorithms to draw BVAP groupings within a district, stopping once the algorithm grouped together enough BVAP to constitute a majority within the district. Namely, Trende employed a moment of inertia ("MOI") analysis and "an areal variation of the Chen & Rodden method."[7] Trende reaches the conclusion that the minority populations in the illustrative districts proposed by Mr. Cooper are not derived from compact minority populations of sufficient numerosity to constitute a majority of the illustrative districts.[8]

Plaintiffs argue that Trende's methods are irrelevant, unreliable, have no support in the political science community, and have not been accepted by any Court.[9]

**A. Relevance**

The first *Gingles* precondition requires that the "minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district."[10] The "compactness" precondition "focuse[s] on geographical compactness and

---

[6] Rec. Doc. 171.
[7] Rec. Doc. 160, p. 3; Rec. Doc. 16-2.
[8] Rec. Doc. 162-2.
[9] Rec. Doc. 156-1.
[10] *Allen v. Milligan*, 599 US 1 (2023), citing *Wisconsin Legislature v. Wisconsin Elections Commission*, 142 S. Ct. 1245, 1248, 595 U.S. 398, 402 (2022).

2

numerosity, [] 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'"[11]

The VRA §2 compactness inquiry looks to compactness of the minority population.

> [I]n the equal protection context, [] compactness focuses on the contours of district lines to determine whether race was the predominant factor in drawing those lines. See *Miller v. Johnson*, 515 U.S. 900, 916–917, 115 S.Ct. 2475, 132 L.Ed.2d 762. Under § 2, by contrast, the injury is vote dilution, so the compactness inquiry considers "the compactness of the minority population, not ... the compactness of the contested district." *Vera*, 517 U.S., at 997, 116 S.Ct. 1941. A district that "reaches out to grab small and apparently isolated minority communities" is not reasonably compact. *Id.*, at 979, 116 S.Ct. 1941.[12]

Hence, the opinions that Trende proposes to offer are relevant. The question is whether his opinions are based on sufficient facts or data, the product of reliable principles and methodology, and whether the conclusions reached reflect a reliable application of the principles and methods to the facts of the case. [13]

### B. Reliability

"Trende uses two algorithms to draw BVAP groupings within a district, stopping once the algorithm has grouped together enough BVAP to constitute a majority within a district."[14] Plaintiffs argue that using the MOI algorithm in this manner goes against the scientific norms of political science because MOI should be used to generate or measure whole districts as opposed to pockets or clusters of minority votes within a district.[15] Plaintiffs argue that this methodology ignores "other redistricting criteria that might inform a whole district, such as equal population, contiguity, and communities of interest."[16]

---

[11] *Allen v. Milligan*, 143 S. Ct. 1487, 1503, 599 U.S. 1, 18, citing, *Growe v. Emison*, 507 U.S. 25, 40, 113 S. Ct. 1075, 122 L. Ed.2d 388 (1993).
[12] *League of United Latin American Citizens v. Perry,* 126 S. Ct. 2594, 2600, 548 U.S. 399, 402 (2006).
[13] Fed. R. of Evid. 702, considering imminent revisions and the comments associated therewith.
[14] Rec. Doc. 156-1.
[15] Rec. Doc. 156-1, n.1.
[16] Rec. Doc. 156-1, p.4.

Trende was engaged for the limited purpose "to determine whether the populations in the districts were compact -- the minority populations in the districts were compact,"[17] and to identify "a compact population within a district that's already been drawn."[18] He did not consider other traditional redistricting criteria.[19] Plaintiffs do not argue that the use of MOI for this limited purpose yields unreliable results. Rather, the argument is that MOI is most often applied to measure compactness district wide. While the use of MOI to measure compactness within a proposed district may be unconventional, the Court finds Trende's opinions are based on sufficient facts or data, are the product of reliable principles and methodology, and the conclusions reached, while narrow in scope, reflect a reliable application of the principles and methods to the facts of the case. The *Daubert*/FRE 702 inquiry is not concerned with which party is right. The scope of Trende's findings and the interplay of other redistricting criteria can be aptly explored in cross-examination at trial.

Plaintiffs further argue that Trende's second method of analyzing compactness of populations within the illustrative districts, the *Chen and Rodden* algorithm, was improvidently employed and thus unreliable. Plaintiffs argue that the *Chen and Rodden* methodology "focus[es] on whole districts and create[s] statewide maps" and "controls for both equal population and contiguity."[20] Trende admits that his use of the *Chen and Rodden* algorithm does not control for contiguity and does not equalize populations.[21] The Plaintiffs maintain that Trende's methodology deviates from the *Chen and Rodden* model in weighing district size and population, which results in an over emphasis on urban

---

[17] Rec. Doc. 156-3, pp. 58-59.
[18] *Id.* at p. 85.
[19] *Id.* at p. 59.
[20] Rec. Doc. 156-1, p. 8.
[21] Rec. Doc. 156-3, pp. 83, 100.

