IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | |
| *Plaintiffs,* | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| v. | Chief Judge Shelly D. Dick |
| R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |

Pursuant to Doc. Nos. 110 and 157, Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana ("Defendant Ardoin"); Defendant Intervenors Patrick Page Cortez and Clay Schexnayder in their respective official capacities as President of the Louisiana Senate and Speaker of the Louisiana House of Representatives ("Legislative Defendants"); and Intervenor-Defendant the State of Louisiana, through Louisiana Attorney General Jeff Landry (collectively, "Defendants") hereby submit their pre-trial Proposed Findings of Fact and Conclusions of Law.

**TABLE OF CONTENTS**

**PROPOSED FINDINGS OF FACT**

I.  **Background Louisiana demographics**................................................................. **4**

   A.  Demographics by race.......................................................................................... 4

   B.  Increase in majority-Black districts over time. ................................................... 4

II.  **The 2022 redistricting process in Louisiana.** ................................................... **5**

   A.  Redistricting criteria............................................................................................ 5

   B.  Road shows. ......................................................................................................... 6

   C.  House Bill 14. ...................................................................................................... 7

   D.  Senate Bill 1....................................................................................................... 10

III.  **Plaintiffs' Illustrative Plans.** ............................................................................ **12**

   A.  Mr. Cooper did not actually consider socio-economic data. ............................ 15

   B.  Mr. Cooper first used the wrong enacted maps. ............................................... 16

   C.  Mr. Cooper's Illustrative Plans were not drawn to improve compactness. ....... 16

   D.  Mr. Cooper did not even rely upon his own cultural regions when drawing his Illustrative Plans, they were merely "in the background." ....................................... 17

   E.  Sean Trende demonstrates Mr. Cooper's new majority-Black districts do not contain a compact minority population. ..................................................................... 18

   G.  Dr. Michael Barber demonstrates that Mr. Cooper seeks to maximize the number of majority-Black districts in urban regions to not only equal, but exceed proportionality, while disregarding traditional redistricting criteria.................................. 34

   H.  Dr. Johnson and Dr. Murray demonstrate that Mr. Cooper's predominant purpose when drawing the Illustrative Plans was race. ....................................................... 44

IV.  **Voting Patterns**................................................................................................. **61**

   A.  Dr. Handley attempts to show minority cohesion and legally significant White bloc voting........................................................................................................................... 61

   B.  Dr. Handley's estimates are unreliable. ............................................................. 63

   C.  Dr. Handley's assumption that nearly all voters across an entire parish vote in the same manner leads to misleading conclusions on voter polarization................................. 67

   D.  Dr. Handley failed to perform a district-specific functional analysis............... 70

   E.  A functional analysis shows that additional majority-Black districts are not needed in the "areas of interest" due to sufficient White crossover voting...................................... 70

   F. At most Dr. Handley shows partisan polarization and not racial polarization. ................. 72

V.  **Circumstances bearing on vote dilution.** ........................................................ **75**

**VI.**    **Individual Plaintiffs.** ................................................................................... **76**

**VII.**    **Entity Plaintiffs.** ......................................................................................... **77**

   A.    Black Voters Matter Capacity Building Institute ............................................ 77

   B.    Plaintiff Louisiana NAACP. ......................................................................... 78

**VIII.**    **Defendants.** ................................................................................................... **80**

## PROPOSED CONCLUSIONS OF LAW

**I.**    **This lawsuit.** ................................................................................................ **81**

**II.**    **Plaintiffs lack standing.** ........................................................................... **82**

   A.    The Entity Plaintiffs lack standing to sue for members. ................................ 83

   B.    The Entity Plaintiffs lack standing to sue in their own right. .......................... 86

    i.    The Entity Plaintiffs lack Article III standing. .......................................... 86

   ii.    The Entity Plaintiffs lack statutory standing. ............................................ 87

   C.    The evidence does not establish standing for Individual Plaintiffs. ................ 90

   D.    At most, Plaintiffs have demonstrated standing in only nine districts. ............. 90

**III.**    **Plaintiffs' Voting Rights Act claim lacks merit.** ...................................... **91**

   A.    The legal standard. ...................................................................................... 91

   B.    First precondition. ....................................................................................... 92

    i.    The Illustrative House Plan. .................................................................... 96

   ii.    Illustrative Senate Plan. ......................................................................... 103

   iii.    Plaintiffs' erroneous contentions. ............................................................ 106

   iv.    One-Person, One Vote. ........................................................................... 110

   B.    Second and third preconditions. ................................................................... 111

   C.    Totality of the Circumstances. ..................................................................... 123

    i.    Proportionality ...................................................................................... 123

   ii.    Additional considerations ........................................................................ 131

## PROPOSED FINDINGS OF FACT

**I.    Background Louisiana demographics.**

**A.    Demographics by race.**

1.    Following the 2020 Census, Louisiana had a total population of 4,657,757. PX20 at ¶ 21, Fig. 1. That was an increase of 124,385 people or 2.74% from the prior decade. *Id.*

2.    Based upon the 2020 Census, the Black population (Any Part Black) in Louisiana constitutes 33.13% of the State's total population. PX20 at ¶ 21, Fig. 1. That is a slight increase from 2000 where the Black population (Any Part Black) composed 32.86% of the State's population. *Id.*

3.    Since 2000, the Black voting age population ("BVAP") in Louisiana has grown by 1.3%. PX20 at ¶ 34.  Based upon the 2020 census, Louisiana's current BVAP is 31.25%.  *Id.*

4.    While the minority population in Louisiana overall climbed from 37.47% in 2000 to 44.25% in 2020, that increase was largely the result of increases in other minority groups, not the Black population. PX20 at ¶ 23, Fig. 1.

5.    In fact, the increase in the minority population was largely due to the significant increase in the Latino population in Louisiana from 107,738 in 2000 to 322,549 in 2020. *Id.*

6.    Indeed, the percentage of non-Hispanic Black population in Louisiana decreased from 32.3% in 2000 to 31.18% in 2020. *Id.*

**B.    Increase in majority-Black districts over time.**

7.    The number of majority-Black districts in both the Louisiana House of Representatives and Senate redistricting plans has generally increased over the past four decades.

8.    Louisiana has included the following number of majority-Black districts in the Senate under the redistricting plans over the last few decades:

      a.  1990 – 10

      b.  2000 – 9

      c.  2010 – 11

      d.  2020 – 11

PX20 at ¶ 54, Fig. 11.

9.    Louisiana has included the following number of majority-Black districts in the House under the redistricting plans over the last few decades:

      a.  1990 – 26

      b.  2000 – 27

      c.  2010 – 28

      d.  2020 – 29

*Id*.

10.    Thus, the percentage of majority-Black districts in Louisiana has increased by 2.8% in the House and 2.6% in the Senate since 2000—higher than the 1.3% increase in the BVAP of the State during this same timeframe. LDTX51 at ¶¶ 27, 28, Fig. 5.

## II.    The 2022 Redistricting Process in Louisiana.

### A.    Redistricting Criteria.

11.    On June 11, 2021, the Louisiana Legislature adopted Joint Rule No. 21, which established "Redistricting Criteria" to "promote the development of constitutionally and legally acceptable redistricting plans." LDTX55.

12.    As to state legislative districts, those criteria require that (a) the plan shall comply with the Equal Protection Clause of the Fourteenth and Fifteenth Amendments to the U.S. Constitution, the Voting Rights Act of 1965, and all other applicable federal and state laws; (b)

districts shall be composed of contiguous territory; (c) districts shall be single member, and shall be substantially equal in population (with a deviation of at most +/- 5%); and (d) due consideration shall be given to traditional district alignments to the extent practicable. *Id.*

13.    The Joint Rule 21 criteria further provided that to the extent practicable, a redistricting plan should contain whole Voting Tabulation Districts ("VTDs"). *Id*.

14.    The Joint Rule 21 criteria also indicated that "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable," but this "criterion is subordinate and shall not be used to undermine the maintenance of communities of interest within the same district to the extent practicable." *Id*.

**B.    Road shows.**

15.    The Legislature conducted nine different meetings across the state to receive input and feedback about the potential redistricting plans, commonly referred to as "road shows." LDTX1-9.

16.    These road shows were held in Monroe, Shreveport, Lafayette, Alexandria, Baton Rouge, Covington, Lake Charles, New Orleans, and Thibodaux. *Id*.

17.    During the road shows, the Legislature was able to receive input from the public at large on things like communities of interest. Schexnayder Dep.[1] at 22:25-23:19.

18.    The members of the Government Affairs Committees then took into account all of the information received during the road shows in drawing the maps. LDTX11 at 5:10-8:11; LDTX15 at 4:22-6:19.

---

[1] Deposition designations for Speaker Schexnayder will be filed at the appropriate time as ordered by the Court and discussed at the pretrial conference.

19.     During the road shows he attended, President Cortez did not recall anyone expressing the view that they wished for more majority-Black districts in the Senate.

20.     Speaker Schexnayder recalled that during the road shows he attended there were comments all across the board, with some wanting additional majority-Black districts and others thinking they should get rid of some. Schexnayder Dep. at 25:14-28.

21.     Citizens at the road shows who wanted additional majority-Black districts typically made only broad requests without specifying where, how many, or for what state legislative body those additional districts should be added. *See, e.g.*, LDTX1 at 82:4-11; LDTX2 at 69:20-70:1; LDTX5 at 76:1-7; *but see* LDTX8 at 101:14-19 (requesting just one additional majority-Black Senate district for Jefferson Parish).

22.     Some citizens asked that the number of majority-Black districts be reduced to maintain the diversity and common interest of each district. *See, e.g.*, LDTX4 at 59:20-60:9 (providing example of "segregation" between parallel Senate districts 29 (majority-Black) and 35 (majority-White) as result of majority-Black redistricting efforts).

**C.     House Bill 14.**

23.     House Bill 14, which proposed a redistricting plan for the Louisiana House of Representatives, was first introduced in the House on February 4, 2022 and referred to the Committee on House and Government Affairs. LDTX33.

24.     Speaker Clay Schexnayder introduced the bill but it was carried by Chairman John Stefanski. Schexnayder Dep. at 32:20-23.

25.     Speaker Schexnayder attended meetings with members of the delegation to receive input on the maps. *Id.* at 21:15-25.

26.    Chairman Stefanski and Vice-Chairman Royce Duplessis obtained input from all members of the House. *Id.* at 31:20-32:13.

27.    Speaker Schexnayder testified regarding the importance of obtaining opinions from members on communities of interest. *Id.* at 49:6-25.

28.    The House Government Affairs Committee met and discussed H.B. 14 on multiple occasions from February 7-16, 2022. *See* LDTX15, 16, 18, 20, 21, and 29.

29.    The principles that guided redistricting for the House were one-person one-vote, geography, communities of interest, and compliance with the law. LDTX15 at 6:7-15.

30.    In addition, there was tremendous population loss in north Louisiana so a district needed to be moved.  The legislature determined to move HD23 to south Louisiana to account for the population gain in that area, and because HD23 was represented by a term limited member. *Id.* at 22:4-24:6, 31:5-19.

31.    Although there were questions about maintaining HD23 as a majority-Black district, there were also strong questions regarding whether that district would continue to perform to elect a candidate of choice of Black voters. *Id.* at 25:16-26:8; 31:10-19.

32.    Although there were some requests during the roadshows and public meetings for additional majority-Black districts, due to the geographic dispersion of the Black population, it was difficult to do so without diluting BVAPs of existing districts and violating other redistricting principles. *Id.* at 38:24-40:6, 44:6-47:11, 134:2-136:22, 146:7-23.

33.    For example, despite some requests for proportionality between the Black population percentage in Louisiana and the number of majority-Black legislative districts, testimony was provided during the road shows and public meetings explaining that this is not

required by the Voting Rights Act and does not comply with various redistricting principles, such as compactness and communities of interest. *Id.*; LDTX1 at 20:21-21:12; LDTX11 at 28:1-31:13.

34.    House Bill 14 was voted on by the full House Chamber, signed by the Speaker of the House and the Senate President on February 18, 2022, and became effective on March 9, 2022 ("2022 House Plan"). LDTX31, 33.

35.    The 2022 House Plan contains 29 majority-Black districts, one more than the prior decade's plan. LDTX33. Those majority-Black districts include: HD2, HD3, HD4, HD11, HD16, HD17, HD21, HD23, HD26, HD29, HD34, HD40, HD44, HD57, HD58, HD61, HD62, HD63, HD67, HD72, HD83, HD87, HD93, HD96, HD97, HD99, HD100, HD101, and HD102. *See id.*

36.    Representative Glover proposed three different amendments to H.B. 14 on the floor of the House that added one additional majority-Black district in the Shreveport area – Amendments 62, 90, and 113. PX234-36; LDTX23 at 21:12-63:24. All of those amendments were rejected. *Id.*

37.    Representative Glover also introduced three proposed bills for the House plan – H.B. 21 (LDTX38); H.B. 23 (LDTX39); and H.B. 24 (LDTX40). Each of these bills proposed just one additional majority-Black district in the Shreveport area similar to the proposals in his amendments, but were voted down in committee because of various concerns, including that the proposed additional district would dilute other majority-Black districts. LDTX21 at 11:1-97:2; LDTX29 at 121:1-181:20.

38.    No other member introduced any bills or amendments that would have increased the number of majority-Black districts. LDTX15 at 40:6-41:2; LDTX23 at 9:1-21.

39.    Representative Duplessis, a Black member, introduced a bill (H.B. 11) that contained only 29 majority-Black districts, the same as contained in H.B. 14. LDTX35. That bill, however, kept HD23 as a majority-Black district.  LDTX15 at 3:13-23.

40.    Speaker Schexnayder testified that Rep. Duplessis' bill did not have enough votes to come out of Committee. Schexnayder Dep. at 57:7-17.

41.    Similarly, Representative Jenkins, a Black member, introduced a bill (H.B. 15) that likewise contained only 29 majority-Black districts and likewise maintained HD23 as a majority-Black district. LDTX36. H.B. 15 was deferred. LDTX20 at 112:7-8.

42.    Representative Magee testified during committee hearing that H.B. 14 was better than H.B. 15 because it would create a new majority-Black district in HD62 with a much higher BVAP than keeping HD23 and would be a safer minority seat. LDTX16 at 66:3-10.

**D.    Senate Bill 1.**

43.    Senate Bill 1, which proposed a redistricting plan for the Louisiana Senate, was first introduced in the Senate on February 1, 2022 and referred to the Committee on Senate and Government Affairs. LDTX34.

44.    The Senate Government Affairs Committee met and discussed S.B. 1 on multiple occasions from February 2-4, 2022. *See* LDTX11, 12, and 14.

45.    S.B. 1 was voted on the full Senate floor, signed by the Speaker of the House and the Senate President on February 18, 2022, and became effective on March 9, 2022 ("2022 Senate Plan"). LDTX32, 34.

46.    The 2022 Senate Plan contains 11 majority-Black districts. LDTX34; LDTX29 at 12:1-5. Those majority-Black districts include: SD2, SD3, SD4, SD5, SD7, SD14, SD15, SD24, SD29, SD34, and SD39. *Id.*

47.    Senate President Patrick Page Cortez testified that he met with all 38 other senators to seek input about the map. LDTX14 at 4:10–:13.

48.    Due to population loss in the northwest part of the State, one state Senate district had to be moved from that region and relocated in the South where there was population gain. LDTX17 at 3-4.

49.    President Cortez testified that the main tenets of redistricting for the Senate were one-person one-vote, continuity of representation, communities of interest and to maintain the number of majority-Black districts from the prior decade. LDTX11 at 6:8-8:11; LDTX17 at 2-3. The primary tenet was one-person one-vote with the secondary tenet being maintaining the number of majority-Black districts. *Id.*

50.    He also explained during the Senate Chamber session that the Joint Governmental Affairs Committee established as a rule to not split precincts as best as practical so he would not be able to support amendments to S.B. 1 that would request splitting precincts. LDTX17 at 33.

51.    He further testified that he would not have been able to, nor did any Senators propose an amendment to, include an additional majority-Black Senate district in S.B. 1 because it would dilute the BVAPs and thus prevent the performance of other majority-Black districts. LDTX29 at 18:24–19:14.

52.    In addition, creating additional majority-Black districts would have violated various other redistricting principles, including disrupting communities of interest and continuity of representation. *Id.* at 14:1–19:14; LDTX11 at 26:2–30:20.

53.    President Cortez relied upon information from members about how their districts would perform based upon the level of BVAP in their district, and that many did not want it lowered. LDTX17 at 42–43.

54.    In addition, President Cortez relied upon analysis from legal counsel regarding compliance with the Voting Rights Act.

55.    Senator Price introduced a bill that would have created 13 majority-Black districts in the Senate. LDTX41; LDTX14 at 31:18-32:3. It was referred to the Senate Government Affairs Committee, which voted to defer S.B. 17. LDTX14 at 34:4–:8. Committee members voted to defer due to concerns that the addition of the majority-Black district proposed in S.B. 17 would result in lower BVAPs in both the new and existing majority-Black districts and disable those districts from performing. LDTX11 at 100:1-101:7; LDTX29 at 14:1-19:14.

56.    Public testimony in opposition to S.B. 17 was also offered to the Committee arising out of concerns that S.B. 17 would create higher VAPs for White populations in majority-Black districts leading to increased partisan voting. LDTX11 at 110:16-111:16.

57.    Senator Gary Carter offered Amendment 100 to S.B. 1, which would have increased the BVAP of SD5 from 50.9% to 54.5% and kept Senator Carter's district within Orleans Parish. Following debate, the amendment was voted down, including by four members of the Black caucus.  LDTX17 at 17-32.

58.    No other senator introduced any other bills or amendments that would have increased the number of majority-Black districts in the senate. LDTX29 at 12:1-6, 17:17-19:14.

**III.    Plaintiffs' Illustrative Plans.**

59.    Plaintiffs' counsel retained a demographer – Mr. William Cooper – to determine whether the Black population in Louisiana is "sufficiently large and geographically compact" to allow for the creation of additional majority-Black districts beyond those enacted in the 2022 House Plan and the 2022 Senate Plan.  PX20 at ¶ 8.

60.    Mr. Cooper drew two illustrative plans – one for the House ("Illustrative House Plan") and one for the Senate ("Illustrative Senate Plan") (collectively, the "Illustrative Plans")– purporting to demonstrate that additional reasonably configured districts can be drawn with 50+% BVAPs. *Id.* at ¶¶ 16–19.

61.    To begin his work, Mr. Cooper started with the enacted maps.  He then focused on particular areas of the State where the Black population had experienced substantial growth and where there was a corresponding decline in White population to look for opportunities to draw additional majority-Black districts. PX20 at ¶¶ 12–13.

62.    He also specifically looked for districts with high BVAP, including in Baton Rouge and Shreveport, to potentially "un-pack" the Black population to create additional majority-Black districts. *See, e.g., id.* at ¶ 95, Fig. 19.

63.    He started in the Shreveport area, City of Baton Rouge, metro New Orleans, and Lake Charles – all areas where he creates new majority-Black districts – because he understood these were the parts of the state that had larger Black populations. *See id.* at ¶ 17.

64.    Mr. Cooper achieved his intent. Mr. Cooper "carv[es] up" various regions of the State to "maximize the number of House Districts that are just barely over 50% AP Black18+%." LDTX51 at ¶ 75.

65.    Mr. Cooper's Illustrative House Plan creates 6 additional majority-Black districts: one in Shreveport, one in Natchitoches, one in Lake Charles, and three in Baton Rouge. PX20 at ¶ 17.

66.    Mr. Cooper's Illustrative Senate Plan creates 3 additional majority-Black districts: one in Shreveport, one in Baton Rouge, and one in New Orleans. *Id*.

67.     Under Mr. Cooper's Illustrative Plans, 35 of the 105 House districts (33.33%) are majority-Black and 14 of the 39 Senate districts are majority-Black (35.90%).  These both exceed the percentage of Any Part Black population in the state of 33.13% and the BVAP in the state of 31.25%. *See* PX20 ¶¶ 21, Fig. 1, 34.

68.     Mr. Cooper claims that he focused on traditional redistricting principles – one-person one-vote, compactness, contiguity, the non-dilution of minority voting strength, and preservation of communities of interest – when drafting his Illustrative Plans. PX20 at ¶ 69.

69.     But Mr. Cooper's statements that he was simply following traditional redistricting criteria are not credible.

70.     In fact, Mr. Cooper conceded that the enacted maps, from which he started, generally complied with the Joint Rule 21 criteria other than the dilution of minority vote.

71.     He could not identify any changes he made to the enacted plans to unite any particular parish or municipality or to improve compactness.

72.     It is clear that all of Mr. Cooper's changes from the enacted plans to his Illustrative Plans were to create additional majority-Black districts.

73.     Mr. Cooper initially prepared his Illustrative Plans in July 2022. PX89 at ¶ 4.

74.     However, he prepared a revised set of plans with in his June 29, 2023 report that made changes to numerous districts. *See* PX20; PX89.

75.     The revised Illustrative House Plan made changes to 21 different House districts and moved over 83,000 people into a different district. LDTX51 at ¶¶ 7, 9.

76.     Similarly, Mr. Cooper made changes to 7 of the 39 senate districts and moved over 35,000 people in the Illustrative Senate Plan. *Id*. at ¶ 14.

77.    Mr. Cooper claims that these changes were made "to better respect communities of interest" and include other technical changes, but again, the evidence demonstrates otherwise. PX89 at ¶ 30.

78.    He testified that the changes were the result of Plaintiffs' suggestions based upon their "underground knowledge of the populations include in the majority-Black districts."

79.    He admitted that he was not trying to improve compactness with the changes he made in 2023. And they did not significantly improve municipal splits either.

80.    Rather, Mr. Cooper admitted that changes were made to improve the performance of districts for Black voters based upon information from one of Plaintiffs other experts, Dr. Lisa Handley. PX89 at ¶ 30.

   A.    **Mr. Cooper did not actually consider socio-economic data.**

81.    Mr. Cooper claims that he relied upon socio-economic data from the American Community Survey ("ACS") when drawing his Illustrative Plans. PX20 at ¶¶ 10, 75, 105-06.

82.    However, Mr. Cooper did not load any of the ACS data into Maptitude—the mapdrawing software he used to draw his Illustrative Plans.

83.    Moreover, the ACS data that Mr. Cooper purportedly used was only at the parish or municipal level. Mr. Cooper admitted that he never attempted to de-aggregate that data to a block level. Thus, Mr. Cooper had no socio-economic data to inform the drawing of his lines within a parish or within a municipality, including at the VTD level.

84.    In addition, Mr. Cooper admitted that he did not even look at each of the ACS reports for each parish and each municipality.

**B.    Mr. Cooper first used the wrong enacted maps.**

85.    Mr. Cooper did not use the block assignment files for the adopted versions of H.B. 14 or S.B. 1 with his report served in June 2023.  This caused his reporting on the metrics for the enacted plans, and, thus, comparisons to his Illustrative Plans to be inaccurate. LDTX51 at ¶ 47; LDTX42 at ¶¶ 1-9.

86.    Mr. Cooper provided a corrected report that utilized the enacted versions of the 2022 House Plan and the 2022 Senate Plan, which was attached to his rebuttal report dated August 11, 2023. PX89 at ¶¶ 4, 28; PX90.

**C.    Mr. Cooper's Illustrative Plans were not drawn to improve compactness.**

87.    Mr. Cooper focuses on statewide averages of compactness scores that measure the aesthetics of a district line. PX20 at ¶ 85, 112.  He does not conduct a district-by-district or even regional analysis of compactness.  *See id.*

88.    Mr. Cooper's Illustrative Plans only marginally improve compactness scores from the 2022 Enacted Plans. The mean Reock and Polsby-Popper scores are .36 and .18 in the 2022 Senate Plan, and just .37 and .22 in the Illustrative Senate Plan. PX20 at ¶ 85, Fig. 14. The mean Reock and Polsby-Popper scores are .40 and .29 in the 2022 House Plan, and .40 and .29 in the Illustrative House Plan – the same as the enacted map. PX20 at ¶ 112, Fig. 25.

