IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana,<br><br>Defendant. | Civil Action No. 3:22-CV-00178-SDD-SDJ<br><br>Chief Judge Shelly D. Dick<br><br>Magistrate Judge Scott D. Johnson |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF SUMMARY JUDGMENT**

# INTRODUCTION

Plaintiffs claimed to have standing to challenge some 47 legislative districts based principally on the assurances of the Louisiana NAACP's President that the NAACP had members residing in those districts. That claim collapsed under the slightest scrutiny, however, as Plaintiffs can now only identify named individual Plaintiffs or Louisiana NAACP members that allegedly reside in eight challenged House districts (HDs 1, 25, 34, 60, 65, 66, 68, 101) and four Senate districts (SDs 2, 8, 17, 38). Nevertheless, Plaintiffs cannot rely on associational or organizational standing of their Entity Plaintiffs for standing, and the Court should enter summary judgment in Defendants' favor.

# ARGUMENT

## A. Associational Standing

Standing in a § 2 case requires an organization to identify specific members that are harmed. Defendants explained that the Louisiana NAACP cannot rely on associational standing here because it did not timely "name the individuals who were harmed by the" challenged redistricting plans. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009); Doc. 149-1 at 7–10. For months, Plaintiffs asserted that they did not need to identify specific members to assert associational standing. Plaintiffs are wrong.

With their Opposition, Plaintiffs attached the Declaration of Michael McClanahan. Doc. 163-10. Mr. McClanahan, who is the President of the Louisiana NAACP, asserts that he has identified specific members in Shreveport, Baton Rouge, New Orleans, Natchitoches, and Lake Charles. *Id*. at ¶ 6. But he does not identify their names or addresses. He claims to have reviewed their "membership information" but admitted at his deposition that the Louisiana NAACP does not have any membership lists. Doc. 163-8 at 74:6-16, 81:24-82:2, 82:11-15, 82:25-83:21.

Thus, this case proves why this Court cannot "accept[] the organization's self-description of . . . its members." *Summers*, 555 U.S. at 497. A prior declaration from Mr. McClanahan stated that he had identified members in "at least" 47 legislative districts, Doc. 135-1 at 2, but in response to the Court's order, the Louisiana NAACP identified only 10 individuals, Doc. 173-1 at 2–6. In opposition to Defendants' summary-judgment motion, Mr. McClanahan said the Louisiana NAACP "identified a [] member in a dilutive district in the Lake Charles area . . . who could be drawn into a new opportunity district as demonstrated by Illustrative House District 38." Doc. 163-10 at ¶ 6(f). But the only Louisiana NAACP member identified from the Lake Charles area who would reside in illustrative HD38, *see* Doc. 173-1 at 2–6, already resides in a majority-Black district (HD34) in the enacted plan. That alleged member therefore does not suffer a § 2 injury; moving that alleged member from one majority-Black district to another does nothing of legal significance. Plaintiffs' contention that their assertions should be trusted without adversarial vetting, *see* Doc. 163 at 15–19, is legally wrong—and for good reason. *Summers*, 555 U.S. at 497.

Louisiana NAACP's position finds no support in *Alabama Legislative Black Caucus v. Alabama*, 575 U.S. 254 (2015), either. The Court found "reversible error," not because the trial court demanded identification of members, Doc.163 at 16, but because it granted judgment without providing an opportunity to "provide a membership list." 575 U.S. at 270. The rule of *Alabama* is that a court, "rather than act *sua sponte*," must "give [an entity plaintiff] an opportunity to provide evidence of member residence." *Id.* at 271. That is why the Court did not find standing on the record before it. Instead, the Court issued a "remand" so that the district court would "permit[] the Conference to *file its list of members* and permit[] the State to respond, as appropriate." *Id.* (emphasis added). Plaintiffs' argument that it need not actually name individual members is wrong.

In this case, the Court is not acting *sua sponte* to surprise Louisiana NAACP. Louisiana

NAACP has had the notice that its standing was challenged, and that membership identification was required, since July 2022 (when Defendant served discovery requests addressing standing) or at least as of August 9, 2023, when Louisiana NAACP sought protection from discovery regarding its members. Doc. 119. Even after this Court held that that "standing has been raised by the Defendant," on October 24, Doc. 158, the Louisiana NAACP *still refused* to name its members, Doc. 163 at 15–19 (filed October 27). In *Alabama*'s posture, that would be as if the Court had remanded and the Louisiana NAACP *still refused to name its members*. Obviously, that would not have worked in *Alabama*, where the whole point of remand was production of a membership list. It cannot work here.[1] And absent the actual identification of such members, the Louisiana NAACP cannot demonstrate associational standing. *See Summers*, 555 U.S. at 498.

