IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

DOROTHY NAIRNE, *et al.*,

        Plaintiffs,

        v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State of Louisiana,

        Defendant.

Case No. 3:22-cv-178-SDD-SDJ

**BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY OF
SECTION 2 OF THE VOTING RIGHTS ACT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. ii

PRELIMINARY STATEMENT ....................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND........................................................ 1

STATUTORY BACKGROUND ..................................................................................... 2

ARGUMENT .................................................................................................................. 3

    I.     The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's
          Authority to Enact Section 2 of the Voting Rights Act. ................................................. 4

    II.    Supreme Court Precedent Forecloses Defendants' Constitutional Arguments. .............. 8

         A.    There Are No Constitutional Concerns That Require Revisiting the *Gingles*
              Preconditions.......................................................................................................... 9

         B.    The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for
              Section 2 Violations.............................................................................................. 12

CONCLUSION............................................................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Milligan*, 599 U.S. 1 (2023) ................................................................. passim

*B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138 (2015) ................................ 5

*Bartlett v. Strickland*, 556 U.S. 1 (2009) .................................................................. 9

*City of Rome v. United States*, 446 U.S. 156 (1980) ................................................... 12

*Clark v. Calhoun Cnty.*, 88 F.3d 1393 (5th Cir. 1996) ............................................. 5, 11

*Clark v. Martinez*, 543 U.S. 371 (2005) ........................................................ 5, 6, 7, 8

*Growe v. Emison*, 507 U.S. 25 (1993) ...................................................................... 10

*Jennings v. Rodriguez*, 138 S. Ct. 830 (2018) ............................................................. 6

*Johnson v. Arteaga-Martinez*, 596 U.S. 573 (2022) ...................................................... 6

*Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir. 1984) ........................................... 2, 13

*La Unión del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509 (W.D. Tex. 2022) ................. 4

*League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2021 WL 5762035

   (W.D. Tex. Dec. 3, 2021) (three-judge court) ......................................................... 4

*League of United Latin Am. Citizens v. Perry*, 548 U.S. 399 (2006) ............................. 12

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831

   (5th Cir. 1993) (en banc) ......................................................................... 5, 11

*McMillan v. Escambia Cnty.*, 748 F.2d 1037 (Former 5th Cir. 1984) ............................ 13

*Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984) ............................... 4, 13

*OCA-Greater Houston v. Texas*, 867 F.3d 604 (5th Cir. 2017) ..................................... 4

*Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023) ........................................... 4, 12, 14

*Robinson v. Ardoin*, No. 22-30333 (5th Cir. Dec. 15, 2023) (per curiam) ...................... 4

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) .................................................................... 1, 15, 16

*Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218 (11th Cir. 2000) (en banc) ............................ 5

*South Carolina v. Katzenbach*, 383 U.S. 301 (1966) .................................................................. 16

*Students for Fair Admissions Inc. v. President & Fellows of Harvard Coll.*,

    143 S. Ct. 2141 (2023) ........................................................................................................ 14, 17

*Teague v. Attala Cnty.*, 92 F.3d 283 (5th Cir. 1996) ............................................................. 5, 6, 11

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ........................................................................... passim

*United States v. Apel*, 571 U.S. 359 (2014) ................................................................................... 7

*United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546 (11th Cir. 1984) ................................ 10

*Veasey v. Abbott*, 830 F.3d 216 (5th Cir. 2016) (en banc) .......................................................... 13

*Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109 (5th Cir. 1991) .......... 16

*Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398 (2022) ............................................... 12

**Statutes**

28 U.S.C. § 2403 ............................................................................................................................. 2

52 U.S.C. § 10301 ............................................................................................................... 1, 2, 15

**Legislative Materials**

S. Rep. No. 97-417 (1982) ...................................................................................................... 15, 16

**Rules**

Fed. R. Civ. P. 5.1 ........................................................................................................................... 2

**Other Authorities**

Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends* (2022) ............................ 11

Heather K. Gerken, *A Third Way for the Voting Rights Act: Section 5 and the Opt-In Approach*,

    106 Colum. L. Rev. 708 (2006) .......................................................................................... 16

## PRELIMINARY STATEMENT

The United States intervened in this action to defend the constitutionality of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  Section 2 is a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013).  The Supreme Court has repeatedly upheld the Section 2 prohibition on any state-imposed "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color," 52 U.S.C. § 10301(a), as an appropriate exercise of Congress's remedial powers under the Fourteenth and Fifteenth Amendments.  *See, e.g.*, *Allen v. Milligan*, 599 U.S. 1, 41 (2023).  Courts can apply Section 2 to redistricting claims consistent with the Fourteenth and Fifteenth Amendments, under the well-settled and recently reaffirmed test set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986).[1]

