IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| *Plaintiffs,* | |
| v. | Chief Judge Shelly D. Dick |
| R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |

## <u>DEFENDANTS' POST-TRIAL BRIEF</u>

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.    PLAINTIFFS LACK STANDING TO CHALLENGE ALL BUT (POSSIBLY) FOUR DISTRICTS.................................................................................................3

II.   SECTION 2 OF THE VOTING RIGHTS ACT DOES NOT GRANT A PRIVATE RIGHT OF ACTION. .........................................................................................9

III.  PLAINTIFFS DID NOT PROVE A § 2 CLAIM.................................................9

    A.    Plaintiffs Did Not Establish the First Precondition............................... 10

        1.    The Minority Population Is Not Compact. ...............................10

        2.    Plaintiffs' Plans Are Racial Gerrymanders. ...........................13

    B.    Plaintiffs Did Not Establish the Second and Third *Gingles* Preconditions........... 18

        1.    Failure of Evidence. ..................................................................18

        2.    Political Polarization................................................................21

        3.    No Legally Significant White Bloc Voting. ..............................25

    C.    Totality of the Circumstances. ............................................................. 27

        1.    Plaintiffs' Demand for Better That Proportionality Lacks a Foundation in § 2. ...................................................................27

        2.    Additional Factors Undercut Plaintiffs' Claim. .........................34

IV.   PLAINTIFFS' CONSTRUCTION OF SECTION 2 VIOLATES THE CONSTITUTION AS APPLIED HERE.................................................................36

CONCLUSION..................................................................................................... 40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)................................................................................10, 13

*Abrams v. Johnson*,
    521 U.S. 74 (1997)...........................................................................................25

*Ala. Legislative Black Caucus v. Ala.*,
    575 U.S. 254 (2015)...........................................................................................5

*Allen v. Milligan*,
    599 U.S. 1 (2023)..................................................................................... *passim*

*Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*,
    86 F.4th 1204 (8th Cir. 2023) ............................................................................9

*Ass'n of Cmty. Organizations for Reform Now v. Fowler*,
    178 F.3d 350 (5th Cir. 1999) ....................................................................4, 7, 8

*Aviva Sports. Inc. v. Fingerhut Direct Marketing, Inc.*,
    829 F. Supp. 2d 802 (D. Minn. 2011)..............................................................20

*Baird v. Consol. City of Indianapolis*,
    976 F.2d 357 (7th Cir. 1992) ....................................................................21, 27

*Bethune-Hill v. Virginia State Bd. of Elections*,
    580 U.S. 178 (2017)..........................................................................................15

*Bone Shirt v. Hazeltine*,
    461 F.3d 1011 (8th Cir. 2006) .........................................................................14

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321 (2021)......................................................................................38

*Bush v. Vera*,
    517 U.S. 952 (1996)..........................................................................................33

*Campos v. City of Baytown, Tex.*,
    840 F.2d 1240 (5th Cir. 1988) .........................................................................18

*Carney v. Adams*,
    592 U.S. 53 (2020)..............................................................................................3

*Christian Ministerial All. v. Sanders*,
  No. 4:19-cv-00402, 2023 WL 4745352 (E.D. Ark. July 25, 2023) ........................................18

*City of Boerne v. Flores*,
  521 U.S. 507 (1997).................................................................................................37, 38

*City of Richmond v. J.A. Croson Co.*,
  488 U.S. 469 (1989).........................................................................................................38

*Cooper v. Harris*,
  581 U.S. 285 (2017).......................................................................................12, 27, 34

*Covington v. North Carolina*,
  316 F.R.D. 117 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017)............................25

*Davis v. Chiles*,
  139 F.3d 1414 (11th Cir. 1998) ......................................................................................14

*Fairley v. Hattiesburg Mississippi*,
  662 Fed. Appx. 291 (5th Cir. 2016)........................................................................30, 34

*Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*,
  527 U.S. 627 (1999).................................................................................................37, 38

*Fullilove v. Klutznick*,
  448 U.S. 448 (1980) ........................................................................................................38

*Fusilier v. Landry*,
  963 F.3d 447 (5th Cir. 2020) ...................................................................................27, 34

*Alpha Phi Alpha Fraternity Inc. v. Raffensberger*,
  2023 WL 7037527 (N.D. Ga. Oct. 26, 2023) ................................................................14

*Gill v. Whitford*,
  138 S. Ct. 1916 (2018)................................................................................................3, 4

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982)...............................................................................................7, 8, 9

*In re Colo. General Assembly*,
  828 P.2d 185 (Co. 1992)..................................................................................................12

*In re Isbell Records, Inc.*,
  774 F.3d 859 (5th Cir. 2014) ...........................................................................................7

*In re Zyprexa Prod. Liab. Litig.*,
  489 F. Supp. 2d 230 (E.D.N.Y. 2007) ............................................................................20

*Jennings v. Rodriguez*,
    138 S. Ct. 830 (2018) ........................................................................................37

*Johnson v. De Grandy*,
    512 U.S. 997 (1994) ..................................................................................... *passim*

*League of United Latin Am. Citizens, Council No. 4434 v. Clements*,
    999 F.2d 831 (5th Cir. 1993) ...............................................................21, 24, 25

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ..................................................................................... *passim*

*Lopez v. Abbott*,
    339 F.Supp.3d 589 (S.D. Tex. 2018) ..............................................................36

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..........................................................................................3

*Luna v. Cnty. of Kern*,
    291 F. Supp. 3d 1088 (E.D. Cal. 2018) ...........................................................32

*McConchie v. Scholz*,
    577 F. Supp. 3d 842 (N.D. Ill. 2021) ..............................................................32

*Miller v. Johnson*,
    515 U.S. 900 (1995) ..................................................................................... *passim*

*N.A.A.C.P. v. City of Kyle, Tex.*,
    626 F.3d 233 (5th Cir. 2010) ...................................................................5, 7, 9

*Nixon v. Kent Cnty.*,
    76 F.3d 1381 (6th Cir. 1996) ...........................................................................39

*North Carolina v. Covington*,
    138 S. Ct. 2548 (2018) .......................................................................................3

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ....................................................................................37, 38

*Overton v. City of Austin*,
    871 F.2d 529 (5th Cir. 1989) .......................................................................19, 20

*Perez v. Pasadena Indep. Sch. Dist.*,
    958 F. Supp. 1196 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999) ............19

*Robinson v. Ardoin*,
    37 F.4th 208 (5th Cir. 2022) ...................................................................11, 12, 13

iv

*Robinson v. Ardoin*,
   86 F.4th 574 (5th Cir. 2023) ................................................................. *passim*

*Rodriguez v. Bexar Cnty., Tex.*,
   385 F.3d 853 (5th Cir. 2004) .............................................................. 20

*Rodriguez v. Harris Cnty., Tex.*,
   964 F. Supp. 2d 686 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris
   Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015) ...................................... 18

*Rodriguez v. Pataki*,
   308 F. Supp. 2d 346 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004) ................. 29

*Rose v. State of Georgia*,
   87 F.4th 469 (11th Cir. 2023) ............................................................. 14

*Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*,
   209 F.3d 835 (6th Cir. 2000) .............................................................. 29

*Sanchez v. Colorado*,
   97 F.3d 1303 (10th Cir. 1996) ............................................................ 14, 40

*Sensley v. Albritton*,
   385 F.3d 591 (5th Cir. 2004) .............................................................. 12, 13

*Shaw v. Hunt*,
   517 U.S. 899 (1996) ........................................................................... 29, 33

*Soto Palmer v. Hobbs*,
   No. 3:22-CV-05035, 2023 WL 5125390 (W.D. Wash. Aug. 10, 2023), *petition
   for cert. docketed Trerino v. Palmer*, No. 23-489 (U.S. Nov. 7, 2023) ........ 29, 30

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
   600 U.S. 181 (2023) ........................................................................... 4, 5, 7

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009) ........................................................................... 4, 5

*Texas State LULAC v. Elfant*,
   52 F.4th 248 (5th Cir. 2022) ............................................................. *passim*

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ............................................................................. *passim*

*Voinovich v. Quilter*,
   507 U.S. 146 (1993) ........................................................................... 25

*Westwego Citizens for Better Gov't v. City of Westwego*,
   946 F.2d 1109 (5th Cir. 1991) ................................................................10

*Wis. Legislature v. Wis. Elections Comm'n*,
   595 U.S. 398 (2022) (per curiam) ....................................................27, 34

**Statutes**

52 U.S.C. § 10301(b) .......................................................... *passim*

**Other Authorities**

S. Rep. No. 94-295..........................................................................39

S. Rep. No. 97–417, 97th Cong.2nd Sess. 28 (1982) ............................35, 39

# INTRODUCTION

Plaintiffs' claim under § 2 of the Voting Rights Act ("VRA") is an overreach. Louisiana's house and senate redistricting plans provide *more* districts of majority Black voting-age population ("BVAP") than any prior plans in entirety of Louisiana history. Four individuals and two advocacy groups ("Plaintiffs") now demand nine new majority-BVAP legislative districts, six in the house and three in the senate. No one advocating before the Legislature during the 2021/2022 redistricting cycle suggested § 2 requires that many majority-Black districts, and no proposed plan came close to matching it. "Forcing proportional representation is unlawful and inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen v. Milligan*, 599 U.S. 1, 28 (2023). But Plaintiffs go further, past proportional representation, into mandating *disproportionate* over-representation. The Court should reject that ploy for multiple reasons.

*First*, Plaintiffs lack standing to challenge all but a handful of legislative districts. A redistricting plaintiff claiming vote dilution has standing to challenge that plaintiff's own district, nothing more. The four individuals ("Individual Plaintiffs") thus collectively have standing to challenge at most four legislative districts alleged to violate § 2. That cannot get them the 47 districts' worth of relief they demand. Plaintiffs therefore necessarily rely on the standing of advocacy groups (the "Entity Plaintiffs") for the remaining districts.

But the Entity Plaintiffs lack standing entirely. The one Entity Plaintiff that asserts associational standing has not proven it has members in all remaining challenged districts. Nor have the Entity Plaintiffs established Article III standing in their own right for organizational standing. And § 2—which contains no right of action for anyone—certainly cannot be read to confer a right on corporations to assert the voting rights of non-members.

*Second*, Plaintiffs did not prove the essential threshold prerequisites of a § 2 claim. The minority groups they would gerrymander into new majority-BVAP districts, by an unlawful

maximization policy, are not compact. The only evidence before the Court concerning *population* compactness (as opposed to compactness of district shapes) shows that Plaintiffs' expert stitched together far-flung pockets of Black voting-age persons into new majority-BVAP districts, which § 2 does not require or permit. Moreover, Plaintiffs did not prove that voting is racially polarized: their expert failed to measure, in a reliable way, the very large segment of votes cast in early or absentee voting. Even if Plaintiffs' estimates were reliable, they show that there is political (not racial) polarization in Louisiana. One defense expert properly controlled for partisan polarization in his study and determined that differences in political views—not racial animus—is driving the patterns Plaintiffs count as polarized. Plaintiffs' experts, by contrast, myopically focused on White Democratic voters in attempting to differentiate race from politics, which makes no sense when it is White *Republican* voters whose voting choices Plaintiffs' experts are deeming polarized.

