# **Attachment 2**

```
1              R O U G H   D R A F T

2          IN THE UNITED STATES DISTRICT COURT

3          FOR THE MIDDLE DISTRICT OF LOUISIANA

4

5   DR. DOROTHY NAIRNE,
    JARRETT LOFTON, REV.
6   CLEE EARNEST LOWE, DR.
    ALICE WASHINGTON, AND
7   DR. ROSE THOMPSON,        COMPLAINT FOR
    BLACK VOTERS MATTER       DECLARATORY
8   CAPACITY BUILDING         JUDGMENT AND
    INSTITUTE, and THE        INJUNCTIVE
9   LOUISIANA STATE
    CONFERENCE OF THE         RELIEF
10  NAACP,
         Plaintiff,           STATUTORY CLAIMS ONLY
11                            SINGLE-JUDGE DISTRICT
    VERSUS
12                            COURT
    KYLE ARDOIN, in his
13  official capacity as
    Secretary of State of
14  Louisiana
         Defendant.
15

16             TRIAL PROCEEDINGS

17       Held on Tuesday, November 28, 2023

18                 Before The

19           HONORABLE SHELLY DICK

20              Judge Presiding

21            Baton Rouge, Louisiana

22

23  REPORTED BY:CHERIE' E. WHITE
```

```
24              CCR (LA), CSR (TX), CSR (MS), RPR
25              CERTIFIED COURT REPORTER
```

2

```
1   APPEARANCES:

2

3   Representing the Plaintiffs:

4       MEGAN KEENAN

5       JOHN ADCOCK

6

7

8

9   Representing the Defendants:

10      ALYSSA RIGGINS

11      ROBERT CLARK

12      JOSEPHINE BAHN

13      MICHAEL de LEEUW

14      AMANDA GIGLIO

15      VICTORIA WENGER

16      STUART NAIFEH

17      SARA ROMANI

18

19  Representing the Legislative Intervenors, Clay

20  Schexnayder, in his Official Capacity as Speaker

21  of the Louisiana House of Representatives, and of
```

22    Patrick Page Cortez, in his Official Capacity as

23    President of the Louisiana Senate:

24

25

1    Representing the Defendant/Intervenor, State of

2    Louisiana, through Jeff Landry in his Official

3    Capacity as Attorney General:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                        I N D E X

2

3    Plaintiffs' Witnesses:                    PAGE

4    DR. LISA HANDLEY

5

6    DR. CRAIG COLTEN

7

8    WILLIAM COOPER

9

10   DR. R. BLAKESLEE GILPIN

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                 P R O C E E D I N G S

2        THE BAILIFF:

3                All rise.

4        THE COURT:

5                I good morning.  Be seated.

6        Plaintiffs may call their next witness.

7        MS. KEENAN:

8                Your Honor, can we do a half of

9        quick matters to discuss first, is that

10       okay.

11       THE COURT:

12               Yes.  So it's just three items.

13       MS. KEENAN:

14               Your Honor, Megan Keenan for the

15       plaintiffs.  First of the -- court noted

16      that several of the exhibits had nonpublic

17      personal identifying information.  We did

18      upload those exhibits to jurors with the

19      redactions.  Do you need us to list the

20      exhibits that were redacted for the record

21      or is it okay that we just --

22      THE COURT:

23          Did you supplement the ones that

24      were in there Suzie didn't know how to

25      handle that.

6

1       MS. KEENAN:

2           We replaced them to avoid the.

3       THE COURT:

4           The district, that's fine.

5       MS. KEENAN:

6           Okay.  Second, also related to

7       jurors, I prepared for witnesses last now

8       we noticed a few errors.  Jurors the --

9       the first is joint Exhibits 55 and joint

10      Exhibit 56, that's legislative record

11      material.  The parties have agreed on were

12      /EUPB add vertical at the particular time

13      /HRAOE /#2K34EU9ed from junior or /SOS we

14          uploaded them that's joint 21 in-house

15          bill 16 with the court's preadmission.

16          The parties have both consented to those.

17      THE COURT:

18              There's no objection to the

19      redirection?

20      MS. HOLT:

21              No objection, Your Honor.

22      THE COURT:

23              You should stand when you address

24      the court.

25      MS. KEENAN:

                                                    7

1               The last one is plaintiff, it was

2       just showing sort of in the Adobe cartoon

3       like image.  We have re-uploaded that into

4       two parts, so it's now 163A and 163B in

5       jurors.

6       THE COURT:

7               Thank you.

8       MS. KEENAN:

9               Thank you.

10      THE COURT:

11              Anything further?

12          MS. KEENAN:

13                Not from the plaintiff case.

14          THE COURT:

15                All right.  Call your next witness,

16          please.

17          MS. KEENAN:

18                Your Honor, Sarah Brannon, ACLU for

19          the plaintiffs and we will call Dr. Lisa

20          Handily.

21                MS. LISA HANDLEY,

22    after having first been duly sworn by the

23    above-mentioned Court Reporter did testify as

24    follows:

25          MS. KEENAN:

                                        8

1                Your Honor, I'm going to actually go

2          get my glasses.

3          THE COURT:

4                Okay.

5          THE CLERK:

6                And would you please state your name

7          and spell it for the record?

8          THE WITNESS:

9                Lisa Handley, H-A-N-D-L-E-Y.

10      MS. BRANNON:

11          Your Honor, may I approach the

12      witness with a binder which, for the

13      record, is Plaintiff's Exhibits PL 1

14      through 19?

15      THE COURT:

16          Is there any objection?  They have

17      not been admitted, but I assume that they

18      are going to be admitted.

19      MS. BRANNON:

20          So, Your Honor, we don't have any

21      objection to Dr. Handley having this

22      binder.  I would note that plaintiffs

23      Exhibits 16, 17, 18 and 19, are a sur

24      rebuttal report prepared by Dr. Handley

25      that was in response to Dr. Solansky

9

1       reports which Your Honor has excluded in

2       her ruling on plaintiff's motion in

3       limine.

4       THE COURT:

5           So we need to have 16 through 19.

6       MS. BRANNON:

7           Your Honor, we will 16 and 19, and I

8       assume topics today are going to cover

9       some of the same issues that were raised

10      by defendants related to the nature of Dr.

11      Handley's opinions and her report.

12      THE COURT:

13          So you said you were planning to --

14      MS. KEENAN:

15          We are planning to move to admit the

16      sur rebuttal which is PL 16 and 19.

17      THE COURT:

18          And you are going to admit it in

19      your case in chief?

20      MS. BRANNON:

21          We are.

22      THE COURT:

23          Let's just see where it go make your

24      objections as they arose.  I'll allow you

25      to make your opinion to Dr. Handley and

                                                    10


1       give her opinion and testimony.

2       MS. BRANNON:

3           Thank you, Your Honor.

4       THE COURT:

5           Good morning, Dr. Handley.

6    BY MS. BRANNON:

7         Q.    Dr. Handley, did you prepare a

8    report in the case?

9         A.    I did.

10        Q.    And can you turn to A in your binder

11   and can we see approximate Exhibit PL 1 on the

12   screen.  Is this a copy of the report you

13   prepared?

14        A.    It is.

15        Q.    Can you turn to Tab 2 in your binder

16   and can we see Exhibit PL 2 on the screen.  Do

17   you recognize this document?

18        A.    Yes.

19        Q.    Is this a complete and accurate

20   summary of your background and professional

21   experience?

22        A.    Yes.

23        Q.

24        A.    It might not include all my recent

25   court cases --

                                                    11


1         Q.    Okay.

2         A.    -- in the list.

3         Q.    But within the last year, it's an

4    accurate and up to date representation of your

5    CV?

6         A.    Yes.

7         Q.    What do you do for a living,

8    Dr. Handley?

9         A.    I am a political scientist by

10   training and I run a consulting firm that

11   primarily works for the UN and a USA funded NGO

12   call like this working to provide election

13   administration assistance to post-conflict and

14   transitional countries.

15        Q.    Can you provide some examples of

16   some of your different clients?

17        A.    As I just mentioned, the UN is a

18   primary client for that kind of work.  If you

19   mean here in the United States, my clients

20   include the U.S. Department of Justice, a number

21   of civil rights organizations and a lot of

22   various states and local jurisdictions as well as

23   simply independent redistricting commissions.

24        Q.    And can you describe some of the

25   academic work you've done in the -- on the topic

                                                      12

1    of redistricting and minority vote dissolution?

2          A.    Well, if you look at my CV, almost

3    every article that's listed there and there's a

4    couple dozen at least deal with those subjects.

5          Q.    Approximately, how many times have

6    you performed a racial block voting analysis?

7          A.    Hundreds.

8          Q.    And have you been accepted as an

9    expert before?

10         A.    Yes.

11         Q.    Have you been accepted as an expert

12   in redistricting and racially polarized voting?

13         A.    Yes.

14         Q.    How many times?

15         A.    Dozens.

16         Q.    Okay.  The plaintiffs move to admit

17   Dr. Handley as an expert on redistricting and

18   minority vote dissolution?

19         THE COURT:

20              Any cross on the tender?

21         /SKWRAO:

22              No, Your Honor.

23         THE COURT:

24              Okay.  The court will accept

25              Dr. Handley to give opinion testimony in

1          redistricting and am I not on --

2      /STPHAO:

3              It's redistricting and minority vote

4      dissolution.

5      THE COURT:

6              And minority vote /TKEUS /HRAOUGZ.

7      She was looking at me.  I thought maybe my

8      light wasn't on accept to give opinion in

9      that field.

10  BY MS. KEENAN:

11      Q.    Dr. Handley, what were you asked to

12  do in this case?

13      A.    I was asked to conduct a racial

14  block voting analysis in specific areas of the

15  state as well as evaluate a set of illustrative

16  districts and enacted districts in the Senate and

17  house plans.

18      Q.    And were you asked to evaluate the

19  entire state?

20      A.    No, just in the specific areas of

21  interest.

22      Q.    Can we see Table 9, page 2 from

23  Dr. Handley's report PL 1.  Do you recognize this

24  table?

25          A.    Yes.

                                                    14

1           Q.    What does this table show?

2           A.    This shows the areas of interest

3    that my analysis focused on.  There were seven

4    areas of interest, three of them related to the

5    State Senate plan and five of them related to the

6    State House plan because area one was

7    encompassed.  Both an extra State Senate and

8    extra State House district.

9           Q.    Can you walk us through briefly what

10   geographies are included in your areas of

11   interest as reflected on this table?

12          A.    You can see that area one northwest

13   Louisiana includes Bossier and Caddo Parish and

14   that includes an additional illustrative State

15   Senate district 38 and an additional illustrative

16   State House district one.  And the second area is

17   Southeast Louisiana Jefferson and St. Charles

18   Parishes.  That includes additional illustrative

19   State Senate district 19, area three, East

20   Central Louisiana includes four parishes,

21   Baton Rouge, West Baton Rouge, Iberville and

22   Pointe Coupee and that is additional illustrative

23    State Senate district 17, area four, Western

24    Louisiana is Desoto and I'm not going to say that

25    right.

15

1         THE COURT:

2              Natchitoches.

3         THE WITNESS:

4              And Red River Parishes that is State

5              House -- illustrative State House district

6              23, area five, Southwest Louisiana,

7              Calcasieu Parish, and that's illustrative

8              State House district 38, area six, South

9              Central Louisiana Ascension and Iberville

10             and that's State House district house 60

11             and /TPHAOEUBL /AOE, East Central

12             Louisiana that's area seven, Baton Rouge

13             and East Feliciana and that includes

14             actually two additional illustrative State

15             House districts, 68 and 69.

16    BY MS. BRANNON:

17         Q.   And can you describe for us how you

18    selected these parishes in relation to the

19    illustrative districts you've just identified?

20         A.   Yes.  So the illustrative districts

21    were -- the additional illustrative districts

22    were located in those parishes so, for example,

23    State Senate district 38 in the illustrative plan

24    covered parts of Bossier and Caddo.

25        Q.    Okay.  All right.  We can take this

                                                        16

1    down.  Dr. Handley, now turning to your more of

2    your specific analysis, at a high -- let me

3    rephrase.

4            Dr. Handley, how would you define

5    cohesive voting?

6        A.    Minority voters because of their

7    shared interests are cohesive when they

8    consistently support the same candidates.

9        Q.    And at a high level, can you

10    summarize your opinions as to whether black

11    voters in Louisiana in your areas of interest

12    vote cohesive?

13        A.    Yes, they certainly do vote

14    cohesively.  Black voters are very cohesive in

15    the seven areas.

16        Q.    At a high level, can you summarize

17    your opinion as to whether white voters typically

18    vote in a block to defeat the black candidate of

19    interest, black candidate of choice in your areas

20    of interest?

21        A.    Yes.  White voters do typically vote

22    as a block to defeat the black preferred

23    candidates.

24        Q.    And, Dr. Handley, how would you

25    define racially polarized voting?

17

1        A.    I define a contest as racially

2    polarized if the outcome would have been

3    different, if the black voters and white voters

4    voted separately.

5        Q.    At a high level, can you summarize

6    your opinions with respect to whether there is

7    racially polarized voting in the areas of

8    Louisiana you examined?

9        A.    Nearly every single contest that I

10    looked at was racially polarized.

11        Q.    And at a high level, does this

12    racially polarized voting effect the ability of

13    black voters to elect the candidate of their

14    choice in the state legislature in the areas of

15    interest you analyzed?

16        A.    Yes, it does.  What it means is that

17    unless you draw a district that provides

18    minorities with an opportunity to elect their

19    candidates of choice they will not be able to.

20         Q.    What statistical techniques did you

21    use to evaluate whether voting in Louisiana in

22    the areas of interest is racially polarized?

23         A.    I used the three standard techniques

24    they are called homogeneous ecological inference

25    and, in fact, I used two types of ecological

                                                    18

1    inference.

2         Q.    And why did you use all of these

3    methods?

4         A.    Although ecological inference is now

5    considered most accurate, I used the other

6    methods as a check in one part and on the other

7    hand it's also easier to understand the other

8    methods, so it's easier to explain those methods

9    and the courts have traditionally used those

10    methods and that's what I was trained on.

11         Q.    So you have an opinion that the

12    ecological inference is the best of the methods?

13         A.    Over time they have gotten more

14    sophisticated methods so they have improved over

15    time so yes, I think that's the most reliable, I

16    think that's basically what almost every expert I

17    can think of uses now.

18        Q.    And so the ecological inference has

19    been accepted by courts?

20        A.    Yes.

21        Q.    What kind of data did you use in

22    order to conduct your statistical analysis?

23        A.    The analysis is looking for patterns

24    across areas in this particular case, we are

25    looking at precincts and we need to know the

                                                    19


1    racial composition of those precincts and the

2    voting patterns of those precincts, so you need a

3    database that provides the racial composition of

4    the precincts and voting patterns of the

5    precincts, in other words, the election returns

6    by precinct and what I used for racial

7    composition here in Louisiana we had turn out by

8    race.  So we had information about the race of

9    the people who were turning out in each precinct

10    as well as who they voted for and then you look

11    for patterns across these precincts do, for

12    example, does voting for a particular candidate

13    increase as say the percent black turn out of the

14    precincts increase.

15          Q.     And what was the source of the data

16    that you compiled for your analysis in this case?

17          A.     Well, there were different sources

18    depending on the data that I was using.  The turn

19    out by race came from the secretary of state's

20    website, the election returns came from either

21    the secretary of state's website directly or

22    indirectly through open elections, the census

23    data came from the census website, the precinct

24    shape files came either directly from secretary

25    of state's website or indirectly through an

                                                       20


1     organization called "Vest", which is voting and

2     election science team.

3           Q.     Did you compile this data yourself?

4           A.     I did not.

5           Q.     Who compiled the data?

6           A.     I relied on the ACLU's analytics

7     department to compile the data --

8           Q.    Did you --

9           A.     -- and merge it.

10          Q.     Did you verify the accuracy of the

11  data that was compiled by the ACLU analytics, but

12  then you then used for your analysis in this

13  case?

14      A.    Yes, I did.

15      Q.    At what geographic level did you

16  require the data to conduct your analysis?

17      A.    The smallest level at which you

18  could do this, the election returns are available

19  at the precinct level, so this analysis is

20  typically done at the precinct level.

21      Q.    Dr. Handley, is there early absentee

22  voting in Louisiana?

23      A.    There is.

24      Q.    And is the election data for early

25  and absentee voting publicly available?

                                            21


1       A.    It is at the parish level.  It is

2   not available at the precinct level.  You cannot

3   get early results at the precinct level only at

4   the parish level.

5       Q.    So what's the source of that data?

6       A.    The secretary of state.

7       Q.    So the secretary of state does not

8   report the early absentee votes at the precinct

9    level?

10          A.    That's correct.  They do not -- they

11   do not take -- many states actually take it and

12   record it at the precinct level, that is not the

13   case in Louisiana.

14          Q.    Was data from the early and absentee

15   voting including in the database you used for

16   conducting your E & I analysis in this case?

17          A.    Yes.  The early votes were allocated

18   down to the precinct level so that I could use

19   them in my analysis.

20          Q.    Can we see page 6, footnote 18 in

21   Exhibit PL 1?

22          TRIAL TECH:

23                (Complied.)

24   BY MS. BRANNON:

25          Q.    Dr. Handley, can you explain how

                                                        22


1    that allocation, how the method works refreshing

2    your recollection from this example you provided

3    in your report?

4           A.    Yes.  So at the parish level you

5    know how many votes each candidate received.  You

6    also know you can look at the parish level

7    election day votes and the precinct election day

8    votes and you can determine how many votes each

9    candidate got from each precinct and you can use

10   that allocation to actually do the same thing

11   with the early votes.  So if say Biden, President

12   Biden got 60 percent of his votes from this

13   particular election day, votes from this

14   particular candidate, then we allocate it up

15   60 percent of the early votes for Biden to that

16   precinct and did that across the board for all of

17   the candidates for all of the precincts.

18        Q.    And why did you take this approach?

19        A.    Well, in my experience, opinion,

20   that was the best approach to take.  I didn't

21   want to ignore the early vote.  There are too

22   many early votes.  At least 25 to almost

23   50 percent of the votes were early votes so they

24   had to be allocated, and then the most logical

25   way to do that is to do it on the basis of

                                                    23


1    election day voting.

2        Q.    So this is an approach that you

3    think political scientists would endorse?

4        A.    I know political scientists would

5    endorse it.

6         Q.    So can you tell us some other

7    political scientists that you know who use this

8    method?

9         A.    Well, the Vest project that I

10   mentioned voting election science team which is

11   run by political scientists, Michael McDonald at

12   University of Florida, but a number of others use

13   precisely this method and so any political

14   scientist that uses that database and there are

15   quite a number of them actually are using votes

16   allocated in this way.  This is how they did it

17   in Louisiana, this is how they do it in every

18   state for which they supply election results.

19   The political scientists have arrived at the

20   accept Dr. Maximum palmar, for example, doesn't

21   use Vest data, he used allocations method that I

22   used arriving at it separately.

23        Q.    Okay.  Do you know if any other

24   experts who provided reports or opinions in this

25   case, relied on your data?

                                              24


1         A.    I know that Dr. Louis and Dr. Alford

2    used my data.  And raised no concerns about it.

3          Q.    We can take this down.  We are going

4    to move on now to discuss the specifics of the

5    elections that you analyzed in detail.  Can we

6    see Table 1 on page 6 and 7 of PL 1?

7          TRIAL TECH:

8               (Complied.)

9    BY MS. BRANNON:

10         Q.    Did you -- how many statewide

11   elections did you analyze in the seven areas of

12   interest?

13         A.    16 statewide elections.

14         Q.    Does this reflect on the screen on

15   page 6 and 7, contain an accurate list of the 16

16   elections that you looked at?

17         A.    It does.

18         Q.    Why did you choose these elections?

19         A.    These are statewide elections that

20   included black candidates and we know that the

21   courts find these most primitive because even if

22   black voters don't actually support the black

23   candidate, they have the option to support a

24   black candidate should they so wish to.

25         Q.    And do you have an opinion whether

1    it is important to look at elections that include

2    black candidates?

3            A.    Yes.  Again, I would want to know if

4    -- you don't want to -- you want to be assured

5    that black voters have an opportunity to elect

6    not just white candidates of choice, but black

7    candidates of choice and so you want to look at a

8    contest that includes black candidates.

9            Q.    Do these elections include any

10   primary elections?

11           A.    It's a complicated question.  We

12   call the -- typically, primaries are party

13   specific Democrat primaries, Republican primaries

14   here in Louisiana you have what's called a junk

15   gel primaries some of these are junk gel

16   primaries and some of them are the resulting

17   runoffs.

18           Q.    Can you explain when you say junk

19   gel primary, exactly what that means?

20           A.    That means that anybody wants to run

21   for the office regardless of their political

22   party affiliation runs in the primary.

23           Q.    And how does the process work in

24   Louisiana to move from the primary to the runoff?

25           A.    So no candidate in primary gets a

1    percent of the vote.  There's a runoff between

2    the top two voting candidates.

3         Q.    And did you look at these elections

4    statewide?

5         A.    These are statewide elections, but I

6    looked at the voting patterns only in the

7    specific areas that I just described in the

8    parishes or groups of parishes that made up my

9    areas of interest.

10         Q.    Thank you:  We can take this down.

11    Can we see Exhibit PL 3 which is Dr. Handley, at

12    table Tab C in your report, in your binder.

13         TRIAL TECH:

14              (Complied.)

15    BY MS.BRANNON:

16         Q.    Do you recognize this spreadsheet?

17         A.    I do.

18         Q.    And can you explain what this

19    spreadsheet is?

20         A.    This -- this relays the results of

21    my racial block voting analysis.

22         Q.    And can you explain for what area of

23    interest this spreadsheet relates?

24          A.     This particular one is area of

25     interest one Bossier and Caddo parishes.

                                              27


1          Q.     Okay.  And can we highlight -- we

2     are going to walk through -- have you walk

3     through one example and explain an analysis that

4     you've done in this case.  Can we highlight

5     November 2019, secretary of state election, which

6     I believe is on the second page?

7          TRIAL TECH:

8               (Complied.)

9     BY MS. BRANNON:

10          Q.     Can you walk us through what this

11     table shows using that November 19th election as

12     an example?

13          A.     Yes.  So in the first column you see

14     the -- the date and the office as well as the

15     candidates.  I identified the party of the

16     candidates and the race of the candidates.  Then

17     you have four sets of estimates, for black voters

18     and the same four sets of estimates for white

19     voters as well as confidence in their votes so

20     the first column is what we talked about, the I R

21     times C.  I think these are the most accurate and

22    they also have associated with them confidence

23    intervals that are deemed by political scientists

24    in this particular area of specialization as the

25    most accurate.  So we have the EIR times C

                                                      28


1    estimate, then we have the confidence intervals

2    around that estimate, then we have the EI by two

3    estimate, the ER estimate and then the HP, which

4    is homogeneous precinct estimate, then we have

5    the same information for the white voters.  So

6    for again, Collins green /AEU the EIR by C

7    estimate of the percentage of black voters that

8    supported her is 96.9, the EI two by two is 97.4,

9    the ER is 98.8 and the HP is 94.5.  They are all

10   as you can see, very close.

11        Q.    And why don't you include confidence

12   intervals for your EI two by two?

13        A.    Those are generally not accepted by

14   political scientists in this area.

15        Q.    And would you characterize this

16   November 2019 secretary of state's election, as a

17   polarized contest within the area of interest?

18        A.    Yes.  You can see that black voter

19   voted if you consider just black voters, they'd

20    have overwhelmingly elected Collins green up

21    while white voters would have elected Ardoin.

22         Q.    Is it in your opinion, are white

23    voter -- or black voters voting cohesively in

24    this election?

25         A.    In this particular election you have

29

1    over 95 percent of the black voters supporting a

2    particular candidate, that's very cohesive.

3         Q.    And in your opinion, is it fair to

4    say that the white voters voted as a block

5    against the black for candidate in this election?

6         A.    Yes.

7         Q.    Did you do this same type analysis

8    for the other 16 elections in all the other areas

9    of interest that you looked at?

10        A.    Yes.  For all seven areas of

11    interest, I did this analysis for all 16

12    statewide contests.

13        Q.    We can take this down.  And those

14    other analysis are in your report in similar

15    tables that have been labeled appendix A 2

16    through A 7; is that correct?

17        A.    That's correct.  Appendix A includes

18    all of the areas of interest, the 16 contests

19    that I analyzed for all of the areas of interest.

20        Q.    And for the record, those additional

21    appendixes for the other six areas, are exhibits

22    PL 4 through PL 9.  Did you reach any conclusion

23    -- what, if any, conclusions did you reach about

24    racially polarized voting in Louisiana in these

25    seven areas of interest based on your analysis of

1    these 16 elections?

2        A.    In most of the areas of interest,

3    all 16 contests were polarized.  In two of the

4    areas, all but one was polarized, so essentially

5    very, very polarized voting in these seven areas

6    that I looked at.

7        Q.    Can we see Table 3 on page 10 of the

8    P X -- of PL 1.  Do you recognize this table?

9        TRIAL TECH:

10            (Complied.)

11        THE WITNESS:

12            Yes.

13    BY MS. BRANNON:

14        Q.    Can you explain what information is

15    reflected on this table?

16        A.    This just presents the averages

17   across the 16 contests for each of the areas.

18        Q.    What, if anything, did you conclude

19   about the racially polarized voting in these

20   seven areas based on your analysis of the

21   statewide elections?

22        A.    Well, you can see that in the

23   average percentage of black voters who supported

24   the black preferred candidate regardless of the

25   number of candidates was 82.7 when you limit it

                                                    31


1    to just two candidate contests of which that was

2    half of the 16 contests it goes up to

3    93.2 percent, so on average 93.2 percent of black

4    voters supported the same candidate in two

5    candidate contests, that's very cohesive in terms

6    of white voters.  You can see that on average

7    only 12.2 percent of white voters supported the

8    black preferred candidates in the 16 contests as

9    a whole and it goes up to only 15.6 percent when

10   you are looking at the two candidate contests.

11        Q.    Okay.  We can take that down.  Now,

12   I'd like to turn to -- talk a little bit about

13   the state legislative contests that you analyzed.

14  Did you also look at state legislative elections?

15       A.    I did look at biracial state

16  legislative elections in the seven areas of

17  interest.

18       Q.    Okay.  Why did you look at those

19  state legislative election contests?

20       A.    Because it's the office at issue.

21  These aren't actually districts at issue so we

22  wouldn't really call them endogenous elections,

23  but it is for the office at issue state

24  legislative and I just wanted to see if voting

25  was also quite polarized in state legislative

                                                32

1  elections and it was.

2       Q.    And how did you select the state

3  legislative districts that you looked at?

4       A.    These were elections that included

5  black candidates, black candidates and white

6  candidates and where the district was wholly or

7  partially contained within the area of interest

8  in the parishes in the area of interest.

9       Q.    Can we see page 11 of PX 1, PL one?

10      TRIAL TECH:

11           (Complied.)

12    BY MS. BRANNON:

13         Q.    Dr. Handley, can you explain to us

14    what's in the two texts, two pieces of texts that

15    have been highlighted to refresh your

16    recollection about how many state legislative

17    districts you looked at?

18         A.    So there were 11 state legislative

19    -- State elective elections that I looked at, ten

20    of which were polarized.  There were ten State

21    House contests that I looked at and all of them

22    were polarized.

23         Q.    So you looked at a total of 21 state

24    legislative elections?

25         A.    That's correct.

                                                     33


1          Q.    And what analysis did you use when

2     you were evaluating those elections?

3          A.    I simply did a racial block voting

4     analysis.

5          Q.    This is the same type of analysis

6     that we were just discussing --

7          A.    (Nodded head affirmatively.)

8          Q.    -- related to the statewide

9     elections you did in this case?

10          A.     That's right.  If you look at

11    appendix B which reports these, you'll see the

12    exact same format on the appendix and that as you

13    see the ER -- EIR times C, EI two by two, ER and

14    HP estimates as well as the confidence levels.

15          Q.     And for the record, Dr. Handley, did

16    you attach these to your report as appendix B 1

17    and B 2?

18          A.     I did.

19          Q.     And for the record, appendix B 1 and

20    B 2 on plaintiff's Exhibit 10 and 11.

21               Did you form an opinion about the --

22    did you form an opinion, if any, about the racial

23    polarization of state legislative elections in --

24          A.     Yes.  Again, almost all of them were

25    racially polarized.

                                              34


1          Q.     At a high level, if at all, did this

2    -- how, if at all, did this racially polarized

3    voting in the 21 state legislative elections,

4    effect the ability of black voters to elect

5    candidates of their choice in state -- in the

6    state legislature in the area that you analyzed?

7          A.     You can see that in almost all of

8    the contests were polarized in majority black

9    districts.  The black preferred candidate

10    actually won while in the districts that were not

11    majority black in composition, the minority

12    preferred candidates almost always lost.

13        Q.    So at a high level, did white voters

14    vote as a block to usually defeat the black

15    preferred candidate in the house and Senate

16    districts you analyzed where the population of

17    the district was not a black majority?

18        A.    That's correct.

19        Q.    Okay.  Now, we are going to turn to

20    -- look at the -- some of the analysis that you

21    did of districts in the illustrative and enacted

22    maps.  Did you calculate the opportunity of black

23    voters to elect their candidates of choice in the

24    areas of interest in the enacted map?

25        A.    I did.

                                                    35


1        Q.    Did you --

2        A.    Not in all of the districts just in

3    the areas of interest in the districts that are

4    indicated in the tables.

