# **Attachment 4**

1                  UNITED STATES DISTRICT COURT

2                   MIDDLE DISTRICT OF LOUISIANA

3

4    DOROTHY NAIRNE, ET AL          *          CIVIL ACTION
                                    *
5    VERSUS                         *          NO. 3:22-178-SDD
                                    *
6    KYLE ARDOIN, ET AL             *          NOVEMBER 30, 2023
     * * * * * * * * * * * * * * * *
7

8

9                            DAY 4
                          BENCH TRIAL
10            BEFORE THE HONORABLE SHELLY D. DICK
              UNITED STATES CHIEF DISTRICT JUDGE
11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:         AMERICAN CIVIL LIBERTIES UNION
                                 FOUNDATION
15                               BY:  MEGAN C. KEENAN, ESQ.
                                      SARAH E. BRANNON, ESQ.
16                                    DAYTON CAMPBELL-HARRIS, ESQ.
                                 915 15TH STREET, NW
17                               WASHINGTON, DC 20005

18                               NAACP LEGAL DEFENSE & EDUCATION
                                 FUND, INCORPORATED
19                               BY:  VICTORIA WENGER, ESQ.
                                      SARA ROHANI, ESQ.
20                                    STUART C. NAIFEH, ESQ.
                                 40 RECTOR STREET, FIFTH FLOOR
21                               NEW YORK, NEW YORK 10006

22                               COZEN O'CONNOR
                                 BY:  JOSEPHINE M. BAHN, ESQ.
23                               1200 19TH STREET, NW
                                 THIRD FLOOR
24                               WASHINGTON, DC 20036

25

```
 1                                  COZEN O'CONNOR
                                    BY:  ROBERT S. CLARK, ESQ.
 2                                  ONE LIBERTY PLACE
                                    1650 MARKET STREET, SUITE 2800
 3                                  PHILADELPHIA, PENNSYLVANIA  19103

 4                                  COZEN O'CONNOR
                                    BY:  AMANDA GIGLIO, ESQ.
 5                                  3 WORLD TRADE CENTER
                                    55TH FLOOR
 6                                  NEW YORK, NEW YORK 10007

 7                                  AMERICAN CIVIL LIBERTIES UNION
                                    FOUNDATION, VOTING RIGHTS PROJECT
 8                                  BY:  GARRETT MUSCATEL
                                    125 BROAD STREET, 18TH FLOOR
 9                                  NEW YORK, NEW YORK  10004

10                                  ELECTION LAW CLINIC
                                    HARVARD LAW SCHOOL
11                                  BY:  T. ALORA THOMAS, ESQ.
                                    6 EVERETT STREET, SUITE 4105
12                                  CAMBRIDGE, MASSACHUSETTS 02138

13                                  ADCOCK LAW, LLC
                                    BY:  JOHN N. ADCOCK, ESQ.
14                                  3110 CANAL STREET
                                    NEW ORLEANS, LOUISIANA 70119

15
    FOR THE DEFENDANT,              NELSON MULLINS RILEY &
16  KYLE ARDOIN, IN HIS             SCARBOROUGH, LLP
    OFFICIAL CAPACITY AS            BY:  PHILLIP J. STRACH, ESQ.
17  SECRETARY OF STATE:                  THOMAS A. FARR, ESQ.
                                         CASSIE A. HOLT, ESQ.
18                                       ALYSSA M. RIGGINS, ESQ.
                                    4140 PARKLAKE AVENUE, STE. 200
19                                  RALEIGH, NORTH CAROLINA 27612

20                                  SHOWS, CALI & WALSH, LLP
                                    BY:  JOHN C. CONINE, JR., ESQ.
21                                       JOHN C. WALSH, ESQ.
                                    628 ST. LOUIS STREET
22                                  BATON ROUGE, LOUISIANA 70802

23  FOR THE INTERVENOR,             BAKER & HOSTETLER, LLP
    CLAY SCHEXNAYDER                BY:  KATE MCKNIGHT, ESQ.
24  AND PATRICK PAGE                     ROBERT J. TUCKER, ESQ.
    CORTEZ:                              PATRICK LEWIS, ESQ.
25                                  200 CIVIC CENTER DRIVE, STE. 1200
                                    COLUMBUS, OHIO 43215
```

```
 1                                  BAKER & HOSTETLER, LLP
                                    BY:  MICHAEL W. MENGIS, ESQ.
 2                                  811 MAIN STREET, SUITE 1100
                                    HOUSTON, TEXAS 77002
 3
      FOR THE INTERVENOR, THE       HOLTZMAN VOGEL JOSEFIAK
 4    STATE OF LOUISIANA BY AND     TORCHINSKY, PLLC
      THROUGH ATTORNEY GENERAL      BY:  BRENNAN BOWEN, ESQ.
 5    JEFF LANDRY:                  2575 EAST CAMELBACK RD., STE. 860
                                    PHOENIX, ARIZONA 85016
 6
                                    HOLTZMAN VOGEL JOSEFIAK
 7                                  TORCHINSKY, PLLC
                                    BY:  PHILLIP M. GORDON, ESQ.
 8                                  15404 JOHN MARSHALL HIGHWAY
                                    HAYMARKET, VIRGINIA 20169
 9
                                    LOUISIANA DEPARTMENT OF JUSTICE
10                                  BY:  ANGELIQUE D. FREEL, ESQ.
                                         JEFFREY M. WALE, ESQ.
11                                       AMANDA M. LAGROUE, ESQ.
                                    1885 N. THIRD STREET
12                                  BATON ROUGE, LOUISIANA 70804

13    OFFICIAL COURT REPORTER:      TERI B. NORTON, FCRR, RMR, RDR
                                    UNITED STATES DISTRICT COURT
14                                  501 E. COURT STREET, STE. 2.500
                                    JACKSON, MISSISSIPPI 39201
15                                  TERI_NORTON@MSSD.USCOURTS.GOV
                                    (601)608-4186
16
            PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
17                   COMPUTER-AIDED TRANSCRIPTION SOFTWARE

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3

4    Rule 52(c) Motion by Defendant/Intervenors  ...............5

5    WITNESSES FOR THE DEFENDANTS/INTERVENORS:

6    PAGE CORTEZ

7        Direct Examination   .................................20

8        Cross-Examination By Mr. Adcock  ....................64

9    DR. JOHN ALFORD

10       Direct Examination By Mr. Tucker  ...................91

11       Cross-Examination By Mr. Campbell-Harris  ..........136

12   SEAN TRENDE

13       Direct Examination By Mr. Strach  ..................161

14

15

16

17

18

19

20

21

22

23

24

25

8:58AM  1          **THE COURT:**  WE ARE BACK ON THE RECORD IN THE NAIRNE

2     VERSUS ARDOIN CASE, 22 CIVIL ACTION 178.  I BELIEVE THE PARTIES

3     HAVE A RULE 52(C) MOTION THAT THEY WANT TO -- OR THE

4     DEFENDANT/INTERVENORS HAVE A 52(C) THAT THEY WANT TO URGE.  I'M

5     GOING TO GIVE EACH SIDE TEN MINUTES TO ARGUE THE 52(C), AND

6     THEN WE WILL TAKE A TEN-MINUTE BREAK AND COMMENCE WITH

7     TESTIMONY.

8          ALSO, JUST FOR HOUSEKEEPING PURPOSES SO THAT YOU ALL KNOW,

9     WE WILL TAKE AN EXTENDED NOONTIME BREAK FROM 11:30 TO 1:30.  I

10    HAD MENTIONED THAT TO YOU AT THE PRETRIAL CONFERENCE, SO THAT

11    WILL BE THE SCHEDULE FOR TODAY.  OKAY.  MR. STRACH.

12          **MR. STRACH:**  THANK YOU, YOUR HONOR, AND GOOD MORNING.

13    PHIL STRACH FOR THE SECRETARY OF STATE.  YOUR HONOR, ALL

14    DEFENDANTS MOVE FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO

15    RULE 52(C).  AND WE HAVE THREE OR FOUR PRIMARY REASONS FOR THE

16    BASIS OF OUR MOTION.

17          THE FIRST IS PROVIDED IN OUR MOTION TO DISMISS FILED

18    YESTERDAY.  SECTION 2 DOES NOT CONFER A PRIVATE RIGHT OF

19    ACTION.  I WON'T GO INTO DETAIL ON THAT.  THAT IS IN OUR

20    MOTION, WHICH THE COURT WILL DEAL WITH IT IN DUE COURSE.  I DID

21    WANT TO NOTE, YOUR HONOR, THAT YESTERDAY, IN *ELIZONDO VERSUS*

22    *SPRING BRANCH ISP*, CASE NUMBER 4:21CV01997, THE SOUTHERN

23    DISTRICT OF TEXAS CANCELLED A TRIAL DATE SET FOR DECEMBER 4,

24    2023 IN A SECTION 2 CASE INVOLVING SCHOOL BOARD DISTRICTS IN

25    LIGHT OF THE EIGHTH CIRCUIT'S RULING IN ARKANSAS STATE

9:00AM   1   CONFERENCE NAACP, SO I WANTED THE COURT TO BE AWARE THAT A

2   SISTER COURT IN TEXAS TOOK THE CASE OFF THE TRIAL CALENDAR

3   BECAUSE OF THAT PENDING RULING.

4       SECOND, PLAINTIFFS HAVE STANDING TO CHALLENGE, AT MOST,

5   ONLY THOSE DISTRICTS THAT THE INDIVIDUAL PLAINTIFFS TESTIFY

6   THAT THEY LIVE IN.  THAT'S CLEAR FROM *GILL V. WHITFORD*, 138

7   SUPREME COURT 1916, AND *NORTH CAROLINA VERSUS COVINGTON*, 138

8   SUPREME COURT 2548.  DEFENDANTS PURPORT TO CHALLENGE 34 ENACTED

9   HOUSE DISTRICTS AND 13 ENACTED SENATE DISTRICTS, BUT THEY

10   CANNOT ASSERT INJURY FOR DISTRICTS OTHER THAN THOSE CHALLENGED

11   DISTRICTS IN WHICH THEY RESIDE.

12       DR. NAIRNE IS IN SENATE DISTRICT 2 AND HOUSE DISTRICT 60,

13   BUT SENATE DISTRICT 2 IS AN EXISTING MAJORITY-MINORITY

14   DISTRICT, SO THERE IS NO INJURY AND NO STANDING THERE.

15   DR. WASHINGTON LIVES IN HOUSE DISTRICT 66.  REVEREND HARRIS IS

16   IN HOUSE DISTRICT 25.  REVEREND LOWE IS IN HOUSE DISTRICT 66.

17   SO OF THE CHALLENGED DISTRICTS, THAT'S, AT MOST, THREE

18   LEGISLATIVE DISTRICTS THAT THE PLAINTIFFS HAVE STANDING TO

19   CHALLENGE.

20       FURTHER, THERE'S NO ORGANIZATIONAL STANDING.  LOUISIANA

21   NAACP HAS NOT SHOWN ANY DIVERSION IN FUNDING SPECIFIC TO THE

22   STATE CONFERENCE.  ALL THE ALLEGED HARMS ARE TO THE BRANCHES,

23   WHICH ARE SEPARATE LEGAL ENTITIES WHICH ARE NOT PART OF THIS

24   LAWSUIT.

25       MR. MCCLANAHAN SPOKE IN GENERALITIES ABOUT BANQUETS AND

9:02AM   1   FUNDRAISING, BUT THOSE ARE ALL BY THE BRANCHES.  AND IN FACT,

2   HE TESTIFIED THAT THE STATE CONFERENCE HAD, IN FACT, HAD ITS

3   ANNUAL CONFERENCE THIS YEAR.

4       ALL THE HARM MS. HO SANG TESTIFIED TO WAS TO THE BLACK

5   VOTERS MATTER FUND, NOT THE CAPACITY BUILDING INSTITUTE.  THEY

6   ARE SEPARATE ENTITIES, DIFFERENT TAX STATUSES.  BUT EVEN IF

7   THEY WEREN'T, THE ALLEGED HARM AND DIVERSION OF RESOURCES

8   OCCURRED BEFORE THE MAPS WERE PASSED.

9       THERE IS NO ASSOCIATIONAL STANDING.  THAT WAS NOT RAISED

10   BY BVM BECAUSE THEY DON'T HAVE ANY MEMBERS.  THE LOUISIANA

11   NAACP CANNOT ASSERT STANDING ON BEHALF OF THE BRANCH MEMBERS.

12   THEY ARE TOTALLY SEPARATE ORGANIZATIONS.  FURTHERMORE, THE TIME

13   FOR MEASURING STANDING IS AT THE FILING OF THE COMPLAINT, AS

14   YOUR HONOR CORRECTLY NOTED IN THE SUMMARY JUDGMENT ORDER AT

15   DOC. 181 AT PAGE 5.  THE PLAINTIFFS OFFERED NO EVIDENCE AS TO

16   WHEN THESE INDIVIDUALS BECAME MEMBERS, LET ALONE WHETHER THEY

17   VOTE OR WHETHER THEIR CANDIDATES OF CHOICE ARE WINNING THEIR

18   DISTRICTS.  MR. MCCLANAHAN CONCEDED THAT HE DID NOT CONTACT THE

19   MEMBERS WHO WAIVED THEIR ASSOCIATIONAL PRIVILEGE UNTIL A FEW

20   WEEKS AGO, AND DEFENDANTS HAVE NOT BEEN ABLE TO DEPOSE THOSE

21   WITNESSES.

22       EVEN SO, MR. MCCLANAHAN ONLY TESTIFIED TO THREE ENACTED

23   SENATE DISTRICTS AND FOUR ENACTED HOUSE DISTRICTS IN WHICH

24   MEMBERS OF CERTAIN LOCAL NAACP BRANCHES RESIDE.  SO WHEN

25   COMBINED WITH THE INDIVIDUAL PLAINTIFFS, THAT WOULD BE, AT

9:03AM   1   MOST, 10 LEGISLATIVE DISTRICTS OUT OF THE 47 ENACTED DISTRICTS

2   THAT PLAINTIFFS CHALLENGE.

3       FINALLY, YOUR HONOR, THE PLAINTIFFS HAVE FAILED TO PRESENT

4   A VIABLE REMEDY.

5       IN *ROSE V. GEORGIA*, NUMBER 1:20CV2921, IN THE SOUTHERN

6   DISTRICT OF GEORGIA, THE ELEVENTH CIRCUIT HELD THAT A PLAINTIFF

7   MUST PRESENT A SATISFACTORY REMEDIAL PLAN TO MEET THE *GINGLES*

8   PRECONDITIONS.  HERE PLAINTIFFS HAVE PRESENTED NO EVIDENCE THAT

9   THE PROPOSED ILLUSTRATIVE DISTRICTS WILL PERFORM AND ELECT A

10   BLACK VOTER'S CANDIDATE OF CHOICE.  DR. HANDLEY TESTIFIED THAT

11   SHE DID NOT CONDUCT A DISTRICT-SPECIFIC ABILITY-TO-ELECT

12   ANALYSIS.  SHE FAILED TO CONDUCT A DISTRICT-SPECIFIC ANALYSIS

13   OF WHAT BVAP IS NECESSARY FOR BLACK VOTERS' CANDIDATES OF

14   CHOICE TO WIN.

15       IN *COVINGTON V. NORTH CAROLINA*, THE COURT OBSERVED THAT

16   THE CORRECT ANALYSIS TO SATISFY THE THIRD PRONG IS A, QUOTE,

17   DISTRICT EFFECTIVENESS ANALYSIS, WHICH IS, QUOTE, USED TO

18   DETERMINE THE MINORITY VOTING AGE POPULATION LEVEL AT WHICH A

19   DISTRICT BECOMES EFFECTIVE IN PROVIDING A REALISTIC OPPORTUNITY

20   FOR VOTERS OF THAT MINORITY GROUP TO ELECT CANDIDATES OF THEIR

21   CHOICE, CLOSE QUOTE.  AND, OF COURSE, THAT DECISION WAS

22   AFFIRMED UNANIMOUSLY BY THE UNITED STATES SUPREME COURT.

23       DR. HANDLEY ADMITTED THAT SHE DID NOT CONDUCT A

24   DISTRICT-SPECIFIC ANALYSIS EXCEPT FOR HER EFFECTIVENESS SCORES,

25   WHICH WERE ONLY FOR THE DISTRICTS AS DRAWN, NOT THE PROPOSED

9:05AM  1   ILLUSTRATIVE DISTRICTS.

2          FURTHERMORE, SHE ALSO FAILED TO CONSIDER ENDOGENOUS

3   ELECTIONS.  THE COURTS WITHIN THIS CIRCUIT HAVE ROUTINELY HELD

4   THAT ENDOGENOUS ELECTIONS ARE MORE PROBATIVE OF UNEQUAL

5   ELECTORAL OPPORTUNITY, CITING *RODRIGUEZ VERSUS HARRIS COUNTY*,

6   964 F.SUPP.2D 686, AFFIRMED BY THE FIFTH CIRCUIT IN 2015.

7          IN ADDITION, THE PLAINTIFFS HAVE PUT ON NO EVIDENCE OF

8   DEMONSTRATING THAT THE POPULATION, THE MINORITY POPULATION IN

9   THE PROPOSED ILLUSTRATIVE DISTRICTS ARE COMPACT.  AND

10  THEREFORE, THE CLAIMS FAIL FOR THAT REASON.  ALSO, THEREFORE,

11  THEY HAVE FAILED TO DEMONSTRATE THAT THEY HAVE A VIABLE REMEDY,

12  AND THEREFORE DEFENDANTS ARE ENTITLED TO A RULE 52(C) JUDGMENT.

13  THANK YOU, YOUR HONOR.

14          **THE COURT:**  THANK YOU.  COUNSEL FOR THE PLAINTIFF.

15          **MS. KEENAN:**  YES, YOUR HONOR.  MAY I PROCEED?

16          **THE COURT:**  YES.

17          **MS. KEENAN:**  SO I THINK MR. STRACH SAID THERE WERE

18  THREE OR FOUR PRIMARY REASONS --

19          **THE COURT:**  MAKE AN APPEARANCE FOR THE COURT

20  REPORTER.  WE HAVE A NEW COURT REPORTER.

21          **MS. KEENAN:**  OH, I APOLOGIZE.  MEGAN KEENAN FOR THE

22  PLAINTIFFS.

23          **THE COURT:**  THANK YOU.

24          **MS. KEENAN:**  I THINK MR. STRACH SAID THERE WERE THREE

25  OR FOUR PRIMARY REASONS.  I'M NOT SURE I GOT EXACTLY THAT MANY,

9:06AM  1    BUT I WILL TRY TO TAKE THEM IN TURN AS I HEARD THEM.

2          SO FIRST WAS AS TO THE REQUEST THAT WE SHOULD STAY OR

3    CANCEL THE TRIAL RELATING TO THE PRIVATE RIGHT OF ACTION

4    DECISION THAT CAME OUT OF THE ARKANSAS DECISION IN THE EIGHTH

5    CIRCUIT.  AS MR. STRACH NOTED, THERE WAS NO MOTION FILED ON

6    THIS ISSUE YESTERDAY FOR THE FIRST TIME DURING THE LUNCH BREAK

7    OF DAY THREE OF THE TRIAL.  THE DEFENDANTS HAVE NEVER ASKED

8    THIS COURT TO DISMISS THIS CASE ON THE BASIS OF A PRIVATE RIGHT

9    OF ACTION PRIOR TO THAT MOTION.  THEY DID NOT RAISE IT IN THEIR

10   ANSWER, FOR EXAMPLE.  AND THEY DIDN'T RAISE IT IN ANY MOTION TO

11   DISMISS THAT WAS FILED AT AN APPROPRIATE TIME.  SO AS AN

12   INITIAL MATTER, PLAINTIFFS WANT TO PRESERVE THAT THIS ARGUMENT

13   WAS NOT TIMELY MADE.

14         BUT ON THE SUBSTANCE, ADDITIONALLY, AS YOUR HONOR MADE

15   CLEAR AT THE TOP OF THIS TRIAL, THIS COURT IS BOUND BY THE

16   FIFTH CIRCUIT'S DECISION IN *ROBINSON VERSUS ARDOIN*, WHICH JUST

17   WEEKS AGO CONFIRMED THAT PRIVATE PLAINTIFFS HAD A PRIVATE RIGHT

18   OF ACTION UNDER SECTION 2.  TO BE SPECIFIC, THE COURT WAS FACED

19   WITH THE QUESTION OF, QUOTE, WHETHER SECTION 2 PROVIDES FOR A

20   PRIVATE RIGHT OF ACTION, CLOSE QUOTE, AND IT HELD THAT PRIVATE

21   PLAINTIFFS, INCLUDING SOME OF THE VERY PARTIES IN THIS VERY

22   CASE, QUOTE, ARE AGGRIEVED PERSONS, AND THAT THERE IS A RIGHT

23   FOR PLAINTIFFS TO BRING THESE CLAIMS, CLOSE QUOTE.  THAT'S THE

24   ROBINSON SLIP OPINION AT PAGES 9 TO 10.  SO THIS COURT IS BOUND

25   BY THE FIFTH CIRCUIT'S EXISTING LAW SAYING THAT THERE IS, IN

9:08AM  1  FACT, A PRIVATE RIGHT OF ACTION UNDER SECTION 2.

2       MR. STRACH DID NOT SEEM TO RAISE THE JURISDICTIONAL

3  ARGUMENT HERE TODAY.  WE ARE PREPARED TO ADDRESS THAT TO THE

4  EXTENT OF THIS UNDERSTANDING, BUT WE WILL, IN ANY EVENT, BE

5  ADDRESSING THE JURISDICTIONAL COMPONENT, WHICH WE THINK IS

6  WRONG-HEADED, IN THE MOTION THAT YOUR HONOR SAID WE CAN FILE

7  AFTER TRIAL IN THIS CASE.

8       TO BRIEFLY COMMENT ON THAT ISSUE, WE DON'T UNDERSTAND ANY

9  SOURCE OF AUTHORITY FOR THAT ARGUMENT.  THE EIGHTH CIRCUIT

10  DECISION THAT THE DEFENDANTS HAVE RAISED ADDRESSES JURISDICTION

11  BRIEFLY TO SAY THAT THEY FOUND THAT THE DISTRICT COURT HAD

12  JURISDICTION ALL ALONG AND THAT THERE ARE ONLY VERY SPECIFIC

13  CIRCUMSTANCES WHERE THE PRIVATE RIGHT OF ACTION ISSUE IS

14  JURISDICTIONAL AND THAT THIS ISN'T ONE OF THEM.

15       THE ONLY OTHER SOURCE OF AUTHORITY ABOUT THIS PRIVATE

16  RIGHT OF ACTION ISSUE AND WHETHER PRIVATE PLAINTIFFS CAN BRING

17  A CLAIM UNDER SECTION 2, TO OUR KNOWLEDGE, IS JUSTICE GORSUCH'S

18  CONCURRENCE IN *BRNOVICH*, WHICH AGAIN SPECIFICALLY STATES THAT

19  THIS IS NOT A JURISDICTIONAL ISSUE, SO WE DON'T UNDERSTAND ANY

20  BASIS FOR THAT SORT OF AN ARGUMENT.

21       THE LAST THING ON THIS ISSUE ABOUT THE PRIVATE RIGHT OF

22  ACTION IS THAT THE CASE THAT MR. STRACH CITED OUT OF THE

23  SOUTHERN DISTRICT OF TEXAS, OF COURSE, WAS SET TO BEGIN LATER

24  IN DECEMBER.  YOUR HONOR HAS ALREADY DECIDED NOT TO STAY THIS

25  TRIAL, AND NOW WE ARE MID-WAY THROUGH THE TRIAL.  SO WE WOULD

9:09AM   1    OBJECT TO ANY ARGUMENT THAT THERE SHOULD BE JUDGMENT ENTERED ON

2    THE BASIS OF THE EIGHTH CIRCUIT DECISION AT THIS STAGE OF

3    TRIAL.

4        I'M GOING TO MOVE ON NEXT TO WHAT I UNDERSTAND TO BE AN

5    ARGUMENT THAT AFFECTS THE INDIVIDUAL STANDING IN THIS CASE,

6    MR. STRACH'S ARGUMENT ABOUT THE INJURIES TO THOSE PLAINTIFFS

7    AND TO WHICH DISTRICTS THE PLAINTIFFS ARE ABLE TO CHALLENGE.

8    AS THE COURT EXPLAINED IN ITS ORDER DENYING SUMMARY JUDGMENT

9    PRIOR TO TRIAL, THE INJURY-IN-FACT INQUIRY REQUIRES PLAINTIFFS

10   TO SHOW THE EXISTENCE OF AT LEAST ONE PERSON WHO WAS A BLACK

11   REGISTERED VOTER RESIDING IN EACH DILUTIVE DISTRICT THAT COULD

12   BE REDRAWN INTO A MAJORITY BLACK DISTRICT.  THAT'S FROM YOUR

13   HONOR'S ORDER DENYING SUMMARY JUDGMENT.

14       HERE, THE TESTIMONY OF THE INDIVIDUAL PLAINTIFFS AND

15   PRESIDENT MCCLANAHAN ESTABLISHED THE RACE AND VOTER

16   REGISTRATION STATUS OF EACH PLAINTIFF AND NAACP MEMBER.  THE

17   TESTIMONY OF THE INDIVIDUAL PLAINTIFFS, PRESIDENT MCCLANAHAN

18   AND BILL COOPER, ESTABLISHED THE ILLUSTRATIVE AND ENACTED

19   DISTRICTS IN WHICH EACH PLAINTIFF AND NAACP MEMBER CURRENTLY

20   RESIDES.  AND PLAINTIFFS' EXHIBITS 23, 24, 33 AND 40

21   ESTABLISHED THE BVAP PERCENTAGE OF EACH ENACTED AND

22   ILLUSTRATIVE HOUSE AND SENATE DISTRICT.

23       FROM THOSE SOURCES THAT I'VE JUST MENTIONED, WE

24   ESTABLISHED THE FOLLOWING INFORMATION:  EACH PLAINTIFF AND

25   NAACP MEMBER IS BLACK AND A REGISTERED VOTER IN THE STATE OF

9:10AM   1    LOUISIANA.   DR. NAIRNE CURRENTLY RESIDES IN MAJORITY WHITE

2    ENACTED HD 60 AND WOULD RESIDE IN MAJORITY BLACK ILLUSTRATIVE

3    HOUSE DISTRICT 58.   REVEREND LOWE CURRENTLY RESIDES IN MAJORITY

4    WHITE ENACTED HD 66 AND WOULD RESIDE IN MAJORITY BLACK

5    ILLUSTRATIVE HD 101.   REVEREND HARRIS CURRENTLY RESIDES IN

6    MAJORITY WHITE ENACTED HD 25 AND WOULD RESIDE IN MAJORITY BLACK

7    ILLUSTRATIVE HD 23.   DR. WASHINGTON CURRENTLY RESIDES IN

8    MAJORITY WHITE ENACTED HD 66 AND WOULD RESIDE IN MAJORITY BLACK

9    ILLUSTRATIVE HD 101.

10        AND WITHOUT GETTING INTO THE SPECIFIC NAMES AND ADDRESSES

11    DISCUSSED UNDER SEAL, OF COURSE, MR. COOPER WALKED US THROUGH

12    HOW EACH NAACP MEMBER CURRENTLY RESIDES IN A PACKED OR CRACKED

13    DISTRICT IN THE ENACTED MAP AND WOULD INSTEAD LIVE IN A

14    REASONABLY CONFIGURED MAJORITY BLACK DISTRICT IN THE

15    ILLUSTRATIVE MAP, INCLUDING SPECIFICALLY ILLUSTRATIVE HD 1, 23,

16    38, 65, 68, AND 69, AS WELL AS ILLUSTRATIVE SENATE DISTRICTS

17    17, 19 AND 38.

18        IN ADDITION TO MR. COOPER, MR. MCCLANAHAN'S TESTIMONY

19    ABOUT THE NAACP MEMBERS, DR. NAIRNE ALSO TESTIFIED THAT SHE IS

20    AN NAACP MEMBER, AND SHE LIVES IN ENACTED HD 60, WHICH

21    MR. COOPER UNCRACKED TO CREATE MAJORITY BLACK HD 60.

22        SO IN EACH OF THOSE DISTRICTS THAT I'VE JUST NAMED, HD 1,

23    23, 38, 65, 68 AND 69 AND 60 AND ILLUSTRATIVE SD 17, 19 AND 38,

24    PLAINTIFFS HAVE ESTABLISHED STANDING AS YOUR HONOR DEFINED IT

25    IN THE ORDER DENYING SUMMARY JUDGMENT IN THIS CASE.

9:12AM   1          AS FOR THE ASSOCIATIONAL STANDING THAT MR. STRACH RAISED,

        2    I AM UNAWARE OF ANY ASSOCIATIONAL STANDING CASE IN WHICH AN

        3    ORGANIZATION HAS HAD TO PROVE NOT ONLY THE NAMES AND THE

        4    ADDRESSES AND THE VOTER REGISTRATION STATUS AND THE RACE OF ITS

        5    MEMBERS AND WHERE THEY WOULD LIVE UNDER BOTH THE ENACTED AND

        6    THE ILLUSTRATIVE PLANS, BUT ALSO THE DATE ON WHICH EACH MEMBER

        7    JOINED THE ORGANIZATION IN QUESTION.  THERE IS NO EVIDENCE

        8    CERTAINLY SUGGESTING THAT THEY WERE NOT MEMBERS, SO AT THIS

        9    POINT, WE THINK THE PLAINTIFFS HAVE MET THEIR BURDEN ON

       10    ASSOCIATIONAL STANDING AND HAVE PROVED EVERYTHING THEY NEED TO

       11    ABOUT THE NAACP MEMBERS IN THIS CASE.

       12          FINALLY, ON THE NAACP MEMBER POINT, I BELIEVE THAT

       13    MR. STRACH HAS CONFUSED THE FACTS ABOUT THE BRANCH TESTIMONY

       14    THAT CAME IN AND THE LOUISIANA NAACP TESTIMONY THAT CAME IN.

       15    AS WE'VE ALREADY BRIEFED IN THIS CASE, THERE'S A MULTI-TIER

       16    MEMBERSHIP STRUCTURE OF THE LOUISIANA NAACP, NAMELY THE

       17    LOUISIANA NAACP HAS MEMBERS THAT ARE ITS BRANCHES, AND THOSE

       18    BRANCHES HAVE INDIVIDUAL MEMBERS.  AND WE'VE TALKED ABOUT CASE

       19    LAW SHOWING THAT THIS MULTI-TIER MEMBERSHIP STRUCTURE DOES NOT

       20    DESTROY ASSOCIATIONAL STANDING.

       21          BUT AS TO THE DIVERSION OF RESOURCES STANDING, WHICH MR.

       22    STRACH ALSO ADDRESSED, THERE WAS NO TESTIMONY THAT THE

       23    DIVERSION OF RESOURCES WAS ONLY AT THE BRANCH LEVEL RATHER THAN

       24    AT THE STATE LOUISIANA NAACP LEVEL.  RATHER, MR. MCCLANAHAN,

       25    THE PRESIDENT OF THE LOUISIANA NAACP, TESTIFIED ABOUT THE

9:14AM   1   SPECIFIC RESOURCES THAT THAT ORGANIZATION IS DIVERTING.  AND IN

2   PARTICULAR, YOUR HONOR, HE TESTIFIED ABOUT HOW THE LOUISIANA

3   NAACP HAS HAD TO PULL PEOPLE BACK FROM DOING WORK ON HEALTH,

4   EDUCATION, AND OTHER PROJECTS AND HOW MUCH ADDITIONAL

5   ORGANIZING AND MOBILIZATION ARE NOW REQUIRED TO COUNTERACT THE

6   STATE HOUSE AND SENATE MAPS, GIVEN THEIR INSTALLATION OF

7   DISILLUSIONMENT IN BLACK VOTERS AND THEIR EFFECT ON OTHER

8   ORGANIZATIONS, CANDIDATES AND FUNDERS' WILLINGNESS TO INVEST

9   RESOURCES INTO BLACK COMMUNITIES' NEEDS IN LOUISIANA.

10       I'M NEXT GOING TO ADDRESS THE ORGANIZATIONAL STANDING

11   ISSUE AS TO BLACK VOTERS MATTER CAPACITY INSTITUTE, WHICH

12   AGAIN, I DON'T QUITE UNDERSTAND.  MR. STRACH REPRESENTED THAT

13   THE RESOURCES DIVERTED WERE FROM BVM FUND, BUT THAT IS SIMPLY

14   NOT WHAT MS. HO SANG TESTIFIED.  WHEN ASKED SPECIFICALLY ABOUT

15   WHERE THE RESOURCES THAT SHE TESTIFIED ABOUT WERE EXPENDED

16   FROM, SHE SAID ONE HUNDRED PERCENT OF THOSE RESOURCES CAME FROM

17   THE C3, FROM BVM CAPACITY BUILDING INSTITUTE.  THAT'S THE NAMED

18   PLAINTIFF IN THIS CASE.

19       SO THE PLAINTIFFS HAVE SHOWN THAT THE RESOURCES MS. HO

20   SANG TESTIFIED ABOUT CAME FROM THE NAMED PLAINTIFF

21   ORGANIZATION.  AND MR. STRACH ALSO SUGGESTED THAT THOSE

22   RESOURCES WERE ONLY EXPENDED PRIOR TO THE PASSAGE OF THE MAP.

23   BUT AGAIN, THAT IS NOT WHAT MS. HO SANG TESTIFIED.  SHE DID, OF

24   COURSE, TALK ABOUT HOW BVM CAPACITY BUILDING INSTITUTE EXPENDED

25   SUBSTANTIAL RESOURCES TOWARD COUNTERACTING THE STATE HOUSE AND

9:15AM    1    SENATE MAPS FROM THE TIME THEY WERE INITIALLY PROPOSED,

2    INCLUDING BY SUSPENDING SUBSTANTIAL AMOUNTS OF MONEY ON STAFF

3    TIME ON EDUCATING, MOBILIZING, AND TRANSPORTING BLACK VOTERS

4    FROM AROUND THE STATE TO TESTIFY AT ROAD SHOW HEARINGS AND THE

5    STATE HOUSE, ALL TO COUNTERACT THE UNLAWFUL MAP THAT THE

6    LEGISLATURE ULTIMATELY DID PASS.

7         BUT IN ADDITION TO ALL OF THE WORK SHE TESTIFIED ABOUT

8    LEADING UP TO THE PASSAGE OF THE STATE HOUSE AND SENATE MAPS,

9    SHE MADE CLEAR THAT BVM CONTINUED TO DIVERT RESOURCES AFTER THE

10   PASSAGE OF THE MAP TO COUNTERACT DEFENDANTS' CONDUCT AND THAT

11   THAT DIVERSION IS ONGOING.

12        MS. HO SANG TALKED IN DETAIL ABOUT HOW BVM, FOR EXAMPLE,

13   LAUNCHED A NEW ACCOUNTABILITY STRATEGY.  THAT IS ONE CONCRETE

14   MEASURE BVM IS TAKING TO COUNTERACT THE MAP'S DILUTIVE EFFECT

15   AND SUPPRESSION OF BLACK VOTERS' POWER.  SHE TALKED ABOUT HOW

16   THAT ACCOUNTABILITY STRATEGY INCLUDES FINDING NEW WAYS TO HOLD

17   ELECTED OFFICIALS ACCOUNTABLE TO BLACK VOTERS, WHETHER BY

18   DEVOTING STAFF TIME TOWARD CREATING FLIERS AND E-MAILS AND

19   SOCIAL MEDIA POSTS, LIKE PLAINTIFFS' EXHIBITS 205, 206, 207,

20   AND 208, TO EDUCATE VOTERS ON WHICH REPRESENTATIVES VOTED

21   AGAINST THEIR INTERESTS AND HOW TO CONTACT THOSE

22   REPRESENTATIVES DIRECTLY, OR BY HOSTING VIRTUAL AND IN-PERSON

23   FREEDOM SCHOOLS TO TEACH BVM'S PARTNERS AND COMMUNITIES ABOUT

24   HOW TO ENGAGE WITH ELECTED OFFICIALS WHO DON'T REPRESENT THEIR

25   COMMUNITIES AND TO MAKE THEIR NEEDS HEARD.

9:16AM    1    MS. HO SANG ALSO EXPLAINED THAT THE DILUTIVE STATE HOUSE

2    AND SENATE MAPS HAVE DEEPENED VOTER APATHY AND DISILLUSIONMENT

3    BY PROVIDING WHAT SHE CALLED A CASE IN POINT, THAT DESPITE

4    BLACK COMMUNITIES ORGANIZING AND TESTIFYING BEFORE THE

5    LEGISLATURE AND FIGHTING FOR THEIR RIGHTS, THE ENACTED MAPS DO

6    NOT GIVE THEM AN OPPORTUNITY TO ELECT A REPRESENTATIVE OF THEIR

7    CHOICE, AND SO THEY LITERALLY PREVENT THEIR VOTES FROM

8    MATTERING.

9    AND TO COUNTERACT THIS DISTINCTIVE EFFECT OF THE STATE

10    HOUSE AND SENATE MAPS, AGAIN, AFTER THE MAPS WERE PASSED, BVM

11    HAS HAD TO DEVOTE EVEN MORE STAFF TIME AND RESOURCES TOWARD

12    CONVINCING BLACK LOUISIANANS THAT THEIR VOTES MATTER, INCLUDING

13    BY CHANGING ITS PRACTICE OF EXPENDING RESOURCES ON VOTER

14    ENGAGEMENT EFFORTS CLOSE IN TIME TO ELECTION DAY, TO WHICH SHE

15    DESCRIBED AS A 365 YEAR-ROUND VOTER ENGAGEMENT APPROACH.

16    PERHAPS MOST IMPORTANTLY, MS. HO SANG ALSO EXPLAINED HOW

17    EACH OF THESE CONCRETE MEASURES BVM IS TAKING TO COUNTERACT THE

18    DEFENDANTS' CONDUCT PERCEPTIVELY IMPAIRS BVM'S ABILITY TO CARRY

19    OUT OTHER ACTIVITIES.  RECALL, FOR EXAMPLE, MS. HO SANG'S

20    TESTIMONY ABOUT HOW BVM HAS LIMITED TIME AND RESOURCES AND HOW

21    POURING ITS EFFORTS AND RESOURCES INTO THE ACCOUNTABILITY

22    STRATEGY AND ITS 365 VOTER ENGAGEMENT WORK AFTER THE PASSAGE OF

23    THE MAPS HAVE DELAYED OR PREVENTED BVM FROM ENGAGING IN

24    CAPACITY FOR BUILDING WORK WITH ITS PARTNERS.  FOR EXAMPLE, ITS

25    PARTNERS' ISSUE MINING NEEDS THAT ARE CRITICALLY IMPORTANT TO

1    THEIR ABILITY TO EFFECTIVELY MOBILIZE AND EMPOWER BLACK VOTERS

2    IN LOUISIANA.

3         ALL OF THAT TESTIMONY AND THE EXHIBITS I MENTIONED HAVE

4    COME INTO EVIDENCE, AND SO PLAINTIFFS HAVE ESTABLISHED THAT BVM

5    DID DIVERT RESOURCES SUFFICIENT TO ESTABLISH ORGANIZATIONAL

6    STANDING IN THIS CASE.

7         THE NEXT THING I HAVE IS AN ARGUMENT THAT THERE'S NO

8    EVIDENCE THAT THE PROPOSED ILLUSTRATIVE DISTRICTS WILL PERFORM,

9    WHICH AGAIN, DR. HANDLEY CERTAINLY TESTIFIED TO YESTERDAY.  AS

10   THIS COURT HAS ALREADY OBSERVED IN THE *DAUBERT* ORDER IN THIS

11   CASE, DR. HANDLEY'S TESTIMONY WAS SUFFICIENTLY LOCALIZED,

12   ESPECIALLY GIVEN THAT IT WOULD HAVE BEEN IMPOSSIBLE TO HAVE

13   DONE DISTRICT-SPECIFIC ANALYSIS ON DISTRICTS THAT HADN'T HAD

14   ANY ELECTIONS YET.

15        DR. HANDLEY DID, HOWEVER, TRY TO CREATE ENDOGENOUS

16   ELECTIONS, AS SHE TESTIFIED IN HER EXPERT OPINIONS, BY

17   ASSEMBLING AREAS OF INTEREST IN THE STATE, LOOKING AT

18   LEGISLATIVE RACES THAT HAD HAPPENED IN THE DISTRICTS THAT ARE

19   NOW IN THE ILLUSTRATIVE -- OR NOW THE ENACTED DISTRICTS, AND BY

20   TALKING ABOUT HOW THERE WAS RACIALLY POLARIZED VOTING IN EACH

21   OF THOSE AREAS.

22        DR. HANDLEY ALSO INCLUDED IN HER REPORT EFFECTIVENESS

23   SCORES FOR NOT ONLY THE ENACTED BUT THE ILLUSTRATIVE DISTRICTS.

24   SO SHE CERTAINLY PROVIDED BOTH EVIDENCE ABOUT HOW RACIALLY

25   POLARIZED VOTING EXISTS IN LOUISIANA AND HOW IT AFFECTS

9:19AM  1    ELECTIONS.  SHE TALKED ABOUT HOW THAT AFFECTED EACH OF THE

2    PROPOSED ILLUSTRATIVE DISTRICTS IN THIS CASE, AND SHE INCLUDED

3    AN EFFECTIVENESS SCORE FOR EACH OF THOSE DISTRICTS.

4         SO PLAINTIFFS BELIEVE THAT THEY HAVE ESTABLISHED WHAT IS

5    NECESSARY FOR *GINGLES* II AND III AS IT RELATES TO A PERFORMANCE

6    OF THE DISTRICTS.

7         I'M JUST CHECKING MY NOTES TO SEE IF THERE IS ANYTHING

8    ELSE I WANTED TO INCLUDE ON THE RECORD, YOUR HONOR.

9         I GUESS, JUST TO ADD ONE MORE THING ABOUT THE

10    EFFECTIVENESS OF THE DISTRICT, AS I SAID, DR. HANDLEY

11    CALCULATED THE EFFECTIVENESS SCORE OF ALL ENACTED DISTRICTS IN

12    THE AREAS OF INTEREST.  SHE DIDN'T FIND A SINGLE ENACTED

13    DISTRICT WITH BVAPS LESS THAN 50 PERCENT THAT WERE EFFECTIVE IN

14    ELECTING BLACK PREFERRED CANDIDATES.  THAT'S ALSO ENTIRELY

15    CONSISTENT WITH TESTIMONY FROM FACT WITNESSES LIKE

16    REPRESENTATIVE GLOVER ABOUT HOW SELDOM BLACK CANDIDATES SUCCEED

17    OUTSIDE OF MAJORITY BLACK DISTRICTS.  WE THINK THAT TESTIMONY

18    ALSO GOES TO THE EFFECTIVENESS OF THE DISTRICTS IN THIS CASE.

19         I'M GOING TO BRIEFLY CONFER WITH COUNSEL TO MAKE SURE

20    THERE ISN'T ANYTHING ELSE WE WANT TO SAY IN RESPONSE TO

21    MR. STRACH'S ARGUMENTS.

22              **THE COURT:**  YOU MAY.

23              **MS. KEENAN:**  THAT'S ALL FROM PLAINTIFFS, YOUR HONOR.

24              **THE COURT:**  OKAY.  THE COURT IS GOING TO TAKE THE

25    52(C) UNDER ADVISEMENT AND, UNDER THE EXPRESS TEXT OF 52(C),

P. CORTEZ - DIRECT

9:21AM 1 DECLINES TO RENDER ANY JUDGMENT UNTIL THE CLOSE OF EVIDENCE.

2 WE WILL TAKE A RECESS UNTIL 9:30, AND THEN WE WILL COMMENCE

3 WITH THE DEFENDANTS' CASE-IN-CHIEF.

4   **(RECESS TAKEN AT 9:21 A.M.  UNTIL 9:34 A.M.)**

5   **THE COURT:**  THE DEFENDANTS/INTERVENORS MAY CALL THEIR

6 FIRST WITNESS.

7   **MS. MCKNIGHT:**  GOOD MORNING, YOUR HONOR.  MAY IT

8 PLEASE THE COURT.  WE WOULD CALL PRESIDENT OF THE SENATE, PAGE

9 CORTEZ, TO THE STAND.

10   **THE COURT:**  OKAY.  THANK YOU.  MS. MCKNIGHT, MAKE AN

11 APPEARANCE FOR THE COURT REPORTER, PLEASE.

12   **MS. MCKNIGHT:**  GOOD MORNING.  MY NAME IS KATE

13 MCKNIGHT WITH BAKER HOSTETLER HERE ON BEHALF OF THE LEGISLATIVE

14 INTERVENORS.

15   **THE CLERK:**  IF YOU WOULD, SIR, PLEASE STATE YOUR NAME

16 AND SPELL IT FOR THE RECORD.

17   **THE WITNESS:**  MY NAME IS PAGE CORTEZ, P-A-G-E,

18 C-O-R-T-E-Z.

19       **PAGE CORTEZ,**

20 **HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

21      **DIRECT EXAMINATION**

22 **BY MS. MCKNIGHT:**

23 Q.  GOOD MORNING, MR. PRESIDENT.

24 A.  GOOD MORNING.

25 Q.  COULD YOU START BY TELLING US WHERE YOU ARE FROM.

P. CORTEZ - DIRECT

9:35AM   1    A.   I'M FROM LAFAYETTE, LOUISIANA, AND I REPRESENT DISTRICT

2    23, SENATE DISTRICT 23, WHICH IS PRIMARILY LAFAYETTE PARISH.

3    Q.   OKAY.   AND HOW LONG HAVE YOU SERVED IN THE LEGISLATURE?

4    A.   SIXTEEN YEARS.

5    Q.   AND WHAT WAS YOUR ROLE IN THE 2022 REDISTRICTING CYCLE?

6    A.   WELL, I'M THE PRESIDING OFFICER OF THE SENATE.   I ALSO

7    SERVE EX OFFICIO ON ALL COMMITTEES, DO NOT HAVE VOTING

8    PRIVILEGES ON THE COMMITTEES, AND I'VE AUTHORED SENATE BILL 1,

9    WHICH WAS ONE OF THE REDISTRICTING BILLS.   I ALSO AUTHORED A

10   BILL RELATIVE TO THE CONGRESSIONAL DISTRICTS AND TO THE BOARD

11   OF ELEMENTARY AND SECONDARY EDUCATION.   I AUTHORED THREE

12   DIFFERENT BILLS.   THE ONLY ONE THAT WAS PASSED ULTIMATELY WAS

13   THE SENATE BILL 1.

14   Q.   AND WHAT WAS THE SENATE COMMITTEE THAT WAS RESPONSIBLE FOR

15   THE REDISTRICTING CYCLE?

16   A.   SENATE AND GOVERNMENTAL AFFAIRS.

17   Q.   COULD YOU TELL US, AS PRESIDENT OF THE SENATE, DO YOU HAVE

18   ANY ROLE IN MANAGING VOTES FOR PIECES OF LEGISLATION?

19   A.   NO.   I MEAN, WHEN YOU SAY MANAGING VOTES, I DON'T -- I

20   ONLY ATTEMPT TO FIGURE OUT WHERE THE VOTES ARE FOR THE

21   SUBSEQUENT PASSAGE OF THE LEGISLATION.

22   Q.   SO IN YOUR ROLE, DO I UNDERSTAND THAT YOU'D NEED TO KNOW

23   THE LEVELS OF SUPPORT FOR DIFFERENT PIECES OF LEGISLATION?

24   A.   YES.

25   Q.   AND DID YOU HAVE THAT ROLE DURING THE REDISTRICTING CYCLE?

P. CORTEZ - DIRECT

9:36AM   1    A.   YES.

2    Q.   AND I KNOW WE HAVE BEEN FOCUSED ON REDISTRICTING IN THIS

3    CASE.   IS THE REDISTRICTING EFFORT BY THE LEGISLATURE TREATED

4    JUST LIKE ANY OTHER PIECE OF LEGISLATION?

5    A.   YES.   IN TERMS OF PROCESS, IT'S A HUNDRED PERCENT THE SAME

6    AS ANY OTHERS.   YOU KNOW, AS FAR AS FOR HOW MANY VOTES IT TAKES

7    TO PASS AND THE GOVERNOR'S SIGNATURE, ET CETERA, YES, IT IS

8    IDENTICAL.

9    Q.   LET'S BRING UP JOINT EXHIBIT NUMBER 53.   THIS IS LABELED

10   JRULE OR JOINT RULE 21.   DO YOU RECOGNIZE THIS DOCUMENT,

11   MR. PRESIDENT?

12   A.   YES.

13   Q.   AND WHAT IS IT?

14   A.   THE HOUSE OF REPRESENTATIVES HAS THEIR SET OF RULES, THE

15   SENATE HAS ITS SET OF RULES, AND THEN THERE'S A SEPARATE SET

16   CALLED JOINT RULES OF BOTH THE HOUSE AND THE SENATE.   THEY HAVE

17   TO BE VOTED ON BY BOTH CHAMBERS, AND THEY ARE APPLICABLE WHEN

18   THERE IS A JOINT COMMITTEE OR WHEN THERE'S A JOINT SESSION.

19   THESE RULES WERE RELATIVE TO THE REDISTRICTING PROCESS.   AS I

20   RECALL PRIMARILY, THEY WERE TO SET FORTH GUARDRAILS FOR THE

21   ROAD SHOWS AND HOW WE WERE TO PROCEED.

22   Q.   AND WHEN DID JOINT RULE 21 BECOME EFFECTIVE?

23   A.   IN THE '21 SESSION.

24   Q.   AND I SEE A DATE AT THE BOTTOM THAT SAYS JUNE 11, 2021.

25   DO YOU SEE THAT?

9:38AM   1    A.   YES.

2    Q.   WHY WOULD IT BECOME EFFECTIVE IN JUNE 2021?

3    A.   WELL, IT WAS CONTEMPLATING THAT THE ROAD SHOWS GOING INTO

4    THE '22 EXTRAORDINARY SESSION, THAT WAS GOING TO DEAL WITH THE

5    REDISTRICTING PROCESS.

6    Q.   AND DID JOINT RULE 21 HELP INFORM THE PUBLIC DURING THESE

7    ROAD SHOWS?

8    A.   WELL, WE WOULD LIKE TO THINK SO, BUT I DON'T THINK THE

9    PUBLIC IN GENERAL READS OUR JOINT RULES.  MANY OF THE MEMBERS

10   PROBABLY DON'T READ THEM.  BUT YES, THAT WAS THE ATTEMPT WAS TO

11   SAY THESE ARE THE GUARDRAILS WITH WHICH WE WERE GOING TO APPLY

12   THE PRINCIPLES OF REDISTRICTING, WHICH DEAL WITH THE

13   CONSTITUTIONAL REQUIREMENTS, THE STATUTORY REQUIREMENTS, THE

14   FEDERAL REQUIREMENTS AND SO FORTH.

15   Q.   AND IN YOUR VIEW, DID THE ROAD SHOWS HELP EDUCATE THE

16   PUBLIC ABOUT SOME OF THE GUARDRAILS TO REDISTRICTING?

17   A.   I THINK --

18        **MR. ADCOCK:**  YOUR HONOR, I NEED TO LODGE AN OBJECTION

19   HERE.  SORRY ABOUT THAT.  I DON'T NORMALLY OBJECT TO LEADING,

20   BUT I THINK IT IS IMPORTANT HERE.  THESE ARE JUST LEADING

21   QUESTIONS, AND THIS IS DIRECT EXAMINATION.  I'M JUST LODGING AN

22   OBJECTION.

23        **THE COURT:**  MS. MCKNIGHT?

24        **MS. MCKNIGHT:**  YES, YOUR HONOR.  WE ARE TRYING TO --

25   THESE ARE JUST PREFATORY QUESTIONS.  WE HAVEN'T GOTTEN INTO THE

9:39AM   1   DEPTH OF ANY SORT OF CONTENTIOUS ISSUES.  WE ARE LAYING THE

2   GROUNDWORK FOR WHAT JOINT RULE 21 WAS.

3               **THE COURT:**  TECHNICALLY, THEY ARE LEADING, BUT IT'S A

4   BENCH TRIAL.  I'M GOING TO GIVE YOU SOME LATITUDE.  YOU MAY

5   PROCEED.

6               **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

7    A.  YEAH, THE PRIMARY PURPOSE OF THE ROAD SHOW WAS TO EDUCATE

8   THE AREAS -- I THINK IT WAS PART TO EDUCATE NOT ONLY THE PUBLIC

9   BUT THE MEMBERS OF THE LEGISLATURE WHO ATTENDED THE ROAD SHOWS

10   AS TO WHAT ARE THE CONSTITUTIONAL REQUIREMENTS, WHAT ARE THE

11   STATUTORY REQUIREMENTS, AND TO BRIEF EVERYONE.  NOT EVERYONE

12   THAT SERVES IN THE LEGISLATURE IS AN ATTORNEY AND UNDERSTANDS

13   THE LAW AS REGARDS -- RELATIVE TO REDISTRICTING.  AND SO THAT'S

14   WHY THIS RULE WAS SET OUT, TO MAKE SURE THAT EVERYBODY

15   UNDERSTANDS THIS IS WHAT YOU HAVE TO DO.  AND SO IT WAS

16   PRESENTED AT ALL THE ROAD SHOWS, ALONG WITH THE SLIDE

17   PRESENTATION BY STAFF, WHO WERE OUR LEGAL EXPERTS ON THE

18   PROCESS.

19   **BY MS. MCKNIGHT:**

20    Q.  AND DO YOU HAVE ANY EXAMPLES FROM THOSE ROAD SHOWS OF WHEN

21   THE PUBLIC MADE A REQUEST THAT WOULDN'T COMPLY WITH

22   REDISTRICTING CRITERIA IN JOINT RULE 21?

23    A.  I'M NOT SURE I HAVE A SPECIFIC EXAMPLE, BUT I HEARD IT

24   COME UP OVER AND OVER, THAT -- I WILL GIVE YOU -- WELL, I DO

25   RECALL ONE IN THE LAFAYETTE ROAD SHOW WHERE -- BY SOMEONE FROM

9:41AM   1   ST. LANDRY PARISH, AS I RECALL, WANTED TO HAVE THE MAJORITY OF

2   THE SENATE DISTRICT OR CONGRESSIONAL DISTRICT.  WELL, THERE'S

3   ONLY 60,000 PEOPLE IN ST. LANDRY PARISH, AND A CONGRESSIONAL

4   DISTRICT IS MADE UP OF 750,000 PEOPLE.  YOU CAN'T HAVE THE

5   MAJORITY WHEN YOU ONLY HAVE 60,000 PEOPLE.  A SENATE DISTRICT

6   IS 120,000.  60,000 WOULD BE POTENTIALLY HALF OF IT BUT

7   PROBABLY WOULDN'T BE THE WHOLE DISTRICT.

8       BUT THEY WERE REFERRING TO MANY YEARS AGO WHEN ST. LANDRY

9   PARISH HAD 60 OR MORE THOUSAND PEOPLE, AND THE SENATE DISTRICT

10   WAS MAYBE 90,000 PEOPLE, AND THEY WERE THE HOUSE OF THE

11   DISTRICT, AND THEY WERE SAYING THEY HAD LOST THEIR SENATOR.  SO

12   IT JUST DOESN'T APPLY, BUT THAT WOULD BE, I GUESS, AN EXAMPLE.

13   Q.  THANK YOU.  AND I WILL HAVE MORE SPECIFIC QUESTIONS IN A

14   MINUTE, BUT COULD YOU GIVE THE COURT A SENSE OF THE MAIN TENETS

15   OF JOINT RULE 21?

16   A.  WELL, THEY ARE PRETTY WELL ENUMERATED, BUT, YOU KNOW, EACH

17   DISTRICT HAS TO BE CONTIGUOUS IN NATURE.  THEY HAVE TO COMPLY

18   WITH THE 14TH AMENDMENT, THE 15TH AMENDMENT, SECTION 2 OF THE

19   VOTING RIGHTS ACT.  I MEAN, IT IS ALL ENUMERATED IN THERE.  IT

20   HAS TO BE SINGLE-MEMBER DISTRICTS.  IT HAS TO BE A WHOLE PLAN.

21   THEY HAVE TO BE SUBSTANTIALLY EQUAL IN POPULATION.  AND THERE'S

22   TWO DIFFERENT CRITERIA, AND JOINT RULE LAYS THIS OUT, THAT

23   CONGRESSIONAL PLANS ARE DIFFERENT THAN THE STATE DISTRICT

24   PLANS, AND THAT THE STATE DISTRICT PLANS HAVE A LITTLE MORE

25   DEVIATION OR ALLOW FOR THAT THAN THE CONGRESSIONAL PLANS.

9:43AM   1          YOU KNOW, THEY ASK THAT YOU GIVE CONSIDERATION TO

         2   TRADITIONAL DISTRICT ALIGNMENTS TO THE EXTENT THAT IS

         3   PRACTICABLE.  I MEAN, I COULD GO THROUGH AND READ THEM ALL, BUT

         4   YES, IT DID GIVE CERTAIN TENETS.  YOU KNOW, OBVIOUSLY THE

         5   ONE-PERSON, ONE-VOTE IS THE IDEA OF THE DEVIATION AND EQUAL

         6   NUMBERS IN THE DISTRICTS --

         7   Q.  OKAY.  THANK YOU.  LET'S TURN TO SECTION D.  CAN YOU

         8   EXPLAIN WHAT SECTION D WAS MEANT TO ACCOMPLISH?

         9   A.  WELL, IT SPECIFICALLY TALKS ABOUT THE PLANS THAT WE HAD

        10   TO -- THE MAPS THAT WE HAD TO CREATE RELATIVE TO THE HOUSE OF

        11   REPRESENTATIVES, THE SENATE, THE PUBLIC SERVICE COMMISSION, AND

        12   THE BOARD OF ELEMENTARY AND SECONDARY EDUCATION.  AGAIN, IT

        13   PROVIDED FOR THE SINGLE-MEMBER DISTRICTS.  THEY HAD TO BE EQUAL

        14   IN POPULATION.  I REFER TO THAT AS THE ONE-PERSON, ONE-VOTE

        15   DOCTRINE.

        16          THERE WAS A DEVIATION THAT WE -- A STANDARD THAT WAS

        17   ACCEPTABLE OF PLUS OR MINUS FIVE PERCENT FROM THE IDEAL

        18   DISTRICT POPULATION.  IT HAD TO BE A WHOLE PLAN.  IT COULDN'T

        19   BE A PORTION OF THE STATE.  IT HAD TO BE THE WHOLE STATE.  AND

        20   THEN THE LAST ONE WAS TO GIVE CONSIDERATION FOR TRADITIONAL

        21   DISTRICT ALIGNMENTS TO THE EXTENT PRACTICABLE.  I SOMETIMES

        22   CALL THAT COMMUNITIES OF INTEREST IN CONTINUITY OF

        23   REPRESENTATION.

        24   Q.  WERE YOU HERE YESTERDAY FOR DR. BURCH'S TESTIMONY?

        25   A.  I WAS.

P. CORTEZ - DIRECT

9:44AM

1    Q.  OKAY.  AND DID YOU HEAR HER CLAIM THAT JOINT RULE 21 DID

2    NOT MENTION CONTINUITY OF REPRESENTATION?

3    A.  I DID.

4    Q.  OKAY.  AND I HEARD YOU JUST TESTIFY THAT SECTION D(4)

5    RELATED TO CONTINUITY OF REPRESENTATION.  DID I UNDERSTAND THAT

6    CORRECTLY?

7    A.  YES.

8            **MR. ADCOCK:**  OBJECTION, JUDGE.  THAT'S NOT WHAT THE

9    WITNESS TESTIFIED TO, AND I DON'T THINK THAT'S WHAT THE

10   DOCUMENT SAYS.

11           **MS. MCKNIGHT:**  WOULD YOU LIKE ME TO RESPOND, YOUR

12   HONOR?

13           **THE COURT:**  I DON'T KNOW WHAT THE NATURE OF THE

14   OBJECTION IS.  IS THERE SOME CODE OF EVIDENCE THAT YOU --

15           **MR. ADCOCK:**  COUNSEL IS MISCHARACTERIZING THE

16   TESTIMONY THAT WAS JUST GIVEN ABOUT A DOCUMENT THAT IS RIGHT

17   HERE IN FRONT OF US THAT DOESN'T SAY WHAT HE JUST SAID IT SAYS.

18           **THE COURT:**  OKAY.  THE DOCUMENT IS IN EVIDENCE, AND

19   THE TESTIMONY OF THE WITNESS IS ALSO IN EVIDENCE.  SO IF

20   THERE'S SOME INCONSISTENCY, IT WILL BE CLEAR IN THE EVIDENCE.

21   YOUR OBJECTION IS OVERRULED.

22           **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

23   **BY MS. MCKNIGHT:**

24   Q.  SO LET'S FOCUS ON THE LANGUAGE OF SECTION D(4).  WHY DOES

25   THIS MEAN TO YOU THAT YOU ARE FOCUSED ON MAINTAINING CONTINUITY

P. CORTEZ - DIRECT

9:45AM  1    OF REPRESENTATION WHEN YOU REFER TO MAINTAINING TRADITIONAL

2    DISTRICT ALIGNMENTS?

3    A.   WELL, THERE WAS A NUMBER OF FACTORS THAT WENT INTO THIS,

4    PROBABLY ABOUT FOUR OR FIVE THAT I COULD GO INTO RIGHT NOW.

5    THE MAP DRAWING AND THE PROCESS, WE HAD TO ADHERE TO A LOT OF

6    DIFFERENT PRINCIPLES.  THIS WAS ONE OF THEM.  BUT BY EXAMPLE,

7    TRADITIONAL DISTRICT ALIGNMENTS WOULD BE PARISHES THAT WERE

8    CONSIDERED -- I'M GOING TO SAY SENATE SEATS.

9         LET'S JUST USE THE EXAMPLE OF TWO PARISHES THAT HAD ALWAYS

10   BEEN TOGETHER.  THEY DID NOT WANT TO BE BROKEN UP.  AND I WILL

11   GIVE YOU EXAMPLES, LIKE LAFOURCHE AND TERREBONNE, BY EXAMPLE,

12   OR ST. JOHN AND ST. CHARLES.  BUT THEN YOU ALSO HAD THE CASE OF

13   MEMBERS WHO OVER THE YEARS UNDERSTOOD THAT GOING BACK INTO THE

14   '80S, THE PERSON WHO REPRESENTED THAT DISTRICT, PRIOR TO TERM

15   LIMITS -- WE CERTAINLY HAVE TERM LIMITS -- PRIOR TO TERM

16   LIMITS, THEY ALWAYS REPRESENTED ST. CHARLES AND ST. JOHN

17   BECAUSE IT WAS A RIVER PARISH DISTRICT.  THEY HAD COMMUNITIES

18   OF INTEREST.  AND TO SEPARATE THAT AND SAY, WELL, THE PEOPLE IN

19   ST. JOHN DON'T -- WE DON'T NEED THEM TO BE WITH ST. CHARLES, SO

20   WE ARE GOING TO PUT ST. CHARLES IN A DIFFERENT AREA, WOULD BE

21   EFFECTIVELY LETTING THE LEGISLATURE PICK THE POPULATION VERSUS

22   THE POPULATION PICKING THE LEGISLATOR.  AND THAT IS WHAT I

23   CONSIDERED CONTINUITY OF REPRESENTATION.  DON'T CONFUSE THE

24   VOTERS WHEN YOU DON'T HAVE TO.

25   Q.   THANK YOU.  LET'S BRING UP JX21, AND WE WILL LOOK AT THE

P. CORTEZ - DIRECT

9:47AM   1   FIRST PAGE.  MR. PRESIDENT, I WILL REPRESENT TO YOU THAT THIS

2   IS A TRANSCRIPT THAT HAS BEEN ADMITTED AS A JOINT EXHIBIT OF A

3   COMMITTEE HEARING FOR THE SENATE AND GOVERNMENTAL AFFAIRS ON

4   FEBRUARY 2, 2022.  DO YOU SEE THAT?

5   A.   YES.

6   Q.   AND DO YOU REMEMBER PARTICIPATING IN THIS MEETING?

7   A.   YES.

8   Q.   LET'S TURN TO PAGE 7.  ACTUALLY, LET'S TURN BACK TO

9   PAGE 6.  I WANT TO MAKE IT CLEAR THAT THIS IS -- CAN WE GO BACK

10   TO PAGE 5?  MR. PRESIDENT, DO YOU SEE THAT THIS IS A STATEMENT

11   BY YOU IN THAT MEETING?

12   A.   YES.

13   Q.   SO LET'S TURN TWO PAGES TO PAGE 7.  COULD YOU READ LINES 9

14   THROUGH 21?  AND THEN I WOULD LIKE TO ASK YOU SOME QUESTIONS

15   ABOUT IT.

16   A.   "THE THIRD TENET OR PRINCIPLE WAS AS BEST POSSIBLE TO

17   MAINTAIN THE CONTINUITY OF REPRESENTATION.  WHAT DO I MEAN BY

18   THAT?  IT MEANS THAT IF YOUR DISTRICT ELECTED YOU AND YOU'VE

19   DONE A GOOD JOB, THEY ALSO HAVE A RIGHT TO REELECT YOU.

20   CONVERSELY, YOU DON'T GET TO CHOOSE WHO YOUR POPULATION IS;

21   THEY CHOOSE YOU.  IF YOU DIDN'T DO A GOOD JOB, THEY HAVE THE

22   RIGHT TO UNELECT YOU.  AND THE PEOPLE WHO -- PEOPLE WHO KNOW

23   YOUR JOB THE BEST FOR THOSE WHO WERE IN YOUR DISTRICT, SO TO GO

24   GRAB A SEPARATE POPULATION FROM ANOTHER DISTRICT JUST SCREAMS

25   TO THE PUBLIC THAT YOU ARE LOOKING FOR A BETTER GROUP OF PEOPLE

9:49AM   1   TO KEEP YOU IN OFFICE, SO THAT IS A PRINCIPLE WE TRIED TO

2   ADHERE TO."

3   Q.   AND IN THIS MEETING, WERE YOU DISCUSSING SENATE BILL 1?

4   A.   YES.

5   Q.   AND WHEN YOU ARE DISCUSSING SENATE BILL 1 IN THIS EXCERPT,

6   HOW DOES THIS RELATE TO YOUR EFFORT TO COMPLY WITH JOINT RULE

7   21 D(4)?

8   A.   WELL, IT'S THE CONTINUITY OF SERVICE -- OF REPRESENTATION.

9   THE CONTINUITY OF REPRESENTATION IS THAT IF YOU'VE DONE A GOOD

10   JOB -- BUT AGAIN, MANY MEMBERS HAVE TURNED OUT, SO IT FLOWS

11   INTO COMMUNITIES OF INTEREST AS WELL AS THE ACTUAL SERVICE.  IF

12   YOU'VE DONE A GOOD JOB, YOU'D HAVE A CHANCE TO GET REELECTED,

13   NOT BECAUSE YOU ARE TRYING TO PROTECT YOUR REELECTION BUT

14   BECAUSE THEY KNOW WHO YOU ARE AND THEY KNOW WHAT YOU HAVE DONE.

15   IF YOU GO PULL YOURSELF INTO ANOTHER GROUP OR POPULATION OF

16   PEOPLE WHO DON'T KNOW YOU, THEN THEY CAN'T JUDGE AS WELL AS

17   THOSE WHO YOU HAVE SERVED.

18   Q.   AND YOU WERE HERE FOR DR. BURCH'S TESTIMONY YESTERDAY.  DO

19   YOU REMEMBER HER DESCRIBING THIS EFFORT AS BEING

20   SELF-INTERESTED AND FOR THE PURPOSES OF INCUMBENCY PROTECTION?

21   A.   YES.

22   Q.   IS WHAT YOU ARE DESCRIBING HERE AS SELF-INTEREST

23   INCUMBENCY PROTECTION EFFORT?

24   A.   WELL, IF THE PERSON -- NOT WHAT I'M DESCRIBING.  WHAT I'M

25   DESCRIBING IS THE PUBLIC.  YOU ARE TRYING TO TAKE CARE OF THE

P. CORTEZ - DIRECT

9:51AM   1    PUBLIC.  YOU ARE NOT TRYING TO TAKE CARE OF THE PERSON.  THE

        2    PUBLIC HAS THE RIGHT TO CHOOSE.  THE PERSON DOESN'T HAVE THE

        3    RIGHT TO CHOOSE THE PUBLIC OR THE PEOPLE THAT THEY WANT VOTING

        4    ON THEM.

        5    Q.  THANK YOU.  LET'S GO BACK TO JX53, JOINT RULE 21.  MOVING

        6    ON TO SECTION G(1), I SEE A REFERENCE TO WHOLE ELECTION

        7    PRECINCTS.  DO YOU SEE THAT?

        8    A.  YES.

        9    Q.  AND WHAT WAS -- WHAT WERE YOU TRYING TO ACCOMPLISH WITH

       10    JOINT RULE 21, SECTION G?

       11         MR. ADCOCK:  YOUR HONOR, I OBJECT.  I DON'T THINK

       12    COUNSEL HAS LAID A FOUNDATION FOR THE WITNESS' KNOWLEDGE OF

       13    JOINT RULE 21.  I SHOULD HAVE MADE THIS EARLIER, BUT I'M MAKING

       14    IT NOW.

       15         THE COURT:  THE QUESTION IS WHAT WAS MEANT BY G(1),

       16    AND THE EARLIER QUESTION THAT DREW NO OBJECTION WAS WHAT WAS

       17    MEANT BY I THINK IT WAS D3.  I'M GOING TO SUSTAIN -- WELL, LET

       18    ME LET YOU RESPOND, BUT HOW DOES MR. -- PRESIDENT CORTEZ ATTEST

       19    TO THE MINDSET OF BOTH CHAMBERS OF THE LEGISLATURE, WHICH HE

       20    SAID WERE NEEDED TO ENACT JOINT RULE 21?

       21         MS. MCKNIGHT:  I SEE, YOUR HONOR.  LET ME REPHRASE TO

       22    AVOID THAT.

       23         THE COURT:  THE OBJECTION IS GRANTED.  YOU MAY

       24    REPHRASE.

       25         MS. MCKNIGHT:  THANK YOU.

9:52AM   1   **BY MS. MCKNIGHT:**

2   Q.  MR. PRESIDENT, WERE YOU PRESIDENT OF THE SENATE WHEN JOINT

3   RULE 21 WAS PASSED?

4   A.  YES.

5   Q.  OKAY.  AND WERE YOU AWARE OF JOINT RULE 21 WHEN IT WAS

6   PASSED?

7   A.  YES.

8   Q.  WERE YOU AWARE OF ITS PURPOSE IN PASSING?

9   A.  YES.

10   Q.  AND AT THE TIME IT WAS PASSED, DID YOU HAVE AN

11   UNDERSTANDING OF WHAT THESE PROVISIONS MEANT FOR THE

12   REDISTRICTING PROCESS?

13         **MR. ADCOCK:**  YOUR HONOR, AGAIN, THESE ARE LEADING

14   QUESTIONS.  THIS IS DIRECT.  NORMALLY I WOULDN'T OBJECT, BUT I

15   THINK IT IS IMPORTANT HERE, GIVEN WE ARE TALKING ABOUT THE

16   WITNESS' KNOWLEDGE OF AN IMPORTANT DOCUMENT.

17         **MS. MCKNIGHT:**  YOUR HONOR, THESE ARE FAIR QUESTIONS

18   FOR LAYING FOUNDATION.

19         **THE COURT:**  THEY ARE.  I WILL GIVE YOU SOME LATITUDE.

20   OVERRULED.

21         **MS. MCKNIGHT:**  THANK YOU.

22   A.  YES.

23   **BY MS. MCKNIGHT:**

24   Q.  OKAY.  SO WHAT WAS YOUR UNDERSTANDING OF JOINT RULE 21 G

25   AND WHAT IT WAS MEANT TO ACCOMPLISH?

9:53AM   1          **MR. ADCOCK:**  OBJECTION, JUDGE.  I STILL DON'T THINK

2   THAT COUNSEL HAS LAID A FOUNDATION.  SHE JUST ASKED IF HE WAS

3   PRESIDENT OF THE SENATE AND HE PRESIDED OVER IT WHEN THIS WAS

4   PASSED.  NOW, WHETHER HE WAS ACTIVELY INVOLVED IN DRAFTING IT,

5   WHETHER HE HAD INPUT INTO THE LANGUAGE, WHETHER HE WAS PART OF

6   THE DEBATE, HE DIDN'T DESCRIBE WHO THE AUTHORS WERE, WHETHER HE

7   WAS ONE OF THE AUTHORS, WHETHER HE TALKED TO THE AUTHORS,

8   WHETHER THEY CONSULTED WITH HIM.  PRESUMABLY THERE WERE AUTHORS

9   AND INPUT FROM BOTH HOUSES.  HE DIDN'T TESTIFY THAT HE TALKED

10   TO ANY OF THOSE PEOPLE.  SO I DON'T THINK THERE HAS BEEN A

11   PROPER FOUNDATION LAID TO ASK THIS WITNESS QUESTIONS ABOUT THE

12   MEANING OF THESE VARIOUS TERMS IN JOINT RULE 21.

13          FURTHER, I THINK THE PRIOR TESTIMONY THAT I DIDN'T OBJECT

14   TO SHOULD BE STRUCK, GIVEN THE SHORTCOMINGS AND LAYING A

15   FOUNDATION.

16          **THE COURT:**  YOUR MOTION TO STRIKE IS DENIED.  AND

17   WITH RESPECT TO THIS QUESTION, YOUR OBJECTION IS OVERRULED.

18   THIS QUESTION WAS, "WHAT WAS YOUR INTENT IN ENACTING JOINT RULE

19   21?"  IF HE VOTED ON IT, HE CAN CERTAINLY EXPRESS WHAT HIS

20   INTENT WAS.  OVERRULED.

21   A.  SO JOINT RULE 21 WAS A HOUSE CONCURRENT RESOLUTION.  IT

22   WAS AUTHORED BY THE HOUSE.  I BELIEVE IT WAS OFFERED BY

23   REPRESENTATIVE STEFANSKI, WHO WAS THE CHAIRMAN OF HOUSE AND

24   GOVERNMENTAL AFFAIRS.  I HAD MULTIPLE CONVERSATIONS WITH

25   REPRESENTATIVE STEFANSKI AND TRISH LOWERY, WHO WAS THE DRAFTER

P. CORTEZ - DIRECT

9:54AM  1   RELATIVE TO THIS JOINT RULE.  I ALSO SERVED IN THE LEGISLATURE

     2   TEN YEARS PRIOR, 11 YEARS PRIOR, WHERE WE HAVE A SIMILAR SET OF

     3   RULES BUT WE HAD TO MAKE SOME CHANGES TO IT.  THE STAFF IN THE

     4   SENATE, I DID SPEAK TO SENATOR HEWITT RELATIVE TO THESE RULES.

     5       THERE WERE MULTIPLE DISCUSSIONS RELATIVE TO WHICH OF THESE

     6   RULES WOULD WE KEEP IN THE JOINT RULE, AND THERE WAS SOME

     7   DISAGREEMENT AMONGST THE SENATE AND THE HOUSE.  I CAN'T RECALL

     8   EXACTLY WHAT RULES WERE -- WHICH PARTS OF THESE WE HAD

     9   DISAGREEMENT WITH, BUT THEY WERE SUBTLE.  THEY WERE SUBTLE

    10   DISAGREEMENTS.

    11       AT THE END OF THE DAY, WE ALL AGREED TO PUT FORWARD THIS

    12   JOINT RULE.  G(1) SPECIFICALLY TALKS ABOUT USING WHOLE

    13   PRECINCTS AND NOT SPLITTING PRECINCTS, AND I REMEMBER THAT TO

    14   BE VERY IMPORTANT BECAUSE OF THE CONCEPT OF CONFUSING VOTERS.

    15   IF YOU LIVE IN A PRECINCT AND YOUR NEXT DOOR NEIGHBOR VOTES FOR

    16   A DIFFERENT SENATOR THAN YOU DO, YOU ARE CONFUSED.  WHY ARE WE

    17   GOING TO THE SAME VOTING BOOTH, AND YET YOU VOTE FOR SENATE

    18   DISTRICT 22 AND I VOTE FOR SENATE DISTRICT 23?  AND SO WE TRIED

    19   AS MUCH AS POSSIBLE -- I'M NOT GOING TO TELL YOU THAT ON EVERY

    20   MAP WE DIDN'T SPLIT PRECINCTS, BUT AS MUCH AS PRACTICABLE, WE

    21   DID NOT SPLIT PRECINCTS, AND THAT IS WHAT THIS WAS ABOUT, THIS

    22   PARTICULAR RULE.

    23   Q.  AND TO BE CLEAR, YOU SPONSORED SB 1; IS THAT RIGHT?

    24   A.  CORRECT.

    25   Q.  AND SB 1 BECAME THE ENACTED PLAN; IS THAT RIGHT?

P. CORTEZ - DIRECT

9:56AM   1    A.   CORRECT.

2    Q.   DID JOINT RULE 21 GUIDE YOUR DEVELOPMENT OF SB 1?

3    A.   YES.

4    Q.   WERE THERE EVER TIMES WHERE THERE WERE PROPOSALS FOR A MAP

5    THAT YOU HAD TO DECIDE WHETHER TO VOTE ON OR NOT, AND YOU MADE

6    A DETERMINATION WHETHER TO VOTE BASED ON SPLIT VTDS?

7            **MR. ADCOCK:**   OBJECTION, COMPOUND QUESTION.

8            **THE COURT:**   SUSTAINED.

9    **BY MS. MCKNIGHT:**

10   Q.   DID JOINT RULE 21 G(1) EVER GUIDE YOUR VOTING ON ANY

11   REDISTRICTING BILLS?

12   A.   I THINK IT WAS PART OF ALL OF -- ALL OF JOINT RULE 21 WAS

13   PART OF -- YOU HAD TO LOOK AT IT HOLISTICALLY.  IF IT VIOLATED

14   A PRINCIPLE TO THE POINT WHERE YOU DIDN'T THINK IT WAS LEGAL,

15   YOU HAD TO VOTE AGAINST IT.

16   Q.   NOW I WOULD LIKE TO DRAW YOUR ATTENTION DOWN TO JOINT RULE

17   21, SECTION H.  I SEE A REFERENCE TO MAINTENANCE OF COMMUNITIES

18   OF INTEREST.  COULD YOU EXPLAIN HOW THAT GUIDED YOU IN YOUR

19   SPONSORSHIP OF THE BILL SB 1?

20           **MR. ADCOCK:**   YOUR HONOR, AGAIN, MY OBJECTION IS TO

21   FOUNDATION.  THE PREVIOUS QUESTION THAT WAS OVERRULED WAS WHAT

22   WAS YOUR UNDERSTANDING OR BELIEF WHEN YOU VOTED FOR JOINT RULE

23   21.  NOW WE ARE ASKING ABOUT TEXT OF JOINT RULE 21.  LIKE I

24   SAID EARLIER, I DON'T THINK THERE HAS BEEN A FOUNDATION LAID

25   THAT THE WITNESS WAS SUFFICIENTLY INVOLVED IN THE DRAFTING,

9:57AM  1   WRITING OF JOINT RULE 21 TO ANSWER THE MEANING OF IT.

2          **THE COURT:**  HER QUESTION WAS, "HOW DID SECTION H

3   GUIDE YOU IN DRAFTING SENATE BILL 1?"  YOUR OBJECTION IS

4   OVERRULED.

5   A.  SO WHEN MEMBERS OF THE SENATE CAME TO ME AND SAID -- AND I

6   USED THESE EXAMPLES EARLIER, AND I WILL USE IT AGAIN --

7   LAFOURCHE PARISH AND TERREBONNE PARISH HAVE ALWAYS BEEN WHOLLY

8   OR ALMOST WHOLLY IN THE SAME SENATE DISTRICT.  WHY WOULD YOU

9   SPLIT THEM UP?  THEY ARE COMMUNITIES OF INTEREST.  THEY HAVE

10  SIMILAR -- YOU KNOW, SIMILAR LIFESTYLE, SIMILAR PROFESSIONS.

11         THE OTHER ONE THAT I DIDN'T MENTION EARLIER THAT I WILL

12  MENTION IS HISTORICALLY VERMILLION PARISH AND ACADIA PARISH

13  WERE ALWAYS IN THE SAME DISTRICT, BUT THEY HAD BEEN SEPARATED

14  DUE TO POPULATION SHIFT IN THE 2011 REDISTRICTING -- NOT

15  SEPARATED, BUT THE VERMILLION PARISH, WHICH WAS WHOLLY IN THE

16  SENATE DISTRICT, PICKED UP A PART OF LAFAYETTE PARISH BECAUSE

17  OF ITS GROWTH IN 2011, AND PART OF ST. LANDRY PARISH AND PART

18  OF ACADIA PARISH.  THE CONVERSATION FROM THE SENATORS IN

19  SOUTHWEST LOUISIANA --

20         **MR. ADCOCK:**  YOUR HONOR, I HAVE TO OBJECT HERE.  THIS

21  IS VERY IMPORTANT.  I OBJECT ON HEARSAY AND THEN TWO OTHER

22  THINGS.

23         DURING THE DEPOSITION, I ASKED NUMEROUS QUESTIONS ABOUT

24  THE WITNESS' CONVERSATIONS WITH OTHER LEGISLATORS, SPECIFICALLY

25  OTHER SENATORS.  THOSE QUESTIONS WERE OBJECTED TO.  THE WITNESS

P. CORTEZ - DIRECT

9:59AM   1   WAS DIRECTED NOT TO ANSWER THOSE QUESTIONS BASED ON LEGISLATIVE

2   PRIVILEGE.  COUNSEL CITED TO ME, AND I AGREED WITH HER, THIS

3   CAN'T BE USED AS A SWORD AND A SHIELD.  THEY USED IT AS A

4   SHIELD IN THE DEPOSITION, AND NOW THEY WANT TO USE IT AS A

5   SWORD TO GIVE SELF-SERVING EVIDENCE ABOUT INTENT HERE.  THEY

6   ARE PROHIBITED FROM DOING THAT, AND I HAVE CASES I'M HAPPY TO

7   ARGUE.

8        THIRD OF ALL, TO THE EXTENT HE IS RELYING ON OTHER

9   LEGISLATORS WHO WILL PRESUMABLY TESTIFY TO THIS, THIS IS A

10   DISCOVERY VIOLATION.  THIS WASN'T TURNED OVER.  WE WEREN'T TOLD

11   HE WAS GOING TO TESTIFY TO THIS.  I ASKED ABOUT IT IN THE

12   DEPOSITION.  IT WAS OBJECTED TO NUMEROUS TIMES.  WE HAVEN'T

13   BEEN NOTIFIED OF OTHER WITNESSES WHO ARE GOING TO TESTIFY TO

14   THIS OR THE SUBSTANCE OF THESE CONVERSATIONS.  MAINLY THEY ARE

15   JUST TRYING TO PERVERT THIS LEGISLATIVE PRIVILEGE OBJECTION

16   WHERE THEY DIRECTED THE WITNESS NOT TO ANSWER ON NUMEROUS

17   OCCASIONS DURING DEPOSITION AND THEN TRY TO GET AROUND IT WITH

18   THE SELF-SERVING TESTIMONY.  SO I OBJECT ON THOSE GROUNDS,

19   UNLESS THEY WANT TO WAIVE THE LEGISLATIVE PRIVILEGE OF THESE

20   OTHER LEGISLATORS, WHICH IN WHICH CASE WE WANT ALL OF THE

21   COMMUNICATIONS BETWEEN THOSE LEGISLATORS AND SENATOR CORTEZ,

22   INCLUDING MEMOS OR E-MAILS OR ANYTHING THAT WAS GIVEN TO HIM BY

23   OTHER LEGISLATORS.  BUT RIGHT NOW, THIS IS IMPERMISSIBLE.

24        AND WE ASKED FOR -- THIS IS THE LAST THING I WILL SAY.  WE

25   ASKED FOR A DEPOSITION.  HE SAID HE WAS ACTUALLY NOT ANSWERING

10:00AM

1    BECAUSE HE WANTED TO RESPECT THE RIGHT OF OTHER LEGISLATORS TO

2    ASSERT LEGISLATIVE PRIVILEGE.  AND COUNSEL COMMITTED TO US THAT

3    THEY WOULD GET US THE WAIVERS OF OTHER LEGISLATORS IF THEY

4    WAIVED THAT PRIVILEGE BY AUGUST 25TH, WHICH WAS TWO DAYS AFTER

5    THAT DEPOSITION.  THEY HAVEN'T DONE IT.  WE HAVEN'T RECEIVED

6    THOSE WAIVERS, SO HE CAN'T TESTIFY TO THESE CONVERSATIONS.

7              **THE COURT:**  MS. MCKNIGHT?

8              **MS. MCKNIGHT:**  YES, YOUR HONOR.  FIRST OF ALL,

9    LEGISLATIVE PRIVILEGE IS A VERY IMPORTANT ISSUE IN THIS CASE,

10   AND WE TAKE IT SERIOUSLY.  THE TESTIMONY I'M ELICITING -- AND

11   THIS IS MY FAULT FOR NOT ASKING THE PREFATORY QUESTION.  I'M

12   ONLY GOING TO ELICIT TESTIMONY HERE TODAY FROM PRESIDENT CORTEZ

13   FROM THE PUBLIC TRANSCRIPT.  BUT BY PUBLIC TRANSCRIPT, I MEAN

14   THERE WERE HEARINGS ON THE FLOOR.  THERE WERE HEARINGS ON

15   COMMITTEE.  WE HAVE DETAILED TRANSCRIPTS.  THEY ARE ALL IN THE

16   RECORD.  PLAINTIFFS HAVE HAD THEM SINCE THE TIME THEY OCCURRED,

17   SO THERE'S NO DISCOVERY VIOLATION.

18        SO I WILL MAKE SURE THAT I PREFACE QUESTIONS TO MAKE SURE

19   THAT ANY TESTIMONY I ELICIT FROM PRESIDENT CORTEZ TODAY IS FROM

20   PUBLIC TRANSCRIPTS.

21        NOW, AS FAR AS LEGISLATIVE PRIVILEGE, WE -- AGAIN,

22   PRESIDENT CORTEZ IS NOT IN A POSITION TO WAIVE LEGISLATIVE

23   PRIVILEGE FOR ANY OF THE OTHER LEGISLATORS.  PLAINTIFFS WERE

24   ENTITLED TO GO OUT AND LOOK FOR ANY OTHER SENATORS THEY WANTED

25   AND PUT THEM ON IN THEIR CASE-IN-CHIEF.  THEY DID NOT.  SO WE

10:02AM   1   ARE HERE TODAY USING THE LEGISLATIVE TRANSCRIPTS THAT WERE

          2   PRODUCED.  THEY ARE A MATTER OF PUBLIC RECORD.

          3           **THE COURT:**  OKAY.  I'M GOING TO SUSTAIN THE

          4   OBJECTION.  PRESIDENT CORTEZ, WHETHER YOU FOLLOW IT OR NOT

          5   FOLLOW IT, I'M GOING TO INSTRUCT YOU THAT YOU SHOULD CONFINE

          6   YOUR ANSWERS TO THINGS THAT WERE SAID IN THE PUBLIC RECORD.

          7   OTHERWISE, THE COURT WILL FIND THAT YOU'VE WAIVED THE

          8   LEGISLATIVE PRIVILEGE, AND I'M SURE THAT'S NOT THE POSITION

          9   THAT YOU WANT TO FIND YOURSELF IN.

         10       YOUR ATTORNEY NEEDS TO BE MORE CIRCUMSPECT IN THE SCOPE OF

         11   HER QUESTIONS, BUT YOU NEED TO BE ADVISED -- AND THE COURT IS

         12   HEREBY ADVISING YOU -- I SHOULDN'T SAY ADVISING, I SHOULD SAY

         13   INSTRUCTING YOU THAT YOU NEED TO TREAD LIGHTLY IN TERMS OF YOUR

         14   COMMUNICATIONS WITH OTHER LEGISLATORS.

         15           **MR. ADCOCK:**  JUDGE, THE LAST THING IS, BASED ON THAT

         16   RULING, I WOULD MOVE TO STRIKE THE FIRST PART OF HIS ANSWER,

         17   WHICH I OBJECTED TO.

         18           **THE COURT:**  DENIED.

         19   **BY MS. MCKNIGHT:**

         20   Q.  MR. PRESIDENT, I'M GOING TO STEP BACK FROM JOINT RULE 21.

         21   LET'S PUT UP A MAP OF THE SENATE ENACTED PLAN.  THIS IS PX34.

         22   MR. PRESIDENT, THIS IS PLAINTIFFS' EXHIBIT, AN ILLUSTRATION OF

         23   THE 2022 SENATE PLAN.  DOES IT APPEAR ACCURATE TO YOU AS THE

         24   2022 SENATE PLAN?

         25   A.  THIS IS THE ENACTED PLAN?

10:03AM 1   Q.   CORRECT.

2   A.   AS FAR AS I CAN TELL, IT LOOKS LIKE IT.  I MEAN, IT

3   DOESN'T GO DOWN TO THE PRECINCT LEVEL, BUT AS FAR AS I CAN

4   TELL, IT LOOKS LIKE THE ENACTED PLAN.

5   Q.   OKAY.  I WOULD LIKE TO ASK YOU ABOUT WHAT KIND OF

6   POPULATION SHIFT AND POPULATION CHANGE ISSUES YOU WERE

7   ADDRESSING IN YOUR BILL SB 1.  SO USING THIS MAP, COULD YOU

8   DESCRIBE THE POPULATION SHIFT YOU WERE FACED WITH IN LOUISIANA

9   WHEN YOU WERE PREPARING SB 1?

10   A.   SURE.  SO THE WAY THAT SENATE DISTRICTS ARE NUMBERED IS

11   THEY START WITH NUMBER 1, WHICH IS IN THE FAR SOUTHEAST PORTION

12   OF THE STATE, AND THEY FINISH WITH 39, WHICH IS IN THE

13   NORTHWEST CORNER.  THE HOUSE MAP IS EXACTLY OPPOSITE.  IT

14   STARTS WITH DISTRICT 1 IN THE NORTHWEST CORNER AND FINISHES

15   WITH 105 DOWN IN THE FAR SOUTHEAST CORNER.

16       SOME OF THESE NUMBERS HAVE BEEN MOVED OUT OF ORDER.

17   BECAUSE OF A REDISTRICTING, WE MOVE A NUMBERED DISTRICT TO

18   ANOTHER AREA OF THE STATE AND POPULATION SHIFTS.  BUT AT THE

19   TIME, IN THE PREVIOUS MAP, IF YOU LOOK AT SENATE DISTRICT 28

20   AND GO NORTH FROM THERE, 28 AND 30 AND GO NORTH, EFFECTIVELY, I

21   CALL IT THE TOP OF THE BOOT, THOSE 12 DISTRICTS HAD A COMBINED

22   LOSS FROM THE DEVIATION.  FROM THE 120,000, I'M GOING TO SAY,

23   COLLECTIVELY THEY HAD LOST 90,000 PEOPLE.  IF YOU ADDED ALL THE

24   LOSSES -- EVERY DISTRICT HAD LOST POPULATION.  IF YOU ADDED

25   THEM ALL UP, IT WAS ROUGHLY 90,000.  SO JUST A FEW THOUSAND

P. CORTEZ - DIRECT

10:05AM
1   SOUTH OF A FULL SENATE DISTRICT.

2        IF YOU GO TO THE SOUTHEAST, NORTH OF -- WE CALL THE NORTH

3   SHORE NORTH OF LAKE PONTCHARTRAIN, AND YOU LOOK AT SENATE

4   DISTRICTS 1, 11, 12, 6, 13 AND 18, POSSIBLY -- YEAH, THOSE

5   COLLECTIVELY -- YOU WILL SEE IN THIS PARTICULAR ONE, THERE'S 37

6   NOW, AND THAT WAS BECAUSE WE REMOVED A DISTRICT FROM NORTHWEST

7   LOUISIANA AND PUT IT ON THE NORTH SHORE, BUT THEY COLLECTIVELY

8   HAD 70,000 MORE PEOPLE THAN THE DEVIATION.

9        SO YOU HAD 70,000 PEOPLE MORE IN POPULATION THAN THOSE

10  DISTRICTS COULD TAKE IN, AND YOU HAD 90,000 LESS THAN THEY

11  NEEDED TO BE MADE ONE-PERSON, ONE-VOTE EQUAL.

12       SO WE HAD TO CHOOSE TO DO TWO THINGS, THREE THINGS -- WE

13  HAD THREE OPTIONS, REALLY, I GUESS.  WE COULD -- WELL, WE HAD

14  MULTIPLE OPTIONS, MORE THAN THREE, BUT WE HAD A

15  MAJORITY-MINORITY DISTRICT 29 UP IN NORTH LOUISIANA, CENTRAL

16  AND NORTH LOUISIANA.  IF WE WANTED TO MAINTAIN THAT MINORITY

17  DISTRICT, WHICH WAS ONE OF THE TENETS THAT WE TALKED ABOUT,

18  CONTINUITY OF REPRESENTATION, THEN YOU HAD TO EITHER MIGRATE

19  ALL THE OTHERS SOUTH TO PICK UP MORE POPULATION, WHICH WOULD

20  HAVE CREATED LARGER DISTRICTS GEOGRAPHICALLY TO PICK UP THE

21  POPULATION.  YOU COULD ROLL THE DISTRICTS COUNTER-CLOCKWISE OR

22  CLOCKWISE TO PICK UP THE POPULATION.

23       YOU HAD ANOTHER MINORITY DISTRICT, DISTRICT 34, WHICH WE

24  WANTED TO MAINTAIN THAT MINORITY DISTRICT, AND IT WAS ON THE

25  MISSISSIPPI STATE LINE.  SO YOU COULDN'T PICK A POPULATION

P. CORTEZ - DIRECT

10:07AM   1    GOING INTO MISSISSIPPI, AND YOU COULDN'T PICK A POPULATION

      2    GOING UP INTO ARKANSAS.  SO THE ONLY PLACE THEY COULD GO TO

      3    PICK UP POPULATION WAS TOWARDS THE CENTRAL PART OF THE STATE OR

      4    SOUTH.

      5         THE 29 DISTRICT WAS IN SOME WAYS LIKE A WALL IN THE MIDDLE

      6    OF THE STATE, SO YOU HAD TO GO AROUND IT TO THE NORTH OR UNDER

      7    IT TO THE SOUTH.  IT HAD TO GROW AS WELL.  IT HAD TO PICK UP

      8    POPULATION.

      9         SO IN THE END, I WENT HISTORICALLY AND LOOKED AT, I THINK

     10    IT WAS IN 1990 THAT THE NORTHERN PART OF THE STATE HAD LOST

     11    POPULATION, AND AT THAT TIME, THEY CHOSE TO REMOVE A SENATE

     12    DISTRICT FROM MONROE AREA, FROM THE NORTHEAST AREA, AND THEY

     13    BROUGHT IT TO SOUTH LOUISIANA.  I MADE THE DECISION TO REMOVE A

     14    DISTRICT FROM NORTHWEST LOUISIANA AND PLACE IT ON THE NORTH

     15    SHORE IN MY MAP, BECAUSE ANYTHING OTHER THAN THAT WOULD HAVE

     16    DISTORTED EVERY OTHER DISTRICT IN THE STATE TO THE POINT WHERE

     17    IT WOULD NOT HAVE LOOKED LIKE IT PREVIOUSLY LOOKED.

     18         SO THAT WAS THE BIGGEST CHALLENGE WAS THE POPULATION

     19    SHIFT, THAT NORTH LOUISIANA HAD LOST POPULATION, AND SOUTH

     20    LOUISIANA, PRIMARILY THE NORTH SHORE, BUT THE LAFAYETTE AREA

     21    GAINED, LAKE CHARLES HAD GAINED, BATON ROUGE HAD GAIN

     22    POPULATION, THE ASCENSION PARISH AREA HAD GAINED POPULATION.

     23    ALL OF THOSE DISTRICTS NEEDED TO SHRINK IN SIZE AND ALL OF THE

     24    NORTH LOUISIANA EITHER HAD TO GROW IN SIZE, OR YOU COULD PULL

     25    ONE OUT AND THEN THEY COULD MAINTAIN THEIR SEMBLANCE TO WHAT

10:09AM   1    THEY WERE BEFORE.

2    Q.   THANK YOU.  I WANT TO MAKE SURE I UNDERSTAND.  YOU

3    MENTIONED A 1990 PLAN WHERE IT REMOVED A DISTRICT FROM THE

4    NORTHEAST.  WHY WAS THAT RELEVANT TO YOUR DRAWING OF SB 1?

5    A.   WELL, IN FAIRNESS TO THE STATE, IF YOU KEEP PLUCKING

6    SENATE DISTRICTS OUT OF ONE AREA OF THE STATE, THEY BECOME --

7    EXCUSE ME -- THEY BECOME VERY LARGE RURAL DISTRICTS THAT DON'T

8    HAVE COMMUNITIES OF INTEREST.  THE ONE THAT WE TOOK WAS

9    DISTRICT 37, WAS A VERY COMPACT DISTRICT, AND THAT POPULATION

10   COULD BE SPREAD AMONGST THE LOSSES FROM THE SURROUNDING

11   DISTRICTS.

12        AND IT WAS A FAIRNESS ISSUE THAT IF NORTHEAST LOUISIANA

13   HAD LOST ONE SOME 30 YEARS AGO, 40 YEARS AGO, THEN NORTHWEST

14   LOUISIANA WOULD BE IN LINE TO LOSE A DISTRICT.

15        NO ONE WANTS TO LOSE A DISTRICT.  I MEAN, YOU DON'T REALLY

16   LOSE A DISTRICT.  YOU JUST CHANGE WHO REPRESENTS YOU OR WHAT

17   DISTRICT NUMBER REPRESENTS YOU.

18   Q.   WERE THERE ANY ISSUES WITH CONGREGATE SETTINGS?

19   A.   YES.  THAT WAS ANOTHER CHALLENGE.  BECAUSE OF COVID, THE

20   WAY THE CENSUS IS DONE IN YEARS PAST AND MANY OF THE DECADES

21   PAST, IF YOU WERE -- IF YOU WERE LIVING IN A DORMITORY AT LSU,

22   YOU WOULD BE COUNTED IN EAST BATON ROUGE PARISH, OR IF YOU

23   WERE -- BUT IF YOU WERE FROM, LET'S SAY, HOUMA OR LAFAYETTE AND

24   YOU WERE DOING DISTANT LEARNING DURING THAT TIME PERIOD OF THE

25   CENSUS, YOU WERE COUNTED IN LAFAYETTE OR IN HOUMA.  SO WE KNOW

10:11AM

1    THAT HAD SOME CHANGE.  WE DON'T KNOW EXACTLY WHAT THAT NUMBER

2    IS.  I DON'T KNOW THAT IT'S A HUGE NUMBER, BUT IT WAS A NUMBER

3    THAT POTENTIALLY INFLATED SOME AREAS THAT OTHERWISE WOULDN'T

4    HAVE GOTTEN SOME AND DEFLATED SOME AREAS THAT OTHERWISE WOULD

5    HAVE GOTTEN SOME DUE TO CONGREGATE.

6    Q.  WE'VE TALKED ABOUT POPULATION CHANGES IN LOUISIANA.  I

7    WOULD LIKE TO ASK YOU ABOUT WHAT SORTS OF GEOGRAPHIC BARRIERS

8    OR CHALLENGES YOU FACED IN PREPARING SB 1.

9    A.  THE BIGGEST CHALLENGES WERE THE DISTRICTS THAT BORDER

10   EITHER THE GULF OF MEXICO, MISSISSIPPI, ARKANSAS OR TEXAS.  I

11   HAD THE CHALLENGE OF WANTING TO MAINTAIN WHAT WAS PRECLEARED

12   UNDER THE JUSTICE DEPARTMENT SOME 11 YEARS EARLIER.  39 AND 34

13   ARE BOTH MINORITY DISTRICTS.  39 IS BORDERED BY ARKANSAS AND

14   TEXAS.  34 IS BORDERED BY ARKANSAS AND MISSISSIPPI.  THEY CAN'T

15   GROW INTO ARKANSAS TO PICK UP POPULATION, THEY CAN'T GROW INTO

16   MISSISSIPPI TO PICK UP POPULATION, BUT THEY WERE BOTH BELOW THE

17   DEVIATION, SO THEY HAD TO PICK UP POPULATION FROM SOMEWHERE.

18   THEY HAD TO GROW INTO THE STATE.

19       DOWN IN SOUTH LOUISIANA, YOU KNOW, 20 IS AN EXAMPLE, THE

20   GULF OF MEXICO IS TO ITS SOUTH.  IT COULD NOT GROW SOUTH.  IT

21   HAD TO GROW EITHER NORTH, EAST OR WEST.  AND WHEN YOU HAVE

22   OTHER DISTRICTS THAT ARE ALSO OVER IN POPULATION OR YOU -- THEY

23   NEED TO GIVE UP POPULATION, YOU NEED TO GIVE UP POPULATION.

24   WHERE DO YOU GIVE IT TO?  WHO DO YOU GIVE IT TO?  SO THOSE WERE

25   CHALLENGES.

10:12AM   1            AND YOU HAVE THE LAKE, AS WELL AS THE ATCHAFALAYA BASIN.

2       SO GEOGRAPHICALLY, LAKE PONTCHARTRAIN, YOU CAN'T SAY, IF YOU

3       ARE A NORTH SHORE DISTRICT, OH, BUT I'M GOING TO GIVE YOU SIX

4       PRECINCTS IN METAIRIE.  WELL, THAT DOESN'T MAKE SENSE.  IF YOU

5       ARE IN ST. MARTIN PARISH, YES, YOU ARE CONTIGUOUS WITH

6       IBERVILLE PARISH, BUT IT WOULDN'T MAKE SENSE TO SAY I'M GOING

7       TO GIVE YOU SIX PRECINCTS IN BRUSLY, BECAUSE YOU WOULD HAVE TO

8       GET ON THE ATCHAFALAYA BASIN AND GO ALL THE WAY ACROSS TO MEET

9       WITH THOSE CONSTITUENTS.  THEY ARE CONTIGUOUS BY NATURE OF

10      PRECINCTS, BUT THE ATCHAFALAYA BASIN IS THE LARGEST BASIN IN

11      THE U.S., AND YOU WOULDN'T DO THAT.  SO YOU ARE LIMITED TO

12      GOING SOUTH OR NORTH WITH THAT DISTRICT.  CONVERSELY, WITH THE

13      NORTH SHORE AND THE SOUTH SHORE, YOU CAN'T CROSS THE -- YOU CAN

14      LEGALLY CROSS IT, BUT IT MAKES NO SENSE TO DO SO.

15      Q.  TURNING TO THE ROAD SHOWS PRIOR TO DRAWING, DID YOU ATTEND

16      ANY OF THE ROAD SHOWS?

17      A.  I DID.

18      Q.  OKAY.  AND WHICH ONE DID YOU ATTEND?

19      A.  I ATTENDED THE ONE IN LAFAYETTE FOR THE WHOLE ROAD SHOW.

20      I THINK I -- I STUCK MY HEAD INTO BATON ROUGE FOR A FEW MINUTES

21      BUT DIDN'T STAY FOR THE ENTIRETY OF IT.

22      Q.  AND DID OTHER SENATORS ATTEND OTHER ROAD SHOWS?

23      A.  THE HOUSE AND GOVERNMENTAL --

24            **MR. ADCOCK:**  OBJECTION, JUDGE.  I DON'T KNOW THAT SHE

25      HAS LAID A FOUNDATION FOR HIM TO KNOW WHICH SENATORS ATTENDED

P. CORTEZ - DIRECT

10:14AM   1   WHICH ROAD SHOWS OR WHETHER ANY OF THEM ATTENDED THEM.

2        **THE COURT:**  MS. MCKNIGHT?

3        **MS. MCKNIGHT:**  I CAN REPHRASE, YOUR HONOR.

4        **THE COURT:**  PLEASE DO.

5    **BY MS. MCKNIGHT:**

6    Q.  ARE YOU AWARE OF WHETHER ANY SENATORS ATTENDED OTHER ROAD

7    SHOWS?  AND THEN I WILL ASK YOU A FOLLOW-UP QUESTION.  IT IS

8    JUST A YES OR NO.

9    A.  YES.

10   Q.  OKAY.  AND WHAT IS YOUR AWARENESS OF WHETHER OTHER

11   SENATORS ATTENDED OTHER ROAD SHOWS?

12   A.  WELL, THEY TOOK ROLL AT ALL OF THE ROAD SHOWS.

13   Q.  AND YOU ARE AWARE OF THAT PARTICIPATION; IS THAT FAIR?

14   A.  CORRECT.

15   Q.  DID YOU HAVE AN UNDERSTANDING OF ANY SENATE AND

16   GOVERNMENTAL AFFAIRS REQUIREMENT ABOUT ATTENDANCE AT ROAD

17   SHOWS?

18   A.  I'M NOT AWARE OF THE REQUIREMENT.  IT'S MY BELIEF THAT THE

19   MEMBERS ATTENDED AS MANY AS PRACTICABLE, THAT THAT WAS THEIR --

20   THEY UNDERSTOOD WHEN THEY WERE APPOINTED TO THAT COMMITTEE THAT

21   REDISTRICTING WAS GOING TO BE A HIGH PRIORITY FOR PARTICIPATION

22   ON THAT COMMITTEE.

23        **MR. ADCOCK:**  YOUR HONOR, I'M SORRY.  THIS IS SNEAKING

24   UP ON ME BECAUSE OF THE WAY IT'S PHRASED.  I HAVE TO OBJECT

25   AGAIN.  HE IS TESTIFYING OTHER LEGISLATORS UNDERSTOOD THAT WHEN

10:15AM

1    THEY WERE PUT ON THE COMMITTEE -- LIKE, THAT GETS INTO OTHER

2    LEGISLATORS' THOUGHTS.  PRESUMABLY HE CAN'T KNOW THAT UNLESS

3    THEY TOLD HIM THAT.  SO I OBJECT FOR THE SAME REASON I WAS

4    OBJECTING PREVIOUSLY REGARDING THE TESTIMONY OF OTHER

5    LEGISLATORS.

6         **THE COURT:**  WELL, YOUR OBJECTION IS SUSTAINED.  THE

7    QUESTION DIDN'T CALL FOR HIM TO OFFER THE MENTAL STATES OF

8    OTHER LEGISLATORS.  PRESIDENT CORTEZ, PLEASE UNDERSTAND THAT

9    YOU HAVE FIRSTHAND KNOWLEDGE OF WHAT WAS IN YOUR MIND.  YOU

10   DON'T HAVE FIRSTHAND KNOWLEDGE OF WHAT WAS IN OTHER PEOPLE'S

11   MINDS.  SHE DIDN'T CALL FOR YOU TO ANSWER THAT, BUT IF YOU

12   WOULD REFRAIN FROM OFFERING THAT, IT WOULD BE MOST HELPFUL.

13        **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

14   A.   THANK YOU, YOUR HONOR.  CAN I OFFER SOMETHING ELSE?  I

15   THINK IT'S IMPORTANT TO KNOW THAT AS A MEMBER OF SENATE AND

16   GOVERNMENTAL AFFAIRS, THE SENATE RULES REQUIRED AND I EXPLAINED

17   TO EACH MEMBER WHEN THEY WERE APPOINTED TO SENATE AND

18   GOVERNMENTAL AFFAIRS THAT THEY WERE APPOINTED BECAUSE THEY WERE

19   A MEMBER OF A CERTAIN CONGRESSIONAL DISTRICT, BECAUSE WE WERE

20   IN A REDISTRICTING CYCLE.  THAT REDISTRICTING WAS -- PART OF

21   THEIR JOB WAS TO OVERSEE ALL OF THE REDISTRICTING PROCESS AND

22   TO VOTE IN COMMITTEE ON ALL OF THOSE BILLS.  MY -- IT'S NOT

23   WHAT THEY THOUGHT.  IT'S WHAT I TOLD THEM AT THE TIME OF THEIR

24   APPOINTMENT.

25        **THE COURT:**  RIGHT.  BUT THE WAY YOU PHRASED IT WAS,

10:16AM   1    WHAT YOUR WORDS WERE, "THEY UNDERSTOOD."  YOU CAN CERTAINLY SAY

          2    THESE WERE THE INSTRUCTIONS, THIS WAS THE REASON THEY WERE

          3    CHOSEN, WHAT YOU DID, WHAT YOU THOUGHT, WHAT YOU SAID, BUT YOU

          4    CAN'T SAY WHAT OTHER PEOPLE DID, THOUGHT OR SAID.

          5              **THE WITNESS:**  MY APOLOGIES.

          6              **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

          7    **BY MS. MCKNIGHT:**

          8    Q.  MR. PRESIDENT, DURING THE ROAD SHOWS THAT YOU ATTENDED, DO

          9    YOU RECALL ANYONE EXPRESSING THE VIEW THAT THEY WISHED FOR MORE

         10    MAJORITY BLACK DISTRICTS IN THE SENATE?

         11    A.  NO.

         12    Q.  NOW, AS PART OF THE REDISTRICTING PROCESS, DID YOU MEET

         13    WITH OTHER SENATORS?

         14    A.  YES.

         15    Q.  HOW MANY OTHER SENATORS DID YOU MEET WITH?

         16    A.  I MET WITH EVERY ONE OF THE OTHER 38 SENATORS.

         17    Q.  DID YOU MEET WITH SOME OF THEM MORE THAN ONCE?

         18    A.  YES.

         19    Q.  DID YOU EVER DENY A SENATOR A MEETING WHEN THEY REQUESTED

         20    ONE ON THE TOPIC OF REDISTRICTING?

         21    A.  NO.

         22    Q.  AND DID YOU RELY ON INFORMATION YOU LEARNED FROM MEMBERS

         23    IN THOSE MEETINGS IN DRAWING SB 1?

         24              **MR. ADCOCK:**  YOUR HONOR, SAME OBJECTION.  THIS IS

         25    KIND OF AN IN ROUTE AROUND THE SWORD AND SHIELD DOCTRINE.  HE

10:18AM  1   RELIED ON THEM.

2             **THE COURT:**  IT IS.  WHAT IS YOUR RESPONSE?

3             **MS. MCKNIGHT:**  I'M NOT ASKING HIM WHAT THEY SAID OR

4   HOW IT CHANGED THE MAP.  I'M ASKING ABOUT WHETHER IT FED INTO

5   HIS DEVELOPMENT OF SB 1.

6             **THE COURT:**  SUSTAINED.  ASK A DIFFERENT QUESTION.

7             **MS. MCKNIGHT:**  SURE.

8   **BY MS. MCKNIGHT:**

9   Q.  WERE THESE MEETINGS WITH THE OTHER SENATORS ABOUT

10   INCUMBENCY PROTECTION OR DISTRICT PERFORMANCE?

11            **MR. ADCOCK:**  SAME OBJECTION, JUDGE.

12            **THE COURT:**  MS. MCKNIGHT, LET ME BE VERY CLEAR.  YOU

13   CANNOT ASSERT LEGISLATIVE PRIVILEGE AND THEN IN AN INDIRECT WAY

14   TRY TO GET AT THE SUBJECT MATTER OF LEGISLATIVE MEETINGS AND

15   DISCUSSIONS.  SO YOU CAN HAVE IT ONE WAY OR THE OTHER.

16            **MS. MCKNIGHT:**  I UNDERSTAND, YOUR HONOR.

17            **THE COURT:**  OBJECTION SUSTAINED.

18            **MS. MCKNIGHT:**  PARDON ME, YOUR HONOR.  I DIDN'T MEAN

19   TO INTERRUPT YOU.  I UNDERSTAND AND I'LL MOVE ON.

20   **BY MS. MCKNIGHT:**

21   Q.  MR. PRESIDENT, I WOULD LIKE TO ASK YOU ABOUT DRAWING SB 1

22   IN ORDER TO COMPLY WITH THE VOTING RIGHTS ACT.  DID YOU DRAW

23   ANY GUIDANCE FOR COMPLIANCE FROM THE PRIOR DECADE'S

24   REDISTRICTING?

25   A.  YES.

10:19AM   1   Q.   AND WHAT WAS THAT GUIDANCE?

2   A.   WELL, IN 2011, WE WERE UNDER A DIFFERENT SECTION OF THE

3   VOTING RIGHTS ACT THAT REQUIRED A PRECLEARANCE BY THE JUSTICE

4   DEPARTMENT ON THE MAPS.  AND AT THAT TIME, IT'S MY RECOLLECTION

5   THAT WE ADDED A MAJORITY-MINORITY DISTRICT IN THE SENATE, AND

6   IT WAS PRECLEARED BY THE JUSTICE DEPARTMENT AT THAT TIME.

7        AND SO 11 YEARS LATER, THE FACT THAT THE POPULATION HAD

8   NOT CHANGED DRAMATICALLY IN ANY WAY, I FELT CONFIDENT THAT IF

9   WE FOLLOWED THE JUSTICE DEPARTMENT'S PRECLEARANCE MODEL, THAT

10   BY MAINTAINING A NUMBER OF MAJORITY-MINORITY DISTRICTS, WE

11   WOULD BE IN COMPLIANCE WITH FEDERAL LAW.

12   Q.   AND YOU APPRECIATE THAT THE STATE WAS NO LONGER UNDER

13   SECTION 5 PRECLEARANCE AT THE TIME YOU REDREW THE MAP; IS THAT

14   RIGHT?

15        **MR. ADCOCK:**  YOUR HONOR, I'M SORRY.

16        **THE COURT:**  CALLS FOR A LEGAL CONCLUSION.  SUSTAINED.

17        **MS. MCKNIGHT:**  THANK YOU.

18   **BY MS. MCKNIGHT:**

19   Q.   DID YOU -- IN ADDITION TO THAT GUIDANCE, DID YOU SEEK

20   LEGAL COUNSEL ABOUT COMPLIANCE?

21   A.   YES.

22   Q.   NOW, WHEN YOU WERE DRAWING YOUR DISTRICT, YOUR PLAN,

23   RATHER, WERE YOU DRAWING IT FOR ONE ELECTION OR FOR A WHOLE

24   DECADE?

25   A.   FOR THE DECADE.

10:20AM    1    Q.   OKAY.   WHAT DOES THAT MEAN TO YOU WHEN YOU THINK ABOUT

           2    POPULATION SHIFTS IN THE STATE?

           3    A.   WELL, FIRST OF ALL, FROM AN ELECTED PERSPECTIVE, I WAS

           4    TURNED DOWN.   IT WAS IRRESPECTIVE TO MY DISTRICT.   IT WAS ABOUT

           5    THE POPULATION OF MY AREA AND HOW THEY COULD BEST BE SERVED IN

           6    THE FUTURE BY WHOEVER WAS ELECTED.   SO AGAIN, THOSE TENETS THAT

           7    I HAD TALKED ABOUT, COMMUNITIES OF INTEREST, ALL HAD TO BE

           8    MAINTAINED, YET YOU HAD TO CHANGE THE MAKEUP OF THEM BECAUSE

           9    SOME HAD TO SHRINK BECAUSE THEY WERE TOO POPULATED, AND SOME

          10    HAD TO GROW GEOGRAPHICALLY.   SO HOW DO YOU DO THAT AND PREPARE

          11    FOR THE NEXT DECADE, YOU KNOW, WHERE GROWTH IS GOING TO HAPPEN

          12    AND SHRINKAGE IS GOING TO HAPPEN?

          13    Q.   AND WHEN YOU WERE DRAWING THE SB 1, HOW DID YOU ATTEMPT TO

          14    COMPLY WITH THE VOTING RIGHTS ACT IN LIGHT OF THE SHIFTING

          15    POPULATION?

          16    A.   WELL, WE WANTED TO CERTAINLY MAINTAIN THE

          17    MAJORITY-MINORITY DISTRICTS, THAT WAS NUMBER ONE, BUT WE DIDN'T

          18    WANT TO DISRUPT THOSE COMMUNITIES OF INTEREST.   THAT WAS THE

          19    BIG -- THAT WAS THE SECOND -- AND OF COURSE, AGAIN, IT ALL

          20    COMES BACK TO THE NUMBER ONE THING.   IT'S THE ONE-PERSON,

          21    ONE-VOTE.   YOU'VE GOT TO COMPLY WITH THAT BEFORE YOU COMPLY

          22    WITH ANYTHING ELSE.   YOU KNOW, THAT -- YOU CAN'T HAVE A

          23    DISTRICT MADE OF 150,000 PEOPLE AND ONE MADE OF 60,000.   THAT

          24    WOULD VIOLATE THE MAP IMMEDIATELY.

          25    Q.   DID YOU EVER HAVE A CONCERN THAT YOU COULD DRAW A DISTRICT

10:22AM   1   YOU BELIEVED WAS COMPLIANT WITH THE VRA THIS YEAR BUT COULD

          2   FALL OUT OF COMPLIANCE IN SUBSEQUENT YEARS?

          3   A.   WE HAD EXAMPLES OF THAT FROM THE PREVIOUS MAP.  THAT EXACT

          4   PROBLEM OCCURRED POST-KATRINA.  THE MODEL WAS, THERE WAS SOME

          5   MOVEMENT IN THE NEW ORLEANS AREA, AND OVER THE LAST TWO

          6   DECADES, THERE HAS BEEN SOME MIGRATION BACK TO THE ORLEANS

          7   AREA.  SO WE SAW THAT HAPPEN WHERE THE MAP THAT WAS CREATED IN

          8   2011 WAS APPROVED BY THE JUSTICE DEPARTMENT, BUT TODAY -- NOT

          9   TODAY -- A YEAR AGO, WHEN WE PASSED THIS MAP, I DON'T THINK IT

         10   WOULD HAVE BEEN IN COMPLIANCE HAD WE NOT CHANGED IT.

         11   Q.   AND WHY NOT?

         12   A.   BECAUSE THERE WAS A MAJORITY-MINORITY DISTRICT THAT WAS

         13   UNDER 50 PERCENT.

         14   Q.   YESTERDAY WE SAW A SLIDE FROM PLAINTIFFS, AND I WOULD LIKE

         15   TO ASK YOU FIRST IF YOU SAW THE SAME SLIDE, AND THEN I WILL ASK

         16   YOU SOME QUESTIONS ABOUT IT.  WE SAW A SLIDE FROM PLAINTIFFS

         17   CLAIMING THAT YOU WERE PRESSING FOR A NEW STANDARD OF

         18   COMPLIANCE FOR VOTING RIGHTS ACT, THAT YOU WERE LOOKING TO

         19   CREATE A, QUOTE, SLAM DUNK GUARANTEE OF PERFORMANCE.  DO YOU

         20   RECALL SEEING THAT SLIDE?

         21   A.   YES.

         22   Q.   LET'S TURN TO JX21.  MR. PRESIDENT, THIS IS THE SAME

         23   TRANSCRIPT WE WERE LOOKING AT EARLIER OF THE SENATE AND

         24   GOVERNMENTAL AFFAIRS COMMITTEE MEETING ON FEBRUARY 2, 2022.

         25   LET'S TURN TO PAGE 33.  AND FIRST, AS A FOUNDATIONAL QUESTION,

10:24AM   1    MR. PRESIDENT, DO YOU RECOGNIZE THE TEXT IN THE FIRST HALF OF

          2    THIS PAGE?

          3    A.   YES.

          4    Q.   AND WHO IS SPEAKING IN THIS PORTION OF THE TRANSCRIPT?

          5    A.   IT'S ME.

          6    Q.   OKAY.  AND I SEE A REFERENCE IN LINE 13 TO, QUOTE-UNQUOTE,

          7    SLAM DUNK.  COULD YOU EXPLAIN WHAT YOU WERE TALKING ABOUT HERE?

          8    A.   SO I WAS USING, IN ESSENCE, A BASKETBALL ANALOGY WHEREBY A

          9    THREE-POINT SHOT IN BASKETBALL IS A LOW PERCENTAGE SHOT, AND A

         10    SLAM DUNK IS A HIGH PERCENTAGE SHOT.  IF YOU TAKE A THREE-POINT

         11    SHOT, YOUR CHANCE OF MAKING THE GOAL IS MUCH LOWER.  AND SO

         12    RELATIVE TO OPPORTUNITY, DO YOU HAVE AN OPPORTUNITY TO MAKE IT?

         13    YES.  IF YOU TAKE A HALF COURT SHOT, YOU HAVE AN OPPORTUNITY TO

         14    MAKE IT.  BUT THE PERCENTAGE OF MAKING IT COULD BE -- I MEAN,

         15    THE BEST NBA PLAYERS MAKE LESS THAN 30-PERCENT THREE-POINTERS.

         16    SO THAT MEANS 7 OUT OF 10 TIMES THEY FAIL.

         17         WHAT'S AN OPPORTUNITY?  WELL, YOU WANT TO HAVE A BETTER

         18    THAN HALF CHANCE OF MAKING IT, AND A SLAM DUNK IS A BETTER THAN

         19    50-PERCENT CHANCE.  I COULD HAVE SAID LAY-UP.  I COULD HAVE

         20    USED ANOTHER TERM.  BUT SLAM DUNK WAS WHAT I USED TO SUGGEST

         21    THAT IF YOU HAVE AN OPPORTUNITY TO GET OVER -- THEY PROBABLY

         22    MAKE OVER 50-PERCENT SLAM DUNKS.

         23    Q.   DOES THIS TRANSCRIPT DEMONSTRATE THAT YOU WERE PUSHING FOR

         24    A GUARANTEED WIN FOR VRA DISTRICTS IN SB 1?

         25         **MR. ADCOCK:**  OBJECTION, JUDGE.  SHE IS ASKING ABOUT

P. CORTEZ - DIRECT

10:26AM   1    WHAT THE TRANSCRIPT MEANS.  IT SPEAKS FOR ITSELF.

        2            **THE COURT:**  WELL, AND IT IS LEADING.  I'M GOING TO

        3    SUSTAIN THE OBJECTION.  ASK A DIFFERENT QUESTION.

        4    **BY MS. MCKNIGHT:**

        5    Q.   OKAY.  WHEN YOU WERE DRAWING SB 1, WERE YOU LOOKING TO

        6    DRAW GUARANTEED WIN VRA DISTRICTS?

        7            **MR. ADCOCK:**  OBJECTION, LEADING.

        8            **THE COURT:**  SUSTAINED.

        9    **BY MS. MCKNIGHT:**

       10    Q.   WHAT KIND OF OPPORTUNITY WERE YOU TRYING TO CREATE IN

       11    DRAWING VRA DISTRICTS IN SB 1?

       12    A.   IT WAS MY BELIEF, AFTER ALL OF THE MEETINGS THAT I HAD,

       13    THAT AN OPPORTUNITY REQUIRED A CERTAIN LEVEL OF BVAP.  AND WHEN

       14    YOU GOT BELOW A CERTAIN LEVEL OF BVAP IN CERTAIN DISTRICTS,

       15    THERE WAS NO OPPORTUNITY.  IN OTHER DISTRICTS, YOU COULD GO

       16    BELOW A CERTAIN NUMBER AND THERE WAS STILL AN OPPORTUNITY.  AND

       17    THAT WAS MY BELIEF, THAT THEY WERE DIFFERENT IN THE URBAN AND

       18    THE RURAL AREAS.  THERE WERE DIFFERENT REASONS.  AND THAT WAS

       19    BASED ON ALL OF THE CONVERSATIONS THAT I HAD WITH EVERY MEMBER

       20    OF THE SENATE --

       21            **MR. ADCOCK:**  OBJECTION, AGAIN, JUDGE.

       22            **THE COURT:**  MY APOLOGIES.

       23            **MR. ADCOCK:**  LET ME FINISH.  SO HE'S TESTIFYING AGAIN

       24    ABOUT WHAT HE BELIEVED, QUOTE, BASED ON HIS CONVERSATION WITH

       25    ALL THE LEGISLATORS -- OTHER LEGISLATORS.  I OBJECT FOR THE

P. CORTEZ - DIRECT

10:27AM   1   SAME BASIS I OBJECTED EARLIER.

2               **THE COURT:**  SUSTAINED.

3               **MR. ADCOCK:**  IF THIS KEEPS GOING, I'M SORRY, I'M

4   GOING TO HAVE TO -- THIS IS GOING TO BE A WAIVER.  HE'S DOING

5   THIS AS HE WANTS TO.

6               **THE COURT:**  SUSTAINED.  I MEAN, WE ALL KNOW WHAT IS

7   AT RISK.  SUSTAINED.

8   **BY MS. MCKNIGHT:**

9    Q.  LET'S TURN TO THE BOTTOM OF PAGE 32 WHERE YOU BEGAN YOUR

10   STATEMENT ON 33.  I SEE A DISCUSSION BY YOU ABOUT A TURNOUT

11   CONCERN.  COULD YOU TELL ME WHAT YOU WERE THINKING OF HERE

12   WITHOUT DESCRIBING ANY CONVERSATIONS WITH OTHER LEGISLATORS?

13    A.  IT SPEAKS FOR ITSELF, THAT THERE WAS SOME STATISTICAL

14   ANALYSIS DONE IN THE RURAL MINORITY DISTRICTS THAT SUGGESTED

15   THAT TURNOUT WAS LOWER THAN IN THE URBAN DISTRICTS.

16               **MR. ADCOCK:**  YOUR HONOR, I HAVE TO OBJECT AGAIN.  THE

17   ONLY STATISTICS IN THE RECORD ON THIS THAT HE'S REFERENCING

18   CAME FROM HIS LAWYER, IS MY UNDERSTANDING.  SO IF HE IS

19   TESTIFYING TO WHAT HIS LAWYER GAVE HIM IN TERMS OF THESE

20   STATISTICS, THEN IT'S A WHOLE OTHER PRIVILEGE WE ARE GETTING

21   INTO THAT I ASKED ABOUT IN DEPOSITION AND HE WAS INSTRUCTED NOT

22   TO ANSWER.  SO THAT'S MY OBJECTION.

23               **MS. MCKNIGHT:**  YOUR HONOR, I DON'T THINK IT IS CLEAR

24   THAT THAT IS FROM A PRIVILEGE, THAT HE HAS THIS ANALYSIS OUT OF

25   A PRIVILEGE.  I CAN ASK HIM --

10:29AM   1          **THE COURT:**  YOU CAN CROSS-EXAMINE HIM ON THAT

2   QUESTION.  GO AHEAD.  ASK YOUR QUESTION.

3          **MS. MCKNIGHT:**  THANK YOU.

4   **BY MS. MCKNIGHT:**

5   Q.  SO I NOTICE WHEN YOU STARTED THIS ANSWER, YOU REFERENCED

6   "WHAT I ALLUDED TO EARLIER."  SO I WOULD LIKE TO GO EARLIER IN

7   THE TRANSCRIPT BY A FEW PAGES TO PAGE 30.  COULD YOU READ LINE

8   7 THROUGH 20, AND I WILL HAVE QUESTIONS FOR YOU, PLEASE.

9   A.  "I THINK WE AGREE ONE HUNDRED PERCENT.  I THINK THAT THE

10   MAP THAT I'VE DRAWN GIVES THAT OPPORTUNITY, AND WHAT THAT

11   OPPORTUNITY IS, I THINK, IS WHERE YOU AND I MAY HAVE A

12   DIFFERENCE OF OPINION.  DROPPING THE PERCENTAGE DOWN WITHOUT

13   KNOWING THE STATISTICAL ANALYSIS BEHIND IT, I THINK YOU COULD

14   HAVE AN ARGUMENT THAT YOU HAVE DONE EXACTLY THE OPPOSITE OF

15   WHAT YOU'RE INTENDING TO DO, BECAUSE I COULD DRAW THE MAP WITH

16   A BUNCH OF 50.1S, THERE WOULD BE A BUNCH OF 50.1S, THEY WOULD

17   GO ALL OVER, THEY WOULD LOOK LIKE SPIDERS, AND THE REALITY OF

18   IT IS THAT THAT MAP WOULD NOT PASS MUSTER.  IT WOULD VIOLATE

19   EVERY OTHER PRINCIPLE OF COMMUNITIES OF INTEREST.  IT WOULD

20   VIOLATE THE PRINCIPLES.  SO THE VOTING RIGHTS ACT, I AGREE, IS

21   ABOUT OPPORTUNITY."

22          DO YOU WANT ME TO READ TO THE BOTTOM?

23          "THAT'S WHAT THIS DID, AND I DIDN'T -- IN FACT, I

24   MENTIONED IN THE SECOND PRINCIPLE THAT I WAS GOING TO FOLLOW,

25   NOT THAT THEY WERE RANKED IN ANY PARTICULAR ORDER, BUT

10:30AM    1    POPULATION IS ONE."

         2    **BY MS. MCKNIGHT:**

         3    Q.   YOU MENTIONED DROPPING THE BVAP PERCENTAGE DOWN WITHOUT

         4    KNOWING THE STATISTICAL ANALYSIS BEHIND IT.  DO YOU SEE THAT?

         5    A.   YES.

         6    Q.   DID YOU EVER RECEIVE FROM ANYONE, ANY OTHER SENATORS,

         7    ANYONE, A STATISTICAL ANALYSIS SUPPORTING DROPPING BVAP DOWN TO

         8    CLOSE TO 50 PERCENT FOR OPPORTUNITY DISTRICTS?

         9         **MR. ADCOCK:**  YOUR HONOR, SAME OBJECTION.  THEY ARE

        10    PASSING INFORMATION ALONG TO HIM.  THOSE ARE

        11    COMMUNICATIONS THAT WE WEREN'T ASKED --

        12         **THE COURT:**  YOU SPECIFICALLY -- MS. MCKNIGHT, YOU

        13    SPECIFICALLY CALLED FOR DID HE GET STATISTICS FROM ANY OTHER

        14    SENATORS.  I MEAN, HOW IS THAT --

        15         **MS. MCKNIGHT:**  I'M TALKING ABOUT -- LET ME CAVEAT --

        16    YOUR HONOR, I UNDERSTAND.

        17    **BY MS. MCKNIGHT:**

        18    Q.   IN THIS LEGISLATIVE PROCESS, DID ANY SENATORS OR STAFF PUT

        19    FORWARD IN THE PASSING -- THE DEVELOPMENT AND PASSING OF SB 1

        20    STATISTICAL ANALYSIS THAT SHOWED THAT VRA DISTRICTS COULD BE

        21    DROPPED BELOW 50 PERCENT AND STILL PERFORM?

        22         **MR. ADCOCK:**  JUDGE, I WILL RESPOND TO THAT.  SO THE

        23    INSTRUCTION WAS CLEAR, IT'S ONLY BASIS ON THINGS IN THE RECORD.

        24    THE WAY TO DO THAT IS TO ASK SPECIFICALLY, ONLY ON THE RECORD,

        25    DID YOU SEE ANY STATISTICS GIVEN BY OTHER SENATORS IN THE

P. CORTEZ - DIRECT

10:31AM   1    PUBLIC RECORD.

2              **THE COURT:**  SUSTAINED.  DO YOU HAVE THE STATISTICS IN

3    THE PUBLIC RECORD?  SHOW HIM.

4              **MS. MCKNIGHT:**  SURE.

5    **BY MS. MCKNIGHT:**

6    Q.  IN THE PUBLIC RECORD, DO YOU --

7              **THE COURT:**  NO.  DO YOU HAVE THEM?  SHOW THEM.

8              **MS. MCKNIGHT:**  YOUR HONOR, PARDON ME.  IT WOULD BE

9    PROVING A NEGATIVE.  I'M TRYING TO SHOW THAT THERE IS NOTHING

10   IN THE PUBLIC RECORD.  IT WAS NEVER PUT FORTH IN THE PUBLIC

11   RECORD.

12             **MR. ADCOCK:**  SO YOU CAN'T ASK ABOUT IT.

13             **MS. MCKNIGHT:**  WHY NOT?

14             **THE COURT:**  OKAY.  BUT WHAT YOU ARE ASKING IS HAS ANY

15   SENATOR OR STAFFER GIVEN YOU ANYTHING?  AND --

16             **MS. MCKNIGHT:**  THAT'S WHY I FOCUSED ON IN THE PASSAGE

17   OF THIS PLAN IN THE LEGISLATIVE PROCESS.  AND I CAN INSERT THE

18   WORD "PUBLIC" THERE.  I'M TRYING TO BE VERY CLEAR THAT THERE IS

19   A WHOLE LEGISLATIVE RECORD.  PLAINTIFFS HAVE HAD ACCESS TO IT

20   TOO.  I WOULD LIKE TO FOCUS MY QUESTION -- I BELIEVE I DID --

21   IF I DIDN'T, I CAN DO IT, I CAN TRY AGAIN -- ON THE PUBLIC

22   RECORD RELATED TO SB 1, ANY AMENDMENTS TO SB 1, OR ANY OF THE

23   MAP DRAWING.  THERE ARE OTHER MAPS THAT WERE SUBMITTED.

24             THE POINT IS THAT THERE WAS NO ANALYSIS SUBMITTED IN THE

25   PUBLIC RECORD TO SUPPORT THIS.  AND SO I BELIEVE IT IS FAIR TO

10:32AM   1    ASK A QUESTION OF WHETHER THE PUBLIC RECORD REFLECTS THAT ANY

2    OF THAT TYPE OF ANALYSIS WAS EVER SUBMITTED.

3              **MR. ADCOCK:**  THEN ASK THAT QUESTION.  THAT IS FINE.

4    BUT JUST ASK THAT QUESTION.  WE HAVE SEEN THAT THIS WITNESS IS

5    NOT GOOD AT FOLLOWING THESE INSTRUCTIONS, SO IT HAS TO BE CLEAR

6    QUESTIONS.  THAT WASN'T A CLEAR QUESTION.  THE EXAMPLE COUNSEL

7    JUST GAVE IS A CLEAR QUESTION.  THAT'S A FINE QUESTION.

8              **THE COURT:**  THE OBJECTION IS SUSTAINED.  REPHRASE

9    YOUR QUESTION.

10             **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

11   **BY MS. MCKNIGHT:**

12   Q.  MR. PRESIDENT, IN THE DRAWING OF SB 1, AND IN THE

13   REDISTRICTING PROCESS AS A WHOLE IN THE SENATE, WAS THERE EVER

14   AN ANALYSIS PUT FORWARD ON THE SENATE FLOOR OR IN THE SENATE

15   AND GOVERNMENTAL AFFAIRS COMMITTEE MEETINGS THAT SHOWED AN

16   ANALYSIS SUPPORTING THE DRAWING OF VRA DISTRICTS AT CLOSE TO

17   50 PERCENT THAT WOULD STILL PERFORM?

18   A.  NO.

19   Q.  MR. PRESIDENT, ARE YOU AWARE OF THE MEMBERS -- WHO THE

20   MEMBERS ARE OF THE SENATE AND GOVERNMENTAL AFFAIRS COMMITTEE?

21   A.  YES.

22   Q.  OKAY.  AND WERE THERE MEMBERS OF THE BLACK CAUCUS ON THAT

23   COMMITTEE?

24   A.  YES.

25   Q.  DID ANY OF THOSE MEMBERS OFFER ANY AMENDMENTS TO SB 1?

P. CORTEZ - DIRECT

10:34AM

1    A.  NO.

2    Q.  DO THE SGA COMMITTEE MEMBERS HAVE OPPORTUNITIES TO OFFER

3    AMENDMENTS TO SENATE BILLS?

4    A.  YES.

5    Q.  MR. PRESIDENT, DO YOU THINK THE ENACTED SENATE PLAN, YOUR

6    SB 1, REFLECTS THE RESULT OF A LEGISLATIVE PROCESS?

7    A.  YES.

8    Q.  OKAY.  LET'S PULL UP PLAINTIFF'S EXHIBIT 48.  THIS IS

9    ILLUSTRATIVE SENATE MAP SHOWING THE STATEWIDE MAP OF

10   PLAINTIFFS' ILLUSTRATIVE PLAN.  MR. PRESIDENT, I WOULD LIKE TO

11   ASK YOU QUESTIONS ABOUT WHAT THIS PLAN DOES TO DIFFERENT AREAS

12   OF THE STATE.  COULD I ASK YOU ABOUT THE AREA OF ACADIA PARISH

13   AND WHETHER -- AND WHETHER THOSE CHANGES REFLECTED SOMETHING

14   YOU VIEWED AS IMPORTANT IN PREPARING SB 1?

15         MR. ADCOCK:  YOUR HONOR, OBJECTION.  THAT QUESTION IS

16   VERY, VERY VAGUE.  AND GIVEN THE SLIPPERINESS OF THESE PROBLEMS

17   WITH PRIVILEGE, I THINK WE NEED TO BE MORE EXACTING IN OUR

18   QUESTIONS AND MAKE SURE WE DON'T GET INTO THESE NONPUBLIC

19   CONVERSATIONS.

20         MS. MCKNIGHT:  YOUR HONOR, I'M EITHER LEADING OR TOO

21   VAGUE.

22   BY MS. MCKNIGHT:

23   Q.  I THINK HERE, MR. PRESIDENT, TO BE CLEAR, THIS QUESTION

24   RELATES ONLY TO INFORMATION YOU HAD THAT WAS PUBLICLY

25   AVAILABLE.  MY QUESTION IS FOCUSED ON YOUR UNDERSTANDING AND

10:36AM   1   YOUR REVIEW OF THIS MAP AND WHETHER IT COMPLIES WITH YOUR GOALS

        2   IN DRAWING SB 1.

        3           **MR. ADCOCK:**  RIGHT, JUDGE.  AND MY OBJECTIONS EARLIER

        4   WERE SOMETIMES THE WITNESS WOULD TESTIFY THAT HIS UNDERSTANDING

        5   OF SOMETHING WAS BASED ON CONVERSATIONS WITH OTHER LEGISLATORS.

        6   SO THAT WAS WHY I WAS ARTICULATING THE PROBLEMS WITH

        7   SLIPPERINESS HERE.  WE NEED TO BE EXACTING.  YOU CAN ASK HIM AN

        8   EXACTING QUESTION WITHOUT ASKING A LEADING QUESTION, OR YOU CAN

        9   ALSO LAY A FOUNDATION WITHOUT ASKING A LEADING QUESTION.

       10   THAT'S MY OBJECTION.

       11           **THE COURT:**  OVERRULED.

       12   A.   WITH REGARD TO ACADIA PARISH, IT VIOLATES THE COMMUNITIES

       13   OF INTEREST IMMEDIATELY JUST LOOKING AT THE FACT THAT IT IS

       14   BROKEN INTO THREE DIFFERENT SENATE DISTRICTS.  CROWLEY IS THE

       15   SEAT OF ACADIA PARISH.  IT LOOKS LIKE -- I CAN'T TELL FROM THE

       16   MAP, BUT IT LOOKS LIKE IT MAY EVEN CUT THE CITY OF CROWLEY.

       17   BUT CERTAINLY CHURCH POINT AND CROWLEY APPEAR TO BE IN TWO

       18   DIFFERENT DISTRICTS.  THOSE ARE COMMUNITIES OF INTEREST.  IT'S

       19   A SMALL PARISH IN GENERAL, ROUGHLY 40,000 PEOPLE, AND IT WOULD

       20   BE SPLIT INTO THREE DIFFERENT SENATE DISTRICTS.

       21   **BY MS. MCKNIGHT:**

       22   Q.   AND TURNING TO SD 6, IN THE ILLUSTRATIVE PLAN, WHAT IS

       23   YOUR REACTION TO HOW THAT IS DRAWN?

       24   A.   OKAY.  YES.  SO 6, THAT DISTRICT WAS ONE OF THOSE

       25   DISTRICTS THAT MIGRATED AFTER KATRINA TO THE BATON ROUGE AREA,

10:38AM   1   AND THAT DISTRICT, OVER THE LAST DECADE, HAD BEEN PRIMARILY AN

2   EAST BATON ROUGE DISTRICT.  AND IT LOOKS LIKE THAT DISTRICT

3   BECOMES A VERY RURAL DISTRICT AND HAS -- I CAN'T TELL FROM THE

4   MAP IF IT HAS ANY OF BATON ROUGE PROPER.  IT LOOKS LIKE IT'S

5   GOT PARTS OF NORTHEAST/EAST BATON ROUGE PARISH IN IT, BUT IT

6   PICKS UP LIVINGSTON, ST. HELENA, EAST FELICIANA, WEST

7   FELICIANA, CONCORDIA.  IT ALSO CUTS THE NORTHERN PART OF

8   LIVINGSTON.  IT LOOKS AS THOUGH LIVINGSTON PARISH IS GETTING

9   CHOPPED UP, AND LIVINGSTON PARISH HAD BEEN ESSENTIALLY KEPT

10   WHOLE IN PREVIOUS MAPS.

11   Q.  LET'S TURN BRIEFLY BACK TO JX21, THE TRANSCRIPT OF THE

12   FEBRUARY 2, 2022 MEETING.  WE ARE GOING TO TURN TO PAGE 42,

13   LINES 18 THROUGH 25.  COULD YOU READ THOSE LINES, AND THEN I

14   WILL ASK YOU QUESTIONS ABOUT THEM.

15   A.  "-- THAT WERE LAFOURCHE PARISH PRECINCTS THAT HAD BEEN

16   MOVED INTO SENATE DISTRICT 8, WHICH WAS THE WEST JEFFERSON

17   PARISH DISTRICT, AND GRAND ISLE IS PART OF JEFFERSON PARISH.

18   THOSE HAVE BEEN MOVED BACK AGAIN TO KEEP LAFOURCHE PARISH WHOLE

19   AND WHOLLY IN SENATE DISTRICT 20.  AS I MENTIONED EARLIER,

20   SENATE DISTRICT 20 INITIALLY WAS SHORT AND HAD TO PICK UP

21   POPULATION."

22   Q.  LET'S TURN BACK TO PL48.  AND IN REVIEWING PLAINTIFFS'

23   ILLUSTRATIVE MAP, ARE LAFOURCHE AND TERREBONNE KEPT TOGETHER

24   HERE?

25   A.  NO, LAFOURCHE APPEARS TO BE CUT IN ITS WESTERN AND

P. CORTEZ - DIRECT

10:40AM

1    NORTHWESTERN PORTION BY DISTRICT 8, AND TERREBONNE HAS PART OF

2    IT -- HAS TO GIVE UP PART OF IT, BUT TERREBONNE HAS GOT A

3    POPULATION BASE, BUT IT GIVES A PART OF IT TO SENATE DISTRICT

4    21, WHICH I THINK IT DOES IN THE CURRENT MAP AS WELL.

5    Q.  MR. PRESIDENT, I WOULD LIKE TO STEP BACK AND ASK YOU,

6    BASED ON YOUR POLITICAL EXPERIENCE IN THE STATE AND YOUR

7    REDISTRICTING EXPERIENCE, WHAT WOULD YOU EXPECT TO HAPPEN OVER

8    TIME IN AN AREA LIKE NEW ORLEANS IF THE LEGISLATURE HAD DRAWN

9    DISTRICTS AT 50-PERCENT BVAP?

10           **MR. ADCOCK:**  OBJECTION, YOUR HONOR.  I DON'T KNOW

11   THAT THAT LAYS A FOUNDATION FOR HIS KNOWLEDGE OF THE CHANGING

12   DEMOGRAPHICS OF NEW ORLEANS OVER THE YEARS.

13           **THE COURT:**  I'M GOING TO OVERRULE THE OBJECTION.  I

14   THINK HE HAS BEEN IN THE SENATE FOR 30 YEARS AND HAS WATCHED, I

15   GUESS WHAT WE WILL TALK ABOUT, HUMAN MIGRATORY PATTERNS, AND IF

16   HE HAS GOT A PERCEPTION OF WHAT IS GOING TO HAPPEN IN THE

17   FUTURE, I'M WILLING TO LISTEN TO IT.  HIS PERCEPTION IS AS GOOD

18   AS ANYBODY ELSE'S.

19           **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

20   A.  SO OVER THE LAST DECADE, ORLEANS PARISH PICKED UP ROUGHLY

21   40,000 RESIDENTS, AND 30,000 WERE WHITE.  THERE'S A COMMON

22   THOUGHT THAT THE GENTRIFICATION OF THE UPTOWN AREA HAS

23   OCCURRED.  I THINK IT HAS OCCURRED.  AND I THINK THAT YOU ARE

24   SEEING AND YOU HAVE SEEN, AT LEAST MY TENURE IN THE LEGISLATURE

25   IS THAT THERE HAVE BEEN WHITE DEMOCRATS THAT HAVE BEEN ELECTED

10:42AM   1   FROM THOSE DISTRICTS IN THE HOUSE, SPECIFICALLY, AND I THINK

2   THAT OVER TIME, THE REDUCTION OF BVAP, IT'S MY BELIEF THAT OVER

3   TIME YOU WOULD GET MORE WHITE DEMOCRATS BEING ELECTED OR

4   POTENTIALLY WHITE MODERATE REPUBLICANS OR INDEPENDENTS OR

5   SOMETHING OTHER THAN MINORITIES.  I THINK THAT THAT'S A STRONG

6   POSSIBILITY THAT THAT COULD HAPPEN.

7            **MS. MCKNIGHT:**  THANK YOU, MR. PRESIDENT.  NO FURTHER

8   QUESTIONS.

9            **THE COURT:**  WE WILL TAKE A 15-MINUTE RECESS, AND THEN

10  YOU CAN COMMENCE YOUR CROSS.

11       **(RECESS TAKEN AT 10:42 A.M. UNTIL 10:58 A.M.)**

12            **THE COURT:**  PRESIDENT CORTEZ, IF YOU WOULD TAKE THE

13  STAND, PLEASE.  BE SEATED.  YOUR WITNESS, MR. ADCOCK.

14            **MR. ADCOCK:**  THANK YOU, JUDGE.

15                      **CROSS-EXAMINATION**

16  BY MR. ADCOCK:

17  Q.  SENATOR, YOUR TENET NUMBER 1 FOR REDISTRICTING WAS TO

18  FOLLOW THE ONE-PERSON, ONE-VOTE RULE?

19  A.  YES.

20  Q.  ONE-PERSON, ONE-VOTE, TO YOU, SUPERSEDES ALL OTHERS?

21  A.  YES.

22  Q.  AND BECAUSE A PERSON IS ELECTED TO THE SENATE SHOULD NOT

23  HAVE TO -- SHOULD NOT HAVE THE SAME POWER AS SOMEONE WHO IS

24  ELECTED BY MORE PEOPLE, CORRECT?  FOR INSTANCE, YOU CAN'T DRAW

25  A DISTRICT AROUND YOUR OWN HOUSE AND THEN DRAW A DISTRICT

10:59AM   1   AROUND 200,000 PEOPLE AND CALL THAT EVEN, CORRECT?

2   A.   CORRECT.

3            **MS. MCKNIGHT:**  OBJECTION, COMPOUND.

4   **BY MR. ADCOCK:**

5   Q.   AND THAT'S THE ONE-PERSON, ONE-VOTE --

6            **THE COURT:**  MR. ADCOCK, I ALLOWED HER TO RESPOND TO

7   YOUR OBJECTIONS, AND SHE DIDN'T JUST PLOW THROUGH.  AND I

8   EXPECT YOU TO GIVE HER THE SAME COURTESY.  THERE WAS AN

9   OBJECTION, AND YOU SHOULD HAVE PAUSED.

10            **MR. ADCOCK:**  I SHOULD HAVE.

11            **THE COURT:**  THE QUESTION HAS BEEN ASKED AND ANSWERED.

12   CARRY ON.

13            **MR. ADCOCK:**  I APOLOGIZE, JUDGE.

14   **BY MR. ADCOCK:**

15   Q.   AND THAT'S THE ONE-PERSON, ONE-VOTE PRINCIPLE?

16   A.   CORRECT.

17   Q.   AND WHICH IS APPORTIONMENT, BASICALLY?

18   A.   CORRECT.

19   Q.   NOW, SB 1 THAT YOU WERE DISCUSSING ON DIRECT, YOU WERE THE

20   SPONSOR OF THAT BILL?

21   A.   THE AUTHOR.  YES.

22   Q.   YOU WERE THE AUTHOR OF THAT BILL?

23   A.   CORRECT.

24   Q.   YOU DRAFTED THAT BILL?

25   A.   CORRECT.

11:00AM    1    Q.   YOU WROTE THAT BILL?

           2    A.   WITH STAFF.

           3    Q.   WITH STAFF.  AND YOU DID NOT PRESENT ANY STATISTICAL

           4    ANALYSIS ON THE RECORD IN SUPPORT OF THAT BILL?

           5    A.   CORRECT.  WELL, WHEN YOU SAY STATISTICAL ANALYSIS,

           6    EVERY -- THAT BILL HAD INCLUDED IN IT PERCENTAGES OF VOTERS BY

           7    DEMOGRAPHICS.  SO YES, IT HAD STATISTICAL ANALYSIS, BUT I WANT

           8    TO BE CLEAR, IT WAS THE NUMBER OF PEOPLE IN THE DISTRICT, THE

           9    NUMBER OF REGISTERED THIS, REGISTERED THAT, ET CETERA.  SO IT

          10    DID HAVE SOME STATISTICAL ANALYSIS.

          11    Q.   AND THAT WAS ATTACHED TO THE BILL?

          12    A.   YES, THAT WAS ATTACHED, YES.

          13    Q.   AND NOTHING ELSE OTHER THAN WHAT YOU JUST SAID?

          14    A.   CORRECT.

          15    Q.   SO NOTHING WAS ATTACHED TO THE BILL OR PRESENTED IN --

          16    EXCUSE ME -- NOTHING WAS ATTACHED TO THE BILL IN TERMS OF A

          17    PERFORMANCE ANALYSIS?

          18    A.   NO.

          19    Q.   NOTHING WAS ATTACHED TO THE BILL IN TERMS OF AN

          20    EFFECTIVENESS SCORE?

          21    A.   NO.

          22    Q.   AND NOTHING WAS PRESENTED ON THE FLOOR OR IN COMMITTEE IN

          23    TERMS OF AN EFFECTIVENESS SCORE IN SUPPORT OF SB 1?

          24         **MS. MCKNIGHT:**  OBJECTION, COMPOUND.

          25    **BY MR. ADCOCK:**

11:02AM   1    Q.   NOTHING WAS PRESENTED IN COMMITTEE --

          2         **THE COURT:**  OVERRULED.  YOU HAVE TO LET ME --

          3         **MR. ADCOCK:**  I'M SORRY.  I WAS GOING TO REPHRASE AND

          4    I SHOULD HAVE SAID THAT.  I APOLOGIZE, JUDGE.

          5         **THE COURT:**  OKAY.  REPHRASE.

          6    **BY MR. ADCOCK:**

          7    Q.   NOTHING WAS PRESENTED IN COMMITTEE IN SUPPORT OF SB 1 IN

          8    TERMS OF A PERFORMANCE ANALYSIS?

          9    A.   NO.

         10    Q.   NOTHING WAS PRESENTED ON THE SENATE FLOOR IN SUPPORT OF SB

         11    1 IN TERMS OF A PERFORMANCE ANALYSIS?

         12    A.   NO.

         13    Q.   OR AN -- I WILL MOVE ON.  NOW, BETWEEN -- THERE WAS

         14    DISCUSSION ABOUT THE MAP CREATED AFTER 2010 IN DIRECT AND THE

         15    MAP CREATED AFTER THE 2021 CENSUS.  DO YOU REMEMBER THAT?

         16    A.   COULD YOU RESTATE THE QUESTION?

         17    Q.   YOU WERE TALKING ON DIRECT ABOUT THE MAPS CREATED AFTER

         18    2011, CORRECT?

         19    A.   CORRECT.

         20    Q.   AND THAT MAP WAS PRECLEARED BY THE DEPARTMENT OF JUSTICE?

         21    A.   CORRECT.

         22    Q.   NOW, DOES IT STRIKE YOU AS ACCURATE THAT THERE WERE 29

         23    OPPORTUNITY DISTRICTS IN THE 2011 MAP?

         24         **MS. MCKNIGHT:**  OBJECTION, CALLS FOR SPECULATION.

         25         **MR. ADCOCK:**  HE'S THE SENATE PRESIDENT, JUDGE.

11:03AM  1            THE COURT:  OVERRULED.

        2    BY MR. ADCOCK:

        3    Q.  DOES IT STRIKE YOU AS ACCURATE THAT THERE WERE 29

        4    OPPORTUNITY DISTRICTS IN THE 2011 MAP?

        5    A.  YOU ARE TALKING ABOUT THE HOUSE MAP?

        6    Q.  I'M TALKING ABOUT -- SORRY.  I WILL REPHRASE.  IF YOU LOOK

        7    AT BOTH THE SENATE AND HOUSE MAPS THAT WERE PRECLEARED IN 2011,

        8    THAT'S WHAT I'M TALKING ABOUT, SENATOR.  OKAY?

        9            MS. MCKNIGHT:  OBJECTION, FOUNDATION.

       10    BY MR. ADCOCK:

       11    Q.  YOU ARE AWARE, YOU KNOW --

       12            THE COURT:  THIS IS THE LAST TIME I'M GOING TO ASK

       13    YOU.  IF SHE MAKES AN OBJECTION, YOU HAVE TO PAUSE.

       14            MR. ADCOCK:  I UNDERSTAND, JUDGE.  I APOLOGIZE.

       15            THE COURT:  OBJECTION SUSTAINED.

       16    BY MR. ADCOCK:

       17    Q.  THE 2011 MAP FOR THE HOUSE OF REPRESENTATIVES IN LOUISIANA

       18    WAS PRECLEARED BY THE DEPARTMENT OF JUSTICE?

       19    A.  YES.

       20            MS. MCKNIGHT:  OBJECTION, FOUNDATION.  PARDON ME.  I

       21    DIDN'T UNDERSTAND --

       22            THE COURT:  OVERRULED.

       23    BY MR. ADCOCK:

       24    Q.  AND THE 2011 MAP FOR THE LOUISIANA SENATE WAS PRECLEARED

       25    IN 2011?

11:04AM   1    A.   YES.

          2    Q.   TOGETHER THEY CREATED 29 OPPORTUNITY DISTRICTS, CORRECT?

          3         **MS. MCKNIGHT:**  OBJECTION, FOUNDATION.

          4         **THE COURT:**  OVERRULED.

          5    A.   I'M NOT AWARE OF THAT.  I WOULDN'T KNOW IF THAT'S ACCURATE

          6    OR NOT.

          7    **BY MR. ADCOCK:**

          8    Q.   IT WAS IMPORTANT TO YOU IN PASSING THE 2022 MAP THAT THE

          9    2011 MAP WAS PRECLEARED, CORRECT?

         10    A.   YES, BUT THE QUESTION, I WANT TO BE CLEAR, WAS RELATIVE TO

         11    THE SENATE BILL 1.  I THINK YOU ARE ASKING ABOUT TWO MAPS AT

         12    THE SAME TIME.  I'M NOT SURE I'M UNDERSTANDING YOUR QUESTION.

         13    ARE YOU ASKING ME ABOUT TWO MAPS?  BECAUSE THERE'S ONLY 39

         14    SENATORS, AND WHEN YOU SAY 29 OPPORTUNITY, THAT'S NOT ACCURATE

         15    IN THE SENATE MAP.  I'M NOT SURE YOU -- I JUST WANT TO BE CLEAR

         16    IF I'M TALKING ABOUT SENATE BILL 1 OR THE SENATE MAP OR THE

         17    HOUSE MAPS OR BOTH.

         18         **MR. ADCOCK:**  THAT'S OKAY.  I WILL MOVE ON.  I WILL

         19    MOVE ON.

         20    **BY MR. ADCOCK:**

         21    Q.   SO THE SENATE MAP IN 2011 HAD 11 OPPORTUNITY DISTRICTS,

         22    CORRECT?

         23         **MS. MCKNIGHT:**  OBJECTION, YOUR HONOR.  IT CALLS FOR A

         24    LEGAL CONCLUSION AND AN OBJECTION THAT WAS SUSTAINED ON MY

         25    DIRECT.

P. CORTEZ - CROSS

11:05AM   1          THE COURT:  WHAT WAS THE QUESTION?

          2          MR. ADCOCK:  THE SENATE MAP CREATED IN 2011 HAD 11

          3   OPPORTUNITY DISTRICTS.

          4          THE COURT:  OVERRULED.

          5   A.  MY UNDERSTANDING WAS THAT IT HAD 11 MAJORITY-MINORITY

          6   DISTRICTS.  I DON'T KNOW THAT THE TERM "OPPORTUNITY" IS THE

          7   SAME AS MAJORITY-MINORITY.

          8   BY MR. ADCOCK:

          9   Q.  I'M USING THEM INTERCHANGEABLY.

         10   A.  OKAY.

         11   Q.  AND THE 2022 MAP, IT WAS PASSED INTO LAW, AND SB 1, THE

         12   SENATE MAP, HAD 11 MAJORITY-MINORITY DISTRICTS?

         13   A.  CORRECT.

         14   Q.  NOW, ABOUT PRECLEARANCE, DO YOU KNOW THE CRITERIA THE

         15   DEPARTMENT OF JUSTICE USES TO PRECLEAR OR APPROVE A MAP DURING

         16   THE PRECLEARANCE PROCESS?

         17          MS. MCKNIGHT:  OBJECTION, CALLS FOR A LEGAL

         18   CONCLUSION.

         19          MR. ADCOCK:  NO, IT DOESN'T, JUDGE.  I'M JUST ASKING

         20   IF HE KNOWS WHAT THE CRITERIA IS.

         21          THE COURT:  IF HE KNOWS WHAT THE PROCESS IS, I WILL

         22   ALLOW HIM TO ANSWER THE QUESTION.

         23   A.  NO.

         24   BY MR. ADCOCK:

         25   Q.  NOW, AS THE SENATE PRESIDENT, YOU WERE OVERSEEING THE

11:06AM   1   REDISTRICTING SESSION IN EARLY 2022, CORRECT?

          2   A.   YES, PRESIDING OVER THE DELIBERATIONS ON THE FLOOR, YES.

          3   Q.   THE FLOOR OF THE SENATE, WITH REPRESENTATIVE SCHEXNAYDER,

          4   CORRECT, IN THE HOUSE?

          5   A.   HE WAS PRESIDING OVER THE HOUSE.

          6   Q.   YOU WERE WORKING TOGETHER?

          7   A.   WE PRESIDE OVER DIFFERENT CHAMBERS.  I MEAN, OUR STAFFS

          8   WORK TOGETHER.  I GUESS WE WORK TOGETHER, BUT WE WEREN'T IN THE

          9   SAME COMMITTEE HEARINGS TOGETHER, WE WEREN'T IN THE -- WE SERVE

         10   IN TWO DIFFERENT BODIES.

         11   Q.   AND YOU WERE GOING TO VOTE ON -- YOU KNEW YOU WOULD BE

         12   VOTING ON THE MAP THAT WAS PASSED FOR THE HOUSE OF

         13   REPRESENTATIVES?

         14   A.   YES.

         15   Q.   OKAY.  SO IT WAS IMPORTANT TO YOU TO KNOW WHAT'S IN A

         16   PIECE OF LEGISLATION THAT COMES OVER FROM THE HOUSE?

         17   A.   YES.

         18   Q.   OKAY.  BECAUSE YOU WERE GOING TO BE ASKED TO VOTE ON

         19   WHETHER YOU AGREE WITH THAT LEGISLATION OR YOU DON'T?

         20   A.   YES.

         21   Q.   SO IT'S IMPORTANT FOR YOU TO LEARN ABOUT THAT LEGISLATION?

         22   A.   YES.

         23   Q.   IT'S IMPORTANT TO YOU TO LEARN WHAT SUPPORTS THAT

         24   LEGISLATION?

         25   A.   YOU SAID WHAT OR WHO?

P. CORTEZ - CROSS

11:08AM  1   Q.  WHAT SUPPORTS THAT LEGISLATION, WHAT INFORMATION SUPPORTS

2   THAT LEGISLATION.

3   A.  YES.

4   Q.  AND IN LEARNING THE INFORMATION THAT SUPPORTS THAT

5   LEGISLATION, YOU WANT TO KNOW IF IT'S A GOOD BILL, CORRECT, SO

6   TO SPEAK?

7           **MS. MCKNIGHT:**  OBJECTION, VAGUE.

8   **BY MR. ADCOCK:**

9   Q.  YOU WANT TO KNOW IF THE BILL THAT COMES OVER FROM THE

10   HOUSE IS A GOOD BILL, SO TO SPEAK?

11           **THE COURT:**  ARE YOU JUST, LIKE, A SLOW LEARNER?

12           **MR. ADCOCK:**  I'M NOT, JUDGE.  I'M A LITTLE NERVOUS,

13   AND I APOLOGIZE.

14           **THE COURT:**  OKAY.

15           **MR. ADCOCK:**  AND I UNDERSTAND YOU WHY YOU'RE UPSET

16   WITH ME.

17           **THE COURT:**  WELL, THEN JUST TAKE A BIG, DEEP BREATH,

18   AND DON'T BE SO NERVOUS.  NOBODY IS GOING TO BITE YOU, EXCEPT

19   POSSIBLY ME IF YOU KEEP NOT ALLOWING ME TO RULE ON THE

20   OBJECTIONS.  I MEAN, I DON'T KNOW IF IT'S THAT YOU CAN'T --

21   THAT YOU DON'T RECOGNIZE MS. MCKNIGHT WHEN SHE SPEAKS.  THAT

22   WOULD BE A PROBLEM.  SHE'S YOUR OPPOSING COUNSEL.  LISTEN FOR

23   HER VOICE.  WHEN SHE OBJECTS, BE QUIET.  OBJECTION OVERRULED.

24   NOW ASK A QUESTION.

25           **MR. ADCOCK:**  I APOLOGIZE.

P. CORTEZ - CROSS

11:09AM   1    **BY MR. ADCOCK:**

2    Q.   SO IN DETERMINING WHETHER SOMETHING IS A GOOD BILL, YOU

3    WOULD REFERENCE WHAT IS PUT ON IN EVIDENCE IN COMMITTEE,

4    CORRECT?

5    A.   WELL, I DON'T SERVE ON THE SENATE AND GOVERNMENTAL AFFAIRS

6    COMMITTEE AS A MEMBER.  I'M AN EX OFFICIO MEMBER, AND I DIDN'T

7    ATTEND ALL OF THE MEETINGS, SO I PRIMARILY HAVE TO WEIGH THE

8    EVIDENCE THAT'S PRESENTED ON THE FLOOR OF THE SENATE BY THOSE

9    PRESENTING THE BILL AND THOSE IN OPPOSITION TO THE BILL.  AND

10    SO AS A VOTE, I HAVE ONE VOTE IN THE SENATE, AND IT'S BASED ON

11    THE PRESENTATION IN THAT DELIBERATIVE BODY.

12    Q.   NOW, I'M TALKING ABOUT THE HOUSE BILL, THE HOUSE MAP.  AND

13    TO -- YOU HAVE ACCESS TO HEARING VIDEOS AND HEARING TRANSCRIPTS

14    OF COMMITTEE HEARINGS IN THE HOUSE, CORRECT?

15         **MS. MCKNIGHT:**  OBJECTION, YOUR HONOR, THIS IS NOW WAY

16    BEYOND THE SCOPE OF DIRECT.

17         **THE COURT:**  RESPOND.

18         **MR. ADCOCK:**  I DON'T BELIEVE IT IS.  WE'VE ASKED

19    ABOUT THE PASSAGE OF THESE MAPS, WHETHER THEY COMPLY WITH THE

20    VRA, WHAT HIS PRIORITIES ARE, WHAT HIS GUIDEPOSTS ARE IN JOINT

21    RULE 21 IN PASSING A MAP THAT IS COMPLIANT WITH THE VRA.  I

22    WANT TO GET INTO HIS KNOWLEDGE OF THE EVIDENCE PRESENTED IN

23    HEARINGS IN SUPPORT OF BILLS THAT WERE INTRODUCED IN THE HOUSE.

24         **MS. MCKNIGHT:**  YOUR HONOR, I ASKED HIM ZERO QUESTIONS

25    ABOUT BILLS THAT WERE PRESENTED IN THE HOUSE.

P. CORTEZ - CROSS

11:10AM   1          **MR. ADCOCK:**  I CAN RESPOND TO THAT.

2          **THE COURT:**  ALL RIGHT.

3          **MR. ADCOCK:**  SO THE QUESTION -- THE TESTIMONY ON

4    DIRECT WAS THERE WAS NO ALTERNATIVE MAPS THAT INCREASED

5    MAJORITY-MINORITY DISTRICTS IN THE ALTERNATIVE TO THE MAPS THAT

6    WERE PASSED IN THE 2022 LEGISLATURE.  AND I WANT TO GET INTO

7    HIS KNOWLEDGE OF THE FACT THAT THERE WERE ALTERNATIVE MAPS PUT

8    IN.

9          **MS. MCKNIGHT:**  FIRST OF ALL, THAT MISSTATES PRIOR

10   TESTIMONY.  SECOND, IT REMAINS OUTSIDE THE SCOPE OF THE DIRECT

11   WHICH FOCUSED ON SENATE BILLS.

12          **THE COURT:**  CONFINE YOUR QUESTIONS TO THE SENATE

13   BILLS.  SHE IS CORRECT.  SHE DID CONFINE HER QUESTIONS TO THE

14   SENATE.  OBJECTION IS SUSTAINED.

15   **BY MR. ADCOCK:**

16   Q.  NOW, YOU TESTIFIED ABOUT THE IMPORTANCE OF COMMUNITIES OF

17   INTEREST?

18   A.  YES.

19   Q.  AND IMPORTANT TO YOU IN DRAWING A SENATE MAP?

20   A.  I THINK IT WAS IMPORTANT TO THE PUBLIC.

21   Q.  IT WAS IMPORTANT TO YOU, TOO.

22   A.  OF COURSE, IT WAS ONE OF THE TENETS OF THE JOINT RULE AND

23   I BELIEVE TO BE IN COMPLIANCE WITH THE LAW.

24   Q.  OKAY.  AND YOU ARE FAMILIAR WITH THE WEST BANK OF NEW

25   ORLEANS?

P. CORTEZ - CROSS

11:11AM   1   A.   JEFFERSON PARISH?

          2   Q.   YES.

          3   A.   YES.

          4   Q.   OKAY.  CAN WE PULL UP -- AND THE WEST BANK IS IN JEFFERSON

          5   PARISH.

          6   A.   WELL, THERE IS A WEST BANK OF NEW ORLEANS, AND THAT'S WHY

          7   I ASKED THE QUESTION -- I'M SORRY, YOUR HONOR.  I'M TRYING TO

          8   CLARIFY.

          9       THERE IS A WEST BANK, BUT JEFFERSON PARISH IS OFTEN

         10   REFERRED TO AS THE WEST BANK, BUT THERE IS ORLEANS PARISH ON

         11   THE WEST BANK AS WELL.

         12   Q.   RIGHT.

         13       **MR. ADCOCK:**  SO CAN WE PULL UP DEMONSTRATIVE 31.

         14   **BY MR. ADCOCK:**

         15   Q.   SENATOR, DO YOU RECOGNIZE THIS?

         16   A.   I MEAN, I THINK IT'S -- RELATIVELY SPEAKING, IT LOOKS LIKE

         17   THE ORLEANS/WEST BANK JEFFERSON PARISH AND MAYBE PART OF

         18   JEFFERSON PARISH, POSSIBLY EVEN PLAQUEMINES AND ST. BERNARD.

         19   Q.   RIGHT.  IT IS GENERALLY THE GREATER NEW ORLEANS AREA,

         20   CORRECT?

         21   A.   THAT'S WHAT IT LOOKS LIKE.

         22   Q.   OKAY.  AND --

         23       **MS. MCKNIGHT:**  YOUR HONOR -- PARDON ME, MR. ADCOCK.

         24   I JUST WANTED TO FIND A BREAK.  I WOULD LIKE TO NOTE AN

         25   OBJECTION THAT THESE -- HE REFERRED TO THIS AS A DEMONSTRATIVE.

11:13AM  1   THIS WAS NOT A DEMONSTRATIVE THAT WAS PRODUCED ACCORDING TO THE

       2   PARTIES' AGREEMENT, WHICH IS THE EVENING BEFORE.

       3            **MR. ADCOCK:**  I HAVE A RESPONSE.

       4            **THE COURT:**  MR. ADCOCK?

       5            **MR. ADCOCK:**  YES, TWO RESPONSES.  ONE IS, I DON'T

       6   BELIEVE THERE WAS AN AGREEMENT TO TURN OVER EVIDENCE YOU WERE

       7   GOING TO USE ON CROSS.  BUT, TWO, THIS IS ACTUALLY THE ENACTED

       8   MAP THAT THE SENATOR PASSED INTO LAW.  IT'S HIS BILL.  HE WAS

       9   THE AUTHOR OF IT.  THIS IS JUST A BLOW-UP OF THE NEW ORLEANS

      10   AREA IN THE ENACTED MAP.  SO I CAN'T SEE HOW THIS IS A

      11   SURPRISE.

      12            **THE COURT:**  OBJECTION OVERRULED.

      13   **BY MR. ADCOCK:**

      14   Q.  SENATOR, THIS LOOKS LIKE A BLOW-UP OF THE NEW ORLEANS

      15   AREA, CORRECT?

      16   A.  YES.

      17   Q.  IN THE ENACTED MAP?

      18   A.  YES.

      19   Q.  FROM 2022?

      20   A.  YES.

      21   Q.  OKAY.  DO YOU SEE SENATE DISTRICT 5 THERE?

      22   A.  YES.

      23   Q.  OKAY.  NOW, 5 IS PARTLY ON THE EAST BANK, CORRECT?

      24   A.  CORRECT.

      25            **MR. ADCOCK:**  CAN I DRAW ON THIS, MADAM CLERK?

P. CORTEZ - CROSS

11:14AM  1   **BY MR. ADCOCK:**

2   Q.   NOW, IT INCLUDES UPTOWN AREA RIGHT HERE, CORRECT?

3   A.   CORRECT.

4   Q.   AND IT INCLUDES PARTS OF TREMÉ RIGHT HERE?  CORRECT?

5   A.   CORRECT.

6   Q.   AND THAT'S WHERE CONGO SQUARE IS?

7   A.   I'M NOT SURE, BUT I TAKE YOUR WORD FOR IT, THAT IT'S

8   THERE.

9   Q.   DO YOU THINK CONGO SQUARE IS IMPORTANT TO THE TREMÉ

10  NEIGHBORHOOD?

11  A.   I WOULD THINK SO.

12  Q.   NOW, ON THE LEFT OVER HERE, WE CALL THAT GERT TOWN,

13  CORRECT?

14  A.   AGAIN, I DON'T -- I DON'T KNOW SPECIFICALLY WHAT THE NAMES

15  OF THE SUBDIVISIONS ARE AND WHAT THE NAMES OF ALL OF THE

16  SUBDIVISIONS THROUGHOUT THE STATE, BUT I TAKE YOUR WORD FOR IT.

17  Q.   OKAY.  AND ACROSS CARROLLTON, KIND OF OVER HERE, A PLACE

18  CALLED HOLLYGROVE, CORRECT?

19  A.   AGAIN, I'M NOT SURE.

20  Q.   OKAY.  AND THEN -- IT'S HARD TO USE THESE PHRASES IN NEW

21  ORLEANS, BUT NORTH OF HOLLYGROVE RIGHT ABOUT HERE IS PIGEON

22  TOWN, CORRECT?

23  A.   I WOULDN'T KNOW.

24  Q.   NOW, OVER HERE, FOR LACK OF A BETTER PHRASE, THE RIGHT

25  PART OF THE DISTRICT IS -- THAT'S THE SEVENTH WARD, CORRECT?

P. CORTEZ - CROSS

11:15AM   1   A.   I THINK IT IS.

2   Q.   AND PART OF THE SEVENTH WARD IS GENTILLY TRACE?   EXCUSE

3   ME.   I WILL REPHRASE THAT.   PART OF THE SEVENTH WARD IS

4   GENTILLY TERRACE?

5   A.   AGAIN, I WOULDN'T KNOW, BUT I WILL TAKE YOUR WORD FOR IT.

6   Q.   OKAY.   THEN SENATE DISTRICT 5, IT GOES ACROSS THE RIVER

7   OVER INTO JEFFERSON PARISH, CORRECT?

8   A.   YES.

9   Q.   OKAY.   AND RIGHT HERE, DO YOU KNOW WHAT THAT'S CALLED?

10   A.   I DO NOT.

11   Q.   SO THE BIG THING I'M CIRCLING ON THE WEST BANK, YOU DON'T

12   KNOW WHAT THAT'S CALLED.   OKAY.

13   A.   WEST JEFFERSON PARISH?

14   Q.   IT'S JEFFERSON PARISH.   YOU DON'T KNOW WHAT MUNICIPALITY

15   OR TOWN THAT IS?   YOU DON'T KNOW IF IT'S INCORPORATED?

16   A.   I DON'T.   I DON'T.   I WOULD BE SPECULATING, BUT I WOULD

17   SAY IT'S ROUGHLY MARRERO, BUT I WOULD BE SPECULATING.

18   Q.   OKAY.   NOW, SD 5 IN THE ILLUSTRATIVE MAP DOES NOT CROSS

19   THE MISSISSIPPI RIVER, CORRECT?

20   A.   I DON'T RECALL.

21   Q.   OKAY.   LET'S PULL UP DEMONSTRATIVE 30.

22   **MS. MCKNIGHT:**   PARDON ME, MR. ADCOCK.   YOUR HONOR,

23   JUST FOR THE RECORD, WE'D LODGE THE SAME OBJECTION.   THIS ISN'T

24   A DEMONSTRATIVE THAT WAS SHARED.   AT MOST, IT'S AN ILLUSTRATIVE

25   AID.

11:17AM  1              **THE COURT:**  THE COURT WILL CONSIDER IT AS AN

2    ILLUSTRATIVE AID.

3              **MR. ADCOCK:**  THANK YOU, JUDGE.

4    BY MR. ADCOCK:

5    Q.  SENATOR, THIS IS A -- IS IT FAIR TO SAY THIS IS A MAP OF

6    THE GREATER NEW ORLEANS AREA?

7    A.  IT LOOKS -- YES.

8    Q.  OKAY.  I WILL TELL YOU THIS IS A BLOW-UP OF THE NEW

9    ORLEANS AREA IN THE SENATE DISTRICT MAP.  EXCUSE ME.  THIS IS A

10   BLOW-UP OF THE NEW ORLEANS AREA IN PLAINTIFFS' ILLUSTRATIVE

11   MAP.  I'M REPRESENTING THAT TO YOU.  OKAY?

12   A.  OKAY.

13   Q.  NOW, DO YOU SEE SENATE DISTRICT 5 THERE IN THE MIDDLE?

14   A.  I DO.

15   Q.  OKAY.

16   A.  EXCUSE ME.  YES.

17   Q.  DOES THAT LOOK -- AND THAT DOESN'T CROSS THE RIVER IN THE

18   ILLUSTRATIVE MAP, CORRECT?

19   A.  IT DOESN'T APPEAR TO, NO.

20   Q.  OKAY.  DO YOU SEE THAT NUMBER THERE UNDER 5, 51.8 PERCENT?

21   A.  51.8, YES.

22   Q.  YES.  DOES THAT SOUND LIKE A GOOD -- IN THE BALLPARK OF

23   WHAT THE BVAP POPULATION PERCENTAGE IS IN SENATE DISTRICT 5?

24              **MS. MCKNIGHT:**  OBJECTION, LACK OF FOUNDATION.  PARDON

25   ME, COUNSEL.  THIS IS A DIFFERENT MAP THAN 31?  THE NUMBERS ARE

P. CORTEZ - CROSS

11:18AM   1   DIFFERENT?

2              **MR. ADCOCK:**  RIGHT.  THIS IS ILLUSTRATIVE 30.

3              **MS. MCKNIGHT:**  OKAY.  THANK YOU.  OBJECTION,

4   FOUNDATION.

5              **MR. ADCOCK:**  THE ENACTED MAP IS DEMONSTRATIVE -- OR

6   ILLUSTRATIVE -- EXCUSE ME.  THE ENACTED MAP IS 31.  THIS IS 30.

7              **THE COURT:**  OVERRULED.

8   **BY MR. ADCOCK:**

9   Q.  DOES 51.8 PERCENT SOUND ABOUT RIGHT TO YOU?

10  A.  FOR THAT PARTICULAR DISTRICT, CAN I -- CAN I -- I'M PRETTY

11  SURE THAT DISTRICT WAS THE DISTRICT THAT WAS SERVED BY SENATOR

12  PETERSON, AND NOW SENATOR DUPLESSIS IS SERVING IN THAT

13  DISTRICT.

14  Q.  MY QUESTION IS, DOES 51.8 PERCENT SOUND LIKE THE BVAP

15  PERCENTAGE POPULATION OF SENATE DISTRICT 5?

16             **MS. MCKNIGHT:**  OBJECTION AGAIN, YOUR HONOR.  THIS IS

17  THE PLAINTIFFS' ILLUSTRATIVE PLAN.  THIS IS NOT THE PRESIDENT'S

18  SB 1 PLAN.  HE HAS NO FOUNDATION TO KNOW WHETHER 51.8 PERCENT

19  BVAP IS ACCURATE FOR PLAINTIFFS' PROPOSED PLAN.

20             **THE COURT:**  WHAT IS THE FOUNDATION?  HOW IS HE

21  SUPPOSED TO KNOW THIS?

22             **MR. ADCOCK:**  YOUR HONOR, I CAN REPHRASE THIS AND DO

23  IT A DIFFERENT WAY.

24             **THE COURT:**  PLEASE DO.  YOUR OBJECTION IS SUSTAINED.

25  **BY MR. ADCOCK:**

P. CORTEZ - CROSS

11:19AM

1    Q.  LET'S GO TO DEMONSTRATIVE 31.  AND YOU SEE THIS IS THE

2    ENACTED MAP, SENATOR.  AND YOU SEE SENATE DISTRICT 5 THERE.

3    AND I REPRESENT TO YOU THAT 50.24 PERCENT IS THE BVAP

4    PERCENTAGE FOR SENATE DISTRICT 5 IN THE ENACTED MAP.  DOES THAT

5    SOUND RIGHT TO YOU?

6    A.  IT DOES.

7    Q.  OKAY.  WAS THERE ANY -- WAS THERE ANY ANALYSIS PRESENTED

8    ON THE RECORD IN SUPPORT OF WHETHER -- WHAT BVAP SENATE

9    DISTRICT 5 NEEDED TO ELECT A BLACK PREFERRED CANDIDATE?

10   A.  I DON'T RECALL.

11   Q.  AND YOU YOURSELF PRESENTED NO ANALYSIS IN SUPPORT OF THIS

12   BVAP NUMBER FOR SENATE DISTRICT 5 IN THE ENACTED MAP, CORRECT?

13   A.  SENATE DISTRICT 5?

14   Q.  CORRECT.

15   A.  NO.

16   Q.  NOW, THERE WAS TESTIMONY FROM HEARINGS FROM THE SENATOR IN

17   THAT DISTRICT DURING THE REDISTRICTING SESSION, CORRECT?  I

18   WILL REPHRASE IT.  THE SENATOR FOR SENATE DISTRICT 5 IN 2022

19   TESTIFIED IN THE REDISTRICTING SESSION, CORRECT?

20   A.  WELL, ON THE FLOOR OF THE SENATE.  IF YOU ARE REFERRING TO

21   SENATOR PETERSON, SHE DID MAKE COMMENTS ON THE FLOOR OF THE

22   SENATE WHEN SENATE BILL 1 WAS BEING DELIBERATED.

23   Q.  AND SHE DID NOT TESTIFY THERE NEEDED TO BE AN ADDITIONAL

24   BVAP NUMBER, A HIGHER BVAP NUMBER FOR THIS TO PERFORM, DID SHE?

25   A.  AS I RECALL, SHE CAME TO THE FLOOR IN OBJECTION TO AN

P. CORTEZ - CROSS

11:21AM

1    AMENDMENT THAT WAS BEING PRESENTED BY SENATOR CARTER, WHO

2    REPRESENTS I BELIEVE SENATE DISTRICT 7, AND THERE WAS AN

3    AMENDMENT BY SENATOR CARTER THAT WOULD HAVE TAKEN A PART OF HER

4    DISTRICT OFF OF THE MAP, ROUGHLY THE MORIAL CENTER AND A LOT OF

5    THAT AREA ALL THE WAY DOWN INTO THE UPTOWN AREA, WHICH WOULD

6    HAVE GIVEN HIM MORE ORLEANS AND LESS JEFFERSON PARISH.  I THINK

7    THAT WAS HIS GOAL, STATED GOAL ON THE RECORD WAS TO CHANGE HIS

8    PERCENTAGE OF PARISH POPULATION.  SHE OBJECTED BECAUSE IT WOULD

9    CUT INTO THE CORE OF HER DISTRICT, AND HER DISTRICT WAS

10   BASICALLY THE MORIAL, THE WAREHOUSE DISTRICT, THE UPTOWN

11   DISTRICT, AND HE WAS TAKING A TRADITIONAL DISTRICT AND CUTTING

12   IT UP.

13         DISTRICT 3, WHICH IS CURRENTLY SENATOR BOUIE'S DISTRICT,

14   USED TO, IN THE 2011 CYCLE, IT HAD GONE ACROSS TO JEFFERSON

15   PARISH AND WENT ALL THE WAY DOWN TO AVONDALE ALMOST ALONG THE

16   RIVER.  AND THERE WAS -- IN THIS CURRENT MAP, IT WAS MY BELIEF

17   THAT THAT DISTRICT NEEDED TO BE MORE ORLEANS-CENTRIC, SO IN

18   PUTTING IT BACK INTO ORLEANS, IT WAS ORLEANS-CENTRIC, BUT IT

19   HAD JUST A -- I'M GOING TO CALL IT JUST A HIGHWAY ALL THE WAY

20   DOWN TO PICK UP POPULATION.  I WANT TO SAY AVONDALE, BUT THAT'S

21   PROBABLY NOT EXACTLY WHERE IT WAS, BUT IT WAS ALONG THE WEST

22   BANK.  AND IN DOING THAT, IN PUTTING THAT BACK IN -- SENATE

23   DISTRICT 3 BACK IN ALL -- WHOLLY ENCLOSED ON THE EAST BANK, YOU

24   HAD TO PICK UP POPULATION ON THE WEST BANK BY ONE OF THOSE

25   DISTRICTS.

11:23AM   1          DISTRICT 5 AT THE TIME WAS BELOW THE OPPORTUNITY -- BELOW

       2     50 PERCENT.  IT WAS 48-POINT-SOMETHING PERCENT.  I MADE THE

       3     DECISION TO BRING DISTRICT 5 ACROSS THE RIVER TO GET IT ABOVE

       4     THE 48 PERCENT, TO GET IT TO 50-PLUS PERCENT.  IT DID CREATE,

       5     ADMITTEDLY, A LESS COMPACT DISTRICT, BUT BY DOING SO, OTHER

       6     DISTRICTS AROUND IT WERE, IN MY OPINION, MUCH MORE

       7     OPPORTUNITIES TO ELECT A MINORITY CANDIDATE AND WERE MUCH SAFER

       8     IN COMPLYING WITH WHAT I BELIEVE WAS CLEARED UNDER THE JUSTICE

       9     DEPARTMENT YEARS EARLIER.

      10     Q.  BUT YOU DIDN'T PRESENT ANY ANALYSIS TO SUPPORT -- IN

      11     PUBLIC TO SUPPORT YOUR OPINION?

      12              **MS. MCKNIGHT:**  OBJECTION, ASKED AND ANSWERED.

      13              **THE COURT:**  OVERRULED.

      14     A.  IT WAS ALL MY COLLECTIVE OPINION OVER THE COURSE OF THE

      15     PROCESS.

      16     **BY MR. ADCOCK:**

      17     Q.  YOU DIDN'T PRESENT ANY --

      18     A.  I DID NOT PRESENT ANY ANALYSIS.

      19     Q.  YOU DID NOT PRESENT AN EFFECTIVENESS SCORE FOR SENATE

      20     DISTRICT 5 IN THE ENACTED MAP?

      21     A.  I DON'T RECALL ANYONE PRESENTING THAT TO SAY IT COULD OR

      22     COULDN'T EITHER WAY.  AND I WOULD LIKE TO HAVE SEEN THAT.

      23     Q.  BUT YOU DIDN'T PRESENT IT?

      24     A.  I DID NOT.

      25     Q.  NOW, IF WE CAN GO BACK TO DEMONSTRATIVE 30 REAL QUICK.

11:25AM  1    NOW, THIS IS THE PLAINTIFF'S ILLUSTRATIVE MAP, SENATOR.  NOW,

2    YOU SEE IN SENATE DISTRICT 5, IT SAYS 51.8 PERCENT THERE?

3    A.  CORRECT.

4    Q.  REPRESENTING TO YOU THAT THAT'S THE BVAP PERCENTAGE FOR

5    SENATE DISTRICT 5 IN THE ILLUSTRATIVE MAP?

6    A.  CORRECT.

7    Q.  THAT'S VERY SIMILAR TO THE ENACTED MAP BVAP, CORRECT?

8    A.  WELL, IT IS FAR FROM THE ENACTED MAP IN REGARDS TO SENATE

9    DISTRICTS 3 AND 7, WHICH ARE MUCH LOWER AND REDUCE THE

10   OPPORTUNITY DRAMATICALLY, IN MY OPINION, TO ELECT A MINORITY,

11   AND 19 AS WELL.

12   Q.  NOW, YOU ARE FAMILIAR WITH HOUSE DISTRICT 23?

13   A.  YES, THAT'S MY DISTRICT.

14   Q.  HOUSE --

15   A.  THAT WAS A TRICK QUESTION.

16   Q.  HOUSE --

17   A.  OH, HOUSE DISTRICT 23.  OH, SENATE DISTRICT 23 IS MINE.

18   I'M NOT FAMILIAR WITH HOUSE DISTRICT 23.  IT WAS A TRICK

19   QUESTION.

20   Q.  NOW, YOU WENT TO -- YOU ARE FAMILIAR WITH THE ROAD SHOWS.

21   WE HAVE TALKED ABOUT THOSE.

22   A.  YES.

23   Q.  YOU ONLY ATTENDED ONE ROAD SHOW?

24   A.  YES.  I BELIEVE I ARRIVED AT THE BATON ROUGE ROAD SHOW,

25   BUT I DIDN'T STAY AFTER THE OPENING REMARKS.

11:27AM  1    Q.   AND DURING -- THE ROAD SHOW THAT YOU ATTENDED, THAT WAS IN

         2    LAFAYETTE?

         3    A.   CORRECT.

         4    Q.   AND DURING THE ROAD SHOW, YOU WERE CALLED TO THE BACK OF

         5    THE ROOM BY THE SENATE PRESIDENT?

         6    A.   I AM THE SENATE PRESIDENT.

         7    Q.   EXCUSE ME.   YOU WERE CALLED TO THE BACK OF THE ROOM BY THE

         8    PARISH PRESIDENT?

         9    A.   I DON'T RECALL BEING CALLED BACK THERE, BUT I REMEMBER

        10    GOING TO THE BACK OF THE ROOM TO VISIT WITH SENATOR MILLS,

        11    SENATOR FRED MILLS, WHO WAS THERE AND A FEW OTHER ELECTED

        12    OFFICIALS FROM DIFFERENT PARISHES.   I THINK THE PARISH

        13    PRESIDENT OF ST. MARTIN PARISH I MIGHT HAVE MET WITH, AND I

        14    KNOW I MET WITH SOMEBODY IN THE BACK OF THE ROOM FROM ST.

        15    LANDRY PARISH WHO WANTED TO VISIT WITH ME.

        16    Q.   AND IS IT YOUR TESTIMONY THAT YOU ARE NOT AWARE OF ANYONE

        17    IN ANY OF THE ROAD SHOWS EXPRESSING AN OPINION THAT THEY WANTED

        18    MORE MAJORITY-MINORITY DISTRICTS FOR THE STATE LEGISLATURE?

        19    A.   I REMEMBER IT BEING VERY CLEAR FOR THE CONGRESSIONAL MAP.

        20    THAT WAS A REPEATED CONVERSATION OVER AND OVER THAT THE

        21    CONGRESSIONAL MAP, THIS 33 1/3 IS EQUAL TO 1/3, AND 1/3 OF 6 IS

        22    2, AND IT WAS SIMPLE MATH, AND THAT WAS STATED OVER AND OVER.

        23    I DON'T SPECIFICALLY RECALL ABOUT THE SENATE MAP, THERE BEING A

        24    CONVERSATION EVER HAD THAT SAID 11 IS NOT ENOUGH, 16 IS TOO

        25    MANY, OR ANYTHING LIKE THAT, BUT I DON'T EVER RECALL ANYBODY

11:28AM   1   CALLING FOR THAT.  I'M NOT SAYING THAT IT DIDN'T HAPPEN.  I

2   DON'T EVER RECALL THAT BEING SAID.

3        AND BY THE WAY, I DID ATTEND IT, I SAT AT THE DAIS FOR

4   MOST OF IT, BUT I'M NOT ON THE COMMITTEE.  I WAS SIMPLY THERE

5   AS A GUEST SITTING AND LISTENING TO THE STAFF PRESENT THE

6   PROCESS, AND THEN I HEARD A FEW OF THE COMMENTS, AND THEN I DID

7   GO TO THE BACK OF THE ROOM AND VISIT WITH SOME OF THE OFFICIALS

8   THAT WERE THERE.

9   Q.   DO YOU KNOW HOW MANY ROAD SHOWS THERE WERE?

10   A.   I DON'T RECALL THE EXACT NUMBER, BUT I'M GOING TO SAY

11   ROUGHLY 9 -- 9 AND 12 -- THEY WENT TO EACH PART OF THE STATE.

12   I CAN'T REMEMBER.

13   Q.   AND YOU THOUGHT THEY WERE IMPORTANT?

14   A.   OH, YEAH, FOR A NUMBER OF REASONS.  ONE, TO EDUCATE THE

15   PUBLIC.  NUMBER TWO, TO EDUCATE THE MEMBERS OF THE LEGISLATURE

16   IN THOSE REGIONS AND TO EDUCATE OTHER ELECT OFFICIALS WHO WOULD

17   MAKE CLAIMS LIKE WE WANT TO HAVE OUR OWN SENATOR, WHEN YOU ONLY

18   HAVE 40,000 PEOPLE IN YOUR PARISH.

19   Q.   YOU ARE AWARE THERE WERE VIDEOS MADE OF THE ROAD SHOWS?

20   A.   YES.

21   Q.   EVERY ONE OF THEM?

22   A.   YES.  STAFF MADE SURE TO DOCUMENT EVERYTHING THAT WAS

23   STATED AT THE ROAD SHOWS.

24   Q.   AND A LEGISLATOR COULD WATCH THOSE VIDEOS?

25   A.   I GUESS THEY COULD HAVE GONE TO THE ARCHIVES AND WATCHED

P. CORTEZ - CROSS

11:29AM

1    ANY OF THEM.

2    Q.   IF THEY WANTED TO?

3    A.   I ASSUME THEY COULD HAVE, YES.

4    Q.   IF THEY WANTED TO.

5         **MS. MCKNIGHT:**  OBJECTION, ASKED AND ANSWERED.

6         **THE COURT:**  SUSTAINED.

7    **BY MR. ADCOCK:**

8    Q.   AND IF THEY WATCHED THOSE VIDEOS, THEY COULD LEARN WHAT

9    WAS SAID AT THE ROAD SHOWS?

10   A.   I GUESS THEY COULD.

11   Q.   AND IF A CITIZEN VOICED AN OPINION ABOUT THE HOUSE MAP,

12   THE LEGISLATOR WOULD BE ABLE TO HEAR THAT?

13        **MS. MCKNIGHT:**  OBJECTION, CALLS FOR SPECULATION.  HE

14   IS REFERRING -- IT IS OUTSIDE THE SCOPE OF DIRECT.

15        **MR. ADCOCK:**  I'M NOT SURE HOW THAT CALLS FOR

16   SPECULATION.  IF YOU LISTEN TO A VIDEO, YOU CAN HEAR WHAT

17   SOMEONE SAYS IN THE VIDEO, JUDGE.

18        **MS. MCKNIGHT:**  IT IS OUTSIDE THE SCOPE OF DIRECT,

19   WHICH DID NOT ASK ANY QUESTIONS ABOUT THE HOUSE.

20        **THE COURT:**  SUSTAINED.  HE SAID THAT THEY COULD LOOK

21   AT THE VIDEO.  YOU CAN HEAR AND SEE IT ON THE VIDEO.  IT IS

22   PRETTY SELF-EVIDENT.

23   **BY MR. ADCOCK:**

24   Q.   IF A CITIZEN VOICED AN OPINION ABOUT THE SENATE MAP, THE

25   LEGISLATOR COULD HEAR THAT ON THE VIDEO?

11:30AM

1    A.   I ASSUME THEY COULD.

2    Q.   IF A CITIZEN SAID THEY WANTED MORE OPPORTUNITY DISTRICTS

3    IN THE STATE SENATE MAP DURING A ROAD SHOW, A LEGISLATOR COULD

4    SEE THAT ON THE VIDEO?

5    A.   I ASSUME THEY COULD.

6    Q.   AND HEAR THAT?

7    A.   CERTAINLY.

8    Q.   AND THAT WOULD BE IMPORTANT?

9    A.   IT MAY OR MAY NOT BE IMPORTANT TO WHOEVER IS LISTENING TO

10   IT.  I DON'T KNOW.  I CAN'T GET INTO THE MIND OF WHO WOULD BE

11   LISTENING TO IT AND WHY THEY WOULD BE LISTENING TO IT AND FOR

12   WHAT PURPOSE THEY WOULD BE LISTENING TO IT, BUT WE HAVE

13   THOUSANDS, HUNDREDS OF THOUSANDS OF HOURS OF ARCHIVED VIDEOS

14   FROM EVERY HEARING THAT HAS EVER BEEN HAD, PROBABLY GOING BACK

15   INTO THE EARLY 2000S.

16          **THE COURT:**  MR. ADCOCK, THE COURT IS GOING TO HAVE TO

17   RECESS FOR THE NOON BREAK.  WE WILL BE IN RECESS UNTIL 1:30.

18          **(RECESS TAKEN AT 11:31 A.M. UNTIL 1:35 P.M.)**

19          **THE COURT:**  YOU MAY CONTINUE, COUNSEL.

20          **MR. ADCOCK:**  THANK YOU, JUDGE.

21   **BY MR. ADCOCK:**

22   Q.   SENATOR, BEFORE LUNCH YOU TESTIFIED YOU COULD HAVE WATCHED

23   VIDEOS OF THE ROAD SHOWS; IS THAT CORRECT?

24   A.   YES.

25   Q.   IF YOU WANTED TO?

1:35PM   1   A.   YES.

2   Q.   BUT YOU DID NOT WATCH THOSE VIDEOS?

3   A.   ME?

4   Q.   YES.

5   A.   PERSONALLY?  NO, I DID NOT WATCH ANY.

6   Q.   OR ANY OF THE OTHER ROAD SHOWS?

7   A.   NO.

8           **MR. ADCOCK:**  THAT'S ALL THE QUESTIONS I HAVE, JUDGE.

9           **THE COURT:**  YOU ARE FINISHED?

10          **MR. ADCOCK:**  YES.

11          **THE COURT:**  ANY REDIRECT, MS. MCKNIGHT?

12          **MS. MCKNIGHT:**  NO, YOUR HONOR, NO REDIRECT.

13          **THE COURT:**  YOU MAY STEP DOWN.  THANK YOU, SIR.

14  DEFENDANTS MAY CALL THEIR NEXT WITNESS.

15          **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.  LET ME TAKE A

16  BRIEF MOMENT.  COUNSEL IS OUTSIDE THE DOOR.

17          **THE COURT:**  OKAY.

18          **MS. MCKNIGHT:**  IT WON'T TAKE LONG.

19          **THE COURT:**  WHO IS YOUR NEXT WITNESS?

20          **MS. MCKNIGHT:**  DR. JOHN ALFORD.

21          **THE COURT:**  OKAY.  IS THERE A PROBLEM?

22          **MS. MCKNIGHT:**  PARDON, ME, YOUR HONOR.  THE ONLY

23  PROBLEM IS, WE ARE HAVING -- WE ARE TRYING TO LOCATE THE

24  EXPERT.  HE WAS SUPPOSED TO BE BACK HERE BY 1:30, AND SO THERE

25  IS A DELAY, CLEARLY.  AND I THINK HE PROBABLY EXPECTED THERE TO

1:37PM   1   BE MORE OF A CROSS-EXAMINATION AFTER 1:30.  SO WE ARE TRYING TO

         2   LOCATE HIM TO MAKE SURE HE GETS IN THE COURTROOM.

         3          PARDON ME, YOUR HONOR, WE CAN BE DOCKED THE TIME, BUT WE

         4   ARE SORRY TO HOLD THE COURT OVER THIS TIME.

         5              **THE COURT:**  WHO IS TAKING THIS WITNESS?

         6              **MS. MCKNIGHT:**  MR. TUCKER.

         7              **MR. TUCKER:**  I AM, YOUR HONOR.

         8              **THE COURT:**  WHERE IS HE, MR. TUCKER?

         9              **MR. TUCKER:**  I AM NOT SURE.  HE WAS IN THE COURTROOM

        10   EARLIER THIS MORNING.  I SAW HIM OVER AT LUNCH, AND I'VE BEEN

        11   TRYING TO E-MAIL HIM AND GET AHOLD OF HIM, BUT I ASSUME HE IS

        12   ON HIS WAY.  I HOPE NOTHING HAS HAPPENED TO HIM AT THIS POINT,

        13   BUT HE IS HERE IN TOWN.  HE WAS HERE THIS MORNING.  AND I

        14   APOLOGIZE TO THE COURT.

        15              **THE COURT:**  DO YOU HAVE ANOTHER WITNESS YOU CAN CALL

        16   WHILE WE ARE AWAITING DR. ALFORD?

        17              **MR. TUCKER:**  I DON'T THINK WE HAVE ANY IN THE

        18   COURTROOM RIGHT NOW.

        19              **THE COURT:**  WELL, THE COURT IS GOING TO BE IN RECESS.

        20          **(RECESS TAKEN AT 1:38 P.M. UNTIL 1:44 P.M.)**

        21              **THE COURT:**  CALL YOUR NEXT WITNESS.  MAKE YOUR WAY TO

        22   THE FRONT, SIR.  YOU'VE MADE US WAIT LONG ENOUGH.  CALL YOUR

        23   NEXT WITNESS.

        24              **MR. TUCKER:**  THANK YOU, YOUR HONOR.  THANK THE COURT

        25   FOR YOUR PATIENCE VERY MUCH.  WE APOLOGIZE.  THE DEFENDANTS

1:44PM   1   CALL DR. JOHN ALFORD.

2               **(OATH ADMINISTERED.)**

3               **THE COURT:**  BEFORE YOU GET STARTED, DR. ALFORD, DO

4   YOU SEE ALL OF THESE PEOPLE IN THIS COURTROOM?

5               **THE WITNESS:**  YES.

6               **THE COURT:**  ABOUT HALF OF THEM ARE BILLING THE STATE

7   OF LOUISIANA AND THE TAXPAYERS, AND YOU'VE MADE THEM WAIT FOR

8   15 MINUTES, NOT TO MENTION THE COURT AND THE COURT'S TIME.

9   IT'S A WASTE OF TAXPAYERS' MONEY, AND YOU ARE BILLING THE

10   TAXPAYERS OF THIS STATE.

11          I WOULD EXPECT THAT AS A PROFESSIONAL EXPERT, SOMEBODY WHO

12   IS USED TO TESTIFYING IN COURT, THAT YOU WOULD UNDERSTAND THE

13   NATURE OF PROCEEDINGS AND THE IMPORTANCE OF BEING ON TIME.  YOU

14   MAY BEGIN YOUR DIRECT EXAMINATION.

15               **MR. TUCKER:**  THANK YOU, YOUR HONOR.  YOUR HONOR, MAY

16   I APPROACH AND GIVE THE WITNESS A HARD COPY OF HIS EXPERT

17   REPORT?

18               **THE COURT:**  YOU MAY.

19               **MR. TUCKER:**  YOU MAY.

20                    **DR. JOHN ALFORD,**

21   **HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

22                    **DIRECT EXAMINATION**

23   **BY MR. TUCKER:**

24   Q.   GOOD AFTERNOON, DR. ALFORD.

25   A.   GOOD AFTERNOON.

DR. J. ALFORD - DIRECT

1:45PM  1    Q.  SO I'VE HANDED YOU AND IF WE COULD PUT UP ON THE SCREEN

     2    WHAT HAS BEEN MARKED AS LDTX 53.

     3    A.  YES.

     4    Q.  AND DO YOU RECOGNIZE THIS DOCUMENT?

     5    A.  I DO.

     6    Q.  AND WHAT IS IT?

     7    A.  IT IS MY REPORT IN THIS CASE.

     8         **MR. TUCKER:**  AND CONSISTENT WITH THE PARTIES'

     9    STIPULATION, WE MOVE TO ADMIT DR. ALFORD'S REPORT, WHICH IS

    10    LDTX 53, INCLUDING APPENDICES A AND B.

    11         **THE COURT:**  ADMITTED.

    12    **BY MR. TUCKER:**

    13    Q.  DR. ALFORD, WOULD YOU PLEASE TURN TO APPENDIX A OF YOUR

    14    REPORT.

    15    A.  (WITNESS COMPLIES.)  YES.

    16    Q.  AND IS THIS A COPY OF YOUR CV?

    17    A.  IT IS.

    18    Q.  IS IT UP TO DATE?

    19    A.  IT LOOKS -- IT IS FOR PUBLICATIONS.  I THINK THERE MAY BE

    20    A FEW ADDITIONAL CONSULTING MATTERS I'M INVOLVED IN THAT AREN'T

    21    INCLUDED HERE THAT HAVE COME UP MORE RECENTLY, BUT WITH REGARD

    22    TO THE REST OF IT, IT IS CURRENT.

    23    Q.  CAN YOU BRIEFLY DESCRIBE YOUR EDUCATIONAL BACKGROUND?

    24    A.  I HAVE A BACHELOR DEGREE, BACHELOR OF SCIENCE DEGREE IN

    25    POLITICAL SCIENCE FROM THE UNIVERSITY OF HOUSTON.  I HAVE A

DR. J. ALFORD - DIRECT

1:46PM   1   MASTER'S IN PUBLIC ADMINISTRATION FROM THE UNIVERSITY OF

       2   HOUSTON.  AND I HAVE A MASTER'S AND PH.D. IN POLITICAL SCIENCE

       3   FROM THE UNIVERSITY OF IOWA.

       4   Q.  AND WHAT WAS THE TOPIC OF YOUR DISSERTATION?

       5   A.  MY DISSERTATION TOPIC WAS ON THE PARTY STRENGTH IN THE

       6   ELECTORATE AND IN CONGRESS.  AND MY EXAMINATION FOCUSES WERE IN

       7   AMERICAN POLITICS, IN PUBLIC POLICY, AND IN METHODOLOGY.

       8   Q.  WHERE DO YOU CURRENTLY TEACH?

       9   A.  I TEACH AT RICE UNIVERSITY IN HOUSTON, TEXAS.

      10   Q.  AND HOW LONG HAVE YOU TAUGHT THERE?

      11   A.  THIRTY-EIGHT YEARS.

      12   Q.  ARE YOU A FULL PROFESSOR?

      13   A.  I AM.

      14   Q.  WHAT COURSES DO YOU CURRENTLY TEACH?

      15   A.  I REGULARLY TEACH INTRODUCTION TO AMERICAN POLITICS.  I

      16   REGULARLY TEACH A COURSE ON ELECTIONS.  I TEACH COURSES ON

      17   VOTING BEHAVIOR, COURSES ON POLITICAL BEHAVIOR, AND COURSES ON

      18   THE BIOLOGY OF POLITICS.

      19   Q.  DO ANY OF THESE COURSES INVOLVE THE VOTING RIGHTS ACT?

      20   A.  IT WOULD BE INVOLVED IN THE INTRODUCTION OF AMERICAN

      21   POLITICS IN THE SECTION ON VOTING, BUT NOT -- NONE OF THE

      22   COURSES FOCUS SPECIFICALLY ON THE VOTING RIGHTS ACT.

      23   Q.  HAVE YOU TAUGHT ANY OTHER COURSES HISTORICALLY THAT RELATE

      24   TO YOUR OPINIONS BEING OFFERED IN THIS CASE?

      25   A.  I DID TEAM TEACH A COURSE ON REDISTRICTING AND VOTING LAW,

DR. J. ALFORD - DIRECT

1:48PM    1    WITH THE FORMER LIEUTENANT GOVERNOR OF TEXAS, BILL HOBBY, AT

          2    RICE.  BUT THAT'S THE ONLY COURSE I'VE TAUGHT SPECIFICALLY

          3    RELATED TO REDISTRICTING.

          4    Q.  WHAT IS YOUR EXPERIENCE WITH STATISTICAL ANALYSIS?

          5    A.  SO MY INITIAL TRAINING, I WAS TRAINED EARLY ON IN

          6    UNDERGRADUATE.  I WAS A SCIENCE MAJOR INITIALLY, SO I HAD

          7    SCIENCE AND MATH COURSES.  I WAS HIRED AS A RESEARCH ASSISTANT

          8    AT THE INSTITUTE FOR URBAN STUDIES AT THE UNIVERSITY OF HOUSTON

          9    WHEN I WAS IN THE MASTER'S PROGRAM.  AND MY JOB WAS TO DO

         10    STATISTICAL ANALYSIS RELATED TO ASSESSING PUBLIC POLICY IN

         11    TEXAS.

         12         I STUDIED METHODS.  AGAIN, AS ONE OF MY EXAM FIELDS AT

         13    UNIVERSITY OF IOWA, I WENT TO THE SUMMER PROGRAM AT UNIVERSITY

         14    OF MICHIGAN.  THEY RUN A SUMMER PROGRAM IN METHODOLOGY THERE,

         15    DURING THE TIME I WAS AT IOWA.  WHEN I WAS HIRED AT THE

         16    UNIVERSITY OF GEORGIA, I WAS HIRED IN PART AS THE DIRECTOR OF

         17    THE POLITICAL SCIENCE DATA ANALYSIS CENTER.  WHEN I MOVED TO

         18    RICE, I ESTABLISHED THE POLITICAL SCIENCE AND SOCIAL SCIENCE

         19    DATA CENTER AT RICE UNIVERSITY.  AND FOR PROBABLY THE FIRST 10

         20    OR 15 YEARS OF MY CAREER, I TAUGHT METHODS BOTH AT THE

         21    UNDERGRADUATE AND GRADUATE LEVEL.

         22    Q.  DO YOU HAVE ANY EXPERIENCE SPECIFICALLY WITH ECOLOGICAL

         23    REGRESSION OR ECOLOGICAL INFERENCE?

         24    A.  I'VE UTILIZED ECOLOGICAL REGRESSION AND ECOLOGICAL

         25    INFERENCE IN MY CONSULTING WORK GOING BACK TO THE LATE 1980S.

1:50PM    1    Q.   AND HOW DO YOU STAY CURRENT ON UPDATES TO ECOLOGICAL

        2    INFERENCE?

        3    A.   I READ THE LITERATURE, WAS EXCITED WHEN DR. KING

        4    INTRODUCED HIS EI, ADDITIONAL 2 X 2 EI METHOD, AND FOLLOWED

        5    THAT AND UTILIZED THAT FAIRLY EARLY ON IN CONSULTING, IN

        6    ADDITION TO THE ECOLOGICAL REGRESSION AND EXTREME PRECINCT

        7    ANALYSIS THAT WE HAD IN THE SORT OF TOOL KIT EARLIER ON.  AND

        8    I'VE KEPT UP WITH THAT SINCE.

        9        I SKIPPED USING ITERATIVE EI AND MOVED DIRECTLY TO USING

       10    WHAT IS CURRENTLY THE MOST RECENT VERSION, WHAT IS SOMETIMES

       11    CALLED EI RXC, AND I USE THAT PRETTY MUCH EXCLUSIVELY NOW.  I

       12    THINK IT IS CERTAINLY NO WORSE THAN ANY OTHER TECHNIQUES, AND

       13    IT HAS SOME DISTINCT ADVANTAGES, SO THAT'S WHAT I FOCUS MY WORK

       14    ON.

       15    Q.   HAVE YOU PREVIOUSLY SERVED AS AN EXPERT IN REDISTRICTING

       16    CASES?

       17    A.   I HAVE.

       18    Q.   AND APPROXIMATELY HOW MANY?

       19    A.   I WOULD SAY MAYBE EVEN CLOSE TO 50 CASES.

       20    Q.   AND HOW MANY OF THOSE INVOLVE CLAIMS UNDER THE VOTING

       21    RIGHTS ACT?

       22    A.   I THINK ALMOST ALL OR CERTAINLY THE VAST MAJORITY.

       23    Q.   AND HOW MANY TIMES HAVE YOU TESTIFIED IN REDISTRICTING

       24    CASES?

       25    A.   PROBABLY 30 TIMES.

DR. J. ALFORD - DIRECT

1:51PM  1    Q.   AND DO MOST OF THOSE ALSO INVOLVE THE VOTING RIGHTS ACT?

        2    A.   I THINK MAYBE ALL BUT ONE WOULD HAVE BEEN VOTING RIGHTS

        3    ACT CASES, YES.

        4    Q.   CAN YOU BRIEFLY DESCRIBE THE TYPES OF OPINIONS YOU HAVE

        5    OFFERED IN REDISTRICTING CASES?

        6    A.   SO EARLIER ON IN MY CAREER, I DID KIND OF A WIDE VARIETY

        7    OF THINGS.  SO I WAS INVOLVED IN DRAWING DISTRICTS, TESTIFIED

        8    ABOUT ISSUES RELATED TO *GINGLES* I, II AND III, AS WELL AS

        9    RACIALLY POLARIZED VOTING IN THE SENSE OF THE SENATE FACTOR.

       10         I'VE ALSO TESTIFIED ABOUT ALTERNATIVE ELECTION SCHEMES,

       11    TESTIFIED ABOUT THINGS LIKE REPRESENTATIVENESS OF THE JURY

       12    WHEEL, SOME OTHER STATISTICAL ISSUES.  BUT IN THE LAST TWO

       13    DECADES, I HAVE NARROWED DOWN TO FOCUS ALMOST EXCLUSIVELY ON

       14    *GINGLES* II AND III, AND THEN POLARIZED, RACIALLY POLARIZED AS A

       15    SENATE FACTOR.

       16    Q.   HAS ALL OF YOUR RACIALLY POLARIZED VOTING EXPERIENCE COME

       17    FROM YOUR EXPERT WORK?

       18    A.   YES.

       19    Q.   AND HAVE YOU DONE YOUR OWN RACIALLY POLARIZED VOTING

       20    ANALYSIS?

       21    A.   HISTORICALLY I DID MY OWN ANALYSIS.  MORE RECENTLY, THE

       22    LAST 15 YEARS OR SO, I'VE PARTNERED WITH ANOTHER PROFESSOR,

       23    RANDY STEVENSON AT RICE UNIVERSITY, AND HE, WORKING UNDER MY

       24    DIRECTION, HE DOES BASICALLY THE R PROGRAMMING TO MAKE THE

       25    ANALYSIS MORE EFFICIENT, MAKE THE USE OF MY TIME MORE

DR. J. ALFORD - DIRECT

1:53PM  1    EFFICIENT.

2          I SUPPLY HIM WITH THE INSTRUCTIONS FOR HOW I WANT THAT TO

3    BE CARRIED OUT, WITH THE DATA THAT I WANT TO BE ANALYZED, AND

4    HE RUNS THE PROGRAM, PROVIDES THE RESULTS BACK TO ME, AND THEN

5    THE REST OF THE TASK OF WRITING THE REPORT AND MAKING SENSE OF

6    ALL OF THAT IS MINE.

7    Q.   AND HAVE YOU USED ECOLOGICAL INFERENCE AS PART OF YOUR

8    RACIALLY POLARIZED VOTING ANALYSES?

9    A.   SO SOME FORM OF -- YOU KNOW, ECOLOGICAL INFERENCE IS BOTH

10   I GUESS A PROBLEM AND A SOLUTION.  SO ORIGINALLY, WHAT YOU

11   MIGHT THINK OF AS EI WITH SMALL LETTERS IS THE PROBLEM OF

12   WANTING TO ASK A QUESTION AT THE INDIVIDUAL LEVEL BUT NOT

13   HAVING DATA AT THE INDIVIDUAL LEVEL.  SO WE HAVE AGGREGATE

14   DATA, AND WE HAVE AN INDIVIDUAL LEVEL QUESTION, AND THAT IS --

15   IT MEANS WE DEAL WITH THE ECOLOGICAL FALLACY, AND IT MEANS WE

16   NEED SOME TECHNIQUE FOR MAKING INFERENCES WITH DATA THAT'S AT

17   THE WRONG LEVEL.

18        SOME OF THOSE EARLY TECHNIQUES WERE THE ER APPROACH THAT

19   WAS UTILIZED.  WHEN DR. KING PRODUCED HIS BOOK AND THE

20   METHODOLOGY FOR DOING WHAT HE CALLED EI WITH A CAPITAL E AND A

21   CAPITAL I, THAT BECAME HIS ADVANCEMENT IN SOLUTIONS TO HOW TO

22   DO THIS ANALYSIS IN THE BEST AND MOST EFFICIENT WAY IT COULD BE

23   DONE.  IT'S NOT A SOLUTION TO THE PROBLEM.  WE ARE STILL ONLY

24   ESTIMATING INDIVIDUAL LEVEL BEHAVIOR FROM AGGREGATE DATA, BUT

25   WE DO THAT BECAUSE, SOMEWHAT UNIQUELY, AT LEAST IN THE

DR. J. ALFORD - DIRECT

1:55PM   1    POLITICAL SCIENCE REALM, MOSTLY WHEN WE HAVE INDIVIDUAL

         2    QUESTIONS, WE COLLECT INDIVIDUAL DATA.  WE DO A SURVEY.  WE DO

         3    AN EXPERIMENT.  BUT HERE, BECAUSE THE VOTE IS SECRET, WE

         4    HAVE -- ALTHOUGH WE HAVE INDIVIDUAL LEVEL INFORMATION ABOUT

         5    RACE AND ETHNICITY, WE DON'T HAVE INDIVIDUAL LEVEL INFORMATION

         6    ABOUT HOW THE VOTE WAS CAST.  SO WE ARE CONSTRAINED TO DO SOME

         7    FORM OF ECOLOGICAL INFERENCE.

         8         AND AGAIN, KING'S MOST RECENT, THE EI RXC SOLUTION IS THE

         9    CLOSEST WE'VE GOTTEN TO BEING ABLE TO ANALYZE AS EFFICIENTLY AS

        10    WE CAN THE ANSWER TO THESE QUESTIONS WITH ECOLOGICAL DATA,

        11    RECOGNIZING THAT WE ARE STILL JUST MAKING AN ECOLOGICAL

        12    ESTIMATE OR INFERENCE RATHER THAN ACTUALLY CONNECTING AN

        13    ANALYSIS OF HOW INDIVIDUALS AT THE INDIVIDUAL LEVEL ARE VOTING.

        14    Q.  DR. ALFORD, HAS ANY COURT EVER FOUND YOUR METHODOLOGY FOR

        15    RACIALLY POLARIZED VOTING TO NOT BE RELIABLE?

        16    A.  NO.

        17    Q.  HAS ANY COURT EVER EXCLUDED YOU AS AN EXPERT?

        18    A.  NO.

        19    Q.  HAS ANY COURT EVER EXCLUDED ANY OF YOUR OPINIONS THAT YOU

        20    OFFERED IN A CASE?

        21    A.  THEY CERTAINLY HAVEN'T ALWAYS FOLLOWED THEM, BUT THEY

        22    HAVEN'T EXCLUDED THEM.

        23         **MR. TUCKER:**  YOUR HONOR, AT THIS TIME, WE MOVE TO

        24    QUALIFY DR. ALFORD AS AN EXPERT IN VOTING BEHAVIOR AND

        25    REDISTRICTING.

1:56PM   1          **THE COURT:**  OKAY.  THE TENDER IS IN VOTING BEHAVIOR

2    AND REDISTRICTING.  IS THERE ANY CROSS ON THE TENDER?

3          **MR. CAMPBELL-HARRIS:**  NO OBJECTION, YOUR HONOR.

4          **THE COURT:**  OKAY.  DR. ALFORD WILL BE ACCEPTED TO

5    GIVE OPINION TESTIMONY ON VOTING BEHAVIOR AND -- I DIDN'T WRITE

6    IT DOWN.

7          **MR. TUCKER:**  REDISTRICTING.

8          **THE COURT:**  REDISTRICTING.

9    **BY MR. TUCKER:**

10   Q.  DR. ALFORD, CAN YOU TURN TO PAGE 3 OF YOUR REPORT?

11   A.  YES.

12   Q.  CAN YOU BRIEFLY DESCRIBE THE METHODS UTILIZED TO FORMULATE

13   YOUR OPINIONS IN THIS CASE?

14   A.  SO THE METHODS I'M USING HERE ARE -- ESSENTIALLY MATCH

15   WITH THE METHODS USED BY DR. HANDLEY.  WE ARE BOTH USING THE

16   SAME SOURCES OF DATA TO DO THE RACIALLY POLARIZED VOTING

17   ANALYSIS.  WE ARE BOTH USING -- ALTHOUGH SHE USES -- PROVIDES

18   ESTIMATES FOR A VARIETY OF TECHNIQUES, WE BOTH ULTIMATELY ALSO

19   REPORT THE RXC RESULTS.  I THINK WE AGREE THAT THOSE ARE, ALL

20   OTHER THINGS BEING EQUAL, PROBABLY THE BEST -- BEST OF THE

21   RESULTS.  SO WE ARE USING THE SAME DATA AND WE ARE USING THE

22   SAME STATISTICAL TECHNIQUE TO ANALYZE THE DATA THAT WE HAVE ON

23   THIS ISSUE OF RACIALLY POLARIZED VOTING.

24   Q.  SO DID YOU USE THE EI RXC METHODOLOGY IN THIS CASE?

25   A.  YES, THIS IS KING'S EI RXC.  AND IT'S NOT A SIMPLE

DR. J. ALFORD - DIRECT

1:58PM   1   TECHNIQUE TO EXPLAIN EXACTLY WHAT IS GOING ON WITH THE

         2   TECHNIQUE, BUT THERE WERE SEVERAL THINGS ABOUT IT THAT MAKE IT

         3   SUPERIOR TO THE EARLIER ER OR ECOLOGICAL REGRESSION.

         4        ECOLOGICAL REGRESSION IS PRETTY EASY TO UNDERSTAND.  IF

         5   YOU DO A SCATTER PLOT AND YOU RUN A LINE THROUGH IT, THAT IS

         6   ECOLOGICAL REGRESSION.  IT IS VERY CONSUMER-FRIENDLY.

         7        ECOLOGICAL INFERENCE IS NOT.  THERE IS SORT OF A MORE ACT

         8   OF FAITH I THINK IN ACCEPTING IT, BUT IT DOES SOME THINGS THAT

         9   ARE REALLY IMPORTANT.  IT ELIMINATES THE PROBLEM OF OUT OF

        10   BOUNDS ESTIMATES, WHICH WAS A COMMON PROBLEM WITH ECOLOGICAL

        11   REGRESSION.  SO YOU WOULD GET AN ESTIMATE THAT BLACK VOTERS ARE

        12   VOTING 120 PERCENT FOR A CANDIDATE.  AND MAYBE THAT'S AN

        13   ENTHUSIASM ADJUSTMENT, BUT IT IS PROBLEMATIC.  IT CAN'T BE

        14   CORRECT.  AND GIVEN THAT THE LINE IS DEPENDENT ON ITS END

        15   POINTS, THAT MEANS THERE ARE PROBLEMS WITH THE LINE ITSELF.  SO

        16   IT ELIMINATES THE PROBLEM OF OUT OF BOUNDS ESTIMATES.

        17        IT ELIMINATES THE PROBLEM IN SOME EARLIER TECHNIQUES, LIKE

        18   ITERATIVE TECHNIQUES.  OF THE TOTAL VOTES, WHEN YOU WOULD ADD

        19   UP THE ESTIMATED VOTES FOR, SAY, A RACIAL GROUP ACROSS FIVE

        20   CANDIDATES, YOU MIGHT GET SOMETHING THAT ADDED TO MORE THAN

        21   WHAT WAS POSSIBLE OR TO LESS THAN WHAT WAS POSSIBLE.  IN THE EI

        22   RXC, THEY ARE CONSTRAINED BECAUSE THE METHOD DEPENDS ON A

        23   PARTICULAR DISTRIBUTION THAT'S CONSTRAINED TO ADD UP TO ONE, A

        24   PROBABILITY DISTRIBUTION THAT ADDS UP TO ONE, A MULTINOMIAL

        25   PROBABILITY.  IT CONSTRAINS THE VOTES CAST BY ANY GROUP TO ADD

DR. J. ALFORD - DIRECT

1:59PM   1   UP TO 100 PERCENT, WHICH IS CORRECT.  IT SHOULD BE THAT.

2        THE TWO OTHER THINGS THAT ARE IMPORTANT IS THAT THE

3   TECHNIQUE IS MORE EFFICIENT BECAUSE IT'S A METHOD OF BOUNDS,

4   WHICH ER IS NOT.  AND BY METHOD OF BOUNDS, IT MEANS THAT THE

5   TECHNIQUE TAKES INTO ACCOUNT AND GIVES ADDED -- ESSENTIALLY

6   GIVES SOME ADDED WEIGHT TO INSTANCES WHERE IN A PARTICULAR

7   PRECINCT THERE ARE -- GIVEN THE WAY THE VOTES WERE CAST AND THE

8   PROPORTION MINORITY IN A PARTICULAR PRECINCT, THERE ARE CERTAIN

9   LIMITS OF WHAT COULD BE POSSIBLE THERE.  SO YOU COULD SAY AT

10  LEAST 60 PERCENT OF THE MINORITY MUST HAVE CAST THEIR VOTES

11  THIS WAY, GIVEN THE VOTES CAST IN THE PRECINCT.  AND THAT

12  INFORMATION IS USEFUL.  IT IS IGNORED BY ER, BUT IT IS

13  INCORPORATED INTO EI'S METHODS OF BOUND.

14       AND FINALLY, THE ER HAS A LINEAR ASSUMPTION.  IT ASSUMES

15  THAT THERE'S A CONSTANT LINEAR RATE OF INCREASING VOTE OR

16  DECREASING VOTE AS YOU MOVE ACROSS POPULATION METRICS.  AND EI

17  ALLOWS THAT RELATIONSHIP TO BE NONLINEAR, WHICH TYPICALLY IS A

18  MORE APPROPRIATE WAY OF DESCRIBING THE VOTE SHARES ACROSS

19  DIFFERENT TYPES OF PRECINCTS.

20       **COURT REPORTER:**  VOTE SHARES?

21  A.  VOTE SHARES ACROSS DIFFERENT TYPES OF PRECINCTS.  I WILL

22  TRY TO SLOW DOWN.  I'M VERY BAD ABOUT TALKING FAST.

23       **COURT REPORTER:**  SPEAK UP A LITTLE BIT TOO.

24       **THE COURT:**  YES.  YOU CAN ADJUST THE MIC SO THAT IT'S

25  CLOSER TO YOU.

DR. J. ALFORD - DIRECT

2:00PM   1   **BY MR. TUCKER:**

2   Q.   AND DR. ALFORD, I WILL STOP YOU THERE SO WE CAN GIVE OUR

3   COURT REPORTER HERE A LITTLE BIT OF A BREAK AND ASK YOU ANOTHER

4   QUESTION.   SO THE EI RXC METHOD THAT YOU USED IN THIS CASE, IS

5   THAT THE SAME METHOD OR ONE OF THE SAME METHODS THAT DR.

6   HANDLEY USED?

7   A.   YES, IT IS.

8   Q.   AND WHAT DATA DID YOU RELY UPON TO INFORM YOUR OPINIONS IN

9   THIS CASE?

10   A.   SO MOST OF THE DATA IS NOT JUST THE SAME DATA OR THE

11   SOURCE OF DATA THAT DR. HANDLEY USED BUT THE ACTUAL DATA THAT

12   DR. HANDLEY DISCLOSED.   SO WHEREVER POSSIBLE, I RELIED ON THAT

13   SAME DATA BECAUSE I DON'T -- I PREFER THAT THE DISPUTES NOT BE

14   ABOUT DATA OR ABOUT METHODS BUT BE ABOUT SORT OF WHAT OUR

15   INTERPRETATION IS OF THE RESULT.   SO WHEREVER POSSIBLE, IT IS

16   ACTUALLY THE SAME EXACT DATA PRODUCED BY AND RELIED ON BY DR.

17   HANDLEY.

18        WHERE I DID SOME ADDITIONAL ELECTIONS, THE SOURCES FOR THE

19   ELECTION DATA ARE EXACTLY THE SAME AS THE SOURCES FOR DR.

20   HANDLEY'S DATA, THE SECRETARY OF STATE'S OFFICE.

21   Q.   THANK YOU, DR. ALFORD.   CAN YOU TURN NOW TO TABLE 1 ON

22   PAGE 6 OF YOUR REPORT.

23   A.   YES.

24   Q.   CAN YOU TELL THE COURT WHAT THIS TABLE REFLECTS?

25   A.   SO THIS IS A REPLICATION ANALYSIS, AND IT WAS PERFORMED

2:02PM  1    TO -- BASICALLY TO MAKE SURE THAT EVEN THOUGH WE ARE USING THE

      2    SAME DATA, THE SAME TECHNIQUE, THAT WE ARE IN FACT GETTING

      3    RESULTS THAT ARE SIMILAR ENOUGH.  SO BECAUSE I HAVE SOME

      4    ELECTIONS THAT DR. HANDLEY DIDN'T ANALYZE, I WANT TO MAKE SURE

      5    THAT WHEN WE ARE COMPARING THE ELECTIONS, MY ANALYSIS OF THE

      6    ELECTIONS SHE DIDN'T ANALYZE TO THE ELECTIONS SHE DID ANALYZE,

      7    THAT ANY DIFFERENCES THERE ARE NOT THE RESULT OF METHODOLOGICAL

      8    DIFFERENCES.

      9        THIS ALSO PROVIDES A CHECK FOR ME ON MY EI ANALYSIS

     10    BECAUSE I CAN LOOK AT MY EI ANALYSIS AND COMPARE IT TO HER

     11    INDEPENDENT EI ANALYSIS.  WE SHOULD GET VERY SIMILAR RESULTS.

     12    AND WE GET, AS YOU CAN SEE IN THIS TABLE, WE GET EXTREMELY

     13    SIMILAR RESULTS.  SO IT BOTH VALIDATES HER RESULTS AND

     14    VALIDATES MY ANALYSIS.

     15        THERE ARE SOME VERY MODEST DIFFERENCES, WHICH IN AN ER

     16    TECHNIQUE, YOU WOULD NOT GET ANY DIFFERENCES AT ALL WITH THE

     17    SAME TECHNIQUE ON THE SAME DATA.  WITH EI, BECAUSE OF SOME

     18    VARIATIONS AND BECAUSE IT'S A PROBABILISTIC TECHNIQUE, EACH RUN

     19    TYPICALLY PRODUCES A DIFFERENT RESULT, AND EVEN MULTIPLE RUNS

     20    WILL AVERAGE TO A SLIGHTLY DIFFERENT RESULT ACROSS, EVEN FOR --

     21    IF I WAS TO REPEAT THE SAME ANALYSIS, UNLESS I HELD THE RANDOM

     22    NUMBER SEED EQUAL, I WOULD GET A SLIGHTLY DIFFERENT RESULT.

     23    AND THESE ARE WELL WITHIN THAT VERY SLIGHT LESS THAN A

     24    PERCENTAGE POINT DIFFERENCE THAT WE WOULD EXPECT TO SEE IN TWO

     25    INDEPENDENT EI ANALYSES.

DR. J. ALFORD - DIRECT

2:03PM

1    Q.   SO JUST TO CONFIRM, ARE THE SLIGHT VARIATIONS YOU SEE IN

2    YOUR RESULTS AND DR. HANDLEY'S RESULTS PROBLEMATIC IN ANY WAY?

3    A.   NOT AT ALL.

4    Q.   I WOULD LIKE YOU NOW TO TURN TO PAGE 7 OF YOUR REPORT, AND

5    SPECIFICALLY HEADING A.

6    A.   YES.

7    Q.   AND CAN YOU BRIEFLY DESCRIBE THE ANALYSIS YOU PERFORMED IN

8    THIS PART OF THE REPORT?

9    A.   SO THIS IS JUST SORT OF A BEGINNING AND A VERY KIND OF

10   HIGH LEVEL OF ABSTRACTION.  LOOKING AT WHAT IS THE TOP OF THE

11   TICKET, ELECTION ON YOUR BALLOT, IT'S THE PRESIDENTIAL

12   ELECTION.  IT'S THE ELECTION THAT HAS THE MOST VOTERS IN IT AND

13   THE MOST VOTER ATTENTION TO IT.  SO IT MAKES A NICE EXAMPLE

14   ELECTION TO GET A PICTURE, A FULL PICTURE OF HOW VOTERS ARE

15   CASTING THEIR VOTES.

16        WE CAN ALSO COMPARE IT ACROSS YEARS BECAUSE IT'S THE SAME

17   OFFICE ACROSS DIFFERENT YEARS, AND IT IS ALWAYS CONTESTED.

18   SOMETIMES WE SEE NONCONTESTED ELECTIONS, BUT WE HAVEN'T SEEN A

19   NONCONTESTED PRESIDENTIAL ELECTION.  SO IT IS A GOOD COMPARISON

20   ELECTION.  AND THIS LOOKS AT THE 2012, 2016 AND 2020.

21        AS IT HAPPENS, THIS SET OF ELECTIONS ALSO INCLUDES THREE

22   DIFFERENT PATTERNS OF RACIALLY CONTESTED ELECTIONS.  SO IT

23   LET'S US LOOK AT VARIATION IN THE RACIAL NATURE OF THE

24   CONTESTATION, AS WELL AS LOOKING AT A SINGLE ELECTION OVER

25   TIME.

DR. J. ALFORD - DIRECT

2:05PM   1   Q.   WHAT DO YOU MEAN BY THE --

2              **MR. CAMPBELL-HARRIS:**  YOUR HONOR, I DON'T MEAN TO

3       INTERRUPT, BUT THERE'S BLUE DOTS ON THE SCREEN.  CAN WE HAVE

4       THAT FIXED BY THE TECH FOR OPPOSING CO-COUNSEL?

5              **MR. TUCKER:**  I ACTUALLY SAW THE SAME THING, AND IT IS

6       DISTRACTING TO THE COURT AND EVERYONE ELSE.  THANK YOU.  I

7       WASN'T AWARE HOW TO DO THAT.

8              **THE COURT:**  SHE CLEARED IT.

9              **MR. TUCKER:**  THANK YOU.

10      **BY MR. TUCKER:**

11      Q.   DR. ALFORD, WHAT DID YOU MEAN -- AND I DON'T REMEMBER YOUR

12      EXACT WORDS, BUT YOU SAID SORT OF THE DIFFERENT RACIAL

13      COMPOSITION OF THESE ELECTIONS, OR SOMETHING TO THAT EFFECT.

14      WHAT DID YOU MEAN BY THAT?

15      A.   SO THE FIRST ELECTION, THE NOVEMBER '12 ELECTION, IS WHAT

16      DR. HANDLEY IS REFERRING TO WHEN SHE TALKS ABOUT A RACIALLY

17      CONTESTED ELECTION.  SO AT THE TOP OF THE TICKET HERE IS A

18      BLACK CANDIDATE, BARACK OBAMA, AND A WHITE CANDIDATE, MITT

19      ROMNEY.  SO THAT IS A RACIALLY CONTESTED ELECTION.  IT'S AN

20      ELECTION THAT WOULD BE INCLUDED, FOR EXAMPLE, AMONG THE

21      STATEWIDE KINDS OF CONTESTS THAT DR. HANDLEY ANALYZED THAT WERE

22      RACIALLY CONTESTED.

23             THE NOVEMBER '16 ELECTION FEATURES HILLARY CLINTON AND

24      DONALD TRUMP, BOTH OF WHICH ARE WHITE CANDIDATES, AS ARE THE

25      VICE-PRESIDENTIAL CANDIDATES, KAINE AND PENCE.  SO THIS IS A

DR. J. ALFORD - DIRECT

2:06PM

1    NONRACIALLY CONTESTED ELECTION.  IT IS AN ELECTION THAT IS NOT

2    INCLUDED IN DR. HANDLEY'S ANALYSIS FOR THAT REASON.

3         AND THEN FINALLY, IN 2020, YOU HAVE A RACE THAT'S NOT

4    RACIALLY CONTESTED AT THE TOP OF THE TICKET, BIDEN AND TRUMP,

5    BUT THERE IS RACIAL VARIATION IN THE VICE PRESIDENTIAL SLOT

6    BETWEEN KAMALA HARRIS AND MIKE PENCE.

7         SO WE HAVE A FULLY RACIALLY CONTESTED ELECTION, A

8    NONRACIALLY CONTESTED ELECTION, AND A PARTIALLY RACIALLY

9    CONTESTED ELECTION ALL IN THE SAME OFFICE IN BACK-TO-BACK

10   CONTESTS.

11   Q.   SO IN THE TITLE OF TABLE 2 HERE, AT THE SECOND ROW YOU SAY

12   AVERAGES OF EI RXC ESTIMATES.  SO DOES THAT MEAN THAT YOU USED

13   YOUR EI RXC METHODOLOGY FOR THIS ANALYSIS?

14   A.   SO THIS IS THE EI RXC METHODOLOGY, AND IT IS PERFORMED

15   INDIVIDUALLY FOR EACH OF THE SEVEN, THE SAME SEVEN LEVELS OF

16   INTEREST THAT DR. HANDLEY USED IN HER REPORT.  IT IS REPORTED

17   AT THAT LEVEL IN THE APPENDIX.  BUT AGAIN, TO MAKE IT EASIER TO

18   RECEIVE WHAT THE PATTERN IS, THESE ARE AVERAGED, AND THOSE

19   AVERAGES REFLECT -- WHAT THEY REFLECT AS AVERAGES IS A PATTERN

20   THAT'S ALSO SEEN IN EACH OF THE SEVEN AREAS THAT ARE BEING

21   AVERAGED TOGETHER TO PRODUCE THIS ESTIMATE.

22   Q.   AND AGAIN, IS THAT, USING THOSE SEVEN AREAS AND AVERAGES

23   OF THOSE SEVEN AREAS, IS THAT THE SAME METHODOLOGY THAT DR.

24   HANDLEY USED?

25   A.   IT IS THE SAME METHODOLOGY DR. HANDLEY USES.

2:08PM  1    Q.  AND WHAT CONCLUSIONS CAN YOU DRAW FROM THIS ANALYSIS THAT

2    IS REFLECTED IN TABLE 2?

3    A.  FIRST OF ALL, YOU CAN CLEARLY SEE THAT VOTING IS

4    POLARIZED.  SO BLACK SUPPORT IS IN THE HIGH 90 PERCENT RANGE

5    FOR THE DEMOCRATIC CANDIDATES IN ALL OF THESE CONTESTS.  IT'S

6    ALSO VERY STABLE.  GIVEN THE CONFIDENCE -- OR SORRY, THE

7    CREDIBLE INTERVALS, I WOULDN'T REALLY CHARACTERIZE ANY OF THESE

8    AS BEING DIFFERENT.  THEY JUST REFLECT OVERWHELMING COHESION

9    AMONG BLACK VOTERS FOR THE DEMOCRATIC CANDIDATE AT WELL ABOVE

10    90 PERCENT.

11         LOOKING AT WHITE SUPPORT, WHITE SUPPORT IS SOMEWHAT LESS

12    CONCENTRATED BUT STILL VERY COHESIVE, MID 80S TO HIGH

13    80 PERCENT RANGE FOR THE REPUBLICAN CANDIDATE IN ALL THREE OF

14    THESE CONTESTS.

15         SO WHEN WE ARE TALKING ABOUT WHAT DOES POLARIZATION LOOK

16    LIKE IN AN ELECTION ANALYSIS, THIS IS WHAT POLARIZATION LOOKS

17    LIKE, VERY COHESIVE VOTING FOR MINORITY VOTERS AND VERY

18    COHESIVE VOTING IN THE OPPOSITE DIRECTION FOR WHITE VOTERS.

19    Q.  DO YOU SEE RACIAL POLARIZATION IN THIS ANALYSIS?

20    A.  WELL, I GUESS THAT DEPENDS ON HOW YOU DEFINE RACIAL

21    POLARIZATION.  BUT CLEARLY WE SEE THERE IS A PARTISAN PATTERN

22    HERE.  SO THAT STABLE PATTERN WE ARE SEEING IS VERY STABLE WITH

23    REGARD TO A VERY SALIENT CUE IN ELECTIONS, WHICH IS THE PARTY

24    CUE THAT'S NOT ONLY PROMINENT IN THE WAY WE RUN POLITICS IN THE

25    UNITED STATES BUT ALSO IS PROMINENT BECAUSE IT IS ON THE

2:09PM   1   BALLOT, BUT IT IS BY THE NAMES OF THE CANDIDATES, SO WE

2   ACTUALLY HAVE PARTISAN BALLOTS AS WELL AS A PARTISAN NOMINATION

3   SYSTEM.  SO THAT'S VERY CLEAR.  RIGHT?  THESE ARE VERY STABLE,

4   VERY HIGH LEVELS OF DIFFERENCE IN THE WAY DEMOCRATS AND

5   REPUBLICANS ARE SUPPORTED BY BLACK AND WHITE VOTERS.

6       ON THE OTHER HAND, WHEN WE LOOK AT THE VARIATION IN THE

7   DEGREE TO WHICH THE ELECTION IS RACIALLY CONTESTED, WE SEE A

8   DIFFERENT PATTERN.  SO IF WE ARE LOOKING AT BLACK SUPPORT, IF

9   YOU WERE LOOKING ONLY AT 2012, YOU COULD SAY IT IS CLEAR THAT

10   BLACKS OVERWHELMINGLY PREFER BLACK CANDIDATES BECAUSE THEY GIVE

11   98 PERCENT OF THEIR VOTE TO OBAMA AND ONLY THREE PERCENT TO

12   MITT ROMNEY.

13       WHEN YOU LOOK AT THE NEXT ELECTION DOWN, YOU NOW HAVE TWO

14   WHITE CANDIDATES RUNNING, AND BLACKS ARE GIVING THE SAME,

15   ESSENTIALLY THE SAME LEVEL OF SUPPORT TO CLINTON THAT THEY GAVE

16   TO OBAMA.  SO IF THAT LEVEL OF SUPPORT IS THE SAME AND THE

17   RACIAL CHARACTERISTIC OF THE CANDIDATES IS DIFFERENT, THEN I

18   THINK WHAT YOU CAN CONCLUDE FROM THAT IS THE PARTY IS THE SAME

19   AND THE SUPPORT IS THE SAME.  AND SO THIS IS A PARTISAN -- A

20   VERY HIGH LEVEL OF PARTISAN COHESION.  IT IS NOT A STRONG

21   REFLECTION OF BLACK SUPPORT FOR BLACK CANDIDATES VERSUS WHITE

22   CANDIDATES BECAUSE THERE ISN'T ANY VARIATION THERE AT ALL.

23       AND THE SAME IS TRUE AGAIN WITH THE BIDEN/HARRIS TICKET.

24   THE SUPPORT THERE, AGAIN, IS A VERY HIGH LEVEL OF SUPPORT AMONG

25   BLACK VOTERS, AND SO THE BLACK SUPPORT IS COHESIVE SUPPORT FOR

DR. J. ALFORD - DIRECT

2:11PM

1    THE DEMOCRATIC CANDIDATE BUT NOT NECESSARILY A SUPPORT THAT

2    VARIES DEPENDING ON WHETHER THE CANDIDATE IS BLACK OR WHITE.

3    Q.   AND I SEE A FEW COLUMNS IN THIS CHART THAT ARE REFERENCING

4    PERCENTAGE LOW CI AND PERCENTAGE HIGH CI.   CAN YOU EXPLAIN WHAT

5    THOSE ARE?

6    A.   SO THESE ARE THE 95-PERCENT CREDIBLE INTERVALS.   IF YOU'VE

7    MANAGED TO GET YOUR HEAD AROUND THE IDEA OF A CONFIDENCE

8    INTERVAL, SORT OF A 95-PERCENT CONFIDENCE INTERVAL, THESE ARE

9    NOT CONFIDENCE INTERVALS, BUT THEY ARE THE SORT OF

10   PROBABILISTIC EQUIVALENT.   THE CREDIBLE INTERVALS ARE, RATHER

11   THAN BEING MATHEMATICALLY DERIVED, ARE ACTUALLY SAMPLED.   THEY

12   ARE SOMETHING DERIVED FROM THE SAMPLE DISTRIBUTION OF THE

13   REPEATED ITERATIONS OF THE EI.

14       SO ALTHOUGH IT IS THE ROUGH EQUIVALENT, I THINK IT

15   SUGGESTS SOMETHING ABOUT EI VERSUS, SAY, A CONFIDENCE INTERVAL

16   AND A SURVEY SAMPLE.   IN A SURVEY SAMPLE, A 95-PERCENT

17   CONFIDENCE INTERVAL TELLS US THAT WE CAN BE -- BASICALLY GIVEN

18   THE SAMPLE WE'VE DRAWN, WE CAN BE 95-PERCENT CONFIDENT THAT THE

19   VALUE IN THE POPULATION FALLS SOMEWHERE IN THAT RANGE.   AND

20   THAT'S MATHEMATICALLY DERIVED FROM SAMPLING THEORY.

21       A CREDIBLE INTERVAL JUST SAYS THAT IN THIS ITERATIVE

22   PROCESS, 95 PERCENT OF THE DRAWS IN THAT ITERATIVE PROCESS

23   PRODUCED A RESULT THAT WAS NO LOWER THAN THE LOWER AND NO

24   HIGHER THAN THE HIGHER BOUND.   THAT DOESN'T MEAN THAT THE REAL

25   WORLD VALUE FALLS IN THERE 95 PERCENT OF THE TIME.   IN FACT,

DR. J. ALFORD - DIRECT

2:13PM

1    THERE'S SOME WORK THAT'S TRIED TO -- THAT'S LOOKED AT THAT

2    EXACT ISSUE AND FINDS THAT THE REAL WORLD VALUE DOESN'T FALL IN

3    THAT INTERVAL MOST OF THE TIME, BECAUSE THE REAL WORLD VALUE IS

4    NOT SOMETHING WE HAVE ACCESS TO THE IN THE SENSE WE DO IN

5    SAMPLING THEORY.

6         SO IT IS IMPORTANT TO REMEMBER THAT IT TELLS US HOW -- HOW

7    NARROWLY THE RESULTS VARIED IN TERMS OF THE PROCESS OF

8    DETERMINING THE VALUE THROUGH EI, BUT IT DOESN'T NECESSARILY

9    TELL US THAT THE REAL WORLD VALUE FALLS THERE.

10   Q.  CAN YOU NOW TURN TO SECTION B OF YOUR REPORT ON PAGE 8.

11   SO DID YOU ALSO REVIEW THE SAME ELECTIONS THAT DR. HANDLEY

12   ANALYZED?

13   A.  YES.  SO THESE ARE THE EXACT SAME RACIALLY CONTESTED

14   ELECTIONS THAT WERE INCLUDED IN DR. HANDLEY'S REPORT.

15   Q.  AND I THINK YOU TESTIFIED EARLIER YOU WERE ABLE TO

16   REPLICATE HER RXC EI ANALYSIS?

17   A.  YES.

18   Q.  AND DID YOU REPORT THAT ANALYSIS ANYWHERE?

19   A.  YES, I REPORTED IN THE APPENDIX.

20   Q.  WHICH APPENDIX SPECIFICALLY?

21   A.  EXCUSE ME?

22   Q.  WHICH APPENDIX SPECIFICALLY?

23   A.  APPENDIX B, I BELIEVE.

24   Q.  THANK YOU.  WAS IT AN ISSUE FOR YOU THAT DR. HANDLEY ONLY

25   USED RACIALLY CONTESTED ELECTIONS?

DR. J. ALFORD - DIRECT

2:14PM

1  A.  IT IS -- I THINK IT IS AN ISSUE.  THEY ARE -- THERE IS AN

2  ARGUMENT FOR WHY THOSE ELECTIONS ARE MORE PROBATIVE, AND I

3  THINK THAT IS PART OF THE LEGAL ARGUMENT, BUT I THINK PARTIALLY

4  ALSO KIND OF A MORE SUBSTANTIVE ARGUMENT.  BUT I THINK --

5  AGAIN, WE DON'T -- IF WE UTILIZE ONLY RACIALLY CONTESTED

6  ELECTIONS, WE CAN EASILY MISUNDERSTAND OR MISINTERPRET, AS BOTH

7  EXPERTS AND COMMENTATORS OFTEN DO.  SO IT IS NOT UNCOMMON TO

8  SEE SOMEONE LOOK AT A RACIALLY POLARIZED VOTING ANALYSIS THAT

9  ONLY UTILIZED RACIALLY CONTESTED ELECTIONS AND ASSUME THAT IT

10  TELLS THEM SOMETHING THAT THEY DON'T AND TO REPORT IT AS

11  SOMETHING THAT ISN'T.

12       SO AGAIN, IF WE LOOK AT THAT OBAMA ELECTION AND WE ARE

13  ASKED TO COMMENT ON WHAT THAT ANALYSIS SHOWS ABOUT THE OBAMA

14  ELECTION AND ABOUT HOW BLACK VOTERS ARE VOTING AND ABOUT HOW

15  WHITE VOTERS ARE VOTING, BASED ON THAT SINGLE ELECTION, WE

16  COULD SAY THAT ELECTION DEMONSTRATES THAT BLACK VOTERS VOTE

17  OVERWHELMINGLY FOR A BLACK CANDIDATE, AND THAT WOULDN'T

18  SURPRISE ANYBODY.  I WOULDN'T THINK IT WOULD SURPRISE ANYBODY

19  TO KNOW THAT BLACK VOTERS WERE ENTHUSIASTIC SUPPORTERS OF

20  BARACK OBAMA.  IT ALSO WOULD SHOW THAT WHITE VOTERS WERE

21  OVERWHELMINGLY OPPOSED TO THE BLACK CANDIDATE, AND THAT SAYS

22  SOMETHING ABOUT BEHAVIOR.

23       I MEAN, FIRST OF ALL, IT IDENTIFIES A BEHAVIOR THAT IS NOT

24  UNCOMMON EVEN TODAY, AND IT CERTAINLY WASN'T UNCOMMON AT THE

25  PERIOD IN WHICH THE VOTING RIGHTS ACT WAS PASSED.  SO IT IS

DR. J. ALFORD - DIRECT

2:16PM

1   DEFINITELY THE CASE THAT THERE'S LOTS OF ANALYSIS THAT SHOWS

2   THAT BLACK VOTERS VOTE IN A VERY HIGH LEVEL OF SUPPORT FOR

3   BLACK CANDIDATES, AND THE WHITE VOTERS DON'T SUPPORT BLACK

4   CANDIDATES.  SO YOU MIGHT EASILY THINK THAT ANALYSIS SHOWS

5   THAT, BUT AGAIN, JUST GOING TO THE VERY NEXT PRESIDENTIAL

6   ELECTION MAKES IT CLEAR THAT'S NOT WHAT IT SHOWS AT ALL.

7   Q.  CAN YOU TURN TO THE NEXT PAGE, PLEASE, AND SPECIFICALLY I

8   WANT TO HAVE YOU LOOK AT TABLE 3.

9   A.  YES.

10   Q.  AND WHAT DOES TABLE 3 REFLECT?

11   A.  SO TABLE 3, AGAIN, IS EXACTLY THE SAME ELECTIONS THAT DR.

12   HANDLEY ANALYZED, SO JUST THE RACIALLY CONTESTED ELECTIONS, AND

13   JUST PROVIDES THE FULL SET OF ESTIMATES FOR ALL OF THE

14   CANDIDATES IN THOSE ELECTIONS, WHICH GIVEN LOUISIANA'S SOMEWHAT

15   UNIQUE ELECTION SYSTEM SOMETIMES IS A LOT OF CANDIDATES IN THAT

16   INITIAL OCTOBER ROUND.

17   Q.  ARE THERE RACES IN THIS DATA SET WITH MULTIPLE BLACK

18   CANDIDATES?

19   A.  YES.

20   Q.  I WANT TO POINT YOU TO A COUPLE OF SPECIFIC RACES, FIRST

21   STARTING WITH THE OCTOBER 2015 ATTORNEY GENERAL'S RACE.  DO YOU

22   SEE THAT AT THE TOP?

23   A.  YES.

24   Q.  DO YOU HAVE ANY SPECIFIC OPINIONS ABOUT WHAT YOU SEE IN

25   THE RESULTS OF THE ANALYSIS OF THIS RACE?

2:17PM   1   A.  SO AGAIN, IF WE LOOK AT THE VERY BOTTOM WHERE WE SIMPLY

2   SUM UP THE DEMOCRATIC CANDIDATES, WE CAN SEE THAT ALTHOUGH THIS

3   IS SLIGHTLY LOWER THAN WE SAW IN THAT ESTIMATE FOR THE

4   PRESIDENTIAL CONTEST, CLOSE TO 80 PERCENT OF BLACKS ARE

5   SUPPORTING DEMOCRATIC CANDIDATES IN THIS ELECTION, AND

6   SOMETHING LESS THAN 10 PERCENT OF WHITE VOTERS ARE SUPPORTING

7   DEMOCRATIC CANDIDATES IN THIS ELECTION.  SO IT CLEARLY REFLECTS

8   THAT PARTISAN POLARIZATION THAT WE SAW EARLIER.

9       WHEN WE LOOK AT THE INDIVIDUAL CANDIDATES, WE CAN SEE THAT

10   THERE ARE TWO BLACK DEMOCRATIC CANDIDATES AND THE BLACK VOTE IS

11   -- FIRST OF ALL, NOT ALL THE BLACK VOTE IS GOING FOR THOSE TWO

12   CANDIDATES BUT THAT -- IT'S CERTAINLY OVERWHELMINGLY FOR THOSE

13   TWO CANDIDATES, BUT IT IS PRETTY EVENLY SPLIT BETWEEN THEM.  SO

14   HERE THERE ARE DIFFERENCES.  THE BLACK VOTERS ARE NOT UNIFYING

15   AROUND A PARTICULAR DEMOCRATIC CANDIDATE BUT IS ACTUALLY

16   DISTRIBUTED ACROSS THOSE CANDIDATES.  YOU SEE THE SAME THING

17   WITH TWO OF THE REPUBLICAN CANDIDATES THAT ARE SPLITTING THE

18   WHITE VOTE.

19       SO AT THE LEVEL OF THE CONNECTION BETWEEN VOTERS AND THE

20   CANDIDATES, THERE IS DISAGREEMENT ABOUT CANDIDATES, BUT AGAIN,

21   AS WE SAW EARLIER WITH REGARD TO PARTY, THERE IS POLARIZATION.

22   Q.   IS THE BLACK VOTE COHESIVE IN THIS RACE IN YOUR OPINION?

23   A.   IT IS NOT COHESIVE FOR A PARTICULAR CANDIDATE, BUT IT IS

24   COHESIVE IN THE SENSE OF IT'S COHESIVE IN SUPPORTING DEMOCRATS

25   RATHER THAN REPUBLICANS.

2:19PM    1    Q.   IF YOU CAN NOW FLIP DOWN TO THE BOTTOM OF THE PAGE.  I

        2    WANT TO ASK YOU ABOUT THE NOVEMBER 2018 SECRETARY OF STATE

        3    RACE.   SIMILAR QUESTION, WHAT OPINIONS CAN YOU DRAW FROM THE

        4    RESULTS OF THIS ANALYSIS?

        5    A.   AGAIN, YOU CAN SEE THAT THE BLACK VOTE IS SPLITTING

        6    BETWEEN THE TWO DEMOCRATIC CANDIDATES.   THE WHITE VOTE IS

        7    SPLITTING ACROSS THE REPUBLICAN CANDIDATES.   WHEN YOU LOOK AT

        8    THAT BOTTOM LINE SUM-UP, AGAIN, ALMOST 90 PERCENT OF THE BLACK

        9    VOTERS ARE FAVORING ONE OF THE TWO DEMOCRATIC CANDIDATES.   ONLY

       10    15 PERCENT OF THE WHITE VOTERS ARE SUPPORTING ONE OF THE TWO

       11    DEMOCRATIC CANDIDATES.

       12         YOU CAN ALSO SEE THAT ONE OF THE DEMOCRATIC CANDIDATES IS

       13    WHITE AND ONE IS BLACK.   AND THE VOTING THERE IS BLACK VOTERS

       14    SHOW -- RATHER THAN SHOWING 90-PERCENT PREFERENCE FOR THE BLACK

       15    CANDIDATE, AS THEY DID IN THE OBAMA CONTEST, THE PREFERENCE

       16    HERE IS 56 PERCENT.   SO A LITTLE MORE THAN HALF FOR THAT

       17    CANDIDATE, AND THE OTHER 44 PERCENT ARE FAVORING EITHER THE

       18    OTHER DEMOCRAT OR REPUBLICAN, ALL OF WHICH ARE WHITE.   SO HERE

       19    THE BLACK VOTE IS SPLITTING FAIRLY CLOSE TO EVENLY BETWEEN THE

       20    BLACK CANDIDATE AND WHITE CANDIDATES.   BUT AGAIN, WITH REGARD

       21    TO PARTY, IT IS VERY COHESIVE.

       22    Q.   SO IN YOUR OPINION, DOES THIS RACE REFLECT A RACIALLY

       23    POLARIZED ELECTION?

       24    A.   NO, AGAIN, IT REFLECTS A PARTY POLARIZED ELECTION.

       25    Q.   IF YOU COULD FLIP TO THE NEXT PAGE THEN AND TAKE A LOOK AT

DR. J. ALFORD - DIRECT

2:20PM   1   THE NOVEMBER 2020 SENATE RACE.  DO WE SEE SOMETHING SIMILAR

2   HERE IN THIS RACE AS WELL?

3   A.   YES.  AGAIN, HERE YOU'VE GOT TWO DEMOCRATIC CANDIDATES,

4   AND YOU CAN SEE THAT THE VOTE IS SPLITTING BETWEEN THE TWO,

5   BETWEEN THE TWO CANDIDATES, BUT AGAIN, BLACK SUPPORT FOR

6   DEMOCRATS TOTAL IS QUITE COHESIVE.  WHITE SUPPORT IS COHESIVE

7   FOR THE SINGLE REPUBLICAN CANDIDATE.

8   Q.   SO IN YOUR OPINION, DO THE RACES EXAMINED BY DR. HANDLEY

9   SHOW RACIAL POLARIZATION?

10   A.   AGAIN, BOTH WITH REGARD TO THESE DETAILS, BUT MORE

11   BROADLY, SIMPLY BY LOOKING AT THAT, AGAIN, THAT SAME ISSUE OF

12   SORT OF WHETHER THIS IS PARTY OR RACE, I THINK IT CLEARLY

13   DEMONSTRATES THAT THERE IS PARTY POLARIZATION.

14   Q.   DR. ALFORD, HOW DO YOU DEFINE COHESION FOR PURPOSES OF A

15   RACIALLY POLARIZED VOTING ANALYSIS?

16   A.   PERSONALLY, I DEFINE COHESION -- COHESION IS -- COHESION

17   IS A CONTINUUM, SO THE BEST WAY TO DEFINE COHESION IS BY USING

18   A NUMBER THAT REPRESENTS HOW COHESIVE A PARTICULAR RESULT IS.

19   AND THAT NUMBER WILL VARY BETWEEN, IN, SAY, A TWO-PARTY

20   CONTEST, THAT NUMBER WILL VARY BETWEEN 50 PERCENT AND A HUNDRED

21   PERCENT.  AND IN A HUNDRED PERCENT, IT MEANS VOTERS ARE

22   PERFECTLY COHESIVE. THAT'S WHY WE CAN SAY THAT AT 98 PERCENT,

23   BLACK VOTERS ARE VERY, VERY COHESIVE IN THEIR SUPPORT OF A

24   DEMOCRATIC CANDIDATE.  AT 50 PERCENT IN A TWO-PARTY CONTEST, IT

25   REPRESENTS A ZERO COHESION.  IT MEANS VOTERS ARE AS NONCOHESIVE

2:22PM   1   AS YOU CAN POSSIBLY BE.  THEY ARE EVENLY SPLIT BETWEEN CHOICE

       2   ONE AND CHOICE TWO.  AND THAT'S WHY WHEN YOU SEE A NUMBER LIKE

       3   56 PERCENT, YOU MIGHT THINK, WELL, THAT IS PRETTY COHESIVE

       4   BECAUSE IT'S A LONG WAY FROM ZERO, BUT ZERO IS NOT 50 PERCENT.

       5   ZERO COHESION ISN'T 50 PERCENT -- NOT 50-PERCENT COHESION.  SO

       6   THAT IS VERY CLOSE TO NO COHESION AT ALL.

       7   Q.  ARE YOU AWARE OF AN INDUSTRY STANDARD FOR WHEN IT IS

       8   CONSIDERED COHESIVE VERSUS NOT COHESIVE?

       9   A.  I'M NOT AWARE OF ANY POLITICAL SCIENCE STANDARD FOR

      10   TURNING THAT CONTINUOUS RANGE INTO A DICHOTOMY OR ANY

      11   PARTICULAR REASON WHY YOU WOULD WANT TO TURN THAT INTO A

      12   DICHOTOMY.  I'M AWARE THAT THE COURT DOES WANT TO TURN THAT

      13   INTO A DICHOTOMY, THAT IT WANTS TO MAKE A DECISION ABOUT THAT

      14   SOMETHING IS COHESIVE OR NOT, BUT COURTS HAVE NOT, AT LEAST IN

      15   MY EXPERIENCE OVER THE LAST 30 ODD YEARS, HAVE NOT OFFERED

      16   ANYTHING CLOSE TO A CLEAR STANDARD FOR WHAT THAT MIGHT BE.

      17   Q.  DR. ALFORD, DID YOU REVIEW ANY ADDITIONAL ELECTIONS

      18   OUTSIDE THOSE REVIEWED BY DR. HANDLEY?

      19   A.  YES.  SO, AGAIN, COVERING THE SAME TIME PERIOD, DR.

      20   HANDLEY SELECTED ONLY THE RACIALLY CONTESTED ELECTIONS.  I

      21   FILLED IN WITH ALL OF THE OTHER ELECTIONS THAT WERE CONTESTED.

      22   SO NEITHER OF US ANALYZED NONCONTESTED ELECTIONS BECAUSE THERE

      23   IS NOTHING THERE TO ANALYZE, BUT I DID ANALYZE THE REMAINING

      24   CONTESTED ELECTIONS, INCLUDING THE ONES THAT SHE EXCLUDED AS

      25   NOT BEING RACIALLY CONTESTED.

2:24PM    1    Q.   WERE THESE STATEWIDE ELECTIONS?

          2    A.   YES.   SO THEY ARE FOR THE SAME SORTS OF OFFICES, AGAIN,

          3    MANY TIMES FOR THE SAME OFFICES THAT SHE MIGHT HAVE INCLUDED IN

          4    A DIFFERENT ELECTION YEAR.   SO IT'S THE SAME -- WE ARE USING

          5    THE SAME UNIVERSE OF ELECTIONS TO DRAW FROM, AND I'M JUST

          6    BRINGING IN A FEW ADDITIONAL CONTESTED ELECTIONS THAT WEREN'T

          7    RACIALLY CONTESTED.

          8    Q.   HOW CAN YOU TELL IF THERE'S RACIAL POLARIZATION IF THESE

          9    ARE NOT RACIALLY CONTESTED ELECTIONS?

         10    A.   AGAIN, YOU CAN LOOK AT THE DIFFERENCE IN THE WAY VOTERS

         11    VOTE.   IN THESE ELECTIONS THE NONRACIALLY CONTESTED ELECTIONS

         12    ARE OFTEN COMMONLY USED AS EVIDENCE IN THESE CASES BECAUSE THEY

         13    DO PROVIDE INFORMATION ABOUT CANDIDATE PREFERENCE.   SO THE

         14    CANDIDATE PREFERENCE OF BLACK VOTERS DOESN'T NECESSARILY HAVE

         15    TO BE A BLACK CANDIDATE.   THEY CAN SHOW A PREFERENCE FOR WHITE

         16    CANDIDATES.   SO THESE ELECTIONS ARE VALID ELECTIONS AND DO

         17    PROVIDE INFORMATION ABOUT THE PREFERRED CANDIDATE OF BOTH BLACK

         18    AND WHITE VOTERS.

         19    Q.   CAN YOU TURN TO TABLE 4 ON PAGE 13 OF YOUR REPORT?

         20    A.   YES.

         21    Q.   AND CAN YOU DESCRIBE WHAT THIS TABLE REFLECTS?

         22    A.   SO THIS IS -- THIS TABLE IS THOSE ADDITIONAL ELECTIONS,

         23    SOME ELECTIONS FROM 2015 AND SOME ELECTIONS FROM 2019 THAT WERE

         24    NOT INCLUDED IN DR. HANDLEY'S REPORT BECAUSE THEY WEREN'T

         25    SUFFICIENTLY RACIALLY CONTESTED.   AND THEN THE ANALYSIS IS THE

DR. J. ALFORD - DIRECT

2:25PM

1    SAME ANALYSIS AS WAS REPORTED EARLIER FOR THE RACIALLY

2    CONTESTED ELECTIONS.

3    Q.   AND WHAT CONCLUSIONS DID YOU DRAW FROM THIS ANALYSIS?

4    A.   AGAIN, WE -- LOOKING JUST AT THAT -- FIRST, JUST AT THE

5    DEMOCRATIC SUM CATEGORY, YOU CAN SEE THAT THE -- THAT BLACKS

6    ARE VOTING, AGAIN, OVERWHELMINGLY -- ARE OVERWHELMINGLY

7    COHESIVE IN FAVOR OF THE DEMOCRATIC CANDIDATE, EVEN THOUGH NONE

8    OF THESE DEMOCRATIC CANDIDATES ARE BLACK CANDIDATES.  THEY ARE

9    WHITE CANDIDATES.  AND WHITE VOTERS CONTINUE TO VOTE AT VERY

10   HIGH LEVELS FOR THE REPUBLICAN CANDIDATES, EVEN THOUGH THEY ARE

11   NOT DOING THAT IN REACTION TO THE FACT THAT THE DEMOCRATIC

12   CANDIDATE IS BLACK, BECAUSE THE DEMOCRATIC CANDIDATE IS WHITE.

13        SO IF WHITE VOTERS WERE VOTING CONSISTENTLY IN THE CONTEST

14   THAT DR. HANDLEY PROVIDED, BECAUSE THEY DIDN'T WANT TO SUPPORT

15   A BLACK CANDIDATE, WHICH MEANS THEY WOULD HAVE TO VOTE

16   REPUBLICAN SINCE THE REPUBLICAN CANDIDATE WAS THE WHITE

17   CANDIDATE, HERE THAT'S NO LONGER OPERATING.  WHITE VOTERS CAN

18   VOTE FOR A WHITE CANDIDATE WHETHER THEY VOTE DEMOCRATIC OR

19   REPUBLICAN, BUT THEY CONTINUE TO VOTE -- AGAIN, AS WE SEE, THEY

20   CONTINUE TO BE -- TO OVERWHELMINGLY FAVOR THE REPUBLICANS, EVEN

21   IF THE DEMOCRATIC CANDIDATE IS A WHITE CANDIDATE, AS THE

22   REPUBLICAN CANDIDATE IS.

23   Q.   DR. ALFORD, I NOTICE THAT THERE ARE SOME BLACK CANDIDATES

24   IN THESE ELECTIONS, SO CAN YOU EXPLAIN THAT AND WHY YOU STILL

25   BELIEVE THEY ARE NOT RACIALLY CONTESTED ELECTIONS?

DR. J. ALFORD - DIRECT

2:27PM

1    A.   SO AT LEAST AS I UNDERSTAND DR. HANDLEY'S EXPLANATION, SHE

2    DIDN'T BELIEVE THAT THE BLACK CANDIDATES HERE, BOTH BECAUSE OF

3    THE VERY LOW LEVELS OF SUPPORT THEY DREW AND MAYBE SOME OTHER

4    ASPECTS OF THEIR CAMPAIGN OR THEIR CAMPAIGN FUNDING, SHE

5    BASICALLY DIDN'T THINK OF THEM AS SERIOUS CANDIDATES.  SO IT'S

6    NOT UNCOMMON TO ADDRESS THE ISSUE OF HOW PROBATIVE A NONSERIOUS

7    CANDIDATE IS.  BUT THEY ARE ON THE BALLOT, AND THEY ARE BLACK

8    CANDIDATES.

9    Q.   SO WERE YOU JUST FOLLOWING WHAT DR. HANDLEY WAS DOING?

10   A.   I GUESS I'M -- I'M INCLUDING ALL THE ELECTIONS THAT SHE

11   DIDN'T INCLUDE.  AND SO I'M NOT SAYING THAT THESE ARE NOT

12   RACIALLY CONTESTED ELECTIONS.  I'M JUST SAYING THESE ARE

13   ELECTIONS THAT SHE DIDN'T BELIEVE WERE RACIALLY CONTESTED.

14   Q.   THANK YOU.  I WANT TO CALL YOUR ATTENTION SPECIFICALLY TO

15   THE JOHN BEL EDWARD RACES.  DO YOU HAVE ANY OPINION

16   SPECIFICALLY ABOUT THESE RACES?

17   A.   IT IS CLEAR THAT JOHN BEL EDWARDS DRAWS A HIGHER LEVEL OF

18   WHITE SUPPORT THAN OTHER WHITE REPUBLICAN CANDIDATES.  AND I

19   THINK -- I MEAN, HE OBVIOUSLY WAS ABLE TO SUCCESSFULLY NAVIGATE

20   THE ELECTORAL SYSTEM OF LOUISIANA TO BECOME GOVERNOR AND BE

21   REELECTED AS GOVERNOR.  HE WAS IN MANY WAYS, I THINK, KIND OF A

22   PROTOTYPICAL DEMOCRATIC CANDIDATE IN THE ELECTION ENVIRONMENT

23   THAT HE IS RUNNING IN.  HE'S, YOU KNOW, QUITE CONSERVATIVE ON

24   SOME HOT BUTTON ISSUES, LIKE ABORTION AND GUN CONTROL, SO HE'S

25   NOT A SORT OF PROTOTYPICAL URBAN LIBERAL CANDIDATE.  AND HE WAS

2:29PM    1    ABLE TO PARLAY THAT IDEOLOGICAL MODERATION I THINK INTO SOME

2    SUCCESSFUL RUNS FOR GOVERNOR.

3    Q.   OKAY.   CAN YOU NOW SWITCH TO SECTION C OF YOUR REPORT AT

4    THE BOTTOM OF PAGE 13?

5    A.   YES.

6    Q.   CAN YOU BRIEFLY DESCRIBE WHAT ANALYSIS YOU ARE PERFORMING

7    HERE?

8    A.   SO THIS IS KIND OF ANOTHER VARIATION.

9    Q.   ACTUALLY, DR. ALFORD, CAN WE PLEASE SWITCH TO PAGE 14,

10   WHERE THE BODY OF THIS IS.   PLEASE CONTINUE.

11   A.   THIS IS KIND OF ANOTHER TWIST ON THIS.   THESE ARE

12   ELECTIONS THAT ARE NOT PARTY CONTESTED.   SO THESE ARE ELECTIONS

13   WHERE THERE WERE -- BOTH OF THE CANDIDATES IN THE ELECTION

14   HAPPENED TO BE REPUBLICANS.   IN A MAJORITY REPUBLICAN STATE,

15   THAT SOMETIMES HAPPENS.   YOU RARELY -- YOU WOULD NOT EXPECT

16   NECESSARILY TO SEE TWO DEMOCRATIC CANDIDATES AND NO REPUBLICAN,

17   GIVEN THAT IT'S A REPUBLICAN MAJORITY STATE.   SO.

18        THERE ARE THREE ELECTIONS WHERE THE ONLY CANDIDATES

19   CONTESTING THE ELECTION WERE REPUBLICAN, SO THESE ARE THE

20   EQUIVALENT OF WHAT WOULD BE A REPUBLICAN PRIMARY IN THE STATE

21   THAT RAN A TRADITIONAL PRIMARY SYSTEM.

22        SO HERE WE GET A CHANCE TO SEE, WHEREAS IN THE -- WHEN WE

23   CAN COMPARE RACIALLY TO NONRACIALLY CONTESTED ELECTIONS, WE CAN

24   SEE WHAT DIFFERENCE THE RACE OF A CANDIDATE MAKES TO THE

25   BEHAVIOR OF VOTERS.   HERE WE CAN SEE WHAT DIFFERENCE THE SORT

2:30PM   1   OF VARIATION OR LACK OF VARIATION IN PARTY MAKES TO THE

         2   BEHAVIOR OF VOTERS.

         3    Q.   AND WHAT CONCLUSIONS CAN YOU DRAW FROM THAT BASED UPON

         4   YOUR ANALYSIS OF THESE ELECTIONS?

         5    A.   AGAIN, YOU CAN SEE THAT THESE LOOK DRAMATICALLY DIFFERENT

         6   THAN ALL THE OTHER ELECTIONS WE HAVE LOOKED AT.  SO AGAIN, IF

         7   PARTY IS AN IMPORTANT CUE THAT IS DRIVING POLARIZATION, THEN MY

         8   PREDICTION WOULD BE, IF THE ELECTIONS AREN'T PARTY CONTESTED,

         9   THEY WON'T BE POLARIZED.  AND THAT'S EXACTLY WHAT THE CASE IS

        10   HERE.  THESE ELECTIONS ARE NOT POLARIZED.

        11        I MEAN, LOOK AT THE FIRST ELECTION.  BLACK VOTERS ARE

        12   GIVING COHESIVE SUPPORT SIMILAR TO THE SUPPORT THAT IN OTHER

        13   ELECTIONS THEY MAY HAVE GIVEN, FOR EXAMPLE, TO A BLACK

        14   DEMOCRAT, IN THIS CASE, COHESIVE SUPPORT TO A WHITE REPUBLICAN,

        15   TO JOHN NEELY KENNEDY.  AND AGAIN, IF ELECTIONS WERE RACIALLY

        16   POLARIZED, THEN WHITE VOTERS SHOULD BE EQUALLY COHESIVE IN

        17   OPPOSITION TO KENNEDY, BECAUSE KENNEDY IS THE PREFERRED

        18   CANDIDATE OF BLACK VOTERS IN LOUISIANA.  IN FACT, WHITE VOTERS

        19   OVERWHELMINGLY SUPPORT THE SAME CANDIDATE AS BLACK VOTERS.  SO

        20   WHITE VOTERS OBVIOUSLY ARE NOT REACTING TO SOMETHING ABOUT THE

        21   KENNEDY CAMPAIGN OR THE NATURE OF KENNEDY'S SUPPORT.  THEY ARE

        22   NOT TRYING TO VETO THE CHOICE OF BLACK VOTERS HERE.  THEY HAVE

        23   THE SAME CHOICE AS BLACK VOTERS.

        24        WHEN YOU LOOK AT THE NOVEMBER 2015 ATTORNEY GENERAL

        25   CONTEST, HERE YOU SEE A MODEST BUT NOT REALLY COHESIVE SUPPORT

DR. J. ALFORD - DIRECT

2:32PM  1    AMONG BLACK VOTERS FOR CALDWELL OVER LANDRY, KIND OF A 60/40

         2    SPLIT, AND A 60/40 SPLIT, NONCOHESIVE SPLIT, AMONG WHITE VOTERS

         3    IN THE OPPOSITE DIRECTION.

         4         SO THAT'S MODEST, AND I THINK IT PROBABLY -- IT COULD VERY

         5    WELL REFLECT A MODEST PARTISAN VOTING PATTERN BECAUSE CALDWELL

         6    WAS PREVIOUSLY ELECTED TO THAT OFFICE AS A DEMOCRAT AND THEN

         7    SWITCHED PARTIES AND RAN AS A REPUBLICAN AND LOST.

         8         AND THEN IN THE COMMISSIONER OF INSURANCE ELECTION, THE

         9    BLACK VOTE IS COMPLETELY UNCOHESIVE, AS IS WHITE VOTE.  BLACK

        10    VOTERS AND WHITE VOTERS ARE BASICALLY SPLITTING EVENLY BETWEEN

        11    THE TWO CANDIDATES.  SO NONE OF THESE THREE ELECTIONS LOOK

        12    ANYTHING LIKE THE PARTY CONTESTED ELECTIONS.

        13    Q.   DR. ALFORD -- WE CAN TAKE THIS DOWN NOW -- IS PARTY

        14    POLARIZATION, IN YOUR OPINION, INCREASING IN THE UNITED STATES?

        15    A.   PARTY POLARIZATION IS INCREASING IN THE UNITED STATES AND

        16    HAS BEEN FOR SOME TIME.  WE HAD -- I HAVE BEEN AROUND A LONG

        17    TIME, SO WHEN I STARTED STUDYING POLITICS, POLITICAL SCIENCE

        18    WAS VERY ANIMATED BY THE FACT THAT THE PARTIES WEREN'T VERY

        19    POLARIZED IN THE U.S.  THERE WAS AN ARTICLE COMPARING THE TWO

        20    PARTIES AS TWEEDLE DEE AND TWEEDLE DUM, AND EUROPEANS LOOKED

        21    DOWN ON THE U.S. BECAUSE WE DIDN'T HAVE REALLY DISTINCTIVE

        22    IDEOLOGICAL PARTIES LIKE EUROPE HAD.  AND AMERICAN POLITICAL

        23    SCIENCE ASSOCIATION ACTUALLY ISSUED A REPORT CALLED "TOWARD A

        24    MORE RESPONSIVE TWO-PARTY SYSTEM," SUGGESTING THAT THERE MIGHT

        25    BE THINGS WE COULD DO TO MAKE THE PARTIES MORE DIFFERENT, MORE

2:34PM   1    IDEOLOGICAL AND MORE APPROPRIATE ADVERSARIES.  I DOUBT THAT

         2    THAT HAD ANYTHING TO DO WITH WHAT HAPPENED OVER THE ENSUING

         3    DECADES, BUT WE HAVE GONE FROM A SYSTEM WHERE THE PARTIES WERE

         4    VERY CENTRIST TO A SITUATION WHERE THE PARTIES ARE VERY

         5    POLARIZED.

         6         SO THE PARTIES ARE POLARIZED, THE PARTY REPRESENTATIVES IN

         7    CONGRESS ARE DRAMATICALLY POLARIZED, AS WE SEE IN THE

         8    DYSFUNCTION OF THE GOVERNMENT, VOTERS ARE POLARIZED, AS WE SEE

         9    IN THE WAY VOTERS CAST VOTES BETWEEN THE PARTIES.  AND IT ISN'T

        10    JUST A POLARIZATION -- IT IS PARTLY A POLARIZATION ABOUT

        11    IDEOLOGY, BUT IT IS ALSO WHAT POLITICAL SCIENTISTS CALL

        12    AFFECTIVE POLARIZATION.

        13         SO THE DEGREE TO WHICH PEOPLE DISLIKE PEOPLE OF THE

        14    OPPOSITE PARTY HAS GROWN VERY SUBSTANTIALLY OVER THE LAST 30

        15    YEARS.  SO MOST DEMOCRATS DON'T LIKE THE DEMOCRATIC PARTY ANY

        16    BETTER THAN THEY DID IN 1970, BUT THEY DISLIKE THE REPUBLICAN

        17    PARTY A LOT MORE THAN THEY DISLIKED THE REPUBLICAN PARTY IN

        18    1970, AND THE SAME IS TRUE FOR REPUBLICANS.

        19    Q.   AND IN WHAT DIRECTION DO YOU SEE, IN YOUR OPINION, RACIAL

        20    POLARIZATION GOING?

        21    A.   AGAIN, I'VE BEEN AROUND FOR A LONG TIME, AND A LOT OF THAT

        22    TIME I'VE LIVED IN THE SOUTH.  AND RACIAL POLARIZATION WAS, AT

        23    THE TIME OF THE PASSAGE OF THE VOTING RIGHTS ACT, WAS PRETTY

        24    DRAMATIC, AND NOT JUST IN THE SOUTH.  FRANKLY, IN A LOT OF

        25    PLACES THAT WERE NOT COVERED JURISDICTIONS, FOR EXAMPLE, RACIAL

2:35PM    1    POLARIZATION WAS STILL QUITE STRONG.  IT REMAINS STRONG IN SOME

          2    PLACES TODAY.  I MEAN, I SAW A RECENT ANALYSIS FOR ELECTIONS IN

          3    MASSACHUSETTS, I THINK, THAT SHOWED THAT IN SOME LOCAL

          4    ELECTIONS THERE WAS STILL FAIRLY DRAMATIC RACIAL POLARIZATION.

          5        BUT ON A WHOLE -- IN A VERY LARGE VARIETY OF WAYS, RACIAL

          6    POLARIZATION HAS DIMINISHED, AND I THINK IT'S DIMINISHED AND WE

          7    CAN SEE THAT IN ALL KINDS OF SURVEY MEASURES.  WE CAN ALSO JUST

          8    SEE IT IN THE REAL WORLD.

          9        I TAUGHT AT THE UNIVERSITY OF GEORGIA IN THE EARLY 1980S,

         10    AND ONE OF THE STUDENTS IN INTRO AMERICAN WAS A YOUNG FOOTBALL

         11    PLAYER NAMED HERSCHEL WALKER.  AND I WAS THINKING ABOUT THIS

         12    RECENTLY.  IF HE HAD APPROACHED ME AND SAID, I'M THINKING ABOUT

         13    RUNNING FOR SENATOR IN GEORGIA, I THINK I WOULD HAVE ADVISED

         14    HIM TO MAYBE NOT LIVE IN GEORGIA, BUT FIND ANOTHER STATE,

         15    BECAUSE I THINK IT WOULD HAVE BEEN A DIFFICULT RUN.  IF HE HAD

         16    SAID, AND ALSO, I PLAN TO RUN AS A REPUBLICAN, I WOULD HAVE

         17    TOLD HIM THAT HE WAS NOT GOING TO GET NOMINATED IN THE

         18    REPUBLICAN PARTY.  AND IN THE MOST RECENT SENATE ELECTION --

         19        **MR. CAMPBELL-HARRIS:**  YOUR HONOR, I DON'T MEAN TO

         20    INTERRUPT, BUT I'M GOING TO MOVE TO STRIKE THIS.  THIS IS

         21    COMPLETELY IRRELEVANT TO LOUISIANA.  HE IS TALKING ABOUT

         22    GEORGIA.  I DON'T SEE HOW THIS IS RELEVANT TO THE STATE OF

         23    LOUISIANA WHATSOEVER.

         24        **THE COURT:**  WELL, IT'S NOT TERRIBLY RELEVANT, BUT THE

         25    COURT FINDS IT HELPFUL TO UNDERSTANDING THE ISSUES, SO I'M

2:37PM    1    GOING TO OVERRULE YOUR OBJECTION.

          2    A.   SO MY POINT BEING, IT'S DIFFICULT FOR ME TO LOOK AT THAT

          3    ELECTION IN GEORGIA.  I MEAN, I CELEBRATE THAT ELECTION IN

          4    GEORGIA.  THIS IS A BLACK CANDIDATE WHO BASICALLY RUNS THE

          5    REPUBLICAN PRIMARY AGAINST WHITE CANDIDATES, INCLUDING A WHITE

          6    CANDIDATE WHO I KNOW PERSONALLY AND I WOULD HAVE PUT MONEY ON

          7    IN THE BEGINNING, A LONG-TERM VERY CONSERVATIVE WHITE

          8    REPUBLICAN WHO HAD LOTS OF PUBLIC SUPPORT AND HAD THE

          9    ENDORSEMENT OF THE SHERIFF ASSOCIATION, COUNTY ASSOCIATIONS,

         10    AND BASICALLY HAD WORKED REPUBLICAN POLITICS A LONG TIME AND

         11    DIDN'T EVEN COME IN CLOSE, DIDN'T EVEN MAKE IT INTO THE

         12    20-PERCENT RANGE AGAINST HERSCHEL WALKER.  AND THAT'S IN A

         13    PARTY THAT'S OVERWHELMINGLY WHITE IN GEORGIA AND OVERWHELMINGLY

         14    CONSERVATIVE.

         15         SO YOU HAD THE DEMOCRATIC PARTY NOMINATED A BLACK

         16    CANDIDATE, THE REPUBLICAN PARTY NOMINATED A BLACK CANDIDATE,

         17    AND GEORGIA ELECTED A BLACK SENATOR.  I ALSO WOULD SAY I THINK

         18    THEY ELECTED THE CORRECT CANDIDATE IN THAT CASE.

         19         BUT THAT, AGAIN, TO ARGUE THAT GEORGIA IS MORE RACIALLY

         20    POLARIZED THAN IT WAS WHEN I WAS THERE IN THE 1980S, GIVEN THE

         21    VOTING AND ELECTION, THERE'S JUST A REALITY ON THE GROUND.  I

         22    THINK IS -- I DON'T THINK WE CAN SAY THAT THERE HASN'T BEEN

         23    PROGRESS MADE IN TERMS OF THE DEGREE TO WHICH RACE DRIVES

         24    AMERICAN BEHAVIOR, AMERICAN POLITICAL BEHAVIOR.

         25    Q.   DR. ALFORD, SIR, TO PULL BACK TO YOUR OPINIONS IN YOUR

DR. J. ALFORD - DIRECT

2:38PM    1    REPORT IN THIS CASE NOW, DID YOU DO ANY ANALYSIS TO SUPPORT

          2    YOUR OPINIONS ABOUT THE TREND OF RACIAL POLARIZATION?

          3    A.   AGAIN, THERE'S LOTS OF CONTROVERSY ABOUT THIS, AND I

          4    PROVIDED TWO PIECES OF INFORMATION THAT I SIMPLY TOOK FROM

          5    ARTICLES OR SOURCES THAT HAVE BEEN CITED BY PLAINTIFFS IN

          6    ARGUING THAT RACIAL POLARIZATION WAS MOVING UP IN THE UNITED

          7    STATES RATHER THAN DOWN.

          8    Q.   ACTUALLY, CAN I STOP YOU?  I WANT TO PULL IT UP ON THE

          9    SCREEN SO THE COURT CAN SEE IT.

         10          MR. TUCKER:  SO CAN WE PUT UP FIGURE 1 ON PAGE 16.

         11    BY MR. TUCKER:

         12    Q.   NOW, IS THIS ONE OF THE STUDIES YOU ARE REFERRING TO?

         13    A.   YES, THIS IS A STUDY THAT HAS BEEN CITED REPEATEDLY BY

         14    PLAINTIFFS, A STUDY THAT ADDRESSES -- BY TWO POLITICAL

         15    SCIENTISTS THAT ADDRESSES THIS ISSUE ABOUT WHY DEMOCRATS LOST

         16    THE SOUTH.  SO IT GIVES YOU TWO IMPORTANT PIECES OF

         17    INFORMATION.

         18          THIS IS ABOUT -- THE QUESTION IS WHETHER YOU WOULD BE

         19    WILLING TO VOTE FOR A BLACK CANDIDATE FOR PRESIDENT.  AND AS

         20    YOU CAN SEE IN THE 1960S, THAT THE RED LINE IS THE SOUTH AND

         21    THE BLUE LINE IS THE NON-SOUTH.  60 PERCENT OF VOTERS IN THE

         22    NON-SOUTH OPENLY ADMITTED IN A SURVEY, DESPITE WHATEVER SOCIAL

         23    PRESSURE OR WHATEVER, THE MAJORITY OF THE RESPONDENTS INDICATED

         24    THEY WOULD NOT BE WILLING TO VOTE FOR -- THESE ARE WHITE

         25    RESPONDENTS -- TO VOTE FOR A BLACK CANDIDATE FOR PRESIDENT.  IN

DR. J. ALFORD - DIRECT

2:40PM   1   THE NORTH, IN SOMETHING CLOSE TO 90 PERCENT OF WHITE VOTERS IN

         2   THE SOUTH SAID THEY WOULD NOT VOTE FOR A BLACK CANDIDATE FOR

         3   PRESIDENT.

         4        BY THE TIME WE GET TO 2000, AND IN THE PERIOD SINCE, THERE

         5   IS NO REAL DIFFERENCE BETWEEN THE NORTH AND THE SOUTH.  AND

         6   ROUGHLY 90 PERCENT OF VOTERS IN BOTH AREAS INDICATE THEY WOULD

         7   VOTE FOR A BLACK CANDIDATE FOR PRESIDENT.  AND I THINK YOU CAN

         8   SAY, WELL, SOME OF THIS IS SORT OF CHANGING SOCIAL NORMS.  SOME

         9   PEOPLE SAY, WELL, IT IS BECAUSE IT'S JUST NOT POLITICALLY

        10   CORRECT TO ADMIT YOU WOULDN'T VOTE FOR A BLACK PRESIDENT NOW,

        11   BUT IT WAS THEN.  IF THAT IS ALL THE CHANGE, THAT IS A CHANGE.

        12   RIGHT?  IF IT'S THE CASE THAT FRANK RACIAL DISCRIMINATION IS NO

        13   LONGER SOMETHING PEOPLE WANT TO ADMIT TO PUBLICLY, THAT IS A

        14   CHANGE, MAYBE NOT A HUNDRED PERCENT CHANGE, BUT IT'S A CHANGE.

        15   IF ALL THIS WAS WAS WHAT ECONOMISTS CALL CHEAP TALK, THEN I

        16   THINK YOU WOULD HAVE DIFFICULTY EXPLAINING HOW BARACK OBAMA WAS

        17   ELECTED PRESIDENT.

        18        IT IS HARD TO IMAGINE BARACK OBAMA COULD BE ELECTED

        19   PRESIDENT IN 1960, WHEN THE MAJORITY OF PEOPLE EVERYWHERE IN

        20   THE COUNTRY SAID THEY WOULD NOT VOTE FOR A BLACK CANDIDATE FOR

        21   PRESIDENT.  THE ERA IN WHICH OBAMA IS ELECTED IS AN ERA IN

        22   WHICH 90 PERCENT PLUS OF WHITES, ADULT WHITES, INDICATE THEY

        23   WOULD VOTE FOR A BLACK CANDIDATE FOR PRESIDENT, AND THE

        24   MAJORITY OF THEM DID.

        25   Q.  CAN WE TURN NOW TO FIGURE 2 ON PAGE 17.  AND CAN YOU

DR. J. ALFORD - DIRECT

2:41PM    1    BRIEFLY SUMMARIZE WHAT THIS FIGURE REFLECTS?

2    A.   SO THIS IS SORT OF ANOTHER MAJOR OF PEOPLE'S RACIAL

3    OPINIONS, AND IT'S APPLIED TO A BEHAVIOR.  IT'S NOT A POLITICAL

4    BEHAVIOR IN THIS CASE, ALTHOUGH INTERRACIAL MARRIAGE IS, OF

5    COURSE, BOTH A LEGAL AND A CONSTITUTIONAL ISSUE EARLIER ON IN

6    THIS ERA.

7         AND HERE AGAIN, YOU CAN SEE THIS BEGINS IN THE LATE '60S,

8    EARLY '70S, BUT WHAT YOU CAN SEE IS AMONG WHITE ADULTS,

9    SOMETHING LIKE 75 TO 80 PERCENT DO NOT APPROVE OF INTERRACIAL

10    MARRIAGE.

11         AND AGAIN, BY THE END OF THE -- BY 2021, APPROVAL -- BOTH

12    WHITE AND BLACK ADULTS APPROVE OF INTERRACIAL MARRIAGE IS IN

13    THE 90-PERCENT RANGE.  SO A VERY SIMILAR SORT OF CHANGE OVER

14    TIME.

15         IN THAT SUBTABLE BELOW, YOU CAN SEE THAT -- WHERE THE

16    SOUTH WAS DISTINCTIVE IN ITS LOW LEVELS OF APPROVAL OF

17    INTERRACIAL MARRIAGE IN 1991, BY 2021, THE SOUTH IS NOT

18    DISTINCTIVE ANYMORE.  ALL REGIONS OF THE COUNTRY, MOST ADULTS

19    APPROVE, WHITE ADULTS APPROVE OF INTERRACIAL MARRIAGE.

20    Q.   DR. ALFORD, AREN'T THERE MORE CURRENT SOCIAL OR POLITICAL

21    ISSUES TO USE TO MEASURE RACIAL POLARIZATION, SUCH AS THINGS

22    LIKE CRIMINAL JUSTICE?

23    A.   SO THERE ARE A WHITE RANGE OF THINGS THAT YOU CAN USE TO

24    MEASURE THE KINDS OF ATTITUDES THAT MIGHT DRIVE VOTING BEHAVIOR

25    THAT MIGHT BE RACIALIZED.  SO I'M TAKING THESE FROM STUDIES

2:43PM  1    THAT HAVE BEEN CITED BY PLAINTIFFS AND ONES WHERE -- IN THE

        2    CASE OF THE INTERRACIAL MARRIAGE, ONE WHERE WE HAVE AT LEAST A

        3    BRIEF SORT OF COMPANION SERIES.  THE QUESTION ON INTERRACIAL

        4    MARRIAGE HISTORICALLY WAS ASKED ABOUT INTERRACIAL MARRIAGE.  IT

        5    WAS ALSO ASKED ABOUT MARRIAGE ACROSS DIFFERENT RELIGIOUS

        6    GROUPS, SO THE ISSUE ABOUT WHETHER A MARRIAGE THAT INVOLVED

        7    PEOPLE FROM TWO DIFFERENT RELIGIONS.

        8         THE TREND FOR INTERRELIGION MARRIAGE AND INTERRACIAL

        9    MARRIAGE ARE VERY SIMILAR.  THERE WAS WIDE OPPOSITION TO THAT

       10    EARLIER ON AND NOW VERY LITTLE OPPOSITION.

       11         MORE RECENTLY, SHANTO IYENGAR AND SOME PEOPLE AT STANFORD

       12    HAVE BEEN PULLING TOGETHER DATA ON PEOPLE'S OPINION ABOUT

       13    INTERPARTY MARRIAGE, THAT IS, WOULD YOU BE UPSET IF YOUR -- IF

       14    A DEAR RELATIVE MARRIED SOMEONE OF A DIFFERENT PARTY OR OF A

       15    DIFFERENT IDEOLOGY.  AND CONCERN ABOUT OR OPPOSITION TO

       16    INTERPARTY MARRIAGE HAS NOT BEEN GOING DOWN.  IT HAS BEEN GOING

       17    UP.  SO PEOPLE ARE NOW MUCH MORE CONCERNED ABOUT THEIR -- ABOUT

       18    CLOSE RELATIVES, CHILDREN OR CLOSE RELATIVES MARRYING SOMEONE

       19    OF A DIFFERENT PARTY THAN THEY ARE IF THEY ARE MARRYING SOMEONE

       20    OF A DIFFERENT RELIGION OR A DIFFERENT RACE.  I JUST FIND THAT

       21    FASCINATING.

       22         AND AGAIN, IT'S AN INDICATION OF THE FACT THAT OUR PARTY

       23    POLARIZATIONS HAVE GONE UP NOT JUST IN ELECTIONS BUT IN EVERY

       24    ASPECT.  THERE ARE SOME VERY GOOD STUDIES THAT SHOW THE

       25    TENDENCY OF DEMOCRATS TO SEEK OUT NEIGHBORHOODS THAT ARE MOSTLY

2:45PM    1    DEMOCRATIC WHEN THEY ARE MOVING, AND REPUBLICANS TO SEEK OUT

2    REPUBLICAN NEIGHBORHOODS HAS GONE UP DRAMATICALLY.  SO WE SORT

3    BY RESIDENCE.  OUR PARTISAN POLARIZATION IS NOT JUST ABOUT

4    ELECTIONS, ALTHOUGH THAT IS PROBABLY THE MOST SALIENT EXAMPLE,

5    BUT IT AFFECTS OTHER ASPECTS OF LIFE.

6         AND WHEN YOU TALK TO PEOPLE -- I'VE INTERVIEWED PEOPLE

7    ABOUT THIS ISSUE, AND WHAT'S INTERESTING IS HOW SIMILAR THE

8    DISCUSSION IS ABOUT PARTY TO WHAT DISCUSSION WOULD HAVE BEEN

9    ABOUT RACE, SAY, 40 YEARS AGO.  SO ONE OF THE BIG ISSUES FOR

10    PARENTS IS, YOU KNOW, THEY ALWAYS START BY SAYING MARRIAGE IS

11    DIFFICULT ENOUGH, WHICH I THINK IS A GOOD OBSERVATION.  AND

12    THEN WHEN YOU ASKED THAT IN PREVIOUS ERAS ABOUT INTERRELIGION

13    OR INTERRACE, THEY WOULD JUST SAY IT RAISES QUESTIONS FOR -- IT

14    MAKES LIFE MORE DIFFICULT, AND IT WILL MAKE THE CHILDREN'S

15    LIVES MORE DIFFICULT OR MORE COMPLICATED.

16         ONE OF THE FIRST THINGS PARENTS WANT TO -- ARE CONCERNED

17    ABOUT IS HOW THE CHILDREN, IF THEIR DAUGHTER MARRIES A

18    REPUBLICAN AND THEY ARE A DEMOCRATIC FAMILY, THEY WANT THE

19    COUPLE TO THINK ABOUT HOW THEY ARE GOING TO RAISE THEIR

20    CHILDREN.  ARE THEY GOING TO RAISE THEM AS DEMOCRATS OR ARE

21    THEY GOING TO RAISE THEM AS REPUBLICANS?  THAT'S JUST AN ISSUE,

22    AS FAR AS WE CAN TELL, THAT WAS SIMPLY NOT ON PEOPLE'S RADAR 20

23    YEARS AGO, BUT NOW IT'S SOMETHING THAT PEOPLE THINK VERY

24    SERIOUSLY ABOUT.

25    Q.  DR. ALFORD, JUST A COUPLE MORE QUESTIONS.  SOME OF THE

DR. J. ALFORD - DIRECT

2:46PM

1  PLAINTIFFS' EXPERTS IN THIS CASE HAVE CRITICIZED YOUR OPINIONS

2  SAYING THAT YOU CAN'T COMPLETELY SEPARATE RACE AND POLITICS.

3  DO YOU HAVE ANY RESPONSE TO THOSE CRITICISMS?

4  A.  I THINK THE ANALYSIS PRESENTED HERE BY DR. HANDLEY AND

5  SUPPLEMENTED NARROWLY BY MYSELF DOES ALLOW YOU TO SEPARATE

6  THOSE TWO CUES, RIGHT?  IN A CONTEST WHERE YOU HAVE CANDIDATES,

7  THERE ARE CANDIDATE CUES, AND THOSE CUES INCLUDE CANDIDATE RACE

8  AND CANDIDATE PARTY.  AND SO ANALYTICALLY WE CAN SEPARATE THEM,

9  AND I DON'T THINK THE RESULTS ARE IN DISPUTE HERE.  RIGHT?  THE

10  RESULTS SHOW THAT THE POLARIZATION BY PARTY IS DRAMATIC, AND

11  THAT THE POLARIZATION BY THE RACE OF THE CANDIDATES JUST ISN'T.

12  IT ISN'T THE CAUSE OF THAT -- YOU CAN'T ATTRIBUTE THAT

13  POLARIZATION TO RESPONDING DIFFERENTLY, WILLINGNESS TO SUPPORT

14  OR NOT SUPPORT A CANDIDATE BASED ON THEIR RACE, AND THAT'S JUST

15  WHAT THIS SURVEY SHOWS ABOUT WILLINGNESS TO SUPPORT A BLACK

16  CANDIDATE FOR PRESIDENT, FOR EXAMPLE.

17  Q.  DID YOU REVIEW A COPY OF DR. BURCH'S SUPPLEMENTAL REPORT

18  IN THIS CASE?

19  A.  I DID.

20  Q.  AND YOU RECALL DR. BURCH CITING A NUMBER OF DIFFERENT

21  ARTICLES IN THAT REPORT?

22  A.  I WILL SAY THIS.  THE FIRST THING THAT I REMEMBER FROM DR.

23  BURCH'S REPORT IS SOMETHING THAT I COMPLETELY AGREE WITH AND I

24  THINK IS VERY IMPORTANT TO REMEMBER HERE.  SO THE FIRST THING

25  DR. BURCH SAYS IN RESPONSE TO MY ANALYSIS IS, FIRST OF ALL,

DR. J. ALFORD - DIRECT

2:48PM  1    LET'S GET THIS OUT OF THE WAY.  THIS DOESN'T MATTER.  OKAY?  IT

        2    JUST DOESN'T MATTER WHETHER THIS POLARIZATION IS ABOUT PARTY OR

        3    WHETHER THE POLARIZATION IS ABOUT RACE.  IT DOESN'T MATTER

        4    WHETHER THE RACE OF THE CANDIDATE HAS ANY EFFECT AT ALL BECAUSE

        5    THE ISSUE HERE, THE LEGAL ISSUE HERE IS JUST ARE BLACKS AND

        6    WHITES VOTING DIFFERENTLY.  AND SO SORT OF AT THAT POINT, FULL

        7    STOP, WE ARE IN COMPLETE AGREEMENT.

        8        I DON'T KNOW -- I'M NOT A LAWYER.  THANKFULLY, I'M NOT A

        9    FEDERAL JUDGE.  SO IF THE ISSUE HERE, IF THE QUESTION HERE IS

       10    SORT OF THE QUESTION BRENNAN FRAMED, ARE BLACKS AND WHITES

       11    VOTING DIFFERENTLY, THEN DR. BURCH IS EXACTLY CORRECT, AND I

       12    AGREE A HUNDRED PERCENT.  IF THAT DOESN'T MAKE ANY DIFFERENCE,

       13    THEN IT DOESN'T MAKE ANY DIFFERENCE, AND THAT'S THE END OF THE

       14    STORY.

       15        AS A SUBSTANTIVE MATTER, AS A RESEARCH MATTER, I THINK IT

       16    MAKES A HUGE DIFFERENCE.  I THINK IT IS VERY IMPORTANT TO

       17    UNDERSTAND THAT HISTORICALLY IN THE U.S., OUR ELECTIONS WERE,

       18    IN VERY MANY PLACES, WERE DRAMATICALLY RACIALLY POLARIZED, AND

       19    THAT CURRENTLY PARTISANSHIP HAS OVERWHELMED THAT, AND PEOPLE

       20    WILL SUPPORT A CANDIDATE.  REPUBLICANS WILL SUPPORT BLACK

       21    REPUBLICANS.  DEMOCRATS WILL SUPPORT BLACK OR WHITE DEMOCRATS.

       22    THE FACT THAT PARTISANSHIP HAS SORT OF TAKEN FRONT STAGE AND

       23    RACE HAS MOVED TO A LESSER POSITION I THINK IS REALLY

       24    IMPORTANT.  IT MAY NOT BE LEGALLY IMPORTANT.  IF BRENNAN IS

       25    RIGHT, BRENNAN SAYS, FOR HEAVEN'S SAKE, DON'T PAY ANY ATTENTION

2:49PM   1   TO WHAT IS GOING ON BEHIND THE CURTAIN BECAUSE IT JUST ELEVATES

         2   ALL OF THIS TO A RACIAL DISCUSSION.

         3        BUT I THINK, AGAIN, IN MY OWN VIEW, I THINK EVEN IF IT'S

         4   NOT AN IMPORTANT LEGAL DISTINCTION, IT'S A VERY IMPORTANT

         5   EVIDENTIARY DISTINCTION TO SAY THAT VOTERS NOW VOTE ON THE

         6   BASIS OF PARTY AND ARE PRETTY MUCH INDIFFERENT TO THE RACE OF

         7   CANDIDATES IS A VERY IMPORTANT CHANGE.  AND IF THAT CHANGE

         8   DOESN'T IMPLICATE WHAT HAPPENS IN THE VOTING RIGHTS ACT, THEN I

         9   THINK IT SHOULD BE ACKNOWLEDGED WHEN THE COURT IS -- WHEN A

        10   COURT IS OVERRIDING A LOCAL DECISION ABOUT DISTRICTING OR

        11   AT-LARGE ELECTIONS, A DECISION THAT SAYS, YOU KNOW, VOTING IN A

        12   SCHOOL DISTRICT IS RACIALLY POLARIZED SAYS SOMETHING TO THE

        13   PUBLIC ABOUT THE SCHOOL DISTRICT.  IT SAYS SOMETHING ABOUT THE

        14   VOTERS IN THAT SCHOOL DISTRICT.

        15        AND IF THE EVIDENTIARY BASIS WAS THAT MOST MINORITY VOTERS

        16   VOTED DEMOCRAT AND MOST WHITE VOTERS VOTED REPUBLICAN, AND

        17   NOTHING MORE THAN THAT WAS ACTUALLY DEMONSTRATED IN SPRING

        18   BRANCH ISD OR IN THE SEVEN REGIONS OF THE STATE OF LOUISIANA,

        19   IT'S REALLY IMPORTANT TO GET THAT RIGHT UP FRONT, THAT YOU ARE

        20   NOT SAYING THAT VOTERS IN LOUISIANA ARE VOTING ON A RACES

        21   BASIS.  YOU ARE JUST SAYING THAT RACIAL GROUPS ARE NOW SORTED

        22   INTO TWO DIFFERENT PARTIES, AND THEY ARE VOTING ON THE BASIS OF

        23   PARTY.  AND AS A LEGAL MATTER, THAT IS SOMETHING THAT'S STILL

        24   IMPORTANT IN TERMS OF THE VOTING RIGHTS ACT.

        25        SO I DON'T -- I MEAN, I HAVE ALL KINDS OF PERSONAL

2:51PM

1   PREFERENCES, BUT AS A POLITICAL SCIENTIST, WHAT I WANT IS THAT

2   PEOPLE ARE CLEAR ABOUT -- THIS IS WHERE, LOOKING ONLY AT

3   RACIALLY CONTESTED ELECTIONS, I THINK OPENLY, NOT INTENTIONALLY

4   BUT OPENLY ALLOWS FOR THAT PUBLIC MISINTERPRETATION, BECAUSE

5   YOU CAN SAY THERE WERE 16 ELECTIONS HERE, AND IN NOT A SINGLE

6   ONE OF THOSE ELECTIONS WERE WHITE VOTERS WILLING TO GIVE MORE

7   THAN 20 PERCENT OF THEIR VOTE TO A BLACK CANDIDATE.  THAT

8   SOUNDS, QUITE FRANKLY, TO ME LIKE OPEN AND VERY LARGE LEVELS OF

9   WHITE RACIAL PREJUDICE, SAYING THE SAME THING ABOUT NONRACIALLY

10  CONTESTED ELECTIONS, THAT BASICALLY THE SAME PROPORTION OF

11  VOTERS ARE UNWILLING TO VOTE FOR A WHITE DEMOCRAT, I THINK IS

12  -- WE LIVE IN A DIFFERENT WORLD.

13       AND I THINK FOR SOME PEOPLE THAT CHANGE IS -- CERTAINLY

14  FOR SOME JUDGES ON THE SUPREME COURT, THAT'S THE CHANGE THEY

15  WERE LOOKING FOR TO INDICATE THAT THE VOTING RIGHTS ACT WORKED,

16  AND FOR THEM THAT MEANS MAYBE WE SHOULDN'T HAVE A VOTING RIGHTS

17  ACT.  FOR ME, IT INDICATES THAT THE VOTING RIGHTS ACT WORKED,

18  AND THAT'S WHY I'VE ALWAYS BEEN A SUPPORTER OF THE VOTING

19  RIGHTS ACT.  I BELIEVE IN IT.  I BELIEVE IT'S AN AMAZING

20  SUCCESS.  AND I THINK TO ARGUE ON THE BASIS OF WHAT ARE REALLY

21  BOTH FRAGMENTARY AND I THINK SOMEWHAT MISGUIDED SURVEYS, TO

22  ARGUE THAT THE U.S. IS MORE RACIALLY POLARIZED THAN IT WAS IN

23  PREVIOUS ERAS DOES A DISSERVICE TO THE VOTING RIGHTS ACT AND TO

24  THE VOTERS, FRANKLY.

25  Q.  DR. ALFORD, JUST ONE FINAL QUESTION.  SO FROM ALL THE

2:52PM    1    ANALYSIS YOU CONDUCTED IN THIS CASE, DID YOU REACH AN OVERALL

          2    CONCLUSION REGARDING WHETHER ELECTIONS IN THE SEVEN AREAS OF

          3    THE STATE OF LOUISIANA ARE RACIALLY POLARIZED?

          4    A.   I DID.

          5    Q.   AND WHAT IS THAT CONCLUSION?

          6    A.   THOSE ELECTIONS ARE PARTISAN POLARIZED ELECTIONS, VERY

          7    POLARIZED ON A PARTISAN BASIS, BUT THERE IS NOT EVIDENCE THAT

          8    THEY ARE POLARIZED IN THE SENSE I MEAN IT, AS A MATTER OF

          9    RACIAL POLARIZATION.

         10          **MR. TUCKER:**  THANK YOU, YOUR HONOR.  I TENDER THE

         11    WITNESS.

         12          **THE COURT:**  OKAY.  GO AHEAD.  JUST ONE MOMENT.  DR.

         13    ALFORD, I APOLOGIZE FOR SCOLDING YOU.

         14          **THE WITNESS:**  I'M SORRY?

         15          **THE COURT:**  FOR SCOLDING YOU FOR YOUR TARDINESS.  I

         16    APOLOGIZE.

         17          **THE WITNESS:**  I WOULD EXPLAIN THE SITUATION, EXCEPT

         18    I'VE ALWAYS LIKED THE ADMONITION OF "DON'T COMPLAIN, DON'T

         19    EXPLAIN."  SO THERE IS AN EXPLANATION --

         20          **THE COURT:**  WELL, AND I'M NOT GOING TO EXPLAIN WHY I

         21    SCOLDED YOU.  I APOLOGIZE.

         22          **THE WITNESS:**  I RESPECT YOU, BUT I ALSO, AS A COLLEGE

         23    INSTRUCTOR, WHO IS OFTEN REQUIRED TO ADMONISH STUDENTS ON

         24    EXACTLY THE SAME ISSUE, WHERE IT'S DUE, IT'S DUE.

         25          **THE COURT:**  ALL RIGHT.  GOOD.  YOU MAY PROCEED WITH

2:53PM   1   YOUR CROSS.

2                    **MR. CAMPBELL-HARRIS:**  THANK YOU, YOUR HONOR.

3                           **CROSS-EXAMINATION**

4   **BY MR. CAMPBELL-HARRIS:**

5   Q.  GOOD AFTERNOON, DR. ALFORD.  MY NAME IS DAYTON

6   CAMPBELL-HARRIS, AND I HAVE THE PLEASURE OF CROSSING YOU THIS

7   AFTERNOON.

8   A.  GOOD AFTERNOON.

9   Q.  YOU'VE NEVER -- OR YOU'VE NOT PUBLISHED ANYTHING ABOUT

10  SECTION 2 OF THE VOTING RIGHTS ACT IN ANY ACADEMIC PUBLICATION,

11  CORRECT?

12  A.  I DO NOT DO ACADEMIC WORK IN THIS AREA.

13  Q.  AND YOU HAVE NOT PUBLISHED ANY PAPERS ABOUT RACIALLY

14  POLARIZED VOTING EITHER?

15  A.  THAT IS RIGHT.

16  Q.  AND YOU HAVE NOT PUBLISHED ANY PEER-REVIEWED ARTICLES

17  USING ECOLOGICAL INFERENCE METHODS, CORRECT?

18  A.  THAT IS CORRECT.

19  Q.  AND ARE YOU OKAY IF I USE EI INSTEAD OF ECOLOGICAL

20  INFERENCE?

21  A.  I'M FINE.

22  Q.  EXCELLENT.  I WANT TO ASK YOU SOME GENERAL QUESTIONS ABOUT

23  RACIALLY POLARIZED VOTING.  YOU'VE DESCRIBED RACIALLY POLARIZED

24  VOTING AS A PATTERN IN WHICH DIFFERENT RACIAL GROUPS SPOKE

25  DIFFERENTLY AND AT SIGNIFICANT LEVELS AND REASONABLY

DR. J. ALFORD - CROSS

2:54PM

1    COHESIVELY.  IS THAT CORRECT?

2    A.  YES.

3    Q.  AND YOU DESCRIBED THE TERM "RACIALLY POLARIZED VOTING" AS

4    PEJORATIVE TOO, RIGHT?

5    A.  I THINK IT CAN BE COMPLETELY NONPEJORATIVE, BUT IT ALSO

6    CAN BE USED AS A PEJORATIVE.  YES.

7    Q.  OKAY.  SO YOU'VE DESCRIBED IT AS PEJORATIVE.  RIGHT?

8    A.  YES, IT IS DEFINITELY -- I THINK IT IS OFTEN RECEIVED TO

9    MEAN WHAT IT FRANKLY SAYS, AND I THINK THAT IS PEJORATIVE.

10   Q.  AND YOU WOULD AGREE THAT VOTING IS POLARIZED BETWEEN BLACK

11   VOTERS AND WHITE VOTERS IN LOUISIANA?

12   A.  YES.

13   Q.  AND YOUR PREFERRED METRIC FOR VOTER COHESION, IS IT

14   75 PERCENT?

15   A.  I DON'T KNOW IF IT'S MY PREFERRED METRIC, BUT BECAUSE THE

16   COURT SEEMS TO BE UNABLE TO COME UP WITH ANY TYPE OF METRIC, I

17   KNOW VARIOUS PLAINTIFFS' EXPERTS, FOR THE FIRST TIME THIS

18   DECADE, ROUND, THREE OR FOUR DIFFERENT EXPERTS WHO I HAVE A LOT

19   OF RESPECT FOR, HAVE STARTED PROPOSING 60 PERCENT AS A

20   THRESHOLD TO GET AWAY FROM -- YOU OFTEN SAW PLAINTIFFS' EXPERTS

21   IN PREVIOUS DECADES SAY BASICALLY COHESIVE VOTING OCCURS

22   WHENEVER THERE IS A PREFERRED CANDIDATE.  BUT BECAUSE THERE IS

23   ALWAYS A PREFERRED CANDIDATE BY DEFINITION, IT MEANS THAT

24   *GINGLES* II IS NOT JUST NOT A THRESHOLD TEST, IT'S NOT A TEST AT

25   ALL.  IT LITERALLY WOULD BE MET IN EVERY SINGLE ELECTION CASE

2:56PM   1    EVER BROUGHT.  IT WOULD BE MET IF ALL IT REQUIRED WAS THAT

         2    MINORITIES HAVE A PREFERRED CANDIDATE.

         3         IT CLEARLY, BECAUSE IT IS A THRESHOLD TEST, THE COURT

         4    CLEARLY MEANT IT TO BE COHESIVE VOTING TO BE SOMETHING MORE

         5    THAN JUST 50 PERCENT PLUS ONE, BECAUSE THAT -- PARTICULARLY

         6    WHEN YOU DON'T TIE IT TO THE RACE OF THE CANDIDATE, IT

         7    LITERALLY MEANS THAT IN EVERY ELECTION, THERE IS A PREFERRED

         8    CANDIDATE, AND THEREFORE, IN EVERY ELECTION, THE MINORITY GROUP

         9    IS COHESIVE BY DEFINITION, AND THAT'S NOT -- THAT'S A

        10    DEFINITION WITHOUT A DIFFERENCE.

        11         SO I THINK RECOGNIZING THAT, SOME PLAINTIFFS' EXPERTS HAVE

        12    SORT OF MOVED UP TO 60 PERCENT, SUGGESTING THAT MIGHT BE A

        13    REASONABLE PLACE.  AND ALL I'M POINTING OUT ABOUT 75 PERCENT IS

        14    THAT 60 PERCENT IS AN ARBITRARY THRESHOLD.  THERE IS NOTHING

        15    SPECIAL ABOUT 60 PERCENT.

        16         THERE IS SOMETHING SPECIAL ABOUT 75 PERCENT.  AT

        17    75 PERCENT, YOU ARE HALFWAY BETWEEN ABSOLUTELY NO COHESION AND

        18    PERFECT COHESION.  SO IF YOU WANT TO SAY WE WILL DEFINE

        19    COHESION, FOR LEGAL PURPOSES, AS A GROUP VOTING IN A RANGE

        20    CLOSER TO PERFECT COHESION THAN THEY ARE TO NONCOHESION, THEN

        21    THAT 75 PERCENT WOULD BE A PLACE YOU MIGHT DRAW THE LINE.  BUT

        22    AGAIN, I'M ONLY SUGGESTING THAT BECAUSE I THINK THE

        23    MISUNDERSTANDING OF THIS, FOR EXAMPLE, THE FACT THAT COURTS

        24    OFTEN ACCEPT 50 PERCENT PLUS ONE, WHICH IS SOMETIMES PHRASED AS

        25    MINORITIES PREFER A DIFFERENT CANDIDATE THAN NONMINORITIES,

2:57PM    1    THAT MINORITIES PREFER A CANDIDATE -- THERE IS A MINORITY

2    PREFERRED CANDIDATE, BUT THAT'S NOT COHESION.  CONFLATING THOSE

3    COMES FROM THIS MISUNDERSTANDING THAT AT 50 PERCENT, YOU ARE

4    NOT HALFWAY TO COHESION.  YOU ARE AT ZERO COHESION.

5        SO I THINK THAT IT IS HIGHLIGHTED BY PLACING THAT 75

6    PERCENT THERE.  IF THE COURT DECIDES THEY WANT TO GO WITH 60,

7    THEY WILL RECOGNIZE THAT THEY ARE PLACING A RELATIVELY LOW

8    THRESHOLD.  AND IF YOU WANT TO GO WITH 80, YOU ARE PLACING A

9    RELATIVELY HIGH THRESHOLD.

10        THERE IS NO POLITICAL SCIENCE DEFINITION.  AGAIN, WHEN WE

11   TALK ABOUT LEGISLATIVE COHESION, WE ARE USUALLY TALKING ABOUT

12   SOMETHING MUCH CLOSER TO A HUNDRED PERCENT, 90 PERCENT.  WHEN

13   25 PERCENT OF THE REPUBLICAN PARTY DEFECTS ON A PARTY LINE

14   VOTE, WE DON'T CALL THAT A COHESION.  THEY DON'T CALL THAT

15   PARTY COHESION.  WE CALL THAT THE PARTY COLLAPSE.

16        SO IT IS VERY CONTEXT DEPENDENT.  THE COURT HAS TO FIGURE

17   OUT WHAT IT MEANS IN THIS CONTEXT.  I WILL SAY 60 PERCENT

18   COHESION IS A VERY LOW STANDARD, NOT JUST BECAUSE IT IS CLOSE

19   TO 50 BUT BECAUSE IF MINORITIES ARE VOTING AT 60 PERCENT

20   COHESION AND WHITES ARE VOTING, SAY, 80 PERCENT, LIKE THEY ARE

21   HERE, 80 PERCENT COHESIVE, THE DISTRICT WILL NEED TO BE OVER

22   75 PERCENT MINORITY BEFORE IT WILL PERFORM.  SO THAT LEVEL OF

23   COHESION HAS A DRAMATIC EFFECT ON WHAT THE SOLUTION IS.

24        A MAJORITY BLACK DISTRICT WILL NOT PERFORM IF BLACK

25   COHESION IS AT 60 PERCENT AND WHITE OPPOSITION IS AT

2:59PM   1   80 PERCENT.  IT WILL NOT PERFORM WITHOUT EXTRAORDINARILY HIGH

         2   LEVELS OF CONCENTRATION.  AND THIS IS EXACTLY WHAT YOU SEE IN

         3   TEXAS.  THERE IS NO HISPANIC DISTRICT IN TEXAS THAT PERFORMS

         4   THAT IS LESS THAN 75 PERCENT HISPANIC.  AND THE REASON FOR THAT

         5   IS BOTH SOME TURNOUT ISSUE BUT ALSO BECAUSE HISPANIC COHESION

         6   IS DRAMATICALLY LOWER THAN BLACK COHESION.  AND SO WHEN YOU

         7   HAVE HISPANICS VOTING AT 60 OR 65 PERCENT DEMOCRATIC AND 35,

         8   40 PERCENT REPUBLICAN, IT TAKES EXTRAORDINARY CONCENTRATION TO

         9   GET THOSE DISTRICTS TO PERFORM.

        10       SO THAT -- THE ISSUE OF WHAT THE REMEDY IS IS TIED BACK,

        11   AS IT ALWAYS HAS BEEN, YOU KNOW, AS A FUNCTIONAL MATTER IS TIED

        12   BACK TO ALL THREE OF THE *GINGLES* THRESHOLDS.

        13   Q.  OKAY.  BUT THAT 75 PERCENT METRIC THAT YOU PREFER, IT

        14   WOULD HAVE TO BE DIFFERENT FOR ELECTIONS WITH MORE THAN TWO

        15   CANDIDATES, CORRECT?

        16   A.  FOR ELECTIONS WITH MORE THAN TWO CANDIDATES, YOU HAVE A

        17   MORE COMPLEX ISSUE TO ADDRESS THERE, AND I AM WILLING TO STOP

        18   AND SIMPLY -- IF THE COURT WILL FIND A METRIC FOR THE SIMPLE

        19   TWO-PARTY ELECTIONS, THEN DR. HANDLEY AND I CAN TELL THEM HOW

        20   YOU TRANSFER THAT.  THERE ARE A LOT OF DIFFERENT WAYS TO DO IT,

        21   BUT I'M GUESSING WE COULD PROBABLY AGREE IN AN AFTERNOON ON HOW

        22   TO TURN THAT INTO AN APPROPRIATE METRIC FOR LOUISIANA.

        23   Q.  AND YOU ARE NOT OFFERING AN OPINION HERE ON THE CAUSE OF

        24   BLACK VOTERS' VOTING BEHAVIOR, CORRECT?

        25   A.  SO I'M NOT DOING THIS -- THIS IS NOT A CAUSAL ANALYSIS.  I

3:01PM   1   HAVE BEEN DOING THIS FOR A LONG TIME.  I'VE NEVER SEEN A CAUSAL

         2   ANALYSIS INTRODUCED BY ANYBODY IN ANY VOTING RIGHTS ACT CASE

         3   THAT I'VE EVER SEEN.  SO THAT'S VERY IMPORTANT.

         4         CAUSAL ANALYSIS IS A VERY, VERY DIFFERENT THING.  IT'S NOT

         5   SOMETHING YOU GET OUT OF A SURVEY.  IT'S SURELY NOT SOMETHING

         6   YOU GET OUT OF AN ECOLOGICAL INFERENCE ANALYSIS.  WE CAN DRAW

         7   INFERENTIAL INFORMATION ABOUT THE NATURE OF THE POLARIZATION

         8   AND THE KINDS OF THINGS THAT ARE ASSOCIATED WITH IT.  SO WE DO

         9   HAVE, IN THE CONTRAST BETWEEN RACIALLY AND NONRACIALLY

        10   CONTESTED ELECTIONS, WE DO HAVE -- WE HAVE VERY CLEAR

        11   INFORMATION USING -- JUST SIMPLY USING THE BASIC ANALYSIS THAT

        12   HAS BEEN USED BY THE COURTS THROUGH THE HISTORY OF THE VOTING

        13   RIGHTS ACT.

        14         WE HAVE IN THAT ANALYSIS, AGAIN, THE ANALYSIS DR. HANDLEY

        15   IS PROVIDING, THE ANALYSIS I'M PROVIDING, IT IS A VERY

        16   TRADITIONAL ANALYSIS, IT'S NOT CAUSAL ANALYSIS, BUT IT DOES LET

        17   US SEPARATE OUT HOW IMPORTANT IS THE RACE OF THE CANDIDATE

        18   VERSUS HOW IMPORTANT IS THE PARTY OF THE CANDIDATE AND WHICH

        19   ONE OF THOSE IS ASSOCIATED WITH THE POLARIZATION THAT WE SEE.

        20   SO WE CAN ANSWER THE QUESTION TO THE EXTENT THAT WE RELY ON THE

        21   SAME KIND OF DATA WE HAVE ALWAYS RELIED ON HERE.  WE CAN ANSWER

        22   THAT QUESTION AND ANSWER IT QUITE CLEARLY.

        23   Q.  SO, SIMILARLY, YOU ARE NOT OFFERING AN OPINION AS TO THE

        24   CAUSE OF WHITE LOUISIANANS' VOTING BEHAVIOR EITHER?

        25   A.  BEYOND THE FACT THAT THE ANALYSIS PROVIDED BY MYSELF AND

DR. J. ALFORD - CROSS

3:02PM

1    DR. HANDLEY, WHICH IS THE -- AS I UNDERSTAND IT IN THIS CASE,

2    IS THE ONLY ANALYSIS THAT IS DIRECTED LOCALLY TO THE ELECTION

3    AREAS OF INTEREST AND TO THE BEHAVIOR INTEREST.  THAT ELECTION

4    ANALYSIS CLEARLY SHOWS THAT WHITE VOTERS IN LOUISIANA VOTE

5    OVERWHELMINGLY FOR REPUBLICANS.

6    Q.   OKAY.  I WANT TO ASK YOU SOME QUESTIONS ABOUT DR.

7    HANDLEY'S REPORT THAT YOU TESTIFIED TO ON DIRECT.  I WANT TO

8    CIRCLE BACK, ACTUALLY, TO ASK AGAIN ABOUT YOUR 75 PERCENT

9    THRESHOLD THAT YOU PREFER.  YOU AGREE THAT FOR A VOTING GROUP

10   TO HAVE COHESION IN AN ELECTION WITH MORE THAN TWO CANDIDATES,

11   IT HAS TO BE 75 PERCENT?

12   A.   SO --

13            **MR. TUCKER:**  I OBJECT TO THE QUESTION, YOUR HONOR.  I

14   DON'T THINK THE WITNESS EVER TESTIFIED THAT 75 PERCENT WAS HIS

15   PREFERRED LEVEL OF COHESION.

16            **THE COURT:**  DO YOU WANT TO RESPOND TO THE OBJECTION?

17            **MR. CAMPBELL-HARRIS:**  I THINK HE MENTIONED THAT IT

18   WAS HIS PREFERRED METHOD AND THAT 60 PERCENT WAS THE PREFERRED

19   FOR OTHER POLITICAL SCIENTISTS, AND THEN THERE WAS OTHER

20   METRICS PREFERRED BY OTHER POLITICAL SCIENTISTS.

21            **THE COURT:**  WHAT HE SAID WAS THAT IT'S A CONTINUUM

22   AND THAT COURTS TEND TO TRY TO MAKE IT A DICHOTOMY FOR LEGAL

23   REASONS.  I WILL ALLOW THE QUESTION, BUT HE DIDN'T SAY THAT

24   THAT'S WHAT HE PREFERRED.

25            **MR. CAMPBELL-HARRIS:**  OKAY.  THANK YOU, YOUR HONOR.

DR. J. ALFORD - CROSS

3:04PM

1          THE COURT:  BUT YOU CAN ASK THE QUESTION.  DO YOU
2    WANT TO ASK IT AGAIN?
3          MR. CAMPBELL-HARRIS:  I CAN REPHRASE THE QUESTION,
4    YOUR HONOR.
5          THE COURT:  ALL RIGHT.  ASK IT AGAIN.
6    BY MR. CAMPBELL-HARRIS:
7    Q.  SO YOU AGREE THAT FOR COHESION TO EXIST FOR BLACK VOTERS
8    OR WHITE VOTERS IN AN ELECTION, THEY HAVE TO OFFER MORE THAN
9    75-PERCENT SUPPORT FOR A CANDIDATE IN A TWO-CANDIDATE RACE?
10   A.  IF THE THRESHOLD IS 75 PERCENT, THEN THEY WOULD HAVE TO BE
11   AT 75 PERCENT OR HIGHER FOR THEM TO HAVE MET THE THRESHOLD,
12   YES.
13   Q.  OKAY.  THANK YOU.  SO IN YOUR REPORT, YOU DID NOT EXPRESS
14   ANY CONCERNS ABOUT THE DATA THAT DR. HANDLEY RELIED ON TO REACH
15   YOUR CONCLUSIONS IN THIS CASE, CORRECT?
16   A.  I DID NOT EXPRESS ANY CONCERNS IN MY REPORT.  THAT IS
17   CORRECT.
18   Q.  AND ONE OF THE STATISTICAL TECHNIQUES THAT DR. HANDLEY
19   USED WAS EI R TIMES C, RIGHT?
20   A.  EI RXC, THAT IS CORRECT.
21   Q.  OKAY.  AND YOU AGREE THAT DR. HANDLEY IS AN EXPERT IN THE
22   APPLICATION OF EI R TIMES C?
23   A.  I JUST WANT TO MAKE SURE -- SO I'M NOT TRYING TO BE A
24   COLLEGE PROFESSOR HERE, BUT I AM.  THE X LOOKS LIKE R TIMES C,
25   BUT IT IS ACTUALLY R BY C, MEANING -- IT LITERALLY MEANS ROW BY

DR. J. ALFORD - CROSS

3:05PM

1    COLUMN.  SO IT'S NOT ROW TIMES COLUMN, WHICH WOULD BE MATRIX

2    ALGEBRA.  IT IS ROW BY COLUMN, WHICH IS DESCRIBING THAT NATURE

3    OF THE SPREADSHEET, BASICALLY.  SO IT'S -- TECHNICALLY, IT IS R

4    BY C, BUT ALWAYS WRITTEN AS CAPITAL R, SMALL X, CAPITAL C.

5    Q.  OKAY.  SO YOU AGREE THAT DR. HANDLEY IS AN EXPERT IN THE

6    APPLICATION OF EI RXC?

7    A.  I AGREE.

8    Q.  OKAY.  AND YOUR REPORT DOES NOT CRITICIZE ANY OF THE

9    STATISTICAL METHODS THAT DR. HANDLEY USED, CORRECT?

10   A.  THAT IS CORRECT.

11   Q.  OKAY.  AND YOU DO NOT DISPUTE ANY OF THE RESULTS THAT DR.

12   HANDLEY REACHED OR PRODUCED BY HER STATISTICAL METHODS, RIGHT?

13   A.  AGAIN, I'M BOTH RELYING ON HER DATA.  I CAN REPLICATE HER

14   METHODOLOGY, AND I THINK SHE PROVIDES EXACTLY THE KIND OF

15   EVIDENCE THAT A COURT NEEDS TO MAKE THIS DECISION.  I'M JUST

16   SAYING THAT BY BROADENING THE SLATE OF ELECTIONS, USING THE

17   SAME METHODS, THE SAME DATA SOURCES, THERE ARE DIFFERENT WAYS

18   TO INTERPRET THE RESULTS SHE BROUGHT, BUT I'M NOT QUESTIONING

19   THE RESULTS THEMSELVES.

20   Q.  OKAY.  AND YOU REPLICATED THE SELECTIVE RESULTS OF DR.

21   HANDLEY'S ANALYSIS IN YOUR REPORT, CORRECT?

22   A.  I DID.

23   Q.  OKAY.

24   A.  I'M SORRY.  I JUST WANT TO -- I'M TRYING TO BE REALLY

25   DIRECT, BUT I WANT TO MAKE SURE THAT I'M NOT MISINFORMING YOU.

DR. J. ALFORD - CROSS

3:06PM   1   I'M NOT SAYING THAT THAT WAS THE WAY I WOULD HAVE NECESSARILY

         2   DONE THIS IF I WAS COMING AT IT ENTIRELY FRESH, BUT MY CONCERN

         3   IS THAT I'M NOT TRYING TO -- I BELIEVE THAT HER RESULTS ARE

         4   ACCURATE, AND SO I'M TRYING NOT TO HAVE A METHODOLOGICAL

         5   DISPUTE.  IT DOESN'T MEAN THAT EVERYTHING SHE CHOSE TO DO I

         6   WOULD THINK WAS THE BEST POSSIBLE PRACTICES, BEYOND THE USE OF

         7   RXC, WHICH SHE USES AND USES COMPETENTLY, IN MY EXPERIENCE.

         8        WE BEEN INVOLVED IN A LOT OF CASES TOGETHER.  SHE HAS

         9   ALWAYS DONE GOOD ANALYSIS.  I HAVE ALWAYS BEEN ABLE TO

        10   REPLICATE IT.  IT DOESN'T MEAN THAT I WOULD HAVE MADE ALL THE

        11   SAME CHOICES DOING IT MYSELF, BUT I DON'T THINK -- I DON'T

        12   BELIEVE THAT THOSE CHOICES ARE WHAT MATTERS IN THIS CASE, AND I

        13   THINK THAT'S DEMONSTRATED BY THE FACT THAT OUR ANALYSIS IS

        14   COMPATIBLE.

        15   Q.  AND IN YOUR OPINION, YOU WOULD AGREE THAT ALL THINGS BEING

        16   EQUAL, BI-RACIAL ELECTIONS ARE MOST PROBATIVE FOR DETERMINING

        17   RACIAL POLARIZATION OF VOTING, CORRECT?

        18   A.  COURTS HAVE MENTIONED THAT, OFTEN MENTION THAT.  I DO

        19   THINK IT IS IMPORTANT TO SORT OF LOOK BACK AND UNDERSTAND WHAT

        20   THAT CONTEXT IS.  THE CONTEXT OF THAT IS THAT WHERE YOU HAVE

        21   RACIALLY POLARIZED -- I'M SORRY, WHERE YOU HAVE RACIALLY

        22   CONTESTED ELECTIONS, YOU CAN LOOK AT THOSE ELECTIONS AND YOU

        23   CAN LOOK AT THE NONRACIALLY CONTESTED ELECTIONS AND YOU CAN

        24   ANSWER AN IMPORTANT QUESTION, WHICH IS, IS IT THE CASE THAT

        25   BASICALLY BLACK VOTERS CAN HAVE ANY CANDIDATE THEY WANT, AS

3:08PM    1    LONG AS IT IS A WHITE DEMOCRAT, BASICALLY.  THAT IS,

          2    HISTORICALLY -- IT WAS THE CASE THAT IN FACT THE PREFERRED

          3    CANDIDATE OF BLACK VOTERS IN LOUISIANA AND IN GEORGIA AND IN

          4    ALABAMA WERE ELECTED ALMOST UNIFORMLY IN THE ELECTIONS BECAUSE

          5    THEIR PREFERRED CANDIDATE -- THEIR PARTY WAS THE DEMOCRATIC

          6    PARTY.

          7         ONCE THAT MUCH EARLIER TRANSITION OF BLACKS OUT OF THE

          8    REPUBLICAN PARTY OCCURRED, YOU KNOW, PEOPLE THAT WERE -- WHITES

          9    THAT WERE ELECTED IN THE GENERAL ELECTION WERE THE PREFERRED

         10    CANDIDATE OF BLACK VOTERS, BUT THEY WERE NOT BLACK CANDIDATES.

         11    AND IN FACT, BLACK CANDIDATES WOULD NOT HAVE MADE IT TO THAT

         12    ELECTION SETTING.

         13         SO I DO THINK IT IS IMPORTANT TO UNDERSTAND WHAT HAPPENS

         14    WHEN YOU HAVE BLACK CANDIDATES.  BUT IF YOU THINK ABOUT IT, THE

         15    POINT OF THAT IS, THE POINT OF SAYING IT IS ESPECIALLY

         16    PROBATIVE IS BECAUSE THE COURT IS ESPECIALLY INTERESTED IN THE

         17    DIFFERENCE BETWEEN WHAT HAPPENS WHEN A BLACK CANDIDATE RUNS AND

         18    WHAT HAPPENS WHEN A WHITE CANDIDATE RUNS.  WHAT HAPPENS WHEN

         19    THE PREFERRED CANDIDATE OF BLACK VOTERS IS A BLACK?  IS THAT

         20    DIFFERENT THAN IF THE PREFERRED CANDIDATE OF BLACK VOTERS IS A

         21    WHITE?  THAT'S WHY IT IS PROBATIVE.  IT IS PROBATIVE FOR THAT

         22    ISSUE.  THAT'S THE ISSUE I'M USING IT FOR.  I AGREE THAT IT'S

         23    PROBATIVE, AND THAT'S WHY I'M PRESENTING EVIDENCE ABOUT IT.

         24    Q.   OKAY.  SO YOU AGREE THAT YOU'VE PREVIOUSLY TESTIFIED THAT

         25    BI-RACIAL ELECTIONS, ALL THINGS BEING EQUAL, ARE MOST PROBATIVE

DR. J. ALFORD - CROSS

3:09PM   1    OF DETERMINING RACIAL POLARIZATION OF VOTING, RIGHT?

2    A.   YES.

3    Q.   OKAY.  THANK YOU.  I WANT TO TALK ABOUT YOUR REPORT A

4    LITTLE BIT.  DO YOU STILL HAVE YOUR REPORT IN FRONT OF YOU?

5    A.   YES.

6    Q.   CAN YOU TURN TO PAGE 7 AT TABLE 2?  DO YOU SEE THE TITLE

7    OF THE REPORT, OR THE TITLED TABLE CALLED "PRESIDENTIAL

8    ELECTION RESULTS, AVERAGES OF EI RXC ESTIMATES ACROSS HANDLEY'S

9    SEVEN AREAS OF INTEREST"?

10   A.   YES.

11   Q.   DID I READ THAT CORRECTLY?

12   A.   YES.

13   Q.   OKAY.  AND BELOW THIS REPORT, YOU SAID, "IF THE RACE OF

14   THE CANDIDATES IS THE FOCUS FOR BLACK VOTERS, THEN WE WOULD

15   EXPECT A CLEAR ORDERING OF BLACK VOTER SUPPORT HIGHEST FOR THE

16   2012 OBAMA/BIDEN TICKET, LOWEST FOR THE 2016 CLINTON/KAINE

17   TICKET, AND SOMEWHERE IN BETWEEN FOR THE 2020 BIDEN/HARRIS

18   TICKET."  DID I READ THAT RIGHT?

19   A.   YES.

20   Q.   JUST FOR THE RECORD, THIS IS LEGISLATIVE DEFENDANT'S

21   EXHIBIT 53.  SO GOING BACK TO TABLE 2, THE GENERAL INFERENCE --

22   SORRY, THE GENERAL DIFFERENCES BETWEEN THE LEVEL OF BLACK

23   SUPPORT FOR BIDEN/HARRIS YOU HAVE ESTIMATED HERE AT 96.3,

24   CLINTON/KAINE AT 98.7, AND OBAMA/BIDEN AT 98.5; IS THAT ALL

25   RIGHT?

DR. J. ALFORD - CROSS

3:10PM

1    A.   THAT IS CORRECT.

2    Q.   COULD THESE VARIANCES IN ANY OF THESE NUMBERS BE

3    ATTRIBUTABLE TO SOME OF THE INHERENT VARIATION ASSOCIATED WITH

4    THE EI ESTIMATION?

5    A.   YES.

6    Q.   OKAY.  LET'S TURN TO TABLE 3 ON PAGE 9.  DO YOU SEE THAT

7    ON THIS TABLE THERE ARE SEVEN BI-RACIAL ELECTIONS WITH TWO

8    CANDIDATES?  I THINK WE MIGHT NEED TO SPLIT IT INTO THE TWO

9    PAGES.

10   A.   THAT'S -- I THINK THAT'S THE SAME COUNT I GET.

11   Q.   OKAY.  AND WOULD YOU AGREE THAT THE BLACK VOTERS ARE

12   COHESIVELY SUPPORTING THE BLACK CANDIDATES IN EACH OF THOSE

13   BI-RACIAL TWO-CANDIDATE RACES?

14   A.   AGAIN, BECAUSE THAT BLACK CANDIDATE ALSO HAPPENS TO BE THE

15   DEMOCRATIC CANDIDATE, YES, THEY ARE SUPPORTING THE BLACK

16   DEMOCRAT IN ALL OF THOSE ELECTIONS, OVERWHELMINGLY.

17   Q.   OKAY.  AND THE WHITE VOTERS IN THOSE ELECTIONS ARE ALSO

18   COHESIVELY SUPPORTING THE WHITE CANDIDATE IN EACH OF THOSE

19   RACES, RIGHT?

20   A.   AGAIN, THEY ARE OVERWHELMINGLY SUPPORTING THE WHITE

21   REPUBLICAN IN THOSE CONTESTS.

22   Q.   OKAY.  AND BASED ON YOUR DATA IN THOSE ELECTIONS, THESE

23   RACES ARE RACIALLY POLARIZED, CORRECT?

24   A.   I VIEW THEM, AGAIN, AS PARTISAN POLARIZED BECAUSE I THINK,

25   AGAIN, PRECISELY BECAUSE OF THE WAY YOU'VE ASKED THAT QUESTION,

3:12PM  1   AREN'T THE BLACK VOTERS SUPPORTING OVERWHELMINGLY THE BLACK

2   CANDIDATE?  THEY ARE BECAUSE YOU SELECTED ONLY RACES IN WHICH

3   THE DEMOCRATIC CANDIDATE WAS THE BLACK CANDIDATE.

4        SO AGAIN, IF YOU WANT TO USE THAT TO SAY THIS IS RACIAL

5   POLARIZATION -- THAT'S WHY I THINK YOU NEED TO BE CAREFUL.

6   THIS IS PARTISAN POLARIZATION.  THE TABLE DOESN'T DEMONSTRATE

7   THAT THIS IS WHAT I'VE CONSIDERED TO BE SOMETHING THAT SHOULD

8   BE LABELED AS RACIAL POLARIZATION.

9   Q.  OKAY.  LET'S LOOK AT SOME OF THESE INDIVIDUAL RACES THEN.

10  LET'S START WITH THE OCTOBER 2015, SECRETARY OF STATE RACE.

11  YOUR ESTIMATES SHOW THAT 93.3 PERCENT OF BLACK VOTERS OFFERED

12  SUPPORT FOR THE BLACK CANDIDATE IN THAT ELECTION, CORRECT?

13  A.  CORRECT.

14  Q.  OKAY.  AND YOUR ESTIMATES ALSO SHOW THAT WHITE VOTERS

15  OFFERED 85.7 PERCENT SUPPORT FOR THE WHITE CANDIDATE THERE,

16  CORRECT?

17  A.  CORRECT.

18  Q.  OKAY.  AND IN YOUR OPINION, THIS RACE IS NOT RACIALLY

19  POLARIZED?

20  A.  AGAIN, IF BY RACIALLY POLARIZED YOU MEAN THAT TWO RACIAL

21  GROUPS ARE VOTING IN A DIFFERENT WAY, THEN THAT IS PERFECTLY

22  FINE.  BUT AGAIN, YOU ARE PREFACING -- YOU ARE MAKING THE

23  NATURE OF THE QUESTION -- YOU ARE MAKING THE NATURE OF THE

24  QUESTION ABOUT THE RACE OF THE CANDIDATES.  YOU ARE NOT ASKING

25  ME ABOUT WHETHER THE BLACK VOTERS PREFERRED THE DEMOCRAT AND

3:13PM    1    WHITE VOTERS PREFERRED THE REPUBLICAN, WHICH IS WHAT THE

2    OVERALL ANALYSIS SHOWS.  YOU ARE SPECIFICALLY SAYING, DON'T

3    BLACK VOTERS PREFER THE BLACK CANDIDATE, DON'T WHITE VOTERS

4    PREFER THE WHITE CANDIDATE?  THAT IS EXACTLY WHAT I'M OBJECTING

5    TO, THAT WE HAVE A BROADER ANALYSIS HERE OF THESE ELECTIONS,

6    AND WE KNOW THAT THAT PARTICULAR PHRASING IS ACTUALLY -- IS

7    SORT OF TAKING INFORMATION OUT OF WHAT IS ACTUALLY HERE IN THIS

8    ANALYSIS.  WHAT WE KNOW IS THAT BLACK VOTERS OVERWHELMINGLY

9    PREFER DEMOCRATIC CANDIDATES, WHETHER THEY ARE BLACK OR WHITE.

10    AND SO IF YOU ARE GOING TO PHRASE IT THAT WAY, IT'S LIKE

11    THAT IS TRUE.  IN THIS PARTICULAR ELECTION, BLACK VOTERS ALSO

12    OVERWHELMINGLY PREFERRED CANDIDATES WHOSE FIRST NAME IS CHRIS,

13    BUT THAT'S REALLY NOT OF ANY USE TO US HERE.

14    Q.  OKAY.  YOU PREVIOUSLY TESTIFIED A LITTLE BIT EARLIER THAT

15    YOU DESCRIBE RACIALLY POLARIZED VOTING AS A PATTERN IN WHICH

16    DIFFERENT RACIAL GROUPS VOTE DIFFERENTLY AND AT SIGNIFICANT

17    LEVELS AND REASONABLY COHESIVELY, RIGHT?

18    A.  YES, THAT IS WHAT IS TRADITIONALLY LABELED AS RACIALLY

19    POLARIZED VOTING.  AND AGAIN, IF, AS DR. BURCH SAYS, ALL THAT

20    IS REQUIRED IS THAT THE TWO GROUPS VOTE DIFFERENTLY,

21    IRRESPECTIVE OF WHAT THE REASONS ARE FOR THEM VOTING

22    DIFFERENTLY, BRENNAN'S BASIC MINORITY OPINION HOPE, THEN THAT

23    MEETS THAT TEST.  I JUST DON'T -- I DON'T PERSONALLY -- I DON'T

24    LIKE TO CALL SOMETHING RACIALLY POLARIZED VOTING IF I KNOW THAT

25    THE EVIDENCE CLEARLY SHOWS THAT IT'S PARTISAN POLARIZED VOTING,

3:14PM   1   BECAUSE PARTISAN POLARIZED VOTING, AS NASTY AS IT CAN BE, IS A

         2   LONG WAY FROM WHERE WE WERE 40 YEARS AGO, WHEN OUR VOTING WAS

         3   LITERALLY RACIALLY POLARIZED.

         4   Q.   OKAY.  YOU PREFER NOT TO CALL IT RACIALLY POLARIZED

         5   VOTING, BUT YOU AGREE THAT THIS 2015 OCTOBER ELECTION IS

         6   RACIALLY POLARIZED, CORRECT?

         7           **MR. TUCKER:**  OBJECTION, YOUR HONOR.  ASKED AND

         8   ANSWERED.

         9           **MR. CAMPBELL-HARRIS:**  I DON'T BELIEVE THE WITNESS

        10   ANSWERED THE QUESTION, YOUR HONOR.

        11           **THE COURT:**  OVERRULED.

        12   A.   AGAIN, RACIAL GROUPS ARE VOTING DIFFERENTLY.  IF THAT'S

        13   WHAT YOU WANT TO CALL RACIALLY POLARIZED VOTING, THEN IT'S

        14   RACIALLY POLARIZED VOTING.  IT IS -- THAT, I THINK, IS AN

        15   INAPPROPRIATE DESCRIPTOR BECAUSE IT WOULD LEAD ANY REASONABLE

        16   PERSON TO THINK SOMETHING WAS TRUE THAT THIS DOESN'T

        17   DEMONSTRATE.  THIS ELECTION IS POLARIZED ON THE BASIS OF

        18   PARTISAN -- THE PARTISAN LABELS OF THE CANDIDATES.

        19   **BY MR. CAMPBELL-HARRIS:**

        20   Q.   OKAY.  LET'S TURN TO TABLE 4 ON PAGE 13.  THERE'S A TABLE

        21   THERE TITLED "PARTY CONTESTED STATEWIDE ELECTIONS NOT INCLUDED

        22   IN THE HANDLEY REPORT, AVERAGES ACROSS HANDLEY'S SEVEN AREAS OF

        23   INTEREST."  DID I READ THAT CORRECTLY?

        24   A.   CORRECT.

        25   Q.   LET'S LOOK AT THE NOVEMBER 2015 GUBERNATORIAL ELECTION.

DR. J. ALFORD - CROSS

3:16PM

1   DO YOU SEE THAT?

2   A.   YES.

3   Q.   WHAT PERCENT OF WHITE VOTERS SUPPORTED JOHN BEL EDWARDS IN

4   THE 2015 NOVEMBER GUBERNATORIAL ELECTION?

5   A.   36.3 PERCENT.

6   Q.   OKAY.  AND DO YOU SEE THE NOVEMBER 2019 GUBERNATORIAL

7   ELECTION?

8   A.   I DO.

9   Q.   AND YOU ESTIMATED THAT 28.5 PERCENT OF WHITE VOTERS VOTED

10  FOR JOHN BEL EDWARDS IN THAT ELECTION.  CORRECT?

11  A.   THAT IS CORRECT.

12  Q.   OKAY.  CAN YOU IDENTIFY ANY OTHER LOUISIANA ELECTIONS

13  WHERE A BLACK CANDIDATE EARNED THE SAME LEVEL OF SUPPORT AS

14  JOHN BEL EDWARDS FOR WHITE CROSSOVER VOTERS?

15  A.   NO.

16  Q.   OKAY.  AND WITH THE EXCEPTION OF JOHN BEL EDWARDS'

17  GUBERNATORIAL RACES, WHITE CROSSOVER VOTING IS RELATIVELY LOW

18  IN LOUISIANA; IS THAT CORRECT?

19  A.   WITH THE EXCEPTION OF JOHN BEL EDWARDS, THAT IS TRUE FOR

20  THE -- SO FOR THE OTHER SITUATIONS IN WHICH THERE IS A WHITE

21  DEMOCRATIC CANDIDATE, AGAIN, JOHN BEL EDWARDS STANDS OUT AMONG

22  THE OTHER WHITE DEMOCRATIC CANDIDATES BECAUSE OF THAT STRONG

23  LEVEL OF CROSSOVER SUPPORT THAT HE WAS ABLE TO OBTAIN.  I WOULD

24  ALSO NOTE THAT -- SORRY.  I WON'T NOTE IT.

25  Q.   OKAY.  I ONLY HAVE A FEW MORE QUESTIONS, DR. ALFORD.  YOU

3:17PM   1    TESTIFIED IN OTHER CASES THAT PARTY AFFILIATION RATHER THAN

         2    RACE IS DRIVING POLARIZATION, RIGHT?

         3    A.   THE PARTY LABEL OF CANDIDATES IS DRIVING POLARIZATION.

         4    AND I WOULD ASSUME IN A CURRENT POLARIZED ATMOSPHERE THAT

         5    PROBABLY IS RELATED TO THE PARTY IDENTIFICATION OF CANDIDATES,

         6    BUT WE DON'T HAVE PARTY IDENTIFICATION OF CANDIDATES HERE.

         7         SO IN TERMS OF WHAT IS IN EVIDENCE HERE, WHAT IS IN

         8    EVIDENCE HERE IS INFORMATION ABOUT THE PARTY AFFILIATION OF THE

         9    CANDIDATES, WHICH IS ON THE BALLOT, AND THE RACIAL LABELS OR

        10    RACIAL ORIENTATION OF CANDIDATES, WHICH IS ALSO PUBLICLY

        11    AVAILABLE INFORMATION.  SO WE HAVE BOTH OF THOSE PIECES OF

        12    INFORMATION IN THIS ANALYSIS.  WE KNOW THE RACE OF THE

        13    CANDIDATES.  WE KNOW THE PARTY AFFILIATION OF THE CANDIDATES.

        14    WE KNOW WE ARE ANALYZING RACIAL VOTING BY LOOKING AT THE RACE

        15    OF VOTERS, BUT WE ARE NOT ANALYZING PARTY IDENTIFICATION.

        16    Q.   SO YES, YOU'VE TESTIFIED IN OTHER CASES THAT PARTY

        17    AFFILIATION RATHER THAN RACE IS DRIVING POLARIZATION?

        18    A.   I THINK ONE OF THE CONCLUSIONS YOU COULD DRAW FROM THIS IS

        19    THAT IT'S PARTY -- BECAUSE THE PARTY AFFILIATION OF THE

        20    CANDIDATES IS WHAT IS DRIVING -- IS WHAT IS IN EVIDENCE HERE

        21    FROM THIS POLARIZATION.  IT IS CONSISTENT THAT THE PARTY

        22    AFFILIATION OF THE CANDIDATES PRODUCES POLARIZED VOTING,

        23    WHEREAS THE RACIAL IDENTIFICATION OF THE CANDIDATES DOESN'T.

        24    YOU MIGHT INFER FROM THAT, GIVEN THE IMPORTANCE OF -- I'VE

        25    SPENT MOST OF MY CAREER STUDYING PARTY IDENTIFICATION.  GIVEN

3:19PM  1   THE UNIQUE IMPORTANCE OF PARTY IDENTIFICATION IN THE U.S. AND

        2   THE UNIQUE NATURE OF PARTY IDENTIFICATION IN THE U.S., I THINK

        3   IT IS A VERY REASONABLE INFERENCE THAT THAT'S PROBABLY RELATED

        4   TO PARTY IDENTIFICATION OF VOTERS.

        5       I SUSPECT VOTERS WHO CONSIDER THEMSELVES DEMOCRATS, WE

        6   HAVE ANY NUMBER OF STUDIES THAT SHOW THAT THEY ACTUALLY DO VOTE

        7   OVERWHELMINGLY FOR DEMOCRATS AND REPUBLICANS FOR REPUBLICANS,

        8   BUT WE DON'T HAVE THAT EVIDENCE HERE.  SO I DON'T THINK WE NEED

        9   TO -- I DON'T SEE HOW THAT IS SOMETHING WE HAVE TO REACH

       10   BECAUSE THAT'S NOT THE EVIDENCE WE HAVE HERE.

       11   Q.  OKAY.

       12   A.  SO AGAIN, I'M NOT TALKING ABOUT A CAUSAL -- IN ANY SENSE A

       13   CAUSAL ANALYSIS.  I'M JUST TALKING ABOUT WHAT EVIDENCE HAVE THE

       14   PLAINTIFFS PRODUCED IN THIS CASE ABOUT ELECTIONS IN THE WAY

       15   THAT ELECTION ANALYSIS IS ALWAYS CONDUCTED IN THIS CASE AND

       16   WHAT CAN WE DRAW FROM THAT.  WE CAN DRAW A CONCLUSION ABOUT HOW

       17   TWO DIFFERENT GROUPS VOTE AS GROUPS.  WE CAN ALSO DRAW A

       18   CONCLUSION ABOUT WHETHER THAT DIFFERENTIAL BEHAVIOR BY GROUPS

       19   IS RESPONDING TO THE CUE OF THE PARTY OF THE CANDIDATES OR IS

       20   RESPONDING TO THE CUE OF THE RACE OF THE CANDIDATES.  THOSE ARE

       21   THE TWO CONCLUSIONS WE CAN DRAW.

       22   Q.  OKAY.  SO THE STATISTICAL ANALYSIS AND THE DATA ARE NOT

       23   DISPUTED, IT SOUNDS LIKE, BUT THE OPINIONS OF THAT ANALYSIS AND

       24   THAT DATA, THAT IS WHAT IS IN DISPUTE, CORRECT?

       25   A.  IN SOME BROADER SENSE, I SUPPOSE IT IS.  I ACTUALLY -- I

3:20PM    1    MEAN, I COULD BE WRONG, BUT I DON'T THINK DR. HANDLEY AND I

         2    DISAGREE ABOUT WHAT THE ANALYSIS SHOWS.  AGAIN, AS DR. BURCH

         3    SAYS, THE ONLY THING THAT MATTERS IS WHETHER THE TWO GROUPS ARE

         4    VOTING DIFFERENTLY.  IF YOU BELIEVE THAT, THEN YOU BELIEVE THAT

         5    AND YOU CAN CALL IT WHAT YOU LIKE.

         6         THE DATA IS THE DATA IS THE DATA.  MY ANALYSIS AND DR.

         7    HANDLEY'S ANALYSIS ARE NOT COMING FROM TWO DIFFERENT UNIVERSES

         8    OR -- THEY ARE SHOWING -- IF SHE HAD ANALYZED THE RACIALLY

         9    NONCONTESTED ELECTIONS THAT I DID, SHE WOULD HAVE GOTTEN THE

        10    SAME RESULT BECAUSE I'M USING THE SAME DATA AND THE SAME

        11    TECHNIQUE.  SO WE ARE NOT DISAGREEING ABOUT WHAT THE PATTERN OF

        12    VOTING IS IN LOUISIANA.  WE ARE DISAGREEING MAYBE ABOUT ITS

        13    LEGAL SIGNIFICANCE OR MAYBE ABOUT WHAT YOU CALL IT, BUT I THINK

        14    WE BOTH RECOGNIZE THAT THIS IS -- THIS IS CONSISTENT PARTY

        15    POLARIZATION.  AND THEN WHAT YOU MAKE OF THAT IS EITHER A LEGAL

        16    ISSUE OR A MUCH DIFFERENT RESEARCH QUESTION THAN ANYBODY IS

        17    ANALYZING OR BRINGING TO THE COURT IN THIS OR ANY OTHER CASE

        18    I'VE BEEN INVOLVED IN.

        19    Q.  OKAY.  YOU TESTIFIED IN *NAACP V. EAST RAMAPO CENTRAL*

        20    *SCHOOL DISTRICT*, CORRECT?

        21    A.  I DID.

        22    Q.  AND THE COURT THERE CONCLUDED THAT YOUR TESTIMONY, WHILE

        23    SINCERE, DID NOT REFLECT CURRENT ESTABLISHED SCHOLARSHIP AND

        24    METHODS OF ANALYSIS OF RACIALLY POLARIZED VOTING AND VOTING

        25    ESTIMATES?

DR. J. ALFORD - CROSS

3:22PM    1    A.   I RECALL THAT JUDGE SEIBEL SAID EXACTLY THAT.

2    Q.   AND THE COURT, IN *PATINO V. THE CITY OF PASADENA* IN THE

3    SOUTHERN DISTRICT OF TEXAS, ALSO DISAGREED WITH YOUR OPINIONS

4    ON RACIAL BLOCK VOTING, CORRECT?

5    A.   YOU WILL HAVE TO REMIND ME.   THERE ARE A LOT OF CASES IN

6    TEXAS THAT SEEM TO GO ON CONTINUOUSLY ACROSS DECADE AFTER

7    DECADE.   I HONESTLY DON'T KNOW WHAT CASE YOU ARE TALKING ABOUT.

8    Q.   IF YOU DON'T RECALL, THAT IS OKAY.   YOU CAN SAY YOU DON'T

9    RECALL.

10    A.   I DON'T RECALL.

11    Q.   OKAY.   AND IN *TEXAS V. UNITED STATES* IN THE DC DISTRICT

12    COURT, THE COURT FOUND THAT YOUR APPROACH LIES OUTSIDE OF

13    ACCEPTED ACADEMIC NORMS AMONG REDISTRICTING EXPERTS AND INSTEAD

14    RELIED HEAVILY ON DR. HANDLEY'S ANALYSIS.   DO YOU RECALL THAT?

15    A.   I DEFINITELY RECALL THAT.

16    Q.   AND IN *MONTES V. CITY OF YAKIMA* IN THE EASTERN DISTRICT OF

17    WASHINGTON, THE COURT THERE ALSO DECLINED TO ACCEPT YOUR

18    ANALYSIS ON THE SECOND AND THIRD *GINGLES* PRECONDITIONS,

19    CORRECT?

20    A.   I DON'T THINK THAT IS CORRECT.

21    Q.   YOU DON'T THINK THAT IS CORRECT?

22    A.   I DON'T.

23    Q.   OKAY.   AND THEN IN 2009, IN THE NORTHERN DISTRICT OF

24    TEXAS, IN *BENAVIDEZ V. CITY OF IRVING*, THE COURT REJECTED YOUR

25    CONCLUSIONS AND ANALYSIS IN THE SECOND *GINGLES* PRECONDITIONS?

3:23PM    1    A.   THAT'S -- THAT'S A LONG TIME AGO.  I DON'T -- I'M PRETTY

        2    SURE THAT THE PLAINTIFFS WON THAT CASE, SINCE I'M PRETTY SURE

        3    THAT THE COURT WOULD HAVE HAD TO REJECT MY VIEW ABOUT WHAT

        4    CONSTITUTED COHESION.  OTHERWISE, THEY COULDN'T HAVE MADE IT

        5    PAST THE SECOND *GINGLES* THRESHOLD.  SO, YOU KNOW, PERSONALLY, I

        6    VIEW THAT AS A SUCCESS.  IF I'M MAKING MY POINT CLEARLY AND THE

        7    COURT HAS TO CLEARLY REJECT MY POINT IN ORDER TO GET TO WHERE

        8    THEY THINK THEY NEED TO BE, THEN I'VE DONE MY JOB.  I'VE MADE

        9    THEM DECIDE WHAT IS COHESION OR WHAT ISN'T COHESION IN A

       10    PARTICULAR SETTING.

       11        SO VERY OFTEN JUDGES DON'T AGREE -- JUDGES COME TO A

       12    CONCLUSION THAT IS DIFFERENT THAN WHAT I WOULD COME TO.

       13    CERTAINLY MORE AND MORE, AS I'M TESTIFYING ABOUT THE ROLE OF

       14    PARTY VERSUS THE ROLE OF RACE, AS AGAIN, I SAID, THAT IS NOT A

       15    SETTLED -- IN MY VIEW, NOT A SETTLED LEGAL ISSUE.  SO JUDGES

       16    OFTEN DON'T COME TO THE SAME CONCLUSION.  THEY OFTEN DON'T

       17    CREDIT MY TESTIMONY ABOUT PARTISANSHIP AS BEING OF ANY UTILITY.

       18    THEY JUST SIMPLY, AS BURCH WOULD HAVE IT, SIMPLY SAY THAT

       19    DOESN'T MATTER, AND I ACCEPT -- I AM PERFECTLY WILLING TO

       20    ACCEPT THAT.

       21        THE ONE THING I WOULD TAKE EXCEPTION TO, THOUGH, JUDGE

       22    SEIBEL -- I ONE HUNDRED PERCENT AGREE THAT THE PLAINTIFFS

       23    SHOULD HAVE WON THAT CASE, BUT ON THE BASIS OTHER THAN THE

       24    METHODOLOGICAL -- IN THE METHODOLOGICAL DISPUTE BETWEEN MYSELF

       25    AND DR. BARRETO, I WAS NOT THE ONE WHO WAS METHODOLOGICAL

DR. J. ALFORD - CROSS

3:25PM

1    DEFICIENT.  I APPARENTLY JUST WAS NOT SUFFICIENTLY PERSUASIVE

2    IN EXPLAINING METHODOLOGY.  THE THINGS HE WAS -- I MEAN, HE

3    SAID, FOR EXAMPLE, IN THE SOCIAL SCIENCE AND POLITICAL SCIENCE

4    IN PARTICULAR, WE NO LONGER PLACE ANY EMPHASIS ON CONFIDENCE

5    INTERVALS OR STATISTICAL SIGNIFICANCE AT ALL.  WE JUST DON'T

6    USE IT ANYMORE, THAT THAT IS A PRIMITIVE CONCEPT IN MODERN

7    POLITICAL SCIENCE, MODERN SOCIAL SCIENCE DOESN'T RELY ON.  HE

8    BASICALLY WAS ARGUING THAT THE COURT SHOULD IGNORE THE

9    CONFIDENCE INTERVALS.  I THINK THAT IS WRONG AS A MATTER OF

10    COURT PRECEDENT.  IT IS WRONG, WAY WRONG AS A MATTER OF WHAT WE

11    DO IN POLITICAL SCIENCE.

12        I HAVE PUBLISHED A LOT OF ARTICLES IN POLITICAL SCIENCE,

13    AND YOU DON'T PUBLISH ARTICLES BY MAKING ARGUMENTS ABOUT A

14    WHOLE BUNCH OF FINDINGS, NONE OF WHICH ARE STATISTICALLY

15    SIGNIFICANT.  SO -- AND THE JUDGE'S VIEW OF THAT WAS THAT

16    DR. BARRETO WAS CORRECTLY EXPLAINING MODERN POLITICAL SCIENCE

17    AND THAT I APPARENTLY WAS LOST IN THE PAST, AND THAT SIMPLY IS

18    -- AS A MATTER OF SORT OF DISCIPLINARY PRIDE, THAT IS JUST

19    INCORRECT.  DR. BARRETO WAS MISCHARACTERIZING STATISTICAL

20    SIGNIFICANCE AS IT IS USED IN THE SOCIAL SCIENCES AND IN

21    POLITICAL SCIENCE AND IN THE COURT, AND BECAUSE THE COURT

22    WANTED -- I WON'T SPEAK TO THE MOTIVATIONS OF JUDGE SEIBEL.  I

23    HAVE ALL KINDS OF REGARD FOR JUDGE SEIBEL.  BUT TO GET TO WHERE

24    JUDGE SEIBEL WANTED TO GET, BERETTA HAD TO BE RIGHT AND I HAD

25    TO BE WRONG, AND THAT'S PART OF THE GAME.  I DON'T DISPUTE IT.

3:26PM   1   I JUST, IN THIS PARTICULAR CASE, THERE WERE OTHER WAYS THAT

         2   COULD HAVE BEEN PHRASED THAT WOULD HAVE BEEN CORRECT.  THE WAY

         3   SHE PHRASED IT WAS SIMPLY INCORRECT.

         4   Q.   OKAY.  AND IN NONE OF THESE CASES DID THE COURT ADOPT YOUR

         5   OPINION THAT PARTY AFFILIATION INSTEAD OF RACE IS DRIVING

         6   POLARIZATION?  ISN'T THAT ALSO CORRECT?

         7   A.   IN THOSE PARTICULAR CASES?

         8   Q.   IN THOSE PARTICULAR CASES.

         9   A.   IN THE CASES WHERE THEY DECIDED FOR THE PLAINTIFFS, THEY

        10   DID NOT ADOPT THAT.  IN OTHER CASES, THE COURT HAS ADOPTED

        11   THAT.  SO IN THE RECENT CASE REVOLVING AROUND THE SAME ISSUE IN

        12   THE CHALLENGE TO THE AT-LARGE ELECTION OF THE SUPREME COURT AND

        13   THE COURT OF APPEALS IN TEXAS, THE COURT DID ADOPT THAT

        14   OPINION.  AND WE COULD CAREFULLY PARSE THAT, BASICALLY SAID

        15   THIS IS THE WAY IT WORKS.  IT DOESN'T MATTER FOR THE *GINGLES*

        16   THRESHOLD.  THE *GINGLES* THRESHOLD IS JUST A WAY TO GET TO THE

        17   BIG ISSUE.  AND SO FOR THE GINGLES THRESHOLD PURPOSE, ALL THAT

        18   MATTERS, AS DR. BURCH SAID, IS WHETHER THE TWO GROUPS ARE

        19   VOTING COHESIVELY AND VOTING DIFFERENTLY.

        20        THE COURT THEN SAID THAT WHEN YOU GET TO TOTALITY OF THE

        21   CIRCUMSTANCES, IN THE TOTALITY OF THE CIRCUMSTANCES, THAT'S

        22   RACIALLY POLARIZED VOTING, NOT *GINGLES* II, NOT *GINGLES* III, BUT

        23   PUTTING THEM TOGETHER AND SAYING, OKAY, IS THE VOTING RACIALLY

        24   POLARIZED.  AND THE COURT THERE SAID THAT IT WAS CLEAR THAT THE

        25   VOTING WAS POLARIZED ON THE BASIS OF PARTISANSHIP BUT NOT

3:27PM   1   POLARIZED ON THE BASIS OF RACE, AND THE COURT DECLINED TO RULE

         2   AGAINST THE AT-LARGE ELECTION OF SUPREME COURT JUDGES IN TEXAS.

         3            **MR. CAMPBELL-HARRIS:**  THANK YOU.  ONE SECOND, YOUR

         4   HONOR, WHILE I CONFER WITH COUNSEL.

         5            **THE COURT:**  TAKE A MINUTE.

         6            **MR. CAMPBELL-HARRIS:**  A COUPLE MORE QUESTIONS, YOUR

         7   HONOR.  CAN WE GO BACK TO TABLE 3 OF DR. ALFORD'S REPORT?

         8   **BY MR. CAMPBELL-HARRIS:**

         9   Q.  IN TABLE 3, ARE ANY OF THE ELECTIONS THAT YOU ANALYZED,

        10   WAS THERE A SINGLE REPUBLICAN CANDIDATE THAT RECEIVED -- A

        11   BLACK REPUBLICAN CANDIDATE THAT RECEIVED MORE THAN FIVE PERCENT

        12   OF THE WHITE VOTE?

        13   A.  I'M SORRY.  COULD YOU REPEAT THE QUESTION?

        14   Q.  I CAN.  IN ANY OF THE TABLES OR THE ELECTIONS THAT YOU

        15   ANALYZED, IN EXHIBIT 53, LEGISLATIVE EXHIBIT 53, WAS THERE A

        16   SINGLE BLACK REPUBLICAN CANDIDATE WHO RECEIVED MORE THAN FIVE

        17   PERCENT OF THE WHITE VOTE?

        18   A.  I DON'T BELIEVE SO.

        19   Q.  OKAY.  AND I WANT TO GO BACK AGAIN TO THE 75 PERCENT

        20   COHESION THRESHOLD ISSUE.  YOU TESTIFIED THAT IN AN ELECTION

        21   WITH MORE THAN TWO CANDIDATES, THE THRESHOLD FOR COHESION COULD

        22   BE LESS THAN 75 PERCENT.  IS THAT CORRECT?

        23   A.  IT COULD BE.

        24            **MR. CAMPBELL-HARRIS:**  THOSE ARE ALL THE QUESTIONS I

        25   HAVE, YOUR HONOR.  THANK YOU.

3:30PM   1          **THE COURT:**  MR. TUCKER, ANY REDIRECT?

2          **MR. TUCKER:**  NO REDIRECT, YOUR HONOR.

3          **THE COURT:**  YOU MAY STEP DOWN, SIR.  DO YOU HAVE A

4   WITNESS LEFT?

5          **MR. TUCKER:**  WE DO, YOUR HONOR.

6          **THE COURT:**  OKAY.  WE ARE GOING TO GO UNTIL 4.  WE

7   WILL TAKE JUST A FEW MINUTE RECESS.  WE MAY EVEN GO TO 4:30.

8   SEAN TRENDE.

9          **(RECESS TAKEN AT 3:30 P.M UNTIL 3:44 P.M.)**

10          **THE COURT:**  NEXT WITNESS.

11          **MR. STRACH:**  THANK YOU, YOUR HONOR.  THE DEFENDANTS

12   CALL SEAN TRENDE.

13          **(OATH ADMINISTERED.)**

14          **MR. STRACH:**  YOUR HONOR, MAY I APPROACH THE WITNESS

15   WITH HIS REPORT?

16          **THE COURT:**  YOU MAY.

17          **THE CLERK:**  SIR, WOULD YOU PLEASE STATE YOUR NAME FOR

18   THE RECORD AND SPELL IT FOR THE RECORD.

19          **THE WITNESS:**  YES, IT IS SEAN TRENDE, T-R-E-N-D-E.

20                    **SEAN TRENDE,**

21   **HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

22                 **DIRECT EXAMINATION**

23   **BY MR. STRACH:**

24   Q.  ALL RIGHT.  GOOD AFTERNOON, MR. TRENDE.  YOU'VE STATED

25   YOUR NAME FOR THE RECORD.  CAN YOU TELL THE COURT ABOUT YOUR

3:44PM    1    EDUCATION THROUGH 2001?

2    A.   YES.   I GRADUATED FROM YALE UNIVERSITY IN 1995 WITH A

3    DOUBLE MAJOR IN HISTORY AND POLITICAL SCIENCE.   I WENT TO LAW

4    SCHOOL AT DUKE IN 1998 AND GRADUATED WITH MY JD IN 2001.   AND

5    DUKE HAS A PROGRAM WHERE YOU CAN EARN A MASTER'S DEGREE ALONG

6    WITH YOUR JD, SO AT THE SAME TIME, I GOT A MASTER'S DEGREE IN

7    POLITICAL SCIENCE WITH FOCUS ON AMERICAN POLITICS.

8    Q.   ALL RIGHT.   WHAT DID YOU DO AFTER YOU GRADUATED FROM LAW

9    SCHOOL?

10    A.   I CLERKED FOR JUDGE DEANELL TACHA ON THE TENTH CIRCUIT,

11    FOR A YEAR, AND THEN I WENT TO WORK IN LAW FIRMS, KIRKLAND &

12    ELLIS IN WASHINGTON D.C., HUNTON & WILLIAMS IN RICHMOND.

13    Q.   ALL RIGHT.   WHAT ARE YOU DOING CURRENTLY?

14    A.   I'M CURRENTLY -- I RETIRED FROM THE PRACTICE OF LAW IN

15    2010 AND BECAME A POLITICAL WRITER.   I WORK FOR REAL CLEAR

16    POLITICS.

17    Q.   AND WHAT IS THAT?

18    A.   SO REAL CLEAR POLITICS IS A COMPANY THAT PRODUCES A

19    WEBSITE THAT COVERS POLITICAL ISSUES ACROSS THE SPECTRUM.

20    Q.   ALL RIGHT.   WHAT KIND OF ISSUES DOES IT COVER?

21    A.   SO IT'S POLITICS IN GENERAL.   IT WILL AGGREGATE NEWS

22    ARTICLES.   WE ALSO ARE FAMOUS FOR AGGREGATING POLLS, SO YOU

23    DON'T JUST SEE THE ONE POLL THAT A NEWS CHANNEL MIGHT COVER.

24    YOU CAN GET ALL THE POLLS AT ONCE.   AND WE ALSO PRODUCE

25    ORIGINAL CONTENT.

3:46PM    1    Q.   ALL RIGHT.  DO YOU PRODUCE ANY OF THAT ORIGINAL CONTENT?

       2    A.   I DO.

       3    Q.   WHAT KIND OF CONTENT?

       4    A.   SO MY MAIN FOCUS IS ON UNITED STATES ELECTIONS, WHERE

       5    THINGS STAND, WHERE THEY ARE LIKELY TO GO, SOME LEGAL ANALYSIS

       6    EVERY NOW AND AGAIN, BUT MOSTLY ANALYSIS OF ELECTIONS.

       7    Q.   ALL RIGHT.  DOES REAL CLEAR POLITICS HAVE EMPLOYEES IN AN

       8    OFFICE SOMEWHERE?

       9    A.   YES, WE'VE GOT ABOUT FIFTY EMPLOYEES, GIVE OR TAKE, AT ANY

      10    GIVEN TIME.  WE HAVE PHYSICAL OFFICES IN WASHINGTON D.C.

      11    Q.   ALL RIGHT.  AND ARE YOU AFFILIATED WITH ANY OTHER

      12    EMPLOYERS?

      13    A.   YES, I'M A VISITING SCHOLAR AT THE AMERICAN ENTERPRISE

      14    INSTITUTE.

      15    Q.   ALL RIGHT.  WE LEFT OFF WITH YOUR EDUCATION IN 2001.

      16    SINCE THEN, HAVE YOU COMPLETED ANY ADDITIONAL DEGREES?

      17    A.   YES.  SO IN 2016, I MATRICULATED -- I'M SORRY, I DO HAVE

      18    TO SAY IT THIS WAY -- THE OHIO STATE UNIVERSITY.  I ENROLLED IN

      19    A DOCTORAL PROGRAM IN POLITICAL SCIENCE.  AND WHEN I GOT THERE,

      20    THEY LOOKED AT THE STATISTICAL WORK THAT I HAD DONE FOR MY

      21    MASTER'S DEGREE AND SUBSEQUENT TO IT, AND THEY SUGGESTED THAT

      22    RATHER THAN DO THEIR POLITICAL SCIENCE RUN OF STATISTICAL

      23    ANALYSIS, THAT I GO TO THE DEPARTMENT OF STATISTICS.  SO I DID

      24    THAT, AND THREE YEARS LATER I EMERGED WITH MY MASTER'S IN

      25    APPLIED STATISTICS, WHICH I EARNED IN 2019.

S. TRENDE - DIRECT

3:47PM    1    Q.   ALL RIGHT.  HAVE YOU BEEN WORKING ON A PH.D.?

2    A.   I HAVE BEEN.

3    Q.   WHAT'S THE STATUS OF THAT?

4    A.   I SUCCESSFULLY DEFENDED MY DISSERTATION ABOUT A MONTH AGO

5    AND SHOULD BE AWARDED MY DOCTORATE IN THREE WEEKS.

6    Q.   ALL RIGHT.

7              **THE COURT:**  AND IS THAT IN STATISTICS OR IN POLITICAL

8    SCIENCE?

9              **THE WITNESS:**  I'M SORRY, YOUR HONOR.  IT'S IN

10    POLITICAL SCIENCE.

11    **BY MR. STRACH:**

12    Q.   WHAT WAS THE FORMAT OF YOUR DISSERTATION?  TALK TO THE

13    COURT A LITTLE BIT ABOUT YOUR DISSERTATION.

14    A.   SO RATHER THAN DO THE TRADITIONAL DISSERTATION WHERE YOU

15    FOCUS IN ON ONE SUBJECT AND RIGHT A BOOK-LENGTH REPORT, I DID

16    WHAT IS KNOWN AS A THREE-PAPERS DISSERTATION WHERE YOU WRITE

17    THREE PUBLISHABLE PAPERS ON A VARIETY OF SUBJECTS.

18         SO THE FIRST PAPER WAS ON ANALYSIS OF SUPREME COURT VOTING

19    BEHAVIOR IN THE EARLY 1900S.  THE SECOND PAPER, AND THIS IS A

20    BIT OF A MOUTHFUL, BUT IT WAS A METHODS PAPER ON USE OF

21    INTEGRATED NESTED LAPLACE APPROXIMATIONS FOR BAYESIAN ANALYSIS

22    OF SPATIAL STATISTICS.  THEN THE THIRD WAS ON THE USE OF

23    COMMUNITIES OF INTEREST IN REDISTRICTING SIMULATIONS.

24    Q.   AND DID YOU STUDY A VARIETY OF SIMULATION TECHNIQUES FOR

25    THIS?

S. TRENDE - DIRECT

3:49PM

1    A.    YES, FOR THAT THIRD PAPER, YOU KNOW, YOU STILL HAVE TO DO

2    THE REGULAR LITERATURE REVIEW THAT YOU WOULD HAVE FOR A REGULAR

3    DISSERTATION, SO I HAD TO LEARN HOW REDISTRICTING SIMULATIONS

4    HAD BEEN INVENTED, WHAT DIFFERENT TECHNIQUES WERE AVAILABLE,

5    HOW TO PROGRAM THEM AND THE LIKE.

6    Q.    DID YOU WRITE YOUR OWN SIMULATION CODE FOR THIS?

7    A.    I DID.

8    Q.    ALL RIGHT.  AND WHAT OTHER ASPECTS OF THE REDISTRICTING

9    DID YOU EXAMINE FOR THIS?

10    A.    WELL, WHEN YOU ARE WRITING SIMULATION CODE, YOU HAVE TO

11    TELL THE COMPUTER WHAT FACTORS OR CONSTRAINTS TO OPERATE UNDER,

12    SO YOU NEED TO KNOW HOW -- DIFFERENT APPROACHES TO CONTIGUITY,

13    AND THERE ARE DIFFERENT APPROACHES TO IT.  YOU HAVE TO KNOW --

14    I HAD TO LOOK AT DIFFERENT WAYS TO DEFINE COMMUNITIES OF

15    INTEREST.  AND THEN I ALSO -- MOST SIMULATIONS HAVE A

16    COMPACTNESS PARAMETER, SO I HAD TO EXAMINE THE DIFFERENT WAYS

17    THAT PEOPLE HAD DEFINED COMPACTNESS OVER THE YEARS.

18    Q.    ALL RIGHT.  AND HAVE YOU TAUGHT COLLEGE LEVEL COURSES?

19    A.    I HAVE.

20    Q.    WHAT ARE THOSE?

21    A.    FOR A SEMESTER AT OHIO WESLEYAN, I TAUGHT MASS MEDIA AND

22    AMERICAN POLITICS.  AT OHIO STATE, I TAUGHT THE INTRO TO

23    AMERICAN POLITICS COURSE FOUR TIMES.  I TAUGHT -- WELL, I

24    TAUGHT SURVEY METHODS ONCE, AND I WILL TEACH IT AGAIN IN THE

25    SPRING.  AND I TAUGHT A CLASS CALLED "VOTING AND AMERICAN

S. TRENDE - DIRECT

3:50PM

1    POLITICAL PARTICIPATION" FOUR TIMES NOW.

2    Q.  ALL RIGHT.  SO YOU WILL BE TEACHING IN THE SPRING IF THEY

3    ASK YOU TO STAY ON AT OHIO STATE?

4    A.  YES, THEY HAVE ASKED ME TO STAY ON AS A LECTURER.

5    Q.  ALL RIGHT.  TELL ME ABOUT THE POLITICAL PARTICIPATION AND

6    VOTING BEHAVIOR CLASS.  DID IT COVER THE VOTING RIGHTS ACT?

7    A.  IT DID.  IT STARTS OUT WITH AN EXAMINATION OF THE

8    POLITICAL SCIENCE LITERATURE ON THE DECISION OF WHETHER OR NOT

9    TO VOTE, HOW PEOPLE MAKE THEIR DECISIONS FOR WHOM TO VOTE.  THE

10   SECOND HALF OF THE CLASS KIND OF TIES THAT INTO THE LAW, SO WE

11   LOOK AT PHOTO ID LAWS, EARLY VOTE -- THE CASES ON PHOTO ID AND

12   EARLY VOTING AND HOW THE POLITICAL SCIENCE LITERATURE HAS BEEN

13   USED THERE.  WE SPEND A LOT OF TIME ON POLITICAL

14   GERRYMANDERING, ON THE VOTING RIGHTS ACT, AND ON RACIAL -- THE

15   14TH AMENDMENT CLAIMS.

16   Q.  ALL RIGHT.  AND DO YOU COVER THE *GINGLES* FACTORS IN THIS

17   CLASS?

18   A.  WE DO.  WE DO A FAIRLY DEEP DIVE INTO THE VOTING RIGHTS

19   ACT AND HOW IT IS INTERPRETED BY COURTS.

20   Q.  ALL RIGHT.  WHAT ABOUT RACIAL GERRYMANDERING; IS THAT

21   COVERED TOO?

22   A.  SAME THING.  WE SPEND A FAIR AMOUNT OF TIME ON 14TH

23   AMENDMENT CLAIMS AND HOW THEY HAVE EVOLVED AS WELL.

24   Q.  ALL RIGHT.  HAVE YOU EVER BEEN APPOINTED BY A COURT AS AN

25   EXPERT?

S. TRENDE - DIRECT

3:51PM   1    A.  I HAVE.  TWICE.

2    Q.  ALL RIGHT.  TELL US ABOUT THE FIRST INSTANCE.

3    A.  SO THE FIRST INSTANCE, I WAS ACTUALLY APPOINTED BY THE

4    SUPREME COURT OF BELIZE AS THE COURT'S EXPERT IN THEIR

5    COUNTRY'S VERSION OF *BAKER V. CARR*.  I WAS ASKED TO EXAMINE

6    THEIR MAPS AND DETERMINE WHETHER THEY COMPORTED WITH

7    INTERNATIONAL STANDARDS OF FAIRNESS, AND ALSO TO DESIGN

8    POTENTIAL REMEDIAL MAPS FOR USE.

9    Q.  ALL RIGHT.  WHAT ABOUT THE SECOND INSTANCE?

10   A.  SO THE SECOND INSTANCE, IN VIRGINIA, AFTER THE VIRGINIA

11   REDISTRICTING COMMISSION DEADLOCKED, THE SUPREME COURT OF

12   VIRGINIA APPOINTED TWO SPECIAL MASTERS TO DRAW THE MAPS.  AND

13   SO WE PRODUCED I THINK 160 DISTRICTS IN FOUR WEEKS FOR THE

14   COURT.

15   Q.  AND WHO WAS THE OTHER EXPERT?

16   A.  BERNIE GROFMAN, WHO WAS THE EXPERT IN *GINGLES* FOR THE

17   PLAINTIFFS.

18   Q.  AND ARE THE MAPS THAT YOU TWO DREW STILL CURRENTLY IN

19   EFFECT?

20   A.  THEY ARE.

21   Q.  HAVE YOU EVER BEEN APPOINTED BY A COMMISSION?

22   A.  YES.  I WAS APPOINTED BY THE ARIZONA INDEPENDENT

23   REDISTRICTING COMMISSION AS ONE OF THE VOTING RIGHTS EXPERTS

24   FOR THE LAWYERS IN THAT CASE.

25   Q.  ALL RIGHT.  AND HAVE YOU EVER SERVED AS AN EXPERT WITNESS

3:53PM    1    FOR PARTIES IN POLITICAL OR RACIAL GERRYMANDERING CASES BEFORE?

2    A.    YES, I HAVE BEEN IN SEVERAL CASES, THE TWO CASES THAT WENT

3    UP TO THE -- THE *NICHOLS* CASE AND THE *RUCHO* CASE THAT WENT UP

4    TO THE SUPREME COURT FOR POLITICAL GERRYMANDERING.  I TESTIFIED

5    IN THE MICHIGAN LITIGATION A FEW WEEKS AGO ON BEHALF OF

6    PLAINTIFFS THERE.  I'VE TESTIFIED ON BEHALF OF DEFENDANTS IN

7    THE SOUTH CAROLINA CASE THAT IS CURRENTLY BEFORE THE SUPREME

8    COURT AND A COUPLE OF OTHER PLACES.

9    Q.    WHAT ABOUT VRA CASES?  HAVE YOU TESTIFIED IN THOSE CASES?

10    A.    YES.  SO THE MICHIGAN CASE IS A VOTING RIGHTS ACT CASE.

11    THERE IS TESTIMONY PENDING WHENEVER THE TEXAS CASE GOES TO

12    TRIAL, AND THEN THE SOUTH CAROLINA CASE.  WELL, NO, THE SOUTH

13    CAROLINA CASE IS PURE 14TH AMENDMENT.

14    Q.    WHAT ABOUT MICHIGAN?

15    A.    THE MICHIGAN CASE IS BOTH 14TH AMENDMENT AND VRA.

16    Q.    REMIND ME, WHAT WAS YOUR ROLE IN THAT CASE?

17    A.    I WAS AN EXPERT FOR THE PLAINTIFFS IN THAT CASE.

18    Q.    OKAY.  HAVE YOU EVER BEEN EXCLUDED -- HAS YOUR TESTIMONY

19    EVER BEEN EXCLUDED?

20    A.    IT HAS BEEN.

21    Q.    HOW MANY TIMES?

22    A.    ONCE.

23    Q.    TELL THE COURT ABOUT THAT CASE.

24    A.    YEAH, THAT WAS AN ELECTION, A VOTE DILUTION CASE IN -- I'M

25    SORRY, A VOTE -- THE NONREDISTRICTING TYPE OF VOTING RIGHTS ACT

3:54PM   1   CLAIM THAT I'M BLANKING ON RIGHT NOW, IN GEORGIA, WHERE THE

         2   COURT RULED THAT I DIDN'T HAVE SUFFICIENT EXPERTISE IN ELECTION

         3   ADMINISTRATION TO GIVE AN OPINION.

         4   Q.  ALL RIGHT.  DID THAT CASE INVOLVE REDISTRICTING AT ALL?

         5   A.  NOT AT ALL.

         6        **MR. STRACH:**  YOUR HONOR, AT THIS TIME, WE WOULD LIKE

         7   TO TENDER MR. TRENDE AS AN EXPERT IN THE FIELDS OF POLITICAL

         8   METHODOLOGY, AMERICAN POLITICS, WITH AN EMPHASIS ON VOTING

         9   BEHAVIOR AND REDISTRICTING, AND THE VOTING RIGHTS ACT.

        10        **THE COURT:**  YOU ARE TENDERING HIM AS AN EXPERT IN THE

        11   VOTING RIGHTS ACT?

        12        **MR. STRACH:**  YES.

        13        **THE COURT:**  YOU ARE TENDERING HIM IN A LEGAL FIELD?

        14        **MR. STRACH:**  WELL, BASED ON HIS EXPERIENCE AS AN

        15   EXPERT IN NUMEROUS VRA CASES.

        16        **THE COURT:**  AND SO MY ROLE IN THIS IS WHAT?

        17        **MR. STRACH:**  WELL, HE WILL BE TESTIFYING ABOUT

        18   VRA-RELATED ISSUES.  THE COURT IS GOING TO HAVE TO DECIDE

        19   WHETHER THEY AGREE WITH MR. TRENDE OR NOT, BUT HE WILL BE

        20   TESTIFYING ABOUT THINGS LIKE THE *GINGLES* FACTORS AND THINGS

        21   LIKE THAT THAT THE COURT WILL ULTIMATELY HAVE TO RULE UPON.

        22        **THE COURT:**  SO HE IS GOING TO TELL ME WHAT THE LAW

        23   IS?

        24        **MR. STRACH:**  NO.

        25        **THE COURT:**  THEN I DON'T UNDERSTAND.  OKAY.  LET ME

3:55PM   1   JUST HEAR -- DO YOU HAVE A CROSS ON THE TENDER?

2   **MS. THOMAS:**   YOUR HONOR, WE DON'T HAVE A CROSS ON THE

3   TENDER AT THIS TIME.   WE DID FILE A *DAUBERT* MOTION WHICH THIS

4   COURT HAS ALREADY DECIDED, AND WE ARE WILLING TO STAND ON THAT.

5   WE STILL HAVE SOME RESERVATIONS ABOUT SOME OF MR. TRENDE'S

6   OPINIONS, BUT WE BELIEVE THOSE CAN BE SUFFICIENTLY --

7   **THE COURT:**   FULLY EXPLORED ON CROSS-EXAMINATION?

8   **MS. THOMAS:**   EXACTLY.

9   **THE COURT:**   I WILL ACCEPT HIM IN THOSE FIELDS, BUT

10   I'M NOT GOING TO TAKE LEGAL CONCLUSIONS FROM HIM.

11   **MR. STRACH:**   ABSOLUTELY.   IN FACT, I'VE ALREADY

12   TALKED TO HIM ABOUT IT.

13   **THE COURT:**   ALL RIGHT.   LET'S GO.

14   **MR. STRACH:**   I'M WITH YOU.

15   **THE COURT:**   I'VE BEEN SITTING HERE FOR FOUR DAYS, AND

16   I WOULD LIKE TO -- GO AHEAD.   GO AHEAD.

17   **MR. STRACH:**   I'M WITH YOU.   NO, JUDGE, YOU ARE

18   EXACTLY RIGHT.   AT THIS POINT, YOUR HONOR, WE WOULD LIKE TO

19   MOVE THE ADMISSION OF MR. TRENDE'S REPORTS, WHICH ARE SOS

20   EXHIBITS 3 AND 6.

21   **MS. THOMAS:**   NO OBJECTION.

22   **THE COURT:**   ADMITTED.

23   **BY MR. STRACH:**

24   Q.   ALL RIGHT.   MR. TRENDE, JUST TELL THE COURT IN GENERAL

25   WHAT YOU WERE ASKED TO DO IN THIS CASE.

3:57PM

1    A.  SO I WAS ASKED TO EXAMINE THE DEMONSTRATION DISTRICTS OF

2    MR. COOPER AND EXAMINE WHETHER THE POPULATIONS IN THOSE

3    DISTRICTS WERE COMPACT.

4    Q.  ALL RIGHT.  WHEN YOU SAY COMPACTNESS OF THE POPULATION,

5    WHAT DO YOU MEAN BY THAT?

6    A.  SO THERE'S A DIFFERENCE IN THE LITERATURE I'VE LOOKED AT

7    ON COMPACTNESS BETWEEN THE WAY THAT A DISTRICT OR REALLY ANY

8    ENTITY IS MEASURED IN TERMS OF COMPACTNESS VERSUS POINTS, THE

9    INDIVIDUALS IN IT, AND I UNDERSTAND -- I'M NOT OFFERING A FINAL

10   OPINION ON IT, BUT I UNDERSTAND THAT THE DEFENDANTS' THEORY IN

11   THE CASE IS THAT THE VOTING RIGHTS ACT SHOULD FOCUS ON

12   POPULATION COMPACTNESS RATHER THAN DISTRICT COMPACTNESS, AND SO

13   I WAS EXPLORING THE DIFFERENCES BETWEEN THE TWO.

14   Q.  OKAY.  DO YOU USE METRICS LIKE REOCK, POLSBY-POPPER AND SO

15   FORTH FOR MEASURING THE COMPACTNESS OF A DISTRICT?

16   A.  ABSOLUTELY.  THOSE ARE THE PROPER METRICS FOR DETERMINING

17   THE COMPACTNESS OF THE DISTRICT ITSELF.  YES.

18   Q.  ALL RIGHT.  ARE THOSE USEFUL, THOUGH, FOR MEASURING

19   POPULATION COMPACTNESS?

20   A.  THEY REALLY ARE NOT.  SO YOU CAN THINK OF IT IN TERMS OF

21   THIS COURTROOM.  IF YOU WANTED TO KNOW WHETHER THE COURTROOM

22   ITSELF WAS COMPACT, YOU COULD EASILY MEASURE THE BOUNDARIES,

23   THE WALLS OF THE COURTROOM, AND YOU COULD APPLY POLSBY-POPPER,

24   REOCK, YOU COULD SEE HOW MUCH OF THE BOUNDING CIRCLE THE

25   COURTROOM FILLED.  BUT IF YOU WANTED TO KNOW WHETHER THE PEOPLE

3:58PM

1    WITHIN THE COURTROOM WERE DISTRIBUTED IN A COMPACT MANNER, YOU

2    CAN'T REALLY MEASURE THE POINTS BECAUSE THERE'S A LOT OF EMPTY

3    SPACE IN BETWEEN US.  SO THE LITERATURE EXPLORES DIFFERENT WAYS

4    OF MEASURING THE COMPACTNESS OF THE INDIVIDUALS.

5    Q.  ALL RIGHT.  SO DID YOU LOOK AT EVERY DISTRICT MR. COOPER

6    DREW?

7    A.  I DID NOT.

8    Q.  WHICH ONES DID YOU LOOK AT?

9    A.  I LOOKED AT THE NEW DEMONSTRATION DISTRICTS OR

10   ILLUSTRATIVE DISTRICTS THAT HE HAD PROVIDED.

11   Q.  ALL RIGHT.  AND WHY DIDN'T YOU LOOK AT THE OTHER

12   DISTRICTS?

13   A.  WELL, FIRST, BECAUSE THOSE ARE THE MOST RELEVANT ISSUES TO

14   THE CASE, BUT IF YOU ARE TALKING ABOUT, SAY, A WHITE MAJORITY

15   DISTRICT, YOU KNOW, AS I UNDERSTAND THE *GINGLES* TEST, IT'S THE

16   POPULATION THAT'S SUFFICIENT TO BE 50 PERCENT PLUS ONE OF THE

17   POPULATION IN THE DISTRICT.  WELL, IF IT'S A MAJORITY WHITE

18   DISTRICT, THERE'S NOT GOING TO BE A MINORITY POPULATION, AND IT

19   IS SUFFICIENT TO BE 50 PERCENT PLUS ONE OF THE POPULATION BY

20   DEFINITION.  SO IT JUST DIDN'T MAKE SENSE.

21       YOU KNOW, IF THIS WERE A RACIAL GERRYMANDERING CASE OR

22   SOMETHING WHERE YOU WERE INTERESTED -- A 14TH AMENDMENT CLAIM

23   WHERE YOU WERE INTERESTED IN LOOKING AND COMPARING THE WHITE

24   POPULATION, HOW IT IS TREATED, TO THE BLACK POPULATION, THEN

25   YOU MIGHT DO THAT SORT OF ANALYSIS, BUT SINCE THE PRONG OF

4:00PM    1    *GINGLES* I'M LOOKING AT A SOLELY FOCUSED ON, AS I UNDERSTAND IT,

        2    ON THE COMPACTNESS OF THE MINORITY POPULATION, I SOLELY LOOKED

        3    AT THE DISTRICTS WHERE THERE IS A MINORITY POPULATION

        4    SUFFICIENT TO BE 50 PERCENT PLUS ONE OF THE POPULATION.

        5    Q.  ALL RIGHT.  AND IN YOUR OPINION, ARE ALL OF PLAINTIFFS',

        6    MR. COOPER'S MAJORITY BLACK DISTRICTS, DO THEY HAVE

        7    GEOGRAPHICALLY COMPACT BLACK POPULATIONS?

        8    A.  I THINK SOME DO.  IT'S NOT SOMETHING THAT'S DESIGNED TO

        9    FAIL.  YOU CAN MEET THIS TEST, AND WE HAVE SOME EXAMPLES OF

       10    THAT.  BUT FOR THE MOST PART -- BUT THE NEW DISTRICTS THAT HE

       11    DRAWS AND INTRODUCES, NO, THEY DO NOT.

       12    Q.  ALL RIGHT.  WELL, LET'S JUST LOOK AT A FEW EXAMPLES, MR.

       13    TRENDE.  WE ARE GOING TO PULL UP MR. TRENDE'S REPORT AT SOS 3

       14    FOR US, AND LOOK AT FIGURE 5, PAGE 13.

       15        ALL RIGHT.  WOULD YOU JUST BLOW THAT UP A LITTLE BIT, IF

       16    IT IS POSSIBLE.  AND I BELIEVE, MR. TRENDE, THIS IS HOUSE

       17    DISTRICT 1?

       18    A.  THAT IS CORRECT.

       19    Q.  IS THIS MR. COOPER'S VERSION OF HD 1?

       20    A.  THAT IS RIGHT.  THIS IS THE DISTRICT AS MR. COOPER DREW

       21    IT.

       22    Q.  ALL RIGHT.  WHAT KIND OF MAP -- WHAT DO YOU CALL THIS KIND

       23    OF MAP THAT WE ARE LOOKING AT RIGHT NOW?

       24    A.  SO THIS IS CALLED A DOT DENSITY MAP.

       25    Q.  OKAY.  AND ARE YOU AWARE OF DOT DENSITY MAPS BEING USED IN

S. TRENDE - DIRECT

4:01PM  1   LITIGATION BEFORE?

2   A.   YES.   I DON'T KNOW THE FIRST TIME THAT THEY WERE

3   NECESSARILY USED, BUT THE FIRST TIME OF WHICH I'M AWARE WAS IN

4   THE *BETHUNE-HILL* CASE.

5   Q.   WHAT ARE THEY USED TO DO?

6   A.   SO YOU CAN THINK OF KIND OF THE TRADITIONAL -- WE CALL

7   THEM CHOROPLETH MAPS, BUT THEY ARE THE MAPS -- I HAVE SOME OF

8   THEM IN THE REPORT AS WELL, WHERE YOU WOULD, SAY, ILLUSTRATE A

9   PRECINCT OR BLOCK MAP OF THE AREA, AND YOU WOULD SHADE THE

10   PRECINCTS OR THE BLOCKS BY THE BVAP.   SO YOU WOULD HAVE KIND OF

11   A PATCHWORK OF -- THE SIMPLEST EXAMPLE IS THE PRECINCTS.   AND

12   THOSE ARE USEFUL.   THEY SERVE THEIR PURPOSE OF SHOWING WHERE

13   KIND OF THE PERCENTAGES OF BLACK VERSUS WHITE RESIDENTS LIVE.

14        THE PROBLEM WITH THOSE IS THAT THEY TREAT A -- A PRECINCT

15   THAT HAS ONE RESIDENT THE SAME AS IT TREATS A PRECINCT WITH A

16   HUNDRED RESIDENTS OR A THOUSAND RESIDENTS.

17        SO WHAT THE DOT DENSITY MAP DOES, IT'S REALLY SOMETHING

18   YOU CAN KIND OF USE HAND-IN-GLOVE WITH THE CHOROPLETH MAPS.

19   THE DOT DENSITY MAPS ALLOW US TO SEE THE DISTRIBUTION OF

20   INDIVIDUALS WITHIN THE DISTRICT BETTER THAN A CHOROPLETH MAP.

21   Q.   ALL RIGHT.   AND WHAT DO THE VARIOUS DOTS ON THIS MAP

22   REPRESENT?

23   A.   SO THE DOTS ON THIS MAP, EVERY BLUE DOT REPRESENTS TEN

24   BLACK RESIDENTS OF VOTING AGE, AND AN ORANGE X REPRESENTS TEN

25   WHITE RESIDENTS OF VOTING AGE.

4:03PM  1    Q.   OKAY.  AND IT LOOKS LIKE THE XS ARE A BIT LARGER THAN THE

        2    DOTS.  WHY IS THAT?

        3    A.   SO THE WAY THAT THE SOFTWARE IS DESIGNED TO CREATE THE

        4    MAPS IS THAT IT DRAWS THEM IN LAYERS.  SO THERE'S THE

        5    BACKGROUND MAP THAT IS TAKEN FROM OPEN STREET MAP.  THE NEXT

        6    LAYER IT WILL DRAW IS THE DISTRICT BOUNDARY.  THE NEXT LAYER IT

        7    DRAWS YOU HAVE TO SELECT, SO IT DRAWS THE WHITE OR THE ORANGE

        8    XS NEXT.  AND THEN THE BLUE DOTS ARE DRAWN ON TOP OF THAT.

        9         AND IF THE ORANGE XS AND THE BLUE DOTS WERE ALL THE SAME

       10    SIZE, THE BLUE DOT WOULD COVER UP AN ORANGE X, AND IT WOULD

       11    MAKE A PLACE LOOK LIKE IT HAS ONLY BLACK RESIDENTS, WHEN IN

       12    FACT IT IS MULTI-RACIAL.  SO MAKING THE ORANGE X A LITTLE BIT

       13    LARGER ALLOWS THOSE XS TO STAND OUT WHERE BOTH BLACK AND WHITE

       14    RESIDENTS RESIDE IN THE SAME PLACE.

       15    Q.   ALL RIGHT.  COULD SOMEONE TRY THIS IN A DIFFERENT WAY, IF

       16    THEY WANTED TO?

       17    A.   YES, SOMEONE WHO IS FAMILIAR WITH THE R -- THE R, IT'S

       18    JUST THE LETTER R -- PROGRAMMING PACKAGE, WHICH IS KIND OF THE

       19    STANDARD USE STATISTICAL ANALYSIS TOOL IN POLITICAL SCIENCE AND

       20    STATISTICS.  THERE IS JUST A SINGLE LABEL THAT HAS TO BE

       21    CHANGED.  IT'S CALLED SIZE, AND YOU WOULD TAKE THE SIZE AND YOU

       22    WOULD MAKE IT 5 INSTEAD OF 3, IF YOU THOUGHT THAT THIS WAS

       23    MISLEADING.

       24    Q.   ALL RIGHT.  IS THERE ANY ROUNDING INVOLVED IN THE DOTS?

       25    A.   NECESSARILY.  I MEAN, YOU COULD DRAW THIS MAP WHERE A DOT

S. TRENDE - DIRECT

4:04PM

1   REPRESENTED ONE PERSON, BUT I WILL TESTIFY IT LOOKS LIKE A MESS

2   BECAUSE THERE'S SO MUCH OVERPLOTTING.  SO IF YOU WANT TO MAKE

3   THE XS AND DOTS REPRESENT MORE PEOPLE, THERE'S INEVITABLY GOING

4   TO BE SOME ROUNDING THAT GOES ON.  SO A DISTRICT WITH 22 WHITE

5   RESIDENTS IS JUST GOING TO GET 2 XS.

6   Q.  ALL RIGHT.  SO JUST IN GENERAL, LOOKING AT THIS MAP, CAN

7   YOU EXPLAIN TO THE COURT WHAT YOU ARE TRYING TO MEASURE THROUGH

8   THIS MAP?

9   A.  SO WHAT THE -- WHAT THE REOCK OR THE POLSBY-POPPER SCORE

10  WOULD MEASURE IS IT WOULD LOOK AT THAT PERIMETER AND TRY TO

11  DETERMINE IF IT IS COMPACT.  THE REOCK SCORE WOULD IMAGINE A

12  CIRCLE AROUND THE DISTRICT AND WOULD TELL YOU WHAT PERCENTAGE

13  OF THAT CIRCLE THE DISTRICT FILLS.  A REOCK SCORE OF .25

14  LITERALLY MEANS IT FILLS UP 25 PERCENT OF THE BOUNDING DISTRICT

15  OR THE BOUNDING CIRCLE.

16      POLSBY-POPPER WOULD CREATE A CIRCLE WITH THE SAME

17  PERIMETER AS THE DISTRICT AND TELL YOU WHAT PERCENTAGE OF THAT

18  CIRCLE IT FILLED.

19      THE PROBLEM AGAIN IS THAT WE ARE LOOKING AT POPULATIONS

20  HERE.  WE ARE TRYING TO FIGURE OUT THESE DOTS.  SO WHAT THESE

21  DOTS START US DOWN THE PATH TO DO IS THEY GIVE YOU AN IDEA OF

22  WHAT THE DISTRIBUTION OF BLACK AND WHITE RESIDENTS IN THE

23  DISTRICT THAT MR. COOPER DREW WOULD BE.

24  Q.  OKAY.  SO ARE THERE DIFFERENT WAYS THE RESIDENTS COULD BE

25  COMBINED TO REACH 50 PERCENT PLUS ONE IN ANY GIVEN DISTRICT?

4:06PM

1    A.  SO THAT'S WHERE THIS STARTS TO GET CONCEPTUALLY TRICKY IS

2    THAT BECAUSE THIS DISTRICT IS MORE THAN 50.0001 PERCENT BVAP,

3    THERE'S A LOT OF DIFFERENT WAYS THAT THESE BLUE DOTS COULD BE

4    COMBINED TO CREATE A 50 PERCENT PLUS ONE POPULATION.  AND SO

5    THE VOTING RIGHTS ACT JUST REQUIRES ONE, AS I UNDERSTAND IT.

6    IT'S -- AS I UNDERSTAND *GINGLES* 1, IT'S A -- THE MINORITY GROUP

7    SUFFICIENTLY COMPACT TO CONSTITUTE 50 PERCENT PLUS ONE OF THE

8    POPULATION.

9        SO WHAT WE ARE LOOKING FOR IS A WAY TO IDENTIFY THE

10   VARIOUS COMPACT GROUPINGS OF BLACK RESIDENTS OF THIS DISTRICT

11   AND KIND OF GIVE THE BENEFIT OF THE DOUBT TO THE PLAINTIFFS,

12   FRANKLY, BY SELECTING THE MOST COMPACT ONE, KIND OF TRAINING

13   THE EYE ON THOSE DOTS, BECAUSE YOU CAN SEE IN THE BOTTOM, THERE

14   ARE ACTUALLY SOME VERY COMPACT POPULATIONS DOWN THERE.  IF

15   THOSE HAD BEEN -- IF THOSE ADDED UP TO 50 PERCENT OF THE

16   DISTRICT'S POPULATION, THEN THIS MAP DOES WHAT IT IS SUPPOSED

17   TO DO.  IT DEMONSTRATES -- THE PLAINTIFFS HAVE DEMONSTRATED A

18   SUFFICIENTLY COMPACT POPULATION TO BE 50 PERCENT PLUS ONE.  AND

19   THE REST OF THE DOTS ARE JUST THERE BECAUSE YOU HAVE TO MEET

20   THE EQUAL POPULATION REQUIREMENT.

21       SO WHAT WE ARE REALLY TRYING TO DO IS DETERMINE, LIKE, ARE

22   THESE DIFFERENT CLUSTERS DOWN AT THE BOTTOM SUFFICIENT TO GET

23   TO 50 PERCENT PLUS ONE, OR DO YOU HAVE TO TAKE IN ISOLATED OR

24   DISPARATE COMMUNITIES WITHIN THE DISTRICT BOUNDARY.

25   Q.  ALL RIGHT.  SO HOW DO YOU MEASURE COMPACTNESS OF THE

4:08PM    1    POPULATION THROUGH THIS METHOD?

          2    A.   SO AS I WAS DOING MY WORK FOR MY DISSERTATION, I CAME

          3    ACROSS -- I LOOKED AT EARLY SIMULATIONS, AND AS IT TURNS OUT,

          4    MOST OF THE PERIMETER COMPACTNESS MEASURES COME LATER, REOCK --

          5    IT'S JUST R-E-O-C-K -- WAS DEVELOPED IN THE EARLY '60S, AND

          6    THEN SOMETHING CALLED THE MOMENT OF INERTIA APPROACH IS WHAT

          7    APPEARS NEXT.   AND THE EARLY COMPUTER SIMULATIONS, WHEN THEY

          8    ARE TRYING TO MEASURE COMPACTNESS, USE THIS MOMENT OF INERTIA

          9    APPROACH TO DETERMINE THE COMPACTNESS OF INDIVIDUAL RESIDENTS.

         10    Q.   ALL RIGHT.   AND HOW DOES IT DO THAT EXACTLY?

         11    A.   SO MATHEMATICALLY, IT'S A LITTLE BIT DIFFICULT TO EXPLAIN,

         12    FRANKLY, BUT YOU CAN THINK OF IT IN TERMS OF, AGAIN, THE

         13    RESIDENTS OR THE PEOPLE WHO LIVE IN THIS COURTROOM RIGHT NOW.

         14    YOU FIND THE GEOGRAPHIC CENTER OF THEM, AND THEN YOU START

         15    MEASURING DISTANCES FROM THAT CENTER TO EACH INDIVIDUAL.

         16         AND THE IDEA IS, IF WE WERE ALL CLUSTERED AROUND THE

         17    TABLE, WHICH I THINK MOST PEOPLE WOULD CONSIDER VERY -- THE

         18    ESSENCE OF A COMPACT POPULATION, THE DISTANCES FROM THAT CENTER

         19    TO THE INDIVIDUALS WOULDN'T BE VERY FAR.   IT WOULD JUST BE THE

         20    SUM OF A BUNCH OF LINES COMING OUT FROM THE TABLE.   BUT IF WE

         21    ALL MOVED INTO THE CORNERS OF THE COURTROOM, THOSE DISTANCES

         22    WOULD BE VERY LARGE, AND IT WOULD SHOW UP IN THE MOMENT OF

         23    INERTIA METRICS.   SO THE MOST COMPACT GROUPING WOULD BE HAVING

         24    US BE IN A VERY SMALL CONCENTRATED GEOGRAPHIC AREA CLOSE TO OUR

         25    POPULATION CENTERS.

4:09PM    1    Q.   ALL RIGHT.   IN THIS MOMENT OF INERTIA CONCEPT THAT YOU ARE

          2    USING HERE, IS THIS SOMETHING THAT YOU FOUND INDEPENDENT OF

          3    THIS PARTICULAR CASE?

          4    A.   ABSOLUTELY.   I FOUND IT BEFORE I WAS RETAINED.

          5    Q.   OKAY.   HOW DOES YOUR ALGORITHM MEASURE THE MOMENT OF

          6    INERTIA?

          7    A.   SO LIKE I SAID, THERE'S A BUNCH OF DIFFERENT WAYS THAT YOU

          8    CAN COMBINE THESE INDIVIDUALS IN THIS PARTICULAR DISTRICT TO

          9    GET TO 50 PERCENT PLUS ONE OF THE DISTRICT POPULATION.   SO WHAT

         10    THE ALGORITHM DOES IS IT ITERATES ITS STARTING POINT THROUGH

         11    DIFFERENT POPULATIONS -- THROUGH DIFFERENT PRECINCTS IN THE

         12    DISTRICT.   IT ENUMERATES ALL OF THE DIFFERENT COMBINATIONS THAT

         13    -- COMPACT COMBINATIONS THERE WOULD BE.   AND AS IT IS GOING,

         14    IT'S TALLYING WHICH OF THOSE ENUMERATIONS HAS THE SMALLEST

         15    MOMENT OF INERTIA.

         16        AND AGAIN, I WANT TO EMPHASIZE, THIS IS JUST TO HELP US

         17    IDENTIFY IN THIS DISTRICT WHAT IS THE MOST COMPACT POPULATION,

         18    WHAT'S THE BEST CASE SCENARIO FOR THE PLAINTIFFS TO SAY THAT

         19    THIS PARTICULAR DISTRICT ILLUSTRATES A COMPACT 50 PERCENT PLUS

         20    ONE BLACK POPULATION.

         21    Q.   IN THE LITERATURE, HAS ANYONE EVER DISPUTED, TO YOUR

         22    KNOWLEDGE, WHETHER MOMENT OF INERTIA IS A PROPER WAY TO MEASURE

         23    POPULATION COMPACTNESS?

         24    A.   I'M NOT AWARE OF ANY DISPUTES ABOUT IT, AND I'M NOT AWARE

         25    OF A LOT OF ALTERNATIVES EITHER, FRANKLY.

4:11PM  1    Q.  OKAY.  YOU KNOW, I THINK YOU DID USE ONE OTHER POTENTIAL

2    ALTERNATIVE.  CAN YOU DESCRIBE TO THE COURT WHAT YOU DID THERE?

3    A.  SO ONE ALTERNATIVE WAS, LOOKING AT A DICTIONARY FROM 1978,

4    THE DEFINITION OF COMPACTNESS IN IT EMPHASIZED SMALL AREAS.

5    AND THROUGH MY WORK ON REDISTRICTING SIMULATIONS, ONE OF THE

6    PREMIER SIMULATION TECHNIQUES BY TWO PROFESSORS, JOWEI CHEN AND

7    JONATHAN RODDEN, R-O-D-D-E-N, LOOKS AT -- IT GENERATES COMPACT

8    DISTRICTS BY USING A COMPACTNESS CONCEPT THAT KEEPS THE

9    PRECINCTS CLOSE TOGETHER.

10           AND SO USING -- I THOUGHT THAT MIGHT BE APPROPRIATE

11    BECAUSE THIS IS -- THE 1978 DEFINITION IS WHAT THE COURT WOULD

12    HAVE UNDERSTOOD COMPACTNESS TO MEAN IN 1986 UNDER SOME

13    ARGUMENTS, SO THIS USES THAT SAME CONCEPTION.  THE COURT WILL

14    ULTIMATELY DECIDE THAT.  I DON'T MEAN TO INVADE THE PROVINCE OF

15    THE COURT.  THAT WAS JUST MY THOUGHT PROCESS FOR USING THIS

16    TECHNIQUE.

17           **MS. THOMAS:**  I'M JUST GOING TO OBJECT TO THAT ANSWER

18    TO THE EXTENT THAT I'VE GIVEN QUITE A BIT OF LEEWAY AS FAR AS

19    GETTING INTO LEGAL OPINIONS, BUT I THINK THAT LAST ANSWER

20    REALLY CROSSED THE LINE.

21           **THE COURT:**  WELL, I'M GOING TO JUST LET IT GO TO THE

22    WEIGHT.  I MEAN, I'M GOING TO LET IT GO TO THE WEIGHT.  YOUR

23    OBJECTION IS OVERRULED.

24           **MR. STRACH:**  THANK YOU, YOUR HONOR.

25    **BY MR. STRACH:**

4:12PM  1    Q.   WHAT ARE THE DIFFERENCES BETWEEN WHAT YOU DESCRIBED AS

2    THIS SORT OF CHEN-RODDEN APPROACH VERSUS MOMENT OF INERTIA?

3    A.   SO THE DIFFERENCE IS, THE MOMENT OF INERTIA IS LOOKING AT

4    EACH OF THESE DOTS, FINDING THE CENTER OF THE DOTS AND THEN

5    MEASURING THE DISTANCES FROM THAT CENTER TO EACH INDIVIDUAL DOT

6    AND TAKING THE SCORE FROM THERE.   THE CHEN AND RODDEN APPROACH

7    IS TAKING A PRECINCT AND THEN SELECTING THE PRECINCT WITH THE

8    CLOSEST CENTROID.   AND SO IT BUILDS OUT THE POPULATIONS THAT

9    WAY BY MAKING SURE THE PRECINCT CENTERS ARE CLOSE TO EACH

10    OTHER.

11         AND AGAIN, THAT'S JUST THE WAY THAT SOMEONE IN THE

12    PEER-REVIEWED LITERATURE CONCEPTUALIZED THE IDEA OF

13    COMPACTNESS.   SO THAT'S ANOTHER WAY TO THINK ABOUT THIS.

14    Q.   ALL RIGHT.   SO THERE'S BEEN SOME CRITICISM OF YOU IN THIS

15    CASE BY THE PLAINTIFFS IN THE WAY OF SAYING THAT THESE

16    TECHNIQUES HAVEN'T BEEN USED TO DRAW WHOLE DISTRICTS.   DO YOU

17    RECALL THAT CRITICISM?

18    A.   YES.

19    Q.   WHAT'S YOUR RESPONSE TO THAT?

20    A.   WELL, CERTAINLY IN THE REDISTRICTING SIMULATIONS, THAT WAS

21    THE APPLICATION OF THE CONCEPTS.   THEY WERE USING THESE

22    CONCEPTS OF COMPACTNESS TO DEFINE COMPACTNESS FOR PURPOSES OF A

23    SIMULATION.   BUT IT'S REALLY THE CONCEPTION OF COMPACTNESS THAT

24    MATTERS AND THAT CAN BE APPLIED IN DIFFERENT CIRCUMSTANCES.   IN

25    THIS CIRCUMSTANCE, WE HAVE AN ILLUSTRATIVE DISTRICT FROM

S. TRENDE - DIRECT

4:14PM

1    MR. COOPER THAT PURPORTS TO SHOW THAT YOU CAN IN FACT DRAW A

2    DISTRICT WHERE BLACK RESIDENTS COMPRISE 50 PERCENT PLUS ONE OF

3    THE DISTRICT POPULATION.  AND THIS IS JUST THE WAY TO PUT THAT

4    TO THE TEST AND SAY OF THE BLACK RESIDENTS IN THIS DISTRICT, IS

5    THERE A COMBINATION OF THEM THAT ADDS UP TO 50 PERCENT PLUS ONE

6    THAT IS ALSO COMPACT?

7    Q.  ALL RIGHT.  SO CONCEPTUALLY WITH THIS MOMENT OF INERTIA,

8    CONCEPTUALLY, IS THERE ANYTHING SIMILAR OF THAT TO REOCK AND

9    POLSBY-POPPER IN TERMS OF HOW THEY ARE MEASURED?

10   A.   THEY REALLY ARE APPLES AND ORANGES.  AND AGAIN, YOU CAN

11   GET THE IDEA BY THINKING, YOU KNOW, WE CAN HAVE EVERYONE IN

12   THIS ROOM CLUSTERED AROUND THE TABLE, WE COULD HAVE EVERYONE IN

13   THIS ROOM SPREAD OUT EQUALLY, WE COULD HAVE EVERYONE IN THIS

14   ROOM PLACED IN THE DIFFERENT CORNERS, AND I THINK WE WOULD

15   UNDERSTAND -- WE WOULD AGREE THAT THE POPULATION IN THOSE THREE

16   DIFFERENT SCENARIOS HAS DIFFERENT DEGREES OF COMPACTNESS, BUT

17   THE COMPACTNESS OF THE ROOM STAYS THE SAME IN ALL THREE OF

18   THOSE SCENARIOS.

19        SO YOU COULD HAVE THIS COURTROOM BE A NICE SQUARE COMPACT

20   FIGURE, BUT THE POPULATIONS WITHIN IT CAN BE EXTREMELY COMPACT

21   OR NOT SO COMPACT, DEPENDING ON HOW THEY ARE DISTRIBUTED.  AND

22   THAT'S WHY YOU HAVE A DIFFERENT TEST FOR MEASURING POPULATION

23   COMPACTNESS IN THE LITERATURE THAN PARAMETER OR DISTRICT

24   COMPACTNESS, AERIAL COMPACTNESS.

25   Q.  ALL RIGHT.  WHEN YOU ARE LOOKING AT DISTRICT COMPACTNESS,

S. TRENDE - DIRECT

4:16PM

1   REOCK, POLSBY-POPPER, IS THERE ANYTHING ABOUT THOSE MEASURES

2   THAT WOULD TELL YOU WHAT IS COMPACT AND WHAT IS NOT?

3   A.  WELL, NOT WITH -- IT WILL TELL YOU WHETHER THE BOUNDARY OF

4   THE UNIT IS COMPACT, BUT FOR THE PARTS THAT ARE WITHIN THE

5   BOUNDARY, IT REALLY DOESN'T.  LIKE I SAID, YOU COULD HAVE

6   PEOPLE IN THIS ROOM AROUND A DESK, YOU COULD HAVE THEM SPREAD

7   EQUALLY THROUGH THE ROOM.  YOU COULD HAVE THEM PLACED IN THE

8   CORNERS OF THE ROOM.  THE PEOPLE IN THE ROOM, THEIR COMPACTNESS

9   CHANGES DEPENDING ON WHERE THEY ARE STANDING OR MILLING ABOUT.

10  THE ROOM ITSELF, WHICH IS WHAT THE POLSBY-POPPER AND THE REOCK

11  ARE ABOUT, THE COMPACTNESS STAYS THE SAME IN EACH ONE OF THOSE

12  EXAMPLES.

13  Q.  RIGHT.  SO IF A DISTRICT LINE -- IF THE LINES OF A

14  DISTRICT HAD A REOCK SCORE OF, SAY, .20, WOULD THAT TELL YOU

15  ANYTHING ABOUT WHETHER IT WAS, QUOTE, COMPACT OR NOT?

16  A.  IT WOULD TELL YOU -- THAT'S ONE OF THE PROBLEMS WITH REOCK

17  IS THAT ALL THAT REALLY TELLS YOU IS THAT THE DISTRICT FILLS

18  20 PERCENT OF A MINIMUM BOUNDING CIRCLE.  WHETHER IT IS .2 OR

19  .21, OR .19, AT WHAT POINT IT BECOMES A COMPACT DISTRICT, I

20  DON'T KNOW, BECAUSE INTERPRETING THOSE REOCK SCORES IS

21  DIFFICULT BECAUSE THEY DON'T HAVE A FIXED MEANING OR A LODESTAR

22  WHEN SOMETHING BECOMES COMPACT OR NOT.

23  Q.  OKAY.  SO LET'S KEEP LOOKING AT HOUSE DISTRICT 1.

24       **MR. STRACH:**  FORREST, WE ARE GOING TO PULL UP FIGURE

25  6 ON PAGE 17.

S. TRENDE - DIRECT

4:17PM

1    **BY MR. STRACH:**

2    Q.  ALL RIGHT.  MR. TRENDE, DID YOU IDENTIFY THE MOST COMPACT

3    BLACK POPULATION IN THE DISTRICT, IN THIS DISTRICT USING THE

4    MOMENT OF INERTIA APPROACH?

5    A.  I DID.

6    Q.  SO WHAT DOES THIS FIGURE SHOW?

7    A.  SO THIS FIGURE IS THE SAME DOT DENSITY MAP WE HAVE SEEN

8    BEFORE, EXCEPT I HAVE USED DASHED LINES TO IDENTIFY THE OUTER

9    BOUNDARY OF WHERE -- OF THE PRECINCTS CONTAINING THE MOST

10   COMPACT BLACK POPULATION IN THE DISTRICT, SUFFICIENT TO

11   CONSTITUTE 50 PERCENT PLUS ONE OF THE DISTRICT'S POPULATION.

12   Q.  ALL RIGHT.  I NOTICE THERE'S A LITTLE HOLE IN THERE WITH

13   THE BLUE DASHES.  WHAT IS THAT ALL ABOUT?

14   A.  SO IN A SIMULATION, IF YOU WERE TRYING TO BUILD OUT THE

15   DISTRICTS THEMSELVES, YOU WOULD PUT IT IN A CONSTRAINT TO KEEP

16   THE HOLE FROM APPEARING IN IT, BUT WE ARE JUST LOOKING AT THE

17   POPULATION.  YOU KNOW, YOU COULD BUILD THAT CONSTRAINT IN.  I

18   DON'T THINK IT WOULD CHANGE THE ANSWER SUBSTANTIALLY, BUT

19   AGAIN, WE ARE JUST LOOKING AT THE DISTRICTS THAT MR. COOPER

20   DREW TO TRY TO DEMONSTRATE OR ILLUSTRATE THE EXISTENCE OF A

21   50 PERCENT PLUS ONE COMPACT BLACK POPULATION.  THIS IS THE BEST

22   CASE SCENARIO FOR WHAT THE MOST COMPACT POPULATION IS USING THE

23   MOMENT OF INERTIA APPROACH.

24   Q.  ALL RIGHT.  SO WITH RESPECT TO FIGURE 6, WHAT'S YOUR

25   CONCLUSION ABOUT THE COMPACTNESS OF THE BLACK POPULATION IN

S. TRENDE - DIRECT

4:19PM   1    THIS DISTRICT?

2    A.  SO WHAT THIS SHOWS IS THAT THE POPULATION CLUSTER IN THE

3    CITY OF SHREVEPORT IS NOT SUFFICIENT TO BE 50 PERCENT PLUS ONE

4    OF THE DISTRICT'S POPULATION.  TO GET TO 50 PERCENT PLUS ONE IN

5    THIS DISTRICT, YOU REALLY DO HAVE TO GO OUT INTO THE -- YOU

6    KNOW, CROSS BAYOUS AND RIVERS, GO OUT INTO THE HEAVILY WHITE

7    SUBURBS AND THEN INTO HEAVILY RURAL AREAS IN CADDO PARISH TO

8    GET TO THAT 50 PERCENT PLUS ONE.  IN OTHER WORDS, THESE KIND OF

9    DISPARATE GROUPS IN LOCATIONS OF BLACK INDIVIDUALS IN RURAL

10   CADDO PARISH AREN'T INCIDENTAL AND AREN'T JUST AN ARTIFICE OF

11   THE FACT THAT YOU HAVE TO MEET THE EQUAL POPULATION

12   REQUIREMENTS.  HE NEEDS THOSE RESIDENTS, NO MATTER WHAT YOU DO,

13   TO GET TO 50 PERCENT PLUS ONE OF THE POPULATION IN THIS

14   DISTRICT.  THAT'S NOT ALWAYS GOING TO BE THE CASE, BUT IN THIS

15   PARTICULAR ILLUSTRATIVE DISTRICT, IT IS.

16   Q.  ALL RIGHT.  AND DID YOU ALSO LOOK AT THIS DISTRICT USING

17   SORT OF THE CHEN AND RODDEN APPROACH?

18   A.  YES, CHEN AND RODDEN OR AERIAL APPROACH.

19   Q.  WE WILL PULL UP FIGURE 7 ON PAGE 18.  WHAT DID YOU FIND

20   HERE USING THAT APPROACH?

21   A.  IT'S THE SAME STORY.  SO IN THIS PARTICULAR DISTRICT, YOU

22   NEED AT LEAST 16,737 BLACK RESIDENTS OF VOTING AGE TO

23   CONSTITUTE 50 PERCENT PLUS ONE OF THE VOTING AGE POPULATION OF

24   THE DISTRICT.

25        USING THE AERIAL APPROACH, THIS IS THE MOST COMPACT

4:21PM   1    GROUPING OF 16,737 BLACK RESIDENTS OF VOTING AGE.  AND IT'S THE

         2    SAME STORY.  THOSE RESIDENTS IN THE CITY OF SHREVEPORT AREN'T

         3    SUFFICIENT TO GET TO 50 PERCENT PLUS ONE.  YOU HAVE TO GO OUT

         4    INTO BAYOUS, ACROSS EMPTY TERRITORY AND PICK UP ISOLATED

         5    POCKETS OF INDIVIDUALS TO REACH THAT 50 PERCENT PLUS ONE

         6    THRESHOLD.

         7     Q.  ALL RIGHT.  AND THEN WE WILL JUST SHOW THE COURT AN

         8    EXAMPLE OF WHAT YOU CALLED A CHOROPLETH MAP.  WE ARE GOING TO

         9    PULL UP FIGURE 3 ON PAGE 11.  AND DESCRIBE WHAT THIS MAP IS

        10    SHOWING US VERSUS THE DOT MAP.

        11     A.  SO WHEN THESE APPEAR IN MY REPORT, THESE ARE YOUR

        12    TRADITIONAL CHOROPLETH MAPS THAT SHOW FOR -- AND THESE ARE

        13    CENSUS BLOCKS, AND IT SHOWS THE BVAPS, THE BLACK VOTING AGE

        14    POPULATION OF THE CENSUS BLOCKS.  SO IT DOES SHOW, YOU KNOW,

        15    THE BLOCKS IN SHREVEPORT THEMSELVES ARE DENSELY POPULATED --

        16    ARE HEAVILY -- HAVE HIGH BLACK POPULATIONS.  THERE IS A DENSE

        17    CONCENTRATION THERE.  AND THEN WHEN YOU GET OUT INTO THE RURAL

        18    AREAS, THERE ARE, AS I SAID, SWATHS WHERE SOME OF THE BLOCKS

        19    ARE ENTIRELY WHITE, LARGE SWATHS WHERE NO ONE LIVES BECAUSE IT

        20    IS A RIVER OR AN INTERSTATE OR SWAMPLAND, AND THEN SOME POCKETS

        21    THAT ARE HEAVILY BLACK.

        22        ON THIS MAP, YOU'LL SEE THE DASHED -- I SHOULD HAVE

        23    THOUGHT THIS ONE THROUGH BETTER, I SUPPOSE, I APOLOGIZE, BUT

        24    THE DASHED BLUE LINE HERE IS THE PARISH BOUNDARY.

        25     Q.  RIGHT.  OKAY.  SO THINKING ABOUT MR. COOPER'S OTHER

4:22PM    1    DISTRICTS THAT HE DREW IN THE SHREVEPORT AREA, ARE THERE OTHER

2    DISTRICTS OTHER THAN THIS ONE THAT HAD GEOGRAPHICALLY COMPACT

3    BLACK POPULATIONS?

4    A.    SOME OF THEM DO.    SOME OF THEM, THE POPULATIONS ARE

5    CONCENTRATED WITHIN THE CITY OF SHREVEPORT, AND THOSE ARE

6    DESCRIBED IN THE REPORT, BUT THAT GETS YOU THREE.    IT'S THIS

7    FOURTH ONE WHERE UNDER ANY CONCEPT OF A COMPACT POPULATION, I

8    THINK IT IS HARD TO SAY IT IS COMPACT.    BUT THAT IS ULTIMATELY

9    SOMETHING FOR THE FINDER OF FACT TO DETERMINE.    THAT IS JUST MY

10    INTERPRETATION.

11    Q.    ALL RIGHT.    LET'S --

12            **MR. STRACH:**    JUDGE, I WANT TO BE RESPECTFUL OF YOUR

13    4:30 --

14            **THE COURT:**    HOW LONG ARE YOU GOING TO BE?

15            **MR. STRACH:**    I'VE PROBABLY GOT ANOTHER TWENTY

16    MINUTES.

17            **THE COURT:**    LET'S FINISH IT UP.

18            **MR. STRACH:**    OKAY.

19    **BY MR. STRACH:**

20    Q.    MR. TRENDE, LET'S SWITCH GEARS TO BATON ROUGE.    WE ARE

21    GOING TO BRING UP ENACTED DISTRICT 29, SO THIS IS AN ENACTED

22    DISTRICT.

23            **MR. STRACH:**    FORREST, IT IS FIGURE 38 ON PAGE 58.

24    **BY MR. STRACH:**

25    Q.    AND MR. TRENDE, DO YOU RECOGNIZE THAT DISTRICT?

4:24PM   1   A.  I DO.

2   Q.  ALL RIGHT.  AND WHEN LOOKING AT THE DISTRICT LINES, DOES

3   THAT LOOK LIKE A VERY COMPACT DISTRICT TO YOU JUST BASED ON THE

4   LINES?

5   A.  FROM THE LINES ITSELF, NO.  YOU CAN IMAGINE THE BOUNDING

6   CIRCLE AROUND IT, AND THE DISTRICT WOULDN'T FILL MUCH OF THAT

7   BOUNDING CIRCLE.  IT HAS A LOT OF ZIGS AND ZAGS, SO IT'S GOING

8   TO HAVE A LARGE PERIMETER.  SO FOR PURPOSES OF POLSBY-POPPER,

9   IT'S NOT GOING TO FILL MUCH OF A CIRCLE WITH THE SAME PERIMETER

10   AS THE DISTRICT.

11   Q.  BUT WHAT DOES THIS TELL YOU USING YOUR MOMENT OF INERTIA

12   APPROACH?

13   A.  SO THIS IS WHY IT IS IMPORTANT.  IF YOU JUST DID A VISUAL

14   INSPECTION OF THE DISTRICT AS A WHOLE, YOU WOULD LOOK AT IT AND

15   SAY, OKAY, THERE IS A CONCENTRATION AROUND NORTH BATON ROUGE

16   AND THE AIRPORT THAT HAS A LOT OF BLACK RESIDENTS, BUT IT ALSO

17   PICKS UP A LOT OF BLACK RESIDENTS ACROSS THE RIVER, IN HEAVILY

18   WHITE AREAS, ISOLATED, IT GOES ACROSS EMPTY AREAS AND SWAMPS

19   AND WHATNOT, AND YOU MIGHT TREAT THIS THE SAME AS DISTRICT 1.

20       WHY I THINK THIS ONE IS IMPORTANT IS IT ILLUSTRATES THAT

21   THIS ISN'T SOMETHING THAT'S DESIGNED TO FAIL OR MAKE IT

22   IMPOSSIBLE TO DRAW VOTING RIGHTS ACT COMPLIANT DISTRICTS,

23   BECAUSE WHEN YOU LOOK AT A -- WHEN YOU CONSTRAIN YOURSELF TO

24   EXAMINING POPULATIONS THAT CAN CONSTITUTE 16,500 -- THAT HAVE

25   16,519 BLACK RESIDENTS, RESIDENTS SUFFICIENT TO BE 50 PERCENT

4:25PM

1   PLUS ONE OF THE POPULATION, THE PART THAT CROSSES THE RIVER

2   ISN'T NECESSARY, THAT POPULATION, TO GET TO 50 PERCENT PLUS

3   ONE.  IT'S JUST -- IN TERMS OF *GINGLES* I, IT'S ALMOST

4   SUPERFLUOUS BECAUSE THOSE RESIDENTS WOULD BE ADDED FOR EQUAL

5   POPULATION REQUIREMENTS.

6       THE BLACK POPULATION THAT IS IN BATON ROUGE EAST OF THE

7   RIVER ALONE GETS YOU TO 50 PERCENT PLUS ONE, SO IT CLEARLY HAS

8   A COMPACT POPULATION OF 16,519 BLACK RESIDENTS THAT ARE ENOUGH

9   TO BE -- THAT'S ENOUGH TO GET TO 50 PERCENT PLUS ONE IN THIS

10  DISTRICT.

11  Q.  ALL RIGHT.  SO LET'S LOOK AT MR. COOPER'S VERSION, WHICH

12  IS FIGURE 39 ON PAGE 59.

13  A.  OKAY.  SO THIS IS THE SAME BASIC AREA.  YOU CAN SEE IT IS

14  SOUTH OF THE -- THE POPULATION SOUTH OF THE AIRPORT.  AND IT

15  DOES CROSS THE RIVER LIKE THE OLD VERSION, BUT UNLIKE THE OLD

16  VERSION, YOU NEED ALMOST EVERY ONE OF THOSE BLACK RESIDENTS TO

17  GET TO A POPULATION OF, AS MR. COOPER DREW THE DISTRICT, 17,076

18  BLACK RESIDENTS.  YOU DON'T NEED ALL OF THOSE RESIDENTS TO GET

19  TO 50 PERCENT PLUS ONE.  THERE ARE SOME PEOPLE IN THE NORTH OF

20  THE DISTRICT, SOME IN THE SOUTHEAST, BUT IN GENERAL, YEAH, THE

21  BLACK POPULATION IN THIS DISTRICT, THIS DISTRICT CONFIGURATION

22  THAT REPRESENTS 50 PERCENT PLUS ONE OF THE POPULATION IS SPREAD

23  OUT IN RURAL AREAS AND SUBURBS, ACROSS SWAMPLANDS AND RIVERS,

24  NOT COMPACT IN THE DISTRICT LIKE THE ORIGINAL CONFIGURATION IS,

25  BECAUSE HIS APPROACH IS TO TAKE THE COMPACT BLACK POPULATION IN

S. TRENDE - DIRECT

4:27PM    1   BATON ROUGE AND SPLIT IT UP AMONG MULTIPLE DISTRICTS.  HE

2   REDUCES THE NUMBER OF BLACK RESIDENTS FROM BATON ROUGE IN THESE

3   DISTRICTS AND THEN TAKES OUT -- TAKES ON ADDITIONAL RESIDENTS

4   ACROSS THE RIVER TO MAKE UP FOR THAT.

5          **MR. STRACH:**  OKAY.

6          **MS. THOMAS:**  OBJECTION TO THE EXTENT THAT THIS

7   WITNESS IS GETTING TOWARDS THE INTENT OF MR. COOPER, WHICH THIS

8   COURT HAS ALREADY RULED IS NOT APPROPRIATE FOR ANY OF THE

9   EXPERTS IN THIS CASE.

10          **THE COURT:**  SUSTAINED.  YOU DON'T KNOW WHAT

11   MR. COOPER WAS THINKING.  SUSTAINED.

12          **MR. STRACH:**  ALL RIGHT.  THANK YOU, JUDGE.

13   **BY MR. STRACH:**

14   Q.  LET'S LOOK AT DISTRICT 63 IN BATON ROUGE, WHICH IS FIGURE

15   44, PAGE 66.  AND I BELIEVE THIS IS THE ENACTED DISTRICT.  IS

16   THAT RIGHT?

17   A.  THAT IS CORRECT.

18   Q.  WHAT DO YOU CONCLUDE FROM THIS MAP?

19   A.  SO THIS IS ANOTHER EXAMPLE OF HOW YOU CAN HAVE A COMPACT

20   BLACK POPULATION IN A DISTRICT AND ALSO HAVE, YOU KNOW, SOME

21   BLACK POPULATION THAT IS SPREAD OUT THROUGHOUT THE DISTRICT.

22   YOU KNOW, THIS WOULD, NEVERTHELESS, IN THE SOUTHEAST PORTION OF

23   THE DISTRICT, HAVE A CONCENTRATION OF BLACK RESIDENTS THAT GETS

24   YOU 16,793 RESIDENTS, WHICH IS 50 PERCENT PLUS ONE OF THE

25   DISTRICT.

S. TRENDE - DIRECT

4:29PM   1   Q.  ALL RIGHT.  LET'S LOOK AT MR. COOPER'S VERSION OF THAT

2   DISTRICT, FIGURE 45 ON PAGE 67.  SO WHAT DO YOU CONCLUDE ABOUT

3   THIS VERSION OF THE DISTRICT?

4   A.  SO AGAIN, YOU START OUT WITH THE SAME BASIC AREA.  IT'S

5   RECONFIGURED A LITTLE BIT.  BUT TO GET TO 50 PERCENT PLUS ONE,

6   THE POPULATION IS SPREAD OUT INTO RURAL AREAS ACROSS EMPTY

7   PRECINCTS AND BLOCKS INTO -- YOU KNOW, FAR AWAY FROM THE

8   DOWNTOWN CLUSTER.

9   Q.  OKAY.  LET'S MOVE TO CENTRAL LOUISIANA DISTRICT 23.

10  THAT'S FIGURE 23 ON PAGE 39.  WHAT DO YOU CONCLUDE FROM THIS

11  MAP?

12  A.  SO IN THIS MAP, IT TURNS OUT THAT BECAUSE THE BVAP IS

13  PRETTY DARN CLOSE TO 17,494 RESIDENTS OF THE DISTRICT AS A

14  WHOLE, WHICH IS WHAT GETS YOU TO 50 PERCENT PLUS ONE, YOU NEED

15  THE ENTIRE POPULATION.  SO IN THIS CONFIGURATION, THE MOMENT OF

16  INERTIA/CHEN AND RODDEN LINE FALLS ON THE DISTRICT BOUNDARY.

17  SO YOU CAN SEE THAT THERE'S A BLACK POPULATION, I DON'T KNOW IF

18  THAT'S NATCHITOCHES OR NOT, BUT IN THE SOUTHEAST OF THE

19  DISTRICT, ANOTHER POPULATION IN THAT LITTLE AREA THAT POINTS

20  NORTHWARD, NORTH OF IT, AND THEN IN THE WEST AREA OF THE

21  DISTRICT, BUT NONE OF THOSE CLUSTERS ARE 50 PERCENT PLUS ONE OF

22  THE POPULATION.  HE NEEDS TO JOIN TOGETHER THREE GEOGRAPHICALLY

23  DISPARATE CLUSTERS, A BUNCH OF INDIVIDUALS IN RURAL AREAS AND

24  HEAVILY WHITE AREAS IN ORDER TO GET TO 50 PERCENT PLUS ONE

25  BVAP.

S. TRENDE - DIRECT

4:31PM

1  Q.  ALL RIGHT.  LET'S LOOK AT THE ST. CHARLES AREA.  LET'S

2  LOOK AT HOUSE DISTRICT 34, WHICH IS FIGURE 29 ON PAGE 46.  WHAT

3  DO YOU CONCLUDE FROM THIS MAP?

4  A.  SO IN ST. CHARLES, MR. COOPER TAKES THE ONE BLACK MAJORITY

5  DISTRICT THAT EXISTS AND SPLITS IT INTO TWO DISTRICTS.  SO WHAT

6  YOU SEE -- I GET A LITTLE WHIMSICAL WITH THIS.  I THINK THIS

7  LOOKS LIKE A POINTER DOG.  BUT YOU CAN SEE THAT THERE'S A

8  CONCENTRATION OF BLACK RESIDENTS OF VOTING AGE IN THIS

9  DISTRICT, BUT BECAUSE HE, I THINK, HAS TEN MORE BLACK RESIDENTS

10  OF VOTING AGE THAN WOULD GET YOU TO 50 PERCENT PLUS ONE, EVERY

11  BLACK RESIDENT IN THIS DISTRICT IS NECESSARY TO GET TO THAT

12  THRESHOLD.

13      SO OUTSIDE OF THE CLUSTER IN ST. CHARLES, THERE ARE, IN

14  KIND OF THE BACK FOOT OF THE POINTER DOG, ISOLATED POCKETS,

15  THERE ARE SOME IN THE HEAVILY WHITE AREA IN THE POINTER HAND OF

16  THE POINTER DOG -- I WILL STOP BEATING THAT ANALOGY FURTHER

17  THAN IT DESERVES TO GO -- BUT AGAIN, NOT TERRIBLY COMPACT.

18  Q.  OKAY.  THEN LET'S LOOK AT HOUSE DISTRICT 38, WHICH IS

19  FIGURE 34 ON PAGE 51.  WHAT DO YOU CONCLUDE FROM THIS MAP?

20  A.  SO THIS IS THE SECOND DISTRICT THAT MR. COOPER DRAWS, AND

21  TO GET TO 50 PERCENT PLUS ONE -- ONCE AGAIN, THE MOST

22  COMPACT -- THE BOUNDARY OF THE MOST COMPACT POPULATION FALLS ON

23  THE DISTRICT BOUNDARIES.  AND SO THE BLACK POPULATION SPRAWLS

24  OVER EMPTY AREAS AND SWAMPLAND, AS WELL AS CONCENTRATION AROUND

25  LAKE ST. CHARLES ITSELF -- LAKE CHARLES.

S. TRENDE - DIRECT

4:33PM

1    Q.   ALL RIGHT.  LET'S LOOK AT THE SENATE BRIEFLY.  WE ARE

2    GOING TO PULL UP I THINK IT'S FIGURE 97 ON PAGE 133.  WHAT DO

3    YOU CONCLUDE FROM THIS ONE?

4    A.   SO THIS IS ANOTHER WAY OF ILLUSTRATING THE POPULATIONS OF

5    A SENATE DISTRICT IN THIS INSTANCE, SO, AGAIN, YOU CAN SEE THAT

6    IN THIS DEMONSTRATION, THIS ILLUSTRATIVE DISTRICT, THE

7    POPULATIONS -- AND AGAIN, THE BOUNDARIES OF THE MOST COMPACT

8    50 PERCENT PLUS ONE VOTING AGE POPULATION GROUP LIE ON THE

9    DISTRICT BOUNDARY.  YOU CAN SEE THAT -- WELL, THERE'S ONE

10   CARVE-OUT ON THE WEST, SO IT IS MORE OR LESS ON THE DISTRICT

11   BOUNDARY.

12        YOU KNOW, IT IS NOT A COMPACT -- WELL, THE FINDER OF FACT

13   WILL DECIDE IF IT IS COMPACT, BUT THERE ARE DISTINCT GROUPINGS

14   THAT ARE SPREAD OUT THROUGHOUT THE DISTRICT THAT ARE JOINED

15   TOGETHER TO GET TO 50 PERCENT PLUS ONE.

16   Q.   OKAY.  MR. TRENDE, ARE YOU GENERALLY FAMILIAR WITH THE

17   CONCEPT OF PACKING?

18   A.   YES.

19   Q.   DOES THIS APPROACH, THE MOMENT OF INERTIA APPROACH,

20   REQUIRE PACKING OF BLACK VOTERS?

21   A.   IT REALLY DOESN'T.  IT REQUIRES A GROUP THAT IS 50 PERCENT

22   PLUS ONE, WHICH I UNDERSTAND IS YOUR THEORY OF WHAT COMPACTNESS

23   IS, BUT THIS IS ALSO ILLUSTRATIVE DISTRICTS, NOT NECESSARILY

24   THE FINAL REMEDIAL DISTRICTS THAT GET PRODUCED.

25   Q.   OKAY.  I THINK YOU TESTIFIED EARLIER THAT YOU WERE ONE OF

S. TRENDE - DIRECT

4:34PM
1    THE SPECIAL MASTERS IN THE VIRGINIA CASE.  DID YOU USE MOMENT

2    OF INERTIA THERE?

3    A.  WE DID NOT.

4    Q.  WHY NOT?

5    A.  BECAUSE WE HAD A MONTH TO DRAW 160 DISTRICTS, RECEIVE

6    PUBLIC COMMENTARY, TAKE THAT PUBLIC COMMENTARY AND PRODUCE A

7    SECOND SET, WE DECIDED AT THE OUTSET THAT WE DIDN'T HAVE TIME

8    TO DO A FULL VRA ANALYSIS, WITH BERNIE GROFMAN, WHO WAS ONE OF

9    THE FATHERS OF *GINGLES*, AS MY CO-MAP DRAWER.

10        AS IT TURNS OUT, THANKFULLY IN VIRGINIA, WHEN YOU DO A

11   RACE-NEUTRAL DRAW, WHICH IS WHAT WE DID, THE POLITICAL

12   GEOGRAPHY OF BLACK RESIDENTS OF VIRGINIA IS SUCH THAT YOU DRAW

13   NATURALLY VRA COMPLIANT DISTRICTS.  AND SO WE ULTIMATELY DIDN'T

14   GET HEAVY OBJECTIONS IN THE COMMENT PHASE FROM THE NAACP.  WE

15   DIDN'T GET EXAMPLES OF OTHER ADDITIONAL VRA DISTRICTS WE COULD

16   HAVE DRAWN, SO IT WORKED OUT.  BUT WE NEVER DID A FULL *GINGLES*

17   ANALYSIS THERE.

18   Q.  ALL RIGHT.  DID YOU EXAMINE MR. COOPER'S DISTRICTS AT ALL

19   TO SEE IF THEY COMPLY WITH ONE-PERSON, ONE-VOTE?

20   A.  I DID NOT.

21   Q.  DID YOU EXAMINE THE POPULATION DEVIATION OF ANY OF THE

22   ENACTED OR ILLUSTRATIVE DISTRICTS?

23   A.  I DID NOT.

24   Q.  ALL RIGHT.  IF MR. COOPER TESTIFIED THAT YOU CRITICIZED

25   HIM ON THIS POINT, HOW WOULD YOU RESPOND?

4:36PM   1    A.  I DIDN'T DO ANY ANALYSIS IN THAT REALM.

         2    Q.  OKAY.  DID YOU OPINE ABOUT MR. COOPER'S ROUNDING PRACTICES

         3    IN ANY OF YOUR REPORTS?

         4    A.  NO, I SAW A REFERENCE IN THE ROUGH, AND I RECOGNIZE THAT

         5    THAT IS A ROUGH TRANSCRIPT, BUT I DIDN'T DO ANY OF THAT.

         6    Q.  DID YOU AT ANY TIME CALCULATE AVERAGES OR MEANS FOR MR.

         7    COOPER'S MAJORITY BLACK DISTRICTS?

         8    A.  AGAIN, I SAW THAT IN THE ROUGH TRANSCRIPTS, AND THOSE ARE

         9    ROUGHS, BUT I DIDN'T DO ANY ANALYSIS OF THAT.

        10    Q.  ALL RIGHT.  THANK YOU.

        11         **MR. STRACH:**  YOUR HONOR, THAT IS ALL THE QUESTIONS WE

        12    HAVE AT THIS TIME.

        13         **THE COURT:**  OKAY.  WE ARE GOING TO BREAK FOR THE DAY.

        14    WE WILL RECONVENE TOMORROW AT 9:00 A.M. WITH CROSS-EXAMINATION.

        15         **MR. STRACH:**  MAY I SAY ONE THING, YOUR HONOR?

        16         **THE COURT:**  YES.

        17         **MR. STRACH:**  WE HAVE BEEN REASSESSING WHETHER TO CALL

        18    MS. HADSKEY.  WE'VE BEEN GETTING THE TEAM TOGETHER AND THINKING

        19    ABOUT THAT.  I THINK WE HAVE DECIDED WE WILL CALL HER, SO OUR

        20    ORDER OF WITNESSES TOMORROW WOULD BE FINISH MR. TRENDE, THEN

        21    DR. DOUG JOHNSON, THEN DR. BARBER, AND THEN MS. HADSKEY IN THE

        22    AFTERNOON.

        23         **THE COURT:**  OKAY.  FRANKLY, I HAD JUST ABSOLUTELY

        24    FORGOTTEN THAT I NEEDED TO RULE ON THOSE EXHIBITS, AND I WAS

        25    GOING TO GRANT ADMISSION, BUT IF YOU ARE GOING TO CALL

4:37PM    1    MS. HADSKEY, I WILL JUST RESERVE RULING.  WE MAY NOT NEED THEM.

2    **MR. STRACH:**  OKAY.   THANK YOU.

3    **THE COURT:**   WE WILL BE IN RECESS UNTIL 9 A.M.

4    (TRIAL RECESSED UNTIL 9:00 A.M. THE FOLLOWING MORNING.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4:37PM   1

2                    CERTIFICATE OF COURT REPORTER

3

4          I, TERI B. NORTON, RMR, FCRR, RDR, OFFICIAL COURT

5   REPORTER FOR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

6   DISTRICT OF MISSISSIPPI, APPOINTED PURSUANT TO THE PROVISIONS

7   OF TITLE 28, UNITED STATES CODE, SECTION 753, DO HEREBY CERTIFY

8   THAT THE FOREGOING IS A CORRECT TRANSCRIPT OF THE PROCEEDINGS

9   REPORTED BY ME USING THE STENOTYPE REPORTING METHOD IN

10  CONJUNCTION WITH COMPUTER-AIDED TRANSCRIPTION, AND THAT SAME IS

11  A TRUE AND CORRECT TRANSCRIPT TO THE BEST OF MY ABILITY AND

12  UNDERSTANDING.

13         I FURTHER CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

14  COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL

15  CONFERENCE OF THE UNITED STATES.

16

17

18

19          S/ TERI B. NORTON
            TERI B. NORTON, RMR, FCRR, RDR
20          OFFICIAL COURT REPORTER

21

22

23

24

25