# **Attachment 6**

```
 1            ******************************

 2                   Rough Draft Only

 3                   DAY 6 OF TRIAL

 4            ******************************

 5      THE JUDGE:

 6            Does counsel need to be heard before we

 7      put Dr. Barber back on the stand?

 8      PLAINTIFF COUNSEL:

 9            Your Honor, understanding at the end of

10      Friday that Your Honor was going to consider

11      the relevance objection to Dr. Barber's

12      testimony.

13      THE CLERK:

14            Come to podium or speak up.

15      PLAINTIFF COUNSEL:

16            Your Honor, we understood that Your

17      Honor would be ruling on our relevance

18      objection to Dr. Barber's simulations report.

19      THE JUDGE:

20            I'm prepared to do that.  The testimony

21      as thus far and as indicated in Dr. Barber's

22      report, which the Court reviewed again over

23      the weekend is of marginal relevance;
```

24      however, the predominance question is a

25      defense, and the Defendants are entitled to

2

1       put on a defense, and the court will weigh

2       that evidence and make a determination at the

3       close of the evidence.  You may certainly

4       object to individual questions that you

5       believe go beyond either to scope of his

6       expertise or the scope of his report, but

7       otherwise, your general relevance objection

8       that would go as Court kind of understanding

9       it, to exclusion of Dr. Barber is overruled.

10      Put Dr. Barber back on the stand, please.

11      DEFENSE COUNSEL:

12          Your Honor, thank the Court for allowing

13      me for questioning from the table.  Had some

14      issues over the weekend, and this is most

15      helpful to me.  Thanks again.

16      THE JUDGE:

17          Yes, you may stay seated in your

18      examination of Dr. Barber.

19          Dr. Barber you're still under oath from

20      Friday.  Mr. Farr, you may carry on.

21      DEFENSE COUNSEL:

22          Thank you, Your Honor.

23   EXAMINATION BY DEFENSE COUNSEL:

24       Q.   Dr. Barber, do you have your two reports

25   up there with you in a notebook?

3

1        A.   Yes, I do.

2        Q.   What I'm asking you questions, you're

3   free to use the notebook, and also will be calling

4   up sections of your report on the screen in front

5   of you.  So you can use either one of those

6   things.

7        A.   Okay.

8        Q.   So where we stopped on Friday was you

9   talked about how you done 100,000 simulations for

10   the Senate and the house, and I wanted to ask you,

11   what was your main take away from doing those

12   simulations?

13       PLAINTIFF COUNSEL:

14          Your Honor, I just want to put the

15          relevance objection on the record, I don't

16          intend to continue objecting throughout the

17          testimony.

18       THE JUDGE:

19          Your relevance objection is deemed

20      continuing.  You may continue.

21  EXAMINATION BY DEFENSE COUNSEL:

22      Q.    The main takeaway or --

23      A.    The main takeaway or the main conclusion

24  I take way from simulations is that when we run

25  the algorithm using the criteria outlined in the

4

1   joint rule that the simulations produce a set of

2   maps that look very different from the

3   illustrative map, notably on the number of

4   majority black districts that are created.

5       Q.    Can we turn to Secretary of State

6   Exhibit 1, page 15.  And on that page, there's a

7   figure 1, could you explain to the Court the

8   significance of figure 1?

9       A.    Certainly.  This figure shows the

10  distribution of majority BVAP Senate districts

11  that are created in the hundred thousand

12  simulations.  Those gray bars represent the number

13  of districts created and the frequency with which

14  that occurs.  On the right side of the figure, we

15  see the number of majority BVAP districts in both

16  the enacted map and the illustrative map.

17      Q.    Do you know how many districts there are

18    in the Louisiana Senate?

19         A.    39.

20         Q.    What is the ever over all black voting

21    age population for Louisiana under the 20 census?

22         A.    It's approximately 31 percent.

23         Q.    Based upon the state's black voting age

24    population, how many majority black districts

25    would be exactly proportional?

5

1          A.    It would be approximately 12.

2          Q.    How would you calculate that?

3          A.    By simply multiplying 31 percent times

4    39.

5          Q.    How many majority black Senate districts

6    did the 100,000 race neutral simulations draw on

7    average?

8          A.    On average, between 3 and 4.

9          Q.    How many majority black Senate districts

10    are in 2022 enacted plan?

11         A.    There are 11.

12         Q.    How many majority black districts are in

13    Mr. Cooper's illustrative Senate plan?

14         A.    There are 14.

15         Q.    How did the number of majority black

16    senate districts in the enacted plan and Mr.

17    Cooper's plan compare to proportionality?

18        A.    The enacted plan is one fewer than

19    proportionality.    The illustrative map is two

20    greater than proportionality.

21        Q.    On Exhibit Secretary of State 1 page 17,

22    could have turn to table 2 and explain to the

23    Court the significance of this table?

24        A.    So this table is also showing the

25    results of the simulations but rather than showing

6

1    the number of majority BVAP districts that are

2    generated it breaks down the districts down by the

3    percent BVAP in the districts and so you can see

4    down the roads, rows those different categories or

5    brackets for the various BVAP percentages.    The

6    table shows the outcome for the simulations in

7    that second column, and then the distribution of

8    districts for the 2011 map, the enacted map and

9    the illustrative map.

10        Q.    Is there anything that you find

11    particularly significant about this analysis?

12        A.    I think the most significant thing that

13    we see in this table is in the row labeled 50 to

14    52.99 percent.  So this row is showing the number

15    and frequency of districts that fall in that

16    narrow band just above 50 percent.  And when we

17    look across the row, with e can see that on

18    average or typically the simulations generated

19    about 1 of those districts.  The 2011 map

20    contained one such district, the enacted map also

21    contained or contains one such district, and the

22    illustrative the map on the other hand, contains 1

23    nine districts that fall within that narrow range.

24        Q.   In your opinion, would we see that

25    pattern, if adherence to nonracial criteria had

7

1    been the primary criteria used to Dr. Mr. Cooper's

2    maps?

3        PLAINTIFF COUNSEL:  Objection, this is asking

4        for Mr. Cooper's intent.  The effect of the

5        question was, what was Mr. Cooper ignoring

6        tray additional create to get to this number.

7        THE JUDGE:  Mr. Far, you want to respond.

8        DEFENSE COUNSEL:  There was nothing in that

9        question about Mr. Cooper's interpret.  It

10       was based upon Dr. Barber's forensic

11       examination of the map and his analysis of

12          whether or not you'd have nine carefully

13          drawn majority black districts between 50 and

14          53 percent if Mr. Cooper hads prioritized

15          practice additional redistricting principles.

16      THE JUDGE:  I think the objection is the

17          reference to what Mr. Cooper's intent is.

18          I'll sustain the objection.  Rephrase your

19          question.

20  EXAMINATION BY DEFENSE COUNSEL:

21      Q.   Automatic sorry, Your Honor, did you say

22  I could repeat the question?

23      THE JUDGE:  You can rephrase your question.

24  EXAMINATION BY DEFENSE COUNSEL:

25      Q.   Dr. Barber, in your opinion, would we

8

1   see the pattern you have explained in Mr. Cooper's

2   illustrative maps if he had prioritized

3   traditional redistricting principles?

4       PLAINTIFF COUNSEL:  Your Honor T same

5          objection.  If he had prioritized.

6       THE JUDGE:  Sustained.

7       PLAINTIFF COUNSEL:  Mr. Cooper.

8       DEFENSE COUNSEL:  Let me rephrase, Your

9          Honor.

10        THE JUDGE:  Rephrase.

11   EXAMINATION BY DEFENSE COUNSEL:

12        Q.   Dr. Coop or, would you see the pattern

13   in Mr. Cooper's maps if any maps or any other map

14   drawer had maximized or prioritized traditional

15   redistricting principles?

16        PLAINTIFF COUNSEL:  Objection.

17        THE JUDGE:  Sustained.

18        DEFENSE COUNSEL:  I'm sorry, what did you say

19        Your Honor.

20        THE JUDGE:  Sustained.  There's not a pattern

21        in Mr. Cooper's maps.  There's a pattern that

22        he shows on his whatever this is, table 2,

23        but where's the pattern in Mr. Cooper's --

24        you're calling for this witness to give

25        testimony about Mr. Cooper's intentions.

9

1        DEFENSE COUNSEL:  Your Honor, we gratefully

2        accept your ruling, but I respectfully

3        disagree that we're asking about Mr. Cooper's

4        intent.  We're asking whether or not any map

5        drawer who prioritized adherens to

6        traditional redistricting principles

7        principals would end up with nine districts

8          in the State of Louisiana that had a Blake

9          voting age population between 50 and

10         52.99 percent.

11         THE JUDGE:  Any map drawer.

12         DEFENSE COUNSEL:  Mr. Cooper's intent, but we

13         accept.

14         THE JUDGE:  Any map drawer or any computer.

15         There is a difference map drawer and a

16         computer.

17         DEFENSE COUNSEL:  Okay.  I'll try again.

18         THE JUDGE:  Well, you can try.

19         DEFENSE COUNSEL:  Your Honor, I'll just on

20         the question.  I'll move on.

21         THE JUDGE:  All right.

22         DEFENSE COUNSEL:  Thank you very much.

23    EXAMINATION BY DEFENSE COUNSEL:

24         Q.   All right.  Dr. Barber, could you pull

25    up page 17 of Exhibit of Secretary of State

                                                  10

1    Exhibit 1.

2         A.   Yes, I'm there.

3         Q.   Could you tell the Court the

4    significance of that table?

5         A.   So this figure shows the same

6    distribution of majority BVAP districts that are

7    produced by the 100 simulations in the house.

8    Those gray bars again show the number of majority

9    black districts and the frequency with which they

10   occur.  And then again the dashed lines show the

11   number of majority BVAP districts in the enacted

12   map as well as the illustrative map.

13        Q.    How many house districts are there in

14   Louisiana?

15        A.    105.

16        Q.    How many majority black house districts

17   would be exactly proportional?

18        A.    Would be about 33.

19        Q.    How did you calculate that?

20        A.    By taking 31 percent times the number of

21   districts.

22        Q.    How many majority black house districts

23   did the 100,000 race neutral simulations draw on

24   average?

25        A.    On average, between 13 and 14.

                                                        11


1        Q.    How many majority black house districts

2    are in the 2022 enacted plan?

3        A.    There are 29.

4        Q.   How about Mr. Cooper's illustrative

5    house plan?

6        A.   There are 35.

7        Q.   How do those two plans compare to the

8    proportion number of house districts?

9        A.   The enacted map is approximately four

10   below.  And the illustrative map is approximately

11   two above.

12       Q.   Okay.  Can we now turn to table 9,

13   Secretary of State 1 page 58.  Are you there?

14       A.   Yes, I am.

15       Q.   Could you tell the Court what that table

16   represents?

17       A.   So this table shows that same

18   information that we were looking at in the Senate,

19   rather than the number of majority BVAP districts

20   we're looking at the distribution according to

21   particular percentages.  Again we have those

22   different ranges to split on the rows and the

23   typical outcome in the simulations, the 2011 plan

24   the enacting and the illustrative map.

25       Q.   Could you again go into a little more

                                                    12


1    detail about the range of black voting ankle

2    population in Mr. Cooper's illustrative map?

3         A.   So again I think the most important row

4    there is the one displaying the 50 to 53 percent

5    range, where we see that the simulations, the 2011

6    map, the enacted map all produce relatively few

7    districts in that range.  And we see a very

8    different distribution when we look at the

9    illustrative map.

10        Q.   With minute my August of parish and

11   municipal boundaries reduce this pattern?

12        A.   No.

13        Q.   Stepping back Dr. Coop, the results of

14   these subcontract simulations and form your

15   conclusions about the illustrative map?

16        A.   So looking at the distribution here, we

17   can see that something very different in the

18   illustrative map compared to either the enacted

19   map, the 2011 plan or the simulations, and so what

20   we can infer from that is some other criteria were

21   used in producing the illustrative map that

22   generated a very different distribution compared

23   to these other maps we've been discussing.

24        Q.   Okay.  Now let's turn to the concept of

25   the core retention.  What is core retention?

1      A.    Core retention is a term that's used to

2    describe the degree to which voters are retained.

3    Held in the same district from the previous plan

4    into whatever new plan is drawn going forward

5    whether that's a result of the decennial

6    redistricting or some other reason why districts

7    are redrawn.

8      Q.    Could a lay person calculate core

9    retention?

10     A.    No.

11     Q.    What expertise and skills are need to

12    analyze core retention?

13     A.    Well, first you have to understand the

14    concept and how to measure it.  And beyond that,

15    then you have to be able to acquire the data at

16    your merging data sets together that link the old

17    map and the new map, you have to then connect

18    those to population data from the census.  And

19    then be able to appropriately aggregate all of

20    that data together.

21     Q.    How did you calculate core retention in

22    this case?

23     A.    So I calculate core retention as the

24    proportion of voters who are held in the same

25    district from the previous map to the new map,

 1    district by district.

 2         Q.    Did Mr. Cooper do a core retention

 3    analysis for his illustrative maps?

 4         A.    He has a reference to core retention,

 5    but it's in reference to the degree to which the

 6    illustrative map retains the enacted map, the 2022

 7    map.  I calculate core retention to the degree to

 8    which the enacted map and the illustrative map

 9    retain the 2011 map, which I think is the more apt

10    comparison since that's the district that is the

11    voters are coming from in the previous decade.  So

12    we want to know whether the enacted map is the one

13    that goes forward or the illustrative map is

14    implemented.  We would want to know the degree to

15    which the voters from the previous decade is

16    retained into the districts that are going to be

17    used going forward.

18         Q.    Okay.  And could core retention be an

19    explanation for why Mr. Cooper's illustrative maps

20    contain more majority black voting age population

21    districts than the simulations Orion maps?

22         PLAINTIFF COUNSEL:  Objection, it's asking

23          for Mr. Cooper's intent again.

24          DEFENSE COUNSEL:  Your Honor on that.

25          THE JUDGE:  Yes, you may.

                                                        15


1           DEFENSE COUNSEL:  I should have said this

2           earlier, Your Honor, but I want to make the

3           point that Plaintiffs in this case filed a

4           day Bert motion on Dr. Johnson's testifying

5           about the subjective intent of Mr. Cooper.

6           They didn't file a day Bert motion on Dr.

7           Barber.  I would suggest to you Your Honor

8           the reason why they didn't do that is we

9           cited to a brief in our findings of fact,

10          which document 177 page 34 note 5, that was

11          filed by Ms. Thomas' organization, the

12          Harvard election law clinic with unit supreme

13          Court in the South Carolina case.  I went

14          quote it, but we cite it to.  There's a

15          lengthy in this case, about why simulations

16          are relevant evidence of the intent of the

17          map drawer in a racially case where there's a

18          claim of injury.  They were aware of this

19          brief at the time that the day Bert motion

20          was filed.  Afterwards, Your Honor, there was

21          a stipulation entered in this case, and I'll

22          try to quote it the best I can.  I think it's

23          document 182.  The stipulation says that the

24          expert reports of all the experts would come

25          into evidence without any objection as to the

16

1          authenticity or the admissibility if the

2          expert appeared to testify.  That stipulation

3          did not say if the expert appears to testify

4          and he's qualified as an expert.  It did not

5          say that the report comes into evidence

6          subject to subsequent motions to strike

7          testimony in the report.  It says the report

8          is in evidence.  So the Plaintiffs have in

9          our view waived any right to object to this

10         testimony by Dr. Barber.  In any case again

11         this is not a testimony about Mr. Cooper's

12         subjective intent.  He's never mentioned Mr.

13         Cooper.  He's never -- unlike.

14         THE JUDGE:  Your question mentions Mr.

15         Cooper.

16         DEFENSE COUNSEL:  What's that.

17         THE JUDGE:  Your question mentions Mr.

18         Cooper.  And so you're one step removed

19    perhaps from calling for intent.  Your

20    question doesn't call for intent, but your

21    question calls for what is the conclusion

22    that you draw about Mr. Cooper's maps.

23    DEFENSE COUNSEL:  Your Honor.

24    THE JUDGE:  That question.

25    DEFENSE COUNSEL:  I'm going have to read the

                                                    17


1    report or the brief that was submitted by.

2    THE JUDGE:  You don't need to do that.

3    DEFENSE COUNSEL:  Well, I need to make a

4    record, Your Honor.  It's important for you

5    to understand this.  If I may have your

6    permission, because it explains better --

7    they've explained better than I have been

8    able to do why this is relevant testimony.

9    THE JUDGE:  It's in the record.  There is a

10    record.  I'm overruling the objection.  Ask

11    your question again.

12  EXAMINATION BY DEFENSE COUNSEL:

13    Q.   All right Dr. Barber, did you compare

14  the core retention figures for Mr. Cooper's map

15  and for the enacted plan?

16    A.   Yes.

17          Q.   Which one of those plans performed

18     better?

19          A.   The enacted map.

20          Q.   Can you turn to page 1 of secretary

21     exhibit -- excuse me, page 26 of secretary Exhibit

22     1, table 5.  Can you tell the Court what that

23     table is please?

24          A.   This table shows the results of the core

25     retention analysis.  You can see the rows show the

                                                        18

1      various ranges of core retention, the enacted map

2      and the number of districts that fall in those

3      ranges for the Senate and the illustrative maps,

4      the number of districts that fall within those

5      ranges, and then at the bottom the average core

6      retention in each of the maps.

7           Q.   Let's turn to Secretary of State Exhibit

8      1, page 65, table 12.  Can you tell the Court what

9      that table is?

10          A.   This table shows the same analysis for

11     the house.  So we have again core retention and

12     the various ranges for the enacted map and the

13     illustrative house map.  At the bottom we have the

14     average core retention in each of those maps.

15          Q.    What were the average for enacted map

16    and Mr. Cooper's?

17          A.    Retained about 83 percent of people in

18    the compared to the 2011 map.  And the

19    illustrative map retained approximately

20    72 percent.

21          Q.    In your opinion, as a political

22    scientist, is core retention a valid redistricting

23    criteria for the state to consider?

24          A.    It is.  There's been a variety of

25    academic research on the concept.  Voters tend to

                                                      19


1     prefer or to the end to do better with stability.

2     They tend to know their representatives better.

3     They tend to be more likely to participate in the

4     political process when there's less variation and

5     change things related to voting, including whether

6     they moved in and out of districts, that sort of

7     thing.

8           Q.    Let's turn back to your report.  Did you

9     perform any analysis of subsections or region of

10    the state?

11          A.    Yes.

12          Q.    What do you mean by regional analysis

13    and why is that significant?

14         A.    So we're looking at rather than the

15    results of a statewide analysis, we're looking at

16    particular portions of the state.  That's

17    important because the voters in the state aren't

18    evenly distributed across the state.  So in this

19    case where we're talking about drawing majority

20    black districts, there are only certain parts of

21    the state where that's even possible.  There are

22    other places where despite having substantial

23    number of black resident, it's just simply not

24    possible to draw majority black districts.  The

25    regional analysis, I look at places in which it

                                                    20

1    actually occurs, that majority black districts are

2    drawn.

3         Q.    Could you now please turn to page 23 of

4    secretary Exhibit 1.  There's a map on that page

5    title parish map and black voting age population.

6    Could you tell the Court what this map represents?

7         A.    Sure.  This map is parish map of the

8    state.  The parishes are colored by their BVAP

9    percentages.  And so you can see on the right, the

10    key there shows that the colors that are more

11    yellow beige and then into red and dark red are

12    the areas or the parishes in the state where

13    there's higher BVAP percentages.

14        Q.    Does the pattern of residential pattern

15    of afternoon can Americans in Louisiana have any

16    implications as far as drawing districts?

17        A.    Absolutely.  As I said, because in some

18    of these places while you might have say

19    20 percent of the population that are of black

20    voting age population, it's just not possible to

21    draw any majority black districts in those areas.

22    So if you're going to create a map that has

23    proportionality or even exceeds proportionality

24    statewide, given the areas where you can't draw

25    majority black districts, you have to overdraw or

                                                    21

1    overrepresent the BVAP population in the remaining

2    parts of the state where it is possible.

3        Q.    Could a lay person perform a regional

4    analysis similar to what you've done in your

5    report?

6        A.    No.

7        Q.    What type of expertise or software is

8    required to perform the regional analysis that

9    you've performed in this report?

10        A.    So familiarity with geographic

11   information systems, ability to work with shape

12   files, merging data into those shape files, and

13   analysis that would come from that.  Those would

14   all be things that would require a great deal of

15   expertise.

16        Q.    Let's pull up table 3 on Secretary of

17   State Exhibit 1, page 19.  Can you tell the Court

18   what this table represents?

19        A.    So this table shows regions in the state

20   where there are majority BVAP districts.

21        Q.    This is for the Senate plan, correct?

22        A.    Yes.  This is in the Senate.  The

23   regions that are highlighted in yellow are the

24   regions where the illustrative map contains an

25   additional majority BVAP district compared to the

                                                    22


1    enacted map.

2         Q.    How did you identify the regions that

3    you used in this table?

4         A.    So the regions are the parishes in which

5    we see majority BVAP districts.  In addition,

6    there are various regional definitions that have

7    been used by the Plaintiff's experts, so my intent

8    was to find the greater of greatest commonalities

9    across the regions, in addition to the majority

10    BVAP.

11        Q.    To the regions you identified were in

12    part based upon testimony by Plaintiff's experts

13    on their opinions on regions?

14        A.    That's correct.

15        Q.    All right.  To help the Court understand

16    table 3, we don't need to go through the whole

17    table.  Could you please explain the first row

18    that deals -- it says Caddo, does that mean Caddo

19    Bossier?

20        A.    Correct.  So that would be the regions

21    in the northwest of the state in and around

22    Shreveport area.

23        Q.    So just walk across that row and tell

24    the Court, so the Court will understand the other

25    regional evidence, how the top row works?

                                                           23

1        A.    So in that region, we see that the

2    enacted map contains one majority BVAP district.

3    The next column shows the proportion of the

4    simulations that produce the same number of

5   majority BVAP districts as the enacted map.  So we

6   can see that when we set the simulations, and then

7   look at the results afterwards, it's quite common

8   for the simulations to produce an outcome similar

9   to the enacted map in this region.  About

10  88 percent of the time.  In the next column, we

11  see the illustrative map contains two majority

12  BVAP districts in that region.  And then the final

13  column shows the outcome never occurred in the

14  simulations.

15       Q.   Now let's turn to page 34 officious

16  Exhibit 1.  There's a table 6 Senate district core

17  retention in Shreveport regions.  Could you tell

18  the Court what this table shows?

19       A.   So this table goes into more detail in

20  that particular region.  We see that there are

21  three districts contained in the region.  The

22  table shows the district numbers, the BVAP in each

23  of those districts and the core retention scores

24  for each of those districts.  The top half of the

25  table shows this information for the enacted map,

                                                    24


1   and the bottom half of the table shows this

2   information for the illustrative map.  And again,

3    the rows highlighted in yellow indicate districts

4    that are majority BVAP.

5         Q.   What is the collective black voting age

6    population in these two parishes?

7         A.   So in this region, the BVAP is

8    approximately 39 percent.

9         Q.   What share of the districts in the

10   enacted map is majority black voting age

11   population in this region?

12        A.   In the enacted map, one of the three

13   districts in this region are majority black.

14        Q.   And that's what percent?

15        A.   About 33 percent.

16        Q.   What about Mr. Cooper's illustrative

17   maps, what share of the districts in this region

18   are majority black voting age population?

19        A.   Approximately 2 of the three -- I'm

20   sorry, two of the three districts are majority

21   BVAP approximately 67 percent.

22        Q.   Okay.  Is the illustrative map in this

23   region extra proportional?

24        A.   It goes beyond proportionality by a

25   little more than 20 percentage points.

25

1      Q.    Does the enacted map reach

2  proportionality?

3      A.    It's under proportionality about six

4  percentage points.

5      Q.    Is it possible to achieve exact

6  proportionality in this region?

7      A.    It's not possible to get exactly there

8  simply because we're only dealing with three

9  districts.  So you really only have options of

10  units of, you know, units of three effectively.

11      Q.    Okay.  Can we turn to Secretary of State

12  Exhibit 1 page 28, figure 7.  That's titled

13  Shreveport region Cooper illustrative Senate

14  district boundaries.  Do you see that?

15      A.    Yes.

16      Q.    Could you tell the Court what this

17  figure shows?

18      A.    So this figure shows a map of the three

19  districts in the illustrative map in this

20  particular region.  So we the two districts that

21  are majority, majority BVAP, highlighted in

22  yellow, and the third district in gray.  The red

23  dotted lines show the parish boundaries.

24      Q.    Does this orientation of -- does the

25  orientation of Mr. Cooper's 38 suggest it adheres

1   to race neutral redistricting criteria?

2       A.   It does not.  The district spans both

3   counties, it spans the two largest cities in the

4   area, it has an unusual shape.  Kind of has a C

5   shape.  And so in that way, it's not adhering to

6   any of the criteria in particular.

7       Q.   Let's turn to figure 8.  On Secretary of

8   State Exhibit 1 on page 39.  Can you tell the

9   Court what this figure shows?

10      A.   This figure shows it's schooled on

11  district Zoomed in district 38, illustrative

12  district 38.  It colors the precincts by their

13  BVAP percentages, and so the darker more purple

14  colors are precincts with higher BVAP.  The

15  lighter more yellow colors are precincts with

16  lower BVAP.  The numbers of the precinct labels,

17  the district itself is out lined with the dark

18  gray, the dark gray line.

19      Q.   Is there anything significant in your

20  opinion about the shape of Mr. Cooper's Senate

21  district 38?

22      A.   Yes.  In having that, as I mentioned,

23  that C shape of the district, you can see that the

24    district avoids grouping of precincts in the

25    center there near where the figure says SD36.  And

 1    those precincts have very few black residents and

 2    are heavily white.  So you can see the district

 3    very carefully walks around that group of

 4    precincts.

 5         Q.   What does this suggest to you?

 6         A.   It suggests to me that the district's

 7    shape is because it has that C shape, it's missing

 8    those precincts in the middle that are majority

 9    white, and that to me suggests that that shape is

10    kind of carefully winding around those majority

11    white precincts in the center there.

12         Q.   Do you do similar analysis for other

13    regions in the state where Mr. Cooper created

14    additional majority black Senate districts?

15         A.   Yes.

16         Q.   Did you come to similar conclusions in

17    regards --

18         PLAINTIFF COUNSEL:  I'm going to object, Your

19         Honor.  That question calls for Mr. Cooper's

20         objective intent and how he drew this

21         district.  The answer included testimony

22          about this objective intent.  I did not get

23          an objection on the record in time for that

24          answer, but I'm going to object to further

25          questions that ask for that same kind of

                                                                    28


1          testimony.

2                DEFENSE COUNSEL:  May I be heard, Your Honor?

3                THE JUDGE:  The objection is overruled.

4                DEFENSE COUNSEL:  Thank you, Your Honor.

5    EXAMINATION BY DEFENSE COUNSEL:

6          Q.   Did you do similar analysis for the

7    other regions in the state where Mr. Cooper

8    created additional majority black Senate

9    districts?

10         A.   Yes.

11         Q.   Did you come to similar conclusions?

12         A.   Yes.

13         Q.   We won't have to go through those other

14   regions, because that testimony, Dr. Barber.

15   Thank you.  Let's move to the house.  Can you turn

16   to Secretary of State 1, page 59.  Can you tell

17   the Court this table is marked Louisiana and

18   number of majority black Senate -- majority black

19   voting age house districts table 10.  Could you

20    explain that table to the Court, please?

21         A.    So this is the same table we were

22    looking at but for the house instead of the

23    Senate.  So here we have regions of the state in

24    which there are majority BVAP districts.  The rows

25    highlighted in yellow illustrate the regions where

                                                          29

1    the illustrative map contains additional majority

2    BVAP districts when compared to the enacted map.

3         Q.    Was there anything particularly

4    significant in your view about the range of black

5    voting age population?

6         A.    So again, as we saw on the previous

7    table, the number of majority BVAP districts in

8    the enacted map, as then we can compare that to

9    the proportion of time the simulations generate

10    the same number of majority BVAP districts

11    compared to the enacted map.  And then in the last

12    column, the proportion of times that the

13    simulations generate the same number of majority

14    BVAP districts as in the illustrative map.

15         Q.    Let's look at one of these regions with

16    more specificity.  Can we pull up table 16 on

17    Secretary of State Exhibit 1 page 95.

18        A.    I'm there.

19        Q.    Is that in front of you?

20        A.    Yes, it is.

21        Q.    Okay.  Could you explain that table to

22   the Court, please?

23        A.    So this table focuses in on the regions

24   in and around Baton Rouge.  And again, it shows

25   the particular districts in that region.  The BVAP

                                                         30

1    in each of those districts on the retention scores

2    for each of those districts, again the top half is

3    for the enacted map.  The bottom half is for the

4    illustrative map.  And the rows highlighted in

5    yellow are again those districted where that

6    contain majority BVAP population.

7         Q.    And is this the table explain how many

8    house districts are in this region?

9         A.    It does, yes.  There are eleven.

10        Q.    What's the racial composition of these

11   two parishes?

12        A.    Collectively, it's approximately

13   44 percent.

14        Q.    How many of the districts in this area

15   are majority black voting age population in the

16    enacted plan?

17         A.   Six of the eleven, or about 54 and a

18    half percent.

19         Q.   So the enacted house plan already

20    exceeds proportionality in this region?

21         A.   Yes, it does.

22         Q.   All right.  How many districts in this

23    region are majority black in Mr. Cooper's

24    illustrative map?

25         A.   Eight of the 11 are, or about

                                                      31

1    73 percent.

2         Q.   Does this percent exceed proportionality

3    for Mr. Cooper's plan?

4         A.   Yes, it does.

5         Q.   Let's now look at figure 37, Secretary

6    of State Exhibit 1 page 99.  Can you tell us what

7    this figure represents?

8         A.   This figure is showing the orientation

9    of these districts in this region for the

10    illustrative map.  And again the districts that

11    are contained majority papulation are highlighted

12    in yellow.

13         Q.   What do you find noteworthy about these

14     districts?

15          A.     I think the most noteworthy is you can

16     see some of the districts contain some unusual

17     shapes, particularly direct 70, I think district

18     71 are two that I highlighted in my report.

19          Q.     Let's look at figure 38 on page 100.

20     Can you explain what this represents to the Court?

21          A.     So this figure looks specifically at

22     illustrative district 68 and 70.  And again, as in

23     the example we looked at earlier in the Senate, it

24     shows the precincts contained in each of those

25     districts colored by the black voting age

                                                        32

1     population in each precinct.  The boundary of the

2     precincts are shown using the dark gray lines.

3          Q.     What's significant about these

4     districts?

5          A.     I think what we see is district 70 has

6     this unusual U shape that's kind of horseshoe

7     shaped, in which it kind of winds around the

8     bottom of house district 68, which house district

9     68 is majority BVAP district, and house district

10    70 is not.

11         Q.     Why was -- in looking at the map, was

12    there anything that you can deduce from the

13    demographics of the precincts based upon the U

14    shape?

