# **Attachment 7**

1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4  DOROTHY NAIRNE, ET AL     : CIVIL ACTION

5  VERSUS                    : NO. 3:22-178-SDD

6  KYLE ARDOIN, ET AL       : DECEMBER 5, 2023

7  ==========================================================
                         DAY 7
8                       BENCH TRIAL
           BEFORE THE HONORABLE SHELLY D. DICK
9         UNITED STATES CHIEF DISTRICT JUDGE

10                 A P P E A R A N C E S

11
   FOR THE PLAINTIFFS:
12
       AMERICAN CIVIL LIBERTIES UNION FOUNDATION
13     BY: MEGAN C. KEENAN, ESQ.
       BY: SARAH E. BRANNON, ESQ.
14     BY: DAYTON CAMPBELL-HARRIS, ESQ.
       915 15TH STREET, NW
15     WASHINGTON, DC 20005

16     NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
       BY: VICTORIA WENGER, ESQ.
17     BY: SARA ROHANI, ESQ.
       BY: STUART C. NAIFEH, ESQ.
18     40 RECTOR STREET, FIFTH FLOOR
       NEW YORK, NEW YORK 10006
19
       COZEN O'CONNOR
20     BY: JOSEPHINE M. BAHN, ESQ.
       1200 19TH STREET, NW, THIRD FLOOR
21     WASHINGTON, DC 20036

22     COZEN O'CONNOR
       BY: ROBERT S. CLARK, ESQ.
23     ONE LIBERTY PLACE
       1650 MARKET STREET, SUITE 2800
24     PHILADELPHIA, PENNSYLVANIA  19103

25

```
 1              A P P E A R A N C E S (CONTINUED)

 2        COZEN O'CONNOR
          BY: AMANDA GIGLIO, ESQ.
 3        3 WORLD TRADE CENTER, 55TH FLOOR
          NEW YORK, NEW YORK 10007
 4
          ELECTION LAW CLINIC
 5        HARVARD LAW SCHOOL
          BY: T. ALORA THOMAS, ESQ.
 6        6 EVERETT STREET, SUITE 4105
          CAMBRIDGE, MASSACHUSETTS 02138
 7
          ADCOCK LAW, LLC
 8        BY: JOHN N. ADCOCK, ESQ.
          3110 CANAL STREET
 9        NEW ORLEANS, LOUISIANA 70119

10  FOR THE DEFENDANT, KYLE ARDOIN, IN HIS OFFICIAL
    CAPACITY AS SECRETARY OF STATE:
11
          NELSON MULLINS RILEY & SCARBOROUGH, LLP
12        BY: PHILLIP J. STRACH, ESQ.
          BY: THOMAS A. FARR, ESQ.
13        BY: CASSIE A. HOLT, ESQ.
          BY: ALYSSA M. RIGGINS, ESQ.
14        4140 PARKLAKE AVENUE, SUITE 200
          RALEIGH, NORTH CAROLINA 27612
15
          SHOWS, CALI & WALSH, LLP
16        BY: JOHN C. CONINE, JR., ESQ.
          BY: JOHN C. WALSH, ESQ.
17        628 ST. LOUIS STREET
          BATON ROUGE, LOUISIANA 70802
18
          SECRETARY OF STATE'S OFFICE
19        BY: CHARLTON J. MEGINLEY, ESQ.
          8585 ARCHIVES AVENUE
20        BATON ROUGE, LOUISIANA 70809

21  FOR THE DEFENDANT, CLAY SCHEXNAYDER:

22        BAKER & HOSTETLER, LLP
          BY: KATE MCKNIGHT, ESQ.
23        BY: ROBERT J. TUCKER, ESQ.
          BY: PATRICK LEWIS, ESQ.
24        200 CIVIC CENTER DRIVE, SUITE 1200
          COLUMBUS, OHIO 43215
25
```

1          A P P E A R A N C E S (CONTINUED)

2      BAKER HOSTETLER, LLP
       BY: MICHAEL W. MENGIS, ESQ.
3      811 MAIN STREET, SUITE 1100
       HOUSTON, TEXAS 77002

4
   FOR THE INTERVENOR, THE STATE OF LOUISIANA BY AND
5  THROUGH ATTORNEY GENERAL JEFF LANDRY:

6      HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
       BY: BRENNAN BOWEN, ESQ.
7      2575 EAST CAMELBACK ROAD, SUITE 860
       PHOENIX, ARIZONA 85016

8
       HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
9      BY: PHILLIP M. GORDON, ESQ.
       15404 JOHN MARSHALL HIGHWAY
10     HAYMARKET, VIRGINIA 20169

11     LOUISIANA DEPARTMENT OF JUSTICE
       BY: ANGELIQUE D. FREEL, ESQ.
12     BY: JEFFREY M. WALE, ESQ.
       BY: AMANDA M. LAGROUE, ESQ.
13     1885 NORTH THIRD STREET
       BATON ROUGE, LOUISIANA 70804

14

15

16

17

18

19

20

21        REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
               UNITED STATES COURTHOUSE
22               777 FLORIDA STREET
            BATON ROUGE, LOUISIANA 70801
23               (225) 389-3565

24   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
          COMPUTER-AIDED TRANSCRIPTION SOFTWARE
25

1              I N D E X

2  DEFENDANTS' WITNESSES:

3  JEFFREY LEWIS                                    PAGE

4      DIRECT EXAMINATION BY MS. MCKNIGHT ............5

5      CROSS-EXAMINATION BY MS. ROHANI ..............29

6      REDIRECT EXAMINATION MS. MCKNIGHT ............42

7  PLAINTIFFS' REBUTTAL WITNESSES:

8  MARVIN P. KING

9      VOIR DIRE BY MS. GIGLIO ......................51

10      DIRECT EXAMINATION BY MS. GIGLIO .............59

11      CROSS-EXAMINATION BY MR. LEWIS ...............86

12  CORY MCCARTAN

13      VOIR DIRE BY MS. BRANNON ....................119

14      DIRECT EXAMINATION BY MS. BRANNON ...........122

15      CROSS-EXAMINATION BY MS. HOLT ...............160

16  LISA HANDLEY

17      DIRECT EXAMINATION BY MS. BRANNON ...........165

18      CROSS-EXAMINATION BY MS. MCKNIGHT ...........189

19      REDIRECT EXAMINATION BY MS. BRANNON .........212

20

21

22

23

24

25

10:01a

1          **(DECEMBER 5, 2023)**

2                    **PROCEEDINGS**

3            **(CALL TO THE ORDER OF COURT.)**

4          **THE COURT:**  GOOD MORNING, EVERYONE.  BE

5  SEATED.

6              MS. MCKNIGHT, I THOUGHT YOU WERE

7  FINISHED.  YOU'RE NOT FINISHED?

8          **MS. MCKNIGHT:**  NO.  YESTERDAY WHEN YOU ASKED

9  IF --

10         **THE COURT:**  OH, THAT'S RIGHT.  WE TOOK A

11  BREAK AT -- OKAY.  THANK YOU FOR HAVING DR. CLARK

12  BACK ON THE STAND.

13         **MS. MCKNIGHT:**  MAY I PROCEED, YOUR HONOR?

14         **THE COURT:**  YOU MAY.

15         **MS. MCKNIGHT:**  THANK YOU.

16         **DIRECT EXAMINATION (CONTINUED)**

17  **BY MS. MCKNIGHT:**

18     **Q**   DR. LEWIS, LET'S START WHERE WE ENDED

19  YESTERDAY --

20         **THE COURT:**  DR. LEWIS.  I'M SORRY.

21         **MS. MCKNIGHT:**  THAT'S OKAY.

22         **THE COURT:**  IT'S BEEN A LONG WEEK, DR.

23  LEWIS.

24         **THE WITNESS:**  I KNOW IT HAS.

25  **BY MS. MCKNIGHT:**

10:01a

1     Q    LET'S START WHERE WE ENDED YESTERDAY WITH

2  DEMONSTRATIVE LEWIS 4.  WE'LL BRING IT UP ON THE

3  SCREEN.

4          DO YOU REMEMBER TESTIFYING ABOUT THIS

5  YESTERDAY, DR. LEWIS?

6     A    I DO.

7     Q    OKAY.  COULD YOU TELL THE COURT:  WHAT IS

8  THE AVERAGE PERSON BLACK VAP NEEDED FOR A WIN BY A

9  BLACK-PREFERRED CANDIDATE IN PLAINTIFFS' ILLUSTRATIVE

10 HD 1?

11    A    AS, YOU KNOW, ESTIMATED FROM THESE DATAS --

12 APPROXIMATELY FROM THESE DATA -- 49 PERCENT.

13    Q    AND WHAT DOES THIS ANALYSIS SHOW ABOUT THAT

14 FIGURE FOR PLAINTIFFS' ILLUSTRATIVE HD 23?

15    A    45 PERCENT.

16    Q    AND FOR HD 38?

17    A    35 PERCENT.

18    Q    AND FOR HD 60?

19    A    34 PERCENT.

20    Q    AND HD 65?

21    A    48 PERCENT.

22    Q    HD 68?

23    A    38 PERCENT.

24    Q    HD 69?

25    A    42 PERCENT.

10:03a

1    Q    SD 17?

2    A    41 PERCENT.

3    Q    SD 19?

4    A    13 PERCENT.

5    Q    SD 38?

6    A    44 PERCENT.

7    Q    HAVE WE COVERED ALL THE FIGURES ON THIS

8 CHART?

9    A    IN THAT COLUMN, YES.

10    Q    FOR ANY OF THE TEN DISTRICTS WE JUST

11 DISCUSSED, ACCORDING TO THIS ANALYSIS, DID ANY OF

12 THOSE DISTRICTS NEED 50 PERCENT BLACK VAP IN ORDER TO

13 ELECT A BLACK-PREFERRED CANDIDATE?

14    A    ON AVERAGE, NO.

15    Q    AND I'D LIKE TO MOVE ON TO ASK YOU ABOUT THE

16 DISTRICTS THAT BORDER THESE TEN DISTRICTS.

17         NOW, IN CONDUCTING YOUR ANALYSIS YOU RELIED

18 ON DR. HANDLEY'S DATA.  CORRECT?

19    A    THAT'S CORRECT.

20    Q    WERE YOU ABLE TO CONDUCT YOUR ANALYSIS ON

21 EVERY SINGLE DISTRICT IN THE PLANS?

22    A    NO, I DID NOT.

23    Q    AND WOULD YOU HAVE BEEN ABLE TO?

24    A    I THINK IT WOULD HAVE BEEN -- IT WOULD HAVE

25 BEEN QUITE TIME-CONSUMING, MOSTLY FOR COMPUTER, TO

10:04a

**1**  HAVE ANALYZED EVERY DISTRICT THAN

**2**  DISTRICT-BY-DISTRICT THE WAY THAT WE DID.

**3**     **Q**    SO I'D LIKE TO ASK YOU QUESTIONS ABOUT SOME

**4**  OF THE DISTRICTS WHERE YOU WERE ABLE TO CONDUCT AN

**5**  ANALYSIS.  WE'RE GOING TO PULL UP TWO DOCUMENTS ON

**6**  THE SCREEN.  ON THE LEFT SIDE LET'S START WITH

**7**  PLAINTIFFS' EXHIBIT 72.  THESE ARE ENLARGED MAPS OF

**8**  PLAINTIFFS' ILLUSTRATIVE DISTRICTS.  WE BELIEVE THIS

**9**  HAS ALREADY BEEN ADMITTED THROUGH MR. COOPER'S

**10**  TESTIMONY.

**11**         NOW, ON THE RIGHT SIDE OF THE SCREEN, LET'S

**12**  PULL UP YOUR REPORT, DTH 52.  SO IN PLAINTIFFS'

**13**  ILLUSTRATIVE MAPS, LET'S MOVE TO PAGE PL -- PAGE 22

**14**  TO LOOK AT HD 65.  AND THEN ON THE RIGHT-HAND OF THE

**15**  SCREEN IN YOUR REPORT, LET'S MOVE TO PAGE 38 FOR THE

**16**  FIGURES ON THE DISTRICTS NEAR THIS DISTRICT.

**17**         TO START WITH, DID I UNDERSTAND CORRECTLY

**18**  THAT HD 65 IN PLAINTIFFS' ILLUSTRATIVE PLAN DOES NOT

**19**  NEED 50 PERCENT BVAP TO WIN, ACCORDING TO YOUR

**20**  ANALYSIS?

**21**     **A**    65 I'M NOT SURE APPEARS ON THIS PAGE, SO WE

**22**  SHOULD CHECK.  IS IT --

**23**     **Q**    LET'S TURN TO PAGE 39.  AND LET'S LOOK AT

**24**  H23-65 AND THE AVERAGE PERCENT BLACK VAP NEEDED FOR

**25**  WIN.  IS THAT FIGURE ABOVE 50 PERCENT OR AT 50

10:06a

1    PERCENT?

2        **A**    I -- WITHOUT A PIECE OF PAPER, IT'S A LITTLE

3    HARD TO READ ACROSS THE LINE.  IS IT CORRECT THAT THE

4    NUMBER THAT'S -- THAT REGISTERS WITH THAT LINE IS 46?

5        **Q**    YES.  COULD WE --

6            **MS. MCKNIGHT:**  COULD WE -- MR. WILLIAMSON,

7    COULD WE HIGHLIGHT THE ROW FOR H23-65.

8    **BY THE WITNESS:**

9        **A**    48.  LESS THAN 50.

10       **Q**    SO I'D LIKE TO ASK THE TRIAL TECH TO PUT A

11   RED CIRCLE AROUND THE NUMBER 65 ON THE LEFT SIDE OF

12   THE SCREEN.

13           OKAY.  LET'S -- ON THE RIGHT SIDE OF THE

14   SCREEN, LET'S TURN BACK TO PAGE 38 AND LET'S START

15   WITH THE DISTRICT BORDERING TO THE WEST OF HD 65.

16   THIS IS PLAINTIFFS' ILLUSTRATIVE DISTRICT 29.

17           NOW, ON THE RIGHT SIDE OF THE SCREEN IN YOUR

18   REPORT, WHEN YOU LOOK AT THE ROW TITLED -- AND I'D

19   ASK THIS TO BE HIGHLIGHTED AS WE GO -- THE ROW TITLED

20   "H 2329," WHAT IS THE AVERAGE PERCENT VAP NEEDED FOR

21   A WIN IN THAT DISTRICT?

22       **A**    42.

23       **Q**    AND IS THAT BELOW 50?

24       **A**    IT IS.

25       **Q**    LET'S PUT A RED CIRCLE AROUND THE NUMBER 29

10:07a

1    ON THE MAP.

2            NOW, LET'S MOVE ON TO THE NEXT DISTRICT.  I

3    SEE DISTRICT 62 UP IN THE UPPER RIGHT CORNER.  ON THE

4    RIGHT-HAND PAGE, LET'S TURN TO PAGE 39 OF YOUR REPORT

5    AT LDTX 52.  AND LET'S HIGHLIGHT THE ROW FOR S23 -- I

6    MEAN H23-62.

7            WHAT IS THE BVAP NEEDED TO WIN FOR H23-62?

8        A    THE ESTIMATE THAT APPEARS THERE IS 39

9    PERCENT.

10       Q    AND IS THAT BELOW 50?

11       A    IT IS BELOW 50.

12       Q    LET'S PUT A RED CIRCLE AROUND THE NUMBER 62

13   IN THE MAP ON THE LEFT.

14           NOW LET'S GO BACK TO THE RIGHT SIDE.  LET'S

15   LOOK AT HD 63.  COULD WE HIGHLIGHT THE ROW FOR HD 63.

16           DR. LEWIS, WHAT IS THE PERCENT BLACK VAP

17   NEEDED FOR A WIN IN HD 63 IN PLAINTIFFS' ILLUSTRATIVE

18   MAP?

19       A    THAT ESTIMATE IS 46 PERCENT.

20       Q    AND IS THAT AT 50 OR ABOVE?

21       A    THAT IS BELOW 50.

22       Q    AND THEN IN THE LEFT-HAND SIDE OF THE

23   SCREEN, LET'S PUT A CIRCLE AROUND HD 63, PLEASE.

24           LET'S MOVE ON TO THE NEXT ONE.  WE HAVE --

25   ROTATING DOWN TO THE SOUTH THERE IS DISTRICT HD 67.

10:08a

1   DO YOU SEE THAT IN THE MAP, DR. LEWIS?

2       A    I DO.

3       Q    OKAY.  SO ON THE RIGHT SIDE, WHAT IS THE

4   BVAP NEEDED FOR WIN IN HD 67 IN PLAINTIFFS'

5   ILLUSTRATIVE MAP?

6       A    THE ESTIMATE IS 26.

7       Q    OKAY.  IS THAT BELOW 50?

8       A    IT IS.

9       Q    LET'S PUT A RED CIRCLE AROUND HD 67 IN

10  PLAINTIFFS' ILLUSTRATIVE MAP.

11           MOVING ON AROUND, I SEE HD 61 IN THE AREA.

12  DO YOU SEE THAT DISTRICT?

13      A    I DO.

14      Q    SO ON THE RIGHT SIDE OF THE SCREEN, LET'S

15  LOOK AT THE BVAP NEEDED FOR WIN IN HD 61 IN

16  PLAINTIFFS' ILLUSTRATIVE 61.  WHAT IS THAT FIGURE?

17      A    20.

18      Q    AND IS THAT BELOW 50?

19      A    IT IS.

20      Q    AND IN THE LEFT SCREEN LET'S PUT A RED

21  CIRCLE AROUND 61.

22           NOW, I SEE HD 68 BORDERING HD 65.  DO YOU

23  SEE THAT, DR. LEWIS?

24      A    I DO.

25      Q    AND ON THE RIGHT-HAND SIDE OF YOUR SCREEN,

10:09a

1    WHAT IS THE PERCENT BLACK VAP NEEDED FOR WIN IN HD

2    68?

3         A    38.

4         Q    IS THAT BELOW 50?

5         A    IT IS.

6         Q    LET'S PUT A RED CIRCLE AROUND THE NUMBER 68

7    ON THE LEFT-HAND SIDE OF THE SCREEN.

8         LET'S MOVE ON TO HD 69.  IN YOUR REPORT,

9    WHAT WAS THE BVAP NEEDED FOR WIN IN -- IDENTIFIED BY

10   THE ANALYSIS YOU CONDUCTED IN YOUR REPORT?

11        A    THE ESTIMATE IS 42.

12        Q    AND IS THAT BELOW 50?

13        A    IT IS.

14        Q    SO LET'S PUT A RED CIRCLE AROUND HD 69 IN

15   PLAINTIFFS' ILLUSTRATIVE MAP.

16        NOW, I SEE A DISTRICT ON THE EASTERN BORDER

17   OF HD 65 AS BEING HD 64.  DO YOU SEE THAT, DR. LEWIS?

18        A    I DO.

19        Q    WERE YOU ABLE TO CONDUCT AN ANALYSIS ON HD

20   64 FOR YOUR REPORT?

21        A    I DID NOT.

22        Q    AND NOW LET'S TURN THE PAGE TO PAGE 40 OF

23   YOUR REPORT, LDTX 52 AT PAGE 40.  AND I SEE A

24   DISTRICT BORDERING THE SOUTH OF HD 65, DISTRICT NO.

25   101 IN PLAINTIFFS' ILLUSTRATIVE PLAN.

10:11a

**1**      WHAT WAS THE BVAP NEEDED FOR WIN ACCORDING

**2**  TO YOUR ANALYSIS IN HD 101?

**3**    **A**    THE ESTIMATE IS 37.

**4**    **Q**    IS THAT BELOW 50?

**5**    **A**    IT IS.

**6**    **Q**    LET'S PUT A RED CIRCLE AROUND 101 IN THE

**7**  MAP.

**8**      SO, DR. LEWIS, FOR THE SEVEN RED-CIRCLED

**9**  DISTRICTS AROUND HD 65 IN PLAINTIFFS' ILLUSTRATIVE

**10**  PLAN, DID ANY OF THESE NEED 50 PERCENT BVAP IN ORDER

**11**  FOR A BLACK CANDIDATE TO BE -- TO WIN?

**12**    **A**    THE ESTIMATED AVERAGE PERCENT NEEDED TO WIN

**13**  WAS BELOW 50 PERCENT IN EVERY CASE.

**14**    **Q**    ALL RIGHT.  LET'S STAY ON LDTX 52, BUT IN

**15**  THE MAP ON THE LEFT SIDE LET'S SWITCH FROM PL 72 TO

**16**  PL 53.

**17**      NOW, DR. LEWIS, WE WERE JUST DISCUSSING AN

**18**  EXAMPLE IN PLAINTIFFS' HOUSE ILLUSTRATIVE MAPS.  I'D

**19**  LIKE TO ASK YOU ABOUT AN EXAMPLE FROM PLAINTIFFS'

**20**  SENATE ILLUSTRATIVE MAPS.  SO IN PL 53 LET'S TURN TO

**21**  PAGE 10 ON THE MAP.  IN LDTX 52 COULD WE TURN THE

**22**  PAGE TO THE NEXT PAGE, PLEASE.

**23**      **MS. MCKNIGHT:**  THANK YOU, MR. WILLIAMSON.

**24**  **BY MS. MCKNIGHT:**

**25**    **Q**    SO STARTING WITH THE DISTRICT AT THE HEART

10:13a

1  HERE, SENATE DISTRICT 19 IN PLAINTIFFS' ILLUSTRATIVE

2  PLANS, IN LDTX 52 WHAT DOES YOUR ANALYSIS SHOW IS THE

3  BVAP NEEDED FOR WIN FOR S23-19?  AND WE'LL HAVE THAT

4  HIGHLIGHTED FOR YOU.

5      A    30 PERCENT.

6      Q    AND IS THAT FIGURE BELOW 50?

7      A    IT IS.

8      Q    OKAY.  SO IN THE MAP LET'S PUT A RED CIRCLE

9  AROUND THE NUMBER 19.

10          NOW, IT'S A LITTLE HARD TO SEE, DR. LEWIS,

11  BUT THERE IS A NUMBER 3 -- THESE ARE PLAINTIFFS'

12  ILLUSTRATIVE MAPS.  THERE IS A NUMBER 3 UNDER THE KEY

13  THAT SAYS "ILLUSTRATIVE SENATE."  AND UNDER THE

14  WORD -- NEXT TO THE WORD "MILES," YOU CAN BARELY MAKE

15  OUT A NUMBER 3.  DO YOU SEE THAT?

16      A    I HAVE VERY POOR VISION.  I'LL TAKE YOUR

17  WORD THAT IT'S THERE.

18      Q    LET'S START THERE, BECAUSE IT'S THE LOWEST

19  NUMBER.  WE'LL JUST GO IN NUMERICAL ORDER.

20          COULD YOU LOOK AT YOUR ANALYSIS IN YOUR

21  REPORT FOR S23-3.  THIS IS PLAINTIFFS' ILLUSTRATIVE

22  SENATE MAP 3.  AND WHAT IS THE PERCENT VAP NEEDED FOR

23  A WIN IN SD 3?

24      A    15.

25      Q    IS THAT LOWER THAN 50?

10:15a

1    **A**    IT IS.

2    **Q**    SO LET'S PUT A RED CIRCLE AROUND THAT

3   SLIGHTLY SHADED NO. 3 UP NEXT TO THE WORD "MILES" IN

4   THE MAP.  SO IN THE MAP -- THERE WE GO.  THANK YOU.

5         SO NOW -- IT'S A LITTLE HARD TO SEE IN THE

6   ILLUSTRATIVE WITH THE KEY OVER IT.  BUT LET'S LOOK AT

7   SD 4 AND WHICH -- WHAT THE RESULT IS FOR BLACK VAP

8   NEEDED FOR WIN IN SD 4; S23-4.  AND WE'LL HIGHLIGHT

9   THAT FOR YOU.

10        AND WHAT IS THE BLACK VAP NEEDED FOR A WIN

11   IN SD 4?

12    **A**    16.

13    **Q**    OKAY.  AND I'LL REPRESENT TO YOU THAT THE

14   NUMBER 4 IS HIDING JUST BENEATH THE WORD "MSA" IN

15   ILLUSTRATIVE SENATE.

16        **MS. MCKNIGHT:**  SO, MR. WILLIAMSON, COULD WE

17   PUT A CIRCLE AROUND THAT WORD "MSA" SO IT'S CLEAR

18   WHERE SENATE DISTRICT 4 IS IN PLAINTIFFS'

19   ILLUSTRATIVE MAP.  THANK YOU.

20   **BY MS. MCKNIGHT:**

21    **Q**    LET'S MOVE ON TO HD -- TO SD 5.  DO YOU SEE

22   SENATE DISTRICT 5 IN THE MAP JUST NORTH OF THE RIVER

23   IN SENATE DISTRICT 7?

24    **A**    YES, I DO.

25    **Q**    SO IN YOUR ANALYSIS FOR SENATE DISTRICT 5,

10:17a

1   WHAT DOES YOUR ANALYSIS SHOW AS THE BLACK VAP NEEDED

2   FOR WIN IN THAT DISTRICT?

3       **A**   ONE PERCENT.

4       **Q**   IS THAT BELOW 50?

5       **A**   IT IS.

6       **Q**   LET'S MOVE ON TO SENATE DISTRICT 8.  WHAT

7   DOES YOUR ANALYSIS SHOW ABOUT THE BLACK VAP NEEDED

8   FOR WIN IN SENATE DISTRICT 8?

9       **A**   LOOKS LIKE 41 PERCENT.

10      **Q**   AND IS THAT BELOW 50?

11      **A**   IT IS.

12      **Q**   LET'S PUT A RED CIRCLE AROUND SENATE

13  DISTRICT 8.  I'LL NEED TO GO BACK TO PUT A RED CIRCLE

14  AROUND SENATE DISTRICT 7 AND SENATE DISTRICT 5.

15          DR. LEWIS, FOR THE FIVE RED CIRCLES -- FOR

16  THE SIX RED CIRCLES IN THE DISTRICTS IN SENATE

17  DISTRICT 19 AND THE SURROUNDING DISTRICTS, DID ANY OF

18  THESE DISTRICTS NEED 50 PERCENT BVAP IN ORDER FOR A

19  WIN?

20      **A**   AS ESTIMATED ON AVERAGE, NO.

21      **Q**   IS IT FAIR TO SAY THAT THERE IS VARIATION IN

22  RACIALLY POLARIZED VOTING PATTERNS WITHIN THE STATE

23  OF LOUISIANA?

24      **A**   YES.

25      **Q**   LET'S BRING UP YOUR REPORT ON THE RIGHT-HAND

10:18a

1    SIDE.  AND WE'LL GO TO PAGES 42 AND 43 OF YOUR

2    REPORT.  SO THAT'S LDTX 52 AT 42 AND 43.

3           DO THESE TABLES ADDRESS THIS VARIATION?

4      A    ONE ASPECT OF THE VARIATION, YES.

5      Q    AND WHAT DO THE NUMBERS SHOW ABOUT WHERE

6    THIS VARIATION OCCURRED?

7      A    WE SEE VARIATION IN THE LEFT PAGE IN FIGURE

8    1.  WE SEE VARIATION IN THE DEGREE OF WHITE CROSSOVER

9    VOTING, AS THE PERCENT OF THE DISTRICT THAT IS

10   DESIGNATED BY THE CENSUS TO LIE WITHIN AN URBAN AREA,

11   INCREASES.

12     Q    AND SO IS IT POSSIBLE -- WE WERE JUST

13   LOOKING AT DISTRICTS NEAR AND BORDERING PLAINTIFFS'

14   ILLUSTRATIVE DISTRICTS.  IS IT POSSIBLE THAT THERE

15   ARE OTHER DISTRICTS NEAR THOSE PLAINTIFFS'

16   ILLUSTRATIVE DISTRICTS THAT REQUIRE 50 PERCENT OR

17   MORE BVAP ACCORDING TO THE ANALYSIS?

18     A    I'M SORRY.  COULD YOU RESTATE THE QUESTION?

19     Q    SURE.  WE WERE JUST DISCUSSING VARIATION.

20   AND SO THE QUESTION WAS:  IS IT POSSIBLE THAT THERE

21   ARE DISTRICTS NEAR OR AROUND PLAINTIFFS' ILLUSTRATIVE

22   DISTRICTS THAT DO NOT NEED -- WHERE THE ILLUSTRATIVE

23   DISTRICTS DO NOT NEED 50 PERCENT BVAP BUT THERE ARE

24   OTHER DISTRICTS NEARBY THAT MIGHT NEED 50 PERCENT OR

25   ABOVE BVAP?

10:20a

**1**    **A**    THAT'S CORRECT, YES.

**2**    **Q**    WE CAN TAKE THIS DOWN.

**3**         DR. LEWIS, DID YOU UNDERSTAND THERE TO BE

**4**    CRITICISM BY PLAINTIFFS THAT YOUR ANALYSIS ISN'T

**5**    CHECKED AGAINST REALITY?

**6**    **A**    YES.

**7**    **Q**    WHAT IS YOUR UNDERSTANDING OF THAT CRITICISM

**8**    AND WHAT IS YOUR RESPONSE?

**9**    **A**    WELL, I GUESS THE FIRST THING IS THAT I

**10**   WOULD SAY MY ANALYSIS IS BASED ON THE SAME REALITY AS

**11**   OTHER EXPERTS AND CERTAINLY AS DR. HANDLEY'S HERE

**12**   BASED ON THE SAME DATA.  IT'S -- IT'S DIFFICULT TO DO

**13**   A REALLY TRUE REALITY CHECK, BECAUSE IN ORDER TO DO A

**14**   TRUE REALITY CHECK ONE WOULD HAVE TO KNOW EXACTLY THE

**15**   THINGS THAT WE'RE HERE OR THAT I'M HERE TO -- TO TALK

**16**   ABOUT, WHICH CAN'T BE KNOWN.  AND SO IN A CERTAIN

**17**   SENSE I DON'T THINK THAT YOU CAN SAY THAT IT'S

**18**   POSSIBLE TO DO A TRUE REALITY CHECK; IN OTHER WORDS,

**19**   WE CAN'T -- YOU KNOW, WE'RE HERE, AS WE TALKED ABOUT

**20**   BEFORE, TO THINK ABOUT HOW THESE DISTRICTS -- HOW

**21**   PEOPLE WOULD VOTE IN THEM IN THE FUTURE.  WE DON'T

**22**   KNOW THAT.

**23**        WE CAN DO WHAT YOU MIGHT CALL SORT OF SANITY

**24**   CHECKS TO MAKE SURE THAT IT DOESN'T SEEM LIKE

**25**   SOMETHING HAS GONE HORRIBLY AWRY.  BUT IT'S VERY

10:21a

**1**  DIFFICULT TO KNOW BY LOOKING -- YOU KNOW, IN OTHER

**2**  WORDS, WE APPLY THESE METHODS EXACTLY BECAUSE WE

**3**  CAN'T KNOW IN SOME OTHER WAY WHICH WE COULD THEN USE

**4**  AS A BENCHMARK.

**5**      **Q**   AND DID YOU UNDERSTAND ANY CRITICISM BY

**6**  PLAINTIFFS ABOUT THE FACT THAT THERE -- WHERE THERE

**7**  ARE NO DISTRICTS DRAWN BETWEEN 40 AND 50 PERCENT,

**8**  WHAT THAT MEANS FOR YOUR ANALYSIS?

**9**      **A**   YEAH.  I THINK THE CHALLENGE IS IF YOU WERE

**10**  TO ASK THE QUESTION COULD WE THINK ABOUT HOW

**11**  DISTRICTS IN CERTAIN PARTS OR IN ALL OF LOUISIANA

**12**  WOULD PERFORM AT 40 TO 60 PERCENT AND THEN WE DON'T

**13**  SEE ANY -- THERE ARE VERY FEW THAT ARE IN THAT

**14**  INTERVAL -- THEN IT'S VERY HARD TO DRAW A CONCLUSION

**15**  ABOUT WHETHER THEY WOULD PERFORM OR NOT.  SO TO SAY

**16**  WE DON'T SEE SOMEONE OF -- YOU KNOW, A DEMOCRAT OR A

**17**  BLACK-PREFERRED CANDIDATE GETTING ELECTED IN

**18**  DISTRICTS THAT WE DON'T SEE VERY MANY OF, IT'S HARD

**19**  TO KNOW WHAT THAT MEANS.

**20**       SO, FOR EXAMPLE, I DON'T THINK IT WOULD BE A

**21**  VERY COMPELLING ARGUMENT PERHAPS -- AND, YOU KNOW,

**22**  I'M NOT HERE TO MAKE ARGUMENTS, YOU KNOW.  BUT I

**23**  GUESS IF I WERE TO TRY TO THINK ABOUT JUST ANSWERING

**24**  THE QUESTION HOW WOULD -- A 40 TO 50 PERCENT

**25**  DISTRICT, WHAT WOULD BE THE MINIMUM PERCENT NEEDED TO

10:22a

1    WIN, WHAT WOULD THE WIN RATE BE IN A DISTRICT LIKE

2    THAT IF WE HAVEN'T SEEN ONE, I DON'T THINK THAT IT

3    WOULD BE -- THAT IF, FOR EXAMPLE, WE WERE IN A WORLD

4    IN WHICH THE DISTRICTS HAD BEEN DRAWN IN A WAY THAT

5    THERE WERE NO DISTRICTS BELOW 65 PERCENT BLACK BVAP

6    AND THEN DOWN TO, SAY, 25 OR 30, I DON'T THINK WE

7    WOULD REALLY THINK IT WAS A VERY GOOD SORT OF

8    SCIENTIFIC CONCLUSION; THAT BECAUSE WE ONLY SEE

9    DISTRICTS THAT ARE TWO-THIRDS BLACK OR MORE AND THOSE

10   ARE THE ONLY DISTRICTS THAT ARE ELECTING

11   BLACK-PREFERRED CANDIDATES, THAT A DISTRICT BELOW

12   TWO-THIRDS COULDN'T FUNCTION.  I THINK THAT WOULD BE

13   A STANDARD THAT -- OF EVIDENCE THAT WOULDN'T BE VERY

14   COMPELLING.

15      Q    IN YOUR OPINION, ARE CONTESTS WITH A BLACK

16   CANDIDATE ALWAYS MORE PROBATIVE THAN CONTESTS WITHOUT

17   A BLACK CANDIDATE IN DOING THE TYPE OF ANALYSIS YOU

18   DID IN THIS CASE?

19      A    NOT CATEGORICALLY.  THAT'S CERTAINLY ONE

20   FACTOR THAT I THINK THE COURTS HAVE THOUGHT ABOUT

21   MAYBE.  AND I KNOW THAT IN SOME CASES THAT'S

22   SOMETHING THAT'S FOCUSED ON.  SO I PROVIDE THE

23   ANALYSIS THAT'S BROKEN DOWN TO CONTESTS THAT INVOLVE

24   ONLY -- THAT INVOLVE AT LEAST ONE BLACK CANDIDATE

25   SEPARATELY FROM THE LARGER SET.

10:24a

**1**       BUT THERE ARE OTHER FEATURES THAT MIGHT MAKE

**2**   A CERTAIN ELECTION MORE ANALOGOUS TO WHAT WE MIGHT

**3**   EXPECT A FUTURE STATE HOUSE OR STATE SENATE ELECTION

**4**   TO LOOK LIKE IN A PARTICULAR DISTRICT.  AND SO I

**5**   THOUGHT IT WAS USEFUL TO PROVIDE THE COURT WITH SOME

**6**   SENSE OF WHAT THE ANSWER MIGHT BE IF WE WENT BEYOND

**7**   JUST CASES WITHOUT BLACK CANDIDATES.

**8**       I ALSO WOULD JUST QUICKLY SAY THAT YEAH, I

**9**   MEAN, THERE COULD BE CASES WHERE PROBABLY YOU

**10**  COULDN'T FIGURE OUT MUCH ABOUT BLACK-PREFERRED

**11**  CANDIDATES BY NOTING THE FACT THAT THERE IS A BLACK

**12**  CANDIDATE IN THE RACE.  SO, FOR EXAMPLE, I THINK IF

**13**  WE WERE IN SOUTH CAROLINA, I'M NOT SURE THAT

**14**  ELECTIONS INVOLVING TIM SCOTT WOULD BE MORE PROBATIVE

**15**  WITH RESPECT TO -- FOR SENATE -- A BLACK POLITICIAN

**16**  WOULD BE MORE PROBATIVE THAN OTHER ELECTIONS.  THAT

**17**  WOULD BE AN EXAMPLE.

**18**    Q   AS A RELATED EXAMPLE, WOULD THE ELECTION OF

**19**  JOHN BEL EDWARDS HERE IN LOUISIANA BE AN EXAMPLE OF

**20**  THE COROLLARY POINT TO THAT?

**21**    A   IT COULD BE, YES.  I MEAN, I THINK ONE OF

**22**  THE ISSUES THAT YOU HAVE IS THAT THERE ARE OTHER --

**23**  THERE ARE OTHER FEATURES OF THESE ELECTIONS WHICH YOU

**24**  WOULD LIKE TO BE SIMILAR WHEN YOU'RE USING THEM AS

**25**  ANALOGS FOR WHAT WOULD HAPPEN IN THESE DISTRICTS THAT

10:25a

**1**  ARE DRAWN IN A WAY THAT'S MEANT TO EITHER BE

**2**  COMPETITIVE OR -- OR EVEN MORE THAN COMPETITIVE FOR

**3**  DEMOCRATIC CANDIDATES.  AND THE STATEWIDE ENVIRONMENT

**4**  IN LOUISIANA IS TYPICALLY NOT THAT COMPETITIVE FOR

**5**  DEMOCRATS STATEWIDE.

**6**           AND SO YOU END UP IN SITUATIONS SOMETIMES I

**7**  THINK WHERE YOU'VE GOT CANDIDATES WITH HIGH NAME

**8**  RECOGNITION THAT ARE WELL-FUNDED ON ONE SIDE RUNNING

**9**  AGAINST CANDIDATES ON THE OTHER SIDE THAT DON'T HAVE

**10**  A LOT OF ELECTORAL EXPERIENCE, THAT DON'T HAVE A LOT

**11**  OF CAMPAIGN FINANCE BACKING, MAYBE DON'T HAVE A LOT

**12**  OF NAME RECOGNITION.  A NUMBER OF THOSE CANDIDATES AT

**13**  THE STATEWIDE LEVEL ALSO HERE MIGHT BE BLACK, SO YOU

**14**  MIGHT WANT TO LOOK BEYOND THOSE CONTESTS TO SEE ALSO

**15**  IF THERE ARE CONDITIONS -- ELECTORAL CONDITIONS WHERE

**16**  THE CANDIDATES THAT ARE BEING SELECTED AMONG ARE ONES

**17**  THAT ARE MORE SIMILAR IN THEIR RELATIVE AMOUNT OF --

**18**  THEIR RELATIVE COMPETITIVENESS THAN YOU WOULD SEE IN

**19**  AN ELECTION THAT MAYBE DID INVOLVE A BLACK CANDIDATE

**20**  BUT DIDN'T HAVE THOSE OTHER FEATURES OF BALANCE THAT

**21**  YOU MIGHT EXPECT TO SEE IN A MORE COMPETITIVE

**22**  ELECTORAL SETTING.

**23**           **MS. ROHANI:**  OBJECTION, YOUR HONOR.  THERE

**24**  IS NOTHING IN DR. LEWIS'S REPORT THAT DEALS WITH

**25**  CANDIDATE FUNDING OR ANYTHING THAT HE RESPONDED IN

10:26a

1    RESPONSE TO MS. MCKNIGHT'S QUESTION.

2          MS. MCKNIGHT:  I CAN -- I'M HAPPY TO BRING

3    UP THE PORTION OF HIS REPORT WHERE HE ADDRESSES

4    CANDIDATE FUNDING, IF THAT WOULD BE HELPFUL.

5          THE COURT:  WELL, THE QUESTION HAS BEEN

6    ASKED AND ANSWERED, SO I'M GOING TO OVERRULE THE

7    OBJECTION.

8              BUT I WOULD ASK YOU TO CONFINE YOUR

9    QUESTIONS TO THOSE THINGS THAT ARE DISCUSSED IN HIS

10   REPORT.

11         MS. MCKNIGHT:  OKAY.

12   BY MS. MCKNIGHT:

13     Q   OKAY.  DR. LEWIS, IN GENERAL WHEN YOU ARE

14   CONDUCTING A RACIALLY POLARIZED VOTING ANALYSIS AND

15   YOU'RE FACED WITH AN ENVIRONMENT WHERE THERE ARE NOT

16   THAT MANY CONTESTS WITH A BLACK CANDIDATE, HOW DO YOU

17   ADDRESS THIS ISSUE?

18     A   WELL, SOMETIMES THAT'S JUST A LIMITATION.

19   BUT AGAIN, I WOULD LOOK BEYOND THE CONTESTS THAT

20   INVOLVE A BLACK CANDIDATE TO TRY TO FIND OTHER

21   CONTESTS THAT MIGHT HAVE VALUE IN ESTABLISHING THE

22   ANSWERS TO THE QUESTIONS THAT WE'RE SEEKING HERE

23   ABOUT WHETHER THERE IS AN OPPORTUNITY TO ELECT.

24     Q   DID YOU FIND IN YOUR ANALYSIS THAT SOMETIMES

25   WHITE DEMOCRATS WERE THE CANDIDATE OF CHOICE FOR

10:28a

1  BLACK VOTERS?

2      **A**    YES.

3      **Q**    SO WHAT WILL ANALYZING RACES WITH WHITE

4  DEMOCRATS TELL THE COURT ABOUT WHETHER BLACK VOTERS

5  ARE ABLE TO ELECT THEIR CANDIDATES OF CHOICE?

6      **A**    WELL, A GREAT DEAL OF I THINK WHAT

7  CHARACTERIZES ELECTIONS IN THE UNITED STATES THESE

8  DAYS IS RIGOR ON PARTISAN LINES.  SO IF YOU HAVE AN

9  ELECTION THAT INVOLVES A DEMOCRAT AND A REPUBLICAN,

10 IT'S LIKELY THAT THAT ELECTION WILL GIVE SOME INSIGHT

11 INTO THE PREFERENCES OF VOTERS OF DIFFERENT RACIAL

12 GROUPS.

13     **Q**    CAN THE COURT STILL LEARN ABOUT RACIALLY

14 POLARIZED VOTING THROUGH ELECTIONS WHERE A BLACK

15 CANDIDATE IS NOT ON THE BALLOT?

16     **A**    YES.

17     **Q**    LET'S LOOK AT LDTX 54, TABLE 1.

18          DR. LEWIS, DOES THIS TABLE ADDRESS THE ISSUE

19 OF CONTESTS WITH OR WITHOUT BLACK CANDIDATES?

20     **A**    IT DOES.

21     **Q**    AND WHAT DOES IT SHOW THE COURT?

22     **A**    IT SHOWS THAT IN THE CONTESTS THAT I

23 ANALYZED HERE, THE ANSWERS ARE GENERALLY SIMILAR.

24 THE QUANTITIES THAT WE TALKED ABOUT THE OTHER DAY ARE

25 GENERALLY SIMILAR ACROSS THE TWO SETS OF CONTESTS

10:29a

1    THAT I SET FORTH.  SO THE SET OF CONTESTS THAT

2    INCLUDES CERTAIN CONTESTS THAT DID NOT HAVE A BLACK

3    CANDIDATE AND THEN, WHEN I DRILL DOWN, TO JUST THOSE

4    THAT DID.

5        Q    AND DO YOU RECALL CRITICISM FROM PLAINTIFFS

6    FOR YOU AVERAGING SOME OF YOUR NUMBERS?  DO YOU

7    RECALL THAT CRITICISM?

8        A    I DO.

9        Q    DID YOU RESPOND TO THIS CRITICISM IN YOUR

10   SURREBUTTAL REPORT?

11       A    I DID.

12       Q    LET'S TURN TO PAGE 7 OF LDTX 54.

13            IS THIS WHERE YOU ADDRESS THE CRITICISM OF

14   AVERAGING?

15       A    YES.

16       Q    OKAY.  AND WHAT DOES THIS SHOW THE COURT?

17       A    WELL, YOU KNOW, ONE QUESTION HERE IS, IS THE

18   AVERAGE SORT OF -- YOU KNOW, YOU GET THE SAME AVERAGE

19   IN DIFFERENT WAYS, AND YOU MIGHT BE INTERESTED IN

20   SOMETHING THAT'S MORE ANALOGOUS TO THE WIN RATE THAT

21   WE TALKED BEFORE ABOUT.

22            AND SO RATHER THAN THINKING ABOUT WHAT THE

23   MINIMUM PERCENTAGE IS REQUIRED ON AVERAGE FOR THE

24   BLACK-PREFERRED CANDIDATES AS ESTIMATED TO WIN BY ONE

25   VOTE, AS WE TALKED ABOUT BEFORE, YOU COULD RATHER

10:30a

1   WANT TO THINK ABOUT LIKE, WELL, WHAT -- WHAT

2   PERCENTAGE IS REQUIRED TO ELECT DIFFERENT PERCENT --

3   DIFFERENT FRACTIONS OF THE -- DIFFERENT FRACTIONS

4   OF -- I'M SORRY -- BLACK-PREFERRED CANDIDATES IN

5   DIFFERENT FRACTIONS OF THE CONTEST.  SORRY.  THERE IS

6   A LOT OF PERCENTAGES GOING BACK AND FORTH HERE.  SO

7   THAT'S SOMETHING THAT YOU COULD DO.

8         AND IF WE WANT TO THINK ABOUT 50 PERCENT, SO

9   YOU WOULD EXPECT -- YOU KNOW, HOW MANY BLACK VOTERS

10  WOULD YOU NEED -- HOW MUCH BLACK POPULATION WOULD YOU

11  NEED IN ORDER TO -- FOR THE BLACK-PREFERRED CANDIDATE

12  TO WIN HALF THE TIME.  THAT'S WHAT'S SORT OF SHOWN IN

13  THE 50 PERCENT COLUMN THERE.  SO YOU CAN ESTIMATE IT

14  THAT WAY.  AND THAT'S ACTUALLY THE MEDIAN OF THE

15  RESULTS ACROSS THE ELECTIONS THAT I'M LOOKING AT

16  HERE.  SO SIX ELECTIONS IN THE CASE OF H 4 AND H 69

17  AND SO FORTH.  AND SO REALLY, YOU KNOW, IT'S JUST A

18  COMPARISON OF THE MEAN AND THE MEDIAN HERE.

19        HERE YOU CAN SEE THAT THE DIFFERENCE BETWEEN

20  THOSE TWO NUMBERS IS GENERALLY SMALL.  SO IN THIS

21  CASE, WHETHER YOU'RE LOOKING AT THE AVERAGE OR THE

22  MEDIAN, THE 50 PERCENT NUMBER THERE ON THE NEXT

23  COLUMN YOU GET PRETTY SIMILAR -- YOU GET PRETTY

24  SIMILAR ANSWERS.

25     Q   WE CAN TAKE THIS DOWN.

10:32a

**1**        DR. LEWIS, AT WHAT LEVEL OF GEOGRAPHY DID

**2**   YOU CONDUCT YOUR EI ANALYSIS?

**3**      **A**    I FIT THE MODEL THAT -- I CREATED AN

**4**   ESTIMATE OF BLACK COHESION IN WHITE CROSSOVER VOTING

**5**   AND ALSO THE SUPPORT FOR THE VARIOUS CANDIDATES AMONG

**6**   FOLKS THAT DIDN'T IDENTIFY AS BLACK OR WHITE FOR

**7**   EVERY DISTRICT INDEPENDENTLY.

**8**      **Q**    AND WHY DID YOU DO THIS?

**9**      **A**    TO RECOGNIZE THAT THERE COULD BE

**10**  HETEROGENEITY IN THE DEGREE OF COHESION AND THE

**11**  DEGREE OF CROSSOVER VOTING ACROSS THE DIFFERENT

**12**  DISTRICTS.

**13**     **Q**    DID YOU FIND THAT HETEROGENEITY?

**14**     **A**    YES.  WE'VE SEEN SOME OF THAT HETEROGENEITY

**15**  IN SOME OF THE PREVIOUS SLIDES THAT YOU'VE PUT UP.

**16**     **Q**    IF YOU CONDUCTED YOUR EI ANALYSIS AT A

**17**  STATEWIDE LEVEL OR EVEN AT A REGIONAL LEVEL, WHAT

**18**  COULD YOU MISS OUT ON THAT YOU DETECTED IN YOUR

**19**  DISTRICT-SPECIFIC ANALYSIS?

**20**     **A**    WELL, SOME OF THAT HETEROGENEITY, SO WE

**21**  WOULD BE AVERAGING EFFECTIVELY ACROSS THAT

**22**  HETEROGENEITY.  AND IT'S ALSO A CHALLENGE IN THESE

**23**  MODELS -- AS I SAID BEFORE, THEY REST ON THE DATA,

**24**  BUT THEY ALSO REST HEAVILY ON ASSUMPTION.  AND ONE OF

**25**  THE ASSUMPTIONS IS THAT THE SUPPORT OF WHITE VOTERS

10:33a

**1**  FOR THE BLACK-PREFERRED CANDIDATE OR ANY OTHER

**2**  CANDIDATE IS NOT VARYING AS A FUNCTION OF THE

**3**  DEMOGRAPHIC COMPOSITION OF THE PRECINCT OR THE

**4**  DISTRICT.  SO IT CAN'T BE THE CASE, IF THESE MODELS

**5**  ARE TO BE EFFECTIVE, THAT THE BLACKER THE PRECINCT

**6**  IS -- BY WHICH I MEAN THE MORE HIGHER THE BLACK

**7**  BVAP -- BLACK VOTER POPULATION IS, THE -- IT CAN'T BE

**8**  THE CASE THAT THE WHITE VOTERS BECOME MORE LIKELY TO

**9**  SUPPORT THE BLACK-PREFERRED CANDIDATE.

**10**       AND, OF COURSE, WHAT WE'VE SEEN HERE IS THAT

**11**  IN -- AT LEAST IN SOME CASES, IT IS TRUE THAT IF YOU

**12**  DRILL DOWN YOU FIND THAT IN SOME OF THESE DISTRICTS

**13**  THAT HAVE HIGHER BLACK POPULATION, THE WHITE VOTERS

**14**  ARE CROSSING OVER MORE.  SO IF YOU DON'T TRY TO

**15**  ISOLATE THOSE REGIONS THAT HAVE HIGHER, LOWER BLACK

**16**  VOTING AGE POPULATION, WHEN YOU APPLY THE ANALYSIS

**17**  YOU COULD CREATE WHAT'S CALLED AGGREGATION BIAS,

**18**  WHICH IS A TENDENCY TO MISATTRIBUTE THE BEHAVIOR OF

**19**  WHITE VOTERS TO BLACK VOTERS, WHICH LEADS TO AN

**20**  OVERSTATEMENT OF COHESION AND AN UNDERSTATEMENT OF

**21**  CROSSOVER VOTING IN SOME CASES.

**22**       **MS. MCKNIGHT:**  NO FURTHER QUESTIONS, YOUR

**23**  HONOR.

**24**       **THE COURT:**  CROSS-EXAMINATION?

**25**       **MS. ROHANI:**  GOOD MORNING.  SARA ROHANI ON

10:34a

1    BEHALF OF THE PLAINTIFFS.

2                        **CROSS-EXAMINATION**

3    **BY MS. ROHANI:**

4        **Q**    GOOD MORNING, DR. LEWIS.  IT'S GOOD TO SEE

5    YOU AGAIN.

6        **A**    GOOD TO SEE YOU AGAIN.  GOOD MORNING.

7            **MS. ROHANI:**  STEPHEN, CAN YOU PLEASE PULL UP

8    LDTX 52, PAGE B-2 OF THE APPENDIX.  THANK YOU.

9    **BY MS. ROHANI:**

10       **Q**    SO, DR. LEWIS, THE ELECTIONS THAT YOU

11   INCLUDE IN YOUR WIN RATE CALCULATIONS IN TABLE 1 ARE

12   PRIMARY ELECTIONS WITH THREE OR MORE CANDIDATES.

13   CORRECT?

14       **A**    YES.

15           **MS. ROHANI:**  AND THEN, STEPHEN, CAN YOU

16   PLEASE TURN TO PAGE 6 OF THIS EXHIBIT.

17   **BY MS. ROHANI:**

18       **Q**    AND FOR PURPOSES OF TABLE 1, YOU DEFINE WIN

19   AS A CANDIDATE WHO GAINED OVER 50 PERCENT OF THE VOTE

20   OR WAS AMONG THE TWO CANDIDATES WHO ADVANCED TO THE

21   RUNOFF.  IS THAT CORRECT?

22       **A**    YES.

23       **Q**    AND THEN NOW GOING BACK TO B 2, FOR EACH

24   DISTRICT IN THIS TABLE IN TABLE 1 YOU LISTED THE

25   NUMBER OF CONTESTS THAT YOU CONSIDERED.  IS THAT

10:35a

1  CORRECT?

2      A    YES.

3      Q    AND SO NOWHERE IN YOUR REPORT DO YOU STATE

4  HOW MANY OF THOSE ELECTION CONTESTS RESULTED IN AN

5  OUTRIGHT WIN.  CORRECT?

6      A    I DO NOT.

7      Q    AND NOWHERE IN YOUR REPORT DO YOU STATE HOW

8  MANY OF THOSE ELECTION CONTESTS INVOLVED A CANDIDATE

9  ADVANCING TO A RUNOFF.  IS THAT CORRECT?

10     A    I'M TRYING TO THINK IF THAT'S SOMETHING THAT

11 COULD BE INFERRED FROM THESE NUMBERS OR NOT.  I DON'T

12 KNOW.  I DON'T BELIEVE I EXPLICITLY DISCUSS HOW MANY

13 END IN RUN-OFFS VERSUS OUTRIGHT WINS, IF THAT'S YOUR

14 QUESTION.

15     Q    THANK YOU.

16          AND A CANDIDATE WHO ADVANCES TO A RUNOFF MAY

17 ULTIMATELY GO TO LOSE THAT RUNOFF ELECTION.  IS THAT

18 CORRECT?

19     A    OF COURSE, YES.

20     Q    AND NOWHERE IN YOUR REPORT DO YOU STATE HOW

21 MANY OF THOSE CANDIDATES FROM TABLE 1 WHO ADVANCED TO

22 THE RUNOFF ACTUALLY WON THE RUNOFF.  IS THAT CORRECT?

23     A    THAT'S -- NOT EXPLICITLY.  IN OTHER WORDS,

24 WE DON'T FOLLOW THEM FROM TABLE 1 FORWARD, OTHER THAN

25 THAT IN TABLE 2 WE ANALYZE THE ELECTIONS THAT ARE

10:36a

1   RUNOFFS.  AND PRESUMABLY THOSE ALL CAME FROM CASES IN

2   WHICH SOMEBODY GOT THROUGH THE PRIMARY TO GET TO THE

3   RUNOFF.

4      Q    BUT JUST TO CONFIRM, THAT THIS TABLE WHICH

5   DOES NOT ADDRESS THAT ISSUE -- NOWHERE IN YOUR REPORT

6   DO YOU STATE THAT IN THIS TABLE HOW MANY OF THE

7   CANDIDATES ADVANCED TO THE RUNOFF AND ACTUALLY WON

8   THE RUNOFF?

9      A    NO, THAT'S CORRECT.

10     Q    SO NOW TURNING TO TABLE 3 ON PAGE B-14 OF

11  THE APPENDIX.  SO TABLE 3 WAS CONSTRUCTED IN THE SAME

12  WAY AS TABLE 1 BUT INCLUDED ONLY ELECTIONS WITH BLACK

13  CANDIDATES.  IS THAT CORRECT?

14     A    I BELIEVE SO, YES.

15     Q    AND SO THE WIN RATES WERE CONSTRUCTED IN THE

16  SAME WAY AS THEY WERE IN TABLE 1.  IS THAT CORRECT?

17     A    THAT'S CORRECT.

18     Q    AND FOR TABLE 3 YOU ALSO DON'T REPORT THE

19  NUMBER OF ELECTIONS THAT RESULTED IN AN OUTRIGHT WIN.

20  IS THAT CORRECT?

21     A    NOT IN THE TABLE, NO.

22         THE REPORTER:  I'M SORRY.  "NOT" --

23         THE WITNESS:  NOT IN THE TABLE, NO.  I'M

24  SORRY.  LET ME MOVE THE MICROPHONE.

25  BY MS. ROHANI:

10:37a

**1**      Q    AND THEN TURNING BACK TO PAGE 6.  SO IN

**2**  TABLE 2 YOU LOOKED AT TWO CANDIDATE CONTESTS.  AND

**3**  THE DEFINITION THAT YOU PRESENT IS:  TABLE 2 PRESENTS

**4**  RESULTS FOR GENERAL ELECTIONS AND TWO-CANDIDATE

**5**  PRIMARY ELECTIONS THAT INCLUDED A BLACK CANDIDATE.

**6**  DID I READ THAT CORRECTLY?

**7**      A    I BELIEVE SO.

**8**      Q    AND SO WIN FOR PURPOSES OF TABLE 2 MEANS

**9**  WHOEVER OF THE TWO CANDIDATES ACTUALLY WON THE SEAT.

**10**  IS THAT CORRECT?

**11**      A    YES.

**12**      Q    SO NOW TURNING BACK TO PAGE B-20.  B-20 OF

**13**  THE APPENDIX.  THANK YOU.

**14**          SO THIS IS TABLE 4.  NOW, TABLE 4 WAS

**15**  CONSTRUCTED IN THE SAME WAY AS TABLE 2 BUT INCLUDED

**16**  ONLY ELECTIONS WITH BLACK CANDIDATES.  IS THAT

**17**  CORRECT?

**18**      A    YES.

**19**      Q    AND SO THE WIN RATES IN TABLE 4 WERE

**20**  CONSTRUCTED IN THE SAME WAY AS THEY WERE FOR TABLE 2.

**21**  IS THAT CORRECT?

**22**      A    YES.

**23**      Q    NOW, CAN WE PLEASE PULL UP LDTX 54 ON PAGE

**24**  3.

**25**          SO DO YOU SEE THE SENTENCE THAT BEGINS WITH

10:38a

1    "THAT IS, TO SUCCEED" --

2           MS. ROHANI:  AND IF, STEPHEN COULD HIGHLIGHT

3    THAT.  IT'S "THAT IS, TO SUCCEED IN" -- PERFECT.

4    BY MS. ROHANI:

5        Q    DR. LEWIS, WOULD YOU MIND READING THE

6    SENTENCE OUT LOUD FOR THE RECORD?

7        A    SURE.  "THAT IS, TO SUCCEED IN AN ELECTION

8    IN LOUISIANA, A CANDIDATE MUST SURVIVE THE PRIMARY

9    AND (IF NECESSARY) GO ON TO WIN THE RUNOFF.  THE

10   QUESTION IN ESTABLISHING WHETHER A DISTRICT HAS

11   SUFFICIENT BVAP FOR BLACK-PREFERRED CANDIDATES TO WIN

12   ELECTION IS EXACTLY WHETHER BVAP IS SUFFICIENT TO

13   SUPPORT SUCCESS AT BOTH STAGES."

14       Q    THANK YOU.

15           SO THE BVAP SUFFICIENT -- THE BVAP

16   SUFFICIENT TO SUPPORT SUCCESS AT BOTH STAGES IS THE

17   BVAP THAT WAS PRESENTED IN TABLES 2 AND 4.  CORRECT?

18       A    THE -- I'M TRYING TO MAKE SURE THAT I

19   UNDERSTAND THE QUESTION.  MAYBE IF YOU COULD JUST TRY

20   AND RESTATE IT ONE MORE TIME FOR ME.  I DON'T MEAN TO

21   BE DIFFICULT.

22       Q    NO PROBLEM.  SO THE SENTENCE THAT YOU JUST

23   READ --

24       A    YEAH.

25       Q    -- STATED THAT THE -- I'M JUST GOING TO

10:39a

1   REPEAT IT.  THE QUESTION IN ESTABLISHING WHETHER A

2   DISTRICT HAS SUFFICIENT BVAP FOR BLACK-PREFERRED

3   CANDIDATES TO WIN IS EXACTLY WHETHER THE BVAP IS

4   SUFFICIENT TO SUPPORT SUCCESS AT BOTH STAGES.

5            AND THEN SO MY QUESTION WAS:  THAT THE BVAP

6   SUFFICIENT TO SUPPORT SUCCESS OF BOTH STAGES IS ONLY

7   PRESENT IN TABLES 2 AND 4.  IS THAT CORRECT?

8       A    WELL, IF IT WERE THE CASE THAT IN TABLES 1

9   AND 3 THE BVAP REQUIRED TO ESCAPE THE PRIMARY AND

10  REACH A RUNOFF HAD BEEN -- WERE HIGHER THAN THOSE IN

11  TABLES 2 AND 4, THEN I DON'T THINK THAT WHAT YOU SAID

12  WOULD BE CORRECT.  IN OTHER WORDS, THE BINDING

13  CONSTRAINT COULD BE THE PRIMARY STAGE.

14      Q    BUT YOU DID JUST STATE THAT -- ARE THERE ANY

15  DISTRICTS LIKE THAT IN YOUR REPORT?

16      A    I DON'T -- I DON'T RECALL.  I KNOW GENERALLY

17  SPEAKING THE MINIMUM REQUIRED TO SUCCEED IS HIGHER --

18  NECESSARY MINIMUM REQUIRED TO SUCCEED IS HIGHER IN

19  THE RUNOFF FOR TWO-CANDIDATE ELECTIONS THAN IN THE

20  FIRST STAGE OR PRIMARY ELECTIONS.

21      Q    SO IS IT FAIR TO SAY THAT THE

22  BLACK-PREFERRED CANDIDATE WOULD WIN IF -- IF WE'RE

23  LOOKING AT WHETHER THE BLACK-PREFERRED CANDIDATE TO

24  WIN IF A RUNOFF IS REQUIRED, YOU WOULD NEED TO LOOK

25  AT THE BVAPs IN TABLES 2 AND 4?

10:41a

**1**   **A**   YES.  YOU WOULD NEED TO -- WELL, I MEAN,

**2**   YOU -- IN GENERAL YOU WOULD NEED TO LOOK AT BOTH.

**3**   AND THEN AS IT IS REQUIRED TO WIN BOTH ELECTIONS IN

**4**   ORDER TO SUCCEED, YOU COULD LOOK AT THE LARGER OF

**5**   THOSE TWO NUMBERS AS BEING THE MINIMUM REQUIRED.

**6**   **Q**   AND JUST TO CONFIRM, THESE DEFINITIONS OF

**7**   WIN THAT WE JUST DISCUSSED, THEY APPLY TO YOUR WIN

**8**   RATES?

**9**   **A**   YES.

**10**   **Q**   AND DO THEY -- THEY APPLY TO YOUR

**11**   PERCENT-NEEDED-TO-WIN FIGURES AS WELL.  IS THAT

**12**   CORRECT?

**13**   **A**   YES.

**14**   **Q**   SO YESTERDAY YOU TESTIFIED ABOUT WHAT YOU

**15**   CALLED A THOUGHT EXPERIMENT.  AND IN THAT THOUGHT

**16**   EXPERIMENT THAT YOU DISCUSSED YESTERDAY, THE

**17**   DISTRICTS IN THE ILLUSTRATIVE PLAN THAT ARE OVER 50

**18**   PERCENT BVAP, THEY COULD PERFORM AT LESS THAN 50

**19**   PERCENT BVAP AS WELL.  CORRECT?

**20**   **A**   THAT'S WHAT THE ESTIMATES SUGGEST IN I THINK

**21**   MOST ALL CASES, YES.

**22**   **Q**   AND MEANING THAT YOUR PERCENT NEEDED TO WIN

**23**   IN THOSE DISTRICTS IS LESS THAN 50 PERCENT?

**24**   **A**   YES.

**25**   **Q**   SO YOU WOULD AGREE THAT IF YOU CHANGED THE

10:42a

1  BOUNDARIES OF A DISTRICT IN A WAY THAT REDUCED THE

2  BVAP OF THE DISTRICT, THAT WOULD CHANGE WHICH VOTERS

3  ARE IN THE DISTRICT?

4      A    CERTAINLY.

5      Q    AND THEN YOU'D HAVE TO RUN A NEW EI ANALYSIS

6  TO UNDERSTAND THE VOTING PATTERNS IN THAT NEW

7  DISTRICT?

8      A    ONCE YOU DRAW IT, THEN YOU COULD DO THAT,

9  YES.

10     Q    YOU COULD DO THAT OR YOU WOULD NEED TO RUN A

11  NEW EI ANALYSIS?

12     A    WELL, FOR WHAT PURPOSE?

13     Q    IN ORDER TO UNDERSTAND THE VOTING PATTERNS

14  IN THE NEW DISTRICT.  BECAUSE YOU JUST AGREED THAT IF

15  YOU CHANGE THOSE BOUNDARIES IN THE DISTRICT WHICH

16  CHANGES THE BVAP, IN ORDER TO UNDERSTAND THE VOTING

17  PATTERNS YOU WOULD HAVE TO RUN A NEW EI ANALYSIS FOR

18  THAT DISTRICT.  IS THAT CORRECT?

19     A    YEAH.  YOU COULD DO THAT, YES.

20     Q    YOU COULD OR YOU HAVE TO?  AGAIN, IN ORDER

21  TO UNDERSTAND THE VOTING PATTERNS IN THAT NEW

22  DISTRICT, WHICH IS DIFFERENT THAN THE PREVIOUS ONE,

23  DO YOU HAVE TO OR COULD YOU?

24     A    IT DEPENDS ON HOW MUCH OF A CHANGE YOU MADE

25  AND WOULD YOU NEED TO ANALYZE IT AGAIN TO MAKE A GOOD

10:43a

1  INFERENCE ABOUT WHAT THE LIKELY EFFECT WOULD BE.  BUT

2  YEAH, I MEAN, ULTIMATELY ONCE YOU'VE DRAWN YOUR

3  DISTRICTS, I THINK I WOULD WANT TO DO THE ANALYSIS ON

4  THOSE DISTRICTS HAVING THEM HAD BEEN DRAWN.

5      Q    TO UNDERSTAND A GOOD INFERENCE, YOU WOULD

6  PERSONALLY DO THAT; RUN A NEW EI ANALYSIS?

7      A    AGAIN, I -- I THINK THAT THE ANSWER TO THAT

8  IS YES.  BUT I'M NOT SURE THAT THAT -- YOU KNOW,

9  I'M -- AGAIN, THE THOUGHT EXPERIMENT WOULD DEVIATE

10  VERY MUCH FROM THAT -- FROM THAT ANSWER.

11      Q    AND THEN YOU'D HAVE TO RECALCULATE THE

12  PERCENT NEEDED TO WIN?

13      A    YES.  OR YOU CAN RECALCULATE THE -- I MEAN,

14  YOU WOULD.  IF YOU GOT NEW ESTIMATES, THEN YOU WOULD

15  HAVE TO RECALCULATE, YES.

16      Q    SO THE PERCENT NEEDED TO WIN IN THAT

17  DISTRICT MIGHT BE DIFFERENT?

18      A    IN ANY DISTRICT THAT YOU DREW IT MIGHT BE

19  DIFFERENT.  SO THE THOUGHT EXPERIMENT, AGAIN, AS WE

20  TALKED ABOUT YESTERDAY, HOLDS CERTAIN THINGS CONSTANT

21  THAT IN REALITY MIGHT NOT BE CONSTANT.

22      Q    SO I'D LIKE TO TAKE AN EXAMPLE.

23          MS. ROHANI:  STEPHEN, CAN YOU PULL UP LDTX

24  52 AT B-21 OF THE APPENDIX.  B-21 WOULD BE THE PAGE.

25  BY MS. ROHANI:

10:44a

**1**   Q   AND THIS IS YOUR INITIAL REPORT, DR. LEWIS.

**2**  THANK YOU.

**3**        SO I'D LIKE TO LOOK AT -- ACTUALLY, IS IT

**4**  YOUR UNDERSTANDING THAT ENACTED DISTRICT 69 AND

**5**  ILLUSTRATIVE DISTRICT 69 OVERLAP?

**6**        **MS. MCKNIGHT:**  OBJECTION.  BEYOND THE SCOPE

**7**  OF HIS OPINION; OVERLAP BETWEEN DISTRICTS ENACTED AND

**8**  SIMULATED IN THE ILLUSTRATIVE.

**9**        **THE COURT:**  YOU CAN RESPOND.

**10**       **MS. ROHANI:**  YOUR HONOR, THIS IS ABOUT HIS

**11**  UNDERSTANDING OF HIS NUMBERS THAT HE STATED HIMSELF

**12**  WERE HIS OPINIONS AND CONCLUSIONS.

**13**       **THE COURT:**  I'M GOING TO ALLOW IT.

**14**  OVERRULED.

**15**  BY MS. ROHANI:

**16**   Q   SO, DR. LEWIS, AGAIN, IS IT YOUR

**17**  UNDERSTANDING THAT ENACTED DISTRICT 69 AND

**18**  ILLUSTRATIVE DISTRICT 69 OVERLAP?

**19**   A   I DON'T KNOW IF THEY OVERLAP OR NOT.

**20**   Q   SO JUST LOOKING AT YOUR TABLES, ENACTED

**21**  DISTRICT 69 IS 23.7 PERCENT BVAP.  DID I READ THAT

**22**  CORRECTLY?

**23**   A   YES.

**24**   Q   AND ILLUSTRATIVE DISTRICT 69, WHICH WOULD BE

**25**  ON THE NEXT PAGE -- ON B-23.  WE CAN TURN TO THAT,

10:46a

1   TWO PAGES LATER.

2           SO ILLUSTRATIVE DISTRICT 69, HOUSE DISTRICT

3   69, IS 50.2 PERCENT BVAP.  IS THAT CORRECT?

4       A    YES.

5       Q    AND THEN TURNING BACK TO B-21, IN TABLE 4

6   YOUR PERCENT NEEDED TO WIN FOR ENACTED DISTRICT 69 IS

7   60 PERCENT.  IS THAT CORRECT?

8       A    YES.

9       Q    AND THEN TURNING BACK TO B-23 TO TABLE 4,

10  YOUR PERCENT NEEDED TO WIN IN ILLUSTRATIVE DISTRICT

11  69 IS 42 PERCENT.  IS THAT CORRECT?

12      A    YES.

13      Q    AND THAT'S BECAUSE THERE ARE DIFFERENT

14  VOTERS IN ENACTED DISTRICT 69 THAN ILLUSTRATIVE

15  DISTRICT 69.  IS THAT CORRECT?

16      A    I ASSUME SO, YES.

17      Q    YOU ASSUME SO?

18      A    WELL, I -- YOU KNOW, I DON'T ACTUALLY KNOW

19  HOW MANY OF THE VOTERS ARE THE SAME VOTERS OR

20  DIFFERENT VOTERS OR --

21      Q    OF COURSE.

22      A    SO THAT WOULD EXPLAIN THE DIFFERENCE, YES.

23      Q    SO IN THE ENACTED PLAN, ARE YOU -- WE CAN

24  PULL THIS DOWN.

25           ARE YOU AWARE OF ANY DISTRICTS THAT ARE NOT

10:47a

**1**  MAJORITY BLACK THAT WHERE THE WIN RATE YOU CALCULATED

**2**  IS OVER 30 PERCENT?

**3**      **A**    I HAVEN'T THOUGHT ABOUT THAT NUMBER, SO I

**4**  DON'T KNOW.  I'M NOT -- ACTUALLY, IT'S FAIR TO SAY

**5**  I'M NOT AWARE.  I DON'T THINK IT'S FAIR TO SAY THAT

**6**  I -- THAT THERE ARE OR AREN'T ANY ON THE BASIS OF

**7**  WHETHER I'M AWARE.

**8**      **Q**    OKAY.  I WILL SUBMIT TO YOU THAT I LOOKED

**9**  THROUGH YOUR TABLES AND WAS ONLY ABLE TO FIND ONE,

**10**  WHICH IS HOUSE DISTRICT 91.  DO YOU AGREE WITH THAT?

**11**      **A**    I BELIEVE THAT YOU WOULD NOT LIE TO ME.

**12**      **Q**    THANK YOU.

**13**          DO YOU KNOW IF THAT DISTRICT IS MAJORITY

**14**  WHITE?

**15**      **A**    I DO NOT KNOW.

**16**      **Q**    AND WOULD IT SURPRISE YOU TO FIND OUT THAT

**17**  THIS DISTRICT IS ACTUALLY A MAJORITY-MINORITY

**18**  DISTRICT?

**19**      **A**    WOULD IT SURPRISE ME?  I GUESS I -- I

**20**  HAVEN'T GIVEN THAT QUESTION VERY MUCH THOUGHT,

**21**  EITHER.  IT'S CERTAINLY POSSIBLE.  I KNOW THAT THERE

**22**  ARE DISTRICTS WHERE THE OTHER POPULATION -- AND I'D

**23**  BE LESS FAMILIAR WITH WHAT THE CENSUS BREAKDOWN WOULD

**24**  BE BECAUSE I WAS MORE IN THE VOTING SIDE OF THE

**25**  EQUATION HERE AND JUST MAKING SOME ADJUSTMENTS FOR

10:48a

1  TURNOUT AT THE END.

2          BUT THERE ARE PLACES WHERE THERE IS A

3  SIGNIFICANT OTHER POPULATION, SO I KNOW THERE TO BE

4  DISTRICTS WHICH ARE MAJORITY-MINORITY BUT NOT

5  MAJORITY BLACK.  SO I KNOW SUCH THINGS EXIST.  I

6  COULDN'T TELL YOU WHETHER THE ONE YOU'RE REFERRING TO

7  IS ONE OF THEM.

8      Q    THANK YOU.

9          AND JUST TO CLARIFY, YOU'D AGREE WITH ME

10 THAT A MAJORITY-MINORITY DISTRICT IN LOUISIANA IS ANY

11 DISTRICT IN WHICH A MAJORITY OF THE VOTERS ARE

12 NON-WHITE?

13     A    I BELIEVE THAT YOU COULD DEFINE IT THAT WAY,

14 YES.

15     Q    THANK YOU.

16         AND SO JUST TO RETURN, ARE THERE ANY HOUSE

17 DISTRICTS THAT ARE NOT MAJORITY BLACK WHERE THE WIN

18 RATE IS ABOVE 30 PERCENT?

19     A    I DON'T KNOW, AGAIN.  MAYBE YOU WILL TELL ME

20 THAT THAT'S THE CASE.

21         MS. ROHANI:  JUST ONE MOMENT WHILE I CONFER

22 WITH MY COLLEAGUES.

23             NO FURTHER QUESTIONS, YOUR HONOR.

24         THE COURT:  ANY REDIRECT?

25         MS. MCKNIGHT:  JUST ONE QUESTION.

10:49a

**1**          **REDIRECT EXAMINATION**

**2** BY MS. MCKNIGHT:

**3**    **Q**    DR. LEWIS, ARE YOU AWARE OF ANY EXPERT

**4** REPORT IN THIS MATTER THAT STUDIED THE OVERLAP

**5** PERCENTAGE OF ENROLLED, THE ENACTED DISTRICTS AS

**6** COMPARED TO THE ILLUSTRATIVE DISTRICTS, ON A

**7** DISTRICT-BY-DISTRICT BASIS?

**8**    **A**    I'M NOT AWARE.

**9**          **MS. MCKNIGHT:**  YOUR HONOR, I WOULD LIKE TO

**10** LODGE A STANDING OBJECTION TO ANY TESTIMONY OR

**11** PROVISION OF EVIDENCE THAT PLAINTIFFS WILL SEEK TO

**12** PUT FORWARD IN FINDINGS OF FACT, ET CETERA, THAT

**13** COMPARES THE ILLUSTRATIVE DISTRICT TO THE ENACTED

**14** PLAN AND THE POPULATION OVERLAP.  THAT IS SOMETHING

**15** THAT COULD HAVE BEEN DONE BY AN EXPERT.  IT WAS NOT

**16** DONE HERE.  IT REQUIRES A COMPARISON OF PERCENTAGE OF

**17** POPULATION AND WHAT IT'S LIKE AND WHAT IT'S LIKE.

**18** IT'S DONE IN THESE CASES.  IT WASN'T DONE HERE.

**19**          **THE COURT:**  DO YOU WANT TO RESPOND?

**20**          **MS. KEENAN:**  YES, YOUR HONOR.  BECAUSE THIS

**21** IS AN OBJECTION TO THE FINDING OF FACT, MEGAN KEENAN

**22** FOR THE PLAINTIFFS RESPONDING.

**23**          **THE COURT:**  GO AHEAD.

**24**          **MS. KEENAN:**  MR. COOPER'S REPORT HAS

**25** DETAILED TABLES WITH THE POPULATION OF EACH, IN

10:50a

1   ADDITION TO MAPS THAT SHOW THE OVERLAPPING OF THE

2   DISTRICTS, SO WE WOULD DEFINITELY DISAGREE ABOUT WHAT

3   WE CAN PUT INTO THE FINDINGS OF FACT AS TO THAT

4   POINT.

5          **MS. MCKNIGHT:**  TO BE SPECIFIC, YOUR HONOR,

6   WORDS MATTER HERE.  I SAID DISTRICT-BY-DISTRICT

7   BASIS, AND THAT'S IMPORTANT HERE.  AND THAT WAS

8   NOT -- THAT WAS NOT DONE BY MR. COOPER.

9              SO WE'LL -- WE NEED TO ASSERT THAT

10  OBJECTION AND MAKE CLEAR ON THE RECORD THAT THAT WAS

11  NOT DONE.

12         **MS. KEENAN:**  AND, YOUR HONOR, WE CAN POINT

13  YOU TO -- THE TABLES ARE ALL IN THE RECORD.  THEY ARE

14  DISTRICT BY DISTRICT AND MAY BREAK DOWN A DECENT

15  AMOUNT OF INFORMATION ABOUT THE POPULATION.

16  ADDITIONALLY, THE MAPS SHOW EACH DISTRICT, OF COURSE,

17  SO YOU CAN SEE IT IN THE PHOTOS AS WELL.

18         **THE COURT:**  WELL, THE COURT WILL TAKE --

19  WILL CONSIDER THE OBJECTION AND TAKE IT UNDER

20  CONSIDERATION IN RENDERING ITS RULING.

21         **MS. MCKNIGHT:**  YOUR HONOR, ONE MORE ISSUE.

22  I NEED -- I WOULD LIKE TO MOVE FOR THE ADMISSION OF

23  THOSE FOUR LEWIS DEMONSTRATIVES.  IT'S LEWIS 1

24  THROUGH 4.  THOSE ARE THE DEMONSTRATIVES WE DISCUSSED

25  YESTERDAY.  THEY ARE SUMMARIES UNDER RULE 1006 OF

10:51a

1    VOLUMINOUS DATA.  THERE IS NO CHANGE FROM THE

2    INFORMATION FROM HIS REPORT TO WHAT THEY APPEAR ON

3    THE DEMONSTRATIVES.

4            **MS. ROHANI:**  SUBJECT TO OUR OBJECTION THAT

5    THE INFORMATION ABOUT PERCENT NEEDED TO WIN IS

6    IRRELEVANT, WE HAVE NO OBJECTIONS TO THE EXHIBITS

7    BEING INTRODUCED.

8            **THE COURT:**  WHAT ARE YOUR EXHIBIT NUMBERS?

9            **MS. MCKNIGHT:**  SO THIS WOULD BE -- I BEG

10   YOUR PARDON, YOUR HONOR.

11           THANK YOU, YOUR HONOR.  WE WILL SUBMIT

12   THAT AS LDTX 62.  AND THOSE ARE LEWIS 1 THROUGH 4

13   DEMONSTRATIVES.

14           **THE COURT:**  ADMITTED.

15           **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

16           **THE COURT:**  YOU MAY STEP DOWN.  THANK YOU,

17   SIR.

18           **THE WITNESS:**  THANK YOU.

19                   **(OFF THE RECORD)**

20

21

22

23

24

25

1        **THE COURT:**  OKAY.  NEXT WITNESS.

2        **MR. STRACH:**  WE DON'T HAVE ANY FURTHER

3   WITNESSES AT THIS TIME.  WE'LL MOVE THE ADMISSION OF

4   ANY EXHIBITS THAT WE NEED TO MOVE IN, PLUS A PROFFER.

5   WE'LL DO A PROFFER OF SOLANKY'S REPORT.  AND I THINK

6   MR. LEWIS WANTS TO ADDRESS THE PROFFER OF PARTS OF

7   THE DOUG JOHNSON REPORT.

8        **THE COURT:**  OKAY.  SO LET'S START WITH

9   WHATEVER EXHIBITS THAT YOU THINK YOU NEED TO MOVE IN.

10       **MS. HOLT:**  YES, YOUR HONOR.  WE HAVE NO

11  FURTHER EXHIBITS FOR THE RECORD AT THIS TIME.  BUT WE

12  DO WANT TO MAKE A PROFFER.

13       MY NAME IS CASSIE HOLT ON BEHALF OF

14  SECRETARY ARDOIN.  AND PURSUANT TO RULE 103 AND FOR

15  THE REASONS SET FORTH IN RECORD DOCUMENT 160,

16  DEFENDANTS PROFFER DR. SOLANKY'S THREE EXPERT

17  REPORTS, WHICH WERE PREVIOUSLY UPLOADED TO JERS AT

18  SOS 2, WHICH IS ENTITLED "EXPERT REPORT OF TUMULESH"

19  -- THAT'S T-U-M-U-L-E-S-H -- "K. SOLANKY" -- THAT'S

20  S-O-L-A-N-K-Y -- "PH.D." DATED JULY 28, 2023.

21       ADDITIONALLY, THAT'S SOS 5, WHICH IS

22  DR. SOLANKY'S REBUTTAL REPORT DATED AUGUST 21, 2023,

23  AND SOS 39, WHICH IS DR. SOLANKY'S SUPPLEMENTAL

24  REPORT DATED OCTOBER 27, 2023.

25       **THE COURT:**  THE FIRST REPORT -- I'M SORRY, I

10:54a

1    JUST DIDN'T WRITE THE EXHIBIT NUMBER DOWN.  HIS

2    INITIAL REPORT WAS EXHIBIT NUMBER WHAT?

3          **MS. HOLT:**  SOS 2, YOUR HONOR.

4          **THE COURT:**  2.

5                ALL RIGHT.  THE COURT WILL ADMIT 2, 5

6    AND 39 AS PROFFERS AND THAT --

7          **MS. GIGLIO:**  YOUR HONOR --

8          **THE COURT:**  YOU MAY BE HEARD, YES.

9          **MS. GIGLIO:**  I APOLOGIZE, YOUR HONOR, FOR

10   INTERRUPTING.

11         **THE COURT:**  GO AHEAD.  YOU MAY BE HEARD.

12         **MS. GIGLIO:**  WE'D JUST LIKE TO MAINTAIN THE

13   OBJECTIONS TO DR. SOLANKY'S REPORTS AS ARTICULATED IN

14   THE MOTION IN LIMINE PRACTICE BEFORE THIS COURT AND

15   AS ARTICULATED IN YOUR HONOR'S DECISION ON DR.

16   SOLANKY'S TESTIMONY.

17               WE WOULD ALSO FURTHER OBJECT TO THE

18   PROFFER OF DR. SOLANKY'S SUPPLEMENTAL REPORT.  THAT'S

19   AT SOS 39 I BELIEVE, AS COUNSEL REPRESENTED.  TO THE

20   EXTENT THAT DR. SOLANKY'S SUPPLEMENTAL REPORT GOES

21   BEYOND RESPONDING TO DR. HANDLEY'S SUPPLEMENTAL

22   REPORT WHICH WAS PREVIOUSLY ADMITTED TO THIS COURT AS

23   PLAINTIFFS' EXHIBIT 19 -- 16 THROUGH 19, YOUR HONOR.

24         **THE COURT:**  OKAY.  THE COURT OF APPEAL WILL

25   TAKE UP YOUR OBJECTIONS IN THE EVENT THAT THE COURT

10:55a

1  DETERMINES THAT THE MOTION IN LIMINE EXCLUDING DR.

2  SOLANKY'S PROPOSED OPINION TESTIMONY WAS EXCLUDED BY

3  THE COURT.

4           EXHIBITS 2, 5 AND 39 ARE ADMITTED AS

5  PROFFER EXHIBITS.  AND COUNSEL FOR THE DEFENDANTS ARE

6  INSTRUCTED TO AMEND YOUR JERS DESCRIPTION TO SHOW

7  "PROFFER," SO THAT WHEN IT GOES TO THE COURT OF

8  APPEAL THERE IS NO CONFUSION ABOUT WHAT'S PART OF THE

9  PROFFER AND WHAT'S PART OF THE RECORD.

10           SO THE FIRST -- THE FIRST WORDS IN YOUR

11  DESCRIPTION SHOULD SAY "PROFFER" AND THEN SAY, YOU

12  KNOW, "DR. SOLANKY REPORT" OR WHATEVER.

13          MS. GIGLIO:  AND, YOUR HONOR, FOR THE SAKE

14  OF THE RECORD -- MY NAME IS AMANDA GIGLIO ON BEHALF

15  OF PLAINTIFFS.  AND I JUST WANT TO BE CLEAR, YOUR

16  HONOR, THAT OUR OBJECTION TO USE DR. SOLANKY'S REPORT

17  OR DR. SOLANKY'S SUPPLEMENTAL REPORT AT SOS 39 IS

18  THAT ANY PORTIONS OF IT THAT GO BEYOND DR.

19  HANDLEY'S -- BEYOND RESPONDING TO DR. HANDLEY'S OWN

20  SUPPLEMENTAL REPORT ARE UNTIMELY.

21          THE COURT:  OKAY.  IT'S NOTED FOR THE

22  RECORD.

23          MS. HOLT:  YES.  AND, YOUR HONOR, IF I MAY

24  BRIEFLY RESPOND.

25          THE COURT:  YOU MAY.

10:56a

**1**      MS. HOLT:  SOS 39 IS DIRECTLY IN RESPONSE TO

**2**  DR. HANDLEY'S SUPPLEMENTAL REPORT, WHICH DEFENDANTS

**3**  MAINTAIN WAS UNTIMELY.  THANK YOU.

**4**      THE COURT:  OKAY.  ANYTHING ELSE THAT THE

**5**  DEFENDANTS NEED TO TAKE CARE OF IN THE WAY OF

**6**  HOUSEKEEPING OR PROFFERS BEFORE YOU CLOSE --

**7**  BEFORE YOU REST?

**8**      MR. LEWIS:  YES.  YOUR HONOR, PATRICK LEWIS

**9**  ON BEHALF OF THE LEGISLATIVE DEFENDANTS.

**10**      YOUR HONOR, YOUR RULING ON THE MOTION

**11**  IN LIMINE EXCLUDED PORTIONS BUT NOT THE ENTIRETY OF

**12**  THE TWO REPORTS OF DR. DOUGLAS JOHNSON AT LDTX 51 AND

**13**  58.  YOUR HONOR DIRECTED US TO PREPARE A REDACTED

**14**  VERSION OF THOSE TWO EXHIBITS THAT REDACTED THE

**15**  EXCLUDED PORTIONS.

**16**      I AM PLEASED TO REPORT TO THE COURT

**17**  THAT WE HAVE MET AND CONFERRED WITH PLAINTIFFS'

**18**  COUNSEL AND, AS OF ROUGHLY 20 MINUTES AGO, HAVE FINAL

**19**  REDACTED VERSIONS.  WE WOULD PROPOSE TO UPLOAD THOSE

**20**  AT THE NEXT BREAK.

**21**      THE COURT:  SO YOUR REDACTED VERSIONS WILL

**22**  BE 1 AND 58.  IS THAT CORRECT?

**23**      MR. LEWIS:  51 AND 58.  YES, YOUR HONOR.

**24**      THE COURT:  51 AND 58.  OKAY.

**25**      MR. LEWIS:  YES, YOUR HONOR.

10:58a

1    AND THEN I UNDERSTAND -- AND WE WILL

2    VERIFY AT THE BREAK -- THAT THE UNREDACTED VERSIONS

3    HAVE BEEN RELABELED AS LDTX 51-A AND LDTX 58-A.  AND

4    THOSE UNREDACTED VERSIONS, YOUR HONOR, PURSUANT TO

5    RULE OF EVIDENCE 103 AND FOR THE REASONS STATED ON

6    THE RECORD, AS WELL AS IN RECORD DOCUMENT NO. 160, WE

7    WOULD PROFFER IS THE TESTIMONY OF AND OPINIONS OF

8    DR. JOHNSON, THE SUBSTANCE OF THAT TESTIMONY AND

9    OPINIONS THAT HE WOULD HAVE PROVIDED IF HE WOULD HAVE

10   BEEN ALLOWED TO TESTIFY AS TO THOSE ISSUES.

11        **THE COURT:**  DO YOU WANT TO BE HEARD?

12        **MS. KEENAN:**  YOUR HONOR, I BELIEVE THAT WE

13   MADE THE OBJECTION AT THE TIME THAT THE REPORTS WERE

14   ATTEMPTED TO BE ADMITTED DURING DR. JOHNSON'S DIRECT.

15   WE WOULD STAND AGAIN ON THE MOTIONS IN LIMINE

16   PRACTICE AS WELL AS THE RULINGS ARTICULATED IN YOUR

17   HONOR'S ORDER AS TO WHY THE PORTIONS OF MISTER -- OF

18   DR. JOHNSON'S REPORT SHOULD BE EXCLUDED.

19        AND I WOULD OTHERWISE JUST REPRESENT

20   THAT MR. LEWIS IS CORRECT THAT WE AGREED TO THE

21   REDACTED PORTIONS THAT CAN BE ADMITTED INTO THE

22   RECORD.

23        **THE COURT:**  OKAY.  SO HERE'S WHAT I WANT YOU

24   TO DO.  ON 51-A AND 58-A -- IS IT THE FULL REPORT ALL

25   OVER AGAIN?

10:59a

1      MR. LEWIS:  YES, IT IS LITERALLY THE
2  ORIGINAL VERSIONS OF 51 AND 58 RELABELED.
3      THE COURT:  WHY DON'T YOU JUST PUT THE
4  REDACTED VERSIONS IN SO WE DON'T HAVE SO VOLUMINOUS A
5  RECORD?  I'M ACTUALLY JUST TRYING TO SAVE SOME --
6  WHAT?
7      THE COURTROOM DEPUTY:  I'VE ALREADY MARKED
8  THEM "PROFFERED" AND "UNDER SEAL," THE As.
9      THE COURT:  OKAY.  THEY'RE ALREADY IN JERS
10  AS 51-A AND 58-A AS PROFFER AND UNDER SEAL.  AND THE
11  SAME NAMING NOMENCLATURE WILL APPLY TO THE
12  DR. JOHNSON PROFFER AS APPLIED TO THE DR. SOLANKY
13  PROFFER.  OKAY?
14      MR. LEWIS:  THANK YOU, YOUR HONOR.
15      THE COURT:  YOU'RE WELCOME.
16      MS. KEENAN:  YOUR HONOR, IF I MAY BRIEFLY
17  CLARIFY ONE OTHER THING NOT RELATED TO DR. JOHNSON
18  BUT RELATED TO MS. MCKNIGHT'S OBJECTION RELATED TO
19  THE OVERLAPPING DISTRICTS.
20      JUST FOR THE CLARITY OF THE RECORD, THE
21  COOPER EXHIBITS AND REPORT THAT I WAS SPEAKING ABOUT
22  CAN BE FOUND AT EXHIBIT 20, PARAGRAPHS 92 AND 120, AS
23  WELL AS EXHIBITS 56, 57, 58, 59, 75, 76, 77 AND 78,
24  JUST SO THE RECORD IS CLEAR ON THAT ISSUE.
25      MS. MCKNIGHT:  YOUR HONOR, I NEED TO

11:00a

1   WITHDRAW MY OBJECTION.  I'VE BEEN CORRECTED, AND I

2   WANT TO MAKE CLEAR THAT I WITHDRAW THAT OBJECTION.

3            **THE COURT:**  THANK YOU FOR YOUR

4   PROFESSIONALISM.

5            **MS. MCKNIGHT:**  THANK YOU.

6            **THE COURT:**  ALL RIGHT.

7            **MR. STRACH:**  THANK YOU, YOUR HONOR.  PHIL

8   STRACH.

9               ALL OF THE DEFENDANTS REST.

10           **THE COURT:**  THE DEFENDANTS AND THE

11  INTERVENING DEFENDANTS ARE RESTING?

12           **MR. STRACH:**  CORRECT.

13           **THE COURT:**  OKAY.

14              ALL RIGHT.  IS THERE ANY REBUTTAL?

15           **MS. GIGLIO:**  YES, YOUR HONOR.  PLAINTIFFS

16  CALL DR. MARVIN KING TO THE STAND.

17           **THE COURT:**  I'M SO SORRY.  I WAS READING

18  SOMETHING.  WHAT -- WHO ARE YOU CALLING?

19           **MS. GIGLIO:**  PLAINTIFFS CALL REBUTTAL

20  WITNESS DR. MARVIN P. KING TO THE STAND.

21           **(WHEREUPON, MARVIN P. KING, BEING DULY**

22  **SWORN, TESTIFIED AS FOLLOWS.)**

23           **MS. GIGLIO:**  YOUR HONOR, MAY I APPROACH THE

24  WITNESS TO HAND HIM A COPY OF HIS REPORT?

25           **THE COURT:**  YOU MAY.

11:01a

**1**          **THE COURTROOM DEPUTY:**  WOULD YOU PLEASE

**2**   STATE YOUR NAME AND SPELL IT FOR THE RECORD, PLEASE.

**3**          **THE WITNESS:**  MARVIN KING.  M-A-R-V-I-N,

**4**   K-I-N-G.

**5**          **MS. GIGLIO:**  AND GOOD MORNING AGAIN.  THIS

**6**   IS AMANDA GIGLIO, G-I-G-L-I-O, ON BEHALF OF

**7**   PLAINTIFFS.

**8**                       **VOIR DIRE**

**9**   BY MS. GIGLIO:

**10**      **Q**   GOOD MORNING, DR. KING.

**11**      **A**   GOOD MORNING.

**12**      **Q**   CAN YOU PLEASE SHARE YOUR EDUCATIONAL

**13**   BACKGROUND WITH THE COURT, STARTING WITH COLLEGE?

**14**      **A**   I HAVE A DEGREE IN GOVERNMENT FROM THE

**15**   UNIVERSITY OF TEXAS AT AUSTIN AND A PH.D. FROM THE

**16**   UNIVERSITY OF NORTH TEXAS IN POLITICAL SCIENCE, 2005.

**17**      **Q**   SO YOU RECEIVED YOUR PH.D. IN 2005?

**18**      **A**   YES.

**19**      **Q**   AND WHAT WAS THE FOCUS OF YOUR PH.D.

**20**   RESEARCH, DR. KING?

**21**      **A**   AFRICAN-AMERICAN VOTING BEHAVIOR.

**22**      **Q**   WHAT WAS YOUR DISSERTATION ABOUT?

**23**      **A**   WHY AFRICAN AMERICANS VOTE THE WAY THEY DO,

**24**   SPECIFICALLY THEIR PARTISANSHIP, GIVEN THAT IT'S BEEN

**25**   SO CONSISTENTLY DEMOCRATIC FOR SO MANY YEARS BEYOND

11:02a

1   THE CIVIL RIGHTS MOVEMENT.

2       Q    WHAT HAVE YOU DONE SINCE RECEIVING YOUR

3   PH.D., DR. KING?

4       A    I HAVE BEEN A PROFESSOR -- ASSOCIATE

5   PROFESSOR OF POLITICAL SCIENCE WITH A JOINT

6   APPOINTMENT IN AFRICAN-AMERICAN STUDIES AT THE

7   UNIVERSITY OF MISSISSIPPI.

8       Q    DO YOU HAVE TENURE AT THE UNIVERSITY OF

9   MISSISSIPPI?

10      A    I DO.  I'M A ASSOCIATE PROFESSOR WITH THAT

11  JOINT APPOINTMENT.

12      Q    WHAT ARE YOUR AREAS OF RESEARCH?

13      A    AFRICAN-AMERICAN VOTING BEHAVIOR.  AND RIGHT

14  NOW I'M WRITING A BOOK MANUSCRIPT ON ECONOMIC AND

15  WEALTH INEQUALITY AND HOW IT AFFECTS POLITICS BUT

16  SPECIFIC TO BLACK AMERICANS.

17      Q    DO YOU STUDY AFRICAN-AMERICAN POLITICS?

18      A    YES.

19      Q    WHAT IS AFRICAN-AMERICAN POLITICS?

20      A    AFRICAN-AMERICAN POLITICS IS UNDERSTANDING

21  THAT BLACKS AS A NUMERIC MINORITY IN THE UNITED

22  STATES HAVE ALWAYS HAD A DIFFERENT POLITICAL

23  EXPERIENCE.  SO WHEN WE THINK OF AFRICAN-AMERICAN

24  POLITICS, AT LEAST IN MY CLASSES I EXPLAIN HOW IT'S

25  BEEN A DIFFERENT POLITICAL ORIENTATION FOR BLACKS

11:03a

1   GOING ALL THE WAY BACK TO THE CONSTITUTION.  WE'LL

2   LOOK AT, FOR INSTANCE, THE IMPOSITION OF JIM CROW,

3   HOW JIM CROW WAS OVERCOME LEGALLY AND THROUGH

4   LEGISLATION AS WELL AS THROUGH THE COURTS, AND THEN

5   CONTEMPORARY POLITICAL AND VOTING ISSUES TODAY.

6        Q    AND ASIDE FROM YOUR DISSERTATION, DR. KING,

7   HAVE YOU PUBLISHED ACADEMIC ARTICLES?

8        A    YES, I HAVE.

9        Q    ARE ALL OF THE ARTICLES THAT YOU'VE

10   PUBLISHED REFLECTED ON YOUR C.V.?

11        A    YES, THEY ARE.

12        Q    WHAT'S THE GENERAL FOCUS OF YOUR ACADEMIC

13   RESEARCH -- OR YOUR ACADEMIC ARTICLES?  EXCUSE ME,

14   DR. KING.

15        A    AFRICAN-AMERICAN POLITICS, VOTING BEHAVIOR,

16   DONATIONS, POLITICAL DONATIONS.

17        Q    AND YOU MENTIONED THAT YOU'RE WORKING ON A

18   BOOK MANUSCRIPT, DR. KING.  CAN YOU TELL THE COURT A

19   LITTLE BIT MORE ABOUT THE BOOK THAT YOU'RE WORKING

20   ON?

21        A    YES.  SO I'M LOOKING AT INCOME AND WEALTH

22   INEQUALITY AND HOW POLITICS AFFECTS THAT.  AND SO,

23   YOU KNOW, ONE OF THE POLITICAL MANIFESTATIONS OF

24   POLITICAL INEQUALITY, IF YOU WILL, BEING A NUMERIC

25   MINORITY, CAN MANIFEST ITSELF IN TERMS OF INCOME AND

11:04a

1    WEALTH INEQUALITY.

2        Q    DR. KING, ARE YOU FAMILIAR WITH THE CONCEPT

3    OF RACIALLY POLARIZED VOTING?

4        A    YES, I AM.

5        Q    CAN YOU BRIEFLY DESCRIBE RACIALLY POLARIZED

6    VOTING FOR THE COURT?

7        A    YES.  RACIALLY POLARIZED VOTING IS WHEN YOU

8    HAVE A MAJORITY OF ONE RACE VOTING AGAINST A MAJORITY

9    OF ANOTHER RACE.

10       Q    AND IS RACIALLY POLARIZED VOTING A TOPIC

11   THAT YOU STUDY?

12       A    YES.  IT HAS APPEARED IN A COUPLE OF MY

13   PUBLISHED WORKS AND IN THE CLASSES THAT I TEACH.

14       Q    CAN YOU TELL US A LITTLE BIT ABOUT HOW IT

15   COMES UP IN THE CLASSES THAT YOU TEACH?

16       A    SO TWO CLASSES IN PARTICULAR -- I TEACH

17   SEVERAL CLASSES, BUT TWO IN PARTICULAR THAT ARE

18   RELEVANT TO THIS WOULD BE MY AFRICAN-AMERICAN

19   POLITICS CLASS AS WELL AS POLITICS OF THE AMERICAN

20   SOUTH.

21       Q    CAN YOU TELL US A LITTLE BIT HOW ABOUT --

22   CAN YOU TELL US A LITTLE BIT ABOUT HOW RACIALLY

23   POLARIZED VOTING COMES UP IN YOUR POLITICS OF THE

24   AMERICAN SOUTH CLASS?

25       A    SURE.  SO THAT CLASS IS ESSENTIALLY ABOUT

11:05a

1   PARTY CHANGE.  THE AMERICAN SOUTH WAS LARGELY A

2   ONE-PARTY DEMOCRATIC PARTY STRONGHOLD, BUT THEN

3   BEGINNING IN THE 1960s IT TRANSITIONED TO REPUBLICAN

4   PARTISANSHIP.

5        SO IN UNDERSTANDING AFRICAN-AMERICAN

6   POLITICS HERE, THERE HAS LONG BEEN A RECOGNITION THAT

7   BLACK AND WHITE VOTING BEHAVIOR HAS BEEN DIFFERENT,

8   AND SO THAT HELPS EXPLAIN THE PARTY CHANGE FROM

9   DEMOCRATIC PARTY DOMINANCE TO REPUBLICAN PARTY

10  DOMINANCE IN THE SOUTH.  MUCH OF THE LITERATURE

11  ASSERTS THAT YOU HAD A RACE-BASED PARTISAN

12  REALIGNMENT, SO YOU DID HAVE PARTY POLARIZATION BUT

13  IT WAS BECAUSE OF A RACIAL TRIGGER.

14    Q    CAN YOU TELL US A LITTLE BIT ABOUT HOW

15  RACIALLY POLARIZED VOTING COMES UP IN YOUR AFRICAN-

16  AMERICAN POLITICS CLASS?

17    A    SURE.  SO IT COMES UP LOTS OF WAYS.  BUT

18  JUST AS ONE EXAMPLE:  SO IN MY CLASSES I MIGHT

19  EXPLAIN, FOR INSTANCE, THE EXISTENCE OF, SAY, THE

20  CONGRESSIONAL BLACK CAUCUS, OR AT THE STATE LEVEL YOU

21  HAVE LEGISLATIVE BLACK CAUCUSES.  AND SO THEN I HAVE

22  TO EXPLAIN TO MY CLASS WHY WE HAVE BLACK CAUCUSES,

23  WHAT TYPE OF DISTRICTS THEY REPRESENT.  SO THAT LEADS

24  INTO A DISCUSSION OF MAJORITY-MINORITY DISTRICTS.  SO

25  THEN I MIGHT EXPLAIN WHY WE HAVE MAJORITY-MINORITY

11:06a

1   DISTRICTS.

2           AND WHEN I SAY "WHY," YOU KNOW, THE PROCESS

3   OF WHERE THE COURTS HAVE ALLOWED THESE TYPES OF

4   DISTRICTS TO BE CREATED.  SO ALL OF THAT, THOUGH, IS

5   LAID ON A FOUNDATION THAT THERE IS RACIALLY POLARIZED

6   VOTING AND, THEREFORE, WE HAVE THESE LEGAL, YOU KNOW,

7   LEGISLATIVE AND JUDICIAL, YOU KNOW, EDICTS TO CREATE

8   THESE MAJORITY-MINORITY DISTRICTS.

9       Q    IS RACIALLY POLARIZED VOTING A TOPIC THAT

10  YOU PUBLISH ON?

11      A    YEAH.  IT HAS COME UP IN A COUPLE OF THE

12  ARTICLES I HAVE PUBLISHED.

13      Q    CAN YOU POINT THOSE ARTICLES OUT TO THE

14  COURT?

15      A    SURE.  SO POLITICAL RACIAL CYCLES, THE

16  ELECTORAL CYCLES IN RACIAL POLARIZATION IN THE 2006

17  SENATE ELECTIONS, AND THEN THE ELECTORAL GEOGRAPHY OF

18  BLACK ELECTORAL SUCCESS.

19      Q    AND AGAIN, BOTH OF THOSE ARTICLES ARE

20  REFLECTED ON YOUR C.V.  IS THAT RIGHT?

21      A    YES, THAT IS CORRECT.

22      Q    DR. KING, ARE YOU FAMILIAR WITH REGRESSION

23  ANALYSIS?

24      A    YES, I AM.

25      Q    HOW DID YOU BECOME FAMILIAR WITH IT?

11:07a

1    **A**    IN GRADUATE SCHOOL IN A METHODS COURSE.

2    **Q**    DO YOU USE REGRESSION ANALYSIS IN YOUR WORK?

3    **A**    YES, IT HAS COME UP IN MY WORK.

4    **Q**    CAN YOU BRIEFLY DESCRIBE WHAT REGRESSION

5    ANALYSIS IS FOR US?

6    **A**    SURE.  ESSENTIALLY REGRESSION ANALYSIS IS

7    JUST SEEING WHAT THE EFFECTS OF ONE VARIABLE ARE ON

8    OTHER VARIABLES.

9    **Q**    AND ARE YOU FAMILIAR WITH ECOLOGICAL

10   INFERENCE?

11   **A**    YES, I AM.

12   **Q**    IF I REFER TO IT AS EI, WILL YOU UNDERSTAND

13   WHAT I MEAN?

14   **A**    YES.

15   **Q**    DO YOU ENCOUNTER ECOLOGICAL INFERENCE IN

16   YOUR WORK?

17   **A**    YES, ESPECIALLY AND MOST RELEVANT TO, YOU

18   KNOW, UNDERSTANDING THIS SORT OF SPECIFIC WORK THAT

19   WE'RE LOOKING AT IN THIS SORT OF CASE; YOU KNOW,

20   UNDERSTANDING VOTING BEHAVIOR.

21   **Q**    WHEN YOU SAY "THIS SORT OF CASE," WHAT DO

22   YOU MEAN BY THAT?

23   **A**    SO REDISTRICTING CASES, YES.

24   **Q**    AND CAN YOU BRIEFLY DESCRIBE WHAT ECOLOGICAL

25   INFERENCE ACCOMPLISHES TO THE COURT?

11:08a

1    **A**    SURE.  SO ESSENTIALLY YOU'RE JUST TAKING --

2    YOU'RE TRYING TO UNCOVER INDIVIDUAL LEVEL BEHAVIOR

3    WITH AGGREGATE DATA.  SO ESSENTIALLY YOU'VE GOT A

4    POPULATION AND THEN YOU'RE TRYING TO FIGURE OUT MAYBE

5    HOW A SUBPOPULATION BEHAVED.  AND SO ECOLOGICAL

6    INFERENCE IS THE TOOL AND IT'S WHAT'S RECOMMENDED FOR

7    USE IN REDISTRICTING CASES INVOLVING RACE, YES.

8         **MS. GIGLIO:**  YOUR HONOR, AT THIS TIME

9    PLAINTIFFS SEEK TO MOVE DR. KING'S REPORT, WHICH IS

10   PLAINTIFFS 133, AND DR. KING'S C.V., WHICH IS

11   PLAINTIFFS 134, INTO EVIDENCE.  PLAINTIFFS ALSO SEEK

12   TO TENDER DR. KING AS AN EXPERT IN POLITICAL SCIENCE,

13   VOTING BEHAVIOR, AND RACIALLY POLARIZED VOTING.

14        **THE COURT:**  ALL RIGHT.  ANY CROSS ON THE

15   TENDER?

16        **MR. LEWIS:**  NO, YOUR HONOR.

17        **THE COURT:**  AND NO OBJECTIONS TO THE

18   ADMISSIONS?

19        **MR. LEWIS:**  THAT IS CORRECT, YOUR HONOR.

20        **THE COURT:**  THE C.V. AND REPORT ARE

21   ADMITTED.

22              **DIRECT EXAMINATION**

23   BY MS. GIGLIO:

24    **Q**    DR. KING, WE'RE NOW GOING TO TAKE A LOOK AT

25   THE EXPERT REPORT THAT YOU PREPARED IN THIS CASE.

11:09a

1        AND CAN WE PULL UP PLAINTIFFS' EXHIBIT 133.

2        AND IF YOU TURN TO THE FIRST TAB IN YOUR

3   BINDER, DR. KING, IS THAT A COPY OF THE REPORT THAT

4   YOU PREPARED FOR THIS CASE?

5      A    YES, IT IS.

6      Q    AND, DR. KING, WHAT WERE YOU ASKED TO DO?

7      A    I WAS ASKED TO PROVIDE A REBUTTAL REPORT TO

8   DR. ALFORD SPECIFIC TO HIS CONCLUSIONS ON THE

9   EXISTENCE OR NONEXISTENCE OF RACIALLY POLARIZED

10  VOTING AS WELL AS A DISCUSSION ON COHESION AND POLICY

11  PREFERENCES.

12     Q    AND I'M GOING TO TAKE THOSE IN TURN, DR.

13  KING.  WHAT DID YOU DO TO REBUT DR. ALFORD'S

14  CONCLUSIONS REGARDING POLITICAL -- OR REGARDING THE

15  EXISTENCE OF RACIAL POLARIZATION?

16     A    SO I RAN A ECOLOGICAL INFERENCE TEST ON AN

17  ELECTION -- THE 2022 U.S. SENATE ELECTION.  AND I DID

18  IT SLIGHTLY DIFFERENT THAN SOME OTHER ECOLOGICAL

19  INFERENCE TESTS, BUT -- JUST BECAUSE I WANTED TO

20  RECREATE A DEMOCRATIC PRIMARY, WHICH DOESN'T STRICTLY

21  EXIST HERE IN LOUISIANA BECAUSE OF LOUISIANA'S UNIQUE

22  ELECTORAL SYSTEM.

23     Q    CAN YOU TELL US A LITTLE BIT ABOUT WHY OR

24  HOW LOUISIANA'S ELECTORAL SYSTEM IS UNIQUE?

25     A    SURE.  SO, YOU KNOW, HISTORICALLY IT WAS

11:11a

1   KNOWN AS A JUNGLE PRIMARY WHERE IN LOUISIANA YOU

2   WOULD HAVE CANDIDATES OF BOTH PARTIES, REPUBLICAN AND

3   DEMOCRATS AS WELL AS INDEPENDENTS, ALL ON ONE BALLOT.

4   AND SO THEN VOTERS WOULD BE FACED WITH ANY NUMEROUS

5   NUMBER OF CANDIDATES.

6            AND SO IN DR. ALFORD'S REPORT, HIS

7   CONCLUSION IS THAT THERE IS EVIDENCE OF PARTY

8   POLARIZATION.  AND PARTY POLARIZATION DOES EXIST, BUT

9   THAT DOESN'T MEAN THAT RACIAL POLARIZATION DOESN'T

10  ALSO EXIST.  AND SO WHAT I WANTED TO DO ESSENTIALLY

11  WAS SIMULATE A DEMOCRATIC PRIMARY.  IN OTHER STATES

12  YOU REALLY WOULDN'T HAVE TO WORRY ABOUT IT.  YOU

13  WOULD HAVE A DEMOCRATIC PRIMARY AND A REPUBLICAN

14  PRIMARY.  BUT HERE IN LOUISIANA THAT'S NOT THE CASE.

15           SO ESSENTIALLY WHAT I DID WAS JUST -- IN THE

16  ANALYSIS I RAN THE SAME ECOLOGICAL INFERENCE METHODS.

17  IT WAS JUST A DIFFERENT UNIT OF ANALYSIS.  SO I JUST

18  EXCLUDED THE REGISTERED REPUBLICANS AND JUST FOCUSED

19  ON REGISTERED DEMOCRATS.  AND THAT WAY PARTISANSHIP

20  IS KIND OF OUT OF THE EQUATION AND NOW WE'RE JUST

21  LOOKING AT:  IS THERE STILL A DIFFERENCE IN VOTING

22  AMONG WHITE VOTERS AND BLACK VOTERS, BUT NOW YOU'VE

23  ELIMINATED PARTY.  SO THAT'S WHAT I WANTED TO DO.

24     Q    EXCUSE ME.  HOW DID THE 2022 U.S. SENATE

25  ELECTION IN LOUISIANA ALLOW YOU TO ACCOMPLISH THIS

11:12a

1   GOAL?

2       A    WELL, SO THE NICE THING ABOUT A FEDERAL

3   SENATE ELECTION IS IT'S A BIG ELECTION, AND THAT'S

4   IMPORTANT IN THE SENSE THAT YOU'RE GOING TO HAVE THE

5   HIGHEST LEVELS OF TURNOUT WITH YOUR FEDERAL

6   ELECTIONS, ESPECIALLY A STATEWIDE FEDERAL ELECTION.

7   AND THEN ALSO THIS PARTICULAR ELECTION FEATURED A

8   VIABLE BLACK DEMOCRATIC CANDIDATE AS WELL AS A VIABLE

9   WHITE DEMOCRATIC CANDIDATE.  SO YOU HAVE GARY

10  CHAMBERS, THE BLACK CANDIDATE, AND LUKE MIXON, THE

11  WHITE CANDIDATE.  THERE WERE OTHER CANDIDATES AS

12  WELL, BUT YOU HAD TWO VIABLE CANDIDATES; ONE BLACK,

13  ONE WHITE.

14      Q    WHAT DO YOU MEAN BY "VIABLE"?

15      A    WHAT I MEAN IS THAT THEY RAISED MONEY, THEY

16  HAD NAME RECOGNITION, SO THEY WERE ABLE TO RUN

17  STRONG, CREDIBLE CAMPAIGNS.  THERE WERE SOME MINOR

18  CANDIDATES THAT DID NOT RAISE SUBSTANTIAL AMOUNTS OF

19  MONEY, SO THEY WEREN'T ABLE TO REALLY CONDUCT A

20  STRONG CAMPAIGN, AND THEY WERE MINOR CANDIDATES, IF

21  YOU WILL.  BUT THIS RACE FEATURED A VIABLE BLACK

22  CANDIDATE AS WELL AS A VIABLE WHITE CANDIDATE.

23      Q    AND, DR. KING, WHAT DATA DID YOU USE TO

24  CONDUCT THE ECOLOGICAL INFERENCE ANALYSIS YOU DID ON

25  THE 2022 U.S. SENATE ELECTION IN LOUISIANA?

11:13a

1    **A**   SO PLAINTIFFS' COUNSEL PROVIDED ME A DATA

2    SET WITH ALL OF THE INFORMATION.  AND THEIR

3    INFORMATION CAME FROM THE SECRETARY OF STATE'S

4    INFORMATION, WHICH HAD THE VOTE RESULTS BY -- WELL,

5    ACTUALLY BY PRECINCT, BUT PARISH.  AND IT HAD THE

6    NUMBER OF WHITE REGISTERED DEMOCRATS AND THE NUMBER

7    OF BLACK REGISTERED DEMOCRATS, YOU KNOW, SO THAT

8    INFORMATION IS JUST PROVIDED.

9    **Q**   AND DID YOU DO ANYTHING TO CONFIRM THE

10   ACCURACY OF THAT DATA?

11   **A**   SURE.  I THEN LOOKED AT THE SECRETARY OF

12   STATE'S DATA JUST TO MAKE SURE THAT THE DATA I

13   RECEIVED FROM PLAINTIFFS COMPORTED WITH THE SECRETARY

14   OF STATE'S DATA.  AND IT DID.

15   **Q**   AND DO YOU THINK THAT ANALYZING ONLY

16   REGISTERED DEMOCRATS AS OPPOSED TO ALL VOTERS AFFECTS

17   THE RELIABILITY OF YOUR ANALYSIS?

18   **A**   NO.  IT'S THE SAME METHOD.  IT'S JUST A

19   DIFFERENT UNIT OF ANALYSIS.  THEY JUST FOCUSED ON

20   DEMOCRATS, AGAIN, JUST TO TAKE PARTISANSHIP OUT OF

21   THE EQUATION.

22        BUT THAT'S WHY IT WAS IMPORTANT TO DO A --

23   YOU KNOW, FOR ME AT LEAST -- A STATEWIDE FEDERAL

24   RACE, BECAUSE THEN YOU HAD A LARGE IN, A LARGE NUMBER

25   OF VOTERS; YOU KNOW, COMBINED -- I DON'T KNOW THE

11:15a

1    NUMBER OFFHAND.  BUT COMBINED, CHAMBERS AND MIXON HAD

2    TWO HUNDRED AND FIFTY-SOMETHING THOUSAND VOTES, SO

3    YOU'RE DEALING WITH A LARGE NUMBER.

4        Q    I'D LIKE TO TURN TO PAGE 5 AND 6 OF YOUR

5    REPORT, WHICH AGAIN IS PLAINTIFFS' EXHIBIT 133 FOR

6    THE RECORD, SPECIFICALLY TABLE 4.

7        A    OKAY.

8        Q    ARE THESE RESULTS OF THE ECOLOGICAL

9    INFERENCE ANALYSIS YOU CONDUCTED ON THE U.S. SENATE

10   ELECTION IN 2022 IN LOUISIANA?

11       A    IT IS.

12       Q    AND CAN YOU JUST DESCRIBE THE DATA THAT IS

13   REFLECTED IN THIS CHART FOR THE COURT?

14       A    SURE.  JUST MOVING LEFT TO RIGHT WE HAVE

15   FIVE COLUMNS.  THE FIRST COLUMN LIST THE PARISH, AND

16   UNDERNEATH THAT YOU HAVE YOUR CREDIBLE INTERVALS,

17   WHICH IS JUST A MEASURE OF UNCERTAINTY.  AND THEN

18   I'VE GOT THE PERCENTAGE OF BLACK SUPPORT FOR

19   CHAMBERS -- THIS WAS THE RESULTS FROM THE EI -- THE

20   PERCENTAGE OF WHITE SUPPORT FOR CHAMBERS, AND THEN

21   THE PERCENTAGE OF BLACK SUPPORT FOR MIXON AND THE

22   PERCENTAGE OF WHITE SUPPORT FOR MIXON.

23       Q    AND CAN YOU REMIND THE COURT OF THE RACES OF

24   THESE CANDIDATES AGAIN?

25       A    SURE.  SO CHAMBERS, COLUMNS 2 AND 3, IS THE

11:16a

1   BLACK CANDIDATE; AND MIXON, COLUMNS 4 AND 5, WOULD BE

2   THE WHITE CANDIDATE.

3       Q    AND, DR. KING, YOU INDICATE THAT YOU

4   SELECTED PARISHES TO ANALYZE HERE.  HOW DID YOU

5   SELECT THOSE PARISHES?

6       A    MY UNDERSTANDING IS THAT PLAINTIFFS ARE NOT

7   BRINGING A STATEWIDE CHALLENGE, AND SO THAT THE

8   PARISHES THAT I USED ARE THE ONES THAT ARE MOST

9   RELEVANT TO THE SPECIFIC CHALLENGE IN THIS CASE.

10      Q    AND YOU INDICATED THAT THE -- THAT YOU

11  INCLUDED CREDIBLE -- CREDIBLE INTERVIEWS?

12      A    INTERVALS, YES.

13      Q    CREDIBLE INTERVALS.  EXCUSE ME.  AND THAT

14  THEY INDICATE A MEASURE OF UNCERTAINTY.  CAN YOU

15  EXPLAIN THAT A LITTLE BIT FURTHER TO THE COURT?

16      A    SURE.  IT'S JUST A RANGE.  SO ESSENTIALLY IF

17  YOU WERE TO RUN THIS TEST A HUNDRED TIMES, 95 PERCENT

18  OF THE TIME YOUR MEDIAN RESULT IS GOING TO BE

19  SOMEWHERE BETWEEN -- SO, FOR INSTANCE, WITH ASCENSION

20  AND BLACK SUPPORT FOR CHAMBERS, THE RANGE YOU'RE

21  GOING TO GET WILL BE SOMEWHERE BETWEEN 71 AND 76

22  PERCENT.

23      Q    AND, DR. KING, LOOKING AT ALL OF TABLE 4 AS

24  A WHOLE -- AND IF WE COULD JUST PULL THEM UP SIDE BY

25  SIDE -- WHAT DOES THE EVIDENCE REFLECTED IN TABLE 4

11:17a

1  EVIDENCE?

2      A    WHEN I LOOK AT THIS I SEE EVIDENCE OF

3  RACIALLY POLARIZED VOTING, BECAUSE, AGAIN, WE'RE JUST

4  LOOKING AT REGISTERED DEMOCRATIC VOTERS.  AND SO, FOR

5  INSTANCE, WITH ASCENSION YOU SEE 73 -- ALMOST 74

6  PERCENT OF BLACKS SUPPORTED CHAMBERS BUT ONLY 40

7  PERCENT OF WHITES, SO THAT'S A 33 PERCENT GAP.  AND

8  THEN LIKEWISE SUPPORT FOR MIXON YOU HAVE 25

9  PERCENT -- ALMOST 26 PERCENT OF BLACKS WHO SUPPORTED

10 MIXON BUT 60 PERCENT OF WHITES SUPPORTED MIXON.  SO,

11 YOU KNOW, MORE THAN A TWO-TO-ONE DIFFERENCE.  SO WHEN

12 I LOOK AT THAT, I'M SEEING EVIDENCE OF RACIALLY

13 POLARIZED VOTING.

14     Q    WE CAN TAKE THIS DOWN.

15          SO, DR. KING, YOU INDICATED THAT YOU WERE --

16 YOU REVIEWED DR. ALFORD'S REPORT IN THIS CASE.  IS

17 THAT RIGHT?

18     A    YES, I DID.

19     Q    SO I'D LIKE TO BRING UP DR. ALFORD'S REPORT.

20 THAT'S LDTX 53, AND IT'S BEEN PREVIOUSLY ADMITTED.

21 AND I'D LIKE TO PULL UP TABLE 3, WHICH IS ON PAGE 10

22 OF THIS REPORT.  IF WE COULD BLOW THAT UP, THAT WOULD

23 BE GREAT.

24          SO, DR. KING, WHAT DO YOU UNDERSTAND TABLE 3

25 TO REPRESENT?

11:18a

1     **A**    I AM LOOKING AT A VARIETY OF STATEWIDE

2   ELECTIONS SHOWING THE DATE, THE CONTEST, THE

3   CANDIDATES, THEIR PARTY, THEIR RACE, AND SIMILAR

4   ECOLOGICAL INFERENCE RESULTS.

5     **Q**    AND I'D LIKE TO FOCUS SPECIFICALLY ON THE

6   DATA CONTAINED IN THE BOTTOM-MOST CHART OF THIS, OF

7   TABLE 3, WHICH IS THE NOVEMBER 2022 SENATE ELECTION.

8          DR. KING, IS THIS THE SAME ELECTION THAT YOU

9   ANALYZED IN YOUR REPORT?

10    **A**    YES, IT IS.

11    **Q**    AND CAN YOU WALK ME THROUGH WHAT

12  DR. ALFORD'S DATA INDICATES TO YOU?

13    **A**    SURE.  SO AGAIN, WE'RE LOOKING AT THE DATE,

14  THE CONTEST, THE CANDIDATES; WE'VE GOT THEIR PARTY

15  AND THEIR RACE AND THEN THE BLACK SUPPORT, AGAIN,

16  WITH THOSE CREDIBLE INTERVALS, AND THEN THE WHITE

17  SUPPORT WITH THOSE CREDIBLE INTERVALS.

18    **Q**    WHAT WAS THE BLACK SUPPORT FOR MR. CHAMBERS,

19  THE BLACK CANDIDATE IN THIS RACE, AS REPORTED BY DR.

20  ALFORD?

21    **A**    SO THIS IS 56.8 PERCENT.  AND I WOULD JUST

22  NOTE THAT THIS WOULD BE STATEWIDE RESULTS.

23    **Q**    AND THIS -- THESE RESULTS REFLECT ALL

24  VOTERS?

25    **A**    YES.  YES.  WE'VE GOT BOTH DEMOCRATS AND

11:19a    **1**    REPUBLICAN VOTERS HERE, YES.

**2**    **Q**    UNDERSTOOD.  SO WE INDICATE -- YOU INDICATED

**3**    EARLIER THAT THE BLACK SUPPORT FOR GARY CHAMBERS AS

**4**    REFLECTED IN DR. ALFORD'S DATA IS 56.8 PERCENT.  WHAT

**5**    ABOUT THE WHITE SUPPORT FOR GARY CHAMBERS AS

**6**    REFLECTED IN DR. ALFORD'S REPORT?

**7**    **A**    4.3 PERCENT.

**8**    **Q**    AND CAN WE TAKE US THROUGH THE DATA

**9**    REFLECTED FOR MR. MIXON, THE WHITE CANDIDATE?

**10**    **A**    SURE.  FOR MR. MIXON IT IS 23.9 PERCENT

**11**    BLACK SUPPORT AND NINE PERCENT WHITE SUPPORT.  SO

**12**    JUST -- YOU KNOW, SO THAT WOULD BE AMONG, YOU KNOW,

**13**    VOTES FOR THE DEMOCRATS THERE.  SO NINE PERCENT OF

**14**    WHITES VOTED FOR MIXON, FOUR PERCENT OF WHITES VOTED

**15**    FOR CHAMBERS.

**16**    **Q**    AND HOW DID THOSE RESULTS COMPARE?

**17**    **A**    SO WHEN I LOOK AT THAT, I'M SEEING A --

**18**    ESSENTIALLY LIKE A TWO-TO-ONE DIFFERENCE.  SO AMONG

**19**    VOTE -- AMONG PEOPLE WHO VOTED FOR DEMOCRATS, I'M

**20**    SEEING A TWO-TO-ONE ADVANTAGE FOR THE WHITE CANDIDATE

**21**    FROM WHITE VOTERS, SO I'M SEEING RACIALLY POLARIZED

**22**    VOTING JUST -- WHEN YOU JUST LOOK AT DEMOCRATS.

**23**    AND SO WHEN I WAS DOING MY REBUTTAL,

**24**    ACTUALLY I SAW THIS FIRST AND I THOUGHT, OKAY, THIS

**25**    IS EVIDENCE OF RACIALLY POLARIZED VOTING.  AND SO

11:21a

1  THEN I JUST WANTED TO LOOK AT THOSE PARISHES SPECIFIC

2  TO THE AREAS THAT ARE BEING CHALLENGED IN THIS CASE.

3      Q    UNDERSTOOD.  I'D LIKE TO TAKE ANOTHER --

4  TAKE A LOOK AT ANOTHER ELECTION CONTAINED IN TABLE 3

5  OF DR. ALFORD'S REPORT.  CAN WE TURN TO PAGE 9 OF DR.

6  ALFORD'S REPORT.  AND AGAIN, THIS IS LDTX 53.  SO I'D

7  LIKE TO TAKE A LOOK AT THE ELECTION THAT TOOK PLACE

8  IN NOVEMBER 2018 FOR SECRETARY OF STATE.

9          AND, DR. KING, BASED ON THE DATA IN FRONT OF

10  YOU, HOW MANY DEMOCRATS RAN IN THIS ELECTION?

11      A    I SEE TWO CANDIDATES.

12      Q    AND WHO WERE THEY?

13      A    WE HAVE GWEN COLLINS-GREENUP, WHO IS BLACK,

14  AND RENEE FONTENOT FREE, WHO IS WHITE.

15      Q    WHAT ARE THE -- YOU ALREADY GAVE ME THE

16  RESPECTIVE RACES, DR. KING.  WAY TO JUMP AHEAD.

17      A    APOLOGIES.

18      Q    SO LET'S LOOK AT THE PERCENTAGE OF BLACK

19  SUPPORT FOR MS. COLLINS-GREENUP AS REFLECTED.  WHAT

20  DOES THAT FIGURE REFLECT?

21      A    SO I SEE 56.3 PERCENT BLACK SUPPORT FOR

22  COLLINS-GREENUP.

23      Q    WHAT WAS THE PERCENTAGE OF WHITE SUPPORT FOR

24  MS. COLLINS-GREENUP?

25      A    5.4 PERCENT.

11:22a

1    Q   WHAT ABOUT FOR MS. FONTENOT FREE?  WHAT WAS

2  THE BLACK SUPPORT FOR MS. FONTENOT FREE?

3    A   31.1 PERCENT.

4    Q   AND WHAT ABOUT THE WHITE SUPPORT FOR

5  MS. FONTENOT FREE?

6    A   9.7 PERCENT.

7    Q   AND AGAIN, WHAT CONCLUSIONS CAN YOU DRAW

8  FROM THIS ELECTION?

9    A   WHILE IT'S NOT QUITE A TWO-TO-ONE, IT'S MORE

10  ABOUT -- I CAN'T DO THAT MATH IN MY HEAD, BUT 1.75

11  PERCENT DIFFERENCE ROUGHLY.  SO I'M SEEING EVIDENCE

12  OF RACIALLY POLARIZED VOTING.  SO JUST EVEN AMONG

13  THOSE VOTING FOR THE DEMOCRATS, WE SEE WHITE AND

14  BLACK VOTERS DIFFER SUBSTANTIALLY ON THEIR PREFERRED

15  CANDIDATE.

16    Q   AND IN YOUR EXPERT OPINION, DR. KING, WHAT

17  DOES THE EI ANALYSIS THAT WE JUST EXAMINED FROM

18  YOURSELF AND FROM DR. ALFORD TELL YOU ABOUT VOTING

19  BEHAVIOR IN LOUISIANA?

20    A   IT TELLS ME THAT PARTY POLARIZATION IS ONLY

21  PART OF THE STORY, THAT RACIAL POLARIZATION ALSO

22  EXISTS EVEN AMONG COPARTISANS.  AND BY "COPARTISANS,"

23  I MEAN EVEN PEOPLE WHO SHARE THE SAME PARTY

24  IDENTIFICATION, YOU STILL SEE RACIALLY POLARIZED

25  PREFERENCES.  VOTERS CAN SHARE THE SAME PARTY BUT NOT

11:23a

1    WANT THE SAME CANDIDATE.  WE ARE SEEING THIS WITH

2    THE -- SORRY.  I WAS GOING TO SAY THE REPUBLICAN

3    PRESIDENTIAL NOMINATION RIGHT NOW.  SO YOU CAN SHARE

4    THE SAME PARTY BUT HAVE STRONGLY DIFFERENT

5    PREFERENCES ON WHO YOU WANT.

6        Q    HOW, IF AT ALL, DOES THIS OBSERVATION IMPACT

7    BLACK VOTERS IN LOUISIANA?

8        A    OH.  WELL, WHAT IT MEANS IS IN THE ABSENCE

9    OF A DISTRICT DRAWN WHERE BLACKS ARE A NUMERIC

10   MAJORITY, LIKE A MAJORITY-MINORITY DISTRICT OR AT

11   LEAST A STRONG POLARITY, BLACK VOTERS CANNOT COUNT ON

12   WHITE COPARTISANS TO ELECT THEIR PREFERRED CANDIDATE.

13       Q    DR. KING, I'D LIKE TO MOVE TO A

14   DISCUSSION -- THANK YOU SO MUCH, STEPHEN.

15            I'D LIKE TO MOVE TO A DISCUSSION OF THE

16   CONCEPT OF COHESION.  WHAT IS YOUR UNDERSTANDING OF

17   COHESION?

18       A    COHESION IS WHEN YOU HAVE -- YOU KNOW, SO IN

19   THIS INSTANCE WHERE WE'RE DEALING WITH RACIAL GROUPS,

20   COHESION WOULD BE WHERE YOU HAVE MORE THAN 50 PERCENT

21   SUPPORT FOR A PREFERRED CANDIDATE.

22       Q    AND ARE YOU FAMILIAR WITH DR. ALFORD'S

23   PERSPECTIVE ON COHESION?

24       A    YES, I AM.

25       Q    WHAT IS IT?

11:24a

**1**   **A**   SO MY UNDERSTANDING OF DR. ALFORD'S -- THE

**2**   WAY HE REPRESENTS COHESION IS THAT IT'S A CONTINUUM

**3**   BUT THAT YOU -- IN ORDER TO -- COHESION TO BE

**4**   OPERATIONAL OR DEFINITIVE, IT WOULD NEED TO BE CLOSER

**5**   TO 70 PERCENT OR MORE, EVEN CLOSER TO 80 PERCENT.  HE

**6**   DOES NOT -- IN HIS REPORT HE SAYS THAT THERE IS NOT A

**7**   THRESHOLD OR A CUT POINT, WHICH I WOULD AGREE WITH.

**8**   BUT I WOULD ARGUE THAT 70 PERCENT IS TOO HIGH TO SAY

**9**   THAT A GROUP IS VOTING COHESIVELY.

**10**  **Q**   YOU INDICATED THAT YOU WOULD AGREE WITH DR.

**11**  ALFORD THAT THERE IS NO THRESHOLD.  IS THERE ANY

**12**  POLITICAL SCIENCE LITERATURE THAT YOU'RE AWARE OF

**13**  THAT DISCUSSES A THRESHOLD?

**14**  **A**   THERE IS NOT.

**15**  **Q**   YOU MENTIONED BEFORE, DR. KING, THAT

**16**  LOUISIANA HAS A UNIQUE ELECTION SYSTEM.  DOES THAT

**17**  UNIQUE ELECTION SYSTEM AFFECT YOUR UNDERSTANDING OF

**18**  COHESION?

**19**  **A**   SURE.  SO PRIMARIES AND GENERAL ELECTIONS

**20**  ARE GOING TO SEE SOMETHING DIFFERENT, AND THAT'S JUST

**21**  BECAUSE IN PRIMARIES WHERE YOU'VE GOT LOTS OF

**22**  CANDIDATES, BY DEFINITION -- I SHOULDN'T SAY BY

**23**  DEFINITION, BUT ALMOST INVARIABLY YOU'RE GOING TO

**24**  HAVE VOTES SPREAD OUT AMONG MORE CANDIDATES.  AND SO

**25**  AS A RESULT, YOU'RE LESS LIKELY TO SEE COHESION

11:26a

**1**   REACHED.  I WOULD STILL SAY IT'S THE SAME -- TO ME

**2**   COHESION IS ONCE YOU GET TO ABOUT 50 PERCENT.

**3**        BUT IN A GENERAL ELECTION WHERE YOU JUST

**4**   HAVE TWO CANDIDATES, COHESION IS GOING TO LOOK --

**5**   IT'S GOING TO BE EASIER TO REACH THAT BAR BECAUSE

**6**   YOU'RE JUST LOOKING AT TWO CANDIDATES.  BUT IN A

**7**   WIDE-RANGING PRIMARY, ESPECIALLY THE WAY IT'S

**8**   CONDUCTED IN LOUISIANA WHERE YOU CAN HAVE MANY, MANY

**9**   CANDIDATES OF BOTH PARTIES, COHESION IS GOING TO LOOK

**10**  DIFFERENT.

**11**     **Q**    AND ARE YOU AWARE OF ANY POLITICAL SCIENCE

**12**  LITERATURE THAT DISCUSSES THE CONCEPT OF COHESION?

**13**     **A**    NO, NOT IN THIS SENSE.  THE ONLY -- THE ONLY

**14**  PLACE WHERE I'VE SEEN VOTING COHESION TALKED ABOUT IN

**15**  A SIMILAR MANNER IS ACTUALLY IN STUDIES OF

**16**  LEGISLATIVE BODIES, SO SPECIFICALLY HOW PARTIES VOTE

**17**  TOGETHER, HOW MAYBE DEMOCRATS VOTE TOGETHER AS A

**18**  GROUP AGAINST REPUBLICANS IN LEGISLATIVE, SO IN

**19**  CONGRESS OR IN STATE LEGISLATIVE BODIES.  BUT EVEN

**20**  THEN THERE IS NO DEFINITION OF SAYING HERE'S WHEN

**21**  COHESION IS MET.

**22**        BUT, YOU KNOW, THE CLOSER YOU GET TO 100

**23**  PERCENT IN SAYING THAT'S COHESIVE, THEN YOU'RE REALLY

**24**  ACTUALLY GETTING TOWARDS UNANIMITY, WHICH TO ME IS A

**25**  DIFFERENT STANDARD THAN COHESION.

11:27a

**1**     Q    UNDERSTOOD.  DR. KING, ARE YOU FAMILIAR WITH

**2**  DR. MURRAY'S PERSPECTIVE ON COHESION?

**3**     A    YES.  I LOOKED AT A COUPLE OF PARAGRAPHS OF

**4**  DR. MURRAY'S REPORT, NOT HIS ENTIRE REPORT BUT JUST A

**5**  COUPLE OF THOSE PARAGRAPHS DEALING WITH COHESION.

**6**  AND MY UNDERSTANDING OF DR. MURRAY'S REPORT IS THAT

**7**  IF YOU REDUCE THE NUMBER OF BLACKS, THE BLACK VOTING

**8**  AGE POPULATION IN A DISTRICT, THAT THAT MIGHT SOMEHOW

**9**  REDUCE COHESION.

**10**    Q    AND DO YOU AGREE WITH THAT PERSPECTIVE?

**11**    A    NO.  COHESION IS IRRESPECTIVE OF THE NUMBER

**12**  OF -- THE BLACK VOTING AGE POPULATION IN A DISTRICT.

**13**  SO YOU COULD HAVE 50 BLACKS OR 500,000 BLACKS, BUT

**14**  THAT'S NOT GOING TO CHANGE COHESION OR HOW I WOULD

**15**  THINK OF WHAT COHESION MEANS.

**16**    Q    UNDERSTOOD.  I'D LIKE TO TAKE A LOOK AT

**17**  ANOTHER PORTION OF YOUR REPORT, DR. KING.  SO IF WE

**18**  COULD TURN TO TABLE 5, WHICH IS PAGE 7 OF PLAINTIFFS'

**19**  EXHIBIT 133.

**20**         DR. KING, WHAT TABLE -- WHAT DATA IS SHOWN

**21**  IN TABLE 5?

**22**    A    SO THIS IS WHITE SUPPORT FOR RECENT

**23**  DEMOCRATIC PRESIDENTIAL NOMINEES.

**24**    Q    WHY DID YOU INCLUDE THIS DATA IN YOUR

**25**  REPORT?

11:28a

**1**     **A**    WELL, AGAIN, AS I WAS WRITING A REBUTTAL

**2**  REPORT TO DR. ALFORD, HE HAD TALKED ABOUT IN HIS

**3**  REPORT THE PERFORMANCE OF THE CLINTON-KAINE TICKET IN

**4**  2016 AND HOW IT PERFORMED POORLY AMONG WHITES.  AND

**5**  HE WAS USING IT TO DEMONSTRATE THAT AN ALL-WHITE

**6**  TICKET, THAT THERE WAS STILL -- THAT THERE WAS STILL

**7**  -- HE WAS JUST ESSENTIALLY -- FROM MY RECOLLECTION

**8**  NOW IS THAT HE WAS CITING THE CLINTON-KAINE TICKET AS

**9**  A PROXY FOR WHITE SUPPORT FOR -- WHITE VOTER SUPPORT

**10** FOR AN ALL-WHITE DEMOCRATIC TICKET.

**11**    **Q**    HOW DOES THE DATA THAT YOU INCLUDE IN TABLE

**12** 5 ADDRESS THAT CONCLUSION?

**13**    **A**    I JUST WANTED TO PUT IT IN CONTEXT HOW WELL

**14** CLINTON AND KAINE DID.  CLINTON AND KAINE WERE

**15** PARTICULARLY ILL-RECEIVED IN LOUISIANA AND OTHER DEEP

**16** SOUTH STATES, AND SO I JUST WANTED TO PUT THAT IN

**17** CONTEXT.  SO DEPENDING ON WHICH CANDIDATE YOU SELECT,

**18** YOU CAN ALWAYS DRAW, YOU KNOW, CERTAIN INFERENCES.

**19** BUT CLINTON-KAINE WERE PARTICULARLY UNDERPERFORMING,

**20** IF YOU WILL, AND SO I JUST WANTED TO ILLUSTRATE THAT

**21** WITH THIS.

**22**    **Q**    ARE ANY OTHER ALL-WHITE TICKETS REFLECTED ON

**23** THIS CHART?

**24**    **A**    WELL, SURE.  SO IN PARTICULAR IN 2004 YOU

**25** HAVE THE KERRY-LIEBERMAN TICKET WHICH RECEIVED 41

11:30a

1    PERCENT SUPPORT, SO FOUR PERCENT MORE THAN CLINTON-

2    KAINE.  AND IN MY REPORT I REFERENCE SOME LITERATURE

3    SPECIFIC TO LOUISIANA AND THE WHITE VOTER SUPPORT FOR

4    THESE -- IN THESE ELECTIONS.

5        Q    WE CAN TAKE THIS DOWN.

6             SO, DR. KING, I'D LIKE TO MOVE TO A

7    DISCUSSION OF ONE OF THE OTHER ISSUES THAT YOU

8    STATED YOU ADDRESSED IN YOUR REPORT, WHICH IS BLACK

9    AND WHITE ATTITUDES ON POLICY ISSUES.

10       A    OKAY.

11       Q    WHAT DO YOU UNDERSTAND DR. ALFORD'S POSITION

12   TO BE ON THAT TOPIC?

13       A    MY UNDERSTANDING OF DR. ALFORD'S REPORT IS

14   THAT BECAUSE WE ELECTED -- "WE" AS IN AMERICANS --

15   ELECTED A BLACK MAN, BARACK OBAMA, AS PRESIDENT AND

16   BECAUSE THERE IS SOME PUBLIC OPINION POLLING SHOWING

17   CONVERGENCE ON INTERRACIAL MARRIAGE, THAT BLACKS AND

18   WHITES HAVE LARGELY THE SAME POLICY PREFERENCES.

19       Q    DO YOU AGREE WITH DR. ALFORD'S POSITION?

20       A    I DO NOT.

21       Q    WHY NOT?

22       A    SO FIRST, WHEN IT COMES TO INTERRACIAL

23   MARRIAGE, IT HAS BEEN SETTLED LAW SINCE 1967 WITH THE

24   *LOVING V VIRGINIA* DECISION, AND AS A RESULT IT'S NOT

25   A SALIENT ISSUE.  IT JUST MEANS THIS ISN'T SOMETHING

1   THAT PEOPLE ARE THINKING ABOUT WHEN THEY'RE VOTING,

2   BECAUSE IT'S SETTLED LAW.  AND SO AS A RESULT, IT'S

3   NOT THE MOST RELEVANT -- IT'S RELEVANT BUT IT'S NOT

4   SALIENT.

5        MORE IMPORTANTLY, YOU'VE GOT SOMETHING OF A

6   SOCIAL DESIRABILITY BIAS, SO WITH SOME SPECIFIC

7   ISSUES IN INTERRACIAL MARRIAGE WOULD BE ONE OF THEM.

8   SOCIAL DESIRABILITY BIAS JUST SIMPLY MEANS THAT

9   RESPONDENTS TO SURVEYS MAY NOT GIVE THEIR FULLY

10  TRUTHFUL ANSWER FOR FEAR OF OFFENDING OR JUST SAYING

11  SOMETHING THAT THEY MIGHT -- THEY KNOW MIGHT BE

12  CONSIDERED AS LIKE POLITICALLY INCORRECT, IF YOU

13  WILL.  AND SO THAT CAN BE AN ISSUE WITH THAT.

14        BUT MORE IMPORTANTLY, YOU KNOW -- SO BEYOND

15  THOSE SPECIFIC CRITICISMS OF INTERRACIAL MARRIAGE TO

16  ACT AS a PROXY FOR POLICY CONVERGENCE, I WOULD JUST

17  SAY THAT THERE ARE MANY OTHER EXAMPLES OF PUBLIC

18  POLICY ISSUES WHERE WE KNOW THERE IS WIDE POLICY

19  DIVERGENCE BETWEEN BLACKS AND WHITES.

20   Q   SO I JUST WANT TO BREAK THAT DOWN A LITTLE

21  BIT.  SO YOU SAID THAT THE CONCEPT OF SOCIAL

22  DESIRABILITY BIAS COULD IMPACT SURVEY RESULTS ON

23  ISSUES LIKE INTERRACIAL MARRIAGE.  HOW WOULD THAT

24  POSSIBLY PLAY OUT?

25   A   SO LET ME -- COULD YOU REASK THAT?  I JUST

**1**  WANT TO MAKE SURE I UNDERSTAND WHAT YOU'RE ASKING ME.

**2**     Q    SURE.  SO YOU INDICATED THAT SOCIAL

**3**  DESIRABILITY BIAS COULD IMPACT POLLING RESULTS ON

**4**  ISSUES LIKE INTERRACIAL MARRIAGE.  HOW WOULD IT

**5**  IMPACT POLLING RESULTS?

**6**     A    WELL, SO IF PEOPLE DON'T GIVE THEIR

**7**  FORTHRIGHT RESPONSE, THERE IS SOME -- IN THE

**8**  POLITICAL SCIENCE LITERATURE THERE IS SOME RATIONALE

**9**  WHY PEOPLE MIGHT DO THAT.  AND SO IF THEY DO THAT,

**10**  THEN IT MIGHT -- WE MIGHT HAVE A CONFUSED SENSE OF

**11**  WHAT POLICIES ARE MOST IMPORTANT FOR BLACK VOTERS AND

**12**  WHITE VOTERS.  AND SO IN THE LITERATURE THERE IS

**13**  EVIDENCE OF HOW THIS SOCIAL DESIRABILITY BIAS CAN

**14**  AFFECT OUR UNDERSTANDING OF PUBLIC POLICY

**15**  PREFERENCES.

**16**     Q    DOES DR. ALFORD CITE POLLING TO SUPPORT HIS

**17**  VIEWS ON INTERRACIAL MARRIAGE?

**18**     A    YES.  SO HE CITES A -- YES, HE DOES.  HE

**19**  USES GALLUP, AND I USE GALLUP AS WELL.

**20**     Q    SO HE USES A GALLUP POLL TO SUPPORT HIS

**21**  POSITION ON INTERRACIAL MARRIAGE ON CHANGING

**22**  ATTITUDES?

**23**     A    I BELIEVE THAT'S WHAT HE USES, YES.

**24**     Q    AND YOU ALSO INDICATED THAT THERE ARE OTHER

**25**  POLICY ISSUES THAT ARE MORE SALIENT THAN INTERRACIAL

**1** MARRIAGE.  CAN YOU DESCRIBE THOSE KINDS OF POLICY

**2** ISSUES TO THE COURT?

**3**     **A**    SURE.  SO, FOR INSTANCE, YOU WOULD HAVE USE

**4** OF FORCE BY POLICE.  THAT IS WHERE WE SEE -- AN

**5** EXAMPLE WHERE WE SEE WIDE DIVERGENCE BETWEEN BLACKS

**6** AND WHITES.  ALSO WHEN PEOPLE ARE ASKED QUESTIONS

**7** ABOUT WHETHER OR NOT BLACKS AND WHITES HAVE EQUAL

**8** CHANCES TO SUCCEED, WE SEE WIDE DIVERGENCE.  IN FACT,

**9** THE POLLING SHOWS THAT THAT DIVERGENCE HAS GOTTEN

**10** WIDER OVER TIME, EVEN DURING THE OBAMA

**11** ADMINISTRATION.  AND THAT'S ONE OF THE REASONS WHY I

**12** WANTED TO USE THE GALLUP AS AIDS, INFORMATION THAT

**13** DR. ALFORD USED.  AND SO BECAUSE I WAS WRITING A

**14** REBUTTAL REPORT, I JUST WANTED, YOU KNOW, SIMILAR

**15** INFORMATION.  BUT ALSO THE GALLUP POLL SPANS THE

**16** OBAMA ADMINISTRATION.

**17**         AND SO SPECIFICALLY DR. ALFORD HAD SAID --

**18** HAD CITED THE ELECTION OF BARACK OBAMA AS EVIDENCE

**19** THAT WE'RE MOVING TOWARDS SOME SORT OF POST-RACIAL

**20** AMERICA.  BUT I JUST WANTED TO DEMONSTRATE, IN FACT,

**21** THAT GALLUP SHOWS THE OPPOSITE.

**22**     **Q**    AND IN YOUR OPINION, DR. ALFORD, WHAT

**23** MOTIVATES THE GAP BETWEEN BLACK AND WHITE AMERICANS

**24** ON THESE POLICY ISSUES?

**25**     **A**    SO FOR A LONG TIME THE POLITICAL SCIENCE

11:35a

1    LITERATURE HAS UTILIZED THIS CONCEPT OF RACIAL

2    RESENTMENT IN EXPLAINING THE VOTING BEHAVIOR OF

3    WHITES.

4        Q    WHAT IS RACIAL RESENTMENT?

5        A    SO RACIAL RESENTMENT IS -- IT'S AN ATTITUDE

6    BORNE OF BOTH SOME ANTI-BLACK SENTIMENT MARRIED WITH

7    CONSERVATIVE VIEWS.  AND SO BOTH GALLUP AS WELL AS

8    SOME -- MANY DIFFERENT POLITICAL SCIENCE SPECIFIC

9    POLLS HAVE BEEN ASKING QUESTIONS THAT GET AT RACIAL

10   RESENTMENT FOR MANY, MANY, MANY YEARS NOW.

11       Q    SO IN THE GALLUP POLL THAT YOU REFERENCED,

12   HOW DOES THAT GALLUP POLL SEEK TO MEASURE RACIAL

13   RESENTMENT?

14       A    SO I LIST FOUR DIFFERENT -- ON PAGES -- AT

15   LEAST ON THIS PAPER COPY I'VE GOT IN FRONT OF ME.

16       Q    YEAH, WE CAN PULL IT UP.

17       A    -- PAGES 9 AND 10 OF MY REPORT WHERE IT

18   LISTS --

19       Q    AND THAT WILL BE PAGES -- JUST FOR THE

20   RECORD --

21       A    SORRY.

22       Q    I'M SO SORRY.  NO, I'M SORRY, DR. KING.  FOR

23   THE RECORD, THAT'S PAGES 10 AND 11 OF PL 133.  THAT'S

24   JUST A PDF ISSUE.  CAN WE HAVE THAT PULLED UP?  10

25   AND 11.  GREAT.

11:37a

**1**      AND SO, DR. KING, I CAN REASK THE QUESTION.

**2**  SO HOW DOES THE GALLUP POLL MEASURE RACIAL RESENTMENT

**3**  AS INDICATED ON THESE PAGES?

**4**      **A**    OKAY.  SO, YOU KNOW, WE'VE GOT HERE -- SO AT

**5**  THE TOP HERE OF PAGE 10 ON THIS PDF, THAT WOULD BE

**6**  THE THIRD AND FOURTH QUESTIONS.  SO THESE

**7**  QUESTIONS -- THE NICE THING ABOUT THESE QUESTIONS IS

**8**  THEY DON'T ASK ABOUT A SPECIFIC POLICY.  IT'S JUST

**9**  MORE ABOUT AN ATTITUDE.  AND SO THESE QUESTIONS ASKED

**10**  IN A VERY SIMILAR FORMAT OVER A NUMBER OF YEARS ALLOW

**11**  US TO UNDERSTAND IF PEOPLE HAVE DIFFERENT ATTITUDES

**12**  TOWARDS RACIAL GROUPS.

**13**      AND SO, FOR INSTANCE, WITH THIS QUESTION NO.

**14**  3:  "IN GENERAL, DO YOU THINK THAT BLACKS HAVE AS

**15**  GOOD A CHANCE AS WHITES IN YOUR COMMUNITY TO GET ANY

**16**  HOUSING THEY CAN AFFORD, OR DON'T YOU THINK THEY HAVE

**17**  AS GOOD S A CHANCE?"  AND THEN WITH NO. 4:  "ARE

**18**  BLACKS TREATED LESS FAIRLY THAN WHITES?"

**19**      SO WHEN WE LOOK AT THESE QUESTIONS AND THEN

**20**  HOW PEOPLE ANSWER THEM AND THEN SEE HOW THAT AFFECTS

**21**  THEIR VOTING BEHAVIOR OR IF HOW PEOPLE RESPOND TO

**22**  THIS IN ANY WAY CORRELATES TO THEIR VOTING

**23**  BEHAVIOR -- OR IF THERE IS A RELATIONSHIP, I SHOULD

**24**  SAY -- THAT RACIAL RESENTMENT INDEX CAN TELL US A LOT

**25**  ABOUT WHO'S LIKELY TO SUPPORT CERTAIN CANDIDATES.

11:38a

1      Q    HOW DOES IT TELL US WHO'S LIKELY TO SUPPORT

2   CERTAIN CANDIDATES?

3      A    WELL, WHAT WE SEE IS WHITE VOTERS WHO

4   EXPRESS RACIAL RESENTMENT ARE LESS LIKELY TO SUPPORT

5   BLACK CANDIDATES EVEN WHEN THEY SHARE THE SAME PARTY.

6      Q    AND, DR. KING, YOU INDICATED THAT THIS IS A

7   GALLUP SURVEY OR GALLUP POLL.  WHY DO YOU THINK THAT

8   A GALLUP POLL IS A RELIABLE SOURCE OF THIS DATA?

9      A    GALLUP POLL.  GALLUP IS ONE OF THE MOST

10  WIDELY RESPECTED, LONG-USED POLLSTERS.  THEY'VE BEEN

11  AROUND FOR DECADES.  AGAIN, THERE IS OTHERS:

12  NATIONAL ELECTION STUDIES THAT POLITICAL SCIENTISTS

13  COMMONLY USE ASKS VERY SIMILAR QUESTIONS AND HAVE FOR

14  A LONG TIME.  BUT GALLUP IS WIDELY RESPECTED, AND

15  THEY HAVE A GOOD TRACK RECORD.  AND AGAIN, DR. ALFORD

16  ALSO USED GALLUP, SO I JUST WANTED TO USE SOMETHING

17  SIMILAR.

18     Q    DOES TABLE 6 OF YOUR REPORT INDICATE THE

19  RESULTS OF THE GALLUP POLL?

20     A    YES.  AND --

21     Q    CAN YOU DESCRIBE THEM FOR THE COURT?

22     A    SURE.  SO THIS IS JUST LOOKING AT WHITE

23  VOTERS.  SO WE SEE THAT THERE ARE SOME LEVELS OF

24  RACIAL RESENTMENT AMONG BOTH BLACK -- EXCUSE ME --

25  AMONG BOTH DEMOCRATS, INDEPENDENTS AND REPUBLICANS.

11:39a

1   YOU TEND TO SEE OVER TIME RACIAL RESENTMENT WENT DOWN

2   A LITTLE BIT AMONG WHITE DEMOCRATS, IT STAYED

3   CONSTANT AMONG WHITE REPUBLICANS, BUT WE STILL SEE

4   IT.  AND SO THERE IS LOTS OF IMPLICATIONS FOR THIS

5   EXISTENCE OF RACIAL RESENTMENT.

6        Q    CAN YOU TELL US SOME OF THOSE IMPLICATIONS?

7        A    WELL, WHAT IT MEANS IS THAT IF YOU'RE A

8   BLACK CANDIDATE, YOU CANNOT COUNT ON WHITE SUPPORT,

9   EVEN AMONG COPARTISANS, TO THE SAME LEVEL THAT YOU

10  MIGHT BE ABLE TO COUNT ON BLACK SUPPORT.  SO WE OFTEN

11  USE THIS TO EXPLAIN WHY YOU MIGHT GET NON-VOTING, SO

12  YOU MIGHT GET A LOT OF PEOPLE WHO JUST STAY HOME ON

13  ELECTION DAY.

14        SO THE RESEARCH SHOWS THAT IF YOU'VE GOT

15  BLACK CANDIDATES, SAY, IN A BLACK PRIMARY, YOU'RE

16  MORE LIKELY TO HAVE RACIALLY RESENTFUL WHITE

17  DEMOCRATS JUST STAY HOME.  THEY MAY NOT VOTE FOR THE

18  REPUBLICAN, BUT THEY MAY JUST NOT VOTE FOR ANYBODY AT

19  ALL, OR THEY'RE LESS LIKELY TO SUPPORT BLACK

20  CANDIDATES.  AND THE REASON FOR THIS IS -- AS I

21  REFERENCED EARLIER -- IS PEOPLE CAN SHARE THE SAME

22  PARTY BUT STILL HAVE DIFFERENT PREFERENCES ON WHO

23  THEY WANT TO REPRESENT THEM.

24        Q    WE CAN TAKE THIS DOWN.

25        DR. KING, YOU TALKED ABOUT HOW RACIAL

11:40a

**1**  RESENTMENT CAN IMPACT ELECTIONS.  ARE THERE ANY

**2**  EXAMPLES OF RACIAL RESENTMENT IMPACTING ELECTIONS

**3**  THAT YOU CAN THINK OF?

**4**     **A**    SURE.  SO AS I CITE IN MY REPORT, THERE IS

**5**  RESEARCH SHOWING THAT BARACK OBAMA EVEN IN VICTORY

**6**  STILL LOST SUPPORT BECAUSE OF RACIALLY RESENTFUL

**7**  VOTERS; THAT LIKELY HE WOULD HAVE WON BY MORE, ALL

**8**  THINGS CONSIDERED, HAD IT NOT BEEN FOR RACIALLY

**9**  RESENTFUL VOTERS.  AND WE ALSO KNOW AT -- THERE IS

**10** ALSO SOME RESEARCH THAT I CITE AT LOWER LEVELS WHERE

**11** YOU SEE SOMETHING SIMILAR, AND IT TENDS TO MANIFEST

**12** ITSELF IN NON-VOTING, SO PEOPLE JUST STAY HOME.  THEY

**13** MAY NOT VOTE FOR THE REPUBLICAN BUT THEY JUST WON'T

**14** VOTE AT ALL.

**15**    **Q**    AND, DR. KING, IS THERE ANY EVIDENCE OF HOW

**16** MUCH -- HOW MANY MORE VOTES PRESIDENT OBAMA MAY HAVE

**17** GOTTEN IF NOT FOR RACIALLY RESENTFUL VOTERS?

**18**    **A**    IN THE LITERATURE I CITE, THEY ESTIMATE THAT

**19** IT'S THE EQUIVALENT OF ABOUT ONE STATE'S WORTH OF

**20** ELECTORAL COLLEGE VOTES, SO ON AVERAGE THAT WOULD BE

**21** ABOUT SEVEN ELECTORAL COLLEGE VOTES, WHICH HAD IT

**22** BEEN A CLOSER ELECTION COULD HAVE BEEN -- WE KNOW HOW

**23** MUCH A DIFFERENCE ONE STATE CAN MAKE IN PRESIDENTIAL

**24** ELECTIONS.

**25**    **Q**    JUST IN SUMMARY, DR. KING, WHAT DOES YOUR

11:42a

1  ANALYSIS INDICATE ABOUT BLACK LOUISIANANS' ABILITY TO

2  ELECT THEIR CANDIDATE OF CHOICE?

3     **A**    IN THE ABSENCE OF DISTRICTS WHERE BLACKS ARE

4  A MAJORITY OR CLOSE TO MAJORITY -- A STRONG POLARITY,

5  I GUESS YOU COULD SAY IT -- THAT BLACK VOTERS

6  CANNOT -- EXCUSE ME -- BLACK CANDIDATES CANNOT JUST

7  ASSUME THAT WHITE CROSSOVER VOTES WILL BE THERE; THAT

8  THEY'LL BE IN SUBSTANTIAL ENOUGH NUMBERS FOR EITHER

9  THE BLACK CANDIDATE TO WIN OR FOR BLACK VOTERS TO

10  ELECT THEIR PREFERRED CANDIDATE.  RACIAL RESENTMENT

11  WOULD ARGUE THAT THAT IS IN NO WAY GUARANTEED.

12     **Q**    THANK YOU, DR. KING.

13        **MS. GIGLIO:**  YOUR HONOR, MAY I HAVE A MOMENT

14  TO CONFER WITH COUNSEL?

15        **THE COURT:**  YOU MAY.

16        **MS. GIGLIO:**  YOUR HONOR, JUST QUICKLY,

17  BEFORE I TENDER THE WITNESS, WE NOTE THAT I'M NOT

18  SURE THAT YOU ACTUALLY TENDERED DR. KING AS AN EXPERT

19  WHEN RULING ON OUR TENDER.

20        **THE COURT:**  ACCEPTING HIM AS AN EXPERT?

21        **MS. GIGLIO:**  OH, DID YOU?

22        **THE COURT:**  WELL, LET ME JUST -- I THOUGHT I

23  DID, BUT LET'S JUST MAKE SURE.

24        **MS. GIGLIO:**  WELL, YOUR HONOR --

25        **THE COURT:**  THE COURT ACCEPTS DR. KING TO

11:43a

1   GIVE OPINION TESTIMONY IN THE FIELDS OF POLITICAL

2   SCIENCE, VOTING BEHAVIOR, AND RACIALLY POLARIZED

3   VOTING.  IS THAT THE CORRECT FIELDS?

4        **MS. GIGLIO:**  YES, YOUR HONOR.  THANK YOU

5   VERY MUCH.  AND WE TENDER THE WITNESS.

6        **THE COURT:**  MR. LEWIS, ABOUT HOW MUCH TIME

7   DO YOU THINK YOU NEED?

8        **MR. LEWIS:**  I WOULD HOPE ABOUT 20 MINUTES.

9        **THE COURT:**  OKAY.

10                    **CROSS-EXAMINATION**

11  BY MR. LEWIS:

12     **Q**   GOOD MORNING, DR. KING.

13     **A**   GOOD MORNING.  IS IT STILL MORNING?

14     **Q**   IT IS.  I JUST WANT TO GO THROUGH QUICKLY

15  SOME OF THE ASPECTS OF YOUR REPORT.

16        SO LET ME START BY ASKING YOU:  YOU WERE

17  ASKED ON DIRECT EXAMINATION ABOUT YOUR EXPERIENCE

18  WITH THE ECOLOGICAL INFERENCE TECHNIQUE.  IS THAT

19  RIGHT?

20     **A**   CORRECT.

21     **Q**   NOW, YOU'VE NOT CONDUCTED ECOLOGICAL

22  INFERENCE ANALYSES IN YOUR PUBLISHED RESEARCH.  IS

23  THAT RIGHT?

24     **A**   THAT IS CORRECT.

25     **Q**   AND I BELIEVE YOU TAUGHT YOURSELF HOW TO USE

11:44a

1   THE SOFTWARE.  IS THAT RIGHT?

2        A    YES.  I WOULD JUST SAY THAT THE SOFTWARE --

3   I'M NOT SURE IT EXISTED WHEN I WAS IN GRADUATE

4   SCHOOL.  MAYBE IT DID, BUT IT WASN'T FAMILIAR TO ME,

5   SO I DIDN'T REALLY HAVE A CHOICE.

6        Q    OKAY.  ALL RIGHT.  AND I BELIEVE YOU

7   TESTIFIED ON DIRECT EXAMINATION THAT YOU TOOK -- THE

8   VOTING DATA THAT YOU USED FOR YOUR ECOLOGICAL

9   INFERENCE ANALYSIS, YOU OBTAINED THAT DATA FROM THE

10  ACLU.  IS THAT RIGHT?

11       A    YES.

12       Q    AND THEN I BELIEVE YOU INDICATED THAT YOU

13  ENSURED THAT YOUR DATA, QUOTE, COMPORTED WITH THE

14  SECRETARY OF STATE'S DATA.  IS THAT RIGHT?

15       A    YES.

16       Q    BUT YOU'D AGREE WITH ME THAT THE SECRETARY

17  OF STATE'S OFFICE REPORTS EARLY AND ABSENTEE BALLOTS

18  AT THE PRECINCT -- OR EXCUSE ME -- AT THE PARISH

19  LEVEL INSTEAD OF THE PRECINCT LEVEL.  IS THAT RIGHT?

20       A    THAT'S MY UNDERSTANDING HOW THEY DO IT.

21       Q    AND YOU'D AGREE WITH ME THAT THE DATA YOU

22  OBTAINED FROM THE ACLU HAD ALLOCATED THE CENTRAL

23  ABSENTEE AND EARLY VOTING DATA FROM THE PARISH TO THE

24  PRECINCT LEVEL.  IS THAT RIGHT?

25       A    YES, THAT'S MY UNDERSTANDING.

11:45a

**1**      Q    AND YOU DIDN'T PERFORM THAT ALLOCATION

**2**  YOURSELF.  RIGHT?

**3**      A    I DID NOT.

**4**      Q    TURNING TO YOUR ANALYSIS OF THE NOVEMBER

**5**  2022 U.S. SENATE ELECTION, AS I UNDERSTAND IT, YOU

**6**  RAN YOUR ECOLOGICAL INFERENCE STUDY BY COMPARING THE

**7**  TOP TWO DEMOCRATIC VOTE-GETTERS IN THAT ELECTION

**8**  AMONG VOTES CAST BY REGISTERED DEMOCRATS.  IS THAT

**9**  RIGHT?

**10**      A    YES.

**11**      Q    ALL RIGHT.  AND ARE YOU AWARE OF PUBLISHED

**12**  ACADEMIC RESEARCH THAT USES -- WELL, LET ME TAKE A

**13**  STEP BACK.

**14**          SO DO I UNDERSTAND CORRECTLY THAT THE

**15**  ECOLOGICAL INFERENCE TECHNIQUE THAT YOU USED IS

**16**  DESIGNED TO ESTIMATE THE PERCENTAGE OF WHITE AND

**17**  BLACK SUPPORT FOR A CANDIDATE BECAUSE YOU DON'T KNOW

**18**  HOW INDIVIDUALS ARE GOING TO VOTE.  IS THAT RIGHT?

**19**      A    YES, RIGHT.  SO ECOLOGICAL INFERENCE IS

**20**  JUST, YOU KNOW, INFERRING, YOU KNOW, THAT VOTING

**21**  BEHAVIOR.  BUT WE HAVE THE DATA OF HOW MANY BLACKS

**22**  AND WHITES VOTED BECAUSE THAT IS REPORTED.

**23**      Q    SO JUST AT VERY, VERY HIGH LEVELS, IS IT THE

**24**  GENERAL IDEA THAT YOU'RE LOOKING THROUGHOUT THE --

**25**  YOU'RE COMPARING DIFFERENT PRECINCTS, YOU'RE

**1**  COMPARING THE ELECTION RETURNS FROM THAT PRECINCT TO

**2**  THE PERCENTAGE OF THE RACIAL COMPOSITION OF THAT

**3**  PRECINCT.  THAT'S THE BASIC IDEA AS TO HOW YOU'RE

**4**  ESTIMATING SUPPORT.  RIGHT?

**5**    A    WELL, I JUST LOOKED AT EVERYTHING AT THE

**6**  PARISH LEVEL, SO I DIDN'T --

**7**    Q    I SEE.

**8**    A    SO, YOU KNOW -- BECAUSE I JUST REPORTED IT

**9**  BY THE PARISHES, SO I JUST COMBINED ALL THE PRECINCT

**10**  DATA FOR EACH PARISH.

**11**    Q    OKAY.  I SEE.  SO YOU JUST USED IT AT THE

**12**  PARISH LEVEL?

**13**    A    YES, THAT'S RIGHT.  THAT'S RIGHT.  SO I

**14**  DIDN'T NEED TO -- HOW THOSE VOTES ARE ALLOCATED TO

**15**  THE PRECINCT LEVEL DOESN'T MATTER FOR ME BECAUSE I

**16**  JUST COMBINED IT ALL IN, YOU KNOW, PARISH TOTALS.

**17**    Q    I SEE.  ARE YOU AWARE OF PUBLISHED RESEARCH

**18**  THAT USES ECOLOGICAL INFERENCE TO SIMULTAN- -- TO

**19**  ESTIMATE TURNOUT AMONG BLACK DEMOCRATS VERSUS WHITE

**20**  DEMOCRATS; IN OTHER WORDS, WHERE YOU'RE CONTROLLING

**21**  FOR BOTH RACE AND PARTISAN AFFILIATION?

**22**    A    WELL, I MEAN, THAT'S -- I MEAN, THAT WOULD

**23**  BE THE PURPOSE HERE, IS JUST TO -- WELL, YOU KNOW,

**24**  AND SO FOR ME BY RUNNING -- BY EXCLUDING THE

**25**  REPUBLICAN VOTES AND JUST LOOKING AT THE DEMOCRATIC

11:48a

1   VOTES, SO THEN I'M JUST FOCUSING ON DEMOCRATIC VOTES.

2       Q    RIGHT.  BUT --

3       A    I MAY HAVE MISUNDERSTOOD THE QUESTION, SO IF

4   YOU WANT TO ASK IT AGAIN.

5       Q    SURE.  SO YOU DON'T -- YOU'RE NOT ABLE -- IN

6   YOUR DATABASE YOU'RE NOT ABLE TO EXCLUDE SPECIFIC

7   VOTES CAST BY REGISTERED REPUBLICANS.  RIGHT?

8       A    NO.  I MEAN, THAT'S WHAT I DID, IS -- YOU

9   KNOW, WITH THE DATASET.  SO THEN I -- I MEAN, SO ALL

10  OF THAT DATA WAS PRESENTED TO ME, BUT THEN I JUST

11  KIND OF SET THE REPUBLICAN VOTES ASIDE AND JUST

12  FOCUSED ON DEMOCRATIC VOTES, WHITES AND BLACKS WHO

13  ARE DEMOCRATIC, AND THEN THAT WAY PARTY IS OUT OF THE

14  EQUATION.

15      Q    OKAY.  BUT YOU HAD TO ESTIMATE THE VOTES

16  AMONG REGISTERED DEMOCRATS IN ORDER TO DO THAT

17  ANALYSIS.  RIGHT?

18      A    YEAH -- SO I WAS ESTIMATING THE PERCENT -- I

19  WAS ESTIMATING WHAT PERCENTAGE OF THE BLACK VOTE WENT

20  TO EACH CANDIDATE AND WHAT PERCENTAGE OF THE WHITE

21  VOTE WENT TO EACH CANDIDATE.  BUT THE DATA AS

22  PRESENTED -- LIKE FROM THE SECRETARY OF STATE'S

23  WEBSITE THAT THE ACLU USED, IT PRESENTS WHITE

24  DEMOCRATIC VOTES, BLACK DEMOCRATIC VOTES, WHITE

25  REPUBLICAN VOTES.  THERE AREN'T MANY BLACK REPUBLICAN

11:50a

1    VOTES USUALLY BUT THERE IS A HANDFUL AND -- YOU KNOW,

2    AT THE PRECINCT LEVEL.  AND THEN I JUST KIND OF

3    AGGREGATED IT TO THE PARISH LEVEL.  SO THAT ALL COMES

4    WITH THE DATA.  SO I DON'T HAVE TO -- THE ONLY THING

5    I'M INFERRING IS JUST THE PERCENT THAT THE BLACK VOTE

6    WENT TO EACH CANDIDATE OR THE WHITE VOTE WENT TO EACH

7    CANDIDATE.

8        Q    SINCE YOU DON'T KNOW HOW ANY PARTICULAR

9    PERSON VOTED, YOU'RE STILL HAVING TO DRAW AN

10   INFERENCE --

11       A    YES.

12       Q    -- ABOUT HOW WHITE --

13       A    CORRECT.

14       Q    -- ABOUT THE DIFFERENCE BETWEEN A REGISTERED

15   DEMOCRAT AND SOMEBODY THAT MIGHT BE A REGISTERED

16   INDEPENDENT THAT MIGHT ALSO VOTE FOR A DEMOCRAT.

17   RIGHT?

18       A    YES.  BUT I JUST LOOKED AT THE REGISTERED

19   DEMOCRATIC VOTERS.

20       Q    AND IN ORDER FOR YOU TO LOOK AT JUST THE

21   REGISTERED DEMOCRATS, YOU HAD TO PERFORM AN

22   ESTIMATION PROCEDURE.  CORRECT?

23       A    NO.  NO.  I MEAN, IT -- THEY TELL YOU WHO'S

24   VOTING -- I MEAN, SO THE DATA TELLS YOU WHO'S -- LIKE

25   HOW MANY WHITE REGISTERED DEMOCRATS VOTED IN EACH

11:51a

1   PARISH.

2       Q    RIGHT.

3       A    SO I DON'T HAVE TO INFER THAT.  THAT JUST

4   COMES WITH THE DATA FROM THE SECRETARY OF STATE.

5       Q    CORRECT.  BUT THE SECRETARY OF STATE'S DATA

6   DOESN'T -- IS IT YOUR POSITION THAT THE SECRETARY OF

7   STATE'S DATA IS SAYING THAT THERE WERE -- FOR

8   EXAMPLE, IN ASCENSION PARISH, THAT THERE WERE -- I'LL

9   MAKE UP A NUMBER -- 10,000 VOTES CAST FOR CANDIDATE

10  CHAMBERS BY WHITE DEMOCRATS?

11      A    NO.  IT WOULD JUST TELL ME HOW MANY WHITE

12  DEMOCRATS VOTED.  SO YES, THE ECOLOGICAL INFERENCE

13  WOULD THEN HAVE TO INFER HOW MANY OF THOSE VOTED FOR

14  CHAMBERS.

15      Q    OKAY.  AND IT WOULD HAVE TO INFER THAT FOR

16  BOTH RACE AND FOR PARTY.  CORRECT?

17      A    YES.

18      Q    OKAY.  AND ARE YOU AWARE OF -- WELL, LET ME

19  ASK THIS.  DO YOU CITE ANY ACADEMIC RESEARCH IN YOUR

20  REPORT THAT HAS USED THE ECOLOGICAL INFERENCE

21  TECHNIQUE TO SIMULTANEOUSLY ESTIMATE RACE AND PARTY?

22      A    I DO NOT CITE THAT.

23      Q    OKAY.  NOW, BECAUSE OF THE WAY YOU'VE

24  CONSTRUCTED YOUR STUDY, YOUR STUDY WOULD NOT CONSIDER

25  HOW BLACK VOTERS WHO ARE NOT REGISTERED DEMOCRATS

11:52a

1    WOULD HAVE VOTED IN THAT PRIMARY.  IS THAT RIGHT?

2         A    CORRECT.

3         Q    OKAY.  AND VICE VERSA; YOU WOULD NOT -- YOU

4    WOULDN'T BE ABLE TO TELL HOW WHITE VOTERS WHO AREN'T

5    REGISTERED DEMOCRATS VOTED IN THE PRIMARY.  RIGHT?

6         A    CORRECT.

7         Q    ALL RIGHT.  SO IF WE GO TO TABLE 4 ON PAGE 4

8    OF YOUR REPORT, PL 133, IF WE COULD PULL THAT UP.

9    THERE WE GO.

10             THIS IS YOUR RESULTS AT THE PARISH LEVEL FOR

11   THIS ELECTION -- FOR THE TWO CANDIDATES IN THIS

12   ELECTION.  IS THAT RIGHT?

13        A    YES.

14        Q    SO IF WE JUST LOOK AT CADDO PARISH, AM I

15   LOOKING -- AM I READING THIS CORRECTLY THAT YOU

16   ESTIMATE 43 PERCENT OF WHITE REGISTERED DEMOCRATS

17   SUPPORTED THE BLACK CANDIDATE CHAMBERS?  IS THAT

18   RIGHT?

19        A    THAT IS CORRECT.

20        Q    OKAY.  AND WOULD YOU VIEW THAT 43 PERCENT AS

21   WHITE CROSSOVER VOTING?

22        A    IT COULD BE VIEWED THAT WAY.

23        Q    OKAY.  AND DO YOU VIEW 43 -- AND THAT'S A

24   FAIR AMOUNT OF WHITE CROSSOVER VOTING.  WOULD YOU

25   AGREE?

11:53a

1      **A**    IT DEPENDS ON THE NUMBER.  I MEAN, THIS

2   COULD BE 43 PERCENT OF FIVE PEOPLE.  IT'S NOT

3   ACTUALLY, BUT I MEAN -- SO IT WOULD JUST DEPEND ON

4   HOW BIG OF A POLL POPULATION YOU'RE TALKING WITH.  SO

5   MY OFFICIAL ANSWER I GUESS IS IT DEPENDS.

6      **Q**    IT DEPENDS, OKAY.

7              AND YOU'RE NOT OFFERING IN THIS CASE A

8   PARTICULAR CUT POINT OR A MINIMUM OF WHITE CROSSOVER

9   VOTING.  IS THAT CORRECT?

10     **A**    I AM NOT.

11     **Q**    I'D LIKE TO TURN VERY QUICKLY TO YOUR

12  DISCUSSION OF COHESION.  BEFORE I DO, I BELIEVE YOU

13  AGREE WITH DR. ALFORD'S DATA IN THIS CASE.  IS THAT

14  CORRECT?

15     **A**    YES, I DO.

16     **Q**    OKAY.  SO THIS IS REALLY A DISAGREEMENT OVER

17  THE INTERPRETATION OF THE DATA.  IS THAT RIGHT?

18     **A**    CORRECT.

19     **Q**    OKAY.  SO I BELIEVE YOU TESTIFIED THAT YOU

20  -- THAT YOU GENERALLY LIKE TO SEE 50 PERCENT SUPPORT

21  FOR A CANDIDATE TO FIND COHESION.  IS THAT RIGHT?

22     **A**    YES.  THAT'S A MAJORITY, SO TO ME THAT MAKES

23  COHESION.

24     **Q**    OKAY.  BUT WOULD YOU AGREE WITH ME THAT AT

25  50 PERCENT, JUST AS MANY VOTERS OF A GIVEN RACE MAY

11:55a

1    BE VOTING AGAINST THE, QUOTE, PREFERRED CANDIDATE AS

2    VOTING FOR THAT CANDIDATE?

3        A    IF IT'S 50 PERCENT ON THE NOSE, YES.  BUT TO

4    ME, 50 -- YOU KNOW, WHEN I SAY A MAJORITY, I'M

5    ASSUMING THAT IT'S, YOU KNOW, 50 PERCENT PLUS ONE.

6        Q    OKAY.  SO AT 50 PERCENT PLUS ONE, THEN THAT

7    ONE EXTRA PERSON IS WHAT DEFINES COHESION FOR YOU?

8        A    IT HAS TO BE SOMEWHERE.

9        Q    IT HAS TO BE SOMEWHERE.

10       A    IT HAS TO BE SOMEWHERE, AND A MAJORITY IS A

11   MAJORITY.  AND IN ELECTIONS THE MAJORITY IS WHAT

12   WE'RE LOOKING FOR.  YOU KNOW, THAT'S HOW ELECTIONS

13   ARE WON, IS WITH A MAJORITY.

14            SO THAT TO ME BECOMES THE DECISIVE NUMBER,

15   NOT A SUPER MAJORITY OR TWO-THIRDS OR THREE-FOURTHS.

16   THAT'S -- TO ME THEN YOU'RE GETTING CLOSER TO

17   UNANIMITY, WHICH IS A COMPLETELY DIFFERENT THRESHOLD

18   THAN COHESION.

19       Q    BUT YOU'D AGREE WITH ME THAT 50 PERCENT PLUS

20   ONE COMPARED TO 40 -- WELL, OR 50 PERCENT MINUS

21   ONE --

22       A    SURE.

23       Q    -- IS NOT EXACTLY UNANIMITY.  RIGHT?

24       A    MY UNDERSTANDING OF DR. ALFORD -- AND AGAIN,

25   ME JUST WRITING REBUTTAL -- IS THAT HE SAYS COHESION

11:56a

1   IS A CONTINUUM.  AND I WOULD AGREE WITH THAT.  BUT AS

2   FAR AS I KNOW, THE -- CERTAINLY NOT IN THE POLITICAL

3   SCIENCE LITERATURE AND I DON'T THINK THE COURTS HAVE

4   SAID THERE HAS TO BE A CERTAIN AMOUNT OF COHESION.

5   IT'S JUST COHESION IS COHESION, SO IT HAS TO BEGIN

6   SOMEWHERE.  AND I ARGUE THAT IT'S A MAJORITY.

7       Q    AND AT A 50-PERCENT-PLUS-ONE STANDARD, FAIR

8   TO SAY THAT, YOU KNOW, YOU'D ALMOST ALWAYS FIND

9   COHESION IN A TWO-CANDIDATE RACE.  RIGHT?

10      A    IN A TWO-CANDIDATE -- IN A TWO-CANDIDATE

11  RACE, YES.  BUT, YOU KNOW, LOUISIANA DOESN'T OFTEN

12  HAVE TWO-CANDIDATE RACES, YOU KNOW, ESPECIALLY WITH

13  ITS UNIQUE PRIMARY SYSTEM.

14      Q    ALL RIGHT.  DR. KING, I'D NOW LIKE TO TURN

15  TO YOUR DISCUSSION OF POLICY DIVERGENCE BASED ON

16  RACE.  NOW, YOU MENTIONED -- WE HAD THIS DISCUSSION

17  ABOUT ATTITUDES TOWARDS SAME-SEX MARRIAGE.  DO YOU

18  RECALL THAT?

19      A    SAME-SEX MARRIAGE OR INTERRACIAL MARRIAGE?

20      Q    I'M SORRY.  INTERRACIAL MARRIAGE.  IT WAS IN

21  MY NOTES WRONG.  IT'S INTERRACIAL MARRIAGE.

22      A    WE CAN TALK ABOUT THAT, TOO.

23      Q    DIFFERENT CASE.

24           BUT INTERRACIAL MARRIAGE -- WE HAD A

25  DISCUSSION OF INTERRACIAL MARRIAGE.  CORRECT?

**1**    A    CORRECT.

**2**    Q    OKAY.  AND I BELIEVE YOU GAVE THE VIEW THAT

**3**  YOU VIEWED IT AS BEING LESS SALIENT BECAUSE IT HAD

**4**  BEEN SORT OF SETTLED LAW SINCE THE '60s THAT

**5**  INTERRACIAL MARRIAGE WAS LEGAL.  IS THAT RIGHT?

**6**    A    THAT IS CORRECT.

**7**    Q    AND THEN YOU OFFERED AN OPINION IN YOUR

**8**  REPORT -- I BELIEVE YOU TESTIFIED TO IT -- THAT THERE

**9**  WAS A WIDE PARTISANSHIP GAP IN OPPOSITION TO

**10**  INTERRACIAL MARRIAGE EVEN TODAY.  IS THAT RIGHT?

**11**    A    YES.

**12**    Q    OKAY.

**13**    A    I DON'T KNOW IF I USED THE WORD "WIDE,"

**14**  BUT -- AND IF I DID, THEN I DID.  BUT A PARTISAN GAP,

**15**  YES.

**16**    Q    WELL, WE'LL SHOW -- SINCE I'M GOING TO GET

**17**  INTO THE FOOTNOTES, WE MIGHT AS WELL.  IF WE COULD GO

**18**  TO PAGE 8 OF YOUR REPORT, TOWARD THE BOTTOM.  AND I

**19**  BELIEVE IT ALSO MOVES ON TO THE TOP OF PAGE 9, BUT

**20**  WE'RE LOOKING AT THAT BOTTOM PARAGRAPH ON PAGE 8.

**21**         OKAY.  SO I GUESS MY QUESTION FOR YOU IS --

**22**  NOW, YOU CITE FOR VIEWS ON INTERRACIAL MARRIAGE THIS

**23**  ARTICLE BY CHRISTOPHER INGRAHAM.  IS THAT RIGHT?

**24**    A    YES.

**25**    Q    OKAY.  WOULD YOU AGREE WITH ME THAT THAT

11:59a

1 CITATION INDICATES THAT IN 2021 ONLY SEVEN PERCENT OF

2 AMERICAN ADULTS EXPRESSED OPPOSITION TO A CLOSE

3 RELATIVE MARRYING A BLACK PERSON?

4     **A**    YES, SEVEN PERCENT.

5     **Q**    SEVEN PERCENT, OKAY.

6          AND DO YOU RECALL WHERE THAT SAME -- THAT

7 ARTICLE REPORTED THAT THE SAME PERCENTAGE WAS ABOUT

8 60 PERCENT IN 1990?

9     **A**    YES.

10    **Q**    OKAY.  AND YOU HAVE NO BASIS TO DISAGREE

11 WITH MR. INGRAHAM'S CALCULATIONS.  IS THAT RIGHT?

12    **A**    THAT IS CORRECT.

13    **Q**    OKAY.  SO WOULD YOU AGREE THAT A REDUCTION

14 OF SOME 53 PERCENTAGE POINTS OF AMERICANS OPPOSED TO

15 INTERRACIAL MARRIAGE FROM 1990 TO 2021 REPRESENTS A

16 SIGNIFICANT SHIFT IN PUBLIC OPINION?

17    **A**    YES AND NO.  YES, BUT IT'S RELATIVE.

18    **Q**    OKAY.  WOULD YOU AGREE WITH ME THAT THE

19 *LOVING VS VIRGINIA* DECISION WAS JUST AS SETTLED LAW

20 IN 1990 AS IT WAS IN 2021?

21    **A**    YES.  BUT WE ALSO KNOW THAT THERE IS A LONG

22 LAG OF TIME BETWEEN COURT DECISIONS AND PUBLIC

23 ACCEPTANCE OF THOSE COURT DECISIONS.  SO, FOR

24 INSTANCE, WITH BUSSING CASES FROM THE COURTS IN THE

25 1970s, A FULL GENERATION AFTER *BROWN VS BOARD*,

12:00p

1    SETTLED LAW DOESN'T MEAN ACCEPTANCE.

2        Q    AND SO I BELIEVE THERE WAS ALSO A DISCUSSION

3    IN YOUR DIRECT EXAMINATION ABOUT SOCIAL DESIRABILITY

4    BIAS.  DO YOU RECALL THAT?

5        A    YES.

6        Q    OKAY.  AND THE WAY THAT QUESTION THAT YOU

7    CITED FROM MR. INGRAHAM WAS PHRASED, THAT TALKED

8    ABOUT AMERICAN ADULTS BEING OPPOSED TO A CLOSE

9    RELATIVE MARRYING A BLACK PERSON.  DO YOU RECALL

10   THAT?

11       A    YES.

12       Q    OKAY.  AND IS THAT AN EXAMPLE OF A SURVEY

13   DESIGN THAT'S DESIGNED TO MITIGATE THE EFFECTS OF

14   SOCIAL DESIRABILITY BIAS?

15       A    TO THE BEST OF ITS POSSIBILITY, YES.

16       Q    JUST TO BE VERY CLEAR FOR THE RECORD, IS THE

17   IDEA THAT IF YOU ASK SOMEBODY "ARE YOU" -- "WOULD YOU

18   BE WILLING TO BE IN" -- FOR EXAMPLE, "WOULD YOU BE

19   WILLING TO BE IN AN INTERRACIAL MARRIAGE?" THAT

20   PERSON MAY FEEL PRESSURED TO SAY "YES"?

21       A    CORRECT.  THAT'S RIGHT.

22       Q    SO THEN THE IDEA IS IF YOU ASK ABOUT THE --

23   "WOULD YOU BE OPPOSED TO A CLOSE RELATIVE?" THAT THAT

24   MAY OFFER MORE COMFORT TO GIVE THE LESS DESIRABLE

25   OPINION?

12:01p

**1**    A    THAT IS CORRECT.

**2**    Q    OKAY.  ALL RIGHT.  SO I'D LIKE TO NOW TURN

**3** TO PAGE 9 OF YOUR REPORT, WHICH IS ALREADY ON OUR

**4** SCREEN.  AND SPECIFICALLY THAT SECOND -- WELL, FIRST

**5** AND SECOND FULL PARAGRAPHS AT THE TOP, IF WE CAN

**6** START THERE.

**7**         AND HERE YOU TALK ABOUT GALLUP DIVERGENCES

**8** ON POLICIES.  I JUST HAD A QUESTION FOR YOU ABOUT --

**9** IT'S SORT OF IN THE MIDDLE OF THE PAGE WHERE YOU TALK

**10** ABOUT A GALLUP QUESTION ABOUT RACE RELATIONS AND YOU

**11** INDICATE THAT THE GAP INCREASED FROM FOUR TO 14

**12** POINTS ON THAT QUESTION.

**13**    A    YES.

**14**    Q    DO YOU SEE THAT?

**15**    A    YES.

**16**    Q    AND THE QUESTION IS SPECIFICALLY:  "DO YOU

**17** THINK THAT RELATIONS BETWEEN BLACKS AND WHITES WILL

**18** ALWAYS BE A PROBLEM FOR THE UNITED STATES, OR THAT A

**19** SOLUTION WILL EVENTUALLY BE WORKED OUT?"  IS THAT

**20** CORRECT?

**21**    A    YES.

**22**    Q    OKAY.  IS IT FAIR TO SAY THAT THAT QUESTION

**23** IS ATTEMPTING TO MEASURE OPTIMISM VERSUS PESSIMISM?

**24**    A    I THINK YOU COULD LOOK AT IT THAT WAY, YES.

**25**    Q    AND WOULD YOU AGREE THAT MUCH OF THE GROWTH

12:03p

1   IN THAT GAP FROM FOUR TO 14 POINTS BETWEEN 1996 AND

2   2016 IS EXPLAINABLE BY WHITE RESPONDENTS BECOMING

3   MORE OPTIMISTIC AS TIME PASSES?

4        A    I WOULD HAVE TO GO BACK AND LOOK AT THAT

5   DATA SPECIFICALLY.  IT COULD BE WHITES BEING MORE

6   OPTIMISTIC BECAUSE OF THE ELECTION OF OBAMA, BUT THEN

7   IT COULD ALSO BE BLACKS BECOMING MORE PESSIMISTIC.

8   SO I WOULD HAVE TO -- I COULD ONLY QUALIFY MY ANSWER.

9        Q    ALL RIGHT.  AND DO YOU RECALL GIVING A

10  DEPOSITION IN THIS CASE?

11       A    YES.

12       Q    OKAY.  AND DO YOU RECALL BEING ASKED HOW

13  THAT GAP CAN BE EXPLAINED?

14       A    IF YOU TELL ME.

15       Q    OKAY.

16       A    THERE WERE A LOT OF QUESTIONS.

17       Q    THERE WERE A LOT OF QUESTIONS.  ALL RIGHT.

18  SO I'D LIKE TO PULL UP YOUR DEPOSITION ON -- AT PAGE

19  102.

20            THE COURTROOM DEPUTY:  YOU'RE DOING IT FROM

21  HERE OR BACK THERE?

22            MR. LEWIS:  HE'S DOING IT, BUT WE'RE ON THE

23  SCREEN.

24  BY MR. LEWIS:

25       Q    AND DO YOU RECALL GIVING AN OATH TO TELL THE

12:04p

1  TRUTH IN THAT DEPOSITION?

2      **A**    YES.

3      **Q**    OKAY.  AND YOU DID SO.  IS THAT RIGHT?

4      **A**    YES.

5      **Q**    OKAY.  AND SO I'M JUST GOING TO READ TO YOU

6  THE QUESTION BEGINNING ON LINE 11.

7      **A**    OKAY.

8      **Q**    AND IT READS:  "IS IT FAIR TO SAY THAT MUCH

9  OF THE GAP THAT YOU DESCRIBED, DR. KING, IS

10  EXPLAINABLE BY WHITE RESPONDENTS BECOMING MORE

11  OPTIMISTIC AS TIME PASSES INSTEAD OF BLACK

12  RESPONDENTS BECOMING MORE PESSIMISTIC AS TIME

13  PASSES?"  DO YOU SEE THAT?

14          **MS. GIGLIO:**  YOUR HONOR, RESPECTFULLY, THIS

15  IS IMPROPER IMPEACHMENT.  THIS IS NOT THE QUESTION

16  THAT MR. LEWIS ASKED.  AND, FRANKLY, IT REFLECTS THE

17  WITNESS'S RESPONSE.

18          **THE COURT:**  IT'S NOT EXACTLY THE SAME

19  QUESTION.  I'M GOING TO OVERRULE THE OBJECTION.  YOU

20  CAN ASK THE QUESTION.

21          **MR. LEWIS:**  THANK YOU, YOUR HONOR.

22  BY MR. LEWIS:

23      **Q**    DO YOU SEE YOUR ANSWER BEGINNING ON LINE 18?

24      **A**    YES.

25      **Q**    OKAY.  AND DOES IT SAY "I WOULD MOSTLY AGREE

12:05p

1   WITH THAT, YES"?

2       A    YES.

3       Q    OKAY.  THANK YOU.  WE CAN TAKE THAT DOWN.

4            SO, DR. KING, WHEN YOU LOOKED AT THOSE

5   GALLUP QUESTIONS ABOUT RACE RELATIONS, NONE OF THOSE

6   WERE SPECIFICALLY STUDYING AREAS OF LOUISIANA AT

7   ISSUE IN THIS LAWSUIT.  IS THAT RIGHT?

8       A    FROM THE GALLUP QUESTIONS?

9       Q    YES.

10      A    NO.  I MEAN, SO THIS WOULD HAVE BEEN A

11  NATIONAL SURVEY.

12      Q    OKAY.

13      A    A SURVEY OF NATIONAL RESPONDENTS.

14      Q    SURE.  BUT NOT JUST -- IT WAS NOT, YOU KNOW,

15  A SURVEY EXCLUSIVELY OF PEOPLE WITHIN THE AREAS OF

16  LOUISIANA THAT ARE AT ISSUE IN THIS CASE.  RIGHT?

17      A    THAT IS CORRECT.

18      Q    ALL RIGHT.  SO, DR. KING, I'D NOW LIKE TO

19  TURN TO THE -- THIS ANALYSIS OF RACIAL RESENTMENT

20  THAT YOU PERFORMED.  AND I'D LIKE TO TAKE A LOOK AT

21  THE QUESTIONS.  SO IF WE COULD GO TO -- LOOKS LIKE

22  THE BOTTOM OF PAGE 9 AND THE TOP OF PAGE 10 OF YOUR

23  REPORT.  IF WE COULD PUT THOSE UP SIDE BY SIDE.

24           AND SO WE LOOK AT THE VERY FIRST QUESTION,

25  AND IT READS, QUOTE, IN GENERAL DO YOU THINK THAT

12:06p

**1** BLACKS HAVE AS GOOD A CHANCE AS WHITES IN YOUR

**2** COMMUNITY TO GET ANY KIND OF JOB FOR WHICH THEY ARE

**3** QUALIFIED, OR DON'T YOU THINK THEY HAVE AS GOOD A

**4** CHANCE.  IS THAT RIGHT?

**5**     **A**    YES.

**6**     **Q**    OKAY.  AND SO AS I UNDERSTAND IT, IF THE --

**7** IF A RESPONDENT WERE TO ANSWER "YES" TO THAT

**8** QUESTION, THAT WOULD COUNT AS A FINDING OF RACIAL

**9** RESENTMENT.  IS THAT RIGHT?

**10**     **A**    YES.

**11**     **Q**    OKAY.  AND DO I UNDERSTAND YOUR POSITION --

**12** AND WHY IS THAT?

**13**     **A**    SO RACIAL RESENTMENT IS AN INDEX.  SO WHEN

**14** YOU COMBINE THE ANSWERS TO ALL OF THESE, WHAT -- AS

**15** RACIAL RESENTMENT IS DEFINED AND ARTICULATED IS YOU

**16** HAVE WHITES WHO FEEL THAT BLACKS DO HAVE AS GOOD OF A

**17** CHANCE AS WHITES.  AND FOR BLACKS TO SAY THAT THEY

**18** DON'T MEANS THAT THEY ARE NOT PUTTING IN MAYBE FULL

**19** EFFORT OR TRYING AS HARD AS WHITES AND THAT THEY HAVE

**20** ALL THE ADVANTAGES THAT THEY NEED AND SO THEY DON'T

**21** NEED ANY ADDITIONAL HELP FROM GOVERNMENT.

**22**     **Q**    BUT THEY DON'T -- THERE IS NOTHING IN THIS

**23** QUESTION THAT ACTUALLY SAYS THAT ANYONE NEEDS HELP

**24** FROM THE GOVERNMENT.  RIGHT?

**25**     **A**    THAT IS CORRECT.  AND AGAIN, THAT'S WHY THE

12:08p

1   RACIAL RESENTMENT SCALE IS -- IT'S AN ADDITIVE INDEX,

2   SO IT'S LOOKING AT THE RESPONSES TO A VARIETY OF

3   QUESTIONS.

4        Q    AND THEN IS THE IDEA THAT IF SOMEBODY

5   ANSWERS "NO," THAT THEY MAY UNDERSTAND, FOR EXAMPLE,

6   THAT THERE ARE SOCIETY LEVEL INFLUENCES THAT MAY MAKE

7   CHANCES FOR SUCCESS FOR BLACK AMERICANS MORE

8   DIFFICULT?  IS THAT THE IDEA?

9        A    YES, I WOULD AGREE WITH THAT.

10       Q    OKAY.  AND THEN IF THE PERSON ANSWERS "YES,"

11  AM I UNDERSTANDING YOU TO TRY TO DRIVE IT, THE

12  RESPONDENT MAY BE LOOKING AT MORE INDIVIDUAL LEVEL

13  FACTORS?  IS THAT RIGHT?

14       A    CORRECT.

15       Q    OKAY.  AND SO THE IDEA THAT SOCIETY LEVEL

16  INFLUENCES THAT MIGHT IMPACT CHANGES FOR -- OR

17  OPPORTUNITY FOR BLACK SUCCESS, THAT'S THE IDEA OF

18  SYSTEMIC RACISM.  IS THAT CORRECT?

19       A    YES.

20       Q    NOW, YOU'D AGREE THAT SOMEONE WHO ANSWERS

21  "YES" TO, FOR EXAMPLE, THIS QUESTION MAY NOT

22  NECESSARILY BE RACIALLY RESENTFUL.  RIGHT?

23       A    YES.  BUT I'M -- I MEAN, YOU'RE ASKING ME --

24  I MEAN, I'M NOT SURE I CAN GET INTO THE HEAD OF

25  INDIVIDUAL RESPONSES.  SO AGAIN, THIS IS WHY IT'S

12:10p

1   JUST AN ADDITIVE INDEX LOOKING AT, YOU KNOW, THE

2   CUMULATIVE RESPONSES TO SEVERAL QUESTIONS, SO -- BUT

3   I WOULD AGREE WITH YOU IN PRINCIPLE, IF I UNDERSTAND

4   YOU CORRECTLY.

5       Q    SURE.   OKAY.   ALL RIGHT.   NOW, IF WE LOOK AT

6   THE RESULTS -- IF WE COULD PULL BACK FROM THIS AND

7   THEN LOOK AT TABLE 6.   SO YOU HAVE SOME -- YOU HAVE

8   SOME VALUES HERE ON THE PAGE.   DO I UNDERSTAND THAT

9   WHERE YOU HAVE THE .87 FOR REPUBLICANS -- WELL, I

10  GUESS YOU HAVE TWO .87s FOR REPUBLICANS.   BUT THAT

11  THAT VALUE MEANS THAT -- DO I UNDERSTAND CORRECTLY

12  THAT THAT MEANS 87 PERCENT OF REPUBLICANS ANSWERED

13  "YES" TO AT LEAST ONE QUESTION ON THE BATTERY?

14      A    THAT IS CORRECT.   AND IF I COULD, EARLIER

15  YOU ASKED -- YOU PHRASED THIS AS MY ANALYSIS.   AND

16  JUST TO BE CLEAR, THIS IS GALLUP ANALYSIS.   I'M JUST

17  RE- -- REPRINTING, CITING WHAT THEY HAD USED.   SO

18  THIS ISN'T MY ANALYSIS.   THIS IS JUST ME REPORTING

19  GALLUP ANALYSIS.   BUT YES, THAT IS CORRECT.

20      Q    OKAY.   ALL RIGHT.   SO THEN IF WE COULD GO

21  BACK TO -- AND I DON'T MEAN -- YOU KNOW, I DON'T

22  THINK WE HAVE TO BELABOR THIS.   BUT I BELIEVE OF THE

23  EIGHT QUESTIONS ON THIS BATTERY, WOULD YOU AGREE WITH

24  ME THAT ONLY THE VERY LAST QUESTION ABOUT DEALING

25  WITH THE POLICE IS DIRECTLY ASKING A SURVEY

12:11p

1  RESPONDENT ABOUT RACIAL DIFFERENCES AND HOW THE

2  GOVERNMENT TREATS BLACK AMERICANS?

3      A    YES.  AND I WOULD JUST SAY, AGAIN, THIS

4  IS -- IT'S JUST A FUNCTION OF WHICH SOURCE YOU USE.

5  THE NES, THE NATIONAL ELECTION STUDIES, THEY HAVE

6  DIFFERENT QUESTIONS THAT GET TO THE SAME EFFECT,

7  BUT -- AND AGAIN, I JUST WANTED TO USE GALLUP BECAUSE

8  DR. ALFORD HAD USED GALLUP, SO I JUST WANTED TO USE

9  SIMILAR DATA.

10     Q    SURE.  AND AGAIN, YOUR RACIAL RESENTMENT

11 SCALE DOES NOT MEASURE RACIAL RESENTMENT AMONG

12 LOUISIANA -- WHITE LOUISIANA RESIDENTS ALONE.  IS

13 THAT CORRECT?

14     A    CORRECT.

15     Q    OKAY.  AND NOT WHITE LOUISIANANS WITHIN THE

16 AREAS OF LOUISIANA STUDIED IN THIS LAWSUIT.  RIGHT?

17     A    THAT IS CORRECT.

18     Q    OKAY.  NOW, IS THE RACIAL RESENTMENT INDEX

19 THAT YOU REPORT IN YOUR EXPERT REPORT THE ONLY ONE

20 USED IN THE ACADEMIC LITERATURE?

21     A    NO.

22     Q    ALL RIGHT.  SO, FOR EXAMPLE, IF WE GO TO

23 PAGE 10 OF YOUR REPORT -- AND I'M LOOKING AT THE

24 FIRST SENTENCE UNDER TABLE 6 WHERE IT SAYS, "THERE

25 ARE ELECTORAL CONSEQUENCES TO RACIAL RESENTMENT WITH

12:13p

1   MULTIPLE RESEARCH FINDINGS OF EVIDENCE THAT WHITE

2   VOTERS DISCRIMINATE AGAINST BLACK CANDIDATES."  DO

3   YOU SEE THAT?

4        A    YES.

5        Q    OKAY.  AND I BELIEVE THE CITATION FOOTNOTE

6   15 AT THE BOTTOM IS TO AN ARTICLE FROM JACK CITRIN

7   AND OTHERS IN "PUBLIC OPINION QUARTERLY."  DO YOU SEE

8   THAT?

9        A    YES.

10        Q    THERE WE GO.  SO WE HAVE A COPY OF THAT

11   ARTICLE, AND I'D LIKE TO PUT THAT UP NOW ON THE

12   SCREEN AS -- THE FIRST PAGE OF WHICH I BELIEVE IS

13   LDTX KING 4.  IF WE CAN GO TO THAT.

14        OKAY.  SORRY FOR THAT DELAY, DR. KING.  DO

15   YOU RECOGNIZE THIS ARTICLE?

16        A    YES.

17        Q    OKAY.  AND SO I'D LIKE TO TURN TO -- LOOKS

18   LIKE THERE IS A COUPLE OF TITLE PAGES, SO WE'RE GOING

19   TO GO TO PAGE 3 OF THE EXHIBIT, WHICH I UNDERSTAND IS

20   PAGE 1 OF THIS ARTICLE.  THERE WE GO.

21        ALL RIGHT.  AND JUST LOOKING AT THE

22   ABSTRACT, DO I UNDERSTAND CORRECTLY THAT THIS STUDY

23   EXAMINED THE 1982 CALIFORNIA GUBERNATORIAL ELECTION?

24        A    I BELIEVE IT DOES, YES.

25        Q    AND SPECIFICALLY THE ONE WITH TOM BRADLEY

12:15p

1   WHO WAS A BLACK CANDIDATE.  IS THAT RIGHT?

2        A    YES.

3        Q    OKAY.  AND THIS PARTICULAR STUDY ALSO LOOKED

4   AT THE CONCEPT OF RACIAL RESENTMENT.  IS THAT RIGHT?

5        A    I BELIEVE SO, YES.

6        Q    OKAY.  SO I'D LIKE TO TURN TO PAGE 11 OF THE

7   ARTICLE, WHICH UNDER THEIR NUMBERING IS -- I THINK

8   IT'S PAGE -- NUMBERED PAGE 82.  THERE WE GO.  ALL

9   RIGHT.  THIS IS TABLE 2.

10            AND THIS TABLE IS REPORTING RACIAL OPINIONS

11  EXPRESSED AMONG WHITE CALIFORNIA VOTERS.  IS THAT

12  RIGHT?

13       A    YES.

14       Q    AND SO LIKE THE FIRST QUESTION ASKED, QUOTE,

15  THE GOVERNMENT SHOULD NOT MAKE ANY SPECIAL EFFORT TO

16  HELP BLACKS AND OTHER RACIAL MINORITIES BECAUSE THEY

17  SHOULD HELP THEMSELVES.  DO YOU SEE THAT QUESTION?

18       A    I DO, YES.

19       Q    AND IS THAT A QUESTION THAT COULD MEASURE

20  RACIAL RESENTMENT?

21       A    IT COULD.

22       Q    AND IS IT FAIR TO SAY THAT A QUESTION LIKE

23  THAT IS MEASURING RESENTMENT BASED ON QUESTIONS

24  TESTING WHAT PEOPLE THINK ABOUT HOW THE GOVERNMENT

25  TREATS MEMBERS OF ONE RACIAL GROUP VERSUS ANOTHER?

12:16p

1      A    YES.

2      Q    OKAY.  AND IF WE THEN GO TO -- I FEEL LIKE

3   IT'S THE NEXT PAGE.  LET'S SEE IF I'M RIGHT -- PAGE

4   83, THERE IS THEN ANOTHER CATEGORY OF QUESTIONS THAT

5   THIS STUDY IS ALSO LOOKING AT UNDER THE HEADING

6   "PERCEIVED TRAITS OF BLACKS."  DO YOU SEE THAT?

7      A    YES.

8      Q    OKAY.  AND SO THE FIRST QUESTION ASKS WHICH

9   OF THE FOLLOWING GROUPS ARE THE LEAST LAW-ABIDING,

10  AND THEN IT LISTS A SERIES OF GROUPS.  DO YOU SEE

11  THAT?

12     A    YES.

13     Q    OKAY.  AND IS IT FAIR TO SAY THAT QUESTIONS

14  LIKE THAT ONE ARE TESTING IF SURVEY RESPONDENTS AGREE

15  WITH A RACIAL STEREOTYPE?

16     A    YES.  I WOULD -- I WOULD ALSO -- YES.

17     Q    OKAY.  AND WE CAN TAKE THAT DOWN.

18          SO IS IT FAIR TO SAY THAT THE QUESTIONS LIKE

19  THOSE USED IN THE CITRIN ARTICLE THAT YOU CITE IN

20  YOUR EXPERT REPORT ARE MEASURING DIFFERENT RACIAL

21  ATTITUDES AND VIEWS THAN THE BATTERY OF QUESTIONS

22  THAT YOU SELECTED IN YOUR STUDY?

23     A    THAT 1982 GUBERNATORIAL RACE IN CALIFORNIA

24  IS OFTEN CITED AS THE PROTOTYPICAL EXAMPLE OF SOCIAL

25  DESIRABILITY BIAS, BECAUSE TOM BRADLEY LED IN ALL THE

12:18p

1   POLLS BUT THEN LOST.  AND SO I WOULD HAVE TO REREAD

2   THAT ARTICLE PROBABLY IN ITS ENTIRETY TO UNDERSTAND

3   IF THEY'RE TRYING TO -- IF THAT ARTICLE IS

4   SPECIFICALLY FOCUSED ON THE RACIAL RESENTMENT OR THE

5   SOCIAL DESIRABILITY.

6       Q    BUT THOSE QUESTIONS ARE MEASURING RACIAL

7   ATTITUDES AND VIEWS VERY DIFFERENTLY THAN YOUR

8   QUESTIONS IN THIS CASE.  IS THAT RIGHT?

9       A    AS I SAID, THERE ARE MANY DIFFERENT SURVEYS

10  LOOKING AT RACIAL RESENTMENT; FOR INSTANCE, THE

11  NATIONAL ELECTION STUDIES THAT POLITICAL SCIENTISTS

12  OFTEN USE, SO THEY'RE GOING TO ASK SIMILAR QUESTIONS

13  BUT THEY WILL BE WORDED SLIGHTLY DIFFERENTLY.

14           SO I WOULD AGREE THAT YES, THESE QUESTIONS

15  ARE DIFFERENT, THEY'RE GETTING AT THE SAME ATTITUDE,

16  BUT YES, THEY ARE ASKED DIFFERENTLY AND YOU MIGHT GET

17  SOME SPECIFIC DIFFERENCES, YES.

18      Q    SURE.  OKAY.

19           AND SO TO WRAP THIS UP, I WANT TO -- AND I'M

20  SORRY TO HAVE TO KIND OF REWIND A LITTLE BIT.  BUT I

21  WANT TO JUST KIND OF CONCLUDE WITH YOUR REVIEW OF THE

22  2018 SECRETARY OF STATE ELECTION.  SO I'D LIKE TO GO

23  INTO YOUR REPORT ON PAGE 7.  I BELIEVE IT'S THE

24  SECOND PARAGRAPH.  DID I GET THAT RIGHT?  THE FIRST

25  FULL PARAGRAPH.  EXCUSE ME.  IF WE COULD JUST ZOOM IN

12:19p

1   ON THAT.  OKAY.

2           SO DO I UNDERSTAND YOUR POSITION THAT YOU'RE

3   LOOKING AT A MEASURE OF DIFFERENCE BY RACE BECAUSE

4   YOU'RE LOOKING AT HOW THE -- AMONG WHITE DEMOCRAT --

5   AMONG WHITE VOTERS THE BLACK DEMOCRATIC CANDIDATE

6   RECEIVED FIVE PERCENT OF THE WHITE VOTE AND THE OTHER

7   RECEIVED 9.7.  IS THAT RIGHT?

8     A    YES.

9     Q    OKAY.  AND SO FOR YOU, THE -- YOU'RE FINDING

10  POLARIZATION BECAUSE YOU'RE SEEING THAT NINE PERCENT

11  IS HIGHER THAN THE FIVE.  IS THAT RIGHT?

12    A    YES.  MY INTERPRETATION OF DR. ALFORD'S

13  ANALYSIS.

14    Q    AND SO JUST TO MAKE SURE WE'RE LOOKING AT

15  THE WHOLE THING, I'D LIKE TO PULL UP DR. ALFORD'S

16  REPORT ADMITTED AS LDTX 53.  AND WE'RE GOING TO GO

17  BACK TO PAGE 9, WHICH I THINK WE LOOKED AT IN YOUR

18  DIRECT.  OKAY.  AND IF WE COULD JUST HIGHLIGHT THAT

19  BOTTOM ELECTION, NOVEMBER 2018 SECRETARY OF STATE.

20  THERE WE GO.  ALL RIGHT.

21          SO DO YOU AGREE WITH ME, JUST AS I'M READING

22  THIS TABLE, THAT AT THE BOTTOM OF THE PAGE, THE

23  BOTTOM OF THIS TABLE, IT'S SUMMARIZING THE TOTAL

24  PERCENT OF BLACK SUPPORT FOR DEMOCRATIC CANDIDATES AT

25  87 PERCENT?

12:21p

1        A    YES.

2        Q    OKAY.  AND FOR THE PERCENTAGE OF WHITE

3    SUPPORT FOR DEMOCRATIC CANDIDATES AT 15 PERCENT.  IS

4    THAT RIGHT?

5        A    YES.

6        Q    AND SO IS IT FAIR TO SAY THAT YOU'RE LOOKING

7    AT RACIAL POLARIZATION IN THIS ELECTION BY LOOKING

8    JUST AT THE 15 PERCENT OF THE WHITE VOTES CAST FOR

9    DEMOCRATIC CANDIDATES.  IS THAT RIGHT?

10       A    YES, THAT IS CORRECT.

11       Q    OKAY.  SO YOU'RE NOT ABLE TO EVALUATE THE

12   VOTE -- RACIAL POLARIZATION SEPARATE FROM PARTY

13   POLARIZATION IN THIS ELECTION FROM 85 PERCENT OF

14   WHITE VOTERS.  IS THAT RIGHT?

15       A    I'M JUST -- YES.  SO IN MY INTERPRETATION OF

16   DR. ALFORD'S DATA, YES, THAT IS CORRECT.  I'M JUST

17   LOOKING AT THE COPARTISANS, JUST THE DEMOCRATS.

18       Q    I SEE.  OKAY.  AND SO IF WE LOOK AT THE 15

19   PERCENT AND YOU LOOK AT THE 5.4, WOULD YOU AGREE THAT

20   IN THIS ELECTION THAT THE BLACK CANDIDATE -- THE

21   BLACK DEMOCRATIC CANDIDATE WAS RECEIVING ABOUT A

22   THIRD OF THE WHITE VOTE -- WHITE DEMOCRATIC VOTE?

23       A    YES.

24       Q    OKAY.  AND SO YOU'RE UNABLE -- JUST FROM

25   LOOKING AT THIS, YOU'RE NOT ABLE TO EXCLUDE THE

12:22p

1   POSSIBILITY THAT PARTISAN POLARIZATION RATHER THAN

2   RACIAL POLARIZATION IS INFLUENCING THE VOTING

3   BEHAVIOR OF THE 85 PERCENT OF THE WHITE VOTERS THAT

4   VOTED FOR A REPUBLICAN CANDIDATE IN THIS ELECTION.

5   IS THAT RIGHT?

6       A    TWO THINGS CAN EXIST AT THE SAME TIME WHEN I

7   LOOK AT THIS.  SO AMONG THE DEMOCRATS, AMONG THE

8   WHITES WHO VOTED FOR DEMOCRATS, THERE'S RACIAL

9   POLARIZATION.  AMONG THE WHITES WHO VOTED FOR THE

10  REPUBLICANS, I'M NOT MAKING ANY CHARACTERIZATION ON

11  WHY THEY VOTED FOR THE REPUBLICAN.

12          MR. LEWIS:  THANK YOU, YOUR HONOR.  I HAVE

13  NO FURTHER QUESTIONS.

14          THE COURT:  ANY REDIRECT?

15          MS. GIGLIO:  NO REDIRECT, YOUR HONOR.

16          THE COURT:  OKAY.  THANK YOU.

17          YOU MAY STEP DOWN, SIR.

18          OKAY.  AS A MATTER OF HOUSEKEEPING, I

19  HAVE SOME GOOD NEWS.  AND THE GOOD NEWS IS THAT THE

20  COURT REPORTER WHO WAS HERE YESTERDAY CAN FILL IN

21  TODAY FROM TWO TO FIVE, SO WE CAN GO THIS AFTERNOON

22  MAYBE UNTIL COMPLETION, IF YOU-ALL ARE PREPARED FOR

23  THAT.  I REALIZE THAT I'M KIND OF DOUBLE-CROSSING

24  YOU, BUT I JUST FOUND OUT THIS MORNING.

25

12:23p

1    MS. KEENAN:  YES, YOUR HONOR, PLAINTIFFS ARE

2    PREPARED TO CALL THE REMAINDER OF THEIR WITNESSES

3    TODAY.  WE WOULD LIKE TO INQUIRE ABOUT WHETHER THERE

4    IS ANY ADDITIONAL LEGAL ARGUMENT YOUR HONOR WOULD

5    LIKE SO WE CAN PREPARE IN THE REMAINING TIME.

6    THE COURT:  I WAS GETTING TO THAT.

7    MS. KEENAN:  SURE.

8    THE COURT:  SO NO CLOSING ARGUMENTS.  AND

9    FINALLY, I AM GOING TO -- I HAVE RECONSIDERED MY

10   STATEMENTS AT THE INITIAL -- AT THE OUTSET OF THIS

11   TRIAL ABOUT TRIAL BRIEFS.  THE COURT WILL ACCEPT

12   TRIAL BRIEFS FROM BOTH PARTIES BUT THEY'LL BE

13   SIMULTANEOUS FILINGS; PAGE LIMIT OF 40 PAGES AND A

14   TIME DEADLINE.  I DON'T -- I'M TRYING NOT TO MAKE

15   YOU-ALL HAVE A BRIEF RIGHT DURING THE HOLIDAY SEASON,

16   BUT I'LL LISTEN TO WHAT YOU HAVE TO SAY.

17   MS. KEENAN:  YOUR HONOR, MAYBE WE CAN CONFER

18   WITH OUR COUNSEL DURING THE BREAK AND THEN LET YOU

19   KNOW WHAT TIME WORKS FOR EACH SIDE.

20   THE COURT:  YES, WHY DON'T YOU DO THAT.

21   MR. LEWIS:  WE AGREE WITH THAT.

22   MR. TUCKER:  AND, YOUR HONOR, ONE OTHER

23   QUESTION THE -- WE HAD DISCUSSED AT THE BEGINNING OF

24   TRIAL ABOUT UPDATING THE FINDINGS OF FACT.  WOULD THE

25   COURT STILL WANT UPDATES WITH CITATIONS TO THE RECORD

12:24p

1    AND --

2            THE COURT:  I THINK NOT.  I THINK THAT'S

3    GOING TO BE PROBABLY MORE LABORIOUS AFTER HAVING GONE

4    BACK AND LOOKED AT THE PROPOSED FINDINGS OF FACT AND

5    CONCLUSIONS OF LAW.  I'M SORRY TO DOUBLE-CROSS YOU,

6    MR. TUCKER, BUT IT'S MY PREROGATIVE.

7            MR. TUCKER:  THAT'S FINE, YOUR HONOR.  WE

8    JUST WANTED TO KNOW WHAT THE COURT WOULD BE LOOKING

9    FOR.

10           THE COURT:  I'M REALLY LOOKING FOR TRIAL

11   BRIEFS SIMULTANEOUSLY FILED, NOT TO EXCEED 40 PAGES,

12   AND CITATIONS TO THE RECORD WHERE HUMANLY POSSIBLE.

13   I REALIZE THAT -- YOU'VE GOT A REALTIME REPORTER SO

14   YOU SHOULD BE ABLE TO CITE TO THE RECORD, BUT, YOU

15   KNOW, DO THE BEST YOU CAN.

16           MR. LEWIS:  AND, YOUR HONOR, WE WILL MEET

17   AND CONFER.  I THINK ONE QUESTION I'M SURE WE'LL

18   DISCUSS IS, YOU KNOW, CITATIONS TO THE ROUGH VERSUS

19   THE FINAL TRANSCRIPTS.  I SUSPECT THE COURT MAY

20   PREFER US TO CITE TO FINALS, BUT I WILL -- WE WILL

21   OBVIOUSLY DEFER TO YOUR HONOR.

22           THE COURT:  OKAY.  WELL, YOU MEAN THE

23   CERTIFIED RECORD FROM THE COURT?

24           MR. LEWIS:  THAT IS CORRECT, YOUR HONOR.

25           THE COURT:  NO.  I DON'T WANT TO DELAY THIS

12:25p

**1**  THING THAT LONG, SO YOU CAN CITE TO ROUGH TRANSCRIPT

**2**  TESTIMONY.  AS YOU WELL KNOW, WE HAVE A RECORDING OF

**3**  THIS AND I CAN LISTEN TO THE RECORDING, SO I CAN -- I

**4**  MEAN, IF YOU BLATANTLY MISREPRESENT SOMETHING FROM A

**5**  ROUGH TRANSCRIPT OR IF -- IT WOULDN'T BE NECESSARILY

**6**  A MISREPRESENTATION.  IF THE ROUGH TRANSCRIPT IS JUST

**7**  REALLY ROUGH, I'M GOING TO BE ABLE TO TELL THAT.

**8**  OKAY?

**9**          MR. LEWIS:  YOUR HONOR, WE APPRECIATE THAT.

**10**  I KNOW WE HAVE PEOPLE WORKING.  I KNOW THE COURT

**11**  REPORTERS HERE HAVE BEEN WORKING VERY HARD TO GET US

**12**  DAILIES.  THERE ARE SOME, YOU KNOW, PEOPLE

**13**  MISIDENTIFIED AND LITTLE MISTAKES HERE AND THERE.

**14**  THAT'S THE ONLY REASON WE WERE ASKING.  THAT HAPPENS

**15**  WHEN PEOPLE ARE WORKING VERY QUICKLY.  BUT AGAIN,

**16**  PERHAPS WE CAN MEET AND CONFER WITH COUNSEL.

**17**          THE COURT:  YES.  AND, YOU KNOW, WHEN YOU'RE

**18**  CITING TO THE ROUGH TESTIMONY AND IF YOU WANT TO

**19**  BRACKET SOMETHING AND THEN DRAW UP A FOOTNOTE THAT

**20**  SAYS "IT WAS TRANSCRIBED AS THIS BUT COUNSEL RECALLS

**21**  IT TO BE THAT," THAT'S FINE.  IF YOU POINT THAT OUT

**22**  TO ME, I WILL LISTEN TO THE RECORDINGS, OKAY?  SO --

**23**  AND THEN WE'LL KNOW.

**24**          ALL RIGHT.  SO LET'S BE IN RECESS UNTIL

**25**  1:30.

01:33p

**1**          **(WHEREUPON, A LUNCH RECESS WAS TAKEN.)**

**2**          **THE COURT:** BE SEATED.

**3**               ALL RIGHT.  BEFORE WE GET STARTED, DID

**4** Y'ALL MAKE ANY DECISIONS ABOUT PRETRIAL OR POST-TRIAL

**5** BRIEFING?

**6**          **MS. KEENAN:** YES, YOUR HONOR.  MEGAN KEENAN

**7** FOR THE PLAINTIFFS.

**8**               OUR TEAM HAS CONFERRED.  WE THINK WE'D

**9** BE ABLE TO GET THOSE TO YOUR HONOR BY NOT THIS FRIDAY

**10** BUT THE FOLLOWING FRIDAY, THE 20TH.  I BELIEVE THE

**11** DEFENDANTS HAVE A DIFFERENT TIMELINE IN MIND.  I'M

**12** HAPPY TO LET MR. LEWIS REPRESENT THAT.

**13**          **THE COURT:** MR. LEWIS, WHAT'S YOUR PROPOSAL?

**14**          **MR. LEWIS:** YOUR HONOR, THE DEFENDANTS WOULD

**15** PROPOSE FRIDAY, DECEMBER 22ND.  I BELIEVE PLAINTIFFS

**16** ARE -- WELL, YOU SAID THE 20TH AND FRIDAY.  I THINK

**17** YOU MEANT THE 15TH.

**18**          **MS. KEENAN:** THAT'S MY FAULT, YOUR HONOR.

**19** IT'S FRIDAY, THE 15TH.  AND THE DEFENDANTS ARE

**20** PROPOSING FRIDAY, THE 22ND.

**21**          **THE COURT:** OKAY.  WE'RE GOING TO SPLIT THE

**22** DIFFERENCE.  THEY'LL BE DUE ON TUESDAY, THE 19TH.

**23**          **MR. LEWIS:** THANK YOU, YOUR HONOR.

**24**          **MS. KEENAN:** THANK YOU, YOUR HONOR.

**25**          **THE COURT:** ALL RIGHT.

01:34p

**1**       OKAY.  NEXT WITNESS.

**2**       MS. BRANNON:  YOUR HONOR, SARA BRANNON FOR

**3**  THE PLAINTIFFS.  AND I CALL DR. CORY MCCARTAN.

**4**       **(WHEREUPON, CORY MCCARTAN, BEING DULY SWORN,**

**5**  **TESTIFIED AS FOLLOWS.)**

**6**       MS. BRANNON:  YOUR HONOR, MAY I APPROACH THE

**7**  WITNESS TO GIVE HIM A COPY OF HIS REPORT?

**8**       **THE COURT:**  YES.

**9**       SIR, IF YOU'LL STATE AND SPELL YOUR

**10**  NAME FOR THE RECORD, PLEASE.

**11**       **THE WITNESS:**  SURE.  IT'S CORY MCCARTAN.

**12**  C-O-R-Y, M-C-C-A-R-T-A-N.

**13**       **MS. BRANNON:**  FOR THE RECORD, DR. MCCARTAN'S

**14**  REPORT IS EXHIBIT PL 135.

**15**                    **VOIR DIRE**

**16**  BY MS. BRANNON:

**17**     **Q**   DR. MCCARTAN, IS THE C.V. ATTACHED TO YOUR

**18**  REPORT?

**19**     **A**   IT IS.

**20**     **Q**   CAN WE SEE DR. MCCARTAN'S C.V. ON THE

**21**  SCREEN.  I BELIEVE IT IS EXHIBIT A IN HIS REPORT.

**22**       IS THIS A COMPLETE AND ACCURATE SUMMARY OF

**23**  YOUR BACKGROUND AND PROFESSIONAL EXPERIENCE?

**24**     **A**   IT IS.

**25**     **Q**   WHAT IS YOUR EDUCATIONAL BACKGROUND?

01:35p

**1**     **A**    I HAVE A BACHELOR'S IN MATH FROM GRINNELL

**2**  COLLEGE AND A MASTER'S AND PH.D. IN STATISTICS FROM

**3**  HARVARD.

**4**     **Q**    WHAT IS YOUR CURRENT EMPLOYMENT?

**5**     **A**    I'M A DATA SCIENCE ASSISTANT PROFESSOR, A

**6**  FACULTY FELLOW AT THE CENTER FOR DATA SCIENCE AT NYU.

**7**     **Q**    WHAT ARE YOUR FUTURE EMPLOYMENT PLANS?

**8**     **A**    THIS NEXT SUMMER I'LL START ON THE TENURE

**9**  TRACK AS AN ASSISTANT PROFESSOR OF STATISTICS AT PENN

**10**  STATE.

**11**     **Q**    APPROXIMATELY HOW MANY PEER-REVIEW ARTICLES

**12**  HAVE YOU PUBLISHED?

**13**     **A**    MAYBE A DOZEN OR SO.

**14**     **Q**    CAN YOU DESCRIBE SOME OF YOUR ACADEMIC WORK

**15**  THAT YOU HAVE DONE ON THE TOPIC OF REDISTRICTING AND

**16**  THE USE OF SIMULATIONS?

**17**     **A**    SURE.  SO THE FIRST THING I DID THERE IS I

**18**  WROTE AN ARTICLE DEVELOPING A REDISTRICTING

**19**  SIMULATION ALGORITHM TO GENERATE REDISTRICTING PLANS.

**20**  AND THEN IN WORK SINCE THEN I'VE APPLIED THAT TOOL TO

**21**  STUDY --

**22**          **THE REPORTER:**  I'M SORRY.  A LITTLE SLOWER.

**23**  "TO STUDY" --

**24**          **THE WITNESS:**  I'M SORRY.  PARTISAN

**25**  GERRYMANDERING, CENSUS DATA, AND OTHER TOPICS.

01:36p

1   BY MS. BRANNON:

2       **Q**   ARE YOU FAMILIAR WITH THE REPORTS THAT DR.

3   BARBER PROVIDED IN THIS CASE?

4       **A**   I AM.

5       **Q**   DID YOU REVIEW THOSE REPORTS?

6       **A**   YES.

7       **Q**   WHAT SOFTWARE DID DR. BARBER USE IN

8   CONDUCTING THE ANALYSIS IN HIS REPORTS?

9       **A**   HE USED THE REDIST SOFTWARE, WHICH IS

10  SOFTWARE THAT I HELPED WRITE THAT IMPLEMENTS THIS

11  ALGORITHM THAT I WAS JUST TALKING ABOUT.

12      **Q**   ARE THERE PEER-REVIEWED ARTICLES ABOUT THE

13  WORK YOU HAVE DONE IN CREATING THIS SOFTWARE?

14      **A**   YES.  SO I THINK IT'S ACTUALLY THE FIRST ONE

15  THERE IN MY LIST:  "SEQUENTIAL MONTE CARLO FOR

16  SAMPLING BALANCED AND COMPACT REDISTRICTING PLANS"

17  THAT DEVELOPED THIS ALGORITHM.  AND AS PART OF THAT

18  WE ALSO RELEASED THE SOFTWARE THAT IMPLEMENTS THAT.

19          **MS. BRANNON:**  PLAINTIFFS MOVE TO ADMIT DR.

20  MCCARTAN AS AN EXPERT IN THE FIELD OF REDISTRICTING

21  AND THE USE OF SIMULATIONS IN REDISTRICTING.

22          **THE COURT:**  ANY OBJECTION OR CROSS ON THE

23  TENDER?

24          **MS. HOLT:**  NO OBJECTION, YOUR HONOR.

25          **THE COURT:**  DR. MCCARTAN WILL BE PERMITTED

01:37p

1   TO GIVE OPINION TESTIMONY ON REDISTRICTING AND THE

2   USE OF -- I'M SORRY.  CAN Y'ALL NOT HEAR ME -- AND

3   THE USE OF SIMULATIONS IN REDISTRICTING.

4                    **DIRECT EXAMINATION**

5   **BY MS. BRANNON:**

6        **Q**   WHAT DID THE PLAINTIFFS ASK YOU TO DO IN

7   THIS CASE?

8        **A**   I WAS RETAINED TO STUDY DR. BARBER'S REPORT

9   AND THE EVIDENCE HE PRESENTED THERE.

10       **Q**   CAN YOU DESCRIBE IN VERY GENERAL TERMS WHAT

11  ANALYSIS DR. BARBER DID IN THESE REPORTS?

12       **A**   SURE.  SO IN HIS FIRST REPORT DR. BARBER

13  ATTEMPTED TO RUN A SIMULATION ANALYSIS GENERATING

14  RANDOM PLANS AND COMPARING THEM AGAINST THE

15  ILLUSTRATIVE MAP, THE ENACTED PLAN.  HE ALSO

16  PERFORMED A NUMBER OF WHAT HE CALLED REGIONAL

17  ANALYSES TO FURTHER EXAMINE THOSE TWO PLANS.

18       **Q**   AND DID THESE SIMULATIONS USE A PARTICULAR

19  SOFTWARE?

20       **A**   YES.  HE GENERATED THOSE SIMULATIONS WITH

21  THIS REDIST SOFTWARE THAT I HELPED WRITE.

22       **Q**   DID THOSE -- DOES THAT SOFTWARE IMPLEMENT AN

23  ALGORITHM?

24       **A**   YES.  SO AS PART OF THAT SOFTWARE YOU CAN

25  RUN THIS -- WE CALL IT THE SMC ALGORITHM, SEQUENTIAL

01:38p

1  MONTE CARLO.  IT'S A WAY OF GENERATING RANDOM

2  REDISTRICTING PLANS.

3     Q    SO IF WE CALL IT SMC THROUGHOUT TODAY'S

4  PRESENTATION, YOU'LL KNOW WHAT WE'RE TALKING ABOUT?

5     A    YES.

6     Q    CAN YOU DESCRIBE WHAT THE ALGORITHM DOES?

7     A    SURE.  SO AS WE SAY, ITS GOAL IS TO GENERATE

8  A REPRESENTATIVE RANDOM SAMPLE OF REDISTRICTING PLANS

9  THAT -- FROM THE SET OF ALL THE PLANS THAT MEET

10 VARIOUS CRITERIA OR SATISFY OR FOLLOWS CERTAIN

11 PRINCIPLES.  SO THE WAY IT DOES THAT IS IT STARTS

12 WITH A BLANK MAP OF WHATEVER STATE YOU'RE IN.  IT

13 DRAWS DISTRICTS ONE AT A TIME ON THAT MAP.  AND IT

14 DOES THIS ACTUALLY FOR MANY, MANY MAPS AT A TIME.

15 AND BY KEEPING TRACK OF HOW IT'S DRAWING ALL THESE

16 DISTRICTS ON THE MAPS, IT'S DESIGNED THEN TO

17 GUARANTEE THAT THE ULTIMATE SAMPLE YOU HAVE IS

18 REPRESENTATIVE.

19    Q    IS THE REDIST SOFTWARE AVAILABLE FOR PUBLIC

20 USE?

21    A    YEAH.  SO IT'S WHAT WE CALL OPEN SOURCE,

22 MEANING THAT THE CODE AND THE SOFTWARE ITSELF ARE

23 FREE TO USE AND AVAILABLE, YOU KNOW, FROM OUR

24 WEBSITE.  ANYONE CAN GO AND INSTALL IT VERY QUICKLY

25 AND EASILY.  AND IT COMES ALONG WITH SOME PLAIN

01:40p

**1**  ENGLISH DOCUMENTATION THAT EXPLAINS WHAT THE SOFTWARE

**2**  IS, HOW TO USE IT, AND HOW TO RUN PARTICULAR CODE TO

**3**  ACCOMPLISH CERTAIN OBJECTIVES.

**4**      **Q**   AND YOU JUST MENTIONED CREATING A

**5**  REPRESENTATIVE SAMPLE.  HOW DO YOU DETERMINE THAT A

**6**  SAMPLE IS REPRESENTATIVE?

**7**      **A**   RIGHT.  SO WHEN I SAY "REPRESENTATIVE," I

**8**  THINK -- THE GOOD ANALOGY IS LIKE A POLL.  YOU HAVE A

**9**  BIG POPULATION.  IN THE CASE OF A POLL, IT'S LIKE

**10**  U.S. VOTERS.  IN THE CASE OF THIS ALGORITHM, IT'S ALL

**11**  THE PLANS POSSIBLE OUT THERE THAT MEET THESE CRITERIA

**12**  OR FOLLOW THESE PRINCIPLES.  AND YOU CAN'T ACTUALLY

**13**  GO AND CHECK ALL OF THE WHOLE POPULATION.  YOU HAVE

**14**  TO ONLY LOOK AT A SUBSET, AND YOU CAN LOOK AT A

**15**  SAMPLE.  AND FOR THAT EXERCISE TO BE USEFUL, THAT

**16**  SAMPLE HAS TO BE REPRESENTATIVE SO THAT THE

**17**  CONCLUSIONS YOU DRAW FROM THE SAMPLE ALSO HOLD IN THE

**18**  POPULATION.

**19**         SO THE GOAL OF THE ALGORITHM IS TO PROVIDE A

**20**  REPRESENTATIVE SAMPLE, JUST LIKE THE GOAL OF A POLL

**21**  IS TO TALK TO A REPRESENTATIVE SAMPLE OF THE VOTERS

**22**  SO YOU CAN MAKE CONCLUSIONS.  AND OBVIOUSLY IF YOU

**23**  ARE NOT LOOKING AT A REPRESENTATIVE SAMPLE, YOU CAN

**24**  MAKE CONCLUSIONS THAT ARE GOING TO BE FAULTY.  SO

**25**  LIKE FAMOUSLY WRITE IN, IN 2016 ELECTION POLLING, YOU

01:41p

**1**   KNOW, HAD HILLARY CLINTON WINNING THE ELECTION AND

**2**   THEN THAT DIDN'T HAPPEN, THAT WAS BECAUSE THE SAMPLES

**3**   WEREN'T REPRESENTATIVE.

**4**          SO IN OUR SOFTWARE, UNLIKE IN POLLING, WE

**5**   ACTUALLY HAVE CONFLICT WAYS TO TRY TO HELP USER

**6**   IDENTIFY WHEN THEY'RE IN THOSE SCENARIOS AND ACTUALLY

**7**   KNOW IN ADVANCE THAT WHETHER OR NOT THEY ARE SAMPLES

**8**   REPRESENTATIVE OR NOT.

**9**      **Q**    AND ARE THOSE THE STANDARD DIAGNOSTICS?

**10**     **A**    RIGHT.  SO THE WAY WE DO THAT -- AND YOU

**11**  CANNOT BE A HUNDRED PERCENT SURE.  BUT WE'VE COME UP

**12**  AND WE THEN DEVELOPED WHAT WE CALL DIAGNOSTIC

**13**  MEASURES.  THESE ARE BASICALLY FORMULAS.  THEY

**14**  PRODUCE A NUMBER AND THAT NUMBER TAKES ON CERTAIN

**15**  VALUES THAT'S INDICATIVE OF PROBLEMS LIKE A RED FLAG,

**16**  IF YOU WILL, THAT THE SAMPLE YOU'VE GENERATED IS NOT

**17**  REPRESENTATIVE.

**18**     **Q**    SO WE'RE GOING TO DISCUSS THE IMPLEMENTATION

**19**  OF THE STANDARD DIAGNOSTICS AND A FEW OF YOUR OTHER

**20**  OPINIONS ABOUT THE STEPS DR. BARBER TOOK TO IMPLEMENT

**21**  YOUR SOFTWARE SHORTLY.  BUT LET'S START WITH THE BIG

**22**  PICTURE.

**23**          DID YOU REVIEW DR. BARBER'S CONCLUSIONS?

**24**     **A**    I DID.

**25**     **Q**    IN VERY GENERAL TERMS, CAN YOU DESCRIBE YOUR

01:42p

 1   UNDERSTANDING OF DR. BARBER'S CONCLUSIONS?

 2       A    RIGHT.  SO AS WE TALKED ABOUT, HE ATTEMPTED

 3   TO FIRST RUN THIS SIMULATION STUDY, GENERALLY WHAT HE

 4   CALLED A RACE-NEUTRAL BASELINE OF PLANS, WHICH HE

 5   THEN COMPARED AGAINST THE ILLUSTRATIVE MAP AND THE

 6   ENACTED.  ON THE BASIS OF THAT SET, DR. BARBER

 7   CONCLUDED THAT RACE PLAYED A ROLE IN THE DRAWING OF

 8   THE ILLUSTRATIVE MAP.

 9            DR. BARBER THEN ALSO PERFORMED WHAT HE

10   CALLED THESE REGIONAL ANALYSES.  AND PUTTING THOSE

11   THINGS TOGETHER HE CONCLUDED THAT RACE PLAYED A

12   SIGNIFICANT ROLE, MORE SO AND ABOVE THESE OTHER

13   TRADITIONAL REDISTRICTING PRINCIPLES.

14       Q    DO YOU AGREE WITH DR. BARBER'S CONCLUSIONS?

15       A    I DON'T.

16       Q    DO YOU THINK DR. BARBER ESTABLISHED -- DR.

17   BARBER'S SIMULATIONS ESTABLISHED THAT -- LET ME

18   REPHRASE THE QUESTION.

19            DO DR. BARBER'S SIMULATIONS ESTABLISH A MORE

20   SIGNIFICANT FACTOR IN THE ILLUSTRATIVE MAP OTHER THAN

21   REDISTRICTING PRINCIPLES?

22       A    NO, THEY DON'T.

23       Q    WHY NOT?

24       A    WELL, REALLY -- SO DR. BARBER ONLY RAN WHAT

25   WE CALL ONE SIMULATION STUDY.  HE GENERATED ONE SET,

01:43p

**1**  IN THIS CASE A HUNDRED THOUSAND PLANS.  AND THAT ONE

**2**  SET IS ACTUALLY NEVER GOING TO BE ENOUGH TO MAKE A --

**3**  EVEN IF YOU RUN THAT SET CORRECTLY, IT'S NEVER GOING

**4**  TO BE ENOUGH TO ESTABLISH THAT ONE FACTOR DOMINATED

**5**  OR OVERWHELMED OTHER FACTORS, BECAUSE FUNDAMENTALLY

**6**  IT'S ABOUT HOW FACTORS ARE PLAYING AGAINST EACH

**7**  OTHER.  AND ALL YOU CAN DO WITH A SINGLE STUDY IS

**8**  MEASURE THE IMPACT OF ONE FACTOR ON A PARTICULAR

**9**  OUTCOME.

**10**      **Q**    THE HUNDRED THOUSAND RUNS THAT YOU JUST

**11**  MENTIONED, THAT'S THE SIMULATION STUDY THAT DR.

**12**  BARBER DID IN HIS FIRST REPORT.  IS THAT CORRECT?

**13**      **A**    THAT'S RIGHT.

**14**      **Q**    IN GENERAL TERMS, WHAT IS YOUR OPINION OF

**15**  THE VALUE OF THAT FIRST SIMULATION STUDY?

**16**      **A**    SO AS I SAID, YOU KNOW, WHEN DONE CORRECTLY,

**17**  THESE SIMULATIONS CAN COME UP WITH A REPRESENTATIVE

**18**  SAMPLE, THEY CAN MEASURE THE IMPACT OF MAYBE ONE

**19**  FACTOR.  BUT DR. BARBER DIDN'T PERFORM THIS FIRST SET

**20**  OF SIMULATIONS CORRECTLY.  AND SO REALLY, AS FAR AS

**21**  I'M CONCERNED, THAT FIRST SET REALLY IS KIND OF

**22**  USELESS FOR ANSWERING THE QUESTIONS HE WAS TRYING TO

**23**  ASK.

**24**      **Q**    SO WITH HIS SECOND SIMULATION STUDY BEING OF

**25**  MORE VALUE, WHICH WE'LL GET TO, HE ESSENTIALLY ONLY

01:44p

1    RAN ONE SIMULATION STUDY, IN YOUR OPINION?

2        **A**    THAT'S RIGHT.  BECAUSE THE FIRST ONE, LIKE I

3    SAID, WAS -- DIDN'T HAVE ANY VALUE.

4        **Q**    IN YOUR OPINION, CAN SIMULATIONS BE USED TO

5    CREATE A REPRESENTATIVE SAMPLE OF PLANS THAT COMPLY

6    WITH CERTAIN REDISTRICTING PRINCIPLES?

7        **A**    YEAH.  SO WHEN USED CORRECTLY, THAT'S ONE OF

8    THE THINGS THEY'RE DESIGNED TO DO.

9        **Q**    HAVE YOU DONE ANY WORK IN ANOTHER STATE

10   USING THE SMC ALGORITHM TO EVALUATE REDISTRICTING

11   MAPS?

12       **A**    YEAH.  SO AS I MENTIONED, WE -- IN A LOT OF

13   MY ACADEMIC WORK WE'VE USED THIS ALGORITHM.  WE HAD A

14   PROJECT WHERE WE WERE TRYING TO MEASURE THE IMPACT OF

15   PARTISAN CONSIDERATIONS OR PARTISAN GERRYMANDERING IN

16   ALL 50 STATES' CONGRESSIONAL MAPS WHERE WE USED THIS

17   ALGORITHM THROUGHOUT.

18       **Q**    AND WHAT STEPS WERE INVOLVED IN THAT WORK?

19       **A**    SURE.  WELL, MAYBE IT'S EASY TO GIVE YOU AN

20   EXAMPLE.  SO ONE STATE WE LOOKED AT OBVIOUSLY WAS

21   FLORIDA.  AND AS I SAY, THERE WE'RE TRYING TO MEASURE

22   THE IMPACT OF THIS PARTISANSHIP FACTOR, SO THAT

23   INVOLVES COMPARING THE PLAN THAT WAS ACTUALLY ADOPTED

24   IN FLORIDA WITH A SET THAT INCLUDES ALL THE OTHER

25   FACTORS AND PRINCIPLES THAT YOU WANT IN CONGRESSIONAL

01:46p

1   MAPS IN FLORIDA EXCEPT PARTISANSHIP.  SO WE STILL

2   WANT TO CONSIDER THE COMPACTNESS OF THE DISTRICTS,

3   THE POPULATION, MAYBE PRESERVING COUNTIES,

4   MUNICIPALITIES.  THE VOTING RIGHTS ACT IS OBVIOUSLY A

5   CONSIDERATION IN THAT STATE.

6           SO TO INCORPORATE ALL THOSE FACTORS INTO A

7   SIMULATION, YOU KNOW, YOU START WITH THE FACTORS IN

8   PLAIN ENGLISH.  YOU NEED TO SOMEHOW TRANSLATE THOSE

9   TO CODE OR MATH THAT THE ALGORITHM CAN ACTUALLY

10  UNDERSTAND AND WORK WITH.  AND THAT'S NOT, YOU KNOW,

11  A SIMPLE OR ONE-TO-ONE PROCESS.  THERE IS CHOICES YOU

12  CAN MAKE AS TO HOW TO DO THAT INTERPRETATION.

13          AND IN PARTICULAR, YOU KNOW, FOR MANY OF

14  THESE PRINCIPLES, YOU HAVE TO SORT OF DECIDE HOW

15  STRONG OF AN INSTRUCTION YOU WANT TO PROVIDE TO THE

16  ALGORITHM; HOW MUCH SHOULD IT PRIORITIZE THIS

17  PRINCIPLE AND THIS FACTOR.  AND THERE IS NO WAY A

18  PRIORITY TO REALLY KNOW EXACTLY HOW TO MAKE ALL THE

19  SETTINGS.  WHAT YOU HAVE TO DO IS TRY SOME VALUES,

20  SOME SETTINGS, SOME WAYS OF INCORPORATING THESE

21  PRINCIPLES.  YOU CAN TRY THAT OUT, PRODUCE A

22  SIMULATED SET, AND THEN LOOK AT IT AND STUDY IT AND

23  SAY, OKAY, DID THIS MEET -- DID THIS INCORPORATE THE

24  PRINCIPLES I WANT?  ARE THESE PLANS SATISFACTORY?

25  YOU MIGHT WANT TO TRY WRITING THE ALGORITHM MULTIPLE

01:47p

1   TIMES, JUST CHANGING ONE THING AT A TIME TO EVALUATE

2   THE IMPACT OF A SINGLE FACTOR, A SINGLE CHANGE.

3   THESE TYPE OF EXPERIMENTS ARE LIKE REALLY CRUCIAL FOR

4   COMING UP ULTIMATELY WITH A SET OF PLANS THAT

5   INCORPORATES OTHER PRINCIPLES THAT YOU WANT TO

6   INCORPORATE.

7          SO IN THE CASE OF FLORIDA, I THINK IT TOOK

8   US ON THE ORDER OF MONTHS REALLY TO RUN ALL THE

9   EXPERIMENTS WE WANTED, TRY THINGS OUT, STUDY THE

10  RESULTS AND COME UP WITH ULTIMATELY A FINAL SET OF

11  INSTRUCTIONS OR PARAMETERS FOR THE ALGORITHM THAT WE

12  WERE HAPPY WITH.

13     Q    HAVE YOU RUN ANY SIMULATION STUDIES YOURSELF

14  RELATED TO THE LOUISIANA STATE LEGISLATIVE MAPS?

15     A    NO, I HAVEN'T.  I WASN'T RETAINED TO DO

16  SIMULATIONS SPECIFICALLY, AND REALLY I DIDN'T NEED TO

17  DO SIMULATIONS MYSELF TO EVALUATE THE SIMULATION WORK

18  THAT DR. BARBER DID AND THE OTHER EVIDENCE HE

19  PRESENTED.

20     Q    AND WHY NOT?

21     A    WELL, I LIKE I SAY, YOU KNOW -- YOU KNOW,

22  WHEN YOU'RE DOING A SIMULATION ANALYSIS, THAT

23  INVOLVES, YOU KNOW, A CERTAIN PROCEDURE AND STEPS.

24  IT'S NOT A FORMULA, BUT THERE IS A WORKFLOW ISSUE YOU

25  GENERALLY FOLLOW.  AND THERE IS ALSO THINGS YOU CAN

**1** DO AS PART OF THAT WORKFLOW LIKE CHECKING THESE

**2** DIAGNOSTICS THAT WE'VE BEEN TALKING ABOUT.  AND SO IF

**3** YOU'RE NOT CHECKING THESE DIAGNOSTICS OR IF YOU'RE

**4** NOT FOLLOWING THE WORKFLOW PROPERLY, YOU KNOW, YOU --

**5** I WAS ABLE TO, YOU KNOW, SEE IF THOSE STEPS WERE

**6** BEING FOLLOWED, WHERE THE DIAGNOSTICS WERE

**7** APPROPRIATE WITHOUT HAVING TO GO AND DO MY OWN

**8** SIMULATION WORK.

**9**     Q    AND DO YOU KNOW HOW LONG IT MIGHT TAKE TO

**10** RUN REPRESENTATIVE SIMULATION STUDIES FOR THE

**11** LOUISIANA STATE LEGISLATIVE MAPS?

**12**     A    YEAH.  WELL, YOU KNOW, IT DEPENDS WHAT WE

**13** MEAN BY "REPRESENTATIVE."  AND WHAT I MEAN BY THAT IS

**14** IT DEPENDS WHAT CONSTRAINTS AND PRINCIPLES AND

**15** CRITERIA WE'RE TRYING TO INCORPORATE INTO THE

**16** ALGORITHM, THE SIMULATIONS.  YOU KNOW, SOMETIMES

**17** IT'S -- YOU CAN JUST ASK TOO MUCH.  YOU KNOW, THESE

**18** ALGORITHMS AREN'T LIKE A MAGIC BULLET.  IT'S POSSIBLE

**19** TO SAY -- TO TRY TO PUT TOO MUCH IN.  AND IT COULD

**20** ACTUALLY JUST NOT EVEN BE POSSIBLE TO GENERATE A

**21** REPRESENTATIVE SAMPLE WITH CERTAIN COMBINATIONS OF

**22** CONSTRAINTS OR PRINCIPLES.  THE ONLY WAY YOU CAN KNOW

**23** FOR SURE IS BY TRYING OUT AND GOING THROUGH THE SORT

**24** OF ITERATIVE EXPERIMENTAL PROCESS THAT I STARTED

**25** TALKING ABOUT WHAT WE DID IN FLORIDA.  AND SO JUST

01:49p

1   SITTING AT THE START YOU CAN'T ALWAYS KNOW IF IT'S

2   POSSIBLE OR, IF IT IS POSSIBLE, HOW LONG IT WOULD

3   TAKE.

4       Q    DID YOU REVIEW THE REPORTS THAT DR. BARBER

5   ENTERED INTO THIS CASE?

6       A    I DID.

7       Q    AFTER REVIEWING DR. BARBER'S FIRST REPORT,

8   DID YOU DRAFT A REPORT REFLECTING YOUR OPINIONS?

9       A    YES, I DID.

10      Q    CAN WE SEE PL 135.

11           IS THAT -- IS THIS THAT REPORT?

12      A    IT LOOKS LIKE IT.

13      Q    CAN WE TURN TO PAGES 5 AND 6.

14           ARE YOU FAMILIAR WITH THESE PAGES?

15      A    YEAH.  THIS IS A SECTION WHERE I SUMMARIZE

16   MY OPINIONS.

17      Q    CAN WE HIGHLIGHT LANGUAGE IN THE FIRST

18   BULLET POINT?  IT STARTS -- CAN YOU READ THE

19   HIGHLIGHTED LANGUAGE?

20      A    SURE.  "DR. BARBER DID NOT FOLLOW BEST

21   PRACTICES IN USING THE SMC ALGORITHM AND REDIST

22   SOFTWARE.  IN PARTICULAR, HE DIDN'T CHECK STANDARD

23   DIAGNOSTICS THAT WOULD HAVE IDENTIFIED NUMEROUS

24   PROBLEMS IN BOTH THE SIMULATED SETS OF SENATE AND

25   HOUSE PLANS."

01:50p

**1**    **Q**    WHAT DO YOU MEAN BY THIS SENTENCE?

**2**    **A**    SURE.  SO WE'VE TOUCHED ON SORT OF IN

**3**   GENERAL TERMS THERE IS NUMERICAL DIAGNOSTICS THAT

**4**   INDICATE OR THAT A SIMULATION SAMPLE YOU'VE GENERATED

**5**   IS LIKELY NOT REPRESENTATIVE.  AND IT'S AN IMPORTANT

**6**   PART OF PERFORMING THESE SIMULATION ANALYSES TO RUN

**7**   THOSE DIAGNOSTICS AND CHECKS SO THAT YOU KNOW IF

**8**   THERE IS PROBLEMS THAT YOU CAN TAKE STEPS TO ADDRESS.

**9**        DR. BARBER DIDN'T DO THAT, ALTHOUGH HE COULD

**10**  HAVE.  HE DIDN'T CHECK THESE DIAGNOSTICS AND,

**11**  THEREFORE, DIDN'T FIX PROBLEMS THAT TURNED OUT TO BE

**12**  PRESENT.

**13**   **Q**    DR. MCCARTAN, WERE YOU HERE YESTERDAY WHEN

**14**  DR. BARBER TESTIFIED?

**15**   **A**    I WAS.

**16**   **Q**    WHEN YOU'RE TALKING ABOUT THE STANDARD

**17**  DIAGNOSTICS, IS THAT THE SAME THING AS THE CONVERGENT

**18**  DIAGNOSTICS DR. BARBER WAS DISCUSSING YESTERDAY?

**19**   **A**    OH, YES.  SO I THINK FOR OUR PURPOSES THESE

**20**  ARE PRETTY MUCH SYNONYMOUS.  SO WHEN WE SAY A SAMPLE

**21**  IS REPRESENTATIVE OR THAT THE ALGORITHM IS CONVERGED,

**22**  THOSE ARE REALLY GETTING AT THE SAME THING:  YOU

**23**  KNOW, CAN WE TRUST THE RESULTS.  SO THESE DIAGNOSTICS

**24**  ARE DESIGNED TO CHECK CONVERGENCE OR ESTABLISH

**25**  REPRESENTATIVENESS.  IT'S TWO SIDES OF THE SAME COIN.

01:51p

1    **Q**    DID YOU HEAR DR. BARBER TESTIFY YESTERDAY

2  THAT HE PROVIDED STANDARD DIAGNOSTICS FOR HIS FIRST

3  SET OF SIMULATIONS?

4    **A**    I DID.

5    **Q**    AND DO YOU BELIEVE HE ACTUALLY CHECKED THESE

6  DIAGNOSTICS?

7    **A**    NO.  WHAT I UNDERSTOOD HIM TO MEAN WHEN HE

8  SAID "PROVIDED THE DIAGNOSTICS" IS THAT -- SO THE

9  DATA THAT ARE NEEDED TO CALCULATE THESE DIAGNOSTICS

10  ARE ACTUALLY SAVED AUTOMATICALLY BY THE SOFTWARE SO

11  THAT WHEN THE FINALS WERE TURNED OVER TO ME, I GUESS

12  THROUGH THE DISCOVERY PROCESS, THAT DATA WAS STILL

13  INCLUDED.  BUT TO ACTUALLY CHECK AND RUN THE

14  DIAGNOSTICS REQUIRES THAT THE ANALYST, YOU KNOW, RUN

15  SOME CODE -- RUN A LINE OF CODE AND LOOK AT THE

16  RESULTS AND EVALUATE THEM.

17        AND THE CODE THAT DR. BARBER TURNED OVER

18  THAT I REVIEWED, THERE WERE NO SUCH INSTRUCTIONS TO

19  CHECK THESE DIAGNOSTICS.  IN FACT, IF HE HAD RUN THE

20  CODE, THERE WOULD HAVE BEEN -- THE DIAGNOSTICS WOULD

21  HAVE IDENTIFIED SEVERAL PARTICULAR ISSUES AND ACTION

22  STEPS THAT IT RECOMMENDED SHOULD BE TAKEN.  SINCE DR.

23  BARBER DIDN'T, YOU KNOW, ADDRESS THOSE ISSUES, I CAN

24  ONLY ASSUME THAT HE DIDN'T ACTUALLY CHECK THE

25  DIAGNOSTICS EVEN THOUGH, AS WE SAID, THEY WERE -- THE

01:53p

1    DATA WERE THERE TO CALCULATE THEM.

2        **Q**    DID YOU CHECK THE DIAGNOSTICS?

3        **A**    I DID.

4        **Q**    CAN WE SEE PAGES 22 AND 23 FROM DR.

5    MCCARTAN'S REPORT, WHICH --

6            AND THEN WHAT DO THESE PAGES SHOW?

7        **A**    SURE.  SO THIS SECTION A HERE IS THE ACTUAL

8    OUTPUT FROM THE COMPUTER YOU'D GET IF YOU RAN THIS

9    CODE TO PRODUCE THE DIAGNOSTICS FOR HIS SENATE

10   SAMPLE.

11       **Q**    CAN WE JUST HIGHLIGHT THE LANGUAGE THAT'S ON

12   PAGE 23 ABOVE THE B BULLET POINT.

13           CAN YOU TELL US IN VERY GENERAL TERMS WHAT

14   THAT LANGUAGE IS?

15       **A**    SURE.  SO EVERYTHING ABOVE THAT IS A BUNCH

16   OF NUMBERS THAT ARE SORT OF -- CONSTITUTE THE

17   DIAGNOSTICS.  AND THEN WHAT THE COMPUTER DOES IS IT

18   GOES THROUGH AND SORT OF CHECKS THOSE NUMBERS

19   ACCORDING TO SOME SORT OF RULES OF THUMB AND FIGURES

20   OUT IF IT THINKS THERE IS PROBLEMS.  AND IF THERE ARE

21   PROBLEMS, IT SUMMARIZES THOSE HERE AT THE BOTTOM IN

22   THESE BULLET POINTS.

23           SO HERE THERE IS SORT OF THREE -- THREE

24   POTENTIAL PROBLEMS THEY IDENTIFIED.  THESE ARE ALL

25   INDICATIVE OF A SAMPLE THAT'S NOT REPRESENTATIVE.  SO

01:54p

**1**  FOR EACH OF THESE PARTICULAR PROBLEMS, SOMETIMES IT

**2**  WILL RECOMMEND STEPS THAT YOU COULD TAKE TO TRY TO

**3**  ADDRESS THEM.  THE GOAL ISN'T NECESSARILY, YOU KNOW

**4**  -- THESE AREN'T LIKE -- THESE ARE SYMPTOMS.  BUT THE

**5**  REAL PROBLEM IS A LACK OF REPRESENTATIVENESS.

**6**      **Q**    AND HOW WOULD A PERSON WHO IS USING YOUR

**7**  REDIST SOFTWARE KNOW ABOUT THESE STANDARD

**8**  DIAGNOSTICS?

**9**      **A**    OH, SURE.  SO IN THE PAPER THAT WE TALKED

**10**  ABOUT IN MY C.V. THAT INTRODUCED THIS ALGORITHM, WE

**11**  ACTUALLY HAVE A WHOLE SECTION TITLED "DIAGNOSTICS"

**12**  THAT EXPLAINS WHY THESE ARE IMPORTANT AND RECOMMENDS

**13**  PARTICULARLY FORMULAS TO USE IN CALCULATING THESE

**14**  DIAGNOSTICS.  AS I THINK I MENTIONED, THE SOFTWARE

**15**  ALSO COMES WITH DOCUMENTATION.  SO IN ADDITION TO

**16**  CODE, THERE IS ACTUAL, YOU KNOW, ENGLISH WRITE-UPS OF

**17**  HOW TO USE THE SOFTWARE, ET CETERA.  AND THOSE

**18**  CONTAIN MULTIPLE REFERENCES ABOUT THE IMPORTANCE OF

**19**  USING THE DIAGNOSTICS AS WELL AS THE ACTUAL CODE YOU

**20**  WOULD RUN TO CHECK -- TO CHECK THEM.  AND THAT'S --

**21**  LIKE I SAY, THAT DOCUMENTATION IS ACTUALLY BUNDLED

**22**  WITH THE SOFTWARE, SO WHEN YOU INSTALL IT IT'S -- A

**23**  COPY OF THAT IS DOWNLOADED TO YOUR COMPUTER AND IT'S

**24**  REAL EASY TO GO AND VIEW THAT.

**25**          **THE COURT:**  MS. BRANNON, CAN I JUST

01:55p

**1**   INTERRUPT FOR ONE SECOND?

**2**           THERE WAS SOMETHING YOU SAID THAT I DID

**3**   NOT -- I DID NOT EITHER CATCH OR DID NOT UNDERSTAND.

**4**   YOU SAID THAT -- I APOLOGIZE.

**5**           **MS. BRANNON:**  OF COURSE, YOUR HONOR.

**6**           **THE COURT:**  YOU SAID THAT THE DATA NEEDED TO

**7**   RUN THE DIAGNOSTICS IS PRESERVED IN THE DATA FILES

**8**   AND THAT YOU GOT THOSE THROUGH YOUR COUNSEL FROM --

**9**   ON THE DATA THAT DR. BARBER RAN.

**10**          **THE WITNESS:**  THAT'S RIGHT.

**11**          **THE COURT:**  OKAY.  BUT THEN YOU SAID THERE

**12**  WERE NO DIAGNOSTICS RUN BY DR. BARBER.  I MISSED THE

**13**  PART OF HOW YOU MADE THAT -- HOW YOU MADE THAT

**14**  FINDING.

**15**          **THE WITNESS:**  OH, SURE.  SURE.  SO WHEN

**16**  YOU'RE WRITING AN ANALYSIS LIKE THIS, LIKE WHAT YOU

**17**  DO IS -- THAT INVOLVES WRITING CODE AND YOU PUT

**18**  THE -- ALL THE CODE YOU RUN IN A FILE, LIKE A SCRIPT

**19**  WE CALL IT.  THAT WAY IF YOU NEED TO GO BACK AND

**20**  CHANGE THINGS LATER OR RERUN THE ANALYSIS, IT'S ALL

**21**  SAVED.  RIGHT?  SO IT'S LIKE YOU DON'T JUST WRITE IT

**22**  AND FORGET ABOUT IT.  YOU'RE ACTUALLY BUILDING A

**23**  RECORD OF WHAT YOU RAN.  SO THAT SCRIPT FILE WAS ALSO

**24**  INCLUDED IN THE DISCOVERY OF EVIDENCE.

**25**          AND SO I TOOK THAT TO BE, YOU KNOW, A

01:56p

**1** COMPLETE AND ACCURATE SORT OF TRANSCRIPT, IF YOU

**2** WILL, OF THE CODE THAT DR. BARBER RAN AS PART OF HIS

**3** COMPLETE ANALYSIS.  AND NOWHERE IN THAT SCRIPT, THAT

**4** COMPUTER CODE, WAS WITH THE INSTRUCTIONS TO RUN THESE

**5** DIAGNOSTICS.

**6**            IN ADDITION, IT'S -- YOU KNOW, IT'S

**7** ALWAYS POSSIBLE, I SUPPOSE, THAT HE RAN THEM WITHOUT

**8** RECORDING THEM IN THE SCRIPT.  BUT AS WE SEE HERE,

**9** YOU KNOW, IF HE HAD RUN THEM, THERE WOULD HAVE BEEN,

**10** YOU KNOW, STEPS RECOMMENDED THAT HE SHOULD HAVE

**11** TAKEN.  AND SINCE THERE WERE NO EFFORTS TO ADDRESS

**12** ANY OF THESE ISSUES IN HIS CODE THAT HE TURNED OVER,

**13** IT HELPED ME SORT OF ALSO CONCLUDE THAT HE HADN'T

**14** CHECKED.

**15**        **THE COURT:**  THANK YOU.

**16**            PARDON THE INTERRUPTION.

**17**        **MS. BRANNON:**  OF COURSE, YOUR HONOR.

**18** BY MS. BRANNON:

**19**    **Q**    JUST TO CLARIFY FOR THE RECORD, THE SCRIPT

**20** WAS PROVIDED BY DEFENDANTS IN THE DISCOVERY IN THIS

**21** CASE AND GIVEN TO YOU BY COUNSEL?

**22**    **A**    THAT'S MY UNDERSTANDING, YES.  YEAH.

**23**    **Q**    OKAY.  TURNING BACK TO YOUR REPORT, CAN WE

**24** GO BACK TO PAGES 5 AND 6 OF PL 135.  AND CAN YOU READ

**25** THE SECOND HIGHLIGHTED SENTENCE?

01:57p

**1**    **A**    YEAH.  "HE" -- DR. BARBER -- "ALSO FAILED TO

**2**  PERFORM MULTIPLE INDEPENDENT RUNS OF THE ALGORITHM,

**3**  WHICH PREVENTED THE CALCULATION OF IMPORTANT

**4**  ADDITIONAL DIAGNOSTICS AND MARGINS OF ERROR."

**5**    **Q**    WHAT DO YOU MEAN BY THIS STATEMENT?

**6**    **A**    SURE.  SO I'VE BEEN USING DIAGNOSTICS AS

**7**  SORT OF AN UMBRELLA TERM.  THERE'S A NUMBER OF THEM;

**8**  YOU KNOW, DIFFERENT FORMULAS.  AN IMPORTANT SET OF

**9**  DIAGNOSTICS CENTER AROUND BASICALLY CHECKING THAT THE

**10**  RESULTS OF THE ALGORITHM ARE RELIABLE.  SO I

**11**  MENTIONED THIS ALGORITHM IS RANDOM; IT USES RANDOM

**12**  NUMBERS.  AND SO IF YOU RUN THE ALGORITHM WITH THE

**13**  EXACT SAME INSTRUCTIONS TWICE, YOU MIGHT GET SLIGHTLY

**14**  DIFFERENT RESULTS.

**15**        AND SO AN IMPORTANT THING TO DO IS ACTUALLY

**16**  TO DO THAT; TO RUN IT WITH THE EXACT SAME

**17**  INSTRUCTIONS TWICE OR MORE AND CHECK THAT THE RESULTS

**18**  ARE SIMILAR.  AND WE HAVE A PARTICULAR WAY OF

**19**  MEASURING THAT.  AND THAT CHECK IS AN ADDITIONAL

**20**  IMPORTANT SET OF DIAGNOSTICS THAT I'M REFERRING TO

**21**  HERE.  AND IF YOU DO THAT, YOU CAN HAVE A LOT MORE

**22**  CONFIDENCE THAT THE RESULTS YOU HAVE ARE

**23**  REPRESENTATIVE AND THE ALGORITHM IS CONVERGED.

**24**        IF YOU DON'T DO THESE MULTIPLE INDEPENDENT

**25**  RUNS, THEN YOU'RE NOT EVEN ABLE TO RUN THOSE

01:58p

**1**  DIAGNOSTICS AND YOU'RE LACKING AN IMPORTANT PIECE OF

**2**  INFORMATION AROUND CONVERGENCE, REPRESENTATIVENESS.

**3**      IN THIS CASE DR. BARBER DID NOT RUN MULTIPLE

**4**  INDEPENDENT RUNS AND SO HE DIDN'T EVEN HAVE ACCESS TO

**5**  THIS IMPORTANT SECOND SET OF DIAGNOSTICS.

**6**    **Q**   AND DO YOU BELIEVE THAT WAS A MISTAKE THAT

**7**  HE DIDN'T RUN THE SECOND SET OF INDEPENDENT -- AN

**8**  INDEPENDENT RUN OF THE ALGORITHM?

**9**    **A**   YES.  CERTAINLY, YOU KNOW, LIKE IN THE PAPER

**10** THAT WE TALKED ABOUT, WE ARE VERY CLEAR THIS IS

**11** PROBABLY THE MOST IMPORTANT OF THE DIAGNOSTICS, IS

**12** THIS ONE THAT REQUIRES MULTIPLE INDEPENDENT RUNS.  WE

**13** MADE CLEAR THAT'S OUR STRONG RECOMMENDATION FOR

**14** ANYONE USING THE ALGORITHM.

**15**   **Q**   AND YOU TESTIFIED EARLIER ABOUT THE VALUE

**16** AND NEEDING TO DO MULTIPLE ADDITIONAL VALID

**17** SIMULATIONS.  CAN YOU EXPLAIN THE DIFFERENCE BETWEEN

**18** THAT CONCEPT AND THIS CONCEPT THAT WE'RE TALKING

**19** ABOUT DOING AN INDEPENDENT RUN OF THE SAME ALGORITHM?

**20**   **A**   SURE.  THE ALGORITHM IS PROBABLY A LITTLE

**21** CONFUSING.  SO A SIMULATION STUDY, WHEN I SAY THAT,

**22** THAT'S -- YOU'RE PRODUCING A SET OF THE RANDOM

**23** PLANS -- TEN THOUSAND, A HUNDRED THOUSAND,

**24** WHATEVER -- AND THAT'S TO ANSWER -- MAKE A PARTICULAR

**25** COMPARISON, ANSWER A PARTICULAR QUESTION WITH A

01:59p

**1** PARTICULAR SET OF CRITERIA, PRINCIPLES, WHAT HAVE

**2** YOU.

**3**        SO WE TALKED ABOUT WHEN YOU'RE DOING THESE

**4** ANALYSES LIKE I DID IN FLORIDA, YOU HAVE TO DO THAT

**5** WHOLE SIMULATION STUDY PROCESS MANY TIMES -- OFTEN

**6** ITERATIVELY, EXPERIMENTALLY -- TO ARRIVE AT A SET OF

**7** INSTRUCTIONS, PARAMETERS, CRITERIA THAT YOU'RE HAPPY

**8** WITH THAT PROVIDES THE EVIDENCE YOU'RE TRYING TO, YOU

**9** KNOW, LOOK FOR.  WITHIN ANY SINGLE SIMULATION STUDY,

**10** THIS PRACTICE OF -- WITH THE EXACT SAME INSTRUCTIONS

**11** AND NUMBERS, RUNNING THE ALGORITHM MULTIPLE TIMES, IS

**12** AN IMPORTANT DIAGNOSTIC, YOU KNOW, TECHNICAL CHECK.

**13** SO THAT'S HAPPENING WITHIN EACH OF THESE STIMULATION

**14** STUDIES.  BUT DOING MANY STUDIES IS PART OF SORT OF

**15** THE SCIENCE PROCESS OF ALL THIS THAT'S IMPORTANT.

**16**    Q    DO YOU BELIEVE, BASED ON YOUR EXPERIENCE AND

**17** EXPERTISE, THAT THE SIMULATION STUDY IN DR. BARBER'S

**18** FIRST REPORT HAS ANY VALUE?

**19**    A    TO BE HONEST, NO.  I THINK IT'S BASICALLY

**20** USELESS FOR THE QUESTIONS HE WAS TRYING TO ANSWER.

**21**    Q    DID YOU REVIEW DR. BARBER'S REBUTTAL REPORT?

**22**    A    I DID.

**23**    Q    AND WHAT'S PROVIDED IN DR. BARBER'S REBUTTAL

**24** REPORT?

**25**    A    SO IN HIS REPLY OR REBUTTAL REPORT, HE DID A

02:01p

1   NEW SET OF SIMULATIONS TO ADDRESS SOME OF THE

2   CONCERNS I RAISED IN MY REPORT.  SO HE DOES ONE

3   ADDITIONAL SET OF SIMULATIONS WHERE HE CHANGES A

4   NUMBER OF THINGS ABOUT HOW HE RAN IT, AND THEN HE

5   CONCLUDES THAT NOTHING REALLY CHANGED AS FAR AS HIS

6   CONCLUSIONS OR, YOU KNOW, QUANTITATIVE RESULTS

7   BETWEEN THE FIRST AND SECOND SET.

8       Q    AND DID HE CORRECT SOME OF THE MISTAKES THAT

9   WE HAVE BEEN DISCUSSING TODAY IN HIS SECOND

10  SIMULATION STUDY?

11      A    YEAH.  SO SOME OF THESE LIKE TECHNICAL

12  ISSUES WE'VE BEEN TALKING ABOUT WITH THE DIAGNOSTICS,

13  WITH THE MULTIPLE INDEPENDENT RUNS, HE DID ADDRESS

14  THOSE CONCERNS IN THE SECOND SET.  SO HE REPRESENTS

15  IN HIS SECOND REPORT THAT HE DID MULTIPLE INDEPENDENT

16  RUNS, RAN ALL OF THE DIAGNOSTICS, AND THAT NONE OF

17  THOSE INDICATED ANY TECHNICAL ISSUES WITH HIS SECOND

18  SET OF SIMULATIONS.

19      Q    CAN WE STILL -- WE HAVE PAGE 5 AND 6 UP.

20  CAN WE HAVE -- CAN YOU READ THE SECOND HIGHLIGHTED

21  BULLET POINT?

22      A    SURE.  "DR. BARBER DID NOT CORRECTLY

23  IMPLEMENT A 'CORE RETENTION' CONSTRAINT FOR HIS

24  SENATE SAMPLES, MEANING THAT THEY DO NOT 'RESPECT

25  PRE-EXISTING DISTRICT BOUNDARIES' BY DESIGN AS

02:02p

1    REQUIRED BY JOINT RULE 21."

2         **Q**    WHAT DOES THIS SENTENCE MEAN?

3         **A**    SURE.  SO IN HIS FIRST REPORT DR. BARBER

4    WROTE THAT HE INSTRUCTED THE ALGORITHM TO FOCUS ON

5    PRESERVING THE CORES OF THE 2011 DISTRICTS IN THE NEW

6    MAP THAT HE WAS DRAWING.  THE WAY HE WENT ABOUT DOING

7    THAT -- BECAUSE THAT'S JUST -- YOU KNOW, THE CORE OF

8    THE DISTRICTS, THAT'S JUST AN ENGLISH SENTENCE.  TO

9    ACTUALLY PUT THAT INTO CODE, YOU HAVE TO COME UP WITH

10   A WAY OF TRANSLATING WHAT "CORES" MEANS FOR THE

11   ALGORITHM.

12        THE WAY HE DID THAT IS BY INSTRUCTING THE

13   ALGORITHM TO MEASURE CORE RETENTION AS FOLLOWS:  LOOK

14   AT A 2011 DISTRICT AND SEE WHETHER OR NOT A NEW

15   DISTRICT YOU'RE DRAWING IS CONTAINED ENTIRELY WITHIN

16   IT OR IF IT IS SPLIT OR CROSSES THE 2011 DISTRICT.

17   ONLY IF IT'S -- IT ALL CROSSES, UNLESS IT'S ENTIRELY

18   CONTAINED WITHIN THE 2011 DISTRICT, HE HAS THE

19   ALGORITHM TO RECORD THAT AS ZERO CORE RETENTION.  AND

20   THEN HE TELLS THE ALGORITHM:  USING THIS DEFINITION

21   OF CORE RETENTION, TRY TO MAXIMIZE THIS CORE

22   RETENTION OR PLACE MORE WEIGHT ON DISTRICTS THAT

23   RETAIN CORES.

24        SO WHAT I DID IS I ACTUALLY WENT THROUGH ALL

25   100,000 SENATE MAPS IN HIS SAMPLE AND I LOOKED AT THE

02:04p

1  CORE RETENTION USING THE DEFINITION THAT HE GAVE THE

2  ALGORITHM AND FOUND THAT ACTUALLY ALL 100,000 PLANS

3  HAD ZERO CORE RETENTION USING THIS DEFINITION.  SO

4  WHAT THAT MEANS IS, EVEN THOUGH HE TOLD THE ALGORITHM

5  TRY TO MAXIMIZE YOUR -- OR PLACE MORE WEIGHT USING

6  THIS DEFINITION OF CORE RETENTION, ALL OF THE PLANS

7  WERE ZERO.  SO THIS INSTRUCTION WAS ACTUALLY HAVING

8  NO EFFECT ON THE PLANS THAT HE SIMULATED AND,

9  THEREFORE, HIS CONCLUSIONS.

10     Q    AND YOU HEARD DR. BARBER TESTIFY YESTERDAY

11  THAT IN HIS FIRST SET OF SIMULATIONS HE IMPOSED VERY

12  LOW CORE RETENTION CONSTRAINTS OR NO CORE RETENTION

13  CONSTRAINTS.  CORRECT?

14     A    THAT'S WHAT I REMEMBER, YEAH.

15     Q    SO DO YOU AGREE THAT HE IMPOSED NO CORE

16  RETENTION CONSTRAINTS IN HIS FIRST SET OF

17  SIMULATIONS, PARTICULARLY IN THE SENATE MAP?

18     A    I DO.

19     Q    AND THIS IS BECAUSE OF THE REVIEW THAT YOU

20  HAVE JUST REVIEWED TO THE COURT OF THE RESULTS?

21     A    THAT'S RIGHT.

22     Q    DO YOU THINK IT WAS A MISTAKE TO NOT

23  IMPLEMENT ANY CORE RETENTION IN HIS FIRST SET OF HIS

24  FIRST SIMULATION STUDY?

25     A    I THINK IF YOU SAY THAT YOU'RE TRYING TO

02:05p

1  GENERATE SAMPLES THAT RESPECT THE CORES OR PRESERVE

2  THE CORES, IT WOULD BE A MISTAKE TO IMPLEMENT IT THIS

3  WAY BECAUSE IT'S -- AS WE'VE SEEN, IT ENDED UP NOT

4  ACTUALLY HAVING ANY EFFECT.

5     Q    DID HE CORRECT THIS MISTAKE IN HIS SECOND

6  SIMULATION STUDY DISCUSSED IN HIS REBUTTAL REPORT?

7     A    WELL, HE COMPLETELY CHANGED HOW HE

8  IMPLEMENTED THIS CORE RETENTION PRINCIPLE OR

9  OBJECTIVE IN HIS SECOND SET.

10    Q    DID YOU HEAR DR. BARBER TESTIFY ABOUT HIS

11 DEFINITION OF CORE RETENTION YESTERDAY?

12    A    YES.

13    Q    AND WHAT'S YOUR UNDERSTANDING OF HIS

14 DEFINITION OF CORE RETENTION?

15    A    IF I REMEMBER RIGHT, HE SAID THAT HE

16 MEASURES CORE RETENTION AS LOOKING AT THE PERCENT --

17 PERCENTAGE OF THE POPULATION IN AN OLD DISTRICT

18 THAT'S MAINTAINED INTO A NEW DISTRICT.

19    Q    IS THIS THE MEASUREMENT OF CORE RETENTION

20 THAT DR. BARBER ACTUALLY USED IN HIS SECOND SET OF

21 SIMULATIONS?

22    A    NO.  SO IN HIS SECOND -- SO IN THE FIRST SET

23 HE DID THIS THING WITH THE SPLITS.  IN THE SECOND SET

24 HE -- BEFORE HE EVEN RAN THE SIMULATIONS, HE SORT OF

25 PREDEFINED WHAT HE MEANT BY THE CORE OF EACH

02:06p

1    DISTRICT.  SO HE DID THAT BY BASICALLY TAKING EACH

2    PRECINCT AND SAYING, YOU KNOW, THIS PRECINCT BELONGS

3    TO THE CORE OF A PARTICULAR DISTRICT OR THIS PRECINCT

4    DOESN'T BELONG TO THE CORE.  AND THE WAY HE DEFINED

5    THESE CORES WAS BY ANY PRECINCT THAT WASN'T ON THE

6    BOUNDARY OF A DISTRICT.  SO IF A PRECINCT TOUCHED A

7    PRECINCT IN ANOTHER DISTRICT, IT WASN'T IN THE CORE.

8    OTHERWISE IT WAS IN THE CORE OF THE DISTRICT.  SO

9    ACTUALLY MOST OF THE PRECINCTS IN THE STATE ENDED UP

10   BEING IN ONE OF DR. BARBER'S CORES BASED ON THE 2011

11   DISTRICTS.

12         SO ONCE HE PREDEFINED THESE CORES, HE THEN

13   TOLD THE ALGORITHM TO GUARANTEE THAT ALL THE CORES

14   WOULD REMAIN TOGETHER, SO ALL THE PRECINCTS IN THE

15   CORE WOULD HAVE TO END UP IN THE SAME NEW DISTRICT

16   THAT WOULD BE SIMULATED.  SO THIS IS ACTUALLY -- THIS

17   IS ACTUALLY -- THIS TYPE OF APPROACH WHERE YOU

18   PREDEFINE THE CORE AND THEN TRY TO HOLD THOSE

19   TOGETHER, THAT'S ACTUALLY AN APPROACH THAT I'VE USED

20   IN SOME OF MY ACADEMIC WORK.  IT'S A SORT OF GENERAL

21   APPROACH IN THAT YOU CAN DECIDE HOW BIG YOU WANT

22   THESE CORES TO BE, RIGHT?  SO YOU CAN HAVE THE CORES

23   GO ALL THE WAY TO THE BOUNDARY OR YOU CAN HAVE THE

24   CORES JUST BE MUCH SMALLER AND JUST BE IN THE CENTER

25   OF EACH DISTRICT.  SO YOU SORT OF HAVE TO CHOOSE HOW

02:07p

1  STRONG YOU WANT THIS CORE CONSTRAINT TO BE

2  IMPLEMENTED.  WHAT DR. BARBER DID WAS TO JUST MAKE IT

3  AS STRONG AS POSSIBLE, SO HE MADE THE CORES AS LARGE

4  AS POSSIBLE.

5      Q    AND DO YOU HAVE AN OPINION ABOUT THE IMPACT

6  ON OUTCOME OF HIS SECOND SIMULATION STUDY OF THIS

7  APPROACH OF IMPLEMENTING A STRONG CORE RETENTION

8  CONSTRAINT?

9      A    YEAH.  WE CAN'T KNOW FOR SURE BECAUSE DR.

10  BARBER ONLY PROVIDED THIS ONE ADDITIONAL SET OF

11  SIMULATIONS WHERE HE CHANGED A NUMBER OF OTHER

12  THINGS, INCLUDING THIS WAY OF DOING CORE RETENTION.

13  SO WE DON'T HAVE A SIDE-BY-SIDE WHERE ALL HE CHANGED

14  WAS THIS CORE RETENTION AND WE CAN MEASURE THE IMPACT

15  OF THAT, SO WE DON'T KNOW FOR SURE.

16      YOU WOULD EXPECT, ESPECIALLY IF WE HAVE A

17  STRONG CORE CONSTRAINT, THAT WOULD TEND TO PRODUCE

18  DISTRICTS THAT LOOK MORE LIKE THE 2011 MAP, WHICH THE

19  CORES ARE BASED ON.  TO THE EXTENT THAT THE ENACTED

20  PLAN LOOKS LIKE THE 2011 MAP, IT WOULD ALSO TEND TO

21  MAKE THE DISTRICTS LOOK MORE LIKE THE ENACTED MAP.

22  BUT AGAIN, LIKE I SAY, HOW MUCH OF AN EFFECT THAT

23  HAD, HARD TO KNOW.  WE DO KNOW THAT THE CORE

24  CONSTRAINT WAS ON THE STRONG END OF THE SCALE.

25      Q    DID DR. BARBER EVALUATE THE IMPACT OF THIS

02:08p

**1**  APPROACH TO IMPLEMENTING A CORE RETENTION CONSTRAINT

**2**  IN HIS SECOND SET OF SIMULATIONS?

**3**     **A**    NOT TO MY KNOWLEDGE.  AS I SAID, HE WOULD

**4**  HAVE HAD TO, YOU KNOW, RUN THIS WHOLE SIMULATION

**5**  STUDY WITH AND WITHOUT A CORE CONSTRAINT OR VARYING

**6**  THE STRENGTH OF HIS CONSTRAINT AND THEN REPORT THOSE

**7**  RESULTS.  HE CERTAINLY DIDN'T REPORT ANYTHING.  AND

**8**  SO, YOU KNOW, WE JUST DON'T KNOW WHAT THE EFFECT

**9**  WOULD HAVE BEEN.

**10**     **Q**    AND WHAT ARE SOME OTHER OPTIONS FOR

**11**  IMPLEMENTING A CORE RETENTION CONSTRAINT THAT YOU

**12**  MIGHT RECOMMEND?

**13**     **A**    WELL, I THINK -- AS I SAID, YOU KNOW, I

**14**  DON'T NECESSARILY OBJECT TO THIS GENERAL STRATEGY

**15**  THAT HE HAD FOR THIS CORE CONSTRAINT.  BUT IT'S UP TO

**16**  THE ANALYST TO DECIDE HOW STRONG YOU WANT THAT

**17**  CONSTRAINT TO BE.  IF IT'S TOO STRONG, IT COULD

**18**  ACTUALLY OVERWHELM OTHER PRINCIPLES OR FACTORS YOU'RE

**19**  TRYING TO INCORPORATE IN THE MAPS.

**20**        AND SO AS FAR AS I'M CONCERNED, THE PRACTICE

**21**  AN ANALYST SHOULD FOLLOW INVOLVES TRYING MULTIPLE

**22**  LEVELS OR STRENGTHS OF HIS CONSTRAINT AND EVALUATING

**23**  THAT.  I'M SURE THERE IS OTHER WAYS THAT ONE COULD

**24**  IMPLEMENT A CORE CONSTRAINT.  THERE IS NOT

**25**  NECESSARILY EXACTLY ONE WAY.  BUT IF YOU'RE GOING TO

CORY MCCARTAN                                    149

02:10p

1   GO DOWN THIS ROUTE, YOU HAVE TO HAVE SOME REASON FOR

2   PICKING THAT PARTICULAR STRENGTH OF A CONSTRAINT THAT

3   YOU SETTLE ON.

4       Q    CAN WE GO BACK TO PAGE 5 AND 6 OF YOUR

5   REPORT.  AND CAN YOU READ THE NEXT HIGHLIGHTED

6   SENTENCE IN THE BULLET POINT?

7       A    SURE.  "DR. BARBER GENERATED HOUSE PLANS BY

8   DIVIDING LOUISIANA INTO THREE SEPARATE DIVISIONS,

9   DEFINED BY ARBITRARY GROUPINGS OF PARISHES, AND THEN

10  GENERATING PLANS WITHIN EACH DIVISION."

11      Q    AND HOW DOES THAT WORK?

12      A    SURE.  SO DR. BARBER LITERALLY TOOK THE

13  STATE OF LOUISIANA AND DREW TWO LINES ACROSS IT ALONG

14  PARISH BOUNDARIES, AND THAT CREATED THREE SEPARATE

15  REGIONS OF THE STATE.  I THINK I HAVE A MAP IN MY

16  REPORT ACTUALLY OF WHAT THAT LOOKS LIKE.  BUT WITHIN

17  EACH DIVISION, THEN, HE RUNS A COMPLETELY SEPARATE

18  RUN OF THE ALGORITHM TO PRODUCE ROUGHLY A THIRD OF

19  THE TOTAL DISTRICTS, AND THEN HE PUTS THOSE ALL

20  TOGETHER TO FORM A STATEWIDE MAP.

21      Q    WHAT IMPACT DOES DIVIDING THE STATE INTO

22  PARTITIONS HAVE ON THE OPTIONS THAT MIGHT BE

23  GENERATED BY A SIMULATION STUDY?

24      A    YEAH.  SO AS YOU CAN IMAGINE, IF I'M

25  GENERATING DISTRICTS WITHIN EACH REGION SEPARATELY,

02:11p

1  NO DISTRICT THAT I GENERATE CAN POSSIBLY CROSS THE

2  LINES THAT, YOU KNOW, DELINEATE THESE REGIONS.  AND

3  SO IT'S IMPOSSIBLE, ONCE YOU'VE DEFINED THE REGIONS

4  AND TAKE THIS APPROACH, TO COME UP WITH A PLAN THAT

5  HAS ANY DISTRICTS CROSSING THESE LINES.  YOU'RE

6  GUARANTEED TO HAVE ALL THE DISTRICTS SORT OF STICK TO

7  THEIR OWN REGION.

8          NOTABLY, THE ENACTED PLAN IS ONE OF THE

9  PLANS THAT WOULD ACTUALLY BE IMPOSSIBLE TO GENERATE

10 UNDER THIS APPROACH.

11    Q    DR. MCCARTAN, WHAT DOES IT MEAN TO HAVE

12 TRANSPARENCY WHEN YOU'RE IMPLEMENTING CONSTRAINTS

13 INTO AN ALGORITHM BEING RUN BY THE REDIST SOFTWARE?

14    A    SO IN PERFORMING ANY SIMULATION ANALYSIS, AS

15 YOU MAKE THE TRANSLATION FROM SORT OF A PLAIN-

16 LANGUAGE UNDERSTANDING OF A PRINCIPLE OR A CRITERIA,

17 AS YOU TRANSLATE THAT INTO CODE YOU HAVE CHOICES.

18 THERE IS NUMBERS YOU HAVE TO SET, THERE IS DIFFERENT

19 STRATEGIES YOU CAN TAKE TO IMPLEMENT IT, AS WE SAW

20 WITH CORE RETENTION.  AND BECAUSE THOSE CAN HAVE AN

21 EFFECT ON YOUR RESULTS, I THINK IT'S IMPORTANT TO BE

22 TRANSPARENT IN REPORTING YOUR RESULTS ABOUT WHAT

23 THOSE PARAMETERS WERE OR AT LEAST SORT OF THE

24 CRITERIA YOU PUT IN AND THE DECISIONS YOU MADE AND

25 MAYBE WHY YOU MADE THOSE DECISIONS.

CORY MCCARTAN                                    **151**

02:12p

**1**          IT WOULD NOT BE, IN MY VIEW, APPROPRIATE OR

**2**   SURELY NOT TRANSPARENT TO PUT IN SOME KIND OF

**3**   INSTRUCTION OR CRITERIA AND THEN NOT REPORT THAT,

**4**   BECAUSE IT COULD HAVE AN EFFECT ON THE RESULTS.

**5**      Q    WOULD YOU CHARACTERIZE DR. BARBER'S REPORTS

**6**   AS TRANSPARENT?

**7**      A    I WOULDN'T, ESPECIALLY -- YOU KNOW, THE

**8**   FIRST REPORT, THIS DIVISION OF THE HOUSE INTO THREE

**9**   REGIONS WASN'T DISCLOSED AT ALL, DESPITE IT, YOU

**10**  KNOW, AFFECTING WHAT TYPES OF MAPS COULD EVEN BE

**11**  DRAWN.  I ONLY DISCOVERED THAT BY GOING THROUGH THAT

**12**  TRANSCRIPT OF THE CODE HE RAN.  YOU KNOW, THAT --

**13**  THERE'S JUST ONE EXAMPLE OF SORT OF THE LACK OF

**14**  TRANSPARENCY AROUND THE INSTRUCTIONS HE PROVIDED TO

**15**  THE ALGORITHM.

**16**     Q    DID DR. BARBER IMPLEMENT PARTITIONS OF THE

**17**  STATE IN THE HOUSE AND SENATE MAPS IN HIS SECOND SET

**18**  OF SIMULATIONS?

**19**     A    YEAH.  SO IN THE FIRST SET THE SENATE WAS

**20**  DONE STATEWIDE.  THERE WERE NO REGIONS.  THE HOUSE

**21**  WAS DIVIDED INTO THREE.  IN THE SECOND SET HE DIVIDED

**22**  THE STATE INTO SEVEN REGIONS FOR THE HOUSE AND FOUR

**23**  FOR THE SENATE.

**24**     Q    HAVE YOU EVER RUN SIMULATIONS WHERE YOU

**25**  PARTITIONED A JURISDICTION INTO SUBPARTS?

02:14p

1      **A**    I THINK I HAVE.  SO SOMETIMES -- YOU DO IT

2   FOR VARIOUS REASONS.  BUT THERE IS NOT JUST MAYBE ONE

3   WAY TO DO THIS.  SO I THINK SOMETHING I PROBABLY DO

4   NOW IS -- MOST OFTEN OR A BEST PRACTICE -- WOULD BE

5   YOU CAN CREATE THESE DIVIDING LINES, BUT THERE IS A

6   WAY TO ACTUALLY SORT OF ERASE THEM PARTWAY THROUGH

7   THE WAY THE ALGORITHM IS RUNNING.  SO YOU CAN DRAW

8   SOME OF THE DISTRICTS AND THEN FORGET ABOUT THESE

9   DIVISIONS AND FILL IN THE REST.  REGARDLESS OF WHAT,

10  YOU KNOW, SPECIFIC APPROACH YOU'RE TAKING WITH THE

11  LINES AND ALL -- YOU KNOW, IT'S KIND OF TECHNICAL,

12  BUT -- I'M GOING TO SOUND LIKE A BROKEN RECORD

13  HERE -- IT'S ALWAYS IMPORTANT TO UNDERSTAND THE

14  EFFECT THAT THESE CHOICES ARE HAVING.

15         VERY RARELY ARE THESE -- YOU KNOW, THESE

16  DIVISIONS THAT YOU IMPOSE, SOMETHING YOU'RE GOING TO

17  FIND IN STATE CRITERIA OR IN A LAW OR SOMETHING, SO

18  THIS IS ALMOST ALWAYS AN ADDITIONAL SORT OF

19  CONSTRAINT YOU'RE IMPOSING.  SO THERE YOU ESPECIALLY

20  WANT TO BE CAREFUL THAT THAT CHOICE IS NOT GOING TO

21  INFLUENCE YOUR RESULTS.  AND SO, FOR INSTANCE, YOU

22  COULD -- YOU MIGHT WANT TO TRY DIVIDING THE STATE A

23  DIFFERENT WAY, INTO FOUR PIECES OR THREE PIECES AND

24  MAKING SURE THAT YOUR CONCLUSIONS ARE THE SAME.

25         SO WHEN WE DIVIDE STATES, IF WE DIVIDE

02:15p

1    STATES, YOU KNOW, WE'LL TRY TO FIRST OF ALL BASE THE

2    GROUPS ON SOMETHING OBJECTIVE LIKE A METROPOLITAN

3    AREA, AND THEN WE'LL ALWAYS MAKE SURE TO TRY TO

4    EVALUATE THE EFFECT THAT THAT'S HAVING ON OUR

5    CONCLUSIONS.

6        Q    AND DID DR. BARBER EVALUATE THE EFFECT OF

7    HIS DECISIONS TO PARTITION THE STATE IN HIS SECOND

8    SIMULATION RUN?

9        A    NOT TO MY KNOWLEDGE.  HE ONLY HAS THIS

10   SINGLE SIMULATION STUDY.  AS FAR AS WE CAN SEE, HE

11   ONLY DIVIDED THE STATE IN ONE PARTICULAR WAY.  HE

12   DOESN'T RECORD ANY OTHER EXPERIMENTS THAT HE RAN.

13       Q    DR. MCCARTAN, DID YOU HEAR DR. BARBER

14   TESTIFY YESTERDAY THAT HE USED THE BOUNDARIES OF THE

15   ILLUSTRATIVE MAP AS THE BOUNDARIES OF HIS SUBPART HE

16   CREATED IN THE SECOND SIMULATION STUDY?

17       A    YES, I DID.

18       Q    DID YOU HEAR HIM TESTIFY THAT HE IMPLEMENTED

19   THE SUBPARTS IN THIS WAY BECAUSE HE BELIEVED IT WOULD

20   PROVIDE THE BEST CASE FOR THE ILLUSTRATIVE MAP?

21       A    I DID HEAR THAT.

22       Q    DO YOU AGREE?

23       A    WELL, I DON'T THINK DR. BARBER OR MYSELF OR

24   ANYONE CAN REALLY KNOW EXACTLY WHAT THE EFFECT WOULD

25   BE.  AGAIN, THAT'S BECAUSE DR. BARBER DIDN'T JUST

CORY MCCARTAN                                           **154**

02:16p

**1**  CHANGE THIS REGIONAL DIVISION THING IN HIS SECOND

**2**  SET.  HE ALSO CHANGED THE CORE RETENTION.  HE CHANGED

**3**  A NUMBER OF PLANS.  HE CHANGED A LOT OF STUFF.  SO WE

**4**  DON'T HAVE THE SIDE-BY-SIDE THAT WOULD LET US

**5**  EVALUATE THE IMPACT OF THIS PARTICULAR CHOICE.

**6**         THAT BEING SAID, I WOULD PROBABLY AGREE WITH

**7**  DR. BARBER TO THE EXTENT THAT THERE MIGHT BE A

**8**  TENDENCY TO MAKE THE DISTRICTS LOOK A LITTLE MORE

**9**  LIKE THE ILLUSTRATIVE MAP WHEN YOU'RE DEFINING THESE

**10** REGIONS ON THE BASIS OF THE ILLUSTRATIVE MAP.  AGAIN,

**11** THE EXTENT TO WHICH THAT'S HAPPENING, I DON'T THINK

**12** ANYONE CAN KNOW BECAUSE WE DIDN'T RUN A SIDE-BY-SIDE

**13** THAT MEASURED THAT.

**14**    **Q**   AND YOU JUST MENTIONED, AND WE HAD DISCUSSED

**15** EARLIER, THAT THERE IS A POTENTIAL UNKNOWN IMPACT OF

**16** DR. BARBER'S IMPLEMENTATION OF A STRONG CONSTRAINT

**17** FOR CORE RETENTION; AND, THEN, ALSO IT'S AN UNKNOWN

**18** IMPACT WHAT IMPACT THE PARTITIONS HAD ON THE

**19** SIMULATIONS.

**20**        WHAT IMPACT DOES IT HAVE ON THE MAPS CREATED

**21** BY THE SECOND STIMULATION TO BOTH THESE CONSTRAINTS

**22** IMPOSED TOGETHER?

**23**    **A**   RIGHT.  SO ONCE AGAIN, WE CAN'T KNOW FOR

**24** SURE BECAUSE WE HAVEN'T BROKEN OUT THE PIECES

**25** SEPARATELY.  BUT AS WE SAID, ON THE ONE HAND YOU HAVE

02:17p

1   THE CORE CONSTRAINT THAT ANYTHING IS GOING TO PULL

2   DISTRICTS TO LOOK LIKE THE 2011 MAP; AND THEN ON THE

3   OTHER HAND YOU HAVE THIS WAY HE DIVIDED THE STATE,

4   WHICH, IF ANYTHING, IS GOING TO PULL THE DISTRICTS TO

5   LOOK MORE LIKE THE ILLUSTRATIVE MAP.  SO THAT

6   POSSIBLY CREATES A TENSION.  IT CERTAINLY SORT OF

7   REDUCES YOUR OPTIONS.  RIGHT?  YOU'RE TRYING TO

8   SATISFY BOTH THESE THINGS AT THE SAME TIME.

9        AND SO, IF ANYTHING, THAT SORT OF TENDS TO

10  NARROW, YOU KNOW, THE RANGES OF OUTCOMES YOU MIGHT

11  EXPECT.  BUT THE OVERALL IMPACT REALLY IS NOT

12  KNOWABLE BECAUSE HE CHANGED ALL THESE THINGS AT ONCE

13  AND DIDN'T EVALUATE THEIR IMPACTS SEPARATELY.

14   Q    DID YOU HEAR DR. BARBER TESTIFY YESTERDAY

15  THAT IN HIS OPINION THERE WAS VERY LITTLE DIFFERENCE

16  IN THE RESULTS OF HIS TWO DIFFERENT STIMULATION

17  STUDIES?

18   A    I DID.

19   Q    CAN WE CALL UP FROM DR. BARBER'S ORIGINAL

20  REPORT, WHICH IS EXHIBIT SOS 1, PAGE 56, AND CALL OUT

21  FIGURE 17; AND THEN ALSO FROM DR. BARBER'S REBUTTAL

22  REPORT, WHICH IS, FOR THE RECORD, SECRETARY OF STATE

23  EXHIBIT 4 AT PAGE 5; AND THEN CALL OUT THE HOUSE MAP

24  THAT IS ON THE RIGHT SIDE OF THE PAGE.

25        DR. MCCARTAN, ARE YOU FAMILIAR WITH THESE

02:19p

1 FIGURES THAT WE'VE JUST PUT ON THE SCREEN?

2     **A**   YES.  SO THEY'RE SHOWING THE RANGE OR THE

3 DISTRIBUTION OF BVAP-MAJORITY HOUSE DISTRICTS.  AND

4 ON THE LEFT I THINK THIS IS A FIRST SIMULATION SET,

5 AND ON THE RIGHT IS HIS SECOND SIMULATION SET.  AND

6 THEN ALSO PLOTTED ARE THE BVAP DISTRICTS IN THE

7 ENACTED AND ILLUSTRATIVE MAPS.

8     **Q**   AND DO YOU AGREE WITH DR. BARBER'S OPINION

9 THAT THERE IS VERY LITTLE DIFFERENCE BETWEEN THE

10 OUTCOMES OF HIS TWO STIMULATION STUDIES?

11    **A**   I DON'T.

12    **Q**   CAN YOU EXPLAIN?

13    **A**   WELL, JUST EVEN EYEBALLING, THESE ARE PRETTY

14 DIFFERENT DISTRIBUTIONS.  SO THE LEFT IS THE FIRST

15 SET.  THE RANGE OF BVAP DISTRICTS RUNS FROM NINE TO

16 18, 19, AND THE AVERAGE IS MAYBE 13, 14.  IN THE

17 SECOND SET THE RANGE GOES FROM TEN OR 11 TO I THINK

18 25, AND THE AVERAGE IS 18.  SO IN THE AVERAGE OF THE

19 NEW SET WAS BASICALLY THE UPPER END OF THE FIRST SET.

20 SO I WOULD DEFINITELY NOT DESCRIBE THAT AS VERY

21 LITTLE DIFFERENCE.

22    **Q**   IN YOUR OPINION, THERE WAS A SIGNIFICANT

23 DIFFERENCE?

24    **A**   YEAH.

25    **Q**   WHAT'S YOUR UNDERSTANDING OF DR. BARBER'S

02:20p

1    ULTIMATE CONCLUSIONS IN HIS SECOND REPORT?

2        A    AS I UNDERSTOOD IT, HE, AS WE TALKED ABOUT,

3    CHANGED A NUMBER OF THINGS, RERAN SIMULATIONS.  BUT

4    HE MADE THE SAME CONCLUSION; THAT THERE WAS NOT --

5    THAT BASICALLY THE SECOND REPORT WAS -- HAD THE --

6    MADE THE SAME CONCLUSIONS AS THE FIRST REPORT.

7        Q    WHAT'S YOUR OPINION ABOUT THOSE CONCLUSIONS?

8        A    I DON'T THINK IT'S FAIR TO CHARACTERIZE THE

9    SECOND REPORT AS MAKING THE SAME CONCLUSIONS AS THE

10   FIRST REPORT BECAUSE OF THESE CHANGES IN BOTH THE

11   HOUSE AND THE SENATE.  YEAH.

12       Q    AND DO YOU HAVE AN OPINION -- JUST GOING

13   BACK TO REPEAT SOMETHING I THINK THAT YOU SAID

14   BEFORE, DO YOU HAVE AN OPINION AS TO WHETHER DR.

15   BARBER'S SIMULATIONS ESTABLISHED THAT ONE FACTOR WAS

16   MORE SIGNIFICANT IN THE ILLUSTRATIVE PLAN THAN OTHER

17   REDISTRICTING PRINCIPLES?

18       A    RIGHT.  SO WE TALKED ABOUT IN -- ON THE

19   BASIS OF HIS FIRST SET OF SIMULATIONS AND THE

20   REGIONAL ANALYSES, I DON'T THINK THAT CONCLUSION WAS

21   SUPPORTED, PRIMARILY BECAUSE THE FIRST SET OF

22   SIMULATIONS IS USELESS.  THE SECOND SET I STILL THINK

23   IS NOT SUFFICIENT TO REACH THE CONCLUSION THAT DR.

24   BARBER DRAWS THERE, MOSTLY, AGAIN, BECAUSE A SINGLE

25   SET OF SIMULATIONS, A SINGLE SIMULATION STUDY, CAN'T

02:21p

1  EVER REALLY BE SUFFICIENT TO ESTABLISH THAT ONE
2  FACTOR, YOU KNOW, OVERWHELMINGLY WAS MORE SIGNIFICANT
3  THAN OTHER FACTORS, BECAUSE FUNDAMENTALLY THAT'S
4  ABOUT COMPARING MULTIPLE FACTORS OR HOW THOSE TWO
5  FACTORS INTERSECT OR BUMP UP AGAINST EACH OTHER.  AND
6  A SINGLE STUDY CAN ONLY LOOK AT THE IMPACT OF ONE
7  FACTOR, SO YOU CAN'T MAKE OR STUDY HOW THOSE FACTORS,
8  YOU KNOW, RUN INTO EACH OTHER.
9      Q    AND I JUST WANT TO ASK ONE FINAL QUESTION
10 FOR A POINT OF CLARIFICATION.  WHEN YOU'RE TALKING
11 ABOUT MULTIPLE ADDITIONAL VALID SIMULATIONS AND THEN
12 A SIMULATION STUDY THAT HAS, FOR EXAMPLE, A HUNDRED
13 THOUSAND MAPS OR FIVE HUNDRED THOUSAND MAPS, THOSE
14 ARE TWO DISTINCT THINGS.  CAN YOU JUST EXPLAIN?
15     A    YEAH.
16     Q    I JUST WANT THE RECORD TO BE CLEAR.
17     A    YEAH.  SO AGAIN -- SORRY.  IT'S ALL A LITTLE
18 CONFUSING.  BUT WHEN YOU RUN A SINGLE RUN OF THE
19 ALGORITHM OR SINGLE SIMULATION STUDY, YOU ALSO GET TO
20 PICK HOW MANY PLANS ARE GOING TO BE IN YOUR SAMPLE.
21 IN HIS FIRST SET, THAT WAS A HUNDRED THOUSAND; IN THE
22 SECOND SET, THAT'S 500,000.  ALL 500,000 ARE STILL
23 FOLLOWING THE VARIOUS CRITERIA AND PRINCIPLES THAT
24 HAD BEEN INSTRUCTED.  SO, FOR EXAMPLE, WHEN HE MAKES
25 THE DIVISIONS OF THE STATE, YOU KNOW, ALL 500,000

02:22p

1   PLANS ARE GOING TO HAVE NO DISTRICTS THAT CROSS THE

2   LINES HE'S DRAWN IN THE STATE AND SO ON.

3           SO IT'S IMPORTANT TO HAVE ENOUGH -- A

4   HUNDRED THOUSAND, FIVE -- IT'S IMPORTANT TO GENERATE

5   ENOUGH PLANS TO GET A REPRESENTATIVE SAMPLE.  BUT,

6   SAY, GOING FROM A HUNDRED THOUSAND TO 500,000 DOESN'T

7   MAGICALLY PRODUCE SORT OF MORE EVIDENCE AROUND YOUR

8   ULTIMATE QUESTION.  IT'S STILL JUST ONE SIMULATION

9   STUDY.

10          MS. BRANNON:  YOUR HONOR, CAN I JUST CONFER

11  WITH MY ASSOCIATES?

12          THE COURT:  YES, YOU MAY.

13  BY MS. BRANNON:

14     Q   IS IT POSSIBLE THAT THE CORE RETENTION

15  CONSTRAINT IN THE SECOND SIMULATION COULD MAKE IT

16  IMPOSSIBLE FOR THE COMPUTER TO GENERATE

17  ILLUSTRATIVE -- THE ILLUSTRATIVE PLAN?

18     A   YEAH, IT'S CERTAINLY IMPOSSIBLE.  I -- YOU

19  KNOW, NEITHER DR. BARBER OR MYSELF, YOU KNOW,

20  PERFORMED EXPERIMENTS TO SORT OF DETERMINE WHETHER

21  THAT -- WHETHER OR NOT THAT'S POSSIBLE.  BUT AGAIN,

22  GIVEN SORT OF THE FACT THAT THE WAY HE DID THE CORE

23  CONSTRAINT IN THE SECOND SET WAS SORT OF THE

24  STRONGEST POSSIBLE WAY YOU COULD TAKE THAT PARTICULAR

25  APPROACH, YEAH, IT WOULDN'T SURPRISE ME IF IT WAS, IN

02:24p

1    FACT, NOT POSSIBLE TO GENERATE THE ILLUSTRATIVE MAP

2    USING THAT APPROACH.

3         **MS. BRANNON:**  AND PLAINTIFFS MOVE TO ADMIT

4    DR. MCCARTAN'S REPORT, PL 135.

5         **THE COURT:**  ADMITTED.

6              CROSS.

7         **MS. BRANNON:**  I PASS THE WITNESS.

8                   **CROSS-EXAMINATION**

9    BY MS. HOLT:

10        **Q**    GOOD AFTERNOON, DR. MCCARTAN.  MY NAME IS

11   CASSIE HOLT.  I'M WITH THE LAW FIRM NELSON MULLINS,

12   AND WE REPRESENT THE LOUISIANA SECRETARY OF STATE IN

13   THIS MATTER.  IT'S NICE TO MEET YOU.

14        **A**    NICE TO MEET YOU.

15        **Q**    DR. MCCARTAN, YOU RECEIVED THE BACK-UP DATA

16   FOR DR. BARBER'S REPORT.  CORRECT?

17        **A**    HIS -- YES, I DID.

18        **Q**    AND THE PARAMETERS THAT DR. BARBER USED WERE

19   DISCLOSED IN HIS BACK-UP MATERIAL THAT WAS RECEIVED

20   BY YOU?

21        **A**    THE PARAMETERS HE SET WERE IN THE CODE THAT

22   WAS PROVIDED, YES.

23        **Q**    ARE YOU AWARE THAT SOME EXPERTS IN THIS

24   FIELD HAVE WHOLLY REFUSED TO DISCLOSE THE PARAMETERS

25   USED IN SIMILAR SIMULATIONS?

02:25p

1      **A**    I AM NOT.

2      **Q**    DR. MCCARTAN, DR. BARBER RAN YOUR

3    DIAGNOSTICS AND CHECKED THEM IN HIS SECOND SET OF

4    SIMULATIONS.  IS THAT CORRECT?

5      **A**    HE REPRESENTED THAT HE DID IN HIS REPORT.

6      **Q**    OKAY.  AND IT'S YOUR UNDERSTANDING FROM

7    REVIEWING HIS REPORT THAT THEY ALL CAME BACK OKAY?

8      **A**    HE SAID THAT THEY DID.

9      **Q**    AND I UNDERSTAND YOUR TESTIMONY TO BE -- TO

10   CRITICIZE DR. BARBER FOR FAILING TO PERFORM MULTIPLE

11   INDEPENDENT RUNS OF THE ALGORITHM.  CORRECT?

12     **A**    THAT WAS ONE OF THE PROBLEMS IN HIS FIRST

13   SET OF SIMULATIONS, BECAUSE IT PREVENTED HIM FROM

14   CALCULATING THAT IMPORTANT SECOND ROUND OF

15   DIAGNOSTICS.

16     **Q**    "MULTIPLE" MEANS AT LEAST TWO.  RIGHT?

17     **A**    RIGHT.  SO IT'S IMPOSSIBLE TO COMPUTE THESE

18   DIAGNOSTICS WITH JUST ONE.  BUT TWO WOULD BE

19   SUFFICIENT.

20     **Q**    THANK YOU, DR. MCCARTAN.

21          AND DR. BARBER DID PERFORM INDEPENDENT RUNS

22   OF THE ALGORITHM IN HIS SECOND SET OF SIMULATIONS.

23   IS THAT CORRECT?

24     **A**    YES.

25     **Q**    AND IN YOUR REPORT YOU DID NOT FORM AN

CORY MCCARTAN                           162

02:26p

1   OPINION ON WHAT REGIONS MIGHT BE NECESSARY TO RUN

2   SIMULATIONS IN LOUISIANA.  IS THAT CORRECT?

3       A    SORRY.  WHAT DO YOU MEAN BY, LIKE, REGIONS

4   THAT MIGHT BE NECESSARY?

5       Q    SURE.  SO YOU DID NOT DEFINE REGIONS IN

6   LOUISIANA THAT WOULD BE DIFFERENT THAN WHAT DR.

7   BARBER PROPOSED IN THE HOUSE.  IS THAT CORRECT?

8       A    LIKE WHAT KIND OF REGIONS?  SORRY.

9       Q    SURE.  SO MY UNDERSTANDING IS THAT DR.

10  BARBER SET A PARAMETER DIVIDING THE STATE OF

11  LOUISIANA INTO THREE REGIONS.  AND CORRECT ME IF I'M

12  WRONG, BUT I BELIEVE YOUR TESTIMONY WAS THAT YOU HAD

13  PERFORMED SIMILAR ANALYSES IN OTHER STATES.  IS THAT

14  CORRECT?

15      A    IN OTHER STATES AT SOME POINT I BELIEVE I

16  HAVE DIVIDED THE STATE INTO DIFFERENT REGIONS.

17      Q    OKAY.  AND YOUR REPORT HERE DOES NOT CONTAIN

18  ANY RECOMMENDATIONS ON HOW TO SIMILARLY -- EXCUSE

19  ME -- DIVIDE THE STATE OF LOUISIANA.  IS THAT

20  CORRECT?

21      A    RIGHT.  AS I EXPLAINED, MY OBJECTION TO WHAT

22  DR. BARBER DID WAS NOT THE CREATION OF THE REGIONS

23  PER SE BUT IN FAILING TO EVALUATE THEIR IMPACT OR

24  DISCLOSE THEIR PRESENCE OR THE IMPACT THAT THAT WOULD

25  NECESSARILY HAVE ON THE TYPES OF MAPS THAT THE

02:28p

1  ALGORITHM WOULD GENERATE.

2      **Q**    AND IN DR. BARBER'S FIRST REPORT HE

3  PERFORMED 100,000 SIMULATIONS.  IS THAT CORRECT?

4      **A**    IN EACH OF THE HOUSE AND THE SENATE, YES.

5      **Q**    YES.  AND THEN 500,000 IN HIS REPLY REPORT?

6      **A**    YEAH.  HE DID 250,000 FOR TWO INDEPENDENT

7  RUNS.  SO PUT THOSE TOGETHER, HALF A MILLION.

8      **Q**    AND ARE YOU AWARE OF OTHER EXPERTS IN THIS

9  FIELD USING AS LITTLE AS 5,000 TO 10,000 INDIVIDUAL

10 MAPS?

11     **A**    FOR WHAT KIND OF ANALYSIS?

12     **Q**    FOR SIMULATION FOR PARTISAN REDISTRICTING

13 ANALYSIS.

14     **A**    I GUESS THE REASON I ASK IS THERE IS NOT

15 LIKE A THRESHOLD MAGIC NUMBER.  THE APPROPRIATE

16 NUMBER OF PLANS TO GENERATE IN ANY ANALYSIS IS

17 DEPENDENT ON THE PARTICULARS OF THAT ANALYSIS; THE

18 DIFFICULTY, THE PROBLEM, HOW MANY DISTRICTS ARE

19 PRESENT, THE TYPE OF -- THE CONCLUSIONS OR NUMERICAL

20 SUMMARIES YOU'RE TRYING TO DRAW.  AND SO OUR

21 RECOMMENDATION -- AND YOU'LL FIND THIS IN THE PAPER

22 THAT WE WERE DISCUSSING -- IS TO USE THE DIAGNOSTICS

23 TO GUIDE YOU IN DETERMINING WHETHER OR NOT YOU HAVE

24 ENOUGH PLANS.

25          AND SO IF YOU DON'T -- IF THE DIAGNOSTICS

02:29p

1   ARE INDICATING PROBLEMS, ONE OF THE BEST STEPS YOU

2   CAN TAKE AT THAT POINT IS TO INCREASE THE NUMBER OF

3   RANDOM PLANS YOU'RE GENERATING.  AND SO AS WE SAW IN

4   THE DIAGNOSTICS THAT WERE AVAILABLE BUT NOT CHECKED

5   BY DR. BARBER IN THE FIRST SET, A HUNDRED THOUSAND

6   WAS NOT SUFFICIENT FOR THE ANALYSIS HE WAS TRYING TO

7   RUN IN THAT FIRST SET OF SIMULATIONS.

8          MS. HOLT:  YOUR HONOR, IF I MAY HAVE A

9   MOMENT TO CONFER WITH MY CO-COUNSEL.

10         THE COURT:  YOU MAY.

11         MS. HOLT:  THANK YOU, DR. MCCARTAN.  NO

12  FURTHER QUESTIONS.

13         THE COURT:  ANY REDIRECT, MS. BRANNON?

14         MS. BRANNON:  NO REDIRECT, YOUR HONOR.

15         THE COURT:  THANK YOU, DR. MCCARTAN.  YOU

16  MAY STEP DOWN.

17         THE WITNESS:  THANK YOU.

18         THE COURT:  SO YOU HAVE ONE MORE WITNESS.

19  IS THAT CORRECT?

20         MS. BRANNON:  YES, YOUR HONOR.  WE CALL

21  DR. LISA HANDLEY TO THE STAND.  AND JUST GIVE ME A

22  MINUTE.

23         THE COURT:  OKAY.

24         DR. HANDLEY, YOU HAVE -- GO AHEAD AND

25  SWEAR HER IN AGAIN.

02:31p

 1          **(WHEREUPON, LISA HANDLEY, BEING PREVIOUSLY**

 2     **SWORN, TESTIFIED AS FOLLOWS.)**

 3          **THE COURT:**  IT'S JUST A FORMALITY.  I MEAN,

 4     TECHNICALLY YOU'RE PROBABLY STILL UNDER OATH, BUT

 5     THAT WAS SEVERAL DAYS AGO, SO...

 6          **MS. BRANNON:**  YOUR HONOR, WE HAVE A BINDER I

 7     THINK FOR DR. HANDLEY WITH COPIES OF HER REPORT THAT

 8     MY PARALEGAL IS ABOUT TO GO GET, BUT I'M HAPPY TO

 9     START IF YOU DON'T MIND THE INTERRUPTION.

10          **THE COURT:**  IF YOU DON'T MIND GOING AHEAD

11     AND STARTING, AND THEN WHEN SHE GETS HERE SHE MAY

12     CERTAINLY APPROACH AND PROVIDE HER WITH HER REPORTS.

13          IF THERE IS SOMETHING THAT YOU CAN'T

14     ANSWER BECAUSE OF YOUR REPORTS, WE'LL JUST -- WE'LL

15     TAKE A MINUTE.

16          **MS. BRANNON:**  I THINK IT WON'T BE NECESSARY

17     FOR THE FIRST PART OF THE DIRECT.

18                    **DIRECT EXAMINATION**

19     BY MS. BRANNON:

20       **Q**   DR. HANDLEY -- WE'LL COME BACK TO THE

21     REBUTTAL REPORT THAT YOU DRAFTED.  DR. HANDLEY, YOU

22     DID REVIEW THE REPORTS THAT DR. LEWIS PROVIDED IN

23     THIS CASE.  CORRECT?

24       **A**   I DID.

25       **Q**   AND YOU WERE PRESENT WHEN DR. LEWIS

02:32p

1    TESTIFIED TODAY AND YESTERDAY.  CORRECT?

2        A    YES.

3        Q    AND DO YOU KNOW IF DR. LEWIS PROVIDED --

4            MS. BRANNON:  YOUR HONOR, CAN I APPROACH THE

5    WITNESS?

6            THE COURT:  YOU MAY APPROACH.

7            MS. BRANNON:  WE'LL COME BACK TO THE REPORT,

8    BECAUSE IT'S MORE RELEVANT TO THE LATER LINE OF

9    QUESTIONING.

10   BY MS. BRANNON:

11       Q    DR. HANDLEY, DO YOU KNOW IF DR. LEWIS

12   PROVIDED WHAT HE IS REFERRING TO AS WIN RATES IN HIS

13   REPORTS?

14       A    YES.  AMONG THE THINGS HE PROVIDED IN HIS

15   TABLES WERE WHAT HE CALLED WIN RATES.

16       Q    AND WHAT'S YOUR UNDERSTANDING OF HOW DR.

17   LEWIS IS DEFINING A WIN RATE?

18       A    IN TWO OF THE TABLES, TABLES 1 AND 3, WITH

19   MORE THAN -- WITH THREE OR MORE CANDIDATES, A WIN,

20   ACCORDING TO HIS DEFINITION, WAS SIMPLY EITHER MAKING

21   IT TO A RUNOFF OR WINNING OUTRIGHT.

22       Q    AND DO YOU AGREE WITH HIS DEFINITION?

23       A    NO.  I THINK MAKING IT TO THE RUNOFF IS

24   MAKING IT TO THE RUNOFF.  YOU STILL HAVE TO WIN THE

25   ELECTION IN THE RUNOFF TO ACTUALLY WIN THE SEAT.

02:33p

**1**    Q   CAN WE SEE PLAINTIFFS' ILLUSTRATIVE AID 41.

**2**        MS. BRANNON:  YOUR HONOR, WOULD YOU LIKE A

**3**  PAPER COPY OF THIS?

**4**        THE COURT:  IS THIS THE SAME ONE THAT WAS

**5**  USED WITH DR. LEWIS?

**6**        MS. BRANNON:  NO.  THIS IS A NEW ONE.

**7**        THE COURT:  YES, I'D LIKE A PAPER COPY.

**8**        MS. BRANNON:  JUST FOR THE RECORD, YOUR

**9**  HONOR, THIS IS AN ILLUSTRATIVE.  WE DON'T HAVE ANY

**10**  INTENTION TO ENTER THIS INTO THE EVIDENCE.

**11**        THE COURT:  OKAY.

**12**  BY MS. BRANNON:

**13**    Q   DR. HANDLEY, WOULD YOU LIKE A PAPER COPY?

**14**    A   THIS IS PERFECT.  I'M GOOD.

**15**        MS. BRANNON:  OKAY.  DOES DEFENSE COUNSEL

**16**  WANT A PAPER COPY?

**17**        MS. MCKNIGHT:  THANK YOU.

**18**  BY MS. BRANNON:

**19**    Q   DR. HANDLEY, DID YOU CREATE THIS CHART?

**20**    A   I DID.

**21**    Q   WHAT INFORMATION -- WHAT IS THE SOURCE OF

**22**  INFORMATION PROVIDED IN THIS CHART?

**23**    A   I HAVE PROVIDED THE PERCENT BLACK VAP FOR A

**24**  SET OF DISTRICTS AS WELL AS THE PERCENT NEEDED TO

**25**  WIN.  THIS IS FROM -- DIRECTLY FROM DR. LEWIS, HIS

02:34p

1   TABLE 1 THROUGH 4.  I'VE ALSO INCLUDED THE WIN RATES

2   FROM DR. LEWIS' TABLES 1 THROUGH 4.  AND THEN THE

3   EFFECTIVENESS SCORES COME FROM MY EXPERT REPORT.

4       Q    AND FOR THE RECORD, THAT'S PLAINTIFFS'

5   EXPERT EXHIBIT 1.

6            DO YOU KNOW HOW DR. LEWIS DEFINES WINNING IN

7   HIS TABLE 1?

8       A    IN HIS TABLE 1, FOR BOTH THE WIN RATE AND

9   THE PERCENT NEEDED TO WIN, THAT WAS, AGAIN, WHETHER

10  THE BLACK-PREFERRED CANDIDATE EITHER WON OUTRIGHT OR

11  PROCEEDED TO THE RUNOFF.

12      Q    AND WHAT ABOUT IN HIS TABLE 2?

13      A    IN TABLE 2 HE FOCUSED ON TWO CANDIDATE RACES

14  SO THAT THE WINNER WOULD ACTUALLY BE THE WINNER OF

15  THE SEAT.

16      Q    AND WHAT ABOUT TABLE 3?

17      A    TABLE 3 LOOKS LIKE TABLE 1, IN THAT HE

18  LOOKED AT THREE OR MORE CANDIDATES; AND THE CANDIDATE

19  MERELY HAD TO PROCEED TO THE RUNOFF FOR HIM TO

20  CONSIDER IT A WIN.

21      Q    AND WHAT ABOUT TABLE 4?

22      A    TABLE 4, AGAIN, WAS TWO-CANDIDATE CONTESTS,

23  SO THE WINNER WAS SOMEBODY WHO WOULD -- WAS THE

24  CANDIDATE WHO RECEIVED AT LEAST 50 PERCENT OF THE

25  VOTE AND ACTUALLY OBTAINED THE SEAT.

02:36p

1    **Q**    IS -- IN TABLE 3 -- IN TABLE 1 AND TABLE 2,

2   IS THE METHODOLOGY THAT DR. LEWIS USED HOW YOU WOULD

3   CALCULATE A WIN RATE?

4    **A**    NO.  I THINK THAT A WIN RATE MEANS THAT YOU

5   HAVE TO HAVE WON THE SEAT.

6    **Q**    AND HOW DID YOU SELECT THE ENACTED DISTRICTS

7   THAT YOU HAVE INCLUDED IN THIS CHART?

8    **A**    COUNSEL SUGGESTED THAT THOSE ARE THE --

9   THOSE ARE THE DISTRICTS THAT I SHOULD LOOK AT.

10    **Q**    LET'S WALK THROUGH AN EXAMPLE.  CAN WE

11   HIGHLIGHT ENACTED DISTRICT 8.

12       CAN YOU WALK US THROUGH WHAT'S SHOWN IN EACH

13   COLUMN THAT HAS BEEN HIGHLIGHTED FOR ENACTED DISTRICT

14   8 IN THIS CHART?

15    **A**    SO FOR ENACTED DISTRICT 8, IN THE SECOND

16   COLUMN I REPORT THE PERCENT BLACK VOTING AGE

17   POPULATION.  AND THEN THE NEXT FOUR COLUMNS ARE THE

18   PERCENT-NEEDED-TO-WIN ESTIMATES THAT DR. LEWIS

19   PRODUCED IN HIS REPORT.

20       SO IN THE THIRD ROW -- IN THE THIRD COLUMN

21   WE SEE THAT HE ESTIMATES THAT BASED ON CROSSOVER AND

22   COHESION AND TURNOUT RATES, THAT A 25 PERCENT BLACK

23   VAP DISTRICT WOULD BE SUFFICIENT FOR THE

24   BLACK-PREFERRED CANDIDATE TO WIN.  IN TABLE 2 WE ARE

25   LIMITING IT TO TWO CANDIDATES, AND NOW THE PERCENT

02:37p

1   BLACK VAP NEEDED TO WIN RISES TO 38 PERCENT.  IN

2   TABLE 3 WE'RE GOING BACK TO THREE OR MORE CANDIDATES,

3   BUT ONE OF THE CANDIDATES AT LEAST HAS TO BE A BLACK

4   CANDIDATE; AND WE'RE AT 24 PERCENT.  AND FINALLY IN

5   TABLE 4 WE'RE CALCULATING OUR PERCENT NEEDED TO WIN

6   BASED ON TWO CANDIDATES, ONE OF WHOM IS BLACK; AND

7   WE'RE UP AT 40 PERCENT FOR THE PERCENT NEEDED TO WIN.

8          SO YOU CAN SEE WE HAVE A VERY LARGE

9   DIFFERENCE WHEN WE MOVE FROM TABLE 1 AT 25 PERCENT TO

10  TABLE 4 AT 40 PERCENT.

11     Q   DR. HANDLEY, YOU DID NOT DO ANY PERCENT-

12  NEEDED-TO-WIN ANALYSIS IN THIS CASE.  CAN YOU EXPLAIN

13  TO THE COURT AGAIN WHY NOT?

14     A   BECAUSE I ACTUALLY HAD DISTRICTS THAT I

15  COULD LOOK AT TO DETERMINE IF THEY WERE EFFECTIVE OR

16  NOT.  I DIDN'T NEED TO CALCULATE A PERCENT NEEDED TO

17  WIN IN TERMS OF IDENTIFYING SOME HYPOTHETICAL

18  DISTRICT THAT MIGHT OR MIGHT NOT WORK.

19     Q   NOW, LET'S TURN TO THE WIN RATES

20  SPECIFICALLY.  AND AGAIN, GOING BACK TO ENACTED

21  DISTRICTS -- ENACTED SENATE DISTRICT 8, WHAT IS THE

22  WIN RATE IN DR. LEWIS' TABLE 1 FOR CD 8?

23     A   THE WIN RATE IS ACTUALLY AKIN TO MY

24  RECOMPILED ELECTION RESULTS, SO THIS IS NOT A

25  HYPOTHETICAL AT THIS POINT.  THIS IS LOOKING AT A SET

02:39p

1   OF CONTESTS RECONSTITUTED FOR THIS ENACTED DISTRICT.

2   AND IT'S TELLING US THE PERCENTAGE OF CONTESTS THAT

3   DR. LEWIS EXAMINED, IN WHICH IN TABLE 1 THE

4   CANDIDATES EITHER WON OUTRIGHT OR PROCEEDED TO THE

5   RUNOFF.  IN TABLE 2 WE'VE GOT TWO CANDIDATES AGAIN,

6   SO THE WINNER IS THE OUTRIGHT WINNER OF THE SEAT.  IN

7   TABLE 3 WE'RE BACK TO THREE OR MORE CANDIDATES, ONE

8   OF WHOM -- AT LEAST ONE OF WHOM IS BLACK.  SO AGAIN,

9   IT'S A MATTER OF IS THE CANDIDATE GOING TO PROCEED TO

10  THE RUNOFF OR WIN OUTRIGHT.  AND FINALLY IN TABLE 4

11  WE HAVE TWO CANDIDATES, AT LEAST ONE OF WHOM IS

12  BLACK.

13      Q    CAN YOU EXPLAIN HOW THE WIN RATES IN DR.

14  LEWIS REPORTS -- DR. LEWIS' REPORT RELATE TO YOUR

15  EFFECTIVENESS SCORE NO. 1?

16      A    MY EFFECTIVENESS SCORE NO. 1 LOOKS

17  CONSISTENTLY AT ALL 16 CONTESTS THAT I ANALYZED

18  STATEWIDE AND JUST DETERMINES IF THE CANDIDATE

19  PREFERRED BY BLACK VOTERS PROCEEDED TO THE RUNOFF --

20  EITHER WON OUTRIGHT OR PROCEEDED TO THE RUNOFF.  SO

21  IT'S SIMILAR TO TABLE 3, EXCEPT IN DR. LEWIS' TABLE 3

22  HE ONLY LOOKS AT CONTESTS WITH THREE OR MORE

23  CANDIDATES.  MY EFFECTIVENESS SCORE LOOKS AT ALL

24  CONTESTS THAT I EXAMINED, WHETHER THERE WAS TWO OR

25  THREE CANDIDATES.

02:40p

1    THE SECOND SCORE, SCORE NO. 2, IS MORE

2  SIMILAR TO HIS TABLE NO. 4 BECAUSE IT'S LOOKING AT

3  TWO CANDIDATES, ONE OF WHOM MUST BE BLACK.  BUT YOU

4  CAN SEE WE HAVE SLIGHTLY DIFFERENT RESULTS, AND

5  THAT'S BECAUSE WE'RE LOOKING AT A DIFFERENT SET OF

6  ELECTIONS.  WE HAVE THE SAME DEFINITION AT THIS

7  POINT; THE BLACK-PREFERRED CANDIDATE WAS INEVITABLY

8  BLACK IN THESE -- IN MY CONTEST ANYWAY.  I DON'T KNOW

9  ABOUT HIS CONTEST.  BUT IT'S BLACK IN MY INSTANCE.

10 AND YOU CAN SEE THAT I HAVE SCORES OF ZERO TO 25

11 PERCENT.

12    HE LOOKS AT A DIFFERENT SET OF ELECTIONS AND

13 COMES UP WITH A DIFFERENT SCORE.  I DON'T KNOW WHAT

14 SET OF ELECTIONS HE'S LOOKING AT.  AND IT VARIES,

15 BECAUSE YOU CAN SEE -- LOOKING AT THE TOP WE'VE GOT

16 7, 7, 6, 6, 7.  I'M NOT SURE WHAT THOSE CONTESTS ARE.

17    BUT OTHER THAN THE DIFFERENCE IN THE

18 CONTESTS WE'RE LOOKING AT AND, THEREFORE, GETTING

19 SLIGHTLY DIFFERENT RESULTS, THAT TABLE 4 WIN RATE

20 COMES THE CLOSEST TO MY EFFECTIVENESS SCORE OF 2.

21    **Q**   WHAT'S YOUR UNDERSTANDING OF HOW DR. LEWIS

22 SELECTED THE ELECTIONS THAT ARE USED IN HIS WIN RATE

23 CALCULATIONS?

24    **A**   IT'S A LITTLE BIT PUZZLING.  HE DOES LIST A

25 SERIES OF ELECTIONS THAT HE LOOKS AT BUT THEN

02:42p

1   LATER -- I THINK IT WAS IN THE DEPOSITION -- SAYS HE

2   NARROWED THEM DOWN AT SOME POINT FOR SOME PURPOSE.

3   HE -- IT'S UNCLEAR AND IT CHANGES.

4        AND ANOTHER THING ABOUT THE ELECTIONS THAT

5   HE LOOKS AT IS SOME OF THE DISTRICTS -- SOME OF THE

6   ELECTIONS ARE WHAT WE CALL DISTRICTED ELECTIONS.  SO

7   HE COULD LOOK AT A STATE SENATE ELECTION THAT DOESN'T

8   COMPLETELY OVERLAP WITH EITHER THE ENACTED OR THE

9   ILLUSTRATIVE PLAN.  BUT SO LONG AS ONLY 75 PERCENT OF

10  THE VOTERS ARE IN THAT DISTRICT, THE PLAN -- THE

11  ORIGINAL PLAN DISTRICT, HE WILL TELL YOU WHETHER THEY

12  WON OR NOT.  SO IT'S THESE DISTRICTED CONTESTS

13  INCLUDED.  WE DON'T KNOW WHERE AND WE DON'T KNOW IF

14  ALL OF THE VOTERS ARE, IN FACT, OVERLAPPING SO THAT

15  YOU COULD ACTUALLY GET A TRUE WIN RATE.

16     Q    THAT'S BECAUSE AT THE TIME THAT HE DID THIS

17  ANALYSIS THERE WERE NO ELECTIONS THAT HAD BEEN RUN IN

18  ANY OF THE ACTUAL ENACTED DISTRICTS.  CORRECT?

19     A    THAT'S CORRECT.

20     Q    AND DO YOU HAVE ANY CONCERNS ABOUT HIS

21  POLICY OF USING -- HIS PRACTICE OF USING DISTRICTED

22  ELECTIONS THAT OVERLAP 75 PERCENT IN HIS WIN RATE

23  CALCULATIONS?

24     A    SURE.  THE OTHER 25 PERCENT COULD HAVE MADE

25  A DIFFERENCE IN TERMS OF WINNING OR LOSING.

02:43p

**1**    Q    AND THEN DID DR. LEWIS LIST SPECIFICALLY THE

**2**  ELECTION CONTESTS HE LOOKED AT FOR THE WIN RATE IN CD

**3**  8?

**4**    A    NO.

**5**    Q    DID HE LIST SPECIFICALLY ANY OF THE ELECTION

**6**  CONTESTS HE LOOKED AT FOR THE WIN RATES FOR ANY OF

**7**  THE ENACTED DISTRICTS THAT ARE REFLECTED ON THIS

**8**  CHART?

**9**    A    NO.

**10**    Q    AND THEN I THINK YOU MAY HAVE ALREADY

**11**  ADDRESSED THIS.  BUT JUST TO MAKE SURE IT'S CLEAR FOR

**12**  THE RECORD, HOW DOES DR. LEWIS' DEFINITION OF WINNING

**13**  IN TABLE 4 COMPARE WITH YOUR EFFECTIVENESS SCORE IN

**14**  TABLE 2?

**15**    A    AGAIN, THAT IS THE MOST COMPARABLE IN TERMS

**16**  OF HIS WIN RATE IN TABLE 4 AND MY SCORE TOO, WITH THE

**17**  EXCEPTION OF THE FACT THAT DIFFERENT CONTESTS ARE

**18**  BEING CONSIDERED.

**19**    Q    AND THEN CAN WE JUST TAKE -- ALSO TAKE A

**20**  LOOK AT THE WIN RATE FOR ENACTED SENATE DISTRICT 38.

**21**  AND CAN YOU TELL US WHAT THE WIN RATES ARE FOR SENATE

**22**  DISTRICT 38?

**23**    A    THE WIN RATES, ACCORDING TO TABLE 1, IS 43

**24**  PERCENT.  BUT IN TABLE 2 IT'S ZERO PERCENT.  IN TABLE

**25**  3 IT'S 50 PERCENT.  BUT IN TABLE 4 IT'S AT ZERO

02:45p

1   PERCENT.

2       **Q**   AND WHAT ARE THE PERCENT NEEDED TO WINS

3   REFLECTED FOR TABLE 2 AND TABLE 4 IN DR. LEWIS'

4   REPORT AS IT'S SHOWN IN THIS CHART?

5       **A**   I'M SORRY.  CAN YOU REPEAT THAT?  FIRST

6   START WITH THE DISTRICT.  WHAT DISTRICT --

7       **Q**   WE'RE GOING BACK TO DISTRICT THIRTY --

8   SENATE DISTRICT 38, WHICH HAS BEEN HIGHLIGHTED.  AND

9   I JUST WANT TO KNOW THE PERCENT NEEDED TO WIN AS

10  REFLECTED IN TABLE 2 AND TABLE 4.

11      **A**   THE PERCENT NEEDED TO WIN UNDER TABLE 2 IS

12  51 PERCENT; IN TABLE 4, 55 PERCENT.

13      **Q**   AND, DR. HANDLEY, DO YOU THINK THESE

14  DISTRICTS ARE OPPORTUNITY DISTRICTS, GIVEN THE

15  RESULTS SHOWN ON THIS CHART?

16      **A**   I DO NOT.

17      **Q**   DR. HANDLEY, WAS YOUR RPV ANALYSIS A

18  REGIONAL ANALYSIS?

19      **A**   I CALLED IT AN AREA OF INTEREST.  IT WAS, I

20  THINK, NARROWER THAN A REGION.  IT WAS ONE-TO-FOUR

21  PARISHES WIDE.

22      **Q**   AND WHY DID YOU CONDUCT YOUR RPV ANALYSIS

23  USING THAT METHOD?

24      **A**   WELL, BECAUSE WE DON'T KNOW WHAT REMEDIAL

25  DISTRICTS WILL LOOK LIKE IF THERE ARE REMEDIAL

02:46p

1   DISTRICTS.  WE COULD DO THE ENACTED, WE COULD DO THE

2   ILLUSTRATIVE.  BUT WHAT WE REALLY WANT TO KNOW IS:

3   IN THAT AREA IN GENERAL, IF YOU WERE GOING TO CREATE

4   REMEDIAL DISTRICTS, WHAT -- WHAT THE VOTING PATTERNS

5   ARE A LITTLE MORE BROADLY THAN THE VOTING PATTERNS IN

6   THESE ILLUSTRATIVE DISTRICTS FOR CERTAIN.

7       Q    BECAUSE YOU HEARD -- DID YOU HEAR DR. LEWIS

8   TESTIFY THIS MORNING THAT DOING A REALITY CHECK OF

9   HIS PERCENT NEEDED TO -- PERCENTS NEEDED TO WIN WAS

10  DIFFICULT?

11      A    YES.

12      Q    DO YOU HAVE ANY OPINION ABOUT WHETHER IT

13  WOULD BE POSSIBLE TO DO A REALITY CHECK?

14      A    IT DEPENDS ON WHAT TABLES YOU'RE TALKING

15  ABOUT.  IF YOU'RE TALKING ABOUT TABLES 2 AND 4 WHERE

16  HIS PERCENT NEEDED TO WINS FELL WITHIN THE RANGE OF,

17  SAY -- I THINK IT WAS ABOUT 30 AND 50 PERCENT --

18  THE -- THERE ARE VERY FEW, IF ANY, DISTRICTS THAT

19  ACTUALLY FALL WITHIN THAT RANGE IN BOTH THE 2011 PLAN

20  AND THE TWO THOUSAND TWENTY -- WHATEVER IT WAS --

21  2021 PLAN.

22          BUT IF YOU'RE TALKING ABOUT TABLES 1 AND 3

23  WHERE HE FOUND PERCENT NEEDED TO WINS IN THE AREA OF

24  LIKE 15, 17, 22 PERCENT, CERTAINLY HE COULD HAVE DONE

25  WHAT I WOULD CALL A REALITY CHECK AND SEE IF

02:47p

1  DISTRICTS COMPOSED OF, SAY, 22 PERCENT BLACK VOTING

2  AGE POPULATION WERE ELECTING BLACKS TO OFFICE.  AND

3  YOU WOULD FIND THERE WERE NO BLACK LEGISLATORS

4  ELECTED FROM OFFICES -- FROM DISTRICTS WITH LESS THAN

5  50 PERCENT, INCLUDING DISTRICTS AROUND 19 OR 27 OR

6  31, ET CETERA.

7      Q    AND, DR. HANDLEY, YOU DID PREPARE A REBUTTAL

8  REPORT IN THIS CASE.  CORRECT?

9      A    YES.

10     Q    AND THAT REBUTTAL REPORT REFLECTS SOME OF

11  YOUR OPINIONS ABOUT DR. LEWIS' INITIAL REPORT?

12     A    YES.

13     Q    AND THAT REPORT, FOR THE RECORD, IS PL 12.

14          CAN YOU TURN TO YOUR BINDER.  AND I BELIEVE

15  IT'S THE VERY FIRST TAB.  AND CAN WE SHOW PL 12 ON

16  THE SCREEN.

17          IS THIS THE REBUTTAL REPORT THAT YOU DRAFTED

18  IN THIS CASE?

19     A    IT IS.

20     Q    DOES THIS REPORT ALSO DISCUSS THE REBUTTAL

21  REPORT THAT DR. ALFORD PRESENTED IN THIS CASE?

22     A    DO YOU WANT TO REPEAT THAT?

23     Q    SORRY.  DOES THIS -- YOUR REBUTTAL REPORT

24  ALSO DISCUSS THE REPORT THAT DR. ALFORD PRESENTED IN

25  THIS CASE?

02:49p

**1**     **A**    YES.

**2**     **Q**    DR. HANDLEY, WHAT IS YOUR DEFINITION OF

**3**  RACIALLY POLARIZED VOTING?

**4**     **A**    I BELIEVE A CONTEST IS POLARIZED IF BLACK

**5**  AND WHITE VOTERS VOTE DIFFERENTLY SUCH THAT,

**6**  CONSIDERED SEPARATELY, BLACK VOTERS WOULD HAVE

**7**  ELECTED A DIFFERENT CANDIDATE THAN WHITE VOTERS.

**8**     **Q**    DR. HANDLEY, DID YOU HEAR DR. ALFORD'S

**9**  TESTIMONY LAST WEEK?

**10**     **A**    I DID.

**11**     **Q**    AND WHAT IS YOUR UNDERSTANDING OF DR.

**12**  ALFORD'S APPROACH TO DETERMINING IF THERE IS RACIALLY

**13**  POLARIZED VOTING?

**14**     **A**    I WOULD SAY THAT WE DIFFER IN AT LEAST TWO

**15**  WAYS ON HOW WE APPROACH THIS.  THE FIRST IS, HE SEEMS

**16**  TO -- HE DOES INSERT A REQUIREMENT THAT BLACK VOTERS

**17**  BE VERY COHESIVE BEFORE HE WILL DETERMINE THAT A

**18**  SINGLE -- THAT A CONTEST CONSIDERED ALONE IS RACIALLY

**19**  POLARIZED.  I LOOK AT COHESION AS A SEPARATE INQUIRY

**20**  RELATED TO THE SECOND PRONG OF *GINGLES* AND DON'T

**21**  INSERT IT INTO MY DETERMINATION OF WHETHER A CONTEST

**22**  IS RACIALLY POLARIZED.

**23**        BUT MORE IMPORTANTLY, HE BELIEVES THAT IF,

**24**  US HERE IN LOUISIANA, BLACK VOTERS USUALLY SUPPORT

**25**  DEMOCRATS AND WHITE VOTERS USUALLY SUPPORT

02:50p

1   REPUBLICANS, THAT YOU COULD ONLY CONCLUDE YOU HAD

2   RACIALLY POLARIZED VOTING IF WHITE VOTERS WHO WERE

3   SUPPORTING DEMOCRATS SUPPORTED BLACK DEMOCRATS AND

4   WHITE DEMOCRATS UNEQUALLY; DIDN'T PROVIDE THE SAME

5   SUPPORT FOR BLACK AND WHITE DEMOCRATS.

6       Q    DR. HANDLEY, DID YOU DO ANY ANALYSIS TO

7   REBUT DR. ALFORD'S OPINIONS ABOUT VOTING PATTERNS OF

8   WHITE AND BLACK DEMOCRATS AND ASSIST YOU IN

9   EVALUATING WHETHER WHITE VOTERS WHO VOTE FOR

10  DEMOCRATS ARE VOTING FOR WHITE AND BLACK CANDIDATES

11  EQUALLY?

12      A    I DID DO SUCH AN ANALYSIS.

13      Q    CAN WE SEE PL 13.

14           DR. HANDLEY, IS THIS AN EXHIBIT THAT WAS

15  ATTACHED TO YOUR REBUTTAL REPORT?

16      A    YES.

17      Q    DO YOU RECOGNIZE THIS TABLE?

18      A    YES.

19      Q    IS THIS -- CAN YOU EXPLAIN WHAT INFORMATION

20  IS PROVIDED IN THIS TABLE?

21      A    WHAT I WANTED TO DO WAS TO SEE IF WHITE

22  VOTERS AND BLACK -- AND BLACK VOTERS, AS A MATTER OF

23  FACT, WERE SUPPORTING WHITE DEMOCRATS AND BLACK

24  DEMOCRATS AT DIFFERENT RATES.  AND I DID THIS USING

25  THE ESTIMATES PRODUCED BY DR. ALFORD'S REPORT.  AND I

02:51p

1    DID IT FOR EACH AREA.  SO THIS IS JUST THE AVERAGE

2    VOTE FOR -- THE AVERAGE, SAY, PERCENT SUPPORT FROM

3    BLACK VOTERS FOR BLACK DEMOCRATS AND THE AVERAGE

4    PERCENT OF BLACK VOTER SUPPORT FOR WHITE DEMOCRATS.

5    AND I COMPARED IT TO THE AVERAGE PERCENT SUPPORT FROM

6    WHITE VOTERS FOR BLACK DEMOCRATS AND WHITE DEMOCRATS.

7    AND AGAIN, THIS IS USING DR. ALFORD'S EI ESTIMATES

8    AND SIMPLY AVERAGING THEM ACROSS THE SEVEN AREAS.

9        Q    THE SEVEN AREAS THAT ARE REFERENCED IN THIS

10   TABLE ARE THE SAME SEVEN AREAS THAT YOU CREATED FOR

11   YOUR INITIAL REPORT AND HAVE ALREADY TESTIFIED ABOUT

12   IN THIS CASE?

13       A    THEY ARE.  AND DR. ALFORD ALSO USED THOSE

14   AREAS, WHICH IS WHY I WAS ABLE TO USE HIS ESTIMATES.

15       Q    DO YOU HAVE ANY OPINION -- DO YOU HAVE AN

16   OPINION, IF ANY, AS TO WHETHER WHITE VOTERS IN

17   LOUISIANA WHO VOTED FOR DEMOCRATS, IN THE AREAS OF

18   INTEREST IN THE ELECTIONS ANALYZED AND INCLUDED IN

19   THIS TABLE, ON AVERAGE VOTED FOR BLACK CANDIDATES AND

20   WHITE CANDIDATES EQUALLY?

21       A    YOU CAN SEE LOOKING AT THIS TABLE THEY DID

22   NOT.  THE DIFFERENCES ARE VERY -- THEY'RE SMALL, BUT

23   THEY'RE VERY CONSISTENT.  IN EVERY AREA IN ALL

24   INSTANCES WHITE VOTERS GAVE MORE SUPPORT TO THE WHITE

25   DEMOCRATS THAN THE BLACK DEMOCRATS.  AND CONVERSELY,

02:53p

1    AT LEAST IN THE LARGER SET, BLACK VOTERS GAVE MORE

2    SUPPORT TO BLACK DEMOCRATS THAN WHITE DEMOCRATS.

3         THE FIRST TWO ROWS ARE LOOKING AT ALL BLACK

4    DEMOCRATS AND WHITE DEMOCRATS.  AND THEN IN THE

5    SECOND TWO I'M LOOKING AT BLACK AND WHITE DEMOCRATS

6    WHO WERE RUNNING IN CONTEST WITH ONLY TWO CANDIDATES.

7    AND FINALLY, THE THIRD IS BLACK DEMOCRATS AND WHITE

8    DEMOCRATS IN CONTESTS WITH THREE OR MORE.

9         Q    AND THERE IS NOT A SINGLE EXAMPLE REFLECTED

10   IN THIS TABLE WHERE WHITE VOTERS SUPPORTED BLACK

11   DEMOCRATS AND WHITE DEMOCRATS EQUALLY?

12        A    THAT'S CORRECT.

13        Q    CAN WE SEE PL 14.  AND I THINK THIS IS TAB C

14   IN YOUR BINDER.

15             DO YOU RECOGNIZE THIS TABLE?

16        A    YES.

17        Q    THIS IS AN APPENDIX THAT WAS CREATED AS PART

18   OF YOUR EXPERT REBUTTAL REPORT.  CORRECT?

19        A    CORRECT.

20        Q    CAN YOU DESCRIBE WHAT'S IN THIS TABLE?

21        A    I ESSENTIALLY JUST PULLED OUT TWO CONTESTS

22   TO LOOK AT -- BECAUSE THESE TWO CONTESTS HAD BOTH A

23   BLACK AND A WHITE DEMOCRAT RUNNING FOR THE SAME

24   OFFICE AT THE SAME TIME -- TO SEE IF BLACK AND WHITE

25   VOTERS WERE SUPPORTING THE BLACK AND WHITE DEMOCRATS

02:54p

1   AT EQUAL AMOUNTS.

2       **Q**    I THINK YOU JUST SAID IT, BUT CAN YOU

3   EXPLAIN AGAIN, JUST SO IT'S CLEAR, WHY YOU THOUGHT

4   THESE TWO ELECTIONS WERE PARTICULARLY IMPORTANT TO

5   LOOK AT?

6       **A**    BECAUSE THERE WAS A WHITE DEMOCRAT AND A

7   BLACK DEMOCRAT RUNNING IN EACH OF THESE ELECTIONS AT

8   THE SAME TIME.

9       **Q**    DO YOU HAVE AN OPINION IF WHAT -- DO YOU

10  HAVE AN OPINION, IF ANY, AS TO WHETHER WHITE VOTERS

11  IN LOUISIANA WHO VOTED FOR DEMOCRATS IN THE NOVEMBER

12  2022 SENATE ELECTION CONTEST, IN THE AREAS OF

13  INTEREST ANALYZED BY YOU AND DR. ALFORD, DID NOT

14  SUPPORT BLACK AND WHITE CANDIDATES EQUALLY?

15      **A**    THAT'S CORRECT.  YOU CAN SEE THAT IN THAT

16  PARTICULAR ELECTION WHITE VOTERS DIDN'T SUPPORT

17  EITHER DEMOCRAT VERY MUCH.  BUT IN ALL INSTANCES IN

18  ALL AREAS THAT I LOOKED AT, THEY SUPPORTED THE WHITE

19  DEMOCRAT TO A HIGHER PERCENTAGE THAN THE BLACK

20  DEMOCRAT.

21      **Q**    AND DO YOU HAVE AN OPINION, IF ANY, AS TO

22  WHETHER WHITE VOTERS IN LOUISIANA VOTED FOR DEMOCRATS

23  IN THE NOVEMBER 2018 SECRETARY OF STATE ELECTION

24  CONTEST, IN THE AREAS OF INTEREST ANALYZED IN THIS

25  CASE BY YOU AND DR. ALFORD, DID NOT SUPPORT WHITE AND

02:55p

1   BLACK CANDIDATES EQUALLY?

2       **A**    AGAIN, THEY DID NOT SUPPORT WHITE AND BLACK

3   DEMOCRATS EQUALLY.  AGAIN, THE DIFFERENCES ARE SMALL

4   BUT CONSISTENT.  IN EVERY SINGLE AREA IN THIS CONTEST

5   WHITE VOTERS PROVIDED THE WHITE DEMOCRAT WITH A

6   HIGHER PERCENTAGE OF THE VOTES THAN THE BLACK

7   DEMOCRAT.  THE RELATIONSHIP WAS REVERSED FOR BLACK

8   VOTERS.

9       **Q**    DR. HANDLEY, DID YOU DO ANY ADDITIONAL

10  ANALYSIS RELATED TO YOUR OPINION THAT WHITE VOTERS IN

11  LOUISIANA, IN THE AREAS OF INTEREST ANALYZED IN THIS

12  CASE BY YOU AND DR. ALFORD, WHO VOTE FOR DEMOCRATIC

13  CANDIDATES DO NOT SUPPORT WHITE AND BLACK CANDIDATES

14  EQUALLY?

15      **A**    I THINK I GOT THE QUESTION.  I DID DO

16  ANOTHER TABLE, AND THAT MIGHT BE WHAT YOU'RE

17  REFERRING TO.

18      **Q**    YES.

19      **A**    YES.

20      **Q**    LET'S TURN TO -- CAN WE TURN TO PLAINTIFFS'

21  EXHIBIT 15.

22          IS THIS THE ADDITIONAL TABLE THAT YOU DID AS

23  PART OF YOUR REBUTTAL REPORT?

24      **A**    YES.

25      **Q**    DO YOU RECOGNIZE THIS -- THIS IS A

02:56p

1   SPREADSHEET, I THINK.  DO YOU RECOGNIZE THIS

2   SPREADSHEET?

3      **A**   YES.

4      **Q**   AND WHAT ANALYSIS IS REFLECTED ON THIS

5   SPREADSHEET?

6      **A**   HERE I WANTED TO DETERMINE IF WHITE

7   DEMOCRATS -- NOT JUST WHITE VOTERS IN GENERAL -- BUT

8   IF WHITE DEMOCRATS VOTED DIFFERENTLY FOR WHITE

9   DEMOCRATS AND BLACK DEMOCRATS.  SO I'M LOOKING

10  SPECIFICALLY AT WHITE VOTERS WHO ARE REGISTERED AS

11  DEMOCRATS IN THIS ANALYSIS.  THIS IS AN EI ANALYSIS,

12  THE SAME STATISTICAL TECHNIQUE THAT I USED TO DRAW

13  ALL OF MY ESTIMATES OF VOTING PATTERNS.  AND I LOOKED

14  AT ALL OF THE VOTERS, AND I'M REPORTING HERE HOW

15  BLACK REGISTERED DEMOCRATS AND WHITE REGISTERED

16  DEMOCRATS VOTED IN THESE CONTESTS ACROSS THE SEVEN

17  AREAS.

18     **Q**   AND JUST TO CLARIFY FOR THE RECORD, HOW DOES

19  THIS ANALYSIS DIFFER FROM YOUR ANALYSIS IN TABLE 1

20  AND 2 WE WERE JUST LOOKING AT?

21     **A**   HERE I'M JUST FOCUSING ON VOTERS WHO ARE

22  REGISTERED AS DEMOCRATS RATHER THAN ALL BLACK VOTERS

23  AND ALL WHITE VOTERS.

24     **Q**   AND CAN YOU WALK US THROUGH IN GENERAL TERMS

25  WHAT SPECIFIC ANALYSIS IS REFLECTED ON THIS TABLE 3?

02:58p

1      **A**     LET'S TAKE AREA 1.  YOU SEE THE

2   GUBERNATORIAL AND THE LIEUTENANT GOVERNOR'S CONTEST

3   HERE.  THIS IS THE NOVEMBER 2015 RUNOFF.  AND I AM

4   ESTIMATING THE PERCENTAGE OF BLACK VOTERS WHO ARE

5   REGISTERED AS DEMOCRATS WHO SUPPORTED THE CANDIDATES

6   FOR -- HOW THEY SUPPORTED THE CANDIDATES FOR GOVERNOR

7   AND LIEUTENANT GOVERNOR.  I PROVIDED THE COMPETENCE

8   INTERVALS.  AND THEN I HAVE THE PERCENTAGE OF WHITE

9   REGISTERED VOTERS -- REGISTERED DEMOCRATS WHO

10  SUPPORTED EACH OF THESE CANDIDATES AND THE ASSOCIATED

11  COMPETENCE INTERVALS.

12     **Q**    WHAT FOUR ELECTIONS DID YOU INCLUDE IN THIS

13  TABLE ALTOGETHER?

14     **A**    SO WE HAVE THE NOVEMBER 2015 RUNOFF FOR

15  GOVERNOR AND LIEUTENANT GOVERNOR AND WE HAVE THE 2019

16  RUNOFF FOR GOVERNOR AND SECRETARY OF STATE.

17     **Q**    AND WHY DID YOU SELECT THESE FOUR ELECTIONS?

18     **A**    BECAUSE ALTHOUGH THEY WEREN'T RUNNING FOR

19  THE SAME OFFICE, WE HAVE A TWO-CANDIDATE CONTEST THAT

20  INCLUDES A WHITE DEMOCRAT FOR GOVERNOR AND, IN 2015,

21  A BLACK DEMOCRAT FOR LIEUTENANT GOVERNOR; IN NOVEMBER

22  OF 2019, A BLACK CANDIDATE FOR SECRETARY OF STATE --

23  A BLACK DEMOCRAT.

24     **Q**    JUST FOR THE RECORD, KIP HOLDEN WAS THE

25  BLACK CANDIDATE RUNNING FOR LIEUTENANT GOVERNOR.

02:59p

1   CORRECT?

2       **A**   CORRECT.

3       **Q**   AND COLLINS-GREENUP WAS THE BLACK CANDIDATE

4   RUNNING FOR SECRETARY OF STATE IN THE NOVEMBER

5   2018 SECRETARY OF STATE -- 2019 SECRETARY OF STATE --

6   LET ME REPHRASE THIS.

7           COLLINS-GREENUP WAS THE BLACK CANDIDATE

8   RUNNING FOR SECRETARY OF STATE IN THE NOVEMBER 2019

9   SECRETARY OF STATE RACE?

10      **A**   CORRECT.

11      **Q**   DO YOU HAVE AN OPINION, IF ANY, AS TO

12  WHETHER WHITE VOTERS REGISTERED AS DEMOCRATS ARE

13  SUPPORTING JOHN BEL EDWARDS AT THE SAME RATE AS THEY

14  ARE SUPPORTING KIP HOLDEN IN THE NOVEMBER 2015 RUNOFF

15  ELECTION?

16      **A**   NO.  WHITE REGISTERED VOTERS ARE SUPPORTING

17  EDWARDS AT A HIGHER RATE THAN THEY ARE SUPPORTING

18  HOLDEN ACROSS ALL OF THE DISTRICT -- ALL OF THE

19  AREAS.

20      **Q**   DO YOU HAVE AN OPINION AS TO WHETHER WHITE

21  VOTERS REGISTERED AS DEMOCRATS ARE SUPPORTING JOHN

22  BEL EDWARDS AT THE SAME RATE AS THEY SUPPORTED

23  COLLINS-GREENUP IN THE NOVEMBER 2019 RUNOFF ELECTION?

24      **A**   AGAIN, THE WHITE REGISTERED DEMOCRATS

25  SUPPORTED EDWARDS AT A HIGHER RATE THAN THEY

03:01p

1 SUPPORTED COLLINS-GREENUP IN EVERY AREA. ACTUALLY,

2 NOT EVERY AREA IS UP HERE, BUT I BELIEVE IT'S EVERY

3 AREA. THERE IS ANOTHER PAGE THAT HAS MORE AREAS.

4 **Q** JUST FOR THE RECORD, CAN WE TURN TO THE

5 SECOND PAGE OF TABLE 3. OR THERE'S -- I THINK THERE

6 ARE THREE PAGES OF TABLE 3.

7 **A** THAT'S WHY YOU DIDN'T PUT THEM UP.

8 **Q** THERE ARE THREE PAGES OF TABLE 3.

9 BUT THIS REFLECTS THE SAME EI ANALYSIS FOR

10 ALL OF THE AREAS OF INTEREST THAT YOU HAVE USED

11 THROUGHOUT YOUR ANALYSIS IN THIS CASE FOR THESE TWO

12 RUNOFF ELECTIONS WE'VE BEEN DISCUSSING. CORRECT?

13 **A** CORRECT.

14 **Q** OKAY. DR. HANDLEY, WHAT DID YOU CONCLUDE

15 ABOUT THE BEHAVIOR OF WHITE REGISTERED DEMOCRATS IN

16 THESE ELECTIONS ACROSS THE AREAS OF INTEREST?

17 **A** WHITE DEMOCRATIC VOTERS ARE WILLING TO

18 SUPPORT A WHITE DEMOCRAT IN -- IN FACT, IN 2015 -- IN

19 ALL -- AT LEAST SIX OF THE SEVEN AREAS A MAJORITY OF

20 WHITE DEMOCRATS SUPPORTED EDWARDS, BUT IN NO INSTANCE

21 DID A MAJORITY SUPPORT THE BLACK DEMOCRAT THAT WAS

22 RUNNING AT THE SAME TIME.

23 **MS. BRANNON:** PLAINTIFFS MOVE TO ADMIT DR.

24 HANDLEY'S REBUTTAL REPORT AND RELATED EXHIBITS. SO

25 THAT IS PLAINTIFFS' EXHIBITS 12, 13, 14 AND 15.

03:02p

**1**          **MS. MCKNIGHT:**  NO OBJECTIONS, YOUR HONOR.

**2**          **THE COURT:**  ADMITTED.

**3**          **MS. BRANNON:**  AND THEN LET ME JUST CONFER

**4** WITH MY CO-COUNSEL.

**5** BY MS. BRANNON:

**6**    **Q**    CAN WE SEE PLAINTIFFS' ILLUSTRATIVE AID 41

**7** AGAIN.

**8**          AND, DR. HANDLEY, CAN YOU JUST WALK THROUGH

**9** WHICH ENACTED DISTRICTS ARE INCLUDED ON THIS TABLE?

**10**    **A**    SENATE DISTRICTS 8, 19 AND 38, HOUSE

**11** DISTRICTS 7, 60, 68, 69 AND 70.

**12**    **Q**    AND IT'S YOUR OPINION THAT NONE OF THESE

**13** DISTRICTS THAT YOU HAVE JUST LISTED OUT ARE

**14** OPPORTUNITY DISTRICTS?

**15**    **A**    I DO NOT BELIEVE THAT ANY OF THESE DISTRICTS

**16** ARE BLACK OPPORTUNITY DISTRICTS.

**17**          **MS. BRANNON:**  LET ME JUST CONFER AGAIN.

**18** BY MS. BRANNON:

**19**    **Q**    AND ALSO, DR. HANDLEY, FOR THE RECORD, CAN

**20** YOU TELL US IF ANY OF THOSE ENACTED DISTRICTS THAT

**21** ARE LISTED ON THIS TABLE, THIS CHART, ARE

**22** MAJORITY-BLACK DISTRICTS?

**23**    **A**    NONE OF THESE DISTRICTS ARE MAJORITY-BLACK

**24** DISTRICTS.

**25**    **Q**    THE PERCENTAGE BLACK BVAP IS REFLECTED ON

03:04p

1  THE TABLE?

2      **A**    THAT'S CORRECT.

3          **MS. BRANNON:**  AND, YOUR HONOR, WE DID SAY WE

4  WEREN'T GOING TO MOVE THIS INTO EVIDENCE.  BUT GIVEN

5  THAT DR. LEWIS' ILLUSTRATIVE DEMONSTRATIVE EXHIBIT

6  WAS MOVED INTO EVIDENCE, WE ARE GOING TO REQUEST THAT

7  WE CAN MOVE PLAINTIFFS' ILLUSTRATIVE AID 41 INTO

8  EVIDENCE.  ALL OF THE INFORMATION COMES FROM DR.

9  LEWIS' TABLES, WHICH ARE IN EVIDENCE, AND DR.

10  HANDLEY'S TABLES, WHICH ARE ALSO IN EVIDENCE.

11          **THE COURT:**  IS THERE ANY OBJECTION?

12          **MS. MCKNIGHT:**  NO OBJECTION, YOUR HONOR.

13          **THE COURT:**  WHAT'S YOUR EXHIBIT NUMBER?

14          **MS. BRANNON:**  THIS IS -- WHAT'S OUR FINAL

15  EXHIBIT NUMBER?  JUST GIVE US ONE MINUTE.  SO THIS

16  WILL BE EXHIBIT 257.

17          **THE COURT:**  EXHIBIT 257 IS ADMITTED.

18          **MS. BRANNON:**  AND I PASS THE WITNESS.

19          **THE COURT:**  MS. MCKNIGHT?

20          **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

21                  **CROSS-EXAMINATION**

22  BY MS. MCKNIGHT:

23      **Q**    GOOD AFTERNOON, DR. HANDLEY.

24      **A**    HELLO.

25      **Q**    DR. HANDLEY, I JUST HEARD YOU TESTIFY ABOUT

03:05p

**1** DR. LEWIS' REPORTS.  HOLD ON ONE MOMENT.  LET ME -- I

**2** THINK WE NEED TO -- THANK YOU.

**3**      I HEARD YOU TESTIFY ABOUT DR. LEWIS' REPORT.

**4** DO YOU RECALL THAT?

**5**   **A**   YES.

**6**   **Q**   OKAY.  AND YOU DON'T REPORT ANY QUALMS ABOUT

**7** THE ACCURACY OF DR. LEWIS' REPORT.  CORRECT?

**8**   **A**   I WONDER IF YOU COULD -- DO YOU MEAN ABOUT

**9** HOW HE'S CALCULATED THE PERCENT NEEDED TO WIN OR THE

**10** WIN RATES?  I DON'T KNOW WHAT YOU MEAN BY "ACCURACY."

**11**   **Q**   OKAY.

**12**   **A**   IF YOU COULD SPECIFY.

**13**   **Q**   YOU DIDN'T REPORT ANY QUALMS ABOUT THE

**14** ACCURACY OF DR. LEWIS' CALCULATIONS.  CORRECT?

**15**   **A**   CORRECT.

**16**   **Q**   AND YOU RECEIVED BACK-UP DATA FOR DR. LEWIS'

**17** REPORT.  ISN'T THAT RIGHT?

**18**   **A**   CORRECT.

**19**   **Q**   LET'S BRING UP PLAINTIFFS' EXHIBIT 14.

**20**      DR. HANDLEY, DO YOU RECALL TESTIFYING ABOUT

**21** THIS WITH PLAINTIFFS' COUNSEL JUST A MOMENT AGO?

**22**   **A**   YES.

**23**   **Q**   FOR ANY OF THE AREAS IS THE PERCENT SUPPORT

**24** FROM WHITE VOTERS ZERO?

**25**   **A**   NO.

03:07p

**1**    **Q**   AND THE PERCENTAGE POINTS OF SUPPORT FROM

**2**  WHITE VOTERS IN THESE AREAS, WOULD YOU CONSIDER THAT

**3**  CROSSOVER VOTING?

**4**    **A**   REPEAT THE QUESTION.

**5**    **Q**   SURE.  THE PERCENTAGE NUMBERS UNDER PERCENT

**6**  SUPPORT FROM WHITE VOTERS IN THE DIFFERENT AREAS,

**7**  WOULD YOU CONSIDER THAT CROSSOVER VOTING?

**8**    **A**   I WOULD DEFINE CROSSOVER VOTING AS CONTESTS

**9**  THAT WERE -- THE PERCENTAGE OF WHITES WHO WERE VOTING

**10**  FOR THE BLACK-PREFERRED CANDIDATE IN A CONTEST THAT

**11**  WAS POLARIZED.  IF WE UNDERSTAND THE DEFINITION THE

**12**  SAME, THEN I WOULD SAY THOSE PERCENTAGES WOULD

**13**  REPRESENT THE PERCENTAGE -- THAT WOULD BE CROSSOVER

**14**  IN MY DEFINITION.

**15**    **Q**   OKAY.  DR. HANDLEY, WOULD YOU AGREE WITH ME

**16**  THAT IT IS THE RACE OF THE CANDIDATE, NOT THE RACE OF

**17**  THE VOTER THAT IS RELEVANT TO A VOTE DILUTION CLAIM?

**18**    **A**   NO.  YOU SAID THE RACE OF THE CANDIDATE

**19**  IS -- I'M GOING TO MAKE SURE.  YOU SAID DO I THINK

**20**  THE RACE OF THE CANDIDATE IS RELEVANT?

**21**    **Q**   I'LL SAY IT AGAIN.

**22**    **A**   OKAY.

**23**    **Q**   YOU WOULD AGREE WITH ME THAT IT IS THE RACE

**24**  OF THE CANDIDATE, NOT THE RACE OF THE VOTER THAT IS

**25**  RELEVANT TO A VOTE DILUTION CLAIM.  CORRECT?

03:08p

**1**      **A**    NO.

**2**           **MS. BRANNON:**  SO I'M GOING TO OBJECT, YOUR

**3**   HONOR.  I THINK THAT THAT'S CALLING FOR A LEGAL

**4**   CONCLUSION.

**5**           **MS. MCKNIGHT:**  YOUR HONOR, DR. HANDLEY HAS

**6**   COME BEFORE THE COURT AND SAID THAT CERTAIN ELECTIONS

**7**   ARE RELEVANT TO YOU AND CERTAIN ARE NOT.  WE HAVE HER

**8**   SWORN TESTIMONY PRIOR TO TODAY WITH THIS EXACT

**9**   STATEMENT.  I'M TRYING TO CONFIRM THAT THAT'S WHAT

**10**  SHE BELIEVES BEFORE EXPLORING SOME OF THE ELECTIONS

**11**  THAT SHE CHOSE TO PUT BEFORE THIS COURT AND SOME OF

**12**  THOSE THAT SHE CHOSE NOT TO PUT BEFORE THIS COURT.

**13**           I'M USING DR. HANDLEY'S WORDS IN

**14**  RELEVANT.  I'M NOT LOOKING FOR A LEGAL CONCLUSION.

**15**  I'M LOOKING TO FOR WHAT SHE BELIEVES IS RELEVANT TO

**16**  HER ANALYSIS FOR THIS COURT.

**17**           **THE COURT:**  WHICH IS ULTIMATELY WHAT'S

**18**  RELEVANT FOR THE TRIER OF FACT.  I'M GOING TO ALLOW

**19**  IT, BUT I THINK IT'S VERY MARGINALLY IRRELEVANT.

**20**           **MS. BRANNON:**  THANK YOU.

**21**           **THE COURT:**  OVERRULED.  GO AHEAD.

**22**  **BY THE WITNESS:**

**23**      **A**    YOU'RE ASKING ME IF I -- ARE YOU SUGGESTING

**24**  THAT I BELIEVE THAT THE RACE OF THE VOTERS ARE

**25**  IRRELEVANT IN THIS KIND OF CASE?

03:09p

1      Q    I'M SIMPLY ASKING IF YOU WOULD AGREE WITH ME

2   WITH THIS STATEMENT -- AND I CAN READ IT AGAIN.

3   WOULD YOU AGREE WITH ME THAT IT IS THE RACE OF THE

4   CANDIDATE, NOT THE RACE OF THE VOTER THAT IS RELEVANT

5   TO A VOTE DILUTION CLAIM?

6      A    I WOULD NOT AGREE WITH YOU.

7      Q    OKAY.  SO IT'S YOUR TESTIMONY TODAY THAT

8   THAT IS NOT -- YOU DO NOT AGREE WITH THAT STATEMENT?

9      A    I BELIEVE THAT WE'RE LOOKING AT HOW BLACK

10  VOTERS AND WHITE VOTERS ARE VOTING AND WHETHER

11  THEY'RE VOTING DIFFERENTLY.  SO THAT'S THE RACE OF

12  THE VOTER, YES.

13     Q    OKAY.  AND SO PARDON ME, DR. HANDLEY, I HAVE

14  TO TAKE THIS IN BABY STEPS AND MAKE SURE I GET A

15  "YES" OR "NO" ANSWER TO THIS QUESTION.

16          IS IT YOUR TESTIMONY TODAY THAT YOU DO NOT

17  AGREE THAT THE RACE OF THE CANDIDATE AND NOT THE RACE

18  OF THE VOTER IS WHAT IS RELEVANT TO A VOTE DILUTION

19  CLAIM?

20     A    I DO NOT AGREE WITH THAT STATEMENT.

21     Q    DO YOU RECALL BEING DEPOSED IN THIS MATTER?

22     A    I WAS DEPOSED.  IF YOU'RE GOING TO ASK ME

23  SPECIFIC QUESTIONS ABOUT IT -- BUT YES, I WAS DEPOSED

24  IN THIS CASE.

25     Q    OKAY.  AND DO YOU RECALL MAKING THIS

03:11p

**1**   STATEMENT DURING THAT DEPOSITION?

**2**       **A**   I WOULD HAVE TO SEE THE CONTEXT.

**3**       **Q**   LET'S BRING UP THE HANDLEY DEPOSITION

**4**   TRANSCRIPT, PAGE 48, LINES 1 THROUGH 5.

**5**           **THE COURT:**  MS. MCKNIGHT, HOLD ON JUST A

**6**   MINUTE.

**7**                     **(OFF THE RECORD)**

**8**           **THE COURT:**  ALL RIGHT.  I HAD A MOMENTARY

**9**   PANIC ATTACK ABOUT THE COURT REPORTER.  GO AHEAD.

**10**  I'M SORRY.

**11**  **BY MS. MCKNIGHT:**

**12**      **Q**   AND PARDON ME.  I THINK WE NEED TO GO TO THE

**13**  LINE -- TO THE PAGE BEFORE THIS.  COULD WE TURN TO

**14**  PAGE 47.

**15**          DR. HANDLEY, IT SEEMS THAT YOU WERE

**16**  DISCUSSING HERE A SUPREME COURT CASE?

**17**      **A**   RIGHT.

**18**      **Q**   I WANT TO GIVE YOU THE CONTEXT, SO WE CAN

**19**  TURN THE PAGE TO PAGE 48.

**20**      **A**   I'M GUESSING.  I -- BUT I THINK THAT THIS IS

**21**  PROBABLY THE *GINGLES* CASE, AND I'M TALKING ABOUT MY

**22**  MENTOR, DR. BERNIE GROFMAN, WHO WAS AN EXPERT IN THAT

**23**  CASE.

**24**          **MS. BRANNON:**  YOUR HONOR, I JUST WANT TO

**25**  OBJECT.  I THINK THAT THIS LINE OF QUESTIONING DOES

03:13p

1  CROSS OVER THE LINE ABOUT -- INTO ASKING DR. HANDLEY

2  FOR A LEGAL OPINION.  SHE'S DISCUSSING THE *GINGLES*

3  CASE.

4       **THE COURT:**  THE QUESTION ASKED HER IF SHE

5  WAS DISCUSSING A SUPREME COURT CASE.  I WILL SUSTAIN

6  THE OBJECTION.

7       **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

8  BY MS. MCKNIGHT:

9     **Q**   LET'S MOVE ON.  DR. HANDLEY, YOU ANALYZED 16

10 ELECTIONS -- CORRECT? -- IN THIS CASE?

11    **A**   YES.

12    **Q**   OKAY.  AND OF THOSE 16 ELECTIONS, ONLY TWO

13 HAD BOTH A BLACK DEMOCRATIC CANDIDATE AND A WHITE

14 DEMOCRATIC CANDIDATE.  CORRECT?

15    **A**   YES; ALTHOUGH THERE MIGHT HAVE BEEN WHAT I

16 WOULD CALL A NONVIABLE BLACK OR WHITE CANDIDATE IN

17 SOME OTHER CONTESTS.  THESE WERE THE ONLY VIABLE

18 BLACK AND WHITE CANDIDATES, YES.

19    **Q**   OKAY.  LET'S TAKE A LOOK.  LET'S BRING UP

20 LDTX 53 AT PAGE 9.  THIS IS TABLE 3 IN DR. ALFORD'S

21 REPORT TITLED "RACIALLY CONTESTED STATEWIDE ELECTIONS

22 INCLUDED IN THE HANDLEY REPORT - AVERAGES OF EI RXC

23 ESTIMATES ACROSS HANDLEY'S SEVEN AREAS OF INTEREST."

24 DO YOU SEE THAT?

25    **A**   I DO.

03:14p

1     Q    AND THE NOVEMBER 2018 SECRETARY OF STATE

2  CONTEST -- LET'S FOCUS ON THAT ONE.  SO THIS CONTEST

3  IS AN EXAMPLE WHERE IT INCLUDED BOTH A BLACK DEMOCRAT

4  AND A WHITE DEMOCRAT.  CORRECT?

5     A    THAT'S CORRECT.

6     Q    AND THIS IS THE NOVEMBER 2018 SECRETARY OF

7  STATE RACE.  AND HERE THE WHITE SUPPORT FOR THE BLACK

8  DEMOCRATIC CANDIDATE WAS 5.4 PERCENT.  DO YOU SEE

9  THAT?

10     A    YES.

11     Q    AND THAT WOULD BE CROSSOVER VOTING, WOULDN'T

12  IT?

13     A    THAT IS, YES.

14     Q    AND WERE YOU AWARE THAT THE BLACK DEMOCRATIC

15  CANDIDATE HERE, GWEN COLLINS-GREENUP, MOVED ON TO THE

16  RUNOFF WITH THE WHITE REPUBLICAN CANDIDATE, NOT THE

17  WHITE DEMOCRAT CANDIDATE?

18     A    YES.

19     Q    LET'S LOOK AT THE SECOND EXAMPLE.  WE'LL

20  TURN THE PAGE TO PAGE 10 AND GO TO THE NOVEMBER 2022

21  SENATE RACE.

22          THIS IS AN EXAMPLE OF A CONTEST THAT

23  INCLUDES BOTH A BLACK DEMOCRAT AND A WHITE DEMOCRAT.

24  CORRECT?

25     A    YES.

03:16p

**1**      Q    HERE WHITE VOTER SUPPORT FOR THE BLACK

**2**   DEMOCRATIC CANDIDATE WAS 4.3 PERCENT.  IS THAT RIGHT?

**3**      A    YES.

**4**      Q    AND THAT'S CONSIDERED CROSSOVER VOTING?

**5**      A    YES.

**6**      Q    AND THE TWO ELECTIONS WE JUST DISCUSSED ARE

**7**   THE ONLY TWO OF THE 16 ELECTIONS THAT INCLUDED A

**8**   BLACK DEMOCRAT AND A WHITE DEMOCRAT.  IS THAT RIGHT?

**9**      A    AGAIN, THE ONLY TWO VIABLE I THINK, BUT

**10**  THERE WERE SOME INSTANT POSSIBLY -- I'M NOT SURE

**11**  ABOUT THIS, BUT THERE MIGHT HAVE BEEN A BLACK

**12**  DEMOCRAT IN THE CONTEST THAT GOT SOMETHING LIKE ONE

**13**  PERCENT OF THE VOTE.  BUT THESE ARE THE TWO CONTESTS

**14**  THAT INCLUDED BLACK AND WHITE DEMOCRATS THAT RECEIVED

**15**  SOME PORTION OF THE VOTE.

**16**     Q    I SEE.  SO IF THERE WAS AN ISSUE WITH

**17**  VIABILITY, YOU WOULD NOT HAVE INCLUDED IT IN THIS

**18**  ELECTION LIST?

**19**     A    IF THE CANDIDATE GOT, SAY, LESS THAN ONE OR

**20**  TWO PERCENT OF THE VOTE, I CAN'T GET RELIABLE

**21**  ESTIMATES.  QUITE OFTEN I WILL GET ESTIMATES THAT

**22**  ACTUALLY EXCEED THE AMOUNT OF VOTE THE CANDIDATE GOT.

**23**  SO I GROUP THOSE CANDIDATES TOGETHER AND RUN AN

**24**  ANALYSIS AND CALL THEM OTHERS.

**25**     Q    I SEE.  NOW, LET'S GO BACK TO THE FULL-PAGE

03:17p

1    VIEW.  ONE OF THE CONTESTS YOU ANALYZED AND WHICH

2    SUPPORTED YOUR CONCLUSIONS IN THIS CASE WAS A CONTEST

3    IN OCTOBER OF 2019 FOR ATTORNEY GENERAL.  DO YOU SEE

4    THAT?

5        **A**    YES.

6        **Q**    AND IT WAS BETWEEN IKE JACKSON AND JEFF

7    LANDRY.  DO YOU SEE THAT?

8        **A**    YES.

9        **Q**    I'M GOING TO HAVE SOME QUESTIONS FOR YOU

10   LATER ON.  I JUST WANT TO RECALL THAT THIS ELECTION

11   IS PART OF YOUR ANALYSIS, SO THANK YOU.

12           NOW I'D LIKE TO TURN TO AN ELECTION THAT YOU

13   DID NOT INCLUDE IN YOUR ANALYSIS.  LET'S BRING UP

14   YOUR REBUTTAL REPORT.  THIS IS PLAINTIFFS' EXHIBIT

15   12.  AND WE'RE GOING TO GO TO PAGE 10.  WE'RE GOING

16   TO LOOK AT FOOTNOTE 17.

17           IN THAT FOOTNOTE -- AND I'D LIKE YOU TO

18   CORRECT ME IF I MISREAD THIS -- YOU STATED THERE WAS

19   A CONTEST YOU HAVE NOT COMPARED HERE.  IT WAS FROM AN

20   OCTOBER 2019 ELECTION FOR COMMISSIONER OF

21   AGRICULTURE.  IT INCLUDED TWO WHITE DEMOCRATS AND A

22   BLACK DEMOCRAT.  IN THIS CONTEST BLACK AND WHITE

23   VOTERS BOTH SUPPORTED ONE OF THE WHITE DEMOCRATS OVER

24   THE OTHER WHITE DEMOCRAT AND THE BLACK DEMOCRAT.  DO

25   YOU SEE THAT?

03:18p

**1**      **A**    I DO.

**2**      **Q**    LET'S TURN TO LDTX 53.  THIS IS DR. ALFORD'S

**3**   REPORT ON PAGE 13, AND LET'S TAKE A LOOK AT THIS

**4**   CONTEST.

**5**           **MS. MCKNIGHT:**  PAGE 13.  THANK YOU,

**6**   MR. WILLIAMSON.

**7**   **BY MS. MCKNIGHT:**

**8**      **Q**    NOW, DR. HANDLEY, I SEE ON HERE THAT THE

**9**   RACE IS INCLUDED IN DR. ALFORD'S REPORT.  IT IS THE

**10**  OCTOBER 2019 COMMISSIONER OF AGRICULTURE RACE.  DO

**11**  YOU SEE THAT?

**12**     **A**    YES.

**13**     **Q**    AND THE NUMBERS SHOW THAT OF DEMOCRATIC

**14**  VOTERS, WHITE AND BLACK DEMOCRATIC VOTERS BOTH

**15**  SUPPORTED THE WHITE DEMOCRAT MARGUERITE GREEN.  DO

**16**  YOU SEE THAT?

**17**     **A**    I'M SORRY.  SAY THAT AGAIN.  YOU SAID THAT

**18**  WHITE VOTERS SUPPORTED MARGUERITE GREEN?  THEY

**19**  SUPPORTED --

**20**     **Q**    I'LL SAY IT AGAIN, BECAUSE I WANT TO MAKE

**21**  SURE IT'S CLEAR.

**22**          I'M FOCUSED NOW ON THE TOP THREE ROWS OF

**23**  DEMOCRATIC PARTY VOTERS.  SO OF DEMOCRATIC VOTERS,

**24**  WHITE AND BLACK DEMOCRATIC VOTERS BOTH SUPPORTED THE

**25**  WHITE DEMOCRAT MARGUERITE GREEN WITH THE MOST AMOUNT

LISA HANDLEY                                            **200**

03:20p

1   OF THEIR SUPPORT.  ISN'T THAT RIGHT?

2        **A**    I'M NOT SURE THAT THEY'RE DEMOCRATIC VOTERS.

3   BUT OF THE WHITES WHO VOTED FOR DEMOCRATS, THE

4   DEMOCRAT WHO GOT THE MOST VOTE WAS MARGUERITE GREEN.

5        **Q**    AND WHITE AND BLACK DEMOCRAT VOTERS ALSO

6   SHARED THE SAME CANDIDATE AT THE -- WITH THE SECOND-

7   MOST AMOUNT OF VOTES, MEANING WHITE SUPPORT OF THE

8   SECOND AMOUNT -- MOST PERCENTAGE OF VOTES FOR WHITE

9   DEMOCRATS AND THE BLACK SUPPORT PERCENTAGE FOR THE

10  SECOND-MOST WAS -- THEY WERE BOTH FOR CHARLIE GREER,

11  A WHITE DEMOCRAT.  ISN'T THAT RIGHT?

12       **A**    I'M NOT SURE THAT YOUR PHRASING IS RIGHT,

13  BUT CHARLIE GREER WAS THE SECOND DEMOCRAT.  I MEAN,

14  HE GOT 4.8 PERCENT OF THE WHITE VOTES.  WE DON'T KNOW

15  IF THEY'RE DEMOCRATS.  BUT HE WAS THE DEMOCRAT WHO

16  GOT THE SECOND-MOST VOTES OF THE DEMOCRATS FROM WHITE

17  VOTERS.  IS THAT RIGHT?  I'M NOT SURE IF I'M GETTING

18  THAT RIGHT.  BUT I SEE WHAT YOU'RE SAYING.

19       **Q**    THANK YOU.

20       **A**    HE GOT 4.8 PERCENT OF THE VOTE.

21       **Q**    AND SIMILARLY, ON THE BLACK SUPPORT SIDE OF

22  BLACK VOTERS, BLACK SUPPORT, THE CANDIDATE THAT GOT

23  THE SECOND-MOST PERCENTAGE OF BLACK SUPPORT WAS ALSO

24  CHARLIE GREER.  CORRECT?

25       **A**    YES.

03:21p

1    Q    OKAY.  AND THEN GOING DOWN TO THE THIRD

2 CANDIDATE, WHITE AND BLACK DEMOCRATIC VOTERS GAVE THE

3 SAME CANDIDATE, PETER WILLIAMS, THE LEAST AMOUNT OF

4 VOTES OF THEIR SUPPORT; MEANING BLACK SUPPORT FOR

5 PETER WILLIAMS WAS 19.8 PERCENT AND WHITE SUPPORT WAS

6 TWO PERCENT.  DO YOU SEE THAT?

7    A    YES.

8    Q    AND YOU DID NOT INCLUDE THIS CONTEST IN YOUR

9 ANALYSIS.  CORRECT?

10    A    I DID NOT INCLUDE IT IN MY AVERAGES, AND I

11 EXPLAINED WHY.  BUT I ALSO EXPLAINED THAT IT FOLLOWED

12 THE SAME PATTERN AS THE OTHER CONTEST.  BUT IN THIS

13 PARTICULAR CASE THE BLACK DEMOCRAT WAS NOT THE BLACK-

14 PREFERRED CANDIDATE.

15    Q    AND BY "SAME PATTERN," YOU MEAN THAT BLACK

16 SUPPORT PERCENTAGE WAS HIGHER THAN WHITE SUPPORT

17 PERCENTAGE FOR THESE CANDIDATES.  RIGHT?

18    A    FOR THE BLACK CANDIDATE.

19    Q    OKAY.  BUT THE BLACK CANDIDATE CAME IN THIRD

20 FOR BOTH BLACK VOTERS AND WHITE VOTERS.  ISN'T THAT

21 RIGHT?

22    A    YES.

23    Q    DR. HANDLEY, WOULD YOU AGREE WITH ME THAT

24 DISTRICTS DRAWN -- AND WE CAN TAKE THIS DOWN -- THAT

25 DISTRICTS DRAWN BETWEEN 40 AND 50 PERCENT BVAP CAN

03:23p

1   OFFER BLACK VOTERS A BETTER THAN EQUAL OPPORTUNITY TO

2   ELECT THEIR CANDIDATES OF CHOICE?

3       A    AS A GENERAL PROPOSITION, YES.  WE'VE SEEN

4   THAT IN A LOT OF STATES.

5       Q    AND YOU HAVE WRITTEN WITH COAUTHORS ABOUT

6   FINDING THE SO-CALLED SWEET SPOT FOR MINORITY

7   CANDIDATE SUCCESS IN NON-MAJORITY-MINORITY DISTRICTS.

8   RIGHT?

9       A    YES.

10      Q    AND YOU CONCLUDED WITH YOUR COAUTHORS THAT

11  CAUTION MUST BE EXERCISED.  DETERMINING WHETHER A

12  MINORITY CANDIDATE CAN WIN ELECTION IN A GIVEN

13  DISTRICT REQUIRES A DISTRICT-SPECIFIC ANALYSIS.

14  CORRECT?

15      A    I DON'T HAVE IT IN FRONT OF ME, BUT THAT --

16          MS. BRANNON:  YOUR HONOR, I'M JUST GOING TO

17  OBJECT.  I THINK THIS QUESTION IS BEYOND THE SCOPE OF

18  THE REBUTTAL PRESENTATION.

19          THE COURT:  DO YOU WANT TO RESPOND?

20          MS. MCKNIGHT:  THE REBUTTAL PRESENTATION IS

21  A REACTION TO DEFENDANTS' EXPERT REPORTS THAT TALK

22  ABOUT ABILITY OF CANDIDATES TO BE ELECTED.  SHE HAS

23  COME IN WITH HER REBUTTAL REPORT AND TOLD THE COURT

24  THAT DEFENDANTS' REPORT SHOULD BE IGNORED; THEY DON'T

25  GIVE THE COURT MEANINGFUL INFORMATION.

03:24p

1          AND THIS GOES TO SHOWING THAT SHE

2   HERSELF UNDERSTANDS THAT THE CANDIDATES CAN WIN IN

3   THESE ELECTIONS AT LOWER PERCENTAGES AND THAT SHE'S

4   DONE THE ANALYSIS BEFORE OF WHAT IS REQUIRED TO DRAW

5   DISTRICTS THAT PERFORM.  SO IT'S ABSOLUTELY RELEVANT

6   TO HER REBUTTAL REPORT AND WHAT DEFENDANTS' REPORTS

7   HAVE SAID.

8          **MS. BRANNON:**  I THINK, YOUR HONOR, DR.

9   HANDLEY WAS GIVING A FAIRLY NARROW REBUTTAL

10  PRESENTATION OF SOME VERY SPECIFIC ELECTIONS IN

11  LOUISIANA THAT SHE ANALYZED AND SPOKE TO.  THIS IS A

12  VERY GENERAL STATEMENT OF A ARTICLE DR. HANDLEY MAY

13  HAVE WRITTEN THAT WE DID NOT ADDRESS AT ALL IN HER

14  DIRECT.  AND I THINK HER DIRECT WAS PRETTY LIMITED TO

15  SPECIFIC ANALYSIS OF LOUISIANA ELECTIONS.

16         **MS. MCKNIGHT:**  YOUR HONOR, WE'RE NOT LIMITED

17  TO DIRECT.  WE ARE ABLE TO EXAMINE HER ON HER

18  REBUTTAL REPORT IN THIS MATTER.

19         **THE COURT:**  OVERRULED.

20  BY MS. MCKNIGHT:

21    **Q**   WOULD YOU LIKE ME TO READ IT AGAIN, DR.

22  HANDLEY?

23    **A**   I DON'T HAVE IT IN FRONT ME.  BUT IF YOU'RE

24  READING SOMETHING, YOU COULD SHOW ME OR I COULD GUESS

25  THAT YOU'RE TELLING -- YOU'RE READING IT CORRECTLY.

03:25p

1   I'M NOT SURE WHAT TO DO HERE.

2        Q    IT'S LESS ABOUT WHETHER IT'S ACCURATE.  DO

3   YOU DISAGREE WITH IT?

4        A    TELL ME AGAIN WHAT YOU WANT ME TO AGREE

5   WITH.

6        Q    SURE.  THAT CAUTION MUST BE EXERCISED

7   DETERMINING WHETHER A MINORITY CANDIDATE CAN WIN

8   ELECTION IN A GIVEN DISTRICT BECAUSE IT REQUIRES A

9   DISTRICT-SPECIFIC ANALYSIS.

10       A    I AGREE WITH THAT.

11       Q    WOULD YOU ALSO AGREE THAT A DISTRICT-

12  SPECIFIC ANALYSIS THAT INCLUDES AN ANALYSIS OF VOTING

13  PATTERNS WOULD PROVIDE AN INDICATION OF HOW TO ADJUST

14  A MODEL TO ACCOUNT FOR LESS THAN PERFECT MINORITY

15  VOTING COHESION, LESS THAN 100 PERCENT WHITE

16  DEMOCRATIC CROSSOVER VOTING FOR THE MAJORITY-MINORITY

17  CANDIDATE, AND LESS THAN EQUAL MINORITY AND WHITE

18  VOTING AGE PARTICIPATION?

19       A    IT WOULD BE EASIER IF YOU JUST SHOWED ME

20  THIS.  THIS IS KIND OF LENGTHY.  IF YOU'RE READING

21  SOMETHING THAT I'VE WRITTEN, CAN'T WE JUST LOOK AT IT

22  AND AGREE OR DISAGREE THAT I WROTE IT?

23       Q    SURE.  BUT AS YOU SIT NOW -- I'M HAPPY TO

24  PUT IT UP.  BUT AS YOU SIT NOW, DO YOU DISAGREE WITH

25  ANYTHING I JUST SAID?

03:27p

**1**      **A**    I DOUBT IT.  BUT COULD WE DO IT PIECE BY

**2**  PIECE THEN?

**3**         **THE COURT:**  IT WAS COMPOUND.  THERE WERE

**4**  THREE DIFFERENT STATEMENTS.  AND HER STATEMENT MAY

**5**  HAVE BEEN COMPOUND, BUT IT IS RATHER DIFFICULT.  I

**6**  HAVE A HARD TIME FOLLOWING IT.  SO BREAK IT INTO

**7**  THREE SEPARATE SEGMENTS.

**8**         **MS. MCKNIGHT:**  OKAY.

**9**  BY MS. MCKNIGHT:

**10**     **Q**    I'LL BREAK IT INTO THREE SEPARATE SEGMENTS

**11**  AND LET'S SEE IF YOU AGREE WITH ME.

**12**         A DISTRICT-SPECIFIC ANALYSIS THAT INCLUDES

**13**  AN ANALYSIS OF VOTING PATTERNS WOULD PROVIDE AN

**14**  INDICATION OF HOW TO ADJUST A MODEL TO ACCOUNT FOR,

**15**  FIRST, LESS THAN PERFECT MINORITY VOTING COHESION.

**16**  IS THAT RIGHT?

**17**     **A**    YES.  I THINK WE'RE TALKING ABOUT ADJUSTING

**18**  THE BLACK VOTING AGE POPULATION.  WE WOULD ADJUST IT

**19**  IF BLACK VOTERS WERE LESS COHESIVE OR MORE COHESIVE

**20**  DEPENDING ON THE LEVEL OF COHESION.  IS THAT WHAT

**21**  WE'RE TALKING ABOUT?

**22**     **Q**    I WAS ASKING IF YOU WOULD AGREE THAT A

**23**  DISTRICT-SPECIFIC ANALYSIS WOULD ALLOW YOU TO ADJUST

**24**  IN CIRCUMSTANCES WHERE YOU HAVE LESS THAN PERFECT

**25**  MINORITY VOTING COHESION.

03:28p

1      **A**   I DON'T EVEN KNOW WHAT YOU MEAN BY

2   "DISTRICT-SPECIFIC" IN THIS PARTICULAR INSTANCE.  I

3   MEAN, HERE IF WE WANTED TO DO A DISTRICT-SPECIFIC

4   ANALYSIS, WHICH I DID DO, WE KNOW IF IT'S EFFECTIVE

5   OR NOT.  I GUESS -- CAN WE JUST LOOK AT THE ARTICLE?

6          **THE COURT:**  SHOW HER WHAT YOU'RE READING

7   FROM.

8          **MS. MCKNIGHT:**  SURE.  LET'S BRING UP

9   SECRETARY OF STATE EXHIBIT 36 AT PAGE 19.

10          **THE COURT:**  DID YOU SEE WHICH ARTICLE IT

11   WAS?

12          **THE WITNESS:**  YES.

13          **MS. MCKNIGHT:**  PARDON ME.  COULD YOU START

14   WITH PAGE 1, MR. WILLIAMSON.  LET'S GET THIS ON THE

15   RECORD.

16   **BY MS. MCKNIGHT:**

17      **Q**   DR. HANDLEY, THIS IS A 2020 ARTICLE TITLED

18   "MINORITY SUCCESS IN NON-MAJORITY-MINORITY DISTRICTS:

19   FINDING THE SWEET SPOT."  AND YOU COAUTHORED IT.  IS

20   THAT RIGHT?

21      **A**   YES.

22      **Q**   LET'S TURN TO PAGE 19, WHICH IS PAGE 293 OF

23   THE ARTICLE.  AND HERE I'M LOOKING AT THE VERY LAST

24   SENTENCE ON THE PAGE IN THIS CONCLUSION SECTION.

25          DR. HANDLEY, YOU WROTE HERE -- AND MAYBE WE

03:29p

1  COULD GET THAT BOTTOM PAGE CONNECTED WITH THE NEXT

2  PAGE SO WE CAN READ THE WHOLE QUOTE.  YOU WROTE HERE

3  THAT A DISTRICT-SPECIFIC ANALYSIS THAT INCLUDES AN

4  ANALYSIS OF VOTING PATTERNS WOULD PROVIDE AN

5  INDICATION OF HOW TO ADJUST A MODEL TO ACCOUNT FOR

6  LESS THAN PERFECT MINORITY VOTING COHESION, LESS THAN

7  100 PERCENT WHITE DEMOCRATIC CROSSOVER VOTING FOR THE

8  MINORITY CANDIDATE, AND LESS THAN EQUAL MINORITY IN

9  WHITE VOTING AGE PARTICIPATION.  CORRECT?

10     A   YES.  PARTICIPATION RATES, YES.

11     Q   DR. HANDLEY, IN YOUR REPORT, THE ANALYSIS

12  YOU CONDUCTED IN THIS CASE, DID YOU REPORT OUT

13  NUMBERS ON MINORITY VOTING COHESION ON A DISTRICT-BY-

14  DISTRICT BASIS?

15     A   YES.

16     Q   DID YOU REPORT OUT MINORITY VOTING COHESION

17  ON A DISTRICT-BY-DISTRICT BASIS IN PLAINTIFFS'

18  ILLUSTRATIVE PLAN?

19     A   THEY'RE INCORPORATED IN THE ANALYSIS, BUT

20  THERE ARE NOT SPECIFIC ESTIMATES.

21     Q   AND IN YOUR REPORT DID YOU REPORT OUT WHITE

22  DEMOCRATIC CROSSOVER VOTING FOR PLAINTIFFS'

23  ILLUSTRATIVE PLAN ON A DISTRICT-BY-DISTRICT BASIS?

24     A   THEY'RE INCORPORATED IN THE EFFECTIVENESS

25  ANALYSIS, BUT THEY'RE NOT REPORTED INDIVIDUALLY.

03:32p

**1**    Q    AND THEY'RE INCORPORATED IN THE

**2**  EFFECTIVENESS ANALYSIS BECAUSE YOU USED RECOMPILED

**3**  ELECTION RESULTS TO CREATE THAT EFFECTIVENESS

**4**  ANALYSIS.  IS THAT RIGHT?

**5**    A    YES.

**6**    Q    SO WHEN YOU SAY IT'S INCORPORATED, IT'S A

**7**  RESULT OF ELECTION RESULTS BEING RECOMPILED WITHIN

**8**  DISTRICTS.  IS THAT RIGHT?

**9**    A    THAT'S CORRECT.

**10**    Q    ACTUALLY, IS IT NOT DISTRICTS?  IT'S BY

**11**  REGION.  ISN'T THAT RIGHT?

**12**    A    NO.

**13**    Q    OKAY.  AND SO WITHIN THESE DISTRICTS YOU

**14**  NEVER IDENTIFIED THAT SEPARATE WHITE DEMOCRATIC

**15**  CROSSOVER VOTING ON A DISTRICT LEVEL.  CORRECT?

**16**    A    NOT FOR THE ILLUSTRATIVE DISTRICTS, BUT IT

**17**  IS ON A DISTRICT LEVEL.  YOU WOULD BE INCORRECT.

**18**    Q    WELL, I WANT TO MAKE SURE WE'RE CLEAR HERE,

**19**  WHEN YOU'RE PRESSING BACK ON "IT'S ON A DISTRICT

**20**  LEVEL."  I'M INTERESTED IN UNDERSTANDING IF YOU

**21**  REPORTED ANY OF THESE NUMBERS FOR PLAINTIFFS'

**22**  ILLUSTRATIVE PLAN ON A DISTRICT LEVEL.  I BELIEVE THE

**23**  ANSWER IS "NO."  CORRECT?

**24**    A    THAT'S CORRECT.

**25**    Q    THANK YOU.

03:33p

1          AND NOW ON A DISTRICT-BY-DISTRICT BASIS, DO

2     YOU -- YOUR REPORT DID NOT IDENTIFY FOR PLAINTIFFS'

3     ILLUSTRATIVE PLAN WHETHER THERE WAS EQUAL MINORITY IN

4     WHITE VOTING AGE PARTICIPATION.  CORRECT?

5          A    AGAIN, IT INCORPORATES IT BUT NOT -- NO

6     INDIVIDUAL -- THEY WOULDN'T HAVE TO HAVE BEEN

7     ESTIMATES.  THEY COULD HAVE BEEN ACTUAL FIGURES.  BUT

8     NO, THEY WEREN'T DONE ON AN INDIVIDUAL DISTRICT

9     BASIS.

10         Q    THANK YOU.

11              NOW, AT THE END OF THIS STATEMENT IN THIS

12    ARTICLE THERE IS A FOOTNOTE 22.  DO YOU SEE THAT

13    INDICATION THERE?

14         A    I SEE THE 22.

15         Q    LET'S GO TO FOOTNOTE 22.  AND THIS IS ON

16    PAGE 296.  AS I READ THIS FOOTNOTE, IT SAYS:

17    "WHETHER ANY SPECIFIC CANDIDATE CAN WIN A GIVEN

18    GENERAL ELECTION IS ALSO DEPENDENT ON CONSIDERATIONS

19    THAT CANNOT BE INCLUDED IN THE MODEL, SUCH AS HOW

20    WELL-QUALIFIED THE CANDIDATES ARE AND HOW MUCH MONEY

21    THE CANDIDATES ARE ABLE TO RAISE."  DID I READ THAT

22    CORRECTLY?

23         A    YOU DID.

24         Q    DO YOU AGREE WITH THAT?

25         A    I DO.

03:34p

1    Q    OKAY.  AND SO DID YOU CONDUCT ANY KIND OF

2  ANALYSIS IN THIS CASE ON HOW WELL-QUALIFIED

3  CANDIDATES WERE OR HOW MUCH MONEY THE CANDIDATES WERE

4  ABLE TO RAISE?

5    A    I DID NOT.

6    Q    SO YOU DECIDED TO INCLUDE IN YOUR ANALYSIS

7  AN ELECTION -- I'D LIKE TO LOOK AT AN EXAMPLE OF AN

8  ELECTION YOU INCLUDED:  THE 2019 ATTORNEY GENERAL

9  RACE BETWEEN JEFF LANDRY AND IKE JACKSON.  DO YOU

10  REMEMBER DISCUSSING THAT A FEW MOMENTS AGO?

11    A    YES.

12    Q    AND YOU INCLUDED THAT CONTEST IN YOUR

13  ANALYSIS TO PROVIDE THE COURT CONCLUSIONS ABOUT

14  RACIALLY POLARIZED VOTING.  CORRECT?

15    A    CORRECT.

16    Q    NOW, CANDIDATE FUND-RAISING IS A MATTER OF

17  PUBLIC RECORD.  CORRECT?

18    A    POSSIBLY.

19    Q    YOU COULD HAVE LOOKED UP HOW MUCH MONEY JEFF

20  LANDRY AND IKE JACKSON RAISED IN THEIR CONTEST?

21    A    IF IT'S PUBLICLY AVAILABLE, I SUPPOSE I

22  COULD HAVE.

23    Q    BUT YOU DIDN'T IN THIS CASE?

24    A    CERTAINLY NOT.

25    Q    WOULD IT SURPRISE YOU TO KNOW THAT CANDIDATE

03:36p

**1**  JEFF LANDRY RAISED CLOSE TO TWO MILLION AND CANDIDATE

**2**  IKE JACKSON RAISED LESS THAN $5,000?

**3**  **A**  I HAVE NO IDEA.

**4**  **MS. BRANNON:** YOUR HONOR, I JUST WANT TO

**5**  OBJECT TO THIS LINE OF QUESTIONING, WHICH IS ABOUT

**6**  INFORMATION THAT'S NOT IN EVIDENCE AND IS ALSO, I

**7**  THINK, CLEARLY BEYOND THE SCOPE OF DR. HANDLEY'S

**8**  REBUTTAL AND PERHAPS EVEN BEYOND THE SCOPE OF DR.

**9**  HANDLEY'S OPINIONS IN THIS CASE.

**10**  **MS. MCKNIGHT:** I'M MOVING ON, YOUR HONOR.

**11**  BUT IT IS RELEVANT BECAUSE DR. HANDLEY IS TELLING

**12**  THIS COURT THAT CERTAIN CANDIDATES AND THEIR LOSS --

**13**  THEIR WIN OR LOSS IS TELLING -- TELLS THIS COURT --

**14**  IS PROBATIVE FOR THIS COURT TO EXAMINE WHETHER

**15**  CANDIDATES COULD WIN.

**16**  HERE DR. HANDLEY -- IT'S IMPEACHMENT.

**17**  SHE'S ALREADY TOLD THE COURT THAT IT'S IMPORTANT TO

**18**  UNDERSTAND IN CERTAIN CASES HOW WELL-QUALIFIED THE

**19**  CANDIDATES ARE, HOW MUCH MONEY THEY WERE ABLE TO

**20**  RAISE, THAT THAT AFFECTS WHETHER -- HOW PROBATIVE AN

**21**  ELECTION IS.

**22**  SO IT IS RELEVANT TO WHETHER -- TO HER

**23**  ANALYSIS, THE ELECTION SHE CHOSE, WHAT -- AND WHAT

**24**  ANALYSIS SHE DECIDED TO DO AND OFFER THE COURT AND

**25**  WHAT ANALYSIS SHE WITHHELD.

03:37p

**1**      **THE COURT:**  YOU CAN PUT ALL OF THAT IN YOUR

**2**  BRIEF.  IT IS BEYOND THE SCOPE OF BOTH HER REPORTS

**3**  AND THE DIRECT AND THE CASE-IN-CHIEF AND THE DIRECT

**4**  ON REBUTTAL.  THE QUESTION HAS BEEN ASKED AND

**5**  ANSWERED.  IT'S ON THE RECORD.  THE COURT WILL

**6**  CONSIDER IT AS TO WEIGHT.

**7**      **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.

**8**  BY MS. MCKNIGHT:

**9**      **Q**   DR. HANDLEY, I HEARD YOU TESTIFY EARLIER

**10**  THAT 25 PERCENT OF VOTERS WITHIN A PLAN, WITHIN A

**11**  DISTRICT, COULD MAKE A DIFFERENCE IN WINNING OR

**12**  LOSING.  DO YOU REMEMBER THAT TESTIMONY?

**13**      **A**   YES.

**14**      **Q**   ARE YOU AWARE THAT THE AVERAGE FOR THE

**15**  ELECTION YEARS THAT YOU STUDIED, ON AVERAGE

**16**  APPROXIMATELY 30.6 VOTERS VOTED EARLY OR BY ABSENTEE?

**17**      **A**   I KNOW IT VARIED BY YEAR.  I DON'T KNOW --

**18**  SOMEWHERE I HAVE THAT INFORMATION.  I DON'T KNOW OFF

**19**  THE TOP OF MY HEAD.

**20**      **Q**   NO FURTHER QUESTIONS.  THANK YOU, DR.

**21**  HANDLEY.

**22**      **THE COURT:**  IS THERE ANY REDIRECT?

**23**      **MS. BRANNON:**  I JUST HAVE ONE QUESTION ON

**24**  REDIRECT.

**25**               **REDIRECT EXAMINATION**

03:38p

BY MS. BRANNON:

1    Q    DEFENSE COUNSEL WAS SHOWING YOU AN ARTICLE
2  THAT YOU WROTE I THINK IN 2015 THAT DISCUSSES A
3  NUMBER OF ELECTIONS AND CHANGES AND A NUMBER OF
4  THINGS.
5        BUT IS IT ACCURATE TO SAY THAT THAT ARTICLE
6  IS DISCUSSING OPPORTUNITIES FOR BLACK-PREFERRED
7  CANDIDATES IN DISTRICTS THAT HAVE BVAPs BETWEEN 40
8  AND 50 PERCENT?
9    A    IT'S ACCURATE TO DESCRIBE IT THAT WAY, YES.
10   Q    ARE THERE DISTRICTS IN THE STATE OF
11 LOUISIANA IN THE ENACTED MAP THAT HAVE BVAPs BETWEEN
12 40 AND 50 PERCENT?
13   A    THERE MIGHT BE ONE IN THE HOUSE.  THERE IS
14 CERTAINLY NONE IN THE SENATE.
15   Q    SO IT'S FAIR TO SAY THERE IS ALMOST NO
16 DISTRICTS IN THE ENACTED MAP IN LOUISIANA THAT HAVE
17 BVAPs BETWEEN 40 AND 50 PERCENT?
18   A    THAT WOULD BE CORRECT.
19       MS. BRANNON:  NOTHING FURTHER, YOUR HONOR.
20       THE COURT:  YOU MAY STEP DOWN.  THANK YOU,
21 MA'AM.
22       ARE THERE ANY FURTHER WITNESSES?
23       MS. KEENAN:  NO, YOUR HONOR, NO FURTHER
24 WITNESSES FROM THE PLAINTIFFS.

03:39p

1        **THE COURT:**  SO BOTH PARTIES HAVE RESTED?

2            **MS. KEENAN:**  YES, YOUR HONOR.

3          **MS. MCKNIGHT:**  YES, YOUR HONOR.

4        **THE COURT:**  THE COURT WILL TAKE THIS MATTER

5   UNDER SUBMISSION.  WE'VE DISCUSSED THE POST-TRIAL

6   BRIEFS.  I'VE FORGOTTEN THE DATE NOW.  DO Y'ALL HAVE

7   THE DATE?

8            **MS. KEENAN:**  DECEMBER 19TH.  I THINK IT'S

9   THE TUESDAY.

10           **THE COURT:**  DECEMBER 19TH.  SIMULTANEOUS

11  BRIEFS, NO REPLIES, LIMITED TO 40 PAGES.

12               ARE THERE ANY OTHER MINISTERIAL MATTERS

13  THAT WE CAN TAKE UP?

14         **MS. MCKNIGHT:**  YES, YOUR HONOR, BRIEFLY,

15  JUST ONE.

16               DEFENDANTS MUST RENEW THEIR RULE 52(C)

17  MOTION FOR THE REASONS DETAILED IN OUR MOTION PAPERS

18  AND DURING ARGUMENT.  THANK YOU, YOUR HONOR.

19         **THE COURT:**  THANK YOU.  AND I WILL ADDRESS

20  IT MOST LIKELY AS ITEM NO. 1 IN THE WRITTEN RULING.

21               ANYTHING ELSE?

22         **MS. MCKNIGHT:**  YOUR HONOR, BRIEFLY.  WE JUST

23  WANT TO THANK EVERYONE, COUNSEL FOR THEIR

24  PROFESSIONALISM, THE COURT AND THE STAFF.  THANK YOU

25  VERY MUCH.

03:40p

1    **MS. KEENAN:** SAME FROM PLAINTIFFS. NOTHING

2  FURTHER. THANK YOU, YOUR HONOR.

3    **THE COURT:** Y'ALL DID A REMARKABLE JOB, DOWN

4  TO THE LAST PERSON, SO I THANK YOU FOR YOUR

5  PROFESSIONALISM, YOUR COURTESY AND ALSO YOUR

6  PATIENCE.

7    ALL RIGHT. WE WILL STAND ADJOURNED.

8    **(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)**

9    **C E R T I F I C A T E**

10   **I CERTIFY THAT THE FOREGOING IS A CORRECT**

11  **TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE**

12  **ABOVE-ENTITLED NUMBERED MATTER.**

13  **S:/NATALIE W. BREAUX**

14  **NATALIE W. BREAUX, RPR, CRR**

15  **OFFICIAL COURT REPORTER**

16

17

18

19

20

21

22

23

24

25