**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

DR. DOROTHY NAIRNE, REV. CLEE
EARNEST LOWE, DR. ALICE
WASHINGTON, STEVEN HARRIS, BLACK
VOTERS MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

        *Plaintiffs*,

    v.

R. KYLE ARDOIN, in his official capacity as
Secretary of State of Louisiana,

        *Defendant*.

CIVIL ACTION NO. 3:22-cv-00178
SDD-SDJ

**PLAINTIFFS' POST-TRIAL BRIEF**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

ARGUMENT ...............................................................................................................................1

I.    Plaintiffs' Proof at Trial Established Standing. .....................................................................1

A. Each individual plaintiff established standing. ......................................................................1

B. The Louisiana NAACP established associational standing. ..................................................2

C. Both organizational plaintiffs established organizational standing........................................5

II.   Plaintiffs' Proof at Trial Established *Gingles* I...................................................................7

A. Plaintiffs' illustrative maps satisfy Gingles I. ......................................................................7

B. Defendants' experts failed to show that race predominated the drawing Plaintiffs' illustrative maps and that the maps fail to meet compactness and other traditional redistricting criteria. ...........................................................................................................10

III.  Plaintiffs' Proof at Trial Established *Gingles* II and III........................................................20

A. The trial record confirms voting in Louisiana is racially polarized. ...................................20

B. Evidence from Defendants' expert Dr. Lewis is either irrelevant or supports Plaintiffs' vote dilution claims. ...................................................................................................................23

IV.   Plaintiffs' Proof at Trial Established a Section 2 Violation under the Totality of the Circumstances...................................................................................................................25

A. Senate Factor 1 .................................................................................................................26

B. Senate Factor 2 .................................................................................................................27

C. Senate Factor 3 .................................................................................................................30

D. Senate Factor 5 .................................................................................................................31

E. Senate Factor 6 .................................................................................................................35

F. Senate Factor 7 .................................................................................................................36

G. Senate Factor 8 .................................................................................................................36

H. Senate Factor 9 .................................................................................................................38

V.    Evidence Proffered at Trial Justified Plaintiffs' Requested Remedies..................................39

CONCLUSION............................................................................................................................40

# TABLE OF AUTHORITIES

**Cases**

*Allen v. Milligan*,
   599 U.S. 1 (2023) ................................................................................................... *passim*

*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*,
   No. 1:21-CV-5337-SCJ, 2023 WL 5674599 (N.D. Ga. July 17, 2023) ................................... 13

*Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*,
   No. 1:21-CV-5337-SCJ, 2023 WL 7037537 (N.D. Ga. Oct. 26, 2023) ................................... 21

*Bartlett v. Strickland*,
   556 U.S. 1 (2009) ...................................................................................................... 25

*Bush v. Vera*,
   517 U.S. 952 (1996) .................................................................................................... 8

*Chisom v. Edwards*,
   690 F.Supp. 1524 (E.D. La. 1998) ................................................................................. 26

*Clarke v. City of Cincinnati*,
   40 F.3d 807 (6th Cir. 1994) .......................................................................................... 24

*Consumer Data Indus. Association v. Texas*,
   No. 21-51038, 2023 WL 4744918 (5th Cir. 2023) ............................................................. 4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993) .............................................................................................. 12, 19

*East Jefferson Coalition for Leadership & Development v. Parish of Jefferson*,
   926 F.2d 487 (5th Cir. 1991) ......................................................................................... 21

*Fabela v. City of Farmers Branch*,
   No. 3:10-CV-1425-D, 2012 WL 3135545 (N.D. Tex. Aug. 2, 2012) ...................................... 21

*Friends of the Earth, Inc. v. Chevron Chemical Co.*,
   129 F.3d 826 (5th Cir. 1997) .......................................................................................... 4

*Gaffney v. Cummings*,
   412 U.S. 735 (1973) ................................................................................................... 15

*General Electric Co. v. Joiner*,
   522 U.S. 136 (1997) ................................................................................................... 13

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ................................................................................................. 1

*Hall v. Louisiana*,
   974 F.Supp.2d 978 (M.D. La. 2013) ................................................................................. 1

*Hancock County Board of Supervisors v. Ruhr*,
   487 F.App'x 189 (5th Cir. 2012) ..................................................................................... 4

*Harding v. County of Dallas*,
 948 F.3d 302 (5th Cir. 2020) ................................................................ 1, 3

*Harding v. Edwards*,
 484 F.Supp.3d 299 (M.D. La. 2020) ........................................................ 5

*Havens Realty Corp. v. Coleman*,
 455 U.S. 363 (1982) ..................................................................... 5, 7

*Hunt v. Washington State Apple Advertising Commission*,
 432 U.S. 333 (1977) ......................................................................... 2

*Karcher v. Daggett*,
 462 U.S. 725 (1983) ........................................................................ 15

*Kirkpatrick v. Preisler*,
 394 U.S. 526 (1969) ........................................................................ 15

*Kumar v. Independent School District*,
 476 F.Supp.3d 439 (2020) .................................................................. 10

*Louisiana State Conference of the NAACP v. Louisiana*,
 490 F.Supp.3d 982 (M.D. La. 2020) ......................................................... 1

*League of United Latin American Citizens v. Perry*,
 548 U.S. 399 (2006) ................................................................... 10, 11

*Lopez v. Abbott*,
 339 F.Supp.3d 589 (S.D. Tex. 2018) ............................................ 21, 23, 27

*Magnolia Bar Association, Inc. v. Lee*,
 994 F.2d 1143 (5th Cir. 1993) .............................................................. 21

*Major v. Treen*,
 574 F.Supp. 325 (E.D. La. 1983) ........................................................... 26

*Miller v. Johnson*,
 515 U.S. 900 (1995) ........................................................................ 10

*Morris v. City of Houston*,
 894 F.Supp. 1062 (S.D. Tex. 1995) ........................................................ 24

*North Carolina v. Covington*,
 581 U.S. 486 (2017) ........................................................................ 39

*OCA-Greater Houston v. Texas*,
 867 F.3d 604 (5th Cir. 2017) ............................................................. 5, 7

*Patino v. City of Pasadena*,
 230 F.Supp.3d 667 (S.D. Tex. 2017) .................................................. 20, 21

*Robinson v. Ardoin*,
 605 F.Supp.3d 759 (M.D. La. 2023) ............................................ 8, 17, 26, 39

*Robinson v. Ardoin*,
 86 F.4th 574 (5th Cir. 2023) .............................................................. 23

*Teague v. Attala County*,
  92 F.3d 283 (5th Cir. 1996)..................................................................... 28

*Terrebonne Parish Branch NAACP v. Jindal*,
  74 F.Supp.3d 395 (M.D. La. 2017) ......................................................... 26

*Texas State League of United Latin American Citizens v. Elfant*,
  52 F.4th 248, 255 (5th Cir. 2022)............................................................. 5

*Thornburg v. Gingles*,
  478 U.S. 30 (1986) ......................................................................... *passim*

*United States v. Village of Port Chester*,
  704 F.Supp.2d 411 (S.D.N.Y. 2010) ....................................................... 20

*Westwego Citizens for Better Government v. City of Westwego*,
  872 F.2d 1201 (5th Cir. 1989).................................................................. 21

*Wisconsin v. City of New York*,
  517 U.S. 1 (1996).................................................................................... 15

*Wright v. Sumter County Board of Elections & Registration*,
  361 F.Supp.3d 1296 (M.D. Ga. 2018 ...................................................... 40

**Statutes**

Fed. R. Civ. P. 702(a) ..................................................................... 12, 19

## PRELIMINARY STATEMENT

Plaintiffs have established each precondition set forth in *Thornburg v. Gingles*, 478 U.S. 30 (1986), and have proven that, under the totality of the circumstances, Black voters in Louisiana have less opportunity than other members of the electorate to participate in the political process and elect their candidates of choice. Plaintiffs carried their burden to show by a preponderance of the evidence that Defendants unlawfully abridged their right to vote in violation of Section 2 of the Voting Rights Act. Plaintiffs submit this brief to highlight key evidence introduced at trial and explain why Defendants' counterarguments cannot be squared with the trial record. Because the trial record weighs heavily in Plaintiffs' favor, this Court should conclude that Louisiana's state House and Senate maps violate Section 2 and proceed to determining an appropriate remedy.

## ARGUMENT

## I.    Plaintiffs' Proof at Trial Established Standing.

Because there is no serious dispute that the injuries at issue are traceable to and redressable by Defendant Ardoin,[1] Plaintiffs focus their standing briefing on each plaintiff's injury in fact.

### A.    Each individual plaintiff established standing.

To have standing, Plaintiffs needed to prove that they are Black, registered voters and reside in a dilutive district that could be redrawn into a majority-Black district. *See Harding v. Cnty. of Dallas*, 948 F.3d 302, 307 (5th Cir. 2020); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1930-31 (2018) ("[T]he harm asserted by the plaintiffs is best understood as arising from a burden on those plaintiffs' own votes . . . [T]hat burden arises through a voter's placement in a 'cracked' or 'packed'

---

[1] "[G]iven [the Secretary of State's] role as the "chief election officer in the state," La. R.S. § 18:421, it cannot be said that he would not be required to comply with the orders of this Court in this matter, or that he would not be involved in providing, implementing, and/or enforcing whatever injunctive or prospective relief may be granted to [Plaintiffs]." *Hall v. Louisiana*, 974 F.Supp.2d 978, 993 (M.D. La. 2013); *see also La. State Conf. of NAACP v. Louisiana*, 490 F.Supp.3d 982, 1027-32 (M.D. La. 2020), *aff'd sub nom. Allen v. Louisiana*, 14 F.4th 366 (5th Cir. 2021) (collecting cases and explaining why injury resulting from Section 2 violation "is traceable to and redressable by the Secretary of State").

district."). The trial record demonstrates that the individual plaintiffs have standing to challenge vote dilution in several of the seven areas of interest.

The individual plaintiffs' testimony established that Dr. Dorothy Nairne, Rev. Clee Earnest Lowe, Pastor Steven Harris, and Dr. Alice Washington are Black registered voters in Louisiana. Certified 11/27/23 Tr. 18:22-20:12, 55:9-56:24, 67:20-22, 76:12-18, 89:11-16, 90:14-91:2, 105:5-8.[2] And the record established each individual plaintiff currently lives in a packed or cracked district in the enacted map, and would live in a majority-Black district in the illustrative map: Dr. Nairne lives in Enacted HD 60 and would live in Illustrative HD 58, Certified 11/29/23 AM Tr. 52:17-53:11; Rev. Lowe lives in Enacted HD 66 and would live in Illustrative HD 101, *id.* 58:25-59:14; Pastor Harris lives in Enacted HD 25 and would live in Illustrative HD 23, *id.* 49:10-20; and Dr. Washington lives in Enacted HD 66 and would live in Illustrative HD 101, *id.* 58:25-59:14; Certified 11/27/23 Tr. 26:23-26, 30:12-14, 57:2-4, 76:19-20, 105:5-8, 106:15-107:11.

