1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4    DOROTHY NAIRNE, ET AL     : CIVIL ACTION

5    VERSUS                    : NO. 3:22-178-SDD

6    KYLE ARDOIN, ET AL        : NOVEMBER 29, 2023

7    =========================================================
                  DAY 3 (AFTERNOON SESSION)
8                      BENCH TRIAL
              BEFORE THE HONORABLE SHELLY D. DICK
9            UNITED STATES CHIEF DISTRICT JUDGE

10                  A P P E A R A N C E S

11

     FOR THE PLAINTIFFS:
12
         AMERICAN CIVIL LIBERTIES UNION FOUNDATION
13       BY: MEGAN C. KEENAN, ESQ.
         BY: SARAH E. BRANNON, ESQ.
14       BY: DAYTON CAMPBELL-HARRIS, ESQ.
         915 15TH STREET, NW
15       WASHINGTON, DC 20005

16       NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
         BY: VICTORIA WENGER, ESQ.
17       BY: SARA ROHANI, ESQ.
         BY: STUART C. NAIFEH, ESQ.
18       40 RECTOR STREET, FIFTH FLOOR
         NEW YORK, NEW YORK 10006
19
         COZEN O'CONNOR
20       BY: JOSEPHINE M. BAHN, ESQ.
         1200 19TH STREET, NW, THIRD FLOOR
21       WASHINGTON, DC 20036

22       COZEN O'CONNOR
         BY: ROBERT S. CLARK, ESQ.
23       ONE LIBERTY PLACE
         1650 MARKET STREET, SUITE 2800
24       PHILADELPHIA, PENNSYLVANIA  19103

25

```
 1              A P P E A R A N C E S (CONTINUED)

 2       COZEN O'CONNOR
         BY: AMANDA GIGLIO, ESQ.
 3       3 WORLD TRADE CENTER, 55TH FLOOR
         NEW YORK, NEW YORK 10007
 4
         ELECTION LAW CLINIC
 5       HARVARD LAW SCHOOL
         BY: T. ALORA THOMAS, ESQ.
 6       6 EVERETT STREET, SUITE 4105
         CAMBRIDGE, MASSACHUSETTS 02138
 7
         ADCOCK LAW, LLC
 8       BY: JOHN N. ADCOCK, ESQ.
         3110 CANAL STREET
 9       NEW ORLEANS, LOUISIANA 70119

10  FOR THE DEFENDANT, KYLE ARDOIN, IN HIS OFFICIAL
    CAPACITY AS SECRETARY OF STATE:
11
         NELSON MULLINS RILEY & SCARBOROUGH, LLP
12       BY: PHILLIP J. STRACH, ESQ.
         BY: THOMAS A. FARR, ESQ.
13       BY: CASSIE A. HOLT, ESQ.
         BY: ALYSSA M. RIGGINS, ESQ.
14       4140 PARKLAKE AVENUE, SUITE 200
         RALEIGH, NORTH CAROLINA 27612
15
         SHOWS, CALI & WALSH, LLP
16       BY: JOHN C. CONINE, JR., ESQ.
         BY: JOHN C. WALSH, ESQ.
17       628 ST. LOUIS STREET
         BATON ROUGE, LOUISIANA 70802
18
         SECRETARY OF STATE'S OFFICE
19       BY: CHARLTON J. MEGINLEY, ESQ.
         8585 ARCHIVES AVENUE
20       BATON ROUGE, LOUISIANA 70809

21  FOR THE DEFENDANT, CLAY SCHEXNAYDER:

22       BAKER & HOSTETLER, LLP
         BY: KATE MCKNIGHT, ESQ.
23       BY: ROBERT J. TUCKER, ESQ.
         BY: PATRICK LEWIS, ESQ.
24       200 CIVIC CENTER DRIVE, SUITE 1200
         COLUMBUS, OHIO 43215
25
```

```
 1              A P P E A R A N C E S (CONTINUED)

 2     BAKER HOSTETLER, LLP
       BY: MICHAEL W. MENGIS, ESQ.
 3     811 MAIN STREET, SUITE 1100
       HOUSTON, TEXAS 77002
 4
     FOR THE INTERVENOR, THE STATE OF LOUISIANA BY AND
 5   THROUGH ATTORNEY GENERAL JEFF LANDRY:

 6     HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
       BY: BRENNAN BOWEN, ESQ.
 7     2575 EAST CAMELBACK ROAD, SUITE 860
       PHOENIX, ARIZONA 85016
 8
       HOLTZMAN VOGEL JOSEFIAK TORCHINSKY, PLLC
 9     BY: PHILLIP M. GORDON, ESQ.
       15404 JOHN MARSHALL HIGHWAY
10     HAYMARKET, VIRGINIA 20169

11     LOUISIANA DEPARTMENT OF JUSTICE
       BY: ANGELIQUE D. FREEL, ESQ.
12     BY: JEFFREY M. WALE, ESQ.
       BY: AMANDA M. LAGROUE, ESQ.
13     1885 NORTH THIRD STREET
       BATON ROUGE, LOUISIANA 70804
14

15

16

17

18

19

20

21        REPORTED BY:  NATALIE W. BREAUX, RPR, CRR
               UNITED STATES COURTHOUSE
22               777 FLORIDA STREET
            BATON ROUGE, LOUISIANA 70801
23               (225) 389-3565

24   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
           COMPUTER-AIDED TRANSCRIPTION SOFTWARE
25
```

1                        I N D E X

2   PLAINTIFFS WITNESS:

3   TRACI BURCH                                    PAGE

4       VOIR DIRE EXAMINATION BY MS. WENGER ........6

5       DIRECT EXAMINATION BY MS. WENGER ..........11

6       CROSS-EXAMINATION BY MR. LEWIS ............74

7       REDIRECT EXAMINATION BY MS. WENGER .......105

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

01:32p

1        (NOVEMBER 29, 2023 AFTERNOON SESSION)

2                        PROCEEDINGS

3        THE COURT:  BE SEATED.

4             NEXT WITNESS, PLEASE.

5        MS. WENGER:  GOOD AFTERNOON, YOUR HONOR.

6             VICTORIA WENGER WITH LDF.

7             PLAINTIFFS CALL DR. TRACI BURCH.

8        (WHEREUPON, TRACI BURCH, BEING DULY SWORN,

9    TESTIFIED AS FOLLOWS.)

10        MS. WENGER:  YOUR HONOR, I'D ASK TO APPROACH

11   THE WITNESS TO PROVIDE A FOLDER CONTAINING THREE

12   DOCUMENTS PREMARKED AS PLAINTIFFS' EXHIBITS 126, 127,

13   128, AND SOME WATER.

14        THE COURT:  ARE THERE OBJECTIONS TO 126, 127

15   OR 128?  ARE THOSE THE EXPERT REPORTS?

16        MR. LEWIS:  YOUR HONOR -- PATRICK LEWIS FOR

17   THE LEGISLATIVE INTERVENORS -- THOSE ARE THE REPORTS

18   AND THE C.V.  WE DO NOT OBJECT, SUBJECT TO -- I

19   BELIEVE THE SECOND REPORT IS THE SURREBUTTAL IN

20   RESPONSE TO ANOTHER EXPERT, SO I THINK WE WOULD WANT

21   THE SAME AGREEMENT THAT WE HAD WITH MR. COOPER; THAT

22   IF SHE'S PERMITTED TO TESTIFY IF PLAINTIFFS' CASE-

23   IN-CHIEF IN REBUTTAL TO DEFENSE EXPERTS, THAT SHE

24   TESTIFY ONCE AND NOT COME BACK AGAIN IN REBUTTAL.

25        THE COURT:  DO WE HAVE THAT AGREEMENT?

01:34p

 1          MS. WENGER:  ABSOLUTELY.  THE SUPPLEMENTAL

 2   REPORT, 128, IS IN REBUTTAL TO DR. ALFORD'S

 3   TESTIMONY, AND DR. BURCH WOULD NOT BE COMING BACK

 4   AFTER HIS TESTIMONY.

 5          THE COURT:  OKAY.  YOU MAY CERTAINLY HAND

 6   HER THE DOCUMENTS.  AND LET'S GO AHEAD AND GET 126,

 7   127 AND 128 ADMITTED.

