1                  UNITED STATES DISTRICT COURT

2                  MIDDLE DISTRICT OF LOUISIANA

3

4    DOROTHY NAIRNE, ET AL              : CIVIL ACTION

5    VERSUS                            : NO. 3:22-00178-SDD

6    KYLE ARDOIN, ET AL                : NOVEMBER 28, 2023

7                                      : MORNING SESSION

8    ===============================================================
                                DAY 2
9                            BENCH TRIAL
                BEFORE THE HONORABLE SHELLY D. DICK
10              UNITED STATES CHIEF DISTRICT JUDGE
     ===============================================================

11

12                    A P P E A R A N C E S

13   **FOR THE PLAINTIFFS:**

14      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
        BY:  MEGAN C. KEENAN, ESQ.
15           SARAH E. BRANNON, ESQ.
             DAYTON CAMPBELL-HARRIS, ESQ.
16      915 15TH STREET, NW
        WASHINGTON, DC 20005

17

18      NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
        BY:   VICTORIA WENGER, ESQ.
19            SARA ROHANI, ESQ.
              STUART C. NAIFEH, ESQ.
20      40 RECTOR STREET, FIFTH FLOOR
        NEW YORK, NEW YORK 10006

21

22      COZEN O'CONNOR
        BY:   JOSEPHINE M. BAHN, ESQ.
23      1200 19TH STREET, NW
        THIRD FLOOR
24      WASHINGTON, DC  20036

25

1   **APPEARANCES CONTINUED:**

2       COZEN O'CONNOR
        BY:   ROBERT S. CLARK, ESQ.
3       ONE LIBERTY PLACE
        1650 MARKET STREET, SUITE 2800
4       PHILADELPHIA, PENNSYLVANIA 19103

5       COZEN O'CONNOR
        BY:   AMANDA GIGLIO, ESQ.
6       3 WORLD TRADE CENTER, 55TH FLOOR
        NEW YORK, NEW YORK  10007
7
        ELECTION LAW CLINIC
8       HARVARD LAW SCHOOL
        BY:  T. ALORA THOMAS, ESQ.
9       6 EVERETT STREET, SUITE 4105
        CAMBRIDGE, MASSACHUSETTS 02138
10
        ADCOCK LAW, LLC
11      BY:   JOHN N. ADCOCK, ESQ.
        3110 CANAL STREET
12      NEW ORLEANS, LOUISIANA  70119

13

14  **FOR THE DEFENDANT, KYLE ARDOIN, IN HIS OFFICIAL CAPACITY AS
    SECRETARY OF STATE:**
15
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
16      BY:   PHILLIP J. STRACH, ESQ.
             THOMAS A. FARR, ESQ.
17           CASSIE A. HOLT, ESQ.
             ALYSSA M. RIGGINS, ESQ.
18      4140 PARKLAKE AVENUE, SUITE 200
        RALEIGH, NORTH CAROLINA  27612
19
        SHOWS, CALI & WALSH, LLP
20      BY:   JOHN C. CONINE, JR., ESQ.
             JOHN C. WALSH, ESQ.
21      628 ST. LOUIS STREET
        BATON ROUGE, LOUISIANA  70802
22

23

24

25

1  **FOR THE DEFENDANT, CLAY SCHEXNAYDER:**

2     BAKER & HOSTETLER, LLP
      BY:   KATE MCKNIGHT, ESQ.
3           ROBERT J. TUCKER, ESQ.
            PATRICK LEWIS, ESQ.
4     200 CIVIC CENTER DRIVE, SUITE 1200
      COLUMBUS, OHIO  43215
5
      BAKER & HOSTETLER, LLP
6     BY:   MICHAEL W. MENGIS, ESQ.
      811 MAIN STREET, SUITE 1100
7     HOUSTON, TEXAS  77002

8  **FOR THE INTERVENOR, THE STATE OF LA. BY AND THROUGH ATTORNEY**
   **GENERAL JEFF LANDRY:**
9
      HOLTZMAN VOGEL JOSEFIAK
10    TORCHINSKY, PLLC
      BY:   BRENNAN BOWEN, ESQ.
11    2575 EAST CAMELBACK ROAD, SUITE 860
      PHOENIX, ARIZONA  85016
12
      HOLTZMAN VOGEL JOSEFIAK
13    TORCHINSKY, PLLC
      BY:   PHILLIP M. GORDON, ESQ.
14    15404 JOHN MARSHALL HIGHWAY
      HAYMARKET, VIRGINIA  20169
15
      LOUISIANA DEPARTMENT OF JUSTICE
16    BY:   ANGELIQUE D. FREEL, ESQ.
            JEFFREY M. WALE, ESQ.
17          AMANDA M. LAGROUE, ESQ.
      1885 N. THIRD STREET
18    BATON ROUGE, LOUISIANA  70804

19

20

21            **REPORTED BY: GINA DELATTE-RICHARD,CCR**

22            **UNITED STATES COURTHOUSE**
              **777 FLORIDA STREET**
23            **BATON ROUGE, LOUISIANA 70801**
              **(225) 389-3564**
24

25

1                              **INDEX**

2    **PLAINTIFFS' WITNESS:**

3       *DR. LISA HANDLEY*

4              DIRECT EXAMINATION BY MS. BRANNON................... 8

5              CROSS-EXAMINATION BY MS. RIGGINS....................51

6              REDIRECT EXAMINATION BY MS. BRANNON................87

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           **NOVEMBER 28TH, 2023**

2           **(CALL TO THE ORDER OF THE COURT)**

3           **THE COURT:**  GOOD MORNING, BE SEATED.  THE PLAINTIFFS

4    MAY CALL THEIR NEXT WITNESS.

5           **MS. KEENAN:**  YOUR HONOR, WE DO HAVE A HANDFUL OF

6    QUICK HOUSEKEEPING MATTERS FIRST, IF THAT'S OKAY?

7           **THE COURT:**  YES.

8           **MS. KEENAN:**  SO IT'S JUST THREE ITEMS, YOUR HONOR.

9    MEGAN KEENAN FOR THE PLAINTIFFS.  FIRST, DURING MS. (INAUDIBLE)

10   DIRECT YESTERDAY, THE COURT NOTED THAT SEVERAL OF THE EXHIBITS

11   HAD NONPUBLIC PERSONAL IDENTIFYING INFORMATION.  WE DID UPLOAD

12   THOSE EXHIBITS TO JERS WITH THE REDACTIONS.  DO YOU NEED US TO

13   LIST THE EXHIBITS THAT WERE REDACTED FOR THE RECORD OR IS IT

14   OKAY THAT WE JUST UPLOADED THEM?

15          **THE COURT:**  DID YOU SUPPLEMENT THE ONES THAT WERE IN

16   THERE?  SUZIE, HOW DO I NEED TO HANDLE THAT?

17          **MS. KEENAN:**  I BELIEVE WE REPLACED THEM TO AVOID

18   THE --

19          **THE COURT:**  THE DUPLICATE.

20          **MS. KEENAN:**  YES.

21          **THE COURT:**  OKAY.  THAT'S FINE.

22          **MS. KEENAN:**  OKAY.  SECOND, ALSO RELATED TO JERS, IN

23   PREPARING WITH SOME WITNESSES LAST NIGHT, WE NOTICED TWO OTHER

24   SMALL ERRORS ON JERS, WHICH WE'VE CORRECTED.  WE JUST WANTED TO

25   BRING IT TO THE COURT'S ATTENTION.  THE FIRST IS JOINT EXHIBIT

1    55 AND JOINT EXHIBIT 56, THAT'S LEGISLATIVE RECORD MATERIAL

2    THAT THE PARTIES HAVE AGREED ON WERE INADVERTENTLY OMITTED FROM

3    JERS, SO WE'VE UPLOADED THEM AND THAT'S JOINT RULE 21 AND HOUSE

4    BILL 16.  WITH THE COURT'S PERMISSION, WE DID WANT TO PREADMIT

5    THOSE.  THE PARTIES HAVE BOTH CONSENTED TO THOSE JOINT

6    EXHIBITS.

7              **THE COURT:**  THERE'S NO OBJECTION TO PREADMISSION?

8              **MS. WENGER:**  NO OBJECTION, YOUR HONOR.

9              **THE COURT:**  YOU SHOULD STAND WHEN YOU ADDRESS THE

10   COURT, MA'AM.  OKAY.  ADMITTED.

11             **MS. KEENAN:**  AND THEN THE LAST THING IS THERE WAS ONE

12   OTHER ERROR.  PLAINTIFFS' EXHIBIT 163, THERE WAS A FILE SIZE

13   ISSUE WITH A PDF AND IT WAS JUST SHOWING UP AS SORT OF AN ADOBE

14   CARTOON LIKE IMAGE.  WE'VE RE-UPLOADED THAT IN TWO PARTS SO

15   IT'S NOW 163-A AND 163-B IN JERS.

16             **THE COURT:**  OKAY.  SO NOTED.  THANK YOU.  ANYTHING

17   FURTHER?

18             **MS. KEENAN:**  NOT FROM THE PLAINTIFFS.

19             **THE COURT:**  OKAY.  ALL RIGHT.  CALL YOUR NEXT

20   WITNESS, PLEASE.

21             **MS. BRANNON:**  SARAH BRANNON, ACLU FOR THE PLAINTIFFS.

22   AND WE CALL DR. LISA HANDLEY.

23             **THE COURT:**  DR. HANDLEY.

24                      **DR. LISA HANDLEY,**

25        **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

1         **COURTROOM DEPUTY:**  WOULD YOU PLEASE STATE YOUR NAME

2    AND SPELL IT FOR THE RECORD.

3         **THE WITNESS:**  LISA HANDLEY, H-A-N-D-L-E-Y.

4         **MS. BRANNON:**  YOUR HONOR, MAY I APPROACH THE WITNESS

5    WITH A BINDER WHICH, FOR THE RECORD, IS PLAINTIFFS' EXHIBITS

6    PL-1 THROUGH 19.

7         **THE COURT:**  IS THERE ANY OBJECTION?  THEY'VE NOT BEEN

8    ADMITTED, BUT I ASSUME THAT THEY'RE GOING TO BE ADMITTED.

9         **MS. RIGGINS:**  SO, YOUR HONOR, WE DON'T HAVE ANY

10   OBJECTION TO DR. HANDLEY HAVING THIS BINDER.  I WOULD NOTE THAT

11   PLAINTIFFS' EXHIBITS 16, 17, 18 AND 19 ARE A SURREBUTTAL REPORT

12   PREPARED BY DR. HANDLEY THAT WAS IN RESPONSE TO DR. SOLANKY'S

13   REPORTS WHICH YOUR HONOR HAS EXCLUDED IN HER RULING ON

14   PLAINTIFF*S' MOTION IN LIMINE.*

15        **THE COURT:**  SO DO WE NEED 16 THROUGH 19?

16        **MS. BRANNON:**  YOUR HONOR, WE WERE PLANNING TO PRESENT

17   TESTIMONY RELATED TO 16 AND 19 AS I ASSUME THAT THE TOPICS

18   TODAY ARE GOING TO COVER SOME OF THE SAME ISSUES THAT WERE

19   RAISED BY DEFENDANTS RELATED TO THE NATURE OF DR. HANDLEY'S

20   OPINIONS IN HER REPORT.

21        **THE COURT:**  SO YOU SAID YOU WERE PLANNING TO?

22        **MS. BRANNON:**  WE ARE PLANNING TO MOVE TO ADMIT THE

23   SURREBUTTAL WHICH IS PL-16 THROUGH PL-19.

24        **THE COURT:**  AND YOU'RE GOING TO ADMIT IT IN YOUR CASE

25   AND CHIEF?

1          **MS. BRANNON:**  WE ARE.

2          **THE COURT:**  LET'S JUST SEE WHERE WE GO AND MAKE YOUR

3   OBJECTIONS AS THEY ARISE.  I'LL ALLOW YOU TO PRESENT THE

4   MATERIALS TO DR. HANDLEY TO REFRESH HER RECOLLECTION AND MAKE

5   HER -- GIVE HER OPINION TESTIMONY.

6          **MS. BRANNON:**  OKAY.  THANK YOU, YOUR HONOR.

7          **THE COURT:**  GOOD MORNING, DR. HANDLEY.

8   **DIRECT EXAMINATION**

9   **BY MS. BRANNON:**

10  **Q.**   DR. HANDLEY, DID YOU PREPARE A REPORT IN THIS CASE?

11  **A.**   I DID.

12  **Q.**   CAN YOU TURN TO TAB A IN YOUR BINDER AND CAN WE SEE

13  EXHIBIT PL-1 ON THE SCREEN?  IS THIS A COPY OF THE REPORT YOU

14  PREPARED?

15  **A.**   IT IS.

16  **Q.**   CAN YOU TURN TO TAB 2 IN YOUR BINDER, AND CAN WE SEE

17  EXHIBIT PL-2 ON THE SCREEN?  DO YOU RECOGNIZE THIS DOCUMENT?

18  **A.**   YES.

19  **Q.**   IS THIS A COMPLETE AND ACCURATE SUMMARY OF YOUR BACKGROUND

20  AND PROFESSIONAL EXPERIENCE?

21  **A.**   YES.  GIVE ME JUST -- IT MIGHT NOT INCLUDE ALL MY RECENT

22  COURT CASES.

23  **Q.**   OKAY.  BUT WITHIN THE LAST YEAR IT'S AN ACCURATE AND

24  UP-TO-DATE REPRESENTATION OF YOUR CV?

25  **A.**   YES.

1    **Q.**   WHAT DO YOU DO FOR A LIVING, DR. HANDLEY?

2    **A.**   I AM A POLITICAL SCIENTIST BY TRAINING, AND I RUN A

3    CONSULTING FIRM THAT PRIMARILY WORKS FOR THE U.N. AND A U.S AID

4    FUNDED INGO (SIC) CALLED IFES WORKING TO PROVIDE ELECTION

5    ADMINISTRATION ASSISTANCE TO POST CONFLICT IN TRANSITIONAL

6    COUNTRIES.

7    **Q.**   CAN YOU PROVIDE SOME EXAMPLES OF SOME OF YOUR DIFFERENT

8    CLIENTS?

9    **A.**   AS I JUST MENTIONED, THE U.N. IS A PRIMARY CLIENT FOR THAT

10   KIND OF WORK.  IF YOU MEAN HERE IN THE UNITED STATES, MY

11   CLIENTS INCLUDE THE U.S. DEPARTMENT OF JUSTICE, THE -- A NUMBER

12   OF CIVIL RIGHTS ORGANIZATIONS AND A LOT OF VARIOUS STATES AND

13   LOCAL JURISDICTIONS, AS WELL AS SOME INDEPENDENT REDISTRICTING

14   COMMISSIONS.

15   **Q.**   CAN YOU DESCRIBE SOME OF THE ACADEMIC WORK YOU HAVE DONE

16   ON THE TOPIC OF REDISTRICTING AND MINORITY VOTE DILUTION?

17   **A.**   IF YOU LOOK AT MY CV ALMOST EVERY ARTICLE THAT'S LISTED

18   THERE, AND THERE'S A COUPLE DOZEN AT LEAST, DEAL WITH THOSE

19   SUBJECTS.

20   **Q.**   APPROXIMATELY HOW MANY TIMES HAVE YOU PERFORMED A RACIAL

21   BLOC VOTING ANALYSIS?

22   **A.**   HUNDREDS.

23   **Q.**   HAVE YOU BEEN ACCEPTED AS AN EXPERT BEFORE?

24   **A.**   YES.

25   **Q.**   HAVE YOU BEEN ACCEPTED AS AN EXPERT IN REDISTRICTING AND

1  RACIALLY POLARIZED VOTING?

2  **A.**   YES.

3  **Q.**   HOW MANY TIMES?

4  **A.**   DOZENS.

5        **MS. BRANNON:**  THE PLAINTIFFS MOVE TO ADMIT

6  DR. HANDLEY AS AN EXPERT ON REDISTRICTING AND MINORITY VOTING

7  DILUTION.

8        **THE COURT:**  ANY CROSS ON THE TENDER?

9        **MS. RIGGINS:**  NO, YOUR HONOR.

10        **THE COURT:**  THE COURT WILL ACCEPT DR. HANDLEY TO GIVE

11  OPINION TESTIMONY IN THE FIELD OF REDISTRICTING AND -- AM I NOT

12  ON?

13        **MS. BRANNON:**  IT'S REDISTRICTING AND MINORITY VOTE

14  DILUTION.

15        **THE COURT:**  AND MINORITY VOTE DILUTION.  SHE WAS

16  LOOKING AT ME.  I THOUGHT MAYBE MY MIC WASN'T ON.  ACCEPTED TO

17  GIVE OPINION TESTIMONY IN THAT FIELD.

18  **BY MS. BRANNON:**

19  **Q.**   DR. HANDLEY, WHAT WERE YOU ASKED TO DO IN THIS CASE?

20  **A.**   I WAS ASKED TO CONDUCT A RACIAL BLACK VOTING ANALYSIS IN

21  SPECIFIC AREAS OF THE STATE, AS WELL AS EVALUATE A SET OF

22  ILLUSTRATIVE DISTRICTS AND ENACTED DISTRICTS IN THE SENATE AND

23  HOUSE PLANS.

24  **Q.**   WERE YOU ASKED TO EVALUATE THE ENTIRE STATE?

25  **A.**   NO, JUST IN THE SPECIFIC AREAS OF INTEREST.

1  **Q.**   CAN WE SEE TABLE 9, PAGE 2 FROM DR. HANDLEY'S REPORT PL-1?

2  DO YOU RECOGNIZE THIS TABLE?

3  **A.**   YES.

4  **Q.**   WHAT DOES THIS TABLE SHOW?

5  **A.**   THIS SHOWS THE AREAS OF INTEREST THAT MY ANALYSIS FOCUSED

6  ON.   THERE WERE SEVEN AREAS OF INTEREST.   THREE OF THEM RELATED

7  TO THE STATE SENATE PLAN AND FIVE OF THEM RELATED TO THE STATE

8  HOUSE PLAN BECAUSE AREA 1 WAS ENCOMPASSED BOTH AN EXTRA STATE

9  SENATE AND AN EXTRA STATE HOUSE PLAN -- DISTRICT.

10  **Q.**   CAN YOU WALK US THROUGH BRIEFLY WHAT GEOGRAPHIES ARE

11  INCLUDED IN YOUR AREAS OF INTEREST AS REFLECTED ON THIS TABLE?

12  **A.**   YOU CAN SEE THAT AREA 1 NORTHWEST LOUISIANA INCLUDES

13  BOSSIER AND CADDO PARISH AND THAT INCLUDES AN ADDITIONAL

14  ILLUSTRATIVE STATE SENATE DISTRICT 38 AND AN ADDITIONAL

15  ILLUSTRATIVE STATE HOUSE DISTRICT 1.

16           THEN THE SECOND AREA, SOUTHEAST LOUISIANA, JEFFERSON

17  AND ST. CHARLES PARISHES.   THAT INCLUDES AN ADDITIONAL

18  ILLUSTRATIVE STATE SENATE DISTRICT 19; AREA 3, EAST CENTRAL

19  LOUISIANA, INCLUDES FOUR PARISHES, EAST BATON ROUGE, WEST BATON

20  ROUGE, IBERVILLE AND POINT COUPEE AND THAT IS ADDITIONAL

21  ILLUSTRATIVE STATE SENATE DISTRICT 17; AREA 4, WESTERN

22  LOUISIANA, IS DESOTO, NATCH -- I'M NOT GOING TO SAY THAT RIGHT.

23           **THE COURT:**  NATCHITOCHES.

24           **THE WITNESS:**  -- AND RED RIVER PARISHES, THAT IS

25  STATE HOUSE -- ILLUSTRATIVE STATE HOUSE DISTRICT 23; AREA 5,

1   SOUTHWEST LOUISIANA, CALCASIEU PARISH AND THAT'S ILLUSTRATIVE

2   STATE HOUSE DISTRICT 38; AREA 6, SOUTH CENTRAL LOUISIANA,

3   ASCENSION AND IBERVILLE AND THAT'S STATE HOUSE DISTRICT 60;

4   AND, FINALLY, EAST CENTRAL LOUISIANA, THAT'S AREA 7, EAST BATON

5   ROUGE AND EAST FELICIANA AND THAT INCLUDES ACTUALLY TWO

6   ADDITIONAL ILLUSTRATIVE STATE HOUSE DISTRICTS 68 AND 69.

7   **BY MS. BRANNON:**

8   **Q.**   AND CAN YOU DESCRIBE FOR US HOW YOU SELECTED THESE

9   PARISHES IN RELATION TO THE ILLUSTRATIVE DISTRICTS YOU'VE JUST

10   IDENTIFIED?

11   **A.**   YEAH.  SO THE ILLUSTRATIVE DISTRICTS WERE -- THE

12   ADDITIONAL ILLUSTRATIVE DISTRICTS WERE LOCATED IN THOSE

13   PARISHES.  SO, FOR EXAMPLE, STATE SENATE DISTRICT 38 IN THE

14   ILLUSTRATIVE PLAN COVERED PARTS OF BOSSIER AND CADDO.

15   **Q.**   WE CAN TAKE THIS DOWN.  DR. HANDLEY, NOW TURNING TO

16   YOUR -- MORE OF YOUR SPECIFIC ANALYSIS.  AT A HIGH -- LET ME

17   REPHRASE.  DR. HANDLEY, HOW WOULD YOU DEFINE COHESIVE VOTING?

18   **A.**   MINORITY VOTERS, BECAUSE OF THEIR SHARED INTERESTS, ARE

19   COHESIVE WHEN THEY CONSISTENTLY SUPPORT THE SAME CANDIDATES.

20   **Q.**   AND AT A HIGH LEVEL CAN YOU SUMMARIZE YOUR OPINIONS AS TO

21   WHETHER BLACK VOTERS IN LOUISIANA IN YOUR AREAS OF INTEREST

22   VOTE COHESIVELY?

23   **A.**   YES, THEY CERTAINLY DO VOTE COHESIVELY.  BLACK VOTERS ARE

24   VERY COHESIVE IN THE SEVEN AREAS OF INTEREST I LOOKED AT.

25   **Q.**   AT A HIGH LEVEL CAN YOU SUMMARIZE YOUR OPINIONS AS TO

1  WHETHER WHITE VOTERS TYPICALLY VOTE AS A BLOC TO DEFEAT THE

2  BLACK CANDIDATE OF INTEREST -- THE BLACK CANDIDATE OF CHOICE IN

3  YOUR AREAS OF INTEREST?

4  **A.**   YES.  WHITE VOTERS DO TYPICALLY VOTE AS A BLOC TO DEFEAT

5  THE BLACK-PREFERRED CANDIDATES.

6  **Q.**   DR. HANDLEY, HOW WOULD YOU DEFINE RACIALLY POLARIZED

7  VOTING?

8  **A.**   I DEFINE A CONTEST AS RACIALLY POLARIZED IF THE OUTCOME

9  WOULD HAVE BEEN DIFFERENT IF BLACK VOTERS AND WHITE VOTERS

10  VOTED SEPARATELY.

11  **Q.**   AT A HIGH LEVEL CAN YOU SUMMARIZE YOUR OPINIONS WITH

12  RESPECT TO WHETHER THERE IS RACIALLY POLARIZED VOTING IN THE

13  AREAS OF LOUISIANA THAT YOU EXAMINED?

14  **A.**   NEARLY EVERY SINGLE CONTEST THAT I LOOKED AT WAS RACIALLY

15  POLARIZED.

16  **Q.**   AT A HIGH LEVEL DOES THIS RACIALLY POLARIZED VOTING AFFECT

17  THE ABILITY OF BLACK VOTERS TO ELECT THE CANDIDATE OF THEIR

18  CHOICE IN THE STATE LEGISLATURE IN THE AREAS OF INTEREST YOU

19  ANALYZED?

20  **A.**   YES, IT DOES.  WHAT IT MEANS IS THAT UNLESS YOU DRAW A

21  DISTRICT THAT PROVIDES MINORITIES WITH AN OPPORTUNITY TO ELECT

22  THEIR CANDIDATES OF CHOICE THEY WILL NOT BE ABLE TO.

23  **Q.**   WHAT STATISTICAL TECHNIQUES DID YOU USE TO EVALUATE

24  WHETHER VOTING IN LOUISIANA IN THE AREAS OF INTEREST IS

25  RACIALLY POLARIZED?

1   **A.**   I USED THE THREE STANDARD TECHNIQUES.  THEY'RE CALLED

2   HOMOGENEOUS PRECINCT ANALYSIS, ECOLOGICAL REGRESSION, AND

3   ECOLOGICAL INFERENCE.  AND IN FACT, I USED TWO TYPES OF

4   ECOLOGICAL INFERENCE.

5   **Q.**   WHY DID YOU USE ALL OF THESE METHODS?

