1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF LOUISIANA

3

4   DOROTHY NAIRNE, ET AL              : CIVIL ACTION

5   VERSUS                            : NO. 3:22-00178-SDD

6   KYLE ARDOIN, ET AL                : DECEMBER 4, 2023

7                                      : AFTERNOON SESSION

8   ============================================================
                              DAY 6
9                          BENCH TRIAL
            BEFORE THE HONORABLE SHELLY D. DICK
10           UNITED STATES CHIEF DISTRICT JUDGE
    ============================================================
11

12                  A P P E A R A N C E S

13   FOR THE PLAINTIFFS:

14      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
        BY:  MEGAN C. KEENAN, ESQ.
15           SARAH E. BRANNON, ESQ.
             DAYTON CAMPBELL-HARRIS, ESQ.
16      915 15TH STREET, NW
        WASHINGTON, DC 20005
17

18      NAACP LEGAL DEFENSE & EDUCATION FUND, INC.
        BY:   VICTORIA WENGER, ESQ.
19            SARA ROHANI, ESQ.
              STUART C. NAIFEH, ESQ.
20      40 RECTOR STREET, FIFTH FLOOR
        NEW YORK, NEW YORK 10006
21

22      COZEN O'CONNOR
        BY:   JOSEPHINE M. BAHN, ESQ.
23      1200 19TH STREET, NW
        THIRD FLOOR
24      WASHINGTON, DC  20036

25

1   **APPEARANCES CONTINUED:**

2       COZEN O'CONNOR
        BY:   ROBERT S. CLARK, ESQ.
3       ONE LIBERTY PLACE
        1650 MARKET STREET, SUITE 2800
4       PHILADELPHIA, PENNSYLVANIA 19103

5       COZEN O'CONNOR
        BY:   AMANDA GIGLIO, ESQ.
6       3 WORLD TRADE CENTER, 55TH FLOOR
        NEW YORK, NEW YORK  10007
7
        ELECTION LAW CLINIC
8       HARVARD LAW SCHOOL
        BY:  T. ALORA THOMAS, ESQ.
9       6 EVERETT STREET, SUITE 4105
        CAMBRIDGE, MASSACHUSETTS 02138
10
        ADCOCK LAW, LLC
11      BY:   JOHN N. ADCOCK, ESQ.
        3110 CANAL STREET
12      NEW ORLEANS, LOUISIANA  70119

13

14  **FOR THE DEFENDANT, KYLE ARDOIN, IN HIS OFFICIAL CAPACITY AS
    SECRETARY OF STATE:**
15
        NELSON MULLINS RILEY & SCARBOROUGH, LLP
16      BY:   PHILLIP J. STRACH, ESQ.
              THOMAS A. FARR, ESQ.
17            CASSIE A. HOLT, ESQ.
              ALYSSA M. RIGGINS, ESQ.
18      4140 PARKLAKE AVENUE, SUITE 200
        RALEIGH, NORTH CAROLINA  27612
19
        SHOWS, CALI & WALSH, LLP
20      BY:   JOHN C. CONINE, JR., ESQ.
              JOHN C. WALSH, ESQ.
21      628 ST. LOUIS STREET
        BATON ROUGE, LOUISIANA  70802
22

23

24

25

1   **APPEARANCES CONTINUED:**

2   **FOR THE DEFENDANT, CLAY SCHEXNAYDER:**

3       BAKER & HOSTETLER, LLP
        BY:   KATE MCKNIGHT, ESQ.
4             ROBERT J. TUCKER, ESQ.
              PATRICK LEWIS, ESQ.
5       200 CIVIC CENTER DRIVE, SUITE 1200
        COLUMBUS, OHIO  43215
6
        BAKER & HOSTETLER, LLP
7       BY:   MICHAEL W. MENGIS, ESQ.
        811 MAIN STREET, SUITE 1100
8       HOUSTON, TEXAS  77002

9   **FOR THE INTERVENOR, THE STATE OF LA. BY AND THROUGH ATTORNEY
    GENERAL JEFF LANDRY:**
10
        HOLTZMAN VOGEL JOSEFIAK
11      TORCHINSKY, PLLC
        BY:   BRENNAN BOWEN, ESQ.
12      2575 EAST CAMELBACK ROAD, SUITE 860
        PHOENIX, ARIZONA  85016
13
        HOLTZMAN VOGEL JOSEFIAK
14      TORCHINSKY, PLLC
        BY:   PHILLIP M. GORDON, ESQ.
15      15404 JOHN MARSHALL HIGHWAY
        HAYMARKET, VIRGINIA  20169
16
        LOUISIANA DEPARTMENT OF JUSTICE
17      BY:   ANGELIQUE D. FREEL, ESQ.
              JEFFREY M. WALE, ESQ.
18            AMANDA M. LAGROUE, ESQ.
        1885 N. THIRD STREET
19      BATON ROUGE, LOUISIANA  70804

20

21

22              **REPORTED BY: GINA DELATTE-RICHARD,CCR**

23              **UNITED STATES COURTHOUSE**
                **777 FLORIDA STREET**
24              **BATON ROUGE, LOUISIANA 70801**
                **(225) 389-3564**
25

1                              <u>**INDEX**</u>

2     **DEFENSE WITNESSES:**

3        ***SHERRI HADSKEY***

4              DIRECT EXAMINATION BY MR. WALSH..................... 5

5              CROSS-EXAMINATION BY MS. GIGLIO....................17

6        ***DR. ALAN MURRAY***

7              DIRECT EXAMINATION BY MR. LEWIS....................36

8              CROSS-EXAMINATION BY MS. BAHN......................85

9              REDIRECT EXAMINATION BY MR. LEWIS.................107

10       ***DR. JEFFREY LEWIS***

11             DIRECT EXAMINATION BY MS. MCKNIGHT................109

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **AFTERNOON SESSION DECEMBER 4, 2023**

2    **THE COURT:**  CALL YOUR NEXT WITNESS.

3    AND, COUNSEL, PLEASE, MAKE APPEARANCES.  WE DO

4    HAVE A NEW COURT REPORTER.

5    **MR. WALSH:**  GOOD AFTERNOON, YOUR HONOR.  JOHN WALSH

6    ON BEHALF OF SECRETARY OF STATE ARDOIN.  YOUR HONOR, THE

7    DEFENSE WOULD CALL SHERRI HADSKEY.

8    *SHERRI HADSKEY,*

9    **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

10   **COURTROOM DEPUTY:**  IF YOU WOULD, PLEASE STATE YOUR

11   NAME AND SPELL IT FOR THE RECORD.

12   **THE WITNESS:**  SHERRI WHARTON HADSKEY, S-H-E-R-R-I

13   W-H-A-R-T-O-N, H-A-D-S-K-E-Y.

14   **DIRECT EXAMINATION**

15   **BY MR. WALSH:**

16   **Q.**   GOOD AFTERNOON, MS. HADSKEY.  WHERE ARE YOU CURRENTLY

17   EMPLOYED?

18   **A.**   I'M EMPLOYED FOR THE LOUISIANA SECRETARY OF STATE.

19   **Q.**   WHAT POSITION DO YOU HOLD WITH THE SECRETARY OF STATE'S

20   OFFICE?

21   **A.**   I'M THE COMMISSIONER OF ELECTIONS.

22   **Q.**   HOW LONG HAVE YOU HELD THIS POSITION?

23   **A.**   I WAS APPOINTED IN 2017.

24   **Q.**   AND WOULD YOU MIND WALKING THE COURT THROUGH YOUR HISTORY

25   WORKING WITH THE SECRETARY OF STATE'S OFFICE AND THE VARIOUS

1  POSITIONS YOU'VE HELD?

2  **A.**   SURE.  I STARTED IN 1986 AND I WAS AN ELECTION'S PROGRAM

3  SPECIALIST, AND I MOVED TO THE ELECTION'S OPERATIONS DIRECTOR

4  AND FROM THE DIRECTOR I MOVED INTO THE COMMISSIONER OF

5  ELECTIONS' POSITION.

6  **Q.**   AND IN THE POSITION OF COMMISSIONER OF ELECTIONS, WHAT ARE

7  YOUR DUTIES AND RESPONSIBILITIES?

8  **A.**   AS COMMISSIONER OF ELECTIONS I OVERSEE THE ELECTIONS'

9  PROCESS, THE DRAINAGE OF THE MACHINES, THE STORAGE OF THE

10  MACHINES, THE QUALIFYING OF CANDIDATES, THE PROCESS OF BUILDING

11  THE BALLOTS AND PROGRAMMING THE BALLOTS, THE ELECTION NIGHT

12  TABULATION AND RESULTS AND THE AUDIT PROCESS, JUST OVERSIGHT OF

13  ELECTIONS.

14  **Q.**   COMMISSIONER HADSKEY, ARE YOU REGISTERED TO VOTE?

15  **A.**   I AM.

16  **Q.**   AND WHEN DID YOU REGISTER?

17  **A.**   IN 1983.

18  **Q.**   AND WHEN YOU REGISTERED TO VOTE, WHAT WERE THE MECHANICS

19  OF REGISTRATION AT THAT TIME.

20          **MS. GIGLIO:**  OBJECTION, YOUR HONOR, RELEVANCE?

21          **THE COURT:**  WHAT IS THE RELEVANCE, MR. WALSH?

22          **MR. WALSH:**  YOUR HONOR, I'M JUST TRYING TO LAY THE

23  FOUNDATION TO TALK ABOUT VOTING IN LOUISIANA AND WHERE VOTING

24  HAS COME SINCE 1983 QUITE FRANKLY.

25          **MS. GIGLIO:**  EXCUSE ME, YOUR HONOR.  MY NAME IS

1   AMANDA GIGLIO, THAT'S G-I-G-L-I-O FOR THE PLAINTIFFS.  MY

2   APOLOGIES.

3          **THE COURT:**  I'LL ALLOW IT.  OVERRULED.

4          **THE WITNESS:**  AT THAT TIME I HAD TO GO INTO THE

5   REGISTRAR OF VOTERS OFFICE AND FILL OUT AN APPLICATION

6   IN-PERSON.

7   **BY MR. WALSH:**

8   **Q.**   IS THAT STILL HOW YOU REGISTER TO VOTE TODAY?

9   **A.**   IT'S ONE WAY, BUT THAT'S NOT THE ONLY WAY.

10  **Q.**   WHAT OTHER WAYS CAN YOU REGISTER TO VOTE IN LOUISIANA

11  TODAY?

12  **A.**   CURRENTLY IN LOUISIANA, OF COURSE, YOU CAN REGISTER ON

13  LINE.  YOU CAN GO TO OMV OR DMV AND REGISTER.  WE HAVE MANY

14  PRIVATE ELECTIONS AROUND THE STATE.  WE DO SCHOOL ELECTIONS AND

15  WE BRING REGISTRATION CARDS FOR SENIORS TO INTRODUCE THEM TO

16  THE ELECTIONS' PROCESS.  IT'S AN INSTRUCTIONAL MECHANISM.

17  SOCIAL SERVICE OFFICES HAVE VOTER REGISTRATION AVAILABLE.  OF

18  COURSE ON LINE, YOU CAN REGISTER ON LINE AND, YES, THERE'S MANY

19  WAYS, VARIOUS WAYS.

20  **Q.**   YOU MENTIONED TWO ACRONYMS AND I JUST WANT TO BE CLEAR FOR

21  THE RECORD YOU SAID OMV AND --

22  **A.**   OFFICE OF MOTOR VEHICLES AND DEPARTMENT OF MOTOR VEHICLES.

23  **Q.**   THAT WAS DMV?

24  **A.**   YES.

25  **Q.**   DO YOU HAVE TO BE A CERTAIN AGE TO REGISTER TO VOTE IN

1    LOUISIANA?

2    **A.**    YES, YOU DO.

3    **Q.**    WHAT AGE IS THAT?

4    **A.**    SIXTEEN.

5    **Q.**    WHAT AGE CAN YOU START VOTING?

6    **A.**    EIGHTEEN?

7    **Q.**    SO YOU'RE SAYING YOU CAN PRE-REGISTER AT 16?

8    **A.**    THAT'S CORRECT.

9    **Q.**    AND THEN -- LET'S JUST SAY IF YOUR BIRTHDAY IS JULY 1ST

10   AND THERE'S AN ELECTION ON JULY 1ST AND YOU'VE PRE-REGISTERED,

11   CAN YOU VOTE THAT DAY?

12   **A.**    YES.  THE DAY YOU TURN 18 YOU'RE ELIGIBLE TO VOTE.

13   **Q.**    IF YOU'VE PRE-REGISTERED?

14   **A.**    IF YOU'VE PRE-REGISTERED.

15   **Q.**    WHOSE ROLE IS IT IN LOUISIANA -- STRIKE THAT.  WHO'S

16   PRIMARILY RESPONSIBLE FOR VOTER REGISTRATION IN LOUISIANA?

17   **A.**    THAT'S THE REGISTRAR OF VOTERS.

18   **Q.**    DOES THE SECRETARY OF STATE DO ANYTHING TO SUPPORT THE

19   REGISTRAR OF VOTERS?

20   **A.**    THE SECRETARY OF STATE'S OFFICE CURRENTLY HAS A SYSTEM,

21   THE ERIN SYSTEM, ELECTIONS REGISTRATION INFORMATION NETWORK,

22   AND IT HOUSES THE INFORMATION THAT IS INPUT BY THE REGISTRAR OF

23   VOTERS.  SO IT'S MINISTERIAL IN THE ASPECT OF THE VOTER

24   REGISTRATION PROCESS.

25   **Q.**    ARE THERE ANY REASONS FOR WHICH A VOTER'S REGISTRATION

1  COULD BE CANCELED IN LOUISIANA?

2  **A.**   THERE'S A FEW REASONS THAT IT COULD BE CANCELED.

3  **Q.**   AND WHAT ARE THOSE?

4  **A.**   OF COURSE IF YOU PASS AWAY.  IF YOU DIE, THEN YOUR VOTER

5  REGISTRATION IS CANCELED.  IF YOU ARE INACTIVE AND YOU MISS TWO

6  FEDERAL ELECTIONS YOUR NAME IS PUBLISHED IN THE NEWSPAPER AND

7  THE ATTEMPT TO REACH YOU IS THERE, BUT YOU ARE CANCELED AFTER

8  MISSING THE TWO FEDERAL AND YOU'RE INACTIVE.

9       IF YOU MOVE OUT-OF-STATE YOU CAN CONTACT THE STATE OF

10  LOUISIANA AND NOTIFY THEM THAT YOU ARE NO LONGER WISHING TO BE

11  REGISTERED IN OUR STATE, THAT YOU'VE MOVED AND YOU'RE IN

12  ANOTHER STATE.  AND THEN IF YOU'RE CONVICTED OF AN ELECTIONS'

13  CRIME THEY CAN CANCEL YOUR REGISTRATION.

14  **Q.**   IS AN ELECTIONS' CRIME THE ONLY CRIME FOR WHICH YOU CAN

15  HAVE YOUR REGISTRATION CANCELED?

16  **A.**   TO MY KNOWLEDGE, YES.

17  **Q.**   IF A VOTER IS CONVICTED OF A FELONY THAT IS NOT AN

18  ELECTIONS' CRIME, WHAT HAPPENS TO THEIR REGISTRATION?

19  **A.**   THEY'RE SUSPENDED.

20  **Q.**   IS THERE A MECHANISM FOR THE SUSPENSION TO BE LIFTED?

21  **A.**   YES.  BY LAW THERE'S A MECHANISM AFTER FIVE YEARS OF BEING

22  INCARCERATED TO RE-REGISTER AND HAVE YOUR REGISTRATION OFF THE

23  SUSPENDED LIST AND ONTO THE ACTIVE LIST.

24  **Q.**   LET'S SWITCH GEARS.  DO YOU REMEMBER THE FIRST TIME YOU

25  VOTED?

1    **A.**   YES.

2    **Q.**   AND WHEN WAS THAT?

3    **A.**   IN 1983.

4    **Q.**   AND HOW DID YOU VOTE IN 1983?  WHAT WAS THE PROCESS?

5    **A.**   I WENT TO THE PRECINCT AND I VOTED AT THE PRECINCT.

6    **Q.**   AT THAT TIME, IN 1983, WAS THAT THE ONLY WAY TO VOTE IN

7    LOUISIANA?

8    **A.**   TO MY KNOWLEDGE.

9    **Q.**   AND SINCE YOU'VE CAST YOUR FIRST VOTE IN LOUISIANA IN

10   1983, HAVE THE WAYS OR HAVE WE EXPANDED THE WAYS YOU CAN CAST A

11   VOTE?

12   **A.**   YES.

13   **Q.**   TELL THE COURT THE WAYS YOU CAN NOW CAST A VOTE.

14        **MS. GIGLIO:**  OBJECTION, YOUR HONOR.  I'M REALLY

15   STRUGGLING TO SEE THE RELEVANCE OF THIS TESTIMONY TO ISSUES

16   RELATED TO REDISTRICTING?

17        **MR. WALSH:**  YOUR HONOR, WE'VE HAD TESTIMONY FROM

18   PLAINTIFFS EARLIER THIS WEEK THAT TALKED ABOUT THE DIFFICULTIES

19   THAT THEY HAD IN VOTING.  I THINK THIS IS IMPORTANT FOR THE

20   COURT TO KNOW THE WAY WE HAVE EXPANDED, GREATLY, VOTING IN

21   LOUISIANA OVER THE YEARS.

22        **THE COURT:**  THE HISTORICAL PROSPECTIVE IS PART OF THE

23   SENATE FACTORS AND TOTALITY OF THE CIRCUMSTANCES, SO I'M GOING

24   TO ALLOW THE QUESTION.  OVERRULED.

25   **BY MR. WALSH:**

1   **Q.**   CAN YOU EXPLAIN TO THE COURT THE WAYS WE NOW HAVE TO VOTE

2   IN LOUISIANA TODAY?

3   **A.**   SURE.   IN LOUISIANA CURRENTLY, OF COURSE, YOU CAN APPLY

4   FOR AN ABSENTEE BY MAIL BALLOT, AND IF YOU MEET THE APPLICATION

5   REQUIREMENTS, YOU CAN RECEIVE A MAIL BALLOT.   YOU ALSO HAVE

6   NURSING HOME VOTING, WHERE THE NURSING HOMES CAN ENROLL IN A

7   PROGRAM AND THEY'RE ALLOWED TO VOTE AT THE NURSING HOMES.   WE

8   ALSO HAVE EARLY VOTING IN-PERSON AND YOU CAN GO FOR -- THERE'S

9   NO EXCUSE NECESSARY AND IT'S SEVEN DAYS, SATURDAY TO SATURDAY.

10   SUNDAY IS NOT A VOTING DAY IN-PERSON EARLY VOTING.

11          AND THEN MILITARY AND OVERSEAS, THEY HAVE THE RIGHT

12   TO REQUEST AN E-MAIL BALLOT.   IF YOU ARE WANTING TO VOTE BY

13   FAX, YOU CAN VOTE BY FAX.   THERE'S A FAX PROCESS.   IF YOU'RE

14   HOSPITALIZED, THE REGISTRAR OF VOTERS WORKS WITH THE HOSPITAL

15   FACILITIES TO ALLOW YOU TO VOTE AND THEN ALSO IF YOU ARE

16   INCARCERATED BUT YOU'RE NOT CONVICTED OF A FELONY, YOU CAN ALSO

17   REQUEST A BALLOT AND THE REGISTRAR WORKS WITH THE FACILITIES,

18   THE CORRECTIONAL FACILITIES, FOR THAT PROCESS.

19   **Q.**   DO WE HAVE ANY PROGRAMS THAT SENIOR CITIZENS CAN

20   PARTICIPATE IN?

21   **A.**   IF YOU'RE OVER 65 YOU CAN ENROLL IN THE MAIL BALLOT --

22   ABSENTEE BY MAIL BALLOT PROGRAM AND YOU'RE AUTOMATICALLY MAILED

23   A BALLOT TO YOUR HOUSE FOR EVERY ELECTION.   YOU DON'T HAVE TO

24   VOTE BY BALLOT.   YOU COULD GO IN-PERSON, BUT YOU'RE

25   AUTOMATICALLY ENROLLED IN THAT PROGRAM TO RECEIVE A BALLOT.   IF

1  YOU'RE DISABLED, YOU CAN ALSO RECEIVE A BALLOT IN THE

2  DISABILITY PROGRAM.

3  **Q.**   LET ME ASK A LITTLE BIT MORE ABOUT EARLY VOTING IN-PERSON.

4  YOU MENTIONED THAT EARLY VOTING RUNS FROM SATURDAY TO SATURDAY.

5  IS THAT THE SAME FOR FEDERAL ELECTIONS?

6  **A.**   NO.   FOR A FEDERAL ELECTION IT'S TUESDAY TO TUESDAY.

7  HOWEVER, IN LOUISIANA THE LAW CHANGED NOT LONG AGO.   FOR

8  PRESIDENTIAL ELECTIONS IT'S TEN DAYS OF EARLY VOTING.

9  **Q.**   PRIOR TO ELECTION DAY, WHERE CAN A CITIZEN FIND THEIR

10  BALLOT?

11  **A.**   CURRENTLY IN THE STATE, IF YOU'RE LOOKING FOR A SAMPLE

12  BALLOT, YOU CAN GO TO THE GO VOTE APP AND LOOK AT YOUR SAMPLE

13  BALLOT.   THERE'S A VOTER PORTAL THAT HAS THE SAMPLE BALLOTS

14  AVAILABLE, AND THEN IN THE PRECINCTS OR DURING EARLY VOTING

15  THERE ARE SAMPLE BALLOTS REQUIRED BY LAW TO BE AVAILABLE TO ALL

16  VOTERS.

17  **Q.**   YOU MENTIONED THE GO VOTE APP.   WHOSE APP IS THAT?

18  **A.**   IT'S THE SECRETARY OF STATE'S APP AND IT'S A FREE APP.

19  YOU DOWNLOAD IT AND YOU CAN REVIEW EVERYTHING.   YOU CAN REVIEW

20  YOUR POLLING LOCATION.   YOU CAN LOOK AT YOUR SAMPLE BALLOT,

21  YOUR PARTY, ALL OF YOUR INFORMATION.   YOUR REGISTRAR OF VOTERS'

22  ADDRESSES, THINGS LIKE THAT.

23  **Q.**   COMMISSIONER, LET ME ASK YOU ANOTHER QUESTION AROUND

24  POLLING LOCATIONS.   YOU PREVIOUSLY SAID YOU WORKED IN

25  ELECTIONS' OPERATIONS EARLIER IN YOUR CAREER; IS THAT CORRECT?

1   **A.**   THAT'S CORRECT.

2   **Q.**   WHO'S RESPONSIBLE FOR SELECTING POLLING LOCATIONS IN

3   LOUISIANA?

4   **A.**   POLLING LOCATIONS ARE SELECTED BY THE PARISH GOVERNING

5   AUTHORITY.  EACH PARISH GOVERNING AUTHORITY SELECTS THE POLLING

6   LOCATION AND THEN THEY HAVE TO MAKE SURE THAT IT MEETS THE

7   DISABILITY REQUIREMENTS.  ONCE IT'S SELECTED, THEY ARE REQUIRED

8   TO SEND AN ORDINANCE OR A RESOLUTION TO THE SECRETARY OF

9   STATE'S OFFICE, AND WHEN THAT'S RECEIVED IT'S ENTERED INTO THE

10  ERIN SYSTEM AND IT POPULATES THE GO VOTE APP AND IT ALSO

11  POPULATES THE VOTER CARDS THAT ARE SENT TO THE VOTERS SAYING

12  THAT THEIR POLLING LOCATION HAS CHANGED.

13  **Q.**   COMMISSIONER, VOTING MACHINES IN LOUISIANA, DO WE HAVE NEW

14  ONES?  DO WE HAVE OLD ONES?  WHAT'S THE STATUS OF VOTING

15  MACHINES HERE?

16  **A.**   ELECTION DAY VOTING MACHINES CURRENTLY ARE LEGACY

17  MACHINES.  THEY WERE PURCHASED IN 1991 AND THEY ARE OLD.  WE

18  ARE IN THE PROCESS OF TRYING TO OBTAIN NEW MACHINES.

19  **Q.**   ARE THESE MACHINES WEB-BASED?

20  **A.**   NO.

21  **Q.**   SO THERE'S NO INTERNET CAPABILITIES WITH THESE MACHINES?

22  **A.**   NO.

23  **Q.**   IS THERE A WAY TO -- ONCE A VOTER CASTS THEIR VOTE IS

24  THERE A WAY TO CHANGE THEIR VOTE WITH THESE MACHINES?

25  **A.**   NO.

1    **Q.**   IN YOUR EXPERIENCE AS COMMISSIONER, HAVE YOU EVER SEEN A

2    VOTE BE CHANGED WITH THESE MACHINES?

3    **A.**   NO, I HAVE NOT.

4    **Q.**   YOU MENTIONED THAT THEY'RE OLD MACHINES.

5    **A.**   YES.

6    **Q.**   DO WE EVER HAVE ANY PROBLEMS WITH THEM?

7    **A.**   YES, WE DO.

8    **Q.**   TELL ME WHAT KIND OF PROBLEMS DO WE HAVE.

9    **A.**   ON ELECTION DAY WE HAVE PROBLEMS WITH THE MECHANICS OF THE

10   MACHINES.  WE HAVE CERTIFIED TECHNICIANS THAT HAVE PROCEDURES

11   TO REPAIR ANY VOTING MACHINE THAT HAS A PROBLEM.  ANY VOTER

12   THAT IS IN A VOTING MACHINE THAT HAS A PROBLEM EXITS THAT

13   MACHINE AND IS PUT ON TO ANOTHER MACHINE UNTIL THE TECHNICIAN

14   CAN REPAIR THAT MACHINE.

15   **Q.**   HAS IT EVER PREVENTED AN ELECTION FROM OCCURRING -- ANY

16   PROBLEMS WITH THESE MACHINES?  HAVE ELECTIONS BEEN HELD UP

17   BECAUSE OF THEM?

18   **A.**   NO.

19           **MR. WALSH:**  CAN I HAVE ONE MOMENT, YOUR HONOR?

20           **THE COURT:**  YES.

21           **MR. WALSH:**  COMMISSIONER HADSKEY, THAT'S ALL THE

22   QUESTIONS THAT I HAVE FOR YOU.  PLEASE ANSWER ANY QUESTIONS

23   THAT COUNSEL OR THE COURT MAY HAVE.  THANK YOU, JUDGE.

24           **THE COURT:**  COUNSEL, I'M JUST GOING TO GIVE YOU FAIR

25   NOTICE, YOU'RE GOING TO PROBABLY OBJECT THAT IT'S OUTSIDE THE

1    SCOPE OF CROSS, BUT I'M GOING TO WANT TO KNOW WHAT THE TIMELINE

2    IS.  AND IF YOU DON'T WANT TO ASK IT I'LL ASK IT.

3         **MR. WALSH:**  THAT'S FINE, JUDGE.

4         **MS. GIGLIO:**  EXCUSE ME, YOUR HONOR.  WE WOULD

5    MAINTAIN THAT MS. HADSKEY DOESN'T HAVE THE SUFFICIENT PERSONAL

6    KNOWLEDGE TO TESTIFY AS TO THE TIMING OF REDISTRICTING.  I CAN

7    EXPLAIN IF YOUR HONOR WOULD LIKE.

8         **THE COURT:**  OKAY.  GO AHEAD.

9         **MS. GIGLIO:**  AT HER DEPOSITION, MS. HADSKEY INDICATED

10   THAT SHE HAD TO SPEAK WITH HER ADMINISTRATIVE MANAGERS, IN WHAT

11   SHE SUPERVISES AS THE BUSINESS AND SERVICES DIVISION, TO

12   SPECIFICALLY DISCUSS THE TIMING RELATED TO REDISTRICTING

13   MATTERS.  SHE HAS NO PERSONAL KNOWLEDGE OF THAT AND ANY

14   TESTIMONY THAT SHE GIVES WOULD BE ROOTED IN HEARSAY.

15        **THE COURT:**  OKAY.  MS. HADSKEY, ARE YOU ABLE TO GIVE

16   THIS COURT FIRSTHAND KNOWLEDGE ABOUT THE DEADLINES AND DATES

17   FOR THINGS LIKE MAKING -- PUBLISHING THE BALLOTS, THE LAST

18   POSSIBLE DATE THAT YOU COULD PUBLISH A BALLOT IN ORDER TO HAVE

19   AN ELECTION?  CAN YOU GIVE FIRSTHAND KNOWLEDGE ON THAT?

20        **THE WITNESS:**  MY BUSINESS AND SERVICES DIVISION DOES

21   DEVELOP THE TIMELINE FOR THAT, SO I HAVE CHECKED WITH THEM.  I

22   KNOW WHAT THEIR THOUGHTS ARE, BUT I DON'T DO IT MYSELF.  BUT

23   I'M HAPPY TO PROVIDE WHATEVER THE COURT NEEDS TO MY KNOWLEDGE.

24        **MS. GIGLIO:**  I WOULD ALSO OFFER, YOUR HONOR, IF I

25   MAY, THAT MS. HADSKEY HERSELF HAS NEVER WORKED IN THE BUSINESS

1   AND SERVICES DIVISION.  SHE WORKED IN ELECTIONS' OPERATIONS

2   WHICH DEALS WITH BALLOT BUILDING AND THINGS TO THAT EFFECT.

3           **THE COURT:**  SO Y'ALL DON'T REALLY WANT TO KNOW WHAT

4   THE TIMELINE IS?  WHY DON'T Y'ALL WANT TO KNOW?

5           **MS. GIGLIO:**  WE WOULD MAINTAIN THAT MS. HADSKEY CAN'T

6   TELL US.  SHE'S NOT THE PROPER WITNESS TO TELL US THAT

7   INFORMATION.

8           **THE COURT:**  CAN YOU TELL US THE TIMELINE?

9           **THE WITNESS:**  I CAN TELL YOU WHAT'S IN THE BALLOT

10  BOX; THE DATES THAT ARE IN THE BALLOT BOX.

11          **THE COURT:**  WHAT DOES THAT MEAN?

12          **THE WITNESS:**  THE BALLOT BOX IS WHAT BUSINESS AND

13  SERVICE PUTS TOGETHER AND IT HAS EVERY DATE IN THERE COMING UP

14  FOR THE UPCOMING ELECTION.

15          **THE COURT:**  WHEN YOU SAY "EVERY DATE IN THERE," LIKE

16  GIVE ME AN EXAMPLE.

17          **THE WITNESS:**  FOR EXAMPLE, UPCOMING IS THE

18  PRESIDENTIAL PREFERENCE PRIMARY.  WHAT ARE THE QUALIFYING

19  DATES; WHAT'S THE LAST DAY TO CALL A SPECIAL; WHEN IS EARLY

20  VOTING, THAT TYPE OF THING.

21          **THE COURT:**  YOU DON'T WANT TO KNOW THOSE DATES?

22          **MS. GIGLIO:**  WELL, YOUR HONOR, WE WOULD BE -- IF

23  MS. HADSKEY CAN TESTIFY TO THAT IN HER PERSONAL KNOWLEDGE THAT

24  IS PERFECTLY SUFFICIENT FOR PLAINTIFFS.  WE WOULD MAINTAIN THAT

25  IF DEFENDANTS SEEK TO LODGE ANY *PERSELL* OBJECTIONS, IT'S THEIR

1   RESPONSIBILITY TO PROFFER EVIDENCE ON THOSE OBJECTIONS AND THEY

2   HAVEN'T DONE THAT WITH MS. HADSKEY.

3           **THE COURT:**  OH, SO YOU THINK THAT THEY'RE NOT LYING A

4   FOUNDATION FOR A SUBSEQUENT *PERSELL* ARGUMENT.

5           **MS. GIGLIO:**  THAT IS PRECISELY OUR POSITION, YOUR

6   HONOR, YES.

7           **THE COURT:**  DOES ANYBODY CARE THAT I MIGHT NEED TO

8   KNOW SO THAT I CAN DO WHAT THE COURT OF APPEAL HAS TOLD ME TO

9   DO IN THE *ROBINSON* CASE AND WHAT THE U.S. SUPREME COURT HAS

10  SAID TO DO IN THE *MILLIKEN* CASE?

11          **MS. GIGLIO:**  WELL, YOUR HONOR, WE WOULD MAINTAIN THAT

12  THE SECRETARY'S OFFICE HAS ALREADY MADE REPRESENTATIONS TO THE

13  FIFTH CIRCUIT --

14          **THE COURT:**  IN THE CONGRESSIONAL CASE.

15          **MS. GIGLIO:**  YES, YOUR HONOR. AND --

16          **THE COURT:**  IS THIS TIMELINE THE SAME AS THE

17  CONGRESSIONAL CASE?  I HATE TO SOUND IGNORANT, BUT IS IT?

18          **MS. GIGLIO:**  WELL, YOUR HONOR, WE DON'T KNOW.  BUT

19  MS. HADSKEY HASN'T PUT ON ANY AFFIRMATIVE TESTIMONY AS TO THAT

20  ISSUE.

21          **THE COURT:**  WELL, DO YOUR CROSS-EXAMINATION AND I'LL

22  THINK ABOUT IT.  GO AHEAD.

23  **CROSS-EXAMINATION**

24  **BY MS. GIGLIO:**

25  **Q.**   GOOD AFTERNOON, MS. HADSKEY.

1    **A.**   HELLO.

2    **Q.**   MY NAME IS AMANDA GIGLIO AND I'M HERE REPRESENTING THE

3    PLAINTIFFS.  AS STATED, YOU STARTED WORKING IN THE SECRETARY OF

4    STATE'S OFFICE IN 1986, CORRECT?

5    **A.**   THAT'S CORRECT.

6    **Q.**   IT WAS CALLED A DIFFERENT THING AT THAT TIME THOUGH.  IT

7    WAS THE DEPARTMENT OF ELECTIONS; ISN'T THAT RIGHT?

8    **A.**   DEPARTMENT OF ELECTIONS AND REGISTRATION, YES, UNDER JERRY

9    FOWLER.

10   **Q.**   AND THE DEPARTMENT OF ELECTIONS WAS RESPONSIBLE FOR

11   MACHINES AND TABULATION; IS THAT RIGHT?

12   **A.**   THEY WERE RESPONSIBLE FOR THE VOTING MACHINES AND

13   TABULATION.  BACK THEN WAS LEVER MACHINES, SO THERE WAS NO

14   TRANSMISSION.  THERE WAS NO AUDITS.  IT WAS DONE ON THE PARISH

15   LEVEL MORE SO THAN THE STATE.

16   **Q.**   WHEN -- THE DEPARTMENT OF ELECTIONS AND THE SECRETARY OF

17   STATE, THEY MERGED; ISN'T THAT RIGHT?

18   **A.**   THAT'S CORRECT.

19   **Q.**   WHEN THEY MERGED YOU STARTED WORKING AS AN ELECTIONS'

20   DIRECTOR OVER BALLOTING?

21   **A.**   THE BALLOTING DEPARTMENT IS NOW THE BUSINESS AND SERVICE

22   DIVISION.  THE MACHINE PROGRAMMING DEPARTMENT WAS OPERATIONS.

23   **Q.**   AND YOU WORKED IN OPERATIONS, CORRECT?

24   **A.**   AND I WORKED IN OPERATIONS, THAT'S CORRECT.

25   **Q.**   THEN IN AROUND 2008, YOU BECAME THE DIRECTOR OF

1    OPERATIONS?

2    **A.**    THAT'S CORRECT.

3    **Q.**    WHILE YOU WERE THE DIRECTOR OF OPERATIONS, YOU DIDN'T HAVE

4    ANYTHING TO DO AT ALL WITH REDISTRICTING, RIGHT?

5    **A.**    NO.  WELL, I TAKE THAT BACK.  WHENEVER YOU REDISTRICT AND

6    YOU CHANGE DISTRICTS IN THE STATE, IT CHANGES THE DATABASES FOR

7    THE PROGRAMMING PORTION OF IT, THE BALLOT BUILDING AND PORTION.

8    SO SIMPLY DATA ENTRY TO CHANGE THAT IS WHAT WAS DONE IN

9    OPERATIONS.

10    **Q.**    UNDERSTOOD.  SO NOW, AS THE COMMISSIONER OF ELECTIONS, YOU

11    SUPERVISE OPERATIONS, CORRECT?

12    **A.**    I DO.

13    **Q.**    AND YOU SUPERVISE THE BUSINESS AND SERVICES DIVISION?

14    **A.**    I DO.

15    **Q.**    AND THE BUSINESS AND SERVICES DIVISION IS WHAT HANDLES

16    THINGS LIKE REDISTRICTING, RIGHT?

17    **A.**    THAT IS CORRECT.

18    **Q.**    BUT YOU'VE NEVER WORKED IN THE BUSINESS AND SERVICES GROUP

19    YOURSELF?

20    **A.**    NO.

21    **Q.**    IN PREPARING, DO YOU RECALL GIVING A DEPOSITION IN THIS

22    CASE?

23    **A.**    I DO.

24    **Q.**    AND YOU SERVED AS THE 30(B)(6) WITNESS FOR THE SECRETARY

25    OF STATE'S OFFICE; ISN'T THAT RIGHT?

1   **A.**   I DON'T KNOW WHAT 30(B)(6) MEANS.  I'M SORRY.

2   **Q.**   SURE.  NO, IT'S FINE.  SO WHEN YOU SAT THROUGH YOUR

3   DEPOSITION, YOU WERE REPRESENTING BOTH YOURSELF AND THE OFFICE

4   OF THE SECRETARY OF STATE; ISN'T THAT RIGHT?

5   **A.**   YES.

6   **Q.**   TO PREPARE FOR YOUR DEPOSITION, YOU SPOKE TO

7   ADMINISTRATIVE MANAGERS IN THE BUSINESS AND SERVICES GROUP,

8   CORRECT?

9   **A.**   I DID.

10  **Q.**   BECAUSE WITHOUT TALKING TO THEM, YOU WOULDN'T KNOW THE

11  TIME FRAMES INVOLVED IN ADMINISTERING AN ELECTION, CORRECT?

12  **A.**   THAT IS CORRECT.

