```
 1                  UNITED STATES DISTRICT COURT

 2                  MIDDLE DISTRICT OF LOUISIANA

 3

 4   DOROTHY NAIRNE, ET AL        *        CIVIL ACTION
                                  *
 5   VERSUS                       *        NO. 3:22-178-SDD
                                  *
 6   KYLE ARDOIN, ET AL           *        NOVEMBER 29, 2023
                                  *
 7   * * * * * * * * * * * * * *  *        MORNING SESSION

 8

 9                            DAY 3
                           BENCH TRIAL
10             BEFORE THE HONORABLE SHELLY D. DICK
               UNITED STATES CHIEF DISTRICT JUDGE
11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:        AMERICAN CIVIL LIBERTIES UNION
                                FOUNDATION
15                              BY:  MEGAN C. KEENAN, ESQ.
                                     SARAH E. BRANNON, ESQ.
16                                   DAYTON CAMPBELL-HARRIS, ESQ.
                                915 15TH STREET, NW
17                              WASHINGTON, DC 20005

18                              NAACP LEGAL DEFENSE & EDUCATION
                                FUND, INCORPORATED
19                              BY:  VICTORIA WENGER, ESQ.
                                     SARA ROHANI, ESQ.
20                                   STUART C. NAIFEH, ESQ.
                                40 RECTOR STREET, FIFTH FLOOR
21                              NEW YORK, NEW YORK 10006

22                              COZEN O'CONNOR
                                BY:  JOSEPHINE M. BAHN, ESQ.
23                              1200 19TH STREET, NW
                                THIRD FLOOR
24                              WASHINGTON, DC 20036

25
```

```
 1                            COZEN O'CONNOR
                             BY:  ROBERT S. CLARK, ESQ.
 2                            ONE LIBERTY PLACE
                             1650 MARKET STREET, SUITE 2800
 3                            PHILADELPHIA, PENNSYLVANIA 19103

 4                            COZEN O'CONNOR
                             BY:  AMANDA GIGLIO, ESQ.
 5                            3 WORLD TRADE CENTER
                             55TH FLOOR
 6                            NEW YORK, NEW YORK 10007

 7                            ELECTION LAW CLINIC
                             HARVARD LAW SCHOOL
 8                            BY:  T. ALORA THOMAS, ESQ.
                             6 EVERETT STREET, SUITE 4105
 9                            CAMBRIDGE, MASSACHUSETTS 02138

10                            ADCOCK LAW, LLC
                             BY:  JOHN N. ADCOCK, ESQ.
11                            3110 CANAL STREET
                             NEW ORLEANS, LOUISIANA 70119

12

13   FOR THE DEFENDANT,       NELSON MULLINS RILEY & SCARBOROUGH,
     KYLE ARDOIN, IN HIS      LLP
14   OFFICIAL CAPACITY AS     BY:  PHILLIP J. STRACH, ESQ.
     SECRETARY OF STATE:           THOMAS A. FARR, ESQ.
15                                 CASSIE A. HOLT, ESQ.
                                   ALYSSA M. RIGGINS, ESQ.
16                            4140 PARKLAKE AVENUE, SUITE 200
                             RALEIGH, NORTH CAROLINA 27612
17
                             SHOWS, CALI & WALSH, LLP
18                            BY:  JOHN C. CONINE, JR., ESQ.
                                  JOHN C. WALSH, ESQ.
19                            628 ST. LOUIS STREET
                             BATON ROUGE, LOUISIANA 70802
20

21   FOR THE DEFENDANT,       BAKER & HOSTETLER, LLP
     CLAY SCHEXNAYDER:        BY:  KATE MCKNIGHT, ESQ.
22                                 ROBERT J. TUCKER, ESQ.
                                   PATRICK LEWIS, ESQ.
23                            200 CIVIC CENTER DRIVE, SUITE 1200
                             COLUMBUS, OHIO 43215
24

25
```

```
 1                                    BAKER & HOSTETLER, LLP
                                      BY:  MICHAEL W. MENGIS, ESQ.
 2                                    811 MAIN STREET, SUITE 1100
                                      HOUSTON, TEXAS 77002
 3
      FOR THE INTERVENOR, THE         HOLTZMAN VOGEL JOSEFIAK
 4    STATE OF LOUISIANA BY AND       TORCHINSKY, PLLC
      THROUGH ATTORNEY GENERAL        BY:  BRENNAN BOWEN, ESQ.
 5    JEFF LANDRY:                    2575 EAST CAMELBACK ROAD, SUITE 860
                                      PHOENIX, ARIZONA 85016
 6
                                      HOLTZMAN VOGEL JOSEFIAK
 7                                    TORCHINSKY, PLLC
                                      BY:  PHILLIP M. GORDON, ESQ.
 8                                    15404 JOHN MARSHALL HIGHWAY
                                      HAYMARKET, VIRGINIA 20169
 9
                                      LOUISIANA DEPARTMENT OF JUSTICE
10                                    BY:  ANGELIQUE D. FREEL, ESQ.
                                           JEFFREY M. WALE, ESQ.
11                                         AMANDA M. LAGROUE, ESQ.
                                      1885 N. THIRD STREET
12                                    BATON ROUGE, LOUISIANA 70804

13
      OFFICIAL COURT REPORTER:        SHANNON L. THOMPSON, CCR
14                                    UNITED STATES COURTHOUSE
                                      777 FLORIDA STREET
15                                    BATON ROUGE, LOUISIANA 70801
                                      SHANNON_THOMPSON@LAMD.USCOURTS.GOV
16                                    (225)389-3567

17          PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                     COMPUTER-AIDED TRANSCRIPTION SOFTWARE
18

19

20

21

22

23

24

25
```

1                                INDEX

2                                                              <u>PAGE</u>

3   **PLAINTIFFS' WITNESS:**

4   **WILLIAM S. COOPER**

5       DIRECT EXAMINATION CONTINUED BY MS. THOMAS          9

6       CROSS-EXAMINATION BY MR. TUCKER                     60

7       REDIRECT EXAMINATION BY MS. THOMAS                 113

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **(NOVEMBER 29, 2023)**

2          **(CALL TO THE ORDER OF COURT)**

3     **THE COURT:**  GOOD MORNING.

4          BE SEATED.

5          OKAY.  I BELIEVE MR. COOPER WAS ON THE STAND.

6     **MR. STRACH:**  YOUR HONOR, MAY I ADDRESS THE COURT?

7     **THE COURT:**  YES, MR. STRACH, YOU MAY.

8     **MR. STRACH:**  I JUST WANTED TO GIVE THE COURT A

9  HEADS-UP UPDATE ABOUT ADMINISTRATIVE/TIMING ISSUE.

10    **THE COURT:**  OKAY.

11    **MR. STRACH:**  SO WE WERE INFORMED YESTERDAY AFTERNOON

12  THAT THE PLAINTIFFS WOULD PROBABLY WRAP UP THEIR CASE EARLY

13  THIS AFTERNOON, I GUESS.  FRANKLY, WE WERE THINKING IT WOULD BE

14  THURSDAY AFTERNOON.  SO WE'VE BEEN SCRAMBLING AROUND,

15  SCROUNGING UP OUR WITNESSES.  WE'VE BEEN ABLE TO SECURE

16  PRESIDENT CORTEZ FOR THIS AFTERNOON.  WE'VE GOT A COUPLE OF

17  WITNESSES ON THE WEST COAST THAT WE'VE ASKED TO GO AHEAD AND

18  JUMP ON A PLANE AND GET OUT HERE SO WE CAN PUT THEM UP THIS

19  WEEK INSTEAD OF NEXT WEEK, BUT THAT DOESN'T MEAN WE MIGHT NOT

20  COME UP SHORT A COUPLE OF AFTERNOONS THIS WEEK, JUST BECAUSE WE

21  ARE TRYING TO ROUND UP ALL OF OUR WITNESSES, SOME OF WHOM COULD

22  ONLY TESTIFY TILL NEXT WEEK.

23          THE BOTTOM LINE, WE CERTAINLY WON'T GO PAST

24  WEDNESDAY.  I THINK EVEN IF WE COME UP SHORT WITH SOME

25  WITNESSES A FEW AFTERNOONS THIS WEEK, I DON'T THINK OUR CASE

09:03  1   WILL EVEN GO PAST MONDAY.  SO I DON'T THINK WE ARE GOING TO --

2   I DON'T THINK IT'S GOING TO IMPINGE ON ANY TIME THE COURT'S

3   ALREADY SET ASIDE, BUT I WANTED TO GIVE YOU THE HEADS-UP THAT

4   WE ARE DOING THE BEST WE CAN.

5                 **THE COURT:**  OKAY.

6            **MR. STRACH:**  AND WE'RE GOING TO TRY TO --

7            **THE COURT:**  ALL RIGHT.  IF THIS WERE A JURY TRIAL,

8   I'D PROBABLY LOSE MY MIND RIGHT NOW, BUT IT'S NOT.  AND SO WE

9   ARE NOT IMPOSING ON CITIZENS TO WAIT AROUND WHILE WITNESSES

10  COME IN.  SO WE WILL JUST DO -- DO THE BEST YOU CAN.  I'M SURE

11  YOU ARE DOING THE BEST YOU CAN, AND WE WILL MOVE STEADILY, AS

12  STEADILY AS WE CAN.

13           **MR. STRACH:**  OKAY.  THANK YOU, JUDGE.  IT APPRECIATE

14  IT.

15           **THE COURT:**  ALL RIGHT.  THANK YOU FOR THE

16  INFORMATION.

17                 ANYTHING FROM THE PLAINTIFFS?

18           **MS. KEENAN:**  NO.  I THINK WE CAN SORT IT OUT OUTSIDE

19  OF COURT.  WE JUST -- WE WOULD APPRECIATE -- WE HAVE RECEIVED

20  NO NOTICE ABOUT THE WITNESSES WHO ARE HOPPING ON A PLANE.  WE

21  DON'T KNOW ANYTHING ABOUT WHICH WITNESSES MAY OR MAY NOT BE

22  PRESENTED TODAY, OTHER THAN PRESIDENT CORTEZ.  SO IF THERE ARE

23  FOLKS WHO MAY BE COMING IN AS EARLY AS TODAY, WE WOULD

24  APPRECIATE THE SAME NOTICE THAT WE HAVE EXTENDED TO DEFENDANTS

25  ABOUT WHICH WITNESSES WILL BE TESTIFYING THE NEXT DAY.

09:04 1  BUT, OF COURSE, WE CAN -- THIS IS ATTORNEY BACK AND FORTH.  WE

2  DON'T NEED TO ADDRESS IT WITH THE COURT.

3        **THE COURT:**  AND, MR. STRACH, I MEAN, I AM -- THEY

4  HAVE BEEN VERY FORTHCOMING.  LOOK, I UNDERSTAND THAT ORDER OF

5  TESTIMONY AND ALL THAT IS WORK PRODUCT.  YEAH, YEAH, YEAH, GOT

6  IT.

7        **MR. STRACH:**  YES.

8        **THE COURT:**  THEY HAVE BEEN VERY FORTHCOMING WITH THE

9  ORDER OF THEIR WITNESSES TO ALLOW YOU-ALL TO PREP, AND I WOULD

10  EXPECT THAT YOU WOULD DO THE SAME.

11        **MR. STRACH:**  WE ARE CERTAINLY GOING TO DO THAT.

12        **THE COURT:**  ALL RIGHT.

13        **MR. STRACH:**  PRESIDENT CORTEZ IS ALL WE ARE GOING TO

14  HAVE THIS AFTERNOON.

15        **THE COURT:**  OKAY.

16        **MR. STRACH:**  AND THEN THIS EVENING, WE WILL NOTIFY

17  THEM ABOUT THE ORDER FOR TOMORROW.

18        **THE COURT:**  ALL RIGHT.  THANK YOU.

19          OKAY.  MR. COOPER MAY RESUME THE WITNESS STAND.

20          MS. THOMAS, YOU MAY RESUME YOUR EXAMINATION.

21        **MS. THOMAS:**  JUST BEFORE WE START WITH MR. COOPER --

22  MY WATER WAS CONFISCATED ON THE WAY IN.  IF SOMEONE COULD BRING

23  MR. COOPER A WATER.  I THINK WE ARE TRYING TO GET WATER IN,

24  AND WHEN IT IS IN THE COURTHOUSE, IF I'M ALLOWED TO JUST

25  APPROACH AND GIVE IT TO HIM.

09:05 1          **THE COURT:**  YES.

2          **MS. THOMAS:**  OH, HERE WE GO.

3          **THE COURT:**  THANK YOU.

4          **MS. THOMAS:**  THANK YOU.

5          **THE COURT:**  ALL RIGHT.

6          **MS. THOMAS:**  MAY I APPROACH?

7          **THE COURT:**  YOU MAY.

8          **MS. THOMAS:**  THANK YOU.

9          **THE COURT:**  YOU'RE WELCOME.

10              WHAT WERE YOU TRYING TO CARRY IN YOUR WATER THAT

11   GOT IT CONFISCATED?

12          **MS. THOMAS:**  IT WAS JUST -- THEY WERE OPEN.  I DON'T

13   KNOW.  THIS WAS THE FIRST TIME.

14          **THE COURT:**  OH, I MEAN, IT'S LIKE TSA, MAN.  YOU

15   CAN'T BRING IN OPEN WATER BOTTLES.

16          **MS. THOMAS:**  I'M SORRY, YOUR HONOR.

17          **THE COURT:**  IT'S THE FEDERAL GOVERNMENT.

18          **MS. THOMAS:**  THERE WAS A CLOSED ONE.  BUT I HAD AN

19   OPEN ONE, AND BOTH WERE CONFISCATED ON MY WAY IN.

20          **THE COURT:**  OKAY.  CARRY ON.

21

22

23

24

25

10:32  1                      **WILLIAM S. COOPER,**

2    **HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:**

3                    **DIRECT EXAMINATION CONTINUED**

4    BY MS. THOMAS:

5    **Q.**   GOOD MORNING, MR. COOPER.

6    **A.**   GOOD MORNING.

7    **Q.**   SO I'D LIKE TO ASK YOU A COUPLE OF QUESTIONS.  ARE YOU

8    FAMILIAR WITH A TERM "BLOCK EQUIVALENCY FILE"?

9    **A.**   YES.  I USE BLOCK EQUIVALENCY FILES FREQUENTLY.

10    **Q.**   AND WHAT IS A BLOCK EQUIVALENCY FILE?

11    **A.**   IT'S JUST A FILE EXPORTED FROM GIS SOFTWARE, AND IT

12    REFLECTS THE BLOCK LEVEL CONFIGURATION OF A REDISTRICTING PLAN,

13    OR SOME OTHER KIND OF DISTRICT, NOT NECESSARILY A REDISTRICTING

14    DISTRICT, A SCHOOL ZONE OR SOMETHING OF THAT NATURE.

15    **Q.**   AND WHAT HAPPENS WHEN YOU UPLOAD A BLOCK EQUIVALENCY FILE

16    INTO A GIS SOFTWARE?

17    **A.**   YOU CAN GET AN IMMEDIATE VIEW OF THE VOTING PLAN IN

18    QUESTION.

19    **Q.**   DID YOU CREATE BLOCK EQUIVALENCY FILES FOR YOUR

20    ILLUSTRATIVE MAPS HERE?

21    **A.**   I DID.  AND THEY WERE GIVEN TO THE DEFENDANTS.

22    **Q.**   OKAY.  DID YOU CREATE A BLOCK EQUIVALENCY FILE FOR THE

23    ILLUSTRATIVE SENATE PLAN?

24    **A.**   YES.

25    **Q.**   IF WE COULD PULL UP WHAT HAS BEEN MARKED AS PLAINTIFF

WILLIAM S. COOPER

09:07 1   EXHIBIT 116.

2           **THE COURT:**  AND HAS THAT BEEN PREADMITTED?  I AM NOT

3   LOOKING BACK AT MY NOTES.

4           **MS. THOMAS:**  THAT HAS NOT BEEN PREADMITTED.

5           **THE COURT:**  OKAY.

6           **MS. THOMAS:**  I AM ADMITTING IT NOW.

7   BY MS. THOMAS:

8   **Q.**   DO YOU RECOGNIZE THIS FILE?

9   **A.**   YES.  TO ACTUALLY SEE THE BLOCK NUMBER IN ITS CORRECT

10   FORMAT, YOU HAVE TO LOAD THAT UP AS A COMMA-SEPARATED VALUE

11   TEXT FILE.  YOU CAN DO THAT FROM WITHIN EXCEL SO YOU DON'T GET

12   THE EXPONENTIALS THERE.

13   **Q.**   OKAY.  BUT IS THIS HOW THE FILE IS DOWNLOADED INTO EXCEL?

14   **A.**   YEAH.

15           **MS. THOMAS:**  AT THIS POINT WE'D LIKE TO MOVE IN

16   PLAINTIFFS' EXHIBIT 116.

17           **MR. TUCKER:**  NO OBJECTION.

18           **THE COURT:**  ADMITTED.

19   BY MS. THOMAS:

20   **Q.**   DID YOU ALSO CREATE A BLOCK EQUIVALENCY FILE FOR YOUR

21   ILLUSTRATIVE HOUSE PLAN?

22   **A.**   YES.

23   **Q.**   IF WE COULD PULL UP PLAINTIFF EXHIBIT 117.

24   **A.**   YES.  AND YOU CAN SEE THAT'S THE HOUSE PLAN BECAUSE

25   THERE'S A DISTRICT 46 THERE.

WILLIAM S. COOPER

09:08 1   Q.   OKAY.

2           **MS. THOMAS:**  AT THIS POINT WE WOULD ALSO LIKE TO MOVE

3   IN PLAINTIFF EXHIBIT 117.

4           **MR. TUCKER:**  NO OBJECTION.

5           **THE COURT:**  ADMITTED.

6   BY MS. THOMAS:

7   Q.   NOW, WHEN WORKING ON THE MAPS THAT ARE REPRESENTED IN THE

8   TWO BLOCK EQUIVALENCY FILES THAT WE'VE JUST ENTERED, DID YOU

9   RECEIVE ANY FEEDBACK FROM THE OTHER EXPERTS IN THIS CASE

10   THROUGH COUNSEL?

11   A.   I DID GET SOME FEEDBACK DURING THE TIME I WAS WORKING ON

12   THE FINAL 2023 ILLUSTRATIVE PLAN, OR MAYBE JUST PRIOR TO IT.

13   I'D DONE AN EARLIER PLAN IN 2022.  AND SO MINOR MODIFICATIONS

14   WERE MADE AS A RESULT OF SOME DISCUSSIONS WITH THE PLAINTIFFS'

15   ATTORNEYS.

16   Q.   OKAY.  AND DID YOU HAVE AN UNDERSTANDING OF WHICH EXPERTS

17   WERE PROVIDING FEEDBACK?

18   A.   YES.

19   Q.   AND WHO WERE THOSE EXPERTS?

20   A.   I BELIEVE THE ONLY EXPERT THAT ACTUALLY CHIMED IN ON THIS

21   WAS DR. COLTEN, WHO IS A RESIDENT OF LOUISIANA, AND OBVIOUSLY

22   KNOWS THE STATE QUITE WELL, GIVEN HIS PRESENTATION YESTERDAY.

23   Q.   DO YOU RECALL WHETHER YOU RECEIVED ANY FEEDBACK FROM ANY

24   OTHER EXPERTS ABOUT THE PERFORMANCE OF YOUR DISTRICTS?

25   A.   IN TERMS OF THE PERFORMANCE OF THE DISTRICTS, I DID HAVE

WILLIAM S. COOPER

09:09 1  SOME COMMUNICATION FROM YOU THAT IT WOULD BE PREFERABLE TO MAKE

2  MINOR CHANGES TO A COUPLE OF HOUSE DISTRICTS IN EAST BATON

3  ROUGE.

4  **Q.**    DID YOU RECEIVE ANY FEEDBACK THROUGH COUNSEL FROM THE

5  PLAINTIFFS IN THIS CASE?

6  **A.**    I DID, AGAIN, THROUGH YOU.

7  **Q.**    GOING TO THE MAPS THAT YOU DREW, IF WE COULD PULL UP WHAT

8  IS PLAINTIFFS' EXHIBIT 20, FIGURE 1 ON PAGE 9.

9  **A.**    YES.

10  **Q.**    SO STARTING -- I BELIEVE YOU TESTIFIED YESTERDAY THAT YOU

11  STARTED WITH THE CENSUS DATA.  WHAT DOES THIS FIGURE SHOW US?

12  **A.**    WELL, THIS FIGURE JUST SHOWS YOU THE TOTAL POPULATION OF

13  LOUISIANA ACCORDING TO THE 2000 TO 2010 AND 2020 DECENNIAL

14  CENSUSES.  AND IT'S BROKEN OUT WITH TOTAL POPULATION, AND THEN

15  BY RACE AND ETHNICITY -- OR AT LEAST SOME OF THE ETHNICITIES

16  ALL THE WAY DOWN THE CHART.

17  **Q.**    AND WHAT DOES THIS CHART TELL US ABOUT WHAT HAPPENED TO

18  THE POPULATION FROM 2020 [SIC] TO 2010 TO 2020?

19  **A.**    WELL, YOU CAN SEE THAT THE STATE HAS INCREASED A LITTLE

20  BIT IN POPULATION IN TERMS OF TOTAL POPULATION.  AND YOU CAN

21  ALSO SEE IF YOU GO DOWN TO THE BOTTOM ROW, THE "ANY PART BLACK"

22  CATEGORY, YOU CAN SEE THAT IT TOO HAS INCREASED IN TOTAL

23  POPULATION AS WELL AS A SLIGHT INCREASE IN THE PERCENTAGE ANY

24  PART BLACK FROM 32.86 PERCENT IN 2000 TO 33.13 PERCENT IN 2020,

25  A SLIGHT INCREASE.

WILLIAM S. COOPER

09:11   1          THE BIG CHANGES WERE THAT THE NON-HISPANIC WHITE
        2   POPULATION, WHICH WAS ALMOST 2.8 MILLION IN 2000 HAS NOW FALLEN
        3   TO ABOUT 2.6 MILLION IN 2020.  SO UNDER THE 2000 CENSUS, THE
        4   NON-HISPANIC WHITE POPULATION MADE UP ABOUT 62.5 PERCENT OF THE
        5   TOTAL POPULATION IN THE STATE AND THAT HAS NOW DROPPED TO
        6   ROUGHLY 55.8 PERCENT.  I'M ROUNDING.  THOSE ARE ACTUALLY
        7   CARRIED OUT TO THE HUNDREDTH POINT IN THE CHART ITSELF.
        8   Q.   AND IF I COULD ASK YOU, WHY DID YOU USE THE "ANY PART
        9   BLACK" MEASURE?
       10   A.   BECAUSE THAT IS THE ACCEPTED STANDARD NOW IN SECTION 2
       11   CASES WHEN EXAMINING THE RACIAL COMPOSITION OF A STATE OR A
       12   DISTRICT.  THAT GOES BACK TO *ASHCROFT V. GEORGIA* IN I THINK
       13   2002, A SUPREME COURT RULING.
       14   Q.   I WOULD NOW LIKE TO TURN TO PAGE 17, FIGURE 7 OF THE SAME
       15   EXHIBIT.
       16          WHAT DOES THIS FIGURE SHOW US?
       17   A.   OKAY.  THIS IS A SIMILAR TABLE THAT BREAKS OUT THE
       18   POPULATION CHANGES AT THE REGIONAL LEVEL IN LOUISIANA SINCE
       19   2000 WHERE THERE'S BEEN A LOT MORE CHANGE IN DYNAMIC
       20   REPERCUSSIONS, DEPENDING UPON WHICH PART OF THE STATE YOU'RE
       21   IN.  YOU CAN SEE THAT TO A LARGE DEGREE, ALL OF THESE
       22   METROPOLITAN STATISTICAL AREAS, MSAS, WHICH ARE DEFINED BY THE
       23   CENSUS BUREAU AND THE OFFICE OF MANAGEMENT AND BUDGET, HAVE
       24   SHOWN A SIGNIFICANT POPULATION GROWTH SINCE THE YEAR OF 2000,
       25   WITH THE EXCEPTION OF NEW ORLEANS, AND THAT IS IN MANY WAYS A

WILLIAM S. COOPER

09:13 1    REFLECTION OF HURRICANE KATRINA, BECAUSE THERE WAS A BIG DROP

2    IN THE POPULATION BETWEEN 2000 AND 2010.  IT'S COMING BACK A

3    BIT.  THE NEW ORLEANS MSA DID GAIN SOME POPULATION BETWEEN 2010

4    AND 2020.  BUT STILL, SINCE THE YEAR 2000, THE POPULATION LOSS

5    HAS BEEN ALMOST 5 PERCENT OR ABOUT 66,000 PEOPLE.

6            ELSEWHERE THERE'S BEEN BIG GROWTH.  THERE WAS A BIG

7    CHANGE IN BATON ROUGE.  IT'S GROWN BY 141,000 PERSONS, A

8    20 PERCENT GROWTH OVER THAT 20-YEAR PERIOD.

9            OTHER AREAS HAVE ALSO GROWN QUITE A BIT, INCLUDING

10    PLACES LIKE HAMMOND AND ALSO LAFAYETTE, ALMOST 15 PERCENT.

11    **Q.**    AND WHY DID YOU BREAK THE CENSUS DATA DOWN BY METROPOLITAN

12    AREA?

13    **A.**    WELL, IT WAS CLEAR TO ME WHEN I STARTED WORKING ON THIS

14    CASE AND THE CONGRESSIONAL CASE -- AND I HAD ACTUALLY LOOKED AT

15    SOME DATA FROM AN EARLIER CONGRESSIONAL CASE THAT WAS DISMISSED

16    IN LATE 2019, I THINK.  I'D SEEN THAT THERE WERE BIG CHANGES AT

17    THE REGIONAL LEVEL, AND THAT TELLS ME THAT MAYBE BECAUSE OF

18    THESE CHANGES, PERHAPS THERE WOULD BE AN OPPORTUNITY TO CREATE

19    SOME ADDITIONAL MAJORITY-BLACK HOUSE OR SENATE DISTRICTS.  SO I

20    HAD THIS AT MY SIDE AS I WAS BEGINNING TO WORK ON THE POTENTIAL

21    ILLUSTRATIVE HOUSE AND SENATE PLANS.

22    **Q.**    IF WE COULD TURN NOW TO PAGE 18, FIGURE 8 IN THE SAME

23    EXHIBIT.

24    **A.**    YES.  THIS SHOWS THE BLACK POPULATION CHANGE IN THE STATE

25    AT THE MSA LEVEL.  AND HERE AGAIN, YOU CAN SEE THAT THERE'S

WILLIAM S. COOPER

09:15  1   BEEN CONSISTENT GROWTH EVERYWHERE EXCEPT IN NEW ORLEANS AND THE

2   RURAL AREAS OF THE STATE.  AND THE BATON ROUGE AREA HAS SEEN A

3   25 PERCENT INCREASE IN BLACK POPULATION.  IN ABSOLUTE TERMS,

4   ALMOST 64,000 PEOPLE.  SO JUST ALONE, THE BLACK POPULATION

5   GROWTH IN THE BATON ROUGE MSA WOULD AMOUNT TO ALMOST TWO HOUSE

6   DISTRICTS.  AND THERE'S BEEN A SIGNIFICANT GROWTH IN LAFAYETTE

7   AND IN LAKE CHARLES IN PERCENTAGE TERMS ANY WAY.  AND ALSO EVEN

8   IN SHREVEPORT WHERE THE WHITE POPULATION HAS FALLEN.  WE'LL SEE

9   THAT ON THE NEXT CHART.

10          BUT WITH RESPECT TO THE BLACK POPULATION, IT'S UP BY

11   11.4 PERCENT OR ALMOST 17,000 PERSONS.

12   **Q.**   IF WE COULD NOW TURN TO PAGE 20, FIGURE 10.

13   **A.**   YES.  HERE YOU SEE ALMOST ALL RED.  THIS SHOWS THE

14   POPULATION CHANGE FOR THE WHITE POPULATION IN THE STATE OVER

15   THAT 20-YEAR PERIOD.  AND ASIDE FROM HAMMOND, WHICH IS ACTUALLY

16   TANGIPAHOA PARISH BASICALLY, AND MAYBE ANOTHER ONE, THERE'S

17   BEEN POPULATION LOSS.  IT'S BEEN FAIRLY STABLE, OF COURSE, IN

18   LAFAYETTE, BUT ELSEWHERE IT'S DROPPED IN EVERY SINGLE -- IN

19   EVERY SINGLE MSA AND EVEN IN THE RURAL AREAS.

20          AND I DO NOTE ON THIS CHART -- BECAUSE THIS GETS KIND

21   OF CONFUSING, THAT THE CENSUS BUREAU MADE A -- KIND OF A FAIRLY

22   SIGNIFICANT MISTAKE IN THE WAY THEY COUNTED PEOPLE IN WEST

23   FELICIANA PARISH.  THEY IDENTIFIED ALL OF THE PRISONERS AT

24   ANGOLA INSTEAD OF -- WELL, THEY IDENTIFIED -- THEY MISMATCHED

25   BLACKS AND WHITES AT THE ANGOLA FACILITY.  SO THAT INSTEAD OF

WILLIAM S. COOPER

09:17 1    CALLING OR COUNTING ROUGHLY 4,000 OF THOSE WHO ARE IMPRISONED

2    AT ANGOLA -- THERE ARE 5,000 IMPRISONED AS BLACK, THEY WERE

3    COUNTED AS WHITE, AND THAT CENSUS ERROR HASN'T BEEN CORRECTED.

4    SO THIS PARTICULAR CHART I'M SHOWING AN INCREASE OF 13,240

5    PERSONS IN BATON ROUGE PARISH THAT ARE WHITE.  BUT IF YOU

6    DISCOUNT FOR THIS ERROR, THEN THE ACTUAL POPULATION INCREASE

7    THAT IS WHITE IN THE BATON ROUGE MSA IS 9,240 PERSONS.  SO IT'S

8    A -- THE OFFICIAL COUNT IS ACTUALLY OVERCOUNTING THE WHITE

9    POPULATION IN THE BATON ROUGE MSA.

10         AND THE BATON ROUGE MSA IS RATHER LARGE

11    GEOGRAPHICALLY, AND DOES EXTEND OUT INTO -- EVEN ALMOST INTO

12    PARTS OF ACADIANA.

13    Q.   OKAY.  STICKING WITH THIS FIGURE, WHAT HAPPENED TO THE

14    WHITE POPULATION IN NEW ORLEANS?

15    A.   THE WHITE POPULATION IN NEW ORLEANS FELL BY ALMOST 117,000

16    PERSONS OR ROUGHLY 6 PERCENT.

17    Q.   AND IF WE COULD GO BACK TO FIGURE 8 ON PAGE 18.

18         HOW DOES WHAT HAPPENED TO THE WHITE POPULATION IN NEW

19    ORLEANS COMPARE TO WHAT HAPPENED TO THE BLACK POPULATION IN NEW

20    ORLEANS?

21    A.   THE BLACK POPULATION ALSO FELL IN ABSOLUTE NUMBERS BY A

22    SMALLER AMOUNT, BUT IT DID FALL.

23    Q.   AND YOU SAID "BY A SMALLER AMOUNT," BY HOW MUCH SMALLER OF

24    AN AMOUNT?

25    A.   I'D HAVE TO GO BACK AND SEE THE OTHER CHART.  BUT COULD I

WILLIAM S. COOPER

09:19 1   SEE -- WELL, I CAN LOOK AT, FIGURE 9.

2   **Q.**   IF WE COULD GO BACK TO FIGURE 10 ON PAGE 20?

