<pre>
 1                   UNITED STATES DISTRICT COURT

 2                   MIDDLE DISTRICT OF LOUISIANA

 3

 4   DOROTHY NAIRNE, ET AL        *      CIVIL ACTION
                                  *
 5   VERSUS                       *      NO. 3:22-178-SDD
                                  *
 6   KYLE ARDOIN, ET AL           *      DECEMBER 4, 2023
                                  *
 7   * * * * * * * * * * * * * *  *      MORNING SESSION

 8

 9                              DAY 6
                             BENCH TRIAL
10              BEFORE THE HONORABLE SHELLY D. DICK
                UNITED STATES CHIEF DISTRICT JUDGE
11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:         AMERICAN CIVIL LIBERTIES UNION
                                 FOUNDATION
15                               BY:  MEGAN C. KEENAN, ESQ.
                                      SARAH E. BRANNON, ESQ.
16                                    DAYTON CAMPBELL-HARRIS, ESQ.
                                 915 15TH STREET, NW
17                               WASHINGTON, DC 20005

18                               NAACP LEGAL DEFENSE & EDUCATION
                                 FUND, INCORPORATED
19                               BY:  VICTORIA WENGER, ESQ.
                                      SARA ROHANI, ESQ.
20                                    STUART C. NAIFEH, ESQ.
                                 40 RECTOR STREET, FIFTH FLOOR
21                               NEW YORK, NEW YORK 10006

22                               COZEN O'CONNOR
                                 BY:  JOSEPHINE M. BAHN, ESQ.
23                               1200 19TH STREET, NW
                                 THIRD FLOOR
24                               WASHINGTON, DC 20036

25
</pre>

```
 1                            COZEN O'CONNOR
                              BY:  ROBERT S. CLARK, ESQ.
 2                            ONE LIBERTY PLACE
                              1650 MARKET STREET, SUITE 2800
 3                            PHILADELPHIA, PENNSYLVANIA 19103

 4                            COZEN O'CONNOR
                              BY:  AMANDA GIGLIO, ESQ.
 5                            3 WORLD TRADE CENTER
                              55TH FLOOR
 6                            NEW YORK, NEW YORK 10007

 7                            ELECTION LAW CLINIC
                              HARVARD LAW SCHOOL
 8                            BY:  T. ALORA THOMAS, ESQ.
                              6 EVERETT STREET, SUITE 4105
 9                            CAMBRIDGE, MASSACHUSETTS 02138

10                            ADCOCK LAW, LLC
                              BY:  JOHN N. ADCOCK, ESQ.
11                            3110 CANAL STREET
                              NEW ORLEANS, LOUISIANA 70119

12

13   FOR THE DEFENDANT,       NELSON MULLINS RILEY & SCARBOROUGH,
     KYLE ARDOIN, IN HIS      LLP
14   OFFICIAL CAPACITY AS     BY:  PHILLIP J. STRACH, ESQ.
     SECRETARY OF STATE:           THOMAS A. FARR, ESQ.
15                                 CASSIE A. HOLT, ESQ.
                                   ALYSSA M. RIGGINS, ESQ.
16                            4140 PARKLAKE AVENUE, SUITE 200
                              RALEIGH, NORTH CAROLINA 27612
17
                              SHOWS, CALI & WALSH, LLP
18                            BY:  JOHN C. CONINE, JR., ESQ.
                                   JOHN C. WALSH, ESQ.
19                            628 ST. LOUIS STREET
                              BATON ROUGE, LOUISIANA 70802
20

21   FOR THE DEFENDANT,       BAKER & HOSTETLER, LLP
     CLAY SCHEXNAYDER:        BY:  KATE MCKNIGHT, ESQ.
22                                 ROBERT J. TUCKER, ESQ.
                                   PATRICK LEWIS, ESQ.
23                            200 CIVIC CENTER DRIVE, SUITE 1200
                              COLUMBUS, OHIO 43215
24

25
```

```
 1                                  BAKER & HOSTETLER, LLP
                                    BY:  MICHAEL W. MENGIS, ESQ.
 2                                  811 MAIN STREET, SUITE 1100
                                    HOUSTON, TEXAS 77002
 3
      FOR THE INTERVENOR, THE       HOLTZMAN VOGEL JOSEFIAK
 4    STATE OF LOUISIANA BY AND      TORCHINSKY, PLLC
      THROUGH ATTORNEY GENERAL       BY:  BRENNAN BOWEN, ESQ.
 5    JEFF LANDRY:                   2575 EAST CAMELBACK ROAD, SUITE 860
                                    PHOENIX, ARIZONA 85016
 6
                                    HOLTZMAN VOGEL JOSEFIAK
 7                                  TORCHINSKY, PLLC
                                    BY:  PHILLIP M. GORDON, ESQ.
 8                                  15404 JOHN MARSHALL HIGHWAY
                                    HAYMARKET, VIRGINIA 20169
 9
                                    LOUISIANA DEPARTMENT OF JUSTICE
10                                  BY:  ANGELIQUE D. FREEL, ESQ.
                                         JEFFREY M. WALE, ESQ.
11                                       AMANDA M. LAGROUE, ESQ.
                                    1885 N. THIRD STREET
12                                  BATON ROUGE, LOUISIANA 70804

13
      OFFICIAL COURT REPORTER:      SHANNON L. THOMPSON, CCR
14                                  UNITED STATES COURTHOUSE
                                    777 FLORIDA STREET
15                                  BATON ROUGE, LOUISIANA 70801
                                    SHANNON_THOMPSON@LAMD.USCOURTS.GOV
16                                  (225)389-3567

17        PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
                 COMPUTER-AIDED TRANSCRIPTION SOFTWARE
18

19

20

21

22

23

24

25
```

1                                   <u>INDEX</u>

2                                                                  <u>PAGE</u>

3  **PLAINTIFFS' WITNESS**:

4  **MICHAEL BARBER, PH.D.**

5        DIRECT EXAMINATION CONTINUED BY MR. FARR          6

6        CROSS-EXAMINATION BY MR. NAIFEH                    48

7        REDIRECT EXAMINATION BY MR. FARR                   80

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

|   |   |
|---|---|
| 1 | **(DECEMBER 4, 2023)** |
| 2 | **(CALL TO THE ORDER OF COURT)** |
| 3 | **THE COURT:**  GOOD MORNING. |
| 4 | BE SEATED |
| 5 | OKAY.  DOES COUNSEL NEED TO BE HEARD BEFORE WE |
| 6 | PUT DR. BARBER BACK ON THE STAND? |
| 7 | **MR. NAIFEH:**  YOUR HONOR, OUR UNDERSTANDING AT THE END |
| 8 | OF FRIDAY WAS THAT YOUR HONOR WAS GOING TO CONSIDER THE |
| 9 | RELEVANCE OBJECTION TO DR. BARBER'S TESTIMONY. |
| 10 | **THE DEPUTY CLERK:**  SIR, WOULD YOU EITHER COME TO THIS |
| 11 | PODIUM OR SPEAK UP?  I AM HAVING TROUBLE HEARING YOU.  THANK |
| 12 | YOU. |
| 13 | **MR. NAIFEH:**  IS THIS WORKING TODAY?  OKAY.  GREAT. |
| 14 | YOUR HONOR, WE UNDERSTOOD THAT YOUR HONOR WOULD |
| 15 | BE RULING ON OUR RELEVANCE OBJECTION TO DR. BARBER'S |
| 16 | SIMULATIONS' REPORT. |
| 17 | **THE COURT:**  YES. |
| 18 | **MR. NAIFEH:**  AND WE -- |
| 19 | **THE COURT:**  AND I AM PREPARED TO DO THAT.  THE |
| 20 | TESTIMONY THUS FAR, AND AS INDICATED IN DR. BARBER'S REPORT, |
| 21 | WHICH THE COURT REVIEWED AGAIN OVER THE WEEKEND, IS OF MARGINAL |
| 22 | RELEVANCE.  HOWEVER, THE PREDOMINANT QUESTION IS A DEFENSE, AND |
| 23 | THE DEFENDANTS ARE ENTITLED TO PUT ON A DEFENSE.  AND THE COURT |
| 24 | WILL WEIGH THAT EVIDENCE AND MAKE A DETERMINATION AT THE CLOSE |
| 25 | OF THE EVIDENCE.  YOU MAY CERTAINLY OBJECT TO INDIVIDUAL |

09:05 1 | QUESTIONS THAT YOU BELIEVE GO BEYOND EITHER THE SCOPE OF HIS
2 | EXPERTISE OR THE SCOPE OF HIS REPORT.  BUT OTHERWISE, YOUR
3 | GENERAL RELEVANCE OBJECTION THAT WOULD GO, AS THE COURT KIND OF
4 | UNDERSTANDS IT, TO EXCLUSION OF DR. BARBER IS OVERRULED.
5 | PUT DR. BARBER BACK ON THE STAND, PLEASE.
6 | **MR. FARR:**  YOUR HONOR, MAY I THANK THE COURT AGAIN
7 | FOR ALLOWING ME TO QUESTION FROM THE TABLE.  I'M GRATEFUL TO
8 | YOU.  I HAD SOME ISSUES OVER THE WEEKEND, AND THIS IS MOST
9 | HELPFUL TO ME, SO THANKS AGAIN.
10 | **THE COURT:**  YES, YOU MAY STAY SEATED IN YOUR
11 | EXAMINATION OF DR. BARBER.
12 | **MICHAEL BARBER, PH.D.,**
13 | **HAVING BEEN PREVIOUSLY SWORN, TESTIFIED AS FOLLOWS:**
14 | **THE COURT:**  DR. BARBER, YOU ARE STILL UNDER OATH FROM
15 | FRIDAY.
16 | MR. FARR, YOU MAY CARRY ON.
17 | **MR. FARR:**  THANK YOU, YOUR HONOR.
18 | **DIRECT EXAMINATION CONTINUED**
19 | BY MR. FARR:
20 | **Q.**  DR. BARBER, DO YOU HAVE YOUR TWO REPORTS UP THERE WITH YOU
21 | IN A NOTEBOOK?
22 | **A.**  YES, I DO.
23 | **Q.**  AND WHEN I'M ASKING YOU QUESTIONS, YOU ARE FREE TO USE A
24 | NOTEBOOK.  AND ALSO, WE WILL BE CALLING UP SECTIONS OF YOUR
25 | REPORT ON THE SCREEN IN FRONT OF YOU.  SO YOU CAN USE EITHER

**MICHAEL BARBER, PH.D.**

09:06   1   ONE OF THOSE THINGS.

2   **A.**   OKAY.

3   **Q.**   ALL RIGHT.  SO WHERE WE STOPPED ON FRIDAY WAS YOU HAD

4   TALKED ABOUT HOW YOU HAD DONE A 100,000 SIMULATIONS FOR THE

5   SENATE AND THE HOUSE, AND I WANTED TO ASK YOU WHAT WAS YOUR

6   MAIN TAKEAWAY FROM DOING THOSE SIMULATIONS?

7            **MR. NAIFEH:**   YOUR HONOR, I JUST WANT TO PUT THE

8   RELEVANCE OBJECTION ON THE RECORD AS A CONTINUING OBJECTION.  I

9   DON'T INTEND TO CONTINUE OBJECTING THROUGHOUT THE TESTIMONY.

10            **THE COURT:**   YOUR RELEVANCE OBJECTION IS DEEMED

11   CONTINUING.

12            YOU MAY CONTINUE.

13   **BY THE WITNESS:**

14   **A.**   THE MAIN TAKEAWAY OR THE MAIN CONCLUSION THAT I DRAW FROM

15   LOOKING AT THE SIMULATIONS IS THAT WHEN WE RUN THE ALGORITHM

16   USING THE CRITERIA OUTLINED IN THE JOINT RULE THAT THE

17   SIMULATIONS PRODUCE A SET OF MAPS THAT LOOK VERY DIFFERENT FROM

18   THE ILLUSTRATIVE MAP, NOTABLY ON THE NUMBER OF MAJORITY-BLACK

19   DISTRICTS THAT ARE CREATED.

20   **Q.**   ALL RIGHT.  SO CAN WE TURN TO SECRETARY OF STATE EXHIBIT

21   1, PAGE 15 AND ON THAT PAGE THERE'S A FIGURE 1, AND COULD YOU

22   EXPLAIN TO THE COURT THE SIGNIFICANCE OF FIGURE 1.

23   **A.**   CERTAINLY.  THIS FIGURE SHOWS THE DISTRIBUTION OF MAJORITY

24   BVAPS IN THE DISTRICTS THAT ARE CREATED IN THE 100,000

25   SIMULATIONS.  THOSE GRAY BARS REPRESENT THE NUMBER OF DISTRICTS

MICHAEL BARBER, PH.D.

09:07 1   CREATED AND THE FREQUENCY WITH WHICH THAT OCCURS.  AND THEN ON
      2   THE RIGHT SIDE OF THE FIGURE, WE SEE THE NUMBER OF MAJORITY
      3   BVAP DISTRICTS IN BOTH THE ENACTED MAP AND THE ILLUSTRATIVE
      4   MAP.
      5   Q.   AND DO YOU KNOW HOW MANY DISTRICTS THERE ARE IN THE
      6   LOUISIANA SENATE?
      7   A.   THIRTY-NINE.
      8   Q.   WHAT IS THE OVERALL BLACK VOTING AGE POPULATION FOR
      9   LOUISIANA UNDER THE 2020 CENSUS?
     10   A.   IT'S APPROXIMATELY 31 PERCENT.
     11   Q.   BASED UPON THE STATE'S BLACK VOTING AGE POPULATION, HOW
     12   MANY MAJORITY-BLACK DISTRICTS WOULD BE EXACTLY PROPORTIONAL?
     13   A.   IT WOULD BE APPROXIMATELY 12.
     14   Q.   AND HOW WOULD YOU CALCULATE THAT?
     15   A.   BY SIMPLY MULTIPLYING 31 PERCENT TIMES 39.
     16   Q.   AND HOW MANY MAJORITY-BLACK SENATE DISTRICTS DID THE
     17   100,000 RACE-NEUTRAL SIMULATIONS DRAW ON AVERAGE?
     18   A.   ON AVERAGE, BETWEEN THREE AND FOUR.
     19   Q.   HOW MANY MAJORITY-BLACK SENATE DISTRICTS ARE IN 2022
     20   ENACTED PLAN?
     21   A.   THERE ARE 11.
     22   Q.   HOW MANY MAJORITY-BLACK DISTRICTS ARE IN MR. COOPER'S
     23   ILLUSTRATIVE SENATE PLAN?
     24   A.   THERE ARE 14.
     25   Q.   HOW DID THE NUMBER OF MAJORITY-BLACK SENATE DISTRICTS IN

MICHAEL BARBER, PH.D.

09:08  1  THE ENACTED PLAN AND MR. COOPER'S PLAN COMPARE TO
       2  PROPORTIONALITY?
       3  A.   SO THE ENACTED PLAN IS ONE FEWER THAN PROPORTIONALITY, AND
       4  THE ILLUSTRATIVE MAP IS TWO GREATER THAN PROPORTIONALITY.
       5  Q.   ALL RIGHT.  NOW, ON EXHIBIT SECRETARY OF STATE 1, PAGE 17,
       6  COULD YOU TURN TO TABLE 2 AND EXPLAIN TO THE COURT THE
       7  SIGNIFICANCE OF THIS TABLE.
       8  A.   SO THIS TABLE IS ALSO SHOWING THE RESULTS OF THE
       9  SIMULATIONS, BUT RATHER THAN SHOWING THE NUMBER OF MAJORITY
      10  BVAP DISTRICTS THAT ARE GENERATED, IT BREAKS THE DISTRICTS DOWN
      11  BY THE PERCENT BVAP IN THE DISTRICTS.  AND SO YOU CAN SEE DOWN
      12  THE ROWS THOSE DIFFERENT CATEGORIES OR BRACKETS FOR THE VARIOUS
      13  BVAP PERCENTAGES.  THE TABLE SHOWS THE OUTCOME FOR THE
      14  SIMULATIONS IN THAT SECOND COLUMN, AND THEN THE DISTRIBUTION OF
      15  DISTRICTS FOR THE 2011 MAP, THE ENACTED MAP, AND THE
      16  ILLUSTRATIVE MAP.
      17  Q.   IS THERE ANYTHING THAT YOU FIND PARTICULARLY SIGNIFICANT
      18  ABOUT THIS ANALYSIS?
      19  A.   I THINK THE MOST SIGNIFICANT THING THAT WE SEE IN THIS
      20  TABLE IS IN THE ROW LABELED "50-52.99 PERCENT," SO THIS ROW IS
      21  SHOWING THE NUMBER AND FREQUENCY OF DISTRICTS THAT FALL IN THAT
      22  NARROW BAND JUST ABOVE 50 PERCENT.  AND WHEN WE LOOK ACROSS THE
      23  ROW, WE CAN SEE THAT ON AVERAGE OR TYPICALLY THE SIMULATION IS
      24  GENERATED ABOUT ONE OF THOSE DISTRICTS.  THE 2011 MAP CONTAINED
      25  ONE SUCH DISTRICT.  THE ENACTED MAP ALSO CONTAINED -- OR

**MICHAEL BARBER, PH.D.**

09:10   1   CONTAINS ONE SUCH DISTRICT.  AND THE ILLUSTRATIVE MAP, ON THE
      2   OTHER HAND, CONTAINS NINE DISTRICTS THAT FALL IN THAT NARROW
      3   RANGE.
      4   **Q.**   AND IN YOUR OPINION, WOULD WE SEE THAT PATTERN IF
      5   ADHERENCE TO NON-RACIAL CRITERIA HAD BEEN THE PRIMARY CRITERIA
      6   USED TO DRAW MR. COOPER'S MAPS?
      7         **MR. NAIFEH:**  OBJECTION.  THIS IS ASKING FOR MR.
      8   COOPER'S INTENT, THAT'S THE EFFECT OF THE QUESTION, YOU KNOW,
      9   WAS MR. COOPER IGNORING TRADITIONAL REDISTRICTING CRITERIA TO
    10   GET TO THIS NUMBER.
    11         **THE COURT:**  MR. FARR, DO YOU WANT TO RESPOND?
    12         **MR. FARR:**  THERE WAS NOTHING IN THAT QUESTION ABOUT
    13   MR. COOPER'S INTENT.  IT WAS BASED UPON DR. BARBER'S FORENSIC
    14   EXAMINATION OF THE MAP AND HIS ANALYSIS OF WHETHER OR NOT YOU'D
    15   HAVE NINE, CAREFULLY DRAWN MAJORITY-BLACK DISTRICTS BETWEEN 50
    16   AND 53 PERCENT IF MR. COOPER HAD PRIORITIZED TRADITIONAL
    17   REDISTRICTING PRINCIPLES.
    18         **THE COURT:**  WELL, I THINK THE OBJECTION IS THE
    19   REFERENCE TO WHAT MR. COOPER'S INTENT IS.  I WILL SUSTAIN THE
    20   OBJECTION.  REPHRASE YOUR QUESTION.
    21         **MR. FARR:**  I'M SORRY, YOUR HONOR.  DID YOU SAY I
    22   COULD REPEAT THE QUESTION?
    23         **THE COURT:**  YOU CAN REPHRASE YOUR QUESTION.
    24         **MR. FARR:**  OKAY.
    25   **BY MR. FARR:**

MICHAEL BARBER, PH.D.

09:12 1  **Q.**  DR. BARBER, IN YOUR OPINION, WOULD WE HAVE SEEN THE

2  PATTERN THAT YOU EXPLAINED IN MR. COOPER'S ILLUSTRATIVE MAPS IF

3  HE HAD PRIORITIZED TRADITIONAL REDISTRICTING PRINCIPLES?

4  **MR. NAIFEH:**  YOUR HONOR, THE SAME OBJECTION.  "IF HE

5  HAD PRIORITIZED" IS ABOUT WHAT MR. COOPER WAS DOING.

6  **THE COURT:**  SUSTAINED.

7  **MR. FARR:**  LET ME REPHRASE IT, YOUR HONOR.

8  **THE COURT:**  REPHRASE.

9  BY MR. FARR:

10  **Q.**  DR. COOPER [SIC], WOULD YOU SEE THE PATTERN THAT'S IN MR.

11  COOPER'S MAPS, IF ANY MAP DRAWER, ANY OTHER MAP DRAWER HAD

12  MAXIMIZED OR PRIORITIZED TRADITIONAL REDISTRICTING PRINCIPLES?

13  **MR. NAIFEH:**  OBJECTION.

14  **THE COURT:**  SUSTAINED.

15  **MR. FARR:**  I'M SORRY.  WHAT DID YOU SAY, YOUR HONOR?

16  **THE COURT:**  SUSTAINED.  THERE IS NOT A PATTERN IN MR.

