1                    UNITED STATES DISTRICT COURT

2                    MIDDLE DISTRICT OF LOUISIANA

3

4    DOROTHY NAIRNE, ET AL          *          CIVIL ACTION
                                    *
5    VERSUS                         *          NO. 3:22-178-SDD
                                    *
6    KYLE ARDOIN, ET AL             *          DECEMBER 1, 2023
     * * * * * * * * * * * * * * * *

7

8

9                              DAY 5
                            BENCH TRIAL
10          BEFORE THE HONORABLE SHELLY D. DICK
              UNITED STATES CHIEF DISTRICT JUDGE

11

12

13   APPEARANCES:

14   FOR THE PLAINTIFFS:           AMERICAN CIVIL LIBERTIES UNION
                                   FOUNDATION
15                                 BY:  MEGAN C. KEENAN, ESQ.
                                        SARAH E. BRANNON, ESQ.
16                                      DAYTON CAMPBELL-HARRIS, ESQ.
                                   915 15TH STREET, NW
17                                 WASHINGTON, DC 20005

18                                 NAACP LEGAL DEFENSE & EDUCATION
                                   FUND, INCORPORATED
19                                 BY:  VICTORIA WENGER, ESQ.
                                        SARA ROHANI, ESQ.
20                                      STUART C. NAIFEH, ESQ.
                                   40 RECTOR STREET, FIFTH FLOOR
21                                 NEW YORK, NEW YORK 10006

22                                 COZEN O'CONNOR
                                   BY:  JOSEPHINE M. BAHN, ESQ.
23                                 1200 19TH STREET, NW
                                   THIRD FLOOR
24                                 WASHINGTON, DC 20036

25

```
 1                              COZEN O'CONNOR
                               BY:  ROBERT S. CLARK, ESQ.
 2                              ONE LIBERTY PLACE
                               1650 MARKET STREET, SUITE 2800
 3                              PHILADELPHIA, PENNSYLVANIA  19103

 4                              COZEN O'CONNOR
                               BY:  AMANDA GIGLIO, ESQ.
 5                              3 WORLD TRADE CENTER
                               55TH FLOOR
 6                              NEW YORK, NEW YORK 10007

 7                              AMERICAN CIVIL LIBERTIES UNION
                               FOUNDATION, VOTING RIGHTS PROJECT
 8                              BY:  GARRETT MUSCATEL
                               125 BROAD STREET, 18TH FLOOR
 9                              NEW YORK, NEW YORK  10004

10                              ELECTION LAW CLINIC
                               HARVARD LAW SCHOOL
11                              BY:  T. ALORA THOMAS, ESQ.
                               6 EVERETT STREET, SUITE 4105
12                              CAMBRIDGE, MASSACHUSETTS 02138

13                              ADCOCK LAW, LLC
                               BY:  JOHN N. ADCOCK, ESQ.
14                              3110 CANAL STREET
                               NEW ORLEANS, LOUISIANA 70119

15
    FOR THE DEFENDANT,         NELSON MULLINS RILEY &
16  KYLE ARDOIN, IN HIS        SCARBOROUGH, LLP
    OFFICIAL CAPACITY AS       BY:  PHILLIP J. STRACH, ESQ.
17  SECRETARY OF STATE:             THOMAS A. FARR, ESQ.
                                    CASSIE A. HOLT, ESQ.
18                                  ALYSSA M. RIGGINS, ESQ.
                               4140 PARKLAKE AVENUE, STE. 200
19                              RALEIGH, NORTH CAROLINA 27612

20                              SHOWS, CALI & WALSH, LLP
                               BY:  JOHN C. CONINE, JR., ESQ.
21                                  JOHN C. WALSH, ESQ.
                               628 ST. LOUIS STREET
22                              BATON ROUGE, LOUISIANA 70802

23  FOR THE intervenor,        BAKER & HOSTETLER, LLP
    CLAY SCHEXNAYDER           BY:  KATE MCKNIGHT, ESQ.
24  AND PATRICK PAGE                ROBERT J. TUCKER, ESQ.
    CORTEZ:                         PATRICK LEWIS, ESQ.
25                              200 CIVIC CENTER DRIVE, STE. 1200
                               COLUMBUS, OHIO 43215
```

```
 1                                  BAKER & HOSTETLER, LLP
                                    BY:  MICHAEL W. MENGIS, ESQ.
 2                                  811 MAIN STREET, SUITE 1100
                                    HOUSTON, TEXAS 77002
 3
     FOR THE INTERVENOR, THE        HOLTZMAN VOGEL JOSEFIAK
 4   STATE OF LOUISIANA BY AND      TORCHINSKY, PLLC
     THROUGH ATTORNEY GENERAL       BY:  BRENNAN BOWEN, ESQ.
 5   JEFF LANDRY:                   2575 EAST CAMELBACK RD., STE. 860
                                    PHOENIX, ARIZONA 85016
 6
                                    HOLTZMAN VOGEL JOSEFIAK
 7                                  TORCHINSKY, PLLC
                                    BY:  PHILLIP M. GORDON, ESQ.
 8                                  15404 JOHN MARSHALL HIGHWAY
                                    HAYMARKET, VIRGINIA 20169
 9
                                    LOUISIANA DEPARTMENT OF JUSTICE
10                                  BY:  ANGELIQUE D. FREEL, ESQ.
                                         JEFFREY M. WALE, ESQ.
11                                       AMANDA M. LAGROUE, ESQ.
                                    1885 N. THIRD STREET
12                                  BATON ROUGE, LOUISIANA 70804

13   OFFICIAL COURT REPORTER:       TERI B. NORTON, FCRR, RMR, RDR
                                    UNITED STATES DISTRICT COURT
14                                  501 E. COURT STREET, STE. 2.500
                                    JACKSON, MISSISSIPPI 39201
15                                  TERI_NORTON@MSSD.USCOURTS.GOV
                                    (601)608-4186
16
                 PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY USING
17                      COMPUTER-AIDED TRANSCRIPTION SOFTWARE

18

19

20

21

22

23

24

25
```

1                          TABLE OF CONTENTS

2

3       WITNESSES FOR THE DEFENDANT/INTERVENORS:

4       SEAN TRENDE

5          CROSS-EXAMINATION By Ms. Thomas   ........................5

6       DR. DOUGLAS JOHNSON

7          DIRECT EXAMINATION By Mr. Lewis   .....................25

8          CROSS-EXAMINATION By Ms. Keenan   ....................102

9          REDIRECT EXAMINATION By Mr. Lewis   ...................162

10      DR. MICHAEL BARBER

11         DIRECT EXAMINATION By Mr. Farr   ......................165

12         CROSS-EXAMINATION ON TENDER By Mr. Naifeh   ...........171

13         DIRECT EXAMINATION By Mr. Farr   ......................181

14

15

16

17

18

19

20

21

22

23

24

25

9:00AM   1              **THE COURT:**  I THINK MR. TRENDE CAN TAKE THE STAND.  I

       2     THINK WE ARE ON CROSS-EXAMINATION.  YOU ARE STILL UNDER OATH,

       3     SIR.

       4              **THE WITNESS:**  YES, YOUR HONOR.

       5              **THE COURT:**  MS. THOMAS, MAKE AN APPEARANCE FOR THE

       6     NEW COURT REPORTER, PLEASE.

       7              **MS. THOMAS:**  ALORA THOMAS FOR THE HARVARD ELECTION

       8     LAW CLINIC.  GOOD MORNING, MR. TRENDE.  NICE TO SEE YOU AGAIN.

       9     I'M SURE THE NEXT TIME I SEE YOU, YOU WILL BE DR. TRENDE.

      10              **THE WITNESS:**  GOOD TO SEE YOU, TOO.

      11                        **SEAN TRENDE,**

      12     **HAVING PREVIOUSLY BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

      13                     **CROSS-EXAMINATION**

      14     **BY MS. THOMAS:**

      15     Q.  SO GOING OVER SOME OF THE THINGS THAT YOU DISCUSSED IN

      16     YOUR DIRECT, YOU HAVE TWO ALGORITHMS THAT YOU USED IN YOUR

      17     EXPERT REPORT; IS THAT CORRECT?

      18     A.  THAT IS CORRECT.

      19     Q.  AND THE FIRST WEIGHTS THE BLACK VOTING AGE POPULATION?  IF

      20     I SAY BVAP, WILL YOU UNDERSTAND WHAT I MEAN?

      21     A.  YES, I'LL UNDERSTAND THAT.  AND YES, THAT'S RIGHT, IT

      22     WEIGHTS THAT.

      23     Q.  AND THE SECOND ALGORITHM WEIGHTS PRECINCT SIZE; IS THAT

      24     CORRECT?

      25     A.  THAT IS CORRECT.

9:01AM  1   Q.   AND NEITHER OF THESE ALGORITHMS CREATE WHOLE MAPS; IS THAT

     2   CORRECT?

     3   A.   THAT'S RIGHT.   THEY ARE DESIGNED TO IDENTIFY CLUSTERS OF

     4   BLACK RESIDENTS OF VOTING AGE THAT WOULD BE 50 PERCENT PLUS ONE

     5   OF THE BVAP IN THE DISTRICT THAT -- THE ILLUSTRATIVE DISTRICT

     6   THAT MR. COOPER DREW.

     7   Q.   AND YOU DID NOT USE EITHER OF THESE EXACT ALGORITHMS IN

     8   YOUR DISSERTATION; IS THAT CORRECT?

     9   A.   THAT IS CORRECT.   IT'S THE CONCEPTIONS OF COMPACTNESS THAT

    10   I WAS FAMILIARIZED WITH.

    11   Q.   AND THESE ALGORITHMS ARE BASED ON MOMENT OF INERTIA; IS

    12   THAT CORRECT?

    13   A.   THAT IS CORRECT.

    14   Q.   AND YOU DID NOT USE MOMENT OF INERTIA IN YOUR

    15   DISSERTATION; IS THAT CORRECT?

    16   A.   THAT'S CORRECT.   I USED IT IN MY RESEARCH FOR IT, I CAME

    17   ACROSS IT, BUT I DIDN'T USE THAT IN THE DISSERTATION ITSELF.

    18   Q.   AND FOCUSING ON YOUR DISSERTATION FOR A MINUTE, NONE OF

    19   THE CHAPTERS IN YOUR DISSERTATION HAD BEEN PUBLISHED IN A

    20   PEER-REVIEWED ARTICLE -- PEER-REVIEWED JOURNAL?

    21   A.   THAT IS RIGHT.

    22   Q.   AND YOU ONLY HAVE ONE PEER-REVIEWED ARTICLE; IS THAT

    23   CORRECT?

    24   A.   THAT IS CORRECT.

    25   Q.   AND YOUR PEER-REVIEWED ARTICLE DID NOT DISCUSS EITHER OF

9:02AM    1    THE ALGORITHMS YOU ARE USING IN THIS CASE?

          2    A.   RIGHT.

          3    Q.   AND YOU DID NOT USE MOMENT OF INERTIA IN YOUR

          4    PEER-REVIEWED ARTICLE?

          5    A.   CORRECT.

          6    Q.   AND YOUR ONE PEER-REVIEWED ARTICLE DID NOT DISCUSS

          7    COMPACTNESS; IS THAT CORRECT?

          8    A.   CORRECT.

          9    Q.   AND IT'S YOUR UNDERSTANDING THAT YOU ARE CRITIQUING A

         10    *GINGLES* I EXPERT, MR. COOPER; IS THAT CORRECT?

         11    A.   I'M CRITIQUING MR. COOPER, THAT'S RIGHT.

         12    Q.   AND DO YOU UNDERSTAND THAT MR. COOPER IS A *GINGLES* I

         13    EXPERT IN THIS CASE?

         14    A.   I DON'T KNOW WHAT HIS PROFFER WAS, BUT I WON'T DISPUTE YOU

         15    ON THAT.

         16    Q.   AND WOULD YOU AGREE THAT A *GINGLES* I EXPERT MUST DRAW A

         17    *GINGLES* I COMPLIANT MAP?

         18    A.   YES.

         19    Q.   IN MR. COOPER'S WORK, HE USED REOCK AND POLSBY-POPPER,

         20    ALONG WITH OTHER MEASURES TO ESTABLISH THE COMPACTNESS OF HIS

         21    DISTRICTS; IS THAT CORRECT?

         22    A.   THAT'S RIGHT.

         23    Q.   AND YOU DID NOT ANALYZE MR. COOPER'S REOCK SCORES; IS THAT

         24    CORRECT?

         25    A.   THAT'S RIGHT.   I HAVE NO REASON TO DISPUTE HIM ON THE

9:04AM  1    DISTRICT COMPACTNESS.

2    Q.   AND YOU DID NOT ANALYZE MR. COOPER'S SCORE ON

3    POLSBY-POPPER?

4    A.   THAT'S RIGHT.

5    Q.   AND YOU DON'T HAVE A BASIS TO CONCLUDE THAT MR. COOPER'S

6    DISTRICTS ARE NONCOMPACT?

7    A.   THAT'S RIGHT.  I DON'T ANALYZE THE DISTRICT COMPACTNESS.

8    Q.   AND YOU ALSO DID NOT RUN A COMPACTNESS ANALYSIS ON THE

9    ENACTED MAP; IS THAT CORRECT?

10   A.   THAT'S CORRECT.

11   Q.   AND YOU WOULDN'T BE SURPRISED IF MR. COOPER'S ILLUSTRATIVE

12   MAPS EITHER MET OR BEAT THE ENACTED MAP ON COMPACTNESS

13   MEASURES?

14   A.   IT WOULDN'T SURPRISE ME EITHER WAY.  NO, THAT IS CORRECT.

15   Q.   NOW, WHAT YOU DID DO IN THIS CASE IS YOU USED THE MOMENT

16   OF INERTIA METHOD WE'VE BEEN DISCUSSING.  COULD THE MOMENT OF

17   INERTIA METHOD GIVE A NUMERIC VALUE?

18   A.   YES.

19   Q.   AND COULD YOU USE THAT NUMERIC VALUE TO COMPARE DIFFERENT

20   DISTRICTS?

21   A.   I SUPPOSE YOU COULD.  IT'S TOUGH TO DO A DIRECT COMPARISON

22   BECAUSE WHAT THE MOMENT OF INERTIA VALUE IS IS THE AVERAGE

23   SQUARE -- AVERAGE DISTANCE FROM THE CENTROID.  SO COMPARING

24   ACROSS DISTRICTS IS A LITTLE TRICKY, BUT REMEMBER, HERE I'M

25   ONLY USING IT TO HELP IDENTIFY THE MOST COMPACT GROUPING OF

9:05AM  1   BLACK RESIDENTS OF VOTING AGE IN THE DISTRICT THAT CAN BE

2   50 PERCENT PLUS ONE.  SO IT'S TRYING TO FIND THE BEST GROUPING

3   FOR MR. COOPER IN ANALYZING THAT.

4   Q.  BUT YOU DID NOT RELAY THE NUMERIC VALUE FOR YOUR MOMENT OF

5   INERTIA IN YOUR REPORT, CORRECT?

6   A.  THAT'S RIGHT.

7   Q.  INSTEAD OF RELAYING A NUMERIC VALUE, YOU USED A VISUAL

8   DEPICTION; IS THAT CORRECT?

9   A.  THAT'S RIGHT.  I FOLLOWED THE SUPREME COURT APPROACH IN

10  RACIAL GERRYMANDERING CASES AND IN SOME OF THESE SECTION 2

11  CASES, OR TRIED TO FOLLOW IT, AT LEAST, AND AN ULTIMATE VISUAL

12  ANALYSIS OF THE COMPACTNESS, BECAUSE THIS IS AN AREA, AS

13  JUSTICE O'CONNOR WROTE, WHERE APPEARANCES DO MATTER.

14  Q.  AND IN ORDER TO MAKE THE VISUAL COMPARISON, SOMEONE WOULD

15  HAVE TO MAKE A JUDGMENT CALL BASED ON THE VISUALS; IS THAT

16  CORRECT?

17  A.  THAT'S RIGHT.  THE FINDER OF FACT MAKES THE ULTIMATE

18  CONCLUSION AND JUDGMENT CALL ON THIS.

19  Q.  AND I THINK YOU TESTIFIED YESTERDAY AND AGAIN IN YOUR

20  TESTIMONY JUST NOW THAT THE MOMENT OF INERTIA, YOU ARE USING IT

21  TO FIND THE MOST COMPACT POPULATION; IS THAT RIGHT?

22  A.  THAT'S RIGHT.

23  Q.  AND I THINK YOU TESTIFIED IN THAT -- EARLIER AND AT YOUR

24  DEPOSITION THAT THE ARTICLES THAT YOU CITE FOR THE MOMENT OF

25  INERTIA DO NOT USE THE MOST COMPACT CONCEPT IN THE EXACT WAY

9:07AM   1   THAT YOU DO; IS THAT RIGHT?

2   A.   THAT IS RIGHT.   THEY PROVIDE THE CONCEPT OF COMPACTNESS,

3   AND THEN THEY APPLY IT TO THE DRAWING OF FULL DISTRICTS.   I'M

4   JUST TAKING THE CONCEPT OF COMPACTNESS AND APPLYING IT TO A

5   DIFFERENT SCENARIO.

6   Q.   *GINGLES* I DOES NOT REQUIRE THAT A DISTRICT BE DRAWN AROUND

7   THE MOST COMPACT POPULATION; DOES IT?

8   A.   OH, NO, NO.   I'M JUST SAYING WITHIN THE ILLUSTRATIVE

9   DISTRICT THAT MR. COOPER DREW, WHAT'S THE MOST COMPACT

10   POPULATION SOMEONE COULD POINT TO TO ARGUE THAT THE MINORITY

11   POPULATION IN THE DISTRICT IS COMPACT?   THAT'S ALL THE MOMENT

12   OF INERTIA IS BEING USED FOR IS TO FIND THE BEST CASE SCENARIO

13   FOR PLAINTIFFS.

14   Q.   AND YOU WOULD AGREE THAT YOU BASE YOUR FINDINGS OF

15   COMPACTNESS ON YOUR OPINION OF WHAT A REASONABLE DEFINITION OF

16   THE TERM WOULD BE?

17   A.   COULD YOU REPEAT THAT?   I'M SORRY.

18   Q.   YOU WOULD AGREE THAT YOU BASE YOUR FINDINGS OF COMPACTNESS

19   ON YOUR OPINION OF WHAT A REASONABLE DEFINITION OF COMPACTNESS

20   WOULD BE?

21   A.   RIGHT, RIGHT.   THE REPORT HAS MY ANALYSIS OF WHY I THINK

22   IT'S NOT COMPACT, BUT IT'S ULTIMATELY SOMETHING -- IT'S A FINE

23   LINE TO WALK IN THAT REPORT BETWEEN NOT INVADING THE PROVINCE

24   OF THE FACT-FINDER AND YET GIVING SOME TYPE OF ANALYSIS ON

25   COMPACTNESS.

9:08AM   1    Q.   AND YOUR DEFINITION OF COMPACTNESS IS ONE THAT THE

2    FACT-FINDER MIGHT ULTIMATELY DISAGREE WITH.   YOU WOULD --

3    A.   OH --

4    Q.   -- AGREE WITH THAT?

5    A.   I'M SORRY.   I DIDN'T MEAN TO TALK OVER YOU.   A HUNDRED

6    PERCENT.

7    Q.   NOW, I THINK YOU TESTIFIED YESTERDAY AND IN YOUR

8    DEPOSITION THAT YOU HAVE BEEN INVOLVED IN DRAWING MAPS IN THE

9    PAST; IS THAT CORRECT?

10   A.   THAT'S RIGHT.

11   Q.   AND WHEN YOU'VE DRAWN MAPS, YOU'VE USED TRADITIONAL

12   REDISTRICTING CRITERIA; IS THAT CORRECT?

13   A.   THAT'S CORRECT.

14   Q.   AND BASED ON YOUR EXPERIENCE, *GINGLES* I EXPERTS, WHEN THEY

15   ARE DRAWING MAPS, USE TRADITIONAL REDISTRICTING CRITERIA; IS

16   THAT CORRECT?

17   A.   THAT'S CORRECT.

18   Q.   STATES OFTEN HAVE A LIST OF TRADITIONAL REDISTRICTING

19   CRITERIA THAT THEY PRIORITIZE IN THEIR MAP DRAWING; IS THAT

20   CORRECT?

21   A.   YES.

22   Q.   AND LOUISIANA HAS A LIST OF TRADITIONAL REDISTRICTING

23   CRITERIA THAT IT PRIORITIZES?

24   A.   YES.

25   Q.   AND MR. COOPER USED TRADITIONAL REDISTRICTING CRITERIA IN

9:10AM   1   DESIGNING HIS MAP; IS THAT CORRECT?

2   A.   THAT'S MY UNDERSTANDING.

3   Q.   AND YOU WOULD AGREE THAT IN DRAWING MAPS, TRADE-OFFS ARE

4   SIMPLY INEVITABLE BETWEEN TRADITIONAL REDISTRICTING CRITERIA,

5   RIGHT?

6   A.   YES.

7   Q.   YOU DIDN'T CONSIDER ANY TRADITIONAL REDISTRICTING CRITERIA

8   IN ANSWERING THIS QUESTION OTHER THAN COMPACTNESS?

9   A.   NO, BECAUSE TYPICALLY THE VOTING RIGHTS ACT STANDS FIRST

10   IN TERMS OF PRINCIPLES AND WOULD OVERRIDE STATE CONCLUSIONS

11   ABOUT TRADITIONAL REDISTRICTING PRINCIPLES.   SO IF IT'S TRUE

12   THAT IT'S POPULATION COMPACTNESS THAT MATTERS, THAT WOULD BE

13   ONE OF THE PRIME CONSIDERATIONS.   THAT'S WHY I DID IT THE WAY I

14   DID.

15   Q.   AND AT YOUR DEPOSITION, YOU DID NOT KNOW WHAT EFFECT

16   INCORPORATING TRADITIONAL REDISTRICTING CRITERIA WOULD HAVE HAD

17   IN YOUR ANALYSIS IF YOU WOULD HAVE INCLUDED IT?

18   A.   THAT'S RIGHT.

19   Q.   IN YOUR DIRECT WE WENT THROUGH ENACTED DISTRICT 29.   DO

20   YOU RECALL THAT?

21   A.   YES.

22   Q.   OKAY.   IF WE COULD GET ON THE SCREEN THE SECRETARY OF

23   STATE'S EXHIBIT 3, WHICH I BELIEVE IS MR. TRENDE'S REPORT.

24        YES.   WE ARE NOW LOOKING AT DISTRICT 29 FROM YOUR REPORT.

25   IT'S FOUND ON PAGE 8, AND THIS IS FIGURE 38.   DO YOU RECALL

9:11AM  1    THIS?

2    A.  YES.

3    Q.  OKAY.  SO I'M JUST GOING TO ASK YOU A FEW QUESTIONS.  YOU

4    DON'T KNOW WHETHER THE COMMUNITIES ON EITHER SIDE OF THE

5    RIVERBANK ARE CONSIDERED SEPARATE COMMUNITIES OF INTEREST?

6    A.  THAT'S RIGHT.  I DON'T OFFER COMMUNITIES OF INTEREST

7    ANALYSIS.

8    Q.  OKAY.  IF WE COULD LOOK AT FIGURE 96 ON PAGE 132 OF THE

9    SAME EXHIBIT.  THERE'S ANOTHER RIVERBANK IN THE NEW ORLEANS

10    AREA.  DO YOU KNOW ANYTHING ABOUT THE TWO COMMUNITIES ON EITHER

11    SIDE OF THE RIVERBANK?

12    A.  NO.

13    Q.  DO YOU KNOW ANYTHING ABOUT WHAT ROLE COMMUNITIES MAY HAVE

14    PLAYED IN THE DRAWING OF THIS DISTRICT?

15    A.  NO.

16    Q.  WE'VE LOOKED AT SOME OF THE -- SORRY, STRIKE THAT.  I

17    BELIEVE IN YOUR DIRECT EXAMINATION WE LOOKED AT -- AND WE

18    LOOKED AT JUST NOW DISTRICT 29 IN THE ENACTED MAP.  DID YOU DO

19    AN EXHAUSTIVE REVIEW OF THE ENACTED MAP'S MAJORITY BLACK

20    DISTRICTS?

21    A.  NO.

22    Q.  AND AT YOUR DEPOSITION YOU STATED YOU DID NOT KNOW WHETHER

23    ANY OF THE DISTRICTS IN THE ENACTED MAP WERE VOTING RIGHTS ACT

24    COMPLIANT, CORRECT?

25    A.  THAT'S RIGHT.  THEY MAY ALL NOT BE.

9:13AM   1    Q.   AND YOU TESTIFIED AT YOUR DEPOSITION THAT YOU HAD TURNED

        2    OVER YOUR CODE TO THE PLAINTIFFS; IS THAT CORRECT?

        3    A.   YES.

        4    Q.   AND IF WE RAN YOUR CODE, WE COULD REPLICATE YOUR ANALYSIS?

        5    A.   THAT'S RIGHT.   YOU WOULD HAVE TO CHANGE SOME OF THE

        6    DISTRICT NUMBERS, I THINK, TO BRING UP DIFFERENT DISTRICTS, BUT

        7    YEAH, YOU COULD RUN THE CODE ON ANY DISTRICT ON ANY MAP YOU

        8    WANTED TO.

        9    Q.   AND IN YOUR DEPOSITION, WE SPOKE ABOUT DISTRICT 62 IN THE

        10   ENACTED MAP, CORRECT?

        11   A.   I HAVE NO REASON TO DISPUTE YOU ON THAT.   WE TALKED ABOUT

        12   A LOT OF DISTRICTS.

        13   Q.   DO YOU NEED ME TO REFRESH YOUR RECOLLECTION?

        14   A.   I TRUST YOU.

        15   Q.   OKAY.   AND AT YOUR DEPOSITION, YOU AGREED THAT DISTRICT 62

        16   OF THE ENACTED MAP CLEARLY FAILS YOUR EYEBALL TEST; IS THAT

        17   RIGHT?

        18   A.   YEAH, DISTRICT 62 IS A -- IT WOULD BE A REMEDIAL, NOT AN

        19   ILLUSTRATIVE DISTRICT, BUT I REMEMBER LOOKING AT IT AND

        20   THINKING, NO, THAT IS NOT A COMPACT BLACK POPULATION.

        21   Q.   JUST SO THE RECORD IS CLEAR, WE LOOKED AT DISTRICT 62 IN

        22   THE ENACTED MAP, CORRECT?

        23   A.   RIGHT.

        24   Q.   AND AT YOUR DEPOSITION YOU SAID THAT YOU WOULD NOT DEFEND

        25   DISTRICT 62 AS A VOTING RIGHTS ACT DISTRICT.   DO YOU RECALL

9:14AM   1   THAT?

2   A.   THAT'S RIGHT.

3   Q.   SO GOING BACK TO TRADITIONAL REDISTRICTING CRITERIA, ONE

4   SUCH CRITERIA IS ONE-PERSON, ONE-VOTE, ALSO KNOWN AS EQUAL

5   POPULATION.   ARE YOU FAMILIAR WITH THAT?

6   A.   YES.

7   Q.   AND DISTRICTS MUST COMPLY WITH ONE-PERSON, ONE-VOTE,

8   BECAUSE IT'S A CONSTITUTIONAL REQUIREMENT, CORRECT?

9   A.   ABSOLUTELY.

10   Q.   YOUR ALGORITHM DOES NOT ACCOUNT FOR EQUAL POPULATION OR

11   ONE-PERSON, ONE-VOTE; IS THAT CORRECT?

12   A.   WELL, NO, BUT WE ARE TAKING THE DISTRICTS THAT MR. COOPER

13   DREW, WHICH WOULD ALREADY BE ONE-PERSON, ONE-VOTE COMPLIANT,

14   AND JUST LOOKING TO SEE IF THERE IS A -- IF THEY DO ILLUSTRATE

15   THE EXISTENCE OF A COMPACT BLACK POPULATION SUFFICIENT TO BE

16   50 PERCENT PLUS ONE OF THE BVAP.   SO BECAUSE THE DISTRICTS ARE

17   ALREADY DRAWN, ONE-PERSON, ONE-VOTE COMPLIANT, IT DOESN'T HAVE

18   TO BE CODED IN.

19   Q.   THE ALGORITHM STOPS ONCE IT REACHES 50 PERCENT PLUS ONE OF

20   BLACK POPULATION BUT DOES NOT REQUIRE FILLING OUT A FULL

21   POPULATION OF A DISTRICT; IS THAT CORRECT?

22   A.   WELL, THAT'S RIGHT, BUT THE DISTRICT IS ALREADY DRAWN.

23   IT'S LOOKING WITHIN THE DISTRICT HOW DO YOU BEST GET TO

24   50 PERCENT PLUS ONE?   WHAT IS THAT DISTRICT REALLY

25   ILLUSTRATING?

9:16AM    1    Q.   AND YOU TESTIFIED THAT YOUR SECOND ALGORITHM WAS SIMILAR

          2    TO THE CHEN AND RODDEN METHOD.  DO YOU RECALL THAT?

          3    A.   THAT'S CORRECT.

          4    Q.   AND YOU CLAIM THAT THIS METHOD WAS FROM A PAPER THAT THEY

          5    WROTE 10 YEARS AGO IN 2013.  DO YOU RECALL THAT?

          6    A.   THAT'S RIGHT.

          7    Q.   UNLIKE YOUR ALGORITHM, THE CHEN AND RODDEN METHOD USED THE

          8    CENTROID OF A PRECINCT, AND YOUR METHOD USED THE CENTROID OF A

          9    POPULATION.  DO YOU RECALL THAT?

         10    A.   YES.

         11    Q.   AS A RESULT, THE CHEN AND RODDEN METHOD DRAWS ACTUAL

         12    DISTRICTS WHERE YOUR METHOD DOES NOT DRAW DISTRICTS IN AND OF

         13    ITSELF?

         14    A.   WELL, THAT'S RIGHT.  AGAIN, I'M TAKING THE CONCEPTION OF

         15    COMPACTNESS AND APPLYING IT TO A DIFFERENT SCENARIO, JUST AS

         16    THEY TAKE THE IDEA OF COMPACTNESS AND APPLY IT TO THE DRAWING

         17    OF SIMULATED MAPS.

         18    Q.   AND IN CREATING THEIR DISTRICT, CHEN AND RODDEN'S GOAL WAS

         19    TO DESIGN A REDISTRICTING ALGORITHM THAT USES ONLY TRADITIONAL

         20    GEOGRAPHIC CRITERIA OF THE KIND FAVORED BY REFORM ADVOCATES.

         21    DO YOU RECALL THAT?

         22    A.   THAT IS RIGHT.  ONE OF THOSE CRITERIA IS COMPACTNESS, AND

         23    IT IS THAT CONCEPTION OF COMPACTNESS THAT I'M TAKING AND

         24    APPLYING TO A DIFFERENT SET OF FACTS.

         25    Q.   NOT ONLY DOES THE CHEN AND RODDEN METHOD DRAW DISTRICTS,

S. TRENDE - CROSS

9:17AM   1   BUT IT ENSURES THAT THESE DISTRICTS MEET THE EQUAL POPULATION

2   REQUIREMENT.  DO YOU RECALL THAT?

3   A.  YES.

4   Q.  AND AS WE HAVE DISCUSSED, YOUR METHOD DOES NOT DO THAT?

5   A.  THAT'S RIGHT.

6   Q.  AND CHEN AND RODDEN ALSO SOUGHT TO GUARANTEE CONTIGUITY.

7   DO YOU RECALL THAT?

8   A.  YES.

9   Q.  AND AS WE SAW YESTERDAY, YOUR ALGORITHM CAN CREATE

10  NONCONTIGUOUS PLACES; DO YOU RECALL THAT?

11  A.  WELL, THE 50 PERCENT PLUS ONE GROUPING OF BLACK RESIDENTS

12  WILL BE CONTIGUOUS.  WHAT IS LEFT OVER DOESN'T HAVE TO BE.

13  BUT, AGAIN, THE DISTRICT IS ALREADY DRAWN.  WE ARE JUST LOOKING

14  WITHIN THAT DISTRICT WHAT IS THE MOST COMPACT POPULATION.

15  Q.  BUT AS WE SAW YESTERDAY, THERE CAN BE NONCONTIGUOUS SPACES

16  WITHIN YOUR ALGORITHM?

17  A.  WITHIN THE MOST COMPACT POPULATION THAT'S 50 PERCENT PLUS

18  ONE OF THE DISTRICT, YES, BUT THE DISTRICT IS ALREADY DRAWN,

19  AND IT'S CONTIGUOUS.

20  Q.  AND CHEN AND RODDEN HAD SPECIFIC STEPS IN THEIR ALGORITHM

21  TO ENSURE EQUAL POPULATION AND CONTIGUITY.  DO YOU RECALL THAT?

22  A.  THAT IS RIGHT.  FOR DRAWING THE FULL DISTRICT, THEY

23  ABSOLUTELY DO USE THOSE.

24  Q.  AND YOU DID NOT USE THOSE STEPS IN YOUR ALGORITHM,

25  CORRECT?

9:19AM    1    A.   THAT'S RIGHT, BECAUSE I'M NOT DRAWING DISTRICTS.

          2    Q.   I WOULD LIKE TO TURN TO YOUR PRIOR WORK AS AN EXPERT

          3    WITNESS OR AS AN EXPERT IN GENERAL.   SOME OF THESE THINGS WILL

          4    BE EXPERT WITNESSES AND NOT.   BUT YOU HAVE SERVED AS AN EXPERT

          5    WITNESS IN SECTION 2 VOTE DILUTION CASES IN THE PAST; IS THAT

          6    CORRECT?

          7    A.   THAT'S RIGHT.

          8    Q.   AND THE MOST PROMINENT MEASURES OF DISTRICT COMPACTNESS

          9    THAT YOU'RE AWARE OF ARE REOCK AND POLSBY-POPPER; IS THAT

         10    CORRECT?

         11    A.   ABSOLUTELY.

         12    Q.   AND YOU HAVE RUN THE REOCK MEASURE IN YOUR EXPERT

         13    REDISTRICTING WORK BEFORE, HAVEN'T YOU?

         14    A.   OH, YES.

         15    Q.   AND YOU HAVE RUN THE POLSBY-POPPER COMPACTNESS MEASURE IN

         16    YOUR EXPERT REDISTRICTING WORK BEFORE?

         17    A.   THAT'S RIGHT.

         18    Q.   AND I BELIEVE YESTERDAY YOU TESTIFIED TO YOUR WORK IN

         19    VIRGINIA.   DO YOU RECALL THAT?

         20    A.   YES.

         21    Q.   AND IN VIRGINIA, YOU USED REOCK AND POLSBY-POPPER?

         22    A.   YEAH, VIRGINIA HAS A SPECIFIC CONSTITUTIONAL REQUIREMENT

         23    THAT THE DISTRICTS WOULD BE COMPACT, AND I ABSOLUTELY AGREE

         24    THAT IF YOU ARE LOOKING AT THE COMPACTNESS OF THE DISTRICT,

         25    REOCK AND POLSBY-POPPER ARE THE PROPER TOOLS, BUT THAT IS

9:20AM   1   DISTINCT FROM POPULATION COMPACTNESS.

2   Q.   AND YOU WERE AWARE IN VIRGINIA THAT THE VOTING RIGHTS ACT

3   MIGHT BE TRIGGERED, GIVEN VIRGINIA'S POPULATION WHEN YOU WERE

4   DRAWING YOUR MAPS?

5   A.   THAT'S RIGHT.

6   Q.   AND I BELIEVE YOU TESTIFIED YESTERDAY THAT YOU DIDN'T DO

7   MOMENT OF INERTIA IN VIRGINIA BECAUSE YOU DIDN'T HAVE TIME TO

8   DO THAT.   IS THAT RIGHT?

9   A.   WELL, WE DIDN'T DO ANY *GINGLES* ANALYSIS IN VIRGINIA

10   BECAUSE WE DIDN'T HAVE TIME.   AND AS I THINK ABOUT IT, THAT

11   VIRGINIA WORK WAS DONE BEFORE I WOULD HAVE BECOME AWARE OF THE

12   MOMENT OF INERTIA ANALYSIS, BUT IT WOULDN'T HAVE MATTERED

13   BECAUSE WE DIDN'T DO A *GINGLES* STEP I, II OR III ANALYSIS.

14   Q.   IN ADDITION TO VIRGINIA, YOU SERVED AS AN EXPERT IN

15   ARIZONA; IS THAT CORRECT?

16   A.   THAT'S RIGHT.

17   Q.   AND IN ARIZONA, SECTION 2 COMPLIANCE WAS AT ISSUE; IS THAT

18   CORRECT?

19   A.   THAT'S RIGHT.

20   Q.   AND IN ARIZONA, YOU USED REOCK AND POLSBY-POPPER?

21   A.   YEAH, WE WERE LOOKING AT DISTRICT COMPACTNESS THERE.

22   Q.   YOU DID NOT USE MOMENT OF INERTIA IN ARIZONA?

23   A.   CORRECT.

24   Q.   AT THE TIME OF YOUR DEPOSITION, YOU TESTIFIED THAT YOU HAD

25   NOT USED MOMENT OF INERTIA NOT ONLY IN THESE TWO CASES THAT

9:21AM  1    WE'VE DISCUSSED WHERE YOU WERE AN OUTSIDE CONSULTING EXPERT BUT

        2    IN YOUR THREE SECTION 2 CASES WHERE YOU WERE RETAINED AS A

        3    TESTIFYING EXPERT.  DO YOU RECALL THAT?

        4    A.  OH, THAT'S RIGHT.

        5    Q.  AND ONE OF THOSE CASES YOU DISCUSSED YESTERDAY WAS

        6    MICHIGAN.  DO YOU RECALL THAT?

        7    A.  THAT'S RIGHT.  WE WERE ON THE PLAINTIFF'S SIDE IN

        8    MICHIGAN.

        9    Q.  AND THAT WAS A SECTION 2 CASE WHERE YOU WERE A *GINGLES*

       10    EXPERT FOR THE PLAINTIFFS?

       11    A.  THAT'S RIGHT.  AND IF YOU LOOK AT THE DISTRICTS IN

       12    MICHIGAN, JUST BECAUSE OF THE GEOGRAPHY OF MICHIGAN, THE BLACK

       13    POPULATION IN THOSE DISTRICTS PRETTY MUCH HAS TO BE COMPACT.

       14    BUT NO ONE CONTESTED POPULATION COMPACTNESS THERE, TO MY

       15    KNOWLEDGE.

       16    Q.  AND YOU RAN REOCK AND POLSBY-POPPER IN MICHIGAN, CORRECT?

       17    A.  THAT'S RIGHT.  IT WAS A -- IT WAS A SECTION 2 CASE, BUT IT

       18    WAS ALSO A 14TH AMENDMENT CASE, AND SO THE SHAPE OF THE

       19    DISTRICTS IS HIGHLY RELEVANT, IN MY EXPERIENCE, FOR 14TH

       20    AMENDMENT CLAIMS.

       21    Q.  YOU WERE RETAINED AS AN EXPERT IN THE CONGRESSIONAL CASES

       22    IN LOUISIANA KNOWN AS *GALMON* AND *ROBINSON*, CORRECT?

       23    A.  THAT'S RIGHT.

       24    Q.  AND YOU SUBMITTED A REPORT TO THE PLAINTIFFS IN THAT CASE,

       25    CORRECT?

9:23AM

1    A.   THAT'S RIGHT.

2    Q.   AND IN THAT REPORT, YOU USED REOCK AND POLSBY-POPPER?

3    A.   YES, BECAUSE IN THAT CASE, PART OF THE TESTIMONY OR REPORT

4    WAS THAT RACE PREDOMINATED IN THE DRAWING OF THAT REMEDIAL

5    DISTRICT, AND WE WANTED TO COMPARE THE DISTRICT SHAPE TO

6    DISTRICT SHAPES IN OTHER 14TH AMENDMENT CASES.  THAT WASN'T FOR

7    PURPOSES OF A SECTION 2 ANALYSIS.

8    Q.   YOU DID NOT RUN MOMENT OF INERTIA IN THE LOUISIANA

9    CONGRESSIONAL CASES, CORRECT?

10   A.   NO, THAT WAS A REMEDIAL MAP, NOT AN ILLUSTRATIVE MAP, TO

11   MY UNDERSTANDING.

12   Q.   FROM YOUR SECTION 2 WORK, YOU ARE NOT AWARE OF ANY CASE

13   WHERE THE MOMENT OF INERTIA HAS BEEN RUN IN *GINGLES* I?

14   A.   WELL, THAT'S RIGHT, BUT I'M NOT AWARE OF THE POPULATION --

15   POPULATION DISTRICT COMPACTNESS DISTINCTION BEING DRAWN EITHER.

16   I AGREE, FOR DISTRICT COMPACTNESS, YOU USE REOCK AND

17   POLSBY-POPPER, BUT I'M NOT AWARE OF ANY OTHER METRIC FOR

18   MEASURING POPULATION COMPACTNESS, AND AS FAR AS I KNOW, NONE

19   HAS BEEN SUGGESTED.

20   Q.   AND FROM YOUR SECTION 2 WORK, YOU ARE AWARE OF OTHER CASES

21   WHERE REOCK AND POLSBY-POPPER HAVE BEEN USED IN A *GINGLES* I

22   ANALYSIS, CORRECT?

23   A.   RIGHT.  AGAIN, TO MY EXPERIENCE, MOST OF THESE CASES HAVE

24   FOCUSED ON DISTRICT COMPACTNESS.  IT'S A DIFFERENT THEORY THAN

25   WHAT DEFENDANTS ARE CLAIMING HERE.  IF THE DEFENSE THEORY IS

9:24AM   1   WRONG, THEN IT'S WRONG, BUT IF IT'S RIGHT, THEN YOU HAVE TO

2   LOOK AT POPULATION COMPACTNESS.  I DON'T KNOW HOW ELSE YOU DO

3   IT, AND I'M NOT AWARE OF ANY SUGGESTION BEING MADE OF HOW ELSE

4   TO DO IT.

5   Q.  AND AT YOUR DEPOSITION, YOU STATED THAT THE MOMENT OF

6   INERTIA IS ONE OF THE OLDEST METHODS FOR ANALYZING COMPACTNESS

7   OF A POPULATION, YET IT STILL HAS NOT MADE AN APPEARANCE IN ANY

8   *GINGLES* I CASE OF WHICH YOU ARE AWARE?

9   A.  WELL, THAT'S RIGHT.

10   Q.  AND AT YOUR DEPOSITION, YOU ALSO SAID THAT THE LEGAL

11   THEORY BEING PROPOUNDED HERE ISN'T ONE THAT HAS BEEN EXPLORED,

12   RIGHT?

13   A.  AS FAR AS I KNOW, IT'S A DIFFERENT INTERPRETATION OF HOW

14   YOU MEASURE COMPACTNESS THAN I'VE ENCOUNTERED IN THE PAST.  IF

15   IT IS RIGHT, THIS IS HOW YOU DO IT.  IF IT'S NOT, WELL, THEN

16   YOU WOULD USE A REOCK AND POLSBY-POPPER FOR A DISTRICT

17   COMPACTNESS.

18   Q.  AND I BELIEVE IN YOUR REBUTTAL REPORT, YOU STATED THAT THE

19   TECHNOLOGY IS FAIRLY NEW TO DO MOMENT OF INERTIA AT THIS LEVEL;

20   IS THAT RIGHT?

21   A.  THAT'S RIGHT.  SO IF YOU GO BACK TO THOSE EARLY ALGORITHMS

22   IN THE '60S, THEY ARE TYPICALLY USING EITHER THEORETICAL OR

23   USING VERY SMALL NUMBER OF PRECINCTS.  IT WASN'T UNTIL THE LATE

24   '90S THAT COMPUTATIONAL POWER WAS STRONG ENOUGH TO RUN

25   REDISTRICTING SIMULATIONS ON WHOLE DISTRICTS.  SO IF YOU WANTED

9:26AM    1    TO DO THIS ON A DISTRICT IN THE '80S OR '90S, YOU JUST COULDN'T

          2    HAVE DONE IT.  PROBABLY COULD HAVE DONE IT IN THE 00S, AUGHTS,

          3    WHATEVER THEY ARE CALLED, BUT YOU WOULD HAVE HAD TO HAVE ACCESS

          4    TO PROBABLY A SUPER COMMUTER TO DO IT.  IT'S JUST IN THE LAST

          5    DECADE -- JUST TO PUT IT INTO PERSPECTIVE, I HAVE A PRETTY

          6    STATE-OF-THE-ART ALIENWARE COMPUTER, AND IT TAKES ABOUT HALF AN

          7    HOUR TO ANALYZE ONE OF THE SENATE DISTRICTS.  SO IT'S JUST

          8    BECOME PRACTICABLE IN THE LAST COUPLE OF DECADES.

          9    Q.  AT YOUR DEPOSITION, YOU TESTIFIED THAT EXPERTS HAD ACCESS

         10    TO COMPUTERS THAT COULD EFFICIENTLY CALCULATE THE MOMENT OF

         11    INERTIA IN THE WAYS IN WHICH WE ARE DISCUSSING IN THE LAST 20

         12    YEARS.  DO YOU RECALL THAT?

         13    A.  THAT'S RIGHT.  SO IF YOU WERE AN EXPERT WHO HAD ACCESS TO,

         14    SAY, A UNIVERSITY SUPER COMPUTER, YOU PROBABLY COULD HAVE DONE

         15    THE MOMENT OF INERTIA APPROACH, BUT AGAIN, FOR MUCH OF THE

         16    VOTING RIGHTS ACT EXISTENCE, THAT TECHNOLOGY JUST DIDN'T EXIST.

         17    Q.  OKAY.  DO YOU RECALL THAT I ASKED YOU AT YOUR DEPOSITION

         18    HOW RECENTLY THIS ANALYSIS COULD BE DONE, AND YOU -- AND I

         19    ASKED YOU SPECIFICALLY IF IT WAS THE LAST TEN YEARS, AND YOU

         20    ANSWERED NO, IT WOULD BE THE LAST 20 YEARS?

         21    A.  YEAH.

         22    Q.  OKAY.  SO I WOULD LIKE TO GO TO YOUR PRIOR WORK AS AN

         23    EXPERT.  I BELIEVE YOU AND MR. STRACH SPOKE ABOUT THE ONE

         24    INSTANCE IN WHICH YOU WERE EXCLUDED.  DO YOU RECALL THAT?

         25    A.  YES.

9:28AM   1   Q.   DO YOU RECALL WHETHER COURTS HAVE FOUND YOUR OPINION

2   UNPERSUASIVE?

3   A.   OH, I KNOW AT TIMES THEY HAVE.

4   Q.   DID YOU RENDER OPINION IN MARYLAND ON COMPACTNESS?

5   A.   THE MARYLAND GERRYMANDERING CASE?

6   Q.   YES, SIR.

7   A.   YES.

8   Q.   OKAY.  AND DO YOU KNOW WHETHER THE MARYLAND SUPREME COURT

9   AFFORDED ANY WEIGHT TO YOUR COMPACTNESS OPINION?

10   A.   OH, THAT WAS THE -- YEAH, THAT WAS DISTRICT COMPACTNESS IN

11   THE STATE LEGISLATIVE CASE, AND THEY DID NOT.  IT WAS THE

12   CONGRESSIONAL CASE THAT THE JUDGE DID.

13   Q.   AND YOU WOULDN'T BE SURPRISED IF THE MARYLAND SUPREME

14   COURT FOUND YOUR NUMBER CRUNCHING HAD THE APPEARANCE OF RIGOR

15   BUT CONTRIBUTED LITTLE?

16   A.   I WOULD NOT BE SURPRISED.

17   Q.   AND YOU WOULD NOT BE SURPRISED THAT THE MARYLAND SUPREME

18   COURT FOUND YOUR ANALYSIS OF A SUPERFICIAL QUALITY?

19   A.   I WOULD NOT BE SURPRISED.

20   Q.   AND YOU WOULD NOT BE SURPRISED IF THE MARYLAND SUPREME

21   COURT FOUND YOUR ANALYSIS NOT INSTRUCTIVE ON THE ISSUES BEFORE

22   THE COURT?

23   A.   CORRECT.

24   Q.   HAVE YOU ALSO RECENTLY GIVEN TESTIMONY IN A CASE BEFORE

25   THE U.S. DISTRICT COURT IN SOUTH CAROLINA?

9:29AM  1    A.   THAT'S RIGHT.

2    Q.   DO YOU KNOW WHETHER THAT COURT FOUND YOUR WORK PERSUASIVE?

3    A.   THEY DID NOT.   THAT'S THE CASE THAT'S UNDER APPEAL TO THE

4    SUPREME COURT RIGHT NOW.

5            **MS. THOMAS:**  LET ME JUST CONFER WITH MY CO-COUNSEL

6    FOR A MINUTE.   I CAN TENDER THE WITNESS.

7            **THE COURT:**  ANY REDIRECT?

8            **MR. STRACH:**  NO REDIRECT, YOUR HONOR.

9            **THE COURT:**  YOU MAY STEP DOWN, SIR.   NEXT WITNESS.

10            **MR. LEWIS:**  SORRY, YOUR HONOR.   WE ARE JUST CHANGING

11    SEATS.   YOUR HONOR, PATRICK LEWIS FOR THE LEGISLATIVE

12    DEFENDANTS.   THE DEFENDANTS CALL DR. DOUGLAS JOHNSON TO THE

13    STAND.

14        **(OATH ADMINISTERED.)**

15            **THE CLERK:**  IF YOU WOULD, SIR, PLEASE STATE YOUR NAME

16    AND SPELL IT FOR THE RECORD.

17            **THE WITNESS:**  DOUGLAS JOHNSON, D-O-U-G-L-A-S,

18    J-O-H-N-S-O-N.

19            **MR. LEWIS:**  YOUR HONOR, MAY I APPROACH THE WITNESS

20    WITH A BINDER CONTAINING HIS TWO REPORTS AND CV?

21            **THE COURT:**  YOU MAY.

22                **DR. DOUGLAS JOHNSON,**

23    **HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

24                **DIRECT EXAMINATION**

25    **BY MR. LEWIS:**

9:31AM   1     Q.   OKAY.  GOOD MORNING, DR. JOHNSON.

         2     A.   GOOD MORNING.

         3     Q.   DR. JOHNSON, I WOULD LIKE TO CALL UP THE DEFENSE EXHIBIT

         4     57 -- OR EXCUSE ME, 59.  IF YOU WILL PLEASE TURN TO THE TAB IN

         5     YOUR BINDER.  IS THIS YOUR RESUMÉ, DR. JOHNSON?

         6     A.   YES.

         7     Q.   OKAY.  AND CAN YOU DESCRIBE FOR THE COURT YOUR EDUCATIONAL

         8     BACKGROUND?

         9     A.   I HAVE A BACHELOR'S IN GOVERNMENT FROM CLAREMONT MCKENNA

        10     COLLEGE.  AT CLAREMONT, GOVERNMENT IS WHAT THEY CALL POLITICAL

        11     SCIENCE.  I HAVE A MASTER'S, AN M.B.A. FROM THE UC LOS ANGELES

        12     ANDERSON SCHOOL OF BUSINESS, AND A PH.D. IN POLITICAL SCIENCE

        13     FROM THE CLAREMONT GRADUATE UNIVERSITY.

        14     Q.   OKAY.  AND DID YOU STUDY REDISTRICTING ISSUES IN YOUR

        15     ACADEMIC WORK?

        16     A.   YES, BOTH MY UNDERGRADUATE SENIOR THESIS AND MY PH.D.

        17     DISSERTATION WERE SPECIFICALLY ON REDISTRICTING, AND I WROTE

        18     MANY OTHER PAPERS AS WELL.

        19     Q.   AND DO YOU HAVE ANY -- I SEE IN YOUR RESUMÉ A REFERENCE TO

        20     BEING A FELLOW AT THE ROSE INSTITUTE FOR STATE AND LOCAL

        21     GOVERNMENT AT CLAREMONT MCKENNA COLLEGE.  CAN YOU EXPLAIN WHAT

        22     THAT IS?

        23     A.   YES, IT IS A RESEARCH INSTITUTE.  WE ACTUALLY JUST

        24     CELEBRATED OUR 50-YEAR ANNIVERSARY AT CMC THAT WAS FOUNDED TO

        25     FOCUS ON STATE AND LOCAL ISSUES, IN PARTICULAR REDISTRICTING

9:33AM   1   AND DEMOGRAPHICS, AND HAS DONE EXTENSIVE RESEARCH AND ORGANIZED

2   CONFERENCES AND THINGS LIKE THAT SINCE THE '70S ON THIS TOPIC.

3   Q.   ALL RIGHT.   AND DR. JOHNSON, WHERE ARE YOU CURRENTLY

4   EMPLOYED?

5   A.   I AM PRESIDENT OF MY OWN FIRM, NATIONAL DEMOGRAPHICS

6   CORPORATION.

7   Q.   OKAY.   AND HOW LONG HAVE YOU BEEN EMPLOYED BY NATIONAL

8   DEMOGRAPHICS CORPORATION?

9   A.   I ACTUALLY STARTED -- THE COMPANY WAS STARTED BY TWO OF MY

10   PROFESSORS, SO I STARTED AS AN UNDERGRAD BACK IN THE '80S, LATE

11   '80S, WORKED FOR THEM IN THE 1991 REDISTRICTING CYCLE, AND THEN

12   LEFT AND WENT OFF AND DID OTHER THINGS, AND THEN CAME BACK IN

13   2001, STARTED WORKING FOR THEM, AND THEN I TOOK OVER THE

14   COMPANY IN 2006.   SO I STARTED IN THE 1991 REDISTRICTING CYCLE,

15   CAME BACK AND HAVE BEEN THERE CONTINUOUSLY SINCE 2001.

16   Q.   AND WHAT BUSINESSES IS NATIONAL DEMOGRAPHICS CORPORATION

17   ENGAGED IN?

18   A.   WE DO DISTRICTING AND REDISTRICTING WORK ESSENTIALLY

19   FULL-TIME.

20   Q.   SO HOW LONG WOULD YOU SAY YOU HAVE WORKED PROFESSIONALLY

21   IN THE REDISTRICTING FIELD?

22   A.   WELL, IN REDISTRICTING, WE TEND TO THINK IN CYCLES, THE

23   1991 CYCLE, 2001 CYCLE, 2011, 2021.   SO SINCE THE 1991 CYCLE,

24   WITH A MID-DECADE BREAK IN THE '90S.

25   Q.   OKAY.   AND HAVE YOU PUBLISHED ON REDISTRICTING?

9:34AM

1    A.   YES.

2    Q.   OKAY.  AND ARE SOME OF YOUR PUBLICATIONS LISTED ON YOUR

3    CV?

4    A.   YES, INDEED.

5    Q.   AND HAVE YOU PUBLISHED ON ISSUES OF VOTING RIGHTS?

6    A.   IN THE CONTEXT OF DEMOGRAPHICS AND REDISTRICTING, YES.

7    Q.   AND HAVE YOU SPOKEN AT PROFESSIONAL CONFERENCES ON

8    REDISTRICTING?

9    A.   YES, MANY TIMES.

10   Q.   CAN YOU GIVE ME A FEW EXAMPLES OF CONFERENCES YOU SPOKE

11   AT?

12   A.   AT A NUMBER OF NATIONAL CONFERENCES OF STATE LEGISLATURE,

13   GENERAL MEETINGS AND SPECIFIC SEMINAR SESSIONS AT NCSL

14   ORGANIZED ON REDISTRICTING, FOR THE ARIZONA LEAGUE OF CITIES

15   AND TOWNS, FOR THE CALIFORNIA LEAGUE OF CITIES.  I'M ACTUALLY

16   SPEAKING NEXT WEEK AT THE CALIFORNIA ASSOCIATION OF CITY

17   CLERKS, A NEW LAW CONFERENCE.  I'VE SPOKEN TO THE CALIFORNIA

18   SCHOOL BOARD ASSOCIATION, MANY, MANY DIFFERENT ORGANIZATIONS

19   WHOSE JURISDICTIONS HAVE TO GO THROUGH DISTRICTING AND

20   REDISTRICTING ISSUES.

21   Q.   AND HAVE YOU PREPARED, IN THE COURSE OF YOUR PROFESSIONAL

22   WORK, DISTRICTING PLANS TO BE ADOPTED BY REDISTRICTING

23   AUTHORITIES?

24   A.   YES.

25   Q.   APPROXIMATELY HOW MANY HAVE YOU PREPARED?

DR. D. JOHNSON - DIRECT

9:36AM

1    A.  I THINK WE ARE NOW AT RIGHT AROUND 500 PROJECTS THAT I'VE

2    EITHER OVERSEEN OR DIRECTLY RUN, AND I'VE DRAWN IN THE COURSE

3    OF THAT THOUSANDS OF MAPS.

4    Q.  ALL RIGHT.  AND DO YOU USE ANY COMPUTER SOFTWARE IN YOUR

5    REDISTRICTING WORK?

6    A.  YES.

7    Q.  OKAY.  AND WHAT IS THAT SOFTWARE?

8    A.  PRIMARILY MAPTITUDE FOR REDISTRICTING.

9    Q.  AND HOW MUCH EXPERIENCE DO YOU HAVE WORKING WITH

10   MAPTITUDE?

11   A.  I'VE WORKED WITH IT ALMOST EVERY SINGLE DAY FOR THE LAST

12   22 YEARS, PLUS BACK IN -- WITH EARLIER VERSIONS OF A SIMILAR

13   SOFTWARE BACK IN 1991.

14   Q.  OKAY.  AND DR. JOHNSON, HAVE YOU SERVED AS AN EXPERT

15   WITNESS IN REDISTRICTING LITIGATION?

16   A.  YES.

17   Q.  IN APPROXIMATELY HOW MANY CASES?

18   A.  OH, AROUND A DOZEN OR SO.

19   Q.  OKAY.  AND HAVE YOU EVER BEEN EXCLUDED AS A WITNESS?

20   A.  NO.

21   Q.  AND HAVE YOU HAD A CASE WHERE YOU'VE HAD A PORTION OF

22   YOUR -- OF AN EXPERT REPORT YOU DRAFTED EXCLUDED?

23   A.  YES.

24   Q.  OKAY.  AND CAN YOU TELL THE COURT JUST A LITTLE BIT ABOUT

25   THAT?

DR. D. JOHNSON - DIRECT

9:37AM

1    A.   SURE.   IN *COMMON CAUSE V. LEWIS* IN NORTH CAROLINA, I HAD

2    SEVEN -- I THINK IT WAS SEVEN TOPICS THAT I WROTE ABOUT.   IN

3    ONE OF THEM, WHEN I DID THE PROGRAMMING TO DO THE CALCULATIONS,

4    I PROGRAMMED IT WRONG, AND THAT WAS NOT SHARED WITH ME UNTIL I

5    WAS SITTING HERE IN THIS CHAIR, AND IT WAS BROUGHT UP IN THE

6    COURT.   IT WASN'T MENTIONED AHEAD OF TIME.   OBVIOUSLY, I WOULD

7    HAVE FIXED IT HAD SOMEONE MENTIONED IT AHEAD OF TIME.   BUT THAT

8    PIECE WAS EXCLUDED.

9        THERE WAS A MOTION TO EXCLUDE MY WHOLE REPORT BECAUSE I

10   HAD ERRED, AND THE COURT RULED AGAINST THAT MOTION SAYING THAT

11   THE ONLY PROBLEM WAS WITH THAT ONE SECTION.

12   Q.   OKAY.  ALL RIGHT.  AND HAVE ANY OF YOUR CASES INVOLVED --

13   ANY OF YOUR PRIOR CASES INVOLVED THE VOTING RIGHTS ACT?

14   A.   YES.

15   Q.   AND I BELIEVE SOME OF YOUR CASES ALSO INVOLVED THE

16   CALIFORNIA VOTING RIGHTS ACT; IS THAT RIGHT?

17   A.   YES.

18   Q.   OKAY.

19       **MR. LEWIS:**  YOUR HONOR, AT THIS TIME, WE WOULD MOVE

20   THE ADMISSION OF DR. JOHNSON AS AN EXPERT IN THE FIELDS OF

21   POLITICAL SCIENCE, POLITICAL GEOGRAPHY, REDISTRICTING, AND THE

22   MAPTITUDE SOFTWARE.

23       **THE COURT:**  ANY OBJECTIONS?

24       **MS. KEENAN:**  WE DON'T HAVE ANY OBJECTIONS TO THE

25   QUALIFICATIONS AS HE HAS JUST DESCRIBED THEM.

9:38AM   1            **THE COURT:**  POLITICAL SCIENCE, REDISTRICTING,

2   POLITICAL SCIENCE GEOGRAPHY?  IS THAT IT?

3            **MR. LEWIS:**  POLITICAL GEOGRAPHY, YOUR HONOR.

4            **THE COURT:**  POLITICAL GEOGRAPHY.  AND THE MAPTITUDE

5   SOFTWARE.  DR. JOHNSON WILL BE PERMITTED TO GIVE OPINION

6   TESTIMONY IN THOSE FIELDS.

7            **MR. LEWIS:**  THANK YOU, YOUR HONOR.

8            **THE COURT:**  I SHOULD SAY IN THOSE SUBJECTS.  I'M NOT

9   SURE.  YOU KNOW, SOME OF THEM ARE FIELDS.  SOME OF THEM ARE

10  SUBJECTS.  THERE YOU GO.

11           **MR. LEWIS:**  THANK YOU, YOUR HONOR.

12  **BY MR. LEWIS:**

13   Q.  I WOULD LIKE NOW TO TURN TO --

14           **MR. LEWIS:**  I GUESS JUST AS A HOUSEKEEPING MATTER, AT

15  THIS POINT, YOUR HONOR, WE HAVE A STIPULATION -- BY STIPULATION

16  OF COUNSEL, WE WOULD LIKE TO MOVE THE ADMISSION OF THE TWO

17  EXPERT REPORTS HE HAS WRITTEN, LDTX51, LDTX58, AND THEN THE CV,

18  WHICH IS LDTX 59.

19           **MS. KEENAN:**  YOUR HONOR, MAY I BE HEARD ABOUT THE

20  TREATMENT OF THE REPORT BRIEFLY?

21           **THE COURT:**  YOU MAY.

22           **MS. KEENAN:**  SO AS WE'VE STATED, WE ARE NOT OBJECTING

23  TO DR. JOHNSON'S QUALIFICATIONS AS DESCRIBED HERE, BUT AFTER

24  THE PARTIES REACHED THEIR STIPULATIONS ABOUT ADMITTING ALL OF

25  THE REPORTS, THIS COURT DID ISSUE A RULING ON PLAINTIFFS'

9:39AM   1   *DAUBERT* MOTION THAT EXCLUDED SIGNIFICANT PORTIONS OF DR.

2   JOHNSON'S TESTIMONY AND OPINIONS.  BECAUSE WE UNDERSTAND THAT

3   YOUR HONOR KNOWS WHICH PARTS OF THE OPINIONS THAT THE COURT HAS

4   EXCLUDED, PLAINTIFFS WOULD BE CONTENT WITH A LIMITING

5   INSTRUCTION THAT THE OPINIONS CONTAINED WITHIN THE REPORT CAN

6   BE ADMITTED TO THE EXTENT THAT THEY ARE CONSISTENT WITH YOUR

7   COURT'S ORDER, EXCLUDING CERTAIN TESTIMONY AND OPINIONS, BUT WE

8   WANT TO MAKE SURE WE PRESERVE OUR OBJECTION TO THE EXCLUDED

9   OPINIONS FOR THE RECORD.

10          **THE COURT:**  MR. LEWIS?

11          **MR. LEWIS:**  YOUR HONOR, I THINK AS WE GO THROUGH THE

12   DIRECT EXAMINATION OF THIS WITNESS, A FEW COMMENTS.  I THINK,

13   FIRST OF ALL, WE DO UNDERSTAND THE COURT'S RULING.  I THINK WE

14   WOULD WANT TO -- TO THE EXTENT THAT THERE ARE QUESTIONS THAT HE

15   IS NOT ALLOWED TO TESTIFY TO, WE WOULD WANT THE REPORT TO SERVE

16   AS A PROFFER UNDER RULE 103.  AND OTHERWISE, I THINK THE

17   LIMITING INSTRUCTION IS FINE.

18       AS TO, FOR EXAMPLE, THE QUESTION ABOUT THE SUBJECTIVE

19   BELIEFS OR INTENTS OF MR. COOPER, WE WOULD SEEK RECONSIDERATION

20   OF THE COURT'S EXCLUSION OF DR. JOHNSON'S ANALYSIS AND THE

21   CHANGES BETWEEN MR. COOPER'S 2022 AND 2023 ILLUSTRATIVE PLANS.

22   I DON'T KNOW IF IT'S APPROPRIATE TO ARGUE THAT NOW OR WHEN IT

23   COMES UP IN THIS QUESTIONING, AS PLAINTIFFS HAVE ELICITED ON

24   DIRECT EXAMINATION TESTIMONY FROM MR. COOPER ABOUT THE NATURE,

25   EXTENT AND REASONING, PURPORTED REASONING FOR THOSE CHANGES.

9:41AM   1   SO THEY HAVE PLACED THE RELEVANCE OF THOSE CHANGES INTO

2   QUESTION.

3        I BELIEVE THERE IS ALSO -- AND FINALLY, YOUR HONOR, I KNOW

4   THERE WAS A PORTION OF DR. JOHNSON'S REPORT CONCERNING THE

5   ERROR IN THE MAP, THE ORIGINAL ENACTED MAP THAT MR. COOPER

6   ANALYZED, BUT IN LIGHT OF MR. COOPER'S ADMISSION ON THE STAND,

7   I THINK WE WOULD JUST PROFFER HIS REPORT, PROFFER THOSE

8   OPINIONS FOR THE REPORT BUT NOT QUESTION HIM.

9        **THE COURT:**  GO AHEAD AND RESPOND.

10        **MS. KEENAN:**  SO, YOUR HONOR, WE DON'T HAVE ANY

11   OBJECTION TO THE PROFFER MECHANISM THAT WE DISCUSSED AT THE

12   PRETRIAL CONFERENCE.  WE UNDERSTAND THAT THEY HAVE THE RIGHT TO

13   PRESERVE THAT FOR APPEAL.  SO AS LONG AS WE ARE ADMITTING THE

14   REPORTING WITH THE LIMITING INSTRUCTION WE HAVE DESCRIBED ABOUT

15   THE OPINIONS YOU'VE EXCLUDED.  BUT AS FOR THE MOTION FOR

16   RECONSIDERATION, I GUESS -- DOES YOUR HONOR INTEND TO PERMIT

17   ARGUMENT ON THAT, OR SHOULD I RESPOND TO THAT ISSUE?

18        **THE COURT:**  NO, THE MOTION FOR RECONSIDERATION IS

19   DENIED.  WITH RESPECT TO THE PROFFER, I MEAN, THIS, QUOTE,

20   LIMITING INSTRUCTION WOULD MAKE SOME SENSE IF THIS WAS A JURY,

21   BUT IT DOESN'T MAKE A WHOLE LOT OF SENSE TO ME.  I'M SUPPOSED

22   TO GIVE MYSELF A LIMITING INSTRUCTION, OR I'M SUPPOSED TO GIVE

23   THE COURT OF APPEAL A LIMITING INSTRUCTION?  I'M THINKING THE

24   COURT OF APPEAL IS NOT GOING TO TAKE TOO KINDLY TO ME GIVING

25   THEM A LIMITING INSTRUCTION.  SO I DON'T KNOW HOW MECHANICALLY

9:42AM    1   YOU WANT TO WORK THIS OUT.

          2          **MS. KEENAN:**  SURE, YOUR HONOR.  I GUESS IT'S JUST

          3   THAT WE DON'T THINK WE NEED TO MOVE TO EXCLUDE EACH INDIVIDUAL

          4   PARAGRAPH OF THE REPORT THAT CONTAINS AN OPINION THAT YOU HAVE

          5   EXCLUDED.  WE CAN, IF YOUR HONOR WOULD LIKE, BUT WE THOUGHT IT

          6   MIGHT BE EASIER TO CONSTRUCTIVELY ADMIT THE PORTIONS OF THE

          7   REPORT THAT ARE CONSISTENT WITH YOUR HONOR'S OPINION AND NOT TO

          8   ADMIT THE PORTIONS THAT ARE INCONSISTENT.  THAT'S THE OPTION --

          9          **THE COURT:**  I THINK THE BEST WAY TO DO THIS, FRANKLY,

         10   FOR THE RECORD -- I'M JUST TRYING TO THINK ABOUT IF I'M LOOKING

         11   AT A COLD RECORD, WHAT WOULD MAKE SENSE TO ME.  THE MOTION IN

         12   LIMINE IS -- YOUR MOTION FOR RECONSIDERATION IS DENIED, SO THE

         13   MOTION IN LIMINE IS WHAT IT IS, AND THE RULING ON THE MOTION IN

         14   LIMINE IS WHAT IT IS.

         15          I WILL ADMIT THE REPORTS.  HOWEVER, WHAT I WANT YOU TO DO

         16   IS TAKE OUT THOSE PORTIONS OF THE REPORT THAT ARE AFFECTED BY

         17   THE MOTION IN LIMINE, THAT WOULD BE EXCLUDED BY THE MOTION IN

         18   LIMINE, AND EXCISE THOSE AND PRODUCE THEM AS A SEPARATE

         19   PROFFER.  AND THAT WAY THE COURT -- YOU ARE DOING THE WORK FOR

         20   THE COURT OF APPEAL, AND SOMEBODY LATER DOESN'T HAVE TO TRY TO

         21   FIGURE OUT, WELL, WHAT -- YOU KNOW, WHAT IS WHAT.  I THINK YOU

         22   NEED TO SEPARATE OUT YOUR PROFFER.

         23          **MR. LEWIS:**  OKAY.  YOUR HONOR, WE ARE HAPPY TO DO

         24   THAT.  OBVIOUSLY --

         25          **THE COURT:**  I KNOW YOU ARE NOT PREPARED TO DO THAT

9:43AM   1    NOW.  I'M GOING TO LET YOU DO IT.

2              **MR. LEWIS:**  I APPRECIATE THAT, YOUR HONOR.  AND I

3        THINK THAT HOPEFULLY THE DIRECT EXAMINATION OF THIS WITNESS

4        WILL AID THE COURT IN ASSESSING AND CERTAINLY WILL AID THE

5        PARTIES IN ASSESSING EXACTLY WHAT IN THE REPORT WOULD BE

6        SUBJECT TO EXCISEMENT.

7             AS YOUR HONOR HAS INDICATED, I THINK THE TWO PIECES ABOUT

8        THE COMPARISON BETWEEN THE ILLUSTRATIVE PLANS AND -- THAT IS

9        FAIRLY OBVIOUS.  THERE'S A VERY DEFINED PARAGRAPH RANGE.  I

10       THINK THE FIRST TOPIC REGARDING, YOU KNOW, OPINIONS OF MOTIVE

11       OR INTENT, I THINK THAT IS GOING TO BE A FUNCTION OF POSSIBLY

12       SPECIFIC PARAGRAPHS OR SPECIFIC PHRASES, WORDS OR SENTENCES --

13             **THE COURT:**  I MEAN, I THINK WITH RESPECT TO THE

14       SUBJECTIVE INTENT TESTIMONY OR PROPOSED TESTIMONY, YOU ARE

15       GOING TO NEED TO PRESERVE THAT BY OBJECTION, AND I WILL RULE ON

16       THE OBJECTIONS AS THEY COME, BECAUSE THIS IS DYNAMIC.  I DON'T

17       KNOW HOW THIS EVIDENCE IS GOING TO DEVELOP.  I MEAN, THERE MAY

18       BE SOME OF IT THAT YOU ARE SUCCESSFUL WITH.  I DON'T KNOW.  SO

19       LET'S JUST GO FROM THERE.

20             BUT AS TO THE ADMISSION OF THE EXHIBITS, 79, WHICH IS THE

21       CV, IS ADMITTED.  51 AND 58 WILL BE ADMITTED WITH REDACTIONS,

22       AND THEN YOU CAN MAKE A PROFFER OF WHATEVER IS REDACTED.

23             **MR. LEWIS:**  THANK YOU, YOUR HONOR.

24             **THE COURT:**  OKAY.

25             **THE CLERK:**  59.

9:45AM   1                 **THE COURT:**  OH, 51 AND 59?  I'M SORRY.

2                 **THE CLERK:**  51 AND 58 WITH THE REDACTIONS, AND 59 WAS

3     THE CV.

4                 **THE COURT:**  OH, I THOUGHT IT WAS 79.  I'M SORRY.

5     OKAY.  SO WHERE I SAID -- I WROTE DOWN 79 BOTH TIMES.

6         OKAY.  59 IS ADMITTED.  51 AND 58 WILL BE ADMITTED WITH

7     REDACTIONS AND SUBJECT TO DEFENSE COUNSEL'S PERMISSION TO

8     SUBSTITUTE OR TO FILE NEW RECORDS OR NEW EXHIBITS AS A PROFFER.

9                 **MR. LEWIS:**  THANK YOU, YOUR HONOR.  SO IF WE CAN NOW

10    DISPLAY DEFENDANT'S EXHIBIT 51.

11    **BY MR. LEWIS:**

12    Q.  AND DR. JOHNSON, CAN YOU IDENTIFY THIS DOCUMENT FOR THE

13    RECORD?

14    A.  YES.  THIS IS MY INITIAL REPORT.

15    Q.  ALL RIGHT.  THANK YOU.  AND SO I WOULD LIKE TO START, I

16    THINK -- AND WE WILL SKIP AROUND A LITTLE BIT IN THIS REPORT,

17    AND MY APOLOGIES IN ADVANCE FOR THAT, BUT YOU OFFER IN THIS

18    REPORT OPINIONS ON A NUMBER OF TOPICS, AND I WOULD LIKE TO

19    START WITH SOME ANALYSIS YOU PERFORMED ON SOME GENERAL

20    POPULATION DEMOGRAPHICS IN LOUISIANA.

21        DID YOU REVIEW MR. COOPER'S CLAIMS ABOUT CHANGES IN BLACK

22    POPULATION IN LOUISIANA FROM 2000 TO PRESENT?

23    A.  YES.

24    Q.  OKAY.  AND DID YOU REVIEW MR. COOPER'S CLAIMS ABOUT

25    CHANGES IN THE NUMBER OF MAJORITY BLACK DISTRICTS IN THE

9:46AM   1   LOUISIANA HOUSE AND SENATE FROM 2000 TO PRESENT?

         2   A.  YES.

         3   Q.  OKAY.  I WOULD LIKE TO TURN TO PAGE 11 OF THIS REPORT,

         4   LDTX51.  AND IF WE COULD HIGHLIGHT FIGURE 5 APPEARING ON THAT

         5   PAGE.  DR. JOHNSON, CAN YOU WALK US THROUGH THIS FIGURE?  WHAT

         6   IS THIS SHOWING US?

         7   A.  SURE.  THIS IS A SUMMARY OF INFORMATION MR. COOPER HAD IN

         8   HIS REPORT LOOKING AT THREE DIFFERENT VARIABLES, EACH LISTED ON

         9   THE LEFT-HAND SIDE OF THE CHART:  THE BLACK PERCENTAGE OF

        10   VOTING AGE POPULATION, THE PERCENTAGE OF HOUSE DISTRICTS THAT

        11   ARE MAJORITY BLACK, AND THE PERCENTAGE OF SENATE DISTRICTS THAT

        12   ARE MAJORITY BLACK.  AND THEN YOU CAN SEE THAT THE MIDDLE

        13   COLUMN IS THE 2000 DATA FOR EACH OF THOSE CATEGORIES, AND THEN

        14   THE RIGHT-HAND COLUMN IS THE 2020/2022 PERCENTAGES, SO LOOKING

        15   AT THE 2020 CENSUS DATA AND THE 2022 MAP.

        16   Q.  ALL RIGHT.  AND JUST FOR THE CLARITY OF THE RECORD, WHEN

        17   YOU DESCRIBE BLACK PERCENTAGE OF VOTING AGE POPULATION, WHAT

        18   METHOD OF -- LIKE, WHAT VERSION OF BLACK VOTING AGE POPULATION

        19   ARE YOU USING?

        20   A.  AS DID MR. COOPER, I'M USING ANY PART BLACK, SO IT'S BLACK

        21   AP VAP, ANY PART BLACK VOTING AGE POPULATION.

        22   Q.  AND SO YOU HAVE A PERCENTAGE INCREASE IN THIS RIGHT-HAND

        23   COLUMN FOR THE PERCENTAGE BLACK VOTING AGE POPULATION.  WHAT IS

        24   THAT -- WHAT IS THAT VALUE AND WHAT IS IT TELLING US?

        25       WE WILL START WITH ONE QUESTION.  WHAT IS THE INCREASE IN

9:48AM   1   BLACK VOTING AGE POPULATION FROM 2000 TO 2020?

2   A.   SO 2020, THE BLACK VAP PERCENTAGE HAD INCREASED TO 31.25

3   PERCENT, WHICH WAS A 1.3 PERCENT INCREASE FROM ITS 2000 VALUE.

4   Q.   OKAY.  AND IF WE LOOK AT THE PERCENTAGE OF MAJORITY OF

5   BLACK DISTRICTS IN THE LOUISIANA HOUSE, HOW HAS THAT NUMBER

6   CHANGED FROM 2000 TO 2022?

7   A.   IN 2000, THERE WERE 26 MAJORITY BLACK HOUSE SEATS.  AND IN

8   THE 2022 MAP, THERE ARE 29, WHICH IS A 2.8 PERCENT INCREASE.  I

9   DID NOTE MR. COOPER HAS OBJECTED THAT RATHER THAN THE MAP IN

10   PLACE IN 2000, HE MEANT THE 2001 MAP, IN WHICH CASE THE 26

11   WOULD BECOME 27.  THE INCREASE IN THAT CASE WOULD BE

12   1.9 PERCENT RATHER THAN 2.8 PERCENT.

13   Q.   ALL RIGHT.  AND THEN JUST FOR THAT BOTTOM ROW, HOW HAVE

14   THE PERCENTAGE OF MAJORITY BLACK SEATS IN THE SENATE CHANGED

15   FROM 2000 TO 2022?

16   A.   IT HAS INCREASED FROM -- THERE WERE 10 MAJORITY BLACK

17   SENATE SEATS IN 2000, AND THERE ARE 11 IN THE ENACTED MAP.  SO

18   THAT'S A 2.6 PERCENT INCREASE.

19   Q.   OKAY.  AND DR. JOHNSON, WHAT CONCLUSION DO YOU DRAW FROM

20   THIS ANALYSIS?

21   A.   THE NUMBER OF MAJORITY BLACK HOUSE AND SENATE SEATS HAS

22   INCREASED FROM 2000 AND FROM 2021 TO 2022 BY SIGNIFICANTLY MORE

23   THAN THE INCREASE IN BLACK POPULATION.  THE NUMBER OF SENATE

24   SEATS HAS GROWN TWICE AS FAST AS THE BLACK PERCENTAGE OF THE

25   STATE'S POPULATION.

9:50AM   1         AND DEPENDING ON WHETHER WE ARE TALKING ABOUT THE 2000 OR

         2    THE 2021 MAP AS THE STARTING POINT, THE MAJORITY BLACK

         3    PERCENTAGE OF HOUSE SEATS HAS EITHER GROWN 50 PERCENT FASTER OR

         4    TWICE AS FAST AS THE BLACK PERCENTAGE OF VOTING AGE POPULATION

         5    HAS INCREASED.

         6    Q.   ALL RIGHT.  WE CAN -- SO I WOULD LIKE -- SO I WOULD LIKE

         7    NOW TO TURN TO YOUR EVALUATION OF MR. COOPER'S 2023

         8    ILLUSTRATIVE PLAN IN THIS CASE.

         9         DR. JOHNSON, WHEN YOU BEGAN YOUR EVALUATION OF

        10    MR. COOPER'S ILLUSTRATIVE PLANS, WHAT CRITERIA DID YOU DECIDE

        11    TO USE IN YOUR EVALUATION?

        12    A.   I WAS EVALUATING THE CRITERIA THAT MR. COOPER CITED IN HIS

        13    REPORT, SO MY GOAL WAS TO LOOK AT HIS STATED REASONS FOR WHERE

        14    LINES WERE DRAWN, WHERE THEY SHOWED UP IN HIS MAP, AND TO

        15    REVIEW WHETHER THOSE ACTUALLY EXPLAINED WHERE THOSE LINES WERE

        16    DRAWN, IF HIS WORDS MATCHED HIS MAP.

        17    Q.   AND DID YOU ALSO EVALUATE THE DATA PRODUCED BY MR. COOPER

        18    IN CONNECTION WITH HIS REPORTS AS PART OF THAT EVALUATION?

        19    A.   YES.

        20    Q.   AND WHAT ARE SOME OF THE CRITERIA THAT YOU UTILIZED WHEN

        21    EVALUATING MR. COOPER'S ILLUSTRATIVE PLANS?

        22    A.   SO MR. COOPER TALKED ABOUT BOTH THE JOINT RULE --

        23    LOUISIANA JOINT RULE LIST OF CRITERIA AND TRADITIONAL

        24    REDISTRICTING PRINCIPLES.  AS HE SPELLED THEM OUT, THEY'RE

        25    FOLLOWING VTD'S, EQUAL POPULATION OBVIOUSLY BEING CONTIGUOUS,

9:52AM    1    BEING COMPACT, AND THEN LOOKING AT COMMUNITIES OF INTEREST,

2    WHICH SOMETIMES HE REFERRED TO GENERALLY AND SOMETIMES HE

3    CALLED OUT PARISHES AND CITY BORDERS AND THINGS LIKE THAT AS

4    SPECIFIC COMMUNITIES.  AND THEN HE ALSO MENTIONED HIS KIND OF

5    SUPER COMMUNITIES THAT WERE MUCH LARGER REGIONAL AREAS.

6    Q.   OKAY.  AND I BELIEVE WHEN YOU REFER TO SUPER REGIONS, ARE

7    THOSE, FOR EXAMPLE, SOME OF THE CULTURAL REGIONS THAT HE

8    REFERENCED?

9    A.   EXACTLY.  HE HAD PLANNING AREAS, HE HAD THE CENSUS

10    DEFINED, MSAS, OR METROPOLITAN STATISTICAL AREAS, AND HE HAD

11    WHAT HE CALLED HIS KEY REGIONS OR KEY CULTURAL REGIONS, EACH OF

12    WHICH WAS A MAP OF EITHER THE WHOLE STATE OR MOST OF THE STATE

13    BROKEN UP INTO LARGE REGIONAL PIECES.

14    Q.   OKAY.  AND DID MR. COOPER'S REPORT INDICATE THAT RACE WAS

15    A CONSIDERATION IN THE CONSTRUCTION OF HIS PLAN?

16         **MS. KEENAN:**  OBJECTION TO RACE AS A CONSIDERATION TO

17    THE EXTENT THAT FOCUSES ON HIS INTENT.

18         **THE COURT:**  GIVE ME YOUR SPECIFIC QUESTION AGAIN,

19    BECAUSE I'M NOT SURE THAT -- I WANT TO HEAR THE QUESTION AGAIN.

20         **MR. LEWIS:**  SURE.

21    **BY MR. LEWIS:**

22    Q.   DR. JOHNSON, WAS RACE IDENTIFIED BY MR. COOPER AS A

23    CONSIDERATION IN THE CONSTRUCTION OF HIS ILLUSTRATIVE PLAN?

24         **MS. KEENAN:**  I'LL WITHDRAW THE OBJECTION.  I MISHEARD

25    IT.  THANK YOU.

9:54AM    1    A.  YES.

2    **BY MR. LEWIS:**

3    Q.  OKAY.  AND WAS COMPACT -- DISTRICT COMPACTNESS A CRITERION

4    IDENTIFIED BY MR. COOPER?

5    A.  YES.

6            **COURT REPORTER:**  COULD YOU SPEAK UP A LITTLE BIT?

7    **BY MR. LEWIS:**

8    Q.  I HAVE TO REPEAT THE QUESTION.  WAS COMPACTNESS A MEASURE

9    OR, EXCUSE ME, A CRITERION THAT MR. COOPER IDENTIFIED?

10   A.  YES.

11   Q.  NOW, DR. JOHNSON, SPEAKING METHODOLOGICALLY, WHEN YOU ARE

12   EVALUATING A PLAN'S COMPLIANCE WITH CRITERIA, HOW DO YOU GO

13   ABOUT PERFORMING THAT ANALYSIS?

14   A.  WELL, EACH OF THESE CRITERIA ARE SOMETHING YOU CAN SEE ON

15   A MAP.  SO COMPACTNESS, YOU CAN MEASURE IT.  COMMUNITIES OF

16   INTEREST, YOU IDENTIFY THE BOUNDARIES OF THAT COMMUNITY OF

17   INTEREST.  CONTIGUITY, OBVIOUSLY, YOU LOOK AT THE MAP AND SEE

18   IT.  SO YOU CAN LOOK AT THE MAP AND SAY, DOES THIS -- DOES EACH

19   DISTRICT OR THE DISTRICT THAT WE ARE LOOKING AT IN PARTICULAR

20   AT A GIVEN TIME FOLLOW THOSE ELEMENTS OF THE MAP:  IS IT

21   COMPACT, IS IT FOLLOWING THE BOUNDARY OF A COMMUNITY OF

22   INTEREST, IS IT FOLLOWING A PARISH BOUNDARY?  IT IS A PRETTY

23   STRAIGHTFORWARD WAY OF LOOKING AT THE MAP AND LOOKING AT THE

24   WORDS TO SEE IF THEY MATCH.

25   Q.  AND IS IT -- IS IT IMPORTANT, WHEN DRAWING A MAP, FOR THE

DR. D. JOHNSON - DIRECT

9:55AM  1   MAP-MAKER TO DOCUMENT THE BASES FOR SPECIFIC LINE DRAWING

2   DECISIONS?

3   A.   YES.

4   Q.   AND WHY IS THAT A GOOD PRACTICE?

5   A.   REDISTRICTING MAPS OFTEN END UP IN COURT, AND YOU WANT TO

6   HAVE YOUR METHOD AND YOUR RATIONALE ON THE RECORD.   SOME COURTS

7   HAVE REJECTED KIND OF POST -- I NEVER GET MY LATIN TERMS RIGHT,

8   BUT POST FACTO EXPLANATIONS THAT WERE NOT PUT IN THE RECORD AND

9   EXPLAINED AT THE TIME THE MAP WAS DRAWN AND DISCUSSED.

10  Q.   SO, FOR EXAMPLE, IN YOUR OWN REDISTRICTING PRACTICE, DR.

11  JOHNSON, DO YOU GO ABOUT PROVIDING A RECORD OF THE BASES FOR

12  DECISIONS AT THE TIME MAPS ARE DRAWN?

13  A.   YES.

14  Q.   OKAY.   NOW, DR. JOHNSON, AS PART OF YOUR EVALUATION OF A

15  REDISTRICTING PLAN, DO YOU JUST REVIEW THE MAPS, OR DO YOU

16  REVIEW THE DATA ASSOCIATED WITH THE MAPS TOO?

17  A.   BOTH.

18  Q.   OKAY.   NOW, WHEN YOU EVALUATED MR. COOPER'S 2023

19  ILLUSTRATIVE PLANS, WHAT DID YOU EVALUATE?

20  A.   WELL, OBVIOUSLY HE GAVE US THE MAP FILES, SO I BROUGHT

21  THOSE INTO MY MAPTITUDE MAPPING SYSTEM.   AND THEN I LOOKED AT

22  HIS DATA AND ALSO HAD MY OWN DATA IN MAPTITUDE FROM THE STATE'S

23  DATABASE.   SO I WAS LOOKING AT BOTH THE ACTUAL DISTRICT LINES,

24  THE DEMOGRAPHIC DATA THAT MATCH UP WITH THOSE LINES, AND THEN,

25  OF COURSE, IN THE MAPPING SOFTWARE WE HAVE ALL KINDS OF LAYERS

9:57AM

1    WE CAN LAY ON THERE.  SO WE HAVE PARISHES, CITY LINES, CENSUS

2    DESIGNATED PLACE LINES, RIVERS, ALL KINDS OF GEOGRAPHY AND

3    POLITICAL BOUNDARIES.

4    Q.  AND IS THAT DATA ON THE POLITICAL BOUNDARIES AND SO FORTH,

5    WHERE DOES THAT DATA COME FROM?

6    A.  IT COMES SOME OF IT FROM THE STATE AND SOME OF IT FROM THE

7    CENSUS BUREAU.

8    Q.  ALL RIGHT.  NOW, DR. JOHNSON, BEFORE WE GET TOO MUCH

9    FURTHER, I WOULD LIKE TO HAVE YOU KIND OF EXPLAIN THE BASICS OF

10   HOW ALL OF THIS DATA WE HAVE BEEN TALKING ABOUT IS USED IN

11   MAPTITUDE.  SO IF WE COULD TURN TO PAGE 9 OF YOUR REPORT, AND

12   THEN ZOOM IN TO FIGURE 4.

13       ALL RIGHT.  DR. JOHNSON, CAN YOU ORIENT THE COURT TO THIS

14   FIGURE?  WHAT IS IT SHOWING US?

15   A.  SO THIS IS THE MAPTITUDE MAPPING SOFTWARE, AND THIS IS

16   WHAT IT LOOKS LIKE WHEN YOU ARE WORKING ON A PLAN IN THE

17   SOFTWARE.  AND SO AT DIFFERENT PIECES OF THE SCREEN, OBVIOUSLY

18   THERE IS A LOT OF INFORMATION GOING ON.  OBVIOUSLY YOU HAVE

19   YOUR MAP, AND YOU CAN SEE THE MAP OF LOUISIANA IN THIS CASE.

20   IN THIS CASE, EACH DISTRICT IS SHADED IN.  IT IS POSSIBLE, AS

21   OTHER FIGURES IN MY REPORT SHOW, TO COLOR THINGS IN BASED ON

22   DIFFERENT FACTORS.  IN THIS CASE, THE DISTRICTS THEMSELVES ARE

23   SHADED.

24       OVER WHERE THERE IS THE YELLOW 1, YOU CAN SEE THE LIST OF

25   ALL OF THOSE DIFFERENT LAYERS.  SO YOU CAN SEE, YOU KNOW, FIRST

DR. D. JOHNSON - DIRECT

9:58AM

1    IS THE SENATE MAP.  THAT'S THE MAP WE ARE LOOKING AT.  AND THEN

2    WHERE THERE'S A RED X, THOSE LAYERS ARE NOT SHOWN.  AND WHERE

3    THERE'S A GREEN CHECK, THOSE LAYERS ARE SHOWN.  SO YOU CAN SEE

4    IN THIS MAP I JUST HAVE THE DISTRICTS AND THE PARISH LINES ON.

5    BUT AVAILABLE TO BE CLICKED AND TURNED ON ARE ALL OF THESE

6    OTHER LAYERS, FROM TRIBAL RESERVATIONS TO CENSUS PLACES TO

7    OTHER MAP -- YOU CAN SEE AT THE BOTTOM IN THE LIST THAT THE

8    HOUSE MAP IS THERE, SO IT CAN BE OVERLAID.  SO YOU HAVE ALL OF

9    THOSE GEOGRAPHIC LAYERS AVAILABLE.

10       THEN UP IN THE AREA LABELED 2 IS THE DATA.  SO THOSE ARE

11   SHOWING -- THAT BOX IS SHOWING THE DISTRICT NUMBER, THE TOTAL

12   POPULATION, THE DEVIATION FROM THE IDEAL, AND THEN ALL THE

13   VARIOUS DEMOGRAPHIC VARIABLES THAT ARE AVAILABLE IN THE

14   DATASET.

15       ONE OF THE THINGS MAPTITUDE DOES THAT'S SO HANDY IS, IN

16   THE TOP BOX LABELED 2 ARE THE TOTALS FOR THE DISTRICTS WE ARE

17   LOOKING AT.  IF I WANT TO LOOK AT CHANGING A DISTRICT, AS I

18   CLICK ON EACH CENSUS BLOCK TO POTENTIALLY MOVE THAT, BLOCK 3

19   WILL POP UP AND SHOW ME THE CHANGE.  AND SO IT WILL GIVE BOTH

20   THE -- IN BOX 2, I SEE THE CURRENT POPULATION AND ALL THE

21   ETHNIC PERCENTAGES.  IN BOX 3, AS I CLICK ON EACH BLOCK, IT

22   WILL INSTANTLY SHOW ME HOW THE DYNAMICS OR THE DEMOGRAPHICS OF

23   THAT DISTRICT CHANGE AS I CLICK BLOCK BY BLOCK, AND I CAN

24   DECIDE IF THAT'S MAKING -- ACHIEVING THE GOAL I WANT OR IF IT'S

25   NOT.

10:00AM   1    Q.   AND, DR. JOHNSON, IS IT POSSIBLE FOR YOU TO ASSIGN -- WHEN

          2    YOU ARE DRAWING A MAP WITH MAPTITUDE, TO ASSIGN TERRITORY TO A

          3    DISTRICT BY, FOR EXAMPLE, PRECINCT INSTEAD OF BY CENSUS BLOCK?

          4    A.   YES, THE SOFTWARE IS VERY GOOD.   IN THE BOTTOM LEFT, YOU

          5    CAN SEE THE LITTLE BOX WHERE IT SAYS TARGET AND SOURCE AND

          6    SELECTION LAYER.   THAT'S HOW YOU CONTROL WHAT LAYER YOU ARE

          7    PICKING AT.   YOU CAN SEE THE SELECTION LAYER.   IT SAYS BLOCK.

          8    THAT COULD ALSO BE VOTING DISTRICT.   IT COULD EVEN BE A WHOLE

          9    CITY OR PARISH.   THE SOFTWARE IS VERY, VERY FLEXIBLE TO EASILY

         10    SWITCH BACK AND FORTH BETWEEN THEM.

         11    Q.   OKAY.   ALL RIGHT.   SO, FOR EXAMPLE, IF YOU WERE TO BE

         12    ASSIGNING TERRITORY TO A DISTRICT BY PRECINCT, WOULD THAT

         13    SCREEN NUMBER 3, THAT DATA VIEW SCREEN, ALSO SHOW YOU PROPOSED

         14    CHANGES BY PRECINCT?

         15    A.   YES, EXACTLY.   WHATEVER AREA YOU CHOOSE, BE IT A BLOCK,

         16    BLOCK GROUP OR PRECINCT OR WHATEVER, THE SOFTWARE WILL PICK

         17    THAT AREA AND SHOW YOU THE CHANGES.

         18    Q.   OKAY.   AND DR. JOHNSON, IS IT POSSIBLE TO LOAD ELECTION

         19    DATA INTO MAPTITUDE?

         20    A.   YES, IT'S POSSIBLE AND VERY COMMON.

         21    Q.   AND ARE THERE -- IS IT POSSIBLE TO LOAD SOCIO-ECONOMIC

         22    DATA INTO MAPTITUDE?

         23    A.   YES.   FOR THE REDISTRICTING SOFTWARE TO WORK RIGHT, YOU

         24    HAVE TO -- ALL THE DATA HAS TO BE THE SAME AT THE BLOCK AND THE

         25    VTD AND THE TRACT LEVEL SO THAT AS YOU SWITCH FROM LAYER TO

10:02AM    1   LAYER, THE SOFTWARE CAN KEEP UP WITH YOU AND KNOW WHICH DATA TO

           2   SHOW.  SO YOU HAVE TO BREAK THE DATA DOWN, AND SOCIO-ECONOMIC

           3   DATA USUALLY COMES AT THE BLOCK OR THE TRACT LEVEL, BUT THERE

           4   ARE VERY COMMONLY USED AND WIDELY ACCEPTED METHODS FOR BREAKING

           5   THAT DOWN BY BLOCK, AND THEN YOU AGGREGATE IT BACK UP TO VTD

           6   AND ALL THE HIGHER LEVELS OF GEOGRAPHY.

           7   Q.   AND IS THERE A GENERALLY ACCEPTED WAY THAT ONE CAN USE

           8   SOCIO-ECONOMIC DATA TO DRAW MAPS?

           9   A.   YES.  IT'S VERY COMMONLY USED, AND YOU PUT IT IN THE

          10   DATABASE SO THAT AS YOU DRAW YOUR LINES, YOU CAN TELL WHAT THE

          11   IMPACT IS.

          12        I'M WORKING IN A JURISDICTION NOW WHERE RENTERS IS A BIG

          13   ISSUE.  SO WE HAVE THE RENTER DATA BROKEN DOWN INTO THE MAPPING

          14   SOFTWARE, AND AS WE CHANGE EACH LINE, WE CAN INSTANTLY KNOW

          15   WHAT PERCENTAGE OF EACH DISTRICT'S RESIDENTS ARE RENTERS, FOR

          16   EXAMPLE.  SO YOU CAN DO THAT FOR INCOME LEVELS, ANY OF THE

          17   SOCIO-ECONOMIC DATA THAT YOU HAVE AVAILABLE.

          18        **THE COURT:**  LET ME JUST MAKE SURE I UNDERSTAND.  SO

          19   THE SOCIO-ECONOMIC DATA IS COLLECTED BY BLOCK, BUT THEN YOU

          20   AGGREGATE IT UP TO THE VTD.  DID I HEAR THAT RIGHT?

          21   A.   IT'S THE SECOND STEP.  THERE'S A FIRST STEP -- IT'S

          22   ACTUALLY COLLECTED AT WHAT THEY CALL THE BLOCK GROUP -- THE

          23   TERM IS CONFUSING -- OR AT THE TRACT LEVEL.  BUT TO MAKE IT

          24   WORK IN THE SOFTWARE, WE BREAK IT DOWN INTO BLOCK AND THEN

          25   BRING IT BACK UP.  YOU HAVE TO GET IT DOWN TO THE SMALLEST UNIT

10:03AM   1   OF GEOGRAPHY IN ORDER FOR THE SOFTWARE TO PROPERLY USE IT AS

          2   YOU COME BACK UP.

          3                **THE COURT:**  OKAY.  GOT IT.

          4   **BY MR. LEWIS:**

          5    Q.  AND DR. JOHNSON, MAYBE JUST TO MAKE SURE WE MAKE A CLEAN

          6   RECORD ABOUT THAT, CAN YOU EXPLAIN THE DIFFERENCE BETWEEN A

          7   BLOCK AND A BLOCK GROUP?

          8    A.  SURE.  A BLOCK IS THE SMALLEST UNIT OF CENSUS GEOGRAPHY,

          9   SO IN A CITY, IT IS GOING TO BE A CITY BLOCK.  THAT'S THE TERM.

         10   WHEN YOU GET OUTSIDE OF THE CITY OR IF YOU GET INTO AREAS WHERE

         11   THERE ARE CUL-DE-SACS AND HILLS, IT GETS A LITTLE -- THEY GET A

         12   LITTLE MORE ODD-SHAPED AND STRANGE-LOOKING.  BUT THAT'S THE

         13   BASIC UNIT OF GEOGRAPHY.  IT'S THE SMALLEST UNIT OF GEOGRAPHY

         14   WHERE THE CENSUS RELEASES POPULATION DATA.

         15         THE NEXT LEVEL UP IS BLOCK GROUP.  USUALLY IT'S ANYWHERE

         16   FROM 2 TO MAYBE 10 OR SO CENSUS BLOCKS, SO IT'S STILL A PRETTY

         17   SMALL AREA.  IT COULD BE TWO CITY BLOCKS OR TEN CITY BLOCKS.

         18   AND IT'S REALLY KIND OF AN INTERMEDIATE STEP.  IT DOESN'T SERVE

         19   A LOT OF PURPOSE OTHER THAN AS A DATA-GATHERING MEASURE.

         20         THE NEXT LEVEL UP IS TRACTS, AND THOSE WERE DEFINED LONG

         21   AGO AS VERY, VERY ROUGH NEIGHBORHOODS.  THEY TEND TO BE

         22   ANYWHERE FROM 2,000 TO 4,000 PEOPLE, ALTHOUGH THERE IS A LOT OF

         23   VARIATION IN THAT.  AND THE CENSUS BUREAU TRIES TO KEEP THOSE

         24   FAIRLY CONSISTENT OVER TIME SO THAT RESEARCHERS CAN HAVE A

         25   STEADY DATA SOURCE.  SO BLOCKS AND BLOCK GROUPS MAY CHANGE A

10:05AM
1    LOT AS DEVELOPMENT HAPPENS.  SOMETIMES TRACTS CHANGE, BUT THEY

2    TRY NOT TO.

3         AND THEN THE NEXT LEVEL UP FROM TRACTS IS COUNTIES, WHICH

4    IS OBVIOUSLY A CLEAR LEVEL.  ON THE SIDE PATH, THAT IS KIND OF

5    -- THE CENSUS BUREAU HAS A LITTLE TREE OF DATA THEY SHOW.

6    THAT'S THEIR STANDARD TREE IS BLOCK, BLOCK GROUP, TRACT,

7    COUNTY, STATE.

8         ON KIND OF A BRANCH OFF FROM THAT TREE ARE VTDS, WHICH THE

9    CENSUS BUREAU CALCULATES BECAUSE THE STATES ASK THEM TO.  SO

10   THE STATES SUBMIT THEIR PRECINCT LINES, AND THEN THE CENSUS

11   BUREAU THEN ADDS UP ALL OF THE CENSUS BLOCKS IN THAT PRECINCT

12   AND GIVES YOU THE VTD DATA.  SO IT IS USUALLY SOMEWHERE BETWEEN

13   A BLOCK GROUP AND A TRACT, BUT IT'S A BRANCH, NOT IN THE SAME

14   TREE.

15   Q.  ALL RIGHT.  AND THANK YOU FOR THAT, DR. JOHNSON.

16        NOW, WHAT ADVANTAGES DOES INCLUDING SOCIO-ECONOMIC DATA IN

17   YOUR MAPTITUDE SOFTWARE OFFER A REDISTRICTING PROFESSIONAL?

18   A.  WELL, IF -- WE ARE TRYING TO DRAW MAPS TO KEEP TOGETHER A

19   GIVEN COMMUNITY, AND THAT COMMUNITY IS DEFINED BASED ON THE

20   SOCIO-ECONOMIC FACTOR.  THEN THE DATA TELLS US IF WE ARE

21   SUCCEEDING WITH THAT GOAL OR NOT.  AND IF WE DON'T HAVE THE

22   DATA IN THE SYSTEM, THEN IT'S KIND OF AN EYEBALL SWING AND A

23   MISS, HOPE AND A PRAYER APPROACH.  SO WE PUT THE DATA IN SO

24   THAT -- AS I MENTIONED, THE ONE JURISDICTION, THEY ARE VERY

25   INTERESTED IN ARE WE KEEPING THE RENTERS TOGETHER IN A

DR. D. JOHNSON - DIRECT

10:07AM

1    DISTRICT.  WELL, AS I DRAW THE LINES, I CAN SEE RIGHT FROM THE

2    NUMBERS WE ARE KEEPING THE RENTERS TOGETHER.

3         YOU CAN SEE ON THE SCREEN, YOU KNOW, OBVIOUSLY IN A VOTING

4    RIGHTS SITUATION, WE ARE LOOKING AT THE PROTECTED CLASS IN

5    QUESTION.  WHERE ARE THOSE NUMBERS SHIFTING?  IF WE ARE LOOKING

6    AT INCOME LEVELS -- THE ONE I DEAL WITH A LOT IN CALIFORNIA IS

7    LANGUAGE SPOKEN AT HOME.  DO THEY SPEAK SPANISH AT HOME?  WELL,

8    LET'S KEEP THAT COMMUNITY TOGETHER.  OR ARE THEY LIMITED

9    ENGLISH SPEAKERS?  SO ALL OF THOSE DIFFERENT FACTORS CAN ALL BE

10   DONE.

11        IF YOU HAVE THE DATA IN YOUR SYSTEM, YOU CAN SEE THE

12   IMPACT OF EVERY CHANGE ON THAT COMMUNITY, AND ARE YOU KEEPING

13   IT TOGETHER OR ARE YOU BREAKING IT UP?  IF YOU DON'T HAVE THE

14   DATA IN THE SYSTEM, YOU ARE JUST KIND OF WINGING IT.

15   Q.   AND DR. JOHNSON, I WILL REPRESENT TO YOU THAT MR. COOPER

16   TESTIFIED THAT HE RELIED ON PARISH OR CITY LEVEL CENSUS ACS

17   DATA.  DO YOU RECALL THAT?

18   A.   YES.

19   Q.   AND IS THAT COMMON IN MODERN REDISTRICTING PRACTICE?

20   A.   NO.

21   Q.   WHY NOT?

22   A.   IT REALLY DOESN'T DO YOU ANY GOOD UNLESS YOU ARE DEALING

23   WITH A REALLY SMALL PARISH OR A REALLY SMALL CITY, BECAUSE, FOR

24   EXAMPLE, IF YOU ARE IN EAST BATON ROUGE, KNOWING THE AVERAGE

25   HOUSEHOLD INCOME OF THE PARISH AS A WHOLE DOESN'T TELL YOU

10:08AM   1   ANYTHING ABOUT WHERE TO DRAW THE LINES OF THE, YOU KNOW,

          2   HOWEVER MANY DISTRICTS YOU ARE DRAWING IN THAT PARISH.  WHAT

          3   YOU NEED TO KNOW IS WHERE THE COMMUNITY THAT YOU ARE LOOKING

          4   AT, WHATEVER SOCIO-ECONOMIC DEFINED COMMUNITY YOU ARE LOOKING

          5   AT, IS WITHIN THE PARISH.

          6        AND SO, YOU KNOW, IT'S AS IF YOU ARE LOOKING AT THE STATE

          7   OF LOUISIANA.  IF I KNOW THE INCOME LEVEL OF THE STATE OF

          8   LOUISIANA, THAT TELLS ME NOTHING ABOUT THE INCOME LEVEL OF AN

          9   INDIVIDUAL PARISH.  SAME THING IN A CITY OR WITHIN A PARISH.

         10   THE INCOME LEVEL OF THE PARISH AS A WHOLE TELLS ME NOTHING

         11   ABOUT WHERE PEOPLE -- OR HOW MUCH MONEY PEOPLE IN EACH

         12   INDIVIDUAL SECTION OF THE PARISH EARN.

         13   Q.  AND SO IS MR. COOPER'S METHOD A REASONABLE ONE TO FOLLOW

         14   IF ONE WAS TO USE SOCIO-ECONOMIC DATA WHEN CONSTRUCTING A PLAN?

         15   A.  NO.

         16   Q.  I WOULD LIKE NOW TO TURN TO MR. COOPER'S MULTI-PARISH

         17   CULTURAL REGIONS.  SO I WOULD LIKE TO TURN TO PAGE 13 OF YOUR

         18   REPORT, AND SPECIFICALLY HIGHLIGHTING PARAGRAPHS 33 AND 34.  SO

         19   IT APPEARS YOU HAVE SOME QUESTIONS OR SOME CONCERNS ABOUT THE

         20   METHODOLOGY MR. COOPER EMPLOYED WHEN DEFINING HIS MULTI-PARISH

         21   CULTURAL REGIONS.  CAN YOU DISCUSS SOME OF THOSE CONCERNS?

         22   A.  YES.  MY FATHER-IN-LAW IS A FORMER LSU PROFESSOR, AND AT

         23   THE -- WITH THE STUDENTS, WE WOULD NEVER ACCEPT WIKIPEDIA AS A

         24   RELIABLE SOURCE FOR ANY OFFICIAL DATA OR BASIS OF ANY ACTION.

         25   YOU JUST DON'T DO IT.  ANYONE CAN WRITE ANYTHING IN WIKIPEDIA,

10:10AM  1   AND IT'S NOT A RELIABLE SOURCE.

2        SIMILARLY, HE HAD A KEY REGION DEFINED BY THE REGION'S

3   CHARACTERISTICS IN 1812, YOU KNOW, OVER 200 YEARS AGO.  YOU

4   KNOW, THAT'S 50 YEARS BEFORE THE CIVIL WAR.  IT JUST DOESN'T

5   MAKE ANY SENSE OR HAVE ANY RELEVANCE TO TODAY.  IF THERE WERE

6   FACTORS BACK THEN THAT ARE INFLUENCING LIFE IN THOSE AREAS

7   TODAY, LOOK AT THE FACTORS TODAY.

8        SO WHEN YOU ARE LOOKING AT A KEY REGION, TO HIS CREDIT,

9   ACADIANA, AS HE NOTES, IS A LEGISLATIVE CAUCUS.  THEY HAVE

10  SHARED ISSUES THAT THEY WORK ON.  THAT'S THE KIND OF THING WE

11  ARE LOOKING FOR WHEN WE ARE TRYING TO DEFINE A COMMUNITY OF

12  INTEREST THAT'S RELEVANT TO REDISTRICTING TODAY.  WIKIPEDIA,

13  WHAT WAS HAPPENING IN THE AREA IN 1812, NO, THOSE ARE NOT

14  SOURCES THAT I WOULD EVER RELY ON TO DEFINE MY COMMUNITIES.

15  Q.  ALL RIGHT.  SO IF WE TURN, THEN, TO THE NEXT SECTION OF

16  THIS REPORT, BEGINNING ON THE SAME PAGE, I WOULD LIKE TO TURN

17  TO YOUR ANALYSIS OF HOW THE KEY REGIONS IN MR. COOPER'S PLANS

18  WERE TREATED.  DID YOU ASSESS WHETHER MR. COOPER ADHERED TO HIS

19  VARIOUS KEY REGIONS IN THE ILLUSTRATIVE PLANS?

20  A.  I DID ASSESS THAT, YES.

21  Q.  OKAY.  AND DID YOU REVIEW MR. COOPER'S TRIAL TESTIMONY

22  FROM WEDNESDAY?

23  A.  YES.

24  Q.  OKAY.  AND AGAIN, I WILL REPRESENT TO YOU DURING THAT

25  TESTIMONY ON WEDNESDAY, PAGES 41 AND 42 OF THE TRANSCRIPT,

10:12AM   1   MR. COOPER DESCRIBED, QUOTE, CULTURAL REGIONS, END QUOTE, AND

          2   REPORTED THAT HE WAS, QUOTE, LOOKING AT THE REGIONS AND TRIED

          3   TO KEEP THEM TOGETHER AS CLOSE AS POSSIBLE, END QUOTE.  WHAT

          4   DID YOU UNDERSTAND THAT CLAIM TO MEAN?

          5   A.   SO KEEPING A COMMUNITY OF INTEREST TOGETHER IS A VERY

          6   COMMON PRACTICE.  IT IS OFTEN LEGALLY REQUIRED WHEN DRAWING

          7   DISTRICTS.  AND WHAT THAT MEANS IS THAT WHEN A DISTRICT GETS

          8   CLOSE TO THE COMMUNITY BORDER, THE DISTRICT BOUNDARY FOLLOWS

          9   THE COMMUNITY BORDER.  YOU DON'T CROSS IT AND SPLIT THE

         10   DISTRICT AMONGST MULTIPLE COMMUNITIES OF INTEREST BECAUSE THEN

         11   YOU ARE BREAKING UP THAT COMMUNITY BETWEEN THE DIFFERENT

         12   DISTRICTS.

         13        SO HIS CLAIM IS A COMMON STATEMENT MADE THAT WHEN YOU DO

         14   THAT, YOU ARE KEEPING THE DISTRICTS SO THAT THEIR BOUNDARIES

         15   FOLLOW THE COMMUNITY OF INTEREST BOUNDARY.

         16   Q.   OKAY.  AND WHAT DID YOU CONCLUDE ABOUT WHETHER MR. COOPER

         17   ADHERED TO HIS KEY REGIONS?

         18   A.   HE DID NOT.

         19   Q.   AND I WOULD LIKE TO TURN TO PAGE 14 OF YOUR REPORT, AND I

         20   WILL KIND OF GO THROUGH A FEW OF THESE, AND I WOULD LIKE TO

         21   START HERE ON PARAGRAPH 38 AT THE BOTTOM OF THE PAGE HERE.  AND

         22   WHAT DO YOU REPORT HERE ABOUT MR. COOPER'S ILLUSTRATIVE SENATE

         23   PLAN?

         24   A.   THAT IT SPLITS THE PLANNING DISTRICT REGIONS BY HAVING

         25   ANYWHERE FROM THREE TO SEVEN HOUSE DISTRICTS CROSS THAT

10:14AM

1    BOUNDARY.  SO IT'S NOT FOLLOWING THAT BOUNDARY.  IT'S NOT EVEN

2    CLOSE TO FOLLOWING THE PLANNING DISTRICT BOUNDARIES AS

3    COMMUNITIES OF INTEREST.

4    Q.  AND JUST TO MAKE SURE THAT I'M NOT LEADING YOU ASTRAY, DR.

5    JOHNSON, WE ARE TALKING ABOUT REGIONS THAT I BELIEVE YOU

6    ANALYZED.  HOW MANY DIFFERENT TYPES OF CULTURAL REGIONS DID YOU

7    ANALYZE?

8    A.  I FOCUSED ON TWO SETS, THE PLANNING DISTRICTS AND THE KEY

9    CULTURAL REGIONS.  I ALSO LOOKED AT THE MSAS AS WELL.  MSAS

10   DON'T COVER THE ENTIRE STATE, SO IT'S A LITTLE BIT OF A

11   DIFFERENT COMPARISON, BUT I DID LOOK AT THOSE.  BUT PRIMARILY

12   ON THE PLANNING DISTRICTS AND THE KEY CULTURAL REGIONS.

13   Q.  OKAY.  SO, FOR EXAMPLE, IF WE THEN LOOK AT -- OKAY.  SO IF

14   WE THEN LOOK AT PARAGRAPH 39, WHICH LOOKS AT, I BELIEVE, THE

15   ILLUSTRATIVE, HOW MANY -- SENATE MAP -- EXCUSE ME.  HOW MANY

16   TIMES DOES MR. COOPER DIVIDE PLANNING DISTRICTS IN THE

17   ILLUSTRATIVE SENATE PLAN?

18   A.  HE HAS ONE THAT HE DIVIDES AND CROSSES A BOUNDARY WITH

19   ONLY TWO DISTRICTS.  I SAY ONLY.  YOU MIGHT HAVE TO DO TWO, BUT

20   GENERALLY YOU HAVE TO DO ONE FOR POPULATION BALANCING.  SO ONE

21   IS NOT TOO BAD.  IT KIND OF FOLLOWS THE PLANNING DISTRICT

22   BOUNDARY.  BUT EVERY OTHER PLANNING DISTRICT IS CROSSED

23   ANYWHERE FROM THREE TO AS MANY AS EIGHT TIMES, SO HE IS CLEARLY

24   NOT USING PLANNING DISTRICTS AS A GUIDING CONSIDERATION IN

25   DRAWING THE LINES.

10:16AM   1          **MS. KEENAN:**  OBJECTION, YOUR HONOR.  THAT SAYS WHAT

2     HE WAS USING AS A CONSIDERATION TO DRAW THE LINES.  THAT DOES

3     GO TO MR. COOPER'S INTENT.

4          **THE COURT:**  WELL, IT'S A SUMMARY.  I'M GOING TO

5     OVERRULE THE OBJECTION.  I MEAN, IT KIND OF STATES WHAT I THINK

6     THAT HE IS SHOWING THAT THE DATA -- OR THAT HIS DATA SHOWS.

7     OVERRULED.

8     **BY MR. LEWIS:**

9     Q.   AND DR. JOHNSON, JUST TO BE VERY CLEAR, YOU ARE NOT

10    OFFERING TESTIMONY TODAY ABOUT YOUR -- ABOUT WHAT WAS

11    SUBJECTIVELY IN MR. COOPER'S HEAD; IS THAT RIGHT?

12    A.   CORRECT.

13    Q.   ALL RIGHT.  AND SO I JUST WANT TO MAKE SURE -- I MAY NOT

14    HAVE ASKED THAT QUESTION INITIALLY AND INTENDED TO, BUT WHEN

15    YOU ARE LOOKING AT THESE PLANNING DISTRICTS, HOW MANY TIMES DO

16    YOU HAVE TO DIVIDE THEM IN ORDER TO ACHIEVE POPULATION

17    EQUALITY?

18    A.   HOPEFULLY THE NUMBERS WOULD BALANCE OUT AND YOU WOULDN'T

19    HAVE TO CROSS THE BORDER AT ALL.  OFTEN THAT DOESN'T WORK OUT,

20    BECAUSE THE POPULATION REQUIREMENTS ARE PRETTY STRICT.  SO YOU

21    MAY HAVE TO CROSS A LINE ONCE IF THE NUMBER OF PEOPLE IN THE

22    COMMUNITY DOESN'T ALMOST PERFECTLY MATCH UP WITH A MULTIPLE OF

23    DISTRICTS.  SOMETIMES WE WILL GET STUCK, AND IN ORDER TO

24    BALANCE THE POPULATIONS OF THE COMMUNITY NEXT TO YOU AND THE

25    COMMUNITY ON THE OTHER SIDE OF YOU, YOU MAY HAVE TO CROSS A

DR. D. JOHNSON - DIRECT

10:17AM

1    BORDER TWICE, ONCE TO LET POPULATION OUT OF THE AREA, FOR

2    EXAMPLE, TO THE EAST, AND ONCE TO SPILL OVER EXTRA POPULATION

3    TO THE WEST.  BUT FOR POPULATION BALANCING REASONS, YOU SHOULD

4    NEVER HAVE TO CROSS A BOUNDARY MORE THAN TWICE.

5    Q.  ALL RIGHT.  AND I WOULD LIKE TO NOW TURN TO PARAGRAPH 42.

6    AND THIS, I BELIEVE, IS WHERE YOU ADDRESS MR. COOPER'S KEY

7    REGIONS.  IS THAT RIGHT?

8    A.  YES.

9    Q.  OKAY.  AND DID YOU CALCULATE THE NUMBER OF TIMES THAT, FOR

10   POPULATION BALANCE, A KEY REGION WOULD HAVE TO BE DIVIDED?

11   A.  YES.

12   Q.  AND HOW MANY TIMES IS THAT?

13   A.  ACTUALLY, IF WE GO TO -- 42 IS JUST WHAT WE WERE JUST

14   TALKING ABOUT.  43, 44 ARE THE SPECIFICS, REGION BY REGION.

15   BUT YES, THERE -- IN 43, IT TALKS ABOUT AN UNNAMED REGION THAT

16   DIDN'T HAVE A TITLE IN HIS MAP.  IT IS CROSSED ONLY ONCE.  BUT

17   THEN WE GET TWICE INTO TWO REGIONS, THREE TIMES, FIVE TIMES,

18   AND ACADIANA IS ACTUALLY CROSSED SEVEN TIMES IN THE HOUSE MAP.

19   AND THEN IN THE SENATE MAP, SIMILAR RESULTS, THREE, FOUR, FIVE

20   OR EVEN EIGHT TIMES THAT BOUNDARY IS BEING CROSSED BY

21   DISTRICTS.

22   Q.  OKAY.  AND DO THOSE DISTRICT BOUNDARIES REFLECT ADHERENCE

23   TO THE KEY CULTURAL REGIONS IN THE CONSTRUCTION OF THE 2023

24   ILLUSTRATIVE MAPS?

25   A.  NO.  UNLESS YOU -- UNLESS A DISTRICT HAS TO CROSS THE LINE

10:19AM    1   FOR POPULATION BALANCING, YOU ARE NOT LETTING THAT COMMUNITY

           2   BOUNDARY CONTROL YOUR DISTRICTING WHEN YOU CROSS IT.

           3   Q.   AND SIMILARLY, IF WE TURN TO PARAGRAPH 46 OF YOUR REPORT,

           4   DR. JOHNSON, DO YOU PERFORM A SIMILAR ANALYSIS OF THE

           5   METROPOLITAN STATISTICAL AREAS THAT MR. COOPER CONSIDERED?

           6   A.   YES.

           7   Q.   AND CAN YOU WALK THE COURT THROUGH THAT ANALYSIS?

           8   A.   YES.   AS IT -- WHEN YOU GET IN THE MIDDLE OF THE PARAGRAPH

           9   THERE, IT TALKS ABOUT THE -- THERE'S ONE MSA THAT THE SENATE

          10   MAP IS PRETTY GOOD ON.   IT JUST CROSSES TWICE.   ARGUABLY THAT

          11   WOULD BE REQUIRED FOR POPULATION BALANCING.   BUT THE OTHER

          12   EIGHT MSAS ARE CROSSED, AGAIN, THREE, FOUR, FIVE, EVEN SIX

          13   TIMES BY THE SENATE DISTRICTS.   AS THE SENATE DISTRICTS CROSS

          14   THESE LINES, THEY ARE CLEARLY NOT USING THE COMMUNITY OF

          15   INTEREST AS A DEFINITION THAT SHOULD GUIDE WHERE THE BOUNDARIES

          16   GO.

          17        AND ON THE HOUSE SIDE, YOU ARE SEEING THE SAME THING, MSA

          18   BOUNDARIES BEING CROSSED EIGHT TIMES, SEVEN TIMES.   THESE KINDS

          19   OF NUMBERS ARE SHOWING THAT THE COMMUNITY AS DEFINED IN THE MAP

          20   IS NOT CONTROLLING WHERE THE LINES ARE DRAWN.

          21   Q.   I WOULD LIKE TO RETURN BRIEFLY TO -- YOU HAVE A FIGURE,

          22   FIGURE 4 ON PAGE 14.   IF WE COULD TURN BACK TO THAT.   THIS

          23   FIGURE APPEARS TO DEPICT ILLUSTRATIVE HOUSE DISTRICTS 55 AND 54

          24   IN LAFOURCHE AND JEFFERSON PARISHES; IS THAT RIGHT?

          25   A.   I THINK IT IS ACTUALLY 84.   IT'S A LITTLE HARD TO READ ON

10:21AM   1   THERE, BUT 54 AND 84.

2   Q.   I MAY HAVE MISSPOKEN.   THAT IS MY MISTAKE.   WHAT IS THAT

3   FIGURE SHOWING US?

4   A.   SO THE PURPLE AREA, HOUSE DISTRICT 54, IS ON THE LEFT, AND

5   THEN THE YELLOW LINE IS THE PARISH BOUNDARY.   SO YOU CAN SEE 84

6   IS COMING IN JEFFERSON.   BUT 54, DOWN AT THE SHORELINE, HAS A

7   PENINSULA THAT STICKS OVER, THAT CROSSES THE PARISH LINE AND

8   CROSSES -- THIS IS ACTUALLY SOME OF THE REGIONAL LINES THAT

9   MR. COOPER SHOWED IN HIS MAP WHEN HE TRIED TO DEFINE THESE BIG

10   REGIONS.   AND 54 IS JUST CROSSING RIGHT THROUGH THEM IN ORDER

11   TO PICK UP THAT PENINSULA.

12   Q.   OKAY.   APPROXIMATELY HOW MANY PEOPLE LIVE IN THE

13   PENINSULA?

14   A.   JUST OVER A THOUSAND.   IT IS 1005.

15   Q.   ALL RIGHT.   WE CAN TAKE THAT DOWN.

16       SO DR. JOHNSON, JUST TAKING A STEP BACK, BASED ON WHAT WE

17   HAVE TALKED ABOUT IN TERMS OF THESE PLANNING DISTRICTS,

18   CULTURAL REGIONS, WHAT CONCLUSIONS DID YOU DRAW ABOUT

19   MR. COOPER'S ADHERENCE TO THESE REGIONAL BOUNDARIES?

20   A.   THE VARIOUS DEFINITIONS OF REGIONS, WHETHER THEY BE

21   PLANNING, KEY CULTURAL OR MSA, ARE NOT LINES THAT THE

22   ILLUSTRATIVE DISTRICT LINES FOLLOW.   SO THESE COMMUNITY LINES

23   ARE NOT CONTROLS THAT ARE GUIDING THE DRAWING OF THOSE LINES.

24   Q.   AND COULD A MAP-MAKER HAVE REDUCED THE NUMBER OF DIVISIONS

25   OF THESE REGIONS?

10:23AM  1    A.   CERTAINLY.  IF A MAP-MAKER WAS ACTUALLY TRYING TO KEEP A

2    COMMUNITY TOGETHER, YOU DRAW DISTRICTS TO THE REGIONAL OR

3    COMMUNITY BOUNDARY AND STOP.  AND ONE WOULD KEEP THOSE

4    DISTRICTS IN THAT COMMUNITY IN ORDER TO AVOID EXCESSIVE

5    DIVISION OF THE COMMUNITY AMONGST THE MAP.

6    Q.   ALL RIGHT.  DR. JOHNSON, I WOULD NOW LIKE TO SWITCH GEARS

7    AND TO TAKE YOU THROUGH YOUR ANALYSIS OF THE DIFFERENT 2023

8    ILLUSTRATIVE MAJORITY BLACK DISTRICTS THAT MR. COOPER

9    CONSTRUCTED.  SO I WOULD LIKE TO PULL UP FIGURE 16 APPEARING ON

10   PAGE 27 OF YOUR REPORT.

11        OKAY.  AND DR. JOHNSON, I BELIEVE THIS IS A FIGURE

12   DEPICTING ILLUSTRATIVE SENATE DISTRICTS 38 AND 39.  DOES THAT

13   LOOK RIGHT?

14   A.   YES.

15   Q.   OKAY.  AND CAN YOU ORIENT -- AND THIS IS IN THE SHREVEPORT

16   AREA; IS THAT RIGHT?

17   A.   YES.

18   Q.   AND DR. JOHNSON, CAN YOU ORIENT US TO THE FIGURE?  EXPLAIN

19   THE COLORS AND THE LINES ON THIS PAGE.

20   A.   HAPPY TO, YES.

21   Q.   ALL RIGHT.

22   A.   SO I MENTIONED BEFORE THE MAPTITUDE SCREEN THAT WE LOOKED

23   AT WHERE EACH INDIVIDUAL DISTRICT WAS COLORED IN.  IN THIS

24   CASE, THE BLUE DASHED LINES ARE THE DISTRICT LINES FOR THE

25   ILLUSTRATIVE SENATE MAP.  AND THE COLORS THAT WE ARE SEEING ARE

DR. D. JOHNSON - DIRECT

10:25AM

1    THOSE CENSUS BLOCKS.  SO THIS IS A -- WE HAVE A FAIRLY DENSELY

2    POPULATED AREA IN SHREVEPORT.  PRETTY CONSISTENTLY EACH CITY

3    BLOCK IS ITS OWN CENSUS BLOCK.

4         THE COLORING THAT YOU ARE SEEING HERE, YOU CAN SEE THE

5    CODING ON THE LEFT, THE PURPLE AREAS ARE 25 PERCENT BLACK VAP,

6    ANY PART BLACK VAP OR LOWER.  THE DARKER BLUE AND LIGHTER BLUE

7    ARE 25 TO 50 PERCENT.  AND THEN THE AREAS THAT ARE GREEN,

8    YELLOW OR RED ARE MAJORITY BLACK.  THEY ARE 50 TO 65, 65 TO 75,

9    OR 75 TO 100 PERCENT OF THE VOTING AGE POPULATION IS BLACK.  SO

10   YOU CAN SEE THROUGH THE CENTER OF THIS AREA, GOING NORTH/SOUTH,

11   CERTAINLY OVERWHELMINGLY 75 PERCENT OR HIGHER OF THE VOTING AGE

12   POPULATION IS ANY PART BLACK.

13        THE OTHER LINES SHOWN ON HERE, UP IN THE TOP RIGHT, YOU

14   CAN SEE KIND OF THE DASHED -- THE THICK DASHED LINES.  THOSE

15   ARE THE PARISH BOUNDARIES SHOWN IN BROWN IN THE TOP RIGHT.

16   THEN WE HAVE THE FREEWAYS IN ORANGE SHOWN THERE.  AND IT DIDN'T

17   TRANSLATE VERY WELL TO PDF.  ON THE COMPUTER SCREEN IT SHOWS

18   VERY WELL, BUT THERE ARE THE THIN RED LINES THAT DON'T REALLY

19   COME THROUGH ON THIS THAT ARE THE CENSUS PLACE OR CITY

20   BOUNDARIES.  YOU CAN SEE THE DIFFERENT CENSUS PLACE NAMES,

21   RIGHT IN THE MIDDLE OF SHREVEPORT AND UP IN THE TOP RIGHT,

22   BUT -- I THINK IT'S PRONOUNCED BOSSIER.  DON'T HOLD ME TO ANY

23   OF MY PRONUNCIATION OF NAMES DOWN HERE.  I'M VERY BAD OF THAT.

24   MY FATHER-IN-LAW WOULD BE ASHAMED.  BUT TO THE BEST I CAN,

25   BOSSIER PARISH UP IN THE TOP RIGHT.

10:27AM  1   Q.  AND WHAT STANDS OUT AT YOU ABOUT THE BOUNDARY LINE ON THIS

         2   IMAGE RUNNING BETWEEN ILLUSTRATIVE SENATE DISTRICT 38 AND

         3   ILLUSTRATIVE SENATE DISTRICT 39?

         4   A.  IT DEFINITELY CURVES IN LINES IN ODD WAYS.  YOU KNOW, IT'S

         5   NOT FOLLOWING THE FREEWAY, EXCEPT FOR A VERY SHORT PERIOD.

         6   RIGHT IN THE MIDDLE, NEXT TO SHREVEPORT, YOU CAN SEE WHERE THE

         7   FREEWAY LINE IS.  IN THAT LITTLE STRETCH IT FOLLOWS THE

         8   FREEWAY.

         9        YOU KNOW, I CAN SEE AN ARGUMENT THAT FOLLOWING THE

        10   BOUNDARY OF THE AIRPORT COULD BE A CONSIDERATION.  BUT OTHER

        11   THAN THAT, THE LINES KIND OF ZIG AND ZAG IN VERY ODD WAYS THAT

        12   DON'T FOLLOW COMPACTNESS, THAT DON'T FOLLOW CITY BOUNDARIES,

        13   THAT DON'T FOLLOW SOCIO-ECONOMIC BOUNDARIES, THAT DON'T FOLLOW

        14   KEY REGIONS.  ALL THE CRITERIA THAT MR. COOPER LISTED, THE LINE

        15   ISN'T FOLLOWING.  SOME OF IT MIGHT BE BECAUSE OF ODD-SHAPED

        16   VTDS, BUT STILL, WE ARE PICKING AND CHOOSING VTDS NOT BASED ON

        17   TRADITIONAL CRITERIA.  WE ARE JUST WEAVING AROUND AND GOING

        18   LEFT AND RIGHT FOR REASONS THAT ARE NOT EXPLAINED BY ANY OF THE

        19   CRITERIA THAT MR. COOPER OFFERED AS EXPLANATIONS.

        20   Q.  OKAY.  AND IS FOLLOWING A PARISH BOUNDARY, I THINK YOU

        21   SAID MAJOR ROADWAYS AND NEIGHBORHOODS, ARE THOSE TRADITIONAL

        22   CRITERIA?

        23   A.  YES.

        24   Q.  AND SO DOES THIS BOUNDARY APPEAR TO RESPECT A NONRACIAL

        25   REDISTRICTING CRITERION THAT MR. COOPER SAYS IN HIS REPORT THAT

10:29AM   1   HE FOLLOWED?

2   A.   NO.

3   Q.   AND YOU KNOW, WE HAVE -- I THINK IN THE MIDDLE OF THIS

4   FIGURE, YOU CAN SEE THESE SORT OF JAGGED LINES.  ABOUT HOW MANY

5   PEOPLE RESIDE IN THE AREA BOUNDED IN THOSE JAGGED LINES?

6   A.   THIS IS VERY DENSELY POPULATED AREAS, OBVIOUSLY BEING IN

7   SHREVEPORT, SO WE ARE TALKING THOUSANDS OF PEOPLE IN EACH OF

8   THESE ZIGS AND ZAGS.

9   Q.   AND WHAT IS THE RANGE OF BLACK VOTING AGE POPULATION IN

10   THE AREA OF THESE ZIGS AND ZAGS?

11   A.   ALL THROUGH THE MIDDLE, IT IS OVERWHELMINGLY RED, WHICH

12   MEANS 75 TO A 100 PERCENT OF THE VOTING AGE POPULATION IS AT

13   LEAST PART BLACK.

14   Q.   AND I KNOW IT'S REPORTED IN A HUNDRED PLACES, BUT ARE YOU

15   AWARE OF THE BLACK VOTING AGE POPULATION IN ILLUSTRATIVE SENATE

16   DISTRICTS 38 AND 39?

17   A.   YES, THEY BOTH END UP 50-PERCENT MAJORITY BLACK.

18   Q.   MAYBE A LITTLE -- MAYBE A LITTLE ABOVE?

19   A.   OH, YEAH, SORRY, NOT PRECISELY 50 PERCENT, BUT JUST OVER

20   50 PERCENT.

21   Q.   OKAY.  AND SO DO YOU SEE ANY TRADITIONAL CRITERIA -- I

22   THINK YOU'VE ALREADY ANSWERED THAT, BUT IN THE ABSENCE OF

23   TRADITIONAL CRITERIA, WHAT EXPLANATION MIGHT THERE BE FOR A

24   DISTRICT CONFIGURATION LIKE THIS ONE?

25   A.   WELL, JUST GOING BY MR. COOPER'S OWN WORDS, HE TALKS

10:30AM   1   ABOUT -- HE USED TRADITIONAL CRITERIA AND RACE.  AND IF THE

          2   LINES DON'T REFLECT ANY TRADITIONAL CRITERIA, THEN BY HIS OWN

          3   WORDS, HE IS FOLLOWING RACE.

          4   Q.  AND JUST LOOKING AT THE DATA, DOES THE LINE -- COULD THE

          5   LINE BE CONSISTENT WITH FOLLOWING RACE?

          6   A.  YES.  IF YOU ARE TRYING TO GET THE TWO NUMBERS TO BALANCE

          7   OUT JUST RIGHT, THAT TAKES -- WHETHER YOU ARE DOING IT BECAUSE

          8   YOU HAVE TO UNDER COURT ORDER OR WHATEVER REASON, OR BECAUSE

          9   YOU HAVE YOUR OWN GOAL, YOU ARE GOING TO BALANCE OUT THE

         10   DIFFERENT SHADING AREAS, YOU KNOW, THE DIFFERENT

         11   CONCENTRATIONS.  AND YOU CAN SEE HERE -- YOU KNOW, I DIDN'T

         12   MENTION IT, BUT OVER ON THE EAST SIDE, YOU CAN SEE THE THICK

         13   BLUE DASHED LINE AROUND THE PURPLE AREA.  THAT IS ANOTHER

         14   DISTRICT COMING IN AND TAKING THAT AREA AWAY FROM DISTRICT 38.

         15   SO YOU ARE GOING TO OFTEN END UP WITH STRANGE SHAPED LINES IF

         16   YOU ARE TRYING TO GET JUST TO A CERTAIN RACIAL PERCENTAGE IN

         17   YOUR DISTRICTS.

         18   Q.  SURE.  AND NOW, DR. JOHNSON, I WOULD LIKE TO TURN TO

         19   IBERVILLE PARISH, NOT FAR FROM HERE.  SO IF WE COULD TURN TO

         20   FIGURE 17 ON PAGE 28.  AND WHAT ARE WE LOOKING AT HERE, DR.

         21   JOHNSON?  CAN YOU ORIENT US TO THIS FIGURE?

         22   A.  SO IT'S NOT A CRYSTAL CLEAR MAP.  MY APOLOGIES FOR THAT.

         23   BUT WHAT WE ARE LOOKING AT IS SENATE DISTRICT 17.  AGAIN, THE

         24   BLUE DASHED LINES IN THE TOP LEFT ARE THE BOUNDARIES OF 2023

         25   ILLUSTRATIVE MAP, SENATE DISTRICT 17.  THEN --

10:32AM

1          **THE COURT:** 17 OR 19?

2          **THE WITNESS:** 17.

3          **THE COURT:** OKAY.

4    A.   THEN, AGAIN, THE THICK BROWN HASH MARKS ARE THE PARISH

5    BOUNDARIES.  AND THE COLOR CODING, THERE ARE PURPLES, GREENS

6    AND REDS, ARE THE SAME AS THEY WERE IN THE LAST MAP.  THE

7    PURPLES ARE 25 PERCENT BLACK OR LOWER.  THE GREENS, YELLOWS AND

8    REDS ARE MAJORITY BLACK.  SO WE HAVE GOT THE SENATE DISTRICT 17

9    IN THE ILLUSTRATIVE MAP, SENATE DISTRICT 17 IN THE TOP LEFT

10   FOLLOWING THE BLUE DASHED LINES.

11        THE ENACTED SENATE DISTRICT 17 ALSO INCLUDED THE KIND OF

12   RED-TINTED AREA GOING ALL THE WAY DOWN TO THE PARISH LINE.  SO

13   THERE'S A RED LINE THAT RUNS OVER THE PARISH LINE AT THE SOUTH

14   END OF THE PARISH, AND THEN OVER BY THE RIVER IN THE TOP RIGHT,

15   YOU CAN SEE THE RED LINE OUTLINING THE RED SHADED AREA.

16        SO THE ENACTED MAP TOOK EVERYTHING THAT IS IN THE

17   ILLUSTRATIVE 17 IN THE TOP LEFT AND KEPT GOING ALL THE WAY TO

18   THE PARISH BOUNDARY, USING -- FOLLOWING THE PARISH BOUNDARY AS

19   THE DISTRICT BOUNDARY, THE STANDARD CRITERIA LISTED IN THE

20   STATE'S JOINT RULE AND THE TRADITIONAL REDISTRICTING PRINCIPLE.

21        THE ILLUSTRATIVE MAP REMOVED ALL OF THAT RED SHADED AREA

22   FROM SENATE DISTRICT 17.  AND AS YOU CAN SEE, IT IS MOSTLY BLUE

23   AND PURPLE, SO IT IS MOSTLY WHITE.  IT TOOK THE MOSTLY WHITE

24   AREA OUT AND STOPPED THE BOUNDARY AT THE BLUE DASHES, KIND OF

25   IN THE MIDDLE OF NOWHERE, AND THAT BOUNDARY IS NOT FOLLOWING

10:34AM   1   ANY TRADITIONAL REDISTRICTING PRINCIPLE.  IT DOESN'T FOLLOW THE

2   PARISH, IT DOESN'T FOLLOW A MAJOR ROAD, IT DOESN'T FOLLOW A

3   COMMUNITY LINE, IT DOESN'T FOLLOW A KEY CULTURAL REGION.  IT

4   JUST IS DRAWN OUT IN THE MIDDLE OF NOWHERE.  AND THE RESULT IS

5   THAT YOU TOOK OUT THESE HEAVILY WHITE AREAS AND IT INCREASED

6   THE BLACK PERCENTAGE OF ILLUSTRATIVE SENATE DISTRICT 17.

7   **BY MR. LEWIS:**

8   Q.  AND AGAIN, RECOGNIZING WE HAVE THIS NUMBER IN A HUNDRED

9   PLACES, BUT DO YOU KNOW THE BVAP OF ILLUSTRATIVE SENATE

10   DISTRICT 17?

11   A.  AGAIN, IT IS OVER 50 PERCENT BLACK.

12   Q.  AND SO DO YOU SEE ANY -- JUST BASED ON THE LINES, DO YOU

13   SEE ANY NONRACIAL REDISTRICTING CRITERION THAT COULD EXPLAIN

14   THIS CONFIGURATION?

15   A.  NO.

16   Q.  AND COULD A RACIAL CONSIDERATION EXPLAIN THIS

17   CONFIGURATION?

18   A.  IT COULD.

19   Q.  AND WHAT CONSIDERATION WOULD THAT BE?

20   A.  IF ONE'S GOAL WAS TO INCREASE SENATE DISTRICT 17 TO BE

21   OVER 50 PERCENT BLACK, CUTTING OUT THIS AREA, ESSENTIALLY NOT

22   GOING TO THE PARISH BOUNDARY, TO THE TRADITIONAL REDISTRICTING

23   BOUNDARY, AND INSTEAD STOPPING THE LINE IN THE MIDDLE OF

24   NOWHERE, WOULD HELP ACHIEVE THAT RACIAL TARGET.

25   Q.  ALL RIGHT.  AND SO FINALLY, DR. JOHNSON, WE GET TO -- WE

DR. D. JOHNSON - DIRECT

10:36AM   1    COME TO ILLUSTRATIVE SENATE DISTRICT 19 IN JEFFERSON PARISH.  I

          2    WOULD LIKE TO TURN TO FIGURE 18 ON PAGE 29.

          3          SO IT LOOKS LIKE, DR. JOHNSON, IT LOOKS LIKE YOU HAVE A

          4    MAP OF THE DISTRICT AND THEN AN INSET.  AND MAYBE IT'S BEST TO

          5    START WITH THE FULL MAP, AND THEN WE CAN GET TO THE INSET.  BUT

          6    CAN YOU WALK THE COURT THROUGH WHAT YOU ARE SHOWING IN THIS

          7    MAP?

          8    A.   SURE.  VERY SIMILAR TO THE EARLIER MAPS, WE ARE LOOKING AT

          9    THE BLUE LINES BEING THE ILLUSTRATIVE SENATE DISTRICT 19

         10    BOUNDARY.  WE HAVE GOT THE THICK BROWN DASHES BEING THE PARISH

         11    BOUNDARY.  YOU CAN REALLY SEE THEM BEST OVER ON THE RIGHT-HAND

         12    SIDE OF THE MAP, AND THEN THROUGH THE KIND OF LEFT MIDDLE OF

         13    THE MAP, YOU CAN SEE THE PARISH BOUNDARIES COMING DOWN.

         14          THERE IS ALSO -- THE BLUE HATCHING AT THE TOP IS WATER,

         15    AND YOU CAN SEE THE RIVER ALSO IN THE BLUE HATCHING GOING

         16    THROUGH THE LEFT OR RIGHT, THROUGH THE MIDDLE OF THE MAP.

         17          AND THEN WE'VE GOT THE SAME COLOR SHADING, SO CITY BLOCKS

         18    BY CITY BLOCKS, AND WE'RE IN THE HEAVILY POPULATED AREA.  WE

         19    HAVE GOT THE PURPLE BEING 25 PERCENT OR LESS, THE BLUE BEING

         20    LESS THAN 50 PERCENT BLACK, AND THEN THE GREENS, YELLOWS AND

         21    REDS BEING MAJORITY BLACK.  AND REALLY AT A GLANCE, YOU CAN SEE

         22    THERE ARE SOME EDGE COMMUNITIES, BUT THE MAP IS VERY HEAVILY

         23    EITHER PURPLE OR RED.  IT IS EITHER LESS THAN 25 PERCENT BLACK

         24    OR OVER 75 PERCENT BLACK.  ONLY AMONG THE EDGES WHERE THE TWO

         25    COLORS MEET ARE THERE MORE BLENDED NEIGHBORHOODS.

DR. D. JOHNSON - DIRECT

10:38AM

1    Q.  SO JUST TO HIGHLIGHT JUST A FEW AREAS ON THIS MAP, SO

2    MOVING TO THE FAR WEST, I DON'T THINK EITHER ONE OF US ARE

3    GOING TO PRONOUNCE THESE CORRECTLY, BUT IS IT BOOT

4    (PRONOUNCING), B-O-U-T-T-E?

5            **THE COURT:**  BOUTTE.

6            **THE WITNESS:**  BOUTTE.

7    **BY MR. LEWIS:**

8    Q.  BOUTTE.  OKAY.

9    A.  SO BOUTTE IS A COMMUNITY THAT'S JUST OUTSIDE THE BOUNDARY

10   OVER THERE ON THE WEST SIDE.

11   **BY MR. LEWIS:**

12   Q.  AND THEN MOVING NORTH, IT LOOKS LIKE KENNER AND RIVER

13   RIDGE.  WHAT IS GOING ON THERE?

14   A.  OH, YES.  SO THIS IS WHERE THE -- THE ARROWS KIND OF

15   HIGHLIGHT NOTABLE AREAS, AS I LOOK AT THIS MAP, WHERE THE

16   BOUNDARY LINE IS -- IT STARTS IN THE TOP LEFT ON THE LAKE, IF

17   THAT MAKES SENSE, AND THEN IT STARTS TO COME DOWN ALONG THE

18   PARISH LINE.  YOU CAN SEE THE THICK BROWN DASHED LINE THERE,

19   BUT INSTEAD OF FOLLOWING THE PARISH, IT ZIGS IN, AND IT'S NOT

20   FOLLOWING A FREEWAY, IT'S NOT FOLLOWING A COMMUNITY BOUNDARY.

21   IT ZIGS IN TO GET A PART OF KENNER.  AND THEN IT CROSSES A

22   FREEWAY, COMES DOWN.  THE WHITE AREAS HAVE NO PEOPLE IN THEM.

23   THEY ARE OPEN SPACE.  SO IT COMES DOWN THROUGH OPEN SPACE AND

24   THEN AGAIN ZIGS TO THE EAST TO PICK UP A RED, 75-PERCENT BLACK

25   OR MORE COMMUNITY FROM OUT OF AN OTHERWISE PURPLE AREA.

10:39AM  1          **MS. KEENAN:**  OBJECTION, YOUR HONOR.  MAY I EXPLAIN?

2          **THE COURT:**  YOU MAY.

3          **MS. KEENAN:**  AGAIN, IT'S ABOUT PRECISION OF LANGUAGE

4    HERE.  HE CAN TALK ABOUT THE WAY THAT THE DISTRICT IS SHAPED

5    AND WHAT TERRITORY IT DOES PICK UP, BUT WHAT HE IS TESTIFYING

6    RIGHT NOW IS THAT A DISTRICT ZIGS OR ZAGS IN A CERTAIN WAY TO

7    PICK UP A SPECIFIC COMMUNITY, AND THAT'S GOING TO THE INTENT OF

8    MR. COOPER, NOT JUST TO WHAT THE MAPS ACTUALLY SHOW ON THE

9    SCREEN.  IT IS JUST THE PRECISION HERE.

10          **THE COURT:**  MR. LEWIS?

11          **MR. LEWIS:**  YOUR HONOR, HE IS DESCRIBING -- I

12    THINK -- I AM INTERPRETING HIS LANGUAGE AS THE LANGUAGE OF THE

13    FACT THAT THE LINE COMES OVER.  HE'S NOT SAYING MR. COOPER DREW

14    THIS CONFIGURATION FOR THIS PURPOSE.  HE IS DESCRIBING THE

15    EFFECT.

16          **THE COURT:**  WELL, IT SOUNDS TO ME LIKE THAT IT IS FOR

17    THIS PURPOSE, SO I WOULD SUSTAIN THE OBJECTION.  YOU CAN ASK IT

18    A DIFFERENT WAY, AND MAYBE DR. JOHNSON WILL ANSWER IT USING

19    DIFFERENT TERMINOLOGY.

20          **MR. LEWIS:**  YES, YOUR HONOR.

21    **BY MR. LEWIS:**

22    Q.  SO, DR. JOHNSON, YOU WERE TALKING ABOUT RIVER RIDGE.  WHAT

23    IS THE EFFECT OF THE -- YOU DESCRIBED THIS DISTRICT BOUNDARY

24    COMING IN FROM THE PARISH BORDER AND SURROUNDING RIVER RIDGE.

25    WHAT IS THE EFFECT OF THAT LINE BEING DRAWN IN THAT LOCATION?

10:41AM

1   A.   SURE.  AS IT COMES SOUTH ALONG THE PARISH, THE LINE THEN

2   MOVES TO THE EAST, AND IT PICKS UP THE AREA OF KENNER.  IT IS

3   NO LONGER FOLLOWING THE PARISH BOUNDARY, IT'S NOT FOLLOWING THE

4   FREEWAY BOUNDARY, IT'S NOT FOLLOWING A COMMUNITY, A CITY OR

5   OTHER COMMUNITY OF INTEREST BOUNDARY.  IT KIND OF JUST ZIGS AND

6   ZAGS THROUGH THE NEIGHBORHOODS.  IN SO DOING IT, IT ENCOMPASSES

7   A MAJORITY BLACK AREA IN KENNER.  IT THEN -- THE BOUNDARY LINE

8   THEN MOVES SOUTH THROUGH THE WHITE -- WHITE MEANS THERE'S NO

9   POPULATION IN THAT AREA -- THROUGH THAT OPEN AREA, AND THE LINE

10  THEN MOVES TO THE EAST AND AROUND THE RIVER RIDGE AREA.  AS IT

11  GOES EAST, IT TAKES IN THE RED 75-PERCENT BLACK AREA, WITH THE

12  EFFECT OF TAKING THAT AREA INTO THE ILLUSTRATIVE SENATE

13  DISTRICT 19, AND LEAVING OUTSIDE OF THE DISTRICT THE PURPLE

14  25 PERCENT OR LESS AREA THAT GEOGRAPHICALLY SURROUNDS RIVER

15  RIDGE OR THE PART OF RIVER RIDGE IT IS PICKING UP.

16       IT THEN MOVES SOUTH AND GETS TO THE RIVER AND THEN FOLLOWS

17  THE RIVER AND THE PARISH BOUNDARY, WHICH IS THE RIVER IN THAT

18  SECTION, FOR A CONSIDERABLE WAY, AND THAT IS FOLLOWING A

19  TRADITIONAL PRINCIPLE, OBVIOUSLY.  THE RIVER IS A BIG

20  GEOGRAPHIC FEATURE, AND IT'S VERY CLEAR TO RESIDENTS WHERE THAT

21  IS, AND THAT'S AN EASILY UNDERSTOOD BOUNDARY, WHICH IS A

22  TRADITIONAL PRINCIPLE.  BUT THEN AS IT GETS TO ITS EASTERN

23  EDGE, THE BLUE DASHES, WHICH ARE THE BOUNDARY OF SENATE

24  DISTRICT 17, TURN SOUTH.  THEY DON'T CONTINUE ON JUST THAT

25  SHORT DISTANCE TO CONTINUE FOLLOWING THE RIVER AND THE PARISH.

10:42AM   1    THEY STOP, AND THE LINE MOVES SOUTH.  YOU CAN SEE IT, AND THIS

          2    PART IS THE PART THAT IS IN THE INSET MAP IN A LITTLE MORE

          3    DETAIL TO THE RIGHT.

          4         WE ARE GOING THROUGH -- DOWN TO WOODMERE.  SO AS IT GOES

          5    DOWN TO WOODMERE, IT HAS VARIOUS BUMPS AND INLETS THAT IT TAKES

          6    IN AND LEAVES OUT AS -- I DON'T KNOW IF YOU CALL IT THE CLUB OR

          7    THE FOOT, I DON'T KNOW HOW TO DESCRIBE THAT, THE SOUTHEASTERN

          8    KIND OF CLUB OF ILLUSTRATIVE SENATE DISTRICT 19.  IT GETS DOWN

          9    TO THE OPEN SPACE, BUT THEN IT COMES BACK UP.  AND AS YOU CAN

         10    SEE ON BOTH THE MAPS, THE INSET AND THE BIG MAP, IT THEN CARVES

         11    AROUND A POPULATION AREA, IT CARVES AROUND ESTELLE, LEAVING THE

         12    PURPLE AREA OUT OF SENATE DISTRICT 19, KIND OF ISOLATING THAT

         13    AGAINST THE WHITE UNPOPULATED AREA AND COMES AROUND TO MARRERO,

         14    I HOPE I SAID THAT RIGHT, AND GOING OVER TO AVONDALE AND THOSE

         15    AREAS UNTIL IT GETS BACK OVER AND AGAIN CROSSES, BRIEFLY

         16    FOLLOWS, A PARISH BOUNDARY AS IT MOVES UP TO THE NORTHWEST, AND

         17    THEN AGAIN LEAVES THE PARISH BOUNDARY, NOT FOLLOWING A

         18    TRADITIONAL PRINCIPLE, AND HEADS WEST AND THEN ZIGS AND ZAGS

         19    AROUND -- FROM BOUTTE BACK TO THE LAKE.

         20         SO IT'S AN ALMOST SERPENTINE DISTRICT AS IT KIND OF

         21    SOMETIMES FOLLOWS THE PARISH BOUNDARY, SOMETIMES FOLLOWS THE

         22    RIVER BUT MOST OF THE TIME DOES NOT.

         23    Q.  AND WHEN YOU ARE DESCRIBING PURPLE AREAS, DR. JOHNSON,

         24    JUST TO MAKE SURE I'M CLEAR, IS THAT A REFERENCE TO REGIONS

         25    THAT HAVE 25 PERCENT OR LESS BLACK VOTING AGE POPULATION?

DR. D. JOHNSON - DIRECT

10:44AM

1    A.   EXACTLY.   THERE'S, YOU KNOW -- THERE'S A STRONG

2    CORRELATION BETWEEN WHERE THE LINES ENDED UP AND THE --

3    INCLUDING THE 75 PERCENT AND HIGHER BLACK VAP AREAS AND

4    EXCLUDING THE 25 PERCENT AND LESS AREAS, WHETHER INTENTIONALLY

5    OR NOT.

6    Q.   OKAY.   AND DR. JOHNSON, DOES THE -- TAKEN AS A WHOLE, DOES

7    THE DISTRICT BOUNDARY FOR ILLUSTRATIVE SENATE DISTRICT 19

8    APPEAR TO RESPECT NONRACIAL REDISTRICTING CRITERIA THAT

9    MR. COOPER SAYS THAT HE FOLLOWED?

10   A.   ONLY IN VERY LIMITED SMALL SECTIONS OF IT.   THE

11   OVERWHELMING MAJORITY OF THE BOUNDARY DOES NOT.

12   Q.   OKAY.   AND IS THERE A RACIAL REDISTRICTING CRITERION THAT

13   COULD EXPLAIN THIS PARTICULAR CONFIGURATION?

14   A.   YES.

15   Q.   AND WHAT WOULD THAT CRITERIA BE?

16   A.   THE END RESULT IS THAT IT'S A MAJORITY BLACK SENATE

17   DISTRICT.

18   Q.   OKAY.   NOW, YOU MENTIONED THAT YOU REVIEWED MR. COOPER'S

19   TRIAL TESTIMONY FROM WEDNESDAY.   IS THAT RIGHT?

20   A.   YES.

21   Q.   AND DID YOU REVIEW MR. COOPER'S TRIAL TESTIMONY ABOUT

22   THESE THREE DISTRICTS?

23   A.   YES.

24   Q.   DID THAT TESTIMONY CHANGE ANY OF YOUR OPINIONS?

25   A.   NO.

10:46AM  1    Q.  WHY NOT?

2    A.  HE STATED THAT IT -- HE FOLLOWED TRADITIONAL REDISTRICTING

3    CRITERIA AND RACE.  AND WHEN I LOOK AT THESE LINES, THEY ARE

4    NOT FOLLOWING TRADITIONAL REDISTRICTING PRINCIPLES, SO THAT

5    LEAVES, JUST IN HIS OWN WORDS, RACE.

6         **MR. LEWIS:**  YOUR HONOR, JUST AS A TIME KEEPING, I

7    KNOW WE ARE PAST 10:30.

8         **THE COURT:**  YOU ARE MOVING ON TO HOUSE DISTRICTS NOW?

9         **MR. LEWIS:**  YES.

10        **THE COURT:**  THIS IS A GOOD TIME TO TAKE A BREAK.  I

11   WAS GOING TO SUGGEST THAT WE TAKE A BREAK AT THAT POINT.

12        **MR. LEWIS:**  YES, YOUR HONOR.

13        **THE COURT:**  FIFTEEN MINUTES.

14        **(RECESS TAKEN AT 10:46 A.M. UNTIL 11:02 A.M.)**

15        **THE COURT:**  DR. JOHNSON, WOULD YOU TAKE THE STAND

16   AGAIN, PLEASE?  MR. LEWIS, YOU MAY CONTINUE.

17   **BY MR. LEWIS:**

18   Q.  THANK YOU, DR. JOHNSON.  I WOULD LIKE TO NOW TURN TO YOUR

19   REVIEW OF MR. COOPER'S ILLUSTRATIVE HOUSE DISTRICTS.  AND THE

20   FIRST TWO I WOULD LIKE TO LOOK AT ARE ILLUSTRATIVE HOUSE

21   DISTRICTS 1 AND 2 IN SHREVEPORT.  IF WE COULD TURN TO FIGURE 19

22   ON PAGE 3.

23        SO DR. JOHNSON, CAN YOU ORIENT THE COURT TO THIS FIGURE?

24   WHAT ARE WE SEEING HERE?

25   A.  WE ARE LOOKING AT ROUGHLY THE SAME AREA WE WERE LOOKING AT

11:03AM

1    IN THE SENATE MAP OF THE SHREVEPORT AREA.  ONE CHANGE IS THE

2    PARISH BOUNDARIES ARE NOW THE BLACK DASHED LINES RATHER THAN

3    THE THICK BROWN DASHED LINES.  AND IN THIS CASE, THE RED LINES

4    ARE A LITTLE THICKER, SO THEY ARE A LITTLE EASIER TO SEE THE

5    CITY AND CENSUS PLACE BOUNDARIES.  BUT YOU CAN SEE THE FREEWAY

6    RUNNING THROUGH THE MIDDLE AND THE RIVER STARTING AND THE TOP

7    AND COMING OFF THE EAST SIDE.  SO IT IS ROUGHLY THE SAME AREA.

8    IN THIS CASE, THE PURPLE-BLUE LINES ARE THE ILLUSTRATIVE HOUSE

9    MAP.

10   Q.  I SEE.  OKAY.  AND THE COLOR SHADING FOR CENSUS BLOCKS,

11   THAT'S THE SAME SCALE OF BLACK VOTING AGE POPULATION WE'VE BEEN

12   USING?

13   A.  CORRECT.

14   Q.  SO WHAT DID YOU FIND NOTEWORTHY ABOUT THE CONFIGURATION OF

15   -- LET'S START WITH ILLUSTRATIVE HOUSE DISTRICT 1.  WHAT DID

16   YOU FIND NOTEWORTHY ABOUT THE CONFIGURATION OF THIS DISTRICT

17   BOUNDARY?

18   A.  WELL, YOU CAN SEE THE PARISH BOUNDARY AT THE TOP PART OF

19   THE MAP, AGAIN, THE BLACK DASHED LINE.  DISTRICT 1 GOES RIGHT

20   ACROSS THAT.  SO IT'S NOT FOLLOWING THE PARISH BOUNDARY.  IN

21   ADDITION, YOU CAN SEE THE RIVER COMING DOWN, THE BLUE HATCHING

22   ON THE WHITE AREA.  DISTRICT 1 GOES RIGHT ACROSS THAT.  SO IT'S

23   NOT FOLLOWING THE PARISH BOUNDARY, IT'S NOT FOLLOWING THE

24   RIVER, IT'S NOT FOLLOWING MAJOR ROADS.

25        YOU CAN SEE ALONG THE TOP THERE IT IS CLOSE TO BUT ALSO

11:04AM  1   NOT FOLLOWING THE CITY OR CENSUS PLACE BOUNDARIES.  SO IT'S

2   JUST TAKING BOTH SIDES OF THE RIVER, NOT FOLLOWING ANY

3   TRADITIONAL BOUNDARY -- ACTUALLY, I SHOULD SAY BOTH SIDES OF

4   THE RIVER, BOTH SIDES OF THE PARISH BOUNDARY, NOT FOLLOWING ANY

5   TRADITIONAL REDISTRICTING PRINCIPLE.

6   Q.   OKAY.  AND DO YOU HAPPEN -- WELL, I MEAN -- OKAY.  AND IF

7   WE THEN TURN TO -- AND DOES IT KEEP BOSSIER CITY WHOLE?

8   A.   NO, IT DOES NOT.

9   Q.   AND IF WE TURN TO ILLUSTRATIVE HOUSE DISTRICT 2 TO ITS

10   SOUTH, WHAT IS NOTEWORTHY TO YOU ABOUT THIS BOUNDARY LINE?

11   A.   AGAIN, WE ARE GETTING ZIGS AND ZAGS.  WHAT IS RATHER

12   TELLING IS IT HAS AN ODD-SHAPED WESTERN BOUNDARY, BUT IT IS

13   FAIRLY WIDE AS YOU GO FROM THE WEST END OVER TO THE FREEWAY,

14   RIGHT ALONG WHERE THE 02 LABEL IS, AND THEN IT GETS REALLY

15   NARROW.  AND IT'S GETTING NARROW TO NOT GO NORTH INTO ONE, AND

16   IT IS GETTING NARROW IN A WAY THAT AVOIDS GOING INTO THE PURPLE

17   OR VERY LOW BLACK PERCENTAGE AREA TO THE SOUTH SHOWN IN

18   DISTRICT 6.  SO IT GETS A NARROW NECK THROUGH THAT AREA AS IT

19   MOVES FROM WEST TO EAST, AND THEN IT WINDS BACK OUT AS YOU GET

20   MORE REDS, MORE GREENS.  AND AGAIN, IT CROSSES THE PARISH LINE,

21   IT CROSSES THE RIVER.  AND THEY DON'T SHOW THE WHOLE THING OUT

22   TO THE EAST, BUT IT REALLY IS SPLITTING.  YOU CAN SEE ONE NECK

23   JUST ABOVE WHERE IT SAYS 09.  ONE NECK OF IT IS GOING THAT WAY,

24   AND THEN ONE NECK GOING DOWN TO THE RIGHT THERE.  SO IT SPLITS

25   AND GOES OFF IN TWO BRANCHES.

11:06AM   1          SO AGAIN, IT'S A VERY UNUSUAL GEOGRAPHIC SHAPE THAT DOES

2    NOT FOLLOW A PARISH BOUNDARY, DOES NOT FOLLOW THE RIVER, DOES

3    NOT FOLLOW A FREEWAY, DOES NOT FOLLOW A CITY BOUNDARY.  IT

4    DOESN'T SEEM TO FOLLOW ANY TRADITIONAL REDISTRICTING PRINCIPLE.

5    Q.  OKAY.  AND DOES IT APPEAR TO RESPECT ANY COMMUNITIES

6    DEFINED BY, FOR EXAMPLE, SHARED SOCIO-ECONOMIC FACTORS OR

7    ANYTHING LIKE THAT?

8    A.  NO.  AGAIN, WE ARE LOOKING WITHIN A CITY, SO THERE'S --

9    IT'S NOT FOLLOWING ANY SOCIO-ECONOMIC FACTORS THAT I SEE ON THE

10   MAP, AND MR. COOPER SAID HE DID NOT HAVE SOCIO-ECONOMIC DATA

11   WITHIN THE CITY.  HE ONLY HAD THE CITY TOTALS.  AND SO IF ALL

12   YOU HAVE IS THE CITY TOTALS, THERE IS NO WAY TO FOLLOW THE

13   SOCIO-ECONOMIC LINES WHEN YOU ARE DRAWING WITHIN THE CITY.

14   Q.  SO, DR. JOHNSON, IS THERE A RACIAL REDISTRICTING CRITERIA

15   THAT COULD EXPLAIN THE CONFIGURATION OF DISTRICTS 1 AND 2?

16   A.  YES.  IT DOES END UP WITHIN BOTH RESULTING AT MAJORITY

17   BLACK.

18   Q.  OKAY.  ALL RIGHT.  AND I WOULD LIKE TO NOW MOVE SOUTH FROM

19   HERE TO LOOK AT MR. COOPER'S ILLUSTRATIVE HOUSE DISTRICT 23

20   CENTERED IN NATCHITOCHES PARISH.  SO IF WE COULD GO TO FIGURE

21   20 ON PAGE 31.  AND DR. JOHNSON, CAN YOU ORIENT THE COURT TO

22   THIS FIGURE?  WHAT ARE WE LOOKING AT?

23   A.  SIMILAR LAYOUT OF LAYERS.  WE HAVE GOT OUR COLOR-CODED

24   CENSUS BLOCKS AT THE BOTTOM THAT ARE THE SAME SHADING OF PURPLE

25   TO RED THAT WE'VE BEEN LOOKING AT ALL THE MAPS.  YOU CAN SEE

11:08AM    1    THE BLUE HATCH ON WHITE THAT ARE THE LAKES AND RIVERS ON THE

2    MAP.

3         THE RED LINES HERE ARE THANKFULLY EASIER TO SEE THAN THAT

4    FIRST MAP AROUND THE CITIES AND CENSUS DESIGNATED PLACES.  AND

5    THEN OVER ON THE RIGHT-HAND SIDE, YOU CAN SEE THE BLACK DASHED

6    LINES OF THE PARISH BOUNDARIES AS WELL.

7         BUT WE ARE LOOKING PRIMARILY AT DISTRICT 23 AS IT COMES

8    INTO NATCHITOCHES AND THEN A LITTLE BIT OF 22 AS IT SENDS A

9    FINGER DOWN INTO NATCHITOCHES, PULLING OUT THAT NORTHEASTERN

10   CORNER OF THE CITY AND KIND OF SENDING DISTRICT 23 AROUND IT TO

11   GET UP TO THE PORTION OF CLARENCE THAT DISTRICT 22 AND 23

12   SPLIT.

13   Q.  SO IF WE LOOK AT THE PORTION OF CLARENCE THAT'S IN HD 23,

14   WHAT IS THE BLACK VOTING AGE POPULATION RANGE IN THAT AREA?

15   A.  IT'S GOT THE -- RIGHT WHERE THE C-L-A-R IN CLARENCE IS,

16   IT'S GOT A LITTLE LIGHT BLUE, BUT THEN ABOVE WHERE THE TITLE

17   IS, IT'S THE RED, THE 75 PERCENT BLACK OR HIGHER.

18   Q.  OKAY.  AND THE PORTION OF NATCHITOCHES THAT IS ASSIGNED

19   INTO HD 22, WHAT IS THE RACIAL MAKEUP OF THAT REGION?

20   A.  IT'S PURPLE AND BLUE, SO LESS THAN 50 PERCENT BLACK, AND

21   THE PURPLE AREAS ARE LESS THAN 25 PERCENT BLACK.

22   Q.  OKAY.  AND DO YOU HAPPEN TO KNOW THE BVAP OF ILLUSTRATIVE

23   HOUSE DISTRICT 23?

24   A.  IT IS MAJORITY BLACK.

25   Q.  IS IT FAIRLY CLOSE TO THE 50 PERCENT LINE OR HIGHER?

DR. D. JOHNSON - DIRECT

11:10AM

1    A.   YES.

2    Q.   WHICH ONE?

3    A.   PARDON?

4    Q.   I ASKED A BAD QUESTION, DR. JOHNSON.  IS IT CLOSE TO THE

5    50 PERCENT LINE?

6    A.   YES.

7    Q.   OKAY.  AND DR. JOHNSON, DOES THE BOUNDARY OF HOUSE

8    DISTRICT -- ILLUSTRATIVE HOUSE DISTRICT 23 APPEAR TO FOLLOW A

9    NONRACIAL REDISTRICTING CRITERION THAT MR. COOPER REPRESENTED

10   THAT HE FOLLOWED?

11   A.   NO.

12   Q.   ALL RIGHT.  SO MAJOR ROADS?

13   A.   YES.  THERE'S A LITTLE BIT -- IT'S WEIRD.  IT FOLLOWS THE

14   RIVER ON THE NORTH SIDE OF 23, BETWEEN 22 AND 23, KIND OF WHERE

15   22, 23 AND 13 ALL COME TOGETHER OVER BY ST. MAURICE.  IT DOES

16   FOLLOW THE RIVER.  BUT THEN TO THAT AREA, YOU ARE JUST TALKING

17   ABOUT IT ZIGS OFF THE RIVER TO COME IN AND TAKE OUT A CHUNK OF

18   NATCHITOCHES, NOT FOLLOWING A MAJOR ROAD, NOT FOLLOWING A WATER

19   FEATURE, NOT FOLLOWING -- ACTUALLY DELIBERATELY OR OTHERWISE

20   CROSSING RIGHT OVER THE CITY BOUNDARY TO TAKE OUT THAT CHUNK OF

21   THE CITY AND FORCE 23 AROUND IT, WHICH BOTH DIVIDE THE

22   COMMUNITY AND MAKES 23 LESS COMPACT.

23   Q.   OKAY.  AND DR. JOHNSON, IS THERE A RACIAL REDISTRICTING

24   CRITERIA THAT COULD EXPLAIN THIS CONFIGURATION?

25   A.   YES.

DR. D. JOHNSON - DIRECT

11:12AM

1    Q.  AND WHAT IS THAT?

2    A.  THE -- CAREFULLY OR COINCIDENTALLY, THE CARVING OUT OF

3    THAT VERY LOW BLACK AREA OF NATCHITOCHES FROM DISTRICT 23 HELPS

4    MAKE DISTRICT 23 MAJORITY BLACK.

5    Q.  OKAY.  ALL RIGHT.  SO DR. JOHNSON, JUST CONTINUING SOUTH

6    TO THE LAKE CHARLES AREA, I WOULD NOW LIKE TO TURN TO YOUR

7    ANALYSIS OF ILLUSTRATIVE HOUSE DISTRICT NUMBERS 38 AND 34.  SO

8    IF WE COULD TURN TO FIGURE 21 ON PAGE 32.  WE HAVE A FAIR

9    NUMBER OF DISTRICTS ON THE SCREEN, DR. JOHNSON.  CAN YOU ORIENT

10   THE COURT TO WHAT WE HAVE SHOWN HERE?

11   A.  YES.  SO THE GEOGRAPHY IS THE SAME.  WE HAVE GOT OUR

12   CENSUS BLOCKS WITH THE SAME BLACK COLOR CODING TO THEM AS

13   BEFORE, WITH THE PURPLES BEING LOW AND REDS BEING HIGH.  WE

14   HAVE THE SAME PURPLE -- THICK PURPLE LINES ARE THE ILLUSTRATIVE

15   MAP BOUNDARIES, AND THE RED LINES ARE THE CITY AND CENSUS PLACE

16   LINES.  AND THEN YOU CAN SEE THE FREEWAYS AND THE VARIOUS WATER

17   FEATURES ALSO ON THE MAP.

18       THIS IS A DENSE AREA, LOTS OF POPULATION, SO WE ARE

19   GETTING A LOT OF DISTRICTS, BUT THE MAIN FOCUS OF MY ANALYSIS

20   IS 34 AND 38 AND THE IMPACT THAT 36 HAS ON 34.

21   Q.  OKAY.  AND SO LET'S START WITH -- WHY DON'T WE START WITH

22   ILLUSTRATIVE DISTRICT 38.  NOW, ARE THERE ANY FEATURES OF THIS

23   DISTRICT'S CONFIGURATION THAT STAND OUT TO YOU?

24   A.  YES.  IN THE TOP OF THE MAP, BY WHERE IT SAYS MOSS BLUFF,

25   IT IS COMING DOWN, IT IS ACTUALLY FOLLOWING A WATER FEATURE AS

11:14AM   1   IT GOES AROUND THERE.  IT IS FOLLOWING A RIVER MAINLY.  BUT

2   THEN WHEN IT GETS OVER TO WESTLAKE, IT LEAVES THE RIVER, IT

3   STOPS FOLLOWING THE RIVER, AND IT CUTS RIGHT THROUGH WESTLAKE.

4   SO IT IS CARVING OUT THE SOUTHEASTERN PORTION OF WESTLAKE,

5   GOING AROUND, GETTING KIND OF THE BIG OPEN AREA THERE THAT IS

6   PURPLE, BUT WHEN CENSUS BLOCKS ARE THAT BIG, IT TENDS TO

7   INDICATE THEY ARE RELATIVELY LOW POPULATION USUALLY.

8        AND THEN IT GETS INTO THE MORE CITY TYPE CITY BLOCK BY

9   CITY BLOCK SOUTHERN PORTION OF WESTLAKE WHERE YOU CAN SEE THE

10   DENSE CONCENTRATION OF YELLOW AND RED AREAS.  SO AS THE LINE,

11   THE PURPLE LINE GOES AROUND THROUGH THE CITY, IT HAS THE IMPACT

12   OF OR THE EFFECT OF BRINGING IN THAT SOUTH WESTLAKE

13   NEIGHBORHOOD INTO DISTRICT 38 AND SPLITTING THE CITY.

14        AND THEN IT COMES DOWN AND KIND OF WEAVES AROUND THE WATER

15   FEATURE AGAIN BEFORE GETTING TO THE DISTRICT 34 AND DISTRICT 38

16   BOUNDARY, WHICH DOESN'T FOLLOW A FREEWAY, DOESN'T FOLLOW A CITY

17   OR OTHER CLEAR COMMUNITY BOUNDARY.

18        AGAIN, WE ARE WITHIN A PARISH AND WITHIN A CITY THERE, SO

19   IF YOU ONLY HAVE CITY LEVEL SOCIO-ECONOMIC DATA, THAT CAN'T BE

20   -- THAT DOESN'T GIVE YOU ANY INFORMATION THAT COULD BE FOLLOWED

21   WITHIN THE CITY AS YOUR BOUNDARY LINE.  SO IT COMES ALONG AND

22   CARVES THROUGH THE CITY, NOT FOLLOWING ANY TRADITIONAL

23   REDISTRICTING PRINCIPLE.

24   Q.  AND WHEN YOU TALKED ABOUT THAT SOUTHERN PORTION OF

25   WESTLAKE THAT WAS ASSIGNED -- THAT WAS SPLIT FROM THE REST OF

11:16AM  1   THE CITY AND ASSIGNED INTO ILLUSTRATIVE HOUSE DISTRICT 38, WHAT

2   WAS THE RACIAL COMPOSITION OF THAT PIECE?

3   A.   IT'S A MAJORITY BLACK.   THE CITY BLOCKS ARE ALL YELLOW AND

4   RED, SO IT IS INDICATING 65 PERCENT OR HIGHER.

5   Q.   OKAY.   ALL RIGHT.   AND SO TURNING TO ILLUSTRATIVE HOUSE

6   DISTRICT 34 TO THE SOUTH OF ILLUSTRATIVE HOUSE DISTRICT 38,

7   WHAT FEATURES OF THIS DISTRICT CONFIGURATION STOOD OUT TO YOU?

8   A.   WELL, IT HAS THE SAME CONCERN THAT I MENTIONED ABOUT

9   DISTRICT 38 IN TERMS OF ITS NORTHERN BOUNDARY, WHERE IT BORDERS

10   WITH 38.   AND THEN ON -- IT'S HARD TO DESCRIBE THE SOUTHERN AND

11   SOUTHWESTERN BOUNDARIES OF 34.   IT'S A LOT OF FINGERS.   YOU

12   KNOW, IT DOES GO WEST FOLLOWING THE FREEWAY, I WILL GIVE CREDIT

13   FOR THAT, TO THE RIVER AND FOLLOWS THE RIVER ON THE WEST EDGE

14   OR STOPS AT THE RIVER ON THE WEST EDGE, BUT THAT'S AN ODD

15   FINGER STICKING OUT.

16       THEN I MENTIONED I LOOKED AT 36 AS IT IMPACTS 34.   36

17   COMES INTO LAKE CHARLES, THAT KIND OF WRAPAROUND EFFECT THAT

18   THEY HAVE GOING ON THERE.   IT'S NOT FOLLOWING A CITY BOUNDARY,

19   IT'S NOT FOLLOWING A COMMUNITY BOUNDARY.   BUT 34 THEN HAS THE

20   ODD FINGER DOWN TO THE LEFT.   IT'S PURPLE, SO I DON'T KNOW WHAT

21   THE REASON FOR THAT IS, AND THERE'S NO VISIBLE REASON ON THE

22   MAP THERE.

23       THEN 36 AGAIN KIND OF HAS TEETH COMING UP INTO 34, PULLING

24   OUT THE -- IN ONE CASE FOLLOWING THE CITY BOUNDARY AND THE

25   EASTERN OF THE TWO TEETH, BUT ON THE WESTERN TOOTH, IT'S

11:18AM   1   CUTTING RIGHT IN THE CITY, PICKING UP AN AREA THAT IS PURPLE,

          2   SO 25 PERCENT BLACK OR LESS.  AND THEN THE AREAS THAT ARE

          3   35 PERCENT, WHAT IS IT, 25 -- EVEN 25 TO 50 PERCENT END UP IN

          4   34, WHILE THE 25 PERCENT AND BELOW END UP IN 36.  AND THEN IT

          5   KEEPS CARVING AROUND AND AGAIN PICKS UP THE -- KIND OF GOES

          6   AROUND THE PURPLE AREA AND PICKS UP THE BLUE AREA AS IT OF

          7   CRISS-CROSSES AND ZIG ZAGS ACROSS THE CITY BOUNDARY.

          8   Q.  AND AGAIN, DR. JOHNSON, IS THERE A NONRACIAL REDISTRICTING

          9   CRITERIA THAT EXPLAINS THIS DISTRICT CONFIGURATION FOR YOU?

         10   A.  THERE'S NO TRADITIONAL REDISTRICTING PRINCIPLE THAT

         11   EXPLAINS THIS CONFIGURATION.

         12   Q.  AND DO YOU KNOW THE BVAP OF ILLUSTRATIVE HOUSE DISTRICTS

         13   34 AND 38?

         14   A.  THEY ARE MAJORITY BLACK.

         15   Q.  ARE THEY CLOSE TO THE 50 PERCENT LINE?

         16   A.  38 IS RIGHT AT, JUST BARELY OVER 50 PERCENT.  34 IS

         17   HIGHER.

         18   Q.  ALL RIGHT.  AND SO COULD THERE BE A RACIAL REDISTRICTING

         19   CRITERIA THAT WOULD EXPLAIN THIS CONFIGURATION?

         20   A.  YOU KNOW, CAREFULLY OR COINCIDENTALLY, WHATEVER THE REASON

         21   IS, 38 GETS JUST ENOUGH OF THE BLACK POPULATION ALONG THE

         22   BORDER WITH 34 TO END UP JUST BARELY OVER 50 PERCENT.

         23   Q.  OKAY.  FINALLY, DR. JOHNSON, I WOULD LIKE TO TURN TO

         24   MR. COOPER'S ILLUSTRATIVE HOUSE DISTRICTS CENTERED IN THE BATON

         25   ROUGE AREA.  SO IF WE COULD TURN TO FIGURE 22 ON PAGE 34.

11:20AM   1        OKAY.  ALL RIGHT.  SO NOW, DR. JOHNSON, IT LOOKS LIKE

       2   YOU'VE ADDED SOME PERCENTAGES TO YOUR LABELS FOR THE DIFFERENT

       3   ILLUSTRATIVE HOUSE DISTRICTS.  CAN YOU IDENTIFY WHAT THAT

       4   PERCENTAGE IS BENEATH EACH?

       5   A.  YES, SO THE BLACK ON BLUE, OR BLACK ON TEAL -- I'M NOT

       6   SURE HOW TO DESCRIBE THAT -- LABELS, IT GIVES THE DISTRICT

       7   NUMBER FIRST AND THEN THE BLACK -- ANY PART BLACK VAP

       8   PERCENTAGE FOR EACH DISTRICT THAT'S LABELED ON THIS MAP.

       9   Q.  OKAY.  ALL RIGHT.  I SAW A REFERENCE IN YOUR REPORT, DR.

      10   JOHNSON, FOR THIS FIGURE.  I BELIEVE YOU DESCRIBED SOME OF

      11   THESE DISTRICTS AS A PINWHEEL.  CAN YOU EXPLAIN WHAT YOU MEAN

      12   BY A PINWHEEL?

      13   A.  YES.  SO, OF COURSE, THE PINWHEEL IS THE KID'S TOY ON A

      14   STICK.  YOU HAVE THE LITTLE SPINNER WITH IT THAT HAS THE

      15   DIFFERENT LEAVES OR PETALS COMING OFF THE PINWHEEL.

      16   SIMILARLY -- ACTUALLY, JUST UP THE ROAD HERE, RIGHT NEXT TO THE

      17   LITTLE FREEWAY SYMBOL THERE THAT YOU SEE, THE DISTRICTS ALL

      18   COME TOGETHER.  SO YOU CAN SEE WHERE 29, 63, 65, 69, 68, 61 AND

      19   67 ALL KIND OF MEET AT ONE POINT.  AND THEN EACH ONE IS A PETAL

      20   COMING OFF OF THAT CENTRAL SPINNER POINT.

      21        SO WE ARE COMBINING THE CORE AREA RIGHT AROUND THE

      22   PINPOINT AND THEN TAKING EACH OF THESE DISTRICTS OUT INTO --

      23   THROUGH THE COMMUNITY AND OUT INTO THE OUTER REACHES OF EAST

      24   BATON ROUGE AND WEST BATON ROUGE PARISH.

      25   Q.  NOW, IN PARAGRAPH 76, I BELIEVE, OF YOUR REPORT, YOU ALSO

11:22AM   1   DISCUSS CENTRAL, LOUISIANA, JUST EAST OF EAST BATON ROUGE.  AND

        2   HOW DOES THE ILLUSTRATIVE PLAN TREAT CENTRAL?

        3   A.   JUST UNDER 30,000 RESIDENTS OF CENTRAL ARE DIVIDED AMONG

        4   THREE DIFFERENT DISTRICTS.

        5   Q.   OKAY.  NOW, YOU REPORT THE BLACK VOTING AGE POPULATIONS OF

        6   SEVERAL DISTRICTS IN THIS AREA.  AND HOW MANY OF THOSE

        7   DISTRICTS ARE MAJORITY-MINORITY?

        8   A.   THE EIGHT THAT ARE LABELED IN THE MAP ARE ALL

        9   MAJORITY-MINORITY.

       10   Q.   AND HOW MANY OF THOSE ARE JUST BARELY OVER 50 PERCENT?

       11   A.   ESSENTIALLY HALF OF THEM.  WE HAVE 50.2, 50.2, 50.8, AND

       12   51.6.

       13   Q.   JUST FOR THE RECORD, WHICH DISTRICT NUMBERS WERE YOU

       14   IDENTIFYING THERE?

       15   A.   OH, THANK YOU.  61, 69, 101 AND 67.

       16   Q.   AND DR. JOHNSON, I KNOW WE WERE FOCUSING ON THE

       17   ILLUSTRATIVE DISTRICTS HERE.  DO THESE DISTRICT BOUNDARIES

       18   APPEAR TO RESPECT NONRACIAL REDISTRICTING CRITERIA?

       19   A.   NO.  SIMILAR TO THE EARLIER DISCUSSION ABOUT THE BIG

       20   REGIONS, THESE -- WHAT THE PINWHEEL DOES IS IT ACTUALLY CUTS

       21   THROUGH COMMUNITIES.  SO YOU ARE TAKING THE CENTRAL CORE OF THE

       22   CITY AND TAKING EACH OF THESE DISTRICTS, HAVING A PIECE OF THAT

       23   CORE ALL THE WAY OUT.  AS YOU LOOK AT THE COLOR CODING, YOU CAN

       24   REALLY SEE THE RED KIND OF CENTRAL PORTION OF THE PARISH, AND

       25   THEN AS YOU GET FARTHER OUT, YOU ARE GETTING INTO BLUES AND

11:24AM  1   THEN ULTIMATELY PURPLE AREAS WHERE THE BLACK PERCENTAGE IS

2   BELOW 25 PERCENT.

3        SO EACH OF THESE DISTRICTS IS STARTING IN THE 75 PERCENT

4   CORE AND THEN STRETCHING OUT AND BLENDING PIECES OF THE

5   COMMUNITIES AS YOU GO OUT FROM THE RED TO THE PURPLE PORTIONS

6   OF THE PARISH.

7   Q.   AND ARE THERE TRADITIONAL CRITERIA THAT MR. COOPER

8   IDENTIFIED THAT EXPLAIN THESE BOUNDARIES?

9   A.   NO.

10  Q.   OKAY.  AND IS THERE A RACIAL REDISTRICTING CRITERIA THAT

11  COULD EXPLAIN THE CONFIGURATION OF THE DISTRICTS IN THIS AREA?

12  A.   YES.  THE END RESULT IS THAT YOU HAVE A NUMBER OF

13  DISTRICTS THAT JUST ALMOST PERFECTLY BALANCE THE PURPLE AND

14  GREEN AREAS WITH THE RED AREAS, WITH THE END RESULT BEING THEY

15  ARE JUST BARELY OVER 50-PERCENT BLACK.

16  Q.   OKAY.  AND I DO WANT TO CLEAN UP ONE POINT FROM TESTIMONY

17  WE HEARD EARLIER THIS WEEK.  DR. JOHNSON, YOU REVIEWED

18  MR. COOPER'S DIRECT EXAMINATION ON WEDNESDAY; IS THAT RIGHT?

19  A.   YES.

20  Q.   AND I WILL REPRESENT TO YOU ON PAGE 76 OF THE

21  NOVEMBER 29TH TRANSCRIPT, THAT MR. COOPER TESTIFIED THAT,

22  QUOTE, CURRENTLY THERE ARE 12 DISTRICTS IN THE HOUSE PLAN THAT

23  CONVERGE ON EAST BATON ROUGE PARISH IN WHOLE OR IN PART, AND I

24  HAVE REDUCED THAT NUMBER TO 8 IN THE ILLUSTRATIVE PLAN, END

25  QUOTE.  DID THAT ASSERTION SURPRISE YOU?

11:25AM  1    A.   YES.

         2    Q.   OKAY.  I WOULD LIKE TO DISPLAY THE DEMONSTRATIVE EXHIBIT

         3    THAT WE HAVE FOR YOU, AND I WILL REPRESENT THAT THIS WAS

         4    PRODUCED TO PLAINTIFFS' COUNSEL YESTERDAY PER OUR AGREEMENT.

         5         OKAY.  NOW, DR. JOHNSON, CAN YOU EXPLAIN HOW THIS

         6    DEMONSTRATIVE WAS CREATED?

         7    A.   YES.  SO IN THE MAPTITUDE SOFTWARE, THE RED AREA IN THE

         8    MIDDLE IS EAST BATON ROUGE PARISH.  SO I'VE HIGHLIGHTED THE

         9    PARISH IN RED.  AND THEN THE BLACK LINES ARE THE

        10    ILLUSTRATIVE -- THE 2023 ILLUSTRATIVE HOUSE MAP.  YOU CAN SEE

        11    THE DISTRICT NUMBERS ON THEM.  AND THE BLUE AROUND THE OUTSIDE

        12    ARE DISTRICTS THAT ARE PARTIALLY IN AND PARTIALLY OUT OF EAST

        13    BATON ROUGE PARISH.  SO 62, 71, 29 ON THE OUTSIDE ARE ALL

        14    PARTIALLY IN THE PARISH AND PARTIALLY OUT.

        15    Q.   OKAY.  AND JUST TO BE VERY CLEAR, DR. JOHNSON, THE

        16    DISTRICT NUMBERING COMES FROM MR. COOPER'S 2023 ILLUSTRATIVE

        17    HOUSE PLAN; IS THAT RIGHT?

        18    A.   YES.

        19    Q.   OKAY.  AND DR. JOHNSON, HOW MANY OF MR. COOPER'S 2023

        20    ILLUSTRATIVE HOUSE DISTRICTS ARE, QUOTE, IN WHOLE OR IN PART

        21    LOCATED IN EAST BATON ROUGE PARISH?

        22    A.   TWELVE.

        23    Q.   OKAY.  CAN YOU IDENTIFY THOSE FOR THE RECORD?

        24    A.   SURE.  29, 62, 71 ARE ALL PARTIALLY IN AND PARTIALLY OUT,

        25    AND THEN GOING FROM NORTH TO SOUTH, 63, 65, 101, 69, 61, 68,

DR. D. JOHNSON - DIRECT

11:27AM   1  70, 67, AND 66 ARE ALL IN THE PARISH.

2  Q.   OKAY.  WE CAN TAKE THAT DOWN.  THANK YOU.

3       DR. JOHNSON, I BELIEVE YOU -- DID YOU REVIEW MR. COOPER'S

4  TRIAL TESTIMONY ABOUT THESE SIX ILLUSTRATIVE MAJORITY-MINORITY

5  DISTRICTS IN THE HOUSE?

6  A.   I'M SORRY.  ABOUT THE WHAT?

7  Q.   DID YOU REVIEW MR. COOPER'S TRIAL TESTIMONY ABOUT THESE

8  SIX ILLUSTRATIVE MMDS IN THE HOUSE THAT WE HAVE TALKED ABOUT?

9  A.   YES.

10  Q.   AND DID HIS TESTIMONY CHANGE ANY OF YOUR OPINIONS?

11  A.   NO.

12  Q.   ALL RIGHT.  NOW, STEPPING BACK FROM THE -- FROM YOUR

13  DISTRICT-BY-DISTRICT EVALUATION OF MR. COOPER'S ILLUSTRATIVE

14  HOUSE DISTRICTS, I WOULD LIKE TO TALK ABOUT YOUR ANALYSIS OF

15  THOSE PLANS MORE -- MORE BROADLY.  COULD WE START ON PARAGRAPH

16  82 ON PAGE 36.  TURN TO THAT.

17       ALL RIGHT.  AND YOU DISCUSS YOUR POINT ABOUT WHERE A

18  PORTION OF THE BLACK VOTING AGE POPULATION THAT WAS MOVED FROM

19  THE ENACTED PLANS TO CREATE THE NEW ILLUSTRATIVE

20  MAJORITY-MINORITY DISTRICTS.  CAN YOU EXPLAIN THIS ANALYSIS?

21  A.   SO WHEN WE ARE TALKING ABOUT DISTRICTS THAT ARE MAJORITY

22  BLACK, OBVIOUSLY THERE ARE VARIATIONS IN HOW MUCH OVER

23  50 PERCENT EACH DISTRICT CAN BE.  AND SO IN ORDER TO GET A

24  DISTRICT THAT, IN THE ENACTED MAP, IS NOT MAJORITY BLACK UP TO

25  MAJORITY STATUS, YOU CAN EITHER FIND BLACK POPULATION THAT IS

11:29AM   1   IN OTHER DISTRICTS THAT ARE NOT MAJORITY AND ADD THEM IN OR YOU

        2   CAN TAKE A MAJORITY BLACK DISTRICT AND REDUCE ITS PERCENTAGE,

        3   SO BRING IT DOWN FROM, SAY, 57 PERCENT TO 50.2 PERCENT, OR

        4   SOMETHING LIKE THAT, IN ORDER TO FREE UP BLACK POPULATION THAT

        5   YOU THEN ADD TO YOUR NEW DISTRICT IN AN EFFORT TO MAKE IT

        6   MAJORITY BLACK.

        7   Q.   OKAY.  AND WHAT DO YOU -- WHAT DO YOU CONCLUDE ABOUT

        8   THAT -- THE NATURE OF THAT REASSIGNMENT OF BLACK VOTING AGE

        9   POPULATION IN MR. COOPER'S ILLUSTRATIVE HOUSE PLAN?

       10   A.   MUCH OF THE BLACK POPULATION THAT'S ADDED TO CERTAIN

       11   DISTRICTS TO BRING THEM UP TO BE MAJORITY BLACK COMES FROM

       12   EXISTING MAJORITY BLACK DISTRICTS.  SO IT MAKES THOSE MAJORITY

       13   BLACK SEATS IN THE ENACTED MAP LESS -- LESS BLACK VAP OR LOWER

       14   BLACK VAP PERCENTAGES.

       15   Q.   OKAY.  AND IF WE CAN TURN TO THE NEXT PAGE, PAGE 37 IN

       16   PARAGRAPH 83.  SO I WANT TO FOCUS ON THE MIDDLE OF THAT

       17   PARAGRAPH, AND JUST A FEW QUICK QUESTIONS.  THE FIRST IS HOW

       18   MANY MAJORITY-MINORITY DISTRICTS IN THE ILLUSTRATIVE HOUSE PLAN

       19   ARE UNDER 53-PERCENT BLACK VOTING AGE POPULATION?

       20   A.   ELEVEN.

       21   Q.   OKAY.  AND IS THAT MORE OR LESS THAN WHAT WAS UNDER THE

       22   ENACTED PLAN?

       23   A.   THAT'S EIGHT MORE.  THERE ARE ONLY THREE SUCH BORDERLINE

       24   DISTRICTS, BORDERLINE HOUSE DISTRICTS IN THE ENACTED MAP.

       25   Q.   AND TURNING TO THE ILLUSTRATIVE SENATE PLAN, HOW MANY OF

DR. D. JOHNSON - DIRECT

11:31AM   1   THE MAJORITY-MINORITY DISTRICTS IN THE ILLUSTRATIVE SENATE PLAN

2   ARE UNDER 53 PERCENT BVAP?

3   A.   IT'S A HUGE PERCENTAGE OF THEM.   11 OF THE 16 MAJORITY

4   BLACK VAP DISTRICTS ARE JUST BARELY MAJORITY BLACK.   THEY ARE

5   BETWEEN 50 AND 53 PERCENT BLACK.

6   Q.   DR. JOHNSON, IN YOUR EXPERIENCE, IS IT LIKELY TO GET SO

7   MANY DISTRICTS JUST OVER THE 50 PERCENT LINE BUT NONE JUST

8   UNDER BY CHANCE?

9   A.   IT IS EXTREMELY UNLIKELY.

10   Q.   SO I WOULD LIKE TO TURN NOW TO YOUR SURREBUTTAL REPORT,

11   LDTX058, AND SPECIFICALLY LOOK AT THE FIGURE APPEARING ON THE

12   TOP OF PAGE 9.   AND THIS IS ONE -- I BELIEVE THIS IS ONE OF THE

13   ILLUSTRATIVE HOUSE DISTRICTS, BUT DO YOU REPORT IN YOUR REPORT

14   THE BLACK VOTING AGE POPULATION OF ILLUSTRATIVE DISTRICT 69?

15   A.   YES.   IN PARAGRAPH 33, I MENTION THAT IT IS 50.2 PERCENT

16   ANY PART BLACK VAP.

17   Q.   AND IN YOUR EXPERIENCE, IS THAT A VERY PRECISE BVAP NUMBER

18   TO ARRIVE AT?

19   A.   YES.   IT'S ABOUT AS CLOSE TO 50 PERCENT PLUS ONE AS ONE

20   CAN GET WHEN YOU ARE USING AGGREGATED CENSUS BLOCK DATA.

21   Q.   OKAY.   AND WITHOUT READING, YOU KNOW, GOING THROUGH THE

22   ENTIRE DATA, IS THERE A NONRACIAL EXPLANATION FOR THE LINES IN

23   THIS DISTRICT?

24   A.   THE WEST SIDE, PROBABLY.   THAT STRAIGHT DIAGONAL LINE

25   MAKES SENSE AND COULD BE JUSTIFIED AS A TRADITIONAL

11:34AM   1    REDISTRICTING PRINCIPLE, BUT THE KIND OF EASTERN ARM, THE WAY

        2    IT ZIGS OUT AT THE NORTH PART IN THE RED AND YELLOW AREA AND

        3    THEN JUST ABOVE THE HIGHWAY RATHER THAN FOLLOWING THE HIGHWAY,

        4    IT IS PICKING UP THE GREEN AND YELLOW AREAS THAT ARE MAJORITY

        5    BLACK, AND THEN IT GOES DOWN AND KIND OF ZIGS OVER AGAIN.

        6         SO THE WAY -- WE CALL IT KIND OF A STAIR STEP AS THAT

        7    EASTERN LINE IS DRAWN.  JUST IN ONE PART IT IS FOLLOWING THE

        8    CITY BORDER, BUT OTHERWISE, IT DOESN'T SEEM TO FOLLOW ANY

        9    TRADITIONAL REDISTRICTING PRINCIPLE.

       10    Q.  COULD THERE BE A RACIAL CRITERIA THAT COULD EXPLAIN THIS

       11    CONFIGURATION?

       12    A.  YES.  CAREFULLY OR COINCIDENTALLY, IT ENDS UP JUST BARELY

       13    MAJORITY BLACK.

       14    Q.  WE CAN TAKE THAT DOWN.  I WOULD LIKE TO NOW TURN TO SOME

       15    CONCERNS THAT YOU'VE RAISED IN YOUR INITIAL REPORTS.  WE ARE

       16    GOING TO GO BACK TO LDTX51, YOUR INITIAL REPORT, AND DISPLAY

       17    PARAGRAPH 84 BETWEEN PAGES 37 AND 38.

       18         AND I BELIEVE, DR. JOHNSON -- THERE WE GO -- THAT YOU

       19    PROVIDE HERE SOME CONCERNS ABOUT THE SPECIFIC BVAP LEVELS THAT

       20    ARE EMPLOYED IN MANY OF MR. COOPER'S ILLUSTRATIVE HOUSE

       21    DISTRICTS.  I BELIEVE THE FIRST IS DIFFERENTIAL PRIVACY.  DO

       22    YOU SEE THAT?

       23    A.  YES.

       24    Q.  CAN YOU EXPLAIN TO THE COURT WHAT DIFFERENTIAL PRIVACY IS?

       25    A.  SO DIFFERENTIAL PRIVACY IS NEW THIS REDISTRICTING CYCLE.

11:36AM   1   FOR THE 2020 CENSUS, THE CENSUS BUREAU WAS WORRIED THAT DATA

2   MINING FIRMS WERE GETTING GOOD ENOUGH THAT THEY COULD GO INTO

3   THE CENSUS BLOCK LEVEL DATA AND FIGURE OUT WHAT AN INDIVIDUAL

4   HAD ANSWERED IN TERMS OF THEIR AGE AND ETHNICITY, AND SO THEY

5   WERE WORRIED THAT WE ARE LOSING THE PRIVACY OF THE CENSUS

6   RESPONSES.

7        SO THE BUREAU'S APPROACH TO FIXING THAT PROBLEM WAS TO

8   ADD -- REALLY TO ADD ERROR, TO ADD WHAT THEY CALL NOISE INTO

9   THE DATA SO THAT IN EACH CENSUS BLOCK, THE NUMBERS WOULD BE

10   CHANGED A LITTLE BIT IN A WAY THAT WOULD, AS THEY SAY, BLUR THE

11   CENSUS DATA AND MAKE IT HARD FOR THOSE DATA MINERS TO FIGURE

12   OUT INDIVIDUAL CENSUS RESPONDENTS AND TO PROTECT THE PEOPLE WHO

13   ANSWERED THE CENSUS, THEIR PRIVACY.  A GOOD GOAL, BUT THE END

14   RESULT IS THAT CENSUS DATA HAS NEVER BEEN PERFECT, EVER.  IT IS

15   IMPOSSIBLE TO HAVE A PERFECT CENSUS, BUT NOW WE HAVE AN

16   INTENTIONAL STEP OF INTENTIONALLY BLURRING THE DATA AND MAKING

17   THE DATA LESS PRECISE.

18        **MS. KEENAN:**  OBJECTION, YOUR HONOR, TO THE RELEVANCE

19   OF THE INTENTIONAL STEP TAKEN BY THE CENSUS BUREAU.  HE HAS

20   JUST TESTIFIED THAT CENSUS DATA IS ALWAYS IMPERFECT.  I'M NOT

21   SURE WHY IT MATTERS THAT THERE WAS AN INTENTIONAL STEP VERSUS

22   AN UNINTENTIONAL STEP ABOUT THE BLURRING.

23        **THE COURT:**  THE COURT WILL NOT CONSIDER THE TERM

24   "INTENTIONAL," BUT I WANT TO UNDERSTAND HOW THIS DIFFERENTIAL

25   PRIVACY RESULTS IN, IF IT IS YOUR OPINION THAT IT DOES, THAT IT

11:37AM   1   RESULTS IN A BLURRING OF THE DATA.  I WANT YOU TO EXPLAIN THAT.

          2    A.   IT'S ACTUALLY ON PURPOSE, AND PERHAPS NEW IS A BETTER WORD

          3   THAN INTENTIONAL.  IT'S A NEW WAY.  SO ESSENTIALLY WHERE WE

          4   USED TO KNOW THAT THE DATA IN EACH BLOCK WAS THE ACTUAL COUNT

          5   OF PEOPLE THAT THE CENSUS BUREAU COUNTED AND ASSIGNED TO A

          6   BLOCK, NOW THE BUREAU WILL CHANGE THOSE NUMBERS A LITTLE BIT IN

          7   ORDER TO KIND OF DISRUPT THE ALGORITHMS THAT THE DATA MINERS

          8   USE TO TRY TO IDENTIFY THE DATA.  AND SO THEY TRY, AS YOU GET

          9   TO EACH LEVEL, TO MAKE, LIKE, EACH CENSUS TRACT RIGHT AND EACH

         10   COUNTY RIGHT, BUT THE BLOCKS AND THE SMALLER UNITS OF GEOGRAPHY

         11   THE BUREAU JUST ADMITS WILL BE OFF.

         12            **THE COURT:**  BY PLUS OR MINUS WHAT?

         13    A.   THAT'S A GOOD QUESTION.  WE DON'T KNOW.  AND SO THE BUREAU

         14   HAS NOT YET RELEASED THOSE NUMBERS.  THEY DO -- THEY'VE HAD A

         15   LOT OF CALLS.  THIS WAS OBVIOUSLY A VERY MUCH DISCUSSED PROCESS

         16   LEADING UP TO THE CENSUS, AND SO THEY DO THESE NATIONAL CALLS

         17   FOR NTSL AND OTHER ORGANIZATIONS THAT I'M ON, AND THEY'VE SAID

         18   AT THE CONGRESSIONAL LEVEL, IT'S PROBABLY ABOUT A ONE-PERCENT

         19   ERROR.  YOUR TOTAL POPULATION NUMBERS ARE GOING TO BE OFF OR

         20   SHOULD BE WITHIN ONE PERCENT.  AS THE UNITS OF GEOGRAPHY GET

         21   SMALLER, SO AT THE LEGISLATIVE DISTRICT LEVEL, THAT ERROR IS

         22   GOING TO BE BIGGER.  AND AS YOU GET DOWN TO THE COUNTY OR

         23   PARISH AND CITY LEVEL, THEY WILL GET BIGGER.

         24            **MS. KEENAN:**  OBJECTION, YOUR HONOR, TO LACK OF

         25   FOUNDATION.  HE'S NOT EXPLAINED WHAT THE SOURCE OF THIS

11:39AM   1   TESTIMONY IS ABOUT THE DIFFERENT LEVELS AND THE INCREASE TO NOT

2   JUST SMALLER UNITS, BUT HE'S NOW LISTING SPECIFIC TYPES OF

3   DISTRICTS.  HE'S NOT TESTIFIED THAT THE CENSUS BUREAU HAS

4   STATED ANYTHING ABOUT DISTRICT LEVELS OTHER THAN CONGRESS.

5           **THE COURT:**  WELL, I GUESS I WOULD SUSTAIN THAT

6   OBJECTION TO MY QUESTION.

7           **MS. KEENAN:**  I'M SORRY, YOUR HONOR.

8           **THE COURT:**  WHY DON'T YOU ASK THE QUESTION AND SEE IF

9   YOU CAN DO A BETTER JOB.

10          (GROUP LAUGHTER)

11          **MR. LEWIS:**  ALL RIGHT.

12  **BY MR. LEWIS:**

13   Q.  SO DR. JOHNSON, IF YOU -- TO TRY TO CUT THROUGH THIS A

14  LITTLE BIT, DR. JOHNSON, ARE YOU --

15          **THE COURT:**  I'VE RENDERED HIM SPEECHLESS.

16  **BY MR. LEWIS:**

17   Q.  IS DIFFERENTIAL PRIVACY A MATTER THAT HAS AFFECTED YOUR

18  WORK AS A REDISTRICTING PROFESSIONAL?

19   A.  YES.  IT IS A BIG CONCERN, IN PARTICULAR BECAUSE, AS I

20  MENTIONED, I'VE DONE AROUND 500 OF THESE PROJECTS.  I HAVEN'T

21  DONE 500 STATE PROJECTS OR CONGRESSIONAL PROJECTS.  99 PERCENT

22  OF MY WORK IS SCHOOL DISTRICTS, CITIES, YOU KNOW, COMMUNITY

23  COLLEGE DISTRICTS, THESE SMALL GEOGRAPHIC -- RELATIVELY SMALL

24  GEOGRAPHIC AREAS.

25          SO WHERE WE HAVE A ONE PERCENT ESTIMATED ERROR AT THE

11:40AM

1    CONGRESSIONAL LEVEL, AND THAT'S JUST KIND OF A BALLPARK TERM

2    AND THE CENSUS BUREAU HAS NOT GIVEN ANY SPECIFICS ABOUT WHAT

3    THE ERROR IS, I WILL NOTE AT THE BOTTOM OF PAGE 38 I HAVE A

4    FOOTNOTE THAT LINKS TO THE CENSUS BUREAU'S FULL DISCUSSION OF

5    DIFFERENTIAL PRIVACY AND BACKGROUND INFORMATION, BUT THAT'S

6    WHERE THEY TALK ABOUT THE ERROR GETS BIGGER AS YOU GET INTO

7    SMALLER GEOGRAPHY.  THAT IS TRUE OF ALL CENSUS DATA, BUT

8    PARTICULARLY TRUE OF DIFFERENTIAL PRIVACY.

9        SO A ONE-PERCENT ERROR AT THE CONGRESSIONAL LEVEL COULD BE

10   A TEN-PERCENT ERROR IN A SCHOOL DISTRICT, WHICH WOULD THEN MAKE

11   OUR SCHOOL DISTRICT DISTRICTS OUT OF THE POPULATION RANGE AND

12   ILLEGAL.

13       **MS. KEENAN:**  YOUR HONOR, OBJECTION, THESE NUMBERS ARE

14   NOT -- HE JUST SAID THE CENSUS BUREAU HASN'T ACTUALLY GIVEN A

15   NUMBER, AND NOW HE IS TESTIFYING TO SPECIFIC PERCENTAGES THAT A

16   MARGIN OF ERROR MIGHT BE IN A SMALLER PLAN.  THERE IS NO

17   FOUNDATION FOR THAT.

18       **THE COURT:**  DO YOU WANT TO RESPOND?

19       **MR. LEWIS:**  YOUR HONOR, HE WAS OFFERING -- I BELIEVE

20   HE WAS OFFERING THE TEN PERCENT AS A HYPOTHETICAL, AND I

21   BELIEVE PLAINTIFFS' COUNSEL CAN INQUIRE OF THE WITNESS ON

22   CROSS-EXAMINATION IF --

23       **THE COURT:**  THE COURT WILL CONSIDER IT AS A

24   HYPOTHETICAL BASED ON HIS EXPERIENCE IN DRAWING MAPS THAT

25   INVOLVE SMALLER GEOGRAPHIC AREAS.

11:42AM  1   **BY MR. LEWIS:**

2   Q.   AND DR. JOHNSON, JUST -- HAVE YOU REVIEWED -- HAVE YOU

3   RELIED UPON INFORMATION PROVIDED BY THE U.S. CENSUS BUREAU TO

4   INFORM YOUR KNOWLEDGE OF DIFFERENTIAL PRIVACY?

5   A.   YES, I'VE BEEN ON MANY WEBINARS, READ MANY REPORTS AND

6   RAISED MANY QUESTIONS WITH THE BUREAU STAFF ABOUT THIS ISSUE.

7   Q.   OKAY.  AND YOU'VE CITED -- I BELIEVE YOU'VE MENTIONED AND

8   YOU'VE CITED INFORMATION FROM THE CENSUS BUREAU IN THE FOOTNOTE

9   ACCOMPANYING PAGE 38 OF YOUR REPORT, CORRECT?

10  A.   YES.

11  Q.   AND THE CENSUS BUREAU -- HAS THE CENSUS BUREAU PROVIDED

12  THE ESTIMATE OF ERROR AT THE CONGRESSIONAL LEVEL?

13  A.   THEY GAVE THE BALLPARK FIGURE OF ABOUT 1 PERCENT, BUT THEY

14  HAVE NOT RELEASED THE PRECISE FIGURES.

15  Q.   OKAY.  NOW, HOW CAN DIFFERENTIAL PRIVACY POTENTIALLY

16  IMPACT AN EFFORT TO DRAW A DISTRICT TO A SPECIFIC RACIAL

17  PERCENTAGE?

18  A.   SO IF THE CENSUS BUREAU -- I'M SORRY.  IF THE CENSUS DATA

19  SAYS THAT A DISTRICT IS 50.2 PERCENT BLACK, IT MAY OR MAY NOT

20  BE OVER 50 PERCENT.  WE HAVE THIS MARGIN OF ERROR THAT WE KNOW

21  IS -- BECAUSE LEGISLATIVE DISTRICTS ARE SMALLER THAN

22  CONGRESSIONAL DISTRICTS, THE BUREAU HAS BEEN CLEAR, LEGISLATIVE

23  DISTRICTS WILL HAVE A LARGER ERROR THAN A CONGRESSIONAL

24  DISTRICT.  BUT WE KNOW THAT THERE'S SOME ERROR.  WE DON'T KNOW

25  HOW MUCH.  SO THE CLOSER YOU GET TO THAT 50-PERCENT POINT, THE

11:43AM   1   MORE LIKELY THAT AN ERROR, BE IT A HALF PERCENT, A ONE PERCENT

2   OR WHATEVER NUMBER THAT IS, THAT THAT ERROR WOULD MEAN THE

3   DISTRICT THAT LOOKS LIKE IT IS MAJORITY BLACK ISN'T.

4   Q.   SO YOU GO ON, DR. JOHNSON, TO DESCRIBE SOMETHING CALLED A

5   SENSITIVITY ANALYSIS IN PARAGRAPHS 85 AND 90 OF YOUR REPORT.

6   JUST GENERALLY SPEAKING, WHAT IS THE SENSITIVITY ANALYSIS?

7   A.   SO A SENSITIVITY ANALYSIS IS A STANDARD PRACTICE IN

8   SOCIOLOGY, IN FINANCE AND ECONOMICS WHERE YOU TAKE AN

9   ASSUMPTION AND SAY, OKAY, WE HAVE ASSUMED FOR OUR MODEL OR

10  ALGORITHM, OR WHATEVER WE ARE DOING, A CERTAIN NUMBER.  IN THIS

11  CASE, REDISTRICTING, SO IT WOULD BE THE CENSUS POPULATION

12  COUNTS.  A BANK MIGHT SAY WE EXPECT THE INTEREST RATE TO BE

13  THIS IN A YEAR.  AND THEN YOU TEST.  WELL, IF OUR NUMBER IS

14  OFF, HOW MUCH DOES THAT IMPACT US?  SO IF YOU ARE A BANK,

15  YOU'RE LIKE, WELL, IF THE INTEREST RATE ACTUALLY IS HIGHER THAN

16  WE THOUGHT IT WAS GOING TO BE, HOW DOES THAT IMPACT OUR

17  PROFITS?  IF THE NUMBER IS LOWER THAN WHAT WE EXPECT IT WOULD

18  BE, HOW IS THAT GOING TO IMPACT OUR PROFITS?  AND YOU SEE WHAT

19  THE RISK IS AND THE DANGER EITHER WAY.

20       SAME WAY HERE.  A SENSITIVITY ANALYSIS WOULD LOOK AND SAY,

21  OKAY, SAY THERE'S A ONE-PERCENT ERROR, JUST TO PICK A NUMBER, A

22  HYPOTHETICAL NUMBER.  IF THE 50 PERCENT IS ACTUALLY 49 PERCENT,

23  OR IF THE ACTUAL -- I'M SORRY, IF THE BLACK VOTING AGE

24  POPULATION IS ACTUALLY ONE PERCENT LOWER, HOW MANY DISTRICTS DO

25  WE LOSE?  AND ON THE FLIP SIDE, IF THE BLACK VOTING AGE

11:45AM   1   POPULATION IS ONE PERCENT HIGHER, HOW MANY MORE DISTRICTS WOULD

2   WE GAIN THAT WOULD BE MAJORITY BLACK?

3        SO THAT'S THE SENSITIVITY ANALYSIS, ACKNOWLEDGING THAT

4   THERE'S AN ERROR AND LOOKING AT THE RISK TO THE OVERALL POLICY

5   GOAL OR THE OVERALL END RESULT THAT THAT ERROR COULD GENERATE.

6        IN THE CASE OF A BANK, IT'S WHAT IMPACT WOULD THERE BE IN

7   THE PROFITS.  IN THE CASE OF THIS EXERCISE WE'VE BEEN LOOKING

8   AT, WHAT'S THE IMPACT ON THE NUMBER OF MAJORITY BLACK

9   DISTRICTS?

10  Q.  SO, DR. JOHNSON, I WOULD JUST LIKE TO TURN TO FIGURE 28,

11  WHICH I BELIEVE PROVIDES SOME INFORMATION ABOUT THE 2023

12  ILLUSTRATIVE SENATE MAPS.  IF WE COULD TURN TO THAT ON PAGE 42.

13  DR. JOHNSON, WHAT DOES FIGURE 28 SHOW US?

14  A.  SO THIS IS A CHART OF THE ENACTED AND ILLUSTRATIVE SENATE

15  DISTRICTS.  THE PURPLE -- EACH PURPLE BAR REPRESENTS AN ENACTED

16  MAP SENATE DISTRICT.  EACH GREEN BAR REPRESENTS AN ILLUSTRATIVE

17  2023 MAP SENATE DISTRICT.  AND THE HEIGHT OF EACH BAR INDICATES

18  THE BLACK VOTING AGE PERCENTAGE OF THAT DISTRICT.  SO ON THE

19  FAR LEFT, DISTRICT 15 IN THE ENACTED MAP IS A LITTLE OVER

20  70-PERCENT BLACK.  DISTRICT 15 IN THE ILLUSTRATIVE MAP IS

21  AROUND 55-PERCENT BLACK.

22       AND THEN WE GO LEFT TO RIGHT.  IT'S ARRANGED IN ORDER OF

23  THE ENACTED MAP'S BLACK VOTING AGE POPULATION.  SO 15 IS THE

24  HIGHEST IN THE ENACTED MAP.  13 ON THE FAR RIGHT IS THE LOWEST

25  ON THE ENACTED MAP.

11:47AM   1   Q.  AND SO -- AND THEN IF WE TURN TO FIGURE 29, WHICH MAY

          2   ILLUSTRATE THIS A LITTLE BETTER, BUT IF WE FLIP TO 29, WHAT

          3   DOES THIS SHOW US ON THE SAME PAGE?

          4   A.  SO I HAVE ZOOMED IN ESSENTIALLY ON JUST THE MAJORITY BLACK

          5   SENATE DISTRICTS IN THE ILLUSTRATIVE MAP AND THEIR

          6   CORRESPONDING ENACTED MAP PERCENTAGES.  SO YOU CAN SEE THE

          7   50 PERCENT LINE THERE AT 50 PERCENT GOING ACROSS.  YOU CAN SEE

          8   THERE ARE TWO PURPLE BARS, THE ENACTED MAPS THAT ARE JUST

          9   BARELY ABOVE 50 PERCENT, AND THERE ARE, AS I MENTIONED BEFORE,

         10   A LOT OF ILLUSTRATIVE SENATE MAP -- ILLUSTRATIVE SENATE MAP

         11   DISTRICTS THAT ARE JUST BARELY OVER 50 PERCENT.

         12   Q.  AND SO FROM A SENSITIVITY ANALYSIS PERSPECTIVE, LET ME

         13   JUST ASK, ARE THERE ILLUSTRATIVE SENATE DISTRICT PLANS HERE

         14   THAT ARE JUST -- THAT ARE JUST BELOW 50 PERCENT?

         15   A.  NO.

         16   Q.  OKAY.  AND SO IF WE ARE OFF BY -- IF THE TRUE BVAP NUMBER

         17   IS OFF BY JUST A LITTLE BIT, WHAT IMPACT WOULD THAT HAVE ON THE

         18   NUMBER OF MAJORITY-MINORITY DISTRICTS IN THE

         19   ILLUSTRATIVE SENATE PLAN?

         20         **MS. KEENAN:**  OBJECTION, YOUR HONOR.  MAY I EXPLAIN?

         21         **THE COURT:**  YES.

         22         **MS. KEENAN:**  HE'S NOT ACTUALLY DONE ANY EFFECTIVENESS

         23   OR SENSITIVITY ANALYSIS EITHER, SO TO ASK HIM WHAT EFFECT IT

         24   WOULD HAVE ON THE DISTRICT IS IMPROPER AT THIS POINT BASED ON

         25   THE FOUNDATION THEY HAVE LAID.

11:49AM

1          **THE COURT:**  WHERE IS THE SENSITIVITY OR EFFECTIVENESS

2     ANALYSIS, OTHER THAN THE ORANGE LINE RUNNING ACROSS THAT PAGE?

3          **MR. LEWIS:**  EFFECTIVELY, YOUR HONOR, THAT'S THE POINT

4     THAT HE IS TRYING TO MAKE.  HE IS TRYING TO MAKE THE POINT

5     THAT IF THERE -- I DON'T WANT TO TESTIFY FOR THE WITNESS, BUT

6     THIS IS ESSENTIALLY THE POINT THAT HE IS MAKING.

7          **THE COURT:**  I'M GOING TO SUSTAIN THE OBJECTION IN

8     TERMS THAT IT CALLS FOR HIM TO CHARACTERIZE THIS AS SOME SORT

9     OF A SENSITIVITY ANALYSIS.  IT IS PLOTTED OUT -- I'M REFERRING

10    TO FIGURE 29 FOR THE RECORD.  IT'S PLOTTED OUT THE ILLUSTRATIVE

11    MAPS OR THE ILLUSTRATIVE DISTRICTS COMPARED TO THE ENACTED

12    DISTRICTS, AND IT JUST IS A CHART SHOWING WHICH OF THOSE ARE

13    ABOVE OR BELOW 50-PERCENT BVAP.  I MEAN, THERE'S NO NUMBER

14    CRUNCHING THAT LED TO THAT 50 PERCENT LINE.  I CAN DRAW THAT

15    LINE.  SO I WOULD SUSTAIN THE OBJECTION.  YOU CAN REPHRASE.

16         **MR. LEWIS:**  ALL RIGHT.

17    **BY MR. LEWIS:**

18    Q.  SO, DR. JOHNSON, JUST FROM A -- WHAT SENSITIVITY ANALYSIS

19    HAVE YOU PERFORMED IN TERMS OF THE ILLUSTRATIVE SENATE?  WHAT

20    HAVE YOU DONE?

21    A.  SO USING THE DATA THAT'S SHOWN IN THIS CHART, IF YOU LOOK

22    AT PARAGRAPH 93 RIGHT BEFORE IT, IT SHOWS THE RESULTS OF THE

23    SENSITIVITY ANALYSIS WHERE I RAN THE NUMBERS FOR IF THE

24    SENSITIVITY ANALYSIS WAS 3 PERCENT EITHER WAY.  LOOKING AT

25    3 PERCENT ERROR BELOW AND 3 PERCENT ERROR ABOVE, HOW MANY

DR. D. JOHNSON - DIRECT

11:50AM   1   DISTRICTS WOULD FLIP?  AND THE 50-PERCENT NUMBER I USED BECAUSE

         2   THAT'S MR. COOPER'S NUMBER.

         3        THE WHOLE FOCUS OF MR. COOPER'S MAPPING APPROACH HAS BEEN

         4   TO LOOK AT THE NUMBER OF DISTRICTS THAT ARE 50 PERCENT.  SO I

         5   PERFORMED THE SENSITIVITY ANALYSIS LOOKING AROUND THAT

         6   50 PERCENT LINE, AND THE ILLUSTRATIVE -- IF THE SENSITIVITY

         7   MEASURE IS 3 PERCENT, ONLY 5 DISTRICTS IN THE ILLUSTRATIVE

         8   SENATE MAP WOULD BE MAJORITY BLACK, AND THUS FROM THE NUMBERS

         9   THAT WE HAVE SEEN FOR MR. COOPER, MAJORITY BLACK AND LIKELY TO

        10   ELECT COMPARED TO 10 DISTRICTS IN THE ENACTED MAP.

        11        AND ON THE FLIP SIDE, THERE ARE NO DISTRICTS THAT ARE JUST

        12   BELOW THE 50 PERCENT LINE AS DRAWN, IN EITHER THE ENACTED OR

        13   THE ILLUSTRATIVE MAP.  SO A 3-PERCENT ERROR THE OTHER WAY WHEN

        14   I RAN THOSE NUMBERS WOULD NOT ADD ANY MAJORITY BLACK DISTRICTS.

        15   Q.  AND DO YOU PERFORM A SIMILAR ANALYSIS IN THE STATE HOUSE?

        16   A.  YES.  I WENT THROUGH THE SAME PROCESS AND SAME COUNTING OF

        17   HOW MANY DISTRICTS WOULD NO LONGER BE MAJORITY IF THE DATA ARE

        18   OFF BY 3 PERCENT.

        19   Q.  OKAY.  AND IS THAT SENSITIVITY ANALYSIS IN THE HOUSE

        20   INCLUDED IN YOUR REPORT, INCLUDING AROUND PARAGRAPHS 85 THROUGH

        21   90?

        22   A.  YES.

        23   Q.  OKAY.  WE CAN TAKE THAT DOWN.  I JUST HAVE A FEW WRAP-UP

        24   QUESTIONS FOR YOU, DR. JOHNSON.

        25        WE'VE SPENT A LOT OF TIME EXAMINING, BOTH AT THE DISTRICT

DR. D. JOHNSON - DIRECT

11:53AM   1   AND PLAN LEVEL, MR. COOPER'S ILLUSTRATIVE MAJORITY-MINORITY

2   DISTRICTS AND THE DATA THAT WERE USED.  WHAT CONCLUSIONS DO YOU

3   DRAW FROM THE DISTRICT BOUNDARIES AND THE UNDERLYING DATA ABOUT

4   THE CONFIGURATION OF THOSE MAJORITY-MINORITY DISTRICTS RELATIVE

5   TO TRADITIONAL REDISTRICTING CRITERIA?

6    A.  AS WE'VE WALKED THROUGH IN DETAIL FOR EACH ONE OF THEM,

7   THE DISTRICTS WE HAVE BEEN LOOKING AT ARE NOT DRAWN BASED ON

8   TRADITIONAL REDISTRICTING CRITERIA.

9    Q.  OKAY.  DOES ANY EXPLANATION GIVEN BY MR. COOPER FOR THE

10   CONFIGURATION OF HIS ILLUSTRATIVE DISTRICTS CONSISTENTLY LINE

11   UP WITH HOW THE LINES ARE DRAWN?

12    A.  SO IN HIS REPORT, HE REPEATEDLY CITES THAT HE LOOKS --

13   WELL, IN HIS TESTIMONY, I GUESS, HE CONSISTENTLY CITES THAT HE

14   LOOKED AT TRADITIONAL REDISTRICTING PRINCIPLES AND RACE.  SO IF

15   THE TRADITIONAL REDISTRICTING PRINCIPLES DON'T DICTATE WHERE

16   THE LINES ARE, THE ONLY EXPLANATION IS RACE, USING HIS OWN

17   WORDS.

18    Q.  OKAY.  AND DR. JOHNSON, BASED ON THIS DATA OFFERED, DO YOU

19   HAVE AN OPINION ON THE PREDOMINANT FACTOR EXPLAINING THE

20   BOUNDARIES OF THE ILLUSTRATIVE DISTRICTS IN MR. COOPER'S

21   ILLUSTRATIVE PLANS?

22         **MS. KEENAN:**  OBJECTION, YOUR HONOR, THE PREDOMINANT

23   FACTOR OPINION IS EXACTLY THE ONE THIS COURT EXCLUDED.

24         **THE COURT:**  I THINK IT IS A QUESTION TOO FAR.  YOU

25   MAY RESPOND.

DR. D. JOHNSON - DIRECT

11:54AM    1              **MR. LEWIS:**  YOUR HONOR, WE ARE NOT TRYING TO GET AT

2     HIS SUBJECTIVE INTENT.  WE ARE ASKING FOR THE FACTOR THAT BEST

3     EXPLAINS THE DATA.  THAT IS SOMETHING THAT IS WITHIN THE

4     PURVIEW OF A POLITICAL SCIENTIST.  WE ARE NOT ASKING FOR

5     SUBJECTIVE INTENT.

6              **THE COURT:**  I MEAN, HE HAS BASICALLY SAID IT ABOUT, I

7     DON'T KNOW, 15 TIMES.  I'M GOING TO SUSTAIN THE OBJECTION.

8              **MR. LEWIS:**  OKAY.  THEN AT THIS POINT, I HAVE NO

9     FURTHER QUESTIONS, YOUR HONOR.  WE WOULD TENDER THE WITNESS

10    SUBJECT TO, OF COURSE, THE PROFFER OF THE EXCLUDED PORTIONS OF

11    DR. JOHNSON'S REPORT.

12             **THE COURT:**  OKAY.  AND THAT BRINGS UP A QUESTION

13    BEFORE WE TAKE OUR NOON BREAK.  GIVEN THE TESTIMONY, YOU HAVE A

14    RIGHT TO A PROFFER, AND I'M NOT SUGGESTING OTHERWISE, BUT I

15    WOULD ASK THAT YOU MAYBE CONFER AND THINK ABOUT WHETHER YOU

16    EVEN NEED THAT 2022-23 COMPARISON PROFFER INFORMATION.  IF YOU

17    DO, GREAT.  I'M JUST TRYING TO SAVE YOU THE HEADACHE OF KIND OF

18    PARSING THROUGH THIS EXPERT REPORT FOR MAKING THE REDACTIONS

19    FOR WHAT IS COMING IN IN YOUR CASE-IN-CHIEF AND WHAT IS COMING

20    IN IN YOUR PROFFER.  JUST GIVE IT SOME THOUGHT.

21             **MR. LEWIS:**  YOUR HONOR, WE APPRECIATE THAT.  I THINK

22    WE DO BELIEVE THAT PARTICULARLY GIVEN THAT MR. COOPER --

23    PLAINTIFFS ELICITED QUITE A BIT OF TESTIMONY FROM MR. COOPER

24    ABOUT THE NATURE, EXTENT AND BASES OF THOSE CHANGES.  WE DO

25    BELIEVE THERE IS RELEVANCE, SO I THINK WE CAN --

11:56AM 1          **THE COURT:** YEAH, I DON'T DOUBT THAT THERE MIGHT BE

2     RELEVANCE ON THE PROFFER.  IT IS JUST A QUESTION OF PROOF.  YOU

3     ARE ENTITLED TO DO YOUR PROFFER.  SO I WOULD ASK THAT BEFORE WE

4     CLOSE THE CASE, WHETHER THAT IS TODAY OR MONDAY, THAT YOU GET

5     WITH YOUR CO-COUNSEL AND FIGURE OUT WHAT PARTS OF THE REPORT

6     ARE COMING IN AS SUBSTANTIVE EVIDENCE AND WHAT PARTS OF THE

7     REPORT ARE GOING TO COMPRISE YOUR PROFFER.

8          **MR. LEWIS:** OKAY.  YOUR HONOR, WE ARE HAPPY TO

9     INVITE CO-COUNSEL.  I THINK YOU WERE MEANING PLAINTIFF'S

10    COUNSEL?

11         **THE COURT:** THAT'S WHAT I MEAN, OPPOSING COUNSEL.

12         **MR. LEWIS:** YES, YOUR HONOR, WE WILL MEET AND CONFER.

13    HOPEFULLY IT WILL BE -- I THINK WITH RESPECT TO THE 2022 AND

14    2023, IT WILL BE VERY EASY.  IT IS A NICE SELF-CONTAINED

15    SECTION.

16         **THE COURT:** IT IS.  OKAY.

17         **MR. LEWIS:** I THINK THE PREDOMINANT INTENT WILL BE A

18    LITTLE MORE WORDSMITHING, BUT WE WILL COMPLY WITH THE COURT'S

19    DIRECTIVE.

20         **THE COURT:** OKAY.  ALL RIGHT.  WE WILL BE IN RECESS

21    UNTIL 1:15.

22      **(RECESS TAKEN AT 11:57 A.M. UNTIL 1:17 P.M.)**

23         **THE COURT:** PLEASE RETAKE THE STAND.  OKAY.  IT'S THE

24    PLAINTIFFS' CROSS.  YOU MAY PROCEED.

25         **MS. KEENAN:** THANK YOU.

1:17PM

1              **CROSS-EXAMINATION**

2   **BY MS. KEENAN:**

3   Q.  GOOD AFTERNOON, DR. JOHNSON.  MY NAME IS MEGAN KEENAN FOR

4   THE ACLU, REPRESENTING THE PLAINTIFFS IN THIS CASE.  I WANT TO

5   START WHERE I BELIEVE YOU STARTED WITH YOUR DIRECT EXAMINATION

6   WITH POPULATION CHANGE.  DO YOU RECALL TALKING ABOUT THAT

7   EARLIER TODAY?

8   A.  IN THE STATE AS A WHOLE?

9   Q.  YES.

10  A.  YES.

11          **MS. KEENAN:**  CAN THE TECH PLEASE PULL UP WHAT IS

12  MARKED AS LDTX51, PAGE 11, SPECIFICALLY?

13  **BY MS. KEENAN:**

14  Q.  OKAY.  AND YOU SEE ON THE SCREEN THAT FIGURE 5 THAT YOU

15  TALKED ABOUT IN YOUR DIRECT EXAMINATION, RIGHT?

16  A.  YES.

17  Q.  YOU TESTIFIED ABOUT THE RATE AT WHICH THE NUMBER OF BLACK

18  MAJORITY SEATS INCREASED IN THE HOUSE AND THE SENATE, RIGHT?

19  A.  YES.

20  Q.  AND THIS TABLE SHOWS THE INCREASE IN THE PERCENTAGE OF

21  TOTAL MAJORITY BLACK DISTRICTS FROM 2000 TO 2020?

22  A.  YES.

23  Q.  YOU DIDN'T ANALYZE WHETHER THE PERCENTAGE OF SEATS

24  ALLOCATED TO MAJORITY BLACK DISTRICTS WERE PROPORTIONAL TO THE

25  BVAP OF LOUISIANA IN EITHER YEAR?

D. JOHNSON - CROSS

1:18PM

1   A.   ARE YOU ASKING A QUESTION?

2   Q.   YES.  DID YOU DO THAT?

3   A.   OH, NO, I DID NOT.

4   Q.   THIS FIGURE ALSO DOESN'T SHOW ANYTHING ABOUT LOUISIANA'S

5   DECLINING WHITE POPULATION, DOES IT?

6   A.   NO.

7   Q.   AND SO THIS TABLE DOESN'T OFFER ANY ANALYSIS ABOUT HOW THE

8   DECLINING WHITE POPULATION IN LOUISIANA WOULD AFFECT THE

9   APPROPRIATE NUMBER OF MAJORITY BLACK DISTRICTS IN THE STATE,

10  DOES IT?

11  A.   I DON'T KNOW HOW YOU WOULD SHOW THAT.

12  Q.   OKAY.  SO THAT'S A NO?

13  A.   CORRECT, IT DOESN'T SHOW THAT.

14  Q.   OKAY.  YOU ALSO TALKED A BIT ABOUT SOCIO-ECONOMIC DATA IN

15  YOUR DIRECT EXAMINATION.  DO YOU RECALL THAT?

16  A.   YES.

17  Q.   YOU REVIEWED MR. COOPER'S REBUTTAL REPORT IN THIS CASE,

18  DIDN'T YOU?

19  A.   YES.

20  Q.   YOU ACTUALLY PREPARED A SURREBUTTAL REPORT RESPONDING TO

21  THAT REPORT, RIGHT?

22  A.   YES.

23          **MS. KEENAN:**  COULD THE TECH PLEASE PULL UP PLAINTIFFS

24  EXHIBIT 89, AND TURN TO PAGE 12, PLEASE.  I'M SORRY.  IT'S

25  PLAINTIFFS 89.  AND COULD WE TURN TO PAGE 12, PLEASE.

1:19PM   1   **BY MS. KEENAN:**

2   Q.   DO YOU RECALL WHETHER YOU READ PARAGRAPHS 47 AND 48 OF

3   MR. COOPER'S REBUTTAL REPORT?

4   A.   YES.

5   Q.   AND YOU WOULD AGREE THAT IT SAYS, STARTING IN PARAGRAPH

6   47, QUOTE, I HAVE PREPARED A SET OF MAP EXHIBITS WHICH

7   DEMONSTRATE THAT THE ADDITIONAL MAJORITY BLACK DISTRICTS IN THE

8   ILLUSTRATIVE PLAN GENERALLY KEEP TOGETHER LOW AND MODERATE

9   INCOME NEIGHBORHOODS, INDEPENDENT OF RACE.  DO YOU SEE WHERE IT

10   SAYS THAT?

11   A.   YES, AFTER HE DREW THE MAPS, HE DID DO THAT.

12   Q.   RIGHT.  HAVE YOU REVIEWED PLAINTIFFS EXHIBITS 107 THROUGH

13   115 WHICH SHOW THE MAP EXHIBITS DISCUSSED IN PARAGRAPH 47?

14   A.   I GLANCED AT THEM.

15   Q.   OKAY.  AND LIKE YOU SAID EARLIER, YOU PREPARED A

16   SURREBUTTAL REPORT RESPONDING TO MR. COOPER'S REBUTTAL REPORT,

17   RIGHT?

18   A.   YES.

19   Q.   IN THAT SURREBUTTAL REPORT, YOU DIDN'T INCLUDE ANY

20   OPINIONS ABOUT WHETHER THOSE EXHIBITS TO MR. COOPER'S REBUTTAL

21   REPORT SHOW THAT HIS MAJORITY BLACK ILLUSTRATIVE DISTRICTS

22   GENERALLY KEEP TOGETHER LOW INCOME NEIGHBORHOODS, DID YOU?

23   A.   I DID NOT LOOK INTO WHETHER AFTER-THE-FACT ANALYSES

24   RETROACTIVELY EXPLAINED A CORRELATION THAT HE WASN'T LOOKING AT

25   AT THE TIME HE DREW THE MAPS.

1:20PM    1    Q.  SO YOU DON'T KNOW WHETHER THE DISTRICTS THAT WERE DRAWN

2    COMPLY WITH THE DATA THAT IS IN THOSE EXHIBITS; IS THAT RIGHT?

3    A.  IF I HAD FOUND A FACTUAL ERROR IN THEM, I WOULD HAVE

4    HIGHLIGHTED THAT, AND I DID NOT.

5    Q.  OKAY.  NOW, YOU TOLD US TODAY THAT THE ILLUSTRATIVE

6    DISTRICTS WERE INCONSISTENT WITH ALL OF THE TRADITIONAL

7    REDISTRICTING FACTORS THAT MR. COOPER TESTIFIED TO IN HIS

8    REPORT WITH THE EXCEPTION OF RACE.  DID I GET THAT RIGHT?

9    A.  I WOULD -- YOU ARE TRYING TO ENCOMPASS ALL OF MY EARLIER

10    DIRECT TESTIMONY IN ONE SUMMARY.  I'M NOT SURE IT'S A

11    COMPLETELY FULL ONE-SENTENCE SUMMARY.

12    Q.  SURE.  I CAN BE MORE SPECIFIC.  GIVE ME ONE MOMENT.

13         I WROTE DOWN WHAT MR. LEWIS ASKED YOU IN ONE OF HIS

14    WRAP-UP QUESTIONS.  SPECIFICALLY, HE ASKED, "DOES ANY

15    EXPLANATION GIVEN BY MR. COOPER FOR THE CONFIGURATION OF HIS

16    ILLUSTRATIVE DISTRICTS CONSISTENTLY LINE UP WITH HOW THE

17    DISTRICTS WERE DRAWN?"  DO YOU RECALL THAT QUESTION?

18    A.  YES.

19    Q.  AND YOU SAID NO, RIGHT?

20    A.  CORRECT.

21    Q.  OKAY.  I WANT TO TALK A BIT ABOUT THAT.  I'M SHOWING THE

22    WITNESS HIS REPORT MARKED LDTX51.  IF WE COULD TURN TO PAGE 26.

23    SO YOU RECOGNIZE THIS AS THE SECTION OF YOUR REPORT YOU

24    DISCUSSED WHERE YOU TALK ABOUT SPECIFIC ILLUSTRATIVE DISTRICTS

25    IN MR. COOPER'S MAP, RIGHT?

1:22PM

1    A.  ARE YOU TALKING ABOUT THE TOP FIGURE OR THE PARAGRAPHS

2    BELOW?

3    Q.  STARTING AT THE TITLE THAT SAYS, "CORRELATION OF RACE AND

4    THE ILLUSTRATIVE PLAN DISTRICT LINES."  THIS IS THE TOP OF THE

5    SECTION IN YOUR REPORT WHERE YOU DISCUSS THE SPECIFIC

6    ILLUSTRATIVE DISTRICTS.  RIGHT?

7    A.  YES.

8    Q.  OKAY.  NOW, IN DISCUSSING THE ILLUSTRATIVE DISTRICTS, YOUR

9    REPORT DOESN'T EXPLAIN HOW YOU RULED OUT THE OTHER TRADITIONAL

10   REDISTRICTING FACTORS WITH RESPECT TO EACH DISTRICT, DOES IT?

11   A.  IT DOES.  I LOOKED AT THE MAPS AND COMPARED THEM TO THE

12   TRADITIONAL PRINCIPLES THAT HE HAD LISTED.  THE NICE THING

13   ABOUT MAPS AND COMMUNITY BOUNDARIES IS THERE IS NO ALGORITHM.

14   IT'S A MAP.  YOU JUST LOOK AT IT.

15   Q.  OKAY.  SO I WANT TO BREAK THAT DOWN A LITTLE BIT.  IN

16   PARAGRAPH 69, TO START, YOU STATE THAT MR. COOPER DREW HIS NEW

17   MAJORITY BLACK SD 38, QUOTE, WITHOUT ANY REFERENCE TO

18   COMPACTNESS, MAJOR ROADS, COMMUNITIES, NEIGHBORHOODS, CLEAR

19   VISIBLE FEATURES, OR ANY OTHER REDISTRICTING PRINCIPLE.  AM I

20   READING THAT QUOTE CORRECTLY?

21   A.  YES.

22   Q.  OKAY.  AND YOU ARE OFFERING THE OPINION, AS I UNDERSTAND

23   IT, THAT JUST LOOKING AT EACH OF THOSE DISTRICTS AND THE

24   FIGURES YOU PROVIDED, YOU CAN TELL THAT THE DISTRICT WAS DRAWN,

25   QUOTE, WITHOUT ANY REFERENCE, CLOSE QUOTE, TO TRADITIONAL

1:23PM

1    REDISTRICTING FACTORS; IS THAT RIGHT?

2    A.   WELL, IT IS ACTUALLY MR. COOPER WHO IS GIVING THE FACTORS

3    THAT HE USED TO DRAW THE MAPS, AND THEN I'M REVIEWING THOSE.

4    AND HE DIDN'T PROVIDE ANY OF THESE FACTORS THAT EXPLAIN WHY

5    THAT LINE IS DRAWN THERE.

6    Q.   RIGHT.  SO YOU ARE OFFERING THE OPINION THAT BY JUST

7    LOOKING AT THE DISTRICTS AS YOU'VE SHOWN THEM IN YOUR REPORT,

8    YOU CAN TELL THAT THE DISTRICT WAS DRAWN WITHOUT ANY REFERENCE

9    TO THE FACTORS MR. COOPER IDENTIFIED IN HIS REPORT.  IS THAT

10   YOUR OPINION?

11          **MR. LEWIS:**  OBJECTION, YOUR HONOR, MISCHARACTERIZES

12   THE WITNESS'S TESTIMONY.

13          **THE COURT:**  ACTUALLY, IT IS NOT.  HE SAID THAT THESE

14   AREN'T -- THAT THE NICE THING ABOUT MAPS IS THAT THEY ARE MAPS

15   AND THAT YOU DON'T HAVE TO DO ANY ANALOGUES ON THEM, YOU JUST

16   LOOK AT THEM.  SO IT REALLY DOESN'T.  YOUR OBJECTION IS

17   OVERRULED.  IF YOU NEEDED TO REPHRASE OR RESTATE THE QUESTION,

18   IF THAT HAS CAUSED YOU TO FORGET IT, I WOULD UNDERSTAND.

19   A.   IF YOU COULD RESTATE IT, PLEASE.

20   **BY MS. KEENAN:**

21   Q.   SURE.  SO JUST TO BE CLEAR, YOU ARE OFFERING THE OPINION

22   THAT JUST BY LOOKING AT EACH DISTRICT, LIKE YOU SAID, YOU COULD

23   TELL THAT THE DISTRICT WAS DRAWN WITHOUT ANY REFERENCE TO THE

24   OTHER TRADITIONAL REDISTRICTING FACTORS THAT MR. COOPER

25   SPECIFIED IN HIS REPORT?

1:24PM   1   A.  NO, THE REFERENCE IS BOTH ON THE MAP AND IN MR. COOPER'S

        2   REPORT.  SO MR. COOPER DID NOT PROVIDE ANY REFERENCE TO THESE

        3   FACTORS THAT STAND UP WHEN YOU LOOK AT THE MAP.

        4   Q.  RIGHT.  SO YOU ARE SAYING HE DIDN'T MAKE ANY REFERENCE IN

        5   HIS MAPS TO THE FACTORS THAT HE IDENTIFIED IN HIS REPORT.  I

        6   JUST WANT TO MAKE SURE I'M UNDERSTANDING YOUR CRITICISM

        7   CORRECTLY BEFORE I ASK YOU SOME MORE QUESTIONS ABOUT IT.

        8   A.  OKAY.  SO MR. COOPER GAVE HIS STATEMENTS IN HIS REPORT FOR

        9   WHY HE DREW THE LINES WHERE THEY WERE, AND HE LISTED THE

       10   FACTORS AND THE THINGS THAT HE CONSIDERED.  YOU CAN LOOK AND

       11   SEE DO THE FACTORS THAT HE LISTS EXPLAIN WHERE THE LINES ARE.

       12   HE CITED HIS KEY CULTURAL REGIONS, THE PLANNING AREAS, THE

       13   VTDS, AND NONE OF THOSE FACTORS THAT HE CITED WOULD EXPLAIN WHY

       14   THE LINE BETWEEN 38 AND 39 IS DRAWN WHERE IT IS.

       15   Q.  OKAY.  SO I WANT TO WALK THROUGH SOME OF THOSE FACTORS AND

       16   HOW YOU CONSIDERED THEM IN TRYING TO RULE THEM OUT.  LET'S

       17   STICK WITH MAJORITY BLACK SD 38, WHICH IS STILL ON THE SCREEN

       18   IN PARAGRAPH 69 OF YOUR REPORT.  YOU SAID THAT THIS DISTRICT

       19   WAS DRAWN WITHOUT ANY REFERENCE TO COMMUNITIES.  IS THAT RIGHT?

       20   A.  YES.

       21   Q.  YOU WERE NOT TENDERED AS AN EXPERT ON COMMUNITIES OF

       22   INTEREST IN THIS CASE.  DO YOU AGREE?

       23   A.  YES.

       24   Q.  AND YOUR REPORT DOESN'T IDENTIFY ANY EXAMPLES OF

       25   COMMUNITIES OF INTEREST IN LOUISIANA, DOES IT?

D. JOHNSON - CROSS

1:26PM

1    A.  I'M JUST RESPONDING TO MR. COOPER, SO THERE'S EXTENSIVE

2    DISCUSSION OF COMMUNITIES IN MY REPORT BECAUSE I'M DISCUSSING

3    MR. COOPER'S IDENTIFIED COMMUNITIES.

4    Q.  SURE.  SO YOU TALK ABOUT SOME OF THE THINGS IN MR.

5    COOPER'S REPORT, BUT YOU DON'T IDENTIFY ANY ADDITIONAL OR

6    CONTRARY COMMUNITIES OF INTEREST IN YOUR REPORT, RIGHT?

7    A.  I DON'T GO BEYOND WHAT MR. COOPER DID, NO.

8    Q.  OKAY.  YOU TOLD US THAT YOU REVIEWED MR. COOPER'S

9    TESTIMONY FROM THE TRIAL THIS WEEK.  DID YOU REVIEW ANYBODY

10   ELSE'S TESTIMONY FROM THE TRIAL THIS WEEK?

11   A.  NO.

12   Q.  OKAY.  SO YOUR REPORT DOESN'T ADDRESS THE COMMUNITIES OF

13   INTEREST SPECIFIC REPORT OF DR. CRAIG COLTEN, DOES IT?

14   A.  NO.

15   Q.  YOU DIDN'T REVIEW THAT REPORT, DID YOU?

16   A.  NO.

17   Q.  AND YOU DIDN'T REVIEW MR. COLTEN'S TESTIMONY HERE AT THIS

18   TRIAL, RIGHT?

19   A.  NO.

20   Q.  SO YOU'RE NOT AWARE OF WHETHER THAT REPORT OR THAT

21   TESTIMONY WOULD CHANGE YOUR OPINION ABOUT WHETHER THE

22   ILLUSTRATIVE MAP IS CONSISTENT WITH COMMUNITIES OF INTEREST IN

23   LOUISIANA, ARE YOU?

24   A.  AGAIN, I'M FOCUSING ON WHAT MR. COOPER CITED AS WHY HE

25   DREW THE LINES, AND HE HIMSELF SAID THAT THAT REPORT ONLY HAD A

1:27PM    1    VERY TINY IMPACT ON THE REVISIONS TO THE ILLUSTRATIVE MAP.

2    Q.   I'M NOT ASKING YOU ABOUT WHAT MR. COOPER WAS TRYING TO DO

3    OR HOW HE DREW THE MAP, JUST ABOUT WHETHER YOU ARE AWARE

4    WHETHER HIS MAPS WERE ULTIMATELY CONSISTENT WITH THE

5    COMMUNITIES OF INTEREST REFLECTED IN DR. COLTEN'S OPINIONS.

6    AND YOU ARE NOT AWARE OF THAT, ARE YOU?

7    A.   I DID NOT REVIEW MR. COLTEN'S OPINIONS, SO I DON'T HAVE AN

8    OPINION ON THAT.

9    Q.   OKAY.  SO YOUR REPORT DOESN'T RULE OUT THAT ANY OF THE

10    DISTRICT LINES CAPTURE ANY OF THE COMMUNITIES DISCUSSED IN

11    DR. COLTEN'S REPORT, DOES IT?

12    A.   NO, BECAUSE DR. COLTEN DIDN'T DRAW THE MAP.

13    Q.   YOUR REPORT ALSO DOESN'T COMPARE THE ILLUSTRATIVE MAP'S

14    TREATMENT OF COMMUNITIES OF INTEREST TO THE ENACTED MAP'S

15    TREATMENT OF COMMUNITIES OF INTEREST, DOES IT?

16    A.   CORRECT.

17    Q.   OKAY.  I WANT TO MOVE ON TO COMPACTNESS.  YOU ALSO OFFER

18    THE OPINION HERE IN PARAGRAPH 69, "THE DISTRICT WAS DRAWN

19    WITHOUT ANY REFERENCE TO COMPACTNESS."  AM I READING THAT

20    CORRECTLY?

21    A.   YES.

22    Q.   BUT YOUR REPORT DOESN'T COMPARE THE ILLUSTRATIVE MAP'S

23    COMPACTNESS SCORES TO THE ENACTED MAP'S COMPACTNESS SCORES,

24    DOES IT?

25    A.   WELL, JUST IN TERMS OF -- WELL, I'M WANDERING INTO IN

1:29PM   1    LIMINE TERRITORY.

2    Q.   I'M SORRY.   I'M TALKING SPECIFICALLY ABOUT COMPACTNESS

3    SCORES HERE TO START, AND YOUR REPORT DOESN'T COMPARE THE

4    ILLUSTRATIVE MAP'S COMPACTNESS SCORES TO THE ENACTED MAP'S

5    COMPACTNESS SCORES, RIGHT?

6    A.   OH, TO THE ENACTED MAP, CORRECT.

7    Q.   AGAIN, YOU ARE JUST VISUALLY INSPECTING THE MAPS, LIKE YOU

8    TALKED ABOUT EARLIER, WHEN IT COMES TO COMPACTNESS, RIGHT?

9    A.   NO, I'M LOOKING AT WHAT MR. COOPER CITED AS THE REASONS

10   WHY HE DREW THE LINES FOR THAT DISTRICT AND DOES COMPACTNESS

11   EXPLAIN WHY THAT LINE WOULD END UP WHERE IT DID.

12   Q.   RIGHT, BUT I WANT TO TALK ABOUT HOW YOU DETERMINED WHETHER

13   COMPACTNESS WOULD COMPLY WITH MR. COOPER'S RATIONALE.   WHAT YOU

14   DID WAS YOU LOOKED AT THE PICTURES OF THE MAPS, RIGHT?

15   A.   YES.

16   Q.   OKAY.

17   A.   I MEAN, I ALSO REVIEWED THE NUMBERS BUT DID SO ONLY BASED

18   ON HOW IT LOOKS, AS DR. POLSBY OR POPPER CALLED IT, THE

19   INTRAOCULAR TEST.

20   Q.   SURE.   BUT YOU SAID YOU LOOKED AT THE NUMBERS.   JUST TO BE

21   PERFECTLY CLEAR, YOUR REPORT DOES NOT INCLUDE ANY OF THOSE

22   NUMBERS COMPARING THE ILLUSTRATIVE MAP'S COMPACTNESS SCORES TO

23   THOSE IN THE ENACTED MAP, CORRECT?

24   A.   CORRECT.

25   Q.   YOU ALSO SAY IN PARAGRAPH 69 AGAIN THAT THE MAP WAS

1:30PM 1   DRAWN -- OR, I'M SORRY, MAJORITY BLACK SD 38 WAS DRAWN WITHOUT

2   ANY REFERENCE TO MAJOR ROADS.  DID I READ THAT CORRECTLY?

3   A.  YES.

4   Q.  I'M NOW SHOWING THE WITNESS PAGE 27 OF THE SAME REPORT,

5   LDTX51.  THIS IS A PICTURE OF ILLUSTRATIVE SENATE DISTRICT 38

6   IN FIGURE 16 OF YOUR REPORT, RIGHT?

7   A.  YES.

8   Q.  THIS IS IMMEDIATELY BELOW THE PARAGRAPH WE JUST DISCUSSED

9   ABOUT ILLUSTRATIVE SENATE DISTRICT 38?

10   A.  YES.

11   Q.  OKAY.  AND THIS IS THE SAME FIGURE YOU DISCUSSED IN YOUR

12   DIRECT EXAMINATION, RIGHT?

13   A.  YES.

14   Q.  I WANT YOU TO TAKE A LOOK AT THIS PICTURE.  YOU WOULD

15   AGREE THAT THIS PICTURE OF SENATE DISTRICT 38 IN FIGURE 16 DOES

16   DEPICT LINES THAT FOLLOW MULTIPLE MAJOR ROADS, RIGHT?

17   A.  A TINY FRACTION OF IT DOES, YES.

18   Q.  LET'S WALK THROUGH A COUPLE OF THEM.  YOU WOULD AGREE THAT

19   SOME OF THE BORDERS IN THIS MAP, SPECIFICALLY IN THE BOTTOM

20   LEFT CORNER OF THIS IMAGE, TRACK INTERSTATE 220.  WOULD YOU

21   AGREE WITH THAT?

22   A.  FOR A SHORT SEGMENT, YES.

23   Q.  AND YOU WOULD AGREE THAT SOME OF THE BORDERS IN THIS MAP

24   TRACK I-20, LIKE RIGHT IN THE CENTER OF FIGURE 16 IN YOUR

25   REPORT, RIGHT?

D. JOHNSON - CROSS

1:31PM    1    A.   A VERY BRIEF SEGMENT, YES.

2    Q.   YOU WOULD AGREE SOME OF THE BORDERS TRACK OTHER ROADS,

3    LIKE THE BORDER IN THE TOP RIGHT CORNER OF FIGURE 16 OF YOUR

4    REPORT, THE STRAIGHT DIAGONAL ONE PROCEEDING INTO THE BORDER?

5    A.   THE ONE RIGHT BY BUT NOT QUITE BY THE PARISH LINE?

6    Q.   YES.

7    A.   YES, IT DOES FOLLOW THE STREET RATHER THAN FOLLOWING THE

8    PARISH LINE.

9    Q.   AND YOU WOULD AGREE THAT ANOTHER BORDER TRACKS THE

10    BOUNDARIES AT THE SHREVEPORT REGIONAL AIRPORT LIKE YOU TALKED

11    ABOUT IN YOUR REPORT -- OR SORRY, LIKE YOU TALKED ABOUT EARLIER

12    TODAY?

13    A.   YES.

14    Q.   NOW, YOU STATED REPEATEDLY IN YOUR DIRECT THAT THE FIGURES

15    IN YOUR REPORT SHOW HOW THE ILLUSTRATIVE DISTRICTS DO NOT

16    FOLLOW ANY OF THE TRADITIONAL REDISTRICTING CRITERIA THAT

17    MR. COOPER MENTIONED IN HIS REPORT, RIGHT?

18    A.   YES.

19    Q.   I NOTICED THAT YOUR REPORT DOESN'T CITE JOINT RULE 21, BUT

20    YOU ARE FAMILIAR WITH THAT RULE, RIGHT?

21    A.   YES.

22    Q.   OKAY.  AND YOU KNOW THAT'S THE LOUISIANA LEGISLATURE'S

23    SPECIFIC CRITERIA THAT NEED TO BE CONSIDERED WHEN DRAWING MAPS

24    IN THE STATE?

25    A.   YES.

1:32PM   1    Q.   YOU ARE AWARE THAT ONE OF THOSE CRITERIA IS KEEPING

      2    PRECINCTS AS REPRESENTATIVES' VOTING DISTRICTS OR VTDS WHOLE,

      3    RIGHT?

      4    A.   YES.

      5    Q.   YOU ACKNOWLEDGED ON DIRECT THAT MR. COOPER LOOKED AT THE

      6    JOINT RULE, RIGHT?

      7    A.   YES.

      8    Q.   THAT HE LOOKED AT THE TRADITIONAL FACTORS IDENTIFIED IN

      9    THAT JOINT RULE, RIGHT?

     10    A.   YES.

     11    Q.   AND THAT ONE OF THOSE TRADITIONAL REDISTRICTING FACTORS

     12    WAS FOLLOWING VTD LINES?

     13    A.   YES.

     14    Q.   SPECIFICALLY NOT SPLITTING VTD LINES, RIGHT?

     15    A.   YES, I GUESS -- THE VTDS ARE IN THE JOINT RULE.  THEY ARE

     16    A LITTLE SEPARATE FROM TRADITIONAL FACTORS, BUT MORE OR LESS IT

     17    IS THE SAME THING.

     18    Q.   SURE.  SO WE CAN BE SPECIFIC, UNDER LOUISIANA'S JOINT RULE

     19    SPECIFYING THE REDISTRICTING CRITERIA THAT MAP DRAWERS NEED TO

     20    USE, MR. COOPER SAID THAT HE COMPLIED WITH THE REQUIREMENT TO

     21    FOLLOW THE VTD LINES, RIGHT?

     22    A.   I BELIEVE HE SAID TO THE EXTENT PRACTICABLE.

     23    Q.   RIGHT.  WOULD YOU AGREE THAT PRECINCT LINES OR VTD LINES

     24    CAN SOMETIMES SPLIT MUNICIPALITIES?

     25    A.   WELL, I DON'T KNOW IN LOUISIANA IF THEY CROSS MUNICIPALITY

1:34PM   1    BOUNDARIES, BUT CERTAINLY THERE ARE MANY PRECINCTS OR VTDS IN A

         2    BIG CITY LIKE SHREVEPORT.

         3    Q.   SURE.   AND THERE ARE PRECINCT LINES THAT CAN SPLIT MAJOR

         4    ROADS, FOR EXAMPLE?

         5    A.   YES.

         6    Q.   WERE YOU HERE WHEN MR. TRENDE TESTIFIED EARLIER TODAY?

         7    A.   JUST FOR THE CROSS AT THE VERY END.

         8    Q.   OKAY.   DID YOU HAPPEN TO HEAR HIM STATE THAT TRADE-OFFS

         9    BETWEEN TRADITIONAL REDISTRICTING CRITERIA ARE SIMPLY

        10    INEVITABLE?

        11    A.   I WASN'T PAYING THAT CLOSE OF ATTENTION, TO BE HONEST.

        12    Q.   WOULD YOU AGREE WITH THAT STATEMENT, THAT TRADE-OFFS

        13    BETWEEN TRADITIONAL REDISTRICTING CRITERIA ARE INEVITABLE WHEN

        14    YOU'RE DRAWING MAPS?

        15    A.   MOST OF THE TIME, YES.

        16    Q.   DID YOU TAKE PRECINCT OR VTD LINES INTO ACCOUNT IN

        17    CRITIQUING MR. COOPER'S MAPS?

        18    A.   NOT AT THE TIME I WROTE THE ORIGINAL REPORT.   OBVIOUSLY IN

        19    MY DIRECT, I WAS REFERRING TO THEM.

        20    Q.   SURE.   I WANT TO BE CLEAR ABOUT WHAT YOU REVIEWED AT THE

        21    TIME YOU PREPARED YOUR REPORT.   TO REVIEW MR. COOPER'S MAPS IN

        22    MAPTITUDE, YOU USED A GIS SOFTWARE PACKAGE CALLED MAPTITUDE FOR

        23    REDISTRICTING DEVELOPED BY THE CALIPER CORPORATION, RIGHT?

        24    A.   YES.

        25    Q.   THE PL94171 DATA WAS IN THAT MAPTITUDE DATABASE, RIGHT?

1:35PM   1   A.   YES.

2   Q.   AND THE PRECINCT INFORMATION WAS CONTAINED WITHIN THE

3   PL94171 DATASET, RIGHT?

4   A.   YES.

5   Q.   THE SOFTWARE THAT YOU USED MERGES THE DEMOGRAPHIC DATA

6   FROM THE PL94171 FILES TO MATCH UP WITH THE RELEVANT DECENNIAL

7   CENSUS GEOGRAPHY, RIGHT?

8   A.   IT CAN.

9   Q.   SO YOU HAD THE ABILITY TO LOOK AT THOSE PRECINCT OR VTD

10   LINES AS A LAYER IN MAPTITUDE WHEN YOU WERE REVIEWING MR.

11   COOPER'S MAPS, RIGHT?

12   A.   YES.

13   Q.   YOU TESTIFIED ON DIRECT THAT THESE LAYERS CAN BE CLICKED

14   ON AND OFF TO SHOW DIFFERENT FACETS OF THE DATASET, RIGHT?

15   A.   YES.

16   Q.   OKAY.   YOU ALSO TOLD US ON DIRECT THAT YOU DID NOT JUST

17   LOOK AT MR. COOPER'S MAPS.   YOU ALSO REVIEWED THE DATA

18   ASSOCIATED WITH THOSE MAPS TOO, RIGHT?

19   A.   YES.

20   Q.   USING THE MAPTITUDE SOFTWARE, YOU WOULD ALSO AGREE IT IS

21   POSSIBLE TO DRAW MAPS AT THE PRECINCT OR VTD LEVEL, RIGHT?

22   A.   SURE.

23   Q.   AND YOU WOULD AGREE THAT'S WHAT MR. COOPER SAID THAT HE

24   DID IN DRAWING THE MAPS IN THIS CASE, RIGHT?

25   A.   TO THE EXTENT PRACTICABLE.

D. JOHNSON - CROSS

1:36PM  1    Q.   RIGHT.  NOW, THIS FIGURE IN FRONT OF US, YOU TESTIFIED

2    THAT IT DIVIDES UP THE AREA IN CENSUS BLOCKS, RIGHT?

3    A.   THE MAP IS SHOWING THE ETHNIC DATA BY BLOCK.

4    Q.   RIGHT.  HAVE YOU LOOKED AT THIS FIGURE WITH THE PRECINCT

5    DATA LOADED ONTO IT?

6    A.   NO, BUT THE PRECINCTS ARE GOING TO BE GROUPINGS OF BLOCKS,

7    SO I CAN TELL WHAT THE PRECINCT SHADING IS GOING TO LOOK LIKE

8    BY LOOKING AT THE BLOCKS.

9    Q.   SURE.  WELL, LET'S TAKE A LOOK.  I'M GOING TO SHOW THE

10   WITNESS ILLUSTRATIVE AID 39, WHICH DEPICTS THE SAME AREA

11   DEPICTED IN FIGURE 16 OF HIS REPORT BUT WITH AN OVERLAY OF THE

12   PRECINCT LINES THAT WE JUST TALKED ABOUT.

13        DO YOU HAVE ANY REASON TO DISPUTE THAT THIS IS AN

14   ILLUSTRATIVE AID SHOWING THE PRECINCT LINES ON THE SAME AREA WE

15   JUST DISCUSSED IN YOUR REPORT?

16   A.   I DON'T KNOW EITHER WAY.

17   Q.   OKAY.  DO YOU SEE THE 2021 CALIPER STAMP AT THE BOTTOM

18   CENTER OF THIS ILLUSTRATIVE AID?

19   A.   YES.

20   Q.   THAT'S THE SAME SOFTWARE THAT YOU USED TO CREATE THE

21   FIGURES IN YOUR REPORT, RIGHT?

22   A.   YES.

23   Q.   OKAY.  WOULD YOU AGREE THAT MANY OF THE PLACES WHERE MR.

24   COOPER'S LINES DIVERGE FROM THE MAJOR ROADS YOU JUST TALKED

25   ABOUT ACTUALLY TRACK PRECINCT BOUNDARIES?

1:37PM   1    A.   I MEAN, ALL THE LINES TRACK PRECINCT BOUNDARIES.

2    Q.   I WANT TO TAKE A LOOK SPECIFICALLY AT THE MAJOR ROADS AND

3    WHERE THE LINES DIVERGE FROM THOSE ROADS.  SO LET'S LOOK AT THE

4    BOTTOM CORNER, TRACKING THE SAME BOTTOM CORNER OF FIGURE 16 IN

5    YOUR REPORT.  YOU SEE THAT WHERE THE LINE DIVERGES FROM I-220,

6    LIKE WE TALKED ABOUT, THE LINE IS FOLLOWING THAT PRECINCT

7    HIGHLIGHTED IN BLUE, RIGHT?

8    A.   NOT IN THE PART TO THE RIGHT.

9    Q.   I'M SORRY.  I'M JUST TALKING ABOUT WHERE THE LINE DIVERGES

10   FROM 220 IN THE BOTTOM LEFT CORNER.  AND YOU CAN SEE THAT WHEN

11   IT BREAKS OFF OF 220, IT IS FOLLOWING A PRECINCT LINE EXACTLY

12   AND THEN REJOINING I-220 ON THE OTHER SIDE OF THAT PRECINCT

13   LINE.  DO YOU SEE THAT IN THE CORNER?

14   A.   IN THAT LITTLE PIECE OF IT, YES, BUT OVER ON THE RIGHT,

15   NO.

16   Q.   NOW, I WANT TO ZOOM BACK OUT FOR A MOMENT AND LOOK AT

17   WHERE THE LINES DIVERGE FROM I-20.  THIS IS DIRECTLY ABOVE THE

18   NUMBER 38 IN BOTH FIGURES, SO THIS ALSO TRACKS FIGURE 16 IN

19   YOUR REPORT.  YOU WOULD AGREE THAT BOTH PLACES THAT THE LINE

20   DIVERGES FROM THE MAJOR ROAD HERE, SPECIFICALLY ABOVE THE

21   NUMBER 38, IT IS FOLLOWING A PRECINCT LINE, RIGHT?

22   A.   NOT IN BOTH.

23   Q.   OKAY.  LET'S TALK ABOUT THAT, THEN.  NO, NO, CAN YOU

24   PLEASE ZOOM BACK INTO THE SAME SPOT?  ABOVE 38, YOU CAN SEE

25   THAT -- CAN I DRAW ON IT?  I'M NOT SURE IF I CAN DRAW ON IT.

1:39PM   1          **THE COURT:**  YOU CAN.  WELL, I DON'T KNOW IF YOU

2     CAN'T --

3          **MS. KEENAN:**  THAT'S OKAY.  NO WORRIES.  I CAN EXPLAIN

4     IT ORALLY BECAUSE IT'S NOT GOING TO BE IN EVIDENCE.

5          **THE COURT:**  I THINK HE CAN ACTIVATE IT.  I KNOW THE

6     WITNESS CAN DRAW, BUT SINCE YOU ARE USING YOUR COMPUTER, I'M

7     JUST NOT A HUNDRED PERCENT SURE.  JAVI, DO YOU KNOW?

8          **THE CLERK:**  SHE SHOULD BE ABLE TO DRAW ON THERE.

9          **MS. KEENAN:**  IS THERE A MOUSE?

10          **THE CLERK:**  NO, IT IS TOUCH SCREEN.

11          **MS. KEENAN:**  I THINK IT'S OKAY.  I DON'T NEED TO DRAW

12     ON IT.  I CAN ASK THE QUESTIONS WITHOUT DRAWING.

13          **THE COURT:**  OKAY.

14     **BY MS. KEENAN:**

15     Q.  SO YOU CAN FIRST LOOK AT THE LINE HIGHLIGHTED HERE.  YOU

16     WOULD AGREE THAT THERE, WHERE THE LINE DIVERGES FROM I-20, IT

17     IS FOLLOWING A PRECINCT LINE, YES?

18     A.  YES, THERE IT IS.

19     Q.  OKAY.  THE SAME IS TRUE ON THE LEFT SIDE OF THE IMAGE YOU

20     SEE HERE, AND ALSO ON FIGURE 16, YOU WOULD AGREE THAT THERE'S A

21     PORTION THAT BREAKS OFF FROM I-20 WHERE THE BLUE PRECINCT LINE

22     IS, AND THEN IT FOLLOWS THE YELLOW PRECINCT LINE.  AGAIN, IT IS

23     FOLLOWING THE PRECINCT LINE EXACTLY, RIGHT?

24     A.  BUT IN THAT CASE, THE PRECINCT DOES NOT CROSS THE FREEWAY.

25     IF HE HAD FOLLOWED THE FREEWAY -- HE COULD USE PRECINCTS AND

1:40PM   1   FOLLOWED THE FREEWAY THERE.  HE JUST CHOSE NOT TO.

2   Q.  YOU WOULD AGREE, THOUGH, THAT IN THE FIRST LINE THAT WE

3   TALKED ABOUT, HE WOULD ACTUALLY HAVE TO SPLIT TWO PRECINCTS IN

4   ORDER TO FOLLOW THE MAJOR ROAD, RIGHT?

5   A.  YES.

6        **MS. KEENAN:**  CAN WE ZOOM BACK OUT AND REMOVE THE

7   HIGHLIGHTS?

8   **BY MS. KEENAN:**

9   Q.  DURING YOUR DIRECT TESTIMONY, YOU TALKED ABOUT HOW THE

10   LINES CURVE AND WIND IN VERY ODD WAYS THAT DON'T FOLLOW THE

11   CRITERIA THAT MR. COOPER LISTED.  DO YOU RECALL TESTIFYING TO

12   THAT?

13   A.  CERTAINLY SOMETHING TO THAT EFFECT, YES.

14   Q.  DO YOU AGREE -- I'M SORRY.  I'M NOT SURE WHY THAT RED IS

15   ON THE SCREEN.  YOU CAN IGNORE IT.

16   A.  NO, I UNDERSTAND.  YOUR LINES FINALLY SHOWED UP.

17        **THE COURT:**  YOU CAN CLEAR IT.  THERE YOU GO.

18        **MS. KEENAN:**  CAN WE PUT THE IMAGE BACK ON THE SCREEN?

19   THANK YOU.

20   **BY MS. KEENAN:**

21   Q.  EACH OF THE LINES THAT MR. COOPER DRAWS FOLLOWS A PRECINCT

22   LINE, YES?

23   A.  AND IT CURVES AND SHIFTS IN ODD WAYS, PICKING PRECINCTS

24   THIS AND THAT IN ODD WAYS.

25   Q.  BUT CAN YOU SEE ANY LINE IN THIS ILLUSTRATIVE AID OF

D. JOHNSON - CROSS

1:41PM   1   SENATE DISTRICT 38 WHERE THE LINES DO NOT TRACK A PRECINCT

        2   LINE?

        3   A.  NO.

        4   Q.  OKAY.  NONE OF THE IMAGES IN YOUR REPORT SHOW PRECINCT

        5   BOUNDARIES APART FROM THE CENSUS BLOCK BOUNDARIES UNDERNEATH

        6   THEM, RIGHT?

        7   A.  CORRECT.

        8   Q.  OKAY.  AND YOU RECALL TESTIFYING THAT THE DISTRICT LINES

        9   WEREN'T CONSISTENT WITH ANY, QUOTE, VISIBLE REASON ON THE MAPS

       10   IN YOUR REPORT, RIGHT?

       11   A.  CORRECT.

       12   Q.  BUT LOOKING AT THE FIGURES IN YOUR REPORT, YOU WOULD NOT

       13   BE ABLE TO SEE WHETHER MR. COOPER WAS COMPLYING WITH THE JOINT

       14   RULE 21 REQUIREMENT OF FOLLOWING VTD LINES, WOULD YOU?

       15   A.  NO, BUT THERE ARE MANY WAYS TO COMPLY WITH THAT.  HE COULD

       16   HAVE CHOSEN PRECINCTS THAT WERE MORE COMPACT THAT FOLLOWED

       17   MAJOR FEATURES AND FOLLOWED CITY BOUNDARIES.

       18   Q.  I'M NOT ASKING ABOUT THE OTHER WAYS HE COULD COMPLY WITH

       19   THAT SAME FACTOR, BUT YOU WOULD AGREE THAT IN THE AREAS WHERE

       20   YOU TALK ABOUT HOW A DISTRICT LINE ZIGS AND ZAGS, YOU CANNOT

       21   RULE OUT THAT MR. COOPER WAS SIMPLY FOLLOWING A PRECINCT LINE

       22   BASED ON THE FIGURES IN YOUR REPORT, RIGHT?

       23   A.  I CAN'T RULE OUT THAT HE WAS SIMPLY FOLLOWING IT.

       24   Q.  YOU CANNOT RULE OUT THAT MR. COOPER WAS TRACKING THE

       25   BORDERS OF A PRECINCT LINE EXACTLY WHEN HE WAS ZIGGING AND

1:43PM   1   ZAGGING IN THE FIGURES IN YOUR MAPS?

2   A.   CORRECT.  I HAVE NO REASON TO THINK HE WASN'T FOLLOWING

3   PRECINCT LINES.

4   Q.   OKAY.  SO I WANT TO RETURN TO THE WRAP-UP QUESTION THAT

5   MR. LEWIS ASKED YOU EARLIER.  HE SAYS, "DOES ANY EXPLANATION

6   GIVEN BY MR. COOPER FOR THE CONFIGURATION OF HIS ILLUSTRATIVE

7   DISTRICTS CONSISTENTLY LINE UP WITH HOW THE DISTRICTS ARE

8   DRAWN?"  DO YOU RECALL THAT QUESTION?

9   A.   YES.

10   Q.   AND YOU SAID NO.  CORRECT?

11   A.   CORRECT.

12   Q.   BUT YOU WOULD AGREE THAT MR. COOPER'S LINES ARE

13   CONSISTENTLY DRAWN TO REFLECT THE VTD LINES THAT JOINT RULE 21

14   REQUIRES, RIGHT?

15   A.   I HAVEN'T GONE THROUGH TO SEE WHY HE INCLUDED THE PHRASE

16   "TO THE EXTENT PRACTICABLE."  I HAVEN'T LOOKED FOR WHAT

17   PRECINCTS HE SPLIT, IF ANY, BUT HIS TENDENCY CERTAINLY IS TO

18   FOLLOW VTDS.

19   Q.   I WANT TO TALK ABOUT THAT "TO THE EXTENT PRACTICABLE"

20   PHRASE QUICKLY BEFORE WE MOVE ON.  YOU HAVE REVIEWED JOINT RULE

21   21, HAVEN'T YOU?

22   A.   YES.

23        **MS. KEENAN:**  I BELIEVE IT IS JOINT EXHIBIT 56.  CAN

24   WE PULL THAT UP?  I'M GOING FROM MEMORY.  OH, THERE WE GO.

25   COULD WE TAKE A LOOK AT SECTION G OF JOINT RULE NUMBER 21.

1:44PM     1     **BY MS. KEENAN:**

2     Q.   I'M JUST GOING TO START READING AT SECTION G1 HERE.   IT

3     SAYS, "TO THE EXTENT PRACTICABLE, EACH DISTRICT WITHIN A

4     REDISTRICTING PLAN SUBMITTED FOR CONSIDERATION SHALL CONTAIN

5     WHOLE ELECTION PRECINCTS AS THOSE ARE REPRESENTED AT VOTING

6     DISTRICTS VTDS."   DID I READ THAT CORRECTLY?

7     A.   YES.

8     Q.   OKAY.   IS IT -- DO YOU HAVE ANY REASON TO BELIEVE THAT THE

9     PHRASE "TO THE EXTENT PRACTICABLE" DIDN'T COME DIRECTLY FROM

10    JOINT RULE 21?

11    A.   NO.

12    Q.   OKAY.   I WANT TO TURN BACK TO LDTX51, PAGE 29 THIS TIME.

13    NOW, YOU ALSO TALKED ABOUT THIS FIGURE IN YOUR DIRECT, RIGHT?

14    A.   YES.

15    Q.   YOU WOULD AGREE THIS FIGURE ALSO DOESN'T SHOW PRECINCT

16    LINES, DOES IT?

17    A.   NO, IT DOES NOT.

18    Q.   OKAY.   SPECIFICALLY YOU CRITICIZE MR. COOPER HERE FOR

19    DRAWING THE DISTRICT LINE ACROSS THE MISSISSIPPI RIVER IN THE

20    LEFT SIDE OF THIS IMAGE INSTEAD OF CONTINUING TO FOLLOW THE

21    RIVER.   DO YOU RECALL THAT?

22    A.   YES, ON THE LEFT SIDE, HE CROSSES IT.   ON THE RIGHT SIDE,

23    HE TURNS AWAY FROM IT.

24    Q.   BECAUSE YOU DIDN'T REVIEW DR. COLTEN'S OPINIONS, YOU DON'T

25    KNOW WHETHER HIS DISCUSSION OF COMMUNITIES OF INTEREST WOULD

1:45PM   1   CHANGE YOUR OPINIONS ABOUT WHETHER CROSSING THE RIVER HERE

       2   COMPLIED WITH TRADITIONAL REDISTRICTING FACTORS, RIGHT?

       3   A.  I DO KNOW THAT.

       4   Q.  YOU TESTIFIED EARLIER THAT YOU HAD NOT REVIEWED

       5   DR. COLTEN'S OPINIONS, RIGHT?

       6   A.  CORRECT.

       7   Q.  AND YOU'VE TALKED ABOUT HOW COMMUNITIES OF INTEREST ARE A

       8   TRADITIONAL REDISTRICTING FACTOR, RIGHT?

       9   A.  CORRECT.

      10   Q.  SO YOU WOULD AGREE IF THERE IS A COMMUNITY OF INTEREST ON

      11   EITHER SIDE OF THE RIVER THAT IS SHARED, IT COULD REFLECT A

      12   TRADITIONAL REDISTRICTING FACTOR TO KEEP THE DISTRICT AROUND

      13   THE ENTIRE COMMUNITY OF INTEREST STRADDLING THE RIVER, RIGHT?

      14   A.  MY OPINION IS THAT THE LINE DID NOT FOLLOW ANY OF THE

      15   TRADITIONAL REDISTRICTING CRITERIA CITED BY MR. COOPER.  I

      16   DIDN'T REVIEW ANYTHING THAT MR. COOPER DIDN'T REVIEW.

      17           MS. KEENAN:  YOUR HONOR, I WOULD MOVE TO STRIKE THAT

      18   ANSWER AS NONRESPONSIVE.

      19           THE COURT:  WELL, THE RECORD IS THE RECORD.  SO IT'S

      20   NONRESPONSIVE.  ASK YOUR QUESTION AGAIN, BUT WE ARE NOT GOING

      21   TO STRIKE ANYTHING OUT OF THE RECORD.

      22           MS. KEENAN:  OKAY.

      23   BY MS. KEENAN:

      24   Q.  I WILL REPEAT THE QUESTION, THEN.  YOU WOULD AGREE THAT IT

      25   IS CONSISTENT -- IT COULD BE CONSISTENT WITH TRADITIONAL

1:47PM   1   REDISTRICTING PRINCIPLES TO DRAW A DISTRICT ON BOTH SIDES OF A

          2   RIVER IN ORDER TO CAPTURE A COMMUNITY OF INTEREST THAT IS

          3   SHARED ACROSS THAT RIVER, RIGHT?

          4   A.   I WOULD SAY THAT IS OUTSIDE THE SCOPE OF MY REPORT, BUT IF

          5   YOU WOULD LIKE ME TO OPINE ON THINGS OUTSIDE THE SCOPE OF MY

          6   REPORT, I'M HAPPY TO.

          7   Q.   WE CAN MOVE ON FROM THAT QUESTION.  THAT IS FINE.

          8        YOU HAVE REVIEWED THE ENACTED SENATE MAP, HAVEN'T YOU?

          9   A.   I HAVE LOOKED AT IT.

         10   Q.   RIGHT.  YOU TALKED ABOUT EARLIER HOW YOU LOOKED AT THAT IN

         11   PARTICULAR TO COMPARE THE SHAPES AND THE CONFIGURATION OF THE

         12   DISTRICTS, RIGHT, WITH THE ILLUSTRATIVE MAPS?

         13        **MR. LEWIS:**  OBJECTION.  MISSTATES THE WITNESS'S

         14   TESTIMONY ON DIRECT.

         15        **MS. KEENAN:**  I'M SORRY.  THAT WAS ON CROSS, YOUR

         16   HONOR, BUT I CAN REPHRASE IT.

         17        **THE COURT:**  REPHRASE.

         18   **BY MS. KEENAN:**

         19   Q.   EARLIER ON CROSS-EXAMINATION, YOU TESTIFIED THAT THE ONLY

         20   WAY YOU LOOKED AT THE ENACTED MAP AND THE ILLUSTRATIVE MAP WAS

         21   WITH REGARD TO THE SHAPES OF THOSE TWO DISTRICTS TO DETERMINE

         22   COMPACTNESS.  YOU SAID THAT WAS THE ONLY WAY YOU REVIEWED

         23   COMPACTNESS ACROSS THE TWO MAPS, RIGHT?

         24   A.   NO, THAT'S NOT WHAT I SAID.

         25   Q.   WOULD YOU AGREE THAT YOU LOOKED AT BOTH MAPS AND

1:48PM   1   CONSIDERED THE COMPACTNESS OF THE ENACTED AND THE ILLUSTRATIVE

2   MAPS?

3   A.   NO, MY EARLIER TESTIMONY -- WHY I MENTIONED THAT IT WAS

4   GETTING IN THE IN LIMINE REALM IS I LOOKED AT THE FIRST

5   ILLUSTRATIVE MAP AND THE SECOND ILLUSTRATIVE MAP.

6   Q.   SO IS IT YOUR TESTIMONY THAT YOU'VE NEVER EVEN LOOKED AT

7   THE ENACTED MAP?

8   A.   NO, THAT'S NOT MY TESTIMONY.

9   Q.   OKAY.  SO YOU DID REVIEW THE ENACTED SENATE MAP THEN,

10   RIGHT?

11   A.   AS I JUST SAID A MINUTE AGO, YES.

12   Q.   AND YOU LOOKED AT THE SHAPES OF THOSE DISTRICTS?

13   A.   BRIEFLY.

14   Q.   OKAY.  I'M GOING TO SHOW THE WITNESS ILLUSTRATIVE AID 31,

15   WHICH DEPICTS ENACTED SENATE DISTRICT 5 WITH RACIAL SHADING.  I

16   WOULD LIKE TO PUT THESE TWO SIDE BY SIDE ACTUALLY WITH THE

17   FIGURE WE WERE JUST LOOKING AT.  THAT WAS LDTX51, PAGE 29.

18           MS. KEENAN:  AND IF WE COULD ZOOM IN ON THE FIGURE

19   AGAIN, THAT WOULD BE GREAT, STEPHEN.  THANK YOU SO MUCH.

20   BY MS. KEENAN:

21   Q.   YOU CAN SEE FROM THE TWO IMAGES ON THE SCREEN THAT THIS

22   IMAGE OF THE ENACTED MAP AND THE ILLUSTRATIVE MAP SHOW ROUGHLY

23   THE SAME TERRITORY IN THE STATE, RIGHT?

24           MR. LEWIS:  OBJECTION, YOUR HONOR.  THIS GOES BEYOND

25   THE SCOPE OF DIRECT EXAMINATION.  IT GOES BEYOND THE SCOPE OF

1:49PM  1    THE WITNESS' REPORT.  THE WITNESS DID NOT ANALYZE THE DISTRICT

2    LINES OF THE ENACTED PLAN.

3              **MS. KEENAN:**  MAY I EXPLAIN, YOUR HONOR?

4              **THE COURT:**  YOU MAY RESPOND.

5              **MS. KEENAN:**  IN DISCUSSING THE COMPACTNESS OF A

6    DISTRICT OR THE SHAPE OF A DISTRICT AND WHETHER IT WAS DRAWN IN

7    A WAY THAT'S CONSISTENT WITH TRADITIONAL REDISTRICTING

8    PRINCIPLES, IT MAKES SENSE TO CONSIDER WHETHER THE ENACTED MAP

9    MADE SOME OF THE SAME TYPES OF DECISIONS THAT MR. JOHNSON IS

10   CRITIQUING IN HIS REPORT HERE.  IT GOES TO WHETHER MR. COOPER'S

11   MAPS ARE REASONABLY CONFIGURED, WHETHER THEY COMPLY WITH

12   TRADITIONAL REDISTRICTING PRINCIPLES.  AND IF I CAN MAKE A

13   PROFFER OF WHAT THIS WILL SHOW.

14             **THE COURT:**  MR. LEWIS?

15             **MR. LEWIS:**  AGAIN, YOUR HONOR, MR. COOPER DREW HIS

16   PLAN.  DR. JOHNSON EVALUATED MR. COOPER'S PLAN.  GETTING INTO

17   AN ANALYSIS OF THE ENACTED PLAN, IT GOES BEYOND THE SCOPE OF

18   THE WITNESS' TESTIMONY.  IT IS BEYOND THE SCOPE OF DIRECT,

19   BEYOND THE SCOPE OF THE REPORT.

20             **MS. KEENAN:**  MAY I RESPOND?

21             **THE COURT:**  YOU MAY.

22             **MS. KEENAN:**  I THINK IT GOES TO THE WEIGHT OF HIS

23   OPINION, WHETHER SOMETHING THAT MR. COOPER DID THAT HE

24   CRITICIZED IS SOMETHING THAT THE ENACTED MAP ALSO DID,

25   SPECIFICALLY, CROSSING THE MISSISSIPPI RIVER IN THIS EXACT AREA

1:50PM   1   OF THE STATE.

2           **THE COURT:**  YEAH, IT REALLY IS ALMOST IN THE WAY OF,

3   FOR LACK OF A BETTER WORD, IMPEACHMENT.  I'M GOING TO OVERRULE

4   THE OBJECTION.

5   **BY MS. KEENAN:**

6   Q.  SO JUST TO CONFIRM, YOU CAN SEE FROM THE TWO IMAGES ON

7   YOUR SCREEN ROUGHLY THE SAME TERRITORY OF THE STATE WITH THE

8   ENACTED MAP ON THE LEFT-HAND SIDE AND THE ILLUSTRATIVE MAP ON

9   THE RIGHT-HAND SIDE.  WOULD YOU AGREE WITH THAT?

10   A.  I'M TRYING TO GET MY BEARINGS BETWEEN THE TWO MAPS.  I

11   MEAN, I CAN SEE THE MIDDLE CURVE OF THE RIVER COMPARES, BUT

12   THEY ARE VERY DIFFERENT SCALE MAPS.

13   Q.  SURE.  WELL, YOU DON'T NEED TO WORRY ABOUT THE SCALE FOR

14   THE QUESTIONS I'M GOING TO ASK YOU.  YOU WOULD AGREE THIS IS

15   THE MISSISSIPPI RIVER THAT YOU ARE LOOKING AT?

16   A.  OH, SURE.

17   Q.  AND THAT THIS IS ROUGHLY ORLEANS PARISH AND JEFFERSON

18   PARISH, ALONG WITH THE SURROUNDING AREA?  YES?

19   A.  PIECES OF THEM, YES.

20   Q.  OKAY.  I WANT YOU TO LOOK AT ENACTED SD 5, JUST TO REFRESH

21   YOUR RECOLLECTION OF THE SHAPE OF THAT DISTRICT.  WOULD YOU

22   AGREE THAT THE PORTION OF SD 5 THAT TOUCHES THE RIVER USES THE

23   MISSISSIPPI RIVER AS A BORDER IN PART?

24   A.  IN PART, YES.

25   Q.  AND YOU WOULD AGREE THAT THE OTHER PART OF SD 5 REACHES

1:51PM    1    ACROSS THE RIVER.  WOULD YOU AGREE WITH THAT?

2    A.  YES.

3    Q.  YOU WOULD ALSO AGREE THAT IN EFFECT, IT CAPTURED A BLACK

4    POPULATION IN JEFFERSON PARISH IN DOING SO?

5    A.  ARE YOU TALKING ABOUT THE RED AREA AT THE BOTTOM OF SD 5?

6    Q.  I AM.

7    A.  OKAY.  YES, THAT IS BROUGHT INTO 5.

8    Q.  OKAY.  I WOULD NOW LIKE TO TALK ABOUT LDTX51, PAGE 14.  WE

9    CAN REMOVE THE SIDE BY SIDE.  THIS IS FIGURE 7 WHICH YOU TALKED

10    ABOUT ON DIRECT AS WELL, RIGHT?

11    A.  YES.

12    Q.  HERE YOU CALLED ATTENTION TO WHAT YOU CALLED A PENINSULA

13    OR A FINGER EXTENDING FROM DISTRICT 54 IN THIS FIGURE, RIGHT?

14    A.  YES.

15    Q.  ARE YOU AWARE THAT THE CROSSING FROM LAFOURCHE PARISH INTO

16    JEFFERSON PARISH THAT YOU CALLED A FINGER ACTUALLY CAPTURES AN

17    ISLAND?

18    A.  I ACTUALLY -- WELL, I THOUGHT IT WAS A PENINSULA.  I GUESS

19    THE BRIDGE IS CONNECTING TO THE ISLAND.

20    Q.  THAT'S BECAUSE THIS MAP DOESN'T SHOW WATERWAYS IN THE

21    STATE, DOES IT?

22    A.  NO.

23    Q.  ARE YOU AWARE THAT THE ONLY WAY TO GET TO THAT ISLAND FROM

24    JEFFERSON PARISH IS ACTUALLY BY LAND THROUGH LAFOURCHE PARISH?

25    A.  SURE.

1:53PM   1   Q.   OKAY.  YOU TALKED ABOUT HOW THE MAP DOESN'T -- HOW MR.

2   COOPER'S DISTRICTS DON'T COMPLY WITH VISIBLE FEATURES IN YOUR

3   MAPS.  WOULD YOU AGREE THIS IS AN EXAMPLE WHERE SEEING A WATER

4   FEATURE MIGHT BE HELPFUL IN DETERMINING WHETHER MR. COOPER'S

5   MAPS WERE CONSISTENT WITH VISIBLE FEATURES ON YOUR MAP?

6   A.   NO.  I MEAN, WHEN I DESCRIBED IT, I MENTIONED IT ON THE

7   SHORELINE.  I THINK EVERYONE KNOWS THAT WE ARE DOWN AT THE GULF

8   HERE.

9   Q.   OKAY.  SO YOU DON'T THINK IT WOULD BE HELPFUL TO INCLUDE

10   THE WATERWAYS AND THE IMAGES IN YOUR REPORT?

11   A.   NOT FOR ME.

12   Q.   OKAY.  NEXT I WANT TO TALK ABOUT THE LAKE

13   CHARLES/CALCASIEU AREA THAT YOU DISCUSSED EARLIER TODAY.  YOU

14   TALKED ABOUT THE ILLUSTRATIVE MAP'S TREATMENT OF THE LAKE

15   CHARLES AREA IN CALCASIEU.  THAT INCLUDES HD 34.  DO YOU RECALL

16   THAT TESTIMONY?

17   A.   GENERALLY, YES.

18   Q.   AGAIN, ARE YOU AWARE OF HOW THE ENACTED AND THE

19   ILLUSTRATIVE PLANS TREAT THE CALCASIEU PARISH AREA WITH RESPECT

20   TO DRAWING DISTRICT LINES?

21   A.   AGAIN, I DID NOT SPEND MUCH TIME ON THE ENACTED MAP.  I

22   LOOKED AT IT, BUT I DID NOT LOOK AT IT IN DETAIL.  MY REPORT,

23   YOU KNOW, IS ALL ABOUT THE ILLUSTRATIVE MAPS.

24   Q.   WOULD IT SURPRISE YOU TO LEARN THAT MR. COOPER REDUCED THE

25   NUMBER OF PARISH SPLITS IN CALCASIEU PARISH FROM THE ENACTED

1:54PM  1    MAP?

2    A.   OFF THE TOP OF MY HEAD, I DON'T REMEMBER THE COUNTS OF

3    SPLITS IN ANY GIVEN PARISH, BUT I WOULD NOTE THE IMAGE ON THE

4    SCREEN RIGHT NOW HIGHLIGHTS THAT IT IS IMPORTANT TO UNDERSTAND

5    WHY A PARISH IS SPLIT.  THERE ARE SOME VERY UNDERSTANDABLE

6    REASONS TO SPLIT IT.  SO REDUCING THE NUMBER OF SPLITS, IT

7    SOUNDS NICE, BUT IT REALLY IS WHAT IS THE IMPACT OF REDUCING

8    THE SPLITS.  IF YOU WERE TO REDUCE THE SPLIT THAT WE ARE

9    LOOKING AT NOW, JEFFERSON, YOU WOULD ACTUALLY BE CUTTING OFF

10    THAT ISLAND, AS YOU SAID.

11    Q.   I KNOW YOU ARE SAYING THAT REDUCING THE NUMBER OF PARISH

12    SPLITS SOUNDS NICE, BUT YOU WOULD ALSO AGREE IT IS A

13    TRADITIONAL REDISTRICTING FACTOR, RIGHT?

14    A.   IT IS ONE OF THE CONSIDERATIONS, BUT AS THIS MAP SHOWS,

15    THERE ARE OTHER CONSIDERATIONS THAT CAN JUSTIFY A SPLIT.

16    Q.   OF COURSE.  THOSE ARE THE TYPES OF TRADE-OFFS THAT WE

17    TALKED ABOUT EARLIER, RIGHT?

18    A.   YES.

19    Q.   BUT KEEPING DISTRICTS WITHIN PARISH BOUNDARIES IS ONE OF

20    THE TRADITIONAL REDISTRICTING FACTORS, YES?

21    A.   YES.

22    Q.   OKAY.  ON DIRECT EXAMINATION YOU ALSO TESTIFIED ABOUT AN

23    ILLUSTRATIVE AID IN THE BATON ROUGE AREA.  DO YOU RECALL THAT?

24    A.   YES.

25    Q.   OKAY.  I'M GOING TO SHOW THE WITNESS THAT ILLUSTRATIVE AID

D. JOHNSON - CROSS

1:56PM  1  WHICH OUR TECH HAS LABELED AS I4.  THIS IS THE FIGURE YOU

2  TALKED ABOUT DURING YOUR DIRECT EXAMINATION.  IS THAT RIGHT?

3  A.  YES.

4  Q.  OKAY.  I WANT TO BE CLEAR ABOUT WHAT IT SHOWS CURRENTLY

5  BEFORE I MOVE ON WITH MY TESTIMONY.  SO LIKE YOU SAID, THIS

6  INCLUDES ANY ILLUSTRATIVE DISTRICT THAT TOUCHES EAST BATON

7  ROUGE PARISH, RIGHT?

8  A.  WELL, THAT INCLUDES A PIECE OF EAST BATON ROUGE PARISH,

9  YES.

10  Q.  SURE.  THE ILLUSTRATIVE DISTRICT BORDERS ARE IN BLACK

11  HERE.  YES?

12  A.  YES.

13  Q.  AND THE PORTIONS OF THE DISTRICT WITHIN EAST BATON ROUGE

14  ARE SHADED IN RED?

15  A.  CORRECT.

16  Q.  AND THE PORTIONS OF THE DISTRICTS THAT ARE NOT IN EAST

17  BATON ROUGE PARISH ARE SHADED IN BLUE, RIGHT?

18  A.  YES.

19  Q.  SO FIRST I WANT TO TALK ABOUT MR. COOPER'S TESTIMONY.  YOU

20  TOLD US YOU REVIEWED THE TRANSCRIPT OF HIS TESTIMONY ABOUT THIS

21  AREA OF THE STATE, RIGHT?

22  A.  YES.

23  Q.  IN THAT TRANSCRIPT YOU SAW THAT DEFENSE COUNSEL DIDN'T ASK

24  HIM ANY QUESTIONS ABOUT THIS STATEMENT, RIGHT?

25  A.  I DON'T RECALL.

1:56PM   1    Q.   YOU DON'T KNOW WHETHER MR. COOPER HAPPENED TO MISSPEAK

2    ABOUT THE NUMBERS IN THIS AREA?

3    A.   I DIDN'T SEE ANY CORRECTION TO IT.

4    Q.   WOULD YOU AGREE IT IS NOT UNCOMMON TO MAKE A MISTAKE IN

5    RECITING NUMBERS WHEN YOU ARE TESTIFYING AND TO ACCIDENTALLY

6    FAIL TO CORRECT THEM?

7    A.   GOOD LORD, THAT'S A GENERAL QUESTION.

8    Q.   I CAN BE MORE SPECIFIC.

9    A.   OKAY.

10    Q.   FOR EXAMPLE, YOU TESTIFIED EARLIER TODAY THAT 11 OF 16

11    SENATE MAJORITY-MINORITY DISTRICTS ARE BETWEEN 50 AND

12    53 PERCENT BVAP.  DO YOU REMEMBER THAT?

13    A.   I DON'T REMEMBER THE SPECIFIC WORDING, BUT THAT WAS

14    READING FROM MY REPORT, I BELIEVE.

15    Q.   WOULD YOU AGREE THERE ARE ACTUALLY ONLY 14 TOTAL SENATE

16    MAJORITY-MINORITY DISTRICTS?

17    A.   I WAS LOOKING AT ALL OF THIS DISTRICT BY DISTRICT, SO I

18    DON'T HAVE THE TOTAL COUNTS OFF THE TOP OF MY HEAD, BUT IT IS

19    IN MY CHART HERE.

20    Q.   SURE.  IT IS POSSIBLE YOU MADE A MISTAKE, RIGHT?

21    A.   YEAH.  IN THE ILLUSTRATIVE MAP, THERE ARE 14.

22    Q.   RIGHT.  YOU WOULD AGREE THAT MISTAKE DIDN'T AFFECT

23    ANYTHING ELSE YOU TESTIFIED ABOUT ON YOUR DIRECT EXAMINATION,

24    RIGHT?

25    A.   CORRECT.

1:58PM   1    Q.  YOU DON'T OFFER ANY CONCLUSIONS ABOUT THE NUMBER OF

         2    DISTRICTS IN THE BATON ROUGE AREA IN YOUR REPORTS, RIGHT?

         3    A.  NO.

         4    Q.  BUT JUST LIKE WITH THE OTHER DISTRICTS YOU TALKED ABOUT

         5    TODAY, YOU DO OFFER CRITIQUES ABOUT WHETHER THE DISTRICTS IN

         6    THIS AREA COMPLY WITH TRADITIONAL REDISTRICTING PRINCIPLES,

         7    RIGHT?

         8    A.  YES.

         9    Q.  AND AGAIN, ON -- IN YOUR REPORT, YOU STATE THAT THESE

        10    DISTRICTS WERE DRAWN WITHOUT REGARD TO THOSE PRINCIPLES,

        11    INCLUDING CITY BORDERS.  DO YOU RECALL THAT?

        12    A.  AS SPECIFIED BY MR. COOPER IN HIS REPORT.

        13    Q.  NO, BUT I WANT TO BE CLEAR.  YOU CONCLUDED THAT MR.

        14    COOPER'S DISTRICTS WERE DRAWN WITHOUT REGARD TO CITY BORDERS,

        15    RIGHT?

        16    A.  AS FAR AS HIS EXPLANATION OF WHY HE DREW THE LINES WHERE

        17    THEY WERE, HIS CLAIM THAT HE FOLLOWED CITY BORDERS DID NOT

        18    MATCH UP WITH HIS MAP.

        19    Q.  BEFORE WE GET INTO CITY BORDERS, I WANT TO SHOW YOU AN

        20    ILLUSTRATIVE AID ON THIS ILLUSTRATIVE AID 35, WHICH IS A MOCKUP

        21    OF DR. JOHNSON'S OWN ILLUSTRATIVE AID WE WERE JUST TALKING

        22    ABOUT THAT ADDS AN OVERLAY DISPLAYING THE PRECINCTS IN GREEN

        23    DOTTED LINES --

        24         (AUDIO DISRUPTION.)

        25              **THE COURT:**  WE ARE GOING TO TAKE A RECESS.

1:59PM   1      **(RECESS TAKEN AT 1:59 P.M.  UNTIL 2:04 P.M.).**

         2                **THE COURT:**  OKAY.  IT REPAIRED ITSELF BEFORE IT EVEN

         3      GOT HERE.  I THINK WE HAVE A POLTERGEIST.

         4                **MS. KEENAN:**  CAN I PROCEED, YOUR HONOR?

         5                **THE COURT:**  OH, YES, PLEASE.  PLEASE PROCEED.  I

         6      THOUGHT YOU WERE ALREADY UP THERE.

         7                **MS. KEENAN:**  BEFORE WE PULL THAT SAME THING BACK UP,

         8      I'M GOING TO ASK YOU TO SHOW ANOTHER EXHIBIT, JUST A QUESTION I

         9      FORGOT TO ASK ABOUT EARLIER.  COULD THE TECH PLEASE PULL UP

        10      EXHIBIT 20 -- IT'S PLAINTIFF'S EXHIBIT 20, I'M SORRY, PAGE 42.

        11      **BY MS. KEENAN:**

        12      Q.  OKAY.  DR. JOHNSON, DO YOU RECOGNIZE THIS AGAIN AS THAT

        13      SAME ORLEANS/JEFFERSON PARISH AREA WE TALKED ABOUT A MOMENT

        14      AGO?

        15      A.  YES.

        16      Q.  ON YOUR DIRECT, DO YOU RECALL TALKING ABOUT HOW THE BOTTOM

        17      OF THE ILLUSTRATIVE DISTRICT HAS A CLUB-LIKE SHAPE REACHING

        18      DOWN INTO JEFFERSON PARISH?

        19      A.  YES.

        20      Q.  ARE YOU AWARE OF HOW THIS IMAGE SHOWS THE ENACTED AND THE

        21      ILLUSTRATIVE BORDERS?

        22      A.  IF I'VE SEEN THIS BEFORE, I DON'T RECALL IT.

        23      Q.  OKAY.  I CAN REPRESENT TO YOU THAT THE RED LINE SHOWN ON

        24      YOUR SCREEN IS THE ILLUSTRATIVE DISTRICT.  DO YOU RECOGNIZE

        25      THAT CONFIGURATION BASED ON WHAT YOU'VE TALKED ABOUT IN YOUR

2:05PM   1   REPORT?

2   A.   YES.

3   Q.   SURE.   AND THE SHADED DISTRICTS THAT ARE NUMBERED ARE THE

4   ENACTED DISTRICT.   DOES THAT LOOK FAMILIAR WITH THE ENACTED

5   SENATE DISTRICT 5 THAT WE JUST TALKED ABOUT A MOMENT AGO?

6   A.   YES.

7   Q.   CAN YOU TAKE A LOOK AT ENACTED DISTRICT 7 SHADED IN PEACH

8   ON THE JEFFERSON PARISH SIDE OF THE RIVER?

9   A.   YES.

10   Q.   YOU WOULD AGREE IT INCLUDES THE SAME BORDERS AT THAT

11   BOTTOM PART OF THE DISTRICT THAT YOU CALLED A CLUB, RIGHT?

12   A.   WELL, IT'S MUCH WIDER.   RIGHT WHERE THE 7 IS, IN THAT PART

13   OF THE CLUB, IT DOESN'T HAVE THE NARROW HANDLE, ALTHOUGH IT

14   DOES GO DOWN TO THE BOTTOM END OF IT, SIMILARLY.

15   Q.   YOU WOULD AGREE THAT THE BOTTOM OF THAT DISTRICT IS THE

16   SAME BORDERS, RIGHT?

17   A.   YES, THERE IS VERY LITTLE PEOPLE DOWN AT THE BOTTOM.   THE

18   MAIN PART IS THE HANDLE THROUGH THE -- AROUND WHERE THE 7 IS.

19   Q.   I WANT TO GO BACK TO THE BATON ROUGE AREA THAT WE WERE

20   JUST TALKING ABOUT, STARTING WITH ILLUSTRATIVE AID 35, WHERE WE

21   LEFT OFF BEFORE THE TECH ISSUE.   OKAY.   SO I WILL REPRESENT --

22   AGAIN, THIS IS A MOCKUP OF THE DEMONSTRATIVE AID THAT YOU

23   TESTIFIED ABOUT ON DIRECT THAT ADDS AN OVERLAY DISPLAYING THE

24   PRECINCTS IN GREEN DOTTED LINES.   BASED ON WHERE THOSE BLACK

25   BORDERS THAT YOU TOLD US ABOUT OF THE ILLUSTRATIVE DISTRICTS

D. JOHNSON - CROSS

2:07PM

1   AND THE GREEN DOTTED LINES OVERLAP, CAN YOU IDENTIFY ANY LINE

2   IN THIS ILLUSTRATIVE AID OF THE BATON ROUGE AREA THAT DOES NOT

3   TRACK A PRECINCT LINE?

4   A.   JUST A QUICK REVIEW.  I DON'T SEE ANY.

5   Q.   DO YOU RECALL TALKING ABOUT THE CITY OF CENTRAL IN YOUR

6   REPORT?

7   A.   YES.

8   Q.   YOU TALKED ABOUT HOW THE ILLUSTRATIVE MAP SPLITS THE CITY

9   OF CENTRAL, AND YOU REPRESENTED THAT THE ENACTED MAP KEEPS

10  CENTRAL WHOLE.  DO YOU RECALL THAT?

11  A.   YES.

12  Q.   I'M NOW SHOWING THE WITNESS ILLUSTRATIVE AID 36, WHICH IS

13  DR. JOHNSON'S -- AGAIN, A MOCKUP OF DR. JOHNSON'S ILLUSTRATIVE

14  AID, BOTH AN OVERLAY OF THE CITY OF CENTRAL IN WHITE BORDERS,

15  AS WELL AS AN OVERLAY OF THE ENACTED MAP IN YELLOW BORDERS.

16  DR. JOHNSON, AGAIN, YOU RECOGNIZE THAT 2021 CALIPER STAMP AT

17  THE BOTTOM OF THIS IMAGE?

18  A.   YES.

19  Q.   YOU SEE THAT THE KEY IS SIMILAR TO THE ONES THAT YOU USE

20  IN THE FIGURES IN YOUR OWN REPORT, RIGHT?

21  A.   YES.

22  Q.   OKAY.  AND SO YOU CAN SEE THAT THE CITY LIMITS OF CENTRAL

23  ARE REPRESENTED IN WHITE BASED ON THE KEY?

24  A.   OKAY.

25  Q.   AND THAT THE ENACTED HOUSE DISTRICT BORDERS ARE

2:08PM   1   REPRESENTED IN YELLOW, RIGHT?

2   A.   THAT'S WHAT IT SAYS, YES.

3   Q.   WOULD YOU AGREE, THEN, THAT THE ENACTED HOUSE DISTRICT 65

4   DOES SPLIT THE CITY OF CENTRAL?

5   A.   ARE YOU REFERRING TO THE WHITE SLIVER AT THE VERY -- THE

6   LITTLE SLIVER AT THE VERY TOP?

7   Q.   I AM.

8   A.   IT DOES APPEAR THAT.  NOW, WHEN LINES CORRESPOND IN THE

9   GIS SYSTEM AS CLOSELY AS THOSE DO, THAT'S PROBABLY JUST A

10   PROJECTION ERROR.  IT PROBABLY MEANS THAT THE TWO LINES ARE NOT

11   DRAWN SIMILARLY AND THAT THEY COULD VERY WELL CORRELATE WHEN

12   THEY ARE THAT CLOSE TOGETHER, BECAUSE I'M NOT AWARE OF THE

13   ENACTED SPLITTING OFF FROM VTDS EITHER.  I WOULD BE SURPRISED

14   IF A SLIVER LIKE THAT IS A VTD.

15   Q.   YOU WOULD AGREE AGAIN, THOUGH, THAT VTDS AND MUNICIPALITY

16   LINES DON'T ALWAYS TRACK EACH OTHER, RIGHT?

17   A.   IT DEPENDS ON THE STATE.  I DON'T KNOW WHAT THE RULE IS IN

18   LOUISIANA.

19   Q.   OKAY.  CAN WE GO TO LDTX51 ON PAGE 34.  THIS IS FIGURE 22

20   OF YOUR REPORT SHOWING THE SAME AREA.

21   A.   YES.

22   Q.   DO YOU SEE THE CITY OF CENTRAL WHERE THOSE PURPLE LINES

23   CONVERGE ON THE RIGHT SIDE OF THE IMAGE?

24   A.   YES.

25           MS. KEENAN:  AND COULD THE TECH ZOOM TO SHOW THE RED

2:09PM    1    LINE AT THE TOP?

2    **BY MS. KEENAN:**

3    Q.   DO YOU SEE THAT RED LINE IN THE FIGURE IN YOUR OWN REPORT?

4    A.   YES.

5    Q.   YOU WOULD AGREE THAT'S WHAT YOU USE TO SHOW THE CITY

6    LIMITS OF CENTRAL, RIGHT?

7    A.   CORRECT.

8    Q.   AND WOULD YOU AGREE THAT THE CITY LIMITS IN THAT LINE

9    MATCH THE ONES IN THE ILLUSTRATIVE MAP THAT WE JUST SHOWED --

10   OR THE ILLUSTRATIVE AID THAT WE JUST SHOWED?

11   A.   YES.

12   Q.   OKAY.  DID YOU ALSO REVIEW THE EXHIBITS TO MR. COOPER'S

13   REPORT?

14   A.   THERE WERE A LOT OF THEM, SO, YES, I HAD THEM, AND I

15   LOOKED AT SOME OF THEM IN DETAIL AND SOME OF THEM JUST VERY,

16   VERY BRIEFLY.

17            **MS. KEENAN:**  COULD THE TECH PULL UP PLAINTIFFS

18   EXHIBIT 44.

19   **BY MS. KEENAN:**

20   Q.   YOU RECOGNIZE THIS AS AN ANALYSIS OF SPLITS OF CERTAIN

21   CENSUS PLACES?

22   A.   YES.

23   Q.   OKAY.  COULD WE GO TO PAGE 2?  DO YOU SEE THAT ABOUT IN

24   THE MIDDLE OF THE PAGE NEXT TO DISTRICT 64 AND DISTRICT 65,

25   CENTRAL IS LISTED TWICE?

2:10PM  1   A.  YES.

2   Q.  AND IF WE COULD ZOOM BACK OUT, YOU WOULD AGREE THIS IS THE

3   SPLIT FOR THE LA ENROLLED HOUSE, OR THE ENACTED MAP IN THIS

4   CASE, RIGHT?

5   A.  YES.

6   Q.  SO YOU WOULD AGREE THAT THESE SPLITS ALSO SHOW THAT THE

7   ENACTED MAP SPLITS THE CITY OF CENTRAL, CONTRARY TO WHAT YOU

8   SAID IN YOUR REPORT; IS THAT RIGHT?

9   A.  YES, IT LOOKS LIKE I MISSED THAT ABOUT THREE-QUARTERS OF

10  ONE PERCENT OF THE CITY'S POPULATION WERE NOT INCLUDED IN THE

11  DISTRICT.

12  Q.  YOU WOULD AGREE IT SPLITS THE CITY OF CENTRAL, JUST TO BE

13  CLEAR?

14  A.  JUST A TINY BIT.

15  Q.  I WANT TO GO BACK TO ILLUSTRATIVE AID 36.

16  A.  I ACTUALLY GAVE THE NUMBER RIGHT THERE, 99.16 PERCENT OF

17  THE CITY WAS KEPT INTACT.

18  Q.  SURE.  BUT IT DIDN'T FOLLOW THE CITY LINE, RIGHT?

19  A.  CORRECT.

20  Q.  YOU MENTIONED CENTRAL IN YOUR REPORT, BUT DID YOU TAKE A

21  LOOK AT HOW THE ENACTED -- HOW THE ILLUSTRATIVE MAPS TREAT ANY

22  OF THE OTHER NEARBY CITIES?

23  A.  I DID LOOK AT THEM AS THEY WERE IN THE MAP AS AN OVERLAY.

24  I DID NOT GO INTO DETAIL OR COMMENT ON THEM, OTHER THAN TO

25  COMMENT THAT I DO NOT SEE THE ILLUSTRATIVE MAP FOLLOWING THE

2:12PM   1   CITY BOUNDARIES IN ANY SIGNIFICANT EXTENT.

2   Q.   SURE.   YOU SPECIFICALLY MENTION THE CITY OF BAKER IN

3   ADDITION TO THE CITY OF CENTRAL IN YOUR REPORT.   DO YOU RECALL

4   THAT?   IT'S PARAGRAPH 76 OF YOUR REPORT.

5   A.   YES, I DON'T REMEMBER WORD FOR WORD OF IT, BUT I CAN FLIP

6   TO THAT.

7   Q.   SURE.

8           **MS. KEENAN:**   THIS IS PAGE 33, STEPHEN.

9   A.   YES.

10   **BY MS. KEENAN:**

11   Q.   SO YOU SEE THE IMAGE IN BOTH CENTRAL AND BAKER HERE?

12   A.   YES.

13   Q.   DID YOU CHECK HOW THE ILLUSTRATIVE MAP TREATS THE CITY OF

14   BAKER OR ANY OF THE OTHER NEARBY CITIES TO CENTRAL?

15   A.   NO, BECAUSE THAT WASN'T WHAT I WAS DISCUSSING HERE.

16   Q.   OKAY.   I'M GOING TO SHOW THE WITNESS ILLUSTRATIVE AID 37.

17   THIS IS THE SAME AID WE WERE JUST DISCUSSING BUT WITH THE

18   ADDITION OF THE CITY LIMITS IN THE NEARBY CITIES OF BAKER AND

19   MERRYDALE, ALSO IN WHITE BORDERS.

20       DR. JOHNSON, AS YOU CAN SEE HERE, THE ILLUSTRATIVE MAP

21   BORDERS REMAIN IN BLACK, AND THE ENACTED MAP BORDERS REMAIN IN

22   YELLOW.   DOES THAT COMPORT WITH YOUR UNDERSTANDING OF WHAT IS

23   ON THE SCREEN HERE?

24   A.   YES.

25   Q.   YOU CAN SEE, BASED ON THIS ILLUSTRATIVE AID, THAT THIS IS

2:13PM   1   AN AREA WHERE THERE'S A TRADE-OFF MADE IN THE TWO MAPS, RIGHT?

2   A.   I'M NOT SURE WHAT YOU MEAN BY TRADE-OFF.

3   Q.   SURE.   SO THE ILLUSTRATIVE MAP -- I'M SORRY.   THE ENACTED

4   MAP KEEPS MOST OF CENTRAL WHOLE, RIGHT?

5   A.   YES.

6   Q.   BUT IT SPLITS BAKER AND MERRYDALE RIGHT DOWN THE MIDDLE?

7   A.   IT SPLITS THEM.   I DON'T KNOW THE PERCENTAGES, BUT YES.

8   Q.   SURE.   IN CONTRAST, THE ILLUSTRATIVE MAP SPLITS CENTRAL,

9   LIKE YOU TALKED ABOUT IN YOUR REPORT, RIGHT?

10   A.   YES.

11   Q.   BUT IT APPEARS TO KEEP BAKER AND MERRYDALE WHOLE OR AT

12   LEAST NEARLY WHOLE, RIGHT?

13   A.   IT'S HARD TO TELL FROM THIS BECAUSE THE BLACK LINES

14   DISAPPEAR UNDER THE YELLOW LINES.

15   Q.   I CAN PUT UP A SIDE-BY-SIDE OF THIS WITH THE INITIAL OF

16   I4.

17        **MS. KEENAN:**   STEPHEN, COULD YOU PUT THEM NEXT TO EACH

18   OTHER?   AND COULD YOU ZOOM IN ON THIS PLACE WHERE THOSE THREE

19   LINES DIVERGE ABOVE 65, AS WELL AS THE EAST BATON ROUGE

20   BORDERS, SO WE CAN SEE THE SAME TERRITORY.   I'M SORRY.   IT'S A

21   BIT HIGHER THAN THAT.   STARTING AT THE TOP.   THERE YOU GO.

22   EXACTLY.   THANK YOU.

23   **BY MS. KEENAN:**

24   Q.   CAN YOU SEE THE TWO SETS OF LINES NOW?

25   A.   YES.

2:15PM

1    Q.   AND WOULD YOU AGREE THAT THE ENACTED MAP KEEPS BAKER AND

2    MERRYDALE LARGELY WHOLE?

3    A.   YES.

4    Q.   OH, SORRY.  I WITHDRAW THE QUESTION BECAUSE I MISSTATED.

5    IT'S THE ILLUSTRATIVE MAP THAT KEEPS BAKER AND MERRYDALE

6    LARGELY WHOLE, RIGHT, DR. JOHNSON?

7    A.   I WAS WITH YOU.  YES.

8    Q.   THANK YOU.  SORRY FOR THE CONFUSION.

9         ARE YOU AWARE OF THE POPULATION OF ANY OF THESE THREE

10   CITIES?

11   A.   I KNOW THE POPULATION COUNT OF CENTRAL IS JUST BELOW

12   30,000, AND MY REPORT MENTIONS THE POPULATION DENSITY, I THINK,

13   OF THE OTHERS.

14   Q.   THAT'S RIGHT.  AND YOU MENTIONED THE POPULATION OF CENTRAL

15   TO SHOW THAT IT WAS SMALL ENOUGH TO BE DRAWN INTO A SINGLE

16   HOUSE DISTRICT, RIGHT?

17   A.   YES.

18   Q.   ARE YOU ALSO AWARE OF THE BVAP OF ANY OF THESE THREE

19   CITIES?

20   A.   NO.

21   Q.   OKAY.  I'M NOW SHOWING THE WITNESS ILLUSTRATIVE AID 38,

22   AGAIN, SAME AID BUT WITH THE ADDITION OF THE POPULATION AND

23   BVAP OF EACH CITY.  SO YOU WOULD AGREE THAT THE POPULATION OF

24   CENTRAL COMPORTS WITH THE NUMBER IN YOUR REPORT THAT IS 29,565

25   PEOPLE IN CENTRAL, RIGHT?

2:16PM   1   A.   YES.

2   Q.   DO YOU AGREE THAT'S SMALL ENOUGH TO BE DRAWN INTO A SINGLE

3   HOUSE DISTRICT, LIKE YOU SAID?

4   A.   YES.

5   Q.   THIS AID SHOWS THAT MERRYDALE AND BAKER BOTH HAVE SMALLER

6   POPULATIONS, RIGHT?

7   A.   YES.

8   Q.   ALSO SMALL ENOUGH TO BE DRAWN INTO A SINGLE HOUSE

9   DISTRICT, RIGHT?

10   A.   YES.

11   Q.   DO YOU HAVE ANY REASON TO DISPUTE THAT THE BVAP OF CENTRAL

12   IS 10.94 PERCENT?

13   A.   I DON'T KNOW WHAT IT IS.

14   Q.   OKAY.   DO YOU HAVE ANY REASON TO DISPUTE THAT THE BVAP OF

15   BAKER IS 80.80 PERCENT?

16   A.   I DON'T KNOW WHAT IT IS.

17   Q.   AND DO YOU HAVE ANY REASON TO DISPUTE THE BVAP OF

18   MERRYDALE IS 94.73 PERCENT?

19   A.   I DO NOT KNOW WHAT IT IS.

20   Q.   ALTHOUGH YOU DON'T KNOW WHAT IT IS RIGHT NOW, YOU WOULD

21   AGREE THAT YOU HAD THAT INFORMATION AVAILABLE TO YOU WHEN YOU

22   WERE REVIEWING MR. COOPER'S MAPS, RIGHT?

23   A.   YES.   IT'S IN THE LAYER.   I COULD HAVE PULLED IT AND SEEN

24   WHAT IT WAS.

25   Q.   WHEN YOU TALKED ABOUT THE CITY OF CENTRAL, YOU PULLED SOME

2:17PM

1   OF THAT INFORMATION, INCLUDING THE POPULATION OF CENTRAL,

2   RIGHT?

3   A.   I THINK THAT WAS WHAT I PULLED WAS THE POPULATION OF

4   CENTRAL.

5   Q.   YOU'VE TALKED ABOUT HOW YOU'VE DRAWN MAPS IN THE

6   REDISTRICTING CONTEXT, RIGHT?

7   A.   YES.

8   Q.   EARLIER I THINK YOU TESTIFIED YOU HAD DRAWN THOUSANDS?

9   A.   YES.

10  Q.   YOU'VE TESTIFIED PREVIOUSLY THAT WHEN YOU HAVE TO CHOOSE

11  BETWEEN DIVIDING ONE OF TWO COMMUNITIES OF INTEREST IN YOUR OWN

12  MAPS, YOU TRY TO MAKE SURE THAT THE ONE YOU ARE DIVIDING IS NOT

13  ONE OF THE ONES THAT IS HEAVILY MADE UP OF A PROTECTED CLASS.

14  DO YOU RECALL THAT TESTIMONY?

15  A.   IS THAT FROM THE DEPOSITION?

16  Q.   IT IS.

17  A.   I DON'T RECALL SPECIFICALLY SAYING, BUT IT DOES SOUND

18  FAMILIAR.

19        **MS. KEENAN:**  I CAN REFRESH THE WITNESS' RECOLLECTION.

20  COULD THE TECH PLEASE PULL UP PAGE 198 OF HIS DEPOSITION.

21  **BY MS. KEENAN:**

22  Q.   COULD YOU TAKE A LOOK AT LINES 10 THROUGH 25 OF THIS

23  DEPOSITION.  YOU CAN JUST READ IT TO YOURSELF.  LET ME KNOW

24  WHENEVER YOU ARE DONE, PLEASE.

25  A.   (WITNESS COMPLIES.)  SURE.  I'M DONE.

D. JOHNSON - CROSS

2:18PM   1    Q.  I WILL ASK THE QUESTION AGAIN.  CAN YOU TAKE DOWN THE

        2    DEPOSITION, PLEASE.  WHEN YOU HAVE TO CHOOSE BETWEEN DIVIDING

        3    ONE OF TWO COMMUNITIES OF INTEREST IN YOUR OWN MAPS, YOU

        4    TESTIFIED THAT YOU TRY TO MAKE SURE THAT THE ONE YOU ARE

        5    DIVIDING IS NOT ONE OF THE ONES THAT IS HEAVILY MADE UP OF A

        6    PROTECTED CLASS, RIGHT?

        7    A.  IN GENERAL, YES.  THE ISSUE CHANGES IF BOTH DISTRICTS

        8    DIVIDING IT ARE MAJORITY PROTECTED CLASS.  THAT IS A DIFFERENT

        9    SITUATION.  BUT IN GENERAL, YES.

       10    Q.  AND BEFORE WE MOVE ON TO BATON ROUGE, YOUR REPORT OFFERED

       11    THE OPINION THAT EACH DISTRICT IS DRAWN WITHOUT REGARD TO MAJOR

       12    ROADS IN BATON ROUGE AS WELL.  DO YOU RECALL THAT?

       13    A.  YES.

       14    Q.  OKAY.  THE ILLUSTRATIVE AID YOU TALKED ABOUT IN COURT

       15    TODAY DOESN'T SHOW MAJOR ROADS, DOES IT, THE ONE WITH THE

       16    DISTRICTS OF -- THAT TOUCH ON EAST BATON ROUGE?

       17    A.  THE ONE WITH THE PARISH COLORED RED?

       18    Q.  YES.

       19    A.  NO, THAT WAS JUST COUNTING HOW MANY DISTRICTS ARE IN THE

       20    PARISH.

       21    Q.  RIGHT.  BUT YOUR REPORT DOES SHOW THE MAJOR ROADS IN BATON

       22    ROUGE, RIGHT?

       23    A.  YES.

       24    Q.  SO YOU WOULD RECOGNIZE THE MAJOR ROADS IN THE CITY OF

       25    BATON ROUGE IF YOU SAW THEM?

2:19PM   1   A.   CERTAINLY THE FREEWAYS AND HIGHWAYS, THINGS LIKE THAT.

2            **MS. KEENAN:**  COULD THE TECH PLEASE PULL UP

3   ILLUSTRATIVE AID 12.

4   **BY MS. KEENAN:**

5   Q.   DO YOU RECOGNIZE THESE AS THE MAJOR STREETS IN BATON

6   ROUGE?  SPECIFICALLY, YOU RECOGNIZE THE HIGHWAYS AND FREEWAYS?

7   A.   YES.

8   Q.   OKAY.  ARE YOU FAMILIAR WITH AIRLINE HIGHWAY?

9   A.   I DON'T KNOW THE INDIVIDUAL NAMES.

10   Q.   ARE YOU FAMILIAR WITH THE ROAD MARKED U.S. 61, U.S. 190,

11   RIGHT HERE IN THE CENTER OF THIS ILLUSTRATIVE AID?

12   A.   I CAN SEE IT, YES.

13            **MS. KEENAN:**  CAN THE TECH PULL UP ILLUSTRATIVE AID

14   113 NEXT.

15   **BY MS. KEENAN:**

16   Q.   THIS IS A DEPICTION OF THE ILLUSTRATIVE DISTRICTS IN BATON

17   ROUGE THAT YOU CRITICIZED, RIGHT?

18   A.   YES, IT'S SHIFTED A LITTLE BIT SOUTH OF WHAT I WAS

19   SHOWING, BUT YES.

20   Q.   AND ALTHOUGH YOU'VE TESTIFIED THAT THE LINES AREN'T

21   CONSISTENT WITH MAJOR ROADS, YOU CAN SEE THAT THE MAJOR BORDER

22   BETWEEN ILLUSTRATIVE HOUSE DISTRICT 68 AND 69 IS AIRLINE

23   HIGHWAY, RIGHT?

24   A.   THAT ONE BORDER, YES.

25   Q.   THE ONE BORDER BETWEEN THE TWO ILLUSTRATIVE MAJORITY BLACK

2:20PM    1    DISTRICTS, YES.

2    A.    BUT THERE ARE MORE THAN TWO MAJORITY BLACK DISTRICTS HERE.

3    Q.    DO YOU AGREE THAT ILLUSTRATIVE HD 68 IS A MAJORITY BLACK

4    DISTRICT?

5    A.    YES.

6    Q.    YOU WOULD AGREE THAT ILLUSTRATIVE HOUSE DISTRICT 69 IS A

7    MAJORITY BLACK DISTRICT?

8    A.    JUST BARELY.

9    Q.    AND DO YOU AGREE THAT THE BORDER BETWEEN THOSE TWO

10    DISTRICTS IS AIRLINE HIGHWAY?

11    A.    YES.

12    Q.    I KNOW WE TALKED A LITTLE BIT ABOUT THIS, BUT YOU DIDN'T

13    REVIEW DR. COLTEN'S OPINIONS ABOUT THIS AREA OF THE STATE

14    EITHER?

15    A.    CORRECT.

16    Q.    SO AGAIN, YOU DON'T KNOW WHETHER HIS OPINIONS WOULD IMPACT

17    YOUR TESTIMONY ABOUT WHETHER THESE DISTRICTS ARE CONSISTENT

18    WITH COMMUNITIES OF INTEREST IN THE CITY?

19    A.    WITH HIS VIEW OF COMMUNITIES OF INTEREST?

20    Q.    YES.    CORRECT.    YOU CAN TAKE THE DEMONSTRATIVE DOWN.

21    THANK YOU.

22        YOU TALKED A LITTLE BIT ABOUT THE CONCEPT OF DIFFERENTIAL

23    PRIVACY EARLIER TODAY.    DO YOU REMEMBER THAT?

24    A.    YES.

25    Q.    OKAY.    ON DIRECT EXAMINATION, YOU SAID, AND I'M QUOTING

2:22PM   1    FROM YOUR TESTIMONY, "WE USED TO KNOW THAT THE DATA IN EACH

         2    BLOCK WAS THE ACTUAL COUNT OF PEOPLE THAT THE CENSUS BUREAU

         3    COUNTED."  RIGHT?

         4    A.   YES.

         5    Q.   AND IT'S YOUR UNDERSTANDING THAT THE NEW PROCEDURE THE

         6    CENSUS BUREAU INTRODUCED THIS YEAR DISRUPTED THAT ACTUAL COUNT

         7    OF PEOPLE THAT YOU USED TO HAVE INFORMATION ABOUT.  IS THAT

         8    RIGHT?

         9    A.   IT ADDS NOISE OR CHANGES THE DATA, YES.

        10    Q.   IT'S NOT YOUR OPINION, THOUGH, THAT THE CONCEPT OF

        11    DIFFERENTIAL PRIVACY IS NEW FOR THE CENSUS BUREAU, IS IT?

        12    A.   THE POLICY IS NEW.  I DON'T KNOW WHAT YOU MEAN BY THE

        13    CONCEPT.

        14    Q.   SURE.  ARE YOU AWARE THAT THE CENSUS BUREAU HAD

        15    IMPLEMENTED A DATA SWAPPING PROCESS TO PROTECT PRIVACY SINCE

        16    1990?

        17    A.   OH, YEAH, BUT THAT IS COMPLETELY DIFFERENT THAN

        18    DIFFERENTIAL PRIVACY.

        19    Q.   THE REASON IT IS DIFFERENT IS THAT UNDER -- ONE REASON IT

        20    IS DIFFERENT, AS YOU EXPLAINED, IS THAT YOU MAY HAVE KNOWN THE

        21    ACTUAL COUNT OF PEOPLE BEING SWAPPED, RIGHT, UNDER THE DATA

        22    SWAPPING MACHINE?

        23    A.   IT'S NOT REALLY AN ACCURATE DESCRIPTION OF IT.

        24    Q.   YOU WOULD AGREE, THOUGH, THAT THE DIFFERENCE, ONE

        25    DIFFERENCE BETWEEN THE DATA SWAPPING AND THE NEW DISCLOSURE

D. JOHNSON - CROSS

2:23PM    1   AVOIDANCE PROCESS IS THAT IT AFFECTS THE ACTUAL COUNT OF PEOPLE

          2   THAT SHOW UP IN THE CENSUS BLOCKS?

          3   A.   THE DIFFERENTIAL PRIVACY DOES SO, YES.

          4   Q.   WHEN YOU SAY DIFFERENTIAL PRIVACY, YOU WOULD AGREE THAT'S

          5   THE SAME AS THE DISCLOSURE AVOIDANCE PROCESS THAT THE CENSUS

          6   BUREAU HAS DISCUSSED, JUST TO BE PRECISE?

          7   A.   WELL, DISCLOSURE AVOIDANCE IS THE BIG TENT.  DATA SWAPPING

          8   WAS AN OLD PIECE OF IT.  DIFFERENTIAL PRIVACY IS THE NEW

          9   APPROACH TO IT.

         10   Q.   OKAY.  SO LET'S MAKE SURE WE ARE USING THE SAME TERMS

         11   THEN.  YOU WOULD DESCRIBE DISCLOSURE AVOIDANCE AS THE UMBRELLA

         12   TERM, RIGHT, OF THOSE TWO CONCEPTS WE JUST TALKED ABOUT?

         13   A.   I GUESS SO, YES.

         14   Q.   AND YOU WOULD SAY THAT DATA SWAPPING AND DIFFERENTIAL

         15   PRIVACY ARE TWO DIFFERENT WAYS OF GETTING AT DISCLOSURE

         16   AVOIDANCE BY THE CENSUS BUREAU?

         17   A.   TWO RADICALLY DIFFERENT WAYS.

         18   Q.   BUT YOU WOULD AGREE THAT EVEN UNDER DATA SWAPPING, PRIOR

         19   TO THE INTRODUCTION OF DIFFERENTIAL PRIVACY, YOU DID NOT KNOW

         20   THE EXACT RACIAL COMPOSITION OF EACH BLOCK, EVEN IF YOU KNOW

         21   THE ACTUAL COUNT OF PEOPLE?

         22   A.   DATA SWAPPING IS RARE.  IT DOESN'T HAPPEN IN EVERY BLOCK.

         23   IT ONLY HAPPENS IN CERTAIN CIRCUMSTANCES WHERE THERE ARE

         24   CERTAIN CONCERNS.  AND SO IN THOSE FEW BLOCKS, YOU ARE CORRECT,

         25   THEY MIGHT CHANGE THE NUMBER.  DIFFERENTIAL PRIVACY HAPPENS IN

2:24PM   1    EVERY BLOCK.  IT CHANGES EVERY NUMBER.

         2    Q.  WE WILL TALK MORE ABOUT DIFFERENTIAL PRIVACY IN A MINUTE.

         3    I WANT TO FOCUS ON DATA SWAPPING FIRST.  EVEN THOUGH IT DOESN'T

         4    HAPPEN IN EVERY BLOCK, YOU WOULD AGREE THAT THE SWAPPING IS

         5    RANDOMIZED, RIGHT?

         6    A.  NO.

         7    Q.  ARE YOU ALWAYS ABLE TO DISCERN WHICH BLOCKS HAVE BEEN

         8    CHANGED?

         9    A.  TO A DEGREE.  IT'S BEEN A LONG TIME SINCE I'VE TALKED

        10    ABOUT DATA SWAPPING, BUT IT WOULD ONLY HAPPEN WHEN THERE WAS

        11    LIKE A -- LIKE A SINGLE PERSON KIND OF FACTOR.  THAT IS

        12    PROBABLY TOO SPECIFIC.  IT WOULD PROBABLY ONLY HAPPEN WHEN

        13    THERE WERE SO FEW PEOPLE IN A GIVEN GROUP THAT THEY COULD BE

        14    EXPOSED -- THAT THEIR DATA COULD BE EXPOSED, ESSENTIALLY WHEN

        15    THERE'S ONLY ONE NATIVE AMERICAN IN A BLOCK.  THEY ARE NOT

        16    GOING TO GIVE THE DATA FOR THE NATIVE AMERICAN IN THAT BLOCK.

        17    SO IT WAS PRETTY RARE.  SO IT WOULD TEND TO HAPPEN IN THOSE FEW

        18    SITUATIONS.

        19    Q.  BUT YOU WOULD AGREE THAT IN BLOCKS WHERE THE DATA HAD BEEN

        20    SWAPPED, YOU WOULDN'T KNOW THE EXACT RACIAL COMPOSITION OF EACH

        21    BLOCK AS IT WAS SHOWN IN THE CENSUS DATA, RIGHT?

        22    A.  IN THOSE FEW BLOCKS, IT WOULD BE OFF BY ONE PERSON.

        23    Q.  SO EVEN BEFORE THIS CYCLE, YOU WOULD AGREE THAT THERE WERE

        24    SOME INACCURACIES IN THE CENSUS BUREAU DATA ABOUT THE EXACT

        25    RACIAL COMPOSITION OF CERTAIN DISTRICTS?

2:26PM

1    A.   IN DATA SWAPPING YOU ARE TALKING ABOUT THOUSANDS OF A

2    PERCENT OF A DISTRICT.  I MEAN, THE NUMBERS ARE TINY.  I DON'T

3    KNOW -- I CAN'T TELL YOU THE EXACT PERCENTAGE IT WOULD SHIFT,

4    BUT I WOULD BE STUNNED IF IT WOULD CHANGE A .01 PERCENTAGE OF A

5    DISTRICT'S DEMOGRAPHICS.  I MEAN, THE CENSUS ISN'T ACCURATE.

6    THAT'S A MUCH BIGGER FACTOR THAN DATA SWAPPING WAS.

7    Q.   I WANT TO GET TO THAT IN JUST A MINUTE.  FIRST I WANT TO

8    TALK ABOUT THE DIFFERENTIAL PRIVACY AS YOU ARE DESCRIBING IT.

9    THIS IS WHAT YOU ARE CALLING THE NEW PROCEDURE THAT THE CENSUS

10   BUREAU HAS PUT INTO PLACE THAT INVOLVES BLURRING OR ADDING

11   NOISE TO THE DISTRICTS, RIGHT, JUST SO WE AGREE ON TERMS?

12   A.   YES.

13   Q.   YOU REFERENCED A BALLPARK OF A ONE-PERCENT MARGIN OF ERROR

14   IN CONGRESSIONAL PLANS AS THE CENSUS BUREAU HAS DISCUSSED?

15   A.   YES.

16   Q.   YOU WOULD AGREE THEY HAVEN'T GIVEN ANY PRECISE FIGURE

17   ABOUT THE MARGIN OF ERROR THAT THIS DIFFERENTIAL PRIVACY

18   PROCESS INTRODUCES?

19   A.   CORRECT.

20   Q.   AND THEY HAVE NOT EXPLAINED THE MARGIN OF ERROR IN STATE

21   LEGISLATIVE REDISTRICTING PLANS AT ALL, RIGHT?

22   A.   WELL, THEY HAVE SAID THAT IT'S BIGGER -- AS THE GEOGRAPHY

23   GETS SMALLER, THE ERROR GETS BIGGER.  SO WE KNOW WHATEVER IT

24   WAS AT THE CONGRESSIONAL LEVEL, THE LEGISLATIVE LEVEL IS GOING

25   TO BE BIGGER, THE PARISH LEVEL IS GOING TO BE BIGGER, THE CITY

2:27PM   1   AND TRACT LEVELS ARE GOING TO BE EVEN BIGGER.

2   Q.   BUT AGAIN, NO PRECISE FIGURE, RIGHT?

3   A.   CORRECT.

4   Q.   AND YOU ARE NOT TESTIFYING THAT YOU KNOW THE MARGIN OF

5   ERROR THAT WOULD BE INTRODUCED HERE BY THIS DIFFERENTIAL

6   PRIVACY PROCESS?

7   A.   I WISH I COULD, BUT NOBODY OUTSIDE OF THE CENSUS BUREAU

8   CAN.  AND THEY GO TO JAIL IF THEY SAY.

9   Q.   AND FOR THAT REASON, YOU DIDN'T CONDUCT ANY ANALYSIS TO

10   PROVIDE AN ACTUAL RATHER THAN A HYPOTHETICAL MARGIN OF ERROR IN

11   THE STATE LEGISLATIVE REDISTRICTING PLANS, RIGHT?

12   A.   THAT WOULD BE IMPOSSIBLE.

13   Q.   LIKE YOU JUST TOLD US, CENSUS DATA IS ALWAYS IMPERFECT,

14   EVEN PRIOR TO THE INTRODUCTION OF THE DIFFERENTIAL PRIVACY

15   PROCESS, RIGHT?

16   A.   YES.

17   Q.   SOME OF THE OTHER MARGINS OF ERROR IN CENSUS DATA INCLUDE

18   PROBLEMS THAT RESULT FROM UNDERCOUNTING.  ARE YOU FAMILIAR WITH

19   THAT PROCESS?

20   A.   AND OVERCOUNTING, CERTAINLY.

21   Q.   YOU WOULD AGREE THAT THE MARGIN OF ERROR CREATED BY

22   UNDERCOUNTING CAN BE FOR LARGER THAN ONE PERCENT, RIGHT?

23   A.   YES.

24   Q.   ARE YOU AWARE THAT PAST CENSUS RESULTS HAVE BEEN ESTIMATED

25   TO UNDERSTATE THE ACTUAL BLACK POPULATION, FOR EXAMPLE, BY MORE

D. JOHNSON - CROSS

2:28PM   1   THAN 7 PERCENT?

2   A.   I DON'T RECALL SEEING A SPECIFIC STUDY SAYING THAT.

3   Q.   YOU WOULDN'T DISPUTE THAT, THOUGH, RIGHT?

4   A.   OFF THE TOP OF MY HEAD, I DON'T KNOW.

5   Q.   DESPITE THESE MARGINS OF ERROR AND THE CENSUS DATA IN

6   GENERAL, YOU RELY ON CENSUS DATA IN DRAWING YOUR MAPS, RIGHT?

7   A.   BY LAW WE DO.

8   Q.   RIGHT.  YOU ARE NOT AWARE OF ANY COURT THAT HAS REJECTED A

9   *GINGLES* I EXPERT'S RELIANCE UPON CENSUS DATA IN A SECTION 2

10   CASE, ARE YOU?

11   A.   YOU MEAN THEY REJECTED THE USE OF CENSUS DATA?

12   Q.   I'M SAYING THAT'S NEVER HAPPENED, RIGHT?  THE USE OF

13   CENSUS DATA IS COMMON IN REDISTRICTING, ESPECIALLY IN SECTION 2

14   CASES?

15   A.   OH, OF COURSE.  IT'S THE BEST AVAILABLE DATA.

16   Q.   RIGHT.  I NOW WANT TO TALK ABOUT SENSITIVITY OR

17   EFFECTIVENESS.  DO YOU REMEMBER DISCUSSING THAT ON YOUR DIRECT?

18   A.   THE SENSITIVITY ANALYSIS?  YES.

19   Q.   OKAY.  WHEN YOU ARE DRAWING MAJORITY-MINORITY DISTRICTS IN

20   YOUR OWN WORK, YOU AGREE IT IS IMPORTANT TO CONSIDER WHETHER

21   THAT DISTRICT IS AFFECTED, RIGHT?

22   A.   IN MY OWN WORK, YES.

23   Q.   THAT'S BECAUSE WHEN YOU ARE TRYING TO EMPOWER A REGION

24   THAT'S HISTORICALLY BEEN UNDERREPRESENTED, YOU WANT TO BE SURE

25   THE DISTRICT YOU'VE DRAWN IS ACTUALLY CAPABLE OF EMPOWERING

2:29PM   1   THEM, RIGHT?

2   A.   THAT'S PROBABLY A FAIR DESCRIPTION OF IT.   IT CERTAINLY

3   CAPTURES THE IDEA.

4   Q.   OKAY.   JUST TO MAKE SURE THE RECORD IS CLEAR, I'M GOING TO

5   SHOW THE WITNESS PAGE 259 OF HIS DEPOSITION.   THIS IS JUST

6   REFRESHING HIS RECOLLECTION, NOT AN ATTEMPT AT IMPEACHMENT.

7   A.   I JUST PHRASED MY OWN QUOTE.

8   Q.   WOULD YOU MIND READING LINES 4 TO 7 HERE?

9   A.   IF WE'RE TRYING TO --

10   Q.   I'M SORRY.   JUST TO YOURSELF.

11   A.   I'M SORRY.

12   Q.   HAVE YOU READ IT?

13   A.   YES.

14   Q.   OKAY.   I WILL TAKE IT DOWN.   I JUST WANT TO REASK THE

15   QUESTION AGAIN TO MAKE SURE WE ARE ON THE SAME PAGE.   "THE

16   REASON EFFECTIVENESS IS IMPORTANT TO YOU IS BECAUSE WHEN YOU

17   ARE TRYING TO EMPOWER A REGION THAT HAS HISTORICALLY BEEN

18   UNDERREPRESENTED, YOU WANT TO BE SURE THAT THE DISTRICT YOU

19   HAVE DRAWN IS ACTUALLY CAPABLE OF EMPOWERING THEM," RIGHT?

20   A.   YES.

21   Q.   NOW, YOUR REPORT STATES -- CAN WE PULL UP LDTX51 AT PAGE

22   41.   I'M LOOKING AT PAGE -- PARAGRAPH 93.   YOUR REPORT STATES,

23   "THE ENACTED MAP PERFORMS MUCH BETTER IN A

24   SENSITIVITY/ROBUSTNESS TEST."   DID I READ THAT CORRECTLY?

25   A.   YES.

2:31PM

1    Q.  I WANT TO TALK ABOUT WHAT YOU MEAN WHEN YOU SAY YOU

2    CONDUCTED A SENSITIVITY OR EFFECTIVENESS TEST.  YOU DID NOT

3    ATTEMPT TO CALCULATE THE EFFECTIVENESS LEVEL OF ANY DISTRICT,

4    CORRECT?

5              **MR. LEWIS:**  OBJECTION.  IT MISCHARACTERIZES THE

6    WITNESS'S REPORT.  HE DIDN'T SAY HE CONDUCTED AN EFFECTIVENESS

7    TEST.

8              **MS. KEENAN:**  MAY I RESPOND, YOUR HONOR?

9              **THE COURT:**  YOU MAY.

10             **MS. KEENAN:**  HE SPECIFICALLY SAID THAT IN HIS DIRECT

11   TESTIMONY.  I OBJECTED AND I WAS TOLD THAT I COULD EXPLORE IT

12   ON CROSS-EXAMINATION.

13             **THE COURT:**  OVERRULED.

14   **BY MS. KEENAN:**

15   Q.  YOU DID NOT ATTEMPT TO CALCULATE THE EFFECTIVENESS LEVEL

16   OF ANY DISTRICT?

17   A.  CORRECT.  I DID A, AS I WROTE HERE, SENSITIVITY/ROBUSTNESS

18   TEST, NOT AN EFFECTIVENESS TEST.

19   Q.  RIGHT.  SO IN CONDUCTING WHAT YOU ARE CALLING A

20   SENSITIVITY OR ROBUSTNESS TEST, YOU DISCUSS A HYPOTHETICAL CASE

21   WHERE THE EFFECTIVENESS LEVEL OF EVERY DISTRICT MIGHT BE

22   53 PERCENT AP BLACK VAP, RIGHT?

23   A.  YES, I'M SHIFTING FROM -- WELL, I'M SAYING A SENSITIVITY

24   RANGE AROUND MR. COOPER'S DISTRICTS THAT HE PROVIDED AS

25   EFFECTIVE.  SO I'M ACCEPTING HIS EFFECTIVENESS TESTING AND THEN

D. JOHNSON - CROSS

2:32PM   1   DOING A SENSITIVITY/ROBUSTNESS TESTING AROUND THAT.

2   Q.   I WANT TO BREAK THAT DOWN.   MR. COOPER'S REPORT TALKS

3   ABOUT THE BVAP OF EACH OF HIS DISTRICTS, RIGHT?

4   A.   YES.

5   Q.   SO THAT'S WHAT YOU ARE DRAWING FROM MR. COOPER'S REPORT IS

6   THE BLACK VOTING AGE POPULATION PERCENTAGE OF EACH DISTRICT?

7   A.   AND HIS STATEMENT THAT THEY ARE EFFECTIVE.

8   Q.   RIGHT.   HE HAS STATED THAT THEY ARE EFFECTIVE.   HE DID NOT

9   PROVIDE THE 53 PERCENT NUMBER THAT YOU SUPPLY IN YOUR REPORT,

10   RIGHT?

11   A.   CORRECT.   THAT'S THE SENSITIVITY/ROBUSTNESS TEST.

12   Q.   THAT NUMBER IS A HYPOTHETICAL THAT YOU CAME UP WITH AND

13   INCLUDED IN YOUR REPORT, RIGHT?

14   A.   CORRECT.

15   Q.   SAME WITH THE 45 PERCENT NUMBER.   THAT NUMBER DID NOT COME

16   FROM MR. COOPER, RIGHT?

17   A.   WHICH 45 PERCENT NUMBER?

18   Q.   THAT'S IN PARAGRAPH 89 OF YOUR REPORT, FIRST SENTENCE

19   THERE IN PARAGRAPH 89.

20   A.   OH, CORRECT.   THAT'S ALSO A HYPOTHETICAL.

21   Q.   RIGHT.   SO AGAIN, THIS IS A HYPOTHETICAL NUMBER THAT YOU

22   INSERTED IN THE REPORT, NOT ANYTHING THAT MR. COOPER SAID HIS

23   DISTRICTS COMPLIED OR DIDN'T COMPLY WITH?

24   A.   CORRECT.   I'M JUST USING WORDS TO ILLUSTRATE WHAT CAN BE

25   DONE VISUALLY ON THOSE CHARTS.   YOU CAN USE WHATEVER

D. JOHNSON - CROSS

2:33PM

1   HYPOTHETICAL NUMBER YOU WISH AND JUST LOOK AT THE CHART TO SEE

2   HOW MANY DISTRICTS WOULD FALL ABOVE OR BELOW THOSE HYPOTHETICAL

3   LINES.

4   Q.  AND THAT SORT OF HYPOTHETICAL LINE DRAWING, THAT'S THE

5   EXTENT OF THE EFFECTIVENESS OR SENSITIVITY ANALYSIS THAT YOU

6   PURPORT TO CONDUCT IN YOUR REPORT, RIGHT?

7   A.  YES, THAT'S ALL THAT IT INVOLVES.

8   Q.  YOU HAVEN'T TRIED TO REACH ANY CONCLUSION ABOUT THE ACTUAL

9   EFFECTIVENESS LEVEL REQUIRED TO ELECT A BLACK CANDIDATE OF

10  CHOICE IN ANY ILLUSTRATIVE DISTRICT IN MR. COOPER'S MAP, RIGHT?

11  A.  CORRECT.  I AM ACCEPTING HIS ASSERTION THAT THEY MEET THE

12  EFFECTIVE NUMBERS.

13  Q.  WHEN YOU SAY YOU ARE ACCEPTING HIS ASSERTION, DO YOU

14  RECALL REVIEWING MR. COOPER'S TESTIMONY ABOUT THE EFFECTIVENESS

15  OF HIS DISTRICTS, HIS TRIAL TESTIMONY, TO BE CLEAR?

16  A.  YES.

17  Q.  DO YOU RECALL THAT HE TALKED ABOUT RECEIVING INPUT FROM

18  COUNSEL ABOUT THE REPORT OF DR. LISA HANDLEY?

19  A.  YES.

20  Q.  YOU HAVE NOT REVIEWED THE REPORT OF DR. LISA HANDLEY?

21  A.  CORRECT.

22  Q.  YOU HAVE NOT REVIEWED HER TRIAL TESTIMONY?

23  A.  CORRECT.

24  Q.  YOU DON'T KNOW WHETHER DIFFERENTIAL PRIVACY OR ANY OF THE

25  OTHER SENSITIVITY ISSUES YOU HAVE DISCUSSED IN THIS REPORT

2:34PM   1   WOULD HAVE ANY EFFECT ON DR. HANDLEY'S OPINIONS, DO YOU?

2   **MR. LEWIS:**  OBJECTION, YOUR HONOR, THIS IS PART OF

3   THE CHANGES BETWEEN THE 2022 AND 2023 ILLUSTRATIVE PLANS.

4   THAT'S WHERE DR. HANDLEY'S INPUT CAME UP.  THAT WAS STRICKEN

5   FROM HIS REPORT, AND THEREFORE IT IS BEYOND THE SCOPE OF

6   DIRECT.  AGAIN, WE'VE BEEN --

7   **THE COURT:**  RESPOND TO THAT.

8   **MS. KEENAN:**  MR. COOPER TALKED ABOUT HOW HE DREW HIS

9   ILLUSTRATIVE PLANS IN PART TO ACCOUNT FOR THE EFFECTIVENESS OF

10   DISTRICTS AS PROVIDED BY INPUT FROM COUNSEL ABOUT DR. LISA

11   HANDLEY.  THIS IS THE SAME THING THAT DR. JOHNSON JUST

12   TESTIFIED HE DOES WHEN HE DRAWS ILLUSTRATIVE DISTRICTS, THAT HE

13   TRIES TO ACCOUNT FOR EFFECTIVENESS THAT IS IMPORTANT TO MAKE

14   SURE YOU ARE ACTUALLY EMPOWERING THE COMMUNITY --

15   **THE COURT:**  BUT YOU MOVED TO EXCLUDE THE COMPARISON

16   BETWEEN '22 AND '23.

17   **MS. KEENAN:**  I AM NOT TRYING TO COMPARE BETWEEN '22

18   AND '23, JUST TO TALK ABOUT THAT MR. COOPER ACCOUNTED FOR THE

19   EFFECTIVENESS OF THE DISTRICTS WHEN HE DREW THE ILLUSTRATIVE

20   PLANS AT ISSUE, THE 2023 PLANS, NOT THE 2022 PLANS WHICH WERE

21   STRICKEN.

22   **THE COURT:**  RIGHT, BUT HE ACCOUNTED FOR EFFECTIVENESS

23   AFTER CONSULTING WITH YOU, WHO CONSULTED WITH DR. HANDLEY.  AM

24   I NOT REMEMBERING THAT RIGHT?  I DON'T SAY YOU, BUT YOUR TRIAL

25   TEAM OR YOUR REPRESENTATION TEAM CONSULTED WITH DR. HANDLEY,

2:36PM   1   GAVE MR. COOPER SOME ADDITIONAL INFORMATION, AND THEN HE TESTED

         2   -- OR THEN HE MADE SOME, HIS WORDS, MINOR ALTERATIONS TO BE

         3   MORE EFFECTIVE.

         4           **MS. KEENAN:**  YES, I THINK THAT IS ALL RIGHT.

         5           **THE COURT:**  WELL, THAT'S A COMPARISON BETWEEN 2022

         6   AND 2023.

         7           **MS. KEENAN:**  CAN I TRY TO CLARIFY ONE MORE THING AND

         8   SEE IF I CAN REPHRASE -- CAN I ASK YOUR HONOR ONE MORE THING

         9   BEFORE I TRY TO REPHRASE THE QUESTION TO MAKE SURE I'M

        10   COMPLYING WITH YOUR --

        11           **THE COURT:**  WELL, YOU CAN ASK ME SOMETHING.  I'M

        12   GOING TO SUSTAIN THE OBJECTION.  WHAT IS YOUR QUESTION?

        13           **MS. KEENAN:**  SURE.  SO OUR UNDERSTANDING IS THAT THE

        14   2023 ILLUSTRATIVE MAP IS THE ONE THAT IS RELEVANT, THE ONE THAT

        15   WE HAVE ALL BEEN DISCUSSING THROUGHOUT THE TRIAL AT THIS POINT.

        16   THAT'S THE ONE WE ARE FOCUSING ON.  AND THE EFFECTIVENESS

        17   SCORES ARE ONE OF THE THINGS HE CONSIDERED WHEN DRAWING THOSE

        18   DISTRICTS.  SO I'M NOT ASKING ABOUT THE 2022 MAPS AT ALL, JUST

        19   ABOUT THE EFFECTIVENESS SCORE AND HOW IT IMPACTED THE DISTRICTS

        20   THAT WE ARE ALL CONSIDERING HERE TODAY.

        21           **THE COURT:**  OKAY.  MR. LEWIS?

        22           **MR. LEWIS:**  YOUR HONOR, I THINK OUR RESPONSE TO THAT

        23   IS THAT THERE IS NOTHING IN MR. COOPER'S -- MR. COOPER'S REPORT

        24   DOES NOT REPORT ANALYSIS FROM HANDLEY OR ANY OTHER SOURCE ABOUT

        25   EFFECTIVENESS.  THAT COMES FROM HANDLEY, WHO DR. JOHNSON DIDN'T

2:37PM   1   RESPOND TO.  AND TO THE EXTENT THAT THERE IS ANYTHING IN MR.

2   COOPER'S REPORT OR TESTIMONY THAT TALKS ABOUT DISTRICT

3   EFFECTIVENESS, IT COMES FROM THE CHANGES BETWEEN 2022 AND 2023,

4   WHICH AGAIN IS OUTSIDE THE SCOPE BECAUSE THAT PORTION OF DR.

5   JOHNSON'S REPORT WAS STRICKEN.

6            **MS. KEENAN:**  MAY I RESPOND TO THAT BRIEFLY?

7            **THE COURT:**  YES.

8            **MS. KEENAN:**  DR. JOHNSON IS PROVIDING A SENSITIVITY

9   ANALYSIS THAT TALKS ABOUT THE EFFECTIVENESS OF VARIOUS

10   DISTRICTS.  THAT'S A WHOLE SECTION IN HIS REPORT THAT HE

11   TESTIFIED ABOUT HERE TODAY.  THERE IS A COMPETING EXPERT IN

12   THIS CASE WHO HAS TALKED ABOUT THE EFFECTIVENESS OF DISTRICTS

13   IN SOME DETAIL, AND I'M JUST TRYING TO EXPLORE THE INTERACTION

14   BETWEEN HIS CONCLUSIONS AND HER CONCLUSIONS.  I CAN MOVE ON

15   FROM WHETHER HE CONSIDERED DR. HANDLEY'S TESTIMONY HIMSELF AND

16   JUST ASK THE QUESTION ABOUT HOW HIS CONCLUSIONS RELATE TO HERS.

17            **THE COURT:**  OKAY.  WELL, I'VE SUSTAINED THE

18   OBJECTION.  WE ARE GOING TO GO QUESTION BY QUESTION.  ASK YOUR

19   NEXT QUESTION AND WE WILL SEE WHAT MR. LEWIS DOES.

20   **BY MS. KEENAN:**

21   Q.  YOU WOULD AGREE THAT THE DIFFERENTIAL PRIVACY CONCEPT THAT

22   YOU HAVE DISCUSSED DOESN'T HAVE ANY EFFECT ON ELECTION RETURNS

23   DATA, DOES IT?

24   A.  CORRECT.

25   Q.  THAT'S BECAUSE IT IS LIMITED TO THE CENSUS BUREAU'S DATA,

2:38PM  1   AND THAT'S THE SET OF DATA THAT IT AFFECTS?

     2   A.  YES.

     3   Q.  AND SO IF YOU WERE TO CONDUCT AN ANALYSIS THAT INSTEAD

     4   FOCUSED ON ELECTION RETURNS, THE DIFFERENTIAL PRIVACY

     5   DISCUSSION IN YOUR REPORT WOULD HAVE NO BEARING ON THAT

     6   ANALYSIS, RIGHT?

     7   A.  IF I HAD DATA ON THE ETHNICITY OF THE VOTERS AND WASN'T

     8   USING CENSUS DATA AS MY DENOMINATOR.

     9            **MS. KEENAN:**  CAN I HAVE A BRIEF MOMENT TO CONFER WITH

    10   COUNSEL?  I THINK I MAY BE FINISHED.

    11            **THE COURT:**  YES.

    12            **MS. KEENAN:**  THAT'S ALL FOR PLAINTIFFS.  I PASS THE

    13   WITNESS.

    14            **THE COURT:**  REDIRECT, SIR?

    15                    **REDIRECT EXAMINATION**

    16   BY MR. LEWIS:

    17   Q.  DR. JOHNSON, GOOD AFTERNOON.  ARE VOTER TABULATION

    18   DISTRICTS JUST A LARGER BUILDING BLOCK IN A CENSUS BLOCK?

    19   A.  CORRECT.  THEY ARE NOT A TRADITIONAL REDISTRICTING

    20   PRINCIPLE.  THEY ARE A TECHNICAL TOOL USED TO BUILD THE MAPS

    21   INTO DISTRICTS THAT COMPLY WITH TRADITIONAL REDISTRICTING

    22   PRINCIPLES.  THEY ARE A BUILDING BLOCK USED TO BUILD DISTRICTS

    23   INTO TRADITIONAL REDISTRICTING -- I'M SORRY -- USED TO BUILD

    24   DISTRICTS THAT COMPLY WITH TRADITIONAL REDISTRICTING

    25   PRINCIPLES.  DID I MANGLE THAT ENOUGH?  SORRY.

DR. D. JOHNSON - REDIRECT

2:41PM

1  Q.  DR. JOHNSON, WOULD IT HAVE BEEN POSSIBLE TO FOLLOW VTD

2  BOUNDARIES WITHOUT ALL THE ZIGS AND THE ZAGS THAT WE SAW IN ALL

3  OF THE ILLUSTRATIVE PLAN BOUNDARIES WE LOOKED AT?

4  A.  YES.  I MEAN, THE ENACTED MAP FOLLOWS VTDS AS WELL, THAT

5  MR. COOPER'S POSITION IS THAT THAT DOESN'T COMPLY WITH

6  TRADITIONAL REDISTRICTING PRINCIPLES.

7         **MS. KEENAN:**  OBJECTION TO WHAT HE JUST CHARACTERIZED

8  AS MR. COOPER'S TESTIMONY ABOUT WHETHER THE ENACTED MAPS COMPLY

9  WITH TRADITIONAL REDISTRICTING PRINCIPLES.  THAT

10  MISCHARACTERIZES MR. COOPER'S TESTIMONY.

11         **THE COURT:**  THE RECORD WILL SPEAK FOR ITSELF.  GO

12  AHEAD.  HE HAS ALREADY ANSWERED IT.  NEXT QUESTION.

13  **BY MR. LEWIS:**

14  Q.  DR. JOHNSON, ARE ANY OF THE ITEMS DISCUSSED DURING YOUR

15  CROSS-EXAMINATION ABOUT BOUNDARY LINES GIVEN AS REASONS FOR THE

16  DISTRICT BOUNDARIES IN MR. COOPER'S REPORT?

17  A.  SORRY.  COULD YOU REPEAT THAT?

18  Q.  SURE.  SURE.  SO WE TALKED ABOUT -- I WILL WITHDRAW THAT

19  QUESTION AND I WILL ASK A DIFFERENT ONE.  FOR EXAMPLE, MS.

20  KEENAN ASKED YOU ON CROSS-EXAMINATION ABOUT A TRADE-OFF BETWEEN

21  SPLITTING CENTRAL TO KEEP MERRYDALE AND BAKER WHOLE.  DO YOU

22  RECALL THAT?

23  A.  YES.

24  Q.  DOES MR. COOPER REFERENCE THAT TRADE-OFF AS A REASON FOR

25  HIS DISTRICT CONFIGURATION IN HIS REPORT?

2:43PM   1   A.   NO.

2   Q.   DOES HE REFERENCE IT IN THE BACK-UP TO HIS REPORT?

3   A.   NO.

4   Q.   OKAY.  DOES MR. COOPER DISCUSS THE DECISION TO KEEP -- TO

5   DRAW A BORDER BETWEEN ILLUSTRATIVE HOUSE DISTRICT 68 AND 69 TO

6   FOLLOW THE AIRLINE ROAD?

7   A.   NO.

8            **MR. LEWIS:**  YOUR HONOR, WE HAVE NO FURTHER QUESTIONS.

9            **THE COURT:**  OKAY.  YOU MAY STEP DOWN, SIR.  THANK

10   YOU.  SO WHERE ARE WE IN TERMS OF THESE PROCEEDINGS?  HOW MANY

11   WITNESSES ARE LEFT?

12            **MR. TUCKER:**  YOUR HONOR, WE HAVE THREE ADDITIONAL

13   EXPERT WITNESSES STILL TO CALL AND ONE ADDITIONAL FACT WITNESS

14   TO CALL.

15            **THE COURT:**  IS THERE ANYTHING THAT WE CAN ACCOMPLISH

16   BETWEEN NOW AND 4:00?

17            **MR. TUCKER:**  YOUR HONOR, I'M GOING TO DEFER TO MY

18   CO-COUNSEL WHO ARE HANDLING THOSE OTHER EXPERTS ON HOW THEY

19   PLAN ON PROCEEDING FOR THE REST OF THE DAY.  WE HAVE WITNESSES

20   HERE.  I JUST WANT TO TURN IT OVER TO THEM TO FIGURE OUT WHAT

21   WE ARE DOING.

22            **MR. LEWIS:**  YOUR HONOR, I KNOW THE NEXT WITNESS UP --

23            **MR. FARR:**  YOUR HONOR, I HAVE THE NEXT WITNESS.  MAY

24   I CONSULT WITH HIM FIRST?

25            **THE COURT:**  YES, TAKE A MINUTE.  SO ARE YOU GOING TO

DR. M. BARBER - DIRECT

2:45PM   1   CALL YOUR NEXT WITNESS, MR. FARR?

2        **MR. FARR:**  I WAS GOING TO ASK YOU, YOUR HONOR, ARE

3   YOU GOING TO HAVE A HARD STOP AT 4:00?

4        **THE COURT:**  YES.

5        **MR. FARR:**  WE CAN'T GET DONE BY 4:00.

6        **THE COURT:**  WELL, GET WHAT YOU CAN DONE.

7        **MR. FARR:**  WE ARE WILLING TO START IF THAT'S WHAT YOU

8   PREFER.

9        **THE COURT:**  YEAH, I WANT YOU TO GET SOMETHING DONE.

10        **MR. FARR:**  WE NOW CALL MICHAEL BARBER.

11        **THE COURT:**  JUST A MINUTE, SIR, HE IS GOING TO SWEAR

12   YOU IN.

13        **(OATH ADMINISTERED.)**

14        **THE CLERK:**  STATE YOUR NAME FOR THE RECORD.

15        **MR. FARR:**  CAN YOU HEAR ME, DR. BARBER?

16        **THE COURT:**  HE'S GOING TO STATE HIS NAME AND SPELL IT

17   FOR THE RECORD, AND THEN YOU CAN DO YOUR DIRECT.

18        **THE WITNESS:**  MICHAEL BARBER.  M-I-C-H-A-E-L,

19   B-A-R-B-E-R.

20        **THE COURT:**  ALL RIGHT, MR. FARR.

21                    **DR. MICHAEL BARBER,**

22   **HAVING FIRST BEEN DULY SWORN, TESTIFIED AS FOLLOWS:**

23                    **DIRECT EXAMINATION**

24   **BY MR. FARR:**

25   Q.  MAY I CALL YOU DR. BARBER?

2:47PM   1   A.   YOU MAY.

2   Q.   DR. BARBER, HAVE YOU PREPARED TWO EXPERT REPORTS IN THIS

3   CASE?

4   A.   YES, I HAVE.

5           **MR. FARR:**   YOUR HONOR, MAY I APPROACH THE BENCH AND

6   GIVE DR. BARBER HIS EXPERT REPORTS?

7           **THE COURT:**   THE WITNESS STAND?   YES, YOU MAY.

8   **BY MR. FARR:**

9   Q.   OKAY, DR. BARBER.   DO YOU HAVE A NOTEBOOK WITH YOUR TWO

10   EXPERT REPORTS IN THIS CASE?

11   A.   YES, I DO.

12   Q.   IS YOUR FIRST OPENING EXPERT REPORT MARKED SECRETARY OF

13   STATE EXHIBIT 1?

14   A.   YES.

15   Q.   IS YOUR REBUTTAL REPORT MARKED SECRETARY OF STATE EXHIBIT

16   4?

17   A.   YES.

18           **MR. FARR:**   YOUR HONOR, WE MOVE FOR THE INTRODUCTION

19   INTO EVIDENCE OF SECRETARY OF STATE EXHIBITS 1 AND 4.

20           **MR. NAIFEH:**   YOUR HONOR, WE WOULD REQUEST THAT THE

21   DECISION ON ADMITTING THE EXPERT REPORTS BE DEFERRED UNTIL THE

22   TENDER.   WE WILL HAVE SOME CROSS ON THE TENDER, AND WE THINK IT

23   MAY CHANGE EXACTLY WHICH PORTIONS OF THE REPORT COME IN.

24           **MR. FARR:**   EXCUSE ME, SIR.   COULD YOU REPEAT THAT?

25           **MR. NAIFEH:**   WE WILL HAVE SOME CROSS ON THE TENDER,

DR. M. BARBER - DIRECT

2:48PM

1    AND WE WOULD LIKE TO RESERVE ADMISSION OF THE REPORT UNTIL WE

2    CAN ESTABLISH EXACTLY WHAT HE IS QUALIFIED TO TESTIFY ABOUT,

3    AND THAT MAY IMPACT WHAT WE WOULD THINK SHOULD COME IN FROM THE

4    REPORT.

5              **MR. FARR:**  I THOUGHT YOU STIPULATED THAT THE REPORT

6    WOULD COME INTO EVIDENCE IF HE APPEARED TO TESTIFY.  ISN'T

7    THERE A STIPULATION ON THAT?

8              **MR. NAIFEH:**  THERE IS A STIPULATION THAT IF HE

9    APPEARS TO TESTIFY AS AN EXPERT, THE REPORT WILL COME IN.  WE

10   HAVE QUESTIONS ABOUT WHAT EXACTLY HE IS QUALIFIED TO TESTIFY

11   ABOUT, AND WE WOULD LIKE TO ESTABLISH WHAT THAT IS.

12             **THE COURT:**  IN OTHER WORDS, MOVE THE REPORT IN AFTER

13   YOU HAVE QUALIFIED HIM.  SO I'M GOING TO SUSTAIN THE OBJECTION

14   AT THIS POINT.  YOU CAN RE-MOVE THE REPORT -- YOU CAN ASK FOR

15   THE REPORTS TO BE ADMITTED AFTER YOU HAVE EXAMINED HIM ON HIS

16   QUALIFICATIONS AND THEY HAVE CROSSED ON HIS QUALIFICATIONS.

17             **MR. FARR:**  ALL RIGHT.  THANK YOU, YOUR HONOR.

18   **BY MR. FARR:**

19   Q.  DR. BARBER, WHO RETAINED YOU TO BE AN EXPERT IN THIS CASE?

20   A.  THE SECRETARY OF STATE.

21   Q.  WERE YOU ASKED TO RENDER ANY LEGAL OPINIONS?

22   A.  NO.

23   Q.  I'M GOING TO ASK YOU TO EXPLAIN YOUR EXPERTISE THAT

24   QUALIFIES YOU TO OFFER THE OPINIONS THAT YOU HAVE IN YOUR

25   EXPERT REPORTS.  TURNING TO SECRETARY OF STATE EXHIBIT 1, IS

DR. M. BARBER - DIRECT

2:49PM   1    YOUR CURRICULUM VITAE ATTACHED TO THE END OF YOUR ORIGINAL

2    REPORT?

3    A.   YES, IT IS.

4    Q.   COULD YOU TELL US ABOUT YOUR EDUCATIONAL BACKGROUND.

5    A.   I HAVE A BACHELOR'S DEGREE FROM BRIGHAM YOUNG UNIVERSITY

6    AND A MASTER'S AND PH.D. IN POLITICAL SCIENCE FROM PRINCETON

7    UNIVERSITY.

8    Q.   AND WHAT WERE YOUR AREAS OF CONCENTRATION FOR YOUR POST

9    GRADUATE DEGREES?

10   A.   MY AREAS OF CONCENTRATION WERE BROADLY IN AMERICAN

11   POLITICS AND THE USE OF QUANTITATIVE METHODS.

12   Q.   CAN YOU TELL US ABOUT YOUR PROFESSIONAL EXPERIENCE?

13   A.   YES.   I'M AN ASSOCIATE PROFESSOR WITH TENURE AT BRIGHAM

14   YOUNG UNIVERSITY IN THE POLITICAL SCIENCE DEPARTMENT.   I'M ALSO

15   THE DIRECTOR OF THE CENTER FOR THE STUDY OF ELECTIONS AND

16   DEMOCRACY, WHICH IS ALSO LOCATED AT BYU.

17   Q.   WHAT CLASSES DO YOU TEACH AT BYU?

18   A.   I TEACH A CLASS ON THE LEGISLATIVE PROCESS, AND I ALSO

19   TEACH A CLASS ON THE USE OF QUANTITATIVE METHODS FOR THE STUDY

20   OF SOCIAL SCIENCE.   AND THEN I ALSO TEACH A SEMINAR FOR THE

21   STUDY OF -- THE TOPIC OF THE CLASS IS THE STUDY OF

22   REPRESENTATION IN AMERICA.

23   Q.   ARE YOU A TENURED PROFESSOR?

24   A.   YES.

25   Q.   HAVE YOU WRITTEN ANY PEER-REVIEWED ARTICLES?

DR. M. BARBER - DIRECT

2:51PM   1    A.   YES, I HAVE.

2    Q.   HOW MANY?

3    A.   I BELIEVE AT THE MOMENT 25 TO 26 HAVE BEEN PUBLISHED IN

4    PEER-REVIEWED JOURNALS.

5    Q.   ARE THOSE LISTED IN YOUR CV?

6    A.   YES, THEY ARE.

7    Q.   WHAT ARE SOME OF THE SUBJECTS ON WHICH YOU HAVE WRITTEN

8    THAT RELATE TO THE MATTERS THAT YOU ARE TESTIFYING ABOUT IN

9    THIS CASE?

10   A.   SO I PUBLISHED BROADLY ON THE CONCEPT OF REPRESENTATION

11   AND ACCOUNTABILITY IN AMERICAN POLITICS.  I HAVE PUBLISHED AND

12   STUDIED THE QUESTION OF VOTER BEHAVIOR AND VOTER PREFERENCES,

13   HOW THAT RELATES TO QUESTIONS OF PARTISANSHIP AND RACE, SO

14   THOSE ARE ALL TOPICS THAT I'VE PUBLISHED ON THAT ARE RELEVANT

15   TO THE DISCUSSION TODAY.

16   Q.   OKAY.  HAVE YOU EVER TESTIFIED AS AN EXPERT WITNESS?

17   A.   YES, I HAVE.

18   Q.   ARE THOSE CASES LISTED IN YOUR CV?

19   A.   YES, THEY ARE.

20   Q.   AND HOW MANY OF THOSE CASES INVOLVE CHALLENGES TO

21   REDISTRICTING PLANS?

22   A.   I BELIEVE SOMEWHERE BETWEEN 6 AND 8 OF THOSE.

23   Q.   HOW MANY OF THOSE CASES INVOLVED CLAIMS INVOLVING SECTION

24   2 OF THE VOTING RIGHTS ACT?

25   A.   TWO.  I'VE BEEN AN EXPERT WITNESS IN THE CASE IN GEORGIA

DR. M. BARBER - DIRECT

2:52PM    1    REGARDING THE PUBLIC SERVICE COMMISSION, AND I'M INVOLVED

          2    CURRENTLY IN AN ONGOING LAWSUIT IN THE CITY OF COLORADO

          3    SPRINGS.

          4    Q.   ALL RIGHT.   DR. BARBER, WHEN I TALK ABOUT SIMULATED MAPS,

          5    DO YOU KNOW WHAT I'M REFERRING TO?

          6    A.   YES.

          7    Q.   WHAT ARE SIMULATED MAPS?

          8    A.   SO THAT'S A TERM THAT REFERS BROADLY TO A PROCESS OR

          9    CONCEPT OF USING A COMPUTER TO DRAW A LARGE SET OF MAPS IN A

         10    PARTICULAR JURISDICTION.   SO IT COULD BE DONE AT A STATE LEVEL,

         11    COUNTY LEVEL, COULD BE DONE FOR A CITY COUNCIL.

         12         THERE ARE DIFFERENT WAYS OR DIFFERENT PROCESSES THAT HAVE

         13    BEEN USED, BUT GENERALLY IT'S THE USE OF SOME SORT OF COMPUTER

         14    ALGORITHM, THE USE OF DATA ABOUT THE POPULATION AND THE

         15    DISTRIBUTION OF THE POPULATION WITHIN THAT JURISDICTION, AND

         16    THAT INFORMATION IS THEN USED BY THE COMPUTER TO DRAW A VERY

         17    LARGE SET OF MAPS USING THAT PARTICULAR ALGORITHM.

         18    Q.   HAVE YOU PREPARED OR ANALYZED SIMULATED MAPS IN ANY OF THE

         19    CASES IN WHICH YOU HAVE BEEN INVOLVED?

         20    A.   YES, I HAVE.

         21    Q.   CAN YOU TELL THE COURT WHAT CASES THOSE ARE?

         22    A.   SURE.   SO I HAVE USED SIMULATED MAPS FOR A REDISTRICTING

         23    CASE IN THE STATE OF NEW YORK, IN THE CITY OF BUFFALO, NEW

         24    YORK, ALSO IN THE STATE OF PENNSYLVANIA, AND AS WELL IN THE

         25    STATE OF NORTH CAROLINA.

DR. M. BARBER - CROSS ON TENDER

2:54PM  1    Q.   AND HAVE YOU PREPARED SIMULATED REPORTS IN THIS CASE?

2    A.   SIMULATED MAPS?

3    Q.   SIMULATED MAPS, YES.

4    A.   YES, I HAVE.

5              **MR. FARR:**  YOUR HONOR, WE WOULD LIKE TO TENDER DR.

6    BARBER AS AN EXPERT IN POLITICAL SCIENCE, AMERICAN POLITICS,

7    VOTING BEHAVIOR AND PATTERNS, AND SIMULATED MAPS.

8              **THE COURT:**  YOU WILL HAVE TO GIVE THAT TO ME AGAIN.

9    POLITICAL SCIENCE --

10             **MR. FARR:**  I'M SORRY, YOUR HONOR.

11             **THE COURT:**  GO AHEAD.  TELL ME THE FOUR AREAS AGAIN,

12   PLEASE.

13             **MR. FARR:**  YES, MA'AM.  POLITICAL SCIENCE, AMERICAN

14   POLITICS, VOTING BEHAVIOR AND PATTERNS, AND SIMULATED MAPS.

15             **THE COURT:**  CROSS ON THE TENDER?

16                    **CROSS-EXAMINATION ON TENDER**

17   BY MR. NAIFEH:

18   Q.   GOOD AFTERNOON, DR. BARBER.

19             **MR. NAIFEH:**  STEPHEN, COULD WE PULL UP SOS101.

20   BY MR. NAIFEH:

21   Q.   DR. BARBER, THIS IS YOUR REPORT IN FRONT OF YOU ON THE

22   SCREEN.  AND I DON'T HAVE A SCREEN, BUT I'M GUESSING IT'S UP.

23   A.   YES, I SEE IT.

24   Q.   IN TURNING TO PAGE 5 OF YOUR REPORT, THIS IS THE SUMMARY

25   OF YOUR CONCLUSIONS, CORRECT?

DR. M. BARBER - CROSS ON TENDER

2:55PM   1    A.  IT IS, YES.

2    Q.  AND THEN ON PAGE 6, LOOKING AT THE LAST BULLET IN THE

3    SUMMARY OF CONCLUSIONS, CAN YOU READ THAT?

4    A.  DO YOU WANT ME TO READ IT OUT LOUD?

5    Q.  YES, PLEASE.

6    A.  "TO CREATE THESE ADDITIONAL MAJORITY BVAP DISTRICTS, IT IS

7    CLEAR THAT IN THE ILLUSTRATIVE MAPS VARIOUS DECISIONS ABOUT

8    WHERE TO PLACE THE DISTRICT BOUNDARIES WERE MADE WITH RACE AS

9    THE PREDOMINANT FACTOR.  THIS IS THE CASE BECAUSE THESE

10   DECISIONS ARE NOT WELL EXPLAINED BY ADHERENCE TO OTHER

11   TRADITIONAL REDISTRICTING CRITERIA."

12   Q.  I KNOW WE WILL GET THERE, BUT IN THIS BULLET ARE YOU

13   DESCRIBING THE OPINIONS YOU OFFER IN THE SECTIONS OF YOUR

14   REPORT THAT YOU CALL REGIONAL ANALYSIS?

15   A.  ARE YOU ASKING IF THIS BULLET POINT REFERS --

16   Q.  TO THE REGIONAL ANALYSIS OR TO THE CONCLUSIONS DRAWN IN

17   THE REGIONAL ANALYSIS?

18   A.  I BELIEVE THIS BULLET POINT REFERS MORE BROADLY TO THE

19   ENTIRETY OF THE REPORT COLLECTIVELY.

20   Q.  OKAY.  AND I WOULD LIKE TO ASK JUST ABOUT THE REGIONAL

21   ANALYSIS.  YOU HAVE A SECTION IN YOUR REPORT, TWO SECTIONS, I

22   BELIEVE, CALLED REGIONAL ANALYSIS IN YOUR REPORT, CORRECT?

23   A.  YES.

24   Q.  AND NOTHING IN YOUR REGIONAL ANALYSIS IS DERIVED FROM THE

25   SIMULATIONS, CORRECT?

2:56PM

1    A.   IN THIS FIRST REPORT, I BELIEVE IT IS THE CASE THAT THE

2    REGIONAL ANALYSES ARE SEPARATE FROM THE SIMULATION ANALYSIS.

3    Q.   AND THE CONCLUSIONS DO NOT DERIVE FROM THE SIMULATIONS?

4    A.   I THINK THE REPORT STATES THAT THE CONCLUSIONS ARE DRAWN

5    BY CONNECTING THE RESULTS OF THE SIMULATIONS TO THE ANALYSIS IN

6    THE REGIONAL -- THE SECTION OF THE REPORT THAT TALKS ABOUT

7    REGIONAL ANALYSES.  I THINK THAT THE TWO PORTIONS SPEAK TO ONE

8    ANOTHER.

9    Q.   OKAY.

10         MR. NAIFEH:  STEPHEN, CAN WE PULL UP DR. BARBER'S

11   DEPOSITION AT PAGE 159, AND LOOKING AT LINES 5 TO 12.

12   BY MR. NAIFEH:

13   Q.   CAN YOU READ THAT, THOSE LINES?

14   A.   THE ANSWER, THE QUESTION, OR BOTH?

15   Q.   THE QUESTION IS, "DOES ANYTHING IN THE SECTION ON REGIONAL

16   ANALYSIS, THESE TWO SECTIONS, DERIVE FROM THE SIMULATIONS YOU

17   RAN?"

18         THE ANSWER IS, "NOTHING IN THESE SECTIONS IS DERIVED FROM

19   THE SIMULATIONS.  THERE ARE NO MAPS IN THIS SECTION FROM THE

20   SIMULATIONS OR REFERENCE TO THE METRICS THAT WERE DISCUSSED

21   EARLIER FROM THE SIMULATIONS."  DID I READ THAT CORRECTLY?

22   A.   YES, YOU DID.

23   Q.   OKAY.  AND THIS SECTION ON THE REGIONAL ANALYSIS IS NOT

24   BASED ON ANY OTHER STATISTICAL ANALYSIS APART FROM THE

25   SIMULATIONS THAT YOU PERFORMED, CORRECT?

2:58PM

1   A.   ARE YOU ASKING IF THERE ARE NO STATISTICAL ANALYSES IN THE

2   REGIONAL SECTION OF THE REPORT?

3   Q.   I'M ASKING IF YOU DID ANY STATISTICAL ANALYSIS TO SUPPORT

4   THE CONCLUSIONS YOU DRAW IN THE REGIONAL ANALYSIS SECTIONS OF

5   YOUR REPORT.

6   A.   I DO THINK THAT THERE ARE -- I DON'T KNOW IF YOU WOULD

7   CALL THEM STATISTICAL ANALYSES.   THERE IS QUANTITIVE

8   ANALYSES --

9   Q.   YOU ARE REFERRING TO THINGS LIKE THE COMPACTNESS SCORES

10  AND THINGS LIKE THAT?

11  A.   THAT, IN ADDITION TO COMPUTATION OF THE BVAP SCORES, CORE

12  RETENTION SCORES, THOSE TYPES OF COMPUTATIONS.

13           MR. NAIFEH:   YOUR HONOR, WE WOULD MOVE TO EXCLUDE ANY

14  OPINION TESTIMONY FROM DR. BARBER CONCERNING WHETHER PARTICULAR

15  LINE DRAWING DECISIONS IN MR. COOPER'S MAPS ARE WELL EXPLAINED

16  BY ADHERENCE TO TRADITIONAL REDISTRICTING PRINCIPLES.   FOR THE

17  RECORD, THOSE ARE SECTION 8, STARTING AT PAGE 30, AND SECTION

18  12 STARTING AT PAGE 68 ARE THE TWO SECTIONS THAT HE CALLS

19  REGIONAL ANALYSIS.

20       AND THE REGIONAL ANALYSIS IS NOT BASED ON THE SIMULATIONS,

21  WHICH HE HAS ESTABLISHED HIS EXPERTISE IN.   IT'S BASED ON HIS

22  REVIEW OF MAPS AND DATA FROM MR. COOPER'S REPORT AND WHETHER HE

23  BELIEVES MR. COOPER DREW LINES BASED ON RACE OR BASED ON OTHER

24  TRADITIONAL REDISTRICTING PRINCIPLES.

25       AND AS YOUR HONOR SAID WITH RESPECT TO DR. JOHNSON IN THE

3:00PM   1   RULING ON THE MOTION IN LIMINE, THE DEFENDANTS HAVEN'T TENDERED

2   DR. BARBER AS -- THAT HE HAS A SPECIALTY DISCIPLINE OR

3   EXPERTISE IN DISCERNING A PERSON'S SUBJECTIVE INTENT AND

4   DECISION-MAKING, SO WE ARE ASKING THAT HE NOT BE PERMITTED TO

5   TESTIFY REGARDING MR. COOPER'S SUBJECTIVE INTENT IN DRAWING ANY

6   LINES IN THE ILLUSTRATIVE PLANS.

7        **THE COURT:**  I WOULD SUSTAIN ANY OBJECTIONS THAT YOU

8   MAKE TO SUBJECTIVE INTENT THAT DR. BARBER ATTEMPTS TO TESTIFY

9   TO, BUT HOW DOES THAT -- HOW DOES THAT DISQUALIFY HIM FROM THE

10   ENTIRE SECTION ON HIS REGIONAL ANALYSIS?

11        **MR. NAIFEH:**  IT'S NOT THE ENTIRE SECTION THAT WE

12   WOULD SEEK TO EXCLUDE, JUST THE PORTIONS OF IT THAT CONCERN MR.

13   COOPER'S SUBJECTIVE INTENT.

14        **THE COURT:**  MR. FARR, DO YOU WANT TO ADDRESS THAT?

15        **MR. FARR:**  YOUR HONOR, IT'S NOT OUR INTENTION TO HAVE

16   DR. BARBER TESTIFY TO MR. COOPER'S SUBJECTIVE INTENT, BUT WE DO

17   INTEND TO ASK HIM TO EVALUATE AS A POLITICAL SCIENTIST WHETHER

18   OR NOT BASED UPON HIS UNDERSTANDING OF THE TERM "PREDOMINANT

19   FACTOR," WHETHER RACE IS THE PREDOMINANT FACTOR AS A POLITICAL

20   SCIENTIST IN DRAWING SOME OF THESE DISTRICTS.

21   HE IS NOT TALKING ABOUT MR. COOPER'S SUBJECTIVE INTENT.

22   HE IS LOOKING AT THE MAPS, HE IS LOOKING AT THE SIMULATIONS,

23   AND HE IS DRAWING CONCLUSIONS AS A POLITICAL SCIENTIST AS TO

24   WHAT BEST EXPLAINS THE MAPS.  IT HAS NOTHING TO DO WITH MR.

25   COOPER'S SUBJECTIVE INTENT.

DR. M. BARBER - CROSS ON TENDER

3:01PM    1          **THE COURT:**  THEN YOU NEED TO LAY A -- YOU NEED TO

2    QUALIFY HIM OR GIVE ME SOME REASON TO UNDERSTAND THAT

3    PREDOMINANCE IN MAP-DRAWING IS SOME PARTICULAR FIELD OR SUBJECT

4    MATTER THAT'S A DISCERNIBLE SUBJECT MATTER WITHIN POLITICAL

5    SCIENCE.  MAYBE IT'S JUST THE COURT'S LACK OF UNDERSTANDING OF

6    THE SCOPE OF THE FIELD OF POLITICAL SCIENCE, BUT I DON'T KNOW.

7    IS THERE A CLASS ON PREDOMINANCE IN MAP DRAWING?

8          **MR. FARR:**  YOUR HONOR, THE REPORTS LIKE THE ONE MR.

9    COOPER IS SUBMITTING ARE REGULARLY SUBMITTED IN CASES INVOLVING

10    RACIAL GERRYMANDERS, THE *BETHUNE-HILL* CASE BEING AN EXAMPLE,

11    THE CASE IN SOUTH CAROLINA BEING AN EXAMPLE THAT WE'LL TALK

12    ABOUT LATER WHERE SIMULATED MAPS WERE USED TO ATTEMPT TO

13    ESTABLISH THAT RACE WAS THE PREDOMINANT EXPLANATION.

14          AGAIN, WE ARE NOT QUESTIONING MR. COOPER'S SUBJECTIVE

15    INTENT.  WE ARE NOT QUESTIONING HIS GOOD FAITH.  WE ARE TRYING

16    TO SAY THAT WHEN YOU DO A FORENSIC EXAMINATION OF THESE MAPS,

17    THAT THEY CANNOT BE EXPLAINED FOR ANY OTHER REASON OTHER THAN

18    RACE.  AND YES, I THINK THAT IS PART OF THE REALM OF

19    DR. COOPER'S EXPERTISE.

20          **THE COURT:**  DR. BARBER.

21          **MR. FARR:**  EXCUSE ME, DR. BARBER'S EXPERTISE.  AND I

22    THINK, AGAIN, IT IS THE TYPE OF EVIDENCE THAT'S BEEN RECOGNIZED

23    AND SUBMITTED BY OTHER COURTS IN OTHER SIMILAR CASES.

24          **THE COURT:**  DO YOU WANT TO RESPOND?

25          **MR. NAIFEH:**  YOUR HONOR, WHETHER RACE PREDOMINATES IN

3:03PM   1   AN ENACTED MAP OR IN AN ILLUSTRATIVE MAP, IF IT'S EVEN A

2   RELEVANT CONCEPT, THERE IS A LEGAL CONCLUSION THAT HE IS NOT

3   QUALIFIED TO RENDER.  AND AS YOUR HONOR HAS ALREADY EXPLAINED

4   IN THE RULING ON THE MOTION IN LIMINE, THAT IS A QUESTION FOR

5   YOU AS THE FACT-FINDER AND NOT FOR -- AND YOU HAVE ALREADY

6   EXCLUDED OTHER EXPERTS FROM TESTIFYING ABOUT RACIAL

7   PREDOMINANCE, AT LEAST AS FAR AS A LEGAL CONCLUSION.  HE CAN

8   TESTIFY ABOUT WHAT TRADITIONAL REDISTRICTING PRINCIPLES THE MAP

9   DOES OR DOES NOT COMPLY WITH, BUT GOING THE NEXT STEP AND

10   RENDERING AN OPINION ABOUT WHETHER THAT MEANS RACE PREDOMINATES

11   IS NOT SOMETHING I BELIEVE HE HAS BEEN QUALIFIED TO TESTIFY

12   ABOUT.

13          **MR. FARR:**  MAY I RESPOND, YOUR HONOR?

14          **THE COURT:**  YES.

15          **MR. FARR:**  YOUR HONOR, WE HAD A SCHEDULING ORDER IN

16   THIS CASE, AND THERE WERE DEADLINES FOR *DAUBERT* MOTIONS.  THERE

17   WAS NO *DAUBERT* MOTION FILED ON DR. BARBER.  THERE WAS ONE FILED

18   ON DR. JOHNSON.  THE ISSUES WERE BRIEFED, AND THE DEFENSE HAD

19   NOTICE OF THE ARGUMENTS THE PLAINTIFFS WERE GOING TO MAKE.

20          THIS IS THE FIRST WE'VE HEARD ABOUT PLAINTIFFS' CONTENTION

21   THAT DR. BARBER IS NOT QUALIFIED TO GIVE THE OPINIONS THAT ARE

22   STATED IN THIS REPORT, WHICH THEY HAVE STIPULATED COULD COME

23   INTO EVIDENCE.

24          SO I WOULD JUST SAY, YOUR HONOR, THAT THIS IS CAUSING

25   SUBSTANTIAL PREJUDICE TO US TO ALLOW THEM TO GET AROUND THE

DR. M. BARBER - CROSS ON TENDER

3:04PM

1   DEADLINE YOU SET FOR THE FILING OF *DAUBERT* MOTIONS, SO WE WOULD

2   HAVE HAD AMPLE TIME TO BE ABLE TO BRIEF THIS ISSUE.

3           **THE COURT:**  A *DAUBERT* MOTION IS NOT THE ONLY METHOD

4   BY WHICH YOU CAN CHALLENGE AN EXPERT'S -- THE SCOPE OF THEIR

5   EXPERTISE.  I MEAN, THERE'S NO LAW THAT THE COURT KNOWS OF THAT

6   SAYS THAT FAILURE TO FILE A *DAUBERT* SOMEHOW WAIVES YOUR ABILITY

7   TO CROSS AN EXPERT, A PROPOSED EXPERT ON THE NATURE AND EXTENT

8   OF THE FIELD OF TENDER, AND THAT'S WHAT'S BEING DONE HERE.  THE

9   FIELD OF TENDER HAS BEEN CROSS-EXAMINED, AND THEY ARE SEEKING

10  TO EXCLUDE EXPERT TESTIMONY, OPINION TESTIMONY, IN THAT

11  PARTICULAR FIELD, NAMELY THE SUBJECT OF RACE PREDOMINANCE.

12      YOUR *DAUBERT* ARGUMENT MISSES THE MARK, AND THE STIPULATION

13  WAS THAT OF THOSE EXPERTS THAT TESTIFY, THEIR REPORTS WOULD

14  COME IN.  SO IF HE DOESN'T TESTIFY, HIS REPORT DOESN'T COME IN,

15  OR AT LEAST THOSE AREAS OF HIS REPORT DOESN'T COME IN.

16      NOW, THE BEST I CAN DO FOR YOU IS WE CAN RECESS UNTIL

17  MONDAY MORNING, BUT I THINK THERE'S A STRONG ARGUMENT HERE THAT

18  WHILE HE CAN CERTAINLY TESTIFY TO WHAT ARE THE TRADITIONAL

19  REDISTRICTING FACTORS, A LOT LIKE DR. JOHNSON DID, TO DRAW THE

20  ULTIMATE CONCLUSION, WHICH IS DID RACE PREDOMINATE, THAT'S A

21  QUESTION OF FACT FOR ME.

22          **MR. FARR:**  YOUR HONOR, I THINK IT IS A QUESTION OF

23  LAW FOR YOU.

24          **THE COURT:**  WELL --

25          **MR. FARR:**  IT'S NOT A QUESTION --

3:06PM    1                    **THE COURT:**  -- IT'S NOT A QUESTION FOR HIM.

          2                    **MR. FARR:**  POLITICAL SCIENTISTS REGULARLY LOOK AT

          3      MAPS LIKE THIS AND DRAW CONCLUSIONS ABOUT WHETHER POLITICS WAS

          4      THE PREDOMINANT MOTIVE.  WE HAVE HAD YEARS OF LITIGATION OVER

          5      EXPERT REPORTS AND SIMULATED MAPS WITH EXPERTS TESTIFYING THAT

          6      A MAP WAS AN ILLEGAL POLITICAL GERRYMANDER.  THIS SAME

          7      PRINCIPLE APPLIES TO CASES WHERE THERE'S A RACIAL GERRYMANDER.

          8                NOW, THE POINT OF THIS CASE, YOUR HONOR, IS THAT FOR THE

          9      PLAINTIFFS TO PREVAIL, THEY HAVE TO PROVE THAT THEY ARE

         10      OFFERING A LEGAL REMEDY.  THAT IS PART OF THE BURDEN OF PROOF

         11      FOR A SECTION 2 LAWSUIT.  MR. COOPER'S MAPS, WE BELIEVE, ARE

         12      RACIAL GERRYMANDERS IN THE WAY THEY WERE DRAWN, AND ALSO

         13      BECAUSE THEY ILLEGALLY MAXIMIZED THE NUMBER OF MAJORITY BLACK

         14      DISTRICTS ABOVE PROPORTIONALITY.  SO WE BELIEVE THAT THIS COURT

         15      COULD NOT ORDER THE STATE TO ADOPT THIS MAP AND THAT THIS MAP

         16      DOES NOT REPRESENT AN EXAMPLE OF A LEGAL REMEDY THAT THE

         17      PLAINTIFFS HAVE TO OFFER TO PROVE THEIR CASE.

         18                THIS IS WELL WITHIN DR. BARBER'S EXPERTISE.  HE HAS HAD

         19      GREAT EXPERIENCE INVOLVING SIMULATED MAPS WHERE QUESTIONS OF

         20      INTENT WERE INVOLVED IN THE CASES IN WHICH HE HAS TESTIFIED.

         21      AND THE EXPERT WITNESSES WERE NOT ALLOWED TO GIVE LEGAL

         22      CONCLUSIONS.  THAT IS STRICTLY UP TO YOU.

         23                HE'S NOT QUALIFIED TO SAY WHAT MR. COOPER WAS THINKING.

         24      WE ARE NOT CHALLENGING WHAT MR. COOPER WAS THINKING.  WHAT WE

         25      ARE SAYING IS, HE IS A POLITICAL SCIENTIST.  HE CAN DO A

DR. M. BARBER - CROSS ON TENDER

3:07PM

1    FORENSIC EXAMINATION ON THESE MAPS, WHICH HE HAS DONE IN HIS

2    REPORT, AND THEN HE CAN DRAW A CONCLUSION BASED ON HIS

3    UNDERSTANDING OF WHAT THE WORD "PREDOMINANT" MEANS, WHICH WE

4    WILL GO INTO.  HE WILL EXPLAIN WHAT HE MEANS BY PREDOMINANT,

5    AND THAT THIS IS SOMETHING REGULARLY DONE BY POLITICAL

6    SCIENTISTS IN CASES LIKE THIS.  IT'S BEEN DONE OVER AND OVER

7    AND OVER AGAIN, YOUR HONOR. AND DR. BARBER IS WELL QUALIFIED TO

8    DO THAT BECAUSE HE HAS BEEN INVOLVED IN CASES WHERE THIS VERY

9    ISSUE HAS BEEN LITIGATED.

10         **THE COURT:**  OKAY.  THE TENDER IS IN POLITICAL

11   SCIENCE, AMERICAN POLITICS, VOTING BEHAVIOR AND PATTERNS AND

12   SIMULATED MAPS.  WHAT OF THOSE AREAS OF TENDER ARE YOU

13   OBJECTING TO?

14         **MR. NAIFEH:**  WE ARE OBJECTING TO ANYTHING THAT GOES

15   BEYOND THOSE AREAS OF TENDER, AND WE THINK THAT SOME PORTIONS

16   OF THE REPORT GO BEYOND THOSE AREAS OF TENDER.

17         **THE COURT:**  OKAY.  WELL, THEN, ARE YOU AGREEING, OR

18   ARE YOU WILLING TO STIPULATE THAT HE MAY GIVE OPINION TESTIMONY

19   IN THE FIELDS OF POLITICAL SCIENCE, AMERICAN POLITICS, VOTING

20   BEHAVIOR AND PATTERNS, AND SIMULATED MAPS?

21         **MR. NAIFEH:**  YES, YOUR HONOR.

22         **THE COURT:**  THEN HE WILL BE ACCEPTED TO GIVE OPINION

23   TESTIMONY IN THAT FIELD, AND YOU MAY MAKE OBJECTIONS TO

24   ANYTHING THAT YOU THINK IS OBJECTIONABLE.  WE WILL DEAL WITH IT

25   ON A QUESTION-BY-QUESTION BASIS.  THE EXHIBIT -- OFFER YOUR

DR. M. BARBER - DIRECT

3:09PM   1   EXHIBITS AGAIN, MR. FARR, PLEASE.

2           **MR. FARR:**  THANK YOU VERY MUCH, YOUR HONOR.  IT WOULD

3   BE SECRETARY OF STATE EXHIBIT 1 AND SECRETARY OF STATE EXHIBIT

4   4 WE MOVE TO BE INTRODUCED INTO EVIDENCE.

5           **THE COURT:**  ADMITTED.

6           **MR. FARR:**  MAY I CONTINUE, YOUR HONOR?

7           **THE COURT:**  YES.

8           **DIRECT EXAMINATION** (CONTINUING)

9   **BY MR. FARR:**

10   Q.   ALL RIGHT.  DR. BARBER, I JUST WANT TO REPEAT A FEW

11   THINGS.  YOU ARE NOT INTENDING TO GIVE A LEGAL OPINION IN THIS

12   CASE; IS THAT CORRECT?

13   A.   THAT IS CORRECT.

14   Q.   AND ARE YOU INTENDING TO TESTIFY ABOUT WHAT MR. COOPER WAS

15   THINKING WHEN HE DREW HIS MAPS?

16   A.   NO, I AM NOT.

17   Q.   ALL RIGHT.  YOU'VE HEARD THIS WORD "PREDOMINANT" THROWN

18   AROUND.  I RECALL THAT MR. COOPER USED THE WORD "PREDOMINANT,"

19   BUT I DON'T RECALL ANYONE EVER DEFINING WHAT THAT MEANT.  SO I

20   WANT YOU, AS A POLITICAL SCIENTIST, TO DEFINE TO THE COURT WHAT

21   YOU MEAN AS A POLITICAL SCIENTIST, WHAT DOES PREDOMINANT MEAN?

22   A.   SO IN MY VIEW, WHEN SOME FACTOR IN A HOST OF FACTORS

23   PREDOMINATES, WHAT WE ARE LOOKING AT IS THAT IN ORDER TO

24   ACHIEVE A PARTICULAR OBJECTIVE OR TO ACCOMPLISH SOME OBJECTIVE

25   WITH REGARDS TO THAT FACTOR, THAT IF IT IS THE CASE THAT THAT

DR. M. BARBER - DIRECT

3:10PM

1    FACTOR CAME IN CONFLICT WITH OTHER FACTORS, THAT THOSE OTHER

2    FACTORS WOULD GIVE WAY OR TO SOME DEGREE BE SUBORDINATED IN

3    ORDER TO ACCOMPLISH THE PREDOMINANT FACTOR IN QUESTION.

4           **MR. NAIFEH:**  YOUR HONOR, I WANT TO OBJECT NOT TO THE

5    ANSWER BUT TO ANY FURTHER TESTIMONY ABOUT -- IN THAT AREA OF

6    THE ANSWER BECAUSE THAT DEFINITION OF PREDOMINANCE IS ABOUT THE

7    SUBJECTIVE INTENT OF THE MAP-DRAWER.

8           **MR. FARR:**  YOUR HONOR, I COMPLETELY DISAGREE WITH IT.

9    WE ARE NOT TALKING ABOUT THE INTENT.  YOU KNOW, MR. COOPER MAY

10   BE ABSOLUTELY GENUINE, AND I DON'T HAVE ANY DOUBT THAT HE IS

11   GENUINE IN HIS BELIEF THAT HE DID NOT USE RACE AS A PREDOMINANT

12   FACTOR, BUT THAT DOESN'T MEAN HE IS RIGHT.  THAT IS UP TO YOU

13   TO DECIDE.

14      IN MAKING THAT DECISION, YOU ARE ENTITLED TO HEAR OTHER

15   EVIDENCE NOT ABOUT MR. COOPER'S SUBJECTIVE INTENT BUT A

16   FORENSIC EXAMINATION OF A MAP BY A PERSON WHO IS HIGHLY

17   QUALIFIED TO LOOK AT A MAP AND TO GIVE YOU HIS OPINION AS A

18   POLITICAL SCIENTIST AS TO WHAT FACTOR WAS THE DRIVING FORCE

19   BEHIND THE MAP.

20          **THE COURT:**  IT'S A PRETTY THIN LINE, WHAT FACTOR WAS

21   THE DRIVING FORCE BEHIND THE MAP.  I'M GOING TO GIVE YOU SOME

22   LATITUDE, BUT IT REALLY DOES -- IT'S A HORSE BY A DIFFERENT

23   COLOR OR A HORSE BY A DIFFERENT NAME, BUT IT DOESN'T MAKE IT A

24   ZEBRA.  I MEAN, IT IS STILL A HORSE, AND YOU ARE STILL

25   ASKING -- AT ITS BASE, IT IS A QUESTION OF WHAT WAS THE

3:12PM    1    SUBJECTIVE INTENT, WHICH MEANS THAT -- WELL, I'M GOING TO

          2    OVERRULE THE OBJECTION, BUT I THINK THAT IT'S REALLY ON A LINE.

          3                **MR. FARR:**  THANK YOU, YOUR HONOR.  MAY I CONTINUE?

          4                **THE COURT:**  YOU MAY.

          5    **BY MR. FARR:**

          6    Q.  SO BASED UPON YOUR DEFINITION OF PREDOMINANT, DID YOU

          7    REACH ANY CONCLUSIONS ABOUT MR. COOPER'S MAPS?

          8    A.  YES.

          9    Q.  WHAT WERE THEY?

         10                **MR. NAIFEH:**  OBJECTION, YOUR HONOR.  HE IS ASKING

         11    HIM, BASED ON HIS DEFINITION OF PREDOMINANCE, TO OFFER A

         12    CONCLUSION, AND HIS DEFINITION OF PREDOMINANCE WAS SPECIFICALLY

         13    ABOUT WHAT FACTORS WERE PUT INTO PLAY IN -- THE LANGUAGE HE

         14    JUST STATED IN HIS PRIOR ANSWER WAS IN ORDER TO ACHIEVE A

         15    PARTICULAR OBJECTIVE.  THAT IS -- THAT'S THE SUBJECTIVE INTENT

         16    OF THE MAP-DRAWER ABOUT WHAT THEY DID IN ORDER TO ACHIEVE AN

         17    OBJECTIVE, AND THAT'S WHAT HE IS ABOUT TO ELICIT AN ANSWER --

         18                **THE COURT:**  OBJECTION IS SUSTAINED.  YOU ARE ASKING

         19    HIM FOR THE ULTIMATE CONCLUSION OF WHAT WAS THE PREDOMINANT

         20    FACTOR IN MR. COOPER'S MIND.  OBJECTION IS SUSTAINED.

         21                **MR. FARR:**  JUST TO ESTABLISH THE RECORD, YOUR HONOR,

         22    MAY I BE HEARD AGAIN?

         23                **THE COURT:**  NO.  YOU MAY ASK ANOTHER QUESTION.

         24                **MR. FARR:**  MAY I ASK DR. COOPER TO ANSWER THE

         25    QUESTION TO MAKE A PROFFER OF PROOF FOR THE RECORD?

3:13PM   1            THE COURT:  WHEN THE COURT IS OFF THE BENCH, YOU CAN

         2    MAKE A PROFFER.  AND HIS NAME IS DR. BARBER.

         3            MR. FARR:  I'M SORRY, MA'AM.  IT IS 3:15, AND I'M A

         4    LITTLE WORN OUT.  SO I APOLOGIZE.

         5            THE COURT:  YOU CAN MAKE A PROFFER AT THE APPROPRIATE

         6    TIME, BUT NOT WHILE WE ARE ON THE RECORD IN THIS PROCEEDING

         7    WHILE I'M SITTING HERE, BECAUSE I DON'T NEED TO BE HERE FOR

         8    YOUR PROFFER.

         9            MR. FARR:  WILL I BE ABLE TO MAKE THAT PROFFER WITH

        10    THE COURT REPORTER?

        11            THE COURT:  YES.  YES, YOU WILL.

        12            MR. FARR:  THANK YOU.

        13    BY MR. FARR:

        14    Q.  NOW, DR. BARBER, YOU STATED THAT YOU HAVE MADE SIMULATED

        15    MAPS IN OTHER CASES.  CAN YOU TELL US THE SPECIFICS OF HOW A

        16    SIMULATED MAP COMES ABOUT AND WHAT IS AN ALGORITHM?

        17    A.  SURE.  SO THE BASIC IDEA OF HOW SIMULATED MAPS WORK IS YOU

        18    HAVE AN ALGORITHM THAT IS DESIGNED TO DRAW A LARGE NUMBER OF

        19    MAPS IN A PARTICULAR JURISDICTION, AND IN THIS CASE WE ARE

        20    TALKING ABOUT THE STATE OF LOUISIANA.

        21            THE ALGORITHM IS PROVIDED WITH A NUMBER OF PIECES OF DATA

        22    THAT ALLOW IT TO DRAW THE MAPS.  INITIALLY, THAT BEGINS BY

        23    GIVING THE COMPUTER A PIECE OF -- A LARGE DATASET THAT CONTAINS

        24    THE INFORMATION ABOUT THE NUMBER OF VOTERS THAT LIVE IN THE

        25    STATE AND THE GEOGRAPHIC LOCATION OF THOSE VOTERS, SO HOW THEY

3:14PM   1   ARE DISTRIBUTED ACROSS THE STATE.

2        BEYOND THAT, YOU THEN WOULD INSTRUCT THE ALGORITHM TO TAKE

3   THAT INFORMATION AND DRAW A PARTICULAR NUMBER OF DISTRICTS.

4   AND SO IN THIS CASE WE ARE DEALING WITH 39 DISTRICTS IN THE

5   SENATE AND 105 DISTRICTS IN THE HOUSE.  IN ORDER TO DRAW THOSE

6   DISTRICTS, YOU THEN INSTRUCT THE ALGORITHM TO TAKE INTO ACCOUNT

7   VARIOUS FACTORS OR COMPONENTS, AND SO THOSE ARE WHAT ARE OFTEN

8   REFERRED TO AS THE TRADITIONAL REDISTRICTING CRITERIA, THINGS

9   LIKE EQUAL POPULATION, GEOGRAPHIC CONTIGUITY, FACTORS LIKE

10   THAT.

11   Q.   WHAT IS MEANT BY THE TERM "CONSTRAINT"?

12   A.   SO CONSTRAINT IS ANOTHER WORD FOR THESE FACTORS THAT YOU

13   PROVIDE TO THE ALGORITHM.  SO BY CONSTRAINT, I MEAN WE FORCE

14   THE ALGORITHM TO DRAW 39 DISTRICTS OR WE FORCE THE DISTRICTS TO

15   HAVE ROUGHLY EQUAL POPULATION.  SO WE CONSTRAIN THE ALGORITHM

16   TO MEET THESE CRITERIA THAT WE ARE PROVIDED WITH.

17   Q.   HOW DID YOU DECIDE WHICH CONSTRAINTS TO IMPLEMENT IN THE

18   ALGORITHM THAT YOU USED IN THIS CASE?

19   A.   SO THE GUIDING DOCUMENT FOR THE PARTICULAR CONSTRAINTS

20   THAT I PROVIDED THE ALGORITHM ARE THE JOINT -- THE CONSTRAINTS

21   OUTLINED IN THE JOINT RULE 21.

22        **MR. FARR:**  YOUR HONOR, I THINK FOR THE RECORD, THAT

23   IS EXHIBIT JX53.

24        **THE COURT:**  HE IS ASKING YOU TO CLARIFY YOUR

25   QUESTION.  I DON'T THINK HE UNDERSTOOD YOUR QUESTION.  CLARIFY

DR. M. BARBER - DIRECT

3:16PM  1   YOUR QUESTION.  HE SAID -- IS THAT WHAT YOU WERE DOING?

2                    **THE WITNESS:**  I'M SORRY.  THAT WAS MY ANSWER.

3                    **THE COURT:**  OH, I'M SORRY.  I MISUNDERSTOOD YOU.

4                    **THE WITNESS:**  MY APOLOGIES.

5                    **THE COURT:**  JOINT RULE 21.

6   **BY MR. FARR:**

7   Q.  SIR, JUST TO MAKE SURE WE HAVE A COMPLETE ANSWER, COULD

8   YOU AGAIN STATE ALL THE CONSTRAINTS THAT YOU USED IN FORMING

9   THE ALGORITHM THAT YOU USED IN THIS CASE?

10  A.  SURE.  SO THE ALGORITHM IS PROGRAMMED TO CONSTRUCT THE

11  APPROPRIATE NUMBER OF DISTRICTS FOR THE SENATE AND HOUSE.  IT'S

12  INSTRUCTED TO, FOR EACH OF THOSE DISTRICTS, TO HAVE ROUGHLY

13  EQUAL POPULATION, TO BE GEOGRAPHICALLY CONTIGUOUS.  I FURTHER

14  INSTRUCT THE ALGORITHM TO PRIORITIZE DISTRICTS, DRAWING

15  DISTRICTS THAT HAVE MINIMAL OR MINIMIZE THE NUMBER OF PARISH

16  AND MUNICIPAL DIVISIONS.  AND THEN BEYOND THAT, I INSTRUCT THE

17  ALGORITHM TO MAKE THE DISTRICTS ROUGHLY GEOGRAPHICALLY COMPACT

18  AND TO THEN ALSO TRY TO MINIMIZE DEVIATIONS FROM THE PREVIOUS

19  DECADE'S PLAN.

20  Q.  WAS PARTISANSHIP ONE OF THE CONSTRAINTS THAT YOU USED?

21  A.  NO, THE COMPUTER HAS NO INFORMATION ABOUT THE PARTISANSHIP

22  OF VOTERS IN THE STATE.

23  Q.  WHAT ABOUT RACE?  WAS THAT A CONSTRAINT THAT YOU USED?

24  A.  NO.  SO THE COMPUTER DOES NOT HAVE ANY INFORMATION ABOUT

25  THE RACIAL COMPOSITION OF THE VOTERS IN THE STATE.

3:18PM    1    Q.   WHY WAS THAT IMPORTANT?

          2    A.   SO THAT'S KIND OF THE KEY TO WHAT THESE ALGORITHMS ARE

          3    DESIGNED TO DO IS YOU INSTRUCT THE ALGORITHM TO DRAW A LARGE

          4    SET OF MAPS USING THE CRITERIA THAT WE HAVE JUST DISCUSSED.

          5    BUT IN SHIELDING THE ALGORITHM FROM INFORMATION ABOUT RACE, WE

          6    THEN KNOW THAT AT THE END OF THE PROCESS, WE HAVE A LARGE SET

          7    OF MAPS THAT ARE DRAWN WITHOUT ANY REGARD TO RACE.   WE KNOW

          8    THAT THE ALGORITHM HAS NOT CONSIDERED RACE IN THE DRAWING OF

          9    THE DISTRICTS.

         10         AT THAT POINT, WE ARE THEN ABLE TO COMPARE THAT LARGE SET

         11    OF SIMULATED MAPS TO A MAP IN QUESTION WHERE THERE IS A

         12    QUESTION AS TO WHETHER RACE OR THE DEGREE TO WHICH RACE WAS

         13    USED IN DRAWING THAT MAP.

         14    Q.   OKAY.  AND HOW WOULD THAT WORK IN THIS CASE?

         15    A.   SO IN THIS CASE, WE DRAW A LARGE SET OF MAPS USING THE

         16    ALGORITHM, AT WHICH POINT WE CAN THEN COMPARE THAT SET OF MAPS

         17    TO, IN THIS CASE, THE ILLUSTRATIVE MAPS THAT WERE DRAWN.  WE

         18    CAN THEN COMPARE THEM ON A NUMBER OF METRICS, ONE OF THOSE

         19    METRICS BEING THE RACIAL COMPOSITION OF THE ILLUSTRATIVE MAPS

         20    COMPARED TO THE RACIAL COMPOSITION OF THE MAPS DRAWN BY THE

         21    COMPUTER ALGORITHM.

         22    Q.   NOW, DR. BARBER, ARE YOU FAMILIAR WITH THE ALABAMA CASE,

         23    *MERRILL V. MILLIGAN*?

         24    A.   YES.

         25    Q.   AND ARE YOU AWARE THAT SIMULATED MAPS WERE USED IN THAT

DR. M. BARBER - DIRECT

3:19PM   1   CASE?

2   A.   YES.

3   Q.   IS YOUR USE OF SIMULATED MAPS IN THIS CASE THE SAME AS

4   WHAT -- AS HOW THE STATE USED SIMULATED MAPS IN THE ALABAMA

5   CASE?

6   A.   NO, IT'S A DIFFERENT UNDERTAKING HERE.  MY UNDERSTANDING

7   IN THE *MILLIGAN* CASE IS THAT THE MAPS WERE USED TO ARGUE THAT

8   THE STATE'S MAP DID NOT HAVE A DISCRIMINATORY EFFECT, AND

9   THAT'S NOT WHAT WE ARE DOING HERE.  HERE WE ARE DRAWING THE

10   MAPS TO USE AS A COMPARISON SET AGAINST THE ILLUSTRATIVE MAP

11   AND IDENTIFY DIFFERENCES THAT EXIST BETWEEN A MAP THAT WAS

12   POTENTIALLY DRAWN WITH RACE AS A CONSIDERATION AND A LARGE SET

13   OF MAPS WHERE WE KNOW WITH CERTAINTY THAT RACE WAS NOT A

14   CONSIDERATION.

15        **MR. NAIFEH:**  OBJECT, YOUR HONOR, TO ANY FURTHER

16   QUESTIONS ABOUT LEGAL -- ASKING FOR LEGAL CONCLUSIONS.  HE JUST

17   TESTIFIED TO HIS UNDERSTANDING OF WHAT MAPS WERE USED FOR IN

18   THE *MILLIGAN* CASE AND HOW THE COURT TREATED THEM.

19        **THE COURT:**  THAT WILL BE SUSTAINED.  YOU CAN ARGUE,

20   MR. FARR, AND I'M SURE YOU WILL AND I'M SURE YOU ARE ABLE TO,

21   THAT THERE'S SOME DISTINCTION HERE, BUT TO ASK HIM TO DRAW A

22   DISTINCTION BETWEEN WHAT YOU HAVE ASKED HIM TO DO AND WHAT AN

23   EXPERT IN ANOTHER CASE DID, I MEAN --

24        **MR. FARR:**  I'M SORRY, YOUR HONOR.  I WON'T ASK THAT

25   QUESTION AGAIN.

3:21PM   1               **THE COURT:** ALL RIGHT.  MOVE ON.

         2               **MR. FARR:** THANK YOU.

         3    **BY MR. FARR:**

         4    Q.  NOW, LET'S TURN TO THE RESULTS OF YOUR SIMULATION,

         5    DR. BARBER.  HOW MANY SIMULATED MAPS DID YOU PRODUCE?

         6    A.  I PRODUCED 100,000 SIMULATED MAPS IN THE HOUSE AND 100,000

         7    SIMULATED MAPS IN THE SENATE.

         8    Q.  WHY DID YOU PRODUCE SO MANY MAPS?

         9    A.  SO THE PARTICULAR NUMBER IS NOT AS CRITICAL AS THE FACT

        10    THAT IT'S A LARGE SET OF MAPS THAT ARE REPRESENTATIVE OF THE

        11    UNIVERSE OF POTENTIAL MAPS THAT COULD BE DRAWN.  GIVEN THE SIZE

        12    OF THE STATE, THE NUMBER OF DISTRICTS THAT WE ARE TALKING ABOUT

        13    AND THE NUMBER OF PRECINCTS THAT COMPOSE THOSE DISTRICTS, THERE

        14    ARE LITERALLY BILLIONS OF POTENTIAL MAPS THAT COULD BE DRAWN.

        15               SO WHAT IS GOOD ABOUT THESE ALGORITHMS IS THAT THEY ARE

        16    CAPABLE OF DRAWING A LARGE SAMPLE OF MAPS THAT ARE THEN

        17    REPRESENTATIVE OF THAT UNIVERSE OF POTENTIAL MAPS, IN MUCH THE

        18    SAME WAY THAT WHEN WE DO SURVEY RESEARCH, WE DON'T TALK TO

        19    EVERY PERSON IN THE COUNTRY.  WE TAKE A SAMPLE OF THE

        20    POPULATION TO TALK ABOUT BROADER TRENDS ACROSS THE COUNTRY.

        21    Q.  SO AFTER YOU DREW THE HUNDRED THOUSAND MAPS -- YOU DID A

        22    HUNDRED THOUSAND MAPS FOR BOTH THE SENATE AND THE HOUSE; IS

        23    THAT CORRECT?

        24    A.  YES, THAT IS CORRECT.

        25    Q.  OKAY.  WHAT DID YOU DO WITH THOSE MAPS AFTER YOU HAD

3:22PM   1   GENERATED A HUNDRED THOUSAND MAPS?  HOW DID YOU ANALYZE THEM?

2   A.   ONCE WE HAVE THE SET OF MAPS, THEN WE CAN COMPUTE VARIOUS

3   STATISTICS ABOUT THOSE MAPS AND COMPARE THOSE STATISTICS TO

4   EITHER THE ENACTED MAP OR THE ILLUSTRATIVE MAP.

5        SO IN THIS CASE, I COMPUTED THE BLACK VOTING AGE

6   POPULATION IN EACH OF THE DISTRICTS IN EACH OF THE SIMULATED

7   MAPS AND THEN CAN COMPARE THAT TO THE BVAP IN THE ENACTED MAP

8   OR THE ILLUSTRATIVE MAP.

9   Q.   WHAT WAS THE MAIN TAKEAWAY THAT YOU HAD, DR. BARBER, AFTER

10   YOU DID THAT COMPARISON?

11   A.   THE MAIN TAKEAWAY IS THAT IN USING THE REDISTRICTING

12   CRITERIA THAT WE JUST DISCUSSED FROM JOINT RULE 21, THE

13   SIMULATED MAPS PRODUCED FAR FEWER MAJORITY BVAP DISTRICTS THAN

14   THE ILLUSTRATIVE MAP.

15        MR. NAIFEH:  YOUR HONOR, I'M GOING TO OBJECT HERE ON

16   RELEVANCE GROUNDS.  HE IS ATTEMPTING TO ESTABLISH THAT HIS

17   SIMULATIONS CREATED SOME KIND OF REPRESENTATIVE SAMPLE OF

18   DISTRICTS THAT DID NOT CONSIDER RACE.  THE SUPREME COURT

19   RECENTLY REJECTED DEFENDANT'S ARGUMENTS THAT AN ILLUSTRATIVE

20   PLAN MUST BE ASSESSED AGAINST A RACE-NEUTRAL BENCHMARK, AND

21   THAT WAS RECENTLY REINFORCED BY THE FIFTH CIRCUIT IN THE

22   ROBINSON CASE, AND SO THIS WHOLE TOPIC OF SIMULATIONS PRODUCING

23   A RACIAL NEUTRAL BENCHMARK PROVIDES NO RELEVANT INFORMATION TO

24   THE RESOLUTION OF THIS CASE.

25        MR. FARR:  YOUR HONOR, I THINK IT IS VERY RELEVANT TO

DR. M. BARBER - DIRECT

3:24PM   1   COMPARE -- YOU SAID WE CAN PUT ON EVIDENCE RELATED TO THE FACTS

2   OF THE MAPS, AND IT'S RELEVANT IN YOU MAKING YOUR DECISION

3   ABOUT WHETHER RACE WAS THE PREDOMINANT FACTOR.

4           **THE COURT:**  BUT NOW WE COME RIGHT BACK TO SUBJECTIVE

5   INTENT, AND HE IS CORRECT, THE U.S. SUPREME COURT IN *MILLIGAN*

6   SAID THAT A BENCHMARK OF RACE-NEUTRAL MAPS WAS NOT SUITABLE FOR

7   A SECTION 2 INQUIRY.

8           **MR. FARR:**  THAT WAS NOT THE PURPOSE OF THE MAPS IN

9   *MILLIGAN*, YOUR HONOR.  THAT'S WHY I ASKED THAT QUESTION.  THE

10   SIMULATED MAPS IN *MILLIGAN* WERE OFFERED TO PROVE THAT IF THE

11   PLAINTIFFS DID NOT PROPOSE A REMEDIAL MAP THAT WAS ONE OF THE

12   SIMULATIONS, THAT MEANT THAT THEIR MAP WAS ILLEGAL.  WE ARE NOT

13   OFFERING IT FOR THAT REASON.  WE ARE OFFERING THE SIMULATED

14   MAPS SO YOU CAN MAKE A COMPARISON AND EVALUATE THE EVIDENCE TO

15   DECIDE WHETHER OR NOT RACE WAS THE PREDOMINANT MOTIVE, WHICH IS

16   WITHIN THE PROVINCE OF THE COURT.

17        THAT'S EXACTLY WHY I WANTED TO MAKE THE POINT THAT THESE

18   SIMULATED MAPS ARE NOT BEING OFFERED FOR THE SAME REASON AS

19   THEY WERE IN THE ALABAMA CASE.  I ALSO THINK THAT A LOT OF WHAT

20   PLAINTIFFS' COUNSEL IS DOING HE CAN BRING UP ON

21   CROSS-EXAMINATION.

22           **MR. NAIFEH:**  YOUR HONOR, MAY I RESPOND?

23           **THE COURT:**  YOU MAY.

24           **MR. NAIFEH:**  IN *MILLIGAN*, THE ARGUMENT THAT

25   DEFENDANTS PRESENTED WAS THAT BECAUSE THE ILLUSTRATIVE MAPS DID

DR. M. BARBER - DIRECT

3:25PM   1   NOT COME OUT OF A SIMULATION, THAT WAS AN INDICATION THAT RACE

2   WAS THE PREDOMINANT FACTOR IN THE CREATION OF THOSE MAPS, AND

3   THE STATE ARGUED THAT THAT MEANT THE PLAINTIFFS HAD NOT

4   SATISFIED *GINGLES* I.  THAT'S THE SAME ARGUMENT THEY ARE

5   PRESENTING HERE.  I MEAN, THAT'S ESSENTIALLY THE SAME REASON

6   THEY ARE OFFERING THIS EVIDENCE IS TO PROVE THAT RACE

7   PREDOMINATED IN THE ILLUSTRATIVE MAPS, WHICH SOMEHOW RENDERS

8   THEM IMPROPER AS EVIDENCE OF, YOU KNOW, UNDER *GINGLES* I IN THIS

9   CASE.

10         **THE COURT:**  WELL, I DON'T KNOW THAT *GINGLES* I IS HIS

11   ANGLE.

12         **MR. FARR:**  EXCUSE ME?

13         **THE COURT:**  I SAID I'M NOT CERTAIN THAT *GINGLES* I IS

14   YOUR ANGLE.

15         **MR. FARR:**  IT'S NOT, YOUR HONOR.  IT'S NOT OUR ANGLE.

16         **THE COURT:**  IT'S THE 14TH AMENDMENT.

17         **MR. FARR:**  WHAT'S THAT?

18         **THE COURT:**  IT'S THE 14TH AMENDMENT.

19         **MR. NAIFEH:**  I THINK, AS I UNDERSTAND -- WHETHER IT'S

20   *GINGLES* I OR IT'S THE 14TH AMENDMENT, THE ARGUMENT IS THAT

21   BECAUSE THE MAP PURPORTEDLY VIOLATES THE 14TH AMENDMENT, IT

22   CANNOT BE OFFERED TO PROVE A SECTION 2 VIOLATION.  THAT WAS THE

23   SAME ARGUMENT THE STATE MADE IN THE ALABAMA CASE THAT THE

24   SUPREME COURT REJECTED.

25         **THE COURT:**  OKAY.  THE COURT IS GOING -- WE ARE GOING

DR. M. BARBER - DIRECT

3:26PM   1   TO BREAK FOR THE WEEKEND AND COME BACK AT 9:00 ON MONDAY

2   MORNING SO THAT THE COURT CAN LOOK AT THE ISSUE.   IT WOULD HAVE

3   BEEN MOST HELPFUL HAD YOU TEED THIS UP IN A MOTION IN LIMINE.

4   WE ARE GOING TO BE AT RECESS UNTIL 9 A.M. MONDAY MORNING.

5        (TRIAL RECESSED UNTIL 9:00 A.M., MONDAY, DECEMBER 3, 2023)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3:26PM   1

2

3                    CERTIFICATE OF COURT REPORTER

4

5        I, TERI B. NORTON, RMR, FCRR, RDR, OFFICIAL COURT

6   REPORTER FOR THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN

7   DISTRICT OF MISSISSIPPI, APPOINTED PURSUANT TO THE PROVISIONS

8   OF TITLE 28, UNITED STATES CODE, SECTION 753, DO HEREBY CERTIFY

9   THAT THE FOREGOING IS A CORRECT TRANSCRIPT OF THE PROCEEDINGS

10  REPORTED BY ME USING THE STENOTYPE REPORTING METHOD IN

11  CONJUNCTION WITH COMPUTER-AIDED TRANSCRIPTION, AND THAT SAME IS

12  A TRUE AND CORRECT TRANSCRIPT TO THE BEST OF MY ABILITY AND

13  UNDERSTANDING.

14       I FURTHER CERTIFY THAT THE TRANSCRIPT FEES AND FORMAT

15  COMPLY WITH THOSE PRESCRIBED BY THE COURT AND THE JUDICIAL

16  CONFERENCE OF THE UNITED STATES.

17

18

19

20            S/ TERI B. NORTON
              TERI B. NORTON, RMR, FCRR, RDR
21            OFFICIAL COURT REPORTER

22

23

24

25