## UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF LOUISIANA

DOROTHY NAIRNE, *et al*

*versus*

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

CIVIL ACTION

22-178-SDD-SDJ

## **RULING AND ORDER**

Plaintiffs, a group of Black Louisianans and two nonprofit organizations, brought this suit against Kyle Ardoin, the Louisiana Secretary of State in his official capacity, alleging that the 2022 redistricting plans for the Louisiana House of Representatives and State Senate unlawfully dilute Black voting strength in violation of § 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301.[1] Patrick Page Cortez, the President of the Louisiana State Senate, and Clay Schexnayder, the Speaker of the Louisiana House of Representatives, intervened in the suit as Defendants, as did Louisiana Attorney General Jeff Landry (collectively, "the Intervenor Defendants").[2]

This matter came before the Court for a seven-day non-jury trial on the merits beginning November 27, 2023 and ending December 5, 2023. Thereafter, Plaintiffs and Defendants (along with the Intervenor Defendants) filed post-hearing briefs.[3] The Court has considered the Parties' pre-trial and post-trial submissions, the evidence admitted at trial, and the arguments presented, and the Court finds that Plaintiffs have satisfied their burden of proving that the Louisiana State House and Senate electoral maps enacted by the Louisiana Legislature (S.B. 1 and H.B. 14) violate § 2 of the VRA.

---

[1] Rec. Doc. 14.
[2] Rec. Doc. 13; Rec. Doc. 33.
[3] Rec. Doc. 206; Rec. Doc. 207.

Throughout the reasons that follow, the Court makes credibility findings, findings of fact, and conclusions of law. In fidelity to Rule 52(a) and for ease of review, the Court appends separately enumerated findings of facts and conclusions of law to its opinion.

## I.    FACTUAL BACKGROUND

The Louisiana State Legislature is responsible for drawing the boundaries of the state legislative districts. The number of state legislative districts is set by the Louisiana State Constitution. Pursuant to La. Const. art. III, § 3, there are 39 State Senate districts and 105 State House districts. In 2021, the Legislature adopted Joint Rule 21, which sets forth the criteria that any redistricting plan submitted for consideration by the Legislature must satisfy. Each redistricting plan must comply with the Equal Protection Clause of the Fourteenth Amendment and the Fifteenth Amendment to the U.S. Constitution; § 2 of the VRA, and all other applicable federal and state laws.[4] Joint Rule 21 also requires that each legislative redistricting plan: (1) provide for single-member districts; (2) comprise districts that have a population as nearly equal to the ideal district population as practicable; and (3) be a whole plan which assigns all of the geography of the State.[5] Additionally, "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable."[6]

Plaintiffs, a group of Black Louisianans and Louisiana nonprofit organizations, filed this suit seeking a preliminary injunction on March 14, 2022, alleging that the 2022 redistricting plans for the Louisiana House of Representatives and State Senate

---

[4] Joint-56, Joint Rule 21.
[5] *Id.*, § D.
[6] *Id.*, § H.

unlawfully diluted their votes in violation of § 2 of the VRA.[7] The Court converted the matter to a trial on the merits on June 21, 2023.[8]

## II.    APPLICABLE LAW

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives."[9] *Thornburg v. Gingles* sets forth three threshold conditions for a claim of vote dilution under § 2: "first, that [the minority group] is sufficiently large and geographically compact to constitute a majority in a single-member district"; second, "that it is politically cohesive"; and third, "that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate."[10]

"The 'geographically compact majority' and 'minority political cohesion' showings are needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district. And the 'minority political cohesion' and 'majority bloc voting' showings are needed to establish that the challenged districting thwarts a distinctive minority vote by submerging it in a larger white voting population."[11] "Unless these points are established, there neither has been a wrong nor can [there] be a remedy."[12] Consequently, if Plaintiffs fail to establish any one of these three conditions, the Court need not consider the other two.[13]

---

[7] Rec. Doc. 14.
[8] Rec. Doc. 93.
[9] *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).
[10] *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citing *Gingles*, 478 U.S. at 50–51).
[11] *Id.* (citations omitted).
[12] *Id.* at 40–41.
[13] *See Voinovich v. Quilter*, 507 U.S. 146, 158 (1993).

Under the first prong of *Gingles*, "a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent."[14] Because "only eligible voters affect a group's opportunity to elect candidates,"[15] this requirement is analyzed in terms of Black voting-age population (or "BVAP"). Proving the existence of a sufficiently *large* minority population does not end the inquiry; compactness is also required. If the minority population is dispersed such that a reasonably compact majority-minority district cannot be drawn, "§ 2 does not require a majority-minority district...."[16]

"While no precise rule has emerged governing § 2 compactness, the inquiry should take into account traditional districting principles such as maintaining communities of interest and traditional boundaries."[17] "Community of interest" is a term of art that has no universal definition in the districting context. Visual assessments are appropriate when assessing compactness. "[B]izarre shaping of" a district that, for example, "cut[s] across pre-existing precinct lines and other natural or traditional divisions," suggests "a level of racial manipulation that exceeds what § 2 could justify."[18]

Other traditional districting principles that should be considered are contiguity and protecting of incumbents. "Contiguity as a traditional redistricting principle does not mean that that the concentrations of [Black] voters in the proposed district must be contiguous. Rather, it means that the illustrative district be connected in one piece."[19] Regarding the

---

[14] *Bartlett v. Strickland*, 556 U.S. 1, 19–20 (2009).
[15] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).
[16] *Bush v. Vera*, 517 U.S. 952, 979 (1996).
[17] *LULAC*, 548 U.S. at 433 (internal quotation marks omitted).
[18] *Vera*, 517 U.S. at 980–81.
[19] *See Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People v. Ala.*, 612 F. Supp. 3d 1232, 1263 (M.D. Ala. 2020) (quoting *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395, 424 (M.D. La. 2017)).

protection of incumbents, the redistricting process should "avoid contests between incumbent officer-holders."[20]

To determine whether Plaintiffs satisfy the first *Gingles* requirement, the Court compares the Enacted Map with Plaintiffs' Illustrative Plan.[21] The Court's comparison is for the limited purpose of evaluating *Gingles I*, which requires a district that is "*reasonably compact and regular*";[22] compactness is not a "beauty contest[]"[23] where the most attractively shaped district carries the day.

The second and third requirements of *Gingles* require Plaintiffs to establish that voting in the challenged districts is racially polarized.[24] As the Supreme Court has explained, "in the absence of significant white bloc voting it cannot be said that the ability of minority voters to elect their chosen representatives is inferior to that of white voters."[25]

If Plaintiffs establish all three *Gingles* requirements, the Court then analyzes whether a § 2 violation has occurred based on the "totality of the circumstances." At this step, the Court considers the Senate Factors, which include:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group, such as unusually large election districts, majority vote requirements, and prohibitions against bullet voting; the exclusion of members of the minority group from candidate slating processes; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political

---

[20] *See id.* at 1263 (citing *Karcher v. Daggett*, 462 U.S. 725, 740 (1983)).
[21] *LULAC*, 548 U.S. at 430 (citing *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994) (requiring "a comparison between a challenger's proposal and the 'existing number of reasonably compact districts'")).
[22] *Vera,* 517 U.S. at 977 (emphasis in original).
[23] *Id.*
[24] *See, e.g., LULAC*, 548 U.S. at 427.
[25] *Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (quoting *Gingles*, 478 U.S. at 49 n.15).

campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.[26]

Supreme Court precedent also dictates that the Court must consider whether the number of majority-Black districts in the Enacted Map is roughly proportional to the Black share of the population in Louisiana.[27]

Not relevant to the Court's inquiry is whether the Louisiana Legislature *intended* to dilute the votes of Black Louisianans. The Court's § 2 analysis "assess[es] the impact of the contested structure or practice on minority electoral opportunities on the basis of objective factors."[28] The Legislature's intent is therefore "the wrong question."[29] "The 'right question . . . is whether 'as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.'"[30]

Prior to analyzing the substantive merits of Plaintiffs' claim under the applicable law, the Court will address procedural/preliminary matters raised by Defendants.

## III.    PRELIMINARY MATTERS

### A.  Standing

Defendants moved for summary dismissal of Plaintiffs' claims prior to trial by alleging that Plaintiffs lacked the requisite standing to proceed.[31] Four Individual Plaintiffs remain in this matter: Dr. Dorothy Nairne, Reverend Clee Earnest Lowe, Dr. Alice Washington, and Steven Harris. There are also two entity Plaintiffs: Black Voters Matter

---

[26] *Caster v. Merrill*, No. 2:21-CV-1536-AMM, 2022 WL 264819, at *20 (N.D. Ala. Jan. 24, 2022) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1010 n.9 (1994)).
[27] *See LULAC*, 548 U.S. at 426; *De Grandy*, 512 U.S. at 1000.
[28] *Gingles*, 478 U.S. at 44 (internal quotation marks and citation omitted).
[29] *Id.* (internal quotation marks and citation omitted).
[30] *Id.* (internal citation omitted).
[31] Rec. Doc. 149.

Capacity Building Institute ("BVM") and the Louisiana State Conference of the National Association for the Advancement of Colored People (the "Louisiana NAACP" or "NAACP").

The Court denied Defendants' *Motion for Summary Judgment*.[32] In its *Ruling*, the Court found that based on the summary judgment evidence presented, Plaintiffs met the constitutional standing requirements for purposes of defeating Defendants' summary judgment *Motion*.[33] Additional evidence has since been introduced at trial proving that all Plaintiffs have standing.

"Article III standing is a jurisdictional prerequisite."[34] If the plaintiff lacks standing to bring a claim, the Court lacks subject matter jurisdiction over the claim.[35] The party seeking to invoke federal jurisdiction bears the burden of showing that standing existed at the time the lawsuit was filed.[36] Article III of the Constitution limits federal courts' jurisdiction to certain "cases" and "controversies." "[N]o principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."[37] "One element of the case-or-controversy requirement" is that Plaintiffs "must establish that they have standing to

---

[32] Rec. Doc. 181.

[33] *Id.*

[34] *Crenshaw-Logal v. City of Abilene, Tex.*, 436 F. App'x. 306, 308 (5th Cir. 2011) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998); *Xerox Corp. v. Genmoora Corp.*, 888 F.2d 345, 350 (5th Cir. 1989)).

[35] *See Whitmore v. Ark.*, 495 U.S. 149, 154–55 (1990); *Chair King, Inc. v. Hous. Cellular Corp.*, 131 F.3d 507, 509 (5th Cir. 1997), *abrogated by Mims v. Arrow Fin. Servs., LLC,* 565 U.S. 368 (2012).

[36] *See Howery v. Allstate Ins. Co.*, 243 F.3d 912, 916 (5th Cir. 2001); *Ramming v. U.S.*, 281 F.3d 158, 161 (5th Cir. 2001); *The M.D. Anderson Cancer Ctr. v. Novak*, 52 S.W.3d 704, 708 (Tex. 2001).

[37] *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006) (internal quotation marks omitted) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997) (internal quotation marks omitted)). *See, e.g., Summers v. Earth Island Inst.*, 555 U.S. 488, 492–493 (2009).

sue."[38] The United States Supreme Court has held that "the irreducible constitutional minimum of standing contains three elements":[39]

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of— the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[40]

To establish Article III standing, an injury must be "concrete, particularized, and actual or imminent."[41] A particularized injury is one which "affect[s] the plaintiff in a personal and individual way."[42] "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending."[43] "Allegations of *possible* future injury" do not suffice.[44]

### i.    Standing of Individual Plaintiffs

To have standing, the Individual Plaintiffs must allege that they are Black, registered voters who reside in a cracked or packed voting district under the Enacted Map. "In vote dilution cases, the 'harm arises from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight

---

[38] *Raines*, 521 U.S. at 818. *See also Summers*, 555 U.S. at 492–493; *DaimlerChrysler Corp.*, 547 U.S. at 342; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).
[39] *Lujan*, 504 U.S. at 560.
[40] *Id.* at 560–61 (internal citations and quotation marks omitted).
[41] *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 149 (2010).
[42] *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (quoting *Lujan*, 504 U.S. at 560 n.1).
[43] *Lujan*, 504 U.S. at 564 n.2 (internal quotation marks omitted).
[44] *Whitmore v. Ark.*, 495 U.S. 149, 158 (1990) (emphasis added).

than it would carry in another, hypothetical district.'"[45] The Plaintiffs alleged and the trial evidence established that:

Dr. Dorothy Nairne is a Black registered voter and NAACP member who resides in Assumption Parish and House District 60. Under the Illustrative House Plan created by Plaintiffs' expert William Cooper and introduced into evidence at trial, Dr. Nairne would reside within the boundaries of Illustrative House District 58.[46]

Reverend Clee Earnest Lowe is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[47]

Dr. Alice Washington is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[48]

Steven Harris is a Black registered voter and NAACP member who resides in Natchitoches Parish and House District 25, but who would reside within the boundaries of Illustrative House District 23.[49]

The Plaintiffs allege and the record establishes that each Individual Plaintiff currently lives in a packed or cracked district in the Enacted Map and would live in a majority-Black district under the Illustrative Plan. The Individual Plaintiffs alleged that cracked and packed legislative districts effectively denied them an equal opportunity to

---

[45] *Anne Harding v. Cnty. of Dallas, Tex.*, 948 F.3d 302, 307 (5th Cir. 2020).
[46] Rec. Doc. 225, p. 52, line 17–p. 53, line 11.
[47] *Id.* at p. 58, line 25–p. 59, line 14.
[48] *Id.*
[49] *Id.* at p. 49, lines 10–20.

elect a candidate of their choice. The Court finds that individual Plaintiffs have standing to challenge the alleged vote dilution.

### ii. __Standing of Organizational Plaintiffs__

When a plaintiff is an organization, "the standing requirements of Article III can be satisfied in two ways. Either the organization can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"[50] Organizational and associational standing are alternative paths for the plaintiff organization to satisfy Article III standing. For example, "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members."[51] A plaintiff's specific claims determine which one type of standing must be satisfied, as it depends on who suffered the injury alleged and what relief is sought.[52]

The Plaintiffs' alleged and the trial evidence established the standing of both BVM and the Louisiana NAACP.

### a.  *Associational Standing of the NAACP*

An organization has associational standing to bring suit on behalf of its members when: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual

---

[50] *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)).
[51] *Warth v. Seldin*, 422 U.S. at 511.
[52] *Id.* at 515 ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought. If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured. Indeed, in all cases in which we have expressly recognized standing in associations to represent their members, the relief sought has been of this kind.").

members in the lawsuit."[53] Because the organization's members should otherwise have standing to sue in their own right, "[t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit."[54] The relief sought, such as a declaration, injunction, or other form of prospective relief, also must be for "the benefit of those members of the association actually injured."[55]

At trial, the Louisiana NAACP presented evidence of members who would have standing in their own right. Plaintiffs identified Louisiana NAACP members who are Black registered voters whose vote is allegedly diluted by the district where they live. The Louisiana NAACP's president Michael McClanahan testified under seal to the names and addresses of those individuals.[56] Redressability was demonstrated by the testimony of William Cooper, who testified to the unpacked or uncracked majority-Black illustrative districts in which the identified members would reside under the Illustrative Plan.[57]

Contrary to Defendants' assertions, the NAACP's membership structure does not preclude it from demonstrating associational standing. Testimony was introduced at trial demonstrating that members of the NAACP are simultaneously members of the local NAACP branch in their area, the Louisiana NAACP, and the national NAACP.[58] The Fifth Circuit has instructs that courts should not "exalt form over substance" when assessing

---

[53] *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977).
[54] *Id.* at 432 U.S. at 342 (quoting *Warth*, 422 U.S. at 511).
[55] *Warth*, 422 U.S. at 515.
[56] Rec. Doc. 224 (SEALED), p. 5, line 22–p. 31, line 12.
[57] Rec. Doc. 225, p. 38, line 23–p. 59, line 14.
[58] Rec. Doc. 223, p. 120, lines 2–7.

membership for associational standing.[59] Accordingly, the individuals who make up the branches of the Louisiana NAACP can be said to be "members" of the NAACP for purposes of associational standing.

The remaining elements for associational standing were also demonstrated. As the Fifth Circuit has previously held, "protecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission" at all levels of the organization.[60] Finally, because the Louisiana NAACP seeks prospective and injunctive relief instead of individualized damages, participation of individual members is not required.[61] Plaintiffs established the associational standing of the Louisiana NAACP.

### b. Organizational Standing of NAACP and BVM

An organization "can establish standing in its own name if it 'meets the same standing test that applies to individuals.'"[62] An organizational Plaintiff must demonstrate the same "injury-in-fact," traceability, and redressability required of individual plaintiffs. The Fifth Circuit has held that nonprofit organizations can suffer an Article III injury when a defendant's actions frustrate their missions and force them to "divert [] significant resources to counteract the defendant's conduct."[63] Organizational standing based on resource diversion arises when "the defendant's conduct significantly and 'perceptibly impair[s]' the organization's ability to [conduct] its 'activities—with the consequent drain

---

[59] *Friends of the Earth, Inc. v. Chevron Chem. Co.*, 129 F.3d 826, 828 (5th Cir. 1997) (citing *Hunt*, 432 U.S. at 345).

[60] *Hancock Cnty. Bd. of Supervisors v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012) ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission.").

[61] *Consumer Data Indus. Ass'n v. Tex. ex rel Paxton*, 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. 2023) ("Participation of individual members generally is not required when the association seeks prospective or injunctive relief, as opposed to damages.").

[62] *OCA-Greater Hous. v. Tex.*, 867 F.3d 604, 610 (5th Cir. 2017) (quoting *Fowler*, 178 F.3d at 356).

[63] *NAACP v. City of Kyle, Texas*, 626 F.3d 233, 238 (5th Cir. 2010).

on the organization's resources . . . .' Such injury must be 'concrete and demonstrable.'"[64]

"Not every diversion of resources to counteract the defendant's conduct, however, establishes an injury in fact."[65]

At trial, the Court was presented with testimony that, in response to the Enacted Map, BVM diverted resources away from its core mission of expanding Black voter engagement and building capacity in partner organizations.[66] Instead, BVM launched new accountability initiatives to hold elected officials accountable to Black voters in order to counteract the map's dilutive effect.[67] The Court also heard testimony that the Enacted Map caused voter apathy, requiring BVM to devote additional staff time and resources toward convincing Black voters that their votes matter.[68] The Court finds that Black registered voters were discouraged by what they perceived as deafness to their appeals at the redistricting roadshows. This voter frustration manifested in increased voter apathy, causing BVM to divert mission-specific resources to voter retention efforts.

Following the passage of the Enacted Maps, the Louisiana NAACP also undertook additional organization and mobilization efforts to counteract the effects of the Enacted Maps on voter disillusionment, potential candidates, and funders' willingness to invest resources into Black communities in Louisiana.[69]

Plaintiffs presented testimony proving that in an effort to counteract the Enacted Maps' dilutive effect, the organizational Plaintiffs diverted resources from their core

---

[64] *Id.* (internal citations omitted).
[65] *Id.*
[66] Rec. Doc. 223, p. 164, line 22–p. 165, line 3; p. 167, line 8–p. 186, line 13; p. 201, line 20–p. 202, line 5.
[67] Rec. Doc. 223, p. 177, line 2–p. 179, line 19; Pla-207; Pla-208.
[68] Rec. Doc. 223, p. 175, lines 7–17; p. 179, line 20–p. 183, line 5.
[69] Rec. Doc. 223, p. 128, line 9–p. 131, line 20.

activities toward previously unplanned response strategies.[70] Additionally, the core missions of BVM and the Louisiana NAACP—to increase power in marginalized, predominantly Black communities—are impaired by the Enacted Maps' dilutive effects.[71]

The Court concludes that the NAACP and BVM established standing at trial.

### B. Defendants' Motion to Dismiss

During trial, Defendants jointly moved to dismiss this case pursuant to Rule 12(b)(1), or alternatively, Rule 12(b)(6) of the Federal Rules of Civil Procedure.[72] Prior to this, Defendants filed a *Joint Motion to Stay Proceedings*[73] "pending resolution by the Supreme Court or the Fifth Circuit of whether Section 2 [of the Voting Rights Act] grants a private right of action and, thus, whether Plaintiffs have standing to pursue their VRA claim."[74] The Defendants brought this motion because in the separate, but related case, *Robinson v. Ardoin*, the Fifth Circuit granted Defendant, the State of Louisiana an extension of time to file a Petition for En Banc Rehearing.[75] However, the Fifth Circuit ultimately denied this petition.[76] In the petition, the State addressed whether Section 2 of the VRA confers a private right of action.[77] At trial, this Court orally denied the Motion to Stay Proceedings, but took the Motion to Dismiss under advisement until the close of evidence.[78]

---

[70] Rec. Doc. 223, p. 172, line 3–p. 173, line 7; p. 174, line 17–p. 177, line 19; p. 181, line 15–p. 183, line 5 (BVM is prevented from engaging in get-out-the-vote efforts and capacity building work with its partners in order to focus its resources on its accountability strategy and 365 voter engagement strategy); p. 131, lines 8–14 (NAACP has to pull members from working on health, education, and other projects in order to focus their efforts on combating the dilutive effects of the Enacted Maps).
[71] Rec. Doc. 223, p. 113, line 3–p. 114, line 1; p. 164, line 25–p. 165, line 3.
[72] Rec. Doc. 187.
[73] Rec. Doc. 184.
[74] Rec. Doc. 187-1, p. 3.
[75] *Id.* at p. 2.
[76] *Id.*; Rec. Doc. 210, p. 2.
[77] Rec. Doc. 187-1, p. 2.
[78] Rec. Doc. 186; Rec. Doc. 192.

