**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**

DOROTHY NAIRNE, *et al*

CIVIL ACTION

*versus*

22-178-SDD-SDJ

R. KYLE ARDOIN, in his capacity
as Secretary of State of Louisiana

<u>**APPENDIX**</u>

In fidelity to Rule 52(a) and for ease of review, the Court appends the following separately enumerated findings of facts and conclusions of law to its *Ruling and Order* in the above-captioned matter. The following are not intended as an exhaustive recapitulation of the Court's reasoning, findings, or conclusions.

**I.    FINDINGS OF FACT**

<u>Standing</u>

1.  Dr. Dorothy Nairne is a Black registered voter and NAACP member who resides in Assumption Parish and House District 60, but who would reside within the boundaries of Illustrative House District 58.[1]

2.  Reverend Clee Earnest Lowe is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[2]

---

[1] Rec. Doc. 225, p. 52, line 17–p. 53, line 11.
[2] Rec. Doc. 225, p. 58, line 25–p. 59, line 14.

3.  Dr. Alice Washington is a Black registered voter who resides in East Baton Rouge Parish and House District 66, but who would reside within the boundaries of Illustrative House District 101.[3]

4.  Steven Harris is a Black registered voter and NAACP member who resides in Natchitoches Parish and House District 25, but who would reside within the boundaries of Illustrative House District 23.[4]

5.  Each Individual Plaintiff currently lives in a packed or cracked district in the Enacted Map and would live in a majority-Black district in the Illustrative Plan.

6.  Members of the NAACP are simultaneously members of the local NAACP branch in their area, the Louisiana NAACP, and the national NAACP.[5]

7.  Louisiana NAACP members include Black registered voters whose votes are diluted in the districts in which they vote and thus have standing in their own right.[6]

8.  In response to the Enacted Map, Black Voters Matter ("BVM") diverted resources away from its core mission of expanding Black voter engagement and building capacity in partner organizations.[7] BVM launched new accountability initiative to hold elected officials accountable to Black voters in order to counteract the enacted map's dilutive effect.[8]

9.  Black registered voters were discouraged by what they perceived as deafness to their appeals at the redistricting roadshows. This voter frustration manifested in

---

[3] Rec. Doc. 225, p. 58, line 25–p. 59, line 14.
[4] Rec. Doc. 225, p. 49, lines 10–20.
[5] Rec. Doc. 223, p. 120, lines 2-7.
[6] Rec Doc. 224 (SEALED), p. 5, line 22–p. 31, line 12.
[7] Rec. Doc. 223, p. 164, line 22–p. 165, line 3; p. 167, line 8–p. 186, line 13; p. 201, line 20–p. 202, line 5.
[8] Rec. Doc. 223, p. 177, line 2–p. 179, line 19; Pla-207; Pla-208.

increased voter apathy, causing BVM to divert core mission resources to voter retention efforts.[9]

10. The Enacted Map caused voter apathy, requiring BVM to devote additional staff time and resources toward convincing Black voters that their votes matter.[10]

11. Following the passage of the Enacted Maps, the Louisiana NAACP implemented organization and mobilization efforts to counteract the effects of the Enacted Maps on voter disillusionment, potential candidates, and funders' willingness to invest resources into Black communities in Louisiana.[11]

12. To counteract the Enacted Maps' dilutive effect, the organizational Plaintiffs diverted resources from their core activities toward previously unplanned response strategies.[12]

13. The core missions of BVM and the Louisiana NAACP—to increase power in marginalized, predominantly Black communities—are impaired by the Enacted Maps' dilutive effects.[13]

<u>Population Statistics</u>

14. In 2000, African Americans comprised 32.86 percent of the state's population and Non-Hispanic Whites comprised 62.53 percent of the state population.[14]

---

[9] Rec. Doc. 223, p. 180, line 21–p. 135, line 5.
[10] *Id.* at p. 175, lines 7–17; p. 179, line 20–p. 183, line 5.
[11] *Id.* at p. 128, line 9–p. 131, line 20.
[12] *Id.* at p. 172, line 3–p. 173, line 7; p. 174, line 17–p. 177, line 19; p. 181, line 15–p. 183, line 5 (BVM is prevented from engaging in get-out-the-vote efforts and capacity building work with its partners in order to focus its resources on its accountability strategy and 365 voter engagement delays); p. 131, lines 8–20 (NAACP has to pull members from working on health, education, and other projects in order to focus their efforts on combating the dilutive effects of the Enacted Maps).
[13] *Id.* at p. 113, line 3–p. 114, line 1; p. 164, line 25–p. 165, line 3.
[14] Pla-20, p. 9.

