IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, JARRETT LOFTON, REV. CLEE EARNEST LOWE, DR. ALICE WASHINGTON, STEVEN HARRIS, ALEXIS CALHOUN, BLACK VOTERS MATTER CAPACITY BUILDING INSTITUTE, and THE LOUISIANA STATE CONFERENCE OF THE NAACP,<br><br>      *Plaintiffs*,<br><br>v.<br><br>NANCY LANDRY, in her official capacity as Secretary of State of Louisiana,<br><br>      *Defendant*. | Civil Action No. 3:22-cv-00178 SDD-SDJ |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SPECIAL ELECTION AND EXPEDITED BRIEFING SCHEDULE**

  Plaintiffs have met their burden of establishing that S.B. 1 and H.B. 14 improperly dilute Black Louisianans' voting strength and have shown that it is possible to draw remedial maps that include additional Black-majority districts using traditional redistricting principles. In order to prevent ongoing and further harm to Black Louisianans, Plaintiffs hereby move for an order requiring the State to hold a special election for the Louisiana state legislature in November 2024 concurrent with other elections on the calendar, using new remedial maps either drawn by the Louisiana Legislature or this Court.

  Plaintiffs also request an expedited briefing schedule on this motion to ensure that a new map can be adopted and a special election can be conducted in a timely and orderly manner. If this Court grants Plaintiffs' motion for a special election, then prompt implementation of legally compliant House and Senate Maps must follow to provide Defendants with time to administer an election this fall. Accordingly, it is vital that this motion is resolved expeditiously to ensure that,

if the Court grants Plaintiffs' request to order a special election, it will be possible to effectuate that relief.

## FACTUAL BACKGROUND

Plaintiffs—four individual voters in Louisiana and two organizations dedicated to furthering the voting rights of Black Louisianians—initiated this action to challenge redistricting plans for the Louisiana House and the Louisiana Senate that disenfranchise minority voters pursuant to Section 2 of the Voting Rights Act of 1965 ("Section 2"), 52 U.S.C. § 10301. Following a seven-day trial on the merits beginning November 27, 2023 and ending December 5, 2023, this Court ruled that Plaintiffs had met their burden of establishing that, under the totality of the circumstances, S.B. 1 and H.B. 14 have the effect of abridging the right of Plaintiffs and other Black voters to an equal opportunity to elect their candidates of choice in violation of Section 2, and enjoined any further elections under those maps. *See generally* ECF No. 233.

Due to circumstances beyond Plaintiffs' control and despite Plaintiffs' diligence in acting expeditiously, the trial did not take place until after the dilutive map was used for the 2023 elections. Plaintiffs filed their complaint on March 14, 2022, less than a week after S.B. 1 and H.B. 14 became law without the Governor's signature on March 9, 2022. *See* ECF No. 1; La. Legis., SB1 (2022 First Extraordinary Session), *available at* https://perma.cc/RX74-VU4H (last visited Feb. 12, 2024); La. Legis., HB14 (2022 First Extraordinary Session), https://perma.cc/2QKG-2KML (last visited Feb. 12, 2024). Plaintiffs then moved for this case to be considered on an expedited basis, noting that "[t]he elections that are the subject of this litigation fall on the latter half of the 2023 calendar," and seeking a schedule that would allow this Court to "reach a final judgment before those deadlines" associated with the 2023 elections. ECF No. 45-

1. This Court granted that motion and scheduled a bench trial to take place beginning January 17, 2023. ECF No. 66.

The trial did not occur as scheduled, however, because Defendants successfully moved for a stay, which prevented Plaintiffs from securing relief on their Section 2 claims before elections were conducted under the challenged maps. ECF No. 61, 79. In their request to lift the stay, filed the day after the Supreme Court issued its decision in *Allen v. Milligan*, 599 U.S. 1 (2023), Plaintiffs requested a pretrial schedule that would permit them to seek a preliminary injunction, allowing for relief in time for the 2023 legislative elections. ECF No. 83-1. In an exercise of judicial restraint, this Court denied that request and set the case on an expedited trial schedule. ECF No. 93. With that schedule in place, Plaintiffs moved promptly toward trial, *see* ECF No. 82-1; ECF No. 94, in the face of continued machinations by Defendants to delay resolution of the case, *see, e.g.*, ECF No. 92; ECF No. 101; ECF No. 107; ECF No. 184.

