IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| *Plaintiffs,* | |
| v. | Chief Judge Shelly D. Dick |
| NANCY LANDRY, in her official capacity as Secretary of State of Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |

**JOINT MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTIONS FOR SPECIAL ELECTION AND SCHEDULING ORDER**

Defendant Nancy Landry, in her official capacity as Secretary of State of Louisiana (the "Secretary"), and Intervenor-Defendant the State of Louisiana (the "State") (collectively, "Defendants"), jointly file this Opposition to Plaintiffs' (1) Motion to Set Schedule for Remedial Proceedings, [Rec. Doc. 235], ("Remedial Schedule Motion"), and (2) Motion for Special Election, ("Special Election Motion"), [Rec. Doc. 237].

As an initial matter, Plaintiffs' request for a November 2024 special election on yet-to-be-drawn legislative districts should be denied. First, the Court does not have jurisdiction to order a remedy because a notice of appeal has been filed. [Rec Docs 241; 242]. Second, even if this Court had jurisdiction, the appropriate remedy is to first allow the legislature an opportunity to redraw the maps to be used in *the next election*. *See Reynolds v. Sims*, 377 U.S. 533, 585 (1964) (*emphasis added*). Third, Plaintiffs fail to show under the careful balancing of the equities required on this record, that a November 2024 special election is warranted or even possible. Remedial maps, to the extent any are even necessary after appeals are exhausted, should be used in the next regularly

scheduled state House and state Senate elections. In sum, Plaintiffs' Special Election Motion must be denied.

Additionally, even if the Court had jurisdiction—which it does not—Plaintiffs' Remedial Scheduling Motion seeks an extreme remedy: an unjustifiably expedited schedule for remedial proceedings before election deadlines that are *years* away.  Plaintiffs' assertion that their proposed schedule "provides the state with a reasonable period of time to pass new maps," [Rec. Doc. 235-1 at 1], is belied by the realities of the political process. Remarkably, Plaintiffs feign shock at Defendants' response to their requested meet-and-confer—as though failing to instantaneously agree to an unreasonably expeditiousness scheduling request somehow renders Defendants unreasonable.  [*Id.* at 2]. It does not. The State requested more time so that it could confer with its co-Defendants.  That request was ignored.  Just as Plaintiffs' request to confer was illusory so too is their timeline to allow the Legislature to enact a remedial map—should it elect to do so. Regardless, Defendants now respond and request that the Court deny the Remedial Scheduling Motion and Special Election Motion.

The Court should set a remedial schedule that allows the Legislature and Defendants a non-illusory opportunity to consider the Court's Order and possible remedy.  With the next state legislative elections occurring in 2027, an expedited schedule and special election are simply unnecessary, unhelpful, and in contravention of the rights of the Defendants and the state Legislature. *See In re Landry*, 83 F.4th 300, 303–04 (5th Cir. 2023) ("Since 1966, the Supreme Court has repeatedly reminded lower federal courts that if legislative districts are found to be unconstitutional, the elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority. . . . The district court did

not follow the law of the Supreme Court or this court."). Not allowing an appropriate amount of time will surely and inevitably lead to increased voter confusion and additional litigation.

## BACKGROUND

Plaintiffs filed this case on March 14, 2022. [Rec. Doc. 1]. Over the next several months, discovery began, and the Court entered a scheduling order contemplating a January 2023 trial date. [Rec. Doc. 66]. On August 30, 2022, the Court stayed this case until *Merrill v. Milligan* was decided. [Rec. Doc. 79]. At no time between March 14 and August 30 did Plaintiffs file a motion for preliminary injunction.

After *Milligan* was decided and the stay lifted in June of 2023, Plaintiffs moved the Court for an order to expedite the case for a quick resolution of a "proposed" motion for preliminary injunction that was never filed. [Rec. Doc. 83, 83-1, 89]. The Court declined that relief and set two options for the trial start date: November 6, 2023 or November 27, 2023. [Rec. Doc. 96]. Trial commenced on November 27, 2023, approximately 9 days after the November 18, 2023 statewide elections.

During trial, Defendants called Sherri Hadskey, Commissioner of Elections for the State of Louisiana, in their case in chief. At the conclusion of direct examination, the Court informed defense counsel that though the line of questioning would be outside the scope of cross, the Court was "going to want to know what the timeline is. And if you don't want to ask it I'll ask it." [Rec. Doc. 281 at 14:24–15:2]. Defense counsel consented to this request. [Rec. Doc. 281 at 15:3]. But counsel for Plaintiffs took the incredible position that the Commissioner of Elections for Louisiana did not "have the sufficient personal knowledge to testify as to the timing of redistricting." [Rec. Doc. 281 at 15:4–7]. Rightfully puzzled, the Court questioned Plaintiffs' counsel several times on why they did not "want to know those dates[.]" [*See* Rec. Doc. 281 at 16:3–4 ("So y'all don't

really want to know what the timeline is? Why don't y'all want to know?"), 16:21 ("Y'all don't want to know those dates?")]. Despite this encouragement,[1] Plaintiffs still willfully refused to ask Commissioner Hadskey any specific questions on the necessary deadlines for a November 2024 special election. [*See* Rec. Doc. 281 at 15:4–36:4].