4

populations. Again, the *Daubert*/FRE 702 inquiry is not concerned with which party is right. Trende's deviation from *Chen and Rodden's* accepted methodology, may render it less useful and less probative but it does not make his limited analysis unreliable. The failure to control for contiguity and population parity can be aptly explored in cross-examination at trial.

The Court finds that Secretary Ardoin, the proponent of Trende's opinions, has demonstrated that the opinions are relevant to the compactness inquiry and the methodologies used reliably measure compactness of minority populations within districts. The relative weight to be accorded to Trende's compactness methodology as compared to Mr. Cooper's methodology and the ultimate value of each in establishing or rebutting *Gingles I* is an issue for trial. The *Motion* to exclude Mr. Trende is DENIED.

## II.    MOTION TO EXCLUDE DR. DOUGLAS JOHNSON

Dr. Johnson was retained by the Legislative Intervenors to analyze the illustrative maps prepared by William Cooper. By his Declaration,[22] he states that he will offer opinions:

- on "whether race appears to be the predominate consideration used in drawing those maps,"
- to "identify the scope of changes between" the "the 2022 Illustrative Maps and the 2023 Illustrative Maps," and
- to identify whether there is sufficient evidence to support "Key Regions" referenced in the 2023 illustrative maps.

---

[22] Rec. Doc. 156-7.

5

## A. RACIAL PREDOMINANCE

When it comes to considering race in the context of districting, we have made clear that there is a difference "between being aware of racial considerations and being motivated by them." Miller, 515 U.S. at 916, 115 S.Ct. 2475; see also North Carolina v. Covington, 585 U. S. ——, ——, 138 S.Ct. 2548, 2553, 201 L.Ed.2d 993 (2018) (*per curiam*). The former is permissible; the latter is usually not. That is because "[r]edistricting legislatures will ... almost always be aware of racial demographics," Miller, 515 U.S. at 916, 115 S.Ct. 2475, but such "race consciousness does not lead inevitably to impermissible race discrimination," Shaw, 509 U.S. at 646, 113 S.Ct. 2816. *Section 2 itself "demands consideration of race."* *31 Abbott, 581 U. S., at ——, 138 S.Ct., at 2315. *The question whether additional majority-minority districts can be drawn, after all, involves a "quintessentially race-conscious calculus."* De Grandy, 512 U.S. at 1020, 114 S.Ct. 2647.[23]

Plaintiffs persuasively argue that Dr. Johnson should not be permitted to opine as to Mr. Cooper's subjective intent in drawing the illustrative map in this case. The Court agrees. The Defendants do not contend that Dr. Johnson has a specialty, discipline or expertise in discerning a person's subjective intent in decision making. Dr. Johnson is simply unqualified[24] to opine on Cooper's subjective intent. Furthermore, the question of what considerations drove the mapmaking is ultimately a question for the trier of fact.

Citing *Cooper v. Harris*, Defendants argue that *"[t]he plaintiff* may make the required showing through 'direct evidence' of legislative intent, 'circumstantial evidence of a district's shape and demographics,' or a mix of both."[25] Defendants argue that Johnson may "draw inferences from 'circumstantial' idicia of intent'" to opine that Mr.

---

[23] *Allen v. Milligan*, 599 US 1, 30-31 (2023) (emphasis added)
[24] *Moyer v. Siemens Vai Services, LLC*, 2013 WL 12231281, at *2 (E.D.La., 2013) (FRE 702 requires an opinion witness to be qualified "by knowledge, skill, experience, training or education" in the field "in [his] field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth." citing, *United States v. Hicks*, 389 F.3d 514, 524 (5th Cir. 2004) (quoting *United States v. Bourgeois*, 950 F.2d 980, 987 (5th Cir. 1992)). . . . "'A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject.'" *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (quoting *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999)).).
[25] *Cooper v. Harris*, 581 U.S. 285, 291 (2017).