89.    In addition, Mr. Cooper's reported compactness scores contained reporting errors and were not in agreement with each other. LDTX42 at ¶¶ 13-15, 20-21.

90.    Given that Mr. Cooper started with the enacted maps, his Illustrative Plans could not have been designed to improve compactness scores.

91.    Similarly, the changes made to the Illustrative Plans in 2023 could not have been to improve compactness because the districts he changed became *less* compact. LDTX58 at ¶ 16.

In fact, he admitted that he was not trying to improve compactness with the changes he made in 2023.

92.    Compactness could not have been the reason for his revisions between his 2022 and 2023 Illustrative Plans either.

**D.    Mr. Cooper did not even rely upon his own cultural regions when drawing his Illustrative Plans, they were merely "in the background."**

93.    In his report, Mr. Cooper states that he utilized "key multiparish cultural regions" when drawing his Illustrative Plans. PX20 at ¶ 27.

94.    Yet, Mr. Cooper admitted that he prioritized parishes and VTDs and municipalities over cultural regions, which were merely "in the background." He further stated that it was "pointless to consider cultural regions because they're different ways to define cultural regions."

95.    He did not consult with Plaintiffs' expert, Dr. Colten, about his cultural regions.

96.    If Mr. Cooper was truly prioritizing these "cultural" regions he would only need to divide them at most twice, but he divides them significantly more times than necessary. LDTX51 at ¶¶ 36, 41–42.

97.    Indeed, some of these regions are crossed three, five and seven times in the Illustrative House Plan, and even more astonishingly, three, four, five and eight times in the Illustrative Senate Plan. *Id*. at ¶¶ 43–44.

98.    As such, it is clear that these "cultural" regions were not the basis for Mr. Cooper's Illustrative Plans.

99.    Similarly, his consideration of economic planning districts, PX20 at ¶¶ 29-32, was likewise just "in the background."

100.

E.     **Sean Trende demonstrates Mr. Cooper's new majority-Black districts do not contain a compact minority population.**

101.     For starters, Mr. Cooper admitted he was not attempting to draw districts with a compact minority population. Mr. Cooper claimed that the compactness of the minority population is not relevant.

102.     Defendant Ardoin engaged Sean Trende to evaluate the minority compactness and numerosity requirements of *Gingles* I with regards to Mr. Cooper's Illustrative Plans. SOSX3 at 7.

103.     Mr. Trende has testified in many Section 2 cases and is currently retained as an expert in three additional vote dilution Voting Rights Act cases in other states. *Id.* at 4–7. Mr. Trende has considerable experience in political science, and has authored many publications and spoken on elections and districting in the United States and abroad. *Id.* at 1–2. Mr. Trende has finished his coursework for his Ph.D in political science at the Ohio State University and currently serves as the Senior Elections Analyst for Real Clear Politics. *Id.* at 1–3.

104.     Mr. Trende used qualitative and quantitative approaches in his reports to assess compactness and numerosity. Mr. Trende's qualitative approach looks to visual illustrations of the BVAP in the enacted and illustrative districts and compares the two. *Id.* at 13. For his quantitative analyses, Mr. Trende used the statistical software R to run algorithms aimed at assessing and measuring minority population compactness. *Id.* at 17–19. The two methodologies Mr. Trende used to measure compactness of the minority population include moment-of-inertia and the areal/Chen & Rodden method. *Id.* at 10–16. Both methods are peer reviewed and are meant to measure the dictionary definition of the word "compact" at the time the 1982 Amendments to the Voting Rights Act were passed. *Id.* Ultimately Mr. Trende concluded *inter alia* that (1) Mr. Cooper's illustrative majority-Black districts "are not based upon compact minority

populations[;]" and (2) the compact minority populations within some of Mr. Cooper's illustrative districts "are not large enough to constitute a majority of the district." *Id.* at 7–8, 138.

### i. Mr. Cooper's Illustrative House Plan.

105.    While the 2022 House Plan already creates three majority-Black districts in the Shreveport area (Districts 2, 3, and 4), Mr. Cooper's Illustrative House Plan creates four majority-Black districts in the region (Illustrative House Districts 1-4). To achieve this, Mr. Cooper sacrifices both district compactness of Illustrative House District 3, but also lowers the BVAP of all the districts in the area, failing to create a district with a compact minority group in Illustrative House District 1 ("IHD1"). SOSX3 at 7–34.

| Majority-Black Districts in the 2022 House Plan | Majority-Black Districts in the Illustrative House Plan |
|:---:|:---:|
|  |  |
| **SOSX3 Figure 1** | **SOSX3 Figure 2** |

106.    In IHD1, Mr. Cooper combines a large Black population in downtown Shreveport with other clusters past Interstate 220, reaching across swaths of rural White voters all the way up to the towns between Caddo and Black Bayou Lakes. Mr. Cooper does this because the greatest Black population concentration in the district, within Shreveport itself, is insufficient to create a majority-Black district. Thus, Mr. Cooper's IHD1 must extend well out into the rural areas, not to pick up extra population to meet one-person-one-vote requirements, but to absorb other small disparate Black communities. SOSX3 at 10–14. Below are heat maps and dotplots depicting the lack of a compact minority population in IHD1.

**SOSX3 Figure 3 (IHD1)**              **SOSX3 Figure 5[2] (IHD1)**




---

[2] This Figure depicts the location of Black and White citizens of voting age in IHD1. One blue dot is equal to 10 Black residents of voting age. One orange "x" is equal to ten White residents of voting age. SOSX3 at 13. The same is true of the remaining Figures with blue dots and orange "x"s : one blue dot represents 10 Black residents of voting and one orange "x" represents 10 White residents of voting age. *Id.*

107.    In Illustrative House District 23 ("IHD23"), Mr. Cooper creates a majority-Black district in northwest Louisiana, an area where the 2022 House Plan does not. Mr. Cooper is able to achieve a 50.56% BVAP in IHD23 *only* by connecting geographically distant and distinct populations of minority voters spanning across portions of Natchitoches and Campti in the southeast, all the way to Coushatta in the northeast and Mansfield in the west. Notably, the Black populations within each of these respective areas are insufficient alone to create a majority-Black district. Moreover, in combining these disparate areas, Mr. Cooper reaches across heavily White, rural precincts to pick up Black voters located within those areas. SOSX3 at 34–39. Below are heat maps and dotplots depicting the lack of a compact minority population in IHD23.

**SOSX3 Figure 19 (IHD23)**          **SOSX3 Figure 21 (IHD23)**



108.    The 2022 House Plan creates one majority-Black House district in the St. Charles area (District 34). In addition to modifying district 34 ("IHD34"), Mr. Cooper creates a second Majority-Black district ("IHD38"). Because there is not a large enough compact Black population to support two majority-Black districts, both IHD34 and IHD38 have issues meeting the compactness requirement of *Gingles* I. For example, in IHD34, Mr. Cooper creates a majority-Black district by a narrow margin of ten people. To accomplish this, Mr. Cooper reaches into

heavily White portions of the district, linking together Black residents who are themselves located in heavily White areas. Likewise, in IHD38 Mr. Cooper selects a cluster of Black voting-age residents from the surrounding Lake Charles area and combines them with isolated populations of Black individuals located across the countryside and into the town of Iowa. Again, Mr. Cooper does this because, standing alone, Lake Charles does not have a compact Black population large enough to support two majority-Black districts. SOSX3 at 42–54. Below are heat maps and dotplots depicting the lack of a compact minority population in IHDs 34 and 38.

**IHD34**

| SOSX3 Figure 26 | SOSX3 Figure 28 |
|:---:|:---:|

 

**IHD38**

| SOSX3 Figure 31 | SOSX3 Figure 33 |
|:---:|:---:|



109.    In the Baton Rouge area, the 2022 House Plan creates six majority-Black state House Districts (HDs 29, 61, 62, 63, 67, and 101). Mr. Cooper creates four additional majority-Black districts (Illustrative House Districts 60, 65, 68, and 69) while simultaneously removing one of the 2022 House Plan's majority-Black districts (HD62), for a net addition of three majority-Black districts. In creating these additional districts, Mr. Cooper had to divide the core area of Black voters located within the City of Baton Rouge. This division forces the remaining districts within the Baton Rouge area to be strung together across geographically distinct and distant portions of the region. While Mr. Cooper's additional majority-Black districts are majority-Black, they do so at the expense of breaking apart otherwise compact districts created by the 2022 House Plan. SOSX3 at 54–94.

110.    Unlike Mr. Cooper's illustrative districts, HD61 in the 2022 House Plan contains a Black population that is large and distinct enough to lead to the creation of a majority-Black district. While HD61 in the Enacted Plan does connect heavily White areas and isolated Black residents, it does so pursuant to the one-person-one-vote requirement. See Figure 41 below, which shows the most compact group of Black residents of voting age population in enacted District 61 under the Chen & Rodden method, whether the dashed blue line indicates "the outer boundaries of precincts containing the most compact group." SOSX3 at 62. These connections are not necessary for the Enacted Plan's District 61 to achieve a 50% plus 1 BVAP. In contrast, Mr. Cooper's Illustrative House District 61 ("IHD61") connects Black residents in the north by reaching across heavily White areas to the south to achieve a 50% plus 1 BVAP, and not to satisfy the one-person-one-vote requirement. SOSX3 at 61–64. Below are dotplots depicting the compactness of the Black VAP in enacted HD61 as compared to the lack of a compact minority population in IHD61.

**SOSX3 Figure 41 (Enacted HD61)**          **SOSX3 Figure 42 (IHD61)[3]**




111.    Similarly, the 2022 House Plan's HD63 encompasses several lightly populated rural areas while still maintaining a Black population large enough to warrant a majority-Black district. This is due in large part to the heavy concentration of Black voters in the southeast portion of enacted HD63. *See* Figure 44 below, which shows the most compact group of Black residents of voting age population in enacted HD63 under the Chen & Rodden method, whether the dashed blue line indicates "the outer boundaries of precincts containing the most compact group." In contrast, Mr. Cooper's Illustrative House District 63 ("IHD63") extends further, seeking out isolated Black individuals in distant locations in order to achieve a majority-Black threshold. SOSX3 at 65–68. Below are dotplots depicting the compactness of the Black VAP in enacted District 63 as compared to the lack of a compact minority population in IHD63.

---

[3] This Figure shows the "[m]ost compact group of Black residents of voting age" in IHD61 sufficient to constitute a majority using the moment-of-inertia approach. The "dashed blue lines indicate the outer boundary of precincts containing the most compact group." SOSX3 at 63.

**SOSX3 Figure 44 (Enacted HD63)**          **SOSX3 Figure 45 (IHD63)[4]**

          

112.    In Illustrative House District 60 ("IHD60"), Mr. Cooper groups distant concentrations of otherwise unconnected minority groups, including Black voters in Gonzales, White Castle, and Plaquemine. The result of this bizarre grouping is that, in order to cross the Mississippi River which flows through IHD60, one must actually leave and re-enter the district. Moreover, none of these areas, standing alone, contain a sufficient number of Black voting age residents to command a majority-Black district. As a result, Mr. Cooper combines, these distinct groupings of Black populations with the sparce Black populations in the majority White areas surrounding them to achieve a 50% plus 1 BVAP. SOSX3 at 69–73. Below are heat maps and dotplots depicting the lack of a compact minority population in IHD60.

---

[4] This Figure shows the "[m]ost compact group of Black residents of voting age" in IHD61 sufficient to constitute a majority using the moment-of-inertia approach. The "dashed blue lines indicate the outer boundary of precincts containing the most compact group." SOSX3 at 67.

**SOSX3 Figure 47 (IHD60)**　　　　　**SOSX3 Figure 48 (IHD60)**



113.　In Illustrative House District 60 ("IHD65"), the Black population is largely concentrated in the western section of the district. This population alone is not large enough to accomplish a majority. In order to draw a majority-Black district, Mr. Cooper reaches beyond the compact area and pulls in Black residents who reside in heavily White precincts, largely along the outskirts of Baton Rouge. SOSX3 at 74–78. Below are heat maps and dotplots depicting the lack of a compact majority-Black population in IHD65.

**SOSX3 Figure 51 (IHD65)**　　　　　**SOSX3 Figure 52 (IHD65)**



114.　Mr. Cooper's Illustrative House District 69 ("IHD69") takes a heavily concentrated Black population along the northern edge of the district and reaches down to south "into mixed

and even overwhelmingly White areas of the region" in order to cross the majority-Black threshold. The heavy majority-Black population in the north is insufficient, standing alone, to create a majority-Black district. IHD69 "barely" crosses the 50% + 1 target. SOSX3 at 84–88. Below are heat maps and dotplots depicting the lack of a compact minority population in IHD69.

**SOSX3 Figure 59 (IHD69)**      **SOSX3 Figure 60 (IHD69)**



#### ii.  Mr. Cooper's Illustrative Senate Plan.

115.   Mr. Cooper's Illustrative Senate Plan creates three additional majority-Black districts as compared to the 2022 Senate Plan. SOSX3 at 94. One of those three districts is found in the Shreveport area. In Shreveport, the 2022 Senate Plan creates a single majority-Black district (SD39). Mr. Cooper splits the Black population and creates two majority-Black districts in the region, Illustrative Senate District 38 ("ISD38") and 39 ("ISD39"). This forces ISD38 and ISD39 to expand outward, relinquishing enacted District 39's overall compactness in order to capture additional separate and distinct minority populations. *Id.* at 94–108.

**Majority-Black Districts in the
2022 Senate Plan**

**Majority-Black Districts in the
Illustrative Senate Plan**





**SOSX3 Figure 67**

**SOSX3 Figure 68**

116.    ISD38 achieves a 50% plus 1 BVAP by stitching together disparate Black populations across the region. To accomplish this, Mr. Cooper takes a portion of the district found in Caddo Parish, which itself is dispersed and multi-racial, and crosses the Red River into downtown Bossier City, and then out again into rural Bossier Parish, picking up predominantly White populations along the way. SOSX3 at 97–102. Below are heat maps and dotplots depicting the lack of a compact minority population in ISD38.

**SOSX3 Figure 69 (ISD38)**     **SOSX3 Figure 71 (ISD38)**



117.    While the enacted SD39 had a BVAP of 63.7%, Mr. Cooper's ISD39 drops the BVAP significantly to 52.5%. This reduction is largely due to Mr. Cooper needing a portion of that Black population to create his second majority-Black district, with some of the Black population moved to ISD38. As a result, ISD39 is forced to expand outward into the rural areas of Caddo Parish to secure small concentrations of Black residents who are then grouped together with individual Black residents in order to meet the 50% plus 1 BVAP threshold. SOSX3 at 94, 103–08. Below are heat maps and dotplots depicting the lack of a compact minority population in ISD39.

**SOSX3 Figure 74 (ISD39)**          **SOSX3 Figure 76 (ISD39)**



118.    The 2022 Senate Plan creates two majority-Black districts (SDs 14 and 15) in the
Baton Rouge Area. SOSX3 at Figure 79. Mr. Cooper creates an additional majority-Black district
(Illustrative House District 17 ("ISD17")) in his Illustrative Senate Plan. SOSX3 at Figure 80. To
create this additional district, Mr. Cooper takes the core Black population of Baton Rouge and
"baconmanders" it across the three districts thus creating districts that are less compact than SDs
14 and 15. SOSX3 at 109–17.

**Majority-Black Districts in the
2022 Senate Plan**

**Majority-Black Districts in the
Illustrative Senate Plan**





**SOSX3 Figure 79**

**SOSX3 Figure 80**

119.    Mr. Cooper's ISD17 only achieves a 50% plus one BVAP by taking concentrations of Black populations located along the Mississippi River in East Baton Rouge, then crossing over White populations to reach Black residents in West Baton Rouge, before adding sections of Iberville and Point Coupee together into the district's core. This is evident by the large geographic size of the district comparatively. ISD17 also captures New Roads and Plaquemine to create a majority-Black district. SOSX3 at 112–17. Below are heat maps and dotplots depicting the lack of a compact minority population in ISD17.

**SOSX3 Figure 81**

**SOSX3 Figure 83**




120.     In the St. Charles/Orleans area, Mr. Cooper again adds an additional district. In order to turn the 2022 Senate Plan's SD19 into a majority-Black district, Mr. Cooper alters the composition of SDs 3, 4, 5, and 7 of the Enacted Plan. Mr. Cooper's changes to SD3 being the most drastic. SOSX3 at 118–34.

121.     Illustrative Senate District 3 ("ISD3") moves the enacted district away from a once compact population center by linking heavily concentrated BVAP areas with a variety of heavily White areas to grab the last bit of Black population needed in the far corners of the district. SOSX3 at 123–28. Below are heat maps and dotplots depicting the lack of a compact minority population in ISD3.

**SOSX3 Figure 89 (ISD3)**          **SOSX3 Figure 91 (ISD3)**



122.    Mr. Cooper's Illustrative Senate District 19 ("ISD19") marginally achieves a 50%

plus 1 BVAP. To accomplish this, ISD19 stretches across the northern portion of Jefferson Parish

before reaching down into sections of St. Charles Parish before systematically selecting portions

of heavily Black populations in areas such as Woodmere and Waggaman. To pick up these

populations, Mr. Cooper must also add White populations in Westwego and Destrehan. Each of

these towns and parishes is necessarily linked together so the district can maintain the required

BVAP numbers. SOSX3 at 129–35. Below are heat maps and dotplots depicting the lack of a

compact minority population in ISD19.

**SOSX3 Figure 94 (ISD19)**           **SOSX3 Figure 96 (ISD19)**




**G.    Dr. Michael Barber demonstrates that Mr. Cooper seeks to maximize the number of majority-Black districts in urban regions to not only equal, but exceed proportionality, while disregarding traditional redistricting criteria.**

123.    Dr. Michael Barber was retained by Defendant Ardoin "to evaluate whether the illustrative maps created by Mr. Cooper that contain additional majority Black voting age population (BVAP) districts were drawn with race as a predominant factor, and whether or not these maps adhere to traditional redistricting criteria." SOSX1 at 4. Dr. Barber offers these opinions, not in the context of examining effects, but to prove intent.[5] *Id.* at 14, 19; SOSX4 at 29.

124.    Dr. Barber is currently an associate professor of political science at Brigham Young University and serves as the Director for the Center for the Study of Elections and Democracy. Dr. Barber received his Ph.D. in political science from Princeton in 2014, with an emphasis in American politics and quantitative methods/statistical analyses. SOSX1 at 4. Dr. Barber has served

---

[5] Unlike how simulations were offered in *Allen v. Milligan,* this is the traditional and correct way to use simulations to evaluate redistricting plans. *See* 599 U.S. 1, 44 (2023) (Kavanaugh, J. concurring). *See also,* Amicus Brief of Jowei Chen *et al.*, *Alexander v. South Carolina*, No. 22-807 https://www.supremecourt.gov/DocketPDF/22/22-807/275639/20230818110350391_22-807%20Alexander%20v%20SC%20State%20Conf%20of%20the%20NAACP%20BRIEF.pdf

as an expert in a wide variety of election and districting-related matters, including at least two Section 2 of the Voting Rights Act cases, and has published over 20 peer-reviewed articles. SOSX1 at 4.

125.    To assess Mr. Cooper's Illustrative Plans, Dr. Barber used a simulation analysis whereby he compared Mr. Cooper's Illustrative Plans "to a set of alternative maps that are drawn using *only* districting criteria that also consider the same geographic distribution of voters" in order to "evaluate if oddities or patterns in the proposed plan are due to the political geography of the state because the simulated maps are drawn *using the same political geography*." *Id.* at 11 (alterations in original). Specifically, Dr. Barber used a SMC algorithm to create his representative sample of maps to compare the Illustrative Plans, which is peer reviewed and was created by Plaintiffs' expert Dr. Cory McCartan. *Id.* at 10–12

126.    Evidence of district proportionality also cuts against Plaintiffs. Under the 2020 census, the BVAP for the State of Louisiana, using the any-part Black census designation, is 31.25%. *Id.* at 5. Even though not legally required, exact proportionality for Black voters under Louisiana's 39 Senate districts would be approximately 12 majority-Black districts. *Id.* at 5. The 2022 Senate Plan has 11 majority-Black districts, which is 28.2% of the 39 total Senate districts, a mere 3% difference. *Id.* at 5, 8. In contrast, Plaintiffs' Illustrative Senate Plan contemplates extra proportionality statewide, and contains 14 majority-Black districts, which would be 35.9% of the 39 total districts.  *Id.*

127.    The story in the Louisiana House is similar. Proportionality for Louisiana's 105 House districts would result in 33 majority-Black districts. *Id.* at 6. The 2022 House Plan has 29 majority-Black districts, which is 27.6% of the 105 total state House districts, a less than 4%

difference. SOSX1 at 5, 8. Plaintiffs' Illustrative House Plan again seeks extra proportionality, including 35 majority-Black districts, which is 33.3% of the 105 state House districts. *Id.* at 6, 8.

128.    Plaintiffs' Illustrative Plans seek to maximize the number of majority-Black districts possible, not just statewide, but within major regions of the State. For example, Mr. Cooper's Illustrative Senate Plan seeks to add at least one majority-Black Senate district in the Shreveport, Baton Rouge and Orleans metropolitan regions. SOSX1 at 11. Notably, Dr. Barber ran 100,000 state Senate simulations using race-neutral districting criteria, and none of the simulations contained any additional majority-Black districts in these areas of the state. *Id.* Dr. Barber reached the same general conclusion when running a new set of simulated districts—after running 500,000 state Senate simulations using race-neutral districting criteria, none of the simulations contained the number of majority-Black Senate districts as Mr. Cooper's Illustrative Senate Plan. SOSX4 at 9. This is clear evidence that speaks to the racial intent of the mapmaker.

129.    Dr. Barber's reports further demonstrate Mr. Cooper's predominate use of race in the Illustrative House Plan.  Mr. Cooper adds two majority-Black House districts in the Baton Rouge Metropolitan Region, an outcome that appeared in none of Dr. Barber's 100,000 House simulations. SOSX1 at 59.

130.    Mr. Cooper also added an additional majority-Black House district in Calcasieu Parish, and in the Iberville, Ascension, and St. James region of the state, an outcome that appeared in virtually none of Dr. Barber's simulations. *Id.*

131.    Mr. Cooper also added an additional House district in the Shreveport area, an outcome which occurred only in only 0.16% of Dr. Barber's race-neutral simulations. *Id*.

132.    Finally, Mr. Cooper created a new majority-Black district in Natchitoches out of whole cloth, which did not appear in the Enacted Plan, and only appeared in Dr. Barber's simulations 0.002% of the time. *Id*.

133.    Dr. Barber reached the same general conclusions when running a new set of 500,000 state Senate simulations using race-neutral districting criteria: that none of the simulations contained the number of majority-Black Senate districts as Mr. Cooper's Illustrative Senate Plan. SOSX4 at 9. Dr. Barber's simulations show that Mr. Cooper's Illustrative Plans could not have resulted from simply following traditional redistricting criteria. It demonstrates an intent to not only draw additional majority-BVAP districts, but to maximize the number of such districts. Dr. Barber's simulations are only the "beginning of [Dr. Barber's] investigation into whether or not race predominated in the drawing of the Illustrative maps." *Id.* at 5.