Only last week did the Louisiana NAACP identify specific individuals. But its choice to do so only after discovery closed in a case this Court expedited for Plaintiffs' benefit is wholly improper. Their disclosures are untimely and this evidence should be disregarded.

Redistricting "is not a game of ambush." *In re Landry*, 83 F.4th 300, 303 (5th Cir. 2023). But that is what Plaintiffs have made it, aided by this Court's orders. Plaintiffs admit Defendants have engaged in "months of pursuing discovery," Doc. 173 at 2, but Defendants should not have had to do that. The reason Defendants pursued discovery was not merely to obtain "the information Plaintiff has produced," *id.*, but to obtain it in time to vet the Louisiana NAACP's standing assertion on a transparent record. Plaintiffs' obstinance enabled them to thwart that, as they disclosed member identities more than two months after fact discovery closed and just three weeks

---

[1] As Defendants anticipated, Louisiana NAACP relies on cases in the motion-to-dismiss posture, including one that found the error was in failing to grant "leave to amend" to state member names. *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015); *see also Democratic Party of Virginia v. Brink*, 599 F. Supp. 3d 346, 354 (E.D. Va. 2022) (motion-to-dismiss posture). Notably, *Democratic Party* is bad law under Fourth Circuit precedent, *see S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013).

before trial is set to begin. Doc. 110 at 2.[2]

That affords Defendants no means of discovery to assess basic questions, such as how the Louisiana NAACP ascertained information about these individuals when its President "*didn't have a list or anything*" and simply "spoke with my lawyers" before vetting membership. Doc. 163-8 at 91 (emphasis added). It is a mystery how these individuals were identified, who identified them, what means were taken to ensure accuracy of the disclosed information, and whether that information is true. Defendants also have no means of determining whether the listed members vote for the candidates Plaintiffs believe are minority-preferred.

Compounding these irregularities is Plaintiffs' apparent fast-and-loose treatment of the Louisiana NAACP's structure. Plaintiffs allege only that their newly disclosed "members" are members of NAACP "branch" organizations, *see* Doc. 173-1 at 2–6, and claim members of "branches" are "automatically" members of the Louisiana NAACP (i.e., the "State Conference"). Doc. 163 at 13. But the sources cited for that assertion do not support it. Plaintiffs attach a document they claim are the Louisiana NAACP's "bylaws," Doc. 163-9, but provide no admissible evidence that this document is the Louisiana NAACP's governing bylaws: it is unsigned, nowhere says it is the Louisiana NAACP's bylaws (it has blank lines for the organization's name on the first page), and it has not been authenticated by declaration or deposition testimony. But even assuming the "bylaws" are the actual bylaws, neither provision Plaintiffs cite show that a member of a "branch" is a member of the State Conference—only that a member of a "Unit" (which can include a "branch") is a member of the national NAACP (which is not a plaintiff), *id.* at art. IV, § 1(a), and that the "Unit" *itself* is the member of the State Conference, *id.* at art. IV, § 3(a). This

---

[2] Plaintiffs are incorrect to assert that this Court's production order absolved the Louisiana NAACP of its obligations under the Court's scheduling order. By ordering production, the Court commanded what the Louisiana NAACP was obligated to provide all along.

4

matters because, according to both Mr. McClanahan, Doc 163-8 at 50:9–11, and the "bylaws" themselves, Doc. 163-9 at art. III, § 1(a), "Units" are separate nonprofit organizations that manage their own membership, have their own officers, and could have served as plaintiffs (and have in past voting-rights cases). *See, e.g., Terrebonne Parish Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 407 (M.D. La. 2017), *rev'd on other grounds sub nom*, 963 F. 3d 447 (5th Cir. 2020) (NAACP Louisiana "branch" was plaintiff in Section 2 case).