## FACTUAL AND PROCEDURAL BACKGROUND

In this case, Plaintiffs challenge Louisiana's legislative maps as impermissibly diluting minority voting strength, in violation of Section 2 of the Voting Rights Act, 52 U.S.C. § 10301.  On November 9, 2023, Defendant and Intervenor-Defendants (collectively "Defendants") filed a notice of constitutional questions pursuant to Federal Rule of Civil Procedure 5.1(a), asserting that "finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question" and that "[t]o grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution."  Notice of Constitutional Question, ECF No. 178; *see also* Defs.' Proposed Findings of Fact & Conclusions of Law 81-82, 130, ECF No. 177 ("Defs.' Proposed Findings & Conclusions").  This Court has

---

[1] The United States takes no position on any factual dispute in this matter nor on any legal question other than the constitutionality and appropriate application of Section 2.

1

not yet certified that a statute has been questioned.  *See* 28 U.S.C. § 2403(a); Fed. R. Civ. P. 5.1(b); *see also Jones v. City of Lubbock*, 727 F.2d 364, 372 (5th Cir. 1984) (requiring certification).

Trial on the merits began on November 27, 2023, and concluded on December 5, 2023. On December 7, 2023, the United States intervened in this case to defend the constitutionality of Section 2 and indicated that it would submit a brief to that end by December 19, 2023.  *See* U.S. Notice of Intervention, ECF No. 199.  This brief follows.

## STATUTORY BACKGROUND

Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits voting practices and procedures that discriminate on the basis of race, color, or membership in a language minority group.  "The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."  *Gingles*, 478 U.S. at 47.  Section 2 prohibits vote dilution, including the use of districting schemes "to minimize or cancel out the voting strength of racial [minorities in] the voting population."  *Id.* (alteration in original) (quotation mark omitted); *see also Milligan*, 599 U.S. at 40-41 (rejecting contrary arguments).

In *Thornburg v. Gingles*, 478 U.S. 30 (1986), the Supreme Court set out the requirements for a vote dilution claim, including three preconditions to liability.  *See Milligan*, 599 U.S. at 17-18.  "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district."  *Gingles*, 478 U.S. at 50.  "Second, the minority group must be able to show that it is politically cohesive."  *Id.* at 51.  "Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate

2

running unopposed—usually to defeat the minority's preferred candidate." *Id.* (citations omitted). If plaintiffs establish all three preconditions, consideration proceeds to a totality of the circumstances analysis. *See id.* at 36-37 (enumerating relevant factors); *see also Milligan*, 599 U.S. at 18-19 (explaining and reaffirming *Gingles* procedure).

## ARGUMENT

It is well established that Section 2 of the Voting Rights Act is a permissible exercise of Congress's Fourteenth and Fifteenth Amendment enforcement powers. In their notice identifying constitutional questions, Defendants do not facially challenge Section 2's constitutionality. Instead, they assert that, as applied to the facts of this case, the Courts must interpret Section 2 in ways that conflict with the Supreme Court's recent ruling in *Milligan* because any interpretation supporting liability here would call the constitutionality of Section 2 into question and any interpretation supporting a remedy would violate the Constitution. Defendants' arguments are neither novel nor correct.

To begin, Defendants misapply the canon of constitutional avoidance, which is not a means to relitigate a settled statutory construction or to render a statute inoperative in a particular case. Their arguments may be rejected on that basis alone. And even if Defendants' arguments were properly presented, they are indistinguishable from those rejected in *Milligan*. There, the Supreme Court reiterated that the third *Gingles* precondition does not require proof of racial causation and reaffirmed the constitutionality of race-based remedies for Section 2 violations. Accordingly, Defendants' constitutional arguments pose no obstacle to liability or an appropriate remedy.[2]

---

[2] During trial, Defendants moved to dismiss for lack of jurisdiction, under the theory that Section 2 does not contain a private right of action. *See* Mot. to Dismiss, ECF No. 187. However, the Fifth Circuit has already held that aggrieved voters have "a right . . . to bring these claims."