*Third*, Plaintiffs have no viable claim to *dis*proportionate representation, when § 2 disavows even proportionality. With respect to the regions of focus that Plaintiffs have identified (which is the inquiry required by precedent), Plaintiffs uniformly seek *more* than proportionality. For example, in the house plan in the Baton Rouge area (44% BVAP), the enacted plan provides six majority-BVAP districts out of eleven (54%). But Plaintiffs demand *eight—i.e.*, 73% of the districts versus 44% BVAP in the Baton Rouge area. Similarly, Plaintiffs also seek disproportionate representation statewide: their illustrative plans make 33.3% of the house district and 35.9% of the senate districts majority-Black, even though the State's BVAP is 31.25%. That illustrative plans are thus "unlawful and inconsistent with" § 2. *Allen*, 599 U.S. at 28. For these reasons, those discussed below, and those raised in Defendants' pretrial filing, Doc. 177, and other briefing in this matter, this Court should enter judgment for the defense.

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING TO CHALLENGE ALL BUT (POSSIBLY) FOUR DISTRICTS.

Plaintiffs lack Article III standing for most of the relief they seek. Plaintiffs "bear[] the burden" to satisfy the "irreducible constitutional minimum" of standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). They must prove that they "suffered a concrete and particularized injury that is fairly traceable to the challenged conduct, and is likely to be redressed by a favorable judicial decision." *Carney v. Adams*, 592 U.S. 53, 58 (2020) (quotation omitted). In the vote-dilution context, that requires showing—at a minimum—that each plaintiff resides in each district challenged as unlawful. *Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018). Plaintiffs appear to challenge 34 house and 13 senate districts, for a total of 47 districts.[1] But Individual Plaintiffs only presented evidence of standing in, at most, three house districts and one challenged senate district—thereby failing to demonstrate standing for the vast majority of the State.

There are four Individual Plaintiffs: Dr. Nairne, Rev. Lowe, Dr. Washington, and Pastor Harris. Individuals have standing "only with respect to those legislative districts in which they reside." *North Carolina v. Covington*, 138 S. Ct. 2548, 2553 (2018). Dr. Nairne testified that she resides in HD60 and SD2. 1.TR[2] 26:22–25, 29:10–12. Rev. Lowe and Dr. Washington both reside in HD66 and SD16, 1.TR 56:25–57:4, 105:5–8 (though SD16 is not challenged). *See* Doc. 163-1 at 5. Pastor Harris resides in HD25 under the enacted plan and he did not disclose his senate district.

---

[1] Plaintiffs say their case "directly implicate[d] the following enacted districts: House Districts 1, 2, 3, 4, 5, 6, 7, 8, 9, 13, 22, 25, 29, 34, 35, 36, 37, 47, 57, 58, 59, 60, 61, 62, 63, 65, 66, 67, 68, 69, 70, 81, 88, and 101, and Senate Districts 2, 5, 7, 8, 10, 14, 15, 17, 19, 31, 36, 38, and 39." Doc. 163-1 at 5.

[2] Defendants have requested, but have not yet received, final transcripts in this matter. Due to the expedited nature of this post-trial briefing, and pursuant to Defendants' understanding of the Court's instructions, Defendants provide citations to cleaned-up rough transcripts and rough transcripts (when the cleaned-up versions were not available) filed contemporaneously as sequential attachments, with the exception of Day 3, which is broken into Attachments 3A (a.m. session) and 3B (p.m. session). The transcripts will be referred to as "[Day#].TR [Page#:Line#]." For example, 1.TR 26:22–25 refers to the attached Day 1 transcript at page 26, lines 22 through 25. o

1.TR 76:19–20. At best then, Individual Plaintiffs have established standing to challenge SD2, HD60, HD66, and HD25.

Plaintiffs lack standing to challenge SD2, however, because it is majority-Black under the enacted plan. 1.TR 82:5–9. Plaintiffs are not injured by districts that provide them with an equal opportunity to elect their representatives of choice, *see Gill*, 138 S. Ct. at 1932, as SD2 does. Any claim by the Individual Plaintiffs that other districts cause them injury is a "generalized grievance" that does not confer standing. *Id.* at 1931. The Entity Plaintiffs thus have an enormous gap to fill: *i.e.*, the 43-44 districts in which no Individual Plaintiff resides. To do that, Plaintiffs attempt to rely on the alleged standing of Entity Plaintiffs Black Voters Matter Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP").

For organizational plaintiffs, Article III standing "can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'" *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("*SFFA*") (citation omitted). Where an organization asserts members' standing, it must "make specific allegations establishing that at least one identified member" would have standing in that member's own right. *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009). "An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals." *Ass'n of Cmty. Organizations for Reform Now v. Fowler*, 178 F.3d 350, 356 (5th Cir. 1999) ("*ACORN*"). The Entity Plaintiffs have not established standing under either theory.

Plaintiffs do not claim associational standing for BVM, *see* Doc. 163 at 12 n.4, only for the Louisiana NAACP.  And that assertion failed at trial.

4

To establish associational standing, an entity "must demonstrate that (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *SFFA*, 600 U.S. at 199 (quotation omitted). The Supreme Court's precedents "have required plaintiff-organizations to make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers*, 555 U.S. at 498; *see also SFFA*, 600 U.S. at 201. This includes a "requirement of naming the affected members." *Summers*, 555 U.S. at 498; *see Ala. Legislative Black Caucus v. Ala.*, 575 U.S. 254, 271 (2015); *N.A.A.C.P. v. City of Kyle, Tex.*, 626 F.3d 233, 237 (5th Cir. 2010).

Here, the Louisiana NAACP refused to provide the "list of members" necessary to establish standing, *Ala. Legislative Black Caucus,* 575 U.S. at 271, even after Defendants sought that information in discovery. When Defendants moved to compel discovery responses on that topic, the Louisiana NAACP first relied on an interrogatory response of its president, Mr. McClanahan, that he "identified at least one member" in each of the 47 challenged districts, *see* Doc. 135-10 at 2, but the Louisiana NAACP refused discovery into membership. After discovery closed, and after the Court entered an order on November 2, 2023 (just 25 days before trial) clarifying that Plaintiffs must disclose the names of members whose standing they might rely on. *See* Doc. 169 at 2. But the Louisiana NAACP then disclosed "members" in only ten districts, *see* Doc. 173-1, a number that dwindled to nine "members" at trial. *See infra* p. 6. That showing was too little, too late.

*First,* Mr. McClanahan conceded that Louisiana NAACP—a State Conference of the NAACP—does not actually have individual members itself. 1.TR 134:15–17. Instead, Mr. McClanahan claimed to satisfy the Louisiana NAACP's associational standing by identifying members of affiliated NAACP branches, despite being the president of no branch. 1.TR 134:25–

135:1. This difference matters because the NAACP's branches are *separate legal entities* with their own officers, 1.TR 135:2–7, and elect "delegates" to attend state conventions and select Louisiana NAACP officers. 1.TR 124:20–25. Mr. McClanahan did not testify that the nine alleged branch members were officers of the Louisiana NAACP or delegates to a state convention. Nor did Plaintiffs provide evidence of what rights and privileges are afforded to "members" of a branch as to the State Conference (the Louisiana NAACP).[3] Louisiana NAACP's claim of associational standing thus fails on that basis alone.

*Second*, the "evidence" that these nine individuals are branch members was scant and objectionable. Mr. McClanahan testified that the nine named individuals reside in three senate districts (SD8, SD17, and SD38) and six house districts (HD1, HD25, HD34, HD65, HD68, HD101). 1.TR* 5-19.[4] But he could not recall whether branches had members in certain districts or the names or addresses of members, and essentially read an interrogatory response (likely drafted by lawyers) as his testimony. *Id.* Further, Plaintiffs adduced no evidence that those alleged branch members are regular voters or that they are not represented by their candidates of choice.

Much of this testimony was hearsay, which was improperly admitted over Defendants' objections that they were denied discovery, including the right to depose the nine alleged members who waived their First Amendment associational privilege. *See* 1.TR* 12:7–13:5, 23:18–24. That discovery would have allowed adversarial vetting of the Louisiana NAACP's representations about these alleged branch members. Through this series of events, the Louisiana NAACP used

---

[3] Plaintiffs attempted to elicit testimony from Mr. McClanahan about a document they purported to be the Louisiana NAACP's bylaws, but he—the group's president—could not authenticate the document and it was properly excluded. 1.TR 121:17–124:1.

[4] Upon Plaintiffs' request, this portion of the testimony was designated as "Attorneys Eyes Only," and the courtroom was cleared. Out of an abundance of caution, Defendants are not filing a rough transcript under seal, but provide citations to the cleaned-up Day 1 sealed testimony ("1.TR*") to aid the Court once final transcripts are available. If the Court requests, Defendants will provide citations to the final, official trial transcripts once available, to avoid further filing under seal.

its First Amendment associational privilege as both sword and shield by making a highly selective, eleventh-hour disclosures while shielding the topic from discovery. This approach is unsupported in precedent and prejudicial to Defendants, as Defendants argued previously. *See, e.g.*, Doc. 122 at 1–5; Doc. 132-1 at 6–8.

*Third*, Plaintiffs offered no evidence of *when* these identified individuals became branch members or where they resided when this action commenced. That omission is fatal because the Louisiana NAACP was required to "demonstrate that" the alleged branch members "have standing to sue in their own right," *SFFA*, 600 U.S. at 199, as judged "as of the commencement of the suit." *In re Isbell Records, Inc.*, 774 F.3d 859, 869 (5th Cir. 2014) (citation omitted). Without evidence concerning that time period, Plaintiffs' standing assertion fails.

To establish standing in their own right (i.e., organizational standing), the Entity Plaintiffs must demonstrate a "concrete and demonstrable injury to the organization's activities," not "simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982). Plaintiffs must present specific "evidence showing that [they] [were] 'directly affected' by" the challenged redistricting plans. *ACORN*, 178 F.3d at 357. An organization may do this "by showing that it had diverted significant resources to counteract the defendant's conduct." *N.A.A.C.P.*, 626 F.3d at 238. Plaintiffs failed these requirements too.

The Louisiana NAACP alleges injury based on the alleged expenditures of time and money it spent to get members "excited" about elections. 1.TR 128:15, 130:11–131:7. But that establishes nothing but "routine" strategic "activities" of a group that always spends money to motivate members and must, in all events, decide where to focus resources. *See N.A.A.C.P.*, 626 F.3d at 238. Moreover, this identifies no cost increase that is "concrete or identifiable" or a diversion of resources from other activities. *ACORN*, 178 F.3d at 360; *Texas State LULAC v. Elfant*, 52 F.4th

248, 253 (5th Cir. 2022) (reversing finding of standing where the evidence "fail[ed] to link any diversion of resources specifically to" the challenged law). The evidence shows (at most) a shift, which includes cost savings in some cases that is consistent with overall net cost reduction. Further, claimed injury in the form of alleged reduced excitement on the part of Black voters "simply" describes "a setback to the organization's abstract . . . interests." *Havens Realty*, 455 U.S. at 379.