5        Q.    Yes.  Can we call up Table 4 A on

6    page 14 of plaintiff's Exhibit 1.

7         TRIAL TECH:

8              (Complied.)

9    BY MS. BRANNON:

10        Q.    And then, did you also evaluate the

11   opportunity of black voters to elect a candidate

12   of choice in the areas of interest in the

13   illustrative maps drawn by plaintiff's expert

14   Bill Cooper?

15        A.    Again, yes.  I looked at the

16   opportunity to elect the -- in terms of the

17   districts that you see in this table, so I looked

18   at illustrative districts 36, 38, 39, for

19   example, in State Senate cluster one and compared

20   it to enacted districts 36, 38 and 39.

21        Q.    So this table reflects Senate

22   districts?

23        A.    This table reflects the Senate

24   districts that I evaluated.

25        Q.    And how did you go about determining

                                              36

1    which districts to include from the illustrative

2    districts and from the enacted districts in this

3    analysis?

4         A.    First, I identified the additional

5    illustrative district that was offered, the

6    illustrative -- the additional majority black

7    illustrative district and then I looked at

8    neighboring districts in that area and attempted

9    to come up with a similar number of districts to

10   compare.  I left out of the analysis the same

11   number of majority black districts in terms of

12   both the illustrative and the enacted plan and

13   focused just on the districts in the area in

14   which the illustrative plan offered an additional

15   district.

16        Q.    Can we see Table 4 B which is on

17   page 15?

18        TRIAL TECH:

19             (Complied.)

20   BY MS. BRANNON:

21        Q.    And is this the same table for the

22   house?

23        A.    It is.

24        Q.    And were these districts selected in

25   the same -- using the same method?

                                                37

1         A.    With the exception of the first

2    State house cluster one where there was -- there

3    was a majority black district, it was taken away

4    in the enacted plan and spread across three

5    districts and then there was in the illustrative

6    plan it was kept intact, so that's the only time

7    in which you see a comparison of one district to

8    three.

9         Q.    And you described doing an analysis.

10   Can you explain to us the details of the actual

11   analysis that you conducted on all of these

12   districts Table 4 A and 4 B?

13        A.    Yes.  I produced effectiveness

14   scores and I did this on the basis of recompiled

15   election results.  A lot of times, redistrictors

16   will want to look at the performance of a

17   proposed district by looking at recompiled

18   election results.  That means that they are going

19   to take past elections and conform those

20   elections to the boundaries of the proposed

21   district to see how particular candidates would

22   do in the new district.  You can only do that

23   with statewide elections because you are not

24   going to have enough overlap if you use say, for

25   example, state legislative districts, you are

1    going to use statewide elections and you can see

2    how candidates perform in the proposed districts.

3              Now, it's a little complicated here

4    because of the junk gel primary system.

5    Ordinarily, you would forget just look at general

6    elections and I do co-produce an average

7    percentage vote for how your particular

8    candidates would do.  Oh, this Republican would

9    get 75 percent of the vote across these

10   candidates, but here, I had so say I can't do

11   that because you have these runoff situations, so

12   instead what I did was I looked at the -- looking

13   at recompiled election results how often, what

14   percentage of those contests would the black

15   preferred candidate either win or make it to the

16   runoff.  So this -- the effectiveness scores are

17   actually the percentage of contest in terms of

18   effecting the score one the percentage of

19   contests that the black preferred candidate would

20   win or make it to the runoff win out right or

21   make it to the runoff effectiveness score two

22   focuses on the two candidate where you would have

23   in the instance of a runoff and that looks at the

24   percentage of say, runoff contests, the black

25    preferred candidate would win in that particular

39

1    contest.  It turns out that the runoff is the

2    barrier to being elected.  Sometimes it's not so

3    hard to make it into the runoff, it's in the

4    runoff that you're excluded.

5        Q.    Can we see a table on page 17 and

6    the maps on page 18 of PL 1?  Is this table here

7    that's shown on the screen reflect the

8    effectiveliness and effectiveness two 64s that

9    you were just speaking about?

10        A.    Yes.  So you can see that, for

11    example, illustrative district 36 has an

12    effectiveness score 1 of 0 and an effectiveness

13    score 2 of 0, the same for the enacted district

14    36, 0 and 0 and so on.

15        Q.    In this table, some of the districts

16    are in bold; is that correct?

17        A.    Yes.

18        Q.    And why is that?

19        A.    Those are majority black voting age

20    population districts.  So you can see that in the

21    enacted plan there's one in this particular

22    cluster and in the illustrative plan there are

23    two.

24          Q.    Your Honor, I'm going to use the

25    demonstrative to walk through some of Lisa

                                                        40

1    Handley's maps in her report.  That I need to set

2    up on the easel?

3          THE COURT:

4                Go ahead.

5          MS. BRANNON:

6                Just give me a minute.

7          THE WITNESS:

8                Is it possible to get some water?

9          THE COURT:

10                Yes.

11          MS. BRANNON:

12                Counsel, can you-all see it from

13    here?

14          THE WITNESS:

15                I need to know the actual --

16          MS. BRANNON:

17                Can you see that?

18          THE WITNESS:

19                Absolutely.  Thank you.

20          THE COURT:

21          The record will reflect that there's

22      a demonstrative map on the easel and

23      defense counsel has indicated that they

24      are able to see the map.  Is the witness

25      able to see the map?

                                                41

1       THE WITNESS:

2              Yes, I am.

3       THE COURT:

4              Okay.  Everyone's on the same page.

5   BY MS. BRANNON:

6       Q.    For the record, this is a blow up of

7   plaintiff's Exhibit PL 04 from Bill Cooper's

8   report.  And we are going to label it

9   demonstrative Exhibit 27.  Dr. Handley, are you

10  familiar with what this blow up is showing?

11      A.    Yes.

12      Q.    Okay.  And then you are also

13  familiar with the map that's shown on this screen

14  right now?

15      A.    I am familiar with the two maps,

16  yes.

17      Q.    Okay.  Can you see where I'm

18  pointing?

19        A.    I can.

20        Q.    And the court reporter hear me is

21    this the /#15EU78 as the maps that are currently

22    shown on the screen?

23        A.    That is the area, yes.

24        Q.    Hold on one second.  There's this

25    map on her screen.  Hold on a second.  I'm not --

                                                42


1    I'm confused.  Can you go back and show me

2    Table 17 and page 18?

3        TRIAL TECH:

4            It's on the screen now.

5    BY MS. BRANNON:

6        Q.    Yeah.  I'm talking about the

7    relationship between the map that's on the screen

8    that's from your report and the demonstrative.

9    You're aware -- did you understand my question?

10        A.    I did.

11        Q.    Okay.

12        A.    Yes.  Yes.

13        Q.    Okay.  So I should ask again was it

14    confusing?

15        THE COURT:

16            Well, I mean, you don't have much of

17          a record.  Your record right now says you

18          point at something and you say does this

19          recollect that, so I don't know, maybe you

20          want to ask it again.

21    BY MS. BRANNON:

22          Q.    Okay.  This is the demonstrative

23    that's here is the state map, correct?

24          A.    Yes.

25          Q.    For the record, I am pointing to the

                                                    43

1    north east -- northwest of the state, correct?

2          A.    Yes, that would be the northwest of

3    the state.

4          Q.    All right.  And for the record, what

5    we want to move into evidence is the maps from

6    Dr. Handley's report.  This is just a

7    demonstrative to give a perspective of where

8    those maps are in the state.  It is not intended

9    to be evidence.  We are not going to admit this

10    document through Dr. Handley into the evidence

11    today?

12          THE COURT:

13                Okay.

14    BY MS. BRANNON:

15          Q.    All right.

16          THE COURT:

17               Carry on.

18   BY MS. BRANNON:

19          Q.    Okay.  Dr. Handley, turning back to

20   your table, you explained to us how you

21   calculated the effectiveness scores, would you

22   characterize any of the State Senate districts

23   from enacted map in the area of cluster one as an

24   opportunity district?

25          A.    Yes.  District 39 in the enacted

                                              44


1    plan is an effective district.

2          Q.    And can you just explain to us what

3    that means?

4          A.    It means that I believe that it will

5    provide black voters an opportunity to elect

6    their candidates of choice.

7          Q.    And would you characterize any of

8    the state Senate districts from the illustrative

9    map in the area of Senate cluster one as

10   opportunity districts?

11          A.    Yes.  I would identify districts 38

12   and 39 as effective districts that is districts

13    that are likely to provide minority voters with

14    an opportunity to elect their candidates of

15    choice.

16         Q.    Did you draw any conclusions about

17    the ability of black voters to elect their

18    candidates of choice in the illustrative map

19    versus the enacted map in the area of Senate

20    cluster one?

21         A.    Yes.  The illustrative district --

22    the illustrative districts -- the illustrative

23    plan offers one additional effective black

24    district in this particular area.

25         Q.    Can we see the maps on page 20 and

                                                      45


1    the table on page 19 from PL 1?

2         TRIAL TECH:

3              (Complied.)

4    BY MS. BRANNON:

5         Q.    Do you recognize this -- these maps

6    and this table?

7         A.    I do.

8         Q.    And the same -- we are going to go

9    through the same exercise just to give context of

10    where these are.  I am pointing now to the area

11    of St. Charles parish; is that correct?

12         A.    Yes.

13         Q.    Is this area on the demonstrative

14    map the same area that is in your map that's

15    currently on the screen?

16         A.    Yes.

17         Q.    And this table reflects the same

18    analysis that we have just been discussing in

19    terms of effectiveness scores for the direct in

20    the illustrative and the enacted maps?

21         A.    That's correct.

22         Q.    Do you draw any conclusions about

23    the ability of black voters to elect their

24    candidate of choice in the illustrative plan

25    versus the enacted plan in the area of Senate

                                                    46


1     cluster two?

2          A.    Yes.  The additional majority black

3     district in this particular area is an effective

4     black district and therefore, the illustrative

5     plan offers one additional majority black

6     effective district in this area.

7          Q.    Can we see page 22, table -- the

8     table on page 21?

```
 9          TRIAL TECH:

10               (Complied.)

11   BY MS. BRANNON:

12          Q.    Do you recognize these -- this table

13   and these maps?

14          A.    I do.

15          Q.    Okay.  And I am now pointing for the

16   record, in the area of Baton Rouge?

17          A.    Okay.

18          Q.    And is this area of Baton Rouge the

19   same area that is reflected in the maps from your

20   report on this table?

21          A.    Yes.

22          THE CLERK:

23               Ma'am, would you try and speak into

24          that microphone or that handheld because

25          I'm having trouble hearing the audio?
```

                                                      47

```
 1          MS. BRANNON:

 2               Is this better if I do it next time?

 3   BY MS. BRANNON:

 4          Q.    And, Dr. Handley, the analysis that

 5   is reflected on this table is the same analysis

 6   that we have been discussing?
```

7          A.    That's correct.

8          Q.    Did you form an opinion about -- did

9    you draw any conclusions about the ability of

10   black voters to elect their candidate of choice

11   in the illustrative plan versus the enacted plan

12   in Senate cluster three?

13         A.    Yes.  In Senate cluster three, there

14   are two effective black districts in the enacted

15   plan and there are three in the illustrative

16   plan.

17         Q.    Can we call up page 24 and page 23,

18   the table on page 23 in the map and on page 24.

19         TRIAL TECH:

20              (Complied.)

21   BY MS. BRANNON:

22         Q.    And for the record, this is Exhibit

23   No. PL 048, which has been demonstrative that I'm

24   now through with it.  And for the record, I've

25   just put up what we are labelling demonstrative

                                              48


1    28 which is a blow up of PL 067, which is from

2    Dr. Cooper's report.

3               Dr. Handley, do you recognize this

4    document?

5          A.    I do.

6          Q.    And what is it?

7          A.    That is a map of the State of

8    Louisiana with the illustrative house plan put

9    onto it.

10         Q.    Okay.  And for the record, I am

11   pointing now to PL 07, which is demonstrative 28

12   in the area of Red River.  In this -- is this the

13   same where I'm pointing, is that the same area of

14   this map that is shown in more detail on the blow

15   ups from your report that are on the screen at

16   the moment?

17         A.    Yes.

18         Q.    And the analysis that you conducted

19   that's reflected in this table, is the same type

20   of effectiveness analysis we have been

21   discussing, correct?

22         A.    Yes.

23         Q.    Did you form an opinion about the

24   ability of black voters to elect their candidate

25   of choice in the illustrative plan versus the

                                                    49


1    enacted plan in-house cluster one?

2          A.    Yes.

3          MS. BRANNON:

4                Okay.  Can we see page 28 and 27

5          from plaintiff's Exhibit 1.

6          TRIAL TECH:

7                (Complied.)

8    BY MS. BRANNON:

9          Q.    Dr. Handley, do you recognize this

10   table and this map that's currently on the

11   screen?

12         A.    I do.

13         Q.    Oh, actually, can we go back?

14   Sorry.  Can we do 26 and 25, page 26 and table on

15   page 25 from plaintiff's Exhibit 1.  Do you

16   recognize these -- this table and these maps?

17         A.    Yes.

18         Q.    And for the record, I'm now pointing

19   to PL 067 in the area of Lake Charles?

20         A.    Yes.

21         Q.    And is this area that's reflected

22   here on this that I am pointing to, the same area

23   that is shown in more detail in the map in PL 1

24   from your report?

25         A.    Yes.

1          Q.    And is the table here in-house

2    cluster two, reflect the same analysis that we

3    have been discussing?

4          A.    Yes.

5          Q.    Do you have an opinion about the

6    ability of black voters to elect their candidate

7    of choice in the illustrative plan versus the

8    enacted plan in-house cluster two?

9          A.    Yes.  The enacted plan offers one

10   minority opportunity district and the

11   illustrative plan offers two black opportunity

12   districts in this particular area.

13         Q.    Okay.  Now, can we see page 28 and

14   -- the table on page 27 from PL 1.  Do you

15   recognize this table and this -- these maps?

16         TRIAL TECH:

17               (Complied.)

18         THE WITNESS:

19               I do.

20   BY MS. BRANNON:

21         Q.    Okay.  And I'm -- now for the

22   record, I am now pointing at the demonstrative

23   Exhibit 28 which is from plaintiff's Exhibit PL

24   67 in the area of Caddo and Bossier parish.  Is

25   this area that I'm pointing to the same area that

1    is reflected in more detail on the map from your

2    report that's on the screen?

3        A.    Yes.

4        Q.    And is the analysis that's reflected

5    in cluster -- the table about house cluster three

6    that's on the screen, the same type of analysis

7    we have been discussing?

8        A.    Yes.

9        Q.    Do you have an opinion as to the

10   ability of black voters to elect their candidate

11   of choice in the illustrative map versus the

12   enacted map in-house cluster three?

13       A.    Yes.  My opinion is that the enacted

14   plan offers three effective black districts and

15   the illustrative plan offers four effective black

16   districts in this particular area.

17       Q.    Okay.  Can we move now to page 30

18   and the table -- the maps on page 30 and the

19   table on page 29 from plaintiff's Exhibit 1?

20       TRIAL TECH:

21            (Complied.)

22   BY MS. BRANNON:

23       Q.    Do you recognize the table and the

24    maps that are on the screen?

25         A.    I do.

52

1          Q.    And, for the record, we are almost

2    done.  For the record, I am now pointing to PL 67

3    which is demonstrative 28 in the area of house

4    district 60 which is south of Baton Rouge; is

5    that correct?

6          A.    Yes.

7          Q.    And is that the same area of the

8    state that is shown in more detail on the map,

9    that is part of your report that's currently on

10   the screen?

11         A.    Yes.

12         Q.    And is the analysis that's reflected

13   in the table that's currently on the screen about

14   house cluster four, the same type of analysis we

15   have been discussing?

16         A.    Yes.

17         Q.    And do you have an opinion about the

18   ability of black voters to elect their candidates

19   of choice in-house cluster one in the

20   illustrative map versus the enacted map house

21   cluster four?

22          A.    I do.  In this particular area,

23    there is no enacted district that provides black

24    voters with an opportunity to elect.  There is

25    one such district in the illustrative plan.

                                                    53

1          Q.    Okay.  Can we see the maps on

2    page 32 and the table on page 31 of plaintiff's

3    Exhibit 1.

4          TRIAL TECH:

5               (Complied.)

6    BY MS. BRANNON

7          Q.    Do you recognize these?

8          A.    Yes.

9          Q.    And this is the same table and the

10    same kind of maps that we have been discussing,

11    correct?

12          A.    That's correct.

13          Q.    And for the -- for the record, I am

14    pointing to demonstrative Exhibit 28 which is PL

15    067 in this area which is in Baton Rouge; is that

16    correct?

17          A.    Yes.

18          Q.    And this area of Baton Rouge is the

19    same area that's shown in more detail in the

20    blown up map that is part of your report of PL 1?

21         A.    Yes, it is.

22         Q.    All right.  And do you have an

23    opinion as to the effective -- do you have an

24    opinion as to the ability of black voter to elect

25    their candidate of choice in the illustrative map

                                                    54

1    versus the enacted map for house cluster five?

2         A.    Yes.  You can see that the enacted

3    plan offers five black opportunity districts and

4    the illustrative plan offers seven effective

5    black districts in the -- in this particular

6    area.

7         Q.    Okay.  We can pull this down now.

8    Did you conduct any additional functional

9    analysis effectiveness score analysis for other

10   districts in the enacted map?

11        A.    I did.  I looked at the calculated

12   effectiveness scores for all districts over

13   25 percent black in voting age population.

14        Q.    And what did you find?

15        A.    I found that there were with one

16   exception, no districts that were effective that

17   were under 50 percent with the exception of I

18    think it's house district 91.  It's mentioned in

19    the footnote.  There is one exception, but that

20    is the only exception.  All of the effective

21    districts were at least 50 percent black in

22    voting age population and none of the districts

23    except the one, that was less than majority black

24    was an effective district.

25         Q.    Okay.  Bringing your racially

                                                    55


 1    polarized analysis and your effectiveness

 2    analysis of the enacted and illustrative maps

 3    together, how does the racial block voting in

 4    Louisiana effect black voters opportunities to

 5    elect their candidates of choice in the legislate

 6    -- in state legislative elections in the seven

 7    areas of interest that you evaluated for this

 8    case?

 9         A.    In the seven areas of interest that

10    I evaluated for this case, without exception a

11    majority black district is necessary to elect

12    black preferred candidates to the state

13    legislature.

14         Q.    The plaintiffs would move for

15    admission of Dr. Handley's report, which is PL

16    report and then the related exhibits which are PL

17    2 through PL 11?

18         MS. RIGGINS:

19              No objection to the admission.

20    THE COURT:

21              Admitted.  Can we pre-admit the

22         expert reports for those that we know are

23         going to testify so that we don't have to

24         have this labor us exercise.

25    MS. RIGGINS:

                                                      56


1              So, Your Honor, our agreement

2         notwithstanding my earlier objections

3         regarding Dr. Solanky and Dr. Handley's

4         reports at PL 17 through PL 19, that is

5         our agreement.  We are unsure if two of

6         plaintiff's experts will be testifying.

7         They were on the may call witness, but for

8         those that testify, that's fine.

9    THE COURT:

10              At the beginning of the experts

11         testifying, let's get the reports admitted

12         so that we don't have to streamline things

13         a little bit so let's carry on admitting.

14          MS. BRANNON:

15                  Okay.  I just have a few more

16          questions for Dr. Handley.

17     BY MS. BRANNON:

18          Q.    Dr. Handley, we discussed earlier

19     your methodologies for early and absentee votes,

20     correct?

21          A.    Yes.

22          Q.    Do you have any concerns about this

23     process potentially creating any bias in your EI

24     analysis.

25          A.    I do not.

                                                    57


1           Q.    And why not?

2           A.    Well, I did some analysis to -- to

3      determine if this was the case.  I did a couple

4      of different things to determine if it was likely

5      that bias was being introduced.

6           Q.    So then I am going to call up

7      plaintiff's Exhibit 16, which defendants have

8      articulated an objection to.  This is additional

9      analysis that Dr. Handley did to verify the

10     opinions that she has provided in her additional

11     report.  It does not speak to anything

12    specifically that Dr. Solanky has discussed or

13    talked about and plaintiff's think it's

14    appropriate for admission because it relates to

15    Dr. Handley's initial report and it's for the

16    benefit of the court to understand the specific

17    analysis that Dr. Handley did.  So we would move

18    for admission.  We are going to walk through it a

19    little bit, but we would move for admission of PL

20    17 through -- PL 16 through PL 19.

21         MS. RIGGINS:

22              And, Your Honor, if I may be

23         permitted to respond?

24    THE COURT:

25              Please.

                                                  58

1         MS. RIGGINS:

2              So PL 16, the first --

3    THE COURT:

4              Adjust your mic.  You're very soft

5         spoken so speak up.

6         MS. RIGGINS:

7              I'm sorry, Your Honor.  Is that

8         better?

9    THE COURT:

10          Yes.

11     MS. RIGGINS:

12          Is the first phrase in PL 16 starts

13     with Dr. Solanky contends PL 16 was

14     authored in response to work that Dr.

15     Solanky did that criticized Dr. Handley's

16     allocation method the entire report and

17     the appendices attached there to were done

18     in response to Dr. Solanky that has been

19     excluded.  If plaintiffs want to testimony

20     to come in we think it's only fair that

21     Dr. Solanky be allowed to testify to this

22     as well.

23     THE COURT:

24          The court is not going to reconsider

25     it's motion in immaterially on

                                              59


1     Dr. Solanky.  The question on the table is

2     whether or not the allocation method that

3     Dr. Handley used to allocate the -- what

4     we will call the absentee or the early

5     votes that are collected at a parish wide

6     level, how did she -- what was the

7     methodology for allocating those to the

8          precinct level.  She's given us that

9          testimony already.  Now, the question is:

10          Was that methodology used biased.  The

11          court will allow the question.  The court

12          will defer ruling on the admission of the

13          reports until we are concluded with this.

14          But the court's going to allow that

15          question.

16     BY MS. BRANNON:

17          Q.    Okay.  Thank you, Your Honor.  Can

18     we see PL 16?

19          TRIAL TECH:

20              (Complied.)

21     BY MS. BANNON:

22          Q.    What's this document?

23          A.    This is a supplemental report I

24     prepared.

25          Q.    And what analysis is reflected in

                                                    60


1     this supplemental report?

2          A.    I did several analyses, first, I

3     looked to see if casting an early or absentee

4     vote was related to the party -- the party of the

5     voters and determined that there was little

6   difference in whether you were a Republican or

7   Democrat as to whether you cast an early vote

8   with one exception and that is in 2020, and in

9   2020 you were more likely to vote early if you

10  were a Democrat than if you were a Republican.

11  Otherwise, most years was very comparable or

12  Republicans or slightly more like to -- to early

13  vote than Democrats except for 2022 where

14  Democrats were slightly more likely to early vote

15  than Republicans.  But the only year that there

16  was a distinct difference was in 2020.

17          Q.    Can we see PL 17?

18          TRIAL TECH:

19               (Complied.)

20  BY MS. BRANNON

21          Q.    Are you familiar with this document?

22          A.    Yes.  That's the table I prepared on

23  which I just based the conclusion that I gave

24  you.

25          Q.    Can we now see PL 19.

                                                    61


1           TRIAL TECH:

2                (Complied.)

3   BY MS. BRANNON:

4          Q.    Dr. Handley, are you familiar with

5    this document?

6          A.    Yes.

7          Q.    Can you explain what this document

8    shows?

9          A.    Yes.  So we don't know at the

10   precinct level how the early votes compared to

11   the election day votes because we don't know who

12   the candidates were that each of the precincts

13   voted for, but we do do know that at the parish

14   level, so these are scatter plots of the parishes

15   each point is a parish and I essentially did a

16   racial block voting analysis of the early votes

17   for each of the candidates and of the election

18   day votes for each of the candidates, so the top

19   plot is a plot of the parishes early votes for in

20   this particular instance, Gary chambers who ran

21   for Senate in 2022 and the middle plot is looking

22   at the proportion of election day votes by

23   proportion of election day black turn out and you

24   can see that both are equally polarized, so at

25   that time there is essentially no difference

                                                        62


1    between the early votes, the degree of

```
2      polarization among the early voters and the

3      election day voters.

4                And then the last scatter plot

5      simply looks at the proportion of early votes to

6      the proportion of election day votes for chambers

7      to see if there was a difference.

8           Q.   Did you evaluate any more elections

9      besides the November 2022 election?

10          A.   Yes, I looked at several elections.

11          Q.   Can we turn to the next page?

12     TRIAL TECH:

13               (Complied.)

14     BY MS. BRANNON:

15          Q.   Was this one of the other elections

16     that you evaluated?

17          A.   Yes.

18          Q.   And then can we turn to the next

19     page?

20     TRIAL TECH:

21               (Complied.)

22     BY MS. BRANNON:

23          Q.   And for the record, the last one was

24     November 20th -- the 2020 election, correct?

25          A.   The one prior to the one showing on
```

1    the screen, yes, correct.

2         Q.    And then the next one is this one of

3    the elections that you evaluated in this method?

4         A.    Yes.

5         Q.    And for the record, this is

6    November 19th?

7         A.    Yes.

8         Q.    And then if we turn to the next

9    page?

10         TRIAL TECH:

11              (Complied.)

12    BY MS. BRANNON:

13         Q.    And for the record, is this one of

14    the other elections that you evaluate indeed this

15    method?

16         A.    Yes.

17         Q.    And for the record, this is

18    October 2019?

19         A.    Yes.

20         Q.    And then can we turn to what I think

21    is the last page?

22         TRIAL TECH:

23              (Complied.)

24    BY MS. BRANNON:

25          Q.    And is this one of the other

                                                    64


1    elections that you evaluated in this method?

2          A.    That's correct.

3          Q.    And for the record, this is

4    December 2018?

5          A.    Correct.

6          Q.    Okay.  So, Your Honor, we would move

7    for admission of the report.  We could do just

8    the exhibits to reflect the analysis if we didn't

9    want to do the actual report which does mention

10   Dr. Solanky in the first sentence as a comprise?

11        THE COURT:

12              Does that solve your problem?

13        MS. BRANNON:

14              Your Honor, I wish it did, but it

15              doesn't.  The analysis and appendices were

16              prepared in the rebuttal of that service

17              report and it's all in response to

18              Dr. Solanky's analysis which he first

19              raised as to whether this allocation was

20              biased in his expert report and those have

21              been excluded.

22        THE COURT:

23          You may address it the proper rule,

24     but go ahead.

25     MS. BRANNON:

65

1          Yeah.  I think, Your Honor, the

2     substantive factual issue has been raised

3     in this case and as I stated before, I

4     think the report is an appropriate

5     supplement to Dr. Handley's original

6     opinion because it provides clarity to the

7     report.  The analysis is reflective of Dr.

8     Handley's own opinions about work that she

9     did in this case from the initial -- you

10     know, when she first did her report

11     addressing an issue just to verify the

12     validity of the opinions that she's giving

13     and I think that is an appropriate

14     supplement for us to produce and to be

15     entered into evidence regardless of the

16     position of Dr. Solanky being excluded.

17     THE COURT:

18          Okay.  The court is going to admit

19     Plaintiff's 16 through 19 and the reason

20     is that under 702 it is the moving

21          parties, the offering party of the experts

22          burden to show the reliability of the

23          opinion testimony and this goes directly

24          to reliability.  That burden of proof is

25          being -- has -- is being made part of the

66

1          rule effective December the 1st, but the

2          case law would reflect that it's always

3          been the movements burden and so

4          therefore, in the interest of the court's

5          full understanding and the ability for the

6          court to make the analysis of the

7          reliability of the opinion testimony, the

8          court will allow it for completion of the

9          record or to make a complete record.  So

10          PL -- Plaintiff's 16 through 19 are

11          admitted.

12          MS. BRANNON:

13              Thank you.  Just a couple more

14          questions.  Can we turn to Dr. Handley's

15          CV again at Exhibit PL 2.

16          TRIAL TECH:

17              (Complied.)

18     BY MS. BRANNON:

19        Q.    That's at tab two of your binder and

20    can we go to I think it's the third page?

21        TRIAL TECH:

22            (Complied.)

23    BY MS. BRANNON:

24        Q.    Yes.  Dr. Handley, did you write an

25    article for the North Carolina law review?

67

1        A.    I co-authored the article being

2    highlighted here, yes.

3        Q.    Okay.  Given the -- can you read the

4    title of that article into the record?

5        A.    Drawing effective minority districts

6    a conceptual framework and some empirical

7    evidence.

8        Q.    Given the title of that article,

9    does this article discuss ways to determine if

10    election districts are effective?

11        A.    Yes, it does.

12        Q.    And what approaches are discussed?

13        A.    I discuss the approach I took here

14    in terms of recompiled election results.  If you

15    actually have proposed districts you look at

16    recompiled election results and it also offers a

17    new way of looking at whether a district is

18    likely to be effected before actually drawing

19    districts.  You would look at -- you would take

20    the information from the racial black voting

21    analysis and produce what's called a percent

22    needed to win percentage.

23        Q.    Did you conduct a percent needed to

24    win analysis in this case?

25        A.    I did not do so in this case.  In

                                                    68

1    this case I had proposed districts to evaluate.

2    I had enacted districts as well as illustrative

3    districts.  The boundaries were already drawn.

4        Q.    And do you have an opinion of which

5    one of those analyses is the most available to

6    addressing racial -- racially polarized voting in

7    your opinion in this case?