15         A.    Well, one thing that occurs in having

16    that shape is that HD70 kind of goes very -- it

17    kind of digs south to avoid that precinct at the

18    bottom that's majority BVAP.  And then comes back

19    around on the other side and scoops up some

20    precincts that are heavily white.  And in order

21    to -- for district 68 to remain majority BVAP, it

22    needs those very heavy BVAP precincts at the

23    bottom of the map there.

24         Q.    This is suggesting to -- does this

25    suggest anything to you in particular?

                                                    33


1         PLAINTIFF COUNSEL:  Objection to the extent

2         it calls for Mr. Cooper's.

3         THE JUDGE:  It's just a question too far.  I

4         mean, I'm following you.  It's a question too

5         far.  Sustained.

6         DEFENSE COUNSEL:  Your Honor, could you hear

7         the answer before you sustain the objection.

8         THE JUDGE:  Yes, give me a response.

9         DEFENSE COUNSEL:  He's just going to say that

10          the districts don't comply with traditional

11          redistricting.

12          THE JUDGE:  That's what he's going to say.

13          You know what he's going to say.

14          DEFENSE COUNSEL:  Yes.

15          THE JUDGE:  I'm going to let him answer the

16          question.

17          THE WITNESS:  The shape of the HD70 is not --

18          doesn't comport with other traditional

19          redistricting principles.

20     EXAMINATION BY DEFENSE COUNSEL:

21          Q.   Did you do similar analysis for other

22     house regions in the state where Mr. Cooper

23     created additional majority black house districts?

24          A.   I did, yes.

25          Q.   Now I'm going to turn to your rebuttal

                                                        34


1      report.  Could you call up and turn to Secretary

2      of State Exhibit 4.  This is the rebuttal report

3      you prepared for this case?

4           A.   Yes, it is.

5           Q.   Why did you prepare this?

6           A.   I prepared this in response to a report

7      filed by Dr. McCartin.

8      Q.   Who's Dr. McCartin?

9      A.   Yes.

10      Q.   That's M-C-C-A-R-T-I-N, for the court

11   reporter?

12      A.   That's correct.

13      Q.   Who's Dr. McCartin?

14      A.   He's one of the co-authors of the

15   algorithm that I used in this case in addition to

16   other professors, Dr. Emy and others who wrote the

17   algorithm.

18      Q.   Did Dr. McCartin offer any objections to

19   your original report?

20      A.   Yes, he did.

21      Q.   What were they?

22      A.   He offered a number of critiques,

23   particularly to the way in which the simulations

24   were structured, the particular parameter values

25   that were chosen, the number of simulations that

                                                          35


1   were conducted, the particular way in which the

2   state I partitioned the state in order to conduct

3   the simulations, and I believe that the end there

4   some of the what are called convergence

5   diagnostics.

6       Q.   What are convergence diagnostics?

7       A.   More or less they are statistics that

8   you would look at to be assured that the algorithm

9   ran correctly, that it kind of ran to completion

10  appropriately, that sort of thing.

11      Q.   How did you respond to Dr. McCartin's

12  criticisms?

13      A.   So I incorporated each of those

14  criticisms and conducted a second set of

15  simulations and then compared the results of that

16  second set of simulations to the initial set that

17  I had run in my original report.

18      Q.   What if any changes resulted from the

19  conclusions you reached in your original

20  simulations?

21      A.   The second set of simulations doesn't

22  change my opinions in any meaningful way.

23      Q.   Let's walk through a few specifics in

24  your rebuttal report.  Secretary of State Exhibit

25  4, section 3 on page 8, can we turn to that.  At

                                                    36


1   the top of the page, you state something to the

2   effect that Dr. McCartin did not run any

3   simulations.  Why is that significant?

4       A.   I think that's significant because he

5    certainly could have.  And is certainly capable of

6    that.  And in doing so, he certainly could have

7    provided a set of simulations using the criteria

8    out lined by the state and shown that when

9    introducing these criteria in the way he felt was

10   most appropriate, that of the simulations, closely

11   resemble the illustrative map.

12       Q.   Let's clarify that a little bit.  What

13   information did he need to do to run simulations

14   to test your report?

15       A.   So we provided with my report data back

16   up code, that sort of information to replicate the

17   original set of simulations.

18       Q.   The fact that he did not do any

19   simulations, does that suggest anything to you?

20       A.   So as I was saying, he certainly could

21   have done that.  And produced a new set of

22   simulations that he felt were better or more

23   appropriately reflected the countries criteria of

24   the statement had those simulations reflected the

25   illustrative map, that I think would have been

                                                        37

1    very strong suggestive evidence, and we don't see

2    that here.

3         Q.    How long would it have taken

4    Dr. McCartin to run simulations to test your

5    conclusions?

6         A.    Given the information that we provided.

7         PLAINTIFF COUNSEL:  Objection.  This is

8         beyond the scope of the report.  There's

9         nothing in the report about what Dr. McCartin

10        could have done beyond what's in this

11        paragraph.  There's nothing about how long it

12        would take, there's nothing about what it

13        would have shown.

14        DEFENSE COUNSEL:  Your Honor, this is

15        interesting.  I'm not allowed to ask him

16        questions about things that are in the report

17        that they admitted into evidence and thereby

18        waived any objections.  And now I'm not

19        allowed to ask him questions to clarify his

20        testimony that's in the report.

21        THE JUDGE:  Overruled.

22   EXAMINATION BY DEFENSE COUNSEL:

23        Q.    How long would it have taken

24   Dr. McCartin to run simulations to test the

25   criticisms that he made of your report?

1       A.   In my estimate, it would not have taken

2    particularly long, given the information that we

3    provided and his expertise in this area.  The

4    better part of perhaps a day's work.

5       Q.   Let's turn to page 6 of Secretary of

6    State -- let's turn to page 6 of Secretary of

7    State Exhibit 4, section 3.1 titled partitioning

8    the state.  Could you explain that section?

9       A.   Yes.  This section is addressing a

10   criticism offered by Dr. McCartin regarding the

11   way in which I close to partition the state prior

12   to running the simulations.  In a state like

13   Louisiana, where you have a large number of

14   districts and even a larger number of precincts

15   that are being grouped together to compose those

16   districts, it's not uncommon to first divide the

17   state into a number of sub regions, and conduct

18   the simulations within those regions, and then

19   stitch them back together into a statewide

20   analysis.  This has been done in the number of

21   cases in Louisiana is similar to those.  So.

22      Q.   Could I ask you a question.  How many

23   other examples can you recall of people who --

24   expert, simulation experts who have done

25    simulations by dividing a state into regions?

39

1          A.    So I know that this has been done in a

2    case in Pennsylvania in which the expert divided

3    the state into various regions.  It's been done in

4    other published word including in some of

5    Dr. McCartin's own published work.  It's a widely

6    used and commonly used and widely accepted

7    practice.

8          Q.    So despite the fact that it's a commonly

9    accepted practice, what was your response to the

10    criticism from Dr. McCartin?

11          A.    So my response was to take into account

12    his criticism and alter the way in which the state

13    was divided prior to running simulations.  In the

14    first set of simulations, the state is partitioned

15    according to parish boundaries.  And the second

16    set of simulations, the state has partitioned

17    according to the boundaries of the illustrative

18    map and the impact that that has is that it in

19    some ways makes it more likely for the simulations

20    to produce something that resembles the

21    illustrative map.  And so it in some ways, you can

22    say almost like a leg up to the simulations in

23   producing something that resembles the

24   illustrative map.

25        Q.   Could I stop you there and make sure the

                                                            40


1   Court understand it.  We're talking about the

2   house map?

3        A.   That's correct.  The first set of

4   simulations, I partitioned the state into she

5   regions in the house.  I do not partition the

6   state in the Senate.  In the second set of

7   simulations, I partitioned both the Senate and the

8   house according to groupings of the illustrative

9   districts.

10        Q.   Explain why your regions and your second

11   set of simulations were based upon Mr. Cooper's

12   illustrative districts?

13        A.   So one of the criticisms was that in

14   partitioning the state by parish boundaries, it

15   would make it difficult or perhaps impossible to

16   recreate, to perfect rep will aequat, for the

17   simulations to perfectly replicate say the enacted

18   map, given the way in which the enacted map

19   crosses certain parish boundaries.  Given that you

20   could think of this the hard case against the

21    simulations would be do they resemble the

22    illustrative map.  So to give the best scenario or

23    the best case scenario toward allowing the

24    simulations to produce something resembling the

25    illustrative map, I partitioned the state

                                                          41

1    according to boundaries of the illustrative map.

2         Q.    And in doing that, did it make any

3    difference in your results?

4         A.    The results were not substantively

5    different after making that adjustment.

6         Q.    Let's turn to Secretary of State 4 page

7    8, there's a section titled 3.2 core retention.

8    Could you explain that section to the Court?

9         A.    So this section addresses the critique

10    of the way in which the core retention constraint

11    is implemented in the simulations.  And in the

12    second set of simulations, I implement a much

13    stronger core retention constraint.  So the

14    algorithm is instructed to give much greater

15    weight or priority to this criteria of core

16    retention.

17         Q.    Where did you get that criteria for core

18    retention?

19      A.   So the country criteria, the particular,

20   is implemented in this set of simulations is drawn

21   from instructions or recommendations contained

22   within the algorithm itself, from Dr. McCartin and

23   his co authors.

24      Q.   How would you respond in a criticism

25   that you should have run simulations using a low

                                                          42

1   range for core retention versus a high range for

2   core retention?

3      A.   So my response would be that that's

4   exactly what we have here, the first set of

5   simulations have a very low range of core

6   retention or no core retention constraint.  The

7   second set of simulations have a very high core

8   retention constraint.  And so we can see the

9   outcome of bearing the strength of that constraint

10   in comparing the two.  The two set to one another.

11      Q.   All right.  So let's turn to Secretary

12   of State Exhibit 4, page 9, Section 3.3 titled

13   number of unique maps.  Could you please explain

14   that section to the Court?

15      A.   Sure.  One of the additional critiques

16   was that the simulations had not perhaps generated

17    a sufficient number of maps or unique maps to

18    represent the possible -- to be a representative

19    sample of maps and so in addressing that critique,

20    increased the number of maps that were drawn by 5

21    times from 100,000 to 500,000 maps.

22        Q.   In your opinion, was Dr. McCartin

23    criticism that you had not constructed a

24    sufficient number of simulations in your first

25    set.  Was that a valid criticism in your view?

                                                        43


1         A.   No, I don't think so.  100,000 maps is

2    substantial.  It exceeds the number of maps in

3    many other redistricting cases in which this

4    algorithm has been used.  And perhaps -- or in

5    those cases, you've seen 10,000, 5,000 maps being

6    used.  And so I don't think it was necessarily a

7    valid criticism to begin with.  But nevertheless,

8    just to be sure, I increased the number of maps

9    drawn by five times.

10        Q.   Am I understanding you correctly, you

11    did 500,000 Senate maps and 500,000 house maps?

12        A.   That's correct.

13        Q.   In doing that, did it make any

14    difference in your conclusions?

15      A.   Again, the substantive conclusions

16  didn't change dramatically, or didn't change at

17  all really.

18      Q.   So, Dr. Barber, just to be clear, did

19  you implement these changes one at a time or all

20  at once?

21      A.   Collectively.  So I took all of these

22  critiques together and implemented them in a

23  second set of simulations that addressed all of

24  them simultaneously.

25      Q.   Now let's turn to Secretary of State

                                                        44


1   Exhibit 4 page 11.  There's a section titled

2   conversion diagnostics.  Could you explain that

3   section to the Court?

4       A.   Sure.  One of the criticisms offered was

5   that I failed to check or provide diagnostic

6   convergence diagnostics regarding the first set of

7   simulations.  And to address that, I include those

8   again a second time in addition to other measures

9   that were recommended again none of the -- those

10  results indicated there were problems with the

11  simulations.

12      Q.   Just to be clear could you explain to

13    the Court the type of problems that converge and

14    statistics might reveal?

15        A.    Probably they would indicate that the

16    model or the algorithm hadn't run appropriately or

17    it hadn't correctly -- the term we would use is

18    converged.  That simply means that the algorithm

19    basically did what we want it to do.  It ran

20    appropriately and collected a representative

21    sample of maps.

22        Q.    Again, what did the converge statistics

23    show for your second set of simulations?

24        A.    They indicated that the model had run

25    appropriately.

                                                                45

1        Q.    Now, the criticism Dr. McCartin made

2    about converge and statewide order particulars on

3    your first set of simulations, do you think that

4    was a fair criticism?

5        A.    No.  Those diagnostics were include with

6    the materials we provided.  Dr. McCartin saw those

7    and made reference to them.  He indicated

8    additional convergence diagnostics that he thought

9    would be appropriate.  Those are include in the

10    second set of simulations.

11          Q.    Okay.  Let's now move on to page 12 of

12    so the Exhibit 4, section 4.  Titled regional

13    analysis.  And on that page, Dr. Barber, there's a

14    color-coded maps.  Could you explain to the Court

15    what's reflected by that color-coded map of

16    Louisiana?

17          A.    So this map indicates the way in which

18    the simulations are partitioned for the Senate.

19    So I partitioned the state into four regions.  You

20    can see those regions are groupings of

21    illustrative Senate districts.

22          Q.    Just to be clear, how did you identify

23    the regions that you used?

24          A.    So as I said, there are groupings of

25    illustrative Senate districts that they're

                                                        46


1    geographically connected to one another.

2          Q.    Let's turn to page 14 of Secretary of

3    State Exhibit 4.  There's a chart at the bottom of

4    the page titled minority majority black voting age

5    population districts in simulation Senate region

6    1.  Could you explain to the Court what that chart

7    reflects?

8          A.    So this chart is showing the results of

9    the second set of simulations for the Senate

10   region 1, if you look back at the map, the area in

11   and around New Orleans.  And the results here show

12   the proportion of simulations that generate a

13   particular number of majority BVAP districts on

14   the far left we can see that in that set of

15   simulations, 100 percent of the maps generate at

16   least one majority BVAP district.  We can see then

17   on the next bar that approximately 70 percent of

18   the simulations generate at least two majority

19   BVAP districts.  Then finally we can see that in

20   that set of simulations, approximately ten percent

21   of the simulations generate three majority BVAP

22   districts on the far right of the figure, we see

23   where the illustrative map is at 6.

24        Q.   How many simulations map generated six

25   majority black districts in region 1?

                                                    47


1         A.   There were none.

2         Q.   What conclusions did you reach from this

3    analysis?

4         A.   The conclusions that I reach is that

5    even after we respecify the -- if I the

6    simulations to incorporate all of these changes

7    and we rerun the algorithm, the set of simulations

8    nevertheless produce largely the same results that

9    they failed to produce the number of majority BVAP

10    districts as in the illustrative map.

11         Q.   I apologize, Your Honor, I may have

12    asked this, but just to be clear:  Did you do

13    similar analysis for Senate regions 2, 3 and 4, on

14    pages 15 through 18 of Secretary of State Exhibit

15    4?

16         A.   Yes, I did.

17         Q.   All right.  Now let's turn to Secretary

18    of State Exhibit 4 page 19 secretary labeled 4.2

19    house.  Could you tell the Court what is reflected

20    by the color-coded map Louisiana that appears on

21    page 19?

22         A.   So this is showing the choice of regions

23    for the simulations in the house.  So again, you

24    can see these are groupings of illustrative house

25    districts.  There are seven in the -- you can see

                                                    48


1    that are color-coded on the map there.

2         Q.   Okay.  Again, how did you identify these

3    house regions?

4         A.   So as I said, they're groupings of

5     illustrative house districts that are

6     geographically close or connected to one another.

7         Q.   Like the Senate chart we looked at, did

8     you do a similar chart for all the house regions

9     to compare the number of majority black simulated

10    districts to the number found in enacted and

11    illustrative plan?

12        A.   Yes.

13        Q.   What did you find?

14        A.   So again, the results are similar to the

15    results of the Senate for the second set of

16    simulations.  And for the results of the first set

17    of simulations, the illustrative maps stands as an

18    outlier, significant outlier, when compared to the

19    results of the simulations with regards to the

20    number of majority BVAP districts that are

21    generated.

22        Q.   Did you reach any conclusions from that?

23        A.   The conclusions are that again even

24    after respecifying the algorithm, taking into

25    account all of these changes that we just -- we

                                                      49


1     simply don't see a similar number of majority BVAP

2     districts in the simulations when compared to the

3    illustrative map.

4        Q.    Let's turn now to Secretary of State

5    Exhibit 4 page 9, figure 1.  On that page, there's

6    two charts there.  Mr. Barber, one says number of

7    majority black VAP Senate districts, 500,000 maps.

8    The other chart says number of majority black VAP

9    500 thousands house districts.  Could you explain

10   to the Court what's reflected by these two

11   figures?

12       A.    So these two figures take all of those

13   regional simulations and piece them back together

14   to look at this at a statewide level.  Similar to

15   the figures we looked at, at the very beginning of

16   my testimony.  Again we're seeing the distribution

17   of majority BVAP districts produced by the

18   simulations in the Senate on the left and the

19   house on the right, again, in comparison to the

20   dashed lines in each figure, which show the

21   enacted map and the illustrative map.

22       Q.    All right.  So let's start with the

23   house.  What was the average number of majority

24   black house -- Senate -- I'm going to go with the

25   Senate first, because it's on the left.  What was

50

1    the average number of majority black Senate

2    districts generated by your second set of

3    simulations?

4        A.    In the Senate, the average was a little

5    more than five.

6        Q.    How many again majority black house

7    districts are in the enacted plan?

8        A.    In the enacted plan, in the Senate,

9    there are 11.

10        Q.    How about in Mr. Cooper's illustrative

11    plan?

12        A.    14.

13        Q.    Let's move slightly to the right, which

14    is your chart for the second set of house

15    simulations.  What's the average number of

16    majority black house districts created by your

17    second set of simulations?

18        A.    So in the second set of simulations in

19    the house, the average number produced by the

20    simulations is between 17 and 18.

21        Q.    And how many majority black house

22    districts are in the enacted 2022 house plan?

23        A.    29.

24        Q.    How many majority black districts are in

25    Mr. Cooper's illustrative house plan?

1        A.    35.

2        Q.    Can you conclude, Dr. Barber, by briefly

3    summarizing what you relied upon to form your

4    opinions in this case?

5        A.    So in kind of holistically, we have at

6    this point a first set of simulations, a second

7    set of simulations that are specified very

8    differently than the first set of simulations.

9    Nevertheless both of them produce come to a

10   similar conclusion, which is that we just don't

11   see something resembling the illustrative map,

12   given the criteria that are outlined in the joint

13   rule combine and the simulations from that.  More

14   over, when we look at the particular distribution

15   of the districts, just whether they're majority or

16   not, we see something very different as well.  And

17   then finally just a visual inspection of the

18   district boundaries.  We see in some cases some

19   unusual shaped districts and odd appendages and

20   things like that, that are not well explained by

21   the traditional redistricting criteria.

22       Q.    All right.

23           DEFENSE COUNSEL:

```
24              Your Honor, subject to redirect, no

25          further questions, but I also want to make a
```

                                                                    52

```
1           proffer of proof at the time the Court tells

2           me it's proper for me to do that.

3      THE JUDGE:

4              Permitted.  All right.  Cross.

5  EXAMINATION BY PLAINTIFF COUNSEL:

6      Q.   Good morning, Dr. Barber.

7      A.   Good morning.

8      THE JUDGE:

9              Make an appearance, we have a new court

10         reporter.

11     PLAINTIFF COUNSEL:

12             Stewart Naifeh from legal defense fund

13         for the Plaintiffs.

14  EXAMINATION BY PLAINTIFF COUNSEL:

15     Q.   So, Dr. Barber, you testified in a case

16  in the Northern District of Florida called

17  Jacobson versus Lee; is that correct?

18     A.   Yes, I did.

19     Q.   Did you recall what weight Chief Judge

20  Walker afforded your opinions?

21     A.   I do not recall.
```

22    Q.    Stephen, can we pull up Jacobson versus

23  Lee, and turn to page 18 of this PDF.  For the

24  record, this is 411 F sub third at 1239 is the

25  citation for the case.  And pen cite for this page

53

1   is 1274.

2       Dr. Barber, do you read -- can you see the

3   highlighted text there?

4       A.    Yes.

5       Q.    Can you read that?

6       A.    "This Court further finds Dr. Barber's

7   testimony emphatically not credible and his

8   opinions offered in this case to be unreliable."

9       Q.    Does that refresh your recollection of

10  that weight Chief Judge Walker afforded your

11  opinions?

12      A.    Yes.

13      Q.    Okay.  Did you also testify in a

14  Northern district of Florida case called Jones

15  versus Desantis?

16      A.    Yes.

17      Q.    And do you recall if Judge Hainkel

18  accredited your testimony in this case?

19      A.    I do not recall.

20      Q.    Stephen, can we pull up Jones V

21   Desantis.  I see it's on the screen.  Turn to page

22   37 of this PDF.  This is 462 F, the third, 1196.

23   The pen cite is page 1246 of the reporter.

24          Do you see the highlighted text there?

25      A.    Yes.

                                                    54


1       Q.    Can you read that text?

2       A.    "The state says the focus groups and

3    pooling show that payment of LFOs, including by

4    those unable to pay, was critical to passage of

5    the amendment.  They even presented expert

6    testimony to support the assertion.  I do not

7    credit testimony."

8       Q.    The expert testimony there, that was

9    your testimony that the Court is referring?

10      A.    I believe so.

11      Q.    Okay.  Does that refresh your

12   recollection about the weight that Judge Hainkel

13   gave your testimony?

14      A.    Yes.

15      Q.    All right.  And, Dr. Barber, you have

16   never drawn districting plans outside of

17   litigation, correct?

18          A.    That's correct.

19          Q.    And you don't have experience drawing

20    districting plans without the use of simulations,

21    correct?

22          A.    I'm not sure what you mean.

23          Q.    So you haven't used Maptitude to

24    assemble census blocks and precincts by hand into

25    districts?

                                                            55


1           A.    I have not used Maptitude to create a

2     districting plan.

3           Q.    Okay.  And have you used any other

4     software other than simulation software to create

5     districting plan?

6           A.    I have used the program called Dave's

7     redistricting.  I'm familiar with that

8     redistricting program.

9           Q.    You have used that software to create an

10    entire redistricting plans?

11          A.    I use it in my course work.  I teach

12    students about redistricting in my legislative

13    politics class.  And I have an assignment that

14    asks them to create redistricting plans using

15    criteria.  So I've used it in the academic and

16    pathological setting.

17        Q.    Dr. Barber, a few general questions

18    about simulations analysis.  When you perform a

19    simulation analysis, you use a computer to create

20    a large number of maps, correct?

21        A.    Yes.

22        Q.    And you impose a set of constraints on

23    how the computer uses those maps?

24        A.    Yes.

25        Q.    Okay.  And those constraints are

                                                          56

1    intended to approximate various redistricting

2    principles that a human map drawer might consider,

3    correct?

4        A.    They are intended to approximate the

5    criteria that whichever jurisdiction you're

6    working with, they have out lined as the criteria

7    that should guide redistricting.

8        Q.    And they could also include criteria

9    that a map drawer considered whether or not

10    whether some injury discovery have out lined those

11    criteria, correct?

12        A.    I'm sorry, I'm not sure I understand.

13        Q.    So a human map drawer might consider

14    criteria that are not those out lined by a

15    jurisdiction, correct?

16         A.   Yes, that's correct.

17         Q.   And those could also be programmed into

18    a simulation?

19         A.   Yes, they could.

20         Q.   Okay.  To do that, you have to reduce

21    the redistricting considerations as a human map

22    drawer might apply them to a formula that could be

23    captured in computer code, correct?

24         A.   I'm sorry, I'm not sure I understand.

25         Q.   In order to implement redistricting

                                                    57


1    criteria, whether specified by a jurisdiction or

2    use bid a human map drawer, you need to convert

3    those into something a computer could actually

4    calculate, correct?

5         A.   Yes, that's correct.

6         Q.   Okay.  One use of simulations is to

7    isolate the effect of a particular redistricting

8    consideration on a configuration of districts in a

9    particular map you're interested in analyzing?

10         A.   That's one of many uses.

11         Q.   Okay.  To do that, you produce simulated

12    maps that do not include the redistricting

13    consideration whose impact you're trying to study;

14    is that right?

15         A.   I'm sorry, can you --

16         Q.   So in order to isolate the effect of

17    redistricting consideration, you exclude that

18    consideration from the simulation; is that

19    correct?

20         A.   That would be one approach, that's part

21    of the process.  So I wouldn't say that that's the

22    only -- like, that's the final thing, but this

23    is -- like, that's one step in the process.

24         Q.   Is that what you did in this case?

25         A.   It's -- I think it's a description of

                                                    58

1    part of what I did.  I wouldn't say it's

2    everything.

3         Q.   And then once you produce that set of

4    simulations that exclude that criteria, you

5    compare them to the map you're studying?

6         A.   Yes, that's correct.

7         Q.   Okay.  And for this simulations to be

8    useful in testing the impact of the excluded

9    consideration on the map you're studying, a

10    simulation has to include all the other

11    redistricting criteria that went into the map

12    you're studying, correct?

13         A.    I don't think that that is the case.    I

14    don't think that anyone could do that.    I think

15    that's an impossible task.

16         Q.    So you're saying it's impossible to I

17    conclude all the criteria that the map drawer who

18    drew the map you're studying used?

19         A.    I'm sorry, to include all of the

20    criteria?

21         Q.    Yes.

22         A.    You can do -- you can obviously do your

23    best at trying to do as much as possible, but I

24    think that we could sit here and articulate and

25    possibly a number of criteria.    That's not

                                                        59


 1    something that could be done.

 2         Q.    Turning to the simulations you created

 3    in this case.    The excluding redistricting in your

 4    consideration was race, correct?

 5         A.    Race is not included in the simulations.

 6         Q.    Right.    And that's because you want to

 7    assess the impact on race on the illustrative maps

8    created by Mr. Cooper?

9         A.   That's correct.

10        Q.   Okay.  You specifically want to study

11   the number of majority black districts in Mr.

12   Cooper's illustrative plans as compared to the

13   simulations, correct?

14        A.   That's one of the comparisons, among

15   others.

16        Q.   Your opinion in this case is that the

17   simulations you ran show that racial

18   considerations did have an effect on Mr. Cooper's

19   maps, correct?

20        A.   Yes.  That's correct.

21        Q.   And Mr. Cooper has candidly acknowledged

22   he considered race in his map drawing process,

23   correct?

24        A.   Yes, I believe he has.

25        Q.   He also has acknowledged that

                                                    60


1    consideration of race was factor in his conclusion

2    that he could create additional majority black

3    districts over what are in the enacted plan,

4    correct?

5         A.   Yes, I believe he has said that.

6        Q.    Okay.  One of the constraints that you

7    included in your simulations that is the

8    district's must have equal populations, correct?

9        A.    They have to fall within a range of

10    population.  So roughly equal within, I think, the

11    state set a five percent boundary or threshold.

12        Q.    Okay.  That's plus or minus five percent

13    over the target district population?

14        A.    Yes.  That's correct.

15        Q.    Okay.  That's a hard constraint,

16    correct?

17        A.    Yes.

18        Q.    A hard constraint is a constraint that

19    the simulation will not produce any map that

20    violates a hard constraint; is that right?

21        A.    That's one way of putting it, yes.

22        Q.    Okay.  When you instruct the simulation

23    to create districts of equal population, you're

24    measuring that using total population, correct?

25        A.    That's correct.

61


1        Q.    It's not calculated using voting age

2    population, correct?

3        A.    That's correct.

4      Q.   And you also considered contiguity,

5   correct?

6      A.   Yes.

7      Q.   Is that also a hard constraint, right?

8      A.   Yes, that's correct.

9      Q.   Okay.  You considered parish splits?

10     A.   Yes.

11     Q.   And municipal splits?

12     A.   Yes.

13     Q.   And core preservation?

14     A.   Yes.

15     Q.   And geographic or mathematical

16  compactness?

17     A.   Correct.

18     Q.   Those are all soft constraints; is that

19  right?

20     A.   That's correct.

21     Q.   A soft constraint means that the

22  simulation will prefer maps that perform better on

23  those constraints, but it won't require any

24  particular threshold; is that right?

25     A.   Yes.

                                                62


1      Q.   Okay.  And it's possible using the Redus

2    software that you used here to assign a weight to

3    each of the soft constraints, correct?

4         A.   Yes.

5         Q.   Okay.  So you can give more weight to

6    some constraints and less weight to others?

7         A.   Yes.

8         Q.   Okay.  And you used the default

9    weighting of those -- all of those constraints

10   provided by the Redus software, correct?

11        A.   No, I don't believe that's correct.

12        Q.   Okay.  In your opinion, none of the

13   constraints you considered predominated in the

14   maps produced by the simulations, correct?

15        A.   That's correct.

16        Q.   Okay.  You did no simulations that

17   removed any of those other constraints to study

18   what impact they are having on the simulations?

19        A.   I'm sorry, I don't --

20        Q.   You didn't run a simulation that

21   excluded for example, compactness as a criteria?

22        A.   No.  That was not the purpose of my

23   inquiry.

24        Q.   So you don't have any simulations that

25   would tell you how much impact the compactness

                                                    63

1    constraint was having on for example, the

2    distribution of majority black districts?

3         A.   No.   That was not my intent.

4         Q.   Okay.   Your simulations did not include

5    protecting communities of interest as a

6    constraint, correct?

7         A.   So I think we talked about how in order

8    to know what communities of interest would be

9    included, you would have to first articulate what

10   communities of interest you would want to be

11   protected to begin with.

12        Q.   So you excluded them because you were

13   not aware of any -- of what communities of

14   interest should be considered; is that right?

15        A.   I think we, in my deposition, talked

16   about how insofar as communities of interest are

17   co term news with municipalities or with parishes,

18   that the simulations would take into account those

19   communities of interest.

20        Q.   Okay.   But you didn't include

21   communities of interest separate from preserving

22   from parish and municipal boundaries?

23        A.   I did not include an additional set of

24   communities of interest, because I couldn't

25    identify a list of community of interest either in

64

1    the joint rule or in Mr. Cooper's report that

2    would have guided that decision.

3        Q.    Okay.  Mr. Cooper did seek to protect

4    communities of interest in his maps?

5        A.    I think he says that he tries to do

6    that.  I don't know that he further articulates

7    particular communities of interest that he uses to

8    guide the particular districts that he's drawing.

9        Q.    So you don't know if Mr. Cooper had a

10    definition of the communities of interest he was

11    considering?

12        A.    I'm not aware of a particular list of

13    communities of interest that he provides.

14        Q.    Okay.  Are you aware of any other

15    experts in that that's that offered communities of

16    interest in different parts of Louisiana?

17        A.    I am aware of experts who have offered

18    opinions about I would say larger communities of

19    interest that are kind of regional, you might say.

20    But those would be, you know, much larger than a

21    particular district that we're talking about.  So

22    those would fall under what I was describing

23    earlier in terms of parishes and preservation of

24    parishes.