### B.     The Louisiana NAACP established associational standing.

The Louisiana NAACP has demonstrated associational standing based on its members. An organization has associational standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). The Louisiana NAACP satisfies all three *Hunt* factors. First, the Louisiana NAACP has presented evidence of the existence of members who would have standing in their own right. In each area of the state where the NAACP challenges the enacted maps, the NAACP has identified a named

---

[2] Plaintiffs have cited to all certified transcripts that are currently completed by the court reporters. The only draft transcripts Plaintiffs cite are labeled "Draft," and can be accessed at ECF Nos. 206-2 (11/28/23) & 206-7 (12/4/23).

member who is Black, a registered voter, and whose vote is diluted in the district where they live—specifically, Enacted SD 8, 17, and 38, and Enacted HD 1, 34, 60, 65, 68, and 101. Certified 11/27/23 Sealed Tr. 5:22-31:12. Michael McClanahan, the Louisiana NAACP's president, testified under seal to the names and addresses of those individuals. *Id.* Meanwhile, Plaintiffs' expert, William S. Cooper, testified to the unpacked or uncracked majority-Black illustrative districts in which the identified members would reside under the illustrative maps, demonstrating redressability. Certified 11/29/23 AM Tr. 38:23-59:14. Absent relief from this Court, these members will continue to sustain the injury of vote dilution because they live in State House or Senate districts in which the Black population has been "cracked" or "packed." Residing in a cracked or packed voting district is sufficient to confer standing. *See Harding v. Cnty. of Dallas*, 948 F.3d at 307.[3]

The Louisiana NAACP's multi-tiered membership structure does not preclude it from demonstrating associational standing. Members of the NAACP are simultaneously members of the local NAACP branch in their area, the Louisiana NAACP, and the national NAACP. Certified 11/27/23 Tr. 120:2-120:7. President McClanahan testified that the State Conference's officers are elected by delegates who are chosen by members of the branches. *Id.* 124:4-19. The State Conference also has committees composed of NAACP members who participate in the State Conference's activities related to health, voting, education, and other issues important to the membership. *Id.* 125:2-7, 125:14-24, 126:2-12. During weekly calls, members decide actions for the State Conference to take, including the activities in opposition to the enacted maps passed by the Legislature. *Id.* 126:17-25. The Louisiana NAACP also receives a portion of its funding

---

[3] The Supreme Court has explained that "packing" the minority vote, so that minority voters are "concentrat[ed] . . . into districts where they constitute an excessive majority," is an injury-in-fact because packed districts dilute minority votes, allowing them to elect only one candidate of choice, when a lawful map may allow them to elect additional candidates of choice. *Gingles*, 478 U.S. at 46 n.11.

through membership dues. *Id*. 114:9. Under this structure, the Louisiana NAACP undeniably has members with standing in their own right. *See Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (adopting "indicia of membership" associational standing test).

Moreover, even if an individual member were a member only of the local branch, which in turn is a member of the Louisiana NAACP, that would not deprive the Louisiana NAACP of associational standing. An organization's formal membership structure is irrelevant where "the goals of the constitutional standing requirement" have been fulfilled. *Id.* at 828. Both the Supreme Court and the Fifth Circuit have held that an associational standing inquiry should not "exalt form over substance" when analyzing whether an association has "members" for standing purposes. *Id*. The key inquiry is simply whether the association "provides the means by which [its members] express their collective views and protect their collective interests." *Id*.

Additionally, Defendants have identified no case suggesting that an organization may not assert associational standing based on members whose standing in their own right is also based on associational standing. If the Louisiana NAACP's local branches have associational standing through their members—as the evidence establishes—then the Louisiana NAACP, in turn, has associational standing through its local branches.

Finally, the Louisiana NAACP has met the other two elements of the associational standing test. As the Fifth Circuit has previously held, "protecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission" at all levels of the organization. *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F.App'x 189, 197 (5th Cir. 2012). Moreover, participation of individual members is not required because the Louisiana NAACP seeks prospective and injunctive relief, not individualized damages. *Consumer Data Indus. Ass'n v. Texas*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023).

### C.    Both organizational plaintiffs established organizational standing.

BVM and Louisiana NAACP demonstrated organizational standing based on their diversion of resources. A nonprofit organization can demonstrate organizational standing by establishing that it devoted resources "toward mitigating [the] real-world impact" of the challenged conduct, and that doing so "consumed its time and resources in a way they would not have been spent absent the [challenged] law." *OCA-Greater Houston v. Texas*, 867 F.3d 604, 612 (5th Cir. 2017). Organizational standing based on resource diversion arises when the resources expended in response to the defendants' conduct "perceptibly impaired" the organization's ability to pursue its mission and conduct its ordinary activities. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *see generally* ECF No. 181 at 10-15. Plaintiffs must show "concrete evidence" of that perceptible impairment, *Tex. State LULAC v. Elfant*, 52 F.4th 248, 255 (5th Cir. 2022), but "the injury alleged as an Article III injury-in-fact need not be substantial; it need not measure more than an identifiable trifle," *OCA*, 867 F.3d at 612 (cleaned up). Here, each organizational plaintiff "went out of its way to counteract the effect" of the challenged maps, *id.*, and provided sufficiently concrete evidence of the resources it expended to do so. *Ass'n of Cmty. Orgs. for Reform Now v. Fowler*, 178 F.3d 350, 360 (8th Cir. 1996); *see also Harding v. Edwards*, 484 F.Supp.3d 299, 316 (M.D. La. 2020) (holding organizations' "concrete spending changes and new initiatives in response to Defendants' actions" demonstrated standing).

BVM[4] has diverted resources from its core mission—expanding Black voter engagement and building capacity in partner organizations to increase power in Black communities, Certified 11/27/23 Tr. 164:22-165:3—towards responding to Louisiana's enacted maps, both during and

---

[4] BVM's redistricting work was non-partisan, and all of the resources that BVM spent on redistricting work came from Black Voters Matter Capacity Building Institute, the 501(c)(3) entity that serves as a named plaintiff in this litigation. Certified 11/27/23 Tr. at 201:20-202:5.

after the redistricting process unfolded in Louisiana. *Id.* 167:8-186:13, 201:20-202:5.[5] For example, instead of expending its limited resources on capacity building efforts, BVM launched a new accountability strategy to counteract the maps' dilutive effect and suppression of Black voters' power, by finding new ways to hold elected officials accountable to Black voters in districts that do not fairly represent them and prevent them from electing the candidate of their choice. *Id.* 177:2-179:19; PL207 & 208.[6] The dilutive maps have also deepened voter apathy, requiring BVM to devote even more staff time and resources toward convincing Black Louisianans that their votes matter. *Id.* 175:7-17, 179:20-183:5. This included changing BVM's practice of expending resources on voter engagement close in time to *election day* to a "365"-day, year-round voter engagement approach, rather than concentrating its phone banking and canvassing efforts closer in time to each election. *Id.* 180:21-183:5.

The Louisiana NAACP made similar showings about its efforts to mitigate the effects of the maps. During the redistricting process, the Louisiana NAACP collaborated with BVM on many of the same education and mobilization efforts described *supra*, *see, e.g.*, PL184, 185, & 187. And following the passage of the enacted maps, the Louisiana NAACP undertook additional organizing and mobilization efforts to counteract the enacted maps, given their installation of disillusionment in Black voters and their effect on other organizations, candidates, and funders' willingness to invest resources into Black communities' needs in Louisiana. Certified 11/27/23 Tr. 128:9-131:20.

If the unlawful maps remain in place, the organizational plaintiffs will continue to need to divert resources from its core activities toward previously unplanned activities that are required to respond to the enacted maps' dilutive effect. And each concrete step the organizational plaintiffs

---

[5] PL184, 185, 186, 187, 188, 191, 192, 193, 194, 195, 196, 199, 200, 201, 203, & 204 (documents demonstrating BVM's deployment of resources during redistricting process); PL205, 206, 207, & 208 (documents demonstrating examples of BVM's deployment of resources *after* the legislature passed the challenged maps).

[6] Each exhibit is referred to by its exhibit stamp (here, "PL") along with the number it is assigned in JERS.

take to counteract the defendants' conduct perceptibly impairs their ability to carry out their other activities and consumes their time and resources in a way they would not have been spent absent the maps. *OCA*, 867 F.3d at 612-13. Pouring BVM's efforts and resources into its accountability strategy and 365 voter engagement delays and prevents BVM from engaging in get-out-the-vote efforts and capacity building work with its partners. Certified 11/27/23 Tr. 172:3-173:7, 174:17-177:19, 181:15-183:5; *see also id.* 174:20-175:6, 175:18-177:1 (testimony about how BVM's efforts to respond to the passage of the enacted maps have delayed BVM's critical issue mining work). And to combat the effects of the dilutive maps, the Louisiana NAACP has had to pull people back from doing work on health, education, and other projects. *Id.* 131:8-14.

Finally, the enacted maps' dilutive effect on the organizational plaintiffs' members and constituents also frustrates and fundamentally impairs their core missions to increase power in marginalized, predominantly Black communities, Certified 11/27/23 Tr. 113:3-114:1, 164:25-165:3, further reinforcing the organizations' standing. *See OCA*, 867 F.3d at 610-12; *Havens Realty Corp.*, 455 U.S. at 379.

## II.  Plaintiffs' Proof at Trial Established *Gingles* I.

### A.  Plaintiffs' illustrative maps satisfy *Gingles* I.

The first *Gingles* precondition "focuse[s] on geographical compactness and numerosity, [and] is 'needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.'" *Allen v. Milligan*, 599 U.S. 1, 18 (2023) (quoting *Growe v. Emison*, 507 U.S. 25, 40 (1993)). This precondition is satisfied by showing that "the minority group [is] sufficiently large and geographically compact to constitute a majority in a reasonably configured district." *Id.* "A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact" and "respect[ing] existing political subdivisions, such as counties, cities, and towns." *Id.* at 18, 20 (citing *Ala. Legis. Black*

*Caucus v. Alabama*, 575 U.S. 254, 272 (2015)); *see also Bush v. Vera*, 517 U.S. 952, 977 (1996). Plaintiffs can make this showing through drawing a district that is 50% plus one in minority population, in accordance with the traditional redistricting criteria, and then running standard compactness measures to score the district. *See, e.g.*, *Milligan*, 599 U.S. at 20 (favorably citing Mr. Cooper's illustrative maps). Plaintiffs' expert, William S. Cooper, developed illustrative maps to assess whether the Black population in Louisiana is sufficiently large and geographically compact to allow for three additional majority-Black Senate districts and six additional majority-Black House districts. Certified 11/28/23 PM Tr. 119:13-22; *see Milligan*, 599 U.S. at 18; *Robinson v. Ardoin*, 605 F.Supp.3d 759, 778 (M.D. La. 2023).

Mr. Cooper began his map drawing process by downloading and analyzing the relevant Census data for Louisiana. Certified 11/28/23 Tr. 114:1-115:5; PL20 ¶¶ 10-11. He focused his inquiry on Louisiana's metropolitan areas, given the increasing Black population and decreasing White population in Louisiana as a whole and in metropolitan areas specifically. Certified 11/29/23 AM Tr. 13:14-17:7; PL20 ¶¶ 13-15, 21-52. He also sought to determine whether the majority-Black district that the enacted map removed from the Natchitoches area could be maintained. PL20 ¶ 15; *see also* Certified 11/29/23 AM Tr. 48:17-21, 101:4-6. While Mr. Cooper was aware of race and considered it at times during the map drawing process, race did not predominate his map drawing. Rather than try to maximize or prioritize race, Mr. Cooper sought to draw new majority-Black districts while adhering to and balancing traditional redistricting criteria. Certified 11/29/23 AM Tr. 18:20-19:23, 28:5-36:13; *see also* PL20 ¶ 72. He sought to adhere to Joint Rule 21 and other common traditional redistricting principles including compactness, contiguity, parish and municipal boundaries, precinct lines, equal population/one-person, one-vote, communities of interest, and incumbency. Certified 11/29/23 AM Tr. 28:8-23; *see also id.* 19:17-23; PL20 ¶ 72.