 8          MS. WENGER:  THANK YOU.

 9          THE COURTROOM DEPUTY:  AND WOULD YOU PLEASE

10   STATE YOUR NAME AND SPELL IT FOR THE RECORD.

11          THE WITNESS:  YES.  IT'S TRACI, T-R-A-C-I,

12   BURCH, B-U-R-C-H.

13                      VOIR DIRE

14   BY MS. WENGER:

15       Q   GOOD AFTERNOON, DR. BURCH.

16           WHAT IS YOUR ROLE IN THIS CASE?

17       A   I'M HERE AS AN EXPERT.

18       Q   LET'S TAKE A LOOK AT THE DOCUMENT IN FRONT

19   OF YOU LABELED PLAINTIFFS' EXHIBIT 127.  DO YOU HAVE

20   THAT IN FRONT OF YOU?

21       A   I DO.

22       Q   ARE YOU FAMILIAR WITH THIS DOCUMENT?

23       A   YES.

24       Q   WHAT IS IT?

25       A   IT'S A COPY OF THE C.V. THAT I PROVIDED WITH

01:35p

1   THIS REPORT.  IT'S A COPY OF THE C.V. THAT I PROVIDED

2   WITH THIS REPORT.

3       Q    DR. BURCH, WHAT IS YOUR EDUCATIONAL

4   BACKGROUND?

5       A    SO I FINISHED MY UNDERGRADUATE WORK AT

6   PRINCETON IN POLITICS, WHICH IS WHAT THEY CALL

7   POLITICAL SCIENCE, WITH A MINOR IN AFRICAN-AMERICAN

8   STUDIES.  AND MY PH.D. IS IN GOVERNMENT AND SOCIAL

9   POLICY FROM HARVARD.  AND GOVERNMENT IS WHAT THEY

10  CALL POLITICAL SCIENCE THERE AND SOCIAL POLICY IS A

11  SEPARATE DEPARTMENT.

12      Q    EXCELLENT.  AND JUST FOR THE COURT'S

13  AWARENESS AND THE RECORD, I'LL BE USING AN

14  ILLUSTRATIVE AID SLIDE DECK THAT'S BEEN MARKED WITH

15  CITATIONS THAT CORRESPOND TO THE MATERIALS YOU'LL BE

16  REVIEWING, DR. BURCH.  THIS WAS PROVIDED TO

17  DEFENDANTS LAST NIGHT.

18          DR. BURCH, WHAT IS YOUR CURRENT OCCUPATION?

19      A    SO CURRENTLY I AM BOTH ASSOCIATE PROFESSOR

20  OF POLITICAL SCIENCE AT NORTHWESTERN AND A RESEARCH

21  PROFESSOR AT THE AMERICAN BAR FOUNDATION.

22      Q    HOW LONG HAVE YOU BEEN TEACHING?

23      A    I'VE BEEN AT NORTHWESTERN AND THE BAR

24  FOUNDATION SINCE 2007.

25      Q    IN YOUR SCHOLARSHIP DO YOU HAVE ANY

01:36p

1  PARTICULAR FOCUS?

2      A    YES.  SO I WRITE TYPICALLY IN THE FIELD OF

3  POLITICAL BEHAVIOR WITH A FOCUS IN POLITICAL

4  PARTICIPATION.  AND THAT INCLUDES THINGS LIKE

5  BARRIERS TO VOTING AS WELL AS OTHER KINDS OF

6  PARTICIPATION LIKE PROTESTS.  AND I ALSO DO WORK IN

7  RACE AND ETHNIC POLITICS AND PUBLIC POLICY AND IN

8  CRIMINAL JUSTICE POLICY AS WELL.

9      Q    HAVE YOU BEEN PUBLISHED IN PEER-REVIEWED

10 BOOKS OR JOURNALS?

11     A    YES.  I'VE WRITTEN BOTH AS SOLO AND A

12 CO-AUTHORED BOOK AS WELL AS SEVERAL ARTICLES IN

13 PEER-REVIEWED JOURNALS.

14     Q    HAVE YOU RECEIVED ANY AWARDS OR RECOGNITIONS

15 IN YOUR FIELD?

16     A    YES.  SEVERAL.  SO FOR MY DISSERTATION I

17 RECEIVED SEVERAL AWARDS INCLUDING BEST DISSERTATION

18 AWARD FROM HARVARD AS WELL AS BEST DISSERTATION

19 AWARDS IN THE FIELD OF AMERICAN GOVERNMENT FROM THE

20 AMERICAN POLITICAL SCIENCE ASSOCIATION AND SEVERAL

21 OTHERS FOR MY DISSERTATION AS WELL.

22          FOR MY BOOK, "TRADING DEMOCRACY FOR

23 JUSTICE," I RECEIVED THE RALPH BUNCHE AWARD FROM THE

24 AMERICAN POLITICAL SCIENCE ASSOCIATION AS WELL AS

25 AWARDS FROM THE LAW IN COURTS AND URBAN SECTION AS

01:37p

1    WELL.  I'VE ALSO RECEIVED SOME RESEARCH GRANTS.

2        Q    DR. BURCH, HAVE YOU TESTIFIED AS AN EXPERT

3    BEFORE IN LITIGATION?

4        A    YES.

5        Q    DOES THAT INCLUDE IN VOTING RIGHTS CASES?

6        A    YES.

7        Q    ROUGHLY HOW MANY CASES HAVE YOU TESTIFIED IN

8    AS OF THE SUBMISSION OF YOUR ORIGINAL EXPERT REPORT?

9        A    I THINK SIX, COUNTING ONE WHERE THE FINAL

10   TESTIMONY WAS A DEPOSITION AND ALSO A PRELIMINARY

11   INJUNCTION HEARING.

12       Q    AND HAVE YOU ACTED AS AN EXPERT IN ANY MORE

13   CASES SINCE?

14       A    YES.  SEVERAL.

15       Q    VOTING RIGHTS CASES AS WELL?

16       A    YES.

17       Q    ANY CASES UNDER SECTION 2 OF THE VOTING

18   RIGHTS ACT?

19       A    YES.  INCLUDING ONE IN GALVESTON, GEORGIA.

20   AND THOSE ARE THE TWO THAT I'M THINKING ABOUT RIGHT

21   NOW.

22       Q    WERE ANY OF THE MATTERS THAT YOU'VE WORKED

23   IN IN THE PAST REGARDING STATE LEGISLATIVE

24   REDISTRICTING PLANS?

25       A    YES.  THE GEORGIA CASE WAS.

01:38p

   **1**      Q    HAVE YOU BEEN ADMITTED AS AN EXPERT IN ALL

   **2**  OF THE CASES IN WHICH YOU HAVE TESTIFED?

   **3**      A    YES.

   **4**      Q    HAVE THERE BEEN ANY ADDITIONAL CHANGES TO

   **5**  YOUR C.V. OR QUALIFICATIONS SINCE THEY WERE SUBMITTED

   **6**  FOR THIS CASE?

   **7**      A    YES.  SO, FOR INSTANCE, I KNOW -- I THINK

   **8**  THERE IS AN ADDITIONAL PUBLICATION THAT HAS COME OUT

   **9**  SINCE, INCLUDING -- THERE IS ACTUALLY TWO.  ONE CAME

   **10** OUT YESTERDAY.  SO I HAVEN'T HAD A CHANCE TO UPDATE

   **11** FOR THAT ONE ESPECIALLY.

   **12**     Q    SO PRIMARILY JUST PUBLICATIONS AND MORE

   **13** CASEWORK?

   **14**     A    YES.

   **15**     Q    EXCELLENT.

   **16**         MS. WENGER:  YOUR HONOR, I WOULD LIKE TO

   **17** MOVE TO HAVE DR. BURCH ADMITTED AS AN EXPERT WITNESS

   **18** IN RACIAL DISCRIMINATION, POLITICAL PARTICIPATION,

   **19** AND BARRIERS TO VOTING.

   **20**         MR. LEWIS:  NO OBJECTION, YOUR HONOR.

   **21**         THE COURT:  WITHOUT ANY CROSS ON THE TENDER,

   **22** DR. BURCH WILL BE PERMITTED TO GIVE OPINION TESTIMONY

   **23** ON RACIAL DISCRIMINATION -- WHAT WAS THE POLITICAL?

   **24** POLITICAL --

   **25**         MS. WENGER:  POLITICAL PARTICIPATION.

01:39p

**1**          THE COURT:  -- PARTICIPATION AND BARRIERS TO

**2**   VOTING.

**3**          MS. WENGER:  THANK YOU.

**4**                    DIRECT EXAMINATION

**5**   BY MS. WENGER:

**6**     Q    DR. BURCH, DID YOU SUBMIT ANY REPORTS AS

**7**   PART OF YOUR WORK IN THIS CASE?

**8**     A    YES; TWO.

**9**     Q    CAN YOU DESCRIBE WHAT THOSE WERE?

**10**    A    SO ONE WAS AN INITIAL EXPERT REPORT AND THEN

**11**   A SUPPLEMENT IN RESPONSE TO DR. ALFORD'S REPORT.

**12**    Q    ALL RIGHT.  LET'S START BY LOOKING AT WHAT

**13**   IS MARKED AS PLAINTIFFS' EXHIBIT 126, YOUR INITIAL

**14**   EXPERT REPORT.  DO YOU HAVE THAT IN FRONT OF YOU?

**15**    A    I DO.

**16**    Q    EXCELLENT.  AND IS THAT THE REPORT THAT YOU

**17**   SUBMITTED IN THIS CASE INITIALLY?

**18**    A    YES.

**19**    Q    ARE YOU BEING PAID AS PART OF YOUR

**20**   PARTICIPATION IN THIS CASE?

**21**    A    I AM.  $300 AN HOUR.

**22**    Q    IS YOUR COMPENSATION CONTINGENT OR TIED TO

**23**   YOUR OPINIONS IN THIS REPORT?

**24**    A    NO.

**25**    Q    WHAT DID YOU SET OUT TO EVALUATE IN YOUR

01:40p

1   EXPERT REPORT, DR. BURCH?

2       A    SO I WAS ASKED TO LOOK AT THE LOUISIANA

3   LEGISLATURE'S PASSAGE OF SB 1 AND HB 14 WITH RESPECT

4   TO THE TOTALITY OF THE CIRCUMSTANCES AS IT RELATES TO

5   SECTION 2 OF THE VOTING RIGHTS ACT.  AND I WAS ASKED

6   TO LOOK AT SENATE FACTORS 5, 6, 7, 8 AND 9.

7       Q    WHAT METHODOLOGIES DID YOU APPLY FOR THIS

8   ANALYSIS?

9       A    SO I LOOKED AT TYPICAL STANDARD METHODS THAT

10  WE USE IN POLITICAL SCIENCE, SUCH AS REVIEWING THE

11  SCHOLARLY LITERATURE, ANALYZING DEMOGRAPHIC AND

12  CENSUS DATA, LOOKING AT HISTORICAL RECORDS AND

13  GOVERNMENT REPORTS AND DATA, NEWS, LEGISLATIVE

14  PROCEEDINGS.  I ALSO LOOKED AT PUBLIC OPINION SURVEYS

15  AS WELL.

16      Q    AT A HIGH LEVEL, CAN YOU EXPLAIN THE FOCUS

17  OF EACH OF THE SENATE FACTORS YOU WERE ASKED TO

18  ASSESS, STARTING WITH SENATE FACTOR 5?

19      A    YES.  SO SENATE FACTOR 5 SPECIFICALLY REFERS

20  TO THE EXTENT TO WHICH MINORITY GROUP MEMBERS BEAR

21  THE EFFECTS OF DISCRIMINATION IN AREAS SUCH AS

22  EDUCATION, EMPLOYMENT AND HEALTH, WHICH HINDER THEIR

23  ABILITY TO PARTICIPATE EFFECTIVELY IN THE POLITICAL

24  PROCESS.  AND I WAS ASKED TO CONSIDER THAT

25  SPECIFICALLY FOR BLACK LOUISIANIANS.

01:41p

1        AND SENATE FACTOR 6 IS THE USE OF OVERT OR

2   SUBTLE RACIAL APPEALS IN POLITICAL CAMPAIGNS.  SENATE

3   FACTOR 7 LOOKS AT THE EXTENT TO WHICH MEMBERS OF THE

4   MINORITY GROUP HAVE BEEN ELECTED TO PUBLIC OFFICE IN

5   THE JURISDICTION.  SENATE FACTOR 8 IS ABOUT A LACK OF

6   RESPONSIVENESS ON THE PART OF ELECTED OFFICIALS TO

7   THE PARTICULARIZED NEEDS OF THE MINORITY GROUP

8   MEMBERS.  AND SENATE FACTOR 9 IS WHETHER THE POLICY

9   UNDERLYING THE CHANGE, STANDARD, OR PRACTICE IS

10  TENUOUS.

11     Q    THANK YOU, DR. BURCH.

12        LET'S GO THROUGH YOUR ANALYSIS OF EACH OF

13  THESE FACTORS, STARTING WITH FACTOR 5 REGARDING THE

14  EFFECTS OF DISCRIMINATION HERE IN LOUISIANA.

15        WHAT WERE YOUR SPECIFIC AREAS OF FOCUS IN

16  ANALYZING THE PRESENCE OF SENATE FACTOR 5 IN THE

17  STATE?

18     A    SO FOR SENATE FACTOR 5, IT'S NOT EXHAUSTIVE

19  BUT -- IN THE LIST THAT'S DISCUSSED SPECIFICALLY.

20  BUT I WANTED TO MAKE SURE THAT I TALKED ABOUT THE

21  KINDS OF AREAS THAT WERE IN THE POLITICAL SCIENCE

22  LITERATURE AS AFFECTING VOTER TURNOUT.  AND SO I

23  FOCUSED ON EDUCATION, SOCIOECONOMIC STATUS, SEVERAL

24  MEASURES OF THAT INCLUDING EMPLOYMENT AS WELL AS

25  INCOME -- MEDIAN HOUSEHOLD INCOME AND THE LIKE,

01:42p

**1** RACIAL RESIDENTIAL SEGREGATION, HEALTH AND CRIMINAL

**2** JUSTICE.

**3**          **THE REPORTER:**  CRIMINAL?

**4**          **THE WITNESS:**  JUSTICE.

**5** BY MS. WENGER:

**6**     **Q**     DR. BURCH, LET'S BEGIN BY TALKING ABOUT

**7** EDUCATION.  IF YOU CAN TURN YOUR ATTENTION TO THE

**8** ILLUSTRATIVE AID ON YOUR SCREEN, WHICH REPRODUCES

**9** HERE FIGURE 1 ON PAGE 7 OF YOUR REPORT, WHAT DOES

**10** THIS CHART DISPLAY?

**11**     **A**     SO THIS CHART IS LOOKING AT EDUCATIONAL

**12** ATTAINMENT BY RACE IN LOUISIANA.  AND IT'S JUST FOR

**13** ADULTS AGES 25 AND OLDER, BECAUSE WE WANT TO GIVE

**14** PEOPLE A CHANCE TO, IF THEY'RE GOING TO GO TO

**15** COLLEGE, MAYBE TO KIND OF FINISH IT.  AND THE SOURCE

**16** IS FROM THE AMERICAN COMMUNITY SURVEY ONE-YEAR

**17** ESTIMATES THAT COME FROM THE CENSUS BUREAU.

**18**          AND YOU CAN SEE HERE THAT THE DIFFERENT

**19** LEVELS OF EDUCATION ARE RIGHT ACROSS THE BOTTOM OF

**20** THE CHART, AND LATINOS ARE HERE.  BUT IN PARTICULAR,

**21** WHITE PEOPLE ARE LISTED IN GOLD AND BLACK PEOPLE ARE

**22** IN THE PURPLE BARS.  AND THE IMPORTANT TAKE-AWAY FROM

**23** THIS CHART IS THAT YOU CAN SEE THAT AT THE LOWER

**24** LEVELS OF EDUCATION -- SPECIFICALLY LESS THAN HIGH

**25** SCHOOL -- BLACK PEOPLE ARE MUCH MORE LIKELY THAN

01:43p

1   WHITE PEOPLE IN LOUISIANA TO HAVE NOT COMPLETED HIGH

2   SCHOOL.  IN FACT, IF YOU JUST KIND OF COMPARE ACROSS

3   THE PURPLE BARS, YOU CAN SEE THAT MORE -- THERE ARE

4   MORE BLACK PEOPLE IN LOUISIANA WHO HAVEN'T FINISHED

5   HIGH SCHOOL THAN THERE ARE WHO HAVE FINISHED COLLEGE.

6       IN COMPARISON, AMONG WHITE PEOPLE IN

7   LOUISIANA, THERE ARE FEWER OF THEM WHO ARE

8   CONCENTRATED IN THOSE LOWER EDUCATIONAL ECHELONS.

9   AND MANY MORE -- A LARGER PERCENTAGE OF THE GROUP --

10  HAS COMPLETED A BACHELOR'S DEGREE OR HIGHER.

11      Q    THANK YOU, DR. BURCH.

12      AND JUST FOR CLARITY OF THE RECORD, THE

13  CORRESPONDING FIGURES IN YOUR REPORT ARE MONOCHROME

14  BUT HAVE BEEN REPRODUCED WITH COLORS IN THE SLIDE

15  JUST FOR EASE OF VISUALIZING THE DATA THAT YOU ARE

16  DISCUSSING HERE.

17      TURNING TO THE NEXT SLIDE, THIS REPRODUCES

18  TABLE 1 FROM PAGE 7 OF YOUR REPORT.  WHAT DOES THIS

19  TABLE CONVEY?

20      A    SO THIS TABLE IS FROM THE 2020 CURRENT

21  POPULATION SURVEY VOTING AND REGISTRATION SUPPLEMENT,

22  WHICH IS ANOTHER SURVEY THAT'S PRODUCED BY THE CENSUS

23  BUREAU THAT'S SUPPOSED TO BE REPRESENTATIVE AT THE --

24  OF THE NATION AND AT THE STATE LEVEL.  AND WHAT THEY

25  DO IS THE CENSUS BUREAU ASKS PEOPLE IF THEY VOTED IN

01:44p

1  THE 2020 GENERAL ELECTION.

2          AND WHAT I HAVE HERE IN THIS CHART IS -- FOR

3  EACH EDUCATIONAL LEVEL I HAVE WHITE TURNOUT AND I

4  HAVE BLACK TURNOUT.  NOW, ONE OF THE THINGS THAT'S

5  READILY APPARENT FROM THIS CHART, IF YOU JUST READ

6  DOWN THE TABLE WITH WHITE TURNOUT, YOU CAN SEE THAT

7  WHITE TURNOUT INCREASES ALMOST UNIFORMLY IN TERMS OF

8  IT'S ALWAYS INCREASING WITH EDUCATIONAL ATTAINMENT.

9  SO THE RELATIONSHIP HERE -- AND THE SAME IS TRUE FOR

10 BLACK TURNOUT.  SO THE RELATIONSHIP HERE BETWEEN

11 EDUCATIONAL ATTAINMENT AND VOTER TURNOUT, WHEN YOU

12 JUST LOOK AT THESE DIFFERENT LEVELS OF EDUCATION,

13 IT'S QUITE STARK.

14          SO THE ISSUE HERE, OF COURSE, IF WE RECALL

15 FROM THE PREVIOUS SLIDE, IS THAT BLACK PEOPLE ARE

16 CONCENTRATED IN THIS NO HIGH SCHOOL DIPLOMA LOWER --

17 IN HIGH SCHOOL DIPLOMA LOWER TURNOUT CATEGORIES;

18 WHEREAS WHITE PEOPLE ARE MORE LIKELY TO BE IN THESE

19 BACHELOR'S DEGREE AND GRADUATE SCHOOL CATEGORIES,

20 WHICH MAKES IT SO THAT THEY ARE -- THE WAYS THAT THE

21 GROUPS ARE ARRANGED IN THESE CATEGORIES KIND OF

22 SHAPES THE GAP IN TURNOUT.  SO HERE YOU CAN CLEARLY

23 SEE THAT EDUCATIONAL ATTAINMENT INCREASES VOTER

24 TURNOUT, AND IT DOES SO FOR BOTH RACIAL GROUPS.

25     Q    THANK YOU, DR. BURCH.

01:46p

**1**      TURNING TO THE NEXT SLIDE, CAN YOU WALK ME

**2** THROUGH YOUR FINDINGS REGARDING PATTERNS OF

**3** SEGREGATION IN LOUISIANA SCHOOLS?

**4**    **A**    YES.  SO HISTORICALLY THERE HAS BEEN

**5** SEGREGATION IN LOUISIANA SCHOOLS.  BUT THE DATA ALSO

**6** SHOW THAT THERE IS STILL SOME EDUCATIONAL SEGREGATION

**7** WITHIN LOUISIANA TODAY.  SO ACCORDING TO PROPUBLICA'S

**8** *MISEDUCATION* PROJECT, AS RECENTLY AS 2017 HALF OF

**9** TRADITIONAL SCHOOL DISTRICTS IN LOUISIANA THAT WERE

**10** AVAILABLE DEMONSTRATED HIGH LEVELS OF RACIAL

**11** SEGREGATION WITHIN THE DISTRICT.  AND THERE ARE NINE

**12** OF THE 68 TRADITIONAL SCHOOL DISTRICTS IN LOUISIANA

**13** THAT ARE MORE THAN 87 PERCENT NON-WHITE.  SO EVEN

**14** THOUGH WE KNOW ABOUT THE HISTORICAL SCHOOL

**15** SEGREGATION THAT I TALK ABOUT AT LENGTH IN MY REPORT,

**16** THIS IS ALSO A CONTINUING ISSUE.

**17**    **Q**    TURNING TO THE NEXT SLIDE, REPRODUCING

**18** FIGURE 2 FROM PAGE 8 OF YOUR REPORT, WHAT DOES THIS

**19** CHART TELL US?

**20**    **A**    SO THIS CHART LOOKS SPECIFICALLY AT EAST

**21** BATON ROUGE PARISH, AND IT TALKS ABOUT A COMPARISON

**22** BETWEEN, IN THE DOTTED LINES, THE ACTUAL WHITE AND

**23** BLACK POPULATIONS OF THE PARISH.  AND THE SOLID LINES

**24** ARE THE SCHOOL POPULATIONS.  AND YOU CAN SEE THAT

**25** THERE IS KIND OF PARITY BETWEEN BLACK PEOPLE AND

01:47p

**1**  WHITE PEOPLE IN EAST BATON ROUGE PARISH.  BUT IN THE

**2**  SCHOOL SYSTEM IT'S OVER -- EXCUSE ME -- OVER 70

**3**  PERCENT BLACK.

**4**       AND THE REASON FOR THAT IS FOR -- THERE ARE

**5**  SEVERAL REASONS FOR THAT.  BUT ONE OF THEM, FOR

**6**  INSTANCE, IS SUCCESSION MOVEMENTS IN WHICH SOME

**7**  PARENTS CHOSE TO JUST ABANDON -- WHITE PARENTS CHOSE

**8**  TO ABANDON EAST BATON ROUGE PARISH FOR A DIFFERENT

**9**  SCHOOL DISTRICT.

**10**     **Q**    THANK YOU, DR. BURCH.

**11**       TURNING TO THE NEXT SLIDE, THIS REPRODUCES

**12**  FIGURE 3 FROM PAGE 9 OF YOUR REPORT.  WHAT CAN THIS

**13**  CHART TELL US?

**14**     **A**    SO THIS CHART LOOKS AT TEST SCORES IN EIGHTH

**15**  GRADE IN 2019 FOR MATH IN LOUISIANA.  AND IT LOOKS AT

**16**  IT BY RACE.  SO AS YOU CAN SEE FROM THIS CHART, THE

**17**  WHITE CIRCLES REPRESENT WHITE STUDENTS IN EACH YEAR

**18**  AND THE CROSSES REPRESENT BLACK STUDENTS IN EACH

**19**  YEAR.  AND THERE IS A PRETTY PERSISTENT 30'ISH POINT

**20**  GAP BETWEEN BLACK AND WHITE STUDENTS ACROSS TIME.

**21**  AND IN EACH -- AND IT LOOKS LIKE -- AT THE BOTTOM IT

**22**  SHOWS YOU WHETHER THAT'S A STATISTICALLY SIGNIFICANT

**23**  DIFFERENCE.  AND THE DIFFERENCE IS SORT OF LIKE NOT

**24**  CHANGING OVER TIME.  AND -- BUT THOSE GAPS IN TEST

**25**  SCORES ARE PERSISTENT.

01:49p

**1**   **Q**   LET'S TURN TO THE NEXT SLIDE.  REPRODUCING

**2**  HERE FIGURE 4 FROM PAGE 9 OF YOUR REPORT, WHAT CAN

**3**  THIS CHART TELL US?

**4**   **A**   AGAIN, THE OUTCOMES FOR RACIAL GROUPS IN

**5**  LOUISIANA SCHOOLS ARE THIS TIME FOR EIGHTH GRADE

**6**  READING BY RACE.  AND AGAIN, WHITE STUDENTS' OUTCOMES

**7**  ON TESTS ARE MUCH BETTER THAN BLACK STUDENTS'

**8**  OUTCOMES.  AND THOSE, AGAIN, ARE ABOUT -- HOVERING

**9**  AROUND 25 TO -- 22 TO 25 POINTS IN EACH GIVEN YEAR.

**10**   **Q**   DR. BURCH, I'D LIKE TO TURN TO YOUR

**11**  OVERARCHING OPINIONS ON EDUCATION DISPARITIES IN

**12**  LOUISIANA.

**13**        FROM YOUR ACADEMIC ASSESSMENT, WHAT EXPLAINS

**14**  THESE MEASURES OF INEQUITY IN EDUCATIONAL ATTAINMENT

**15**  BASED ON RACE IN LOUISIANA?

**16**   **A**   SO IN MY REPORT I TALK ABOUT BOTH THE

**17**  HISTORICAL AND THE KINDS OF CONTEMPORARY

**18**  DISCRIMINATION THAT LOUISIANIANS HAVE FACED -- BLACK

**19**  LOUISIANIANS HAVE FACED IN THE EDUCATIONAL SYSTEM.

**20**  AND I POINT OUT THAT, ESPECIALLY FOR THE HISTORICAL

**21**  DISCRIMINATION, IT'S NOT DISTANT HISTORY.  MANY -- A

**22**  LARGE PROPORTION OF THE ELECTORATE THAT WAS AROUND TO

**23**  EXPERIENCE THESE LEGALLY SEGREGATED SCHOOLS ARE STILL

**24**  HERE AND VOTING IN LOUISIANA.  AND THAT KIND OF HELPS

**25**  EXPLAIN SOME OF THOSE RACIAL DISPARITIES THAT I

01:50p

1  SHOWED YOU IN THE CHARTS.

2       THERE ARE RACIAL GAPS IN VOTER TURNOUT IN

3  LOUISIANA.  AND VOTER TURNOUT VARIES BY EDUCATIONAL

4  ATTAINMENT IN THE WAYS THAT I SHOWED YOU, SUCH THAT

5  HIGHLY EDUCATED VOTERS ARE MORE LIKELY TO TURN OUT

6  THAN VOTERS WITH LOW EDUCATIONAL ATTAINMENT.  AND

7  THAT CAN EXPLAIN SOME OF THE RACIAL GAP IN VOTER

8  TURNOUT IN LOUISIANA.

9       AND EDUCATION IS IMPORTANT -- AND I'M

10 SPENDING SO MUCH TIME ON IT -- BECAUSE FOR A

11 POLITICAL SCIENTIST IT'S ONE OF THE MOST FUNDAMENTAL

12 EXPLANATORY VARIABLES WITH RESPECT TO EXPLAINING HOW

13 AND WHEN PEOPLE VOTE AND PARTICIPATE IN POLITICS

14 GENERALLY.  BECAUSE EDUCATION JUST MAKES IT EASIER

15 FOR PEOPLE TO NAVIGATE THE COST OF VOTING AND LIKE

16 ACQUIRING INFORMATION ABOUT THE CANDIDATES OR

17 LEARNING HOW TO REGISTER AND NAVIGATING THE PROCESS.

18 SO IT'S -- SO EDUCATION IS REALLY IMPORTANT.  THERE

19 ARE GAPS THAT ARE CAUSED BY CONTEMPORARY AND

20 HISTORICAL DISCRIMINATION BY GOVERNMENT.  AND

21 EDUCATION, AGAIN, IS FUNDAMENTAL TO VOTING.

22    Q   LET'S MOVE ALONG TO YOUR ANALYSIS OF

23 EMPLOYMENT AND SOCIOECONOMIC INDICATORS.

24       DR. BURCH, WHAT WERE YOUR FINDINGS ABOUT

25 BLACK LOUISIANIANS' PERCEPTIONS OF THEIR

01:51p

1   OPPORTUNITIES RELATED TO HIRING, PAY, AND PROMOTIONS

2   HERE?

3       A    SO I LOOKED AT THE 2021 LOUISIANA SURVEY FOR

4   THIS INFORMATION, WHICH IS A REPRESENTATIVE STUDY --

5   SURVEY OF PEOPLE IN LOUISIANA.  AND I FOUND -- THE

6   STUDY FOUND THAT 74 PERCENT OF BLACK PEOPLE AGREE

7   THAT BLACK PEOPLE ARE TREATED LESS FAIRLY THAN WHITE

8   PEOPLE IN HIRING, PAY, AND PROMOTIONS AT WORK.  AND

9   RESEARCH ACTUALLY SUPPORTS THAT CLAIM.  A VARIETY OF

10  AUDIT STUDIES, WHICH HOLD CONSTANT ALL KINDS OF

11  FACTORS AND THEN SENDS IN LIKE TRAINED ACTORS TO

12  APPLY FOR JOBS OR SENDS IN RÉSUMÉS THAT ARE IDENTICAL

13  EXCEPT FOR EITHER THE NAME OR THE RACE OF THE

14  POTENTIAL APPLICANT, THEY SHOW THAT EMPLOYERS DO

15  DISCRIMINATE AGAINST RACIAL MINORITIES IN HIRING.

16      Q    ALL RIGHT.  LET'S TURN YOUR ATTENTION TO THE

17  NEXT SLIDE, WHICH REPRODUCES FIGURE 5 FROM PAGE 10 OF

18  YOUR REPORT.

19          DR. BURCH, WHAT DOES THIS CHART REFLECT?

20      A    SO THIS CHART IS ALSO FROM THE AMERICAN

21  COMMUNITY SURVEY 2019 ONE-YEAR ESTIMATES.  AND THIS

22  ONE IS LOOKING AT THE UNEMPLOYMENT RATE BY RACE FOR

23  LOUISIANA, JUST THE CIVILIAN LABOR FORCE, AGES 16 AND

24  OVER.  AND YOU CAN SEE FOR BLACK UNEMPLOYMENT -- THAT

25  BLACK UNEMPLOYMENT IS HIGHER THAN WHITE UNEMPLOYMENT

01:52p

1   IN LOUISIANA IN THAT YEAR AND CONSISTENTLY TENDS TO

2   BE HIGHER.

3        Q    ALL RIGHT.  LET'S TURN TO THE NEXT SLIDE.

4   THIS REPRODUCES FIGURE 6 FROM PAGE 11 OF YOUR REPORT.

5             WHAT DOES THIS CHART DISPLAY?

6        A    SO THIS CHART SWITCHES FROM INDIVIDUALS AND

7   LOOKS AT HOUSEHOLDS.  AND SO THIS LOOKS AT THE MEDIAN

8   HOUSEHOLD INCOME IN LOUISIANA BY THE RACE OF THE

9   HOUSEHOLDER.  AND HERE WE CAN SEE THAT BLACK

10  HOUSEHOLDS -- SORRY -- WHITE HOUSEHOLDS EARN OR HAVE

11  INCOMES THAT ARE TENS OF THOUSANDS OF DOLLARS HIGHER

12  AT THE MEDIAN THAN BLACK HOUSEHOLDS.

13       Q    AND TURNING TO THE NEXT SLIDE, WHICH

14  REPRODUCES FIGURE 7 FROM PAGE 11 OF YOUR REPORT, WHAT

15  DOES THIS CHART DISPLAY?

16       A    SO THIS CHART LOOKS AT FAMILY POVERTY IN

17  LOUISIANA, AGAIN, BY RACE OF THE HOUSE -- THE HEAD OF

18  THE HOUSEHOLD OF FAMILY.  AND 2019 -- AND THIS IS THE

19  2019 AMERICAN COMMUNITY SURVEY AGAIN.  AND AGAIN,

20  WHITE PEOPLE IN THIS CHART ARE IN GOLD AND BLACK

21  PEOPLE ARE IN PURPLE.  AND THE DATA SHOW THAT BLACK

22  POVERTY IS MORE THAN DOUBLE, ALMOST TRIPLE THAT OF

23  WHITE POVERTY.

24       Q    LET'S TURN TO THE NEXT SLIDE, REPRODUCING

25  FIGURE 8 FROM PAGE 12 OF YOUR REPORT.

01:54p

**1**    WHAT DOES THIS CHART DISPLAY?

**2**    **A**    SO THIS CHART LOOKS, AGAIN, AT LOUISIANA

**3**  HOUSEHOLDS AND LOOKS AT HOUSEHOLDS THAT DON'T HAVE

**4**  ACCESS TO A VEHICLE BY RACE OF THE HOUSEHOLDER.  AND

**5**  AGAIN, BLACK HOUSEHOLDS -- A SIGNIFICANT PERCENTAGE

**6**  OF BLACK HOUSEHOLDS DON'T HAVE ACCESS TO A CAR,

**7**  COMPARED WITH LESS THAN -- IT LOOKS LIKE ABOUT 5

**8**  PERCENT OF WHITE HOUSEHOLDS.

**9**    **Q**    CAN YOU DISCUSS HOW THAT MIGHT IMPACT A

**10**  VOTER'S ACCESS?

**11**    **A**    YES.  SO IF YOU NEED TO GO TO A POLLING

**12**  PLACE OR GO TO REGISTER OR IF YOU'RE GOING TO, FOR

**13**  INSTANCE, REGISTER THROUGH MOTOR VOTER, IF YOU DON'T

**14**  HAVE A DRIVER'S LICENSE OR A CAR YOU'RE NOT GOING TO

**15**  NECESSARILY HAVE TO DO THAT.  SO IT DEFINITELY --

**16**  HAVING A CAR DEFINITELY MAKES IT EASIER FOR PEOPLE TO

**17**  BE ABLE TO GO IN PERSON TO DO THINGS THEY MAY HAVE TO

**18**  DO IN ORDER TO VOTE.

**19**    **Q**    ALL RIGHT, DR. BURCH.  I'D LIKE TO TURN TO

**20**  YOUR OVERARCHING OPINIONS ON EMPLOYMENT DISPARITIES

**21**  IN LOUISIANA.  FROM YOUR ACADEMIC ASSESSMENT, WHAT

**22**  EXPLAINS THESE MEASURES OF INEQUITY IN EMPLOYMENT IN

**23**  THE STATE?

**24**    **A**    SO AS I SAY, THERE IS -- AND AS I SHOW --

**25**  THERE ARE MARKERS OF CONTEMPORARY AND HISTORICAL

01:55p

**1** DISCRIMINATION BY GOVERNMENT AND BY MARKET

**2** INSTITUTIONS AND ACTORS THAT ARE -- THAT ARE IN

**3** LOUISIANA THAT ARE TAKING -- MAKING IT -- THESE

**4** ECONOMIC DISPARITIES APPARENT.

**5**          AND WHAT'S INTERESTING ABOUT THEM IS THAT

**6** THEY'RE -- EDUCATION IS KIND OF ALSO FEEDING INTO

**7** THESE SOCIOECONOMIC INDICATORS AS WELL.  SO

**8** EDUCATIONAL ATTAINMENT KIND OF ALSO AFFECTS INCOME

**9** AND OTHER -- ALL OF THESE OTHER SOCIOECONOMIC

**10** INDICATORS.  SO IF YOU THINK ABOUT THIS COMBINATION,

**11** SO PEOPLE WITH WHITE COLOR OCCUPATIONS LIKE MANY OF

**12** US IN THIS COURTROOM, IT MAKES -- IT MIGHT MAKE IT

**13** EASIER FOR PEOPLE TO DEVELOP CIVIC SKILLS THAT CAN BE

**14** USEFUL IN THINKING ABOUT HOW TO NAVIGATE

**15** BUREAUCRACIES.  AND IT ALSO MIGHT MAKE -- GIVE YOU

**16** GREATER FREEDOM TO TAKE TIME OFF OF WORK WITHOUT

**17** LOSING OR RISKING YOUR PAY OR HOURLY PAY.  AND WORK

**18** IS ALSO -- CAN BE AN IMPORTANT SITE FOR RECRUITMENT

**19** INTO POLITICS AND ASKING PEOPLE TO BE MORE POLITICAL,

**20** WHICH ALSO INCREASES VOTER TURNOUT.

**21**          SO THERE IS A NUMBER OF MECHANISMS IN THE

**22** LITERATURE BY WHICH ALL OF THESE OTHER KINDS OF

**23** SOCIOECONOMIC INDICATORS LIKE EMPLOYMENT AND INCOME

**24** AND HAVING A VEHICLE CAN FEED INTO VOTING.

**25**      **Q**    THANK YOU, DR. BURCH.  LET'S MOVE TO YOUR

01:56p

**1**  ANALYSIS OF HOUSING DISPARITIES AND RESIDENTIAL

**2**  SEGREGATION IN LOUISIANA.  TURNING YOUR ATTENTION TO

**3**  THE NEXT SLIDE, THIS REPRODUCES FIGURES 9 AND 10 FROM

**4**  PAGES 14 AND 15 OF YOUR REPORT RESPECTIVELY.

**5**          DR. BURCH, WHAT DO THESE MAPS DEPICT?

**6**      **A**   SO THESE ARE HISTORICAL MAPS THAT WERE DRAWN

**7**  BY THE HOMEOWNERS LOAN CORPORATION.  AND THEY WERE

**8**  USED BY THE FHA TO FIGURE OUT WHERE THEY WOULD MAKE

**9**  LOANS FOR MORTGAGES.  AND THESE MAPS -- I HAVE TO

**10**  CHECK TO SEE.  IT'S HARD FOR ME TO SEE AND RECALL THE

**11**  DATES HERE.  BUT THESE WERE TYPICALLY IN THE LATE

**12**  '30s, EARLY '40s IN WHICH THESE MAPS WERE PRODUCED.

**13**          WHAT'S INTERESTING ABOUT THE MAPS THAT THE

**14**  FHA WAS USING FOR UNDERWRITING LOANS IS THAT THIS

**15**  COLOR CODING IS THE RUBRIC FOR WHERE IT WAS SAFE TO

**16**  MAKE MORTGAGE LOANS.  AND THAT'S WHERE THEY DIRECTED

**17**  THE MONEY, VERSUS THE ONES WHERE THEY WERE NOT.

**18**          SO BLUE AND GREEN ARE I THINK A AND B, THOSE

**19**  GRADES.  AND THOSE ARE GOOD PLACES TO MAKE MORTGAGE

**20**  LOANS; WHEREAS RED AND YELLOW ARE MARKS AS DECLINING

**21**  OR HAZARDOUS.  THESE MAPS, AGAIN, THAT WERE USED BY

**22**  THE FEDERAL HOUSING ADMINISTRATION FOR MAKING LOANS,

**23**  THE WAY THAT THIS COLOR CODING TAKES PLACE IS

**24**  ARGUABLY ALMOST ALL ABOUT RACE.

**25**          THERE IS SOME INDICATION THAT IN THE NEW

01:58p

**1**  ORLEANS MAP THE FLOODING AND ELEVATION ALSO PLAY A

**2**  ROLE IN THESE GRADES.  BUT THEN IF YOU LOOK AT WHAT

**3**  THE ACTUAL DESCRIPTIONS ARE OF SOME OF THESE RED ZONE

**4**  AREAS -- LIKE, FOR INSTANCE, I TALK ABOUT IN MY

**5**  REPORT AREA 35 IS DESCRIBED AS, QUOTE, COMPOSED OF

**6**  TWO-STORY DOUBLES, NEGRO ROW HOUSES AND RAISED

**7**  SINGLES.  THIS AREA INCLUDES WHAT IS OFTEN REFERRED

**8**  TO AS THE IRISH CHANNEL AND IS ONE OF THE TOUGHEST

**9**  SECTIONS IN THE ENTIRE CITY.  IT HAS A MIXED

**10**  POPULATION.  SOME BLOCKS ARE MIXED WHITE AND COLORED,

**11**  SOME SOLID WHITE, SOME SOLID COLORED, AND PROPERTIES

**12**  ARE IN A VARYING CONDITION:  FAIR, BAD AND

**13**  INDIFFERENT.  IT IS A REGULAR CONGLOMERATION OF THE

**14**  WORST FEATURES FOUND IN THE CITY.  AND IN SHREVEPORT,

**15**  ALL THE AREAS GRADED A OR B WERE 100 PERCENT WHITE,

**16**  WHILE ALL THE AREAS MARKED D OR HAZARDOUS OR RED HAD

**17**  SOME PROPORTION OF BLACK RESIDENTS.

**18**    Q    DR. BURCH, FOR CLARITY OF THE RECORD, WHAT

**19**  IS THE FHA?

**20**    A    SO THE FHA IS THE FEDERAL HOUSING

**21**  ADMINISTRATION.  AND AT LEAST WITH RESPECT TO THESE

**22**  MAPS, THEY WERE TASKED WITH HELPING TO PROVIDE LOANS

**23**  TO -- UNDERWRITING LOANS SO THAT PEOPLE COULD GET

**24**  MORTGAGES.

**25**    Q    AND WHAT IS THE HOMEOWNERS LOAN CORPORATION?

01:59p

**1**      **A**    THE HOMEOWNERS LOAN CORPORATION IS THE

**2**   ORGANIZATION THAT MADE THESE MAPS FOR -- THAT THE FHA

**3**   USED IN DETERMINING WHERE IT WAS -- WHERE YOU COULD

**4**   MAKE THE -- WHICH LOANS THEY WOULD UNDERWRITE.

**5**      **Q**    AND SPEAKING TO CONTEMPORARY TRENDS, ARE

**6**   THERE ANY OTHER EXAMPLES OF WAYS IN WHICH AID OR

**7**   OTHER MONETARY SUPPORT HAS NOT BEEN ABLE TO BE

**8**   INVESTED IN THOSE REDLINE COMMUNITIES?

**9**      **A**    SO I THINK IT'S CLEAR THAT THERE -- THE DATA

**10**  SHOW THAT MANY OF THESE CITIES -- EXCUSE ME -- ARE

**11**  STILL SEGREGATED BY RACE.  SO THERE IS BOTH CENSUS

**12**  DATA AND THE GEOGRAPHIC ANALYSIS OF CELL PHONE DATA

**13**  THAT DEMONSTRATE THAT MANY OF THE CITIES AND METRO

**14**  AREAS YOU CAN THINK OF IN LOUISIANA ARE STILL HIGHLY

**15**  SEGREGATED BY RACE.  SO THE OTHER -- OTHERING &

**16**  BELONGING INSTITUTE CHARACTERIZED SEVERAL

**17**  METROPOLITAN AREAS IN THE STATE AS HIGH SEGREGATION,

**18**  INCLUDING THE NEW ORLEANS, METAIRIE, KENNER AREA,

**19**  BATON ROUGE, SHREVEPORT, BOSSIER CITY AND LAKE

**20**  CHARLES AS WELL.

**21**     **Q**    IS THERE ANY INTERPLAY BETWEEN SEGREGATION

**22**  AND DISASTER RELIEF?

**23**     **A**    YES.  SO ONE OF THE ISSUES WITH RESPECT TO

**24**  HOW POLICIES ARE SHAPING BOTH WHERE PEOPLE LIVE AND

**25**  WHERE PEOPLE CAN LIVE IS WITH RESPECT TO DISASTER

02:01p

1   RELIEF.  AND IT'S MUCH HARDER FOR -- FOR INSTANCE,

2   AFTER KATRINA IN 2005, MOST OF THE NEIGHBORHOODS THAT

3   SUSTAINED THE MOST DAMAGE WERE -- HAD A HIGHER BLACK

4   POPULATION THAN NEIGHBORHOODS THAT DIDN'T SUSTAIN A

5   LOT OF DAMAGE.  BUT IT'S ALSO THE CASE THEN THAT

6   BLACK NEW ORLEANS RESIDENTS WERE MORE LIKELY TO BE

7   DISPLACED AND THEN HAD A HARDER TIME COMING BACK TO

8   THE CITY AND -- BECAUSE OF DELAYED TIMING OF DISASTER

9   RELIEF AND REBUILDING EFFORTS.

10         SO IT'S NOT JUST THE CASE THAT IT'S

11  CONTEMPORARY ISSUES WITH RESPECT TO POLICY SHAPING --

12  WHO CAN COME BACK AND WHO CAN LIVE WHERE -- THERE IS

13  ALSO SOME -- IN THE PAST THERE IS ALSO SOME

14  CONTEMPORARY POLICIES SUCH AS HOW DISASTER RELIEF IS

15  HANDLED AND WAS HANDLED AFTER NATURAL DISASTERS THAT

16  CAN SHAPE WHO GETS TO LIVE WHERE AND WHO CAN AFFORD

17  TO COME BACK.

18     Q    THANK YOU, DR. BURCH.

19         LET'S TURN TO YOUR OVERARCHING OPINIONS ON

20  HOUSING DISPARITIES IN LOUISIANA.  FROM YOUR ACADEMIC

21  ASSESSMENT, WHAT EXPLAINS THESE PATTERNS OF

22  SEGREGATION BASED ON RACE IN LOUISIANA IN THE PAST

23  AND TODAY?

24     A    SO THERE ARE BOTH CONTEMPORARY AND

25  HISTORICAL FACTORS SUCH AS RACIAL DISCRIMINATION BY

02:02p

**1**  GOVERNMENT AND MARKET ACTORS THAT CAN SHAPE PATTERNS

**2**  OF RESIDENTIAL RACIAL SEGREGATION.  AND RACIAL

**3**  RESIDENTIAL SEGREGATION IS IMPORTANT SIMPLY BECAUSE

**4**  THERE IS -- IT'S BEEN SHOWN TO AFFECT VOTING THROUGH

**5**  A NUMBER OF MECHANISMS.  SEGREGATION HAS BEEN SHOWN

**6**  TO INCREASE -- DECREASE BLACK VOTER TURNOUT.  AND

**7**  ALSO SEGREGATED BLACK AREAS, I CITE RESEARCH IN MY

**8**  REPORT THAT TALKS ABOUT HOW THOSE AREAS TEND TO HAVE

**9**  LESS ACCESS TO PUBLIC GOODS SUCH AS TRANSPORTATION OR

**10**  POLLING PLACES THAT MIGHT MATTER FOR VOTING.  AND

**11**  RACIAL RESIDENTIAL SEGREGATION IS ALSO AN IMPORTANT

**12**  DETERMINATE, AS I TALK ABOUT IN MY REPORT, OF SOME OF

**13**  THE OTHER FACTORS THAT ALSO SHAPE VOTING, LIKE

**14**  ECONOMIC OUTCOMES AND HEALTH OUTCOMES AS WELL.  SO

**15**  ALL OF THESE FACTORS ARE ALSO NOT SEPARATE BUT

**16**  INTERPLAY WITH ONE ANOTHER AS WELL.

**17**      Q    LET'S DISCUSS YOUR FINDINGS ON HEALTH

**18**  DISPARITIES IN LOUISIANA.  TURNING TO THE SLIDE ON

**19**  YOUR SCREEN WHICH REPRODUCES FIGURE 11 FROM PAGE 17

**20**  OF YOUR REPORT, WHAT CAN YOU TELL US ABOUT THIS

**21**  CHART?

**22**      A    SO THIS IS A CHART TAKEN FROM THE CDC'S

**23**  CHRONIC DISEASE INDICATORS FOR LOUISIANA ADULTS.  AND

**24**  IT LOOKS AT DISEASE MORTALITY AND RACE FOR SOME

**25**  DIFFERENT DISEASES WHICH TYPICALLY TEND TO BE LARGE

02:03p

1  -- HIGH SOURCES OF MORTALITY IN POPULATIONS.  AND AS

2  YOU CAN SEE, AGAIN BLACK PEOPLE ARE THE PURPLE BARS

3  AND WHITE PEOPLE ARE THE GOLD BARS.  AND FOR EACH OF

4  THESE DISEASES, BLACK PEOPLE ARE MORE LIKELY TO DIE

5  FROM THEM THAN WHITE PEOPLE.

6       INTERESTINGLY ENOUGH, THOUGH, AT LEAST FOR

7  CANCER, ONE OF THE THINGS THAT'S INTERESTING IS THAT

8  THE RATES OF GETTING CANCER BETWEEN BLACK AND WHITE

9  LOUISIANIANS ACTUALLY ISN'T THAT DIFFERENT.  BUT

10 BLACK PEOPLE TEND TO JUST HAVE WORSE OUTCOMES WITH

11 RESPECT TO GETTING -- WITH RESPECT TO DYING FROM

12 CANCER.

13   Q   TURNING TO THE NEXT SLIDE, REPRODUCING

14 FIGURE 12 FROM PAGE 17 OF YOUR REPORT, WHAT DOES THIS

15 CHART TELL US?

16   A   SO THIS CHART LOOKS AT LIFE EXPECTANCY AT

17 BIRTH.  AND THIS -- AND LIFE EXPECTANCY IS REALLY

18 JUST KIND OF A -- GIVES YOU A OVERARCHING SENSE OF

19 THE HEALTH OF A POPULATION.  AND THIS IS FROM THE

20 LOUISIANA DEPARTMENT OF PUBLIC HEALTH.  AND IT LOOKS

21 AT LIFE EXPECTANCY BETWEEN MEN AND WOMEN FOR THE TWO

22 DIFFERENT GROUPS.

23       AND AGAIN, WITH WHITE IN YELLOW AND BLACK IN

24 PURPLE, A LOT OF THESE HEALTH DISPARITIES AND OTHER

25 ISSUES TRANSLATE INTO JUST LONGER LIVES BY A NUMBER

02:04p

1   OF YEARS.  SO WHITE MEN ARE EXPECTED -- AND WHITE

2   WOMEN ARE EXPECTED TO LIVE SEVERAL YEARS LONGER THAN

3   BLACK MEN AND WOMEN IN LOUISIANA.

4       Q    TURNING TO THE NEXT SLIDE, REPRODUCING

5   FIGURE 13 FROM PAGE 18 OF YOUR REPORT, WHAT DO WE

6   LEARN FROM THIS CHART ABOUT ACCESS TO HEALTH

7   INSURANCE FOR BLACK LOUISIANIANS?

8       A    SO SOME OF THESE FACTORS CAN BE EXPLAINED BY

9   SOME POLICIES.  SO, FOR INSTANCE, LOUISIANIANS

10  WITHOUT HEALTH INSURANCE COVERAGE BY RACE, WE CAN SEE

11  HERE -- AGAIN, WITH BLACK IN PURPLE AND WHITE IN

12  YELLOW -- THERE ARE SLIGHTLY -- BLACK PEOPLE ARE

13  SLIGHTLY MORE LIKELY TO BE UNINSURED THAN WHITE

14  PEOPLE.

15      Q    DR. BURCH, DO ENVIRONMENTAL FACTORS

16  CONTRIBUTE TO RACIAL HEALTH DISPARITIES IN LOUISIANA?

17      A    YES.  SO I CITE SEVERAL STUDIES THAT TALK

18  ABOUT THE ENVIRONMENTAL FACTORS THAT CAN SHAPE HEALTH

19  OUTCOMES.  SO AS I JUST MENTIONED, KATRINA, NATURAL

20  DISASTERS ARE ONE AVENUE.  AND ESPECIALLY WITH

21  KATRINA, BLACK PEOPLE WERE SIGNIFICANT -- IN ORLEANS

22  PARISH ACROSS ALL AGE GROUP CATEGORIES AGE 30 YEARS

23  AND OLDER, THEY WERE JUST MORE LIKELY TO HAVE DIED IN

24  THAT STORM THAN PEOPLE OF OTHER RACIAL GROUPS.

25          BUT ALSO THE WAY THAT CHEMICAL PLANTS ARE

02:06p

1   CITED, PARTICULARLY IN THE AREA OF THE STATE KNOWN AS

2   CANCER ALLEY, THAT CAN EXPOSE RESIDENTS TO HIGH

3   LEVELS OF AIR POLLUTION AND OTHER DANGERS.  AND THOSE

4   HAVE BEEN SHOWN TO DETRIMENTALLY AFFECT HEALTH.  SO

5   STUDIES IN THAT AREA HAVE LINKED HIGH LEVELS OF AIR

6   POLLUTION TO RESPIRATORY ILLNESSES LIKE CANCER, COVID

7   19, AND ASTHMA.