6   **A.**   ALTHOUGH ECOLOGICAL INFERENCE IS NOW CONSIDERED THE MOST

7   ACCURATE, I USE THE OTHER METHODS AS A CHECK ON ONE PART AND ON

8   THE OTHER HAND IT'S ALSO EASIER TO UNDERSTAND THE OTHER

9   METHODS, SO IT'S EASIER TO EXPLAIN THOSE METHODS.  AND THE

10   COURTS HAVE TRADITIONALLY USED THOSE METHODS AND THAT'S WHAT I

11   WAS TRAINED ON.

12   **Q.**   SO YOU HAVE AN OPINION THAT THE ECOLOGICAL INFERENCE IS

13   THE BEST OF THE METHODS?

14   **A.**   OVER TIME THEY'VE GOTTEN MORE SOPHISTICATED, THE METHODS,

15   SO THEY'VE IMPROVED OVER TIME.  SO, YES, I THINK THAT THAT'S

16   THE MOST RELIABLE.  I THINK THAT'S BASICALLY WHAT ALMOST EVERY

17   EXPERT I CAN THINK OF USES NOW.

18   **Q.**   AND SO THE ECOLOGICAL INFERENCE HAS BEEN ACCEPTED BY

19   COURTS?

20   **A.**   YES.

21   **Q.**   WHAT KIND OF DATA DID YOU USE IN ORDER TO CONDUCT YOUR

22   STATISTICAL ANALYSIS?

23   **A.**   THE ANALYSIS IS LOOKING FOR PATTERNS ACROSS AREAS.  IN

24   THIS PARTICULAR CASE WE'RE LOOKING AT PRECINCTS.  AND WE NEED

25   TO KNOW THE RACIAL COMPOSITION OF THOSE PRECINCTS AND THE

1   VOTING PATTERNS OF THOSE PRECINCTS.  SO YOU NEED A DATABASE

2   THAT PROVIDES BOTH THE RACIAL COMPOSITION OF THOSE PRECINCTS

3   AND VOTING PATTERNS OF THE PRECINCTS.

4           IN OTHER WORDS, THE ELECTION RETURNS BY PRECINCT.

5   AND WHAT I USED FOR RACIAL COMPOSITION, HERE IN LOUISIANA WE

6   HAVE TURNOUT BY RACE.  SO WE HAD INFORMATION ABOUT THE RACE OF

7   THE PEOPLE WHO WERE TURNING OUT IN EACH PRECINCT, AS WELL AS

8   WHO THEY VOTED FOR.  AND THEN YOU LOOK FOR PATTERNS ACROSS

9   THESE PRECINCTS.  DO -- FOR EXAMPLE, DOES VOTING FOR A

10  PARTICULAR CANDIDATE INCREASE AS, SAY, THE PERCENT BLACK

11  TURNOUT OF THE PRECINCTS INCREASE.

12  **Q.**   WHAT WAS THE SOURCE OF THE DATA THAT YOU COMPILED FOR YOUR

13  ANALYSIS IN THIS CASE?

14  **A.**   WELL, THERE WERE DIFFERENT SOURCES DEPENDING ON THE DATA

15  THAT I WAS USING.  THE TURNOUT BY RACE CAME FROM THE SECRETARY

16  OF STATE'S WEBSITE.  THE ELECTION RETURNS CAME FROM EITHER THE

17  SECRETARY OF STATE'S WEBSITE DIRECTLY OR INDIRECTLY THROUGH

18  OPEN ELECTIONS.  THE CENSUS DATA CAME DIRECTLY FROM THE CENSUS

19  WEBSITE.  THE PRECINCT SHAPED FILES CAME EITHER DIRECTLY FROM

20  THE SECRETARY OF STATE'S WEBSITE OR INDIRECTLY THROUGH AN

21  ORGANIZATION CALLED VEST, WHICH IS VOTING AND ELECTION SCIENCE

22  TEAM.

23  **Q.**   DID YOU COMPILE THIS DATA YOURSELF?

24  **A.**   I DID NOT.

25  **Q.**   WHO COMPILED THE DATA?

1  **A.**   I RELIED ON THE ACLU'S ANALYTICS DEPARTMENT TO COMPILE THE

2  DATA AND MERGE IT.

3  **Q.**   DID YOU VERIFY THE ACCURACY OF THE DATA THAT WAS COMPILED

4  BY THE ACLU ANALYTICS THAT YOU THEN USED FOR YOUR ANALYSIS IN

5  THIS CASE?

6  **A.**   YES, I DID.

7  **Q.**   WHAT GEOGRAPHIC LEVEL DID YOU REQUIRE THE DATA TO CONDUCT

8  YOUR ANALYSIS?

9  **A.**   THE SMALLEST LEVEL AT WHICH YOU CAN DO THIS.  THE ELECTION

10  RETURNS ARE AVAILABLE AT THE PRECINCT LEVEL.  SO THIS ANALYSIS

11  IS TYPICALLY DONE AT THE PRECINCT LEVEL.

12  **Q.**   DR. HANDLEY, IS THERE EARLY AND ABSENTEE VOTING IN

13  LOUISIANA?

14  **A.**   THERE IS.

15  **Q.**   AND IS THE ELECTION DATA FOR EARLY AND ABSENTEE VOTING

16  PUBLICLY AVAILABLE?

17  **A.**   IT IS AT THE PARISH LEVEL.  IT IS NOT AVAILABLE AT THE

18  PRECINCT LEVEL.  SO YOU CANNOT GET EARLY RESULTS AT THE

19  PRECINCT LEVEL, ONLY AT THE PARISH LEVEL.

20  **Q.**   SO WHAT'S THE SOURCE OF THAT DATA?

21  **A.**   THE SECRETARY OF STATE.

22  **Q.**   SO THE SECRETARY OF STATE DOES NOT REPORT THE EARLY AND

23  ABSENTEE VOTES AT THE PRECINCT LEVEL?

24  **A.**   THAT'S CORRECT.  THEY DO NOT -- THEY DO NOT TAKE -- MANY

25  STATES ACTUALLY TAKE IT AND REPORT IT AT THE PRECINCT LEVEL,

1    THAT IS NOT THE CASE IN LOUISIANA.

2    **Q.**   WAS DATA FROM THE EARLY AND ABSENTEE VOTING INCLUDED IN

3    THE DATABASE YOU USED FOR CONDUCTING YOUR EI ANALYSIS IN THIS

4    CASE?

5    **A.**   YES.   THE EARLY VOTES WERE ALLOCATED DOWN TO THE PRECINCT

6    LEVEL SO THAT I COULD USE THEM IN MY ANALYSIS.

7    **Q.**   CAN WE SEE PAGE 6, FOOTNOTE 18 IN EXHIBIT PL-ONE?

8    DR. HANDLEY, CAN YOU EXPLAIN HOW THAT ALLOCATION METHOD WORKS

9    REFRESHING YOUR RECOLLECTION FROM THIS EXAMPLE YOU'VE PROVIDED

10   IN YOUR REPORT?

11   **A.**   YES.   SO AT THE PARISH LEVEL YOU KNOW HOW MANY VOTES EACH

12   CANDIDATE RECEIVED.   YOU ALSO KNOW -- YOU CAN LOOK AT THE

13   PARISH LEVEL ELECTION DAY VOTES AND THE PRECINCT ELECTION DAY

14   VOTES AND YOU CAN DETERMINE HOW MANY VOTES EACH CANDIDATE GOT

15   FROM EACH PRECINCT.   AND YOU CAN USE THAT ALLOCATION TO

16   ACTUALLY DO THE SAME THING WITH THE EARLY VOTES.

17            SO IF, SAY, BIDEN, PRESIDENT BIDEN, GOT 60 PERCENT OF

18   HIS VOTES FROM THIS PARTICULAR ELECTION DAY VOTES, FROM THIS

19   PARTICULAR CANDIDATE, THEN WE ALLOCATED 60 PERCENT OF THE EARLY

20   VOTES FOR BIDEN TO THAT PRECINCT AND DID THAT ACROSS THE BOARD

21   FOR ALL OF THE CANDIDATES FOR ALL OF THE PRECINCTS.

22   **Q.**   WHY DID YOU TAKE THIS APPROACH?

23   **A.**   IN MY EXPERT OPINION THAT WAS THE BEST APPROACH TO TAKE.

24   I DIDN'T WANT TO IGNORE THE EARLY VOTES.   THERE ARE TOO MANY

25   EARLY VOTES.   AT LEAST 25 TO ALMOST 50 PERCENT OF THE VOTES

1   WERE EARLY VOTES, SO THEY HAD TO BE ALLOCATED.  AND THE MOST

2   LOGICAL WAY TO DO THAT IS TO DO IT ON THE BASIS OF ELECTION DAY

3   VOTING.

4   **Q.**   SO THIS IS AN APPROACH THAT YOU THINK POLITICAL SCIENTISTS

5   WOULD ENDORSE?

6   **A.**   I KNOW POLITICAL SCIENTISTS WOULD ENDORSE IT.

7   **Q.**   SO CAN YOU TELL US SOME OTHER POLITICAL SCIENTISTS THAT

8   YOU KNOW WHO USE THIS METHOD?

9   **A.**   THE VEST PROJECT THAT I MENTIONED, VOTING AND ELECTION

10  SCIENCE TEAM, WHICH IS RUN BY POLITICAL SCIENTISTS, INCLUDE

11  MICHAEL MCDONALD AT THE UNIVERSITY OF FLORIDA, BUT A NUMBER OF

12  OTHERS, USE PRECISELY THIS METHOD.  SO ANY POLITICAL SCIENTIST

13  THAT USES THAT DATABASE, AND THERE ARE QUITE A NUMBER OF THEM,

14  ACTUALLY ARE USING VOTES ALLOCATED IN THIS WAY.  THIS IS HOW

15  THEY DID IT IN LOUISIANA.  THIS IS HOW THEY DO IT IN EVERY

16  STATE FOR WHICH THEY SUPPLY ELECTION RESULTS.

17         OTHER POLITICAL SCIENTISTS HAVE ARRIVED AT

18  SEPARATELY -- DR. MAX PALMER, FOR EXAMPLE, DOESN'T USE VEST

19  DATA.  HE USES THE ALLOCATION THAT I USED ARRIVING AT IT

20  SEPARATELY.

21  **Q.**   DO YOU KNOW IF ANY OTHER EXPERTS WHO PROVIDED REPORTS OR

22  OPINIONS IN THIS CASE RELIED ON YOUR DATA?

23  **A.**   I KNOW THAT DR. LEWIS AND DR. ALFORD USED MY DATA AND

24  RAISED NO CONCERNS ABOUT IT.

25  **Q.**   WE CAN TAKE THIS DOWN.  WE'RE GOING TO MOVE ON NOW TO

1  DISCUSS THE SPECIFICS OF THE ELECTIONS THAT YOU ANALYZED IN

2  DETAIL.

3           CAN WE SEE TABLE 1 FROM PAGE 6 AND 7 OF PL-1.

4           DID YOU -- HOW MANY STATEWIDE ELECTIONS DID YOU

5  ANALYZE IN THE SEVEN AREAS OF INTEREST?

6  **A.**   SIXTEEN STATEWIDE ELECTIONS.

7  **Q.**   DOES, AS REFLECTED ON THE SCREEN, PAGE 6 AND 7 CONTAIN AN

8  ACCURATE LIST OF THE 16 ELECTIONS THAT YOU LOOKED AT?

9  **A.**   IT DOES.

10  **Q.**   WHY DID YOU CHOOSE THESE ELECTIONS?

11  **A.**   THESE ARE STATEWIDE ELECTIONS THAT INCLUDED BLACK

12  CANDIDATES.  AND WE KNOW THAT THE COURTS FIND THESE MOST

13  PROBATIVE BECAUSE EVEN IF BLACK VOTERS DON'T ACTUALLY SUPPORT

14  THE BLACK CANDIDATE, THEY HAVE THE OPTION TO SUPPORT A BLACK

15  CANDIDATE SHOULD THEY SO WISH TO.

16  **Q.**   AND DO YOU HAVE AN OPINION AS TO WHETHER IT IS IMPORTANT

17  TO LOOK AT ELECTIONS THAT INCLUDE BLACK CANDIDATES?

18  **A.**   YES.  AGAIN, I WOULD WANT TO KNOW IF -- YOU DON'T WANT

19  TO -- YOU WANT TO BE ASSURED THAT BLACK VOTERS HAVE AN

20  OPPORTUNITY TO ELECT NOT JUST WHITE CANDIDATES OF CHOICE, BUT

21  BLACK CANDIDATES OF CHOICE.  SO YOU WANT TO LOOK AT CONTESTS

22  THAT INCLUDE BLACK CANDIDATES.

23  **Q.**   DO THESE ELECTIONS INCLUDE ANY PRIMARY ELECTIONS?

24  **A.**   THAT'S A COMPLICATED QUESTION.  WE CALL THE -- TYPICALLY

25  PRIMARIES ARE PARTY SPECIFIC, DEMOCRATIC PRIMARIES, REPUBLICAN

1  PRIMARIES.  HERE, IN LOUISIANA, YOU HAVE WHAT'S CALLED A JUNGLE

2  PRIMARY, SO SOME OF THESE ARE JUNGLE PRIMARIES AND SOME OF THEM

3  ARE THE RESULTING RUNOFFS.

4  **Q.**   CAN YOU EXPLAIN WHEN YOU SAY, "JUNGLE PRIMARY" EXACTLY

5  WHAT THAT MEANS?

6  **A.**   IT MEANS THAT ANYBODY WHO WANTS TO RUN FOR THE OFFICE,

7  REGARDLESS OF THEIR POLITICAL PARTY AFFILIATION, RUNS IN THE

8  PRIMARY.

9  **Q.**   AND HOW DOES THE PROCESS WORK IN LOUISIANA TO MOVE FROM

10  THE PRIMARY TO THE RUNOFF?

11  **A.**   SO IF NO CANDIDATE IN THE PRIMARY GETS 50 PERCENT OF THE

12  VOTE, THERE'S A RUNOFF BETWEEN THE TOP TWO VOTE-GETTING

13  CANDIDATES.

14  **Q.**   DID YOU LOOK AT THESE ELECTIONS STATEWIDE?

15  **A.**   THESE ARE STATEWIDE ELECTIONS, BUT I LOOKED AT THE VOTING

16  PATTERNS ONLY IN THE SPECIFIC AREAS THAT I JUST DESCRIBED; IN

17  THE PARISHES OR GROUPS OF PARISHES THAT MADE UP MY AREAS OF

18  INTEREST.

19  **Q.**   THANK YOU.  WE CAN TAKE THIS DOWN.  CAN WE SEE EXHIBIT

20  PL-3 WHICH IS, DR. HANDLEY, AT TABLE TAB C IN YOUR REPORT -- IN

21  YOUR BINDER.  DO YOU RECOGNIZE THIS SPREADSHEET?

22  **A.**   I DO.

23  **Q.**   CAN YOU EXPLAIN WHAT THIS SPREADSHEET IS?

24  **A.**   THIS -- THIS RELAYS THE RESULTS OF MY RACIAL BLOC VOTING

25  ANALYSIS.

1  **Q.**   CAN YOU EXPLAIN FOR WHAT AREA OF INTEREST THIS SPREADSHEET

2  RELATES?

3  **A.**   THIS PARTICULAR ONE IS AREA OF INTEREST 1, BOSSIER AND

4  CADDO PARISHES.

5  **Q.**   THANK YOU.  CAN WE HIGHLIGHT -- WE'RE GOING TO WALK

6  THROUGH -- HAVE YOU WALK THROUGH ONE EXAMPLE AND EXPLAIN THE

7  ANALYSIS THAT YOU'VE DONE IN THIS CASE.  CAN WE HIGHLIGHT

8  NOVEMBER 2019, SECRETARY OF STATE ELECTION WHICH IS, I BELIEVE,

9  ON THE SECOND PAGE.

10         CAN YOU WALK US THROUGH WHAT THIS TABLE SHOWS USING

11  THAT NOVEMBER 19 ELECTION AS AN EXAMPLE?

12  **A.**   YES.  SO IN THE FIRST COLUMN YOU SEE THE DATE AND THE

13  OFFICE AS WELL AS THE CANDIDATES.  I IDENTIFY THE PARTY OF THE

14  CANDIDATES AND THE RACE OF THE CANDIDATES.  THEN YOU HAVE FOUR

15  SETS OF ESTIMATES FOR BLACK VOTERS AND THE SAME FOUR SETS OF

16  ESTIMATES FOR WHITE VOTERS, AS WELL AS CONFIDENCE INTERVAL.

17         SO THE FIRST COLUMN IS WHAT WE TALKED ABOUT, THE EI

18  RXC.  I THINK THESE ARE THE MOST ACCURATE AND THEY ALSO HAVE

19  ASSOCIATED WITH THEM CONFIDENCE INTERVALS THAT ARE DEEMED BY

20  POLITICAL SCIENTISTS IN THIS PARTICULAR AREA OF SPECIALIZATION

21  AS THE MOST ACCURATE.

22         SO WE HAVE THE EI RXC ESTIMATE, THEN WE HAVE THE

23  CONFIDENCE INTERVALS AROUND THAT ESTIMATE, THEN WE HAVE THE EI

24  2X2 ESTIMATE, THE ER ESTIMATE, AND THEN THE HP WHICH IS

25  HOMOGENEOUS PRECINCT ESTIMATE AND WE HAVE THE SAME INFORMATION

1   FOR THE WHITE VOTERS.

2          SO FOR GWEN COLLINS-GREENUP, THE EI RXC ESTIMATE OF

3   THE PERCENTAGE OF BLACK VOTERS THAT SUPPORTED HER IS 96.9, THE

4   EI 2X2 IS 97.4, THE ER IS 98.8 AND THE HP IS 94.5.  THEY'RE

5   ALL, AS YOU CAN SEE, VERY CLOSE.

6   **Q.**   WHY DON'T YOU INCLUDE CONFIDENCE INTERVALS FOR YOUR EI

7   2X2?

8   **A.**   THOSE ARE GENERALLY NOT ACCEPTED BY POLITICAL SCIENTISTS

9   IN THIS AREA.

10  **Q.**   WOULD YOU CHARACTERIZE THIS NOVEMBER 2019 SECRETARY OF

11  STATE'S ELECTION AS A POLARIZED CONTEST WITHIN THE AREA OF

12  INTEREST?

13  **A.**   YES.  YOU CAN SEE THAT IF BLACK VOTERS VOTED -- IF YOU

14  CONSIDERED JUST BLACK VOTERS, THEY WOULD HAVE OVERWHELMINGLY

15  ELECTED COLLINS-GREENUP, WHILE WHITE VOTERS WOULD HAVE ELECTED

16  ARDOIN.

17  **Q.**   IS IT -- IN YOUR OPINION ARE WHITE VOTER -- BLACK VOTERS

18  VOTING COHESIVELY IN THIS ELECTION?

19  **A.**   IN THIS PARTICULAR ELECTION YOU HAVE OVER 95 PERCENT OF

20  THE BLACK VOTERS SUPPORTING A PARTICULAR CANDIDATE.  THAT'S

21  VERY COHESIVE.

22  **Q.**   AND IN YOUR OPINION IS IT FAIR TO SAY THAT THE WHITE

23  VOTERS VOTED AS A BLOC AGAINST THE BLACK-PREFERRED CANDIDATE IN

24  THIS ELECTION?

25  **A.**   YES.

1   **Q.**   DID YOU DO THIS SAME TYPE ANALYSIS FOR THE OTHER 16

2   ELECTIONS IN ALL THE OTHER AREAS OF INTEREST THAT YOU LOOKED

3   AT?

4   **A.**   YES.  FOR ALL SEVEN AREAS OF INTEREST I DID THIS ANALYSIS

5   FOR ALL 16 STATEWIDE CONTESTS.

6   **Q.**   WE CAN TAKE THIS DOWN.  AND THOSE OTHER ANALYSES ARE IN

7   YOUR REPORT IN SIMILAR TABLES THAT HAVE BEEN LABELED APPENDIX

8   A2 THROUGH A7; IS THAT CORRECT?

9   **A.**   THAT'S CORRECT.  APPENDIX A INCLUDES ALL OF THE AREAS OF

10   INTEREST; THE 16 CONTESTS THAT I ANALYZED FOR ALL OF THE AREAS.

11   **Q.**   FOR THE RECORD, THOSE ADDITIONAL APPENDIXES FOR THE OTHER

12   SIX AREAS ARE EXHIBITS PL-4 THROUGH PL-9.

13         DID YOU REACH ANY CONCLUSION -- WHAT, IF ANY,

14   CONCLUSIONS DID YOU REACH ABOUT RACIALLY POLARIZED VOTING IN

15   LOUISIANA IN THESE SEVEN AREAS OF INTEREST BASED ON YOUR

16   ANALYSIS OF THESE 16 ELECTIONS?

17   **A.**   IN MOST OF THE AREAS OF INTEREST, ALL 16 CONTESTS WERE

18   POLARIZED.  IN TWO OF THE AREAS ALL BUT ONE WAS POLARIZED.  SO

19   ESSENTIALLY VERY, VERY POLARIZED VOTING IN THE SEVEN AREAS THAT

20   I LOOKED AT.

21   **Q.**   CAN WE SEE TABLE 3 ON PAGE 10 OF PL-1?  DO YOU RECOGNIZE

22   THIS TABLE?

23   **A.**   YES.

24   **Q.**   CAN YOU EXPLAIN WHAT INFORMATION IS REFLECTED ON THIS

25   TABLE?

1   **A.**   THIS JUST PRESENTS THE AVERAGES ACROSS THE 16 CONTESTS FOR

2   EACH OF THE AREAS.

3   **Q.**   WHAT, IF ANYTHING, DID YOU CONCLUDE ABOUT THE RACIALLY

4   POLARIZED VOTING IN THESE SEVEN AREAS BASED ON YOUR ANALYSIS OF

5   THE STATEWIDE ELECTIONS?

6   **A.**   YOU CAN SEE THAT IN THE AVERAGE PERCENTAGE OF BLACK VOTERS

7   WHO SUPPORTED THE BLACK-PREFERRED CANDIDATE, REGARDLESS OF THE

8   NUMBER OF CANDIDATES, WAS 82.7.  WHEN YOU LIMIT IT TO JUST TWO

9   CANDIDATE CONTESTS, OF WHICH THAT WAS HALF OF THE 16 CONTESTS,

10  IT GOES UP TO 93.2 PERCENT.  SO ON AVERAGE 93.2 PERCENT OF

11  BLACK VOTERS SUPPORTED THE SAME CANDIDATE IN TWO CANDIDATE

12  CONTESTS.  THAT'S VERY COHESIVE.

13          IN TERMS OF WHITE VOTERS, YOU CAN SEE THAT ON AVERAGE

14  ONLY 12.2 PERCENT OF WHITE VOTERS SUPPORTED THE BLACK-PREFERRED

15  CANDIDATES IN THE 16 CONTESTS AS A WHOLE AND IT GOES UP TO ONLY

16  15.6 PERCENT WHEN YOU'RE LOOKING AT THE TWO CANDIDATE CONTESTS.