13  **Q.**   ONE OF THOSE TASKS INVOLVED IN REDISTRICTING IS UPDATING

14  VOTER DISTRICTS; ISN'T THAT RIGHT?

15  **A.**   UPDATING VOTER DISTRICTS ON A LEGISLATIVE LEVEL.  ON A

16  LOCAL LEVEL IT'S DONE BY THE LOCALS.

17  **Q.**   UNDERSTOOD.  AT YOUR DEPOSITION YOU SAID THAT YOU HAD NO

18  WAY TO ESTIMATE HOW MUCH WORK YOUR OFFICE WOULD NEED TO DO TO

19  RECONCILE NEW MAPS WITH WORK YOU DID ON OLD MAPS; ISN'T THAT

20  RIGHT?

21  **A.**   RIGHT.  NOT WITHOUT ASKING THE BUSINESS AND SERVICE

22  DIRECTOR.

23  **Q.**   AND SOMEONE IN BUSINESS AND SERVICES IS ALSO RESPONSIBLE

24  FOR UPLOADING THE NEW MAPS INTO ERIN; ISN'T THAT RIGHT.

25  **A.**   YES, THEY ARE.

1   **Q.**   AND THAT'S THE SYSTEM YOU MENTIONED EARLIER --

2   **A.**   CORRECT.

3   **Q.**   -- THAT THE SECRETARY USES?  YOU DON'T HAVE ANY DIRECT

4   KNOWLEDGE OF WHAT THAT PROCESS IS; ISN'T THAT RIGHT?

5   **A.**   I'VE NEVER DONE IT MYSELF.

6   **Q.**   AND ANOTHER STEP INVOLVED IN REDISTRICTING IS TO PROVIDE

7   NOTERS -- VOTERS NOTICE OF THEIR DISTRICT CHANGE, CORRECT?

8   **A.**   CORRECT.

9   **Q.**   AND THAT'S COMMUNICATED BY VOTER CARDS?

10  **A.**   THAT IS CORRECT.

11  **Q.**   YOUR OFFICE PREPARES VOTER CARDS BY UPLOADING INFORMATION

12  IN ERIN TO STATE PRINTING; IS THAT RIGHT?

13  **A.**   THAT IS RIGHT.

14  **Q.**   AND THEN THE USPS DELIVERS THOSE CARDS TO THE VOTERS?

15  **A.**   THAT'S CORRECT.

16  **Q.**   BUT YOU DON'T KNOW HOW LONG IT TAKES BETWEEN INPUTTING

17  CHANGES INTO ERIN AND GETTING VOTER CARDS, RIGHT?

18  **A.**   THAT'S CORRECT.  THE ONLY INFORMATION THAT I HAVE ABOUT

19  THAT IS WHEN A REGISTRAR HAS PROBLEMS WITH USPS AND THE DELAY.

20  THEY NOTIFY US BECAUSE WE HAVE A REGIONAL USPS DIRECTOR THAT WE

21  HAVE TO TURN PROBLEMS IN TO WHERE PEOPLE ARE RECEIVING CARDS

22  LATE OR NOT RECEIVING BALLOTS, THINGS LIKE THAT.  THAT'S MY

23  LIMITED KNOWLEDGE OF THAT.

24  **Q.**   UNDERSTOOD.  COMMISSIONER HADSKEY, YOU HAVEN'T WORKED IN

25  THE OPERATIONS GROUP FOR ABOUT SIX YEARS, RIGHT?

1   **A.**   IT'S BEEN A WHILE, YES.

2   **Q.**   BECAUSE YOU'VE BEEN THE COMMISSIONER?

3   **A.**   THAT'S CORRECT.

4   **Q.**   SO IT'S BEEN A WHILE SINCE YOU'VE HAD YOUR HANDS IN THE

5   WEEDS OR THE PROCESS OF BALLOT BUILDING, RIGHT?

6   **A.**   CORRECT.  ALTHOUGH --

7   **Q.**   AND YOU -- I'M SORRY.  GO AHEAD.

8   **A.**   I'M VERY SORRY.  ALTHOUGH, WE WERE SO HOPEFUL TO GET NEW

9   EQUIPMENT AND THAT MEANS NEW PROGRAMMING, SO MY KNOWLEDGE WOULD

10  NOT BE AS VAST.  BUT BECAUSE WE STILL HAVE THE LEGACY

11  EQUIPMENT, I DO HAVE CERTAIN KNOWLEDGE OF THE WAY THAT IT'S

12  PROGRAMMED.  THEY'VE ADVANCED SOMEWHAT ON THE IMPORT SYSTEM, SO

13  I WOULDN'T HAVE AS MUCH, BUT I DO HAVE SOMEWHAT KNOWLEDGE OF IT

14  BECAUSE IT'S SO OLD.

15  **Q.**   RIGHT.  AND BECAUSE IT'S SO OLD, YOU SPOKE TO THE GROUPS

16  THAT ARE CURRENTLY IN YOUR OPERATIONS -- OR THE ADMINISTRATIVE

17  MANAGERS THAT ARE CURRENTLY IN YOUR OPERATIONS GROUP TO PREPARE

18  FOR YOUR DEPOSITION; ISN'T THAT RIGHT?

19  **A.**   I DID.

20  **Q.**   TO MAKE SURE THAT THE PROCESSES THAT THEY USE NOW ARE THE

21  SAME OR THAT YOU UNDERSTOOD THE DIFFERENCES BETWEEN THE

22  PROCESSES NOW AND THE PROCESSES THAT WERE AT PLAY WHEN YOU WERE

23  ACTUALLY WORKING IN OPERATIONS; ISN'T THAT RIGHT?

24  **A.**   CORRECT.

25  **Q.**   SO, MS. HADSKEY, I'D JUST LIKE TO TAKE A MINUTE TO DISCUSS

1   A COUPLE OF THE STEPS THAT THE SECRETARY HAS INDICATED THAT

2   THEY USE TO IMPLEMENT REDISTRICTING.

3   **A.**   OKAY.

4   **Q.**   NOW, MY UNDERSTANDING IS THAT THE FIRST STEP IS

5   PROOFREADING THE MAP; ISN'T THAT RIGHT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   AND THAT INVOLVES LINING OUT THE PRECINCTS TO CONFIRM THAT

8   THE RIGHT VOTERS ARE IN THE RIGHT AREAS; IS THAT RIGHT?

9   **A.**   THAT'S -- TO MY KNOWLEDGE THAT IS CORRECT.  AND IT'S A

10  THREE-STEP PROCESS.  IT'S NOT JUST PROOFING BY ONE INDIVIDUAL

11  OR TWO INDIVIDUALS.  THEY TAKE IT AND PROOF IT, ACCORDING TO MY

12  ELECTIONS BUSINESS AND SERVICE DIRECTOR, THEY PROOF IT AND THEN

13  THEY HAVE A DIFFERENT SET OF EYES PROOF IT AGAIN AND A

14  DIFFERENT SET OF EYES PROOF IT AGAIN.  BECAUSE THE CONCERN IS

15  WANTING TO BE ABSOLUTELY CERTAIN THAT EVERYTHING IS ACCURATE.

16  **Q.**   SURE.  YOU DON'T WANT TO GIVE A VOTER INCORRECT

17  INFORMATION, RIGHT?

18  **A.**   THAT'S CORRECT.

19  **Q.**   BUT SITTING HERE TODAY, YOU DON'T KNOW HOW LONG IT WOULD

20  TAKE TO PROOFREAD NEW MAPS FOR THE STATE HOUSE AND THE STATE

21  SENATE GIVEN THAT A PROOFREADING PROCESS HAS ALREADY BEEN DONE

22  WITH THE PAST MAPS; ISN'T THAT RIGHT?

23  **A.**   WHAT I DO KNOW FROM MY QUESTIONS IS THAT THE MORE

24  DISTRICTS THAT ARE CHANGED, THE LONGER IT TAKES.  SO IN OTHER

25  WORDS, IF YOU ONLY CHANGED THREE DISTRICTS OR FOUR DISTRICTS,

1   THE TIME WOULD NOT BE AS LONG AS IF YOU CHANGED 64 DISTRICTS.

2   **Q.**   UH-HUH.  WELL, LET ME ASK YOU A COUPLE OF QUESTIONS ABOUT

3   THAT THEN.  YOU MENTIONED THAT IT'S AN ISSUE OF THE NUMBER OF

4   DISTRICTS CHANGED; IS THAT RIGHT?

5   **A.**   TO MY KNOWLEDGE.

6   **Q.**   BUT THE NUMBER OF DISTRICTS -- THE PROOFREADING PROCESS

7   OCCURS VOTER BY VOTER; ISN'T THAT RIGHT?

8   **A.**   THE PROOFREADING PROCESS FOR LEGISLATIVE, YES, VOTER BY

9   VOTER.  THE PARISH-LEVEL RACES, IT'S ALSO DONE VOTER BY VOTER,

10  BUT IT'S A COMBINATION OF THE LOCAL -- THE REGISTRAR OF VOTERS

11  AND THEN ALSO OUR DEPARTMENT WILL ASSIST THEM WHEN THEY CAN.

12  **Q.**   UH-HUH.  AND SO IN THIS INSTANCE, GIVEN THAT WE'RE DEALING

13  WITH THE STATE HOUSE AND THE STATE SENATE MAPS, THAT WOULD BE

14  POTENTIALLY A VOTER-BY-VOTER QUESTION; ISN'T THAT RIGHT?

15  **A.**   YES.  PARISH BY PARISH AND THEN VOTER BY VOTER, EXCEPT

16  WHEN YOU MOVE AN ENTIRE PARISH INTO A NEW DISTRICT AND THE

17  LINES ARE DRAWN AND IT IS THE ENTIRE PARISH, NO MATTER WHAT,

18  THEN IT'S PROOFED, NOT ONLY TO MAKE SURE THE VOTERS ARE IN THE

19  RIGHT DISTRICTS.  BECAUSE REDISTRICTING IN OTHER AREAS YOU WANT

20  TO MAKE SURE EVERYTHING IS CORRECT.

21          AND, ALSO, I THINK YOU MAY KNOW, OR MAYBE YOU DON'T

22  KNOW, RECENTLY PART OF VERMILLION PARISH BECAME PART OF IBERIA

23  PARISH.  SO MAKING SURE WHEN THINGS LIKE THAT HAPPEN, AND THAT

24  WAS DONE LEGISLATIVELY, MAKING SURE IT'S ACCURATE.

25  **Q.**   SURE.  WELL, ARE YOU AWARE WHETHER THE LEGISLATIVE

1   PROOFING PROCESS FOR THE STATE HOUSE AND STATE SENATE IS

2   SIMILAR OR THE SAME TO THE LEGISLATIVE PROOFING PROCESS FOR THE

3   CONGRESSIONAL MAPS?  BOTH DEAL WITH LEGISLATIVE ISSUES.

4   **A.**   YES, TO MY KNOWLEDGE IT IS.

5   **Q.**   OKAY.  SO THE PROOFREADING PROCESS IS THE SAME FOR BOTH

6   THE STATE AND THE CONGRESSIONAL MAPS?

7   **A.**   IT SHOULD BE.

8   **Q.**   MS. -- COMMISSIONER HADSKEY, EXCUSE ME.

9   **A.**   NO, THAT'S OKAY.

10  **Q.**   ARE YOU AWARE THAT THE SECRETARY OF STATE IS BEING SUED IN

11  A SEPARATE LITIGATION DEALING WITH THE CONGRESSIONAL MAP?

12  **A.**   YES, I AM.

13  **Q.**   AND ARE YOU AWARE THAT THE LEGISLATURE COULD POTENTIALLY

14  PASS NEW MAPS GOVERNING LOUISIANA'S CONGRESSIONAL DISTRICTS NO

15  LATER THAN JANUARY 30TH, 2024 AS A RESULT OF THAT LITIGATION?

16  **A.**   YES.

17  **Q.**   ARE YOU AWARE THAT YOUR COUNSEL IN THAT LITIGATION

18  REPRESENTED THAT IN THE EVENT THAT THE LOUISIANA LEGISLATURE

19  DOES NOT PASS A MAP THAT IS COMPLIANT WITH THE VOTING RIGHTS

20  ACT BY THEN, THAT THE SECRETARY WOULD IDEALLY LIKE TO HAVE A

21  MAP IN PLACE AND KNOW WHAT MAP IS GOING TO BE USED IN 2024 BY

22  LATE MAY?

23  **A.**   YES.

24  **Q.**   AND YOU JUST SAID THE PROOFREADING PROCESS FOR THAT MAP

25  AND THIS MAP WOULD BE THE SAME, CORRECT?

1   **A.**   YES.  IT SHOULD BE.

2   **Q.**   JUST TO BE CLEAR, CERTAIN THINGS -- ALSO IN THIS LIT- --

3   IN THE CONGRESSIONAL LITIGATION EVERY VOTER COULD BE IMPACTED

4   BY THE SCOPE OF THE CHANGE TO THE MAP; ISN'T THAT RIGHT?

5   **A.**   YES.

6   **Q.**   AND IN THIS LITIGATION THAT'S NOT THE CASE; ISN'T THAT

7   RIGHT?

8   **A.**   I HAVEN'T BEEN HERE, BUT I BELIEVE THE DISCUSSION HAS BEEN

9   NOT A STATEWIDE BUT ONLY CERTAIN DISTRICTS.  AND IF THAT'S THE

10  CASE, THEN IT WOULDN'T BE ALL VOTERS IN THE STATE.

11  **Q.**   EXACTLY.  SO THE PROOFREADING PROCESS WOULDN'T NECESSARILY

12  HAVE TO INCLUDE ALL VOTERS IN DEALING WITH THE NEW MAPS IN THIS

13  CASE?

14  **A.**   THAT WOULD BE CORRECT.

15  **Q.**   I'D ALSO LIKE TO TALK TO YOU A LITTLE BIT, COMMISSIONER

16  HADSKEY, ABOUT SPECIAL ELECTIONS.

17  **A.**   OKAY.

18  **Q.**   SO SPECIAL ELECTIONS GENERALLY INVOLVE THE SAME BASIC

19  PROCEDURAL DEADLINES AS ANY ELECTION IN LOUISIANA, RIGHT?

20  **A.**   YES.

21  **Q.**   GENERALLY?

22  **A.**   GENERALLY.

23  **Q.**   SO THEY HAVE A QUALIFYING DEADLINE?

24  **A.**   YES.

25  **Q.**   AND THEN A PRIMARY?

1    **A.**    YES.

2    **Q.**    AND THEN A GENERAL; ISN'T THAT RIGHT?

3    **A.**    DEPENDING ON IF THREE CANDIDATES QUALIFY, YOU HAVE A

4    GENERAL; TWO CANDIDATES QUALIFY, YOU DON'T HAVE A GENERAL.

5    **Q.**    GOT IT.    THAT'S VERY HELPFUL.    AND SPECIAL ELECTIONS ARE

6    CALLED BY THE GOVERNOR; ISN'T THAT RIGHT?

7    **A.**    SPECIAL ELECTIONS CAN BE CALLED BY THE LEGISLATURE.

8    **Q.**    AND THE GOVERNOR?

9    **A.**    THE SPEAKER OF THE HOUSE, YES.

10    **Q.**    GOT IT.

11    **A.**    AND THE GOVERNOR SIGNS IT.    BUT THEY CALL ABOUT THE DATES

12    AND REQUIRE THAT.    I'M NOT A LAWYER, SO FORGIVE ME IF I MISS

13    SOMETHING ON THAT PROCESS.

14    **Q.**    WELL, FORGIVE ME IF I MISS SOMETHING ABOUT THAT PROCESS.

15    SO THE SECRETARY OF STATE DOESN'T SET THE TIMING FOR SPECIAL

16    ELECTIONS; ISN'T THAT RIGHT?

17    **A.**    NO, THEY DO NOT.

18    **Q.**    SO THE LEGISLATURE -- THIS IS MY UNDERSTANDING AND I'D

19    LIKE FOR YOU TO SEE IF THAT'S RIGHT.    THE LEGISLATURE SETS THE

20    QUALIFYING DEADLINE FOR A SPECIAL ELECTION, RIGHT?

21    **A.**    THAT IS CORRECT.

22    **Q.**    AND THEN THE DATE FOR THE PRIMARY ELECTION IS SET RELATIVE

23    TO THE QUALIFYING DEADLINE, RIGHT?

24    **A.**    THAT IS CORRECT.

25    **Q.**    AND THEN THE DATE FOR A GENERAL ELECTION, IF ONE IS

1  REQUIRED, IS SET BASED ON THE PRIMARY DATE -- THE DATE OF THE

2  PRIMARY ELECTION?

3  **A.**   CORRECT.

4  **Q.**   AND YOUR OFFICE SOMETIMES TRIES TO MAKE RECOMMENDATIONS TO

5  THE LEGISLATURE ABOUT WHAT THE QUALIFYING DATE FOR THESE

6  ELECTIONS SHOULD BE; ISN'T THAT RIGHT?

7  **A.**   BASED ON TRYING TO SAVE THE STATE MONEY.  IF THERE'S AN

8  ELECTION COMING UP AND THERE'S A GENERAL DATE THAT COULD BE

9  USED FOR BOTH, THEN TRYING TO CALL A PRIMARY WHERE THE GENERAL

10  WOULD FALL INTO PLACE SO YOU'RE SAVING THE STATE INSTEAD OF

11  HAVING TWO SEPARATE ELECTIONS AND THEN ANOTHER ELECTION.

12  **Q.**   SURE.  SO IN THE EVENT THAT A SPECIAL ELECTION IS

13  NECESSARY, IT MAKES SENSE TO SCHEDULE THEM AT THE SAME TIME AS

14  EXISTING ELECTIONS ON THE CALENDAR?

15  **A.**   IF YOU CAN.

16  **Q.**   YEAH, IF YOU CAN.  SO YOU CAN SAVE MONEY?

17  **A.**   CORRECT.

18  **Q.**   BECAUSE THE SAME ADMINISTRATIVE NEEDS ARE REQUIRED FOR A

19  SPECIAL ELECTION AS ARE REQUIRED FOR ANY ELECTION, CORRECT?

20  **A.**   CORRECT.

21  **Q.**   POLLING --

22  **A.**   BUT THE LEGISLATURE MAY BE -- THEY MAY HAVE THEIR OWN

23  REASONS FOR LOOKING FOR THE DATES, SUCH AS WANTING TO HAVE A

24  SEAT FILLED SO THAT THAT DISTRICT IS REPRESENTED, WHICH DOESN'T

25  FALL INTO OUR OTHER DATES, AND SO THE COST OF IT MAY NOT BE THE

1    NUMBER ONE PRIORITY.

2    **Q.**    SURE.

3    **A.**    IT JUST DEPENDS ON WHAT THEY'RE LOOKING FOR.

4    **Q.**    GOT IT.

5    **A.**    IN OTHER WORDS --

6    **Q.**    GO AHEAD.  I'M SO SORRY.

7    **A.**    THERE'S BEEN TIMES THAT I WAS TOLD, I KNOW YOU SET THESE

8    DATES, BUT THESE ARE THE DATES WE'RE USING.

9    **Q.**    SURE.  AND YOU --

10   **A.**    IT'S NOT UP TO ME TO QUESTION THEIR REASON FOR THE DATE.

11   **Q.**    AND YOU GUYS MAKE IT WORK, RIGHT?

12   **A.**    THAT'S CORRECT.

13   **Q.**    AND THE AMOUNT OF STAFF THAT YOU NEED TO ADMINISTER

14   ELECTIONS DEPENDS ON A LOT OF THINGS, RIGHT?  LIKE THE NUMBER

15   OF CANDIDATES?

16   **A.**    NOT AS MUCH AS THE NUMBER OF CANDIDATES.  THE NUMBER OF

17   RACES.  HOW BIG THE PARISH IS.  IF IT'S A PARTIAL PARISH OR A

18   FULL PARISH.  IF IT'S STATEWIDE, ET CETERA.  BUT THE PROCEDURES

19   TO SET UP AN ELECTION AND TO -- ALL THE PRELIMINARY WORK AND

20   THE TESTING AND ET CETERA IS NO DIFFERENT.  WE HAVE TO MAKE

21   SURE THAT EVERY SINGLE MOTION IS COMPLETED TO ENSURE THE

22   SECURITY AND THE ACCURACY OF THE ELECTION.  IN OTHER WORDS, WE

23   CAN'T SKIP SOMETHING, YOU KNOW, TO TRY AND SAVE TIME.  THERE'S

24   NO WAY.  WE WOULD WANT IT TO BE ACCURATE.

25   **Q.**    GOT IT.  BUT THERE ARE SOME ADMINISTRATIVE --

1  ADMINISTRATIVE THINGS THAT MIGHT MAKE THE PROCESS FOR BUILDING

2  A BALLOT, SAY, A LITTLE BIT EASIER; ISN'T THAT RIGHT?  LIKE IF

3  THERE -- IF THE ELECTION IS UNCONTESTED, FOR EXAMPLE?

4  **A.**   IF THE ELECTION IS UNCONTESTED, THEN THERE'S NOT A GENERAL

5  ELECTION IF IT WAS ONLY TWO CANDIDATES, SO YOU WOULDN'T HAVE

6  THAT.

7  **Q.**   UH-HUH.  MS. -- COMMISSIONER HADSKEY, EXCUSE ME.  IN

8  RECENT YEARS LOUISIANA HAS HAD AT LEAST FOUR ELECTIONS EVERY

9  YEAR; ISN'T THAT RIGHT?

10  **A.**   YES.

11  **Q.**   SO IN 2019 THERE WERE SIX ELECTIONS; ISN'T THAT RIGHT?

12  **A.**   CORRECT.

13  **Q.**   AND IN 2020 THERE WERE FOUR ELECTIONS?

14  **A.**   YES.  I -- THE MAX I EVER REMEMBER CONDUCTING IN A SINGLE

15  YEAR WAS 12, 12 ELECTIONS IN A SINGLE YEAR.  IT JUST DEPENDS

16  ON -- AND SEVERAL OF THOSE ELECTION DATES HAVE BEEN DONE AWAY

17  WITH.  WE USED TO HAVE A PROP ELECTION DATE IN JULY.  IT WAS

18  LEGALLY MANDATORY FOR A PROP ELECTION IN JULY AND THEY'VE DONE

19  AWAY WITH THAT ONE.

20  **Q.**   GOT IT.  UNDERSTOOD.  AND IN THE 2023 CYCLE, THERE WERE

21  SIX ELECTIONS, ISN'T THAT RIGHT; ORIGINALLY SCHEDULED THIS

22  YEAR?

23  **A.**   UM, SIX DATES -- YEAH.  WELL, NOT SCHEDULED.  WE HAD AN

24  EXACT TIE, I BELIEVE IT WAS, THAT CAUSED A JANUARY ELECTION.

25  SIMILAR TO WHAT'S GOING ON RIGHT NOW.  WE HAVE TWO EXACT TIES

1   FROM THIS PAST GENERAL, SO NOW WE HAVE A DECEMBER ELECTION IN

2   THOSE TWO PARISHES.  THE LAW REQUIRES THAT IF AN EXACT TIE

3   OCCURS YOU HAVE TO CONDUCT ANOTHER ELECTION.  SO IT MAY NOT

4   HAVE BEEN A SCHEDULED.  IT WAS THE REPERCUSSIONS OF HAVING THE

5   EXACT TIE.

6   **Q.**   RIGHT.  SO ULTIMATELY THERE ARE SEVEN ELECTIONS THIS YEAR;

7   ISN'T THAT RIGHT?

8   **A.**   YES.

9   **Q.**   AND THOSE ELECTIONS INCLUDE SPECIAL ELECTIONS?

10  **A.**   YES.

11  **Q.**   LET ME SHOW YOU WHAT'S BEEN PREADMITTED AS PLAINTIFFS'

12  EXHIBIT 169.  THAT'S THE 2023 ELECTION CALENDAR.

13  **A.**   OKAY.

14  **Q.**   SO IN 2023, IF YOU LOOK AT THE SECOND COLUMN UNDER

15  FEBRUARY 18, YOU CAN SEE THAT THERE'S AN ELECTION FOR A STATE

16  HOUSE DISTRICT; ISN'T THAT RIGHT?

17  **A.**   THAT IS CORRECT.

18  **Q.**   THAT'S THE 93RD DISTRICT?

19  **A.**   THAT IS.

20  **Q.**   IF YOU LOOK AT THOSE DATES FOR THAT ELECTION, YOU CAN SEE

21  THAT THE QUALIFYING DATES WERE JANUARY 11, 2023 TO

22  JANUARY 13TH, 2023; ISN'T THAT RIGHT?

23  **A.**   THAT'S CORRECT.

24  **Q.**   AND THEN THE PRIMARY DATE FOR THAT ELECTION IS RIGHT AT

25  THE TOP, ISN'T THAT RIGHT; THE FEBRUARY 18TH DATE?

1   **A.**   THAT IS CORRECT.

2   **Q.**   THEN IF YOU LOOK TO THE COLUMN DIRECTLY TO THE RIGHT OF

3   PLAINTIFFS' EXHIBIT 169, YOU'LL SEE THAT THERE IS A SPECIAL

4   GENERAL ELECTION FOR ORLEANS STATE REPRESENTATIVE AND HOUSE

5   DISTRICT 93.  SO THE GENERAL ELECTION OCCURRED ABOUT A MONTH

6   LATER; ISN'T THAT RIGHT?

7   **A.**   THE GENERAL ELECTION, THAT WAS ONE OF THE CIRCUMSTANCES

8   WHERE -- WHAT I WAS TALKING ABOUT EARLIER.  THE PRIMARY CAME SO

9   THAT THE GENERAL WOULD FALL ON AN ALREADY SCHEDULED MUNICIPAL

10  PRIMARY DATE.

11  **Q.**   MAKES SENSE.  AND YOU ALSO -- WE CAN TAKE THIS EXHIBIT

12  DOWN.  THANKS.  AND IN 2022, THERE WAS ANOTHER SPECIAL ELECTION

13  FOR A STATE SENATE DISTRICT; ISN'T THAT RIGHT?

14  **A.**   IN 2022 -- IN JANUARY, I BELIEVE.  I'D NEED TO LOOK AT

15  THAT.

16  **Q.**   I THINK IT WAS LATER IN THE YEAR.  IT WAS FOR SENATE

17  DISTRICT FIVE; DO YOU RECALL THAT?

18  **A.**   NO, BUT IF YOU SHOW IT TO ME IT'LL JOG MY MEMORY.

19  **Q.**   SURE.  WELL, I DON'T HAVE THAT CALENDAR RIGHT HERE FOR

20  YOU, BUT I CAN TELL YOU THAT IT WAS AFTER SENATOR PETERSON

21  RESIGNED FROM OFFICE IN APRIL OF 2022; DOES THAT RING ANY

22  BELLS?

23  **A.**   OKAY.  IT DOES.

24  **Q.**   SENATOR CORTEZ SET A SPECIAL ELECTION FOR THAT -- SET THE

25  DEADLINES FOR THAT SPECIAL ELECTION; ISN'T THAT RIGHT?

1   **A.**   YES.

2   **Q.**   AND THAT SPECIAL ELECTION TOOK PLACE ON THE SAME DATES AS

3   THE FEDERAL ELECTIONS THAT TOOK PLACE IN FEBRUARY 2022; ISN'T

4   THAT RIGHT?

5   **A.**   YES.

6   **Q.**   AND, MS. HADSKEY, OR, COMMISSIONER HADSKEY -- I WILL GET

7   THAT RIGHT AT SOME POINT.

8   **A.**   IT'S OKAY.

9   **Q.**   YOU COULD NOT THINK -- AT YOUR DEPOSITION, YOU COULDN'T

10  THINK OF ANY REASON WHY A SPECIAL STATE ELECTION COULDN'T

11  HAPPEN AT THE SAME TIMELINE AS A FEDERAL ELECTION; ISN'T THAT

12  RIGHT?

13  **A.**   THAT'S CORRECT.  MY ONLY CONCERN, AND I MENTIONED IT

14  BEFORE, IS WITH THE LEGACY MACHINES, THE REAL ESTATE ON THE

15  BALLOT.  SO ON THE -- IN JUNE WE HAVE THE DEADLINE TO CALL A

16  PROP AND IN JULY WE HAVE THE LEGISLATURE PROVIDING US WITH

17  CONSTITUTIONAL AMENDMENTS.  THE MOST I'VE EVER SEEN I THINK WAS

18  ABOUT 17.  SO WITH THE PRESIDENTIAL TAKING UP TWO COLUMNS, AND

19  IT KEEPS GROWING EVERY YEAR, AND -- OUR STATE IS ONE OF THE

20  ONLY STATES THAT REQUIRES THE ELECTORS TO BE LISTED ON THE

21  BALLOT WHICH TAKES UP A LOT OF ROOM.  AND THEN YOU FALL IN WITH

22  THE LOCAL RACES AND THEN YOU FALL IN WITH THE PROPS AND THE

23  CA'S.

24          SO MY CONCERN WOULD BE I CAN'T BUY ANYMORE OF THESE

25  MACHINES TO HAVE MORE MACHINES TO RUN THE BALLOT OVER TO, SO

1   THAT WOULD BE MY CONCERN -- THAT WOULD BE ONE OF MY BIGGEST

2   CONCERNS.

3   **Q.**   UNDERSTOOD.  BUT IF THE CIRCUMSTANCES CALLED FOR IT, IF IT

4   WOULD SAY, SAVE ADMINISTRATIVE TIME, SAVE ADMINISTRATIVE MONEY,

5   YOU COULD TRY TO MAKE IT WORK?

6   **A.**   WE WOULD TRY.  IF IT OVERFLOWED I WOULD THROW THE PROBLEM

7   BACK TO SOMEBODY ELSE LEGISLATIVELY OR LEGALLY TO SAY I

8   CAN'T -- I CAN'T -- THERE'S NOT ENOUGH BUTTONS ON HERE.

9         THE OTHER CONCERN IS WE HAVE A SENATE RACE WHERE 22

10  PEOPLE QUALIFIED.  THE MORE CANDIDATES THAT QUALIFY AND THE

11  MORE THAT EVERYBODY PUTS ON THERE, UNLIKE MOST OF THE REST OF

12  THE NATION WHERE THEY HAVE PAGE BALLOTS WHERE YOU CAN KEEP

13  PAGING OVER TO GO TO THE NEXT ONES.  SO, YES, IT WOULD END UP

14  BEING SOMEBODY'S LEGAL PROBLEM THAT -- I MEAN BECAUSE THE

15  BOTTOM LINE IS I CAN ONLY DO WHAT I CAN DO ON THAT MACHINE.

16  THERE'S ONLY SO MANY BUTTONS SO...

17  **Q.**   UNDERSTOOD.  COMMISSIONER HADSKEY, THIS GOES WITHOUT

18  SAYING I THINK BUT -- GIVEN YOUR TESTIMONY TODAY, YOU WOULD

19  SEEK TO FULFILL YOUR RESPONSIBILITY TO ENSURE THAT ALL

20  ELECTIONS RUN ON THE SCHEDULE THAT'S REQUIRED; ISN'T THAT

21  RIGHT?

22  **A.**   ABSOLUTELY.

23  **Q.**   AND THAT INCLUDES SPECIAL ELECTIONS THAT ARE CALLED?

24  **A.**   YES, IT DOES.  ABSOLUTELY.

25  **Q.**   AND OTHER -- OTHER ENTITIES HAVE IMPOSED REQUIREMENTS ON

1   ELECTIONS BEFORE, RIGHT; OUTSIDE OF THE SECRETARY'S OFFICE?

2   **A.**   MEANING THE LEGISLATURE?

3   **Q.**   THE LEGISLATURE.

4   **A.**   YES.

5   **Q.**   AND COURTS?

6   **A.**   YES.

7   **Q.**   AND THE GOVERNOR?

8   **A.**   YES.

9   **Q.**   AND YOU'VE COMPLIED WITH ALL OF THOSE REQUIREMENTS; ISN'T

10   THAT RIGHT?

11   **A.**   WE HAVE.

12   **Q.**   RELATED TO ELECTION ADMINISTRATION?

13   **A.**   RELATED TO ELECTIONS' ADMINISTRATION.  HOWEVER, IT IS MY

14   JOB AS COMMISSIONER TO BRING UP TO THE COURTS OR TO THE

15   LEGISLATURE OR TO THE SECRETARY HIMSELF WHEN SOMETHING IS NOT

16   BEING MET BECAUSE OF A REQUIREMENT THAT HAS BEEN PUT ON US, AND

17   I MAKE SURE THAT THAT IS DOCUMENTED AND NOTED.  SO IF BY CHANCE

18   SOMEBODY FILES SOMETHING AFTER THE ELECTION DATE, BASED ON

19   THAT, THEN THERE'S EVIDENCE OF WHAT OCCURRED.

20   **Q.**   SURE.

21   **A.**   AND THAT HAPPENS WITH EMERGENCY ELECTIONS ALSO.  WHEN YOU

22   HAVE EMERGENCIES THAT FALL INTO PLACE AND SOME DEADLINE IS

23   HAVING TO BE OVERLOOKED, IT'S NOTED THAT, YOU KNOW, IN CASE

24   SOMEBODY WERE TO FILE SOME SORT OF CONTEST SUIT OR SAY THAT

25   THERE WAS A PROBLEM WITH IT.

1  **Q.**   UNDERSTOOD.  BUT EVEN UNDER THOSE CIRCUMSTANCES, YOU WOULD

2  MAKE EVERY EFFORT TO COMPLY WITH WHAT WAS REQUIRED; ISN'T THAT

3  RIGHT?

4  **A.**   I WILL ALWAYS DO WHAT'S LEGALLY REQUIRED OF ME.

5          **MS. GIGLIO:**  LET ME CONCUR WITH MY COUNSEL BRIEFLY,

6  YOUR HONOR.  NO FURTHER QUESTIONS, YOUR HONOR.

7          **THE COURT:**  REDIRECT?

8          **MR. WALSH:**  NO, YOUR HONOR.  THANK YOU.

9          **THE WITNESS:**  THANK YOU.

10         **THE COURT:**  NEXT WITNESS.

11         **MR. LEWIS:**  YOUR HONOR, THIS IS PATRICK LEWIS FOR THE

12  LEGISLATIVE DEFENDANTS AND WE CALL DR. ALAN MURRAY.

13                        **ALAN MURRAY,**

14      **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

15         **COURTROOM DEPUTY:**  WOULD YOU PLEASE STATE YOUR NAME

16  AND SPELL IT FOR THE RECORD?

17         **THE WITNESS:**  MY NAME IS ALAN MURRAY; A-L-A-N,

18  M-U-R-R-A-Y.

19         **MR. LEWIS:**  YOUR HONOR, MAY I APPROACH THE WITNESS TO

20  PROVIDE HIM WITH A BINDER CONTAINING HIS REPORT AND REPORT

21  EXHIBITS?

22         **THE COURT:**  YOU MAY.

23  **DIRECT EXAMINATION**

24  **BY MR. LEWIS:**

25  **Q.**   GOOD AFTERNOON, DR. MURRAY.  I'D LIKE TO TURN NOW TO

1   EXHIBIT LDTX 42, WHICH IS IN THE BINDER I JUST HANDED YOU.  DO

2   YOU RECOGNIZE THIS DOCUMENT, DR. MURRAY?

3   **A.**   YES, I DO.

4   **Q.**   AND IS THIS YOUR REPORT?

5   **A.**   YES, IT IS.

6   **Q.**   OKAY.  I'D LIKE TO TURN TO THE APPENDIX BEGINNING ON PAGE

7   35, WHICH I BELIEVE IS YOUR CV.  IT'S UP ON THE SCREEN.  DO YOU

8   RECOGNIZE THIS, DR. MURRAY?

9   **A.**   YES, I DO.

10   **Q.**   IS THIS YOUR CURRENT CURRICULUM VITAE?

11   **A.**   YES, IT IS.

12   **Q.**   OKAY.  CAN YOU EXPLAIN TO THE COURT YOUR EDUCATIONAL

13   BACKGROUND?

14   **A.**   YES.  I HAVE A BACHELOR'S IN MATHEMATICS, A MASTER'S IN

15   PROBABILITY AND STATISTICS AND A PH.D IN GEOGRAPHY, ALL FROM

16   THE UNIVERSITY OF CALIFORNIA, SANTA BARBARA.

17   **Q.**   WHAT ARE YOUR AREAS OF FOCUS IN YOUR STUDIES?

18   **A.**   SPATIAL ANALYSIS, SPATIAL ANALYTICS AND GIS.

19   **Q.**   AND WHAT IS THE STUDY OF SPATIAL ANALYTICS?

20   **A.**   BASICALLY THE EVALUATION OF DISTRIBUTION, SPATIAL

21   DISTRIBUTIONS, POPULATION, RACE, SERVICE POTENTIAL, THINGS

22   ALONG THOSE LINES.

23   **Q.**   AND GIS, WHAT IS THAT STUDY?

24   **A.**   GIS IS AN ACRONYM FOR GEOGRAPHIC INFORMATION SYSTEMS.

25   THEY ARE DATABASE MANAGEMENT SYSTEMS TO WORK PRIMARILY WITH

1   SPATIAL INFORMATION SPECIALIZING IN DATA COLLECTION, DATA

2   MANAGEMENT, MANIPULATION, ANALYSIS AND MAPPING.

3   **Q.**   AND WHAT KIND OF PROBLEMS OR PROJECTS DID YOU STUDY USING

4   SPATIAL ANALYTICS?

5   **A.**   A WHOLE HOST OF THINGS, BUT EARLY ON A LOT OF WORK IN THE

6   AREA OF SCHOOL DISTRICTING, WORK LOOKING AT TRANSPORTATION,

7   ACCESS AND ACCESSIBILITY, TRANSPORTATION SERVICE AREAS,

8   EMERGENCY SERVICE, SERVICE AREAS, FOREST MANAGEMENT AREAS,

9   PLANNING UNITS AND THINGS ALONG THOSE LINES.

10  **Q.**   AND IS THE STUDY OF DISTRICTING PART OF YOUR WORK IN

11  SPATIAL ANALYTICS?

12  **A.**   ABSOLUTELY.