3   **A.**   YEAH.  ROUGHLY HALF.  I MEAN, IT'S -- THE POPULATION LOSS

4   FOR THE BLACK POPULATION IN NEW ORLEANS MSA WAS ABOUT 58,000,

5   AND THE WHITE POPULATION WAS ABOUT 116,000.  SO THERE'S BEEN

6   DEEPER POPULATION LOSS BY THE NON-HISPANIC WHITE POPULATION IN

7   THE NEW ORLEANS MSA VIS-À-VIS THE BLACK POPULATION.

8   **Q.**   NOW, GETTING BACK TO YOUR MAP DRAWING PROCESS, I BELIEVE

9   WE'VE DISCUSSED A LITTLE BIT GIS SOFTWARE.  DO YOU USE GIS

10   SOFTWARE WHEN YOU'RE DRAWING A MAP?

11   **A.**   YES.  I USE MAPTITUDE FOR REDISTRICTING, WHICH I THINK IS

12   PROBABLY THE PRIMARY SOFTWARE USED FOR REDISTRICTING PURPOSES

13   AT THE STATE LEGISLATIVE LEVEL AND IS ALSO, OF COURSE, USED BY

14   MANY LOCAL GOVERNMENTS AROUND THE COUNTRY AND BY MANY EXPERTS

15   WHO TESTIFY IN REDISTRICTING CASES.

16   **Q.**   AND WHAT DID YOU USE THE SOFTWARE TO DO?

17   **A.**   TO DEVELOP THE ILLUSTRATIVE PLANS AND TO ANALYZE THE

18   ENACTED PLANS.

19   **Q.**   NOW, YESTERDAY YOU TESTIFIED THAT YOU WERE TRYING TO

20   DEVELOP A *GINGLES 1* COMPLIANT MAP.  IS THAT RIGHT?

21   **A.**   YES.

22   **Q.**   AND WHAT IS YOUR UNDERSTANDING OF THE REQUIREMENTS FOR A

23   *GINGLES 1* COMPLIANT MAP?

24   **A.**   WELL, IT MUST ADHERE TO TRADITIONAL REDISTRICTING

25   PRINCIPLES.  IN OTHER WORDS, IT IS GENERALLY UNDERSTOOD THAT IF

WILLIAM S. COOPER

09:20 1  ONE IS DRAWING A VOTING DISTRICT, THAT VOTING DISTRICT NEEDS TO

2  BE REASONABLY COMPACT, A REASONABLE SHAPE; IT MUST BE

3  CONTIGUOUS, UNLESS THERE'S WATER INVOLVED; IT NEEDS TO RESPECT

4  COMMUNITIES OF INTEREST.  OF COURSE, IT NEEDS TO MEET

5  ONE-PERSON, ONE-VOTE REQUIREMENTS.

6  AND HERE IN LOUISIANA IT'S UNDERSTOOD THAT DISTRICTS

7  CAN BE PLUS OR MINUS 5 PERCENT IN STATE LEGISLATIVE PLANS.  SO

8  ABOVE ALL -- OR THOSE ARE THE FACTORS, ALONG WITH THE

9  NON-DILUTION OF MINORITY VOTING STRENGTHS THAT ONE MUST TAKE

10  INTO CONSIDERATION AS A TRADITIONAL REDISTRICTING PRINCIPLE.

11  ALSO IN THE BACKGROUND, ALTHOUGH IT'S OFTEN NOT

12  LISTED AS A TRADITIONAL REDISTRICTING PRINCIPLE, IS THE NEED TO

13  PAY ATTENTION WHERE THE INCUMBENTS LIVE AND TO TRY TO AVOID

14  PAIRING INCUMBENTS.  SO THAT'S -- EXCUSE ME.  THAT'S WHAT I DID

15  IN THIS PLAN.  I, AS FAR AS I KNOW, DID NOT PAIR ANY OF THE

16  INCUMBENTS WHO WERE TERM LIMITED IN EITHER THE ILLUSTRATIVE

17  PLAN OR THE -- FOR THE HOUSE OR THE SENATE.  BUT I DON'T HAVE

18  INFORMATION ON THE RECENT ELECTION, SO I'M NOT SURE ABOUT THAT.

19  **Q.**   ALL RIGHT.  THANK YOU.

20  WHEN WORKING ON DRAWING YOUR MAPS, DID YOU CONSIDER

21  RACE?

22  **A.**   I WAS AWARE OF RACE.  ONE HAS TO BE AWARE OF RACE TO

23  ADHERE TO TRADITIONAL REDISTRICTING PRINCIPLES AND COMPLY WITH

24  THE VOTING RIGHTS ACT.

25  **Q.**   AND HOW DID YOU CONSIDER RACE IN DRAWING YOUR MAPS?

WILLIAM S. COOPER

09:22 1    **A.**   I HAD INFORMATION AT THE PRECINCT LEVEL THAT I WAS LOOKING

2    AT AND IDENTIFIED PRECINCTS THAT WERE ROUGHLY 30 PERCENT BLACK

3    OR MORE, WHICH MADE IT POSSIBLE TO THEN BEGIN TO RECONFIGURE

4    DISTRICTS AND CREATE THE ADDITIONAL MINORITY/MAJORITY

5    DISTRICTS.  I DID NOT USE BLOCK-LEVEL DATA, AND I THINK SOME OF

6    THE OTHER EXPERTS HERE HAVE PRODUCED MAPS THAT ARE TOTALLY

7    FOREIGN TO ME.  I DON'T WORK WITH BLOCK-LEVEL DATA, EXCEPT

8    MAYBE IN CONGRESSIONAL PLANS.  OCCASIONALLY I HAVE TO SPLIT A

9    PRECINCT, SO I DO LOOK AT THE BLOCKS.  BUT I'M NOT DRAWING BY

10   RACE LOOKING AT THE BLOCKS.  I'M MAINLY LOOKING AT POPULATION

11   TOTALS SO THAT I CAN GET WITHIN PLUS OR MINUS ONE PERSON FOR A

12   CONGRESSIONAL PLAN AND THAT'S IT.

13          I MEAN, I'M DRAWING THESE MAPS AT THE PRECINCT LEVEL.

14   AND SO THE MAPS THAT THE OTHER EXPERTS ARE SHOWING HERE TODAY

15   ARE NOT SOMETHING I WAS LOOKING AT.  THEY SEEM TO BE OVERLY

16   OBSESSED WITH RACE.

17   **Q.**   DID RACE PREDOMINATE YOUR DRAWING OF THE MAPS HERE?

18   **A.**   NO, IT DID NOT.  IT WAS ONE OF SEVERAL FACTORS.  I WAS

19   CONSTANTLY BALANCING TRADITIONAL REDISTRICTING PRINCIPLES.  IF

20   I PRIORITIZED ANYTHING AT ALL, IT WAS TO AVOID PAIRING

21   INCUMBENTS, AND THAT DOES MAKE A DIFFERENCE WHEN YOU'RE DRAWING

22   A PLAN BECAUSE INCUMBENTS CAN LIVE ALL OVER THE PLACE AND SO

23   THAT BECOMES A FACTOR.

24   **Q.**   NOW, WHEN DISCUSSING *GINGLES 1*, ARE YOU FAMILIAR WITH THE

25   *GINGLES 1* COMPACTNESS REQUIREMENT?

WILLIAM S. COOPER

09:23 1   **A.**   YES.  IT'S A VERY GENERAL TERM THAT DISTRICTS SHOULD BE

2   SUFFICIENTLY NUMEROUS AND GEOGRAPHICALLY COMPACT.

3   **Q.**   AND HOW DID YOU SET ABOUT COMPLYING WITH THE COMPACTNESS

4   REQUIREMENT?

5   **A.**   PRIMARILY I JUST VISUALLY LOOKED AT THE DISTRICTS AS I WAS

6   DRAWING THE PLAN AND ATTEMPTED TO ALWAYS HAVE A DISTRICT IN

7   FRONT OF ME THAT WAS REASONABLE.  I WOULD ALSO OCCASIONALLY

8   CHECK THE COMPACTNESS SCORES THAT ARE BUILT INTO THE MAPTITUDE

9   FOR A REDISTRICTING MODULE.  SO I HAD THAT AS ANOTHER CHECK.

10   **Q.**   OKAY.  SO PAUSING FOR A MINUTE ON THE COMPACTNESS SCORES.

11   I WOULD LIKE TO PULL UP WHAT HAS BEEN ADMITTED YESTERDAY AS

12   PLAINTIFFS' EXHIBIT 55.  AND I BELIEVE THIS IS K-2 IN YOUR

13   REPORT.

14         IT SHOULD ALSO BE ON YOUR SCREEN, MR. COOPER.

15   **A.**   OH, YES.  OKAY.  YES.

16   **Q.**   OKAY.

17   **A.**   THOSE ARE COMPACTNESS SCORES GENERATED BY MAPTITUDE WITH A

18   MEAN AVERAGE AT THE TOP LINE, AND THEN BELOW FOR THE NEXT

19   COUPLE OF PAGES YOU SEE THE SCORES FOR THE INDIVIDUAL

20   DISTRICTS.

21   **Q.**   OKAY.  AND THE FIRST COLUMN IN THIS EXHIBIT IS TITLED

22   "REOCK."  WHAT IS "REOCK"?

23   **A.**   "REOCK" IS ONE WAY TO MEASURE COMPACTNESS, AND IT'S AN

24   AREA-BASED SCORE THAT IS DERIVED BY SIMPLY DRAWING A CIRCLE

25   AROUND THE AREA OF THE DISTRICT, AND THEN WITH FURTHER

WILLIAM S. COOPER

09:25  1    MATHEMATICAL PERMUTATIONS, YOU GET A SCORE BETWEEN ZERO AND

2    ONE, WHERE ONE WOULD BE A PERFECT CIRCLE.  DISTRICTS ARE NEVER

3    PERFECT CIRCLES OR HARDLY EVER.  AND MOST DISTRICTS I THINK IN

4    MY EXPERIENCE GENERALLY FALL IN A RANGE BETWEEN OF .20 AND .40

5    OR 50; RARELY DO YOU SEE ANYTHING MUCH HIGHER THAN THAT.

6    **Q.**   AND WHAT IS THIS NEXT MEASURE TITLED "POLSBY-POPPER"?

7    **A.**   THAT IS A PERIMETER-BASED MEASURE THAT, AGAIN, INVOLVES

8    DRAWING A CIRCLE AROUND THE DISTRICT, AND THEN YOU MEASURE THE

9    PERIMETER OF THE DISTRICT.  AND, AGAIN, WITH A FEW MORE

10    MATHEMATICAL CALCULATIONS TO GET A SCORE.

11         POLSBY-POPPER SCORES ARE ALMOST INVARIABLY LOWER THAN

12    REOCK SCORES JUST BECAUSE OF THE NATURE OF THE CALCULATION.

13    AND SO THAT'S THE SECOND CHECK.  AND THOSE TWO, REOCK AND

14    POLSBY-POPPER, ARE THE TWO MOST COMMONLY-REFERENCED COMPACTNESS

15    SCORES BY EXPERTS AND STATE LEGISLATURES.

16         I ALSO INCLUDED ANOTHER SCORE HERE CALLED THE

17    AREA/CONVEX HULL.  THAT IS SIMILAR TO POLSBY-POPPER IN THAT IT

18    IS A PERIMETER BASED SCORE THAT ALSO INCORPORATES AREA TO A

19    CERTAIN EXTENT BECAUSE IT DISCOUNTS FOR SOME ODD-SHAPED

20    DISTRICTS THAT ARE PERHAPS ODD SHAPED BECAUSE THEY ARE RIVER

21    BANKS AND MUNICIPALITIES THAT HAVE ODD SHAPES.  IT'S A WAY TO

22    TAKE POINTS FROM THE PERIMETER, EXPAND THEM OUT, AND THEN DRAW

23    A POLYGON AROUND THOSE POINTS, AND THEN DRAW THE CIRCLE AROUND

24    THE POLYGON.  AND SO YOU GET A HIGHER SCORE FOR THE AREA/CONVEX

25    HULL TYPICALLY.  AND IT'S A -- IT'S A WAY TO TAKE INTO ACCOUNT

WILLIAM S. COOPER

09:27 1    SOME AREAS THAT APPEAR TO HAVE VERY LOW SCORES UNDER

2    POLSBY-POPPER, BUT PERHAPS FOR A GOOD REASON IF YOU ARE

3    FOLLOWING THE MISSISSIPPI RIVER OR FOLLOWING A MUNICIPAL

4    BOUNDARY, WHICH OFTENTIMES CAN BE ODD SHAPED.

5    **Q.**    SO WHY DID YOU USE OR REPORT ALL THREE TESTS HERE?

6    **A.**    WHY DID I?

7    **Q.**    YES.

8    **A.**    BECAUSE THAT'S JUST THREE DIFFERENT WAYS TO LOOK AT

9    COMPACTNESS SCORES.  MAPTITUDE FOR REDISTRICTING ACTUALLY

10    GENERATES A DOZEN OF THOSE, MAYBE 13.  AND IN RESPONSE TO THE

11    DEFENDANTS' EXPERTS IN MY REBUTTAL REPORT, I ACTUALLY PRODUCED

12    THE SCORES -- ALL THE SCORES THAT ARE PRODUCED IN MAPTITUDE.

13    AND SO THOSE CHARTS ARE IN MY REBUTTAL DECLARATION.

14        AND BASICALLY THE SENATE PLAN IS UNQUESTIONABLY MORE

15    COMPACT, THE ILLUSTRATIVE SENATE PLAN THAN THE ENACTED SENATE

16    PLAN.

17        THE HOUSE PLAN FOR THE ENACTED AND ILLUSTRATIVE PLANS

18    ARE ABOUT THE SAME IN TERMS OF COMPACTNESS.  SO THERE IS NO

19    REAL COMPACTNESS ISSUE HERE AT ALL.

20    **Q.**    AND DO YOU LOOK AT MULTIPLE COMPACTNESS SCORES WHEN YOU'RE

21    DRAWING YOUR MAP?

22    **A.**    I OCCASIONALLY LOOK AT COMPACTNESS SCORES.  I DON'T -- I'M

23    NOT CONSTANTLY LOOKING AT IT ON THE SCREEN, THOUGH.  IT'S JUST

24    IF I'M CURIOUS AS TO WHETHER IT'S A DISTRICT THAT HAS A

25    REASONABLY HIGH OR LOW COMPACTNESS MEASURE, I'LL TAKE A LOOK AT

WILLIAM S. COOPER

09:28 1    IT.  BUT MORE OFTEN THAN NOT, I'M JUST DOING A VISUAL ANALYSIS.

2    **Q.**    AND WHY DO YOU RUN THESE TESTS AT THE END OF YOUR MAP

3    DRAWING PROCESS ON COMPACTNESS?

4    **A.**    JUST FOR THE RECORD SO THAT IT'S CLEAR WHAT THESE SCORES

5    SHOW.  SO I ALWAYS WOULD INCLUDE AN EXHIBIT SHOWING THE

6    MEASURES OF COMPACTNESS REPORT FROM MAPTITUDE.

7    **Q.**    DID DR. MURRAY DISCUSS -- SORRY.  STRIKE THAT.

8         I'LL START OVER.  DID YOU REVIEW -- I BELIEVE YOU

9    TESTIFIED YESTERDAY THAT YOU REVIEWED DR. MURRAY'S REPORT.  IS

10   THAT CORRECT?

11   **A.**    I DID REVIEW HIS REBUTTAL REPORT, YES.

12   **Q.**    AND DO YOU RECALL WHETHER HE DISCUSSED YOUR COMPACTNESS

13   MEASURES?

14   **A.**    HE DISCUSSED THE COMPACTNESS MEASURES.  HE'S USING A

15   DIFFERENT SOFTWARE PROGRAM.  AND SO HE HAD SLIGHTLY DIFFERENT

16   FINAL NUMBERS, BUT NOTHING OF CONSEQUENCE.  AND I DON'T -- I

17   DON'T HAVE -- I THINK HE WAS USING A PYTHON OR MAYBE RGIS, AND

18   I DON'T HAVE THAT SOFTWARE.  SO I CAN'T REALLY VOUCH FOR THE

19   ACCURACY OF HIS REPORT IN THAT SENSE IN TERMS OF COMPACTNESS.

20   BUT THE DIFFERENCES ARE DE MINIMIS REALLY.

21        HE COMPLAINED ABOUT MY DECISION TO JUST ROUND THINGS

22   TO THE HUNDREDTHS INSTEAD OF TO THE THOUSANDS POINT OR

23   SOMETHING.  I DON'T KNOW.  BUT MAPTITUDE JUST GENERATES THESE

24   NUMBERS AT THE HUNDREDTH POINT.  IT GOES NO FURTHER.  AND IF

25   THERE'S A DIFFERENCE OF A COUPLE HUNDREDTHS POINTS, IT'S NOT

WILLIAM S. COOPER

09:30 1  GOING TO MATTER IN THE END.

2  **Q.**   AND DID YOU RECORD YOUR OPINIONS OF DR. MURRAY'S ANALYSIS

3  IN YOUR REBUTTAL REPORT, WHICH HAS ALREADY BEEN ADMITTED AS

4  EXHIBIT 89?

5  **A.**   YES.

6          **MR. TUCKER:**  YOUR HONOR, WE OBJECT TO ANY TESTIMONY

7  IN PLAINTIFFS' CASE-IN-CHIEF ABOUT THE REBUTTAL REPORTS OF DR.

8  MURRAY.  IF THE PLAINTIFFS WANT TO ADDRESS THAT, THAT CAN BE

9  ADDRESSED IN THEIR REBUTTAL CASE OR AT LEAST IN THE

10 ALTERNATIVE, PLAINTIFFS IF THEY WANT TO DO -- WHAT WE HAD ONE

11 JUDGE REFER TO AS A PREBUTTAL AND ADDRESS THOSE NOW AND THEY

12 SHOULDN'T BE PERMITTED TO THEN LATER ALSO ADDRESS THEM AGAIN IN

13 THEIR REBUTTAL CASE.

14         **THE COURT:**  DO YOU WANT TO RESPOND, MS. THOMAS?

15         **MS. THOMAS:**  YES, YOUR HONOR.  MR. COOPER IS HERE

16 FROM OUT OF TOWN.  HE HAS BEEN GIVING HIS TIME.  THE REBUTTAL

17 REPORTS HAVE ALREADY BEEN ADMITTED WITHOUT OBJECTION OF

18 OPPOSING COUNSEL.  FOR COURT EFFICIENCY, IT MAKES MUCH MORE

19 SENSE FOR MR. COOPER TO GIVE ALL OF HIS TESTIMONY AND NOT TO

20 STAY HERE FOR DAYS, ESPECIALLY WHEN THEIR WITNESSES AREN'T

21 AVAILABLE AND BE CALLED BACK.

22         **MR. TUCKER:**  YOUR HONOR, IF PLAINTIFFS ARE

23 REPRESENTING THAT THEY ARE NOT TO GOING TO CALL HIM AGAIN IN

24 THEIR REBUTTAL CASE, THEN WE HAVE NO OBJECTION.

25         **THE COURT:**  I THINK THAT'S HIS ISSUE.  HE DOESN'T

WILLIAM S. COOPER

09:31 1    WANT YOU TO GET TWO BITES AT THE APPLE.

2                MS. THOMAS:  HE'S NOT COMING BACK.

3                THE COURT:  ALL RIGHT.  THEN I'LL ALLOW THE QUESTION.

4                MR. TUCKER:  THANK YOU, YOUR HONOR.

5                THE COURT:  YOU'LL WITHDRAW YOUR OBJECTION, I ASSUME?

6                MR. TUCKER:  I WITHDRAW THE OBJECTION.

7                THE COURT:  THANK YOU.

8                MS. THOMAS:  ALL RIGHT.  SO I BELIEVE THE OBJECTION

9     WAS WITHDRAWN AND THE WITNESS HAD ALREADY ANSWERED THE QUESTION

10    PRIOR TO THE OBJECTION.

11               THE COURT:  I DON'T KNOW IF THE WITNESS ANSWERED THE

12    QUESTION BECAUSE I WAS TRYING TO LISTEN TO THE OBJECTIONS.  SO

13    IF YOU WANT TO GET IT TO MAKE SURE IT'S ON THE RECORD, YOU MAY

14    ASK IT AGAIN.

15               MS. THOMAS:  OKAY.

16    BY MS. THOMAS:

17    Q.   WERE YOUR OPINIONS OF MR. MURRAY'S COMPACTNESS' ANALYSIS

18    REFLECTED IN YOUR REBUTTAL REPORT, WHICH IS MARKED AS EXHIBIT

19    89?

20    A.   WELL, THE POINT IS THERE'S REALLY NO MEANINGFUL DISPUTE

21    BETWEEN MYSELF AND MR. MURRAY, DR. MURRAY, ON COMPACTNESS.  THE

22    REST OF HIS REPORT I HAVE MAJOR ISSUES WITH, BUT I THINK HE

23    WOULD AGREE THAT THE DIFFERENCES IN THE COMPACTNESS SCORES ARE

24    DE MINIMIS.

25    Q.   OKAY.  DID YOU REVIEW DR. TRENDE'S REPORT?

WILLIAM S. COOPER

09:32 1    **A.**   I DID.

2    **Q.**   AND DID DR. TRENDE'S REPORT PURPORT TO ANSWER THE *GINGLES*

3    *1* COMPACTNESS QUESTION?

4    **A.**   IT PURPORTS TO ANSWER THAT.  IT'S TOTALLY MISPLACED IN

5    THIS CASE.  IT HAS NOTHING TO DO WITH TRADITIONAL REDISTRICTING

6    PRINCIPLES.  THE METHODOLOGY HE EMPLOYS IS JUST NOT APPROPRIATE

7    FOR A *GINGLES 1* CASE.  IT IS NOT A REQUIREMENT THAT THE

8    MINORITY POPULATION BE DETERMINED BY THE MOMENT OF INERTIA

9    METHODOLOGY.  IT IS WAY OFF BASE.  I CAN'T SAY THAT ENOUGH.

10   IT'S SORT OF LIKE -- I DON'T KNOW.  IT'S THE REDISTRICTING

11   EQUIVALENT, WHICH IS DESIGNED -- AND IT'S DESIGNED TO FAIL JUST

12   LIKE COUNTING BEANS IN A JAR IS DESIGNED TO FAIL FOR VOTER

13   REGISTRATION.  IT'S MISPLACED AND IT SHOULD NEVER BE ACCEPTED

14   AND AS AN APPROPRIATE WAY TO DETERMINE WHETHER ONE CAN DRAW A

15   *GINGLES 1* COMPLIANT DISTRICT AND MEET THE COMPACTNESS

16   REQUIREMENT.

17   **Q.**   IN YOUR 55 CASES IN WHICH YOU'VE TESTIFIED IN VOTING, ARE

18   YOU AWARE OF ANY OTHER EXPERT USING MR. TRENDE'S ANALYSIS?

19   **A.**   NO, I'M NOT.  AND, YOU KNOW, I LOOKED AT THE -- MR. TRENDE

20   WAS THE SPECIAL MASTER FOR THE VIRGINIA REDISTRICTING

21   COMMISSION, AND HE DIDN'T -- AS BEST I CAN TELL, HE DIDN'T

22   REPORT A MOMENT OF INERTIA COMPACTNESS TEST FOR ANY OF THE

23   DISTRICTS HE DREW IN PLACES LIKE --

24          **MR. TUCKER:**  OBJECTION, YOUR HONOR.  MR. TRENDE'S

25   TESTIMONY ABOUT WHAT HE MAY OR MAY NOT HAVE DONE IN ANOTHER

09:34 1    CASE DOESN'T SEEM RELEVANT TO WHAT HE DID IN THIS CASE.

2              **THE COURT:**  DO YOU WANT TO RESPOND?

3              **MS. THOMAS:**  WELL, CERTAINLY IT'S RELEVANT AS WE

4    OUTLINED IN OUR *DAUBERT* MOTION ABOUT THE PROVIDENCE OF USING

5    THIS MEASURE TO DEFINE COMPACTNESS AS IT IS DEFINED IN *GINGLES*

6    *1.*  AND MR. COOPER IS OUR *GINGLES 1* EXPERT WHO HAS PREVIOUSLY

7    TESTIFIED THAT HE REVIEWED MR. TRENDE'S WORK, AND THIS IS HIS

8    OPINION ABOUT MR. TRENDE'S WORK GIVEN MR. COOPER'S OWN

9    EXPERIENCE AND KNOWLEDGE OF BOTH EXPERTS IN GENERAL.  AND I

10   BELIEVE IT'S NOW DR. TRENDE, BUT IT WAS MR. TRENDE AT THE TIME

11   OF WRITING THE REPORT -- DR. TRENDE'S WORK.

12             **THE COURT:**  THE COURT IS GOING TO OVERRULE THE

13   OBJECTION.  THE COURT -- THIS IS HELPFUL TO THE TRIER OF FACT

14   TO UNDERSTAND THE DIFFERENT METHODOLOGIES AND TO ALSO GAIN SOME

15   AWARENESS AND UNDERSTANDING OF WHAT THE ACCEPTED METHODOLOGIES

16   IN THE FIELD ARE.  THE OBJECTION IS OVERRULED.

17   **BY MS. THOMAS:**

18   **Q.**   GOING BACK TO OUR LINE OF QUESTIONING.  DR. TRENDE

19   PURPORTS TO ANSWER THE QUESTION OF WHETHER THE MINORITY

20   POPULATION IS SUFFICIENTLY COMPACT.  DO YOU BELIEVE YOUR

21   ANALYSIS ANSWERS THIS QUESTION?

22   **A.**   YES, I DO.  AND I BELIEVE HIS ANALYSIS DOES NOT.

23   **Q.**   AND HAVE COURTS ACCEPTED YOUR ANALYSIS ON WHETHER THE

24   MINORITY POPULATION IS SUFFICIENTLY COMPACT AS DEFINED IN

25   *GINGLES 1* IN THE PAST?

WILLIAM S. COOPER

09:36 1  A.   YES.

2  Q.   NOW WE'VE SPENT SOME TIME EARLIER DISCUSSING TRADITIONAL

3  REDISTRICTING PRINCIPLES.  DO YOU RECALL THAT?

4  A.   PARDON?

5  Q.   WE SPENT SOME TIME EARLIER DISCUSSING TRADITIONAL

6  REDISTRICTING PRINCIPLES.  DO YOU RECALL THAT?

7  A.   YES.

8  Q.   OKAY.  AND DO YOU RECALL WHETHER THE STATE HAD PUBLISHED

9  WHICH TRADITIONAL REDISTRICTING PRINCIPLES SHOULD BE

10  PRIORITIZED IN MAP DRAWING IN LOUISIANA?

11  A.   YES, IN WHAT IS KNOWN AS JOINT RULE 21.  THAT WAS POSTED

12  ON THE LEGISLATURE'S WEBSITE IN EARLY 2022, I THINK.

13  Q.   ALL RIGHT.  I WOULD LIKE TO PULL UP WHAT HAS BEEN

14  PREADMITTED AS JOINT EXHIBIT 56.

15          AND DO YOU RECOGNIZE THIS DOCUMENT?

16  A.   YES.

17  Q.   WHAT IS IT?

18  A.   IT IS JOINT RULE 21, AS BEST I CAN TELL.

19  Q.   AND DID YOU CONSULT JOINT RULE 21 WHEN DRAWING YOUR MAPS?

20  A.   I DID REVIEW IT, YES.

21  Q.   AND DID THE METHODOLOGY YOU USED TO DRAW YOUR MAPS ALIGN

22  WITH JOINT RULE 21?

23  A.   I BELIEVE IT DOES.

24  Q.   DOES JOINT RULE 21 INCLUDE COMPLIANCE WITH THE VOTING

25  RIGHTS ACT?

WILLIAM S. COOPER

09:37  1    **A.**    IT DOES.

2    **Q.**    AND DOES JOINT RULE 21 INCLUDE A CONTIGUITY REQUIREMENT?

3    **A.**    IT DOES.

4    **Q.**    AND WHAT IS "CONTIGUITY"?

5    **A.**    THAT ALL PIECES OF THE DISTRICT NEED TO MEET UP AT SOME

6    POINT.

7    **Q.**    AND HOW DID YOU ACCOUNT FOR CONTIGUITY IN YOUR MAP

8    DRAWING?

9    **A.**    MAPTITUDE HAS A CHECK, A LITTLE MODULE THAT YOU CAN JUST

10    PRESS A BUTTON; IT'LL TELL YOU IF THERE'S NOT A CONTIGUOUS

11    DISTRICT IN FRONT OF YOU.

12    **Q.**    AND DOES JOINT RULE 21 ACCOUNT FOR EQUAL POPULATION?

13    **A.**    IT DOES.  IT ALLOWS FOR -- I THINK MAYBE -- IN MY REPORT I

14    MAY HAVE SUGGESTED THAT THERE WAS NO CLARITY AS TO EXACTLY WHAT

15    RANGE THE STATE IS USING.  BUT I BELIEVE THEY DID ACTUALLY SAY

16    SOMEWHERE IN JOINT RULE 21 THAT PLUS OR MINUS 5 PERCENT WAS THE

17    ACCEPTED RANGE, AND THAT'S A TYPICAL RANGE FOR A TYPICAL STATE

18    LEGISLATIVE PLAN.  SOME ARE TIGHTER ON THAT.

19              BUT IN LOUISIANA IT'S PLUS OR MINUS 5 PERCENT AND

20    THAT'S A GOOD IDEA BECAUSE LOUISIANA'S GOT COMPLEX GEOGRAPHY,

21    AND SO IT DOES MAKE IT EASIER TO DRAW THE LEGISLATIVE PLANS.

22    **Q.**    AND DID YOU USE THE PLUS OR MINUS 5 PERCENT WHEN DRAWING

23    YOUR MAPS?

24    **A.**    YES.

25    **Q.**    DO YOU RECALL WHETHER DR. MURRAY CRITIQUED YOUR

WILLIAM S. COOPER

09:38 1    ONE-PERSON, ONE-VOTE ANALYSIS?

2    **A.**   YES.  HE SEEMS TO BE A FISH OUT OF WATER IN THIS CASE.  HE

3    DIDN'T EVEN SEEM TO KNOW HOW TO CALCULATE WHAT IS UNDERSTOOD TO

4    BE TOTAL DEVIATION.  HE TOOK AN AVERAGE, AND THEN CLAIMED

5    BECAUSE HE TOOK THE AVERAGE OF ALL OF THE DEVIATIONS THAT

6    SOMEHOW OR ANOTHER MY PLAN DIDN'T ADHERE TO THE ONE-PERSON,

7    ONE-VOTE REQUIREMENT OR THAT MY NUMBERS WERE WRONG ANY WAY.

8    AND HE, IN FACT, IS WRONG AND I'M RIGHT.  HE DID THAT

9    THROUGHOUT HIS REPORT, AND IN EVERY INSTANCE, AS BEST I CAN

10    TELL, HE'S WRONG, I'M RIGHT.

11    **Q.**   AND DID YOU RECORD YOUR THOUGHTS ON DR. MURRAY'S

12    ONE-PERSON, ONE-VOTE, ALSO KNOWN AS EQUAL POPULATION ANALYSIS

13    IN YOUR REBUTTAL REPORT?

14    **A.**   YES.  AND COULD I SAY ONE THING ABOUT HIS REPORT AND THE

15    OTHER EXPERT'S REPORT?  THEY ARE CORRECT THAT I HAD USED

16    MISTAKENLY A COMMITTEE PLAN FROM 2022 INSTEAD OF THE FINAL

17    ENACTED PLAN FROM 2022 HOUSE AND SENATE.  AND SO THEY SPENT,

18    YOU KNOW, I DON'T KNOW HOW MUCH TIME DETERMINING HOW THOSE

19    PLANS DIFFERED IN THEIR REPORTS, AND I HAVE NO COMPLAINT WITH

20    THEIR ASSESSMENT THERE.  I USED THE WRONG PLAN.  IT'S REAL

21    SIMPLE, AND I FIXED THAT IN THE 2023 DECLARATION I FILED.

22    **Q.**   OKAY.  GOING BACK TO RULE 21, DID IT HAVE ANY GUIDELINES

23    ABOUT DIVISION SPLITS?

24    **A.**   ABOUT DIVISION SPLITS?

25    **Q.**   YES.