17  COOPER'S MAPS.  THERE IS A PATTERN THAT HE SHOWS ON HIS --

18  WHATEVER THIS IS, TABLE 2.  BUT WHERE IS THE PATTERN IN MR.

19  COOPER'S -- YOU ARE CALLING FOR THIS WITNESS TO GIVE TESTIMONY

20  ABOUT MR. COOPER'S INTENTIONS.

21  **MR. FARR:**  AND, YOUR HONOR, WE GRATEFULLY ACCEPT YOUR

22  RULING, BUT I RESPECTFULLY DISAGREE THAT WE WERE ASKING ABOUT

23  MR. COOPER'S INTENT.  WE ARE ASKING WHETHER OR NOT ANY MAP

24  DRAWER WHO PRIORITIZED ADHERENCE TO TRADITIONAL REDISTRICTING

25  PRINCIPLES WOULD END UP WITH NINE MAJORITY-BLACK DISTRICTS IN

09:13 1    THE STATE OF LOUISIANA THAT HAD A RACIAL -- THAT HAD A BLACK

2    VOTING AGE POPULATION BETWEEN 50 AND 52.99 PERCENT.  THAT'S NOT

3    A QUESTION --

4              THE COURT:  ANY MAP DRAWER OR ANY --

5              MR. FARR:  -- ABOUT MR. COOPER'S INTENT.  BUT WE

6    ACCEPT YOUR RULING, YOUR HONOR.

7              THE COURT:  OKAY.  ANY MAP DRAWER OR ANY COMPUTER?

8    THERE IS A DIFFERENCE BETWEEN A MAP DRAWER AND A COMPUTER.

9              MR. FARR:  OKAY.  I'LL TRY AGAIN.

10             THE COURT:  WELL, YOU CAN TRY.

11             MR. FARR:  YOUR HONOR, I'LL JUST REST ON THE

12   QUESTION.  I'LL MOVE ON.

13             THE COURT:  ALL RIGHT.

14             MR. FARR:  THANK YOU VERY MUCH.

15   BY MR. FARR:

16   Q.    ALL RIGHT.  LET'S SEE.  DR. BARBER, COULD YOU PULL UP

17   FIGURE 17 ON PAGE 56 OF SECRETARY OF STATE EXHIBIT 1.

18   A.    YES, I'M THERE.

19   Q.    AND COULD YOU TELL THE COURT THE SIGNIFICANCE OF THAT

20   TABLE?

21   A.    SO THIS FIGURE SHOWS THE SAME DISTRIBUTION OF MAJORITY

22   BVAP DISTRICTS THAT ARE PRODUCED BY THE 100,000 SIMULATIONS IN

23   THE HOUSE.  THOSE GRAY BARS, AGAIN, SHOW THE NUMBER OF

24   MAJORITY-BLACK DISTRICTS AND THE FREQUENCY WITH WHICH THEY

25   OCCUR.  AND THEN, AGAIN, THE DASHED LINES SHOW THE NUMBER OF

**MICHAEL BARBER, PH.D.**

09:14  1    MAJORITY BVAP DISTRICTS IN THE ENACTED MAP AS WELL AS THE

2    ILLUSTRATIVE MAP.

3    **Q.**   OKAY.  AND HOW MANY HOUSE DISTRICTS ARE THERE IN

4    LOUISIANA?

5    **A.**   105.

6    **Q.**   HOW MANY MAJORITY-BLACK HOUSE DISTRICTS WOULD BE EXACTLY

7    PROPORTIONAL?

8    **A.**   IT WOULD BE ABOUT 33.

9    **Q.**   AND HOW DID YOU CALCULATE THAT?

10    **A.**   BY TAKING 31 PERCENT TIMES THE NUMBER OF DISTRICTS.

11    **Q.**   HOW MANY MAJORITY-BLACK HOUSE DISTRICTS DID THE 100,000

12    RACE-NEUTRAL SIMULATIONS DRAW ON AVERAGE?

13    **A.**   ON AVERAGE, BETWEEN 13 AND 14.

14    **Q.**   HOW MANY MAJORITY-BLACK HOUSE DISTRICTS ARE IN THE 2022

15    ENACTED PLAN?

16    **A.**   THERE ARE 29.

17    **Q.**   HOW ABOUT MR. COOPER'S ILLUSTRATIVE HOUSE PLAN?

18    **A.**   THERE ARE 35.

19    **Q.**   HOW DO THOSE TWO PLANS COMPARE TO THE PROPORTIONAL NUMBER

20    OF HOUSE DISTRICTS?

21    **A.**   THE ENACTED MAP IS APPROXIMATELY FOUR BELOW, AND THE

22    ILLUSTRATIVE MAP IS APPROXIMATELY TWO ABOVE.

23    **Q.**   OKAY.  CAN WE NOW TURN TO TABLE 9, SECRETARY OF STATE 1,

24    PAGE 58.

25              AND ARE YOU THERE?

MICHAEL BARBER, PH.D.

09:16 1   **A.**   YES, I AM.

2   **Q.**   AND COULD YOU TELL THE COURT WHAT THAT TABLE REPRESENTS?

3   **A.**   SO THIS TABLE SHOWS THAT SAME INFORMATION THAT WE WERE

4   LOOKING AT IN THE SENATE.  THE -- RATHER THAN THE NUMBER OF

5   MAJORITY BVAP DISTRICTS, WE ARE LOOKING AT THE DISTRIBUTION

6   ACCORDING TO PARTICULAR PERCENTAGES.  AND, AGAIN, WE HAVE THOSE

7   DIFFERENT RANGES DISPLAYED ON THE ROWS AND THE TYPICAL OUTCOME

8   IN THE SIMULATIONS, THE 2011 PLAN, THE ENACTED PLAN, AND THE

9   ILLUSTRATIVE MAP.

10   **Q.**   OKAY.  AND COULD YOU, AGAIN, GO INTO A LITTLE MORE DETAIL

11   ABOUT THE RANGE OF BLACK VOTING AGE POPULATION IN MR. COOPER'S

12   ILLUSTRATIVE MAP?

13   **A.**   AND SO, AGAIN, I THINK THAT THE MOST IMPORTANT ROW THERE

14   IS THE ONE DISPLAYING THE 50 TO 53 PERCENT RANGE WHERE WE SEE

15   THE SIMULATIONS, THE 2011 MAP, THE ENACTED MAP ALL PRODUCE

16   RELATIVELY FEW DISTRICTS IN THOSE -- IN THAT RANGE.  AND WE SEE

17   A VERY DIFFERENT DISTRIBUTION WHEN WE LOOK AT THE ILLUSTRATIVE

18   MAP.

19   **Q.**   WOULD MINIMIZATION OF PARISH AND MUNICIPAL BOUNDARIES

20   PRODUCE THIS PATTERN?

21   **A.**   NO.

22   **Q.**   STEPPING BACK, DR. COOPER, [SIC] HOW DO THE RESULTS OF

23   THESE SIMULATIONS INFORM YOUR CONCLUSIONS ABOUT THE

24   ILLUSTRATIVE MAP?

25   **A.**   SO LOOKING AT THE DISTRIBUTION HERE, WE CAN SEE THAT

MICHAEL BARBER, PH.D.

09:17 1    SOMETHING VERY DIFFERENT IN THE ILLUSTRATIVE MAP COMPARED TO
2    EITHER THE ENACTED MAP, THE 2011 PLAN, OR THE SIMULATIONS.  AND
3    SO WHAT WE CAN INFER FROM THAT IS THAT SOME OTHER CRITERIA WERE
4    USED IN PRODUCING THE ILLUSTRATIVE MAP THAT GENERATED A VERY
5    DIFFERENT DISTRIBUTION COMPARED TO THESE OTHER MAPS THAT WE'VE
6    BEEN DISCUSSING.
7    **Q.**    OKAY.  NOW, LET'S TURN TO THE CONCEPT OF CORE RETENTION.
8    WHAT IS "CORE RETENTION"?
9    **A.**    CORE RETENTION IS A TERM THAT'S USED TO DESCRIBE THE
10   DEGREE TO WHICH VOTERS ARE RETAINED, HELD IN THE SAME DISTRICT
11   FROM THE PREVIOUS PLAN INTO WHATEVER NEW PLAN IS DRAWN GOING
12   FORWARD, WHETHER THAT'S AS A RESULT OF THE DECENNIAL
13   REDISTRICTING OR SOME OTHER REASON WHY DISTRICTS ARE REDRAWN.
14   **Q.**    COULD A LAY PERSON CALCULATE CORE RETENTION?
15   **A.**    NO.
16   **Q.**    WHAT EXPERTISE AND SKILLS ARE NEEDED TO ANALYZE CORE
17   RETENTION?
18   **A.**    WELL, FIRST, YOU HAVE TO UNDERSTAND THE CONCEPT AND HOW TO
19   MEASURE IT, AND BEYOND THAT THEN YOU HAVE TO BE ABLE TO ACQUIRE
20   THE DATA.  YOU ARE MERGING DATA SETS TOGETHER THAT LINK THE OLD
21   MAP AND THE NEW MAP.  YOU HAVE TO THEN CONNECT THOSE TO
22   POPULATION DATA FROM THE CENSUS AND THEN BE ABLE TO
23   APPROPRIATELY AGGREGATE ALL OF THAT DATA TOGETHER.
24   **Q.**    AND HOW DID YOU CALCULATE CORE RETENTION IN THIS CASE?
25   **A.**    SO I CALCULATE CORE RETENTION AS THE PROPORTION OF VOTERS

MICHAEL BARBER, PH.D.

09:19 1  WHO ARE HELD IN THE SAME DISTRICT FROM THE PREVIOUS MAP TO THE
      2  NEW MAP DISTRICT BY DISTRICT.
      3  **Q.**   DID MR. COOPER DO A CORE RETENTION ANALYSIS FOR HIS
      4  ILLUSTRATIVE MAPS?
      5  **A.**   HE HAS A REFERENCE TO CORE RETENTION, BUT IT'S IN
      6  REFERENCE TO THE DEGREE TO WHICH THE ILLUSTRATIVE MAP RETAINS
      7  THE ENACTED MAP, THE 2022 MAP.
      8         I CALCULATE CORE RETENTION TO THE DEGREE TO WHICH THE
      9  ENACTED MAP AND THE ILLUSTRATIVE MAP RETAIN THE 2011 MAP, WHICH
     10  I THINK IS THE MORE APT COMPARISON SINCE THAT'S THE DISTRICTS
     11  THAT THE VOTERS ARE COMING FROM IN THE PREVIOUS DECADE.
     12         SO WE WOULD WANT TO KNOW WHETHER THE ENACTED MAP IS
     13  THE ONE THAT GOES FORWARD OR THE ILLUSTRATIVE MAP IS
     14  IMPLEMENTED.  WE WOULD WANT TO KNOW THE DEGREE TO WHICH VOTERS
     15  FROM THE PREVIOUS DECADE ARE RETAINED INTO THE DISTRICTS THAT
     16  ARE GOING TO BE USED GOING FORWARD.
     17  **Q.**   OKAY.  AND COULD CORE RETENTION BE AN EXPLANATION FOR WHY
     18  MR. COOPER'S ILLUSTRATIVE MAPS CONTAIN MORE MAJORITY-BLACK
     19  VOTING AGE POPULATION DISTRICTS THAN THE SIMULATIONS OR THE
     20  ENACTED MAPS?
     21         **MR. NAIFEH:**  OBJECTION.  THAT'S ASKING FOR MR.
     22  COOPER'S INTENT AGAIN.
     23         **MR. FARR:**  MAY I BE HEARD ON THAT, YOUR HONOR?
     24         **THE COURT:**  YES, YOU MAY.
     25         **MR. FARR:**  I SHOULD HAVE SAID THIS EARLIER, YOUR

MICHAEL BARBER, PH.D.

09:20 1    HONOR, BUT I WANT TO MAKE THE POINT THAT THE PLAINTIFFS IN THIS
2    CASE FILED A *DAUBERT* MOTION ON DR. JOHNSON TESTIFYING ABOUT THE
3    SUBJECTIVE INTENT OF MR. COOPER.  THEY DIDN'T FILE A *DAUBERT*
4    MOTION ON DR. BARBER.
5              I WILL SUGGEST TO YOU, YOUR HONOR, THE REASON
6    WHY THEY DIDN'T DO THAT IS -- WE'VE CITED TO A BRIEF IN OUR
7    FINDINGS OF FACT AT DOCUMENT 177, PAGE 34, NOTE 5, THAT WAS
8    FILED BY MS. THOMAS'S ORGANIZATION, THE HARVARD LAW ELECTION
9    SCHOOL CLINIC, WITH THE UNITED STATES SUPREME COURT IN THE
10   SOUTH CAROLINA CASE.
11             AND I WON'T QUOTE IT BECAUSE WE'VE CITED IT TO
12   YOU, BUT THERE'S A LENGTHY DISCUSSION IN THIS CASE ABOUT WHY
13   SIMULATIONS ARE RELEVANT EVIDENCE ON THE INTENT OF THE MAP
14   DRAWER IN A RACIAL CASE WHERE THERE'S A CLAIM OF RACIAL
15   GERRYMANDERING.
16             SO THEY WERE AWARE OF THIS BRIEF AT THE TIME
17   THAT THE *DAUBERT* MOTION WAS FILED.  NO *DAUBERT* MOTION WAS
18   FILED.  AND THEN AFTERWARDS, YOUR HONOR, THERE WAS A
19   STIPULATION ENTERED IN THIS CASE.  AND I'LL TRY TO QUOTE IT THE
20   BEST I CAN.  I THINK IT'S DOCUMENT 182.  BUT THE STIPULATION
21   SAYS THAT THE EXPERT REPORTS OF ALL THE EXPERTS WOULD COME INTO
22   EVIDENCE WITHOUT ANY OBJECTION AS TO THE AUTHENTICITY OR THE
23   ADMISSIBILITY IF THE EXPERT APPEARED TO TESTIFY.  THAT
24   STIPULATION DID NOT SAY IF THE EXPERT APPEARS TO TESTIFY AND
25   HE'S QUALIFIED AS AN EXPERT.  IT DID NOT SAY THAT THE REPORT

**MICHAEL BARBER, PH.D.**

09:22   1   COMES INTO EVIDENCE SUBJECT TO SUBSEQUENT MOTIONS TO STRIKE

2   TESTIMONY IN THE REPORT.  IT SAYS THE REPORTS IN EVIDENCE.

3             SO THE PLAINTIFFS HAVE, IN OUR VIEW, WAIVED ANY

4   RIGHT TO OBJECT TO THIS TESTIMONY BY DR. BARBER.  IN ANY CASE,

5   AGAIN, THIS IS NOT TESTIMONY ABOUT MR. COOPER'S SUBJECTED

6   INTENT.  HE'S NEVER MENTIONED MR. COOPER.  HE'S NEVER -- UNLIKE

7   --

8           **THE COURT:**  YOUR QUESTION MENTIONS MR. COOPER.

9           **MR. FARR:**  WHAT'S THAT?

10           **THE COURT:**  YOUR QUESTION MENTIONS MR. COOPER.  AND

11   SO IF -- YOU ARE ONE STEP REMOVED, PERHAPS, FROM CALLING FOR

12   INTENT.  YOUR QUESTION DOESN'T CALL FOR INTENT, BUT YOUR

13   QUESTION CALLS FOR WHAT IS THE CONCLUSION THAT YOU DRAW ABOUT

14   MR. COOPER'S MAPS.

15           **MR. FARR:**  WELL, OKAY, YOUR HONOR, THEN I'M GOING TO

16   HAVE TO READ --

17           **THE COURT:**  AND THAT QUESTION --

18           **MR. FARR:**  -- THE REPORT OR THE BRIEF THAT WAS

19   SUBMITTED BY --

20           **THE COURT:**  YOU DON'T NEED TO DO THAT.

21           **MR. FARR:**  WELL, I NEED TO MAKE A RECORD, YOUR HONOR.

22   IT'S IMPORTANT FOR YOU TO UNDERSTAND THIS, IF I MAY HAVE YOUR

23   PERMISSION, BECAUSE IT EXPLAINS BETTER.  THEY HAVE EXPLAINED

24   BETTER THAN I HAVE BEEN ABLE TO DO, WHY THIS IS RELEVANT

25   TESTIMONY.

MICHAEL BARBER, PH.D.

09:24 1          **THE COURT:**  IT IS IN THE RECORD.  THERE IS A RECORD.

2  I AM OVERRULING THE OBJECTION.  ASK YOUR QUESTION AGAIN.

3  **BY MR. FARR:**

4  **Q.**   ALL RIGHT, DR. BARBER.  DID YOU COMPARE THE CORE RETENTION

5  FIGURES FOR MR. COOPER'S MAP AND FOR THE ENACTED PLAN?

6  **A.**   YES.

7  **Q.**   WHICH ONE OF THOSE PLANS PERFORMED BETTER?

8  **A.**   THE ENACTED MAP.

9  **Q.**   CAN YOU TURN TO PAGE 1 OF SECRETARY OF EXHIBIT -- OR

10  EXCUSE ME, PAGE 26 OF SECRETARY EXHIBIT 1, TABLE 5.

11          AND CAN YOU TELL THE COURT WHAT THAT TABLE IS,

12  PLEASE.

13  **A.**   SO THIS TABLE SHOWS THE RESULTS OF THE CORE RETENTION

14  ANALYSIS.  YOU CAN SEE, THE ROWS SHOW THE VARIOUS RANGES OF

15  CORE RETENTION:  THE ENACTED MAP, AND THE NUMBER OF DISTRICTS

16  THAT FALL IN THOSE RANGES FOR THE SENATE; AND THE ILLUSTRATIVE

17  MAP, AND THE NUMBER OF DISTRICTS THAT FALL WITHIN THOSE RANGES.

18  AND THEN AT THE BOTTOM, THE AVERAGE CORE RETENTION IN EACH OF

19  THE MAPS.

20  **Q.**   ALL RIGHT.  NOW, LET'S TURN TO SECRETARY OF STATE'S

21  EXHIBIT 1, PAGE 65, TABLE 12.

22          AND CAN TELL YOU THE COURT WHAT THAT TABLE IS.

23  **A.**   THIS TABLE SHOWS THE SAME ANALYSIS FOR THE HOUSE.  SO WE

24  HAVE, AGAIN, CORE RETENTION AND THE VARIOUS RANGES FOR THE

25  ENACTED MAP AND THE ILLUSTRATIVE HOUSE MAP.  AND AT THE BOTTOM

MICHAEL BARBER, PH.D.

09:26   1   WE HAVE THE AVERAGE CORE RETENTION IN EACH OF THOSE MAPS.

2   **Q.**   AND WHAT WERE THE AVERAGES FOR THE ENACTED PLAN VERSUS MR.

3   COOPER'S PLAN?

4   **A.**   SO THE ACTED MAP ON AVERAGE RETAINED ABOUT 83 PERCENT

5   OF -- I'M SORRY -- OF PEOPLE IN THE -- COMPARED TO THE 2011

6   MAP.   AND THE ILLUSTRATIVE MAP RETAINED APPROXIMATELY

7   72 PERCENT.

8   **Q.**   IN YOUR OPINION AS A POLITICAL SCIENTIST, IS CORE

9   RETENTION A VALID REDISTRICTING CRITERION FOR THE STATE TO

10   CONSIDER?

11   **A.**   IT IS.   THERE'S BEEN A VARIETY OF ACADEMIC RESEARCH ON THE

12   CONCEPT.   VOTERS TEND TO PREFER OR TEND TO DO BETTER WITH

13   STABILITY.   THEY TEND TO KNOW THEIR REPRESENTATIVES BETTER.

14   THEY TEND TO BE MORE LIKELY TO PARTICIPATE IN THE POLITICAL

15   PROCESS WHEN THERE'S LESS VARIATION AND CHANGE IN THINGS

16   RELATED TO VOTING, INCLUDING WHETHER THEY ARE MOVED IN OR OUT

17   OF DISTRICTS, THAT SORT OF THING.

18   **Q.**   OKAY.   LET'S TURN BACK TO YOUR REPORT.   DID YOU PERFORM

19   ANY ANALYSES OF SUBSECTIONS OR REGIONS OF THE STATE?

20   **A.**   YES.

21   **Q.**   WHAT DO YOU MEAN BY "REASONABLE ANALYSIS," AND WHY IS THAT

22   SIGNIFICANT?

23   **A.**   SO WE'RE LOOKING AT -- RATHER THAN THE RESULTS OF THE

24   STATEWIDE ANALYSIS, WE ARE LOOKING AT A PARTICULAR PORTION OF

25   THE STATE.   THAT'S IMPORTANT BECAUSE VOTERS IN THE STATE AREN'T

MICHAEL BARBER, PH.D.

09:27  1   EVENLY DISTRIBUTED ACROSS THE STATE.  AND SO IN THIS CASE,
       2   WHERE WE ARE TALKING ABOUT DRAWING MAJORITY-BLACK DISTRICTS,
       3   THERE ARE ONLY IN CERTAIN PARTS OF THE STATE WHERE THAT'S EVEN
       4   POSSIBLE.  THERE ARE OTHER PLACES WHERE DESPITE HAVING A
       5   SUBSTANTIAL NUMBER OF BLACK RESIDENTS, IT'S JUST SIMPLY NOT
       6   POSSIBLE TO DRAW MAJORITY-BLACK DISTRICTS.
       7           AND SO IN THE REGIONAL ANALYSIS, I LOOK AT THE PLACES
       8   IN WHICH IT ACTUALLY OCCURS THAT MAJORITY-BLACK DISTRICTS ARE
       9   DRAWN.
      10   Q.   COULD YOU NOW PLEASE TURN TO 23 OF SECRETARY EXHIBIT 1 AND
      11   THERE'S A MAP ON THAT PAGE TITLED "PARISH MAP AND BLACK VOTING
      12   AGE POPULATION."
      13           COULD YOU TELL THE COURT WHAT THIS MAP REPRESENTS.
      14   A.   SURE.  THIS MAP IS A PARISH MAP OF THE STATE.  THE
      15   PARISHES ARE COLORED BY THEIR BVAP PERCENTAGES.  AND SO YOU CAN
      16   SEE THAT ON THE RIGHT, THE KEY THERE SHOWS THAT THE COLORS THAT
      17   ARE MORE YELLOW, BEIGE, AND THEN INTO RED AND DARK RED ARE THE
      18   AREAS OR THE PARISHES IN THE STATE WHERE THERE'S HIGHER BVAP
      19   PERCENTAGES.
      20   Q.   AND DOES THE PATTERN OF -- THE RESIDENTIAL PATTERN OF
      21   AFRICAN AMERICANS IN LOUISIANA HAVE ANY IMPLICATIONS AS FAR AS
      22   DRAWING DISTRICTS?
      23   A.   OH, ABSOLUTELY.  AND THAT'S, AS I SAID, BECAUSE IN SOME OF
      24   THESE PLACES WHILE YOU MIGHT HAVE, SAY, 20 PERCENT OF THE
      25   POPULATION THAT ARE OF BLACK VOTING AGE POPULATION, IT'S JUST

MICHAEL BARBER, PH.D.