In Defendants' 12(b)(1) Motion to Dismiss, Defendants argue the Court lacks subject matter jurisdiction over Plaintiffs' claims because Section 2 of the VRA does not provide a private right of action, and, as such, Plaintiffs "do not have authority to bring their Section 2 claim."[79] On a Rule 12(b)(1) motion, the party asserting the jurisdiction bears the burden of proving that jurisdiction exists.[80] Moreover, a party may challenge the Court's subject matter jurisdiction at any stage of the proceedings.[81]

Defendants rely on the Eighth Circuit's recent ruling in *Arkansas State Conference NAACP v. Arkansas Board of Apportionment*, where the Circuit Court found that § 2 of the Voting Rights Act does not confer a private right of action. The Eighth Circuit wrote, "[e]veryone agrees that § 2 itself contains no private enforcement mechanism" and the section does not state "*who* can enforce it."[82] Analyzing § 2 in conjunction with § 12 of the VRA, the Eighth Circuit discerned that § 2 of the Voting Rights Act empowers the Attorney General to "bring 'an action for preventive relief….for a temporary or permanent injunction restraining order, or other order.'"[83] Therefore, the Circuit Court concluded that Congress intended to limit the enforcement power of § 2 to the Attorney General and not extend this right to private parties.

---

[79] Rec. Doc. 187-1, p. 3.

[80] *Cell Sci. Sys. Corp. v. La.Health Serv.*, 804 F. App'x 260, 262 (5th Cir. 2020) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

[81] *See id.* ("A 'factual attack' [sic] challenges the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered. Moreover, a 'factual attack' under 12(b)(1) may occur at any stage of the proceedings, and plaintiff bears the burden of proof that jurisdiction does in fact exist.") (citing *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)) (citation omitted.)

[82] *Ark. State Conf. NAACP v. Ark. Bd. of Apportionment*, 86 F.4th 1204, 1210 (8th Cir. 2023).

[83] *See id.* ("We must look elsewhere for the who. Another provision, § 12, empowers the Attorney General to bring 'an action for preventive relief….for a temporary or permanent injunction, restraining order, or other order.'") (citing 52 U.S.C. § 10308(d)).

Although Defendants seek to use this case and task the Court with a thorough analysis of previous Supreme Court decisions and the intentions of Congress, the Court finds these steps unnecessary as the Fifth Circuit has already addressed this issue and reached a different conclusion from the Eighth Circuit, a point acknowledged by the Defendants and the Plaintiffs.[84] Defendants concede that the Fifth Circuit has addressed this issue, but argue the appellate court "did not thoroughly analyze [it]."[85]

In *Robinson v. Ardoin*, the Fifth Circuit concluded that § 2 of the Voting Rights Act confers a private right of action. The Circuit Court acknowledged that "[t]here is no cause of action expressly created in the text of Section 2" but explained that a plurality of the Supreme Court "stated that 'the existence of the private right of action under Section 2. . . has been clearly intended by Congress since 1965.'"[86] Moreover, the Fifth Circuit pointed to the Eleventh Circuit and the Sixth Circuit, both of which analyzed this issue and concluded that § 2 conveys a private right of action.[87] Finally, the Court of Appeals also relied on its precedent in *OCA-Greater Houston v. Texas*, under which it held that "the Voting Rights Act abrogated the state sovereign immunity anchored in the Eleventh Amendment."[88] The *Robinson* Court concluded that Congress "should not be accused of abrogating sovereign immunity without some purpose. The purpose surely is to allow the States to be sued by someone."[89] Unlike the Eighth Circuit decision, the Fifth Circuit turned to 52 U.S.C § 10302 of the VRA and determined that "proceedings to enforce voting guarantees in any state or political subdivision can be brought by the Attorney

---

[84] Rec. Doc. 187-1, p. 4–5; Rec. Doc. 210, p. 2.
[85] Rec. Doc. 187-1, p. 5.
[86] *Robinson v. Ardoin*, 86 F.4th 574, 587 (5th Cir. 2023).
[87] *Id.*
[88] *Id.* (discussing *OCA-Greater Houst. v. Tex.*, 867 F.3d 604 (5th Cir. 2017)).
[89] *Id.*

general or by an 'aggrieved person.'"[90] From here, the Court concluded the plaintiffs in *Robinson* were "aggrieved persons" and therefore had a right to bring their claims.[91]

District courts are bound by their circuit's decisions unless a decision is overturned by an en banc decision of their circuit court or the Supreme Court.[92] As the Fifth Circuit has already concluded that Section 2 provides a right of action to private plaintiffs, this Court is bound to this decision and will not rule counter to its precedent. Especially so because the Plaintiffs in this case are almost identical to the plaintiffs in *Robinson*.[93] For these reasons, Defendants' 12(b)(1) motion is denied.

In the alternative, Defendants move to dismiss for the same reasons, but pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. A 12(b)(6) motion must be filed before filing an answer.[94] However, pursuant to Rule 12(h)(2)(C) of the Federal Rules of Civil Procedure, a party may move to dismiss at trial for "[f]ailure to state a claim upon which relief can be granted."[95] Plaintiffs argue that Rule 12(h)(2) "does not supersede this Court's inherent power to manage its own affairs and set deadlines for motions asserting that claim."[96] The Court agrees and points out that the motion deadline in this matter was October 6, 2023.[97] However, the Court recognizes that the Defendants rely on an Eighth

---

[90] *Id.*

[91] *Id.*

[92] *In re ASARCO LLC*, 477 B.R. 661, 670 (S.D. Tex. 2012) ("District courts are bound by the law of their circuit.") (citing *Campbell v. Sonat Offshore Drilling Inc.*, 979 F.2d 1115, 1121 n.8 (5th Cir. 1992); *Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798, 800 (5th Cir.1983)). *See also La Union del Pueblo Entero v. Abbott*, 618 F. Supp. 3d 449, 501 (W.D. Tex. 2022) (The Court "is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court.") (quoting *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (citing *Soc'y of Separationists, Inc. v. Herman*, 939 F.2d 1207, 1211 (5th Cir. 1991)).

[93] Dr. Dorothy Nairne and Dr. Alice Washington are individual plaintiffs in *Robinson* and are plaintiffs in this case. Additionally, the Louisiana State Conference of the NAACP is a plaintiff in *Robinson* and is one in this case.

[94] Fed. Rul. Civ. P. 12(b)(6).

[95] Fed. Rul. Civ. P. 12(h)(2)(C).

[96] Rec. Doc. 210, p. 6.

[97] Rec. Doc. 110, p. 10.

Circuit case, which was decided in November 2023 after the Court's deadlines had passed. Under these circumstances, the Court will consider the Defendants' out of time Motion. But, as the Court has stated with respect to the 12(b)(1) motion, the Fifth Circuit has already addressed this issue. Accordingly, for the same reasons the Court denies Defendants' 12(b)(1) motion, the Court denies Defendants' 12(b)(6) motion.

Having dismissed Defendants' Rule 12 motions, Defendants request that the Court certify the private right of action challenge for interlocutory appeal.[98] "Title 28, § 1292(b) of the United States Code permits a court to certify an interlocutory appeal where (1) a controlling question of law is involved, (2) there is substantial ground for difference of opinion about the question of law, and (3) immediate appeal will materially advance the ultimate termination of the litigation."[99] "A district court cannot certify an order for interlocutory appeal unless all three criteria are present."[100] Moreover, "[i]nterlocutory appeals are generally disfavored, and statutes permitting them must be strictly construed."[101] "An interlocutory appeal should be granted pursuant to 1292(b) only in exceptional cases that meet the statutory criteria."[102] The Fifth Circuit cautions that interlocutory appeals "'do not lie simply to determine the correctness' of an order."[103]

---

[98] Rec. Doc. 187-1, p. 8 ("In the event this Court denies Defendants' motion to dismiss Plaintiffs' amended complaint (including on the basis that the Court deems itself bound by *Robinson* or *OCA-Houston*), Defendants respectfully request that the Court certify its order denying the motion to dismiss for immediate appeal pursuant to 28 U.S.C. § 1292(b).")

[99] *La. State Conf. of Nat'l Ass'n for the Advancement of Colored People v. La.*, 495 F. Supp. 3d 400, 409 (M.D. La. 2020) (citing *Rico v. Flores*, 481 F.3d 234, 238 (5th Cir. 2007)).

[100] *Id.* at 410 (citing *Gruver v. La. Through Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, No. 18-772, 2019 WL 6245421, at *1 (M.D. La. Nov. 22, 2019) (citing *Aparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981))).

[101] *Id.* (citing *Fannie Mae v. Hurst*, 613 F. App'x 314, 318 (5th Cir. 2015) (quoting *Allen v. Okam Holdings, Inc.*, 116 F.3d 153, 154 (5th Cir. 1997))).

[102] *Id.* (citing *U.S. v. Garner*, 749 F.2d 281, 286 (5th Cir. 1985), *opinion supplemented*, 752 F.2d 116 (5th Cir. 1985); *U.S. v. Bear Marine Servs.*, 696 F.2d 1117, 1119 (5th Cir. 1983).

[103] *Johnson v. Ardoin*, No. 18-625, 2019 WL 4318487 at *1 (M.D. La. Sept. 12, 2019) (quoting *Clark–Dietz & Associates–Engineers, Inc. v. Basic Constr. Co.*, 702 F.2d 67, 67–69 (5th Cir. 1983); *Tolson v. U.S.*, 732 F.2d 998, 1002 (D.C. Cir. 1984)).

To determine if an issue is a controlling question of law, the Court asks where the issue has "potential to have some impact on the course of the litigation."[104] It is not disputed that whether § 2 confers a private right of action is a controlling question of law. The answer determines whether this Court has jurisdiction to hear Plaintiffs' claims; this certainly "ha[s] some impact on the course of the litigation."

A substantial ground for difference of opinion exists where:

> a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.[105]

Defendants argue that this question is "novel," "difficult," and "of first impression" and the Eighth Circuit's decision has resulted in a circuit split.[106] Defendants contend that the Supreme Court will have to weigh in on this "unsettled law."[107] While a circuit split does exist, the Fifth Circuit Court of Appeals *has* spoken on the point. The Fifth Circuit concluded that § 2 confers a private right of action and analyzed this issue through some of the very same plaintiffs in this case. Although Defendants are critical of the Circuit's resolution in *Robinson*, an interlocutory appeal is not meant to "determine the correctness" of this decision or this Court's abidance to it.[108] A "[d]isagreement with the

---

[104] *La. State Conf. of Nat'l Ass'n for the Advancement of Colored People*, 495 F. Supp. 3d at 409 (M.D. La. 2020) (citing *U.S. v. La. Generating LLC*, No. 09-100, 2012 WL 4588437, at *1 (M.D. La. Oct. 2, 2012) (quoting *Tesco Corp. v. Weatherford Int'l, Inc.*, 722 F. Supp. 2d 755, 766 (S.D. Tex. 2010))).

[105] *Johnson*, No. 18-625, 2019 WL 4318487, at *1 (M.D. La. Sept. 12, 2019) (citing *Mitchell v. Hood*, No. 13-5875, 2014 WL 1764779, at *5 (E.D. La. May 2, 2014) (quoting *Couch v. Telescope Inc.*, 611 F.3d 629, 633 (9th Cir. 2010))).

[106] Rec. Doc. 187-1, p. 10.

[107] *Id.*

[108] *Johnson*, No. 18-625, 2019 WL 4318487 at *1 (M.D. La. Sept. 12, 2019) (quoting *Clark–Dietz & Associates–Engineers, Inc. v. Basic Constr. Co.*, 702 F.2d 67, 67–69 (5th Cir. 1983); *Tolson v. U.S.*, 732 F.2d 998, 1002 (D.C. Cir. 1984)).

Court's ruling is insufficient to establish a substantial ground for a difference of opinion."[109] Consequently because Defendants cannot satisfy the second requirement, the Court denies Defendants' request[110] to certify this order to the Court of Appeals.[111]

### C. Notice of Constitutional Question

Defendants filed a *Notice of Constitutional Question* pursuant to Federal Rule of Civil Procedure 5.1(a), asserting that "finding for Plaintiffs requires interpreting the Voting Rights Act in a way that calls its constitutionality into question."[112] Defendants claim that "[t]o grant the relief Plaintiffs seek, the Court must interpret the Voting Rights Act in a way that violates the U.S. Constitution."[113] Thereafter, the United States intervened in this case to defend the constitutionality of § 2 and submitted a brief to that end for the Court's consideration.[114]

The Court rejects Defendants' arguments, which do not facially challenge the constitutionality of § 2 itself. Instead, Defendants argue that any interpretation of § 2 that would support finding liability would necessarily call the constitutionality of § 2 into question, and any interpretation supporting a remedy in favor of Plaintiffs would violate the Constitution. In doing so, Defendants misapply the canon of constitutional avoidance, which is a means for differentiating between two competing plausible statutory

---

[109] *Id. at* \*4 (quoting *June Med. Services LLC v. Gee*, No 16-00444 2018 WL 1041301, at \*2 (M.D. La. Feb. 23, 2018) (citing *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 724 (N.D. Tex. 2006))).
[110] Rec. Doc. 187.
[111] The Court finds that Defendants can satisfy the third prong of § 1292(b) because "[a]voidance of a post-trial appeal is sufficient to satisfy the third prong." *See La. State Conf. of Nat'l Ass'n for the Advancement of Colored People*, 495 F. Supp. 3d at 416 (M.D. La. 2020) (citing *Cazorla v. Koch Foods of Miss.*, 838 F.3d 540, 548 (5th Cir. 2016)). However, all three requirements must be met for an interlocutory appeal to be granted. *See id.* at 410 ("A district court cannot certify an order for interlocutory appeal unless all three criteria are present.") (citing *Gruver*, 2019 WL 6245421, at \*1 (M.D. La. Nov. 22, 2019) (citing *Aparicio*, 643 F.2d at 1110 n.2 (5th Cir. 1981))).
[112] Rec. Doc. 178, p.1.
[113] *Id.* at p. 2.
[114] Rec. Doc. 205.

interpretations.[115] There is no such challenge here. Defendants assert an argument that was recently rejected by the Supreme Court in *Allen v. Milligan*.[116] There, the Court reiterated that the third *Gingles* precondition does not require proof of racial causation and reaffirmed the constitutionality of race sensitive remedies for § 2 violations.[117]

### D. Defendants' Rule 52(c) Motion

At the conclusion of the Plaintiffs' case, the Defendants orally moved for a judgment on partial findings pursuant to Federal Rule of Civil Procedure 52(c). The Court took that motion under advisement. Defendants re-urged the motion at the conclusion of trial. The Court took the motion under advisement and set a post-trial briefing schedule for the parties. For the following reasons the Defendants 52(c) Motion is Denied and the Court will enter judgment in favor of the Plaintiffs.

## IV.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. *Gingles* I

The first precondition requires Plaintiffs to establish that a "'minority group [is] sufficiently large and geographically compact to constitute a majority' in some reasonably configured legislative district."[118] Satisfying this precondition is necessary to show that "the minority has the potential to elect a representative of its own choice in some single-member district."[119] In a vote dilution claim, as here, *Gingles I* condition requires the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice.[120] This does not

---

[115] *Clark v. Martinez*, 543 U.S. 371, 385 (2005).
[116] 599 U.S. at 25–26.
[117] *Id.*
[118] *Cooper v. Harris*, 581 U.S. 285, 301 (2017) (citing *Thornburg v. Gingles*, 478 U.S. 30, 50 (1986)).
[119] *Bartlett v. Strickland*, 556 U.S. 1, 15 (2009) (quoting *Grove v. Emison*, 507 U.S. 25, 40 (1993)).
[120] *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994).

mean that a minority group must have the "most potential, or [even] the best potential" to elect their chosen candidate.[121] *Gingles I* does not require such a high standard. Relatedly, establishing a "minority group is sufficiently large" does not require a showing that a group is overwhelmingly populating a district, but merely that a minority group is greater than 50 percent of a district's population.[122] This requirement is analyzed in terms of Black voting-age population ("BVAP") because "only eligible voters affect a group's opportunity to elect candidates."[123]

Under the compactness inquiry, the Court should examine whether an illustrative plan abides traditional districting principles such as respecting communities of interest, including reasonably shaped districts, ensuring districts are contiguous, and avoiding pairing incumbents.[124]

Redistricting in Louisiana is further guided by Joint Rule 21.[125] Joint Rule 21 codifies traditional redistricting criteria, such as contiguity, protecting communities of interest, and respecting the traditional boundaries. Joint Rule 21 additionally requires that "districts are substantially equal in population," prohibiting "an absolution deviation of population which exceeds plus or minus five percent of the ideal district population."[126] Additionally, "[t]o the extent practicable, each district within a redistricting plan submitted

---

[121] *Bartlett*, 556 U.S. at 15.
[122] *See Id.* at 19–20 ("It remains the rule, [sic], that a party asserting § 2 liability must show by a preponderance of the evidence that the minority population in the potential election district is greater than 50 percent.")
[123] *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429 (2006).
[124] *See supra* notes 16–18.
[125] Joint-56, Enacted by the Louisiana Legislature in 2021 in anticipation of the 2022 redistricting cycle. Testimony of former Senate President Page Cortez, Rec. Doc. 228, pp. 22-23.
[126] Joint-56; Joint Rule 21(D)(2) H.C.R 90, 2021 R.S. (June 11, 2021).

for consideration shall contain whole election precincts" also known as "Voting Tabulation Districts" ("VTDs").[127]

To satisfy the first precondition, Plaintiffs offered Mr. William S. Cooper. The parties stipulated and the Court accepted Mr. Cooper to give opinion testimony in the fields of demographics, census data, and redistricting.[128] Cooper provided an Illustrative Plan to show "whether the African American population in Louisiana is 'sufficiently large and geographically compact' to allow for the creation of additional majority-Black State House and State Senate districts beyond those [created in the Enacted Map]."[129] Cooper has testified in approximately 55 cases at trial and 55 cases through deposition and declaration, and "probably 95 percent of [these] cases have related to redistricting" and Section 2 cases."[130] Additionally, as of 2023, he prepared illustrative election plans for Section 2 litigation in 23 states, including Louisiana prior to this case.[131]

Cooper used data from the U.S. Census Bureau as well as socioeconomic data reported in the American Community Survey ("ACS") on African Americans and non-Hispanic Whites.[132] Using Maptitude software and shape files produced from the U.S. Census Data and the Louisiana Legislature, Cooper created an Illustrative Plan for the State House and the State Senate.[133] According to Cooper, Maptitude is "probably the primary software used for redistricting purposes at the state legislative level and is also [sic] used by many local governments around the country. . . ."[134] Cooper determined that

---

[127] Joint-56; Joint Rule 21(G)(1) H.C.R 90, 2021 R.S. (June 11, 2021).
[128] Rec. Doc. 212, p. 113; Pla-21. The parties stipulated to the admission of Mr. Cooper's report and rebuttal report. Pla-20; Pla-89.
[129] Pla-20, p. 4.
[130] Rec. Doc. 212, p. 107.
[131] Pla-21, p. 1.
[132] Rec. Doc. 212, p. 114, line 9–p. 116, line 10.
[133] Rec. Doc. 212, p. 119, lines 13–22.
[134] Rec. Doc. 225, p. 17, lines 11–15.

three additional reasonably configured majority-Black districts could be created for the State Senate and an additional six majority-Black districts could be created for the State House.[135] The Court found Coopers testimony credible and persuasive, his methodology sound and the resulting conclusions reliable.

### i.    Demographic and Socioeconomic Changes in Population

Cooper testified, and the data established, that between 2000 and 2020 Louisianas White population declined and Louisiana's Black population increased.  According to U.S. Census data in 2000 African Americans comprised 32.86 percent of the state's population but as of 2020, that segment of the population increased to 33.13 percent of the state population.[136] This is the "second highest proportion [of African Americans] of any state in the nation."[137] U.S. Census data shows that the African American population is somewhat dispersed across the state, with higher concentrations in urban areas.[138]

 As of 2020, Non-Hispanic Whites comprised 55.75 percent of Louisiana's population.[139] While Non-Hispanic Whites remain the largest ethnic group within the state, this percentage significantly decreased from the Non-Hispanic White population in 2000.[140] In 2000, Non-Hispanic Whites comprised 60.33 percent of the state population.[141]

---

[135] Rec. Doc. 212, p. 119, lines 16–22.
[136] Pla-20, p. 9.
[137] *Id*. at p. 10.
[138] *Id*. ("Black Louisianans are present in substantial numbers in every region and sub-region").
[139] *Id*. at p. 9.
[140] *Id*.
[141] *Id*.