15. In 2020, African Americans comprised 33.13 percent of the state population and Non-Hispanic Whites comprised 55.75 percent of Louisiana's population.[15]

16. Louisiana has the second highest proportion of African American population of any state in the nation.[16]

17. In 2000, the White Voting Age Population ("WVAP") in Louisiana was 65.51 percent and the Black Voting Age Population ("BVAP") was 29.95 percent.[17]

18. In 2020, the WVAP in Louisiana was 58.31 percent and the BVAP was 31.25 percent.[18]

19. From 2000 to 2020, the White population decreased by over 200,000 persons, with decreases in six of the state's nine metropolitan statistical areas ("MSA").[19]

20. The Black population increased in eight of the state's nine MSAs.[20]

21. The Black population in the Baton Rouge MSA increased by over 60,000 persons from 2000 to 2020.[21]

22. The Black population growth in the Baton Rouge MSA is equivalent to the population required for two House districts.[22]

<u>Enacted Map</u>

23. In the Enacted Senate Map, there are 11 majority Black Senate districts.[23]

---

[15] *Id*.
[16] *Id*. at p. 10.
[17] *Id*. at p. 14.
[18] *Id*.
[19] *Id*. at p. 20.
[20] *Id*. at p. 18.
[21] Rec. Doc. 225, p. 15, lines 3–6.
[22] *Id*.
[23] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced in Pla-20, p. 31).

24. The BVAP populations in these Senate districts are as follows: District 5 (50.24 BVAP percentage); District 24 (53.09 BVAP percentage); District 29 (56.56 BVAP percentage); District 4 (57.2 BVAP percentage); District 3 (57.27 BVAP percentage); District 2 (57.75 BVAP percentage); District 14 (58 BVAP percentage); District 7 (59.46 BVAP percentage); District 34 (63.74 BVAP percentage); District 39 (63.75 BVAP percentage); District 15 (73.87 BVAP percentage).[24]

25. In the Enacted House Map, there are 29 majority Black House districts.[25]

26. The BVAP populations in these House districts are as follows: District 23 (50.86 BVAP percentage); District 67 (51.85 BVAP percentage); District 72 (52.67 BVAP percentage); District 83 (54.57 BVAP percentage); District 40 (54.68 BVAP percentage); District 62 (55.08 BVAP percentage); District 96 (55.13 BVAP percentage); District 21 (55.42 BVAP percentage); District 11 (56.4 BVAP percentage); District 93 (56.6 BVAP percentage); District 58 (56.76 BVAP percentage); District 57 (57.86 BVAP percentage); District 87 (59.07 BVAP percentage); District 44 (59.45 BVAP percentage); District 101 (60.22 BVAP percentage); District 16 (62.5 BVAP percentage); District 17 (63.26 BVAP percentage); District 26 (64.33 BVAP percentage); District 102 (65.58 BVAP percentage); District 2 (67.38 BVAP percentage); District 63 (69.65 BVAP percentage); District 4 (72.07 BVAP percentage); District 97 (72.34 BVAP percentage); District 34 (72.57 BVAP percentage); District 29 (73.56 BVAP

---

[24] *Id.*

[25] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::d63b737c-a8b3-46e9-8855-aa20a728c2b5 (referenced in Pla-20, p. 45).

percentage); District 3 (73.86 BVAP percentage); District 61 (75.29 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage).[26]

27. The Enacted House Map unjustifiably concentrates or fragments the BVAP in the districts discussed on pages 29 through 33 of the Court's opinion.[27]

28. The Enacted Senate Map unjustifiably concentrates or fragments the BVAP in the districts discussed on pages 27 through 33 of the Court's opinion.[28]

<u>Illustrative Plan</u>

29. The Illustrative Senate Plan contains 14 majority minority districts with the following BVAP populations: District 2 (51.73 BVAP percentage); District 3 (51.3 BVAP percentage); District 4 (58.15 BVAP percentage); District 7 (52.29 BVAP percentage); District 14 (58.08 BVAP percentage); District 15 (54.45 BVAP percentage); District 17 (52.48 BVAP percentage); District 19 (50.97 BVAP percentage); District 24 (52.05 BVAP percentage); District 29 (50.93 BVAP percentage); District 5 (51.8 BVAP percentage); District 34 (63.02 BVAP percentage); District 38 (53.17 BVAP percentage); and District 39 (52.46 BVAP percentage).[29]