As a result of the stay, between the date when Plaintiffs commenced this action (March 14, 2022) and the date this Court issued its decision on the merits (February 8, 2024), Louisiana held an election for its state legislature (both House and Senate) using the electoral maps that this Court has now enjoined. *See* La. Legis, Members Elected for the 2024–2028 Term, https://perma.cc/H8PX-TL8H (last visited Feb. 13, 2024). Unless a special election is called, Senators and Representatives elected under these maps—which have been illegal under Section 2 since passed—will sit in office until 2028, effectively continuing to dilute Black Louisianans' voting power illegally for another four years. *Id.*

## ARGUMENT

A district court has broad discretion to order appropriate remedial relief for Section 2 violations, and remedial relief should be "fashioned in the light of well-known principles of

3

equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) [hereinafter "*Covington I*"]. "Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). To determine appropriate relief, a district court "must undertake an 'equitable weighing process' to select a fitting remedy for the legal violations it has identified." *Covington I*, 581 U.S. at 488 (quoting *NAACP v. Hampton Cnty. Election Comm'n*, 470 U.S. 166, 183 n.36 (1985)).

In many instances—including here—a special election is the appropriate remedy to redress the harm suffered. "[W]here a governing body has been elected under … an election scheme [that] cancel[s] out the voting strength of a cognizable portion of the populace, thus denying them access to the political process, prompt new elections are appropriate." *Wallace v. House*, 377 F. Supp. 1192, 1201 (W.D. La. 1974), *aff'd in part and rev'd in part on other grounds*, 515 F.2d 619 (5th Cir. 1975); *see also Clark v. Roemer*, 777 F. Supp. 471, 484 (M.D. La. 1991) ("Federal courts have ordered special elections to remedy violations of voting rights on many different occasions."); *Arbor Hill Concerned Citizens v. Cnty. of Albany*, 357 F.3d 260, 262 (2d Cir. 2004); *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 498 (2d Cir. 1999); *Large v. Fremont Cnty.*, No. 05-cv-0270, 2010 WL 11508507, at *15 (D. Wyo. Aug. 10, 2010); *United States v. Osceola Cnty.*, 474 F. Supp. 2d 1254, 1256 (M.D. Fla. 2006); *Williams v. City of Dallas*, 734 F. Supp. 1317, 1318, 1415 (N.D. Tex. 1990).

The Supreme Court has laid out three "obvious considerations" to weigh when assessing whether to order a special election: (1) "the severity and nature" of the violation at issue; (2) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed"; and (3) "the need to act with proper judicial restraint when intruding on state

4

sovereignty." *Covington I*, 581 U.S. at 488.  As explained further below, each of those "obvious considerations" weighs in favor of granting Plaintiffs' request for a special election.[1]

      **A.     The Severity and Nature of Defendants' Section 2 Violations Demand a Special Election.**

The factors enumerated in *Covington* and its progeny demonstrate why the severity of the Voting Rights Act violation in this case requires a special election.  On remand from the Supreme Court, the three-judge district court in *Covington* again considered whether to order a special election.  *Covington v. North Carolina*, 270 F. Supp. 3d 881 (M.D.N.C. 2017) [hereinafter "*Covington II*"].  In assessing the severity and nature of the violation as instructed by the Supreme Court, the district court considered five factors:  (1) the importance of the rights at issue and the harms attendant to their violation, *id.* at 890–91; (2) whether the existence of a violation was "a close case," *id.* at 891–92; (3) the geographic scope of the violation, *id.* at 892; (4) the human toll of the violation in terms of the number of individual voters impacted and the harm to their communities, *id.* at 893–94; and (5) the temporal scope of the violation, *id.* at 894.  Applying these factors in the present case demonstrates that the Section 2 violation this Court identified in its Ruling is especially severe and pernicious, justifying a special election.

First, like *Covington II*, this case involves both a violation of the right to vote and racial discrimination.  *Id.* at 890–91.  As this Court has explained:

> Though the states retain considerable power to regulate elections, their power has limits: in the course of their regulation, they may not unduly burden the citizens' right to vote – the fundamental political right, because preservative of all rights. Indeed, voting is of the most fundamental significance under our constitutional structure.