Now, despite willfully refusing to ask the necessary questions to build a record in support of a 2024 Special Election, Plaintiffs belatedly seek this extraordinary relief before the legislature has even had a chance to contemplate drawing a new map, or before any appeals are resolved. [Rec. Doc. 237]. Such a process is unacceptable. *See In re Landry*, 83 F.4th at 305 ("That this application presents an unusual posture for mandamus is not a contrivance of Landry or this panel but the result of the district court's unique rush to remedy when circumstances did not require it. . . . The plaintiffs respond that the state may adequately appeal following the decision formulating a court-ordered redistricting plan. That outcome would embarrass the federal judiciary and thwart rational procedures."). As shown below, nothing in law or equity requires such an extraordinary remedy.

## ARGUMENT

### I.    A Special Election is Neither Required, Nor Permitted Here.

#### A.    This Court does not currently have jurisdiction to order a special election.

Plaintiffs' Special Election Motion fails because this Court does not currently possess jurisdiction to order a special election. Defendants have filed their notices of appeal from the court's injunction, which divested this Court of jurisdiction to alter that injunction—including by amending it to require special elections. [*See* Rec Docs. 241; 242].

---

[1] Counsel for Plaintiffs appeared concerned that Defendants would try to use Ms. Hadskey's testimony as a *Purcell* argument. This, of course, was nonsensical as the next regularly scheduled legislative elections were four years away.

"The filing of a notice of appeal is an event of jurisdictional significance"—it confers jurisdiction on the appellate court and divests the district court of jurisdiction over the matters appealed. *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982); *see Donovan v. Richland Cty. Ass'n*, 454 U.S. 389, 390 n.2 (1982). Once a notice of appeal is filed, the district court no longer has the authority to revisit the merits of its ruling or to enlarge the scope of injunctive relief. *McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731, 734 (9th Cir. 1982). This rule avoids confusion and prevents appeals from becoming moving targets, with district courts free to modify decisions while they are under review. *See Griggs*, 459 U.S. at 58.

Under limited circumstances, district courts may take action to implement or enforce unstayed injunctions during the pendency of an appeal. But there is a clear line between enforcement of an injunction as originally issued versus expansion of the injunction. *City of Cookeville v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007). The relief sought by Plaintiffs in their Motion is a clear expansion of the remedy ordered by the Court and is therefore prohibited. *Id.*; *see also McClatchy*, 686 F.2d at 734–36.

For example, in *Zimmer v. McKeithen*, 467 F.2d 1381 (5th Cir. 1972), after the defendants filed a notice of appeal from a court-ordered apportionment plan, the district court attempted to modify its order to encompass an alternative apportionment plan. The Fifth Circuit refused to consider the second order, ruling that it had been issued "without jurisdiction" because it postdated the notice of appeal. *Id.* at 1382. The case later came before the United States Supreme Court, which noted approvingly that "the Court of Appeals vacated the [second] order on the ground that when the appeal was filed, the District Court lost jurisdiction over the case." *E. Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636, 638 n.4 (1976) (per curiam).

The same result must follow here. This court entered an injunction on February 8, 2024, Rec. Doc. 233, which ordered "that elections under S.B. 1 and H.B. 14 be and are hereby ENJOINED. The State is hereby permitted a reasonable period of time, to be determined by the Court following submittals by the parties, to address the Court's findings and implement State House and Senate election maps that comply with § 2 of the Voting Rights Act." [Rec. Doc. 233 at 91]. No other relief was ordered.

On February 19, 2024, Defendants entered their notices of appeal, [Rec Docs. 241; 242], divesting this Court of jurisdiction to modify the injunction on appeal. To be clear, Plaintiffs had every opportunity to put forth the evidence needed to seek a 2024 Special Election at trial, such that the timing could be considered in crafting the Court's now-appealed injunction. But, Plaintiffs chose not to do so. "Equity ministers to the vigilant, not to those who sleep upon their rights." *Texaco P.R., Inc. v. Dep't of Consumer Affs.,* 60 F.3d 867, 879 (1st Cir. 1993). The Court should not reward Plaintiffs for their lack of vigilance. In light of the choices Plaintiffs made, at this juncture the Court has no jurisdiction to act, as ordering a special election for November 2024 would invalidate the November 2023 election results and be an improper expansion of the remedy granted in the February 8 Order. *See Zimmer* 467 F.2d at 1382; *McClatchy Newspapers*, 686 F.2d at 734.