Cooper's map drawing was racially motivated.[26] The *Cooper v. Harris* case presented challenges to *legislatively enacted plans* on the grounds that the State-enacted plans were the result of racial gerrymandering in violation of the Fourteenth Amendment.[27] A key distinction between the illustrative maps advanced by the Plaintiffs and the maps at issue in *Cooper* and *Bethune-Hill* are that the latter involve State action.[28] The purpose of illustrative maps is to demonstrate that it is possible to draw additional majority-minority State House and Senate districts, while minding other redistricting criteria. Mr. Cooper, the map drawer, is not an arm of the State, and thus reliance on the Fourteenth Amendment is misplaced. The Court does not read Section 2 VRA precedent as requiring that the Fourteenth Amendment Equal Protection analysis be piggybacked onto the *Gingles I* analysis. Rather, the question is whether Mr. Cooper's maps respect the Section 2 proportionality proviso. The Supreme Court instructs that "properly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality."[29] Thus, as it relates to criticisms of Cooper's maps, the relevant inquiry is his respect and adherence to the *Gingles I* and redistricting criteria. The Court will not permit Dr. Johnson to testify about his subjective beliefs or opinions of Mr. Cooper's motives when drawing the illustrative maps. The Court will permit opinion testimony from Dr. Johnson regarding how the majority-minority districts[30] proposed in Cooper's 2023 illustrative maps compare to the enacted plan on the relevant metrics, such as compactness and numerosity, and relevant redistricting criteria.

---

[26] Rec. Doc. 160, p. 18.
[27] *Cooper v. Harris*, 581 U.S. 285, 291 (2017). Likewise, *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S.178 (2017) relied upon by defendants also presented a 14th Amendment challenge to legislature enacted maps.
[28] *Id.*
[29] *Allen v. Milligan*, 599 US 1, 26 (2023).
[30] Senate Districts 39, 17 and 19 and House Districts 1, 23, 60, 65 and 68. Rec. Doc. 156-3.

## B. COMPARISON OF 2022 AND 2023 ILLUSTRATIVE MAPS

In July 2022, Mr. Cooper submitted illustrative maps.[31] This case was stayed by Order of this Court pending the United States Supreme Court's decision in *Allen v. Milligan*.[32] After this case was re-opened in 2023, Cooper submitted new illustrative maps[33] with what he describes reflect "minor changes."[34] Dr. Johnson spills much ink comparing Cooper's 2022 illustrative maps with his 2023 illustrative maps and implying racial motive for the changes.[35] The Court will exclude any testimony that compares the illustrative maps prepared in 2022 with those prepared in 2023. It is irrelevant and not helpful to the Court as the trier of fact to spend precious trial time comparing various versions of illustrative maps. The issue before the Court is whether the totality of circumstances show that the "political processes leading to nomination or election" of State House and Senate members "are not equally open to participation" to voters who are "any part black" so that these voters "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[36] A comparison of illustrative maps offers nothing probative on this question, is unhelpful, and is a waste of judicial and party resources. Dr. Johnson will not be permitted to offer opinion testimony on the differences between Mr. Cooper's 2022 and 2023 illustrative maps. The *Motion in Limine* is GRANTED in this respect.

---

[31] Rec. Doc. 156-7, p. 3.
[32] Rec. Doc. 79.
[33] Rec. Doc. 156-7, p. 3.
[34] Rec. Doc. 159.
[35] Rec. Doc. 156-7.
[36] 52 USC 10301.

## C. THE ENACTED PLAN

Dr. Johnson dedicates 10 pages of his report pointing out that Mr. Cooper did not use the actual 2022 enacted plan for his analysis.[37] Mr. Cooper candidly concedes that "my initial declarations mistakenly relied on plans that were developed in legislative committees during the 2022 redistricting process rather than the final plans enacted by the Legislature and signed into law by Governor Edwards."[38] Upon learning of his error, he updated his "June 29, 2023 Declaration to accurately reflect the Enacted Plan."[39]

Dr. Johnson will not be permitted to offer opinion testimony critical of the initial error in Mr. Cooper's assumptions. It is unhelpful, irrelevant, and a waste of judicial and party resources.

## D. KEY REGIONS OPINIONS

As stated, the Court will not permit Dr. Johnson to testify about Mr. Cooper's subjective intent. Conclusory statements like if he "actually considered" key communities he "would not have drawn a map in that way" are pejorative and unnecessary.[40] Johnson may testify as to municipal and regional splits data but will not be permitted to draw subjective conclusions as to Mr. Cooper's state of mind. Johnson concedes that "correlation itself, does not indicate causation."[41] What, if anything, the data suggests about the map maker's intent is a question for the trier of fact.

---

[37] Rec. Doc. 156-7 ¶¶ 47 -67.
[38] Rec. Doc. 156-9.
[39] *Id.*
[40] Rec. Doc. 156-7 ¶¶ 36, 38, 40, 45.
[41] Rec. Doc. 156-8.