134.    Dr. Barber further demonstrated how poorly Mr. Cooper's Illustrative Plans fair on core retention – a core redistricting principle enunciated in Joint Rule 21.  In the House, Mr. Cooper's Illustrative House Plan retains on average just 71.58% of citizens in the same district whereas the 2022 House Plan is at 83.16%. SOSX1 at 65. And there are 47 House districts that retain less than 70% versus the enacted map that has only 19. *Id*. The results are "nearly identical" when Dr. Barber implemented a pre-processing constraint recommended by Dr. McCartan. SOSX4 at 8–9.

135.    Dr. Barber also conducted a regional analysis of Mr. Cooper's Illustrative Plans in both the House and Senate to demonstrate how the Illustrative Plans consistently exceed proportionality in the areas with higher BVAP and where Mr. Cooper draws new majority-Black districts.  SOSX1 at 68–112.

i.    **Illustrative House Plan.**

136.    In the Shreveport region composed of Bossier and Caddo parishes, the BVAP is 39.1%. *Id.* at 70. The 2022 House Plan has eight House districts in this region and three of them are majority-Black (37.5%). *Id.* Yet, four of the eight districts in the Illustrative House Plan in this area are majority-Black (50%). *Id.*

137.    Dr. Barber demonstrated how Mr. Cooper's illustrative districts in this area carve up the population in the city of Shreveport to create an additional majority-Black district:

Figure 23: **Shreveport Region - Comparison of Division of Shreveport Population.** In both maps the shaded area inside the blue line is the municipal boundaries of Shreveport. The left panel shows how districts in the 2022 enacted House map divide Shreveport. The right panel shows how the Cooper Illustrative House map divides Shreveport. To create an additional major-ity BVAP district, Cooper Illustrative HD-1 now takes a significant part of Shreveport's popula-tion. These figures are from Dave's Redistricting: https://davesredistricting.org/join/fa47d389-42de-49ac-9c57-cc2434249cc2



*Id.* at 77.

138.    Dr. Barber next looked at the Natchitoches Region compromised of DeSoto, Natchitoches and Red River Parishes. *Id.* at 78. The overall BVAP of this region is 37.8%. *Id.*

HD23 in this area was previously a majority-BVAP districts but split all three parishes and required linking distant Black populations in Mansfield, Coushatta, Campti, and Natchitoches. *Id*. Mr. Cooper's Illustrative House Plan keeps HD23 as a majority-Black district but must carefully draw lines to include only precincts with high BVAP and exclude precincts with higher White populations as shown in the figure below:

Figure 28: **BVAP of Precincts In and Around Cooper Illustrative HD-23**



*Id*. at 85.

139.    Dr. Barber analyzed the Lake Charles region comprised of Calcasieu Parish. The overall BVAP is 25.7%. *Id.* at 86. The 2022 House Plan has five districts in this area and one of them is majority-Black (20%). *Id.*The Illustrative House Plan in this region contains two majority-Black districts (40%). *Id.* To create the second majority-Black district, Mr. Cooper divides the Black population in Lake Charles between IHD34 and IHD38 as shown below:

Figure 33: **BVAP of Precincts In and Around Cooper Illustrative HD-34** -
The district has an odd geographical shape with three "arms" that extent to the west,
southwest, and south to incorporate precincts with larger Black populations and avoid
nearby precincts with lower Black populations. This figure is from Daves Redistricting:
https://davesredistricting.org/join/fa47d389-42de-49ac-9c57-cc2434249cc2



*Id.* at 92.

140.    This creates an odd three armed geographical shape in HD34 that is not consistent
with traditional redistricting principles. *Id.* at 86.

141.    The Baton Rouge region is comprised of East and West Baton Rouge Parishes and
contains eleven state House districts, six of which are majority-Black in the 2022 House Plan
(54.5%). SOSX1 at 93. The Illustrative House Plan, however, contains an astonishing eight
majority-Black districts in area (72.7%). *Id.*

142.    To create the additional three majority-BVAP districts in this region, the Illustrative
House Plan packs White voters into IHD70, and gives it a "U" shape to avoid a concentration of
Black precincts placed into IHD68 as shown below:

Figure 38: **BVAP of Precincts In and Around Cooper Illustrative HD-70.** The district does an odd "U" turn to avoid several heavily Black precincts that are placed in HD-68. HD-70 then joins precincts on either side that have higher White populations. This figure is from Daves Redistricting: https://davesredistricting.org/join/fa47d389-42de-49ac-9c57-cc2434249cc2



*Id.* at 100.

143.    Second, the Illustrative House Plan takes several majority-White precincts and joins with heavily White precincts in Livingston Parish in IHD71, which allows IHD69 and

IHD101 to both be majority-Black. *Id.* at 94.  But this again gives IHD71 an odd shape inconsistent

with traditional redistricting principles:

Figure 39: **BVAP of Precincts In and Around Cooper Illustrative HD-71.** The district starts in Livingston Parish and then reaches under HD-69 and HD-101 into Baton Rouge to prevent several heavily White precincts from being joined to either HD-69 or HD-101.  This figure is from Daves Redistricting: https://davesredistricting.org/join/fa47d389-42de-49ac-9c57-cc2434249cc2



*Id.* at 101.

144.    Finally, Dr. Barber looked at the Iberville, Ascension, St. James and Assumption

Parishes Region in the House. *Id.* at 102.  In this region, there are four state House districts and

the BVAP is 29.9%. *Id.* In the 2022 House Plan, one of the four districts is majority BVAP (25%).

The Illustrative House Plan has two majority-Black districts in this region (50%). *Id.*

ii.     **Illustrative Senate Plan.**

145.     Dr. Barber also analyzed various regions in the Senate.

146.     Dr. Barber again begins by analyzing the Shreveport region comprised of Caddo and Bossier Parishes. SOSX1 at 32. The overall BVAP in this region is 39.1%. *Id*. There are three Senate districts in this region in the 2022 Senate Plan, one of which is majority-Black (33.33%). *Id*. In the Illustrative Senate Plan, however, two of the three districts are majority-Black (66.66%). *Id*. at 33.

147.     To create a second majority-Black district, ISD38 must avoid majority-White areas of both cities that span the Red River, and, therefore, it takes on a "C" shape to avoid the areas of southeastern Shreveport as shown below:

Figure 8: **Shreveport Region - Cooper Illustrative Senate District 38** - Precincts are labeled and shaded by their BVAP percentage. To remain a majority BVAP district, SD-38 winds around SD-36 to avoid a cluster of precincts that have a lower BVAP.



Note: This map was produced from Dave's Redistricting at the following link: https://davesredistricting.org/join/fdcf5b8e-7661-4390-9060-264b6e44ce37

*Id*. at 33, 39.

148.    Next, Dr. Barber examines the Jefferson and St. Charles Region comprised of five Senate districts. *Id.* at 40.  The 2022 Senate Plan creates one majority-Black district in this area (20%), whereas the Illustrative Senate Plan creates two (40%). *Id.*

149.    In order to generate a second majority-Black district, the Illustrative Senate Plan must deviate from traditional redistricting principles, and cross the Mississippi River to take on heavily Black portions of Kenner, Metairie, and River Ridge. *Id.* at 41. In the Illustrative Senate Plan, no parish is kept whole in this area. *Id.*

150.    Dr. Barber finally examines the Baton Rouge region comprised of ten different parishes and eight Senate districts. *Id.* at 47. The BVAP in this region is 34.3%. *Id.* The 2022 Senate Plan creates three majority-BVAP districts in this region (37.5%). *Id.* The Illustrative Senate Plan, however, creates four (50%). *Id.* at 48.

151.    ISD17 takes a substantial portion of northern Baton Rouge and pulls nearly half of the district's population from East Baton Rouge Parish and joins them with people living in Pointe Coupee, Iberville, and West Baton Rouge Parishes. *Id.*

152.    The Illustrative Senate Plan divides East Baton Rouge Parish into six different Senate districts. *Id.* at 49. In order to make ISD17 a majority-BVAP district, it must extend further into East Baton Rouge Parish and into the City of Baton Rouge to take on a larger Black population. *Id.*

**H.    Dr. Johnson and Dr. Murray demonstrate that Mr. Cooper's predominant purpose when drawing the Illustrative Plans was race.**

**i.    Dr. Douglas Johnson.**

153.    Legislative Defendants offered the expert testimony of Dr. Douglas Johnson. LDTX51.

154.    Dr. Johnson is the President of National Demographics Corporation. He has an undergraduate degree in Government from Claremont McKenna College, a graduate degree in Management from UCLA, and a Ph.D. in Political Science from Claremont Graduate University. LDTX59 at 1.

155.    He has consulted on over 400 redistricting projects across the country. *Id.* at ¶¶ 1–7; LDTX51 at ¶ 24.

156.    He has written numerous articles on redistricting and map drawing. LDTX59 at 1.

157.    Dr. Johnson has served as an expert in around 10 redistricting cases previously. Doc. 150-9 at 17:12-24. He has testified in numerous redistricting trials. *Id.* at 20:12-16. He has drawn "thousands" of maps in the redistricting context, *id.* at 27:14-17, including ones involving the Voting Rights Act. *Id.* at 27:21-23.

158.    Dr. Johnson demonstrates that Mr. Cooper's Illustrative Plans were in fact not driven by the traditional redistricting criteria Mr. Cooper stated, but with the sole desire to maximize the number of majority-Black districts.

159.    Dr. Johnson is qualified as an expert in political science, political geography and redistricting.

160.    In the House, Dr. Johnson demonstrated that Mr. Cooper created a new majority-Black district in the northwest part of the State by precisely dividing the Black population of Shreveport without any reference to compactness, major roads, communities, neighborhoods, or clear visible features. LDTX51 at ¶ 72.  The below map reflects how Shreveport was split with no explanation except race:



LDTX51 at ¶ 72, Fig. 19.

161.    Mr. Cooper admitted, consistent with Dr. Johnson's analysis, that he took IHD1 into Shreveport to pick up Black population to create another majority-Black district.

162.    In Natchitoches, Mr. Cooper's HD23 wanders across city and community boundaries, ignoring freeways and other roads to pick up enough Black population to maintain a majority-Black district here. *Id.* at ¶ 73.



*Id.* at ¶ 73, Fig. 20.

163.    In Lake Charles, Mr. Cooper carefully carved around the Black population in Westlake, and sweeps south to pull in a few majority-Black census blocks, ignoring city borders, freeways, communities, and even socio-economic data, in order to create two majority-Black districts that are just over 50% at 50.8% and 50.3% respectively. *Id.* at ¶ 74.



*Id.* at ¶ 74, Fig. 21.

164.    Mr. Cooper admitted, consistent with Dr. Johnson's findings, that he split the Black population in Lake Charles to create a second majority-Black district.

165.    In Baton Rouge, Dr. Johnson demonstrated that Mr. Cooper used a pinwheel arrangement to maximize the number of majority-Black districts that could be drawn. *Id.* at ¶ 75.



*Id.* at 76, Fig. 22.

166.     A prime example is the City of Central, which is just two-thirds the size of a House district and need not be split. The 2022 House Plan leaves it intact, but Mr. Cooper divides it into three difference House districts to spread out the Black population. *Id.* at ¶ 76.  There is no explanation for this other than race.

167.     Mr. Cooper admitted that he had to lower the BVAP in many districts in the Baton Rouge area to create an additional majority-Black district.

168.     Indeed, Mr. Cooper creates a new majority-Black district by eliminating one that existed in the 2022 House Plan. He creates four new majority-Black districts but dismantles an existing one (enacted HD62). PX89 at ¶ 36.

169.    In the Senate, Dr. Johnson likewise demonstrated that Mr. Cooper created a new majority-Black district in the northwest (ISD38) by dividing the Black population in Shreveport without any reference to major roads, communities, neighborhoods or clear visible features. LDTX51 at ¶ 69.



*Id.* at ¶ 69, Fig. 16.

170.    Similarly, Mr. Cooper carved the southern portion of Iberville Parish out of ISD17 with no explanation that can be explained by traditional redistricting principles. *Id.* at ¶ 70.



*Id.* at ¶ 70, Fig. 17.

171.    Again, Mr. Cooper admitted that the reasoning behind his changes was a desire to draw an additional majority-Black district due to the increase in Black population in this area.

172.    Finally, in ISD19 in the New Orleans area, Mr. Cooper used the Mississippi River as the boundary, except where he needed to cross the river to pick up additional concentrations of Black population to create his new majority-Black district. LDTX51 at ¶ 71.



*Id.* at ¶ 71, Fig. 18.

173.    Mr. Cooper admitted that his manner of redrawing lines in New Orleans for his Illustrative Senate Plan was to create another majority-Black district.

174.    Dr. Johnson further demonstrated that Mr. Cooper's Illustrative Plans were driven at reaching implicit racial targets of just barely over 50% BVAP, which executed on a plan to divide the Black population in urban areas to achieve his goal of maximizing the number of majority-Black districts. LDTX51 at ¶ 75.

175.    Indeed, 10 of his 35 majority-Black districts in the Illustrative House Plan are between 50 and 53% BVAP. PX66.

176.    And 9 of his 14 majority-Black districts in the Illustrative Senate Plan are between 50 and 53% BVAP. PX47.

177.    In addition, there are 8 districts in the Illustrative House Plan between 50.03% and 50.9% - IHD5, IHD23, IHD34, IHD38, IHD61, IHD69, IHD72, and IHD101. PX66.  All but one

are in areas where Mr. Cooper creates new majority-Black districts. That does not happen by accident.

178.    In addition, there are seven state House districts in the 2022 House Plan that were already majority-Black and were reduced to a BVAP between 50% and 53% in the Illustrative House Plan:

| % AP Black VAP | | | |
|---|---|---|---|
| HD | 2022 | IHD | Change |
| 67 | 51.9% | 51.6% | -0.3% |
| 23 | 50.9% | 50.6% | -0.3% |
| 72 | 52.7% | 50.6% | -2.1% |
| 58 | 56.8% | 51.3% | -5.5% |
| 101 | 60.2% | 50.8% | -9.5% |
| 34 | 72.6% | 50.0% | -22.5% |
| 61 | 75.3% | 50.2% | -25.1% |

LDTX51 at ¶ 82, Fig. 25.

179.    Dr. Johnson demonstrated with the below charts just how many majority-Black districts Mr. Cooper draws right near the 50% BVAP threshold in both the Illustrative House and Senate Plans:





LDTX51 at ¶¶ 91, 93 Fig. 27, 29.

180.    Thus, Dr. Johnson aptly demonstrates that Mr. Cooper's predominant intent in drawing the Illustrative Plans was race.

### ii.    Dr. Alan Murray

181.    Legislative Defendants offer the expert opinions of Dr. Alan Murray.

182.    Dr. Murray is an expert in spatial analytics with 30+ years of experience. LDTX42 at 1.  He is a professor in the Department of Geography at the University of California Santa Barbara with previous appointments at Ohio State University, Arizona State University, and Drexel University. *Id*. He has a Bachelor of Science in Mathematics, a Master's in Statistics and Applied Probability, and a Ph.D. in Geography from the UCSB. *Id*. He has authored three books and over 300 articles or book chapters and has received numerous awards. *Id*.

183.    Dr. Murray has served as an expert in several other cases including *Robinson, et al. v. Ardoin*, M.D. La. No. 3:22-cv-0211-SDD-SDJ and *Galmon, et al. v. Ardoin*, M.D. La. No. 3:22-cv-00214-SDD-SDJ. *Id*. at 66.

184.    Dr. Murray is qualified as an expert in geography, spatial analytics, and statistics.

185.    Dr. Murray first showed that Mr. Cooper reduced the BVAP in many existing majority-Black districts in the 2022 House Plan in order to achieve his goal of creating additional majority-Black districts.  Dr. Murray examined the BVAP of the districts that are neighboring majority-Black districts in Mr. Cooper's Illustrative House Plan:

**Figure 20: Summary of BVAP for Illustrative House District 1**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 2 | 67.4% | 2 | 67.34% |
| 4 | 72.1% | 4 | 57.53% |
| 3 | 73.9% | 3 | 58.85% |

**Figure 21: Summary of BVAP for Illustrative House District 23**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 3 | 73.9% | 3 | 58.85% |

**Figure 22: Summary of BVAP for Illustrative House District 38**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 34 | 72.6% | 34 | 50.03% |

**Figure 23: Summary of BVAP for Illustrative House District 60**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 29 | 73.6% | 29 | 57.77% |
| 67 | 51.9% | 67 | 51.58% |
| 58 | 56.8% | 58 | 51.27% |

**Figure 24: Summary of BVAP for Illustrative House District 65**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 63 | 6977.0% | 63 | 57.20% |
| 62 | 55.1% | 62 | 26.83% |
| 101 | 60.2% | 101 | 50.75% |
| 61 | 75.3% | 61 | 50.2% |
| 29 | 73.6% | 29 | 57.77% |
| 67 | 51.9% | 67 | 51.58% |

**Figure 25: Summary of BVAP for Illustrative House District 68**

| 2022 House (Enrolled) | | Illustrative House | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 29 | 73.6% | 29 | 57.77% |
| 61 | 75.3% | 61 | 50.2% |
| 62 | 55.1% | 62 | 26.83% |
| 101 | 60.2% | 101 | 50.75% |
| 67 | 51.9% | 67 | 51.58% |
| 63 | 69.7% | 63 | 57.20% |

LDTX42 at ¶ 25, Fig. 20-25.

186. The same is true in the Senate where neighboring majority-Black districts had their BVAP significantly reduced to create additional majority-Black districts:

**Figure 12: Summary of BVAP for Illustrative Senate District 17**

| 2022 Senate (Enrolled) | | Illustrative Senate | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 15 | 73.90% | 15 | 54.45% |
| 2 | 57.70% | 2 | 51.73% |
| 14 | 58.00% | 14 | 58.08% |

**Figure 13: Summary of BVAP for Illustrative Senate District 19**

| 2022 Senate (Enrolled) | | Illustrative Senate | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 5 | 50.20% | 5 | 51.80% |
| 7 | 59.50% | 7 | 52.29% |
| 3* | 57.30% | 3 | 51.3% |

**Figure 14: Summary of BVAP for Illustrative Senate District 38**

| 2022 Senate (Enrolled) | | Illustrative Senate | |
|---|---|---|---|
| District ID | % BVAP | District ID | %BVAP |
| 39 | 63.70% | 39 | 52.46% |

LDTX42 at ¶ 19, Fig. 12.

187.   Dr. Murray also demonstrated the precision with which Mr. Cooper carved up neighborhoods to draw his nine additional majority-Black districts.

58

188.    Dr. Murray did so by examining homogeneous neighborhoods through analysis of census block groups. LDTX42 ¶ 27.

189.    He identified homogeneous Black groups through use of basic characteristics of income, education and racial composition from the 2021 ACS Census information. *Id*. Dr. Murray then analyzed how often Mr. Cooper's Illustrative Plans split these "neighborhoods." *Id.*

190.    Dr. Murray provides a sample of 27 "neighborhoods" that were split by Mr. Cooper's Illustrative Plans in the Senate, many of which are in the areas where he draws new majority-Black districts. LDTX42 at ¶ 28, Fig. 30.

191.    For example, Dr. Murray showed how Mr. Cooper carved around the Black population in the Harvey area of New Orleans:



LDTX42 at 22, Fig. 31b. Dr. Murray provided other similar examples in his report. *Id*. at 21–25.

192.    Dr. Murray also provided a sample of 29 "neighborhoods" that were split by Mr. Cooper's Illustrative Plans in the House. LDTX42 at ¶ 29, Fig. 34.

193.    His small sample demonstrates 11 neighborhood splits in the Shreveport area including 7 involving IHD1 – a new majority-Black district in Mr. Cooper's Illustrative House Plan. *Id*.

194.    The below example shows how Mr. Cooper carved up the Black population in Shreveport with precision to create an additional majority-Black district:



LDTX42 at 27-28, Fig. 35b. Dr. Murray provided other similar examples in his report. *Id*. at 27-31.

195.    His sample also reflects two splits between IHD34 and IHD38 in Lake Charles – where Mr. Cooper against divides the Black population to create two majority-Black districts. *Id*.

196.    In just this small sample, Dr. Murray also identifies 12 neighborhood splits in the Baton Rouge area, including at least four involving IHD65. *Id*.

197.    Thus, Dr. Murray concluded that race predominated over communities of interest in the drawing of Mr. Cooper's Illustrative Plans in order to achieve majority-BVAP in certain districts. LDTX42 at 32.

**IV.    Voting Patterns.**

    **A.    Dr. Handley attempts to show minority cohesion and legally significant White bloc voting.**

198.    Plaintiffs retained Dr. Handley to analyze "voting patterns by race" to lay "the foundation of two of the three elements of the 'results test' as outlined in *Thornburg v. Gingles*: a racial bloc voting analysis . . . to determine whether the minority group is politically cohesive; and . . . to determine if whites are voting sufficiently as a bloc to usually defeat the candidates preferred by minority voters." PX1 at 2–3.

199.    Dr. Handley is the only expert witness offered by Plaintiffs to opine on *Gingles* preconditions II and III.

200.    As a preliminary matter, Dr. Handley and Plaintiffs complained of the lack of endogenous elections needed to perform a district-specific analysis, considering the most pertinent general election in the challenged legislative districts had not occurred at the time she conducted her analysis. PX1 at 12; Doc. 162 at 19 ("Dr. Handley was facing sparse data because, at the time she did her analysis and wrote her report, no state legislative elections with the new adopted districts had yet taken place for her to analyze."), 20 ("Courts have consistently held that endogenous elections, as elections for the same office within the same area, are more probative

than exogenous elections." (citing *Magnolia Bar Ass'n v. Lee*, 994 F.2d 11432, 1149 (5th Cir. 1993), cert. denied, 510 U.S. 994 (1993)). Due to the scheduling order in this matter, Doc. 110, no parties could consider the potentially outcome-determinative 2023 legislative election results. The schedule in this case also prevented many defense experts, like Dr. Tumulesh Solanky, from conducting complete analyses given Plaintiffs' experts material changes to their 2022 expert reports and the mere 10 days between Plaintiffs' Reply expert reports and Defendants' Surrebuttal expert reports being due.  *See* Doc. 110; SOSX2 at 4; SOSX5 at ¶ 16.

201.    Dr. Handley did not analyze specific districts.

202.    Instead, Dr. Handley analyzed seven geographic "areas of interest" in the state based on the location of Mr. Cooper's Illustrative Plans. PX1 at 7. She conducted her analysis using three statistical techniques: homogenous precinct, ecological regression, and three versions of ecological inference RxC ("EI RxC"). *Id.* at 4–5. Experts generally agree that EI RxC is the only measure of value modernly and it is the typical statistical method used by others in the field.

203.    Dr. Handley did not include in her "areas of interest" other areas in Mr. Cooper's illustrative maps that "generally encompass areas within majority-Black districts under the 2022 [] illustrative majority-Black districts." PX20 at 29, 43. This means Dr. Handley studied only the areas with additional majority-Black districts created by Mr. Cooper, not areas with existing majority-Black districts that Mr. Cooper also re-drew.

204.    Using only elections with at least one Black candidate, Dr. Handley concluded that voting was racially polarized in her seven areas of interest because the minority group is politically cohesive and the White voting bloc defeats the Black voters' candidate of choice in the sixteen statewide elections Dr. Handley analyzed. PX1 at 2. However, various flaws in Dr. Handley's

analysis artificially inflate her polarization numbers across and render the entirety of her reports and testimony unreliable.

**B.    Dr. Handley's estimates are unreliable.**

205.    Before conducting her racial bloc voting ("RPV") analyses, Dr. Handley had to first create a database "that combines election results with demographic information[.]"  PX1 at 5.