As shown, Louisiana NAACP's assertions about membership have been inaccurate (or at least doubtful) many times over, and they have frustrated Defendants' ability to learn the truth by demanding expedited proceedings and delaying production until there was no possibility of vetting the truth of the Louisiana NAACP's representations. The Court's slow-walking of the motions about this matter has enabled this ambush.[3]

The Louisiana NAACP, meanwhile, has no argument that its untimely production was justified or harmless, as is required under Fed. R. Civ. P. 37(c)(1). Thus, it must be excluded. *See La. Corral Mgmt., LLC v. Axis Surplus Ins. Co.*, 22-cv-2398, 2023 WL 315940, at *2 (E.D. La. Jan. 19, 2023). Louisiana NAACP's argument that trial should proceed as scheduled gets Rule 37(c) backward. One factor is "the availability of a continuance to cure [the] prejudice" of untimely disclosure. *See, e.g., Red Dot Bldgs. v. Jacobs Tech., Inc.*, No. 11-cv-1142, 2012 WL 2061904, at *4 (E.D. La. June 7, 2012). Because Rule 37 "places the burden on" Plaintiffs "to prove harmlessness or substantial justification," *La. Corral Mgmt.*, 2023 WL 315940, at *2, they are obligated to show why the material should not be excluded. Having insisted that a continuance is not available, Plaintiffs cannot argue that prejudice to Defendants from their untimely disclosure can be cured.

---

[3] *See* Docs. 121, 122, 126, 127, 129, 130, 131, 132, 132-1, 132- 2, 135, 135-1, 136, 144, 144-1, 149, 149-1, 153, 153-1, 158, 159, 163, 169.

In any event, the untimely disclosed identities do not provide standing for the relief that Plaintiffs seek. Louisiana NAACP's associational standing (even if shown as to disclosed persons) can support only a hollowed-out version of their § 2 claim. They have disclosed 10 individuals, but they challenge dozens of districts and demand a plan with 49 majority-BVAP districts. *See* Doc. 163-1 at 5; Doc. 135 at 3 n.1. Because an individual plaintiff has standing "only with respect to those legislative districts in which they reside," *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018), Plaintiffs can (at most) challenge HD1, HD25, HD34, HD60, HD65, HD66, HD68, HD101, SD2, SD8, SD17, and SD38. That cannot result in a judgment requiring "at least 14 majority-Black State Senate districts" and "at least 35 majority-Black State House districts." Doc. 150-10 at 6–7.

Plaintiffs respond that they have standing to "seek to alter the boundaries" of more than "the specific districts in which they live." Doc. 173 at 5. But that is true only as "necessary to reshape the voter's district." *Gill v. Whitford*, 138 S. Ct. 1916, 1931 (2018). An individual NAACP member is entitled to changes to neighboring district lines for the sole purpose of making that *member's* district an opportunity district under § 2, not to ensure that any other districts in the area where that member lives are also majority-BVAP, as Plaintiffs erroneously suggest. Plaintiffs say *Gill* is not on point because it concerned "gerrymandering," *id.*, but the "alleged harm" in that case was "the dilution of [the plaintiffs'] votes." *Gill*, 138 S. Ct. at 1920. That is the same harm as is alleged under § 2. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2337 (2021); *Thornburg v. Gingles*, 478 U.S. 30, 42 (1986) (articulating the "claim of vote dilution").

Binding precedent holds that, "[t]o the extent that the plaintiffs' alleged harm is *the dilution of their votes*, that injury is district specific." *Gill*, 138 S. Ct. at 1920–21. That was recognized in *Petteway v. Galveston Cnty.*, 3:22-cv-57, 2023 WL 2782704 (S.D. Tex. Mar. 30, 2023), and even

6

Plaintiffs admit: "the court held that a plaintiff lacked standing where the plaintiffs had not even alleged, much less offered, evidence that the individual could be drawn into a new, reasonably compact majority-minority district." Doc. 173 at 5. Exactly. Disclosed NAACP members may (if evidence about them is accepted and accurate) have standing to claim that *one* district where *each* resides become a majority-BVAP district where *that voter* resides. But that is no basis to demand many *more* districts "in the areas of the state" where Plaintiffs (now) focus their challenge. *Id.* Without defying basic principles of math, 10 disclosed residents cannot obtain 35 House districts and 14 Senate districts with BVAP majorities; the most they could ever hope for would be eight House and four Senate districts with BVAP majorities.[4] *See* Doc. 172 at 4; Doc. 173 at 2–6.