3

I.     **The Canon of Constitutional Avoidance Is Not a Vehicle to Challenge Congress's Authority to Enact Section 2 of the Voting Rights Act.**

Courts may resolve Section 2 vote dilution claims using the well-established *Gingles* test, a standard "repeatedly applied" by federal courts "for the last four decades." *Milligan*, 599 U.S. at 41 (citing *Gingles*, 478 U.S. at 30). Despite this clear and consistent standard, Defendants contend that "finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question." Defs.' Proposed Findings & Conclusions 81. After finding liability, federal courts have regularly "authorized race-based redistricting as a remedy for state districting maps that violate" Section 2, as interpreted in *Gingles*. *Milligan*, 599 U.S. at 41 (citing *Miss. Republican Exec. Comm. v. Brooks*, 469 U.S. 1002 (1984)). Nonetheless, Defendants claim that to "grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the United States Constitution." Defs.' Proposed Findings & Conclusions 82. Defendants' implication is that this Court must interpret Section 2 in whatever manner upholds Louisiana's maps and forecloses a remedy, to avoid an unconstitutional reading of the Voting Rights Act. Because neither argument properly applies the canon of constitutional avoidance, the Court may reject them without engaging in unnecessary constitutional analysis.

---

*Robinson v. Ardoin*, 86 F.4th 574, 587-88 (5th Cir. 2023); *see also, e.g.*, *La Unión del Pueblo Entero v. Abbott*, 614 F. Supp. 3d 509, 531-34 (W.D. Tex. 2022); *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259, 2021 WL 5762035, at *1 (W.D. Tex. Dec. 3, 2021) (three-judge court); *cf. OCA-Greater Houston v. Texas*, 867 F.3d 604, 614 (5th Cir. 2017) (holding that the Voting Rights Act validly abrogated state sovereignty). Moreover, the Court of Appeals has since denied a petition to rehear this issue en banc. *See Robinson v. Ardoin*, No. 22-30333 (5th Cir. Dec. 15, 2023) (per curiam). In any case, for the reasons the United States has articulated in briefing before the Eighth Circuit, the Western District of Texas, and other courts, private plaintiffs may enforce Section 2. *See, e.g.*, U.S. Amicus Br., *Ark. State Conf. of NAACP v. Ark. Bd. of Apportionment*, No. 22-1395 (8th Cir. Apr. 22, 2022), https://perma.cc/5MAE-9DSR; U.S. Statement of Interest, *League of United Latin Am. Citizens v. Abbott*, No. 3:21-cv-259 (W.D. Tex. Nov. 30, 2021), ECF No. 46; U.S. Statement of Interest, *La Unión del Pueblo Entero v. Abbott*, No. 5:21-cv-844 (W.D. Tex. Nov. 4, 2021), ECF No. 83, https://perma.cc/VK72-LLTN.

The canon of constitutional avoidance is a tool for choosing between competing plausible statutory interpretations, *see Clark v. Martinez*, 543 U.S. 371, 385 (2005), but Defendants' avoidance arguments concerning liability do not press for an alternative reading of Section 2. They assert that finding a Voting Rights Act violation here would call the constitutionality of Section 2 into question because "any polarization is based on political affiliation, not race." Defs.' Proposed Findings & Conclusions 81, 130.  But if such a finding were in fact warranted, Fifth Circuit law would preclude finding the third *Gingles* precondition.  *See League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850-51, 861 (5th Cir. 1993) (en banc) (barring liability when "the record indisputably proves that partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens"); *cf. Clark v. Calhoun Cnty.*, 88 F.3d 1393, 1397 (5th Cir. 1996) (holding that the third *Gingles* precondition was present where the record supported "no other conclusion but that racially polarized voting exists" and the defendant offered "no other explanation of the divergent voting patterns"); *Teague v. Attala Cnty.*, 92 F.3d 283, 291 (5th Cir. 1996) (holding that the third *Gingles* precondition was present where "defendant had itself produced no real evidence that factors other than race were at work").  "[B]ecause [the Fifth Circuit's] cases are so clear, there is no ambiguity . . . to sidestep through constitutional avoidance."  *B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 151 (2015).[3]

---

[3] Fifth Circuit doctrine is an outlier, but the sole available alternative would only diminish consideration of racial causation.  Eight Justices held in *Gingles* that plaintiffs need show "neither causation nor intent" to prove racially polarized voting under the preconditions.  478 U.S. at 62 (plurality opinion); *see also id.* at 100 (O'Connor, J., joined by Burger, C.J., Powell, J., and Rehnquist, J., concurring in the judgment) ("I agree that defendants cannot rebut this showing by offering evidence that the divergent racial voting patterns may be explained in part by causes other than race.").  The Supreme Court has trodden the same path ever since.  *See, e.g.*, *Milligan*, 599 U.S. at 18; *see also, e.g.*, *Solomon v. Liberty Cnty. Comm'rs*, 221 F.3d 1218, 1225 (11th Cir. 2000) (en banc) (relegating causation to the totality of the circumstances stage).