BVM[5] likewise failed to prove standing. BVM operates in some 25 states, Doc. 149-6 at 18:7–25, and does not have individual members, 1.TR 195:5–7, but instead works with "partner organizations." 1.TR 196:5–9. Not all partners have members. 1.TR 196:10–15. BVM's goal is to increase the outreach capacity of partner organizations engaged in voter participation and that otherwise "address our issues in their community," 1.TR 164:24–165:3, meaning that not all BVM's partners engage in voter outreach.

BVM claims that, as a result of the redistricting process, it diverted time and funds it might have otherwise used towards funding its partners' non-redistricting purposes and missions. *See* 1.TR 172:20–173:7. Specifically, BVM points to costs associated with a bus tour it coordinated during the legislative redistricting and related events from before the maps became law. *See* 1.TR 172:3–19, 199:23–200:7. But BVM has "made no showing that these . . . costs are fairly traceable to any of the conduct by Louisiana that [BVM] claims in its complaint is illegal." *ACORN*, 178 F.3d at 359. These expenses were undertaken before the challenged plans became law, so, if the Legislature had selected BVM's desired plan, those same costs would still have been spent. BVM cannot claim injury from legislative deliberations, and, like the "monitoring" and "litigation" costs

---

[5] Omari Ho-Sang testified that Black Voters Matter Capacity Building Institute (501(c)(3)) and Black Voters Matter Fund (501(c)(4)) are separate entities. 1.TR 195:10–196:1. Nearly all evidence submitted relates to the activities of the 501(c)(4)—which is not a named plaintiff in this case. *See* PL184–PL208. Defendants maintain that no evidence was presented involving harm to the Capacity Building Institute. That said, even assuming *arguendo* the alleged harm to the 501(c)(3) is the same as the harm to the 501(c)(4), BVM has failed to show it has standing.

found non-cognizable in *ACORN*, *see id.* at 358–59, the costs of lobbying the Legislature for a different outcome cannot be regarded as injuries from the enacted plans, *see N.A.A.C.P.*, 626 F.3d at 238 ("lobbying activities" not cognizable injury-in-fact).

BVM also claims that the redistricting process created an increasing sentiment in minority communities that "their votes doesn't matter," which BVM asserted "ma[de] it a bit more challeng[ing] for us to have the conversation" with Black voters. 1.TR 174:17–175:17. Ultimately, this showing, like Louisiana NAACP's, "simply" describes "a setback to the organization's abstract . . . interests" insufficient to show standing. *Havens Realty*, 455 U.S. at 379. *See also Texas State LULAC,* 52 F.4th at 253. BVM therefore lacks organizational standing to sue.

## II.    SECTION 2 OF THE VOTING RIGHTS ACT DOES NOT GRANT A PRIVATE RIGHT OF ACTION.

As the Eighth Circuit recently held, there is no private right of action to enforce § 2. *Arkansas State Conf. NAACP v. Arkansas Bd. of Apportionment*, 86 F.4th 1204 (8th Cir. 2023). Although the Fifth Circuit reached a contrary conclusion in *Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. 2023), that conclusion is incorrect for all of the reasons explained in *Arkansas State Conf. NAACP.* Defendants preserve this argument for additional appellate review for the reasons set forth in their Motion to Dismiss and Memorandum in Support, Docs. 187 and 187-1.

## III.    PLAINTIFFS DID NOT PROVE A § 2 CLAIM.

For a § 2 claim to be viable, (1) "the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district," (2) "the minority group must be able to show that it is politically cohesive," and (3) "the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Thornburg v. Gingles*, 478 U.S. 30, 50–51 (1986). "If a plaintiff makes that showing, it must then go on to prove that, under the totality

of the circumstances, the district lines dilute the votes of the members of the minority group."
*Abbott v. Perez*, 138 S. Ct. 2305, 2331 (2018).

"The question which the court must answer in a section 2 case is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'" *Westwego Citizens for Better Gov't v. City of Westwego*, 946 F.2d 1109, 1120 (5th Cir. 1991) (citation omitted). The inquiry "depends upon a searching practical evaluation of the past and present reality" and on a "functional view of the political process." *Id.* at 34. In this case, the challenged Louisiana State House and Senate plans contain 40 majority-BVAP districts. SOS_1 at 8. Plaintiffs are therefore asserting, "not the chance for some electoral success in place of none, but the chance for more success in place of some." *Johnson v. De Grandy*, 512 U.S. 997, 1012–13 (1994). Consequently, this case presents (at best) "closer calls" than many § 2 cases. *Id.* "As facts beyond the ambit of the three *Gingles* factors loom correspondingly larger, factfinders cannot rest uncritically on assumptions about the force of the *Gingles* factors in pointing to dilution." *Id.*

### A. Plaintiffs Did Not Establish the First Precondition.

#### 1. The Minority Population Is Not Compact.

"[T]he first *Gingles* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson*, 512 U.S. at 1008. Plaintiffs must show that the "minority group" is "sufficiently large and geographically compact to constitute a majority" in more "reasonably configured district[s]" than currently exist. *Allen*, 599 U.S. at 18. "The first Gingles condition refers to the compactness of the minority population, not to the compactness of the contested district." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006) (hereinafter "*LULAC*").

Plaintiffs failed to adduce *any* evidence of the compactness of the *minority population* in their new illustrative majority-Black districts. Plaintiffs' expert, Bill Cooper, presented those illustrative plans for the house and senate. PL20, PL89. Yet Mr. Cooper did nothing to assess the compactness of the Black population grouped within his proposed new majority-Black districts. 3A.TR 89:9–13. He deemed that inquiry "not necessary" and "something that one does not need to do to answer the *Gingles* I inquiry." *Id*. at 89:13–14.  Mr. Cooper thought it irrelevant the Black population was located across different parts of the district. *Id*. at 90:14–16.

The Fifth Circuit begs to differ: the compactness inquiry evaluates "the compactness of the *minority population* in the proposed district, not the proposed district itself." *Robinson v. Ardoin*, 37 F.4th 208, 218 (5th Cir. 2022) (citing *LULAC*, 548 U.S. at 433). But Mr. Cooper failed to offer any evidence or analysis as to this dispositive inquiry, instead deeming that controlling inquiry irrelevant. That error—and the resulting absence of *any* relevant analysis/evidence—is fatal here.

The only trial evidence concerning the compactness of the minority population was the reports and testimony of defense expert Sean Trende. Mr. Trende first employed a qualitative approach, examining dot density maps showing the dispersion of the Black population. *See* SOS_3 at 10; 4.TR 173:22–174:20. For example, he showed that in Illustrative House District ("IHD") 1 in the Shreveport area, the Black population is not compact but rather spread out, separated by White populations. Ex. 1 at 1[6]. Similar maps show similar patterns across Mr. Cooper's new majority-Black districts. SOS_3 at Figs. 21, 33, 48, 52, 71, 83, 96.

Mr. Trende also applied quantitative approaches to assessing population compactness, using both moment of inertia[7] and the areal/Chen & Rodden compactness measures. SOS_3 at 14-

---

[6] Attached hereto as Exhibit 1 ("Ex. 1") are copies of Figures 5 and 6 from Mr. Trende's Expert Report, SOS_3 at 13, 17.

[7] Moment of inertia is one of the oldest redistricting metrics. SOS_3 at 14-15 (citing scholarly articles dating back to 1963). "The moment of inertia approach is defined as the 'sum of squared distances from each person to [their]

16; 4.TR 177:25–179:25, 180:1–181:13. By these methods, Mr. Trende demonstrated the most compact group of Black voting-age residents in Mr. Cooper' illustrative districts that would constitute a majority. For example, Mr. Trende found in IHD1 (Shreveport) that the most compact Black population sufficient for a majority stretches beyond Shreveport city limits, crossing heavily White areas to pick up distant Black population further north. SOS_3 at 19. He concluded that these isolated Black populations are "not incidental to the 50%+1 district, they are needed to draw such a district in the configuration." *Id.* He presented these depictions in additional figures in his report. Ex. 1 at 2; *see* SOS_3 at Figs. 7, 22, 23, 34, 35, 49, 50, 53, 54, 72, 73, 84, 85, 97, 98.

Based upon these methods, Mr. Trende concluded that Mr. Cooper's illustrative majority-Black districts "are not based upon compact minority populations" and that areas within some of Mr. Cooper's illustrative districts that capture disparate Black populations that "are not large enough to constitute a majority of the district." SOS_3 at 7-8, 138. *See Cooper v. Harris*, 581 U.S. 285, 305 (2017) ("When a minority group is not sufficiently large to make up a majority in a reasonably shaped district, § 2 simply does not apply.").

Plaintiffs did not rebut Mr. Trende's conclusions. Plaintiffs rely on the Reock and Polsby-Popper measures, which measure the compactness of the *district shape*, not its min*ority population*. 4.TR 171:14–172:4. That is plainly insufficient under binding Fifth Circuit precedent. *Robinson*, 37 F.4th at 218. This case is in all respects like *Sensley v. Albritton*, 385 F.3d 591 (5th Cir. 2004), which rejected a proposed district that would "lump together two groups of African–American citizens who were from two distinct communities . . . which are separated by

---

district's center'" *Id.* at 15 (citation omitted). It is not relevant whether courts have in the past accepted moment-of-inertia analyses for the first precondition. 4.TR 188:11–189:5. No court has rejected it, at least one redistricting decision has recognized moment of inertia as a compactness measure, *see In re Colo. General Assembly*, 828 P.2d 185, 198 (Co. 1992), and no rule binds all litigants to the same forms of proof as prior litigants. It is a well-known methodology in the field of geography, with 19,000 references in the academic literature. 6.TR 151:13–152:15 (testimony of Dr. Murray). Besides, the first precondition is Plaintiffs' to prove, not Defendants' to disprove.

considerable distance (approximately 18 miles) and share few community interests." *Id.* at 598. In each region where Plaintiffs demand additional majority-BVAP districts, Mr. Cooper does just that.

Thus, Plaintiffs neither met their burden under the correct standard nor responded adequately to the defense evidence. In addition, Mr. Cooper did not analyze compactness at the district level.  He only assessed the compactness of his plans statewide, as compared to the enacted plans. *See* PL20 at ¶¶ 82-85, Fig. 14; ¶¶ 110-113, Fig. 25. While he appended district compactness scores in his illustrative plans to his report, he performed no analysis district by district. 3A.TR 90:17–91:21, 92:8–14. He made only visual assessments of the new district lines. *Id.* at 92:11–14. But the Fifth Circuit in *Robinson* found that assessment of compactness on a statewide basis, and not district-by-district, does not show that the minority population in plaintiffs' proposed district was geographically compact. 37 F.4th at 218-29 (holding that federal courts "cannot rely on" analysis that "addresses compactness on a plan-wide basis, not a district-by-district basis—as the first *Gingles* precondition requires").