8        A.    The -- looking at recompiled

9    election results focuses in on the very specific

10    voters that will be included in the district.  It

11    also takes into account, of course, turn out and

12    voting patterns because you are looking at

13    previous elections just as you would if you

14    calculated a percent needed to win.  But this

15    focuses on just specifically the residents of the

16    proposed district.

17          Q.    So it looks at the actual districts

18    that have been enacted and not hypothetical

19    districts?

20          A.    Correct.

21          Q.    Okay.

22    MS. BRANNON:

23              I have nothing further.  Thank you,

24    Dr. Handley.

25    THE COURT:

                                              69


1              Cross?

2    MS. BRANNON:

3              Oh, wait.  Let me confer with them.

4    Yeah.  I have nothing further.

5    THE COURT:

6              Cross?

7    EXAMINATION BY MS. RIGGINS:

8          Q.    Good morning, Your Honor.  Lisa

9    Riggins on behalf of the secretary of state.  May

10    I have a minute with Ms. Brannon, please?

11    THE COURT:

12              You may.

13          MS. RIGGINS:

14                  Your Honor, just to clarify the date

15          on the expert report which is plaintiff's

16          Exhibit PL 1, it is incorrect.  That

17          report was produced on June 30th of 2023.

18          Isn't that correct, Dr. Handley?

19          THE WITNESS:

20                  Yes.

21          THE COURT:

22                  I note that fact.  Glad you cleared

23          that up for the record.

24          MS. RIGGINS:

25                  Yeah.  Dr. Handley PL 1 which has

                                                70

1           now been admitted was produced on

2           June 30th of 2003.

3           THE COURT:

4                   2023?

5           MS. RIGGINS:

6                   2023.  Thank you.

7           THE COURT:

8                   Thank you for your professionalism,

9           Ms. Riggins.

10    BY MS. RIGGINS:

11          Q.    Good morning, Dr. Handley.  It is

12    nice to see you again.  How are you today?

13          A.    I'm good.  And yourself?

14          Q.    I am fine.  I finally managed to get

15    a hot cup of coffee.  It took me a while this

16    morning.  So, Dr. Handley, you conducted a

17    racially polarized voting analysis in this

18    matter; is that correct?

19          A.    Yes.

20          Q.    Okay.  And would you agree with me,

21    Dr. Handley, that this racially polarized voting

22    analysis is needed to determine first, whether a

23    minority group is politically cohesive and

24    second, to determine if white voters are voting

25    as a block to defeat the candidates preferred by

                                                       71


1     those minority voters?

2           A.    I would agree.

3           Q.    And, Dr. Handley, if I refer to a

4     racially polarized analysis as an RVP analysis,

5     will you know what I mean?

6           A.    I will.

7           Q.    Thank you.  So in order to conduct

8     your RVP analysis Dr. Handley, you needed an

9    aggregate level database; isn't that correct?

10          A.    Yes.  By aggregate, we mean that we

11    don't have individual level data.  We are looking

12    at precinct level data in this case.

13          Q.    Okay.  Thank you, Dr. Handley.  But

14    I believe you testified earlier that you sourced

15    this data from the secretary of state's website

16    open elections and the census; is that right?

17          A.    I sourced -- that is the source of

18    it, yes.

19          Q.    And some of this data that was used

20    in your report was also gathered for the current

21    congressional case pending in Louisiana, the

22    Robinson case for which you are also an expert,

23    isn't that right, Dr. Handley?

24          A.    Yes.

25          Q.    And you personally did not compile

                                                      72

1    all of this data?

2          A.    I did not compile the precinct level

3    data.

4          Q.    And who compiled that data, Dr.

5    Handley?

6          A.    The personnel who work at it, the

7    ACLU Analytics department.

8         Q.    And you were retained by the ACLU in

9    this case, is that right, Dr. Handley?

10        A.    Yes.

11        Q.    All right.  And I would like to turn

12   to Table 1 in your report, which is plaintiff's

13   Exhibit 6, please.  And do you still have your

14   white binder in front of you Dr. Handley?

15        A.    I do.

16        Q.    Is it okay if Dr. Handley uses that

17   binder?

18        MS. BRANNON:

19             Yes.

20   BY MS. RIGGINS:

21        Q.    Save some trees.  I think it's tab A

22   in your report, Dr. Handley?

23        A.    Okay.  We are also bringing it up on

24   the screen which is actually easier for me to

25   see.  I have to put on my glasses, but --

                                                    73


1         Q.    That's fine.  I'm happy to do it

2    whatever way is easier for you.

3         THE COURT:

4              Adjust the microphone.  There you

5          go.  Bend it down a little bit.

6    BY MS. RIGGINS:

7          Q.    Sorry.  I'm short.  Dr. Handley, can

8    you please turn to table one in your report, I

9    think it starts on page 6.

10         A.    Yes.

11         Q.    So these are the 16 statewide

12   election contests that you analyzed in this

13   report; isn't that right, Dr. Handley?

14         A.    These are the 16 statewide, that's

15   correct.

16         Q.    And these 16 statewide election

17   contests include a black candidate in each of

18   them, isn't that right?

19         A.    At least one, that's correct.

20         Q.    And so because the 2016 presidential

21   election did not include a black candidate you

22   did not analyze that election in this report,

23   Dr. Handley?

24         A.    Correct.

25         Q.    And so you likewise in this report,

                                              74


1    did not examine the 2015 or the 2019

2    gubernatorial elections, did you?

3        A.    Correct.

4        Q.    But don't you understand,

5   Dr. Handley, that Governor Edwards received a

6   high level of support from the black community as

7   analyzed in your rebuttal report?

8        A.    As reported -- I did not analyze it.

9   I used Dr. Offered's estimates and I would agree

10  that Edwards received a high percentage of the

11  black vote.

12       Q.    Thank you, Dr. Handley.

13             Do you agree with me, Dr. Handley,

14  that the black preferred candidate is usually a

15  Democrat?

16       A.    In Louisiana, yes.

17       Q.    And would you also agree with me,

18  Dr. Handley, that sometimes a white candidate can

19  be the candidate of choice for the black

20  community?

21       A.    Yes.

22       Q.    And, in fact, Dr. Handley, haven't

23  you conducted racially polarized voting analyses

24  in other states where you examine elections with

25  white candidates only?

1        A.    Yes.  If there are not a sufficient

2    number of contests that include black candidates.

3    Here, of course, I had 16 so I did have a

4    sufficient number, but in some states, for

5    example, in Arkansas, you had maybe two

6    candidates, black candidates who ran statewide

7    over an entire decade, so I did look at contests

8    that included only white candidates.

9        Q.    Okay.  But here in Louisiana you

10   were able to find 16 biracial contests over a

11   period of approximately seven years?

12       A.    Yes.

13       Q.    And, Dr. Handley, you -- the results

14   of the statistical analysis that you performed,

15   we looked at those earlier.  Those are contained

16   in exhibit -- I'm sorry, Appendix A to your

17   report?

18       A.    Correct.

19       Q.    All right.  And you also examined

20   State house and State Senate elections in

21   Appendix B it owe your original report; isn't

22   that right?

23       A.    Yes.

24       Q.    But those state legislative

25   elections that you examined in appendix B to your

1   report are not really endogenous elections, are

2   they, Dr. Handley?

3          A.    As I said, those are for the office

4   at issue, but not for the actual districts at

5   issue.

6          Q.    Okay.  And so therefore, they are

7   not actually endogenous elections because they

8   are not the election districts at issue in this

9   case?

10         A.    As I understand the word endogenous.

11  I'm not sure that all courts would agree, but

12  that's how I understand it.

13         Q.    Thank you, Dr  Handley?

14         A.    And, Dr. Handley, would you agree

15  with me that it's valuable for experts such as

16  yourself to study endogenous elections when they

17  are available.

18         A.    Yes.

19         Q.    And so in this report you don't

20  examine any endogenous elections, do you?

21         A.    Depending on your definition, I

22  would say I looked at state legislative

23  elections, but not for the districts at issue.

24      Q.    But isn't your definition of an

25   endogenous election, Dr. Handley, that the

77

1    election is for the district at issue?

2         A.    That -- that's my definition.

3    Again, I'm not really sure the court's came up

4    with the word and I'm not really sure what courts

5    would have to say about that.

6         Q.    But studying the election district

7    at issue, that's your definition of an endogenous

8    election?

9         A.    Yes.

10        Q.    Could we please turn to Table 2

11   which is on page 9 of your report, please?

12        TRIAL TECH:

13             (Complied.)

14   BY MS. RIGGINS:

15        Q.    I think it's also up on the screen

16   if that's easier for you, Dr. Handley.

17             These are the seven areas of

18   interest that you studied in your June 2023

19   report; isn't that right, Dr. Handley?

20        A.    Yes.

21        Q.    And you chose these districts

22    because they were based on areas where plaintiffs

23    illustrative maps added additional majority

24    minority districts; isn't that true?

25             A.    Yes.   I think you phrased that

78

1    incorrectly, but yes.

2             Q.    So you did not examine the entire

3    State of Louisiana?

4             A.    That's correct.

5             Q.    And you did not study majority

6    minority districts outside of these seven areas

7    of interest?

8             A.    That's correct.

9             Q.    Can we please turn to Table 3

10   forest, from the next page?

11   TRIAL TECH:

12             (Complied.)

13   THE WITNESS:

14             I neglected to mention something.  I

15             did not study or do any analysis other

16             than produce effectiveness scores.  I did

17             calculate effectiveness scores.  Sorry

18             about that.

19   BY MS. RIGGINS:

20          Q.    I appreciate the clarity,

21   Dr. Handley.  Thank you.  And, Dr. Handley, do

22   you see that Table 3 is up on your screen?

23          A.    Yes.

24          Q.    And I believe that you discussed

25   this table earlier on direct; is that right?

79

1          A.    Yes.

2          Q.    Okay.  And I'd like to look at the

3   second set of columns here,the two candidate

4   contests; is that right?

5          A.    Yes.

6          Q.    Can you see that okay.  Area of

7   interest three, do you recall what area of

8   interest that is?

9          A.    Off the top of my head, no.  I

10   could certainly go back and look.

11          Q.    Yes, of course.

12          MS. RIGGINS:

13                Could we maybe pull that up or put

14          those side by side?

15          TRIAL TECH:

16                (Complied.)

17   BY MS. RIGGINS:

18        Q.    So, Dr. Handley.  Do you see these

19   Table 2 and Table 3 up side by side on your

20   screen?

21        A.    I do.

22        Q.    Okay.  So what area of interest is

23   area of interest three?

24        A.    East central Louisiana, that

25   includes Baton Rouge, West Baton Rouge, Iberville

                                                    80


1    and point could you please pee.

2         Q.    Great.  Thank you.  And what areas

3    of interest does area seven include?

4         A.    Baton Rouge and East Feliciana.

5         Q.    So Baton Rouge is examined in both

6    area three and area seven; is that right?

7         A.    Correct.

8         Q.    Okay.  And so looking at the two,

9    candidate contests for area three in Table 3,

10   isn't the white vote for black preferred

11   candidate approximately 20 percent?

12        A.    For area seven?

13        Q.    For area three.

14        A.    It's 19.6 to be exact.

15        Q.    Okay.  And it's 20.1 for area seven;

16    isn't that right?

17         A.    Yes.

18         Q.    Okay.  Thank you, Forest.  We can

19    take this down.

20         TRIAL TECH:

21              (Complied.)

22         MS. RIGGINS:

23              And Forest, can we pull up

24         plaintiff's Exhibit 3, please?

25    BY MS. RIGGINS:

                                        81

1         Q.    And if it's easier on paper,

2    Dr. Handley, whichever is easier for you.  This

3    is appendix A-1 covering area of interest one

4    Bossier and Caddo Parish; isn't that right,

5    Dr. Handley?

6         A.    Yes.

7         Q.    And you would agree with me, Dr.

8    Handley, that appendix A-1 is not a district

9    specific analysis, is it?

10        A.    It's a very area specific analysis.

11    It focuses on the area where the additional

12    illustrative district is drawn, an illustrative

13    district is drawn.

14          Q.    So the answer to my question is yes,

15  this is not a district specific analysis?

16          A.    It focuses on the two parishes in

17  which there is an illustrative, an additional

18  illustrative district.

19          Q.    But appendix A-1 does not study

20  specific districts within Bossier and Caddo

21  Parish, does it?

22          A.    No.

23          Q.    Thank you.  So there is some column

24  headers here that you and Ms. Brannon went

25  through earlier, EIR by CEI two by two and ER.

                                                    82

1  Do you see those?

2          A.    Yes.

3          Q.    And these are all statistical

4  estimates; is that right, Dr. Handley?

5          A.    Yes.

6          Q.    But the homogenous precinct

7  analysis, those are real election percentages

8  reported in the HP column?

9          A.    Yes.  Those are the percentages for

10  in -- in the first column for the precincts --

11  for all of the precincts that at least 90 percent

12    of the voters were black and in the white

13    section.  It was for those precincts in which at

14    least 90 percent of the voters were white.

15          Q.    Thank you, Dr. Handley.  So setting

16    aside the HP column which I understand are

17    actually election percentages, the remainder of

18    the EI and ER analysis here in the appendix

19    reports, estimates for black and white voters in

20    Bossier and Caddo Parishes for the 16 statewide

21    election contest we discussed earlier; isn't that

22    right?

23          A.    Yes.

24          Q.    And the numbers in the EIR by C

25    column, are statistical estimates of a

                                                  83

1    percentage; isn't that right?

2          A.    Yes.

3          Q.    So I'd like to, if we could,

4    Dr. Handley, look at the 2020 November

5    presidential election.  If we could, look under

6    the estimates in the far right section of columns

7    estimate for white voters.  Would you agree with

8    me that the 22.6 number that is on the screen

9    here, represents the estimates of the percentage

10    of white voters who voted for president Biden

11    across all precincts in Caddo and Bossier

12    parishes?

13         A.    Yes.

14         Q.    And, Dr. Handley, you used R code

15    and several R code packages to produce the EI and

16    ER and HP analysis replicated here; isn't that

17    right?

18         A.    Yes.

19         Q.    Okay.  Do you recall which R code

20    packages you used to produce this analysis?

21         A.    Yes.  Well, more or less, yes.

22         Q.    And which packages were those?

23         A.    EI pack and EI compare for the ER

24    estimates and HP estimates.  Maybe -- maybe EI

25    pack for the ER estimates.  I don't remember, but

                                                      84

1     I used both of those packages.

2          Q.    Thank you, Dr. Handley.  And I

3     believe you testified to this earlier, but the

4     data unit that you are using to conduct this

5     analysis is per precinct; isn't that right?

6          A.    The unit of analysis or observation

7     is the R precincts.

8        Q.    And so to produce this 22.6 number

9    that we just mentioned a few minutes ago, you

10   instructed your packages in R code to limit the

11   results in just the precincts in Bossier and

12   Caddo Parishes; isn't that right?

13       A.    Yes.

14       Q.    And so next to this 22.6 number,

15   there are two numbers reported here for

16   95 percent confidence interval; is that right?

17       A.    Yes.

18       Q.    All right.  And what are those two

19   numbers, Dr. Handley?

20       A.    So EIR times C is actually a

21   simulation process, and I believe I ran something

22   like 250,000 simulations and this range 17.2 to

23   30.5 indicates that 95 percent of my simulations

24   produced means within that range.

25       Q.    So then -- I appreciate the

                                                    85


1    explanation, Dr. Handley.  I was going to try to

2    do the inverse and ask you questions about that,

3    but your explanation is much better than mine.

4    But just to clarify, you said means within this

5    range, you mean that 95 percent of the results of

6      your simulations produced a mean between 17.2 and

7      30.5 in this specific example we are looking at?

8             A.    Yes.

9             Q.    And would you generally agree with

10     me, Dr. Handley, that the smaller the range of

11     the 95 percent confidence interval the better

12     idea you have as to the true number?

13            A.    The less uncertainty attached to the

14     estimate.

15            Q.    So the smaller the range, the more

16     certain you are about the estimate?

17            A.    The less than certainty are I

18     suppose you could read it at, but a statistician

19     would say the wider the range the more

20     uncertainty.

21            Q.    And you do not produce confidence

22     intervals for EI two by two or ecological

23     regression, do you, Dr. Handley?

24            A.    Those have been rejected as by

25     experts.

                                                    86


1             Q.    But your package would allow you to

2      produce those confidence intervals; isn't that

3      true, Dr. Handley?

4        A.    No, not for EI compare, no.

5        Q.    But what about for EI pack?

6        A.    Yes.

7        Q.    What is the estimate for EI two by

8   two reported here for white voters in Caddo and

9   Bossier parishes for president Biden and versus

10  president Harris in the November 2022 election?

11       A.    The EI two by two did you ask?

12       Q.    Yes, ma'am.

13       A.    9.8.

14       Q.    All right.  And what is it for ER?

15       A.    9.3.

16       Q.    And both of these numbers are

17  outside of the 95 percent confidence interval you

18  reported for EIR by C; isn't that right?

19       A.    Different statistical methods.

20       Q.    So the answer to my question is yes?

21       A.    They are outside the 17.2 to 30.5,

22  yes.

23       Q.    And would you agree with me,

24  Dr. Handley, that these estimates being outside

25  of the confidence intervals, isn't necessarily

                                              87


1   surprising because this analyzes the

2    November 2022 election?

3         A.    In part, but it is also not

4    surprising because these are different methods.

5    They rely on different statistical assumptions

6    and produce different statistical estimates.

7         Q.    Sure.  But in part, isn't it also

8    because this analyzes the November 2022 election

9    which produced problematic estimates due to the

10   number of people voting early?

11        A.    It is true that these estimates are

12   more problematic.

13        Q.    Dr. Handley, I don't want to be

14   repetitive, but would you agree with the

15   statement that the November 2020 election

16   produced problematic estimates because of the

17   number of people who early voted in Louisiana?

18        A.    No, I would not disagree with that.

19        Q.    You would not disagree with that

20   statement?

21        A.    That's correct.

22        Q.    So let's look one election up, if we

23   can, to the 2022 November Senate election.

24              I would also like to look at the

25   estimates for white voters which are on the far

88

1    right side of your screen.  Was Mr. Chambers the

2    black candidate of choice in this race,

3    Dr. Handley?

4         A.    Yes.

5         Q.    And what is the EIR by C estimate

6    for Mr. Chambers for white voters in Bossier and

7    Caddo Parishes?  EIR by C, I'm sorry?

8         A.    For Mr. Chambers did you say?

9         Q.    Yes, ma'am?

10        A.    Five, 5 percent.

11        Q.    And what are your 95 percent

12   confidence intervals for that EIR by C estimate?

13        A.    4.3 to 5.7.

14        Q.    And what is the EI two by two

15   estimate here?

16        A.    3.5.

17        Q.    And what is the ER estimate?

18        A.    3.9.

19        Q.    And again, both the EI two by two

20   and the ER estimates are outside of the

21   95 percent confidence interval; isn't that right,

22   Dr. Handley?

23        A.    Yes.  Sure.  I should have waited.

24   Sorry.  Sorry about that.

25          Q.    Dr. Handley, would you agree with me

89

1    that if you looked at different election contests

2    with different candidates than the ones listed in

3    appendix A-1, you would have gotten different

4    estimates?

5          A.    The estimates are election specific.

6          Q.    So the answer to my question is yes?

7          A.    I wouldn't address it that way, but

8    I think I answered it different elections would

9    produce different estimates.

10          Q.    Thank you, Dr. Handley.  So I would

11    like to move on and talk a bit about

12    effectiveness scores unless Your Honor would like

13    to take the morning break?

14    THE COURT:

15              How much longer do you have?

16    MS. RIGGINS:

17              15 to 20 minutes, Your Honor.

18    THE COURT:

19              Let's take a 15-minute recess.

20    THE BAILIFF:

21              All rise.  The court is in recess.

22    (A short recess was taken at 10:36 a.m.)

23        THE BAILIFF:

24             All rise.  The court.

25        THE COURT:

90

1             Okay.  Cross you may continue.

2   BY MS. RIGGINS:

3        Q.    Thank you, Your Honor.  Dr. Handley,

4   I'd like to shift gears a little bit and talk

5   about your effectiveness scores, but before I do

6   your kind counsel pointed out in a couple of

7   places it may have referred as the Biden election

8   as occurring in November 2020, that is an error

9   obviously on my part.  Can we agree, Dr. Handley,

10  that Biden was elected in November 2022 not in

11  2020?

12       A.    Yes.

13       Q.    Can we look at -- thank you, Forest.

14  There's a comparison table here for State Senate

15  cluster three isn't that right?

16       A.    Yes.

17       Q.    And what areas of interest are

18  included in State Senate cluster three?

19       A.    Area of interest, I think it's area

20  of interest three.  Do you mean what parishes,

21    perhaps?

22         Q.    Yes.  I'm sorry.  What parishes are

23    included in that, Dr. Handley?

24         A.    East and west Baton Rouge, Iberville

25    and Point could you please pay.

91

1         Q.    Thank you.  And the scores here on

2    on the comparison table, these are specific to

3    the illustrative and enacted districts; isn't

4    that right, Dr. Handley?

5         A.    Yes.

6         Q.    And would you agree with me,

7    Dr. Handley, that if any of these districts are

8    split precincts, you would be required to perform

9    a census block desegregation in order to

10   calculate these effectiveness scores?

11        A.    I would agree that you would have to

12   do that.  I don't believe that there are any

13   split precincts, but --

14        Q.    And so that gets to my next

15   question, Dr. Handley.  You did not perform any

16   census block desegregation yourself in this case,

17   did you?

18        A.    The precinct results were brought

19    down to the block level, but it would only impact

20    a precinct result if a precinct was split, but I

21    don't believe there are any split precincts.

22    There's certainly none in the enacted and maybe

23    one or two in the illustrative plan as a whole.

24         Q.    Thank you, Dr. Handley?

25         A.    I'm sorry.  I don't know the

                                                      92

1    question.  Can you --

2         Q.    Sure.  So you did not perform a

3    census block disaggravation yourself in this

4    case, did you?

5         A.    A -- the election returns were

6    disaggregated down to the block.

7         Q.    But did the ACLU data analytics team

8    perform that function for you?

9         A.    Yes.

10         Q.    Thank you.  All right.  And so there

11    are two types of effectiveness scores listed here

12    for the illustrative and enacted districts; isn't

13    that right, Dr. Handley?

14         A.    Yes.

15         Q.    Can you explain to me the difference

16    between the effectiveness score No. One and score

17    No. Two?

18         A.    Yes.  Score number one considers all

19    16 contests and indicates whether the black

20    preferred candidate would have one or made to the

21    runoff so that's the percentage of the 16

22    contests in which the black preferred candidate

23    won or made it to the runoff.  The effectiveness

24    score two was only at the eight contests in which

25    there were two candidate to give you and

                                                         93

1    indication of what would happen if the minority

2    preferred candidate made it to the runoff would

3    they, in fact, win the runoff so it looks at at

4    only eight contests.

5         Q.    Thank you, Dr. Handley.  You did not

6    report effectiveness scores for illustrative or

7    enacted Senate District two in this cluster, did

8    you?

9         A.    No.  I might have calculated them.

10    It depends.  Is it over 25 percent?  Black in

11    voting age population.

12         Q.    Well, I guess my question,

13    Dr. Handley is:  In this table you don't report

14    effectiveness scores for Senate District two;

15    isn't that right?

16         A.    Yes.

17         MS. RIGGINS:

18              Okay.   And Forest, if we could, pull

19         up the map of this region on the next page

20         which is page 22, and while we do that,

21         I'm going to grab the pen I left on the

22         table.

23         TRIAL TECH:

24              (Complied.)

25    BY MS. RIGGINS:

                                        94


1         Q.    Dr. Handley, does the top map here,

2    depict the illustrative district contained or

3    districts, I'm sorry -- contained in State Senate

4    cluster three?

5         A.    Yes.   That's a -- that's a map of

6    those -- of that area, yes.

7         Q.    Okay.   And it's a map of the same

8    area for the enacted district on the bottom of

9    the page; is that right?

10         A.    Yes.

11         Q.    Okay.   And there's a kind of

12    yellowish shading on some of these maps; is that

13     right?

14          A.     Yes.

15          Q.     And does that represent shading for

16     districts that are majority black districts that

17     you analyzed?

18          A.     Yes.

19          Q.     All right.  And so an enacted

20     district 17 on the map at the bottom of the page

21     that is not shaded, correct, Dr. Handley?

22          A.     That's correct.

23          Q.     So enacted district 17 is not a

24     majority minority district, is it?

25          A.     It is not.

                                                      95


1          Q.     Okay.  But it is shaded above in the

2     illustrative districts?

3          A.     Because it's a majority minority,

4     yes.

5          Q.     Thank you.  Senate district two is

6     shown on both of these maps; isn't that right,

7     Dr. Handley?

8          A.     Yes.

9          Q.     And it's not shaded in either map?

10          A.     It was not included in the clusters

11    you pointed out, right, so I only shaded the

12    districts that were included in the cluster, I

13    believe.

14          Q.    Right.  So you did not include

15    Senate district two in this cluster?

16          A.    Correct.

17          Q.    Okay.  Even though portions of

18    Senate district two are in the parishes covered

19    by Senate district three?

20          A.    That's correct.

21          Q.    Okay.  And is Senate district two a

22    majority minority district in the enacted

23    district map depicted in the bottom map below?

24          A.    So those are both majority minority

25    districts, both you know, in the illustrative and

                                                  96


1    the enacted plan district two is majority black.

2          Q.    Thank you, Dr. Handley.  And what is

3    the level of black voting age population in the

4    enacted plan as shown on your map here for Senate

5    district two?

6          A.    I -- I'm having a little trouble.  I

7    think it says 57.75.

8          MS. RIGGINS:

```
 9              Forest, could we Zoom in on that
10         placard, is that possible?
11    TRIAL TECH:
12              (Complied.)
13    THE WITNESS:
14              Try putting on my glasses, but I
15         think just the wrong distance that neither
16         set is going to work.
17    BY MS. RIGGINS:
18         Q.    Is that better for you, Dr. Handley?
19         A.    It is.
20         Q.    So what is the level of BVAP for
21    Senate district two shown here?
22         A.    57.75.
23         MS. RIGGINS:
24              Thank you.  And Forest, can we Zoom
25         in on the same placard for Senate district
```

                                                    97

```
 1         two in the illustrative plan, please?
 2    TRIAL TECH:
 3              (Complied.)
 4    BY MS. RIGGINS:
 5         Q.    What is the level of BVAP for Senate
 6    district two in the illustrative plan here,
```

 7    Dr. Handley?

 8              A.    51.73 percent.

 9              Q.    Thank you.  And do you see in --

10    this is helpful, Forest, to leave it Zoomed in,

11    please.

12                    Do you see that district 14 and

13    district 17 in the enacted plan border each other

14    here?

15              A.    14 and 17 border each other, yes.

16              Q.    Okay.  And the yellow portion of 17

17    indicates that that's a majority minority

18    district here, right?

19              A.    17.

20              Q.    Is it a majority black district?

21              A.    Yes.

22              MS. RIGGINS:

23                    Thank you.  Forest, and can we do

24              the same Zoom in for the enacted map

25              below, please?

                                                        98


 1              TRIAL TECH:

 2                    (Complied.)

 3    BY MS. RIGGINS:

 4              Q.    And so in the enacted map there's

5    still a portion of Senate district two that

6    borders in between Senate district 17 and 14.  Do

7    you see that, Dr. Handley?

8         A.    Say that again.

9         Q.    So there is -- do you see Senate

10   district two in gray on the screen, Dr. Handley?

11        A.    Yes.

12        Q.    And do you see how it comes north

13   and is on the border between both Senate

14   districts 14 and 17?

15        A.    Yes.

16        Q.    Okay.  And you did not analyze

17   Senate district two in your effectiveness scores,

18   right?

19        A.    I did.  Not in the table, but I did.

20   You recall that I looked at the effectiveness

21   scores of all of the districts that were over 25,

22   but it's not included in the table.

23        Q.    So that's an interesting point,

24   Dr. Handley.

25        MS. RIGGINS:

                                                99


1              Can we turn to footnote 18 on

2              page 16 of your report?  Thank you,

3        Forest.

4     BY MS. RIGGINS:

5        Q.    Do you see here in footnote 18 that

6     it states that you examined the house and Senate

7     districts with BVAPs between 35 and 49.9 percent,

8     Dr. Handley?

9        A.    I do.

10       Q.    Okay.  And so I believe you

11    testified earlier that you examined the House and

12    Senate districts with BVAPs between two -- at

13    25 percent or higher?

14       A.    That's correct.

15       Q.    Okay.  So where are -- where is the

16    analysis for the districts between 25 and

17    35 percent?

18       A.    On a piece of paper on my computer.

19       Q.    So it's not -- does this refresh

20    your recollection, Dr. Handley, that you actually

21    only studied the House and Senate districts

22    between 35 and 49.9 percent BVAP?

23       A.    That's incorrect.

24       Q.    Fine.  So if you studied them,

25    Dr. Handley, did you report them anywhere in this

                                              100

1  report?

2          A.    I did not.

3          Q.    Thank you.  And because Senate

4  district two was majority minority, it does not

5  fall within the 35 to 49.9 percent range

6  referenced in this footnote?

7          A.    That's correct.  But of course, I

8  did do an effectiveness analysis of it.

9          Q.    That is not reported in this report?

10          A.    Correct.

11          Q.    Dr. Handley, I believe that Senate

12  district two was one of the election -- there was

13  some election contests that you examined for this

14  district; is that right?