25        Q.   And you didn't consider those larger

65

1    regions?

2        A.   Insofar as the districts are assembled

3    by parishes, and the parishes make up those

4    regions, and then the particular in the second set

5    of simulations, the grouping of the states

6    according to the illustrative district would in

7    some way address that as well.

8        Q.   But you didn't include as a separate

9    constraint in your simulations the regional

10    communities of interest that you're describing?

11        A.   Those larger regions are not included as

12    their own independent parameter in the algorithm.

13        Q.   You're not aware of expert testimony

14    concerning more local communities of interest in

15    this case?

16        A.   I'm not.

17        Q.   Your simulations also did not include

18    avoiding incumbent appearances, correct?

19        A.   That was not included in the

20    simulations.  It wasn't something that I saw in

21    the joint rule as a factor to be considered.

22    Beyond the preservation of existing district

23    boundaries, which again would also serve to

24    preserve incumbents within their districts.

25         Q.    So reserving existing district

66

1    boundaries, could preserve incumbents in their

2    districts if the incumbent was included in the

3    part of the district that was preserved, correct?

4         A.    Yes, that's correct.

5         Q.    But not in the incumbent was in a part

6    of the district that was not preserved, correct?

7         A.    That's correct.

8         Q.    You're aware that Mr. Cooper did seek to

9    avoid inherent encumbrances in his maps?

10         A.    I'm aware he sought to do that in the

11    drawing of his map.  I don't think that it is

12    suggestive of why the simulations deviate from or

13    looked different from the outcome of his M. I

14    don't see that connection.

15         Q.    You don't see that connection, because

16    you didn't study it?

17         A.    No, because I don't think it's

18    substantively contributes to the explanation.

19      Q.   Okay.  And you didn't include a

20   principle or a constraint concerning the number of

21   parishes spanned by a district?

22      A.   The districts have to contain equal

23   population.  So it's not as though districts can

24   run across a lot of parishes.  I guess I'm not

25   exactly sure what you mean by that constraint.

                                                      67

1    It's unclear to me how that.

2       Q.   So it's true that in your regional

3    analysis, in some instances, you describe the

4    number of parishes spanned by a district and how

5    that differs from the enacted plan to Mr. Cooper's

6    plan, correct?

7       A.   The number of parishes that are -- that

8    a district crosses?

9       Q.   Yes.

10      A.   Yes.

11      Q.   You didn't include that as a separate

12   constraint from just keeping parishes whole,

13   correct?

14      A.   Well, in keeping parishes whole, that's

15   going to have the markets that's going to have the

16   effect of reducing the number of parishes the

17    districts span.  Because if a district is trying

18    to keep a parish -- or if the algorithm is trying

19    to keep parishes whole, then it's going to, by

20    definition, minimize the number of districts

21    present in a parish.

22        Q.   But you didn't report any numbers in

23    your report anywhere about average number of

24    parishes spanned by a district?

25        A.   I report just the parish splits, the

                                                        68


 1    number of times a parish is split.

 2        Q.   Okay.  I'd like to discuss your regional

 3    analysis a little bit.  For the record, Dr.

 4    Barber, you reviewed Mr. Cooper's report in this

 5    case from June 2023, correct?

 6        A.   Yes.

 7        Q.   And did you review some of the exhibits

 8    to Mr. Cooper's report?

 9        A.   There are a lot of them.  I did review

10    many of them.

11        Q.   Okay.  You reviewed the exhibits

12    containing compactness scores?

13        A.   Yes.

14        Q.   You reviewed the exhibits concerning

15    parish splits?

16        A.   Yes.

17        Q.   You would agree that on average Mr.

18    Cooper's plan splits fewer parishes over all than

19    the enacted plan?

20        A.   I don't recall the particular numbers

21    off the top of my head.  I believe that it is

22    fewer.  I couldn't articulate to you the exact

23    number.

24        Q.   Okay.  Mr. Cooper's plans ever overall

25    are more compact than the own plan?

                                                    69


1         A.   Again, off the top of my head, don't

2    have those numbers.  I don't have reason to doubt

3    your representation, but I couldn't tell you off

4    the top of my head.

5         Q.   Okay.  Mr. Far earlier asked you about

6    proportional misty some of the tables you include

7    in your report, reporting on proportional number

8    of districts, correct?

9         A.   Yes, that's correct.

10        Q.   You calculated proportionality based

11    upon voting age population, correct?

12        A.   Yes, that's correct.

13          Q.    Your report doesn't anywhere report on

14    proportionality based on total population?

15          A.    No.  I used the voting age population.

16          Q.    So in your regional analysis, you

17    analyze the illustrative map on the one hand to

18    the 2011 map or the 2022 enacted map on the other,

19    correct?

20          A.    Yes.

21          Q.    All right.  And you're not making a

22    comparison to the samples produced by your

23    simulations, correct?

24          A.    So there are tables where we, just in

25    the questions that Mr. Farr asked me, talked about

                                                        70


1    particular regions and the number of majority BVAP

2    districts produced by the simulations in those

3    regions.  So I don't want to say that the

4    simulations never touch on a discussion of

5    reachings.

6          Q.    Okay.  But with respect to the specific

7    redistricting principles and whether or not the

8    illustrative plan complies with or doesn't comply

9    with them, that's focused on the comparison to the

10    enacted plan or to the 2011 plan?

11          A.    The core retention scores in those

12    sections are a comparison to the 2011 plan.

13    They're not a comparison to the simulations.

14          Q.    Okay.  You find generally that the new

15    majority black districts have lower core retention

16    scores than the districts they replace, correct?

17          A.    Yes.  That's correct.

18          Q.    You discuss other metrics with respect

19    to specific districts, as well, correct?

20          A.    Yes.

21          Q.    Okay.  I'd like to turn to your

22    discussion of the new majority black district in

23    the Caddo Bossier region.  That's at Secretary of

24    State Exhibit 1 at page 33.  You discuss here that

25    compactness scores of SD38 in Mr. Cooper's

                                                      71


1    illustrative plan as compared to the 2022 enacted

2    plan, correct?

3          A.    Yes that's correct.

4          Q.    All right.  You don't include the

5    compactness scores of neighboring SD39, which is

6    also majority black?

7          A.    SD39, I do not report the compactness

8    scores for SD39 in this case.  I was focused on

9    the new illustrative districts.  I believe SD39 is

10   majority black in both of the maps.

11       Q.   Okay.  You don't discuss parish splits

12   in your discussion of the Caddo Bossier region in

13   the Senate map, correct?

14       A.   I would have to go back through to be

15   absolutely sure.  But I take your representation

16   as being accurate.

17       Q.   Okay.  Let's move to the Jefferson and

18   St. Charles Parish area.  That's in SOS Exhibit 1

19   at page 41.  Let's back up a little bit so just so

20   we can see, 40 and 41.

21       In this region, you don't report any

22   compactness scores, correct?

23       A.   That's correct.

24       Q.   And instead, you're comparing the

25   enacted and illustrative plans on parish splits?

72

1        A.   I believe the section has a discussion

2    of how the districts and the enacted plan and the

3    illustrative plan treat the parishes in this area.

4        Q.   Okay.  And you agree that the new

5    majority black district 19 spans only two parishes

6    in Mr. Cooper's illustrative map, correct?

7        A.   Yes, that's correct.

8        Q.   Those are St. Charles and Jefferson?

9        A.   Correct.

10       Q.   In the enacted plan, it spans four

11  district -- four parishes?

12       A.   Correct.

13       Q.   I just want to get something on the

14  record here for the benefit of the Court and the

15  report.  And that is, I think in this last

16  paragraph on page 41 we discussed at your

17  deposition where it says SD9, it should say SD19?

18       A.   That's correct.  It should say SD19.

19       Q.   Okay.  So the four parishes that SD19

20  spans in the enacted plan are St. Charles,

21  Lafourche, St. John the Baptist, and Jefferson?

22       A.   Yes.

23       Q.   You say here that keeping entire

24  parishes whole within districts is a traditional

25  redistricting criteria, correct?

                                                     73


1        A.   Correct.

2        Q.   You say that in the enacted plan St.

3   Charles parish is kept whole, correct?

4        A.   Yes.

5        Q.    And the illustrative plan, it's split?

6        A.    Yes.

7        Q.    And St. John the baptist parish is made

8    whole in the illustrative plan, correct?

9        A.    Correct.

10       Q.    And it's split in the enacted plan,

11   correct?

12       A.    Correct.

13       Q.    Okay.  But you don't mention that it's

14   made whole in your report anywhere, correct?

15       A.    I don't think it's mentioned here.

16       Q.    Okay.  Is it mentioned anywhere in your

17   report that St. John the baptist parish is made

18   whole in the illustrative plan?

19       A.    I don't know that I specifically

20   highlight that particular parish.  It would

21   obviously be included in the maps that cover the

22   whole plan and the plan wide statistics and that

23   sort of thing.

24       Q.    But that's something you considered when

25   highlighting the ways in which Mr. Cooper's plan

                                                    74


1    does or does not comport with traditional

2    redistricting principles?

3        A.    I think in this section, I was focused

4    particularly on these two parishes.  So that's why

5    the focus is on those two parishes.

6        Q.    Okay.  You also explained that

7    neighboring District 8 spans more parishes than

8    the illustrative plan than the enacted plan,

9    correct?

10       A.    Correct.

11       Q.    And that's four instead of two, so sort

12   of the reverse of what we see with district 19?

13       A.    Correct.

14       Q.    Okay.  And that's because you considered

15   a number of parishes span by a district to be a

16   traditional redistricting principles or keeping

17   that number low?

18       A.    I'm sorry, can you say that again?

19       Q.    So you're talking about the number of

20   parishes spanned by a district.  And that's

21   because that is a consideration that you consider

22   important in assessing adherens to traditional

23   redistricting principles?

24       A.    I think I was referring to that in

25   combination with the splitting of the particular

75

1    parishes.

2        Q.    Okay.  Let's move to the Baton Rouge

3    region and the new Senate district 17 in the

4    illustrative plan.  That's on Secretary of State

5    Exhibit 1 at page 48.  Let's go back pains to see

6    where we are.  So this is Baton Rouge.  So you

7    mention here, and this is on page 48, that the new

8    district 17 you say it connects parts of east

9    Baton Rouge to Pointe Coupee, Iberville and west

10   Baton Rouge, correct?

11       A.    Correct.

12       Q.    And that's four parishes, right?

13       A.    Yes.

14       Q.    So illustrative district 17 spans four

15   parishes?

16       A.    I believe so.  I'm not certain if I'm

17   reporting on the entirety of the district here.  I

18   can't recall off the top of my head what the

19   particular district's orientation is.

20       Q.    I think it's page 54, where you have

21   your map.  Can you turn to that?  Can you see this

22   map?

23       A.    Yes.

24       Q.    You see SD17, illustrative SD17 on this

25   map?

1          A.    Yes, I do.

2          Q.    Does it look like it spans four

3    parishes?

4          A.    Yes, it does.

5          Q.    Okay.  Let's go back to page 48.  So

6    illustrative -- so enacted district 17, Senate

7    district 17 spans ten parishes; is that right?

8          A.    Again, I don't know off the top of my

9    head.  I don't have reason to doubt your

10   representation.

11         Q.    But you didn't mention the number of

12   parishes spanned by enacted district 17?

13         A.    I think I discuss more the general shape

14   or the kind of area that the district is spanning,

15   but I don't think I call out the particular

16   parishes, included in the district.

17         Q.    So when a district in Mr. Cooper's map

18   spans more parishes than the enacted map, that was

19   worth calling out in the New Orleans area and

20   district 19, but it's not when it's the enacted

21   plan that spans more parishes, you don't describe

22   that; is that right?

23         A.    No.  I think that in this case, we're --

24    it's -- the comparison is very different.  We're

25    in a different region.  I think I made reference

77

1    to the fact that district -- the enacted district

2    17 is a more rural district, which by definition

3    would mean it's taking in fewer per square mile.

4    So it's going to span a larger area.

5         Q.   Okay.

6         A.   The narrative here is not intended to be

7    an encyclopedic listing of every parish.  There's

8    plenty of evidence in the record which districts

9    take in which parishes and that sort of thing.

10        Q.   But in this section of your report,

11   you're evaluating whether Mr. Cooper's plan does

12   or does not comply, in your view, with traditional

13   redistricting principles?

14        A.   That's correct.

15        Q.   You look at those where -- never mind.

16   Strike that.

17             And then on page 49, you state here that the

18   illustrative plan adds an additional split to east

19   Baton Rouge parish, correct, 6 instead of 5, I

20   believe?

21        A.   I believe that I note that it extends

22    into East Baton Rouge Parish, yes.

23        Q.    Well, so this illustrative Senate

24    district or Senate district 17 extends into east

25    Baton Rouge and both plans -- in both plans; isn't

78

1    that true?

2        A.    I believe so, yes.

3        Q.    Okay.  And you don't -- here you don't

4    note that illustrative district 17 makes west

5    Baton Rouge parish whole, correct?

6        A.    This particular paragraph does not make

7    reference to that.

8        Q.    Do you make reference to that anywhere

9    in your report?

10        A.    Well, I think the maps we just looked at

11    make that clear.

12        Q.    But that's not a consideration when

13    you're here describing how Mr. Cooper's plan

14    departs from traditional redistricting principles,

15    you didn't think it was important that west Baton

16    Rouge parish was made whole in his plan?

17        A.    Again, I'm not trying to provide an

18    encyclopedic explanation for every district and

19    every particular boundary choice.

20      Q.   You also don't make any mention of any

21 compactness scores in the East Baton Rouge area,

22 correct?

23      A.   Not in this particular section, no.

24      Q.   Okay.  Let's move to the house plan.

25 And let's start with the Lake Charles area.

                                              79


1 That's Secretary of State Exhibit 1 of page 90 to

2 91.  Let's start with 91.  So in this Lake Charles

3 area, Mr. Cooper splits Calcasieu into five house

4 districts, correct?

5      A.   Yes.

6      Q.   Those are 33, 34, 35, 36 and 38; is that

7 right?

8      A.   Yes.

9      Q.   Okay.  In the enacted plan splits

10 Calcasieu into seven districts, correct?

11      A.   Yes.

12      Q.   Okay.  And four out of seven of those

13 districts span multiple parishes, correct?

14      A.   I believe so, yes.

15      Q.   Okay.  And Mr. Cooper puts all five

16 districts wholly within Calcasieu parish, correct?

17      A.   He does, yes.

18          Q.    And other than your map, you don't

19    mention that anywhere in your report?

20          A.    I mean, it's here on the map.  You can

21    see it.

22          Q.    But you don't cite that as one of the

23    traditional redistricting principles you

24    considered when you considered whether Mr. Cooper

25    complied with traditional redistricting

                                                        80


1    principles?

2          A.    I did not discuss the particular choice

3    in the county as a whole.  That was not the

4    intention of this section of the report.

5          Q.    Okay.  I think if we go back to page 88,

6    maybe one more.  So this is your description -- I

7    think we can go back actually one more page, of

8    the Lake Charles region and what we've been

9    discussing the districts in that region.  Here you

10    talk about compactness scores again, correct?

11          A.    Yes.

12          Q.    All right.  Here you're talking about

13    the compactness scores for districts 34 and 36?

14          A.    Yes.

15          Q.    All right.  34 is a majority black

16    district in the enacted plan, correct?

17          A.    Yes, that's correct.

18          Q.    And when we were discussing the Senate

19    map and the Caddo Bossier region, you said you

20    didn't look at compactness scores for the

21    districts that were already majority black in the

22    enacted plan, correct?

23          A.    I believe so, yes.

24          Q.    And here you do?

25          A.    I believe that is the case, yes.

                                                          81


 1          Q.    And you don't mention the compactness

 2    score for HD38, which is the new majority black

 3    district?

 4          A.    In this particular region, I think the

 5    numbering can be a little confusing, because it

 6    might be difficult to identify which is in fact

 7    the new district.

 8          Q.    But you don't explain that anywhere in

 9    this section?

10          A.    Well, I note the numbering of the

11    districts in the map.

12          Q.    Yes.  You don't explain that it's

13    confusing or suggests that you think HD34 is

14    really a new district anywhere in this section?

15         A.   It's -- I'm sorry, I don't know that I

16    followed the question you're asking.

17         Q.   Strike that.  Let's go back to Secretary

18    of State Exhibit 1 of page 70 to 71.  This is

19    discussing the Shreveport region and the house

20    map, correct?

21         A.   Yes.

22         Q.   All right.  And in the enacted plan, the

23    city of Shreveport is split among four districts;

24    is that right?

25         A.   I believe that is the case.

                                                        82


1          Q.   The illustrative map, the city of

2     Shreveport the split among four districts; is that

3     correct?

4          A.   I think so.  I would need to again look

5     to be completely certain.

6          Q.   Okay.  In the illustrative plan, you say

7     that city of Shreveport is divided more equally

8     mooning the four districts that it's split among?

9          A.   Yes.

10         Q.   Okay.  You say that this more equal

11    split in Shreveport violates the traditional

12    redistricting principles of avoiding municipal

13    splits?

14        A.    I'm referring the way in which the city

15    is divided can sometimes help us understand what

16    was going on, what was the objective of the map

17    maker, yes.

18        Q.    Let's turn to secretary of state 1 at

19    page 78.  This is about the Natchitoches area; is

20    that right?

21        A.    Yes.

22        Q.    In the Natchitoches area, the 2011 plan

23    included the majority black district, correct?

24        A.    Yes.  In the --

25        Q.    In the 2011 plan, so the plan was being

                                                          83

1    replaced?

2        A.    In the house.

3        Q.    In the house?

4        A.    That's correct.

5        Q.    That was house district 23?

6        A.    Yes.

7        Q.    The illustrative plan also includes

8    house district 23 as a majority black district in

9    the Natchitoches area, correct?

10          A.    Yes.

11          Q.    And the enacted plan relocates house

12   district 23 to the New Orleans area, correct?

13          A.    Numerically, that's where the number

14   ended up.  I don't know that beyond the number

15   it's effectively you could say the district was

16   dissolved and absorbed into the remaining kind of

17   shifted south ward.  The number itself is not, I

18   don't think, especially, informative in some ways,

19   somewhat arbitrary.

20          Q.    Okay.  And in the enacted plan, unlike

21   the 2011 plan and the illustrative plan, there is

22   no majority black district in the Natchitoches

23   area, correct?

24          A.    That's correct.

25          Q.    When you describe that the district

                                                        84


1    prior HD23, was dissolved, that was because of

2    population loss in the northern part of the state?

3          A.    Yes.

4          Q.    You say it's significant I think you

5    used word noteworthy that incumbent in HD23 was no

6    longer eligible to run because of term limits?

7          A.    Yes, I believe so.

8      Q.   Okay.  The illustrative map similar to

9   enacted plan moving to HD23, the illustrative map

10   moved HD5 to the New Orleans area, correct?

11      A.   Again, the number moves down there.

12   It's not as simple as saying like it just

13   transports the district.  It's completely

14   different population.  I would say it again

15   dissolves district 5 and generally shifts the

16   districts in a Southeastern direction.

17      Q.   Okay.  HD5 was a majority white district

18   in the 2011 plan, correct?

19      A.   Yes.

20      Q.   Okay.  It remains a majority white

21   district in the enacted plan?

22      A.   I believe so, yes.

23      Q.   You identify it here as one of the

24   districts that's kind of moved into the area where

25   the HD23 formerly existed?

85

1      A.   Yes.

2      Q.   Okay.  And the incumbent in HD5 was also

3   term limited, correct?

4      A.   I believe that is the case.

5      Q.   Okay.  You don't mention that anywhere

6    in your report?

7        A.    No.

8        Q.    Wasn't noteworthy that the incumbent in

9    HD5 was term limited?

10       A.    It didn't make it into my report.

11       Q.    Okay.  Can we turn to Secretary of State

12   Exhibit 1 page 94.  This is discussing the Baton

13   Rouge region and the house plan; is that right?

14       A.    Yes.

15       Q.    Okay.

16   DEFENSE COUNSEL:  Your Honor, not to

17       interrupt counsel, but Mr. Bash has been

18       going for two hours.  Do you think we could

19       take a 15 minute break.  He's testified

20       longer than any other witness.

21   THE JUDGE:  How much time you got.

22   PLAINTIFF COUNSEL:  Five minutes.

23   THE JUDGE:  Let's finish up.

24   EXAMINATION BY PLAINTIFF COUNSEL:

25       Q.    So looking at the Baton Rouge region in

                                                          86


1    the house plan, you describe here that to shapes

2    of some of these districts, correct?

3        A.    Yes.

4        Q.    But you don't include any numeric

5    compactness scores; is that right?

6        A.    Those again, there's plenty of places

7    where those are reported.  I don't think that it's

8    necessarily the case that we needed to repeat

9    that.

10        Q.    Okay.  In your report here at the second

11    paragraph, on page 94, can you read that first

12    sentence?

13        A.    First the map packs white voters in HD70

14    giving a white voting age population of

15    69 percent; however, to accomplish this --

16        Q.    I didn't need the second sentence.

17        A.    Oh.

18        Q.    Sorry.

19    DEFENSE COUNSEL:

20        Your Honor, can he complete his answer?

21    THE JUDGE:

22        The rule of completeness, I mean, it's

23        in the record.  You can certainly read the

24        second sentence if you'd like to.

25    PLAINTIFF COUNSEL:

87

1        I certainly have no objection to reading

2        the second sentence.  I have no questions

3        about it.

4        THE JUDGE:

5            If you want to read the second sentence,

6        go ahead.

7        THE WITNESS:

8            However, to accomplish this, the Cooper

9        illustrative HD70 takes on a U shape to avoid

10        a concentration of heavily black precincts to

11        have a substantially higher black population.

12    EXAMINATION BY PLAINTIFF COUNSEL:

13        Q.   All right.  So focusing on that first

14    sentence, is avoiding packing voters based on race

15    a traditional redistricting principle?

16        A.   That is a lengthy conversation that you

17    could ask five people and get six different

18    answers.

19        Q.   Okay.  None of your other regional

20    discussions do you discuss the packing of white

21    voters, correct?

22        A.   I think I discuss the particular racial

23    composition of the districts.  I don't use perhaps

24    the word "pack."

25        Q.   Okay.

1       A.   But I think there are many places in

2   which I refer to the racial composition of the

3   districts as being noteworthy.

4       Q.   You don't discuss anywhere whether the

5   illustrative map unpacks any districts based on

6   race as compared to the enacted plan?

7       A.   Well, I think I discuss how the

8   illustrative map very carefully creates districts

9   that are about 50 to 53 percent, which I think is

10  kind of exactly what you're asking about.

11      Q.   Okay.

12  PLAINTIFF COUNSEL:

13          No further questions.

14  DEFENSE COUNSEL:

15          I have a couple.  We can take a break if

16      you want.

17  THE JUDGE:

18          Go ahead.  I'll ask for redirect.

19  EXAMINATION BY DEFENSE COUNSEL:

20      Q.   Dr. Barber, the counsel talked to you

21  about two cases in which you were discredited.

22  Did either of those cases involve testimony on

23  simulated maps?

24      A.   No, they did not.

25          Q.    He didn't cite any cases where you were

                                                              89


1    discredited where you were giving testimony about

2    on simulations maps, correct?

3          A.    That's correct.

4    DEFENSE COUNSEL:

5              I didn't write down the caption of the

6          first case, was it Walker, Counsel?

7    PLAINTIFF COUNSEL:

8              That case was Jacobson v Lee.

9    DEFENSE COUNSEL:

10             What was it?

11   THE JUDGE:

12             Jacobson v Lee.

13   DEFENSE COUNSEL:

14             I'm sorry, Your Honor.  Appreciate it.

15   EXAMINATION BY DEFENSE COUNSEL:

16         Q.    So the Jacobson case, he talked about

17   the district Court Judge discredited you.  Do you

18   know the case history of that case, Dr. Barber?

19         A.    Yes.

20         Q.    Do you know what happened to that case?

21         A.    It went to the 11th circuit and was

22   overturned.

23    Q.   Okay.

24    DEFENSE COUNSEL:

25         Your Honor, that's all I have, except

90

1     for my proffer of proof.

2     THE JUDGE:

3          We'll take a 15-minute recess.

4          (RECESS 11:00-11:15 A.M.)

5     THE JUDGE:

6          We're going to have a little change of

7     order this morning necessitated by two

8     things:

9          We're having some IT problems.  It

10    doesn't involve the auditory equipment or the

11    audio equipment, but it involves the

12    communication among chambers.  We got some

13    problems.  So IT is going to come up.

14         Also, I need to make a change of

15    personnel.  I have, to be quite frank, the

16    court reporter's sick.  So we're going to

17    bring in a new court reporter at 1 o'clock.

18    So in that regard, put your proffer on, and

19    then we'll see --

20    DEFENSE COUNSEL:

21          Do it now, Your Honor?

22     THE JUDGE:

23          That's what I'm saying, put your proffer

24     on, and then we'll be in recess until 1 p.m.

25     There is obviously permitted cross on the

                                                    91


1      proffer.  Mr. Thomas is going to get

2      Mr. Chaffee now.  Wait just a second until

3      he's in position, and then you can do your

4      proffer.

5      DEFENSE COUNSEL:

6          Thank you very much, Your Honor.

7      THE JUDGE:

8          Well, the Court doesn't need to be on

9      the bench for this.  The Court will be back

10     at 1 p.m., but the proffer will be on the

11     record.  Any questions about the process?

12     Okay.

13     THE CLERK:

14          All rise.

15     DEFENSE COUNSEL:

16          Proof of truth of Dr. Barber's

17     testimony.

18     Q.   Dr. Barber, you testified about your

19    understanding of the term "predominate" as a

20    political scientist.  Do you remember that?

21        A.    Yes, I do.

22        Q.    Do you have an opinion whether race was

23    the predominant factor for Mr. Cooper's

24    illustrative plans and the majority black

25    districts that are included in those plans?

                                                    92

 1        A.    Yes.

 2        PLAINTIFF COUNSEL:

 3            Objection.

 4    EXAMINATION BY DEFENSE COUNSEL:

 5        Q.    Can you tell us what that is?

 6        PLAINTIFF COUNSEL:

 7            The objection is that it calls for legal

 8        conclusion.  It's the same record I had made

 9        on the record earlier.  I just want to

10        preserve it for the proffer.

11        A.    Say the question again.

12        Q.    I'm asking you to testify as your

13    understanding of a political scientist and not to

14    make any legal conclusions.

15        My question is:  Do you have an opinion on

16    whether race was predominant factor in the

17    construction of Mr. Cooper's illustrative maps, in

18    particular majority black districts?

19         A.   Yes.  I think it's clear from looking at

20    the simulations and the results of both sets of

21    simulations, that race was the predominant factor

22    in the drawing of the illustrative map, in

23    particular the boundaries of those additional

24    majority BVAP districts.  I don't think that

25    there's really any possible way that those

                                                        93


1    districts could arise using the other nonracial

2    redistricting criteria.  The simulations that

3    incorporate those criteria produced maps are so

4    far distant and different from the illustrative

5    map that it is simply statistical impossibility

6    that those criteria could give rise to the

7    illustrative map without race being the

8    predominant factor.

9         DEFENSE COUNSEL:

10              No further questions.  Thank you, Dr.

11         Barber.

12         PLAINTIFF COUNSEL:

13              Just want to renote the objection for

14         the record.  Objection that the question

15        about predominance calls for legal

16        conclusion.  Also have an objection that the

17        answer went well beyond the scope of the

18        report.

19    DEFENSE COUNSEL:

20            Thank you, Dr. Barber.

21    THE CLERK:

22            We're in recess until 1 o'clock.

23            (RECESS 11:00-1:00 P.M.)

24    THE JUDGE:

25            Call your next witness and if counsel

                                                    94


1        please make appearances, we do have a new

2        court reporter.

3    DEFENSE COUNSEL:

4            John Walsh.  The defense will call

5        Sherri Hadskey.

6            (WITNESS SWORN).

7    THE CLERK:

8            Please state your name and spell it.

9    THE WITNESS:  Sherri Whartton Hadskey

10    S-H-E-R-R-I, W-H-A-R-T-O-N, H-A-D-S-K-E-Y.

11    THE JUDGE:  Go ahead, Mr. Walsh.

12  EXAMINATION BY DEFENSE COUNSEL:

13     Q.   Good afternoon, Mrs. Hadskey.  Where are

14  you currently employed?

15     A.   For the Louisiana Secretary of State.

16     Q.   And in what position do you held with

17  Secretary of State's office?

18     A.   I'm the Commissioner of Elections.

19     Q.   How long have you held this position?

20     A.   I was appointed in 2017.

21     Q.   And would you mind walking through the

22  Court through your history working with the

23  Secretary of State's office in the various

24  positions you held?

25     A.   Sure.  I started in 1986, and I was an

                                              95

1  elections program specialist, and I moved to the

2  elections operations director.  Then from the

3  director, I moved into the commissioner of

4  elections position.

5     Q.   In the position of commissioner of

6  elections, what are your duties and

7  responsibilities?

8     A.   As commissioner of elections, I oversee

9  the elections process, the dredge of machines, the

10  storage of the machines, the qualifying of

11  candidates, the process of building the ballots

12  and programming the ballots, the election night

13  tabulation and results and the audit process, just

14  oversight of elections.

15      Q.    Commissioner Hadskey, are you registered

16  to vote?

17      A.    I am.

18      Q.    And when did you register?

19      A.    In 1983.

20      Q.    When you registered to vote, what were

21  the mechanics of registration at that time?

22  PLAINTIFF COUNSEL:

23          Objection, Your Honor; relevance.

24  THE JUDGE:

25          What is the relevance, Mr. Walsh?

96

1   DEFENSE COUNSEL:

2           Your Honor, I'm just trying to lay the

3   foundation talk about voting in Louisiana and

4   where voting has come since 1983 quite

5   frankly.

6   PLAINTIFF COUNSEL:

7           Excuse me Your Honor, my name is Amanda

8   Giglio, G-I-G-L-I-O, for the Plaintiffs,   My

9        apologies.

10       THE JUDGE:

11              Overruled.  I'll allow it.

12       A.   At that time, I had to go into the

13  registrar of voters office and fill out an

14  application in person.

15       Q.   Is that still how you register to vote

16  today?

17       A.   It's one way, but that's not the only

18  way.

19       Q.   What other ways can you register to vote

20  in Louisiana today?

21       A.   Currently in Louisiana, of course you

22  can register online.  You can go to OMV or DMV and

23  register.  We have many private elections around

24  the state.  We do school elections.  We bring

25  registration cards to seniors to introduce them to

                                                      97


1  the elections process.  It's an instructional

2  mechanism.  Social service offices have voter

3  registration available.  Of course, online, you

4  can register online.  And yes, there's many ways,

5  various ways.

6        Q.   You mentioned two acronyms, I just want

7    to be clear for the record, you said OMV?

8        A.    Office of Motor Vehicles and Department

9    of Motor Vehicles.

10        Q.    That was DMV?

11        A.    Yes.

12        Q.    Do you have to be a certain age to

13    register to vote in Louisiana?