He also received feedback on his maps through counsel on communities of interest from Dr. Colten and district performance from Dr. Handley. Certified 11/29/23 AM Tr. 11:7-12:3; PL89 ¶ 7.

Louisiana's Black population was sufficiently numerous to support the drawing of three additional majority-Black districts in the illustrative Senate map and six additional majority-Black districts in the illustrative House map. African Americans represent 33.13% of the population in 2020—the second highest proportion of any state in the nation. *See* PL20 ¶ 22. Mr. Cooper's analysis illustrated that the Black population was sufficiently compact to support the drawing of his illustrative districts. *See* Certified 11/29/23 AM Tr. 27:18-28:1. Mr. Cooper used the measures traditionally used by *Gingles* I experts in assessing compactness. Certified 11/29/23 AM Tr. 20:3-23:6; PL89 ¶¶ 50-51. First, he used a visual inspection of his districts. Certified 11/29/23 AM Tr. 20:3-23:6. A visual estimation and comparison to Louisiana's enacted maps confirms that the majority-Black districts in Plaintiffs' illustrative maps are geographically compact. *See id.* 20:3-23:6; *see also* PL20 ¶¶ 73-74, 103-04, Fig. 13, Fig. 24. The districts largely follow traditional boundaries, and the boundaries in the illustrative maps correspond to existing voting tabulation districts ("VTDs"). PL20 ¶¶ 82-85, 110-13, Fig. 14, Fig. 25. Mr. Cooper considered district-by-district compactness scores generated by Maptitude. PL20 ¶¶ 82-85, 110-13, Fig. 14, Fig. 25. These measures, particularly Reock and Polsby-Popper, are typically used by *Gingles* I experts in analyzing the mathematical compactness of districts. PL89 ¶ 51; *see also* Certified 11/29/23 AM Tr. 20:21-22:4; 27:18-28:1. All of Mr. Cooper's illustrative districts were similarly compact or more compact than the districts in Louisiana's enacted maps. PL20 ¶¶ 82-85, 110-13, Fig. 14, Fig. 25; *see also* Certified 11/29/23 Tr. 22:8-19.

Mr. Cooper testified that communities of interest also played a role in how he drew his maps. Certified 11/29/23 AM Tr. 17:22-18:5, 32:3-33:14. Courts have recognized that

"maintaining communities of interest" is a traditional redistricting principle. *LULAC v. Perry* , 548 U.S. 399, 433 (2006). "A State is free to recognize communities that have a particular racial makeup" so long as there is "some common thread of relevant interests." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). "The Court recognizes the distinct need to afford communities of interest the respect they deserve." *Kumar v. Indep. Sch. Dist.*, 476 F.Supp.3d 439, 502 (2020). In addition to Mr. Cooper's testimony, Plaintiffs established that there is a "common thread" that binds Black voters who reside in the new majority-Black districts in Plaintiffs' illustrative maps through the testimony of Dr. Colten, an expert in the historical geography of Louisiana. By assembling qualitative and quantitative evidence of the historical geography of the Red River Valley Parishes, Acadiana, and the River Parishes, Dr. Colten analyzed communities with long-standing historical and cultural connections within those territories, and then explained how those communities correlate with the districts in Plaintiffs' illustrative maps, including Illustrative HD 1, 2, 23, 61, 65, 68, 69, and 101, and Illustrative SD 2, 17, 19, and 38. Certified 11/28/23 PM Tr. 19:3-22, 21:3-23:5, 28:20-63:15; *see also* ECF No. 179, ¶¶ 64–82 (Pls.' PFOF).

### B.    Defendants' experts failed to show that race predominated the drawing of Plaintiffs' illustrative maps and that the maps fail to meet compactness and other traditional redistricting criteria.

Defense experts attempt to attack Mr. Cooper's *Gingles* I work along two primary tracks. First, they attempt to prove that race predominated the drawing of Mr. Cooper's illustrative districts rendering them not "reasonably configured" under the *Gingles* I test. This attack fails because, as illustrated in Mr. Cooper's own work and the deficiencies in Defendants' experts' work, Mr. Cooper's illustrative maps easily meet the *Gingles* I test. The second attack assumes that race did not predominate but Mr. Cooper's maps still fail because the Black population is not sufficiently numerous and compact. Defendants seemingly seek to invoke *LULAC v. Perry*, 548 U.S. 399, in this second attack, as prohibiting illustrative districts that draw different minority

communities together when the distance between them exceeds some unspecified threshold, or when there is a white population interspersed between them. *LULAC* does no such thing: the Court "accept[ed] that in some cases members of a racial group in different areas—for example, rural and urban communities—could share similar interests and therefore form a compact district if the areas are in reasonably close proximity." *Id*. at 435 (citation omitted). Just recently, *Milligan* held that an illustrative district joining an urban city with a rural community was reasonably configured. *See Milligan*, 599 U.S. at 19-21. Notwithstanding the Supreme Court's recent reaffirmation of the familiar *Gingles* framework, Defendants seek to use their experts to upend it. This Court should not follow them down this uncharted path.

Defendants offered Mr. Trende as an expert witness to rebut Mr. Cooper's findings that his illustrative maps satisfied the *Gingles* I compactness requirement. Mr. Trende uses two algorithms "to identify compact population clusters" and find "the most compact Black population" within each of Mr. Cooper's illustrative districts. *See* SOS3 at 15-16. Trende's first algorithm uses the moment of inertia to combine neighboring precincts into clusters and uses BVAP in weighting which precincts to pick. *Id*. at 15-16; *see also* Certified 12/1/23 Tr. 5:15-6:6. His second algorithm, purportedly derived from the method used by Professors Jowei Chen and Jonathan Rodden (the "Chen & Rodden" method), is similar to the first, but weights precinct size instead of BVAP. SOS3 at 16; *see also* Certified 12/1/23 Tr. 5:15-6:6. These algorithms do not create whole districts, but rather draw shapes that group together a threshold number of Black adults; once the shape includes enough Black adults to constitute the number necessary for 50%-plus-one BVAP, the algorithm goes no further. SOS3 at 16-17; *see also* Certified 12/1/23 Tr. 5:15-6:6.

As Mr. Trende admitted at trial, his approach is entirely novel and has never before been used as part of a Section 2 case (or in Mr. Trende's own academic work). Certified 12/1/23 Tr.

6:14-7:5; 18:8-23:21. Trende suggests an expert must define the "most compact" grouping of Black voters and then draw a district around this grouping to meet *Gingles* I. Certified 12/1/23 Tr. 9:19-10:13. No Court has ever held that this was the standard for Section 2, despite this methodology being available to experts for the past 20 years. *Id*. 21:12-19; 23:9-21; *see also id*. 9:19-10:13.[7] Instead, courts and Mr. Trende in his other expert map work have all used the standard compactness scores used by Mr. Cooper in assessing whether the *Gingles* I prong can be met.[8] *Id*. 21:20-22:4; *see also id.* 18:8-23:21; PL89 ¶¶ 50-51.

Further, the methodology he uses to determine the "most compact" grouping is irrelevant and unreliable. *See* Fed. R. Civ. P. 702(a); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993); *In re Taxotere (Docetaxel) Prods. Liab. Litig*., 26 F.4th 256, 268 (5th Cir. 2022). The unreliability of Mr. Trende's analysis is evident in his conflicting claims that the moment of inertia is the "oldest" method for defining compactness but also that it has never before been used by any expert in the way in which Mr. Trende uses it. Certified 12/1/23 Tr. 22:5-9. He drastically modifies the Chen & Rodden method beyond recognition by removing controls that would require the algorithm to create whole districts and respect traditional redistricting criteria such as one-person, one-vote, contiguity, and compactness. *Id*. 15:3-18:1. These are the very criteria that Rule 21, and Section 2 precedent, demand that *Gingles* I experts consider in drawing their maps. *See id*. 11:7-12:2.

Trende's unreliable and untested methodology culminates in his *ipse dixit* opinion. While Mr. Trende's approach could result in numbers to compare the compactness of districts, he uses

---

[7] While Trende attempted to argue that, until recently, his novel methodology employed here was impractical due to technological constraints, SOS6 at 2, he admitted that the necessary technology has existed for 20 years, Certified Tr. 12/1/2023 23:9-21.

[8] Mr. Trende also conceded in trial testimony that he has no reason to doubt that the Maptitude-generated compactness scores reported by Mr. Cooper were accurate. *Id.*

only a visual inspection of the figure drawn by his algorithm to opine about whether Mr. Cooper's illustrative districts are compact. *Id*. 8:15-9:13. He admitted that relying on a purely visual inspection relied on a judgment call on his part with which a finder of fact could disagree. *Id*. 10:18-11:6; *see also id*. 9:14-18. The Court should discount this "opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Further, Trende's conclusory opinion encroaches on the Court's role. "The use of any eyeball test to assess irregularities . . . is necessarily a matter for the factfinder." *Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 5674599, at *11 (N.D. Ga. July 17, 2023) (internal quotation marks omitted).

Defendants next sought to undermine Mr. Cooper's compliance with *Gingles* I through the testimony of Dr. Douglas Johnson. After the Court excluded Dr. Johnson's speculative commentary on Mr. Cooper's subjective intent, *see* ECF No. 174 at 5-11, Dr. Johnson purported to offer opinions about whether Mr. Cooper's maps objectively complied with any traditional redistricting principle other than race. But his conclusion—that the only explanation that consistently lines up with Mr. Cooper's map was race, and not *any* traditional redistricting criteria (Certified 12/1/23 Tr. 98:23-99:17)—was belied by the evidence.

Dr. Johnson testified that his opinion that Mr. Cooper's new majority-Black illustrative districts were drawn "without any reference" to traditional redistricting criteria was premised on his observation that Mr. Cooper's maps did not line up with any "visible" feature in the figures provided in Dr. Johnson's report, other than race. *Id.* 79:21-22, 106:15-108:14. The problem is: Dr. Johnson admitted that he repeatedly omitted key visible features from his figures that are consistent with Mr. Cooper's maps.

For example, Dr. Johnson admitted: (a) one redistricting criterion prescribed by the

13

Louisiana Legislature was to keep precincts (as reflected in VTDs) whole, to the extent practicable, *id.* 113:19-114:4, 122:19-123:11; (b) Mr. Cooper stated in his report that following precinct lines, to the extent practicable, was a traditional redistricting factor that drove his drawing of the maps, *id.* 114:5-22; (c) Dr. Johnson did not depict precinct lines in any figures in his report*, id.* 121:4-7; and (d) in each area of the map where Dr. Johnson criticized the lines as zigging and zagging without reference to any traditional redistricting criteria, Dr. Johnson did not rule out that Mr. Cooper was tracking the borders of a precinct line, *id.* 121:4-122:3. Indeed, Dr. Johnson actually admitted that he had "no reason to think [Mr. Cooper] wasn't following precinct lines." *Id.* 122:2-3, 136:19-137:4; *see also id.* 118:1.[9]

Sometimes, Dr. Johnson stated conclusions that ignored even the features that *were visible* in his map. For example, he asserted that Illustrative SD 38 was drawn "without any reference" to "major roads" or "clear visible features," *id.* 106:15-21, but admitted on cross that his own figure does show multiple places where the district follows major roads and the borders of the airport, *id.* 111:25-113:13. Likewise, Dr. Johnson asserted that each illustrative district in the figure in his report depicting the Baton Rouge area is drawn without regard to major roads, but admitted the border between majority-Black Illustrative HD 68 and 69 is Airline Highway. *Id.* 146:10-148:11.