8       Q    THANK YOU, DR. BURCH.

9            I'D LIKE TO TURN TO YOUR OVERARCHING

10  OPINIONS ON HEALTH DISPARITIES IN LOUISIANA.  FIRST,

11  DR. BURCH, FROM YOUR ACADEMIC ASSESSMENT, WHAT

12  EXPLAINS THESE MEASURES OF INEQUITY IN HEALTHCARE AND

13  HEALTH OUTCOMES AND MORTALITY IN LOUISIANA THAT WE'VE

14  JUST DISCUSSED?

15      A    SO I TALK ABOUT IN MY REPORT THE WAYS -- AND

16  I'VE TALKED TODAY -- ABOUT THE WAYS THAT HEALTH

17  DISPARITIES ARE SHAPED BY GOVERNMENT AND MARKET

18  POLICIES.  AND THEY CAN AFFECT THE SITE OF

19  ENVIRONMENTAL HAZARDS AS WELL AS ACCESS TO HEALTHCARE

20  THAT CAN HAPPEN THROUGH HEALTH INSURANCE.  BUT ALSO I

21  TALK ABOUT IN MY REPORT THE WAYS THAT ACCESS IS

22  SHAPED BY RACIAL RESIDENTIAL SEGREGATION.

23            SO ALSO, THE REASON THAT'S IMPORTANT IS

24  BECAUSE HEALTH, AS I ALLUDED TO EARLIER, IS AN

25  IMPORTANT PREDICTOR OF VOTER TURNOUT.  SO THERE ARE

02:07p

1    LOTS OF REASONS THAT HEALTHY PEOPLE ARE MORE LIKELY

2    TO VOTE.  BUT PART OF THAT IS JUST THAT IF YOU'RE

3    REALLY SICK, YOU DON'T HAVE THE TIME AND THE MONEY TO

4    GO VOTE OR ENGAGE IN POLITICS.  IF YOU HAVE IMPAIRED

5    COGNITIVE FUNCTIONING OR PHYSICAL DISABILITY, IT

6    MIGHT MAKE VOTING MORE DIFFICULT.  AND PEOPLE -- AND

7    LIKEWISE, PEOPLE WITH DISABILITIES ARE LESS LIKELY TO

8    VOTE.  AND SOMETIMES THAT'S EXPLAINED BY PROBLEMS

9    WITH POLLING PLACE ACCESSIBILITY, BUT THERE MIGHT BE

10   OTHER KINDS OF ISSUES THAT THEY FACE THAT MAKES IT

11   HARDER FOR THEM TO VOTE AS WELL.

12       Q    THANK YOU, DR. BURCH.

13            LET'S TURN FINALLY FOR SENATE FACTOR 5 TO

14   YOUR ANALYSIS OF DISPARITIES IN LOUISIANA'S CRIMINAL

15   LAW ENFORCEMENT AND PRISON SYSTEMS.

16            BEFORE WE DIVE INTO SOME OF THE QUANTITATIVE

17   DATA YOU CITE, CAN YOU PLEASE PROVIDE SOME INSIGHT

18   INTO THE HISTORIC ROOTS OF LOUISIANA'S CRIMINAL LAW

19   ENFORCEMENT IN PRISON SYSTEMS THAT FRAME YOUR

20   ANALYSIS?

21       A    YES.  SO I TALK IN MY REPORT AT FIRST ABOUT

22   THE HISTORY OF ANGOLA PLANTATION AND HOW IT BECAME

23   ANGOLA PENITENTIARY.  AND ONE OF THE REALLY

24   INTERESTING PHENOMENA THAT I THINK SHAPE BOTH THAT

25   STORY, WHICH IS SO IMPORTANT TO ANGOLA ITSELF -- THEY

02:08p

1  HAVE IT ON THEIR WEBSITE AS KIND OF LIKE A LONG

2  HISTORY OF THE INSTITUTION.  BUT THERE IS THIS REPORT

3  BY THE BUREAU OF JUSTICE STATISTICS THAT LOOKS OVER

4  TIME AT PRISON ADMISSIONS IN DIFFERENT STATES BY

5  RACE.

6          AND ONE OF THE MOST INTERESTING IDEAS THAT

7  COME FROM THIS CHART IS THAT IF YOU LOOK JUST AT THE

8  DATA ON PRISON ADMISSIONS IN LOUISIANA FROM 1925

9  UNTIL 1975, IN THAT 50-YEAR PERIOD, BLACK PEOPLE

10 HAVE -- ADMISSIONS RATES HAVE -- BLACK PEOPLE HAVE

11 ALWAYS BEEN ABOUT 60 PERCENT OF PEOPLE ADMITTED TO

12 PRISON IN LOUISIANA OVER TIME THROUGHOUT HISTORY.

13 AND THEY'RE ABOUT 66 PERCENT OF THE PRISON POPULATION

14 TODAY.  SO THAT UNBROKEN LINE I THINK IS -- AND THAT

15 CONTINUITY IS SOMETHING WE DON'T OFTEN SEE IN SOCIAL

16 SCIENCE.  SO IT'S DEFINITELY IMPORTANT TO ME TO KIND

17 OF LINK THAT HISTORICAL TRAJECTORY WITH WHAT WE SEE

18 IN THE STATE TODAY.

19    Q    TURNING TO THE NEXT SLIDE, REPRODUCING

20 FIGURE 15 FROM PAGE 21 OF YOUR REPORT, WHAT DOES THIS

21 CHART INDICATE?

22    A    SO THIS IS A CHART THAT IS FROM THE

23 LOUISIANA DEPARTMENT OF PUBLIC SAFETY AND CORRECTION

24 THAT LOOKS AT CORRECTIONAL POPULATIONS BY RACE IN THE

25 STATE TODAY.  AND AGAIN, BLACK PEOPLE ARE

02:10p

**1**   OVER-REPRESENTED IN ALL ASPECTS OF CORRECTIONS IN

**2**   LOUISIANA.  SO, OF COURSE, AS I JUST SAID WITH THE

**3**   PRISON POPULATION, THERE IS ABOUT TWO-THIRDS BLACK,

**4**   AND THE PROBATION POPULATION IS SLIGHTLY LESS THAN

**5**   HALF, AGAIN, WHICH REPRESENTS OVER-REPRESENTATION.

**6**   THE PROBATION POPULATION IS BLACK AND THE PAROLE

**7**   POPULATION IS DISPROPORTIONATELY AND MAJORITY BLACK

**8**   AS WELL.

**9**       Q    DR. BURCH, FROM YOUR UNDERSTANDING, ARE

**10**  PEOPLE WHO ARE INCARCERATED DUE TO A CONVICTION ABLE

**11**  TO VOTE IN LOUISIANA?

**12**      A    NO.

**13**      Q    FROM YOUR UNDERSTANDING, ARE VOTING RIGHTS

**14**  AUTOMATICALLY RESTORED FOR PEOPLE ON THE DAY THEY ARE

**15**  RELEASED FROM INCARCERATION?

**16**      A    NO.  IT TAKES SOME TIME.

**17**      Q    TURNING TO SLIDE 37 IN FRONT OF YOU, WHAT IS

**18**  THE IMPACT OF FELONY DISENFRANCHISEMENT POLICIES IN

**19**  LOUISIANA ON THE SIZE OF THE ELECTORATE?

**20**      A    SO ACCORDING TO A STUDY OF MANS AND UGGEN --

**21**  NOT MANS AND UGGEN.  I'M SORRY.  THE SENTENCING

**22**  PROJECT AND CHRIS UGGEN AND CO-AUTHORS -- ALMOST

**23**  48,000 BLACK LOUISIANIANS WERE UNABLE TO VOTE IN THE

**24**  2020 ELECTION DUE TO THEIR FELONY CONVICTIONS.  AND

**25**  AGAIN, A DISPROPORTIONATE AMOUNT OF THE BLACK VOTING

02:11p

1  AGE POPULATION IN LOUISIANA CANNOT VOTE DUE TO A

2  FELONY, RELATIVE TO PEOPLE IN OTHER GROUPS.

3     Q    DR. BURCH, LET'S TURN TO YOUR OVERALL

4  CONCLUSIONS REGARDING THE IMPACT OF CRIMINAL LAW

5  ENFORCEMENT IN LOUISIANA.  FROM YOUR ACADEMIC

6  ASSESSMENT, WHAT EXPLAINS THESE MEASURES OF INEQUITY

7  IN THE STATE?

8     A    SO CRIMINAL JUSTICE INVOLVEMENT DOES AFFECT

9  VOTING, AND THOSE OUTCOMES, AS I SHOWED, VARY BY

10  RACE.  AND -- BUT RESEARCH HAS SHOWN THAT RACIAL

11  DISCRIMINATION PLAYS A ROLE IN PRODUCING THOSE RACIAL

12  DISPARITIES IN CRIMINAL JUSTICE IN LOUISIANA IN THE

13  PAST.  AND THERE IS CONTEMPORARY RESEARCH THAT ALSO

14  SHOWS -- THAT I CITE IN MY REPORT -- THAT TALKS ABOUT

15  THESE ISSUES IN LOUISIANA TODAY.

16         SO THERE ARE SEVERAL STUDIES THAT TALKS

17  ABOUT EITHER THE LIKELIHOOD THAT A BLACK PERSON WILL

18  RECEIVE THE DEATH PENALTY FOR KILLING A BLACK VICTIM

19  VERSUS A WHITE VICTIM THAT I CITE, OR DATA THAT TALKS

20  ABOUT HOW PROSECUTORS TREAT BLACK VICTIMS RATHER THAN

21  WHITE VICTIMS.  BUT I ALSO CITE SOME REALLY

22  INTERESTING DISPARITIES BETWEEN ARRESTS AND

23  SENTENCING.  SO ABOUT TWO -- I THINK ABOUT 63

24  PERCENT -- 65 PERCENT OF THE PEOPLE IN LOUISIANA IN

25  PRISON FOR A DRUG CONVICTION ARE BLACK.  BUT THEN

02:13p

1   WHEN YOU LOOK AT THE ARREST DATA, A MAJORITY OF THE

2   PEOPLE WHO ARE ARRESTED FOR SERIOUS DRUG OFFENSES IN

3   LOUISIANA -- SO THOSE THAT INCLUDE EITHER TRAFFICKING

4   OF ANY DRUG OR POSSESSION OF A HARD DRUG -- ARE

5   WHITE.  SO THE UNDERLYING DATA IN TERMS OF

6   CRIMINALITY AREN'T REALLY EXPLAINING THOSE OUTCOMES

7   WITH RESPECT TO INCARCERATION IN -- AT LEAST WITH

8   RESPECT TO DRUG CONVICTIONS AND DRUG CRIMES.

9           SO -- YES, SO THOSE PATTERNS OF OUTCOMES

10  CAN'T BE FULLY EXPLAINED BY THE DIFFERENTIAL

11  COMMISSION OF CRIMES BY RACE.  AND THEN YOU -- SO

12  THEN YOU HAVE TO LOOK TO THESE OTHER FACTORS LIKE --

13  THAT I CITE IN MY REPORT -- LIKE OVER-POLICING OR

14  DISCRIMINATION IN SENTENCING AND THE LIKE TO EXPLAIN

15  THOSE DISPARITIES.

16      Q   YOU TOUCHED ON THIS A BIT, BUT CAN YOU

17  EXPLAIN HOW, IF AT ALL, THESE DISPARITIES REFLECT ON

18  ACCESS TO THE POLITICAL PROCESS FOR BLACK

19  LOUISIANIANS?

20      A   YES, SURE.  SO PART OF HOW VOTING -- VOTING

21  CAN BE AFFECTED BY CRIMINAL JUSTICE IS VERY CLEAR

22  THROUGH, LIKE I SAID, FELONY DISENFRANCHISEMENT LAWS.

23  BUT MY WORK AND THE WORK OF SEVERAL OTHER PEOPLE IN

24  POLITICAL SCIENCE HAVE -- IT'S SHOWN THAT THESE

25  INTERACTIONS WITH THE CRIMINAL JUSTICE SYSTEM

02:14p

1    GENERALLY, ESPECIALLY THOSE THAT MIGHT BE SEEN AS

2    UNFAIR, TEND TO DEMOBILIZE VOTING AND MAKE PEOPLE SHY

3    AWAY FROM PARTICIPATING IN POLITICS.

4        Q    THANK YOU, DR. BURCH.

5            LET'S MOVE ON TO YOUR DISCUSSION OF SENATE

6    FACTOR 6 REGARDING THE USE OF RACIAL CAMPAIGN APPEALS

7    IN LOUISIANA.  TO BEGIN, WHAT IS A RACIAL APPEAL?

8        A    SO A RACIAL APPEAL IS A USE OF A CODE WORD

9    OR IMAGES OR SOME OTHER KIND OF ASPECT IN A CAMPAIGN

10   THAT MAKES VOTERS THINK ABOUT OR TAKE RACE INTO

11   CONSIDERATION WHEN THEY'RE MAKING CHOICES IN POLICY

12   DECISIONS AND CANDIDATE CHOICE.  THOSE CAN BE EITHER

13   OVERT, MEANING THEY SAY THEY'RE TALKING ABOUT RACE,

14   OR SUBTLE, IN WHICH THEY DON'T USE THE ACTUAL

15   LANGUAGE OF RACE BUT MIGHT -- IT MIGHT RELY MORE

16   HEAVILY ON IMAGERY OR OTHER KINDS OF CODE WORDS.

17       Q    THINKING ABOUT THE LANGUAGE THAT ADS MAY

18   EMPLOY, WHAT ARE SOME EXAMPLES OF CODE WORDS USED IN

19   RACIAL APPEALS?

20       A    THERE IS LOTS OF THEM IN THE LITERATURE.  SO

21   "INNER-CITY," "SANCTUARY CITY," "CRIME," "WELFARE,"

22   "ILLEGAL IMMIGRATION," STUFF LIKE THAT.

23       Q    ARE THERE ANY ADDITIONAL OR MORE RECENT

24   EXAMPLES FROM CONTEMPORARY POLITICAL DISCOURSE?

25       A    THERE IS LIKE "URBAN" OR "GANG," LIKE "WOKE"

02:15p

1    AND "CRITICAL RACE THEORY."  BUT I DON'T KNOW IF

2    THOSE -- THOSE ARE -- I DON'T KNOW IF THOSE ARE EVEN

3    CODE WORDS, BECAUSE LIKE "RACE" IS IN "CRITICAL RACE

4    THEORY," SO THAT MIGHT BE MORE EXPLICIT.

5        Q    HOW ABOUT VISUAL CUES OR SIGNALS THAT ADS

6    MAY EMPLOY?  WHAT ARE SOME EXAMPLES?

7        A    SO WHEN ANALYZING TELEVISION CAMPAIGN ADS,

8    THESE ADS -- MCILWAIN AND CALIENDO FIND THAT THEY

9    TEND TO CONTAIN CERTAIN ELEMENTS.  AND THOSE ELEMENTS

10   ARE THE INVOCATION OF A SALIENT STEREOTYPE ABOUT THE

11   MINORITY GROUP, SO THAT MIGHT BE CRIMINALITY,

12   LAZINESS, TAKING UNDESERVED ADVANTAGE, COUPLED WITH

13   THE CHARGE OF LIBERALISM, SO EXTREME LIBERAL,

14   DANGEROUS LIBERAL, RADICAL.  SO THOSE TWO -- THOSE

15   THINGS GROUPED TOGETHER.

16        THEY SOMETIMES OFTEN SHOW THE IMAGE OF THE

17   MINORITY OPPONENT OR A MINORITY POLITICAL CANDIDATE

18   AND THEN THEY MIGHT ALSO CONTAIN IMAGES OF THE

19   ALL-WHITE -- ALL-WHITE, NONCANDIDATE IMAGES.  SO

20   THERE MIGHT BE LIKE IMAGES OF VOTERS WHO ARE ALL

21   WHITE.  SO THOSE ARE THE PEOPLE WHO ARE, FOR

22   INSTANCE, BEING PROTECTED FROM THE ISSUES IN THE

23   SALIENT STEREOTYPE.  AND SO THAT AUDIENCE WOULD

24   INCLUDE A HIGH PERCENTAGE OF WHITE POTENTIAL VOTERS.

25        Q    FROM YOUR REVIEW OF THE ACADEMIC LITERATURE,

02:17p

1   ARE RACIAL APPEALS EFFECTIVE AT INFLUENCING VOTER

2   BEHAVIOR?

3       A    YES.  SO BOTH IMPLICIT AND NOW EXPLICIT

4   APPEALS HAVE ALSO BEEN SHOWN TO BE EFFECTIVE IN

5   INFLUENCING VOTER BEHAVIOR.

6       Q    HOW SO?

7       A    TO THE EXTENT THAT THEY CAN -- LET ME MAKE

8   SURE I GET THIS RIGHT.  SO THEY CAN MAKE THOSE RACIAL

9   ATTITUDES AND CONCERNS MORE SALIENT IN THE MINDS OF

10  VOTERS, AND THEY CAN MAKE IT SO THAT CERTAIN KINDS OF

11  VOTERS -- I'M SORRY.  I'M TRYING TO SUMMARIZE A BUNCH

12  OF LITERATURE AT ONCE.  BUT, FOR EXAMPLE, YOU MIGHT

13  SEE PEOPLE THINK MORE ABOUT WEIGHING CRIMINAL JUSTICE

14  OR MIGHT WANT TO THINK ABOUT HARSHER CRIMINAL JUSTICE

15  PENALTIES IF THEY SEE AN AD WITH LIKE A MINORITY

16  MUGSHOT THAN IF THEY'RE LOOKING AT SOME OTHER KIND OF

17  AD IN SUPPORT OF A CANDIDATE.

18      Q    AND DO RACIAL APPEALS HAVE ANY DIFFERING

19  IMPACT DEPENDING ON THE AUDIENCE?

20      A    YES.  SO RACIAL APPEALS, DEPENDING ON

21  WHETHER THEY ARE SHOWN BY -- EXPERIENCED BY BLACK

22  MEMBERS AS WELL AS WHITE MEMBERS CAN HAVE DIFFERENT

23  EFFECT.  SO CERTAIN KINDS OF RACIAL APPEALS,

24  ESPECIALLY THOSE THAT ARE DESIGNED TO MAKE BLACK

25  VOTERS FEEL LIKE THEIR CHOSEN CANDIDATES DON'T CARE

02:18p

1    ABOUT THEM.  KIND OF LIKE THE STUFF THAT TROLL FARMS

2    DID ABOUT HILLARY CLINTON IN 2016, THOSE KINDS OF ADS

3    HAVE BEEN SHOWN TO DEMOBILIZE BLACK VOTERS, AND THEY

4    DON'T HAVE THAT EFFECT ON WHITE VOTERS.

5        Q    DR. BURCH, IF YOU CAN TURN YOUR ATTENTION TO

6    THE NEXT SLIDE, WHAT DOES THIS SLIDE DEPICT?

7        A    SO THESE ARE SOME --

8            MR. LEWIS:  EXCUSE ME.  YOUR HONOR, I'M

9    GOING TO OBJECT TO THIS.  THESE IMAGES WERE NOT

10   PRODUCED IN DISCOVERY.  THEY WERE NOT PRODUCED AS

11   PART OF DR. BURCH'S REPORT OR HER REPORT BACK-UP.

12   THEY HAVE NOT BEEN PROVIDED, EITHER THE IMAGES OR THE

13   UNDERLYING VIDEOS THAT -- FROM WHICH THE IMAGES WERE

14   DERIVED.

15           THE COURT:  MS. WENGER, DO YOU WANT TO

16   RESPOND?

17           MS. WENGER:  CERTAINLY.  SO THESE IMAGES ARE

18   DISCUSSED IN DR. BURCH'S REPORT.  I CAN PULL UP THE

19   SITE.  ON PAGE 23 IN THE MIDDLE OF THE PAGE -- WE CAN

20   TAKE THE SLIDE DOWN FOR NOW.

21           IN THE MIDDLE OF THE PAGE ON PAGE 23, THESE

22   IMAGES ARE DISCUSSED AT LENGTH BY DR. BURCH.  AND THE

23   SLIDE DECK THAT WE'RE USING IS NOT MEANT TO BE

24   ADMITTED INTO THE RECORD.  IT IS SIMPLY AN

25   ILLUSTRATIVE VISUAL AID FOR THE ASSISTANCE OF THE

02:20p

1  COURT AND OTHER PEOPLE IN THE ROOM TO UNDERSTAND WHAT

2  DR. BURCH HAS ALREADY DESCRIBED AT LENGTH AND CAN

3  TEXTUALIZE IN HER EXPERT REPORT.  SO WE CERTAINLY

4  DON'T THINK THERE IS ANY UNDUE BIAS BY HAVING THESE

5  DISPLAYED IN THIS SETTING.  BUT WE'RE CERTAINLY NOT

6  RELYING ON THEM IF YOUR HONOR FEELS OTHERWISE.

7          THE COURT:  MR. LEWIS, DO YOU WANT TO

8  RESPOND TO THAT?

9          MR. LEWIS:  YES, YOUR HONOR.  IT'S ONE THING

10 TO HAVE A TEXTUAL DESCRIPTION TO SAY THERE WAS AN AD

11 THAT DOES SOMETHING.  IT'S QUITE ANOTHER TO THEN, YOU

12 KNOW, DISPLAY IMAGES AND USE -- WHICH IS BEING USED

13 FOR EVID- -- IT'S EVIDENTIARY IN CHARACTER.  IT

14 WASN'T PRODUCED.  IT WASN'T IN THE REPORT.  IT WASN'T

15 LINKED FROM THE REPORT.  IT WASN'T IN THE REPORT.

16         THE COURT:  IT IS IN THE REPORT, THE IMAGERY

17 OF THE AD THAT CONTAIN ALL-WHITE, NONCANDIDATE IMAGES

18 OF -- AND SHE MENTIONS THE NAMES THAT I BRIEFLY SAW

19 ON THE PHOTOGRAPHS BEFORE THEY WERE TAKEN DOWN.  I

20 MEAN, THE REPORT -- I'M LOOKING AT IT AND IT DOES

21 DESCRIBE THOSE EXACT IMAGES, AS BEST I CAN TELL FROM

22 WHAT I SAW.  MORE IMPORTANTLY, MS. WENGER IS SAYING

23 THAT THEY'RE NOT -- SHE'S NOT OFFERING THEM INTO

24 EVIDENCE; SHE'S USING THEM ILLUSTRATIVELY.

25         SO DO YOU -- IS IT YOUR CONTENTION THAT

02:21p

1   AS THE TRIER OF THE FACT I'M GOING TO BE SO SHOCKED

2   AND HORRIFIED THAT I'M NOT GOING TO BE ABLE TO --

3   YOU'RE NOT GOING TO BE ABLE TO UNRING THE BELL?  I

4   MEAN, THEY DIDN'T LOOK THAT SHOCKING.

5        MR. LEWIS:  I DON'T -- YOUR HONOR, I JUST --

6   I'M JUST TRYING TO, YOU KNOW, FOOT TO THE RULES OF

7   EVIDENCE.  THEY HAD PLENTY OF OPPORTUNITY --

8        THE COURT:  SHE'S NOT PUTTING IT INTO

9   EVIDENCE.

10        MR. LEWIS:  AND IT'S ALSO -- WE'D ALSO ADD

11   THAT UNDER RULE 1006, IT'S ALSO NOT IMPROPER SUMMARY

12   BECAUSE IT'S A DIFFERENT MEDIUM, RIGHT.  IT'S A TEXT

13   DESCRIPTION, THERE IS A VIDEO, THEN THERE IS THE

14   STILL FROM A VIDEO, YOU KNOW, NONE OF WHICH HAVE

15   BEEN -- HAVE BEEN PROVIDED.  SO I -- THAT'S OUR

16   POSITION.

17        THE COURT:  AND I THINK YOU MAKE A GOOD

18   POINT.  ACTUALLY, THE SUMMARY ARGUMENT THAT YOUR

19   CO-COUNSEL GAVE YOU WAS PRETTY INGENIOUS.  BUT SHE'S

20   NOT OFFERING THEM INTO EVIDENCE.  AND I THINK, AS THE

21   TRIER OF FACT, THEY'RE NOT -- YOU KNOW, THEY'RE NOT

22   PICTURES THAT -- THEY'RE NOT "SHOCKING THE

23   CONSCIENCE" TYPE PICTURES, SO I THINK THAT IT'S

24   PROBABLY OKAY.  I'M GOING TO OVERRULE YOUR OBJECTION.

25   THEY'RE NOT COMING INTO EVIDENCE.

02:22p

**1**        YOU MAY SHOW THE PHOTOS.

**2**         **MS. WENGER:**  THANK YOU, YOUR HONOR.

**3** BY MS. WENGER:

**4**    **Q**   DR. BURCH, WITH THE REPORT YOU HAVE IN FRONT

**5** OF YOU, IF YOU COULD TURN TO PAGE 23 JUST SO THAT WE

**6** CAN USE THAT FOR CONTEXT IN WHAT YOU'RE DESCRIBING.

**7** WE HAVE SOME VISUALS ON THIS SCREEN, BUT I'D LIKE TO

**8** HAVE YOU WALK THROUGH TRULY WHAT YOU'RE TALKING ABOUT

**9** ON PAGE 23 OF YOUR REPORT IN RELATION TO THE 2019

**10** GUBERNATORIAL ELECTION.

**11**    **A**   YES.  SO AS I SAID BEFORE, THERE ARE SOME

**12** HALLMARKS OF THE KINDS OF ADS THAT WE WOULD -- OF ADS

**13** THAT CONSTITUTE IMPLICIT RACIAL APPEALS.  AND AS I

**14** SAID BEFORE, SO THIS AD THAT WAS BY CANDIDATE EDDIE

**15** RISPONE BEGINS WITH MUGSHOTS OF BLACK MEN PROMINENTLY

**16** DISPLAYED ALONGSIDE ADDITIONAL MUGSHOTS OF TWO OTHER

**17** MEN WHO COULD BE LATINO.  THE IMAGERY -- THEN ALSO IN

**18** THE UPPER CORNER CONTAINS THE ALL-WHITE, NONCANDIDATE

**19** IMAGES OF RISPONE WITH HIS CONSTITUENTS THAT MCILWAIN

**20** AND CALIENDO MARK AS COMMON IN THE SENSE THAT IT'S

**21** LIKE THESE ARE THE PEOPLE WE'RE TRYING TO PROTECT.

**22**        AND THEN YOU ALSO SEE WORDS LIKE "SANCTUARY

**23** CITY," AGAIN, THOSE CODE WORDS AS WELL.  AND I HAVE

**24** THE TEXT OF THE AUDIO AS WELL, WHICH SAYS "DANGEROUS,

**25** SICK, VIOLENT.  JOHN BEL EDWARDS PUT THEM BACK ON OUR

02:23p

1   STREETS WHERE THEY ROBBED, ATTACKED, MURDERED.  UNDER

2   EDWARDS MURDER IS UP 20 PERCENT.  THOUSANDS OF

3   DANGEROUS CRIMINALS RELEASED AND NEW ORLEANS A

4   SANCTUARY CITY MECCA FOR LAWLESSNESS.  EDDIE RISPONE

5   WILL BAN SANCTUARY CITIES AND LEAVE FORGIVENESS TO

6   GOD, NOT GOVERNMENT.  COMMIT THE CRIME, DO THE TIME.

7   EDDIE RISPONE FOR GOVERNOR."

8       Q    THANK YOU, DR. BURCH.

9            I'D LIKE TO LEAN IN A LITTLE BIT MORE TO

10  YOUR DISCUSSION OF IMPLICIT RACIAL APPEALS.  ARE

11  THESE APPEALS MEANT TO SHOCK THE CONSCIENCE OR ARE

12  THEY DESIGNED TO CUE OTHER SIGNALS OR SUBCONSCIOUS

13  BIASES?

14      A    YES.  SO I CAN GO BACK TO MY REPORT AND TALK

15  SPECIFICALLY ABOUT THIS.  CANDIDATES -- BECAUSE --

16  THESE ADS HAPPEN BECAUSE CANDIDATES -- I'M ON PAGE 22

17  OF MY REPORT.  THEY STILL HAVE AN INCENTIVE TO APPEAL

18  TO WHITE RACIAL FEARS.  AND KIND OF THIS COMBINATION

19  OF PHENOMENA, THE NEED TO APPEAR RACIALLY EGALITARIAN

20  WHILE ACTIVATING RACIAL ATTITUDES IS WHY YOU HAVE TO

21  DO THIS THROUGH COVERT OR IMPLICIT MEANS SUCH AS

22  IMAGES OR CODED LANGUAGE.  SO IT'S ALMOST TRYING TO

23  ACT SUBCONSCIOUSLY.

24      Q    DOES THAT REFLECT AT ALL ON WHY THESE CUES

25  MIGHT RESONATE DIFFERENTLY FOR DIFFERENT AUDIENCES?

02:25p

1    **A**    YES.