17  **Q.**   WE CAN TAKE THAT DOWN.  NOW I'D LIKE TO TURN TO TALK A

18  LITTLE BIT ABOUT THE STATE LEGISLATIVE CONTESTS THAT YOU

19  ANALYZED.  DID YOU ALSO LOOK AT STATE LEGISLATIVE ELECTIONS?

20  **A.**   I DID LOOK AT BI-RACIAL STATE LEGISLATIVE ELECTIONS IN THE

21  SEVEN AREAS OF INTEREST.

22  **Q.**   WHY DID YOU LOOK AT THOSE STATE LEGISLATIVE ELECTION

23  CONTESTS?

24  **A.**   BECAUSE IT'S THE OFFICE AT ISSUE.  THESE AREN'T ACTUALLY

25  DISTRICTS AT ISSUE SO WE WOULDN'T REALLY PROPERLY CALL THEM

1   INDIGENOUS ELECTIONS, BUT IT IS FOR THE OFFICE AT ISSUE, STATE

2   LEGISLATIVE.  AND I JUST WANTED TO SEE IF VOTING WAS ALSO QUITE

3   POLARIZED IN STATE LEGISLATIVE ELECTIONS AND IT WAS.

4   **Q.**   AND HOW DID YOU SELECT THE STATE LEGISLATIVE DISTRICTS

5   THAT YOU LOOKED AT?

6   **A.**   THESE WERE ELECTIONS THAT INCLUDED BLACK CANDIDATES --

7   BLACK CANDIDATES AND WHITE CANDIDATES, AND THE DISTRICT WAS

8   WHOLLY OR PARTIALLY CONTAINED WITHIN THE AREA OF INTEREST --

9   WITHIN THE PARISHES IN THE AREA OF INTEREST.

10  **Q.**   CAN WE SEE PAGE 11 OF PX-1 -- PL-1?  DR. HANDLEY, CAN YOU

11  EXPLAIN TO US WHAT'S IN THE TWO TEXT -- TWO PIECES OF TEXT THAT

12  HAVE BEEN HIGHLIGHTED TO REFRESH YOUR RECOLLECTION ABOUT HOW

13  MANY STATE LEGISLATIVE DISTRICTS YOU LOOKED AT?

14  **A.**   SO THERE WERE 11 STATE SENATE LEGISLATIVE ELECTIONS THAT I

15  LOOKED AT, TEN OF WHICH WERE POLARIZED.  THERE WERE TEN STATE

16  HOUSE CONTESTS THAT I LOOKED AT AND ALL OF THEM WERE POLARIZED.

17  **Q.**   SO YOU LOOKED AT A TOTAL OF 21 STATE LEGISLATIVE

18  ELECTIONS?

19  **A.**   THAT'S CORRECT.

20  **Q.**   WHAT ANALYSIS DID YOU USE WHEN YOU WERE EVALUATING THOSE

21  ELECTIONS?

22  **A.**   I SIMPLY DID A RACIAL BLOC VOTING ANALYSIS.

23  **Q.**   THIS IS THE SAME TYPE OF ANALYSIS THAT WE WERE JUST

24  DISCUSSING RELATED TO THE STATEWIDE ELECTIONS YOU DID IN THIS

25  CASE?

1  **A.**   THAT'S RIGHT.  IF YOU LOOK AT APPENDIX B, WHICH REPORTS

2  THESE, YOU'LL SEE THE EXACT SAME FORMAT ON THE APPENDICES AND,

3  THAT IS, YOU'LL SEE THE EI RXC, EI 2X2, ER AND HP ESTIMATES, AS

4  WELL AS THE CONFIDENCE INTERVALS.

5  **Q.**   FOR THE RECORD, DR. HANDLEY, DID YOU ATTACH THESE TO YOUR

6  REPORT AS APPENDIX B1 AND B2?

7  **A.**   I DID.

8  **Q.**   AND, FOR THE RECORD, APPENDIX B1 AND B2 ARE PLAINTIFFS'

9  EXHIBIT 1O AND 11.

10         DID YOU FORM AN OPINION ABOUT -- DID YOU FORM AN

11  OPINION, IF ANY, ABOUT THE RACIAL POLARIZATION OF STATE

12  LEGISLATIVE ELECTIONS THAT YOU ANALYZED?

13  **A.**   YES.  AGAIN, ALMOST ALL OF THEM WERE RACIALLY POLARIZED.

14  **Q.**   AT A HIGH LEVEL, IF AT ALL -- HOW, IF AT ALL, DID THIS

15  RACIALLY POLARIZED VOTING IN THE 21 STATE LEGISLATIVE ELECTIONS

16  AFFECT THE ABILITY OF BLACK VOTERS TO ELECT CANDIDATES OF THEIR

17  CHOICE IN THE STATE LEGISLATURE IN THE AREAS THAT YOU ANALYZED?

18  **A.**   YOU CAN SEE THAT IN -- ALMOST ALL OF THE CONTESTS WERE

19  POLARIZED.  IN MAJORITY BLACK DISTRICTS, THE BLACK-PREFERRED

20  CANDIDATE ACTUALLY WON, WHILE IN THE DISTRICTS THAT WERE NOT

21  MAJORITY BLACK IN COMPOSITION, THE MINORITY-PREFERRED

22  CANDIDATES ALMOST ALWAYS LOST.

23  **Q.**   SO AT A HIGH LEVEL, DID WHITE VOTERS VOTE AS A BLOC TO

24  USUALLY DEFEAT THE BLACK-PREFERRED CANDIDATE IN THE HOUSE AND

25  SENATE DISTRICTS YOU ANALYZED WHERE THE POPULATION OF THE

1  DISTRICT WAS NOT OF BLACK MAJORITY?

2  **A.**   THAT'S CORRECT.

3  **Q.**   NOW WE'RE GOING TO TURN TO LOOK AT THE -- SOME OF THE

4  ANALYSES THAT YOU DID OF DISTRICTS IN THE ILLUSTRATIVE AND

5  ENACTED MAPS.

6       DID YOU CALCULATE THE OPPORTUNITY OF BLACK VOTERS TO

7  ELECT THEIR CANDIDATES OF CHOICE IN THE AREAS OF INTEREST IN

8  THE ENACTED MAP?

9  **A.**   I DID.

10  **Q.**   DID YOU --

11  **A.**   NOT IN ALL OF THE DISTRICTS.  JUST IN THE AREAS OF

12  INTEREST IN THE DISTRICTS THAT ARE INDICATED IN THE TABLES.

13  **Q.**   YEAH.  CAN WE CALL UP TABLE 4A ON PAGE 14 OF PLAINTIFFS'

14  EXHIBIT 1?

15       AND THEN DID YOU ALSO EVALUATE THE OPPORTUNITY OF

16  BLACK VOTERS TO ELECT THEIR CANDIDATE OF CHOICE IN THE AREAS OF

17  INTEREST IN THE ILLUSTRATIVE MAPS DRAWN BY PLAINTIFFS' EXPERT

18  BILL COOPER?

19  **A.**   AGAIN, YES.  I LOOKED AT THE OPPORTUNITY TO ELECT IN TERMS

20  OF THE DISTRICTS THAT YOU SEE IN THIS TABLE.  SO I LOOKED AT

21  ILLUSTRATIVE DISTRICTS 36, 38, 39, FOR EXAMPLE, IN STATE SENATE

22  CLUSTER 1 AND COMPARED IT TO ENACTED DISTRICTS 36, 38 AND 39.

23  **Q.**   SO THIS TABLE REFLECTS SENATE DISTRICTS?

24  **A.**   THIS TABLE REFLECTS THE SENATE DISTRICTS THAT I EVALUATED.

25  **Q.**   AND HOW DID YOU GO ABOUT DETERMINING WHICH DISTRICTS TO

1    INCLUDE FROM THE ILLUSTRATIVE DISTRICTS AND FROM THE ENACTED

2    DISTRICTS IN THIS ANALYSIS?

3    **A.**    WELL, FIRST, I IDENTIFIED THE ADDITIONAL ILLUSTRATIVE

4    DISTRICT THAT WAS OFFERED -- LISTED THE ADDITIONAL MAJORITY

5    BLACK ILLUSTRATIVE DISTRICT, AND THEN I LOOKED AT NEIGHBORING

6    DISTRICTS IN THAT AREA AND ATTEMPTED TO COME UP WITH A SIMILAR

7    NUMBER OF DISTRICTS TO COMPARE.  I LEFT OUT OF THE ANALYSIS THE

8    SAME NUMBER OF MAJORITY BLACK DISTRICTS IN TERMS OF BOTH THE

9    ILLUSTRATIVE AND THE ENACTED PLAN, AND FOCUSED JUST ON THE

10   DISTRICTS IN THE AREA IN WHICH THE ILLUSTRATIVE PLAN OFFERED AN

11   ADDITIONAL DISTRICT.

12   **Q.**    CAN WE SEE TABLE 4B WHICH IS ON PAGE 15.  AND IS THIS THE

13   SAME TABLE FOR THE HOUSE?

14   **A.**    IT IS.

15   **Q.**    AND WERE THESE DISTRICTS SELECTED IN THE SAME -- USING THE

16   SAME METHOD?

17   **A.**    WITH THE EXCEPTION OF THE FIRST STATE HOUSE CLUSTER 1

18   WHERE THERE WAS -- THERE WAS A MAJORITY BLACK DISTRICT.  IT WAS

19   TAKEN AWAY IN THE ENACTED PLAN AND SPREAD ACROSS THREE

20   DISTRICTS AND THEN THERE WAS -- IN THE ILLUSTRATIVE PLAN IT WAS

21   KEPT INTACT.  SO THAT'S THE ONLY TIME IN WHICH YOU SEE A

22   COMPARISON OF ONE DISTRICT TO THREE.

23   **Q.**    YOU DESCRIBED DOING AN ANALYSIS.  CAN YOU EXPLAIN TO US

24   THE DETAILS OF THE ACTUAL ANALYSIS THAT YOU CONDUCTED ON ALL OF

25   THESE DISTRICTS IN TABLE 4A AND 4B?

1  **A.**   YES.   I PRODUCED EFFECTIVENESS SCORES, AND I DID THIS ON

2  THE BASIS OF RECOMPILED ELECTION RESULTS.

3         A LOT OF TIMES RE-DISTRICTORS WILL WANT TO LOOK AT

4  THE PERFORMANCE OF A PROPOSED DISTRICT BY LOOKING AT RECOMPILED

5  ELECTION RESULTS.   THAT MEANS THAT THEY'RE GOING TO TAKE PAST

6  ELECTIONS AND CONFORM THOSE ELECTIONS TO THE BOUNDARIES OF THE

7  PROPOSED DISTRICT TO SEE HOW PARTICULAR CANDIDATES WOULD DO IN

8  THE NEW DISTRICT.

9         YOU CAN ONLY DO THAT WITH STATEWIDE ELECTIONS BECAUSE

10 YOU'RE NOT GOING TO HAVE ENOUGH OVERLAP.   IF YOU USE, SAY, FOR

11 EXAMPLE, STATE LEGISLATIVE DISTRICTS, YOU CAN USE STATEWIDE

12 ELECTIONS AND CAN YOU SEE HOW CANDIDATES PERFORM IN THE

13 PROPOSED DISTRICTS.

14        NOW, IT'S A LITTLE COMPLICATED HERE BECAUSE OF THE

15 JUNGLE PRIMARY SYSTEM.   ORDINARILY YOU WOULD, FOR EXAMPLE, JUST

16 LOOK AT GENERAL ELECTIONS AND YOU COULD PRODUCE AN AVERAGE

17 PERCENTAGE VOTE FOR HOW YOUR PARTICULAR CANDIDATES WOULD DO.

18 OH, THIS REPUBLICAN WOULD GET 75 PERCENT OF THE VOTES ACROSS

19 THESE CANDIDATES.   BUT HERE, I HAD TO SAY I CAN'T DO THAT

20 BECAUSE YOU HAVE THESE RUNOFF SITUATIONS.

21        SO INSTEAD, WHAT I DID WAS I LOOKED AT, LOOKING AT

22 RECOMPILED ELECTION RESULTS, HOW OFTEN WHAT PERCENTAGE OF THOSE

23 CONTESTS WOULD THE BLACK-PREFERRED CANDIDATE EITHER WIN OR MAKE

24 IT TO THE RUNOFF.   SO THIS -- THE EFFECTIVENESS SCORES ARE

25 ACTUALLY THE PERCENTAGE OF CONTESTS.   IN TERMS OF EFFECTIVENESS

1    SCORE 1, THE PERCENTAGE OF CONTESTS THAT THE BLACK-PREFERRED

2    CANDIDATE WOULD WIN OR MAKE IT TO THE RUNOFF -- WIN OUTRIGHT OR

3    MAKE IT TO THE RUNOFF.

4            EFFECTIVENESS SCORE 2 FOCUSES ON TWO CANDIDATE

5    CONTESTS, WHERE YOU WOULD HAVE THE INSTANCE OF A RUNOFF.  AND

6    THAT LOOKS AT THE PERCENTAGE OF, SAY, RUNOFF CONTESTS.  THE

7    BLACK-PREFERRED CANDIDATE WOULD WIN IN THAT PARTICULAR CONTEST.

8            IT TURNS OUT THAT THE RUNOFF IS THE BARRIER TO BEING

9    ELECTED SOMETIMES.  IT'S NOT SO HARD TO MAKE IT INTO THE

10   RUNOFF.  IT'S IN THE RUNOFF THAT YOU'RE EXCLUDED.

11   **Q.**  CAN WE SEE THE TABLE ON PAGE 17 AND THE MAPS ON PAGE 18 OF

12   PL-1?

13           DOES THIS TABLE HERE THAT'S SHOWN ON THE SCREEN

14   REFLECT THE EFFECTIVENESS 1 AND EFFECTIVENESS 2 SCORES THAT YOU

15   WERE JUST SPEAKING ABOUT?

16   **A.**  YES.  SO YOU CAN SEE THAT, FOR EXAMPLE, ILLUSTRATIVE

17   DISTRICT 36 HAS AN EFFECTIVENESS SCORE 1 OF ZERO AND AN

18   EFFECTIVENESS SCORE 2 OF ZERO.  THE SAME FOR THE ENACTED

19   DISTRICT 36, ZERO AND ZERO AND SO ON.

20   **Q.**  IN THIS TABLE SOME OF THE DISTRICTS ARE IN BOLD; IS THAT

21   CORRECT?

22   **A.**  YES.

23   **Q.**  AND WHY IS THAT?

24   **A.**  THOSE ARE MAJORITY BLACK VOTING AGE POPULATION DISTRICTS.

25   SO YOU CAN SEE THAT IN THE ENACTED PLAN THERE'S ONE IN THIS

1    PARTICULAR CLUSTER AND IN THE ILLUSTRATIVE PLAN THERE ARE TWO.

2            **MS. BRANNON:**  YOUR HONOR, I'M GOING TO USE A

3    DEMONSTRATIVE TO WALK THROUGH SOME OF LISA HANDLEY'S MAPS IN

4    HER REPORT THAT I NEED TO SETUP ON THE EASEL.

5            **THE COURT:**  GO AHEAD.  CARRY ON.

6            **MS. BRANNON:**  JUST GIVE ME A MINUTE.  COUNSEL, ARE

7    YOU ALL ABLE TO SEE FROM HERE?

8            **MS. RIGGINS:**  I'LL NEED TO KNOW ONCE THE ACTUAL

9    POSTER BOARD GETS UP.

10            **MS. BRANNON:**  ARE YOU ABLE TO SEE THAT?

11            **MS. RIGGINS:**  ABSOLUTELY.  THANK YOU.

12            **THE COURT:**  THE RECORD WILL REFLECT THAT THERE'S A

13    DEMONSTRATIVE MAP ON THE EASEL AND DEFENSE COUNSEL HAS

14    INDICATED THAT THEY ARE ABLE TO SEE THE MAP.  IS THE WITNESS

15    ABLE TO SEE THE MAP, DR. HANDLEY?

16            **THE WITNESS:**  YES, I AM.

17            **THE COURT:**  OKAY.  EVERYONE IS ON THE SAME PAGE.

18    **BY MS. BRANNON:**

19    **Q.**    FOR THE RECORD THIS IS A BLOWUP OF PLAINTIFFS' EXHIBIT

20    PL-04 FROM BILL COOPER'S REPORT AND WE'RE GOING TO LABEL IT

21    DEMONSTRATIVE EXHIBIT 27.

22            DR. HANDLEY, ARE YOU FAMILIAR WITH WHAT THIS BLOWUP

23    IS SHOWING?

24    **A.**    YES.

25    **Q.**    AND THEN YOU'RE ALSO FAMILIAR WITH THE MAP THAT'S SHOWN ON

1  THIS SCREEN RIGHT NOW?

2  **A.**   I AM FAMILIAR WITH THE TWO MAPS, YES.

3  **Q.**   OKAY.  CAN YOU SEE WHERE I'M POINTING?

4  **A.**   I CAN.

5  **Q.**   IS THIS THE SAME AS THE MAPS THAT ARE CURRENTLY SHOWN ON

6  THE SCREEN?

7  **A.**   THAT IS THE AREA, YES.

8         **MS. BRANNON:**  HOLD ON ONE SECOND.  HOLD ON A SECOND.

9  I'M CONFUSED.  CAN YOU GO BACK AND SHOW ME TABLE 17 AND PAGE

10  18?

11  **BY MS. BRANNON:**

12  **Q.**   I'M TALKING ABOUT THE RELATIONSHIP BETWEEN THE MAP THAT'S

13  ON THE SCREEN THAT'S FROM YOUR REPORT AND THE DEMONSTRATIVE.

14  DID YOU UNDERSTAND MY QUESTION?

15  **A.**   I DID, YES.

16  **Q.**   OKAY.  SO SHOULD I ASK IT AGAIN?  WAS IT CONFUSING?

17         **THE COURT:**  WELL, I MEAN, YOU DON'T HAVE MUCH OF A

18  RECORD.  YOUR RECORD RIGHT NOW SAYS -- YOU POINT AT SOMETHING

19  AND YOU SAY DOES THIS REFLECT THAT.  SO, I DON'T KNOW, MAYBE

20  YOU'D WANT TO ASK IT AGAIN.

21         **MS. BRANNON:**  OKAY.

22  **BY MS. BRANNON:**

23  **Q.**   OKAY.  THIS IS -- THE DEMONSTRATIVE THAT'S HERE IS THE

24  STATE MAP, CORRECT?

25  **A.**   YES.

1  **Q.**   FOR THE RECORD, I AM POINTING TO THE NORTHEAST --

2  NORTHWEST OF THE STATE, CORRECT?

3  **A.**   YES, THAT WOULD BE THE NORTHWEST OF THE STATE.

4          **MS. BRANNON:**  AND FOR THE RECORD WHAT WE WANT TO MOVE

5  INTO EVIDENCE IS THE MAPS FROM DR. HANDLEY'S REPORT.  THIS IS

6  JUST A DEMONSTRATIVE TO GIVE A PROSPECTIVE OF WHERE THOSE MAPS

7  ARE IN THE STATE.  IT IS NOT INTENDED TO BE EVIDENCE -- WE'RE

8  NOT GOING TO ADMIT THIS DOCUMENT THROUGH DR. HANDLEY INTO THE

9  EVIDENCE TODAY.

10          **THE COURT:**  OKAY.  CARRY ON.

11          **MS. BRANNON:**  OKAY.

12  **BY MS. BRANNON:**

13  **Q.**   DR. HANDLEY, TURNING BACK TO YOUR TABLE, YOU EXPLAINED TO

14  US HOW YOU CALCULATED THE EFFECTIVENESS SCORES.  WOULD YOU

15  CHARACTERIZE ANY OF THE STATE SENATE DISTRICTS FROM THE ENACTED

16  MAP IN THE AREA OF CLUSTER 1 AS AN OPPORTUNITY DISTRICT?

17  **A.**   YES.  DISTRICT 39 IN THE ENACTED PLAN IS AN EFFECTIVE

18  DISTRICT.

19  **Q.**   AND CAN YOU JUST EXPLAIN TO US AGAIN WHAT THAT MEANS?

20  **A.**   IT MEANS THAT I BELIEVE THAT IT WILL PROVIDE BLACK VOTERS

21  AN OPPORTUNITY TO ELECT THEIR CANDIDATES OF CHOICE.

22  **Q.**   WOULD YOU CHARACTERIZE ANY OF THE STATE SENATE DISTRICTS

23  FROM THE ILLUSTRATIVE MAP IN THE AREA OF SENATE CLUSTER 1 AS

24  OPPORTUNITY DISTRICTS?

25  **A.**   YES.  I WOULD IDENTIFY DISTRICTS 38 AND 39 AS EFFECTIVE

1   DISTRICTS, THAT IS DISTRICTS THAT ARE LIKELY TO PROVIDE

2   MINORITY VOTERS WITH AN OPPORTUNITY TO ELECT THEIR CANDIDATES

3   OF CHOICE.

4   **Q.**   DID YOU DRAW ANY CONCLUSIONS ABOUT THE ABILITY OF BLACK

5   VOTERS TO ELECT THEIR CANDIDATES OF CHOICE IN THE ILLUSTRATIVE

6   MAP VERSUS THE ENACTED MAP IN THE AREA OF SENATE CLUSTER 1?

7   **A.**   YES.  THE ILLUSTRATIVE DISTRICT -- THE

8   ILLUSTRATIVE DISTRICTS -- THE ILLUSTRATIVE PLAN OFFERS ONE

9   ADDITIONAL EFFECTIVE BLACK DISTRICT IN THIS PARTICULAR AREA.

10   **Q.**   CAN WE SEE THE MAPS ON PAGE 20 AND THE TABLE ON PAGE 19

11   FROM PL-1?  DO YOU RECOGNIZE THESE MAPS AND THIS TABLE?

12   **A.**   I DO.

13   **Q.**   WE'RE GOING TO GO THROUGH THE SAME EXERCISE JUST TO GIVE

14   CONTEXT OF WHERE THESE ARE.  I AM POINTING NOW TO THE AREA OF

15   ST. CHARLES PARISH; IS THAT CORRECT?

16   **A.**   YES.

17   **Q.**   IS THIS AREA ON THE DEMONSTRATIVE MAP, THE SAME AREA THAT

18   IS IN YOUR MAP THAT'S CURRENTLY ON THE SCREEN?

19   **A.**   YES.

20   **Q.**   AND THIS TABLE REFLECTS THE SAME ANALYSIS THAT WE'VE JUST

21   BEEN DISCUSSING IN TERMS OF EFFECTIVENESS SCORES FOR THE

22   DISTRICTS IN THE ILLUSTRATIVE AND THE ENACTED MAPS?

23   **A.**   THAT'S CORRECT.

24   **Q.**   DO YOU DRAW ANY CONCLUSIONS ABOUT THE ABILITY OF BLACK

25   VOTERS TO ELECT THEIR CANDIDATE OF CHOICE IN THE ILLUSTRATIVE

1  PLAN VERSUS THE ENACTED PLAN IN THE AREA OF SENATE CLUSTER 2?

2  **A.**   YES.  THE ADDITIONAL MAJORITY BLACK DISTRICT IN THIS

3  PARTICULAR AREA IS AN EFFECTIVE BLACK DISTRICT AND THEREFORE

4  THE ILLUSTRATIVE PLAN OFFERS ONE ADDITIONAL MAJORITY BLACK

5  EFFECTIVE DISTRICT IN THIS AREA.

6  **Q.**   CAN WE SEE PAGE 22 AND THE TABLE ON PAGE 21?  DO YOU

7  RECOGNIZE THESE -- THIS TABLE AND THESE MAPS?

8  **A.**   I DO.

9  **Q.**   AND I AM NOW POINTING, FOR THE RECORD, IN THE AREA OF

10  BATON ROUGE.

11  **A.**   OKAY.

12  **Q.**   IS THIS AREA, BATON ROUGE, THE SAME AREA THAT IS REFLECTED

13  IN THE MAPS FROM YOUR REPORT ON THE SCREEN?

14  **A.**   YES.

15          **COURTROOM DEPUTY:**  MA'AM, WOULD YOU TRY TO SPEAK INTO

16  THE MICROPHONE OR USE A HANDHELD, BECAUSE I'M HAVING TROUBLE

17  HEARING YOU ON THE AUDIO.

18          **MS. BRANNON:**  OKAY.

19  **BY MS. BRANNON:**

20  **Q.**   DR. HANDLEY, THE ANALYSIS THAT IS REFLECTED ON THIS TABLE

21  IS THE SAME ANALYSIS THAT WE HAVE BEEN DISCUSSING?

22  **A.**   THAT'S CORRECT.

23  **Q.**   DID YOU FORM AN OPINION ABOUT -- DID YOU DRAW ANY

24  CONCLUSIONS ABOUT THE ABILITY OF BLACK VOTERS TO ELECT THEIR

25  CANDIDATE OF CHOICE IN THE ILLUSTRATIVE PLAN VERSUS THE ENACTED

1    PLAN IN SENATE CLUSTER 3?

2    **A.**   YES.   IN SENATE CLUSTER 3 THERE ARE TWO EFFECTIVE BLACK

3    DISTRICTS IN THE ENACTED PLAN AND THERE ARE THREE IN THE

4    ILLUSTRATIVE PLAN.

5    **Q.**   CAN WE CALL UP PAGE 24 AND PAGE 23; THE TABLE ON PAGE 23

6    AND THE MAP ON PAGE 24.

7            FOR THE RECORD THIS IS EXHIBIT NUMBER PL-048, WHICH

8    HAS BEEN THE DEMONSTRATIVE THAT I'M NOW GOING TO PUT AWAY.

9            FOR THE RECORD I'VE JUST PUT UP WHAT WE'RE LABELING

10   DEMONSTRATIVE 28 WHICH IS A BLOWUP OF PL-067 WHICH IS FROM

11   DR. COOPERS' REPORT.

12           DR. HANDLEY, DO YOU RECOGNIZE THIS DOCUMENT?

13   **A.**   I DO.