13  **Q.**   AND IS STATISTICS PART OF YOUR ACADEMIC WORK?

14  **A.**   YES, IT IS.

15  **Q.**   AND CAN YOU EXPLAIN TO THE COURT WHAT KIND OF STATISTICS

16  YOU STUDY AS PART OF YOUR ACADEMIC WORK?

17  **A.**   MY AREA IS PRIMARILY IN THE -- ASSOCIATED WITH SPATIAL

18  STATISTICS, GEO STATISTICS, HAVING TO DO WITH LOOKING AT

19  SPATIAL AUTOCORRELATION, CLUSTERING AND THINGS LIKE THAT.

20  **Q.**   AND ON THESE TOPICS INCLUDING SPATIAL ANALYTICS, GIS AND

21  STATISTICS, DO YOU TEACH COURSES ON THESE TOPICS?

22  **A.**   YES, I DO.

23  **Q.**   DO YOU TEACH THEM AT THE GRADUATE LEVEL?

24  **A.**   I TEACH THEM AT UNDERGRADUATE AND GRADUATE LEVELS, YES.

25  **Q.**   DR. MURRAY, DO YOU PUBLISH PEER-REVIEWED ACADEMIC

1   LITERATURE ON THESE TOPICS?

2   **A.**   YES, I DO.

3   **Q.**   APPROXIMATELY HOW MANY PUBLICATIONS AND PEER-REVIEWED

4   PUBLICATIONS DO YOU HAVE?

5   **A.**   OVER 305.

6   **Q.**   AND DO YOU KNOW APPROXIMATELY HOW MANY TIMES YOUR WORK HAS

7   BEEN CITED?

8   **A.**   I THINK NEAR 19,000 TO DATE.

9   **Q.**   WHERE ARE YOU CURRENTLY EMPLOYED?

10  **A.**   I'M CURRENTLY EMPLOYED AT THE UNIVERSITY OF CALIFORNIA

11  SANTA BARBARA IN THE DEPARTMENT OF GEOGRAPHY.

12  **Q.**   AND YOUR TITLE THERE?

13  **A.**   I'M A PROFESSOR OF GEOGRAPHY AND I'M ALSO AN AFFILIATE IN

14  THE BROOM CENTER FOR DEMOGRAPHY, AS WELL AS THE ASSOCIATE

15  DIRECTOR FOR THE CENTER OF SPATIAL STUDIES AND DATA SCIENCE I

16  THINK IS THE NAME.

17  **Q.**   ALL RIGHT.  I GUESS THIS GOES WITHOUT SAYING, BUT DO YOU

18  HAVE TENURE AT UCSB?

19  **A.**   YES, I DO.

20  **Q.**   CAN YOU EXPLAIN WHAT THE BROOM CENTER FOR DEMOCRACY IS --

21  OR DEMOGRAPHY RATHER?

22  **A.**   THE BROOM CENTER FOR DEMOGRAPHY AT UCSB IS BASICALLY LIKE

23  A POPULATION CENTER, SO ITS AFFILIATED WITH FACULTY ACROSS

24  CAMPUS INCLUDING PEOPLE IN ECONOMICS, PEOPLE IN SOCIOLOGY,

25  PEOPLE IN GEOGRAPHY AND THEN OUTSIDE IN OTHER DISCIPLINES THAT

1   DO WORK AND RESEARCH ASSOCIATED WITH POPULATION ISSUES.

2   **Q.**   AND THE SPATIAL ANALYTICS DEPARTMENT YOU MENTIONED, WHAT'S

3   THAT?

4   **A.**   THE CENTER FOR SPATIAL STUDIES AND DATA SCIENCE IS A

5   CENTER.  IT'S FOCUSED ON BASICALLY GIS AND GI SCIENCE

6   APPLICATION AND ISSUES, AND IT'S SORT OF A SECOND GENERATION

7   FROM THE NATIONAL CENTER FOR GEOGRAPHIC INFORMATION AND

8   ANALYSIS THAT WAS A CENTER FUNDED AT USCB BY THE NATIONAL

9   SCIENCE FOUNDATION IN THE EARLY 1990S.

10  **Q.**   AND DOES UCSB HAVE A PROMINENT PROGRAM IN GIS?

11  **A.**   YES, IT DOES.  IT'S RECOGNIZED AS ONE OF THE TOP GIS/GI

12  SCIENCE PROGRAMS IN THE WORLD.

13  **Q.**   DO YOU USE GIS SOFTWARE IN YOUR PROFESSIONAL WORK?

14  **A.**   YES, I DO.

15  **Q.**   WHAT IS THAT SOFTWARE CALLED?

16  **A.**   I PREDOMINANTLY USE ARCGIS.

17  **Q.**   AND IS MAPTITUDE -- ARE YOU FAMILIAR WITH MAPTITUDE FOR

18  REDISTRICTING?

19  **A.**   YES, I AM.

20  **Q.**   WHAT IS THAT?

21  **A.**   IT'S ALSO A GEOGRAPHIC INFORMATION SYSTEM THAT SUGGESTS --

22  IT IS TAILORED TO HELP ADDRESS POLITICAL REDISTRICTING PROBLEMS

23  AND ISSUES.

24  **Q.**   AND I BELIEVE YOU MAY HAVE MENTIONED THIS ALREADY, BUT

25  JUST FOR CLARITY OF THE RECORD, DOES YOUR PROFESSIONAL WORK

1   INVOLVE THE STUDYING OF DEMOGRAPHICS BY RACE?

2   **A.**   YES, IT DOES.

3   **Q.**   HAVE YOU SERVED AS AN EXPERT IN REDISTRICTING LITIGATION

4   IN THE PAST?

5   **A.**   YES, I HAVE.

6   **Q.**   AND THAT WAS THE *ROBINSON* CASE BEFORE THIS COURT; IS THAT

7   RIGHT?

8   **A.**   YES, IT WAS.

9   **Q.**   OKAY.  AND WHO RETAINED YOU TO SERVE AS AN EXPERT IN THIS

10   CASE?

11   **A.**   THE LEADERS OF THE LOUISIANA LEGISLATURE.

12   **Q.**   AND YOU PROVIDED ONE REPORT IN THIS CASE; IS THAT RIGHT?

13   **A.**   YES, I DID.

14        **MR. LEWIS:**  YOUR HONOR, AT THIS TIME WE'D MOVE FOR

15   THE ADMISSION OF DR. MURRAY AS AN EXPERT IN THE FIELDS OF

16   GEOGRAPHY DEMOGRAPHIC ANALYSIS, SPATIAL ANALYTICS AS IT RELATES

17   TO RACE AND STATISTICS.

18        **MS. BAHN:**  NO OBJECTION, YOUR HONOR.

19        **THE COURT:**  ADMITTED IN THE FIELDS TENDERED.

20        **MR. LEWIS:**  THANK YOU, YOUR HONOR.  AT THIS TIME WE

21   WOULD ALSO, PURSUANT TO THE PARTIES' STIPULATION, WE WOULD MOVE

22   FOR THE ADMISSION OF LDTX 42, WHICH IS DR. MURRAY'S REPORT, AND

23   LDTX 43 THROUGH 50, INCLUSIVE, WHICH COMPRISE THE EXHIBITS TO

24   THE EXPERT REPORT.

25        **MS. BAHN:**  NO OBJECTION.

1          **THE COURT:**  ADMITTED.

2          **THE WITNESS:**  SO THAT MEANS I'M DONE.

3          **THE COURT:**  (LAUGHTER) DON'T WE WISH.

4    **BY MR. LEWIS:**

5    **Q.**  LET'S RETURN TO YOUR REPORT, DR. MURRAY, AND SPECIFICALLY

6    I'D LIKE TO TURN TO PAGE 2.

7    **A.**  OKAY.

8    **Q.**  AND I BELIEVE IN THE -- I'D LIKE FOR YOU TO JUST SUMMARIZE

9    FOR THE COURT WHAT YOU WERE ASKED TO DO IN THIS CASE.

10   **A.**  IN TERMS OF THIS ANALYSIS, I WAS ASKED TO EVALUATE THE

11   ILLUSTRATIVE DISTRICTS GENERATED BY MR. COOPER, ALONG WITH THE

12   ENROLLED 2022 SENATE AND HOUSE DISTRICTS.

13   **Q.**  WERE THERE SPECIFIC ASPECTS OF THOSE PLANS THAT YOU LOOKED

14   AT IN YOUR ANALYSIS IN THIS CASE?

15   **A.**  I WAS FOCUSED ON LOOKING AT VARIOUS SORTS OF THINGS;

16   LOOKING AT THE DATA, VERACITY AND THEN THE, I SUPPOSE,

17   COMPLETENESS OF THE ANALYSIS AND CORRECTNESS OF THE ANALYSIS.

18   AND TO THAT END, I UNDERTOOK DATA MANAGEMENT AND MANIPULATION

19   SORTS OF TASKS.  I EVALUATED COMPACTNESS.  I LOOKED AT CORE

20   RETENTION.  I LOOKED AT ASPECTS OF SPATIAL AUTOCORRELATION AND,

21   FINALLY, I LOOKED SPECIFICALLY AT COMMUNITIES OF INTEREST.

22   **Q.**  AND WHAT SOURCES DID YOU ANALYZE WHEN FORMULATING THE

23   OPINIONS IN YOUR REPORT?

24   **A.**  I LOOKED AT THE ILLUSTRATIVE DISTRICTS PROVIDED BY

25   MR. COOPER.  I ALSO LOOKED AT THE ENROLLED SENATE AND HOUSE

1   DISTRICTS PROVIDED BY THE LEGISLATURE, AS WELL AS ASSOCIATED

2   CENSUS BLOCK DATA AND THEN FROM -- FROM THE CENSUS THE BLOCK

3   BOUNDARIES, AS WELL AS, I GUESS I SHOULD ADD, THE CENSUS BLOCK

4   GROUPS.

5   **Q.**   AND DID YOU ALSO LOOK AT ANY SOCIOECONOMIC DATA?

6   **A.**   YEAH.  THAT WAS PROVIDED IN THE BLOCKS AS WELL AS IN THE

7   BLOCK GROUPS ASSOCIATED WITH THE ACS DATA, YES.

8   **Q.**   SO I THINK MY FIRST QUESTION IS DID YOU EVALUATE -- DID

9   YOU REVIEW, I SHOULD SAY, THE COUNTS OF SPLIT PARISHES IN SPLIT

10  VOTER TABULATION DISTRICTS IN THE DISTRICTS CREATED IN

11  MR. COOPER'S ILLUSTRATIVE PLANS?

12  **A.**   YES, I DID.

13  **Q.**   DID YOU REVIEW THE COUNTS OF SPLIT PARISHES AND VTDS IN

14  THE ENROLLED PLANS?

15  **A.**   YES, I DID.

16  **Q.**   JUST TO MAKE SURE WE HAVE A CLEAN RECORD, WHEN WE'RE

17  REFERRING TO THE ILLUSTRATIVE PLANS, WE'RE REFERRING TO THE

18  ONES IN 2023; IS THAT RIGHT?

19  **A.**   THAT'S CORRECT.

20  **Q.**   OKAY.  AND FOR THE ENROLLED PLANS, THOSE ARE IN 2022?

21  **A.**   2022, YES.

22  **Q.**   OKAY.  AND IS THAT ANALYSIS REPORTED IN YOUR EXPERT REPORT

23  IN THIS CASE?

24  **A.**   YES, IT IS.

25  **Q.**   SO I'D LIKE TO FOCUS TODAY ON YOUR ANALYSIS OF THE NUMBER

1   OF DIVIDED VOTER TABULATIONS DISTRICT BOUNDARIES.  SO IF WE

2   COULD START IN THE SENATE.  I BELIEVE THAT'S ON PARAGRAPH 17

3   BETWEEN PAGES 11 AND 12.  LET ME KNOW WHEN YOU GET THERE.

4   **A.**   OKAY.

5   **Q.**   ALL RIGHT.  CAN YOU TELL THE COURT HOW MANY VOTER

6   TABULATION DISTRICT SPLITS THAT YOU FOUND IN THE ENROLLED 2022

7   SENATE PLAN?

8   **A.**   SPLITS FOR THE VOTING DISTRICTS IN THE ENROLLED PLAN WERE

9   6 AND 18 FOR THE ILLUSTRATIVE HOUSE.

10  **Q.**   DID YOU MEAN ILLUSTRATIVE SENATE, I'M SORRY?

11  **A.**   EXCUSE ME.  SENATE.  THERE'S A TYPO.  YOU'RE CORRECT.

12  **Q.**   SO JUST TO MAKE SURE, IT'S 6 IN THE ENROLLED AND 18 IN THE

13  ILLUSTRATIVE; IS THAT CORRECT?

14  **A.**   THAT'S CORRECT.

15  **Q.**   OKAY.  AND IF WE COULD THEN MOVE TO THE HOUSE, I BELIEVE

16  THAT'S PARAGRAPH 23 APPEARING AT THE BOTTOM OF 15 AND TOP OF

17  16.  AND, DR. MURRAY, CAN YOU TELL US HOW MANY VOTER TABULATION

18  DISTRICTS ONES YOU FOUND IN THE ENROLLED 2022 HOUSE PLAN?

19  **A.**   SORRY.  I'M JUST TRYING TO REFRESH MY MEMORY.  ZERO FOR

20  THE HOUSE AND EIGHT FOR THE ILLUSTRATIVE HOUSE, I BELIEVE.

21  UNLESS -- YES.

22  **Q.**   OKAY.  SO NO VTD SPLITS IN THE ENROLLED PLAN; IS THAT

23  RIGHT?

24  **A.**   THAT'S CORRECT.

25  **Q.**   AND THERE WERE EIGHT, I BELIEVE YOU SAID, IN THE

1    ILLUSTRATIVE 2023 HOUSE PLAN?

2    **A.**    THAT'S CORRECT.

3    **Q.**    OKAY.  I'D LIKE TO TURN TO COMPACTNESS.  DR. MURRAY, DID

4    YOU REVIEW THE COMPACTNESS OF THE DISTRICTS CREATED IN MR.

5    COOPER'S ILLUSTRATIVE PLAN?

6    **A.**    YES, I DID.  HE REPORTED THREE DIFFERENT MEASURES OF

7    COMPACTNESS; REOCK, POLSBY-POPPER AND HE SAID IN THE REPORT

8    CONVEX HULL, BUT HE DIDN'T REPORT ANY EMPIRICAL MEASURES FOR

9    THOSE.

10    **Q.**    OKAY.  AND DID YOU ALSO REVIEW THE COMPACTNESS OF THE

11    DISTRICTS IN THE ENROLLED PLANS?

12    **A.**    YES, I DID.

13    **Q.**    OKAY.  SO CAN YOU EXPLAIN THE POLSBY-POPPER COMPACTNESS

14    METRIC?

15    **A.**    SO I PROVIDED ALL THREE MEASURES IN MY REPORT ON PAGE 2,

16    ALTHOUGH IT WAS STIPULATED IN THE DEPOSITION THAT THE

17    POLSBY-POPPER IS MISSING THE TWO EXPONENT ON THE PAREMETER.  IT

18    SHOULD BE IN THE DENOMINATOR PAREMETER SQUARED.  WHICH ONE DID

19    YOU WANT ME TO EXPLAIN?

20    **Q.**    JUST A BRIEF OVERVIEW OF POLSBY-POPPER, I'M SORRY.

21    **A.**    POLSBY-POPPER IS LOOKING AT THE PAREMETER OF A CIRCLE OF

22    THE AREA OF THE DISTRICT DIVIDED BY -- WELL, THE PAREMETER --

23    WELL, THE CIRCUMFERENCE OF THE CIRCLE OF THE SAME AREA SIZE AS

24    THE DISTRICTS SQUARED OVER THE PAREMETER SQUARED OF THE

25    DISTRICT BEING EVALUATED.

1   **Q.**   AND WHEN WAS THAT TECHNIQUE DEVELOPED?

2   **A.**   THE TECHNIQUE IS ATTRIBUTED TO POLSBY-POPPER IN 1991 BUT,

3   IN FACT, IT'S A MEASURE THAT HAS EXISTED SINCE THE 1800S AT

4   LEAST.

5   **Q.**   OKAY.  AND HOW ABOUT THE REOCK METRIC; WHAT IS THAT

6   MEASURING?

7   **A.**   THE REOCK IS THE AREA SQUARED -- AREA OVER THE SMALLEST

8   ENCLOSING CIRCLE OF THAT AREA.  SO IT'S A MEASURE THAT RANGES

9   BETWEEN ZERO AND ONE.

10  **Q.**   OKAY.  AND WHEN WAS REOCK DEVELOPED?

11  **A.**   IT'S ATTRIBUTED TO REOCK IN 1961, BUT IT TOO WAS DISCUSSED

12  AS A METRIC FOR LOOKING AT SHAPE OR COMPACTNESS IN THE 1800S AS

13  WELL.

14  **Q.**   AND ARE THERE ANY DIFFERENCES BETWEEN POLSBY-POPPER AND

15  REOCK IN TERMS OF HOW THEY WORK -- IN TERMS OF WHAT THEY'RE

16  MEASURING AND PRACTICE?

17  **A.**   YES.  AS I DESCRIBED, ONE FOCUSES ON AREA, RELATING THE

18  AREA TO THE AREA OF THE SMALLEST ENCLOSING CIRCLE, AND THE

19  OTHER, POLSBY-POPPER, LOOKS AT THE PAREMETER OF A CIRCLE OVER

20  THE PAREMETER OF THE ACTUAL AREA.

21  **Q.**   SO ARE THERE PARTICULAR SHAPES THAT MIGHT PERFORM POORLY

22  ON ONE MEASURE AND PERFORM WELL ON ANOTHER?

23  **A.**   POSSIBLY.  BOTH ARE ATTEMPTS TO CHARACTERIZE A SHAPE OR A

24  DISTRICT AS A SINGLE NUMBER WHEN, IN FACT, THEY'RE

25  TWO-DIMENSIONAL OBJECTS.

1   **Q.**   AND CONVEX HULL, WHAT IS THAT MEASURING?

2   **A.**   CONVEX HULL LOOKS AT THE AREA OVER THE CONV- -- THE AREA

3   OF THE CONVEX HULL OF THE AREA.  AND THE CONVEX HULL IS A

4   PARTICULAR KIND OF SHAPE THAT HAS A PROPERTY OF CONVEXITY.  SO

5   THAT IS DEFINED TO BE THE SMALLEST POLYGON ESSENTIALLY THAT

6   ENCLOSES -- COMPLETELY ENCLOSES THE DISTRICT.  AND, AGAIN, WHAT

7   YOU HAVE IS A MEASURE THAT'S BETWEEN ZERO AND ONE, BECAUSE THE

8   AREA AND THE NUMERATOR IS ALWAYS GOING TO BE EITHER THE SAME

9   SIZE OR SMALLER THAN THE CONVEX HULL OF THAT AREA.

10  **Q.**   NOW, DID YOU COMPUTE THE MEASURES OF COMPACTNESS THAT YOU

11  REPORT YOURSELF?

12  **A.**   YES, I DID.

13  **Q.**   OKAY.  SO I'D LIKE TO NOW TURN TO FIGURE 7 ON PAGE 9 OF

14  THE REPORT.  AND DOES THIS FIGURE REPORT YOUR COMPUTATIONS OF

15  THE DIFFERENT COMPACTNESS MEASURES IN THE ILLUSTRATIVE AND

16  ENROLLED 2023 -- ILLUSTRATIVE AND ENROLLED SENATE PLAN?

17  **A.**   YES, THEY DO.  YES, IT DOES.

18  **Q.**   OKAY.  AND WHAT IS YOUR OVER -- YOU KNOW, USING THESE

19  THREE MEASURES, WHAT IS YOUR OVERALL CONCLUSION ABOUT THE

20  COMPACTNESS OF THE DISTRICTS IN THE ENACTED SENATE PLAN?

21  **A.**   SO THEY EACH HAVE A VALUE; REOCK IS 0.35, POLSBY-POPPER IS

22  0.18 AND THE CONVEX HULL IS 0.66.  AND ACROSS ALL DISTRICTS

23  THESE MEASURES, CONVEXITY -- COMPACTNESS MEASURES ARE A LITTLE

24  BIT HIGHER THAN WHAT THEY ARE FOR THE MAJORITY BLACK DISTRICTS

25  IN THE PLAN.

1   **Q.**   OKAY.  AND THEN FOR THE -- AND THEN FOR THE ILLUSTRATIVE

2   PLAN, WHAT ARE THE NUMBERS THAT YOU CALCULATED FOR THAT?

3   **A.**   THE NUMBERS ARE, IN A RELATIVE SENSE, PRETTY SIMILAR TO

4   THOSE OBSERVED IN THE SENATE PLAN FOR EACH PARTICULAR METRIC

5   AND THERE'S THE SAME RELATIONSHIP THAT, AMONG THE 14 MAJORITY

6   BLACK DISTRICTS, THAT THE ASSOCIATED COMPACTNESS MEASURES ARE

7   LOWER THAN THEY ARE ACROSS THE WHOLE REGION.

8   **Q.**   AND IF YOU WERE COMPARING -- WE'LL JUST FOCUS ON ALL

9   DISTRICTS IN THE PLAN, BUT IF YOU WERE COMPARING THE

10  COMPACTNESS OF THE ILLUSTRATIVE PLAN VERSUS THE COMPACTNESS OF

11  THE ENROLLED PLAN WHAT CONCLUSIONS CAN YOU DRAW?

12  **A.**   THAT THE ILLUSTRATIVE PLAN HAS A SLIGHTLY HIGHER

13  COMPACTNESS TO THE HUNDREDTHS DECIMAL PLACE.

14  **Q.**   AND IS THAT -- DOES THAT HAVE SUBSTANTIVE SIGNIFICANCE TO

15  YOU AS A SOCIAL SCIENTIST?

16  **A.**   IT'S DIFFERENT.  THE MEASURE IS DIFFERENT.  I'M NOT SURE

17  WITHIN THE CONTEXT OF THE MEASURES THAT THERE'S A LOT OF

18  MEANING THAT CAN BE PUT INTO THE HUNDREDTHS PLACE DIFFERENCE,

19  BUT THERE'S A LITTLE BIT.

20  **Q.**   SURE.  OKAY.  AND I'D LIKE TO NOW TURN TO FIGURE 9, PAGE

21  11 OF YOUR REPORT, IF WE COULD GO THERE.  THIS IS UP ON THE

22  SCREEN.  DR. MURRAY, CAN THERE BE -- I THINK WE TALKED EARLIER

23  ABOUT SOME DIFFERENCES BETWEEN POLSBY-POPPER AND REOCK.  DO THE

24  MEASURES ALWAYS CORRESPOND FOR DISTRICTS?

25  **A.**   NO, THEY DON'T.  SO THE SAME OR DIFFERENT METRICS MAY GIVE

1    A DIFFERENT EVALUATION OF A PARTICULAR DISTRICT IN A

2    COMPARATIVE SENSE.  SO WHAT YOU SEE IN THIS FIGURE IS A PLOT.

3    FOR EACH DISTRICT IT'S MEASURED BY REOCK AGAINST THE MEASURE BY

4    POLSBY-POPPER.  AND IF THE MEASURES AGREED, WHAT YOU'D SEE IS A

5    STRAIGHT LINE OF AGREEMENT OR SOME OTHER TREND.

6    **Q.**   SO JUST TO ORIENT US TO THIS FIGURE, CAN YOU JUST DESCRIBE

7    WHAT'S ON THE X AXIS AND WHAT'S ON THE Y?

8    **A.**   SO THE X AXIS IS PP, THE POLSBY-POPPER AND THEN ON THE Y

9    AXIS IS REOCK.  AND THEN WHAT YOU SEE IS -- IF YOU PICKED ANY

10   PARTICULAR POINT -- SO I'LL LOOK AT THIS ONE THAT HAS A VALUE

11   OF 0.2 AND FOR POLSBY-POPPER IT'S 0.2, AND THEN IF WE LOOK AT

12   REOCK IT'S A LITTLE BIT MORE THAN 0.4.  SO IT'S ONE IN THE

13   MIDDLE.

14   **Q.**   I SEE.

15   **A.**   AND THIS IS DONE FOR EACH OF THE 39 DISTRICTS.

16   **Q.**   SO EACH DOT ON HERE REFERS TO A SPECIFIC DISTRICT AND THEN

17   IT'S PLOTTED BASED ON ITS REOCK AND ITS POLSBY-POPPER; IS THAT

18   RIGHT?

19   **A.**   YES, IT IS.

20   **Q.**   OKAY.  AND DID YOU CALCULATE A CORRELATION BETWEEN A

21   DISTRICT'S REOCK AND POLSBY-POPPER SCORE?

22   **A.**   YES, I DID.  THAT'S REPORTED SOMEWHERE.  IN FIFTEEN, I

23   GUESS.

24   **Q.**   YOU'RE REFERRING TO --

25   **A.**   -- IN THIS PARTICULAR CASE.

1   **Q.**   YOU'RE REFERRING TO PARAGRAPH 15; IS THAT RIGHT?

2   **A.**   THAT'S RIGHT.

3   **Q.**   OKAY.  AND WHAT IS THAT -- WHAT IS THAT CORRELATION?

4   **A.**   THAT CORRELATION IS 0.6449.

5   **Q.**   WHAT DOES THAT NUMBER TELL US ABOUT THE LINEAR

6   RELATIONSHIP OF THOSE TWO MEASURES OF COMPACTNESS?

7   **A.**   WELL, IT SAYS THAT THERE'S SOME CORRELATION HERE, BUT YOU

8   HAVE TO BE CAREFUL TO INTERPRET IT IN TERMS OF A LINEAR

9   IMPLICATION.  A MORE STANDARDIZED WAY TO LOOK AT IT STRICTLY

10  FROM A LINEAR PROSPECTIVE WOULD BE IN A REGRESSION FRAMEWORK,

11  WHICH WOULD EFFECTIVELY BE THIS CORRELATION CO-EFFICIENT

12  SQUARED.

13  **Q.**   SO IF YOU SQUARED THAT NUMBER WHAT WOULD THAT TELL YOU?

14  **A.**   THE ROUGHLY 0.37.  AND WHAT THAT WOULD SAY FROM A LINEAR

15  PROSPECTIVE IS THAT THE RELATIONSHIP BETWEEN THE TWO VARIABLES

16  ARE EXPLAINED -- OR 37 PERCENT OF THE VARIABILITY WITH RESPECT

17  TO LINEARITY IS EXPLAINED BY THESE TWO VARIABLES, WHICH MEANS

18  IN TERMS OF A LINEAR RELATIONSHIP WHAT'S NOT EXPLAINED IS 60.3

19  PERCENT.

20  **Q.**   SO IS THAT WHY THE DOTS ARE SCATTERED PRETTY WIDELY ON

21  THIS CHART?

22  **A.**   THAT'S EXACTLY WHY, YES.

23  **Q.**   OKAY.  NOW, DID YOU USE ANOTHER MEASURE OF COMPACTNESS TO

24  EVALUATE THE DISTRICTS BEYOND THE THREE THAT YOU REPORTED FROM

25  MR. COOPER?

1    **A.**   YES, I DID.  I USED MOMENT OF INERTIA.

2    **Q.**   AND WHY DID YOU SELECT THE MOMENT OF INERTIA?

3    **A.**   THE MOMENT OF INERTIA IS A MEASURE THAT'S MORE WIDELY

4    USED -- OR BECOMING VERY WIDELY USED NOW, THOUGH IT HAS EXISTED

5    FOR MANY YEARS.

6    **Q.**   AND WHEN WAS THE MOMENT OF INERTIA DEVELOPED?

7    **A.**   THE MOMENT OF INERTIA, IF YOU GO BACK INTO THE LITERATURE,

8    IT'S SOMETHING LIKE MAYBE 1963, WEAVER AND HESS, THEY TALK

9    ABOUT IT; ALTHOUGH THEY DO REFER TO A LEONHARD EULER DEVELOPING

10   IT IN THE 1700S.

11   **Q.**   SO THIS IS NOT EXACTLY BRAND NEW TO THE FIELD OF --

12   **A.**   NOT NEW.

13   **Q.**   OKAY.  AND JUST VERY BRIEFLY, HOW DOES THE MOMENT OF

14   INERTIA DIFFER FROM, SAY, POLSBY-POPPER?

15   **A.**   SO THE MOMENT OF INERTIA, AND ONE OF THE REASONS WHY I

16   INCLUDED IT, IS THAT IT'S A MEASURE THAT LOOKS AT THE WHOLE

17   AREA.  AND IF I TOOK A GIVEN DISTRICT, I WOULD BE LOOKING AT

18   ALL THE LOCATIONS, THE INFINITE NUMBER OF LOCATIONS WITHIN THAT

19   DISTRICT, AND LOOKING AT SOME SORT OF SPATIAL VARIABILITY WITH

20   RESPECT TO A CENTRAL LOCATION.

21          SO IN TERMS OF THE MEASURE ITSELF, IT DOES TAKE A

22   GIVEN CENTRAL LOCATION, OFTEN THE CENTROID, AND THEN IT LOOKS

23   AT THIS SQUARED DISTANCE FROM THAT LOCATION TO EVERY POINT, THE

24   INFINITE NUMBER OF POINTS WITHIN THE DISTRICT.  AND IT TAKES

25   THIS MEASURE, THIS SO CALLED MOMENT OF INERTIA, AND IT PUTS IT

1   IN A MEASURE AND THE MEASURE IS BASICALLY THE MOMENT OF INERTIA

2   FOR A CIRCLE OF THE SAME SIZE DIVIDED BY THE MOMENT OF INERTIA

3   FOR THE ACTUAL DISTRICT.

4           SO IT'S A COMPARISON OF SORT OF THE MOST COMPACT

5   SHAPE, BELIEVED TO BE A CIRCLE, AND THEN COMPARING THE BEHAVIOR

6   OF THAT DISTRICT WITH RESPECT TO THAT.  SO IT'S A MEASURE THAT

7   ALSO VARIES BETWEEN ZERO AND ONE.

8   **Q.**   OKAY.  IS THE MOMENT OF INERTIA METHOD PEER REVIEWED?

9   **A.**   YES, IT IS.  SO LIKE IN GEOGRAPHY, AND THAT'S ONE OF THE

10  REASONS THAT I USED IT, IT APPEARED IN THE 70S, AS NOTED IN MY

11  REPORT, I PROBABLY SHOULD QUALIFY THAT THE LITERATURE THAT I

12  NOTE IN THE REPORT IS REALLY THE GEOGRAPHIC LITERATURE AS

13  OPPOSED TO WHAT I JUST MENTIONED PREVIOUSLY, THAT THERE'S

14  OBVIOUSLY OTHER LITERATURE THAT THIS COMES FROM.

15          AND TWO OF THE THINGS INVOLVED -- ACTUALLY A

16  PROMINENT GIS FACULTY MEMBER THAT WAS AT UCSP, MICHAEL

17  GOODCHILD, WAS INVOLVED IN BOTH OF THE REFERENCES THAT I

18  MENTIONED.  TALKING MOSTLY ABOUT THE INTEGRATION OF THIS

19  MEASURE WITHIN THE GIS CON- -- WITHIN A GIS CONTEXT.

20  **Q.**   I SEE.  AND IS THE MOMENT OF INERTIA COMMONLY USED IN YOUR

21  FIELD?

22  **A.**   YES, IT IS.

23  **Q.**   AND HOW WOULD YOU QUALIFY THAT IT'S COMMONLY USED?

24  **A.**   THE -- IF YOU LOOK AT IT IN TERMS OF REFERENCE TO THE TERM

25  IN THE ACADEMIC LITERATURE, AND GOOGLE SCHOLAR SUGGESTS,

1   SOMETHING LIKE 19,000 REFERENCES TO THAT AS A TERM.  AND THEN

2   IF YOU LOOKED IN A NUMBER OF THE PUBLICATIONS, THERE'S, YOU

3   KNOW, HUNDREDS OF CITATIONS, FOR EXAMPLE, TO GOODCHILD AND

4   OTHER WORK THAT I MENTIONED SO FAR.

5   **Q.**   OKAY.  AND, DR. MURRAY, DID YOU CALCULATE COMPACTNESS

6   USING THE MOMENT OF INERTIA APPROACH?

7   **A.**   YES, I DID.

8   **Q.**   SO IF WE COULD TURN NOW TO FIGURE 10 ON PAGE 11 OF YOUR

9   REPORT.  DOES THIS FIGURE ON THE SCREEN HERE, DR. MURRAY, DOES

10  THIS TELL US YOUR CALCULATIONS OF THE MOMENT OF INERTIA FOR THE

11  SENATE?

12  **A.**   YES, IT DOES.

13  **Q.**   OKAY.  OVERALL WHAT DO THESE -- CAN YOU EXPLAIN WHAT THE

14  MOMENT OF INERTIA IS -- WHAT THIS VALUE IS FOR EACH?

15  **A.**   SURE.  SO AS I SAID BEFORE, THIS VALUE OF THIS PARTICULAR

16  MEASURE, LIKE THE REOCK, LIKE POLSBY-POPPER, RANGES BETWEEN

17  ZERO AND ONE.  SO WHAT YOU SEE HERE FOR THE ENROLLED SENATE

18  DISTRICTS IS THAT IT'S 0.59 WHICH SUGGESTS, YOU KNOW, TOWARDS

19  ONE BUT NOT ONE.

20          AND THEN FURTHER, PROVIDED IN THIS TABLE, IS THE

21  MINIMUM AND THE MAXIMUM VALUE AND THAT'S COMPARED TO THE 11

22  MAJORITY BLACK DISTRICTS.  AND WHAT WE SEE IS, ALONG THE LINES

23  THAT THE PREVIOUS SUMMARY MEASURES HAVE SHOWN, THAT THE MEASURE

24  OF COMPACTNESS DECREASES.

25  **Q.**   AND OVERALL, JUST LOOKING AT ALL DISTRICTS IN THE

1   ILLUSTRATIVE SENATE AND ALL DISTRICTS IN THE 2022 SENATE, WHAT

2   DO THESE VALUES TELL YOU?

3   **A.**   SO IT TELLS ME THAT IN TERMS OF COMPARISON TO THE

4   ILLUSTRATIVE PLAN THAT THE COMPACTNESS INCREASES OVERALL.  AND,

5   IN PARTICULAR, WHEN WE LOOK AT THE BLACK -- MAJORITY BLACK

6   DISTRICTS, THAT IN THE ILLUSTRATIVE CASE IT'S INCREASING, THAT

7   THEY'RE MORE COMPACT.

8   **Q.**   ALL RIGHT.  WE CAN TAKE THAT DOWN.

9        LIKE WITH THE SENATE, DID YOU ALSO -- I'D LIKE TO

10  TURN NOW -- I'D LIKE TO FLIP OVER TO THE HOUSE.  WE'VE BEEN

11  TALKING ABOUT THE SENATE.  AND IF WE COULD THEN TURN TO PAGE 13

12  AND FIGURE 15.  AND WHAT IS THIS TABLE SHOWING -- OR FIGURE

13  SHOWING US?

14  **A.**   SO THIS SHOWS THE COMPACTNESS MEASURES FOR THE REOCK,

15  POLSBY-POPPER AND CONVEX HULL FOR THE HOUSE -- ENACTED HOUSE

16  DISTRICTS AND THE ILLUSTRATIVE HOUSE DISTRICTS.

17  **Q.**   OKAY.  AND JUST COMPARING THE ENACTED AND THE ILLUSTRATIVE

18  HOUSE PLAN ALONG THESE THREE COMPACTNESS MEASURES, CAN YOU DRAW

19  ANY CONCLUSIONS?

20  **A.**   VERY SIMILAR IN TERMS OF THE COMPACTNESS FOR EVERY MEASURE

21  PRETTY MUCH.

22  **Q.**   OKAY.  AND LIKE WITH THE SENATE, DID YOU LOOK AT THE

23  CORRELATION BETWEEN REOCK AND POLSBY-POPPER AND THE HOUSE?

24  **A.**   YES, I DID.

25  **Q.**   DO YOU REPORT THE RESULTS OF THAT ANALYSIS IN YOUR REPORT?

1   **A.**   YES, I DO.

2   **Q.**   OKAY.  AND I BELIEVE IT'S ON PARAGRAPH 21 ON PAGE 14.  BUT

3   DO YOU REPORT THE CORRELATION BETWEEN THE REOCK AND

4   POLSBY-POPPER IN THE ILLUSTRATIVE HOUSE?

5   **A.**   YES, I DO.

6   **Q.**   AND WHAT IS THAT?

7   **A.**   IT'S 0.5847.

8   **Q.**   AND THAT NUMBER IS LESS THAN IT IS IN THE SENATE; IS THAT

9   RIGHT?

10  **A.**   THAT'S CORRECT.

11  **Q.**   AND WHAT DOES THAT MEAN PRACTICALLY?

12  **A.**   THAT THERE'S SOME DEGREE OF POSITIVE CORRELATION HERE.

13  AND THEN IF WE LOOKED AT THIS FROM A LINEAR PROSPECTIVE, THAT

14  WE WOULD SQUARE THAT TERM AND SEE THAT IT'S LESS THAN 0.36, I

15  GUESS, IN TERMS OF THE EXPLANATORY POWER FOR THE LINEAR

16  RELATIONSHIP.

17  **Q.**   OKAY.  AND DID YOU ALSO USE MOMENT OF INERTIA TO CALCULATE

18  COMPACTNESS IN THE ENROLLED VERSUS ILLUSTRATIVE HOUSE PLANS?

19  **A.**   YES, I DID.

20  **Q.**   I'D LIKE TO TURN TO FIGURE 18 ON PAGE 15.

21         DR. MURRAY, DOES THIS FIGURE REPORT THE RESULTS OF

22  YOUR MOMENT OF INERTIA COMPACTNESS ANALYSIS IN THE HOUSE?

23  **A.**   YES, IT DOES.