WILLIAM S. COOPER

09:40  1  **A.**   YOU MEAN IN TERMS OF -- YOU MEAN IN TERMS OF PRECINCTS AND
       2  MUNICIPALITIES?
       3  **Q.**   YES, SIR.
       4  **A.**   YES.  YES.
       5  **Q.**   OKAY.  AND WHAT WERE THOSE GUIDELINES?
       6  **A.**   TO THE EXTENT POSSIBLE, PRECINCTS SHOULD BE KEPT WHOLE.
       7  AND TO THE EXTENT POSSIBLE, MUNICIPALITIES, BOUNDARIES SHOULD
       8  BE KEPT WHOLE.  OFTEN IT ISN'T POSSIBLE, BUT I THINK THERE
       9  ARE -- I'M NOT LOOKING AT THE ACTUAL LANGUAGE, BUT THAT'S THE
      10  CRUX OF IT.
      11  **Q.**   OKAY.  AND DID YOU FOLLOW THIS GUIDANCE WHEN DRAWING YOUR
      12  MAPS?
      13  **A.**   YES.
      14  **Q.**   DID YOU ALSO REVIEW THE REPORT OF DR. JOHNSON?
      15  **A.**   I DID.
      16  **Q.**   AND DID DR. JOHNSON DISCUSS YOUR SPLITS IN HIS ANALYSIS?
      17  **A.**   I THINK HE DID.
      18  **Q.**   OKAY.  AND DID YOU RECORD YOUR OPINION OF DR. JOHNSON'S
      19  ANALYSIS IN YOUR REBUTTAL REPORT?
      20  **A.**   I DID.  AND I STAND BY THAT.
      21  **Q.**   SO WE DISCUSSED A FEW TRADITIONAL REDISTRICTING CRITERIA
      22  THAT WERE PRESENTED IN RULE 21.  DID YOU CONSIDER ANY OTHER
      23  TRADITIONAL REDISTRICTING CRITERIA WHEN DRAWING YOUR MAPS?
      24  **A.**   WELL, I THINK RULE 21 ON THE WHOLE BASICALLY ENCOMPASSES
      25  ALL OF WHAT I WOULD CONSIDER TO BE THE TRADITIONAL

WILLIAM S. COOPER

09:41 1    REDISTRICTING PRINCIPLES, BUT AS I MENTIONED, I WAS PAYING
2    ATTENTION TO WHERE THE INCUMBENTS LIVED.
3    **Q.**    IN DRAWING YOUR -- ARE YOU FAMILIAR WITH THE TERM
4    "COMMUNITIES OF INTEREST"?
5    **A.**    YES.
6    **Q.**    AND I BELIEVE YOU'VE ALREADY TESTIFIED THAT THAT WAS ONE
7    THING THAT YOU CONSIDERED WHEN DRAWING YOUR MAP.  IS THAT
8    CORRECT?
9    **A.**    THAT'S CORRECT.
10    **Q.**    AND HOW DID COMMUNITIES OF INTEREST PLAY A ROLE IN YOUR
11    MAP DRAWING?
12    **A.**    WELL, I HAVE IN MY REPORT VARIOUS REGIONS OF THE STATE
13    THAT I WAS EXAMINING AS I WAS DRAWING THE DISTRICTS.  I LOOKED
14    AT THE CULTURAL REGIONS LIKE ACADIANA, WHICH IS ACTUALLY
15    DEFINED BY THE STATE LEGISLATURE, AND ALSO HAD IN ONE OF THE
16    EXHIBITS OR ONE OF THE FIGURES IN MY DECLARATION, I SHOW WHAT
17    IS CONSIDERED TO BE THE DELTA, ROUGHLY 12 PARISHES IN THE
18    NORTHEAST PART OF THE STATE, AND AT LEAST ONE DEFINITION FOR
19    THE RIVER PARISHES AND A TIGHTER DEFINITION FOR I GUESS WHAT IS
20    CALLED THE CAJUN HEARTLAND AND, OF COURSE, THE FLORIDA
21    PARISHES.  SO I WAS LOOKING AT THOSE AS REGIONS THAT I SHOULD
22    TRY TO KEEP TOGETHER TO THE EXTENT POSSIBLE.
23         I ALSO LOOKED AT OTHER REGIONS THAT ARE IMPORTANT,
24    LIKE THE PLANNING DISTRICTS THAT ENCOMPASS ALL OF THE PARISHES
25    IN CADDO.  I DIVIDED I THINK INTO EIGHT DIFFERENT PLANNING

WILLIAM S. COOPER

09:43 1   DISTRICTS STATEWIDE, AND THEN I LOOKED AT METROPOLITAN
2   STATISTICAL AREAS AS ANOTHER WAY TO LOOK AT REGIONS IN THE
3   STATE AND, OF COURSE, PARISHES AND MUNICIPALITIES.
4         AND, AGAIN, THE OTHER EXPERTS IN THIS REPORT DON'T
5   SEEM TO UNDERSTAND THAT I USED MUNICIPALITIES WHEN DOING A
6   CALCULATION AT THE SPLITS.  I DID NOT INCLUDE -- I INCORPORATED
7   PLACES AS THEY SEEM TO IMPLY.  THEY'RE JUST COMPLETELY WRONG
8   THERE.  DR. MURRAY IS WRONG, AND DR. JOHNSON IS WRONG ON THAT
9   SCORE AS WELL.
10        I DON'T THINK DR. TRENDE EVEN BOTHERED TO LOOK AT
11   ANYTHING OTHER THAN THE MOMENT OF INERTIA TO DECLARE THAT
12   SEVERAL OF THE DISTRICTS THAT ARE DEEMED MAJORITY-MINORITY
13   DISTRICTS THAT I'VE DRAWN ARE SOMEHOW OR ANOTHER NOT COMPACT,
14   WHICH, OF COURSE, IS ERRONEOUS BUT MISPLACED.
15   **Q.**   DID CORE RETENTION PLAY ANY ROLE IN YOUR MAP DRAWING?
16   **A.**   YES.  I WAS AWARE OF CORE RETENTION.  AND IN MY
17   DECLARATION -- I DON'T HAVE THE PARAGRAPH IN FRONT OF ME, BUT
18   IT -- I ACTUALLY DO A CALCULATION TO SHOW HOW MANY -- WHAT --
19   THE PERCENTAGE OF THE POPULATION THAT IS KEPT TOGETHER GOING
20   FROM THE ENACTED PLANS TO THE ILLUSTRATIVE PLANS.  AND I THINK
21   IN THE ENACTED HOUSE PLAN ABOUT 74 PERCENT OF THE POPULATION,
22   IT STILL STAYS TOGETHER FROM ONE PLAN TO ANOTHER.  AND IN THE
23   SENATE PLAN, I BELIEVE IT'S 78 PERCENT.
24        SO THERE'S -- THE ORIGINAL ENACTED PLAN, I BELIEVE,
25   WHEN YOU COMPARE IT AGAINST THE 2011 PLAN, HAD SCORES IN THE

WILLIAM S. COOPER

09:45 1   LOW 80S.  SO I WAS NOT THAT FAR FROM WHAT THE STATE DID IN

2   OBSERVING CORE RETENTION AS WHEN THEY WERE DRAWING THE ENACTED

3   PLAN VERSUS THE 2011 ILLUSTRATIVE -- VERSUS THE 2011 BENCHMARK

4   PLANS.

5   **Q.**   IF WE COULD -- I BELIEVE YOU JUST SAID YOU HAD SOME PARTS

6   OF YOUR REPORT THAT DISCUSSED YOUR CORE RETENTION METRICS.  IF

7   WE COULD PULL UP WHAT IS MARKED AND ALREADY ADMITTED AS

8   PLAINTIFF EXHIBIT 57, WHICH I BELIEVE IS EXHIBIT L-2.

9         COULD YOU DESCRIBE THIS REPORT TO US, PLEASE?

10   **A.**   YES.  THIS REPORT IS HOW I DERIVED THE CORE RETENTION

11   PERCENTAGES I JUST REPORTED.  IF YOU TAKE, FOR EXAMPLE,

12   ILLUSTRATIVE HOUSE -- THIS IS ILLUSTRATIVE HOUSE DISTRICT PLAN

13   FROM THE 2023 VERSION.  AND YOU CAN SEE THAT THE BULK OF THE

14   POPULATION IN HOUSE DISTRICT 1 CAME FROM ENROLLED DISTRICT 1,

15   AND THAT'S WITH THE GRAY LINE.

16         SO I GET THE CALCULATION OF -- I THINK IT'S ROUGHLY

17   74 PERCENT CORE RETENTION BY JUST ADDING UP ALL OF THESE GRAY

18   SHADED ROWS BECAUSE THOSE ARE THE ROWS WHERE THE BULK OF THE

19   POPULATION IN ANY GIVEN DISTRICT HAS BEEN DRAWN TO INCLUDE PART

20   OF ANOTHER DISTRICT IN THE ENROLLED PLAN.  SO YOU CAN SEE THERE

21   ARE THREE DISTRICTS THAT ARE PART OF THE ILLUSTRATIVE HOUSE

22   DISTRICT 1.  ILLUSTRATIVE HOUSE DISTRICT 1 IS DRAWN FROM

23   ENROLLED DISTRICTS 1, 2, AND 4.  BUT 45 PERCENT OF THE

24   POPULATION COMES FROM ILLUSTRATIVE -- FROM ENROLLED DISTRICT 1.

25         AND THEN IF YOU LOOK AT HOUSE DISTRICT 2, YOU CAN SEE

09:47 1    THAT 78 PERCENT OF HOUSE DISTRICT 2 IN THE ILLUSTRATIVE PLAN
2    COMES FROM ENROLLED DISTRICT 2.
3              SO IN THAT FASHION YOU CAN GO DOWN THROUGH ALL 105
4    DISTRICTS TO SEE WHERE THE BULK OF THE POPULATION IS COMING, IF
5    THERE IS ANY CHANGE AT ALL.  I DID MANAGE TO KEEP 40 DISTRICTS
6    INTACT WITH NO CHANGES IN THE ILLUSTRATIVE HOUSE PLAN OUT OF
7    105.
8    Q.   AND I BELIEVE YOU'RE USING THE TERM "ENROLLED PLAN," AND I
9    MAY SOMETIMES USE THE TERM "ENACTED PLAN," BUT THEY MEAN THE
10   SAME THING.  IS THAT CORRECT?
11   A.   YES.
12   Q.   OKAY.  NOW, IF WE COULD TURN TO WHAT HAS BEEN ADMITTED AS
13   PLAINTIFF EXHIBIT 76.
14             AND WHAT DOES THIS EXHIBIT SHOW US, MR. COOPER?
15   A.   WELL, THIS IS THE SAME THING, EXCEPT IT'S FOR THE SENATE
16   PLAN.  AND HERE AGAIN YOU CAN SEE FOR ILLUSTRATIVE SENATE
17   DISTRICT 1, 96 PERCENT OF THE POPULATION IN THAT DISTRICT CAME
18   FROM ENROLLED OR ENACTED DISTRICT 1.
19   Q.   NOW, WE'VE DISCUSSED A NUMBER OF REDISTRICTING CRITERIA.
20   DID YOU PRIORITIZE ONE REDISTRICTING CRITERIA OVER THE OTHER
21   WHEN DRAWING YOUR MAPS?
22   A.   ABSOLUTELY NOT.  I WAS CONSTANTLY BALANCING, CONSTANTLY
23   BALANCING.
24   Q.   AND USING THE TRADITIONAL REDISTRICTING PRINCIPLES, HOW
25   DID YOU GO ABOUT ASSESSING WHETHER ADDITIONAL MINORITY

WILLIAM S. COOPER

09:48  1  DISTRICTS COULD BE DRAWN?

2  **A.**   CAN YOU REPEAT THAT?

3  **Q.**   USING THE TRADITIONAL REDISTRICTING PRINCIPLES, HOW DID

4  YOU GO ABOUT ASSESSING WHETHER ADDITIONAL MINORITY DISTRICTS

5  COULD BE DRAWN?

6  **A.**   WELL, IT WAS A PROCESS.  I LOOKED AT DIFFERENT

7  CONFIGURATIONS AND FINALLY SETTLED ON THE ILLUSTRATIVE PLAN

8  THAT I'VE DRAWN.  BUT, YOU KNOW, IT'S NOT SOMETHING YOU SIT

9  DOWN AND DO IN AN AFTERNOON.  IT'S A PROCESS THAT TAKES SEVERAL

10  DAYS, IF NOT MORE.  THESE LEGISLATIVE PLANS ARE COMPLICATED.

11  **Q.**   AND WHAT WOULD YOU DO IF YOU COULD NOT DRAW A DISTRICT

12  WHILE ADHERING TO TRADITIONAL REDISTRICTING PRINCIPLES?

13  **A.**   WELL, THEN I DIDN'T DRAW THAT DISTRICT.

14  **Q.**   I'D LIKE TO NOW GO BACK TO PLAINTIFF EXHIBIT 20, PAGE 29,

15  FIGURE 13.

16         WHAT DOES THIS FIGURE SHOW US?

17  **A.**   WELL, THIS FIGURE JUST SHOWS WHERE I DREW THE ADDITIONAL

18  SENATE DISTRICTS.  SO I DREW ONE IN CADDO AND BOSSIER PARISH,

19  SENATE DISTRICT 38.  I DREW A SECOND ONE IN EAST BATON ROUGE IN

20  -- I'M SORRY -- IN EAST BATON ROUGE AND PART OF WEST FELICIANA

21  AND WEST BATON ROUGE AND IBERVILLE, AND THAT'S SENATE DISTRICT

22  17.  AND THEN I DREW ANOTHER ONE IN THE NEW ORLEANS MSA AND

23  THAT'S FIGURE -- DISTRICT 19, IN THE SOUTHEAST PART OF THE

24  STATE.

25  **Q.**   I'D LIKE TO NOW MOVE TO FIGURE 16 ON PAGE 35.

WILLIAM S. COOPER

09:50 1        WHAT DOES THIS FIGURE SHOW US?

2    **A.**   THIS FIGURE SHOWS THE PERCENTAGE OF THE VOTING-AGE

3    POPULATION THAT IS IN A MAJORITY DISTRICT THAT IS OF THE SAME

4    RACE AS THE POPULATION IN THE ROWS.  SO YOU CAN SEE THAT FOR

5    THE BLACK VOTING-AGE POPULATION IN THE STATE SENATE UNDER THE

6    2020 PLAN, JUST 53 PERCENT OF -- OR MAYBE CLOSER TO 54 PERCENT,

7    OF THE BLACK VOTING-AGE POPULATION LIVES IN A MAJORITY-BLACK

8    DISTRICT COMPARED TO 84.4 PERCENT OF THE WHITE POPULATION,

9    WHICH LIVES, IN FACT, IN A MAJORITY WHITE VOTING-AGE POPULATION

10   DISTRICT UNDER THE ENACTED OR ENROLLED SENATE PLAN.

11         IN SOME WAYS THIS IS SORT OF A PRELIMINARY

12   INDICATOR, A PRIMA FACIA INDICATOR OF CRACKING AND PACKING.  IF

13   YOU SEE THIS HUGE GAP -- WHILE IT DOESN'T PROVE THAT THERE'S

14   PACKING OR CRACKING, IT DRAWS ONE'S ATTENTION TO IT.  IT REALLY

15   DOES, BECAUSE -- AND YOU CAN SEE WHY THE BLACK POPULATION IN

16   THE STATE IS VERY CONCERNED ABOUT HOW THE DISTRICT LINES WERE

17   DRAWN IN THE 2022 ENACTED PLAN WHEN ONLY HALF OF THEM LIVE IN A

18   MAJORITY-BLACK DISTRICT, BUT ALMOST 85 PERCENT OF THE WHITE

19   POPULATION LIVES IN A MAJORITY-WHITE DISTRICT.  IT'S REALLY

20   STRIKING.  AND EVEN AFTER I'VE DRAWN THE ILLUSTRATIVE SENATE

21   PLAN, THERE'S STILL A MISMATCH THERE.

22         BUT AT LEAST UNDER THE ILLUSTRATIVE SENATE, ABOUT

23   61 PERCENT OF THE BLACK VOTING-AGE POPULATION WOULD LIVE IN A

24   MAJORITY-BLACK DISTRICT, AND THE WHITE-MAJORITY DISTRICTS WOULD

25   HAVE A -- SEE A SIMILAR DROP IN THE REVERSE DIRECTION SO THAT

WILLIAM S. COOPER

09:52   1   ONLY 78 PERCENT WOULD LIVE IN A MAJORITY-WHITE SENATE DISTRICT.
        2   **Q.**   DID --
        3   **A.**   SO THERE'S STILL A 17 PERCENTAGE POINT GAP.  THAT GAP CAN
        4   PROBABLY NEVER BE ELIMINATED NECESSARILY BECAUSE YOU HAVE TO
        5   COMPLY WITH THE TRADITIONAL REDISTRICTING PRINCIPLES AS YOU'RE
        6   DRAWING THE PLANS.  SO YOU CAN'T DRAW CRAZY DISTRICTS JUST TO
        7   END UP WITH TWO DISTRICTS IN PARITY IN TERMS OF VOTING-AGE
        8   POPULATION.
        9   **Q.**   AND DID DR. MURRAY DISCUSS THIS FIGURE IN HIS REPORT?
       10   **A.**   YES.  AND HE GOT IT TOTALLY WRONG.  I MEAN, I DON'T KNOW,
       11   MAYBE HE DIDN'T READ MY DECLARATION.  BUT HE JUST ADDED UP ALL
       12   OF THE -- ALL OF THE PERCENTAGES OF THE STATE SENATE PLAN THAT
       13   WERE MAJORITY BLACK, AND THEN ARRIVED AT A MEAN AVERAGE.  AND
       14   THEN IF YOU READ HIS INITIAL REPORT, HE, YOU KNOW, HAD TO GO IN
       15   THERE AND THEN CLAIM THAT HE WAS CORRECTING MY MISTAKE WHEN
       16   THERE WAS NEVER A MISTAKE AT ALL.  HE MISREAD OR DIDN'T EVEN
       17   UNDERSTAND THE POINT THAT I WAS TRYING TO MAKE WITH THIS CHART,
       18   WHICH I CONSIDER TO BE VERY IMPORTANT ACTUALLY.
       19   **Q.**   SO LET'S WALK THROUGH SOME OF YOUR SENATE DISTRICTS.  IF
       20   WE COULD NOW PULL UP WHAT IS ON PAGE 37, FIGURE 18 OF EXHIBIT
       21   20.
       22   **A.**   YES.
       23   **Q.**   OKAY.  WHAT DOES THIS FIGURE SHOW?
       24   **A.**   THIS ZOOMS IN ON NORTHWEST LOUISIANA.  AND YOU CAN SEE IN
       25   THE FIGURE IN THE BRIGHT RED OUTLINE THE ADDITIONAL MAJORITY

WILLIAM S. COOPER

09:53 1    BLACK DISTRICT THAT I DREW FOR THE BOSSIER-SHREVEPORT MSA,

2    SENATE DISTRICT 38.  CURRENTLY THERE IS ONLY ONE IN THAT AREA,

3    SENATE DISTRICT 39, EVEN THOUGH THAT PART OF THE STATE HAS THE

4    HIGHEST PERCENTAGE OF AFRICAN AMERICANS OF ANY OF THE MSAS.

5    **Q.**   AND IF WE COULD NOW TURN TO THE NEXT PAGE AND LOOK AT

6    FIGURE 19.

7            HOW DOES FIGURE 19 DIFFER FROM FIGURE 18?

8    **A.**   WELL, FIGURE 19 JUST OVERLAYS THE ADDITIONAL DISTRICT THAT

9    I DREW, WHICH IS SHOWN IN RED LINES ONTO A MAP OF THE ENACTED

10   PLAN FOR THE 2022 -- FROM THE 2022 SENATE PLAN.

11   **Q.**   AND FOCUSING ON THIS DISTRICT, HOW DID YOU DETERMINE THAT

12   A NEW ILLUSTRATIVE DISTRICT COULD BE DRAWN IN THIS PART OF THE

13   STATE?

14   **A.**   WELL, IT WAS FAIRLY CLEAR TO ME THAT SENATE DISTRICT 39

15   WAS PACKED.  I THINK IT'S -- I DON'T HAVE THE NUMBERS IN FRONT

16   OF ME.  BUT I THINK IT WAS APPROACHING 70 PERCENT BLACK.  AND I

17   THEN CONSIDERED WHETHER ADDITIONAL POPULATION IN THE CADDO

18   PARISH, BOSSIER CITY AREA COULD BE JOINED WITH SOME OF THAT

19   BLACK POPULATION FROM SENATE DISTRICT 29 TO CREATE A SECOND

20   DISTRICT IN THE AREA, AND IT TURNED OUT TO BE QUITE EASY.  IT'S

21   A VERY COMPACT DISTRICT.  IT INCLUDES PART OF CADDO PARISH AND

22   PART OF BOSSIER PARISH.

23   **Q.**   YOU WERE PRESENT ON MONDAY AT THE SEALED TESTIMONY OF MR.

24   MCCLANAHAN.  CORRECT?

25   **A.**   YES.

WILLIAM S. COOPER

09:55 1  **Q.**   AND ALSO PREVIOUS TO THAT SEALED TESTIMONY, YOU HAD BEEN
2  GIVEN THE ADDRESSES OF NAACP MEMBERS.  CORRECT?
3  **A.**   YES.
4  **Q.**   AND DID YOU REVIEW THE LOUISIANA NAACP'S SECOND
5  SUPPLEMENTAL RESPONSE TO THE SECRETARY OF STATE'S INTERROGATORY
6  NO. 3?
7  **A.**   YES.
8  **Q.**   AND WERE YOU ABLE TO TAKE THOSE ADDRESSES AND GEOCODE
9  THEM?
10  **A.**   YES.
11  **Q.**   AND WHAT WAS THE RESULT OF YOUR GEOCODING?
12  **A.**   WELL, I WAS ABLE TO THEN PRODUCE MAPS FOR THE COURT, I
13  THINK, THAT SHOW THAT THEY ARE NAACP MEMBERS IN ALL OF MY
14  ILLUSTRATIVE DISTRICTS.  AND THEY ALSO WERE PREVIOUSLY IN WHITE
15  MAJORITY DISTRICTS I BELIEVE.
16        **MR. TUCKER:**  YOUR HONOR, WE OBJECT.  WE OBJECT.  THIS
17  IS OUTSIDE THE SCOPE OF HIS EXPERT REPORT.
18        **MS. THOMAS:**  MAY I BE HEARD?
19        **THE COURT:**  YOU MAY.
20        **MS. THOMAS:**  OKAY.  UNTIL THE MAGISTRATE JUDGE RULED
21  ON THE QUESTION OF NAACP MEMBERSHIP, THIS WAS NOT AN ISSUE IN
22  THE CASE.  AS SOON IT WAS AN ISSUE, THE PLAINTIFF PROMPTLY
23  PROVIDED THOSE ADDRESSES TO DEFENSE COUNSEL ON MONDAY,
24  NOVEMBER 6TH.
25        ON TUESDAY, NOVEMBER 7TH, MR. TUCKER REQUESTED

WILLIAM S. COOPER

09:56  1    THAT HE BE ABLE TO SHARE THOSE ADDRESSES WITH HIS EXPERT, MR.

       2    JOHNSON -- DR. JOHNSON.  THAT WAS AFTER DR. JOHNSON SIGNED THE

       3    CONFIDENTIALITY ORDER.  THOSE WERE PROMPTLY PROVIDED TO DR.

       4    JOHNSON.  SO THERE IS NO PREJUDICE HERE, IN THAT THEIR EXPERT

       5    HAS THE SAME INFORMATION AS MR. COOPER.  THEY HAVE BEEN TOLD

       6    NUMEROUS TIMES THAT WE HAVE ALSO GEOCODED THOSE ADDRESSES.

       7    THEY WERE TOLD IN THE INTERROGATORY RESPONSES.  THEY WERE TOLD

       8    IN MR. MCCLANAHAN'S TESTIMONY.  AND WE BELIEVE THAT IT IS

       9    APPROPRIATE FOR OUR OWN EXPERT TO DO THE SAME ANALYSIS THAT

      10    THEIR EXPERT HAS DONE AND GEOCODE THE ADDRESSES WITH THE NAACP

      11    MEMBERS.  AND DR. JOHNSON CAN GIVE HIS OWN REBUTTAL TESTIMONY

      12    ON THE GEOCODING IF HE FINDS ANY DISCREPANCY.

      13         MR. TUCKER:  YOUR HONOR, THERE'S ASSUMPTIONS THAT

      14    WHAT DR. JOHNSON MAY OR MAY NOT TESTIFY TO IS, YOU KNOW, IN OUR

      15    CASE-IN-CHIEF ISN'T APPROPRIATE.

      16         THE COURT:  DID THEY WITH A CONFIDENTIALITY AGREEMENT

      17    GIVE YOU THE -- GIVE DR. JOHNSON THE ADDRESSES OF THE VARIOUS

      18    NAACP MEMBERS THAT MR. MCCLANAHAN DISCLOSED UNDER SEAL?

      19         MR. TUCKER:  WE RECEIVED THE ADDRESSES THROUGH THE

      20    INTERROGATORY RESPONSES.  BUT I THINK MY ISSUE HERE IS THERE

      21    COULD HAVE BEEN A SUPPLEMENT TO MR. COOPER'S REPORTS.  THEY

      22    COULD HAVE SUPPLEMENTED THE REPORTS WITH THESE MAPS, WITH THIS

      23    ADDITIONAL INFORMATION, AND THEY FAILED TO DO THAT.

      24         THE COURT:  OKAY.  WELL, IN THE INTEREST OF JUSTICE,

      25    YOUR OBJECTION IS OVERRULED.  AGAIN, I DO TAKE -- AS THE COURT

09:58 1    NOTED IN ITS REVIEW OF THE MAGISTRATE JUDGE'S RECOMMENDATIONS,
2    STANDING HAS ALWAYS BEEN AN ISSUE.  SO IT HAS BEEN KNOWN THAT
3    ORGANIZATIONAL AND/OR ASSOCIATIONAL STANDING OF THE NAACP -- OR
4    IT SHOULD HAVE BEEN KNOWN WAS AT ISSUE.  HOWEVER, BECAUSE OF
5    THE WAY THAT THE CASE DEVELOPED AND THE ORDER -- FRANKLY, THE
6    LATENESS OF THE ORDER OF THE MAGISTRATE JUDGE TO COMPEL THOSE
7    ADDRESSES, THERE WAS NOT SUFFICIENT TIME FOR THE EXPERTS TO
8    RESPOND IN WRITING.  AND SO IN THIS PARTICULAR INSTANCE,
9    BECAUSE THE DEFENSE EXPERT WAS GIVEN THE SAME INFORMATION AND
10   SIGNED A PROTECTIVE ORDER OR A CONFIDENTIALITY AGREEMENT TO USE
11   THAT INFORMATION AS HE MIGHT, THERE'S NO PREJUDICE, AND THE
12   COURT WILL ALLOW THE QUESTION.
13            MS. THOMAS:  THANK YOU, YOUR HONOR.
14            AND WE HAVE NO OBJECTION TO DR. JOHNSON
15   TESTIFYING ON HIS OWN GEOCODING.
16            THE COURT:  SO NOTED.
17   BY MS. THOMAS:
18   Q.   ALL RIGHT.  SO I AM NOW GOING TO PUT ON THE SCREEN WHAT
19   IS ILLUSTRATIVE AID 18 FOR THE PLAINTIFFS.
20            WHAT DOES THIS ILLUSTRATIVE AID REPRESENT?
21   A.   THIS SHOWS THE GEOCODED ADDRESS OF ONE OF THE NAACP
22   MEMBERS WHO LIVES IN SENATE DISTRICT 39.
23   Q.   AND IF WE COULD JUST ZOOM INTO THE RED SECTION.
24   A.   AND HERE YOU SEE THE OTHER NAACP MEMBER WHO LIVES IN
25   SHREVEPORT IN SENATE DISTRICT -- I'D HAVE TO ZOOM OUT AND SEE.

WILLIAM S. COOPER

10:00  1  BUT HE ALSO LIVES OR SHE ALSO LIVES IN THE NEW MAJORITY OR

 2  ADDITIONAL MAJORITY ILLUSTRATIVE DISTRICT 38.  AND I DIDN'T SEE

 3  THE NUMBER AGAIN, BUT THAT'S OKAY.

 4  **Q.**   ALL RIGHT.

 5  **A.**   THIRTY-EIGHT.  THAT'S THE OLD 38, YEAH.  SO THEY LIVE IN

 6  THE OLD 38 AND THE ADDITIONAL NEW ILLUSTRATIVE 38.

 7  **Q.**   AND IF WE COULD GO BACK TO FIGURE 19 ON PAGE 38.

 8         THE ONLY DIFFERENCE BETWEEN THE ILLUSTRATIVE AID THAT

 9  WE JUST LOOKED AT AND THIS FIGURE IN YOUR REPORT IS THE "X"

10  MARKING WHERE AN NAACP MEMBER LIVES.  CORRECT?

11  **A.**   YES.  IT'S AN ASTERISK, A LARGE ASTERISK.  BUT, YES.

12  **Q.**   OKAY.  IF WE COULD NOW MOVE TO PAGE 39, FIGURE 20 OF

13  EXHIBIT 20.

14         WHAT DOES THIS FIGURE SHOW?

15  **A.**   THIS SHOWS THE ILLUSTRATIVE SENATE DISTRICT I DREW IN THE

16  METROPOLITAN BATON ROUGE AREA.  IT WOULD INCLUDE PARTS OF EAST

17  BATON ROUGE, WEST BATON ROUGE, POINTE COUPEE, AND IBERVILLE.

18         AND I THINK I MISSPOKE A COUPLE OF MINUTES AGO AND

19  SAID PART OF IT WAS IN WEST FELICIANA, BUT IT'S ACTUALLY IN

20  POINTE COUPEE.

21  **Q.**   OKAY.

22  **A.**   IT'S ILLUSTRATIVE SENATE DISTRICT 17.

23  **Q.**   AND IF WE COULD NOW MOVE TO THE NEXT PAGE, PAGE 40, FIGURE

24  21.

25         WHAT DOES THIS FIGURE SHOW?

WILLIAM S. COOPER

10:01 1   **A.**   THIS SIMPLY OVERLAYS THE ILLUSTRATIVE SENATE DISTRICT 17
2   ONTO WHAT IS A MAP OF THE ENACTED PLAN.  AND YOU CAN SEE IN THE
3   ENACTED PLAN SENATE DISTRICT 17 COVERS A MUCH LARGER GEOGRAPHIC
4   AREA, STRETCHING FROM ST. LANDRY PARISH ALL THE WAY OVER TO ST.
5   HELENA AND SOUTH INTO IBERVILLE.  SO IT'S A LARGER GEOGRAPHIC
6   AREA, AND IT'S MAJORITY WHITE.
7   **Q.**   AND HOW DID YOU DETERMINE THAT A NEW SENATE ILLUSTRATIVE
8   DISTRICT COULD BE DRAWN IN THIS PART OF THE STATE?
9   **A.**   BY EXAMINING THE POPULATION DISTRIBUTION AND TAKING INTO
10   CONSIDERATION TRADITIONAL REDISTRICTING PRINCIPLES.
11   **Q.**   I WOULD NOW LIKE TO HAVE PUT ON THE SCREEN WHAT IS
12   PLAINTIFF ILLUSTRATIVE AID NO. 19, AND IF WE COULD JUST ZOOM IN
13   ON THE RED PART WITH 17.
14          WHAT DOES THIS ILLUSTRATIVE AID SHOW?
15   **A.**   THIS SHOWS THAT THERE IS AN NAACP MEMBER IN NEW ROADS,
16   WHICH IS IN POINTE COUPEE PARISH.  UNDER THE ILLUSTRATIVE PLAN,
17   THAT PERSON IS IN THE NEW ILLUSTRATIVE DISTRICT 17 AND WAS
18   PREVIOUSLY IN THE WHITE MAJORITY IN -- OR STILL IS ENACTED
19   SENATE DISTRICT 17.
20   **Q.**   OKAY.  NOW LET'S GO BACK TO PLAINTIFF EXHIBIT 20, PAGE 41,
21   FIGURE 22.
22          WHAT DOES THIS FIGURE SHOW?
23   **A.**   THIS SHOWS ILLUSTRATIVE SENATE DISTRICT 19 IN THE NEW
24   ORLEANS MSA AREA IN JEFFERSON AND ST. CHARLES.
25   **Q.**   AND IF WE COULD MOVE TO THE NEXT PAGE.

WILLIAM S. COOPER

10:03 1          WHAT DOES FIGURE 23 SHOW?