09:29 1  NOT POSSIBLE TO DRAW ANY MAJORITY-BLACK DISTRICTS IN THOSE
      2  AREAS.
      3          AND SO IF YOU ARE GOING TO CREATE A MAP THAT HAS
      4  PROPORTIONALITY OR EVEN EXCEEDS PROPORTIONALITY STATEWIDE,
      5  GIVEN THE AREAS WHERE YOU CAN'T DRAW MAJORITY-BLACK DISTRICTS,
      6  YOU THEN HAVE TO OVERDRAW OR OVERREPRESENT THE BVAP POPULATION
      7  IN THE REMAINING PARTS OF THE STATE WHERE IT IS POSSIBLE.
      8  Q.  COULD A LAYPERSON PERFORM A REASONABLE ANALYSIS SIMILAR TO
      9  WHAT YOU'VE DONE IN YOUR REPORT?
     10  A.  NO.
     11  Q.  WHAT TYPE OF EXPERTISE OR SOFTWARE IS REQUIRED TO PERFORM
     12  THE REGIONAL ANALYSIS THAT YOU'VE PERFORMED IN THIS REPORT?
     13  A.  SO FAMILIARITY WITH GEOGRAPHIC INFORMATION SYSTEMS,
     14  ABILITY TO WORK WITH SHAPE FILES, MERGING DATA INTO THOSE SHAPE
     15  FILES, AND AN ANALYSIS THAT WOULD COME FROM THAT, THOSE WOULD
     16  ALL BE THINGS THAT WOULD REQUIRE A GREAT DEAL OF EXPERTISE.
     17  Q.  ALL RIGHT.  LET'S PULL UP TABLE 3 ON SECRETARY OF STATE
     18  EXHIBIT 1, PAGE 19.
     19          AND CAN YOU TELL THE COURT WHAT THIS TABLE
     20  REPRESENTS.
     21  A.  SO THIS TABLE SHOWS REGIONS IN THE STATE WHERE THERE ARE
     22  MAJORITY BVAP DISTRICTS.
     23  Q.  AND THIS IS FOR THE SENATE PLAN.  CORRECT?
     24  A.  YES, THIS IS IN THE SENATE.  THE REGIONS THAT ARE
     25  HIGHLIGHTED IN YELLOW ARE THE REGIONS WHERE THE ILLUSTRATIVE

MICHAEL BARBER, PH.D.

09:30 1  MAP CONTAINS AN ADDITIONAL MAJORITY BVAP DISTRICT COMPARED TO

2  THE ENACTED MAP.

3  **Q.**  AND HOW DID YOU IDENTIFY THE REGIONS THAT YOU USED IN THIS

4  TABLE?

5  **A.**  SO THE REGIONS ARE THE PARISHES IN WHICH WE SEE MAJORITY

6  BVAP DISTRICTS.  IN ADDITION, THERE ARE VARIOUS REGIONAL

7  DEFINITIONS THAT HAVE BEEN USED BY THE PLAINTIFFS' EXPERTS.

8  AND SO MY ATTEMPT WAS TO FIND THE AREAS OF GREATEST COMMONALITY

9  ACROSS THOSE REGIONS IN CONJUNCTION WITH THE LOCATION OF THE

10  MAJORITY BVAP DISTRICTS IN THE STATE.

11  **Q.**  SO JUST TO BE CLEAR:  THE REGIONS THAT YOU IDENTIFIED

12  WERE, IN PART, BASED UPON TESTIMONY BY PLAINTIFFS' EXPERTS ON

13  THEIR OPINIONS ON REGIONS?

14  **A.**  THAT'S CORRECT.

15  **Q.**  ALL RIGHT.  TO HELP THE COURT UNDERSTAND TABLE 3 -- WE

16  DON'T NEED TO GO THROUGH THE WHOLE TABLE -- BUT COULD YOU

17  PLEASE EXPLAIN THE FIRST ROW THAT DEALS -- IT SAYS "CADDO."

18  DOES THAT MEAN CADDO-BOSSIER?

19  **A.**  CORRECT.  SO THAT WOULD BE THE REGION IN THE NORTHWEST OF

20  THE STATE IN AND AROUND THE SHREVEPORT AREA.

21  **Q.**  OKAY.  SO JUST WALK ACROSS THAT ROW AND TELL THE COURT SO

22  THE COURT WILL UNDERSTAND THE OTHER REGIONAL EVIDENCE, HOW THE

23  TOP ROW WORKS.

24  **A.**  SO IN THAT REGION WE SEE THAT THE ENACTED MAP CONTAINS ONE

25  MAJORITY-BVAP DISTRICT.  THE NEXT COLUMN SHOWS THE PROPORTION

09:32   1   OF THE SIMULATIONS THAT PRODUCE THE SAME NUMBER OF MAJORITY

       2   BVAP DISTRICTS AS THE ENACTED MAP.  SO WE CAN SEE THERE THAT

       3   WHEN WE SET THE SIMULATIONS AND THEN LOOK AT THE RESULTS

       4   AFTERWARDS, IT'S QUITE COMMON FOR THE SIMULATIONS TO PRODUCE AN

       5   OUTCOME SIMILAR TO THE ENACTED MAP IN THIS REGION ABOUT

       6   88 PERCENT OF THE TIME.

       7            IN THE NEXT COLUMN WE SEE THE ILLUSTRATIVE MAP

       8   CONTAINS TWO MAJORITY-BVAP DISTRICTS IN THAT REGION.  AND THEN

       9   THE FINAL COLUMN SHOWS THAT THAT OUTCOME NEVER OCCURRED IN THE

     10   SIMULATIONS.

     11   **Q.**   OKAY.  NOW, LET'S TURN TO PAGE 34 OF SECRETARY OF STATE

     12   EXHIBIT 1.

     13            THERE'S A TABLE 6, "SENATE DISTRICT BVAP AND CORE

     14   RETENTION IN SHREVEPORT REGION."

     15            COULD YOU TELL THE COURT WHAT THIS TABLE SHOWS.

     16   **A.**   SO THIS TABLE GOES INTO MORE DETAIL IN THAT PARTICULAR

     17   REGION.  WE SEE THAT THERE ARE THREE DISTRICTS CONTAINED IN THE

     18   REGION.  THE TABLE SHOWS THE DISTRICT NUMBERS, THE BVAP IN EACH

     19   OF THOSE DISTRICTS, AND THE CORE RETENTION SCORES FOR EACH OF

     20   THOSE DISTRICTS.

     21            THE TOP HALF OF THE TABLE SHOWS THIS INFORMATION FOR

     22   THE ENACTED MAP, AND THE BOTTOM HALF OF THE TABLE SHOWS THIS

     23   INFORMATION FOR THE ILLUSTRATIVE MAP.  AND, AGAIN, THE ROWS

     24   HIGHLIGHTED IN YELLOW INDICATE DISTRICTS THAT ARE MAJORITY

     25   BVAP.

**MICHAEL BARBER, PH.D.**

09:33 1 **Q.**   AND WHAT IS THE COLLECTIVE BLACK VOTING AGE POPULATION IN
2 THESE TWO PARISHES?
3 **A.**   SO IN THIS REGION THE BVAP IS APPROXIMATELY 39 PERCENT.
4 **Q.**   AND WHAT SHARE OF THE DISTRICTS IN THE ENACTED MAP IS
5 MAJORITY BLACK VOTING AGE POPULATION IN THIS REGION?
6 **A.**   IN THE ENACTED MAP, ONE OF THE THREE DISTRICTS IN THIS
7 REGION ARE MAJORITY BLACK.
8 **Q.**   AND THAT'S WHAT PERCENT?
9 **A.**   ABOUT 33 PERCENT.
10 **Q.**   AND WHAT ABOUT MR. COOPER'S ILLUSTRATIVE MAPS?  WHAT SHARE
11 OF THE DISTRICTS IN THIS REGION ARE MAJORITY BLACK VOTING AGE
12 POPULATION?
13 **A.**   APPROXIMATELY TWO OF THE THREE -- OR I'M SORRY.  TWO OR
14 THE THREE DISTRICTS ARE MAJORITY BVAP, APPROXIMATELY
15 67 PERCENT.
16 **Q.**   OKAY.  SO IS THE ILLUSTRATIVE MAP IN THIS REGION ACTUALLY
17 PROPORTIONAL?
18 **A.**   IT GOES BEYOND PROPORTIONALITY BY A LITTLE MORE THAN
19 20 PERCENTAGE POINTS.
20 **Q.**   DOES THE ENACTED MAP REACH PROPORTIONALITY?
21 **A.**   IT'S UNDER PROPORTIONALITY BY ABOUT SIX PERCENTAGE POINTS.
22 **Q.**   IS IT POSSIBLE TO ACHIEVE EXACT PROPORTIONALITY IN THIS
23 REGION?
24 **A.**   IT'S NOT POSSIBLE TO GET EXACTLY THERE, SIMPLY BECAUSE WE
25 ARE ONLY DEALING WITH THREE DISTRICTS.  AND SO YOU REALLY ONLY

MICHAEL BARBER, PH.D.

09:34 1   HAVE OPTIONS OF UNITS OF, YOU KNOW -- UNITS OF THREE
2   EFFECTIVELY.
3   **Q.**   OKAY.  CAN WE TURN TO SECRETARY OF STATE EXHIBIT 1,
4   PAGE 38, FIGURE 7 AND THAT'S TITLED "SHREVEPORT REGION - COOPER
5   ILLUSTRATIVE SENATE DISTRICT BOUNDARIES."
6           DO YOU SEE THAT?
7   **A.**   YES.
8   **Q.**   COULD YOU TELL THE COURT WHAT THIS FIGURE SHOWS?
9   **A.**   SO THIS FIGURE SHOWS A MAP OF THE THREE DISTRICTS IN THE
10   ILLUSTRATIVE MAP IN THIS PARTICULAR REGION.  AND SO WE SEE THE
11   TWO DISTRICTS THAT ARE MAJORITY BVAP HIGHLIGHTED IN YELLOW AND
12   THE THIRD DISTRICT IN GRAY.  THE RED DOTTED LINES SHOW THE
13   PARISH BOUNDARIES.
14   **Q.**   OKAY.  DOES THIS ORIENTATION OF -- DOES THE ORIENTATION OF
15   MR. COOPER'S SENATE DISTRICT 38 SUGGEST THAT IT ADHERES TO
16   RACE-NEUTRAL REDISTRICTING CRITERIA?
17   **A.**   IT DOES NOT.  THE DISTRICT SPANS BOTH COUNTIES.  IT SPANS
18   THE TWO LARGEST CITIES IN THE AREA.  IT HAS AN UNUSUAL SHAPE,
19   KIND OF HAS A "C" SHAPE.  AND SO IN THAT WAY IT'S NOT ADHERING
20   TO ANY OF THE CRITERIA IN PARTICULAR.
21   **Q.**   ALL RIGHT.  LET'S TURN TO FIGURE 8 ON SECRETARY OF STATE
22   EXHIBIT 1 ON PAGE 39.
23           CAN YOU TELL THE COURT WHAT THIS FIGURE SHOWS.
24   **A.**   THIS FIGURE SHOWS -- IT'S ZOOMED IN ON DISTRICT 38,
25   ILLUSTRATIVE DISTRICT 38, AND IT COLORS THE PRECINCTS BY THEIR

MICHAEL BARBER, PH.D.

09:36 1    BVAP PERCENTAGES.  AND THE -- SO THE DARKER, MORE PURPLE COLORS

2    ARE PRECINCTS WITH HIGHER BVAP, AND THE LIGHTER MORE YELLOW

3    COLORS ARE PRECINCTS WITH LOWER BVAP.  THE NUMBERS ARE THE

4    PRECINCTS LABELS.  THE DISTRICT ITSELF IS OUTLINED WITH THE

5    DARK GRAY, THE DARK GRAY LINE.

6    Q.    AND IS THERE ANYTHING SIGNIFICANT, IN YOUR OPINION, ABOUT

7    THE SHAPE OF MR. COOPER'S SENATE DISTRICT 38?

8    A.    YES.  IN HAVING THAT, AS I MENTIONED, THAT "C" SHAPE OF

9    THE DISTRICT, YOU CAN SEE THAT THE DISTRICT AVOIDS GROUPING OF

10   PRECINCTS IN THE CENTER THERE NEAR WHERE THE FIGURE SAYS SD-36.

11   AND THOSE PRECINCTS ARE -- HAVE VERY FEW BLACK RESIDENTS AND

12   ARE HEAVILY WHITE.  AND SO YOU CAN SEE THE DISTRICT VERY

13   CAREFULLY WALKS AROUND THAT GROUP OF PRECINCTS.

14   Q.    WHAT DOES THIS SUGGEST TO YOU?

15   A.    IT SUGGESTS TO ME THAT THE DISTRICT SHAPE IS -- YOU KNOW,

16   BECAUSE IT HAS THAT "C" SHAPE, IT'S MISSING THOSE PRECINCTS IN

17   THE MIDDLE THAT ARE MAJORITY WHITE.  AND THAT TO ME SUGGESTS

18   THAT, YOU KNOW, SHAPE IS -- IT'S KIND OF CAREFULLY WINDING

19   AROUND THOSE MAJORITY-WHITE PRECINCTS IN THE CENTER THERE.

20   Q.    OKAY.  DID YOU DO SIMILAR ANALYSES FOR OTHER REGIONS IN

21   THE STATE WHERE MR. COOPER CREATED ADDITIONAL MAJORITY-BLACK

22   SENATE DISTRICTS?

23   A.    YES.

24   Q.    AND DID YOU COME TO SIMILAR CONCLUSIONS IN REGARDS --

25             MR. NAIFEH:  I'M GOING TO OBJECT HERE, YOUR HONOR.

MICHAEL BARBER, PH.D.

09:38 1  THAT QUESTION CALLED FOR MR. COOPER'S SUBJECTIVE INTENT IN HOW

2  HE DREW THIS DISTRICT.  THE ANSWER INCLUDED TESTIMONY ABOUT THE

3  SUBJECTIVE INTENT.  I DID NOT GET AN OBJECTION ON THE RECORD IN

4  TIME FOR THAT ANSWER, BUT I'M GOING TO OBJECT TO FURTHER

5  QUESTIONS THAT ASK FOR THAT SAME KIND OF TESTIMONY.

6           MR. FARR:  MAY I BE HEARD, YOUR HONOR?

7           THE COURT:  NO.  THE OBJECTION IS OVERRULED.

8           MR. FARR:  THANK YOU, YOUR HONOR.

9  BY MR. FARR:

10 Q.   DID YOU DO SIMILAR ANALYSES FOR THE OTHER REGIONS IN THE

11 STATE WHERE MR. COOPER CREATED ADDITIONAL MAJORITY-BLACK SENATE

12 DISTRICTS?

13 A.   YES.

14 Q.   AND DID YOU COME TO SIMILAR CONCLUSIONS?

15 A.   YES.

16 Q.   ALL RIGHT.  WE WON'T HAVE TO GO THROUGH THOSE OTHER

17 REGIONS BECAUSE OF THAT TESTIMONY, DR. BARBER.  THANK YOU.

18           NOW, LET'S MOVE TO THE HOUSE.

19           CAN YOU TURN TO SECRETARY OF STATE 1, PAGE 59.

20           AND CAN YOU TELL THE COURT -- THIS TABLE IS MARKED

21 "LOUISIANA AND NUMBER OF MAJORITY-BLACK VOTING AGE HOUSE

22 DISTRICTS, TABLE 10."

23           COULD YOU EXPLAIN THAT TABLE TO THE COURT, PLEASE.

24 A.   SO THIS IS THE SAME TABLE WE WERE LOOKING AT BUT FOR THE

25 HOUSE INSTEAD OF THE SENATE.  SO HERE WE HAVE REGIONS OF THE

MICHAEL BARBER, PH.D.

09:39  1  STATE IN WHICH THERE ARE MAJORITY BVAP DISTRICTS.  THE ROWS

2  HIGHLIGHTED IN YELLOW ILLUSTRATE THE REGIONS WHERE THE

3  ILLUSTRATIVE MAP CONTAINS ADDITIONAL MAJORITY BVAP DISTRICTS

4  WHEN COMPARED TO THE ENACTED MAP.

5  Q.   AND WAS THERE ANYTHING PARTICULARLY SIGNIFICANT, IN YOUR

6  VIEW, ABOUT THE RANGE OF THE BLACK VOTING AGE POPULATION?

7  A.   SO, AGAIN, AS WE SAW IN THE PREVIOUS TABLE, THE NUMBER OF

8  MAJORITY BVAP DISTRICTS IN THE ENACTED MAP AS -- THEN WE CAN

9  COMPARE THAT TO THE PROPORTION OF TIME THE SIMULATIONS GENERATE

10  THE SAME NUMBER OF MAJORITY BVAP DISTRICTS COMPARED TO THE

11  ENACTED MAP.

12        AND THEN IN THE LAST COLUMN, THE PROPORTION OF TIMES

13  THAT THE SIMULATIONS GENERATE THE SAME NUMBER OF MAJORITY BVAP

14  DISTRICTS AS IN THE ILLUSTRATIVE MAP.

15  Q.   OKAY.  LET'S LOOK AT ONE OF THESE REGIONS WITH MORE

16  SPECIFICITY.  CAN WE PULL UP TABLE 16 ON SECRETARY OF STATE

17  EXHIBIT 1, PAGE 95.

18  A.   I'M THERE.

19  Q.   IS THAT IN FRONT OF YOU?

20  A.   YES, IT IS.

21  Q.   OKAY.  COULD YOU EXPLAIN THAT TABLE TO THE COURT, PLEASE.

22  A.   SO THIS TABLE FOCUSES IN ON THE REGION IN AND AROUND BATON

23  ROUGE.  AND, AGAIN, IT SHOWS THE PARTICULAR DISTRICTS IN THAT

24  REGION, THE BVAP IN EACH OF THOSE DISTRICTS, AND THE RETENTION

25  SCORES FOR EACH OF THOSE DISTRICTS.  AND, AGAIN, THE TOP HALF

**MICHAEL BARBER, PH.D.**

09:41  1   IS FOR THE ENACTED MAP.  THE BOTTOM HALF IS FOR THE

2   ILLUSTRATIVE MAP.  AND THE ROWS HIGHLIGHTED IN YELLOW ARE,

3   AGAIN, THOSE DISTRICTS WHERE -- THAT CONTAIN MAJORITY BVAP

4   POPULATION.

5   **Q.**   AND DOES THIS TABLE EXPLAIN HOW MANY HOUSE DISTRICTS ARE

6   IN THIS REGION?

7   **A.**   IT DOES, YES.  THERE ARE 11.

8   **Q.**   AND WHAT IS THE RACIAL COMPOSITION OF THESE TWO PARISHES?

9   **A.**   COLLECTIVELY IT'S APPROXIMATELY 44 PERCENT.

10   **Q.**   AND HOW MANY OF THE DISTRICTS IN THIS AREA ARE MAJORITY

11   BLACK VOTING AGE POPULATION IN THE ENACTED POPULATION?

12   **A.**   SIX OF THE 11 --

13   **Q.**   AND --

14   **A.**   -- OR ABOUT 54 AND A HALF PERCENT.

15   **Q.**   SO THE ENACTED HOUSE PLAN ALREADY EXCEEDS PROPORTIONALITY

16   IN THIS REGION?

17   **A.**   YES, IT DOES.

18   **Q.**   ALL RIGHT.  HOW MANY DISTRICTS IN THIS REGION ARE MAJORITY

19   BLACK IN MR. COOPER'S ILLUSTRATIVE MAP?

20   **A.**   EIGHT OF THE 11 OR ABOUT 73 PERCENT.

21   **Q.**   DOES THAT PERCENT EXCEED PROPORTIONALITY FOR MR. COOPER'S

22   PLAN?

23   **A.**   YES, IT DOES.

24   **Q.**   LET'S NOW LOOK AT FIGURE 37, SECRETARY OF STATE EXHIBIT 1,

25   PAGE 99.

09:42 1          CAN YOU TELL US WHAT THIS FIGURE REPRESENTS?

2    **A.**   SO THIS FIGURE IS SHOWING THE ORIENTATION OF THESE

3    DISTRICTS IN THIS REGION FOR THE ILLUSTRATIVE MAP AND THE --

4    AGAIN, THE DISTRICTS THAT ARE -- CONTAIN MAJORITY BVAP

5    POPULATION ARE HIGHLIGHTED IN YELLOW.

6    **Q.**   WHAT DO YOU FIND NOTEWORTHY ABOUT THESE DISTRICTS?

7    **A.**   I THINK THE MOST NOTEWORTHY IS YOU CAN SEE SOME OF THE

8    DISTRICTS CONTAIN SOME UNUSUAL SHAPES, PARTICULARLY DISTRICT

9    70, AND, I THINK, DISTRICT 71 ARE TWO THAT I HIGHLIGHT IN MY

10   REPORT.

11   **Q.**   ALL RIGHT.  LET'S LOOK AT FIGURE 38 ON PAGE 100.

12          AND CAN YOU EXPLAIN WHAT THIS REPRESENTS TO THE

13   COURT?

14   **A.**   SO THIS FIGURE LOOKS SPECIFICALLY AT ILLUSTRATIVE DISTRICT

15   68 AND 70.  AND, AGAIN, AS IN THE EXAMPLE WE LOOKED AT EARLIER

16   IN THE SENATE, IT SHOWS THE PRECINCTS CONTAINED IN EACH OF

17   THOSE DISTRICTS COLORED BY THE BLACK VOTING AGE POPULATION IN

18   EACH PRECINCT.  THE BOUNDARIES OF THE DISTRICT ARE SHOWN USING

19   THE DARK GRAY LINES.

20   **Q.**   AND WHAT'S SIGNIFICANT ABOUT THESE DISTRICTS?

21   **A.**   I THINK WHAT WE SEE IS DISTRICT 70 HAS THIS UNUSUAL "U"

22   SHAPE, THIS KIND OF HORSESHOE SHAPE IN WHICH IT KINDS OF WINDS

23   AROUND THE BOTTOM OF HOUSE DISTRICT 68, WHICH HOUSE DISTRICT 68

24   IS A MAJORITY BVAP DISTRICT AND HOUSE DISTRICT 70 IS NOT.

25   **Q.**   WHY WAS THE -- IN LOOKING AT THE MAP, WAS THERE ANYTHING

MICHAEL BARBER, PH.D.