The 2020 census data indicates that the Non-Hispanic White Voting Age Population ("WVAP") was 58.31 percent whereas the BVAP was 31.25 percent.[142] In 2000, the WVAP was 65.51 percent and the BVAP was 29.95 percent.[143]

Considering population change by metropolitan statistical area ("MSA"), Cooper observed a pattern of white exodus from MSAs between 2000 and 2020. Cooper found that in six of the nine MSAs in the state, the White population decreased.[144] Cooper reported that the total Non-Hispanic White population decreased by over 200,000 between 2000 to 2020.[145] In contrast, in eight of the nine MSAs, the Black population increased.[146] In his direct testimony, Cooper pointed to the Baton Rouge MSA as an example of the significant increase in the Black population in an MSA. Between 2000 and 2020, the Baton Rouge MSA saw an increase in the Black population by slightly more than 60,000. Cooper concluded that the "growth in the Baton Rouge MSA would amount to almost two House districts."[147] The population statistics cited by Cooper were undisputed. The Court credits Cooper's population testimony and adopts the population statistics cited by Cooper as findings of fact.

### ii.    Illustrative Districts

In the Enacted Senate Map, there are 11 majority-Black senate districts.[148] Cooper opines that three additional reasonably configured majority-Black districts can be created

---

[142] *Id*. at p. 15.
[143] *Id*. at p. 14.
[144] *Id*. at p. 19.
[145] *Id*. at p. 20.
[146] *Id*. at p. 18.
[147] Rec. Doc. 225, p. 15.
[148] Pla-33. District 5 (50.24 BVAP percentage); District 24 (53.09 BVAP percentage); District 29 (56.56 BVAP percentage); District 4 (57.2 BVAP percentage); District 3 (57.27 BVAP percentage); District 2 (57.75 BVAP percentage); District 14 (58 BVAP percentage); District 7 (59.46 BVAP percentage); District 34 (63.74 BVAP percentage); District 39 (63.75 BVAP percentage); District 15 (73.87 BVAP percentage); *see*

for a total of 14 majority-Black districts.[149] Cooper's Illustrative Senate Plan creates Senate District 28 covering Shreveport and Bossier City MSA; Illustrative Senate District 17 covering the Baton Rouge MSA; and Illustrative Senate District 19 covering the New Orleans MSA.[150]

In the Enacted House Map, there are 29 majority-Black districts.[151] Cooper opines that six additional reasonably configured majority-Black districts can be created for a total 35 majority-Black house districts.[152] The Illustrative House Plan creates Illustrative House District 1 covering the Shreveport and Bossier City MSA; Illustrative House District 23 covering the Natchitoches area and Shreveport-Bossier City MSA; Illustrative House District 38 covering the Lake Charles MSA; and Illustrative House Districts 60, 65, and 68 which cover the Baton Rouge MSA.[153] Figures 13 and 24[154] of Cooper's report illustrate the location of these additional majority-Black districts.

---

*also Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced in Pla-20, p. 31).

[149] Pla-20, p. 6.

[150] *Id.* at p. 6–7.

[151] Pla-40. District 23 (50.86 BVAP percentage); District 67 (51.85 BVAP percentage); District 72 (52.67 BVAP percentage); District 83 (54.57 BVAP percentage); District 40 (54.58 BVAP percentage); District 62 (55.08 BVAP percentage); District 96 (55.13 BVAP percentage); District 21 (55.09 BVAP percentage); District 11 (56.4 BVAP percentage); District 93 (56.6 BVAP percentage); District 58 (56.76 BVAP percentage); District 57 (57.86 BVAP percentage); District 87 (59.07 BVAP percentage); District 44 (59.45 BVAP percentage); District 101 (60.22 BVAP percentage); District 16 (62.5 BVAP percentage); District 17 (63.26 BVAP percentage); District 26 (64.33 BVAP percentage); District 102 (65.58 BVAP percentage); District 2 (67.38 BVAP percentage); District 63 (69.65 BVAP percentage); District 4 (72.07 BVAP percentage); District 97 (72.34 BVAP percentage); District 34 (72.57 BVAP percentage); District 29 (73.56 BVAP percentage); District 3 (73.86 BVAP percentage); District 61 (75.29 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage); *see also Statistics*, https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (referenced in Pla-20, p. 45).

[152] Pla-20, p. 6.

[153] *Id.*

[154] In Figures 13 and 24, additional majority-Black districts are shaded in red and labeled by a blue district number. In Figure 24, which shows the Illustrative House Map, House Districts 65 and 68 are too small to completely display their entire shapes and show they are shaded in red. The Court can decipher that these two districts are additional majority-Black districts from Cooper's expert report, where he writes "[t]he map in Figure 24 displays six additional majority-Black districts (in red with small blue labels) in the Illustrative House: Illustrative HD 1—Shreveport-Bossier City MSA, Illustrative HD 23—Natchitoches area and



Figure 13: Location of 3 Additional Majority-Black Districts in Illustrative Senate Plan



Figure 24: Location of 6 Additional Majority-Black Districts
in Illustrative House

### a. Numerosity

Cooper's Illustrative Senate Plan contains 14 majority-Black districts with a BVAP greater than 50 percent. The majority-Black districts in Cooper's Illustrative Senate Plan contain the following BVAP populations: District 2 (51.73%); District 3 (51.3%); District 4 (58.15%); District 7 (52.29%); District 14 (58.08%); District 15 (54.45%); District 17

Shreveport-Bossier City MSA, Illustrative HD 38—Lake Charles MSA, and Illustrative HDs 60, 65, and 68—Baton Rouge MSA." Pla-20, p. 43.

(52.48); District 19 (50.97%); District 24 (52.05%); District 29 (50.93%); District 34 (63.02%); District 38 (53.17%); and District 39 (52.46%).[155] Cooper used the Enacted Senate Map as a starting point for the Illustrative Senate Plan. The Illustrative Senate Plan makes no changes to Senate Districts 11, 12, 16, and 37.[156] Overall, 74 percent of the state's core population[157] was undisturbed from the Enacted Senate Map.

To create new majority Black districts, Cooper "unpacked"[158] and "uncracked"[159] a number of the districts in the Enacted Senate Map. In the Enacted Senate Map, Senate District 39 has a BVAP of 63.75 percent.[160] Cooper "unpacked" this district and incorporated populations of Enacted Senate Districts 31 and 36 into Illustrative Senate District 38, resulting in Illustrative Senate Districts 38 and 39 both being majority Black.[161] Similarly, when drawing Illustrative Senate District 17, which covers Pointe Coupee, Iberville, West Baton Rouge, and part of East Baton Rouge, Cooper "unpacked" Senate District 15 of the Enacted Senate Map and derived population in part from Senate District 14.[162] In the Enacted Senate Map, Senate District 15 has a BVAP of 73.9 percent and Senate District 14 has a BVAP of 58 percent.[163] This resulted in Districts 14, 15, and 17

---

[155] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).
[156] Pla-20, p. 30.
[157] Cooper defined "core population" as the "largest district-level subset of a population that is kept together in the shift from one plan to another (without taking into account changes in district number or changes in incumbent representation)." Pla-20, p. 30, n.35.
[158] "Packing" is a term of art describing "election districts where a minority population is unnecessarily concentrated, resulting in an overall dilution of minority voting strength in the voting plan." *Id.* at p. 26, n.32.
[159] "Cracking" is a term of art describing "election districts that fragment or divide the minority population, resulting in an overall dilution of minority voting strength in the voting plan." *Id.* at n.31.
[160] Pla-20, p. 37; *see also* "Statistics" https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).
[161] Pla-20, p. 37; *see also Statistics*,
Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).
[162] Pla-20, p. 39.
[163] Pla-20, p. 39; *see also Statistics*,
Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).

becoming majority-Black districts in the Illustrative Senate Plan, while also decreasing, or unpacking, the BVAP in Illustrative Senate District 15 to 54.45 percent.[164] Cooper explained that in creating Illustrative Senate District 19 in the New Orleans-Metairie MSA he "uncrack[ed]" Senate Districts 5, 7,8, 10, and 19 of the Enacted Senate Map.[165] Cooper indicates that a majority-Black district could be created because Senate District 19 of the Enacted Senate Map "cuts across parts of the parishes of Lafourche, St[.]John the Baptist, St. Charles, and Jefferson – in the process submerging a large Black population in a majority-White District."[166] Cooper's Illustrative Senate Plan transforms the BVAP of Senate District 19 from 28.69 percent to 51 percent.[167] The Court credits Cooper's testimony and finds that Enacted Senate Districts 5, 7, 8, 10, 15, 19, and 39 were packed with BVAP or that BVAP was cracked among the identified Enacted Senate Districts. The Court finds that BVAP in Enacted Senate Districts 5, 7, 8, 10, 15, 19, and 39 were packed or cracked and that reassignment of BVAP resulted in three additional reasonably configured majority BVAP Senate Districts, namely Illustrative Senate Districts 28, 17 and 19.

Turning to the Illustrative House Plan, the majority-Black districts in Cooper's Illustrative House Plan contain the following populations: Illustrative House District 1 (55.33%); Illustrative House District 2 (67.34%); Illustrative House District 3 (58.85%); Illustrative House District 4 (57.53%); Illustrative House District 5 (50.86%); Illustrative House District 11 (55.55%); Illustrative House District 16 (59.76%); Illustrative House

---

[164] Pla-20, p. 39.; *see also* "Statistics", https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

[165] Pla-20, p. 41.

[166] *Id.* at p. 42.

[167] *Id.*; *see* also *Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

District 17 (54.48%); Illustrative House District 21 (54.28%); Illustrative House District 23 (50.56%); Illustrative House District 26 (63.38%); Illustrative House District 29 (57.77%); Illustrative House District 34 (50.03%); Illustrative House District 38 (50.84%); Illustrative House District 40 (54.88%); Illustrative House District 44 (60.92%); Illustrative House District 57 (53.43%); Illustrative House District 58 (51.27%); Illustrative House District 60 (52.83%); Illustrative House District 61 (50.2%); Illustrative House District 63 (57.2%); Illustrative House District 65 (56.03%); Illustrative House District 67 (51.58%); Illustrative House District 68 (54.21%); Illustrative House District 69 (50.2%); Illustrative House District 72 (50.6%); Illustrative House District 83 (54.57%); Illustrative House District 87 (59.07%); Illustrative House District 93 (56.6%); Illustrative House District 96 (55.55%) Illustrative House District 97 (72.34%); Illustrative House District 99 (78.11%); Illustrative House District 100 (80.78%); Illustrative House District 101 (50.75%); and Illustrative House District 102 (65.58%).[168] Cooper points out and the Court finds that 78.5 percent of the core population in the Enacted House Map remains in the same districts in the Illustrative House Plan.[169]

Cooper identified several Enacted House districts with packed and cracked BVAPs. By unpacking and uncracking Enacted House districts Cooper illustrated that six additional reasonably configured majority BVAP House districts could be drawn. With Illustrative House District 1, Cooper "unpacked" House District 2 and 4 in the Enacted House Map. As a result, these districts in the Illustrative House Plan have BVAPs of 67.34

---

[168] *See* "Statistics", https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).
[169] Pla-20, p. 44.

percent and 57.53 percent, respectively.[170] For comparison, the BVAPs for these two districts in the Enacted House Map are 67.4 percent and 72.1 percent.[171] With respect to Illustrative House District 23, another majority-Black district, Cooper testified that this majority-Black district existed under the 2011 Benchmark Plan, but "for reasons that [he] still [doesn't] know, it was eliminated in the adopted plan."[172] On Illustrative House District 38, Cooper concluded that a second majority-Black district could be created in this area due to the "growing Black population since 2000 in the Lake Charles MSA ([an increase of] 14,322), coupled with no growth in the White population ([a decrease of] 676)."[173] Cooper found that he had to "unpack" Enacted House District 34 and "uncrack" Enacted House Districts 35 and 37 to create Illustrative House District 38. In the Illustrative House Plan District 34 holds a BVAP of 50.3 percent compared to 72.6 percent in the Enacted House Map.[174] House Districts 35 and 37 contain BVAPs of 8.71 percent and 18.65 percent compared to 12.5 percent and 17.6 percent in the Enacted House Map.[175] Finally, Cooper concluded that three additional majority-Black districts could be created in the Baton Rouge MSA. Cooper created Illustrative House Districts 60, 65, and 68 majority-Black districts. Again, Cooper found if several of the house districts in the Enacted House

---

[170] *Id.* at p. 50; *See also* https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at pla-20, p. 45).

[171] Pla-20, p. 50.

[172] Rec. Doc. 225, p. 48, lines 20–21.

[173] Pla-20, p. 53.

[174] *Id.* at p. 54; *see also Statistics,*

Dave's  Redistricting,  https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).

[175] Pla-20, p. 54*; see also Statistics,*

Dave's  Redistricting*,*  https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).

Map were "unpacked" and "uncracked," these additional majority-Black districts could be created.[176]

The Court credits Cooper's testimony and finds that Enacted House Districts 2, 4, 5, 7, 13, 22, 25, 29, 34, 35, 37, 60, 61, 63, 65, 68, 69, and 70 were packed with BVAP or that BVAP was cracked among the enacted House districts. The Court finds that unpacking and uncracking in those House districts results in six additional reasonably configured majority BVAP House districts as illustrated by Mr. Cooper.

On cross-examination, Cooper acknowledged that in order to create additional majority-Black districts he was required to "lower the BVAP in many other existing majority-Black districts."[177] He explains this is "reduc[ing] packing" because "some of [the] districts [in the Enacted Maps] are in the 70s or higher in Black voting-age population."[178] Cooper compares the 2020 BVAP in majority-Black districts to the 2020 Non-Hispanic WVAP in majority-White districts in both the Enacted Maps and the Illustrative Plan. As shown below, there is a wider range between the percentage of the BVAP in majority-Black Districts and the Non-Hispanic WVAP in majority-White districts in the Enacted Maps as compared to the Illustrative Plan.[179] Cooper observed that "in some ways this [wider range in the Enacted Maps] is sort of a preliminary indicator, a prima facia indicator of cracking and packing. . . . [T]his huge gap—while it doesn't prove that there's packing or cracking, it draws one's attention to it."[180] The Court finds that the data captured in

---

[176] Rec. Doc. 225, p. 54, lines 1–6 (Cooper explains he drew three new districts in East Baton Rouge); *see also* Pla-20, pp. 55-61.
[177] Rec. Doc. 225, p. 66, lines 9–10.
[178] *Id.* at p. 66, lines 11–12.
[179] Pla-20, pp. 35, 48.
[180] Rec. Doc. 225, p. 37, lines 11–14.

Figures 16 and 27 below are probative evidence of cracking and packing BVAP in enacted districts.

**Figure 16: Same Race VAP in Majority-Black and Majority-White Districts Statewide 2022 Senate and Illustrative Senate**

| Legislative Plan | 2020 Black VAP in Majority Black Senate Districts | 2020 NH White VAP in Majority White Senate Districts | Statewide Difference |
|---|---|---|---|
| 2022 Senate | 53.6% | 84.4% | -30.8% |
| Illustrative Senate | 60.6% | 77.9% | -17.3% |

**Figure 27: Same Race VAP in Majority-Black and Majority-White Districts Statewide – 2022 House and Illustrative House**

| Legislative Plan | 2020 Black VAP in Majority Black House Districts | 2020 NH White VAP in Majority White House Districts | Statewide Difference |
|---|---|---|---|
| 2022 House | 55.6% | 83.4% | -27.8% |
| Illustrative House | 61.1% | 77.4% | -16.3% |

Cooper testified that in the process of unpacking and uncracking BVAP he was "positive [he] could have drawn districts with much higher Black VAPs, but [sic] [he was] taking into account other factors."[181]

### b. Compactness

The inquiry of compactness requires the map drawer to consider traditional redistricting principles. Relative to the Illustrative Plan Cooper's considerations of each are summarized below.

---

[181] *Id.* at p. 66, lines 9–11.

## 1.  District Shapes

As mentioned, the shape of a district is relevant as "bizarre shap[es]" that "cut []
across precinct lines . . . or [other] traditional divisions" can suggest racial manipulation.[182]
Cooper testified as part of the "general inquiry" of *Gingles* I, that he "made a point of trying
to draw reasonably shaped compact districts. . . ."[183] Further, he explained that while
some illustrative districts may appear "odd shaped," these shapes result from "following
the Mississippi River or following a municipal boundary."[184] On cross-examination, he
pointed to Enacted Senate District 29, calling it a "bizarre shaped district" [which he
addressed in his Illustrative Senate Plan]."[185] The Court finds the shapes of the districts
in the Illustrative Plan are reasonable considering geographic vagaries created by
waterways and considering the respect given to traditional boundaries such as VTDs and
parish lines.

## 2.  Contiguity

Cooper testified that he understood contiguity to be another traditional redistricting
principle.[186] A district is considered contiguous if it is "connected into one piece."[187]
Cooper accounted for contiguity in his map drawing through Maptitude. He testified,
"Maptitude has a check, a little module that you just press a button [and] it'll tell you if
there's not a contiguous district in front of you."[188] The Court finds that the districts in the
Illustrative Plan are contiguous.

---

[182] *Vera*, 517 U.S. at 980–81.
[183] Rec. Doc. 225, p. 61, lines 18–19.
[184] *See id*. at p. 22, lines 3–4.
[185] *Id.* at p. 69, line 2.
[186] *Id.* at p. 29, lines 2–3.
[187] *Ala. State Conf. of Nat'l Ass'n for Advancement of Colored People*, 612 F. Supp. 3d at 1263 (M.D. Ala. 2020) (quoting *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 395, 424 (M.D. La. 2017)).
[188] Rec. Doc. 225, p. 29, lines 9–11.

### 3.  Preservation of Communities of Interest

Turning to the next principle, the preservation of communities of interest, Cooper observed that the state does not define the term "community of interest."[189] Joint Rule 21 does not provide a definition and the term has no universal definition. The Brennan Center for Justice defines "communities of interest" as "groups of individuals who are likely to have similar legislative concerns, and who might therefore benefit from cohesive representation in the legislature."[190] Cooper relied on this definition in drawing his illustrative maps. Cooper testified that he "looked at the cultural regions like Acadiana which is [sic] defined by the State Legislature. . . [and a] definition for the river parishes and a tighter definition for [sic] what is called the Cajun Heartland and [sic] the Florida parishes."[191] He also "looked at. . .planning districts that encompass all of the parishes in Caddo."[192] He determined that he "should try to keep together [these regions] to the extent possible."[193] Further, Cooper testified that he reviewed socioeconomic characteristics at parish and municipal levels to provide a contextual background when considering communities of interest.[194]

Plaintiffs offered expert witness Dr. Craig Colten to provide opinion testimony on the historical geography of Louisiana and address the communities of interest inquiry. Dr. Colten is a retired tenured professor from Louisiana State University's Department of Geography and Anthropology.[195] He holds a Bachelor of Arts, Master of Arts, and Ph.D.

---

[189] Id. at p. 83, lines 21–22.
[190] Pla-20, pp. 7–8 n.13.
[191] Rec. Doc. 225, p. 32, lines 13–21.
[192] *Id.* at p. 32, lines 24–25.
[193] *Id.* at p. 32, lines 21–22.
[194] Pla-20, pp. 30, 44.
[195] Pla-130, p. 1.

in Geography.[196] Dr. Colten has experience in analyzing community formation as he worked in conjunction with the State's Department of Mineral Management Service completing a series of studies on environment justice.[197] As part of this series, he analyzed both racial and low income communities in the state.[198] Dr. Colten has 20-plus years of experience researching and writing about the historical geography of Louisiana.[199] Dr. Colten has provided deposition testimony 24 times and court testimony three times in state and federal cases.[200] However, he has not provided expert testimony in a redistricting case prior to this case.[201] The Defendants stipulated to Dr. Colten's expertise in the historical geography of Louisiana and the Court admitted his opinion testimony in this field [202]

Dr. Colten was asked to provide quantitative and qualitative evidence of "the historical and current status of communities of interest" in the Red River Parishes, Caddo/Bossier Parishes, Acadiana, and the River Parishes, or that is, the areas addressed by Mr. Cooper in his Illustrative Plan.[203] Dr. Colten was also asked to "review the Legislative Senate and House districts and compare the boundaries of those districts in terms of their geographic correspondence to historical communities of interest."[204] Dr. Colten relied on "methods common in [his] specialty" such as reviewing books, academic

---

[196] *Id.* at p. 2
[197] Rec. Doc. 212, p. 11, lines 17–23.
[198] *Id.*
[199] Pla-129, p. 3.
[200] Pla-130, pp. 11–12.
[201] Rec. Doc. 212, p. 17, lines 2–4.
[202] Dr. Colten's expert, supplemental, and rebuttal reports were admitted into evidence by stipulation of the parties. Pla-129; Pla-131; Pl-132.
[203] Pla-129, p. 2.
[204] Rec. Doc. 212, p. 19, lines 19–22.

publications, reports, news, and scholarly work to draw conclusions about the "cultur[al] histories of each area and the communities of interest there."[205]

Under Dr. Colten's analysis he defined community of interest as a "group of people with comparable, similar social, cultural, economic, [and] political interests within a given territory."[206] Dr. Colten provided opinion evidence of the settlement history, economic landscapes, and cultural identifiers for the Red River Parishes, Acadiana region, River Parishes, and Jefferson Parishes.