---

[26] *Id.*
[27] Pla-20, pp. 44, 48, 50, 53–54, 55–61; *see also* Rec. Doc. 225, p. 54 lines 1–4 (referencing the new house districts in the Baton Rouge MSA);
*see also Statistics*, Dave's Redistricting,
https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).
[28] Pla-20, pp. 37, 39, 41–42; *See* also "Statistics", https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31);
*see also Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::12eedba5-68de-4ab4-a3bb-7f59d9268041 (referenced at Pla-20, p. 31).
[29] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fdcf5b8e-7661-4390-9060-264b6e44ce37 (referenced at Pla-20, p. 31).

30. The Illustrative House Plan contains 35 majority minority districts with the following BVAP populations: District 1 (55.33 BVAP percentage); District 2 (67.34 BVAP percentage); District 3 (58.85 BVAP percentage); District 4 (57.53 BVAP percentage); District 5 (50.86 BVAP percentage); District 11 (55.55 BVAP percentage); District 16 (59.76 BVAP percentage); District 17 (54.48 BVAP percentage); District 21 (54.28 BVAP percentage); District 23 (50.56 BVAP percentage); District 26 (63.38 BVAP percentage); District 29 (57.77 BVAP percentage); District 34 (50.03 BVAP percentage); District 38 (50.84 BVAP percentage); District 40 (54.88 BVAP percentage); District 44 (60.92 BVAP percentage); District 57 (53.43 BVAP percentage); District 58 (51.27 BVAP percentage); District 60 (52.83 BVAP percentage); District 61 (50.2 BVAP percentage); District 96 (55.55 BVAP percentage); District 63 (57.2 BVAP percentage); District 65 (56.03 BVAP percentage); District 67 (51.58 BVAP percentage); District 68 (54.21 BVAP percentage); District 69 (50.2 BVAP percentage); District 72 (50.6 BVAP percentage); District 83 (54.57 BVAP percentage); District 87 (59.07 BVAP percentage); District 93 (56.6 BVAP percentage); District 97 (72.34 BVAP percentage); District 99 (78.11 BVAP percentage); District 100 (80.78 BVAP percentage); District 101 (50.75 BVAP percentage); and District 102 (65.58 BVAP percentage).[30]

31. The BVAP was lowered in some Enacted majority-Black districts to create additional majority-Black districts in the Illustrative Plan.[31]

---

[30] *See Statistics*, Dave's Redistricting, https://davesredistricting.org/maps#stats::fa47d389-42de-49ac-9c57-cc2434249cc2 (referenced at Pla-20, p. 45).
[31] Rec. Doc. 225, p. 66, lines 8–12.

32. 74 percent of the state's core population remained in the same Senate districts in the Illustrative Senate plan as compared to the Enacted Senate Map.[32]

33. 78.5 percent of the state's core population remained in the same House districts in the Illustrative House Plan as compared to the Enacted House Map.[33]

34. The Illustrative Plan adheres to and respects traditional redistricting principles.

35. The shapes of the districts in the Illustrative Plan are reasonable considering geographic vagaries created by waterways and the respect afforded traditional boundaries such as Voting Tabulation Districts ("VTDs") and parish lines.

36. The districts in the Illustrative Plan are contiguous.[34]

37. The districts in the Illustrative Plan were drawn with sensitivity to communities of interest, including Acadiana, the Mississippi River parishes, the Cajun Heartland, the Florida parishes, and the planning districts in Caddo and neighboring parishes.[35]

38. The Red River parish area, including Natchitoches and the Cane River area, discussed by Dr. Colten, can be considered a community of interest and Illustrative House District 23 respects that community of interest.[36]

39. The Shreveport and Bossier MSA's share historical, social, and cultural roots and Illustrative House District 1 respects that area as a community of interest.[37]

---

[32] Pla-20, p. 30.
[33] *Id*. at p. 44.
[34] Rec. Doc. 225, p. 29, lines 7–11.
[35] Rec. Doc. 225, p. 32, line 10– p. 33, line 3; Pla-20, pp. 30, 44.
[36] Rec. Doc. 212, p. 37, line 11–p. 40, line 20; Pla-129, p. 12.
[37] Rec. Doc. 212, p. 29, line 4–p. 36, line 24; Pla-129, pp. 12–14.