---

[1] Courts in the Fifth Circuit have considered a comparable set of factors in ordering special-election relief where elections under unlawful maps would have otherwise occurred.  *See, e.g., Williams*, 734 F. Supp. at 1318; *Tucker v. Buford*, 603 F. Supp. 276, 279 (N.D. Miss. 1985); *Toney v. White*, 488 F.2d 310, 314–15 (5th Cir. 1973); *Keller v. Gilliam*, 454 F.2d 55, 57 (5th Cir. 1972).

*Harding v. Edwards*, 487 F. Supp. 3d 498, 503 (M.D. La. 2020) (internal citations and quotation marks omitted).  It is well-settled that the loss of a meaningful right to vote is unquestionably severe and requires prompt redress (including, in appropriate circumstances, in the form of a special election).  *See Wright v. Sumter Cnty. Bd. of Elections and Registration*, 361 F. Supp. 3d 1296, 1300–02, 1305 (M.D. Ga. 2018), *aff'd*, 979 F.3d 1282 (11th Cir. 2020) (holding that *Covington* considerations favored special election and emphasizing that "the right to vote is a right of paramount constitutional significance, the violation of which permits federal court intercession") (cleaned up).  "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).  "Voting is a 'fundamental political right, because it is preservative of all rights.'"  *Robinson v. Ardoin*, 605 F. Supp. 3d 759, 851 (M.D. La. 2022) (internal citations omitted).

Furthermore, the harms that begin with the enactment of maps that violate the Voting Rights Act "are inflicted again and again with the use of those maps in each subsequent election cycle," and, by allowing legislators to take official acts notwithstanding the illegitimate nature of their elections "continue unabated until new elections are held under [VRA-compliant] districting plans." *Covington II*, 270 F. Supp. 3d at 891.

Second, as this Court's Ruling makes clear, this was not a close case.  Plaintiffs offered stark and largely unrebutted evidence that the enacted maps violate the Voting Rights Act.  Indeed, in assessing the totality of the circumstances under Section 2, this Court found that every applicable factor weighed in Plaintiffs' favor.  ECF No. 233 at 88; *see also id.* at 75–88.  In contrast, much

6

of Defendants' evidence was irrelevant to assessing a Section 2 violation.[2] The Section 2 violation proven in this case is therefore subject to no "rational disagreement." *Covington II*, 270 F. Supp. 3d at 891–92.

Third, in proving their case, Plaintiffs demonstrated violations of Section 2 all across the state, identifying vote dilution in five separate regions in the House map covering every corner of the state and three in the Senate map, affecting dozens of districts into which Black voters were either packed or cracked. ECF No. 233 at 62–67 & n.359. Plaintiffs' illustrative maps demonstrated that the State could draw six additional majority-Black house districts and three additional majority-Black Senate districts in these regions, and this Court has now concluded that the "Enacted House and Senate Maps, in the areas where illustrative districts are proposed, are dilutive of Black voting strength and violative of § 2 of the Voting Rights Act." ECF No. 234 at 4–7, 15.

Fourth, the number of individuals and districts impacted by the violation also enhances the severity of the already severe harm (and the concordant need for immediate redress). *Covington II*, 270 F. Supp. 3d at 892 (concluding that the "substantial number of legislative districts that must be redrawn . . . weighs in favor of ordering a special election"). The evidence in this case showed that hundreds of thousands of voters had their votes diluted as a result of the enacted maps. The court heard testimony from individuals about the everyday impact of unresponsive representation

---

[2] *See, e.g.*, ECF No. 233 at 45 (describing Mr. Trende's compactness measure as "fundamentally flawed and completely useless"); *id.* at 51 (describing Dr. Murray's conclusions as "devoid of probative value"); *id.* at 53, 55 (describing Dr. Barber's conclusions as having "no probative value" and "irrelevant"); *id.* at 56, 57 (describing Dr. Johnson's conclusions as "meaningless," "unremarkable and not probative," and "a red herring"); *id.* at 71 (explaining that Dr. Lewis's conclusions do not address "the focus of the third *Gingles* precondition analysis"); *id.* at 73 (explaining that Dr. Alford's analysis "appears to answer a question that *Gingles* II does not ask and in fact squarely rejects").

in the state legislature. ECF No. 233, at 81–84 & n.445, 450, 452. Because the enacted maps impermissibly impinge upon the right to vote for *all* Black voters living in the many districts where their votes are being diluted, and as elections were conducted in *all* of these districts under the illegal maps in November 2023, the harm suffered by Plaintiffs is severe and warrants a special election.