**B.    The *Covington* litigation shows that a special election cannot be ordered on the present record.**

When a State's legislative apportionment scheme is overturned, courts should "ensure that *no further elections* are conducted under the invalid plan." *Reynolds v. Sims*, 377 U.S. at 585 (declining to order a special election under the circumstances despite the next election being three years away). In support of their claim that a special election is needed, Plaintiffs contend that *North*

*Carolina v. Covington*, 581 U.S. 486 (2017) (per curiam) bolsters their position. [*See* Rec. Doc. 237-1 at 5, 13–14]. But *Covington* demands the opposite result.

The *Covington* litigation began in May 2015 when plaintiffs challenged 28 legislative districts in North Carolina. On August 11, 2016, a three-judge panel held that the challenged districts were unconstitutional racial gerrymanders under the Fourteenth Amendment "and, without imposing a deadline, directed the legislature to draw new districts." *Covington v. North Carolina*, 316 F.R.D. 117, 177 (2016). The November 2016 election proceeded under the old maps that were found to be racial gerrymanders, but the district court "enjoined the defendants from conducting any elections using the unconstitutional districts after November 2016." *Id.* In a subsequent remedial phase, the plaintiffs sought to nullify the 2016 election results partially by ordering a special election in 2017, which the defendants opposed. *Covington v. North Carolina*, No. 1:15-CV-399, 2016 WL 7667298, *1 (M.D.N.C. Nov. 29, 2016). In a November 29, 2016 remedial order, the district court ordered a special election in the fall of 2017 whereby all newly elected legislators would serve limited one-year terms. *Id.* at *3 (M.D.N.C. Nov. 29, 2016). At the time of the order, there was no evidence before the court of the costs or administrative mechanics of a special election and no new remedial plans had been drawn. *Id.*

The district court's remedial order was quickly stayed by the Supreme Court pending appeal. *North Carolina v. Covington*, 580 U.S. 1088 (2017) (Mem.). On the merits, the Supreme Court vacated and remanded the remedial order holding that the district court "failed to meaningfully weigh any equitable considerations." *Covington*, 581 U.S. at 488. The Court specifically noted that the district court only made a cursory inquiry into the equities and "simply announced that '[w]hile special elections have costs,' *those unspecified costs* 'pale in comparison' to the prospect that citizens will be 'represented by legislators elected pursuant to a racial

7

gerrymander.'" *Id.* at 488–89 (emphasis added). This, the Supreme Court dictated, was entirely insufficient.

On remand from the Supreme Court, the *Covington* plaintiffs renewed their request for a special election, which the district court **denied**. *See Covington v. North Carolina*, 270 F. Supp. 3d 811, 902 (M.D.N.C. 2017). After weighing the equities set forth by the Supreme Court, the district court ultimately determined that "ordering a special election would entail either unduly abbreviating the process for enacting and reviewing new legislative districting plans, or ignoring a number of state laws designed to protect voters and the integrity of elections, or accepting the compressed, overlapping schedule proposed by Plaintiffs—which would likely confuse voters, raise barriers to participation, and depress turnout." *Id.* Ultimately, the court concluded that ordering a special election before the next regularly scheduled legislative election "would not be in the best interests of Plaintiffs or the people of North Carolina." *Id.*

Like in *Covington*, there is no evidence in the record for this Court to adequately address the case-specific inquiry of the cost of a special election. Make no mistake: Plaintiffs had ample opportunity to put such evidence on the record at trial. Defendant called Ms. Sherri Hadskey, Commissioner of Elections for the State of Louisiana, who is qualified to opine on such schedules and potential costs of a special election. Much to this Court's surprise, Plaintiffs refused to ask Commissioner Hadskey any questions regarding the timeline or actual costs of what a special election in November 2024 for legislative seats would be. *See supra* pp. 2–3. Instead, Plaintiffs maintain that Defendants should be bound by a timeline proposed to the Fifth Circuit in a *congressional* case, which does have a regularly scheduled November 2024 election, without any consideration of the actual costs of special *legislative* elections across the state. [*See* Rec. Doc. 218

at 16:3–17:22]. This is plainly not the case-specific inquiry that the Supreme Court in *Covington* mandated.

Any remedial order setting a special election without an analysis of the specific costs involved would directly contravene the Supreme Court's holding in *North Carolina v. Covington*. Furthermore, as shown below, the equities weigh against ordering a special election that would truncate current legislators' terms.