9

## E. RELIABILITY

In *Common Cause v. Lewis*,[42] Johnson "was accepted by the Court as an expert in the fields of political science, political geography, [and] redistricting," but joining at least four other Courts, the court in *Lewis* rejected his opinions as unreliable.[43] In *Covington v. North Carolina*,[44] as in this case, Johnson used the BVAP thresholds in the proposed majority-minority districts to fuel his subjective conclusion that the mapmaker "impermissibly pursued racial targets." The district court in *Covington* afforded virtually no weight to Dr. Johnson's opinions. In summary, Dr. Johnson was not excluded pre-trial, but his opinions garnered little respect from the courts, sitting as fact finders.

The Court finds that because of the procedural posture of this case, pretrial exclusion of Dr. Johnson is unsound. This case is scheduled for a trial on the merits. If the plaintiffs prove liability, *i.e.,* a violation of § 2 of the Voting Rights Act, a remedy will have to be addressed. Stated another way, if there is § 2 liability, the illustrative maps may become, or at a minimum inform, remedial maps. Whether remedial maps are the product of legislation or court order that State action must withstand Equal Protection scrutiny. Hence, in this case, the Court will permit Dr. Johnson to give opinion testimony regarding redistricting criteria and data underlying the 2023 illustrative maps.

---

[42] *Common Cause v. Lewis*, No. 18 CVS 014001, 2019 WL 4569584, at *95 (N.C. Super., Wake County Sep. 03, 2019); Rec. Doc. 156-10, p. 269 (¶ 645).
[43] Rec. Doc. 156-10, p. 270 (¶ 648) ("Dr. Johnson has testified as a live expert witness in four cases previously, and the courts in all four cases have rejected his analysis. Tr. 1886:21-1891:14; *see Covington*, 283 F. Supp. 3d at 450 (finding 'Dr. Johnson's analysis and opinion . . .unreliable and not persuasive'); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1137 (E.D.Cal. 2018) (holding that defendants' argument based on Dr. Johnson's analysis 'lacks merits'); *Garrett v. City of Highland*, 2016 WL 3693498, at *2 (Cal. Super. Apr. 06, 2016) (finding Dr. Johnson's methodology 'inappropriate'); *Jauregui v. City of Palmdale*, No.BC483039, 2013 WL 7018375, at *2 (Cal. Super. Dec. 23, 2013) (describing Dr. Johnson's work in the case was 'unsuitable' and 'troubling'). This Court joins these other courts in rejecting Dr. Johnson's methodologies, analyses, and conclusions.").
[44] 283 F. Supp. 3d 410, 449 (M.D.N.C, 2018).

For the forgoing reasons the Plaintiffs' *Motion in Limine* to exclude opinion testimony by Dr. Johnson is GRANTED IN PART AND DENIED IN PART, as set forth above.

## III. MOTION TO EXCLUDE DR. TUMULESH K.S. SOLANKY

Dr. Solanky, a mathematician from University of New Orleans, was retained by Secretary of State Ardoin to rebut the *Gingles II and III* opinions of Dr. Lisa Handley.[45] Plaintiffs move for pretrial exclusion of Dr. Solanky's opinions on the grounds that his methodology is unreliable, and his conclusions are unsubstantiated and irrelevant.

In a nutshell, Dr. Solanky crunches data and concludes that voting in Louisiana is becoming increasingly more polarized along party lines and that voters in urban areas prefer democratic candidates. First, he evaluates party affiliation trends,[46] which he opines reveal an upward trend of voters registering republican and a downward trend of voters registering democrat. "[T]he percentage of registered democrats voting in state-wide elections in Louisiana has decreased over the years while the percentage of registered republicans voting has increased."[47] In other words, voter turnout is stronger among republicans. Then, Solanky analyzes race and party affiliation, concluding that "[t]he percentage of registered white democrats has somewhat steadily decreased, [whereas] [t]he percentage of registered white republicans has steadily increased."[48] He opines that the voter turnout among white democrats has steadily decreased, whereas

---

[45] Defendants submit that "Dr. Solanky did not opine on Mr. Cooper's report directly, he did directly opine on Dr. Handley's analyses which purportedly were on the "areas of interest" in which Mr. Cooper's illustrative majority-minority districts were drawn." Rec. Doc. 160, n.15.
[46] Dr. Solanky analyzes 12 Statewide elections, including 3 that had no minority (Black) candidate at the State-wide and precinct levels. Rec. Doc. 148-5.
[47] Rec. Doc. 148-5, p. 8.
[48] *Id.* at p. 10.