206.    To create the database, demographic data was obtained from the 2020 census and election returns were pulled "from the Secretary of State website or from OpenElections." *Id.* Precinct-level shapefiles were pulled from the Secretary of State website or from the Voting and Election Science Team (VEST) website. *Id.* at 6. Dr. Handley could not articulate which election data points came from which sources. Doc. 148-2 at 13:31–17:1.

207.    Dr. Handley admitted that the "data analytics department at [the] ACLU" assisted with aggregating all of the data sources together to form her database. Doc. 148-2 at 18:8–:10. None of these individuals have been tendered as experts in this matter. In fact, Dr. Handley could not name the specific persons in the ACLU analytics department who helped her compile the database and their identities remain largely unknown. *Id.* at 19:16–20:18.

208.    Because the Louisiana Secretary of State website only reports candidate-specific early and absentee votes at the parish-wide level, Dr. Handley had to disaggregate the data down to the precinct level to perform her RPV analysis. PX1 at 6. To do this, Dr. Handley used an allocation method to assign the early and absentee votes to particular precincts within a parish "proportionally based on the votes received by each of the candidates on Election Day" in each area she studied. *Id.*; Doc. 148-2 Handley Depo. Tr. 161:9-162:3. However, unlike other scholars who have used a similar allocation method to match votes to precincts, Dr. Handley's method did

not cap the number of early or absentee votes assigned to each precinct by the total number of voters who turned out in a particular election. *See id.*

209.    Defendant Ardoin retained Dr. Tumulesh Solanky, a Ph.D. mathematician and statistician with over thirty years of experience, to study voting patterns in Louisiana and assess Dr. Handley's work on Mr. Cooper's illustrative districts. SOSX2 at 3.

210.    Dr. Solanky has a Ph.D. in statistics from the University of Connecticut, and has over 30 years' experience teaching undergraduate and graduate courses in statistics and mathematics. *Id.* Dr. Solanky is currently a professor and chair of the mathematics department at the University of New Orleans (UNO). *Id.*

211.    Dr. Solanky has many peer-reviewed published works in mathematics and statistics, and has presented his research at over 50 national and international conferences to his peers. *Id.*

212.    Dr. Solanky has served as an expert in approximately 40 cases, and testified in over ten, many of those on behalf of the state and federal governments. *Id.* at 32–36.

213.    Dr. Solanky showed that Dr. Handley's allocation method created impossible results where the total votes allocated to certain candidates were significantly overestimated in some precincts while significantly underestimated in others. *Id.* at 13; SOSX5 at ¶¶ 6–15. By failing to cap the votes allocated to precincts to the actual voter turnout, the underlying database Dr. Handley used to run her RPV analysis was biased. SOSX5 at ¶¶ 6–15.

214.    Indeed, Dr. Solanky opined that a reliable EI RxC analysis of voting patterns by race would need the total votes of candidates and the total turnout by race to be equal. *See* SOSX5 at ¶ 8, Remark 2, n. 12. Dr. Handley's allocation method did not, resulting in biased estimates for her racial bloc voting analysis. *See id.*

215.    Moreover, Dr. Solanky found that deflation of votes in other precincts, caused by her over allocation in others, can create as much bias as the surplus/inflation of votes. *See id.* at ¶ 8, Remark 4.

216.    The misallocation of candidate vote shares to precincts spans Dr. Handley's entire underlying database upon which she then runs her statistical analyses. Doc. 148-3 at 13:9–14:2, 161:9-:21.

217.    Dr. Handley testified that she examined the potential bias in her allocation method and was confident that it did not impact her analysis, and any issues were limited solely to the November 2020 presidential election. Doc. 148-3 at 179:8–180:7. Dr. Handley also produced a supplemental rebuttal report after her deposition where she contends that her allocation method did not introduce bias into her analysis. PX16. Dr. Solanky's reports and testimony show otherwise.

218.    In Dr. Solanky's supplemental report, he further explains in detail how Dr. Handley's methodology "neglects to cap the number of early or absentee voters per precinct" and thus "the allocations to [the] remainder of the precincts is also wrong, but not mathematically impossible." SOSX39 at ¶ 6.

219.    Dr. Solanky analyzed Dr. Handley's own spreadsheets to determine how her misallocation created impossible and otherwise biased estimates in her seven "areas of interest" for three elections: (1) the October 2019 Attorney General election, (2) the November 2019 Secretary of State election; and (3) the November 2020 Presidential election. *Id.* at ¶¶ 7-8.

220.    By failing to cap the number of early and absentee votes per precinct, Dr. Handley's method markedly over-assigned a large number of votes to the Democratic candidate in precincts

that had higher Black voter turnout, and over-assigned a large number of votes to the Republican candidate in precincts that had higher White voter turnout. *Id.* at ¶¶ 9–11.

221. Dr. Solanky also found the inverse to be true, whereby Dr. Handley under-assigned votes to the Democratic candidate in precincts that had lower Black voter turnout, and under-assigned votes to the Republican candidate in precincts that had lower White voter turnout. *Id.*

222. For example, for the 2019 Attorney General elections, Dr. Solanky determined that in Dr. Handley's first "area of interest" (Bossier, Caddo Parishes) the biased allocation created the following results:

**APPENDIX 2.7.1**

**HANDLEY'S AREA OF INTEREST 1: PERCENTAGE OF BLACK/WHITE VOTERS
(2019 ATTORNEY GENERAL ELECTIONS)**

Depiction of Handley's Biased Allocation of Early Votes to Jackson





Depiction of Handley's Biased Allocation of Early Votes to Landry





66

PX39 at Appendix 2.7.1. As shown above, when assigning early and absentee votes to the Democratic candidate in Dr. Handley's Area of Interest 1, Dr. Handley's allocation method systematically over-assigned the number of votes to the Democratic candidate in 83.5% of the precincts that had higher Black voter turnout numbers on election day within the geographic area. Conversely, Dr. Handley's allocation method systematically over-assigned the number of votes to the Republican candidate in 82.8% of the precincts that had higher White voter turnout within Area of Interest 1. By assigning more Democratic votes to Black precincts and more Republican votes to White precincts, Dr. Handley's allocation method leads to artificial polarization estimates. *Id.* at ¶¶ 9–11.

223.    As shown by Dr. Handley's Appendix A in her Supplemental Rebuttal Report, PX17, between 20.7% and 45.5% of all votes cast during the elections that Dr. Handley studied voted early. *See also* SOSX2 at 13.

224.    Given the expedited nature of the schedule in this case, Dr. Solanky had limited time to fully determine the scope of Dr. Handley's bias. *Id.* at 4, SOSX5 at ¶ 16.

225.    But Dr. Handley testified that she knew about this issue all along and had ample time to fix it. Doc. 148-3 at 176:1–:12, 179:8–180:7. She did not.

**C.    Dr. Handley's assumption that nearly all voters across an entire parish vote in the same manner leads to misleading conclusions on voter polarization.**

226.    Dr. Solanky also analyzed voting patterns by race in twelve statewide elections using statistical methodology, EI RxC modeling, for several parishes where Mr. Cooper created illustrative majority-Black districts. SOSX2 at 11–17. Eight of the twelve elections overlapped with Dr. Handley's choice of elections. *Id.* at 13. Dr. Solanky chose his other four elections based on (1) higher turnout rates, (2) to diversify his sample by including a few elections with no Black candidates, and (3) whether the election had easily-assignable data, meaning there were fewer

candidates in the "other" category, due to time constraints. Doc. 150-15 at 83:17–91:23. Though Dr. Solanky disagreed with Dr. Handley's allocation method, he used it "in order to verify the EI results presented in Dr. Handley's report." SOSX2 at 13.

227.    Dr. Solanky's analysis showed great variation amongst parishes for White voters voting for the Republican candidate, as depicted below:

Figure 7: White Voters Voting Republican in Louisiana and Selected Parishes in 12 Statewide Elections



*Id.* at 16.

228.    Dr. Solanky further concluded that White voters in East Baton Rouge and West Baton Rouge Parishes "seem to vote significantly more for the democratic candidates." *Id.* at 16–17.

229.    Dr. Solanky's analysis also showed great variation amongst parishes for Black voters voting for a Republican candidate. *Id.* at 14–15. Specifically, three parishes had a

"significantly larger percent of black voters voting for a republican candidate[:] East Baton Rouge, West Baton Rouge, and East Carroll Parishes" as shown below:



Figure 5: Black Voting Republican in Louisiana and Selected Parishes in 12 Statewide Elections

*Id.* at 14–15.

230.    Thus, when analyzing potential voter polarization in "areas of interest"—most of which span several parishes—Dr. Handley's assumption led to misleading conclusions.

231.    To investigate these trends further, Dr. Solanky analyzed the "potential impact of urbanization on how white and black voters vote" by looking at precincts within certain parishes that are part of Mr. Cooper's illustrative districts. *Id.* at 17–18. Dr. Solanky again used EI RxC modeling, but this time by VTD densities to determine the impact of the rural/urban divide. *Id.* at 17–28.

232.    Dr. Solanky further concluded that Dr. Handley's "parish-wide equitable distribution analysis where she assumes all absentee and early voters are homogenous" was flawed

because voting patterns varied "significantly based on precinct location" which, in parishes like Caddo that contain multiple districts, "can impact the performance of the districts." *Id.* at 19–20.

      **D.**    **Dr. Handley failed to perform a district-specific functional analysis.**

233.    The only district-specific information reported by Dr. Handley classifies districts as either "effective" or not, without opining as to the level of BVAP needed to be effective.

234.    This analysis has limited value because it does not inform the court whether a majority-Black district is actually necessary in order for the Black-preferred candidate to be elected.

235.    Dr. Handley conceded that she did not conduct any district-specific analysis with the exact boundaries of the 2022 Enacted Plans because "no state legislative elections have occurred since the new districts were adopted[.]" PX1 at 12.

236.    Moreover Dr. Handley has made no attempt to account for how her faulty allocation method would impact a district-specific RPV analysis, or even her own effectiveness scores, especially in populous parishes with more than one legislative district.

      **E.**    **A functional analysis shows that additional majority-Black districts are not needed in the "areas of interest" due to sufficient White crossover voting.**

237.    Dr. Jeffrey B. Lewis was retained by Legislative Defendants to analyze and estimate "the degree of Black voter cohesion and white crossover" voting included in Dr. Handley's clusters.  LDTX52 at 3. To do so, Dr. Lewis used ecological inference, analyzing elections between 2015 and 2021 and considering "how each contest would have turned out if only the votes of those residing in each enacted and illustrative state House and State Senate had participated." LDTX52 at 3. Dr. Lewis is a Professor at UCLA, where he has been employed since 2001. LDTX52 at 1. At UCLA Dr. Lewis primarily studies quantitative political methodology and

70

has numerous peer reviewed publications on this topic. *Id.* Dr. Lewis has previously been retained as an expert and testified in 10 cases. *Id.*

238.    Dr. Lewis concluded *inter alia* that White crossover voting was high in the challenged districts, ranging from 18% to 27% on average in two-candidate election contests. LDTX54 at 3.

239.    White crossover voting was also higher in more urban districts than less urban districts. LDTX52 at 7. Thus, "the estimated BVAP required to elect Black-preferred candidates is estimated to be lower in more urban districts." *Id.*

240.    Dr. Lewis concluded that in specific illustrative districts drawn by Mr. Cooper, less than 50% BVAP is actually necessary for a 50% win rate. LDTX52 at 4–5, Table 2. For example, in IHD68, which has a 54% BVAP, Dr. Lewis estimates that only 42% BVAP is needed for an equal opportunity to elect the Black-preferred candidate of choice. *Id.* at Table 2. At the current BVAP in IHD68, the Black-preferred candidate of choice would win 90% of the time. *Id.*

241.    In some instances, like in IHD38, there was more BVAP in the illustrative district than needed for the Black-preferred candidate of choice to win 100% of the time. *Id.*

242.    The same trends are seen in Mr. Cooper's Illustrative Senate Plan. *Id.* For example, in ISD19, which has a BVAP of 51%, only 32% BVAP is needed for an equal opportunity to elect the Black-preferred candidate of choice, and only 44% BVAP is needed to elect the Black-preferred candidate 100% of the time. *Id.*

243.    In what Dr. Handley calls "Senate Cluster 1," ISD36, ISD38, and ISD39 would all perform at less than 40% BVAP. *See* LDTX52 at Table 1, B-6; *see also* LDTX54 at 7–8. The four illustrative districts in Dr. Handley's "Senate Cluster 2," PX1 at 19, would all perform at BVAP levels between 25% and 41%, LDTX52 at Table 1,B-6; *see also* LDTX54 at 7–8. Similarly, in

"Senate Cluster 3," ISD14, ISD15, and ISD16 would perform at BVAPs below 36%. LDTX52, Table 1, B-6; *see also* LDTX54 at 7. None of these metrics merit redrawing the 2022 Senate Plan to create new majority-Black districts.

244.    The same pattern is seen in the Illustrative House Plan, with "House Cluster 1" performing at BVAPs between 32% and 42% and "House Cluster 2" performing between 14% and 36%. LDTX52 at Table 1, B-2; *see also* LDTX54 at 7. While one district in House Cluster 2, IHD36, would require a 51% BVAP to perform, Plaintiffs admit this region already contains one performing majority-Black district, PX1 at 25. In "House Cluster 3," PX1 at 27, all districts except one (IHD6) would perform at under 50% BVAP, LDTX52 at Table 1, B-2, and there are currently three performing districts, PX1 at 27. In "House Cluster 4," PX1 at 29, IHD60 and IHD88 would perform with respective BVAPs of 19% and 42%, LDTX52 at Table 1, B-3, and while IHD59 requires slightly above 50% BVAP to perform, there is one district affording about an equal opportunity in this cluster now, PX1 at 29. Lastly, in "House Cluster 5," PX1 at 31, all districts in the Illustrative House Plan would perform with BVAPs below 50%, LDTX52 at Table 1, B-3. None of these metrics merit redrawing the 2022 House Plan to create new majority-Black districts.

**F. At most Dr. Handley shows partisan polarization and not racial polarization.**

245.    Legislative Defendants offered the expert testimony of Dr. John R. Alford. LDTX53.

246.    Dr. Alford is a tenured professor at Rice University who has 35-years' experience teaching courses in redistricting, elections, political representation, voting behavior and statistical methods at both the graduate and undergraduate level. LDTX53 at 2. He has published in numerous academic journals including *American Journal of Political Science*, *Journal of Politics*, *Science*, *Annual Review of Political Science*, *Legislative Studies Quarterly*, *Annals of the American*

*Academy of Political and Social Science*, *Political Psychology*, and *Political Research Quarterly*. *Id*.

247.    Over the last 35 years, he has worked with numerous local governments on districting plans and Voting Rights Act issues and has provided expert reports and/or testified in voting rights and statistical issues in  variety of cases in at least 13 different states. *Id*.

248.    Dr. Alford is qualified as an expert in statistical methods, voting behavior, and elections.

249.    Dr. Alford reviewed the expert reports of Dr. Handley. Dr. Alford was able to replicate the results of Dr. Handley's racially polarized voting analysis with only slight variation. *Id*. at 6.

250.    Dr. Alford reviewed the voting results in Louisiana over the past three presidential elections. *Id*. at 7.  He concluded that "Black and White voters do appear to offer very different levels of support to Democratic and Republican candidates, but there is virtually no difference in the levels of support when we turn the focus to the mix of Black and White candidates in these two-party contested presidential elections." *Id*. at 8. In other words, the predominate factor causing the polarization in these elections was party and not race.

251.    Dr. Alford also examined the elections utilized by Dr. Handley for her RPV analysis. LDTX53 at 8. He concluded, based upon Dr. Handley's analysis, that "Black voters tend to provide cohesive support to Democratic candidates, often in the 80 to 90 percent range, and that White voters in turn support Republican candidates, with White votes for the Republican candidates typically in the 80 to 90 percent range." *Id*. at 10. However, he concluded that when there were multiple Black Democratic candidates, the Black vote was divided. *Id*. at 10-11. In these contests, the Black vote was not cohesive. *Id*.

252.    Dr. Alford also analyzed additional statewide races not considered by Dr. Handley, including the 2019 races for Governor, Insurance Commissioner, Agricultural Commission, and the Governor runoff, and the 2015 races for Governor, Treasurer, Insurance Commission, Agricultural Commission, and the Governor and Attorney General runoffs. *Id*. at 11. Dr. Alford demonstrated that Black voters tend to support Democratic candidates and White voters tend to support Republican candidates and that these support levels remain relatively constant regardless of the race of candidates involved. *Id.* at 9–13.

253.    The sole contests that arguably vary from that trend involve John Bel Edwards, but he has taken "some notable conservative positions on high-profile issues including abortion and gun control" that attract meaningful crossover voting from Republicans, *id.* at 12 n. 5, and these contests have a key factor disproving Plaintiffs' assertions of racial polarization: Black Democratic candidates were on the ballot in October 2015 and October 2019 and received almost no Black support both times. *Id.* at 13. This is additional evidence that partisan, not racial, considerations are driving voting choices.

254.    This analysis again showed that Black voters provide highly cohesive support to their preferred Democratic candidates. *Id*. at 12.

255.    Overall, Dr. Alford concluded that the "high cohesion demonstrated by Black voters in these elections is not a function of Black voters coalescing around Black candidates, but rather is a function of Black voter preferences for Democratic party candidates." *Id*. at 17.

256.    In other words, Dr. Alford concludes that it is party and not race that is driving any Black voter cohesion seen by Dr. Handley. This conclusion is credible and supported by the evidence.

**V.      Circumstances bearing on vote dilution.**

257.    Plaintiffs offer no evidence to show that Black residents have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. Rather the evidence under the totality of the circumstances clearly shows that Black residents of Louisiana have at least an equal opportunity to participate in the political process and to elect a candidate of their choice.

258.    At the outset, Black registered voters make up not only the majority of registered Democrats in the state of Louisiana, but also a majority of Democrats voting in elections including statewide contests over the last decade. *See* SOSX5 at 8, 10. For example, in 1990 the Black registered voters made up 32.6% of all registered Democrats in the state of Louisiana. SOSX11. In 2000, the Black registered vote share of all registered Democrats was at 40%, and in 2010, the number of registered Black Democrats surpassed the number of White registered democrats statewide, representing approximately 48.6% of all registered Democrats. SOSX28, SOSX2.

259.    This has a natural impact, translating into numerous Black candidates in statewide elections. For example, Dr. Handley analyzed sixteen "recent statewide election contests that included Black candidates" for her racially polarized voting analysis in the seven areas of interest. PX1 at 6. These elections include: (1) November 2022 U.S. Senate; (2) November 2020 U.S. President/Vice President; (3) November 2020 U.S. Senate; (4) November 2019 Secretary of State; (5) October 2019 Lieutenant Governor; (6) October 2019 Attorney General; (7) October 2019 Treasurer; (8) October 2019 Secretary of State; (9) December 2018 Secretary of State; (10) November 2018 Secretary of State; (11) November 2017 Treasurer; (12) October 2017 Treasurer; (13) November 2015 Lieutenant Governor; (14) October 2015 Lieutenant Governor; (15) October 2015 Attorney General; and (16) October 2015 Secretary of State. PX1 at 6–7. This means that for

the last two statewide election cycles before 2023, and the corresponding 2018 Secretary of State Special election, there were 14 statewide elections with Black candidates. The touchstone to Section 2 is whether the political process is equally *open* to Black voters, not whether they win their proportion of elections. The fact that Black voters now essentially control one of the two major parties in the state of Louisiana presents a starkly different picture than the burdens facing Black voters in 1982 and showcases the open nature of the political process to Black Louisianans.

260.    Moreover, the number of Black candidates elected to office at all levels has greatly increased over the last nearly 40 years, from winning fewer than 20% of contests in the 1990s to winning close to 30% of contests today, which is roughly proportional to Louisiana's Black population. SOSX7; SOSX1 at 5.

261.    Plaintiffs engaged Dr. Gilpin to examine the *Gingles* Senate Factors. However, Dr. Gilpin only evaluated one out of the nine factors—namely Senate Factor 3. Despite acknowledging that the Louisiana Legislature is the body responsible for redistricting, Dr. Gilpin's report primarily focuses on the acts of other political subdivisions around the state, like School Boards. In fact, Dr. Gilpin is not aware of any court decisions holding that laws adopted by the Legislature on accessibility discriminate against Black residents.

## VI.    Individual Plaintiffs.

262.    The operative complaint lists six individuals as Plaintiffs: Dr. Dorothy Nairne, Jarrett Lofton, Rev. Clee Earnest Lowe, Dr. Alice Washington, Steven Harris, and Alexis Calhoun. *Id.* at ¶¶ 14–25.

263.    Plaintiffs Lofton and Calhoun have since voluntarily dismissed their claims. *See* Doc. 133. The four individuals who remain as Plaintiffs are Dr. Nairne, Rev. Lowe, Dr. Washington, and Mr. Harris (the "Individual Plaintiffs").

264.     Dr. Dorothy Nairne currently resides in enacted HD60 and enacted SD2. Doc. 149-3 at 4. Enacted SD2 is a majority-Black district.

265.     Rev. Lowe currently resides in enacted HD66 and enacted SD16. *Id.* at 51.

266.     Dr. Washington currently resides in enacted HD66 and enacted SD16. *Id.* at 29.

267.     Mr. Harris currently resides in enacted HD25 and enacted SD29. *Id.* at 72.

**VII.     Entity Plaintiffs.**

268.     The operative complaint lists two Entity Plaintiffs, Black Voters Matter Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP"). Amend. Compl., Doc. 14, at ¶¶ 26, 39.

269.     The Entity Plaintiffs are both non-profit corporations. *See* Doc. 149-5 at 21:10–12; 22:21–23:23; 50:2–4; Doc. 149-6 at 12:11–13:7.

**A.     Black Voters Matter Capacity Building Institute.**

270.     Headquartered in Atlanta, Georgia, BVM is a general advocacy organization focusing on the goal of increasing the outreach capacity of other organizations engaged in voter participation and increasing Black voter turnout. Doc. 149-6 at 10:22–11:3; 18:7–25; 25:2–23; 27:3–7. BVM operates in twenty-five states across the country. *Id.* at 18:7–25. BVM maintains an office in Shreveport, Louisiana. *Id.* at 19:22–24; 20:14–19.

271.     BVM does not have individual members. *Id.* at 24:12–15. Instead, BVM works with community "partners," which it defines as organizations who "work with or around increasing voter participation." *Id.* at 11:11–20. BVM estimates that it has approximately 60 partners in Louisiana. *Id.* at 24:16–18.

272.     Partners are entities BVM "support[s]" with financing or assistance "with the planning process" of "partner initiatives." *Id.* at 27:20–23. BVM does not have partners in every parish in Louisiana. *Id.* at 62:7–10.

273.     Not all BVM partners are involved with initiatives relating to redistricting or the redistricting cycle. *Id.* at 26:25–27:14.

274.     BVM claims that, as a result of the redistricting process, it diverted time and funds it might have otherwise used towards funding its partners' non-redistricting purposes and missions. *Id.* at 47:15–48:25. Specifically, BVM points to costs associated with a bus tour it coordinated during the legislative redistricting and related events from before the maps became law. *Id.* at 50:13–52:4.

275.     BVM also claims that the redistricting process has created an "increasing sentiment" amongst communities that their votes do not count, which BVM asserts requires a "nuanced approach" to initiatives and events. *Id.* at 49:1–13.

276.     BVM has continued funding and providing grants for its partners. *Id.* at 57:13–58:2. BVM cannot identify any specific grants or grant applications that did not receive funding as a result of the challenged redistricting plans. *Id.* at 58:3–8.