Plaintiffs are actually entitled to less than that because some disclosed residents already reside in majority-BVAP districts. Plaintiffs respond that, somehow, a person could be injured by being able to elect a preferred candidate. *See* Doc. 173 at 4. *Gill* counsels the opposite, holding that a plaintiff residing in a district where he could already elect his preferred candidate lacked an injury in fact. 138 S. Ct. at 1924. The disclosed members or individual Plaintiffs residing currently in HDs 34 and 101, and SD 2 lack standing to sue in their own right. Doc. 172 at 5.

Finally, Plaintiffs claim that the objections Defendants raise apply only at the remedial phase. Doc. 173 at 5. Not so. Plaintiffs must establish injury-in-fact, causation, and redressability before taking their claims to trial, and that requires proof that members' "votes have been diluted" and that standing only reaches each member's "own district." *Gill*, 138 S. Ct. at 1930–31. Plaintiffs claim they challenge SDs 2, 5, 7, 8, 10, 14, 15, 17, 19, 31, 36, 38 and 39 and HDs 1-9, 13, 22, 25, 29, 34-37, 47, 57, 58-63, 65-70, 81, 88, and 101. *See* Doc. 163-1 at 5; Doc. 135 at 3 n.1. But they

---

[4] The enacted plans already surpass those numbers. A § 2 challenger must show "the possibility of creating more than the existing number of reasonably compact [majority-minority] districts." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994). A claim for *fewer* than the existing number of majority-BVAP districts in Louisiana will surely fail.

do not have Individual Plaintiffs or members in each of those districts. The law is clear that the Court may only try claims as to a very small subset of the challenged districts; it cannot defer its jurisdictional limits to a future remedial phase.

B.     **Organizational Standing**

The Entity Plaintiffs do not have standing to sue in their own right. Plaintiffs' miscellaneous efforts to show Article III standing do not work. Their principal claim is injury where "elections are not competitive" because, where "one party's candidate will win, neither party or candidate has the incentive to expend significant resources on voter mobilization," and "the Louisiana NAACP must step in to fill the gap." Doc. 165 at 5. Plaintiffs infer this harm because "there have been numerous noncompetitive House and Senate elections" under the challenged plans. *Id.*; *see also id.* at 20; Doc. 163-10 ¶¶ 13–17. But § 2 does not require "competitive elections," and Plaintiffs do not ask for competitive elections. They want majority-BVAP districts, which is what § 2 (if satisfied) requires. That is *not* likely to result in competitive elections because "one party's candidate [the Democratic Party's] will win" in districts with Black majorities. Doc. 163 at 5. There must be a "logical nexus between the [plaintiff's] status asserted and the claim," *Flast v. Cohen*, 392 U.S. 83, 102 (1968), and this theory entails no "injury to a cognizable interest" or redressability, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992), since Plaintiffs are unlikely to obtain competitive elections through the relief available under § 2.

Plaintiffs' other arguments are variations on this theme and falter for many reasons. They contend that the redistricting plans require the "reallocation of resources from one part of the state to another," Doc. 163 at 20, but that is just another complaint about competitive elections. Plaintiffs have no coherent argument that any "reallocation" resulted from the *racial* demographics of the challenged plans. That is because the challenged plans have *more* majority-BVAP districts than

8

Louisiana's legislative plans have *ever* had. Relevant under § 2, the Entity Plaintiffs are *better* off now than under prior plans, so if they altered "planned activities," it is based on the competitive-district issue not cognizable under § 2. Besides, Plaintiffs do not identify any "concrete or identifiable" resources, events, or costs. *ACORN*, 178 F.3d at 360; *see* Doc. 163-10; Doc. 163-4 at ¶¶ 24–26. And they have no meaningful explanation of how costs incurred *before* the plans became law create a redressable harm. *See* Doc. 149-1 at 13.