The true dispute between the parties is whether the specific evidence presented at trial establishes that "no [racial] bias exists in the relevant voting community," the showing necessary to establish an absence of racial causation under the third *Gingles* precondition. *Teague*, 92 F.3d at 290. Plaintiffs contend that "Louisiana elections are characterized by stark patterns" of racially polarized voting and that "race and racial attitudes drive party cohesion and vote choice" in the State. Pls.' Proposed Findings of Fact & Conclusions of Law 40-43, ECF No. 179 (quoting Burch Supp. Rep. 4-6, PX 128). Defendants assert that "the predominate factor causing the polarization in [Louisiana] elections was party and not race," based on their expert's opinion that "Black voters tend to support Democratic candidates and White voters tend to support Republican candidates and that these support levels remain relatively constant regardless of the race of candidates involved." Defs.' Proposed Findings & Conclusions 72-74 (citing Alford Rep. 9-13, ECF No. 152-16). Ultimately, the presence of racial causation is a question of fact, and an assertion of constitutional concerns does not lighten Defendants' burden of proof. *See Johnson v. Arteaga-Martinez*, 596 U.S. 573, 581 (2022) (declining to impose a particular burden of proof based on constitutional avoidance); *see also Teague*, 92 F.3d at 290 ("Such a showing is for the defendants to make."). The canon of constitutional avoidance does not operate upon the particular facts "in each individual case," *Clark v. Martinez*, 543 U.S. at 382, and so Defendants' avoidance arguments against liability must fail.

Defendants' avoidance arguments concerning Section 2 remedies are similarly improper. The canon of constitutional avoidance "comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one plausible construction." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (alteration in original) (quoting *Clark v. Martinez*, 543 U.S. at 385). Defendants suggest that limits on Congress's "authority to

constitutionally authorize race-based redistricting" bar such remedies, Defs.' Proposed Findings & Conclusions 82, 130, but they also concede—as they must—that Voting Rights Act remedies are "inherently race-based," *id.* at 81. As they are unable to articulate an alternative construction of the Voting Rights Act that avoids the racial considerations they deem suspect, this Court should reject Defendants' constitutional avoidance arguments concerning Section 2 remedies as well.

Fundamentally, avoidance "is not a method of adjudicating constitutional questions by other means," *United States v. Apel*, 571 U.S. 359, 372 (2014) (quotation marks and citation omitted), or a vehicle for defendants to render federal statutes "inoperative" in individual cases, *Clark v. Martinez*, 543 U.S. at 384. Defendants frame avoidance as one of their "Affirmative Defenses," couching their arguments in terms of how this Court would have to interpret Section 2 to "find[] for Plaintiffs" or "grant the relief Plaintiffs seek." Notice of Constitutional Question 1-2 (citing Answer and Affirmative Defenses, ECF No. 32). And they warn the Court that it must not find Section 2 liability "as applied to the facts in this matter" because doing so would "call[ Section 2's] constitutionality into question." *Id.* at 1. Avoidance principles do not authorize courts to "'interpret' statutes" this way, "by gerrymandering them with a list of exceptions that happen to describe a party's case." *Apel*, 571 U.S. at 372.

Finally, Defendants suggest that the passage of time has undermined the constitutionality of Section 2. *See* Notice of Constitutional Question 1 (addressing application of the Voting Rights Act "at this time"); Defs.' Proposed Findings & Conclusions 81, 130 ("Congressional authority to constitutionally authorize race-based redistricting under Section 2 cannot extend indefinitely unto the future." (citing *Milligan*, 599 U.S. at 45 (Kavanaugh, J. concurring))). This argument is incompatible with the canon of constitutional avoidance as a tool of statutory

interpretation. The canon "rest[s] on the reasonable presumption that Congress did not intend" a statutory reading "which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. at 381. But Defendants' temporal argument necessarily concedes that Section 2, as interpreted and applied in *Gingles*, was constitutional when Congress last amended this portion of the Voting Rights Act in 1982. *See also Milligan*, 599 U.S. at 13-14. There is no basis for then assuming— as application of the avoidance canon would require—that Congress intended Section 2 to mean one thing in 1982 and something else 40 years later. *See Clark v. Martinez*, 543 U.S. at 382 (rejecting contention that avoidance may require statutory meaning to "change" in the presence of new constitutional concerns).