### 2.    Plaintiffs' Plans Are Racial Gerrymanders.

Plaintiffs do not establish the first precondition for the additional reason that their illustrative plans, if ratified, would compel illegal racial gerrymandering. In *Harding v. County of Dallas*, the Fifth Circuit recognized that plaintiffs must put forth an alternative map that is demonstrated to enhance the ability of minority voters to elect their candidates of choice to satisfy the *Gingles* preconditions. 948 F.3d 302, 310 (2020). The Fifth Circuit stated that "'it is hard to see' how the *Gingles* factors 'could be met if the alternative to the district decision at issue would not enhance the ability of minority voters to elect the candidates of their choice.'" *Id*. at 308 (quoting *Abbott v. Perez*, 138 S. Ct. 2305, 2332 (2018)).  In other words, plaintiffs in a VRA case must present a viable alternative to the challenged plan or practice that would remedy the alleged

vote dilution. The Eleventh Circuit recently reached a similar conclusion. *See Rose v. State of Georgia*, 87 F.4th 469 (11th Cir. 2023); *see also Davis v. Chiles*, 139 F.3d 1414 (11th Cir. 1998); *Sanchez v. Colorado*, 97 F.3d 1303, 1311 (10th Cir. 1996) ("The inquiries into remedy and liability, therefore, cannot be separated"); *Bone Shirt v. Hazeltine*, 461 F.3d 1011, 1025 (8th Cir. 2006) (same). This standard requires an early analysis by the Court of whether there is an adequate remedy. *Rose*, 87 F.4th at 482.

Applying the same concept, the Fifth Circuit recently held that an illustrative plan that is the product of racial predominance does not satisfy the first precondition. *See Robinson*, 86 F.4th at 594–95 & n.4. In *Robinson*, the Fifth Circuit held that "Courts must also determine if the illustrative districts have similar needs and interests beyond race." *Id.* at 590. The Court analyzed whether illustrative plans were racial gerrymanders that would violate the Fourteenth Amendment, *id.* at 590–95, explaining that the illustrative plans carry "Equal Protection implications" because they would direct a future "legislatively enacted map" resulting from a § 2 liability finding, *see id.* at 595 n.4. The Fifth Circuit "recognized 'a difference between being aware of racial considerations and being motivated by them'" and that awareness of race is permissible because §2 demands such considerations. *Id.* at 593 (quoting *Allen*, 599 U.S. at 30). But "[a]warness becomes racial predominance when the district lines are drawn with the traditional, race-neutral districting criteria considered *after* the race-based decision is made." *Id*. (emphasis in original) Another court recently reached a similar holding. *See Alpha Phi Alpha Fraternity Inc v. Raffensberger*, 2023 WL 7037537, at *53 (N.D. Ga. Oct. 26, 2023) (recognizing that race cannot predominate in the drawing of the illustrative plans to satisfy the first *Gingles* prerequisite). The Fifth Circuit holding follows directly from *Allen*. *See* 599 U.S. at 30 (plurality) (quoting *Miller v. Johnson,* 515 U.S. 900 (1995)); *see also id.* at 58 (Thomas, J., dissenting).

Several sources of evidence show that race predominated in this case.[8] Mr. Cooper started with the enacted maps, 3A.TR 89:24–90:3, and focused only on (a) areas of the state where the Black population experienced growth and/or there was a corresponding decline in White population or (b) areas with high BVAP where additional majority-Black districts might be configured. 3A.TR 90:4–15; 90:23–91:3. He was not asked to, nor did he move any districts lines to improve compactness or to reduce political subdivision splits. *Id.* at 61:3–25. He was explicitly attempting to draw a number of majority-Black districts "in a range that would be reflective of the overall black population in the state." *Id.* at 65:11–19. And to do so, he had to lower the BVAP of many existing majority-Black districts. *Id.* at 66:8–12. The sole purpose for moving any line from the enacted plans in his illustrative plans was to create a new majority-Black district.

Mr. Cooper claimed that he focused on traditional redistricting principles, but these were "*post hoc* justifications [he] in theory could have used but in reality did not." *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 189–90 (2017). Mr. Cooper admitted that his illustrative plans did not improve population equality, 3A.TR 75:24–76:1, or core retention (a Joint Rule 21 principle), *id.* at 76:2–9. He claims to have drawn his illustrative plans with certain cultural communities of interest in mind (PL20 ¶ 27), but admitted that his cultural regions were merely "in the background." 3A.TR 82:23–83:3. Plaintiffs attempt to justify the illustrative-district boundaries through the testimony of Dr. Colten, their communities of interest expert. But Mr. Cooper admitted that he never spoke with Dr. Colten and only saw his report *after* he drew his

---

[8] At trial, considerable time was spent on objections to questions and testimony that Plaintiffs perceived as going to Mr. Cooper's intent. But Plaintiffs' counsel directly asked Mr. Cooper, "Did race predominate your drawing of the maps here?" to which Mr. Cooper responded in pertinent part: "No, it did not. It was one of several factors. I was constantly balancing traditional redistricting principles." 3A.TR 19:17–18. Yet several objections were sustained whenever any of Defendants' experts—even those not subject to pretrial motions like Dr. Barber—discussed Mr. Cooper's intent. *See, e.g.*, 5.TR 183:6–184:12.

illustrative plans. 3A.TR 76:14–20. Dr. Colten's opinions thus could not have informed or motivated Mr. Cooper's line drawing.

The same is true of Mr. Cooper's statements that he relied upon socio-economic data. Mr. Cooper did not load any of the ACS data into his map-drawing software until *after* he drew his plans, 3A.TR 86:18–87:2, 88:6–10, and hence could not have been drawing lines on that basis. The ACS data that Mr. Cooper purportedly considered outside of his software is reported only at the parish or municipal level, *id.* at 84:19–21, and Mr. Cooper did not disaggregate that data to the census block level, where lines are drawn. *Id.* at 84:22–85:7. And Mr. Cooper admitted that he did not look at each ACS reports for each parish and municipality. *Id.* at 89:3–5.

Mr. Cooper's report demonstrates that his predominate purpose was race-based, i.e., a goal of maximizing majority-Black districts. PL020. Nowhere does Mr. Cooper's report explain the bases for district lines that are not racial. For example, in the Shreveport area, Mr. Cooper testified that he took IHD1 further south into Shreveport to pick up Black population for a new majority-Black district. 3A.TR 98:1–99:3. Likewise, Mr. Cooper significantly changed the boundaries of SD17 to anchor his new majority-Black ISD17 in East Baton Rouge Parish to draw in Black population and then eliminated extending the district west to avoid predominantly White communities. *Id.* at 111:8–12:2. As another example, in IHD60, Mr. Cooper admitted that he combined several municipalities "to create a new majority-Black" district. PL020 ¶ 132. He offered no other explanation for changing the lines in these areas (or any other), such as reuniting any municipality or parish, minimizing any subdivision splits, or improving compactness. The only common index is race. *See LULAC*, 548 U.S. at 433. Maximization is also not the law under § 2. *Johnson*, 512 U.S. at 1017 ("Failure to maximize cannot be the measure of § 2."). In fact, even proportionality is beyond § 2's dictate: "Forcing proportional representation is unlawful and

inconsistent with [the Supreme] Court's approach to implementing § 2." *Allen*, 599 U.S. at 28. The Supreme Court has repeatedly "explained how traditional districting criteria limited any tendency of the VRA to compel proportionality." *Id.* As a result, proportionality is rare and § 2 suits "rarely" succeed. *Id.* at 28–29. The Supreme Court in *Allen* confirmed that this is as it *should* be, since redistricting "is primarily the duty and responsibility of the States, not the federal courts." *Id.* at 29 (quotation and bracket marks omitted). In Louisiana, where the Legislature created more majority-BVAP districts than ever before, there is no basis for Plaintiffs to compel more.

Mr. Cooper maximized majority-BVAP districts, resulting in 14 illustrative majority-BVAP senate districts and 35 illustrative majority-BVAP house districts (for increases of 7.4% in the House and 7.1%, respectively, since 2000). SOS_1 at 5–6; LDTX51 at 10–11. But ensembles of 100,000 and 500,000 simulated house and senate plans[9], configured to respect traditional redistricting principles and not to achieve racial targets, produce no more than 5-8 majority-BVAP Senate districts and 18-23 majority-BVAP House districts. SOS_1 at 15, 56; SOS_4 at 9.[10] The illustrative plans far exceed those figures.

Mr. Cooper's line drawing was more than just race-conscious. He pervasively employed race with surgical and obsessive precision: creating numerous districts just above 50% BVAP to maximize the number of majority-Black districts.[11] Dr. Johnson demonstrated how Mr. Cooper drew lines without reference to any major roads, communities, neighborhoods or clear visible

---

[9] As explained by Justice Kavanaugh, "Computer simulations might help detect the presence or absence of intentional discrimination." *Allen*, 599 U.S. at 44 (Kavanaugh, J. concurring). As such, Dr. Barber's simulations are directly relevant to determining whether race predominated in the drawing of the illustrative plans.

[10] Dr. Barber's conclusions are strongly supported by other evidence on the record, such as Mr. Cooper's admission that his instructions were to draw more majority-Black districts and the undisputed evidence that Mr. Cooper's Illustrative Plans exceed proportionality on a statewide and regional basis. Dr. McCartan criticized various aspects of Dr. Barber's simulations, but admitted that his original criticisms were remedied in Dr. Barber's second report. 7.TR 142:8–18, 161:2–5. Tellingly, Dr. McCartan did not run any simulation studies himself—which he could have easily done. 7.TR 130:13–19.

[11] At least four Supreme Court Justices held that race predominates when a mapdrawer draws to a racial target. *Allen*, 599 U.S. at 61-64 (Thomas, J., Gorsuch, J., Barrett, J., Alito, J. dissenting).

features. *See* LDTX51 ¶¶ 69–76. Configurations were driven at reaching BVAP numbers just above 50%. Eleven of the 35 majority Black districts in the illustrative house plan are between 50% and 53% BVAP, PL066; 5.TR 82:4–9, which is eight more than the enacted plans, *id*. 82:10–12, and eight illustrative house districts fall between 50.03% and 50.9% BVAP. PL066. Similarly, 9 of 14 illustrative majority-Black senate districts falls between 50 and 53% BVAP. PL047. Such narrow-banded precision cannot be explained except by the predominance of race as the principal line-drawing criteria.

### B.    Plaintiffs Did Not Establish the Second and Third *Gingles* Preconditions.

Plaintiffs also failed to establish the second and third preconditions, which require proof that the relevant minority group "is politically cohesive" and that, in the absence of a § 2 remedy, a White voting bloc will usually "defeat the minority's preferred candidate." *Allen*, 599 U.S. at 18 (citation omitted). "The second and third *Gingles* preconditions are often analyzed together." *Christian Ministerial All. v. Sanders*, No. 4:19-cv-00402, 2023 WL 4745352, at *16 (E.D. Ark. July 25, 2023). Plaintiffs failed to prove both for several reasons.

#### 1.    Failure of Evidence.

Plaintiffs failed to show both preconditions because their evidence was incomplete and unreliable to prove Black and White voting preferences. For these inquiries, "the central focus is upon voting patterns." *Campos v. City of Baytown, Tex.*, 840 F.2d 1240, 1244 (5th Cir. 1988). Because the secret ballot prevents direct observation of White and minority voting choices, proving the second and third preconditions "typically requires statistical evaluation of elections." *Rodriguez v. Harris Cnty., Tex.*, 964 F. Supp. 2d 686, 757 (S.D. Tex. 2013), *aff'd sub nom. Gonzalez v. Harris Cnty., Tex.*, 601 F. App'x 255 (5th Cir. 2015).