15          A.    Can you point it to me?

16          Q.    Absolutely.

17          A.    I can't do that off the top of my

18  head.

19          Q.    Sure.  So it's in appendix B in your

20  report which is plaintiff's Exhibit 1.  I'd like

21  to look at the first election contest there.  Do

22  you have it there in front of you, Dr. Handley?

23          A.    Yes, I do.  But even better I have

24  it in front of me on the screen.

25          Q.    Yes.  Perfect.  Thank you.  Is the

1    first election that you analyzed in appendix B,

2    on the October 2015 election for State Senate

3    district two?

4            A.    That's correct.

5            Q.    Okay.  And did you determine,

6    Dr. Handley, that this October 2015 election for

7    State Senate district two was not polarized?

8            A.    Correct.

9        MS. RIGGINS:

10            And so, Dr. Handley -- Forest, you

11        can take PL 10 down.

12        TRIAL TECH:

13            (Complied.)

14        MS. RIGGINS:

15            Can we return to the chart of the

16        illustrative and enacted districts that we

17        were looking at before on page 21?

18        TRIAL TECH:

19            (Complied.)

20    BY MS. RIGGINS:

21            Q.    Thank you.  Dr. Handley, do you see

22    that on the screen in front of you?

23            A.    Yes.

24          Q.     So these scores are for the

25     illustrative and enacted districts as drawn,

102

1     correct, Dr. Handley?

2          A.     Yes.

3          Q.     So you did not do any analysis in

4     this report to determine the level of BVAP needed

5     at which a district would become effective in

6     providing a real particular opportunity for black

7     voters to elect their candidate of choice?

8          A.     Can you repeat the question?

9          Q.     Sure.  In this report, you did not

10    no analysis to determine the BVAP level at which

11    a district would become effective in providing

12    you realistic opportunity for black voter to

13    elect their candidate of choice?

14         A.     I looked at all of the illustrative

15    and enacted districts over 25 percent and

16    determined only districts over 50 percent would

17    elect with the one exception that is noted in the

18    footnote.

19         Q.     Sure.  And those results were only

20    reported for the districts over 35 percent and

21    lower than 49.9 percent unless they were included

22    in these tables; isn't that right, Dr. Handley?

23         A.    I didn't report them on for 35 to

24    49.9.  Either I merely said they are more

25    effective.

103

1          Q.    Okay.  And you did not anywhere in

2     this report, determine any specific level of

3     black voting age population for which a district

4     would become effective; isn't that right,

5     Dr. Handley?

6          A.    Become effective.

7          Q.    I'll rephrase the question?

8          A.    Okay.  Try that.

9          Q.    So you would agree with me,

10    Dr. Handley, that you looked at the illustrative

11    districts as drawn; is that correct?

12         A.    Yes.

13         Q.    And you examined the effectiveness

14    scores with the level of BVAP that was in the

15    districts as drawn?

16         A.    Correct.

17         Q.    And you did no other analysis to

18    determine if any of the illustrative BVAPs would

19    be effective at a different level of BVAP, did

20     you?

21          A.     I looked only at the districts as

22     drawn.

23          Q.     So the answer to my question is that

24     you did not do any analysis to determine a

25     different level of BVAP needed?

                                                    104


1          A.     Different than other than what was

2     drawn.

3          Q.     Correct.

4          A.     I believe that's correct, if I

5     understand your question, yes.

6          Q.     And, Dr. Handley, haven't you found

7     in some jurisdictions that sometimes a majority

8     black district is not necessary to elect a black

9     preferred candidate?

10          A.     Yes.

11          Q.     And, Dr. Handley, did you co-author

12     an article that was published in 2019 that

13     discussed the increased ability of black

14     preferred candidates to win districts that were

15     between 40 and 50 percent black?

16          /STPHAO.

17               Your Honor, we are just going to

18          object.  We think questions about that are

19          outside the scope of the direct.

20     THE COURT:

21               The 2019 article?

22     /STPHAO.

23               Yes, the 2019 article.

24     THE COURT:

25               Your question about the 2019 article

                                                        105

1          is what Ms. Riggins?

2     MS. RIGGINS:

3               I asked Dr. Handley if she

4          co-authored this article that examined the

5          ability of black preferred candidates to

6          win in districts that were between 40 and

7          50 percent black so less than majority

8          minority.

9     THE COURT:

10               I'm going to overrule the question,

11          the whole question and Dr. Handley's

12          entire opinion is racial polarized voting

13          so this is contrary to the courts

14          understanding of racial polarized voting.

15     MS. RIGGINS:

16          Thank, you Your Honor.  Forest, can

17     we please pull up this article so that Dr.

18     Handley can identify it.  It's secretary

19     of state 36.

20     TRIAL TECH:

21          (Complied.)

22  BY MS. RIGGINS:

23          Q.    Dr. Handley, do you see it on the

24  screen in front of you?

25          A.    I do.

                                        106


1          Q.    Okay.  And is this an article that

2  you co-authored in 2019?

3          A.    It was published in 2019.  I think

4  we wrote it years before that, but.

5          Q.    Oh, I apologize.  Is this an article

6  that you published with several co-authors in

7  2019?

8          A.    Yes.

9          Q.    Thank you.  All right.  And

10  Dr. Handley, do you recall if Louisiana was one

11  of the states that you and your co-authors looked

12  at in drafting this article?

13          A.    Yes.  We grouped the south together

14    and Louisiana was one of the states included in

15    the south.

16         Q.    Thank you.  And in this article,

17    didn't you and your colleagues find that white

18    Democrats are more likely to vote for a black

19    Democrat than a white Republican?

20         A.    I don't remember that across the

21    board, but can you point to what you're referring

22    to.

23         MS. RIGGINS:

24              Sure.  Can we please go to page 280

25              of this article?

                                                    107


1         TRIAL TECH:

2              (Complied.)

3    BY MS. RIGGINS:

4         Q.    And this is sort of one of the

5    paragraphs so I apologize, Dr. Handley.  We are

6    looking towards -- there we go -- the middle of

7    the paragraph do you see a sentence that starts

8    the increase in political polarization suggests

9    that comma?

10         A.    I do.

11         Q.    Okay.  And does this refresh your

12    recollection that when you look at the sentence

13    you and your co-authors concluded that white

14    Democrats are more likely to vote for an

15    African-American or latino Democrat than a white

16    Republican?

17         A.    Yes.  It offers this as a reason

18    possibly for the increase in the number of

19    districts that were less than majority minority

20    in composition for electing minority preferred

21    candidates.

22         Q.    And this was because of increased

23    political polarization; is that right,

24    Dr. Handley?

25         A.    Yes.

108

1         Q.    And didn't you and your co-authors

2    also find that so long as Republicans did not

3    constitute a majority of voters in a district,

4    but in general a minority candidate had a better

5    opportunity to get elect indeed a 40 to

6    50 percent BVAP district?

7         A.    Well, you would look at that in each

8    specific location, but in general, that's what we

9    found, yes.

10        Q.    Thank you.  And, Dr. Handley, didn't

11   you determine that enacted house district 91 in

12   this case was effective with a BVAP of 41.7?

13        A.    I don't remember the BVAP, but you

14   can point it out to me.  I'm willing to believe

15   that you know what it is.

16        Q.    Sure?

17        A.    But I did say that there was a

18   district that was -- it's majority minority it's

19   not a majority white district it's a majority

20   minority district and it is BVAP.

21        Q.    Sure.  Dr. Handley, I don't want you

22   to guess for us.  Could we please return to

23   plaintiff's Exhibit 1 on page 16 and we are

24   looking at footnote 18 again.  All right.

25   Dr. Handley, does this refresh your recollection

                                              109


1    that you concluded that the proposed State house

2    district 91 in the enacted state house plan in

3    the illustrative plan was effective with a BVAP

4    of 40.7?

5         A.    Yes.

6         Q.    Thank you.  So, Dr. Handley, we

7    briefly discussed earlier and you discussed on

8   direct early voting as it pertains to the 2020

9   election.

10        MS. RIGGINS:

11             So I'd like to look at footnote 8 on

12         page 6 of your report, if we could,

13         please.

14        TRIAL TECH:

15             (Complied.)

16   BY MS. RIGGINS:

17        Q.    And I believe you explained this

18   earlier.  Is this footnote an example of how you

19   allocated early votes to precincts in this

20   report, Dr. Handley?

21        A.    Yes.

22        Q.    And you followed this allocation

23   method for every area of interest that you

24   studied and every election that you analyzed in

25   this report; isn't that right, Dr. Handley?

                                           110


1        A.    Yes.

2        Q.    Okay.  And, Dr. Handley, do I

3   understand from your deposition testimony that

4   you acknowledge that your allocation method in

5   some instances resulted in candidates being

6    allocated more votes than those cast in the

7    precinct?

8         A.    More votes than turn out I think is

9    what you mean.

10         Q.    Yes, Dr. Handley.  You acknowledge

11    that your allocation method at the precinct level

12    sometimes results in a candidate being allocated

13    more votes than the total number of votes cast in

14    that precinct?

15         A.    No.  That's incorrect.  It was turn

16    out.

17         Q.    Then I apologize, Dr. Handley.  So

18    you acknowledge that your allocation method

19    resulted in candidates being allocated more votes

20    than the total number of voter turn out in that

21    precinct?

22         A.    That's correct.

23         Q.    And, Dr. Handley, do you recall if

24    you knew about this over allocation before your

25    expert report was produced in this case in June

                                              111


1    of 2023?

2         A.    Yes.  I recall.  I do know that this

3    was happening, yes.

4        Q.    Okay.  And you did not report that

5   anywhere in your June 2023 report, did you?

6        A.    No.  I supplied the database.

7        Q.    And the database shows that in

8   certain precincts certain candidates were

9   allocated more votes than the voter turn out; is

10  that right?

11       A.    Correct.

12       Q.    And, Dr. Handley, I think that you

13  testified on direct earlier that you examined

14  whether this would cause any potential bias in

15  your analysis; isn't that right?

16       A.    Correct.

17       Q.    And you conducted this analysis in

18  part in response to expert reports prepared by

19  Dr. Solanky; isn't that right?

20       A.    Yes.

21       Q.    And, Dr. Handley, I would like to

22  look at plaintiff's Exhibit 17 briefly.

23       TRIAL TECH:

24            (Complied.)

25  BY MS. RIGGINS:

                                                    112


1        Q.    Do you recognize this appendix

2    that's been marked as plaintiff's Exhibit 17?

3        A.    Yes.

4        Q.    And did you prepare this appendix,

5    Dr. Handley?

6        A.    Yes.

7        Q.    And was this appendix submitted with

8    your sur rebuttal report in September of 2023?

9        A.    It was submitted with the report.  I

10   don't know that it was called a surrender

11   rebuttal report, but this is appendix two in my

12   reports.

13       MS. RIGGINS:

14            Sure.  Forest, could we please call

15       up plaintiff's Exhibit 16?

16   TRIAL TECH:

17            (Complied.)

18   BY MS. RIGGINS:

19       Q.    I'm sorry, Dr. Handley.  I misquoted

20   you.  It's a supplemental rebuttal report was

21   appendix A appendix?

22       A.    Yes.

23       MS. RIGGINS:

24            And could we flip to the last page

25       in this document, Forest?

1          TRIAL TECH:

2               (Complied.)

3     BY MS. RIGGINS:

4          Q.    Oh, I'm sorry.  It has the

5     appendices still attached to it.  Could you look

6     at page 3 of the document then?  Page 4?  What

7     date did you execute this supplemental rebuttal

8     report, Dr. Handley?

9          A.    September 29th, 2023.

10         Q.    Okay.  And that was after you had

11    had Dr. Solanky's expert reports for over a

12    month; is that right?

13         A.    I don't know when I got his reports.

14         Q.    But you authored this after you had

15    both of Dr. Solanky's expert reports submitted in

16    this case?

17         A.    Certainly, after one of them.  I --

18    I don't even remember how many he submitted.

19         Q.    Sure.  Dr. Handley, do you recall

20    that this expert report was submitted after your

21    deposition in this case?

22         A.    It was.

23         MS. RIGGINS:

24              All right.  And so back to

25          plaintiff's Exhibit 17, please, Forest.

114

1          TRIAL TECH:

2                  (Complied.)

3     BY MS. RIGGINS:

4          Q.     All right.  So, Dr. Handley, you

5     prepared this table and it reports early vote

6     totals for the 16 statewide election contests; is

7     that right?

8          A.     No.  No, not exactly.

9          Q.     All right.  Let's look through just

10    one example then.  So for the November 2022

11    election, do you see that on the first page?

12         A.     Yes.  Let me explain what I mean.

13         Q.     Sure.

14         A.     This is for the actual election

15    date, not for the 16 elections that I looked at

16    unless the 16 elections all occurred on different

17    election dates.  So it is probably less than 16.

18         Q.     I thank you for that clarification,

19    Dr. Handley.  I apologize for my immaterial

20    precise question.  So does appendix A generally

21    then report the percentage of early voters that

22    voted on election day or for that election

23    contest that you studied?

24        A.    For the election day, not for the

25    election contest.

1        Q.    Okay.  And so you looked at the U.

2    S. Senate election that occurred on the election

3    day for November 2022; is that right?

4        A.    So this looks at the election as a

5    whole.  I analyzed the Senate election.

6        Q.    Thank you.  That's what I was trying

7    to get at.  And what is the percentage of people

8    who voted early in the November 2022 election

9    total?

10        A.    26.8 percent.

11        Q.    Okay.  And, Dr. Handley, looking at

12    plaintiff's Exhibit 17 as a whole, do you ever

13    see a total percent of early voters lower than

14    20 percent?  And if you would like to ask

15    Mr. Forest to flip through this exhibit for you,

16    please let me know?

17        A.    He will have to flip through it for

18    me to look at that.

19        Q.    Please let me know when you've had

20    sufficient time to review the first page?

21          A.    I've had sufficient time.

22          Q.    Thanks.  Okay.

23          A.    I've had sufficient time.  I've had

24    sufficient time.

25          Q.    All right.  So, Dr. Handley, do you

                                                    116


1    ever see here in appendix A a total percent of

2    early voters lower than 20 percent for the total?

3          A.    No.  There are a couple at 20.6 or

4    7, but nothing below 20 percent.

5          Q.    Okay.  And what is the percent of

6    early vote for the November 2019 election?

7          A.    33.2 percent.

8          Q.    Okay.  And so that's approximately a

9    third of the voters for that November 2019

10    election; is that right?

11          A.    Correct.

12          MS. RIGGINS:

13                And, Your Honor, if I may have a

14          minute just to consult with my co-counsel

15          I may be done, but I want to make sure.

16          THE COURT:

17                Go ahead.

18    BY MS. RIGGINS:

19          Q.    Dr. Handley, as my co-counsel has

20   reminded me, I neglected to ask you a question on

21   my outline.  Dr. Handley, do you recall our

22   discussion earlier today about endogenous

23   elections?

24          A.    Yes.

25          Q.    And do you understand that elections

                                                    117

1   have been held in Louisiana under the enacted

2   plans in this October and November?

3          A.    Yes.

4   MS. RIGGINS:

5               And, Your Honor, at this time, we

6          would like to conclude our examination of

7          Dr.  Handley.  We would however,

8          Your Honor, for the record, like to note

9          that we believe plaintiff's counsel opened

10          the door by asking Dr. Handley to opine on

11          how other experts treat her allocation

12          method and the level of bias.  We raised

13          these objections earlier, but we think,

14          Your Honor, that you know, plaintiff's

15          counsel has opened the door to allow

16          Dr. Handley to or I'm sorry, Dr. Solanky

17          to testify about this, the reports that

18          were excluded go to Dr. Handley's bias in

19          her allocation method.  We would

20          respectfully request, Your Honor, that you

21          reconsider your ruling and allow

22          Dr. Solanky to testify at least in the

23          limited capacity as to the potential bias

24          and reliability caused by Dr. Handley's

25          allocation method.

                                                118


1           THE COURT:

2                You want to respond?

3           MS. BRANNON:

4                Your Honor, I think your opinion on

5           this matter squarely addressed that

6           question of whether Dr. Solanky's opinions

7           about bias in Dr. Handley'S allocation

8           method was reliable or not reliable and I

9           think Your Honor has already ruled and

10          found that Dr. Solanky's opinions on that

11          topic are not reliable and that is the

12          basis for why you excluded his testimony

13          initially.

14          THE COURT:

15          Okay.  The court is not persuaded

16     that by asking Dr. Handley about the

17     reliability or bias of her calculations

18     and analysis opens the door.  Even if it

19     does open the door, it hadn't -- it

20     doesn't there by convert Dr. Solanky's

21     opinion testimony to reliable or well

22     grounded in facts and data which was the

23     court's basis for excluding Dr. Solanky,

24     so the open the door argument while novel

25     and yeah, novel, it's not -- it's not

                                             119


1      persuasive.  It doesn't there by convert

2      Dr. Solanky's opinions to that of reliable

3      opinions that are required by 702 so your

4      motion is denied.

5      /SKWRAO.

6          Thank you, Your Honor.  We

7      appreciate your consideration.

8      THE COURT:

9          Redirect, please?

10     MS. BRANNON:

11         Yes, Your Honor.

12   EXAMINATION BY MS. BRANNON:

13          Q.    Dr. Handley, defense counsel just

14    asked you about elections in October of 2023 and

15    November of 2023.  Prior to that date, were there

16    any endogenous elections available for you to

17    analyze in your report in this case on the

18    enacted maps that this case is about?

19          A.    No.

20          Q.    Okay.  Have you looked at just

21    briefly the elections that were held in October

22    of 2023 and November of 2023?

23          A.    I have looked at the results.  I

24    have not done a racial polarization analysis.

25          Q.    And as we established for the record

                                                  120


1    your report in this case, initial report was put

2    into evidence in June of 2023 well in advance of

3    those elections?

4          A.    Correct.

5          Q.    Of those elections that took place

6    in October of 2023, how many contested elections

7    were there in the enacted districts that you have

8    analyzed in your report?

9          A.    Off the top of my head, like half of

10    the enacted districts did not have elections.

11     There were no contested elections.  But I don't

12     -- but you asked me about the enacted districts

13     in my report.

14          Q.    In your report, if you know.  If you

15     don't know --

16          A.    I don't know.  All I can tell you is

17     about 50 percent of the districts overall were

18     not contested.

19          Q.    And if there's not a contested

20     election, you couldn't do an endogenous

21     evaluation -- an endogenous RPV analysis any way

22     correct?

23          A.    If there's no election I can't

24     analyze it, that would be correct.

25          Q.    Okay.  In your opinion, counsel was

                                                    121


1     asking you about area -- area of interest three

2     and area of interest seven.  In your opinion, is

3     it fair to say that the white voters as a block

4     voted against the black preferred candidate in

5     the elections you evaluated in area three?

6          A.    Yes.

7          Q.    Is it fair to say that in your

8     opinion white voters voted as a block against the

9    black preferred candidate in the elections that

10    you analyzed in area seven?

11        A.    Yes.

12        Q.    You acknowledge that the EI analysis

13    that you conducted for the presidential election

14    for 2020 was problematic, but do you have an

15    opinion as to whether that analysis was useful to

16    your overall racially -- racial polarization work

17    in this case?

18        A.    Well, I looked at all contests that

19    it was possible to look at.  I merely suggested

20    that this one was less probative than others

21    simply because 45 percent of the votes were cast

22    early and had to be allocated.

23        Q.    Did it have any probative value to

24    your racial Polar vacation analysis?

25        A.    Yes.  Or I would have included it.

                                    122

1        Q.    And was it valuable to you in

2    reaching your opinions in this case that there's

3    polarized voting in the areas of interest you

4    looked at in Louisiana?

5        A.    Yes.

6        Q.    Okay.  Counsel asked you about the

7    data that was allocated by the ACLU analytics

8    team including the work they did to disaggregate

9    the census data down to the block level for the

10   data that was used -- used in your effectiveness

11   scores.  Did you review the work of the ACLU

12   analytics team?

13        A.   Yes.

14        Q.   And did you verify the accuracy of

15   that work?

16        A.   Yes.

17        Q.   And you feel confident in relying on

18   the work that they did?

19        A.   Yes.

20        MS. BRANNON:

21             Can we call up secretary of State's

22        Exhibit 36?

23        TRIAL TECH:

24             (Complied.)

25        MS. BRANNON:

123

1             And can we turn to Table 2?

2         TRIAL TECH:

3             (Complied.)

4    BY MS. BRANNON:

5          Q.    I'm sorry.  This is a table from the

6    report that defense counsel -- that defense

7    counsel asked you about, correct?

8          A.    Yes.

9          Q.    Does this table reflect any specific

10   Louisiana data?

11         A.    This aggregates the southern states

12   I think the 11 states of the confederacy, I don't

13   remember off the top of my head.  It included

14   Louisiana it doesn't differentiate Louisiana from

15   the other states this is a compilation of all of

16   the southern states.

17         Q.    Do you know the specific Louisiana

18   data from the 2015 elections that contributed to

19   this table?

20         A.    I do because I did a special

21   representation it's called a threshold

22   representation.  I know how many majority black

23   districts and how -- elected black candidates and

24   I know where the black representatives came from.

25   And I can tell you in 2015, Louisiana contributed

                                                     124

1    0 to the number of black candidates being elected

2    from non majority black districts at the house

3    level, at the U.S. house level and 0 at the

4    Senate level and one district at the state house

5    level.

6        MS. BRANNON:

7            Can we turn to Table 3, which I

8        believe is on the next page of S O S 36?

9        TRIAL TECH:

10            (Complied.)

11   BY MS. BRANNON:

12        Q.    Is this another table from your

13   report?

14        A.    It is.

15        Q.    Does this table compare performance

16   in different elections in state and house

17   legislative elections around the country looking

18   at how black candidates are performing in

19   different ranges of the BVAP population?

20        A.    It is looking at the number of

21   districts in that range that elected black

22   candidates to office.

23        Q.    And are the -- some of the ranges

24   that are listed in this table, BVAP from 40 to 45

25   and then BVAPs from 45 to 50?

1          A.    Yes.

2          Q.    Are you aware of any district in the

3   -- enacted map in Louisiana in the Senate that

4   has a BVAP between 40 and 50 percent?

5          A.    In the enacted plan, no.  There are

6   none.

7          Q.    Are you aware of any district in the

8   enacted plan in the house that has a BVAP between

9   40 and 50 percent?

10         A.    There might be one.

11         Q.    Are there any -- if there's one is

12  there any more than to the best of your

13  recollection?

14         A.    To the best of my recollection, no.

15         MS. BRANNON:

16              Can we go back to your in areas of

17              interest for -- which is Table 2, can we

18              go back to Table 2 in plaintiff's Exhibit

19              PL 1?

20         TRIAL TECH:

21              (Complied.)

22  BY MS. BRANNON:

23         Q.    Can you just refresh for the court

24  what parishes were evaluated in area three?

25         A.    Baton Rouge, west Baton Rouge,

1    Iberville and Pointe Coupee.

2          Q.    So does that mean you did a racially

3    polarized voting analysis of all of those

4    parishes as part of the analysis you did for area

5    three?

6          A.    Correct.

7          Q.    And so you would have looked at

8    voting behavior in all four of those parishes?

9          A.    Correct.

10         MS. BRANNON:

11               And then can we also turn to page 22

12               of Dr. Handley's report which is a picture

13               of Senate cluster three.  That's the

14               illustrative.  Can we look at the enacted?

15               There we go.

16         TRIAL TECH:

17               (Complied.)

18   BY MS. BRANNON:

19         Q.    So you did a racially polarized

20   voting analysis of all the voting patterns in a

21   number of the parishes that are reflected on this

22   map?

23         A.    Correct.

24        Q.    And that would have included some of

25   the analysis of the voting patterns in CD 2?

                                              127


1         A.    In -- I'm sorry.

2         Q.    CD 2, which is on this map as being

3    part of the west Baton Rouge and Iberville and

4    Baton Rouge CD 2?

5         A.    State Senate district two.

6         Q.    Oh, sorry.  Sorry.  SD 2, State

7    Senate district 2?

8         A.    Yes.

9         Q.    To clarify I was asking about state

10   Senate district two which is on this map.

11              And you were asked a few more

12   questions about the allocation methodology that

13   you used.  If we go back maybe it's easier to

14   just go back to plaintiff's Exhibit 19.

15   TRIAL TECH:

16              (Complied.)

17   BY MS. BRANNON:

18        Q.    These reports, this scatter plot

19   that's shown in Exhibit 19, demonstrates that the

20   -- there was similarity in the polarization of

21   voting early and on election day in the elections

22    that you looked at, correct?

23          A.    Yes.

24          MS. BRANNON:

25                Let me just confer with my team.

                                                    128


1    BY MS. BRANNON:   Just one final question, Dr.

2    Handley.  You were asked some about the fact that

3    the allocation method in some precincts leads to

4    an over or under count of votes.  Does that

5    effect the validity of your opinions about the

6    polarization.

7          A.    No.

8          Q.    And can you explain why?

9          A.    Several reasons.  First of all, I

10   used portions when I did my analysis.  I didn't

11   actually use votes, I used the proportioned vote

12   the and the proportion of black and white turn

13   out when I did the analysis.  But also because

14   there -- I don't believe there was any bias

15   introduced by over and under votes.

16         MS. BRANNON:

17                Okay.  Nothing further.  Thank you

18         very much, Dr. Handley.

19         THE COURT:

20          Okay.  You may step down.  Thank

21          you, ma'am.  All right.  We will be in

22          recess until 1:00 p.m.

23          THE BAILIFF:

24          All rise.  The court's in recess.

25      (A lunch recess was taken at 11:48 a.m)

➤

                                        129


1       THE BAILIFF:

2           All rise.

3       THE COURT:

4           Good afternoon, be seated.  Next

5       witness.

6       MS. KEENAN:

7           Your Honor, plaintiffs call

8       Dr. Craig Colten.

9               CRAIG COLTEN,

10  after having first been duly sworn by the

11  above-mentioned Court Reporter did testify as

12  follows: Suzie

13      THE BAILIFF:

14          Would you please state your name and

15      spell it for the record?

16      THE WITNESS:

17          My name a Craig Colten, C-R-A-I-G,

18      C-O-L-T-E-N.

19      MS. KEENAN:

20          Your Honor, before we get started

21      I'd like to hand Dr. Colten a binder with

22      several exhibits marked in this case.  May

23      I approach?

24      THE COURT:

25          You may.

                                              130


1       /SKWRAO

2           Counsel, you have another book.

3       /STPHAO.

4           Yes.  And, Your Honor, just to state

5       during Dr. Handley's ***expectation, would

6       you like us to produce the exhibits at the

7       outset or after tender him as an expert.

8       THE COURT:

9           If there's no objection go ahead and

10      offer them.  Might waive if you are going

11      to cross on the tender, Mr. Clark.

12      /SKWRAO.

13          Your Honor, I am not going to cross

14      on the expertise.  I have no objection to

15      the admission of the report.

16          THE COURT:

17                Or his CV?

18          /SKWRAO.

19                No, ma'am.

20          THE COURT:

21                Okay.  Go ahead and move the

22          admission.

23          /STPHAO.

24                Your Honor, we will move for the

25          admission of Plaintiff's 129, 130, 131 and

                                                131


1          132.

2          THE COURT:

3                The exhibits are admitted.

4          EXAMINATION BY MS. KEENAN:

5          Q.    So, Dr. Colten, I'd like to start by

6    asking you a few questions about your

7    qualifications as an expert.  Could you turn to

8    Tab 1 of the binder you have in front of you?

9          A.    Yes.

10          Q.    And what is the document in Tab 1?

11          A.    It's my curriculum vitae.

12          Q.    Let the record reflect that

13    curriculum vitae is plaintiff's Exhibit 130.

14    Dr. Colten, could you tell us what positions you

15    currently hold?

16        A.    My main position is professor

17    emeritus which basically is I'm retired from the

18    Louisiana State University from geography and

19    anthropology.  I also hold a position of senior

20    advisor to the water institute of the gulf here

21    in Baton Rouge.

22        Q.    And prior to your retirement, how

23    long where are you a professor?

24        A.    I was an active full-time professor

25    for 21 years here in Baton Rouge and four years

                                                    132

1    in Texas.

2        Q.    Were you tendered prior to your

3    retirement?

4        A.    Yes, I was.

5        Q.    And at your retirement, did you hold

6    any specific title at LSU?

7        A.    Yes.  I hold the Carl /SAL professor

8    of geography.

9        Q.    And what's that?

10        A.    It's an honor area title awarded to

11    people who have distinguished themselves in the

12    course of their career.

13        Q.    Could you tell me about your

14    educational background?

15        A.    Certainly.  I received my bachelor

16    of arts degree here at LSU in 1974, my master of

17    arts at Baton Rouge at LSU in 1978, and my PhD

18    from Syracuse University in 1984.

19        Q.    And what subject was each of your

20    degrees in?

21        A.    Each degree was in geography.

22        Q.    Have the courses you've taught as a

23    professor specialized in any area?

24        A.    Yes.  They have all been -- well,

25    most of them have been in geography.

                                                    133


1         Q.    All right.  And do you view

2    geography through any specific lens in your work

3    as a professor and reserver?

4         A.    Yeah.  My training was in historical

5    geography.  I continue to pursue that in my

6    research and my teaching.

7         Q.    How would you define historical

8    geography?