14        A.    Yes, you do.

15        Q.    What age is statewide order?

16        A.    16.

17        Q.    What age can you start voting?

18        A.    18.

19        Q.    So you're saying you can preregister at

20    16?

21        A.    That's correct.

22        Q.    And then let's just say if your birthday

23    is July 1st, there's an election on July 1st,

24    you've preregistered, can you vote that day?

25        A.    Yes.  The day you turn 18, you're

                                                        98


1    eligible to vote.

2        Q.    If you preregister?

3        A.    If you preregister.

4        Q.    Whose role is it in Louisiana -- strike

5    that.  Whose primarily responsible for voter

6    registration in Louisiana?

7         A.    That's the registrar of voters.

8         Q.    Does the Secretary of State do anything

9    to support the registrar of voters?

10        A.    The Secretary of State's office

11   currently has a system, the errand system,

12   elections registration, information network.  And

13   it houses the informations that input by the

14   registrar of voters.  It's ministerial in aspect

15   of the voter registration process.

16        Q.    Are there any reasons for which a voters

17   registration could be canceled in Louisiana?

18        A.    There's a few reasons that it could be

19   canceled.

20        Q.    What are those?

21        A.    Of course if you pass away, if you die,

22   then your voter registration is canceled.  If you

23   are inactive and you miss two federal elections,

24   your name is published in the newspaper, and the

25   attempt to reach you is there, but you are

                                                    99


1    canceled after missing the two federal, and you're

2    inactive.  If you move out of state, you can

3      contact the State of Louisiana and notify them

4      that you are no longer wishing to be registered in

5      our state, that you've moved, and you're in

6      another state.  And then if you're convicted of an

7      elections crime, they can cancel your

8      registration.

9          Q.   Is an elections crime the only crime for

10     which you can have your registration canceled?

11         A.   To my knowledge, yes.

12         Q.   If a voter is convicted of a felony that

13     is not an elections crime, what happens to their

14     registration?

15         A.   They're suspended.

16         Q.   Is there a mechanism for the suspension

17     to be lifted?

18         A.   Yes.  By law, there's a mechanism after

19     five years of being incarcerated to reregistering,

20     have your registration off the suspended list and

21     on to the active list.

22         Q.   Let's switch gears.  Do you remember the

23     first time you voted?

24         A.   Yes.

25         Q.   When was that?

1        A.    In 1983.

2        Q.    How did you vote in 1983; what was the

3    process?

4        A.    I went to the precinct and voted at the

5    precincts.

6        Q.    At that time in 1983, was that the only

7    way to vote in Louisiana?

8        A.    To my knowledge.

9        Q.    And since you cashed your first vote in

10    Louisiana, in 1983, have the ways or -- expand the

11    ways you can cast the vote?

12        A.    Yes.

13        Q.    Tell the Court the ways you can cast the

14    vote?

15        PLAINTIFF COUNSEL:

16              Your Honor, I'm really struggling to see

17        the relevance of this testimony to issues

18        related to redistricting.

19        DEFENSE COUNSEL:

20              Your Honor, we had testimony earlier

21        this week that talked about the difficulties

22        that they had in voting.  I think this is

23        important for the Court to know the way we

24        have expanded greatly voting in Louisiana

25        over the years.

1     THE JUDGE:

2          The historical perspective is part of

3          the Senate factors in totality of

4          circumstances, so I'm going to allow the

5          question.  Overruled.

6     EXAMINATION BY DEFENSE COUNSEL:

7          Q.   Can you explain to the Court the ways we

8     now have to vote in Louisiana today?

9          A.   Sure.  In Louisiana, currently, of

10    course, you can apply for an absentee by mail

11    ballot F. you meet the application requirements,

12    you can receive a mail ballot.  You also have

13    nursing home voting, where the nursing home can

14    enroll in a program, and they're allowed to vote

15    at the nursing homes.  We also have early voting

16    in person.  And you can go for -- there's no

17    excuse necessary, and it's seven days, Saturday to

18    Saturday.  Sunday is not a voting day in person

19    early voting.  And then military and overseas,

20    they have the right to e request an e-mail ballot.

21    If you are wanting to vote by fax, you can vote by

22    fax.  There's a fax process.  If you're

23    hospitalized, the registrar of voters works with

24    the hospital facilities to allow you to vote and

25    then also if you are incarcerated but you're not

                                                        102

 1    convicted of a felony, you can also request a

 2    ballot, and the registrar works with the

 3    facilities, the correctional facilities for that

 4    process.

 5          Q.    Do we have any programs that senior

 6    citizens can participate in?

 7          A.    If you're over 65, you can enroll in the

 8    mail ballot absentee by mail ballot program.

 9    You're automatically mailed a ballot to your house

10    for every election.  You don't have to vote that

11    ballot.  You could go in person, but you're

12    automatically enrolled in that program to receive

13    a ballot.  If you're disabled, you can also

14    receive a ballot in the disability program.

15          Q.    Let me ask a little bit more about early

16    voting in person.  And you mentioned that early

17    voting runs from Saturday to Saturday.  Is that

18    the same for federal elections?

19          A.    No.  For federal election, it's Tuesday

20    to Tuesday; however in Louisiana, the law changed

21    not long ago for press determine elections, it's

22    ten days of early voting.

23        Q.    Prior to election day, where can a

24    citizen find their ballot?

25        A.    Currently, in the state, if you're

                                                                103

1    looking for a sample ballot, you can go to the go

2    vote app., and look at your sample ballot.

3    There's a voter portal that has the sample ballots

4    available.  And then in the precincts or during

5    early voting, there are sample ballots required by

6    law to be available to all voters.

7        Q.    You mentioned the go vote app.  Whose

8    app is that?

9        A.    It's the Secretary of State's app.  It's

10    a free app.  You download it, and you can review

11    everything.  You can review your pooling location.

12    You can look at your sample ballot, your party,

13    all of your information, your registrar of voters

14    addresses, things like that.

15        Q.    Commissioner, let me ask you another

16    question around polling locations.  You previously

17    said you worked in elections operations earlier in

18    your career; is that correct?

19        A.    That's correct.

20      Q.    Who's responsible for selecting pooling

21  locations in Louisiana?

22      A.    Pooling locations are selected by the

23  parish governing authority.  Each parish governing

24  authority selects the poling location, and then

25  they have to make sure that it meets the

104

1   disability requirements.  Once it's selected, they

2   are required to send an ordinance or a resolution

3   to the Secretary of State's office.  And when

4   that's received, it's entered into the errand

5   system.  And it populates the go vote app, and it

6   also populates the voter cards that are sent to

7   the voters saying that their pole pooling location

8   has changed.

9       Q.    Commissioner, voting machines in

10  Louisiana, do we have new ones, do yes have old

11  ones, what's the status of?

12      A.    Election day voting machines currently

13  are legacy ma shines.  Thypar purchased in 1991.

14  They are old.  We are in the process of trying to

15  obtain new machines.

16      Q.    Are these machines web based?

17      A.    No.

18    Q.    So there's no internet cape 8ables with

19   these machines?

20    A.    No.

21    Q.    Once a voter casts their vote, is there

22   a way to change that vote with these machines?

23    A.    No.

24    Q.    In your experience as commissioner, have

25   you ever seen a vote be changed with these

                                                    105

1   machines?

2    A.    No, I have not.

3    Q.    You mentioned that they're old machines?

4    A.    Yes.

5    Q.    Do you ever have problems with them?

6    A.    Yes, we do.

7    Q.    Tell me what kind of problems do we

8   have?

9    A.    On election day, we have problems with

10   the mechanics of the machines.  We have certified

11   technicians that have procedures to repair any

12   voting machine that has a problem, any voter that

13   is in a voting machine that has a problem, exits

14   that machine and is put on to another machine

15   until the technician can repair that machine.

16      Q.   Has it ever prevented an election from

17   occurring any problems with these machines, have

18   elections been held up because of them?

19      A.   No.

20   DEFENSE COUNSEL:

21        Can I have one moment, Your Honor?

22   THE JUDGE:

23        Yes.

24   DEFENSE COUNSEL:

25        Commissioner Hadskey, that's all the

106

1    questions I have for you.

2    THE JUDGE:

3         Counsel, I'm going to give you fair

4    notice.  You're probably going to object that

5    it's outside the scope of cross.  I want to

6    know what the timeline is.  If you don't want

7    to ask it, I'll ask it.

8    DEFENSE COUNSEL:

9         That's fine, Judge.

10   PLAINTIFF COUNSEL:

11        Excuse me, Your Honor, we would maintain

12   that Ms. Hadskey doesn't have the sufficient

13   personal knowledge to testify as to the

14          timing of redistricting.  I can explain if

15          Your Honor would like.

16               At her deposition Mrs. Hadskey indicated

17          she had to speak with her administrative

18          managers and what she supervisors of business

19          and services division, to specifically the

20          timing relating to redistricting matters.

21          She has no personal knowledge of that, and

22          any testimony she gives will be hearsay.

23          THE JUDGE:

24               Mrs. Hadskey, are you able to give this

25          Court firsthand knowledge about the deadlines

                                                    107


1          and dates or things -- for things like

2          publishing the ballots, the last possible,

3          day you can publish a ballot; can you give

4          firsthand knowledge on that?

5          THE WITNESS:

6               My business and service division does

7          develop the timeline with that.  I have

8          checked with them.  I know what their

9          thoughts are, but I don't do it myself, but

10          I'm happy to provide whatever the Court needs

11          to my knowledge.

12      PLAINTIFF COUNSEL:

13           I would also offer Your Honor if I may,

14      that Mrs. Hadskey herself has never worked in

15      the business and services business division.

16      She worked in elections operations which

17      deals with ballot building.

18      THE JUDGE:

19           Y'all don't really know want to know

20      what the timeline is?  Why wouldn't y'all

21      want to know?

22      PLAINTIFF COUNSEL:

23           We would maintain that Mrs. Hadskey

24      can't tell us.  She's not the proper witness

25      to tell us that information.

                                                    108


1       THE JUDGE:

2            Can you tell us the timeline.

3       THE WITNESS:  I can tell you what's in the.

4            Ballot box, the dates that are in the

5       ballot box.

6       THE JUDGE:

7            What is that?

8       THE WITNESS:

9            The ballot box is what business and

10      service puts together.  It has every date in

11      there for the upcoming elections.

12      THE JUDGE:

13          Give me an example.

14      THE WITNESS:

15          For an example, upcoming is the

16      presidential preference primary, what are the

17      qualifying dates. what the last date to call

18      a special, when is early voting, that type of

19      thing.

20      THE JUDGE:

21          You don't want to know those dates?

22      PLAINTIFF COUNSEL:

23          Your Honor, we would be -- if

24      Mrs. Hadskey could to testify to that in her

25      personal knowledge, that is perfectly

                                                    109


1       sufficient for Plaintiffs.  We would maintain

2       that if Defendants seek to lodge any pracella

3       objections.  It's their responsibility to

4       proffer evidence on those objections, and

5       they haven't done that with Ms. Hadskey.

6       THE JUDGE:

7           Oh, so you think they're not laying a

8       foundation for a subsequent precella?

9       PLAINTIFF COUNSEL:

10              That's precisely our position, yes.

11      THE JUDGE:

12              Does anybody care they might need to

13      know so that I can do what the Court of

14      appeal has told me to do in the Robinson case

15      and what the U.S. Supreme Court said to do in

16      the Milligan case.

17      PLAINTIFF COUNSEL:

18              Your Honor, we would maintain that the

19      secretary's office has already made

20      representations to the fifth circuit --

21      THE JUDGE:

22              In the congressional case.

23      PLAINTIFF COUNSEL:

24              Yes, Your Honor.

25      THE JUDGE:

                                                    110


1               Is this timeline the same as the

2       congressional case?  I hate to sound

3       ignorant, but is it?

4       PLAINTIFF COUNSEL:

5               We don't know.  Mrs. Hadskey hasn't put

6          on any affirmative testimony on that issue.

7          THE JUDGE:

8               Well, do your cross-examination, I'll

9          think about it.  But go ahead.

10     EXAMINATION BY PLAINTIFF COUNSEL:

11          Q.   Good afternoon, Mrs. Hadskey.

12          A.   Hello.

13          Q.   My name is Amanda Gilio.  I'm here

14     representing the Plaintiffs.  I just -- you

15     started working in the Secretary of State's office

16     in 1986, correct?

17          A.   That's correct.

18          Q.   That was -- it was called a different

19     thing at that time, though, it was the department

20     of elections; isn't that right?

21          A.   Department of elections and

22     registration, yes, under Jerry Faller.

23          Q.   And the department of elections was

24     responsible for machines and tabulation; is that

25     right?

                                                    111


1          A.   They were responsible for the voting

2     machines, and tabulation back then was lever

3     machines, so there was no transmission, there was

 4   no audits, it was done on the parish level more so

 5   than the state.

 6       Q.   When the department of elections and the

 7   Secretary of State, they merged; isn't that right?

 8       A.   That's correct.

 9       Q.   When they merged, you started working as

10   an elections director over balloting?

11       A.   The balloting department is now the

12   business and service division.  The machine

13   programming department was operations.

14       Q.   And you worked in operations, correct?

15       A.   And I worked in operations, that's

16   correct.

17       Q.   In around 2008, you became the director

18   of operations?

19       A.   That's correct.

20       Q.   While you were the director of

21   operations, you didn't have anything at all to do

22   with redistricting, right?

23       A.   No.  Well, take that back.  Whenever you

24   redistrict, and you change districts in the state,

25   it changes the data basis for the programming

                                                      112

 1   portion of it, the ballot building portion.  So

2    simply data entry to change that is what was done

3    in operations.

4         Q.   Understood.  So now is the commissioner

5    of elections, you supervise operations?

6         A.   I do.

7         Q.   You service the business and services

8    division?

9         A.   I do.

10        Q.   The business and services business is

11   what handled things like redistricting?

12        A.   That's correct.

13        Q.   But you never worked in the business and

14   services group yourself?

15        A.   No.

16        Q.   And in preparing, do you recall giving a

17   deposition in this case?

18        A.   I do.

19        Q.   And you served as the 30(b)(6) witness

20   for the Secretary of State's office; isn't that

21   right?

22        A.   I don't know what 30(b)(6) means, I'm

23   sorry.

24        Q.    , that's fine so.  When you salt for

25   your deposition, you were representing both

                                                      113

1    yourself and the office of the Secretary of State;

2    isn't that right?

3        A.    Yes.

4        Q.    And to prepare for your deposition, you

5    spoke to administrative managers in the businesses

6    and services group, correct?

7        A.    I did.

8        Q.    Without talking to them, you wouldn't

9    know the timeframes involved in administering an

10   election, correct?

11       A.    That is correct.

12       Q.    One of those tasks involved in

13   redistricting is updating voter districts isn't

14   that right?

15       A.    Updating voter districts on a

16   legislative level.  On a local level, it's done by

17   the locals.

18       Q.    Understood.  And at your deposition, you

19   said that you had no way to estimate how much work

20   your office would need to do to reconcile new maps

21   with work you did on old instance that right?

22       A.    Right, not without asking the business

23   and service director.

24       Q.    And someone in business and services is

25    also responsible for up loading the new maps into

1    errand; isn't that right?

2        A.    Yes, they are.

3        Q.    That's a system you mentioned earlier?

4        A.    Correct.

5        Q.    The secretary uses?  And you don't have

6    any direct knowledge of what that process is isn't

7    that right?

8        A.    I've never done it myself.

9        Q.    And another step involved in

10   redistricting is to provide voters notice of their

11   district change, correct?

12       A.    Correct.

13       Q.    And that's communicated by voter cards?

14       A.    That's correct.

15       Q.    Your office prepares voter cards by up

16   loading in errand to state prints?

17       A.    That's right.

18       Q.    USPS delivers those voter cards to the

19   voters?

20       A.    That's correct.

21       Q.    But you don't know how long it takes

22   between inputting changes into errand and getting

23    voter cards right?

24        A.    That's correct.    The only information

25    that I have about that is when a registrar has

                                                                115

1    problems with USPS and a delay, they notify us,

2    because we have a regional USPS director that we

3    have to turn problems in to where people are

4    receiving cards late or not receiving ballots,

5    things like that.    That's my limited knowledge of

6    that.

7        Q.    Understood Commissioner Hadskey you

8    haven't worked in the operations group six years?

9        A.    It's been a while.

10        Q.    Because you've been the commissioner?

11        A.    That's correct.

12        Q.    It's been a while since you've had your

13    hands in the weeds of ballot building?

14        A.    Correct.    Although.

15        Q.    Sorry.  Go ahead.

16        A.    I'm very sorry.  Although, we were so

17    hope full to get new equipment and that means new

18    programming, so my knowledge would not be as vast.

19    But because we still have the legacy equipment, I

20    do have certain knowledge of the way that it's

21   programmed.  They've advanced somewhat on the

22   import system.  So I wouldn't have as much, but I

23   do have somewhat of knowledge of it, because it's

24   so old.

25       Q.   Right.  And because it's so old, you

                                                              116

 1   spoke to the groups that are currently in your

 2   operations or the administrative managers that are

 3   currently in your operations do you to prepare for

 4   your deposition; assistant?

 5       A.   I did.

 6       Q.   To make sure the process they use now

 7   are the same or that you understood the

 8   differences between the processes now and the

 9   processes that were in play when you were actually

10   working in operations; isn't that right?

11       A.   Correct.

12       Q.   So Mrs. Hadskey, I'd just like to take a

13   minute to discuss a couple of the steps that the

14   secretary has indicated that they used to

15   implement redistricting?

16       A.   Okay.

17       Q.   Now, my understanding is that the first

18   step is proof reading the map; isn't that right?

19        A.   That's correct.

20        Q.   And that involves lining out the

21   precincts to confirm that the right voters are in

22   the right areas; is that right?

23        A.   To my knowledge, that is correct.  And

24   it's a three step process.  It's not just proofing

25   by one individual or two individuals.  They take

117

1   it and proof it according to my elects business

2   and service director.  They proof it, and then

3   they have a different set of ice, proof it again

4   and a different set of eyes proof it again,

5   because the concern is wanting to be absolutely

6   certain that everything is accurate.

7        Q.   Sure.  You don't want to give a voter

8   incorrect information?

9        A.   That's correct.

10        Q.   But sitting here today, you don't know

11   how long it would take to proof read new maps for

12   the state house and the state Senate given that a

13   proof reading process has already been done with

14   the past maps; isn't that right?

15        A.   What I do know is from my questions, is

16   that the more districts that are changed, the

17  longer it takes.  So in other words, if you only

18  changed three districts or four districts, the

19  time would not be as long as if you changed 64

20  districts.

21       Q.   Well, let me ask you a couple of

22  questions about that then.  You mentioned that

23  it's an issue of a number of districts changed.

24       A.   To my knowledge.

25       Q.   Okay.  But the number of districts --

                                                    118

1   but the proof reading process occurs voter by

2   voter isn't that right?

3        A.   The proof reading process for

4   legislative, yes, voter by voter.  The parish

5   level races, it's also done voter by voter, but

6   it's a combination of the local registrar of

7   voters and then also our department will assist

8   them when they can.

9        Q.   And so in this instance, given that

10  we're dealing with the state house and the state

11  Senate maps, that would be a potentially voter by

12  voter question; isn't that right?

13       A.   Yes, parish by parish, and then voter by

14  voter, except when you move an entire parish into

15    a new district and the lines are drawn and it is

16    the entire parish, no matter what, then it's

17    proofed not only to make sure the voters are in

18    the right districts, because redistricting in

19    other areas, you want to make sure everything is

20    correct.  And also, I think you may know, or maybe

21    you don't know, recently, part of Vermillion

22    parish became part of Iberia Parish, so making

23    sure when things like that don't happen, making

24    sure it's accurate.

25        Q.    Are you aware whether the legislative

                                                    119

1    proofing process for the state house and state

2    Senate is similar the same to the legislative

3    proofing process for the congressional maps, both

4    deal with legislative issues?

5        A.    Yes.  To my knowledge it is.

6        Q.    So the proof reading process is the same

7    for both the state and the congressional maps?

8        A.    It should be.

9        Q.    And commissioner Hadskey, are you aware

10    that the Secretary of State is being sued in a

11    separate litigation dealing with the congressional

12    map?

13      A.   Yes, am I.

14      Q.   Are you aware that the legislature could

15  potentially cast new maps governing Louisiana's

16  congressional districts no later than

17  January 30th, 2024 as a result of that litigation?

18      A.   Yes.

19      Q.   Are you aware that your counsel in that

20  litigation represented that in the event that the

21  Louisiana legislature does not pass a map that is

22  compliant with the voters rights act by then, that

23  the secretary would ideally have a map in place

24  and know what map is going to be used in 2024 by

25  late May?

                                                    120


1       A.   Yes.

2       Q.   You just said the proof reading process

3   for that map and this map would be the same,

4   correct?

5       A.   Yes, it should be.

6       Q.   Just to be clear, certain things also in

7   this -- in the congressional litigation, every

8   voter could be impacted by the scope of the change

9   to the map isn't that right?

10      A.   Yes.

11          Q.    And in this litigation, that's not the

12    case; isn't that right?

13          A.    I haven't been in here, but I believe

14    the discussion has been not a statewide, but only

15    certain districts.  And if that's the case, then

16    it wouldn't be all voters in the state.

17          Q.    Exactly.  So the proof reading process

18    wouldn't necessarily have to include all voters in

19    dealing with the new maps in this case?

20          A.    That would be correct.  I'd also like to

21    talk to.

22          Q.    I'd also like to you a little bit about

23    special elections.

24          A.    Okay.

25          Q.    So special elections generally involve

                                                        121


1     the same basic procedural deadlines as any

2     election in Louisiana right?

3           A.    Yes.

4           Q.    Generally?

5           A.    Generally.

6           Q.    So if they have a qualifying deadline?

7           A.    Yes.

8           Q.    And then a primary?

9        A.    Yes.

10       Q.    And then a general?

11       A.    Depending on if three candidates

12   qualify, you have a general two candidates

13   qualify, you don't have a general.

14       Q.    Got it.  That's very helpful.  Special

15   elections are called by the governor; isn't that

16   right special elections can be called by the

17   legislature.  And the governor?

18       A.    The speaker of the house, yes.

19       Q.    Got it.

20       A.    And the governor assigns it.  But they

21   call about the dates and require that.  I'm not a

22   lawyer.  So forgive me if I miss something on that

23   process.

24       Q.    Well, forgive me if I miss something on

25   that process.  So the Secretary of State doesn't

                                                    122


1    set the timing for special elections; isn't that

2    right?

3        A.    No, they do not.

4        Q.    The legislature, this is my

5    understanding and I'd like for you to see if

6    that's right.  The legislature sets the qualifying

7    deadline for a special election right?

8        A.    That is correct.

9        Q.    And then the date for the primary

10   election is set relative to the qualifying

11   deadline right?

12       A.    That is correct.

13       Q.    The date for a general election if one

14   is required is set based on the primary date, the

15   date of the primary election?

16       A.    Correct.

17       Q.    And your office sometimes tries to make

18   recommendations to the legislature about what the

19   qualifying date for these elections should be;

20   isn't that right?

21       A.    Based on trying to save the state money,

22   if there's an election coming up, and there's a

23   general date that could be used for both, then

24   trying to call a primary where the general would

25   fall into place, so you're saving the state

                                                                123

1    instead of having two separate elections and then

2    another election.

3        Q.    Sure.  So in the event that a special

4    election is necessary, it makes sense to schedule

5    them as the same time as exists elections on the

6    calendar?

7         A.   If you can.

8         Q.   So you can save money?

9         A.   Correct.

10        Q.   Because the same administrative needs

11   are required as are needs for any election?

12        A.   Correct.  But the legislature, they may

13   have their own reasons for looking for the dates,

14   such as wanting to have a seat filled so that that

15   district is represented, which doesn't fall into

16   our other dates.  So the cost of it may not be the

17   number one priority.

18        Q.   Sure.

19        A.   It just depends on what they're looking

20   for.

21        Q.   Got it.

22        A.   In other words, there's been times that

23   I was told I know you set these dates, but these

24   are the dates we're using.

25        Q.   Sure.

                                                    124


1         A.   It's not up to me to question their

2    reason for the dates.

3       Q.    Yes, ma'am you guys make it work, right?

4       A.    That's correct.

5       Q.    In the amount of staff that you need to

6    administer elections depends on a lot of things,

7    right, like the number of candidates?

8       A.    Not as much as the number of candidates.

9    The number of races, how big the parish is, if

10   it's a partial parish OR a full parish.  If it's a

11   statewide, et cetera.  But the procedures to set

12   up an election and to all the preliminary work and

13   the testing, and et cetera is no different.  We

14   have to make sure that every single motion is

15   completed to ensure the security and the accuracy

16   of the election.  In other words, we can't skip

17   something, you know, to try and save time.

18   There's no way.  We would want it to be accurate.

19      Q.    Got it.  But there are some

20   administrative things that might make the process

21   for building a ballot say a little bit easier;

22   isn't that right.  If the election is uncontested,

23   for example?

24      A.    If the election is uncontested, then

25   there's not a general election, if it was only two

1    candidates.  You wouldn't have that.

2        Q.    Commissioner had, in recent years,

3    Louisiana has had at least four elections every

4    year isn't that right?

5        A.    Yes.

6        Q.    So in 2019, there were six elections

7    isn't that right?

8        A.    Correct.

9        Q.    In 2020, there were four elections.

10        A.    Yes.  The max I ever remember conducting

11    in a single year was 12, 12 elections in a single

12    year.  It just depends on -- and several of those

13    elections dates have been done away with.  We used

14    to have a proper election date in July.  It was

15    legally mandatory in in July.  They've done away

16    with that one.

17        Q.    Understood.  In the 2023 cycle, there

18    were six elections, isn't that right, this year?

19        A.    Six dates original?  Well, not

20    scheduled.  We had an exact tie, I believe it was,

21    that caused a January election, similar to what's

22    going on right now.  We have two exact ties from

23    this past general.  So now we have a December

24    election.  In those two parishes.  The law

25    requires that if an exact tie occurs you have to

1    conduct another election.  So it might not have

2    been a scheduled.  It was the repercussions of

3    having the fact tie.

4         Q.   So ultimately there's seven elections

5    this year; isn't that right?

6         A.   Yes.

7         Q.   And those elections include special

8    elections?

9         A.   Yes.

10        Q.   And let me show you what's been

11   preadmitted as Plaintiff's Exhibit 169.  That's

12   the 2023 election calendar.

13        A.   Okay.

14        Q.   So in 2023, if you look at the second

15   column under February 18, you can see that there

16   is an election for state house district; isn't

17   that right?

18        A.   That is correct.

19        Q.   That's the 93rd district?

20        A.   That is.

21        Q.   And if you look at those dates for that

22   election, you can see that the qualifying dates

23   were January 11th, 2023, to January 13th 2023;

24    isn't that right?

25        A.   That's correct.

1        Q.   The primary date for that election is

2    right at the top, isn't that right, the

3    February 18th date?

4        A.   That is correct.

5        Q.   If you look to the column directly to

6    the right of Plaintiff's Exhibit 169, you'll see

7    that there is a special general election for

8    Orleans state representative, and then house

9    district 93.  So the general election occurred

10   about a month later; isn't that right?

11       A.   The general election that was one of the

12   circumstances where -- what I was talking about

13   earlier, the primary came so that the general

14   would fall on an already scheduled municipal

15   primary date.

16       Q.   Makes sense.  You also -- we can take

17   this exhibit down.  Things.  In 2022, there was

18   another special election for state Senate

19   district; isn't that right?

20       A.   In 2022, in January, I believe.

21       Q.   I think it was later in the year.  So it

22    was for district 5.  Do you recall that?

23        A.    No, but if you show it to e many, it

24    will jar my memory.

25        Q.    Sure.  I don't have that calendar right

                                                          128


1    here for you, but I can tell you that it was after

2    senator Peterson resigned from office in April of

3    2022.  Does that ring any bells?

4        A.    It does.

5        Q.    And senator cortices set a special

6    election for that or set the deadlines for that

7    special election isn't that right?

8        A.    Yes.

9        Q.    And that special election took place on

10    the same dates as the federal elections that took

11    place in 2022; isn't that right?

12        A.    Yes.

13        Q.    And commissioner Hadskey, get that right

14    at some point?

15        A.    That's okay.

16        Q.    You could not think at your deposition,

17    you couldn't think of any reason why a special

18    state election couldn't happen at the same time as

19    a federal e extremity; is that right?

20        A.    That's correct.  My only concerns I

21    mentioned it before, is with the legacy machines,

22    the real estate on the ballot.  So in June, we

23    have the deadline to call a prop.  And in July, we

24    have the legislature providing us with

25    constitutional amendments.  The most I've ever

                                                    129

1     seen, I think, was about 17.  So with the

2     presidential taking up two columns and it keeps

3     growing every year, and our state is one of the

4     only states that requires the elects toker to be

5     listed on the ballot, which takes up a lot of

6     room.  And then you fall in the with the local

7     races, and then you fall in with the props and the

8     C As.  So my concern would be, I can't buy any

9     more of these machines to have more machines to

10    run the ballot over to.  So that would be my

11    concern.  That would be one of my biggest

12    concerns.

13        Q.    Understood but if the circumstances

14    called for it, if it would say, save

15    administrative time, save administrative money,

16    you could try to make it work?

17        A.    We would try.  If it ever flowed, I

18    would throw the problem back to somebody else

19    legislatively or legally to say, I can't --

20    there's not enough buttons on here.  The other

21    concern is, we have a Senate race where 22 people

22    qualified.  The more candidates that qualify, and

23    the more that everybody put on there, unlike most

24    of the rest of the nation where they have page

25    ballots where you can keep paging over to go to

                                                      130

1    the next ones, so yes, it would end up being

2    somebody's legal problem that -- I mean, because

3    the bottom line is, I can only do what I can do on

4    that machines.  There's only so many buttons.

5         Q.    Understood Commissioner Hadskey, this

6    goes without saying, I think, but given your

7    testimony today, but you would seek to fill full

8    your responsibility to ensure that all elections

9    run on schedule, that's required; isn't that

10   right?

11        A.    Absolutely.

12        Q.    And that includes special elections that

13   are called?

14        A.    Yes, it does, absolutely.

15        Q.    And other entities have imposed

16    requirements on elections before, right, outside

17    of the secretary's office?

18        A.    Meaning the legislature.

19        Q.    The legislature?

20        A.    Yes.

21        Q.    And Courts?

22        A.    Yes.

23        Q.    And the governor?

24        A.    Yes.

25        Q.    And you've complied with all of those

                                                    131

1    requirements; isn't that right?

2        A.    We have.

3        Q.    Related to election administrative?

4        A.    Related to elections administration.

5    However, it is my job as commissioner to bring up

6    to the Courts or to the legislature or to the

7    secretary himself when something is not being met

8    because of a requirement that has been put on us,

9    and I make sure that that is documented and noted.

10    So if by chance somebody files something after the

11    election date, based on that, then there's

12    evidence of what occurred.