Dr. Johnson's two other opinions have no bearing on whether Mr. Cooper's illustrative

---

[9] Other examples abound: Dr. Johnson offered the opinion that Mr. Cooper's lines were drawn without reference to city borders, but his figure displayed the borders of only one city (Central) that the illustrative map splits, and that the enacted map keeps mostly but not entirely whole. Certified 12/1/23 Tr. 134:1-18, 137:5-140:19. Dr. Johnson's figure did not show that the illustrative map keeps two other neighboring cities (Baker and Merrydale) whole that the enacted map splits, *id.* 141:13-143:7, or that the city the enacted map kept mostly whole had a BVAP of 10.94%, while the cities that the illustrative map kept whole had BVAPs of 80.80% and 94.73%. *Id.* 140:20-146:7. (Dr. Johnson agreed that, when he has to choose between dividing one of two communities of interest in his own experience drawing maps, he tries to make sure that the community he is dividing is not one of the ones that is heavily made up of a protected class. *Id.*) Similarly, when cross examined about the illustrative districts in Calcasieu Parish, Dr. Johnson similarly could not rule out that Mr. Cooper had prioritized keeping districts within parish boundaries—yet another traditional redistricting factor. *Id.* 130:12-131:21. In other figures, Dr. Johnson omitted features like water, bridges, and islands (and then proceeded to criticize a line that connected the island with the only land to which it was attached via bridge). *Id.* 129:15-25.

maps complied with *Gingles* I. First, Dr. Johnson suggested that because of the Census Bureau's introduction of a new differential privacy process, the Court should be wary of Mr. Cooper's reliance on the Census data to show that his districts had BVAPs of greater than 50%. Dr. Johnson testified that he did not know the error rate introduced by differential privacy, and that the only number that the Census Bureau has offered is a "ballpark" 1% margin of error. *Id.* 152:13-19, 153:2-12. But Dr. Johnson admitted that, even before differential privacy was introduced: "the Census isn't accurate." *Id.* 151:23-152:6. For example, as both Dr. Johnson and the Supreme Court have acknowledged, the margin of error created by overcounting and undercounting of Census data creates margins of error far larger than one percent. *Id.* 153:13-23; *see also Wisconsin v. City of New York*, 517 U.S. 1, 6-7 (1996); *Gaffney v. Cummings*, 412 U.S. 735, 746 n.10 (1973); *Kirkpatrick v. Preisler*, 394 U.S. 526, 540 n.3 (1969) (Fortas, J., concurring). But despite these longstanding inaccuracies in the Census data, Dr. Johnson agreed that he relies on Census data when drawing his maps because it is the "best available data." Certified 12/1/23 Tr. 154:5-15. For that very reason, the Supreme Court has already concluded that, while any population standard in the redistricting context "involves a certain artificiality," "using the best census data available" avoids the "high degree of arbitrariness" that would come with setting a different standard that attempted to account for deviations based on Census errors. *Karcher v. Daggett*, 462 U.S. 725, 731-32 (1983). The Supreme Court has consistently approved map drawers' reliance on the numbers that the Census Bureau produces—even, for example, in the face of inaccuracies that were estimated to misstate the Black population by more than seven percent. *Gaffney*, 412 U.S. at 745-46 & n.10. Nothing about the new differential privacy process warrants different treatment of the perennially imperfect Census data.

Second, Dr. Johnson's so-called "sensitivity analysis" in his report (LDTX51 at 38-42) does

not undercut Mr. Cooper's work. All this section of Dr. Johnson's report does is: (a) restate the BVAP of each of Mr. Cooper's majority-Black illustrative districts, and then (b) compare those BVAPs to two hypothetical "real-world 'effective' percentage[s]" that he seems to have picked at random. *Id.*; *see also* Certified 12/1/23 Tr. 157:21-158:3 ("You can use whatever hypothetical number you wish and just look at the chart to see how many districts would fall above or below those hypothetical lines."). Dr. Johnson admitted that he did not attempt to calculate the actual effectiveness percentage of any district, nor did he even review the report of the expert in the case who did (Dr. Lisa Handley). Certified 12/1/23 Tr. 157:8-158:23. There is nothing useful about stating that Mr. Cooper's districts might not be effective if the hypothetical effectiveness percentage happened to be higher than the BVAP of those districts.

The testimony and analysis of Dr. Michael Barber also fails to support the conclusion that race predominated in Mr. Cooper's illustrative maps. Dr. Barber conceded that his simulations analysis, which purported to compare Mr. Cooper's maps to a representative sample of maps created with "race-neutral" redistricting criteria, are "only the beginning of the investigation" of race as a factor in a redistricting map and show at most that race was a consideration. SOS4 at 5; Certified 12/4/23 AM Tr. 55:9-12. Of course, "Section 2 itself demands consideration of race," because "the question whether additional majority-minority districts can be drawn . . . involves a quintessentially race-conscious calculus." *Milligan*, 599 U.S. at 30-31 (cleaned up). And Mr. Cooper has candidly acknowledged that he considered race in drawing his illustrative maps. Certified 11/29/23 AM Tr. 18:20-19:16. In other words, Dr. Barber expends considerable energy to establish the unremarkable fact that race played a role in Mr. Cooper's maps, as it did in "every single illustrative map ever adduced at the first step of *Gingles*." *Milligan*, 599 U.S. at 33. Furthermore, insofar as Dr. Barber offers a comparison of Mr. Cooper's maps to a "benchmark . . .

map drawn without any consideration of race," SOS1 at 14, the Supreme Court has rejected the notion that a state's enacted map or an illustrative map must compare favorably to a "race-neutral benchmark."[10] *Milligan*, 599 U.S. at 24; *see also Robinson*, 84 F.4th at 592-93. Thus, his opinions are irrelevant to evaluating Plaintiffs' satisfaction of *Gingles* I.

In addition to being neither helpful nor relevant, Dr. Barber's simulations were flawed in both design and execution. Plaintiffs' expert Dr. Cory McCartan explained that Dr. Barber failed to perform the most basic quality assurance steps in his first set of simulations, rendering them useless for drawing any conclusions about the illustrative maps. Certified 12/5/23, Tr. 127:19-23; 141:16-20; 132:20-25; 137:15-138:14; *see also* PL135. In response to this critique, Dr. Barber attempted a second set of simulations. While Dr. Barber corrected the quality assurance problems, he did not address Dr. McCartan's more fundamental substantive critiques of his methodology. For example, he again performed no analysis to evaluate the strength of the various redistricting constraints he applied or their impact on the resulting sample, and he did not address Dr. McCartan's critique that "one set of simulations is never going to be enough to establish that one factor dominates or overwhelms the other factors because fundamentally that's about factors playing against each other." Certified 12/5/23, Tr. 127:3-7; 157:24-158:8; 145:22-148:9. As a result, Dr. Barber's simulations provide insufficient evidence to answer the question he claimed to be trying to address: how large a role race played in Mr. Cooper's illustrative map. *See* Certified 12/5/23, Tr. 157:18-158:8. Indeed, Dr. Barber conceded many of the limitations highlighted by Dr. McCartan. On cross examination, Dr. Barber stated that it would be "an impossible task" to include

---

[10] At trial, Mr. Farr misrepresented the brief filed by the Harvard Election Law Clinic, which articulated support for the use of simulations in racial gerrymandering cases under the Fourteenth Amendment, but explicitly noted that the Supreme Court has ruled that simulations "ha[ve] no place in racial-vote-dilution cases," and discussed the differences between the two claims. Amicus Brief of Jowei Chen et al., *Alexander v. South Carolina*, No. 22-807, available at docket link.

all non-racial criteria a map maker considered in a simulation. Certified 12/4/23 AM Tr. 54:5-21.[11]

Further, Dr. Barber's regional analysis is neither credible nor reliable. That analysis amounted to cherry-picking redistricting metrics on which Mr. Cooper's maps scored lower than the enacted maps and ignoring all those on which Mr. Cooper's maps were superior. For example, in his analysis of Mr. Cooper's Illustrative SD 19, Dr. Barber opined that no factor other than race would explain the decision to split St. Charles Parish, but he overlooked that the illustrative map healed the enacted map's split of neighboring St. John the Baptist Parish. Certified 12/4/23 AM Tr. 66:1-9, 66:19-67:14. Likewise, Dr. Barber emphasized compactness scores in his analysis of the Caddo/Bossier region, where Mr. Cooper's Illustrative SD 38 was less compact compared to the enacted map, but he ignored compactness scores in the Baton Rouge area, where Illustrative SD 17 was significantly more compact than Enacted SD 17. *Compare id.* 64:24-65:2, *with id.* 71:17-19, and PL55 at 2, *with* PL54 at 1.[12]

Dr. Barber's focus on core retention in his regional analysis is also misplaced. The Supreme Court "has never held that a State's adherence to a previously used districting plan can defeat a § 2 claim. If that were the rule, a State could immunize from challenge a new racially discriminatory redistricting plan simply by claiming that it resembled an old racially discriminatory plan. That is not the law." *Milligan*, 599 U.S. at 22. Dr. Barber's (and Dr. Johnson's and Dr. Murray's) use of maps showing the racial composition of precincts (or census blocks or block groups) included or excluded from Mr. Cooper's illustrative districts (again, selectively), does nothing more than show

---

[11] Dr. Barber further conceded that he had not included in his simulations two key criteria that Mr. Cooper had considered: communities of interest and avoiding incumbent pairings. Dr. Barber's failure to include in his simulations criteria that played a significant role in the plans produced by both the Legislature and Mr. Cooper renders his simulations useless for isolating the impact of race in the illustrative maps.

[12] Dr. Barber's explanations for his focus on different metrics in different areas were not credible. *See, e.g.*, Certified 12/4/23 Tr. 64:21-65:6, 73:5-22 (offering contrived account of differential treatment of districts in Calcasieu and Caddo/Bossier Parishes). And his responses during cross for ignoring metrics on which Mr. Cooper's maps outperformed the enacted map were strained and evasive.

that, to create majority-Black districts where they did not previously exist, Mr. Cooper had to add geographically compact Black neighborhoods to those districts. As Justice Kavanaugh explained in his *Milligan* concurrence, "*Gingles* requires the creation of a majority-minority district only when, among other things, a State's redistricting map cracks or packs a large and 'geographically compact' minority population." 599 U.S. at 43 (Kavanaugh, J., concurring). The only way to create a majority-minority district when a map packs or cracks the minority population is moving the packed or cracked population to a new majority-minority district.

At bottom, Dr. Barber's regional analysis supports exactly the opposite conclusion from the one Defendants offered it for: It shows that Mr. Cooper balanced many redistricting criteria in each part of the state in which he created new illustrative majority-Black districts, scoring better on some metrics and worse on others in comparison to the enacted maps. It does not show that any one criterion predominated over all the others. And statewide, both his maps as a whole and specifically his new illustrative districts perform as well as or better than the enacted maps.