2    **Q**    CAN YOU DESCRIBE EXAMPLES OF ANY OTHER KINDS

3  OF RACIAL APPEALS YOU LOOKED AT IN LOUISIANA BEYOND

4  OR INCLUDING THE STATEWIDE ELECTIONS WE JUST

5  DISCUSSED?

6    **A**    I FOCUSED PRIMARILY ON THE GUBERNATORIAL

7  ELECTION.  BUT THERE WERE EVEN IN THAT EXCHANGE SOME

8  OTHER ACTORS, NOT JUST THE CANDIDATES WHO RELEASED

9  ADS.  FOR INSTANCE, I INCLUDE AN EXAMPLE FROM STATE

10  SENATOR CONRAD APPEL AND FROM THE LOUISIANA

11  REPUBLICAN PARTY AS WELL.

12    **Q**    ANY OTHER HISTORIC EXAMPLES OF RACIAL

13  APPEALS THAT YOU IDENTIFIED IN YOUR REPORT?

14    **A**    YES.  SO I ALSO DISCUSSED THE CANDIDACY IN

15  RACIAL APPEALS GOING BACK TO DAVID DUKE IN LOUISIANA,

16  WHO OBVIOUSLY, FOR THE RECORD, WAS A FORMER GRAND

17  WIZARD OF THE KU KLUX KLAN WHO WON A STRONG MAJORITY

18  OF LOUISIANA'S WHITE VOTE IN THREE STATEWIDE

19  ELECTIONS, AND HE RAN ON A PLATFORM THAT OPENLY

20  APPEALED TO WHITE RACIAL FEARS.

21    **Q**    OVERALL, DR. BURCH, WHAT WERE YOUR

22  CONCLUSIONS ABOUT THE EFFECT OF RACIAL CAMPAIGN

23  APPEALS IN LOUISIANA?

24    **A**    SO I CONCLUDED THAT POLITICAL CAMPAIGNS IN

25  LOUISIANA, THERE IS HISTORICAL EVIDENCE THAT THEY

02:26p

1   HAVE MADE RACIAL APPEALS AND THEY STILL HAVE IMPLICIT

2   AND EXPLICIT RACIAL APPEALS THAT COME OUT IN THESE

3   CAMPAIGNS IN THE ELECTIONS THAT I -- THE CONTEMPORARY

4   ELECTIONS THAT I STUDIED.  AND THOSE RACIAL APPEALS

5   FEATURED PROMINENTLY IN THE 2019 GUBERNATORIAL

6   ELECTION.  AND NOT JUST BY THE CANDIDATES BUT OTHER

7   POLITICAL ORGANIZATIONS MADE THEM, TOO.

8        Q    AND DO YOU HAVE ANY REASON TO BELIEVE THAT

9   SIMILAR TYPES OF APPEALS HAVE CEASED TO EXIST IN THE

10  STATE SINCE 2019?

11       A    NO.

12       Q    ALL RIGHT.  LET'S MOVE ALONG TO YOUR

13  ANALYSIS OF SENATE FACTOR 7 REGARDING THE EXTENT TO

14  WHICH BLACK LOUISIANIANS HAVE BEEN ELECTED TO OFFICE.

15            DR. BURCH, IF YOU CAN TURN YOUR ATTENTION TO

16  THE NEXT SLIDE RIGHT HERE, THIS REPLICATES DATA

17  POINTS FROM PAGE 25 OF YOUR REPORT.  JUST OFFERS A

18  VISUALIZATION OF NUMBERS THAT YOU CITE.  WHAT DOES

19  THIS SLIDE CONVEY -- LET'S START WITH THE FEDERAL

20  LEVEL HERE.  WHAT DID YOUR RESEARCH FIND WITH RESPECT

21  TO REPRESENTATION FOR BLACK LOUISIANIANS IN FEDERAL

22  POSITIONS?

23       A    SO IF WE JUST LOOK AT THE LEFT-HAND PART OF

24  THIS SLIDE, WE CAN SEE FOR THE CONGRESSIONAL

25  DELEGATION CURRENTLY IN LOUISIANA THERE -- WHERE THE

02:27p

1  PURPLE IS THE BLACK REPRESENTATIVES AND YELLOW IS

2  WHITE REPRESENTATIVES -- ONE OUT OF SIX

3  REPRESENTATIVES IN THE CONGRESSIONAL DELEGATION ARE

4  BLACK.

5       AND WITH RESPECT TO THE NUMBER OF BLACK

6  LOUISIANIANS WHO HAD EVER BEEN SENT TO CONGRESS,

7  THERE ARE FIVE IN THE HISTORY OF THE STATE.  AT LEAST

8  THREE CAME FROM CONGRESSIONAL DISTRICT 2.  AND SINCE

9  THE -- AND ONE WAS ELECTED IN RECONSTRUCTION.  AND

10  SINCE THEN ALL OF THE OTHERS CAME FROM MAJORITY-

11  MINORITY DISTRICTS.

12     Q   HAS THERE EVER BEEN A BLACK SENATOR ELECTED

13  FROM LOUISIANA?

14     A   I COULD NOT FIND ONE.

15     Q   LET'S LOOK AT SOME OF THE OTHER POSITIONS

16  YOU ANALYZED HERE.  WHAT CAN THEY TELL US ABOUT

17  REPRESENTATION OF BLACK PEOPLE IN LOUISIANA?

18     A   YES.  SO WITH RESPECT TO THE STATE

19  LEGISLATURE, BLACK LEGISLATORS HOLD ABOUT 25 PERCENT

20  OF ALL OF THE STATE LEGISLATIVE SEATS.  AND THAT'S

21  ACROSS THE HOUSE AND SENATE.  AND THERE IS 26 BLACK

22  LEGISLATORS IN THE HOUSE OUT OF 105 AND LESS -- AND I

23  THINK ABOUT TEN LOUISIANA STATE SENATORS OUT OF 39

24  TOTAL SEATS ARE BLACK.

25     Q   WHAT ABOUT SOME OF THE OTHER POSITIONS?

02:29p

**1**    A    SO THERE IS ALSO SOME -- IF YOU THINK ABOUT

**2**  THE STANDARD OF ABOUT OVER 30 PERCENT OF THE STATE IS

**3**  BLACK, STATE COURT JUDGES ARE ALSO -- BLACK PEOPLE

**4**  ARE ALSO UNDER-REPRESENTED ON THE STATE BENCH, ALSO

**5**  WITH RESPECT TO COUNTY -- WITH EXECUTIVE -- OTHER

**6**  EXECUTIVE POSITIONS LIKE MAYORS, AND ALSO THERE IS

**7**  UNDER-REPRESENTATION ON THE BOARD OF ELEMENTARY AND

**8**  SECONDARY EDUCATION.

**9**    Q    AND FROM YOUR AWARENESS, ARE ANY OF THESE

**10**  ELECTED OFFICIALS ELECTED FROM BLACK-MAJORITY

**11**  DISTRICTS?

**12**    A    I'M SURE THAT SOME ARE.  I THINK THERE --

**13**  I'M NOT SURE A HUNDRED PERCENT ABOUT ALL OF THE --

**14**  FOR INSTANCE, THE MAYORS.  BUT THE STATE LEGISLATIVE

**15**  SEATS MOST PROBABLY ARE.

**16**    Q    HAS THERE EVER BEEN A BLACK GOVERNOR OR A

**17**  LIEUTENANT GOVERNOR IN LOUISIANA SINCE

**18**  RECONSTRUCTION?

**19**    A    NOT SINCE RECONSTRUCTION.

**20**       **THE REPORTER:**  I'M SORRY.

**21**       **THE WITNESS:**  NOT SINCE RECONSTRUCTION.

**22**  BY MS. WENGER:

**23**    Q    DR. BURCH, WHAT WERE YOUR OVERALL

**24**  CONCLUSIONS FROM YOUR ANALYSIS OF SENATE FACTOR 7?

**25**    A    SO OVERALL I CONCLUDED THAT BLACK PEOPLE ARE

02:30p

1   ABOUT A THIRD OF LOUISIANA'S OVERALL POPULATION BUT

2   ARE UNDER-REPRESENTED AMONG ELECTED OFFICIALS AT ALL

3   LEVELS OF GOVERNMENT INCLUDING AMONG EXECUTIVES SUCH

4   AS GOVERNOR, LIEUTENANT GOVERNOR, MAYOR AND

5   LEGISLATORS AT THE FEDERAL AND STATE LEVEL, AND

6   JUDGES.

7       Q    THANK YOU.

8            DR. BURCH, LET'S MOVE TO YOUR DISCUSSION OF

9   SENATE FACTOR 8 REGARDING ANY LACK OF RESPONSIVENESS

10  FROM ELECTED OFFICIALS TO THE NEEDS OF BLACK

11  CONSTITUENTS.  I'D LIKE TO START WITH THE METRICS YOU

12  ASSESSED.  CAN YOU TURN TO THE SLIDE ON YOUR SCREEN

13  HERE AND EXPLAIN A BIT WHAT THESE VISUALIZATIONS

14  INTEND TO CONVEY.

15      A    YES.  SO THESE DATA POINTS FROM MY REPORT

16  TALK ABOUT THE FACT THAT LOUISIANA -- IF YOU'RE

17  LOOKING IN COMPARISON WITH THE OTHER 50 STATES --

18  LOUISIANA RANKS 48TH OUT OF 50 IN MATH ACHIEVEMENT,

19  46 OUT OF 50 IN CANCER DEATH RATE, 44 OUT OF 50 IN

20  LIFE EXPECTANCY.  AND ON ALL OF THESE DIMENSIONS THAT

21  I JUST TALKED ABOUT IN MY REPORT, BLACK PEOPLE ARE

22  WORSE OFF RELATIVE TO WHITE PEOPLE IN THE STATE AMONG

23  ALL OF THESE DIMENSIONS WHERE LOUISIANA IS DOING

24  POORLY.

25           AND SO WHEN WE THINK ABOUT RESPONSIVENESS,

02:31p

1   THEN WE WANT TO THINK ABOUT THE EXTENT TO WHICH WE'RE

2   -- THE STATE IS ENACTING POLICIES THAT ARE DESIGNED

3   TO ADDRESS SOME OF THESE ISSUES.  AND SO -- BUT ONE

4   OF THE EXAMPLES OF THE WAYS THAT PERHAPS THIS IS NOT

5   HAPPENING IS A QUOTATION BY SENATOR CASSIDY, WHICH I

6   THINK GOES TO THE HEART OF RESPONSIVENESS.

7          SO IN TALKING ABOUT MATERNAL MORTALITY AND

8   PRESENTED WITH DATA THAT LOUISIANA IS PERFORMING

9   POORLY WITH RESPECT TO MATERNAL MORTALITY, SENATOR

10  CASSIDY SAID IN RESPONSE "ABOUT A THIRD OF OUR

11  POPULATION IS AFRICAN AMERICAN; AFRICAN AMERICANS

12  HAVE A HIGHER INCIDENCE OF MATERNAL MORTALITY.  SO,

13  IF YOU CORRECT OUR POPULATION FOR RACE, WE'RE NOT AS

14  MUCH OF AN OUTLIER AS IT'D OTHERWISE APPEAR."

15     Q   FOR CLARITY OF THE RECORD, THAT'S FROM PAGE

16  26 OF YOUR REPORT.