14   **Q.**   AND WHAT IS IT?

15   **A.**   THAT IS A MAP OF THE STATE OF LOUISIANA WITH THE

16   ILLUSTRATIVE HOUSE PLAN PUT ONTO IT.

17   **Q.**   OKAY.   FOR THE RECORD I AM POINTING NOW TO PL-07, WHICH IS

18   DEMONSTRATIVE 28, IN THE AREA OF RED RIVER.   IS THIS THE SAME

19   -- WHERE I'M POINTING, IS THAT THE SAME AREA OF THIS MAP THAT

20   IS SHOWN IN MORE DETAIL ON THE BLOWUPS FROM YOUR REPORT THAT

21   ARE ON THE SCREEN AT THE MOMENT?

22   **A.**   YES.

23   **Q.**   AND THE ANALYSIS THAT YOU CONDUCTED THAT'S REFLECTED IN

24   THIS TABLE IS THE SAME TYPE OF EFFECTIVENESS ANALYSIS WE HAVE

25   BEEN DISCUSSING, CORRECT?

1    **A.**   YES.

2    **Q.**   DID YOU FORM AN OPINION ABOUT THE ABILITY OF BLACK VOTERS

3    TO ELECT THEIR CANDIDATE OF CHOICE IN THE ILLUSTRATIVE PLAN

4    VERSUS THE ENACTED PLAN IN HOUSE CLUSTER 1?

5    **A.**   YES.

6    **Q.**   CAN WE SEE PAGE 28 AND 27 FROM PLAINTIFFS' EXHIBIT 1.

7    DR. HANDLEY, DO YOU RECOGNIZE THIS TABLE AND THIS MAP THAT'S

8    CURRENTLY ON THE SCREEN?

9    **A.**   I DO.

10   **Q.**   OH, ACTUALLY CAN WE GO BACK.   SORRY.   CAN WE DO 26 AND

11   25 -- PAGE 26 AND PAGE -- TABLE ON PAGE 25 FROM PLAINTIFFS'

12   EXHIBIT 1.

13           DO YOU RECOGNIZE THESE -- THIS TABLE AND THESE MAPS?

14   **A.**   YES.

15   **Q.**   FOR THE RECORD I'M NOW POINTING TO PL-067 IN THE AREA OF

16   LAKE CHARLES.

17   **A.**   YES.

18   **Q.**   AND IS THIS AREA THAT'S REFLECTED HERE ON THIS THAT I AM

19   POINTING TO, THE SAME AREA THAT IS SHOWN IN MORE DETAIL IN THE

20   MAP IN PL-1 FROM YOUR REPORT?

21   **A.**   YES.

22   **Q.**   DOES THE TABLE HERE IN HOUSE CLUSTER 2 REFLECT THE SAME

23   ANALYSIS THAT WE HAVE BEEN DISCUSSING?

24   **A.**   YES.

25   **Q.**   DO YOU HAVE AN OPINION ABOUT THE ABILITY OF BLACK VOTERS

1   TO ELECT THEIR CANDIDATE OF CHOICE IN THE ILLUSTRATIVE PLAN

2   VERSUS THE ENACTED PLAN IN HOUSE CLUSTER 2?

3   **A.**   YES.  THE ENACTED PLAN OFFERS ONE MINORITY OPPORTUNITY

4   DISTRICT AND THE ILLUSTRATIVE PLAN OFFERS TWO BLACK OPPORTUNITY

5   DISTRICTS IN THIS PARTICULAR AREA.

6   **Q.**   NOW, CAN WE SEE PAGE 28 AND TWENTY -- THE TABLE ON PAGE 27

7   FROM PL-1.  DO YOU RECOGNIZE THIS TABLE AND THESE MAPS?

8   **A.**   I DO.

9   **Q.**   I'M NOW -- FOR THE RECORD I AM NOW POINTING AT THE

10   DEMONSTRATIVE EXHIBIT 28 WHICH IS FROM PLAINTIFFS' EXHIBIT

11   PL-67 IN THE AREA OF CADDO AND BOSSIER PARISH.

12          IS THIS AREA I'M POINTING TO THE SAME AREA THAT IS

13   REFLECTED IN MORE DETAIL ON THE MAP FROM YOUR REPORT THAT'S ON

14   THE SCREEN?

15   **A.**   YES.

16   **Q.**   AND IS THE ANALYSIS AS REFLECTED IN CLUSTER -- TABLE --

17   THE TABLE ABOUT HOUSE CLUSTER 3 THAT'S ON THE SCREEN, THE SAME

18   TYPE OF ANALYSIS WE HAVE BEEN DISCUSSING?

19   **A.**   YES.

20   **Q.**   DO YOU HAVE AN OPINION AS TO THE ABILITY OF BLACK VOTERS

21   TO ELECT THEIR CANDIDATE OF CHOICE IN THE ILLUSTRATIVE MAP

22   VERSUS THE ENACTED MAP IN HOUSE CLUSTER 3?

23   **A.**   YES.  MY OPINION IS THAT THE ENACTED PLAN OFFERS THREE

24   EFFECTIVE BLACK DISTRICTS AND THE ILLUSTRATIVE PLAN OFFERS FOUR

25   EFFECTIVE BLACK DISTRICTS IN THIS PARTICULAR AREA.

1  **Q.**   CAN WE MOVE NOW TO PAGE 30 AND PAGE -- THE MAPS ON PAGE 30

2  AND THE TABLE ON PAGE 29 FROM PLAINTIFFS' EXHIBIT 1.  DO YOU

3  RECOGNIZE THE TABLE AND THE MAPS THAT ARE ON THE SCREEN?

4  **A.**   I DO.

5  **Q.**   AND FOR THE RECORD -- WE'RE ALMOST DONE.  FOR THE RECORD I

6  AM NOW POINTING TO PL-67 WHICH IS DEMONSTRATIVE 28 IN THE AREA

7  OF HOUSE DISTRICT 60 WHICH IS SOUTH OF BATON ROUGE; IS THAT

8  CORRECT?

9  **A.**   YES.

10  **Q.**   AND IS THAT THE SAME AREA OF THE STATE THAT IS SHOWN IN

11  MORE DETAIL ON THE MAP THAT IS PART OF YOUR REPORT THAT IS

12  CURRENTLY ON THE SCREEN?

13  **A.**   YES.

14  **Q.**   AND IS THE ANALYSIS THAT'S REFLECTED IN THE TABLE THAT'S

15  CURRENTLY ON THE SCREEN ABOUT HOUSE CLUSTER 4 THE SAME TYPE OF

16  ANALYSIS WE'VE BEEN DISCUSSING?

17  **A.**   YES.

18  **Q.**   DO YOU HAVE AN OPINION ABOUT THE ABILITY OF BLACK VOTERS

19  TO ELECT THEIR CANDIDATE OF CHOICE IN HOUSE CLUSTER 1 IN THE

20  ILLUSTRATIVE MAP VERSUS THE ENACTED MAP -- HOUSE CLUSTER 4?

21  **A.**   I DO.  IN THIS PARTICULAR AREA THERE IS NO ENACTED

22  DISTRICT THAT PROVIDES BLACK VOTERS WITH AN OPPORTUNITY TO

23  ELECT.  THERE IS ONE SUCH DISTRICT IN THE ILLUSTRATIVE PLAN.

24  **Q.**   CAN WE SEE THE MAPS ON PAGE 32 AND THE TABLE ON PAGE 31 OF

25  PLAINTIFFS' EXHIBIT 1.  DO YOU RECOGNIZE THESE?

1  **A.**   YES.

2  **Q.**   AND THIS IS THE SAME TABLE AND THE SAME KIND OF MAPS THAT

3  WE'VE BEEN DISCUSSING, CORRECT?

4  **A.**   THAT'S CORRECT.

5  **Q.**   FOR THE RECORD I AM POINTING TO DEMONSTRATIVE EXHIBIT 28

6  WHICH IS PL-067 IN THIS AREA WHICH IS IN BATON ROUGE; IS THAT

7  CORRECT?

8  **A.**   YES.

9  **Q.**   AND THIS AREA OF BATON ROUGE IS THE SAME AREA THAT'S SHOWN

10  IN MORE DETAIL IN THE BLOWN UP MAP THAT IS PART OF YOUR REPORT

11  OF PL-1?

12  **A.**   YES, IT IS.

13  **Q.**   DO YOU HAVE AN OPINION AS TO THE EFFECTIVE -- DO YOU HAVE

14  AN OPINION AS TO THE ABILITY OF BLACK VOTERS TO ELECT THEIR

15  CANDIDATE OF CHOICE IN THE ILLUSTRATIVE MAP VERSUS THE ENACTED

16  MAP FOR HOUSE CLUSTER 5?

17  **A.**   YES.  YOU CAN SEE THAT THE ENACTED PLAN OFFERS FIVE BLACK

18  OPPORTUNITY DISTRICTS AND THE ILLUSTRATIVE PLAN OFFERS SEVEN

19  EFFECTIVE BLACK DISTRICTS IN THE -- IN THIS PARTICULAR AREA.

20  **Q.**   WE CAN PULL THIS DOWN NOW.  DID YOU CONDUCT ANY ADDITIONAL

21  FUNCTIONAL ANALYSIS EFFECTIVENESS SCORE ANALYSIS FOR OTHER

22  DISTRICTS IN THE ENACTED MAP?

23  **A.**   I DID.  I LOOKED AT THE -- I CALCULATED EFFECTIVENESS

24  SCORES FOR ALL DISTRICTS OVER 25 PERCENT BLACK IN VOTING AGE

25  POPULATION.

1  **Q.**   AND WHAT DID YOU FIND?

2  **A.**   I FOUND THAT THERE WERE, WITH ONE EXCEPTION, NO DISTRICTS

3  THAT WERE EFFECTIVE THAT WERE UNDER 50 PERCENT WITH THE

4  EXCEPTION OF, I THINK IT'S HOUSE DISTRICT 91.  IT'S MENTIONED

5  IN THE FOOTNOTE.  THERE IS ONE EXCEPTION, BUT THAT IS THE ONLY

6  EXCEPTION.  ALL OF THE EFFECTIVE DISTRICTS WERE AT LEAST

7  50 PERCENT BLACK IN VOTING AGE POPULATION.  AND NONE OF THE

8  DISTRICTS, EXCEPT THE ONE THAT WAS LESS THAN MAJORITY BLACK,

9  WAS AN EFFECTIVE DISTRICT.

10  **Q.**   OKAY.  BRINGING YOUR RACIALLY POLARIZED ANALYSIS AND YOUR

11  EFFECTIVENESS ANALYSIS OF THE ENACTED AND ILLUSTRATIVE MAPS

12  TOGETHER, HOW DOES THE RACIAL BLOC VOTING IN LOUISIANA EFFECT

13  BLACK VOTERS' OPPORTUNITIES TO ELECT THEIR CANDIDATES OF CHOICE

14  IN THE STATE LEGISLATIVE ELECTIONS IN THE SEVEN AREAS OF

15  INTEREST YOU EVALUATED FOR THIS CASE?

16  **A.**   IN THE SEVEN AREAS OF INTEREST THAT I EVALUATED FOR THIS

17  CASE, WITH THAT EXCEPTION, A MAJORITY BLACK DISTRICT WAS

18  NECESSARY TO ELECT BLACK-PREFERRED CANDIDATES TO THE STATE

19  LEGISLATURE.

20        **MS. BRANNON:**  THE PLAINTIFF WOULD MOVE FOR ADMISSION

21  OF DR. HANDLEY'S REPORT WHICH IS PL-1 AND THEN THE RELATED

22  EXHIBITS WHICH ARE PL-2 THROUGH PL-11.

23        **MS. RIGGINS:**  NO OBJECTION TO THE ADMISSION OF THESE,

24  YOUR HONOR.

25        **THE COURT:**  ADMITTED.  CAN WE PREADMIT THE EXPERT

1   REPORTS FOR THOSE THAT WE KNOW THAT ARE GOING TO TESTIFY SO WE

2   DON'T HAVE TO HAVE THIS LABORIOUS EXERCISE.

3            **MS. RIGGINS:**  SO, YOUR HONOR, OUR AGREEMENT,

4   NOTWITHSTANDING MY EARLIER OBJECTIONS REGARDING DR. SOLANKLY

5   AND DR. HANDLEY'S REPORTS, PL-17 THROUGH PL-19, THAT IS OUR

6   AGREEMENT.  WE ARE UNSURE IF TWO OF PLAINTIFFS' EXPERTS WILL BE

7   TESTIFYING.  THEY WERE ON THE MAY CALL LIST, BUT FOR THOSE THAT

8   DO TESTIFY THAT'S OUR UNDERSTANDING.

9            **THE COURT:**  OKAY.  AT THE BEGINNING OF THE EXPERT'S

10  TESTIMONY LET'S GET THE REPORTS ADMITTED SO THAT WE DON'T HAVE

11  TO -- IT'LL STREAMLINE THINGS A LITTLE BIT.  SO LET'S CARRY ON.

12  ADMITTED.

13           **MS. BRANNON:**  OKAY.  I JUST HAVE A FEW MORE QUESTIONS

14  FOR DR. HANDLEY.

15  **BY MS. BRANNON:**

16  **Q.**  DR. HANDLEY, WE DISCUSSED EARLIER YOUR METHODOLOGIES FOR

17  ALLOCATION OF EARLY AND ABSENTEE VOTES, CORRECT?

18  **A.**  YES.

19  **Q.**  DO YOU HAVE ANY CONCERNS ABOUT THIS PROCESS POTENTIALLY

20  CREATING ANY BIAS IN YOUR EI ANALYSIS?

21  **A.**  I DO NOT.

22  **Q.**  WHY NOT?

23  **A.**  I DID SOME ANALYSIS TO DETERMINE IF THIS WAS THE CASE.  I

24  DID A COUPLE OF DIFFERENT THINGS TO DETERMINE IF IT WAS LIKELY

25  THAT BIAS WAS BEING INTRODUCED.

1            **MS. BRANNON:**  SO THEN I AM GOING TO CALL UP

2    PLAINTIFFS' EXHIBIT 16, WHICH THE DEFENDANTS HAVE ARTICULATED

3    AN OBJECTION TO.  THIS IS ADDITIONAL ANALYSIS THAT DR. HANDLEY

4    DID TO VERIFY THE OPINIONS THAT SHE HAS PROVIDED IN HER

5    ADDITIONAL REPORT.  IT DOES NOT SPEAK TO ANYTHING SPECIFICALLY

6    THAT DR. SOLANKY HAS DISCUSSED OR TALKED ABOUT AND PLAINTIFFS

7    THINK IT'S APPROPRIATE FOR ADMISSION BECAUSE IT RELATES TO

8    DR. HANDLEY'S INITIAL REPORT AND IT'S FOR THE BENEFIT OF THE

9    COURT TO UNDERSTAND THE SPECIFIC ANALYSIS THAT DR. HANDLEY DID.

10   SO WE WOULD MOVE FOR ADMISSION -- WE'RE GOING TO WALK THROUGH

11   IT A LITTLE BIT, BUT WE WOULD MOVE FOR ADMISSION OF

12   PL-17 THROUGH -- PL-16 THROUGH PL-19.

13           **MS. RIGGINS:**  AND, YOUR HONOR, IF I MAY BE PERMITTED

14   TO RESPOND?

15           **THE COURT:**  PLEASE.

16           **MS. RIGGINS:**  SO PL-16, THE FIRST --

17           **THE COURT:**  ADJUST YOUR MIC.  YOU'RE VERY SOFT-SPOKEN

18   SO SPEAK UP.

19           **MS. RIGGINS:**  I'M SORRY, YOUR HONOR.  IS THAT BETTER?

20           **THE COURT:**  YES.

21           **MS. RIGGINS:**  THE FIRST PHRASE IN PL-16 STARTS WITH,

22   "DR. SOLANKY CONTENDS."  PL-16 WAS AUTHORED IN RESPONSE TO WORK

23   THAT DR. SOLANKY DID THAT CRITICIZED DR. HANDLEY'S ALLOCATION

24   METHOD.  THE ENTIRE REPORT WAS IN THE APPENDICES ATTACHED

25   THERETO WERE DONE IN RESPONSE TO DR. SOLANKY.  THAT HAS BEEN

1  EXCLUDED.  IF PLAINTIFFS WANT THIS TESTIMONY TO COME IN WE

2  THINK IT'S ONLY FAIR THAT DR. SOLANKY BE ALLOWED TO TESTIFY TO

3  THIS AS WELL.

4         **THE COURT:**  THE COURT'S NOT GOING TO RECONSIDER IT*S*

5  *MOTION IN LIMINE* ON DR. SOLANKY.  THE QUESTION ON THE TABLE IS

6  WHETHER OR NOT THE ALLOCATION METHOD THAT DR. HANDLEY USED TO

7  ALLOCATE WHAT WE'LL CALL THE ABSENTEE OR THE EARLY VOTES THAT

8  ARE COLLECTED AT A PARISH-WIDE LEVEL, HOW DID SHE -- WHAT WAS

9  THE METHODOLOGY FOR ALLOCATING THOSE TO THE PRECINCT LEVEL.

10  SHE'S GIVEN US THAT TESTIMONY ALREADY.

11         NOW THE QUESTION IS, WAS THAT METHODOLOGY USED

12  BIASED.  THE COURT WILL ALLOW THE QUESTION.  THE COURT WILL

13  DEFER RULING ON THE ADMISSION OF THE REPORTS UNTIL WE'RE

14  CONCLUDED WITH THIS, BUT THE COURT'S GOING TO ALLOW THAT

15  QUESTION.

16         **MS. BRANNON:**  THANK YOU, YOUR HONOR.

17  **BY MS. BRANNON:**

18  **Q.**  CAN WE SEE PL-16?  WHAT'S THIS DOCUMENT?

19  **A.**  THIS IS A SUPPLEMENTAL REBUTTAL REPORT I PREPARED.

20  **Q.**  AND WHAT ANALYSIS IS REFLECTED IN THIS SUPPLEMENTAL

21  REPORT?

22  **A.**  I DID SEVERAL ANALYSES.  FIRST, I LOOKED TO SEE IF CASTING

23  AN EARLY OR ABSENTEE VOTE WAS RELATED TO THE PARTY -- THE PARTY

24  OF THE VOTERS AND DETERMINED THAT THERE WAS LITTLE DIFFERENCE

25  IN WHETHER YOU WERE REPUBLICAN OR DEMOCRAT AS TO WHETHER YOU

1  CAST AN EARLY VOTE WITH ONE EXCEPTION AND THAT IS IN 2020.  AND

2  IN 2020 YOU WERE MORE LIKELY TO VOTE EARLY IF YOU WERE A

3  DEMOCRAT THAN IF YOU WERE A REPUBLICAN.

4      OTHERWISE, MOST YEARS WERE VERY COMPARABLE OR

5  REPUBLICANS WERE SLIGHTLY MORE LIKELY TO EARLY VOTE THAN

6  DEMOCRATS, EXCEPT FOR 2022 WHERE DEMOCRATS WERE SLIGHTLY MORE

7  LIKELY TO EARLY VOTE THAN REPUBLICANS.  BUT THE ONLY YEAR THAT

8  THERE WAS A DISTINCT DIFFERENCE WAS IN 2020.

9  **Q.**  CAN WE SEE PL-17?  ARE YOU FAMILIAR WITH THIS DOCUMENT?

10  **A.**  YES.  THAT'S THE TABLE I PREPARED ON WHICH I JUST BASED

11  THE CONCLUSION THAT I GAVE.

12  **Q.**  CAN WE NOW SEE PL-19?  DR. HANDLEY, ARE YOU FAMILIAR WITH

13  THIS DOCUMENT?

14  **A.**  YES.

15  **Q.**  CAN YOU EXPLAIN WHAT THIS DOCUMENT SHOWS?

16  **A.**  YES.  SO WE DON'T KNOW AT THE PRECINCT LEVEL HOW THE EARLY

17  VOTES COMPARED TO THE ELECTION DAY VOTES BECAUSE WE DON'T KNOW

18  WHO THE CANDIDATES WERE THAT EACH OF THE PRECINCTS VOTED FOR,

19  BUT WE DO KNOW THAT AT THE PARISH LEVEL.  SO THESE ARE SCATTER

20  PLOTS OF THE PARISHES.  EACH POINT IS A PARISH.  AND I

21  ESSENTIALLY DID A RACIAL BLOC VOTING ANALYSIS OF THE EARLY

22  VOTES FOR EACH OF THE CANDIDATES AND OF THE ELECTION DAY VOTES

23  FOR EACH OF THE CANDIDATES.

24      SO THE TOP PLOT IS A PLOT OF THE PARISH'S EARLY VOTES

25  FOR, IN THIS PARTICULAR INSTANCE, GARY CHAMBERS WHO RAN FOR

1    SENATE IN 2022, AND THE MIDDLE PLOT IS LOOKING AT THE

2    PROPORTION OF ELECTION DAY VOTES BY PROPORTION OF ELECTION DAY

3    BLACK TURNOUT.  AND YOU CAN SEE THAT BOTH ARE EQUALLY

4    POLARIZED.  SO THAT THERE'S ESSENTIALLY NO DIFFERENCE BETWEEN

5    THE EARLY VOTE -- THE DEGREE OF POLARIZATION AMONG THE EARLY

6    VOTERS AND THE ELECTION DAY VOTERS.

7            AND THEN THE LAST SCATTER PLOT SIMPLY LOOKS AT THE

8    PROPORTION OF EARLY VOTES TO THE PROPORTION OF ELECTION DAY

9    VOTES FOR CHAMBERS TO SEE IF THERE WAS A DIFFERENCE.

10   **Q.**   DID YOU EVALUATE ANYMORE ELECTIONS BESIDES THE

11   NOVEMBER 2022 ELECTION?

12   **A.**   YES.  I LOOKED AT SEVERAL ELECTIONS.

13   **Q.**   CAN WE TURN TO THE NEXT PAGE?  WAS THIS ONE OF THE OTHER

14   ELECTIONS THAT YOU EVALUATED?

15   **A.**   YES.

16   **Q.**   AND THEN CAN WE TURN TO THE NEXT PAGE?  AND FOR THE RECORD

17   THE LAST ONE WAS THE NOVEMBER 2020 ELECTION, CORRECT?

18   **A.**   THE ONE PRIOR TO THE ONE SHOWING ON THE SCREEN, YES,

19   THAT'S CORRECT.

20   **Q.**   AND THEN THE NEXT ONE, IS THIS ONE OF THE ELECTIONS THAT

21   YOU EVALUATED IN THIS METHOD?

22   **A.**   YES.

23   **Q.**   FOR THE RECORD THIS IS NOVEMBER '19?

24   **A.**   CORRECT.

25   **Q.**   THEN CAN WE TURN TO THE NEXT PAGE?  FOR THE RECORD IS THIS

1    ONE OF THE OTHER ELECTIONS THAT YOU EVALUATED IN THIS METHOD?

2    **A.**   YES.

3    **Q.**   FOR THE RECORD THIS IS OCTOBER 2019?

4    **A.**   YES.

5    **Q.**   THEN CAN WE TURN TO WHAT I THINK IS THE LAST PAGE?  AND IS

6    THIS ONE OF THE OTHER ELECTIONS THAT YOU EVALUATED IN THIS

7    METHOD?

8    **A.**   THAT'S CORRECT.

9    **Q.**   AND FOR THE RECORD THIS IS DECEMBER 2018?

10   **A.**   CORRECT.

11          **MS. BRANNON:**  SO, YOUR HONOR, WE WOULD MOVE FOR

12   ADMISSION OF THE REPORT.  WE COULD DO JUST THE EXHIBITS THAT

13   REFLECT THE ANALYSIS IF WE DON'T WANT TO DO THE ACTUAL REPORT

14   WHICH DOES MENTION DR. SOLANKY IN THE FIRST SENTENCE AS A

15   COMPROMISE.

16          **THE COURT:**  DOES THAT SOLVE YOUR PROBLEM?