24  **Q.**   AND CAN YOU JUST BRIEFLY SUMMARIZE FOR THE COURT THE

25  COMPACTNESS NUMBERS AND -- WELL, JUST THE COMPACTNESS NUMBERS

1  FOR THE TWO PLANS?

2  **A.**   YES.  FOR COMPARING THE HOUSE, THE ENACTED HOUSE AND THE

3  ILLUSTRATIVE HOUSE, THEY'RE ALMOST EXACTLY THE SAME IN TERMS OF

4  THESE MEASURES -- THIS MEASURE OF COMPACTNESS.

5  **Q.**   OKAY.  AND SO I'D LIKE TO NOW MOVE ON.  YOU ALSO PERFORMED

6  AN ANALYSIS OF THE PERCENTAGE BLACK VOTING AGE POPULATION IN

7  THE BLACK MAJORITY DISTRICTS IN MR. COOPER'S PLAN; IS THAT

8  RIGHT?

9  **A.**   YES, THAT'S TRUE.

10  **Q.**   OKAY.  AND, IN PARTICULAR, DID YOU LOOK AT AN ANALYSIS

11  MR. COOPER PROVIDED IN HIS REPORT THAT COMPARED THE PERCENTAGE

12  BVAP IN BLACK MAJORITY DISTRICTS TO THE PERCENTAGE WHITE VAP IN

13  WHITE MAJORITY DISTRICTS?

14  **A.**   YES.

15  **Q.**   SO WHAT I'D LIKE TO DO NOW IS I'D LIKE TO DO A

16  SIDE-BY-SIDE OR TOP OR BOTTOM, WHICHEVER WE DID HERE, COMPARING

17  FIGURE 11 ON PAGE 12 OF YOUR REPORT, LDTX 42, AND A

18  SIDE-BY-SIDE WITH FIGURE 16 ON PAGE 35 OF MR. COOPER'S REPORT

19  WHICH IS MARKED PL-20.  AND, DR. MURRAY, YOU'LL PROBABLY HAVE

20  TO USE YOUR SCREEN FOR THIS ONE.

21  **A.**   GOT IT.

22  **Q.**   ALL RIGHT.  JUST TO ORIENT, I'LL JUST REPRESENT THAT THE

23  TOP FIGURE COMES FROM DR. MURRAY'S REPORT AND THE BOTTOM FIGURE

24  COMES FROM MR. COOPER'S.  SO, DR. MURRAY, IS FIGURE 11 THE

25  RESULT OF YOUR RESPONSE TO MR. COOPER'S FIGURE 16?

1  **A.**    YES, IT IS.

2  **Q.**    OKAY.  AND CAN YOU EXPLAIN WHAT ANALYSIS YOU PERFORMED IN

3  FIGURE 11 OF YOUR REPORT?

4  **A.**    SO IN FIGURE 11 THIS WAS BASED UPON HIS ORIGINAL FIGURE 16

5  AND LOOKING AT WHAT WAS BEING REPORTED, AND BASED UPON THIS,

6  WHAT YOU SEE IN THE TABLE IS MY INTERPRETATION OF WHAT THAT

7  SHOULD LOOK LIKE.  SO, IN PARTICULAR, LOOKING AT THE BLACK

8  VOTING AGE POPULATION IN THE MAJORITY DISTRICTS WHAT YOU SEE IS

9  58.98 PERCENT IN THE SENATE ENACTED PLAN, AND THAT'S BASED UPON

10 LOOKING AT THE TOTAL POPULATION BVAP OVER THE TOTAL BVAP IN

11 THOSE MAJORITY DISTRICTS.

12 **Q.**    OKAY.  SO WHEN WE LOOK AT THE CHANGE IN THE MAJORITY BVAP

13 IN THE SENATE, YOU GO FROM THE ENACTED TO THE ILLUSTRATIVE, HOW

14 DOES THAT NUMBER CHANGE?

15 **A.**    SO IN THE ILLUSTRATIVE SENATE IT'S A SIMILAR THING.  THE

16 TOTAL BVAP IN THOSE MAJORITY DISTRICTS DIVIDED BY THE TOTAL

17 BVAP IN THOSE MAJORITY DISTRICTS.

18 **Q.**    SO HOW DOES THAT -- HOW DOES THAT PERCENTAGE CHANGE FROM

19 THE ENACTED TO THE ILLUSTRATIVE SENATE?

20 **A.**    I'M SORRY -- YEAH, THAT'S RIGHT.  SO IN THE ILLUSTRATIVE

21 PLAN WHAT YOU SEE IN PERCENTAGE TERMS IS THAT THERE'S LARGER

22 POPULATION ACROSS THOSE MAJORITY BLACK DISTRICTS AND SO, AS A

23 RESULT, THAT PERCENTAGE OF THE BVAP IN THOSE DISTRICTS IS LESS.

24 SO IT DECREASES FROM THE ENACTED TO THE ILLUSTRATIVE.

25 **Q.**    SO WHEN WE LOOK AND WE SEE THAT THE -- AND WE LOOK OVER AT

1   THE NEXT COLUMN IS "2020 NH WHITE VAP MAJORITY DISTRICTS."

2   WHAT IS THAT COLUMN REPORTING?

3   **A.**   SORRY, CAN YOU SAY AGAIN?

4   **Q.**   SURE.  SO FOR THE SECOND COLUMN IT SAYS WHITE MAJORITY VAP

5   DISTRICTS; WHAT'S THAT LOOKING AT?

6   **A.**   SO IN THOSE DISTRICTS IT'S LOOKING AT THE WHITE VAP ACROSS

7   THE WHITE VAP MAJORITY DISTRICTS AND LOOKING AT THAT PERCENTAGE

8   OF THAT -- OF THE TOTAL POPULATION IN THOSE DISTRICTS.

9   **Q.**   AND SO BETWEEN THE ENACTED AND THE ILLUSTRATIVE WHAT --

10  HOW DOES THAT VALUE CHANGE?

11  **A.**   SO IN THE ENACTED IT'S 68.74 PERCENT AND IN THE

12  ILLUSTRATIVE THIS INCREASES TO 70.15 PERCENT.

13  **Q.**   AND THEN ON THAT RIGHT-HAND COLUMN, THE WORD "DIFFERENCE",

14  WHAT DO YOU UNDERSTAND -- I UNDERSTAND YOU'RE WORKING OFF

15  MR. COOPER'S, BUT THAT DIFFERENCE NUMBER, WHAT DO YOU

16  UNDERSTAND THAT TO BE?

17  **A.**   SO I UNDERSTAND THIS TO BE THE DIFFERENCE BETWEEN

18  58.98 PERCENT MINUS 68.74 PERCENT AND THAT GIVES YOU A MINUS

19  9.76 PERCENT.

20  **Q.**   AND THE SAME CALCULATION FOR THE ILLUSTRATIVE?

21  **A.**   YES.

22  **Q.**   NOW, THESE NUMBERS DON'T AGREE WITH MR. COOPER'S; IS THAT

23  RIGHT?

24  **A.**   THEY DON'T APPEAR TO AGREE, NO.

25  **Q.**   AND CAN YOU EXPLAIN THE DIFFERENCE BETWEEN YOUR NUMBERS

1   AND HIS?

2   **A.**   I BELIEVE I CAN.  FROM MY UNDERSTANDING OF HIS REBUTTAL,

3   IS THAT FOR THE SENATE IT'S THAT BVAP TOTAL IN THOSE DISTRICTS

4   DIVIDED BY BVAP ACROSS THE WHOLE STATE, SO NOT JUST THE

5   POPULATION WITHIN THOSE MAJORITY DISTRICTS.

6   **Q.**   OKAY.  SO JUST TO MAKE SURE I UNDERSTAND, SO IN YOUR

7   FIGURE 11, YOU'RE TAKING THE PERCENTAGE -- THE AVERAGE

8   PERCENTAGE BVAP IN THE BLACK MAJORITY DISTRICTS; IS THAT RIGHT?

9   **A.**   THAT'S RIGHT.

10  **Q.**   AND SO MR. COOPER IS TAKING THE PERCENTAGE BVAP IN

11  MAJORITY DISTRICTS COMPARED WITH THE STATE AS A WHOLE; IS THAT

12  RIGHT?

13  **A.**   THAT'S RIGHT.

14  **Q.**   AND IS THAT THE SAME ANALYSIS UNDERTAKEN WITH RESPECT TO

15  THE WHITE MAJORITY DISTRICTS?

16  **A.**   THAT'S RIGHT, YES.

17  **Q.**   OKAY.  AND IS IT PROBLEMATIC TO COMPARE -- TO DRAW THE

18  COMPARISON AGAINST STATEWIDE NUMBERS INSTEAD OF DISTRICT

19  NUMBERS?

20  **A.**   I BELIEVE THAT IT IS, YES.

21  **Q.**   AND WHY IS THAT?

22  **A.**   I'M NOT SURE THAT IT MAKES SENSE.  BECAUSE IN THE

23  DISCUSSION, BOTH IN THE TABLE AND THE HEADINGS AND THE

24  DISCUSSION IN THE REPORT, IT WAS TRYING TO CHARACTERIZE THAT

25  PERCENTAGE OF THE BVAP OR WHITE VAP IN THOSE DISTRICTS AND HOW

1    THEY COMPARED.  SO BY DIVIDING IT BY THE STATE TOTALS RENDERS

2    IT IN A WAY -- AN INCOMPARABLE KIND OF COMPARISON IN MY

3    OPINION.

4    **Q.**   OKAY.  SO IS THE IDEA THAT IF YOU'RE LOOKING AT

5    CHARACTERISTICS IN DISTRICTS, AM I HEARING YOU RIGHT THAT YOU

6    SHOULD BE LOOKING AT THE DISTRICTS AND NOT PULLING IN NUMBERS

7    FROM OUTSIDE OF THE DISTRICTS?

8    **A.**   THAT'S CORRECT.

9    **Q.**   OKAY.  THEN IF WE SEE UNDER YOUR ANALYSIS, RATHER THAN THE

10   DIFFERENCE NUMBER GETTING CLOSER TO ZERO AS YOU MOVE FROM THE

11   ENACTED TO THE ILLUSTRATIVE SENATE, AS IT DOES IN MR. COOPER'S

12   ANALYSIS, IN YOUR ANALYSIS THE DIFFERENCE GETS LARGER; IS THAT

13   RIGHT?

14   **A.**   THAT'S RIGHT.

15   **Q.**   WHAT IS YOUR INTERPRETATION OF THE DIFFERENCE NUMBER UNDER

16   YOUR FIGURE 11?

17   **A.**   SO IN MY FIGURE 11 WHAT YOU SEE IS THAT THE BVAP IN THOSE

18   BLACK MAJORITY DISTRICTS GOES DOWN A SMALLER PERCENTAGE, TO

19   53 PERCENT, AND THEN AS A RESULT OF THAT YOU'D SEE A GREATER

20   PERCENTAGE OF NONHISPANIC WHITE VAP IN THE OTHER DISTRICTS AND

21   THAT'S WHY IT GOES UP TO 70 PERCENT.  SO INTUITIVELY THIS MAKES

22   SENSE AND ALLOWS FOR COMPARISON AND WHAT HAPPENS IS EXACTLY

23   WHAT YOU WOULD EXPECT.

24   **Q.**   SO IS THIS -- IS THIS FIGURE SHOWING US HOW THE CHANGES

25   BETWEEN THE ENACTED AND ILLUSTRATIVE ARE SORTING THE POPULATION

1   BY RACE?

2   **A.**   IT APPEARS TO, YES.

3   **Q.**   AND HOW DOES IT APPEAR TO DO SO?

4   **A.**   IN THAT BY CREATING MORE MAJORITY BLACK DISTRICTS YOU'D --

5   YOU'RE ISOLATING MORE OF THE BVAP IN THE STATE AND THEN

6   SIMILARLY IN THE WHITE -- NONHISPANIC WHITE VAP DISTRICTS,

7   YOU'RE OBVIOUSLY CREATING A GREATER CONCENTRATION OF THAT WHITE

8   VAP MAJORITY.

9   **Q.**   AND DID YOU PERFORM A SIMILAR ANALYSIS, DR. MURRAY, OF THE

10   HOUSE?

11   **A.**   YES, I DID.

12   **Q.**   OKAY.  I'D LIKE TO TURN QUICKLY TO -- WE'LL DO ONE MORE

13   SIDE-BY-SIDE COMPARISON, FIGURE 19 ON PAGE 16 OF YOUR REPORT,

14   LDTX 42, JUXTA POSED WITH FIGURE 27 APPEARING ON PAGE 48 OF

15   PL-20 WHICH IS COOPER'S.

16         AND CAN YOU JUST BRIEFLY SUMMARIZE FOR THE COURT,

17   DR. MURRAY, YOUR ANALYSIS IN FIGURE 19?

18   **A.**   SIMILAR TO WHAT I JUST TALKED ABOUT FOR THE SENATE, WHAT

19   WE SEE IS 63 PERCENT OF BVAP IN THE BLACK MAJORITY DISTRICTS.

20   AND THEN FOR THE WHITE VOTING AGE POPULATION DISTRICTS, WE SEE

21   BOTH WHITE VAP, WVAP, AT 69.38 PERCENT FOR THE ENACTED HOUSE

22   PLAN, AND THEN THIS GOES DOWN TO 57.24 PERCENT IN THE

23   ILLUSTRATIVE HOUSE FOR THE BVAP, BLACK MAJORITY DISTRICTS, AND

24   THEN 70.25 IN THE NONHISPANIC WHITE VAP MAJORITY DISTRICTS.

25   **Q.**   AND SO AS YOU MOVE FROM THE ENACTED TO THE ILLUSTRATIVE,

1    IS THE DIFFERENCE BETWEEN THOSE PERCENTAGES IN THE BLACK

2    MAJORITY DISTRICTS AND IN THE WHITE MAJORITY DISTRICTS GROWING?

3    **A.**   IT GOES DOWN.

4    **Q.**   BUT IT'S GETTING FARTHER FROM ZERO; IS THAT RIGHT?

5    **A.**   THAT'S RIGHT.

6    **Q.**   SO THEY'RE GETTING MORE DIFFERENT?

7    **A.**   EXACTLY.

8    **Q.**   OKAY.  AND, AGAIN, THAT'S A DIFFERENT DIRECTION THAN

9    MR. COOPER'S CALCULATION OF THE DIFFERENCE USING HIS

10   METHODOLOGY IN HIS FIGURE 27; IS THAT RIGHT?

11   **A.**   THAT'S RIGHT.

12   **Q.**   SO ARE YOUR CONCLUSIONS WITH REGARD TO THE HOUSE SIMILAR

13   AS THEY ARE WITH RESPECT TO THE SENATE?

14   **A.**   YES, THEY ARE.

15   **Q.**   OKAY.  SO I'D LIKE TO NOW MOVE ON TO -- YOU PERFORMED AN

16   ANALYSIS ON -- I BELIEVE YOU PERFORMED AN ANALYSIS COMPARING

17   THE BVAP OF THE ENROLLED AND THE ILLUSTRATIVE DISTRICTS THAT

18   BORDER THE LOCATION OF MR. COOPER'S NEW ILLUSTRATIVE MAJORITY

19   BLACK DISTRICTS; IS THAT RIGHT?

20   **A.**   THAT'S RIGHT.

21   **Q.**   OKAY.  AND WHY DID YOU PERFORM THAT ANALYSIS?

22   **A.**   TO LOOK AT THE IMPACTS OF THE CREATION OF THIS NEW BLACK

23   MAJORITY DISTRICT ON THE LOCAL -- ON THE SURROUNDING DISTRICTS.

24   **Q.**   SO I THINK WE CAN GO PRETTY QUICKLY THROUGH THIS, BUT I'D

25   LIKE TO PULL UP FIGURES 12 TO 14 FROM PAGES 12 TO 13 OF YOUR

1   REPORT.

2          OKAY.  SO CAN YOU ORIENT THE COURT TO THE FIGURES?

3   MAYBE START WITH FIGURE 12 AT THE BOTTOM OF PAGE 12.

4   **A.**   YEAH.  SO THIS LOOKS AT ILLUSTRATIVE SENATE DISTRICT 17

5   AND THOSE NEIGHBORING DISTRICTS -- AND THE NEIGHBORING

6   DISTRICTS, AND THEN LOOKING AT WHAT'S HAPPENING TO THE BVAP

7   PERCENT IN THE ILLUSTRATIVE COMPARED TO THE ENROLLED.  AND WHAT

8   YOU SEE IS THAT IN TERMS OF THE CHANGING NEIGHBORING DISTRICTS

9   TO 17 YOU HAVE 15, 2 AND 14.  AND IN THE ENROLLED IT WAS

10  RESPECTIVELY 73.9 PERCENT BVAP, 57.7 PERCENT AND THEN

11  58 PERCENT.

12          AND THEN WHEN WE LOOK AT THE ILLUSTRATIVE PLAN FOR

13  15, 2 AND 14, AGAIN, RESPECTIVELY, IT GOES DOWN PRETTY MUCH BUT

14  DOES STAY THE SAME FOR 14, BUT FOR 15 AND 2 IT GOES DOWN TO

15  54.4 PERCENT AND 51.73 PERCENT.

16  **Q.**   AND THEN I BELIEVE FIGURE 13 COVERS THE SENATE.  DO YOU

17  SEE A SIMILAR PATTERN IN FIGURE 13?

18  **A.**   YES.

19  **Q.**   AND THEN IF WE LOOK AT FIGURE 14, WHICH COVERS

20  ILLUSTRATIVE SENATE DISTRICT 38, DO YOU SEE THE SAME PATTERN?

21  **A.**   SAME PATTERN, YES.

22  **Q.**   OKAY.  NOW, I NOTICE YOU ONLY HAVE ONE DISTRICT LISTED FOR

23  38; IS THERE A REASON WHY?

24  **A.**   I THINK THAT'S THE ONLY NEIGHBORING DISTRICT THAT CHANGED.

25  I'M NOT SURE IF IT'S THE ONLY NEIGHBORING DISTRICT, BUT IT'S

1   THE ONLY ONE THAT CHANGED.

2   **Q.**   AND THAT'S ONE OF THE SHREVEPORT DISTRICTS, RIGHT?

3   **A.**   I BELIEVE SO.

4   **Q.**   OKAY.  DO YOU PERFORM THE SAME ANALYSIS -- SORRY.  WHAT DO

5   THE DIFFERENCES -- WHAT DOES THIS PATTERN OF DIFFERENCES

6   BETWEEN THE ENACTED AND ILLUSTRATIVE DISTRICT BVAP'S OF THESE

7   NEIGHBORING DISTRICTS TELL US?

8   **A.**   IN MY OPINION IT SUGGESTS THAT TO CREATE THESE NEW

9   MAJORITY BLACK DISTRICTS THAT BVAP FROM NEIGHBORING DISTRICTS

10  NEEDED TO BE ALLOCATED OR BORROWED, IF YOU WILL, IN ORDER TO

11  CREATE THE BLACK MAJORITY DISTRICT.

12  **Q.**   OKAY.  AND, DR. MURRAY, DID YOU PERFORM THIS SAME ANALYSIS

13  FOR THE NEW ILLUSTRATIVE HOUSE DISTRICTS?

14  **A.**   YES.

15  **Q.**   AND DO YOU REPORT THAT ANALYSIS IN FIGURES 20 TO 25 OF

16  YOUR REPORT BEGINNING AT THE BOTTOM OF PAGE 16?

17  **A.**   APPARENTLY I DO, YES.

18  **Q.**   ALL RIGHT.  SO, DR. MURRAY, THE E6 FIGURES PERFORM A

19  SIMILAR CALCULATION FOR EACH OF THE SIX NEW ILLUSTRATIVE HOUSE

20  DISTRICTS IN MR. COOPER'S PLAN; IS THAT RIGHT?

21  **A.**   THAT'S CORRECT.

22  **Q.**   SO I'D LIKE TO JUST USE ONE AS AN EXAMPLE.  LET'S GO WITH

23  MAYBE FIGURE 24 FOR ILLUSTRATIVE HOUSE DISTRICT 65.

24  **A.**   OKAY.

25  **Q.**   SO WHAT IS THIS -- WHAT IS THIS PARTICULAR FIGURE SHOWING

1    US?

2    **A.**   WELL, ONE, IT'S SHOWING AN ERROR, BECAUSE I DON'T KNOW

3    ABOUT 6,977.0 PERCENT, SO THERE'S CLEARLY A TYPO HERE.  I

4    BELIEVE IT'S 69.77 PERCENT, BUT I'D HAVE TO VERIFY THAT.

5         BUT WHAT WE SEE IS A SIMILAR SORT OF RELATIONSHIP IN

6    THAT THE NEIGHBORING DISTRICTS THAT HAVE CHANGED HAVE

7    CONSISTENTLY A HIGHER ENROLLED HOUSE PERCENTAGE BVAP WHEN YOU

8    COMPARE THEM TO THE ILLUSTRATIVE HOUSE CASE.

9    **Q.**   AND I'D LIKE TO LOOK AT MAYBE ONE MORE OF THESE.  IF WE

10   COULD LOOK AT FIGURE 25 WHICH IS FOR ILLUSTRATIVE HOUSE

11   DISTRICT 68.  AND WHAT DO YOU SEE FOR -- WHAT DOES THIS FIGURE

12   TELL US, DR. MURRAY?

13   **A.**   A SIMILAR.  SO THE DISTRICTS THAT NEIGHBOR DISTRICT 68 ARE

14   29, 61, 62, 101, 67, 63, AND THEN YOU SEE THIS RELATIONSHIP OF

15   A DECREASE IN THE BVAP IN THE ASSOCIATED DISTRICTS IN ORDER TO

16   CREATE THE NEW BLACK MAJORITY DISTRICT 68.

17   **Q.**   AND TAKING A LOOK AT THESE NEW ILLUSTRATIVE DISTRICTS AS A

18   WHOLE, DO YOU SEE -- DOES A PATTERN EMERGE FOR YOU FROM THIS

19   ANALYSIS?

20   **A.**   IN TERMS OF CREATING THIS NEW BLACK MAJORITY DISTRICT

21   REQUIRED A SORT OF BORROWING FROM NEIGHBORING DISTRICTS IN

22   ORDER TO ACHIEVE THE MAJORITY DISTRICT STATUS, YES.

23   **Q.**   ALL RIGHT.  SO, DR. MURRAY, DID YOU ALSO LOOK AT CORE

24   RETENTION?

25   **A.**   YES, I DID.

1   **Q.**   WHAT IS CORE RETENTION TO YOU?

2   **A.**   SO CORE RETENTION IS THE IDEA OF HOW MUCH DID A NEW

3   DISTRICTING PLAN MAINTAIN SORT OF THE ORIGINAL REPRESENTATION

4   OR BOUNDARIES FROM THE ORIGINAL.  SO IN THIS PARTICULAR CASE, I

5   COMPARED THE 2022 ENROLLED TO THE 2011 ENROLLED DISTRICTS AND

6   THEN LOOKED AT, FOR EXAMPLE, WHAT THAT PERCENTAGE WAS BEING

7   MAINTAINED IN THE SAME OR AN EQUIVALENT DISTRICT.  AND I DID

8   THIS THROUGH AN ANALYTICAL APPROACH THAT'S DESCRIBED IN THE

9   REPORT.

10  **Q.**   OKAY.  SO I'D LIKE TO PUT UP FIGURES 26 AND 27 APPEARING

11  ON PAGE 18 OF YOUR REPORT, LTDX 42.  DR. MURRAY, DO THESE TWO

12  FIGURES REPORT YOUR CORE RETENTION -- THE RESULTS OF YOUR CORE

13  RETENTION ANALYSIS IN THIS CASE?

14  **A.**   YES, THEY DO.

15  **Q.**   SO IF WE COULD START WITH FIGURE 26, WHAT DO YOU CONCLUDE?

16  **A.**   SO WHAT I CONCLUDE IS THAT LOOKING AT THE 2022 ENROLLED

17  SENATE PLAN THAT IT MAINTAINS, AS A STRICT PERCENTAGE, LOOKING

18  AT THE DISTRICT BOUNDARIES AND HOW MUCH THEY AGREE,

19  83.3 PERCENT RETENTION FROM THE 2011 SENATE DISTRICTS.

20  **Q.**   AND HOW DOES THAT COMPARE TO THE ILLUSTRATIVE SENATE?

21  **A.**   IT'S CONSIDERABLY HIGHER WHEN YOU LOOK AT THE

22  67.17 PERCENT FOR THE ILLUSTRATIVE SENATE.

23  **Q.**   OKAY.  AND SO MOVING TO THE HOUSE, WHAT DO YOU CONCLUDE

24  ABOUT CORE RETENTION IN THE HOUSE IN THE 2022 ENROLLED PLAN?

25  **A.**   SIMILAR TO WHAT WE SAW FOR THE SENATE.  IN THIS CASE THE

1    ENROLLED -- ENROLLED HOUSE PLAN MAINTAINS OR RETAINS

2    75.43 PERCENT FROM THE 2011 HOUSE DISTRICTS, DIFFERING FROM THE

3    ILLUSTRATIVE HOUSE DISTRICTS HAVING 63.06 PERCENT RETENTION.

4    **Q.**   OKAY.  AND, GENERALLY, WHAT DO YOU FIND ABOUT THE DECREASE

5    TO WHICH THE ILLUSTRATIVE PLANS IN THIS CASE RETAIN IN THE

6    CORES OF PRIOR DISTRICTS?

7    **A.**   THAT THE ENROLLED PLANS RETAINED MORE FROM THE 2011

8    DISTRICTS THAN THE ILLUSTRATIVE.

9    **Q.**   AND, FINALLY, DR. MURRAY, I BELIEVE YOU DESCRIBED A

10   COMMUNITY OF INTEREST ANALYSIS THAT YOU UNDERTOOK IN THIS CASE;

11   IS THAT RIGHT?

12   **A.**   YES, I DID.

13   **Q.**   OKAY.  I'D LIKE TO NOW TURN TO THAT.  SO I BELIEVE YOU

14   BEGIN YOUR DISCUSSION OF THIS ANALYSIS ON PARAGRAPH 27, PAGE

15   18; IS THAT RIGHT?

16   **A.**   YES.

17   **Q.**   OKAY.  AND CAN YOU TELL THE COURT WHAT YOU STUDIED IN THIS

18   ANALYSIS?

19   **A.**   SO THE INTENT HERE WAS TO TRY AND GET AT WHETHER THE

20   DECREASE TO WHICH COMMUNITIES OF INTEREST WERE BEING PRESERVED

21   IN THE COOPER REPORT; IT WAS SOMETHING THAT WAS DISCUSSED.  I

22   THINK THERE WAS A MENTION OF MUNICIPALITIES IN COOPER AS

23   POTENTIALLY COMMUNITIES OF INTEREST, BUT CERTAINLY THAT ISN'T A

24   WELL-ACCEPTED DEFINITE.  IT MAY BE ONE TYPE, BUT IT'S CERTAINLY

25   NOT A MORE NEIGHBORHOOD-ORIENTED DEFINITION OF A COMMUNITY OF

1    INTEREST.

2            SO THE INTENT WAS TO LOOK AT WHETHER OR NOT

3    COMMUNITIES OF INTEREST AT A MORE LOCAL LEVEL WERE BEING

4    RETAINED OR SPLIT IN ANY WAY.  SO IN PARTICULAR IN MY ANALYSIS

5    I LOOKED AT BLOCK GROUPS AS ONE FORM OF A POTENTIAL

6    NEIGHBORHOOD AND WHETHER BLOCK GROUPS THAT FORM EITHER A

7    NEIGHBORHOOD IN AND OF THEMSELVES OR A COLLECTION OF LOCALIZED

8    BLOCK GROUPS, THAT IS A BLOCK GROUP AND ITS NEIGHBORS, THAT ANY

9    OF THOSE THAT MAY FORM A CLUSTER OF SIMILAR SOCIOECONOMIC

10   CHARACTERISTICS WERE BEING SPLIT IN THE ILLUSTRATIVE DISTRICT

11   PLANS.

12   **Q.**   AND JUST TO MAKE SURE WE HAVE A CLEAN RECORD, CAN YOU

13   EXPLAIN THE DIFFERENCE BETWEEN A BLOCK AND A BLOCK GROUP?

14   **A.**   SO A BLOCK GROUP, THE DEFINITION IS GIVEN IN THE REPORT,

15   BUT A BLOCK GROUP IS A LARGER GEOGRAPHIC AREA THAT CONSISTS OF

16   MANY BLOCK GROUPS WITHIN IT.

17   **Q.**   BLOCK GROUPS OR BLOCKS?

18   **A.**   BLOCKS, EXCUSE ME.  A BLOCK GROUP CONSISTS OF MANY BLOCKS

19   WITHIN IT, YES.

20   **Q.**   I SEE.  OKAY.  WHAT MADE YOU SELECT BLOCK GROUPS FOR YOUR

21   STUDY HERE?

22   **A.**   IT'S ONE GEOGRAPHY THAT POTENTIALLY REFLECTS

23   CHARACTERISTICS OF A NEIGHBORHOOD, SO THAT LED IT.  SOME PEOPLE

24   HAVE IN SOCIOLOGY AND OTHER AREAS, CERTAINLY IN THE CRIMINOLOGY

25   AREA, RELIED UPON TRACKS, BUT I BELIEVE THAT THEY'RE TOO BROAD

1   TO REPRESENT SOME OF THE LOCALIZED CHARACTERISTICS.  SO I FELT

2   THAT BLOCK GROUPS WERE A REASONABLE PROXY FOR NEIGHBORHOODS OR

3   COMMUNITIES OF INTEREST TO EVALUATE IN THE STUDY.

4   Q.   OKAY.  SO HOW DID YOU GO ABOUT CARRYING OUT THIS ANALYSIS?

5   A.   SO THE ANALYSIS RELIED UPON BLOCK GROUP DATA AS IT SAYS

6   OBTAINED FROM THE ACS CENSUS.  AND IN DOING THIS, ONE OF THE

7   CHARACTERISTICS I LOOKED AT WAS THE DIFFERENCE IN PERCENT WHITE

8   VOTING AGE POPULATION MINUS THE PERCENT OF BLACK BVAP, BLACK

9   VOTING AGE POPULATION, IN ADDITION TO CHARACTERISTICS OF

10  INCOME, AS WELL AS EDUCATIONAL ATTAINMENT.

11  Q.   WHERE DID YOU GET THE DATA ON INCOME AND EDUCATION?

12  A.   THIS IS FROM THE ACS CENSUS INFORMATION.

13  Q.   OKAY.  SO I'D LIKE TO NOW LOOK AT FIGURE 28 ON PAGE 19 OF

14  YOUR REPORT.  AND I KNOW IT COMES FROM SOME ACCOMPANYING TEXT

15  ABOVE IT ON THE PAGE, BUT CAN YOU EXPLAIN TO US KIND OF WHAT --

16  A.   SO METHODOLOGICALLY ONE OF THE TECHNIQUES THAT I USED IS A

17  MEASURE OF SPATIAL AUTOCORRELATION WHICH LOOKS AT THE BLOCK

18  GROUPS AND THE ASSOCIATE ATTRIBUTE OF INTEREST.  SO IN THIS

19  CASE IT WAS WVAP PERCENT MINUS BVAP PERCENT.  AND I LOOKED AT

20  THIS ATTRIBUTE AND LOOKED AT -- AND BASICALLY THE MEASURE OF

21  SPATIAL AUTOCORRELATION IS LOOKING FOR CLUSTERS, LOCAL

22  CLUSTERS, DEFINED AT THE BLOCK GROUP LEVEL AND THE DEGREE TO

23  WHICH A GIVEN BLOCK GROUP IS SIMILAR OR DIFFERENT TO ITS

24  NEIGHBORING UNITS.

25          SO THIS OVERALL VALUE -- SO THE PARTICULAR MEASURE I

1  USED IN THIS CASE WAS LOCAL MORAN'S I.  SO WHAT YOU SEE AT THE

2  TOP OF THIS FIGURE IS THIS MEASURE OF MORAN'S I, WHICH THIS

3  PARTICULAR MEASURE IS FOR THE WHOLE REGION, AND A VALUE OF 0

4  POINT -- AND THIS MEASURE RANGES BETWEEN MINUS ONE AND ONE.  SO

5  IN THIS CASE THIS IS SUGGESTIVE OF A HIGH DEGREE -- A HIGH

6  DEGREE AND SIGNIFICANT DEGREE OF POSITIVE SPATIAL

7  AUTOCORRELATION.  AND THROUGH THIS, WHAT WE WOULD EXPECT IS

8  THAT THERE ARE MANY POCKETS OF HIGH BVAP BLOCK GROUPS

9  SURROUNDED BY OTHER HIGH BVAP BLOCK GROUPS, AS WELL AS HIGH

10 WVAP BLOCK GROUPS, HIGH PERCENTAGE, CLOSER TO ONE, SURROUNDED

11 BY HIGH WVAP BLOCK GROUPS.

12      AND ONE WAY TO LOOK AT THIS -- SO THE GLOBAL MEASURE

13 OF SPATIAL AUTOCORRELATION JUST GIVES YOU ONE NUMBER AND IT

14 JUST SAYS WE THINK THAT THERE'S CLUSTERING IN THE REGION, BUT

15 IT DOESN'T SAY WHERE THAT IS.  BREAKING THIS DOWN, AND THE

16 REASON THAT I USED THE LOCAL MORAN'S I APPROACH, IS THAT THIS

17 DOES TELL US SPATIALLY WHAT BLOCK GROUPS IS THIS OCCURRING AND

18 TO WHAT DEGREE IS IT SIGNIFICANT.

19      SO WHAT YOU SEE HERE IS A PLOT OF THIS ATTRIBUTE

20 VALUE, THE PERCENT WVAP MINUS PERCENT BVAP, THAT'S Y-I.  SO

21 ALONG THIS AXIS USING STANDARDIZED VALUE AND IT'S PLOTTED

22 AGAINST THE NEIGHBOR VALUES OF THIS PARTICULAR MEASURE SO

23 THAT'S WHY YOU GOT THIS SCATTER PLOT AND THAT'S WHY YOU SEE ON

24 THE Y AXIS THAT MATHEMATICAL MESS, IF YOU WILL, IS ACTUALLY THE

25 AVERAGE OF THE NEIGHBORS IN TERMS OF THIS PARTICULAR MEASURE.

1        SO WHAT YOU HAVE IS A BLOCK GROUP MEASURE PLOTTED

2   AGAINST THE NEIGHBOR VALUES AND THEN YOU GET THIS SO-CALLED

3   MORAN SCATTER PLOT.  AND THE SIGNIFICANCE OF THIS PLOT IS THAT

4   IF YOU LOOK AT THE DOTTED LINES, IT BREAKS THESE PLOTTED POINTS

5   INTO QUADRANTS.

6        SO THE TOP-MOST QUADRANT IS CONSIDERED A HIGH VALUE

7   SURROUNDED BY A HIGH VALUE.  THE OTHER ONE OF INTEREST HERE IS

8   THE LOWER-LEFT QUADRANT WHICH SUGGESTS LOW VALUES OF THIS

9   PARTICULAR ATTRIBUTE SURROUNDED BY LOW VALUES.

10  **Q.**   OKAY.  SO JUST TO BE VERY CLEAR, SO EACH BLUE DOT IS A

11  BLOCK GROUP; IS THAT RIGHT?

12  **A.**   THAT'S CORRECT.

13  **Q.**   SO IF I'M IN THE -- IF MY BLOCK GROUP IS IN THE TOP

14  RIGHT-HAND CORNER OF THIS FIGURE, WHAT'S THAT TELLING ME ABOUT

15  THAT BLOCK GROUP'S RACIAL -- WHAT'S THAT TELLING US?

16  **A.**   THAT'S TELLING US THAT IT HAS A HIGH, CLOSE TO ONE

17  PERCENT -- WELL, THE HIGHEST MOST UPPER-RIGHT PART WOULD TELL

18  YOU THAT IT'S BASICALLY A WVAP PERCENT OF ONE, WHICH MEANS 100

19  PERCENT WHITE POPULATION SURROUNDED BY BLOCK GROUPS THAT ARE

20  ALSO BASICALLY 100 PERCENT WHITE POPULATION.  AND THEN IN

21  CONTRAST, THE LOWER LEFT IS TELLING US BASICALLY 100 PERCENT

22  BLACK BVAP SURROUNDED BY AREAS THAT ARE BASICALLY 100

23  PERCENT -- 100 PERCENT BVAP.

24  **Q.**   OKAY.  AND SO --

25  **A.**   BUT IN TERMS OF THE MEASURE, JUST TO CLARIFY, IT COMES UP

1    AS A NEGATIVE VALUE BECAUSE IT'S WVAP PERCENT MINUS BVAP

2    PERCENT.  SO IT'S A NUMBER -- THE VALUE OF W-I RANGES FROM

3    MINUS ONE TO ONE.

4    **Q.**    SO DO YOU PLOT THE RESULTS OF THIS ANALYSIS ON A MAP OF

5    THE STATE?

6    **A.**    YES, I DO.

7    **Q.**    OKAY.  SO IF WE COULD TURN TO FIGURE 29 ON PAGE 20.  CAN

8    YOU EXPLAIN BRIEFLY WHAT THIS -- WHAT THIS FIGURE IS SHOWING

9    US?

10   **A.**    SO BASICALLY THIS TAKES THE BLOCK GROUPS THAT WERE SHOWN

11   IN THE SCATTER PLOT, IDENTIFIES THE ONES THAT WERE FOUND TO BE

12   SIGNIFICANT, AND THEN IT PLOTS THEM IN TERMS OF THEIR QUADRANT

13   LOCATION.  SO THE ONES IN THAT UPPER-RIGHT HIGH SURROUNDED BY

14   HIGH ARE SHOWN IN RED, THE LOWER-LEFT QUADRANT WERE THE HIGH

15   BVAP SURROUNDED BY HIGH BVAP ARE SHOWN IN BLUE, AND THEY'RE

16   JUST CATEGORIZED AS A LOW VALUE SURROUNDED BY LOW BECAUSE IT'S

17   PLOTTING THE WVAP PERCENT MINUS BVAP PERCENT.

18   **Q.**    OKAY.