2    **A.**   THIS SHOWS THE ENACTED PLAN IN THE SAME AREA WITH A RED

3    OUTLINE SHOWING THE ILLUSTRATIVE DISTRICT 19.

4    **Q.**   AND HOW DID YOU DETERMINE THAT A NEW DISTRICT COULD BE

5    DRAWN IN THIS PART OF THE STATE?

6    **A.**   AGAIN, THROUGH EXAMINING THE DISTRIBUTION OF THE

7    POPULATION AND APPLYING TRADITIONAL REDISTRICTING PRINCIPLES

8    AND CONSIDERING POPULATION SHIFTS THAT WE DISCUSSED EARLIER

9    TODAY, I DETERMINED THAT AN ADDITIONAL SENATE DISTRICT COULD BE

10   DRAWN IN THAT AREA.

11   **Q.**   NOW, IF WE COULD PUT UP WHAT IS PLAINTIFFS' ILLUSTRATIVE

12   AID 20.

13          AND WHAT DOES THIS ILLUSTRATIVE AID SHOW?

14   **A.**   THIS SHOWS THAT THERE IS AN NAACP MEMBER WHO LIVES IN

15   ILLUSTRATIVE SENATE DISTRICT 19, WHICH WOULD BE THE NEW

16   MAJORITY-BLACK DISTRICT, AND ALSO LIVES IN A WHITE-MAJORITY

17   DISTRICT UNDER THE 2022 SENATE.

18   **Q.**   I WOULD NOW LIKE TO TURN TO PAGE 43 OF THE SAME EXHIBIT,

19   FIGURE 24, PLEASE.

20          WHAT DOES THIS FIGURE SHOW?

21   **A.**   THIS FIGURE, LIKE THE PREVIOUS FIGURE WE LOOKED AT A FEW

22   MOMENTS AGO WITH RESPECT TO THE SENATE DISTRICTS, SHOWS THE NEW

23   MAJORITY-BLACK DISTRICTS THAT CAN BE DRAWN IN THE STATE.

24   THERE'S SIX OF THEM.  THERE ARE TWO IN THE NORTHWEST:  ONE IN

25   CADDO PARISH IN THE BOSSIER CITY AREA; A SECOND ONE IN DESOTO,

WILLIAM S. COOPER

10:05  1    RED RIVER, AND NATCHITOCHES; A THIRD ONE IN CALCASIEU IN THE

   2    LAKE CHARLES AREA.  AND THEN THREE ADDITIONAL DISTRICTS IN THE

   3    EAST BATON ROUGE AREA, INCLUDING PARTS OF THE BATON ROUGE MSA

   4    AND ASCENSION AND IBERVILLE PARISHES.  THAT'S THE HOUSE

   5    DISTRICT 60.  THE OTHER DISTRICTS ARE IN EAST BATON ROUGE AND

   6    ARE VERY SMALL AND COMPACT AND YOU REALLY CAN'T SEE THE RED

   7    THERE.

   8         AND THE GREEN AREAS ARE THE EXISTING -- OR WHAT WOULD

   9    BE ILLUSTRATIVE MAJORITY-BLACK DISTRICTS THAT I'VE DRAWN IN

  10    AREAS THAT ALREADY DO HAVE IN SOME CONFIGURATION A

  11    MAJORITY-BLACK DISTRICT.

  12    **Q.**   OKAY.  I'D LIKE TO LOOK NOW AT FIGURE 27 ON PAGE 48.

  13         WHAT DOES THIS FIGURE SHOW?

  14    **A.**   WELL, AGAIN, IT'S A PRIMA FACIE INDICATOR THAT THERE IS

  15    SOME CRACKING AND PACKING IN THE STATE HOUSE PLAN.  JUST A

  16    LITTLE BIT OVER THE HALF OF THE VOTING-AGE POPULATION IN THE

  17    STATE THAT IS BLACK, LIVES IN A MAJORITY BLACK VOTING-AGE

  18    DISTRICT COMPARED TO 83.4 PERCENT OF THE WHITE POPULATION,

  19    NON-HISPANIC WHITE POPULATION, THAT LIVES IN A MAJORITY-WHITE

  20    HOUSE DISTRICT.

  21         AND AS YOU CAN SEE AFTER DRAWING THE ILLUSTRATIVE

  22    HOUSE PLAN, I WAS ABLE TO, IN EFFECT, PUT A MORE FOLKS INTO A

  23    MAJORITY-BLACK HOUSE DISTRICT SO THAT IN THE END, THE

  24    ILLUSTRATIVE HOUSE PUT 61.1 PERCENT OF THE BLACK VOTING-AGE

  25    POPULATION IN A MAJORITY-BLACK DISTRICT.  AND IN THE SAME VEIN,

WILLIAM S. COOPER

10:07 1    THE WHITE POPULATION WOULD DROP FROM 83.4 TO 77.4 PERCENT IN

2    MAJORITY-WHITE DISTRICTS.

3    **Q.**    DID DR. MURRAY DISCUSS THIS EXHIBIT?

4    **A.**    WELL, I THINK HE DID.  AND, AGAIN, HE SAID I MADE A

5    MISTAKE, AND THAT I -- MY NUMBERS WERE ALL WRONG, AND THAT'S

6    BECAUSE HE JUST ADDED UP THE BLACK VAP IN THE MAJORITY-BLACK

7    DISTRICTS AND TOOK A MEAN AVERAGE.  SO HIS TABLES ARE TOTALLY

8    WRONG.

9    **Q.**    SO NOW LET'S WALK THROUGH SOME OF YOUR HOUSE DISTRICTS.

10    IF WE COULD NOW PUT UP PAGE 50, FIGURE 29.

11         WHAT DOES THIS FIGURE SHOW?

12    **A.**    THIS WOULD SHOW THE NEW HOUSE DISTRICT IN SHREVEPORT MSA.

13    IT IS HOUSE DISTRICT 1, AND IT EXTENDS FROM SHREVEPORT TO THE

14    NORTH END OF THE PARISH.

15    **Q.**    AND IF WE COULD NOW TURN TO THE NEXT PAGE.

16         WHAT DOES FIGURE 30 SHOW?

17    **A.**    THIS OVERLAYS THE RED LINE OF THE ILLUSTRATIVE HOUSE

18    DISTRICT 1 ONTO THE 2022 HOUSE PLAN, THE ENACTED PLAN.  AGAIN,

19    IT GOES FROM THE SHREVEPORT AREA NORTH TO THE ARKANSAS LINE.

20    IT'S, YOU KNOW, MAYBE 40 MILES.  DR. TRENDE WOULD HAVE YOU

21    BELIEVE THAT THOSE POPULATIONS OUTSIDE OF SHREVEPORT ARE SO

22    DIFFERENT THAT THEY CERTAINLY COULD NOT BE COMPOSED OF A

23    COMPACT MINORITY COMMUNITY.  IT JUST DEFIES COMMON SENSE.  IT'S

24    JUST -- WELL, HE'LL EXPLAIN.

25    **Q.**    AND HOW DID YOU DETERMINE THAT A NEW ILLUSTRATIVE HOUSE

WILLIAM S. COOPER

10:09 1   DISTRICT COULD BE DRAWN IN THIS PART OF THE STATE?

2   **A.**   IT WAS VERY EASY REALLY.  I MEAN, IT PRACTICALLY DRAWS

3   ITSELF.  IN FACT, IT'S A LOT LIKE EXISTING SENATE DISTRICT 1

4   THAT THE STATE DREW IN THAT AREA -- I'M SORRY -- SENATE

5   DISTRICT 38.  IT, TOO, GOES UP TO THE ARKANSAS LINE.

6   **Q.**   I'D LIKE TO NOW PUT UP --

7   **A.**   I SAID SENATE DISTRICT 38.  I MEANT SENATE DISTRICT 39.

8   **Q.**   I WOULD NOW LIKE TO PUT ONTO THE SCREEN PLAINTIFF

9   ILLUSTRATIVE AID NO. 21.

10        WHAT DOES THIS ILLUSTRATIVE AID DEMONSTRATE IN THE

11   RED LINE?

12   **A.**   THE RED LINE THERE IS PART OF THE NEW MAJORITY-BLACK HOUSE

13   DISTRICT 1, AND YOU CAN SEE THAT THERE IS A NAACP MEMBER WHO

14   LIVES IN THAT DISTRICT.

15   **Q.**   AND WHAT IS SHOWN -- I'M NOW GOING TO GO BACK TO EXHIBIT

16   20, PAGE 52, FIGURE 31.

17   **A.**   THIS IS THE ADDITIONAL HOUSE DISTRICT I DREW IN THE

18   NATCHITOCHES AREA, INCLUDING NATCHITOCHES PARISH, PART OF IT

19   ANYWAY, ALL OF RED RIVER AND PART OF DESOTO PARISH.  THIS

20   DISTRICT EXISTED UNDER THE BENCHMARK PLAN.  AND FOR REASONS

21   THAT I STILL DON'T KNOW, IT WAS ELIMINATED IN THE ADOPTED PLAN.

22   THIS IS SORT OF REMINISCENT OF WHAT HAPPENED OVER IN GALVESTON

23   COUNTY WHERE THE TEXAS -- GALVESTON COUNTY TEXAS GOVERNING BODY

24   DECIDED TO ELIMINATE A MAJORITY-BLACK DISTRICT FOR NO GOOD

25   REASON.  HERE THEY ARE DOING THE SAME THING.  ACTUALLY IN THE

WILLIAM S. COOPER

10:11 1   GALVESTON COUNTY, IT'S A COALITION DISTRICT, BUT BLACK LATINO.

2   HERE IT'S JUST A MAJORITY-BLACK DISTRICT THAT THEY ELIMINATED,

3   EVEN THOUGH ONE COULD HAVE EASILY HAVE BEEN DRAWN AS YOU SEE

4   HERE.

5   Q.   IF WE COULD NOW TURN TO PAGE 53, FIGURE 32.

6        WHAT DOES THIS EXHIBIT SHOW?

7   A.   THIS SHOWS THE BOUNDARIES FOR THE ILLUSTRATIVE HOUSE

8   DISTRICT 23 THAT I HAVE DRAWN OVERLAYING THE 2022 ENROLLED

9   HOUSE PLAN.

10  Q.   IF WE COULD NOW -- BEFORE I DO THAT, WERE YOU PRESENT AT

11  REVEREND HARRIS'S TESTIMONY ON MONDAY?

12  A.   YES.  VERY COMPELLING.

13  Q.   AND DO YOU RECALL WHERE REVEREND HARRIS TESTIFIED THAT HE

14  LIVED?

15  A.   I THINK HE LIVES IN NATCHITOCHES.  RIGHT?

16  Q.   IF WE COULD PULL UP ILLUSTRATIVE AID 22.

17       WHAT DOES THIS ILLUSTRATIVE AID SHOW?

18  A.   THIS SHOWS THAT THERE IS A PLAINTIFF IN NATCHITOCHES

19  LIVING IN ILLUSTRATIVE HOUSE DISTRICT 23 AND ALSO IN ENACTED

20  HOUSE DISTRICT 25, WHICH IS MAJORITY WHITE.

21  Q.   IF WE COULD NOW GO BACK TO EXHIBIT 20, FIGURE 33, PAGE 54.

22       IF WE COULD -- IF YOU COULD TELL US WHAT THIS FIGURE

23  SHOWS?

24  A.   WELL, THIS SHOWS THE ADDITIONAL HOUSE DISTRICT I DREW IN

25  THE LAKE CHARLES AREA IN THE CYAN COLOR.  THAT WOULD BE HOUSE

WILLIAM S. COOPER

10:13 1    DISTRICT 38.

2    **Q.**    AND IF WE COULD NOW MOVE TO FIGURE 34, PAGE 55.

3          WHAT DOES THIS FIGURE SHOW?

4    **A.**    THIS OVERLAYS THE ADDITIONAL HOUSE DISTRICT THAT I DREW IN

5    LAKE CHARLES ONTO A MAP OF THE ENROLLED HOUSE.

6    **Q.**    IF WE COULD NOW HAVE ON THE SCREEN ILLUSTRATIVE AID NO.

7    23.

8          WHAT DOES THIS ILLUSTRATIVE AID SHOW?

9    **A.**    THIS SHOWS THAT THERE IS AN NAACP HOUSE MEMBER WHO LIVES

10   IN AN AREA OF EXISTING MAJORITY BLACK 34, WHO WOULD BE DRAWN

11   INTO A NEW MAJORITY BLACK-HOUSE DISTRICT 38.

12         THE BLUE LABELS ON THESE MAPS INDICATE THAT THOSE ARE

13   MAJORITY-BLACK DISTRICTS, AND THE BLACK LABELS INDICATE THAT

14   THEY ARE MAJORITY-WHITE DISTRICTS.  I MAY NOT HAVE CLARIFIED

15   THAT AT THE OUTSET OF ALL THIS.

16   **Q.**    AND IF SOMEONE WANTED TO CONFIRM ON THE BACK END WHICH

17   EXISTING DISTRICTS ARE MAJORITY BLACK, DO YOU HAVE AN EXHIBIT

18   IN YOUR REPORT THAT WOULD CONFIRM THOSE NUMBERS?

19   **A.**    YES.

20   **Q.**    AND IF SOMEONE WANTED TO CONFIRM ON THE BACK END WHICH NEW

21   ILLUSTRATIVE DISTRICTS ARE MAJORITY BLACK, DO YOU HAVE AN

22   EXHIBIT IN YOUR REPORT THAT WOULD CONFIRM THOSE NUMBERS?

23   **A.**    YES.

24   **Q.**    AND WOULD THOSE EXHIBITS BE THE AUTHORITATIVE EVIDENCE OF

25   WHICH DISTRICTS ARE MAJORITY BLACK AND WHICH DISTRICTS ARE NOT?

WILLIAM S. COOPER

10:15  1   **A.**   YES.

2   **Q.**   I'D LIKE TO -- IS -- ARE WE ON -- IF WE COULD NOW MOVE --

3   OH, SORRY.  YES.  IF WE COULD NOW MOVE TO EXHIBIT 20, FIGURE

4   35, PAGE 56.

5          WHAT DOES THIS FIGURE SHOW?

6   **A.**   THIS SHOWS THE ADDITIONAL MAJORITY-BLACK DISTRICT, HOUSE

7   DISTRICT 60 THAT I DREW IN THE BATON ROUGE MSA, BUT IN

8   PRIMARILY IN THE PARISHES OF ASCENSION AND IBERVILLE.

9   **Q.**   AND IF WE COULD NOW MOVE TO FIGURE 36, PAGE 57.

10          WHAT DOES THIS EXHIBIT -- WHAT DOES THIS FIGURE SHOW?

11   **A.**   THIS SHOWS THE OUTLINE OF THE ADDITIONAL DISTRICTS THAT I

12   DREW, HOUSE DISTRICT 60, BUT IT OVERLAYS THE 2022 PLAN.  AND

13   YOU CAN SEE THAT WHILE THERE ARE PARTS OF THAT DISTRICT THAT

14   ARE IN A MAJORITY BLACK-HOUSE DISTRICT 58, THE AREA UP IN

15   IBERVILLE AROUND DONALDSONVILLE AND WHITE CASTLE IS A MAJORITY

16   WHITE DISTRICT 60.

17   **Q.**   AND HOW DID YOU DETERMINE THAT A NEW ILLUSTRATIVE DISTRICT

18   COULD BE DRAWN IN THIS PART OF THE STATE?

19   **A.**   WELL, I EXAMINED THE POPULATION AND WITH SOME

20   EXPERIMENTATION, IT WAS CLEAR THAT YOU COULD GET A NEW DISTRICT

21   IN THIS PART OF BATON ROUGE MSA.

22   **Q.**   IF WE COULD NOW PULL UP PLAINTIFF ILLUSTRATIVE AID NO.

23   24.

24          OKAY.  AND LOOKING AT THIS MAP, I SEE THAT THERE IS

25   AN ASTERISK DOWN NEAR WHAT IS LABELED 60.  DO YOU KNOW WHAT

WILLIAM S. COOPER

10:17 1  THIS ASTERISK REPRESENTS?

2  **A.**   YES.  IT'S AN NAACP MEMBER WHO LIVES IN THE ENACTED HOUSE

3  DISTRICT 60.

4       **MR. TUCKER:**  YOUR HONOR, WE OBJECT.  I BELIEVE THIS

5  WAS THE NAACP MEMBER THAT WITHDREW THEIR WAIVER OF THE

6  PRIVILEGE, AND THAT INFORMATION DID NOT COME IN DURING MR.

7  MCCLANAHAN'S TESTIMONY.

8       **MS. THOMAS:**  I'M GOING TO TRY TO CLEAN THIS UP.  I

9  BELIEVE THAT THERE -- THE TESTIMONY IS INCORRECT AS FAR AS THIS

10  BEING AN NAACP MEMBER.  SO MAY I BE ALLOWED TO TRY TO CLEAN UP

11  THE ANSWER AND TO SEE IF WE CAN RESOLVE MR. TUCKER'S QUESTIONS?

12       **THE COURT:**  I AM GOING TO GRANT THE OBJECTION.

13       **MS. THOMAS:**  OKAY.

14       **THE COURT:**  AND LET YOU TRY TO CLEAN UP.

15       **MS. THOMAS:**  OKAY.

16  BY MS. THOMAS:

17  **Q.**   DO YOU RECALL THE TESTIMONY OF DR. NAIRNE YESTERDAY -- ON

18  MONDAY?

19  **A.**   YES, I DO.

20  **Q.**   AND DO YOU RECALL WHERE DR. NAIRNE LIVES?

21  **A.**   SHE LIVES IN NAPOLEONVILLE.

22  **Q.**   OKAY.  AND DOES THE DEMONSTRATIVE OR ILLUSTRATIVE AID IN

23  FRONT OF YOU HAVE AN ASTERISK FOR NAPOLEONVILLE?

24  **A.**   YES.  YES.

25  **Q.**   AND IS IT YOUR UNDERSTANDING THAT THE ASTERISK IN FRONT OF

WILLIAM S. COOPER

10:18 1  YOU REPRESENTS DR. NAIRNE?

2  **A.**   YES.   SORRY.   I THOUGHT SHE WAS AN NAACP MEMBER.   I

3  MISSPOKE.

4  **Q.**   I THINK THE RECORD STANDS FOR ITSELF OF WHETHER DR. NAIRNE

5  IS AN NAACP MEMBER.

6        SO LOOKING AT THE ASTERISK, IT'S NOT WITHIN THE RED

7  OUTLINE.   IS THAT CORRECT?

8  **A.**   IT IS NOT.   IT IS IN THE MAJORITY WHITE-HOUSE DISTRICT 60.

9  AND IT WOULD BE IN A MAJORITY-BLACK DISTRICT UNDER THE

10  ILLUSTRATIVE PLAN.   HOWEVER, IT WOULD BE IN MAJORITY-BLACK

11  HOUSE DISTRICT 58.

12  **Q.**   THANK YOU.

13        JUST GOING BACK FOR A SECOND, BECAUSE I'M NOT SURE IF

14  I ASKED THIS QUESTION.   IF WE COULD GO BACK TO FIGURE 34 ON

15  PAGE 55.

16        HOW DID YOU DETERMINE THAT A NEW ILLUSTRATIVE

17  DISTRICT COULD BE DRAWN IN THIS PART OF THE STATE?

18  **A.**   WELL, THE BLACK POPULATION HAS GROWN IN THIS AREA, AS WE

19  DISCUSSED EARLIER TODAY, AND THE PRESENT DAY HOUSE DISTRICT 34

20  IS SOMEWHAT PACKED.   I THINK THE PERCENTAGE -- I DON'T HAVE IT

21  FRONT OF ME.   I THINK IT'S APPROACHING 70 PERCENT BLACK.   AND

22  SO I WANTED TO SEE IF MAYBE THERE WOULD BE ANOTHER POTENTIAL

23  DISTRICT IN THE LAKE CHARLES MSA AREA, AND INDEED THERE IS.

24  YOU CAN CREATE A SECOND DISTRICT THERE.

25  **Q.**   ALL RIGHT.   WE CAN TAKE THIS DOWN FOR A SECOND.

WILLIAM S. COOPER

10:20 1            I'D LIKE TO NOW MOVE TO EAST BATON ROUGE.  HOW MANY

2   TOTAL NEW DISTRICTS DID YOU DRAW IN THE EAST BATON ROUGE AREA

3   FOR THE HOUSE?

4   **A.**   I DREW THREE NEW DISTRICTS IN EAST BATON ROUGE.

5   **Q.**   AND DID YOU DISCUSS THREE DISTRICTS IN YOUR REPORT?

6   **A.**   YES.

7   **Q.**   OKAY.  LET'S LOOK AT PLAINTIFF EXHIBIT 40, AND IF WE COULD

8   JUST FOR THE SAKE OF THE WITNESS BEING ABLE TO READ, ZOOM IN ON

9   THE FIRST -- ON THE TOP HALF OF THE EXHIBIT.

10            OKAY.  WHAT DOES PLAINTIFF EXHIBIT 40 SHOW?

11  **A.**   WELL, THIS IS THE TABLE THAT WE WERE REFERENCING

12  PREVIOUSLY THAT SHOWS THE POPULATION TOTALS FOR THE LOUISIANA

13  STATE HOUSE BY TOTAL POPULATION AND BY VOTING AGE BY RACE AND

14  ETHNICITY.

15  **Q.**   AND IS THIS -- WHEN YOU SAY "LOUISIANA STATE HOUSE," IS

16  THIS YOUR ILLUSTRATIVE MAP OR IS THIS THE ENACTED MAP?

17  **A.**   THAT'S THE ENACTED MAP.  AND I'VE ALSO INCLUDED THE

18  CITIZEN VOTING-AGE POPULATION AND REGISTERED BLACK VOTERS IN

19  THOSE DISTRICTS.  THE REST OF THAT CHART IS DIRECTLY FROM THE

20  DECENNIAL CENSUS.

21  **Q.**   AND I NOTICED THAT A COUPLE OF THE -- OR MORE THAN A

22  COUPLE -- SOME OF THE COLUMNS FOR "ANY PART BLACK" IS

23  HIGHLIGHTED IN GREEN.  WHAT DOES THE GREEN HIGHLIGHT INDICATE?

24  **A.**   THOSE ARE THE MAJORITY-BLACK DISTRICTS.

25  **Q.**   OKAY.  NOW, IF WE COULD PULL UP EXHIBIT 66 FOR PLAINTIFFS

WILLIAM S. COOPER

10:22  1    AND ZOOM IN ON THE TOP HALF.

2              OKAY.  WHAT DOES THIS EXHIBIT SHOW?

3    **A.**   THIS SHOWS THE MAJORITY-BLACK DISTRICTS IN THE

4    ILLUSTRATIVE PLAN THAT I DREW IN 2023.  IN THIS PARTICULAR

5    EXHIBIT, I HAD ACTUALLY -- I ALSO IDENTIFIED WHERE THERE WERE

6    CHANGES COMPARED TO 2022.

7              BUT THE MAIN POINT IS THERE ARE ACTUALLY 35 MAJORITY

8    BLACK-HOUSE DISTRICTS IN THE ILLUSTRATIVE PLAN THAT I DREW

9    COMPARED TO 29 IN THE ENACTED SENATE PLAN.

10   **Q.**   IF WE COULD GO BACK TO PLAINTIFF EXHIBIT 20, FIGURE 38 ON

11   PAGE 59.  I BELIEVE IT'S PAGE 59, FIGURE 38.  YES.  THANK YOU.

12             WHAT DOES THIS FIGURE SHOW?

13   **A.**   THIS SHOWS ILLUSTRATIVE HOUSE DISTRICT 65, WHICH I HAVE

14   IDENTIFIED AS ONE OF THE NEW MAJORITY-BLACK DISTRICTS.  IT

15   INCLUDES PART OF THE MUNICIPALITY OF CENTRAL, ALONG WITH PARTS

16   OF EAST BATON ROUGE PARISH, AND ALSO EXTENDS INTO

17   MUNICIPALITIES OF BROWNSVILLE AND MERRYDALE.  THIS IS THE

18   ENACTED PLAN, SO THE RED LINES OVERLAY.  THE RED LINES ARE THE

19   NEW HOUSE DISTRICT, AND THE ENACTED PLAN IS THE BASE MAP HERE.

20   SO YOU CAN SEE HOW IN THE ENACTED MAP THAT AREA WAS SPLIT INTO

21   FOUR OR FIVE DIFFERENT HOUSE DISTRICTS, IN EFFECT, CRACKING THE

22   BLACK POPULATION.

23   **Q.**   IF WE COULD LOOK AT FIGURE 39 ON PAGE 60.

24             WHAT DOES THIS FIGURE SHOW?

25   **A.**   THIS SHOWS THE NEW ILLUSTRATIVE HOUSE DISTRICT 68.  AN

WILLIAM S. COOPER

10:24 1   ADDITIONAL DISTRICT CAN BE DRAWN IN BATON ROUGE.

2   **Q.**   AND I NOTICED -- I BELIEVE YOU TESTIFIED EARLIER THAT THE

3   BLUE BOXES REPRESENT MAJORITY-BLACK DISTRICTS?

4   **A.**   YES.

5   **Q.**   AND WHAT COLOR IS THE BOX FOR 68?

6   **A.**   WELL, IT'S BLUE, SO IT IS A -- IT IS A MAJORITY-BLACK

7   DISTRICT.

8   **Q.**   AND WHAT COLOR IS THE BOX FOR 69?

9   **A.**   SIXTY-NINE IS ALSO MAJORITY BLACK.  IT IS ANOTHER DISTRICT

10   THAT IS IN -- THAT I HAVE DRAWN THAT COULD ALSO BE CONSIDERED

11   ONE OF THE ADDITIONAL MAJORITY-BLACK DISTRICTS.

12   **Q.**   AND DID YOU DISCUSS 69 AS A NEW MAJORITY-BLACK DISTRICT IN

13   YOUR REPORT?

14   **A.**   I DID NOT BECAUSE THE INCUMBENT IN 69 IS ACTUALLY THE

15   PRESENT INCUMBENT OF HOUSE DISTRICT 101.  BUT IT IS IN A SENSE

16   ALSO ONE OF WHAT COULD BE CONSIDERED AS A NEW MAJORITY-BLACK

17   DISTRICT.  THERE ARE FOUR DISTRICTS THAT WE'RE LOOKING AT HERE

18   AND ONLY THREE OF THEM CAN BE CONSIDERED TO BE ADDITIONAL

19   MAJORITY-BLACK DISTRICTS BECAUSE IN ORDER TO MINIMIZE THE

20   NUMBER OF HOUSE DISTRICTS THAT ARE CONTAINED IN EAST BATON

21   ROUGE PARISH, I ELIMINATED HOUSE DISTRICT 62, WHICH EXTENDS UP

22   INTO WEST FELICIANA.  CURRENTLY THERE ARE 12 DISTRICTS IN THE

23   HOUSE PLAN THAT CONVERGE ON EAST BATON ROUGE PARISH IN WHOLE OR

24   IN PART, AND I HAVE REDUCED THAT NUMBER TO EIGHT IN THE

25   ILLUSTRATIVE PLAN.

WILLIAM S. COOPER

10:26 1    Q.   AND IF WE COULD JUST BRIEFLY GO BACK TO PLAINTIFF
2    EXHIBIT 40 AND IF WE COULD GO TO THE SECOND PAGE, PLEASE, AND
3    ZOOM IN ON THE TOP HALF.
4              SO I BELIEVE YOU'VE NOW TESTIFIED ABOUT DISTRICT 65,
5    68, AND 69.  CORRECT?
6    A.   YES.
7    Q.   AND LOOKING AT THIS EXHIBIT, ARE THOSE INDICATED AS
8    MAJORITY-BLACK DISTRICTS IN THE CURRENT PLAN, THE ENACTED PLAN?
9    A.   NO.
10   Q.   NOW IF WE COULD GO BACK TO EXHIBIT 66 AND IF WE COULD GO
11   TO THE LAST PAGE, TOP HALF.
12             NOW, LOOKING AT EXHIBITS -- I MEAN, SORRY.  IF WE
13   COULD -- NOW LOOKING AT DISTRICTS 65, 68, AND 69, ARE THOSE
14   INDICATED AS MAJORITY-BLACK DISTRICTS IN YOUR ILLUSTRATIVE
15   PLAN?
16   A.   YES.
17   Q.   IF WE COULD NOW PUT ON THE SCREEN ILLUSTRATIVE AID 25.
18             WHAT DOES THIS ILLUSTRATIVE AID SHOW?
19   A.   THIS SHOWS THE NAACP MEMBERS IN THE EAST BATON ROUGE
20   PARISH AREA, AND YOU CAN SEE THERE ARE FIVE THAT WERE
21   IDENTIFIED WHEN I GEOCODED.
22   Q.   IS THERE AN -- WAS A MEMBER IDENTIFIED IN ILLUSTRATIVE
23   DISTRICT 65?
24   A.   YES.
25   Q.   WAS A MEMBER IDENTIFIED IN ILLUSTRATIVE DISTRICT 69?

WILLIAM S. COOPER

10:27 1    **A.**   YES.

2    **Q.**   WAS A MEMBER IDENTIFIED IN ILLUSTRATIVE DISTRICT 68?

3    **A.**   YES.

4    **Q.**   NOW, I'D LIKE TO ZOOM IN ON THE TWO DOTS NEAR THE BORDER

5    OF 69.

6          OKAY.  WERE YOU PRESENT IN THE TESTIMONY OF REVEREND

7    LOWE ON MONDAY?

8    **A.**   YES.

9    **Q.**   AND WERE YOU PRESENT IN THE TESTIMONY OF DR. WASHINGTON ON

10    MONDAY?

11    **A.**   YES.

12    **Q.**   DO YOU RECALL WHICH DISTRICTS THEY CURRENTLY RESIDE?

13    **A.**   WELL, I THINK THEY --

14    **Q.**   DO YOU WANT US TO ZOOM OUT A BIT?

15    **A.**   WELL, CAN YOU ZOOM OUT?  YEAH.

16    **Q.**   OKAY.

17    **A.**   THEY CURRENTLY RESIDE IN, I BELIEVE, HOUSE DISTRICT 66.

18    **Q.**   AND DO YOU RECALL WHICH ILLUSTRATIVE DISTRICTS THEY WOULD

19    RESIDE IN?

20    **A.**   THEY WOULD RESIDE IN 69 UNDER THE ENACTED -- UNDER THE

21    ILLUSTRATIVE PLAN.

22    **Q.**   IF WE COULD ZOOM BACK INTO THE TWO ASTERISKS THAT WE WERE

23    LOOKING AT.

24    **A.**   OKAY.

25    **Q.**   LOOKING CLOSER, DO YOU RECALL WHETHER DR. LOWE -- I'M

WILLIAM S. COOPER

10:29  1   SORRY -- REVEREND LOWE AND DR. WASHINGTON WOULD RESIDE IN 69 OR

       2   ANOTHER DISTRICT?

       3   **A.**   ZOOM OUT OF HERE A BIT.

       4        COULD YOU POINT TO THE ASTERISK AGAIN?  I MEAN, THE

       5   ASTERISK YOU'RE LOOKING AT ARE IN --

       6   **Q.**   I BELIEVE IF WE --

       7   **A.**   -- ILLUSTRATIVE HOUSE DISTRICT 69 -- RIGHT? -- WHICH IS

       8   ANOTHER ONE IN HOUSE DISTRICT -- IN ILLUSTRATIVE HOUSE DISTRICT

       9   101, I THINK.

      10   **Q.**   OKAY.  DO YOU RECALL WHETHER THE ASTERISK THAT'S CURRENTLY

      11   ON THE LINE IS IN 69 OR 101?

      12   **A.**   IT COULD BE IN 1O1, YEAH.  I DON'T HAVE THESE MEMORIZED.

      13   IT COULD WELL BE IN 1O1.  THEY'RE BOTH IN THE SAME DISTRICT, I

      14   THINK.

      15        **MS. THOMAS:**  OKAY.  AT THIS POINT WE HAVE NO FURTHER

      16   QUESTIONS, AND WE WILL PASS THE WITNESS.

      17        **THE COURT:**  OKAY.  THIS IS A GOOD TIME FOR A BREAK.

      18   LET'S TAKE A 20-MINUTE RECESS.

      19        **THE LAW CLERK:**  ALL RISE.

      20        COURT IS AT RECESS.

      21        **(WHEREUPON, THE COURT WAS IN RECESS.)**

      22        **THE COURT:**  BE SEATED.