09:44 1   YOU CAN DEDUCE FROM THE DEMOGRAPHICS OF THE PRECINCTS BASED

2   UPON THE U-SHAPE?

3   **A.**   WELL, ONE THING THAT OCCURS IN HAVING THAT SHAPE IS THAT

4   HD-70 KIND OF GOES VERY -- IT KIND OF DIGS SOUTH TO AVOID THAT

5   PRECINCT AT THE BOTTOM THAT'S MAJORITY BVAP AND THEN COMES

6   BACKS AROUND ON THE OTHER SIDE AND SCOOPS UP SOME PRECINCTS

7   THAT ARE HEAVILY WHITE.  AND IN ORDER TO -- FOR DISTRICT 68 TO

8   REMAIN MAJORITY BVAP, IT NEEDS THOSE VERY HEAVY BVAP PRECINCTS

9   AT THE BOTTOM OF THE MAP THERE.

10   **Q.**   AND DOES THIS SUGGEST ANYTHING TO YOU IN PARTICULAR?

11         **MR. NAIFEH:**  OBJECTION, TO THE EXTENT IT CALLS FOR

12   MR. COOPER'S SUBJECTIVE INTENT.

13         **THE COURT:**  IT IS JUST A QUESTION TOO FAR.  I MEAN, I

14   AM FOLLOWING YOU.  IT IS A QUESTION TOO FAR.  SUSTAINED.

15         **MR. FARR:**  WELL, YOUR HONOR, COULD YOU HEAR HIS

16   ANSWER BEFORE YOU SUSTAIN THE OBJECTION?

17         **THE COURT:**  YES.  GIVE ME A RESPONSE.

18         **MR. FARR:**  HE'S JUST GOING TO SAY THAT THE DISTRICTS

19   DON'T COMPLY WITH TRADITIONAL REDISTRICTING PRINCIPLES.

20         **THE COURT:**  THAT'S WHAT HE IS GOING TO SAY?

21         **MR. FARR:**  YES.

22         **THE COURT:**  YOU KNOW WHAT HE IS GOING TO SAY?

23         **MR. FARR:**  YES.

24         **THE COURT:**  I AM GOING TO LET HIM ANSWER THE

25   QUESTION.

**MICHAEL BARBER, PH.D.**

09:45 1   **BY THE WITNESS:**

2   **A.**   THE SHAPE OF HD-70 IS NOT -- DOESN'T COMPORT WITH OTHER

3   TRADITIONAL REDISTRICTING PRINCIPLES.

4   **Q.**   AND DID YOU DO SIMILAR ANALYSES FOR OTHER HOUSE REGIONS IN

5   THE STATE WHERE MR. COOPER CREATED ADDITIONAL MAJORITY-BLACK

6   DISTRICTS, HOUSE DISTRICTS?

7   **A.**   I DID, YES.

8   **Q.**   ALL RIGHT.   NOW, I'M GOING TO TURN TO YOUR REBUTTAL

9   REPORT.   COULD YOU CALL UP AND TURN TO SECRETARY OF STATE

10   EXHIBIT 4.

11             IS THIS THE REBUTTAL REPORT YOU PREPARED FOR THIS

12   CASE?

13   **A.**   YES, IT IS.

14   **Q.**   WHY DID YOU PREPARE THIS?

15   **A.**   I PREPARED THIS IN RESPONSE TO A REPORT FILED BY DR.

16   MCCARTAN.

17   **Q.**   AND WHO IS DR. MCCARTAN?

18   **A.**   YES.

19   **Q.**   AND THAT'S M-C-C-A-R-T-A-N FOR THE COURT REPORTER?

20   **A.**   THAT'S CORRECT.

21   **Q.**   OKAY.   WHO IS DR. MCCARTAN?

22   **A.**   HE'S ONE OF THE CO-AUTHORS OF THE ALGORITHM THAT I USED IN

23   THIS -- IN THIS CASE IN ADDITION TO OTHER PROFESSORS, DR. IMAI

24   AND OTHERS, THAT WROTE THE ALGORITHM.

25   **Q.**   DID DR. MCCARTAN OFFER ANY OBJECTIONS TO YOUR ORIGINAL

MICHAEL BARBER, PH.D.

09:47  1   REPORT?

2   **A.**   YES, HE DID.

3   **Q.**   WHAT WERE THEY?

4   **A.**   HE OFFERED A NUMBER OF CRITIQUES, PARTICULAR TO THE WAY IN

5   WHICH THE SIMULATIONS WERE STRUCTURED, THE PARTICULAR PARAMETER

6   VALUES THAT WERE CHOSEN, THE NUMBERS OF SIMULATIONS THAT WERE

7   CONDUCTED, THE PARTICULAR WAY IN WHICH THE STATE -- I

8   PARTITIONED THE STATE IN ORDER TO CONDUCT THE SIMULATIONS.  AND

9   I BELIEVE AT THE END THERE IS SOME OF THE -- WHAT ARE CALLED

10   "CONVERGENCE DIAGNOSTICS."

11   **Q.**   WHAT ARE CONVERGENCE DIAGNOSTICS?

12   **A.**   MORE OR LESS, THEY ARE STATISTICS THAT YOU WOULD LOOK AT

13   TO BE ASSURED THAT THE ALGORITHM RAN CORRECTLY, THAT IT KIND OF

14   RAN TO COMPLETION APPROPRIATELY, THAT SORT OF THING.

15   **Q.**   SO HOW DID YOU RESPOND TO DR. MCCARTAN'S CRITICISMS?

16   **A.**   SO I INCORPORATED EACH OF THOSE CRITICISMS AND CONDUCTED A

17   SECOND SET OF SIMULATIONS AND THEN COMPARED THE RESULTS OF THAT

18   SECOND SET OF SIMULATIONS TO THE INITIAL SET THAT I HAD RUN IN

19   MY ORIGINAL REPORT.

20   **Q.**   WHAT, IF ANY, CHANGES RESULTED FROM THE CONCLUSIONS YOU

21   REACHED IN YOUR ORIGINAL SIMULATIONS?

22   **A.**   THE SECOND SET OF SIMULATIONS DOESN'T CHANGE MY OPINIONS

23   IN ANY MEANINGFUL WAY.

24   **Q.**   WELL, LET'S WALK THROUGH A FEW SPECIFICS IN YOUR REBUTTAL

25   REPORT.  SECRETARY OF STATE EXHIBIT 4, SECTION 3 ON PAGE 8, CAN

**MICHAEL BARBER, PH.D.**

09:48 1  WE TURN TO THAT.

2           AT THE TOP OF THE PAGE YOU STATE SOMETHING TO THE

3  EFFECT THAT DR. MCCARTAN DID NOT RUN ANY SIMULATIONS.  WHY IS

4  THAT SIGNIFICANT?

5  **A.**   I THINK THAT'S SIGNIFICANT BECAUSE HE CERTAINLY COULD HAVE

6  AND IS CERTAINLY CAPABLE OF THAT.  AND IN DOING SO, HE

7  CERTAINLY COULD HAVE PROVIDED A SET OF SIMULATIONS USING THE

8  CRITERIA OUTLINED BY THE STATE AND SHOWN THAT WHEN INTRODUCING

9  THOSE CRITERIA IN THE WAY THAT HE FELT WAS MOST APPROPRIATE,

10  THAT THE SIMULATIONS CLOSELY RESEMBLED THE ILLUSTRATIVE MAP.

11  **Q.**   WELL, LET'S CLARIFY THAT A LITTLE BIT.  WHAT INFORMATION

12  DOES HE NEED TO DO TO RUN SIMULATIONS TO TEST YOUR REPORT?

13  **A.**   SO WE PROVIDED WITH MY REPORT DATA BACKUP CODE, THAT SORT

14  OF INFORMATION, TO REPLICATE THE ORIGINAL SET OF SIMULATIONS.

15  **Q.**   AND THE FACT THAT HE DID NOT DO ANY SIMULATIONS, DOES THAT

16  SUGGEST ANYTHING TO YOU?

17  **A.**   SO AS I WAS SAYING, HE CERTAINLY COULD HAVE DONE THAT AND

18  PRODUCED A NEW SET OF SIMULATIONS THAT HE FELT WERE BETTER OR

19  MORE APPROPRIATELY REFLECTED THE CRITERIA OF THE STATE.  AND

20  HAD THOSE SIMULATIONS REFLECTED CLOSELY THE ENACTED -- OR

21  THE -- I'M SORRY -- THE ILLUSTRATIVE MAP, THAT I THINK WOULD

22  HAVE BEEN VERY STRONG SUGGESTIVE EVIDENCE AND WE DON'T SEE THAT

23  HERE.

24  **Q.**   HOW LONG WOULD IT HAVE TAKEN DR. MCCARTAN TO RUN

25  SIMULATIONS TO TEST YOUR CONCLUSIONS?

MICHAEL BARBER, PH.D.

09:50 1   **A.**   GIVEN THE INFORMATION THAT WE PROVIDED AND --

2        **MR. NAIFEH:**  OBJECTION.  THIS IS BEYOND THE SCOPE OF

3   THE REPORT.  THERE IS NOTHING IN THE REPORT ABOUT WHAT DR.

4   MCCARTAN COULD HAVE DONE BEYOND WHAT'S IN THIS PARAGRAPH.

5   THERE'S NOTHING ABOUT HOW LONG IT WOULD TAKE.  THERE'S NOTHING

6   ABOUT WHAT IT WOULD HAVE SHOWN.

7        **MR. FARR:**  YOUR HONOR, I -- THIS IS INTERESTING.  I'M

8   NOT ALLOWED TO ASK HIM QUESTIONS ABOUT THINGS THAT ARE IN THE

9   REPORT THAT THEY ADMITTED INTO EVIDENCE AND THEREBY WAIVED ANY

10   OBJECTIONS AND NOW I'M NOT ALLOWED TO ASK HIM ANY QUESTIONS TO

11   CLARIFY THE TESTIMONY THAT'S IN THE REPORT.

12        **THE COURT:**  OVERRULED.

13   **BY MR. FARR:**

14   **Q.**   HOW LONG WOULD IT HAVE TAKEN DR. MCCARTAN TO RUN THE

15   SIMULATIONS TO TEST THE CRITICISMS THAT HE MADE OF YOUR REPORT?

16   **A.**   IN MY ESTIMATE, IT WOULD HAVE NOT TAKEN PARTICULARLY LONG,

17   GIVEN THE INFORMATION THAT WE PROVIDED AND HIS EXPERTISE IN

18   THIS AREA; THE, YOU KNOW, BETTER PART OF PERHAPS A DAY'S WORK.

19   **Q.**   ALL RIGHT.  LET'S TURN TO PAGE 6 OF SECRETARY OF STATE --

20   LET'S TURN TO PAGE 6 OF SECRETARY OF STATE EXHIBIT 4, SECTION

21   3.1, TITLED "PARTITIONING THE STATE."

22        COULD YOU EXPLAIN THAT SECTION?

23   **A.**   YES.  THIS SECTION IS ADDRESSING CRITICISM OFFERED BY DR.

24   MCCARTEN REGARDING THE WAY IN WHICH I CHOSE TO PARTITION THE

25   STATE PRIOR TO RUNNING THE SIMULATIONS.

MICHAEL BARBER, PH.D.

09:52  1          IN A STATE LIKE LOUISIANA, WHERE YOU HAVE A LARGE
        2   NUMBER OF DISTRICTS AND AN EVEN LARGER NUMBER OF PRECINCTS THAT
        3   ARE BEING GROUPED TOGETHER TO COMPOSE THOSE DISTRICTS, IT'S NOT
        4   UNCOMMON TO FIRST DIVIDE THE STATE INTO A NUMBER OF SUBREGIONS
        5   AND CONDUCT THE SIMULATIONS WITHIN THOSE REGIONS AND THEN
        6   STITCH THEM BACK TOGETHER INTO A STATEWIDE ANALYSIS.
        7   THIS HAS BEEN DONE IN A NUMBER OF CASES, AND LOUISIANA IS
        8   SIMILAR TO THOSE.  AND SO --
        9   **Q.**   COULD I ASK YOU A QUESTION?  HOW MANY OTHER EXAMPLES CAN
       10   YOU RECALL OF PEOPLE WHO -- EXPERTS, SIMULATION EXPERTS, WHO
       11   HAVE DONE SIMULATIONS BY DIVIDING A STATE INTO REGIONS?
       12   **A.**   SO I KNOW THAT THIS HAS BEEN DONE IN A CASE IN
       13   PENNSYLVANIA IN WHICH THE EXPERT DIVIDED THE STATE INTO VARIOUS
       14   REGIONS.  IT'S BEEN DONE IN OTHER PUBLISHED WORK, INCLUDING IN
       15   SOME OF DR. MCCARTAN'S OWN PUBLISHED WORK.  IT'S A WIDELY
       16   USED -- OR COMMONLY USED AND WIDELY ACCEPTED PRACTICE.
       17   **Q.**   SO DESPITE THE FACT THAT IT'S A COMMONLY ACCEPTED
       18   PRACTICE, WHAT WAS YOUR RESPONSE TO THE CRITICISM FROM DR.
       19   MCCARTAN?
       20   **A.**   SO MY RESPONSE WAS TO TAKE INTO ACCOUNT HIS CRITICISM AND
       21   ALTER THE WAY IN WHICH THE STATE WAS DIVIDED PRIOR TO RUNNING
       22   THIS -- PRIOR TO RUNNING THE SIMULATIONS.
       23          IN THE FIRST SET OF SIMULATIONS, THE STATE IS
       24   PARTITIONED ACCORDING TO PARISH BOUNDARIES.  AND THE SECOND SET
       25   OF SIMULATIONS, THE STATE IS PARTITIONED ACCORDING TO THE

**MICHAEL BARBER, PH.D.**

09:53  1   BOUNDARIES OF THE ILLUSTRATIVE MAP.

2           AND THE IMPACT THAT THAT HAS IS THAT IT, IN SOME

3   WAYS, MAKES IT MORE LIKELY FOR THE SIMULATIONS TO PRODUCE

4   SOMETHING THAT RESEMBLES THE ILLUSTRATIVE MAP.  AND SO IT, IN

5   SOME WAYS, GIVES -- YOU COULD SAY ALMOST LIKE A LEG UP TO THE

6   SIMULATIONS IN PRODUCING SOMETHING THAT RESEMBLES THE

7   ILLUSTRATIVE MAP.

8   **Q.**   COULD I STOP YOU THERE AND JUST MAKE SURE THE COURT

9   UNDERSTANDS THIS.  WE ARE TALKING ABOUT THE HOUSE MAP RIGHT

10  NOW.  CORRECT?

11  **A.**   THAT'S CORRECT.  IN THE FIRST SET OF SIMULATIONS, I

12  PARTITION THE STATE INTO THREE REGIONS IN THE HOUSE.  I DO NOT

13  PARTITION THE STATE IN THE SENATE.

14          IN THE SECOND SET OF SIMULATIONS, I PARTITION BOTH

15  THE SENATE AND THE HOUSE ACCORDING TO GROUPINGS OF THE

16  ILLUSTRATIVE DISTRICTS.

17  **Q.**   AND EXPLAIN WHY YOUR REGIONS IN YOUR SECOND SET OF

18  SIMULATIONS WERE BASED UPON MR. COOPER'S ILLUSTRATIVE

19  DISTRICTS.

20  **A.**   SO ONE OF THE CRITICISMS WAS THAT IN PARTITIONING THE

21  STATE BY PARISH BOUNDARIES, IT WOULD MAKE IT DIFFICULT OR

22  PERHAPS IMPOSSIBLE TO RECREATE -- TO PERFECTLY REPLICATE -- FOR

23  THE SIMULATIONS TO PERFECTLY REPLICATE, SAY, THE ENACTED MAP,

24  GIVEN THE WAY IN WHICH THE ENACTED MAP CROSSES CERTAIN PARISH

25  BOUNDARIES.

MICHAEL BARBER, PH.D.

09:55  1          GIVEN THAT YOU COULD THINK OF THIS -- THE KIND OF
       2   HARD CASE AGAINST THE SIMULATIONS WOULD BE, DO THEY RESEMBLE
       3   THE ILLUSTRATIVE MAP.  AND SO TO GIVE THE BEST SCENARIO OR THE
       4   BEST-CASE SCENARIO TOWARD ALLOWING THE SIMULATIONS TO PRODUCE
       5   SOMETHING RESEMBLING THE ILLUSTRATIVE MAP, I PARTITIONED THE
       6   STATE ACCORDING TO THE BOUNDARIES OF THE ILLUSTRATIVE MAP.
       7   **Q.**   AND IN DOING THAT, DID IT MAKE ANY DIFFERENCE IN YOUR
       8   RESULTS?
       9   **A.**   THE RESULTS WERE NOT SUBSTANTIVELY DIFFERENT IN -- AFTER
      10   MAKING THAT ADJUSTMENT.
      11   **Q.**   ALL RIGHT.  NOW, LET'S TURN TO SECRETARY OF STATE 4, PAGE
      12   8.  THERE'S A SECTION ENTITLED "3.2 CORE RETENTION."
      13          COULD YOU EXPLAIN THAT SECTION TO THE COURT.
      14   **A.**   SO THIS SECTION ADDRESSES THE CRITIQUE OF THE WAY IN WHICH
      15   THE CORE RETENTION CONSTRAINT IS IMPLEMENTED IN THE
      16   SIMULATIONS.  AND IN THE SECOND SET OF SIMULATIONS, I IMPLEMENT
      17   A MUCH STRONGER CORE RETENTION CONSTRAINT SO THE ALGORITHM IS
      18   INSTRUCTED TO GIVE MUCH GREATER WEIGHT OR PRIORITY TO THIS
      19   CRITERIA OF CORE RETENTION.
      20   **Q.**   OKAY.  AND WHERE DID YOU GET THAT CRITERIA FOR CORE
      21   RETENTION?
      22   **A.**   SO THE CRITERIA ARE DRAWN FROM THE JOINT RULE.  THE
      23   PARTICULAR METHOD BY WHICH THE CORE RETENTION CONSTRAINT IS
      24   IMPLEMENTED IN THIS SET OF SIMULATIONS IS DRAWN FROM
      25   INSTRUCTIONS OR RECOMMENDATIONS CONTAINED WITHIN THE ALGORITHM

09:56 1    ITSELF FROM DR. MCCARTAN AND HIS CO-AUTHORS.

2    **Q.**    AND HOW WOULD YOU RESPOND TO ANY CRITICISM THAT YOU SHOULD

3    HAVE RUN SIMULATIONS USING A LOW RANGE FOR CORE RETENTION

4    VERSUS A HIGH RANGE FOR CORE RETENTION?

5    **A.**    SO MY RESPONSE WOULD BE THAT THAT'S EXACTLY WHAT WE HAVE

6    HERE.  THE FIRST SET OF SIMULATIONS HAVE A VERY LOW RANGE OF

7    CORE RETENTION OR NO CORE RETENTION CONSTRAINT.

8            THE SECOND SET OF SIMULATIONS HAVE A VERY HIGH CORE

9    RETENTION CONSTRAINT.  AND SO WE CAN SEE THE OUTCOME OF VARYING

10    THAT THE STRENGTH OF THAT CONSTRAINT IN COMPARING THE TWO --

11    THE TWO SETS TO ONE ANOTHER.

12    **Q.**    ALL RIGHT.  SO LET'S TURN TO SECRETARY OF STATE EXHIBIT 4,

13    PAGE 9, SECTION 3.3 TITLED "NUMBER OF UNIQUE MAPS."

14            COULD YOU PLEASE EXPLAIN THAT SECTION TO THE COURT.

15    **A.**    SURE.  ONE OF THE ADDITIONAL CRITIQUES WAS THAT THE

16    SIMULATIONS HAD NOT PERHAPS GENERATED A SUFFICIENT NUMBER OF

17    MAPS OR UNIQUE MAPS TO REPRESENT THE POSSIBLE -- YOU KNOW, TO

18    BE A REPRESENTATIVE SAMPLE OF MAPS.  AND SO IN ADDRESSING THAT

19    CRITIQUE, I INCREASED THE NUMBER OF MAPS THAT WERE DRAWN BY

20    FIVE TIMES, FROM 100,000 TO 500,000 MAPS.

21    **Q.**    ALL RIGHT.  AND IN YOUR OPINION WAS DR. MCCARTEN'S

22    CRITICISM THAT YOU HAD NOT CONSTRUCTED A SUFFICIENT NUMBER OF

23    SIMULATIONS IN YOUR FIRST SET, WAS THAT A VALID CRITICISM, IN

24    YOUR VIEW?

25    **A.**    NO, I DON'T THINK SO.  A 100,000 MAPS IS SUBSTANTIAL.  IT

MICHAEL BARBER, PH.D.

09:58  1    EXCEEDS THE NUMBER OF MAPS IN MANY OTHER REDISTRICTING CASES IN
       2    WHICH THIS ALGORITHM HAS BEEN USED AND PERHAPS -- OR IN THOSE
       3    CASES YOU'VE SEEN 10,000, 5,000 MAPS BEING USED.  AND SO I
       4    DON'T THINK IT WAS NECESSARILY A VALID CRITICISM TO BEGIN WITH.
       5    BUT NEVERTHELESS, JUST TO BE SURE, I INCREASED THE NUMBER OF
       6    MAPS DRAWN BY FIVE TIMES.
       7    Q.   AM I UNDERSTANDING YOU CORRECTLY, THAT YOU DID 500,000
       8    SENATE MAPS AND 500,000 HOUSE MAPS?
       9    A.   THAT'S CORRECT.
      10    Q.   AND DOING THIS, DID IT MAKE ANY DIFFERENCE IN YOUR
      11    CONCLUSIONS?
      12    A.   AGAIN, THE SUBSTANTIVE CONCLUSIONS DIDN'T CHANGE
      13    DRAMATICALLY OR DIDN'T CHANGE AT ALL REALLY.
      14    Q.   ALL RIGHT, DR. BARBER.  JUST TO BE CLEAR:  DID YOU
      15    IMPLEMENT THESE CHANGES ONE AT A TIME OR ALL AT ONCE?
      16    A.   COLLECTIVELY.  SO I TOOK ALL OF THESE CRITIQUES TOGETHER
      17    AND IMPLEMENTED THEM IN A SECOND SET OF SIMULATIONS THAT
      18    ADDRESSED ALL OF THEM SIMULTANEOUSLY.
      19    Q.   ALL RIGHT.  NOW, LET'S TURN TO SECRETARY OF STATE EXHIBIT
      20    4, PAGE 11 AND THERE'S A SECTION TITLED "CONVERGENCE
      21    DIAGNOSTICS."
      22         COULD YOU EXPLAIN THAT SECTION TO THE COURT.
      23    A.   SURE.  ONE OF THE CRITICISMS OFFERED WAS THAT I FAILED TO
      24    CHECK OR PROVIDE DIAGNOSTIC -- CONVERGENCE DIAGNOSTICS
      25    REGARDING THE FIRST SET OF SIMULATIONS AND TO ADDRESS THAT.  I

09:59 1   INCLUDED THOSE, AGAIN, A SECOND TIME, IN ADDITION TO OTHER

2   MEASURES THAT WERE RECOMMENDED.  AGAIN, NONE OF THOSE RESULTS

3   INDICATED THAT THAT WERE PROBLEMS WITH THE SIMULATIONS.

4   **Q.**   AND JUST TO BE CLEAR:  COULD YOU EXPLAIN TO THE COURT THE

5   TYPE OF PROBLEMS THAT CONVERGENCE STATISTICS MIGHT REVEAL?

6   **A.**   BROADLY THEY WOULD INDICATE THAT THE MODEL OR THE

7   ALGORITHM HADN'T RUN APPROPRIATELY OR THAT IT HADN'T

8   CORRECTLY -- THE TERM WE WOULD USE IS "CONVERGED."  THAT SIMPLY

9   MEANS THAT THE ALGORITHM BASICALLY DID WHAT WE WANTED IT TO DO.

10   IT RAN APPROPRIATELY AND COLLECTED A REPRESENTATIVE SAMPLE OF

11   MAPS.

12   **Q.**   OKAY.  AND, AGAIN, WHAT DID THE CONVERGENCE STATISTICS

13   SHOW FOR YOUR SECOND SET OF SIMULATIONS?

14   **A.**   THEY INDICATED THAT THE MODEL HAD RUN APPROPRIATELY.