Starting with the Red River Parishes, Dr. Colten examined the Natchitoches and Cane River territory. In his expert report, he notes the community is influenced by French colonialism because early French settlement resulted in French being the dominant language and Catholicism becoming the dominant faith in the territory among White and Black people. A particular rural region of the state, this territory was known for significant cotton cultivation. Additionally, a growing population of freed Black people at Isle Brevelle, an area downstream from Natchitoches, led to increased Black wealth in this territory and the formation of business relationships between freed Black people and White Creoles.[207] However, following the Civil War, the area was plagued with racial tensions and violence. As an example, Dr. Colten pointed out that between 1865 and 1878, the murder rate in Red River valley was "four times that of the second most violent area in Louisiana."[208] Dr. Colten observed that "[w]ith the exception of Grant Parish, the parishes [in this territory]

---

[205] Pla-129, p. 3.
[206] Rec. Doc. 212, p. 20, lines 9–11.
[207] Pla-129, pp. 7–8.
[208] *Id.* at p. 9.

are near or above the state average for African American population (33%) and [the] percent of [the state] population living in poverty (17.8%)."[209]

Dr. Colten also reviewed the cultural and historical developments in Caddo and Bossier Parishes. Finding parallels to the Natchitoches and Cane River territory, this area also saw expanding cotton cultivation, especially so after the "clearing of the 'Great Raft,'" which removed a log jam in Shreveport and increased movement of settlers through Shreveport's riverport.[210] The area was also plagued with intense racial violence throughout Reconstruction, so much so that Caddo Parish was labeled "Bloody Caddo."[211] Dr. Colten notes that in Reconstruction, Caddo held the highest number of homicides in Louisiana, which is "a notoriously violent state."[212] Dr. Colten expands on the cultural and social effects following Bossier becoming a major Air Force base. The parish saw massive growth in adult entertainment and night clubs, and as segregation remained the norm of the time, segregated entertainment districts grew.[213] Dr. Colten concluded that Shreveport's majority-Black population compared to Bossier's low suburban Black population today "reflect[s] [W]hite flight."[214] Dr. Colten determined that this white flight had its genesis following a 1970 court order requiring desegregation, which prompted White families from the city of Shreveport to migrate to Bossier Parish and more distant suburbs.[215]

Moving to the Acadiana region, Dr. Colten discussed the settlement history of the Acadians, which originated from a "singular diaspora of families from Acadie (or Nova

---

[209] *Id.* at p. 6.
[210] *Id.* at p. 12.
[211] *Id.*
[212] *Id.*
[213] *Id.* at p. 13.
[214] *Id.* at p. 12.
[215] *Id.* at p. 13.

Scotia, Canada) in the 18th century."[216] Dr. Colten provided insight on the economic diversity of this region. For example, the economy was supported by the extraction of oil and gas as well as marine fisheries. Additionally, in the east, sugar cane cultivation dominated, whereas in the west, rice growing bolstered the economy.[217] There was in-migration into this region following the discovery of oil and the sugar cane cultivation. Dr. Colten discussed the different cultural groups in the region: Cajuns or White residents, and "Creoles of color" or residents with African heritage who were identified by their French language history.[218] Dr. Colten found that Creoles of color "identified as a separate social class, neither Black nor [W]hite."[219] Creoles of color populated St. Landry Parish within the Acadiana region.

Through his research on the River Parishes,[220] Dr. Colten concluded that the colonization along the Mississippi River led to the River Parishes retaining "a mix of European residents" including Acadians, French Creoles, the Spanish, and Germans.[221] And as planters moved into the region, cotton cultivation dominated more in West Feliciana and East Baton Rouge Parishes, whereas parishes such as Pointe Coupee and St. John the Baptist saw much more sugar cane cultivation.[222] These differentiations were exhibited also culturally, as West Feliciana and East Baton Rouge saw much more Anglo

---

[216] *Id.* at p. 14.
[217] *Id.*
[218] *Id.* at p. 17.
[219] *Id.*
[220] The River Parishes, or those that are "adjacent to the Mississippi River" are Pointe Coupee, West Baton Rouge, Iberville, Assumption, Ascension, St. James, St. John the Baptist, St. Charles, and Jefferson on the west bank. On the east bank of the river, West Feliciana, East Feliciana, East Baton Rouge, and Livingston are culturally considered the Florida Parishes, but Dr. Colten discusses West Feliciana and East Baton Rouge when discussing the River Parishes as a comparison. With respect to Jefferson Parish, Dr. Colten proposes that the parish is "an anomaly among the parishes along the lower Mississippi River and deserves separate consideration." *Id.* at pp. 18–23.
[221] *Id.* at p. 20.
[222] *Id.* at pp. 18–19.

settlers, in contrast to the rest of the River Parishes which were strongly influenced by French settlers and culture.[223] West Feliciana and East Baton Rouge were "culturally part of the Florida Parishes."[224] As both cotton and sugar cane cultivation relied on slave labor, there were Black workers in this region, but as a demand for farm labor decreased, many Black people began to migrate further south in the region, especially so into Baton Rouge.[225] Dr. Colten explains that these communities became "the sites of environmental justice struggles" when the large-scale petrochemical industry developed in the 20th century, leading to African American-led environment justice campaigns in these communities.[226]

With Jefferson Parish, Dr. Colten concluded that the parish "is an anomaly among the parishes along the lower Mississippi River and deserves separate consideration."[227] Colten contends that "[d]espite its proximity, Jefferson Parish is separate from New Orleans in many ways."[228] Dr. Colten found that the parish is significantly segregated, as the east bank of the Mississippi River, which runs through the parish, is highly populated by White and Hispanic people whereas the west bank is heavily populated by Black people.[229] Dr. Colten found similar segregation of economic activities, as ship-building and petrochemical industries clustered on the west bank whereas retail and commercial activity dominated the east bank.[230] "Superior flood protection on the east bank and flood prone neighborhoods in the west bank further reinforced racial segregation."[231] Dr. Colten

---

[223] *Id.*
[224] *Id.* at p. 19.
[225] *Id.* at p. 21.
[226] *Id.* at p. 22.
[227] *Id.* at p. 23.
[228] *Id.* at p. 24.
[229] *Id.*
[230] *Id.*
[231] *Id.* at p. 25.

concluded that "[s]egregation has contributed to community formation and group identity" in Jefferson Parish.[232]

Dr. Colten concluded that the Illustrative Plan preserved communities of interest, whereas some of the communities of interest were not maintained in the Enacted Maps. For example, addressing Illustrative House District 23, Dr. Colten found that the Illustrative Plan "keeps Natchitoches basically together within one effective municipality."[233] However, in this same region in the Enacted Maps, the districts "[create] a stark boundary" between DeSoto Parish and the Red River Parishes although "in many respects [they] had a comparable sort of history."[234] Moreover, he concluded that in the Enacted Maps, "the city [of Natchitoches] is basically taken out from Natchitoches Parish and put into Grant."[235] Similarly, when discussing Illustrative Senate District 19 and comparing it to its counterpart in the Enacted Senate Map, Dr. Colten concluded that the "strong sense of identity" of Jefferson Parish was retained in the illustrative district, but "discontinuity" existed in the enacted counterpart. Dr. Colten discerned that the district in the Enacted Senate Map lost a "big chunk of its territory" to a neighboring district.[236]

The Court found Dr. Colten's testimony credible and well supported by his research. The Court credits Dr. Colten's testimony regarding communities of interest and finds that Shreveport and Bossier form a community of interest; Natchitoches and the Red River Parishes, including DeSoto Parish ,form a community of interest; the River Parishes

---

[232] *Id.*
[233] Rec. Doc. 212, p. 41, lines 21–22.
[234] *Id.* at p. 42, lines 10–12.
[235] *Id.* at p. 42, lines 19–21.
[236] *Id.* at pp. 42, 63.

comprise a community of interests; and Jefferson Parish is a community of interest distinct from Orleans.

### 4.  Compactness Measures

For measuring compactness, Mr. Cooper "visually looked at the districts" but also cross-checked this "eye test" with traditional compactness measures such as the Reock, Polsby-Popper, and Area/Convex Hull tests.[237] Each test provides a score "between 0 and 1, with 1 being the most compact"[238] and are measured in Maptitude. Cooper testified that a compactness score of 1 would produce an area that is a "perfect circle."[239] But, because districts are usually not perfect circles, it is common for districts that are reasonably compact to be in a range of .20 and .40.[240] With the Polsby-Popper test, he testified that because of the "nature of the calculation," this test usually produces a lower compactness score than the Reock test, and the Area/Convex Hull test "typically" results in a higher score because "it discounts for [sic] odd shaped districts."[241] He continued, "[the Area/Convex Hull test provides] a way to take into account some areas that appear to have very low scores under Polsby-Popper, but perhaps for a good reason if you are following the Mississippi River or following a municipal boundary, which oftentimes can be odd shaped."[242]

Cooper's conclusions that the Illustrative Senate Plan was "unquestionably more compact" than the Enacted Senate Map and that the house districts in the Enacted House

---

[237] Rec. Doc. 225, p. 20 line 5–p. 22, line 4.
[238] Id. at p. 21, lines 1–3; Pla-120, p. 32 at n.37.
[239] Rec. Doc. 225, p. 21, line 2.
[240] *Id.* at p. 21, lines 3–4.
[241] *Id.* at p. 21, lines 11–12, 19–25.
[242] *Id.* at p. 22, line 25–p. 22, line 4.

Map and the Illustrative Plan are "about the same in terms of compactness" were supported by the record.[243]

Figures 25 and 14 provide the lowest, highest, and mean compactness scores under the Polsby-Popper and Reock Tests:[244]

**Figure 25: Compactness Scores – 2022 House vs. Illustrative House**

|  | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
|  | Mean | Low | High | | Mean | Low | High |
| **2022 House** | | | | | | | |
| All Districts (mean avg.) | .40 | .13 | .63 | | .29 | .05 | .63 |
| 29 Majority-Black Districts | .38 | .13 | .51 | | .27 | ..15 | .46 |
| **Illustrative House** | | | | | | | |
| All Districts (mean avg.) | .40 | **.16** | **.65** | | .29 | **.12** | **.71** |
| 35 Majority-Black Districts | .38 | **.21** | .51 | | **.28** | **.12** | **.50** |

**Figure 14: Compactness Scores – 2022 Senate vs. Illustrative Senate Plan**

|  | Reock | | | | Polsby-Popper | | |
|---|---|---|---|---|---|---|---|
|  | Mean | Low | High | | Mean | Low | High |
| **2022 Senate** | | | | | | | |
| All Districts | .36 | .11 | .59 | | .18 | .05 | .35 |
| 11 Majority-Black Districts | .28 | .11 | .37 | | .14 | .05 | .29 |
| **Illustrative Senate Plan** | | | | | | | |
| All Districts | 37 | **.19** | .59 | | **.22** | **.07** | **.36** |
| 14 Majority-Black Districts | 32 | **.19** | **.43** | | **.20** | **.07** | **.36** |

These compactness scores were undisputed. The Court finds that both the Illustrative Plan and the Enacted Maps include reasonably compact districts.

---

[243] *Id.* at p. 22, lines 14–18.
[244] Cooper provides the compactness scores for the Illustrative Plan and Enacted Maps under all 12 compactness tests available in Maptitude. However, he provides the lowest, highest, and mean compactness scores under Polsby-Popper and Reock tests because those are the most routinely used tests. Pla-89; Pla-90; Pla-92; Pla-93; Pla-94; Pla-95.

### 5. Joint Rule 21 Considerations

Cooper testified that he considered Louisiana's Joint Rule 21 when creating the Illustrative Plan. He explained that "Rule 21 on the whole basically encompasses all of what [he] would consider to be the traditional redistricting principles."[245] As mentioned, Joint Rule 21 requires that "districts. . . are substantially equal in population" such that a districting plan cannot have "an absolute deviation of population which exceeds plus or minus five percent of the ideal district population."[246] On direct examination, Cooper stated that this is a "typical range for a typical stage legislative plan" and that he employed "the plus or minus 5 percent" population equalization requirement when drawing his maps.[247] Cooper followed the guidance of Joint Rule 21 requiring that, "[t]o the extent possible, precincts. . . be kept whole" and "to the extent possible, municipalities, boundaries . . . be kept whole."[248]

Cooper affirmed that he adhered to the traditional redistricting principles listed above, complied with Joint Rule 21, and made slight modifications to his Illustrative Senate and House Plans following Dr. Colten's considerations of communities of interest.[249]

The Defendants argue that Plaintiffs have failed to satisfy the *Gingles* I inquiry in part because the districts in the Illustrative Plan produced by Cooper are not sufficiently compact. At trial, Defendants offered Dr. Sean Trende to support this argument. Dr.

---

[245] Rec. Doc. 225, p. 31, line 24–p. 32, line 1.
[246] Joint-56; Joint Rule 21(D)(2), H.. R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).
[247] Rec. Doc. 225, p. 29, lines 17–24.
[248] *Id.* at p. 31, lines 6–8.
[249] *See* Rec. Doc. 225, p. 78 (Cooper explains that he did not directly speak to Dr. Colten about his considerations of communities of interest. However, Plaintiffs' counsel informed Cooper that Dr. Colten suggested he make some "minor changes" with respect to the Baton Rouge area. But outside of this, the two experts did not communicate).

Trende suggests that the minority populations in the Illustrative Plans are not geographically compact, but instead, the minority populations are dispersed and Plaintiffs merely cobbled together small pockets of minority populations in order to artificially create compactness. Dr. Trende relies on a novel approach referred to as the "moment of inertia"[250] and asserts the compactness should be measured using this approach.

The Court finds Trende's "moment of inertia" algorithm to be fundamentally flawed and completely useless in evaluating *Gingles* I compactness. First, the "moment of inertia" methodology has never been used in a VRA § 2 case, was not utilized by Trende when he was engaged to draw VRA compliant maps in Arizona and Virginia, nor has Trende employed the methodology in his own research.[251] Trende's "moment of inertia" methodology also fails to consider communities of interest and traditional boundaries. Most glaringly it ignores the legislature's mandate of equal populations among districts.[252] The drawing of a VRA compliant map balances multiple criteria and is considerably more complicated and nuanced than suggested by the oversimplistic and unhelpful compactness measure advanced by Trende.

---

[250] The Defendants suggest that the "moment of inertia" is one of the oldest redistricting metrics. Rec. Doc 206, p. 18, n. 7. However, Trende admits that the "moment of inertia" has never been employed in a redistricting case and that the methodology does not produce entire districts or maps and does not consider traditional districting principles. Rec. Doc. 229, p. 5, line 15–p. 6, line 6; p. 6, line 14–p. 7, line 5; p. 18, line 8–p. 23, line 21. Dr. Murray testified that "moment of inertia" has been peer reviewed and commonly used in the field of Geography, but he is unaware of the "moment of inertia" being used as a compactness measure in any redistricting cases. Rec. Doc. 218, pp. 52, 92.

[251] Rec. Doc. 229, pp. 7, 19–22. Trende admits that when he served as a *Gingles* I expert he relied on the Polsby-Popper and Reock measures for compactness. *Id.*

[252] Figure 6 of Trende's report illustrates with a blue line the point at which BVAP reaches 50 percent plus 1 within Plaintiff's Illustrative District 1. Def-3, p. 17. However, if the illustrative boundary stopped at Trende's blue line, the district would be insufficiently populated. Trende's analysis gave no effect to § D(2) of Joint Rule 21, which forbids the configuration of districts with "an absolute deviation of population which exceeds plus or minus five percent of the ideal district population." Joint-56; Joint Rule 21(D)(2), H.R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).

Trende also used a spin-off of a statistical model first developed by noted researchers Chen and Rodden, which Trende coined the "areal/Chen & Rodden" compactness measure.[253] Trende's degradation of the Chen and Rodden statistical model is untested, not peer reviewed, and never before used.[254] It is unhelpful and unpersuasive as a *Gingles* I compactness measure.[255] Like his "moment or inertia" theory, this "areal" method fails to control for the mandate of equal populations and fails to consider precinct lines, political subdivision boundaries, geographic features, or communities of interest. Existing law does not require a granular analysis of the distribution of minority populations within an illustrative district to the exclusion of other criteria and priorities. "[T]he purpose of illustrative maps is to *illustrate* that creating another majority [B]lack district is possible, consistent with other requirements under Section 2 caselaw."[256]

Accordingly, the Court rejects Dr. Trende's approach to addressing compactness and accepts Cooper's approach. On the issue of compactness, Cooper employed Reock and Polsby-Popper to evaluate the compactness of his Illustrative Plan. It is undisputed that these tests are the gold standard for evaluating the compactness in the context of

---

[253] *See* Def-3, p. 16 (Trende cites Jowei Chen & Jonathan Rodden in his expert report); Rec. Doc. 228, p. 180–81. Rather than using the BVAP to evaluate compactness, he instead utilized the area of precincts. Notably, Trende concedes that this modified Chen & Rodden "approach sometimes produces 'holes' on the map." *See* Def-3, p. 16.

[254] Rec. Doc. 229, pp. 6–7 (Trende admits that neither algorithm he employed has been peer reviewed).

[255] Dr. Murray noted that the "moment of inertia" is peer reviewed in Geography literature but there was no evidence of its peer reviewed use in political redistricting as a compactness measure. Rec. Doc. 218, p. 52.

[256] *Robinson v. Ardoin*, 86 F.4th 574, 593 (5th Cir. 2023).

redistricting.[257] Even Trende admitted that "if you are looking at the compactness of the district, Reock and Polsby-Popper are the proper tools."[258]

Turning to Defendants' next argument, Defendants argue that Plaintiffs failed to satisfy *Gingles* I because race predominated the configurations of the Illustrative Plan. Defendants offered Dr. Alan Murray in support of this argument.

Dr. Alan Murray is a Professor of Geography at the University of California, Santa Barbara.[259] He was offered and accepted by the parties to provide opinion testimony in the fields of Geography, Demographic Analysis, and Spatial Analytics as it relates to race and statistics.[260]

Murray did not conduct any analysis of and offered no opinions on racially polarized voting.[261] Dr. Murray offers a forensic analysis of the Illustrative Plan to reach the opinion that the Illustrative House and Senate Districts advanced by the Plaintiffs were configured predominately based on race.[262] Dr. Murray specifically analyzed compactness, core retention, spatial autocorrelation, and communities of interest. For the following reasons, the Court rejects Dr. Murray's opinions.

---

[257] Defense expert witness Dr. Murray referred to the Reock and Polsby-Popper compactness measures utilized by Mr. Cooper as the "industry de facto" used by state legislatures and experts. Rec. Doc. 160-1, p. 9, line 24; Rec. Doc. 218, p. 106, lines 5–7.

[258] Rec. Doc. 229, p. 18, lines 24–25.

[259] Interv-42, p. 35.

[260] Rec. Doc. 218, p. 41, lines 14–1.

[261] *Id.* at p. 89, lines 16–20.

[262] Interv-42, p. 32. Much of Dr. Murray's report relates to Mr. Cooper's use of incorrect boundaries for the Enacted Maps in his initial report. Cooper candidly admitted that in drawing his initial illustrative districts he "mistakenly relied on plans that were developed in legislative committees during the 2022 redistricting process rather than the final plans enacted by the Legislature and signed into law by Governor Edwards." Pla-89, p. 2. Cooper supplemented his June 29, 2023 Declaration to accurately reflect the Enacted Maps. Dr. Murray offered no criticism or opinion in response to the Amended Illustrative Plan. Rec. Doc. 218, p. 98, line 25–p. 95, line 1

First, Dr. Murray compares compactness of the House and Senate districts in the Enacted Maps to the House and Senate districts in the Illustrative Plan. He uses the familiar Polsby-Popper and Reock tests, the Convex Hull method, and the method dujour, the "moment of inertia." After laboring through numerous charts, graphs, and explanations in his report and over an hour of testimony about the results of the various compactness metrics, he agreed that regardless of the metric used to evaluate compactness, the "illustrative plans are on average as compact as or more compact than the corresponding [enacted] plans."[263]

The Court concludes, as a matter of fact, that compactness of the districts in the Illustrative Plans as compared to the Enacted Maps is not reasonably disputed.[264] The Illustrative Senate Plan is more compact than the Enacted Senate Map and the Illustrative House Plan and the Enacted House Map are substantially equivalent in compactness. In short, Dr. Murray's compactness analysis offers no support for his racial predominance opinion.