40. The distinctiveness of the two major cultural groups in the Cajun Heartland subset of the Acadiana region, Cajuns, and Creoles of Color, are considered and respected in the Enacted Maps and the Illustrative Plan.[38]

41. The segregation of housing and economic activities in Jefferson Parish contribute to a group identity analogous to a community of interest, which is respected by the boundaries of Illustrative Senate District 19.[39]

42. The Illustrative majority-Black districts keep like socioeconomic communities together.[40]

43. The Illustrative Plan is more considerate of communities of interest than the Enacted Maps.[41]

44. Mr. Cooper employed compactness measures uniformly utilized in the redistricting field.[42]

45. The Illustrative Senate Plan is more compact than the Enacted Senate Map, and the Illustrative House Plan is virtually as compact as the Enacted House Map. There is no relevant or meaningful difference in the compactness of the Illustrative Plan as compared to the Enacted Map.[43]

46. The Illustrative Plan abides by Louisiana's Joint Rule 21.[44]

47. The illustrative districts are substantially equal in population.[45]

---

[38] Pla-129, pp. 14–18.
[39] Rec. Doc. 212, p. 57, line 10–p. 62, line 6.
[40] Pla-89, p. 12.
[41] Rec. Doc. 212, p. 41, line 1–p. 42, line 22; p. 61, line 3–p. 63, line 14.
[42] Rec. Doc. 218, p. 106, lines 5–7; Rec. Doc. 229, p. 18, line 8–p. 19, line 1.
[43] Rec. Doc. 218, p. 98, lines 15–20; Rec. Doc. 225, p. 25, lines 17–24.
[44] Rec. Doc. 225, p. 28, line 18–p. 31, line 20.
[45] *Id*. at p. 29, lines 12–24.

48. The Illustrative Plan limits precinct, municipality, and district boundary splits where possible.

49. Fewer parishes were split in the Illustrative Plan than the Enacted Maps.[46]

50. U.S. Census Data is reliable and appropriate to rely on in redistricting.[47]

51. The Court rejects the contention that the Illustrative Plan advanced by the Plaintiffs can only be viewed as a racial gerrymander.

52. Plaintiffs proved by a preponderance of the evidence that the district boundaries in the Illustrative Plan were not predominately motivated by race.

   Racially Polarized Voting

53. Voting in Louisiana breaks down along racial lines.

54. Black voters are highly cohesive in their support of their preferred candidates and White voters consistently bloc vote against the Black-preferred candidates in the seven areas of interest, which include the proposed new minority-majority districts in the Illustrative House and Senate Plans.

55. Blocs of White voters have been successful in consistently defeating Black-preferred candidates.

56. Biracial statewide elections are the most probative for evaluating racial polarization.[48]

57. Districts with a majority BVAP provide a realistic opportunity for Black voters to elect the candidate of their choice.

---

[46] Pla-89, p. 10; Interv-42, p. 11.
[47] Rec. Doc. 229, p. 154, lines 5–15.
[48] Rec. Doc. 217, p. 19, lines 11–15; Rec. Doc. 228, p. 145, lines 15–18.

58. There is no reliable basis upon which it can be concluded that a Black-preferred candidate will consistently prevail in election districts that are less than 50 percent BVAP.

Totality of the Circumstances Facts

59. Although disenfranchisement mechanisms such as poll taxes and literacy tests have been outlawed, Black voter suppression in Louisiana persists today through, closing polling places, restricting access to early voting, polling places, and limiting mail-in voting.

60. Black voters cohesively support candidates who are aligned on issues connected to race.

61. Among other things, the election calendar, and the sheer number of elections in Louisiana has produced voter fatigue and confusion, which is amplified in poor and undereducated communities.

62. Black voters' participation in the elections is negatively affected by historic and continuing socio-economic disparities in education, employment, housing, health, and criminal justice.

63. Black voters in Louisiana experience social and economic disparities that negatively impact voter registration and election participation.

64. Educational and employment opportunities are comparatively lacking for Black Louisianans which impairs meaningful access to the political process.

65. Health disparities between Louisiana's Black and White citizens adversely impact voter engagement and participation.

66. Felony disenfranchisement disproportionality affects Louisiana's Black population.

67. White candidates in recent elections in Louisiana employed overt and subtle racial appeals in their advertising and messaging.

68. Black Louisianans are underrepresented, as compared to their percentage of the population, in elected public offices at all levels.