Finally, the harm to Plaintiffs' precious right to vote is all the more severe because it is *ongoing* and will persist without court intervention. An election *under maps this Court has declared unlawful* took place in 2023. Aggravating that circumstance, that election went forward despite Plaintiffs' efforts to seek prompt resolution of their claims after the maps were enacted because Defendants succeeded in delaying the trial for nearly a year. Without a special election, Plaintiffs will have no opportunity to obtain relief from Defendants' violations until nearly the end of the decade in 2028, when representatives elected under a lawful map will first take office.

Thus, under every relevant consideration, this case presents the special circumstance in which this Court's equitable powers can properly be employed to order a special election.

**B.    A Special Election Will Not Disrupt Louisiana's Governance.**

Similarly, the second "obvious consideration" identified by the Supreme Court in *Covington* weighs in favor of a special election, because it will cause no disruption to the ordinary processes of governance. As when assessing whether a special election will intrude on state sovereignty, courts assessing disruption to ordinary processes of government are "guided by the foundational principle that sovereignty itself remains with the people, by whom and for whom all government exists and acts." *Covington II*, 270 F. Supp. 3d at 898 (internal citation and quotation marks omitted). Relevant to consideration of whether a special election will disrupt the ordinary processes of governance is whether it may lead to voter confusion, the length of time remaining in terms filled through the special election, whether there is sufficient time for judicial review of any

8

remedial map proposed to be used in the special election, and the administrative burdens of conducting the special election. *See id.* at 898–901.

Here, the record demonstrates that, once remedial maps have been selected, there is sufficient time for the State to implement a remedial map *and* to hold a special election in 2024 without disrupting existing schedules or causing voter confusion. Plaintiffs propose a special election on the same calendar as the upcoming regularly scheduled congressional elections. In other words, the special election will not add additional election days in 2024 and will avoid any voter confusion resulting from multiplying the number of elections voters are called on to participate in. *Compare Navajo Nation v. San Juan Cnty.*, No. 2:12-CV-00039, 2017 WL 6547635, at *18 (D. Utah Dec. 21, 2017), *aff'd*, 929 F.3d 1270 (10th Cir. 2019) (applying *Covington I* considerations and finding special elections would not interfere with ordinary process of governance where "[t]he special elections will proceed under the regularly scheduled 2018 election deadlines and processes…."), *with Covington II*, 270 F. Supp. 3d at 899 (declining to impose special election on an *additional* election day because the "close succession during which voters would be called upon to participate in both special and regularly scheduled elections risks generating substantial voter confusion and resulting low voter turnout"). Adding additional races to an already-scheduled election day limits any undue burdens on election officials. *See, e.g.*, *Navajo Nation*, 2017 WL 6547635, at *18; *Cosner v. Dalton*, 522 F. Supp. 350, 364 (E.D. Va. 1981) (ordering special election for state legislature to align with federal congressional elections where new map could not be implemented in time for regularly scheduled state legislative election).

This proposed schedule will preclude overlapping election and campaign periods for the same offices, avoiding voter confusion and administrative burdens on that front as well. *Cf.*

*Covington II*, 270 F. Supp. 3d at 899 (special election would lead to voter confusion where "schedule would require legislative candidates to file to run in the [next regularly scheduled] general election before the … special election takes place," effectively requiring candidates "to run two simultaneous election campaigns for the same seat"). The trial record demonstrates that holding special elections for the state legislature alongside scheduled federal elections in 2024 is part of the regular election administration in Louisiana: Election Commissioner Sherri Hadskey confirmed that the Secretary of State actively tries to schedule special elections alongside already scheduled elections to save costs and for the sake of administrative efficiency, and that special elections for members of the Louisiana House and Senate have been held on the same timeline as federal elections in the recent past. *See* ECF No. 218 at 28:4–29:1, 31:14–33:5 (describing special election for Louisiana House scheduled on "an already scheduled" municipal election date, and special election for Louisiana Senate scheduled on the same dates as federal elections in 2022).

The length of time remaining in the current legislators' terms also counsels in favor of holding a special election here. If the Court does not order a special election, three full years and three regular legislative sessions would remain prior to the next legislative election in 2027. Additionally, the upcoming legislative session will be over before well before the first election deadline—the candidate qualifying period that occurs from July 17 to July 19, 2024, *see* PX 168—and the special election will therefore have no impact on the ability of current legislators to carry out their duties.