### C. The equities weigh against ordering a special election in November 2024.

As the Supreme Court noted in *North Carolina v. Covington*, "in the context of deciding whether to truncate existing legislators' terms and order a special election, there is much for a court to weigh[.]" 581 U.S. at 488. Indeed, ordering special elections is a "drastic if not staggering" remedy that "courts should grant only under the most extraordinary of circumstances." *Gjersten v. Bd. of Election Comm'rs*, 791 F.2d 472, 478 (7th Cir. 1986). Indeed, that "extraordinary remedy . . . can only be employed in exceptional circumstances, usually when there has been egregious defiance of the Voting Rights Act." *Lopez*, 617 F.3d at 340. Thus, even assuming this Court has jurisdiction, the balance of the equities shows a November 2024 special election is unwarranted.

The factors the Supreme Court outlined for lower courts to consider when assessing whether a special election is warranted include: (1) "the severity and nature of the particular constitutional violation"; (2) "the need to act with proper judicial restraint when intruding on state sovereignty"; and (3) "the extent of the likely disruption to the ordinary processes of governance if early elections are imposed." *Covington*, 270 F. Supp. 3d at 890 (quoting *Covington*, 588 U.S. at 488).

### 1. The severity and nature of the particular constitutional violation.

This case does not involve any constitutional claims. Unlike *Covington*, which involved a racial gerrymandering claim under the Fourteenth Amendment, Plaintiffs here brought claims under the Voting Rights Act. The "severity and nature" of the violation at issue here are not constitutional in nature[2], but statutory. The cases Plaintiffs cite in support of the first factor either involve constitutional claims (not solitary Section 2 violations), or decline to officially order a special election until after the new district boundaries are constitutionally drawn. *See Covington v. North Carolina*, 270 F. Supp. 3d 881, 884 (M.D.N.C. 2017); *Harding v. Edwards*, 487 F. Supp. 3d 498, 505–06 (M.D. La. 2020) (First and Fourteenth Amendment claims); *Wright v. Sumter Cnty. Bd. Of Elections and Registration*, 361 F. Supp. 3d 1296, 1300-02, 1305-06 (M.D. Ga. 2018) (enjoining upcoming election but deferring the decision on the timing of a special election until "after Sumter County Board of Education's district boundaries are constitutionally drawn"), *aff'd*, 979 F.2d 1282 (11th Cir. 2020). [*See* Rec. Doc. 237-1 at 6–8]. The nature and severity of the violation here—assuming that there is a violation after all appeals are exhausted—are sufficient to justify upending the Louisiana State legislature prior to the next regularly scheduled election.

### 2. The need to act with proper judicial restraint when intruding on state sovereignty.

A November 2024 special election would dramatically infringe state sovereignty by disregarding Louisiana's constitution and statutory law by truncating the terms of newly-elected state legislators. Specifically, the state legislators elected in 2023 would have their terms cut from 4 years to 1. And any newly elected legislators under a yet-to-be-drawn remedial plan would only hold office for three years instead of four. This could include legislators who were elected in

---

[2] Plaintiffs take key quotes from *Covington* and substitute the term "constitutional" for "VRA-compliant." *Compare* Rec. Doc. 237-1 at 6 (quoting *Covington* as providing that harm from a VRA violation will "continue unabated until new elections are held under [VRA-complaint] districting plans") *with Covington*, 270 F. Supp. 3d at 891 ("continue unabated until new elections are held under constitutionally adequate districting plans").

districts that Plaintiffs did not even challenge. Moreover, the State's longstanding policy choice to conduct state elections on off-years from federal elections would be upended and any remedy "cannot be fundamentally at odds with the state's chosen model of government." *Rose v. Sec'y State of Florida*, 87 F.4th 469, 475 (11th Cir. 2023). Principles of state sovereignty counsel against such an enormous intrusion into the State's sovereign authority to manage its own elections for state offices.

The "constitutional responsibility for the establishment and operation of its own government, as well as the qualifications of an appropriately designated class of public office holders" falls on the States. *Gregory v. Ashcroft*, 501 U.S. 452, 462 (1991); *see* U.S. Const. art. IV §4. A special election would result in a substantial intrusion into state sovereignty by truncating the terms of state legislators. *See Maryland v. King*, 133 S. Ct. 1, 3 (2012) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). And such an intrusion exists here, where the Legislature has not yet been given a chance to draw a new map and any remedial order would unilaterally alter the makeup of the newly-elected state legislature. Any order compelling a special election would also disrupt longstanding state laws. For example, the special election would raise serious issues regarding term limits and whether a one, two, or three year term would count towards the limits in the Louisiana Constitution. *See* Louisiana Const. art. III, § 4(E). A special election would also conflict with various responsibilities of Louisiana's many election officials pursuant the Election Code, Title 18.