11

the turnout among white republicans has steadily increased while turnout among black democrats has remained steady.[49]

Plaintiffs argue that "voter partisan preference" has no bearing on the inquiry of whether voting is racially polarized. The Court agrees. There is no explanation of how or why statewide or precinct specific party affiliation trends are probative of racially polarized voting. The implied, but unstated assumption is that black voters vote democrat. This is at best an unsupported assumption and at worst a gross generalization.[50]

Next, using ecological inference (EI) on five selected parishes[51] and twelve elections, three of which featured no black candidate, he opines that "there is significant variation from parish to parish in the percentage of white and black voters voting for a democrat or republican candidate."[52] The *Gingles II and III* inquiry is not advanced by analyzing outcomes in elections where there is no black candidate. An opinion which ascribes preferences between black and white voters to party affiliation is a red herring.

Finally, looking at 2020 and 2022 statewide election returns in four parishes, EBR, Caddo, Iberville, and Point Coupee,[53] he concludes that "the percentage of white voters who voted for a republican . . . steadily decreases [in more] densely populated [areas]" and conversely "the percentage of white voters who voted for a democrat . . . steadily increases [in more] densely populated [areas]."[54] Presumably, this is an attempt to

---

[49] *Id.* at p. 11.
[50] In fact, in his report, Dr. Solanky acknowledges that the statistics from election numbers 7, 8 and 11 (1/4 of the elections evaluated) do not support the proposition that black voters vote for the democrat. Rec. Doc. 148-5, ¶26.
[51] EBR, WBR, East Carroll, Natchitoches and Orleans.
[52] Rec. Doc. 148-5, ¶31.
[53] The Parishes in "Area of Interest 3" in the Handley report.
[54] Rec. Doc. 148-5, ¶ IV, pp. 17-27.

demonstrate white cross-over voting. The Court finds that data set is so limited that the conclusions reached are unreliable.

Dr. Solanky disclosed no scientific method for his data selection in picking the five parishes he evaluated or for limiting his data set to two elections. Furthermore, his conclusions do not reflect a reliable application of his methods to the facts of the case. Furthermore, the confidence intervals were so wide as to render his conclusions meaningless.[55] Furthermore, Dr. Solanky's density analysis relies upon data from only two elections. An expert's conclusions must be based on "sufficient facts or data."[56] The Court finds these are insufficient facts or data from which to draw such far reaching conclusions about the correlation, if any, between population density and voter behavior. On this point, the Defendants urge this Court to let this go to the weight and not admissibility. Defendants argue that "as a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration."[57] This is the practice that is expressly disapproved by the imminent rules' changes. "[M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a)."[58] The Court declines the invitation to punt this to the "weight" of the evidence.

---

[55] For example, "in the "most dense" areas of East Baton Rouge, Dr. Solanky estimated that somewhere between 18.4% and 60.7% of white voters voted for a Republican in the 2022 Senate election." Rec. Doc. 156-1 citing to Rec. Doc. 148-5, p 53.
[56] FRE 702(b).
[57] Rec. Doc. 160, p. 30, citing *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996).
[58] COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, REPORT OF THE JUDICIAL CONFERENCE COMMITTEE ON RULES OF PRACTICE AND PROCEDURE, E-11 (Sept. 2022) (accessible at https://www.uscourts.gov/rules-policies/pending-rules-and-forms-amendments).

Finally, the Court finds that Dr. Solanky's opinions are irrelevant. The Court has no doubt that Dr. Solanky is a skilled and qualified mathematician and statistician, but his expertise is an "imprecise match" for the legal question at issue: Whether "the minority group . . . is politically cohesive" and "the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."[59] Dr. Solanky offers utterly no opinion on racially polarized voting. The sum and substance of his opinion is that voting behavior can be explained by or correlates to partisan preference, turnout by party affiliation, and population density. While interesting, it is simply not the *Gingles II and III* inquiry. The Plaintiffs' *Motion in Limine* to exclude Dr. Solanky is GRANTED.

## CONCLUSION

For the above-stated reasons, The Plaintiffs' *Motion in Limine* (Rec. Doc. 156) is hereby:

DENIED as to Sean Trende,

GRANTED in part, and DENIED in part as to Dr. Douglas Johnson, and

GRANTED as to Dr. Tumulesh K.S. Solanky.

**IT IS ORDERED.**

Baton Rouge, Louisiana, this 8th day of November 8th, 2023.

*[signature]*
SHELLY D. DICK
CHIEF DISTRICT JUDGE
MIDDLE DISTRICT OF LOUISIANA

---

[59] *Allen v. Milligan*, 599 U.S. 1, 18 (quoting *Gingles*, 478 U.S. at 51).