**B.     Plaintiff Louisiana NAACP.**

277.     The Louisiana NAACP is a volunteer-based 501(c)(4) organization, run by a statewide executive committee. Doc. 149-5 at 21:10–12; 22:21–23:23; 50:2–4. Within Louisiana, there are eight NAACP districts. *Id.* at 23:24–24:3.

278.     The Louisiana NAACP itself does not have individual members, nor does it maintain membership lists. *Id.* at 29:11–15; 37:9–14; 38:16–21. Instead, individual NAACP members belong to their local chapters, or branches, *id.* at 37:11–38:15, which are separate

501(c)(4) organizations, *id.* at 50:9–11, and those local chapters are monitored by the national NAACP, the Louisiana NAACP's parent organization, *id.* at 32:5–7; 20:8–20. There are estimated to be roughly 40 branches of the NAACP in Louisiana. *Id.* at 19:18–23.

279.    The national office of the NAACP is responsible for monitoring which branches and units are deemed out of compliance with any of the organization's standards. *Id.* at 20:8–20. The Louisiana NAACP does not receive lists or rosters of branches or members who are not in good standing, nor does the Louisiana NAACP do anything to independently verify standing status with the national organization. *Id.* at 36:11–37:8.

280.    Membership in an NAACP branch simply requires dues payments. *Id.* at 28:11–16. There are no age or race requirements for membership. *Id.* at 28:11–29:1. One does not need to be a registered voter in order to be a member. *Id.* at 29:2–4; 29:11–30:4. Even "a baby" could join an NAACP branch. *Id.* at 28:19–21.

281.    The Louisiana NAACP does not receive notices when NAACP members pass away, id. at 34:9–21, nor is the organization aware of how—or even if—each branch updates their membership roster when a death occurs, *id.* at 34:21–25.

282.    The current President of the Louisiana NAACP is Mr. Michael McClanahan.

283.    Mr. McClanahan does not know how many senate districts the state of Louisiana has, *id.* at 62:24–63:4, nor does he know how many state House districts Louisiana has, *id.* at 81:12–16.

284.    Mr. McClanahan testified that he does not have a membership list for the Louisiana NAACP, nor did he review or reference any list or roster prior to asserting that the Louisiana NAACP has members in the districts challenged in this lawsuit. *Id.* at 74:6–16; 81:24–82:2; 82:11–15; 82:25–83:21. On November 6, 2023, in Supplemental Discovery disclosures ordered by this

Court, the Louisiana NAACP identified individual members residing only in the following districts: HD1, HD25, HD34, HD60, HD65, HD68, HD101, SD8, SD17, and SD38. *See* Doc. 173-1.

285.    Mr. McClanahan does not know whether branch members have moved since he allegedly became aware of their presence in the specific districts or if the members are registered to vote or are even Black. *Id.* at 84:17–85:14; 89:5–13.

286.    The Louisiana NAACP alleges injury from the challenged redistricting plan based on the expenditures of time and money the organization spent to mobilize members to attend events such as the legislative roadshows and get its members "excited" about more majority-Black districts—which occurred before the plans were enacted. *Id.* at 97:19–99:3. The Louisiana NAACP cites the "emotional[] distress" branch members felt when they allegedly realized that the enacted maps were not going to provide them with the additional majority-Black districts the Louisiana NAACP apparently told them to expect. *Id.* at 99:4–101:24.

287.    The Louisiana NAACP also asserts it felt compelled "to shift" its "action plan" after the legislative maps included fewer majority-Black than it hoped, *id.* at 97:24–98:2, *see also id.* at 98:11–23, choosing "not to spend" in some places and "to double up" in others, *id.* at 103:1–6.

288.    Mr. McClanahan could not identify specific monetary resources diverted because of the challenged plans. *Id.* at 102:15–21; 104:9–21.

**VI.   Defendants.**

289.    Defendant R. Kyle Ardoin, in his official capacity as Secretary of State of Louisiana, is the Chief Election Officer for the State of Louisiana. Louisiana Const. art. 4, sec. 7. Defendant Ardoin is the sole named-defendant in this matter.

290.    Defendant-Intervenors Patrick Page Cortez and Clay Schexnayder, in their respective official capacities as President of the Louisiana Senate and Speaker of the Louisiana House of Representatives, moved to intervene in this matter on April 4, 2022. Doc. 13. The motion was granted on May 17, 2022. Doc. 42. The Louisiana Legislature enacted the challenged state House and state Senate plans, is governed by them, and would be subject to any remedy this Court issues. Doc. 13.

291.    Intervenor-Defendant the State of Louisiana, by and through Louisiana Attorney General Jeff Landry, intervened in this matter on April 13, 2022. Doc. 33. The motion was granted on May 17, 2022. Doc. 42. Many of Plaintiffs' allegations are directly against the State of Louisiana. Doc. 33.

## PROPOSED CONCLUSIONS OF LAW

I.    **This lawsuit.**

1.    This case involves a single cause of action under Section 2 of the Voting Rights Act challenging the Louisiana House and Senate redistricting plans the Legislature enacted in 2022. *See* Amend. Compl., Doc. 14, at 56–58.

2.    Defendants assert that Plaintiffs fail to meet the three *Gingles* requirements.

3.    Defendants assert that finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question because the Voting Rights Act's inherently race-based remedies, as applied to the facts in this matter and at this time, are not justified by present conditions, and are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments to authorize race-based redistricting indefinitely as articulated by Justice Kavanaugh in his concurrence in *Allen v. Milligan*, 599 U.S. 1, 45, 143 S. Ct. 1487, 1519, 216 L. Ed. 2d 60 (2023).

4.      To grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the United States Constitution.

## II.      Plaintiffs lack standing.

5.      "The doctrine of standing" insists "that a litigant 'prove that he has suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision.'" *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (citation omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

6.      In a redistricting case, standing requires—at a minimum—residency in any district challenged as unlawful. "To the extent the plaintiffs' alleged harm is the dilution of their votes, that injury is district specific." *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Accordingly, an individual plaintiff has standing "only with respect to those legislative districts in which they reside." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018); *Gill*, 138 S. Ct. at 1929–30.

7.      "[W]here the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141, 2157 (2023) (SFFA) (citation omitted). Where an organization asserts members' standing, it must "make specific allegations establishing that at least one identified member" would have standing in that member's own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) (*ACORN*).

8.      In this case, there are four individual Plaintiffs: Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris. There are also two entity Plaintiffs: Black Voters Matter Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP"). The Entity Plaintiffs are both non-profit corporations.

### A.      The Entity Plaintiffs lack standing to sue for members.

9.      To establish standing on behalf of members, each Entity Plaintiff "must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *SFFA*, 143 S. Ct. at 2141 (quotation marks omitted). Plaintiffs do not assert associational standing for BVM. Doc. 163 at 12 n.4. Accordingly, an associational standing inquiry is proper only as to the Louisiana NAACP.

10.     The Louisiana NAACP has failed to establish associational standing. The Supreme Court's precedents "have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498 (emphasis added); *see also SFFA*, 143 S. Ct. at 2158 (standing satisfied where "an organization has identified members and represents them in good faith"). During discovery, the Louisiana NAACP refused to disclose any information concerning branch members, and it claims it need not present their "personally identifiable information" to show standing. *See, e.g.*, Doc. 135 at 4. That position is wrong. The Supreme Court has established a "requirement of naming the affected members." *Summers*, 555 U.S. at 498 (emphasis added). The Louisiana NAACP has failed to meet this requirement.

11.    Binding precedent applies this rule in voting cases and cases involving the NAACP. In *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015), a racial-gerrymandering case, the Supreme Court remanded to permit the Alabama Democratic Conference "to file its list of members" to establish standing and for adequate proceedings to permit the other side "to respond." *Id.* at 271. The Conference had shown willingness to prove standing because it "filed just such a list in [the Supreme] Court" and had been denied the opportunity to do so below by an abrupt *sua sponte* dismissal. *Id.* Here, by contrast, the Louisiana NAACP has known for months that Defendants challenge its standing, and it refused to disclose the "list of members" that carried the burden in Alabama Legislative Black Caucus. *Id.* Likewise, in *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233 (5th Cir. 2010), the court rejected the NAACP's assertion of associational standing because "there is no evidence in the record showing that a specific member of the NAACP" was harmed by the challenged zoning ordinance. *Id.* at 237. The same is true here.

12.    Moreover, it is not enough for an organization to identify those members whose standing it asserts. It must also "demonstrate that" they "have standing to sue in their own right." *SFFA*, 143 S. Ct. at 2141. "[T]o demonstrate an injury in fact, a vote dilution plaintiff must show that he or she (1) is registered to vote and resides in the district where the discriminatory dilution occurred; and (2) is a member of the minority group whose voting strength was diluted." *Broward Citizens for Fair Districts v. Broward Cnty.*, No. 12-cv-60317, 2012 WL 1110053, at *3 (S.D. Fla. Apr. 3, 2012); *accord Rose v. Raffensperger*, 511 F. Supp. 3d 1340, 1352 (N.D. Ga. 2021). Even if the Louisiana NAACP had established that a member of one of its branches resides in each challenged district, its evidence does not establish these other essential standing prerequisites. One need not be Black, or registered to vote, or of voting age, or a citizen to belong to an NAACP branch.

13.      After discovery closed, and after the Court clarified that Plaintiffs must disclose members in order to preserve any possibility of relying on their membership at trial, the Louisiana NAACP made a disclosure of 10 members whose standing they allegedly rely upon. This disclosure was untimely. Plaintiffs' disclosure on November 6 was untimely, and Plaintiffs "cannot be allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). Plaintiffs have shown neither element. *See Honey-Love v. United States*, 664 F. App'x 358, 361–62 (5th Cir. 2016) (burden on party acting in contravention of court order). Plaintiffs have not justified their failure to disclose this information in response to discovery sought in July 2023 until October 2023, and only then when ordered by the Court. And the late disclosure was clearly prejudicial to Defendants, who had no opportunity to obtain discovery concerning the newly submitted information.

14.      "The facts necessary to establish standing . . . must not only be alleged at the pleading stage, but also proved at trial." *Gill*, 138 S. Ct. at 1931. Plaintiffs have not provided admissible evidence establishing standing of members.

15.      In addition, the evidence disclosed by Plaintiffs on November 6, 2023 is not sufficient to demonstrate standing in any event.  While it indicates that these ten individuals are Black and are registered to vote, it does not demonstrate that they have in fact voted, and that their preferred candidates lose.  Absent such information, these individuals have not proven they have suffered a cognizable injury and the Louisiana NAACP cannot then seek to represent them to redress such a lack of injury.

**B.    The Entity Plaintiffs lack standing to sue in their own right.**

16.    The Entity Plaintiffs also do not have standing in their "own right." *SFFA*, 143 S. Ct. at 2157.

**i.    The Entity Plaintiffs lack Article III standing.**

17.    To establish standing in their own right, the Entity Plaintiffs must demonstrate a "concrete and demonstrable injury to the organization's activities," not "simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs must present specific "evidence showing that [they] [were] 'directly affected' by" the challenged redistricting plans. *ACORN*, 178 F.3d at 357. An organization may do this "by showing that it had diverted significant resources to counteract the defendant's conduct." *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010). Here, the record does not contain "any concrete or identifiable resources that" the Entity Plaintiffs "could reallocate to other uses, if Louisiana were to" implement redistricting plans with new majority-Black districts. *ACORN*, 178 F.3d at 360.

18.    The Louisiana NAACP contends that it felt compelled to shift its action plan after the Louisiana Legislature's plan included fewer majority-Black districts than it hoped, choosing not to spend in some places and to double up in others. But that is not enough to establish injury. It describes "routine" strategic "activities" of an advocacy group that must, in all events, decide where to focus resources. *See N.A.A.C.P.*, 626 F.3d at 238. Moreover, this identifies no cost increase that is "concrete or identifiable" and diverts resources from other activities. *ACORN*, 178 F.3d at 360; *Texas State LULAC v. Elfant*, 52 F.4th 248, 253 (5th Cir. 2022) (reversing finding of standing where the evidence "fail[ed] to link any diversion of resources specifically to" the challenged law). The evidence shows (at most) a shift, which includes cost savings in some cases

that is consistent with overall net cost reduction. And, to the extent the Louisiana NAACP claims injury from reduced excitement of Black voters, that "simply" describes "a setback to the organization's abstract . . . interests." *Havens Realty*, 455 U.S. at 379.

19.    BVM claims harm from the redistricting takeover and mobilization BVM organized when the Louisiana Legislature was deliberating over redistricting plans, but before the challenged plans became law.  BVM has "made no showing that these . . . costs are fairly traceable to any of the conduct by Louisiana that [BVM] claims in its complaint is illegal." *ACORN*, 178 F.3d at 359. These expenses were undertaken before the challenged plans became law, so, if the Legislature had selected BVM's desired plan, those same costs would still have been spent. BVM cannot claim injury from legislative deliberations, and, like the "monitoring" and "litigation" costs found non-cognizable in *ACORN*, *see id.* at 358–59, the costs of lobbying the Legislature for a different outcome cannot be regarded as injuries from the enacted plans, *see N.A.A.C.P.*, 626 F.3d at 238 ("lobbying activities" not cognizable injury-in-fact); *US Inventor Inc. v. Vidal*, No. 21-40601, 2022 WL 4595001, at *5 (5th Cir. Sept. 30, 2022) (similar).

20.    Even if the Entity Plaintiffs could show Article III standing in their own right, they lack a private right of action under Section 2 in their own right. They are not minority voters. Insofar as they sue in their own right, they claim Louisiana's redistricting plans harm their financial and strategic goals. Those are not VRA injuries, and the VRA does not remedy them.

### ii.    The Entity Plaintiffs lack statutory standing.

21.    Even if the Entity Plaintiffs could show Article III standing in their own right, they lack a private right of action under Section 2 in their own right. They are not minority voters. Insofar as they sue in their own right, they claim Louisiana's redistricting plans harm their financial and strategic goals. Those are not VRA injuries, and the VRA does not remedy them.

22.       "Statutory rights and obligations are established by Congress, and it is entirely appropriate for Congress . . . to determine in addition, who may enforce them and in what manner." *Davis v. Passman*, 442 U.S. 228, 241 (1979). Accordingly, courts must "determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). The Court is therefore "tasked with determining whether" the Entity Plaintiffs have "standing to sue under the substantive statute." *Cell Sci. Sys. Corp. v. Louisiana Health Serv.*, 804 F. App'x 260, 262 (5th Cir. 2020); *accord Superior MRI Servs., Inc. v. All. Healthcare Servs., Inc.*, 778 F.3d 502, 506 (5th Cir. 2015).

23.       Those courts that have found a private cause of action under VRA Section 2 have located it in Section 3, which states that "an aggrieved person" may "institute[] a proceeding." 52 U.S.C. § 10302(a). *See Roberts v. Wamser*, 883 F.2d 617, 621 & n.12 (8th Cir. 1989); *Alabama State Conf. of Nat'l Ass'n for the Advancement of Colored People v. Alabama*, 949 F.3d 647, 651 (11th Cir. 2020), *vacated* 141 S. Ct. 2618 (2021); *cf. Morse v. Republican Party of Virginia*, 517 U.S. 186, 233 (1996). An "aggrieved person" is one "suffering from an infringement or denial of legal rights," Aggrieved, Webster's Third New International Dictionary of the English Language, Unabridged (1971), and Section 2 forbids the "right . . . to vote" from being infringed on "account of race or color," 52 U.S.C. § 10301(a). Because a "person" in this context must be "an individual human being," *Kumar v. Frisco Indep. Sch. Dist.*, 476 F. Supp. 3d 439, 460 (E.D. Tex. 2020) (citation omitted), Section 2 can be read to authorize suit only by "voters" alleging "infringement of the right to vote on account of race." *Roberts*, 883 F.2d at 621.

24.       In *Roberts*, the Eighth Circuit rejected a claim by a candidate for office who sought redress for "the loss of the votes that he claims he would have received if not for the allegedly

88

disproportionate difficulties of Black voters in coping with" the challenged electoral mechanism. 883 F.2d at 621. Other courts have followed suit. Claims by candidates have failed, *Oh v. Philadelphia Cnty. Bd. of Elections*, No. 08-cv-0081, 2008 WL 4787583, at *7 (E.D. Pa. Oct. 31, 2008); *White-Battle v. Democratic Party of Virginia*, 323 F. Supp. 2d 696, 703 (E.D. Va. 2004), *aff'd*, 134 F. App'x 641 (4th Cir. 2005), as have claims by local governments resisting statutes governing their elections, *Conway Sch. Dist. v. Wilhoit*, 854 F. Supp. 1430, 1433 (E.D. Ark. 1994); *City of Baker Sch. Bd. v. City of Baker*, No. 06-cv-937, 2007 WL 9702694, at *2 (M.D. La. Jan. 12, 2007), as did the claim of a White voter asserting he "votes in lockstep with minority groups in all elections," *Vaughan v. Lewisville Indep. Sch. Dist.*, 475 F. Supp. 3d 589, 595 (E.D. Tex. 2020). Similarly, the Supreme Court in *Thompson v. N. Am. Stainless, LP*, 562 U.S. 170 (2011), held that statutory standing under Title VII of the Civil Rights Act for a "person claiming to be aggrieved" does not include "any person injured in the Article III sense." *Id.* at 176. Instead, a plaintiff must be "an employee" of the defendant and a "victim" of a Title VII violation. *Id.* at 178; *see Simmons v. UBS Fin. Servs., Inc.*, 972 F.3d 664, 668 (5th Cir. 2020) (rejecting statutory standing under Title VII because the plaintiff "was not" an "employee" of the defendant).

25.    As in *Roberts*, the Entity Plaintiffs do not "claim that [their] right to vote has been infringed because of [their] race." 883 F.2d at 621. Nor could they. The Entity Plaintiffs are nonprofit corporations that have neither a race nor voting rights. They contend that different redistricting plans would permit them to spend resources differently and—maybe—preserve resources for other purposes. Even if those injuries were sufficient under Article III, they are no different from the benefits VRA enforcement might confer on candidates who might receive votes from minorities, White voters who share minority voting preferences, or local governments that object to state laws potentially overridden by the VRA. No Entity Plaintiff is an "aggrieved person"

in the relevant sense of suffering abridgement of personal voting rights on account of race or language-minority status.

      **C.**      **The evidence does not establish standing for Individual Plaintiffs.**

26.      The Individual Plaintiffs have established residency in only four House Districts (HD25, HD60, HD66, and HD69) and three Senate Districts (SD2, SD16, and SD29).

27.      SD2 is a majority-BVAP district in which Black residents already have an equal opportunity to elect their preferred candidates under the 2022 Senate Plan. *See* PX1 at 27. Black voters in this district (including the resident Individual Plaintiff) do not suffer an injury in fact where they are able to elect their own representatives. *See Gill*, 138 S. Ct. at 1932.

28.      There is no evidence that the Individual Plaintiffs in other districts would reside in equal opportunity districts under a remedial plan, and they therefore have not established redressability. Indeed, SD16 is one of four Senate districts that Mr. Cooper does not change in his Illustrative Plan. *See* PX1 at 14.

29.      Plaintiffs are not injured by districts where they may personally elect their representatives of choice. *See Gill*, 138 S. Ct. at 1932. Their claimed injury could only be that Black voters in neighboring districts suffer vote dilution, and that is nothing but a "generalized grievance about the conduct of government." *Id.* at 1931.

      **D.**      **At most, Plaintiffs have demonstrated standing in only nine districts.**

30.      While Plaintiffs' Amended Complaint seeks a declaration that Louisiana's House and Senate plans be declared invalid in their entirety, Amend. Compl., Doc. 14, Prayer for Relief ¶¶ A and B, they have since abandoned that position and limited their challenge to Senate Districts 2, 5, 7, 8, 10, 14, 15, 17, 19, 31, 36, 38 and 39 and House Districts 1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 22, 25, 29, 34, 35, 36, 37, 47, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69, 70, 81, 88, and 101. *See*

Doc. 163-1 at 5; Doc. 135 at 3 n.1. Plaintiffs' supplemental disclosure, however, only list members in HD1, HD25, HD34, HD60, HD65, HD68, HD101, SD8, SD17, and SD38. The named Plaintiffs provide evidence of residency in HD25, 60, 66, 69 and SD2. Doc. 163-1 at 2. The leaves most districts Plaintiffs challenge with no disclosed member: SD5, 7, 10, 14, 15, 19, 31, 36, 39, and HD2, 3, 4, 5, 6, 7, 8, 9, 13, 22, 29, 35, 36, 37, 47, 57, 58, 59, 62, 61, 63, 67, 70, 81, and 88.

31.    Plaintiffs say it is enough to have identified a member "in each area of the state" they challenge. But the injury of vote dilution "is district specific," not area specific. *Gill*, 138 S. Ct. at 1930; *see Petteway v. Galveston Cnty.*, __F. Supp. 3d __, 2023 WL 2782704, at *5 (S.D. Tex. Mar. 30, 2023) (finding no standing of plaintiff who did not reside in challenged precinct, even though it was possible to create an additional opportunity district in the area). The challenge can proceed (at most) "only with respect to those legislative districts in which" identified members of the NAACP "reside." *Covington*, 138 S. Ct. at 2553. To be sure, relief in a district where a challenger has standing may entail incidental reconfiguration of surrounding districts to achieve relief in the *challenger's* district. *Gill*, 138 S. Ct. at 1931. But that entails "revising only such districts as are necessary to reshape the voter's district." *Id.* Accordingly, Plaintiffs have no standing to demand any specific demographic character of districts where no Plaintiff and no disclosed member resides.

## II.    Plaintiffs' Voting Rights Act claim lacks merit.

### A.    The legal standard.

32.    For a § 2 claim to be viable, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable

it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 51–51 (1986). "If a plaintiff makes that showing, it must then go on to prove that, under the totality of the circumstances, the district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018).

33.     "The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Id.*

34.     In this case, the challenged Louisiana State House and Senate plans contain 40 majority-BVAP districts. Plaintiffs are therefore asserting, "not the chance for some electoral success in place of none, but the chance for more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012–13 (1994). Consequently, this case presents (at the least) "closer calls" than many § 2 cases. *Id.* "As facts beyond the ambit of the three *Gingles* factors loom correspondingly larger, factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution." *Id.*

## B.     First precondition.

35.     Plaintiffs do not satisfy the first *Gingles* precondition, which is "focused on geographical compactness and numerosity." *Allen v. Milligan*, 599 U.S. 1, 18 (2023). Louisiana's 2022 House Plan includes 29 majority-BVAP districts (of 105 districts total), and its 2022 Senate Plan includes 11 (of 39). SOSX1 at 5. That total of 40 majority-BVAP districts is the most ever contained in Louisiana's legislative plans. PX20 at 24.

36.     Plaintiffs cannot show that more are required. "[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson*, 512 U.S. at 1008. Plaintiffs must show that the "minority *group*" is "sufficiently large and geographically compact to constitute a majority" in more "reasonably configured district[s]" than currently exist. *Allen*, 599 U.S. at 18 (emphasis added). That is because "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (*LULAC*). But Black percentage of Louisiana's voting-age population has grown by only 1.3% since 2000. LDTX51 [Johnson] at 11. The percentage increase in legislative majority-BVAP districts (by 2.8% in the House and 2.6% in the Senate) has doubled that growth. *Id.* Plaintiffs have no basis to demand additional increases. They provide no evidence that racial housing segregation has increased in the past generation, and "as residential segregation decreases—as it has 'sharply' done since the 1970s— satisfying traditional districting criteria such as the compactness requirement 'becomes more difficult.'" *Allen*, 599 U.S. at 28–29 (citation omitted).