Setting aside Article III standing, the Entity Plaintiffs do not explain how they can be "aggrieved person[s]" within any right of action available by statute. 52 U.S.C. § 10302(a). They ignore the statutory standing analysis and say nothing meaningful of precedents holding (correctly) that the right of action belongs to "minority voters." *Roberts v. Wamser*, 883 F.2d 617, 621 (8th Cir. 1989). That is "well-settled" law, *see, e.g., White-Battle v. Democratic Party of Va.*, 323 F. Supp. 2d 696, 702 (E.D. Va. 2004), and Plaintiffs' position conflicts with the many decisions holding § 2 protection "is confined to persons whose voting rights have been denied or impaired," *McGee v. City of Warrensville Heights*, 16 F. Supp. 2d 837, 845–46 (N.D. Ohio 1998), which is a standard Plaintiffs do not satisfy. Moreover, even if Plaintiffs' demand for "competitive districts" qualified as an Article III injury, it is well beyond § 2's "zone of interests." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 137 (2014).

Plaintiffs focus on establishing that § 2 contains a right of action, Doc. 163 at 24, but Defendants already stated they are willing to assume as much at this stage for the sake of argument, Doc. 149-1 at 14 n.5. The problem is that "traditional tools of statutory interpretation" do not support a § 2 right of action for the Entity Plaintiffs. *Lexmark*, 572 U.S. at 127. It is unpersuasive for Plaintiffs to claim statutory standing with *no* analysis of the statute. Plaintiffs merely insist that "civil engagement organizations" often bring § 2 claims and ask this Court to do the same without

analysis. But organizations typically can bring VRA claims only if they establish "the standing of the association's members," which is all that occurred in *OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017), a case that did not involve a § 2 challenge or even statutory standing. *See id.* at 607, 610–14 (challenge under "Section 208" analyzed as to Article III standing only).[5] Plaintiffs' other authorities involved Article III standing (principally associational standing) and no meaningful analysis of whether an organization has § 2 standing in its *own* right. *See Veasey v. Perry*, 29 F. Supp. 3d 896, 906–07 (S.D. Tex. 2014) (organizations with associational standing fell within § 2); *Harding v. Edwards*, 484 F. Supp. 3d 299, 315–16 (M.D. La. 2020) (Article III standing with no statutory standing analysis); *People First of Ala. v. Merrill*, 2:20-cv-00619, 2020 WL 4747641, at *4 (N.D. Ala. Aug. 17, 2020) (same). The legislative history Plaintiffs cite makes clear that standing is available only to "an organization *representing the interests of injured persons*." S. Rep. No. 94-295, at 40, reprinted in 1975 U.S. Code Cong. & Admin. News 774, 806–807 (emphasis added). The VRA does not deem organizations *themselves* injured for purposes of their *own* standing.

## CONCLUSION

The Court should grant Defendants' summary-judgment motion.

Respectfully submitted, this the 13th day of November, 2023.

*/s/ Phillip J. Strach*
Phillip J. Strach*
   *Lead Counsel*
Thomas A. Farr*
John E. Branch, III*
Alyssa M. Riggins*
Cassie A. Holt*
**NELSON MULLINS RILEY & SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400

---

[5] The "breadth" of the private right "varies according to the provisions of law at issue." *Lexmark*, 572 U.S. at 130. Thus the analysis under § 2 and § 208 would differ in all events.

Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com

/s/ John C. Walsh
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
**SHOWS, CALL & WALSH, L.L.P.**
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com

*Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana*

Jeff Landry
Louisiana Attorney General

By: */s/ Michael W. Mengis*
LA Bar No. 17994
BAKERHOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
BAKERHOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

By: */s/ Jeffrey M. Wale*
Elizabeth B. Murrill (LSBA No. 20685)
Solicitor General
Shae McPhee (LSBA No. 38565)
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov

Patrick T. Lewis*
BAKERHOSTETLER LLP
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

Erika Dackin Prouty*
Robert J. Tucker*
BAKERHOSTETLER LLP
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

* *Admitted pro hac vice*

*Counsel for Legislative Intervenors, Clay Schexnayder, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Patrick Page Cortez, in his Official Capacity as President of the Louisiana Senate*

walej@ag.louisiana.gov

Jason B. Torchinsky (DC Bar No 976033)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
2300 N Street, NW
Suite 643A
Washington, DC 20037
Tel: 202-737-8808
Email: jtorchinsky@holtzmanvogel.com

Phillip M. Gordon (DC Bar No. 1531277)*
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
Email: pgordon@holtzmanvogel.com

*Admitted pro hac vice*