## II. Supreme Court Precedent Forecloses Defendants' Constitutional Arguments.

In *Milligan*, the Supreme Court recently reaffirmed the *Gingles* framework for resolving Section 2 claims and the constitutionality of Section 2's race-based remedies. *See* 599 U.S. at 25-26. Defendants' as-applied constitutional defenses are flatly inconsistent with *Milligan*. There, the Supreme Court declined Alabama's invitation to alter the *Gingles* framework by adding stringent evidentiary requirements beyond the statutorily enacted "totality of the circumstances" test, *id.*, as Defendants attempt to do here by claiming that their particular evidence of partisan preferences must defeat liability. And the Supreme Court held that Section 2's remedial regime, including race-based remedies where appropriate, is within Congress's enforcement powers. *See id.* at 41. Despite Defendants' vague invocation of considerations "unto the future," Defs.' Proposed Findings & Conclusions 130, their arguments are substantively indistinguishable from the arguments raised and rejected in *Milligan*.

A.   **There Are No Constitutional Concerns That Require Revisiting the *Gingles* Preconditions.**

The Supreme Court's decision in *Milligan* forecloses Defendants' indirect assertion that Section 2 would exceed Congress's Fifteenth Amendment authority if the evidence of racial polarization presented at trial is sufficient to establish the third *Gingles* precondition.  *See* Defs.' Proposed Findings & Conclusions 73-74, 130.  In *Milligan*, Alabama similarly argued that the Section 2 framework is unconstitutional because "racial polarization 'provides no evidence about why people vote the way they do' and . . . does not 'say[] anything about racial animus.'"  Br. for Appellants 76-77, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (alteration in original) (citation omitted).  The Supreme Court disagreed.  It laid out the third *Gingles* precondition precisely as it had in *Gingles*: "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate."  *Milligan*, 599 U.S. at 18 (quoting *Gingles*, 478 U.S. at 51) (alteration in original); *see also id.* at 26 (declining to "revise and reformulate the *Gingles* threshold inquiry" (quoting *Bartlett v. Strickland*, 556 U.S. 1, 16 (2009))).  Nowhere did the Supreme Court require a showing of racial causation as part of the prima facie case or mandate the focus on candidate race utilized by Defendants' expert here.  *See also Gingles*, 478 U.S. at 83 (White, J., concurring) (rejecting only the notion "that the race of the candidate is irrelevant"); *id.* at 101 (O'Connor, J., joined by Burger, C.J., Powell, J., and Rehnquist, J., concurring in the judgment) (same).

To the contrary, *Milligan* reiterated the explanation in *Gingles* that the "risk" of the sort of inequality Section 2 guards against "is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices."  *Milligan*, 599 U.S. at 18 (quoting

*Gingles*, 478 U.S. at 48) (alteration in original).  That formulation does not turn on the reasons why the majority opposes minority voters' choices.  The Supreme Court then agreed with the district court that the plaintiffs had met the third *Gingles* precondition because, "on average, . . . white voters supported Black-preferred candidates with 15.4% of the vote."  *Id.* at 22 (internal quotation marks omitted); *see also id.* (not addressing candidate race).  The Supreme Court never discussed whether the plaintiffs had shown or could show a racial cause for Alabama's racially polarized voting when it found "no reason to disturb the District Court's careful factual findings" or "to upset the District Court's legal conclusions," affirming that the court "faithfully applied [the Court's] precedents."  *Id.* at 23.  And the Supreme Court then upheld the *Gingles* framework, as the district court had applied it, as a proper exercise of Congress's constitutional powers.  *See id.* at 41.

Notably, the Supreme Court described the purpose of the third *Gingles* precondition in a manner that explains why it is constitutional even without a racial causation requirement.  As the Supreme Court explained, the majority bloc voting requirement does provide some evidence of discrimination: "The third precondition, focused on racially polarized voting, 'establish[es] that the challenged districting thwarts a distinctive minority vote' *at least plausibly on account of race*."  *Milligan*, 599 U.S. at 19 (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)) (alteration in original) (emphasis added); *see also, e.g.*, *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1567 (11th Cir. 1984) ("The surest indication of race-conscious politics is a pattern of racially polarized voting.").  Thus, the very existence of racially polarized voting creates a plausible inference that race is at least one reason for minority voters' lack of success.  *See also Milligan*, 599 U.S. at 25 (recognizing that elections are "not equally open when minority voters face—unlike their majority peers—bloc voting along racial lines, arising against the backdrop of

10

substantial racial discrimination"). Within the Fifth Circuit, defendants may rebut this inference, but it is their burden to establish alternative causation. *See Teague*, 92 F.3d at 290 (describing "burden-shifting"); *Clark v. Calhoun Cnty.*, 88 F.3d at 1397. This comprehensive standard is sufficiently robust to permit race-conscious remedies under Congress's authority to enforce the Fourteenth and Fifteenth Amendments. *See Milligan*, 599 U.S. at 41; *see also* Ellen D. Katz et al., *The Evolution of Section 2: Numbers and Trends*, Fig. 7 (2022), https://perma.cc/MH6P-XMZR (recognizing declining case counts and success rates).[4]