Plaintiffs sponsored the opinion of Dr. Handley to make this showing. But her opinions were deficient because she did not adequately account for high levels of absentee and early voting.

*See* SOS_2[12] at 11–14. Dr. Handley's main estimation methods (ecological inference and ecological regression) "compare the density of a particular population group in a specified area with the percentage of votes received by a particular candidate in that area." *Perez v. Pasadena Indep. Sch. Dist.*, 958 F. Supp. 1196, 1215 (S.D. Tex. 1997), *aff'd*, 165 F.3d 368 (5th Cir. 1999). Specifically, they compare the percentage of minority population within precincts against the votes cast for candidates in those precincts to determine whether there is a correlation between minority percentages and candidate preferences. 2.TR 18:24–19:8.

The problem, however, is that about 30% of ballots cast in Louisiana since 2012 were by early or absentee voting, and that number rose to 45.6% in 2020. SOS_2 at 13. Louisiana does not link early or absentee ballots to precincts but instead reports these totals by parish. 2.TR 20:24–21:13. Thus, without a reliable allocation method, a statistical comparison of precinct minority percentages and voting outcomes will be off by anywhere from 20% to nearly 46%, depending on the election. *See* SOS_2 at 13. An error of this size is too large to overlook, *see Overton v. City of Austin*, 871 F.2d 529, 539 (5th Cir. 1989) (per curiam), as Dr. Handley admitted, 2.TR 22:20–22.[13]

Dr. Handley attempted to correct for this problem by allocating early and absentee votes to particular precincts proportionally based on the votes received by each candidate in the election-day vote. *See* PL001 at 6 & n.8; 2.TR 21:14–21. But that is unreliable. The point of measuring voting outcomes against minority percentages in each precinct is to *observe* whether there is a

---

[12] SOS_2, SOS_5, and SOS_39 and the testimony of Dr. Solanky were excluded pursuant to the Court's pretrial ruling, Doc. 174. Defendants renewed their objection to this exclusion at trial and proffered Dr. Solanky's reports. 7.TR 45:10–48:3. Notably, Dr. Handley's supplemental report was received into evidence over Defendants' objections. The supplemental report, and Dr. Handley's testimony, show that Dr. Handley did not disclose the fact that her allocation method resulted in misallocation of approximately 30.9% of the votes in her database until Dr. Solanky exposed this flaw. SOS_2 at 13.

[13] In fact, Dr. Handley rejected review of local elections and criticized Dr. Lewis's district-specific elections analysis because he analyzed districts where there was overlap of 75% or higher for a given local election because "[t]he other 25 percent could have made a difference in terms of winning or losing." 7.TR 173:20–:25. Dr. Handley's own allocation method effected on average 30.9% of all elections she studied, which is even more likely to make a difference in her estimates of voting polarization. SOS_2 at 13.

correlation between the actual votes cast and the minority percentages in each precinct. But to build that observation on an assumption that about one third of voters (in the absentee and early-voting context) exhibit the same preferences as about two thirds (in the election-day vote) is to destroy the process of *observation* and *imputes* the preferences of election-day voters onto early-voting and absentee voters.[14]

Moreover, Dr. Handley did not cap the number of absentee and early voting votes assigned to each precinct by total turnout, so the total votes cast for given candidates was overestimated in some precincts and underestimated in others. The result is an impossible set of over- and under-estimates by precinct, which renders Dr. Handley's opinions so unreliable as to fail the threshold *Daubert* standard, *see Overton*, 871 F.2d at 539, much less to satisfy Plaintiffs' demanding burden, *Rodriguez v. Bexar Cnty., Tex.*, 385 F.3d 853, 867 (5th Cir. 2004) (reversing district court's finding of White block voting when it rejected statistical analysis because there was "no information" as to how voters "actually vote" to support the district court's impermissible assumptions); *Growe v. Emison*, 507 U.S. 125, 41–42 (1993) ("a court may not presume block voting even within a single minority group" (citation omitted)).

Finally, Defendants renew their objection to the Court's exclusion of Dr. Solanky's opinions. Dr. Solanky's opinions are typical of defense experts, who "have no burden to produce models or methods of their own; they need only attack those of plaintiffs' experts." *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 285 (E.D.N.Y. 2007); *see also Aviva Sports. Inc. v. Fingerhut Direct Marketing, Inc.*, 829 F. Supp. 2d 802, 834-35 (D. Minn. 2011) (collecting cases). Far from being immaterial, Dr. Solanky's opinion is highly probative to the question of Dr.

---

[14] While Dr. Handley insisted "political scientists would endorse" her approach, 2.TR 23:2–5, she did not explain why it makes sense in this context. It does not. Mail-in voting populations frequently exhibit different voting preferences from in-person voting populations, and voters of different regions within parishes exhibit different voting preferences. Imputing others' preferences on voters is no better than "to ignore" them. 2.TR 22:20–21.

Handley's methodology for allocating votes to the precinct level. Indeed, Dr. Handley was permitted to testify in response to Dr. Solanky's criticisms of her methodology, even though Dr. Solanky's opinions were excluded. 2.TR 58:11-66:1; 111:7-20. Because a failure to show a proper methodology defeats Plaintiffs' show regarding polarized voting, Dr. Solanky's opinions are so relevant as to possibly make the difference in the outcome.

### 2.    Political Polarization.

Even assuming Dr. Handley's estimates were reliable, Plaintiffs still failed to prove legally significant polarized voting because differences in candidate preferences among White and Black voters reflect a partisan, not racial, divide. Section 2 "is a balm for racial minorities, not political ones—even though the two often coincide." *Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 361 (7th Cir. 1992) (citation omitted). If "partisan affiliation, not race, best explains the divergent voting patterns among minority and white citizens," then there is no "legally significant" racially polarized voting under the third *Gingles* precondition. *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 850 (5th Cir. 1993) (en banc). This is so because "[t]he Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates." *Id.* at 854 (quotation omitted). VRA § 2 "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats." *Id.* As the Fifth Circuit explained in *LULAC, Council No. 4434*, a majority of Justices in *Gingles* held § 2 liability does not lie where different candidate preferences reflect "interest-group politics." *See id.* at 855–59.

In this case, as in *LULAC, Council No. 4434*, the evidence "shows that divergent voting patterns among white and minority voters are best explained by partisan affiliation." *Id.* at 861. Whereas Dr. Handley looked only to contests with Black candidates, 2.TR 24:10–24, Dr. Alford looked to a broader range of elections—including "fully racially contested election[s],"

"nonracially contested elections," and "partially racially contested election[s]," 4.TR 106:7–10—to make comparisons necessary to determine whether voting preferences exhibit partisan polarization or racial polarization. *Id.* at 110:24–111:22; 117:8–18.

The data show the former. Beginning with federal contests, the results show that Black support for Black Democratic presidential candidate Obama matched Black support for White Democratic candidates Clinton and Biden, and that White support for White Republican candidates remained stable regardless of whether the Democratic opponent was White or Black. LDTX53 at 7; 4.TR 107:19–109:2. The pattern of partisan (not racial) polarization also appears in the state elections Dr. Handley analyzed. Black voters consistently support Democratic candidates, but not necessarily Black candidates. *See* LDTX52 at 9. In the 2015 attorney general contest and the 2020 senate contest, Black voters cohesively supported Democratic candidates but were divided among Black (Democratic) candidates; in the 2018 secretary of state contest, Black voters cohesively supported Democratic candidates but gave substantial support to a White Democrat; in the November 2020 senate contest, Black voters were divided among three candidates and gave more support to one White candidate (Mixon) over one Black candidate (Steib). 4.TR 112:10–115:7; LDTX53 at 9–10.

In contests Dr. Handley did not analyze, Dr. Alford found that Black voters cohesively supported Democratic candidates but not necessarily Black candidates.[15] LDTX53 at 9–10. In contests between only Republican candidates, the Black vote loses its cohesion. LDTX53 at 14; 4.TR 120:10–122:12. And, in most all contests, White voters cohesively support Republican

---

[15] For example in the 2015 and 2019 gubernatorial races and the October 2019 agriculture commissioner race, where the Black vote went to White Democrats over a Black Democrats; and the October 2015 insurance commissioner race, the November 2015 and 2019 gubernatorial run-off, where the Black vote cohesively supported Democratic candidates in the absence of a racial choice. 4.TR 118:3–119:13; LDTX53 at 9–10.

candidates regardless of a racial choice on the ballot.[16]  LDTX53 at 7–15. The polarization is thus consistently political, not racial.

Plaintiffs do not effectively rebut this point. Their expert, Dr. King, "agree[s] with Dr. Alford's data;" agrees "that Black support for the Democratic candidates is consistent, whether those candidates are Black or White;" and agrees "that White voters are overwhelmingly Republican." PL133 at 6–7. Dr. King further agreed there was "evidence of party polarization." 7.TR 53:24–25. Attempting to show racial polarization, Dr. King erroneously looked solely at votes cast by registered Democrats. PL133 at 4–7; 7.TR 53:18–54:14. But Dr. King's cherry-picked analysis is misdirected and unavailing. Dr. King admits that White voters consistently vote Republican overall; by focusing purely on White registered Democrats, Dr. King ignores the voting behavior of a super-majority of White voters' behavior (who do not vote for Democrats), and therefore disregards data highly which is highly relevant to the question of polarization.

Dr. Handley makes the same error, opining that "White voters consistently provide more support to White Democrats than they do to Black Democrats" but admitting "White voters do not provide much support to either White or Black Democratic candidates." PL012 at 10. Looking to a very small subset of White voters ignores that White voters supporting *Republicans* are the ones whose choices Plaintiffs count as racially polarized, even though Dr. King admitted that technique does not allow one to "evaluate . . . racial polarization separate from party polarization" for all but a small subset of White voters. 7.TR 103:23–104:4. Only Dr. Alford's analysis gets at the relevant question whether *their* choices are political or racial in character in Louisiana.

---

[16] The exception is White support for Democrat John Bel Edwards, but his conservative positions on salient issues (like abortion and gun rights) only underscore the partisan basis for voting patterns, as it shows Republican voters will "cross over" party lines to vote for a candidate conservative on such issues, not because of race. 4.TR 119:14–120:2.

Further, in determining that White registered Democrats are more likely to vote for White candidates, Dr. King's analysis does not address whether that cause is partisan or racial. In particular, Dr. King appears to presume that Democratic registration shows a willingness of the registrant to vote for Democratic candidates, but voters often do not update their registration as their political views change. That is particularly true in Louisiana, where there are more registered Democrats than Republicans but where Republican candidates have a decided edge. *See* PL133 at 2. The fact that many White registered Democrats apparently support White Republicans only demonstrates that Republican candidates (regardless of race) reflect their increasingly conservative political views (more than their outdated registration status)—not that they refuse to support Black candidates on the basis of those candidates' race.[17]

Ultimately, Plaintiffs prove too much in their assertion that conservatism and Republican Party support *is* a racially polarized choice. *See* PL133 at 8–10. All Dr. King does is define policy differences—such as diverging views over "drug legalization" and "police" policies—as racial differences. *Id.* at 8–9. But the fact that differing views on these questions often follow racial lines does not turn political differences into racial polarization. The point of the inquiry is to differentiate these patterns. *See LULAC, Council No. 4434*, 999 F.2d at 850–59. Plaintiffs' position would effectively codify various left-of-center platforms—e.g., police defunding, drug legalization, ending school standardized tests, etc.—as enjoying special VRA protection, such that jurisdictions that do not implement them risk § 2 liability.