9         A.    A very shorthand way of saying it is

10    we study past geographies what are the processes

11    and movements of people and things that create a

12    place in the past, we go back and try to

13    reconstruct that.  What -- how a place evolves

14    over time and historic, for example, tend to

15    organize things chronologically historical first

16    a place and space nor organize things, so that's

17    a principal framework of what we do.

18         Q.    Have you taught any courses on

19    historical geography?

20         A.    Yes.  I've taught both undergraduate

21    and a graduate course in historical geography.

22         Q.    And what kind of things do you cover

23    in your course on historical geography?

24         A.    My -- my undergraduate courses is

25    typically organized into three major sections,

                                              134


1    the first being a review of the majority figures

2    in the field, their contributions in terms of

3    concepts and theories.  A second phase looks and

4    methods and sources to go to constructing past

5    geographies.  I have taught students how to do

6    that and then the third, is where you are a case

7    studies where experts in the field have actually

8    done this.  We try to critique their ideas, point

9    out really the favorable excellent examples of

10   peopling doing historical geography.

11        Q.    Have you also supervised

12   dissertations related to historical geography?

13        A.    Yes.  I've supervised a number of

14   dissertations in several and historical

15   geography.

16        Q.    Apart from your role as professor,

17   have you held any other affiliations or roles in

18   the field of historical geography?

19        A.    In my first job after my PhD, was I

20   -- was recruited to be a historical geography

21   with the state of Illinois.

22        Q.    How long were you within that

23   position?

24        A.    I was with the department of US

25   ***Geological Survey with the state nearly a

                                                    135


1    decade a few months shy of a decade.

2        Q.    And you mentioned role.  Role with

3    the water institute of the gulf.  Can you tell me

4    a little bit about your role there?

5        A.    Yes, I was brought on in a half time

6    position more or less.  I retained my position at

7    LSU, but also worked more or less as a director

8    of human dimensions.  They are a basic applied

9    research organization here in Baton Rouge and my

10   job was to implement the work of the physical

11   scientists looking at issues related to coastal

12   land loss and hydrology and to try to introduce

13   how people fit into that picture, how -- how

14   humans and society should be factored into the

15   research they were doing and how it might expand

16   their understanding.

17       Q.    When you talk about the human

18   dimension, could you tell us a little bit about

19   whether you've ever studied historical

20   communities in your field of historical geography

21   and how that works?

22       A.    Certainly, yeah.  From -- from my

23   dissertation, research, I've looked very careful

24   at communities.  My dissertation looked at how

25   communities and groups of people migrate from the

                                                    136


1    eastern satisfy board to the state of Ohio and

2    how they used religious institutions to kind of

3    recreate a common communities, communities that

4    were familiar to them on this frontier setting in

5    the time in the early 19th century.  When I came

6    here to Baton Rouge, I started doing a series of

7    studies on environmental justice for the

8    department of -- of minerals management service

9    which is part of the department of the interior,

10   so we looked at community formation as expressed

11   through racial communities and low income

12   communities all my workover the last 10 or

13   12 years has looked at topics such and social

14   memory and community resilience to understand how

15   communities are able to survive and recover and

16   rebound from disastrous environmental events.

17        Q.    So you started to talk a little bit

18   about your work outside of T J, have you

19   published any peer-reviewed books or articles?

20        A.    Quite a number, yes.

21        Q.    Approximately how many peer-reviewed

22   books have you published?

23        A.    I've I've been author co-author for

24   I think six.

25        Q.    And what about articles, how many

137

1    peer-reviewed articles have you published?

2          A.     Articles and book chapters number

3     about a 100.

4          Q.     Okay.  Are any of those books or

5     articles listed in your CV?

6          A.     My CV list is a selected group of

7     them, but some of them are, yes.

8          Q.     Okay.  Have those research in

9     /PURBLZ efforts focused on any particular subject

10    matter?

11         A.     For of the -- of the early part of

12    my career, I was studying mainly environmental

13    issues particularly as if relates to hazardous

14    waste and social and environmental impacts of

15    hazardous waste disposal.  More recently my work

16    has tended to look at human environment

17    interactions particularly as it relates to

18    dealing with -- with hazardous events such as

19    Hurricane Zetas and floods and those kinds of

20    things and how community helps people to rebound

21    from those sort of events.

22         Q.     And how do those focused events

23    relate to your historical field of geography?

24         A.     They all -- all my work has a

25    historical depth to it.  I don't start just with

1    the present and try to explain what's going on

2    now.  I look at -- I  -- each -- each study may

3    start at a different time in the past, but

4    there's a historical depth in the basic purpose

5    to show how things change over time or how things

6    are different or were different in the past than

7    they are today.  But always connecting to the

8    present to show that there is continuity that the

9    past is connected to the present.

10           Q.     How many pouch Louisiana

11   specifically?

12           A.     Well, not really counting the term

13   papers.  I did graduate school, I began work on

14   Louisiana topics specifically in about '96, '97,

15   and have done that to the present.

16           Q.     Have you published any of those

17   peer-reviewed articles or books you mentioned on

18   the topic of historical geography of Louisiana

19   specifically?

20           A.     Yes, I have, quite a number.

21           Q.     And could you give us new examples?

22           A.     The -- the book I did in 19 -- or

23   that came out in 2005 unnatural in respect to

24   /HRUS very much it was historical geography of

25    environmental change in New Orleans.  My most

139

1    recent book, "State of Disaster", is an example.

2    Another book, "Perils in place", is another

3    example of that contracted by the Corps of

4    Engineers and another book, "Southern Waters",

5    includes Louisiana, but it really looks at the

6    broader region of the south.

7        Q.    What about any textbooks have you

8    ever authored or co-edited any textbooks related

9    to historical geography in Louisiana?

10        A.    I co-authored a textbook

11    specifically about the geography of Louisiana

12    yes.

13        Q.    Okay.  Have you received any

14    academic awards or professional honors for your

15    work?

16        A.    Yes, I have.

17        Q.    Could you give us any examples of

18    those?

19        A.    My university awarded me an what

20    they call a rain maker award a few years ago.  I

21    received a couple of national book awards for the

22    book I mentioned earlier unnatural met respect to

23    lis from -- one from the principal geography

24    organization in the country, American Association

25    of Geographer as well as another organization,

140

1    and then recently, I was -- I received the

2    Gilbert white public service honor for the

3    American Association of Geographies.

4          Q.    And what is that that honor that you

5    mentioned?

6          A.    That one is it's awarded to very

7    selective process where nominations go forward to

8    a committee within the association and they

9    select various honoraries for different awards in

10   the course of a year, so it's once a year this

11   award is given out if there's a recipient.

12         Q.    And what about the rain maker award

13   you mentioned from LSU could you explain that?

14         A.    Again, that's a process.  There's a

15   process of selection that goes on within the

16   university administration that seeks to recognize

17   people in different areas of expertise for their

18   contributions in terms of bringing in funded

19   research grants that come in through the

20   university and then publishing the findings from

21    that research.

22         Q.    Dr. Colten, could you explain in

23    general terms the methodology that you've

24    employed to analyze the historical geography of

25    Louisiana?

141

1          A.    Certainly.  And this goes beyond

2     Louisiana.  The first step is really defining a

3     reasonable research question that gives you the

4     basis for the work that follows.  Once the

5     research question is developed, you begin to

6     investigate where primary and secondary sources

7     are what the literature says about the topic,

8     where the gaps are in the literature what the

9     unanswered questions are that you might seek to

10    answer and you assemble credible authoritative

11    resources literature and other primary sources.

12    You analyze that typically in an conductive

13    fashion you can't do lab experiments in

14    historical geography and then you produce a

15    written report whether it be a book or article or

16    articles.

17         Q.    And is that kept with the approach

18    you took in developing your report in this case?

19          A.     Yes, it is.

20          Q.     Is that approach consistent with the

21   generally accepted standards in the field of

22   historical geography?

23          A.     Yes, I believe it is.

24          Q.     Dr. Colten, have you ever testified

25   in court before as an expert in a redistricting

                                                142

1    case?

2           A.     No.

3           Q.     Have you offered expert reports or

4    opinions in other cases?

5           A.     Yes, I have.

6           Q.     About how many times?

7           A.     I've been deposed in the

8    neighborhood of 25 times.  I think court

9    testimony and other cases a handful of times,

10   three, four maybe.

11          Q.     And have you offered reports in

12   cases where you didn't testify or were deposed?

13          A.     Yes, quite a number.

14          Q.     In what field were you qualified as

15   an expert in those cases?

16          A.     As far as I recall, that was a

17    historical geography.

18         Q.    And when was the first time you were

19    deposed as an expert in historical geography?

20         A.    I believe that was '93.  I can --

21    yes.  1993.

22         Q.    And what's the most recent time

23    you've offered expert testimony as a historical

24    geography prior to today?

25         A.    Last year.

                                          143


1         Q.    Was your expert testimony accepted

2    by the court in each of those cases to the best

3    of your recollection?

4         A.    Yes.

5         Q.    And are you aware of any instance in

6    which your testimony or opinion as an historical

7    geographer has been included by a court?

8         A.    No.  I'm not.

9    MS. KEENAN:

10             Your Honor, at this point, the

11             plaintiffs offer Dr. Colten as an expert

12             in the historical geography of Louisiana.

13             /SKWRAO.

14             As we stated, Your Honor, no

15          objection.

16          THE COURT:

17              Okay.  Dr. Colten will be accepted

18          by the court to give opinion testimony in

19          the historical geography of Louisiana.

20          You may proceed.

21  BY MS. KEENAN:

22          Q.    Dr. Colten, could you turn to tab***

23  of the binder in front of you which is

24  plaintiff's Exhibit 129?

25          A.    Yes.

                                        144


1           Q.    What is this document?

2           A.    This is my preliminary expert report

3   submitted last year.

4           Q.    And what was your assignment in

5   preparing this initial report?

6           A.    I was asked to assemble quantitative

7   and qualitative information to try to map out and

8   understand the location of communities of

9   interest within several specific sections of the

10  state.

11          Q.    And would you please before we get

12  into that report, would you please turn to Tab 3,

13    which is plaintiff's Exhibit 131?

14         A.    Yes.

15         Q.    What is that document?

16         A.    That is a supplement to my initial

17    expert report.

18         Q.    And what was your assignment in

19    preparing this report?

20         A.    This was supplemental.  I was asked

21    to review the legislative Senate and House

22    districts and compare the boundaries of those

23    districts in terms of their geographic

24    correspondence to historical communities of

25    interest.

                                        145


1          Q.    Okay.  Now, before we get too much

2    farther into your opinions, could you clarify how

3    you are using the term communities of interest as

4    you used it in your reports.  I'm not asking for

5    any sort of legal definition.

6          A.    When I was asked to participate in

7    this case, I turned first to a number of

8    geographers who had done work on redistricting

9    and specifically the topic of communities of

10    interest.  And I found their definition

11   corresponded with that of a broader groups, but I

12   typically look at a community of interest as a

13   group of people with comparable, similar social

14   cultural, economic political interests within a

15   given territory.

16        Q.    And how do you identify communities

17   with shared cultural histories or interests?

18        A.    I'm sorry.

19        Q.    How do you identify communities that

20   have shared cultural histories or interest?

21        A.    Thank you.  One of the basic ways of

22   doing this is I investigate first, the long-term

23   process of settling how these people have come --

24   how people have document be in a given place,

25   what is the continuity of their presence in that

146

1   place, have there been interactions with other

2   groups, have they sustained group identity over

3   time and remain an a coherent group with shared

4   interests.

5        Q.    Where in the state did you try to

6   identify those historical communities?

7        A.    I'm sorry.  What was it?

8        Q.    I'm sorry.  Where in the state did

9       you try to identify those shared communities?

10              A.      In the -- the initial report there

11      is a map that can help us see that, but it was

12      basically the upper Red River Parishes which is

13      basically from Natchitoches or excuse me, from

14      Alexandria northward to the northwest corner.

15      The state I was asked to look at Acadiana which

16      is a large triangular area that radiates from

17      Avoyelles to the north which is more central

18      Louisiana down to the map of the Sabine river in

19      the southwest down into lower Lafourche Parish

20      and parts of the lower Mississippi River.  I was

21      also asked to look at the river parishes meaning,

22      the Mississippi River parishes and I -- I chose

23      to look at those parishes mostly on the Westbank

24      from Pointe Coupee Parish down to Jefferson

25      Jefferson Parish although, some of those parishes

                                                    147


1       straddled the river.

2               Q.      Are you referring to the map that

3       you included in your report at page 4 of

4       plaintiff's Exhibit 129?

5               A.      Yes, I am.

6               Q.      Would you recognize a copy of that

```
 7   map if we showed it on the screen?

 8        A.    Yes.

 9        Q.    Okay.  We are going to call up

10   plaintiff's demonstrative 26 which is just an

11   enlarged copy of the map included on page 4 of

12   that report of Dr. Colten.

13        MR. FARR:

14             Your Honor, I just want to state I

15             have no objection to this exhibit, but I

16             may have an objection to other

17             demonstrative exhibits we just received

18             this morning.

19        THE COURT:

20             Okay.

21        /SKWRAO.

22             This exhibit is actually in the

23             report unlike the others we are going to

24             be looking at.

25        THE COURT:
```

```
 1             All right.

 2   BY MS. KEENAN:

 3        Q.    So could you talk us through which

 4   area you described is on the demonstrative you
```

5   see in front of you?

6           A.    Yes.  The -- what I have labeled

7   here and with the more or less stippled pattern

8   is the upper Red River region which includes

9   Caddo and Bossier DeSoto and Red River

10  Natchitoches and Rapides Parishes, Caddo Parishes

11  which is a grate toe that's the Red River

12  Parishes.  Now, we are going to go to Acadiana

13  which starting in the center of the state at

14  Avoyelles moving to the southwest Evangeline Jeff

15  Davis, Calcasieu, Cameron, Vermillion, Acadia,

16  St. Landry, Pointe Coupee, Iberville, St. Martin,

17  Iberia, Assumption, St. James, St. John the

18  Baptist, St. Charles, Lafourche and Terrebonne.

19          Q.    And what about the river parishes,

20  where are they on this map?

21          A.    I included this in the assignment

22  Pointe Coupee, West Baton Rouge, Iberville

23  Ascension, Assumption, St. James, St. John the

24  Baptist and St. Charles.

25          Q.    How does identifying communities

                                                149


1   based on the shared culture communities that you

2   just talked about, differ from identifying

3   communities based on political boundaries like

4   you see here?

5        A.    Parish boundaries are typically

6   assigned by government bodies, communities of

7   interest are more genetic, they are more

8   evolutionary.  They arise based on long-term

9   patterns of where people live and where they came

10  from and how they go about pursuing livelihoods

11  and practicing their lives.

12       Q.    So I want to walk through each of

13  the areas you just discussed in a little more on

14  detail starting from north to south.  Let the

15  record reflect that I'm now showing the witness

16  plaintiff's one which is the demonstrative map of

17  Shreveport and Bossier Parishes?

18       THE COURT:

19            Is in your objection.

20       MR. FARR:

21            Can I state my objection,

22  Your Honor?

23       THE COURT:

24            Please.

25       MR. FARR:

```
1              Yes, Your Honor.  Dr. Colten's

2         report in this case, originally the report

3         was 25 pages long.  This morning we got

4         17 pages of a demonstrative exhibits one

5         of which I've already agreed can come into

6         evidence because it is in the expert

7         report.  These other maps were not

8         included in the expert report.  We have no

9         idea when they were made, we have no idea

10        who made them.  It is impossible having

11        received these maps today for defense to

12        have an adequate opportunity to study them

13        to be able to cross examine Dr. Colten on

14        them to defer whether or not there's

15        additional information on these maps that

16        is not included in his report and

17        Your Honor, I have to confess you probably

18        have a better handle on this than I do,

19        but I always get confused between

20        demonstrative active and real exhibits,

21        but whatever demonstrative exhibit is

22        this, crosses the line this is 16, 17 maps

23        that railroad delivered today that we have

24        never seen before cross the -- the line

25        from a demonstrative exhibit to an
```

1    amendment to a report this is essentially

2    giving Dr. Colten to enhance and amend his

3    report without the defense having a chance

4    to study this information to be able to

5    effectively cross examine him.

6    /STPHAO.

7         May I explain, Your Honor?

8    THE COURT:

9         You may respond.

10   MS. KEENAN:

11        One point of clarification, just for

12   the record, these were not sent this

13   morning.  They were sent last night, so

14   it's agreeing:  So it's not just not like

15   we sent them today.  /SOEBGD though

16   Your Honor, none of these are intended to

17   be offered in evidence.  We are not the --

18   these are maps taken in the shape files

19   that were introduced in this case.  All we

20   are going to show if I can make an offer

21   of proof which the demonstrate exhibits

22   which we won't be offering into evidence.

23   THE COURT:

24            Okay.  The court will view them as

25     illustrative aids.  ***they will not be

152

1      entered into evidence, the court will not

2      be entered into evidence 23.  You use

3      illustrative for the assistance of this

4      court, you recognize that the court of

5      appeal will have no access to this so I

6      don't know what are your record's going to

7      be.  If -- if as defense counsel has

8      indicated we cross into an area that is

9      not covering Dr. Colten's report which I

10     have read and I have on my iPad then I'll

11     rely on you to make an objection at which

12     point the court will rule on the

13     objection, but as in all cases, the expert

14     witnesses or the opinion witnesses will be

15     limited to those opinions stated in their

16     reports.

17     /STPHAO.

18            Of course, Your Honor.

19     MR. FARR:

20            Your Honor, thank you for that

21     ruling, Your Honor.  I do want to correct

22        a statement I made.  I'm told we received

23        these last night.  The reason why I

24        thought it was this morning is because I

25        was asleep when we received these maps.

                                                  153


1        THE COURT:

2             They were received at 6:00 p.m.

3        MR. FARR:

4             Thank you.  Your ruling, I

5        understand it.  But I have to say that

6        these maps could have been produced

7        earlier if they were going to be used as

8        demonstrative exhibits.  And I have to say

9        it's quite difficult for me to look at

10       these maps now and try to figure out what,

11       if anything, is on these maps that's in

12       his report because as you know this is not

13       easy stuff looking at these maps there's a

14       lot of stuff you can throw onto a map that

15       may not be obvious to you when you have

16       just a few minutes to look at it, so I

17       appreciate your ruling, Your Honor.  We

18       accept it, but I do want to make that

19       objection.

20          THE COURT:

21                I understand and it's Mr. Far.

22          /SKWRAO.

23                Yes, sir.  I'm sorry.

24          THE COURT:

25                Do you need to stay seated, there

                                          154


1           was permission asked for one of the

2           lawyers to remain seated.

3           MR. FARR:

4                 Yes, sir.  I'm the one that's got a

5           few medical problems.

6           THE COURT:

7                 You may remain seated.

8           MR. FARR:

9                 I like to stand when I'm addressing

10          the court if -- if you'll let me sit while

11          asking questions I will be grateful to

12          you.

13          THE COURT:

14                I will be more than happy to oblige.

15          Carry on.

16     THE ATTORNEY:

17                Q.    So let the record reflect, that I'm

18    showing the plaintiff demonstrative one.  It's

19    just a map of the Shreveport and Bossier Parish.

20    The -- the -- is this a parish that you analyzed

21    in I /-PT when you /TRAOURP trying to show that

22    there were communities that shared cultural

23    histories?

24         A.    Yes, I did.

25         Q.    And can you walk through the

                                                    155


1     historical communities that you identified in the

2     Shreveport and Bossier Parishes?

3          A.    Yes.  Northwest Louisiana, which

4     includes Bossier and Caddo Parish, was originally

5     indigenous lands and in the 1830s and major log

6     jam on the river was broken by Captain Sheave and

7     this area became the destination for Anglo

8     settlers who had not been in this part of the

9     state in any large numbers so we began to have

10    this migration and settlement of Anglo planters

11    who came in seeking fortunes raising cotton using

12    slave labor for the work on the plantations.

13    This work was carried out largely on the flood

14    plane in the area closest to the river relatively

15    flat land.  Bulk scale plantation occurred so you

16    had in Shreveport and Bossier there on the river

17    actually a majority of African-Americans came to

18    be assembled in the plantations along this --

19    this part of the river with a lesser number of --

20    of Anglos for the most part.  Shreveport became

21    an important port exporting cotton down river and

22    you begin to have within the city distinct

23    neighborhoods growing and evolving.  In the early

24    20th century, the traditional agricultural

25    committees was really disrupted with the

156

1    discovery of oil in Caddo Parish and we began to

2    see a rash of new migrants coming into the state,

3    the growth of Shreveport itself.  We also began

4    to see -- well, I'm sorry.  Let me step back.  In

5    the wake of the civil war, there was

6    ***emancipation and the enslaved people were

7    released and we begin to see a confidentiality of

8    racial violence, Caddo became known as bloody

9    Caddo because of a large number of murders by

10    whites against blacks.  We began to see the

11    evolution of Jim you laws even with emancipation

12    the blacks for a time period during

13    reconstruction, those rights were gradually

14    restricted and removed.  Shreveport also became

15    the low can you tell us for any formally enslaved

16    workers moving to the city moving to town and you

17    began to have a considerable number of blacks

18    living in town with this memory of enslavement

19    they tended to live in compact neighbors because

20    very segregation policies and their poverty and

21    just being recently freed so you have very

22    disaggregated neighborhoods.  Within Shreveport

23    as a 20th century rolled in -- in Shreveport,

24    well, Caddo and Bossier both had incredibly high

25    numbers of lynches.  There was racial tension and

157

1    overt racial violence with the discovery of oil

2    there was a rash of small scale black farm owners

3    in the oil producing areas dubbed oil city who

4    turned to white lawyers for guidance a how to

5    manage their new found wealth and in many cases

6    they were basically robbed of their -- of their

7    potential wealth by unethical attorneys.  So you

8    have this historical pattern of racial violence,

9    racial deception racial discrimination that was

10    also carried out in terms of educational

11    situations.  Poorer, poorer educational

12    facilities for African-Americans, the red lining

13    was evident in Shreveport and areas of

14    opportunity for residential movement of blacks

15    was very limited to areas where they could secure

16    funding or buy properties out right.  So this was

17    -- these series of events led to the development

18    of distinct communities that were self identified

19    and that then continued into the 19 -- late '60s

20    early '70s with desegregation.  There were bitter

21    protests against integration of schools in the

22    Caddo, Bossier areas.  We had going on before

23    then and after then white -- flight whites moving

24    to the suburbs leaving Caddo Parish heading to

25    Bossier Parish, so you'd this very, very racial

                                                    158

1    likewise pattern of residents.  It wasn't

2    necessarily a matter of explicit choice, but it

3    was a matter of defacto choice.  There were no

4    other choices of where they lived.  And so this

5    created a great deal of this further enhanced

6    community identity within the black community and

7    it's based on their shared history as much as

8    their skin color.

9         Q.    So I'm going to show you plaintiff's

10    Exhibit 2, which is just a demonstrative map of

11    the same area of the state, but with an overlap

12    of the illustrative Exhibit 38.

13              Could you tell us how illustrative

14    district 38 -- I'm sorry, to correct the record,

15    illustrative Senate district 38 correlate to the

16    that you just discussed here or discussed in your

17    report?

18         A.    Certainly, if you look at the area

19    where the roads converge where the small word

20    Shreveport is just slightly and borrow the left

21    of the city, this is the downtown core of the

22    city and just immediately to the west, that was

23    all what people call the counter public

24    neighborhood.  The areas where black businesses

25    and black churches and black residents first set

                                        159


1    up their -- their their neighborhood in

2    Shreveport.  So this was a core.  But by the --

3    by -- during the post war period, many began

4    moving out towards the neighborhood that's

5    labeled there as Caddo Heights and that was

6    further west towards the airport that you have a

7    green area with a big X on those to the west of

8    the district.  So these were areas that presented

9    continuity in terms of the community members from

10   the old core as they moved further outward.  So

11   this contains a shared community of interest.

12         Q.    And just to confirm for the record,

13   are each of the communities that you just

14   discussed in the neighborhoods located within the

15   boundary of the Senate district 38 as you see it

16   in this map of the illustrative district?

17         A.    Yes.  The old core public

18   neighborhood as well as the areas where the large

19   import is and Caddo Heights word, those are areas

20   within that district that I was discussing.

21         Q.    Okay.  Let the record reflect that

22   I'm now showing the witness plaintiff's

23   demonstrative three.  This is again, the same

24   area, but with an overlay of illustrative house

25   districts and I'm going to focus on HD 1 and 2?

                                                    160


1         THE COURT:

2              One moment.

3    BY MS. KEENAN:

4         Q.    Could you tell us how --

5         THE COURT:

6          He's got an objection.

7          /SKWRAO.

8          May the court please make an

9     ***objection.  Thank you, Your Honor.

10    THE COURT:

11         Sustain the objection.  I know we

12    are using the words illustrative maps, but

13    try to use the word illustrative aids.

14    They are terms of art, but have distinct

15    meaning and maybe that will help keep the

16    record straight.

17    MS. KEENAN:

18         Thank you, Your Honor.  These are

19    maps of plaintiff's illustrative aids, so

20    I'll try to make that --

21    THE COURT:

22         Right.  My appreciation is that

23    demonstrative evidence is committed and it

24    makes part of the record in a jury trial

25    you would send your demonstratives back

161

1     with the jury.  Illustrative are not part

2     of the record.

3     /STPHAO.

 4              Okay.  Sure.  So illustrative A is

 5         the term you would like me to use?

 6    THE COURT:

 7              I'm sorry.  It's going to be redid

 8         you know can't to illustrative maps, but I

 9         would like to make it more clear for the

10         record.

11         /STPHAO.

12              That's okay.  This is just to make

13         it clear.  This is the third illustrative

14         map that we are using and it's the same

15         map of the area with illustrative house

16         districts 1 and 2.

17    THE ATTORNEY:

18         Q.    Could you tell us how illustrative

19    house districts 1 and 2 correlate to the

20    historical geography and the communities you just

21    discussed here and in your report?

22         A.    Is this illustrative --

23         Q.    Yes, this is illustrative?

24         A.    -- districts?

25         Q.    These are the illustrative house

                                                  162


 1    districts 1 and 2, yes.

2          A.    This shows the -- again, starting

3    where -- in district one where you see the word

4    Shreveport, the small Shreveport where the roads

5    converge, you see the -- just to the west of the

6    word Shreveport was the old counter public

7    neighborhood, the old core African-American

8    neighborhood, and this includes one of the first

9    extensions of African-Americans outward from that

10   -- that core district to the west.  And district

11   two contains much of the continuation of that to

12   the south and the west towards the airport and

13   down towards Caddo Heights.

14         Q.    And just to confirm that core

15   counter public space that you were just talking

16   about, is that within the boundaries of house

17   district 1 as you see it on this screen?

18         A.    Yes.

19         Q.    Okay.  I want to move onto the next

20   area of the state.  And so this time I'm going to

21   show the website an illustrate us aid that we

22   have titled just for our purposes of the tech.

23   Plaintiff's D-4.  This shows Desoto Red River,

24   Natchitoches and some of the surrounding

25   parishes.  Dr. Colten, are these areas that you

1    studied in your report and tried to identify

2    historically, communities within?

3         A.    Yes, they are.

4         Q.    Okay.  And can you tell us how --

5    can you tell us about the historical communities

6    that you identified in this area of the state?

7         A.    In many respects along the river,

8    there was a continuation of the flood plain and

9    again, in the 1830s after the clearing of the --

10   the log jam, this area attracted Anglo settlers,

11   but to the south at Natchitoches, Natchitoches

12   was perhaps, the first permanent settlement in

13   Louisiana settled in 1714 by the French.  This

14   was an area that developed a very distinctive and

15   close knit community:  French language, French

16   newspapers, legal documents in French continued

17   into the 1860s at least.  So this was an area

18   that was really set apart from that waive of

19   Anglos that came in much later in the 1830s.  And

20   -- and Natchitoches was an -- an area that also

21   had plantation agriculture.  It was earlier than

22   the cotton boom and we see there was some rice

23   there was some Indigo and other crops.  A little

24   cotton early on and just to the south of the

25    Natchitoches, there was an area that was settled

1    by emancipated mixed race people who became known

2    as Creoles of color.  Who lived in plantations

3    they were slave owners, they were planters.  They

4    had economic and relationships with people and

5    with the white community in the area, so this was

6    a -- not that this was a -- you know, a Panicum,

7    but they didn't have voting rights, but they were

8    a group that had greater means and greater

9    influence in the locality.  They persisted as a

10    very separate distinct community from Natchez in

11    part because of their racial composition.  So

12    this was a historical feature not necessarily

13    just one race and this community still exists,

14    it's been there.  Have been movies made about it

15    and it's now been recognized as a national

16    historic district and so these -- the areas along

17    the river were engaged in plantation agriculture

18    as you move outward from the river up into areas,

19    for example, around ***hall submit or inland in

20    Natchitoches Parish and towards Mansfield and

21    DeSoto Parish, you get into an area that was

22    primarily forested, but was being worked by small

23    scale farmers what we call yeoman farmers.  They

24    may have been planting cotton, they may have had

25    a slave or two, but they were not planters in the

165

1    large scale that the cotton be on the river were,

2    but this was very different also integrated into

3    the local economy and these parishes that had a

4    mix of upland and wetland areas saw that as an

5    advantage and it was something that was

6    characteristic of the region and those people had

7    a shared interest as well.

8         Q.    So I'm now going to show the witness

9    an illustrative aid that we have marked for the

10   tech as D-5.  This is the map, of course, of the

11   same area, but it has an overlay of illustrative

12   and house district 23.  Could you talk a little

13   bit about how illustrative house district 23

14   correlates to the historical geography and the

15   communities that you've just discussed here and

16   in your report?