13        Q.    Sure.

14    A.    And that happens with emergency

15    elections also, when you have emergencies that

16    fall into place and some deadline is having to be

17    overlooked, it's node in case somebody were to

18    file some contest suit or say there was a problem

19    with it.

20    Q.    Understood.  Be even if under those

21    circumstances, you would make every effort to

22    comply with what was required?

23    A.    I will always what's required with me.

24    PLAINTIFF COUNSEL:

25        Let me confer with my counsel briefly,

                                                  132


1    Your Honor.

2        No further questions, Your Honor, I

3    tender the witness.

4    THE JUDGE:

5        Redistrict.

6    DEFENSE COUNSEL:

7        No, Your Honor.

8    THE JUDGE:

9        Next witness.

10    DEFENSE COUNSEL:

11        This is Patrick Lewis for the

12        legislative Defendants, and we call Dr. Alan

13        Murray.

14            (WITNESS SWORN).

15        THE CLERK:

16            Would you please state your name and

17        spell it.

18        THE WITNESS:  Alan Murray,

19        A-L-A-N-M-U-R-R-A-Y.

20        DEFENSE COUNSEL:

21            Your Honor, may I approach the witness

22        to provide him with a binder containing his

23        reports and report exhibits.

24        THE JUDGE:

25            You may.

                                                      133


1   EXAMINATION BY DEFENSE COUNSEL:

2        Q.   Good afternoon, Dr. Murray.  I'd like to

3   turn now to Exhibit LDTX42, which is in the

4   binder, I just handed you.  Do you recognize this

5   document, Dr. Murray?

6        A.   Yes, I do.

7        Q.   Okay.  Is this your report?

8        A.   Yes, it is.

9        Q.   Okay.  I'd like the turn -- to turn to

10     the appendix beginning on page 35, which I believe

11     is your CV.  It's up on the screen.  Do you

12     recognize this, Dr. Murray reference yes, I do.

13          Q.    Is this your current CV?

14          A.    Yes, it is.

15          Q.    Can you explain to the Court your

16     educational background?

17          A.    I have bachelor's in mathematics, a

18     master's in probability and statistics, and a

19     Ph.D. in geography all California, santa Barbara.

20          Q.    What are your areas of focus in your

21     studies.

22          A.    Spacial analysis, spacial analytics and

23     GIS.

24          Q.    Okay.  What is the study of spacial

25     analytics?

                                                        134


1           A.    Basically, the evaluation of

2      distributions, spacial distributions of

3      population, race, service, potential, things along

4      those lines.

5           Q.    Okay.  And GIS, what is that study?

6           A.    GIS is acronym for geographic

7      information systems.  They are database management

8    systems to work primarily with spacial

9    information, specializing in data collection, data

10   management, manipulation, analysis, and mapping.

11        THE CLERK:  What I'm sorry.

12        THE WITNESS:  Mapping.

13   EXAMINATION BY DEFENSE COUNSEL:

14        Q.   What kind of problems or projects have

15   you studies using spacial analytics?

16        A.   A whole host of things, but early on, a

17   lot of work in the area of school districting,

18   work looking at transportation, access and

19   accessibility, transportation service areas,

20   emergency service, service areas, forest

21   management areas, planning units, and things along

22   those lines.

23        Q.   Is the study of districting part of your

24   work in spacial analytics?

25        A.   Absolutely.

                                                    135


1         Q.   Okay.  And is statistics part of your

2    academic work?

3         A.   Yes, it is.

4         Q.   Can you explain to the Court what kind

5    of statistics you study as part of your academic

6   work?

7         A.   My area is primarily in the associated

8   with spacial statistic, geo-statistics, having to

9   do with looking at spacial ought item correlation,

10  clustering and things like that.

11        Q.   On these doings including spacial

12  analytics, GIS statistics, do you teach courses on

13  these topics?

14        A.   Yes, I did.

15        Q.   Do you teach them at the graduate level?

16        A.   I teach them at undergraduate and

17  graduate levels, yes.

18        Q.   Dr. Murray, do you publish peer reviewed

19  academic literature on these topics?

20        A.   Yes, I do.

21        Q.   Approximately how many publications and

22  peer reviewed publications do you have?

23        A.   Over 305.

24        Q.   Okay.  And do you know approximately how

25  many times your work has been cited?

                                                    136


1         A.   I think near 19,000 to date.

2         Q.   All right.  Where are you currently

3   employed?

4      A.   I'm currently employed at the university

5   of California Santa Barbara in the department of

6   geography.

7      Q.   Your title there?

8      A.   I'm a professor of geography.  I'm also

9   an affiliate in the group center for demography as

10  well as the associate director for the center of

11  spacial studies and data science,.

12     Q.   Okay.  I guess this goes without saying,

13  do you have tenure at UCSB?

14     A.   Yes, I do.

15     Q.   Can you explain what the broom center

16  for demography is?

17     A.   The broom center for demography at USCB

18  is basically like a population center.  So it's

19  affiliate faculty across campus including people

20  in economics, people in socially, people in

21  geography.  And outside in other disciplines of it

22  due do work and research associated with

23  population issues.

24     Q.   Okay.  Spacial analytics department you

25  mentioned, what's that?

                                              137

1      A.   The center for spacial studies, and data

2    science is a center, it's focused on basically GIS

3    and GI science application and issues.  And it's

4    sort of second generation from the national center

5    for geographic information and analysis that was a

6    center funded at USCB by the national science

7    foundation in the early 1990s.

8         Q.   Does USCB have a prominent program in

9    GIS?

10        A.   Yes, it does.  It's recognized as one of

11   the top GIS, GIS science programs in the world.

12        Q.   Do you use GIS software in your

13   professional work?

14        A.   Yes, I do.

15        Q.   What is that software called?

16        A.   I predominantly use arch GIS.

17        Q.   Is Maptitude, are you familiar with

18   Maptitude for redistricting?

19        A.   Yes, I am.

20        Q.   What is that?

21        A.   It's also a geographic information

22   system that suggests it is tailored to help

23   address political redistricting problems and

24   issues.

25        Q.   Okay.  And I believe you may have

138

1    mentioned this already, but just for the clarity

2    of the record, does your professional work involve

3    the studying of demographics by race?

4         A.   Yes, it does.

5         Q.   Okay.  Have you served as an expert in

6    redistricting litigation in the past?

7         A.   Yes, I have.

8         Q.   And that was the Robinson case before

9    this Court; is that right?

10        A.   Yes, it was.

11        Q.   Okay.  Who retained you to serve as an

12   expert in this case?

13        A.   The leaders of the Louisiana

14   legislature.

15        Q.   You provided one report in this case; is

16   that right?

17        A.   Yes, I did.

18        Q.   Okay.

19        DEFENSE COUNSEL:  Your Honor, we move for the

20        admission of Dr. Murray as an expert in the

21        fields of geography, demographic analysis,

22        spacial analytics, as it relates to race, and

23        statistic.

24        PLAINTIFF COUNSEL:  No objection Your Honor.

25          THE JUDGE:  Admitted in the fields as

                                                                     139

1          tendered.

2          DEFENSE COUNSEL:  At this time, we would also

3          pursuant the party's stipulation, we would

4          move the admission of LDTX42, which is

5          Dr. Murray's report, and LDTX43 through 50,

6          inclusive, which comprised the exhibits to

7          the expert report.

8          PLAINTIFF COUNSEL:  No objection.

9          THE JUDGE:  Admitted.

10          A.   So that means I'm done?

11          THE JUDGE:  Don't we wish.

12  EXAMINATION BY DEFENSE COUNSEL:

13          Q.   Let's return to your report, Dr. Murray,

14  and specifically I'd like to turn to page 2.

15          A.   Okay.

16          Q.   And I believe in the -- I'd like for you

17  to just summarize for the Court what you were

18  asked to do in this case?

19          A.   In terms of this analysis, I was asked

20  to evaluate the illustrative districts generated

21  by Mr. Cooper, along with the enrolled 2022 and

22  Senate and house districts.

23       Q.    Were there specific aspects of those

24  plans that you looked at in your analysis in this

25  case?

140

1        A.    I was focused on looking at various

2   sorts of things, looking at the data, veracity,

3   and then the I suppose completeness of the

4   analysis and correctness of the analysis, and to

5   that end, I undertook data management manipulation

6   sorts of tasks, I evaluated compactness.  I looked

7   at core, I look at aspects of spacial correlation,

8   and finally looked specifically at communities of

9   interest.

10       Q.    Okay.  And what sources did you analyze

11  in formulating the opinions in your report?

12       A.    I looked at the illustrative districts

13  provided by Mr. Cooper.  I also looked at the

14  enrolled Senate and house districts provided by

15  the legislature, as well as associated census

16  block data, and then from the census to block

17  boundaries.  As well as I guess I should add the

18  census block groups.

19       Q.    Did you also look at any socioeconomic

20  data?

21          A.    Yes.   That provided in the blocks as

22     well as in the block groups, associated with ACS

23     data, yes.

24          Q.    Okay.   So I think my first question is:

25     Did you evaluate, did you review, I should say,

141

1     the counts of split parishes and split voter

2     tabulation districts in the districts created in

3     Mr. Cooper's illustrative plans?

4          A.    Yes, I do.

5          Q.    Did you review the account counts of

6     split parishes in the DDTs in  enrolled plans?

7          A.    Yes, I did.

8          Q.    Just to make sure we have a clean

9     record, when we're referring illustrative plans,

10     we're referring the ones in 2023; is that right?

11          A.    That's correct.

12          Q.    For the enrolled plans, those were in

13     2022?

14          A.    2022, yes.

15          Q.    Okay.   And is that analysis recorded in

16     your expert report in this case?

17          A.    Yes, it is.

18          Q.    So I'd like to focus today on your

19  analysis of the number of divided voter tabulation

20  district boundaries.  So if we could start in the

21  Senate, I believe that's on paragraph 17 between

22  pages 11 and 12.  Let me know when you get there.

23      A.   Okay.

24      Q.   Can you tell the Court how many voter

25  tabulation district splits that you found in the

142

1  enrolled 2022 Senate plan?

2      A.   Splits for the voting districts in the

3  enrolled plan were six.  And 18 illustrative

4  house.

5      Q.   Did you mean illustrative Senate, I'm

6  sorry?

7      A.   Excuse me, Senate.  There's a typo.

8  You're correct.

9      Q.   So just to make sure, it's six in the

10  enrolled and 18 in the illustrative; is that

11  correct?

12      A.   That's correct.

13      Q.   Okay.  If we could then move to the

14  house, I believe that's paragraph 23, appearing at

15  the bottom of 15 and top of 16.  And Dr. Murray,

16  can you tell us how many voter tabulation district

17    splits you found in the enrolled 2022 house plan?

18         A.   Sorry, I'm just trying to refresh my

19    memory.  ZERO for the house and eight for the

20    illustrative house, I believe, unless, yes.

21         Q.   No VDT splits in the enrolled plan?

22         A.   That's correct.

23         Q.   There were eight, I believe you said in

24    the illustrative 2022 house plan?

25         A.   That's correct.

                                                    143


1          Q.   Okay.  I'd like to turn to compactness.

2     Dr. Murray, did you review the compactness of the

3     district's created in Mr. Cooper's illustrative

4     plan?

5          A.   Yes, I did.  He reported three different

6     measures of compactness, Reock, Polsby Popper, and

7     he said in the report compact hole, but he didn't

8     report any empirical measures for those.

9          Q.   Okay.  Did you also review the

10    compactness of the districts in the enrolled

11    plans?

12         A.   Yes, I did.

13         Q.   Okay.  So can you explain the Polsby

14    Popper compactness metric?

15        A.    So I provided all three measures in my

16   report on page 2; although, it was stipulated in

17   the deposition that the Polsby Popper is missing

18   the two Exponent on the perimeter.   In the

19   denominator perimeter -- which one did you want me

20   to explain.

21        Q.    Just a brief overview of Polsby Popper?

22        A.    Polsby Popper is looking at the

23   perimeter of a circle of the area of the district,

24   divided by -- well, the perimeter -- well, the

25   circumference of the circle of the same area, size

                                                        144


1    as the district squared over the perimeter squared

2    of the district being evaluated.

3         Q.    When was that technique developed?

4         A.    The technique is attributed to Polsby

5    Popper in 1991, but in fact it's a measure that

6    has existed since the 1800s at least.

7         Q.    Okay.  How about the Reock metric, what

8    does that measure?

9         A.    The Reock is the area squared or area

10   over the smallest enclosing circle of that area.

11   So it's a measure that ranges between 0 and 1.

12        Q.    Okay.  And when was Reock developed?

13          A.    It's attributed to Reock in 1961, but it

14    too was discussed as a metric for looking at shape

15    or compactness in the 1800s as well.

16          Q.    Okay.  Are there any differences between

17    Polsby Popper and Reock in terms of how they -- in

18    terms of what they're measuring and practice?

19          A.    Yes.  As I described, one focuses on

20    area relating the area to the area of the smallest

21    enclosing circle.  And the other Polsby Popper,

22    looks at the perimeter of a circle over the

23    perimeter of the actual area.

24          Q.    Are there particular shapes that might

25    perform poorly on one measure and per for well on

                                                         145


1     other?

2           A.    Positive.

3                 Both are attempts to characterize a

4                 shape or a district as a single number.

5                 In fact, they're two dimensional objects

6           Q.    Condition vex mall, what is that

7     measuring?

8           A.    Convex haul looks at the area over

9     the -- the area of the convex hole of the area and

10    the convex hole is a particular kind of shape that

11    has a proper convexity, so as defined to be the

12    smallest polygon, essentially, that encloses --

13    completely encloses the district.  Again what you

14    have as a measure between 0 and 1, because the

15    area enumerators always going to be the same size

16    or smaller than the convex of that whole area did

17    you can compute the measure of compactness that

18    you report itself.

19        A.   Yes, I did.

20        Q.   Okay.  So I'd like to now turn to figure

21    7 on page 9 of your report.  Does this figure

22    report your computations of the different

23    compactness measures in the illustrative and

24    enrolled 2023 -- illustrative and enrolled Senate

25    plan?

                                                    146


1         A.   Yes, they do.  Yes, it does.

2         Q.   Okay.  And what is your -- using these

3    three measures, what is your ever all conclusion

4    over all conclusion about the compactness of the

5    districts in the enacted Senate plan?

6         A.    So they each have a value.  Reock is

7    .35.  Polsby Popper is .18.  And the convex hole

8    is .66.  And across all districts these measures

9  convexity -- or compactness measures are a little

10  bit higher than what they are for the majority

11  black districts in the plan.

12      Q.   Okay.  And then for the illustrative

13  plan, what are the numbers that you calculate for

14  that?

15      A.   The numbers are in a relative sense,

16  pretty similar to those observed in the Senate

17  plan for each particular metric, and there's the

18  same relationship that among the 14 majority black

19  districts, that the associated compactness

20  measures are lower than they are across the whole

21  region.

22      Q.   And if you were comparing, we'll just

23  focus on all districts in the plan, but if you

24  were comparing the compactness of the illustrative

25  plan versus the compactness of the plan, what

                                                147


1  conclusions can you draw?

2      A.   That the illustrative plan has slightly

3  higher compactness to the hundreds decimal place.

4      Q.   Is that have substantive significance to

5  you as a social scientist?

6      A.   It's different, the measure is

7      different.  I'm not sure within the context of the

8      measures that there's a lot of meaning that can be

9      put into the hundreds place difference, but

10     there's a little bit.

11          Q.   Okay.  And I'd like to now turn to

12     figure 9, page 11 of your report.  And this is up

13     on the screen.  Dr. Murray, can there be -- we

14     talked earlier about some differences between

15     Polsby Popper and Reock.  Do the measures always

16     correspond for districts?

17          A.   No, they don't.  So the same or

18     different metrics may give a different evaluation

19     of different district in a comparative sense.  So

20     what you see in this figure is a plot for each

21     district, its measure by Reock against the measure

22     by Polsby Popper, and if the measures agreed, what

23     you'd see is a straight line of agreement or some

24     other trend.

25          Q.   So just to orient us to this figure, can

                                                          148


1      you just describe what's on the X axis and Y?

2          A.   The X is PP, Polsby Popper.  Then on the

3      Y axis is Reock.  What you see is if you picked

4      any particular point, so I'll look at this one

5      that has a value of .2.  For Polsby Popper, it's

6      .2.  If we look at Reock, it's a little bit more

7      than .4.  With the 1 in the middle.  This is done

8      for each of the 39 districts.

9            Q.    Okay.  So each dot on here refers to a

10     specific district?

11           A.    Yes.

12           Q.    And then it's plotted based on its Reock

13     and Polsby Popper; is that right?

14           A.    Yes, it is.

15           Q.    Did you calculate a correlation between

16     a district's Reock and Polsby Popper score?

17           A.    Yes, I did.  That's reported somewhere.

18     In 15, I guess.

19           Q.    You're referring --

20           A.    In this particular case.

21           Q.    You're referring to paragraph 15; is

22     that right?

23           A.    That's right.

24           Q.    What is that correlation?

25           A.    That correlation is 0.6449.

149

1            Q.    Okay.  What does that number tell us

2      about the linear relationship of those two

3    measures of compactness?

4        A.    Well, it says that there's some

5    correlation here, but you have to be careful in

6    terms of it in terms of linear implication, a more

7    standardized way to look at it, strictly from a

8    linear perspective would be in a regression

9    framework, which would effectively be this

10   official squared.

11       Q.    So if you squared that number, what

12   would that tell you?

13       A.    Roughly 0.37.  What that would say from

14   a linear perspective is that the relationship

15   between the two variables are explained, are

16   37 percent of the variability with respect to

17   linear is explained by these two variables, which

18   means in terms of linear relationship, what's not

19   explained is 60.3 percent.

20       Q.    Okay.  So is that why the dots are

21   scattered widely on this chart?

22       A.    That is exactly why, yes.

23       Q.    Okay.  Now, did you use another measure

24   of compactness to evaluate the districts beyond

25   the three that you reported than Mr. Obligation

1   Mr. Cooper?

2       A.   Yes, I did.  I moved moi.

3       Q.   Why did you select the my?

4       A.   The moment of inertia, more becoming

5   more widely used now, though it has existed for

6   many years.

7       Q.   When was the moi developed?

8       A.   The my, if you go back into the

9   literature, it's something like 1963, Weaver and

10  he is, they talk about it, although they do refer

11  to a linear -- Leonard oiler developing it in the

12  1700s.

13      Q.   This is not exactly brand new to the

14  field?

15      A.   No.

16      Q.   Okay.  Just very briefly, how does the

17  moment of inertia differ from, say, Polsby Popper?

18      A.   So the moment of inertia, one of the

19  reasons why I included it, is that it's a measure

20  that looks at the whole area and if I took a given

21  district, I would be looking at all the locate

22  locations, infinite number of low cakes within

23  that district and looking at some sort of spacial

24  variability with respect to a central location.

25  So in terms of the measure itself, it does take a

1    given central location, often the centroid.  Then

2    it looks at this squared distance from that

3    location to every point, infinite number of points

4    within the district.  It takes this measure, this

5    so called moment of inertia, and it put it in a

6    measure.  The measure is basically the moment of

7    inertia for circle of the same size, divided by

8    the moment of inertia for the actual district.  So

9    it's a comparison sort of the most compact shape

10   believed to be a circle, and then comparing the

11   behavior that district with respect to that.  So

12   it's a measure that also varies between 0 and 1.

13        Q.   Okay.  Is the moment of inertia method

14   peer reviewed?

15        A.   Yes, it is.  So like in geography,

16   that's one of the reasons that I used it, it

17   appeared in the 70s, as noted in my report.  It

18   probably should qualify that the literature that I

19   noted note in the report is really the geographic

20   literature, as opposed to what I just mentioned

21   previously, there's obviously other literature

22   that this comes from.  Two of the things involved

23   actually are prominent GIS faculty member that was

24    at USCB, Michael good child was involved in both

25    of the references that I mention dollars, talking

152

1    mostly about the integration of this measure

2    within the GIS -- within a GIS context.

3        Q.    I see.  And is the moment of inertia

4    commonly used in your field?

5        A.    Yes, it is.

6        Q.    How would you qualify that it's commonly

7    used?

8        A.    The -- if you look at it in terms of

9    reference to the term, in that academic literature

10    and Google Scholar suggests something like 19,000

11    references to that as a term.  If you looked in a

12    number of the publication, there's hundreds of

13    citations for example, to the root child or other

14    work that I mentioned so far.

15        Q.    Dr. Murray, did you calculate

16    compactness using the moment of inertia approach?

17        A.    Yes, I did.

18        Q.    Okay.  So if we could turn now to figure

19    10 on page 11 of your report.  Does this figure on

20    the screen here, Dr. Murray, does this tell us

21    your calculations at the moment of inertia for the

22    Senate?

23        A.    Yes, it does.

24        Q.    Okay.  Over all, what do these -- can

25    you explain what the moment of inertia is, what

                                                    153


 1    this value is?

 2        A.    So, yes.  As I said before T value of

 3    this particular measure, like the Reock, like

 4    Polsby Popper ranges between 0 and 1.  What you

 5    see here for the enrolled Senate district is that

 6    it's .59, which suggests towards 1, but not 1.

 7    And then further, providing this table as the

 8    minimum and the maximum value, and that's compared

 9    to the 11 majority black districts.  What we see

10    is along the lines that the previous summary

11    measures have shown, that the measure of

12    compactness decreases.

13        Q.    Overall, just looking at all districts

14    in the illustrative Senate and all districts in

15    the 2022 Senate, I mean, what do these values tell

16    you?

17        A.    So that tells me that in terms of

18    comparison to the illustrative plan, that the

19    compactness increases overall.  And in particular,

20   when we look at the black majority black

21   districts, that in the illustrative case, it's

22   increasing, that they're more compact.

23        Q.   We can take that down.  Like with the

24   Senate, did you also -- sorry.  Ahead here.  I'd

25   like to flip over to the house.  We've been

154

1   talking about the Senate.  And if we could then

2   turn to page 13 and figure 15.  And what is this

3   table showing, figure showing us?

4        A.   So this shows the compactness measures

5   for the Reock Polsby Popper and compact sole for

6   the house, senate house districts and the

7   illustrative house districts.

8        Q.   Just comparing the especially acted and

9   house plan, along, can you draw any conclusions?

10        A.   Very similar in terms of the compactness

11   for every measure pretty much.

12        Q.   Okay.  And like with the Senate, did you

13   look at the correlation between Reock and the

14   Polsby Popper and the house?

15        A.   Yes, I did.

16        Q.   Okay.  You report the results of that

17   analysis in your report?

18          A.    Yes, I do.

19          Q.    Okay.  And I believe that's on paragraph

20    21 on page 14.  Do you report the correlation

21    between the Reock and Polsby Popper in the

22    illustrative house?

23          A.    Yes, I do.

24          Q.    What is that?

25          A.    It's 07.5847.

155

1           Q.    That number is less than it is in the

2     Senate; is that right?

3           A.    That's correct.

4           Q.    What does that mean practically?

5           A.    That there's some degree of positive

6     correlation here.  And then if we looked at this

7     from a linear perspective, that we would square

8     that term and see that it's less than .36, I

9     guess, in terms of the explanatory, linear

10    relationship.

11          Q.    Okay.  Did you also use moment of

12    inertia to calculate compactness in the enroll

13    versus else house plans?

14          A.    Yes, I did.

15          Q.    I'd like to turn to figure 18 on page

16    15.  Dr. Murray, does this figure report the rules

17    of your moment of inertia compactness analysis in

18    the house?

19         A.   Yes, it does.

20         Q.   Okay.  Can you just briefly summarize

21    for the Court the compactness numbers and the --

22    just the compactness common numbers for the two?

23         A.   Comparing the enacted house and

24    illustrative house, they're almost exactly the

25    same, in terms of this measure of compactness.

156

1         Q.   Okay.  So I'd like to now move on.  You

2    also performed an analysis of the percentage black

3    voting age population in the black majority

4    districts in Mr. Cooper's plan; is that right?

5         A.   Yes, that's true.

6         Q.   And in particular, did you look at an

7    analysis Mr. Cooper provided in his report that

8    compared the percentage BVAP black majority

9    districts to the percentage white VA P in white

10    majority districts?

11         A.   Yes.

12         Q.   So what I'd like to do now is, I'd like

13    to do a side by side or top or bottom or whichever

14    we did here, comparing figure 11 on page 12 of

15    your report, tell LDTX42, and side by side with

16    figure 16 on page 35 of Mr. Cooper's report which

17    is marked PL20.  Dr. Murray, you'll probably have

18    to use your screen for this one.

19         A.    Got it.

20         Q.    Just to orient, I'll just represent that

21    the top figure comes from Dr. Murray's report, and

22    the bottom figure comes from Mr. Cooper's.  So

23    Dr. Murray, is figure 11 the result of your

24    response to Mr. Cooper's figure 16?

25         A.    Yes, it is.

157

1          Q.    Okay.  Can you explain what analysis you

2     performed in figure 11 of your report?

3          A.    So in figure 11, this was based upon his

4     original figure 16.  And looking at what was being

5     reported and based upon this, what you see in the

6     table, is my interpretation of what that should

7     look like.  So in particular, looking at the black

8     voting age population in the majority districts,

9     what you see is 58.98 percent in the Senate,

10    enacted plan.  That's based upon looking at the

11    total population BVAP over the total BVAP in those

12    majority districts.

13        Q.    Okay.  So when we look at the change in

14    the majority BVAP in the Senate, you go from the

15    enacted to the illustrative, how does that number

16    change?

17        A.    So in the illustrative Senate, it's a

18    similar thing.  The total BVAP in those majority

19    districts divided by the total BVAP in those

20    majority districts.

21        Q.    Okay.  So how does that percentage

22    change from the enacted to the illustrative

23    Senate?

24        A.    I'm sorry.  So in the illustrative plan,

25    what you see in percentage terms is that there's

158

1    larger population across those majority black

2    districts.  So as a result, that percentage of the

3    BVAP in those districts is less.  So it decreases.

4        Q.    Okay.

5        A.    From the enacted to the illustrative.

6        Q.    Okay.  So when we look and we see -- we

7    look over at the next column is 2020NH white VA P

8    majority districts.  What is that column

9    reporting?

10        A.    Sorry, can you say again.

11        Q.    Sure.  So for the second column, it says

12   white majority VAP districts, what's that looking

13   at?

14        A.    So in those districts, it's looking at

15   the white VAP, across the white VAP majority

16   districts.  It's looking at the percentage of the

17   total population in those districts.

18        Q.    Okay.  So between the enacted and the

19   illustrative, how does that value change?

20        A.    So in the enacted it's 68.74 percent.

21   And then in the illustrative, this increases to

22   70.15 percent.

23        Q.    Okay.  And then on that right hand

24   column with the word difference, what do you

25   understand -- I understand you're working off Mr.

                                              159


1    Cooper's, but that difference number, what do you

2    understand that to be?

3         A.    So I understand this to be the

4    difference between 578.98 percent minus

5    68.74 percent.  That gives you a minus

6    9.76 percent.

7         Q.    Okay.  The same calculation for the

8    illustrative?

9         A.    Yes.

10        (INTERRUPTION).

11        Q.    Can you explain the difference between

12   your numbers and his?

13        A.    I believe I can.  From my understanding

14   of his rebuttal is that for the Senate, it's that

15   BVAP total in those districts divided by BVAP

16   across the whole state so not just the population

17   in those majority districts.

18        Q.    Just to make sure I understand.  So in

19   your figure 11, you're taking the percentage, the

20   average percentage BVAP in the black majority

21   districts; is that right?

22        A.    That's right.

23        Q.    So Mr. Cooper is taking the percentage

24   BVAP and majority districts, compared with the

25   state as a whole; is that right?

                                                    160


1         A.    That's right.

2         Q.    Okay.  Is that the same analysis

3    undertaken with the white majority districts?

4         A.    That's.

5         Q.    Is it problematic to compare or to draw

6    the comparison against statewide numbers instead

7    of district numbers?

8        A.    I believe that it is, yes.

9        Q.    Why is that?

10       A.    I'm not sure that it makes sense,

11   because in the discussion both in the tables and

12   the discussion in the report, it was trying to

13   characterize that percentage of the BVAP or the

14   white VAP in those districts and have a compared.

15   So by dividing it by the state totals, renders it

16   in a way an incomparable kind of comparison in my

17   opinion.

18       Q.    Is the idea that if you're looking at

19   characteristics am I hearing you right that you

20   should be looking at the districts and not pulling

21   in numbers outside of the districts?

22       A.    That's correct.

23       Q.    Okay.  Then if we see under your

24   analysis, rather than the difference number,

25   getting closer to 0 as you move from the enacted

                                                        161


1    to the illustrative Senate, as it does in Mr.

2    Cooper's analysis, in your analysis, the

3    difference gets larger; is that right?

4        A.    That's right.

5        Q.    Okay.  And what is your interpretation

6   of the difference number under your figure 11?

7        A.    So in my figure 11, what you see is that

8   BVAP in those black majority districts goes down a

9   smaller percentage to 53 percent, and then as a

10  result of that, you see a greater percentage of

11  nonhispanic white BVAP in the other directions,

12  that's why it goes up to 70 percent.  So

13  intuitively, this makes sense and allows for

14  comparison.  What happens is exactly what you

15  would expect.

16       Q.    So is this figure showing us how the

17  changes between the enacted and illustrative are

18  sorting the population by race?

19       A.    It appears to, yes.

20       Q.    How does it appear to do so?

21       A.    In that by creating more majority black

22  districts, you have -- you're isolating more of

23  the BVAP in the state and then similarly, in the

24  white nonhispanic white BVAP, districts, you're

25  obviously creating a greater concentration of that

                                                   162


1   white VA P majority.

2        Q.    Okay.  Did you perform a similar

3    analysis, Dr. Murray, of the house?

4        A.    Yes, I did.

5        Q.    Okay.  I'd like you to turn quickly to

6    we'll do one more side by side comparison figure

7    19 on page 16 of your report, LDTX42, junction

8    task posed with figure 27, appearing on page 48 on

9    PL20, which is Mr. Cooper's.  Can you briefly

10   summarize for the Court Dr. Murray, your analysis

11   in figure 19?

12       A.    Similar to what I just talked about for

13   the Senate, what we see is 63 percent of BVAP in

14   the black majority districts.  And then for the

15   white voting age population districts, we see both

16   white VA P, BVAP at 69.3 percent, for the enacted

17   house plan.  This goes down to 57.24 percent in

18   the illustrative house for the BVAP for the black

19   majority districts and then 70.25 in the

20   nonhispanic white VA P majority districts.

21       Q.    So as you move from the enacted to the

22   illustrative, is the difference between those

23   percentages in the black majority districts tanned

24   white majority districts grown?

25       A.    It goes down.

163

1      Q.   But it's getting farther from 0?

2      A.   That's right.

3      Q.   They're getting more different?

4      A.   Exactly.

5      Q.   Okay.  Again, that's a different

6   direction than Mr. Cooper's calculation of the

7   difference using his Methodology in his figure 27,

8   right?