Defendants next offered Dr. Alan Murray as an expert witness to rebut Mr. Cooper's *Gingles* I analysis. To do this, Dr. Murray utilized four measures of compactness: Reock, Polsby Popper, Area Over Convex Hull, and moment of inertia. Draft 12/44/23 Tr. 143:1-8, 150:2. But Dr. Murray's measurements are unreliable for several reasons. *First*, Dr. Murray testified at trial that the moment of inertia approach has never before been accepted by a Court for consideration in a Section 2 case, and he could not justify why this Court should be the first to do so. *Id.* 195:1-8, 198:16-20. In contrast, Dr. Murray confirmed that the Reock and Polsby Popper compactness scores utilized by Mr. Cooper were industry standard. *Id.* 201:2-6; 215:11-18. *Second*, Dr. Murray's analysis is otherwise unreliable and irrelevant to this litigation. *See* Fed. R. Civ. P. 702(a); *see also Daubert*, 509 U.S. at 591. Rather than use a proven methodology, Dr. Murray

19

implemented a test that ignores traditional redistricting principles and Joint Rule 21's requirements: indeed, Dr. Murray admitted he had no knowledge of Joint Rule 21 or the traditional redistricting principles used by other experts in assessing compactness under *Gingles* I. *See id*. 215:4-10. Dr. Murray's testimony should be disregarded.

**III.     Plaintiffs' Proof at Trial Established *Gingles* II and III.**

**A.     The trial record confirms voting in Louisiana is racially polarized.**

*Gingles* II and III address whether voting is racially polarized. *See Gingles*, 478 U.S. at 52-56; *Milligan*, 599 U.S. at 18-19. The unrebutted evidence presented at trial demonstrated that *Gingles* II and III have been satisfied. Plaintiffs' expert, Dr. Lisa Handley, employed three separate localized analyses of voting patterns in the areas immediately surrounding Plaintiffs' proposed illustrative districts. *See* Draft 11/28/23 Tr. 125:15-127:8. These analyses constitute the "district-specific" analyses required by *Gingles.* 478 U.S. at 103.

Dr. Handley first used ecological inference ("EI")[13] to analyze voting patterns by race in seven areas of interest. PL1 at 7-8; Draft 11/28/23 Tr. 14:1-15:24. This method is accepted by Courts to prove the second and third *Gingles* preconditions. *See, e.g.*, *Patino v. City of Pasadena*, 230 F.Supp.3d 667, 691 (S.D. Tex. 2017); *United States v. Vill. of Port Chester*, 704 F.Supp.2d 411, 427, 441 (S.D.N.Y. 2010) (noting that "[t]he methods employed by Dr. Handley" including ecological inference analysis "have been accepted by numerous courts in voting rights cases"). These seven areas included parishes that overlap geographically with a new proposed majority-Black district in Mr. Cooper's illustrative maps, such that they contain the areas where the potential voters for the new districts live. Draft 11/28/23 Tr. 15:20-24, 68:8-16, 126:19-127:8.

---

[13] As addressed, *see* ECF Nos. 162 & 171, and confirmed by her trial testimony, Dr. Handley implemented a reliable and peer reviewed methodology to allocate absentee and early votes into the database used for her EI analysis. Draft 11/28/2023 Tr. 23:2-22, 59:25-62:7, 65:18-66:11, 127:11-23. Dr. Handley confirmed this allocation did not create any bias through independent analysis. *See id.*; PL16, 17, 18, & 19; ECF No. 162 at n.4.

Dr. Handley evaluated election results from 16 different statewide elections[14] within these areas.[15] Dr. Handley testified that "nearly every single contest that [she] looked at was racially polarized." Draft 11/28/23 Tr. 17:9-10; PL1, 2, 3, 4, 5, 6, 7, 8, & 9. Based on her analysis, Dr. Handley concluded that "black voters are very cohesive in the seven areas." Draft 11/28/23 Tr. 16:13-15. Courts have found *Gingles* II can be satisfied at levels of cohesion as low as 51%. *See e.g.*, *Patino,* 230 F.Supp.3d at 710-11; *Fabela v. City of Farmers Branch*, No. 3:10-CV-1425-D, 2012 WL 3135545, at \*11 (N.D. Tex. Aug. 2, 2012). Even Defendants' expert acknowledged minority voters can be cohesive at levels below 75% in multi-candidate races. Certified 11/30/23 Tr. 160:19-23; *see also Lopez v. Abbott*, 339 F.Supp.3d 589, 609 (S.D. Tex. 2018).

Dr. Handley also presented evidence that "white voters do typically vote as a block to defeat the black preferred candidate." Draft 11/28/23 Tr. 16:16-23. The average white voter support for the Black-preferred candidate found by Dr. Handley of only 12.6% across 16 elections, *see* PL1 at Table 3, is more than sufficient to satisfy *Gingles* III. *See, e.g*., *Gingles*, 478 U.S. at 56 (holding that there is no specific threshold percentage required to demonstrate bloc voting).

Dr. Handley also analyzed 21 state legislative elections overlapping with the seven areas of interest and found consistently racially polarized voting in all but one of these elections. PL1 at 11; PL10 & 11; Draft 11/28/23 Tr. 32:13-33:25. The "black preferred candidate actually won" in

---

[14] Dr. Handley chose these statewide elections because they were biracial races, which both she and Dr. Alford agree are "most probative" for determining racial polarization. Draft 11/28/23 Tr. 24:18-24; Certified 11/30/23 Tr. 140:13-16. Courts in the Fifth Circuit have consistently agreed. *See, e.g., Magnolia Bar Ass'n, Inc*. *v. Lee*, 994 F.2d 1143, 1149 (5th Cir. 1993); *E. Jefferson Coal. for Leadership & Dev. v. Par. of Jefferson*, 926 F.2d 487, 493 (5th Cir. 1991).

[15] Dr. Handley only included in her EI algorithms the election data for the voters who live within each of these seven different areas, and she looked at each different area separately. *See* PL1 at 8-9; PL3, 4,5, 6, 7, 8, & 9. While these areas of interest are not specific election districts, courts are flexible in allowing the specificity of the RPV analysis to suit the available data. *See Westwego Citizens for Better Gov't v. City of Westwego*, 872 F.2d 1201, 1209 n.11 (5th Cir. 1989) (citations omitted)*. Courts have relied on this exact type of analysis from Dr. Handley in Section 2 cases*. See Alpha Phi Alpha Fraternity, Inc. v. Raffensperger*, No. 1:21-CV-5337-SCJ, 2023 WL 7037537, at \*39-40, 114 (N.D. Ga. Oct. 26, 2023).

majority-Black districts while "in the districts that were not majority black in composition, the minority preferred candidates almost always lost." Draft 11/28/23 Tr. 34:1-12.

Dr. Handley concluded that the consistently racially polarized voting in the areas that she analyzed "substantially impedes" the ability of Black voters to elect candidates of their choice to the Louisiana Legislature in these areas unless districts are drawn to provide Black voters with this opportunity. PL1 at 33; Draft 11/28/23 Tr. 34:13-18.

Lastly, Dr. Handley conducted a district-specific recompiled elections analysis to evaluate whether districts in the enacted and illustrative maps would provide Black voters an opportunity to elect their candidates of choice. Draft 11/28/23 Tr. 35:25-37:8.[16] She selected districts for three "clusters" of Senate districts and five "clusters" of House districts by looking at the new majority-Black districts in Plaintiffs' illustrative maps and the corresponding districts in the enacted maps. *Id.* 35:25-36:15. She then looked individually at the performance of each district in the cluster in the enacted and illustrative maps. PL1 at 12-16. In each cluster, the illustrative maps provided at least one additional district, as compared to the enacted maps, that provided Black voters an opportunity to elect their candidates of choice. Draft 11/28/23 Tr. 43:19-54:6. Dr. Handley concluded in each of the eight clusters, the only districts that provided Black voters with an opportunity to elect their chosen candidates were districts with at least a 50% Black voting age population. PL1 at 16. Dr. Handley also calculated effectiveness scores for every district in either set of maps with a BVAP greater than 25%. Draft 11/28/23 Tr. 54:7-13. "[W]ith one exception, no districts were effective that were under 50 percent [BVAP]." *Id.* 54:13-25.

Dr. Handley concluded that "[i]n the seven areas of interest that [she] evaluated for this case, [with one] exception a majority-black district is necessary to elect black preferred candidates

---

[16] Courts have accepted and relied upon recompiled elections analysis as a form of district-specific analysis. *See, e.g.*, *Robinson*, 605 F.Supp.3d. at 803; *Alpha Phi Alpha Fraternity Inc.,* 2023 WL 7037537, at *40.

to the state legislature." *Id.* 55:9-13; *see also id.* 54:8-24; *infra* n.18. There is an abundance of evidence showing that Black voters in Louisiana are "politically cohesive," and that "the white majority typically votes in a bloc to defeat the minority candidate," establishing *Gingles* II and III. *See Lopez*, 339 F.Supp.3d at 610.

> **B.    Evidence from Defendants' expert Dr. Lewis is either irrelevant or supports Plaintiffs' vote dilution claims.**

Dr. Lewis testified that it might be possible to draw state legislative districts where the white crossover voting is sufficient to allow Black-preferred candidates to prevail in a district without a majority BVAP. *See, e.g.*, Certified 12/5/23 Tr. 5:22-18:1. But "[i]llustrative districts that could perform with a BVAP of less than 50 percent with white crossover voting are not the focus of the third *Gingles* precondition analysis." *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023). "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature." *Id.* at 596 (citing *Robinson* II, 37 F.4th at 226). And both the Supreme Court and Fifth Circuit have held that the third *Gingles* precondition can be met despite the presence of white crossover voting. *Id.* at 597 (citing *Milligan*, 599 U.S. at 22-23). Evidence about potential districts that could be drawn is not relevant to whether Plaintiffs have satisfied the third *Gingles* precondition.[17] Furthermore, the focus on hypothetical opportunity districts is absurd, given that no House or Senate districts in the *enacted* maps provide any opportunities for Black voters to elect their candidates of choice other than districts with a majority BVAP. Draft 11/28/23 Tr. 54:14-25.[18]

Defendants' assertion that there are additional opportunity districts within Plaintiffs' areas

---

[17] Dr. Lewis admitted that his percent needed to win or threshold BVAP calculations for the current illustrative districts would need to be recalculated if the district boundaries were changed. Certified 12/5/23 Tr. 35:25-37:21.
[18] Enacted HD 91, which is not within Plaintiffs' areas of interest and is not majority-white, is the only current legislative district in the state without a majority BVAP where Black-preferred candidates can get elected. *See* PL1 at n.18.

of interest in the enacted maps also misses the mark. *See* ECF No. 177 at 94-95 (Defs.' PFOF/COL); *see also* LDTX52, Table 1. Defendants did not present any evidence that additional opportunity districts *actually exist* in the enacted maps.[19] Defendants' claims are based solely on evidence from Dr. Lewis that, in a few districts without majority BVAP, the Black-preferred candidate could advance[20]—not that the Black-preferred candidates could ultimately win elections. *See* LDTX52, Table 1; *see also* Certified 12/5/23 Tr. 29:18-22. Looking at Dr. Lewis's own analysis of performance (which he refers to as win rates), in all of his reference districts, the Black-preferred candidate does not come close to usually prevailing in the final elections. *See* LDTX52, Table 2 and Table 4. As Dr. Lewis admitted, in order to determine who "succeed[ed]," it is necessary to look at Tables 2 and 4 of his report, as those tables only account for when the Black preferred candidate *actually wins* the elections. Certified 12/5/23 Tr. 34:21-35:9. As Dr. Handley explained, Tables 2 and 4 are the more relevant win rates, because "[y]ou still have to win the election in the runoff to actually win the seat." *See* Certified 12/5/23 Tr. 166:7-25. And Dr. Lewis testified that he was unaware of any districts without a majority BVAP where he calculated a win rate over 30% in his Table 2 or Table 4. Certified 12/5/23 Tr. 39:25-40:7.[21] Furthermore, Dr.