17         TURNING TO THE NEXT SLIDE, YOU DISCUSS

18  CANCER ALLEY IN YOUR REPORT AND I HEARD YOU MENTION

19  IT EARLIER.  HOW DOES CANCER ALLEY IN LOUISIANA

20  REFLECT ON THE RESPONSIVENESS OF ELECTED OFFICIALS TO

21  THE NEEDS OF BLACK PEOPLE IN YOUR ASSESSMENT?

22     A   SO I THOUGHT THAT THIS WAS AN INTERESTING

23  INCIDENT BECAUSE -- EXAMPLE -- BECAUSE THERE IS A

24  SPECIFIC INSTANCE IN WHICH IN 2021 PRESIDENT BIDEN

25  ANNOUNCED SEVERAL CLIMATE-RELATED EXECUTIVE ORDERS

02:33p

 1    THAT WERE DESIGNED TO PROMOTE ENVIRONMENTAL JUSTICE

 2    AND HELP PLACES AND MENTIONED LOUISIANA'S CANCER

 3    ALLEY SPECIFICALLY.  SENATOR CASSIDY ACTUALLY GOT

 4    ANGRY AND CALLED THOSE REMARKS THAT HE MADE A SLAM ON

 5    THE STATE AND THEN DENIED THAT POLLUTION WAS A FACTOR

 6    IN CAUSING THESE ELEVATED CANCER RATES, WHICH I HAVE

 7    ALREADY SAID RESEARCH HAS SHOWN THAT AIR POLLUTION

 8    AND THE LIKE IN THESE AREAS DOES MATTER.  AND SO

 9    INSTEAD WE SAW BEHAVIORAL FACTORS THAT HE BLAMED FOR

10    THE ELEVATED CANCER RATES.

11            SO SENATOR CASSIDY SAYS -- AND I CITE IT ON

12    PAGE 26 -- "WE HAVE A HIGHER INCIDENCE OF CIGARETTE

13    SMOKING, OF OBESITY, OF CERTAIN VIRAL INFECTIONS, AND

14    OTHER THINGS WHICH INCREASE THE INCIDENCE OF CANCER

15    IN OUR STATE."

16            AND AGAIN, PEOPLE WHO -- ADVOCATES FOR THE

17    AREA CALLED CANCER ALLEY WHO HEARD THIS TOOK THIS AS,

18    YOU KNOW, IT'S ALWAYS -- THE QUOTE IS:  "IT'S ALWAYS

19    'BLAME THE FOLKS' -- THE POOR BLACK FOLKS -- FOR

20    THEIR OWN DEMISE."  SO THAT, AGAIN, THEY SAW THAT

21    COMMENT AS BEING NOT RESPONSIVE TO THE NEEDS,

22    ESPECIALLY WHEN SOMEONE AT THE FEDERAL LEVEL WAS

23    TRYING TO HELP THE AREA.

24        Q    ALL RIGHT.  MOVING TO THE NEXT SLIDE,

25    PULLING DATA CITED FROM PAGES 26 TO 27 OF YOUR

02:34p

1   REPORT, CAN YOU DESCRIBE WHY THIS SURVEY DATA -- WHAT

2   THIS SURVEY DATA TELLS US ABOUT BLACK LOUISIANIANS'

3   OWN SENSE OF THEIR ELECTED OFFICIALS' RESPONSIVENESS?

4        A    SO I TOOK DATA FROM THE 2022 LOUISIANA

5   SURVEY, WHICH IS A REPRESENTATIVE SURVEY OF THE

6   STATE.  AND IT SHOWS THAT ACROSS THE STATE ABOUT 70

7   PERCENT OF BLACK RESPONDENTS TO THE SURVEY AGREED

8   THAT, QUOTE, MOST ELECTED OFFICIALS IN LOUISIANA

9   DON'T CARE WHAT PEOPLE LIKE ME THINK.  AND THAT

10  FIGURE IS ACTUALLY PRETTY SIMILAR TO WHAT WHITE

11  LOUISIANIANS THINK.  BUT THEN THERE IS SPECIFIC

12  REASONS THAT BLACK LOUISIANIANS FEEL THAT WAY.  AND

13  THEY GO ON IN THE SURVEY TO TALK ABOUT BLACK PEOPLE

14  IN THE STATE FEEL THAT THEY ARE DISCRIMINATED AGAINST

15  POLITICALLY.  SO FEWER BLACK LOUISIANIANS WERE VERY

16  CONFIDENT THAT PEOPLE WHO ARE LEGALLY QUALIFIED TO

17  VOTE ARE ABLE TO IN THE STATE, AND A MAJORITY OF

18  BLACK LOUISIANIANS BELIEVE THAT, QUOTE, BLACK PEOPLE

19  ARE TREATED LESS FAIRLY THAN WHITE PEOPLE WHEN VOTING

20  IN ELECTIONS.

21       Q    THANK YOU.

22            TURNING TO THE NEXT SLIDE, CAN YOU EXPLAIN

23  HOW PUBLIC TESTIMONY FROM THE REDISTRICTING PROCESS

24  PLAYED INTO YOUR ANALYSIS OF SENATE FACTOR 8?

25       A    SO IF YOU THINK ABOUT THE DATA THAT I JUST

02:35p

1 CITED ABOUT THE CONCERN ABOUT POLITICAL INEQUALITY

2 AMONG BLACK PEOPLE IN THE STATE, THESE CONCERNS THAT

3 I PULLED FROM THE REDISTRICTING ROADSHOWS AND

4 HEARINGS ACTUALLY IS A REFLECTION OF WHAT WE SEE IN

5 THE SURVEY DATA STATEWIDE.  AND SO WE SEE QUOTES, FOR

6 INSTANCE, FROM LYDIA LARSE WHO SAYS -- WHO -- I

7 WATCHED THE VIDEO AND SHE APPEARED TO BE AFRICAN

8 AMERICAN TO ME, AND FROM HER STATEMENTS SEEM SO.  SHE

9 SAYS, QUOTE, THE CONSTITUTION STARTS WITH WE THE

10 PEOPLE.  I DON'T FEEL THAT.  NONE OF YOU GUYS UP HERE

11 REPRESENT ME, BUT A FEW.  WE'RE ONE-THIRD OF THE

12 STATE, AND I'M NOT BEING REPRESENTED.  OUR VOICES ARE

13 NOT BEING HEARD.  AT ALL.  I FEEL AS THOUGH MY VOICE

14 IS NOT BEING HEARD BECAUSE Y'ALL DON'T NEED US.

15 WE'RE NOT NEEDED.  YOU DON'T CARE.

16         DO YOU -- ADAM MOORE SAYS, "DO WE CARE ABOUT

17 GERRYMANDERING?  HEY, LET'S ISOLATE THESE PEOPLE OVER

18 HERE.  DO YOU CARE?  HELP US.  DO ANYONE CARE?  HEY,

19 IT'S NOT MY FAULT I'M BLACK.  I WAS BORN THIS WAY."

20         A COUPLE OF OTHER PEOPLE IN THOSE -- WELL,

21 SEVERAL OTHER PEOPLE SAID THINGS LIKE THIS, BUT JUST

22 A COUPLE OF EXAMPLES ON THE SLIDE THAT LINK

23 REPRESENTATION TO OUTCOMES COME FROM KETURAH BUTLER-

24 REED WHO SAYS, "I CHALLENGE YOU TO PUSH FOR MORE

25 MAJORITY-MINORITY DISTRICTS BECAUSE MORE MEANS MORE

02:37p

1  RESOURCES POURED INTO BLACK SCHOOLS AND MORE OF A

2  SIGNIFICANT VOICE IN BLACK PEOPLE CHOOSING ELECTED

3  OFFICIALS BECAUSE THAT IS REFLECTIVE OF THE NUMBERS

4  OF THE PEOPLE."  SO TYING THAT THEY NEED THOSE

5  MAJORITY-MINORITY DISTRICTS TO TRANSLATE INTO

6  RESOURCES AND OUTCOMES.

7          DEONDRE BELL, II:  "AND SO, TO DEPRIVE

8  ONE-THIRD OF THE STATE'S POPULATION OF THE ABILITY TO

9  ELECT THEIR PREFERRED CANDIDATE KEEPS LOUISIANA AT

10  THE BOTTOM OF NEARLY EVERY STATISTIC IN THIS

11  COUNTRY."

12          SO THEY'RE KIND OF, AGAIN, MAKING THOSE SAME

13  CONNECTIONS THAT I MADE IN MY REPORT.

14      Q    THANK YOU, DR. BURCH.

15          TURNING TO THE NEXT SLIDE, WHAT DO THESE

16  METRICS PULLED FROM PAGE 28 OF YOUR REPORT INDICATE

17  ABOUT THE RESPONSIVENESS OF LOUISIANA LEGISLATORS

18  DURING THE PASSAGE OF THE CHALLENGED SENATE DISTRICTS

19  HERE?

20      A    SO WHAT WAS INTERESTING FROM THE PUBLIC

21  TESTIMONY THAT WE SAW IN LOOKING AT THE PASSAGE OF

22  THE MAPS, 80 PEOPLE SUBMITTED PUBLIC COMMENT CARDS

23  AGAINST THE ENACTED MAP WITHOUT SPEAKING.  AN

24  ADDITIONAL 22 PEOPLE SPOKE AGAINST THE ENACTED MAP

25  AND IN FAVOR OF MORE MAJORITY-MINORITY DISTRICTS.

02:38p

1  AND THERE WERE NO PEOPLE THAT MADE PUBLIC COMMENTS IN

2  SUPPORT OF THE STATUS QUO NUMBER OF MAJORITY-MINORITY

3  SENATE SEATS.

4          AND SO IT'S VERY CLEAR THAT THE PUBLIC

5  COMMENT THAT SENATORS HEARD THERE WAS CLEARLY IN

6  SUPPORT IN INCREASING MINORITY REPRESENTATION.  AND

7  SIMILARLY, PEOPLE -- 56 PEOPLE SUBMITTED COMMENT

8  CARDS IN SUPPORT OF THE ALTERNATIVE MAP THAT ADDED

9  MAJORITY-MINORITY DISTRICTS.  SO THERE IS CLEAR

10 SUPPORT FOR ADDING MAJORITY-MINORITY DISTRICTS, BUT

11 THAT WAS NOT -- OBVIOUSLY WITH THE OUTCOME, THOSE

12 WERE NOT -- THE LEGISLATURE WAS NOT RESPONSIVE TO

13 THOSE.

14     Q    THANK YOU, DR. BURCH.

15          OVERALL WHAT WERE YOUR FINDINGS REGARDING

16 THE PRESENCE OF SENATE FACTOR 8 IN THE CONTEXT OF

17 THIS STATE IN THIS CASE?

18     A    SO I FIND THAT THE OUTCOMES OF POLICIES DO

19 NOT TRACK THE SPECIFIC NEEDS OF THE MINORITY

20 COMMUNITY IN SEVERAL WAYS.  AND I FEEL LIKE IN MY

21 REPORT I'VE SHOWED THE WAYS THAT, AGAIN, OUTCOMES

22 OVER TIME HAVE BEEN PERSISTENT IN TERMS OF RACIAL

23 GAPS IN EDUCATION AND CRIMINAL JUSTICE AND THE LIKE.

24 BLACK LOUISIANANS EXPRESSED IN SURVEYS AND TO THE

25 LOUISIANA LEGISLATURE THAT THEY ARE NOT VALUED

02:39p

1   EQUALLY AND DON'T FEEL VALUED EQUALLY BY ELECTED

2   REPRESENTATIVES AND FEEL DISCRIMINATED AGAINST IN

3   POLITICS.  AND THEN THEY CONNECT THAT POLITICAL

4   INEQUALITY WITH POOR OUTCOMES AS WELL.

5         SO IT'S -- JUST LISTENING TO THE VOICES OF

6   THE PEOPLE, IT'S VERY CLEAR THAT THEY ARE SAYING THEY

7   FEEL THAT THEIR GOVERNMENT IS NOT RESPONSIVE TO THEM.

8       Q    THANK YOU, DR. BURCH.

9         LET'S TURN TO YOUR ANALYSIS OF THE LAST

10  SENATE FACTOR YOU WORKED ON HERE REGARDING THE

11  TENUOUSNESS OF THE LEGISLATURE'S UNDERLYING POLICY

12  JUSTIFICATIONS FOR THEIR ENACTED STATE LEGISLATIVE

13  MAPS.

14        FIRST, WHAT SOURCES DID YOU USE TO EXAMINE

15  AND ASSESS SENATE FACTOR 9?

16      A    SO I INCLUDE HERE SEVERAL VIDEOS OF -- AND

17  ANALYZED THE HEARINGS, THE ROADSHOWS, THE -- SOME

18  OTHER NEWS OR PUBLIC SPEECHES MADE BY LEGISLATORS IN

19  THIS SECTION OF THE REPORT.

20      Q    THANK YOU.

21        BASED ON YOUR REVIEW OF THE LEGISLATORS'

22  STATEMENTS, WHAT DID YOU IDENTIFY AS THE KEY POLICY

23  CONSIDERATIONS LEGISLATORS OFFERED TO JUSTIFY THE

24  LEGISLATIVE MAPS ENACTED WITHOUT SUBSTANTIVELY

25  INCREASING REPRESENTATION FOR BLACK VOTERS?

02:40p

**1**     A    SO IN MY ANALYSIS I PUT THE REASONS FOR NOT

**2**  DRAWING ADDITIONAL MINORITY DISTRICTS INTO THREE

**3**  BUCKETS.  SO THE SUPPORTERS OF THE BILL ARGUE THAT

**4**  ADDITIONAL MAJORITY-MINORITY DISTRICTS WOULD FIRST

**5**  DILUTE THE BLACK VOTE; SECOND, UNDERMINE INCUMBENCY

**6**  PROTECTION AND; THIRD, VIOLATE COMMUNITIES OF

**7**  INTEREST.  AND SO I DISCUSS THOSE IN TURN IN MY

**8**  REPORT.

**9**     Q    GENERALLY, DR. BURCH, DID YOU FIND THAT

**10**  LEGISLATORS SUPPORTED THESE CLAIMS WITH EVIDENCE?

**11**     A    NO.

**12**     Q    LET'S LOOK AT SOME OF THE TESTIMONY YOU

**13**  ANALYZED, TURNING TO THE SLIDE ON YOUR SCREEN.  CAN

**14**  YOU DESCRIBE YOUR FINDINGS REGARDING THE TESTIMONY

**15**  PRESENTED BY THE RESPECTIVE SPONSORS OF THE ENACTED

**16**  MAP?  WE CAN START WITH SB 1.

**17**     A    YES.  SO SENATE PRESIDENT CORTEZ TESTIFIED

**18**  AT VARIOUS POINTS.  HE AGREED THAT THE MAP IN SENATE

**19**  BILL 1 DID NOT INCREASE MAJORITY-MINORITY SENATE

**20**  DISTRICTS FROM THE PRIOR MAP.  AND HE DID AGREE THAT

**21**  LOUISIANA DEMOGRAPHICS HAD SHIFTED.  HE AGREED THAT

**22**  IT WAS POSSIBLE TO CREATE ADDITIONAL MAJORITY-

**23**  MINORITY DISTRICTS.  BUT THEN HE CHOSE NOT TO.  AND

**24**  THEN HE LISTS SPECIFICALLY THREE REASONS.  HE SAYS

**25**  CONTINUITY OF REPRESENTATION, MINORITY VOTE DILUTION,

02:42p

1   AND COMPACTNESS.

2        Q    HOW ABOUT FOR HOUSE BILL 14?

3        A    SO CHAIRMAN STEFANSKI WAS A LITTLE LESS

4   CLEAR ABOUT THE PRIORITIES FOR DRAWING THE MAP IN HB

5   14, SO HE GAVE A LIST OF FACTORS THAT HE TOOK INTO

6   ACCOUNT AND AT VARIOUS POINTS MENTIONED POPULATION

7   SIZE, GEOGRAPHY, COMMUNITIES OF INTEREST, LAWS,

8   PUBLIC COMMENTS, MEMBERS' DESIRES FOR THEIR COMMUNITY,

9   AND CONCERNS ABOUT POPULATION LOSS IN NORTH LOUISIANA

10  AS WELL.

11       Q    AMONG THOSE LAUNDRY LIST OF FACTORS, DID YOU

12  FIND HE ALSO MADE REFERENCE TO THOSE BUCKETS OF

13  CLAIMS THAT YOU HEARD IN PRESIDENT CORTEZ'S

14  TESTIMONY?

15       A    YES.

16       Q    THANK YOU.

17            ALL RIGHT.  LET'S LOOK CLOSER AT YOUR

18  ANALYSIS OF THE LOUISIANA LEGISLATURE'S PURPORTED

19  CONCERNS REGARDING MINORITY VOTE DILUTION.  TURNING

20  TO THE SLIDE BEFORE YOU WHICH PULLS FROM PAGES 30

21  THROUGH 35 OF YOUR REPORT, CAN YOU DESCRIBE YOUR

22  FINDINGS?

23       A    YES.  SO I FOUND THAT THERE WAS AN ARGUMENT

24  THAT WAS MADE BOTH IN SUPPORT OF SB 1 AND HB 14 THAT

25  ADDING A SECOND MAJORITY-MINORITY DISTRICT WOULD

02:43p

1   DILUTE THE BLACK VOTE.  AND SO WHAT THAT MEANS

2   SPECIFICALLY IS THAT THE -- SO THERE IS THIS IDEA

3   THAT THE VOTING RIGHTS ACT KIND OF REQUIRES THE

4   PACKING OF MINORITY VOTERS INTO MAJORITY-MINORITY

5   DISTRICTS IN VERY HIGH CONCENTRATIONS IN ORDER TO

6   GUARANTEE THAT THE MINORITY GROUP WILL ELECT A

7   CANDIDATE OF CHOICE.  SO IN PRESIDENT CORTEZ'S WORDS,

8   IT CAN'T JUST BE AN OPPORTUNITY BUT A SLAM DUNK.  SO

9   UNDER THAT STANDARD, EVEN DISTRICTS WITH LIKE 53

10  PERCENT MINIMUM BLACK VOTING AGE POPULATIONS WOULD

11  NOT BE ADEQUATE UNDER THE VOTING RIGHTS ACT.

12          AND SO HE SAYS SPECIFICALLY -- I QUOTE HIM

13  ON PAGE 31 IN A LONG QUOTE:  "SO, WHAT IS 50 PERCENT

14  PLUS ONE GIVES YOU A MAJORITY OF" -- "MAJORITY OF THE

15  MINORITY IF THAT'S THE POPULATION YOU LOOKING AT, BUT

16  IF THEY ONLY TURN OUT AT 30 OR 35% RATE, AND THE

17  OTHER POPULATION TURNS OUT AT 40 OR 50% RATE, THE

18  MINORITY GROUP IS GOING TO, I'M TRYING TO BE CLEAR.

19  THE MINORITY IS GOING TO HAVE A HIGHER NUMBER OF

20  VOTING AGE POPULATION, BUT THEY WON'T VOTE AND THEY

21  WON'T ELECT THE CANDIDATE OF THEIR CHOICE."  AND SO

22  THAT'S KIND OF HIS ARGUMENT ABOUT VOTE DILUTION.

23      Q    DID HE USE ANY DATA TO BACK UP THAT

24  ARGUMENT?

25      A    NO.

02:44p

**1**    **Q**   IN YOUR ANALYSIS, DR. BURCH, DID ANY OF THE

**2**   SUPPORTERS' OR THE SPONSORS' COLLEAGUES PUSH BACK

**3**   AGAINST THE USE OR SUGGESTION OF THE RELEVANCY OF

**4**   THESE METRICS OR THEORIES?

**5**    **A**   OH, YES.  SO THERE WERE LONG DISCUSSIONS

**6**   ABOUT THIS, ACTUALLY, IN THE RECORD.  AND SO THEY

**7**   HEARD SEVERAL ARGUMENTS FROM -- ESPECIALLY FROM

**8**   MEMBERS OF THE BLACK CAUCUS THAT TALKED ABOUT AND

**9**   CALLED INTO QUESTION THESE CLAIMS.  SO, FOR INSTANCE,

**10**   SENATOR PRICE -- AND I HAVE HIM QUOTED ON PAGE 32.

**11**   HE'S BASICALLY RECALLING OTHER -- MORE COMMENTS THAT

**12**   HAD BEEN MADE BY SENATOR TARVER.  HE ARGUED THAT THE

**13**   REQUIREMENT WAS FOR AN OPPORTUNITY, NOT A GUARANTEE.

**14**        AND SO HE SAYS, "UNDER SECTION 2 OF THE 1965

**15**   VOTING RIGHTS ACT, IT SPECIFICALLY TALKS ABOUT THE

**16**   FACT OF GIVING PEOPLE OPPORTUNITY AND OPPORTUNITY, I

**17**   THINK, IT'S ALL THAT WE CAN ASK FOR, AND YOU SAY,

**18**   WELL, YOU MAY NOT BE ABLE TO ELECT, BUT AS SENATOR

**19**   TARVER SAID, IT'S UP TO THE PERSON IN THE DISTRICT TO

**20**   GET OUT THERE AND MAKE SURE THAT ITS CONSTITUENTS

**21**   COME OUT AND VOTE AND AT LEAST GIVE THEMSELVES THAT

**22**   OPPORTUNITY.  IF WE DO NOT INCREASE THE MINORITY

**23**   DISTRICT, WE'LL NEVER HAVE THAT OPPORTUNITY.  IF WE

**24**   JUST STAY STATUS QUO AS THE MAP IS RIGHT NOW WITHOUT

**25**   EVEN CONSIDERING INCREASE, THEN THE OPPORTUNITY GOES

02:46p

1  AWAY, I THINK, UNDER SECTION 2, IT CLEARLY STATES

2  THAT WE MUST BE GIVEN AN OPPORTUNITY TO ELECT A

3  PERSON OF OUR CHOICE, AND BY NOT PROVIDING THAT

4  OPPORTUNITY, I THINK, IT VIOLATES SECTION 2 OF THE

5  CIVIL RIGHTS ACTS."

6      Q    SOME OF THESE CITATIONS THAT YOU PULLED FROM

7  YOUR REPORT -- FOR EXAMPLE, FROM SENATOR PRICE WHO I

8  BELIEVE REPRESENTS NAPOLEONVILLE, SENATOR TARVER, A

9  FORMER OR CURRENT SENATOR FROM SHREVEPORT -- DID YOU

10  FIND THAT THEIR SENTIMENTS AND DEBATE IN THE

11  LEGISLATIVE RECORD THAT YOU REVIEWED BETTER REFLECTED

12  SOME OF THOSE PUBLIC COMMENTS OR TESTIMONY YOU

13  REVIEWED FROM THE ROADSHOW AND THE LEGISLATIVE

14  PROCESS?

15      A    YES.

16      Q    INCLUDING FROM BLACK CONSTITUENTS?

17      A    YES.

18      Q    IT WAS MORE RESPONSIVE TO WHAT THEY HAD

19  HEARD FROM THE PEOPLE THAT SPOKE UP IN THIS PROCESS?

20      A    YES.

21      Q    LET'S TURN TO YOUR ANALYSIS OF THE

22  LEGISLATURE'S PRIORITIZATION OF INCUMBENT PROTECTION,

23  TURNING TO THE NEXT SLIDE PULLED FROM PAGES 35 TO 38

24  OF YOUR REPORT.  CAN YOU DESCRIBE YOUR FINDINGS?

25      A    YES.  SO BY INCUMBENCY PROTECTION, THIS IS

02:47p

 1  NOT -- THAT TERM IS NOT EXPLICITLY USED AS -- BUT,

 2  RATHER, AT LEAST IT COMES UP IN A COUPLE OF DIFFERENT

 3  WAYS.

 4          SO PRESIDENT CORTEZ ARGUED THAT ADDING

 5  MAJORITY-MINORITY DISTRICTS WOULD VIOLATE THE

 6  PRINCIPLE OF WHAT HE CALLED CONTINUITY OF

 7  REPRESENTATION.  AND WHAT HE MEANT BY THAT IS, QUOTE,

 8  THE THIRD TENET OR PRINCIPLE WAS AS BEST AS POSSIBLE

 9  TO MAINTAIN THE CONTINUITY OF REPRESENTATION.  WHAT

10  DO I MEAN BY THAT?  IT MEANS THAT IF YOUR DISTRICT

11  ELECTED YOU AND YOU'VE DONE A GOOD JOB, THEY ALSO

12  HAVE A RIGHT TO REELECT YOU.  AND THAT'S ON PAGE 36

13  OF MY REPORT.

14          AND HE TALKS ABOUT THIS AGAIN IN MAKING IT

15  CLEAR THAT HE'S TALKING ABOUT INCUMBENCY PROTECTION.

16  AND THE HOUSE PLAN, THIS COMES UP NOT AS -- QUOTE,

17  UNQUOTE -- CONTINUITY OF REPRESENTATION BUT THE

18  DESIRE TO MAKE CHANGES ONLY TO DISTRICTS WHERE

19  INCUMBENTS WERE NOT RETURNING BECAUSE OF TERM LIMITS.

20      Q   WAS INCUMBENCY PROTECTION INCLUDED IN JOINT

21  RULE 21 OR OTHER GUIDANCE PRESENTED IN ADVANCE OF THE

22  REDISTRICTING PROCESS?

23      A   NO.  AND IT'S ALSO -- IT'S NOT INCLUDED AS A

24  PRIORITY IN JOINT RULE 21, AND NEITHER IS THE TERM

25  "LIMITED" -- STICKING THE TERM "LIMITED MEMBERS"

02:48p

1   THING.  BUT EVEN IF IT WERE, THERE ARE ALTERNATIVE

2   HOUSE PLANS THAT -- FOR INSTANCE, THAT MANAGE TO DRAW

3   ADDITIONAL MAJORITY-MINORITY DISTRICTS WHILE FOCUSING

4   ONLY ON THIS TERM "LIMITED DISTRICT" IDEA.  SO THAT'S

5   NOT AN IMPEDIMENT TO ADDING MAJORITY-MINORITY

6   DISTRICTS.  THE TWO THINGS AREN'T MUTUALLY EXCLUSIVE.

7       Q    THANK YOU, DR. BURCH.

8            FINALLY LET'S TURN TO THE NEXT SLIDE PULLING

9   FROM PAGES 38 THROUGH 42 OF YOUR REPORT.  WHAT WAS

10  YOUR ASSESSMENT OF THE DISCUSSION OF COMMUNITIES OF

11  INTEREST LEADING TO THE PASSAGE OF THE ENACTED

12  LEGISLATIVE MAPS HERE IN LOUISIANA?

13      A    SO THERE WAS SOME DISCUSSION OF COMMUNITIES

14  OF INTEREST AS A REASON THAT THEY -- THE DRAWERS OF

15  THE ENACTED MAPS COULDN'T ADD MORE MAJORITY-MINORITY

16  DISTRICTS.  BUT WHAT'S INTERESTING ABOUT THOSE

17  DISCUSSIONS IS THAT FIRST THEY WEREN'T -- AGAIN, A

18  LOT OF TIMES THE DISCUSSION DIDN'T SAY THAT THOSE --

19  KEEPING THOSE COMMUNITIES INTACT WOULD BE MUTUALLY --

20  AND DRAWING A NEW DISTRICT WAS MUTUALLY EXCLUSIVE.

21          SO, FOR INSTANCE, WITH RESPECT TO THE SENATE

22  MAP, SENATE PRESIDENT CORTEZ ARGUED THAT IT WAS

23  IMPOSSIBLE TO CREATE ADDITIONAL MAJORITY-MINORITY

24  DISTRICTS WITHOUT DISRUPTING THE REPRESENTATION OF

25  THAT COMMUNITY BETWEEN ST. CHARLES AND ST. JOHN

02:49p

1   PARISHES.  AND THAT WAS THE PROBLEM WITH ONE OF A NEW

2   MAJORITY-MINORITY DISTRICT.  BUT THERE WAS NO ANSWER

3   THAT THE OTHER ONE IN THE SENATE MAP WOULD VIOLATE A

4   PARTICULAR COMMUNITY OF INTEREST.  SO IT MIGHT BE AN

5   EXCUSE FOR ONE PARTICULAR CONFIGURATION, BUT YOU

6   COULD DO SOMETHING WITH OTHERS.

7           IT'S ALSO TRUE THAT IT'S NOT REALLY CLEAR

8   WHICH COMMUNITIES OF INTEREST WE WERE TALKING ABOUT

9   PRIORITIZING.  SO THE NEEDS OF OTHER COMMUNITIES OF

10  INTEREST THAT WERE DISCUSSED IN THE RECORD, SUCH AS

11  THE BLACK RESIDENTS OF THE WESTBANK IN JEFFERSON

12  PARISH, THOSE WERE IGNORED.  AND THEY WERE IGNORED

13  FOR REASONS THAT WERE THINGS LIKE ONE SENATOR WHO

14  WANTED TO REPRESENT HIS SISTER AND HE WAS STILL

15  PAYING STUDENT LOANS TO TULANE.  SO THE RATIONALE FOR

16  THAT WAS NOT -- IT WAS NOT COMMUNITIES OF -- THAT

17  COMMUNITY OF INTEREST WAS IGNORED FOR REASONS LIKE

18  THAT.

19      Q    THANK YOU, DR. BURCH.

20           DR. BURCH, IN YOUR ASSESSMENT IS THERE

21  POLITICAL SCIENCE DATA TO SUPPORT THE EXISTENCE OF

22  EVERY SINGLE SENATE FACTOR YOU ANALYZED IN LOUISIANA?

23      A    YES.

24      Q    THANK YOU.

25           I'D NOW LIKE TO SHIFT OUR FOCUS TO THE

02:51p

1    SUPPLEMENTAL REPORT THAT DR. BURCH SUBMITTED IN

2    RESPONSE TO DEFENDANTS' EXPERT, DR. ALFORD.  THIS IS

3    PLAINTIFFS' EXHIBIT 128.

4          DO YOU HAVE THAT IN FRONT OF YOU, DR. BURCH?

5    **A**   I DO.

6    **Q**   IS THIS THE REPORT THAT YOU SUBMITTED IN

7    RESPONSE TO YOUR REVIEW OF DR. ALFORD'S REPORT?

8    **A**   YES.

9    **Q**   DR. BURCH, WHAT DOES YOUR SUPPLEMENTAL

10   REPORT EXAMINE?

11   **A**   SO IT LOOKS AT DR. ALFORD'S CONCLUSION THAT

12   CLEAR CORRELATIONS BETWEEN RACE AND VOTING IN

13   LOUISIANA ARE CAUSED BY PARTY COHESION RATHER THAN

14   RACE AND THAT MANY MEASURES OF RACIAL POLARIZATION

15   HAVE DECLINED OVER TIME.

16          AND SO IN ANSWERING THAT, I LOOKED AT THE

17   ROLE OF RACE OR RACIAL ATTITUDES AND PARTISANSHIP IN

18   VOTE CHOICE IN THE POLITICAL SCIENCE LITERATURE.

19   **Q**   WHAT DID YOU REVIEW TO REACH YOUR

20   CONCLUSIONS?

21   **A**   THE RELEVANT LITERATURE IN POLITICAL SCIENCE

22   AND I ALSO HAVE A CHART HERE FROM DATA FROM THE

23   LOUISIANA -- VOTING DATA FROM THE LOUISIANA SECRETARY

24   OF STATE'S OFFICE.

25   **Q**   THANK YOU.

02:52p

**1**        BEFORE CIRCLING BACK TO YOUR OVERALL

**2**   FINDINGS, DID YOU REACH ANY CONCLUSIONS ABOUT THE

**3**   HISTORICAL ROOTS OF THE LINK BETWEEN RACE AND PARTY

**4**   IN THE UNITED STATES AND HERE IN LOUISIANA?

**5**     **A**    YES.   SO THE POLITICAL SCIENCE LITERATURE IS

**6**   QUITE CLEAR THAT PARTISAN REALIGNMENT -- THEY

**7**   DISAGREE SOMETIMES ABOUT THE TIMING.   BUT PARTISAN

**8**   REALIGNMENT REALLY HAPPENED BEGINNING AFTER THE NEW

**9**   DEAL AND ACCELERATING THROUGH WORLD WAR II AS BLACK

**10**  VOTERS BEGAN TO VOTE FOR DEMOCRATS IN LARGER NUMBERS.

**11**  AND THAT MADE THE PARTY MORE RESPONSIVE TO THE NEEDS

**12**  OF AFRICAN AMERICANS.

**13**       AND SO YOU CAN THINK ABOUT -- THE DIXIECRAT

**14**  SUCCESSION IN 1948 WAS WHEN THE DEMOCRATIC PARTY

**15**  FIRST TRIED TO PUT CIVIL RIGHTS AS A PLANK IN ITS

**16**  PARTY PLATFORM.   AND SOUTHERN DEMOCRATS GOT MAD AND

**17**  SUCCEEDED FROM PARTY FOR A MOMENT.   AND SO THERE IS

**18**  THIS HISTORY OF THE DEMOCRATIC PARTY MOVING MORE

**19**  TOWARD BEING THE PARTY OF LIBERALIZATION ON RACIAL

**20**  ISSUES AND CIVIL RIGHTS.   AND SO THEN THAT ALL

**21**  CULMINATED IN THE ELECTION OF 1964 AND YOU STARTED TO

**22**  SEE THIS EXODUS OF SOUTHERN WHITE VOTERS FROM THE

**23**  DEMOCRATIC PARTY -- BEGINNING IN THAT LATE 1950s,

**24**  EARLY 1960s TIME PERIOD -- AS A REFLECTION OF THOSE

**25**  RACIAL ATTITUDES.   AND STUDIES HAVE SHOWN THAT IT IS

02:53p

1   THE CIVIL RIGHTS AND RACIAL ATTITUDES THAT MADE

2   PEOPLE CHANGE -- MOVE OUT OF THE PARTY RATHER THAN

3   INCOME OR OTHER POLICY PREFERENCES.

4        AND SO OTHER STUDIES HAVE SHOWN THAT RACIAL

5   ATTITUDES MORE THAN IDEOLOGICAL SHIFTS OR OTHER

6   POLICY PREFERENCES EXPLAIN AN INCREASINGLY LARGE PART

7   OF CANDIDATE CHOICE AND PARTISANSHIP AMONG WHITE

8   VOTERS BETWEEN 1972 AND 2000.  AND THAT PARTISAN

9   SORTING BY RACIAL GROUP HAS ACTUALLY ONLY GOTTEN

10  STRONGER BEGINNING IN 2008 WITH THE ELECTION OF

11  PRESIDENT OBAMA.

12     Q    THANK YOU, DR. BURCH.

13          AND DOES THIS HISTORY INFORM YOUR

14  PROFESSIONAL OPINIONS AROUND THE EXISTENCE OF

15  RACIALLY POLARIZED VOTING PATTERNS IN THE STATE OF

16  LOUISIANA?

17     A    YES.  SO I LOOKED AT SEVERAL STUDIES OF

18  LOUISIANA POLITICS TO TALK ABOUT THE FACT THAT

19  LOUISIANA HAS FOLLOWED THIS SAME PATTERN IN ABOUT THE

20  SAME TIMING AS OTHER -- THE ELECTORATE IN OTHER

21  SOUTHERN STATES.  AND SO I CONTINUE -- I TALK ABOUT

22  STUDIES THAT HAVE SHOWN HOW THIS HAPPENED

23  HISTORICALLY THROUGH THE 1996 PRESIDENTIAL ELECTION.

24  AND THEN IN MY REPORT I PICK UP ON THAT, LOOKING AT

25  DATA IN LOUISIANA FROM 2000 TO 2022 PARTY

02:54p

1   REGISTRATION BY RACE.

2       Q    LET'S ACTUALLY TURN TO THE NEXT SLIDE THEN.

3   THIS REPLICATES FIGURE 1 IN YOUR SUPPLEMENTAL REPORT.

4   CAN YOU SPEAK TO WHAT THIS CHART TELLS US.

5       A    YES.  SO THIS IS, LIKE I SAID, DATA FROM THE

6   LOUISIANA SECRETARY OF STATE.  AND IT SHOWS THE

7   PERCENTAGE OF LOUISIANA VOTERS REGISTERED AS

8   DEMOCRATS BY RACE.  AND THE PURPLE IS BLACK VOTERS

9   AND THE YELLOW IS WHITE VOTERS.  AND YOU CAN SEE THAT

10  BLACK VOTERS HOVER AROUND 80 PERCENT, BUT THEY WERE

11  REGISTERED AS DEMOCRATIC.  AND IT KIND OF STAYS THAT

12  WAY OVER TIME OVER THE PAST 22 YEARS.

13          BUT WHITE VOTERS CONSISTENTLY, ESPECIALLY

14  BEGINNING BETWEEN THE 2004 AND 2008 PERIOD, YOU SEE

15  THAT DEMOCRATIC REGISTRATION DECLINE.  AND SO LIKE I

16  SAID, WHITE VOTERS ARE MOVING OUT OF THE DEMOCRATIC

17  PARTY TO THE POINT WHERE AT -- BY 2022 IT ONLY LOOKS

18  LIKE 22, 21 PERCENT OF WHITE VOTERS ARE STILL

19  REGISTERED AS DEMOCRATS.  SO YOU SEE THIS

20  POLARIZATION PLAY OUT OVER TIME EXACTLY AS THE

21  LITERATURE SUGGESTS IT WILL.

22      Q    WHAT DOES THE LITERATURE YOU REVIEWED

23  INDICATE, IF ANYTHING, REGARDING PERCEPTIONS OF RACE

24  AND PARTY ALIGNMENT IN THE UNITED STATES?

25      A    SO IT TELLS -- THE LITERATURE TELLS US THAT

02:56p

 1  PARTISANSHIP AND PARTY ALIGNMENT AND PARTY CHOICE IS

 2  ITSELF SHAPED BY RACE AND RACIAL ATTITUDES.  SO, FOR

 3  INSTANCE, FOR BLACK PEOPLE, THE HIGH RATE OF

 4  DEMOCRATIC SUPPORT IS PRIMARILY BASED ON THE IDEA OF

 5  RACIAL LINKED FATE, AND IT -- AND THE SUPPORT OF

 6  RACIAL EGALITARIAN -- RACIALLY EGALITARIAN OR CIVIL

 7  RIGHTS PLANKS AND THE LIKE IS ABOUT THE DEGREE TO

 8  WHICH A BLACK PERSON BELIEVES THAT THEIR FATE IS TIED

 9  TO THE FATE OF THE RACE.  AND IT'S ALSO SOMEWHAT

10  ABOUT SOCIAL PRESSURE TO CONFORM TO GROUP IDEAS OF

11  BLACK UPLIFT.

12        SO THERE IS THESE RACIAL CONSIDERATIONS OF

13  PARTISANSHIP THAT AFFECT HOW BLACK VOTERS CHOOSE TO

14  IDENTIFY WITH PARTIES.  SO AGAIN, IT'S HARD TO SAY

15  THAT THIS IS -- SO TO SAY THAT THESE PATTERNS ARE

16  ABOUT PARTISANSHIP RATHER THAN RACE IGNORES THE ISSUE

17  THAT PEOPLE ARE CHOOSING PARTIES BASED ON HOW THE

18  PARTIES ALIGN ON RACIAL ISSUES.

19        THAT'S ALSO TRUE FOR WHITE REPUBLICANS.  IN

20  THE MINDS OF MOST AMERICANS -- THERE IS THIS REALLY

21  INTERESTING STUDY IN WHICH THEY ASKED AMERICANS TO

22  ENVISION THE TYPICAL PERSON IN A POLITICAL PARTY.

23  AND 97.2 PERCENT OF AMERICANS THINK THAT THE TYPICAL

24  REPUBLICAN IS WHITE.  AND THEN ALSO WHITE RESPONDENTS

25  WHO PERCEIVE THE DEMOCRATIC PARTY AS AFRICAN AMERICAN

02:57p

**1** OR PRIMARILY AFRICAN AMERICAN ARE ACTUALLY LESS

**2** FAVORABLE TOWARD DEMOCRATS.  THEY'RE MORE FAVORABLE

**3** TOWARD REPUBLICANS AND THEY TAKE MORE CONSERVATIVE

**4** ISSUES ON THESE -- ON POLITICAL -- STANCES ON

**5** POLITICAL ISSUES.

**6**        AND SO THERE IS THIS -- AND THERE IS ALSO

**7** DATA THAT SHOW THAT RACIAL ATTITUDES ARE -- MUCH MORE

**8** STRONGLY PREDICT PARTISANSHIP AND PARTY CHOICE TODAY

**9** THAN THEY HAVE PREVIOUSLY.  SO THAT RELATIONSHIP IS

**10** JUST GETTING MUCH MORE TIGHT AS TIME GOES ON.

**11**   **Q**   THANK YOU, DR. BURCH.

**12**        TURNING TO THE NEXT SLIDE, HOW DO METRICS

**13** REGARDING SUPPORT FOR INTERRACIAL MARRIAGE DISCUSSED

**14** ON PAGE 4 OF YOUR SUPPLEMENTAL REPORT PULLED INTO

**15** YOUR ASSESSMENT?

**16**   **A**   SO I DISCUSSED INTERRACIAL MARRIAGE BECAUSE

**17** DR. ALFORD DOES.  I THINK THAT IT -- HE CITES A

**18** STATISTIC ABOUT INTERRACIAL MARRIAGE.  BUT I THINK

**19** IT'S INTERESTING BECAUSE THE WAY THAT MOST OF THE

**20** LITERATURE MEASURES INTERRACIAL -- SUPPORT FOR

**21** INTERRACIAL MARRIAGE ISN'T JUST A GENERALIZED

**22** QUESTION LIKE HE USES.  IT'S ACTUALLY AN EXAMPLE OF

**23** THINKING.  TO GET AT THE -- QUOTE, UNQUOTE -- REAL

**24** ATTITUDE IS ASKING PEOPLE WHAT THEY THINK ABOUT A

**25** CLOSE RELATIVE MARRYING SOMEONE OF A DIFFERENT RACE.

02:58p

1          AND THEN YOU START TO SEE THAT A MINORITY OF

2    WHITE RESPONDENTS SAY THAT THEY FAVORED OR SOMEWHAT

3    FAVORED A CLOSE RELATIVE MARRYING SOMEONE OF A

4    DIFFERENT GROUP.  AND THAT'S COMPARED TO LIKE 53.7

5    PERCENT OF BLACK RESPONDENTS.  SO IT'S STILL CLEAR

6    THAT THERE IS SOME RESISTANCE TO INTERRACIAL MARRIAGE

7    IN THESE GROUPS, ESPECIALLY WHEN YOU ASK ABOUT A

8    CLOSE RELATIVE RATHER THAN A GENERAL BLANKET POLICY

9    STATEMENT.

10          IT'S ALSO INTERESTING THAT PARTISANSHIP AND

11   IDEOLOGY ARE STATISTICALLY SIGNIFICANT PREDICTORS OF

12   SUPPORT FOR INTERMARRIAGE, SO -- INTERRACIAL

13   MARRIAGE.  AND SO EVEN THAT IS TIED UP IN RACIAL

14   POLITICS.  AND SO REPUBLICANS AND IDEOLOGICAL

15   CONSERVATIVES ARE ACTUALLY LESS SUPPORTIVE OF

16   INTERMARRIAGE WITH BLACK PEOPLE.

17       Q    THANK YOU, DR. BURCH.

18          OVERALL WHAT DID YOU CONCLUDE REGARDING THE

19   CONTEMPORARY RELATIONSHIP BETWEEN RACIAL ATTITUDES

20   AND VOTE CHOICE?

21       A    SO I FOUND THAT THE LITERATURE IN POLITICAL

22   SCIENCE VERY CLEARLY SUPPORTS THE POINT THAT PARTY

23   AND CANDIDATE CHOICE IS SHAPED BY RACIAL IDENTITY AND

24   RACIAL ATTITUDES IN THE ELECTORATE.  AND THAT

25   RELATIONSHIP HAS BEEN GETTING STRONGER IN RECENT

02:59p

1   YEARS.  AND SO TO SAY THAT PARTY COHESION RATHER THAN

2   RACIAL CONSIDERATIONS EXPLAINS VOTING PATTERNS ALONG

3   RACIAL DIMENSIONS IN LOUISIANA, IT JUST CONFUSES THE

4   CAUSALITY.  THERE IS REALLY STRONG EVIDENCE IN THE

5   LITERATURE THAT RACE AND RACIAL ATTITUDES ARE WHAT

6   ARE DRIVING PARTY COHESION AND VOTE CHOICE.

7       Q    THANK YOU, DR. BURCH.

8           MS. WENGER:  YOUR HONOR, IF I CAN HAVE A

9   MOMENT TO CONFER WITH MY CO-COUNSEL?

10          THE COURT:  TAKE A MINUTE.

11          MS. WENGER:  YOUR HONOR, IF I CAN JUST MAKE

12  SURE WE HAVE A CLEAN RECORD ON THIS.  I WANT TO MAKE

13  SURE WE HAVE THE NUMBERS.

14              PLAINTIFFS MOVE TO ADMIT PLAINTIFFS'

15  EXHIBIT 126, 127 AND 128 WITHOUT OBJECTION.

16          THE COURT:  I THINK THEY WERE ALREADY

17  ADMITTED.  BUT IF THOSE AREN'T THE RIGHT NUMBERS,

18  THEY ARE NOW THE RIGHT NUMBERS.  126, 127 AND 128 ARE

19  ADMITTED.

20          MS. WENGER:  THANK YOU, YOUR HONOR.

21              THANK YOU, DR. BURCH.

22              I'LL PASS THE WITNESS.

23          THE COURT:  LET'S TAKE A 15-MINUTE RECESS

24  BEFORE YOUR CROSS.

25          THE LAW CLERK:  ALL RISE.  COURT IS IN

03:00p

1    RECESS.

2              **(WHEREUPON, A RECESS WAS TAKEN.)**

3           **THE COURT:**  BE SEATED.

4              CROSS.

5                    **CROSS-EXAMINATION**

6    BY MR. LEWIS:

7       Q    GOOD AFTERNOON, DR. BURCH.  I'M PATRICK

8    LEWIS FOR THE LEGISLATIVE DEFENDANTS.

9       A    GOOD AFTERNOON.

10      Q    ALL RIGHT.  JUST TO BEGIN, I DON'T RECALL

11   YOU TESTIFYING ON DIRECT EXAMINATION ABOUT THE

12   TURNOUT GAP BETWEEN -- THE ACTUAL VALUE OF THE

13   TURNOUT GAP BETWEEN WHITE AND BLACK RESIDENTS IN

14   LOUISIANA.  SO I'D LIKE TO START THERE.

15      A    OKAY.

16      Q    IF WE COULD TURN TO PAGE 6 OF YOUR REPORT,

17   PL 126, WHICH I BELIEVE IS PAGE 8 OF THE EXHIBIT.

18      A    I HAVE IT.

19      Q    OKAY.  WE'RE WAITING FOR THE SCREEN TO GET

20   UP.  THERE WE GO.

21      A    OKAY.  OH.  WELL, THAT'S -- YES.

22      Q    OKAY.  ALL RIGHT.  SO IF I'M READING FROM

23   THE THIRD PARAGRAPH CORRECTLY, YOU REPORT THAT IT WAS

24   64 PERCENT WHITE TURNOUT IN 2020 COMPARED TO 58

25   PERCENT FOR BLACK LOUISIANANS?

03:21p

1     **A**     YES.

2     **Q**     FAIR TO SAY THAT THAT LEVEL OF BLACK TURNOUT

3  IS HIGHER THAN IT WAS IN, FOR EXAMPLE, 1982?

4     **A**     I DON'T HAVE THOSE DATA IN FRONT OF ME, SO I

5  DON'T KNOW.

6     **Q**     YOU DON'T KNOW.  OKAY.

7           HIGHER THAN BLACK TURNOUT WOULD HAVE BEEN IN

8  1965?

9     **A**     I WOULD -- DON'T KNOW, ACTUALLY.

10     **Q**     YOU DON'T KNOW.

11     **A**     I'D HAVE TO LOOK AT THAT.

12     **Q**     OKAY.  SO YOU INCLUDE IN YOUR REPORT AS WELL

13  AND YOU DISCUSSED IN YOUR DIRECT EXAMINATION TABLE 1

14  ON PAGE 7.

15           **MR. LEWIS:**  SO IF WE COULD TURN TO THE NEXT

16  PAGE, MR. WILLIAMSON.

17  **BY MR. LEWIS:**

18     **Q**     IT'S UP ON THE SCREEN.  DO YOU RECOGNIZE

19  THIS TABLE FROM YOUR REPORT?

20     **A**     I DO.