17          **MS. RIGGINS:**  YOUR HONOR, I WISH IT DID, BUT IT

18   DOESN'T.  THE ANALYSIS AND THE APPENDICES WERE PREPARED IN

19   SUPPORT OF THAT SURREBUTTAL REPORT AND IT'S ALL IN RESPONSE TO

20   DR. SOLANKY'S ANALYSIS WHICH HE FIRST RAISED AS TO WHETHER THIS

21   ALLOCATION WAS BIAS IN HIS EXPERT REPORTS AND THOSE HAVE BEEN

22   EXCLUDED.

23          **THE COURT:**  YOU MAY ADDRESS IT, BUT I'M READY TO RULE

24   BUT GO AHEAD.

25          **MS. BRANNON:**  I MEAN, I THINK, YOUR HONOR, THE

1    ISSUE -- SUBSTANTIVE FACTUAL ISSUE HAS DEFINITELY BEEN RAISED

2    IN THIS CASE.  AND AS I STATED BEFORE, I THINK THAT THE REPORT

3    IS AN APPROPRIATE SUPPLEMENT TO DR. HANDLEY'S OPINION BECAUSE

4    IT PROVIDES CLARITY TO THE REPORT.  THE ANALYSIS IS REFLECTIVE

5    OF DR. HANDLEY'S OWN OPINIONS ABOUT WORK THAT SHE DID IN THIS

6    CASE FROM THE INITIAL -- YOU KNOW, WHEN SHE FIRST DID HER

7    REPORT ADDRESSING AN ISSUE JUST TO VERIFY THE VALIDITY OF THE

8    OPINIONS THAT SHE'S GIVING, AND I THINK THAT IS AN APPROPRIATE

9    SUPPLEMENT FOR US TO PRODUCE AND TO BE ENTERED INTO EVIDENCE

10   REGARDLESS OF THE POSITION OF DR. SOLANKY BEING EXCLUDED.

11        **THE COURT:**  THE COURT IS GOING TO ADMIT PLAINTIFFS'

12   16 THROUGH 19, AND THE REASON IS THAT UNDER 702 IT IS THE

13   MOVING PARTY'S -- THE OFFERING PARTY OF THE EXPERT'S BURDEN TO

14   SHOW THE RELIABILITY OF THE OPINION TESTIMONY AND THIS GOES

15   DIRECTLY TO RELIABILITY.  THAT BURDEN OF PROOF IS BEING -- IS

16   BEING MADE PART OF THE RULE EFFECTIVE DECEMBER THE 1ST, BUT THE

17   CASE LAW WOULD REFLECT THAT IT'S ALWAYS BEEN THE MOVANT'S

18   BURDEN.

19        AND SO, THEREFORE, IN THE INTEREST OF THE

20   COURT'S FULL UNDERSTANDING AND THE ABILITY FOR THE COURT TO

21   MAKE THE ANALYSIS OF THE RELIABILITY OF THE OPINION TESTIMONY,

22   THE COURT WILL ALLOW IT FOR COMPLETION OF THE RECORD OR TO MAKE

23   A COMPLETE RECORD.  SO P -- PLAINTIFFS' 16 THROUGH 19 ARE

24   ADMITTED.

25        **MS. BRANNON:**  THANK YOU.

1   **BY MS. BRANNON:**

2   **Q.**   JUST A COUPLE MORE QUESTIONS.  CAN WE TURN TO

3   DR. HANDLEY'S CV AGAIN AT EXHIBIT PL-2?  THAT'S TAB 2 OF YOUR

4   BINDER.  AND THEN CAN WE GO TO, I THINK IT'S THE THIRD PAGE,

5   YES.

6          DR. HANDLEY, DID YOU WRITE AN ARTICLE FOR THE <u>NORTH</u>

7   <u>CAROLINA LAW</u> REVIEW?

8   **A.**   I COAUTHORED THE ARTICLE BEING HIGHLIGHTED HERE, YES.

9   **Q.**   OKAY.  CAN YOU READ THE TITLE OF THAT ARTICLE INTO THE

10  RECORD?

11  **A.**   <u>DRAWING EFFECTIVE MINORITY DISTRICTS:  A CONCEPTUAL</u>

12  <u>FRAMEWORK AND SOME EMPIRICAL EVIDENCE.</u>

13  **Q.**   GIVEN THE TITLE OF THAT ARTICLE, DOES THIS ARTICLE DISCUSS

14  WAYS TO DETERMINE IF ELECTION DISTRICTS ARE EFFECTIVE?

15  **A.**   YES, IT DOES.

16  **Q.**   WHAT APPROACHES ARE DISCUSSED?

17  **A.**   I DISCUSSED THE APPROACH I TOOK HERE IN TERMS OF

18  RECOMPILED ELECTION RESULTS.  IF YOU ACTUALLY HAVE PROPOSED

19  DISTRICTS YOU LOOK AT RECOMPILED ELECTION RESULTS, AND IT ALSO

20  OFFERS A NEW WAY OF LOOKING AT WHETHER A DISTRICT IS LIKELY TO

21  BE EFFECTIVE BEFORE ACTUALLY DRAWING DISTRICTS.  YOU WOULD LOOK

22  AT -- YOU WOULD TAKE THE INFORMATION FROM THE RACIAL BLOC

23  VOTING ANALYSIS AND PRODUCE WHAT'S CALLED A PERCENT NEEDED TO

24  WIN PERCENTAGE.

25  **Q.**   DID YOU CONDUCT A PERCENT NEEDED TO WIN ANALYSIS IN THIS

1   CASE?

2   **A.**   I DID NOT DO SO IN THIS CASE.  IN THIS CASE I HAD PROPOSED

3   DISTRICTS TO EVALUATE.  I HAD THE ENACTED DISTRICTS AS WELL AS

4   ILLUSTRATIVE DISTRICTS.  THE BOUNDARIES WERE ALREADY DRAWN.

5   **Q.**   AND DO YOU HAVE AN OPINION OF WHICH ONE OF THOSE ANALYSES

6   IS MOST VALUABLE TO ADDRESSING RACIAL -- RACIALLY POLARIZED

7   VOTING IN YOUR OPINION IN THIS CASE?

8   **A.**   THE -- LOOKING AT RECOMPILED ELECTION RESULTS, FOCUSES IN

9   ON THE VERY SPECIFIC VOTERS THAT WILL BE INCLUDED IN THE

10  DISTRICT.  IT ALSO TAKES INTO ACCOUNT, OF COURSE, TURNOUT AND

11  VOTING PATTERNS, BECAUSE YOU'RE LOOKING AT PREVIOUS ELECTIONS

12  JUST AS YOU WOULD IF YOU CALCULATED A PERCENT NEEDED TO WIN.

13  BUT THIS FOCUSES ON JUST SPECIFICALLY THE RESIDENCE OF THE

14  PROPOSED DISTRICT.

15  **Q.**   SO IT LOOKS AT THE ACTUAL DISTRICTS THAT HAVE BEEN ENACTED

16  AND NOT HYPOTHETICAL DISTRICTS?

17  **A.**   CORRECT.

18  **Q.**   I HAVE NOTHING FURTHER.  THANK YOU, DR. HANDLEY.

19          **THE COURT:**  CROSS.

20          **MS. BRANNON:**  WAIT, LET ME CONFER.  I HAVE NOTHING

21  FURTHER.

22          **THE COURT:**  CROSS.

23          **MS. RIGGINS:**  GOOD MORNING, YOUR HONOR.  ALYSSA

24  RIGGINS ON BEHALF OF THE SECRETARY OF STATE.  MAY I HAVE A

25  MINUTE WITH MS. BRANNON, PLEASE?

1          **THE COURT:**  YOU MAY.

2          **MS. BRANNON:**  YOUR HONOR, JUST TO CLARIFY, THE DATE

3   ON THE EXPERT REPORT, WHICH IS PLAINTIFFS' EXHIBIT PL-1, IS

4   INCORRECT.  THAT REPORT WAS PRODUCED ON JUNE 30TH OF 2023;

5   ISN'T THAT CORRECT, DR. HANDLEY?

6          **THE WITNESS:**  YES.

7          **THE COURT:**  I NOTICED THAT.  GLAD YOU CLEARED THAT UP

8   FOR THE RECORD.

9          **MS. BRANNON:**  FOR THE RECORD DR. HANDLEY'S PL-1,

10   WHICH HAS NOW BEEN ADMITTED, WAS PRODUCED ON JUNE 30TH OF 2003.

11          **THE COURT:**  2023.

12          **MS. BRANNON:**  2023.  THANK YOU.

13          **THE COURT:**  THANK YOU FOR YOUR PROFESSIONALISM,

14   MS. RIGGINS.

15   **CROSS-EXAMINATION**

16   **BY MS. RIGGINS:**

17   **Q.**   GOOD MORNING, DR. HANDLEY.  IT IS NICE TO SEE YOU AGAIN.

18   HOW ARE YOU TODAY?

19   **A.**   I'M GOOD.  AND YOURSELF?

20   **Q.**   I'M FINE.  I FINALLY MANAGED TO GET A HOT CUP OF COFFEE.

21   IT TOOK ME A WHILE THIS MORNING.  SO, DR. HANDLEY, YOU

22   CONDUCTED A RACIALLY POLARIZED VOTING ANALYSIS IN THIS MATTER;

23   IS THAT CORRECT?

24   **A.**   YES.

25   **Q.**   WOULD YOU AGREE WITH ME, DR. HANDLEY, THAT THIS RACIALLY

1    POLARIZED VOTING ANALYSIS IS NEEDED TO DETERMINE, FIRST,

2    WHETHER A MINORITY GROUP IS POLITICALLY COHESIVE AND, SECOND,

3    TO DETERMINE IF WHITE VOTERS ARE VOTING AS A BLOC TO DEFEAT THE

4    CANDIDATES PREFERRED BY THOSE MINORITY VOTERS?

5    **A.**   I WOULD AGREE.

6    **Q.**   AND, DR. HANDLEY, IF I REFER TO A RACIALLY POLARIZED

7    VOTING ANALYSIS AS AN RPV ANALYSIS WILL YOU KNOW WHAT I MEAN?

8    **A.**   I WILL.

9    **Q.**   THANK YOU.  SO IN ORDER TO CONDUCT YOUR RPV ANALYSIS,

10   DR. HANDLEY, YOU NEEDED AN AGGREGATE-LEVEL DATA BASIS; IS THAT

11   CORRECT?

12   **A.**   YES.  BY AGGREGATE WE MEAN THAT WE DON'T HAVE

13   INDIVIDUAL-LEVEL DATA.  WE ARE LOOKING AT PRECINCT-LEVEL DATA

14   IN THIS CASE.

15   **Q.**   THANK YOU, DR. HANDLEY.  I BELIEVE YOU TESTIFIED EARLIER

16   THAT YOU SOURCED THIS DATA FROM THE SECRETARY OF STATE'S

17   WEBSITE OPEN ELECTIONS AND THE CENSUS; IS THAT RIGHT?

18   **A.**   THAT IS THE SOURCE OF IT, YES.

19   **Q.**   AND SOME OF THIS DATA THAT WAS USED IN YOUR REPORT WAS

20   ALSO GATHERED FOR THE CURRENT CONGRESSIONAL CASE PENDING IN

21   LOUISIANA, THE ROBINSON CASE, FOR WHICH YOU'RE ALSO AN EXPERT;

22   ISN'T THAT RIGHT, DR. HANDLEY?

23   **A.**   YES.

24   **Q.**   YOU PERSONALLY DID NOT COMPILE ALL OF THIS DATA?

25   **A.**   I DID NOT COMPILE THE PRECINCT-LEVEL DATA.

1   **Q.**   AND WHO COMPILED THAT DATA?

2   **A.**   THE PERSONNEL WHO WORK AT THE ACLU ANALYTICS DEPARTMENT.

3   **Q.**   AND YOU WERE RETAINED BY THE ACLU IN THIS CASE; IS THAT

4   RIGHT, DR. HANDLEY?

5   **A.**   YES.

6   **Q.**   AND I WOULD LIKE TO TURN TO TABLE 1 IN YOUR REPORT, WHICH

7   IS PLAINTIFFS' EXHIBIT 6, PLEASE.  AND DO YOU STILL HAVE YOUR

8   WHITE BINDER IN FRONT OF YOU, DR. HANDLEY?

9   **A.**   I DO.

10            **MS. RIGGINS:**  IS IT OKAY IF DR. HANDLEY USES THAT

11   BINDER?

12            **MS. BRANNON:**  YES.

13   **BY MS. RIGGINS:**

14   **Q.**   I THINK IT'S TAB A IN YOUR REPORT, DR. HANDLEY?

15   **A.**   OKAY.  WE'RE ALSO BRINGING IT UP ON THE SCREEN WHICH IS

16   ACTUALLY EASIER FOR ME TO SEE.  I HAVE TO FIND MY GLASSES --

17   **Q.**   THAT'S FINE.  I'M HAPPY TO DO IT WHATEVER WAY IS EASIER

18   FOR YOU.  SO, DR. HANDLEY, COULD YOU PLEASE TURN TO TABLE 1 IN

19   YOUR REPORT?  I THINK IT STARTS ON PAGE 6.

20   **A.**   YES.

21   **Q.**   SO THESE ARE THE 16 STATEWIDE ELECTION CONTESTS THAT YOU

22   ANALYZED IN THIS REPORT; ISN'T THAT RIGHT, DR. HANDLEY?

23   **A.**   THESE ARE THE 16 STATEWIDE, THAT'S CORRECT.

24   **Q.**   AND THESE 16 STATEWIDE ELECTION CONTESTS INCLUDE A BLACK

25   CANDIDATE IN EACH OF THEM; ISN'T THAT RIGHT?

1   **A.**   AT LEAST ONE, THAT'S CORRECT.

2   **Q.**   AND SO BECAUSE THE 2016 PRESIDENTIAL ELECTION DID NOT

3   INCLUDE A BLACK CANDIDATE, YOU DID NOT ANALYZE THAT ELECTION IN

4   THIS REPORT, DR. HANDLEY?

5   **A.**   CORRECT.

6   **Q.**   SO YOU, LIKEWISE, IN THIS REPORT DID NOT EXAMINE THE 2015

7   OR THE 2019 GUBERNATORIAL ELECTIONS, DID YOU?

8   **A.**   CORRECT.

9   **Q.**   BUT DON'T YOU UNDERSTAND, DR. HANDLEY, THAT GOVERNOR

10  EDWARDS RECEIVED A HIGH LEVEL OF SUPPORT FROM THE BLACK

11  COMMUNITY AS ANALYZED IN YOUR REBUTTAL REPORT?

12  **A.**   AS REPORTED -- I DID NOT ANALYZE IT.  I USED DR. ALFORD'S

13  ESTIMATES AND I WOULD AGREE THAT EDWARDS RECEIVED A HIGH

14  PERCENTAGE OF THE BLACK VOTE.

15  **Q.**   THANK YOU, DR. HANDLEY.  DO YOU AGREE WITH ME,

16  DR. HANDLEY, THAT THE BLACK-PREFERRED CANDIDATE IS USUALLY A

17  DEMOCRAT?

18  **A.**   IN LOUISIANA, YES.

19  **Q.**   AND WOULD YOU ALSO AGREE WITH ME, DR. HANDLEY, THAT

20  SOMETIMES A WHITE CANDIDATE CAN BE THE CANDIDATE OF CHOICE FOR

21  THE BLACK COMMUNITY?

22  **A.**   YES.

23  **Q.**   AND, IN FACT, DR. HANDLEY, HAVEN'T YOU CONDUCTED RACIALLY

24  POLARIZED VOTING ANALYSIS IN OTHER STATES WHERE YOU EXAMINED

25  ELECTIONS WITH WHITE CANDIDATES ONLY?

1  **A.**   YES, IF THERE ARE NOT A SUFFICIENT NUMBER OF CONTESTS THAT

2  INCLUDE BLACK CANDIDATES.  HERE, OF COURSE, I HAD 16, SO I DID

3  HAVE A SUFFICIENT NUMBER.  BUT IN SOME STATES, FOR EXAMPLE, IN

4  ARKANSAS, YOU HAD MAYBE TWO CANDIDATES, BLACK CANDIDATES, WHO

5  RAN STATEWIDE OVER AN ENTIRE DECADE.  SO I DID LOOK AT CONTESTS

6  THAT INCLUDED ONLY WHITE CANDIDATES.

7  **Q.**   OKAY.  BUT HERE IN LOUISIANA YOU WERE ABLE TO FIND 16

8  BI-RACIAL CONTESTS OVER A PERIOD OF APPROXIMATELY SEVEN YEARS?

9  **A.**   YES.

10  **Q.**   AND, DR. HANDLEY, THE RESULTS OF THE STATISTICAL ANALYSIS

11  THAT YOU PERFORMED, WE LOOKED AT THOSE EARLIER, THOSE ARE

12  CONTAINED IN EXHIBIT -- I'M SORRY, APPENDIX A TO YOUR REPORT?

13  **A.**   CORRECT.

14  **Q.**   AND YOU ALSO EXAMINED STATE HOUSE AND STATE SENATE

15  ELECTIONS AND IN APPENDIX B TO YOUR ORIGINAL REPORT; ISN'T THAT

16  RIGHT?

17  **A.**   YES.

18  **Q.**   BUT THOSE STATE LEGISLATIVE ELECTIONS THAT YOU EXAMINED IN

19  APPENDIX B TO YOUR REPORT ARE NOT REALLY INDIGENOUS ELECTIONS

20  ARE THEY, DR. HANDLEY?

21  **A.**   AS I SAID, THOSE ARE FOR THE OFFICE AT ISSUE, BUT NOT FOR

22  THE ACTUAL DISTRICTS AT ISSUE.

23  **Q.**   OKAY.  AND SO, THEREFORE, THEY ARE NOT ACTUALLY INDIGENOUS

24  ELECTIONS BECAUSE THEY ARE NOT THE ELECTION AT ISSUE IN THIS

25  CASE?

1  **A.**   AS I UNDERSTAND THE WORD INDIGENOUS, I'M NOT SURE THAT ALL

2  COURTS WOULD AGREE, BUT THAT'S HOW I UNDERSTAND IT.

3  **Q.**   THANK YOU, DR. HANDLEY.  AND, DR. HANDLEY, WOULD YOU AGREE

4  WITH ME THAT IT'S VALUABLE FOR EXPERTS SUCH AS YOURSELF TO

5  STUDY INDIGENOUS ELECTIONS WHEN THEY'RE AVAILABLE?

6  **A.**   YES.

7  **Q.**   AND SO IN THIS REPORT YOU DON'T EXAMINE ANY INDIGENOUS

8  ELECTIONS, DO YOU?

9  **A.**   DEPENDING ON YOUR DEFINITION, I WOULD SAY I LOOKED AT

10 STATE LEGISLATIVE ELECTIONS BUT NOT FOR THE DISTRICTS AT ISSUE.

11 **Q.**   BUT ISN'T YOUR DEFINITION OF AN INDIGENOUS ELECTION,

12 DR. HANDLEY, THAT THE ELECTION IS FOR THE DISTRICT AT ISSUE?

13 **A.**   THAT'S MY DEFINITION.  AGAIN, I'M NOT REALLY SURE IF THE

14 COURTS CAME UP WITH THE WORD AND I'M NOT REALLY SURE WHAT

15 COURTS WOULD HAVE TO SAY ABOUT THAT.

16 **Q.**   BUT STUDYING THE ELECTION DISTRICT AT ISSUE, THAT'S YOUR

17 DEFINITION OF AN INDIGENOUS ELECTION?

18 **A.**   YES.

19 **Q.**   COULD WE PLEASE TURN TO TABLE 2 WHICH IS ON PAGE 9 OF YOUR

20 REPORT, PLEASE.  I THINK IT'S ALSO UP ON THE SCREEN IF THAT'S

21 EASIER FOR YOU, DR. HANDLEY.  THESE ARE THE SEVEN AREAS OF

22 INTEREST THAT YOU STUDIED IN YOUR JUNE 2023 REPORT, ISN'T THAT

23 RIGHT, DR. HANDLEY?

24 **A.**   YES.

25 **Q.**   AND YOU CHOSE THESE DISTRICTS BECAUSE THEY WERE BASED ON

1   AREAS WHERE PLAINTIFFS' ILLUSTRATIVE MAPS ADDED ADDITIONAL

2   MAJORITY MINORITY DISTRICTS; ISN'T THAT TRUE?

3   **A.**   YES.  I THINK YOU PHRASED THAT INCORRECTLY, BUT YES.

4   **Q.**   SO YOU DID NOT EXAMINE THE ENTIRE STATE OF LOUISIANA?

5   **A.**   THAT'S CORRECT.

6   **Q.**   AND YOU DID NOT STUDY MAJORITY MINORITY DISTRICTS OUTSIDE

7   OF THESE SEVEN AREAS OF INTEREST?

8   **A.**   THAT'S CORRECT.

9   **Q.**   CAN WE PLEASE TURN TO TABLE 3 FOR US ON THE NEXT PAGE.

10   **A.**   I NEGLECTED TO MENTION SOMETHING.  I DID NOT STUDY OR DO

11   ANY ANALYSIS OTHER THAN PRODUCE EFFECTIVENESS SCORES.  I DID

12   CALCULATE EFFECTIVENESS SCORES.  SORRY ABOUT THAT.

13   **Q.**   I APPRECIATE THE CLARITY, DR. HANDLEY.  THANK YOU.

14   DR. HANDLEY, DO YOU SEE THAT TABLE 3 IS UP ON YOUR SCREEN?

15   **A.**   YES.

16   **Q.**   AND I BELIEVE THAT YOU DISCUSSED THIS TABLE EARLIER ON

17   DIRECT; IS THAT RIGHT?

18   **A.**   YES.

19   **Q.**   OKAY.  AND I'D LIKE TO LOOK AT THE SECOND SET OF COLUMNS

20   HERE, THE TWO CANDIDATE CONTESTS; IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   CAN YOU SEE THAT?

23   **A.**   YES.

24   **Q.**   OKAY.  GREAT.  AREA OF INTEREST 3, DO YOU RECALL WHAT AREA

25   OF INTEREST THAT IS?

1  **A.**   OFF THE TOP OF MY HEAD, NO.  I COULD CERTAINLY GO BACK AND

2  LOOK FOR YOU.

3  **Q.**   YEAH, OF COURSE.  COULD WE FLIP BACK OR MAYBE PUT THOSE UP

4  SIDE BY SIDE.  DR. HANDLEY, DO YOU SEE TABLE 2 AND TABLE 3 UP

5  SIDE BY SIDE ON YOUR SCREEN?

6  **A.**   I DO.

7  **Q.**   SO WHAT AREA OF INTEREST IS AREA OF INTEREST 3?

8  **A.**   EAST CENTRAL LOUISIANA.  THAT INCLUDES EAST BATON ROUGE,

9  WEST BATON ROUGE, IBERVILLE AND POINTE COUPEE.

10  **Q.**   GREAT.  THANK YOU.  WHAT AREAS OF INTEREST DOES AREA 7

11  INCLUDE?

12  **A.**   EAST BATON ROUGE AND EAST FELICIANA.

13  **Q.**   SO EAST BATON ROUGE IS EXAMINED IN BOTH AREA 3 AND AREA 7;

14  IS THAT RIGHT?

15  **A.**   CORRECT.

16  **Q.**   AND SO LOOKING AT THE TWO CANDIDATE CONTESTS FOR AREA 3 IN

17  TABLE 3, ISN'T THE WHITE VOTE FOR BLACK-PREFERRED CANDIDATE

18  APPROXIMATELY 20 PERCENT?

19  **A.**   FOR AREA 7?

20  **Q.**   FOR AREA 3.

21  **A.**   WELL, IT'S 19.6 TO BE EXACT.

22  **Q.**   OKAY.  AND IT'S 20.1 FOR AREA 7; ISN'T THAT RIGHT?

23  **A.**   YES.

24       **MS. RIGGINS:**  THANK YOU, FORREST.  YOU CAN TAKE THIS

25  DOWN.  AND, FORREST, CAN WE PULL UP PLAINTIFFS' EXHIBIT 3,

1   PLEASE.

2   **BY MS. RIGGINS:**

3   **Q.**   AND IF IT'S EASIER ON PAPER, DR. HANDLEY, WHICHEVER IS

4   EASIER FOR YOU.  THIS IS APPENDIX A1 COVERING AREA OF INTEREST

5   1 BOSSIER AND CADDO PARISH; ISN'T THAT RIGHT, DR. HANDLEY?