19   **A.**    SO THE ONES OF PARTICULAR INTEREST IN TERMS OF CLUSTERING

20   OF LIKE VALUES ARE THE BLUE AND THE BLACK HERE, HIGH SURROUNDED

21   BY HIGH, LOW SURROUNDED BY LOW.

22   **Q.**    I SEE.  SO JUST TO MAKE SURE WE GET ONE CONCEPT.  YOU

23   REPORTED A BUNCH OF THESE AS BEING NOT SIGNIFICANT; WHAT DOES

24   THAT MEAN?

25   **A.**    STATISTICALLY SIGNIFICANT.  SO THE LOCAL MORAN'S I, IT'S A

1   MEASURE, BUT THEN IT'S ALSO A STATISTICAL MEASURE AND ONE CAN

2   DO A TEST FOR THE SIGNIFICANCE LEVEL.

3   **Q.**   I SEE.  OKAY.  SO THE RED CENSUS BLOCKS ARE HIGH WHITE

4   POPULATION SURROUNDED BY HIGH WHITE POPULATION; IS THAT

5   CORRECT?

6   **A.**   THAT'S CORRECT.

7   **Q.**   AND THE DARK BLUE, IS THAT HIGH BLACK POPULATION

8   SURROUNDED BY HIGH BLACK POPULATION?

9   **A.**   YES, CORRECT.

10  **Q.**   GOT IT.  OKAY.  HOW DOES THIS -- WELL, DOES THIS FIGURE

11  ALLOW YOU TO DRAW ANY CONCLUSIONS ABOUT THE RACIAL DISTRIBUTION

12  ACROSS THE STATE OF LOUISIANA?

13  **A.**   I BELIEVE IT DOES.

14  **Q.**   WHAT CONCLUSION IS THAT?

15  **A.**   IS THAT THERE IS CONSIDERABLE SEGREGATION OR A DIFFERENCE

16  IN THE SPATIAL DISTRIBUTION OF THE BLACK POP- -- EXCUSE ME,

17  BLACK POPULATION AND WHITE POPULATION IN THE STATE; WHERE IN

18  THE RURAL AREAS IT'S MORE HEAVILY A WHITE POPULATION AND THEN

19  THE CONCENTRATION OF THE BLACK POPULATION IS MORE IN THE URBAN

20  AREAS, WHICH ARE ADMITTEDLY A LITTLE DIFFICULT TO SEE IN THIS

21  FIGURE.

22  **Q.**   HOW DOES THIS ANALYSIS INFORM YOUR WORK IN LOOKING AT

23  COMMUNITIES OF INTERESTS?

24  **A.**   BECAUSE IT SUGGESTS THAT THERE IS SPATIAL CLUSTERING.  SO

25  TO THAT END, THE IDEA WOULD BE WHETHER SOME OF THESE SPATIAL

1   CLUSTERS ARE BEING SPLIT BY THE ASSOCIATE ILLUSTRATIVE

2   BOUNDARIES.

3   **Q.**   AND THEN IF WE LOOK AT PARAGRAPH 28 ON PAGE 20 OF YOUR

4   REPORT, HOW THEN DID YOU GO ABOUT CONDUCTING THIS ANALYSIS THEN

5   IN THE SENATE?

6   **A.**   SO I LOOKED AT ALL THE BLOCK GROUPS IN THE STATE, 4,291 OF

7   THEM, AS A POTENTIAL COMMUNITY OF INTEREST AND LOOKED TO SEE

8   WHETHER ANY OF THEM WERE BEING SPLIT BY THE ASSOCIATED

9   ILLUSTRATIVE BOUNDARIES.  SO IN THIS PARTICULAR CASE FOR THE

10  SENATE DISTRICTS, ILLUSTRATIVE SENATE DISTRICTS, I FOUND 375

11  BLOCKS THAT WERE BEING SPLIT BY THE DISTRICT BOUNDARIES.

12  **Q.**   AND DID YOU EXAMINE ANY OF THOSE 375?

13  **A.**   I DID EXAMINE A COUPLE OF -- MORE THAN A HANDFUL; 27

14  TOTAL.

15  **Q.**   AND WHY ONLY 27?

16  **A.**   BECAUSE THE LIMITED TIME TO DO THIS.

17  **Q.**   OKAY.  AND WHAT IS THE SIGNIFICANCE OF FINDING A POTENTIAL

18  NEIGHBORHOOD SPLIT IN YOUR ANALYSIS?

19  **A.**   SO DEPENDING UPON THE CHARACTERISTIC OF A BLOCK, IF IT WAS

20  BEING SPLIT AND THAT BLOCK WAS HOMOGENEOUS IN SOMEWAY AND IT

21  WAS RELATIVELY HOMOGENEOUS TO ITS NEIGHBORING AREA, THEN THAT

22  WOULD SUGGEST THAT THIS COMMUNITY OF INTEREST OR A NEIGHBORHOOD

23  WAS BEING SPLIT BY THE BLOCK BOUNDARIES.

24  **Q.**   SO IF WE LOOK AT --

25  **A.**   SPLIT BY THE DISTRICT BOUNDARIES.  EXCUSE ME.

1   **Q.**   DISTRICT BOUNDARIES.  ALL RIGHT.  IF WE COULD TURN TO

2   FIGURE 30 ON PAGE 21.  IS THIS YOUR LIST OF 27 EXAMPLES?

3   **A.**   YES, IT IS.

4   **Q.**   OKAY.  CAN YOU VERY BRIEFLY JUST WALK US THROUGH WHAT

5   SOME -- WHAT IS BEING SHOWN IN THIS REPORT?

6   **A.**   YEAH.  SO THE TABLE INDICATES THE INDIVIDUAL BLOCK THAT

7   WAS IDENTIFIED AS BEING SPLIT THAT SUBSEQUENTLY TRIGGERED A

8   FURTHER EVALUATION OF THE LOCAL AREA.  IT GIVES THE NAME OF THE

9   AREA, APPROXIMATELY, AND THEN IT INDICATES WHICH ILLUSTRATIVE

10  DISTRICTS CREATED THE SPLIT, AND THEN IT GIVES A

11  CHARACTERIZATION OF MEDIAN INCOME, TOTAL POPULATION AND THEN

12  EDUCATIONAL ATTAINMENT.

13          AND THEN THE LAST TWO COLUMNS ARE ASSOCIATED WITH

14  THIS MEASURE BEING USED IN THE EVALUATION, THIS WVAP PERCENT

15  MINUS BVAP PERCENT, SO THAT VALUE RANGES BETWEEN A MINUS ONE

16  AND ONE.  AND THEN IT GIVES THE LOCAL MORAN ASSESSMENT OF IT

17  INDICATING WHAT KIND OF RELATIONSHIP, LIKE IS IT A HIGH

18  SURROUNDED BY A HIGH OR IS IT A LOW SURROUNDED BY A LOW, AND

19  THEN THE LEVEL OF SIGNIFICANCE IN PARENTHESES.

20  **Q.**   BEFORE I MOVE ON, DR. MURRAY, I NOTICED SOME SIGNIFICANT

21  VARIABILITY IN INCOME AND EDUCATIONAL ATTAINMENT ACROSS THE

22  BLOCK GROUPS THAT YOU REPORT HERE; IS THAT RIGHT?

23  **A.**   THAT'S TRUE, YES.

24  **Q.**   OKAY.  AND IS THAT SURPRISING TO YOU THAT THERE WOULD BE

25  SIGNIFICANT VARIABILITY BETWEEN PARTS, FOR EXAMPLE THE INCOME

1  AND EDUCATIONAL ATTAINMENT, IN DIFFERENT PARTS OF NEW ORLEANS?

2  **A.**   NOT AT ALL.  THERE'S A LOT OF SPATIAL VARIABILITY ACROSS

3  THE STATE.

4  **Q.**   SO I JUST WANT TO VERY, VERY BRIEFLY GO THROUGH -- FIRST

5  OF ALL, DO YOU PROVIDE AN ANALYSIS OF EACH ONE OF THE 27

6  POTENTIAL SPLITS IN EXHIBIT C TO YOUR REPORT?

7  **A.**   YES, I DO, I BELIEVE.

8  **Q.**   AND THAT'S LDTX 47; IS THAT RIGHT?

9  **A.**   YES.

10  **Q.**   BUT IF WE STAY IN YOUR REPORT, THOSE ARE THE ONES I WANT

11  TO GO THROUGH -- WELL, THE FIRST ONE.  IF WE COULD GO TO PAGE

12  25 AND PUT UP FIGURES 33(A) AND 33(B).

13         I'D JUST LIKE FOR YOU TO ORIENT THE COURT TO THIS

14  FIGURE.  WE SHOULD PROBABLY START WITH THE ONE AT THE TOP WHICH

15  IS 33(A).  CAN YOU EXPLAIN THIS --

16  **A.**   SO HIGHLIGHTED HERE IN THE YELLOW WOULD BE THE BLOCKS THAT

17  WERE IDENTIFIED.  IN THIS CASE THERE'S MULTIPLE BLOCKS, THAT

18  WERE IDENTIFIED AS BEING SPLIT.  SO IT IDENTIFIES WHICH OF

19  THOSE BLOCKS WAS TRIGGERING FURTHER ANALYSIS BASED UPON A

20  SPLITTING BY DISTRICT BOUNDARIES AND IT PROVIDES SOME

21  ORIENTATION OF WHERE THAT IS.

22  **Q.**   AND WHERE SPECIFICALLY ARE WE LOOKING AT HERE?

23  **A.**   IT'S AN AREA REFERRED TO AS MUSICIANS VILLAGE, I BELIEVE.

24  **Q.**   IS THAT IN NEW ORLEANS?

25  **A.**   YES, IT IS IN NEW ORLEANS.

1  **Q.**  AND WE'RE LOOKING -- AGAIN, WE'RE LOOKING AT THE SENATE;
2  IS THAT RIGHT?
3  **A.**  YES.
4  **Q.**  OKAY.  SO NOW I'D LIKE TO TURN TO THE LOWER FIGURE, 33(B).
5  AND MAYBE WE CAN ZOOM IN ON THAT SO IT'S EASIER TO SEE.  THERE
6  WE GO.  ALL RIGHT.  SO CAN YOU ORIENT THE COURT TO WHAT -- YOU
7  HAVE SOME SHADING HERE.  YOU'VE GOT LINES.  CAN YOU EXPLAIN
8  WHAT'S GOING ON HERE?
9  **A.**  YEAH.  SO THE SHADING LEVELS ARE INDICATED IN THIS LEGEND,
10 AND WHAT IT SHOWS IS THE WVAP PERCENT MINUS BVAP PERCENT, AND
11 SO THE LIGHTER COLORED WOULD BE THE NEGATIVE -- MORE NEGATIVE
12 VALUES OR A HIGHER BVAP PERCENT, SO THAT'S WHAT YOU'D SEE IN
13 THE LIGHTEST COLORS, CLOSER TOWARDS 100 PERCENT BVAP IN THOSE
14 PARTICULAR BLOCKS.  SO WHAT'S BEING SHOWN HERE ARE THE BLOCKS.
15 **Q.**  OKAY.  SO, AGAIN, THOSE LITTLE YELLOW LINES, THOSE ARE THE
16 CENSUS BLOCK GROUPS; IS THAT RIGHT?
17 **A.**  THOSE ARE THE CENSUS BLOCK GROUPS THAT ARE SPLIT, YEAH.
18 **Q.**  GOTCHA.  OKAY.  SO WHAT DOES YOUR ANALYSIS IN THIS FIGURE
19 SHOW YOU ABOUT THIS PARTICULAR SPLIT?
20 **A.**  SO ABOUT -- THIS PARTICULAR SPLIT WE SEE A LOT OF
21 HOMOGENEITY IN EACH OF THOSE INDIVIDUAL BLOCKS THAT ARE
22 IDENTIFIED AS BEING SPLIT, BUT ALSO THAT THEY'RE PART OF A
23 BIGGER, LOCALIZED AREA THAT'S VERY HOMOGENEOUS IN TERMS OF ITS
24 RACIAL COMPOSITION, BUT ALSO OTHER CHARACTERISTICS LIKE INCOME
25 AND EDUCATIONAL ATTAINMENT.

1    **Q.**   WHAT DOES THE DISTRICT BOUNDARY DO TO THIS AREA?

2    **A.**   SO THE DISTRICT BOUNDARY CURVES IT UP.

3    **Q.**   OKAY.  AND DOES PRESERVING THOSE GROUPS AS A POTENTIAL

4    COMMUNITY OF INTEREST, IS THAT -- IS THIS LINE CONSISTENT WITH

5    SUCH AN OBJECTIVE?

6    **A.**   IT DOES NOT SEEM TO BE CONSISTENT WITH PRESERVING

7    COMMUNITIES IN THIS -- A COMMUNITY OF INTEREST IN THIS

8    PARTICULAR CASE, NO.

9    **Q.**   OKAY.  LET'S JUST DO ONE MORE IN THE SENATE AND I'D LIKE

10   TO GO INTO THAT EXHIBIT C.  SO IF WE COULD GO TO LDTX 47 AT

11   PAGES 26 AND 27, WHICH I BELIEVE IS EXHIBIT C-14.  THIS

12   APPEARS -- IS THIS WERNER PARK IN SHREVEPORT?

13   **A.**   I BELIEVE IT IS, YES.

14   **Q.**   OKAY.  AND THEN, AGAIN, IF YOU CAN, STARTING WITH THE BOX

15   ON THE LEFT, EXHIBIT C-14A, CAN YOU EXPLAIN WHAT THIS IS?

16   **A.**   SO, AGAIN, THE HIGHLIGHTED IN YELLOW REPRESENT BLOCK

17   GROUPS THAT HAVE BEEN SPLIT BY DISTRICT BOUNDARIES.  SO THERE'S

18   A NUMBER OF THEM IN THIS AREA.

19   **Q.**   OKAY.  AND THEN IF WE GO TO C-14B.  THIS IS, AGAIN, THIS

20   IS THAT CHART YOU HAVE WITH SOME COLOR SHADING.

21   **A.**   YES.

22   **Q.**   CAN YOU EXPLAIN YOUR ANALYSIS OF THIS SPLIT?

23   **A.**   RIGHT.  SO, AGAIN, SHOWN HERE ARE THE BLOCKS AND IN

24   PARTICULAR THE RACIAL PERCENTAGE.  SO THE LIGHTER COLOR

25   INDICATES HIGHER PERCENTAGE BLACK VOTING AGE POPULATION AND

1    THERE'S A -- IN GENERAL THIS WHOLE AREA, IT'S VERY HOMOGENEOUS

2    WITH RESPECT TO RACIAL COMPOSITION AND A LOT OF SIMILARITY IN

3    TERMS OF MEDIAN INCOME AND EDUCATIONAL ATTAINMENT.

4    **Q.**   AND HOW DOES THE DISTRICT BOUNDARY INTERACT WITH THIS

5    POTENTIAL COMMUNITY OF INTEREST?

6    **A.**   AND IT LOOKS LIKE IN THIS CASE THAT THE DISTRICT BOUNDARY

7    DOES NOT PRESERVE THIS AS A COMMUNITY OF INTEREST -- A

8    POTENTIAL COMMUNITY OF INTEREST.  IT CURVES IT UP.

9    **Q.**   AND IS THERE -- IS THERE A RACIAL EFFECT TO DIVIDING THIS

10   AREA IN THIS FASHION?

11   **A.**   I MEAN IT APPEARS TO BE IN THAT IF ONE LOOKS AT THE

12   DISTRICTS THAT THESE ARE APPARENTLY TRAINED TO HELP ACHIEVE

13   MAJORITY BLACK DISTRICTS, AND SO GETTING THAT PERCENTAGE OF

14   BVAP WHERE IT NEEDS TO BE FOR IT TO BE A MAJORITY DISTRICT.

15   **Q.**   OKAY.  NOW, IF WE GO AND DO YOU SHOW -- I THINK YOU'VE

16   ALREADY MENTIONED THIS, BUT DO YOU SHOW SIMILAR FIGURES FOR

17   EACH OF THE 27 POTENTIAL SPLITS THAT YOU IDENTIFIED?

18   **A.**   YES, I DO.

19   **Q.**   ARE YOU SAYING THAT BEYOND THE 27 THAT THE OTHER ROUGHLY

20   350 POTENTIAL SPLITS THAT YOU'VE IDENTIFIED TOTAL ARE NOT

21   RELEVANT?

22   **A.**   NOT AT ALL.  I ONLY HAD TIME TO EXAMINE THE ONES THAT I

23   REPORTED HERE.

24   **Q.**   OKAY.  SO I'D LIKE TO TURN NOW TO YOUR -- TO WRAP THIS UP,

25   IF WE COULD TURN TO YOUR ANALYSIS OF THE HOUSE, WHICH I BELIEVE

1   IS PAGE 26, PARAGRAPH 29 AND -- OKAY.  WHAT CAN YOU TELL US

2   ABOUT YOUR ANALYSIS IN THE HOUSE?

3   **A.**   SO A SIMILAR SORT OF ANALYSIS WAS UNDERTAKEN LOOKING AT

4   ILLUSTRATIVE HOUSE DISTRICTS, LOOKING AT THE 4,291 BLOCK GROUPS

5   IN THE STATE, AND IN TERMS OF BLOCK GROUP SPLITS OR POTENTIAL

6   NEIGHBORHOOD COMMUNITIES OF INTEREST SPLITS 565 WERE

7   IDENTIFIED.

8   **Q.**   AND HOW MANY OF THOSE 565 DID YOU EVALUATE?

9   **A.**   I LOOKED AT 29.

10  **Q.**   AND WHY ONLY 29?

11  **A.**   TIME LIMITS.

12  **Q.**   OKAY.  AND ARE ALL 29 EXAMPLES REPRODUCED IN EXHIBIT B TO

13  YOUR REPORT WHICH IS LDTX 48?

14  **A.**   YES.

15  **Q.**   NOW, I'D LIKE TO TURN ON TO THE FIGURE -- FIGURE 34, IF WE

16  COULD LOOK AT THAT.  IS THIS FIGURE REPORTING STATISTICS FOR

17  ALL 29?

18  **A.**   YES, IT IS.

19  **Q.**   WHEN I LOOK AT THESE, I SEE YOU HAVE A LOT OF THEM LISTED

20  IN SHREVEPORT.  HOW MANY POTENTIAL NEIGHBORHOOD SPLITS DO YOU

21  REPORT HERE FOR SHREVEPORT?

22  **A.**   ELEVEN.

23  **Q.**   OF THOSE, HOW MANY INVOLVE ILLUSTRATIVE HOUSE DISTRICT 1?

24  **A.**   IT LOOKS LIKE SEVEN, MAYBE EIGHT -- SEVEN.

25  **Q.**   SEVEN?

1   **A.**   SEVEN.

2   **Q.**   ALL RIGHT.  AND I'D LIKE TO JUST GO THROUGH -- I THINK IN

3   THE INTEREST OF TIME, I THINK, LET'S JUST GO THROUGH ONE.  SO

4   IF WE COULD LOOK AT PAGE 29.  OKAY.  THIS HAS FIGURES 36(A) AND

5   36(B).  AND IS THIS IN THE SHREVEPORT AREA?

6   **A.**   YES.  ALLENDALE, LAKESIDE AREA.

7   **Q.**   OKAY.  AND WHAT DO YOU SEE IN YOUR FIGURE 36(B)?  WHAT IS

8   IT SHOWING US?

9   **A.**   SO, AGAIN, IT'S IDENTIFYING THESE BLOCK GROUPS THAT ARE

10   SPLIT BY DISTRICT BOUNDARY.  AND WHEN WE LOOK IN PARTICULAR AT

11   36(B), WHAT WE SEE IS THIS RACIAL COMPOSITION THAT'S MOSTLY OR

12   VERY HIGH IN BVAP PERCENTAGE FOR ALL OF THESE BLOCKS AND

13   THEY'RE SPLIT GOING THROUGH WHAT APPEARS TO BE A COMMUNITY OF

14   INTEREST THAT'S VERY HOMOGENEOUS IN A NUMBER OF WAYS.

15   **Q.**   AND IS THERE A RACIAL EFFECT IN THE COMPETITION OF THESE

16   DISTRICTS BY DIVIDING THIS AREA OF HIGH BVAP?

17          **MS. BAHN:**  OBJECTION TO THE EXTENT THIS CALLS FOR

18   TESTIMONY AND SEEKS TO FIND MR. COPPER'S INTENT.

19          **THE COURT:**  YOU WANT TO RESPOND?

20          **MR. LEWIS:**  YES, YOUR HONOR.  I SPECIFICALLY ASKED

21   FOR THE EFFECT OF THE LINE ON A PARTICULAR ATTRIBUTE.  I DID

22   NOT ASK THE WITNESS TO OPINE AS TO INTENT.

23          **COURTROOM DEPUTY:**  COULD YOU STATE YOUR NAME FOR THE

24   COURT REPORTER?

25          **MS. BAHN:**  NO PROBLEM.  IT'S JOSEPHINE BAHN, B-A-H-N.

1   IF I CAN RESPOND, YOUR HONOR?

2           **THE COURT:**  YOU CAN.  HE ASKED FOR EFFECT.

3           **MS. BAHN:**  MR. LEWIS DID ASK THIS QUESTION SIMILARLY

4   A COUPLE MINUTES AGO AND IN DR. MURRAY'S ANSWER HE DID PROVIDE

5   MR. COPPER'S INTENT.

6           **THE COURT:**  OKAY. WELL, THE QUESTION IS EFFECT.  I'M

7   GOING TO OVERRULE THE OBJECTION.

8           **THE WITNESS:**  IT APPEARS TO BE DONE IN ORDER TO

9   ACHIEVE BLACK MAJORITY STATUS FOR THE ASSOCIATED DISTRICT OR

10  DISTRICTS.

11  **BY MR. WALSH:**

12  **Q.**   OKAY.  IN EXHIBIT D TO YOUR REPORT, DR. MURRAY, DO YOU

13  SHOW SIMILAR FIGURES FOR EACH OF THE 29 SPLITS THAT YOU

14  IDENTIFY?

15  **A.**   YES, I DO.

16  **Q.**   SO -- AND THEN, FINALLY, I KNOW THAT YOU LOOKED AT 29.

17  DOES THAT MEAN THAT THE OTHER, ROUGHLY, 535 POTENTIAL SPLITS

18  ARE NOT RELEVANT?

19  **A.**   NO.  I ONLY HAD TIME TO LOOK AT A FINITE NUMBER.

20  **Q.**   SO TAKING A STEP BACK FROM THIS, DR. MURRAY, WHAT DO THE

21  VOLUME OF THESE POTENTIAL NEIGHBORHOOD SPLITS TELL US ABOUT

22  WHETHER MR. COOPER'S DISTRICT KEPT TOGETHER COMMUNITIES

23  COMPRISED OF AREAS WITH SIMILAR SOCIOECONOMIC STATUS?

24  **A.**   IT DOESN'T APPEAR TO BE THAT IT WAS DONE WITH RESPECT TO

25  LOCALIZED COMMUNITIES OF INTEREST IN THIS CASE.

1  **Q.**   OKAY.  AND IN THE ROUGHLY 60 PERCENT NEIGHBORHOOD SPLITS

2  THAT YOU EXAMINED, AND I KNOW WE ONLY WENT THROUGH A FEW, BUT

3  IN THOSE ROUGHLY 60, DID YOU CONSISTENTLY OBSERVE ANY

4  PARTICULAR ATTRIBUTE AROUND THE LINES AND ANALYSIS THAT YOU

5  SAW?

6  **A.**   YES.

7  **Q.**   WHAT WAS THAT ATTRIBUTE?

8  **A.**   RACE.

9  **Q.**   AND SO IS IT FAIR TO SAY THAT OF THOSE 60 SPLITS, THAT

10  THOSE WERE ALL OF COMMUNITIES THAT WERE BOTH -- THAT WERE

11  HOMOGENEOUS BOTH WITH RESPECT TO RACE AND THE SOCIOECONOMIC

12  ATTRIBUTES THAT YOU EXAMINED?

13  **A.**   YES.

14  **Q.**   AND YET THEY WERE ALL BEING DIVIDED; IS THAT RIGHT?

15  **A.**   THAT'S RIGHT.

16  **Q.**   AND I BELIEVE YOU MENTIONED THIS, BUT WHAT ATTRIBUTE DID

17  YOU CONSISTENTLY OBSERVED IN THOSE 60 POTENTIAL NEIGHBORHOOD

18  SPLITS?

19  **A.**   RACE.

20  **Q.**   OKAY.  CAN YOU ELABORATE ON THAT?

21  **A.**   THAT IN MANY OF THE INSTANCES IT APPEARS THAT THE

22  BOUNDARIES WERE SEEKING TO ACHIEVE SOME PARTICULAR RACIAL

23  REPRESENTATION OR INCLUSION.

24  **Q.**   WAS THERE ANY OTHER APPARENT EXPLANATION FOR THE

25  BOUNDARIES THAT YOU WERE ABLE TO OBSERVE?

1   **A.**   NOT THAT I COULD OBSERVE.

2   **Q.**   OKAY.

3           **MR. LEWIS:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

4           **THE COURT:**  LET'S TAKE A 15-MINUTE RECESS BEFORE

5   CROSS.

6           **MR. LEWIS:**  YOUR HONOR, BEFORE YOU GO -- AND I

7   APOLOGIZE FOR THIS.  THIS WITNESS DOES HAVE A 5 P.M. FLIGHT.  I

8   DON'T KNOW -- AND I KNOW THAT THE COURT HAS -- I KNOW WE'VE HAD

9   A NUMBER OF BREAKS AND ALL, BUT THIS WITNESS ALSO HAS A CLASS.

10  I DON'T KNOW HOW LONG CROSS-EXAMINATION IS BUT --

11          **MS. BAHN:**  I CAN RESPOND, YOUR HONOR.

12          **MR. LEWIS:**  SURE.  PLEASE.

13          **MS. BAHN:**  I DON'T THINK IT'S REALISTIC THAT THE

14  WITNESS IS GOING TO MAKE A 5 P.M. FLIGHT IF IT'S TEN AFTER

15  THREE AND I HAVEN'T GONE YET.

16          **MR. LEWIS:**  IT SOUNDS LIKE WE'LL BE TAKING A BREAK.

17          **THE COURT:**  WE'RE GOING TO TAKE A 15-MINUTE RECESS.

18                          **(RECESS)**

19          **THE COURT:**  BE SEATED.  CROSS.

20          **MS. BAHN:**  GOOD AFTERNOON, YOUR HONOR.  MY NAME IS

21  JOSEPHINE BAHN.  I'M A LAWYER AT COZEN O'CONNOR.  I'M HERE ON

22  BEHALF OF THE PLAINTIFFS IN THIS CASE.  MAY I PROCEED WITH MY

23  EXAMINATION?

24          **THE COURT:**  YOU MAY.

25

1   **CROSS-EXAMINATION**

2   **BY MS. BAHN:**

3   **Q.**   DR. MURRAY, GOOD AFTERNOON.

4   **A.**   HELLO.

5   **Q.**   I'M GOING TO ASK YOU A COUPLE OF QUESTIONS BASED ON THE

6   CONTENTS OF YOUR REPORT AND SOME OF THE TESTIMONY YOU GAVE

7   TODAY.  I'D LIKE TO START BY ASKING, DR. MURRAY, HAVE YOU BEEN

8   DETAINED BY DEFENDANTS AS AN EXPERT WITNESS IN THIS CASE?

9   **A.**   YES.

10   **Q.**   HAS THE COURT EVER DISREGARDED YOUR TESTIMONY AS IT

11   APPLIES TO THE DETERMINATION OF COMPACTNESS?

12   **A.**   NO.

13   **Q.**   DR. MURRAY, WERE YOU RETAINED AS AN EXPERT IN THE *ROBINSON*

14   *V. ARDOIN* CASE?

15   **A.**   YES.

16          **MS. BAHN:**  STEVEN, IF YOU COULD PULL UP AND TURN TO,

17   I THINK IT'S PDF PAGE 41.

18   **BY MS. BAHN:**

19   **Q.**   DR. MURRAY, IF YOU COULD READ -- STARTING WITH THE LAST

20   SENTENCE OF THE FULL PARAGRAPH BEGINNING WITH "ACCORDINGLY THE

21   COURT."  IT'S THE LAST SENTENCE.  IF YOU COULD READ THAT,

22   PLEASE?

23   **A.**   "ACCORDINGLY, THE COURT DISREGARDS HIS TESTIMONY AS IT

24   APPLIES TO THE DETERMINATION OF COMPACTNESS."

25   **Q.**   AND THIS IS DESCRIBING YOUR EXPERT TESTIMONY IN THE

1   *ROBINSON* CASE, CORRECT?

2   **A.**   YES.

3   **Q.**   SO HAS A COURT EVER DISREGARDED YOUR TESTIMONY AS IT

4   APPLIES TO THE DETERMINATION OF COMPACTNESS?

5   **A.**   WELL, I GUESS, YES.  IT WASN'T BASED UPON THE SAME

6   ANALYSIS BUT, YES, I GUESS SO.

7   **Q.**   SO YOUR ANSWER, JUST SO THE RECORD IS CLEAR, A COURT HAS

8   DISREGARDED YOUR TESTIMONY AS IT APPLIES TO COMPACTNESS?

9   **A.**   YES, THIS JUDGE DID IT.

10  **Q.**   AND YOU SUBMITTED AN EXPERT REPORT DATED JULY 28TH, 2023

11  IN THIS CASE, CORRECT?

12  **A.**   WHAT WAS THE DATE AGAIN?

13  **Q.**   JULY 28TH, 2023.

14  **A.**   YES.

15  **Q.**   AND THAT'S WHAT'S BEEN PREVIOUSLY MARKED AND ADMITTED AS

16  LX 42, CORRECT?

17  **A.**   YES.

18  **Q.**   AND YOU HAVE A COPY OF THAT IN FRONT OF YOU, CORRECT?

19  **A.**   YES.

20  **Q.**   DO YOU SEE ON PAGE 2 OF YOUR REPORT THE SECTION TITLED

21  "SPATIAL ANALYSIS UNDERTAKEN"?

22  **A.**   YES.

23  **Q.**   JUST SO THE RECORD IS CLEAR, HAS SPATIAL ANALYSIS --

24  STRIKE THAT.  JUST SO THE RECORD IS CLEAR, SPATIAL ANALYSIS HAS

25  NEVER BEEN ACCEPTED BY A COURT IN A POLITICAL REDISTRICTING

1   CASE, CORRECT?

2   **A.**   SPATIAL ANALYSIS?  I FIND THAT UNTRUE.  LOOKING AT A MAP

3   IS SPATIAL ANALYSIS.  WHAT SPATIAL ANALYSIS ARE YOU REFERRING

4   TO; COMPACTNESS?

5   **Q.**   DR. MURRAY, DID YOU GIVE TESTIMONY IN THE *ROBINSON* CASE AS

6   PART OF YOUR EXPERT DESIGNATION?

7   **A.**   YES.

8            **MS. BAHN:**  STEVEN, CAN WE HAVE THE *ROBINSON* OPINION

9   BACK UP.

10  **BY MS. BAHN:**

11  **Q.**   AND, DR. MURRAY, I'D LIKE TO DIRECT YOUR ATTENTION

12  THERE'S -- GOING BACK TO PAGE 41, I THINK IT IS, OF THE PDF.

13  DIRECTING YOUR ATTENTION TO THE HIGHLIGHTED PARAGRAPHS,

14  STARTING WITH THE SENTENCE THAT'S HIGHLIGHTED, "IN FACT,

15  DR. MURRAY" -- SORRY.  STRIKE THAT.  GIVE ME ONE SECOND.

16            SORRY.  BEGINNING WITH, "LASTLY, DR. MURRAY,

17  TESTIFIED," CAN YOU READ THAT INTO THE RECORD?  "LASTLY,

18  DR. MURRAY..."

19  **A.**   "DR. MURRAY TESTIFIED THAT HE IS NOT AWARE OF ANY COURT

20  CONSIDERING THE TYPE OF SPATIAL ANALYSIS THAT HE PERFORMED IN

21  THE CONTEXT OF A SECTION 2 CASE."

22  **Q.**   SO ARE YOU AWARE OF ANY COURT THAT HAS ACCEPTED SPATIAL

23  ANALYSIS IN A POLITICAL --

24  **A.**   SPATIAL ANALYSIS IS A BROAD TERM THAT APPLIES TO THOUSANDS

25  OF DIFFERENT METHODS.  THE METHOD APPLIED IN THAT CASE WAS

1   SPATIAL AUTOCORRELATION, NOT SPATIAL ANALYSIS.  SPATIAL

2   ANALYSIS IS ANYTHING AND EVERYTHING.

3   **Q.**   DR. MURRAY, MY QUESTION IS DO YOU KNOW ANY COURT THAT HAS

4   ACCEPTED SPATIAL ANALYSIS IN CONSIDERATION OF AN OPINION IN A

5   SECTION 2 CASE?  OF THE TYPE --

6   **A.**   SPATIAL --

7   **Q.**   -- OF THE TYPE THAT YOU EMPLOYED IN THIS CASE?

8   **A.**   IN WHICH CASE?

9   **Q.**   THE CURRENT CASE, DR. MURRAY --

10   **A.**   THE CURRENT CASE?

11   **Q.**   -- THAT YOU'RE TESTIFYING RIGHT NOW IN.

12   **A.**   SPATIAL ANALYSIS IS COMPACTNESS MEASURES.  IT'S ANY

13   MAPPING.  OF COURSE THE COURT HAS ACCEPTED AND USED THESE.

14   **Q.**   DR. MURRAY, ARE YOU AWARE OF ANY COURT THAT HAS ACCEPTED

15   THE TYPE THAT YOU EMPLOYED, MOMENTS OF INERTIA, IN THIS CASE IN

16   ANY OTHER POLITICAL REDISTRICTING CASE?

17   **A.**   MOMENT OF INERTIA WAS NOT APPLIED IN *ROBINSON*, SO I DON'T

18   KNOW HOW YOU'RE MAKING A CONNECTION TO THAT.

19   **Q.**   I APOLOGIZE FOR CONFUSING YOU, DR. MURRAY.  IN THIS

20   CURRENT CASE, IN *NAIRNE V. ARDOIN*, THAT WE'RE ON THE SIXTH DAY

21   OF TRIAL FOR, ARE YOU AWARE OF ANY COURT THAT HAS APPLIED THE

22   SPATIAL ANALYSIS YOU UNDERTOOK AND EMPLOYED IN THIS CASE IN A

23   POLITICAL REDISTRICTING CASE?

24   **A.**   WHICH ONE?  I ALREADY SAID I APPLIED MANY DIFFERENT

25   METHODS.

1   **Q.**   THE MOMENT OF INERTIA TEST.

2   **A.**   THE MOMENT OF INERTIA, AM I AWARE OF IT BEING USED IN ANY

3   PARTICULAR CASE TO DATE?

4   **Q.**   IN A POLITICAL REDISTRICTING CASE.

5   **A.**   I KNOW THAT OTHERS TESTIFIED ABOUT USING IT, SO I GUESS

6   THAT'S A YES.

7   **Q.**   BUT YOU'RE UNAWARE OF ANY COURT THAT'S ACCEPTED IT,

8   CORRECT?

9   **A.**   I GUESS.  I'M NOT AWARE, NO.

10  **Q.**   MOVING BACK TO YOUR REPORT.  ON PAGE 2 IT SAYS THAT YOU

11  WERE RETAINED TO EVALUATE -- AND I'M NOW QUOTING FROM YOUR

12  REPORT -- "ASPECTS OF THE COOPER REPORT THAT SUMMARIZES THE

13  DERIVED ILLUSTRATIVE DISTRICTS AS WELL AS THE ENROLLED 2022

14  DISTRICTS," END QUOTE.  DID I READ THAT CORRECTLY?

15  **A.**   THAT'S WHAT I WROTE, YES.

16  **Q.**   YOU DID NOT PERFORM ANY RPV ANALYSIS IN THIS CASE,

17  CORRECT?

18  **A.**   ANY WHAT?

19  **Q.**   RPV ANALYSIS?

20  **A.**   NO.

21  **Q.**   I'D LIKE TO TALK A LITTLE BIT ABOUT SOME OF THE

22  QUALIFICATIONS THAT YOU LIST IN YOUR CV.  YOUR CV IS ATTACHED

23  TO YOUR EXPERT REPORT, LX 42, CORRECT?

24  **A.**   YES.

25  **Q.**   THE CV ATTACHED TO YOUR REPORT IS THE MOST CURRENT AND

1   ACCURATE REPRESENTATION OF YOUR ACADEMIC WORK AND YOUR EXPERT

2   WORK, CORRECT?

3   **A.**   CORRECT.

4   **Q.**   YOU HAVE NOT PUBLISHED ANY ACADEMIC ARTICLES ON ELECTION

5   LAW, CORRECT?

6   **A.**   NO.

7   **Q.**   YOU HAVE NOT PUBLISHED ANY ACADEMIC ARTICLES ON ELECTORAL

8   REDISTRICTING, CORRECT?

9   **A.**   CORRECT.

10  **Q.**   YOU HAVE NOT WRITTEN OR PUBLISHED ANY ACADEMIC ARTICLES ON

11  THE HISTORY OF RACE IN SOUTHERN AMERICAN STATES, CORRECT?

12  **A.**   CORRECT.

13  **Q.**   OR POLITICS IN SOUTHERN STATES; IS THAT CORRECT?

14  **A.**   CORRECT.

15  **Q.**   YOU HAVE NOT WRITTEN OR PUBLISHED ANYTHING ABOUT SECTION 2

16  OF THE VOTING RIGHTS ACT IN AN ACADEMIC PUBLICATION, CORRECT?

17  **A.**   CORRECT.

18  **Q.**   YOU'VE ALSO NOT PUBLISHED ANY PAPERS ON RACIALLY POLARIZED

19  VOTING, CORRECT?

20  **A.**   CORRECT.

21  **Q.**   YOU'VE NEVER DRAWN POLITICAL OR ELECTORAL REDISTRICTING

22  PLANS FOR ELECTORAL DISTRICTS; IS THAT CORRECT?

23  **A.**   CORRECT.