      23        MR. TUCKER, YOUR WITNESS.

      24        **MR. TUCKER:**  THANK YOU, YOUR HONOR.

      25

WILLIAM S. COOPER

10:54  1                    **CROSS-EXAMINATION**

  2  **BY MR. TUCKER:**

  3  **Q.**   GOOD MORNING, MR. COOPER.

  4  **A.**   GOOD MORNING.

  5  **Q.**   IT'S NICE TO SEE YOU AGAIN.

  6  **A.**   IT IS IN BATON ROUGE RATHER THAN NEW YORK CITY.

  7  **Q.**   THAT'S RIGHT.

  8          I'D LIKE TO HAVE YOU START BY TURNING TO PARAGRAPH 8

  9  OF YOUR REPORT.

 10          AND, FORREST, IF WE COULD PULL UP THAT, IT'S PL-20.

 11  **A.**   YES.

 12  **Q.**   AND IN PARAGRAPH 8 YOU STATE THAT "PLAINTIFFS IN THIS CASE

 13  HAVE ASKED ME TO DETERMINE WHETHER THE AFRICAN-AMERICAN

 14  POPULATION IN LOUISIANA IS 'SUFFICIENTLY LARGE AND

 15  GEOGRAPHICALLY COMPACT' TO ALLOW FOR THE CREATION OF ADDITIONAL

 16  MAJORITY-BLACK STATE HOUSE AND SENATE DISTRICTS BEYOND THOSE

 17  ENACTED ON MAY 9, 2022, WITHOUT GOVERNOR EDWARDS'S SIGNATURE."

 18  IS THAT CORRECT?

 19  **A.**   YES.  I'M STILL NOT THERE.  BUT I DO REMEMBER THAT

 20  PARAGRAPH.

 21          HANG ON.  OKAY.

 22  **Q.**   ARE YOU THERE?

 23  **A.**   YEAH.

 24  **Q.**   SO IS THAT CORRECT?

 25  **A.**   THAT IS CORRECT.

WILLIAM S. COOPER

10:55 1    **Q.**   AND THAT'S WHAT YOU SOUGHT TO DO IN THIS CASE.  CORRECT?
2    **A.**   YES.  AND PROVIDE DEMOGRAPHIC INFORMATION AS WELL.
3    **Q.**   IN HERE YOU DON'T STATE ANYWHERE THAT PLAINTIFFS ASKED YOU
4    TO DRAW MORE COMPACT DISTRICTS.  CORRECT?
5    **A.**   ASKED ME TO DRAW MORE COMPACT DISTRICTS THAN WHAT?
6    **Q.**   I'M JUST SAYING YOU DON'T STATE IN PARAGRAPH 8 THAT THE
7    PLAINTIFFS ASKED YOU TO DRAW MORE COMPACT DISTRICTS, DO YOU?
8    **A.**   MORE COMPACT THAN WHAT?
9    **Q.**   MORE COMPACT THAN THE ENACTED MAP?
10   **A.**   THEY DID NOT SPECIFICALLY ASK ME TO DRAW DISTRICTS THAT
11   WERE MORE COMPACT, NO, I DON'T THINK THEY DID.
12   **Q.**   OR TO LOWER POLITICAL SUBDIVISION SPLITS?  THAT'S NOT
13   CONTAINED IN PARAGRAPH 8 EITHER, IS IT?
14   **A.**   NO.  THAT'S JUST PART OF TRADITIONAL REDISTRICTING
15   PRINCIPLES.  I MEAN, THAT WAS THE GENERAL REQUEST FROM THE
16   ATTORNEYS FOR THE PLAINTIFFS TO ANSWER THE GENERAL INQUIRY AND
17   TO DO THAT I HAD TO ADHERE TO TRADITIONAL REDISTRICTING
18   PRINCIPLES.  SO I MADE A POINT OF TRYING TO DRAW REASONABLY
19   SHAPED COMPACT DISTRICTS AND TO MINIMIZE POLITICAL SUBDIVISION
20   SPLITS TO THE EXTENT POSSIBLE.
21   **Q.**   I APPRECIATE THAT, MR. COOPER.
22        MY QUESTION IS:  IN PARAGRAPH 8 YOU DON'T STATE
23   SPECIFICALLY THAT PLAINTIFFS ASKED YOU TO LOWER ANY POLITICAL
24   SUBDIVISION SPLITS.  CORRECT?
25   **A.**   THAT'S TRUE.

WILLIAM S. COOPER

10:56 1  Q.   AND I WANT TO MAKE SURE WE'RE TALKING ON THE SAME PAGE,

2  TOO.  IF I REFER TO "BVAP," DO YOU UNDERSTAND THAT TO BE BLACK

3  VOTING-AGE POPULATION?

4  A.   ANY-PARTY BLACK VOTING-AGE POPULATION, CORRECT.

5  Q.   AND YOU DEFINE "MAJORITY BLACK" IN THIS CASE TO BE

6  "50 PERCENT PLUS ONE BVAP."  IS THAT CORRECT?

7  A.   THAT IS AS DEFINED IN THE *STRICKLAND* CASE I BELIEVE THAT

8  IS NOW SORT OF ACCEPTED AS THE STANDARD.

9  Q.   THE ENACTED PLAN CONTAINS 29 MAJORITY-BLACK DISTRICTS AND

10  11 MAJORITY BLACK -- SORRY.

11       THE ENACTED PLAN CONTAINS 29 MAJORITY-BLACK DISTRICTS

12  IN THE HOUSE AND 11 MAJORITY-BLACK DISTRICTS IN THE SENATE.

13  CORRECT?

14  A.   CORRECT.

15  Q.   AND YOU DRAW TWO ILLUSTRATIVE PLANS HERE:  ONE FOR THE

16  HOUSE, AND ONE FOR THE SENATE.  CORRECT?

17  A.   CORRECT.

18  Q.   YOUR ILLUSTRATIVE PLAN FOR THE HOUSE CONTAINS 35

19  MAJORITY-BLACK DISTRICTS.  CORRECT?

20  A.   CORRECT.

21  Q.   THAT'S SIX MORE THAN THE ENACTED PLAN?

22  A.   CORRECT.

23  Q.   AND YOUR ILLUSTRATIVE PLAN FOR THE SENATE CONTAINS 14

24  MAJORITY-BLACK DISTRICTS.  CORRECT?

25  A.   CORRECT.

WILLIAM S. COOPER

10:57   1   Q.   THAT'S THREE MORE THAN THE ENACTED PLAN IN THE SENATE?

2   A.   CORRECT.

3   Q.   I'D LIKE TO NOW TURN TO FIGURE 5 ON PAGE 15 OF YOUR

4   REPORT.

5          I'LL MAKE SURE I GIVE YOU A CHANCE TO GET THERE THIS

6   TIME.

7   A.   YES.

8   Q.   SO LET ME KNOW WHEN YOU'RE THERE.

9   A.   YES.  I SEE IT ON THE SCREEN I GUESS.

10   Q.   GREAT.  SO AS I UNDERSTAND, THIS FIGURE REFLECTS THE

11   LOUISIANA VOTING-AGE POPULATION BY RACE AND ETHNICITY FROM 2000

12   TO 2020.  IS THAT CORRECT?

13   A.   IT DOES.

14   Q.   AND THIS REFLECTS THAT THE OVERALL BVAP IN THE STATE OF

15   LOUISIANA FOLLOWING THE 2020 CENSUS WAS 31.25 PERCENT.  IS THAT

16   CORRECT?

17   A.   CORRECT.

18   Q.   AND THAT WAS AN INCREASE OF ONLY 1.3 PERCENT SINCE 2000?

19   A.   THAT IS CORRECT.  THE ABSOLUTE NUMBERS WENT UP

20   CONSIDERABLY, BUT THE PERCENTAGE IS SLIGHTLY HIGHER.

21   Q.   AND ONLY .78 PERCENT SINCE THE LAST DECADE?

22   A.   I'M SORRY?

23   Q.   AND ONLY .78 PERCENT SINCE THE LAST DECADE?

24   A.   YES.

25   Q.   AND I'D LIKE YOU TO TURN BACK NOW TO FIGURE 1 ON PAGE 9.

WILLIAM S. COOPER

10:58 1            AND AS I UNDERSTAND IT, THIS IS A SIMILAR TABLE BUT
2  NOW BASED UPON TOTAL POPULATION AND NOT VOTING-AGE POPULATION.
3  IS THAT CORRECT?
4  **A.**   RIGHT.
5  **Q.**   CORRECT?
6  **A.**   CORRECT.
7  **Q.**   AND HERE THIS REFLECTS THAT THE OVERALL BLACK POPULATION
8  INCREASED BY ONLY .33 PERCENT FROM THE PRIOR DECADE.  IS THAT
9  RIGHT?
10 **A.**   THAT IS CORRECT.
11 **Q.**   NOW, AGAIN, WE TALKED ABOUT EARLIER THAT THE ENACTED PLAN
12 HAS 29 OF THE 105 HOUSE DISTRICTS AS MAJORITY BLACK.  CORRECT?
13 **A.**   YES.
14 **Q.**   AND I'LL REPRESENT TO YOU, BECAUSE I KNOW YOU DON'T HAVE A
15 CALCULATOR ON YOU, THAT THAT IS 27.6 PERCENT.  DO YOU HAVE ANY
16 REASON TO DISAGREE WITH THAT?
17 **A.**   27 -- OF ALL THE DISTRICTS YOU MEAN?
18 **Q.**   CORRECT.
19 **A.**   NOT OFF THE TOP OF MY HEAD, NO.
20 **Q.**   YOU HAVE NO REASON TO DISPUTE THAT?
21 **A.**   NO.  I'LL TAKE YOUR WORD FOR IT.
22 **Q.**   BY YOUR ILLUSTRATIVE PLAN HAS 35 OF THE 105 DISTRICTS AS
23 MAJORITY BLACK.  CORRECT?
24 **A.**   IT DOES.
25 **Q.**   AND I THINK THAT'S MATH MAYBE WE CAN DO.  I THINK THAT'S

WILLIAM S. COOPER

10:59  1    EXACTLY A THIRD, SO 33.33 PERCENT.  IS THAT RIGHT?

2    **A.**    YES.

3    **Q.**    THE ENACTED SENATE PLAN HAS 11 OF THE 39 DISTRICTS AS

4    MAJORITY BLACK, WHICH, AGAIN, I'LL REPRESENT TO YOU IS

5    28.2 PERCENT.  WILL YOU ACCEPT THAT?

6    **A.**    YES.

7    **Q.**    BUT YOUR ILLUSTRATIVE SENATE PLAN HAS 14 OF THE 39

8    DISTRICTS AS MAJORITY BLACK, WHICH I'LL REPRESENT TO YOU IS

9    35.9 PERCENT.  WOULD YOU AGREE?

10    **A.**    I DIDN'T DO THE MATH, BUT I'LL TAKE YOUR WORD FOR IT.

11    **Q.**    SO WERE YOU ATTEMPTING TO DRAW A PERCENTAGE OF

12    MAJORITY-BLACK DISTRICTS IN THE ILLUSTRATIVE PLANS THAT WAS

13    EQUAL TO OR GREATER THAN THE STATE'S OVERALL BVAP?

14    **A.**    NO.   JUST IN SOME SAME -- YOU KNOW, IN A RANGE THAT WOULD

15    BE REFLECTIVE OF THE OVERALL BLACK POPULATION OF THE STATE.  I

16    WAS NOT TRYING TO MAXIMIZE THE NUMBER OF BLACK-MAJORITY

17    DISTRICTS.  ADDITIONAL ONES COULD HAVE BEEN DRAWN PROBABLY.  SO

18    IT ENDED UP THAT I FELT LIKE 35 HOUSE DISTRICTS AND 14 SENATE

19    DISTRICTS WAS A REASONABLE PERCENTAGE.

20    **Q.**    BUT YOU WANTED TO GET A --

21    **A.**    IT MIGHT SLIGHTLY OVERREPRESENT THE BLACK POPULATION, JUST

22    AS THEY'VE BEEN SEVERELY UNDERREPRESENTED IN YEARS PAST.

23    **Q.**    SO I THINK I HEARD YOU JUST AGREE THAT YOUR HOUSE AND

24    SENATE ILLUSTRATIVE PLANS CONTAIN A HIGHER PERCENTAGE OF

25    MAJORITY BVAP DISTRICTS THAN THE OVERALL BVAP PERCENTAGE IN THE

WILLIAM S. COOPER

11:01 1  STATE.  CORRECT?

2  **A.**  YES.  BUT THAT MAY JUST -- I MEAN, IT MAY -- IF YOU JUST

3  LOOKED AT 13 AND 34, MAYBE THE PERCENTAGES WOULD BE DIFFERENT.

4  SO IT'S JUST -- IT'S SORT OF MARGINAL.  IT'S NOT A -- THERE'S

5  NOT A SIGNIFICANT SUPER PROPORTIONAL PERCENTAGE OF

6  BLACK-MAJORITY DISTRICTS IN EITHER MY HOUSE PLAN OR SENATE

7  PLAN, PUT IT THAT WAY.

8  **Q.**  IN ORDER TO CREATE THESE ADDITIONAL MAJORITY-BLACK

9  DISTRICTS, YOU HAD TO LOWER THE BVAP IN MANY EXISTING

10  MAJORITY-BLACK DISTRICTS, DIDN'T YOU?

11  **A.**  YES, I REDUCED PACKING.  SOME OF THESE DISTRICTS ARE IN

12  THE 70S OR HIGHER IN BLACK VOTING-AGE POPULATION.

13  **Q.**  OKAY.  I'D LIKE TO TURN NOW TO THE PREPARATION OF YOUR

14  ILLUSTRATIVE PLANS.  MY UNDERSTANDING IS THAT IN DRAFTING YOUR

15  ILLUSTRATIVE PLANS, YOU BEGAN WITH THE ENACTED PLANS.  CORRECT?

16  **A.**  I DID.  I HAD THE ENACTED PLANS, RIGHT.

17  **Q.**  AND THEN YOU LOOKED TO AREAS THAT HAD POPULATION CHANGE

18  AND/OR HIGH BVAP WHERE YOU COULD POTENTIALLY DRAW ADDITIONAL

19  MAJORITY-BLACK DISTRICTS.  CORRECT?

20  **A.**  YES.  I LOOKED AT THE MSA AREAS WHERE I EXPLAIN IN MY

21  DECLARATION THAT THERE'S BEEN A SIGNIFICANT AMOUNT OF

22  POPULATION SHIFTING OVER THE PAST 20 YEARS, FROM RURAL AREAS TO

23  URBAN AREAS.  SO THAT IS A MAJOR FACTOR AND MAKES IT EASIER NOW

24  TO DRAW DISTRICTS ABOVE AND BEYOND 28 OR 29 THAT'S BEEN THE

25  NUMBER THAT THE STATE HAS HAD OVER THE PAST 20 OR 30 YEARS.  I

WILLIAM S. COOPER

11:02 1   WAS ABLE TO INCREASE IT BY EXAMINING SOME OF THE URBAN AREAS

2   WHERE THERE'S BEEN A LARGE POPULATION INCREASE IN BLACK

3   POPULATION GOING FROM RURAL AREAS TO THE URBAN AREAS THAT

4   CORRESPONDINGLY DROPPED STATEWIDE IN THE WHITE POPULATION.  SO

5   IT IS EASIER TO DRAW THOSE DISTRICTS NOW THAN IT MIGHT HAVE

6   BEEN 30 YEARS AGO.

7   Q.   RIGHT.  SO YOU WEREN'T JUST LOOKING AT POPULATION CHANGE

8   GENERALLY, YOU WERE SPECIFICALLY LOOKING AT AREAS WHERE THERE

9   WAS BLACK POPULATION GROWTH AND/OR WHITE POPULATION DECLINE.

10   CORRECT?

11   A.   THAT'S GENERALLY TRUE, YES.

12   Q.   AND IN PARTICULAR, YOU STARTED BY LOOKING AT THE AREAS OF

13   SHREVEPORT, BATON ROUGE, NEW ORLEANS, AND LAKE CHARLES.

14   CORRECT?

15   A.   YES.  I MAY HAVE LOOKED AT SOME OTHER AREAS LIKE MONROE

16   AREA MAYBE, BUT I SETTLED ON THOSE AREAS, RIGHT.

17   Q.   AND, AGAIN, YOU WANTED TO UNPACK THE BLACK POPULATION IN

18   THESE AREAS TO SEE IF YOU COULD DRAW ADDITIONAL MAJORITY-BLACK

19   DISTRICTS?

20   A.   I WANTED TO SEE IF I COULD DRAW ADDITIONAL MAJORITY-BLACK

21   DISTRICTS INDEPENDENT OF PACKING AND CRACKING, BUT THAT BECOMES

22   A FACTOR AS YOU'RE DRAWING A PLAN.

23   Q.   AND I THINK AS WE DISCUSSED AT YOUR DEPOSITION, YOU WOULD

24   MOVE AROUND VTDS, OR VOTER TABULATION DISTRICTS, AND THEN

25   PERIODICALLY CHECK IN YOUR MAPTITUDE SOFTWARE WHAT THE BVAP WAS

WILLIAM S. COOPER

11:04 1   OF THE DISTRICT TO SEE IF YOU ACHIEVED A 50 PERCENT PLUS ONE
2   THRESHOLD.  IS THAT CORRECT?
3   **A.**   YES.  I WOULD OCCASIONALLY LOOK, RIGHT.  I MEAN, I LOOKED
4   AT -- I CONSIDERED THE 50 PERCENT THRESHOLD TO BE A FLOOR, NOT
5   A CEILING.  YOUR EXPERTS, AND I'M SURE YOU, ASSUME THAT I WAS
6   TRYING TO MAX OUT THE BLACK POPULATION TO THE HIGHEST POSSIBLE
7   PERCENTAGE I COULD GET.  AND IT WAS A FLOOR, BECAUSE I WAS
8   TRYING TO BALANCE ALL FACTORS, NOT JUST THE BLACK VOTING-AGE
9   POPULATION.  I'M POSITIVE I COULD HAVE DRAWN DISTRICTS WITH
10  MUCH HIGHER BLACK VAPS, BUT I WAS TAKING INTO ACCOUNT OTHER
11  FACTORS.  AND THE 50 PERCENT NUMBER THAT YOU'RE FOCUSED ON AND
12  YOUR EXPERTS SEEM TO BE FOCUSED ON IS A FLOOR, NOT A CEILING,
13  AND THEY DON'T SEEM TO UNDERSTAND THAT.
14  **Q.**   YOU AGREED THAT THE ENACTED MAPS GENERALLY COMPLIED WITH
15  THE JOINT RULE 21 CRITERIA, AND THE PRIMARY MISSING INGREDIENT
16  WAS DILUTION OF MINORITY VOTE.  CORRECT?
17  **A.**   WELL, NO.  THERE ARE SOME ISSUES RELATING TO COMPACTNESS
18  FOR SURE AS IT RELATES TO THE SENATE PLAN IN PARTICULAR.  YOU
19  KNOW, WE COULD TURN AND LOOK AT SENATE DISTRICT 29, WHICH IS
20  MAJORITY BLACK.  IF I HAD LEFT THAT DISTRICT IN MY PLAN, IN MY
21  ILLUSTRATIVE PLAN, THE COURT WOULD HAVE RULED IT AS A DISTRICT
22  THAT DIDN'T ADHERE TO TRADITIONAL DISTRICTING PRINCIPLES.
23  **Q.**   AND I UNDERSTAND --
24  **A.**   IT GOES FROM LIKE SOUTH --
25  **Q.**   MR. COOPER.

WILLIAM S. COOPER

11:05 1    **A.**   -- OF ALEXANDRIA, EVANGELINE PARISH, ALL THE WAY UP

2    TO WINN PARISH.  IT'S A BIZARRE SHAPED DISTRICT AND I REMOVED

3    IT.

4    **Q.**   MR. COOPER --

5    **A.**   I -- I --

6    **Q.**   -- WE'RE ON A CLOCK IN THIS CASE, SO I'D APPRECIATE IT IF

7    YOU WOULD JUST --

8    **A.**   I CHANGED THE BOUNDARIES FOR THAT DISTRICT.

9    **Q.**   -- ANSWER MY QUESTION.

10          **THE COURT:**  DON'T INTERRUPT HIM.  DON'T INTERRUPT

11    HIM.  LET HIM FINISH HIS ANSWER, AND THEN YOU CAN ASK YOUR NEXT

12    QUESTION.

13    **BY THE WITNESS:**

14    **A.**   SO ANYWAY, THAT'S AN EXAMPLE OF A DISTRICT THAT I JUST

15    COULD NOT ACCEPT AS A PLAN DRAWER.  YOU MAY HAVE AN EXPLANATION

16    FOR THAT, BUT TO MY MIND, THERE'S NO WAY THAT I COULD HAVE EVER

17    DRAWN A DISTRICT LIKE THAT AND CLAIMED THAT IT ADHERED TO

18    TRADITIONAL REDISTRICTING PRINCIPLES OR MET THE *GINGLES 1*

19    INQUIRY.

20    **Q.**   MR. COOPER, DO YOU RECALL BEING DEPOSED IN THIS CASE.

21    CORRECT?

22    **A.**   I DO.

23    **Q.**   AND AT THAT DEPOSITION YOU SWORE UNDER OATH TO TELL THE

24    TRUTH?

25    **A.**   YES.

WILLIAM S. COOPER

11:06  1    **Q.**   AND YOU DID TELL THE TRUTH AT THAT DEPOSITION.  CORRECT?

2    **A.**   I BELIEVE I DID.

3    **Q.**   CAN WE PULL UP A COPY --

4    **A.**   I COULD HAVE MADE A -- SOME SORT OF A MISSTATEMENT OR

5    SOMETHING.  I'M PERFECTLY CAPABLE OF THAT.

6    **Q.**   CAN WE PLEASE PULL UP MR. COOPER'S DEPOSITION TRANSCRIPT,

7    SPECIFICALLY ON PAGE 128, STARTING AT LINE 2.

8           SO I WANT TO READ TO YOU -- ON LINE 2, THE QUESTION

9    WAS:

10           "SO YOU TESTIFIED YOU STARTED GENERALLY WITH THE

11    ENACTED PLANS BY THE LEGISLATURE.

12           "DO YOU AGREE THAT THOSE PLANS GENERALLY MET

13    TRADITIONAL REDISTRICTING CRITERIA?

14           "ANSWER:  NO.

15           "WHICH OF THE CRITERIA THEY DID NOT MEET?

16           "ANSWER:  WELL, THE NON-DILUTION MINORITY VOTING

17    STRENGTH FOR ONE THING.

18           "ANY OTHERS" -- SORRY.

19           "QUESTION:  ANY OTHERS?

20           "ANSWER:  WELL, THAT'S -- AMONG OTHERS THERE ARE

21    UNNECESSARY PARISH AND MUNICIPALITY SPLITS COMPARED TO THE

22    ILLUSTRATIVE PLAN" --

23           **THE COURT REPORTER:**  YOU NEED TO SLOW DOWN.

24           **MR. TUCKER:**  SORRY.

25    **BY MR. TUCKER:**

WILLIAM S. COOPER

11:07  1   **Q.**  "BUT THERE'S NO CLEAR BENCHMARK AS TO WHAT WOULD BE

2   ACCEPTABLE AND WHAT WOULD NOT BE ACCEPTABLE.  IT'S JUST, IN MY

3   OPINION, THE PRIMARY MISSING INGREDIENT IN THE ENACTED HOUSE

4   AND SENATE PLANS AS IF THERE'S A FAILURE TO TAKE INTO ACCOUNT

5   MINORITY VOTING STRENGTHS."

6              DID I READ THAT CORRECTLY?

7              **MS. THOMAS:**  OBJECTION, YOUR HONOR.  THIS IS IMPROPER

8   IMPEACHMENT.  HE HAS YET TO TESTIFY INCONSISTENTLY WITH WHAT

9   WAS JUST READ.

10             **MR. TUCKER:**  I --

11             **MS. THOMAS:**  AND I ALSO HAVE NOT BEEN GIVEN A FULL

12  COPY OF THE TRANSCRIPT, IF YOU INTEND TO USE IT FOR

13  IMPEACHMENT.

14             **THE COURT:**  MR. TUCKER, WHERE IS THE INCONSISTENCY?

15             **MR. TUCKER:**  I ASKED HIM THE VERY SPECIFIC QUESTION.

16  I'LL READ THE EXACT QUESTION BACK AGAIN.

17              AND YOU AGREE THE ENACTED MAPS GENERALLY COMPLY

18  WITH THE JOINT RULE 21 CRITERIA AND THE PRIMARY MISSING

19  INGREDIENT WAS DILUTION OF MINORITY VOTE.

20             **MS. THOMAS:**  HE NEVER TESTIFIED --

21             **MR. TUCKER:**  IT'S EXACTLY WHAT HE SAID IN HIS

22  DEPOSITION.

23             **MS. THOMAS:**  HE NEVER TESTIFIED GENERALLY COMPLY

24  WITH --

25             **THE COURT:**  MA'AM, LET HIM FINISH.

WILLIAM S. COOPER

11:07 1          **MR. TUCKER:**  YOUR HONOR, IT SPECIFICALLY SAYS IN
2    HERE -- HIS TESTIMONY IS THAT THE PRIMARY MISSING INGREDIENT IN
3    THE ENACTED HOUSE AND SENATE PLANS WAS NOT TAKING IN ACCOUNT
4    MINORITY VOTING STRENGTHS.  THAT'S THE IMPEACHMENT.
5          **MS. THOMAS:**  AND THE QUESTION WAS NOT RELATED SOLELY
6    TO PRIMARILY.  THE FIRST PART OF THE QUESTION WAS GENERALLY
7    COMPLY WITH RULE 21, AND HE NEVER GAVE THAT TESTIMONY.
8          **THE COURT:**  IT'S BORDERLINE IMPROPER IMPEACHMENT, BUT
9    I AM GOING TO OVERRULE THE OBJECTION.  I'M SURE MR. COOPER IS
10   MORE THAN ABLE TO EXPLAIN.
11   **BY MR. TUCKER:**
12   **Q.**   SO DID I READ THAT CORRECTLY, MR. COOPER?
13   **A.**   WELL, YOU DID READ IT BACK CORRECTLY.  I BASICALLY AGREE
14   WITH MYSELF.  THAT WAS JUST A GENERAL STATEMENT.  YOU DIDN'T
15   ASK ME ABOUT SENATE DISTRICT 29 IN MY DEPOSITION.  I FELT THE
16   NEED TO MAYBE MENTION SOMETHING ABOUT THAT PARTICULAR DISTRICT
17   TODAY.
18          **MR. TUCKER:**  YOUR HONOR, I'D APPRECIATE IT IF THE
19   WITNESS WOULD BE DIRECTED TO SIMPLY ANSWER MY QUESTIONS.
20          **THE COURT:**  MR. COOPER, IF YOU COULD ANSWER HIS
21   QUESTIONS.  YOUR LAWYER WILL HAVE -- WILL GIVE YOU A CHANCE ON
22   REDIRECT TO GIVE FURTHER EXPLANATION.
23               CARRY ON, MR. TUCKER.
24          **THE WITNESS:**  YES, YOUR HONOR.
25          **MR. TUCKER:**  THANK YOU, YOUR HONOR.

WILLIAM S. COOPER

11:09  1            WE CAN TAKE THE DEPOSITION TRANSCRIPT DOWN.

2    **BY MR. TUCKER:**

3    **Q.**   AND, MR. COOPER, DO YOU RECALL IN YOUR DEPOSITION THAT YOU

4    COULDN'T POINT TO ANY DISTRICT THAT YOU SPECIFICALLY DREW TO

5    IMPROVE COMPACTNESS.  CORRECT?

6    **A.**   I DON'T RECALL THAT, BUT I WAS NOT CONSTANTLY MONITORING

7    COMPACTNESS AS I WAS DRAWING THE PLAN.  SO I WAS VISUALLY

8    OBSERVING, BUT I WAS NOT CHECKING THE REOCK AND POLSBY-POPPER

9    SCORES AS I WAS DRAWING THE PLAN EXCEPT ONLY ON OCCASION.

10   **Q.**   SO EVEN SITTING HERE TODAY, YOU CAN'T POINT TO A SPECIFIC

11   DISTRICT IN YOUR ILLUSTRATIVE PLAN THAT YOU DREW TO IMPROVE

12   COMPACTNESS?

13   **A.**   OH, YES, I CAN.  IT'S CALLED SENATE DISTRICT 29.  I WAS

14   APPALLED AT THAT DISTRICT.

15   **Q.**   BUT YOU COULDN'T --

16   **A.**   AND I CHANGED IT.

17   **Q.**   BUT YOU COULDN'T RECALL THAT AT YOUR DEPOSITION?

18   **A.**   WELL, I DON'T KNOW, MAYBE I DID.  I'M PRETTY SURE I

19   MENTIONED SENATE DISTRICT 29 IN MY DEPOSITION, BUT MAYBE I

20   DIDN'T.  MAYBE YOU DIDN'T ASK THE QUESTION IN THE FORMAT THAT

21   WOULD HAVE ALLOWED ME TO ANSWER THAT.

22   **Q.**   CAN WE PLEASE PULL UP AGAIN MR. COOPER'S DEPOSITION

23   TRANSCRIPT AT PAGE 128?

24            AND I'LL START AT THE VERY BOTTOM, LINE 25.

25            "WHAT SPECIFIC CHANGES DID YOU MAKE IN YOUR" -- AND

WILLIAM S. COOPER

11:10 1   PLEASE FLIP TO THE NEXT PAGE -- "ILLUSTRATIVE PLANS TO IMPROVE

2   COMPACTNESS?

3          ANSWER, ON LINE 2:  "I COULDN'T TELL YOU."

4          DID I READ THAT CORRECT?

5   **A.**   WELL, THAT'S BECAUSE -- I THINK YOUR QUESTION IS:  DID YOU

6   SET ABOUT TO DRAW COMPACT DISTRICTS WITH THAT AS THE VERY TOP

7   PRIORITY, AND I CANNOT SAY THAT THAT WAS NECESSARILY THE VERY

8   TOP PRIORITY.  BUT I CAN SAY THAT IN TERMS OF MUNICIPAL AND

9   VTDS, I WAS TAKING THAT INFORMATION INTO ACCOUNT.

10          AND I'M ONLY POINTING OUT SENATE DISTRICT 29 BECAUSE

11   YOU'VE SORT OF FOCUSED ON COMPACTNESS HERE, AND I THINK THAT'S

12   A GOOD EXAMPLE OF A DISTRICT THAT I COULD NOT ACCEPT AS A PLAN

13   DRAWER.  IT GOES FROM EVANGELINE PARISH ALL THE WAY UP INTO

14   WINN PARISH.  THE BOUNDARIES ARE SIMPLY CRAZY.  AND HAD I LEFT

15   THAT IN -- IT WAS A POISON PILL.  IT WAS A SETUP SO THAT -- IT

16   MIGHT HAVE BEEN A SETUP, SO THAT IF THIS CASE EVER DID GO TO

17   TRIAL, YOU COULD GET RID OF IT -- THAT PARTICULAR SENATE

18   DISTRICT, MAINTAINING THAT EVEN THOUGH YOU'RE ADDING ONE OVER

19   HERE, YOU CAN TAKE THIS OTHER ONE AWAY BECAUSE IT DOESN'T

20   ADHERE TO TRADITIONAL REDISTRICTING PRINCIPLES.

21   **Q.**   MR. COOPER, YOUR COUNSEL WILL HAVE AN OPPORTUNITY TO

22   REDIRECT YOU ON THIS.  AGAIN, I'D APPRECIATE IT IF YOU WOULD

23   JUST ANSWER MY QUESTIONS.

24          MY QUESTION WAS:  DID I READ THAT CORRECTLY FROM YOUR

25   DEPOSITION TRANSCRIPT?

WILLIAM S. COOPER

11:11 1  **A.**   WHICH -- COULD YOU RE-READ IT?  WHAT ARE YOU TALKING

2  ABOUT?

3  **Q.**   WE CAN GO BACK.

4  **A.**   EARLIER ON PAGE 2?