15   **Q.**   NOW, THE CRITICISM DR. MCCARTAN MADE ABOUT CONVERGENCE

16   STATISTICS ON YOUR FIRST SET OF SIMULATIONS, DO YOU THINK THAT

17   WAS A FAIR CRITICISM?

18   **A.**   NO.  THOSE DIAGNOSTICS WERE INCLUDED WITH THE MATERIALS WE

19   PROVIDED.  DR. MCCARTAN SAW THOSE AND MADE REFERENCE TO THEM.

20   HE INDICATED ADDITIONAL CONVERGENCE DIAGNOSTICS THAT HE THOUGHT

21   WOULD BE APPROPRIATE, AND THOSE ARE INCLUDED IN THE SECOND SET

22   OF SIMULATIONS.

23   **Q.**   OKAY.  LET'S NOW MOVE ON TO PAGE 12 OF SECRETARY OF STATE

24   EXHIBIT 4, SECTION 4, TITLED "REGIONAL ANALYSES" AND ON THAT

25   PAGE, DR. BARBER, THERE'S A COLOR-CODED MAP.  COULD YOU EXPLAIN

MICHAEL BARBER, PH.D.

10:01  1   TO THE COURT WHAT'S REFLECTED BY THAT COLOR-CODED MAP OF
       2   LOUISIANA?
       3   A.   SO THIS MAP INDICATES THE WAY IN WHICH THE SIMULATIONS ARE
       4   PARTITIONED FOR THE SENATE.  SO I PARTITIONED THE STATE INTO
       5   FOUR REGIONS.  YOU CAN SEE THAT THOSE REGIONS ARE GROUPINGS OF
       6   ILLUSTRATIVE SENATE DISTRICTS.
       7   Q.   AND JUST TO BE CLEAR:  HOW DID YOU IDENTIFY THE REGIONS
       8   THAT YOU USED?
       9   A.   SO AS I SAID, THERE ARE GROUPINGS OF ILLUSTRATIVE SENATE
      10   DISTRICTS THAT, YOU KNOW, THEY ARE GEOGRAPHICALLY CONNECTED TO
      11   ONE ANOTHER.
      12   Q.   ALL RIGHT.  LET'S TURN TO PAGE 14 OF THE SECRETARY OF
      13   STATE EXHIBIT 4.
      14   A.   THAT'S A CHART AT THE BOTTOM OF THE PAGE TITLED "MAJORITY
      15   BLACK VOTING AGE POPULATION DISTRICTS IN SIMULATIONS SENATE
      16   REGION 1."
      17        COULD YOU EXPLAIN TO THE COURT WHAT THAT CHART
      18   REFLECTS.
      19   A.   SO THIS CHART IS SHOWING THE RESULTS OF THE SECOND SET OF
      20   SIMULATIONS FOR THE SENATE REGION ONE.  IF YOU LOOK BACK AT THE
      21   MAP, THE AREA IN AND AROUND NEW ORLEANS.  AND THE RESULTS HERE
      22   SHOW THE PROPORTION OF SIMULATIONS THAT GENERATE A PARTICULAR
      23   NUMBER OF MAJORITY BVAP DISTRICTS.
      24        SO ON THE FAR LEFT WE CAN SEE THAT IN THAT SET OF
      25   SIMULATIONS, 100 PERCENT OF THE MAPS GENERATE AT LEAST ONE

MICHAEL BARBER, PH.D.

10:03 1   MAJORITY BVAP DISTRICT.  WE CAN SEE THAT ON THE NEXT BAR THAT

2   APPROXIMATELY 70 PERCENT OF THE SIMULATIONS GENERATE AT LEAST

3   TWO MAJORITY BVAP DISTRICTS.

4        AND THEN FINALLY WE CAN SEE THAT IN THAT SET OF

5   SIMULATIONS, APPROXIMATELY TEN PERCENT OF THE SIMULATIONS

6   GENERATE THREE MAJORITY BVAP DISTRICTS.

7        ON THE FAR RIGHT ON THE FIGURE, WE SEE WHERE THE

8   ILLUSTRATIVE MAP IS AT SIX.

9   Q.   AND HOW MANY SIMULATED MAPS GENERATED SIX MAJORITY-BLACK

10   DISTRICTS IN REGION ONE?

11   A.   THERE WERE NONE.

12   Q.   WHAT CONCLUSIONS DID YOU REACH FROM THIS ANALYSIS?

13   A.   THE CONCLUSION THAT I REACH IS THAT EVEN AFTER WE

14   RESPECIFY THE SIMULATIONS TO INCORPORATE ALL OF THESE CHANGES

15   AND WE RERUN THE ALGORITHM, THE SET OF SIMULATIONS,

16   NEVERTHELESS, PRODUCE LARGELY THE SAME RESULTS, THAT THEY

17   FAILED TO PRODUCE THE NUMBER OF MAJORITY BVAP DISTRICTS AS IN

18   THE ILLUSTRATIVE MAP.

19        **MR. FARR:**  AND I APOLOGIZE, YOUR HONOR.  I MAY HAVE

20   ASKED THIS.

21   BY MR. FARR:

22   Q.   BUT JUST TO BE CLEAR:  DID YOU DO SIMILAR ANALYSES FOR

23   SENATE REGIONS 2, 3, AND 4 ON PAGES 18 THROUGH -- OR PAGES 15

24   THROUGH 18 OF THE SECRETARY OF STATE EXHIBIT 4?

25   A.   YES, I DID.

**MICHAEL BARBER, PH.D.**

10:04  1   Q.   ALL RIGHT.  NOW, LET'S TURN TO SECRETARY OF STATE
      2   EXHIBIT 4, PAGE 19, THE SECTION LABELED "4.2 HOUSE."
      3          COULD YOU TELL THE COURT WHAT IS REFLECTED BY THE
      4   COLOR-CODED MAP OF LOUISIANA THAT'S APPEARS ON PAGE 19.
      5   A.   SO THIS IS SHOWING THE CHOICE OF REGIONS FOR THE
      6   SIMULATIONS IN THE HOUSE.  AND SO, AGAIN, YOU CAN SEE THESE ARE
      7   GROUPINGS OF ILLUSTRATIVE HOUSE DISTRICTS.  THERE ARE SEVEN IN
      8   THE -- YOU CAN SEE THEY ARE COLOR-CODED ON THE MAP THERE.
      9   Q.   OKAY.  AND, AGAIN, HOW DID YOU IDENTIFY THESE HOUSE
     10   REGIONS?
     11   A.   SO AS I SAID, THERE ARE GROUPINGS OF ILLUSTRATIVE HOUSE
     12   DISTRICTS THAT HAVE TO BE -- YOU KNOW, THAT ARE GEOGRAPHICALLY
     13   CLOSE OR CONNECTED TO ONE ANOTHER.
     14   Q.   AND LIKE THE SENATE CHART WE HAVE LOOKED AT, DID YOU DO A
     15   SIMILAR CHART FOR ALL THE HOUSE REGIONS TO COMPARE THE NUMBER
     16   OF MAJORITY-BLACK SIMULATED DISTRICTS TO THE NUMBER FOUND IN
     17   THE ENACTED AND ILLUSTRATIVE PLAN?
     18   A.   YES.
     19   Q.   AND WHAT DID YOU FIND?
     20   A.   SO, AGAIN, THE RESULTS ARE SIMILAR TO THE RESULTS OF THE
     21   SENATE FOR THE SECOND SET OF SIMULATIONS AND FOR THE RESULTS OF
     22   THE FIRST SET OF SIMULATIONS.  THE ILLUSTRATIVE MAP STANDS AS
     23   AN OUTLIER, A SIGNIFICANT OUTLIER WHEN COMPARED TO THE RESULTS
     24   OF THE SIMULATIONS WITH REGARDS TO THE NUMBER OF MAJORITY BVAP
     25   DISTRICTS THAT ARE GENERATED.

MICHAEL BARBER, PH.D.

10:06 1    Q.    AND DID YOU REACH ANY CONCLUSIONS FROM THAT?

2    A.    THE CONCLUSIONS ARE THAT, AGAIN, EVEN AFTER RESPECIFYING

3    THE ALGORITHM, TAKING INTO ACCOUNT ALL OF THESE CHANGES THAT WE

4    JUST -- WE SIMPLY DON'T SEE A SIMILAR NUMBER OF MAJORITY BVAP

5    DISTRICTS IN THE SIMULATIONS WHEN COMPARED TO THE ILLUSTRATIVE

6    MAP.

7    Q.    ALL RIGHT.  LET'S TURN NOW TO SECRETARY OF STATE EXHIBIT

8    4, PAGE 9, FIGURE 1.

9          AND ON THAT PAGE THAT'S TWO CHARTS THERE.  MR.

10    BARBER, ONE SAYS "NUMBER OF MAJORITY-BLACK VAP SENATE DISTRICTS

11    (500,000 MAPS)" AND THE OTHER CHARTS SAYS "NUMBER OF

12    MAJORITY-BLACK VAP HOUSE DISTRICTS (500,000 MAPS)."

13          COULD YOU EXPLAIN TO THE COURT WHAT'S REFLECTED BY

14    THESE TWO FIGURES.

15    A.    SO THESE TWO FIGURES TAKE ALL OF THOSE REGIONAL

16    SIMULATIONS AND PIECE THEM BACK TOGETHER TO LOOK AT THIS AT A

17    STATEWIDE LEVEL.  SIMILAR TO THE FIGURES WE LOOKED AT, AT THE

18    VERY BEGINNING OF MY TESTIMONY, AGAIN, WE ARE SEEING THE

19    DISTRIBUTION OF MAJORITY-BVAP DISTRICTS PRODUCED BY THE

20    SIMULATIONS IN THE SENATE ON THE LEFT AND THE HOUSE ON THE

21    RIGHT.  AGAIN, IN COMPARISON TO THE DASHED LINES IN EACH

22    FIGURE, WHICH SHOW THE ENACTED MAP AND THE ILLUSTRATIVE MAP.

23    Q.    ALL RIGHT.  SO LET'S START WITH THE HOUSE.  WHAT WAS THE

24    AVERAGE NUMBER OF MAJORITY-BLACK HOUSE -- EXCUSE ME --

25    SENATE -- I'M GOING TO GO WITH THE SENATE FIRST BECAUSE IT'S ON

**MICHAEL BARBER, PH.D.**

10:07 1  THE LEFT.

2       WHAT WAS THE AVERAGE NUMBER OF MAJORITY-BLACK SENATE

3  DISTRICTS GENERATED BY YOUR SECOND SET OF SIMULATIONS?

4  **A.**  IN THE SENATE. THE AVERAGE WAS A LITTLE MORE THAN FIVE.

5  **Q.**  AND HOW MANY, AGAIN, MAJORITY-BLACK HOUSE DISTRICTS ARE

6  IN THE ENACTED PLAN?

7  **A.**  IN THE ENACTED PLAN IN THE SENATE, THERE ARE 11.

8  **Q.**  AND HOW ABOUT IN MR. COOPER'S ILLUSTRATIVE SENATE PLAN?

9  **A.**  FOURTEEN.

10  **Q.**  ALL RIGHT.  NOW, LET'S MOVE SLIGHTLY TO THE RIGHT, WHICH

11  IS YOUR CHART FOR THE SECOND SET OF HOUSE SIMULATIONS.  WHAT'S

12  THE AVERAGE NUMBER OF MAJORITY-BLACK HOUSE DISTRICTS CREATED BY

13  YOUR SECOND SET OF SIMULATIONS?

14  **A.**  SO IN THE SECOND SET OF SIMULATIONS IN THE HOUSE, THE

15  AVERAGE NUMBER PRODUCED BY THE SIMULATIONS IS BETWEEN 17 AND

16  18.

17  **Q.**  AND HOW MANY MAJORITY-BLACK HOUSE DISTRICTS ARE IN THE

18  ENACTED 2022 HOUSE PLAN?

19  **A.**  TWENTY-NINE.

20  **Q.**  AND HOW MANY MAJORITY-BLACK DISTRICTS ARE IN MR. COOPER'S

21  HOUSE PLAN?

22  **A.**  THIRTY-FIVE.

23  **Q.**  CAN YOU CONCLUDE, DR. BARBER, BY JUST BRIEFLY SUMMARIZING

24  WHAT YOU'VE RELIED UPON TO FORM YOUR OPINIONS IN THIS CASE?

25  **A.**  SO KIND OF HOLISTICALLY WE HAVE, AT THIS POINT, A FIRST

MICHAEL BARBER, PH.D.

10:09 1   SET OF SIMULATIONS, A SECOND SET OF SIMULATIONS THAT ARE

2   SPECIFIED VERY DIFFERENTLY THAN THE FIRST SET OF SIMULATIONS.

3   NEVERTHELESS, BOTH OF THEM PRODUCE -- COME TO A SIMILAR

4   CONCLUSION, WHICH IS THAT WE JUST DON'T SEE SOMETHING

5   RESEMBLING THE ILLUSTRATIVE MAP, GIVEN THE CRITERIA THAT ARE

6   OUTLINED IN THE JOINT RULE COMBINED IN -- AND THEN IN THE

7   SIMULATIONS FROM THAT.

8        MOREOVER, WHEN WE LOOK AT THE PARTICULAR DISTRIBUTION

9   OF THE DISTRICTS, NOT WHETHER -- JUST WHETHER THEY ARE MAJORITY

10   OR NOT, WE SEE SOMETHING VERY DIFFERENT AS WELL.  AND THEN

11   FINALLY JUST A VISUAL INSPECTION OF THE DISTRICT BOUNDARIES, WE

12   SEE IN SOME CASES SOME UNUSUAL SHAPED DISTRICTS AND ODD

13   APPENDAGES AND THINGS LIKE THAT, THAT ARE NOT WELL EXPLAINED BY

14   THE TRADITIONAL REDISTRICTING CRITERIA.

15        **MR. FARR:**  YOUR HONOR, SUBJECT TO REDIRECT, I HAVE NO

16   FURTHER QUESTIONS.  BUT I ALSO WOULD WANT TO MAKE A PROFFER OF

17   PROOF AT THE TIME THE COURT TELLS ME IT'S PROPER FOR ME TO DO

18   THAT.

19        **THE COURT:**  PERMITTED.

20        ALL RIGHT.  CROSS.

21                    **CROSS-EXAMINATION**

22   BY MR. NAIFEH:

23   **Q.**   GOOD MORNING, DR. MCCARTAN -- DR. BARBER.

24   **A.**   GOOD MORNING.

25        **THE COURT:**  MAKE AN APPEARANCE.  WE HAVE A NEW COURT

MICHAEL BARBER, PH.D.

10:10  1   REPORTER.

2            **MR. NAIFEH:**  YES, YOUR HONOR.  STUART NAIFEH FROM THE

3   LEGAL DEFENSE FUND FOR THE PLAINTIFFS.

4   **BY MR. NAIFEH:**

5   **Q.**   SO, DR. BARBER, YOU TESTIFIED IN A CASE IN THE NORTHERN

6   DISTRICT OF FLORIDA CALLED *JACOBSON VERSUS LEE.*  IS THAT

7   CORRECT?

8   **A.**   YES, I DID.

9   **Q.**   AND DO YOU RECALL WHAT WEIGHT CHIEF JUDGE WALKER AFFORDED

10   YOUR OPINIONS IN THAT CASE?

11   **A.**   I DO NOT RECALL.

12            **MR. NAIFEH:**  STEPHEN, CAN WE PULL UP

13   *JACOBSON VERSUS LEE* AND TURN TO PAGE 18 OF THIS PDF.

14            AND FOR THE RECORD, THIS 411 F. SUPP. 3D AT 1249

15   IS THE CITATION FOR THE CASE, AND THE PEN CITE FOR THIS PAGE IS

16   1274.

17   **BY MR. NAIFEH:**

18   **Q.**   AND, DR. BARBER, DO YOU READ -- CAN YOU SEE THE

19   HIGHLIGHTED TEXT THERE?

20   **A.**   YES.

21   **Q.**   AND CAN YOU READ THAT?

22   **A.**   "THIS COURT FURTHER FINDS DR. BARBER'S TESTIMONY

23   EMPHATICALLY NOT CREDIBLE AND HIS OPINIONS OFFERED IN THIS CASE

24   TO BE UNRELIABLE."

25   **Q.**   AND DOES THAT REFRESH YOUR RECOLLECTION ABOUT WHAT WEIGHT

MICHAEL BARBER, PH.D.

10:11 1   CHIEF JUDGE WALKER AFFORDED YOUR OPINIONS?

2   **A.**   YES.

3   **Q.**   OKAY.  DID YOU ALSO TESTIFY IN A NORTHERN DISTRICT OF

4   FLORIDA CASE CALLED *JONES VERSUS DESANTIS*?

5   **A.**   YES.

6   **Q.**   AND DO YOU RECALL IF JUDGE HINKLE CREDITED YOUR TESTIMONY

7   IN THAT CASE?

8   **A.**   I DO NOT RECALL.

9           **MR. NAIFEH:**  STEPHEN, CAN WE PULL UP

10   *JONES V. DESANTIS*.

11   **BY MR. NAIFEH:**

12   **Q.**   I SEE IT'S ON THE SCREEN.

13           TURN TO PAGE 37 OF THIS PDF.

14           AND THIS IS 462 F. SUPP. 3D AT 1196, AND THE PEN CITE

15   IS PAGE 1246 OF THE REPORTER.

16           AND DO YOU SEE THE HIGHLIGHT TEXT THERE?

17   **A.**   YES.

18   **Q.**   CAN YOU READ THAT TEXT?

19   **A.**   "THE STATE SAYS THE FOCUS GROUPS AND POLLING SHOW THAT

20   PAYMENT OF LFOS, INCLUDING BY THOSE UNABLE TO PAY, WAS CRITICAL

21   TO PASSAGE OF THE AMENDMENT.  THEY EVEN PRESENTED EXPERT

22   TESTIMONY TO SUPPORT THE ASSERTION.  I DO NOT CREDIT THE

23   TESTIMONY."

24   **Q.**   AND THE EXPERT TESTIMONY THERE, THAT WAS YOUR TESTIMONY

25   THAT THE COURT'S REFERRING TO?

MICHAEL BARBER, PH.D.

10:12 1   **A.**   I BELIEVE SO.

2   **Q.**   OKAY.  DOES THAT REFRESH YOUR RECOLLECTION ABOUT THE

3   WEIGHT THAT JUDGE HINKLE GAVE YOUR TESTIMONY?

4   **A.**   YES.

5   **Q.**   OKAY.  ALL RIGHT.  AND, DR. BARBER, YOU HAVE NEVER DRAWN

6   DISTRICTING PLANS OUTSIDE OF LITIGATION.  CORRECT?

7   **A.**   THAT'S CORRECT.

8   **Q.**   AND YOU DON'T HAVE EXPERIENCE DRAWING DISTRICTING PLANS

9   WITHOUT THE USE OF SIMULATIONS.  CORRECT?

10   **A.**   I'M NOT SURE WHAT YOU MEAN.

11   **Q.**   SO NOT -- YOU HAVEN'T USED, YOU KNOW, MAPTITUDE TO

12   ASSEMBLE CENSUS BLOCKS AND PRECINCTS BY HAND INTO DISTRICTS?

13   **A.**   I HAVE NOT USED MAPTITUDE TO CREATE A DISTRICTING PLAN.