Next Dr. Murray compares parish splits and voter tabulation district ("VTD") splits of the Enacted Maps and the Illustrative Plans. Dr. Murray contends that the parish and voting district splits are not correct in Cooper's analysis. He asserts Cooper's analysis is flawed and "some nuanced accounting [must have been] employed."[265] However, in

---

[263]Rec. Doc. 218, p. 98 lines 17–19. Using the conventional measures of compactness (Polsby-Popper and Reock), Dr. Murray opines that the Illustrative Plan scored slightly higher in compactness than the Enacted Maps. Even using the arguably more controversial "moment of inertia" metric, the Enacted House and Illustrative House score almost exactly the same. Rec. Doc. 218, p. 98.

[264] *See id.* (Murray was asked on cross examination, "whether you are looking at Polsby-Popper or Reock or Moment of Inertia, Mr. Cooper's illustrative plans are on average as compact as or more compact than the corresponding enrolled plans, right?" Dr. Murray answered: "I would agree with that."). On direct examination, Cooper states, "the point is there's really no meaningful dispute between myself and [sic] Dr. Murray, on compactness." Rec. Doc. 225, p. 25, lines 20–21.

[265] Interv-42, p. 6.

making these assertions, Murray confuses the concepts of "splits in parishes" and "parish splits." Parish splits refer to "unique parish/district combinations"[266] whereas splits in parishes refers to the number of parishes that are split.[267]

Murray states that Cooper found that there are 81 parish splits in the Enacted Senate Map and 65 parish splits in the Illustrative Senate Plan. But, Murray found that there are 116 parish splits in the Enacted Senate Map and 90 parish splits in the Illustrative Senate Plan.[268] However, it is unclear how Murray calculated these numbers. He offers no computation or exhibits, nor does he cite to any source for his assertion. Instead, he merely concludes that "his analysis" found these split counts. In his expert report, Murray also uses the terms "splits in parishes" and "parish splits" interchangeably, even though they refer to different metrics.[269] Thus, the Court finds his findings on this point conclusory and unreliable.

Moreover, even if Murray's findings were reliable, the Court finds that the Illustrative Senate and House Plan are superior to the Enacted Maps on this metric. Joint Rule 21(H) provides the relevant guidance on parish splits in redistricting plans. It directs that "[a]ll redistricting plans shall respect the established boundaries of parishes, municipalities, and other political subdivisions and natural geography of this state to the extent practicable."[270] Accordingly, a lower number of splits in parishes is ideal. Per Murray, there are 116 "splits in parishes" in the Enacted Senate Plan compared to 90 "splits in parishes" in the Senate Illustrative Plan.[271] Using Murray's conclusions, the

---

[266] Pla-89, p. 10.
[267] *Id.*
[268] Interv-42, p. 11.
[269] Interv-42, p. 11.
[270] Joint-56; Joint Rule 21(H), H.R. Con. Res. 90, 2021 Reg. Sess. (La. 2021).
[271] Interv-42, p. 11.

Illustrative Senate Plan is superior. Again, offering no support for Murray's racial predominance theory.

With respect to splitting VTDs, Murray candidly admits that the Illustrative House and Senate districts "generally maintain Voting District boundaries and recognized places of interest."[272] But he contends that the Illustrative Districts split more VTDs compared to the Enacted Districts. However, Murray formed his analysis using the VTD boundaries issued by the Louisiana Legislature. In contrast, Cooper reported VTD splits in the Illustrative Plan based on U.S. Census VTD boundaries. Cooper's approach is consistent with Joint Rule 21(G) which speaks to minimizing splits in *census* voter tabulation districts. Murray was unaware of this distinction until trial.[273] Murray again showed his unfamiliarity with and misunderstanding of Joint Rule 21. Consequently, his VTD split comparison resulted in ill-founded conclusions.[274] Thus, Murray's opinions regarding the VTD splits in the Illustrative Plan as compared to the Enacted Maps are unreliable and untrustworthy and the Court affords them no credit.

Murray also criticizes the Illustrative Plan for splitting census blocks[275], which he equates to "neighborhoods" which he contends are a proxy for "communities of interests."[276] He asserts Cooper drew the Illustrative Plan without "respect to localized

---

[272] Interv-42, p. 21; Rec. Doc. 218, p. 100, lines 19–22.

[273] Rec. Doc. 218, p. 95, lines 6–12 (Dr. Murray was asked, "[a]re you aware that the Louisiana Legislature periodically issues new boundary files for voter tabulation districts?" Murray answered, "[n]ow I am." Dr. Murray was asked, "[a]re you aware that those are different than the VTD boundaries issued by the Census?" Murray answered, "[i]f what you're saying is true, I guess now I am.").

[274] *See id.* at lines 13–18 (Dr. Murray explained that he used the legislature's updated VTD boundaries in his analysis of VTD splits, and Plaintiffs' counsel informed him that Cooper reported splits based on census VTD boundaries).

[275] *Id.* at p. 74, lines 6–11 (Dr. Murray finds that there are 4,291 block groups in the state and he finds that in the Illustrative Senate Districts, 375 blocks are split by the district boundaries).

[276] *Id.* at p. 69, lines 1–3.

communities of interest."[277] The Court rejects Dr. Murray's conclusion. It is mere *ipsi dixit* reasoning. Throughout his testimony, Murray uses the term "communities of interest" and neighborhood interchangeably, yet he offers no data or evidence to support the assumption that these terms are one in the same. Murray also offers no data or evidence to support his assumption that census blocks serve as a proxy for either term. Even if the Court accepted the unsupported premise that census block groups are a reasonable proxy for communities of interest, Murray did no analysis of how many census blocks are split in the Enacted Maps.[278] Without this comparison, Murray's census block analysis is devoid of probative value.

Finally, Murray crunches a great deal of data to come to the unremarkable conclusion that the BVAP is concentrated in urban areas and the WVAP is concentrated in rural areas.[279] He concedes that property values are a factor in where people can afford to live. He also concedes that educational attainment also drives where people can afford to live. He admits that Louisiana's population is highly racially segregated[280] and admits that patterns of racial segregation, rather than race, is an explanatory factor in where people live.[281]

The Court concludes that Dr. Murray's testimony offered no support for the Defendants' theory that the illustrative districts were configured predominately based on race.

---

[277] *Id*. at p. 82, lines 24–28.
[278] *Id*. at p. 91, lines 17–19.
[279] *Id*. at p. 73, lines 15–21.
[280] *Id*. at p. 107, lines 3–8; Interv-42, p. 19 (looking at Figure 28).
[281] Rec. Doc. 218, p. 103, lines 13–16.

Dr. Michael Barber was offered by the Defendant Secretary of State also in support of the argument that race was the predominate factor in configuring the Illustrative Plan. Dr. Barber is an Associate Professor of Political Science at Brigham Young University and the Director for the Center for the Study of Elections and Democracy.[282] Dr. Barber earned his Ph.D. in Political Science, with emphasis in American politics and quantitative methods/statistical analyses, from Princeton in 2014.[283] He was accepted by the Court as an expert in the fields of political science, American politics, voting behavior and patterns, and simulated maps.[284]

Dr. Barber used a computer algorithm to generate 100,000 simulated random redistricting plans that he compared to the Illustrative Plan. He performed a regional analysis[285] to further compare the computer-generated simulated districts to the Illustrative Plan and Enacted Maps. Dr. Barber used the Redist software developed by Plaintiff's expert Dr. Cory McCartan.[286]

---

[282] Def-1, p. 124.

[283] *Id.*

[284] Rec. Doc. 229, p. 180, lines 17–23.

[285] Dr. Barber ran 100,000 State Senate simulations using districting criteria, not including race. His comparator simulations yielded no additional majority-Black districts in the areas of the Shreveport, Baton Rouge, and Orleans where the Illustrative Plan draws majority minority Senate districts. Dr. Barber reached the same general conclusions when conducting an analysis that compared the Illustrative House Districts with race neutral simulated comparator maps. Def-1, pp. 11–14.

[286] Plaintiffs' expert witness, Dr. McCartan, developed the simulation algorithm, known as the "SMC algorithm," which can generate randomly sampled redistricting plans and "can be applied to measure and evaluate existing redistricting plans along a variety of dimensions, while accounting for local variation in geography and voting patterns." Pla-135, p. 3. Additionally, he developed software packages for using census data. This package includes a tool known as Redist, which includes his SMC algorithm. Dr. Barber employed Dr. McCartan's algorithm when drafting his expert report. *Id.* at p. 4. Dr. McCartan concluded that Dr. Barber did not "follow best practices" when using the algorithm. He contends that Dr. Barber failed to check standard diagnostics. *Id.* at p. 5. When reviewing 2,593 lines of Dr. Barber's computer code, McCartan did not see the instructions to run the software's diagnostic routines. If used, these instructions ensure that the results are "trustworthy." *Id.* at pp. 11-12. Additionally, he asserts that Dr. Barber failed to properly account for "core retention" as his approach did not "take into account the degree of population overlap between old and new districts…." *Id.* at p. 10. Dr. McCartan also found that Dr. Barber failed to perform multiple parallel independent runs of the algorithm in his first set of simulations, as such the conclusions Dr. Barber introduced in his expert report did not provide for margins of error. *Id.* at p. 15. On

Dr. Barber ran simulations to compare splits in parishes, municipal splits, and core retention between the Illustrative Plan and the Enacted Maps.[287] Barber concluded that neither the Enacted House Map or the Illustrative House Plan do "especially well at minimizing parish or municipal splits compared to the simulations."[288] Barber finds that the reason for this under the Enacted House Map is due to the map's retention of the 2011 House district cores.[289] But, he concludes that the Illustrative Plan has a low core retention score. Barber deduces the same under the Enacted Senate Map and the Illustrative Senate Plan. Thus, Dr. Barber suggests that "adherence to [sic] race-neutral criteria does not explain the [sic] Illustrative [sic] map's boundaries."[290]

Defendants contend that Barber's simulations are evidence that in drawing the illustrative districts, Cooper sought to maximize the number of majority-Black districts in urban regions to not only equal, but exceed proportionality.[291] In apparent recognition that that simulations were expressly rejected by the Supreme Court in *Milligan* in the context of a VRA § 2 vote dilution case, Defendants state that they "offer these opinions, not in the context of examining effects, but to prove intent."[292] The Court finds that the illustrative map drawer's intent has no probative value in the context of the VRA § 2 vote dilution case presented here. In *Milligan* the Supreme Court reiterated that § 2 "itself 'demands

---

cross-examination, Dr. McCartan admitted that Dr. Barber performed independent runs of the algorithm in his second set of simulation. Rec. Doc. 214, p. 161, lines 2–5. Because of irregularities in his method, the reliability of his conclusions is questionable. However, the Court does not reject Dr. Barber's opinions as unreliable because, for reasons *infra*, the Court rejects Dr. Barber's opinions as irrelevant.

[287] Def-1, pp. 20, 24.

[288] *Id.* at p. 66.

[289] *Id.* Dr. Barber does not define "cores" in his expert report, but the Court presumes he is referring to core populations.

[290] Def-1, pp. 28, 67.

[291] Rec. Doc. 177, p. 34.

[292] *Id.* (citing Amicus Brief of Jowei Chen *et al.*, *Alexander v. S.C. State Conf. of the NAACP,* 143 S. Ct. 2456 (2023)).

consideration of race'", because "the question whether additional majority-minority districts can be drawn . . . involves a 'quintessentially race-conscious calculus.'"[293]

In *Milligan*,[294] Alabama argued that computer generated maps should be used as a "race-neutral benchmark" against which to measure illustrative maps in a § 2 vote dilution case. The Supreme Court rejected the use of computer-generated maps offered as benchmarks because liability in a VRA § 2 case "turns on the presence of discriminatory effects, not discriminatory intent."[295] Illustrative maps, in the context of a statutory voting rights case, like this one, are offered "to show, as [sic] cases require, that an additional majority-minority district could be drawn."[296] Illustrative maps are "created with an express [racial] target in mind."[297] Indeed, Chief Justice Roberts observed, "[t]hat is the whole point of the enterprise."[298] Concluding that in a VRA § 2 case "[t]he contention that mapmakers must be entirely 'blind' to race has no footing in case law."[299] The illustrative map-makers intent is irrelevant in a statutory § 2 vote dilution case, such as this one.

Computer generated maps may be probative of a state's intent in map-drawing in the context of a Fourteenth Amendment racial gerrymandering case,[300] but that case is not before the Court and the Court declines to reach that constitutional question.[301]

---

[293] *Milligan,* 599 U.S. 1, 30–31 (2023) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1020 (1994)).

[294] *Id*. at 33.

[295] *Id*. at 25.

[296] *Id*. at 33.

[297] *Id*.

[298] *Id*.

[299] *Id*.

[300] *See Milligan*, 599 U.S. at 44 (Kavanaugh, J. concurring) ("[C]omputer simulations might help detect the presence or absence of *intentional* discrimination.")

[301] "[C]onsistent with the longstanding canon of constitutional avoidance," the Alabama district court in *Singleton* declined to decide the Fourteenth Amendment racial-gerrymandering claims. *See Singleton v. Merrill,* 582 F. Supp. 3d 924 (N.D. Ala. 2022), *order clarified*, No. 2:21-CV-1291-AMM, 2022 WL 272637 (N.D. Ala. Jan. 26, 2022), and *appeal dismissed sub nom. Milligan v. Sec'y of State for Alabama*, No. 22-

A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them. This principle required the courts below to determine, before addressing the constitutional issue, whether a decision on that question could have entitled respondents to relief beyond that to which they were entitled on their statutory claims. If no additional relief would have been warranted, a constitutional decision would have been unnecessary and therefore inappropriate.[302]

Scholars point out that "[t]he racial-gerrymandering context is [] materially different from the racial vote-dilution context."[303] Unlike statutory VRA § 2 claims, racial gerrymandering claims require proof of intent. In a case alleging unconstitutional gerrymander, the plaintiff must prove that "race was the predominant factor motivating the *legislature's* decision to place a significant number of voters within or without a particular district."[304] If the plaintiff proves that the district boundaries drawn by the *Legislature w*ere motivated predominately by race, then the disputed district is subject to strict scrutiny.[305] The Illustrative Plan offered by the Plaintiffs demonstrates that additional reasonably configured majority minority districts can be created. It is not a legislative map. There is no state action and thus a Fourteenth Amendment analysis is not triggered. For these reasons the Court finds Dr. Barber's opinions irrelevant.

Finally, Defendants presented Dr. Alan Johnson. Dr. Johnson was accepted by the Court on stipulation of the parties as an expert in the fields of political science, political

---

10278-BB, 2022 WL 2915522 (11th Cir. Mar. 4, 2022), and *aff'd sub nom. Allen v. Milligan*, 599 U.S. 1 (2023).

[302] *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445–46 (1988) (internal citations omitted).

[303] Amicus Brief of Professors Stephanopoulos and Chen at 19, *Alexander v. S.C. State Conf. of the NAACP*, 143 S. Ct. 2456  (2023) (No. 22-807).

[304] *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (emphasis added); *see also Cooper v. Harris,* 581 U.S. 285, 291 (2017); *Hunt v. Cromartie*, 526 U.S. 541, 547 (1999).

[305] *See Cooper*, 581 U.S. at 292 ("[I]f racial considerations predominated over others, the design of the district must withstand strict scrutiny.")

geography, redistricting, and the Maptitude software.[306] Dr. Johnson was critical of Mr. Cooper's methodology and came to the general conclusion that the Illustrative House and Senate Plans were drawn predominantly for reasons of race. The Court finds Dr. Johnson's opinions unpersuasive.

Dr. Johnson's opinions were based on a visual inspection of the Illustrative Plan without any comparison to the Enacted Maps. He opines that from 2000 to 2022 the number of majority-Black House and Senate Districts has increased more than the increase in the BVAP. This observation is meaningless as he concedes that he did not do a proportionality analysis and admits that he did not consider the decline in WVAP during the time period.

On the communities of interest inquiry, Dr. Johnson was critical of Cooper's aggregation of voter socioeconomic data.[307] However, Cooper's rebuttal report establishes that the Illustrative Plan's majority-Black districts keep low and moderate income neighborhoods together.[308] Dr. Johnson also critiqued Cooper's analysis of splits of MSAs, municipal boundaries, and planning district boundaries, and what he called "zigs and zags" of illustrative district boundaries.[309] Though, he conceded that the illustrative districts followed precinct lines and do follow some major roadways. On cross

---

[306] Rec Doc. 229, p. 30, lines 19–25. Dr. Johnson's reports were admitted into evidence by stipulation of the parties. *See* Interv- 51 and Interv-58. The reports were redacted by the parties in compliance with the Court's Ruling on Plaintiffs' Motion in Limine, Rec. Doc. 174. A separate proffer was made by the Defendants of the excluded portions of Dr. Johnson's reports.

[307] Cooper relied on socioeconomic data aggregated at the Parish and City levels. Dr. Johnson testified that this "tells [him] nothing about where people—or how much money people in each individual section of the parish earn." *See* Rec. Doc. 229, p. 50, lines 6–12.

[308] *See* Pla-89 at p. 12 ("[T]he Illustrative Plan generally keep together low- and moderate-income neighborhoods—independent of race.")

[309] Rec. Doc. 229, p. 53, line 1–p. 60, line 19, line ; Interv-58, p. 88.

examination, when asked to compare the Illustrative districts to the Enacted districts in the Calcasieu Parish area, he admitted that the Illustrative Plan split fewer parishes.[310]

Based on the BVAP percentage in the Illustrative majority-Black districts, Dr. Johnson opines that the Illustrative districts were achieved by removing Black voting-age populations from other majority-Black districts. [311] This is unremarkable and not probative. "Section 2 itself demands consideration of race" because "the question whether additional majority-*minority* districts can be drawn . . . involves a quintessentially race-conscious calculus." [312]

Finally, Dr. Johnson hinted that the census data relied upon to configure the Illustrative Plan may be unreliable due to "differential privacy" protocols employed by the Census Bureau. He explained that to protect census respondent privacy, the Census Bureau "blur[s] the census data" at the block levels to prevent data miners from determining the identities of census respondents.[313] "Differential privacy" is a red herring. Dr. Johnson does not know the margin of data error associated with this blurring but guesses that an illustrative district with a 50.2 percent BVAP may not be over 50 percent BVAP considering the "differential privacy" factor.[314] First, Dr. Johnson has no basis for this conclusion. He admittedly does not know what, if any, margin of error results from "differential privacy."[315] Second, he offers no alternative to the use of official census data

---

[310] *See* Rec. Doc. 229, p. 131, lines 11–15 (Dr. Johnson admitted that keeping districts within parish boundaries is one of the traditional redistricting factors).

[311] *See* Rec. Doc. 229, p. 87, lines 1–20 (Dr. Johnson observed that 11 of the Illustrative Plan's minority House districts are under 53 percent BVAP—eight more than the Enacted Map; 11 of the 16 Illustrative Plan's minority Senate districts are between 50 – 53 percent BVAP. He commented that Illustrative House District 69 had a "very precise" BVAP of 50.2 percent.)

[312] *Milligan,* 599 U.S. at 31 (internal quotations omitted) (emphasis in original).

[313] Rec. Doc. 229, p. 89, lines 7–13; Interv-51, p. 38.

[314] Rec. Doc. 229, p. 93, lines 11–14; p. 152, lines 16–19.

[315] *Id.* at p. 152, line 20–p. 153, line 8.

relied upon by virtually every expert in the redistricting field. Finally, he admitted that concerns about the effect of "differential privacy" have nothing to do with the effectiveness of the proposed district. Dr. Johnson admitted that the possibility that "differential privacy" may introduce a small margin of error in the raw census data is not correlated to effectiveness.[316] Dr. Johnson asserts that there is a "sensitivity analysis to consider" to test the effectiveness of the illustrative minority districts, though he admits he performed no such analysis.[317]

Dr. Johnson's analysis does nothing to advance Defendants' argument that race predominated the Illustrative Plan.

Finally, Defendants seek to superimpose an equal protection analysis into the *Gingles* inquiry. The equal protection clause invites examination of a state enacted map,[318] to discern whether the "State, without sufficient justification, [] separat[ed] its citizens into different voting districts on the basis of race."[319] An Equal Protection analysis is premature at this stage. As recognized by the Fifth Circuit, "a Section 2 *Gingles*[320] claim [] is distinct from an Equal Protection racial gerrymander violation."[321]

Section 2 expressly condemns districting solely on the basis of demographic proportionality, and evidence of proportional redistricting may be probative of racial

---

[316] Effectiveness analyzes whether the proposed minority district will provide a reasonable opportunity for the minority voter to elect a preferred candidate. *See* Rec. Doc. 229, p. 161, lines 21–24 (Dr. Johnson agrees that the "differential privacy concept…doesn't have any effect on election returns data.")

[317] Interv-51, p. 28; *See* Rec. Doc. 229, p. 156, lines 15–25 (Dr. Johnson admits that he "did not attempt to calculate the effectiveness level of any district.")