69. Louisiana's elected officials have been and remain unresponsive to the particularized needs of Black Louisianans.

70. In the redistricting process, the Louisiana legislature favored incumbency protection above other redistricting criteria.

71. There is a history of persistent discrimination against Black citizens in Louisiana.

72. The disenfranchisement of Black voters is highly correlated with the political procedures and practices in Louisiana.

73. The Illustrative Plan offered by the Plaintiffs, if enacted by the State legislature, would result in more than proportionality, unlike the Enacted Maps.

74. The district lines in the Enacted Map do not provide political effectiveness in proportion to BVAP.

75. Louisiana's history of persistent discrimination, the impacts of which persist to the present day, and White bloc voting behavior dilute the Black vote and deny minority voters equal political opportunity.

## II.    CONCLUSIONS OF LAW

Standing

1. The Individual Plaintiffs are Black, registered voters who reside in a cracked or packed voting district under the Enacted Map and have standing.

2. The Individual Plaintiffs established that the Enacted Map's vote dilution denies the four Individual Plaintiffs an equal opportunity to elect a candidate of their choice, thus the Individual Plaintiffs have standing to challenge the vote dilution.

3. The individuals who make up the branches of the Louisiana NAACP are "members" of the NAACP for purposes of associational standing.

4. "[P]rotecting the strength of votes . . . [is] surely germane to the NAACP's expansive mission" at all levels of the organization."[49]

5. The Louisiana NAACP seeks prospective and injunctive relief instead of individualized damages, thus direct participation by individual members is not required.[50]

6. The Louisiana NAACP has associational standing.

7. BVM and the Louisiana NAACP have organizational standing.

*Gingles* + Totality of the Circumstances

1. The Plaintiffs have a right of action under § 2 of the VRA.

2. Plaintiffs proved by a preponderance of the evidence that the BVAP is sufficiently large and geographically compact to constitute a majority in several reasonably shaped districts.

3. Plaintiffs satisfied *Gingles* I.

4. The Illustrative Plans do not trigger the Equal Protection Clause of the Fourteenth Amendment because there is no state action.

---

[49] *Hancock Cnty. Bd. of Sup'rs v. Ruhr*, 487 F. App'x 189, 197 (5th Cir. 2012) ) ("Maintaining proportional districts, protecting the strength of votes, and safeguarding the fairness of elections are surely germane to the NAACP's expansive mission.").

[50] *Consumer Data Indus. Ass'n v. Paxton*, No. 21-51038, 2023 WL 4744918, at *4 n.7 (5th Cir. July 25, 2023) ("Participation of individual members generally is not required when the association seeks prospective or injunctive relief, as opposed to damages.").

5. *Gingles* II asks whether Black voters are "politically cohesive,"[51] – in other words, whether Black voters usually support the same candidate in elections. *Gingles* III asks whether White voters vote "sufficiently as a bloc to usually defeat the [Black voters'] preferred candidate."[52] The Plaintiffs proved both.

6. "Illustrative districts that could perform with a BVAP of less than 50 percent with White crossover voting are not the focus of the third *Gingles* precondition analysis."[53]

7. "The relevant consideration under the third *Gingles* precondition is the *challenged* plan, not some *hypothetical* crossover district that could have been but was not drawn by the Legislature."[54]

8. "[U]nder the 'results test' of § 2, only the correlation between race of voter and selection of certain candidates, not the causes of the correlation, matters."[55]

9. Plaintiffs have proven the *Gingles* II and III requirements.

10. Partisan preference is not properly the subject of the *Gingles* II and III inquiry but may be analyzed as part of the totality of the circumstances inquiry.

11. Voting in Louisiana is racially polarized.

12. Based on the totality of the circumstances, if the Enacted Maps are used, Black Louisianans will have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

---

[51] *Cooper v. Harris*, 581 U.S. 285, 302 (2017) (citing *Thornbrug v. Gingles*, 478 U.S. 30, 51 (1986)).
[52] *Id*.
[53] *Robinson v. Ardoin*, 86 F.4th 574, 597 (5th Cir. 2023).
[54] *Id*. at 596
[55] *Thornburg v. Gingles*, 478 U.S. 30, 63 (1986).

13. The Enacted House and Senate Maps, in the areas where illustrative districts are proposed, are dilutive of Black voting strength and violative of § 2 of the Voting Rights Act.

Signed in Baton Rouge, Louisiana, on February 8, 2024.

**CHIEF JUDGE SHELLY D. DICK**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**