Additionally, because of the alacrity with which the Plaintiffs and the Court moved to a trial and judgment, there is more than enough time for the Louisiana Legislature to have an opportunity to develop remedial House and Senate maps, for the Court to review those maps, and if necessary, for the Court to develop its own maps prior to the start of the election season. *See*,

10

*e.g.*, *Larios v. Cox*, 305 F. Supp. 2d 1335, 1342 (N.D. Ga. 2004) (three-judge court) (requiring a state to redraft congressional maps eight months before the general election and retaining jurisdiction for the court to draw an interim plan if the legislature failed to act in time).

Any administrative burdens associated with conducting a special election will be manageable. Commissioner Hadskey testified that the key step in implementing a redistricted map is proofreading the map, ECF No. 218 at 23:4–6, and that the process for proofreading the maps used to elect Louisiana's House and Senate is the same as the process for proofreading the maps used to elect Louisiana's congressional representatives, *id.* at 24:25–26:1.[3] And counsel for the Secretary of State recently represented before the Fifth Circuit that that process can be completed for congressional districts in time for the November 2024 election cycle so long as a remedial map is in place by May 30, 2024. *See Robinson v. Ardoin*, 86 F.4th 574, 584 (5th Cir. 2023) ("[Counsel] additionally suggested a May 30 deadline for a new map to be drawn, approved, and enacted for the 2024 elections."). Because the implementation process for the new state legislative maps should be similar to the process for the changes to Louisiana's congressional map, it should be possible for the Secretary of State to conduct a special election under the new legislative maps in November 2024. Moreover, the evidence in the record established that only 26% of voters within the redrawn Illustrative Senate Plan and 21.5% of voters within the redrawn Illustrative House Plan would have their Senate or House districts changed. ECF 234 ¶¶ 32–33 (citing Pla-20, Corrected Report of Bill Cooper, at 30, 44). There is no reason to expect that any other remedial plan would result in dramatically more voters being moved from one district or another.

---

[3] Moreover, because the proofreading process occurs on a "voter by voter" basis (rather than requiring a proofread for *all* voters for every new map), ECF No. 218 at 24:2–20, 26:2–14, the fact that only about a quarter of all Louisiana voters are implicated by the changes to each legislative map further reveals that the proofreading required to implement the new maps will not impose a significant burden on election officials. *See* ECF 234 ¶¶ 32–33.

11

Moreover, because the process for finalizing ballots cannot begin until after the qualifying deadline in July, *see* PX 168, the State's suggested May 30, 2024 deadline (*see supra*) would allow for the new legislative maps to be in place a month and half before the election officials can even start the process of preparing ballots for the elections. There is abundant time to draft and implement a remedial map in time for a special election for the state legislature to be held during the November 2024 election cycle.

In sum, conducting a special election for state legislative offices in November 2024 will have virtually no impact on the ordinary processes of governance, and this consideration also weighs in favor of a special election in this case.

**C.   Ordering a Special Election Under These Extraordinary Circumstances Would Not Improperly Intrude on State Sovereignty.**

Finally, with respect to the third "obvious consideration," Plaintiffs' requested remedy—a special election—does not improperly intrude on state sovereignty, particularly in light of the severity of the harm and the minimal impact on state policy preferences. *See Covington II*, 270 F. Supp. 3d at 896 (weighing effect of special election on state sovereignty against severity of violation); *see also Wright*, 361 F. Supp. 3d at 1305. Section 2 was enacted pursuant to Congress's powers under the Fifteenth Amendment. *Milligan*, 599 U.S. at 41–42. Like the other Civil War Amendments, the Fifteenth Amendment was "specifically designed as an expansion of federal power and an intrusion on state sovereignty." *City of Rome v. United States*, 446 U.S. 156 (1980); *see also South Carolina v. Katzenbach*, 383 U.S. 301, 325 (1966) ("the Fifteenth Amendment supersedes contrary exertions of state power").