### 3. The extent of likely disruption to the ordinary process of governance if early elections are imposed.

Moreover, the district court in *Covington* only issued its final remedial order after an appeal on the merits was fully disposed. The *Covington* court's initial attempt to do so before all appeals

were exhausted was properly stayed and then rejected by the Supreme Court. *Covington,* 581 U.S. at 488-89; *see also In re Landry*, 83 F.4th at 305 (explaining that a bifurcated and disjointedly overlapping appellate track for the remedial and merits phases "would embarrass the federal judiciary and thwart rational procedures"). Waiting until the conclusion of appeals is the proper procedure because the constant changing of electoral maps leads to voter confusion—especially with successive elections for the same offices within a twelve-month period. *Covington*, 270 F. Supp. 3d at 899 ("The close succession during which voters would be called upon to participate in both special and regularly scheduled elections risks generating substantial voter confusion and resulting low voter turnout, as voters may believe they need to only vote in state legislative elections once during a single calendar year."). Ordering a November 2024 special election, so close in time to the November 2023 election, would cause great confusion among voters—even if the remedy imposed changes some 34 house and 13 senate districts, but not others[3]. As this Court has cautioned, too many elections "breeds voter fatigue and confusion, which is amplified in poor and undereducated communities." [Rec. Doc. 233 at 81]. The cost of rushing towards a November 2024 special election before a remedial map has been drawn is unnecessary when there is no true emergency. *See Reynolds*, 377 U.S. at 585.

The State has a "significant interest in getting on with the process of governing" now that "an electoral cycle is complete." *Bowes v. Ind. Sec'y of State*, 837 F.3d 813, 818 (7th Cir. 2016). A legislature "elected under an unfair apportionment scheme . . . is nonetheless a legislature empowered to act." *Baker v. Carr*, 269 U.S. 186, 250 n.5 (1962) (Douglas, J., concurring). Special elections "disrupt the decision-making process" and "place heavy campaign costs on candidates

---

[3] Plaintiffs insisted throughout trial that they are not challenging the entire state House and state Senate maps, but instead challenge 47 legislative districts. [Rec. Doc. 163-1 at 5]. But, Plaintiffs failed to present any evidence at trial that a re-draw could be limited to just those districts. As such, it is an open question as to how many districts would be impacted by a remedial re-draw, including whether the entire state would be impacted.

and significant election expenses on local government." *Gjersten*, 791 F.2d at 279. Those costs to state governance "should not be cavalierly brushed away by other branches of government, whether federal or judicial, that neither pay it nor impose the tax burden on which a remedy depends." *United States v. City of Houston*, 800 F. Supp. 504, 506 (S.D. Tex. 1992). This is especially true here, where there is at least a fair prospect that any remedial order, or the underlying judgment in this case, could be stayed, vacated, or altered before a November 2024 special election could occur.

Additionally, newly elected legislators would have to turn around and compete in special elections in a few months, which would force them to do more campaigning and less governing than they otherwise would have, at the expense of the constituents that they were elected to represent. Even after a special election, the problems would recur with newly elected representatives who would have shorter terms and have their attention diverted from governing to reelection more quickly. *See Toney v. White*, 488 F.2d 310, 316 (5th Cir. 1973) (reversing remedial order "given both the expense of holding a special election and the short terms of office which would remain").

Notably, in its order denying the plaintiffs' second request for a special election, the district court in *Covington* relied exclusively on the third factor in declining to call a special election because the disruption would "unduly harm" the state's voters. *Covington*, 270 F. Supp. 3d at 901. Specifically, "ordering a special election would entail either unduly abbreviating the process for enacting and reviewing new legislative districting plans, or ignoring a number of state laws designed to protect voters and the integrity of elections, or accepting the compressed, overlapping schedule proposed by Plaintiffs—which would likely confuse voters, raise barriers to participation, and depress turnout." *Id.* at 902. As in *Covington*, a special election in November 2024 would

abbreviate the legislative process, ignore a number of state laws, impose a compressed schedule, confuse voters, raise barriers to participation, and depress turnout. [Rec. Doc. 233 at 80 ("There was evidence of voter confusion that results from repeated and voluminous decentralized elections.")]. Even more significant, it raises cascading issues regarding Louisiana's constitutional mandate of term limits, a consideration the *Covington* district court did not grapple with because North Carolina legislators are not term limited. *See* Louisiana Const. art. III, § 4(E). Plaintiffs fail to cite to any case applying the *Covington* balancing factors to a request for a special election with term-limited legislators. As such, the equities weigh against ordering a special election at this time.