37.     Plaintiffs' Illustrative Plans, prepared by their mapdrawer, Mr. Cooper, maximize majority-BVAP districts, resulting in 14 illustrative majority-BVAP Senate districts and 35 illustrative majority-BVAP House districts (for increases of 7.4% in the House and 7.1%, respectively, since 2000). SOSX1 at 5–6; LDTX51 at 10–11. But ensembles of 100,000 and 500,000 simulated House and Senate plans, configured to respect traditional redistricting principles and not to achieve racial targets, produce no more than 5-8 majority-BVAP Senate districts and 18-23 majority-BVAP House districts. SOSX1 at 15, 56; SOSX4 at 9. The enacted

plans far exceed those figures. Plaintiffs' demand for *more* than what is unsupported by Louisiana's political geography.

38.        The Supreme Court has condemned redistricting policies of "minority district maximization." *Miller v. Johnson*, 515 U.S. 900, 909 (1995). The Supreme Court first encountered this policy in the 1990 redistricting, when the Department of Justice Voting Rights Section enforced a "maximization agenda" by refusing VRA § 5 preclearance of plans that contained less than the full possibility of "majority-black districts." *Id.* at 917, 924–25. The Court repeatedly held that this maximization goal caused state legislatures to engage in racially predominant redistricting. *Id.* at 918 ("[T]he General Assembly acquiesced and as a consequence was driven by its overriding desire to comply with the Department's maximization demands."); *Shaw v. Hunt*, 517 U.S. 899, 913 (1996) (*Shaw II*) ("It appears that the Justice Department was pursuing in North Carolina the same policy of maximizing the number of majority-black districts that it pursued in Georgia."); *Bush v. Vera*, 517 U.S. 952, 960 (1996) (plurality opinion). The Court also repeatedly held that this maximization goal has "no basis under § 5":

> In utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld.

*Miller*, 515 U.S. at 924–25; *accord Shaw II*, 517 U.S. at 913 ("We again reject the Department's expansive interpretation of § 5."); *Bush*, 517 U.S. at 983. The Court also explained that, if VRA § 5 were read to compel maximization, it would be unconstitutional. *Miller*, 515 U.S. at 927 ("[T]he Justice Department's implicit command that States engage in presumptively unconstitutional race-based districting brings the Act . . . into tension with the Fourteenth Amendment.").

39.        Maximization is also not the law under VRA § 2. *Johnson*, 512 U.S. at 1017 ("Failure to maximize cannot be the measure of § 2."). In fact, even proportionality is beyond § 2's dictate: "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen*, 599 U.S. at 28. The Court repeatedly "explained how traditional districting criteria limited any tendency of the VRA to compel proportionality." *Id.* As a result, proportionality is rare and § 2 suits "rarely" succeed. *Id.* at 28–29. The Supreme Court in *Allen* confirmed that this is as it *should* be, since redistricting "is primarily the duty and responsibility of the States, not the federal courts." *Id.* at 29 (quotation and bracket marks omitted). In Louisiana, where the Legislature created more majority-BVAP districts than ever before, there is no basis for Plaintiffs to compel more.

40.        To achieve Plaintiffs' maximization goal, Mr. Cooper "carv[es] up" various regions of Louisiana "to maximize the number of House Districts that are just barely over 50% AP Black18+%." LDTX51 at 32. Mr. Cooper groups distinct Black communities that are not compact into unreasonably configured districts that § 2 does not require. "[T]here is no basis to believe a district that combines two farflung segments of a racial group with disparate interests provides the opportunity that § 2 requires or that the first *Gingles* condition contemplates." *LULAC*, 548 U.S. at 433. This is "because the right to an undiluted vote does not belong to the 'minority as a group,' but rather to 'its individual members.'" *Id.* at 437 (citation omitted). This case is in all respects like *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), which rejected a proposed district that would "lump together two groups of African–American citizens who were from two distinct communities . . . which are separated by considerable distance (approximately 18 miles) and share few community interests." *Id.* at 598. In each region—which Plaintiffs define and where they demand additional majority-BVAP districts—Mr. Cooper does just that.

41.     Because Plaintiffs' Illustrative Plans not only seek "unlawful proportionality" but maximization, Plaintiffs have utterly failed in their burden of submitting an illustrative plan showing the possibility of creating additional *legal* majority-Black districts. *Johnson,* 501 U.S. at 1008. Standing alone, this failure requires the dismissal of Plaintiffs' claims.

### i.     The Illustrative House Plan.

### a.     Shreveport Region.

42.     As noted, the first precondition "requires the possibility of creating more than the existing number of reasonably compact districts" of 50% minority VAP. *Johnson*, 512 U.S. at 1008. In the Shreveport region, the 2022 House Plan includes three majority-BVAP districts, as did last decade's plan. The Shreveport region has a 39.1% BVAP and—due to local population decline—lost one House district, falling from nine to eight. SOSX01 at 70. Accordingly, by maintaining three majority-BVAP districts (three of eight (37.5%)) from the prior decade's state House plan (three of nine (33.3%)), the 2022 House Plan *increases* the percentage of majority-BVAP districts in the region. SOSX1 at 70.

43.     Plaintiffs are unreasonable in demanding that four majority-BVAP districts be forced out of this region. *See* SOSX3 6–8; PX20 at 50–51. It is not easy to make 50% of districts majority BVAP in this area of 39.1% BVAP. Predictably, Plaintiffs show only that three reasonably configured majority-BVAP districts are possible, matching the enacted plan. Their fourth, Illustrative HD1 (IHD1), is not compact. As explained, "[t]he first *Gingles* condition refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433 (citation omitted); *Sensley*, 385 F.3d at 597. IHD1 stitches together isolated pockets of Black voting-age population in Shreveport and near the Arkansas border. SOSX3 11–13. Using the moment-of-inertia method (described in PFOF ¶103), Defendant's

expert, Mr. Trende, shows that even the most compact majority-Black district in IHD1's footprint "stretches beyond Shreveport, out to Caddo Lake, and to the outskirts of Mooringsport and Belcher, which are located almost halfway to the Arkansas border."[6] SOSX3 at 19. "[T]he heavily White, rural precincts in this District are not just added to achieve population equality. They are added to join isolated Black residents with a more compact Black population in Shreveport in order to meet the minority-majority threshold." *Id.* This is the first of many cases where Mr. Cooper groups together two or more "areas of highly-concentrated African–American population, which are . . . miles apart from one another," in contravention of the first step of *Gingles*. *Sensley*, 385 F.3d at 597.

44.     Mr. Cooper's Shreveport configuration for the House also "runs contrary to the traditional redistricting principle of avoiding divisions of pre-existing political subdivisions" by "divide[ing] the city of Shreveport across HDs 1, 2, 3 and 4 by carefully splitting the Black population of the city…." SOSX1 at 71; *see id.* at 74–76. "[T]he only common index is race." *LULAC*, 548 U.S. at 435. Mr. Cooper achieved "his 'new' majority-Black HD1 by precisely dividing the Black population of Shreveport along lines that provide the precise racial percentages needed to make Senate Districts 38 and 39 majority-Black—without any reference to compactness, major roads, communities, neighborhoods, clear visible features or any other traditional redistricting principle." LDTX51 at 29. Mr. Cooper did not "follow major roads, rivers, city borders, [or] parish borders"; he followed racial lines—and nothing else. *Id.* at 29–30. Mr. Cooper's illustrative plan disregards communities of interest, dividing at least seven

---

[6] This moment-of-inertia method is particularly useful in assessing whether it is possible to render better configurations of the existing population than Mr. Cooper achieved. *See Houston v. Lafayette Cnty., Miss.*, 56 F.3d 606, 611 (5th Cir. 1995) ("[T]he question is not whether the plaintiff residents' proposed district was oddly shaped, but whether the proposal demonstrated that a geographically compact district *could be drawn*.").

neighborhoods in this region. LDTX42 at 26. Because three (not four) reasonably configured majority-BVAP districts are possible in this area, Plaintiffs' claim in this region fails the first precondition.

### b.    Natchitoches Region.

45.    No reasonably configured House majority-BVAP district is possible in the Natchitoches region, but Plaintiffs demand one. *See* PX20 at 52–54. Mr. Cooper's IHD23 groups geographically disparate pockets of Black population. SOSX3 at 35–39. Mr. Trende's moment-of-inertia analysis shows no district can be configured around one compact Black community. *Id.* at 38. The configuration is like the one rejected in *Sensley*, 385 F.3d at 597–98; *see also* SOSX1 at 85.

46.    This should not be surprising. Last decade's majority-BVAP district in this region was a misshapen configuration with "a northwest to southeast orientation" that "split all three parishes" in the region and "did not follow any natural boundaries." SOSX1 at 78; *see id.* at 82. Because the Legislature "could not create the district[] without flouting traditional criteria," it was vulnerable even then to a racial-gerrymandering challenge. *Allen*, 599 U.S. at 28. Today, the configuration is untenable: this region lost a House district due to population shifts, *id.* at 78, and is therefore less capable of supporting a majority-Black district than it was last decade.

47.    It was difficult for Mr. Cooper to "just barely clear[] the 50% BVAP threshold (50.6%)" in IHD23. SOSX1 at 79. Mr. Cooper's configuration splits De Soto and Natchitoches Parishes and "carefully include[s] only precincts with high BVAP population and exclude[s] precincts with higher White populations." SOSX1 at 79; *see Sensley*, 385 F.3d at 597–98. The district "wanders across City and community boundaries, ignoring the freeway and other major roads, to focus on including majority-Black Census Blocks." LDTX51 at 30; *see id.* at 31. IHD23

alone divides four neighborhoods. *See* LDTX41 at 26. Because no reasonably configured majority-BVAP districts are possible in this area, Plaintiffs' claim fails the first precondition here.

c.    **Lake Charles Region.**

48.    The 2022 House Plan includes one majority-BVAP House district of five in the area, which is 25.7% BVAP. SOSX1 at 86. To ensure 40% of the districts in this region which has only 25% BVAP are majority-BVAP, Mr. Cooper "evenly divides the heavily Black population in and around Lake Charles between" IHD34 and IHD38, compelling IHD34 into "an odd geographical shape with three 'arms' that extent to the west, southwest, and south to incorporate precincts with larger Black populations to avoid nearby precincts with lower Black populations." SOSX1 at 86. This sacrifices compactness in IHD34 as compared to its enacted counterpart, *id.* at 87, and combines isolated (non-compact) Black populations into IHD38, SOSX3 at 43–45; *Sensley*, 385 F.3d at 597–98. Mr. Trende's moment-of-inertial analysis demonstrates that no more compact district lines were possible to make IHD34 a majority-BVAP district. SOSX3 at 46. This is a case where "the size and *concentration* of the minority population," *Houston*, 56 F.3d at 611, do not support Mr. Cooper's maximization goal.

49.    Likewise, IHD38 "sweeps west to carve the majority-Black Census Blocks out of Westlake, sweeps south out of Lake Charles to pull in a few majority-Black Census Blocks, again ignoring City borders, freeways, communities, and even socio-economic data." LDTX51 at 31. Only by including far-flung groups of Black voting-age persons did Mr. Cooper ensure IHD38's majority-BVAP status, SOSX3 at 27–30, and that was the only way to do so, as Mr. Trende demonstrates, *id.* at 31. IHD34 alone divides at least four neighborhoods. LDTX42 at 26. Because one reasonably configured majority-BVAP districts is possible in this area (not two), Plaintiffs' claim fails the first precondition in this area.

### d.    Baton Rouge Region.

50.    East and West Baton Rouge Parishes are, together, 43.9% BVAP, and six of its eleven enacted House districts have a majority BVAP, an increase from last decade. SOSX1 at 93. Thus, 54% of the region's House districts are majority-BVAP. Plaintiffs demand *three* new majority-BVAP House districts here (i.e., eight out of eleven House districts total in the area (72.7%)). PX20 at 55–61; SOSX1 at 93. To achieve that feat, Mr. Cooper "is forced to 'baconmander'…districts into far-flung areas of the map, creating several districts where the Black population is not geographically compact." SOSX3 at 54. This approach has many first-precondition failings.

51.    First, Mr. Cooper creates new minority opportunity by denying existing opportunity. He actually creates four new majority-BVAP House districts and then dismantles an existing one (HD62), claiming a net increase of three. SOSX3 at 54; PX89 at 9. But HD62 provided equal electoral opportunity for Black voters in East Feliciana Parish (as well as in part of East Baton Rouge), and Mr. Cooper claims to have "replaced [it] with two new majority-Black districts in East Baton Rouge Parish," but not in East Feliciana Parish. PX89 at 9. But "a § 2 violation is proved for a particular area," *Shaw v. Hunt*, 517 U.S. 899, 917 (1996) (*Shaw II*), so dismantling one district for some minority voters (including in East Feliciana Parish) to create others for others (wholly in East Baton Rouge) is improper, *see id.* at 917 (rejecting the notion that a majority-Black district may be drawn "anywhere" as "a misconception of the vote-dilution claim"). There is no one-step-backward-three-steps-forward basis for § 2 liability. *See Johnson*, 512 U.S. at 1019 (rejecting the notion that "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class"); *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000) (declining "to trade the § 2 rights of

individual African-Americans in rural west Tennessee against those of African–American groups elsewhere in the State").

52.     Second, Mr. Cooper creates new 50% BVAP districts by eliminating reasonably configured majority-Black districts and adding unreasonably configured replacements. To squeeze a net increase of three majority-Black districts out of the Baton Rouge region, Mr. Cooper had to utilize the urban population as efficiently as possible, which in turn required that he draw districts into rural areas to capture different pockets of Black voting-age persons to hit 50% BVAP. SOSX03 at 61–64. For example, while HD29 and HD61 group compact urban Black populations, Mr. Cooper's replacement versions expel some of that Black population (for use in other districts) and replace it with isolated Black groups in rural areas. SOSX03 [Trende] at 61–64. This was the error of Texas in *LULAC*: it eliminated a reasonably configured § 2 district and claimed to satisfy § 2 with a new district combining non-compact Hispanic populations, which did not satisfy the § 2 compactness test. 458 U.S. at 427–42. Likewise, Mr. Cooper's proposal takes the region *out* of compliance with § 2.

53.     Third, Plaintiffs can (at very best) match the enacted plan's six reasonably configured majority-BVAP districts but not exceed them. The Black populations grouped into the three additional illustrative majority-BVAP districts are not compact. *See* SOSX3 at 60, 63, 71, 81, 85, 90  (IHD29, IHD61, IHD67, IHD69, IHD101). Under *LULAC* and *Sensley*, Plaintiffs fail the first precondition on that basis alone. In addition, the districts do not "comport[] with traditional districting criteria," *Allen*, 599 U.S. at 20, which is not a surprise when grouping non-compact populations together on the basis of race can lead to misshapen districts, *see Sensley*, 385 F.3d at 596. The key to Mr. Cooper's configuration of the region is majority-White HD70, where Mr. Cooper packs White voters, giving it "a 'U' shape to avoid a concentration of heavily Black

precincts that have a substantially higher Black population." SOSX1 at 94. Then, majority-White precincts were placed into HD71, giving it "an 'arm' that reaches from Livingston Parish into Baton Rouge and under HD-69 and HD-101 to remove these [majority-White] precincts from districts in the parish," rather than place them according to traditional criteria in HD69 or HD101 (at the expense of their majority-BVAP status). *Id.* at 94.

54.     These and other maneuvers exhibit "the blatant use of race as the predominate factor when carving up the region in a 'pinwheel' fashion to maximize the number of House Districts that are just barely over 50% AP Black18+%." LDTX51 at 32. In the process, Mr. Cooper splits at least 13 neighborhoods in the Baton Rouge region. *See* LDTX42 at 26. In sum, Mr. Cooper "concentrated a *dispersed* minority population in a single district by disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions." *Allen*, 599 U.S. at 27 (citation omitted). The first precondition is not satisfied for more than the existing number of majority-Black districts.

### e.     Iberville-Ascension Region.

55.     The first precondition is not met in this area, which is 29% BVAP with four House districts, and one majority-BVAP district (HD58). SOSX01 at 102. Plaintiffs demand another, to make 50% of the districts here majority-BVAP. To that unreasonable end, Mr. Cooper's IHD60 stitches together at least four isolated and non-compact pockets of Black population for that purpose. *See* SOSX3 at 71. That had to be done to force another majority-BVAP district into the region. *See id.* at 73. The resulting districts disregard parish boundaries. SOSX1 at 107. The minority community of this district is not compact, and it fails the first step of *Gingles*.

### f.      Northeast Region.

56.      In the Delta parishes, Mr. Cooper admits he adds no additional majority-BVAP districts, as both his Illustrative House Plan and the 2022 House Plan contain three. *See* SOSX1 at 108. Yet Mr. Cooper's map "dramatically alter[s] the orientation of the districts." *Id.* There is no basis for this, and the first precondition is unmet. *Johnson*, 512 U.S. at 1008 (requiring "more than the existing number of reasonably compact [majority-minority] districts"). Plaintiffs' evidence, at most, is "that lines could have been drawn elsewhere, nothing more." *Id.* at 1015.

### ii.      Illustrative Senate Plan.

### a.      Shreveport Region.

57.      The 2022 Senate Plan  includes three Senate districts in the Shreveport area (Caddo and Bossier parishes), dropping one from last decade's Senate plan due to regional population loss. SOSX1 at 32. One of the districts (SD39) is majority-BVAP. *Id.* Plaintiffs propose splitting the Black population of Shreveport to add a second. SOSX3 at 94. *Gingles* does not require this contortion.

58.      The minority population in SD39 is compact, but Plaintiffs propose two majority-BVAP districts that lack compact minority populations, ISD38 and ISD39. By splitting the Black population of Shreveport, Mr. Cooper made it impossible to reach 50% BVAP in any district based on that compact community, and that in turn required him "to cross the Red River" with ISD38 "to take in downtown Bossier City and then extend further into Bossier Parish past another layer of predominately White precincts." SOSX3 at 97. The isolated pockets of Black voting-age persons are not compact. *See id.* at 98–102. And by "tak[ing] on a 'C' shape to avoid a majority White area of Southeastern Shreveport," SD38 violates traditional criteria and loses geographic

compactness. SOSX1 at 33. The ripple effect of these contortions also harms neighboring district under traditional districting principles. *Id.* at 33–35.

59.     ISD39 is even less defensible. While its duly enacted counterpart provides a § 2 "remedy" for Shreveport's compact Black community, *see Shaw II*, 517 U.S. at 916, Mr. Cooper's expulsion of portions of it required ISD39 "to reach out into rural Caddo Parish to reach the 50%+1 threshold, taking in isolated pockets of Black residents in small towns and individual Black residents." SOSX3 at 103. ISD39 does not contain a compact Black population. *See id.* at 103–08. Mr. Cooper had little choice but race-based contortions; he achieved two majority-BVAP districts "by precisely dividing the Black population of Shreveport along lines that provide the precise racial percentages needed to make Senate Districts 38 and 39 majority-Black—without any reference to compactness, major roads, communities, neighborhoods, clear visible features or any other traditional redistricting principle." LDTX51 at 26. "[B]y disregarding traditional districting principles such as compactness, contiguity, and respect for political subdivisions," *Allen*, 599 U.S. at 27, Mr. Cooper trades one § 2 district for two that are not § 2 districts.

**b.      Jefferson and St. Charles Region.**

60.     In the 2022 Senate Plan, five Senate districts are anchored in Jefferson and St. Charles parishes, and one (SD7) is majority BVAP (59.5%). SOSX01 at 40, 45. The BVAP of these parishes is 26.6%, but Plaintiffs demand that two of five districts (40%) be majority-Black. SOSX1 at 40. Their expert, Mr. Cooper, accomplishes this by substantially reworking the entire New Orleans metropolitan area, "including significant changes to District 3," SOSX3 at 118, which "is no longer anchored in a compact population center," *id.* at 123. Thus, Mr. Cooper's configuration replaces a § 2 district with one grouping non-compact and isolated Black communities (ISD3), *see id.* at 124–28, in contravention of *LULAC*. Mr. Cooper then forces

another "barely" majority-BVAP district (ISD19) out of disparate Black communities that are not compact. SOSX3 at 129–34. This configuration "strays from traditional redistricting principles," including by dragging ISD8 across "four parishes (Plaquemines, Lafourche, St. Charles, and Jefferson)" to the result that "no parish is kept wholly within a single Senate district." SOSX1 at 41. Another race-based departure from traditional criteria is Mr. Cooper's "use of the Mississippi River as the District's northern border – except where concentrations of Black population on the north side of the river lead [him] to subordinate following the river to his predominate consideration (race)." LDTX51 at 28. The first precondition "imposes meaningful constraints on proportionality." *Allen*, 599 U.S. at 26; *see also* LULAC, 548 U.S. at 438. Here, it forbids exceeding proportionality, as Plaintiffs erroneously propose.

### c. Baton Rouge Region.

61.    The Baton Rouge Region contains eight senate districts, including three majority-Black districts. SOSX1 at 47. Thus, 37.5% of the senate districts in this region with a 34.3% BVAP are majority-Black. *Id.* Plaintiffs propose that 50% of the districts should be majority BVAP, but the new majority-BVAP district (ISD17) stitches together disparate Black populations that are not compact. SOSX3 at 112–17. The territory of East and West Baton Rouge parishes in ISD17 does not contain sufficient BVAP for a majority-BVAP district, so Mr. Cooper configured it to "include[] New Roads and Plaquemine" and cross "large swathes of lightly populated, heavily White territory to achieve the" to include the 50% BVAP minimum. SOSX3 at 112. Mr. Cooper dismantles SD17—"a mostly rural district composed of small communities to the north, west, and south of Baton Rouge"—and draws it into Baton Rouge, even though its enacted counterpart does not cross that line. SOSX1  at 48.

62.     In the process, Mr. Cooper "carves the southern portion of Iberville Parish out of illustrative Senate District 17 with no explanation and following no traditional redistricting principle." LDTX51 at 27. "[T]he only explanation is race." *Id.* Ultimately, Mr. Cooper "divides East Baton Rouge parish among six senate districts," while the enacted plan divides it into five. *Id.* at 49. Because "§ 2 never requires adoption of districts that violate traditional redistricting principles," it does not require adoption of Mr. Cooper's configuration of the Baton Rouge region. *Allen*, 599 U.S. at 30 (alteration marks omitted).

### iii.     Plaintiffs' erroneous contentions.

63.     Plaintiffs defend their demand for maximization of majority-Black districts on many grounds, but none have merit.

64.     First, Plaintiffs get the law wrong in arguing that the first precondition looks to the shape of the proposed illustrative district lines and not the compactness of the minority population. *See, e.g.*, PX89 at 13; Doc. 150-1 at 7–8. As already noted, the first precondition "refers to the compactness of the minority population, not to the compactness of the contested district." *LULAC*, 548 U.S. at 433. In *LULAC*, a district court determined that a district satisfied the first precondition because of "the relative smoothness of the district lines," but the Supreme Court reversed, calling this considerations "inapposite." *Id.* At very most, district shape might be "relevant . . . only insofar as" disfigured districts are "indicative of the non-compactness of the minority population in those proposed districts." *Sensley*, 385 F.3d at 596–97. But the inverse does not follow if the minority group is not compact. Mr. Trende's method of examining whether the minority community is reasonably compact speaks directly to the first precondition, and it is the most relevant evidence of district compactness and lack thereof.