In any event, Defendants' generalized arguments do not require constitutionalizing the *Gingles* preconditions, which are a judicially created gatekeeping mechanism to screen out claims that lack merit and do not represent Section 2's full "totality of circumstances" test. *Milligan*, 599 U.S. at 26 (quoting 52 U.S.C. § 10301(b)). Partisan explanations for racially polarized voting can be considered, *see, e.g*, *Clements*, 999 F.2d at 850-51, but nothing in Section 2 or the Fifteenth Amendment requires plaintiffs to disprove partisan explanations for racially polarized voting merely to proceed past the preconditions, *see Milligan*, 599 U.S. at 25-26, 41-42.[5]

---

[4] Defendants' alternative reading mislocates the harm Section 2 seeks to remedy. Their expert analyzed voters' preferences for candidates of a particular race or ethnicity. *See* Defs.' Proposed Findings & Conclusions 73-74. But to the extent that individuals cast ballots based on a preference for or against candidates of a particular race, that is a harm no law can remedy. Rather, Section 2 addresses the harm resulting from a jurisdiction's use of a method of election or districting plan that interacts with racially polarized voting in a manner that eliminates equality of electoral opportunity under the totality of circumstances. *See Milligan*, 599 U.S. at 25 ("A district is not equally open [when] bloc voting along racial lines . . . renders a minority vote unequal to a vote by a nonminority voter.").

[5] Defendants also appear to suggest that because districts *could* be drawn in which Black voters have an electoral opportunity despite making up a minority of the electorate, Plaintiffs cannot satisfy the third *Gingles* precondition. *See* Defs.' Proposed Findings & Conclusions 116-18. This misunderstands the bloc voting inquiry. Even if minority voters could have an opportunity to elect candidates of their choice with less than 50% of the population under some hypothetical *other* map due in part to White support for Black-preferred candidates, it cannot defeat a claim

**B.    The Fifteenth Amendment Permits Race-Based Redistricting as a Remedy for Section 2 Violations.**

In *Milligan,* the Supreme Court clearly rejected Alabama's argument that Section 2 exceeds Congressional enforcement powers.  Consistent with prior cases, *Milligan* explained that Congress may "pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect," and that the Voting Rights Act's "'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment.'"  599 U.S. at 41 (quoting *City of Rome v. United States*, 446 U.S. 156, 173, 177 (1980)).  And the Supreme Court specifically upheld the use of race to remediate Section 2 violations, stating that "for the last four decades," courts "have repeatedly applied the effects test of § 2 as interpreted in *Gingles* and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2."  *Id.*; *see also id.* at 44 (Kavanaugh, J., concurring in part) (agreeing that "the effects test, as applied by *Gingles* to redistricting, requires in certain circumstances that courts account for the race of voters" to remedy violations).  Accordingly, the majority rejected the argument that "§ 2 as interpreted in *Gingles* exceeds the remedial authority of Congress."  *Id.* at 41 (majority opinion).

---

regarding inadequate opportunities under the *current* map.  *See Robinson*, 86 F.4th at 596; *see also Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 404-05 (2022) (requiring analysis of the third *Gingles* precondition "at the district level").  Defendants then suggest that Plaintiffs' illustrative plans "create a gross racial gerrymander" by crafting districts in which Black voters make up an unnecessary majority of the electorate.  Defs.' Proposed Findings & Conclusions 117-18.  But *Milligan* forecloses the notion that illustrative maps designed to contain majority-minority districts are perforce drawn predominantly on the basis of race.  *See* 599 U.S. at 33.  Defendants misunderstand the purpose of an illustrative plan, which merely demonstrates that it is possible to craft reasonably compact, majority-minority districts and thereby meet the first *Gingles* precondition.  *See, e.g.*, *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 430 (2006) (addressing how many such districts could be drawn).  Plaintiffs have not requested use of their illustrative plans as remedies.  *See* Am. Compl. 58, ECF No. 14.