That is why Dr. Alford focuses on policy positions that directly concern *race*, not *politics*, and he found that racial polarization is waning. LDTX53 at 16–17. Plaintiffs are incorrect in their

---

[17] Similar to Dr. King's report, PL133, Dr. Solanky's report, SOS_2, showed voter registration and turnout trends of Republican, Democrat, and Unaffiliated voters, and broke down the trends for Republicans and Democrats based on race. SOS_2 at 4-11. This is yet another piece of probative evidence that Plaintiffs were permitted to submit evidence in support of, but that Defendants were not permitted to rebut at trial.

apparent belief that § 2 creates a right to court-ordered Democratic Party success and Republican failure.

### 3.   No Legally Significant White Bloc Voting.

Plaintiffs further did not prove the existence of an "amount of white bloc voting that can generally 'minimize or cancel' black voters' ability to elect representatives of their choice." *Gingles*, 478 U.S. at 56 (citations omitted). The question is not merely "whether white residents tend to vote as a bloc, but whether such bloc voting is 'legally significant.'" *LULAC, Council No. 4434*, 999 F.2d at 850 (citations omitted). "[I]n the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters." *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n. 15). That is, "[i]n areas with substantial crossover voting" a challenger will not "be able to establish the third *Gingles* precondition—bloc voting by majority voters." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009). For example, in *Abrams v. Johnson*, 521 U.S. 74 (1997), the Supreme Court concluded that majority-Black districts were unnecessary because "the average percentage of whites voting for black candidates across Georgia ranged from 22% to 38%." *Id.* at 92 (citation omitted). According to governing precedent, crossover voting becomes "substantial" when it arises to the level that "a VRA remedy," i.e., a majority-Black district, is not necessary to enable the Black community to usually elect its preferred candidates. *Covington v. North Carolina*, 316 F.R.D. 117, 168 (M.D.N.C. 2016), *aff'd*, 137 S. Ct. 2211 (2017).

The unrebutted evidence shows that no VRA remedy is necessary to replace the districts Plaintiffs challenge. As in *Abrams*, White crossover voting is high, ranging from 18% to 27% on average, and it is higher in two-candidate contests (such as runoffs) than in contests with three or more candidates. *See* LDTX54 at 3. The minimum BVAP needed to create equal opportunity is well below 50% on average, ranging from 23% to 40%, depending on the type of election. *Id.*

Plaintiffs side-stepped the issue. They tendered the expert known for introducing in literature the method for determining "BVAP needed to win" a particular district, 6.TR 229:20–230:6, but did not ask her to perform that analysis. 2.TR 67:23–68:3. Dr. Handley explained she did not conduct that analysis because she "focuse[d] on the residents of the proposed district," 2.TR 69:4–16, but the BVAP needed to win analysis does the same by analyzing voting demographics and behavior on a district-level basis. *See* 6.TR 223:21–227:23 (Dr. Lewis testimony regarding whether a "particular district provide[s] opportunity" to elect). In literature, Dr. Handley has guided that "a district-specific analysis that includes an analysis of voting patterns" would provide an indication of how to adjust for less than perfect minority voting cohesion, less than 100 percent White Democratic crossover voting, and less than equal minority and White voting age participation rates. SOS_ 36 at 19; 7.TR 204:11–205:2. But in this case, and contrary to her own guidance, Dr. Handley chose to aggregate her analysis to a regional level and to not report district-specific estimates on voting cohesion, crossover voting, or participation rates. 7.TR 207:16–208:24.

Only Dr. Lewis conducted and reported that analysis and his numbers are stark. He estimated support in "tens of thousands" of different combinations of candidate contests, 6.TR 232:23-233:4, and reported out district-specific results in four different types of elections. LDTX 52 at B-2-25. His estimates—which Dr. Handley does not contest the accuracy of, 7.TR 190:13–15—show that none of Plaintiffs' illustrative districts require 50%+ BVAP to perform. LDTX62 (showing average percent BVAP needed for win never exceeding 49% for any of Plaintiffs' new districts in any of the four types of elections analyzed). Dr. Handley "define[s]" an "effective district" for performance as one in which "the Black-preferred Black candidate wins more than 50% of the contests examined." PL001 at 16. Dr. Lewis' district-specific analysis shows that ***none*** of Plaintiffs' proposed majority-Black Senate districts require 50% or greater BVAP to achieve a

50 percent win rate. LDTX54 at 7-8. Of Plaintiffs' proposed majority-Black house districts, only **one** requires greater than 50% BVAP for a 50 percent win rate, two require exactly 50% BVAP for that same rate, and the remaining 32 proposed majority-Black house districts do not need 50% BVAP to be "effective" under Plaintiffs' expert's definition. LDTX54 at 7. The Louisiana Legislature could not have enacted Mr. Cooper's illustrative plans because they do not meet *Gingles* I and III and, therefore, do not satisfy the narrow tailoring element required for strict scrutiny. *See Wis. Legislature v. Wis. Elections Comm'n*, 595 U.S. 398, 402–03 (2022) (per curiam); *Cooper*, 581 U.S. at 305.

      **C.**    **Totality of the Circumstances.**

      Finally, even if Plaintiffs had established the *Gingles* preconditions, their claims fail under the totality-of-the-circumstances inquiry. "Satisfaction of" the *Gingles* "'preconditions' is necessary, but not sufficient, to establish liability." *Fusilier v. Landry*, 963 F.3d 447, 455 (5th Cir. 2020). "Plaintiffs must also show that, under the 'totality of circumstances,' they do not possess the same opportunities to participate in the political process and elect representatives of their choice enjoyed by other voters." *Id.* (citation omitted). Even if Plaintiffs had shown the three *Gingles* preconditions, that is not enough where "other considerations show that the minority has an undiminished right to participate in the political process." *Baird*, 976 F.2d at 359. The Court "is instructed to evaluate the totality of the circumstances with a 'functional view of the political process'" and "[a] searching and practical review of electoral conditions." *Fusilier*, 963 F.3d at 456, 462. Plaintiffs' claim fails this inquiry.

      1.    <u>Plaintiffs' Demand for Better That Proportionality Lacks a Foundation in § 2.</u>

      Plaintiffs' § 2 claim lacks merit because it demands the creation of more majority-Black districts than the proportion of Black voting-age persons in the regions Plaintiffs challenge and in

Louisiana. Plaintiffs have not shown that § 2 mandates more than proportionality, especially here, where the challenged plans already have majority-Black districts in substantial proportionality to the Black voting-age population.

As the Supreme Court has explained, one "may suspect vote dilution from political famine, but one is not entitled to suspect (much less infer) dilution from mere failure to guarantee a political feast." *Johnson*, 512 U.S. at 1017. Accordingly, vote dilution will ordinarily not be found where minority voters in the relevant "area would enjoy substantial proportionality," *id.* at 1014, such as where the districting plan offers "majority-minority districts in substantial proportion to the minority's share of voting-age population." *Id.* at 1013. *See also LULAC,* 548 U.S. at 436 (finding it proper to look "first to the proportionality inquiry" in weighing the circumstances).

In this case, Plaintiffs demand a political feast where the challenged plans afford more than equal opportunity. The enacted plans create 40 majority-Black districts (29 in the House and 11 in the Senate), *see* SOS_1 at 8, and thereby "thwart [any] historical tendency to exclude [African-Americans], not encourage or perpetuate it." *Johnson*, 512 U.S. at 1014. That is true at the local geographic areas at issue in this litigation and at the statewide level. By demanding *nine* more majority-Black districts, which substantially exceeds proportionality—something that § 2(b) expressly disavows requiring—Plaintiffs effectively define vote-dilution as the "failure to maximize" majority-Black districts, which "cannot be the measure of § 2." *Id.* at 1016–17.

Plaintiffs demand the creation of *nine* new majority-Black districts (six in the house, three in the senate) in various regions. However, the additional majority-Black districts Plaintiffs demand exceeds the number of such districts that rough proportionality to the Black voters' share of the voting-age population in those regions.

To begin, as in *Johnson*, "the relevant population" for the proportionality analysis is the BVAP population in the geographic areas Plaintiffs identified as the locus of vote dilution. 512 U.S. at 1017; *see also id.* at 1021–22. The analysis must be regional in scope for several reasons. First, as in *Johnson*, Plaintiffs have "litigated" this case on "smaller geographical scale[s]" than the entire house and senate plans. *See id.* Plaintiffs have clarified that they challenge only "*specific districts*" in "*specific areas*"—namely, "the Shreveport area, Jefferson Parish, and in the East Baton Rouge area" of the enacted senate plan and "the Shreveport area, the East Baton Rouge area, the Ascension area, the Lake Charles area, and the Natchitoches area" of the enacted house plan. Doc. 163 at 2. Where challengers' claims focus on regions of a state, courts—following *Johnson*— have conducted the proportionality analysis by region. *See, e.g.*, *Rural W. Tennessee Afr.-Am. Affs. Council v. Sundquist*, 209 F.3d 835, 844 (6th Cir. 2000); *Rodriguez v. Pataki*, 308 F. Supp. 2d 346, 428 (S.D.N.Y.), *aff'd*, 543 U.S. 997 (2004); *Soto Palmer v. Hobbs*, No. 3:22-CV-05035, 2023 WL 5125390, *10 & n.11 (W.D. Wash. Aug. 10, 2023), *petition for cert. docketed Trevino v. Palmer*, No. 23-489 (U.S. Nov. 7, 2023). This Court should too.

Second, foundational § 2 principles require that the analysis "should ordinarily" occur at the local level. *Rural W. Tennessee Afr.-Am. Affs.*, 209 F.3d at 843. The Supreme Court has rejected the theory that § 2 protection "belongs to the minority as a group and not to its individual members" and concluded that, as a result, § 2 liability "is proved for a particular area." *Shaw v. Hunt*, 517 U.S. 899, 917–18 (1996) ("*Shaw II*"). Absent unique circumstances, such as "racially polarized voting—and the possible submergence of minority votes—throughout" a state, *LULAC*, 548 U.S. at 438, the analysis should be local, *see Soto Palmer*, 2023 WL 5125390, at *10 n.11; *Rural W. Tennessee Afr.-Am. Affs.*, 209 F.3d at 843.

Third, the size and numerosity of Louisiana legislative districts counsels in favor of a regional approach. Louisiana's 105 house and 39 senate districts plainly afford representation on a more localized basis than its much-less-numerous and necessarily much-larger six congressional districts. And "[a] statewide assessment of proportionality seems particularly inappropriate here where the interests and representation of" voters in "rural and agricultural" regions "may diverge significantly from those who live in" other areas. *Soto Palmer*, 2023 WL 5125390, at *10 n.11. It is difficult to see how a claim of vote dilution can be "based on a statewide plan" in this context, *LULAC*, 548 U.S. at 438, where various regions of the state operate and can be configured and reconfigured independently of each other.