17        A.    Yes.  The -- if we start in the --

18   in the Desoto Red River area, you see that this

19   area, the -- the district contains both the

20   upland and the lowland areas.  If you look the

21    flood plain basically runs from the river, the

22    Red River, the blue squiggly line to the eastern

23    edge of DeSoto Parish.  That's basically the

24    flood plain and the flood plain was basically in

25    Red River, but DeSoto Parish touched that so you

                                                          166

1     had within this you did a cross section from east

2     to west say, from contain river to Martin you

3     have the uplands you have the flood plain and you

4     have the uplands again, the forested area.  So

5     this was a balance of those territories.  As you

6     look further down into Natchitoches Parish,

7     again, you see within Natchitoches Parish you see

8     both uplands and flood plain area and the most

9     distinctive feature here is that Natchitoches the

10    -- many of the resident much of the city of

11    Natchitoches is within one single district.

12         Q.    We will talk a little bit more about

13    Natchitoches in just a minute.  Before we get

14    there, I'm go to show you another illustrative

15    aid.  This is D-8.  Oh, no.  We will get to

16    Natchitoches now.  Let's cue up D-8.  This is an

17    illustrative aid that Zooms in on the city of

18    Natchitoches, but with the same overlay of

19    illustrative house district 23 that you were just

20    talking about with the court.  You were talking

21    about how the city of Natchitoches was treated in

22    HB 23.  Could you explain a little bit further?

23         A.    Yeah.  This map shows much greater

24    detail than the last one and certainly the one

25    that we worked with previously on the DRA site,

167

1     but this shows that what's important to note here

2     is that where you have a fairly dense street grid

3     pattern in Natchitoches, that is basically the

4     populated and residential commercial area of city

5     almost all of that is within the city of

6     Natchitoches and that area to the north central

7     part of Natchitoches which is in district 22, is

8     largely unpopulated and the area within the city

9     limits of Natchitoches that dark section that

10    radiates to the south into 25, that's largely

11    rural area as well.  So this keeps -- 23 keeps

12    Natchitoches basically together within one

13    effective municipality.

14         Q.    Okay.  I'm now going to show you

15    what's been marked as D-6.  This is an

16    illustrative aid of the Desoto Red River in

17    Natchitoches Parish as we were just discussing,

18    but this time with an overlay of enacted house

19    districts 5, 7 and 25.

20              Could you talk a little bit about

21    how the enacted house districts in this area

22    correlate to the historical geography and

23    communities you discussed here and in your

24    report?

25         A.    Yes.  This really separates the

168

1    Desoto from its connection with the river and the

2    flood plain and Red River to the east.  So this

3    -- between districts 5 and 7.  This really

4    creates a start boundary between those two

5    parishes that in many respects had a comparable

6    sort of history.  One thing I forgot to mention

7    on this.  These two parishes were particularly

8    noteworthy in terms of post reconstruction

9    violence against black communities to the black

10    communities both in rural and urban areas had a

11    strong sense of identity and this separates those

12    communities that had that similar historical

13    past.  And we see, Natchitoches is really the

14    city is basically taken out from Natchitoches

15    Parish and put into grant -- into district 22

16    which is mainly in Grant Parish.

17         Q.    I'm going to show you another

18    illustrative aid that Zooms back in on

19    Natchitoches, this is plaintiff's D-9.  And

20    again, this is that same zoom on the city of

21    Natchitoches with an overlay of 28 and enacted 22

22    and enacted HD 25 which you were just talking

23    about.

24              Could you talk a little bit more

25    about how these districts treat the community you

                                               169


 1    discuss in Natchitoches?

 2         A.    Yes.  You can see that the northwest

 3    section of Natchitoches is in district 25 and the

 4    bulk of the city is in district 22.  But this

 5    really carves up the city of Natchitoches.  And

 6    and actually there's a section of it that's --

 7    that's put into district 13 as well.  But it's --

 8    it just carves up the city and it places it in

 9    two separate districts.

10         Q.    So now, I want to talk about the

11    next area you examined in your report.  Let the

12    record reflect that I'm now showing the witness

13    D-10.  This is an illustrative aid of the

14    overlapping Acadiana and river parish area that

15    he identified in his report in the map on page 4

16    of plaintiff's Exhibit 129.

17              Looking at this illustrative aid,

18    could you tell us a little bit about the

19    historical communities you identified within this

20    area of the state?

21         A.    Well, let's start with Acadiana.

22    The Acadians were recruited by the Spanish in the

23    -- in the 1760s to come to Louisiana because in

24    part, they were devoted catholics and had a great

25    resentment to the British who had compiled them

                                                170


1     and driven them out of what the British called

2     Nova Scotia.  They came and settled in areas

3     south of Baton Rouge along the river near the

4     town of St. Gabriel which is element dead center

5     in this map and they settled along the river.

6     They remained there for some time, but they were

7     small scale farmers.  They weren't large

8     plantation owners.  They didn't engage in large

9     scale rice or even later in sugar planting which

10    didn't really begin eventually in 1790s.  Over

11    time, and some of them also moved into areas in

12    St. Martin Parish near the town of St.

13    Martinville.  Others found their way down the

14    river into Lafourche Parish so this -- these were

15    kind of the core areas of initial Acadia

16    settlement in St. Gabriel in Lafourche Parish and

17    in St. Martin Parish along Bayou Teche.  With the

18    arrival of Anglo planters in the 19th century,

19    many Acadians were bought out.  They moved some

20    of them into the Atchafalaya Basin in Iberville,

21    Assumption, Iberia, St. Martin, St. Landry and

22    then some moved even further west into the

23    prairies, which is a very, very different

24    environmental setting that later became a

25    principal area for rice production in the area of

                                                        171

1    Crowley ain't reign those communities and further

2    west particularly as midwestern farmers were

3    approved to come in and practice large scale

4    agriculture.  So you have Acadians spread

5    throughout this area from Avoyelles and Pointe

6    Coupee all the way down river to St. Charles.

7    Those funding the Mississippi declined in

8    population over time, but other parts of the

9   state, particularly St. Martinville, they really

10  grew in number.  The Acadians were very, very

11  ***/EUPB far population in the early days of

12  their settlement in the state they retained the

13  French language and Catholicism unlike neighbors

14  to the north.  They were small scale farmers not

15  -- most of them big scale, some of them did

16  practice large scale agriculture, but for the

17  most part, they retained their identity and even

18  when their identify was challenged in the 1960s

19  it was kind of revival of ***day judge identity

20  and efforts to revive the French language in the

21  schools in Louisiana and they retained this group

22  of sense of identity.  Another group within that

23  Acadia that territory are a group of what we call

24  Creoles of color.  They were Africa-Americans

25  some of ***Mullates who were sent by French

                                                            172

1   landowner along the river to manage their

2   livestock in the prior part of the parish.  A lot

3   of this took place around the city around the

4   region of St.  Landry and further west St. Landry

5   Parish and city of Opelousas, so this was another

6   group that worked on the plantations, lived on

7    the ranches of the Spanish and French added

8    diversity to this region, but they also retained

9    a very, very powerful sense of identity and even

10    today they still practice trail rides, harking

11    back to their traditional practices from previous

12    generations as rancher and they are still very

13    much an identifiable population in -- within

14    Acadiana, but they are not Cajuns.

15         Q.    Now, you talked about the population

16    that you described in Acadiana on this map.

17    Could you take a look in the binder in front of

18    you on -- at the map on page 4?

19         A.    Yeah.

20         Q.    Is it fair to say that the area

21    depicted in this illustrative aid includes some

22    of the area that's also shaded as river parishes

23    in the map on page 4 of your report?

24         A.    Yes, it does.

25         Q.    And could you explain the historical

                                                      173


1    geography in the river parishes as you identified

2    it in your report in this area of the state?

3         A.    Yes.  This -- this area from Pointe

4    Coupee Parish down river to Jefferson Parish was

5    again, an area flood plain agriculture settled

6    initially by the French who employed many

7    enslaved laborers to do the back breaking work.

8    It also contained back swamp areas, but it was

9    here you had in many cases a majority

10   African-Americans working on these plantations

11   even after the end of the civil war after

12   emancipation the sugar producing districts of the

13   state were very different than areas that

14   produced cotton.  They really demanded highly

15   skilled labor to run the sugar mills to many of

16   the Africa-Americans were sought at and paid

17   better than they might have been having other

18   opportunities and they remained on these

19   plantations.  Also many in some cases, landowners

20   gave some slaves little slivers of land that

21   maybe all through these small narrow linear

22   villages that in many ways became adjacent to

23   petrochemical plants so in this area you had a

24   history of slavery, you had a history of slave

25   insurrection, and -- and then all the other

174

1    discrimination that goes along with a minority

2    community in this part of the world over time and

3      then the ultimate burden of -- of exposure to

4      industrial emissions and so this was an area

5      where again, that history of insurrection has

6      been captured in the spirit of these communities

7      now and there's a selection for the slave

8      insurrection.  This -- this was of the birth

9      places the environmental justice movement in the

10     country basically formed within the

11     African-American community because of their

12     inordinate exposure to pollution and noise and

13     other things.

14          Q.    And now, I'm going to show the

15     witness what's been marked for the tech as D-11.

16     This is an illustrative aid of that same area we

17     just saw with an overlay of illustrative seven

18     districts and particularly, I'd like to focus on

19     2 and 17 consistent with how these illustrative

20     house districts 2 and 17 correlate to the

21     historical geography and communities that you

22     discussed here and in your report?

23          A.    Yeah.  17 reflects one thing that I

24     didn't mention and that's that West Feliciana and

25     east -- and East Feliciana and Baton Rouge are

175

1    basically parishes with more of an Anglo

2    tradition, a cotton economy, but the 17 for the

3    most part stays on the West Bank of the river and

4    includes people who are growing sugar cane from

5    Pointe Coupee all the way down into Iberville as

6    well as communities that were in the back swamp

7    areas places like gross at the time, Maringouin,

8    and so this -- this -- this keeps one strong

9    community together for the most part.  District 2

10   likewise, well, district 2 in contrast I should

11   say stradles the river.  It encompasses both

12   sides of the river because at point moving

13   downstream from Plaquemine you really have

14   comparable populations on both sides of the river

15   a similar economic history, similar settle

16   history, similar communities of interest on both

17   sides of the river all the way down to and beyond

18   St. Charles.

19        Q.    And just to confirm when you say a

20   similar economic history and what you identified

21   in illustrative aid two here, can you describe at

22   what history is?

23        A.    It was a history of sugar cane

24   plantations since about 17 -- or since about 1800

25   with enslaved labor as I mentioned before.

1          Q.    Okay.  Let's move onto the next area

2    of the state that you examined.  Let the record

3    reflect, I'm showing the witness what's been

4    marked for the tech as D-12.  This is an

5    illustrative aid of Baton Rouge and the

6    surrounding area.

7               Dr. Colten, is this one of the areas

8    that you examined in your -- your reports?

9          A.    Yes, it is.

10         Q.    And could you tell us about the

11   historical communities that you identified in

12   this area of the state?

13         A.    Well, Baton Rouge even though it has

14   a French name, was largely an Anglo settlement

15   for many years it was part of British west

16   Florida or Spanish west Florida and then part of

17   the British territory home in this -- in this

18   part of the world.  And the British called it

19   Richmond.  There wasn't that many French who

20   lived in Baton Rouge.  There was a small number,

21   but it's more of a protestant city than areas to

22   the west.  It had -- it became a destination for

23   freed slaves after the end of the civil war by

24    which time it had already become the state

25    capital, so it was growing it was a fairly small

                                                                    177


 1    city even in 1900, but it was growing and it

 2    tended to grow first to the north, the what's

 3    labeled here as the Baton Rouge refinery what's

 4    now the ExxonMobil refinery and that was built in

 5    the early 20th century and it attracted largely a

 6    white working class population who lived in the

 7    mill gate community just outside.  So you have an

 8    extension of white population to the north, you

 9    had a white population extending to the south and

10    west towards LSU and out directly to the west and

11    within the core of the city there was a fairly --

12    there was fairly small areas.  An area that is

13    called here it's another somebody of the bottom

14    it's an area on south of downtown Baton Rouge.

15    It was primarily the of a African-American

16    residential district afternoon.  And then the

17    city graduates was inching its way eastward along

18    Florida and Government Streets.  Florida is the

19    US 190 labeled as U.S. 190 on this map.  In the

20    1940s, the first major bridge was completed

21    across the Mississippi River and extended to the

22    south and east what's labeled here as Airline

23    Highway.  And with that highway, additional

24    neighborhoods were constructed in the '60s and

25    '70s pushing the city further eastward.  It was

178

1    also at this time period that in the '60s and

2    '70s, we begin to get integration.  We begin to

3    get a strong push Baton Rouge east white flight.

4    There's an old sub burns moving further out and

5    east, and it was during this phase of development

6    that we see a lot of the mill workers near the

7    ExxonMobil moving further out and much of that

8    area near the mills became an Africa-American

9    neighborhood, so this is a process of

10   neighborhood turn over that was going on.  And we

11   had a series of new subdivisions that were

12   platted and approved by the city and the parish

13   that enabled the city to add new residential

14   neighborhoods and each new neighborhood was more

15   or less constituted more or less an arc a semi

16   circle of development that one was built another

17   to the east of that -- another to the east of

18   that and so the city was growing eastward out

19   towards the Amite river and out towards Denham

20    Springs and then toward the south and east

21    towards New Orleans.

22        Q.    Okay.  I'm going to show you another

23    illustrative aid this is D-13.  Again, a map of

24    the same area, but this time with an overlay of

25    the illustrative house districts.  I'm going to

                                                    179

1    read into the record some of the house districts

2    that are shown in this illustrative aid.  It

3    includes illustrative house districts 29, 67, 61,

4    68, 69, 70, 65, 101, and a couple in the

5    surrounding area.  Dr. Colten, could you tell us

6    how these illustrative house districts correlate

7    to the historical geography and communities you

8    discussed here in and in your report.

9        A.    Let me start with 67 which is the

10    one closest to the river.  It includes the area

11    immediately adjacent to the Baton Rouge refinery

12    which was originally working class whites.  But

13    by the 1980s, 1990s, it was becoming an

14    Africa-American neighborhood.  We also see at the

15    far southern end of this district 77 going there

16    which was an area that was initially intended for

17    a whole group of apartment complexes, were built

18    there that were completed during the big oil bust

19    and the developers found that they needed -- that

20    they were able to fill them by renting them to

21    African-Americans so you had both these areas

22    near the refinery and around guard year were area

23    where African-Americans left the city and moved

24    out to more suburban locations.  District 61 also

25    represents another phase, a very early phase of

180

1     movement out from the city, schools, commercial

2     districts built at comparable times so you had

3     sort of historical geography the chronology here.

4     Is -- this is an area that was added more or less

5     at one time 68 represents the push of the city

6     out towards Airline Highway 69 another arc beyond

7     that 101 another arc beyond that and then 65 is

8     more of a linear movement outwards towards

9     central city that was established to have a

10    separate school district, so this really quite

11    convincingly mimics that addition of these

12    different additions over time.

13         Q.    So a couple of follow-up questions.

14    At one point I believe you said district 77, were

15    you referring to district 67 here on the aid?

16          A.    I started -- if I said 77, I

17    apologize.   I meant 67 which was the first one I

18    discussed.   It includes the refinery and guard

19    year.

20          Q.    Okay.  Thank you.  And you've talked

21    a little bit about sort of the way that these

22    arcs formed at the same time, I believe was the

23    thing you just said.  I'd like you to explain a

24    little bit from the historical geography

25    perspective about how the communities within

                                               181


1    these arcs relate to each other based on what you

2    talked about in your report?

3          A.    Yes.  Many of these people that were

4    moving to these sub -- subareas bought homes,

5    raised their families there and spent the bulk of

6    their life there.  While they were there, the

7    city responded, the parish responds with building

8    schools in those areas people built churches so

9    you developed communities within these

10   territories.  And and that's a fairly consistent

11   pattern you see in these neighborhoods as they

12   extended eastward.

13         Q.    Okay.  I'm know going to show you

14    another illustrative aid marked for the tech as

15    D-14.  This is the same area again, but in this

16    case*** the house districts, it overlays the

17    enacted house districts just for the record, the

18    record some of those include 29, 67, 61, 68, 69,

19    70, 101, 65 as well as the surrounding area.

20            Dr. Colten, can you tell us how the

21    enacted house districts that you see in this area

22    correlate to the historical geography and the

23    communities that you've discussed here and in

24    your report?

25        A.    I think the -- let's talk about 29.

                                                182


1     Much of it follows the river on the west side of

2     the river, but it also leaps across the river and

3     includes the areas to the east of the Baton Rouge

4     refinery shown here.  The area west of the river

5     was in a different administrative unit, a

6     different parish.  There was a very different

7     population one of the marks of distinction was

8     that the bars stayed open later because there was

9     more of a catholic influence which was more

10    tolerant of later night drinking on the east

11    side.  Baton Rouge was more of a Baptist city and

12    so these really the two -- the areas on the east

13    and West Bank of district 29 were really quite

14    different in terms of their composition both

15    historically and recently.

16              The 67 includes ***Gardere??? Guard

17    /KWRER, but also includes some largely white

18    areas the south side of Baton Rouge.  70, 68, 69

19    are more or less radial -- more or less a radial

20    line extending out from the center of the city

21    south to the east straddling old barriers like

22    Airline Highway as does 61.  61 stradles Airline

23    Highway which once it was open it really -- we

24    saw a real acceleration of development on the

25    east side.  So it -- these districts really don't

                                                    183


1    comport or don't mesh particularly well with the

2    historical geography of the growth of

3    Baton Rouge.

4         Q.    Okay.  And I'd like to move onto the

5    last area of the state that you examined.  Let

6    the record reflect that I'm showing the witness

7    what's been marked for the tech as D-15.  This is

8    an illustrative aid of Jefferson and Orleans

9    Parishes as well as some other surrounding area.

10    Is this one of the areas that you studied in your

11    reports?

12         A.    Yes, it is.

13         Q.    Okay.  And can you tell us about the

14    historical communities that you identified in

15    this area of the state?

16         A.    Now, I touched on some of them

17    earlier, but this is -- most of the area from

18    Destrehan down river through Algiers, on both

19    sides of the river at least initially in the

20    French old was settled boy, French planters, the

21    Eastbank really developed ahead of the Westbank

22    for those of you not from Louisiana, the area

23    south of the river is the Westbank and the area

24    to the north of the river is the Eastbank.  So as

25    -- as New Orleans grew up river, much of the area

                                                  184


1    that's labeled garden district uptown, much of

2    that area was settled by Anglos and we began to

3    see the disappearance of the old traditional

4    sugar cane plantations with African-American

5    labor that doesn't mean African-Americans

6    disappear or wealthy Creoles disappear, but that

7    was ***characterized more on the Anglo settlement

8    on the Westbank.  Agriculture persisted a bit

9    longer as it did up river, but by the 1940s, we

10    began to see a wholesale transformation of

11    Jefferson Parish on the Eastbank.  New Orleans

12    was growing, and by 1950 was beginning to push

13    into Metairie, later ultimately into Kenner after

14    Hurricane Zeta Betsy in this '65, there was an

15    acceleration of this desegregation prompted even

16    more rapid white flight from New Orleans to

17    Metairie and Kenner.  On the -- on the Westbank

18    on the south side of the river, we see a series

19    of highly segregated residential communities that

20    were being built in Gretna and Marrero and

21    Westwego and in particular neighborhoods that

22    were designated for people of different color, so

23    it was a highly deliberate segregation of

24    populations that replaced agriculture, but these

25    were residential areas for working class people

185

1    working in the new mills, the ship building

2    facilities and on the docks on the Harvey Canal

3    and other places upon the Westbank, so this was

4    very much a working class laboring population on

5    this side so very different of the population in

6   uptown and garden district in New Orleans

7   immediately across the river.

8        Q.    And you talked a little bit about

9   this.  Sorry, go back by the microphone.  You

10  talked a little bit about this earlier when we

11  were looking at a different map that captured

12  part of these parishes as well, but upstream from

13  New Orleans and Jefferson Parish, could you talk

14  a little bit about the shared experience of

15  residents in I think Destrehan is a city you

16  mentioned closer to the St. Charles side of the

17  line?

18       A.    It was upstream in some of the sugar

19  planting areas that for many years even the

20  Spanish had been concerned with slave

21  insurrection.  The slave population out numbered

22  the white population and the Spanish period into

23  the early US period after Louisiana parish in

24  1803, but it was -- and here it was here the

25  first often the largest slave insurrection

                                          186


1   occurred in 1807.  Slaves marked downstream to

2   New Orleans and they were repulsed brutally and

3   viciously and as they approached Kenner, so this

4   slave insurrection again, is now celebrated as an

5   act of die /TPAOEUPBS in these areas you also see

6   just back from the river large green areas which

7   enable you to see these marsh areas and swamp

8   areas, these were areas that were -- were

9   destinations for escaped slave which is an

10  fundamental part of slave existence in this area.

11  So they escaped and established what they called

12  maroon colonies in the back swamps so these are

13  things that added to this group identity as did

14  segregation and housing as a whole host of other

15  such as poor quality housing schools and the

16  like.

17          Q.    So I'm now going to show the witness

18  another illustrative aid marked for the tech as

19  D-16.  This is an illustrative aid about the same

20  area we just discussed with an overlay of the

21  illustrative Senate districts and in particular

22  I'd like to focus on illustrative district 19.

23  Can you tell us how illustrative Senate district

24  19 correlates to the historical geography and the

25  communities that you discussed here and in your

187

1   report?

2        A.    By by extending over both sides of

3   the river for a large portion above -- above well

4   above Harahan, it includes people who were

5   resident in the area or had ancestors who were

6   resident in the area during the period of

7   enslavement.  These areas have experienced

8   exposure to industrial pollution, they are part

9   of the group that celebrate the anniversary of

10  the slave insurrection so there's a real strong

11  sense of community within these areas in that

12  area above Harahan where it stradles the river.

13  As you move further downstream, across from

14  Harahan down, down to the bottom or to the south

15  of the river where Waggaman is, these areas that

16  area is more of a working class community,

17  neighborhoods of labor classes become more and

18  more African-American over time, so these areas

19  also have a strong sense of identity and the

20  extension far down to the south includes some of

21  these areas that were exposed to flooding before

22  the post Hurricane Betsy ***perk levees were put

23  in so these areas on the back swamp side of these

24  communities have seen they have been exposed to

25  flooding in more recent years and that's another

1   part of their social memory of existence in this

2   area.

3          Q.    And finally, I'd like to show the

4   witness what's been marked for the tech as D-17.

5   This is an illustrative aid of the same area, but

6   this time with an overlay of the enacted Senate

7   districts in the area.  But to focus this time on

8   enacted Senate district 5.

9                 Could you tell us how that district

10  correlate to the historical geography and

11  communities of interest that you've just

12  discussed here and in your report?

13         A.    Well, the the extension of district

14  5 to the West Bank of the river will inures the

15  historical geography of this settle history the

16  cultural history of this region by including

17  neighborhoods in Jefferson Parish and Orleans

18  Parish.  It tends to disrespect the judicial or

19  jurisdictional lines that were placed, different

20  cities, different parishes even.

21         Q.    And what about that community in

22  Jefferson Parish that you were just discussing

23  that appears in in enacted SD 5, how does it

24  compare to the surrounding Jefferson Parish

25      communities in enacted Senate district 8?

189

1          A.      Repeat the question please.

2          Q.      Sure.   So the part of Jefferson

3    Parish that appears in enacted SD 5 how does it

4    compare to the surrounding territory in Jefferson

5    Parish that's placed in enacted Senate district

6    8?

7          A.      The -- the -- well, Senate district

8    or district 8 loses a big chunk of its -- its

9    territory with that extension of five moving into

10   it and -- and then that causes discontinuity.

11   THE ATTORNEY:

12           Okay.  Thank you.  I have no further

13           questions for Dr. Colten at this time.

14           Your Honor, I did want to put one more

15           thing into the record about the

16           illustrative aid just to make sure it's

17           clear.  All of these illustrative aids

18           were produced from shape files and

19           materials from Mr. Cooper's back up files

20           that were produced to the defendants.  I

21           just wanted to make sure I had put the

22           origin of these illustrative aids into the

23        record.  Thank you, Your Honor.

24        THE COURT:

25             Cross?

190

1        MR. FARR:

2             May I proceed, Your Honor?

3        THE COURT:

4             You may.

5        MR. FARR:

6             Thank you, Your Honor.

7    EXAMINATION BY MR. FARR:

8        Q.    Dr. Colten, can you see the

9    attorney?

10       A.    I can barely see.  I can see, but I

11   would ask you to speak up, if you could, please.

12       Q.    I will.  Can you hear me now?

13       A.    Barely.

14       Q.    Can you hear me now?

15       A.    I can hear you, but a little extra

16   volume wouldn't hurt.

17       Q.    Okay.  How's that?

18       A.    Better.

19       Q.    First, I'm going to ask you some

20   questions about this -- these illustrative maps.

21    When did you first see the maps that have been

22    described as illustrative maps today?

23          A.    The illustrative maps I saw over a

24    year ago.

25          Q.    Okay.  So you had access to these

191

1    maps over a year ago, but you did not include

2    them in your report?

3          A.    The illustrative maps I had access

4    to for over a year, the illustrative aids I did

5    not.

6          Q.    Okay.  And counsel said there was a

7    shape file.  Was that your shape file or was it

8    someone else's shape file?

9          A.    I believe she said it was

10   Mr. Cooper's.

11         Q.    Okay.  And you've never talked to

12   Mr. Cooper, have you?

13         A.    We exchanged some pleasantries in

14   the hall this afternoon or earlier today.

15         MR. FARR:

16               All right.  Now, I want to ask you

17         about demonstrative Exhibit 14, if we

18         could put that up on the screen.

19          TRIAL TECH:

20               (Complied.)

21   BY MR. FARR:

22          Q.    And I seem to recall that your

23   counsel said this was a map of the illustrative

24   districts in the Baton Rouge area?

25          MS. KEENAN:

                                              192


1                    Objection, Your Honor.

2                    Mischaracterizes the testimony.  This is

3                    the enacted districts just to avoid

4                    confusion.

5                    MR. FARR:

6                         Which ones were these?

7                    MS. KEENAN:

8                         The ones you have on the screen,

9                    these reflect the enacted districts.   I

10                   can tell from the district 29 the one in

11                   the series immediately before that's

12                   showing on the screen right now, this is

13                   the illustrative districts just for

14                   clarity.

15                   MR. FARR:

16                        Okay.   So what we have on the map

17          now is Mr. Cooper's map.

18          MS. KEENAN:

19               This is the illustrative aid that

20          includes the illustrative districts that

21          were in Mr. Cooper's map.  I'm sorry for

22          the terminology.  I just want to be clear.

23          MR. FARR:

24               Okay.  Thank you very much.

25     BY MR. FARR:

                                             193


1          Q.    Now, Dr. Colten, you testified about

2     the communities of interest that were related to

3     these illustrative districts.

4               Is this the only way that you could

5     draw this -- this area of Baton Rouge to respect

6     the communities of interest that you talked about

7     because could those districts be configured in

8     different ways and still respect the communities

9     of interest that you've identified?

10         A.    I suspect so.  I mean, it was

11     probably an infinite number of ways you can draw

12     the boundaries.

13         Q.    Okay.  And your report doesn't look

14     into the impact of race and in drawing districts

15    did?

16              A.    I'm sorry.

17              Q.    You didn't talk about race in your

18    report?

19              A.    I'm sorry.  Did you say I didn't or

20    I did.

21              Q.    Did not?

22              A.    I did mention race.

23              Q.    You did not -- you mentioned race?

24              A.    I mentioned race.

25              Q.    Okay.  Did you -- did you look at

                                                  194


1     how race may have effected how the lines were

2     drawn in Mr. Cooper's illustrative districts?

3              MS. KEENAN:

4                    Objection, Your Honor, to the extent

5                    he's asking the witness about Mr. Cooper's

6                    intent.  Your Honor has already excluded

7                    testimony that goes to the intent of

8                    Mr. Cooper and drawing his maps and we ask

9                    that this witness not be called to offer

10                   opinion testimony about that same improper

11                   inference.

12             MR. FARR:

13          Well, Your Honor.  He's testifying

14      about communities of interest that he

15      thinks went into the location of these

16      lines and I'm trying to inquire as to

17      whether he looked at other things that may

18      account for the location of the lines.

19      THE COURT:

20          Other things other than communities

21      of interest, I guess, I'm not -- I'm

22      having difficulty with the -- with your

23      question.

24      MR. FARR:

25          Well, my -- the point I'm trying to

                                              195


1       make, Your Honor, is that he didn't study

2       whether or not these -- he's admitted that

3       these districts are not the perfect and

4       only way to respect the community's of

5       interest in Baton Rouge and I'm asking him

6       if he looked at any other factors that

7       could have effected the way the lines were

8       drawn including the impact of race.  I

9       don't see why that's not a fair question.

10      MS. KEENAN:

11          I don't think that was the question

12          that was asked.

13     THE COURT:

14          I didn't understand.  I didn't

15          understand that that was the question.

16          I'm going to overrule the objection and

17          I'm going to ask that you rephrase your

18          question that was not the question that I

19          understood.