9      A.   Yes, that's right.

10      Q.   Are your conclusions with regard to the

11   house similar as they are with respect to the

12   Senate?

13      A.   Yes, they are.

14      Q.   Okay.  I'd like to now move on to you

15   performed an analysis on, I believe you performed

16   an analysis comparing the BVAP of the enrolled and

17   the illustrative districts that border the

18   location of Mr. Cooper's new illustrative majority

19   black districts; is that right?

20      A.   That's right.

21      Q.   Okay.  Why did you perform that

22   analysis?

23      A.   To look at the impacts of the creation

24   of this new black majority district on the local,

25    on the surrounding districts.

164

1        Q.    Okay.  And so I think we can go pretty

2    quickly through this, but I'd like to pull up

3    figures 12 to 14 from pages 12 to 13 of your

4    report.  So can you orient the Court to the

5    figures, maybe with figure 12 at the bottom of

6    page 12?

7        A.    Yes.  This looks like else Senate

8    district 17.  And those neighboring districts and

9    the neighbors districts, and then looking at

10    what's happening to the BVAP percent in the

11    illustrative compared to the enrolled.  What you

12    see is that in terms of the changing neighboring

13    districts to 17, you have 15, 2 and 14.  And then

14    in the enrolled, it was respectively 73.9 percent

15    BVAP, 57.7 percent, and then 58 percent.  And then

16    when we look at the illustrative plan, 15, 2 and

17    14, again respectively, it goes down pretty much,

18    but does stay the same for 14, but for 15 and 2,

19    it goes down to 54.4 percent, and 51.73 percent.

20        Q.    And then I believe figure 13 covers the

21    Senate.  Do you see a similar pattern in figure

22    13?

23        A.    Yes.

24        Q.    Okay.  And then if we look at figure 14,

25    which covers illustrative Senate district 38, do

165

1    you see the same pattern?

2        A.    Same pattern, yes.

3        Q.    Okay.  I notice you only have one

4    district listed for 38.  Is there a reason why?

5        A.    I think that's the only neighboring

6    district that changed.  I'm not sure if it's the

7    only neighboring district, but it's the only one

8    that changed.

9        Q.    That's one of the Shreveport districts

10    right?

11        A.    I believe so.

12        Q.    Okay.  You performed the same

13    analysis -- oh, sorry.  What did the

14    differences -- what is this difference between the

15    enacted and illustrative BVAPs of these

16    neighboring districts tell us?

17        A.    In my opinion, it suggests that to

18    create these new majority black districts, that

19    BVAP from neighboring districts needed to be

20    allocated or borrowed, if you will, in order to

21    create the black majority district.

22         Q.   Okay.  And Dr. Murray, do you perform

23    this same analysis for the new illustrative house

24    districts?

25         A.   Yes.

166

1          Q.   Okay.  And do you report that analysis

2     in figures 20 to 25 of your report, beginning at

3     the bottom of page 16?

4          A.   Apparently, I do, yes.

5          Q.   All right.  And so Dr. Murray, the E6

6     figures perform a similar calculation for each of

7     the six new illustrative house districts in Mr.

8     Cooper's plan; is that right?

9          A.   That's correct.

10         Q.   Okay.  So I'd like to just use one as an

11    example.  Let's go with maybe figure 24 for

12    illustrative house district 65.

13         A.   Okay.

14         Q.   And so what is this particular figure

15    showing us?

16         A.   Well, one it's showing an error.

17    Because I don't know about 69 and 77,000 percent.

18    So there's clearly a typo here.  69.77 percent.

19    But have to verify that.  But what we see is a

20    similar sort of relationship in the neighboring

21    districts that have changed have consistently a

22    higher enrolled house percentage BVAP.  Than when

23    you compare them to the illustrative house case.

24         Q.   Okay.  And I'd like to look at maybe one

25    more of these.  If we could look at figure 25,

                                                     167


1     which is for illustrative house district 68.  And

2     what do you see -- what does this figure tell us

3     Dr. Murray?

4          A.   A similar.  So the districts that

5     neighbor district 68 are (296)162-0167, 63, and

6     then you see this relationship of a decrease in

7     the BVAP in this associated districts in order to

8     create the new black majority district 68.

9          Q.   Okay.  And taking a look at these new

10    illustrative districts as a whole, do you see --

11    does a pattern emerge for you from this analysis?

12         A.   In terms of creating this new black

13    majority district required a sort of borrowing

14    from neighboring districts in order to achieve the

15    majority district status, yes.

16         Q.   Okay.  So, Dr. Murray, did you also look

17    at core retention?

18         A.    Yes, I did.

19         Q.    What is core retention to you?

20         A.    Core retention is the idea of how much

21    did a new districting plan maintain sort of the

22    original representation or boundaries from the

23    original.  So in this particular case, I compared

24    the 2022 enrolled to the 2011 enrolled districts.

25    And then looked at, for example, what that

                                                      168


1     percentage was being maintained in the same or

2     equivalent district.

3          Q.    Okay.

4          A.    I did this through an analytical

5     approach that's described in the report.

6          Q.    Okay.  So I'd like to put up now figures

7     26 and 27 appearing on page 18 of your report,

8     LDTX122.  Dr. Murray, do these two figures report

9     your core refinings, the results of your core

10    retention analysis in this case?

11         A.    Yes, they do.

12         Q.    So if we could start with figure 26,

13    what do you conclude?

14         A.    So what ICON conclude is that looking at

15    the 2022 enrolled Senate plan, that it maintains

16    as a strict percentage, looking at the district

17    boundaries and how much they agree, 83.3 percent

18    retention from the 2011 Senate districts.

19        Q.    How does that compare to the

20    illustrative Senate?

21        A.    It's considerably higher when you look

22    at the 67.17 percent of the illustrative Senate.

23        Q.    Okay.  And so moving to the house, what

24    do you conclude about core retention in the house

25    in the 2022 enrolled plan?

                                                    169


 1        A.    Similar to what we saw for the Senate.

 2    In this case, the enrolled, or  enrolled house

 3    plan maintains or retains 75.43 percent from the

 4    2011 house districts, differing from the

 5    illustrative house districts having 63.06 percent

 6    retention.

 7        Q.    Okay.  Generally, what do you find about

 8    the degree to which the illustrative plans in this

 9    case are retains in the cores of prior districts?

10        A.    That the enrolled plans retain more from

11    the 2011 districts than the illustrative.

12        Q.    Okay.  Finally, Dr. Murray, I believe

13    you described a community of interest analysis

14    that you undertook in this case; is that right?

15         A.   Yes, I did.

16         Q.   Okay.  I'd like to now turn to that.  So

17    I believe you begin your discussion of this

18    analysis on paragraph 27, page 18; is that right?

19         A.   Yes.

20         Q.   Okay.  And can you tell the Court what

21    you studied in this analysis?

22         A.   So the intent here was to try and get at

23    whether the degree to which communities of

24    interest were being preserved in the Cooper

25    report.  It was something that was discussed.  I

                                                        170


1    think there was a mention of municipalities in

2    Cooper, as potentially communities of interest.

3    That certainly is a well accepted -- it may be one

4    type.  But it's certainly not more of a

5    neighborhood oriented definition of a community of

6    interest.  So the interpret was to -- intent was

7    to look at whether or not communities of interest

8    at a more local level were being retained or split

9    in any way.  So in particular, in my analysis, I

10   looked at block groups as one form of a potential

11    neighborhood, and whether block groups that form

12    either a neighborhood in and of themselves or a

13    collection of localized block groups, that is a

14    block group and its neighbors, that any of those

15    that may form a cluster of similar socioeconomic

16    characteristics were being split in the

17    illustrative district plans.

18         Q.    Just to make sure we have a clean

19    record, can you explain the difference between a

20    block and a block group?

21         A.    So a block group, the definition is

22    given in the report, but a block group is a larger

23    geographic area that consists of many block groups

24    within it.

25         Q.    Block groups or blocks?

                                                        171


1         A.    Blocks, excuse me.  Block group consists

2    of many blocks within it, yes.

3         Q.    I see.  Okay.  What made you select

4    block groups for your study here?

5         A.    One geography that potentially reflects

6    characteristics of a neighborhood.  So that --

7    some people have in sociology and other areas,

8    certainly in the criminal control injure area,

9    relied upon tracks, but I believe that they're too

10   broad to represent some of the localized

11   characteristics.  So I felt that block groups were

12   reasonable proxy for neighborhoods or communities

13   of interest to e veal value wait in the study.

14        Q.   Okay.  So how did you go about carrying

15   out this analysis?

16        A.   So the analysis relied upon block group

17   data, as it says, obtained from the ACS census.

18   And in doing this, one of the characteristics I

19   looked at was the difference in percent white

20   voting age population minus the percent of black

21   BVAP, black voting age population, in addition to

22   characteristic of income as well as education

23   obtainment.

24        Q.   Where did you get the data on income and

25   education?

172

1         A.   This is from the ACS census information.

2         Q.   Okay.  So I'd like to now look at figure

3    28 on page 19 of your report.  I know it comes

4    with some accompanying texts on the page, but can

5    you explain to us kind of what --

6         A.   So method one of the techniques is

7    method of spacial auto correlation, which looks at

8    the block groups and associated block attributes

9    of interest, BVAP minus V BVAP percent.  I looked

10   at this attribute and basically the measure of

11   spacial correlation, was looking for clusters,

12   local clusters, defined at the block group level,

13   and the degree to which a demonstration block

14   group is similar or different to it's neighboring

15   units.  So this overall value, the particular

16   measure I used in this case was local my ran task.

17   So what you see on the top of this figure is this

18   measure of ran tie, which this particular measure

19   is for the whole region, and a value of 0-point --

20   in this measure, ranges between minus 1.  In this

21   case, this is suggestive of a high degree and

22   significant degree of positive auto spacial

23   correlation.  Through this, what we would expect

24   there are many pockets of high BVAP block groups

25   surrounded by other high BVAP block groups, and as

                                                       173


1    well as high W VA P block groups by percentage

2    closer to 1 surrounded by high W VA P block

3    groups.  One way to look at this, so the Global

4    measure of spacial auto correlation just gives you

5    one number.  It just says we think there is

6    clustering in the region, doesn't say where this

7    is.  Breaking this down, the reason I used the

8    local Miranda approach, this does tell us

9    spacially which block groups is this occurring and

10   to what degree is it significant.  What you see

11   here is a plot of this attribute value, the

12   percent W VAP minus percent BVAP, that's YI, so

13   looking at this axis, it's a standardized value.

14   It's plotted against the neighbor values of this

15   particular measure.  So that's why you get this

16   scatter plot.  That's why you see on the Y axis

17   that mathematical mess if you will, is actually

18   the average of the neighbors in terms of this

19   particular measure.  So what you have is a block

20   group measure, plotted against the neighbor

21   values.  And then you get this so called my Rand

22   scatter plot.  And the significance of this plat

23   is that if you look at the dotted lines, it breaks

24   these plotted points into quadrants.  So the top

25   most quadrantes considered a high value surrounded

                                                    174


1    by a high value.  The other one of interest here

2    is the lower left quadrant, which suggests low

3      values of this particular attribute surrounded by

4      low values.

5          Q.   Okay.  And so just to be very clear, so

6      each blue dot is a block group; is that right?

7          A.   That's correct.

8          Q.   So if I'm -- if my block group is in the

9      top right hand corner of this figure, what's that

10     telling me about that block group's racial -- or

11     what's that telling us?

12         A.   That's telling us that it has a i close

13     to one percent, the highest most upper right part

14     would tell you that it's basically a W VAP percent

15     of one, which means 100 percent white population

16     surrounded by block groups that are also basically

17     100 percent white population.  Then in contrast,

18     the lower left, is telling us basically

19     100 percent black BVAP surrounded by areas that

20     are basically 100 percent BVAP.

21         Q.   Okay.  So --

22         A.   But in terms of the measure, just to

23     clarify, it comes up as a negative value, because

24     it's W VA P percent minus BVAP percent.  So it's a

25     number, the value of WI ranges from minus 1 to 1.

175

1      Q.   All right.  So do you plot the results

2    of this analysis on a map of the state?

3      A.   Yes, I do.

4      Q.   Okay.  So if we could turn to figure 29

5    on page 20.  Can you explain briefly what this

6    figure showing us?

7      A.   So basically this takes the block groups

8    that were shown in the scatter plot, identifies

9    the ones that were found to be significant, and

10   then it plots them in terms of their quadrant

11   locations, so the ones that were in that upper

12   right, high surrounded by high are shown in red.

13   The lower left quadrant were the high BVAP

14   surrounded by high BVAP are shown in blue.

15   They're just characterized a as low value surround

16   bid low, because it's plotting W VAP percent minus

17   BVAP percent.  So the ones of particular interest

18   in terms of clustering of like values are blue and

19   the black here.  High surrounded by high.  Low

20   surrounded by low.

21     Q.   I see.  Just to make sure we get one

22   concept out, you reported a bunch of these as

23   being not significant.  What does that mean?

24     A.   Statistically significant.  It's a

25   measure, but it's also a statistical measure.  One

1    can do a test for the significance level.

2         Q.    I see.  Okay.  So if the red census

3    blocks are high white population surrounded by

4    high white population; is that right?

5         A.    That's correct.

6         Q.    The dark blue, is that high black

7    population surrounded by high black population?

8         A.    Yes, correct.

9         Q.    Got it.  Okay.  How does this -- well,

10   does this figure allow the -- allow you to draw

11   any conclusions about the racial distribution

12   across the State of Louisiana?

13        A.    I believe it does.

14        Q.    Okay.  What conclusion is that?

15        A.    Is that there's considerable segregation

16   or difference in the spacial distribution of the

17   black population and white population in the

18   state.

19        Q.    Okay.

20        A.    Wherein in the rural areas, it's more

21   heavily a white population, and in the

22   concentration of the black population is more in

23   the urban areas, which are admittedly a little

24    difficult to see in this figure.

25        Q.   All right.  How does this analysis

                                                  177


 1    inform your work in looking at communities of

 2    interest?

 3        A.   Because it suggests that there is

 4    spacial clustering.  So to that end, the idea

 5    would be whether some of these spacial clusters

 6    are being split by the associated illustrative

 7    boundaries.

 8        Q.   Okay.  If we look at paragraph 28 on

 9    page 20 of your report, how then did you go about

10    conducting this analysis then in the Senate?

11        A.   So I looked at all the block groups in

12    the state, 4,291 of them as a potential community

13    of interest.  And looked to see whether any of

14    them were being split by the associated

15    illustrative boundaries.  So in this particular

16    case, for the Senate districts, illustrative

17    Senate districts, I found 375 blocks that were

18    being split by the district boundaries.

19        Q.   Did you examine any of those 375?

20        A.   I did examine a couple or more than a

21    handful of 27 total.

22        Q.    Okay.  Why only 27?

23        A.    Because limited time to do this.

24        Q.    Okay.  What is the significance of

25   finding a potential neighborhood split in your

                                                        178


 1   analysis?

 2        A.    So depending upon the characteristic of

 3   block, if it was being split, and that block was

 4   homogeneous in some way and it was relatively

 5   homogeneous to its neighboring area, then that

 6   would suggest that this community of interest oar

 7   a neighborhood was being split by the block

 8   boundaries.

 9        Q.    Okay.  So if --

10        A.    Split by the district boundaries, excuse

11   me.

12        Q.    District boundaries, all right.  If we

13   could turn to figure 30 on page 21.  Is this your

14   list of 27 examples?

15        A.    Yes, it is.

16        Q.    Okay.  Can you very briefly just walk us

17   through what is being shown in this?

18        A.    So the table indicates the individual

19   block that was identified as being split, that

20    subsequently triggered a further evaluation of the

21    local area.  It gives a name of the area

22    approximately, and then it indicates which else

23    districts created the split, and then it gives a

24    characterization of median income, total

25    population, and then educational attainment.  And

                                                              179

1    then the last two control sums are associated with

2    this measure of being used in the evaluation, this

3    W VAP percent minus BVAP percent.  So that value

4    ranges between minus 1 and 1.  And then it gives

5    the local my Rand assessment of it, indicating

6    what kind of relationship, like is it a high

7    surround bid high, or low surround bid allow and

8    level after significance in parenthesis.

9        Q.    Before I move on, Dr. Murray, I notice

10    some significant variability in income and

11    educational attainment across the block groups

12    that you report here; is that right?

13        A.    That's true, yes.

14        Q.    Okay.  And is that surprising to you

15    that there would be significant variability

16    between parts, for example, the income and

17    educational attainment in different parts of New

18    Orleans?

19        A.    Not at all.  There's a lot of spacial

20    variability across the state.

21        Q.    So I just want to very, very briefly go

22    through first of all, do you provide an analysis

23    of each one of the 27 potential splits in Exhibit

24    C to your report?

25        A.    Yes, I do.

                                                      180


1        Q.    Okay.  That's LDTX47; is that right?

2        A.    Yes.

3        Q.    If we stay in your report, those are the

4    ones I want to go through, well the first one.  Go

5    to page 25 and put up figures 33A and 33B.  I'd

6    like for you to orient the Court to this figure.

7    We should probably start with the one on the top,

8    which is 33A.  Can you --

9        A.    Highlighted here in the yellow would be

10    the blocks that were identified in this case

11    there's multiple blocks that were identified as

12    being split.  So it identifies which of those

13    blocks was triggering further analysis, based upon

14    a splitting by direction boundaries.  It provides

15    some orientation of where that is.

16        Q.   Okay.  Where specifically are we looking

17   at here?

18        A.   It's an area referred to as musicians

19   valley, I believe.

20        Q.   Is that in New Orleans?

21        A.   Yes.

22        Q.   We're looking at the Senate; is that

23   right?

24        A.   Yes.

25        Q.   All right.  So I'd like now to turn to

                                                      181

 1   the lower figure 33B.  Maybe we can Zoom in on

 2   that so it's easier to see.  There we go.  All

 3   right.  So can you orient the Court to what --

 4   some shading here.

 5        A.   Yes.

 6        Q.   Can you explain what's going on here?

 7        A.   The shading levels are indicated in this

 8   legend.  What it shows is the W VAP percent minus

 9   BVAP percent.  So the lighter colored would be the

10   negative, more negative values or higher BVAP

11   percent.  So that's what you'd see in the lightest

12   colors, closer towards the hundred percent BVAP in

13   those particular blocks.  So what's being shown

14    here are the blocks.

15         Q.   Okay.  So again those little yellow

16    libraries, those are the census block groups; is

17    that right?

18         A.   Though those are the census block groups

19    that are split, yes.

20         Q.   So what does your analysis in this

21    figure show you about this particular split?

22         A.   So about this particular split, we see a

23    lot of homogeneity in each of those individual

24    blocks that are identified as being split, but

25    also that they are part of a bigger localized area

                                                    182

1    that's very homogeneous in terms of its racial

2    composition but also other characteristics like

3    income and education attainment.

4         Q.   What does the district boundary do to

5    this area?

6         A.   So the district boundary carves it up.

7         Q.   Okay.  Does preserving those groups as a

8    potential community of interest, is this line

9    consistent with such an objective?

10         A.   It does not seem consistent with

11    preserving a community of interest in this

12    particular case, no.

13         Q.   Okay.  Let's just do one more in the

14    Senate.  I'd like to go into that exhibit C.  So

15    if we could go into LDTX47 at pages 26 and 27.

16    Exhibit C14.  This appears -- is this Warner park

17    in Shreveport?

18         A.   I believe it is, yes.

19         Q.   Okay.  And then again if you can

20    starting with the box on the left, Exhibit C14A,

21    can you explain what this is?

22         A.   So again, the highlighted in yellow

23    represent block groups that have been split by

24    district boundaries, and so there's a number of

25    them in this area.

                                                   183


1          Q.   Okay.  And then if we go to C14B.  This

2     is again that chart you have with some color

3     shading.  Can you explain your?

4          A.   Yes.

5          Q.   Your analysis of this?

6          A.   So again shown here are the blocks, and

7     in particular, the racial percentage, the lighter

8     color indicates higher percentage black voting age

9     population.  And there's in general this whole

10  area, it's very homogeneous with respect to racial

11  composition, and a lot of similarity in terms of

12  median income and education Callais containment.

13       Q.   How does the district boundary interact

14  with this potential community of interest?

15       A.   And it looks like in this case that the

16  district boundary does not preserve this as a

17  community of interest, potential community of

18  interest.  It carves it up.

19       Q.   Okay.  Is there a racial effect to

20  dividing this area?

21       A.   I mean, it appears to be in that if one

22  looks at the districts, that these are apparently

23  trying to help achieve majority black districts,

24  so getting that percentage of BVAP where it needs

25  to be where it needs to be a majority district.

                                              184


 1       Q.   If we go -- I think you've already

 2  mentioned this, but do you show similar figures

 3  for each of the 27 potential splits that you

 4  identify?

 5       A.   Yes, I do.

 6       Q.   Okay.  You say beyond the 27, that the

 7  other roughly 350 potential splits that you

8    identify total are not relevant?

9        A.   Not at all.  I only had time to examine

10   the ones that I reported here.

11       Q.   Okay.  So I'd like to turn now to

12   your -- to wrap this up.  If we could turn to your

13   analysis of the house, which I believe is page 26,

14   paragraph 29.  And the -- well, okay.  What can

15   you tell us about your analysis in the house?

16       A.   So similar sort of analysis was

17   undertaken, looking at illustrative house

18   districts, looking at the 4,291 block groups in

19   the state, and in terms of block groups splits or

20   potential neighborhood communities of interest

21   splits, 565 were identified.

22       Q.   And how many of the 565 did you

23   evaluate?

24       A.   I looked at 29.

25       Q.   Okay.  And why only 29?

                                                    185


1        A.   Time limits.

2        Q.   Okay.  Are all 29 examples reproduced in

3    Exhibit D to your report, which is LDTX48?

4        A.   Yes.

5        Q.   Now I'd like to turn on to the figure,

6    figure 34, if we could look at that.  Is this

7    figure reporting statistics for all 29?

8         A.   Yes, it is.

9         Q.   Look at these, you have a lot of them

10   listed in Shreveport.  How many potential

11   neighborhood splits do you report here for

12   Shreveport?

13        A.   Eleven.

14        Q.   Of those, how many involve illustrative

15   house district 1?

16        A.   Looks like seven, maybe eight -- b

17   seven.

18        Q.   Seven, all right.  I'd like to just go

19   through, I think in the interest of time, let's

20   just go through one.  So if we could look at page

21   29.  Okay.  This has figures 36A and 36B.  And is

22   this in the Shreveport area?

23        A.   Yes.  Allendale lake side area.

24        Q.   Okay.  What do you see in your figure

25   36B, what does it show in this?

186

1         A.   So again, it's identifying these block

2    groups that are split by district boundary.  When

3    we look in particular at 36B, what we see is this

4    racial composition that's mostly or very high in

5    BVAP percentage for all of these blocks, and that

6    they're split going through what appears to be a

7    community of interest that's very homogeneous in a

8    number of ways.

9        Q.    Is there a racial effect in the

10   composition of these districts by dividing this

11   area of high BVAP?

12       PLAINTIFF COUNSEL:

13           Objection to the extent this calls for

14       testimony, seeks to find Mr. Cooper's intent.

15       THE JUDGE:

16           Respond?

17       DEFENSE COUNSEL:

18           Yes, Your Honor.  I specifically asked

19       for the effect of the line on a particular.

20       I did not ask the witness to opine as to --

21       THE CLERK:

22           State your name.

23       PLAINTIFF COUNSEL:

24           Josephine Vahn, V-A-H-N.  If I can

25       respond.

                                                    187


1        THE JUDGE:

2          You can go.

3     PLAINTIFF COUNSEL:

4          Mr. Lewis did ask this question

5     similarly a few moments ago.  Dr. Murray did

6     provide Mr. Cooper's intent.

7     THE JUDGE:

8          Overrule the objection.

9     A.   It appears to be done in order to

10    achieve a black majority status for the associated

11    district or districts.

12    EXAMINATION BY DEFENSE COUNSEL:

13    Q.   And in Exhibit D to your report,

14    Dr. Murray, do you show similar figures for each

15    of the 29 splits you identify?

16    A.   Yes, I do.

17    Q.   Okay.  So finally, I know you looked at

18    29, does that mean that the other roughly 535

19    potential splits are not relevant?

20    A.   No.  I only had time to look at a finite

21    number.

22    Q.   So taking a step back from this,

23    Dr. Murray, what do the volume of these potential

24    neighborhoods splits tell us about whether Mr.

25    Cooper's district kept together communities

188

1    comprised of areas with similar socioeconomic

2    status?

3         A.    Doesn't appear to be that it was done

4    with respect to localized communities of interest

5    in this case.

6         Q.    Okay.  And in the roughly 60 potential

7    neighbor splits that you examined, I only went

8    through a few, but in those roughly 60, did you

9    consistently observe any particular attribute

10   around the lines and analysis?

11        A.    Yes.

12        Q.    What was that attribute?

13        A.    Race.

14        Q.    Okay.  And so is it fair to say of those

15   06 splits those were all of communities that were

16   homogeneous both with respect to race and the

17   socioeconomic attributes that you examined?

18        A.    Yes.

19        Q.    And yet they were all being divided; is

20   that right?

21        A.    That's right.

22        Q.    I believe you mentioned this, but what

23   attribute did you consistently observe in the 60

24   potential neighborhood splits?

25      A.   Race.

189


1      Q.   Can you elaborate on that?

2      A.   That in many of the instances that it

3   appears that the boundaries were seeking to

4   achieve some particular racial representation or

5   inclusion.

6      Q.   Okay.  Was there any other apparent

7   explanation for the boundaries that you were able

8   to observe?

9      A.   Not that I could observe.

10      Q.   Okay.

11   DEFENSE COUNSEL:

12          I have no further questions.

13   THE JUDGE:

14          Let's take a break.

15   DEFENSE COUNSEL:

16          This witness does have a 5 p.m. flight.

17   I know that the Court is -- I know we've had

18   a number of -- this witness also is a -- I

19   don't know how long cross-examination is.

20   PLAINTIFF COUNSEL:

21          I can respond Your Honor.

22   DEFENSE COUNSEL:

23          Please.

24     PLAINTIFF COUNSEL:

25          I don't think it's realistic that the

                                                    190


1      witness is going to make a 5 p.m. flight if

2      it's 10 after 3, and I haven't gone back.

3      DEFENSE COUNSEL:

4           Sounds like we're going to be taking a

5      break.

6      THE JUDGE:

7           Taking a 15-minute break.

8           (RECESS 3:09-3:25 P.M.)

9      PLAINTIFF COUNSEL:

10          I'm Josephine Vahn, I'm a lawyer on

11     behalf for the Plaintiffs in this case.  May

12     I proceed with my examination?

13     THE JUDGE:

14          Yes.

15     EXAMINATION BY PLAINTIFF COUNSEL:

16     Q.   Dr. Murray, good afternoon.

17     A.   Hello.

18     Q.   I'm going to ask you a couple of

19     questions.  Dr. Murray, have you been retained by

20     Defendants as an expert witness in this case?

21          A.    Yes.

22          Q.    Has the Court ever disregarded your

23     testimony as it applies to the determination of

24     compactness?

25          A.    No.

                                                    191


1           Q.    Dr. Murray, were you retained as an

2      expert witness in the Robinson V Ardoin case?

3           A.    Yes.

4           Q.    Stephen, if you could pull up and turn

5      to I think it's PDF page 41.

6           Dr. Murray, if you could start reading at the

7      last sentence of the full paragraph beginning with

8      accordingly the Court.   The last sentence, read

9      that, please.

10          A.    "Accordingly, the Court disregards his

11     testimony as it applies to the determination of

12     compactness."

13          Q.    And this is describing your expert

14     testimony in the Robinson case, correct?

15          A.    Yes.

16          Q.    So has a Court ever disregard your

17     testimony as it applies to the determination of

18     compactness?

19          A.   Well, I guess, yes.  It wasn't based

20     upon the same analysis, but yes, I guess so.

21          Q.   So your answer so the record is clear,

22     is a Court has disregarded your testimony as it

23     applies to compactness?

24          A.   Yes.  This Judge did.

25          Q.   And you submitted an expert report dated

192

1     July 28th, 2023, in this case, correct?

2          A.   What was the date again.

3          Q.   July actual 2023?

4          A.   Yes.

5          Q.   And that's what's been previously marked

6     and admitted as LX42, correct?

7          A.   Yes.

8          Q.   You have a copy of that in front of you,

9     correct?

10          A.   Yes.

11          Q.   Do you see on page 2 of your report the

12     section titled spacial analysis undertaken?

13          A.   Yes.

14          Q.   Just so the record is clear, has spacial

15     analysis -- strike that.

16          Just so the record is clear, spacial analysis

17    has never been accepted by a Court and number a

18    political redistricting case, correct?

19        A.    Spacial analysis?  I find that untrue.

20    Looking at a map is spacial analysis.  What's

21    spacial analysis are you referring to;

22    compactness?

23        Q.    Dr. Murray, did you give testimony in

24    the Robinson case as part of your expert

25    designation?

                                              193


1         A.    Yes.

2         Q.    Stephen, can we have the Robinson

3     opinion back up.

4             And Dr. Murray, I'd like to direct your

5     attention, there's going back to page 41, I think

6     it is, of the PDF.  Directing your attention to

7     the highlighted paragraphs, starting with the

8     sentence that's highlighted in fact, Dr. Murray --

9     sorry.  Strike that.  Hang on one second.  Sorry.

10            Beginning with lastly Dr. Murray testified.

11    Can you read that into the record lastly

12    Dr. Murray?

13        A.    "Dr. Murray testified that he is not

14    aware of any Court considering the type of spacial

15    analysis that he performed in the context of the

16    section 2 case."

17        Q.    So are you aware of any Court that has

18    accepted spacial analysis?

19        A.    Spacial analysis is a broad term that

20    applies to thousands of different methods.    The

21    method applied in that case was spacial auto

22    correlation, not spacial analysis.    Spacial

23    analysis is anything and everything.

24        Q.    Dr. Murray my question is:  Do you know

25    any Court that has accepted spacial analysis in

                                              194

1    consideration of an opinion in a section 2 case of

2    the type that you employed in this case?

3        A.    In which case?

4        Q.    The current case, Dr. Murray?

5        A.    The current case.

6        Q.    That you're testifying right now?

7        A.    Spacial analysis is compactness

8    measures, it's any mapping.  Of course the Court

9    has accepted and used these.

10        Q.    Dr. Murray, are you aware of any Court

11    that has accepted the type that you employed

12    moment of inertias you used in this case, in any

13    other redistricting case?

14        A.    Moment of inertia was not applied in

15    Robinson.  I don't know how you're making the

16    connection.

17        Q.    I apologize for confusing you.  In this

18    current case, the Naime versus Ardoin case, on the

19    sixth day of trial, are you aware of any Court

20    that has applied the spacial analysis you

21    undertook and employed in this case in a political

22    redistricting case?

23        A.    Which one?  I already said I applied

24    many different methods.

25        Q.    The moment of inertia test.

                                                        195

1         A.    The moment of inertia, am I aware of it

2    being used in any particular case to date?