---

[19] In support of this argument, Defendants cited case law for the proposition that when the minority-preferred candidate can succeed with the "vicinity of 50%" of the time, *Gingles* III has not been satisfied. *See Morris v. City of Houston*, 894 F.Supp. 1062, 1065-67 (S.D. Tex. 1995); *Clarke v. City of Cincinnati*, 40 F.3d 807, 809, 812-813 (6th Cir. 1994). But those cases do not address single district elections—the challenged systems involved citywide elections using proportional representation, and as such, they are inapposite to the current case, which involves single districts where only one winner is elected from each district.

[20] Relying upon Dr. Lewis's win rates from Table 1, Defendants assert that Enacted SD 38, SD 8, SD 19, HD 7, HD 60, HD 68, HD 69, and HD 70 are potentially opportunity districts. ECF No. 177 at 94-95 (Defs.' PFOF/COL); *see also* LDTX52 at Table 1. Defendants also assert that Enacted SD 17, HD 64, HD 72 and HD 21 are potentially opportunity districts, but Dr. Lewis's report does not provide any win rates for these enacted districts, nor was any other relevant evidence presented at trial to show that these additional districts are opportunity districts. None of these districts in the enacted map has a majority BVAP.

[21] None of the win rates provided for all enacted districts identified by Defendants in Tables 2 and 4 of Dr. Lewis's report have win rates over 30% other than HD 60, which has a win rate of only 36% in Table 2. *See* LDTX52. A win rate of only 36% is not an effective opportunity district.

Handley presented clear evidence that no districts in the enacted map that provide Black voters the opportunity to elect their candidate of choice other than those districts with majority BVAP, save for the one exception in Enacted HD 91 (*supra* n.18). Draft 11/28/23 Tr. 54:25-55:13; *see also* PL1 at 16-33; PL257 (showing win rates from Dr. Lewis's report as compared to effectiveness scores in Dr. Handley's report). Plaintiffs have satisfied the third *Gingles* precondition.

## IV.    Plaintiffs' Proof at Trial Established a Section 2 Violation under the Totality of the Circumstances.

The ultimate question in this case is whether the "totality of the circumstances" reveals that Black Louisianans have "less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *See Gingles*, 478 U.S. at 43; *see also Bartlett v. Strickland*, 556 U.S. 1, 21 (2009).[22] The trial record leaves no room for doubt. Plaintiffs' expert Dr. Blakeslee Gilpin provided robust testimony to support a finding of liability on Senate Factors 1 and 3. Certified 11/28/23 PM Tr. 83:14-104:9. The testimony of Dr. Handley and Dr. Marvin P. King, Jr. demonstrated that Senate Factor 2 is met. Certified 12/5/23 Tr. 59:24-86:5, 177:7-188:2; *see supra* Section III.A. Dr. Traci Burch testified as to Senate Factors 5, 6, 7, 8, and 9. Certified 11/29/23 PM Tr. 10:16-11:2. And fact witnesses echoed the experiences of discrimination that undergird the patterns of inequality shown in the experts' analysis. Defendants offered no expert or other substantive evidence to counterbalance Plaintiffs' showing at trial.

---

[22] Ignoring the *Gingles* precedent of the Senate Factors analysis in place since 1986, Defendants argue that voting in Louisiana has changed in the last 40 years because the percentage of Black candidates getting elected has increased. But Defendants presented no evidence of the increase in Black candidates elected in Louisiana. Defendants did repeatedly ask Dr. Handley about an article she co-authored addressing increased success of Black candidates in some election districts per their increased success with white crossover voting. *See, e.g*, Draft 11/28/23 Tr. 106:1-8; SOS36. But the increases in success of Black candidates addressed in the article are n districts with BVAP between 40% and 50%. *See* Draft 11/28/23 Tr. 124:12-125:1; SOS36. This article, therefore, is irrelevant here, as there are almost no such legislative districts in Louisiana. *See* Draft 11/28/23 Tr. 125:2-10. This is another misguided argument from Defendants disputing Plaintiffs' strong claims of vote dilution based on hypothetical districts that might be possible in Louisiana as opposed to addressing the actual districts of the enacted state legislative maps.

### A.    Senate Factor 1

Under Senate Factor 1, the court analyzes "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process." *Gingles*, 478 U.S. at 36-37. Prior caselaw recognizes Louisiana's extensive history of racial discrimination against Black voters.[23] Indeed, Legislative Intervenors have conceded that Louisiana has a "sordid history of discrimination." *Robinson*, 605 F.Supp.3d at 846.

Plaintiffs' expert Dr. Gilpin testified to the long history of official discrimination against Black Louisianans at the ballot box, including through violence by white Louisianans against Black voters, and a series of legal mechanisms designed to prevent Black Louisianans from voting. Certified 11/28/23 PM Tr. 85:24-94:25. Dr. Gilpin concluded that "the same schemes to prevent Black Louisianans from voting are attempted over and over again." Certified 11/28/23 PM Tr. 95:14-16. Discriminatory and dilutive patterns still frame modern voting access across Louisiana. *See, e.g.*, *Robinson*, 605 F.Supp.3d at 847. Following passage of the VRA, Louisiana concocted ways to exclude Black Louisianans from the political process, replicating the "basic patterns" of disenfranchisement before its passage. Certified 11/28/23 PM Tr. 93:9-21; *see Major v. Treen*, 574 F.Supp. 325 (E.D. La. 1983). For example, the "recurring" patterns of polling place changes with discriminatory effects on Black communities cited in Dr. Gilpin's report (PL124 at 34) were echoed in Dr. Nairne's testimony about the frustration and confusion caused by her voting location moving multiple times in recent years. Certified 11/27/23 Tr. 31:14-19. And Dr. Gilpin's discussion of voting barriers for Louisiana's record-setting and predominantly Black formerly

---

[23] *See, e.g.*, *Robinson*, 605 F.Supp.3d at 846; *Terrebonne Par. Branch NAACP v. Jindal*, 74 F.Supp.3d 395, 440 (M.D. La. 2017), *rev'd sub nom. Fusilier v. Landry*, 963 F.3d 447 (5th Cir. 2020); *Major v. Treen*, 574 F.Supp. 325, 339-40 (E.D. La. 1983); *Chisom v. Edwards*, 690 F.Supp. 1524, 1534 (E.D. La.), *vacated sub nom. Chisom v. Roemer*, 853 F.2d 1186 (5th Cir. 1988).

incarcerated population (PL124 at 50) were reinforced by Dr. Washington, who discussed how her Registrar of Voters' Office shared space with the Sheriff's Office. Certified 11/27/23 Tr. 102:11-13. Drawing on her years as a social worker engaging with people impacted by criminal law enforcement, she said she feared "[t]here are scores of people who would just not go near the Voter Registration Office if the Sheriff's Office is right there on the same floor." *Id*.

Dr. Washington also spoke to features of the absentee-by-mail voting process that, while racially neutral on their face, create clear opportunities to enhance disparities in Black voters' access. When she received a text message notification on the eve of the November 2023 election notifying her that her absentee-by-mail ballot was deficient, she had to cancel her plans, drive to the Registrar of Voters' Office, park in a paid garage, navigate City Hall, pass the Sheriff's Office, and fix the error on her ballot envelope—all because she failed to write her mother's maiden name. Certified 11/27/23 Tr. 98:18-103:15. Similar experiences could disenfranchise Black voters without means for cell phones or transportation, who have had negative interactions with law enforcement, or who are disabled. *Id*. 103:16-105:4; *see also infra* Section IV.D (summarizing Dr. Burch's expert analysis about how socioeconomic disparities and law enforcement discrimination lead to discrimination against Black voters).

### B.    Senate Factor 2

Factor 2 assesses "the extent to which voting in the elections of the state or political subdivision is racially polarized." *Gingles*, 478 U.S. at 36-37. In the Fifth Circuit, courts balance the strength of plaintiffs' "evidence of racial bias" with the defendants' "evidence of partisan politics" when deciding whether race rather than partisanship explains polarization. *Lopez*, 339 F.Supp.3d at 604 (citing *LULAC v. Clements*, 999 F.2d 831, 860-61 (5th Cir. 1993) (en banc)). To the extent party preference is relevant to the Section 2 inquiry, it comes in the analysis of the "totality of the circumstances," not in the assessment of racially polarized voting under *Gingles* II

and III. *Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996) ("A defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors under the totality of the circumstances standard.") (cleaned up).

Plaintiffs presented extensive evidence that voting in Louisiana is racially polarized. *Supra* Section III.A. In response, Defendants presented the testimony of Dr. John Alford, who claimed that voting in Louisiana is politically—not racially—polarized. *See* Certified 11/30/23 Tr. 154:22-155:18. But Dr. Handley and Dr. Alford agree that Black and white voters in Louisiana "are voting differently," Draft 11/30/23 Tr. 16:24-17:10; Certified 11/30/23 151:12-18, and as Dr. Alford noted, with little crossover voting between the two groups. Certified 11/30/23 Tr. 152:16-24. They both agree that the seven biracial, two-candidate races analyzed showed Black voters cohesively supporting Black candidates, and white voters "overwhelmingly supporting the white Republican" as a bloc to defeat the Black preferred candidates. *See id.* at 148:6-21. In no election analyzed by either expert did a Black Republican receive more than 5% of the white vote. Dr. Alford maintained that, to establish racially polarized voting, it is necessary to prove that voters support white Democratic and Black Democratic candidates unequally. Certified 12/5/23 Tr. 178:14-179:5. But this definition of racially polarized voting is incorrect—an election contest is racially "polarized if Black and white voters vote differently such that, considered separately, Black voters would have elected a different candidate than white voters." *Id.* 178:2-7.

Even under Dr. Alford's approach, the evidence of racial polarization becomes crystal clear when looking at how Black and white voters offered different levels of support for Black and white candidates of the same political party. Rebutting Dr. Alford's position, Dr. Handley presented evidence establishing that co-partisan (voters of the same political party) are voting differently depending on the race of the candidate. The differences are small but extremely consistent.

Looking at Dr. Alford's own data, Dr. Handley concluded that "very consistent[ly] . . . white voters gave more support to white Democrats than the Black Democrats." *Id.* 180:15-181:12; 182:9-183:8; *see also* PL13 & PL14. Not in a single evaluated election did white voters who were voting for a Democrat support Black and white Democrats equally. Certified 12/5/23 Tr. 181:9-12; *see also* PL13 & PL14. Dr. Handley also did an additional EI analysis further establishing that, even among registered Democrats, white voters are supporting white Democratic candidates more than Black Democratic candidates. Dr. Handley explained that white voters in Louisiana supported the white Democratic candidate, John Bel Edwards, at higher rates both times he ran than they supported a Black Democratic candidate running in the two-candidate run-offs at the same time. Certified 12/5/23 Tr. 186:11-187:22; *see also* PL15.