21     **Q**     OKAY, GREAT.  SO THIS ANALYSIS SHOWS THAT

22  AMONG THE LEAST EDUCATED LOUISIANANS, BLACK TURNOUT

23  ACTUALLY EXCEEDS WHITE TURNOUT.  IS THAT RIGHT?

24     **A**     WELL, IT DEPENDS ON WHAT YOU MEAN BY

25  "LEAST."  SO FOR PEOPLE WITH A HIGH SCHOOL DIPLOMA,

03:22p

1    WHITE TURNOUT EXCEEDS BLACK TURNOUT.  FOR PEOPLE WITH

2    NO HIGH SCHOOL DIPLOMA, BLACK TURNOUT EXCEEDS WHITE

3    TURNOUT.  SO AT THE LOWER END OF THE SCALE IT KIND OF

4    REVERSES.

5        Q    OKAY.  AND AMONG THOSE WITH A BACHELOR'S

6    DEGREE, BLACK TURNOUT ALSO EXCEEDS WHITE TURNOUT.  IS

7    THAT CORRECT?

8        A    YES.  BUT I'M NOT A HUNDRED PERCENT SURE

9    THOSE ARE STATISTICALLY SIGNIFICANT, SO THEY MAY

10   BE -- THAT MAY BE LIKE PARITY.  PARITY, YES.

11       Q    I SEE.  OKAY.  AND THEN AMONG THOSE WITH THE

12   HIGHEST LEVEL OF EDUCA- -- I BELIEVE GRADUATE SCHOOL,

13   YOU HAVE WHITE TURNOUT EXCEEDING BLACK TURNOUT.  IS

14   THAT RIGHT?

15       A    YES.

16       Q    SO THE DIFFERENCE BETWEEN WHITE TURNOUT AND

17   BLACK TURNOUT AS EDUCATION LEVEL INCREASES IS NOT

18   COMPLETELY LINEAR, IS IT?

19       A    NO.  SO THOSE -- SO I GUESS WHAT YOU --

20   ACTUALLY, I DON'T WANT TO GUESS WHAT YOU MEAN BY

21   THAT.  WHAT DO YOU MEAN BY THAT?

22       Q    SURE.  SO THE IDEA IS THAT AS THAT

23   WHITE TURNOUT -- AS EDUCATION LEVEL INCREASES, WHITE

24   TURNOUT DOESN'T ALWAYS EXCEED BLACK TURNOUT.  RIGHT?

25       A    THAT'S TRUE.

03:23p

1    Q    OKAY.  AND --

2    A    TO THE EXTENT THAT -- TO THE EXTENT THAT FOR

3 EACH EDUCATIONAL LEVEL.  SOMETIMES BLACK PEOPLE AT

4 THAT EDUCATIONAL LEVEL VOTE MORE, SOMETIMES WHITE

5 PEOPLE AT THAT EDUCATIONAL LEVEL VOTE MORE, SOMETIMES

6 IT'S PARITY.  LIKE I SAID, IT CAN BE THE SAME.

7    Q    SURE.  SURE.  NO, I UNDERSTAND.

8         AND, IN FACT, THE EDUCATIONAL LEVEL WHERE

9 WHITE TURNOUT EXCEEDS BLACK TURNOUT THE MOST ON THIS

10 TABLE IS AMONG THOSE WITH THE ABSOLUTE HIGHEST LEVEL

11 OF EDUCATION AT GRADUATE SCHOOL.  IS THAT RIGHT?

12   A    YES.

13   Q    SO WE CAN -- ACTUALLY, I'D LIKE NOW TO MOVE

14 TO FIGURE 2 ON PAGE 8 OF YOUR REPORT, SO WE'LL GO TO

15 THE NEXT PAGE.

16        I BELIEVE YOU TESTIFIED ABOUT THIS ON

17 DIRECT.  NOW, THIS -- TO MAKE SURE I UNDERSTAND THIS

18 CORRECTLY, THIS FIGURE IS SHOWING THE RACIAL

19 PERCENTAGE SHIFT ENROLLMENT IN EAST BATON ROUGE

20 SCHOOLS FROM 1970 TO 2019.  IS THAT RIGHT?

21   A    YES.

22   Q    AND SO DO YOU BELIEVE THAT THIS FIGURE IS

23 SHOWING US THAT AS -- THERE IS AN INCREASE IN BLACK

24 STUDENT POPULATION RELATIVE TO WHITE POPULATION IN

25 THE SCHOOL SYSTEM.  ARE YOU SAYING THAT THAT'S A

03:25p

**1**  POSITIVE OR A NEGATIVE THING AS FAR AS EQUAL

**2**  OPPORTUNITY FOR BLACK VOTERS IN LOUISIANA TO VOTE?

**3**      **A**    SO WHAT I'M SAYING IS RELATIVE TO THE

**4**  POPULATION IN THE DISTRICT, SCHOOL SEGREGATION IN

**5**  EAST BATON ROUGE PARISH IS INCREASING.  AND THAT IN

**6**  AND OF ITSELF, AS I SAID BEFORE, AFFECTS OUTCOMES.

**7**          SO RIGHT HERE I TALK ABOUT THE EFFECTS OF

**8**  SCHOOL SEGREGATION IN MY REPORT ON PAGE 7.  SO SCHOOL

**9**  SEGREGATION HAS BEEN SHOWN TO DETRIMENTALLY AFFECT

**10** THE ACADEMIC PERFORMANCE OF MINORITY STUDENTS.  BLACK

**11** AND LATINO STUDENTS WHO GREW UP UNDER CONDITIONS OF

**12** SEGREGATION WERE LESS ACADEMICALLY PREPARED FOR

**13** COLLEGE AND HAD BEEN EXPOSED TO MORE VIOLENCE AND

**14** SOCIAL DISORDER THAN THOSE COMING FROM MAJORITY

**15** DOMINANT SETTINGS.

**16**          SO IF WE TAKE THAT A STEP FURTHER AND THINK

**17** BACK TO THE CHARTS WE JUST REVIEWED, THEN, AGAIN,

**18** BLACK AND LATINO STUDENTS UNDER SEGREGATION BEING

**19** LESS PREPARED FOR COLLEGE, THAT SHAPES WHERE ON THAT

**20** DISTRIBUTION THEY END UP IN TERMS OF THEIR

**21** EDUCATIONAL LEVEL AND THUS THEIR VOTER TURNOUT.

**22**      **Q**    OKAY.  SO THEN IF I UNDERSTAND CORRECTLY

**23** THEN, IF YOU'RE -- ARE YOU THEN SUGGESTING THAT AS

**24** THERE IS AN INCREASE IN THE SHARE OF THE STUDENT

**25** POPULATION IN THE EAST BATON ROUGE SCHOOLS THAT'S

03:26p

1  BLACK, THAT THAT'S THEN INDICATIVE OF AN EDUCATION

2  SYSTEM IN EAST BATON ROUGE THAT WOULD BE HARMFUL TO

3  BLACK VOTING OPPORTUNITY?

4      A    YES.   THE RESEARCH SAYS THAT IT IS; THAT

5  SEGREGATION IS HARMFUL, YES.

6      Q    OKAY.   BUT AGAIN, IN YOUR REPORT YOU DON'T

7  SHOW, FOR EXAMPLE, BLACK TURNOUT RATES IN EAST BATON

8  ROUGE PARISH FROM 1970 TO 2019, DO YOU?

9      A    NO.   JUST STATEWIDE BY EDUCATION.

10     Q    OKAY.  AND SO YOUR REPORT ALSO INCLUDES --

11  AND WE DON'T NECESSARILY HAVE TO GO THROUGH ALL OF

12  THESE, ALTHOUGH WE CAN -- A DISCUSSION OF, YOU KNOW,

13  VARIOUS SOCIOECONOMIC FACTORS.  YOU INCLUDED INCOME,

14  HOUSEHOLD INCOME AND SO FORTH.

15         ALL OF THAT DATA ARE REPORTED ONLY AT THE

16  STATEWIDE LEVEL.  IS THAT CORRECT?

17     A    YES.

18     Q    OKAY.  SORRY.

19     A    YOU'RE -- SORRY.  AND YOU'RE JUST TALKING

20  ABOUT THE SECTION WITH SOCIOECONOMIC DATA?

21     Q    SURE.  SO JUST TO BE VERY CLEAR, IF WE'RE

22  LOOKING AT FIGURES 5 BEGINNING ON PAGE 10 OF YOUR

23  REPORT AND WE GO THROUGH FIGURE 8 APPEARING ON PAGE

24  12.

25     A    YES, THOSE ARE ALL STATEWIDE.

03:28p

**1**      Q    GREAT.  OKAY.  AND THOSE ARE ALL FROM A

**2**  SNAPSHOT FROM 2019.  IS THAT CORRECT?

**3**      A    YES.

**4**      Q    OKAY.  SO -- AND THEN IF WE GO ON TO THE

**5**  HEALTH ANALYSIS THAT YOU -- IF YOU LOOK AT HEALTH

**6**  OUTCOMES BEGINNING BETWEEN PAGES 16 AND 19 OF YOUR

**7**  REPORT -- SORRY, AS I'M FUMBLING THROUGH HERE --

**8**  FIGURES 11 AND 12 AND 13 ON PAGE 18 OF YOUR REPORT,

**9**  ALL OF THOSE ARE EFFECTIVELY A SNAPSHOT IN TIME, TOO.

**10** ISN'T THAT RIGHT?

**11**     A    THOSE FIGURES, YES, ARE FROM 2019.

**12**     Q    OKAY.  AND THOSE, AGAIN, ARE REPORTED SOLELY

**13** AT THE STATEWIDE LEVEL.  IS THAT RIGHT?

**14**     A    FOR THOSE FIGURES, YES.

**15**     Q    SO IN YOUR REPORT YOU DON'T STUDY HOW THOSE

**16** EMPLOYMENT -- ECONOMIC INDICATORS AND HEALTH

**17** INDICATORS CHANGE OVER TIME, DO YOU?

**18**     A    WELL, I DO TALK ABOUT SOME ASPECTS -- I

**19** MOSTLY TALK ABOUT EDUCATION AS IT CHANGES OVER TIME

**20** AND HOUSING AS THEY CHANGE OVER TIME.  WITH RESPECT

**21** TO HEALTH OUTCOMES, I DO NOT TALK ABOUT OVER-TIME

**22** DATA, WITH THE EXCEPTION OF SOME DISCUSSIONS OF

**23** THINGS LIKE KATRINA, FOR INSTANCE.  AND I ALSO TALK

**24** ABOUT SEGREGATION OVER TIME AND I DO -- YEAH.

**25**          SO MOSTLY MY DATA FOR EDUCATION ARE OVER

03:29p

 1   TIME, AND HOUSING AND THE LIKE ARE BOTH CONTEMPORARY

 2   AND OVER TIME.  AND THEN DATA ABOUT INCOME AND

 3   SOCIOECONOMIC STATUS ARE CONTEMPORARY.  THAT'S RIGHT.

 4       Q    AND AGAIN, FOR ALL OF THOSE WITH THE

 5   EXCEPTION OF THIS -- WHICH I GUESS IS STILL ON THE

 6   SCREEN HERE -- FIGURE 2 WITH THE EAST BATON ROUGE

 7   SCHOOLS, ALL THAT DATA REPORTED AT THE STATEWIDE

 8   LEVEL, NOT AT THE LOCAL LEVEL.  IS THAT RIGHT?

 9       A    GIVE ME A SECOND.

10       Q    SURE.

11       A    SO EVEN IN THE EDUCATION SECTION I DO -- IT

12   DEPENDS ON WHAT YOU MEAN BY "STATEWIDE."  SO, FOR

13   INSTANCE, I DO TALK ON PAGE 5, FOR INSTANCE, ABOUT

14   HISTORICAL SEGREGATION, TALKING ABOUT 11 OF 64 --

15   THEY CALL THEM COUNTIES, BUT WE KNOW THEY'RE

16   PARISHES -- THAT ARE SEGREGATED AND SPECIFIC DATA

17   ABOUT ORLEANS PARISH AND THE FIGHT TO DESEGREGATE

18   ORLEANS PARISH.  I TALK ABOUT DATA ON PAGE 7 AT THE

19   BOTTOM.

20           SO, OF COURSE I HAVE THIS CHART ABOUT EAST

21   BATON ROUGE AS ZOOM IN, BUT I ALSO TALK MORE ABOUT

22   THE FACT THAT HALF OF TRADITIONAL SCHOOL DISTRICTS

23   FOR WHICH DATA WERE AVAILABLE IN THE STATE

24   DEMONSTRATE HIGH LEVELS OF RACIAL SEGREGATION WITHIN

25   THE DISTRICT, AND NINE OF 68 WERE MORE THAN 87

03:31p

1   PERCENT NON-WHITE.  SO THAT I THINK IS DATA THAT IS

2   NOT JUST IN THE STATE AS A WHOLE BUT ALSO TALKS ABOUT

3   SPECIFIC -- THAT THESE -- PATTERNS IN DIFFERENT

4   PARISHES.

5       Q    I SEE.  OKAY.  BUT IN YOUR REPORT, THE

6   ONLY -- IN TERMS OF -- I KNOW YOU SET ASIDE THE

7   HISTORICAL EVIDENCE THAT YOU CITED FROM GOING BACK

8   INTO THE '50s.  BUT, FOR EXAMPLE, IN THAT PROPUBLICA

9   STUDY, THE ONLY SCHOOL DISTRICT THAT YOU ACTUALLY

10  IDENTIFIED BY NAME AND TALK ABOUT BY NAME IN THAT

11  PART OF YOUR REPORT IS EAST BATON ROUGE.  IS THAT

12  RIGHT?

13      A    THAT'S NOT FROM THAT REPORT.  BUT YES, THE

14  ONLY ONE THAT I TALK ABOUT BY NAME IS THERE.  BUT

15  AGAIN, I LIST -- I DO DISCUSS SEVERAL OTHERS WITH

16  RESPECT TO HOW THEY BREAK DOWN IN THE -- SO NOT JUST

17  STATEWIDE SEGREGATION BUT ACROSS -- THE FACT THAT IT

18  EXISTS IN DIFFERENT PLACES AS WELL.

19      Q    AGAIN, YOU'RE GOING BACK TO THAT -- THE

20  DESEGREGATION PORTION OF YOUR REPORT.  I UNDERSTAND.

21  OKAY.

22      A    UH-HUH.

23      Q    BUT THERE ARE VARIATIONS, FOR EXAMPLE, IN

24  SOCIOECONOMIC CONDITIONS DEPENDING ON WHERE ONE LIVES

25  WITHIN THE STATE OF LOUISIANA.  IS THAT RIGHT?

03:32p

1    A    YES.

2    Q    SO, FOR EXAMPLE, HOUSEHOLD INCOME FOR BLACK

3  LOUISIANANS IN BATON ROUGE PARISH -- EAST BATON ROUGE

4  PARISH MIGHT NOT BE THE SAME AS HOUSEHOLD INCOME FOR

5  BLACK LOUISIANANS IN, FOR EXAMPLE, THE DELTA

6  PARISHES.  IS THAT RIGHT?

7    A    THAT COULD BE TRUE.

8    Q    AND, IN FACT, WHITE LOUISIANANS WOULD HAVE A

9  SIMILAR HOUSEHOLD INCOME DISPARITY BETWEEN URBAN AND

10 RURAL AREAS, TOO.  RIGHT?

11   A    THAT COULD BE TRUE.

12   Q    COULD BE TRUE, OKAY.

13        AND YOUR REPORT DOESN'T ANALYZE THAT, DOES

14 IT?

15   A    NO.

16   Q    AND LIKEWISE, YOUR REPORT DOES NOT ANALYZE

17 VOTER TURNOUT BY RACE IN DIFFERENT LOCALITIES IN

18 LOUISIANA, DOES IT?

19   A    NO.

20   Q    I'D LIKE TO TURN BRIEFLY TO THE PORTION OF

21 YOUR REPORT THAT DISCUSSED RACIAL APPEALS, WHICH

22 IS -- SO WE'RE GOING TO GO TO PAGE 23 OF YOUR REPORT.

23   A    OKAY.

24   Q    THERE WE ARE.

25        NOW, YOU REFERENCED DAVID DUKE, THE FORMER

Case 3:22-cv-00178-SDD-SDJ   Document 213   12/29/23   Page 84 of 121

03:33p

1   GRAND WIZARD OF THE KKK.  WERE YOU -- BUT YOU ONLY

2   REFERENCE HIS CAMPAIGNS I BELIEVE GOING THROUGH 1991.

3   DO I HAVE THAT RIGHT?

4       A   THE ONE THAT IS IN THE QUOTE HERE IS 1990

5   SENATE RACE, YES, GUBERNATORIAL RUNOFF.

6       Q   WERE YOU AWARE DAVID DUKE ALSO RAN FOR U.S.

7   SENATE IN 2016?

8       A   I THINK I RECALL THAT.

9       Q   YOU RECALL THAT, OKAY.

10      WERE YOU AWARE WHAT SHARE OF THE VOTE DUKE

11  RECEIVED THAT YEAR?

12      A   I BELIEVE IT WAS MUCH LOWER THAN IN THE

13  '90S.

14      Q   ABOUT 3 PERCENT?  DOES THAT SOUND ABOUT

15  RIGHT?

16      A   I DON'T KNOW EXACTLY.

17      Q   YOU DON'T KNOW, OKAY.

18      AND YOU DON'T REFERENCE THAT 2016 CAMPAIGN

19  IN YOUR REPORT, DO YOU?

20      A   NO.  THIS IS JUST, AGAIN, PROVIDING EXAMPLES

21  OF PROMINENT RACIAL APPEALS IN POLITICS, NOT AN

22  EXHAUSTIVE LIST.

23      Q   I SEE.  SO GOING ON TO THOSE EXAMPLES, YOU

24  PROVIDED, I WANT TO SAY, ABOUT FOUR FROM 2019.  IS

25  THAT RIGHT?

Case 3:22-cv-00178-SDD-SDJ   Document 213   12/29/23   Page 85 of 121

03:35p

1      **A**    IF YOU COULD LIST THOSE, WHAT YOU'RE

2   COUNTING, THAT WOULD BE --

3      **Q**    HAPPY TO DO IT.  OKAY.  SO WE START WITH --

4   ON THE THIRD PARAGRAPH ON 23 YOU DISCUSS AN AD FROM

5   EDDIE RISPONE.

6      **A**    UH-HUH.

7      **Q**    SO THAT'S THE FIRST AD.  RIGHT?

8      **A**    YES.

9      **Q**    OKAY.  THEN YOU TALK ABOUT AN AD -- IN THE

10  NEXT PARAGRAPH DOWN, AN AD PLACED IN A PROMINENT

11  NEWSPAPER TALKING ABOUT THE CHARGE OF LIBERALISM.  DO

12  YOU SEE THAT?

13     **A**    YES.  SO THAT'S TWO.

14     **Q**    THAT'S TWO.  AND THEN IF WE GO TO THE NEXT

15  PAGE, PAGE 24, YOU THEN DISCUSS IN THE THIRD

16  PARAGRAPH SUPPORTERS OF EDWARDS RUNNING ADS TARGETING

17  BLACK VOTERS, ARGUING THAT RISPONE TARGETED DONALD

18  TRUMP AND CALLING TRUMP A RACIST.  DO YOU SEE THAT?

19     **A**    YES.

20     **Q**    THAT'S -- IS THAT THE THIRD?

21     **A**    YES, I THINK SO.

22     **Q**    AND I BELIEVE THE FOURTH IS -- AGAIN, IN THE

23  SAME PARAGRAPH IT SAYS IN -- QUOTE, IN RESPONSE,

24  RISPONE AND THE LOUISIANA GOP SAID THAT EDWARDS, WHO

25  DID NOT RUN THE AD HIMSELF, WAS A RACIST TAKING PART

03:36p

1    IN THE FAMILY TRADITION OF TAKING ADVANTAGE OF BLACK

2    PEOPLE.  DO YOU SEE THAT?

3        A    YES.  THAT'S FOUR.

4        Q    THAT'S THE FOURTH?

5        A    SO THE FIFTH ONE --

6        Q    THERE IS A FIFTH, ALL RIGHT.

7        A    YES.  SO THE ONE ON THE NEXT PAGE IS I THINK

8    ALSO FROM 2019.

9        Q    I SEE.  OKAY.  AND THAT WAS FROM A STATE

10   SENATE CANDIDATE.  RIGHT?

11       A    YES.

12       Q    OKAY.  SO I'D JUST LIKE TO START WITH THE

13   FIRST EXAMPLE.  AND TO QUOTE YOUR WORDS FROM THAT --

14   EXCUSE ME.  I ACTUALLY WANT TO LOOK AT -- WELL, LET

15   ME JUST ASK THIS QUESTION.

16            JOHN BEL EDWARDS WON THAT RACE, DIDN'T HE?

17       A    HE DID.

18       Q    SO ANY ADVERSE RACIAL APPEALS THAT YOU ARGUE

19   EXIST IN THESE ADS DID NOT PRECLUDE THE ELECTION OF

20   GOVERNOR EDWARDS?

21       A    SO I WANT TO BE CAREFUL HERE, BECAUSE I

22   DON'T WANT TO SUGGEST THAT BECAUSE HE GOT ELECTED,

23   THE ADS DIDN'T AFFECT THE ELECTION.  SO, FOR

24   INSTANCE, THE -- THE ADS COULD HAVE AFFECTED EITHER

25   HIS ELECTION OR COULD HAVE -- IN TERMS OF MAKING THE

03:37p

1  MARGIN DIFFERENT, OR IT COULD ALSO HAVE AFFECTED

2  DOWN-BALLOT RACES OR SOMETHING LIKE THAT --

3          THE REPORTER:  I'M SORRY.

4          THE WITNESS:  SORRY.

5  BY THE WITNESS:

6     A    IT COULD HAVE AFFECTED DOWN-BALLOT RACES,

7  FOR INSTANCE, OR HIS ELECTION IN TERMS OF THE MARGIN.

8  SO EVEN IF HE GOT ELECTED, I DON'T WANT TO IMPLY HERE

9  THAT THE ELECTION WASN'T AFFECTED BY THESE ADS.

10    Q    BUT MY QUESTION, DR. BURCH, IS WHETHER THOSE

11 ALLEGED RACIAL APPEALS PRECLUDED HIS ELECTION,

12 PREVENTED HIM FROM BEING ELECTED.

13    A    NO.

14    Q    SO I'D LIKE TO TURN TO THE FIRST OF THE NEXT

15 EXAMPLE ON PAGE 24.  AND THIS IS -- YOU DESCRIBE

16 AGAIN ON THAT THIRD PARAGRAPH ON PAGE 24 THE, QUOTE,

17 SUPPORTERS OF EDWARDS RAN ADS TARGETING BLACK VOTERS,

18 ARGUING THAT RISPONE SUPPORTED DONALD TRUMP AND

19 CALLING TRUMP A RACIST.  THE NEXT SENTENCE READS:

20 "STUDIES HAVE SHOWN THAT THIS TYPE OF EXPLICIT RACIAL

21 APPEAL CAN SERVE AS A COUNTERSTRATEGY TO NEUTRALIZE

22 APPEALS IN WAYS THAT GALVANIZE WHITE LIBERALS AND

23 BLACK VOTERS."  DO YOU SEE THAT?

24    A    I DO.

25    Q    OKAY.  SO WOULD GALVANIZING WHITE LIBERALS

03:39p

1   AND BLACK VOTERS BE A WAY TO INCREASE BLACK VOTERS'

2   ABILITY TO ELECT CANDIDATES OF CHOICE?

3      A    NOT -- IT DEPENDS ON WHERE THE ADS ARE

4   TARGETED, SO IT MAY OR MAY NOT BE.  IT JUST DEPENDS.

5      Q    IT DEPENDS, OKAY.

6           AND IS IT FAIR TO SAY THAT IT WOULD BE --

7   BASED ON THE ANALYSIS THAT YOU'RE PROVIDING HERE,

8   THAT IT COULD BE IN DEMOCRATIC CANDIDATES' INTERESTS

9   TO CALL OUT ALLEGED RACIAL APPEALS BY REPUBLICAN

10  CANDIDATES AS RACIST?

11     A    IT SAYS THAT IT CAN SERVE AS THE

12  COUNTERSTRATEGY THAT CAN DO THAT.  BUT SOMETIMES IT

13  --

14          THE REPORTER:  I'M SORRY.  "SOMETIMES" --

15          THE WITNESS:  SOMETIMES IT MAY NOT WORK.

16  BY MR. LEWIS:

17     Q    BUT SOMETIMES IT MAY WORK?

18     A    YES.

19     Q    OKAY.  NOW, MOVING ON TO THE SECOND EXAMPLE

20  IN THAT SAME PARAGRAPH, YOU SAY ALSO IN THE THIRD

21  PARAGRAPH OF YOUR REPORT THAT, QUOTE, RISPONE AND THE

22  LOUISIANA GOP SAID THAT EDWARDS, WHO DID NOT RUN THE

23  AD HIMSELF, WAS A RACIST TAKING PART IN THE FAMILY

24  TRADITION OF TAKING ADVANTAGE OF BLACK PEOPLE.  YOU

25  GO ON TO THEN QUOTE THE AD.

03:40p

1        AND DO YOU SEE WHERE YOU SAY THAT THAT'S AN

2   EXAMPLE OF A STRATEGY TO, QUOTE -- FOR REPUBLICAN

3   CANDIDATES TO, QUOTE, DEMOBILIZE BLACK VOTERS BY,

4   QUOTE, PORTRAYING THEIR CHOSEN CANDIDATE OR PARTY AS

5   INSENSITIVE TO THE GROUP'S NEEDS?  DO YOU SEE THAT?

6        A    SO IN THE PRECEDING PARAGRAPH, YES.  OR IS

7   IT SOMEWHERE ELSE THAT YOU WANT ME TO LOOK?

8        Q    NO, THAT'S WHERE -- YEAH, FROM THE PRECEDING

9   PARAGRAPH.  IS THAT RIGHT?

10       A    YES.

11       Q    SO THEN AM I UNDERSTANDING THIS CORRECTLY

12  THEN THAT THE WORD "RACIST" CAN ONLY BE USED IN A

13  CAMPAIGN AD WHEN IT SUPPORTS DEMOCRATIC CANDIDATES?

14       A    I DON'T SEE WHERE I WRITE THAT.

15       Q    BUT I MEAN, IS THAT THE -- IF YOU'RE SAYING

16  THAT IT'S AN IMPROPER RACIAL APPEAL IF REPUBLICANS

17  MAKE A CHARGE OF RACISM AND IT'S A COUNTERSTRATEGY IF

18  DEMOCRATIC CANDIDATES MAKE A CHARGE OF RACISM, THEN

19  ISN'T THAT -- DOESN'T THAT FOLLOW THAT IT'S

20  APPROPRIATE WHEN IT'S USED BY DEMOCRATS AND NOT WHEN

21  IT'S USED BY REPUBLICANS?

22       A    CAN YOU --

23            MS. WENGER:  OBJECTION.  I THINK THIS BOTH

24  MISCHARACTERIZES THE WITNESS'S TESTIMONY AND ALSO IS

25  VEERING ON ASKED AND ANSWERED.

03:41p

**1**          MR. LEWIS:  SHE HASN'T ANSWERED THE

**2**    QUESTION.

**3**          THE COURT:  OVERRULED.

**4**          MR. LEWIS:  THANK YOU.

**5**    BY THE WITNESS:

**6**      **A**    CAN YOU SHOW ME WHERE I USE -- DESCRIBE THIS

**7**    AS IMPROPER?

**8**      **Q**    WELL, IF YOU -- I DON'T KNOW THAT YOU SAY --

**9**    I DON'T KNOW THAT YOU USED THE WORD "IMPROPER," SO IF

**10**   THAT'S FINE, THEN WE CANNOT USE THE WORD "IMPROPER."

**11**         BUT IF -- BUT IS IT YOUR POSITION, THEN,

**12**   THAT IT IS -- THAT IT -- SO WHAT DOES IT MEAN TO

**13**   DEMOBILIZE BLACK VOTERS?  LET'S START THERE.

**14**     **A**    SO I SAID TWO THINGS.  I SAID THAT RACIAL

**15**   APPEALS OPERATE DIFFERENTLY, SO THAT MEANS THAT THEY

**16**   HAVE DIFFERENT EFFECTS.  BUT I DON'T BELIEVE I

**17**   CHARACTERIZE THOSE EFFECTS IN ANY OTHER WAY OTHER

**18**   THAN TO DESCRIBE WHAT THEY ARE, WHICH IS TO DECREASE

**19**   BLACK VOTERS.  AND THAT'S IN -- ACCORDING TO THE

**20**   LITERATURE THERE.

**21**     **Q**    OKAY.  SO THEN IF REPUBLICAN CANDIDATES MAKE

**22**   CHARGES OF RACISM AGAINST BLACK-PREFERRED CANDIDATES

**23**   AND IF I'M READING PAGE 24 CORRECTLY, YOU'RE SAYING

**24**   THAT CAN LEAD TO DEMOBILIZATION OF BLACK VOTERS.  IS

**25**   THAT RIGHT?

03:42p

1      **A**   YES.  THAT'S WHAT THE LITERATURE SHOWS.