6   **A.**   YES.

7   **Q.**   AND YOU WOULD AGREE WITH ME, DR. HANDLEY, THAT APPENDIX A1

8   IS NOT A DISTRICT SPECIFIC ANALYSIS, IS IT?

9   **A.**   IT'S A VERY AREA-SPECIFIC ANALYSIS THAT FOCUSES ON THE

10  AREA WHERE THE ADDITIONAL ILLUSTRATIVE DISTRICT IS DRAWN -- A

11  ILLUSTRATIVE DISTRICT IS DRAWN.

12  **Q.**   SO THE ANSWER TO MY QUESTION IS, YES, THIS IS NOT A

13  DISTRICT-SPECIFIC ANALYSIS?

14  **A.**   IT FOCUSES ON THE TWO PARISHES IN WHICH THERE IS AN

15  ILLUSTRATIVE AND ADDITIONAL ILLUSTRATIVE DISTRICT.

16  **Q.**   BUT APPENDIX A1 DOES NOT STUDY SPECIFIC DISTRICTS WITHIN

17  BOSSIER AND CADDO PARISH, DOES IT?

18  **A.**   NO.

19  **Q.**   SO THERE ARE SOME COLUMN HEADERS HERE THAT YOU AND

20  MS. BRANNON WENT THROUGH EARLIER.  EI RXC, EI 2X2 AND ER, DO

21  YOU SEE THOSE?

22  **A.**   YES.

23  **Q.**   AND THESE ARE ALL STATISTICAL ESTIMATES; IS THAT RIGHT,

24  DR. HANDLEY?

25  **A.**   CORRECT.

1   **Q.**   BUT THE HOMOGENOUS PRECINCT ANALYSIS, THOSE ARE REAL

2   ELECTION PERCENTAGES REPORTED IN THE HP COLUMN?

3   **A.**   YES.  THOSE ARE THE PERCENTAGES FOR -- IN THE FIRST COLUMN

4   FOR THE PRECINCTS -- FOR ALL OF THE PRECINCTS THAT AT LEAST

5   90 PERCENT OF THE VOTERS WERE BLACK, AND IN THE WHITE SECTION

6   IT WAS FOR THOSE PRECINCTS IN WHICH AT LEAST 90 PERCENT OF THE

7   VOTERS WERE WHITE.

8   **Q.**   THANK YOU, DR. HANDLEY.  SO SETTING ASIDE THE HP COLUMN,

9   WHICH I UNDERSTAND ARE ACTUALLY ELECTION PERCENTAGES, THE

10   REMAINDER OF THE EI AND ER ANALYSIS HERE IN THE APPENDIX

11   REPORTS ESTIMATES FOR BLACK AND WHITE VOTERS IN BOSSIER AND

12   CADDO PARISHES FOR THE 16 STATEWIDE ELECTION CONTESTS WE

13   DISCUSSED EARLIER; ISN'T THAT RIGHT?

14   **A.**   YES.

15   **Q.**   AND THE NUMBERS IN THE EI RXC COLUMN ARE STATISTICAL

16   ESTIMATES OF A PERCENTAGE; ISN'T THAT RIGHT?

17   **A.**   YES.

18   **Q.**   SO I'D LIKE TO, IF WE COULD, DR. HANDLEY, LOOK AT THE 2020

19   NOVEMBER PRESIDENTIAL ELECTION.  IF WE COULD LOOK UNDER THE

20   ESTIMATES IN THE FAR RIGHT SECTION OF COLUMNS ESTIMATE FOR

21   WHITE VOTERS.  WOULD YOU AGREE WITH ME THAT THE 22.6 NUMBER

22   THAT IS ON THE SCREEN HERE REPRESENTS THE ESTIMATES OF THE

23   PERCENTAGE OF WHITE VOTERS WHO VOTED FOR PRESIDENT BIDEN ACROSS

24   ALL PRECINCTS IN CADDO AND BOSSIER PARISHES?

25   **A.**   YES.

1  **Q.**   AND, DR. HANDLEY, YOU USED "R" CODE AND SEVERAL "R" CODE

2  PACKAGES TO PRODUCE THE EI AND ER AND HP ANALYSIS REPLICATED

3  HERE; ISN'T THAT RIGHT?

4  **A.**   YES.

5  **Q.**   DO YOU RECALL WHICH "R" CODE PACKAGES YOU USED TO PRODUCE

6  THIS ANALYSIS?

7  **A.**   YES.  WELL, MORE OR LESS, YES.

8  **Q.**   AND WHAT PACKAGES WERE THOSE?

9  **A.**   THE EI PACK AND EI COMPARE FOR THE ER ESTIMATES AND THE HP

10  ESTIMATES.  MAYBE EI PACK FOR THE ER ESTIMATES, I DON'T

11  REMEMBER.  BUT I USED BOTH OF THOSE PACKAGES.

12  **Q.**   THANK YOU, DR. HANDLEY.  AND I BELIEVE YOU TESTIFIED TO

13  THIS EARLIER, BUT THE DATA UNIT THAT YOU'RE USING TO CONDUCT

14  THIS ANALYSIS IS PER PRECINCT; ISN'T THAT RIGHT?

15  **A.**   THE UNIT OF ANALYSIS OR OBSERVATION IS THE -- ARE

16  PRECINCTS.

17  **Q.**   AND SO TO PRODUCE THIS 22.6 NUMBER THAT WE JUST MENTIONED

18  A FEW MINUTES AGO, YOU INSTRUCTED YOUR PACKAGES AND "R" CODE TO

19  LIMIT THE RESULTS TO JUST THE PRECINCTS IN BOSSIER AND CADDO

20  PARISHES; ISN'T THAT RIGHT?

21  **A.**   YES.

22  **Q.**   SO NEXT TO THIS 22.6 NUMBER, THERE ARE TWO NUMBERS

23  REPORTED HERE FOR A 95 PERCENT CONFIDENCE INTERVAL; IS THAT

24  RIGHT?

25  **A.**   YES.

1   **Q.**   WHAT ARE THOSE TWO NUMBERS, DR. HANDLEY?

2   **A.**   SO EI RXC IS ACTUALLY A SIMULATION PROCESS AND I BELIEVE I

3   RAN SOMETHING LIKE 250,000 SIMULATIONS.  AND THIS RANGE 17.2 TO

4   30.5 INDICATES THAT 95 PERCENT OF MY SIMULATIONS PRODUCED MEANS

5   WITHIN THAT RANGE.

6   **Q.**   SO -- AND I APPRECIATE THE EXPLANATION, DR. HANDLEY.  I

7   WAS GOING TO TRY TO DO THE INVERSE AND ASK YOU QUESTIONS ABOUT

8   THAT, BUT YOUR EXPLANATION IS MUCH BETTER THAN MINE.  BUT JUST

9   TO CLARIFY, YOU SAID MEANS WITHIN THIS RANGE.  YOU MEAN THAT

10  95 PERCENT OF THE RESULTS OF YOUR SIMULATIONS PRODUCED A MEAN

11  BETWEEN 17.2 AND 30.5 IN THIS SPECIFIC EXAMPLE WE'RE LOOKING

12  AT?

13  **A.**   YES.

14  **Q.**   WOULD YOU GENERALLY AGREE WITH ME, DR. HANDLEY, THAT THE

15  SMALLER THE RANGE OF THE 95 PERCENT CONFIDENCE INTERVAL, THE

16  BETTER IDEA YOU HAVE AS TO THE TRUE NUMBER?

17  **A.**   THE LESS UNCERTAINTY ATTACHED TO THE ESTIMATE.

18  **Q.**   SO THE SMALLER THE RANGE, THE MORE CERTAIN YOU ARE ABOUT

19  THE ESTIMATE?

20  **A.**   THE LESS UNCERTAINTY I SUPPOSE YOU COULD READ IT AS, BUT A

21  STATISTICIAN WOULD SAY THE WIDER THE RANGE THE MORE

22  UNCERTAINTY.

23  **Q.**   AND YOU DO NOT PRODUCE CONFIDENCE INTERVALS FOR EI 2X2 OR

24  ECOLOGICAL REGRESSION; DO YOU, DR. HANDLEY?

25  **A.**   THOSE HAVE BEEN REJECTED BY EXPERTS.

1   **Q.**   BUT YOUR PACKAGE WOULD ALLOW YOU TO PRODUCE THOSE

2   CONFIDENCE INTERVALS; ISN'T THAT TRUE, DR. HANDLEY?

3   **A.**   NO, NOT FOR EI COMPARE.   NO.

4   **Q.**   BUT WHAT ABOUT FOR EI PACK?

5   **A.**   YES.

6   **Q.**   WHAT IS THE ESTIMATE FOR EI 2X2 REPORTED HERE FOR WHITE

7   VOTERS IN CADDO AND BOSSIER PARISHES FOR PRESIDENT BIDEN AND

8   VICE-PRESIDENT HARRIS IN THE NOVEMBER 2022 ELECTION?

9   **A.**   THE EI 2X2 DID YOU ASK?

10   **Q.**   YES, MA'AM.

11   **A.**   9.8.

12   **Q.**   AND WHAT IS IT FOR ER?

13   **A.**   9.3.

14   **Q.**   AND BOTH OF THESE NUMBERS ARE OUTSIDE OF THE 95 PERCENT

15   CONFIDENCE INTERVAL YOU REPORTED FOR EI RXC; ISN'T THAT RIGHT?

16   **A.**   DIFFERENT STATISTICAL METHODS.

17   **Q.**   SO THE ANSWER TO MY QUESTION IS YES?

18   **A.**   THEY ARE OUTSIDE THE 17.2 TO 30.5, YES.

19   **Q.**   AND WOULD YOU AGREE WITH ME, DR. HANDLEY, THAT THESE

20   ESTIMATES BEING OUTSIDE OF THE CONFIDENCE INTERVALS ISN'T

21   NECESSARILY SURPRISING BECAUSE THIS ANALYZES THE NOVEMBER 2022

22   ELECTION?

23   **A.**   IN PART, BUT IT IS ALSO NOT SURPRISING BECAUSE THESE ARE

24   DIFFERENT METHODS.   THEY RELY ON DIFFERENT STATISTICAL

25   ASSUMPTIONS AND PRODUCE DIFFERENT STATISTICAL ESTIMATES.

1   **Q.**   SURE.  BUT, IN PART, ISN'T IT ALSO BECAUSE THIS ANALYZES

2   THE NOVEMBER 2022 ELECTION WHICH PRODUCED PROBLEMATIC ESTIMATES

3   DUE TO THE NUMBER OF PEOPLE VOTING EARLY?

4   **A.**   IT IS TRUE THAT THESE ESTIMATES ARE MORE PROBLEMATIC.

5   **Q.**   DR. HANDLEY, I DON'T WANT TO BE REPETITIVE, BUT WOULD YOU

6   AGREE WITH THE STATEMENT THAT THE NOVEMBER 2020 ELECTION

7   PRODUCED PROBLEMATIC ESTIMATES BECAUSE OF THE NUMBER OF PEOPLE

8   WHO EARLY VOTED IN LOUISIANA?

9   **A.**   NO, I WOULD NOT DISAGREE WITH THAT.

10   **Q.**   YOU WOULD NOT DISAGREE WITH THAT?

11   **A.**   THAT'S CORRECT.

12   **Q.**   SO LET'S LOOK ONE ELECTION UP, IF WE CAN, TO THE 2022

13   NOVEMBER SENATE ELECTION.  I WOULD ALSO LIKE TO LOOK AT THE

14   ESTIMATES FOR WHITE VOTERS WHICH IS ON THE FAR RIGHT SIDE OF

15   YOUR SCREEN.  WAS MR. CHAMBERS THE BLACK CANDIDATE OF CHOICE IN

16   THIS RACE, DR. HANDLEY?

17   **A.**   YES.

18   **Q.**   AND WHAT IS THE EI RXC ESTIMATE FOR MR. CHAMBERS FOR WHITE

19   VOTERS IN BOSSIER AND CADDO PARISHES?  EI RXC, I'M SORRY.

20   **A.**   FOR MR. CHAMBERS DID YOU SAY?

21   **Q.**   YES, MA'AM.

22   **A.**   FIVE.  FIVE PERCENT.

23   **Q.**   AND WHAT ARE YOUR 95 PERCENT CONFIDENCE INTERVALS FOR THAT

24   EI RXC ESTIMATE?

25   **A.**   4.3 TO 5.7.

1  **Q.**   WHAT IS THE EI 2X2 ESTIMATE HERE?

2  **A.**   3.5.

3  **Q.**   AND WHAT IS THE ER ESTIMATE?

4  **A.**   3.9.

5  **Q.**   AND, AGAIN, BOTH THE EI 2X2 AND THE ER ESTIMATES ARE

6  OUTSIDE OF THE 95 PERCENT CONFIDENCE INTERVAL; ISN'T THAT

7  RIGHT, DR. HANDLEY?

8  **A.**   YES.  SORRY.

9  **Q.**   DR. HANDLEY, WOULD YOU AGREE WITH ME THAT IF YOU LOOKED AT

10  DIFFERENT ELECTION CONTESTS WITH DIFFERENT CANDIDATES THAN THE

11  ONES LISTED IN APPENDIX A1, YOU WOULD HAVE GOTTEN DIFFERENT

12  ESTIMATES?

13  **A.**   THE ESTIMATES ARE ELECTION SPECIFIC.

14  **Q.**   SO THE ANSWER TO MY QUESTION IS YES?

15  **A.**   I WOULDN'T VEST IT THAT WAY, BUT I THINK I ANSWERED IT.

16  DIFFERENT ELECTIONS WOULD PRODUCE DIFFERENT ESTIMATES.

17  **Q.**   THANK YOU, DR. HANDLEY.  SO I WOULD LIKE TO MOVE ON AND

18  TALK A BIT ABOUT EFFECTIVENESS SCORES.  UNLESS YOUR HONOR WOULD

19  LIKE TO TAKE THE MORNING BREAK?

20          **THE COURT:**  HOW MUCH LONGER DO YOU HAVE?

21          **MS. RIGGINS:**  15 TO 20 MINUTES, YOUR HONOR.

22          **THE COURT:**  LET'S TAKE A 15-MINUTE RECESS.

23                        *(RECESS)*

24          **THE COURT:**  BE SEATED, PLEASE.  CROSS, YOU MAY

25  CONTINUE.

1          **MS. RIGGINS:**  THANK YOU, YOUR HONOR.

2   **BY MS. RIGGINS:**

3   **Q.**   DR. HANDLEY, I'D LIKE TO SHIFT GEARS A BIT AND TALK ABOUT

4   YOUR EFFECTIVENESS SCORES.  BUT BEFORE I DO, YOUR KIND COUNSEL

5   POINTED OUT THAT IN A COUPLE OF PLACES I MAY HAVE REFERRED TO

6   AS THE BIDEN/HARRIS ELECTION AS OCCURRING IN NOVEMBER OF 2020.

7   THAT IS AN ERROR OBVIOUSLY ON MY PART.  CAN WE AGREE,

8   DR. HANDLEY, THAT PRESIDENT BIDEN WAS ELECTED IN NOVEMBER OF

9   2020, NOT NOVEMBER OF 2022?

10  **A.**   WE CAN AGREE TO THAT, YES.

11  **Q.**   SO NOW TURNING TO YOUR EFFECTIVENESS SCORES, DR. HANDLEY.

12  I'D LIKE TO LOOK AT PAGE 21 OF YOUR REPORT.

13          **MS. RIGGINS:**  THANK YOU, FORREST.

14  **BY MS. RIGGINS:**

15  **Q.**   THERE'S A COMPARISON TABLE HERE FOR STATE SENATE CLUSTER

16  3; ISN'T THAT RIGHT?

17  **A.**   YES.

18  **Q.**   WHAT AREAS OF INTEREST ARE INCLUDED IN STATE SENATE

19  CLUSTER 3?

20  **A.**   THE AREA OF INTEREST?  I THINK IT'S AREA OF INTEREST 3-D.

21  DO YOU MEAN THE PARISHES PERHAPS?

22  **Q.**   YES, I'M SORRY.  WHAT PARISHES ARE INCLUDED IN THAT,

23  DR. HANDLEY?

24  **A.**   EAST AND WEST BATON ROUGE, IBERVILLE AND POINTE COUPEE.

25  **Q.**   THANK YOU.  AND THE SCORES HERE ON THE COMPARISON TABLE,

1  THESE ARE SPECIFIC TO THE ILLUSTRATIVE AND ENACTED DISTRICTS;

2  ISN'T THAT RIGHT, DR. HANDLEY?

3  **A.**   YES.

4  **Q.**   WOULD YOU AGREE WITH ME, DR. HANDLEY, THAT IF ANY OF THESE

5  DISTRICTS HAD SPLIT PRECINCTS YOU WOULD BE REQUIRED TO PERFORM

6  A CENSUS BLOCK DISAGGREGATION IN ORDER TO CALCULATE THESE

7  EFFECTIVENESS SCORES?

8  **A.**   I WOULD AGREE THAT YOU WOULD HAVE TO DO THAT.  I DON'T

9  BELIEVE THAT THERE ARE ANY SPLIT PRECINCTS BUT --

10  **Q.**   SO THAT GETS TO MY NEXT QUESTION, DR. HANDLEY.  YOU DID

11  NOT PERFORM ANY CENSUS BLOCK DISAGGREGATION YOURSELF IN THIS

12  CASE, DID YOU?

13  **A.**   THE PRECINCT RESULTS WERE BROUGHT DOWN TO THE BLOCK LEVEL,

14  BUT IT WOULD ONLY IMPACT A PRECINCT RESULT IF A PRECINCT WAS

15  SPLIT, BUT I DON'T BELIEVE THERE ARE ANY SPLIT PRECINCTS.

16  THERE'S CERTAINLY NONE IN THE ENACTED AND MAYBE ONE OR TWO IN

17  THE ILLUSTRATIVE PLAN AS A WHOLE.  I'M SORRY.  I DON'T REMEMBER

18  THE QUESTION.

19  **Q.**   SURE.  YOU DID NOT PERFORM A CENSUS BLOCK DISAGGREGATION

20  YOURSELF IN THIS CASE, DID YOU?

21  **A.**   THE ELECTION RETURNS WERE DISAGGREGATED DOWN TO THE BLOCK.

22  **Q.**   BUT DID THE ACLU DATA ANALYTICS TEAM PERFORM THAT FUNCTION

23  FOR YOU?

24  **A.**   YES.

25  **Q.**   AND SO THERE ARE TWO TYPES OF EFFECTIVENESS SCORES LISTED

1   HERE FOR THE ILLUSTRATIVE AND THE ENACTED DISTRICTS; ISN'T THAT

2   RIGHT, DR. HANDLEY?

3   **A.**   YES.

4   **Q.**   CAN YOU EXPLAIN TO ME THE DIFFERENCE BETWEEN THE

5   EFFECTIVENESS SCORE NUMBER 1 AND SCORE NUMBER 2?

6   **A.**   YES.   SCORE NUMBER ONE CONSIDERS ALL 16 CONTESTS AND

7   INDICATES WHETHER THE BLACK-PREFERRED CANDIDATE WOULD HAVE WON

8   OR MADE IT TO THE RUNOFF, SO THAT'S THE PERCENTAGE OF THE 16

9   CONTESTS IN WHICH THE BLACK-PREFERRED CANDIDATE WON OR MADE IT

10   TO THE RUNOFF.   THE EFFECTIVENESS SCORE 2 LOOKS ONLY AT THE

11   EIGHT CONTESTS IN WHICH THERE WERE TWO CANDIDATES TO GIVE YOU

12   AN INDICATION OF WHAT WOULD HAPPEN IF THE MINORITY-PREFERRED

13   CANDIDATE MADE IT TO THE RUNOFF WOULD THEY, IN FACT, WIN THE

14   RUNOFF.   SO IT LOOKS AT ONLY EIGHT CONTESTS.

15   **Q.**   THANK YOU, DR. HANDLEY.   YOU DID NOT REPORT EFFECTIVENESS

16   SCORES FOR ILLUSTRATIVE OR ENACTED SENATE DISTRICT 2 IN THIS

17   CLUSTER, DID YOU?

18   **A.**   NO.   I MIGHT HAVE CALCULATED THEM.   IT DEPENDS.   IS IT

19   OVER 25 PERCENT BLACK AND VOTING AGE POPULATION?

20   **Q.**   WELL, I GUESS MY QUESTION, DR. HANDLEY, IS IN THIS TABLE

21   YOU DON'T REPORT EFFECTIVENESS SCORES FOR SENATE DISTRICT 2;

22   ISN'T THAT RIGHT?

23   **A.**   YES.

24           **MS. RIGGINS:**   AND, FORREST, IF WE COULD PULL UP THE

25   MAP OF THIS REGION ON THE NEXT PAGE, WHICH IS PAGE 22.   AND

1    WHILE WE DO THAT I'M GOING TO GRAB A PEN THAT I LEFT ON THE

2    TABLE.

3    **BY MS. RIGGINS:**

4    **Q.**   DR. HANDLEY, DOES THE TOP MAP HERE DEPICT THE ILLUSTRATIVE

5    DISTRICT CONTAINED -- OR DISTRICTS, I'M SORRY, CONTAINED IN

6    STATE SENATE CLUSTER 3?

7    **A.**   YES, THAT'S A MAP OF THOSE -- OF THAT AREA, YES.

8    **Q.**   OKAY.  AND IT'S A MAP OF THE SAME AREA FOR THE ENACTED

9    DISTRICT ON THE BOTTOM OF THE PAGE; IS THAT RIGHT?

10   **A.**   YES.

11   **Q.**   AND THERE'S A KIND OF YELLOWISH SHADING ON SOME OF THESE

12   MAPS; IS THAT RIGHT?

13   **A.**   YES.

14   **Q.**   AND DOES THAT REPRESENT SHADING FOR DISTRICTS THAT ARE

15   MAJORITY BLACK DISTRICTS THAT YOU ANALYZED?

16   **A.**   YES.

17   **Q.**   AND -- SO IN ENACTED DISTRICT 17 ON THE MAP AT THE BOTTOM

18   OF THE PAGE, THAT IS NOT SHADED, CORRECT, DR. HANDLEY?

19   **A.**   THAT'S CORRECT.

20   **Q.**   SO ENACTED SENATE DISTRICT 17 IS NOT A MAJORITY-MINORITY

21   DISTRICT, IS IT?

22   **A.**   IT IS NOT.

23   **Q.**   BUT IT IS SHADED ABOVE IN THE ILLUSTRATIVE DISTRICT?

24   **A.**   BECAUSE IT'S MAJORITY MINORITY, YES.

25   **Q.**   SENATE DISTRICT 2 IS SHOWN ON BOTH OF THESE MAPS; ISN'T

1  THAT RIGHT, DR. HANDLEY?

2  **A.**   YES.

3  **Q.**   AND IT'S NOT SHADED IN EITHER MAP?

4  **A.**   IT WAS NOT INCLUDED IN THE CLUSTER SHADED AS YOU POINTED

5  OUT, RIGHT.  SO I ONLY SHADED THE DISTRICTS THAT WERE INCLUDED

6  IN THE CLUSTER, I BELIEVE.

7  **Q.**   RIGHT.  SO YOU DID NOT INCLUDE SENATE DISTRICT 2 IN THIS

8  CLUSTER?

9  **A.**   CORRECT.

10  **Q.**   EVEN THOUGH PORTIONS OF SENATE DISTRICT 2 ARE IN THE

11  PARISHES COVERED BY SENATE DISTRICT 3?

12  **A.**   THAT'S CORRECT.

13  **Q.**   AND IS SENATE DISTRICT 2 A MAJORITY-MINORITY DISTRICT IN

14  THE ENACTED DISTRICT MAP DEPICTED IN THE BOTTOM MAP BELOW?

15  **A.**   THOSE ARE BOTH MAJORITY-MINORITY DISTRICTS BOTH IN THE

16  ILLUSTRATIVE AND THE ENACTED PLAN.  DISTRICT 2 IS MAJORITY

17  BLACK.

18  **Q.**   THANK YOU, DR. HANDLEY.  WHAT IS THE LEVEL OF BLACK VOTING

19  AGE POPULATION IN THE ENACTED PLAN AS SHOWN ON YOUR MAP HERE

20  FOR SENATE DISTRICT 2?

21  **A.**   I'M HAVING A LITTLE TROUBLE.  I THINK IT SAYS 57.75.