24  **Q.**   HAS ANY COURT EVER FOUND THAT YOU HAVE NO BACKGROUND OR

25  EXPERIENCE IN REDISTRICTING?

1  **A.**   I DON'T KNOW.  I ONLY SERVED AS AN EXPERT WITNESS IN ONE

2  CASE, SO I GUESS YOU'RE GOING TO SHOW ME SOMETHING.

3       **MS. BAHN:**  STEVEN, IF YOU CAN PULL UP THE *ROBINSON*

4  OPINION AT 41.

5  **BY MS. BAHN:**

6  **Q.**   AND IF YOU CAN -- BEGINNING WITH, "DR. MURRAY HAS NO

7  BACKGROUND," IF YOU CAN READ THAT INTO THE RECORD?

8  **A.**   "DR. MURRAY HAS NO BACKGROUND OR EXPERIENCE IN

9  REDISTRICTING.  HE DID NOT REVIEW ANY OF PLAINTIFFS'

10  ILLUSTRATIVE PLANS AND, MOST NOTABLY, HE TESTIFIED THAT HE HAS

11  NO BASIS TO DISAGREE WITH ANY OF THE OPINIONS OFFERED BY

12  PLAINTIFFS' EXPERTS IN THIS CASE."

13  **Q.**   SO, DR. MURRAY, JUST TO CONFIRM, A COURT HAS FOUND THAT

14  YOU HAVE NO BACKGROUND AND EXPERIENCE -- OR EXPERIENCE IN

15  REDISTRICTING, CORRECT?

16  **A.**   CORRECT.

17  **Q.**   DR. MURRAY, YOU DIDN'T DO YOUR NEIGHBORHOOD SPLIT ANALYSIS

18  FOR THE ENACTED PLAN, CORRECT?

19  **A.**   NO, I DID NOT.

20  **Q.**   SO YOU DON'T KNOW HOW THE ENACTED AND ILLUSTRATIVE DIFFER

21  WITH RESPECT TO NEIGHBORHOOD SPLITS AS YOU'VE DEFINED THEM,

22  CORRECT?

23  **A.**   CORRECT.

24  **Q.**   I'D LIKE TO MOVE ON TO DISCUSSING YOUR ANALYSIS RELATED TO

25  THIS CASE.  YOU APPLIED FOUR SPATIAL ANALYSIS TESTS OF

1  COMPACTNESS IN THIS CASE, CORRECT?

2  **A.**   CORRECT.

3  **Q.**   THEY WERE REOCK, POLSBY-POPPER, AREA OVER CONVEX HULL AND

4  THE MOMENT OF INERTIA OR MI TESTS; DO I HAVE THAT RIGHT?

5  **A.**   CORRECT.

6  **Q.**   ARE YOU AWARE OF ANY COURT THAT HAS ACCEPTED THE MOMENT OF

7  INERTIA MEASURE OF COMPACTNESS IN A CASE INVOLVING SECTION 2 OF

8  THE VOTING RIGHTS ACT?

9  **A.**   NO.

10  **Q.**   ARE YOU AWARE OF ANY -- STRIKE THAT.  SO, DR. MURRAY, THE

11  MOMENT OF INERTIA TEST HAS BEEN AROUND SINCE JUST AFTER REOCK

12  BASED ON YOUR TESTIMONY ON DIRECT, BUT IT'S NEVER BEEN ACCEPTED

13  BY A COURT, CORRECT?

14  **A.**   DID YOU SAY -- COULD YOU REPEAT THE QUESTION?

15  **Q.**   YES.  SO YOU JUST TESTIFIED THAT YOU'RE NOT AWARE OF ANY

16  COURT THAT HAS ACCEPTED THE MOMENT OF INERTIA AS A MEASURE OF

17  COMPACTNESS, CORRECT?

18  **A.**   CORRECT.

19  **Q.**   SO EVEN THOUGH THE MOMENT OF INERTIA AS A MEASURE OF

20  COMPACTNESS HAS BEEN AROUND SINCE JUST AFTER REOCK, IT'S NEVER

21  BEEN ACCEPTED BY A COURT, CORRECT?

22  **A.**   BUT THAT'S NOT TRUE.  IT'S BEEN AROUND SINCE POTENTIALLY

23  THE 1700S, SO...

24  **Q.**   FAIR ENOUGH.  I'LL REPHRASE MY QUESTION.  YOU TESTIFIED

25  EARLIER THAT THE REOCK -- I'M SORRY.  YOU TESTIFIED EARLIER

1   THAT POLSBY-POPPER WAS A TECHNIQUE FIRST DEVELOPED IN THE 1800S

2   AND CREDITED TO REOCK IN 1961, CORRECT?

3   **A.**   I BELIEVE THAT'S CORRECT.

4   **Q.**   GREAT.  AND YOU THEN TESTIFIED THAT MOMENT OF INERTIA IS

5   BECOMING MORE WIDELY USED, BUT IT'S BEEN AROUND SINCE WEAVER

6   AND HESS; THEY'RE CREDITED IN 1963, CORRECT?

7   **A.**   CORRECT.

8   **Q.**   SO MOMENT OF INERTIA HAS BEEN AROUND SINCE JUST AFTER

9   REOCK OR CREDITED JUST AFTER REOCK, BUT IT'S NEVER BEEN

10  ACCEPTED BY A COURT; IS THAT CORRECT?

11  **A.**   WELL, WEAVER AND HESS WAS 1963 SO -- OH, I SEE WHAT YOU

12  MEAN TO REOCK.  I GUESS.  I'M NOT SURE.

13  **Q.**   I'D LIKE TO SPEND SOME TIME DISCUSSING YOUR EXPERT REPORT

14  FROM JULY 2023.  IN YOUR REPORT YOU SAY THAT, AND I'M GOING TO

15  QUOTE, "MEASURES OF COMPACTNESS ARE RATHER SIMPLE PROXIES FOR

16  THE SHAPE OF A POLITICAL DISTRICT."  AND YOU GO ON TO SAY A

17  LITTLE BIT LATER THAT, "THERE'S WEAK AGREEMENT BETWEEN THE

18  OFTEN USED REOCK AND POLSBY-POPPER METRICS."  DO I HAVE THAT

19  CORRECT?

20  **A.**   CORRECT.

21  **Q.**   REOCK AND POLSBY-POPPER ARE TWO WAYS -- REOCK AND

22  POLSBY-POPPER ARE TWO WAYS TO TEST AREA -- TO TEST COMPACTNESS

23  OF AN AREA, RIGHT?

24  **A.**   YES.

25  **Q.**   THERE'S NO ONE STANDARD TEST TO ASSESS THE COMPACTNESS OF

1   AN AREA, CORRECT?

2   **A.**   CORRECT.

3   **Q.**   THE COURT HAS HEARD TESTIMONY THAT REOCK AND POLSBY-POPPER

4   ARE TWO MOST COMMONLY REFERENCED SCORES BY EXPERTS AND STATE

5   LEGISLATURES; WOULD YOU AGREE WITH THAT STATEMENT?

6   **A.**   I WOULD NOT DISAGREE.

7   **Q.**   IN YOUR REPORT YOU STATE THAT, "THE UTILITY OF SPATIAL

8   AUTOCORRELATION IS THAT IT ENABLES DETECTION OF AREAS THAT ARE

9   SIMILAR IN TERMS OF ONE OR MORE CHARACTERISTICS SUCH AS RACE,

10  SOCIOECONOMIC CHARACTERISTICS, EDUCATION STATEMENT, ET CETERA;"

11  DO I HAVE THAT CORRECT?

12  **A.**   EDUCATIONAL ATTAINMENT, YES, ET CETERA.

13  **Q.**   THANKS.  LOOKING AT PAGES 4 TO 9 OF YOUR REPORT, AM I

14  CORRECT THAT YOUR SIGNIFICANT FINDINGS, NUMBERS 1 THROUGH 12,

15  ALL RELATE TO MR. COOPER'S USE OF THE INCORRECT BOUNDARIES FOR

16  THE ENACTED HOUSE AND SENATE PLANS?

17  **A.**   ONE THROUGH WHICH ONE?

18  **Q.**   TWELVE.

19  **A.**   I WOULD SAY THAT'S CORRECT.

20  **Q.**   ARE YOU AWARE THAT MR. COOPER FILED A CORRECTED REPORT IN

21  WHICH HE ANALYZED THE CORRECT ENACTED HOUSE AND SENATE PLANS?

22  **A.**   YES, I AM.

23  **Q.**   DID YOU REVIEW THAT REPORT?

24  **A.**   YES, I DID.

25  **Q.**   AND YOU PROVIDED NO REPORT AND OFFERED NO OPINIONS

1   CONCERNING MR. COOPER'S CORRECTED REPORT, CORRECT?

2   **A.**   CORRECT.

3   **Q.**   I'D LIKE TO TURN NOW TO DISCUSSING SOME LOUISIANA

4   LEGISLATURE REQUIRED -- REQUIREMENTS.  ARE YOU AWARE THAT

5   LOUISIANA -- STRIKE THAT.

6          ARE YOU AWARE THAT THE LOUISIANA LEGISLATURE

7   PERIODICALLY ISSUES NEW BOUNDARY FILES FOR VOTER TABULATION

8   DISTRICTS?

9   **A.**   NOW I AM.

10  **Q.**   ARE YOU AWARE THAT THOSE ARE DIFFERENT THAN THE VTD

11  BOUNDARIES ISSUED BY THE CENSUS?

12  **A.**   IF WHAT YOU'RE SAYING IS TRUE, I GUESS NOW I AM.

13  **Q.**   AND YOU USED THE LEGISLATURE'S UPDATED VTD BOUNDARIES IN

14  YOUR ANALYSIS OF VTD SPLITS, CORRECT?

15  **A.**   CORRECT.

16  **Q.**   AND MR. COOPER REPORTED SPLITS BASED ON CENSUS VTD

17  BOUNDARIES, CORRECT?

18  **A.**   I'M NOT SURE ABOUT THAT.

19  **Q.**   I'D LIKE TO TURN YOUR -- I'D LIKE TO DIRECT YOUR ATTENTION

20  TO FIGURE 7 AND FIGURE 15 OF YOUR REPORT AND IF WE COULD GET

21  THOSE ON THE SCREEN.  FIGURE 7 IS ON PAGE 9 AND FIGURE 15 IS ON

22  PAGE 13.

23          DR. MURRAY, THESE FIGURES CONCERN MR. COOPER'S

24  COMPACTNESS SCORES FOR RESPECTIVELY THE SENATE AND HOUSE PLANS,

25  CORRECT?

1   **A.**   CORRECT.

2   **Q.**   YOU ANALYZED THESE FIGURES IN YOUR 13TH AND 20TH

3   SIGNIFICANT POINTS OF YOUR REPORT; IS THAT A CORRECT STATEMENT?

4   **A.**   CORRECT.

5   **Q.**   AND IN YOUR REPORT YOU CRITICIZE MR. COOPER'S REPORT AND

6   STATE THAT THERE WERE "OBSERVED ERRORS" THAT WERE "SOMEWHAT

7   SIGNIFICANT AS THE COOPER REPORT ATTEMPTS TO MAKE A DISTINCTION

8   ABOUT DIFFERENCES AT THE HUNDREDTHS LEVEL COMPARING ENROLLED

9   VERSUS ILLUSTRATIVE DISTRICTS."  IS THAT A CORRECT RESTATEMENT

10  OF YOUR REPORT?

11  **A.**   YES.

12  **Q.**   IS IT YOUR OPINION THAT DIFFERENCES IN REOCK AND

13  POLSBY-POPPER SCORES AT THE HUNDREDTH LEVEL ARE NOT

14  SIGNIFICANT?

15  **A.**   I WOULD SAY THAT'S TRUE.

16  **Q.**   I NEXT WANT TO WALK THROUGH YOUR SIGNIFICANT FINDINGS 14

17  AND 15 WITH RESPECT TO THE SENATE AND THE SECOND PART OF

18  FINDING 20 AND 21.  HERE, YOU STATE THAT REOCK AND

19  POLSBY-POPPER MEASURES OF COMPACTNESS DON'T NECESSARILY AGREE,

20  CORRECT?

21  **A.**   CORRECT.

22  **Q.**   AND BY THAT YOU MEAN THAT SOME DISTRICTS MAY BE MORE

23  COMPACT UNDER ONE MEASURE AND LESS COMPACT UNDER ANOTHER,

24  CORRECT?

25  **A.**   CORRECT.

1    **Q.**    YOU WOULD AGREE THAT REOCK AND POLSBY-POPPER MEASURE

2    DIFFERENT THINGS, CORRECT?

3    **A.**    THE WAY THEY MEASURE COMPACTNESS IS DIFFERENT, YES.

4    **Q.**    BECAUSE ONE IS BASED ON AREA AND ONE IS BASED ON

5    PAREMETER, RIGHT?

6    **A.**    CORRECT.

7    **Q.**    AND FOR THAT REASON YOU WOULD AGREE THAT IT CAN BE USEFUL

8    TO LOOK AT BOTH OF THEM, CORRECT?

9    **A.**    SURE.

10    **Q.**    YOU EARLIER TESTIFIED IN AGREEMENT WITH MR. TRENDE THAT

11    REOCK AND POLSBY-POPPER ARE THE TWO MOST COMMONLY REFERENCED

12    SCORES BY EXPERTS AND STATE LEGISLATURES, CORRECT?

13    **A.**    SURE.  YES.

14    **Q.**    TURNING TO SIGNIFICANT FINDING 16 AND 22, HERE YOU REPORT

15    THE MOMENT OF INERTIA SCORES FOR THE ENACTED AND ILLUSTRATIVE

16    SENATE AND HOUSE PLANS, CORRECT?

17    **A.**    YES.

18    **Q.**    AND LIKE POLSBY-POPPER AND REOCK'S, MOMENT OF INERTIA

19    SCORE RANGES FROM ZERO TO ONE, CORRECT?

20    **A.**    CORRECT.

21    **Q.**    ONE IS THE MOST COMPACT SHAPE, CORRECT?

22    **A.**    CORRECT.

23    **Q.**    AND YOU REPORT THE M-I SCORES TO THE HUNDREDTHS PLACE; IS

24    THAT RIGHT?

25    **A.**    I BELIEVE THAT'S -- YES, THAT'S TRUE.

1   **Q.**   AND USING THE MOMENT OF INERTIA MEASURE, YOU OPINE THAT

2   MR. COOPER'S ILLUSTRATIVE PLAN IS SLIGHTLY MORE COMPACT THAN

3   THE ENROLLED PLAN, CORRECT?

4   **A.**   CORRECT.

5   **Q.**   AND YOU OPINE THAT MR. COOPER'S PLAN IS SIMILARLY COMPACT

6   TO THE ENROLLED PLAN USING THE MOMENT OF INERTIA MEASURE,

7   CORRECT?

8   **A.**   THE ILLUSTRATIVE PLAN?

9   **Q.**   YES.

10  **A.**   THE HOUSE PLAN?

11  **Q.**   YES.

12  **A.**   IS THAT WHAT YOU MEAN?

13  **Q.**   YES.

14  **A.**   YES.

15  **Q.**   AND YOU WOULD AGREE, WOULDN'T YOU, THAT REGARDLESS OF

16  WHETHER YOU ARE LOOKING AT POLSBY-POPPER, REOCK OR MOMENT OF

17  INERTIA, MR. COOPER'S ILLUSTRATIVE PLANS ARE ON AVERAGE AS

18  COMPACT AS OR MORE COMPACT THAN THE CORRESPONDING ENROLLED

19  PLANS, RIGHT?

20  **A.**   I WOULD AGREE WITH THAT.

21  **Q.**   I'D NEXT LIKE TO DISCUSS FIGURES 30 AND 34.  IN FIGURES 30

22  AND 34 YOU SPLIT WHAT YOU DESCRIBE AS "POTENTIAL NEIGHBORHOOD

23  SPLITS," DO I HAVE THAT RIGHT?

24  **A.**   YES.

25  **Q.**   AND THESE ARE BASED ON SPLITS OF CENSUS BLOCK GROUPS,

1    CORRECT?

2    **A.**    YES.

3    **Q.**    AND THESE ARE BASED ON A SELECTED SAMPLE, CORRECT?

4    **A.**    CORRECT.

5    **Q.**    BECAUSE YOU DID NOT RUN ALL 500 ITERATIONS, RIGHT?

6    **A.**    I DID NOT HAVE TIME TO DO INDIVIDUAL ANALYSIS OF ALL,

7    CORRECT.

8    **Q.**    SO, YES, YOU DID NOT RUN ALL 500 ITERATIONS, CORRECT?

9    **A.**    CORRECT.  I MEAN THEY'RE ITERATIONS, BUT CORRECT.

10   **Q.**    ARE YOU FAMILIAR WITH LOUISIANA LEGISLATURE'S JOINT RULE

11   21?

12   **A.**    NO.

13   **Q.**    ARE YOU AWARE THAT THE LEGISLATURE'S REDISTRICTING

14   CRITERIA LAID OUT IN RULE 21 REQUIRES, AND I'M GOING TO QUOTE,

15   "UNDER RULE 21 G EACH DISTRICT SUBMITTED FOR CONSIDERATION

16   SHOULD CONTAIN WHOLE ELECTION PRECINCTS, AS THOSE ARE

17   REPRESENTED AS VOTING DISTRICTS OR VTD'S IN THE MOST RECENT

18   CENSUS REDISTRICTING, SHAPE FILES FOR THE STATE OF LOUISIANA

19   WHICH CORRESPONDS TO THE DATA RELEASED.  IF A VTD MUST BE

20   DIVIDED, IT SHALL BE DIVIDED INTO A FEW DISTRICTS AS

21   PRACTICABLE USING CENSUS TABULATION BOUNDARY."  ARE YOU AWARE

22   OF THAT?

23   **A.**    NOW I AM, YES.

24   **Q.**    BUT YOU WEREN'T BEFORE I ASKED MY QUESTION, RIGHT,

25   DR. MURRAY?

1   **A.**   I'M NOT SURE IF I'VE READ THIS OR NOT BEFORE, TO BE

2   HONEST.

3   **Q.**   YOU'RE UNSURE IF YOU'VE READ JOINT RULE 21 BEFORE?

4   **A.**   I MAY HAVE SEEN THIS IN THE PAST.  I'M NOT SURE.

5   **Q.**   IF WE CAN PULL UP DR. MURRAY'S DEPOSITION.

6         DR. MURRAY, DID YOU PROVIDE A DEPOSITION AS PART OF

7   THIS CASE?

8   **A.**   YES, I DID.

9   **Q.**   AND IF WE CAN TURN TO PAGE 115 LOOKING AT LINES 24 AND 25.

10  QUESTION, "ARE YOU FAMILIAR WITH JOINT RULE 21?"  ANSWER THAT

11  YOU PROVIDED, "NO."

12        SO, DR. MURRAY, ARE YOU FAMILIAR WITH THE CRITERIA AS

13  LAID OUT IN JOINT RULE 21?

14  **A.**   WELL, IN TERMS OF THE VERBIAGE OF JOINT RULE 21 I'M NOT.

15  NOT NECESSARILY SURE THAT I HAVEN'T SEEN THAT BEFORE.  THAT'S A

16  FACT.  AM I FAMILIAR WITH JOINT RULE 21 AS AN ENTITY?  NO.  BUT

17  WHETHER I'VE BEEN SHOWN SOME OF THAT VERBIAGE, I CAN'T SAY THAT

18  I HAVEN'T SEEN THAT.

19  **Q.**   I'LL MOVE ON.  YOU ACKNOWLEDGE IN YOUR REPORT THAT, "THE

20  ILLUSTRATIVE DISTRICTS GENERALLY MAINTAIN VOTING DISTRICT

21  BOUNDARIES AND RECOGNIZED PLACES OF INTEREST," IS THAT CORRECT?

22  **A.**   I THINK THAT'S CORRECT.

23  **Q.**   AND SIMILAR LANGUAGE APPEARS IN SIGNIFICANT FINDING 29

24  WITH RESPECT TO THE HOUSE, CORRECT?

25  **A.**   I BELIEVE SO, YES.

1   **Q.**   YOU WOULD AGREE THAT IN SOME INSTANCES KEEPING A VOTING

2   DISTRICT WHOLE MIGHT REQUIRE SPLITTING A BLOCK GROUP?

3   **A.**   IT COULD POTENTIALLY, YES.

4   **Q.**   WHERE A BLOCK GROUP AND A VOTING PRECINCT INTERSECT, FOR

5   EXAMPLE, WOULD BE ONE INSTANCE WHERE KEEPING A VOTING DISTRICT

6   WHOLE MIGHT REQUIRE SPLITTING A BLOCK GROUP, DO I HAVE THAT

7   RIGHT?

8   **A.**   COULD BE, YES.

9   **Q.**   AND YOUR REPORT INCLUDES NO ANALYSIS OF WHETHER THE SPLIT

10  OF BLOCK GROUPS YOU IDENTIFY FOLLOWS VOTING DISTRICT

11  BOUNDARIES, CORRECT?

12  **A.**   THAT'S CORRECT.

13  **Q.**   I'D LIKE TO NOW DISCUSS FIGURE 32(B), IF WE COULD HAVE

14  THAT ON THE SCREEN.

15          **MS. BAHN:**   THANK YOU, STEVEN.

16  **BY MS. BAHN:**

17  **Q.**   CLUSTERS ARE CORRELATED WITH THE POLITICAL ENTITIES OR

18  MUNICIPAL BOUNDARIES, CORRECT?

19  **A.**   COULD YOU REPEAT?

20  **Q.**   CLUSTERS ARE CORRELATED WITH THE POLITICAL ENTITIES OR

21  MUNICIPAL BOUNDARIES, RIGHT?

22  **A.**   IN THIS CASE THE CLUSTER IN TERMS OF --

23  **Q.**   SORRY.

24  **A.**   -- A BLOCK GROUP THAT'S BEING LOOKED AT IS JUST A BLOCK

25  GROUP.

1   **Q.**   I THINK WE'RE SHOWING 33(B) AND I MEAN TO TALK ABOUT

2   32(B).   JUST GIVE US ONE SECOND AND I'LL ASK MY QUESTION AGAIN,

3   DR. MURRAY.

4        SO IN LOOKING AT 32(B), CLUSTERS ARE CORRELATED WITH

5   THE POLITICAL ENTITIES OR MUNICIPAL BOUNDARIES, RIGHT?

6   **A.**   I DON'T UNDERSTAND WHAT THAT QUESTION MEANS.

7   **Q.**   LET'S MOVE ON TO FIGURE 33(B).   THIS FIGURE DOESN'T SHOW

8   VOTING DISTRICT BOUNDARIES, CORRECT?

9   **A.**   NO, IT DOES NOT.

10  **Q.**   YOU DON'T KNOW WHERE THE VOTING DISTRICT BOUNDARIES ARE,

11  RIGHT?

12  **A.**   IN THIS CASE I DO NOT, NO.

13  **Q.**   YOU DON'T KNOW WHETHER THE DISTRICT BOUNDARIES FOLLOW A

14  VOTING DISTRICT BOUNDARY, CORRECT?

15  **A.**   IN THIS CASE I ALREADY SAID I DON'T KNOW.

16  **Q.**   AND THAT'S TRUE OF ALL OF THE FIGURES SHOWING THE 27 BLOCK

17  GROUP SPLITS; IS THAT CORRECT?

18  **A.**   I DID NOT PRODUCE FIGURES SHOWING THE VOTING DISTRICT

19  BOUNDARIES, NO.

20  **Q.**   SO JUST SO THE RECORD IS CLEAR, IT'S TRUE THAT YOU'RE NOT

21  AWARE OF WHETHER THE DISTRICT BOUNDARY FOLLOWS THE VOTING

22  DISTRICT BOUNDARY ACROSS ALL 27 BLOCK GROUP SPLITS, CORRECT?

23  **A.**   CORRECT.

24  **Q.**   I'D LIKE TO MOVE NOW TO DISCUSS SIGNIFICANT FINDING 29 IN

25  WHICH YOU STATE THAT, "RACE APPEARS TO HAVE PREDOMINATED OVER

1   MAINTAINING NEIGHBORHOODS IN MANY INSTANCES."  IS THAT A

2   CORRECT READING OF YOUR REPORT?

3   **A.**   WHICH ONE -- WHICH PARAGRAPH?

4   **Q.**   SIGNIFICANT FINDING 29.

5   **A.**   YES.

6   **Q.**   WOULD YOU AGREE THAT LAND VALUES DRIVE WHO CAN LIVE WHERE?

7   **A.**   I THINK THAT'S TRUE.

8   **Q.**   WOULD YOU AGREE THAT INCOME MEASURES REFLECT LAND VALUES?

9   **A.**   THAT'S PROBABLY TRUE.

10  **Q.**   IS IT THE SAME WITH EDUCATION?

11  **A.**   TO A DEGREE.  CERTAINLY HIGHER EDUCATION FOR HIGHER INCOME

12  GROUPS IS KNOWN TO BE TRUE.

13  **Q.**   IN SIGNIFICANT FINDING 29, THIS SIMPLY REFLECTS

14  SEGREGATION PATTERNS RATHER THAN RACE PREDOMINATING OVER

15  MAINTAINING NEIGHBORHOODS, CORRECT?

16  **A.**   IT MAY BE ONE EXPLANATORY FACTOR.

17  **Q.**   I'D LIKE TO MOVE TO THE FINDINGS YOU MADE IN YOUR SUMMARY.

18  USING BLOCK GROUPS, RATHER THAN MUNICIPAL BOUNDARIES, CHANGES

19  THE ARRANGEMENTS AND THEREFORE RECASTS THE DATA, CORRECT?

20  **A.**   USING BLOCK GROUPS IS DIFFERENT THAN MUNICIPAL BOUNDARIES;

21  IS THAT YOUR QUESTION?

22  **Q.**   YES.

23  **A.**   OF COURSE.

24  **Q.**   CHANGING THE SIZE, SHAPE OR ORIENTATION OF A POLYGON

25  REASSIGNS INDIVIDUAL OBSERVATIONS TO NEW GROUPS, CORRECT?

1   **A.**   I'M NOT SURE WHAT YOU MEAN BY THAT.

2   **Q.**   WE CAN COME BACK TO THAT.  A CHANGE IN THE SIZE OF THE

3   UNITS ACROSS MAPPED REGIONS CHANGES THEIR NUMBERS, CORRECT?

4   **A.**   AGAIN, I'M NOT SURE WHAT YOU MEAN BY THAT.

5   **Q.**   I'VE GOT A COUPLE MORE QUESTIONS FOR YOU, DR. MURRAY.  ARE

6   YOU AWARE OF THE ACCEPTED STANDARD OF RACE COMPOSITION IN

7   SECTION 2 CASES?

8   **A.**   NO.

9   **Q.**   ARE YOU FAMILIAR WITH THE CASE *ASHCROFT V. GEORGIA*?

10   **A.**   NO.

11   **Q.**   WOULD YOU AGREE WITH THE QUOTE THAT, "IF ONE IS DRAWING A

12   VOTING DISTRICT, THAT VOTING DISTRICT NEEDS TO BE REASONABLY

13   COMPACT OR REASONABLY SHAPED THAT MUST BE CONTIGUOUS UNLESS

14   WATER IS INVOLVED TO RESPECT COMMUNITIES OF INTERESTS TO MEET

15   ONE PERSON ONE VOTE REQUIREMENTS AND BE PLUS OR MINUS FIVE

16   PERCENT IN THE STATE LEGISLATIVE PLANS IN THE STATE OF

17   LOUISIANA"?

18   **A.**   WHAT ABOUT IT?

19   **Q.**   WOULD YOU AGREE WITH THAT STATEMENT?

20   **A.**   THAT SOUNDS LIKE A COMMON REDISTRICTING TYPE OF CRITERIA.

21   **Q.**   SO JUST SO THE RECORD IS CLEAR, YOU WOULD AGREE WITH THAT

22   STATEMENT?

23   **A.**   I DON'T KNOW THAT I AGREE OR DISAGREE.  IT'S A STATEMENT.

24   WHAT AM I SUPPOSED TO AGREE TO?

25   **Q.**   SO YOU JUST SAID IT'S A --

1   **A.**   I AGREE THAT IT'S A STATEMENT.

2   **Q.**   YOU AGREE THAT IT'S A COMMON REDISTRICTING PRINCIPLE,

3   CORRECT?

4   **A.**   CORRECT.

5   **Q.**   FOCUSING ON FIGURE 15, WHICH IS ON PAGE 13 OF YOUR REPORT,

6   DR. MURRAY, DID YOU ADD THE PERCENTAGES IN THIS TABLE AND

7   ARRIVE AT A MEAN OR AVERAGE?

8   **A.**   DID I COMPUTE THE MEANS IN THIS CASE?

9   **Q.**   NO.  MY QUESTION IS, DID YOU ADD THE PERCENTAGES IN THIS

10   TABLE AND ARRIVE AT A MEAN OR AVERAGE?

11   **A.**   I'M NOT SURE WHAT YOU MEAN BY THAT QUESTION.

12   **Q.**   DR. MURRAY, WOULD YOU AGREE THAT MEASURING COMPACTNESS

13   INSIDE OF AN ILLUSTRATIVE DISTRICT IS NOT A REQUIREMENT UNDER

14   THE CURRENT GINGLES 1 STANDARD?

15           **MR. LEWIS:**  OBJECTION.  CALLS FOR A LEGAL CONCLUSION.

16           **THE COURT:**  YOU WANT TO RESPOND?

17           **MS. BAHN:**  I MEAN HE'S TESTIFIED ABOUT MEASURING

18   COMPACTNESS FOR THE LAST THREE HOURS.  I THINK HE'S

19   SUFFICIENTLY ABLE TO RESPOND TO --

20           **THE COURT:**  YOU'RE ASKING HIM WHETHER OR NOT IT'S A

21   STANDARD UNDER A UNITED STATES SUPREME COURT CASE.

22           **MS. BAHN:**  I CAN REPHRASE, YOUR HONOR.

23           **THE COURT:**  REPHRASE.

24   **BY MS. BAHN:**

25   **Q.**   DR. MURRAY, WOULD YOU AGREE THAT MEASURING COMPACTNESS

1    INSIDE OF AN ILLUSTRATIVE DISTRICT IS NOT A REQUIREMENT UNDER

2    THE CURRENT REDISTRICTING REQUIREMENTS?

3    **A.**   I DON'T KNOW THAT I AGREE TO THAT AT ALL.  I DON'T KNOW

4    WHAT THAT MEANS.  I'M NOT AWARE OF SUCH A STANDARD.

5    **Q.**   DR. MURRAY, WOULD YOU AGREE THAT REOCK AND POLSBY-POPPER

6    ARE INDUSTRY DE FACTO?

7    **A.**   THAT SEEMS LIKE A REASONABLE STATEMENT.

8    **Q.**   IN FACT, YOU WOULD AGREE THAT THEY'RE THE MOST BROADLY

9    USED TESTS IN REDISTRICTING CASES, CORRECT?

10   **A.**   THAT I'M AWARE OF THAT SEEMS TO BE TRUE, YES.

11   **Q.**   DID YOU PERFORM ANY ANALYSIS TO CONSIDER, AMONG OTHER

12   FACTORS, THE HISTORY OF VOTING DISCRIMINATION IN THE STATE'S

13   PLANS AND DISTRICTS YOU EXAMINED?

14   **A.**   NO, I DID NOT.

15   **Q.**   CAN WE PULL UP FIGURE 28 FROM DR. MURRAY'S REPORT.  THERE

16   WAS SOME BACK AND FORTH ON DIRECT WITH YOU AND MR. LEWIS ABOUT

17   WHAT FIGURE 28 SHOWS.  JUST SO I UNDERSTAND, FIGURE 28 TELLS US

18   THAT THE POPULATION OF LOUISIANA IS HIGHLY SEGREGATED?

19   **A.**   IN 28?

20   **Q.**   YES.

21   **A.**   THIS DOESN'T SHOW IT SPATIALLY, BUT IT SUGGESTS THAT THERE

22   ARE IN FACT CLUSTERS OF HIGH VALUES HERE.  IN THIS CASE IT'S

23   WHITE PERCENTAGE SURROUNDED BY SIMILARLY DEFINED AREAS,

24   SIMILARLY CHARACTERIZE AREAS, AND THEN AREAS WHERE A HIGH

25   PERCENTAGE OF BLACK VAP IS SURROUNDED BY OTHER AREAS OF HIGH

1   BLACK VOTING AGE POPULATION.  THIS FIGURE DOES SUMMARIZE THAT,

2   YES.

3   **Q.**   JUST SO THE RECORD IS CLEAR, THIS SCATTER PLOT IN FIGURE

4   28 SHOWS THAT THE STATE OF LOUISIANA IS HIGHLY SEGREGATED?

5   **A.**   IT SHOWS THAT THERE ARE INSTANCES, YES; SIGNIFICANT

6   CLUSTERS.  IT DOESN'T SHOW IT SPATIALLY.  BUT IT SUGGESTS,

7   BECAUSE OF HOW THEY'RE PLOTTED, IS THAT IT'S A VALUE OF ONE

8   BLOCK GROUP IN RELATION TO ITS NEIGHBOR.

9          **MS. BAHN:**  JUST ONE MOMENT, YOUR HONOR.  NO FURTHER

10  QUESTIONS FOR THIS WITNESS.

11         **THE COURT:**  IS THERE ANY REDIRECT?

12         **MR. LEWIS:**  YOUR HONOR, PATRICK LEWIS FOR DEFENDANTS.

13  VERY BRIEFLY.

14  **REDIRECT EXAMINATION**

15  **BY MR. LEWIS:**

16  **Q.**   DR. MURRAY, ARE YOU AWARE OF A COURT THAT HAS REJECTED THE

17  MOMENT OF INERTIA METHOD?

18  **A.**   NO, I AM NOT.

19  **Q.**   AND CAN POLSBY-POPPER AND REOCK BE USED TO MEASURE THE

20  COMPACTNESS OF A POPULATION AS COMPARED TO A DISTRICT BOUNDARY?

21  **A.**   NO, THEY CANNOT.

22         **MR. LEWIS:**  I HAVE NO FURTHER QUESTIONS, YOUR HONOR.

23         **THE COURT:**  OKAY.  YOU MAY STEP DOWN.  THANK YOU.

24             OKAY.  IT'S 4:00.  BY OUR PRIOR SCHEDULE THAT WE

25  SET AT THE PRETRIAL CONFERENCE, WE'RE GOING TO CLOSE FOR THE

1  AFTERNOON.  WE DO HAVE AN ISSUE FOR TOMORROW.  WE ONLY HAVE A

2  COURT REPORTER FROM TEN TO TWO.  WE DIDN'T MAKE THE

3  ARRANGEMENTS.  I'M NOT GOING TO EXPLAIN WHY.  JUST KNOW THAT IT

4  WAS NOT INTENTIONAL AND THAT WE DID EVERYTHING WE COULD.

5           SO WHAT WE'LL DO IS WE'LL COMMENCE AT 10:00

6  SHARP AND WE'LL TAKE TWO 15 OR 20-MINUTE BREAKS BETWEEN 1O AND

7  2, SO BRING A POWER BAR OR A SMOOTHIE OR SOMETHING BECAUSE

8  WE'RE NOT TAKING A LUNCH BREAK.  WE'RE JUST GOING TO GO

9  STRAIGHT FROM 10 TO 2.  SO ANY CHANCE WE'RE GOING TO FINISH

10 TOMORROW, COUNSEL?

11          **MR. LEWIS:**  YOUR HONOR, FOR DEFENDANTS WE HAVE ONE

12 MORE WITNESS.  I THINK --

13          **THE COURT:**  THE LAST EXPERT?

14          **MR. LEWIS:**  YES, DR. LEWIS.  AND I THINK WE'RE

15 RESTING AND I CAN'T SPEAK FOR THE PLAINTIFFS.

16          **THE COURT:**  OKAY.  ANY CONCEPT ON REBUTTAL?

17          **MS. GIGLIO:**  I THINK WE ARE CERTAINLY HOPEFUL THAT WE

18 COULD WRAP UP TOMORROW AND I'M NOT SURE IF YOUR HONOR IS OPEN

19 TO CONTINUING FOR A LITTLE LONGER TONIGHT TO START INTO THEIR

20 NEXT WITNESS, BUT I BELIEVE BOTH OF THE PARTIES HAVE

21 REPRESENTED THAT THEY'RE AVAILABLE IF THAT WOULD BE HELPFUL TO

22 THE COURT IN TRYING TO WRAP UP TOMORROW.  IT'LL DEPEND A LITTLE

23 BIT ON HOW LONG DR. LEWIS IS FOR US TO KNOW IF WE CAN FINISH

24 OUR TESTIMONY TOMORROW.

25          **THE COURT:**  I'M AMENABLE.  LET ME JUST KIND OF POLL

1    MY STAFF.  OKAY.  WE CAN GO UNTIL FIVE.

2              **MS. GIGLIO:**  THANK YOU, YOUR HONOR.

3              **THE COURT:**  CALL YOUR NEXT WITNESS.

4              **MS. MCKNIGHT:**  THANK YOU, YOUR HONOR.  WE'D CALL

5    DR. JEFFERY LEWIS TO THE STAND.

6                        **DR. JEFFERY LEWIS,**

7          **HAVING BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

8              **COURTROOM DEPUTY:**  WOULD YOU PLEASE STATE YOUR NAME

9    AND SPELL IT FOR THE RECORD.

10             **THE WITNESS:**  MY NAME IS JEFFERY LEWIS.

11   J-E-F-F-R-E-Y, L-E-W-I-S.

12             **MS. MCKNIGHT:**  YOUR HONOR, MAY I APPROACH WITH WATER

13   FOR THE WITNESS?

14             **THE COURT:**  YOU MAY.

15             **MS. MCKNIGHT:**  GOOD AFTERNOON.  KATE MCKNIGHT ON

16   BEHALF OF LEGISLATIVE INTERVENORS.

17   **DIRECT EXAMINATION**

18   **BY MS. MCKNIGHT:**

19   **Q.**   GOOD AFTERNOON, DR. LEWIS.

20   **A.**   GOOD AFTERNOON.

21   **Q.**   WHAT IS YOUR ROLE IN THIS MATTER?