5  **Q.**   ON PAGE 128, THE QUESTION WAS:  "WHAT SPECIFIC CHANGES DID

6  YOU MAKE IN YOUR ILLUSTRATIVE PLANS TO IMPROVEMENT

7  COMPACTNESS?"

8          THE ANSWER WAS:  "I COULDN'T TELL YOU."

9          DID I READ THAT CORRECTLY?

10  **A.**   WELL, IN A SENSE YOU DID BECAUSE I WAS NOT -- I WAS NOT

11  REALLY --

12          **THE COURT:**  HE JUST WANTS TO KNOW IF HE READ IT.

13  RIGHT?

14          **THE WITNESS:**  YEAH, YOU READ IT RIGHT.

15  **BY MR. TUCKER:**

16  **Q.**   THANK YOU.

17  **A.**   ASSUMING IT WAS TRANSCRIBED CORRECTLY.  I DON'T REMEMBER

18  THE EXACT EXCHANGE THERE.

19  **Q.**   WELL, YOU HAD A CHANCE TO ISSUE AN ERRATA SHEET IN -- FOR

20  YOUR DEPOSITION.  CORRECT?

21  **A.**   I DID.

22          **THE COURT:**  OKAY.  LET'S MOVE ON.  GO AHEAD.

23  **BY MR. TUCKER:**

24  **Q.**   AND YOUR ILLUSTRATIVE PLANS DON'T DO ANYTHING TO IMPROVE

25  POPULATION EQUALITY, DO THEY?

WILLIAM S. COOPER

11:12 1  **A.**  NO.  I THINK IT'S ABOUT THE SAME.

2  **Q.**  AND I THINK AS YOU TESTIFIED ON DIRECT, YOUR ILLUSTRATIVE

3  PLANS DON'T IMPROVE CORE RETENTION AS COMPARED TO THE ENACTED

4  PLANS.  CORRECT?

5  **A.**  IF YOU COMPARE THE ILLUSTRATIVE PLANS THAT I DREW

6  VIS-À-VIS, THE ENACTED PLANS THEN COMPARED TO THE CHANGES THAT

7  THE ENACTED PLAN MADE TO THE BENCHMARK PLAN, THAT ENACTED PLAN

8  IS A LITTLE BIT CLOSER TO THE BENCHMARK THAN THE CHANGES THAT I

9  MADE WITH RESPECT TO THE ILLUSTRATIVE PLAN.

10  **Q.**  YOU MENTIONED A LITTLE BIT IN YOUR DIRECT EXAMINATION, AND

11  YOU TALK ABOUT IT IN YOUR REPORT, SOME SELF-IDENTIFIED CULTURAL

12  COMMUNITIES OF INTEREST.  DO YOU RECALL THAT?

13  **A.**  YES.

14  **Q.**  BUT YOU DIDN'T CONSULT ANY OTHER EXPERT IN THIS CASE,

15  INCLUDING DR. COLTEN ON THESE COMMUNITIES OF INTEREST.

16  CORRECT?

17  **A.**  NOT DIRECTLY, NO.

18  **Q.**  IN FACT, YOU ONLY SAW DR. COLTEN'S REPORT IN THIS CASE

19  AFTER YOU HAD DRAWN YOUR ILLUSTRATIVE MAPS?

20  **A.**  THAT'S TRUE, ALTHOUGH I DID GET SOME INPUT FROM THE

21  PLAINTIFFS' ATTORNEYS AS I WAS DRAWING THE 2023 PLAN.

22  **Q.**  GREAT.  ACTUALLY LET'S TALK ABOUT THAT A LITTLE BIT.

23        SO YOU INITIALLY DREW YOUR PLANS IN 2022.  IS THAT

24  CORRECT?

25  **A.**  CORRECT.

WILLIAM S. COOPER

11:13 1   **Q.**  AT THE TIME YOU DREW THOSE PLANS IN 2022, DID YOU RECEIVE

2   ANY FEEDBACK FROM PLAINTIFFS' ATTORNEYS OR ANY OF THE EXPERTS

3   IN THIS CASE ABOUT THE DRAWING OF THOSE MAPS?

4   **A.**  NO.

5   **Q.**  SO THE FEEDBACK YOU RECEIVED WAS BETWEEN THE DRAWING OF

6   YOUR 2022 PLANS AND SOME CHANGES YOU MADE TO THE CURRENT PLANS

7   YOU'RE OFFERING AS ILLUSTRATIVE PLANS TODAY.  CORRECT?

8   **A.**  RIGHT.  AND RELATIVELY MINOR CHANGES IN SO FAR AS THE

9   ILLUSTRATIVE PLANS ARE CONCERNED.

10   **Q.**  AND I BELIEVE YOU TESTIFIED THAT THE CHANGES YOU

11   BELIEVED -- WELL, STRIKE THAT.

12        YOU DIDN'T ACTUALLY TALK TO DR. COLTEN.  CORRECT?

13   **A.**  I HAD NEVER SPOKEN TO OR MET DR. COLTEN UNTIL YESTERDAY,

14   AND WE DID HAVE A -- AS DR. COLTEN I THINK MAY HAVE MENTIONED

15   YESTERDAY, WE EXCHANGED PLEASANTRIES AND HAD NO DISCUSSION

16   ABOUT VOTING DISTRICTS AT ALL.

17   **Q.**  AND SO ALL THE INFORMATION YOU RECEIVED FOR THE CHANGES

18   THAT WERE MADE BETWEEN YOUR 2022 AND 2023 PLANS WAS RECEIVED

19   FROM PLAINTIFFS' COUNSEL.  CORRECT?

20   **A.**  YES.

21   **Q.**  AND ONE OF THE CHANGES YOU MENTIONED DURING YOUR

22   DEPOSITION, IF YOU RECALL, WAS MOVING DONALDSON [SIC] -- ALL OF

23   DONALDSON INTO A MAJORITY-BLACK DISTRICT.  DO YOU RECALL THAT?

24   **A.**  YES.  I HAD PREVIOUSLY SPLIT DONALDSON ALONG A VTD

25   BOUNDARY.  AND I MAY HAVE MISSPOKEN AT SOME POINT IN MY

WILLIAM S. COOPER

11:15 1   DEPOSITION, BUT THE POINT I SHOULD HAVE MADE WAS THAT I PUT ALL

2   OF THE TOWN OF DONALDSON IN A SINGLE DISTRICT, HOUSE DISTRICT

3   60.

4   Q.   AND WAS THAT THE MINOR CHANGES YOU WERE REFERRING TO THAT

5   PERHAPS WERE RECEIVED FROM DR. COLTEN?

6   A.   NO.

7   Q.   WHAT WERE THE MINOR CHANGES YOU BELIEVED WERE RECEIVED

8   FROM DR. COLTEN?

9   A.   THEY HAD TO DO MAINLY I THINK WITH THE BATON ROUGE AREA.

10   I DON'T THINK THAT -- I'M ALMOST A HUNDRED PERCENT CERTAIN THAT

11   THERE WAS NO DISCUSSION RELAYED TO ME FROM DR. COLTEN AS IT

12   PERTAINED TO HOUSE DISTRICT 60.

13   Q.   SO I WANT TO TURN QUICKLY TO YOUR REBUTTAL REPORT, WHICH

14   IS PL-89, AND WE WILL PUT IT UP ON THE SCREEN FOR YOU.

15   A.   OH, OKAY.

16   Q.   IF WE COULD TURN TO PARAGRAPH 30, PLEASE, AND I WANT TO

17   REFER TO THE LAST SENTENCE OF PARAGRAPH 30 WHERE IT SAYS "I

18   ALSO MADE CHANGES TO IMPROVE THE PERFORMANCE OF THE DISTRICTS

19   FOR BLACK-PREFERRED CANDIDATES BASED UPON THE FEEDBACK COUNSEL

20   RECEIVED FROM DR. HANDLEY."

21        DID I READ THAT CORRECTLY

22   A.   YES.  A MINOR CHANGE TO THE HOUSE DISTRICT 65, 68 AREA, I

23   THINK.

24   Q.   AND, AGAIN, THE PURPOSE OF THAT CHANGE WAS TO IMPROVE THE

25   PERFORMANCE OF A PARTICULAR DISTRICT.  IS THAT RIGHT?

11:17  1    **A.**   YES, IMPROVE THE PERFORMANCE.  THERE WAS NO DISCUSSION OF

2    BLACK VAP.

3    **Q.**   BUT WHEN YOU SAY "IMPROVE THE PERFORMANCE," YOU MEAN

4    IMPROVE THE LIKELIHOOD THAT THAT DISTRICT WOULD ELECT A BLACK

5    CANDIDATE?

6    **A.**   THAT WOULD BE THE REQUEST, RIGHT, AS I UNDERSTOOD THE

7    REQUEST ANY WAY.  IT HAD NOTHING TO DO, THOUGH, WITH ENHANCING

8    THE BLACK VOTING-AGE POPULATION IN ANY ONE OF THOSE DISTRICTS.

9    **Q.**   WELL, AS I UNDERSTAND IT --

10   **A.**   IT WAS JUST TO RECONFIGURE IT.

11   **Q.**   AS I UNDERSTAND IT, YOU DIDN'T ACTUALLY TALK TO DR.

12   HANDLEY.  CORRECT?

13   **A.**   I DID NOT.

14   **Q.**   AND SO YOU DON'T KNOW THE PURPOSE FOR WHAT THE REQUESTED

15   CHANGE WAS.  CORRECT?

16   **A.**   WELL, IT WAS MY UNDERSTANDING THAT THE CONFIGURATION I HAD

17   IN, I GUESS, THE ILLUSTRATIVE 2022 PLAN MAY NOT HAVE HAD A

18   SUFFICIENT PROBABILITY IN TERMS OF THE ABILITY TO ELECT A BLACK

19   CANDIDATE.  SO IT WAS SUGGESTED OR REQUESTED THAT I EXPERIMENT

20   WITH OTHER CONFIGURATIONS, AND I DIDN'T HAVE ELECTION DATA.  SO

21   I TRIED ANOTHER CONFIGURATION AND PROVIDED IT TO THE ATTORNEYS.

22   AND, AGAIN, THAT MINOR CHANGE ADHERED TO TRADITIONAL

23   REDISTRICTING PRINCIPLES.  AND I HAVE NO IDEA WHETHER IT

24   INCREASED THE BLACK VOTING-AGE POPULATION OR DECREASED IT.  I

25   WAS NOT TRYING TO DO THAT.  I WAS TRYING TO BALANCE OUT ALL THE

WILLIAM S. COOPER

11:18 1    FACTORS, BUT TO TAKE INTO ACCOUNT AN ALTERNATIVE CONFIGURATION

2    THAT WOULD HAVE PASSED MUSTER WITH DR. HANDLEY'S ANALYSIS.

3    **Q.**   BUT YOU DON'T KNOW WHY HANDLEY BELIEVED IT WOULD OR WOULD

4    NOT PERFORM.  CORRECT?

5    **A.**   WELL, SHE DOES THE PERFORMANCE ANALYSIS AS PART OF *GINGLES*

6    *2 AND GINGLES 3.*

7    **Q.**   BUT YOU DIDN'T SPEAK WITH HER?

8    **A.**   NO, I DID NOT.

9    **Q.**   SO SHE DIDN'T TELL YOU WHY SHE WANTED THAT CHANGED?

10    **A.**   WELL, NO.  IT WAS MY UNDERSTANDING THAT THAT THERE WAS AN

11    ISSUE ABOUT WHETHER OR NOT THAT DISTRICT WOULD HAVE A HIGH

12    LIKELIHOOD OF ELECTING A BLACK CANDIDATE BASED ON HISTORICAL

13    ELECTION DATA.

14    **Q.**   BUT YOU DON'T KNOW WHY DR. HANDLEY FELT THAT WAY?

15          **MS. THOMAS:**  OBJECTION.

16    **BY THE WITNESS:**

17    **A.**   WELL, I MEAN, THAT WAS HER ANALYSIS.  I DIDN'T TALK TO

18    HER.  BUT, I MEAN, THAT -- SHE MADE THAT REQUEST TO THE

19    ATTORNEYS.

20          **THE COURT:**  ASKED AND ANSWERED.  SUSTAINED.  HE'S

21    ALREADY ANSWERED IT.

22                GO AHEAD.  NEXT QUESTION.

23          **MR. TUCKER:**  WE CAN TAKE THAT EXHIBIT OFF THE SCREEN.

24    THANK YOU.

25    **BY MR. TUCKER:**

WILLIAM S. COOPER

11:19 1   **Q.**   SO I WANT TO GO BACK TO TALKING ABOUT YOUR CULTURAL

2   COMMUNITIES OF INTEREST.

3   **A.**   WELL, THEY'RE NOT MY CULTURAL COMMUNITIES OF INTEREST

4   EXACTLY, BUT GO AHEAD.

5   **Q.**   WELL, I'M REFERRING TO THE CULTURAL COMMUNITIES OF

6   INTEREST YOU IDENTIFIED IN YOUR REPORT.  FAIR?

7   **A.**   OKAY.

8   **Q.**   SO, AGAIN, JUST TO REVISIT, SO YOU DIDN'T SEE DR. COLTEN'S

9   REPORT UNTIL AFTER YOU DREW YOUR DISTRICTS IN THIS CASE.

10   CORRECT?

11   **A.**   CORRECT.

12   **Q.**   AND SO DR. COLTEN'S REPORT AND HIS OPINIONS ON COMMUNITIES

13   OF INTEREST DID NOTHING TO INFORM ON THE DRAWING OF THE

14   ILLUSTRATIVE PLANS HERE.  CORRECT?

15   **A.**   HIS REPORT ITSELF, NO.

16   **Q.**   AND, AGAIN, YOU ONLY RECEIVED VERY MINOR COMMENTS AND MADE

17   MINOR CHANGES BASED UPON ANY FEEDBACK FROM DR. COLTEN IN THIS

18   CASE.  CORRECT?

19   **A.**   AGAIN, I BELIEVE THAT HIS REQUEST MAY HAVE FOCUSED MORE ON

20   BATON ROUGE THAN THE AREA IN, SAY, CADDO, BOSSIER CITY, OR

21   HOUSE DISTRICT 60 AS WE JUST SPOKE.  I THINK IT WAS MORE

22   FOCUSED ON MAKING SOME MODIFICATIONS, FOR EXAMPLE, TO SENATE

23   DISTRICT 17 SO THAT IT WENT FURTHER SOUTH TO PICK UP PARTS OF

24   SOUTHERN UNIVERSITY, I THINK.  THAT WOULD HAVE COME FROM PLANS,

25   THOUGH.  THERE WERE VARIOUS SUGGESTIONS, AND I DIDN'T

WILLIAM S. COOPER

11:20  1   NECESSARILY TIE THEM TO ANY ONE INDIVIDUAL, WHETHER IT BE DR.
       2   COLTEN OR A PARTICULAR PLAINTIFF.
       3         OF COURSE, THE PLAINTIFFS WERE NEVER GIVEN -- THAT
       4   INFORMATION FROM THE PLAINTIFFS WAS NEVER PROVIDED TO ME BY
       5   NAME.  I JUST KNEW THAT SOME PLAINTIFFS HAD EXPRESSED ALSO AN
       6   INTEREST MAYBE IN INCLUDING PARTS OF SOUTHERN UNIVERSITY IN
       7   SENATE DISTRICT 77.
       8   Q.   OKAY.  I UNDERSTAND THAT.
       9         SO PLAINTIFFS' COUNSEL NEVER EVEN SPECIFICALLY SAID
      10   "THIS IS INFORMATION FROM DR. COLTEN.  WE WANT YOU TO CONSIDER
      11   IT."  YOU JUST ASSUMED THAT?
      12   A.   WELL, I THINK THERE WAS -- I THINK -- YEAH.  I THINK THAT
      13   WAS THE CASE, THAT I DID LEARN THAT HE HAD SOME INTEREST ABOUT
      14   MAYBE LINING THINGS UP BETTER WITH BATON ROUGE NEIGHBORHOODS.
      15   Q.   NOW, I WANT TO RETURN BACK TO YOUR REPORT.  AGAIN, PL-20,
      16   PLEASE, AT PARAGRAPH 27.
      17   A.   YES.
      18   Q.   AND THESE ARE CULTURAL COMMUNITIES OF INTEREST YOU
      19   DISCUSSED IN YOUR REPORT.  CORRECT?
      20   A.   YES, DRAWN FROM A VARIETY OF SOURCES, AND THEY ARE NOT
      21   CAST IN STONE.  OTHER PERSONS COULD HAVE EASILY MODIFIED THIS
      22   IN SOME FASHION.
      23   Q.   DO YOU RECALL TESTIFYING IN YOUR DEPOSITION THAT THESE
      24   PARTICULAR COMMUNITIES OF INTEREST WERE REALLY JUST IN THE
      25   BACKGROUND AS YOU WERE DRAWING YOUR MAPS?

WILLIAM S. COOPER

11:22 1   **A.**   YES.   I DON'T EXACTLY RECALL THAT EXACT PHRASE, BUT THEY

2   WERE IN THE BACKGROUND.   YES, I WAS AWARE OF THEM.   AND TO THE

3   EXTENT THAT I COULD, I TRIED TO KIND OF STAY IN THAT ZONE.

4   **Q.**   BUT YOU WEREN'T TRYING TO MINIMIZE HOW MANY TIMES YOU

5   SPLIT THESE VARIOUS COMMUNITIES OF INTEREST.   CORRECT?

6   **A.**   WELL, NO.   I MEAN, YOU REALLY CAN'T BECAUSE THEY ARE

7   VARIOUS COMMUNITIES OF INTEREST AND VARIOUS CULTURAL REGIONS.

8   AND I WAS ALSO PAYING ATTENTION TO SPLITS OF MSAS, WHICH

9   INTERSECT AND CROSS THESE CULTURAL REGIONS.   I WAS ALSO PAYING

10   ATTENTION TO PARISH LINES.   I WAS ALSO PAYING ATTENTION TO

11   PLANNING DISTRICT BOUNDARIES.   SO -- AND THE -- ALL OF THEM

12   KIND OF CRISSCROSSED ONE ANOTHER, BUT I WAS AWARE OF IT.

13        I MEAN, I KNEW WHERE ACADIANA WAS BASED ON THE

14   LOUISIANA LEGISLATURE DEFINITION OF 22 PARISHES, AND THEN I

15   ALSO REALIZED THERE'S A SUBSET OF PARISHES THAT MORE PROPERLY

16   REFLECT THE CAJUN HEARTLAND.   SO I TOOK THAT INTO ACCOUNT.

17   BUT, SURE, THERE ARE SPLITS, AS YOUR PLAN, AS THE STATE'S PLAN

18   DOES, THESE REGIONS ARE SPLIT, BECAUSE YOU HAVE TO MAKE SOME

19   SPLITS, IF FOR NO OTHER REASON, JUST TO MEET ONE-PERSON,

20   ONE-VOTE.

21   **Q.**   SO COMMUNITIES OF INTEREST IS A BROAD TERM.   RIGHT?

22   **A.**   IT IS A BROAD TERM, VERY BROAD.

23   **Q.**   AND SOMETIMES BY TRYING TO UNITE ONE COMMUNITY OF

24   INTEREST, YOU MAY HAVE TO DIVIDE ANOTHER?

25   **A.**   THAT'S TRUE.

WILLIAM S. COOPER

11:23 1   **Q.**   I WANT TO SHIFT A LITTLE BIT TO THE DISCUSSION OF YOUR
2   CONSIDERATION OF SOCIOECONOMIC DATA.  I BELIEVE YOU STATE IN
3   YOUR REPORT -- AND I THINK YOU TESTIFIED MAYBE YESTERDAY --
4   THAT YOU CONSIDERED SOCIOECONOMIC DATA FROM THE 2019 AMERICAN
5   COMMUNITY SURVEY.  IS THAT CORRECT?
6   **A.**   2015 TO 2019, A FIVE-YEAR ASC FOR MUNICIPALITIES AND
7   PARISHES, AND THEN FOR THE MSAS, OF WHICH THERE WERE REALLY
8   ONLY TWO, WHERE THE CENSUS BUREAU REPORTS IN AN EASILY
9   ACCESSIBLE SPREADSHEET THE PERCENTAGES.  I LOOKED AT BATON
10   ROUGE MSA AND NEW ORLEANS MSA.  SHREVEPORT AND SOME OF THE
11   OTHER MSAS IN THE STATE ARE A LITTLE MORE DIFFICULT TO GET TO.
12        SO I ONLY REPORTED AT THE MSA LEVEL BATON ROUGE FROM
13   THE 2019 ONE-YEAR SURVEY AND NEW ORLEANS FROM THE 2019 ONE-YEAR
14   SURVEY.  AND I CUT IT AT 2019 INSTEAD OF ADDING IN 2020 OR 2021
15   BECAUSE OF THE -- BECAUSE OF THE PANDEMIC, THAT TENDS TO SKEW
16   THE SOCIOECONOMIC DATA.  AND SO I'VE SORT OF DECIDED THAT 2019
17   IS BETTER AT THIS POINT IN TIME NEXT YEAR MAYBE STARTING -- IF
18   WE'RE BACK HERE NEXT YEAR, WE CAN LOOK AT 2022 OR 2023.
19   **Q.**   THE DATA YOU RELIED UPON FROM THE AMERICAN COMMUNITY
20   SURVEY WAS ONLY AT THE PARISH AND MUNICIPAL LEVEL.  CORRECT?
21   **A.**   THAT'S RIGHT.
22   **Q.**   YOU DID NOT HAVE SUCH DATA AT A SMALLER LEVEL OF
23   GEOGRAPHY?
24   **A.**   I DID NOT RELY ON BLOCK-GROUP LEVEL DATA RELATING TO
25   SOCIOECONOMICS.  AS I WAS DRAWING THE PLAN -- AND ONE REASON

WILLIAM S. COOPER

11:25  1  THAT I DON'T USE IT IS BECAUSE THERE IS A LARGE MARGIN OF ERROR

2  AT THE BLOCK-GROUP LEVEL.  AND SO I PREFER JUST TO GAIN AN

3  UNDERSTANDING OF THE COMMUNITY I'M LOOKING AT BY LOOKING AT A

4  BIGGER PICTURE, WHICH IS THE COMMUNITY ITSELF, THAT WOULD

5  INCLUDE AN AGGREGATION OF BLOCK GROUPS AND BE A MORE RELIABLE

6  PERCENTAGE THAN JUST THE BLOCK-GROUP LEVEL DATA, WHICH IS MICRO

7  LEVEL AND WITH A RELATIVELY HIGH MARGIN OF ERROR.

8  Q.   AND BECAUSE YOU DIDN'T HAVE THAT SMALL LEVEL OF GEOGRAPHY,

9  YOU COULDN'T LOAD IT INTO YOUR MAPTITUDE SOFTWARE.  CORRECT?

10  A.   NO.  I COULD HAVE LOADED IT IN MY SOFTWARE.  IN FACT, I

11  DID IN MY REBUTTAL REPORT.  I SHOW BLOCK GROUPS STATEWIDE BASED

12  ON AN 185 PERCENT POVERTY LEVEL TO DEMONSTRATE THAT IN GENERAL

13  THE AREAS THAT I INCLUDED IN MY ILLUSTRATIVE PLAN IN THE

14  ILLUSTRATIVE DISTRICTS, HOUSE AND SENATE, ARE COMPRISED OF

15  BLOCK GROUPS WHERE THE OVERALL POPULATION, RACE NEUTRAL, NOT

16  JUST AFRICAN AMERICANS, BY ALL RACES, ARE BELOW 185 PERCENT

17  POVERTY.  AND SO THOSE ARE IN MY REBUTTAL REPORT.  YOU CAN SEE

18  THE BLOCK-GROUP SHADING INDICATING WHICH BLOCK GROUPS ARE

19  COMPRISED OF HOUSEHOLDS WHERE THE POPULATION IS MORE THAN

20  50 PERCENT UNDER 185 PERCENT POVERTY IF I CAN MAKE THAT --

21  Q.   SO --

22  A.   THAT'S A SPECIAL TABULATION PREPARED BY THE U.S. CENSUS

23  BUREAU FOR THE U.S. DEPARTMENT OF AGRICULTURAL AND THE SCHOOL

24  MEALS PROGRAM FOR CHILDREN, AND THAT RELATES TO THE SUMMER

25  FEEDING PROGRAM AND ALSO FOR CHILD AND ADULT CARE PROGRAMS.  SO

WILLIAM S. COOPER

11:26  1    THOSE ARE AREAS THAT ARE IDENTIFIED AS BEING PLACES WHERE THE

2    FEDERAL GOVERNMENT CAN PROVIDE SUBSIDIES TO LOCAL GOVERNMENTS

3    OR TO COMMUNITY LEVEL ORGANIZATIONS, NON-GOVERNMENTAL

4    ORGANIZATIONS, TO PROVIDE SCHOOL -- TO PROVIDE AFTER-SCHOOL

5    NUTRITION OR SUMMER FOOD NUTRITION.

6    **Q.**   I WAS ASKING SPECIFICALLY ABOUT THE ACS DATA.

7    **A.**   IT'S ACS DATA.  THAT'S ACS DATA.

8    **Q.**   SO YOU'RE TESTIFYING TODAY THAT YOU LOADED ACS DATA INTO

9    MAPTITUDE?

10   **A.**   WELL, I SURE DID.

11   **Q.**   IS THAT YOUR TESTIMONY HERE TODAY?

12   **A.**   I DID IN MY REBUTTAL REPORT, BUT NOT AS I WAS DRAWING THE

13   PLANS.  I JUST DID THAT TO DEMONSTRATE THAT THE AREAS THAT I'VE

14   IDENTIFIED AS MAJORITY-BLACK DISTRICTS, THE ADDITIONAL

15   MAJORITY-BLACK DISTRICTS, ARE LARGELY ENCOMPASSED BY BLOCK

16   GROUPS WITH 185 PERCENT POVERTY RATE OF WHICH 50 PERCENT OF THE

17   HOUSEHOLDS ARE BELOW THAT LEVEL.

18   **Q.**   CAN WE PLEASE PULL UP MR. COOPER'S DEPOSITION TRANSCRIPT

19   AGAIN?  THIS TIME ON PAGE 90.

20            I WANT TO REFER YOU STARTING AT LINE 25.

21            "QUESTION:  SO THEN YOU DIDN'T LOAD ANY SOCIOECONOMIC

22   DATA INTO THE MAPTITUDE SOFTWARE?"

23            GO DOWN TO THE NEXT PAGE.

24            "ANSWER:  NOT, I DID NOT."

25            DID I READ THAT CORRECT?

WILLIAM S. COOPER

11:28 1   A.   WELL, WHAT DID I JUST TELL YOU?  I DID NOT, BECAUSE I WAS
2   THE DRAWING PLAN.  BUT AS I WAS RESPONDING TO DR. MURRAY'S
3   REBUTTAL -- DR. MURRAY'S REPORT, WHICH CLAIMED THAT BLOCK
4   GROUPS AND NEIGHBORHOODS ARE THE SAME, WHEN THEY'RE REALLY NOT.
5   THEY ARE, MAYBE, PROXIES.  I FELT THE NEED TO THEN GO ONE STEP
6   FURTHER AND SHOW THAT I DID UNDERSTAND WHAT BLOCK GROUPS ARE
7   AND THAT I DID DO A FAIRLY GOOD JOB OF INCLUDING AREAS THAT ARE
8   RELATIVELY LOWER INCOME IN THE HOUSE DISTRICTS THAT I CREATED
9   AND THE SENATE DISTRICTS -- THE SIX HOUSE DISTRICTS AND THE
10   THREE SENATE DISTRICTS.  IT'S NOT A PERFECT MATCH, BECAUSE
11   THERE ARE AREAS IN THOSE MAPS THAT ARE ABOVE THAT HAVE -- DO
12   NOT HAVE 50 PERCENT OF THE POPULATION LIVING BELOW THE
13   185 PERCENT LEVEL.  BUT IF YOU LOOK AT THOSE MAPS, IT COVERS A
14   LOT OF AREA.  AND IT'S NOT JUST BLACK PERSONS, THAT'S RACE
15   NEUTRAL.
16   Q.   MR. COOPER, I'M TRYING NOT TO CUT YOU OFF, BUT YOU NEED TO
17   TRY TO JUST STICK TO ANSWERING MY QUESTION.
18        AND SO I WANT TO UNDERSTAND THIS.  YOU WERE DEPOSED
19   AFTER YOUR REBUTTAL REPORT IN THIS CASE.  CORRECT?
20   A.   I WAS.  AND MAYBE I MISUNDERSTOOD THE QUESTION.  I THOUGHT
21   THE QUESTION WAS DIRECTLY RELATED TO THE PLAN DRAWING PROCESS
22   ITSELF, AND AS I'VE JUST STATED TODAY, I DID NOT LOOK AT BLOCK
23   GROUP LEVEL DATA AS I WAS DRAWING THE PLAN.
24   Q.   THE QUESTION WAS:  "DID YOU LOAD ANY SOCIOECONOMIC DATA
25   INTO MAPTITUDE AT YOUR DEPOSITION?"  AND YOUR ANSWER AT THAT

WILLIAM S. COOPER

11:29 1    TIME WAS "NO."  AND YOU ARE NOW TELLING THE COURT THAT THAT

2    ANSWER WAS FALSE?

3    **A.**   YOU KNOW, YOU SAW MY REBUTTAL REPORT.  YOU MUST HAVE KNOWN

4    THAT I LOADED IT INTO THE SOFTWARE TO DO MY REBUTTAL REPORT,

5    DIDN'T YOU?

6    **Q.**   MR. COOPER, MY QUESTION IS:  ARE YOU TELLING THE COURT

7    TODAY THAT YOUR ANSWER AT YOUR DEPOSITION WAS FALSE?

8    **A.**   NO.  IT WAS TRUE.  I DID NOT USE BLOCK-GROUP LEVEL DATA TO

9    DRAW THE PLAN, WHICH IS WHAT WE WERE DISCUSSING.  BUT I DID USE

10   IT AS AN EXAMPLE TO REBUT SOME OF DR. MURRAY'S TESTIMONY.

11   **Q.**   WHERE IN THE QUESTION --

12          **MS. THOMAS:**  OBJECTION TO THE POINT THAT THIS IS

13   GETTING ARGUMENTATIVE.

14          **THE COURT:**  OBJECTION IS SUSTAINED.

15   BY MR. TUCKER:

16   **Q.**   WHERE IN THE QUESTION DOES IT ASK ANYTHING ABOUT WHEN OR

17   WHY YOU LOADED DATA INTO THE MAPTITUDE SOFTWARE?

18          **THE COURT:**  THE OBJECTION WAS SUSTAINED.

19   BY MR. TUCKER:

20   **Q.**   NOW, YOU GENERATED OR HAD THE ABILITY TO GENERATE A BUNCH

21   OF DIFFERENT REPORTS FROM THE ACS DATA.  CORRECT?

22   **A.**   YES.

23   **Q.**   DIFFERENT REPORTS FOR EACH MUNICIPALITY AND EACH COUNT --

24   OR SORRY -- EACH PARISH.  CORRECT?

25   **A.**   EACH PARISH AND EACH MUNICIPALITY AND EVEN CENSUS

WILLIAM S. COOPER

11:30  1  DESIGNATED PLACE -- UNINCORPORATED PLACES THAT HAD AT LEAST

2  2,500 PEOPLE IN THEM AND WAS 10 PERCENT BLACK.

3  **Q.**   BUT YOU DIDN'T ACTUALLY LOOK AT ALL OF THOSE REPORTS.

4  CORRECT?

5  **A.**   OH, NO.   THERE WAS HUNDREDS OF THEM.

6  **Q.**   AND YOU DON'T STATE ANYWHERE IN YOUR REPORT WHICH ONES YOU

7  SPECIFICALLY REVIEWED.   CORRECT?

8  **A.**   I DO NOT.

9  **Q.**   MR. COOPER, I WANT TO SHIFT GEARS A LITTLE BIT AND TALK

10  ABOUT COMPACTNESS.   YOU DID NOT MEASURE THE COMPACTNESS OF THE

11  MINORITY POPULATION INSIDE EACH OF YOUR ILLUSTRATIVE DISTRICTS.

12  CORRECT?

13  **A.**   I DID NOT, THAT'S NOT NECESSARY.   THAT IS SOMETHING THAT

14  ONE DOES NOT NEED TO DO TO ANSWER THE *GINGLES 1* INQUIRY.

15  **Q.**   ALL RIGHT.