14   **Q.**   OKAY.  AND HAVE YOU USED ANY OTHER SOFTWARE OTHER THAN

15   SIMULATION SOFTWARE TO CREATE A DISTRICTING PLAN?

16   **A.**   I HAVE USED A PROGRAM CALLED DAVE'S REDISTRICTING.  I'M

17   FAMILIAR WITH THAT REDISTRICTING PROGRAM.

18   **Q.**   AND YOU HAVE USED THAT SOFTWARE TO CREATE ENTIRE

19   REDISTRICTING PLANS?

20   **A.**   I USE IT IN MY COURSEWORK.  I TEACH STUDENTS ABOUT

21   REDISTRICTING IN MY LEGISLATIVE POLITICS CLASS, AND I HAVE AN

22   ASSIGNMENT THAT ASKS THEM TO CREATE REDISTRICTING PLANS USING

23   CRITERIA.  AND SO I'VE USED IT IN AN ACADEMIC AND IN A

24   PEDAGOGICAL SETTING.

25   **Q.**   DR. BARBER, I HAVE A FEW GENERAL QUESTIONS ABOUT A

**MICHAEL BARBER, PH.D.**

10:14  1    SIMULATION ANALYSIS.  WHEN YOU PERFORM A SIMULATION ANALYSIS,
       2    YOU USE A COMPUTER TO CREATE A LARGE NUMBER OF MAPS.  CORRECT?
       3    **A.**   YES.
       4    **Q.**   AND YOU IMPOSE A SET OF CONSTRAINTS ON HOW THE COMPUTER
       5    PRODUCES THOSE MAPS?
       6    **A.**   YES.
       7    **Q.**   OKAY.  AND THOSE CONSTRAINTS ARE INTENDED TO APPROXIMATE
       8    VARIOUS REDISTRICTING PRINCIPLES THAT A HUMAN MAP DRAWER MIGHT
       9    CONSIDER.  CORRECT?
      10    **A.**   THEY ARE INTENDED TO APPROXIMATE THE CRITERIA THAT
      11    WHICHEVER JURISDICTION YOU ARE WORKING WITH, THEY HAVE OUTLINED
      12    AS THE CRITERIA THAT SHOULD GUIDE REDISTRICTING.
      13    **Q.**   OR THEY COULD ALSO INCLUDE CRITERIA THAT A MAP DRAWER
      14    CONSIDERED WHETHER OR NOT SOME JURISDICTION HAS OUTLINED THOSE
      15    CRITERIA.  CORRECT?
      16    **A.**   I'M SORRY.  I'M NOT SURE I UNDERSTAND.
      17    **Q.**   SO A HUMAN MAP DRAWER MIGHT CONSIDER CRITERIA THAT ARE NOT
      18    THOSE OUTLINED BY A JURISDICTION.  CORRECT?
      19    **A.**   YES.  THAT'S CORRECT.
      20    **Q.**   AND THOSE COULD ALSO BE PROGRAMMED INTO A SIMULATION?
      21    **A.**   YES, THEY COULD.
      22    **Q.**   OKAY.  AND TO DO THAT, YOU HAVE TO REDUCE THE
      23    REDISTRICTING CONSIDERATIONS -- AS A HUMAN MAP DRAWER MIGHT
      24    APPLY THEM TO A FORMULA THAT WOULD BE CAPTURED IN COMPUTER
      25    CODE.  CORRECT?

MICHAEL BARBER, PH.D.

10:15  1   **A.**   I'M SORRY.  I'M NOT SURE I UNDERSTAND YOUR QUESTION.

2   **Q.**   SO IN ORDER TO IMPLEMENT REDISTRICTING CRITERIA, WHETHER

3   SPECIFIED BY A JURISDICTION OR USED BY A HUMAN MAP DRAWER, YOU

4   NEED TO CONVERT THOSE INTO SOMETHING A COMPUTER CAN ACTUALLY

5   CALCULATE.  CORRECT?

6   **A.**   YES.  THAT'S CORRECT.

7   **Q.**   OKAY.  AND ONE USE OF SIMULATIONS IS TO ISOLATE THE EFFECT

8   OF A PARTICULAR REDISTRICTING CONSIDERATION ON A CONFIGURATION

9   OF DISTRICTS IN A PARTICULAR MAP YOU ARE INTERESTED IN

10   ANALYZING?

11   **A.**   THAT'S ONE OF MANY USES.

12   **Q.**   OKAY.  AND TO DO THAT, YOU PRODUCE SIMULATED MAPS THAT DO

13   NOT INCLUDE THE REDISTRICTING CONSIDERATION WHOSE IMPACT YOU

14   ARE TRYING TO STUDY.  IS THAT RIGHT?

15   **A.**   I'M SORRY.  CAN YOU --

16   **Q.**   SO IN ORDER TO ISOLATE THE EFFECT OF REDISTRICTING

17   CONSIDERATION, YOU EXCLUDE THAT CONSIDERATION FROM THE

18   SIMULATION.  IS THAT CORRECT?

19   **A.**   THAT WOULD BE ONE APPROACH.  THAT'S PART OF THE PROCESS.

20   SO I WOULDN'T SAY THAT THAT'S THE ONLY -- LIKE THAT'S THE FINAL

21   THING, BUT THAT IS A -- LIKE THAT'S ONE STEP IN THE PROCESS.

22   **Q.**   OKAY.  AND IS THAT WHAT YOU DID IN THIS CASE?

23   **A.**   IT'S -- I THINK IT'S A DESCRIPTION OF PART OF WHAT I DID.

24   **Q.**   OKAY.

25   **A.**   I WOULDN'T SAY IT'S EVERYTHING.

**MICHAEL BARBER, PH.D.**

10:17   1   **Q.**   AND THEN ONCE YOU'VE PRODUCED THAT SET OF SIMULATIONS THAT

2   EXCLUDE THAT CRITERIA, YOU COMPARE THEM TO THE MAP YOU ARE

3   STUDYING?

4   **A.**   YES.   THAT'S CORRECT.

5   **Q.**   OKAY.   AND FOR THE SIMULATIONS TO BE USEFUL IN TESTING THE

6   IMPACT OF THE EXCLUDED CONSIDERATION ON THE MAP YOU ARE

7   STUDYING, THE SIMULATION HAS TO INCLUDE ALL THE OTHER

8   REDISTRICTING CRITERIA THAT THAT -- THAT WENT INTO THE MAP YOU

9   ARE STUDYING.   CORRECT?

10   **A.**   I DON'T THINK THAT THAT IS THE CASE.   I DON'T THINK THAT

11   ANYONE COULD DO THAT.   I THINK THAT'S AN IMPOSSIBLE TASK.

12   **Q.**   SO YOU ARE SAYING THAT YOU CAN'T -- IT'S IMPOSSIBLE TO

13   INCLUDE ALL THE CRITERIA THAT THE MAP DRAWER WHO DREW THE MAP

14   YOU ARE STUDYING USED?

15   **A.**   I'M SORRY.   TO INCLUDE ALL OF THE CRITERIA?

16   **Q.**   YES.

17   **A.**   YOU CAN DO -- YOU KNOW, YOU CAN OBVIOUSLY DO YOUR BEST AT

18   TRYING TO DO AS MUCH AS POSSIBLE.   BUT I THINK THAT WE COULD

19   SIT HERE AND ARTICULATE AND, YOU KNOW, POSSIBLY INNUMERATE

20   NUMBER OF CRITERIA AND THAT'S JUST NOT -- YOU KNOW, THAT'S NOT

21   SOMETHING THAT COULD BE DONE.

22   **Q.**   OKAY.   TURNING TO THE SIMULATIONS YOU CREATED IN THIS

23   CASE, THE EXCLUDED REDISTRICTING CONSIDERATION IN YOUR

24   SIMULATIONS WAS RACE.   CORRECT?

25   **A.**   RACE IS NOT INCLUDED IN THE SIMULATIONS.

MICHAEL BARBER, PH.D.

10:18 1  Q.   RIGHT.

2           AND THAT'S BECAUSE YOU WANTED TO ASSESS THE IMPACT OF

3  RACE ON THE ILLUSTRATIVE MAPS CREATED BY MR. COOPER?

4  A.   THAT'S CORRECT.

5  Q.   OKAY.  AND YOU SPECIFICALLY WANTED TO STUDY THE NUMBER OF

6  MAJORITY-BLACK DISTRICTS IN MR. COOPER'S ILLUSTRATIVE PLANS AS

7  COMPARED TO THE SIMULATIONS.  CORRECT?

8  A.   THAT'S ONE OF THE COMPARISONS AMONG OTHERS.

9  Q.   OKAY.  AND YOUR OPINION IN THIS CASE IS THAT THE

10  SIMULATIONS YOU RAN SHOW THAT RACIAL CONSIDERATIONS DID HAVE AN

11  EFFECT ON MR. COOPER'S MAPS.  CORRECT?

12  A.   YES.  THAT'S CORRECT.

13  Q.   OKAY.  AND MR. COOPER HAS ALREADY CANDIDLY ACKNOWLEDGED

14  THAT HE CONSIDERED RACE IN HIS MAP DRAWING PROCESS.  CORRECT?

15  A.   YES, I BELIEVE HE HAS.

16  Q.   OKAY.  AND SO -- AND THAT HE ALSO HAS ACKNOWLEDGED THAT

17  CONSIDERATION OF RACE WAS A FACTOR IN HIS CONCLUSION THAT HE

18  COULD CREATE ADDITIONAL MAJORITY-BLACK DISTRICTS OVER WHAT ARE

19  IN THE ENACTED PLAN.  CORRECT?

20  A.   YES, I BELIEVE HE HAS SAID THAT.

21  Q.   OKAY.  AND ONE OF THE CONSTRAINTS THAT YOU INCLUDED IN

22  YOUR SIMULATIONS IS THAT DISTRICTS MUST HAVE EQUAL POPULATIONS.

23  CORRECT?

24  A.   THEY HAVE TO FALL WITHIN A RANGE OF POPULATION.  SO

25  ROUGHLY EQUAL WITHIN I THINK THE STATE SETS A FIVE PERCENT

**MICHAEL BARBER, PH.D.**

10:20  1   BOUNDARY OR THRESHOLD.

2   **Q.**   OKAY.  AND THAT'S PLUS OR MINUS FIVE PERCENT OVER THE

3   TARGET DISTRICT POPULATION?

4   **A.**   YES.  THAT'S CORRECT.

5   **Q.**   OKAY.  AND THAT'S A HARD CONSTRAINT.  CORRECT?

6   **A.**   YES.

7   **Q.**   AND A "HARD CONSTRAINT" IS A CONSTRAINT THAT THE

8   SIMULATION WILL NOT PRODUCE ANY MAP THAT VIOLATES A HARD

9   CONSTRAINT.  IS THAT RIGHT?

10   **A.**   THAT'S ONE WAY OF PUTTING IT, YES.

11   **Q.**   OKAY.  AND WHEN YOU INSTRUCT THE SIMULATION TO CREATE

12   DISTRICTS OF EQUAL POPULATION, YOU ARE MEASURING THAT USING

13   TOTAL POPULATION.  CORRECT?

14   **A.**   THAT'S CORRECT.

15   **Q.**   OKAY.  IT'S NOT CALCULATED USING VOTING AGE POPULATION.

16   CORRECT?

17   **A.**   THAT'S CORRECT.

18   **Q.**   OKAY.  AND YOU ALSO CONSIDER CONTIGUITY.  CORRECT?

19   **A.**   YES.

20   **Q.**   AND IS THAT ALSO A HARD CONSTRAINT.  RIGHT?

21   **A.**   YES.  THAT'S CORRECT.

22   **Q.**   OKAY.  AND YOU CONSIDERED PARISH SPLITS?

23   **A.**   YES.

24   **Q.**   AND MUNICIPAL SPLITS?

25   **A.**   YES.

MICHAEL BARBER, PH.D.

10:21 1    Q.    AND CORE PRESERVATION?

2    A.    YES.

3    Q.    AND GEOGRAPHIC OR MATHEMATICAL COMPACTNESS?

4    A.    CORRECT.

5    Q.    OKAY.  AND THOSE ARE ALL SOFT CONSTRAINTS.  IS THAT RIGHT?

6    A.    THAT'S CORRECT.

7    Q.    AND A "SOFT CONSTRAINT" MEANS THAT THE SIMULATION WILL

8    PREFER MAPS THAT PERFORM BETTER ON THOSE CONSTRAINTS BUT IT

9    WON'T REQUIRE ANY PARTICULAR THRESHOLD.  IS THAT RIGHT?

10    A.    YES.

11    Q.    OKAY.  AND IT'S POSSIBLE USING THE REDIS SOFTWARE THAT YOU

12    USED HERE TO ASSIGN A WEIGHT TO EACH OF THE SOFT CONSTRAINTS.

13    CORRECT?

14    A.    YES.

15    Q.    OKAY.  SO YOU CAN GIVE MORE WEIGHT TO SOME CONSTRAINTS AND

16    LESS WEIGHT TO OTHERS?

17    A.    YES.

18    Q.    OKAY.  AND YOU USED THE DEFAULT WEIGHTING OF THOSE -- ALL

19    OF THOSE CONSTRAINTS PROVIDED BY THE REDIS SOFTWARE.  CORRECT?

20    A.    NO, I DON'T BELIEVE THAT'S CORRECT.

21    Q.    OKAY.  AND IN YOUR OPINION, NONE OF THE CONSTRAINTS YOU

22    CONSIDERED PREDOMINATED IN THE MAPS PRODUCED BY THE

23    SIMULATIONS.  CORRECT?

24    A.    THAT'S CORRECT.

25    Q.    OKAY.  AND YOU DID NO SIMULATIONS THAT REMOVED ANY OF

MICHAEL BARBER, PH.D.

10:22 1   THOSE OTHER CONSTRAINTS TO STUDY WHAT IMPACT THEY ARE HAVING ON

2   THE SIMULATIONS?

3   **A.**   I'M SORRY.  I DON'T KNOW THAT I --

4   **Q.**   SO YOU DIDN'T RUN A SIMULATION THAT EXCLUDED, FOR EXAMPLE,

5   COMPACTNESS AS A CRITERION?

6   **A.**   NO.  THAT WAS NOT THE PURPOSE OF MY INQUIRY.

7   **Q.**   AND SO YOU DON'T HAVE ANY SIMULATIONS THAT WOULD TELL YOU

8   HOW MUCH IMPACT THE COMPACTNESS CONSTRAINT WAS HAVING ON, FOR

9   EXAMPLE, THE DISTRIBUTION OF MAJORITY-BLACK DISTRICTS?

10   **A.**   NO.  THAT WAS NOT MY INTENT.

11   **Q.**   OKAY.  YOUR SIMULATIONS DID NOT INCLUDE PROTECTING

12   COMMUNITIES OF INTEREST AS A CONSTRAINT.  CORRECT?

13   **A.**   SO I THINK WE TALKED ABOUT HOW IN ORDER TO KNOW WHAT

14   COMMUNITIES OF INTEREST WOULD BE INCLUDED, YOU WOULD HAVE TO

15   FIRST ARTICULATE WHAT COMMUNITIES OF INTEREST YOU WOULD WANT TO

16   BE PROTECTED TO BEGIN WITH.

17   **Q.**   AND SO YOU EXCLUDED THEM BECAUSE YOU WERE NOT AWARE OF

18   ANY -- OF WHAT COMMUNITIES OF INTEREST SHOULD BE CONSIDERED.

19   IS THAT RIGHT?

20   **A.**   I THINK WE IN MY DEPOSITION TALKED ABOUT HOW INSOFAR AS

21   COMMUNITIES OF INTEREST ARE COTERMINOUS WITH MUNICIPALITIES OR

22   WITH PARISHES THAT THE SIMULATIONS WOULD TAKE INTO ACCOUNT

23   THOSE COMMUNITIES OF INTEREST.

24   **Q.**   OKAY.  BUT YOU DIDN'T INCLUDE COMMUNITIES OF INTEREST

25   SEPARATE FROM PRESERVING PARISH AND MUNICIPAL BOUNDARIES?

**MICHAEL BARBER, PH.D.**

10:24 1  **A.**   I DID NOT INCLUDE AN ADDITIONAL SET OF COMMUNITIES OF

2  INTEREST BECAUSE I COULDN'T IDENTIFY A LIST OF COMMUNITIES OF

3  INTEREST EITHER IN THE JOINT RULE OR IN MR. COOPER'S REPORT

4  THAT WOULD HAVE GUIDED THAT DECISION.

5  **Q.**   OKAY.  AND MR. COOPER DID SEEK TO PROTECT COMMUNITIES OF

6  INTEREST IN HIS MAPS?

7  **A.**   I THINK HE SAYS THAT HE TRIES TO DO THAT.  I DON'T KNOW

8  THAT HE FURTHER ARTICULATES PARTICULAR COMMUNITIES OF INTEREST

9  THAT HE USES TO GUIDE THE PARTICULAR DISTRICTS THAT HE'S

10  DRAWING.

11  **Q.**   SO YOU DON'T KNOW IF MR. COOPER HAD A DEFINITION OF THE

12  COMMUNITIES OF INTEREST HE WAS CONSIDERING?

13  **A.**   I'M NOT AWARE OF A PARTICULAR LIST OF COMMUNITIES OF

14  INTERESTS THAT HE PROVIDES.

15  **Q.**   OKAY.  AND ARE YOU AWARE IF ANY OTHER EXPERTS IN THIS CASE

16  THAT OFFERED OPINIONS ABOUT COMMUNITIES OF INTEREST IN

17  DIFFERENT PARTS OF LOUISIANA?

18  **A.**   I'M AWARE OF EXPERTS WHO HAVE OFFERED OPINIONS ABOUT I

19  WOULD SAY LARGER COMMUNITIES OF INTEREST THAT ARE KIND OF

20  REGIONAL YOU MIGHT SAY, BUT THOSE WOULD -- THOSE WOULD BE, YOU

21  KNOW, MUCH LARGER THAN THE -- YOU KNOW, A PARTICULAR DISTRICT

22  THAT WE WERE TALKING ABOUT.  SO THOSE WOULD FALL UNDER A --

23  UNDER WHAT I WAS DESCRIBING EARLIER IN TERMS OF PARISHES AND

24  PRESERVATION OF PARISHES.

25  **Q.**   AND YOU DIDN'T CONSIDER THOSE LARGER REGIONS?

**MICHAEL BARBER, PH.D.**

10:25 1   **A.**   INSOFAR AS THE DISTRICTS ARE ASSEMBLED BY PARISHES AND THE

2   PARISHES MAKEUP THOSE REGIONS.  AND THEN THE PARTICULAR -- IN

3   THE SECOND SET OF SIMULATIONS, THE GROUPING OF THE STATES

4   ACCORDING TO THE ILLUSTRATIVE DISTRICTS WOULD IN SOME WAY

5   ADDRESS THAT AS WELL.

6   **Q.**   BUT YOU DIDN'T INCLUDE AS A SEPARATE CONSTRAINT IN YOUR

7   SIMULATIONS THE REGIONAL COMMUNITIES OF INTEREST THAT YOU ARE

8   DESCRIBING?

9   **A.**   THOSE LARGER REGIONS ARE NOT INCLUDED AS THEIR OWN

10   INDEPENDENT PARAMETER IN THE ALGORITHM.

11   **Q.**   AND YOU ARE NOT AWARE OF EXPERT TESTIMONY CONCERNING MORE

12   LOCAL COMMUNITIES OF INTEREST IN THIS CASE?

13   **A.**   I'M NOT.

14   **Q.**   OKAY.  YOUR SIMULATIONS ALSO DID NOT INCLUDE AVOIDING

15   INCUMBENT PAIRINGS AS A CONSTRAINT.  CORRECT?

16   **A.**   THAT WAS NOT INCLUDED IN THE SIMULATIONS.  IT WASN'T

17   SOMETHING THAT I SAW IN THE JOINT RULE AS A FACTOR TO BE

18   CONSIDERED BEYOND THE PRESERVATION OF EXISTING DISTRICT

19   BOUNDARIES, WHICH, AGAIN, WOULD ALSO SERVE TO PRESERVE

20   INCUMBENTS WITHIN THEIR DISTRICTS.

21   **Q.**   SO PRESERVING EXISTING DISTRICT BOUNDARIES COULD PRESERVE

22   INCUMBENTS IN THEIR DISTRICTS IF THE INCUMBENT WAS INCLUDED IN

23   THE PART OF THE DISTRICT THAT WAS PRESERVED.  CORRECT?

24   **A.**   YES.  THAT'S CORRECT.

25   **Q.**   BUT NOT IF THE INCUMBENT WAS INCLUDED IN A PART OF THE

**MICHAEL BARBER, PH.D.**

10:27 1   DISTRICT THAT WAS NOT PRESERVED.  CORRECT?

2   **A.**   THAT IS CORRECT.

3   **Q.**   OKAY.  AND YOU ARE AWARE THAT MR. COOPER DID SEEK TO AVOID

4   INCUMBENT PAIRINGS IN HIS MAPS?

5   **A.**   I'M AWARE THAT HE SOUGHT TO DO THAT IN THE DRAWING OF HIS

6   MAP.  I DON'T THINK THAT IT IS SUGGESTIVE OF WHY THE

7   SIMULATIONS DEVIATE FROM -- OR LOOK DIFFERENT FROM THE OUTCOME

8   OF HIS MAP.  I DON'T SEE THAT CONNECTION.

9   **Q.**   YOU DON'T SEE THAT CONNECTION BECAUSE YOU DIDN'T STUDY IT?

10   **A.**   NO.  BECAUSE I DON'T THINK IT SUBSTANTIVELY CONTRIBUTES TO

11   THE EXPLANATION.

12   **Q.**   OKAY.  AND YOU DIDN'T INCLUDE A PRINCIPLE OR A CONSTRAINT

13   CONCERNING THE NUMBER OF PARISHES SPANNED BY A DISTRICT?

14   **A.**   THE DISTRICTS HAVE TO CONTAIN EQUAL POPULATIONS.  SO IT'S

15   NOT AS THOUGH DISTRICTS CAN RUN ACROSS A LOT OF PARISHES.  I'M

16   NOT -- I GUESS I'M NOT EXACTLY SURE WHAT YOU MEAN BY THAT

17   CONSTRAINT.  IT'S UNCLEAR TO ME HOW THAT --

18   **Q.**   SO IT'S TRUE THAT IN YOUR REGIONAL ANALYSIS IN SOME

19   INSTANCES YOU DESCRIBE THE NUMBER OF PARISHES SPANNED BY A

20   DISTRICT AND HOW THAT DIFFERS FROM THE ENACTED PLAN TO MR.

21   COOPER'S PLAN.  CORRECT?

22   **A.**   THE NUMBER OF PARISHES THAT ARE -- THAT A DISTRICT

23   CROSSES?

24   **Q.**   YES.

25   **A.**   YES.

MICHAEL BARBER, PH.D.