[318] The Equal Protection Clause of the Fourteenth Amendment prohibits discrimination by government entities, not private parties. Therefore, state action is a prerequisite to bringing an equal protection claim under the Fourteenth Amendment. *See Shelley v. Kraemer*, 334 U.S. 1 (1948) ("[T]he action inhibited by [] the Fourteenth Amendment is only such action as may fairly be said to be that of the States.")

[319] *Bethune-Hill v. Virginia State Bd. of Elections*, 580 U.S. 178, 187 (2017) (citing *Miller v. Johnson*, 515 U.S. 900, 911 (1995)).

[320] *Gingles*, 478 U.S. 30 (1986).

[321] *Robinson v. Ardoin,* 86 F.4th 574, 595 (5th Cir. 2023).

gerrymandering but it is not dispositive. Moreover, the district maps being advanced by the Plaintiffs are illustrative, offered to show that Black voters could constitute a majority in reasonably configured illustrative districts whilst also abiding traditional redistricting considerations such as equal populations; contiguity; respect for existing political subdivisions; such as precincts, parishes, cities, and towns; and communities of interest. The Section 2 analysis considers whether race predominated in the drawing of the illustrative map. The Court finds that the Plaintiffs established by a preponderance of the evidence that race did not predominate in the configuration of the Illustrative Plan.

In conclusion, the Court finds that between 2000 through 2020, Louisiana experienced significant population change, notably an increase in its Black population, and simultaneously a decrease in White population, particularly in the New Orleans-Metairie MSA. The Court finds Cooper to be a credible witness and is persuaded by his method to "uncrack" and "unpack" districts in the Enacted Maps to form additional Black-majority districts. As mentioned above, Cooper's reduction of BVAP in other districts to create additional Black-majority districts is obvious and does nothing to move the needle in Defendants' favor.

Therefore, the Court finds that in the Enacted Senate Map, the Black population is unnecessarily concentrated in Districts 15 and 39. Both these districts contain BVAPs well over 50 percent. The Court also finds that the BVAP is unjustifiably fragmented across Senate Districts 5, 7, 8, 10, and 19, which cover the New Orleans-Metairie MSA.[322] While population trends indicate that this area has seen significant increase in its Black

---

[322] "*Statistics,*" Dave's Redistricting, [https://davesredistricting.org/maps#viewmap::12eedba5-68de-4ab4-a3bb-7f59d9268041] (Referenced at Pla-20, p. 31) (Statistics list the percentages of the population by district and race).

population and decrease in its Non-Hispanic White population between 2000 and 2020, only Districts 5 and 7 are majority-Black districts whereas Districts 8, 10, and 19 are each well below the 50 percent threshold.[323] Notably, the Court finds as fact that in Enacted Senate Districts 8 and 10 Black voters constitute less than a quarter of the VAP.[324] The Court finds that there are similar examples of packed and cracked districts in the Enacted House Map. BVAP is heavily concentrated in Enacted House Districts 2 and 4, which covers Caddo Parish, in the Enacted House Map. Both districts contain BVAPs in the 60s and 70s. There is certainly an opportunity to disperse the Black population into at least one additional district in this region. Moreover, the Court finds that the Black population is fragmented in House Districts 5, 7, 13, 22, and 25 in the Natchitoches Area of the Enacted House Map. None of the districts contain a BVAP over 30 percent, yet in the 2011 Benchmark Plan, a majority-Black district similar to the one proposed by Mr. Cooper existed in this region.[325] The Court finds the Enacted House Map packs and cracks districts in the Lake Charles MSA. House District 34 contains a BVAP of 72.6 percent, but neighboring districts 35 and 37 contain BVAPs of merely 12.5 percent and 17.6 percent.[326] The Court finds that the Enacted House Map unnecessarily concentrates the Black population into one district while dividing the rest of the Black population into smaller districts.

The Court finds as fact that the Black population in the Baton Rouge MSA grew between 2000 and 2020. As such, the Enacted House Map should properly reflect this

---

[323] *See id*.

[324] *See id* (District 8 possesses a BVAP of 25.84 percent and District 10 possesses a BVAP of 12.22 percent).

[325] "*Statistics*," Dave's Redistricting, [https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5] (Referenced at Pla-20, p. 45) (District 2 holds a BVAP of 67. 38 percent and District 4 holds a BVAP of 72.07 percent).

[326] *See id*.

growth. However, the Court finds that the BVAP is diluted in this region because of cracking and packing. The African American population is greatly concentrated in House Districts 29 and 63. Enacted House District 29 contains a BVAP of 73.6 percent and Enacted House District 63 contains a BVAP of 69.7 percent.[327] But, neighboring district 65 contains a BVAP of slightly under 22 percent.[328] The Court finds that there is an opportunity to create at least one additional district in this area covering the cities of Central and Baton Rouge. Enacted House District 60 is also located in the Baton Rouge MSA and surrounds Iberville and Ascension Parishes. The Black population in Ascension Parish has doubled from 15,684 to 32,216 between 2000 and 2020, but Enacted House District 60 holds a BVAP of only 37.7 percent.[329] The Court finds that this low percentage is the result of fragmenting the significant Black population across these parishes. Finally, the Court finds that Enacted House Map cracks and packs the Black population in Districts 61, 68, 69, and 70. While District 61 possesses a BVAP of 75.29 percent, close districts 68, 69, and 70 all possess BVAPs below 25 percent.[330] The Court finds that the Black population in Baton Rouge has grown by 25 percent between 2000 and 2020, and the Enacted House Map does not properly account for this significant growth.[331]

As such, the Court finds the Black population is "sufficiently large" in Louisiana such that the Black population can comprise 50 percent or more of the population for many state house and senate districts. The Court also finds that the Illustrative Plan

---

[327] *See id*.

[328] *See id*. (Enacted House District 63 contains a BVAP of 21.89 percent).

[329] *See id*.; Pla-20, p. 55–56.

[330]    "Statistics",    https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (Referenced at Pla-20, p. 45) (Enacted House District 68 contains a BVAP of 20.18 percent, Enacted House District 69 contains a BVAP of 23.75 percent, and Enacted House District 70 contains a BVAP of 21.21 percent).

[331] Rec. Doc. 225, p. 15, lines 2–4 ("[T]he Baton Rouge Area has seen a 25 percent increase in Black population. In absolute terms, almost 64,000 people.")

"generally maintain[s] Voting District boundaries and recognized places of interest" as set forth in Joint Rule 21.[332] Cooper adhered to traditional redistricting principles when developing the Illustrative Plan. Furthermore, the Court finds Dr. Colten to be a credible witness. His assertions concerning the communities of interest and their preservation within the Illustrative Plan are persuasive. As such, the Court finds that Plaintiffs have satisfied *Gingles* I and the Black voting age population is "sufficiently large and geographically compact" to constitute a majority in several reasonably shaped legislative districts as demonstrated by the Illustrative House and Senate Plans offered by the Plaintiffs.

### B.  *Gingles* II and III

To satisfy the second and third *Gingles* requirements, namely that Black voters are "politically cohesive" and "that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate,"[333] Plaintiffs offered the opinions of Dr. Lisa Handley.[334]

Defendants stipulated to Dr. Handley's expertise in the area of redistricting and minority vote dilution.[335] Employing 35 years of experience as a voting rights and redistricting expert, Dr. Handley analyzed the racial voting patterns in several areas of the State of Louisiana to determine whether voting in these areas is racially polarized.[336] Dr. Handley employed three separate localized analyses of voting patterns in the seven areas of Louisiana where Mr. Cooper's Illustrative House and Senate Plans create more

---

[332] Interv-42, p. 21 (Dr. Murray affirming this point); Joint-56.
[333] *Growe v. Emison*, 507 U.S. 25, 40 (1993) (citing *Gingles*, 478 U.S. 30, at 50–51 (1986)).
[334] Rec. Doc. 217, p. 10, lines 5–7.
[335] Rec. Doc. 217, p. 10, line 9.
[336] Pla-1, p. 2.

majority BVAP districts than the Enacted House and Senate Maps.[337] The "seven areas of interest" include parishes that overlap geographically with the new proposed majority-Black districts in Cooper's Illustrative Plan such that they contain the areas where the potential voters for the new districts live.[338]

Dr. Handley used the statistical methods of homogenous precinct ("HP") analysis, ecological regression ("ER"), and ecological inference ("EI") to calculate estimates of the percentage of Black and White voters who voted for candidates in recent statewide general elections and state legislative elections.[339] Experts agree and courts recognize that EI produces the most reliable estimates, and Dr. Handley used homogenous precinct analysis and ecological regression to check the estimates produced by her EI analysis. These analyses constitute the district-specific analyses required by *Gingles*.[340]

Employing this methodology, Dr. Handley analyzed sixteen recent statewide election contests that included Black candidates. Dr. Handley opines that election contests which include minority candidates are more probative than contests with only White candidates.[341] This Court finds—and both Defendants' expert and additional courts agree—that biracial statewide elections are the "most probative" for determining racial polarization.[342]

Dr. Handley opined on the election results by stating that "Black voters are very cohesive in the seven areas."[343] Her report denotes that, "Black and White voters

---

[337] Rec. Doc. 217, p. 10–11; Pla-1, p. 4.
[338] Rec. Doc. 217, p. 11–12; p. 50, lines 2–14; p. 91, line 25–p. 92, line 13.
[339] Rec. Doc. 217, p. 13, line 23–p. 14, line 11; Pla-1, p. 4. HP and ER were used and accepted by the Supreme Court as far back as *Gingles*, she stated. EI, which was developed later, has since become a widely accepted technique, as well.
[340] *Gingles*, 478 U.S. at 103 (O'Connor, J., concurring).
[341] Pla-1, p. 6, n. 9.
[342] Rec. Doc. 217, p. 19, lines 11–15; Rec. Doc. 228, p. 145, lines 15–18.
[343] Rec. Doc. 217, p. 12, lines 23–24.

supported different candidates in nearly every election contest analyzed, with Black voters cohesive in support of their preferred candidates and the White voters bloc voting against these candidates."[344] Black-preferred candidates received an average of 82.7% of the Black vote in statewide elections in these areas and only an average of 12.2% of the White vote.[345] When limited to only two-candidate contests, Black-preferred candidates received an average 93.2% of the Black vote in statewide races in these areas and an average of 15.6% of the White vote.[346] "Bloc voting by blacks tends to prove that the black community is politically cohesive, that is, it shows that blacks prefer certain candidates whom they could elect in a single-member, black majority district."[347] The analyses conducted by Dr. Handley clearly demonstrate high levels of cohesiveness among Black Louisianans in supporting their preferred candidates in the areas where Mr. Cooper has proposed to draw additional majority-Black districts.[348]

---

[344] Pla-1, p. 9

[345] Pla-1, p. 10.

[346] Pla-1, p. 10.

[347] *Gingles*, 478 U.S. at 68.

[348] In Area 1, the percentage of support from Black voters for the Black-preferred candidate ranges from 98.1% to 44.8%, with the support being over 50% in all the elections analyzed but one, and over 60% in all elections analyzed but three. *See* Pla-3.

In Area 2, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.3% to 50.4%, with the support being over 50% in all the elections analyzed and over 60% in all elections analyzed but two. *See* Pla-4.

In Area 3, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.7% to 39.5%, with the support being over 50% in all but two of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-5.

In Area 4, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.2% to 36.7%, with the support being over 50% in all but two of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-6.

In Area 5, the percentage of support from Black voters for the Black-preferred candidate ranges from 96.5% to 50.7%, with the support being over 50% in all of the elections analyzed and over 60% in all of the elections analyzed but three. *See* Pla-7.

In Area 6, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.5% to 44.9%, with the support being over 50% in all but one of the elections analyzed and over 60% in all elections analyzed but three. *See* Pla-8.

In Area 7, the percentage of support from Black voters for the Black-preferred candidate ranges from 97.4% to 36.8%, with the support being over 50% in all but one of the elections analyzed and over 60% in all elections analyzed but two. *See* Pla-9.

Plaintiffs also presented evidence through Dr. Handley's testimony that White voters typically vote as a bloc to defeat Black voters' preferred candidate.[349] In every election that Dr. Handley analyzed within each of the seven areas of interest, White voters consistently bloc voted to defeat the candidates supported by Black voters. Across the 16 elections, a scant 12.2% of White voters supported the Black preferred candidate in multi candidate races, rising to only 15.6% in two-candidate contests.[350] Dr. Handley found that due to this low level of White support for Black-preferred candidates, blocs of White voters were able to consistently defeat Black-preferred candidates.[351] She also analyzed 21 state legislative elections overlapping with the seven areas of interest and found racially polarized voting occurred in all but one of these elections.[352] Dr. Handley concluded that "[r]acially polarized voting substantially impedes the ability of Black voters to elect candidates of their choice to the Louisiana state legislature in these areas unless districts are drawn to provide Black voters with this opportunity."[353]

Dr. Handley also analyzed whether the Legislature's Enacted Maps provide opportunities for Black voters to elect the candidate of their choice by conducting a district-specific recompiled elections analysis.[354] Comparing the majority-Black districts in Plaintiffs' Illustrative Plans and the corresponding districts in the Enacted Maps, Handley selected three "clusters" of Senate districts and five "clusters" of House districts.[355] She

---

[349] Rec. Doc. 217, p. 13, lines 1–4.
[350] Pla-1, p. 10.
[351] Pla-1, p. 33.
[352] Pla-1, p. 11. Ten of the 11 state senate elections she evaluated were racially polarized. *Id.* All of the ten state house elections she analyzed were racially polarized. *Id.*
[353] Pla-1, p. 33.
[354] Pla-1, p. 12.
[355] State Senate Cluster 1 contains three districts in Bossier and Caddo Parishes; State Senate Cluster 2 contains four districts in Jefferson and St. Charles Parishes; and State Senate Cluster 3 contains four districts in East Baton Rouge, West Baton Rouge, Iberville, and Point Coupee Parishes. Pla-1, p. 14. State

then calculated two effectiveness scores for each cluster: The first score, the All-Elections Effectiveness Score, "demonstrates the percentage of election contests (out of the total 16 statewide contests) that the Black-preferred candidate would have won or advanced to a runoff in the district."[356] The second score, the Two-Candidate Effectiveness Score, "reports the percentage of two-candidate elections (out of the eight two-candidate contests) that the Black-preferred candidate would have won in the district."[357]

Notably, Dr. Handley concluded that only the clusters with at least a 50% BVAP provided Black voters with an opportunity to elect the candidate of their choice. She testified that, "with one exception, no districts were effective that were under 50% [BVAP]."[358] In each of the clusters, the Illustrative Plans drawn by Mr. Cooper provided at least one additional district that would give Black voters an opportunity to elect candidates of their choice as compared to those in the existing Enacted Maps.[359]

---

House Cluster 1 contains several districts in De Soto, Natchitoches, and Red River Parishes; State House Cluster 2 contains five districts from Calcasieu Parish; State House Cluster 3 contains eight districts from Bossier and Caddo Parishes; State House Cluster 4 contains three districts from Ascension and Iberville Parishes; and State House Cluster 5 contains ten districts from East Baton Rouge and East Feliciana Parishes. Pla-1, p. 15.

[356] Pla-1, p. 12.

[357] Pla-1, p. 12.

[358] Rec. Doc. 217, p. 41, lines 2–3.

[359] State Senate Cluster 1 has three districts. Pla-1, p. 16. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SD 38 and 39—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 16–17. By contrast, Enacted SD 38 does not provide an opportunity to elect Black-preferred candidates, with an All-Elections Effectiveness Score of only 18.8% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 17.

    In Senate Cluster 1, therefore, the Illustrative Senate Plan has two effective Black-majority districts, Illustrative SD 38 and 39, while the Enacted Senate Plan has only one effective Black-majority district, Enacted SD 39. Pla-1, p. 16.

    State Senate Cluster 2 has four districts. Pla-1, p. 19. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative Senate Plan—Illustrative SD 19—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 19. By contrast, Enacted SD 8, 9, 10, and 19 do not provide an opportunity to elect Black-preferred candidates, all with an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 19.

In Senate Cluster 2, therefore, the Illustrative Senate Plan has one effective Black-majority district, Illustrative SD 19; while the Enacted Senate Plan does not have any effective Black-majority district. Pla-1, p. 19.

State Senate Cluster 3 has four districts. Pla-1, p. 21. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the three Black-majority districts in the Illustrative Senate Plan in this area—Illustrative SD 14, 15, and 17—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 21. By contrast, Enacted SD 6 and 16 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla- 1, p.  21.

In Senate Cluster 3, therefore, the Illustrative Senate Plan has three effective Black-majority districts, Illustrative SD 14, 15, and 17; while the Enacted Senate Plan has only two effective Black-majority districts, Enacted SD 14 and 15. Pla-1, p. 21.

State House Cluster 1 has three districts. Pla-1, p. 23. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative House Plan in this area—Illustrative HD 23—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 23.

By contrast, Enacted HD 7, 22, and 25 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 23.

In House Cluster 1, therefore, the Illustrative House Plan has one effective Black-majority district, Illustrative HD 23; while the Enacted House Plan does not have any effective Black-majority districts. Pla-1, p. 23.

State House Cluster 2 has five districts. Pla-1, p. 25. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the two Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 34 and 38—had effectiveness scores well over 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 25. By contrast, Enacted HD 33, 35, and 36 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 25.

In House Cluster 3, therefore, the Illustrative House Plan has two effective Black-majority districts, Illustrative HD 34 and 38, while the Enacted House Plan has one only effective Black-majority district, Enacted HD 34. Pla-1, p. 23.

State House Cluster 3 has eight districts. Pla-1, p. 27. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the four Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 1, 2, 3, and 4—had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 27. By contrast, Enacted HD 1, 5, 6, 8, and 9 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 27.

In House Cluster 3, therefore, the Illustrative House Plan has four effective Black-majority districts, Illustrative HD 1, 2, 3, and 4; while the Enacted House Plan has only three effective Black-majority districts, Enacted HD 2, 3, and 4. Pla-1, p. 27.

State House Cluster 4 has three districts. Pla-1, p. 29. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the one Black-majority district in the Illustrative House Plan in this area—Illustrative HD 60—had an effectiveness score of 100%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 29. By contrast, Enacted HD 59, 60, and 88 do not provide an opportunity to elect Black-preferred candidates. Enacted HD 59 and 88 have an All-Elections Effectiveness Score of 6.3% and a Two-Candidate Effectiveness Score of 0%. Pla-1, p. 29. Enacted HD 60 has an All-Elections Effectiveness Score of 43.8% and a Two-Candidate Effectiveness Score of 25%. Pla-1, p. 29.

Based on her analysis of the data, Dr. Handley concluded that because of the clearly racially polarized voting in Louisiana, Black voters can only elect their candidate of choice if a district is drawn that gives them that opportunity.[360]

Defendants challenged the testimony and evidence presented by Plaintiffs by arguing that Dr. Handley's analysis was flawed and by presenting their own theories as to why the *Gingles* II and III preconditions are not satisfied. Defendants first take issue with Dr. Handley's opinion because they say "she did not adequately account for high levels of absentee and early voting."[361] Dr. Handley explained that to perform her RPV analysis, she was required to take candidate-specific early and absentee votes reported at the parish-wide level by the Louisiana Secretary of State website and disaggregate that data down to the precinct level.[362] Accordingly, Dr. Handley used an allocation method to assign the early and absentee votes to particular precincts within a parish "proportionally based on the votes received by each of the candidates on Election Day" in each area she studied.[363] Defendants claim Dr. Handley's method did not cap the number of early or absentee votes assigned to each precinct by the total number of voters

---

In House Cluster 4, therefore, the Illustrative House Plan has one effective Black-majority district, Illustrative HD 60, while the Enacted House Plan does not have any effective Black-majority districts. Pla-1, p. 29.

State House Cluster 5 has ten districts. Pla-1, p. 31. Taking into account the recompiled election results, the two effectiveness scores, and the district BVAP, Dr. Handley concluded that the seven Black-majority districts in the Illustrative House Plan in this area—Illustrative HD 61, 63, 65, 67, 68, 69, and 101— had effectiveness scores well above 50%, and thus would provide Black voters with an opportunity to elect their candidates of choice. Pla-1, p. 31. By contrast, Enacted HD 65, 66, 68, 69, and 70 do not provide an opportunity to elect Black-preferred candidates, each having an All-Elections Effectiveness Score under 20% and a Two-Candidate Effectiveness Score under 12.5%. Pla-1, p. 31.

In House Cluster 5, therefore, the Illustrative House Plan has seven effective Black-majority districts, Illustrative HD 61, 63, 65, 67, 68, 69, and 101, while the Enacted House Plan has only five effective Black-majority districts, Enacted HD 61, 62, 63, 67, and 101. Pla-1, p. 31.