Because enforcement of the Voting Rights Act against a state always involves some intrusion on state sovereignty, the question in evaluating whether a proposed remedy reflects an appropriate exercise of this Court's equitable powers is whether the intrusion on state power is

12

proportional to the violation at issue.  *See Covington II*, 270 F.Supp.3d. at 895 (court must determine "whether a special election constitutes an *undue* intrusion on state sovereignty") (emphasis in original).  In *Covington II*, the district court evaluated the intrusion on state sovereignty represented by special elections by weighing any intrusion against both "the serious and widespread nature" of the violation being remedied, and the district court's "previous exercise of judicial restraint in declining to immediately remedy" that violation.  *Id.* at 896.  Here, both the magnitude of the Voting Rights Act violation and the unusual events that have prevented Plaintiffs from obtaining a remedy sooner (including this Court's previous exercises of restraint) reflect why ordering a special election under the circumstances of this case is consistent with proper judicial restraint.

As this Court has now determined, the current legislative maps are "dilutive of Black voting strength and violative of § 2 of the Voting Rights Act" in each of the areas where Plaintiffs have proposed new illustrative districts—impacting nine total districts in areas across the state of Louisiana where Black voters are currently being denied an opportunity to elect the candidate of their choice.  ECF No. 234 at 4–7, 15.  The scope of the Section 2 violation "also means that the districting plans intrude on popular sovereignty" and "potentially distort the outcome of elections and the composition and responsiveness of the legislature, [interfering] with the very mechanism by which the people confer their sovereignty" on the state legislature and hold its members accountable.  *Covington II*, 270 F. Supp. 3d at 897; *id.* at 896 ("[A] more pervasive constitutional violation may justify—indeed, demand—a more intrusive remedy.").

In contrast, the impact on state sovereignty is slight.  In *Covington II*, the court considered such issues as whether special elections departed from the state's preferred method for filling vacancies, interrupted an ongoing legislative session, or shortened the terms of sitting legislators.

13

*Id.* at 895. Here, unlike in *Covington II*, a special election is entirely consistent with the state's required method for filling vacancies. *See* LA Rev Stat § 18:601 (special elections shall be ordered within 10 days of any vacancy of the state legislature). Similarly, unlike North Carolina, where legislative sessions run for two years, *see Covington II*, 270 F. Supp. 3d at 895, the legislative session in Louisiana runs from March or April to June of each year, La. Const. art. III, § 2, and will not be interrupted by a special election in November 2024, which will ensure a new legislature can be sworn in prior to the start of the next legislative session in April 2025.

A special election would have the effect of shortening the terms of some sitting legislators, but that in itself is an insufficient intrusion on state sovereignty to outweigh the need to remedy the widespread Section 2 violation found by this Court. *See Covington II*, 270 F. Supp. 3d at 896 (collecting cases). The legislature is currently only one year into a four-year term, leaving three years and three regular legislative sessions in the legislative terms after a special election in November 2024.

Further weighing in favor of a special election in this circumstance is the Court's previous exercise of judicial restraint in declining to accommodate Plaintiffs' requested hearing date for a proposed preliminary injunction motion. ECF Nos. 83-1, 93. Here, as in *Covington II*, the intervening election occurred under the State's unlawful maps because the Court declined to impose a provisional map for use in an election where the initial election-related deadlines had already passed. As the *Covington* court explained:

> When, as here, courts have declined to immediately remedy an unconstitutional districting plan due to a rapidly approaching election, those courts have concluded that the balance of equities favors later ordering a special election because citizens are entitled to have their rights vindicated as soon as possible so that they can vote for their representatives under a constitutional apportionment plan.

14

*Covington II*, 270 F. Supp. 3d at 897 (citing *Smith v. Beasley*, 946 F. Supp. 1174, 1212 (D.S.C. 1996); *Cosner*, 522 F. Supp. at 364) (cleaned up). The Court's "exercise of judicial restraint in allowing the State to use the [unlawful] districting plans in the [2023] elections weighs heavily in favor of ordering a special election." *Id.* at 897–98.

Plaintiffs' diligence in pursuing relief and this Court's decision to defer trial until after the 2023 election demonstrate why ordering a special election is consistent with the proper exercise of judicial restraint.[4] Justice has already been long delayed for these Plaintiffs, through no fault of their own. Under these circumstances, it is proper for the Court to take steps to remedy Plaintiffs' harm, rather than allow Black Louisianans to remain governed by districts in which they "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice" for a full four-year term. ECF No. 234 at 14.