> **D.      In the alternative, should this Court determine that it has jurisdiction, this case should be stayed pending appeal.**

In the alternative, if this Court determines that it has jurisdiction, Defendants jointly move the Court to stay its order, [Rec. Doc. 233], pending their appeals to the Fifth Circuit. Courts balance four factors to determine whether an order should be stayed pending appeal: "(1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether granting the stay would serve the public interest." *United States v. Baylor Univ. Med. Ctr.*, 711 F.2d 38, 39 (5th Cir. 1983) (per curiam) (citation omitted). No one factor is dispositive, and the factors should not be applied "in a rigid, mechanical fashion." *Id.*

The Court's order imposes irreparable harm on Defendants and the general public as a matter of law, it is not likely to withstand appellate scrutiny, and the balance of equities favors a stay pending appeal. *See Campaign for S. Equal. V. Bryant,* 773 F.3d 55, 57 (5th Cir. 2014) (granting a stay pending appeal after "concluding that the legal questions presented by this case

are serious, both to the litigants involved and the public at large, and that a substantial question is presented for this court to resolve").

## II.    Plaintiffs' Proposed Schedule is Unworkable and in Contravention of Defendant's Rights.

### A. Because the Motion for Special Elections Should be Denied, an Expedited Remedial Process is Not Necessary.

The Court does not have jurisdiction to enter a scheduling order. *See supra* § I.A. But assuming *arguendo,* it did—and assuming the Court denied Defendant's requested stay in the event the Court found it had jurisdiction, *see supra* § I.D.—the Court should reject Plaintiffs' Remedial Scheduling Motion, [Rec. Doc. 235], and instead set a reasonable schedule for remedial proceedings in the normal course.  "Redistricting based on section 2 of the Voting Rights Act, 52 U.S.C. § 10301, is complex, historically evolving, and sometimes undertaken with looming electoral deadlines."  *In re Landry*, 83 F.4th at 303. However, it is neither "a game of ambush," nor "ordinary litigation."  *Id.* at 303, 307.  And "rushing redistricting via a court-ordered map is a clear abuse of discretion . . . ." *Id*. at 304.

Such an abuse of discretion would be even more obvious here, where a special election is neither required, nor permitted. *See supra* § I. The next election for state legislators is not set to occur until 2027. Under that timeframe, there is more than enough time to let the merits appeal play out, *see supra* §§ I.A. & D, and still conduct a remedial phase hearing (if one is even necessary) in plenty of time to implement whatever remedial map the Court orders or the Legislature passes prior to the 2027 elections.

And the Fifth Circuit has explained that a bifurcated track where a merits appeal progresses while a remedial phase is rushed in the lower court "would embarrass the federal judiciary and thwart rational procedures." *In re Landry*, 83 F.4th at 305. Indeed, this is the very result the Fifth

Circuit sought to avoid when it issued its writ of mandamus in *Robinson*. *Id.* There, the Court explained:

> Denying mandamus effectively means a two-track set of appeals on the merits and the court-ordered plan. No matter the outcome—or timing—of this court's merits panel determination, one side will seek relief in the Supreme Court. Similarly, the anticipated court-ordered redistricting plan will be appealed to this court and likely to the Supreme Court. And all of this will persist well into the 2024 election year. The likelihood of conflicting courts' scheduling and determinations will create uncertainty for the state and, more important, the candidates and electorate who may be placed into new congressional districts. In sum, while there is on paper a right to appeal whatever decision the district court renders on drawing its own redistricting maps, the paper right is a precursor to legal chaos.

*Id.* Adopting Plaintiffs' proposed remedial schedule would result in the same sort of "legal chaos" that the Fifth Circuit found so intolerable in *Robinson*. Indeed, it would be worse because, in *Robinson*, there was an election occurring within about *a year* of the remedial proceeding. But here, the next election is *years* away.

In short, there is no reason to expedite the remedial processes if the Court does not order a special election. Whatever cure is necessary here—if any—will have plenty of time to take effect in the normal course.

**B.    Even if a Special Election is Ordered, there is Insufficient Time before the next Elections in Louisiana to Permit the Legislature a Fair Opportunity to Draft a Remedial Plan and the Defendants a Fair Opportunity Litigate any Potential Remedy.**

When a court determines that an apportionment scheme violates federal law, courts must afford a reasonable opportunity for the legislature to meet and correct the violation. *See Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) (congressional maps). The right of the legislature to have "the first opportunity to accomplish the difficult and politically fraught task of redistricting" is "*required*." *In re Landry*, 83 F.4th at 306–07 (emphasis in original). This is true, even if it means district courts have "to permit elections to be held pursuant to apportionment plans that do not in

all respects measure up to the legal requirements, even constitutional requirements." *Upham v. Semon*, 456 U.S. 37, 44 (1982). Otherwise, the federal judiciary runs the risk of creating "chaos and confusion" for state and local election officials and, more importantly, the electorate. *Merrill v. Milligan*, 142 S. Ct. 879, 880 (2022) (Kavanaugh, J., concurring). What's more, Defendants also have a right to mount an adequate defense, something that Plaintiffs' proposed schedule ill affords. *See In re Landry*, 83 F.4th at 305–06.