65.     Second, Plaintiffs' expert, Mr. Cooper, proposes that the evidence of compactness of the minority community is "one-sided and incomplete" because it does not examine "the White population" in "all of the Enacted districts." PX89 at 13. But the first precondition asks whether "the minority group [is] sufficiently large and geographically compact," *Allen*, 599 U.S. at 18 (alteration marks omitted), not whether any White community is compact, *cf. Fusilier v. Landry*, 963 F.3d 447, 457 (5th Cir. 2020) (observing that a "comparison with other misshapen districts does not make a strong case for the first *Gingles* factor"). Plaintiffs have presented no evidence on that latter question and so would fail any required proof under it. What Plaintiffs seem to forget is that a § 2 claim impinges on "the duty and responsibility of the States" to redistrict, which can by justified only if "exacting requirements" are satisfied (including the first *Gingles* condition). *Allen*, 599 U.S. at 29–30. By comparison, when the Louisiana Legislature creates any districts (majority White or Black), it does not need to justify its choices (absent a basis for a federal court to apply strict scrutiny). *See Voinovich v. Quilter*, 507 U.S. 146, 156–57 (1993) (explaining why limitations on federal courts do not apply to state legislatures). Defendants therefore do not need to show anything about majority-White districts to put Plaintiffs to their proof under § 2 as to the new majority-Black districts they ask this Court to impose.

66.     Third, Plaintiffs attempt to divert the inquiry from the compactness of the minority population to a debate about "style points." *LULAC*, 548 U.S. at 434. Mr. Cooper produces piles of computer-generated paper purporting to show that he checked various cosmetic boxes. This showing is exactly what the Supreme Court in *LULAC* called "inapposite." *Id.* at 437. And Mr. Cooper simply does not overcome the fundamental problem that the Black population does not support the aggressive addition of *nine* new majority-BVAP districts to a State that has not seen meaningful growth of Black population over the last two decades. Mr. Cooper focuses on statewide

averages of compactness scores that measure the aesthetics of district line, *e.g.*, PX20 [Cooper] at 33, and other statewide metrics, *id.* "The problem with that analysis is that it addresses compactness on a plan-wide basis, not a district-by-district basis—as the first *Gingles* precondition requires." *Robinson v. Ardoin*, 37 F.4th 208, 219 (5th Cir. 2022). Mr. Cooper does not conduct a district-by-district or even regional analysis comparing his preferred scores, and charts showing district scores is no substitute. *See* PX20 at 32 (referring reader to lengthy and virtually unusable charts). Mr. Cooper also claims he drew districts based upon socio-economic data (rather than race), but that is not true; he barely used socio-economic data, if at all. [PFOF ¶¶ 81–84].

67.     Finally, Plaintiffs are likely to contend that it does not matter whether race was the predominant basis on which Mr. Cooper drew his illustrative districts. This point is academic because Supreme Court precedent is clear that the first precondition is not satisfied where "the only common index is race." *LULAC*, 548 U.S. at 435; *see also Fusilier*, 963 F.3d at 457 (observing difficulty of establishing the first precondition if "race served as the *sine qua non* for selecting which blocks to include in the proposed district"); *Sensley*, 385 F.3d at 596. That is the case here. Mr. Cooper configured non-compact and disparate pockets of Black population into more majority-BVAP districts than local demographics can reasonably support, for an increase of nine majority-BVAP districts as compared to the plans having the most Louisiana has ever seen.

68.     Besides, *Allen* confirmed that the first precondition is not met by racially predominant redistricting. In *Allen*, eight Justices "appear[ed] to agree that the plaintiffs could not prove the first precondition of their statewide vote-dilution claim . . . by drawing an illustrative map in which race was predominant." *Allen*, 143 S. Ct. at 1527 (Thomas, J., dissenting) (describing *Allen*, 143 S. Ct. at 1511-12). A section of the Chief Justice's opinion that garnered four votes held that the Alabama plaintiffs could "satisfy the first step of *Gingles*" only because they "adduced at

least one illustrative map" in which race did not predominate. *Allen*, 143 S. Ct. at 1512 (plurality opinion). Four dissenting Justices agreed that a plan in which race predominates cannot be reasonably configured under *Gingles*, but concluded that race predominated under the facts at bar. *See id.* at ]1527-30 (Thomas, J., dissenting). Justice Kavanaugh joined neither opinion and did not explain his abstention. *See id.* at 1517-19 (Kavanaugh, J., concurring).

69.      But that omission carries no consequence when eight of nine Justices agreed on the relevant legal holding—that an illustrative comparator cannot satisfy the first precondition if race predominates. Where at least "five Justices found common ground in [a] proposition," even in separate opinions, that proposition becomes the law of the land. *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 718 (1996); *see also, e.g.*, *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 447 (5th Cir. 2020). *Allen*'s understanding on this point is evident in portions of the Chief Justice's opinion that did garner five votes. In holding that "§ 2 never requires adoption of districts that violate traditional redistricting principles," *Allen*, 143 S. Ct. at 1510 (quotation and edit marks omitted), the Court referred back to its racial-gerrymandering precedents, including *Shaw I*, *Miller*, and *Bush v. Vera*, 517 U.S. 952 (1996), explaining that, in each, the first precondition was not satisfied by districts in which race predominated.

70.      Here, the evidence shows that race predominated, for reasons explained. Mr. Cooper maximized the number of majority-BVAP districts in his Illustrative House and Senate Plans with surgically precise line-drawing and careful balancing of minority population to get as many districts as possible just slightly above 50% BVAP. This is a case where race drove the line drawing, and Mr. Cooper only later found non-racial reasons for the lines and offers them now as *post hoc* justifications. *See Cooper v. Harris*, 581 U.S. 285 (2017); *Bethune-Hill v. Virginia State*

*Bd. of Elections*, 580 U.S. 178 (2017); *Shaw v. Hunt*, 517 U.S. 899, 910 (1996). For this reason, among so many others, the first precondition is not satisfied.

### iv. One-Person, One Vote.

71.     Plaintiffs' illustrative districts fail to establish the first *Gingles* precondition for the additional reason that they do not show that a properly apportioned, court-imposed plan can be drawn at 50% plus one coalitional citizen voting-age population.

72.     Mr. Cooper's Illustrative Plans utilize the full 10% total deviation normally allowed to state legislatures and redistricting authorities. *See Harris v. Arizona Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1309 (2016); *see* PX089 at 13 (9.78% total population deviation). But court-imposed maps are subject to a stricter "de minimis" equal-population standard. *Connor v. Finch*, 431 U.S. 407, 413 (1977). Plaintiffs' remedial proposals do not meet this "de minimis" standard; they have deviations of nearly 10%. *See id.* U.S. at 418 ("The Court refused to assume in *Chapman v. Meier* that even a 5.95% deviation from the norm would necessarily satisfy the high standards required of court-ordered plans."). The Court therefore would lack the ability to impose these Illustrative Plans on Louisiana, and they therefore do not establish that a "remedy" can be fashioned "for the claimed injury." *See Hines v. Mayor & Town Council of Ahoskie*, 998 F.2d 1266, 1271 (4th Cir. 1993)

73.     To be sure, if the Louisiana Legislature fulfilled the task of remedying a proposed violation after a finding of liability, it could in principle implement a map with a 10% total-population. But Plaintiffs came to court, not the Legislature. And, if the Legislature declines to issue a remedy, the Court would be helpless to act, since it would not be empowered to implement a district with a 10% total deviation. The Court is required to ensure itself that it can remedy a

supposed violation, and it cannot satisfy this requirement with a plan having an overall population deviation the Court itself is powerless to impose on Louisiana.

**B.      Second and third preconditions.**

74.      Plaintiffs do not establish the second and third preconditions, which require proof that the relevant minority group "is politically cohesive" and that, in the absence of a § 2 remedy, a White voting bloc will usually "defeat the minority's preferred candidate." *Allen*, 599 U.S. at 18 (citation omitted). "The second and third *Gingles* preconditions are often analyzed together." *Christian Ministerial All. v. Sanders*, No. 4:19-cv-00402, 2023 WL 4745352, at *16 (E.D. Ark. July 25, 2023). Plaintiffs fail to prove both for several reasons.

**i.      Failure of evidence.**

75.      Plaintiffs fail to show both preconditions because their evidence is insufficiently complete and reliable to speak to either Black or White voting patterns. For these inquiries, "the central focus is upon voting patterns." *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988). Because the secret ballot prevents direct observation of White and minority voting choices, proving the second and third preconditions "typically requires statistical evaluation of elections." *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 757 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015).

76.      Plaintiffs sponsor the expert opinion of Dr. Handley to show White and Black voting preferences, and to establish legally significant White bloc voting. But, as explained in more depth above (PFOF ¶¶ 206, 207, 219-222), her opinions are deficient because her method did not adequately account for high levels of absentee and early voting. *See* SOSX2 at 11–14. Dr. Handley's estimation methods (ecological inference and ecological regression) "compare the density of a particular population group in a specified area with the percentage of votes received

by a particular candidate in that area." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1215 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999). Specifically, they compare the percentage of minority population within precincts against the votes cast for candidates in those precincts to determine whether there is a correlation between minority percentages and candidate preferences. *Id.*

77.     The problem here, however, is that about 30% of ballots cast in Louisiana since 2012 were by early or absentee voting, and that number rose to 45.6% in 2020. SOSX2 at 13. Louisiana does not link early or absentee ballots to respective voters' home precincts but instead reports these totals at the parish level. Thus, without a reliable allocation method, a statistical comparison of precinct minority percentages and voting outcomes will be off by anywhere from 20% to nearly 46%, depending on the election. *See* SOSX2 at 13. As outlined above (PFOF ¶¶ 219-222), voting preferences cannot be demonstrated where, on average, about one third of votes are missing. An error of one in three votes, on average, is simply too large to overlook. *See Overton v. City of Austin*, 871 F.2d 529, 539 (5th Cir. 1989) (per curiam).

78.     Dr. Handley recognized this problem and attempted to correct it by allocating early and absentee votes to particular precinct proportionally based on the votes received by each of the candidates on election day in the area studied. *See* PX1 at 6 & n.8. But that is unreliable. Mail-in voting populations frequently exhibit different voting preferences from in-person voting populations, and different regions within parishes exhibit different voting preferences. *See* SOSX2 at 17–20. The point of measuring voting outcomes against minority percentages in each precinct is to *observe* whether there is a correlation between the actual votes cast and the minority percentages in each precinct, which does not occur where the voting choices on anywhere between 18% and 46% of voters is only assumed to match the choices of the remaining voting populace.

Dr. Handley's method improperly assumes polarization among all voters based on voting preferences of some.[7] *See Growe v. Emison*, 507 U.S. 25, 42 (1993) ("Section 2 'does not assume the existence of racial bloc voting; plaintiffs must prove it.'" (citation omitted)). Moreover, Dr. Handley did not even cap the number of mail-in votes assigned to each precinct by total turnout, so the total votes cast for given candidates was overestimated in some precincts and underestimated in others. The result is an impossible set of over- and under-estimates of votes per precinct, which renders Dr. Handley's opinions so unreliable as to fail the threshold *Daubert* standard. *See Overton*, 871 F.2d at 539; Doc. 148-1. In all events, evidence this faulty cannot meet Plaintiffs' burden to show the second and third preconditions, which cannot be assumed in their favor. *See Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 867 (5th Cir. 2004) (after district court rejected statistical analysis, there was "*no* information" as to how voters "*actually* vote" and no basis for § 2 liability); *Growe*, 507 U.S. at 42.

### ii.    Failure to establish legally significant White bloc voting.

79.    Setting aside Plaintiffs' failure to prove anything about voting preferences by race, their evidence does not establish an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). The question is not merely "whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *LULAC, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc) (citation omitted).

80.    "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich*

---

[7] Indeed, while Dr. Handley correctly asserts that a valid methods should not "simply ignore these" mail-in votes, PX1 at 6, her allocation method—at best—does just that by assigning votes to precincts based on the voting choices of *other* voters.

*v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n. 15). That is, "[i]n areas with substantial crossover voting" a challenger will not "be able to establish the third *Gingles* precondition—bloc voting by majority voters." *Bartlett*, 556 U.S. at 24. For example, in *Abrams v. Johnson*, 521 U.S. 74 (1997), the Supreme Court concluded that majority-Black districts were unnecessary because "the average percentage of whites voting for black candidates across Georgia ranged from 22% to 38%." *Id.* at 92 (citation omitted). According to governing precedent, crossover voting becomes "substantial" when it arises to the level that "a VRA remedy," i.e., a majority-Black district, is not necessary to enable the Black community to usually elect its preferred candidates. *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017).

81.     The Supreme Court made this clear in *Bartlett*. That decision held that Section 2 does not require jurisdictions to create "crossover" districts, in which "the minority population, at least potentially, is large enough to elect the candidate of its choice with help from voters who are members of the majority and who cross over to support the minority's preferred candidate." 556 U.S. at 13 (plurality opinion). One of the rationales for this conclusion was that a crossover-district requirement "would require us to revise and reformulate the *Gingles* threshold inquiry that has been the baseline of our § 2 jurisprudence." *Id.* at 16. The Court reasoned that "the majority-bloc-voting requirement" will not "be met in a district where, by definition, white voters join in sufficient numbers with minority voters to elect the minority's preferred candidate." *Id.* The Court further explained that, where crossover voting is sufficient to create performing crossover districts, "majority-minority districts would not be required in the first place." *Id.* at 24.

82.     A subsequent summary affirmance confirmed this definition of legally significant White bloc voting. In *Covington*, the North Carolina legislature created twenty-eight majority-

Black districts in its state House and Senate plans, based on the advice of statistical experts who found "statistically significant racially polarized voting in 50 of the 51 counties studied." *Covington*, 316 F.R.D. at 169 (quotation marks omitted). The problem was that North Carolina's experts, addressed "the general term 'racially polarized voting'" which "simply refers to when different racial groups 'vote in blocs for different candidates.'" *Covington*, 316 F.R.D. at 170 (citation omitted). But they missed "crucial difference between legally significant and statistically significant racially polarized voting." *Id.* at 170 (underlining in original). Whereas polarized voting can be said to occur "when 51% of a minority group's voters prefer a candidate and 49% of the majority group's voters prefer that same candidate," *id.* at 170, "the third *Gingles* inquiry is concerned only with 'legally significant racially polarized voting,'" *id.* (quoting *Gingles*, 478 U.S. at 51, 55–56). Non-actionable polarized voting becomes legally significant only when "racial bloc voting is operating at such a level that it would actually minimize or cancel minority voters' ability to elect representatives of their choice, *if no remedial district were drawn*." *Id.* at 168 (quotation and edit marks omitted; emphasis added). The question is whether "the candidate of choice of African-American voters would usually be defeated *without a VRA remedy*." *Id.* (emphasis added).

83.     In addition, considering a minority group that supports a candidate 51% of the time to be cohesive is nonsensical. Under that definition, one would always find cohesion. There is always a preferred candidate in a two-party race. The test for cohesion is linear and resides somewhere between 51% support and 100% - which would equal perfect cohesion.

84.     The *Covington* court—whose decision was endorsed by every Supreme Court justice—criticized the North Carolina legislature because it "**Never Analyzed *Gingles*' Third Factor.**" *Id.* at 167 (bolding and capitalization in original). The legislature did not assess whether the Black-preferred candidate would likely lose "absent some remedy," and this "failure" was

"fatal to their Section 2 defense." *Id.* As *Bartlett* had explained, where a crossover district would perform, "majority-minority districts would not be required in the first place." 556 U.S. at 24 (plurality opinion). They were not required in North Carolina.

85.     *Covington* is not controversial. The case was not close. The three-judge court—led by Fourth Circuit Judge James Wynn—subsequently called the invalidated North Carolina plan "the most extensive unconstitutional racial gerrymander ever encountered by a federal court," *Covington v. North Carolina*, 270 F. Supp. 3d 881, 892 (M.D.N.C. 2017). The U.S. Supreme Court summarily affirmed the decision, which fell within its appellate jurisdiction, in a one-sentence order by a unanimous vote. *North Carolina v. Covington*, 137 S. Ct. 2211 (2017); *Covington*, 270 F. Supp. 3d at 892 ("The Supreme Court affirmed that conclusion without argument and without dissent. And the Supreme Court unanimously held that Senator Rucho and Representative Lewis incorrectly believed that the Voting Rights Act required construction of majority-Black districts[.]" (underlining in original)). The Supreme Court reached a materially identical conclusion in *Cooper*, finding that a majority-Black district was unnecessary, and hence racially gerrymandered, where crossover voting levels were such that a crossover district would perform. 137 S. Ct. at 1471–72.

86.     It is worth recounting this because this case is the other side of the *Covington* coin. Dr. Handley concludes that Black and White voters tend to support different candidates. PX1 at 10. But this merely shows "(to no one's great surprise) that in [Louisiana], as in most States, there are discernible, non-random relationships between race and voting." *Cooper*, 581 U.S. at 304 n.5. Dr. Handley also produced "effectiveness" scores for districts in regions of Louisiana she analyzed, but she did not analyze whether 50% BVAP districts are necessary to ensure equal Black

opportunity. Plaintiffs do not even attempt to show that White bloc voting would usually defeat Black-preferred candidates "without a VRA remedy." *Covington*, 316 F.R.D. at 168.

87.    The unrebutted evidence shows that no VRA remedy is necessary to replace the districts Plaintiffs challenge. As in *Abrams*, White crossover voting is high, ranging from 18% to 27% on average, and it is higher in two-candidate contests (such as runoffs) than in contests with three or more candidates. *See* LDTX54 at 3. The minimum BVAP needed to create equal opportunity is well below 50% on average, ranging from 23% to 40%, depending on the type of election. *Id.* This is true at the regional level. In what Dr. Handley calls "Senate Cluster 1," PX1 at 17, SD36, SD38, and SD39 would all perform at less than 40% BVAP. *See* LDTX52 Table 1 (B-6); *see also* LDTX54 at 7–8. In what Dr. Handley calls "Senate Cluster 2," PX1 at 19, SD8, SD9, SD10, and SD19 would all perform at BVAP levels between 25% and 41%, LDTX52 at Table 1 (B-6); *see also* LDTX54 at 7–8. In what Dr. Handley calls "Senate Cluster 3," PX1 at 21, SD14, SD15, and Sd16 would all perform at BVAPs below 36%, LDTX52 Table 1 (B-6); *see also* LDTX54 at 7. Thus, no region of the senate plan challenged in this case needs to be redrawn to create VRA remedies.

88.    The same is true of the House plan. In what Dr. Handley calls "House Cluster 1," PX1 at 23, HD7, HD22, and HD25 would perform with respective BVAPs between 32% and 42%. LDTX52 at Table 1 (B-2); *see also* LDTX54 at 7. In what Dr. Handley calls "House Cluster 2," PX1 at 25, HD33, HD34, and HD35 would perform with respective BVAPs between 14% and 36%, LDTX52 Table 1 (B-2); *see also* LDTX54 at 7. While one district, HD36, would require a 51% BVAP to perform, Plaintiffs admit this region already contains one performing majority-Black district, PX1 at 25, so the ostensible legal requirement that there be one is satisfied. In what Dr. Handley calls House Cluster 3, PX1 at 27, all districts except one (HD6) would perform at

under 50% BVAP, LDTX52 at Table 1 (B-2), and there are currently three performing districts, easily extinguishing any § 2 liability, PX1 at 27. In what Dr. Handley calls House Cluster 4, PX1 at 29, HD60 and HD88 would perform with respective BVAPs of 19% and 42%, LDTX52 Table 1 (B-3), and while HD59 requires slightly above 50% BVAP to perform, there is one district affording about an equal opportunity in this cluster now, PX1 at 29. In what Dr. Handley calls "House Cluster 5," PX1 at 31, all ten districts challenged would perform with BVAPs below 50%, LDTX52 at Table 1 (B-3). Thus, no region of the 2022 House Plan challenged in this case needs to be redrawn to create additional VRA remedies.

89.    Any other resolution would create a gross racial gerrymander and force unconstitutional race-based redistricting, which cannot be narrowly tailored to § 2 compliance, on Louisiana. *Covington*, 270 F. Supp. 3d at 892; *Cooper*, 581 U.S. at 305–06.

### iii.    Failure to Establish That Black-Preferred Candidates Will Usually Lose.

90.    Even if Plaintiffs were correct that the third precondition can be satisfied by proof that enacted districts will not provide the opportunity of illustrative districts—even where White crossover voting renders majority-Black districts unnecessary—Plaintiffs do not satisfy the third precondition. When viewed against the best election dataset on record, the "clusters" Plaintiffs challenge largely deliver the opportunity Plaintiffs contend is required, if not more than that.

91.    "Properly conceived, the results test protects racial minorities against a stacked deck but does not guarantee that they will be dealt a winning hand." *Uno v. City of Holyoke*, 72 F.3d 973, 982 (1st Cir. 1995). "If specified groups are entitled to 'their' members in the legislature, why bother with elections?" *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992). Because "the norm that the electoral process ensures equality of opportunity and not equality of outcome," *id.*, the question under the third precondition is whether a majority voting

block is "*usually* . . . able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Gingles*, 478 U.S. at 49 (emphasis in original). Where minority-preferred-candidate success is in the vicinity of 50%, this precondition cannot be shown. *See Morris v. City of Houston*, 894 F. Supp. 1062, 1066 (S.D. Tex. 1995), *aff'd sub nom. Campos v. City of Houston*, 113 F.3d 544 (5th Cir. 1997) (data showing "50 percent" success rate "do not support the proposition that Anglo[s] *usually* vote as a bloc to defeat Hispanic candidates"); *Clarke v. City of Cincinnati*, 40 F.3d 807, 813 (6th Cir. 1994) (47% success rate "gives us no reason to find that blacks' preferred black candidates have 'usually' been defeated").

92.      In addition, § 2 does not guarantee majority-Black districts. "States retain broad discretion in drawing districts to comply with the mandate of § 2." *LULAC*, 548 U.S. at 429 (citation omitted). As a result, although VRA § 2 does not require that legislatures create crossover districts, the Supreme Court has signaled that states may voluntarily create them "as a matter of legislative choice or discretion." *Bartlett*, 556 U.S. at 23 (plurality opinion). Where that occurs by legislative volition, the Supreme Court has made clear that § 2 can "be *satisfied* by crossover districts." *Cooper*, 581 U.S. at 305. Indeed, Supreme Court precedent encourages crossover districts because they "may serve to diminish the significance and influence of race by encouraging minority and majority voters to work together toward a common goal." *Bartlett*, 556 U.S. at 23. Majority-minority districts "rely on a quintessentially race- conscious calculus aptly described as the 'politics of second best,'" and the Supreme Court has discouraged them in "communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Johnson*, 512 U.S. at 1020 (citation omitted). For this reason, the Court has explained that "States can—and in proper cases should—defend against alleged § 2 violations by pointing to crossover

voting patterns and to effective crossover districts." *Bartlett*, 556 U.S. at 24. To compel states to draw majority-minority districts even where crossover districts perform would "tend to entrench the very practices and stereotypes the Equal Protection Clause is set against." *Johnson*, 512 U.S. at 1029 (Kennedy, J., concurring in part and concurring in the judgment).

93.     In this case, then, the question is not whether Plaintiffs can provide more majority-Black districts than the Legislature did, but whether their proposed majority-Black districts provide more opportunity than the Legislature's majority-Black districts *and* its crossover districts. *See Bartlett*, 556 U.S. at 24. In this case, Dr. Handley attempts to show enhanced opportunity is possible under Mr. Cooper's Illustrative Plans, but, as demonstrated (PFOF ¶¶ 219-222), her dataset is unnaturally thin and shows signs of bias. The far more probative dataset is provided by defense expert Dr. Lewis, and his dataset shows a very large number of districts in both the 2022 House and Senate Plans where Black-preferred candidates can prevail.