Nevertheless, Defendants assert that "to grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the United States Constitution" because "race-based remedies" for a violation of Section 2 "are not congruent and proportional to the exercise of congressional power under the Fourteenth and Fifteenth Amendments."  Defs.' Proposed Findings & Conclusions 81-82 (citing *Milligan*, 599 U.S. at 45 (Kavanaugh, J., concurring)).  This argument cannot withstand *Milligan*.  *See* 599 U.S. at 38, 41; *id.* at 45 (Kavanaugh J., concurring in part) ("As the Court explains," the argument that Section 2 exceeds Congress's Fourteenth and Fifteenth Amendment powers "is not persuasive."); *see also Brooks*, 469 U.S. at 1002 (affirming decision where appellants asserted that Section 2's results test exceeded Congress's Fifteenth Amendment powers).  Nor can it withstand consistent Fifth Circuit precedent rejecting challenges to Section 2's constitutionality.  *See Veasey v. Abbott*, 830 F.3d 216, 253 & n.47 (5th Cir. 2016) (en banc); *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1041 & n.8 (Former 5th Cir. 1984); *Jones*, 727 F.2d at 372-75.

Indeed, Defendants' arguments are indistinguishable from Alabama's assertions in *Milligan*.  There, the State argued that "[r]equiring racial preferences in single-member districts exceeds any remedial measure the Fifteenth Amendment could authorize."  Br. for Appellants 71, *Milligan*, 559 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146.  And it further asserted that "[r]acial gerrymanders under the auspices of §2 compliance serve no compelling interest that can justify" a race-based remedy consistent with the Fourteenth Amendment.  *Id.* at 76.  Here, Defendants similarly argue that imposing a remedy would require this Court to "interpret the

Voting Rights Act in a way that violates the United States Constitution," Defs.' Proposed

Findings & Conclusions 82—an untenable argument after *Milligan*.[6]

Defendants seemingly attempted to distinguish their arguments from Alabama's by

arguing that race-based redistricting to remedy a Section 2 violation is no longer constitutional

"at this time."  Defs.' Proposed Findings & Conclusions 81; *cf. Milligan*, 599 U.S. at 45

(Kavanaugh, J., concurring in part) (stating that Alabama did not raise this "temporal

argument").  But this argument is undeveloped, unsupported, and unavailing.

Nothing in Defendants' proposed findings of fact and conclusions of law or notice of

constitutional questions suggests any basis for concluding that changed conditions require

reconsideration of the settled constitutionality of race-based remedies for Section 2 violations.

Instead, Defendants' proposed findings of fact and conclusions of law reveal that their

constitutional concerns are little more than a reformulation of their arguments against the need

for a remedy in this case.  Defendants argue only that if the Court "grant[s] the relief Plaintiffs

seek," the Voting Rights Act must be unconstitutional.  Defs.' Proposed Findings & Conclusions

82.  But that merely reflects Defendants' disagreement with Plaintiffs about whether the facts

---

[6] In related litigation, Defendants offered an expanded version of their arguments and claimed that illustrative maps, "if established as the §2 baseline, would compel Louisiana to implement a redistricting plan having all the features of [unconstitutional] affirmative action plans."  Supp. Reply Br. for Appellants 23, *Robinson v. Ardoin*, No. 22-30333 (5th Cir. Sept. 27, 2023) (citing *Students for Fair Admissions Inc. v. President & Fellows of Harvard Coll.*, 143 S. Ct. 2141 (2023)).  The Fifth Circuit rejected that argument, *see Robinson*, 86 F.4th at 593, and with good reason.  Alabama in *Milligan* likewise framed race-conscious remedies as racial preferences and pressed the same constitutional arguments.  *See* Br. for Appellants 76, 79, *Milligan*, 599 U.S. 1 (Nos. 21-1086 & 21-1087), 2022 WL 1276146 (arguing that "allegations of past discrimination or societal discrimination . . . are inadequate to justify race-based redistricting" and asserting that litigants may not, under the Equal Protection Clause, use Section 2 to justify "transparent gerrymandering that boosts one group's chances at the expense of another" (quotation marks and citation omitted)).  Thus, *Milligan* forecloses this argument.  *See* 599 U.S. at 41-42; *id.* at 45 (Kavanaugh, J., concurring in part).

here present one of "'those instances of intensive racial politics' where the 'excessive role [of

race] in the electoral process . . . den[ies] minority voters equal opportunity to participate.'"

*Milligan*, 599 U.S. at 30 (quoting S. Rep. No. 97-417, at 33-34 (1982)) (alterations in original).

The *Gingles* preconditions and totality of the circumstances analysis are the mechanisms to

answer this question.  Given the established constitutionality of the *Gingles* framework,

Defendants identify no constitutional infirmity with imposition of an appropriate remedy in this

case.