Viewed from that correct regional vantagepoint, the relevant Black communities enjoy *at least* substantial proportionality, and often better. The enacted house plan provides substantial proportionality or better in several regions. In the Shreveport region, three out of eight districts are majority-BVAP (37.5%) in a region of 39.1% BVAP, SOS_1 at 70. *See Johnson*, 512 U.S. at 1014 (finding substantial proportionality in 50% Hispanic VAP region where 45% of districts were majority-Hispanic). In Lake Charles, one of five enacted house districts is majority-BVAP (20%) in an area with 25.1% BVAP. SOS_1 at 86. In Baton Rouge, six of eleven enacted house districts are majority-BVAP (54%) in a region with 43.9% BVAP. SOS_1 at 93; 6.TR 30:10-21. And in the Iberville-Ascension region, one of four enacted house districts is majority-BVAP (25%) in an area with 29% BVAP. SOS_1 at 102.

In each of these regions, to add another majority-BVAP district would exceed proportionality, typically by a large margin. And Plaintiffs demand that and frequently more. For example, the additional two districts in the Baton Rouge region they seek would make 73% of the districts become majority-Black in a 44% BVAP region. *See* 6.TR 30:10–13, 30:22–31:4. But in

all of these instances, substantial proportionality already exists in the enacted house plan. *See Fairley v. Hattiesburg Mississippi*, 662 Fed. Appx. 291, 299 (5th Cir. 2016).The VRA requires no more.

Likewise, in the enacted senate plan, substantial proportionality already exists in each region that Plaintiffs challenge. In the Shreveport Region, one of three districts is majority-BVAP (33.33%) in a region with 39.1% BVAP. SOS_1 at 32. In Jefferson and St. Charles, one of five enacted senate districts is majority-BVAP (20%) in a region with 26.6% BVAP. SOS_1 at 40. Finally, in Baton Rouge, three of eight enacted senate districts are majority-BVAP (37.5%) in a region with 34.3% BVAP. SOS_1 at 47. In each of these regions, to add even one additional majority-BVAP district would exceed proportionality, typically by a large margin. In all cases, Plaintiffs demand that the Court "guarantee a political feast," *Johnson*, 512 U.S. at 1017, which § 2 does not require. Indeed, § 2(b) explicitly provides that "nothing in this section [§ 2] establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 52 U.S.C. §10301(b). But Plaintiffs here would not even be content with "numbers equal to their proportion in the population," and instead contend that § 2 demands representation disproportionately in their favor. The VRA does no such thing.

The statewide analysis does not yield a different result, as the enacted plans satisfy the "rough proportionality" standard statewide too, *Johnson*, 512 U.S. at 1023. Louisiana has a 31.25% BVAP according to the 2020 Census. SOS_1 at 5. Exact proportionality—which is not required— would call for 12 majority-Black Senate districts out of 39 total, and 33 majority-Black House districts out of 105 total. SOS_1 at 5, 8. The enacted senate plan includes 11 majority-Black districts, which is 28.2% of the 39 total state senate districts, a 3% difference. SOS_1 at 8. The

enacted house plan has 29 majority-Black districts, which is 27.6% of the 105 total state house districts, less than a 4% difference. SOS_1 at 8. *See also* 3A.TR 88:24–89:4.

    The fact that the enacted plans fall "just short of perfect proportionality" provides no basis for § 2 liability. *Johnson,* 512 U.S. at 1013–14, 1023–24. The Supreme Court subsequently explained that "[t]here is, of course, no 'magic parameter,' and 'rough proportionality,' must allow for some deviations." *LULAC*, 548 U.S. at 438. The Court in *LULAC* therefore assumed that a 16% to 22% comparison between the percentage of majority-Latino districts and Latino citizen voting-age percentage qualified as substantially proportionate—a six-point gap that is substantially larger than here. *See id.* Lower courts have followed suit, upholding deviations in the range of the 2022 enrolled plans' deviation—and beyond—under the rough proportionality standard. *See, e.g.*, *McConchie v. Scholz*, 577 F. Supp. 3d 842, 863 (N.D. Ill. 2021) (finding substantial proportionality in comparisons of 8.5% and 10% representation with 11.1% minority percentage); *Luna v. Cnty. of Kern*, 291 F. Supp. 3d 1088, 1133 (E.D. Cal. 2018) (20% majority-Hispanic CVAP districts found proportional in 30% Hispanic CVAP jurisdiction). The enacted plans easily satisfy this standard.

    Plaintiffs' illustrative plans, by contrast, *exceed* statewide proportionality. Plaintiffs' illustrative senate plan includes 14 majority-Black districts—equaling 35.9% of all districts against 31.25% BVAP. SOS_1 at 5, 8. Their illustrative house plan provides 35 majority-Black districts—33.3% of all districts. SOS_1 at 6, 8. The enacted plans do not create a "political famine" that suggests vote dilution; rather Plaintiffs' illustrative plans instead create a "political feast" that Section 2 does not require. *See Johnson*, 512 U.S. at 1017. Plaintiffs' demand for greater than a proportional number of majority-Black districts reflects an attempt to maximize the number of majority-Black districts in Louisiana's legislative district plans, which "cannot be the measure of

§ 2." *Id.*; *see also Miller v. Johnson*, 515 U.S. 900, 909 (1995) (rejecting a "maximization agenda"); *Shaw II,* 517 U.S. at 913.; *Bush v. Vera*, 517 U.S. 952, 960 (1996) (plurality opinion).

Under the circumstances of this case, the substantial proportionality of the enacted plans confirms that there is no vote dilution. While *Johnson* declined to treat substantial proportionality as a "safe harbor," 512 U.S. at 1019, that case and its progeny make clear that demands for better than proportionality can succeed only in rare circumstances not present here. *Johnson* notes proportionality would not be a legitimate § 2 defense "in cases of alleged dilution by the manipulation of district lines," such as where a jurisdiction gerrymandered its districts to counteract the natural creation of majority-minority districts beyond the minority's proportion of the population due to the state's political geography and application of neutral criteria. *Johnson*, 512 U.S. at 1018–19. *LULAC* was an example of that: there the Court found the Hispanic group's likely proportionality offset by "other evidence of vote dilution," including that the Hispanic community was growing and becoming increasingly active—only to see a functional Hispanic-majority district dismantled. 548 U.S. 399–41.

Nothing remotely equivalent is present here. Louisiana's plans contain more majority-BVAP districts than any maps of prior decades, despite the general stability of the State's BVAP over that time. The plans also substantially exceed the number of majority-Black districts in plans simulated to achieve neutral criteria. Instead, the only way to achieve the maximization Plaintiffs demand is by the intentional and intensive use of race in drawing districts specifically combine non-compact minority populations into districts a smidgen above 50% BVAP—in a nutshell: aggressive racial gerrymandering. Likewise, there is no evidence of invidious electoral manipulation. *See Johnson,* 512 U.S. at 1018 (giving, as examples of such "reprehensible practices," techniques like "ballot box stuffing, outright violence, discretionary registration").

*Johnson* suggested § 2 might command more than proportionality to avoid an outcome where "the rights of some minority voters under § 2 may be traded off against the rights of other members of the same minority class," as might occur where "the most blatant racial gerrymandering in half of a county's single-member districts" were alleged to be would be "offset by political gerrymandering in the other half." 512 U.S. at 1019. That is not so here, where Plaintiffs' demands exceed proportionality at *every* level, both statewide and regional.

It is clear that the predominant—indeed *overwhelming*—motive of Plaintiffs' illustrative plans was to maximize the number of majority-Black districts. Mr. Cooper even admitted to drawing to a racial target. But, even if Plaintiffs' illustrative plans merely sought proportionality, any order by the court ordering their adoption would be subject to a "strict scrutiny" analysis. *Fairley*, 62 Fed. Appx. at 300 (citing *Miller*, 515 U.S. at 915–16); *Cooper*, 518 U.S. at 305. But Plaintiffs here don't seek mere proportionality–rather they affirmatively seek *dis*proportionality weighted in their favor. Such transparent and aggressive use of race to maximizes the number of majority-Black districts does not satisfy strict scrutiny. *Miller*, 515 U.S. at 927-28; *Wis. Legislature*, 142 S. Ct. at 402–03. Because Plaintiffs' illustrative plans seek extra proportionality and are drawn to a racial target, they are illegal and not proper illustrative plans for this Court to consider. *Id.*

### 2.    Additional Factors Undercut Plaintiffs' Claim.

Plaintiffs have failed to meet their burden of showing vote dilution under the totality of the circumstances. *Fusilier*, 963 F.3d at 455. Plaintiffs' evidence of a "history of official discrimination," *Gingles*, 478 U.S. at 37 (citation omitted), is not recent. The discrimination they cite has no iteration past 1975—*nearly a half century ago*—and more recent data points (such as unemployment and school suspensions) are not necessarily evidence of discrimination (as there is no evidence concerning employability or error in suspension). *See* PL126 at 6–12.

34

The evidence shows that "members of the minority group have been elected to public office in the jurisdiction" in large numbers. *Gingles*, 478 U.S. at 37 (citation omitted) (describing Senate Factor 7). Dr. Burch conceded the Legislature has about 25% Black members. PL126 at 25. Dr. Burch obfuscates this by measuring that this factor against strict proportional representation., 3B.TR92:19–93:2, even though Section 2 expressly disavows a right to proportional representation. 52 U.S.C. § 10301(b). In doing so, Dr. Burch demands what Section 2 explicitly disavows: "nothing in this section establishe[]s a right to have members of a protected class elected in numbers equal to their proportion in the population." *Id.* § 10301(b). But the Senate Report described, as "probative" of unequal opportunity, evidence that "no members of a minority group have been elected to office" or that only "a few minority candidates" had been. S. Rep. No. 97-417 at 29 n. 115 (1982), reprinted in 1982 U.S.C.C.A.N. 177. 25% of the Legislature is lightyears beyond no (or "a few") members.

The functional reality of the political process is that Black voters have an equal opportunity to participate in the political process in Louisiana. Black registered voters make up not only the majority of registered Democrats in the state of Louisiana, but also a majority of Democrats voting in elections including statewide contests over the last decade. *See* SOS_5 at 8, 10; SOS_2[18]. *Every single* leadership position in the Democratic Caucus in the Louisiana Legislature is held by a member of the Louisiana Legislative Black Caucus.[19] The House has 33 Democrat

---

[18] Dr. Solanky's reports speak directly to these points, which is another reason why his testimony and reports should not have been excluded.

[19] In the House of Representatives, Rep. Sam Jenkins is the Chairman of the Democratic Caucus, Rep. Matthew Willard is the Vice Chair, and Rep. Randal Gaines is the whip. https://house.louisiana.gov/H_Reps/H_Reps_Caucus_Democrats (last accessed Dec. 18, 2023). In the Senate, Senator Gerald Boudreaux is the Chairman of the Senate Democratic Caucus. https://louisianademocrats.org/our-party/our-leaders/ (last accessed Dec. 18, 2023). All are members of the Louisiana Legislative Black Caucus. https://www.house.louisiana.gov/llbc/index_members (last accessed Dec. 18, 2023).