20     MR. FARR:

21          All right.  Thank you, Your Honor.

22 BY MR. FARR:

23     Q.    In your report, Dr. Colten, in this

24 area of the state in Baton Rouge, you did not

25 make a study on whether or not race could have

                                              196

1 impacted the location of the lines in

2 Mr. Cooper's illustrative districts?

3     MS. KEENAN:

4          Objection.  I think this is in

5          addition to the objection I previously

6          raised.  It's outside the scope of the

7          witness's testimony.  He was never asked

8          about what things Mr. Cooper may have

9  considered in drawing the maps only

10  objectively how his field of study

11  correlates to the illustrative and enacted

12  districts at issue in this case.  He was

13  never asked about Mr. Cooper's intent or

14  attempts in drawing his maps.

15  THE COURT:

16    I'm going to sustain the objection

17  asking Dr. Colten to give essentially

18  opinion testimony on whether race --

19  essentially what you are trying to get at

20  is whether race predominated in

21  Mr. Cooper's maps and that's an

22  inappropriate question for this particular

23  witness.

24  MR. FARR:

25    All right.  Your Honor, thank you.

      197

1  THE WITNESS:

2    Your Honor, if I may clarify

3  something.

4  THE COURT:

5    No, you may not.  One lawyer one

6  witness.

7    BY MR. FARR:

8        Q.    Dr. Colten, you've never testified

9    in court before about communities of interest?

10        A.    That's correct.

11        Q.    And you agree that there are

12    countless ways to define communities of interest?

13        A.    There are many, many ways to define

14    communities of interest.

15        Q.    I'm sorry.

16        A.    And I -- there are many ways to

17    define communities of interest and I tried to

18    explain how I define those.

19        Q.    Well, you can have your counsel ask

20    you that question.  I just want you to -- I think

21    you've admitted there's many ways you can define

22    communities of interest, in fact, in your

23    deposition you said there's countless ways to

24    define communities of interest, did you not?

25        A.    I don't recall exactly.

198

1        Q.    Okay.  Do you agree today, that

2    there are countless ways to define communities of

3    interest?

4        A.    Yes, but I used one.

5        MR. FARR:

6              All right.  Can we turn to

7        Exhibit 129, page 4, please?

8        TRIAL TECH:

9              (Complied.)

10       MR. FARR:

11             And could you expand the map?

12       TRIAL TECH:

13             (Complied.)

14  BY MR. FARR:

15       Q.    So, Dr. Colten, I think you've

16  testified about this map.  Is it fair to say that

17  the shaded areas on this map were the areas that

18  you focused on in your report?

19       A.    I'm sorry.

20       Q.    The areas that are shaded in this

21  map are the areas you focused on in your report?

22       A.    Yes.

23       Q.    Those are the regions you looked at?

24       A.    Those are the sections that I say I

25  looked at, yes.

                                         199


1        Q.    And the areas that are in white, you

2   did not look at those areas for communities of

3    interest?

4          A.    I did do a review of them at some

5    early stage, but not for communities of interest.

6          Q.    Okay.  And you didn't include

7    anything on the report about the communities of

8    interest in the areas of this map that are shaded

9    white?

10          A.    Other than East Baton Rouge Parish.

11          Q.    Okay.  So you did not assess the

12    historical community interests for the entire

13    State of Louisiana?

14          A.    That's correct.

15          Q.    All right.  Now, Dr. Colten I think

16    we agree there's 39 Senate districts in the

17    Senate plan; is that correct?

18          A.    39 Senate districts yes, I agree

19    with that.

20          Q.    And in your report, you only

21    criticize two of the enacted Senate districts; is

22    that right?

23          A.    I'd have to go back and look.  I

24    don't remember that number.

25          MR. FARR:

1              Can we pull up Dr. Colten's

2              deposition, please, page 38.

3       TRIAL TECH:

4              (Complied.)

5    BY MR. FARR:

6       Q.    Okay.  Could you look at the

7    question beginning on line 10 and the way you

8    answered that question and does that refresh your

9    memory about whether you had only criticized two

10   of the enacted Senate districts?

11      A.    What was the question -- what was

12   the question in reference to?  It was to one of

13   my reports.

14      Q.    I'm asking you in your report you

15   only criticize two -- two of the enacted Senate

16   districts?

17      A.    In the supplemental I mention two, I

18   comment on one, two, three, four in the rebuttal,

19   so I've looked -- I commented explicitly on more

20   than two.

21      Q.    All right.  Well, let's turn to your

22   deposition page 38 line 10.  I'm going to read

23   the question.  You can read the answer.  Okay.

24   So in the Senate plan it's my understanding that

25   there are 39 -- 30 to 39 Senate districts in

1    Louisiana, and is it fair to say that you

2    criticized two of those districts.  Could you

3    read your answer, please?

4         A.    Of those I looked at yes, I didn't

5    look at all of them and you asked if fair to say

6    let's see.  You --

7         Q.    That's fine, Dr. Colten?

8         A.    You asked if I criticized two of

9    those, not only two of those as you asked me just

10   now.

11        Q.    Okay.  But in your deposition you

12   said in your report you only criticized two

13   Senate districts.

14        MS. KEENAN:

15            Objection.  That mischaracterizes

16            the witness's testimony.  He answered the

17            question, but he never said he criticized

18            only two in the deposition.  You can see

19            on the screen.

20        THE COURT:

21            The word "only" is not contained in

22            that deposition.  I'll sustain the

23            objection.  I get your point.

24   BY MR. FARR:

25       Q.    Okay.  Dr. Colten, in -- in your

                                                    202

1    study in had your report, you only criticize 7 of

2    the 105 enacted house districts; is that correct?

3        A.    I don't recall right off the top of

4    my head.  I'm sorry.

5        MR. FARR:

6            Okay.  Can we turn to his deposition

7        again, page 46?

8        TRIAL TECH:

9            (Complied.)

10       MR. FARR:

11           Can we turn to page 45, please?

12       TRIAL TECH:

13           (Complied.)

14   BY MR. FARR:

15       Q.    Right.  Dr. Colten, I'm going to

16   start asking questions on page 45 and 46 and I'd

17   like you to give the answer that you gave in your

18   deposition.  So on page 45, line 21, I asked am I

19   correct there's 105 house districts in Louisiana

20   legislature?

21       A.    I responded, I don't do -- I hadn't

22    looked at that full list here today and I don't

23    recall right off the top of my head so I don't

24    know the number.

25          Q.    All right.  No problem.  I have to

                                                    203


1    look -- look at -- look it up myself all the

2    time, but however many there are, you only

3    criticized six enacted districts; is that fair to

4    say your answer?

5          A.    Of those I looked at, at which were

6    within the limited districts, those limited

7    regions.

8          Q.    Okay.  You only looked at six of

9    them; is that correct?

10          A.    I respond, I think there's one, two,

11    three, four, five, six, seven I looked at more.

12          Q.    But you only commented on seven?

13          A.    That's correct.

14          Q.    Okay.  Now, the sections or regions

15    that you chose to study in your report, were

16    chosen by you in consultation with counsel for

17    the plaintiffs; is that correct?

18          A.    Where are you quoting from?

19          Q.    Well, I just am asking you; is that

20    correct?  I'll go to your deposition if you don't

21    remember?

22         A.    Would you repeat the question.  I'm

23    sorry.  I'm having a hard time hearing you.

24         Q.    All right.  The sections you chose

25    to study in your report, were chosen by you in

                                                    204

1    consultation with counsel for the plaintiffs?

2         THE COURT:

3              It's more of a statement than a

4         question.  I think he's asking is that

5         correct.

6         THE WITNESS:

7              If he's asking if that's correct,

8         that's correct.

9         Q.    Okay.  And the sections you decided

10    to study encompassed the district in Mr. Cooper's

11    illustrative map; is that correct?

12         A.    I'm sorry.

13         Q.    The sections you decided to study

14    encompass the districts in Mr. Cooper's

15    illustrative map?

16         A.    Well, they included districts in the

17    illustrative maps.

18          Q.    Okay.  And isn't it correct that you

19   looked at the communities within the regions

20   identified by plaintiff's counsel?

21          A.    Yes.

22          Q.    And would you also agree that an

23   expert can define regions different ways

24   depending on his purpose?

25          A.    Yes.  And I responded to that at the

                                                   205


1    request of counsel for what areas to study.

2           Q.    Right.  But I just -- yesterday you

3    can define regions that an -- an expert wants to

4    study depending upon the purpose; is that a yes

5    or no?

6           A.    There are many ways to define

7    regions.  I chose to fall within the guidance of

8    counsel and so there are many ways to do that.

9           MR. FARR:

10                Okay.  Could you turn to

11          Dr. Colten's deposition page 32.

12          TRIAL TECH:

13                (Complied.)

14   BY MR. FARR:

15          Q.    So I'm going to read the question,

16    Dr. Colten, and I want you to answer what you

17    answered in your deposition so in other words,

18    people can define communities of interest in

19    different ways.

20         MS. KEENAN:

21              Your Honor, I'm going to object at

22              this point.  I'm not sure if this reading

23              from the deposition is intended at

24              impeachment, but to the -- if it is the

25              question that Mr. Farr is inferring, is

                                                    206


1              not the question he asked Mr. Colten and

2              so I'm impeachment.

3         MR. FARR:

4              Then yes, I'm asking this as

5              background question.

6         THE COURT:

7              Is it the same question that you

8              asked the witness if not the impeachment

9              is really been a bit of a tore tore and

10             border or improper.  Is it the same

11             question that you asked the question?

12        MR. FARR:

13             It will be the same yes, Your Honor,

14          when we go to the next page.

15          THE COURT:

16                  All right.  I'll overrule the

17          objection.

18  BY MR. FARR:

19          Q.    Now, in other words, people can

20  define communities of interest in different ways,

21  is that your answer?

22          A.    I respond in community interest in

23  the regions we are talking about are very

24  different.

25          MR. FARR:

                                        207


1                   Okay.  Can people define regions.

2           Go to the next page, please.

3           TRIAL TECH:

4                   (Complied.)

5   BY MR. FARR:

6           Q.    In different ways than you've done

7   in this expert report.

8           MS. KEENAN:

9                   I'm going to object again,

10          Your Honor.  If you look at the answer

11          that Dr. Colten provided, it's not

12    consistent with anything he said here

13    today because it's an improper impeachment

14    of the witness.

15    THE COURT:

16         It's been asked and answered.  He

17    conceded in approximate probably the third

18    or fourth answer to your questions,

19    Mr. Farr, that there are different --

20    different defines for communities of

21    interest.  Ask your next question, please?

22    MR. FARR:

23         Okay.  But, Your Honor, we are

24    getting to the next question, if you let

25    me.

                              208


1    THE COURT:

2         Ask your next question.

3    MR. FARR:

4         Okay.  Can I go back to the -- the

5    previous page, please?

6    TRIAL TECH:

7         (Complied.)

8    MS. KEENAN:

9         Your Honor, I don't think he can

10          just read from the previous page, it's not

11          a question that he's asked the witness.

12          That's not how impeachment works.

13      MR. FARR:

14          Okay.  I'll start over.

15      THE COURT:

16          Okay.  The objection is sustained.

17          Impeachment is ask him the question, if he

18          denies the question consistent with his

19          deposition then you can confront him with

20          his deposition.

21      MR. FARR:

22          Thank you, Your Honor.

23  BY MR. FARR:

24      Q.    Would you agree, Dr. Colten, that an

25  expert can define regions in different ways

                                        209


1   depending upon their purpose?

2       MS. KEENAN:

3           Your Honor, I'm going to object

4           asked and answered.

5       MR. FARR:

6           He did not answer that question,

7           Your Honor.

8          THE WITNESS:

9                 I'm sorry.  Are you reading from the

10         deposition again?

11         MR. FARR:

12                No.  I'm asking the question again.

13         THE COURT:

14                I'm sorry.  I have to rule on the

15         objection.  The objection is overruled.

16         Ask your question again.

17    BY MR. FARR:

18         Q.    Dr. Colten, would you agree that an

19    expert can define regions in different ways

20    depending on their purpose?

21         A.    Yes.  And I chose to follow the

22    guidance of counsel as I was assigned to study.

23         Q.    Do you agree that you could define

24    the regions differently if you had a different

25    purpose?

                                              210


1          A.    As I've said yes, but I chose to

2     follow the guidance, the assignment that I was

3     given.

4          Q.    Okay.  Now, I think you said before,

5     Dr. Colten, that you never talked to Mr. Cooper?

6          A.    I'm sorry.

7          Q.    Before today, you've never talked

8    with Mr. Cooper?

9          A.    That's correct.

10         Q.    And I think you you said today,

11   you've never drawn a congressional or

12   redistricting map?

13         A.    That's correct.

14         Q.    And it's true that you've never used

15   a software program that Mr. Cooper used to draw

16   his illustrative plans?

17         MS. KEENAN:

18              Objection.  Your Honor, we are

19              outside the scope of direct.  Again, he

20              was never tendered as an expert in any of

21              these areas and did not testify about

22              drawing maps for the purposes of this

23              case.

24         THE COURT:

25              He's not a cart graph unless you

                                                    211


1              have some reason for the relevance of that

2              question, it's denied.

3          MS. KEENAN:

4                Well, Your Honor, he's giving

5        explanations for why Mr. Cooper drew this

6        map and I believe I'm entitled to ask him

7        some background on what knowledge he has

8        of how Mr. Cooper drew this map and what

9        was -- was available to him.

10       MR. FARR:

11               May I respond, Your Honor.

12       THE COURT:

13               You may.

14       MR. FARR:

15               He's not done that.  He's not

16       offered any testimony about what

17       Mr. Cooper was doing as an expert in

18       historical geography.  He's talked about

19       communities that exist in the State of

20       Louisiana and the states he looked at and

21       about how those correlate to the various

22       issues in this case.  He has never talked

23       about MR. Cooper's intent or moves.

24       THE COURT:

25               Sustained.

212

1    BY MR. FARR:

2          Q.    You've no personal knowledge of the

3    reasons why Mr. Cooper drew his map?

4          A.    I'm sorry.

5          Q.    You do not have any personal

6    knowledge of the reasons why Mr. Cooper drew his

7    map?

8          A.    Only what I could infer from reading

9    his report.

10          Q.    You made an attempt to determine

11    whether the enacted plan better satisfies the

12    communities of interest that you've identified in

13    some areas of the state than Mr. Cooper's plan?

14          A.    That was not an objective of mine.

15          Q.    And you were not asked to identify

16    the communities of interest in the state before

17    you agreed on the regions of plaintiff's counsel?

18          A.    I'm sorry.

19          Q.    You were not asked to define what

20    you thought were the communities of interest in

21    the entire State of Louisiana before you agreed

22    on the regions that you would study with

23    plaintiff's counsel?

24          A.    That's correct.

25          MR. FARR:

1          No further questions, Your Honor.

2      THE COURT:

3          You tender?  I'm sorry, sir.  What

4      did you say?  You tender the witness?

5      MR. FARR:

6          Yes, ma'am.

7      THE COURT:

8          Any redirect?

9      MS. KEENAN:

10         No further questions, Your Honor.

11     THE COURT:

12         You may step down, sir.  Okay.  This

13     is a good time for a short break.  We will

14     be in recess until 3:00 o'clock.

15     THE BAILIFF:

16         All rise.  Court is in recess.

17     (A short recess was taken at 2:41 p.m.)

18     THE BAILIFF:

19         All rise.

20     THE COURT:

21         Okay.  Be seated.  Call your next

22     witness.

23     John John.

24         Your Honor, next, the plaintiffs

25          call Dr. Blakeslee Gulpin.

214

1                    [!WITNESSNAME],

2     after having first been duly sworn by the

3     above-mentioned Court Reporter did testify as

4     follows:

5          THE CLERK:

6                    Would you please state your name and

7          spell it for the record?

8          THE WITNESS:

9                    It's Robert Blakeslee Gilpin.  You

10         want me to spell the whole thing?

11         R-O-B-E-R-T, B-L-A-K-E-S-L-E-E,

12         G-I-L-P-I-N.

13    EXAMINATION BY MS. THOMAS:

14         Q.    Judge, before we start I'd like --

15    if there's no objection, I'd just like too

16    speaker his report and CV for the record?

17         THE CLERK:

18                   Could you state your name for the

19         record?

20    MR. ADCOCK:

21                   I'm sorry.  It's John Adcock on

22         behalf of the plaintiffs.  I'd like to

23          move into the record what is Dr. Gilpin's

24          report and CV.

25          /SKWRAO.

                                                              215


1                    No objection, Your Honor, and no

2           objection to Dr. Gilpin's qualifications.

3           THE COURT:

4                    Okay.  Plaintiff's Exhibit 124 is

5           admitted.

6    BY MR. ADCOCK:

7           Q.    I'm going to skip over your

8    qualifications what you do for a living, Doctor.

9    We are going to go right to the heart of the

10   matter.  Now, you wrote a report in this case,

11   correct?

12          A.    I did.

13          Q.    And what were you asked to do in

14   that report?

15          A.    I was asked to look at the history

16   of racial discrimination particularly as it

17   related to voter disenfranchise in the State of

18   Louisiana.

19          Q.    And what sources did you use, did

20   you reference in drafting that report?

21          A.      I used a pretty wide variety of

22     sources from primary historical documents to

23     historians writing about this long history of

24     racial discrimination and voter disfranchise as

25     well as court cases and court decisions.

216

1          Q.      Now, is that consistent with

2     generally how historians, the kind of sources

3     historians would look at in analyzing this kind

4     of data?

5          A.      Yep.  Totally in keeping with that.

6          Q.      Now, what were your basic

7     conclusions in your report?

8          A.      I -- again, I think it's hard for

9     any historian who studied the history of

10     Louisiana to come away with any other impression

11     than it is an overwhelming history of

12     discrimination against black people, once blacks

13     gained citizenship after the civil war against

14     black citizens and also the sort of overwhelming

15     and deliberate efforts to prevent them from

16     participating in the political process.

17          Q.      Now, on without going too far back,

18     how did this discrimination against black voters

19    manifest itself after the civil war in Louisiana?

20          A.    Well, most immediately after the

21    civil war, Louisiana law makers began to do what

22    many states in the former confederacy did was to

23    write black codes which were basically designed

24    to put black citizens back into a state of quasi

25    slavery, but following that especially following

217

1    the package of the 14th and 15th amendments,

2    there was a pretty long period of quite explicit

3    political terror and violence remained directly

4    at black voters in order to prevent them from

5    participating in the political process and that

6    lasted approximately 20 years, 20 to 30 years.

7          Q.    20 to 30 years up until when we are

8    talking?

9          A.    The late 1890s is when that period

10    of violence changed pretty dramatically and

11    switched over to a much more formal and legal

12    mechanism to prevent blacks from voting.

13          Q.    Now, what was the story of voter

14    registration for black folks in Louisiana post

15    civil war up to 1900?

16          A.    Well, Louisiana is actually one the

17    most celebrated states during reconstruction for

18    achieving such incredible heights of black voter

19    registration, so the peculiar of that

20    registration was actually in 1898 when it reached

21    45 percent of the black population which is

22    pretty unprecedented in other regions in the

23    south and that was really more than anything else

24    as a signal to white Louisiana is they had to

25    come up with new ways as move agriculture cannon

218

1    in a polling place and murder and terrorism to

2    something legally that was going to prevent

3    blacks from participating in the voting process.

4         Q.    And so what are you referring to

5    these kind of?

6         A.    So the most dispersed tack tack that

7    was struck upon was this thing called the

8    grandfather clause which was in -- in keeping

9    many of the themes that would come up over the

10    next century or more fairly ingenious ways to

11    legally prevent blacks from voting in this case,

12    the grandfather case was if your grandmother had

13    not been a voter in Louisiana, you could not be a

14    voter in Louisiana.  That was a logically

15    possibility for black voters because their

16    grandmothers had been enslaved and so this was a

17    way to obliterate black voters in Louisiana to,

18    so 45 went to 5 percent or under 5 percent in two

19    years and down to 1 percent by 1900, so we are

20    talking about just absolutely evacuation of black

21    voters from the polls in the State of Louisiana.

22         Q.    Was the grandfather clause the only

23    kind of electric mechanism in your view to

24    restrict the ability of registration of blacks to

25    vote around that time?

219

1          A.    As soon as -- as soon as method

2    began to fail, white Louisianians would come up

3    with a replacement and many historians have

4    written about this sort of, it's almost like

5    whackable.  Once the grandfather clause was

6    granted illegal.  Then it would be screams by

7    white Louisiana by blacks registering to vote

8    literacy became very common property requirements

9    these are on the heels of grandfather clause.

10    They are all a manner of strategies used by white

11    Louisianians to prohibit blacks from voting.

12         Q.    And could you explain to the court

13    what a poll tax is?

14        A.    That's simply requiring a citizen to

15    pay money when they are trying to register to

16    vote.

17        Q.    And when generally was a poll tax

18    used in Louisiana, if any?

19        A.    Oh, at election time.

20        Q.    No.  I know, but what years are we

21    talking about?

22        A.    What period.  We are talking about

23    basically, basically beginning in 1900, that is a

24    scheme that began to be used.

25        Q.    Got you.  And you write in your

                                                    220


1    report about the kind of jelly bean test.  Can

2    you explain what that is?

3        A.    Yeah.  I mean, that's a phrase

4    that's used to sort of refer to all of the

5    different schemes that were struck upon by white

6    Louisianians basically in the post 1898 period,

7    so they could be reduced and sometimes were used

8    as simple as having a jar of jelly beans next to

9    the white registrar of voter and they'd ask the

10    perspective black voter whether they could tell

11    them how many jelly beans were in the jar and

12    obviously, this was a task that most likely had

13    no answer and certainly could not be

14    independently verified, but it was a way to

15    prevent blacks from registering to vote.

16         Q.    And these were tests usually used

17    against black folk understand not white folks, is

18    that what we are talking about?

19         A.    Yes,, very selective and obviously

20    discriminatory.

21         Q.    Got you.  Can you tell the court

22    what an all white primary is and when it was in

23    effect if you know?

24         A.    So the all white primary was first

25    used in the '40s and this was sort of as civil

221

1     rights agitation began to sort of become a part

2     of American life and the all white primaries were

3     just again another scheme used especially in the

4     electoral situations to prevent blacks from

5     advancing black preferred candidates or

6     candidates of color.

7          Q.    And what about -- can you explain

8     what a single shot voting is?

9          A.     Single shot voting is used in multi

10   member elections where before there were an

11   single shot laws, minority citizens would try to

12   sort of aggregate their votes behind a single

13   candidate and instead, they were told to vote.

14   They had to vote for every candidate being run in

15   the election which meant that black candidates or

16   black preferred candidates were never being

17   elected that was the -- the and the means was ant

18   single shot voting.

19          Q.     So let me understand this.  So

20   you've got maybe four candidates for three

21   positions on the parish council in Union Parish?

22          A.     Yep.

23          Q.     And people want to use one vote and

24   not use their other two votes?

25          A.     Yes.

222

1          Q.     And they made that illegal, correct?

2          A.     Exactly.  So if you did vote for

3   just a single candidate, your vote would not be

4   -- it would be invalidated in that election.

5          Q.     Got you.

6          A.     And why would that

7    disproportionately prevent black folks from

8    obtaining office.

9         A.    Well, this was a sort of I would

10   call it a means of resistance of trying to elect

11   candidates of their preference.  The law was

12   written in order to make sure that that was not

13   possible.

14        Q.    Uh-huh (affirmatively).  Now, you

15   said that black voters were about 5 percent of

16   the electric vote in Louisiana in 1948.  When the

17   Voting Rights Act was passed, what percentage of

18   the electric vote were they in 1965, do you know?

19        A.    I'm not sure.  I think it's in my

20   report, but I don't recall off the top of my

21   head.

22        Q.    If I said 31 percent, does that

23   sound about right?

24        A.    Yeah, that sounds accurate.

25        Q.    In your opinion, what are the

                                                    223


1    important aspects the voting right acts and how

2    it relates to the narrative of discrimination

3    voting in Louisiana?

4         A.    Well, the Voting Rights Act quite

5    simply is a reaffirmation of promises made much

6    earlier in American history to preserve all

7    citizens equal opportunity to participate in the

8    democratic process.  One of the sort of core

9    active properties of the voters rights act is to

10   alert people when that is not proceeding as it

11   should and by it should, the goal of Voting

12   Rights Act the goal of American democracy is many

13   of our citizens to participate as possible so

14   when there are efforts such as the ones we have

15   talked about in the last couple of minutes to

16   make sure that certain people were not able to

17   vote, those are things that are violating not

18   only the principles of American democracy, but

19   specifically the tenants of the Voting Rights

20   Act.  So I mean, I often compare it to a check

21   engine light on democracy which is that it's

22   alerting people at least preclearance as it

23   existed when the Voting Rights Act was written to

24   something that's going -- onto something that's

25   amiss with that practice of democracy.

                                        224

1         Q.    And the preclearance retirement.

2    I'm sure the court knows that's where you have to

3      submit a voting change to the Department of

4      Justice, is that what you are referring to?

5            A.    Yes.

6            Q.    Okay.  Now, what Voting Rights Act

7      violations do you speak is of in your report post

8      1965 in terms of objection letters or anything

9      like that?

10           A.    Well, there are so many of them,

11     it's hard to single out just a single type even.

12     But I would say that the basic patterns that were

13     in place before the Voting Rights Act was passed

14     are very much present after it is in -- enforced.

15     Which is mainly at large voting, packing and

16     cracking of districts, basically all manner of

17     devices when one fails another one is put in

18     place to try and prevent especially black

19     Louisianians from participating in -- in the

20     Democrat process.

21           Q.    Thank you.  You also thought it was

22     important in your report to spend quite a bit of

23     time on Major Vidrine the case there.  Can you

24     explain why that's significant to the court?

25           A.     It's probably the most significant

225

1    case in the history of Louisiana that

2    demonstrates the importance of preclearance.

3    Because Louisiana voters would likely never have

4    been made aware of the offenses and violations of

5    the Voting Rights Act were it not for

6    preclearance.  What that case revealed it was a

7    redistricting case I mean, pardon my language

8    here, but the man in charge of redistricting said

9    we -- we already have a knicker mayor we don't

10   need any more knicker big shots so it was quite

11   explicitly concocted as a scheme to prevent

12   blacks from voting.  And the -- the resulting

13   redistricting after the violation was discovered

14   was the first black member of Congress elected in

15   the State of Louisiana since 1870, so that if you

16   want to sort of understand the progress that the

17   VRA represented to this state Treen, is probably

18   the most glaring example of that progress, but

19   also of the sort of doing resistance to the

20   changes that the VRA was proposing.

21        Q.    When you said the man in charge of

22   redistricting this was around 1981, was that in

23   the state legislature?

24        A.    Yes, that was in the state

25   legislature.

1          Q.    Okay.  Now, I want to move on more

2     into the present day.

3                What are -- can you give the court

4     an overview here, what are recent examples of

5     discrimination with regard to voting in Louisiana

6     that comes to mind?

7          A.    I mean, at large, voting is ringing

8     a huge problem post '82 so we are just talking

9     post Treen.  Most recently voter requirements

10    closing the polling places, in many ways, post

11    2013 is a very different landscape because

12    preclearance is no longer a part of this at least

13    of what we can know.  But the practices that are

14    still in place and are most closely resemble the

15    things that were taking place before 2013 so the

16    same schemes to prevent black Louisianians's from

17    voting are being attempted over and over again.

18         Q.    That's what I was going to ask you.

19    So just overall why is history important?

20         A.    Oh, I see.

21         Q.    In terms of understanding, but how

22    does it relate to present day practices?

23         A.    Yeah.  I mean, I think that there's

24    obviously many famous sayings of those that

25    ignore history tend to repeat it, but I think the

227

1     more specific reason why we look at things like

2     the long tree of racial discrimination and voter

3     /TK*PL in the State of Louisiana is to see what

4     were the patterns, what were the practices that

5     people were using, are those ends as in is the

6     goal of disenfranchising black voters still out

7     there without the check engine light of

8     preclearance without being made aware of this

9     through this mechanism, does it mean that our

10    engine is running fine.  I would say that the

11    evidence is quite to the contrary that Louisiana

12    it still has an engine that is occasionally

13    malfunctioning and the purpose of that is to try

14    to remedy it and extend the privilege of voting

15    to as many of our citizens as we can.

16         MR. ADCOCK:

17              That's all I have for now, judge.

18         THE COURT:

19              Cross.

20         /SKWRAO.

21              Thank you, Your Honor.

22    CROSS-EXAMINATION BY FARR:

23         Q.    Hi, Dr. Gilpin, how are you?

24         A.    How are you?

25         Q.    Good to see you in person.  Sorry I

                                                    228


1    couldn't do your deposition in person.  I much

2    prefer being with you here today.   In your

3    report, and I think you just testified about the

4    Treen case?

5         A.    Uh-huh (affirmatively).

6         Q.    Does your report have any other

7    examples of court decisions where acts of the

8    legislature have been found to be discriminatory

9    since 1982?

10        A.    I can't think of any.

11        Q.    Okay.  And as far as the legislature

12   is concerned, the legislature has not used

13   multimember districts since 1982?

14        A.    As far as I'm aware, that sounds

15   accurate.

16        Q.    Okay.  So as far as legislative

17   districts, the legislature is not guilty of using

18   unusually large districts?

19        A.    I don't believe so.

20          Q.    And because they don't have

21    multimember districts, there's no ant single shot

22    law that's applied to elections for legislature?