3         Q.    In political redistricting case?

4         A.    I know that others testified about using

5    it, so I guess that's a yes.

6         Q.    But you're unaware of any Court that's

7    accepted it, correct?

8         A.    I guess.  I'm not aware, no.

9         Q.    Moving back to your report on page 2, it

10    says that you were retained to evaluate -- and I'm

11    now quoting from your report, aspects of the

12    Cooper report that summarizes the derived

13    illustrative districts as well as the enrolled

14    2022 districts, end quote.

15         Did I read that correctly?

16    A.    That's what I wrote yes.

17    Q.    Did you not perform any RPV analysis in

18    this case, correct?

19    A.    Any what.

20    Q.    RPV analysis?

21    A.    No.

22    Q.    I'd like to talk a little bit about some

23    of the qualification you list in your CV.  Your CV

24    is attached to your expert report at LX42,

25    correct?

                                                        196


1     A.    Yes.

2     Q.    CV attached to your report is the most

3     current and accurate representation of your

4     academic work and your expert work, correct?

5     A.    Correct.

6     Q.    You have not published any academic

7     articles on election law, correct?

8     A.    No.

9    Q.    You have not published any academic

10   articles on electorial redistricting, correct?

11       A.    Correct.

12       Q.    You have not written or published any

13   academic articles on the history of race in

14   southern American states, correct?

15       A.    Correct.

16       Q.    Or politics in southern states; is that

17   correct?

18       A.    Correct.

19       Q.    You have not written or published

20   anything about section 2 of the voting rights act

21   in an academic publication, correct?

22       A.    Correct.

23       Q.    You have also not published any papers

24   on racially polarized voting, correct?

25       A.    Correct.

197

1    Q.    You've never drawn a political or

2    electorial redistricting plans for electorial

3    districts, correct?

4        A.    Correct.

5        Q.    Has any court ever found that you have

6    no background or experience in redistricting?

7        A.    I don't know.  I only served as an

8    expert witness in one case.  I guess you're going

9    to show me something.

10        Q.    Stephen if you can pull up the Robinson

11    opinion 41.

12        If you can begin with, "Dr. Murray has no

13    background," read that into the record?

14        A.    "Dr. Murray has no background or

15    experience in redistricting.  He did not review

16    any of the Plaintiff's illustrative plans, and

17    most notably he testified that he has no basis to

18    disagree with any of the opinions offered by

19    Plaintiffs, plaintiff's experts in this case."

20        Q.    So, Dr. Murray, just to confirm Court

21    has found you have no background or experience in

22    redistricting, correct?

23        A.    Correct.

24        Q.    Dr. Murray, you didn't do your

25    neighborhood split analysis for the enacted plan,

                                              198


1    correct?

2        A.    No, I did not.

3        Q.    You don't how the enacted and

4    illustrative differ with respect to neighborhood

5    splits as you've defined them, correct?

6        A.   Correct.

7        Q.   I'd like move on to discussing your

8    analysis related to this case.  You applied four

9    spacial analysis tests for compactness in this

10   case, correct?

11       A.   Correct.

12       Q.   They were Reock, Polsby Popper, area

13   pooling location, and moment of inertia or MI

14   test; do I have that right?

15       A.   Correct.

16       Q.   Are you aware of any Court that has

17   accepted the moment of inertia measure of

18   compactness in a case involving section 2 of the

19   voting rights act?

20       A.   No.

21       Q.   Are you aware of any strike that.  So

22   Dr. Murray, the moment of inertia test has been

23   around since just after Reock based on your

24   testimony on direct.  But it's never been air

25   condition accepted by a Court, correct?

                                                     199


1        A.   Did you say -- could you repeat the

2    question?

3          Q.    Yes.  So you just testified that you're

4    not aware of any Court that has accepted the

5    moment of inertia as a measure of compactness,

6    correct?

7          A.    Correct.

8          Q.    So even though the moment of inertia as

9    a measure of compactness has been around since

10   just after Reock, it's never been accepted by a

11   Court, correct?

12         A.    But that's not true.  It's been around

13   since potentially the 1700s, so.

14         Q.    Fair enough.  I'll rephrase my question.

15   You testified earlier that the -- that Reock --

16   I'm sorry.  You testified earlier that Polsby

17   Popper was a technique first developed in the

18   1800s, and credited to Reock in 1961, correct?

19         A.    I believe that's correct.

20         Q.    And you then testified that moment of

21   inertia is becoming more widely used but has been

22   around Weaver and behest, in 1963 correct?

23         A.    Correct.

24         Q.    So moment of inertia has been around

25   since just after Reock, or credited just after

                                                    200

1    Reock, but it's never been accepted by a Court; is

2    that correct?

3        A.    Well, Weaver and Hess was 1963.  Oh, I

4    see what you mean.  I guess.  I'm not sure.

5        Q.    I'd like to spend some time discussing

6    your expert report from July 2023.  In your

7    report, you say that, I'm going to quote, measures

8    of compactness are rather simple proxy for the

9    shape of a political district.  You go on to say a

10   little bit later, there is weak agreement between

11   the often used Reock and Polsby Popper metrics, do

12   I have that correct?

13       A.    Correct.

14       Q.    Reock and Polsby Popper --

15   THE CLERK:

16            Can you slow down a little bit.

17   PLAINTIFF COUNSEL:

18            Sorry.  So eager to get through this.

19   EXAMINATION BY PLAINTIFF COUNSEL:

20       Q.    Reock and Polsby Popper are two ways to

21   test area -- to test compactness of an area,

22   right?

23       A.    Yes.

24       Q.    There's no one standard test to assess

25   the compactness of an area, correct?

1        A.    Correct.

2        Q.    The Court has heard testimony that Reock

3   and Polsby Popper are two most commonly referenced

4   scores by experts and state legislatures.  Would

5   you agree with me with that statement?

6        A.    I would not disagree.

7        Q.    In your report, you state that, quote,

8   the utility of spacial auto correlation is that it

9   enables detection of areas that are similar in

10  terms of one or more characteristics, such as

11  race, socioeconomic characteristics, educational

12  statement, et set A. do I have that correct?

13       A.    Educational attainment, yes, et cetera.

14       Q.    Things.  Looking at pages 4 to 9 of your

15  report, am I correct that your significant

16  findings Numbers 1 through 12 all relate to Mr.

17  Cooper's use of the incorrect boundaries for the

18  enacted house and Senate plans?

19       A.    1 through which one?

20       Q.    12.

21       A.    I would say that's probably correct.

22       Q.    Are you aware that Mr. Cooper filed a

23  corrective report in which he analyzed the correct

24    enacted house and Senate plans?

25         A.   Yes, I am.

                                                    202


 1         Q.   Did you review that report?

 2         A.   Yes, I did.

 3         Q.   You provided no reporting offered no

 4    opinions concerning Mr. Cooper's corrected report,

 5    correct?

 6         A.   Correct.

 7         Q.   I'd like to turn now to discussing some

 8    Louisiana legislature requirements.  Are you aware

 9    that Louisiana strike that.  Are you aware that

10    the Louisiana legislature periodically issues new

11    boundary files from voter tabulation districts?

12         A.   Now I am.

13         Q.   Are you aware that those are different

14    than the VDT boundaries issued by the census?

15         A.   If what you're saying is true, I guess

16    now I am.

17         Q.   Do you use the use updated VDT boundary

18    in your analysis of VDT splits, correct?

19         A.   Correct.

20         Q.   And Mr. Cooper reported splits based on

21    census VDT boundaries, correct?

22        A.    I'm not sure about that.

23        Q.    Direct your attention to figure 7 and

24   figure 15 of your report and if you could get

25   those on the screen.  Figure 7 is on page 9.  And

                                                          203

1    figure 15 is on page 13.  Dr. Murray, these

2    figures concern Mr. Cooper's compactness scores

3    for respectively the Senate and house plans,

4    correct?

5         A.    Correct.

6         Q.    You analyze these figures in your 13th

7    and 20th significant point of your report; is that

8    a correct statement?

9         A.    Correct.

10        Q.    And in your report, you criticize Mr.

11   Cooper's report and state that there were quote

12   observed errors, end quote, that were quote,

13   somewhat significant as the Cooper report attempts

14   to make a detention of the differences at the

15   hundreds level comparing in role versus

16   illustrative districts.  Is that a correct

17   restatement of your work?

18        A.    Yes.

19        Q.    Is it your opinion that differences in

20  Reock and Polsby Popper scores at the hundredth

21  level are not significant?

22      A.   I would say that's true.

23      Q.   I next want to walk through your

24  significant findings 14 and 15 with respect to the

25  Senate, and the second part of finding 20 and 21.

                                                    204


1  Here you state that Reock and Polsby Popper

2  measures of compactness don't necessarily agree,

3  correct?

4       A.   Correct.

5       Q.   By that you mean that some districts may

6  be more compact under one measure and less compact

7  under another, correct?

8       A.   Correct.

9       Q.   You would agree that Reock and Polsby

10  Popper measure different things, correct?

11      A.   The way they measure compactness is

12  different, yes.

13      Q.   Because one is based on area, and one is

14  based on perimeter, right?

15      A.   Correct.

16      Q.   For that reason, you would agree it

17  would be useful to look at both of them, correct?

18          A.   Sure.

19          Q.   Earlier in agreement with Mr. Trende

20     Reock and Polsby Popper are the two common I

21     reference referenced scorns by state lugs toker,

22     correct?

23          A.   Sure.  Yes.

24          Q.   Turning to significant findings 16 and

25     22.  Here you report the moment of inertia scores

                                                  205

1     for the enacted and illustrative Senate and house

2     plans, correct?

3          A.   Yes.

4          Q.   Like Polsby Popper and Reock's moment of

5     inertia score ranges, from 0 to 1, correct?

6          A.   Correct.

7          Q.   And 1 is the most compact shape,

8     correct?

9          A.   Correct.

10          Q.   And you report the MI scores to the

11     hundredths place; is that right?

12          A.   I believe that's correct, yes, that's

13     true.

14          Q.   And using the moment of inertia measure,

15     you oppugned Mr. Cooper's illustrative plan is

16    lightly more compact than the enacted plan,

17    correct?

18         A.    Correct.

19         Q.    You opine that Mr. Cooper had made a

20    similarly compact to the plan using the moment of

21    inertia measure, correct?

22         A.    The illustrative plan?

23         Q.    Yes.

24         A.    The house plan?

25         Q.    Yes.

                                                    206


1         A.    Is that you mean?

2         Q.    Yes.

3         A.    Yes.

4         Q.    You would agree wouldn't you that

5    regardless of whether you are looking at Polsby

6    Popper Reock or moment of inertia, Mr. Cooper's

7    illustrative plans are an average as compact as or

8    more compact than the corresponding enrolled

9    plans, right?

10         A.    I would agree.

11         Q.    I next like to discuss figures 30 and

12    34.  In figures 30 and 34, you split what you

13    describe as quote potential neighborhood splits,

14    unquote.  Do I have that right?

15        A.    Yes.

16        Q.    These are based on splits of census

17    block groups, correct?

18        A.    Yes.

19        Q.    And these are based on selected sample,

20    correct?

21        A.    Correct.

22        Q.    These you did not run all 500

23    iterations?

24        A.    I did not have time to do digital

25    analysis of all.

207

1        Q.    So yes, you did not run all 500

2    iterations, correct?

3        A.    Correct.  They're not iterations, but

4    correct.

5        Q.    Are you familiar with Louisiana lug

6    sure's joint rule 21?

7        A.    No.

8        Q.    Are you aware that the lug sure's

9    redistricting create laid out in rule 21 requires

10    quote, under rule 21G, each district submitted for

11    consideration should contain whole election

12    precincts as those are represented as voting

13    districts or VDTs in the most recent census

14    redistricting.  Shape files for the State of

15    Louisiana, which corresponds to the data released.

16    If a VDT must be divide, it shall be divide intoed

17    a few districts as practical, using census

18    tabulation boundary.  Are you aware of that?

19        A.   Now I am, yes.

20        Q.   But you weren't before I asked my

21    question, right, Dr. Murrayay?

22        A.   I'm not sure if I read this or not

23    before, to be honest.

24        Q.   You're unsure if you've read joint rule

25    21 before?

                                                    208


1         A.   I may have seen this in the past.  I'm

2    not sure.

3         Q.   We can pull up Dr. Murray's deposition.

4    Dr. Murray, did you provide a deposition as part

5    of this case?

6         A.   Yes, I did.

7         Q.   If we can turn to page 115, looking at

8    lines 24 and 25.  Question:  Are you familiar with

9    joint rule 21?  Answer:  That you provided, no.

10          So Dr. Murray, are you familiar with the

11    criteria as laid out in joint rule 21.

12          A.   Well, in terms of the verbiage of joint

13    rule 21, I'm not necessarily sure that I haven't

14    seen that before.  That's a fact.  Am I familiar

15    with joint rule 21 as an entity, no.  But whether

16    I've been shown some of that verbiage, I can't say

17    that I haven't seen that.

18          Q.   We'll move on.  You acknowledge in your

19    report that quote the illustrative district

20    generally maintain voting district boundaries and

21    recognize places of interest; is that correct?

22          A.   I think that's correct.

23          Q.   Similarly language appears in

24    significant finding 29 with respect to the house,

25    correct?

                                                      209


1           A.   I believe so, yes.

2           Q.   You would agree that in some instances

3     keeping a voting district whole might require

4     splitting a block group?

5           A.   It could potentially, yes.

6           Q.   Where a block group and a voting

7     precincts intersect, for example, would be one

8    instance where keeping a voting district whole

9    might require splitting a block group; do I have

10   that right?

11       A.   Could be, yes.

12       Q.   And your report includes no analysis of

13   whether the splits of block groups you identify

14   follows voting district boundaries, correct?

15       A.   That's correct.

16       Q.   I'd like to now discuss figure 32B.  If

17   we can have that on the screen.  Thank you,

18   Stephen.  Clusters are correlated with the

19   political entities or municipal boundaries,

20   correct?

21       A.   Could you repeat?

22       Q.   Clusters are correlated with the

23   political entities or municipal boundaries, right?

24       A.   In this case, the cluster in terms of a

25   block group that's being looked at is just a block

                                                    210


1    group.

2        Q.   I think we're showing 33B.  I mean to

3    talk about 32b.  Give us one second.  I'll ask my

4    question again, Dr. Murray.  So in looking at 32B,

5    clusters are correlated with the political

6   entities or municipal boundaries, right?

7       A.   I don't understand what that question

8   means.

9       Q.   Let's move on to figure 33B.  This

10  figure doesn't show voting district boundaries,

11  correct?

12      A.   No, date us not.

13      Q.   You don't know where the voting district

14  boundaries are, right?

15      A.   In this case, I do not no.

16      Q.   You don't know whether the district

17  boundaries follow a voting district boundary,

18  correct?

19      A.   In this case, I already said I don't

20  know.

21      Q.   And that's true of all the figures

22  showing the 27 block group split; is that correct?

23      A.   I did not produce figures showing the

24  voting district boundaries, no.

25      Q.   So just so the record is clear, it's

                                                211


1   true that you're not aware of whether the district

2   boundary follows the voting district bound roarie

3   across all 27 block group splits, correct?

4        A.    Correct.

5        Q.    Liked to move now to discuss significant

6   finding 29 in which you state that quote race

7   appears to have predominated over maintaining

8   neighborhoods in many instances.  Is that a

9   correct reading of your report?

10       A.    Which paragraph?

11       Q.    Significant finding 29.

12       A.    Yes.

13       Q.    Would you agree with me that land values

14   drive who can live where?

15       A.    I think that's true.

16       Q.    Would you agree with me that income

17   measures reflect land values?

18       A.    That's probably true.

19       Q.    Is it the same with education?

20       A.    To a degree, certainly, higher education

21   for higher income groups is known to be true.

22       Q.    Significant finding 29, this simply

23   reflect segregates patterns rather than race

24   predominating over maintained neighborhoods,

25   correct?

                                                    212


1        A.    May be one explanatory factor.

2        Q.    I'd like to move to the findings you

3    made in your summary.  Using block groups rather

4    than municipal boundaries, changes the

5    arrangements and therefore recasts the data,

6    correct?

7        A.    Using block groups is different than

8    municipal boundaries, is that your question?

9        Q.    Yes.

10        A.    Of course.

11        Q.    Changing the size shape or orientation

12    of a polygon reassigns individual observes to new

13    groups, correct?

14        A.    Not sure what you mean by that.

15        Q.    We can come back to that.  A change in

16    the size of the units across mapped region changes

17    their numbers,correct?

18        A.    Again, I'm not sure what you mean by

19    that.

20        Q.    Got a couple more questions for you,

21    Dr. Murray.  Are you aware of the of race

22    composition in section 2 cases?

23        A.    No.

24        Q.    Are you familiar with the case ash croft

25    V Georgia?

213

1        A.    No.

2        Q.    Would you agree with the quote that if

3    one is drawing a voting district, that voting

4    district needs to be reasonably compact, a

5    reasonably shaped that must be contiguous, unless

6    water is involved to respect communities of

7    interest to meet one person one vote requirements

8    and be plus or minus 5 percent in the state

9    legislative plans in the State of Louisiana?

10        A.    What about it?

11        Q.    Would you agree with me with that

12    statement?

13        A.    That sounds like a common redistricting

14    type of criteria.

15        Q.    Just so the record is clear, you would

16    agree with that statement?

17        A.    I don't know that I agree or disagree.

18    It's a statement.  What am I supposed to agree to?

19        Q.    So you just said --

20        A.    I agree that it's a statement.  You.

21        Q.    You agree it's a common redistricting

22    principle, correct?

23        A.    Correct.

24        Q.    Focusing on figure 15, which is on page

25   13 of your report.  Dr. Murray, did you add the

214

1   percentages in this table and arrive at a mean or

2   average?

3        A.   Did I compute the means in this case?

4   EXAMINATION BY PLAINTIFF COUNSEL:

5        Q.   No.  My question is, did you add the

6   percentages in this table and arrive at a mean or

7   average?

8        A.   Not sure what you mean by that question.

9        Q.   Dr. Murray, would you agree that

10   measuring compactness inside of illustrative

11   district is not a requirement under the current

12   Gingles one standard?

13        DEFENSE COUNSEL:

14            Objection; calls for legal conclusion.

15        THE JUDGE:

16            You want to respond.

17        PLAINTIFF COUNSEL:

18            He's testified about measuring

19        compactness for the last three hours.  I

20        think he's sufficiently able to --

21        THE JUDGE:

22            You're asking him whether or not it's a

23      standard under a United States supreme Court

24      case.

25      PLAINTIFF COUNSEL:

215

1           I can rephrase.

2       THE JUDGE:

3           Rephrase.

4       Q.   Dr. Murray, would you agree that

5   measuring compactness inside illustrative district

6   is not a requirement under current redistricting

7   requirements?

8       A.   I don't know that I agree to that at

9   all.  I don't know what that means.  I'm not aware

10  of such a standard.

11      Q.   Dr. Murray, would you agree that Reock

12  and Polsby Popper are industry de facto?

13      A.   That seems like a reasonable statement.

14      Q.   In fact, you would agree that they are

15  the most broadly used tests in redistricting

16  cases, correct?

17      A.   That I'm aware of, that seems to be

18  true, yes.

19      Q.   Did you perform any analysis to consider

20  among other factors the history of voting

21    discrimination in the state's plans and districts

22    you examined?

23         A.   No, I did not.

24         Q.   With we pull up figure 28 from

25    Dr. Murray's report.  There was some back and

                                                          216


1    forth on direct with you and Mr. Lewis about what

2    figure 28 shows.  Just so I understand, figure 28

3    tells us the population of Louisiana is highly

4    segregated?

5         A.   In 28?

6         Q.   Yes.

7         A.   This doesn't show it spacially, but it

8    suggests that there are in fact clusters of high

9    values here in this case it's white percentage

10   surrounded by similarly defined area characterized

11   areas, and then areas where high percentage of

12   black VAP is surrounded by other areas of high

13   black voting age population.  This figure does

14   summarize that, yes.

15        Q.   Just so the record is clear, this

16   scatter plot in figure 28 shows that the State of

17   Louisiana is highly segregated?

18        A.   It shows that there are instances, yes,

19    significant clusters.  It doesn't show it

20    spacially, but it suggests because of how they're

21    plotted is that it's a value of one block group in

22    relation to its neighbor.

23         Q.   Just one moment, Your Honor.

24         PLAINTIFF COUNSEL:  No further questions for

25         this witness.

                                                    217


1         THE JUDGE:  Redistrict.

2    EXAMINATION BY DEFENSE COUNSEL:

3         Q.   Your Honor, Patrick Lewis for

4    Defendants, very briefly.  Dr. Murray, are you

5    aware of a Court that has rejected the moment of

6    inertia method?

7         A.   No, I am not.

8         Q.   Okay.  And can Polsby Popper and Reock

9    be used to measure the compactness of a population

10    as compared to a district boundary?

11        A.   No, they cannot.

12        DEFENSE COUNSEL:

13             I have no further questions, Your Honor.

14        THE JUDGE:

15             You may step down.  Thank you.

16             It's 4 o'clock.  By our prior schedule

17          that we set at the pretrial conference, we're

18          going to close for the afternoon.  We do have

19          an issue for tomorrow.  Has anything changed

20          Suzie?  We only have a court reporter from 10

21          to 2.  We didn't make the arrangements, I

22          mean, I'm not going to explain why.  Just

23          know that it was not intentional, and that we

24          did everything we could.  So what we'll do is

25          we'll commence at 10 o'clock sharp, and we'll

                                                          218


1           take two 15 or 20 minutes breaks between 10

2           and 2.  So bring a power bar or smoothie or

3           something, we're not taking a lunch break, go

4           straight from 10 to 2.  Any chance we're

5           going to finish tomorrow, counsel?

6           DEFENSE COUNSEL:

7                Your Honor, for Defendants, we have one

8           more witness.  And I think --

9           THE JUDGE:

10               The last expert?

11          DEFENSE COUNSEL:

12               Yes, Dr. Lewis.

13          THE JUDGE:

14               Yes.

15    DEFENSE COUNSEL:

16        I think we're resting, and I can't speak

17    for the Plaintiffs.

18    THE JUDGE:

19        Any concept on rebuttal?

20    PLAINTIFF COUNSEL:

21        I think we are certainly hopeful that we

22    could wrap up tomorrow.  Not sure if Your

23    Honor is open to continuing for a little

24    longer tonight to start into their next

25    witness, but I believe both of the parties

219

1    have represented that they're available that

2    would be helpful to the Court in trying to

3    wrap up tomorrow.  It will depend on how long

4    Dr. Lewis if we can finish our testimony

5    tomorrow.

6    THE JUDGE:

7        I'm amenable.  Let me poll my staff.

8        Okay.  We can go until 5.

9    PLAINTIFF COUNSEL:

10        Thank you, Your Honor.

11    THE JUDGE:

12        Call your next witness.

13        DEFENSE COUNSEL:

14            We call Dr. Jeffrey Lewis to the stand.

15        (WITNESS SWORN).

16        THE CLERK:

17            State your name and spell it for the

18        record.

19        THE WITNESS:

20            My name is Jeffrey Lewis J-E-F-F-R-E-Y,

21        L-E-W-I-S.

22    EXAMINATION BY DEFENSE COUNSEL:

23        Q.   Thank you.  Your Honor, may I approach

24    with water?

25        THE JUDGE:  Yes.

                                                        220


1        DEFENSE COUNSEL:  Kate McKnight on behalf of

2        legislative intervenors.

3    EXAMINATION BY DEFENSE COUNSEL:

4        Q.   Good afternoon, Dr. Lewis.

5        A.   Good afternoon.

6        Q.   What is your role in this matter?

7        A.   I've been retained by defense counsel to

8    analyze patterns of voting in races, in Louisiana

9    related to this litigation.

10       Q.   Let's pull up two exhibits, LDTX52, and

11    LDTX54.  Dr. Lewis, what are these?

12          A.    These appear to be the two reports that

13    I filed in relation to this proceeding.

14          Q.    Okay.  Let's focus on LDTX52 and turn to

15    page 8.  Let's turn one page to page 9.  Is this

16    your CV?

17          A.    Yes.

18          Q.    Is it up to date?

19          A.    I believe so.

20          Q.    Okay.  Let's keep this up for just a

21    moment.  What is your educational background?

22          A.    I earned my bachelor of arts in

23    political science and economics from Westlake

24    university, my Ph.D. in political science from

25    MIT.

                                                        221


1          Q.    What is your academic experience?

2          A.    I'm currently professor of political

3    science at the university of California Los

4    Angeles, which I joined in 2001.  Prior to that I

5    was assistant professor of politics in public

6    policy at Princeton university.

7          Q.    Have you served in leadership roles in

8    the fields of political Methodology or political

9   science?

10      A.   Yes, I am past president of the society

11   for political method injure, which is the learned

12   society for folks that study the application of

13   quantitative data, it's questions in political

14   science.  I've also been an editor of the American

15   political science review, which is the flag ship

16   journal of political science.  I'm past chair of

17   my department.

18      Q.   And what are your teaching interests

19   relevant to this case?

20      A.   My teaching at the moment is focused

21   largely on graduate training in quantitative

22   methods.  And some part of that at least is

23   dedicated to studying ways in which administrative

24   records and other data can be used to infer data

25   intention, factors.

                                                    222


1      Q.   Let's turn to pages to the next page,

2   page 2 of your CV through 4.  Is this where your

3   publications are listed in your CV?

4      A.   Yes.

5      Q.   Okay.  And are any of these publication

6   peer reviewed?

7       A.   I believe them to all be peer reviewed,

8    yes.

9       Q.   Let's turn to page 3.  Let's turn to

10   page 4.  Okay.  Have you been retained as an

11   expert in cases about the topics of political

12   science, quantitative methods and racially

13   polarized voting analyses?

14      A.   I have.

15      Q.   Let's turn back to page 2 of your

16   report, so that the report, and look at paragraph

17   2.  Is this where you list past cases?

18      A.   Yes.

19      Q.   Have you ever been disqualified by a

20   Court from testifying as an expert?

21      A.   I have not.

22      DEFENSE COUNSEL:  Your Honor, at this time,

23      weed like to move for the acceptance of

24      Dr. Lewis as an expert in the fields of

25      political science, quantitative methods, and

                                              223


1       racially polarized voting analysis.

2       THE JUDGE:

3            Cross on the tender?

4       PLAINTIFF COUNSEL:

 5          Good afternoon, Your Honor, Sarah

 6     rohaney.  No objections.

 7     THE JUDGE:

 8          Dr. Jeffrey Lewis will be admitted to

 9     give opinion testimony in the fields

10     identified.

11     DEFENSE COUNSEL:

12          Your Honor, at this time as well based

13     on stipulations by the parties, we'd like to

14     move for admission of his two expert reports

15     served LDTX52 and LDTX54.

16     PLAINTIFF COUNSEL:

17          No objection Your Honor.

18     THE JUDGE:

19          Admitted.

20     EXAMINATION BY DEFENSE COUNSEL:

21     Q.   Dr. Lewis, what kind of analysis did you

22     conduct in your first report in this matter?

23     A.   The bulk of the analysis involved the

24     application of so called especially logical

25     inference methods to infer from precinct levels

                                                224


 1     voting returns and voter registration records, the

 2     fraction of voters who are identified on the voter

3    registration roles as black, white and other, who

4    supported candidates for office in the contests

5    analyzed in each of the districts analyzed.

6        Q.    Did you apply a particular method of EI

7    to conduct this analysis?

8        A.    Yes.  I used method of EI that as goes

9    by various different names.  But it's the one

10   which allows the estimation of the support for

11   multiple candidates by multiple groups.  So I

12   would refer to it by its formal title, which is

13   multi ***nomial dersway** ecological inference.

14       Q.    Did you review reports from this

15   Plaintiffs Dr. Lisa Handley?

16       A.    I've seen those reports, yes.

17       Q.    In your analysis, did you use

18   Dr. Handley's data?

19       A.    Yes, I believe I did.  The way in which

20   I received the data was via an intermediary, Clark

21   Benson of poll data.  It has been represented to

22   me that the data are those data that were

23   originally provided by Dr. Handley.

24       Q.    The data that was provided by

25   Dr. Handley, did it include contests other than

                                                    225

1    statewide down ballot elections involving black

2    candidates?

3         A.   Yes.

4         Q.   I'd like to ask you about the analysis

5    you conducted as compared to the analysis that

6    Dr. Handley conducted in this matter.  First, what

7    question are you and Dr. Handley trying to answer

8    for the Court?

9         A.    I think the questions that are at issue

10   here, again, are what is the level of support,

11   whats the level of cohesion, I should perhaps say,

12   the degree to which black voters support the same

13   candidate in elect to really contests.  Second,

14   the degree to which white voters vote for that

15   preferred candidate of black voters.  And that's

16   sort of the I think, you know, referred to in this

17   area often as cross over.  So what white voters,

18   under the assumption maybe that we're speaking of

19   a is situation in which the preferred or,

20   different.  What fraction of white voters cross

21   over to support the candidate preferred by black

22   voters.  So try to estimate those quantities.  And

23   then using those quantities and other features of

24   the contest, to make some inference about whether

25   a particular district might elect a black

1    candidate of choice, and what might be required in

2    terms of the composition of that district or area

3    in the state that would be again required to elect

4    a black cabbed at that time -- candidate of

5    choice.

6         Q.   Does the issue of turn outcome into play

7    in your analysis?

8         A.   Yes.

9         Q.   How so?

10        A.   Well, you know, in -- all this is of

11   course difficult, because these are -- the facts

12   that we're asked to talk about here can't be

13   directly observed because of the secret ballots.

14   So we can't know the fraction of folks of

15   different races who score different candidates.

16   But we could estimate that.  And if we knew the

17   composition of the folks that voted a particular

18   election, it would be relatively straightforward

19   to figure out what fraction you would need of that

20   area to be black or white in order to achieve

21   50 percent say support for the black preferred

22   candidate or something like that.  That's a

23   relatively easy calculation.  What complicates

24  that a little bit is that what the composition of

25  the folks who vote is on a particular election,

227

1   and the composition of the populations that going

2   to provide that mix of black and white voters.

3   Depends on whether voters of each race turn out at

4   different levels or the same level.

5        Q.   Is it fair to say that you -- both you

6   and Dr. Handley are trying to estimate future

7   voting behavior based on past election results?

8        A.   Yes, that's right.  And of course, as

9   they say in all the financial perspective reports,

10  the past may not be indicative of the future.  But

11  that's what we have to go on, is trying to

12  extrapolate, basically, from elections, maybe for

13  different offices, held at different times and

14  different context, and used as to make some sort

15  of conclusion about what might occur; although the

16  amount of uncertainty is obviously.

17       Q.   I understand you testified in past cases

18  on the issues at play in this case.  The types of

19  analyses that you and Dr. Handley did in this

20  case, have you seen those conducted in past cases

21  on voting rights act cases?

22        A.    Yes.

23        Q.    So we've talked a little bit about the

24   common question you're trying to say.  Now liked

25   to better understand where you and Dr. Handley may

228

1    differ in what type of an analysis you conducted

2    here.  So for your part, what type of analysis did

3    you conduct to answer this question?