Plaintiffs' expert Dr. Marvin P. King, Jr. also testified to this end. Dr. King rebutted Dr. Alford's theories of political polarization by demonstrating the existence of racial polarization among co-partisans. Dr. King conducted an EI analysis of the votes cast by registered Democrats in Louisiana's 2022 U.S. Senate election, which had a viable white Democratic candidate (Luke Mixon) and a viable Black Democratic candidate (Gary Chambers, Jr.). *See* Certified 12/5/23 Tr. 61:6-62:22; PL133 at 3-6. Dr. King's EI analysis revealed that white registered Democrats tended to vote for the white Democrat and that Black registered Democrats tended to vote for the Black Democrat at a nearly 2:1 ratio. Certified 12/5/23 Tr. 66:2-13; *see also* PL133 at 4-5. Review of Dr. Alford's own data—which analyzed the votes cast by all voters, not just registered Democrats— supported Dr. King's conclusions. *See* Certified 12/5/23 Tr. 66:24-69:2; *see also* PL133 at 7. Dr. King also pointed to concepts recognized by political scientists studying how race impacts voting behavior—social desirability bias and racial resentment—to explain why racial polarization in Louisiana's elections persists, why that reality may not be reflected in the opinion polls on

interracial marriage cited by Dr. Alford, and how it impacts voting behavior. Certified 12/5/23 Tr. 76:22-78:23, 79:22-82:5, 82:18-83:23; PL133 at 8-11. Defendants presented no evidence to rebut Dr. King's EI analysis, nor to rebut Dr. King's discussions of racism and its impact on elections and voting behavior.

Plaintiffs' expert Dr. Traci Burch also offered evidence rebutting Dr. Alford's testimony about racial attitudes. Certified 11/29/23 PM Tr. 71:12-72:16. She discussed the historical and social science context of why racial attitudes are more likely increasing polarization than ideological shifts or other policy preferences, which helps to explain the persistence of racially polarized voting in Louisiana. PL128. Her analysis demonstrated that "candidate choice is shaped by racial identity and racial attitudes in the electorate. And that relationship has been getting stronger in recent years." Certified 11/29/23 PM Tr. 72:18-73:6.

C.    Senate Factor 3

Factor 3 measures "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group." *Gingles*, 478 U.S. at 37. Louisiana's election system is defined by multiple practices and procedures that enhance disparities in political participation for Black voters, including features explicitly mentioned in the non-exhaustive list of "enhancing factors" in the Senate Report cited in *Gingles*, like anti-single shot voting policies and the majority vote requirements in Louisiana's open primary system. *See* PL124 at 25; *see also* Certified 11/28/23 PM Tr. 90:14-91:18.

 In addition to these factors, several witnesses spoke to features of Louisiana's election administration that create confusion, deter voting, and enhance disparities in voting access in diluted districts. For example, Dr. Nairne spoke to the confusion caused by Louisiana's incessant and decentralized elections. Certified 11/27/23 Tr. 31:23-32:13. State elections are held off of the

federal cycle, in odd-years with October primaries and November runoff elections, as opposed to federal elections in even-years with November primaries and December runoffs. *See*, *e.g.*, *id*. These staggered fall elections do not even capture *all* the elections held in an average year: Commissioner of Elections Sherri Hadskey testified that seven elections were ultimately scheduled in 2023 and as many as *seventeen* elections have been held in a single year. Draft 12/4/23 Tr. 128:16-129:12. Ms. Ho-Sang confirmed that the incessant calendar of elections fosters a "fatigue around elections" and confusion that strains BVM's mobilization and organizing, and that the Legislature has blocked attempts to streamline elections. Certified 11/27/23 Tr. 189:18-190:23.

### D.     Senate Factor 5

Factor 5 concerns "[t]he extent to which members of the minority group in the state . . . bear the effects of discrimination in such areas as education, employment, and health, which hinder their ability to participate effectively in the political process." *Gingles*, 478 U.S. at 37. Dr. Traci Burch testified that, as a result of Louisiana's long history of discriminating against Black residents, the Black community suffers socioeconomic disparities that impair their ability to participate in the political process. Certified 11/29/23 PM Tr. 11:5-65:23; PL126 at 4-21. Specifically, Black Louisianans suffer disparities in the areas of education, employment, health, housing, and criminal law enforcement. PL126 at 4-21.

*Education*: Dr. Burch's testimony bolstered her conclusion that Louisiana operated a system of separate and unequal public education for white and Black students long after court-ordered integration, and stark patterns of segregation continue to mark contemporary schooling trends, including student test scores. PL126 at 5-6; *see, e.g.*, Certified 11/29/23 PM Tr. 17:1-19:9. Discrimination in contemporary educational access continues to manifest in drastic under-resourcing of predominantly Black schools and underrepresentation of Black people in higher levels of education. Certified 11/29/23 PM Tr. 17:1-19:9. Dr. Burch cited data to connect education

disparities to political participation, demonstrating that higher levels of education are directly correlated with voter registration and participation. *Id.* 14:6-16:24; 105:22-107:8; *see also id.* 19:10-20:21. The interconnectedness of historic and modern educational discrimination was further exemplified in fact witness testimony. Dr. Nairne spoke to her mother's experience leaving Napoleonville for schooling after sixth grade since there were no educational opportunities for Black students in town. Certified 11/27/23 Tr. 22:3-23:12. She compared this reality to the present, when she still observes Black students in her hometown not being able to access the same educational or extracurricular opportunities as their white peers. *Id.* Pastor Harris recounted how the State closed all the schools in his predominately Black community during integration, and now significant numbers of children are dropping out. *Id.* 71:8-17. Rep. Cedric Glover testified to the deficits in funding for HBCUs in Louisiana, as well as shortages at the local level. *Id.* 151:17-22.

*Employment*: Dr. Burch testified to employment disparities across multiple measures and affirmed they can be largely explained by discrimination. Certified 11/29/23 PM Tr. 20:22-24:24; PL126 at 9. Similar observations were reflected in the testimony of fact witnesses. Pastor Harris testified that his community had a high poverty rate because of the lack of access to jobs in the area. Certified 11/27/23 Tr. 71:5-7. Dr. Nairne testified to the challenges she faced securing funding for her start-up businesses while less qualified white applicants secured these opportunities. *Id.* 33:20-34:20. Dr. Burch confirmed that the lack of financial resources translates to limited access to transportation vital to accessing registration and voting sites, and Plaintiffs like Dr. Washington and Dr. Nairne testified to these same transportation barriers in their communities. Certified 11/29/23 PM Tr. 20:22-24:24; Certified 11/27/23 Tr. 32:14-33:7, 104:10-105:4. Moreover, white collar occupations make it easier for people to "develop civic skills," "navigate bureaucracies," and have the "freedom" and "time to take off from work without [losing] or risking

your pay," to vote. Certified 11/29/23 PM Tr. 23:19-24:24. Dr. Burch noted that work can be an important site for political recruitment, which also increases voter turnout. *Id*. Employment and economic opportunity are deeply intertwined with access to the political process.

*Housing*: Racial residential segregation is a persistent feature in areas across Louisiana. Certified 11/29/23 PM Tr. 24:25-27:20; 28:19-29:16. These patterns of segregation persist due to historic discrimination in lending patterns and government policies. *Id*. Racial residential segregation matters in the context of voting because segregated Black areas in Louisiana have less access to public goods that matter for voting, such as polling places and transportation. *Id.* Dr. Burch further cited findings that Black Louisianans face greater challenges in securing support for disaster relief, *id.* 27:21-28:17, and Dr. Nairne testified about the tarps that still drape roofs across her community following Hurricane Ida and a hailstorm in June. Certified 11/27/23 Tr. 25:11-26:3. Like many other Black members of her community, Dr. Nairne lives in an "heir's property," passed down from family. *Id.* 34:21-35:15 This route to homeownership, however, has limited her access to relief funding for the three holes in her roof following the hurricane. *Id*. "[W]hen it rains, it rains inside," she said. *Id*. 35:15-22.

*Health*: Discrimination threatens Black Louisianans' health and lives across multiple measures. Certified 11/29/23 PM Tr. 29:17-33:11. Disease prevalence and mortality rates are higher—and life expectancies are lower—for Black Louisianans than white Louisianans. *Id*. Black Louisianans have less access to insurance and care. *Id.* Dr. Burch confirmed that environmental factors contribute to health disparities and Black people have borne the brunt of disasters and health emergencies, like Katrina and COVID-19. *Id*.; *see also* 107:19-108:1. Today pollution fills the air in predominantly Black communities stretching Cancer Alley, the corridor of chemical plants spanning New Orleans to Baton Rouge. *Id*. Dr. Nairne spoke to the lived realities of these

disparities in her community at the "mouth of Cancer Alley." Certified 11/27/23 Tr. 35:23-36:11. One of her dearest friends and neighbors was uninsured and delayed treatment for pain due to the cost and died within months from Stage 4 cancer. *Id*. "I can't tell you how many funerals I've been to, almost every Saturday," Dr. Nairne said, "Not weddings, but funerals." *Id*. Poor health conditions affect the ability of Black Louisianans to overcome the costs or physical obstacles of voting. Dr. Burch testified that health is an "important predictor of voter [turnout]" because "healthy people are more likely to vote," and sick people have less "time and money to go vote or engage in politics." Certified 11/29/23 PM Tr. 32:9-33:11. Moreover, "impaired cognitive functioning or physical disability" can create further difficulties in voting, resulting in data showing that "people with disabilities are less likely to vote," which can be sometimes explained by problems with polling place accessibility. *Id*. Indeed, health disparities "shaped by government and market policy" have a direct impact on voter participation. *Id*.

*Criminal Justice*: Black Louisianans are disproportionately impacted by criminal law enforcement in Louisiana, where incarceration rates lead the nation. *Id.* 33:13-38:3. This disparity is a result of discrimination in policing, sentencing, and other stages of the justice system dating back to the Reconstruction Era. *Id.*; *see also* PL126 at 19-22. Dr. Gilpin cited estimates that "approximately 80% of the parolees/probationers currently ineligible to vote are African American, compared with about 32% of the population of the state." PL124 at 50. Dr. Burch cited data showing that Black Louisianans are disenfranchised at roughly twice the rate of voters at a statewide level and almost 48,000 Black Louisianans were unable to vote in 2020 due to their felony convictions. Certified 11/29/23 PM Tr. 35:17-38:3. Studies show increased contact with law enforcement also tends to "demobilize voting and make people shy away from participating in politics," especially when seen as unfair. *Id*. This effect was echoed in Dr. Washington's

testimony about the Sheriff's Office being on the same floor as her Registrar of Voter's Office. Certified 11/27/23 Tr. 102:6-14.

### E.    Senate Factor 6

Senate Factor 6 analyzes "whether political campaigns have been characterized by overt or subtle racial appeals." *Gingles*, 478 U.S. at 37. At trial, Dr. Burch provided a framework to understand implicit and explicit appeals, and cited multiple examples of racial appeals in recent and further history, including campaign messaging used by candidates for governor, U.S. Senate, and the state legislature. Certified 11/29/23 PM Tr. 38:5-47:11; *see also* PL126 at 22-25. Multiple fact witnesses also cited racial appeals they witnessed in recent election cycles. For example, Dr. Nairne and Ms. Ho-Sang both referenced one of Senator Kennedy's advertisements during his 2022 reelection campaign, where he evoked images of protests during the Black Lives Matter movement and contended that critics of the police should "call a crackhead" when in need of help instead of police. Certified 11/27/23 Tr. 36:25-40:11; 190:24-191:25. Dr. Nairne also described attacks on Black candidates like Sean Wilson in his 2023 gubernatorial campaign and Davante Lewis during his 2022 Public Service Commissioner campaign that suggested that they were puppets who could not think for themselves. *Id*. Both Ms. Ho-Sang and Dr. Nairne cited recent ads by Governor-Elect Jeff Landry during his 2023 campaign. Ms. Ho-Sang noted an ad with tough on crime messaging that displayed visuals of Black district attorneys but not white peers among other advertisements villainizing "woke" policies and leaders. *Id.* 190:24-191:25. Dr. Nairne similarly cited ads using "woke" as a pejorative. *Id.* 36:25-40:11. Dr. Burch directly cited stereotypes of Black "criminality" and terms like "woke" as examples of modern racial appeals. Certified 11/29/23 PM Tr. 38:17-39:24.