2      **Q**   I SEE.  AND IF -- AND I THINK WE'VE ALREADY

3   DISCUSSED.  IF DEMOCRATIC CANDIDATES CALL OUT OR MAKE

4   CHARGES OF RACISM AGAINST REPUBLICANS, THAT IT CAN

5   LEAD TO GALVANIZING OF WHITE LIBERALS AND BLACK

6   VOTERS.  IS THAT RIGHT?

7      **A**   SO -- HANG ON A SECOND.  SO WHAT I SAY HERE

8   IS NOT NECESSARILY ABOUT PARTY.  SO WHAT I SAY IN THE

9   FIRST PARAGRAPH IS THAT "SPECIFICALLY MESSAGES

10  DESIGNED TO PORTRAY THE CHOSEN CANDIDATE OR PARTY OF

11  BLACK VOTERS AS RACIST."  SO I DON'T SAY "PARTY"

12  THERE.  AND THEN AFTER I SAY "THIS TYPE OF EXPLICIT

13  RACIAL APPEAL CAN SERVE AS A COUNTERSTRATEGY TO

14  NEUTRALIZE RACIAL APPEALS IN WAYS THAT GALVANIZE

15  LIBERALS AND BLACK VOTERS."

16         AND SO IT'S, AGAIN, TALKING ABOUT RACIAL

17  APPEALS THAT CALL OUT RACISM, BUT IT'S NOT

18  NECESSARILY BY PARTY THAT I'M LISTING THERE IN TERMS

19  OF THE DEFINITION OF THE EFFECTS.

20     **Q**   I'D LIKE TO MOVE ON TO YOUR ANALYSIS OF

21  SENATE FACTOR 7 VERY QUICKLY.  AND I THINK -- IS IT

22  YOUR -- I BELIEVE YOU TESTIFIED ON DIRECT EXAMINATION

23  THAT BLACK -- THAT 25 PERCENT OF THE LOUISIANA

24  LEGISLATURE IS MADE UP OF BLACK MEMBERS.  IS THAT

25  CORRECT?

03:44p

1    **A**   I THINK THAT WAS TRUE AS OF WHEN I WROTE THE

2    PRELIMINARY REPORT.  SO THAT MIGHT HAVE BEEN -- WHICH

3    I THINK I DID IN 2022.  NOT ANALYZING THE ELECTION

4    THAT CAME AFTER.

5        **Q**   I SEE.  OKAY.

6            AND SO YOU -- SO WHAT PERCENTAGE OF BLACK

7    ELECTED OFFICIALS IN THE LEGISLATURE DO YOU BELIEVE

8    IS REQUIRED BY SENATE FACTOR 7?

9        **A**   I DIDN'T ANALYZE THAT.

10       **Q**   YOU DIDN'T ANALYZE THAT.  OKAY.

11           BUT YOU WOULD AGREE THAT 25 PERCENT OF THE

12   LEGISLATIVE SEATS ARE DEFINITELY MORE THAN SAYING

13   THAT THERE WERE NO MINORITY-ELECTED OFFICIALS IN THE

14   LEGISLATURE.  CORRECT?

15       **A**   YES.  36 IS MORE THAN ZERO.

16       **Q**   OKAY.  AND THAT 36 IS NOT VERY FEW

17   MINORITY-ELECTED OFFICIALS, IS IT?

18       **A**   THAT'S A QUALITATIVE JUDGMENT.  I DON'T --

19       **Q**   OKAY.  AND SO WHAT PERCENTAGE OF THE

20   LOUISIANA LEGISLATURE -- I MEAN, ARE YOU ADVOCATING

21   IN THIS CASE THAT THIRTY -- THAT THE PERCENTAGE OF

22   THE LEGISLATURE THAT IS BLACK HAS TO EQUAL THE

23   POPULATION OF THE STATE THAT IS BLACK?

24       **A**   I DON'T BELIEVE I MADE THAT STATEMENT.  I'M

25   JUST SAYING THAT BLACK LOUISIANIANS ARE

03:46p

1   UNDERREPRESENTED RELATIVE TO THEIR SHARE OF THE

2   POPULATION.

3       Q    OKAY.  SO YOU BELIEVE THEN THAT THE -- WELL,

4   IF IT'S UNDERREPRESENTED, THEN WHAT WOULD BE ADEQUATE

5   REPRESENTATION IN YOUR MIND?

6       A    SO MY DEFINITION OF UNDERREPRESENTED IS

7   STATISTICAL PARITY.  SO I'M JUST MAKING A FACTUAL

8   CLAIM THAT STATISTICALLY THE PROPORTION IN THE STATE

9   IS GREATER THAN THE PROPORTION IN THE LEGISLATURE.

10      Q    OKAY.  NOW, YOU ALSO MENTIONED IN DIRECT

11  EXAMINATION YOU LOOKED AT THE PERCENTAGE OF MAYORS IN

12  LOUISIANA THAT WERE BLACK.  IS THAT RIGHT?

13      A    YES.

14      Q    OKAY.  BUT NOT ALL LOUISIANA CITIES ARE THE

15  SAME SIZE, ARE THEY?

16      A    NO.

17      Q    OKAY.  SO, FOR EXAMPLE, BEING THE MAYOR OF

18  NEW ORLEANS IS A CONSIDERABLY MORE INFLUENTIAL ROLE

19  THAN BEING THE MAYOR OF A SMALL TOWN.  WOULD YOU

20  AGREE?

21      A    ACTUALLY, I DON'T KNOW THE ANSWER TO THAT.

22  SO IT -- BECAUSE IT KIND OF DEPENDS ON THINGS LIKE

23  WHAT THE -- HOW THE COUNTY GOVERNMENT IS SET UP.  SO

24  IF, YOU KNOW, YOU HAVE A STRONG MAYOR MODEL, THEN

25  PERHAPS.  BUT IF YOU HAVE LIKE A MORE STRONG CITY

03:47p

1   COUNCIL MODEL, THEN THE MAYOR CAN JUST BE A

2   FIGUREHEAD.  SO IT KIND OF VARIES BY JURISDICTION

3   AMONG MORE THINGS THAN JUST POPULATION SIZE.

4       Q    OKAY.  BUT IF WE LOOK AT THE TWO LARGEST

5   CITIES IN LOUISIANA, DO YOU KNOW THE MAYOR PRESIDENT

6   OF THE CITY OF BATON ROUGE AND EAST BATON ROUGE

7   PARISHES?

8       A    NO, I DON'T KNOW THEM.

9       Q    DO YOU KNOW THAT PERSON'S RACIAL

10  IDENTIFICATION?

11      A    IF I REMEMBER CORRECTLY -- I'M ACTUALLY NOT

12  SURE IF THIS HAS CHANGED SINCE THE TIME OF MY REPORT,

13  SO I DON'T WANT TO GUESS.

14      Q    YOU DON'T REMEMBER?

15      A    NO.  I'M GOING TO SAY NO.

16      Q    OKAY.  WOULD IT SURPRISE YOU TO LEARN THAT

17  THE MAYOR-PRESIDENT OF BATON ROUGE IS SHARON WESTON

18  BROOME, A BLACK WOMAN?

19      A    NO.

20      Q    DO YOU KNOW WHO THE MAYOR OF THE CITY OF NEW

21  ORLEANS IS?

22      A    YES.  AGAIN, I'M NOT SURE IF THERE HAS BEEN

23  AN ELECTION SINCE THE LAST TIME I CHECKED.  BUT IF I

24  REMEMBER CORRECTLY, THAT IS A BLACK WOMAN AS WELL.

25      Q    MAYOR CANTRELL?

03:48p

**1**      **A**    YES.

**2**      **Q**    DOES THAT SOUND RIGHT?  OKAY.

**3**           ALL RIGHT.  TURNING TO FACTOR 8,

**4**   RESPONSIVENESS, I JUST HAVE A FEW VERY QUICK

**5**   QUESTIONS.  FIRST, I BELIEVE YOU INDICATED IN YOUR

**6**   REPORT AND ON YOUR DEMONSTRATIVE THAT -- AND WE

**7**   CAN -- LET'S PUT IT UP.  IT'S PAGE 26 OF THE REPORT,

**8**   WHICH IS PAGE 28 OF THE DOCUMENT TOWARD THE BOTTOM.

**9**   IF WE COULD ZOOM IN ON THAT LAST FULL PARAGRAPH, MR.

**10**  WILLIAMSON.

**11**          OKAY.  AND DO YOU SEE THAT SECOND SENTENCE

**12**  THAT SAYS, QUOTE, FOR INSTANCE, ABOUT 70 PERCENT OF

**13**  BLACK RESPONDENTS TO THE LOUISIANA SURVEY AGREED

**14**  THAT, QUOTE, MOST ELECTED OFFICIALS IN LOUISIANA

**15**  DON'T CARE WHAT PEOPLE LIKE ME THINK, END QUOTE, A

**16**  FIGURE THAT WAS SIMILAR TO WHITE LOUISIANANS.  DO YOU

**17**  SEE THAT?

**18**     **A**    I DO.

**19**     **Q**    SO SIMILAR PERCENTAGES OF WHITE AND BLACK

**20**  LOUISIANANS ARE EXPRESSING CONCERN HERE ABOUT

**21**  RESPONSIVENESS.  IS THAT RIGHT?

**22**     **A**    OH, YES.

**23**     **Q**    AND THAT'S NOT TOO DISSIMILAR FROM THE REST

**24**  OF THE COUNTRY.  RIGHT?  PEOPLE OFTEN DON'T LIKE

**25**  THEIR REPRESENTATIVES.  ISN'T THAT RIGHT?

03:50p

**1**      **A**    THAT'S INTERESTING.  MOST PEOPLE -- SO THE

**2**    WAY YOU ASK THAT QUESTION, LIKE MY POLITICAL SCIENCE

**3**    HEAD IS MAKING ME ANSWER MORE THAN YOU PROBABLY

**4**    THOUGHT, BUT -- SO YES, IT'S SIMILAR IN TERMS OF LIKE

**5**    THE FACT THAT MOST PEOPLE DON'T LIKE THE GOVERNMENT

**6**    AND HAVE PROBLEMS WITH THE GOVERNMENT.  BUT ACTUALLY

**7**    MOST PEOPLE HATE CONGRESS BUT LIKE THEIR

**8**    REPRESENTATIVE.  SO IT'S A REALLY INTERESTING DYNAMIC

**9**    WHEN YOU THINK ABOUT IT.

**10**      **Q**    OKAY.  AND THEN TURNING TO RESPONSIVENESS,

**11**    YOU KNOW, YOU CITED -- IT LOOKS LIKE YOU COUNTED UP

**12**    THE COMMENT CARDS, YOU REVIEWED THE LEGISLATIVE

**13**    HEARINGS FROM THE REDISTRICTING PROCESS IN 2022 IN

**14**    LOUISIANA.  IS THAT RIGHT?

**15**      **A**    I DID.  I WATCHED ALL THAT VIDEO.

**16**      **Q**    SO -- BUT YOU'D AGREE WITH ME THAT, YOU

**17**    KNOW, LOOKING AT THE -- I BELIEVE IT'S A HUNDRED AND

**18**    TWO PUBLIC COMMENTS AGAINST THE PLAN AND THE NUMBER

**19**    OF MAJORITY-MINORITY DISTRICTS IN THE PLAN.  THAT'S

**20**    NOT A REPRESENTATIVE SAMPLE OF PUBLIC OPINION IN

**21**    LOUISIANA, IS IT?

**22**      **A**    NO.  THAT'S WHY I DO INCLUDE DATA THAT'S A

**23**    REPRESENTATIVE SAMPLE OF PUBLIC OPINION IN LOUISIANA.

**24**    SO AGAIN, LOOKING AT THE SURVEY DATA THAT I CITE IN

**25**    PAGE 27, AGAIN THAT -- TOP OF 27 -- "MOREOVER, A

03:51p

1  MAJORITY OF BLACK LOUISIANIANS BELIEVE THAT 'BLACK

2  PEOPLE ARE TREATED LESS FAIRLY THAN WHITE PEOPLE'

3  WHEN VOTING IN ELECTIONS."  SO AGAIN, THAT IS BOTH

4  SURVEY DATA THAT TALKS ABOUT POLITICS AND ALSO ABOUT

5  VOTER SUPPRESSION AND ABOUT -- AS WELL AS THE

6  ROADSHOWS.

7      Q    I UNDERSTAND.  YOUR REPORT, HOWEVER, DOESN'T

8  CITE A SINGLE PARTICULAR PUBLIC POLICY, LIKE A PIECE

9  OF LEGISLATION BEFORE THE LEGISLATURE, I GUESS, OTHER

10 THAN THE REDISTRICTING BILL ITSELF, DOES IT?

11     A    NO, OTHER THAN THE -- WELL, THAT'S KIND OF A

12 BIG ONE.

13     Q    I GAVE YOU THE REDISTRICTING BILL.

14     A    YES.

15     Q    I WAS JUST ASKING IF THERE IS ANYTHING ELSE.

16 SO IT'S THE REDISTRICTING BILL?

17     A    YES.  THE REDISTRICTING BILLS ARE KIND OF,

18 YEAH, BIG ONES.

19     Q    I UNDERSTAND.  AND I SEE YOU HAVE A LOT OF

20 QUOTES IN HERE FROM SENATOR CASSIDY.  HE'S A U.S.

21 SENATOR.  RIGHT?

22     A    YES.

23     Q    AND THEN AS FAR AS PUBLIC COMMENT -- I GUESS

24 JUST THE LAST COUPLE OF QUESTIONS FOR YOU ON THAT.

25 WERE YOU AWARE THAT THERE WERE GROUPS INCLUDING THE

03:52p

**1**  ACLU AND ONE OF THE PLAINTIFFS IN THIS CASE, BVM,

**2**  THAT WERE -- THAT PARTICIPATED IN THE LEGISLATIVE

**3**  PROCESS LEADING TO THE REDISTRICTING BILLS AT ISSUE?

**4**      **A**    YES, I DID SEE THEM.  AND MOSTLY THEY -- AS

**5**  FAR AS I COULD TELL, THEY IDENTIFIED THEMSELVES WHEN

**6**  THEY SPOKE, SAYING THEY WERE THERE REPRESENTING X

**7**  GROUP.

**8**      **Q**    SURE.  BUT INNER SCRIPTS CAN OFTENTIMES

**9**  ENCOURAGE THEIR SUPPORTERS TO -- YOU KNOW, TO MAKE

**10**  PUBLIC COMMENTS OR SHOW UP AT MEETINGS IN LEGISLATION

**11**  IMPORTANT TO THE GROUP.  IS THAT RIGHT?

**12**      **A**    YES.  AND I ACTUALLY SAW QUITE A BIT OF THAT

**13**  NOT JUST FROM THE GROUPS THAT YOU MENTIONED BUT, FOR

**14**  INSTANCE -- ONE OF THE THINGS THAT I THOUGHT WAS

**15**  REALLY INTERESTING WAS THAT A LOT OF LOCALITIES

**16**  DURING THE ROADSHOWS WOULD SHOW UP WITH -- DELEGATION

**17**  IS A STRONG WORD -- BUT LOTS OF OFFICIALS, LIKE THE

**18**  CHAMBER OF COMMERCE AND OTHER PLACES TO TALK ABOUT

**19**  THINGS LIKE COMMUNITIES OF INTEREST AND ISSUES SUCH

**20**  AS THAT.  SO IT DEFINITELY HAPPENED THROUGHOUT THE

**21**  PROCESS.  AND AGAIN, MOST OF THE TIME THEY WOULD

**22**  IDENTIFY THEMSELVES WHEN THEY WERE DOING THAT WORK.

**23**      **Q**    SURE.  SO I'D LIKE TO TURN TO THE LAST

**24**  FACTOR YOU ANALYZED, WHICH IS TENUOUSNESS.  SO ON

**25**  PAGE 36 OF YOUR REPORT, WHICH IS PAGE 38 OF OUR -- OF

03:54p

1    YOUR -- OF THE EXHIBIT, YOU DISCUSS PRESIDENT

2    CORTEZ'S VIEWS ON CONTINUITY OF REPRESENTATION.  AND

3    I JUST HAD A COUPLE OF QUESTIONS ON THAT.

4         FIRST, YOU KNOW, YOU HAVE THIS SORT OF BLOCK

5    QUOTED LANGUAGE AT THE VERY TOP OF THE PAGE FROM

6    PRESIDENT CORTEZ BEGINNING WITH THE THIRD TENET OR

7    PRINCIPLE.  AND I JUST WANT TO MAKE SURE I

8    UNDERSTAND.  YOU'RE SAYING THAT THAT BLOCK QUOTED

9    LANGUAGE SUPPORTS THE VIEW THAT YOU MAKE LATER ON IN

10   THE PAGE THAT, QUOTE, CONTINUITY OF REPRESENTATION IS

11   NOT ABOUT VOTERS, RATHER, IT IS ABOUT THE SELF-

12   INTEREST OF THE LEGISLATORS?

13   A    HANG ON.  LET ME FIND -- I DON'T -- NO.  I'M

14   ACTUALLY TALKING ABOUT THE NEXT QUOTATION THERE IN

15   WHICH HE SAYS WHY HE'S TALKING ABOUT -- PRESIDENT

16   CORTEZ IS TALKING ABOUT WHY ADDITIONAL MAJORITY-

17   MINORITY DISTRICTS DO NOT GAIN TRACTION IN THE

18   SENATE.  HE SAID, "THE OTHER PART, YOU KNOW, AS IN

19   THIS BUILDING, YOU GOT TO GET VOTES.  THAT MAP SO

20   DESTROYED MANY OF THE DISTRICTS AND DIDN'T KEEP THAT

21   CONTINUITY OF REPRESENTATION THAT THERE WAS NOT A

22   REAL CHANCE OF GETTING THE 20 VOTES."  AND THEN HE

23   GOES ON TO TALK ABOUT HOW "DRAWING NEW MAJORITY-

24   MINORITY DISTRICTS WAS A NON-STARTER BECAUSE IT WOULD

25   PUT CERTAIN INCUMBENTS IN JEOPARDY."  AND AGAIN,

03:55p

1   QUOTE, AND THEN YOU GET INTO ANOTHER AREA OF PEOPLE

2   THAT YOU'VE NEVER MET BEFORE AND HAVE NEVER VOTED FOR

3   YOU.  AND ALMOST IT WAS MORE THAN 50 PERCENT OF THE

4   PEOPLE IN THAT DISTRICT WOULD NEVER HAVE VOTED FOR

5   THE PERSON CURRENTLY HOLDING.

6        SO THOSE ARE THE KINDS OF THINGS THAT I'M

7   TALKING ABOUT WITH RESPECT TO THE SELF-INTEREST OF

8   THE LEGISLATORS.

9        Q   OKAY.  BUT DO YOU SEE ON THAT -- GOING BACK

10  TO THAT SECOND PARAGRAPH WHERE YOU -- IT BEGINS,

11  QUOTE, TO PRESIDENT CORTEZ, REDISTRICTING VIOLATES

12  THE CONTINUITY OF REPRESENTATION TO THE EXTENT THAT

13  PLANS, QUOTE, GRAB A GROUP OF CONSTITUENTS TO ELECT A

14  DIFFERENT PERSON.  DO YOU SEE THAT?

15       A   I DO.

16       Q   OKAY.  AND YOU LINK THAT TO THE PRIOR

17  SENTENCE YOU QUOTE FROM HIM IN THE BLOCK QUOTE WHERE

18  IT SAYS, QUOTE, IT MEANS THAT IF YOUR DISTRICT

19  ELECTED YOU AND YOU'VE DONE A GOOD JOB, THEY ALSO

20  HAVE A RIGHT TO REELECT YOU.  RIGHT?

21       A   YES.  SO HERE IN THIS PARAGRAPH I'M TRYING

22  TO TALK ABOUT HOW HE DEFINES WHAT CONTINUITY OF

23  REPRESENTATION MEANS TO HIM.

24       Q   NOW, YOU'D AGREE THAT WHEN CITING ANY

25  TRANSCRIPT, IT'S IMPORTANT TO INCLUDE THE APPROPRIATE

03:57p

1  CONTEXT OF SOMEONE'S REMARKS.  RIGHT?

2    **A**    YES.  I TRIED REALLY HARD TO PUT IN WHOLE

3  SENTENCES, DESCRIBE THE CONTEXT BUT IN -- WELL, TO BE

4  HONEST, I WAS MORE WORRIED THAT I WOULD BE ACCUSED OF

5  PUTTING IN TOO MANY LONG BLOCK QUOTES IN ORDER TO

6  PROVIDE CONTEXT RATHER THAN EXCERPTING AND MOVING

7  THINGS ALONG.

8    **Q**    OKAY.  SO I'D LIKE TO JUST PULL UP NOW JX

9  21, JOINT EXHIBIT 21, WHICH HAS BEEN PREADMITTED.

10  AND I'LL REPRESENT TO YOU, DR. BURCH, THIS IS THE

11  TRANSCRIPT FROM THE HEARING THAT YOU'RE CITING IN

12  YOUR PIECE.  AND IF WE COULD GO TO PAGE 7.

13        AND, DR. BURCH, DO YOU SEE THE TEXT FROM --

14  AND I'LL REPRESENT TO YOU THIS IS REMARKS FROM

15  PRESIDENT CORTEZ AT THAT FEBRUARY 2, 2022 SENATE

16  HEARING YOU REFERENCED IN THE FOOTNOTE IN YOUR

17  REPORT.

18        IF WE TURN TO LINE 9 -- AND I'LL READ IT TO

19  YOU.  IT SAYS, QUOTE, THE THIRD TENET OR PRINCIPLE

20  WAS AS BEST POSSIBLE TO MAINTAIN THE CONTINUITY OF

21  REPRESENTATION.  WHAT DO I MEAN BY THAT?  IT MEANS

22  THAT IF YOUR DISTRICT ELECTED YOU AND YOU'VE DONE A

23  GOOD JOB, THEY ALSO HAVE A RIGHT TO REELECT YOU.

24  CONVERSELY, YOU DON'T GET TO CHOOSE WHO YOUR

25  POPULATION IS, THEY CHOOSE YOU.  IF YOU DIDN'T DO A

03:58p

1   GOOD JOB, THEY HAVE THE RIGHT TO UNELECT YOU.  AND

2   THE PEOPLE WHO PEOPLE WHO KNOW YOUR JOB THE BEST FOR

3   THOSE WHO WERE IN YOUR DISTRICT.

4          DO YOU SEE THAT?

5     A    SO I THINK THAT WHAT I PUT IN WAS TRUE TO

6   THE FACT THAT HIS DEFINITION OF CONTINUITY OF

7   REPRESENTATION IS BASICALLY ABOUT INCUMBENCY.

8     Q    BUT YOU SAW THAT SUBSEQUENT TEXT WHEN YOU

9   WATCHED THE VIDEO.  RIGHT?

10    A    YEAH.  SO I DON'T THINK THAT CONTRADICTS

11  WHAT I HAVE HERE IN TERMS OF SAYING THAT THIS IS

12  ABOUT INCUMBENCY.

13    Q    YOU DIDN'T INCLUDE THOSE REMARKS IN YOUR

14  REPORT, DID YOU?

15    A    YOU MEAN THE PART ABOUT "YOU DON'T GET TO

16  CHOOSE WHO YOUR POPULATION IS, THEY CHOOSE YOU"?

17    Q    CORRECT.

18    A    FROM THERE?

19    Q    YES.

20    A    NO.

21    Q    NO, OKAY.  I'D LIKE TO TURN VERY QUICKLY TO

22  A COMMENT THAT YOU MADE ON PAGE 32 OF YOUR REPORT.

23  SO IF WE COULD GO BACK TO PL 126 AND TURN TO PAGE 32.

24         AND SPECIFICALLY THE SECOND PARAGRAPH FROM

25  THE BOTTOM YOU STATE THAT, QUOTE, THE COMMITTEE --

04:00p

1   AND I BELIEVE THAT WAS THE SENATE COMMITTEE -- WAS

2   PRESENTED WITH EVIDENCE THAT STATISTICAL ANALYSES

3   SHOW THAT PLANS SUCH AS THAT PRESENTED IN SB 17 WOULD

4   RELIABLY PERFORM TO ALLOW BLACK LOUISIANANS TO ELECT

5   CANDIDATES OF THEIR CHOICE.  DO YOU SEE THAT?

6        A    I DO.

7        Q    AND WERE YOU AWARE THAT SENATOR HEWITT ASKED

8   MORE THAN ONCE FOR A COPY OF THAT STATISTICAL

9   ANALYSIS?

10       A    I DID SEE HER DO THAT.

11       Q    YOU DID SEE HER DO THAT.

12            AND WERE YOU AWARE THAT THE ACLU DID NOT

13   PROVIDE THAT ANALYSIS TO SENATOR HEWITT?

14       A    I DON'T KNOW.

15       Q    YOU DON'T KNOW, OKAY.

16            AND YOU DIDN'T REFERENCE THAT THAT ANALYSIS

17   WAS REQUESTED AND MAY OR MAY NOT HAVE BEEN PROVIDED

18   IN YOUR REPORT, DO YOU?

19       A    LET ME SEE.  I THINK IT MUST -- IT MUST BE

20   THAT IT WAS DESCRIBED IN -- NO.  I THINK I JUST

21   REFERENCED THE FACT THAT IT WAS DESCRIBED.

22       Q    AND THEN FINALLY I JUST HAD JUST A COUPLE

23   VERY BRIEF WRAP-UP QUESTIONS.

24            YOU REFERENCE A SERIES OF ALTERNATE BILLS

25   THAT WERE PRESENTED TO THE LOUISIANA LEGISLATURE IN

04:01p

1   THAT FIRST EXTRAORDINARY SESSION IN 2022.  IS THAT

2   RIGHT?

3        A    YES.

4        Q    OKAY.  AND DO YOU KNOW IF ANY OF THE -- ANY

5   OF THOSE PLANS PROPOSED 14 OR MORE MAJORITY-BLACK

6   DISTRICTS FOR THE SENATE?

7        A    I DON'T RECALL.

8        Q    YOU DON'T RECALL, OKAY.

9             AND WERE YOU AWARE OF ANY OF THE PLANS --

10  ANY OF THOSE ALTERNATE PLANS THAT WOULD HAVE HAD 35

11  OR MORE MAJORITY-BLACK DISTRICTS IN THE HOUSE?

12       A    I DON'T RECALL.

13       Q    SO FINALLY, I JUST HAD ONE MORE QUESTION FOR

14  YOU, AND IT'S ON PAGE 40 OF YOUR REPORT.  IF WE COULD

15  GO TO THAT QUICKLY.  AND I JUST WANTED TO ASK YOU

16  ABOUT -- YOU MADE REFERENCE IN YOUR TESTIMONY IN

17  DIRECT EXAMINATION ABOUT A STATEMENT MADE BY SENATOR

18  HENRY ABOUT WANTING A DISTRICT A CERTAIN WAY SO HE,

19  QUOTE, REPRESENT HIS SISTER AND WAS STILL PAYING

20  STUDENT LOANS TO TULANE.  DO YOU RECALL THAT?

21       A    I DO.

22       Q    OKAY.  AND I BELIEVE YOU BLOCK QUOTE HIS

23  FULL COMMENTS IMMEDIATELY BELOW THAT TEXT.  DO YOU

24  SEE THAT?

25       A    YES.  YES.

04:03p

1       Q    OKAY.  AND HE'S PRETTY CLEARLY REFERRING TO

2   WANTING TO REPRESENT TULANE AND LOYOLA.  IS THAT

3   RIGHT?

4       A    YES.  AND -- YES.  SO HE'S GOT SOME

5   DISCUSSION -- YES.

6       Q    OKAY.  SO NOT JUST HIS SISTER.  RIGHT?

7       A    WELL, HE ALSO TALKS ABOUT ONE SISTER, TWO

8   SISTERS, A BROTHER AND A FATHER AND A MOTHER.  YEAH.

9   SO THERE IS A LOT -- THERE IS A LOT THERE.

10      Q    AND THOSE ARE ALL PEOPLE THAT HAD

11  CONNECTIONS TO LOYOLA UNIVERSITY.  RIGHT?  FROM HIS

12  STATEMENT?

13      A    YES.

14      Q    OKAY.

15          **MR. LEWIS:**  YOUR HONOR, I HAVE NO FURTHER

16  QUESTIONS.  THANK YOU, DR. BURCH.

17          **THE COURT:**  THANK YOU.

18           ANY REDIRECT?

19          **MS. WENGER:**  JUST A LITTLE.

20              **REDIRECT EXAMINATION**

21  BY MS. WENGER:

22      Q    NOW, DR. BURCH, MR. LEWIS SPOKE TO YOU ABOUT

23  FIGURE 1 AND TABLE 1 FROM PAGE 7 OF YOUR REPORT.  IF

24  WE CAN PULL UP THOSE UP -- THAT PAGE UP.

25           DR. BURCH, IS THERE A REASON THAT YOU SHARED

04:04p

1   THESE DEPICTIONS TOGETHER?

2       **A**   YES.  SO AGAIN, GOING BACK TO FIGURE 1, WHEN

3   YOU LOOK AT LESS THAN HIGH SCHOOL AND EDUCATIONAL

4   ATTAINMENT BY RACE AMONG LOUISIANA ADULTS AGE 25 AND

5   OLDER, AGAIN, LOOKING AT BLACK LOUISIANIANS, THERE

6   ARE MORE OF THEM IN THAT LESS THAN HIGH SCHOOL

7   CATEGORY THAN THERE ARE IN THE LAST TWO -- THE TWO

8   BOTTOM CATEGORIES OF BACHELOR'S DEGREE AND HIGHER.

9   AND SO EVEN IF WHITE TURNOUT AND BLACK TURNOUT AT

10  THAT LESS THAN HIGH SCHOOL DIPLOMA LEVEL, BLACK

11  VOTERS ARE OUTVOTING WHITE PEOPLE THERE.  THE

12  PROPORTION OF THE WHITE GROUP IN LOUISIANA THAT'S IN

13  THAT LESS THAN HIGH SCHOOL CATEGORY IS SO SMALL,

14  ESPECIALLY RELATIVE TO THE NUMBER WHO ARE IN THE

15  BACHELOR'S DEGREE OR HIGHER.

16          AND SO, AGAIN, THINKING ABOUT WHERE PEOPLE

17  ARE CONCENTRATED IN TURNOUT, THE NO HIGH SCHOOL

18  DIPLOMA, EVEN IF THERE IS MORE BLACK PEOPLE VOTING AT

19  HIGHER RATES IN THAT GROUP, THERE IS STILL -- IT'S

20  NOT ENOUGH TO OVERCOME THAT EDUCATIONAL DISPARITY

21  BETWEEN THE TWO GROUPS IN TERMS OF HOW PEOPLE WITH

22  BACHELOR'S DEGREES AND WHO HAVE GONE TO GRADUATE

23  SCHOOL ARE VOTING AMONG WHITE PEOPLE.  SO IT'S JUST,

24  AGAIN, WHAT'S GOING ON ACROSS RACE AND THAT SHOULDN'T

25  -- ISN'T REALLY THE FOCUS.