22       **MS. RIGGINS:**  FORREST, COULD WE ZOOM IN ON THAT

23  PLACARD; IS THAT POSSIBLE?

24       **THE WITNESS:**  I COULD TRY PUTTING ON MY GLASSES, BUT

25  I THINK THIS IS AT JUST THE WRONG DISTANCE THAT NEITHER SET IS

1   GOING TO WORK.

2   **BY MS. RIGGINS:**

3   **Q.**   IS THAT BETTER FOR YOU, DR. HANDLEY?

4   **A.**   IT IS.

5   **Q.**   SO WHAT IS THE LEVEL OF BVAP FOR SENATE DISTRICT 2 SHOWN

6   HERE?

7   **A.**   57.75.

8   **Q.**   THANK YOU.

9           **MS. RIGGINS:**   AND, FORREST, CAN WE ZOOM IN ON THE

10   SAME PLACARD FOR SENATE DISTRICT 2 IN THE ILLUSTRATIVE PLAN,

11   PLEASE.

12   **BY MS. RIGGINS:**

13   **Q.**   WHAT IS THE LEVEL OF BVAP FOR SENATE DISTRICT 2 IN THE

14   ILLUSTRATIVE PLAN HERE, DR. HANDLEY?

15   **A.**   51.73 PERCENT.

16   **Q.**   DO YOU SEE --

17           **MS. RIGGINS:**   THIS IS HELPFUL, FORREST, TO LEAVE IT

18   ZOOMED IN, PLEASE?

19   **BY MS. RIGGINS:**

20   **Q.**   DO YOU SEE THAT DISTRICT 14 AND DISTRICT 17 IN THE ENACTED

21   PLAN BORDER EACH OTHER HERE?

22   **A.**   14 AND 17 BORDER EACH OTHER, YES.

23   **Q.**   AND THE YELLOW PORTION OF 17 INDICATES THAT THAT'S A

24   MAJORITY-MINORITY DISTRICT HERE, RIGHT?

25   **A.**   17 IS A MAJORITY BLACK DISTRICT, YES.

1    **Q.**   THANK YOU.

2         **MS. RIGGINS:**   AND, FORREST, CAN WE DO THE SAME, ZOOM

3    IN FOR THE ENACTED MAP BELOW, PLEASE?

4    **BY MS. RIGGINS:**

5    **Q.**   AND SO IN THE ENACTED MAP THERE'S STILL A PORTION OF

6    SENATE DISTRICT 2 THAT BORDERS IN BETWEEN SENATE DISTRICT 17

7    AND 14; DO YOU SEE THAT, DR. HANDLEY?

8    **A.**   SAY THAT AGAIN.

9    **Q.**   SO THERE IS -- DO YOU SEE SENATE DISTRICT 2 IN GRAY ON THE

10   SCREEN, DR. HANDLEY?

11   **A.**   YES.

12   **Q.**   AND DO YOU SEE HOW IT COMES NORTH AND IS ON THE BORDER

13   BETWEEN BOTH SENATE DISTRICTS 14 AND 17?

14   **A.**   YES.

15   **Q.**   AND YOU DID NOT ANALYZE SENATE DISTRICT 2 IN YOUR

16   EFFECTIVENESS SCORES, RIGHT?

17   **A.**   I DID.  NOT IN THE TABLE, BUT I DID.  YOU'LL RECALL THAT I

18   LOOKED AT THE EFFECTIVENESS SCORES OF ALL OF THE DISTRICTS OVER

19   25 BUT IT'S NOT INCLUDED IN THE TABLE.

20   **Q.**   SO THAT'S AN INTERESTING POINT, DR. HANDLEY.  CAN WE TURN

21   TO FOOTNOTE 18 ON PAGE 16 OF YOUR REPORT?  DO YOU SEE HERE IN

22   FOOTNOTE 18 THAT IT STATES THAT YOU EXAMINED THE HOUSE AND

23   SENATE DISTRICTS WITH BVAP'S BETWEEN 35 AND 49.9 PERCENT,

24   DR. HANDLEY?

25   **A.**   I DO.

1   **Q.**   SO I BELIEVE YOU TESTIFIED EARLIER THAT YOU EXAMINED THE

2   HOUSE AND SENATE DISTRICTS WITH BVAP'S BETWEEN 20 -- AT

3   25 PERCENT OR HIGHER?

4   **A.**   THAT'S CORRECT.

5   **Q.**   SO WHERE ARE -- WHERE IS THE ANALYSIS FOR THE DISTRICTS

6   BETWEEN 25 AND 35 PERCENT?

7   **A.**   ON A PIECE OF PAPER ON MY COMPUTER.

8   **Q.**   SO DOES THIS REFRESH YOUR RECOLLECTION, DR. HANDLEY, THAT

9   YOU ACTUALLY ONLY STUDIED THE HOUSE AND SENATE DISTRICTS

10  BETWEEN 35 AND 49.9 PERCENT BVAP?

11  **A.**   THAT'S INCORRECT.

12  **Q.**   SO IF YOU STUDIED THEM, DR. HANDLEY, DID YOU REPORT THEM

13  ANYWHERE IN THIS REPORT?

14  **A.**   I DID NOT.

15  **Q.**   AND BECAUSE SENATE DISTRICT 2 WAS MAJORITY MINORITY, IT

16  DOES NOT FALL WITHIN THE 35 TO 49.9 PERCENT RANGE REFERENCED IN

17  THIS FOOTNOTE?

18  **A.**   THAT'S CORRECT.  BUT OF COURSE I DID DO AN EFFECTIVENESS

19  ANALYSIS OF IT.

20  **Q.**   THAT IS NOT REPORTED IN THIS REPORT?

21  **A.**   CORRECT.

22  **Q.**   DR. HANDLEY, I BELIEVE THAT SENATE DISTRICT 2 WAS ONE OF

23  THE -- THERE WAS AN ELECTION CONTEST THAT YOU EXAMINED FOR THIS

24  DISTRICT; IS THAT RIGHT?

25  **A.**   CAN YOU POINT IT TO ME?

1   **Q.**   ABSOLUTELY.

2   **A.**   I CAN'T DO THAT OFF THE TOP OF MY HEAD.

3   **Q.**   SURE.  IT'S IN APPENDIX B TO YOUR REPORT, WHICH IS

4   PLAINTIFFS' EXHIBIT 1.  I'D LIKE TO LOOK AT THE FIRST ELECTION

5   CONTEST THERE.  DO YOU HAVE IT THERE IN FRONT OF YOU,

6   DR. HANDLEY?

7   **A.**   YES, I DO.  EVEN BETTER I HAVE IT IN FRONT OF ME ON THE

8   SCREEN.

9   **Q.**   YES, PERFECT.  THANK YOU.  IS THE FIRST ELECTION THAT YOU

10  ANALYZED IN APPENDIX B1 THE OCTOBER 2015 ELECTION FOR STATE

11  SENATE DISTRICT 2?

12  **A.**   THAT'S CORRECT.

13  **Q.**   AND DID YOU DETERMINE, DR. HANDLEY, THAT THIS OCTOBER 2015

14  ELECTION FOR STATE SENATE DISTRICT 2 WAS NOT POLARIZED?

15  **A.**   CORRECT.

16  **Q.**   AND SO, DR. HANDLEY --

17           **MS. RIGGINS:**  FORREST, YOU CAN TAKE PL-10 DOWN.  CAN

18  WE RETURN TO THE CHART OF THE ILLUSTRATIVE AND ENACTED

19  DISTRICTS THAT WE WERE LOOKING AT BEFORE ON PAGE 21.  THANK

20  YOU.

21  **BY MS. RIGGINS:**

22  **Q.**   DR. HANDLEY, DO YOU SEE THAT ON THE SCREEN IN FRONT OF

23  YOU?

24  **A.**   YES.

25  **Q.**   SO THESE SCORES ARE FOR THE ILLUSTRATIVE AND ENACTED

1    DISTRICTS AS DRAWN, CORRECT, DR. HANDLEY?

2    **A.**    YES.

3    **Q.**    SO YOU DID NOT DO ANY ANALYSIS IN THIS REPORT TO DETERMINE

4    THE LEVEL OF BVAP NEEDED AT WHICH A DISTRICT WOULD BECOME

5    EFFECTIVE IN PROVIDING A REALISTIC OPPORTUNITY FOR BLACK VOTERS

6    TO ELECT THEIR CANDIDATE OF CHOICE?

7    **A.**    CAN YOU REPEAT THE QUESTION?

8    **Q.**    SURE.  IN THIS REPORT YOU DID NO ANALYSIS TO DETERMINE THE

9    BVAP LEVEL AT WHICH A DISTRICT WOULD BECOME EFFECTIVE IN

10   PROVIDING A REALISTIC OPPORTUNITY FOR BLACK VOTERS TO ELECT

11   THEIR CANDIDATE OF CHOICE?

12   **A.**    I LOOKED AT ALL OF THE ILLUSTRATIVE AND ENACTED DISTRICTS

13   OVER 25 PERCENT AND DETERMINED ONLY DISTRICTS OVER 50 PERCENT

14   WOULD ELECT WITH THE ONE EXCEPTION THAT IS NOTED IN A FOOTNOTE.

15   **Q.**    SURE.  AND THOSE RESULTS WERE ONLY REPORTED FOR THE

16   DISTRICTS OVER 35 PERCENT AND LOWER THAN 49.9 PERCENT UNLESS

17   THEY WERE INCLUDED IN THESE TABLES; ISN'T THAT RIGHT,

18   DR. HANDLEY?

19   **A.**    I DIDN'T REPORT THEM FOR 35 TO 49.9 EITHER.  I MERELY SAID

20   NONE OF THEM WERE EFFECTIVE.

21   **Q.**    AND YOU DID NOT, ANYWHERE IN THIS REPORT, DETERMINE A

22   SPECIFIC LEVEL OF BLACK VOTING AGE POPULATION FOR WHICH A

23   DISTRICT WOULD BECOME EFFECTIVE, ISN'T THAT RIGHT, DR. HANDLEY?

24   I'M HAPPY TO REPHRASE THE QUESTION IF YOU'D LIKE.

25   **A.**    TRY THAT.

1   **Q.**   SO YOU WOULD AGREE WITH ME, DR. HANDLEY, THAT YOU LOOKED

2   AT THE ILLUSTRATIVE DISTRICTS AS DRAWN; IS THAT CORRECT?

3   **A.**   YES.

4   **Q.**   AND YOU EXAMINED THE EFFECTIVENESS SCORES WITH THE LEVEL

5   OF BVAP THAT WAS IN THE DISTRICTS AS DRAWN?

6   **A.**   CORRECT.

7   **Q.**   AND YOU DID NO OTHER ANALYSIS TO DETERMINE IF ANY OF THE

8   ILLUSTRATIVE BVAP'S WOULD BE EFFECTIVE AT A DIFFERENT LEVEL OF

9   BVAP, DID YOU?

10  **A.**   I LOOKED ONLY AT THE DISTRICTS AS DRAWN.

11  **Q.**   SO THE ANSWER TO MY QUESTION IS THAT YOU DID NOT DO ANY

12  ANALYSIS TO DETERMINE A DIFFERENT LEVEL OF BVAP NEEDED?

13  **A.**   DIFFERENT THAN OTHER THAN WHAT WAS DRAWN?

14  **Q.**   CORRECT.

15  **A.**   I BELIEVE THAT'S CORRECT IF I UNDERSTAND YOUR QUESTION,

16  YES.

17  **Q.**   AND, DR. HANDLEY, HAVEN'T YOU FOUND IN SOME JURISDICTIONS

18  THAT SOMETIMES A MAJORITY BLACK DISTRICT IS NOT NECESSARY TO

19  ELECT A BLACK-PREFERRED CANDIDATE?

20  **A.**   YES.

21  **Q.**   AND, DR. HANDLEY, DID YOU COAUTHOR AN ARTICLE THAT WAS

22  PUBLISHED IN 2019 THAT DISCUSSED THE INCREASED ABILITY OF

23  BLACK-PREFERRED CANDIDATES TO WIN DISTRICTS THAT WERE BETWEEN

24  40 AND 50 PERCENT BLACK?

25          **MS. BRANNON:**  YOUR HONOR, WE'RE JUST GOING TO OBJECT.

1   WE THINK QUESTIONS ABOUT THAT ARTICLE IS OUTSIDE THE SCOPE OF

2   THE DIRECT.

3            **THE COURT:**  THE 2019 ARTICLE?

4            **MS. BRANNON:**  YES, THE 2019 ARTICLE.

5            **THE COURT:**  YOUR QUESTION ABOUT THE 2019 ARTICLE IS

6   WHAT, MS. RIGGINS?

7            **MS. RIGGINS:**  I ASKED DR. HANDLEY IF SHE COAUTHORED

8   THIS ARTICLE THAT EXAMINED THE ABILITY OF BLACK-PREFERRED

9   CANDIDATES TO WIN IN DISTRICTS THAT WERE BETWEEN 40 AND

10  50 PERCENT BLACK, SO LESS THAN MAJORITY MINORITY.

11           **THE COURT:**  I'M GOING TO OVERRULE THE OBJECTION.  THE

12  WHOLE QUESTION AND DR. HANDLEY'S ENTIRE OPINION IS RACIALLY

13  POLARIZED VOTING, SO THIS IS RELEVANT TO THE COURT'S

14  UNDERSTANDING OF RACIALLY POLARIZED VOTING.

15           **MS. RIGGINS:**  THANK YOU, YOUR HONOR.

16           FORREST, COULD WE PLEASE PULL UP THIS ARTICLE SO

17  THAT DR. HANDLEY CAN IDENTIFY IT?  IT'S SECRETARY OF STATE

18  EXHIBIT 36.

19  **BY MS. RIGGINS:**

20  **Q.**   DR. HANDLEY, DO YOU SEE IT ON THE SCREEN IN FRONT OF YOU?

21  **A.**   I DO.

22  **Q.**   OKAY.  AND IS THIS AN ARTICLE THAT YOU COAUTHORED IN 2019?

23  **A.**   IT WAS PUBLISHED IN 2019.  I THINK WE WROTE IT YEARS

24  BEFORE THAT.

25  **Q.**   OH, I APOLOGIZE.  IS THIS AN ARTICLE THAT YOU PUBLISHED

1   WITH SEVERAL COAUTHORS IN 2019?

2   **A.**   YES.

3   **Q.**   ALL RIGHT.  AND, DR. HANDLEY, DO YOU RECALL IF LOUISIANA

4   WAS ONE OF THE STATES THAT YOU AND YOUR COAUTHORS LOOKED AT IN

5   DRAFTING THIS ARTICLE?

6   **A.**   YES.  WE GROUPED THE CELL TOGETHER AND LOUISIANA WAS ONE

7   OF THE STATES INCLUDED IN THE CELL.

8   **Q.**   THANK YOU.  IN THIS ARTICLE DIDN'T YOU AND YOUR COLLEAGUES

9   FIND THAT WHITE DEMOCRATS ARE MORE LIKELY TO VOTE FOR A BLACK

10   DEMOCRAT THAN A WHITE REPUBLICAN?

11   **A.**   I DO NOT REMEMBER THAT ACROSS THE BOARD, BUT CAN YOU POINT

12   TO WHAT YOU'RE REFERRING TO?

13   **Q.**   SURE.  CAN WE PLEASE GO TO PAGE 280 OF THIS ARTICLE?  AND

14   THIS IS SORT OF ONE BIG PARAGRAPH SO I APOLOGIZE, DR. HANDLEY.

15   WE'RE LOOKING TOWARDS -- THERE WE GO -- THE MIDDLE OF THE

16   PARAGRAPH.  DO YOU SEE THE SENTENCE THAT STARTS, "THE INCREASE

17   IN POLITICAL POLARIZATION SUGGESTS THAT COMMA"?

18   **A.**   I DO.

19   **Q.**   OKAY.  AND DOES THIS REFRESH YOUR RECOLLECTION THAT WHEN

20   YOU LOOK AT THE SENTENCE YOU AND YOUR COAUTHORS CONCLUDED THAT

21   WHITE DEMOCRATS ARE MORE LIKELY TO VOTE FOR AN AFRICAN AMERICAN

22   OR LATINO DEMOCRAT THAN A WHITE REPUBLICAN?

23   **A.**   YES.  IT OFFERS THIS AS A REASON POSSIBLY FOR THE INCREASE

24   IN THE NUMBER OF DISTRICTS THAT WERE LESS THAN MAJORITY

25   MINORITY IN COMPOSITION FOR ELECTING MINORITY-PREFERRED

1   CANDIDATES.

2   **Q.**   AND THIS WAS BECAUSE OF INCREASED POLITICAL POLARIZATION;

3   IS THAT RIGHT, DR. HANDLEY?

4   **A.**   YES.

5   **Q.**   AND DIDN'T YOU AND YOUR COAUTHORS ALSO FIND THAT SO LONG

6   AS REPUBLICANS DID NOT CONSTITUTE A MAJORITY OF VOTERS IN A

7   DISTRICT THAT IN GENERAL A MINORITY CANDIDATE HAD A BETTER

8   OPPORTUNITY TO GET ELECTED IN A 40 TO 50 PERCENT BVAP DISTRICT?

9   **A.**   WELL, YOU WOULD LOOK AT THAT IN EACH SPECIFIC LOCATION,

10  BUT IN GENERAL THAT'S WHAT WE FOUND, YES.

11  **Q.**   THANK YOU.  AND, DR. HANDLEY, DIDN'T YOU DETERMINE THAT

12  ENACTED HOUSE DISTRICT 91 IN THIS CASE WAS EFFECTIVE WITH A

13  BVAP OF 41.7?

14  **A.**   I DON'T REMEMBER THE BVAP, BUT YOU CAN POINT IT OUT TO ME.

15  I'M WILLING TO BELIEVE THAT YOU KNOW WHAT IT IS.

16  **Q.**   SURE.

17  **A.**   I DID SAY THAT THERE WAS A DISTRICT THAT WAS -- IT'S

18  MAJORITY MINORITY.  IT'S NOT A MAJORITY WHITE DISTRICT.  IT'S A

19  MAJORITY-MINORITY DISTRICT AND IT IS EFFECTIVE.

20  **Q.**   SURE.  AND, DR. HANDLEY, I DON'T WANT YOU TO GUESS.

21           **MS. RIGGINS:**  FORREST, COULD WE PLEASE RETURN TO

22  PLAINTIFFS' EXHIBIT 1 ON PAGE 16?  AND WE'RE LOOKING AT

23  FOOTNOTE 18 AGAIN.

24  **BY MS. RIGGINS:**

25  **Q.**   ALL RIGHT.  DR. HANDLEY, DOES THIS REFRESH YOUR

1    RECOLLECTION THAT YOU CONCLUDED THAT THE PROPOSED STATE HOUSE

2    DISTRICT 91 IN THE ENACTED STATE HOUSE PLAN IN THE ILLUSTRATIVE

3    PLAN WAS EFFECTIVE WITH A BVAP OF 40.7?

4    **A.**   YES.

5    **Q.**   THANK YOU.  DR. HANDLEY, WE BRIEFLY DISCUSSED EARLIER AND

6    YOU DISCUSSED ON DIRECT EARLY VOTING AS IT PERTAINS TO THE 2020

7    ELECTION.  SO I'D LIKE TO LOOK AT FOOTNOTE 8 ON PAGE 6 OF YOUR

8    REPORT IF WE COULD, PLEASE.

9          AND I BELIEVE YOU EXPLAINED THIS EARLIER.  IS THIS

10   FOOTNOTE AN EXAMPLE OF HOW YOU ALLOCATED EARLY VOTES TO

11   PRECINCTS IN THIS REPORT, DR. HANDLEY?

12   **A.**   YES.

13   **Q.**   AND YOU FOLLOWED THIS ALLOCATION METHOD FOR EVERY AREA OF

14   INTEREST THAT YOU STUDIED AND EVERY ELECTION THAT YOU ANALYZED

15   IN THIS REPORT; ISN'T THAT RIGHT, DR. HANDLEY?

16   **A.**   YES.

17   **Q.**   AND, DR. HANDLEY, DO I UNDERSTAND FROM YOUR DEPOSITION

18   TESTIMONY THAT YOU ACKNOWLEDGE THAT YOUR ALLOCATION METHOD IN

19   SOME INSTANCES RESULTED IN CANDIDATES BEING ALLOCATED MORE

20   VOTES THAN VOTES CASTS IN THE PRECINCTS?

21   **A.**   MORE VOTES THAN TURNOUT I THINK IS WHAT YOU MEAN.

22   **Q.**   YES, DR. HANDLEY.  YOU ACKNOWLEDGE THAT YOUR ALLOCATION

23   METHOD AT THE PRECINCT LEVEL SOMETIMES RESULTED IN A CANDIDATE

24   BEING ALLOCATED MORE VOTES THAN THE TOTAL NUMBER OF VOTES CASTS

25   IN THAT PRECINCT?

1   **A.**   NO, THAT'S INCORRECT.  IT WAS TURNOUT.

2   **Q.**   I APOLOGIZE, DR. HANDLEY.  SO YOU ACKNOWLEDGE THAT YOUR

3   ALLOCATION METHOD RESULTED IN CANDIDATES BEING ALLOCATED MORE

4   VOTES THAN THE TOTAL NUMBER OF VOTER TURNOUT IN THAT PRECINCT?

5   **A.**   THAT'S CORRECT.

6   **Q.**   AND, DR. HANDLEY, DO YOU RECALL IF YOU KNEW ABOUT THIS

7   OVER-ALLOCATION BEFORE YOUR EXPERT REPORT WAS PRODUCED IN THIS

8   CASE IN JUNE OF 2023?

9   **A.**   YES, I RECALL.  I DO KNOW THAT THIS WAS HAPPENING, YES.

10  **Q.**   AND YOU DID NOT REPORT THAT ANYWHERE IN YOUR JUNE 2023

11  REPORT, DID YOU?

12  **A.**   NO.  I SUPPLIED THE DATABASE.

13  **Q.**   AND THE DATABASE SHOWS THAT IN CERTAIN PRECINCTS CERTAIN

14  CANDIDATES WERE ALLOCATED MORE VOTES THAN THE VOTER TURNOUT; IS

15  THAT RIGHT?

16  **A.**   CORRECT.

17  **Q.**   AND, DR. HANDLEY, I THINK THAT YOU TESTIFIED ON DIRECT

18  EARLIER THAT YOU EXAMINED WHETHER THIS WOULD CAUSE ANY

19  POTENTIAL BIAS IN YOUR ANALYSIS; ISN'T THAT RIGHT?

20  **A.**   CORRECT.

21  **Q.**   AND YOU CONDUCTED THIS ANALYSIS IN PART IN RESPONSE TO

22  EXPERT REPORTS PREPARED BY DR. SOLANKY; ISN'T THAT RIGHT?

23  **A.**   YES.

24  **Q.**   AND, DR. HANDLEY, I WOULD LIKE TO LOOK AT PLAINTIFFS'

25  EXHIBIT 17 BRIEFLY.  DO YOU RECOGNIZE THIS APPENDIX THAT'S BEEN

1   MARKED AS PLAINTIFFS' EXHIBIT 17?

2   **A.**   YES.

3   **Q.**   AND DID YOU PREPARE THIS APPENDIX, DR. HANDLEY?

4   **A.**   YES.

5   **Q.**   AND WAS THIS APPENDIX SUBMITTED WITH YOUR SURREBUTTAL

6   REPORT IN SEPTEMBER OF 2023?

7   **A.**   IT WAS TO SUBMITTED WITH THE REPORT.  I DON'T KNOW THAT IT

8   WAS CALLED THE SURREBUTTAL REPORT, BUT THIS IS APPENDED TO ONE

9   OF MY REPORTS.

10   **Q.**   SURE.

11          **MS. RIGGINS:**  FORREST, COULD WE PLEASE CALL UP

12   PLAINTIFFS' EXHIBIT 16?

13   **BY MS. RIGGINS:**

14   **Q.**   I'M SORRY, DR. HANDLEY.  I MISQUOTED YOU.  IT'S A

15   SUPPLEMENTAL REBUTTAL REPORT.  WAS APPENDIX A APPENDED TO THIS?

16   **A.**   YES.