22   **A.**   I'VE BEEN RETAINED BY DEFENSE COUNSEL TO ANALYZE PATTERNS

23   OF VOTING IN RACES IN LOUISIANA RELATED TO THIS -- THAT MAY BE

24   RELATED TO THIS LITIGATION.

25   **Q.**   LET'S PULL UP TWO EXHIBITS, LDTX 52 AND LDTX 54.

1  DR. LEWIS, WHAT ARE THESE?

2  **A.**   THESE APPEAR TO BE THE TWO REPORTS THAT I FILED IN

3  RELATION TO THIS PROCEEDING.

4  **Q.**   LET'S FOCUS ON LDTX 52 AND TURN TO PAGE 8.  TURN ONE PAGE

5  TO PAGE 9.  THERE WE GO.  IS THIS YOUR CV?

6  **A.**   YES.

7  **Q.**   IS IT UP-TO-DATE?

8  **A.**   I BELIEVE SO.

9  **Q.**   LET'S KEEP THIS UP FOR JUST A MOMENT.  WHAT IS YOUR

10  EDUCATIONAL BACKGROUND?

11  **A.**   I EARNED MY BACHELOR OF ARTS IN POLITICAL SCIENCE AND

12  ECONOMICS FROM WESLEYAN UNIVERSITY AND MY PH.D IN POLITICAL

13  SCIENCE FROM MIT.

14  **Q.**   AND WHAT IS YOUR ACADEMIC EXPERIENCE?

15  **A.**   I'M CURRENTLY PROFESSOR OF POLITICAL SCIENCE AT THE

16  UNIVERSITY OF CALIFORNIA LOS ANGELES WHICH I JOINED IN 2001.

17  PRIOR TO THAT, I WAS ASSISTANT PROFESSOR OF POLITICS AND PUBLIC

18  POLICY AT PRINCETON UNIVERSITY.

19  **Q.**   HAVE YOU SERVED IN LEADERSHIP ROLES IN THE FIELDS OF

20  POLITICAL METHODOLOGY OR POLITICAL SCIENCE?

21  **A.**   YES.  I AM PAST PRESIDENT OF THE SOCIETY FOR POLITICAL

22  METHODOLOGY, WHICH IS THE LEARNED SOCIETY FOR FOLKS THAT STUDY

23  THE APPLICATION OF QUANTITATIVE DATA TO QUESTIONS IN POLITICAL

24  SCIENCE.  I'VE ALSO BEEN AN EDITOR OF THE AMERICAN POLITICAL

25  SCIENCE REVIEW, WHICH IS THE FLAGSHIP JOURNAL OF POLITICAL

1   SCIENCE.  I'M PAST CHAIR OF MY DEPARTMENT.

2   **Q.**   AND WHAT ARE YOUR TEACHING INTERESTS RELEVANT TO THIS

3   CASE?

4   **A.**   MY TEACHING, PARTICULARLY AT THE MOMENT, IS FOCUSED

5   LARGELY ON GRADUATE TRAINING IN QUANTITATIVE METHODS AND SOME

6   PART OF THAT AT LEAST IS DEDICATED TO STUDYING WAYS IN WHICH

7   ADMINISTRATIVE RECORDS AND OTHER DATA CAN BE USED TO INFER

8   BEHAVIOR AND INTENTION OF POLITICAL ACTORS.

9   **Q.**   LET'S TURN TO PAGES -- TO THE NEXT PAGE, PAGE 2 OF YOUR CV

10  THROUGH 4.  IS THIS WHERE YOUR PUBLICATIONS ARE LISTED IN YOUR

11  CV?

12  **A.**   YES.

13  **Q.**   ARE ANY OF THESE PUBLICATIONS PEER REVIEWED?

14  **A.**   I BELIEVE THEM TO ALL BE PEER REVIEWED, YES.

15  **Q.**   LET'S TURN TO PAGE 3.  NOW, LET'S TURN TO PAGE 4.  HAVE

16  YOU BEEN RETAINED AS AN EXPERT IN CASES ABOUT THE TOPICS OF

17  POLITICAL SCIENCE, QUANTITATIVE METHODS AND RACIALLY POLARIZED

18  VOTING ANALYSES?

19  **A.**   I HAVE.

20  **Q.**   AND LET'S TURN BACK TO PAGE 2 OF YOUR REPORT, SO OF THE

21  REPORT, AND LOOK AT PARAGRAPH 2.  IS THIS WHERE YOU LIST PAST

22  CASES?

23  **A.**   YES.

24  **Q.**   HAVE YOU EVER BEEN DISQUALIFIED BY A COURT FROM TESTIFYING

25  AS AN EXPERT?

1   **A.**   I HAVE NOT.

2           **MS. MCKNIGHT:**  YOUR HONOR, AT THIS TIME WE'D LIKE TO

3   MOVE FOR THE ACCEPTANCE OF DR. LEWIS AS AN EXPERT IN THE FIELDS

4   OF POLITICAL SCIENCE, QUANTITATIVE METHODS AND RACIALLY

5   POLARIZED VOTING ANALYSES.

6           **THE COURT:**  ANY CROSS ON THE TENDER?

7           **MS. ROHANI:**  GOOD AFTERNOON, YOUR HONOR.  SARA

8   ROHANI.  NO OBJECTIONS.

9           **THE COURT:**  OKAY.  DR. JEFFERY LEWIS WILL BE ADMITTED

10  TO GIVE OPINION TESTIMONY IN THE FIELDS IDENTIFIED.

11          **MS. MCKNIGHT:**  AND, YOUR HONOR, AT THIS TIME AS WELL,

12  BASED ON STIPULATION BY THE PARTIES, WE'D LIKE TO MOVE FOR

13  ADMISSION OF HIS TWO EXPERT REPORTS SERVED IN THIS MATTER.

14  THAT'S LDTX 52 AND LDTX 54.

15          **MS. ROHANI:**  NO OBJECTION, YOUR HONOR.

16          **THE COURT:**  ADMITTED.

17  **BY MS. MCKNIGHT:**

18  **Q.**   DR. LEWIS, WHAT KIND OF ANALYSIS DID YOU CONDUCT IN YOUR

19  FIRST REPORT IN THIS MATTER?

20  **A.**   THE BULK OF THE ANALYSIS INVOLVED THE APPLICATION OF

21  SO-CALLED ECOLOGICAL INTERFERENCE METHODOLOGIES TO INFER FROM

22  PRECINCT LEVEL VOTING RETURNS AND VOTER REGISTRATION RECORDS,

23  THE FRACTION OF VOTERS WHO ARE IDENTIFIED ON THE VOTER

24  REGISTRATION ROLLS AS BLACK, WHITE AND OTHER, WHO SUPPORTED

25  CANDIDATES FOR OFFICE IN THE CONTESTS ANALYZED IN EACH OF THE

1   DISTRICTS ANALYZED.

2   **Q.**   AND DID YOU APPLY A PARTICULAR METHOD OF EI TO CONDUCT

3   THIS ANALYSIS?

4   **A.**   YES.  I USED A METHOD OF EI THAT GOES BY VARIOUS

5   DIFFERENT -- DIFFERENT NAMES, BUT IT'S THE ONE WHICH ALLOWS THE

6   ESTIMATION OF THE SUPPORT FOR MULTIPLE CANDIDATES BY

7   MULTIPLE -- MULTIPLE GROUPS.  SO I WOULD REFER TO IT BY ITS

8   FORMAL TITLE, WHICH IS MULTINOMIAL DIRICHLET ECOLOGICAL

9   INTERFERENCE.

10   **Q.**   DID YOU REVIEW REPORTS SUBMITTED IN THIS MATTER BY

11   PLAINTIFFS FROM DR. LISA HANDLEY?

12   **A.**   I'VE SEEN THOSE REPORTS, YES.

13   **Q.**   IN YOUR ANALYSIS DID YOU USE DR. HANDLEY'S DATA?

14   **A.**   YES, I BELIEVE I DID.  THE WAY IN WHICH I RECEIVED THE

15   DATA WAS VIA AN INTERMEDIARY, CLARK BENSON OF POLIDATA.  BUT IT

16   HAS BEEN REPRESENTED TO ME THAT THE DATA ARE THOSE DATA THAT

17   WERE ORIGINALLY PROVIDED DR. HANDLEY.

18   **Q.**   AND THE DATA THAT WAS PROVIDED BY DR. HANDLEY, DID IT

19   INCLUDE CONTESTS OTHER THAN STATEWIDE DOWN-BALLOT ELECTIONS

20   INVOLVING BLACK CANDIDATES?

21   **A.**   YES.

22   **Q.**   I'D LIKE TO ASK YOU ABOUT THE ANALYSIS YOU CONDUCTED AS

23   COMPARED TO THE ANALYSIS THAT DR. HANDLEY CONDUCTED IN THIS

24   MATTER.  FIRST, WHAT QUESTION ARE YOU AND DR. HANDLEY TRYING TO

25   ANSWER FOR THE COURT?

1  **A.**   I THINK THE QUESTIONS THAT ARE AT ISSUE HERE, AGAIN, ARE

2  WHAT ARE -- WHAT IS THE LEVEL OF SUPPORT -- WHAT IS THE LEVEL

3  OF COHESION, I SHOULD PERHAPS SAY, THE DEGREE TO WHICH BLACK

4  VOTERS SUPPORT THE SAME CANDIDATE IN ELECTORAL CONTESTS.  AND,

5  SECOND, THE DEGREE TO WHICH WHITE VOTERS VOTE FOR THAT

6  PREFERRED CANDIDATE OF BLACK VOTERS.

7         AND THAT'S SORT OF, I THINK, YOU KNOW, REFERRED TO IN

8  THIS AREA OFTEN AS CROSSOVER VOTING.  SO WHAT WHITE VOTERS --

9  UNDER THE ASSUMPTION MAYBE THAT WE'RE SPEAKING OF, A SITUATION

10  IN WHICH THE PREFERRED OR MAJORITY CHOICE CANDIDATE OF WHITE

11  VOTERS IS DIFFERENT FROM THAT OF BLACK VOTERS.  WHAT FRACTION

12  OF WHITE VOTERS CROSS OVER TO SUPPORT THE CANDIDATE PREFERRED

13  BY BLACK VOTERS.

14         SO TO TRY TO ESTIMATE THOSE QUANTITIES AND THEN USING

15  THOSE QUANTITIES AND OTHER FEATURES OF THE CONTESTS, TO MAKE

16  SOME INFERENCE ABOUT WHETHER A PARTICULAR DISTRICT MIGHT ELECT

17  A BLACK CANDIDATE OF CHOICE AND WHAT MIGHT BE REQUIRED IN TERMS

18  OF THE COMPOSITION OF THAT DISTRICT OR AREA IN THE STATE THAT

19  WOULD BE, AGAIN, REQUIRED TO ELECT A BLACK CANDIDATE OF CHOICE.

20  **Q.**   AND DOES THE ISSUE OF TURNOUT COME INTO PLAY IN YOUR

21  ANALYSIS?

22  **A.**   YEAH.

23  **Q.**   HOW SO?

24  **A.**   WELL, YOU KNOW, IN -- ALL OF THIS IS, OF COURSE, DIFFICULT

25  BECAUSE THESE ARE -- THE FACTS THAT WE'RE ASKED TO TALK ABOUT

1   HERE CAN'T BE DIRECTLY OBSERVED BECAUSE OF THE SECRET BALLOT.

2   SO WE CAN'T KNOW THE FRACTION OF FOLKS OF DIFFERENT RACES WHO

3   SUPPORTED DIFFERENT CANDIDATES.  BUT IF WE CAN ESTIMATE THAT,

4   AND IF WE KNEW THE COMPOSITION OF THE FOLKS THAT VOTE IN A

5   PARTICULAR ELECTION, IT WOULD BE RELATIVELY STRAIGHT FORWARD TO

6   FIGURE OUT WHAT FRACTION YOU WOULD NEED OF THAT AREA TO BE

7   BLACK OR WHITE IN ORDER TO ACHIEVE 50 PERCENT, SAY, SUPPORT FOR

8   THE BLACK-PREFERRED CANDIDATE OR SOMETHING LIKE THAT.  THAT'S A

9   RELATIVELY EASY CALCULATION.

10          BUT WHAT COMPLICATES THAT A LITTLE BIT IS THAT WHAT

11  THE COMPOSITION OF THE FOLKS WHO VOTE IS ON A PARTICULAR

12  ELECTION AND THE COMPOSITION OF THE POPULATION THAT IS GOING TO

13  PROVIDE THAT MIX OF BLACK AND WHITE VOTERS, DEPENDS ON WHETHER

14  VOTERS OF EACH RACE TURN OUT AT DIFFERENT LEVELS OR THE SAME

15  LEVEL.

16  **Q.**  IS IT FAIR TO SAY THAT BOTH YOU AND DR. HANDLEY ARE TRYING

17  TO ESTIMATE FUTURE VOTING BEHAVIOR BASED ON PAST ELECTION

18  RESULTS?

19  **A.**  YES, THAT'S RIGHT.  AND OF COURSE, AS THEY SAY IN ALL OF

20  THE FINANCIAL PROSPECTUS REPORTS, THE PAST MAY NOT BE

21  INDICATIVE OF THE FUTURE, SO -- BUT THAT'S WHAT WE HAVE TO GO

22  ON, IS TRYING TO EXTRAPOLATE BASICALLY FROM ELECTIONS MAYBE FOR

23  DIFFERENT OFFICES HELD AT DIFFERENT TIMES IN DIFFERENT CONTEXTS

24  AND USE THOSE TO MAKE SOME SORT OF CONCLUSION ABOUT WHAT MIGHT

25  OCCUR, ALTHOUGH THE AMOUNT OF UNCERTAINTY IS OBVIOUSLY NOT

1    ZERO.

2    **Q.**    AND I UNDERSTAND YOU'VE TESTIFIED IN PAST CASES ON THE

3    ISSUES AT PLAY IN THIS CASE.  THE TYPES OF ANALYSES THAT YOU

4    AND DR. HANDLEY DID IN THIS CASE, HAVE YOU SEEN THOSE CONDUCTED

5    IN PAST CASES ON VOTING RIGHTS ACT CASES?

6    **A.**    YES.

7    **Q.**    SO WE'VE TALKED A LITTLE BIT ABOUT THE COMMON QUESTION

8    YOU'RE TRYING TO ANSWER.  NOW I'D LIKE TO BETTER UNDERSTAND

9    WHERE YOU AND DR. HANDLEY MAY DIFFER AND WHAT TYPE OF AN

10   ANALYSIS YOU'VE CONDUCTED HERE.  SO FOR YOUR PART WHAT TYPE OF

11   ANALYSIS DID YOU CONDUCT TO ANSWER THIS QUESTION?

12   **A.**    WELL, IN ADDITION TO THE ECOLOGICAL INFERENCE ANALYSIS,

13   THE ESTIMATION OF THE SUPPORT AMONG THE DIFFERENT GROUPS FOR

14   EACH CANDIDATE AND IDENTIFYING THE MINORITY-PREFERRED CANDIDATE

15   AND SO FORTH AND SO ON.  I ALSO LOOKED AT THE QUESTION OF

16   WHETHER THERE WAS, I GUESS WHAT YOU MIGHT CALL LEGALLY, I GUESS

17   YOU MIGHT CALL THE OPPORTUNITY TO ELECT.

18            I'M NOT GOING TO SPEAK TO WHAT THE THRESHOLD FOR THAT

19   IS, BUT THAT'S EFFECTIVELY -- THE QUESTION IS, YOU KNOW, WHAT

20   WOULD THE -- WOULD THIS PARTICULAR DISTRICT PROVIDE OPPORTUNITY

21   WOULD THE CANDIDATE OF -- THAT'S PREFERRED BY BLACK VOTERS IN

22   EACH DISTRICT HAVE AN OPPORTUNITY TO ELECT AND THE OPPORTUNITY

23   I TAKE TO BE, YOU KNOW, SORT OF INCREASING -- IS BEING

24   INDICATED BY INCREASING AMOUNTS OF SUCCESS IN PAST ELECTIONS AS

25   WE CAN RECONSTRUCT THEM.

1          SO THERE'S SORT OF TWO WAYS TO THINK ABOUT THAT.  ONE

2   WAY I THINK BOTH DR. HANDLEY AND I DID DO, WHICH IS KIND OF

3   SOMETIMES CALLED RECONSTRUCTED ELECTION ANALYSIS, WHERE YOU

4   THINK ABOUT -- SUPPOSE THAT VARIOUS OTHER ELECTIONS THAT MAYBE

5   WERE STATEWIDE ELECTIONS OR ELECTIONS FOR HOUSE OF

6   REPRESENTATIVE OR WHATEVER THEY MIGHT BE, THAT WERE HELD IN THE

7   SAME PRECINCTS THAT ARE EMPLOYED IN A PARTICULAR ELECTION MAP

8   THAT MIGHT BE IMPLEMENTED, YOU COULD ASK THE QUESTION, WELL, IF

9   THIS ELECTION HAD ONLY TAKEN PLACE IN THOSE PRECINCTS WHO WOULD

10  HAVE WON; HOW MUCH SUPPORT WOULD THAT CANDIDATE THAT WON HAVE

11  GOTTEN AND SO FORTH.

12          AND THE OTHER THING THAT YOU COULD DO IS YOU COULD

13  ASK A SLIGHTLY DIFFERENT QUESTION, WHICH IS IF YOU SAID, WELL,

14  GIVEN WHAT WE KNOW -- WHAT WE ESTIMATE.  I SHOULDN'T SAY KNOW

15  BECAUSE, AGAIN, WE'RE JUST ESTIMATING AND THERE'S A LOT OF

16  UNCERTAINTY.  BUT GIVEN WHAT WE ESTIMATED THE RATE OF COHESION

17  TO BE, WHAT WE'VE ESTIMATED THE RATE OF CROSS-OVER VOTING TO

18  BE, WHAT WE'VE OBSERVED THE LEVELS OF TURNOUT TO BE, WE CAN

19  ASK, HOLDING ALL OF THAT CONSTANT, WHAT DEMOGRAPHIC COMPOSITION

20  OF THE POPULATION WOULD YOU NEED IN ORDER TO CREATE, SAY, AN

21  EQUAL CHANCE OF THE BLACK-PREFERRED CANDIDATE WINNING.

22  **Q.**   AND THE SECOND TYPE OF ANALYSIS YOU JUST DESCRIBED, IS

23  THAT REFERRED TO AS A PERCENT NEEDED TO WIN ANALYSIS?

24  **A.**   YOU COULD CALL IT THAT, YEAH.

25  **Q.**   DID DR. HANDLEY CONDUCT A PERCENT NEEDED TO WIN ANALYSIS

1  IN THIS CASE?

2  **A.**   I DON'T BELIEVE SO.

3  **Q.**   AND DO YOU KNOW IF DR. HANDLEY IS FAMILIAR WITH THE

4  PERCENT NEEDED TO WIN ANALYSIS?

5  **A.**   I DON'T KNOW IF SHE WOULD USE THAT NAME OR NOT, BUT THE

6  TECHNIQUE IS SOMETHING THAT SHE AND SOME COAUTHORS INTRODUCED

7  IN THE LITERATURE.

8  **Q.**   SO WHAT KIND OF ANALYSIS DID DR. HANDLEY CONDUCT IN THIS

9  CASE?

10  **A.**   I BELIEVE THAT WHAT SHE DID WAS SORT OF SIMILAR WITH

11  RESPECT TO ESTIMATING THE RATES OF SUPPORT FOR THE DIFFERENT

12  CANDIDATES, AND I DON'T THINK SHE APPLIED THAT DISTRICT BY

13  DISTRICT BUT IN LARGER AGGREGATES.  AND THEN I THINK THE

14  SECOND -- WHICH IS DIFFERENT FROM WHAT I DID BUT, AGAIN,

15  BROADLY SIMILAR.  AND THEN THE SECOND THING THAT I THINK SHE

16  DID IS THE RECONSTITUTED OR RECONSTRUCTED, IF YOU'D LIKE,

17  ELECTION METHOD TO CALCULATE THE FRACTION OF TIMES THAT IN THE

18  RACE IS CONSIDERED THE MINORITY CANDIDATE OF, QUOTE, UNQUOTE,

19  WON THAT ELECTION.

20  **Q.**   WHAT DO THE TWO TYPES OF ANALYSES PROVIDE THE COURT; A

21  RECOMPILED ELECTION RESULTS ON THE ONE HAND AND PERCENT BVAP

22  NEEDED TO WIN ON THE OTHER?

23  **A.**   YEAH.  SO, AGAIN, I THINK BOTH OF THEM SPEAK TO THIS

24  QUESTION OF WHETHER THE BLACK-PREFERRED CANDIDATE IN A

25  PARTICULAR DISTRICT WILL HAVE A CHANCE OF WINNING AN ELECTION.

1          SO THE CANDIDATES -- THOSE VOTERS WOULD HAVE A CHANCE

2    OF ELECTING THE CANDIDATE OF THEIR CHOICE.  ONE OF THEM, AGAIN,

3    SORT OF TAKES AS GIVEN, THE DISTRICT THAT'S DRAWN, IT JUST SORT

4    OF SAYS HOW WOULD THIS DISTRICT AT THIS LEVEL PERFORM; TRIES TO

5    ESTIMATE THAT QUANTITY.

6          THE SECOND, I THINK, TRIES TO GO MAYBE A LITTLE BIT

7    BEYOND THAT AND ASKS THE QUESTION -- ASKS THE QUESTION SORT OF

8    WHAT WOULD YOU -- WHAT WOULD YOU NEED TO GET PERFORMANCE.  YOU

9    KNOW, DID YOU NEED A VALUE THAT WAS AS HIGH AS THE ONE THAT WAS

10   BUILT OR DO YOU NEED ONE THAT'S HIGHER OR LOWER.  BUT IN BOTH

11   CASES YOU'RE REALLY ASKING THE SORT OF RELATED QUESTION.

12   **Q.**   IS IT YOUR UNDERSTANDING THAT YOU AS AN EXPERT PREPARING

13   AN ANALYSIS IN A CASE LIKE THIS SHOULD NOT CONDUCT A PERCENT

14   NEEDED TO WIN ANALYSIS ON DISTRICTS THAT ARE ALREADY DRAWN?

15   **A.**   I THINK IN A CERTAIN SENSE YOU COULD ONLY PERFORM SUCH

16   ANALYSIS ON DISTRICTS THAT WERE ALREADY -- THAT WERE ALREADY,

17   LIKE YOU SAY, DRAWN -- ALREADY SET FOURTH, STIPULATED.  YEAH,

18   I'M NOT SURE HOW YOU COULD PERFORM SUCH AN ANALYSIS ON

19   DISTRICTS THAT HAVEN'T BEEN DRAWN.

20   **Q.**   AT A HIGH LEVEL WHAT DOES THE PERCENT NEEDED TO WIN

21   ANALYSIS TAKE INTO ACCOUNT?

22   **A.**   AGAIN, IT TAKES INTO ACCOUNT THE LEVEL OF, IN THIS CASE,

23   BLACK -- BLACK VOTER COHESION, CROSSOVER BY WHITE VOTERS.  ALSO

24   WHAT WE MIGHT JUST REFER TO AS CROSSOVER BY OTHER VOTERS THAT

25   MAY LIVE IN THAT DISTRICT, AS WELL AS DIFFERENCES IN TURNOUT IN

1   THE ELECTION.

2   **Q.**   DOES IT ALSO TAKE INTO ACCOUNT DEMOGRAPHIC COMPOSITION?

3   **A.**   YES.  YOU'RE MANIPULATING THE DEMOGRAPHIC COMPOSITION WHEN

4   ASKING THE QUESTION, YOU KNOW, HOW WOULD THIS DISTRICT PERFORM,

5   IF YOU'D LIKE, AT DIFFERENT LEVELS OF BLACK VAP.

6   **Q.**   DID YOU RUN THE CALCULATIONS FOR YOUR PERCENT NEEDED TO

7   WIN ANALYSIS BY HAND?

8   **A.**   NO.

9   **Q.**   IS IT ALL AUTOMATED?

10  **A.**   YES, IT'S ALL SCRIPTED.  SO QUERIES ARE MADE OF THE

11  DATABASE AND THEN THE ALGORITHMS ARE APPLIED TO THE SUBSET FOR

12  A PARTICULAR DISTRICT IN COMBINATION WITH A DISTRICT IN CONTEST

13  AND THEN THE SUMMARY STATISTICS ARE GENERATED.

14  **Q.**   AND ABOUT HOW MANY COMBINATIONS WERE AT ISSUE HERE?

15  **A.**   THERE ARE -- I THINK IN TOTAL WE -- I SHOULDN'T SAY WE.

16  THERE'S REALLY JUST ME AND MY COMPUTER.  WE PROBABLY ESTIMATED

17  THE SUPPORT FOR DIFFERENT CANDIDATE CONTESTS DISTRICT

18  COMBINATIONS IN THE TENS OF THOUSANDS.

19  **Q.**   LET'S PULL UP WHAT HAVE BEEN LABELED AS DEMONSTRATIVES

20  LEWIS 1 THROUGH 4.

21          **MS. MCKNIGHT:**  YOUR HONOR, THESE WERE EXCHANGED PRIOR

22  TO TODAY WITH PLAINTIFFS' COUNSEL PER OUR AGREEMENT.  I HAVE

23  PAPER COPIES.  WOULD YOU LIKE A PAPER COPY, YOUR HONOR?

24          **THE COURT:**  YES.  SO ARE THESE USED ILLUSTRATIVELY OR

25  ARE YOU GOING TO INTRODUCE THEM INTO EVIDENCE?

1          **MS. MCKNIGHT:**  WE'D LIKE TO INTRODUCE THEM INTO

2     EVIDENCE AND HERE'S WHY, YOUR HONOR.

3          **THE COURT:**  WE CAN JUST WAIT AND SEE HOW IT GOES.

4     MOVE AHEAD.  I JUST WANTED TO KNOW WHAT WE WERE LOOKING AT

5     HERE.

6     **BY MS. MCKNIGHT:**

7     **Q.**  DR. LEWIS, WOULD IT BE HELPFUL TO HAVE A PAPER COPY ON

8     HAND?

9     **A.**  I THINK WE CAN GO FROM THE SCREEN, BUT I'LL LET YOU KNOW

10    IF THAT CHANGES.

11    **Q.**  OKAY.  DR. LEWIS, BRIEFLY, COULD YOU TELL THE COURT WHAT

12    THESE TABLES ARE AND WHERE THE INFORMATION COMES FROM?

13    **A.**  RIGHT.  SO THESE ARE A SUBSET OF THE RESULTS THAT ARE

14    PROVIDED IN MY ORIGINAL REPORT IN TABLES -- CORRESPONDING TO

15    TABLE NUMBERS THAT ARE THE SAME I THINK IN THAT REPORT.  SO

16    TABLE 1 IS A SUBSET -- HERE IS A SUBSET OF THE ROWS OF TABLE 1

17    IN THAT ORIGINAL REPORT, TABLE 2, TABLE 3 AND SO FORTH AS WE

18    SEE AS WE MOVE THROUGH.

19    **Q.**  SO IF I WERE TO LOOK AT YOUR REPORT, ALL OF THIS

20    INFORMATION IS IN YOUR REPORT.  THIS IS JUST A SELECT -- SELECT

21    PIECES OF THAT INFORMATION; IS THAT FAIR?

22    **A.**  YES, I BELIEVE SO.

23    **Q.**  LET'S LOOK AT THE FIRST COLUMN.  IT SAYS DISTRICT AND THEN

24    THERE ARE TWO CATEGORIES, STATE HOUSE AND STATE SENATE.  COULD

25    YOU START BY JUST DESCRIBING -- EXPLAINING THE NOMENCLATURE

1   HERE FOR THE COURT?

2   **A.**   YES.  I USE THIS SHORTHAND BECAUSE I LOOKED AT DISTRICTS

3   BOTH OF THE ENACTED PLAN AND ALSO ILLUSTRATIVE PLANS THAT WERE

4   OFFERED IN 2022 AND IN 2023.  I USE A NUMBERING SYSTEM THAT

5   SORT OF HELPS ME KEEP STRAIGHT WHICH ARE WHICH.  SO "H" REFERS

6   TO HOUSE DISTRICT "S" REFERS TO SENATE DISTRICT, 23 REFERS TO

7   THE 2023 ILLUSTRATIVE DISTRICTS AND THEN THE NUMBERS ARE THE

8   DISTRICT NUMBERS, THE NUMBERS THAT FOLLOW THE DASH.

9   **Q.**   SO DID YOU UNDERSTAND THAT THE 2023 ILLUSTRATIVE DISTRICTS

10  WERE ILLUSTRATIVE DISTRICTS PROPOSED BY PLAINTIFFS' EXPERT

11  MR. COOPER?

12  **A.**   YES, THAT'S MY UNDERSTANDING.

13  **Q.**   AND DO YOU UNDERSTAND THAT THE DISTRICTS INDICATED IN

14  THESE TABLES IN THE FIRST COLUMN ARE THE NEW MAJORITY-MINORITY

15  DISTRICTS PROPOSED BY PLAINTIFFS IN THIS CASE?

16  **A.**   THAT'S HOW THEY'VE BEEN REPRESENTED TO ME, YES, I BELIEVE

17  THAT'S TRUE.

18  **Q.**   AND THESE DISTRICT NUMBERS ARE, FOR THE RECORD, HOUSE

19  DISTRICT 1, 23, 38, 60, 65, 68 AND 69 AND SENATE DISTRICTS 17,

20  19 AND 38; IS THAT RIGHT, DR. LEWIS?

21  **A.**   YES.

22  **Q.**   OKAY.  AND I SEE WE HAVE FOUR TABLES HERE.  ARE THOSE THE

23  SAME DISTRICTS IN EVERY TABLE?

24  **A.**   I BELIEVE SO, YES.

25  **Q.**   NOW, I APPRECIATE THIS IS A SELECTION OF DISTRICTS.  IF

1   YOU WANTED TO LOOK AT THE RESULTS OF YOUR ANALYSIS FOR ANY

2   DISTRICT NOT LISTED HERE THAT YOU WERE ABLE TO ANALYZE, COULD

3   YOU JUST TURN TO YOUR EXPERT REPORT IN THIS CASE?

4   **A.**   I COULD FOR THOSE DISTRICTS THAT I'VE ANALYZED.

5   **Q.**   CAN WE WALK THROUGH -- I'D LIKE TO UNDERSTAND THE

6   DIFFERENCE BETWEEN THE TABLES.  SO COULD WE START WITH JUST THE

7   HEADER OF TABLE 1 AND EXPLAIN AND THEN GO -- WE'LL MOVE ON TO

8   TABLE 2, 3 AND 4.  SO FOR TABLE 1 WHAT DOES THIS SHOW THE

9   COURT?

10  **A.**   SO HERE WE'RE FOCUSING ON JUST ELECTIONS FOR OFFICES THAT

11  WERE IN THE, WHAT YOU MIGHT CALL, THE PRIMARY ELECTION STAGE

12  WHICH -- FOR THESE CONTESTS WHICH ARE NON-PRESIDENTIAL

13  ELECTIONS IN LOUISIANA, STATE-LEVEL ELECTIONS IN LOUISIANA.

14  THEY'RE USING TOP TWO ELECTION SYSTEM.  SO THESE ARE CONTESTS

15  IN WHICH THERE ARE THREE OR MORE CANDIDATES VYING TO BE ONE OF

16  THE TOP TWO CANDIDATES TO MAKE IT TO A RUNOFF OR VYING TO WIN

17  THE PRIMARY OUTRIGHT BY GAINING A MAJORITY IN THAT FIRST STAGE.

18  **Q.**   DOES THIS TABLE REFLECT THE RESULTS OF YOUR PERCENT NEEDED

19  TO WIN ANALYSIS?

20  **A.**   IT DOES.

21  **Q.**   LET'S TURN TO TABLE 2.  WHAT DOES THIS SHOW THE COURT?

22  **A.**   SO HERE WE'RE LOOKING AT CONTESTS IN WHICH THERE WERE ONLY

23  TWO CANDIDATES, AND SO THAT WOULD BE THE RUNOFF STAGE

24  ELECTIONS, AND ALSO FIRST STAGE OR PRIMARY ELECTIONS THAT ONLY

25  INVOLVED TWO CANDIDATES.  SO A WINNER IS GOING TO BE DETERMINED

1    IN THAT CONTEST.

2    **Q.**   OKAY.  AND DOES THIS TABLE SHOW THE COURT THE RESULTS OF

3    YOUR PERCENT NEEDED TO WIN ANALYSIS ON THESE DISTRICTS?

4    **A.**   YES.

5    **Q.**   LET'S TURN TO TABLE 3.  WHAT DOES THIS SHOW THE COURT?

6    **A.**   TABLE 3 IS ANALOGOUS TO TABLE 1, EXCEPT HERE WE'VE FOCUSED

7    ON CONTESTS THAT INCLUDED A BLACK CANDIDATE.

8    **Q.**   AND, FINALLY, LET'S TURN TO TABLE 4.  AND FOR TABLE 3,

9    PARDON ME, DR. LEWIS, DOES THAT TABLE SHOW THE COURT THE

10   PERCENT NEEDED TO WIN ANALYSIS YOU CONDUCTED FOR THOSE TYPES OF

11   CONTESTS IDENTIFIED IN TABLE 3?

12   **A.**   YES, IT DOES.

13   **Q.**   OKAY.  NOW, LET'S MOVE ON TO TABLE 4.  WHAT DOES THIS SHOW

14   THE COURT?

15   **A.**   TABLE 4 IS ANALOGOUS TO TABLE 2 THAT WE DISCUSSED BEFORE.

16   SO NOW WE'RE TALKING ABOUT A RUNOFF FOR TWO-CANDIDATE PRIMARY

17   ELECTIONS THAT INCLUDED A BLACK CANDIDATE.

18   **Q.**   OKAY.  NOW, STAYING ON TABLE 4, I'D LIKE TO UNDERSTAND

19   WHAT THE DIFFERENT COLUMN HEADINGS MEAN.  WE'VE ALREADY GONE

20   THROUGH WHAT THE COLUMN HEADING "DISTRICT" MEANS.  SO LET'S

21   START -- MOVE ON TO THE NEXT COLUMN OVER, "PERCENT BLACK VOTING

22   AGE POPULATION."  WHAT DOES THIS MEAN?  WHAT DOES THIS SHOW?

23   **A.**   SO THESE ARE, AGAIN, THEY WERE PROVIDED TO ME, BUT I

24   BELIEVED TO BE BASED ON 2020 CENSUS DATA THAT SHOW THE FRACTION

25   OF THE POPULATION OF EACH DISTRICT THAT IS -- THAT ON THE

1  CENSUS IDENTIFIED AS BLACK ONLY, THE FIRST NUMBER, OR ANY PART

2  BLACK, THE SECOND NUMBER.

3  AND, AGAIN, THIS IS BECAUSE THE CENSUS ALLOWS FOLKS

4  TO -- THIS IS THE DIFFERENCE BETWEEN THE CENSUS AND THE VOTER

5  ROLL.  FOR THE PURPOSES OF THE CENSUS, INDIVIDUALS COULD

6  IDENTIFY AS MANY, I BELIEVE, RACIAL CATEGORIES AS THEY WANTED.

7  SO SOME FOLKS WOULD IDENTIFY THEMSELVES AS BOTH, YOU KNOW, ONE

8  RACE AND ANOTHER.  SO YOU COULD THINK ABOUT PEOPLE WHO SAID I'M

9  ONLY -- CHECKED THAT THEY WERE BLACK OR AFRICAN AMERICAN VERSUS

10  FOLKS THAT WOULD HAVE ALSO INDICATED OTHER RACIAL BACKGROUND.

11  **Q.**  LET'S MOVE ON TO THE COLUMN "NUMBER OF CONTESTS."  WHAT

12  DOES THIS COLUMN SHOW AND WHY DO THESE NUMBERS VARY?

13  **A.**  SURE.  SO THE NUMBER OF CONTESTS IS THE NUMBER OF CONTESTS

14  THAT WERE ANALYZED IN ARRIVING AT THE NUMBERS THAT APPEAR TO

15  THE RIGHT OF THAT COLUMN.  AND THE REASON THEY VARY IS BECAUSE

16  IN DIFFERENT DISTRICTS I HAD MORE OR FEWER CONTESTS TO USE.

17  SOME OF THE CONTESTS THAT I LOOKED AT WERE STATEWIDE

18  RACES, SO THEY WERE OPERATIVE IN EVERY -- EFFECTIVELY IN EVERY

19  DISTRICT AND THEN THERE WERE PERHAPS -- THERE WERE ALSO

20  ELECTIONS THAT WEREN'T STATEWIDE.  SO ELECTIONS FOR THE U.S.

21  HOUSE OR STATE SENATE OR STATE HOUSE THAT COULD BE USED FOR

22  PURPOSES OF ANSWERING THESE QUESTIONS FOR, YOU KNOW, MAYBE A

23  SINGLE HOUSE OR SENATE DISTRICT OR MAYBE A COUPLE HOUSE OR

24  SENATE DISTRICTS.  AND SO WHERE THAT WAS POSSIBLE I DID THAT.

25  **Q.**  NOW, LET'S TURN BRIEFLY TO TABLE 1.  I NOTICE THERE IN

1   TABLE 1 A NUMBER OF CONTESTS ARE HIGHER; DO YOU SEE THAT?

2   **A.**   I DO.

3   **Q.**   COULD YOU EXPLAIN WHY THAT IS?

4   **A.**   WELL, THERE ARE TWO REASONS FOR THE DIFFERENCE IN THE

5   NUMBER OF CONTESTS BETWEEN TABLE 1 AND TABLE 4.  ONE DIFFERENCE

6   IS THE INCLUSION OF CONTESTS THAT DID NOT INVOLVE A BLACK

7   CANDIDATE AND, ALSO, THAT NOT EVERY PRIMARY ELECTION LEADS TO A

8   RUNOFF ELECTION.

9   **Q.**   LET'S GO BACK TO TABLE 4.  WE'RE HERE ON TABLE 4.  DID YOU

10   ONLY ANALYZE ELECTIONS WHERE A BLACK CANDIDATE WAS RUNNING?

11   **A.**   NO.  I ALSO INCLUDED -- I ALSO PROVIDE THE COURT WITH

12   TABLES THAT INCLUDE CONTESTS IN WHICH THERE WAS NO BLACK

13   CANDIDATE, BUT ALWAYS ELECTIONS IN WHICH THERE WAS A DEMOCRAT.

14   **Q.**   AND DID THOSE ELECTIONS HAVE A BLACK-PREFERRED CANDIDATE

15   IDENTIFIED BY EI?

16   **A.**   YES.