16  **A.**   THE MINORITY POPULATION DOES NOT HAVE TO MEET SOME SORT OF

17  INVENTED COMPACTNESS MEASURE BY DR. TRENDE.   I UNDERSTAND THAT

18  COMPACTNESS MEASURE HAS BEEN OUT THERE FOR 60 YEARS, BUT IT'S

19  NEVER SHOWED UP IN ANY CASE I'VE EVER BEEN INVOLVED IN AND FOR

20  GOOD REASON BECAUSE IT HAS NOTHING TO DO WITH DRAWING A

21  REASONABLY COMPACT, REASONABLY SHAPED, ILLUSTRATIVE DISTRICT

22  WHERE THE BLACK POPULATION REPRESENTS A MAJORITY OF AT LEAST 50

23  PERCENT PLUS ONE.   HAS NOTHING TO DO WITH IT.

24  **Q.**   OKAY.   SO IT DOESN'T --

25  **A.**   AND I WANT TO HEAR YOU BRING DR. TRENDE IN HERE -- I WON'T

WILLIAM S. COOPER

11:32  1   BE HERE -- AND TELL THE COURT THAT SOMEBODY WHO HAPPENS TO LIVE

2   IN VIVIAN, INSTEAD OF BOSSIER PARISH, IS NOT PART OF A

3   REASONABLY COMPACT MAJORITY-BLACK DISTRICT.

4           **MR. TUCKER:**  YOUR HONOR, AGAIN, WE'RE ON A CLOCK HERE

5   WITH BOTH PARTIES.  I'D JUST ASK THE WITNESS TO BE REMINDED TO

6   ANSWER THE QUESTION.  HIS COUNSEL WILL HAVE AN OPPORTUNITY TO

7   REDIRECT HIM.

8           **THE COURT:**  YOU ASKED THE QUESTION, SO REMINDED.

9               GO AHEAD.

10          **MR. TUCKER:**  WELL, I THINK HE ANSWERED IT, BUT THEN

11  HE WENT ON FOR SEVERAL MINUTES ABOUT ADDITIONAL THINGS WELL

12  BEYOND THE QUESTION THAT WAS ASKED.

13  **BY MR. TUCKER:**

14  **Q.**   SO IT DID NOT MATTER TO YOU IF THE BLACK POPULATION WAS

15  LOCATED ACROSS DIFFERENT PARTS OF THE DISTRICT?

16  **A.**   NOT REALLY, NO.

17  **Q.**   AND IN YOUR REPORT YOU ONLY ANALYZE COMPACTNESS AT A

18  STATEWIDE LEVEL.  CORRECT?

19  **A.**   THAT'S NOT TRUE.  I HAVE COMPACTNESS SCORES FOR EVERY

20  SINGLE ONE OF THE DISTRICTS THAT I'VE DRAWN.

21  **Q.**   CORRECT.  BUT IN YOUR REPORT -- I UNDERSTAND THERE'S AN

22  EXHIBIT TO YOUR REPORT WHERE YOU REPORT ON THE COMPACTNESS

23  SCORES DISTRICT BY DISTRICT, BUT YOU DON'T DO ANY ANALYSIS IN

24  YOUR REPORT OF DISTRICT BY DISTRICT COMPACTNESS.  CORRECT?

25  **A.**   WELL, IT'S IN THE EXHIBITS.

WILLIAM S. COOPER

11:33  1          **MS. THOMAS:**  SORRY.

2      **BY THE WITNESS:**

3      **A.**   ANYBODY CAN LOOK AT THAT.

4          **THE COURT:**  JUST A MOMENT, SIR.  YOUR LAWYER WANTS TO

5      OBJECT.

6          **MS. THOMAS:**  OBJECTION.  MISREPRESENTS WHAT MR.

7      COOPER HAS DONE.  AS WE SAID IN OUR DIRECT, THE EXHIBITS ARE

8      PART OF HIS REPORT AND WERE TURNED OVER AT THE SAME TIME AS HIS

9      REPORT.

10          **THE COURT:**  SO THE QUESTION IS:  DID HE MAKE SOME

11      SORT OF ANALYTICAL STATEMENTS IN HIS ACTUAL WRITTEN REPORT?

12      I'LL ALLOW THE QUESTION.

13          **MR. TUCKER:**  CORRECT.

14          **THE COURT:**  IT'S KIND OF OBVIOUS.

15      **BY MR. TUCKER:**

16      **Q.**   OTHER THAN JUST REPORTING THE SCORES, DID YOU DO ANY OTHER

17      ANALYSIS OF THOSE SCORES DISTRICT BY DISTRICT IN YOUR REPORT?

18      **A.**   NO.  I DID A SUMMARY.  I DID A SUMMARY IN MY REPORT, AND

19      THEN POINTED IN MY -- IN THE PARAGRAPHS PRECEDING THAT

20      DISCUSSION IN MY DECLARATION, I POINTED THE READER TO AN

21      EXHIBIT WHICH HAD THE EXACT SCORES FOR ALL THE DISTRICTS.

22      **Q.**   CAN WE TURN TO PL-20 AGAIN AND LOOK AT FIGURE 25 ON

23      PAGE 46?

24          AND IS FIGURE 25 THAT'S ON YOUR SCREEN WHAT YOU ARE

25      TALKING ABOUT ON THE REPORTING OF THE ANALYSIS YOU DID OF THE

WILLIAM S. COOPER

11:34   1   COMPACTNESS SCORES FOR THE HOUSE?

2   **A.**   YES, THE SUMMARY TABLE.

3   **Q.**   AND HERE THE MEAN REOCK AND POLSBY-POPPER SCORES ARE THE

4   SAME FOR BOTH YOUR ILLUSTRATIVE PLANS AND THE ENACTED PLANS.

5   CORRECT?

6   **A.**   UNDER THE HOUSE PLAN.  AS I'VE SAID, THERE'S VERY LITTLE

7   DIFFERENCE.

8   **Q.**   SO YOU DIDN'T DO ANY SPECIFIC ANALYSIS IN YOUR REPORT OF

9   WHERE YOU DREW ADDITIONAL MAJORITY-BLACK DISTRICTS OF THE

10   COMPACTNESS SCORES OF THOSE DISTRICTS IN THOSE AREAS?

11   **A.**   I DID NOT DISCUSS IN DETAIL THE COMPACTNESS SCORES OF THE

12   INDIVIDUAL DISTRICTS.  I MADE VISUAL ASSESSMENTS THAT THE NEW

13   ADDITIONAL MAJORITY-BLACK DISTRICTS THAT I DREW WERE

14   SUFFICIENTLY COMPACT TO QUALIFY AS MEETING THE *GINGLES 1* PRONG.

15   **Q.**   AND ARE YOU AWARE THAT YOU OFTEN LOWERED THE COMPACTNESS

16   SCORES IN DISTRICTS IN THE AREAS WHERE YOU CREATE ADDITIONAL

17   MAJORITY-BLACK DISTRICTS?

18   **A.**   IT IS CONCEIVABLE THAT SOME OF THE ADJACENT SCORES DID

19   DROP.  I DON'T KNOW OFF THE TOP OF MY HEAD.  THAT MIGHT NOT --

20   THAT IS -- I DON'T BELIEVE A PROBLEM, BUT WE'LL SEE.

21   **Q.**   CAN WE PULL UP THE IMPEACHMENT DOCUMENT, PLEASE?

22   SO, MR. COOPER, YOU TESTIFIED EARLIER THAT YOU

23   REPORTED ON THE DISTRICT BY DISTRICT COMPACTNESS SCORES AND

24   INCLUDED THOSE IN EXHIBITS TO YOUR REPORT.  CORRECT?

25   **MS. THOMAS:**   SORRY.  I'M JUST GOING TO OBJECT ON

WILLIAM S. COOPER

11:36 1   FOUNDATION.  I HAVE NO IDEA WHAT THIS DOCUMENT IS.  THIS IS MY

2   FIRST TIME SEEING IT.  I DON'T THINK COUNSEL HAS LAID THE

3   FOUNDATION FOR WHAT THIS DOCUMENT IS.

4          **MR. TUCKER:**  YOUR HONOR, THIS IS JUST AN ILLUSTRATIVE

5   AID THAT IS BEING USED FOR IMPEACHMENT.  IT'S A SUMMARY OF ALL

6   THE VARIOUS SCORES OR INFORMATION THAT ARE IN MR. COOPER'S

7   REPORTS OR THE EXHIBITS TO HIS REPORT.  IT'S JUST BEING USED SO

8   HE CAN EASILY REFER TO SCORES.  I'M HAPPY TO GIVE HIM BOTH

9   TABLES IF HE WANTS TO REVIEW IT THAT WAY.  IT'S JUST A SIMPLER

10   WAY FOR HIM TO REVIEW THE INFORMATION.

11          **THE COURT:**  I MEAN, WE'VE GOT SEVERAL THINGS GOING ON

12   HERE.  FIRST OF ALL, YOU DON'T HAVE TO DISCLOSE YOUR

13   IMPEACHMENT.  SO THAT YOU HAVE GOING FOR YOU.

14          BUT WHAT YOU HAVE GOING AGAINST YOU IS THAT THIS

15   IS A SUMMARY OF EXTENSIVE DATA, AND YOU ARE GOING TO

16   CROSS-EXAMINE HIM ON A SUMMARY THAT YOU DID AND YOU CALCULATED.

17   AND 1005 -- I THINK THAT'S THE CODE NUMBER -- TALKS ABOUT

18   SUMMARY EVIDENCE, AND YOU ARE SUPPOSED TO DISCLOSE IF YOU ARE

19   GOING TO USE SUMMARY EVIDENCE.

20          SO, YOU KNOW, HOW IS THIS FAIR?  HOW IS IT FAIR

21   FOR YOU TO CROSS-EXAMINE HIM ON DATA THAT YOU SUMMARIZED FROM

22   AN EXHIBIT THAT'S I DON'T EVEN HOW MANY PAGES LONG?

23          **MR. TUCKER:**  IF THE COURT WOULD PREFER AND THE

24   WITNESS PREFER, WE CAN -- IF WE JUST PULL UP PX -- OR SORRY,

25   PL-73 AND PL-74, WE CAN LOOK AT THOSE SIDE BY SIDE.  THOSE ARE

WILLIAM S. COOPER

11:37  1    THE EXHIBITS TO HIS REPORT WHERE THESE NUMBERS COME FROM THAT I
     2    WAS GOING TO DISCUSS WITH HIM.
     3              THE COURT:  COUNSEL, DO YOU WANT HIM TO DO THAT?
     4              MS. THOMAS:  I WOULD PREFER THAT, GIVEN --
     5              MR. TUCKER:  OKAY.
     6              MS. THOMAS:  -- THAT WE HAVE NOT SEEN THIS
     7    ILLUSTRATIVE DOCUMENT BEFORE AND FOR THE REASONS THAT YOUR
     8    HONOR HAS ARTICULATED.
     9              THE COURT:  ARE PL-72 AND 74 --
    10             MR. TUCKER:  I BELIEVE IT'S 73 AND 74, YOUR HONOR.
    11             THE COURT:  SEVENTY --
    12             MR. TUCKER:  AND THEY ARE ADMITTED.
    13             THE COURT:  NO.  OKAY.  I'M WITH YOU.  BUT I DON'T
    14   HAVE AN INDEPENDENT RECOLLECTION OF THEM.  ARE THEY EXTENSIVE?
    15   OR ARE THEY JUST TALKING ABOUT -- I MEAN, IS IT --
    16             MR. TUCKER:  THERE ARE -- THEY ARE ABOUT NINE PAGES
    17   EACH, I THINK, AND I WAS JUST GOING TO SCROLL THROUGH THEM.
    18             THE COURT:  NINE OR 90?
    19             MR. TUCKER:  NINE.
    20             THE COURT:  NINE.
    21             MR. TUCKER:  THEY REPORT FOR EACH DISTRICT.  THEY
    22   REPORT THE COMPACTNESS SCORES FOR EACH DISTRICT.  AND ONE
    23   EXHIBIT IS FOR THE ENACTED PLAN, AND ONE EXHIBIT IS FOR THE
    24   ILLUSTRATIVE PLAN.
    25             THE COURT:  SO --

WILLIAM S. COOPER

11:38  1        **MR. TUCKER:**  I JUST WANT HIM TO COMPARE THE

2   COMPACTNESS SCORES.  THAT'S ALL.

3        **THE COURT:**  SO THE SUMMARY THAT YOU ARE OFFERING IS A

4   SUMMARY OF NINE PAGES?

5        **MR. TUCKER:**  CORRECT.

6        **THE COURT:**  I AM GOING TO ALLOW IT.

7        **MR. TUCKER:**  THE SUMMARY?

8        **THE COURT:**  YES.

9        **MR. TUCKER:**  THANK YOU, YOUR HONOR.

10        **THE COURT:**  OBJECTION'S OVERRULED.

11   **BY MR. TUCKER:**

12   **Q.**   AND, MR. COOPER, IF YOU NEED TO REFER TO VERIFY ANY OF THE

13   NUMBERS, THEY ARE EXHIBITS 01 AND 02 TO YOUR REPORT, WHICH ARE

14   PX-70 -- OR SORRY, PL-73 AND PL-74.

15   **A.**   WAIT.  WHEN YOU SAY 73 AND 74 TAB?

16   **Q.**   I DON'T KNOW WHAT YOU HAVE IN YOUR BINDERS IN FRONT ON

17   YOU.  IF IT IS THE -- IF THEY ARE NUMBERED BY THE PLAINTIFFS'

18   EXHIBITS, IT SHOULD BE 73 AND 74.

19   **A.**   OKAY.  WELL, I'LL HAVE --

20   **Q.**   I'LL GIVE YOU A CHANCE TO MAKE SURE WE'VE GOT THE RIGHT

21   DOCUMENTS IN FRONT OF YOU.

22   **A.**   OKAY.

23   **Q.**   AND SO JUST TO SET THE RECORD HERE, SO DO YOU RECOGNIZE

24   THAT PL-73 AND PL-74 ARE THE EXHIBITS TO YOUR REPORT THAT

25   REPORT THE COMPACTNESS SCORES FOR EACH DISTRICT IN THE ENACTED

WILLIAM S. COOPER

11:39  1  PLAN AND THE ILLUSTRATIVE PLAN FOR THE HOUSE?

2  **A.**   YES.

3  **Q.**   OKAY.  AND WHAT I'VE DONE HERE IS I HAVE A SUMMARY OF SOME

4  OF THESE DISTRICTS BY REGION AND I BELIEVE THESE ARE SIMILAR TO

5  THE CLUSTERS THAT DR. HANDLEY USED.  AND STARTING UP IN

6  SHREVEPORT IN THE CADDO AND BOSSIER PARISHES, THIS IS ONE AREA

7  WHERE YOU CREATE AN ADDITIONAL MAJORITY-BLACK DISTRICT.

8  CORRECT?

9  **A.**   YES.

10  **Q.**   AND THAT'S YOUR ILLUSTRATIVE HOUSE DISTRICT 1.  CORRECT?

11  **A.**   ILLUSTRATIVE HOUSE DISTRICT 1, YES.

12  **Q.**   OKAY.  NOW, ILLUSTRATIVE HOUSE DISTRICTS 2, 3, AND 4 ARE

13  MAJORITY BLACK, BUT SO ARE THOSE HOUSE DISTRICTS IN THE ENACTED

14  PLAN.  CORRECT?

15  **A.**   THEY ARE I BELIEVE MAJORITY BLACK IN THE HOUSE PLAN,

16  RIGHT.

17  **Q.**   BUT THE COMPACTNESS SCORES OF HOUSE DISTRICT 2 AND HOUSE

18  DISTRICT 3 ARE REDUCED IN YOUR ILLUSTRATIVE PLANS.  CORRECT?

19  **A.**   THEY ARE LOWER, BUT CLEARLY WITHIN THE ACCEPTABLE RANGE.

20  I MEAN, I'VE LOOKED AT LOTS OF DIFFERENT PLANS, LOTS OF

21  DIFFERENT SCORES, AND WITH REOCK SCORES IN THE 30S ABSENT SOME

22  OTHER PROBLEM WITH THE PLAN, I SEE NO REASON TO COMPLAIN.

23  **Q.**   AND TURNING BELOW TO CALCASIEU PARISH IN THE LAKE CHARLES

24  AREA, YOU CREATE A NEW MAJORITY-BLACK DISTRICT IN ILLUSTRATIVE

25  HOUSE DISTRICT 38.  CORRECT?

WILLIAM S. COOPER

11:41  1    **A.**   I DID.

2    **Q.**   BUT IN DOING SO, YOU ARE REDUCING THE COMPACTNESS OF THE

3    EXISTING MAJORITY BLACK-HOUSE DISTRICT IN HD 34.  CORRECT?

4    **A.**   THESE ARE STILL -- THERE'S NO PROBLEM WITH THESE

5    COMPACTNESS SCORES.  YOU CAN JUST LOOK AT THE MAP AND SEE IT'S

6    REASONABLE.  I'M NOT -- YOU KNOW, SURE, I MEAN, I MAY HAVE

7    REDUCED THE COMPACTNESS A LITTLE BIT.  SO WHAT?

8    **Q.**   SO FOR THE RECORD, THAT'S A "YES"?

9    **A.**   THAT IS -- THAT IS -- THE COMPACTNESS SCORE WAS REDUCED,

10   BUT IT IS CLEARLY WITHIN THE RANGE.  IN MY EXPERIENCE, THESE

11   SCORES ARE NOT BAD AT ALL IN THE ILLUSTRATIVE PLAN AND THEY'RE

12   NOT BAD IN THE ENACTED PLAN EITHER.  BUT COMPACTNESS SCORES ARE

13   NOT THE BE-ALL AND THE END-ALL.  I'M BALANCING FACTORS LIKE

14   PARISH SPLITS, MUNICIPAL SPLITS, POPULATION EQUALITY, WHERE THE

15   INCUMBENTS LIVE.

16          AND I HAVE TO COMPLETELY EMPHASIZE THAT POINT; THAT I

17   WOULD SACRIFICE COMPACTNESS TO AVOID PAIRING INCUMBENTS BECAUSE

18   I KNOW THAT IS A NON-STARTER WITH THE LEGISLATURE, TO START

19   PAIRING INCUMBENTS UNLESS IT'S JUST ABSOLUTELY NECESSARY.

20   **Q.**   WE COULD TAKE THE ILLUSTRATIVE AID DOWN NOW.  THANK YOU.

21          ALL RIGHT, MR. COOPER.  CAN YOU TURN NOW TO PAGE 50

22   OF YOUR REPORT, PL-20?

23   **A.**   ALMOST THERE.

24   **Q.**   TAKE YOUR TIME.

25   **A.**   YES.

WILLIAM S. COOPER

11:42  1  **Q.**   OKAY.  AND ON PAGE 50 HERE YOU DISCUSS CREATING A NEW
     2  MAJORITY-HOUSE DISTRICT IN ILLUSTRATIVE HOUSE DISTRICT 1.
     3  CORRECT?
     4  **A.**   YES.
     5  **Q.**   AND THAT'S IN THE SHREVEPORT AREA?
     6  **A.**   YES.
     7  **Q.**   AND TO CREATE THIS NEW MAJORITY-BLACK DISTRICT, YOU MOVE
     8  HOUSE DISTRICT 1 FURTHER SOUTH INTO SHREVEPORT TO PICK UP BLACK
     9  POPULATION IN SHREVEPORT.  CORRECT?
    10  **A.**   I THINK IF WE TURN OVER ON THE PAGE YOU SEE THAT THERE
    11  WASN'T SO MUCH DIFFERENCE IN SHREVEPORT, A LITTLE BIT FURTHER
    12  SOUTH, BUT I ALSO MODIFIED DISTRICT 1 SO THAT IT DIDN'T EXTEND
    13  ALL THE WAY DOWN IN -- ALMOST INTO DESOTO PARISH.
    14  **Q.**   AND IN YOUR REPORT IN THIS SECTION, THERE'S NOTHING IN
    15  HERE THAT MENTIONS REUNITING ANY PARTICULAR PARISH OR
    16  MUNICIPALITY.  CORRECT?
    17  **A.**   WHERE?  WHERE?
    18  **Q.**   IN YOUR SECTION HERE ABOUT ILLUSTRATIVE HOUSE DISTRICT 1,
    19  NOWHERE DO YOU DISCUSS A REPORT ON REUNITING ANY PARISHES OR
    20  PARTICULAR MUNICIPALITIES.  CORRECT?
    21  **A.**   WELL, I MEAN, THAT'S WHY -- THAT'S WHY ILLUSTRATIVE HOUSE
    22  DISTRICT 1 IS JUST FINE BECAUSE IT DOESN'T DO ANYTHING OTHER
    23  THAN -- OTHER THAN ENCOMPASS WHAT IS IN PRESENT DAY HOUSE
    24  DISTRICT 1, AND THEN IT DOES EXTEND INTO BOSSIER CITY, WHICH
    25  AS DR. COLTEN EXPLAINED YESTERDAY, IS AN AREA THAT USED TO BE

11:44 1   PREDOMINATELY WHITE AND NOW WE'RE SEEING A LARGER

2   AFRICAN-AMERICAN POPULATION MOVE INTO THE BOSSIER PARISH AREA.

3   SO IT UNITES PARTS OF BOSSIER PARISH WITH SHREVEPORT.

4   **Q.**   AND GIVEN YOUR OPINION ON THE TOPIC, I ASSUME THAT YOU

5   DIDN'T DO ANYTHING TO GO ABOUT DETERMINING THE COMPACTNESS OF

6   THE BLACK POPULATION WITHIN THE CONTOURS OF ILLUSTRATIVE HOUSE

7   DISTRICT 1?

8   **A.**   NO.   AND THAT'S RIGHT UPFRONT IN DR. TRENDE'S ANALYSIS.

9   IT'S TOPOLOGICAL GOBBLEDYGOOK.   IT MAKES NO SENSE TO MAKE THAT

10   ARGUMENT.   I REITERATE, REPEAT IT, IT IS DESIGNED TO FAIL.   IT

11   IS A REDISTRICTING EQUIVALENT OF ASKING A PROSPECTIVE VOTER TO

12   TELL SOMEONE HOW MANY BEANS ARE IN A JAR.   IT'S DESIGNED TO

13   FAIL.   IF THAT METHODOLOGY WERE ACCEPTED, AT LEAST HALF OF THE

14   MAJORITY-BLACK DISTRICTS IN THE COUNTRY WOULD BE ELIMINATED IN

15   ONE FELL SWOOP.   YOU KNOW IT; I KNOW IT; DR. TRENDE KNOWS IT.

16   AND IT DOESN'T MEAN ANYTHING BECAUSE THERE IS NO WAY IN THE

17   WORLD THAT SOMEBODY WHO LIVES IN SHREVEPORT IS IN ANY WAY

18   DIFFERENT THAN SOMEBODY WHO LIVES IN VIVIAN IF THEY'RE A

19   MEMBER OF THE BLACK COMMUNITY, HIGHLY UNLIKELY.   OBVIOUSLY

20   THERE ARE DIFFERENCES IN PERSONAL FRIENDS AND THINGS.   BUT

21   OVERALL THERE IS A STRONG CONNECTION.   THEY LIVE IN THE SAME

22   PARISH; THEY GO TO THE SAME PARISH COUNCIL MEETINGS; THEY GO TO

23   THE SAME FOOTBALL GAMES.   THEY ARE 30 MILES APART.   THIS IS NOT

24   DRAWING A DISTRICT FROM, I DON'T KNOW, THE RIO GRANDE AROUND

25   REYNOSA, MEXICO, RIGHT ACROSS THE RIVER, ALL THE WAY UP INTO

11:46  1   DOWNTOWN SAN ANTONIO.  YOU GUYS LIKE TO POINT OUT THAT

 2   PARTICULAR RULING TO DEMONSTRATE THAT THE BLACK POPULATION IS

 3   DISPARATE.  BUT COME ON, THIS IS 30 MILES.  THIS IS NOT

 4   300 MILES FROM THE RIO GRANDE TO DOWNTOWN SAN ANTONIO.  IT'S 30

 5   MILES.  IT'S A 15-MINUTE DRIVE ALMOST.

 6               **MR. TUCKER:**  YOUR HONOR, MOVE TO STRIKE.  THE

 7   RESPONSE IS NON-RESPONSIVE.

 8               **THE COURT:**  DENIED.

 9   **BY MR. TUCKER:**

10   **Q.**   NOW I WANT TO TURN TO THE NATCHITOCHES AREA IN YOUR

11   REPORT.  IF YOU COULD GO ON PAGE 51.

12   **A.**   YES.

13   **Q.**   AND, AGAIN, YOU CREATE A MAJORITY-BLACK DISTRICT HERE

14   WHERE THERE'S NOT ONE IN THE ENACTED PLAN.  IS THAT RIGHT?

15   **A.**   THAT'S RIGHT.  YOU DESTROYED IT.  YOU ELIMINATED IT.  IT'S

16   NOT UNLIKE GALVESTON COUNTY, FRANKLIN, MAYBE NOT.  IT'S ALMOST

17   --

18   **Q.**   MR. COOPER, I JUST ASKED YOU A SIMPLE QUESTION.

19   **A.**   YEAH I KNOW, I KNOW.

20   **Q.**   THANK YOU.

21             BUT THIS DISTRICT IN YOUR ILLUSTRATIVE PLAN IS JUST

22   BARELY OVER 50 PERCENT.  IS THAT RIGHT?

23   **A.**   SO IT'S *GINGLES 1* COMPLIANT, AND IT'S A LOVELY LOOKING

24   DISTRICT.

25   **Q.**   AND, AGAIN, NOWHERE IN THIS SECTION ABOUT YOUR CREATION OF

WILLIAM S. COOPER

11:47  1    A NEW MAJORITY-BLACK DISTRICT IN THE NATCHITOCHES AREA DO YOU

       2    MENTION REUNITING ANY PARTICULAR CITY OR MUNICIPALITY.

       3    CORRECT?

       4    **A.**   WELL, IT'S IMPLICIT.  I REUNITE -- I BASICALLY JUST

       5    REPRODUCED A PLAN THAT WAS ALREADY THERE BETWEEN 2011 AND 2020.

       6    SO I'M JUST RENEWING THAT DISTRICT.

       7    **Q.**   YOU'RE REUNITING THE --

       8    **A.**   I DON'T KNOW WHY THAT DISTRICT WAS TAKEN AWAY, BUT THERE

       9    WAS NO REASON TO DO SO.

      10    **Q.**   YOU ARE JUST MAKING THE DISTRICT MORE SIMILAR TO WHAT IT

      11    WAS AFTER THE 2011 CENSUS, IS THAT WHAT YOU'RE SAYING?

      12    **A.**   BY AND LARGE.  I MEAN, THERE ARE DIFFERENCES BECAUSE THE

      13    POPULATION CHANGED, BUT IT'S UNITING NATCHITOCHES, RED RIVER,

      14    AND PART OF DESOTO PARISH INTO A SINGLE DISTRICT, JUST AS IT

      15    WAS UNITED IN THE ENACTED HOUSE PLAN OF 2011.  AND YOU HEARD

      16    THAT TESTIMONY FROM THE REVEREND YESTERDAY ABOUT THE COMMUNITY

      17    LINKS IN THAT AREA ALONG THE RED RIVER.  AND DR. COLTEN TALKED

      18    ABOUT IT, TOO.

      19    **Q.**   THE ENACTED PLAN KEEPS DESOTO PARISH WHOLE.  CORRECT?

      20    **A.**   I'M NOT SURE.  I'D HAVE TO LOOK BACK AT THE MAP, DOES IT?

      21    **Q.**   DO YOU HAVE ANY REASON TO DISPUTE THAT?

      22    **A.**   WELL, I'LL LOOK AT THE MAP AND DOUBLECHECK.  IT DOES.

      23    **Q.**   AND YOUR ILLUSTRATIVE PLAN DIVIDES IT.  CORRECT?

      24    **A.**   THE ILLUSTRATIVE PLAN DOES ONLY PICK UP PART OF DESOTO

      25    PARISH, THAT'S RIGHT.  IT INCLUDES THE MAJORITY BLACK CITY OF

WILLIAM S. COOPER

11:49 1    MANSFIELD AND PORTIONS OF THE PARISH THAT ARE PREDOMINATELY

2    BLACK.

3         FURTHER NORTH AROUND STONEWALL, THE POPULATION HAS

4    INCREASED IN RECENT YEARS.  THERE'S BEEN SOME -- I WON'T CALL

5    IT WHITE FLIGHT, BUT SUBURBAN AREAS AROUND --

6    **Q.**   MR. COOPER, MY SIMPLE QUESTION WAS WHETHER YOU DIVIDED --

7    **A.**   -- STONEWALL THAT ARE PREDOMINATELY WHITE.

8    **Q.**   MY SIMPLE QUESTION WAS WHETHER OR NOT THE ILLUSTRATIVE

9    PLAN DIVIDES DESOTO PARISH, AND YOU ANSWERED THE QUESTION YES.

10   CORRECT?

11   **A.**   WELL, YES.

12   **Q.**   THANK YOU.

13        **THE COURT:**  MR. COOPER, TRY TO KEEP YOUR ANSWERS TO

14   THE QUESTIONS SO THAT WE CAN MAYBE GET OUT OF HERE TODAY.

15        **THE WITNESS:**  YES, YOUR HONOR.

16        **MR. TUCKER:**  THANK YOU, YOUR HONOR.

17   **BY MR. TUCKER:**

18   **Q.**   AND NOW YOUR ILLUSTRATIVE PLAN INCLUDES THE TOWN OF CAMPTI

19   IN ILLUSTRATIVE HOUSE DISTRICT 23.  IS THAT CORRECT?

20   **A.**   YES.

21   **Q.**   AND I BELIEVE IN YOUR DEPOSITION -- DO YOU RECALL SAYING

22   THAT YOU BELIEVE THAT CAMPTI AND NATCHITOCHES WERE A PART OF

23   THE SAME COMMUNITY BECAUSE THEIR FOOTBALL TEAMS PLAY EACH OTHER

24   AND THEY WOULD SHOP AT THE SAME WALMART.  DO YOU RECALL THAT

25   DISCUSSION?

WILLIAM S. COOPER

11:50  1   **A.**   I DO.

2   **Q.**   OKAY.

3   **A.**   AND I BELIEVE THAT'S TRUE.  AND I'M REINFORCED BY THE

4   REVEREND'S TESTIMONY YESTERDAY WHERE HE SPECIFICALLY TALKED

5   ABOUT FAMILY MEMBERS THAT LIVED IN CAMPTI, EVEN THOUGH HE LIVES

6   IN NATCHITOCHES.

7   **Q.**   BUT AT THAT TIME YOU DIDN'T KNOW WHERE THE WALMART EVEN

8   WAS IN THAT AREA.  ISN'T THAT RIGHT?

9   **A.**   WELL, I THINK I -- WHEN I WAS TALKING ABOUT WALMART, I WAS

10   TALKING ABOUT THE SHREVEPORT AREA.

11   **Q.**   OKAY.  WELL, DO YOU RECALL TALKING ABOUT WALMARTS IN THIS

12   AREA?

13   **A.**   I THINK I TOLD YOU AT THE DEPOSITION THAT I HADN'T REALLY

14   LOOKED AT WHERE THE WALMARTS WERE IN THE NATCHITOCHES AND RED

15   RIVER AREA.

16   **Q.**   AND DO YOU EVEN NOW IF -- FIRST OF ALL, DO YOU EVEN KNOW

17   WHAT HIGH SCHOOL FOLKS IN CAMPTI WOULD GO TO?

18   **A.**   OFF THE TOP OF MY HEAD, I CAN'T TELL YOU.  BUT I CAN --

19   I'M ALMOST A HUNDRED PERCENT CONFIDENT, ALTHOUGH I CAN'T SAY

20   WITH CERTAINLY, THAT THERE ARE COMPETITIONS IN THAT AREA

21   BETWEEN THE LOCAL SCHOOLS.

22   **Q.**   DO YOU EVEN KNOW --

23   **A.**   I DON'T THINK THEY'RE GOING DOWN TO BATON ROUGE OR NEW

24   ORLEANS, EXCEPT FOR STATE CHAMPIONSHIPS.

25   **Q.**   DO YOU EVEN KNOW IF NATCHITOCHES AND THE HIGH SCHOOL THAT

WILLIAM S. COOPER

11:50 1    THE FOLKS IN CAMPTI GO TO ARE IN THE SAME FOOTBALL DIVISION?