10:28  1   **Q.**   OKAY.  AND YOU DIDN'T INCLUDE THAT AS A SEPARATE

2   CONSTRAINT FROM JUST KEEPING PARISHES WHOLE.  CORRECT?

3   **A.**   WELL, IN KEEPING PARISHES WHOLE, THAT'S GOING TO HAVE THE

4   IMPACT -- THAT'S GOING TO HAVE THE EFFECT OF REDUCING THE

5   NUMBER OF PARISHES THE DISTRICTS SPAN, BECAUSE IF A DISTRICT IS

6   TRYING TO KEEP A PARISH -- OR IF THE ALGORITHM IS TRYING TO

7   KEEP PARISHES WHOLE, THEN IT'S GOING TO BY DEFINITION MINIMIZE

8   THE NUMBER OF DISTRICTS PRESENT IN A PARISH.

9   **Q.**   BUT YOU DIDN'T REPORT ANY NUMBERS IN YOUR REPORT ANYWHERE

10  ABOUT AVERAGE NUMBER OF PARISHES SPANNED BY A DISTRICT?

11  **A.**   I REPORT JUST THE PARISH SPLITS, THE NUMBER OF TIMES A

12  PARISH IS SPLIT.

13  **Q.**   OKAY.  ALL RIGHT.  I'D LIKE TO DISCUSS YOUR REGIONAL

14  ANALYSIS A LITTLE BIT.  FOR THE RECORD, DR. BARBER, YOU

15  REVIEWED MR. COOPER'S REPORT IN THIS CASE FROM JUNE OF 2023.

16  CORRECT?

17  **A.**   YES.

18  **Q.**   AND DID YOU REVIEW SOME OF THE EXHIBITS TO MR. COOPER'S

19  REPORT?

20  **A.**   THERE ARE A LOT OF THEM.  I DID REVIEW MANY OF THEM.

21  **Q.**   OKAY.  AND YOU REVIEWED THE EXHIBITS CONTAINING

22  COMPACTNESS SCORES?

23  **A.**   YES.

24  **Q.**   AND DID YOU REVIEW THE EXHIBITS CONCERNING PARISH SPLITS?

25  **A.**   YES.

**MICHAEL BARBER, PH.D.**

10:29 1    **Q.**   AND YOU WOULD AGREE THAT ON AVERAGE MR. COOPER'S PLAN

2    SPLITS FEWER PARISHES OVERALL THAN THE ENACTED PLAN?

3    **A.**   I DON'T RECALL THE PARTICULAR NUMBERS OFF THE TOP OF MY

4    HEAD.  I BELIEVE THAT IT IS FEWER.  I COULDN'T ARTICULATE TO

5    YOU THE EXACT NUMBER.

6    **Q.**   OKAY.  AND MR. COOPER'S PLANS OVERALL ARE MORE COMPACT

7    THAN THE ENACTED PLAN?

8    **A.**   I, AGAIN, OFF THE TOP OF MY HEAD, DON'T HAVE THOSE

9    NUMBERS.  I DON'T HAVE REASON TO DOUBT YOUR REPRESENTATION, BUT

10    I COULDN'T TELL YOU OFF THE TOP OF MY HEAD.

11    **Q.**   OKAY.  MR. FARR EARLIER ASKED YOU ABOUT PROPORTIONALITY IN

12    SOME OF THE TABLES THAT YOU INCLUDE IN YOUR REPORT REPORTING ON

13    THE PROPORTIONAL NUMBER OF DISTRICTS.  CORRECT?

14    **A.**   YES.  THAT'S CORRECT.

15    **Q.**   AND YOU CALCULATED PROPORTIONALITY BASED ON VOTING AGE

16    POPULATION.  CORRECT?

17    **A.**   YES.  THAT'S CORRECT.

18    **Q.**   AND YOUR REPORT DOESN'T ANYWHERE REPORT ON PROPORTIONALITY

19    BASED ON TOTAL POPULATION?

20    **A.**   NO.  I USED THE VOTING AGE POPULATION.

21    **Q.**   OKAY.  SO IN YOUR REGIONAL ANALYSIS, YOU ANALYZED THE

22    ILLUSTRATIVE MAP ON THE ONE HAND TO THE 2011 MAP OR THE 2022

23    ENACTED MAP ON THE OTHER.  CORRECT?

24    **A.**   YES.

25    **Q.**   ALL RIGHT.  AND YOU ARE NOT MAKING A COMPARISON TO THE

MICHAEL BARBER, PH.D.

10:31  1  SAMPLES PRODUCED BY YOUR SIMULATIONS.  CORRECT?
        2  A.   SO THERE ARE TABLES WHERE WE -- JUST IN THE QUESTIONS THAT
        3  MR. FARR ASKED ME -- TALKED ABOUT PARTICULAR REGIONS AND THE
        4  NUMBER OF MAJORITY BVAP DISTRICTS PRODUCED BY THE SIMULATIONS
        5  IN THOSE REGIONS, SO I DON'T WANT TO SAY THAT THE SIMULATIONS
        6  NEVER TOUCH ON A DISCUSSION OF REGIONS.
        7  Q.   OKAY.  BUT WITH RESPECT TO THE SPECIFIC REDISTRICTING
        8  PRINCIPLES AND WHETHER OR NOT THE ILLUSTRATIVE PLAN COMPLIES
        9  WITH OR DOESN'T COMPLY WITH THEM, THAT'S FOCUSED ON THE
       10  COMPARISON TO THE ENACTED PLAN OR TO THE 2011 PLAN?
       11  A.   THE CORE RETENTION SCORES IN THOSE SECTIONS ARE A
       12  COMPARISON TO THE 2011 PLAN.  THEY ARE NOT A COMPARISON TO THE
       13  SIMULATIONS.
       14  Q.   OKAY.  AND YOU FIND GENERALLY THAT THE NEW MAJORITY-BLACK
       15  DISTRICTS HAVE LOWER CORE RETENTION SCORES THAN THE DISTRICTS
       16  THEY REPLACE.  CORRECT?
       17  A.   YES.  THAT'S CORRECT.
       18  Q.   OKAY.  AND THEN YOU DISCUSS OTHER METRICS WITH RESPECT TO
       19  SPECIFIC DISTRICTS AS WELL.  CORRECT?
       20  A.   YES.
       21  Q.   OKAY.  SO I'D LIKE TO TURN TO YOUR DISCUSSION OF THE NEW
       22  MAJORITY-BLACK DISTRICT IN THE CADDO-BOSSIER REGION, AND THAT'S
       23  AT SOS EXHIBIT 1 AT PAGE 33.
       24       AND YOU DISCUSS HERE THAT COMPACTNESS SCORES OF SD-38
       25  IN MR. COOPER'S ILLUSTRATIVE PLAN AS COMPARED TO THE 2022

MICHAEL BARBER, PH.D.

10:33 1  ENACTED PLAN.  CORRECT?

2  **A.**   YES.  THAT'S CORRECT.

3  **Q.**   ALL RIGHT.  AND YOU DON'T INCLUDE THE COMPACTNESS SCORES

4  OF NEIGHBORING SD-39, WHICH IS ALSO MAJORITY BLACK.  CORRECT?

5  **A.**   SD-39 -- I DO NOT REPORT THE COMPACTNESS SCORES FOR SD-39

6  IN THIS CASE.  I WAS FOCUSED ON THE NEW ILLUSTRATIVE DISTRICTS.

7  **Q.**   OKAY.

8  **A.**   AND I BELIEVE SD-39 IS MAJORITY BLACK IN BOTH OF THE MAPS.

9  **Q.**   OKAY.  AND YOU DON'T DISCUSS PARISH SPLITS IN YOUR

10  DISCUSSION OF THE CADDO-BOSSIER REGION IN THE SENATE MAP.

11  CORRECT?

12  **A.**   I WOULD HAVE TO GO BACK THROUGH TO BE ABSOLUTELY SURE,

13  BUT I TAKE YOUR REPRESENTATION AS BEING ACCURATE.

14  **Q.**   OKAY.  NOW, LET'S MOVE TO THE JEFFERSON AND ST. CHARLES

15  PARISH AREA, AND THAT'S IN SOS EXHIBIT 1 AT PAGE 41.

16       WELL, LET'S BACK UP A LITTLE BIT JUST SO WE CAN SEE

17  PAGE -- THERE WE GO -- 39 OR 40 -- 40 AND 41.

18       IN THIS REGION YOU DON'T REPORT ANY COMPACTNESS

19  SCORES.  CORRECT?

20  **A.**   THAT'S CORRECT.

21  **Q.**   OKAY.  AND INSTEAD, YOU ARE COMPARING THE ENACTED AND

22  ILLUSTRATIVE PLANS ON PARISH SPLITS?

23  **A.**   I BELIEVE THIS SECTION HAS A DISCUSSION OF HOW THE

24  DISTRICTS IN THE ENACTED PLAN AND THE ILLUSTRATIVE PLAN TREAT

25  THE PARISHES IN THIS AREA.

MICHAEL BARBER, PH.D.

10:35 1  Q.   OKAY.  AND YOU AGREE THAT THE NEW MAJORITY-BLACK DISTRICT
     2  19 SPANS ONLY TWO PARISHES IN MR. COOPER'S ILLUSTRATIVE MAP.
     3  CORRECT?
     4  A.   YES.  THAT'S CORRECT.
     5  Q.   AND THOSE ARE ST. CHARLES AND JEFFERSON?
     6  A.   CORRECT.
     7  Q.   AND IN THE ENACTED PLAN, IT SPANS FOUR DISTRICTS -- FOUR
     8  PARISHES?
     9  A.   CORRECT.
    10  Q.   OKAY.  AND I JUST WANT TO GET SOMETHING ON THE RECORD HERE
    11  FOR THE BENEFIT OF THE COURT AND THE RECORD; AND, THAT IS, I
    12  THINK IN THIS LAST PARAGRAPH ON PAGE 41, WE DISCUSSED AT YOUR
    13  DEPOSITION THAT WHERE IT SAYS SD-9, IT SHOULD SAY SD-19?
    14  A.   THAT'S CORRECT.  IT SHOULD SAY SD-19.
    15  Q.   OKAY.  ALL RIGHT.  AND SO THE FOUR PARISHES THAT SD-19
    16  SPANS IN THE ENACTED PLAN ARE ST. CHARLES, LAFOURCHE, ST. JOHN
    17  THE BAPTIST, AND JEFFERSON?
    18  A.   YES.
    19  Q.   OKAY.  AND YOU SAY HERE THAT "KEEPING ENTIRE PARISHES
    20  WHOLE WITHIN DISTRICTS IS A TRADITIONAL REDISTRICTING
    21  CRITERIA."  CORRECT?
    22  A.   CORRECT.
    23  Q.   OKAY.  AND YOU SAY THAT "IN THE ENACTED PLANS, ST. CHARLES
    24  PARISH IS KEPT WHOLE."  CORRECT.
    25  A.   YES.

**MICHAEL BARBER, PH.D.**

10:36 1   **Q.**  ALL RIGHT.  AND IN THE ILLUSTRATIVE PLAN, IT'S SPLIT?

    2   **A.**  YES.

    3   **Q.**  AND ST. JOHN THE BAPTIST PARISH IS MADE WHOLE IN THE

    4   ILLUSTRATIVE PLAN.  CORRECT?

    5   **A.**  CORRECT.

    6   **Q.**  OKAY.  AND IT SPLIT IN THE ENACTED PLAN.  CORRECT?

    7   **A.**  CORRECT.

    8   **Q.**  OKAY.  BUT YOU DON'T MENTION THAT ITS MADE WHOLE IN YOUR

    9   REPORT ANYWHERE.  CORRECT?

  10   **A.**  I DON'T THINK IT'S MENTIONED HERE.

  11   **Q.**  OKAY.  IS IT MENTIONED ANYWHERE IN YOUR REPORT THAT ST.

  12   JOHN THE BAPTIST PARISH IS MADE WHOLE IN THE ILLUSTRATIVE PLAN?

  13   **A.**  I DON'T KNOW THAT I SPECIFICALLY HIGHLIGHT THAT PARTICULAR

  14   PARISH.  IT WOULD OBVIOUSLY BE INCLUDED IN THE MAPS THAT COVER

  15   THE WHOLE PLAN IN THE PLAN-WIDE STATISTICS AND THAT SORT OF

  16   THING.

  17   **Q.**  OKAY.  BUT THAT'S NOT SOMETHING YOU CONSIDER WHEN

  18   HIGHLIGHTING THE WAYS IN WHICH MR. COOPER'S PLAN DOES OR DOES

  19   NOT COMPORT WITH TRADITIONAL REDISTRICTING PRINCIPLES?

  20   **A.**  I THINK IN THIS SECTION I WAS FOCUSED PARTICULARLY ON

  21   THESE TWO PARISHES.  AND SO THAT'S WHY THE FOCUS IS ON THOSE

  22   TWO PARISHES.

  23   **Q.**  OKAY.  ALL RIGHT.  AND YOU ALSO EXPLAIN THAT NEIGHBORING

  24   DISTRICT EIGHT SPANS MORE PARISHES IN THE ILLUSTRATIVE PLAN

  25   THAN THE ENACTED PLAN.  CORRECT?

**MICHAEL BARBER, PH.D.**

10:38  1   **A.**   CORRECT.

2   **Q.**   AND THAT'S FOUR INSTEAD OF TWO, SO SORT OF THE REVERSE OF

3   WHAT WE SEE WITH DISTRICT 19?

4   **A.**   CORRECT.

5   **Q.**   OKAY.  AND THAT'S BECAUSE YOU CONSIDER THE NUMBER OF

6   PARISHES SPANNED BY A DISTRICT TO BE A TRADITIONAL

7   REDISTRICTING PRINCIPLE OR KEEPING THAT NUMBER LOW?

8   **A.**   I'M SORRY.  CAN YOU SAY THAT AGAIN.

9   **Q.**   SO YOU ARE TALKING ABOUT THE NUMBER OF PARISHES SPANNED BY

10   A DISTRICT, AND THAT'S BECAUSE THAT IS A CONSIDERATION THAT YOU

11   CONSIDER IMPORTANT IN ASSESSING ADHERENCE TO TRADITIONAL

12   REDISTRICTING PRINCIPLES?

13   **A.**   I THINK I WAS REFERRING TO THAT IN COMBINATION WITH THE

14   SPLITTING OF THE PARTICULAR PARISHES.

15   **Q.**   OKAY.  ALL RIGHT.  LET'S MOVE TO THE BATON ROUGE REGION ON

16   THE NEW SENATE DISTRICT 17 IN THE ILLUSTRATIVE PLAN.  THAT'S ON

17   SOS EXHIBIT 1 AT PAGE 48.

18           AND LET'S GO BACK A PAGE JUST TO SEE WHERE WE ARE.

19   SO THIS IS BATON ROUGE.

20           SO YOU MENTIONED HERE -- AND THIS IS ON PAGE 48 --

21   THAT THE NEW DISTRICT 17 -- YOU SAY IT CONNECTS PARTS OF EAST

22   BATON ROUGE TO POINTE COUPEE, IBERVILLE, AND WEST BATON ROUGE.

23   CORRECT?

24   **A.**   CORRECT.

25   **Q.**   AND THAT'S FOUR PARISHES.  RIGHT?

**MICHAEL BARBER, PH.D.**

10:39 1  A.   YES.

2   Q.   OKAY.  SO ILLUSTRATIVE DISTRICT 17 SPANS FOUR PARISHES?

3   A.   I BELIEVE SO.  I'M NOT CERTAIN IF I'M REPORTING ON THE

4   ENTIRETY OF THE DISTRICT HERE.  I WOULD -- I CAN'T RECALL OFF

5   THE TOP OF MY HEAD WHAT THE PARTICULAR DISTRICT'S ORIENTATION

6   IS.

7   Q.   OKAY.  I THINK IT'S PAGE 54 WHERE YOU HAVE YOUR MAP.

8        CAN WE TURN TO THAT.

9        AND CAN YOU SEE THIS MAP?

10  A.   YES.

11  Q.   AND DO YOU SEE SD-17, ILLUSTRATIVE SD-17 ON THIS MAP?

12  A.   YES, I DO.

13  Q.   AND DOES IT LOOK LIKE IT'S SPANS FOUR PARISHES?

14  A.   YES, IT DOES.

15  Q.   OKAY.  LET'S GO BACK TO PAGE 48.

16        SO ILLUSTRATIVE -- SO SORRY.  SO ENACTED DISTRICT 17,

17  SENATE DISTRICT 17, SPANS TEN PARISHES.  IS THAT RIGHT?

18  A.   I, AGAIN, DON'T KNOW OFF THE TOP OF MY HEAD.  I DON'T HAVE

19  REASON TO DOUBT YOUR REPRESENTATION.

20  Q.   OKAY.  BUT YOU DIDN'T MENTION THE NUMBER OF PARISHES

21  SPANNED BY ENACTED DISTRICT 17?

22  A.   I THINK I DISCUSSED MORE THE GENERAL SHAPE OR KIND OF THE

23  AREA THAT THE DISTRICT IS SPANING, BUT I DON'T THINK I CALL OUT

24  THE PARTICULAR PARISHES INCLUDED IN THE DISTRICT.

25  Q.   OKAY.  SO WHEN A DISTRICT IN MR. COOPER'S MAP SPANS MORE

10:41  1   PARISHES THAN THE ENACTED MAP, THAT WAS WORTH CALLING OUT IN
       2   THE NEW ORLEANS AREA IN DISTRICT 19, BUT IT'S NOT -- WHEN IT'S
       3   THE ENACTED PLAN THAT SPANS MORE PARISHES, YOU DON'T DESCRIBE
       4   THAT.  IS THAT RIGHT?
       5   **A.**   NO.  I THINK THAT IN THIS CASE, WE ARE IN A -- IT'S A --
       6   THE COMPARISON IS VERY DIFFERENT.  WE ARE IN A DIFFERENT
       7   REGION.  I THINK I MAKE REFERENCE TO THE FACT THAT DISTRICT --
       8   THE ENACTED DISTRICT 17 IS A MORE RURAL DISTRICT, WHICH BY
       9   DEFINITION WOULD MEAN IT'S TAKING IN FEWER PEOPLE PER SQUARE
      10   MILE, AND SO IT'S GOING TO SPAN A LARGER AREA.
      11   **Q.**   OKAY.
      12   **A.**   THE NARRATIVE HERE IS NOT INTENDED TO BE AN ENCYCLOPEDIC
      13   LISTING OF EVERY PARISH AND EVERY SPLIT IN THAT.  THERE'S
      14   PLENTY OF EVIDENCE IN THE RECORD OF WHICH DISTRICTS TAKE IN
      15   WHICH PARISHES, AND THAT SORT OF THING.
      16   **Q.**   OKAY.  BUT IN THIS SECTION OF YOUR REPORT, YOU ARE
      17   EVALUATING WHETHER MR. COOPER'S PLAN DOES OR DOES NOT COMPLY,
      18   IN YOUR VIEW, WITH TRADITIONAL REDISTRICTING PRINCIPLES?
      19   **A.**   THAT'S CORRECT.
      20   **Q.**   AND YOU LOOK AT THOSE WHERE -- NEVERMIND.  STRIKE THAT.
      21          ALL RIGHT.  AND THEN ON PAGE 49 YOU STATE HERE THAT
      22   "THE ILLUSTRATIVE PLAN ADDS AN ADDITIONAL SPLIT TO EAST BATON
      23   ROUGE PARISH."  CORRECT?  IT'S SIX, INSTEAD OF FIVE, I BELIEVE?
      24   **A.**   I BELIEVE THAT I NOTE THAT IT EXTENDS INTO EAST BATON
      25   ROUGE PARISH, YES.

MICHAEL BARBER, PH.D.

10:43 1   Q.   ILLUSTRATIVE SENATE DISTRICT -- OR SENATE DISTRICT 17
2   EXTENDS INTO EAST BATON ROUGE IN BOTH PLANS.  ISN'T THAT TRUE?
3   A.   I BELIEVE SO, YES.
4   Q.   OKAY.  AND YOU DON'T -- HERE YOU DON'T NOTE THAT
5   ILLUSTRATIVE DISTRICT 17 MAKES WEST BATON ROUGE PARISH WHOLE.
6   CORRECT?
7   A.   THIS PARTICULAR PARAGRAPH DOES NOT MAKE REFERENCE TO THAT.
8   Q.   AND DO YOU MAKE REFERENCE TO THAT ANYWHERE IN YOUR REPORT?
9   A.   WELL, I THINK THE MAPS WE JUST LOOKED AT MAKE THAT CLEAR.
10   Q.   BUT THAT'S NOT A CONSIDERATION WHEN YOU ARE HERE
11   DESCRIBING HOW MR. COOPER'S PLAN DEPARTS FROM TRADITIONAL
12   REDISTRICTING PRINCIPLES.  YOU DIDN'T THINK IT WAS IMPORTANT TO
13   MENTION THAT WEST BATON ROUGE PARISH IS MADE WHOLE IN HIS PLAN?
14   A.   AGAIN, I'M NOT TRYING TO PROVIDE AN ENCYCLOPEDIC
15   EXPLANATION FOR EVERY DISTRICT IN EVERY PARTICULAR BOUNDARY
16   CHOICE.
17   Q.   OKAY.  AND YOU ALSO DON'T MAKE ANY MENTION OF COMPACTNESS
18   SCORES IN THE EAST BATON ROUGE AREA.  CORRECT?
19   A.   NOT IN THIS PARTICULAR SECTION, NO.
20   Q.   ALL RIGHT.  LET'S MOVE TO THE HOUSE PLAN, AND LET'S START
21   WITH THE LAKE CHARLES AREA.  I THINK THAT'S SECRETARY OF STATE
22   EXHIBIT 1 AT PAGE 90 TO 91.  LET'S START WITH 91.
23        SO IN THIS LAKE CHARLES AREA, MR. COOPER SPLITS
24   CALCASIEU PARISH INTO FIVE HOUSE DISTRICTS.  CORRECT?
25   A.   YES.

MICHAEL BARBER, PH.D.

10:45  1    Q.   AND THOSE ARE 33, 34, 35, 36, AND 38.  IS THAT RIGHT?