[360] *See* Pla-1, p. 33.
[361] Rec. Doc. 206, p. 25.
[362] Rec. Doc. 217, p. 15, line 19–p. 16, line 25; p. 89, lines 14–24.
[363] Pla-1, p. 6.

who turned out in a particular election.[364] They claim this amounts to a misallocation of candidate vote shares to precincts underlying the database upon which she then runs her statistical analyses, making her opinions unreliable.[365]

The Court already addressed Defendants' contentions on this point prior to trial. As the Court addressed in its *Ruling*[366] on the *Joint Motion in Limine to Exclude Dr. Lisa Handley's Testimony and Reports*,[367] "[e]arly and absentee votes are reported only at the parish level in Louisiana—they are not allocated back to the precinct where the voter resides. Rather than simply ignore these votes, they have been allocated to the parish precincts proportionally based on the votes received by each of the candidates on Election Day."[368] "The simple fact is that early voting in Louisiana represents a statistically significant percentage of the total vote which must be accounted for, and "the scientifically accepted method for analyzing whether there is racially polarized voting ("RPV") is the ecological inference analysis ("EI"), which requires precinct-level voting data."[369] As elicited during trial, the Louisiana Secretary of State *only* reports candidate-specific early and absentee votes at the parish-wide level.[370] Other states report this information at the precinct level.[371] Accordingly, Dr. Handley assumed the same percentage allocation of election day votes per candidate per precinct to allocate the early votes per candidate per precinct to perform the requisite analysis.[372]

---

[364] Rec. Doc. 206, p. 27.
[365] *Id.; See also* Rec. Doc. 148-1, p. 2.
[366] Rec. Doc. 171.
[367] Rec. Doc. 148.
[368] Rec. Doc. 171, p. 4; Rec. Doc. 165-1, p. 7.
[369] Rec. Doc. 171, p. 4–5.
[370] Rec. Doc. 217, p. 16, line 15–p. 17, line 1.
[371] Rec. Doc. 217, p. 16, line 22–p. 17, line 1.
[372] Rec. Doc. 217, p. 17, lines 2–6.

Defendants do not dispute that precinct-level data is necessary to run the EI analysis, but challenge how to best de-aggregate or allocate the available parish-wide data down to usable precinct-level data. Dr. Handley testified at trial that the methods she employed did not introduce any bias into her EI analysis.[373] The Court is persuaded that the slight over and underestimate of votes per precinct resulting from the subject allocation method is statistically insignificant and thus does not render the conclusions unreliable. "EI analysis is done using proportions of the vote share that each candidate received, . . . not raw total numbers that are input into the EI algorithm."[374] The Court does not find that the method employed by Dr. Handley to de-aggregate parish-wide numbers was the result of bias, and there is no evidence that it rendered the analysis infirm or the conclusions unreliable. The Court finds Dr. Handley's allocation and analysis of the early votes reliable and her conclusions credible.

Defendants further challenge Dr. Handley's opinion by arguing that the only district-specific information reported by Dr. Handley classifies districts as either "effective" or not, without opining as to the level of BVAP needed to be effective. Per Defendants, Handley's analysis has limited value because it does not inform the Court whether a majority-Black district is actually necessary in order for the Black-preferred candidate to be elected.

Instead, Defendants claim that a functional analysis shows that additional majority-Black districts are not needed in the "areas of interest" due to sufficient White crossover voting. To support this proposition, Defendants retained Dr. Jeffrey B. Lewis to analyze and estimate "the degree of Black voter cohesion and white voter crossover" included in

---

[373] Rec. Doc. 217, p. 42, lines 16–25.
[374] Rec. Doc. 165, p. 4 (citing Dr. Handley's deposition, Rec. Doc. 165-3).

Dr. Handley's clusters."[375] By stipulation of the parties, Dr. Lewis was admitted as an expert in political science, quantitative methods, and racially polarized voting analysis.[376] To perform his analysis, Dr. Lewis used the ecological inference method to analyze election data from 2015 to 2021 and consider "how each contest would have turned out if only the votes of those residing in each enacted and illustrative State House and State Senate had participated."[377] He concluded that White crossover voting ranged from 18 percent to 27 percent on average in two-candidate election contests in the challenged districts, and that less than a 50 percent BVAP is actually necessary for a 50 percent win rate in the specific illustrative districts drawn by Mr. Cooper.[378] Defendants argue that because almost all of the House and Senate clusters identified by Dr. Handley would all "perform" at BVAP levels less than 50 percent, none of the metrics warrant a redrawing of the 2022 House and Senate maps to create new majority-Black districts.

However, as held by the Fifth Circuit, "[i]llustrative districts that could perform with a BVAP of less than 50 percent with white crossover voting are not the focus of the third *Gingles* precondition analysis."[379] "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature."[380] Further, Defendants' claims that there are additional opportunity districts in the areas of interest identified in the Enacted Maps are unsupported by evidence. These claims are based solely on Dr. Lewis' opinion that the Black-preferred candidates could advance (not ultimately win) in a few districts

---

[375] Interv-52, p. 3.
[376] Rec. Doc. 218, p. 112, lines 2–10.
[377] Interv-52, p. 2.
[378] Interv-54, p. 3.
[379] *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023).
[380] *Id.* at 596.

without a majority BVAP.[381] An examination of what Dr. Lewis identifies as "win rates" in his reference districts reveals that the Black-preferred candidate does not usually prevail in the final election.[382] There is no evidence that Black-preferred candidates will consistently prevail in election districts that are less than 50 percent BVAP.

When comparing the effectiveness scores in Dr. Handley's report to the win rates from Dr. Lewis' report, the Court finds that Dr. Handley presented clear evidence that, save for the one exception in Enacted House District 91, no districts in the Enacted Maps provide Black voters the opportunity to elect their candidate of their choice other than those districts with a majority BVAP.[383]

Finally, Defendants offered the expert testimony of Dr. John R. Alford, who Plaintiffs stipulated, and the Court accepted, to provide expertise in the areas of voting behavior and redistricting.[384] Dr. Alford reviewed the voting results in Louisiana from the past three presidential elections and concluded that the predominate factor causing polarization in these elections was party and not race.[385] Dr. Alford first challenged Dr. Handley's finding that the Black vote was cohesive by examining the elections used in Dr. Handley's RPV analysis. He opined that "Black voters tend to provide cohesive support to Democratic candidates, often in the 80 to 90 percent range, and that White voters in turn support Republican candidates, with White votes for the Republican candidates typical in the 80 to 90 percent range."[386] However, he conceded that when

---

[381] Rec. Doc. 214, p. 29, line 18–p. 31, line 9.
[382] Rec. Doc. 214, p. 34, line 1–p. 35, line 13.
[383] Enacted HD 91 is the only current legislative district in the state without a majority BVAP where Black-preferred candidates can get elected. *See* Pla-1, p. 16, n.18. Enacted HD 91 is not within Plaintiffs' areas of interest and is not majority-White.
[384] Rec. Doc. 228, p. 99, lines 4–8.
[385] Rec. Doc. 228, p.104, line 7–p. 109, line 2.
[386] Interv-53, p. 10.

multiple Black Democratic candidates were eligible for election, the Black vote was divided.[387]

Dr. Alford also analyzed additional statewide races that did not feature a Black candidate and concluded that Black voters tend to support Democratic candidates, White voters tend to support Republican candidates, and that these support levels remain relatively constant regardless of the race of candidates involved.[388] Dr. Alford relied on the elections of Louisiana's Governor John Bel Edwards (a White Democratic candidate) as further evidence that partisan, not racial considerations, drive voting choices, as Black Democratic candidates were also on the ballot in both the October 2015 and October 2019 elections but received almost no Black support.[389] Dr. Alford concluded that the "high cohesion demonstrated by Black voters in these elections is not a function of Black voters coalescing around Black candidates, but rather is a function of cohesive Black voter preferences for Democratic party candidates."[390]

However, the Court does not credit Dr. Alford's opinion as helpful, as it appears to answer a question that *Gingles* II does not ask and in fact squarely rejects,[391] namely, *why* Black voters in Louisiana are politically cohesive. "It is the *difference* between the choices made by blacks and whites—not the reasons for that difference—that results in blacks having less opportunity than whites to elect their preferred representatives. Consequently, . . . under the 'results test' of § 2, only the correlation between race of voter

---

[387] Interv-53, p. 10–11.

[388] Interv-53, p. 9–13.

[389] Interv-53, p. 11–13.

[390] Interv-53, p. 17.

[391] *Gingles*, 478 U.S. 30, 63 (1986) ("The first reason we reject appellants' argument that racially polarized voting refers to voting patterns that are in some way *caused by race*, rather than to voting patterns that are merely *correlated with the race of the voter*, is that the reasons black and white voters vote differently have no relevance to the central inquiry of § 2").

and selection of certain candidates, not the causes of the correlation, matters."[392] The relevant inquiry in determining whether voting is racially polarized is whether Black and White voters consistently support different candidates—that is, whether Black voters are cohesive in their support of their candidates of choice, and whether the candidates supported by Black voters are usually defeated by the candidates supported by White voters.

To the extent party preference is relevant to the § 2 inquiry, it is appropriately assessed when analyzing the "totality of the circumstances," not in the assessment of racially polarized voting under *Gingles* II and III.[393] Importantly, both Dr. Handley and Dr. Alford agree that Louisiana's Black and White voters "are voting differently,"[394] with Dr. Alford further testifying, "[i]f that's what you want to call racially polarized voting, then it's racially polarized voting."[395]

Dr. Handley presented consistent evidence establishing that co-partisan voters are voting differently depending on the race of the candidate. Looking at Dr. Alford's own data, Dr. Handley concluded that "very consistent[ly] . . . white voters gave more support to white Democrats than the Black Democrats."[396] The Court finds Dr. Handley credible and her conclusions reliable and well supported. The Court rejects Defendants' attempt to append an additional requirement to *Gingles* II & III, namely, that Black voters' cohesion

---

[392] *Id*.
[393] *Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996) ("A defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors under the totality of the circumstances standard.") (cleaned up).
[394] Rec. Doc. 228, p. 151, line 12. *See* Rec. Doc. 217, p. 13.
[395] Rec. Doc. 228, p. 151, lines 12–14.
[396] Rec. Doc. 214, p. 180, line 9–p. 181, line 12; p. 182, line 9–p. 183, line 8.

must be shown to be caused by or attributable to race instead of something else, like partisanship. The Court finds no basis for this requirement in the law.[397]

*Gingles* II asks whether Black voters are "politically cohesive,"[398] – in other words, whether Black voters usually support the same candidate in elections. *Gingles* III asks whether White voters vote "sufficiently as a bloc to usually defeat [Black voters'] preferred candidate."[399] Based on the testimony and reports of expert witnesses presented at trial, the Court finds that the Plaintiffs have proven both preconditions.

### C.  The Totality of the Circumstances: The Senate Factors

A Section 2 violation is established:

> if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial minority group] ... in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.[400]

"[I]t [is] only the very unusual case in which the plaintiffs can establish the existence of the three *Gingles* factors but still have failed to establish a violation of § 2 under the totality of circumstances."[401]

### i.    Senate Factor 1: The Historical Context

This inquiry considers "[t]he extent of any history of official discrimination in the state ... that touched the right of the members of minority group to register, to vote, or otherwise to participate in the democratic process." In other words,

---

[397] For further discussion of the evidence that polarized voting in Louisiana is race-related, *see* Section IV(C)(ii) *infra* on Senate Factor 2.
[398] *Cooper*, 581 U.S. 285, 301-02 (2017).
[399] *Id.*
[400] *Gingles*, 478 U.S. at 36.
[401] *Clark v. Calhoun Cnty.*, 21 F.3d 92, 97 (5th Cir. 1994).

"the history of voting-related discrimination in the State or political subdivision."[402] On this factor there is no meaningful dispute.

For over 40 years, Louisiana's courts have recognized the state's history of official discrimination.[403] The Eastern District of Louisiana noted that "Louisiana's history of racial discrimination, both *de jure* and *de facto*, continues to have an adverse effect on the ability of its black residents to participate fully in the political process."[404] "[I]t would take a multi-volumed treatise to properly describe the persistent, and often violent, intimidation visited by white citizens upon black efforts to participate in Louisiana's political process."[405] Defending a Congressional map enacted by the Legislature, the State of Louisiana advanced the argument that past injustices that were clearly unconstitutional were the State's primary motivation for reinforcing black representation.[406]

Recently, this Court has found it "indisputable that Louisiana has a long history of discriminating against black citizens" such that there is no "sincere dispute regarding Senate factor 1."[407] The unchallenged expert historian in this case, Dr. Gilpin, recounted the sordid history of Louisiana's discriminatory practices, including disenfranchisement of Black voters through poll taxes, property ownership requirements, and literacy tests that were first implemented before Black Louisianans had the right to vote.

Although these disenfranchisement mechanisms were heavy-handed, they were not initially successful. Black Louisianans proved resilient and Black voters made up

---

[402] *Gingles*, 478 U.S. at 44.
[403] *See Major v. Treen*, 574 F. Supp. 325, 339–40 (E.D. La. 1983); *see also Citizens for a Better Gretna v. City of Gretna*, 636 F. Supp. 1113, 1116 (E.D. La. 1986).
[404] *Treen*, 574 F. Supp. at 339–40.
[405] *Gretna*, 636 F. Supp. at 1116.
[406] *Hays v. State of La.*, 862 F. Supp. 119, 128 (W.D. La. 1994). The legislatively enacted congressional maps were ultimately found violative of the 14th Amendment as impermissibly racially gerrymandered.
[407] *Terrebonne Par. Branch NAACP v. Jindal*, 274 F. Supp. 3d 395 (M.D. La. 2017); *Robinson v. Ardoin*, 605 F.Supp. 3d 759 (M.D. La. 2022).

almost 45 percent of registered voters in 1896.[408] In response to this increase in Black engagement, the State implemented increasingly burdensome restrictions which suppressed the Black vote.[409] For example, Louisiana implemented the Grandfather Clause in 1898 which prohibited a Black citizen from voting unless they could establish that their father or grandfather had voted before January 1, 1867.[410] The result of the extensive disenfranchisement efforts employed by the Louisiana government resulted in Black voting plummeting drastically.[411] Between 1910 and 1948, fewer than one percent of Black Louisianans were able to register to vote.[412] When the Voting Rights Act was passed in 1965, only approximately one-third of Black Louisianans were registered to vote.[413]

The Voting Rights Act and federal oversight did not end Louisiana's disenfranchisement efforts.[414] The U.S. Attorney General issued 66 objection letters to more than 200 voting changes in Louisiana from 1965 to 1999.[415] Between 1982 and 2003, there were 13 instances of parishes simply resubmitting objected-to proposals with either cosmetic changes or simply no changes.[416] Recently, in 2021, the City of West Monroe entered into a consent decree with the DOJ regarding its use of solely at-large districts for election to the Board of Aldermen.[417] As explained by Dr. Gilpin, it is commonly recognized that at-large elections result in the dilution of minority votes.[418]

---

[408] Pla-124, p. 21.
[409] *Id.*
[410] *Id.*
[411] *Id.* at p. 24.
[412] *Id.* at p. 25.
[413] *Id.* at p. 27.
[414] *See id.* at pp. 29–30.
[415] *Id.* at p. 30.
[416] *Id.* at p. 39.
[417] *Id.* at p. 49.
[418] *Id.* at p. 39.

Black voter suppression continues in the form of closing polling places, restricting access to polling places, restricting access to early voting, and limiting mail-in voting.[419] For example, Dr. Gilpin reports that "the State does not merely de-prioritize widening access to voting, particularly for Black voters, [but] many Louisiana politicians continue to actively work against that increased access."[420] The effect of closing polling places which serve primarily Black voters was manifest in the 2020 election when many Black voters in Jefferson Parish experienced five-hour waiting times to cast a ballot.[421] Precinct consolidation in St. Landry Parish resulted in some Black voters having to drive 25 miles to cast a ballot.[422] There is no evidence that violations of the VRA are less prevalent than they were in the past decade. Instead, they may be less visible now with the elimination of federal oversight.[423] The Court finds the expert testimony of Dr. Gilpin both persuasive and credible. The Court finds that Senate Factor 1 weighs strongly in favor of the Plaintiffs.

**ii.    Senate Factor 2: Extent of Racial Polarization**

Senate Factor 2 examines "the extent to which voting in the elections of the state or political subdivision is racially polarized."[424] When deciding whether race rather than partisanship explains polarization, courts compare the strength of the evidence presented on racial bias with that of partisan politics.[425] After all, § 2 of the VRA "is implicated only where Democrats lose because they are black, not where blacks lose because they are Democrats."[426]

---

[419] *Id.* at p. 31.
[420] *Id.* at p. 46.
[421] *Id.*
[422] *Id.*
[423] *See Shelby County*, 570 U.S. 529.
[424] *Gingles*, 478 U.S. at 37.
[425] *Lopez*, 339 F. Supp. 3d at 604.
[426] *League of the United Latin Am. Citizens Council*, 999 F.2d 831, 854 (5th Cir. 1993) (en banc).

Defendants relied on the testimony of Dr. John Alford to demonstrate that voting in Louisiana is politically, not racially, polarized.[427] However, Plaintiffs rebutted this testimony with that of Dr. Lisa Handley, who, as previously addressed by the Court, presented evidence that voting in Louisiana is racially polarized. In the elections she analyzed, Dr. Handley found no examples of an election where White voters who were voting for a Democrat supported Black and White Democrats equally.[428] Rather, "very consistent[ly] . . . White voters gave more support to the White Democrats than the Black Democrats."[429] Plaintiffs further rebutted Dr. Alford's theories of partisan polarization with the expert testimony of Dr. Marvin P. King, Jr., who was accepted as an expert in political science, voting behavior and racially polarized voting.[430] Dr. King conducted an EI analysis on Louisiana's 2022 U.S. Senate Election and provided an opinion specifically rebutting Dr. Alford's opinion.[431] Dr. King's EI analysis revealed that White registered Democrats tended to vote for the White Democratic candidate (Luke Mixon) and Black registered Democrats tended to vote for the Black Democratic candidate (Gary Chambers) at a nearly 2:1 ratio.[432] He also reviewed Dr. Alford's data, which analyzed the votes cast by all voters (not just Democrats) and found they supported the conclusion that voting is racially polarized.[433] Dr. King testified that, based on his EI analysis and his review of Dr. Alford's analysis, "party polarization is only part of the story . . . racial polarization also exists even among copartisans."[434] Dr. King ultimately opined that in the

---

[427] Rec. Doc. 228, p. 153–155.
[428] Rec. Doc. 214, p. 181, lines 9–12.
[429] Rec. Doc. 214, p. 180, line 15–p. 181, line 12; p. 182, line 9–p. 183, line 8.
[430] Rec. Doc. 214, p. 59, lines 11–21.
[431] Rec. Doc. 214, p. 60.
[432] Rec. Doc. 214, p. 66.
[433] Rec. Doc. 214, p. 66–69.
[434] Rec. Doc. 214, p. 70, lines 16–22.

absence of additional majority-minority districts, Black voters cannot count on White copartisans to elect the Black voters' preferred candidate.[435]

Defendants did not rebut Dr. King's EI analysis or testimony. The Court credits Dr. King's findings over the conclusions of Dr. Alford and finds Dr. King's testimony more credible. The historical realignment of Black voters from voting Republican to voting Democrat undercuts the argument that the vote is polarized along party lines and not racial lines.

The Court finds that Senate Factor 2 weighs heavily in favor of Plaintiffs.

### iii.   <u>Senate Factor 3</u>

This factor inquires into "[t]he extent to which the state . . . has used . . . voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[436] The Supreme Court counsels examination of "the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group."[437]

Louisiana has a majority vote requirement for its primaries and general elections. Some states have moved away from this. There was evidence of voter confusion that results from repeated and voluminous decentralized elections.[438] Many state elections are conducted in odd-years with October primaries and November runoff elections. This is at odds with federal elections held in even-years with November primaries and

---

[435] Rec. Doc. 214, p. 71.
[436] *Gingles,* 478 U.S. at 37.
[437] *Id.*
[438] Rec. Doc. 223, p. 31, line–p. 32, line 13.

December runoffs.[439] The State held seven elections in 2023 and as many as twelve elections have been held in a single year.[440] The Court finds, consistent with the testimony of voters,[441] this type of calendar of elections breeds voter fatigue and confusion, which is amplified in poor and under educated communities. The Court finds Senate Factor 3 favors the Plaintiffs.

### iv.    Senate Factor 4: Candidate Slating

There is no slating process for Louisiana's State Legislative elections, so this factor is not relevant and the Court makes no finding.

### v.    Senate Factor 5

Factor 5 concerns "the extent to which members of the minority group in the state . . . bear the effects of discrimination in such areas as education, employment [,] and health, which hinder their ability to participate effectively in the political process."[442] The preponderance of the evidence proved that Black voters' participation in the political process is impaired by historic and continuing socio-economic disparities in education, employment, housing, health and criminal justice. Dr. Traci Burch was accepted by the Court and stipulated by the parties as an expert in in the field of racial discrimination, political participation, and barriers to voting.[443] She is well-respected and well qualified in

---

[439] Rec. Doc. 218, p. 30, line 14–p. 31, line 8.