Moreover, in recognition of the state's sovereign interest in drawing redistricting plans for its legislative body, Plaintiffs have requested a scheduling order in this matter that will allow the Louisiana Legislature a reasonable period of time to issue new legislative maps consistent with the Voting Rights Act and this Court's order. Plaintiffs' proposed schedule would afford nearly three full session weeks—and, in total, 35 days from this Court's decision (issued on February 8, 2024, ECF No. 233)—to pass alternative maps that comply with this Court's order. Plaintiffs' proposed

---

[4] Fifth Circuit courts have considered special elections a more favorable form of retroactive relief where Plaintiffs first seek pre-election relief and were denied. *See Tucker*, 603 F. Supp. at 277–79; *Williams*, 734 F. Supp. at 1415. Similarly, where the pendency of a Supreme Court decision interferes with a plaintiff's ability to seek pre-election relief, a special election may also be a proper remedy: in *Clark v. Roemer*, the district court ruled in favor of a special election under analogous circumstances in which a pending Supreme Court decision in *Houston Lawyers' Ass'n v. Attorney General of Texas*, 501 U.S. 419 (1991), would have otherwise delayed plaintiffs from receiving timely relief for judicial districts already found to have violated Section 2 of the Voting Rights Act. 777 F. Supp. 471, 484–85 (M.D. La. 1991).

15

date gives the Louisiana Legislature more than enough time to craft a remedy compliant with the Voting Rights Act: indeed, the Legislature can and has adopted maps this very year with only one week of session time. *See* La. Legis., SB8, *available at* https://perma.cc/MHT4-ZH4U (last visited Feb. 12, 2024) (congressional districting map introduced on January 15, passed on January 19, and signed into law on January 22).

Because the Court "assess[es] any intrusion on state sovereignty from the perspective of the people" of Louisiana, *Covington II*, 270 F. Supp. 3d at 894, any alleged inconvenience to legislators elected under the unlawful maps does not constitute a significant intrusion on state sovereignty and does not outweigh the importance of the voting rights at stake in this case, *id.* at 896 (collecting cases).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant Plaintiffs' motion for a special election.

Date: February 13, 2024                                                Respectfully submitted,

|  |  |
|---|---|
|  | */s/ Megan C. Keenan* |
| Leah Aden (admitted *pro hac vice*) | Megan C. Keenan (admitted *pro hac vice*) |
| Stuart Naifeh (admitted *pro hac vice*) | Sarah Brannon (admitted *pro hac vice*)* |
| Victoria Wenger (admitted *pro hac vice*) | American Civil Liberties Union Foundation |
| NAACP Legal Defense & Educational Fund | 915 15th St. NW |
| 40 Rector Street, 5th Floor | Washington, DC 20005 |
| New York, NY 10006 | sbrannon@aclu.org |
| laden@naacpldf.org | mkeenan@aclu.org |
| snaifeh@naacpldf.org |  |
| vwenger@naacpldf.org | Sophia Lin Lakin (admitted *pro hac vice*) |
|  | Dayton Campbell-Harris (admitted *pro hac vice*)* |
| I. Sara Rohani (admitted *pro hac vice*) |  |
| NAACP Legal Defense & Educational Fund | Garrett Muscatel (admitted *pro hac vice*) |
| 700 14th Street, Suite 600 | American Civil Liberties Union Foundation |
| Washington, DC 20005 | 125 Broad Street, 18th Floor |
| srohani@naacpldf.org | New York, NY 10004 |

16

John Adcock (La. Bar No. 30372)
Adcock Law LLC
Louisiana Bar No. 30372
3110 Canal Street
New Orleans, LA 701119
jnadcock@gmail.com

Michael de Leeuw (admitted *pro hac vice*)
Amanda Giglio (admitted *pro hac vice*)
Robert Clark (admitted *pro hac vice*)
Cozen O'Connor
3 WTC, 175 Greenwich St., 55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn (admitted *pro hac vice*)
Cozen O'Connor
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

slakin@aclu.org
dcampbell-harris@aclu.org
gmuscatel@aclu.org

T. Alora Thomas-Lundborg (admitted *pro hac vice*)
Daniel J. Hessel (admitted *pro hac vice*)
Election Law Clinic
Harvard Law School
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu
dhessel@law.harvard.edu

Nora Ahmed
NY Bar No. 5092374 (admitted *pro hac vice*)
Pronouns: she, her, hers
ACLU Foundation of Louisiana
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org

Ron Wilson (La. Bar No. 13575)
701 Poydras Street, Suite 4100
New Orleans, LA 70139
cabral2@aol.com

*\*Practice is limited to federal court.*

*Attorneys for Plaintiffs*