Consequently, despite the "broad discretion and inherent authority to manage its docket," *In re Deepwater Horizon*, 988 F.3d 192, 197 (5th Cir. 2021), a district court abuses that discretion if it rushes a redistricting map, *Landry*, 83 F.4th at 304; *see also Jones v. City of Lubbock*, 727 F.2d 364, 387 (5th Cir. 1984) (criticizing court-ordered redistricting plan in less than a month and a half following judgment); *See also, e.g., Veasy v. Perry*, 574 U.S. 951 (2014) (rejecting judicial intervention 21 days before the general elections); *Merrill v. People First of Ala.*, 141 S. Ct. 25 (2020) (same for 34 days before general elections); *Andino v. Middleton*, 141 S. Ct. 9 (2020) (same for 46 days before general elections); *Raysor v. DeSantis*, 140 S. Ct. 2600 (2020) (same for 48 days before primary elections); *Moore v. Harper*, 142 S. Ct. 1089 (2022) (same for 92 days before primary elections); *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (same for 120 days before primary elections).

Here, Plaintiff's Motion contains the same flaws that plagued the scheduling in *In re Landry*. In *Landry*, the Fifth Circuit issued a writ of mandamus to vacate this district court's expedited schedule to remedy a preliminary finding of a Section 2 violation. 83 F.4th at 303. There, this court gave the State only five weeks to prepare for a hearing to determine a court-ordered redistricting map. *Id.* at 304. In holding that five weeks was impermissibly rushed, the Fifth Circuit reiterated the Supreme Court's continued admonishment to federal courts that they

should "accommodat[e] to the greatest extent the legislatures' ability to confect its own remedial plans." *Id.* at 308. Failure to do so, "placed the state at an intolerable disadvantage legally and tactically," in *Robinson*, *id.*, and it would do the same here.

Here, Plaintiff's Remedial Schedule Motion mischaracterizes how much time should actually be afforded to Defendants. Plaintiffs claim that their proposed schedule would afford the Legislature "nearly three full session weeks and 35 total days," [Rec. Doc. 235-1 at 3], which is an even shorter timeframe than that criticized by the Fifth Circuit as being insufficient for the Legislature consider a remedial map. *See In re Landry*, 83 F.4th at 304 ("Undeterred by the pendency of appeal on the merits, the district court opted to go ahead on October 3-5 with an expedited hearing to determine a court-ordered redistricting map. But the court provided merely *five weeks* for the state's preparation. No mention was made about the state legislature's entitlement to attempt to conform the districts to the court's preliminary injunction determinations.") (emphasis added).

Indeed, even Plaintiffs concede that the 35-day timeframe is calculated as of the Court's February 8 decision. But February 21, the date of the hearing on this issue, is nearly two full weeks after the Court's decision, which means that any court-set schedule—even if set on the date of the hearing—would be a mere 22-days. Thus, Plaintiffs' Motion and proposed schedule is legally deficient, practically rushed, and should be rejected. *See In re Landry*, 83 F.4th at 307 ("Of course, the law as set forth by the Supreme Court's interpretation of the Constitution and section 2 [of the Voting Rights Act] must be vindicated. But the remedy necessarily involves the exercise of discretion by federal courts whose judgments will interfere with a primary constitutional structural device of self-government: making decennial districting choices about representation in legislative bodies.").

Plaintiffs also take the Legislature's ability to quickly create a *congressional* plan out of context, and they ignore the State's procedures for special sessions. Plaintiffs point to the map that the legislature created earlier this year respecting Louisiana's congressional districts and the fact that the legislature did so in five legislative session days. [Rec. Doc. 235-1 at 3]. However, that map—a congressional map with far *fewer* districts, *see supra* sec. I.B.—was created during the First Special Session of 2024, which was called for that very purpose. The First Special Session has already adjourned.

The call for the upcoming Second Special Session of 2024 happened the same day that the Court issued its February 8 Ruling. *Compare* [Rec. Doc. 233], *with* Governor Jeff Landry's February 8 *Call and Convene the Legislature of Louisiana into Extraordinary Session*, Procl. No. 13 JML 2024, (last visited February 15, 2024), legis.la.gov/LegisDocs/242ES/call.pdf. The Second Special Session was also called well before Plaintiffs filed their expedited requests.

Moreover, the Legislature can only pass bills that pertain to the scope of a given special session, and the Second Special Session's scope does not include Louisiana's legislative districts. *See* LA. CONST. art. III, § 2(B) (describing measures for extraordinary legislative sessions, the timing and procedure, and limiting the scope of legislation to the enumerated topics of the session). Which means that the Legislature would not have the opportunity to address any possible remedy until it convenes in regular session on March 11, 2024, at noon. Thus, to comply with Plaintiffs' proposed schedule, the Legislature would have less than a week to draft and adopt new maps for both the House and the Senate. Such a herculean lift is not only politically problematic, it is also legally insufficient. *See In re Landry*, 83 F.4th at 303–04.