94.     Dr. Lewis's data show parity of opportunity in all the regions where Plaintiffs focus their challenge. In what Dr. Handley calls "Senate Cluster 1," where Plaintiffs demand two opportunity districts, PX1 at 17, the enacted plan currently provides a 100% Black-preferred-candidate win rate in SD39, a 43% win rate in SD38, and a 14% win rate in SD36, *see* LDTX52 at Table 1 (B-6). That is an equal opportunity to win two of three districts and matches Plaintiffs' demand for just that. *Cf. Baird*, 976 F.2d at 360 ("[I]t does not violate the Act to have some districts in which black voters form a minority and are unlikely to elect candidates of their choice."). In what Dr. Handley calls "Senate Cluster 2," PX1 at 19, SD8 and SD19 currently exceed equal opportunity, LDTX52 at Table 1 (B-6), so Plaintiffs' demand for *one* opportunity district is already satisfied, under the correct election data. In what Dr. Handley calls "Senate Cluster 3," where Plaintiffs' demand three opportunity districts, PX1 at 21, SD14 and SD15 provide 100% Black-

preferred-candidate win rates, LDTX52 Table 1 (B–6–B-7), and an additional district (SD17) has a BVAP of 30% and was not analyzed by Dr. Handley. But Dr. Lewis's analysis indicates that districts in this area perform with BVAPs as low as 11%, so SD17 likely affords equal opportunity as well, matching Plaintiffs' demand for three opportunity districts. In any event, Plaintiffs cannot prove otherwise. *See Rodriguez*, 385 F.3d at 867.

95.    In what Dr. Handley calls "House Cluster 1," PX1  at 23, HD7 provides an equal opportunity for a Black-preferred candidate to prevail, LDTX52 at Table 1 (B-2), matching Plaintiff's demand for one opportunity district. In what Dr. Handley calls "House Cluster 3," PX1 at 27, four districts (HD2, HD3, HD4, and HD7) currently afford equal opportunity, LDTX52 at Table 1 (B-2), matching Plaintiffs' demand for four opportunity districts, PX1 at 27. In what Dr. Handley calls "House Cluster 4," where Plaintiffs demand one opportunity district, PX1 at 29, the enacted plan provides it (HD60), LDTX52 at Table 1 (B-3). In what Dr. Handley calls "House Cluster 5," where Plaintiffs demand seven opportunity districts, PX1 at 31, the enacted plan delivers seven (HD60, HD61, HD62, HD63, HD67, HD72, and HD21) and three more (HD68, HD69, and HD70) affording about 30% opportunity for Black-preferred candidates, LDTX52 at Table 1 (B-3). That opportunity is all § 2 requires. Plaintiffs err in demanding more than that.

### iv.    Any polarized voting lacks legal significance, because it reflects political (not racial) polarization.

96.    Legally significant polarized voting cannot be shown for the additional reason that differences in candidate preferences among White and Black voters reflect a partisan, not racial, divide. The VRA "is a balm for racial minorities, not political ones—even though the two often coincide." *Baird*, 976 F.2d at 361. If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens,*

*Council No. 4434 v. Clements,* 999 F.2d 831, 850 (5th Cir. 1993) (en banc). This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.'" *Id.* at 854 (emphasis added) (quoting *Baird,* 976 F.2d at 361). Section 2 "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* As the Fifth Circuit explained in *LULAC, Council No. 4434,* a majority of Justices in *Gingles* held § 2 liability does not lie where different candidate preferences reflect "interest-group politics." *See id.* at 855–59.

97.      In this case, as in *LULAC, Council No. 4434,* the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861. Dr. Handley analyzed only contests involving Black candidates affiliated with the Democratic Party, and thus Plaintiffs do not satisfy their burden to differentiate race and politics. *See id.* at 859–60 (outlining the "powerful argument" that § 2 plaintiffs should have to disentangle these factors under their burden of proof). Moreover, evidence sponsored by the defense does disentangle race and politics and demonstrate that polarization is decidedly political, not racial. *See* LDTX52 at 8–15. As described above (PFOF ¶¶ 249–255), Dr. Alford demonstrated that Black voters tend to support Democratic candidates and White voters tend to support Republican candidates and that these support levels remain relatively constant regardless of the race of candidates involved. *Id.* at 9–13. The sole contests that arguably vary from that trend involve John Bel Edwards, but he has taken "some notable conservative positions on high-profile issues including abortion and gun control" that attract meaningful crossover voting from Republicans, *id.* at 12 n. 5, and these contests have a key factor disproving Plaintiffs' assertions of racial polarization: Black Democratic candidates were on the ballot in October 2015 and October 2019

and received almost no Black support both times. *Id.* at 13. Black voters thus supported a White Democrat over a Black Democrat, signaling that non-racial choices are driving election results.

## C.   Totality of the Circumstances.

98.   Plaintiffs' claim in all events fails under the totality of the circumstances. "Satisfaction of" the *Gingles* "'preconditions' is necessary, but not sufficient, to establish liability." *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Id.* (citation omitted). Even if Plaintiffs had shown the three *Gingles* preconditions, that is not enough where "other considerations show that the minority has an undiminished right to participate in the political process." *Baird*, 976 F.2d at 359. The Court "is instructed to evaluate the totality of the circumstances with a 'functional view of the political process'" and "[a] searching and practical review of electoral conditions." *Fusilier*, 963 F.3d at 456, 462.

### i.   Proportionality

99.   Plaintiffs cannot show vote dilution under the totality of circumstances because they challenge plans (and regions of plans) "whose pertinent features [are] majority-minority districts in substantial proportion to the minority's share of voting-age population." *Johnson*, 512 U.S. at 1013. "One may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Id.* at 1017. Accordingly, the Supreme Court in *Johnson* held that vote dilution will ordinarily not occur where minority voters in the relevant "area would enjoy substantial proportionality." *Id.* at 1014; *see LULAC*, 548 U.S. at 436 (finding it proper to look "first to the proportionality inquiry" in weighing the circumstances); *Little Rock Sch. Dist. v. Pulaski Cnty. Special Sch. Dist., No. 1*, 56 F.3d 904,

912 (8th Cir. 1995) (observing that this consideration "has been given special importance by the Supreme Court"). In *Johnson*, the substantial proportionality for the Hispanic voting-age population in Florida's House plan in Miami-Dade County alone cut so decisively against § 2 liability that the Supreme Court reversed a trial court's finding on that basis alone. *See* 512 U.S. at 1014–15; *see also id.* at 1023–24 (affirming judgment declining intervention as to state senate plan on same ground).

100.     In this case, Plaintiffs demand a political feast where the challenged plans afford more than equal opportunity. By providing 40 majority-BVAP districts—and exceeding proportionality in many relevant regions—the plans "thwart [any] historical tendency to exclude [African-Americans], not encourage or perpetuate it." *Id.* at 1014.

        **a.     The plans are substantially proportional at the regional level.**

101.     As in *Johnson*, "the relevant population" for the proportionality analysis is the population in the geographic areas Plaintiffs identified as the locus of vote dilution. *Id.* at 1017; *see also id.* at 1021–22. Several factors demonstrate that the analysis must be regional in scope.

102.     First, as in *Johnson*, Plaintiffs have "litigated" this case on "smaller geographical scale[s]" than the entire House and Senate plans.[8] *See id.* (analyzing proportionality regionally because the plaintiffs did not "frame their dilution claim in statewide terms"). Plaintiffs have made clear that they challenge only "*specific districts*" in "*specific areas*"—namely, "the Shreveport area, Jefferson Parish, and in the East Baton Rouge area" of the senate plan and "the Shreveport area, the East Baton Rouge area, the Ascension area, the Lake Charles area, and the Natchitoches

---

[8] The Prayer for Relief in Plaintiffs' Amended Complaint asks this Court to enjoin the use of the entire Enacted Senate and House Plans. *See* Doc. 14. This request is inconsistent with Plaintiffs' claims on summary judgment that they are only challenging *specific areas* of the state. If Plaintiffs are to be held to their admission on Summary Judgment, then Plaintiffs may not seek to enjoin the Enacted Plans statewide, and instead must seek relief based upon specific regions.

area" of the 2022 House Plan. Pls' SJ Opp., Doc. 163, at 2. Their evidence focuses on these areas, as their demographic evidence looks at district configurations by region, and they measure voting patterns by region as well. Accordingly, Plaintiffs have not "alleged statewide vote dilution based on a statewide plan." *LULAC*, 548 U.S. at 438. Where challengers' claims focus on regions of a state, courts—following *Johnson*—have conducted the proportionality analysis by region. *See, e.g.*, *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000) (looking to a "seven-county area" where plaintiffs sought additional opportunity districts); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 428 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004) (finding "the most appropriate geographical point of reference is Bronx County and the five districts under the Senate Plan that are located there entirely or primarily," given focus of plaintiffs' claims); *Soto Palmer v. Hobbs*, __F. Supp. 3d__, 2023 WL 5125390, at *10 & n.11 (W.D. Wash. Aug. 10, 2023) (focusing on Yakima Valley region of Washington for similar reasons).

103.    Second, foundational § 2 principles demonstrate that the analysis "should ordinarily" occur at the local level. *Rural W. Tennessee Afr.-Am. Affs.*, 209 F.3d at 843. The Supreme Court has rejected the theory that § 2 protection "belongs to the minority as a group and not to its individual members" and concluded that, as a result, § 2 liability "is proved for a particular area." *Shaw II*, 517 U.S. at 917–18. *Johnson* itself confirmed that "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class." *Johnson*, 512 U.S. at 1019. Accordingly, absent unique circumstances, such as "racially polarized voting—and the possible submergence of minority votes—throughout" a state, *LULAC*, 548 U.S. at 438, the analysis should be local, *see Soto Palmer*, 2023 WL 5125390, at *10 n.11 (distinguishing unique facts of *LULAC*); *Rural W. Tennessee Afr.-Am. Affs.*, 209 F.3d at 843 (resting default principle on § 2 fundamentals).

104.      Third, the size and numerosity of Louisiana legislative districts counsels in favor of a regional approach. Louisiana's 105 House districts and 39 Senate districts afford representation on a more localized basis than its six congressional districts, and "[a] statewide assessment of proportionality seems particularly inappropriate here where the interests and representation of" voters in "rural and agricultural" regions "may diverge significantly from those who live in" other areas. *Soto Palmer*, 2023 WL 5125390, at *10 n.11. It is difficult to see how a claim of vote dilution can be "based on a statewide plan" in this context, *LULAC*, 548 U.S. at 438, where various regions of the state operate and can be configured and reconfigured independently of each other.

105.      Viewed from that correct regional vantagepoint, the relevant Black communities enjoy substantial proportionality, or better. The 2022 House Plan provides substantial proportionality or better in:

•      the Shreveport region, with three majority-BVAP districts of eight total (or 37.5%) in a region of 39.1% BVAP, SOSX1 at 70; *see Johnson*, 512 U.S. at 1014 (finding substantial proportionality in 50% Hispanic VAP region where 45% of districts were majority-Hispanic); *see infra* § II.C.1.b;

•      the Lake Charles region, with one majority-BVAP district of five total (20%) in an area of 25.1% BVAP,  SOSX1 at 86;

•      the East Baton Rouge region, with six majority-BVAP districts of 11 total (54%) in a region that is 43.9% BVAP, *id.* at 93;

•      the Iberville-Ascension region, with one majority-BVAP district of four total (25%) in a region with a 29% BVAP, *id.* at 102.

In each of these regions, to add even one additional majority-BVAP district would exceed proportionality, typically by a large margin, and Plaintiffs demand at least that and, in the case of the Baton Rouge region, an increase of *three* districts, so that 75% of the districts in a 40% BVAP region are majority-Black. In all these instances, substantial proportionality clearly exists in the 2022 House Plan. *See Fairley v. Hattiesburg Mississippi*, 662 Fed. Appx. 291, 299 (5th Cir. 2016) (finding proportionality satisfied because increasing majority-minority districts would substantially exceed proportionality); *Rural W. Tennessee Afr.-Am. Affs. Council, Inc. v. McWherter*, 877 F. Supp. 1096, 1107 n.12 (W.D. Tenn.), *aff'd sub nom. Rural W. Tennessee Afr.-Am. Affs. Council, Inc. v. Sundquist*, 516 U.S. 801 (1995) (similar).

106.    In the 2022 Senate Plan, proportionality exists in every region Plaintiffs challenge:

- In the Shreveport region (39.1% BVAP), one of three districts is majority-BVAP (33.33%), SOSX1 at 32;

- In the Jefferson and St. Charles region (26.6% BVAP), one of five districts is majority-BVAP (20% BVAP), *id.* at 40;

- In the Baton Rouge region (34.3% BVAP), three of eight districts are majority-BVAP (37.5%), *id.* at 47.

In each of these regions, to add even one additional majority-BVAP district would exceed proportionality, typically by a large margin, and Plaintiffs demand precisely that. In all cases, Plaintiffs demand that the Court "guarantee a political feast." *Johnson*, 512 U.S. at 1017.

### b.    The plans are substantially proportional at the statewide level.

107.    The substantial-proportionality standard is also satisfied at the statewide level. Louisiana's BVAP is 31.25%, 29 of 105 House districts (27.6%) are majority-BVAP, and 11 of 39 Senate districts (28.2%) are majority-BVAP. SOSX1 at 5. Plaintiffs' Illustrative Plans, by

comparison, create 35 majority-BVAP House districts (33.3% of the total) and 14 majority-BVAP senate districts (35.9% of the total). *Id.* at 5–6. Viewed this way too, Plaintiffs demand "a political feast." *Johnson*, 512 U.S. at 1017.

108.     It is of no legal consequence that the enacted plans fall "just short of perfect proportionality," because the standard is "rough proportionality." *Id.* at 1023. *Johnson* rejected challenges to Florida's state House and Senate districts, even though there was a gap of a few percentage points between the percentage of majority-minority districts and minority population percentages in the relevant area. *See id.* at 1013–14, 1023–24. The Supreme Court subsequently explained that "[t]here is, of course, no 'magic parameter,' and 'rough proportionality,' must allow for some deviations." *LULAC*, 548 U.S. at 438. The Court in *LULAC* was therefore amenable to assuming that a 16% to 22% comparison between majority-minority district and total minority voting-age percentage qualified as substantially proportionate. *See id.* The lower courts have followed suit. *See, e.g.*, *McConchie v. Scholz*, 577 F. Supp. 3d 842, 863 (N.D. Ill. 2021) (three-judge court) (finding substantial proportionality in respective comparisons of 8.5% and 10% representation with 11.1% minority percentage); *Luna v. Cnty. Of Kern*, 291 F. Supp. 3d 1088, 1133 (E.D. Cal. 2018) (finding proportionality in 30% Hispanic CVAP jurisdiction where 20% of districts Hispanic CVAP majorities). Here, the 2022 Senate Plan is one district below perfect proportionality, and the 2022 House Plan is three districts below that, and Plaintiffs demand *more* than perfect proportionality. SOSX1 at 5–6. The standard of substantial proportionality is met.

### c.     There is no basis to find vote dilution in these circumstances.

109.     Under the circumstances of this case, the substantial proportionality of state House and Senate Plans confirms that there is no vote dilution. To be sure, *Johnson* declined to treat substantial proportionality as a "safe harbor." 512 U.S. at 1019. However, *Johnson* and its progeny

clarify that demands for better than proportionality will be meritorious only in circumstances not present here.

110.    *Johnson* notes proportionality would not be a legitimate § 2 defense "in cases of alleged dilution by the manipulation of district lines," such as where a jurisdiction's neutral criteria would result in majority-minority districts beyond the minority's proportion of the population, and the jurisdiction avoided that outcome. *Johnson*, 512 U.S. at 1018–19. For example, in *LULAC*, the Court found the Hispanic group's likely proportionality offset by "other evidence of vote dilution," including that the Hispanic community was growing and becoming increasingly active—only to see a functional district dismantled— and the "use of race to create the facade of a Latino district." 548 U.S. 399–41. That is nothing like this case. Louisiana's plans contain more majority-BVAP districts than ever, the Black population has remained relatively stagnant over the past 20 years, the plans far exceed the number of majority-Black districts in plans simulated to achieve neutral criteria, and the only way to achieve the maximization Plaintiffs demand is by careful, race-based line drawing to group non-compact minority populations into districts a smidgen above 50% BVAP. No plan before the Legislature—including by Black members—proposed the mass expansion of majority-BVAP districts Plaintiffs demand. Likewise, there is no evidence of invidious electoral manipulation like "ballot box stuffing, outright violence, discretionary registration, property requirements, the poll tax, and the white primary." *Johnson*, 512 U.S. at 1018.

111.    *Johnson* suggested § 2 might command more than proportionality to avoid an outcome where "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class," as might occur where "the most blatant racial gerrymandering in half of a county's single-member districts" were alleged to be would be "offset

by political gerrymandering in the other half." 512 U.S. at 1019. That is not so here, where Plaintiffs demands exceed proportionality at every relevant level, state and local. A fair, sensitive review of the facts shows that Plaintiffs are asking for a political feast.

112.      It was in such a case that *Johnson* deemed proportionality a sufficiently weighty consideration to demand outright rejection of a § 2 claim and reversal of the trial-court decision that found merit in it—on clear-error review. *See* 512 U.S. at 1014–15. This claim is even weaker than the one rejected in *Johnson*.

113.      It is clear that the predominant motive of Plaintiffs Illustrative Plans was to maximize the number of majority-Black districts. But, even if Plaintiffs' Illustrative Plans merely sought proportionality, any order by the court ordering their adoption would be subject to a "strict scrutiny" analysis. *Fairley*, 62 Fed. Appx. at 300 (citing *Miller*, 515 U.S. at 915-16. But Plaintiffs don't simply seek proportionality– here they seek *more* than mere proportionality. Surely a plan that maximizes the number of majority-Black districts to a level above proportionality can never survive strict scrutiny. *Miller*, 515 U.S. at 927-28

114.      Plaintiffs are not entitled to more than proportionality of majority-minority districts. *Johnson*, 512 U.S. at 1000. Because Plaintiffs' Illustrative Plans seek extra proportionality, see PFOF 125-126, they are illegal and not proper Illustrative Plans for this Court to consider. *Id.*

115.      Congressional authority to constitutionally authorize race-based redistricting under Section 2 cannot extend indefinitely unto the future. *Allen*, 599 U.S. at 45. (Kavanaugh, J. concurring). Because it is clear that the political process is equally open to Black voters and any polarization is based on political affiliation, not race, see PFOF ¶¶ 249-258, ordering race-based districting under these facts, would violate the U.S. Constitution.

###### ii.    Additional considerations.

116.    Plaintiffs bear the burden of proving vote dilution under the totality of circumstances. *Fusilier*, 963 F.3d at 455. They have failed to meet that burden.

117.    While *Gingles* calls for a variety of considerations, Plaintiffs' expert on this subject, Dr. Gilpin, evaluated one factor (Senate Factor 3), which asks whether the jurisdiction in question has "unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37 (citation omitted). Dr. Gilpin's analysis lack probative value concerning elections to the Louisiana Legislature: he focused on the acts of other political subdivisions around the state, like School Boards. In fact, Dr. Gilpin is not aware of any court decisions holding that laws adopted by the Legislature on accessibility discriminate against Black residents.

118.    In any event evaluation of this factor does not carry Plaintiffs' burden, which "depends upon a searching practical evaluation of the 'past and present reality,' and on a 'functional' view of the political process." *Id.* at 45 (citation omitted). Plaintiffs' presentation is superficial, outdated, and ultimately unpersuasive.

292.    The functional reality of the political process is that Black residents have an equal opportunity to participate and elect their preferred candidates. Black registered voters make up not only the majority of registered Democrats in the state of Louisiana, but also a majority of Democrats voting in elections including statewide contests over the last decade. *See* SOSX5 at 8, 10. For example, in 1990 the Black registered voters made up 32.6% of all registered Democrats in the state of Louisiana. SOSX11. In 2000, the Black registered vote share of all registered Democrats was at 40%, and in 2010, the number of registered Black Democrats surpassed the

number of White registered democrats statewide, representing approximately 48.6% of all registered Democrats. SOSX28, SOSX2. This has a natural impact, translating into numerous Black candidates in statewide elections, and substantial influence.

293. For the last two statewide election cycles before 2023, and the corresponding 2018 Secretary of State Special election, there were 14 statewide elections with Black candidates. The touchstone to Section 2 is whether the political process is equally *open* to Black voters, not whether they win their proportion of elections. The fact that Black voters now essentially control one of the two major parties in the state of Louisiana presents a starkly different picture than the burdens facing Black voters in 1982 and showcases the open nature of the political process to Black Louisianans. Moreover, the number of Black candidates elected to office at all levels has greatly increased over the last nearly 40 years, from winning fewer than 20% of contests in the 1990s to winning close to 30% of contests today, which is roughly proportional to Louisiana's Black population. SOSX7; SOSX1 at 5.

119. The evidence shows that Black candidates are not denied access to any candidate slating process, that legislative campaigns are not marked by racial appeals, that many Black candidates have won election to the Legislature, and that effects of past discrimination have waned over time. *See Gingles*, 478 U.S. at 37. There is no basis for the Court to find vote dilution.

120. Another factor is whether the "policy underlying" the challenged system "is tenuous." *Gingles*, 478 U.S. at 37 (citation omitted). This presents "a legal question, not a factual one." *Fusilier*, 963 F.3d at 460. Plaintiffs' effort to make out their case through expert opinion therefore miss the mark. *See* PX126 at 28-42. Louisiana had the strongest of interest not to employ a maximization plan of the type condemned in Supreme Court precedent.

121.      Plaintiffs attempt to show that "political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. Their leading point on this, however, proves too much: they effectively claim racial appeals mark every American (or at least southern) election even if race is not mentioned. *See* PX126 at 22. There would be no point in a searching appraisal of courts can just assume racial appeals based on this overbroad conception of racial appeals. Beyond that, Plaintiffs do not present a functional view of legislative elections in Louisiana and almost entirely ignore them. *See id.* at 22-25.

122.      Likewise, Plaintiffs' evidence of a "history of official discrimination," *Gingles*, 478 U.S. at 37 (citation omitted), is not recent. *See, e.g.*, PX126 at 5-6, 6-16. "[T]he authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring). Plaintiffs' reliance on the past does not justify current relief.

123.      Plaintiffs also do not show "lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37 (citation omitted). Their expert contends that "[p]olicy outcomes do not track the specific needs of the minority community," PX126 at 4, but that is not the inquiry: § 2 does not guarantee policy outcomes.

124.      The evidence shows that "members of the minority group have been elected to public office in the jurisdiction" in large numbers. *Gingles*, 478 U.S. at 37 (citation omitted); *see* PX126 at 25. Plaintiffs' expert obfuscates this by measuring this factor against proportional representation. *Id.* at 25. That is not the standard: "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. § 10301(b).

## CONCLUSION

125.        The Court is compelled to enter judgment for Defendants.

Respectfully submitted, this the 9th day of November, 2023.

By: */s/Michael W. Mengis*
LA Bar No. 17994
BAKERHOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
BAKERHOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
BAKERHOSTETLER LLP
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

Erika Dackin Prouty*
Robert J. Tucker*
BAKERHOSTETLER LLP
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

* *Admitted pro hac vice*

*/s/ Phillip J. Strach*
Phillip J. Strach*
         *Lead Counsel*
Thomas A. Farr*
John E. Branch, III*
Alyssa M. Riggins*
Cassie A. Holt*
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

*/s/ John C. Walsh*
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
**SHOWS, CALL & WALSH, L.L.P.**
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com

* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in
his official capacity as Secretary of State of
Louisiana*

Jeff Landry

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

Louisiana Attorney General
By: */s/ Jeffrey M. Wale*
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov
walej@ag.louisiana.gov

Jason B. Torchinsky* (DC Bar No 976033)
Phillip M. Gordon* (DC Bar No. 1531277)
Brennan Bowen* (AZ Bar No. 36639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
bbowen@holtzmanvogel.com

*Admitted pro hac vice*