Finally, even if Defendants had meaningfully pursued the temporal argument, it would

fail.  Defendants suggested more clearly in related litigation that Section 2 presents the same

constitutional concerns at issue in *Shelby County v. Holder*, 570 U.S. 529 (2013).  *See* Supp. Br.

for Appellants 31, *Robinson v. Ardoin*, No. 22-30333 (5th Cir. Aug. 7, 2023).  But *Shelby County*

turned on two primary concerns: (1) that preclearance imposed extraordinary burdens on certain

states by requiring advance permission from the federal government "to implement laws that

they would otherwise have the right to enact and execute on their own," *Shelby Cnty.*, 570 U.S.

at 544; and (2) that "Congress—*if it is to divide the States*—must identify those jurisdictions to

be singled out on a basis that makes sense in light of current conditions," *id.* at 553 (emphasis

added).

Neither of those concerns is present here.  Section 2 does not require preclearance and

applies only after a "standard, practice, or procedure" is "imposed or applied by a[] State or

political subdivision."  52 U.S.C. § 10301(a).  As the Supreme Court observed in *Shelby County*,

there are "important differences between [post-enactment lawsuit] proceedings and preclearance

proceedings."  570 U.S. at 545.  And Section 2 cannot impinge on the "equal sovereignty" of the

states, *id.* at 544, because it applies "nationwide" to all States and political subdivisions, *id.* at 537.

Ultimately, no temporal limitation needs to be applied to the Voting Rights Act because Section 2 is self-limiting: It authorizes race-conscious remedies only if and to the extent required to respond to the "regrettable reality" of racially dominated politics. S. Rep. No. 97-417, at 34. To establish a Section 2 violation, a plaintiff must satisfy both the *Gingles* preconditions and the totality-of-circumstances test, which turn on up-to-date facts in the particular jurisdiction." *See* Defs.' Proposed Findings & Conclusions 92 (quoting *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991)). For example, as the Supreme Court noted in *Milligan*, "as residential segregation decreases—as it has sharply done since the 1970s—satisfying [the first precondition] becomes more difficult." 599 U.S. at 28-29 (internal quotation marks omitted); *see also* Heather K. Gerken, *A Third Way for the Voting Rights Act: Section 5 and the Opt-In Approach*, 106 Colum. L. Rev. 708, 745 (2006) (recognizing that "[w]hen people cease to vote along racial lines," plaintiffs will be unable to satisfy the second and third preconditions). Similarly, when the effects of earlier discrimination and the use of racial appeals diminish in a jurisdiction, a plaintiff will have a harder time proving, under the totality of circumstances, that it is a place in which the "excessive role of race in the electoral process denies minority voters equal opportunity to participate." *Milligan*, 599 U.S. at 30 (citation and alterations omitted).

The rigorous standard for proving a Section 2 claim is well within Congress's power to "use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach*, 383 U.S. 301, 324 (1966); *cf. Shelby Cnty.*, 570 U.S. at 556 (invalidating separate Voting Rights Act provision only after finding that Congress's

justification was "irrational" under the *Katzenbach* test); *id.* at 557 ("Our decision in no way

affects the permanent, nationwide ban on racial discrimination in voting found in § 2.").  And

because that standard is inherently and by design sensitive to changing conditions and calibrated

to the ongoing need for a race-based remedy, Section 2 provides its own "logical end point,"

alleviating any temporal concerns.  *Students for Fair Admissions, Inc. v. President & Fellows of

Harvard Coll.*, 600 U.S. 181, 221 (2023) (citation omitted); *see also Milligan*, 599 U.S. at 29

(noting decline in successful Section 2 challenges over time).  This Court can accordingly apply

Section 2 to Defendants and remediate any liability consistent with the Constitution.

## CONCLUSION

For the foregoing reasons, the Courts should reject Defendants' challenges to the

constitutionality of Section 2 of the Voting Rights Act.

Date:  December 19, 2023

Respectfully submitted,


RONALD C. GATHE, JR.                    KRISTEN CLARKE
United States Attorney                  Assistant Attorney General
Middle District of Louisiana            Civil Rights Division


*/s/ Justin A. Jack*                    */s/ Daniel J. Freeman*
JUSTIN A. JACK, LBN 36508               TIMOTHY F. MELLETT
Assistant U.S. Attorney                 DANIEL J. FREEMAN
777 Florida Street, Suite 208           Attorneys, Voting Section
Baton Rouge, Louisiana 70801            Civil Rights Division
Phone: (225) 389-0443                   U.S. Department of Justice
Fax: (225) 389-0685                     4 Constitution Square
E-mail: justin.jack@usdoj.gov           150 M Street NE, Room 8.923
                                        Washington, DC 20530
                                        Phone: (800) 253-3931
                                        Fax: (202) 307-3961
                                        Email: daniel.freeman@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on December 19, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

/s/ Daniel J. Freeman
DANIEL J. FREEMAN
Civil Rights Division
U.S. Department of Justice