Representatives,[20] and the Senate has 12 Democratic Senators.[21] By exerting effective control over one of two major parties, the Black community has an opportunity to participate and elect candidates. Furthermore, Dr. Alford's reports and testimony show that any polarization is political, not racial. *See Lopez v. Abbott*, 339 F.Supp.3d 589, 602-03 (S.D. Tex. 2018) (holding the plaintiffs met the *Gingles* preconditions, but failed the totality of the circumstances because political polarization was "the better explanation for the defeat of minority-preferred candidates at the polls"). *See* LDTX53 at 7–15.

Plaintiffs also do not show "lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37 (citation omitted). Their expert contends that "[p]olicy outcomes do not track the specific needs of the minority community," PL126 at 4, but § 2 does not guarantee particular policy outcomes. Furthermore, nearly all the examples used to claim a "lack of responsiveness" were (1) the enacted plans at issue in this case itself; (2) unrelated to the Legislature[22]; or (3) statements from a U.S. Senator—who runs *statewide* from boundaries set by Congress, which are thus outside the purview of the Louisiana Legislature. 3B.TR 92:19–93:2. This evidence cannot establish unresponsiveness on the part of the Louisiana Legislature.

## IV.   PLAINTIFFS' CONSTRUCTION OF SECTION 2 VIOLATES THE CONSTITUTION AS APPLIED HERE.

Even if Section 2 could even theoretically sustain the racially maximalist construction that Plaintiffs give it, such a construction would squarely violate the Constitution. *Johnson*, 512 U.S. at 1016; *LULAC*, 548 at 446; *Bartlett*, 556 U.S. at 21–22. And, at a bare minimum, Plaintiffs'

---

[20] https://house.louisiana.gov/H_Reps/H_Reps_Caucus_Democrats (last accessed Dec. 18, 2023).

[21] https://senate.la.gov/Senators_FullInfo (last accessed Dec. 18, 2023).

[22] Dr. Washington testified regarding an issue she recently had with her absentee ballot. 1.TR 98:1–103:15. But Dr. Washington's testimony did not show a lack of responsiveness on the part of elected officials; just the opposite. Dr. Washington received multiple text messages regarding the issues with her ballot, *id.* at 98:18–99:11, and was able to correct the issue at the voter registration office and have her vote counted. *Id.* at 109:6–8.

construction of § 2 invites severe doubts as to whether that statutory provision can be constitutionally applied in that manner. And where "a serious doubt is raised about the constitutionality of an act of Congress, it is a cardinal principle that [courts must] first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings v. Rodriguez*, 138 S. Ct. 830, 842 (2018) (quotation omitted).

The VRA "'imposes current burdens and *must be justified by current needs*.'" *Shelby County, Ala. v. Holder*, 570 U.S. 529, 536 (2013) (emphasis added) (citation omitted). Thus, "even if Congress in 1982 could constitutionally authorize race-based redistricting under § 2 for some period of time, the authority to conduct race-based redistricting cannot extend indefinitely into the future." *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring).

Although a five-member majority found the remedy that plaintiffs sought in *Allen* under § 2 within Congress's remedial authority, *see id.* at 38–42, Justice Kavanaugh cast the fifth vote and expressly noted that a "temporal argument" was not within *Allen*'s holding because "Alabama did not raise" it. *Allen*, 599 U.S. at 45 (Kavanaugh, J., concurring). But Defendants explicitly raise it here. And it is plain that predominance of race that pervades Plaintiffs' § 2 arguments would render that provision unconstitutional as applied if accepted by this Court.

VRA § 2 "imposes current burdens and must be justified by current needs." *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009). That is because Congress's power to enforce the Reconstruction Amendments is "remedial," not "substantive," *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997), so it must "tailor its legislative scheme to remedying or preventing [unconstitutional] conduct," *Fla. Prepaid Postsecondary Educ. Expense Bd. v. Coll. Sav. Bank*, 527 U.S. 628, 639 (1999). That requirement is particularly essential where Congress seeks to abrogate states' sovereign immunity, *see id.* at 639–48, which the Fifth Circuit has held it

did in § 2, *Robinson*, 86 F.4th at 588. In § 2, Congress went beyond the contours of the Reconstruction Amendments to prohibit election schemes that are not unconstitutional. *See Allen*, 599 U.S. at 41. This prophylactic approach falls on the outer edge of Congress's authority, *see City of Boerne*, 521 U.S.at 530–32, necessitating "evidence that unremedied" unconstitutional conduct is "a problem of national import," *Fla. Prepaid*, 527 U.S. at 641. Because § 2 "imposes current burdens" by invalidating election laws that are not unconstitutional, those burdens must be justified, and that is so regardless of whether § 2 "differentiates between the States." *See Nw. Austin*, 557 U.S. at 203 (deeming differential treatment and independent basis for this duty).

Moreover, Congress in § 2 has gone further and *created* constitutional difficulties by imposing a scheme that is not "race-neutral." *Allen*, 599 U.S. at 23; *see Miller*, 515 U.S. at 926–27 (discussing the "troubling questions" raised by a requirement of race-based redistricting). *Allen* held that Congress may properly "authorize[] race-based redistricting," based on Supreme Court "precedent," *id.* at 43, but was not presented with the question whether that authority is justified by current needs. It must be so justified. Congress's authority to effectuate "racial or ethnic criteria" is, when exercised, subject to "close examination," which it satisfies only with "abundant evidence from which it could conclude" that such criteria are necessary. *See Fullilove v. Klutznick*, 448 U.S. 448, 472, 477–78 (1980) (plurality opinion); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 503–04 (1989). Although it "may legislate without compiling the kind of 'record' appropriate with respect to judicial or administrative proceedings," *Fullilove*, 448 U.S. at 478 (plurality opinion), its decisions nonetheless require "evidence" of some kind, *Fla. Prepaid*, 527 U.S. at 640–41; *City of Boerne*, 521 U.S. at 530–31.

In establishing the VRA's scope, including by amending § 2 to reach beyond constitutional prohibitions, *see Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021), Congress

made "'findings' that each of the protected minorities is, or has been, the subject of pervasive discrimination and exclusion from the electoral process." *Nixon v. Kent Cnty.*, 76 F.3d 1381, 1390 (6th Cir. 1996) (en banc). As of 1982, there were "extensive congressional findings of voting discrimination," S. Rep. No. 97–417, 97th Cong.2nd Sess. 28 (1982), U.S. Code Cong. & Admin. News 1982, p. 192, including in conjunction with VRA amendments in the prior decade, *see, e.g.*, S. Rep. No. 94-295 at 28–30. But Congress has made no findings in recent decades that may justify § 2's limitless temporal reach, and it has made no adjustments to § 2's scope or standard tailored to current (or even recent) conditions. *See Shelby Cnty.*, 570 U.S. at 553–54 (discussing deficiencies in most recent findings of 2006). There can be no doubt that "[o]ur country has changed," *id.* at 557, but § 2 has not. Its current burdens thus must be justified by current evidence that Plaintiffs have refused to offer here.

Notably, the number of majority-Black districts drawn by the Legislature here is the highest number *ever* in the history of Louisiana. SOS_1 at 8. It exceeds the  number of majority-Black districts drawn in 2011, which the Obama Administration pre-cleared under § 5. *See id.* But while racial polarization of voting has generally *decreased* over time, Plaintiffs here are not content with the *highest* number of majority-Black districts *ever* that the Legislature has drawn—a map reflecting a level of race consciousness that already approaches the limits of what the Equal Protection Clause and Fifteenth Amendments permit. Plaintiffs' racially maximalist reading of § 2, which demands *over*-representation of majority-Black districts—is plainly a constitutional bridge too far. It reflects a view of § 2 that would have been constitutionally dubious—at best—in 1982. Today it is constitutionally indefensible when evaluated under "*current needs*.'" *Shelby Cnty.*, 570 U.S. at 536 (emphasis added) (citation omitted). And that is particularly so as Plaintiffs did not offer any evidence to sustain their more-maximalist-than-ever use of race in drawing districts.

Especially considering Dr. Alford's unrebutted testimony that showed that any polarization is political, not racial. LDTX53 at 7–15. The lack of a temporal restriction on Section 2 means that as a state, like Louisiana, becomes increasingly politically polarized, Section 2 becomes a means by which more Democrats can be elected. At a minimum, Plaintiffs' construction of § 2 invites the sort of "serious doubt" that requires this Court to construe § 2 in a more restrained and constitutionally sound manner. *Jennings*, 138 S. Ct. at 842.

The § 2 totality-of-circumstances test does not make up this deficiency. Although courts must make a "searching practical evaluation of the 'past and present reality'" of defendant jurisdictions, *Gingles*, 478 U.S. at 62 (citation omitted), they are no substitute for congressional findings because Congress gave them little meaning: "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* at 45 (citation omitted). Thus, § 2 liability can arise beyond and remedial purpose, such as in a case without evidence of recent or impactful voting-related discrimination, *see, e.g.*, *Sanchez.*, 97 F.3d at 1322–24. As shown, Plaintiffs' totality-of-the circumstances case does not justify race-based remedies.

## CONCLUSION

For all the reasons herein, the Court should enter judgment in favor of Defendants.

Respectfully submitted, this the 19th day of December, 2023.

*/s/ Phillip J. Strach*
Phillip J. Strach*
    *Lead Counsel*
Thomas A. Farr*
John E. Branch, III*
Alyssa M. Riggins*
Cassie A. Holt*
**NELSON MULLINS RILEY &**
**SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603

40

Ph: (919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com


*/s/ John C. Walsh*
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
SHOWS, CALL & WALSH, L.L.P.
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com


* *Admitted pro hac vice*

*Counsel for Defendant R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana*

Jeff Landry
Louisiana Attorney General

By: */s/ Michael W. Mengis*
LA Bar No. 17994
BAKERHOSTETLER LLP
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
BAKERHOSTETLER LLP
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

By: */s/ Jeffrey M. Wale*
Elizabeth B. Murrill (LSBA No. 20685)
Solicitor General
Shae McPhee (LSBA No. 38565)
Angelique Duhon Freel (LSBA No. 28561)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)
Jeffrey M. Wale (LSBA No. 36070)
OFFICE OF THE ATTORNEY GENERAL
LOUISIANA DEPARTMENT OF JUSTICE
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
mcphees@ag.louisiana.gov
freela@ag.louisiana.gov
jonescar@ag.louisiana.gov
lagrouea@ag.louisiana.gov

41

Patrick T. Lewis*
BAKERHOSTETLER LLP
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

Erika Dackin Prouty*
Robert J. Tucker*
BAKERHOSTETLER LLP
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

* Admitted pro hac vice

Counsel for Legislative Intervenors, Clay
Schexnayder, in his Official Capacity as
Speaker of the Louisiana House of
Representatives, and of Patrick Page
Cortez, in his Official Capacity as
President of the Louisiana Senate

walej@ag.louisiana.gov

Jason B. Torchinsky* (DC Bar No 976033)
Phillip M. Gordon* (DC Bar No. 1531277)
Brennan Bowen* (AZ Bar No. 36639)
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK, PLLC
15405 John Marshall Hwy.
Haymarket, VA 20169
Telephone: (540) 341-8808
Facsimile: (540) 341-8809
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
bbowen@holtzmanvogel.com

*Admitted pro hac vice