23          A.    No, I don't believe so.

24          Q.    And does the Democrat party or the

25    Republican party in Louisiana have what's known

                                                    229


1    as candidate slating that essentially makes it

2    impossible for an African-American to receive a

3    nomination for their party for legislative race?

4          A.    This is definitely not an area that

5    I'm an expert in so I can't comment to that.

6    THE ATTORNEY:

7              Okay.  All right.  Can we turn to

8              secretary of state Exhibit 35.

9    TRIAL TECH:

10             (Complied.)

11    THE COURT:

12             Is it already in evidence?

13    /SKWRAO.

14             It is, ma'am.

15    THE COURT:

16             Okay.  Go ahead.

17    /SKWRAO.

18          I couldn't remember.  Has it been

19          admitted?  Okay.  Thanks.

20  THE ATTORNEY:

21          Q.    All right.  Dr. Gilpin, are you

22  familiar with secretary of state Exhibit 35?

23          A.    Yes, I am.

24          Q.    And you cite that in your report?

25          A.    I do.

                                              230


1          Q.    And is it fair to say that this is a

2  report by a majority of the commissioners who

3  serve on the Louisiana advisory committee on

4  civil rights?

5          A.    That was my understanding, yes.

6          Q.    So it's not a unanimous opinion,

7  right?

8          A.    I think we went over this in

9  deposition, I'm not total -- I'm not sure.

10          Q.    Okay.  In your report, did you

11  identify any decisions where a court has found

12  discrimination in the location of polling places?

13          A.    I don't believe so.

14          Q.    And have you -- in your report, did

15  you cite any cases where a court has found that

16   Louisiana's laws in early voting discriminate

17   against black voters?

18        A.   I don't believe so.

19        Q.   And did you report, cite any cases

20   polling the legislature guilty of discrimination

21   on largely related to the voting accessibility?

22        A.   Well, I think the Delta when you are

23   getting to the legislature, what it didn't do as

24   much as what it did do.

25        Q.   Okay.  Well, that's a fair point,

                                                231


1   but my question is:  Are there any court

2   decisions hold an act of a legislature as being

3   discriminatory on voting accessibility issues?

4        A.   I don't believe so.

5        Q.   And is there ever been a decision by

6   --

7        THE REPORTER:

8             I'm sorry.  I didn't get his answer.

9        THE WITNESS:

10            I don't believe so.

11   THE ATTORNEY:

12        Q.   Has there ever been a decision by

13   the court finding that the voter law has been

14    discriminatory?

15         A.    I don't believe so.

16         Q.    Has there ever been a decision by a

17    court finding since 1982, I won't /TKEUS /#350U9

18    your history which is compelling of things in the

19    past, but since 1982, has any court made a

20    decision that Louisiana's registration laws

21    discriminate against blacks?

22         A.    After 19 -- you are drawing a firm

23    line in '82?

24         Q.    Yes, sir.

25         A.    I don't believe so.

                                              232


1          Q.    In your report, Dr. Gilpin, you

2     testified about Louisiana acts 636; do you

3     remember that?

4          A.    Uh-huh (affirmatively).

5          Q.    Could you tell the court what that

6     act was all about?

7          A.    I remember it, but I don't remember

8     exactly what it was.

9          Q.    Let me see if I can refresh your

10    memory.

11         A.    Okay.

12      Q.    Did that law allow those who had not

13   incarcerated for the previous five years to

14   regain their right to vote regardless of their

15   provision of parole status?

16      A.    Yes.  Yes.  That's correct.

17      Q.    And would you agree that that law

18   disproportionately benefited black voters because

19   the incarceration rates in Louisiana?

20      A.    That was the intended benefit, yeah.

21   THE ATTORNEY:

22          No further questions, Your Honor.

23   THE COURT:

24          Any redirect?

25   MR. ADCOCK:

                                      233


1          Just a few, judge.

2   BY MR. ADCOCK:

3      Q.    Now, counsel asked you whether you

4   discuss any cases in your report that find

5   discrimination in certain scenarios.  Do you

6   remember that?

7      A.    Yes, I do.

8      Q.    Now, when -- you are forming a

9   narrative about what happened in history, do

10    historians only look at court cases?

11        A.    No.  And I mean, I think that's one

12    of the main problems with the lines that are

13    being drawn here not only in regards to time, but

14    also in regards to what entity is involved with

15    what offense.  One, I think the more glaring

16    lessons from the history of Louisiana is not just

17    that the legislature has not been found guilty of

18    doing something, but that it has not been found

19    guilty of doing something positive or doing

20    something to remedy these situations.  The

21    evidence in my report I think is overwhelming to

22    anyone of how persistent and dogged the efforts

23    of this disenfranchised voting hack that is not

24    consistent from '82, it is something consistent

25    up to present day the question for the

234

1    legislature is why they aren't doing things to

2    out law these practices no matter where they

3    arise if it's in Bossier City city council or if

4    it's in a school district on the Westbank, it

5    doesn't matter where we are talking about.  It's

6    the fact that these practices persist is really a

7    sort of horrible thing that the VRA is really

8    designed to alert Louisianians to not in a

9    punitive context that's what the check engine

10   light is for, it's your engine you got to repair

11   it.  If you don't, your democracy is going to

12   fall apart.

13          MR. ADCOCK:  All right.  No more

14          questions, judge.

15   THE COURT:

16              Okay.  You may step down,

17          Dr. Gilpin.  You have another witness?

18          Next witness.

19   MR. ADCOCK:

20          Do we have a problem?  Do we have a

21          witness?

22          Her her.

23              No we have a witness, she's in the

24          bathroom.

25   THE COURT:

235

1              Call your next witness, please.

2    MR. ADCOCK:

3              I just wanted to address two

4          evidentiary things really quick.  We have

5          a the witness here if I can do that really

6          quick judge I apologize.

7          THE COURT:

8                What are they?

9          /STPHAO.

10               I entered in the report PX 124.  I

11         want to also enter in PX 125 which is

12         Dr. Gilpin's CV.  It is in part in the,

13         but that's the objection.

14         /SKWRAO.

15               No objection, Your Honor.

16         THE COURT:

17               All right.  125 is admitted.

18         /STPHAO.

19               And if I -- Your Honor, I'm sorry

20         about this, but I think that I know that

21         opposing counsel stipulated that the

22         experts qualifications, I don't know if I

23         tendered him as an expert in Louisiana

24         history.

25         THE COURT:

                                                236


1                You did not.

2          /STPHAO.

3                Okay.  I'd like to tender him now

4        based on the testimony and the evidence in

5        the record and his report and the

6        stipulation.

7        THE COURT:

8              Mr. Farr?

9        MR. FARR:

10             We agree.

11        THE COURT:

12             If your opposing counsel wasn't so

13        professional, you would have had a problem

14        MR. ADCOCK:

15             Thank you, judge.

16        THE COURT:

17             Dr. Gilpin is a recognized expert in

18        Louisiana history and the court recognizes

19        him as such as well.

20        MS. THOMAS:

21             Hello, Your Honor.  Alora Thomas for

22        the plaintiffs and we will be calling

23        Mr. Bill Cooper.

24                   [!WITNESSNAME],

25   WITNESS ADDRESS, ^ WITNESS CITY, LOUISIANA

1   WITNESS ZIP, after having first been duly sworn

2   by the above-mentioned Court Reporter did testify

3   as follows:

4          /STPHAO.

5                 Your Honor, may I approach the

6          witness I have a couple binders for him

7          THE COURT:

8                 As long as the opposing counsel has

9          seen them, yes.

10         MS. THOMAS:

11                Yes.  I gave them to opposing

12         counsel.

13         /SKWRAO.

14                Yes, Your Honor, we have a copy.

15         MS. THOMAS:

16                And I have a copy for the court if

17         the court is interested.

18         THE COURT:

19                Well, if you are going to refer to

20         his reports and maps, I have them.

21         MS. THOMAS:

22                We will be referring to his reports

23         and maps.  I know that the witness likes

24         to have paper copies.  There are also a

25         number of exhibits attached to his reports

1           which are in the binders we will be using

2           the screen also, but --

3       THE COURT:

4               I mean, give them -- certainly give

5           them to Mr. Cooper to assist him in his

6           opinion testimony and obviously, I don't

7           have a binder as fat as yours so maybe I

8           don't have everything, but I've got his

9           reports and the maps that are attached to

10          his reports.

11      MS. THOMAS:

12              Thank you, Your Honor.  So at the

13          outset with the practice of today, we

14          would like to move in Exhibit 20 through

15          88 which are Mr. Cooper's corrected report

16          and the attached exhibits there to.

17      /SKWRAO.

18              No objection, Your Honor.

19      THE COURT:

20              Plaintiffs Exhibits 20 through 88

21          are admitted.

22      MS. THOMAS:

23              And then in addition to those 89

24          through 115, which are Mr. Cooper's

25          rebuttal reports and exhibits there to.

                                                    239


1          THE COURT:

2                Is there any objection?

3          /SKWRAO.

4                No objection, Your Honor.

5          THE COURT:

6                Admitted.

7          MS. THOMAS:

8                Thank you, Your Honor.

9     EXAMINATION BY MS. THOMAS:

10         Q.    Good afternoon, Mr. Cooper.  Could

11    you please introduce yourself to the court?

12         A.    Good afternoon.  My name is William

13    S. Cooper.

14         Q.    And what is your profession?

15         A.    I provide consulting services

16    relating to GIS mapping and analysis of census

17    data to various organizations around the country.

18    The bulk of my work is actually related to

19    redistricting, but I do some other smaller

20    projects mainly for non-profits here and there.

21    I occasionally also work for local governments

22    with respect to redistricting.

23          Q.    And can you briefly describe your

24    educational background?

25          A.    I have a B A in economics from

240

1    Davison College in North Carolina.

2          Q.    And can you -- sorry.  Please strike

3    that.

4                Have you testified as an expert

5    witness in the past?

6          A.    Yes.  I believe I have testified in

7    about 55 cases at trial and roughly the same --

8    in the same number, 55 or so, by way of

9    deposition or declaration and probably 95 percent

10    of all those cases have related to redistricting

11    and the vast majority of those another 95 percent

12    of the 95 percent have been Section 2 cases.

13          Q.    And have any of your cases involved

14    state redistricting plans?

15          A.    Yes.  I've testified I believe in

16    nine cases or seven cases at trial involving

17    state redistricting and another two by way of

18    deposition or declaration.

19          Q.    And have any of your cases involved

20    Louisiana?

21          A.    Yes.  Not state level redistricting

22    other than the congressional redistricting.  I

23    testified in -- I believe it was May of 2022, in

24    Baton Rouge on the congressional plan.  The other

25    times I've testified in federal court in

241

1    Louisiana have related to local election plans,

2    once for I think the first case that I testified

3    at federal court here in Baton Rouge involved the

4    city of St. Francisville in West Feliciana

5    Parish.  I also testified in a lawsuit involving

6    the 30 second judicial district in Terrebonne

7    Parish in 2017 I believe, also in federal court

8    here in Baton Rouge.  In other instances, I've

9    provided declarations and or depositions going

10   back into the early '90s on Section 5 matters as

11   well as a Section 2 case or so.  Those -- that

12   testimony has always been deposition not by --

13   not at trial.

14          Q.    And have any of the cases you've

15   worked on in Louisiana happened outside of the

16   voting context?

17          A.    That is true.  I have testified in

18   federal court as recently as August on a school

19    desegregation case in St. Martin Parish.  That

20    was actually the third time I've testified in

21    that case and I believe it's now been resolved.

22    I testified in that case in 2021 and again in

23    2022 at trial.  That's the only other school

24    desegregation case in Louisiana that I testified

25    in.  I have provided a declaration in another

242

1    one.

2            Q.    And what areas of the state has your

3    work involved?

4            A.    Well, frankly, I've been involved in

5    almost every region of the state.  In the early

6    '90s, in the Section 5 matters, I testified in or

7    rather was involved in casing and visited the

8    parishes of West Carroll, East Carroll, Madison,

9    Tensas and then a little bit later in the early

10   '90s, I testified in cases involving Iberville,

11   Pointe Coupee and a couple of other parishes.  I

12   think in both instances I was deposed by the

13   former attorney general Buddy Caldwell in Monroe,

14   Louisiana.  I have mentioned St. Francisville

15   which of course, was trial testimony.  I provided

16   assistance on a Section 5 letter to the DOJ that

17    was put together by attorneys at the southern

18    regional office of the OCLU in the early 2010s

19    involving the city of Lake Charles.  And those

20    would have been -- oh, and I was also involved in

21    Bossier Parish and actually testified that was

22    the Bossier Parish school board case that went to

23    supreme court and I did testify in that case, but

24    that was at the U.S. district court in

25    Washington, D.C.  around 1994, so --

243

1        Q.    And you testified earlier that you

2    have testified in Section 2 cases, correct?

3        A.    Yes.

4        Q.    And what is the nature of your

5    testimony in Section 2 cases in the past?

6        A.    It's almost always related to I

7    think always related to testifying with respect

8    to the /SKWRAOUFTS one inquiry preventing an

9    illustrative plan and I've always been recognized

10    or by the court as an expert in redistricting in

11    demographics because I always include

12    demographics with my declarations including not

13    just basic census demographics, but also

14    socioeconomic statistics that relate to

15    Section 5.

16         Q.    And since the start of this most

17    current redistricting cycle in 2020, how many

18    cases have you served as an expert witness?

19         A.    Eight.  I think in my declaration

20    I've listed seven, but since my declaration and

21    even rebuttal declaration was filed in August, I

22    have testified in another one in Galveston

23    county, Texas in the early part of August also.

24         Q.    And does one of those cases include

25    the Alabama case known as Merrell V medical began

                                              244


1    that recently went to supreme court?

2         A.    Yes.  That was a case I testified in

3    in January of 2022.

4         Q.    And are you aware of the outcome of

5    the case?

6         A.    Yes.  The plaintiffs prevailed in

7    that case.  That case also went to the supreme

8    court and my work in that case was reviewed and

9    cited favorably by the supreme court.

10         THE COURT:

11              By the chief justice.

12         THE WITNESS:

13              Exactly.

14          MS. THOMAS:

15              Thank you, Your Honor.

16    BY MS. THOMAS:

17          Q.    So if we could briefly take a look

18    at exhibit Plaintiff Exhibit 21, which I believe

19    is your CV?

20          A.    Yes.

21          Q.    And Do you have a copy in front of

22    you?

23          A.    Yes.

24          Q.    And this is a true and accurate

25    representation of your CV?

                                              245


1           A.    Yes.  As it relates to the date of

2     May 31, 2023.

3           Q.    Have there been changes since that

4     date?

5           A.    Well, yes.  I -- I did testify in

6     federal court as I mentioned in Galveston county.

7     In fact, the judge in the Galveston county case

8     led off the quote from me in his opinion that's

9     probably never happened before and probably never

10    will again, and as I mentioned the St. Martin

11    parish school board case was also a case that

12    transpired in I think July of 2023, and I file

13    declarations in our cases.  I don't know whether

14    I can speak to those or not, but I filed a

15    declaration in a DeSoto Parish redistricting case

16    and I have not been deposed in that case, but

17    that's another Louisiana locality I've been

18    involved in in recent six.

19              MS. THOMAS:

20                   If we could turn to page 7 of

21              Plaintiff Exhibit 21 and then if we could

22              highlight the section called Louisiana and

23              it should be on your screen now,

24              Mr. Cooper.

25              TRIAL TECH:

                                                246


1                   (Complied.)

2    BY MS. THOMAS:

3         Q.    Is this an example of some of your

4    work in Louisiana?

5         A.    Yes.  Those are the five cases where

6    I've actually testified at trial.

7         Q.    Thank you.  At this time,

8    plaintiff's would like to tender Mr. Cooper as an

9    expert in demographics and redistricting and

10   census data?

11        THE COURT:

12             Any objection?

13        /SKWRAO.

14             No objection, Your Honor.

15        THE COURT:

16             No cross on the tender?

17        /SKWRAO.

18             No, Your Honor.

19        THE COURT:

20             All right.  Mr. Cooper will be

21             accepted to give testimony in demographics

22             census data and redistricting.

23   BY MS. THOMAS:

24        Q.    Mr. Cooper, when were you retained

25   by plaintiffs?

247

1         A.    Well, I was initially retained as

2    part of a multi state letter of engagement from

3    the ACLU in the early winter, January, maybe of

4    2020 right before the pandemic broke out.

5         Q.    And when did you actually begin

6    working on this case?

7        A.     Specifically working with 2020

8    census data in late February of 2022.

9        Q.     And what were you asked to do when

10   you were began your work?

11       A.     I was asked to investigate the

12   January one inquiry whether or not it would be

13   possible to create one or more additional House

14   or Senate seats in the Louisiana legislature

15   above and beyond those districts that would have

16   been in the final enacted plan.

17       Q.     And how did you approach answering

18   this question?

19       A.     I obtained the census data from the

20   census bureau's website the PL 9471 file I also

21   purchased and utilized a data file that is

22   produced by the caliber corporation the makers of

23   Mapitude for redistricting which is a software I

24   use and then obtained what I thought was the

25   enacted version of the state house and state

                                                    248


1    Senate plan in early March of 2022 subsequent to

2    that I learned that I actually only had a

3    committee plan and so I did have to make some

4    adjustments to my declaration further down the

5    road to take into account that a little miss cue.

6    So I was basically relying on data from the --

7    from the legislature and data from the census

8    bureau and the cap per corporations Mapitude for

9    redistricting software and I also apart from that

10   all that sort of related to 2020 census I looked

11   at social you economic data based on the 2015,

12   2019 American community survey that I had

13   obtained in December of 2021.

14        Q.    So just pausing on the socioeconomic

15   data, did you end up using the socioeconomic data

16   that you purchased -- that you collected?

17        A.    Yes.  I used that socioeconomic data

18   to gain a better understanding a little more

19   insight into some of the localities where I was

20   considering whether or not it might be possible

21   to draw an additional majority, minority

22   district.

23        Q.    And in what format did you have the

24   socioeconomic data?

25        A.    Well, it was originally downloaded

                                                  249

1    from the census bureau website for the American

2    community survey.  I was in a comma format.  I

3    took that and uploaded it into Microsoft access

4    and then produced a series of charts and tables

5    comparing contrasting the socioeconomic status of

6    African-Americans and Latinos and non Hispanic

7    whites at the parish and municipal level and

8    place level not incorporated places across the

9    state, so I basically did all the parishes and

10   all the municipalities all the places that were

11   black as memory serves I believe we did look at

12   East Carroll Parish in my previous appearance in

13   this court in the congressional plan and that was

14   the same set of charts that I would be relying

15   upon in this case.

16          Q.    And did you turn over this data to

17   the defense expert when you submitted your

18   reports?

19          A.    Yes.

20   MS. THOMAS:

21          Okay.  If we could pull up Plaintiff

22          Exhibit 20 and I'd like to go to page 23,

23          paragraph 51.

24   TRIAL TECH:

25          (Complied.)

1    BY MS. THOMAS:

2         Q.    Did you also identify this data in

3    your report?

4         A.    Yes.  You can still down load all of

5    that information at that link.  I understand that

6    maybe some websites government related websites

7    may not allow you to download that due to

8    blockage, but you can -- you can get it off your

9    cell phone probably.

10        MS. THOMAS:

11             If we could pull up now what has

12             been marked plaintiff's Exhibit 163.

13        TRIAL TECH:

14             (Complied.)

15        MS. THOMAS:

16             And if we could just scroll through

17             the first couple of pages.

18        TRIAL TECH:

19             (Complied.)

20    BY MS. THOMAS:

21        Q.    This is part of what is a very long

22    exhibit of over 4,000 pages which we have broken

23    into two to be uploaded into the court system and

24    previously exchanged with counsel.  Is this a

25    depiction of the socioeconomic data that you had?

```
1          A.    Yes.  It's each municipality or each

2     parish any way would have about 64 pages of

3     charts and tables some of the municipalities due

4     to popular begin issues may not have all of the

5     data issued, but for the most part, these should

6     run 50 to 60 pages one set of charts and the

7     corresponding table reflected in the charts.

8          THE COURT:

9               Counsel, I'm sorry. What was the

10              exhibit number was it 164?

11         MS. THOMAS:

12              Is 163, Your Honor.

13         THE COURT:

14              163, thank you.

15    BY MS. THOMAS:

16         Q.    And so the record is clear, if you

17    click so the link in your report you would be

18    taken to the site with this information, correct?

19         A.    With that information except instead

20    of having one big file several thousand pages you

21    go click on the parish and get the number and get

22    the report for that parish or that municipality

23    without having a thousand page to go through
```

24     although, I think you could probably just do it

25     by find and search on doe bee and get to it as

                                                    252

1     well.

2          MS. THOMAS:

3               At this point, plaintiff's would

4          like to move in 163.  I know defense

5          counsel in the past had an objection.

6          THE COURT:

7               Counsel?

8          /SKWRAO.

9               I thought we already moved it in as

10         part of all the other exhibits, so no

11         objection.

12         MS. THOMAS:

13              Just so the record is clear, this is

14         not an exhibit to his report this is the

15         data that he used.

16         THE COURT:

17              What she moved previously was

18         Plaintiff's 20 through 88 and 89 through

19         115 and this is like she said, not an

20         exhibit to his report.

21         /SKWRAO.

22          I apologize, Your Honor.  I thought

23     this was one of the exemplars it is an

24     exhibit to his report.  No objection.

25     THE COURT:

253

1          Okay.  P 163 is admitted.

2     Suzie.

3          Exhibits 163 A and B, is that right?

4     MS. THOMAS:

5          Yes, Your Honor.  We would like to

6     move into 163 A and B which is how it's

7     been uploaded to the court's system.

8     THE COURT:

9          So ordered.

10 BY MS. THOMAS:

11     Q.    Now, going back to the work that you

12 consulted as part of your work in this case, did

13 you look at any prior legislative plans in

14 Louisiana?

15     A.    I did look at to a certain extent.

16 I looked at the 2011 bench mark plan and of

17 course, the prior plans being the enacted plans

18 so I certainly looked at the enacted plans as of

19 the 2020 redistricting cycle.  I did have access

20    to earlier congressional plans, but I don't

21    recall actually looking at state legislative

22    plans that predated the 2011 benchmark plan.

23         Q.    And after you looked at this data,

24    did you come to a conclusion about the original

25    question you were asked about jingles one?

                                                    254


1         A.    Yes.  Unquestionably an additional

2    majority black districts can be created in

3    Louisiana at least three new Senate districts and

4    at least six new house districts there would be,

5    you know, various ways they could be constructed.

6    Just simply an illustrative plan it is not

7    submitted as an a proposed remedial plan.

8         Q.    And did you record your opinion in a

9    report?

10         A.    Yes.

11         MS. THOMAS:

12              If we could pull up Plaintiff

13         Exhibit 20.

14         TRIAL TECH:

15              (Complied.)

16    BY MS. THOMAS:

17         Q.    And you have it before you also

18    Mr. Cooper.  Is this a true and accurate copy of

19    your report?

20         A.    Yes.

21         Q.    Did you file any previous versions

22    of this report?

23         A.    Yes.  I filed a version of this

24    report in 2022 which had the Ron us lines for the

25    enrolled house and enrolled Senate a most

255

1    unfortunate oversight on my part.  The

2    differences are really quite minor and the

3    defendants spent an un Godly amount of time

4    comparing and contrasting the actual plan with

5    2022.  I don't understand their point there, but

6    in any event yes, this is the update that is the

7    final report and it incorporates the actual 2023

8    House and Senate plans.

9         Q.    And did you file a final corrected

10    version in September of this year?

11         A.    Yes.  I made it to correct one

12    figure that mistakenly I left in from my earlier

13    report because I did make some minor changes to

14    the illustrative plan in '23 versus the

15    illustrative plan I presented in 2022.

16          Q.    And you've appended exhibits to

17     Plaintiff Exhibit 20.  What was the purpose of

18     these exhibits?

19          A.    The exhibits just show the maps in

20     more detail or additional demographic

21     information.  There are also a number of

22     automated reports from the Mapitude software that

23     would include plan metrics such as compactness

24     municipal politicals identification of which

25     counties are -- or which districts are in which

                                                 256


1     parishes, so those are those are listed in my

2     declaration by the exhibit number in my -- in my

3     declaration so it won't actually deliver you to

4     the right tab on the exhibit book.  I used an

5     alphabetical alignment of exhibits so my

6     alphabetical alignment of exhibits goes from A to

7     -- A to Z and maybe beyond.

8          Q.    Did you also submit a rebuttal

9     report in this case?

10          A.    Yes, I did.  There were a number of

11     misstatements, miss accuracies, astonishing flaws

12     in the reports filed by the three experts in this

13     -- in this the litigation so I did file a

14    rebuttal.

15         Q.    Now, by three experts you mean you

16    looked at three of the defense experts; is that

17    correct?

18         A.    Yes.

19         Q.    And do you recall which expert

20    reports you?

21         A.    Yes.

22         Q.    Reviewed?

23         A.    Yes.  Dr. Murray, Mr. Trendy and

24    Dr. Johnson.

25         Q.    Did you review the reports of any

                                        257


1    other defense experts?

2         A.    I don't think so.

3         MS. THOMAS:

4              And if we could pull up Plaintiff

5         Exhibit 89.

6         TRIAL TECH:

7              (Complied.)

8    BY MS. THOMAS:

9         Q.    And if I do could take a look at the

10    exhibit that you have before you, 89 it should be

11    in your second binder.

12          A.     Oh.

13          Q.     In Volume II.

14          A.     Okay.  I am now at Exhibit 89.

15          Q.     Is this a true and accurate copy of

16   your rebuttal report?

17          A.     Yes.

18          Q.     You also appended exhibits to your

19   rebuttal report.  What were those exhibits?

20          A.     Again, many of the exhibits attached

21   to my rebuttal report mirror the same exhibits

22   that I -- that I had with my initial report, but

23   examined some of the issues raised by the

24   defendants's experts so I have got a more

25   extensive report on measures of compactness for

                                                   258


1    the adopted enrolled plans as well as for the

2    illustrative plans instead of just looking at two

3    or three compactness scores I looked at all 12

4    that are available from Mapitude for

5    redistricting.  I looked at splits of

6    municipalities, some of that was discussed by the

7    experts splits of planning districts, splits of

8    -- of metropolitan fiscal areas so you know, it's

9    basically an extension of my initial report with

10    more detail directly contradicting some of the

11    misstatements and inaccuracies in the -- the

12    experts for the defendants.  There's one section

13    here that's like it's a hundred pages of -- of a

14    split report responding to a misunderstanding or

15    misstatement of fact from Dr. Murray, and also I

16    think may address something that doctor Johnson

17    questioned which is the extent to which census

18    block roads are split in the illustrative plans

19    and I actually fewer census block groups are

20    split in the illustrative plans than in the

21    enacted plans.

22        Q.    And after reviewing all the

23    materials in your rebuttal report, did any of

24    your initial conclusions change?

25        A.    Absolutely not.

                                    259


1        Q.    Your Honor, I can move onto my next

2    section or we could take a break I know we are

3    nearing the end of the day?

4        THE COURT:

5            How much direct exam do you have?

6        MS. THOMAS:

7            At least an hour maybe 90 minutes.

8          THE COURT:

9                  Okay.  We will take a break for the

10         day.  We had agreed on a nine to four

11         schedule so everybody to get some suitable

12         rest for commencing the following day so

13         we will be in recess until 9:00 a.m.

14         Thank you, I'm sorry to hold you over, but

15         -- that's the way it is.

16         THE BAILIFF:

17                  All rise.  The court is in recess.

18     (The trial was concluded at 3:59 p.m. until

19 tomorrow.)

20

21

22

23

24

25

260

1                  REPORTER'S PAGE

2          I, CHERIE' E. WHITE, Certified Court

3 Reporter, in and for the State of Louisiana, the

4 officer, as defined in Rule 28 of the Federal

5 Rules of Civil Procedure and/or Article 1434(B)

6    of the Louisiana Code of Civil Procedure, before

7    whom this sworn testimony was taken, do hereby

8    state on the record;

9        That due to the interaction in the

10    spontaneous discourse of this proceeding, dashes

11    (--) have been used to indicate pauses, changes

12    in thought, and/or talkovers; that same is the

13    proper method for the court reporter's

14    transcription of a proceeding, and that dashes

15    (--) do not indicate that words or phrases have

16    been left out of this transcript; also, that any

17    words and/or names which could not be verified

18    through reference material have been denoted with

19    the phrase "(spelled phonetically)."

20

21

22            CHERIE' E. WHITE, CCR (LA NO. 96002)

23            CSR (TX NO 10720)

24            CSR (MS NO. 1514)

25            RPR (NATIONAL NO. 839452)

                                    261


1            REPORTER'S CERTIFICATE

2

3        This certification is valid only for a

4    transcript accompanied by my original signature

5    and original seal on this page.

6        I, CHERIE' E. WHITE, Certified Court

7    Reporter, in and for the State of Louisiana, do

8    hereby certify that this trial as hereinbefore

9    set forth in the foregoing ___ pages; that this

10   testimony was reported by me in the stenotype

11   reporting method, was prepared and transcribed by

12   me or under my personal direction and

13   supervision, and is a true and correct transcript

14   to the best of my ability and understanding; that

15   I am not related to counsel or the parties

16   herein, nor am I otherwise interested in the

17   outcome of this matter.

18

19

20       CHERIE' E. WHITE, CCR (LA NO. 96002)

21       CSR (TX NO. 10720)

22       CSR (MS NO. 1514)

23       RPR (NATIONAL NO. 839452)

24

25