4        A.    Well, in addition to the ecological and

5    French Quarter analysis in estimation of the

6    support among the different groups for each

7    candidate in identifying the minor any preferred

8    candidate so forth and so on, I also looked at the

9    question of whether there was, I guess what you

10   might call legally you might call the opportunity

11   to elect.  I'm not going to speak to what the

12   threshold for that is.  That's effectively the

13   question is, you know, what would the -- would

14   this particular district provide opportunity,

15   would the candidate of this preferred by black

16   voters in each district have annuitant elect, and

17   that opportunity, I take to be sort of increasing

18   in the -- indicated by increasing an ounce of

19   success in past elections as we can reconstruct

20    them.  So there are sort of two ways to think

21    about that.  One way, I think, both Dr. Handley

22    did do, which is kind of sometimes called a

23    reconstructed election analysis, where you think

24    about suppose that various other elections that

25    maybe were statewide elections or elections for

229

1    house of representative or whatever they might be,

2    that were held in the same precincts that are

3    employed in a particular election math that might

4    be implemented.  You could ask the question, well

5    if this election had only taken place in those

6    precincts, who would have won, how much support

7    would that candidate have won have gotten.  The

8    other thing that you could do is you could ask a

9    slightly different question, which is if you said,

10    well, given what we know, what we estimate, so I

11    shouldn't say know, because again we're just

12    estimating.  There's a lot of uncertainty.  The

13    rate of cohesion to be, what we estimated the

14    cross over voting to be, what we observed the

15    level of turn out to be, we can ask holding all of

16    that constant, what demographic composition of the

17    population would you need in order to create say

18    an equal chance of the black preferred candidate

19    running.

20         Q.    This second type of analysis you just

21    described, is that referred to as a percent needed

22    to win analysis?

23         A.    You could call it that, yes.

24         Q.    Did Dr. Handley conduct a percent needed

25    to win analysis in this case?

                                                        230

1         A.    I don't believe so.

2         Q.    Okay.  And do you know if Dr. Handley is

3    familiar with the percent needed to win analysis?

4         A.    I don't know if she would use that name

5    or not, but the technique is something that she

6    and some co authors introduced in the literature.

7         Q.    Okay.  So what kind of analysis did

8    Dr. Handley conduct in this case?

9         A.    I believe that what she did was sort of

10    similar with respect to estimating the race and

11    support for different candidates.  I don't think

12    she applied that district by district, but in

13    larger aggregates, and then I think the second,

14    which is different from what I did, but again

15    broadly similar, and then the second thing that I

16    think she did is the reconstituted or

17    reconstructed, if you like, election method to

18    calculate the fraction of times in the races

19    considered the minority candidate quote unquote

20    won that election.

21        Q.   What did the two types of analysis

22    provide the Court; recompiled election results on

23    the one hand and the percent needed to win on the

24    other BVAP?

25        A.   So again, I think both of them speak to

                                                    231

1     this question of whether the black preferred

2     candidate in a particular district will have a

3     chance of winning election.  So the candidates,

4     those voters had a chance to elect the candidate

5     of their choice.  One of them, again sort of takes

6     as given, the district that's drainage it just

7     sort of says how this district at this level

8     performed, tries to estimate that quantity.  The

9     second, I think, tries to go maybe a little bit

10    beyond that and asks the question, asks the

11    question sort of what would you need to get to get

12    performance; did you need a value that was as high

13    as the one that was built, or do you need one

14    that's higher or lower.  But both cases you really

15    asking a related question.

16        Q.   Is it your understanding that you as an

17    expert preparing an analysis in a case like this,

18    should not conduct a percent need the to win

19    analysis on districts that are already drawn?

20        A.   I think in a certain sense you could

21    only perform such analysis on districts that were

22    already -- drawn, already set forth stipulated.

23    Yes, so I'm not sure how you could perform an

24    analysis on districts that hadn't been drawn.

25        Q.   At a high level, what does the percent

                                                    232


1    needed to win analysis take into account?

2        A.   Again, it takes into account the level

3    of -- in this case, black voter cohesion, cross

4    overby white voters, also, what we might refer to

5    as crossover voters that may live in that

6    district, as well as differences in turnout in the

7    election.

8        Q.   Does it also take into account

9    demographic composition?

10       A.   Yes.  You're manipulating the

11    demographic composition when asking the question,

12    you know, how would this district perform if you

13    like at different levels of black VAP.

14         Q.   Did you run the calculations for your

15    percent needed to win analysis by hand?

16         A.   No.

17         Q.   Is it all automated?

18         A.   Yes.  It's all scripted.  So queries are

19    made of the database, and then the algorithms are

20    plied to the subset for a particular district in

21    combination with district contest, and then the

22    summary statistics are generated.

23         Q.   About how many combinations were at

24    issue here?

25         A.   There are I think in total, the -- I

                                                      233


1    sound say we.  There's really just me and my

2    computer.  We probably estimated the support for

3    different candidate contest, district combinations

4    in the tens of thousands.

5         Q.   Okay.  Let's pull up what have been

6    labeled demonstrative Defendants 1 through 4, Your

7    Honor, these were exchanged prior to today with

8    Plaintiff's counsel per our agreement.  I have

9    paper copies.  Would you like a paper copy, Your

10    Honor?

11         THE JUDGE:

12              Yes.  Are these used illustratively, or

13         are you going to introduce them evidence?

14         DEFENSE COUNSEL:

15              We'd like to introduce them into

16         evidence.

17         THE JUDGE:

18              I just wanted to know what we were

19         looking at here, that was Judge.

20    EXAMINATION BY DEFENSE COUNSEL:

21         Q.   Dr. Lewis, would it be helpful to have a

22    paper copy on hand?

23         A.   I think we can go from the screen.  I'll

24    let you know if that changes.

25         Q.   Dr. Lewis, briefly, could you tell the

                                                    234


1     Court what these tables are and where the

2     information comes from?

3          A.   Right.  So these are subset of the

4     results that are provided in my original report in

5     tables, corresponding to table Numbers that are

6     the same in that reporter.  So table 1 is subset

7     here is subset of the rows of table 1 in that

8    original report, table 2, 3, so forth as we move

9    threw.

10        Q.    So if I were to look at your report, all

11    this information is in your report, this is just

12    select pieces of that information; is that fair?

13        A.    Yes, I believe so.

14        Q.    Let's look at the first column.  It says

15    district.  There are two categories, state house

16    and state that.  Could you just start by

17    explaining the nomenclature here for the Court?

18        A.    Yes.  I used this shorthand because I

19    looked at directions both at the enacted plan and

20    also illustrative plans that were offered in 2022

21    and in 2022.  I used a number of system that helps

22    me keep straight which is which.  H is refers to

23    house Senate.  S Senate district.  23 refers to

24    the 2023 illustrative districts, and then the

25    numbers are the district numbers the numbers that

                                                    235


1    follow the dash.

2        Q.    So did you understand that the 2023

3    illustrative districts were illustrative districts

4    for those by -- proposed by Plaintiff's expert Mr.

5    Cooper?

6      A.   Yes, that's my understanding.

7      Q.   Do you understand that the districts

8   indicated in these tables in the first column are

9   the new majority minority districts pro peed by

10   Plaintiffs in this case?

11      A.   That's how they've been represented to

12   me, yes, I believe that's true.

13      Q.   These district numbers are for the

14   record, past district 1, 23, 38, 60, 65, 68, and

15   69.  And Senate districts 17, 19, and 38; is that

16   right, Dr. Lewis?

17      A.   Yes.

18      Q.   Okay.  And I see we have four tables

19   here.  Are those the same districts in every

20   table?

21      A.   I believe so, yes.

22      Q.   Now, I appreciate this is a Alexandria

23   solve districts.  If you wanted to look at the

24   results of your analysis for any district, not

25   listed here, that you were able to an nice, could

                                                236


1   you just turn to your expert report in this case?

2      A.   I could for those districts that I

3   analyzed.

4          Q.   Okay.  Can we walk through, I'd like to

5    understand the difference between the tables.  So

6    could we start with just the header of table 1,

7    and explain, and then we'll move on to table 2, 3,

8    4.  So for table 1, what does this show the Court?

9          A.   Hero we're focusing on just elections

10   for offices that were in the what you might call

11   the primary election stage, which for these

12   contests which are nonpresidential elections in

13   Louisiana, state level elections in Louisiana,

14   they're using a top two election system.  So these

15   are contests in which there are three or more

16   candidates, vying to be one of the top two

17   candidates to make it to run off or to win the

18   primary out right by gaining the majority in that

19   first stage.

20         Q.   Does this table reflect the results of

21   your percent needed to win analysis?

22         A.   It does.

23         Q.   Okay.  Let's turn to table 2.  What does

24   this show the Court?

25         A.   So here we're looking at contests in

                                                       237


1    which there were only two candidates.  And so that

2    would be the run off stage elections, and also

3    first stage or primary elections that only

4    involved two candidates.  So a winner is going to

5    be determined in that contest.

6        Q.   Okay.  Does this table show the Court

7    the results of your percent needed to win analysis

8    on these districts?

9        A.   Yes.

10        Q.   Let's turn to table 3.  What does this

11   show the Court?

12        A.   Table 3 is analogous to table 1, except

13   here we focused on contest that included a black

14   candidate.

15        Q.   Finally, let's turn to table 4.  For

16   table 3, pardon me, Dr. Lewis, does that table

17   show the Court the percent needed to win the

18   analysis for those types of contests identified in

19   table 3?

20        A.   Yes, it does.

21        Q.   Now least move on to table 4.  What does

22   this show the Court?

23        A.   Table 4 is analogous to table 2.  Now

24   we're talking about run off where two primary

25   candidate elections that included a black

1    candidate.

2        Q.    Now staying on table 4, I'd like to

3    understand what the different column headings

4    mean.  We've already gone through what the column

5    heading district means.  So let's start, move on

6    to the next column over, percent black voting age

7    population.  What does this mean; what does this

8    show?

9        A.    So these are again data that were

10   provided to me, but I believe to be based on 2020

11   census data, that show the fraction of the

12   population of each district that is -- that on the

13   census identified as black only the first number

14   or any part black, the second number.  Again, this

15   is because the census allows folks to -- this is a

16   difference between the census and the voter roll.

17   For the purposes of the census, individuals could

18   identify as many, I believe, racial categories as

19   they want.  So some folks would identify

20   themselves as both, one race and another.  So you

21   could think about people who said, I am only

22   checked that they were black or African-American

23   versus folks that would have also indicated other

24   racial background.

25          Q.    Let's move on to the column number of

1    contests.  What does this column show, and why do

2    these numbers vary?

3          A.    Sure.  So the number of contests is the

4    number of contests that were analyzed in arriving

5    at the numbers that appear to the right of that

6    column.  And the reason they vary is because in

7    different districts, I had more or fewer contests

8    to use.  Some of the contests that I looked at

9    were statewide races.  So they were operative in

10   every effectively in every district.  And then

11   there were perhaps -- there were also elections

12   that weren't statewide.  So elections for U.S.

13   house or state Senate or state house that could be

14   used for the purposes of answering these questions

15   for, you know, maybe a single house or Senate

16   district, or maybe a couple of house or Senate

17   districts so.  Where that was possible, I did

18   that.

19         Q.    Let's turn briefly to table 1.  I

20   noticed there in table 1 number of contests are

21   higher.  Do you see that?

22         A.    I do.

23    Q.    Could you explain why that is?

24    A.    Well, there are two reasons for the

25    difference in number of contests between table 1

                                                    240

1    and table 4.  One difference is the inclusion of

2    contests that did not involve a black candidate.

3    And also, that not every primary election leads to

4    runoff e.

5    Q.    Okay.  Let's go back to table 4.  We're

6    here on table 4.  Did you only analyze elections

7    where a black candidate was running?

8    A.    No.  I also include like -- I also

9    provide the Court with tables that include

10    contests in which there was no black candidate,

11    but also elections in which there was a democrat.

12    Q.    Did those elections have a black

13    preferred candidate identified by EI?

14    A.    Yes.

15    Q.    And what does that mean black preferred

16    candidate identified by EI?

17    A.    That's a good question.  What it means

18    is that when I applied this algorithm, that makes

19    a guess about what the rate of support was for

20    each candidate among voters of different racial

21  groups.  Again, you can't it's all mixed up.  But

22  the method making strong assumptions will make a

23  guess, an estimate of what that rate was.  And

24  then from that, I will identify as the black

25  preferred candidate, the candidate who received

                                                    241


1  the majority, or in the case of more than two

2  candidates, the plurality of the black vote and

3  similarly for other ethnic groups.

4       Q.   Were there instances where a white

5  candidate would be the candidate of choice for

6  black voters?

7       A.   Well, every contest in which there

8  appear a white voter, could have been.  But there

9  are instances in which EI estimated there to be a

10  preferred candidate for black voters that was

11  white.  Of course in particular a contest that

12  didn't involve a white candidate.

13      Q.   Let's move on to the column average

14  number of precincts.  What does that column show?

15      A.   Well, what we're doing in here is

16  inferring these races support and so forth based

17  on precinct level data.  So it's useful to sort of

18  have a sense of how much information there was to

19    do that.  And the average number of Precisions

20    tells you the average amount of information that

21    was available to make the inference of Blake co

22    meaning white crossover support that we'll talk

23    about in a minute.

24         Q.   Okay.  Let's move on to the column

25    percent black preferred candidates democratic.

242

1    What does that show the Court?

2         A.   That's the fraction of the candidate

3    that EI identifies as the preferred candidate

4    of -- the preferred candidate of black voters for

5    which the -- the -- candidates was democrat.  So

6    in some cases, the candidate there you can see,

7    you know, very high percentage, but it looks like

8    perhaps there's one candidate in one contest,

9    there's not democrat who's identified by EI in

10    these districts as black preferred.

11         Q.   Let's move on to the column average

12    number of candidates.  What does this show?

13         A.   That's pretty straightforward.  That is

14    the average number of candidates in each contest

15    under analysis.  In tables 2 and 4, we're just

16    looking at two candidate runoffs in primaries.

17    The average is two.  The minimum is two.  The

18    maximum one is two.  There's always two.

19         Q.    Let's flip to table 1 to illustrate this

20    point.  Could you talk about average number of

21    candidates in table 1 and why it's different?

22         A.    Sure, because in this case we're looking

23    at elections that have three or more candidates.

24    So in many of these contests, there were

25    substantial number of candidates.  You can see the

                                                        243

1     average exceeds seven in each district.

2          Q.    Let's turn to the column black preferred

3     win rate.  What does that show the Court?

4          A.    So that is effectively the result of the

5     reconstitute or reconstructed election analysis

6     there.  So it asks the question, once we've used

7     the EI to identify the black preferred candidate,

8     if you had only held the particular election that

9     we're analyzing in that particular district, would

10    that black preferred candidate have been

11    successful.  And then the definition of success

12    here is a little bit different in tables 1 and 2,

13    you know, between tables 1 and 2 and between

14    tables 3 and 4.  In the three or more candidate

15    elections, these primary contests, the success

16    measure is just moving on to the next stage or

17    winning out right.  So you don't have to win

18    outright -- you don't have to come in first.  You

19    just have to sort of live to fight another day.

20         Q.   Is the black preferred candidate assumed

21    under this analysis, or is it calculated or

22    estimated in some way?

23         A.   Yes.  The black preferred candidate is

24    estimated from the EI analysis.

25         Q.   On table 4, I see that the win rate is

244

1    50 or higher for every district.  Does this mean

2    that black preferred candidates are winning these

3    districts at a rate of more than half the time,

4    and sometimes 100 percent of the time?

5         A.   Yes, in the contest that we looked at

6    here, they did, you know, turn the vast years that

7    we analyzed -- that I analyzed.

8         Q.   I'd like to draw one specific example to

9    ask you a question, Dr. Lewis.  On table 4 state

10    house district 38, so this is H2338, I see that

11    the BVAP is just barely 50 percent, the black only

12    is 49 percent, and the any part black is

13  50.8 percent.  Do you see that?

14       A.   I do.

15       Q.   Then coming over to the black preferred

16  win rate, I see 100 percent figure; is that right?

17       A.   Yes.

18       Q.   Can we conclude anything about whether

19  majority minority districts are required to create

20  an opportunity to elect in this district?

21       PLAINTIFF COUNSEL:

22            Objection on relevance ground.  This

23       question calls for testimony about whether an

24       opportunity district could hypothetical be

25       drawn BVAP 50 percent.  And the relevant

                                                    245


1       consideration under Gingles and the reason

2       Fifth Circuit opinion in Robinson.  The only

3       relevant opinion is whether the enacted

4       district are opportunity districts as drawn.

5       THE JUDGE:

6            Can you respond.

7       DEFENSE COUNSEL:

8            Your Honor, it sounds like a legal

9       briefs.  This has to do with districts,

10      illustrative districts that are drawn.  And

11          Dr. Lewis is here to testify about percent

12          BVAP needed to win.

13          THE JUDGE:

14              Okay.  Let me ask you this:  so if

15          we're -- if the fifth Circuit has told this

16          Court that if the Court find a violation of

17          section 2, that the legislature has to have

18          an opportunity, correct?  You would agree

19          with that, the legislature has to opportunity

20          to repair it?  The close of this evidence, it

21          is unlikely this Court is going to enact a

22          map.  We're talking about illustrative maps,

23          not remediation maps.

24          DEFENSE COUNSEL:

25              Correct.  Illustrative maps.  There's a

                                                    246

1          straight remedy phase, let me also say that

2          this information is relevant to what is

3          necessary to be drawn.  It is relevant to the

4          Court whether Plaintiffs have put forward a

5          map, that is a viable remedy.

6          THE JUDGE:

7              Why?  If we're going to have a remedy

8          phase, why don't you have the cart before the

 9      horse here?  I'm saying it's never going to

10      be relevant, but why is it relevant now.

11      DEFENSE COUNSEL:

12          There's a number of president behind the

13      fact in order to make aging showing

14      Plaintiffs have to come before the Court and

15      show they have a viable remedy.  When I say

16      remedy, I understand that sounds like

17      remediation phase.  It has to do with

18      Plaintiff's illustrative plan.  They have to

19      come to you and show --

20      THE JUDGE:

21          In a reasonably configured plan is the

22      way I read the law, a reasonably configured

23      illustrative plan.

24      DEFENSE COUNSEL:

25          They also have to show Gingles 3, that

                                               247


 1      the white block is voting consistently, to

 2      outvote black voters.  The testimony here is

 3      about what's happening in these districts and

 4      in these areas.

 5      THE JUDGE:

 6          I understand -- I actually don't even

7       really dispute the relevance of white

8       crossover voting.  I'm questioning, I guess

9       you're saying that white crossover voting

10      creates opportunity districts?

11      DEFENSE COUNSEL:

12          It is correct that white crossover

13      voting is part of the Gingles analysis, and

14      creates -- could create either cross over

15      districts or could contribute to districts

16      being able to perform.

17      THE JUDGE:

18          You want to respond?

19      PLAINTIFF COUNSEL:

20          We're discussing illustrative districts.

21      It is entirely irrelevant to Gingles 1 and 2.

22      Defendants are arguing possibility of

23      crafting these districts with white crossover

24      voting does exempt the State of Louisiana

25      from drawing opportunity district voting.

                                                        248


1       This is exactly the same argument that was

2       rejected in Robinson.

3       DEFENSE COUNSEL:

4           Your Honor, there are case -- there's

5          case after case after case about Plaintiffs

6          needing to come in and show that they have

7          districts that satisfy Gingles 1.  They also

8          need to satisfy Gingles 3.  Plaintiffs, it is

9          our position and it's in the briefs, they've

10         presented no evidence that their proposed

11         districts need to be drawn at 50 percent or

12         above due to white block voting.  They

13         haven't done that.  Dr. Handley came in and

14         gave a general analysis.  We have Dr. Lewis

15         here doing a very specific analysis not only

16         to illustrative districts, but to enacted

17         districts.  It's all in his report.  It's

18         relevant to Plaintiffs showing and Plaintiffs

19         ability to come before the Court and show

20         that Gingles 3.

21     THE JUDGE:

22         Objection overruled.

23  EXAMINATION BY DEFENSE COUNSEL:

24     Q.   Would you like me to ask the question

25  again, doctor?

                                                  249


1      A.   Yes, please.

2      THE JUDGE:

3          I would like you to.

4    EXAMINATION BY DEFENSE COUNSEL:

5          Q.   Dr. Lewis, we were looking at H2338.   We

6    were looking at the BVAP level and the black

7    preferred win rate.  Do you remember that?

8          A.   I do.

9          Q.   Okay.  So I was asking for your opinion

10   about if you see a win rate of 100 percent in

11   districts drawn barely above 50 percent, is there

12   anything that you can conclude about whether

13   majority minority districts are required in order

14   for black voters to have an opportunity to elect

15   their candidates of choice?

16        PLAINTIFF COUNSEL:

17             Your Honor, just for the record, can we

18        have a continuing objection to any further

19        questions that tend to elicit Dr. Lewis of

20        the BVAP percentage needed to win?

21        THE JUDGE:

22             Yes.

23        PLAINTIFF COUNSEL:

24             Thank you.

25

```
 1    DEFENSE COUNSEL:

 2         I'll put a response on the record as

 3    well, Your Honor.  There was no motion in

 4    limine.  There was no Daubert motion.

 5    THE JUDGE:

 6         That's fine.  Her objection is

 7    relevance.  It's continuing objection.  You

 8    can answer if you remember the question.

 9    DEFENSE COUNSEL:

10         Thank you, Your Honor.

11    THE WITNESS:

12         I think I do.  So I think it's again to

13    say the conclusion that you would have to

14    draw, you know, it does again border a little

15    bit on a legal conclusion about what it means

16    for something to be an opportunity and so

17    forth.  I think the idea is if again from a

18    kind of more of a political science than

19    legal perspective, you know, if you were at

20    50.8, you might think, well, if you just drop

21    that down by a point or two would that

22    100 percent win rate, would that drop below

23    50 percent, if you just moved a few voters

24    out of that district.  And that's the sort of

25    thing that this, what you're calling this
```

1           sort of minimum BVAP needs to win, helps us

2           understand, is given what we've estimated,

3           what we believe to be true about the patterns

4           of voting, we can say something about how you

5           might be able to adjust that black voting age

6           population, and still maintain or create

7           doing it -- depending on which way you want

8           to move it, still create or maintain the

9           opportunity for black candidates of choice to

10          win.  And again, that's the -- again, the

11          limit kind -- the win rate in some ways is

12          that it can only tell you in this district as

13          it's drawn, you know, what would it produced

14          historically.

15     EXAMINATION BY DEFENSE COUNSEL:

16          Q.   Moving on to the next column, average

17     black preferred candidate vote share.  Do you see

18     that?

19          A.   I do.

20          Q.   Okay.  What does that show the Court?

21          A.   Again, we're averaging across these six

22     elections here.  We're just saying what was the

23     average rate of support among all voters for the

24    candidate that was identified as the black

25    preferred candidate in the district or in that

252

1    contest in the district.

2        Q.   Let's briefly turn to table 1, where we

3    have more than two candidates.  What does this

4    column, the column average preferred candidate

5    vote share, show the Court about contests with

6    more than seven candidates on average?

7        A.   Well, as one would expect, as the number

8    of candidates increases, the sort of vote shares

9    received by each of the candidates tends to fall.

10   So two candidate election, you need a majority in

11   order to win the election.  If you're trying to

12   get plurality, if they're seven candidates and the

13   votes are distributed, so you do see there that

14   the average number of votes received or shared

15   votes received by the black preferred candidate is

16   a little lower than those two candidate races as

17   you would expect.  Of course, it could be due to

18   other things as well, but that's what you

19   anticipate or expect to see.

20       Q.   It also seems a little higher

21   considering seven candidates.  What does that

22    mean, that it is not one seventh of table 4's vote

23    share?

24        A.   Well, I'm not sure.  Again, I think

25    we're still seeing again in these districts that

                                                    253


1    have large populations, and as we'll see in the

2    next column average sum, the black cohesion is

3    pretty high.  Of course, that translates into an

4    over all vote share for that black preferred

5    candidate that remains quite high, and see

6    generally high enough to win advancement to the

7    next stage or out right victory nearly 100 percent

8    of the time and nearly all the districts.

9        Q.   Staying on table 1, I'm seeing in the

10   column black preferred win rate.  Numbers of 100,

11   100 percent win rate in 8 out of 10 districts

12   analyzed.  Is that a correct read?

13       A.   Yes.

14       Q.   Let's move back to table 4, please.

15   Could we move to the column average percent voters

16   black, and could you tell the Court what that

17   shows?

18       A.   Well, again, the race of the voters is

19   identified in the voter rolls.  And is included in

20    the data that was provided to me.  So I can

21    calculate the fraction of voters in these

22    elections identified as black.

23        Q.    So do you understand that voters in

24    Louisiana, do they register by race, do they

25    indicate their race when they register?

                                                    254

1        A.    Yes, that's my understanding.

2        Q.    So you didn't have to estimate that

3    figure; is that right?

4        A.    No.  That was a relief in this case

5    versus many of the cases that I work on, in other

6    parts of the country, where that is not done, and

7    then a whole big component of this analysis is to

8    try to estimate which voters are in which

9    category.

10        Q.    Let's move on to the column average EI

11    black cohesion.  What does this show the Court?

12        A.    That is the EI algorithms estimate of

13    the share of the black vote that was received by

14    the candidate who estimates received the highest

15    share of black votes.

16        Q.    Let's move on to average EI white

17    crossover support.  What does this show the Court?

18      A.   Again, that's the fraction of estimated.

19   Always estimates like we should never say, oh, we

20   know that number is 10 or 14.  These are estimates

21   that are subject to bias, if their assumptions

22   aren't met, and also uncertainty that arises from

23   the fact that we're not looking at a very large

24   number of contests and don't have an enormous

25   amount of information upon which to base our

                                                        255

1   estimates.  But what it means, is that EI

2   estimated for each contest that was considered the

3   share of the white vote that was cast for the

4   candidate that the model had previously identified

5   as the black preferred candidate, and then average

6   cross those contests to get 10 percent of the 14

7   and so forth that you see in that column that's

8   highlighted.

9       Q.   So where you see in this table white

10   cross year voting and sometimes up to 29 percent,

11   what does that tell the Court?

12      A.   What you see there in those cases, and I

13   think across all the cases is the estimated rate

14   of white cross over voting exceeds -- there's more

15   white voters are crossing to vote for the black

16    candidate than black candidates are crossing over

17    to vote for the white candidate.  That should be

18    the first sort of indication that putting aside

19    differences in turn out that might exist, you can

20    sort of immediately see that you wouldn't

21    necessarily need 50 percent or more in order for

22    the black candidate of choice to prevail, because

23    the black population is estimated to be more

24    cohesive.  So if you think that if the -- if black

25    voters sort of did all their voting the first half

256

1    of the game and white voters did their voting in

2    the second half, the black voters could run up the

3    score enough to win the game.  So you don't

4    actually need the whole half to do that.  I don't

5    know.  That's maybe not the right analogy, but you

6    get the sense of the logic of it.  Crossover.

7         Q.   Let's move to the column percent

8    polarized.  What does this tell the Court?

9         A.   So again, pole risings could have a very

10   specific legal meaning.  My understanding in

11   different litigation, that term is defined

12   differently.  I'll be very specific about what I

13   was asked to calculate here, under that label.

14     That's just the fraction of instances in which the

15     candidate that EI identifies as the preferred

16     candidate of the black voters is not the same

17     candidate that it identifies as the preferred

18     candidate of the white voters.  So it's just a

19     fraction of times in which there is that

20     disagreement between the two racial groups about

21     which candidate should hold office.

22          Q.   Can you tell the Court, can voting both

23     be both polarized on the one hand but still have

24     sufficient crossover for a black candidate of

25     choice to be elected in a nonmajority black

                                                      257


1     district?

2          A.   Yes, in exactly the way we just

3     discussed, that if there is more crossover

4     support, not over 50 percent, so you have pole

5     rights act, in these two candidate elections in

6     that sense, but if there's more heterogeny in the

7     voting of white folks than black folks, then you

8     wouldn't need 50 percent of the population to be

9     black in order to elect a black candidate of

10     choice, again, putting aside differences in

11     turnout.

12        Q.    Moving to the next column, average

13   percent black VAP to win.  Can you tell the Court

14   what this shows?

15        A.    Right.  So the idea there again is to

16   think about a kind of thought experiment where you

17   could keep other features of the district under

18   analysis fixed and just alter the fraction of

19   black voter population, voting age population.

20   And again, we're going to hold fixed the level of

21   cohesion, we're going to hold fix the level of

22   crossover support.  We're going to hold fix the

23   relative size of the white population and the

24   nonwhite or black, sort of other population.

25   We're going to hold those things fixed as we sort

                                                          258

1    of turn the dial on what the size of the black

2    population is.  We're going to tune that dial

3    until given all those numbers, we reach the point

4    where we identify the fraction of the voters that

5    would have to be black in order for the black

6    preferred candidate to just barely certainly win

7    by one vote.  Once we get that number, we have to

8    account the differences in number of turnout, hold

9    those fixed in what they were to be in the

10    context.  And add just that to get that number you

11    see highlighted in yellow.  Again, that's an

12    estimate.

13          Q.    Overall, what was your conclusion about

14    what this type of analysis shows the Court about

15    Plaintiff's proposed new districts?

16          PLAINTIFF COUNSEL:

17                Objection.  This is beyond the scope of

18          his report.  Dr. Lewis did state in his

19          deposition he can point to no conclusions

20          other than the numbers in his report asking

21          him to draw any inferences from those numbers

22          is clearly beyond the scope.

23          DEFENSE COUNSEL:

24                Your Honor, I'm asking him about his

25          numbers that are in his report that are

                                                        259


1           copied here.  I'm asking him about his -- the

2           numbers that are presented here and what they

3           show about Plaintiff's select new districts.

4           THE JUDGE:

5                 Question is did he connect the dots in

6           his report?  You're asking him about his

7           conclusions, and Ms. rohoney is saying it's

8      outside the scope of his written report.

9      DEFENSE COUNSEL:

10         A moment, Your Honor, trying to locate

11      it.  I beg your pardon, Your Honor.  Your

12      Honor, I can come back to this.

13      THE JUDGE:

14         I looked at his conclusion, I actually

15      looked at it before today.  I would sustain

16      the objection.

17      DEFENSE COUNSEL:

18         Okay.  Your Honor, am I about to move

19      into a new section of questions.  And it's

20      almost 5.  Is now a good time to stop?

21      THE JUDGE:

22         How long are you going to be, 30 or 40

23      more minutes.

24      DEFENSE COUNSEL:

25         Yes.

                                        260

1      THE JUDGE:

2         Yes.  We'll take a break for the day.

3      We'll be in recess.  Again the Court

4      apologizes, we'll be in recess until 10 a.m.,

5      we'll go straight through until 2.

```
 6              (COURT RECESS AT 4:56 P.M.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```