While racial appeals are not only used by candidates of one party or racial group, Dr. Burch noted appeals have the impact of demobilizing Black voters in a way not observed among white

voters. *Id.* 40:18-41:4. The adverse impact on Black voters resonated through fact witness testimony. Rev. Lowe testified that hearing subtle racial appeals sends a clear signal to him that particular elected officials are "not going to represent our interests." Certified 11/27/23 Tr. 62:19-24. Dr. Nairne described racial appeals as "alarming" and said that they made her feel "belittled," "in despair," and treated like "just a laughing matter…not really taken seriously." *Id*. 36:25-40:11.

     **F.**    **Senate Factor 7**

Senate Factor 7 measures "the extent to which members of the minority group have been elected to public office in the jurisdiction." *Gingles*, 478 U.S. at 37. Here, Factor 7 weighs heavily in favor of Plaintiffs for all the reasons detailed in Plaintiffs' Pretrial Findings of Fact, ECF No. 179 at 219-24; cited by the Court in *Robinson*, 605 F.Supp.3d at 845-46; and echoed in Dr. Burch's testimony at trial, Certified 11/29/23 PM Tr. 47:12-50:6. In addition, multiple fact witnesses spoke to the lack of Black candidates even entering the race in their communities or failing to successfully advance in districts that are not majority-Black. *See, e.g*., Certified 11/27/23 Tr. 41:4-22; 106:18-107:4, 139:2-8, 151:4-11, 162:6-10.

     **G.**    **Senate Factor 8**

 Senate Factor 8 investigates "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group." *Gingles*, 478 U.S. at 37. On this factor, Dr. Burch gave extensive testimony that was further echoed by fact witnesses. For example, Dr. Burch cited survey data showing that Black Louisianans do not think elected officials care about them and that more Black voters than white voters doubt that the political process is fair to them. Certified 11/29/23 PM Tr. 52:24-53:20.

Policy outcomes also do not track the specific needs of the Black community and leave Louisiana ranked among the bottom of states across major indicators in quality of life. PL126 at 26; *see also* Certified 11/29/23 PM Tr. 50:8-52:23. Moreover, elected leaders have been dismissive

of the unique strife of Black communities. *See, e.g., id.* (citing Senator Cassidy's dismissive comments about Black maternal mortality rates).

The redistricting process and resulting dilutive districts accentuate the lack of responsiveness Black Louisianans receive from candidates and elected leaders. For example, Black Louisianans publicly expressed negative sentiments about their representation during the redistricting process—including that they wanted increased minority representation in the State House and supported maps that drew additional majority-minority districts—but were ignored. *Id.* 53:22-56:14; PL126 at 28. Ms. Ho-Sang explained that communities like Jefferson Parish felt they were overlooked in the Legislature's roadshows, while communities in Shreveport and Lafayette that had roadshow hearings still felt "ignored." Certified 11/27/23 Tr. 169:22-172:2. The Legislature passed maps that were "completely contrary" to the maps and opportunity districts Black voters fought for, creating a "case in point" that Black people are not being represented in Louisiana, she said. *Id.* 173:22-25; 180:21-181:14. Dr. Nairne, Rev. Lowe, Dr. Washington, and Ms. Ho-Sang also testified to how the dilutive districts they live in have resulted in noncompetitive elections and little attention from candidates and elected officials. *Id.* 26:22-29:9, 59:2-9; 60:6-11; 62:25-63:7, 105:5-106:17, 179:25-180:20. Ms. Ho-Sang attested that leaders' unresponsiveness was "evidenced in the conditions in our community," and the failure to act on policies that would improve Black people's lives, including the failure to streamline elections or address issues like Black maternal health and criminal justice. *Id.* 192:19-193:6.

Witnesses noted striking differences between the level of responsiveness they feel from elected officials from majority-Black districts compared to dilutive districts. Pastor Harris said no elected official had investigated the Payne subdivision's infrastructure issues or even visited the area until HD 23 became a majority-Black district in the previous redistricting cycle. *Id.* 74:20-

75:17. Dr. Washington expressed that she was more familiar with members of the Baton Rouge delegation to the State House elected from majority-Black districts than her own, because Black community members "hear from them" and they share "what they are doing." *Id.* 107:12-22. Dr. Nairne contrasted her experience living in SD 2, which is majority-Black, and HD 60, which is majority-white. *Id.* 27:10-30:8. While she attested that she did not believe her representative is responsive to her community's needs because "[h]e's not around," she said her senator is "available" and "accessible," often attending community events. *Id.* The record is replete with evidence of the direct ties between vote dilution and elected officials' responsiveness.

### H. Senate Factor 9

A final factor, often referred to as Senate Factor 9, concerns "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous." *Gingles*, 478 U.S. at 37 (quoting S. Rep. No. 97-417 (1982)). From extensive review of the legislative record leading to the adoption of the enacted maps, Dr. Burch identified three common themes among the Legislature's justification for the districts—each of which she discounted as tenuous. Certified 11/29/23 PM Tr. 57:9-65:24.

First, sponsors of S.B. 1 and H.B. 14 argued, without evidence, that adding a second majority-minority district would "dilute the Black vote" and fail to allow Black Louisianans an opportunity to elect a candidate of their choice. *Id.* Senate President Patrick Page Cortez argued that the standard for performance was not an opportunity, but a "slam dunk," and under this standard even districts with 53% minimum BVAP (such as those in S.B. 1) would not be adequate under the Voting Rights Act. *See id.* Evidence presented in the record, as well as scholarly evidence, debunk this argument. *See id.; see also* Certified 11/30/23 Tr. 51:25-53:22.

Next, the enacted maps' sponsors cite "continuity of representation" as a primary reason for not drawing additional majority-minority districts. Certified 11/29/23 PM Tr. 62:21-64:7.

However, continuity of representation or any other form of incumbency protection is not mentioned as a priority in Joint Rule 21. *Id*. Indeed, as this Court determined in *Robinson*, prioritizing continuity of representation in situations where the population shifted geographically and racially "is nothing more than a guarantee that inequities in the map will be frozen in place despite changes in population." 605 F.Supp.3d at 851. And the availability of alternative maps that managed to add majority-minority districts while focusing on moving only districts with term-limited incumbents show this concern is not an impediment to increasing Black voters' representation. Certified 11/29/23 PM Tr. 62:21-64:7.

Finally, the enacted maps' sponsors' invocations of the need to protect the compactness of certain communities of interest were unsupported and inconsistent. *See id.* 64:8-65:24. For example, in committee hearings, President Cortez opposed an alternative plan that would have added two new majority-minority districts, claiming one of them was impossible to create without disrupting the representation of the community of interest between St. Charles and St. John Parishes, but failing to address the communities of interest in the other district. *Id.*; PL126 at 39. And he wholly ignored other communities of interests' needs, such as that of the Black residents of the West Bank in Jefferson Parish. Certified 11/29/23 PM Tr. 65:7-18. There were no evenly-applied standards for respecting communities of interest—the rationale was merely used as cover for the dilutive maps.

## V.    Evidence Proffered at Trial Justified Plaintiffs' Requested Remedies.

Plaintiffs demonstrated at trial that their requested remedy—injunctive relief calling for the drawing of remedial maps that do not violate Section 2—is warranted. Plaintiffs further demonstrated that this Court can and should order a special election using those remedial maps during the 2024 election cycle. *See North Carolina v. Covington*, 581 U.S. 486, 488-89 (2017) (laying out considerations to weigh in assessing whether to grant special election). Courts may call

for special elections to address the loss of a meaningful right to vote when doing so is administratively feasible. *See, e.g., Wright v. Sumter Cnty. Bd. of Elections & Registration*, 361 F.Supp.3d 1296, 1302, 1304-05 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020).

Evidence proffered at trial demonstrates that remedial maps for the state legislature—like the remedial maps for Louisiana's congressional representatives—can be implemented in time for a special election during the November 2024 election cycle. *See* Draft 12/4/23 Tr. 118:25-119:8, 120:2-20 (testimony indicating that the implementation process for both state legislative maps and congressional maps should be the same); *Robinson*, 86 F.4th at 584 ("[Counsel] additionally suggested a May 30 deadline for a new map to be drawn, approved, and enacted for the 2024 elections."); PL168 (copy of the 2024 elections calendar including dates for November 2024 election cycle). And additional evidence indicates that adding a special election to the 2024 election calendar would not confuse Louisiana voters, who are accustomed to multiple elections each year. *See* Draft 12/4/23 Tr. 125:9-126:9.

## CONCLUSION

For the foregoing reasons and based on the record compiled at trial, the Court should declare that Louisiana's current State House and Senate maps violate Section 2 of the Voting Rights Act and proceed to determining a remedy that will afford Black voters in Louisiana a meaningful opportunity to elect their preferred candidates.

DATED: December 19, 2023

Respectfully submitted,

Leah Aden*
Stuart Naifeh*
Victoria Wenger*
NAACP Legal Defense & Educational Fund
40 Rector Street, 5th Floor
New York, NY 10006

*/s/ Megan C. Keenan*
Megan C. Keenan*
Sarah Brannon*
American Civil Liberties Union Foundation
915 15th St. NW
Washington, DC 20005

laden@naacpldf.org
snaifeh@naacpldf.org
vwenger@naacpldf.org

I. Sara Rohani*
NAACP Legal Defense & Educational
Fund
700 14th Street, Suite 600
Washington, DC 20005
srohani@naacpldf.org

John Adcock (La. Bar No. 30372)
Adcock Law LLC
Louisiana Bar No. 30372
3110 Canal Street
New Orleans, LA 701119
jnadcock@gmail.com

Michael de Leeuw*
Amanda Giglio*
Cozen O'Connor
3 WTC, 175 Greenwich St.,
55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn*
Cozen O'Connor
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

Robert S. Clark*
Cozen O'Connor
1650 Market Street, Suite 2800
Philadelphia, PA 19103
robertclark@cozen.com

sbrannon@aclu.org
mkeenan@aclu.org

Sophia Lin Lakin*
Dayton Campbell-Harris*
Garrett Muscatel*
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, NY 10004
slakin@aclu.org
dcampbell-harris@aclu.org
lroman@aclu.org

T. Alora Thomas-Lundborg*
Daniel J. Hessel*
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

Nora Ahmed (N.Y. Bar. No. 5092374)
ACLU Foundation of Louisiana
1340 Poydras St., Suite 2160
New Orleans, LA 70112
NAhmed@laaclu.org

Ron Wilson (La. Bar No. 13575)
701 Poydras Street, Suite 4100
New Orleans, LA 70139
cabral2@aol.com

*Attorneys for Plaintiffs*
*Admitted Pro Hac Vice