04:06p

1       IT'S TWO THINGS.  IT'S, ONE, THE EFFECT OF

2   EDUCATION ON TURNOUT.  WE CAN SEE IT INCREASES IN

3   EACH RACIAL GROUP, SUCH THAT GENERALLY PEOPLE WITH

4   LOWER EDUCATIONAL ATTAINMENT ARE LESS LIKELY TO VOTE

5   THAN PEOPLE WITH HIGHER EDUCATIONAL ATTAINMENT.

6   AND COUPLED WITH FIGURE 1, WE CAN SEE THAT BLACK

7   PEOPLE ARE MORE LIKELY THAN WHITE PEOPLE TO BE IN

8   THAT LOW TURNOUT AND LOW EDUCATION GROUP.

9       Q    THANK YOU, DR. BURCH.

10       MR. LEWIS ALSO MENTIONED YOUR USE OF BOTH

11   STATEWIDE DATA, ONE, AND DATA FROM THE YEAR OF 2019

12   SPECIFICALLY.  I'D LIKE TO TURN TO THE BOTTOM OF PAGE

13   18 OF YOUR REPORT.  LET'S TALK A LITTLE ABOUT YOUR

14   ANALYSIS OF HEALTH OUTCOMES IN LOUISIANA.

15       YOU MENTIONED CANCER ALLEY.  IS THAT A

16   STATEWIDE REGION OR A SPECIFIC AREA WITHIN THE STATE?

17       A    JUST A SPECIFIC AREA WITHIN THE STATE THAT

18   STRETCHES BETWEEN NEW ORLEANS AND BATON ROUGE.

19       Q    AND DID YOU DISCUSS ANY OTHER HEALTH

20   PHENOMENA BEYOND THE YEAR OF 2019 RELEVANT TO HEALTH

21   OUTCOMES FOR BLACK LOUISIANANS?

22       A    YES, I DO TALK ABOUT RACIAL DISPARITIES AND

23   ACCESS TO COVID-19 VACCINE SITES AS WELL, AND

24   DIFFICULTIES FOR BLACK AMERICANS TO ACCESS PRIMARY-

25   CARE PHYSICIANS AND DOCTORS BECAUSE OF RACIAL

04:07p

1   RESIDENTIAL SEGREGATION.

2       Q    THANK YOU.

3            LET'S TALK A LITTLE BIT ABOUT YOUR

4   DISCUSSION AND WHAT MR. LEWIS DISCUSSED REGARDING

5   RACIAL CAMPAIGN APPEALS.  DOES THE LITERATURE ON

6   RACIAL CAMPAIGN APPEALS OR RACIAL APPEALS GENERALLY

7   THAT YOU DISCUSSED ONLY LOOK AT THE OUTCOMES OF

8   ELECTIONS, OR IS IT ALSO ENGAGING WITH ANY ANALYSIS

9   OF THE EFFECT THAT THESE APPEALS HAVE ON INDIVIDUAL

10  VOTERS?

11      A    YES.  SO A LOT OF THESE ARTICLES, FOR

12  INSTANCE, WHAT THEY MIGHT DO IS ACTUALLY SHOW --

13  RANDOMLY ASSIGN A GROUP OF VOTERS IN AN EXPERIMENTAL

14  CONDITION TO SEE CERTAIN KINDS OF ADS AND THEN TEST

15  THEIR ATTITUDES AFTERWARDS TO SHOW THAT THEY STILL

16  HAVE AN EFFECT ON HOW VOTERS THINK AND WHETHER

17  THEY'RE PRIMED TO THINK ABOUT RACIAL ISSUES VERSUS

18  OTHER KINDS OF ISSUES.

19      Q    ALL RIGHT.  FINALLY, LET'S DISCUSS SOME OF

20  THE METRICS THAT YOU LOOKED AT.  MR. LEWIS

21  DISCUSSED -- I BELIEVE THESE ARE MAINLY FROM PAGE

22  28 -- REGARDING COMMENT CARDS AND OTHER COMMENTARY

23  AROUND THESE OTHER BILLS THAT WERE SUBMITTED DURING

24  THE REDISTRICTING PROCESS THAT INCREASED

25  BLACK-MAJORITY DISTRICTS, BUT PERHAPS THE ISSUE IS

04:08p

1  THE NUMBER OF DISTRICTS THAT WERE ADDED IN RELATION

2  TO PLAINTIFFS' ILLUSTRATIVE MAPS HERE.

3          I'M JUST CURIOUS.  FROM YOUR ANALYSIS OF THE

4  COMMENTS MADE OR COMMENT CARDS SUBMITTED, WERE

5  MEMBERS WHO WENT TO THE CAPITOL TO SPEAK CONSTITUENTS

6  FOCUSED ON THE EXACT NUMBER OF DISTRICTS OR DID THEY

7  SPEAK TO OTHER THEMES THAT MATTERED TO THEM?

8      **A**    MOSTLY THEY WERE ABOUT OTHER THEMES AND

9  ASKING FOR MORE THAN WHAT THEY GOT, SO MORE THAN THE

10 CURRENT MAP.  AND THEY WANTED TO BE REPRESENTED.  SO

11 AGAIN, THERE ARE SOME PEOPLE WHO TALK ABOUT THE

12 ONE-THIRD NUMBER, BUT THEY ARE DEFINITELY NOT

13 SPECIFIC TO A -- SOMETHING LIKE "WE JUST WANT TWO."

14     **Q**    THANK YOU, DR. BURCH.

15         **MS. WENGER:**  NO FURTHER QUESTIONS.

16         **THE COURT:**  ALL RIGHT.  IT IS AFTER FOUR

17 TODAY.  WHERE ARE WE IN TERMS OF THE CASE?

18         **MS. KEENAN:**  SURE, YOUR HONOR.  WOULD YOU

19 LIKE ME TO COME TO THE PODIUM?

20         **THE COURT:**  YES, PLEASE.  IT WOULD BE BETTER

21 FOR THE -- MAKE SURE WE HAVE A GOOD RECORD.

22         **MS. KEENER:**  SO, YOUR HONOR, PLAINTIFFS

23 DON'T HAVE ANY ADDITIONAL WITNESSES TO CALL AT THIS

24 TIME.  BUT BEFORE WE REST OUR CASE-IN-CHIEF, THERE

25 ARE A FEW FINAL MATTERS WE WANT TO ADDRESS WITH THE

04:10p

1   COURT.  WE'RE HAPPY TO DO THAT NOW IF YOUR HONOR

2   WOULD LIKE.

3          **THE COURT:**  GO AHEAD.

4          **MS. KEENAN:**  SO FIRST, THERE ARE A HANDFUL

5   OF EXHIBITS THAT WE'RE HOPING TO ASK THE COURT TO

6   TAKE JUDICIAL NOTICE OF AND ADMIT.  THERE ARE THREE

7   CATEGORIES THAT I CAN RUN THROUGH.

8               THE FIRST IS A HANDFUL OF DOCUMENTS:

9   PLAINTIFFS' EXHIBITS 164 THROUGH 180.  THOSE ARE

10  SECRETARY OF STATE DOCUMENTS, PUBLIC GOVERNMENT

11  DOCUMENTS THAT WERE EITHER PRODUCED BY THE SECRETARY

12  OF STATE IN THIS LITIGATION OR PULLED FROM THE PUBLIC

13  SECRETARY OF STATE WEBSITE BY PLAINTIFFS.

14              THERE HAVE BEEN NO OBJECTIONS TO THE

15  AUTHENTICITY OF THESE DOCUMENTS, AND SO WE ASK YOUR

16  HONOR TO TAKE JUDICIAL NOTICE OF THE SECRETARY OF

17  STATE DOCUMENTS AND TO ADMIT THEM INTO EVIDENCE AT

18  THIS TIME.

19         **THE COURT:**  DOES THE SECRETARY OF STATE OR

20  THE INTERVENORS HAVE ANY OBJECTION?

21         **MR. STRACH:**  NO, YOUR HONOR.

22         **THE COURT:**  OKAY.  164 THROUGH 180 ARE

23  ADMITTED WITHOUT OBJECTION.

24         **MS. KEENAN:**  THE SECOND CATEGORY IS TWO

25  FILES:  PLAINTIFFS' EXHIBIT 120 AND PLAINTIFFS'

04:10p

**1**  EXHIBIT 122.  THESE ARE BLOCK EQUIVALENCY FILES THAT

**2**  ARE, AGAIN, PUBLIC GOVERNMENT DOCUMENTS ON THE

**3**  LOUISIANA LEGISLATURE'S WEBSITE.  WE'D LIKE TO ASK

**4**  THE COURT TO TAKE JUDICIAL NOTICE OF THESE DOCUMENTS

**5**  AND TO ADMIT THEM AS WELL.  AGAIN, THERE HAVE BEEN NO

**6**  OBJECTIONS TO THEIR AUTHENTICITY.

**7**       **THE COURT:**  IS THERE ANY OBJECTION TO

**8**  PLAINTIFF 120 AND 122, THE BLOCK EQUIVALENCY DATA?

**9**       **MR. LEWIS:**  NONE FROM THE LEGISLATIVE

**10**  INTERVENORS, YOUR HONOR.

**11**       **THE COURT:**  ANY FROM THE DEFENDANT?

**12**       **MR. STRACH:**  NOT FROM THE DEFENDANTS, YOUR

**13**  HONOR.

**14**       **THE COURT:**  ADMITTED.

**15**       **MS. KEENAN:**  FINALLY, YOUR HONOR, AS FOR THE

**16**  EXHIBITS, EXHIBITS -- THESE ARE PLAINTIFFS' EXHIBITS

**17**  181 THROUGH 183.  THESE ARE AUDIO AND FILINGS FROM

**18**  THE *ROBINSON* CASE THAT YOUR HONOR IS FAMILIAR WITH.

**19**  THEY ARE STATEMENTS OR ADMISSIONS BY A PARTY OPPONENT

**20**  REGARDING THE TIMING THAT THE STATE OF LOUISIANA WILL

**21**  NEED REGARDING THE MAPS IN THIS CASE.

**22**            WE'RE HOPING THAT BECAUSE THESE ARE

**23**  COURT FILINGS -- THEY'RE SPECIFICALLY FILINGS AND

**24**  RECORDINGS DRAWN FROM THE FIFTH CIRCUIT'S WEBSITE,

**25**  THE SUPREME COURT'S DOCKET, INCLUDING THE STATE'S

04:12p

1  RESPONSE TO OUR MOTION TO STAY WITH THE SUPREME

2  COURT, AND A CERTIFIED TRANSCRIPT OF THE FIFTH

3  CIRCUIT ARGUMENT.  THESE ARE ALL COURT FILINGS THAT

4  THE COURT CAN TAKE JUDICIAL NOTICE OF.  AND WE'D ASK

5  THE COURT TO ADMIT THESE DOCUMENTS AS WELL.

6        **MR. STRACH:**  YOUR HONOR, WE HAVE A RELEVANCE

7  OBJECTION TO THESE.  AND IT'S BECAUSE THEY DEAL WITH

8  *ROBINSON*, A DIFFERENT CASE, DIFFERENT DISTRICT, SO WE

9  HAVE A RELEVANCE OBJECTION.

10        **MS. KEENAN:**  YOUR HONOR, IF I MAY?

11        **THE COURT:**  WHAT ARE YOU TRYING TO SHOW WITH

12  THESE?

13        **MS. KEENAN:**  SURE.  SO IT'S OUR

14  UNDERSTANDING -- AND IT'S I BELIEVE BEEN TALKED ABOUT

15  BOTH AT THE STATUS CONFERENCE AND AT THE TOP OF THIS

16  CASE --

17        **THE COURT:**  THE STATUS CONFERENCE WAS IN A

18  DIFFERENT CASE.  THIS IS A DIFFERENT CASE, BUT LET'S

19  GO AHEAD.  WHAT ARE YOU TRYING TO SHOW?

20        **MS. KEENAN:**  YES.  JUST THAT THE TIMING THAT

21  THE STATE WILL NEED TO IMPLEMENT THESE MAPS IS A FACT

22  THAT WE DON'T THINK IS DISPUTED ACROSS THE CASES.

23  IT'S THE SAME PARTIES.  WE UNDERSTAND THAT

24  REPRESENTATION TO APPLY TO BOTH.  IF THAT'S NOT THE

25  CASE, THAT IS NOT OUR CURRENT UNDERSTANDING.

04:12p

1    SO THE RELEVANCE IS JUST THE

2  REPRESENTATION ABOUT THE TIMING THAT THE STATE WILL

3  NEED TO IMPLEMENT THE MAPS.  AND WE DON'T UNDERSTAND

4  THAT TO BE DIFFERENT ACROSS THE TWO CASES.

5       THE COURT:  IS THE TIMING THAT THE STATE

6  NEEDS TO IMPLEMENT MAPS -- I MEAN, IT'S -- IT IS A --

7  IT'S A LEGISLATIVE AND THEN SECRETARY OF STATE

8  PROCESS.

9         IS THE TIMING DIFFERENT, MR. STRACH?

10       MR. STRACH:  IT COULD VERY WELL BE.  BUT

11  THOSE REPRESENTATIONS WERE MADE SPECIFICALLY ABOUT

12  CONGRESSIONAL MAPS IN THE CONTEXT OF THAT PARTICULAR

13  CASE.  THIS CASE IS MOVING AT A DIFFERENT PACE THAN

14  THAT ONE.  WE DON'T KNOW WHEN THERE MIGHT BE AN

15  ORDER, WHEN THERE MIGHT HAVE TO BE A REMEDIAL

16  PROCESS.  WE HAVE NO IDEA.

17       THE COURT:  THIS IS THE REMEDIAL PROCESS.

18  THIS IS THE TRIAL ON THE MERITS.  YOU MEAN IF THE

19  LEGISLATURE NEEDS TO RESPOND.

20       MR. STRACH:  EXACTLY.  WE HAVE NO IDEA, YOUR

21  HONOR, IF THE --

22       THE COURTROOM DEPUTY:  WOULD YOU GET TO A

23  MICROPHONE, PLEASE?

24       MR. STRACH:  YES.  I'M SORRY.

25       THE COURT:  SHARE YOUR MIC WITH MR. STRACH.

04:13p

**1**     MR. STRACH:  JUDGE, WE JUST DON'T KNOW IF

**2**  IT'S GOING TO BE THE SAME OR NOT, BECAUSE WE'RE

**3**  DEALING WITH A LOT OF DIFFERENT TYPES OF DISTRICTS

**4**  HERE.  THE LEGISLATURE IS ALREADY GOING TO BE DEALING

**5**  WITH THE CONGRESSIONAL MAP, AS THE COURT KNOWS.  WE

**6**  DON'T KNOW WHAT THE TIMING OF A RULING HERE WILL BE.

**7**           SO WE -- THERE IS -- IT WOULD NOT BE

**8**  FAIR.  IT WOULD BE PREJUDICIAL TO TRY TO IMPOSE A

**9**  TIMELINE GIVEN FOR CONGRESSIONAL DISTRICTS ON THE

**10**  LEGISLATIVE CASE.  AND THAT'S WHY THE DOCUMENTS ARE

**11**  JUST NOT RELEVANT HERE.

**12**     MS. KEENAN:  MAY I RESPOND BRIEFLY, YOUR

**13**  HONOR?

**14**     THE COURT:  YES.

**15**     MS. KEENAN:  I THINK THERE IS TWO STRANDS OF

**16**  ARGUMENTS HERE, THOUGH.  IT SEEMS LIKE DEFENDANTS ARE

**17**  NOW SAYING THAT THEY MAY TRY TO SHOW THAT THE TIMING

**18**  IS DIFFERENT THAN WHAT WAS OFFERED THERE.  BUT THAT

**19**  DOESN'T MEAN THAT THE TIMING ISN'T RELEVANT ACROSS

**20**  THE TWO CASES.

**21**           CERTAINLY THE STATE'S REPRESENTATIONS

**22**  ABOUT THE TIME NEEDED TO ADMINISTER ANY MAPS THAT

**23**  COME OUT OF THE REMEDIAL PROCESS IS AT LEAST RELEVANT

**24**  TO THESE PROCEEDINGS.  AND IT DOESN'T SOUND LIKE

**25**  THERE ARE OBJECTIONS TO THE AUTHENTICITY OR THE FACT

04:14p

1   OF THOSE STATEMENTS BEING MADE.  SO I THINK WE WOULD

2   STILL MOVE TO ADMIT THEM.

3        THE COURT:  WHY IS IT RELEVANT?  WHY IS THE

4   TIMING RELEVANT OTHER THAN -- I GET IT.

5        MS. KEENAN:  YEAH.

6        THE COURT:  HURRY UP, GOT TO GO, HURRY UP.

7   I GET IT.  BUT --

8        MS. KEENAN:  WELL, I THINK IT'S A LITTLE

9   MORE THAN JUST THAT, YOUR HONOR.  I THINK THAT IT IS

10  IMPORTANT IN THESE CASES TO ESTABLISH A RECORD FOR

11  THE COURT REGARDING *PURCELL,* REGARDING THE TIMING

12  NEEDED TO SEEK REMEDIES TO EXPEDITE THIS CASE GOING

13  FORWARD.  IT'S INCREDIBLY IMPORTANT FOR US TO CREATE

14  A RECORD ABOUT THE AMOUNT OF TIME THAT THE STATE

15  NEEDS TO IMPLEMENT ANY MAPS THAT ARE GOING TO ARISE

16  OUT OF THIS PROCEEDING.

17       THE COURT:  THEY'RE GOING TO HAVE WITNESSES.

18  CAN'T YOU ASK THEM?

19       MS. KEENAN:  SURE, YOUR HONOR, AS LONG AS

20  THEY CALL THE SECRETARY'S WITNESSES, WHICH ARE

21  CURRENTLY LISTED AS MAY CALLS.  SO I THINK IF THEY

22  CALL THOSE WITNESSES, WE WILL BE ABLE TO TRY TO

23  ELICIT THAT TESTIMONY.

24       THE COURT:  WELL, I KNOW THAT THE PRESIDENT

25  -- THE CURRENT PRESIDENT OF THE SENATE IS SITTING IN

04:15p

1  THE COURTROOM AND HE'S GOING TO BE CALLED -- SORRY,

2  NOT TODAY, PROBABLY TOMORROW.  BUT THERE IS ONE OF

3  YOUR WITNESSES.  ARE YOU GOING TO CALL THE SECRETARY

4  OF -- YOU HAVE A MAY CALL -- I'VE FORGOTTEN HER NAME.

5  SHERRI SOMETHING.

6          MR. STRACH:  SHERRI HADSKEY.

7          THE COURT:  HADSKEY, YES.

8          MR. STRACH:  WE PROBABLY WON'T.  BUT WE'RE

9  WAITING TO SEE HOW THE EVIDENCE PLAYS OUT, BUT WE

10 PROBABLY WON'T.

11          I THINK THAT THESE ISSUES WILL BECOME

12 RELEVANT IF THERE IS AN ORDER AND A REMEDIAL PROCESS.

13 AND THAT'S WHEN WE'LL ALL KNOW WHAT THE TIMING CAN

14 BE.  RIGHT NOW WE'RE ALL SPEAKING INTO A VACUUM.  SO

15 I DON'T SEE HOW IT CAN BE RELEVANT WHEN -- IF THERE

16 IS A REMEDIAL PROCESS AS IN THE CONGRESSIONAL CASE,

17 AGAIN, YOU'RE TALKING ABOUT 144 DISTRICTS HERE, MANY

18 OF WHICH COULD BE IMPACTED.  YOU'RE TALKING ABOUT

19 DISTRICTS WHICH HAVE SPLIT PARISHES, ET CETERA, WHICH

20 IS NOT THE CASE IN THE CONGRESSIONAL CASE.  YOU'RE

21 TALKING ABOUT A WHOLE DIFFERENT CAN OF WORMS WITH

22 LEGISLATIVE DISTRICTS.  AND THE ONE PROCESS IS

23 COMPLETELY UNRELATED TO THE OTHER.

24          MS. KEENAN:  MAY I RESPOND ONE MORE TIME,

25 YOUR HONOR, JUST BRIEFLY?

04:16p

1    **THE COURT:** UH-HUH.  GO AHEAD.  I'M SORRY.

2    **MS. KEENAN:** I THINK ESPECIALLY IN LIGHT OF

3    THE REPRESENTATION THAT SHERRI HADSKEY WILL LIKELY

4    NOT BE CALLED, THESE BECOME MORE IMPORTANT.  THE

5    REASON FOR THAT IS THAT THESE ARE ARGUMENTS THAT WERE

6    LARGELY MADE BY THE SECRETARY OF STATE AND NOT BY THE

7    LEGISLATIVE INTERVENORS.

8    YOUR HONOR MAY BE AWARE THAT IN

9    PARTICULAR AT THE SUPREME COURT STAGE THE LEGISLATIVE

10   INTERVENORS WERE NOT A PARTY TO THAT.  THIS IS SOLELY

11   THE REPRESENTATION OF THE SECRETARY OF STATE'S OFFICE

12   WHO NOW MAY NOT BE TESTIFYING HERE.  SO WE THINK

13   THOSE REPRESENTATIONS ARE BOTH RELEVANT AND MAY NOT

14   COME IN THROUGH LIVE WITNESS TESTIMONY.

15   **THE COURT:** OKAY.  WELL, WHAT'S HAPPENING

16   IS, IS THAT YOU'RE TRYING TO ANTICIPATE *PURCELL* AND

17   ESSENTIALLY COMMIT THE SECRETARY OF STATE TO A

18   POSITION THAT THEY'VE TAKEN IN A -- WE'LL CALL IT A

19   COMPANION CASE, FOR LACK OF A BETTER WORD.  I'M GOING

20   TO TAKE IT UNDER ADVISEMENT.  I THINK IT'S A REALLY

21   CLOSE CALL.  I MEAN, YOU HAVE -- THE SECRETARY OF

22   STATE HAS -- THE PROCESS IS THE PROCESS.  I

23   UNDERSTAND THAT IT'S DIFFERENT MAPS AND IT -- BUT THE

24   PROCESS IS THE PROCESS.

25   AND THE SECRETARY OF STATE HAS MADE

04:18p

1  REPRESENTATIONS IN MULTIPLE COURTS, THIS COURT, THE

2  COURT OF APPEAL, THE SUPREME COURT.  AND, YOU KNOW,

3  YES, A PARTY ADMISSION IS A PARTY ADMISSION, BUT THE

4  PROBLEM IS YOU'RE NOT GOING TO CALL MS. HADSKEY, AND

5  SO -- I'M GOING TO TAKE IT UNDER ADVISEMENT.

6              ARE THERE ANY OTHER HOUSEKEEPING

7  MATTERS?

8         MS. KEENAN:  YES, YOUR HONOR, JUST TWO.

9              FIRST, PLAINTIFFS DO RESERVE THE RIGHT

10 TO CALL REBUTTAL WITNESSES FOLLOWING THE DEFENDANTS'

11 CASE-IN-CHIEF, WITH THE EXCEPTION OF THE HANDFUL WHO

12 WE HAVE ALREADY STIPULATED WILL NOT BE RETURNING.

13         THE COURT:  I MEAN, YOU'RE ENTITLED TO

14 REBUTTAL, SO -- EXCEPT THE TWO, WHICH WERE MR. COOPER

15 AND --

16         MS. KEENAN:  AND DR. BURCH.

17         THE COURT:  -- DR. BURCH.

18         MS. KEENAN:  THAT'S RIGHT.

19              YOUR HONOR, FINALLY, YOUR HONOR MAY OR

20 MAY NOT HAVE SEEN THAT AT THE END OF THE LUNCH BREAK

21 AT 1:25 P.M. CENTRAL --

22         THE COURT:  YOUR HONOR SAW IT.

23         MS. KEENAN:  OKAY.  PLAINTIFFS WOULD LIKE A

24 CHANCE TO RESPOND TO THAT MOTION ON THE RECORD.  WE'D

25 PREFER TO DO SO IN WRITING AFTER THE CONCLUSION OF

04:18p

1    TRIAL.  BUT IF YOUR HONOR WISHES TO RULE BEFORE THEN,

2    I AM PREPARED TO ADDRESS THE MOTION ORALLY ON THE

3    RECORD NOW, JUST AT YOUR HONOR'S PREFERENCE OF THE

4    TIMING.

5         THE COURT:  LET'S HEAR FROM MR. STRACH.

6    REALLY THE ONLY ISSUE IS INTERLOCUTORY APPEAL.  I

7    MEAN --

8         MR. STRACH:  CORRECT.  YOUR HONOR, WE DIDN'T

9    ASK FOR EXPEDITED TREATMENT.  WE EXPECT IT WOULD JUST

10   BE DEALT WITH IN THE NORMAL COURSE, SO WE'D BE HAPPY

11   FOR THEM TO HAVE THE FULL TIME TO RESPOND --

12        THE COURT:  I'D BE VERY HAPPY FOR THAT, TOO.

13        MR. STRACH:  -- AND THE COURT TO RULE AT

14   YOUR CONVENIENCE.

15        THE COURT:  I DIDN'T KNOW IF YOU WANTED TO

16   PUNT IT UP AS A 52(C) OR SOMETHING LIKE THAT.

17        MR. STRACH:  WELL -- SO THAT'S WHERE I'M

18   GOING NEXT.  SO WE WILL BE ASKING -- MAKING A MOTION

19   FOR JUDGMENT ON PARTIAL FINDINGS PURSUANT TO RULE

20   52(C).  WE WERE JUST GOING TO DO IT ORALLY AND THEN

21   ASK THE COURT'S PLEASURE IN TERMS OF BRIEFING THAT

22   LATER.  AGAIN, IT'S -- WE JUST WANT TO MAKE SURE WE

23   MAKE IT AT THE CLOSE OF THEIR EVIDENCE, WHETHER IT'S

24   TODAY OR TOMORROW, AND THEN WE COULD BRIEF IT.

25   HOWEVER, WE DON'T KNOW THERE IS A -- NEEDS TO BE A

04:19p

1  RUSH TO DECIDE IT.

2       THE COURT:  I HAVEN'T HEARD YOUR 52(C).

3  I'LL RESERVE LISTENING TO YOUR 52(C) IN -- HOWEVER,

4  WITH RESPECT TO BRIEFING ON THE MOTION TO DISMISS,

5  YOU CAN HAVE THE REGULAR -- THE TIME FRAME THAT'S SET

6  FORTH IN THE LOCAL RULES.  I GUESS IT'S 21 DAYS,

7  WHATEVER IT IS.

8       MS. KEENAN:  THANK YOU, YOUR HONOR.  THAT'S

9  ALL FROM PLAINTIFFS.  WE'RE PREPARED TO REST OUR

10  CASE-IN-CHIEF.

11       THE COURT:  ARE YOU RESTING YOUR CASE-IN-

12  CHIEF?  AND I'M NOT PUTTING YOU IN A TRICK BAG.  I'M

13  TAKING THIS 181 TO 183 UNDER ADVISEMENT.  I MEAN, IF

14  I ADMIT THEM, I'M GOING TO ADMIT THEM EVEN IF YOU'VE

15  RESTED, SO DON'T FEEL LIKE YOU'RE IN A BOX.

16       MS. KEENAN:  THANK YOU, YOUR HONOR.  ONE

17  MOMENT TO CONFER WITH COUNSEL.

18       THE COURT:  OKAY.  OH, YOU MAY STEP DOWN.  I

19  AM SO SORRY.  NO, YOU JUST HAVE TO SIT THERE AND

20  WATCH THIS.

21       THE WITNESS:  IT'S OKAY.  I WAS BEING NOSY.

22       THE COURT:  I AM SO SORRY.

23       MS. KEENAN:  YOUR HONOR, THAT IS ALL FROM

24  THE PLAINTIFFS.  WE'RE READY TO REST OUR CASE-IN-

25  CHIEF.

1          THE COURT:  THE PLAINTIFFS ARE RESTING.

2              THE COURT WILL HEAR FROM THE DEFENDANTS

3   IN THE DEFENDANTS' CASE-IN-CHIEF IN THE MORNING.

4   I'LL HEAR YOUR 52(C) ARGUMENTS AT 9 A.M.  SO IF YOU

5   WANT TO HAVE -- IF PRESIDENT CORTEZ IS YOUR LEAD-UP,

6   IF YOU WANT TO BE HERE ABOUT 9:30 -- I'D LIKE TO SAVE

7   YOU THE TROUBLE OF BEING HERE AT 9:00, UNLESS YOU

8   JUST WANT TO LISTEN TO THESE FINE PEOPLE TALK.

9              IS THERE ANYTHING ELSE THAT WE NEED TO

10  TAKE UP THIS AFTERNOON BEFORE WE RECESS FOR THE DAY?

11          MR. STRACH:  NOT FROM US, YOUR HONOR.

12          MS. KEENAN:  NOT FROM PLAINTIFFS, YOUR

13  HONOR.

14          THE COURT:  OKAY.  WE'LL SEE Y'ALL IN THE

15  MORNING AT 9:00.

16          (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED

17  UNTIL NOVEMBER 30, 2023 AT 9:00 A.M.)

18              C E R T I F I C A T E

19          I CERTIFY THAT THE FOREGOING IS A CORRECT

20  TRANSCRIPT FROM THE RECORD OF THE PROCEEDINGS IN THE

21  ABOVE-ENTITLED NUMBERED MATTER.

22  S:/NATALIE W. BREAUX

23  NATALIE W. BREAUX, RPR, CRR

24  OFFICIAL COURT REPORTER

25