17          **MS. RIGGINS:**  COULD WE FLIP TO THE LAST PAGE IN THIS

18   DOCUMENT, FORREST?  I'M SORRY.  IT HAS THE APPENDICES STILL

19   ATTACHED TO IT.  CAN WE LOOK AT PAGE 3 OF THE DOCUMENT THEN.

20   PAGE 4?

21   **BY MS. RIGGINS:**

22   **Q.**   WHAT DATE DID YOU EXECUTE THIS SUPPLEMENTAL REBUTTAL

23   REPORT, DR. HANDLEY?

24   **A.**   SEPTEMBER 29TH, 2023.

25   **Q.**   OKAY.  AND THAT WAS AFTER YOU HAD HAD DR. SOLANKY'S EXPERT

1   REPORTS FOR OVER A MONTH; ISN'T THAT RIGHT?

2   **A.**   I DON'T KNOW WHEN I GOT HIS REPORTS.

3   **Q.**   BUT YOU AUTHORED THIS AFTER YOU HAD BOTH OF DR. SOLANKY'S

4   EXPERT REPORTS SUBMITTED IN THIS CASE?

5   **A.**   CERTAINLY AFTER ONE OF THEM.  I DON'T EVEN REMEMBER HAVING

6   THESE SUBMITTED.

7   **Q.**   DR. HANDLEY, DO YOU RECALL THAT THIS EXPERT REPORT WAS

8   SUBMITTED AFTER YOUR DEPOSITION IN THIS CASE?

9   **A.**   IT WAS.

10          **MS. RIGGINS:**  SO BACK TO PLAINTIFFS' EXHIBIT 17,

11   PLEASE, FORREST.

12   **BY MS. RIGGINS:**

13   **Q.**   SO, DR. HANDLEY, YOU PREPARED THIS TABLE AND IT REPORTS

14   EARLY VOTE TOTALS FOR THE 16 STATEWIDE ELECTION CONTESTS; IS

15   THAT RIGHT?

16   **A.**   NO, NOT EXACTLY.

17   **Q.**   ALL RIGHT.  LET'S LOOK THROUGH JUST ONE EXAMPLE THEN.  SO

18   FOR THE NOVEMBER 2022 ELECTION, DO YOU SEE THAT ON THE FIRST

19   PAGE?

20   **A.**   YES.  LET ME EXPLAIN WHAT I MEAN.

21   **Q.**   SURE.

22   **A.**   THIS IS FOR THE ACTUAL ELECTION DATE, NOT FOR THE 16

23   ELECTIONS THAT I LOOKED AT, UNLESS THE 16 ELECTIONS ALL

24   OCCURRED ON DIFFERENT ELECTION DATES.  SO IT IS PROBABLY LESS

25   THAN 16.

1   **Q.**   THANK YOU FOR THAT CLARIFICATION, DR. HANDLEY.   I

2   APOLOGIZE FOR MY IMPRECISE QUESTION.   SO DOES APPENDIX A

3   GENERALLY THEN REPORT THE PERCENTAGE OF EARLY VOTERS THAT VOTED

4   ON ELECTION DAY OR FOR THAT ELECTION CONTEST THAT YOU STUDIED?

5   **A.**   FOR THE ELECTION DAY, NOT FOR THE ELECTION CONTEST.

6   **Q.**   OKAY.   SO YOU LOOKED AT THE U.S. SENATE ELECTION THAT

7   OCCURRED ON THE ELECTION DAY FOR NOVEMBER 2022; IS THAT RIGHT?

8   **A.**   SO THIS LOOKS AT THE ELECTION AS A WHOLE.   I ANALYZED THE

9   SENATE ELECTION.

10   **Q.**   THANK YOU.   THAT'S WHAT I WAS TRYING TO GET AT.   WHAT IS

11   THE PERCENTAGE OF PEOPLE WHO VOTED EARLY IN THE NOVEMBER 2022

12   ELECTION TOTAL?

13   **A.**   26.8 PERCENT.

14   **Q.**   OKAY.   AND, DR. HANDLEY, LOOKING AT PLAINTIFFS' EXHIBIT 17

15   AS A WHOLE, DO YOU EVER SEE A TOTAL PERCENT OF EARLY VOTERS

16   LOWER THAN 20 PERCENT?   AND IF YOU'D LIKE TO ASK MR. WILLAMSON

17   TO FLIP THROUGH THIS EXHIBIT FOR YOU PLEASE LET ME KNOW.

18   **A.**   HE'LL HAVE TO FLIP THROUGH IT FOR ME TO LOOK AT IT.

19   **Q.**   PLEASE LET ME KNOW WHEN YOU'VE HAD SUFFICIENT TIME TO

20   REVIEW THE FIRST PAGE.

21   **A.**   I'VE HAD SUFFICIENT TIME.   I'VE HAD SUFFICIENT -- I'VE HAD

22   SUFFICIENT TIME.   I'VE HAD SUFFICIENT TIME.

23   **Q.**   ALL RIGHT.   SO, DR. HANDLEY, DO YOU EVER SEE HERE IN

24   APPENDIX A, A TOTAL PERCENT OF EARLY VOTERS LOWER THAN

25   20 PERCENT FOR THE TOTAL?

1   **A.**   NO.  THERE ARE A COUPLE AT 20.6 OR 7, BUT NOTHING BELOW

2   20 PERCENT.

3   **Q.**   OKAY.  AND WHAT IS THE PERCENT OF EARLY VOTE FOR THE

4   NOVEMBER 2019 ELECTION?

5   **A.**   33.2 PERCENT.

6   **Q.**   OKAY.  AND SO THAT'S APPROXIMATELY A THIRD OF THE VOTERS

7   FOR THAT NOVEMBER 2019 ELECTION; IS THAT RIGHT?

8   **A.**   CORRECT.

9         **MS. RIGGINS:**  AND, YOUR HONOR, IF I MAY HAVE A MINUTE

10   JUST TO CONSULT WITH MY CO-COUNSEL?  I MAY BE DONE, BUT I WANT

11   TO MAKE SURE.

12        **THE COURT:**  GO AHEAD.

13   **BY MS. RIGGINS:**

14   **Q.**   DR. HANDLEY, AS MY CAPABLE CO-COUNSEL HAS REMINDED ME, I

15   NEGLECTED TO ASK YOU A QUESTION ON MY OUTLINE.  DR. HANDLEY, DO

16   YOU RECALL OUR DISCUSSION EARLIER TODAY ABOUT INDIGENOUS

17   ELECTIONS?

18   **A.**   YES.

19   **Q.**   AND DO YOU UNDERSTAND THAT ELECTIONS HAVE BEEN HELD IN

20   LOUISIANA UNDER THE ENACTED PLANS IN THIS OCTOBER AND NOVEMBER?

21   **A.**   YES.

22        **MS. RIGGINS:**  AND, YOUR HONOR, AT THIS TIME WE WOULD

23   LIKE TO CONCLUDE OUR EXAMINATION OF DR. HANDLEY.  WE WOULD,

24   HOWEVER, YOUR HONOR, FOR THE RECORD LIKE TO NOTE THAT WE

25   BELIEVE PLAINTIFFS' COUNSEL OPENED THE DOOR BY ASKING

1    DR. HANDLEY TO OPINE ON HOW OTHER EXPERTS TREAT HER ALLOCATION
2    METHOD AND THE LEVEL OF BIAS.

3              WE RAISED THESE OBJECTIONS EARLIER, BUT WE
4    THINK, YOUR HONOR, THAT, YOU KNOW, PLAINTIFFS' COUNSEL HAS
5    OPENED THE DOOR TO ALLOW DR. HANDLEY -- I'M SORRY, DR. SOLANKY
6    TO TESTIFY ABOUT THIS.  THE REPORTS THAT WERE EXCLUDED GO TO
7    DR. HANDLEY'S BIAS IN HER ALLOCATION METHOD.  WE WOULD
8    RESPECTFULLY REQUEST, YOUR HONOR, THAT YOU RECONSIDER YOUR
9    RULING AND ALLOW DR. SOLANKY TO TESTIFY, AT LEAST IN A LIMITED
10   CAPACITY, AS TO THE POTENTIAL BIAS AND RELIABILITY CAUSED BY
11   DR. HANDLEY'S ALLOCATION METHOD.

12             **THE COURT:**  YOU WANT TO RESPOND?

13             **MS. BRANNON:**  YOUR HONOR, I THINK YOUR OPINION ON
14   THIS MATTER SQUARELY ADDRESSED THAT QUESTION OF WHETHER
15   DR. SOLANKY'S OPINIONS ABOUT BIAS IN DR. HANDLEY'S ALLOCATION
16   METHOD WAS RELIABLE OR NOT RELIABLE, AND I THINK YOUR HONOR HAS
17   ALREADY RULED AND FOUND THAT DR. SOLANKY'S OPINION ON THAT
18   TOPIC ARE NOT RELIABLE AND THAT IS THE BASIS FOR WHY YOU
19   EXCLUDED HIS TESTIMONY INITIALLY.

20             **THE COURT:**  THE COURT IS NOT PERSUADED THAT BY ASKING
21   DR. HANDLEY ABOUT THE RELIABILITY OR BIAS OF HER CALCULATIONS
22   AND ANALYSES OPENS THE DOOR.  EVEN IF IT DOES OPEN THE DOOR, IT
23   DOESN'T -- IT DOESN'T THEREBY CONVERT DR. SOLANKY'S OPINION
24   TESTIMONY TO RELIABLE OR WELL-GROUNDED IN FACTS AND DATA IN
25   WHICH WAS THE COURT'S BASIS FOR EXCLUDING DR. SOLANKY.  SO THE

1   OPEN THE DOOR ARGUMENT, WHILE CERTAINLY NOVEL AND -- YEAH,

2   NOVEL, IT'S NOT -- IT'S NOT PERSUASIVE.  IT DOESN'T THEREBY

3   CONVERT DR. SOLANKY'S OPINIONS TO THAT OF RELIABLE OPINIONS

4   THAT ARE REQUIRED BY 702, SO YOUR MOTION IS DENIED.

5          **MS. RIGGINS:**  THANK YOU, YOUR HONOR.  WE APPRECIATE

6   YOUR CONSIDERATION.

7          **THE COURT:**  REDIRECT?

8          **MS. BRANNON:**  YES, YOUR HONOR.

9   **REDIRECT EXAMINATION**

10  **BY MS. BRANNON:**

11  **Q.**   DR. HANDLEY, DEFENSE COUNSEL JUST ASKED YOU ABOUT

12  ELECTIONS IN OCTOBER OF 2023 AND NOVEMBER OF 2023.  PRIOR TO

13  THAT DATE, WERE THERE ANY INDIGENOUS ELECTIONS AVAILABLE FOR

14  YOU TO ANALYZE IN YOUR REPORT IN THIS CASE ON THE ENACTED MAPS

15  THAT THIS CASE IS ABOUT?

16  **A.**   NO.

17  **Q.**   HAVE YOU LOOKED AT, JUST BRIEFLY, THE ELECTIONS THAT WERE

18  HELD IN OCTOBER 2023 AND NOVEMBER OF 2023?

19  **A.**   I HAVE LOOKED AT THE RESULTS.  I HAVE NOT DONE A RACIAL

20  BLOC VOTING ANALYSIS.

21  **Q.**   AS WE HAVE ESTABLISHED FOR THE RECORD, YOUR REPORT IN THIS

22  CASE, INITIAL REPORT, WAS PUT INTO EVIDENCE IN JUNE OF 2023

23  WELL IN ADVANCE OF THOSE ELECTIONS?

24  **A.**   CORRECT.

25  **Q.**   OF THOSE ELECTIONS THAT TOOK PLACE IN OCTOBER OF 2023, HOW

1   MANY CONTESTED ELECTIONS WERE THERE IN THE ENACTED DISTRICTS

2   THAT YOU HAVE ANALYZED IN YOUR REPORT?

3   **A.**   OFF THE TOP OF MY HEAD LIKE HALF OF THE ENACTED DISTRICTS

4   DID NOT HAVE ELECTIONS.  THERE WERE NO CONTESTED ELECTIONS.

5   BUT I DON'T -- BUT YOU ASKED ME ABOUT THE ENACTED DISTRICTS IN

6   MY REPORT.

7   **Q.**   IN YOUR REPORT.  IF YOU KNOW.  IF YOU DON'T KNOW --

8   **A.**   I DON'T KNOW.  ALL I CAN TELL YOU IS ABOUT 50 PERCENT OF

9   THE DISTRICTS OVERALL WERE NOT CONTESTED.

10  **Q.**   AND IF THERE'S NOT A CONTESTED ELECTION, YOU COULDN'T DO

11  AN INDIGENOUS -- AN INDIGENOUS RPV ANALYSIS ANYWAYS, CORRECT?

12  **A.**   IF THERE'S NO ELECTION I CAN'T ANALYZE IT, THAT WOULD BE

13  CORRECT.

14  **Q.**   IN YOUR OPINION -- COUNSEL WAS ASKING YOU ABOUT AREA --

15  AREA OF INTEREST 3 AND AREA OF INTEREST 7.  IN YOUR OPINION, IS

16  IT FAIR TO SAY THAT THE WHITE VOTERS AS A BLOCK VOTED AGAINST

17  THE BLACK-PREFERRED CANDIDATE IN THE ELECTIONS YOU EVALUATED IN

18  AREA 3?

19  **A.**   YES.

20  **Q.**   IS IT FAIR TO SAY THAT IN YOUR OPINION WHITE VOTERS VOTED

21  AS A BLOCK AGAINST A BLACK-PREFERRED CANDIDATE IN THE ELECTIONS

22  YOU ANALYZED IN AREA 7?

23  **A.**   YES.

24  **Q.**   YOU ACKNOWLEDGED THAT THE EI ANALYSIS THAT YOU CONDUCTED

25  FOR THE PRESIDENTIAL ELECTION FOR 2020 WAS PROBLEMATIC.  BUT DO

1  YOU HAVE AN OPINION AS TO WHETHER THAT ANALYSIS WAS USEFUL TO

2  YOUR OVERALL RACIAL POLARIZATION WORK IN THIS CASE?

3  **A.**   WELL, I LOOKED AT ALL CONTESTS THAT IT WAS POSSIBLE TO

4  LOOK AT.  I MERELY SUGGESTED THAT THIS ONE WAS LESS PROBATIVE

5  THAN OTHERS SIMPLY BECAUSE 45 PERCENT OF THE VOTES WERE CAST

6  EARLY AND HAD TO BE ALLOCATED.

7  **Q.**   DID IT HAVE ANY PROBATIVE VALUE TO YOUR RACIAL

8  POLARIZATION ANALYSIS?

9  **A.**   YES, OR I WOULDN'T HAVE INCLUDED IT.

10  **Q.**   AND WAS IT VALUABLE TO YOU IN REACHING YOUR OPINIONS IN

11  THIS CASE THAT THERE'S POLARIZED VOTING IN THE AREAS OF

12  INTEREST THAT YOU LOOKED AT IN LOUISIANA?

13  **A.**   YES.

14  **Q.**   COUNSEL ASKED YOU ABOUT THE DATA THAT WAS ALLOCATED BY THE

15  ACLU ANALYTICS TEAM, INCLUDING THE WORK THEY DID TO

16  DISAGGREGATE THE CENSUS DATA DOWN TO THE BLOCK LEVEL FOR THE

17  DATA THAT WAS USED IN YOUR EFFECTIVENESS SCORES.  DID YOU

18  REVIEW THE WORK OF THE ACLU ANALYTICS TEAM?

19  **A.**   YES.

20  **Q.**   AND DID YOU VERIFY THE ACCURACY OF THAT WORK?

21  **A.**   YES.

22  **Q.**   AND DO YOU FEEL CONFIDENT IN RELYING ON THE WORK THAT THEY

23  DID?

24  **A.**   YES.

25  **Q.**   CAN WE CALL UP SECRETARY OF STATE'S EXHIBIT 36.  AND CAN

1  WE TURN TO TABLE 2.  THIS IS A TABLE FROM THE REPORT THAT

2  DEFENSE COUNSEL -- THE ARTICLE DEFENSE COUNSEL ASKED YOU ABOUT,

3  CORRECT?

4  **A.**   YES.

5  **Q.**   DOES THIS TABLE REFLECT ANY SPECIFIC LOUISIANA DATA?

6  **A.**   THIS AGGREGATES THE SOUTHERN STATES.  I THINK THEY ARE THE

7  11 STATES OF THE CONFEDERACY.  I DON'T REMEMBER OFF THE TOP OF

8  MY HEAD.  IT INCLUDED LOUISIANA.  IT DOESN'T DIFFERENTIATE

9  LOUISIANA FROM THE OTHER STATES.  THIS IS A COMPILATION OF ALL

10  THE SOUTHERN STATES.

11  **Q.**   DO YOU KNOW THE SPECIFIC LOUISIANA DATA FROM THE 2015

12  ELECTIONS THAT CONTRIBUTED TO THIS TABLE?

13  **A.**   I DO BECAUSE I DID A THRESHOLD OF REPRESENTATIONS CALLED A

14  THRESHOLD OF REPRESENTATIONS.  I KNOW HOW MANY MAJORITY BLACK

15  DISTRICTS AND HOW MANY ELECTED BLACK CANDIDATES AND I KNOW

16  WHERE THE BLACK REPRESENTATIVES CAME FROM.  AND I CAN TELL YOU

17  IN 2015, LOUISIANA CONTRIBUTED ZERO TO THE NUMBER OF BLACK

18  CANDIDATES BEING ELECTED FROM NON-MAJORITY BLACK DISTRICTS AT

19  THE HOUSE LEVEL -- AT THE U.S. HOUSE LEVEL AND ZERO AT THE

20  SENATE LEVEL AND ONE DISTRICT AT THE STATE HOUSE LEVEL.

21  **Q.**   CAN WE TURN TO TABLE 3, WHICH I BELIEVE IS ON THE NEXT

22  PAGE ON SOS-36.  IS THIS ANOTHER TABLE FROM YOUR REPORT?

23  **A.**   IT IS.

24  **Q.**   DOES THIS TABLE COMPARE PERFORMANCE IN DIFFERENT ELECTIONS

25  AND STATE AND HOUSE LEGISLATIVE ELECTIONS AROUND THE COUNTRY

1    LOOKING AT HOW BLACK CANDIDATES ARE PERFORMING IN DIFFERENT

2    RANGES OF BVAP POPULATION?

3    **A.**   IT IS LOOKING AT THE NUMBER OF DISTRICTS IN THAT RANGE

4    THAT ELECTED BLACK CANDIDATES TO OFFICE.

5    **Q.**   AND ARE THERE -- SOME OF THE RANGES THAT ARE LISTED IN

6    THIS TABLE ARE BVAP'S FROM 40 TO 45 AND THEN BVAP'S FROM 45 TO

7    50?

8    **A.**   YES.

9    **Q.**   ARE YOU AWARE OF ANY DISTRICT IN THE ENACTED MAP IN

10   LOUISIANA IN THE SENATE THAT HAS A BVAP BETWEEN 40 AND

11   50 PERCENT?

12   **A.**   IN THE ENACTED PLAN?  NO, THERE ARE NONE.

13   **Q.**   ARE YOU AWARE OF ANY DISTRICT IN THE ENACTED PLAN IN THE

14   HOUSE THAT HAS A BVAP BETWEEN 40 AND 50 PERCENT?

15   **A.**   THERE MIGHT BE ONE.

16   **Q.**   ARE THERE -- IF THERE'S ONE IS THERE ANY MORE THAN ONE TO

17   THE BEST OF YOUR RECOLLECTION?

18   **A.**   TO THE BEST OF MY RECOLLECTION, NO.

19   **Q.**   CAN WE GO BACK TO YOUR AREAS OF INTEREST FOR -- WHICH IS

20   TABLE 2.  CAN WE GO BACK TO TABLE 2 IN PLAINTIFFS' EXHIBIT

21   PL-1.  CAN YOU JUST REFLECT -- REFRESH FOR THE COURT WHAT

22   PARISHES WERE EVALUATED IN AREA 3?

23   **A.**   EAST BATON ROUGE, WEST BATON ROUGE, IBERVILLE AND POINTE

24   COUPEE.

25   **Q.**   SO DOES THAT MEAN THAT YOU DID A RACIALLY POLARIZED VOTING

1  ANALYSIS OF ALL OF THOSE PARISHES AS PART OF THE ANALYSIS YOU

2  DID FOR AREA 3?

3  **A.**   CORRECT.

4  **Q.**   AND SO YOU WOULD HAVE LOOKED AT VOTING BEHAVIOR IN ALL

5  FOUR OF THOSE PARISHES?

6  **A.**   CORRECT.

7  **Q.**   CAN WE THEN ALSO TURN TO PAGE 22 OF DR. HANDLEY'S REPORT,

8  WHICH IS A PICTURE OF SENATE CLUSTER 3.  THAT'S THE

9  ILLUSTRATIVE.  CAN WE LOOK AT THE ENACT -- THERE WE GO.

10          SO YOU DID A RACIALLY POLARIZED VOTING ANALYSIS OF

11  ALL OF THE VOTING PATTERNS IN A NUMBER OF THE PARISHES THAT ARE

12  REFLECTED ON THIS MAP?

13  **A.**   CORRECT.

14  **Q.**   AND THAT WOULD HAVE INCLUDED SOME ANALYSES OF THE VOTING

15  PATTERNS IN CD-2?

16  **A.**   IN, I'M SORRY?

17  **Q.**   CD-2 WHICH IS ON THIS MAP AS BEING PART WEST BATON ROUGE

18  AND IBERVILLE AND EAST BATON ROUGE.  CD-2.

19  **A.**   STATE SENATE DISTRICT 2?

20  **Q.**   OH, SORRY.  SD-2.  STATE SENATE DISTRICT 2?

21  **A.**   YES.

22  **Q.**   TO CLARIFY, I WAS ASKING ABOUT STATE SENATE DISTRICT 2

23  WHICH IS ON THIS MAP.  AND YOU WERE ASKED A FEW MORE QUESTIONS

24  ABOUT THE ALLOCATION METHODOLOGY THAT YOU USED.  IF WE GO

25  BACK -- MAYBE IT'S EASIER TO JUST GO BACK TO PLAINTIFFS'

1   EXHIBIT 19.  THESE REPORTS -- THIS SCATTER PLOT THAT'S SHOWN IN

2   EXHIBIT 19 DEMONSTRATES THAT THERE WAS SIMILARITY IN THE

3   POLARIZATION OF VOTING EARLY AND ON ELECTION DAY IN THE

4   ELECTIONS THAT YOU LOOKED AT, CORRECT?

5   **A.**  YES.

6           **MS. BRANNON:**  LET ME JUST CONFER WITH MY TEAM.

7   **BY MS. BRANNON:**

8   **Q.**  JUST ONE FINAL QUESTION, DR. HANDLEY.  YOU WERE ASKED SOME

9   ABOUT THE EFFECT THAT THE ALLOCATION METHOD IN SOME PRECINCTS

10  LEADS TO AN OVER OR UNDER COUNT OF VOTES.  DOES THAT AFFECT THE

11  VALIDITY OF YOUR OPINIONS ABOUT THE POLARIZATION?

12  **A.**  NO.

13  **Q.**  CAN YOU EXPLAIN WHY?

14  **A.**  SEVERAL REASONS.  FIRST OF ALL, I USED PROPORTIONS WHEN I

15  DID MY ANALYSIS.  I DIDN'T ACTUALLY USE THE VOTES.  I USED THE

16  PROPORTIONATE VOTES AND THE PROPORTION OF BLACK AND WHITE

17  TURNOUT WHEN I DID THE ANALYSIS.  BUT ALSO BECAUSE I DON'T

18  BELIEVE THERE WAS ANY BIAS INTRODUCED BY OVER AND UNDER VOTES.

19  **Q.**  NOTHING FURTHER.  THANK YOU VERY MUCH, DR. HANDLEY.

20          **THE COURT:**  YOU MAY STEP DOWN.  THANK YOU, MA'AM.

21  ALL RIGHT.  WE WILL BE IN RECESS UNTIL 1 P.M.

22          *(THIS CONCLUDES THE MORNING SESSION OF DAY 2*)

23

24

25

```
 1              C E R T I F I C A T E

 2           I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

 3    FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

 4    NUMBERED MATTER.

 5    /S/GINA DELATTE-RICHARD

 6    GINA DELATTE-RICHARD, CCR

 7    OFFICIAL COURT REPORTER

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```