17   **Q.**   AND WHAT DOES THAT MEAN, "BLACK-PREFERRED CANDIDATE

18   IDENTIFIED BY EI"?

19   **A.**   THAT'S A GOOD QUESTION.  WHAT IT MEANS IS THAT WHEN I

20   APPLIED THIS ALGORITHM THAT MAKES A GUESS ABOUT WHAT THE RATE

21   OF SUPPORT WAS FOR EACH CANDIDATE AMONG VOTERS OF DIFFERENT

22   RACIAL GROUPS, WHICH, AGAIN, YOU CAN'T OBSERVE DIRECTLY.  IT'S

23   ALL MIXED UP.  BUT THE METHOD, MAKING SOME STRONG ASSUMPTIONS,

24   WILL MAKE A GUESS, AN ESTIMATE, OF WHAT THAT RATE WAS AND

25   THEN -- AND THEN FROM THAT I WILL IDENTIFY AS THE

1   BLACK-PREFERRED CANDIDATE THE CANDIDATE WHO RECEIVED THE

2   MAJORITY, OR IN THE CASE OF MORE THAN TWO CANDIDATES, THE

3   PLURALITY OF THE BLACK VOTE AND SIMILARLY FOR THE OTHER ETHNIC

4   GROUPS -- RACIAL ETHNIC GROUPS.

5   Q.   SO WERE THERE INSTANCES WHERE A WHITE CANDIDATE COULD BE

6   THE CANDIDATE OF CHOICE FOR BLACK VOTERS?

7   A.   WELL, IN EVERY CONTEST IN WHICH THERE APPEARED A WHITE

8   VOTER IT COULD HAVE BEEN, BUT THERE ARE INSTANCES IN WHICH EI

9   ESTIMATED THERE TO BE A PREFERRED CANDIDATE FOR BLACK VOTERS

10  THAT WAS WHITE AND, OF COURSE, IN PARTICULAR, IN THE CONTESTS

11  THAT DIDN'T INVOLVE A BLACK CANDIDATE.

12  Q.   LET'S MOVE ON TO THE COLUMN "AVERAGE NUMBER OF PRECINCTS."

13  WHAT DOES THAT COLUMN SHOW?

14  A.   WELL, WHAT WE'RE DOING IN HERE IS INFERRING THESE RATES OF

15  SUPPORT AND SO FORTH BASED ON PRECINCT-LEVEL DATA, SO IT'S

16  USEFUL TO SORT OF HAVE A SENSE OF KIND OF HOW MUCH INFORMATION

17  THERE WAS TO DO THAT, AND THE AVERAGE NUMBER OF PRECINCTS TELLS

18  YOU SORT OF THE AVERAGE AMOUNT OF INFORMATION THAT WAS

19  AVAILABLE TO MAKE THIS INFERENCE OF BLACK COHESION WHITE

20  CROSS-OVER SUPPORT THAT WE'LL TALK ABOUT IN A MINUTE.

21  Q.   OKAY.  LET'S MOVE ON TO THE COLUMN, "PERCENT

22  BLACK-PREFERRED CANDIDATES DEMOCRATIC."  WHAT DOES THAT SHOW

23  THE COURT?

24  A.   THAT'S THE FRACTION OF THE CANDIDATES THAT EI IDENTIFIES

25  AS THE PREFERRED CANDIDATE OF -- THE PREFERRED CANDIDATE OF

1   BLACK VOTERS FOR WHOM -- FOR WHICH THE CANDIDATE WAS DEMOCRAT.

2          SO IN SOME CASES THE CANDIDATE THERE, YOU CAN SEE,

3   YOU KNOW, A VERY HIGH PERCENTAGE, BUT IT LOOKS LIKE PERHAPS

4   THERE'S ONE CANDIDATE IN ONE CONTEST WHO WAS NOT A DEMOCRAT,

5   WHO'S IDENTIFIED BY EI IN THESE DISTRICTS AS BLACK-PREFERRED.

6   **Q.**   LET'S MOVE ON TO THE COLUMN, "AVERAGE NUMBER OF

7   CANDIDATES."  WHAT DOES THIS SHOW?

8   **A.**   WELL, THAT'S PRETTY STRAIGHT-FORWARD.  THAT IS THE AVERAGE

9   NUMBER OF CANDIDATES IN EACH CONTEST UNDER ANALYSIS.  AND SO IN

10  TABLES 2 AND 4 WHERE WE WERE JUST LOOKING AT TWO-CANDIDATE

11  RUNOFFS IN PRIMARIES, THE AVERAGE IS TWO, THE MINIMUM IS TWO,

12  THE MAXIMUM IS TWO.  THERE'S ALWAYS TWO.

13  **Q.**   SO LET'S FLIP TO TABLE 1 TO ILLUSTRATE THIS POINT.  COULD

14  YOU TALK ABOUT AVERAGE NUMBER OF CANDIDATES IN TABLE 1 AND WHY

15  IT'S DIFFERENT?

16  **A.**   SURE.  BECAUSE IN THIS CASE WE'RE LOOKING AT ELECTIONS

17  THAT HAVE THREE OR MORE CANDIDATES.  SO IN MANY OF THESE

18  CONTESTS THERE WERE A SUBSTANTIAL NUMBER OF CANDIDATES TO

19  EXCEED THE AVERAGE -- EXCEEDS SEVEN IN EACH DISTRICT.

20  **Q.**   LET'S TURN TO THE COLUMN "BLACK-PREFERRED WIN RATE."  WHAT

21  DOES THAT SHOW THE COURT?

22  **A.**   SO THAT IS EFFECTIVELY THE RESULT OF THE RECONSTITUTED OR

23  RECONSTRUCTED ELECTION ANALYSIS THERE.  SO IT ASKS THE

24  QUESTION -- ONCE WE'VE USED EI TO IDENTIFY THE BLACK-PREFERRED

25  CANDIDATE, IF YOU HAD ONLY HELD THE PARTICULAR ELECTION THAT

1   WE'RE ANALYZING IN THAT PARTICULAR DISTRICT WOULD THAT BLACK

2   PREFERRED CANDIDATE HAVE BEEN SUCCESSFUL.  AND THEN THE

3   DEFINITION OF SUCCESS HERE IS A LITTLE BIT DIFFERENT IN TABLES

4   1 AND 2 -- YOU KNOW, BETWEEN TABLES 1 AND 2 AND BETWEEN TABLES

5   3 AND 4.  BECAUSE IN THE THREE OR MORE CANDIDATE ELECTIONS,

6   THESE PRIMARY CONTESTS, THE SUCCESS MEASURE IS JUST MOVING ON

7   TO THE NEXT STAGE OR WINNING OUTRIGHT.  SO YOU DON'T HAVE TO

8   WIN OUTRIGHT TO BE THE -- YOU DON'T HAVE TO COME IN FIRST.  YOU

9   JUST HAVE TO SORT OF LIVE TO FIGHT ANOTHER DAY.

10  **Q.**   IS THE BLACK-PREFERRED CANDIDATE ASSUMED UNDER THIS

11  ANALYSIS OR IS IT CALCULATED OR ESTIMATED IN SOMEWAY?

12  **A.**   YES.  THE BLACK-PREFERRED CANDIDATE IS ESTIMATED FROM THE

13  EI ANALYSIS.

14  **Q.**   NOW, ON TABLE 4 I SEE THAT THE WIN RATE IS 50 OR HIGHER

15  FOR EVERY DISTRICT.  DOES THIS MEAN THAT BLACK-PREFERRED

16  CANDIDATES ARE WINNING THESE DISTRICTS AT A RATE OF MORE THAN

17  HALF THE TIME AND SOMETIMES 100 PERCENT OF THE TIME?

18  **A.**   YES.  IN THE CONTESTS THAT WE LOOKED AT HERE THEY DID, YOU

19  KNOW, DURING THE PAST YEARS THAT WE ANALYZED -- THAT I

20  ANALYZED.

21  **Q.**   I'D LIKE TO DRAW ONE SPECIFIC EXAMPLE TO ASK YOU A

22  QUESTION, DR. LEWIS.  ON TABLE 4, STATE HOUSE DISTRICT 38, SO

23  THIS IS H23-38, I SEE THAT THE BVAP IS JUST BARELY 50 PERCENT,

24  THE BLACK ONLY IS 49 PERCENT AND THE ANY PART BLACK IS 50.8

25  PERCENT; DO YOU SEE THAT?

1   **A.**   I DO.

2   **Q.**   THEN COMING OVER TO THE BLACK-PREFERRED WIN RATE I SEE

3   100 PERCENT FIGURE; IS THAT RIGHT?

4   **A.**   YES.

5   **Q.**   OKAY.  CAN WE CONCLUDE ANYTHING ABOUT WHETHER

6   MAJORITY-MINORITY DISTRICTS ARE REQUIRED TO CREATE AN

7   OPPORTUNITY TO ELECT IN THIS DISTRICT?

8           **MS. ROHANI:**  OBJECTION ON RELEVANCE GROUNDS.  THIS

9   QUESTION CALLS FOR TESTIMONY ABOUT WHETHER AN OPPORTUNITY

10  DISTRICT COULD HYPOTHETICALLY BE DRAWN WITH A BVAP UNDER

11  50 PERCENT AND THE RELEVANT CONSIDERATION UNDER GINGLES AND THE

12  RECENT FIFTH CIRCUIT OPINION IN *ROBINSON*.  THE ONLY RELEVANT

13  CONSIDERATION IS WHETHER THE ENACTED DISTRICTS ARE

14  OPPORTUNITY -- ARE OPPORTUNITY DISTRICTS AS DRAWN.

15          **THE COURT:**  CAN YOU RESPOND?

16          **MS. MCKNIGHT:**  YOUR HONOR, IT SOUNDS LIKE A LEGAL

17  ARGUMENT BEST FOR THE BRIEFS.  THIS IS WHOLLY RELEVANT.  THIS

18  HAS TO DO WITH DISTRICTS THAT ARE DRAWN -- ILLUSTRATIVE

19  DISTRICTS THAT ARE DRAWN, AND DR. LEWIS IS HERE TO TESTIFY

20  ABOUT PERCENT BVAP NEEDED TO WIN.

21          **THE COURT:**  OKAY.  LET ME ASK YOU THIS, IF THE FIFTH

22  CIRCUIT HAS TOLD THIS COURT THAT IF THE COURT FINDS A VIOLATION

23  OF SECTION 2 THAT THE LEGISLATURE HAS TO HAVE AN OPPORTUNITY,

24  CORRECT?  YOU WOULD AGREE WITH THAT?  THE LEGISLATURE HAS TO

25  HAVE AN OPPORTUNITY TO REPAIR IT.  SO AT THE CLOSE OF THIS

1    EVIDENCE IT'S UNLIKELY THAT THIS COURT IS GOING TO ENACT A MAP.

2    WHAT WE'VE BEEN TALKING ABOUT ARE ILLUSTRATIVE MAPS, NOT

3    REMEDIAL MAPS.

4            **MS. MCKNIGHT:**  PARDON ME, YOUR HONOR.  THAT'S

5    CORRECT.  WE'RE TALKING ABOUT ILLUSTRATIVE MAPS.  THERE IS A

6    SEPARATE REMEDY PHASE.  BUT THIS -- LET ME ALSO SAY THAT THIS

7    INFORMATION IS RELEVANT TO WHAT IS NECESSARY TO BE DRAWN -- IT

8    IS RELEVANT TO THE COURT WHETHER PLAINTIFFS HAVE PUT FORWARD A

9    MAP THAT IS A VIABLE REMEDY.

10           **THE COURT:**  WHY?  IF WE'RE GOING TO HAVE A REMEDY

11   PHASE, WHY DON'T YOU HAVE THE CART BEFORE THE HORSE HERE?  I'M

12   NOT SAYING IT'S NEVER GOING TO BE RELEVANT, BUT WHY IS IT

13   RELEVANT NOW?

14           **MS. MCKNIGHT:**  THERE'S A NUMBER OF PRECEDENT BEHIND

15   THE FACT THAT IN ORDER TO MAKE A GINGLES' SHOWING PLAINTIFFS

16   HAVE TO COME BEFORE THE COURT AND SHOW THAT THEY HAVE A VIABLE

17   REMEDY.  AND WHEN I SAY, "REMEDY" I UNDERSTAND THAT SOUNDS LIKE

18   REMEDIAL PHASE.  IT HAS TO DO WITH PLAINTIFFS' ILLUSTRATIVE

19   PLAN.  THEY HAVE TO COME TO YOU AND SHOW THAT --

20           **THE COURT:**  WITH A REASONABLY CONFIGURED PLAN IS THE

21   WAY I READ THE LAW.  A REASONABLY CONFIGURED ILLUSTRATIVE PLAN.

22           **MS. MCKNIGHT:**  THEY ALSO HAVE TO SHOW GINGLES 3, THAT

23   THE WHITE BLOCK IS VOTING CONSISTENTLY TO OUTVOTE BLACK VOTERS.

24   AND THE TESTIMONY HERE IS ABOUT WHAT'S HAPPENING IN THESE

25   DISTRICTS AND IN THESE AREAS.

1          **THE COURT:**  I UNDERSTAND THE -- I DON'T -- I ACTUALLY

2     DON'T EVEN WANT TO DISPUTE THAT, THE RELEVANCE OF WHITE

3     CROSSOVER VOTING.  I'M QUESTIONING -- I GUESS YOU'RE SAYING

4     THAT WHITE CROSSOVER VOTING CREATES OPPORTUNITY DISTRICTS.

5          **MS. MCKNIGHT:**  IT IS CORRECT THAT WHITE CROSSOVER

6     VOTING IS PART OF THE GINGLES' ANALYSIS AND CREATES -- COULD

7     CREATE EITHER CROSSOVER DISTRICTS OR COULD CONTRIBUTE TO

8     DISTRICTS BEING ABLE TO PERFORM.

9          **THE COURT:**  YOU WANT TO RESPOND, MS. ROHANI?

10         **MS. ROHANI:**  RIGHT NOW WE'RE ONLY DISCUSSING

11    ILLUSTRATIVE DISTRICTS AND IT IS ENTIRELY IRRELEVANT TO GINGLES

12    2 AND 3.  DEFENDANTS ARE REALLY ESSENTIALLY ARGUING THAT THE

13    POSSIBILITY OF CRAFTING THESE DISTRICTS WITH WHITE CROSSOVER

14    VOTING DOESN'T EXEMPT THE STATE OF LOUISIANA FROM DRAWING

15    OPPORTUNITY DISTRICTS AT ALL AND THIS REALLY IS THE EXACT SAME

16    ARGUMENT THAT WAS REJECTED IN *ROBINSON*.

17         **MS. MCKNIGHT:**  YOUR HONOR, THERE ARE CASE -- THERE'S

18    CASE, AFTER CASE, AFTER CASE ABOUT PLAINTIFFS NEEDING TO COME

19    IN AND SHOW THAT THEY HAVE DISTRICTS THAT SATISFY GINGLES 1.

20    THEY ALSO NEED TO SATISFY GINGLES 3.  PLAINTIFFS, IT IS OUR

21    POSITION AND IT'S IN THE BRIEFS, THEY'VE PRESENTED NO EVIDENCE

22    THAT THEIR PROPOSED DISTRICTS NEED TO BE DRAWN AT 50 PERCENT OR

23    ABOVE DUE TO WHITE-BLOCK VOTING.  THEY HAVEN'T DONE THAT.

24              DR. HANDLEY CAME IN AND GAVE A GENERAL ANALYSIS.

25    WE HAVE DR. LEWIS HERE DOING A VERY SPECIFIC ANALYSIS, NOT ONLY

1    TO ILLUSTRATIVE DISTRICTS, BUT TO ENACTED DISTRICTS.  IT'S ALL

2    IN HIS REPORT.  IT'S RELEVANT TO PLAINTIFFS' SHOWING AND

3    PLAINTIFFS' ABILITY TO COME BEFORE THE COURT AND SHOW THAT

4    GINGLES 3.

5            **THE COURT:**  OBJECTION OVERRULED.

6    **BY MS. MCKNIGHT:**

7    **Q.**   WOULD YOU LIKE ME TO ASK THE QUESTION AGAIN, DR. LEWIS?

8    **A.**   I WOULD, PLEASE.

9            **THE COURT:**  I WOULD LIKE YOU TO.

10   **BY MS. MCKNIGHT:**

11   **Q.**   SO, DR. LEWIS, WE WERE LOOKING AT H23-38 AND WE WERE

12   LOOKING AT THE BVAP LEVEL AND THE BLACK-PREFERRED WIN RATE; DO

13   YOU REMEMBER THAT?

14   **A.**   I DO.

15   **Q.**   SO I WAS ASKING FOR YOUR OPINION ABOUT IF YOU SEE A WIN

16   RATE OF 100 PERCENT IN DISTRICTS DRAWN BARELY ABOVE 50 PERCENT,

17   IS THERE ANYTHING THAT YOU CAN CONCLUDE ABOUT WHETHER

18   MAJORITY-MINORITY DISTRICTS ARE REQUIRED IN ORDER FOR BLACK

19   VOTERS TO HAVE AN OPPORTUNITY TO ELECT THEIR CANDIDATES OF

20   CHOICE?

21           **MS. ROHANI:**  YOUR HONOR, JUST FOR THE RECORD, COULD

22   WE HAVE A CONTINUING OBJECTION TO ANY FURTHER QUESTIONS THAT

23   ATTEMPT TO ILLICIT DR. LEWIS'S DISCUSSION OF THE

24   BVAP PERCENTAGE NEEDED TO WIN?

25           **THE COURT:**  YES.

1          **MS. ROHANI:**  THANK YOU.

2          **MS. MCKNIGHT:**  I'LL PUT A RESPONSE ON THE RECORD AS

3    WELL, YOUR HONOR.  THERE WAS NO *MOTION IN LIMINE*.  THERE WAS NO

4    *DAUBERT* MOTION.  THERE WAS NO EFFORT TO LIMIT HIS TESTIMONY ON

5    THIS REPORT.

6          **THE COURT:**  THAT'S FINE.  HER OBJECTION IS TO

7    RELEVANCE AND IT'S A CONTINUING OBJECTION.  YOU CAN ANSWER IF

8    YOU REMEMBER THE QUESTION.

9          **THE WITNESS:**  I THINK I DO.  SO I THINK IT'S --

10   AGAIN, TO SAY THE CONCLUSION THAT YOU WOULD HAVE TO DRAW, YOU

11   KNOW, IT DOES, AGAIN, BORDER A LITTLE BIT ON A LEGAL CONCLUSION

12   ABOUT WHAT IT MEANS FOR SOMETHING TO BE AN OPPORTUNITY AND SO

13   FORTH.  BUT I THINK THE IDEA IS, AGAIN, FROM A KIND OF -- MORE

14   OF A POLITICAL SCIENCE THAN LEGAL PROSPECTIVE, YOU KNOW, IF YOU

15   WERE AT 50.8 YOU MIGHT THINK, WELL, IF YOU JUST DROP THAT DOWN

16   BY A POINT OR TWO WOULD THAT 100 PERCENT WIN RATE, WOULD THAT

17   DROP BELOW 50 PERCENT IF YOU JUST MOVED A FEW VOTERS OUT OF

18   THAT DISTRICT?

19          AND THAT'S THE SORT OF THING THAT THE -- THIS --

20   WHAT YOU'RE CALLING THIS SORT OF MINIMUM BVAP NEEDED TO WIN

21   HELPS US UNDERSTAND.  IS, GIVEN WHAT WE'VE ESTIMATED, WHAT WE

22   BELIEVE TO BE TRUE ABOUT THE PATTERNS OF VOTING, WE CAN SAY

23   SOMETHING ABOUT HOW YOU MIGHT BE ABLE TO ADJUST THAT BLACK

24   VOTING AGE POPULATION AND STILL MAINTAIN OR CREATE, DEPENDING

25   ON WHICH WAY YOU WANT TO MOVE IT, STILL CREATE OR MAINTAIN THE

1    OPPORTUNITY FOR BLACK -- OF CANDIDATES OF CHOICE TO WIN.

2              AND, AGAIN, THAT'S THE -- AGAIN, THE LIMIT --

3    KIND OF THE WIN RATE IN SOMEWAYS IS THAT IT CAN ONLY TELL YOU

4    IN THIS DISTRICT AS IT'S DRAWN, YOU KNOW WHAT WOULD IT HAVE

5    PRODUCED HISTORICALLY.

6    **BY MS. MCKNIGHT:**

7    **Q.**   MOVING ON TO THE NEXT COLUMN, "AVERAGE BLACK-PREFERRED

8    CANDIDATE VOTE SHARE;" DO YOU SEE THAT?

9    **A.**   I DO.

10   **Q.**   AND WHAT DOES THAT SHOW THE COURT?

11   **A.**   AGAIN, WE'RE AVERAGING ACROSS THESE SIX ELECTIONS HERE AND

12   WE'RE JUST SAYING WHAT WAS THE AVERAGE RATE OF SUPPORT AMONG

13   ALL VOTERS FOR THE CANDIDATE THAT WAS IDENTIFIED AS THE

14   BLACK-PREFERRED CANDIDATE IN THAT DISTRICT OR IN THAT CONTEST

15   IN THAT DISTRICT.

16   **Q.**   LET'S BRIEFLY TURN TO TABLE 1 WHERE WE HAVE MORE THAN TWO

17   CANDIDATES.  WHAT DOES THIS COLUMN, THE COLUMN

18   AVERAGE-PREFERRED CANDIDATE VOTE SHARE, SHOW THE COURT ABOUT

19   CONTESTS WITH MORE THAN SEVEN CANDIDATES ON AVERAGE?

20   **A.**   WELL, AS ONE WOULD EXPECT, AS THE NUMBER OF CANDIDATES

21   INCREASES, THE SORT OF VOTE SHARES RECEIVED BY EACH OF THE

22   CANDIDATES TENDS TO FALL.

23              SO IN A TWO-CANDIDATE ELECTION YOU NEED A MAJORITY IN

24   ORDER TO WIN THE ELECTION.  BUT IF YOU'RE JUST TRYING TO GET A

25   PLURALITY OR FINISH IN THE TOP TWO IF THERE'S SEVEN CANDIDATES

1   AND THE VOTES ARE DISTRIBUTED, YOU HAVE -- SO YOU DO SEE THERE

2   THAT THE AVERAGE NUMBER OF VOTES RECEIVED OR SHARED VOTES

3   RECEIVED BY THE BLACK-PREFERRED CANDIDATE IS A LITTLE LOWER

4   THAN IN THOSE TWO-CANDIDATE RACES, AS YOU WOULD EXPECT.  OF

5   COURSE IT COULD BE DUE TO OTHER THINGS AS WELL, BUT THAT'S WHAT

6   YOU WOULD ANTICIPATE OR WHAT YOU WOULD EXPECT TO SEE.

7   **Q.**   IT ALSO SEEMS A LITTLE HIGHER CONSIDERING SEVEN

8   CANDIDATES.  WHAT DOES THAT MEAN, THAT IT IS NOT ONE-SEVENTH OF

9   TABLE 4'S VOTE SHARE?

10  **A.**   WELL, I'M NOT -- I'M NOT SURE.  AGAIN, I THINK WE'RE STILL

11  SEEING AS -- AGAIN, IN THESE DISTRICTS THAT HAVE LARGE BLACK

12  POPULATIONS, AND AS WE'LL SEE IN THE NEXT COLUMN THE BLACK

13  COHESION IS PRETTY HIGH, OF COURSE THAT TRANSLATES INTO AN

14  OVERALL VOTE SHARE FOR THAT BLACK-PREFERRED CANDIDATE THAT

15  REMAINS QUITE HIGH, AND AS WE CAN SEE, GENERALLY HIGH ENOUGH TO

16  WIN ADVANCEMENT TO THE NEXT STAGE OR OUTRIGHT VICTORY NEARLY

17  100 PERCENT OF THE -- 100 PERCENT OF THE TIME IN NEARLY ALL OF

18  THE DISTRICTS.

19  **Q.**   STAYING ON TABLE 1, I'M SEEING IN THE COLUMN

20  BLACK-PREFERRED WIN RATE NUMBERS OF 100 -- A 100 PERCENT WIN

21  RATE IN EIGHT OUT OF TEN DISTRICTS ANALYZED; IS THAT A CORRECT

22  READ?

23  **A.**   YES.

24  **Q.**   OKAY.  LET'S MOVE BACK TO TABLE 4, PLEASE.  COULD WE MOVE

25  ON TO THE COLUMN, "AVERAGE PERCENT VOTERS BLACK" AND COULD YOU

1  TELL THE COURT WHAT THAT SHOWS?

2  **A.**   WELL, AGAIN, THE RACE OF THE VOTERS AS IDENTIFIED IN THE

3  VOTER ROLLS AND SO -- AS INCLUDED IN THE DATA THAT WAS PROVIDED

4  TO ME.  SO I CAN CALCULATE THE FRACTION OF VOTERS IN THESE

5  ELECTIONS THAT ARE IDENTIFIED AS BLACK.

6  **Q.**   SO DO YOU UNDERSTAND THAT VOTERS IN LOUISIANA, DO THEY

7  REGISTER BY RACE?  DO THEY INDICATE THEIR RACE WHEN THEY

8  REGISTER?

9  **A.**   YES, THAT'S MY UNDERSTANDING.

10  **Q.**   SO YOU DIDN'T HAVE TO ESTIMATE THAT FIGURE; IS THAT RIGHT?

11  **A.**   NO.  THAT WAS A RELIEF IN THIS CASE VERSUS MANY OF THE

12  CASES THAT I WORK IN -- ON IN OTHER PARTS OF THE COUNTRY WHERE

13  THAT IS NOT DONE.  AND THEN A WHOLE BIG COMPONENT OF THIS

14  ANALYSIS IS TO TRY TO ESTIMATE WHICH VOTERS ARE IN WHICH

15  CATEGORY.

16  **Q.**   LET'S MOVE ON TO THE COLUMN, "AVERAGE EI BLACK COHESION."

17  WHAT DOES THIS SHOW THE COURT?

18  **A.**   THAT IS THE EI ALGORITHM'S ESTIMATE OF THE SHARE OF THE

19  BLACK VOTE THAT WAS RECEIVED BY THE CANDIDATE WHO ESTIMATES TO

20  HAVE RECEIVED THE HIGHEST SHARE OF BLACK VOTE.

21  **Q.**   LET'S MOVE ON TO "AVERAGE EI WHITE CROSSOVER SUPPORT."

22  WHAT DOES THIS SHOW THE COURT?

23  **A.**   AGAIN, THAT'S THE FRACTION OF THE -- IT'S ESTIMATED.  I

24  CAN SAY THEY'RE ALWAYS ESTIMATES.  LIKE WE SHOULD NEVER SAY,

25  OH, WE KNOW THAT NUMBERS 10 OR 14, YOU KNOW, THESE ARE

1    ESTIMATES.  THEY'RE SUBJECT TO BIAS IF THEIR ASSUMPTIONS AREN'T

2    MET AND ALSO UNCERTAINTY THAT ARISES FROM THE FACT THAT WE'RE

3    NOT LOOKING AT A VERY LARGE NUMBER OF CONTESTS AND DON'T HAVE

4    AN ENORMOUS AMOUNT OF INFORMATION UPON WHICH TO BASE OUR

5    ESTIMATES.

6            BUT WHAT IT MEANS IS THE EI ESTIMATED FOR EACH

7    CONTEST THAT WAS CONSIDERED, THE SHARE OF THE WHITE VOTE THAT

8    WAS CAST FOR THE CANDIDATE, THAT THE MODEL HAD PREVIOUSLY

9    IDENTIFIED AS THE BLACK-PREFERRED CANDIDATE AND THEN THE

10   AVERAGE ACROSS THIS CONTEST TO GET THE 10 PERCENT OF THE 14 AND

11   SO FOURTH THAT YOU CAN SEE IN THAT COLUMN THAT'S HIGHLIGHTED.

12   **Q.**  SO WHERE YOU SEE IN THIS TABLE WHITE CROSSOVER VOTING IN

13   THE DOUBLE DIGITS AND SOMETIMES UP TO 29 PERCENT, WHAT DOES

14   THAT TELL THE COURT?

15   **A.**  WELL, WHAT YOU SEE THERE IN THOSE CASES, AND I THINK

16   ACROSS ALL THE CASES, IS THE ESTIMATED RATE OF WHITE CROSSOVER

17   VOTING EXCEEDS -- THERE'S CERTAIN -- MORE WHITE VOTERS ARE

18   CROSSING OVER TO VOTE FOR THE BLACK-PREFERRED CANDIDATE THAN

19   BLACK VOTERS ARE CROSSING OVER TO VOTE FOR THE WHITE-PREFERRED

20   CANDIDATE.  AND THAT SHOULD BE, I THINK, THE FIRST SORT OF

21   INDICATION THAT -- PUTTING ASIDE DIFFERENCES IN TURNOUT THAT

22   MIGHT EXIST.

23           YOU CAN SORT OF IMMEDIATELY SEE THAT YOU WOULDN'T

24   NECESSARILY NEED 50 PERCENT OR MORE IN ORDER FOR THE BLACK

25   CANDIDATE OF CHOICE TO PREVAIL, BECAUSE THE BLACK POPULATION IS

1   ESTIMATED TO BE MORE COHESIVE.  SO IF YOU THINK THAT IF BLACK

2   VOTERS SORT OF DID ALL OF THEIR VOTING IN THE FIRST HALF OF THE

3   GAME AND THE WHITE VOTERS DID ALL OF THEIR VOTING IN THE SECOND

4   HALF OF THE GAME, THE BLACK VOTERS COULD RUN UP THE SCORE

5   ENOUGH IN THE FIRST HALF TO WIN THE GAME.  SO YOU DON'T

6   ACTUALLY NEED THE WHOLE HALF TO DO THAT.  I DON'T KNOW.  THAT'S

7   MAYBE NOT THE RIGHT ANALOGY, BUT YOU KIND OF GET THE SENSE OF

8   THE LOGIC OF IT.

9   **Q.**   LET'S MOVE TO THE COLUMN, "PERCENT POLARIZED."  WHAT DOES

10  THIS TELL THE COURT?

11  **A.**   SO, AGAIN, POLARIZATION COULD HAVE A VERY SPECIFIC LEGAL

12  MEANING.  MY UNDERSTANDING IS THAT IN DIFFERENT LITIGATION THAT

13  TERM IS DEFINED DIFFERENTLY, SO I'LL BE VERY SPECIFIC ABOUT

14  WHAT I WAS ASKED TO CALCULATE HERE UNDER THAT LABEL.  AND

15  THAT'S JUST A FRACTION OF INSTANCES IN WHICH THE CANDIDATE THE

16  EI IDENTIFIES AS THE PREFERRED CANDIDATE OF THE BLACK VOTERS IS

17  NOT THE SAME CANDIDATE THAT IT IDENTIFIES AS THE PREFERRED

18  CANDIDATE OF THE WHITE VOTERS.

19          AND SO, YOU KNOW, IT'S JUST THE FRACTION OF TIMES IN

20  WHICH THERE IS THAT DISAGREEMENT BETWEEN THE TWO RACIAL GROUPS

21  ABOUT WHICH CANDIDATE SHOULD -- SHOULD HOLD OFFICE.

22  **Q.**   CAN YOU TELL THE COURT, CAN VOTING BE BOTH POLARIZED ON

23  THE ONE HAND BUT STILL HAVE SUFFICIENT CROSSOVER VOTING FOR A

24  BLACK CANDIDATE OF CHOICE TO BE ELECTED IN A NONMAJORITY-BLACK

25  DISTRICT?

1    **A.**   YES, IN EXACTLY THE WAY THAT WE JUST DISCUSSED.  THAT IF

2    THERE IS MORE CROSSOVER SUPPORT, NOT OVER 50 PERCENT.  SO YOU

3    DO HAVE POLARIZATION IN THESE TWO-CANDIDATE ELECTIONS IN THAT

4    SENSE.  BUT IF -- IF THERE'S MORE HETEROGENEITY IN THE VOTING

5    OF WHITE VOTES THAN BLACK VOTES, THEN YOU WOULDN'T NEED

6    50 PERCENT OF THE POPULATION TO BE BLACK IN ORDER TO ELECT A

7    BLACK CANDIDATE OF CHOICE.  AGAIN, PUTTING ASIDE DIFFERENCES IN

8    TURNOUT.

9    **Q.**   MOVING TO THE NEXT COLUMN, "AVERAGE PERCENT BLACK VAP

10   NEEDED TO WIN."  COULD YOU TELL THE COURT WHAT THIS SHOWS?

11   **A.**   RIGHT.  SO THE IDEA THERE, AGAIN, IS TO THINK ABOUT A KIND

12   OF THOUGHT EXPERIMENT WHERE YOU CAN KEEP OTHER FEATURES OF THE

13   DISTRICT UNDER ANALYSIS FIXED AND JUST ALTER THE FRACTION OF

14   BLACK VOTER -- BLACK POPULATION -- VOTING AGE POPULATION.  AND,

15   AGAIN, WE'RE GOING TO HOLD FIXED THE LEVEL OF COHESION.  WE'RE

16   GOING TO HOLD FIXED THE LEVEL OF CROSSOVER SUPPORT.  WE'RE ALSO

17   GOING TO HOLD FIXED THE RELATIVE SIZE OF THE WHITE POPULATION

18   AND THE NONWHITE OR BLACK, THE SORT OF OTHER POPULATION.

19           SO WE'RE GOING TO HOLD THOSE THINGS FIXED AS WE SORT

20   OF TURN THE DIAL ON WHAT THE SIZE OF THE BLACK POPULATION IS

21   AND WE'RE GOING TO TUNE THAT DIAL UNTIL, GIVEN ALL THOSE

22   NUMBERS, WE REACH THE POINT WHERE WE IDENTIFY THE FRACTION OF

23   THE VOTERS THAT WOULD HAVE TO BE BLACK IN ORDER FOR THE

24   BLACK-PREFERRED CANDIDATE TO JUST BARELY SORT OF WIN BY ONE

25   VOTE.

1             AND THEN ONCE WE GET THAT NUMBER, WE HAVE TO THEN

2    ACCOUNT FOR THE DIFFERENCES IN TURNOUT AND WE'RE GOING TO HOLD

3    THOSE FIXED AT WHAT THEY WERE OBSERVED TO BE IN THE CONTEST,

4    AND THEN MAKE THAT ADJUSTMENT TO ARRIVE AT THAT FINAL NUMBER

5    THAT YOU SEE HIGHLIGHTED IN YELLOW.  AND, AGAIN, THAT'S AN

6    ESTIMATE.

7    **Q.**   OVERALL WHAT WAS YOUR CONCLUSION ABOUT WHAT THIS TYPE OF

8    ANALYSIS SHOWS THE COURT ABOUT PLAINTIFFS' PROPOSED NEW

9    DISTRICTS?

10             **MS. ROHANI:**  OBJECTION.  THIS IS BEYOND THE SCOPE OF

11   HIS REPORT.  DR. LEWIS DID STATE IN HIS DEPOSITION THAT HE

12   COULD POINT TO NO CONCLUSIONS, OTHER THAN THE NUMBERS IN HIS

13   REPORT.  ASKING HIM TO DRAW ANY INTERFERENCES FROM THOSE

14   NUMBERS IS CLEARLY BEYOND THE SCOPE.

15             **MS. MCKNIGHT:**  YOUR HONOR, I'M ASKING HIM ABOUT HIS

16   NUMBERS THAT ARE IN HIS REPORT THAT ARE COPIED HERE.  I'M

17   ASKING HIM ABOUT HIS -- THE NUMBERS THAT ARE PRESENTED HERE AND

18   WHAT THEY SHOW ABOUT PLAINTIFFS' SELECT NEW DISTRICTS.

19             **THE COURT:**  THE QUESTION IS DID HE CONNECT THE DOTS

20   IN HIS WRITTEN REPORT.  YOU'RE ASKING HIM ABOUT HIS CONCLUSIONS

21   AND MS. ROHANI IS SAYING IT'S OUTSIDE THE SCOPE OF HIS WRITTEN

22   REPORT.

23             **MS. MCKNIGHT:**  ONE MOMENT, YOUR HONOR, I'M TRYING TO

24   LOCATE IT.  I BEG YOUR PARDON, YOUR HONOR.  YOUR HONOR, I CAN

25   COME BACK TO THIS.

1          **THE COURT:**  I LOOKED AT HIS CONCLUSION.  I ACTUALLY

2   LOOKED AT IT BEFORE TODAY, AND I WOULD SUSTAIN THE OBJECTION.

3          **MS. MCKNIGHT:**  OKAY.  YOUR HONOR, I'M ABOUT TO MOVE

4   INTO A NEW SECTION OF QUESTIONS AND IT'S ALMOST 5:00.  IS NOW A

5   GOOD TIME TO STOP OR WOULD YOU LIKE ME TO CONTINUE?

6          **THE COURT:**  HOW LONG ARE YOU GOING TO BE?  ARE YOU

7   GOING TO BE 30 OR 40 MORE MINUTES?

8          **MS. MCKNIGHT:**  YES.

9          **THE COURT:**  WE'LL TAKE A BREAK FOR THE DAY.  WE'LL BE

10  IN RECESS -- AGAIN, THE COURT APOLOGIZES.  WE'LL BE IN RECESS

11  UNTIL 10 A.M., BUT WE'LL JUST GO STRAIGHT THROUGH UNTIL 2.

12  *(WHEREUPON, THE TRIAL WAS RECESSED UNTIL 10 A.M. ON DECEMBER 5,*

13                              *2023)*

14                  C E R T I F I C A T E

15          I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT

16  FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED

17  NUMBERED MATTER.

18  **/S/GINA DELATTE-RICHARD**

19  GINA DELATTE-RICHARD, CCR

20  OFFICIAL COURT REPORTER

21

22

23

24

25