2    A.    I DON'T KNOW FOR A FACT, NO.

3    Q.    COULD WE MOVE ON TO PAGE 53 OF YOUR REPORT?

4          AND THIS IS WHERE YOU DISCUSS YOUR ILLUSTRATIVE HOUSE

5    DISTRICTS IN THE LAKE CHARLES AREA.  CORRECT?

6    A.    YES.

7    Q.    AND HERE YOU CREATE A SECOND MAJORITY-BLACK DISTRICT IN

8    ILLUSTRATIVE HOUSE DISTRICT 38?

9    A.    CORRECT.

10   Q.    AND TO DO SO, YOU ESSENTIALLY SPLIT THE BLACK POPULATION

11   IN LAKE CHARLES TO CREATE TWO MAJORITY-BLACK DISTRICTS HERE.

12   CORRECT?

13   A.    THAT'S TRUE.  PARTS OF LAKE CHARLES ARE NOW IN THE NEW

14   MAJORITY-BLACK HOUSE DISTRICT 38.

15   Q.    AND THE ENACTED PLAN KEEPS LAKE CHARLES ALL IN ONE

16   DISTRICT.  IS THAT RIGHT?

17   A.    PROBABLY, BUT I DON'T KNOW.  YOU KNOW, I'M NOT -- WELL,

18   MAYBE ALL IN ONE MAJORITY-BLACK DISTRICT MAYBE.  BUT I THINK

19   LAKE CHARLES ITSELF IS SPLIT.  CORRECT?  BETWEEN SEVERAL OTHER

20   DISTRICTS.  I MEAN, I DO HAVE AN EXHIBIT IN THERE SOMEWHERE

21   THAT ACTUALLY SHOWS THE MUNICIPALITIES IN EACH DISTRICT.

22   Q.    WELL, WE CAN MOVE ON FROM THAT.

23          SO DO YOU RECALL THE BVAPS OF YOUR ILLUSTRATIVE HOUSE

24   DISTRICT 34 AND ILLUSTRATIVE HOUSE DISTRICT 38?

25   A.    THEY WOULD BE SOMEWHERE IN THE LOW 50S, BUT I DON'T RECALL

WILLIAM S. COOPER

11:52 1 THE EXACT NUMBER.

2 **Q.**    IF I TOLD YOU THEY WERE 50.8 PERCENT AND 50.3 PERCENT,

3 WOULD THAT SOUND ABOUT RIGHT?

4 **A.**    THAT WOULD NOT SURPRISE ME.  I'M ASSUME YOU'RE READING THE

5 RIGHT NUMBERS.

6 **Q.**    AND SO, AGAIN, YOU REDUCED THE BVAP IN EXISTING HOUSE

7 DISTRICT 34 IN ORDER TO CREATE A NEW MAJORITY-BLACK DISTRICT IN

8 ILLUSTRATIVE HOUSE DISTRICT 38.  CORRECT?

9 **A.**    THAT'S TRUE.  BUT IT'S MY UNDERSTANDING THAT A

10 PERCENTAGE -- A LOWER PERCENTAGE IN THAT AREA, IT WOULD STILL

11 ELECT A CANDIDATE OF CHOICE ACCORDING TO DR. HANDLEY'S

12 ANALYSIS.

13 **Q.**    BUT YOU DIDN'T HAVE THAT ANALYSIS AT THE TIME YOU WERE

14 DRAWING YOUR MAPS.  CORRECT?

15 **A.**    I DID NOT.

16 **Q.**    AND, AGAIN, IT'S SAFE TO ASSUME YOU DIDN'T DO ANYTHING TO

17 CONFIRM THE COMPACTNESS OF THE BLACK POPULATION WITHIN

18 ILLUSTRATIVE HOUSE DISTRICT 38.  CORRECT?

19 **A.**    THAT IS NOT PART OF THE GENERAL INQUIRY.  IT COULD BECOME

20 A FACTOR IN CERTAIN SECTION 2 CASES.  REMEMBER, THE I-85

21 DISTRICT IN NORTH CAROLINA?  SURE.  THERE'S A GOOD ARGUMENT

22 MAYBE THAT YOU CAN'T COMBINE BLACK FOLKS IN CHARLOTTE WITH

23 BLACK FOLKS IN RALEIGH, BUT THIS IS NOT I-85 DISTRICT.  THIS IS

24 NOT THE *LULAC* CASE IN TEXAS.  IT IS A VERY COMPACT AREA.

25 **Q.**    ALL RIGHT.  SWITCHING NOW FINALLY IN THE HOUSE TO THE

WILLIAM S. COOPER

11:53 1    BATON ROUGE AREA.

2              IF YOU COULD TURN, I THINK, TO THE NEXT PAGE OF YOUR

3    REPORT.

4              FORREST, CAN WE FLIP OVER TO PAGE 56 ACTUALLY?

5              AND, AGAIN, DO YOU RECALL TESTIFYING IN YOUR

6    DEPOSITION THAT YOU LOWERED THE BVAPS IN DISTRICTS IN BATON

7    ROUGE TO CREATE ADDITIONAL MAJORITY-BLACK DISTRICTS HERE?  DO

8    YOU RECALL THAT?

9    **A.**   WELL, THIS IS PART OF THE BATON ROUGE MSA.  THIS DISTRICT

10   I BELIEVE PROBABLY COULD HAVE BEEN CREATED INDEPENDENT OF THE

11   DISTRICTS THAT I CREATED IN EAST BATON ROUGE PARISH.  BUT -- SO

12   I'M NOT SURE IF YOU'RE -- ARE YOU REFERRING TO THE MSA OR TO

13   EAST BATON ROUGE PARISH AND THE CITY OF BATON ROUGE?

14   **Q.**   THAT'S A FAIR POINT.

15             SO MY QUESTION WASN'T NECESSARILY SPECIFICALLY

16   REFERRING TO PAGE 56.  IT WAS A MORE GENERAL QUESTION.  IN THE

17   BATON ROUGE AREA, YOU WERE LOOKING TO UNPACK THE BLACK

18   POPULATION TO CREATE ADDITIONAL MAJORITY-BLACK DISTRICTS.

19   CORRECT?

20   **A.**   SURE.  EXTENDING IT TO IBERVILLE AND ASCENSION.

21   **Q.**   THANK YOU FOR CLARIFYING.

22             SO LET'S -- SPECIFICALLY LOOKING AT HOUSE DISTRICT 60

23   -- OR YOUR ILLUSTRATIVE HOUSE DISTRICT 60, WHICH IS A NEW

24   MAJORITY-BLACK DISTRICT.  CORRECT?

25   **A.**   YES.

WILLIAM S. COOPER

11:54   1   **Q.**   OKAY.  AND I BELIEVE YOU STATE IN PARAGRAPH 132 OF YOUR

2   REPORT, TO CREATE THIS DISTRICT THE MUNICIPALITIES OF

3   DONALDSONVILLE, WHITE CASTLE, PLAQUEMINE ARE JOINED WITH ST.

4   GABRIEL AND GONZALES TO CREATE THIS NEW MAJORITY-BLACK

5   DISTRICT.  CORRECT?

6   **A.**   YES.

7   **Q.**   IF WE COULD TURN TO PAGE 58, PLEASE.

8        AND THIS REFLECTS THE NEW ILLUSTRATIVE -- STRIKE

9   THAT.

10        THIS REFLECTS THE NEW MAJORITY-BLACK DISTRICT IN

11   ILLUSTRATIVE HOUSE DISTRICT 65.  CORRECT?

12   **A.**   YES.

13   **Q.**   AND, AGAIN, IN PARAGRAPH 136 YOU INDICATE YOUR INTENTION

14   WAS TO UNPACK THE BLACK POPULATION IN NEIGHBORING HOUSE

15   DISTRICT 29 AND HOUSE DISTRICT 63.  CORRECT?

16   **A.**   WELL, THAT'S THE BOTTOM LINE IMPACT IN TERMS OF THE BLACK

17   VAP.  I WAS NOT NECESSARILY FOCUSED ON -- AT THE VERY OUTSET OF

18   LOOKING AT THE NUMBERS BEYOND JUST GENERALLY KNOWING THAT

19   SEVERAL OF THOSE DISTRICTS HAD HIGH BLACK POPULATIONS.

20   **Q.**   AND YOU ALSO WERE LOOKING TO UNPACK THE BLACK POPULATION

21   IN HOUSE DISTRICT 62 AND 65.  CORRECT?

22   **A.**   I WASN'T SO MUCH LOOKING AT THEM.  THIS IS JUST THE

23   BOTTOM-LINE END RESULT.

24   **Q.**   THAT'S WHAT YOU HAD TO DO CREATE THE NEW MAJORITY-BLACK

25   DISTRICT HERE?

WILLIAM S. COOPER

11:56 1   A.   THAT'S THE ULTIMATE IMPACT, YES.

2   Q.   BUT YOU DIDN'T JUST UNCRACK THE BLACK POPULATION IN HOUSE

3   DISTRICT 62.  RIGHT?  YOU ELIMINATED IT AS A MAJORITY-BLACK

4   DISTRICT ALTOGETHER.  CORRECT?

5   A.   THE PLAINTIFFS IN THIS CASE WANTED TO HAVE MORE WHOLE

6   DISTRICTS IN EAST BATON ROUGE PARISH.  AND ONE WAY TO DO THAT

7   WAS TO SHIFT HOUSE DISTRICT 62 INTO EAST BATON ROUGE SO THAT

8   INSTEAD OF HAVING 15 DIFFERENT DISTRICTS IN EAST BATON ROUGE

9   PARISH, I WAS ABLE TO REDUCE IT TO 12, WHILE AT THE SAME TIME

10   CREATING TWO ADDITIONAL HOUSE DISTRICTS IN THAT AREA.

11   Q.   AND, AGAIN, JUST A SIMPLE "YES" OR "NO" QUESTION.  YOU

12   DIDN'T DO ANYTHING TO DETERMINE THE COMPACTNESS OF THE BLACK

13   POPULATION WITHIN ILLUSTRATIVE HOUSE DISTRICT 68?

14   A.   WE KEEP GOING OVER THIS.  THAT'S JUST SIMPLY NOT

15   NECESSARY.  THIS IS A *GINGLES 1* CASE, AND IT INVOLVES

16   DEMONSTRATING THAT YOU CAN DRAW A DISTRICT THAT IS REASONABLY

17   COMPACT, SUFFICIENTLY NUMEROUS TO ENCOMPASS A POPULATION THAT

18   IS MAJORITY BLACK, AND THAT'S WHAT I'VE DONE.

19   Q.   AND I UNDERSTAND YOUR POSITION, AND I'LL JUST MAKE THIS

20   SIMPLE SO WE WON'T HAVE TO KEEP GOING OVER THIS, BUT YOU DIDN'T

21   EVALUATE THE COMPACTNESS OF THE BLACK POPULATION OR YOU --

22   STRIKE THAT.

23        YOU DIDN'T DO ANYTHING TO EVALUATE THE COMPACTNESS OF

24   THE BLACK POPULATION WITHIN ANY OF YOUR ILLUSTRATIVE HOUSE

25   DISTRICTS.  CORRECT?

WILLIAM S. COOPER

11:57 1   **A.**   ABSOLUTELY NOT, BECAUSE IT IS ABSOLUTELY NOT NECESSARY.

2   YOU'RE SURELY NOT GOING TO ARGUE THAT SOMEHOW OR ANOTHER THE

3   BLACK POPULATION IN ILLUSTRATIVE HOUSE DISTRICTS 65, 68, AND 69

4   ARE DISPARATE POPULATIONS.  I SUPPOSE YOU WILL.

5   **Q.**   FINALLY, CAN WE TURN TO PAGE 60 OF THE REPORT?

6         AND THIS REFLECTS WHERE YOU CREATE A NEW ILLUSTRATIVE

7   HOUSE DISTRICT IN 68.  CORRECT?

8   **A.**   YES.

9   **Q.**   BUT, AGAIN, IN PARAGRAPH 139 YOU STATE THAT HOUSE DISTRICT

10   68 -- ILLUSTRATIVE HOUSE DISTRICT 68 UNPACKS EXISTING HOUSE

11   DISTRICT 61 AND UNCRACKS BLACK POPULATION IN A MAJORITY-WHITE

12   HOUSE DISTRICT 68, 69, AND 70.  CORRECT?

13   **A.**   YES.  BUT I'M BASICALLY JUST READING OFF OF THE CORE

14   CONSTITUENCY REPORT IN MY DECLARATION TO GET THOSE NUMBERS IN

15   THE EXHIBIT.  I WAS NOT SETTING OUT TO UNCRACK AND UNPACK

16   SPECIFIC DISTRICTS OTHER THAN IN GENERAL.  IN A GENERAL WAY I

17   WAS, BUT I WAS NOT DEAD SET ON DOING ONE THING OR ANOTHER AS I

18   WAS DRAWING THE DISTRICTS.  I JUST WANTED TO SEE IF THEY COULD

19   BE DRAWN, AND I WAS TRYING TO DRAW COMPACT AND REASONABLY

20   SHAPED DISTRICTS.  AND THE END RESULT WAS 139.  AND YOU CAN GO

21   TO THE EXHIBIT, THE CORE CONSTITUENCY EXHIBIT AND SEE THAT THAT

22   WAS THE CASE.

23   **Q.**   ALL RIGHT.  IF WE CAN QUICK SHIFTLY TO THE ILLUSTRATIVE

24   SENATE PLAN NOW, AND WE'LL START IN THE SHREVEPORT AREA.  IF

25   YOU COULD TURN BACK TO PAGE 36 OF YOUR REPORT.

WILLIAM S. COOPER

11:59 1   **A.**   WHICH PAGE?

2   **Q.**   SORRY.  I SAID PAGE 36, BUT I DON'T THINK THAT'S CORRECT.

3   GIVE ME ONE SECOND.

4   **A.**   MAYBE 37?

5   **Q.**   CORRECT, 37.  THANK YOU.

6         AND HERE YOU DISCUSS A NEW MAJORITY-BLACK SENATE

7   DISTRICT THAT YOU CREATE IN THE NORTHWEST PART OF THE STATE.

8   CORRECT?

9   **A.**   YES.

10   **Q.**   AND THAT'S ILLUSTRATIVE SENATE DISTRICT 38?

11   **A.**   YES.

12   **Q.**   AND YOU PARTIALLY CONTAIN BOTH SHREVEPORT AND BOSSIER CITY

13   IN THIS NEW SENATE DISTRICT.  CORRECT?

14   **A.**   YES.

15   **Q.**   IF WE COULD TURN TO PAGE 38 AND 39 OF THE REPORT.

16         HERE YOU DISCUSS THE CREATION OF A NEW MAJORITY-BLACK

17   DISTRICT IN ILLUSTRATIVE SENATE DISTRICT 17.  IS THAT RIGHT?

18   **A.**   YES.

19   **Q.**   AND THIS IS A NEW SENATE DISTRICT IN THE BATON ROUGE AREA?

20   **A.**   YES.  IT'S IN THE BATON ROUGE MSA, BUT IT GOES BEYOND EAST

21   BATON ROUGE PARISH, OF COURSE.  IT GOES INTO WEST -- IT TAKES

22   IN ALL OF WEST BATON ROUGE PARISH AND ALL OF POINTE COUPEE AND

23   MOST OF IBERVILLE.

24   **Q.**   AND YOU MAKE SOME PRETTY SUBSTANTIAL CHANGES IN THIS AREA,

25   PARTICULARLY TO SENATE DISTRICT 17.  CORRECT?

WILLIAM S. COOPER

12:00 1    **A.**    WELL, YES.  SENATE DISTRICT 17 GOES FROM ST. LANDRY PARISH

2    IN THE HEART OF THE CAJUN COUNTRY, ALL THE WAY OVER TO ST.

3    HELENA AND FLORIDA PARISHES.  IT'S A HUGE GEOGRAPHICALLY LARGE

4    AREA.  AND IT DOES FRAGMENT THE BLACK VOTING STRENGTH IN THAT

5    PART OF THE STATE.  IT'S MAJORITY WHITE -- WHEN IT'S VERY EASY

6    TO DRAW A VERY REASONABLY SHAPED, MUCH MORE COMPACT DISTRICT AS

7    I'VE DRAWN IN ILLUSTRATIVE DISTRICT 17.

8    **Q.**    AND I THINK AS YOU TALK ABOUT IN PARAGRAPH 97, YOU

9    PREDOMINANTLY ANCHOR THIS NEW SENATE DISTRICT IN EAST BATON

10   ROUGE.  CORRECT?

11   **A.**    WELL, IT'S IN -- THERE IS SIGNIFICANT POPULATION FROM EAST

12   BATON ROUGE PARISH IN THIS DISTRICT.  I HAVE THE -- THERE'S AN

13   EXHIBIT THAT ACTUALLY SHOWS THE BREAKOUT.  SO I DON'T KNOW THE

14   POPULATION PERCENTAGES.

15   **Q.**    SURE.  BUT I'M USING YOUR OWN WORDS FROM THE REPORT.  IN

16   PARAGRAPH 97 YOU SAY IT'S ANCHORED IN EAST BATON ROUGE.

17   CORRECT?

18   **A.**    WELL, YEAH.  IT IS IN EAST BATON ROUGE, AND IT DOES EXTEND

19   -- POINTE COUPEE AND WEST BATON ROUGE HAVE POPULATIONS THAT

20   ARE, I THINK, YOU KNOW, 25,000 OR SO, EACH ONE OF THOSE.

21   **Q.**    AND ANCHORING IT IN EAST BATON ROUGE, AS YOU STATE, ALLOWS

22   YOU TO DRAW BLACK POPULATION IN FROM PACKED SENATE DISTRICT 15.

23   CORRECT?

24   **A.**    I THINK SO.  THERE IS SOME PACKING INVOLVED IN SENATE

25   DISTRICT 15, RIGHT.  IT'S 74 PERCENT BLACK VOTING AGE.

WILLIAM S. COOPER

12:02 1   **Q.**   SO IS THE ANSWER TO MY QUESTION "YES"?

2   **A.**   WELL, YES.  AGAIN, THIS IS JUST KIND OF A BOTTOM-LINE

3   SUMMARY THAT I'M TAKING DIRECTLY FROM ONE OF THE EXHIBITS

4   SHOWING CORE CONSTITUENCIES.

5   **Q.**   AND UP ABOVE YOU SAY YOU AVOID EXTENDING ILLUSTRATIVE

6   SENATE DISTRICT 17 WEST INTO WHAT WOULD BE PREDOMINATELY WHITE

7   COMMUNITIES.  IS THAT CORRECT?

8   **A.**   WELL, IT WOULD BE EXTENDING WEST INTO EAST FELICIANA,

9   WHICH IS MAJORITY WHITE, I BELIEVE.  ST. HELENA IS ACTUALLY

10   MAJORITY BLACK.  BUT I WAS REALLY TRYING TO MAKE IT MORE OF A

11   MISSISSIPPI DISTRICT, A MISSISSIPPI RIVER DISTRICT, AND I THINK

12   REALLY REFLECTING A COMMUNITY OF INTEREST, WHICH IS KIND OF

13   UNIQUE TO THIS PART OF THE STATE IN A WAY AND REALLY SORT OF

14   UNIQUE WHEN YOU LOOK AT IT NATIONALLY.  I MEAN, IT'S GOT A --

15   YOU KNOW, IT'S GENERALLY KNOWN AS EITHER THE CHEMICAL QUARTER

16   OR CANCER ALLEY.  THERE ARE REAL HEALTH ISSUES THERE RELATING

17   TO FOLKS WHO LIVE IN EITHER HOUSE DISTRICT -- IN SENATE

18   DISTRICT 17 AND --

19           **MR. TUCKER:**  YOUR HONOR, I MOVE TO STRIKE AS

20   NON-RESPONSIVE AND OUTSIDE THE SCOPE OF HIS REPORT.

21           **THE COURT:**  MR. COOPER, LET'S STAY TO THE TASK AT

22   HAND, PLEASE.

23           **THE WITNESS:**  OKAY.  SORRY.

24           **MR. TUCKER:**  OKAY.

25           **THE COURT:**  MOVE ONTO THE NEXT QUESTION.

WILLIAM S. COOPER

12:03 1          **MR. TUCKER:**  OKAY.

2    **BY MR. TUCKER:**

3    **Q.**    SO FINALLY -- LASTLY, JUST LOOKING ON PAGE 41 AND 42 OF

4    YOUR REPORT, THIS IS WHERE YOU SHOW THE CREATION OF A NEW

5    MAJORITY-BLACK DISTRICT IN THE NEW ORLEANS AREA.  CORRECT?

6    **A.**    YES.

7    **Q.**    AND THAT'S ILLUSTRATIVE SENATE DISTRICT 19?

8    **A.**    YES.

9    **Q.**    AND, ONCE AGAIN, IN PARAGRAPH 1O1 YOU STATE THAT WHAT YOU

10   ARE DOING HERE IS YOU ARE UNCRACKING SENATE DISTRICT 19 TO NOW

11   MAKE IT A MAJORITY-BLACK DISTRICT.  IS THAT RIGHT?

12   **A.**    YES.  JUST REPORTING FROM THE END RESULT AS SHOWN IN ONE

13   OF THE EXHIBITS.

14          **MR. TUCKER:**  YOUR HONOR, IF I MAY HAVE JUST A MINUTE

15   TO CONFER WITH MY COLLEAGUES?

16          **THE COURT:**  YOU MAY.

17   **BY MR. TUCKER:**

18   **Q.**    THANK YOU VERY MUCH MR. COOPER.  I HAVE NO FURTHER

19   QUESTIONS.

20          **MR. TUCKER:**  I TENDER THE WITNESS, YOUR HONOR.

21          **THE COURT:**  MS. THOMAS, ANY REDIRECT?

22          **MS. THOMAS:**  VERY SHORT, YOUR HONOR.

23                    **REDIRECT EXAMINATION**

24   **BY MS. THOMAS:**

25   **Q.**    ALL RIGHT.  IT'S ALMOST AFTERNOON.  I BELIEVE IT IS

WILLIAM S. COOPER

12:04  1    AFTERNOON.

       2              GOOD AFTERNOON, AGAIN, MR. COOPER.

       3    **A.**    GOOD AFTERNOON.

       4              **MS. THOMAS:**  THIS WILL BE VERY BRIEF, YOUR HONOR.

       5    **BY MS. THOMAS:**

       6    **Q.**    YOU WERE ASKED SOME QUESTIONS ABOUT YOUR USE OF

       7    TRADITIONAL REDISTRICTING PRINCIPLES IN YOUR REDISTRICTING

       8    PROCESS BY MR. TUCKER.  DO YOU RECALL THAT?

       9    **A.**    YES.

      10    **Q.**    IF WE COULD PULL UP PLAINTIFF EXHIBIT 20, PAGE 27,

      11    PARAGRAPH 68, STARTING AT PARAGRAPH 68.

      12    **A.**    YES.

      13    **Q.**    IS THIS A PART OF YOUR REPORT WHERE YOU OUTLINE THE ROLE

      14    THAT TRADITIONAL REDISTRICTING PRINCIPLES PLAYED IN YOUR MAP

      15    DRAWING PROCESS?

      16    **A.**    YES.

      17    **Q.**    AND IT WAS DISCLOSED AND SHARED WITH DEFENDANTS?

      18    **A.**    WELL, YES.  I MEAN, THESE ARE THE TRADITIONAL

      19    REDISTRICTING PRINCIPLES THAT ALL PLANNERS -- THAT ALL PLAN

      20    DRAWERS SHOULD CONSIDER WHEN DEVELOPING AN ELECTION DISTRICT,

      21    WHETHER YOU'RE DRAWING A PLAN AT THE LOCAL LEVEL OR A

      22    CONGRESSIONAL DISTRICT.

      23    **Q.**    IF WE COULD MOVE TO PAGE 6, PARAGRAPH 15.

      24              YOU WERE ASKED SOME QUESTIONS ABOUT YOUR LINE DRAWING

      25    IN NATCHITOCHES.  DO YOU RECALL THAT?

WILLIAM S. COOPER

12:05 1    A.    YES.

2    Q.    DOES THIS PART OF YOUR REPORT DISCUSS WHAT YOUR INTENTION

3    TO MAKE HD 23 WHOLE AGAIN?

4    A.    YES, IT DOES.   IT SPELLS IT OUT.

5    Q.    OKAY.   I BELIEVE THERE WERE -- THERE WAS A BIT OF

6    CONTENTIOUS TESTIMONY AND BACK-AND-FORTH ABOUT YOUR PREVIOUS

7    DEPOSITION TESTIMONY IN REGARDS TO SOCIOECONOMIC FACTORS.   DO

8    YOU RECALL THAT?

9    A.    YES.   I THINK WE DID HAVE SOME EXCHANGES THERE.   I DIDN'T

10    MEAN IT TO BE CONTENTIOUS, BUT I DON'T WANT TO SELL MYSELF

11    SHORT BEFORE SOME OF THESE ATTORNEYS WHO LIKE TO PICK ON ME.

12    Q.    IF WE COULD --

13              THE COURT:   NOBODY FEELS SORRY FOR YOU.

14              GO AHEAD.

15              MS. THOMAS:   YES, I BELIEVE MR. COOPER CAN HANDLE

16    HIMSELF.

17    BY MS. THOMAS:

18    Q.    IF WE COULD PULL UP MR. COOPER'S DEPOSITION TRANSCRIPT AND

19    GO TO PAGE 101, STARTING AT LINE 24.

20              I BELIEVE THAT YOU WERE ASKED QUESTIONS ABOUT WHETHER

21    YOU DISCLOSED IN YOUR DEPOSITION TRANSCRIPT THAT YOU -- IN YOUR

22    DEPOSITION THAT YOU HAD, IN FACT, UPLOADED SOCIOECONOMIC DATA

23    TO YOUR -- TO MAPTITUDE AS PART OF YOUR REBUTTAL PROCESS.   DO

24    YOU RECALL THAT EXCHANGE WITH MR. TUCKER TODAY?

25    A.    YES.

WILLIAM S. COOPER

12:06 1    **Q.**   IF YOU COULD READ THIS PART OF YOUR DEPOSITION, STARTING

2    WITH MR. TUCKER'S QUESTION ON PAGE 101, LINE 24, GOING ALL THE

3    WAY DOWN THE PAGE TO THE FOLLOWING PAGE, 102 TO LINE 24.

4              **MR. TUCKER:**   YOUR HONOR, OBJECTION.   THIS TESTIMONY

5    HAS NOTHING TO DO WITH WHETHER OR NOT HE UPLOADED THE DATA TO

6    HIS MAPTITUDE SOFTWARE.

7              **MS. THOMAS:**   IT, IN FACT, DOES IF HE IS GIVEN THE

8    OPPORTUNITY TO READ IT.

9              **THE COURT:**   GIVE ME A CHANCE TO READ IT.   HE DOES

10   ADDRESS UPLOADING OR CONSIDERING SOCIOECONOMIC DATA IN HIS

11   REBUTTAL.

12             **MR. TUCKER:**   I UNDERSTAND.   THAT WASN'T THE QUESTION.

13   THE QUESTION WAS WHETHER HE LOADED IT INTO HIS MAPTITUDE

14   SOFTWARE.

15             **THE COURT:**   BUT IT SHOWS THAT YOUR IMPEACHMENT OF HIM

16   WAS NOT REALLY IMPEACHMENT.

17                  OBJECTION IS OVERRULED.

18             **MS. THOMAS:**   WELL, WE BELIEVE THERE'S A DIFFERENCE

19   BETWEEN HAVING IT IN THE MAPTITUDE SOFTWARE, AND THEN SOMEHOW

20   GENERALLY CONSIDERING IT.   THAT WAS THE POINT, BUT I

21   UNDERSTAND, YOUR HONOR.

22             **THE COURT:**   OKAY.   THANK YOU.

23                  OVERRULED.

24   BY MS. THOMAS:

25   **Q.**   DOES THIS REFRESH YOUR RECOLLECTION OF ABOUT WHETHER YOU

WILLIAM S. COOPER

12:08 1    DISCUSSED WITH MR. TUCKER AT YOUR DEPOSITION THIS PARTICULAR

2    SOCIOECONOMIC DATA?

3    **A.**    YES.  AND PROBABLY WITH MORE CLARITY THAN WHAT I SAID

4    TODAY.  I DO WANT TO POINT OUT THAT I THINK I JUST MENTIONED A

5    185 PERCENT POVERTY LEVEL WITHOUT NOTING THAT THAT ONLY

6    INCLUDED HOUSEHOLDS WITH CHILDREN.

7    **Q.**    OKAY.  AND THEN YOU HAD AN EXCHANGE TOWARDS THE END OF

8    YOUR TESTIMONY WITH MR. TUCKER ABOUT COMPACTNESS AS DEFINED BY

9    *GINGLES 1.* DO YOU RECALL THAT?

10    **A.**    YES.

11    **Q.**    AND I BELIEVE YOU AND I ALSO DISCUSSED COMPACTNESS.  DO

12    YOU RECALL THAT?

13    **A.**    YES.

14    **Q.**    AND WHEN I ASKED YOU IN YOUR DIRECT TESTIMONY ABOUT

15    WHETHER YOU THOUGHT YOUR ANALYSIS MET *GINGLES 1*, DO YOU RECALL

16    WHAT YOUR ANSWER WAS?

17    **A.**    WELL, I SAID YES, I HOPE.

18    **Q.**    OKAY.  AND IS IT YOUR TESTIMONY THAT BY DRAWING COMPACT

19    DISTRICTS THAT THE MINORITY POPULATION IS COMPACT?

20    **A.**    SAY THAT AGAIN.

21    **Q.**    IS IT YOUR TESTIMONY THAT BY DRAWING COMPACT DISTRICTS

22    AROUND A MINORITY POPULATION THAT A MINORITY POPULATION IS

23    COMPACT?

24    **A.**    YEAH.  IT'S *IPSO FACTO* COMPACT.

25    **Q.**    OKAY.  AND SO WHEN YOU WERE -- IN YOUR CROSS WHEN YOU WERE

WILLIAM S. COOPER

12:09 1   DISCUSSING THE COMPACTNESS OF THE MINORITY POPULATION, WAS YOUR

2   DISCUSSION ABOUT THE WAY IN WHICH MR. TRENDE DEFINES POPULATION

3   COMPACTNESS?

4   **A.**   COULD YOU -- I'M SORRY. I GOT LOST AGAIN.

5   **Q.**   OKAY. IN THE CROSS TESTIMONY WHEN YOU WERE ASKED ABOUT

6   THE COMPACTNESS OF THE MINORITY POPULATION, WAS YOUR TESTIMONY

7   TARGETED TOWARDS MR. TRENDE'S DEFINITION?

8   **A.**   I HAD SOME COMMENTS ABOUT MR. TRENDE'S DEFINITION, WHICH I

9   BELIEVE TO BE DEEPLY FLAWED.

10   **Q.**   OKAY. AND IN DOING YOUR *GINGLES 1* ANALYSIS AROUND

11   FIGURING OUT IF THE MINORITY POPULATION IS COMPACT, DO YOU USE

12   THE COMPACTNESS SCORES THAT WE'VE DISCUSSED EARLIER TODAY?

13   **A.**   ABSOLUTELY.

14   **Q.**   AND HAS THAT ANALYSIS BEEN ACCEPTED BY COURTS AS PART OF

15   *GINGLES 1*?

16   **A.**   IT HAS OVER AND OVER AND OVER AND OVER AGAIN.

17   **Q.**   NO FURTHER QUESTIONS.

18         **THE COURT:** OKAY. THANK YOU, MR. COOPER.

19         YOU MAY STEP DOWN.

20         OKAY. IT'S 12:15 -- OR WELL, NOT QUITE 12:15.

21   WE WILL BE IN RECESS UNTIL 1:30.

22         **THE LAW CLERK:** ALL RISE.

23         COURT IS IN RECESS.

24       **(WHEREUPON, THE COURT WAS IN RECESS.)**

25           * * *

12:10  1                    **CERTIFICATE**

2        I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

3    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

4    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

5    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

6    PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

7

8                          *Shannon Thompson*

9                    SHANNON THOMPSON, CCR

10                   OFFICIAL COURT REPORTER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25