      2    A.   YES.

      3    Q.   OKAY.  AND THE ENACTED PLAN SPLITS CALCASIEU INTO SEVEN

      4    DISTRICTS.  CORRECT?

      5    A.   YES.

      6    Q.   OKAY.  AND FOUR OUT OF SEVEN OF THOSE DISTRICTS SPAN

      7    MULTIPLE PARISHES.  CORRECT?

      8    A.   I BELIEVE SO, YES.

      9    Q.   OKAY.  AND MR. COOPER PUTS ALL FIVE DISTRICTS WHOLLY

     10    WITHIN CALCASIEU PARISH.  CORRECT?

     11    A.   HE DOES, YES.

     12    Q.   AND OTHER THAN YOUR MAP, YOU DON'T MENTION THAT ANYWHERE

     13    IN YOUR REPORT?

     14    A.   I MEAN, IT'S HERE ON THE MAP.  YOU CAN SEE IT.

     15    Q.   BUT YOU DON'T CITE THAT AS ONE OF THE TRADITIONAL

     16    REDISTRICTING PRINCIPLES YOU CONSIDERED WHEN YOU CONSIDERED

     17    WHETHER MR. COOPER COMPLIED WITH TRADITIONAL REDISTRICTING

     18    PRINCIPLES?

     19    A.   I DID NOT DISCUSS THE PARTICULAR CHOICE IN THE COUNTY AS A

     20    WHOLE.  THAT WAS NOT THE INTENTION OF THIS SECTION OF THE

     21    REPORT.

     22    Q.   OKAY.  ALL RIGHT.  AND THEN I THINK -- I DON'T HAVE THE

     23    PAGE, BUT I THINK IF WE GO BACK TO PAGE ABOUT 88, MAYBE ONE

     24    MORE.

     25         SO THIS IS YOUR DESCRIPTION -- I THINK WE CAN GO BACK

MICHAEL BARBER, PH.D.

10:46  1  ACTUALLY ONE MORE PAGE -- OF THE LAKE CHARLES REGION AND WHAT
       2  WE HAVE JUST BEEN DISCUSSING, THE DISTRICTS IN THAT REGION.
       3  AND HERE YOU TALK ABOUT COMPACTNESS SCORES AGAIN.  CORRECT?
       4  A.   YES.
       5  Q.   ALL RIGHT.  AND HERE YOU ARE TALKING ABOUT THE COMPACTNESS
       6  SCORES FOR DISTRICTS 34 AND 36?
       7  A.   YES.
       8  Q.   ALL RIGHT.  AND 34 IS A MAJORITY-BLACK DISTRICT IN THE
       9  ENACTED PLAN.  CORRECT?
      10  A.   YES.  THAT'S CORRECT.
      11  Q.   AND WHEN WE WERE DISCUSSING THE SENATE MAP AND THE
      12  CADDO-BOSSIER REGION, YOU SAID YOU DIDN'T LOOK AT COMPACTNESS
      13  SCORES FOR THE DISTRICTS THAT WERE ALREADY MAJORITY BLACK IN
      14  THE ENACTED PLAN.  CORRECT?
      15  A.   I BELIEVE SO, YES.
      16  Q.   AND HERE YOU DO?
      17  A.   I BELIEVE THAT IS THE CASE, YES.
      18  Q.   AND YOU DON'T MENTION THE COMPACTNESS SCORE FOR HD-38,
      19  WHICH IS THE NEW MAJORITY-BLACK DISTRICT?
      20  A.   IN THIS PARTICULAR REGION I THINK THE NUMBERING CAN BE A
      21  LITTLE CONFUSING, BECAUSE IT MIGHT BE DIFFICULT TO IDENTIFY
      22  WHICH IS, IN FACT, THE NEW DISTRICT IF THAT --
      23  Q.   YOU DON'T EXPLAIN THAT ANYWHERE IN THIS SECTION?
      24  A.   WELL, I NOTE THE NUMBERING OF THE DISTRICTS IN THE MAP.
      25  Q.   YEAH.  AND YOU DON'T EXPLAIN THAT IT'S CONFUSING OR

MICHAEL BARBER, PH.D.

10:48  1   SUGGEST THAT YOU THINK HD-34 IS REALLY A NEW DISTRICT ANYWHERE
       2   IN THIS SECTION?
       3   **A.**   I'M SORRY.  I DIDN'T -- I DON'T KNOW THAT I FOLLOW THE
       4   QUESTION YOU'RE ASKING.
       5   **Q.**   ALL RIGHT.  STRIKE THAT.
       6           ALL RIGHT.  LET'S GO BACK TO -- LET'S GO TO SOS
       7   EXHIBIT 1 AT PAGE 70 TO 71.
       8           ALL RIGHT.  AND THIS IS DISCUSSING THE SHREVEPORT
       9   REGION IN THE HOUSE MAP.  CORRECT?
      10   **A.**   YES.
      11   **Q.**   ALL RIGHT.  AND IN THE ENACTED PLAN, THE CITY OF
      12   SHREVEPORT IS SPLIT AMONG FOUR DISTRICTS.  IS THAT RIGHT?
      13   **A.**   I BELIEVE THAT IS THE CASE.
      14   **Q.**   AND IN THE ILLUSTRATIVE PLAN THE CITY OF SHREVEPORT IS
      15   SPLIT AMONG FOUR DISTRICTS.  IS THAT CORRECT?
      16   **A.**   I THINK SO.  I, AGAIN, WOULD NEED TO LOOK TO BE COMPLETELY
      17   CERTAIN.
      18   **Q.**   OKAY.  IN THE ILLUSTRATIVE PLAN YOU SAY THAT THE CITY OF
      19   SHREVEPORT IS DIVIDED MORE EQUALLY AMONG THE FOUR DISTRICTS
      20   THAT IT IS SPLIT AMONG?
      21   **A.**   YES.
      22   **Q.**   OKAY.  AND YOU SAY THAT THIS MORE EQUAL SPLIT IN
      23   SHREVEPORT VIOLATES THE TRADITIONAL REDISTRICTING PRINCIPLE OF
      24   AVOIDING MUNICIPAL SPLITS?
      25   **A.**   YES.  I THINK I'M REFERRING TO THE WAY IN WHICH THE CITY

**MICHAEL BARBER, PH.D.**

10:49 1   IS DIVIDED CAN SOMETIMES BE -- HELP US UNDERSTAND WHAT WAS

2   GOING ON, WHAT WAS THE OBJECTIVE OF THE MAPMAKER.

3   **Q.**   OKAY.  ALL RIGHT.  LET'S TURN TO SOS 1 AT PAGE 78.

4         AND THIS IS ABOUT THAT NATCHITOCHES AREA.  IS THAT

5   RIGHT?

6   **A.**   YES.

7   **Q.**   OKAY.  AND IN THE NATCHITOCHES AREA, THE 2011 PLAN

8   INCLUDED A MAJORITY-BLACK DISTRICT.  CORRECT?

9   **A.**   YES.  IN THE --

10   **Q.**   IN THE 2011 PLAN, SO THE PLAN THAT'S BEING -- WAS BEING

11   REPLACED IN 2022?

12   **A.**   IN THE HOUSE?

13   **Q.**   IN THE HOUSE, CORRECT.

14   **A.**   THAT'S CORRECT.

15   **Q.**   ALL RIGHT.  AND THAT WAS DISTRICT -- HOUSE DISTRICT 23?

16   **A.**   YES.

17   **Q.**   AND THE ILLUSTRATIVE PLAN ALSO INCLUDES HOUSE DISTRICT 23

18   AS A MAJORITY-BLACK DISTRICT IN THE NATCHITOCHES AREA.

19   CORRECT?

20   **A.**   YES.

21   **Q.**   ALL RIGHT.  AND THE ENACTED PLAN RELOCATES HOUSE DISTRICT

22   23 TO THE NEW ORLEANS AREA.  CORRECT?

23   **A.**   NUMERICALLY THAT'S WHERE THE NUMBER ENDED UP.  I DON'T

24   KNOW THAT BEYOND THE NUMBER IT'S -- EFFECTIVELY WE COULD SAY

25   THE DISTRICT WAS DISSOLVED AND ABSORBED INTO THE REMAINING --

MICHAEL BARBER, PH.D.

10:51 1    KIND OF SHIFTED SOUTHWARD.  THE NUMBER ITSELF IS NOT -- I DON'T

2    THINK ESPECIALLY INFORMATIVE, IN SOME WAYS SOMEWHAT ARBITRARY.

3    **Q.**    OKAY.  AND IN THE ENACTED PLAN, UNLIKE THE 2011 PLAN AND

4    THE ILLUSTRATIVE PLAN, THERE IS NO MAJORITY-BLACK DISTRICT IN

5    THE NATCHITOCHES AREA.  CORRECT?

6    **A.**    THAT IS CORRECT.

7    **Q.**    OKAY.  AND WHEN YOU DESCRIBE THAT THE DISTRICT -- PRIOR

8    HD-23 WAS DISSOLVED, THAT WAS BECAUSE OF POPULATION LOSS IN THE

9    NORTHWESTERN PART OF THE STATE?

10   **A.**    YES.

11   **Q.**    AND YOU SAY IT'S SIGNIFICANT, I THINK.  YOU USE THE WORD

12   "NOTEWORTHY" THAT THE INCUMBENT IN HD-23 WAS NO LONGER ELIGIBLE

13   TO RUN BECAUSE OF TERM LIMITS?

14   **A.**    YES.  I BELIEVE SO.

15   **Q.**    OKAY.  THE ILLUSTRATIVE PLAN, SIMILAR TO THE ENACTED PLAN,

16   MOVING HD-23, THE ILLUSTRATIVE PLAN MOVES HD-5 TO THE NEW

17   ORLEANS AREA.  CORRECT?

18   **A.**    AGAIN, THE NUMBER MOVES DOWN THERE.  IT'S NOT AS SIMPLE AS

19   SAYING LIKE IT JUST TRANSPORTS THE DISTRICT.  IT'S, YOU KNOW, A

20   COMPLETELY DIFFERENT POPULATION.  I WOULD SAY IT -- AGAIN, IT

21   DISSOLVES DISTRICT FIVE AND GENERALLY SHIFTS THE DISTRICTS INTO

22   THE SOUTHEASTERN DIRECTION.

23   **Q.**    OKAY.  AND HD-5 WAS A MAJORITY-WHITE DISTRICT IN THE 2011

24   PLAN.  CORRECT?

25   **A.**    YES.

**MICHAEL BARBER, PH.D.**

10:52  1    **Q.**   OKAY.  AND IT REMAINS A MAJORITY-WHITE DISTRICT IN THE

       2    ENACTED PLAN?

       3    **A.**   I BELIEVE SO, YES.

       4    **Q.**   AND YOU IDENTIFY IT HERE AS ONE OF THE DISTRICTS THAT'S

       5    KIND OF MOVED INTO THE AREA WHERE HD-23 FORMALLY EXISTED?

       6    **A.**   YES.

       7    **Q.**   OKAY.  AND THE INCUMBENT IN HD-5 WAS ALSO TERM LIMITED.

       8    CORRECT?

       9    **A.**   I BELIEVE THAT IS THE CASE.

      10    **Q.**   OKAY.  AND YOU DON'T MENTION THAT ANYWHERE IN YOUR REPORT?

      11    **A.**   NO.

      12    **Q.**   IT WASN'T NOTEWORTHY THAT THE INCUMBENT IN HD-5 WAS TERM

      13    LIMITED?

      14    **A.**   IT DIDN'T MAKE IT INTO MY REPORT.

      15    **Q.**   OKAY.  ALL RIGHT.  LET'S SEE.  CAN WE TURN TO SOS EXHIBIT

      16    1, PAGE 94.

      17          ALL RIGHT.  AND THIS IS DISCUSSING THE BATON ROUGE

      18    REGION IN THE HOUSE PLAN.  IS THAT RIGHT?

      19    **A.**   YES.

      20    **Q.**   OKAY.

      21          **MR. FARR:**  YOUR HONOR, NOT TO INTERRUPT COUNSEL, BUT

      22    MR. BARBER HAS BEEN GOING FOR TWO HOURS.  DO YOU THINK WE COULD

      23    TAKE A 15-MINUTE BREAK?  I MEAN, HE'S TESTIFIED LONGER THAN ANY

      24    OTHER WITNESS.

      25          **THE COURT:**  HOW MUCH TIME HAVE YOU GOT LEFT?

MICHAEL BARBER, PH.D.

10:54  1        **MR. NAIFEH:**  I THINK I'VE GOT ABOUT -- I THINK I'VE
       2    GOT FIVE MINUTES.
       3        **THE COURT:**  THEN LET'S FINISH UP.
       4    BY MR. NAIFEH:
       5    **Q.**  OKAY.  SO LOOKING AT THE BATON ROUGE REGION IN THE HOUSE
       6    PLAN, YOU DESCRIBE HERE THE SHAPES OF SOME OF THESE DISTRICTS.
       7    CORRECT?
       8    **A.**  YES.
       9    **Q.**  BUT YOU DON'T INCLUDE ANY NUMERIC COMPACTNESS SCORES.  IS
      10    THAT RIGHT?
      11    **A.**  AGAIN, THERE'S PLENTY OF PLACES WHERE THOSE ARE REPORTED,
      12    AND I DON'T THINK THAT IT'S NECESSARILY THE CASE THAT WE NEEDED
      13    TO REPEAT THAT.
      14    **Q.**  OKAY.  AND IN YOUR REPORT HERE IN THE SECOND PARAGRAPH ON
      15    PAGE 94, CAN YOU READ THAT FIRST SENTENCE?
      16    **A.**  "FIRST, THE MAP PACKS WHITE VOTERS INTO THE HD-70, GIVING
      17    IT A WHITE VOTING AGE POPULATION OF 69 PERCENT.  HOWEVER, TO
      18    ACCOMPLISH THIS" --
      19    **Q.**  OKAY.  I DIDN'T NEED THE SECOND SENTENCE.
      20    **A.**  OH.
      21        **MR. NAIFEH:**  SORRY, STEPHEN.
      22        **MR. FARR:**  YOUR HONOR, I MEAN, CAN HE COMPLETE HIS
      23    ANSWER?
      24        **THE COURT:**  FOR THE RULE OF COMPLETENESS -- I MEAN,
      25    IT IS IN THE RECORD.  YOU CAN CERTAINLY READ THE SECOND

MICHAEL BARBER, PH.D.

10:55 1  SENTENCE, SIR, IF YOU WOULD LIKE TO.

2           **MR. NAIFEH:**  I CERTAINLY HAVE NO OBJECTION TO READING

3  THE SECOND SENTENCE.  I DON'T HAVE ANY QUESTIONS ABOUT IT.

4           **THE COURT:**  IF YOU WANT TO READ THE SECOND SENTENCE,

5  YOU CAN.

6  **BY THE WITNESS:**

7  **A.**   "HOWEVER, TO ACCOMPLISH THIS, THE COOPER ILLUSTRATIVE

8  HD-70 TAKES ON A "U" SHAPE TO AVOID A CONCENTRATION OF HEAVILY

9  BLACK PRECINCTS THAT HAVE A SUBSTANTIALLY HIGHER BLACK

10  POPULATION."

11  **Q.**   ALL RIGHT.  SO FOCUSING ON THAT FIRST SENTENCE, IS

12  AVOIDING PACKING VOTERS, BASED ON RACE, A TRADITIONAL

13  REDISTRICTING PRINCIPLE?

14  **A.**   THAT IS A LENGTHY CONVERSATION THAT YOU COULD GET -- YOU

15  COULD ASK FIVE PEOPLE AND GET SIX DIFFERENT ANSWERS.

16  **Q.**   OKAY.  NONE OF YOUR OTHER REGIONAL DISCUSSIONS DO YOU

17  DISCUSS THE PACKING OF WHITE VOTERS.  CORRECT?

18  **A.**   I THINK I DISCUSS THE PARTICULAR RACIAL COMPOSITION OF THE

19  DISTRICTS.

20  **Q.**   OKAY.

21  **A.**   I DON'T USE PERHAPS THE WORD "PACK."

22  **Q.**   OKAY.

23  **A.**   BUT I THINK THERE ARE MANY PLACES IN WHICH I REFER TO THE

24  RACIAL COMPOSITION OF THE DISTRICTS AS BEING NOTEWORTHY.

25  **Q.**   OKAY.  AND YOU DON'T DISCUSS ANYWHERE WHETHER THE

MICHAEL BARBER, PH.D.

10:56  1   ILLUSTRATIVE MAP UNPACKS ANY DISTRICTS BASED ON RACE AS

2   COMPARED TO THE ENACTED PLAN?

3   **A.**   WELL, I THINK I DISCUSS HOW THE ILLUSTRATIVE MAP VERY

4   CAREFULLY CREATES DISTRICTS THAT ARE AT ABOUT 50 TO 53 PERCENT,

5   WHICH I THINK IS KIND OF EXACTLY WHAT YOU'RE ASKING ABOUT.

6   **Q.**   OKAY.  ALL RIGHT.  I HAVE NO FURTHER QUESTIONS.

7           **MR. FARR:**  I HAVE JUST A COUPLE, YOUR HONOR, IF WE

8   CAN GET THE WITNESS DONE.

9           **THE COURT:**  OKAY.

10          **MR. FARR:**  WE'LL TAKE A BREAK IF YOU WANT.  I MEAN,

11  IT'S ONLY TWO OR THREE QUESTIONS.

12          **THE COURT:**  GO AHEAD.  ASK YOUR REDIRECT.

13          **MR. FARR:**  OKAY.

14                    **REDIRECT EXAMINATION**

15  BY MR. FARR:

16  **Q.**   DR. BARBER, THE COUNSEL TALKED TO YOU ABOUT TWO CASES IN

17  WHICH YOU WERE DISCREDITED.  DID EITHER OF THOSE CASES INVOLVE

18  TESTIMONY ON SIMULATED MAPS?

19  **A.**   NO, THEY DID NOT.

20  **Q.**   SO HE DIDN'T CITE ANY CASES WHERE YOU WERE DISCREDITED

21  WHERE YOU HAD GIVEN TESTIMONY ON SIMULATED MAPS.  IS THAT

22  CORRECT?

23  **A.**   THAT'S CORRECT.

24          **MR. FARR:**  AND, COUNSEL, I APOLOGIZE, BUT I DIDN'T

25  WRITE DOWN THE CAPTION OF THE FIRST CASE.  WAS IT WALKER WAS IN

MICHAEL BARBER, PH.D.

10:57 1    THE --

2              MR. NAIFEH:  THAT CASE WAS *JACOBSON VERSUS LEE*.

3              MR. FARR:  WHAT WAS IT?

4              THE COURT:  *JACOBSON V. LEE*.

5              MR. FARR:  I'M SORRY, YOUR HONOR.  I APPRECIATE IT.

6     BY MR. FARR:

7     Q.   SO THE *JACOBSON* CASE, HE TALKED ABOUT THE DISTRICT COURT

8     JUDGES DISCREDITED YOU.  DO YOU KNOW THE CASE HISTORY OF THAT

9     CASE, DR. BARBER?

10    A.   YES.

11    Q.   AND DO YOU KNOW WHAT HAPPENED TO THAT CASE?

12    A.   IT WENT TO THE ELEVENTH CIRCUIT AND WAS OVERTURNED.

13             MR. FARR:  YOUR HONOR, THAT'S ALL I HAVE EXCEPT FOR

14    MY PROFFER OF PROOF.

15             THE COURT:  ALL RIGHT.  WE WILL TAKE A 15-MINUTE

16    RECESS.

17             THE LAW CLERK:  ALL RISE.

18             MR. FARR:  YOUR HONOR, MAY I ASK A QUESTION?

19             THE COURT:  YES.

20             MR. FARR:  DO YOU WANT ME TO DO THAT NOW OR LATER?

21             THE COURT:  NO.  THE COURT REPORTER NEEDS A RECESS AS

22    WELL.

23             MR. FARR:  OKAY.

24             THE LAW CLERK:  COURT'S IN RECESS.

25                 (WHEREUPON, THE COURT WAS IN RECESS.)

11:14 1              THE COURT:  BE SEATED.

2                   WE ARE GOING TO HAVE A LITTLE CHANGE OF ORDER

3        THIS MORNING NECESSITATED BY TWO THINGS.  WE ARE HAVING SOME

4        I.T. PROBLEMS.  IT DOESN'T INVOLVE THE AUDITORY EQUIPMENT OR

5        THE AUDIO EQUIPMENT, BUT IT INVOLVES THE COMMUNICATION AMONG

6        CHAMBERS.  WE HAVE GOT SOME PROBLEMS, SO I.T. IS GOING TO COME

7        UP.

8                   ALSO, I NEED TO MAKE A CHANGE OF PERSONNEL.  I

9        HAVE A -- TO BE QUITE FRANK, THE COURT REPORTER IS SICK.  AND

10       SO WE ARE GOING TO BRING IN A NEW COURT REPORTER AT 1:00.  SO

11       IN THAT REGARD, PUT YOUR PROFFER ON AND THEN YOU CAN --

12              MR. FARR:  WE CAN DO IT NOW, YOUR HONOR?

13              THE COURT:  THAT IS WHAT I AM SAYING.

14              MR. FARR:  THANK YOU.

15              THE COURT:  PUT YOUR PROFFER ON AND THEN WE WILL BE

16       IN RECESS UNTIL 1:00 P.M.  THERE IS OBVIOUSLY PERMITTED TO BE

17       CROSS ON THE PROFFER.  I BELIEVE MS. THOMAS IS GOING TO GET MR.

18       NAIFEH NOW.  SO YOU MIGHT WANT TO WAIT JUST A SECOND UNTIL HE

19       IS IN POSITION AND THEN YOU CAN DO YOUR PROFFER.

20              MR. FARR:  THANK YOU VERY MUCH, YOUR HONOR.

21              THE COURT:  OKAY.  ALL RIGHT.  WELL, THE COURT

22       DOESN'T NEED TO BE ON THE BENCH FOR THIS.  SO THE COURT WILL BE

23       BACK AT 1:00 P.M., BUT THE PROFFER WILL BE ON THE RECORD.

24                   ANY QUESTIONS ABOUT THE PROCESS?  OKAY.

25              THE LAW CLERK:  ALL RISE.

11:15  1           THE COURT IS AT RECESS.

2    **(WHEREUPON, A PROFFER WAS MADE OUTSIDE THE PRESENCE OF THE**

3    **COURT.   THE PROFFER IS FILED IN A SEPARATE TRANSCRIPT.)**

4                         * * *

5                      <u>**CERTIFICATE**</u>

6        I, SHANNON THOMPSON, CCR, OFFICIAL COURT REPORTER FOR THE

7    UNITED STATES DISTRICT COURT, MIDDLE DISTRICT OF LOUISIANA,

8    CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO

9    THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF

10   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

11

12                  _Shannon Thompson_

13                  SHANNON THOMPSON, CCR

14                  OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25