[440] *Id.*

[441] Rec. Doc. 223 (Ho-Sang and Nairne).

[442] *Gingles*, 478 U.S. at 37

[443] Rec. Doc. 213, p. 10, line 16–p. 11, line 3. Dr. Burch is an associate professor of political science at Northwestern University and a research professor at the American Bar Foundation since 2007. Pla-127, p. 1. Dr. Burch received her Ph.D. in government and social policy from Harvard University, and her undergraduate degree in politics from Princeton University. *Id.* Dr. Burch has published numerous peer-reviewed publications and a book on political participation, and she teaches several courses related to voting and political participation. *Id.* Dr. Burch has garnered several prizes and awards, including national prizes, for her book and her dissertation. *Id.* She has also served as a peer reviewer for flagship scholarly journals in her field of political science. *Id.* She is widely regarded as an expert on political behavior, barriers to voting, and political participation and has previously served as an expert witness in at least seven other

her fields of discipline, and the Court finds her opinions credible, well supported by data, and the result of reliable methodology. The Court credits Dr. Burch's testimony. In formulating her opinions, Dr. Burch relied on sources and methodologies recognized in the field and consistent with her work as a political scientist.[444] Dr. Burch cited compelling data that supports the conclusion that Black Louisianans experience social and economic disparities that negatively impact voter registration and participation.[445]

Louisiana has endured de facto segregated public schools.[446] Predominately Black public schools are resource challenged and Black people are underrepresented in higher education.[447] The underfunding of HBCUs reveals that disparities persist into higher education.[448]

Dr. Burch persuasively testified, supported by data, that there are employment disparities because of discrimination, revealed by several measures.[449] The objective evidence of employment disparities presented by Dr. Burch was again buttressed by the

---

cases, including voting rights cases where she offered expert testimony relating to certain Senate Factors. Pla-126 , pp. 1–2.

[444] Pla-126; Pla-128

[445] Rec. Doc. 213, pp. 14,19, 105–107. Dr. Burch's opinions were substantiated and buttressed by the fact testimony. *See* Testimony of Dr. Dorothy Nairne, Rec. Doc. 223, pp. 22–23; Testimony of Pastor Steven Harris, Rec. Doc. 223, p. 71.

[446] The ProPublica's *Miseducation* Project discerns that as of 2017, "half of traditional school districts in Louisiana that were available demonstrated high levels of racial segregation within the district. [T]here are "nine of the 68 traditional school districts in Louisiana that are more than 87 percent non-white." Rec. Doc. 213, p. 17, lines 7–13. In East Baton Rouge, there is "kind of a parity between Black people and White people . . . But "in the school system [in East Baton Rouge] it's over. . . 70 percent Black." *Id.* at p. 17, line 25–p. 18, line 3. This is likely due to white families "abandon[ing] East Baton Rouge for a different school district." *Id.* at p. 18, lines 7–9. Math and reading test scores across Black and White students indicate that White students perform better by about 22–25 points. *Id.* at p. 19, lines 1–10. A 2019 American Community Survey indicates that of Louisiana adults aged 25 and older, over 25 percent of White Louisianans have earned a bachelor's degree or higher compared to a little over 15 percent of Black Louisianans. Pla-126, p. 7.

[447] Pla-126, p. 7.

[448] Rec. Doc. 223, p. 151.

[449] Rec. Doc. 213, p. 20, line 23–p. 24, line 24;Pla-126, p. 9.

firsthand experiences of several of the Plaintiffs' fact witnesses.[450] Economic hardships caused by under-employment are directly manifested in a lack of transportation.[451] Transportation barriers adversely affect access to voter registration and polling sites.[452] Black Louisianans are underrepresented in white collar occupations which provide the security to "time to take off of work without losing or risking your pay," to vote.[453]

The Court credits Dr. Burch's opinions and the supporting testimony of fact witnesses and finds that the marginal educational and employment opportunities available to Black Louisianans hinders and impairs meaningful access to the political process.

The Court also finds that segregated and disparate housing persists in part due to historic public policies and government sanctioned lending practices.[454] This further impairs and frustrates access to polling places and participation in the political process.

A preponderance of the evidence established that the prevalence of disease and mortality rates are higher for Black Louisianans as compared to White Louisianans, and

---

[450] Pastor Harris testified that his community had a high poverty rate because of the lack of access to jobs in the area. Rec. Doc. 223, p. 71, lines 5–7. Dr. Nairne testified to the challenges she faced securing funding for her start-up businesses while less qualified White applicants secured these opportunities. *Id.* at p. 34, lines 3–20.

[451] Data from the 2019 American Community Survey showed that a significant portion of Black households do not have access to a vehicle and that Black property "is more than double, almost triple that of White poverty." Rec. Doc. 213, p. 22, line 16–p. 23, line 8.

[452] *Id.* Again the opinion testimony of Dr. Burch was substantiated by the fact testimony. See testimony of Dr. Washington and Dr. Nairne, Rec. Doc. 223, p. 20, line 22–p. 24, line 24; p. 32, line 14–p. 33, line 7; p. 104, line 10–p. 105, line 4.

[453] Rec. Doc. 213, p. 24, lines 15–17.

[454] Black Louisianans face more difficulty with securing financial relief to rebuild homes and business following natural disasters. Pla-126, p. 10. The Louisiana Survey found 72 percent of Black respondents believe Black people are treated less fairly when applying for a loan or mortgagee. *Id.* The Federal Housing Administration considered race when evaluating "the trajectory" of a city or neighborhoods. This led to Black and racially mixed neighborhoods being "deemed hazardous for lending." *Id.* at p. 13. The FHA also encouraged the use of racially restrictive covenants and racial zoning. These policies were not abandoned until 1949. *Id.* at pp. 12–13. The FHA would rely on Residential Security Maps produced by the Home Owners Loan Corporation to "prevent lending to places Black people lived. *See id.* at p. 13; Rec. Doc. 213, p. 24, line 25–p. 28, line 18.

Black Louisianans have less access to health insurance and healthcare.[455] The Court finds that these health disparities adversely impact voter engagement and participation.[456]

It is a well-known and often cited fact that Louisiana's incarceration rates lead the nation.[457] Black Louisianans are disproportionately jailed as compared to White Louisianans. Dr. Burch persuasively and credibly opined that this disparity is the result of historical discrimination in policing, sentencing, and other stages of the justice system dating back to the Reconstruction Era.[458] "[A]pproximately 80% of the parolees/probationers currently ineligible to vote are African American, compared with about 32% of the population of the state."[459] Nearly 48,000 Black Louisianans were unable to vote in 2020 due to their felony convictions, twice the number of White Louisianans.[460] Studies show that perceived unfair law enforcement tends to "demobilize voting and make people shy away from participating in politics".[461]

The Court finds that Senate Factor 5 weighs decidedly in favor of the Plaintiffs.

### vi.    Senate Factor 6

Senate Factor 6 analyzes "whether political campaigns have been characterized by overt or subtle racial appeals."[462] Dr. Burch cited multiple instances of subtle and overt

---

[455] Rec. Doc. 213, p. 29, line 17–p. 31, line 14.
[456] Dr. Burch testified that health is an "important predictor of voter [turnout]" because "healthy people are more likely to vote," and sick people have less "time and [sic] money to go vote or engage in politics." Rec. Doc. 213, p. 32, line 9–p. 33, line 11. Health disparities "shaped by government and market policy" have a direct impact on voter participation. *Id.*
[457] Rec. Doc. 213, p. 33, line 13–p. 38, line 3.
[458] *Id.*; *see also* Pla-126 at pp. 19-22.
[459] Pla-124, p. 50.
[460] Rec. Doc. 213, p. 35, lines 22–24.
[461] *Id.* at p. 38, lines 2–3. Dr. Washington pointed out the subliminal message of the Sheriff's Office being housed on the same floor as her Registrar of Voter's Office. Rec. Doc 223, p. 102, lines 6–14.
[462] *Gingles*, 478 U.S. at 37

racial appeals in political advertising in recent elections.[463] Plaintiffs Nairne and Ho-Sang testified about the disparaging nature of the messaging by Senator Kennedy's re-election campaign that depicted images of Black Lives Matter protests alongside the comment suggesting that critics of the police should "call a crackhead."[464] They also testified about racially suggestive campaign ads aired in the latest gubernatorial election.[465] Reverend Clee Lowe persuasively explained how subtle racial appeals send a clear signal that particular elected officials are "not going to represent our interests."[466]

The Court finds that Senate Factor 6 weighs in favor of the Plaintiffs.

vii.    **Senate Factor 7**

This factor assesses "the extent to which members of the minority group have been elected to public office in the jurisdiction."[467] It is undisputed that Black Louisianans are underrepresented in public office. No Black candidates have been elected as Governor or Lieutenant Governor in Louisiana since the end of Reconstruction.[468] Never in history has Louisiana elected a Black U.S. Senator.[469] Since 1991, only four Black Louisianans have been elected to Congress, and then only from majority-Black districts.[470]

This underrepresentation persists at other levels of state and local government as well. While the state is roughly one-third Black, Black legislators held only 36 out of 144 total State House seats in 2023 and Black senators held only 10 out of 39 total State

---

[463] Campaign messaging used by candidates for governor, U.S. Senate, and the state legislature. Rec. Doc. 213, p. 38, lines 5–p. 47, line 11; Pla-126, pp. 22–25.

[464] Rec. Doc. 223, p. 26, line 25–p. 40, line 11; p. 190, line 24–p. 191, line 25.

[465] Rec. Doc. 223, p. 36, line 25-p. 39, line 3; p. 190, line 24–p. 191, line 25.

[466] Rec. Doc. 223, p. 62, lines 19–24.

[467] *Gingles*, 478 U.S. at 37.

[468] Pla-126, p. 25.

[469] *Id*.

[470] Before 1991, there was one Black Congressperson elected, and that was during Reconstruction. *Id*.

Senate seats.[471] Less than 25 percent of Louisiana mayors are Black, and only 26.1 percent of Louisiana state court judges are Black.[472] Two of the eight elected Board of Elementary and Secondary Education members are Black, both elected from majority-Black districts.[473] And only one Associate Justice on the Louisiana Supreme Court, who was elected from the State's sole majority-Black Supreme Court district, is Black.[474]

The effect of the Senate factors previously discussed become manifest in these sobering statistics. The Court finds that Senate Factor 7 weighs heavily in favor of Plaintiffs.

### viii.    Senate Factor 8

Senate Factor 8 invites inquiry related to "whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group."[475] The demonstrated disparities across socioeconomic indicators discussed above are evidence of the lack of responsiveness of State government to the needs of Black Louisianans. Nearly 70 percent of Black survey respondents indicated that "most elected officials in Louisiana don't care what people like me think."[476] The redistricting roadshows are further evidence of the non-responsiveness of state elected officials. The roadshows were robustly attended across the state. Time and again Black citizens expressed to their elected representatives that they wanted more minority representation in the State House and Senate.[477] Several proposed maps were advanced

---

[471] *Id.*
[472] *Id.*
[473] *Id.*
[474] *Id.*
[475] *Gingles*, 478 U.S. at 37.
[476] Pla-126, p.26.
[477] State Representative Glover testified that while he was at one of the roadshows "heard folks asking for fair maps that they represent the actual demographics of the state and adhere to the provisions of the

by various stakeholders that accomplished this objective.[478] Instead the Legislature eliminated a majority-Black district in north Louisiana[479] and the President of the Senate unequivocally expressed a notion of incumbency protection as paramount over other redistricting criteria.[480]

A considered review of the cumulative evidence which support Senate Factors 1, 2, 3 and 5 lead to the inevitable conclusion that the State Legislature has been historically unresponsive and remains unresponsive to the needs of the Black communities in Louisiana. The Court finds that Senate Factor 8 weighs in favor of the Plaintiffs.

### ix.    Senate Factor 9

Lastly, in considering the totality of the circumstances, the Court assesses "whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."[481] The

---

Voting Rights Act." Rec. Doc. 223, p. 149, lines 14–20. Ho-Sang testified at the road show hearing to address the "many concerns that were coming" from the Black community. *Id*. at p. 168, lines 15–21. "[D]uring the redistricting road shows…several Black Louisianans from across the state offered opinions on the redistricting process and criticized current official for being unresponsive to their needs. The speakers often explicitly linked officials' lack of responsiveness to race." Pla-126, p. 27. "The committee heard overwhelmingly from the public that they wanted increase minority in their senate maps." *Id*. at p. 28.

[478] State Representative Glover presented the House with several plans that would create at least 30 majority-minority districts as Black legislatures were worried that H.B. 14 "packed Black voters into as few districts as possible, particularly in northwest Louisiana." Pla-126, pp. 35, 42.  One senator "argued vehemently that the people of the West Bank of Jefferson Parish constituted a community of interest that deserved representation…" Pla-126, p. 39.

[479] "H.B. 14 eliminates an existing majority-minority district in the northern part of Louisiana, HD23…" Pla-126, p. 33.

[480] Joint Rule 21 (Pla-53) makes no express reference to "continuity of representation" but Senator Cortez testified that he reads Joint Rule 21, section D(4) which refers to "maintain district alignment" as prioritizing incumbency. Rec. Doc. 228, p. 27, line 24–p. 31, line 4. "It means that if your district elected you and you've done a good job, they also have a right to reelect you." *Id*. at p. 29, lines 18–19. Dr. Nairne, Rev. Lowe, Dr. Washington, and Ms. Ho-Sang testified about the dilutive districts in which they reside, which have resulted in noncompetitive and little interest and attention from candidates in the Black community. Rec Doc. 223, p. 26, line 22–p. 29, line 9; p. 59, lines 2–9; p. 60, lines 6–11; p. 62, lines 25–p. 63, line 7; p. 105, line 5–p. 106, line 17; p. 179, line 25–p. 180, line 20. Ms. Ho-Sang testified that elected officials' unresponsiveness is "evidenced in the conditions in our community," and the failure to initiate and implement policies that would improve Black people's lives, including the failure to streamline elections or address issues like Black maternal health and criminal justice. *Id*. at p. 192, line 19–p. 193, line 6.

[481] *Gingles,* 478 U.S. at 37

evidence supporting Senate Factors 3 and 5 demonstrates the use of voting practices and procedures is tenuous to anything other than disenfranchising Black voter participation in the political process. This factor likewise favors the Plaintiffs.

The Court notes that the Defendants did not meaningfully contest any of the Senate Factors evidence.[482] In conclusion, the Court has evaluated the totality of the circumstances with a "functional view of the political process'" and "[a] searching and practical review of electoral conditions"[483] and finds that all of the Senate Factors relevant to the Court's consideration in this case favor the Plaintiffs.

### x.    Proportionality

Section 2 expressly provides that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." "[P]roperly applied, the *Gingles* framework itself imposes meaningful constraints on proportionality."[484] Defendants advance the argument that "Plaintiffs' § 2 claim lacks merit because it demands the creation of more majority-Black districts than the proportion of Black voting-age persons in the regions Plaintiffs challenge and in Louisiana [and] Plaintiffs have not shown that § 2 mandates more than proportionality."[485] Defendants argue that "vote dilution will ordinarily not be found where minority voters in the relevant 'area would enjoy substantial proportionality,' such as where the *districting plan* offers 'majority-minority districts in substantial proportion to the minority's share of voting-age population.'"[486] The Defendants reliance on *Johnson v. De Grandy*[487] is

---

[482] Rec. Docs. 177 and 206
[483] *Fusilier,* 963 F.3d at 456, 462.
[484] *Milligan,* 599 U.S. at 26.
[485] Rec. Doc. 206, pp. 34–35.
[486] Rec. Doc. 206, p. 35 (citing *Johnson v. DeGrandy,* 512 U.S. 997, 1013–14 and *LULAC v Perry,* 548 U.S. 399, 436 (2006) (citations omitted) (emphasis added).
[487] 512 U.S. 997 (1994).

misplaced. Unlike *Johnson,* the enacted plan challenged in this case does not reflect proportionality.[488] Certainly if a challenged plan effectuates proportionality (which the Enacted Maps challenged herein do not) that may be probative of whether the challenged map provides minority voters with an opportunity to elect candidates of their choice.[489] *Johnson* makes clear that proportionality is but one consideration in the totality of the circumstances of whether an enacted map denies minority voters equal political opportunity.[490] This case presents the "more complex side of the divide, requiring [the] court to determine whether provision for somewhat fewer majority-minority districts than the number sought by the plaintiffs was dilution of the minority votes." [491] The Court finds that the answer to that question is yes.

Defendants argue that the Illustrative House and Senate Plans "demand a political feast where the *challenged plans afford more than equal opportunity*."[492] To the contrary, the Enacted Maps do not afford an equal opportunity for Black voters to elect preferred candidates. Careful analysis of the *Gingles* preconditions and the totality of the circumstances led this Court to conclude that the Enacted State House and Senate Maps,

---

[488] 40 of the 144 districts (28 percent) in the Enacted Plans are majority-minority. Rec. Doc. 206, pp. 38–39 ("The [E]nacted [S]enate [P]lan includes 11 majority-Black districts….The [E]nacted [H]ouse Plan has 29 majority-Black districts…"). The Defendants have conveniently re-coined "substantial proportionality." *Id.* at p. 37.

[489] See *Johnson,* 512 U.S. at 1014, 1020-1021 *(*"[t]reating equal political opportunity as the focus of the enquiry . . . proportionality [may be]  an indication that minority voters have an equal opportunity, in spite of racial polarization,  'to participate in the political process and to elect representatives of their choice' (citing 42 U.S.C. § 1973(b), [but] the degree of probative value assigned to proportionality may vary with other facts. No single statistic provides courts with a shortcut to determine whether a set of single member districts unlawfully dilutes minority voting strength.")

[490] *See Id.* at 998 ("[P]roportionality is not dispositive, it is a relevant fact in the totality of circumstances to be analyzed when determining whether minority voters have 'less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice' (citing 42 U.S.C. § 1973)).

[491] *Id.* at 1013

[492] Rec. Doc. 206, p. 35 (emphasis added). Notably, the Enacted Maps are not proportional. Of Louisiana's 105 House districts, 29 are majority BVAP, and of Louisiana's 39 Senate districts 11 have a majority BVAP.

in the areas of the illustrative districts, are dilutive of Black voting strength and violative of Section 2 of the Voting Rights Act.

Defendants maintain that where, as here, the Plaintiffs have challenged specific districts in specific areas, the proportionality analysis must be conducted by region.[493] The Defendants erroneously seek to import the localized appraisal required in the *Gingles* I analysis with the proportionality analysis required as part of the totality of circumstances analysis. As part of its *Gingles* I analysis, the Court undertook "an intensely local appraisal"[494] of the boundaries in the Enacted Maps in the regions where the illustrative districts were proposed. The Defendants regional proportionality defense is unsupported and directly at odds with Supreme Court precedent which holds that proportionality is a statewide inquiry.[495] Furthermore, the Supreme Court makes clear that proportionality is neither a defense nor safe harbor.[496]

Defendants argue that "the only way to achieve the maximization Plaintiffs demand is by the intentional and intensive use of race in drawing districts specifically combine non-compact minority populations into districts a smidgen above 50 [percent] BVAP—in a nutshell: aggressive racial gerrymandering."[497] The Defendants put the cart before the horse. The Illustrative Plan offered by the Plaintiffs is precisely that; *illustrative.* It does not carry the force of law and is not state action, thus the invitation to strictly scrutinize the Illustrative Plan at this stage is misplaced.

---

[493] Defendants argue that "'the relevant population'" for the proportionality analysis is the BVAP population in the geographic areas Plaintiffs identified as the locus of vote dilution." Rec. Doc. 206, p. 36 (brief, p. 29) (citing *Johnson,* 512 U.S. at 1017).
[494] *Milligan*, 599 U.S. at 15 (quoting *Gingles*, 478 U.S. at 79).
[495] *See LULAC,* 548 U.S. at 437 ("We conclude the answer in these cases is to look at proportionality statewide.").
[496] *Johnson*, 512 U.S. at 1019.
[497] Rec. Doc. 206, p. 40.

The Court holds that the preponderance of the evidence establishes that the Enacted State House and Senate Maps crack or pack large and geographically compact minority populations such that Black voters in the challenged districts "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice,"[498] and the Illustrative Plan offered by the Plaintiffs show that additional opportunity districts can be "reasonably configured."[499]

## V.    CONCLUSION

The Court finds that the State House and Senate electoral maps enacted by the Louisiana legislature (S.B. 1 and H.B. 14) violate § 2 of the Voting Rights Act.

**It is ORDERED** that elections under S.B. 1 and H.B. 14 be and are hereby ENJOINED. The State is hereby permitted a reasonable period of time, to be determined by the Court following submittals by the parties, to address the Court's findings and implement State House and Senate election maps that comply with § 2 of the Voting Rights Act.

Signed in Baton Rouge, Louisiana, on <u>February 8, 2024</u>.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[498] 52 U.S.C § 10301 (2024).
[499] *Milligan*, 599 U.S at 43 (Kavanaugh, J., concurring).