Therefore, the Court has no choice but to reject the Remedial Schedule Motion until at least the Legislature has had an adequate time to consider any potential remedy in this case.

### C.  A More Deliberative Remedial Schedule Must be Permitted.

Because a special election would be improper, *see supra* sec. I, and imposing a rushed remedial phase would violate Defendants' rights, *see supra*. sec. II.A.–B., the Court should adopt a more contemplative schedule. Specifically, the Court should permit the Louisiana Legislature to consider the possible adoption of a remedial map during the 2024 Regular Session, which begins on March 11 and ends, at the latest, on June 3, 2024. *2024 Sessions Information*, Louisiana State Legislature (last visited Feb. 18, 2024) https://legis.la.gov/legis/home.aspx ("The 2024 Regular Legislative Session will convene at noon on Monday, March 11, 2024.  Final Adjournment no later than 6:00 pm on Monday, June 3, 2024."). Furthermore, all appeals to the Court's injunction should be resolved prior to any remedial proceeding.

Defendants therefore propose that, within 30-days of the later of the end of the 2024 Regular Session—should the Legislature choose not to act—or after all appeals have been exhausted—should the Court not be reversed—the Court should hold a scheduling conference to set further deadlines in this matter. Until then, there is no need (nor, indeed, any rational or permissible basis) to expedite remedial proceedings in this matter.

### <u>CONCLUSION</u>

For these reasons, Defendants respectfully request that Plaintiff's Special Election Motion, [Rec. Doc. 237], be denied. In the alternative, Defendants move this court for an order staying this matter pending appeal.

Defendant also respectfully requests that the Court deny the Remedial Schedule Motion, [Rec. Doc. 235].  The 2024 elections are too close to bootstrap a special election along with them, the Legislature needs a non-illusory amount of time to enact a remedial map, and Plaintiffs' proposed schedule does not provide enough time before the 2024 elections for the Legislature to

have a meaningful opportunity to enact a new map.  Failure to reject Plaintiffs' Remedial Schedule

Motion will only lead to chaos and confusion for everyone in the state—an unnecessary result

given that the next legislative elections are not until 2027.

Respectfully submitted this the 20th day of February, 2024.


*/s/ Elizabeth B. Murrill*
Elizabeth B. Murrill (LSBA No. 20685)
    Louisiana Attorney General
Morgan Brungard (LSBA No. 40298)
Carey Tom Jones (LSBA No. 07474)
Amanda M. LaGroue (LSBA No. 35509)

Office of the Attorney General
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70804
(225) 326-6000 phone
(225) 326-6098 fax
murrille@ag.louisiana.gov
jonescar@ag.louisiana.gov
brungardm@ag.louisiana.gov
LaGroueA@ag.louisiana.gov


Jason B. Torchinsky (DC 976033)*
Phillip M. Gordon (DC 1531277)*
Brennan A.R. Bowen (AZ 036639)*
Holtzman Vogel Baran
Torchinsky & Josefiak, PLLC
15405 John Marshall Highway
Haymarket, VA 20169
(540) 341-8808 phone
(540) 341-8809 fax
jtorchinsky@holtzmanvogel.com
pgordon@holtzmanvogel.com
bbowen@holtzmanvogel.com

*Counsel for Defendant State of Louisiana*


*/s/ Phillip J. Strach*
Phillip J. Strach*
        *Lead Counsel*
Thomas A. Farr*
John E. Branch, III*
Alyssa M. Riggins*
Cassie A. Holt*
**NELSON MULLINS RILEY &
SCARBOROUGH LLP**
301 Hillsborough Street, Suite 1400
Raleigh, North Carolina 27603
Ph: (919) 329-3800
phil.strach@nelsonmullins.com
tom.farr@nelsonmullins.com
john.branch@nelsonmullins.com
alyssa.riggins@nelsonmullins.com
cassie.holt@nelsonmullins.com


*/s/ John C. Walsh*
John C. Walsh, LA Bar Roll No. 24903
John C. Conine, Jr., LA Bar Roll No. 36834
**SHOWS, CALL & WALSH, L.L.P.**
628 St. Louis St. (70802)
P.O. Box 4425
Baton Rouge, LA 70821
Ph: (225) 346-1461
Fax: (225) 346-1467
john@scwllp.com
coninej@scwllp.com

*\* Admitted pro hac vice*

*Counsel for Defendant NANCY LANDRY, in her
official capacity as Secretary of State of Louisiana*