# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| DR. DOROTHY NAIRNE, *et al.*, | Civil Action No. 3:22-cv-00178-SDD-SDJ |
| *Plaintiffs,* | |
| | Chief Judge Shelly D. Dick |
| v. | |
| NANCY LANDRY, in her official capacity as Secretary of State of Louisiana, | Magistrate Judge Scott D. Johnson |
| *Defendant.* | |

## LEGISLATIVE INTERVENORS' OPPOSITION TO
## PLAINTIFFS' RENEWED MOTION FOR SCHEDULING CONFERENCE

Plaintiffs have renewed their demand for a hyper-expedited remedial schedule. The Court should deny Plaintiffs' demand for a special election and defer a remedial process until the pending appeals from the Court's injunction are resolved.[1]

Plaintiffs demand a special election that would abridge the terms of all members of both chambers of the Louisiana Legislature from four years to one. Such a stunning intrusion on state sovereignty and burden on the right to vote—effectively cancelling millions of votes cast last October and November—is jurisdictionally barred twice over. The Court lacks jurisdiction to enlarge the scope of injunctive relief during the pending appeals, and most of the legislative districts implicated in Plaintiffs' demand are not within its jurisdictional reach. Besides, Plaintiffs cannot justify their exceptional demand under the high standard of *North Carolina v. Covington*, 581 U.S. 486 (2017). Rather, Plaintiffs' case for a special election smacks of the same "cursory"

---

[1] Legislative Intervenors adopt and join in the arguments raised in Defendants' February 20, 2024, Joint Memorandum in Opposition to Plaintiffs' Motions for Special Election and Scheduling Order, ECF No. 244.

and "minimal reasoning" condemned in *Covington* that would wrongly "justify a special election in *every* racial-gerrymandering case," in contravention to precedent. *Id.* at 489.

Plaintiffs' proposed hyper-expedited remedial schedule is unduly prejudicial and fails to afford an adequate opportunity for the Louisiana Legislature to undertake this work. Plaintiffs are demanding this Court "rush to remedy when circumstances [do] not require it," *In re Landry*, 83 F.4th 300, 305 (5th Cir. 2023), in a cynical effort to short-change the Legislature and force a remedial plan in derogation of precedent. Their motion should be denied and any remedial proceedings should be stayed pending the resolution of the pending appeals.

## **BACKGROUND**

Plaintiffs commenced this action on March 14, 2022, *see* ECF No. 1, and filed the operative Amended Complaint on April 4, 2022. *See* ECF No. 14.  The Court scheduled an eight-day trial to commence January 17, 2023. *See* ECF No. 66. On August 30, 2022, the Court stayed this case pending *Merrill v. Milligan*, No. 21-1086 (U.S.). *See* ECF No. 79.

After that case (restyled *Allen v. Milligan*) was decided on June 22, 2023, this Court vacated the stay, *see* ECF No. 95, and set a trial date of November 27, 2023. *See* ECF No. 97. Notably, in a June 9, 2023, filing, Plaintiffs had proposed to "expedite" this case by filing a motion for preliminary injunction "by June 15, 2023," to "allow new maps to be implemented" in time for Louisiana's October 14, 2023, legislative primary election. ECF No. 83-1 at 1–2. But Plaintiffs did not file a preliminary-injunction motion. Instead, as planned, a seven-day trial occurred beginning November 27, 2023, and briefing did not close until December 19, 2023. *See* ECF Nos. 205, 206, and 207. By that time, all elections to the Louisiana Legislature for the current term of office had been held.

2

The current four-year term of office of the Louisiana Legislature commenced on January 8, 2024. La. Const. art. 3, § 4. This Court's injunction and order was entered February 8, 2024. *See* ECF No. 233.

On February 12, 2024, Plaintiffs filed their Motion to Set Schedule for Remedial Proceedings, ECF No. 235, and on February 13, 2024, Plaintiffs filed their Motion for Special Election, ECF No. 237 (collectively, "Plaintiffs' Initial Motions"). The Court has yet to rule on Plaintiffs' Initial Motions.

Meanwhile, each set of Defendants filed notices of appeal from this Court's February 8 injunction. *See* ECF Nos. 241, 242, and 255.

## **ARGUMENT**

### I.    SPECIAL ELECTIONS ARE UNAVAILABLE

All Plaintiffs' pending requests are predicated on a supposed right to special elections. Because no such right exists, all their requests should be denied.

### A.    The Court Lacks Jurisdiction Under *Griggs* To Order A Special Election

The Court lacks jurisdiction to order a special election while appeals from its injunction are pending. A notice of appeal divests "the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Discount Co.*, 459 U.S. 56, 58 (1982). Under this principle, "the powers of the district court over an injunction pending appeal should be limited to maintaining the status quo . . . ." *Coastal Corp. v. Texas Eastern Corp.*, 869 F.2d 817, 820 (5th Cir. 1989) (analyzing prior Fed. R. Civ. P. 62(c), now 62(d)); *see also, e.g.*, *Louisiana Real Estate Appraisers Bd. v. U.S. Fed. Trade Comm'n*, No. CV 19-214-BAJ-RLB, 2020 WL 1817297, *4 (M.D. La. Apr. 9, 2020) ("The powers of a district court over an injunction pending appeal is limited to maintaining the status quo."). Thus, courts have held that district courts may not expand the scope of an injunction during an appeal from that injunction. *See, e.g.*, *Zimmer v.*

*McKeithen*, 467 F.2d 1381, 1382 (5th Cir. 1972) (holding that district court was "without jurisdiction" to modify redistricting apportionment order during appeal), *aff'd in relevant part E. Carroll Par. Sch. Bd. v. Marshall*, 424 U.S. 636, 638 n.4 (1976); *McClatchy Newspapers v. Cent. Valley Typographical Union*, 686 F.2d 731, 735 (9th Cir. 1982) (holding order reinstating striking employees was improper as it "required a change from the status quo" and went beyond "maintenance of the status quo during pendency of the appeal"); *City of Cookeville, Tenn. v. Upper Cumberland Elec. Membership Corp.*, 484 F.3d 380, 394 (6th Cir. 2007) (holding district court erred by entering an injunction during the pendency of an appeal that "expanded the district court's previous order . . . instead of merely enforcing it").

Plaintiffs insist that an order for special elections "cannot and does not seek to enlarge or alter any order that is currently on appeal." ECF No. 254-1 at 2 n.1. But it does. In *Zimmer*, the Fifth Circuit held that an order approving remedial redistricting plans was without jurisdictional basis when a liability appeal was pending, 467 F.2d at 1382, and that is the same relief Plaintiffs demand here. A more recent federal decision reached an identical holding. *Wright v. Sumter Cty. Bd. of Elec. and Regis.*, No. 1:14-cv-42, 2018 WL 7366501 (M.D. Ga. July 23, 2018). In *Wright*, the court had enjoined a county's at-large system under the Voting Rights Act, including May elections scheduled to take place just two months after the injunction issued. *Id.* at *1. The court ordered the elections moved to November, and began proceedings to implement a remedial plan before then. *Id.* But, after the county appealed, the court found itself without remedial jurisdiction,

because "altering the injunction to also reset district boundaries currently established by statute would be a further intrusion on the State of Georgia's sovereignty."[2] *Id.* at *3. So too here.

Moreover, Plaintiffs demand even *more* relief than was jurisdictionally barred in *Zimmer* and *Wright*. In addition to new plans, they demand one-year term limits and special elections. That is drastically beyond the February injunction. Indeed, Plaintiffs made their demand for special elections with their trial presentation, ECF No. 207 at 40, but the Court did not grant that relief. By presenting the same request now, Plaintiffs demand a dramatically new scope of the Court's injunction. And they demand no small thing: this is a nuclear demand for the most extreme relief conceivable in a redistricting case. This Court therefore lacks jurisdiction to order a special election.

### B.    This Court Lacks Jurisdiction To Order Elections For Two Entire Legislative Chambers

A second jurisdictional bar forecloses Plaintiffs' demand. They do not confine their request to districts where standing was proven or the prerequisites to vote-dilution shown. *See* ECF Nos. 237-1 at 1–2; ECF No. 254-1. But "a plaintiff's remedy 'must be limited to the inadequacy that produced [his] injury in fact.'" *Gill v. Whitford*, 585 U.S. 48, 66 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)); *see also Clark v. Roemer*, 777 F. Supp. 445, 467 (M.D. La. 1990) (a "remedy may be imposed only in those specific districts where violations have been proven"). Because the harm of "dilution" is "district specific," a remedy is limited to what is necessary to cure "the voter's district." *Gill*, 585 U.S. at 66. Any remedial authority of this Court is "limited to

---

[2] The Eleventh Circuit implicitly endorsed this analysis by subsequently issuing a limited-purpose remand to enable additional remedies in light of the November elections. *See Wright v. Sumter Cnty. Bd. of Elec. and Regis.*, 979 F.3d 1282, 1299 (11th Cir. 2020). In suggesting this Court make an indicative ruling, ECF Nos. 254-1 at 3, Plaintiffs implicitly acknowledge that it is the Fifth Circuit, not this Court, that has power to decide how a remedial proceeding should progress.

ensuring that the plaintiffs were relieved of the burden of voting in" dilutive districts. *North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (per curiam).

Plaintiffs' demand that special elections occur for all seats in both legislative bodies is grossly overbroad. Plaintiffs long ago made clear that they "*do not* challenge every district in the House and Senate plans." ECF No. 163 at 2. As they put it, "Plaintiffs seek to create six additional majority-Black districts and three additional majority Senate districts in specific parts of the state. *Id.* Plaintiffs, then, clearly are not entitled to special elections beyond the scope of where they have proven standing and claims. But Plaintiffs' demand for special elections is not confined in any way, Plaintiffs have not identified which districts they believe are proper for special elections, and it was their burden to establish a basis for special elections. They cannot meet their burden by silence. The Court lacks jurisdiction to entertain their sweeping demands.

**C.    Plaintiffs Have Not Shown Entitlement To The Drastic Relief Of A Special Election**

Jurisdiction aside, Plaintiffs have not shown entitlement to such a drastic remedy. As a threshold matter, the Supreme Court has cast doubt on "whether . . . a special election may be a proper remedy" in a redistricting case at all, *Covington*, 581 U.S. at 488, and this is no time to find federal authority for this "[d]rastic, if not staggering," remedial concept, *Bell v. Southwell*, 376 F.2d 659, 662 (5th Cir. 1967). While Plaintiffs try to sugar-coat their request, they are unmistakably asking this court "to invalidate an election." *Gjersten v. Bd. of Election Comm'rs for City of Chicago*, 791 F.2d 472, 478 (7th Cir. 1986). Even in considering constitutional violations, the Supreme Court has made clear that the appropriate remedy is to "insure that no further elections are conducted under the invalid plan," *Reynolds v. Sims*, 377 U.S. 533, 585 (1964), not to cancel

election outcomes. Thus, while dozens of districts have been enjoined even in the past decade,[3] not one special election occurred. Indeed, in *Lopez v. City of Houston*, 617 F.3d 336 (5th Cir. 2010), the Fifth Circuit found the remedy of "a new election" so obviously unavailable that it found a Voting Rights Act case that could not be resolved before the new census moot.[4] *See id.* at 340. It is obviously unavailable here.

Even assuming special elections may be ordered in some exceptional cases, this is not among them. This is "an extraordinary remedy that can only be employed in exceptional circumstances, usually when there has been egregious defiance of [now-inoperative § 5 of] the Voting Rights Act on the part of [a] covered entity." *Id*. Courts should not usually "invalidate elections" and order new ones, even where statutes are found "unconstitutional." *Gjersten*, 791 F.2d at 479 (citing *Connor v. Williams*, 404 U.S. 549, 550 (1972); *Reynolds v. Sims*, 377 U.S. 533, 585 (1964)). When "deciding whether to truncate existing legislators' terms and order a special election, there is much for a court to weigh." *Covington*, 581 U.S. at 488. The Supreme Court has signaled the "obvious considerations" a district court must evaluate when weighing the equities "include the severity and nature of the particular constitutional violation, the extent of the likely disruption to the ordinary processes of governance if early elections are imposed, and the need to act with proper judicial restraint when intruding on state sovereignty." *Id.*

---

[3] *Cooper v. Harris*, 581 U.S. 285 (2017) (two districts invalidated); *Bethune-Hill v. Virginia State Bd. of Elections*, 326 F. Supp. 3d 128 (E.D. Va. 2018) (eleven); *Covington v. North Carolina*, 316 F.R.D. 117 (M.D.N.C. 2016) (twenty-eight), *aff'd*, 581 U.S. 1015 (2017); *Alabama Legislative Black Caucus v. Alabama*, 231 F. Supp. 3d 1026, 1033–34 (M.D. Ala. 2017) (twelve); *Abbott v. Perez*, 138 S. Ct. 2305, 2334–35 (2018) (one); *see also Wisconsin Legislature v. Wisconsin Elections Comm'n*, 595 U.S. 398, 400 (2022) (one).

[4] The holding of mootness entailed a holding that relief through a special election was so far-fetched to be "impossible." *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992).

That test will rarely favor special elections. *Covington* rejected the lower court's conclusory opinion that unspecified "costs" of a special election "pale[d] in comparison" to allowing citizens to be represented by "legislators elected pursuant to a racial gerrymander," finding that such "minimal reasoning would appear to justify a special election in *every* racial-gerrymandering case—a result clearly at odds with our demand for careful case-specific analysis." *Id.* at 488–49 (emphasis in original). The district court in *Covington* took the hint. On remand, the three-judge court denied the special election request, even though the case involved a "widespread, serious, and longstanding . . . constitutional violation" in the form of 28 racially gerrymandered districts, which "represent[ed] the most extensive unconstitutional racial gerrymander ever encountered by a federal court." *Covington v. North Carolina*, 270 F. Supp. 3d 881, 884, 892 (M.D.N.C. 2017). This case is a far weaker candidate for this nuclear option.

### 1.   Severity and Nature of The Particular Constitutional Violation

This first *Covington* factor cuts against a special election. Here, no constitutional violation—much less a severe one—has been alleged or proven. Rather, the Court found a violation of a statute, VRA § 2. *See* ECF No. 233 at 91. As noted, the Fifth Circuit explained that special elections are improper in VRA cases absent "egregious defiance," as occurred where governments subject to the § 5 preclearance requirement would simply decline to submit an election law for preclearance and use it in elections anyway. *Lopez*, 617 F.3d at 340. But the effects standard of § 2 does not require such a showing or, indeed, any showing of discriminatory intent at all. *See* ECF No. 233 at 91 ("Not relevant to the Court's inquiry is whether the Louisiana Legislature *intended* to dilute the votes of Black Louisianans"). Where a State unknowingly violates a federal statute, the violation cannot be severe. This is an even weaker case than *Lopez* (a § 5 case), where the Fifth Circuit found special elections so obviously beyond the proper scope of remedies as to render the claims moot. *See Lopez*, 617 F.3d at 340–42.

It is also a far weaker case than *Covington*, where the district court found that the racially gerrymandered state legislative plans "implicate[d] both the right to vote and the Constitution's prohibition on state governments' unjustified use of race-based classifications." *Covington*, 270 F. Supp. 3d at 890. And it went on—at length—to describe the societal injuries that flow from racial classifications, such as boundaries that "bear[] an uncomfortable resemblance to political apartheid" and "the specter that the electorate will be 'balkanize[d] . . . into competing racial factions.'" *Id.* at 891 (citations and quotations omitted); *see also Agee v. Benson*, No. 1:22-cv-272, 2024 WL 136368, *1 (W.D. Mich. Jan. 12, 2024) (three-judge court) (finding racially gerrymandered districts "odious," but denying special elections).

Nothing like that is present here. At issue is a demand for additional majority-minority districts that were not proposed to the Legislature at the time of redistricting and that this Court found required under § 2 only after lengthy litigation and a trial. The Legislature has not been defiant, and there is no severe violation of anything, much less the Constitution.[5]

    2.    <u>Extent of Likely Disruptions To The Ordinary Processes of Government If Early Elections Are Imposed</u>

Because a special election in the first year of four-year terms would substantially disrupt the ordinary processes of government, the second *Covington* factor cuts against a special election. This is so for several reasons.

**First**, a special election is, as noted, the same thing as "to invalidate an election." *Gjersten*, 791 F.2d at 478. Louisiana voters elect state elected officials in October of odd-numbered years

---

[5] Ordering a special election before the Fifth Circuit rules could *cause* constitutional injuries, given the "competing hazards of liability" created by the tension between the Voting Rights Act and the Fourteenth Amendment. *Abbott v. Perez*, 585 U.S. 579, 587 (2018) (citation omitted). Any remedial plans adopted to comply with the Court's injunction will entail racial predominance. If the Court's ruling is reversed, it will mean voters were subjected to an unjustified racial classification.

and expect them to serve four-year terms. To truncate terms and hold new elections one year into those terms is to invalidate those choices and dilute the value of votes cast in October (and November) 2023.

**Second**, the other side of this coin is the dramatic harm to legislators, who should (according to Plaintiffs) turn around and begin campaigning for their own offices just months after taking their seats. *See Gjersten*, 791 F.2d at 279 (recognizing that "special elections not only disrupt the decision-making process but also place heavy campaign costs on candidates"). That is exceptionally costly in monetary terms, and that is the least substantial harm in play. Members of the Legislature were elected to govern, not campaign. The four-year term reflects the State's judgment of the appropriate time for officeholders to attempt to fulfill promises before defending them again and making new ones. Plaintiffs ask this Court to dramatically alter that policy choice with a second election in 2024, and then yet another will occur in 2027. This replaces the State's policy of "long-termism"—where office-holders have a four-year window for difficult decisions leading to long-term benefits before defending those decisions to voters—with one of "short-termism"—where officer-holders must constantly defend policies that may not yet have had time to blossom into the intended results.[6]

**Third**, the demand would create significant voter confusion and disrupt relationships between legislators and their constituents. Demanding elections just one year after voting creates voter confusion, added costs to voting, and other democratic harms. *See Covington*, 270 F. Supp.

---

[6] For a concise discussion of this concept, *see* PBS News Hour, *Brooks and Capehart on the anniversary of 9/11, the politics of vaccinations*, https://www.pbs.org/newshour/show/brooks-and-capehart-on-the-anniversary-of-9-11-the-politics-of-vaccinations (David Brooks: "We elect people for terms for a reason. And that reason is, sometimes, they have to do unpleasant things that are going to make them unpopular. And we — if you can be recalled at a moment's notice, it — then they're not going to do those things.").

3d at 899 (finding that the "close succession during which voters would be called upon to participate in both special and regularly scheduled elections risks generating substantial voter confusion and resulting low voter turnout"); *see also, e.g.*, *Lower Brule Sioux Tribe v. Lyman Cty.*, 625 F. Supp. 3d 891, 932 (D.S.D. 2022) (rejecting proposed special election as "costly, complicated, and confusing, with a likelihood of such poor voter participation making it hard to characterize whatever result as reflecting the will of the electorate"); *Gjersten*, 791 F.2d at 479 (recognizing that a "state also has an interest in placing a reasonable limit on the number of times voters are called to the polls"). Indeed, this Court itself found "evidence of voter confusion that results from repeated and voluminous decentralized elections." ECF No. 233 at 80.

Relatedly, special elections may impair the relationships between legislators and constituents. As shown, the Court does not have jurisdiction to order elections in all districts. Special elections, then, will place some voters in districts without the members they elected, and leave them no opportunity to elect a new member. As Sixth Circuit Judge Kethledge recently explained, "[t]he effect of that special election, therefore, is to disenfranchise residents of" some districts "and leave them without representation in the post special-election" bodies. *Agee*, 2024 WL 136368, at *2. Accordingly, *Agee* refused to order a special election, even though it found numerous Detroit-area districts had been racially gerrymandered. *Id.*  This case is an even weaker one for special elections.

**Fourth**, a special election would impose a severe administrative challenge for the State, which must also administer federal elections (including those under a new congressional plan). As Defendants argued in opposing the Initial Motions, *see* ECF No. 244 at 2–3, Plaintiffs failed to develop a record supporting their demands. During the testimony of Louisiana's Commissioner of Elections, Sherri Hadskey, the Court indicated an intent to question Ms. Hadskey about "the

timeline" for a potential special election in 2024. 6 Tr. 106:5–7. However, Plaintiffs inexplicably refused to question her regarding the costs and timeline to hold a special election, claiming she was "not the proper witness to tell us that information." *Id.* at 107:19-25. And they refused despite this Court repeatedly asking Plaintiffs' counsel why they did not want the answers to those questions. *See id*. at 107:18–109:5 (Court repeatedly asking Plaintiffs' counsel, "you don't want to know those dates?" or variations thereof).

Plaintiffs, having failed to build a record at trial, now baldly assert that the State can piggyback special state legislative elections statewide, in 105 State House and 39 State Senate districts (144 total districts), on existing federal elections to be held in November 2024. But that would require the Secretary of State to implement two new plans (i.e., to assign, statewide, voters to all those new districts) and to administer 144 "extra" elections in a presidential election year. That would impose a significant burden on the Secretary of State's office, and is a far cry from adding a few city council elections to an existing election calendar.

Notably, virtually all the special-election cases Plaintiffs cited in their Initial Motions from the past thirty years included no meaningful analysis of whether a special election was required, with it often being the case that the governmental entity acquiesced to a special election. *See, e.g.*, *Arbor Hill Concerned Citizens v. Cty. of Albany*, 357 F.3d 260, 262–63 (2d Cir. 2004) ("Plaintiffs, the County, and intervenors . . . urged the district court to order the county to hold a special election"); *United States v. Osceola Cty.*, 474 F. Supp. 2d 1254, 1255–56 (M.D. Fla. 2006) (noting that the "County propose[d] a special election . . ." and approving that election schedule); *Large v. Fremont Cty.*, No. 05-CV-0270, 2010 WL 11508507, *15 (D. Wyo. Aug. 10, 2010) (negligible discussion); *Goosby v. Town Bd. of Hempstead*, 180 F.3d 476, 498 (2d Cir. 1999) (negligible discussion); *Navajo Nation v. San Juan Cty.*, No. 2:12-cv-39, 2017 WL 6547635, at *18–19 (D.

Utah Dec. 21, 2017) (County "did not object to the special elections recommendation in its Objection to" the special master's final report, making its later objection "untimely"), *aff'd*, 929 F.3d 1270, 1277 n. 6 (10th Cir. 2019) (finding objections to special elections were "moot"). Nor have any of those modern cases involved a demand for a statewide special election (they have mostly involved municipal or county-level offices or plans), let alone one involving the entirety of both chambers of a state legislature as Plaintiffs demand this Court order in this case.

**Fifth**, Plaintiffs' demanded abbreviated remedial process leaves the Louisiana Legislature inadequate time to pass any remedial plans that may be necessary. As the *Covington* district court held, a rushed process measured only in a few weeks "would have allowed insufficient time for the General Assembly to obtain and incorporate public input on its redistricting criteria and draft districting plans, and to engage in the robust debate and discussion necessary to enact plans that fully remedy the constitutional violations." 270 F. Supp. 3d at 899–900. Likewise, Plaintiffs propose that the Legislature receive twelve days from the date of this Opposition—until March 25—to fashion and adopt two plans. *See* Mot. at Ex. A, ECF No. 254-2. That is inadequate, *see infra* § II, and allows the Legislature no meaningful opportunity to solicit public feedback. *Covington* also rejected a special election where the hyper-accelerated timeline required to meet it would have allowed that court "less than two weeks to review—as we must—the enacted remedial plans to determine if they are 'legally acceptable.'" 270 F. Supp. 3d at 900 (citation omitted). So too here—Plaintiffs demand the Court hold a remedial hearing on April 10, scarcely two weeks after their deadline for the Legislature to adopt plans.

These collective harms to voters and the State are severe, and they demonstrate that a special election in this case would be untenable and severely prejudicial. As *Covington* found:

> ordering a special election would entail either unduly abbreviating the process for enacting and reviewing new legislative districting plans, or ignoring a number of

state laws designed to protect voters and the integrity of elections, or accepting the compressed, overlapping schedule proposed by Plaintiffs—which would likely confuse voters, raise barriers to participation, and depress turnout.

270 F. Supp. 3d at 902.  Plaintiffs have not justified imposing these harms on the Louisiana voting public and the State, and the Court should not order a special election.

3.    The Need To Act With Proper Judicial Restraint When Intruding On State Sovereignty

The third *Covington* factor also cuts against special elections, which would substantially and unduly intrude on Louisiana's sovereignty. A VRA remedy cannot be "fundamentally at odds with the state's chosen model of government," *Rose v. Sec'y of State of Fla.*, 87 F.4th 469, 475 (11th Cir. 2023) (citing *Nipper v. Smith*, 39 F.3d 1494, 1531 (11th Cir. 1994)), and a remedy cannot be an "undue intrusion on state sovereignty." *Covington*, 270 F. Supp. 3d at 895; *see also Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) ("When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws") (citing *Maryland v. King*, 567 U.S. 1301 (2012) (Roberts, C.J., in chambers))).

Plaintiffs' proposed special election intrudes on Louisiana's state sovereignty in multiple ways. It would offend the State's long settled pattern and practice, pursuant to Louisiana statutory law, of holding its state legislative elections in October of odd-numbered years. *See* La. Rev. Stat. § 18:402(A). It would also upend Louisiana policy, enshrined in the Louisiana Constitution, of all state officials running together and serving coterminous terms of office. *See* La. Const. art. 3, §5(A) ("Members of the legislature shall take office on the same day as the governor and other officials elected statewide"); La. Const. art. 4, § 3(A) ("[T]he governor, lieutenant governor, secretary of state, attorney general, treasurer, commissioner of agriculture, commissioner of insurance, superintendent of education, and commissioner of elections each shall be elected for a term of four years by the electors of the state at the time and place of voting for members of the

legislature"). Worse, the special election would not only decouple legislative and executive branch terms of office, but it would force members of the Legislature to run during a federal presidential election, which tends to dominate the political discourse and requires down-ballot candidates to spend more money to get their message out.

The special election would also offend state sovereignty by truncating the constitutionally prescribed four-year legislative terms to one. Many of the harms that flow from this truncation have been described *supra* and will not be repeated. In addition, the truncation of the Legislature's term of office would create friction with Louisiana's constitutional election limits (aka term limits) for the Legislature. The Louisiana Constitution prescribes that "[n]o person who has been elected to serve as a member of the Senate for more than two and one-half terms in three consecutive terms, that service being during a term of office that began on or after January 8, 1996, shall be elected to the Senate for the succeeding term." La. Const. art. 3, § 4(E). The same limitation applies to Representatives to the Louisiana House of Representatives. *Id.* The controlling date for purposes of computing term limits is "the date of election." *Deculus v. Welborn*, 964 So.2d 930, 935 (La. 2007) (holding that incumbent senator was term-limited because he was first elected to fill a vacancy and, measuring from the date of his election, he had served more than "one half" of his first term, plus two full terms). Abridging the term of the Louisiana Legislature from four years to one will raise a question under the Louisiana Constitution as to whether the abridged one-year term counts as a full "term" for computing election limits under Article 3, Section 4(E). This, in turn, may deprive members of three years of total permitted consecutive service in the Legislature. That, too, is a stunning intrusion into state sovereignty.

## II.   EVEN IF THE COURT COULD ORDER A SPECIAL ELECTION IN 2024, THERE IS NO LONGER SUFFICIENT TIME TO IMPLEMENT A REASONABLE REMEDIAL PLAN.

All that aside, there is insufficient time for a suitable remedial phase in time for a November 2024 election. As such, Plaintiffs' demand for a special election and expedited remedial proceeding should be denied.

**1**. The framework for remedial proceedings is well settled. The Supreme Court has "said on many occasions" that "reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Chapman v. Meier*, 420 U.S. 1, 27 (1975); *see also Growe v. Emison*, 507 U.S. 25, 34 (1993). "Absent evidence that these state branches will fail timely to perform that duty, a federal court must neither affirmatively obstruct state reapportionment nor permit federal litigation to be used to impede it." *Growe*, 507 U.S. at 34.

As applied where federal courts strike down a redistricting plan, this principle requires courts "to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect its own plan." *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978); *see also, e.g.*, *United States v. Brown*, 561 F.3d 420, 435 (5th Cir. 2009) ("[A]t least in redistricting cases, district courts must offer governing bodies the first pass at devising a remedy[.]"); *In re Landry*, 83 F.4th at 303 ("[T]he elected body must usually be afforded an adequate opportunity to enact revised districts before the federal court steps in to assume that authority").

This necessarily requires a period where a district court must "stay[] its hand," *Growe*, 507 U.S. at 33 (citation omitted), and "make every effort not to preempt" the legislative process, *Wise*, 437 U.S. at 539. The Court's role is to review the Louisiana Legislature's work once it is complete or to issue a remedy (or modify a remedy) if the Legislature does not succeed in enacting plans that comply with federal law. In the interim, however, the Legislature may choose and implement

16

"legitimate state policy judgments," *Perry v. Perez*, 565 U.S. 388, 394 (2012), in configuring its remedial districts.

**2.**    The length of the period that constitutes an "adequate opportunity to enact revised districts," *In re Landry*, 83 F.4th at 303, is *not* the mere two-week period (now only twelve days) that Plaintiffs have proposed. Plaintiffs' proposed period is only slightly larger than the "impossibly short timetable for legislative action amounting to only five legislative days" that the Fifth Circuit found unacceptable in the *Robinson* litigation, *id.* at 306. The same is true for the five-and-a-half weeks Plaintiffs propose to allow Defendants to prepare for an April 10 remedial hearing. *See id.* at 304 (criticizing the Court for having "provided merely five weeks for the state's preparation" for an "expedited hearing to determine a court-ordered redistricting map").

The Louisiana Legislature is a part-time body that is not continually in session. Rather, the Louisiana Constitution permits an annual regular session, La. Const. art. 3, § 2(A)(1), and authorizes—upon the call of the Governor or upon written petition of a majority of the elected members of each house—the convening of extraordinary sessions. La. Const. art. 3, § 2(B). Extraordinary sessions must be called on at least "seven calendar days" notice, and the proclamation convening the session must list "the objects of the extraordinary session," with the "power to legislate [being] limited, under penalty of nullity, to the objects specifically enumerated in the proclamation." *Id.*

The task of creating dozens of new legislative districts across both houses of the Legislature is "never easy," *Abbott*, 585 U.S. at 585, and crafting remedial districts is particularly complex given the need to balance the sensitive and competing demands of the Voting Rights Act and the Equal Protection Clause. In this case, the 2024 Regular Session commenced on March 11, 2024,

and is in session until not later than 6:00 p.m. on June 3, 2024.[7] The Louisiana Legislature is hard at work considering legislation to address a host of issues of importance to Louisianans, as evidenced by the 715 pre-filed bills in the House and 376 pre-filed bills in the Senate for consideration in the Regular Session. The Louisiana Legislature is not positioned to craft two remedial plans—one for the House of Representatives and one for the Senate—over less than two weeks at the beginning of this Regular Session, without creating significant disruption to the Legislature's agenda and without shortchanging the opportunity for public feedback.

Accordingly, forcing the Legislature to rush through remedial plans would not afford a "reasonable opportunity" for the Legislature to accomplish this important work, *In re Landry*, 83 F.4th at 307 (quoting *Jones v. City of Lubbock*, 727 F.2d 364, 387 (5th Cir. 1984)), and would not "allow[] the legislature time to solicit, receive, and incorporate public feedback on its criteria and proposed plans"—feedback which "would benefit all" Louisianans, *Covington*, 270 F. Supp. 3d at 900. And as noted above, Plaintiffs' schedule would allow this Court an unreasonably short two weeks (from the deadline to enact remedial plans, March 25, to the date of the hearing, April 10, *see* Mot. at Ex. A, ECF No. 254-2) to "review—as [it] must—the enacted remedial plans to determine if they are 'legally acceptable.'" *Covington*, 270 F. Supp. 3d at 900 (citation omitted). It is far better to allow the appeals to play out and to hold remedial proceedings once those appeals are resolved, in the ordinary course, to allow sufficient time for the Legislature to take up remedial redistricting.

Finally, the Court should reject any argument by Plaintiffs that claims that the Legislature could have been working on remedial plans since February 8, 2024. The 2024 Regular Session

---

[7] Louisiana Legislature, 2024 Sessions Information, https://legis.la.gov/legis/home.aspx (visited Mar. 7, 2024).

only started on March 11, 2024, so no legislative action was possible prior to that date. As Defendants previously pointed out, *see* ECF No. 244 at 19, while there were two Extraordinary Sessions of the Louisiana Legislature that met earlier this year, state legislative redistricting was not an "object" of those sessions. Specifically, those Extraordinary Sessions were called by Governor Landry on January 8, 2024, to commence January 15, 2024 (the First Extraordinary Session),[8] and on February 8, 2024, to commence February 19, 2024 (the Second Extraordinary Session).[9] Both the First and Second Extraordinary Sessions have adjourned, and their proclamations did not identify as "objects" the creation of remedial state legislative districts. Accordingly, neither Extraordinary Session could have taken up legislative redistricting.

## III.    THERE IS NO REASON FOR AN EXPEDITED REMEDIAL PROCEEDING

Plaintiffs contend that an extremely expedited remedial schedule "would permit special elections in November 2024." ECF No. 254-1 at 2. But as the term "special elections" signifies, there are no November 2024 elections scheduled. Because special elections are unavailable, *see* § I, *supra*, Plaintiffs' demand for an expedited remedial proceeding lacks merit.

Instead, the Court should defer on remedial questions until after the Fifth Circuit has had the opportunity to resolve the pending appeals. The next scheduled elections for the Louisiana Legislature are in October 2027. The appellate proceedings in the related *Robinson/Galmon* cases lasted 16 months from start to finish. *See Robinson v. Ardoin*, 605 F. Supp. 3d 759 (M.D. La. June 6, 2022) (this Court's preliminary injunction)*; Robinson v. Ardoin*, 86 F.4th 574 (5th Cir. Nov. 10, 2023) (final decision vacating the preliminary injunction). Using that as a yardstick, there is no reason to believe that the appellate process in this case would be so prolonged as to endanger

---

[8] Gov. Jeff Landry, Proclamation No. 01 JML 2024 (Jan. 8, 2024),
https://legis.la.gov/LegisDocs/241ES/call.pdf.
[9] Gov. Jeff Landry, Proclamation No. 13 JML 2024 (Feb. 8, 2024),
https://legis.la.gov/LegisDocs/242ES/call.pdf.

the ability to implement a remedial plan for the 2027 elections if this Court's ruling is affirmed. And there is much benefit to be gained from a delay to enable the Fifth Circuit to do its work: if the Court's injunction is reversed, vacated or modified, a remedial effort would need to occur after the Fifth Circuit rules in all events. The Court should not conduct two remedial proceedings. Notably, this case is highly complicated, involving districts in two plans in disparate regions of the State. It is plausible that a ruling from the Fifth Circuit would affirm in part, and reverse in part, as to different regions and findings. That, in turn, would alter the scope of an appropriate remedy.

Plaintiffs' demand that the Court rush into remedial proceedings while a liability-phase ruling is on appeal is "a precursor to legal chaos" that would "embarrass the federal judiciary and thwart rational procedures." *In re Landry*, 83 F.4th at 305. That is because allowing remedial proceedings to go forward at the same time as a liability ruling is on appeal "effectively means a two-track set of appeals on the merits and the court-ordered [remedial] plan," and the "likelihood of conflicting courts' scheduling and determinations will create uncertainty for the state and, more important, the candidates and electorate who may be placed into new . . . districts." *Id.* The Court should stay remedial proceeding pending the present appeals; Plaintiffs' "rush to remedy when circumstances [do] not require it" in this case is prejudicial and improper. *Id.*

## CONCLUSION

Plaintiffs ask the Court to build a remedial process on the foundation of a special election called just one year into the Louisiana Legislature's four-year term. But that foundation is, in truth, a legal quicksand that dooms the effort; the Court lacks jurisdiction to order a special election while appeals are pending from its injunction, and Plaintiffs have not and cannot justify that relief under the *Covington* standard. The Court should deny Plaintiffs' motion, and should stay remedial

proceedings until resolution of the appeals from its February 8, 2024, injunction and liability ruling.

Respectfully submitted,

E. Mark Braden*
Katherine L. McKnight*
Richard B. Raile*
**BAKERHOSTETLER LLP**
1050 Connecticut Ave., N.W., Ste. 1100
Washington, D.C. 20036
(202) 861-1500
mbraden@bakerlaw.com
kmcknight@bakerlaw.com
rraile@bakerlaw.com

Patrick T. Lewis*
**BAKERHOSTETLER LLP**
127 Public Square, Ste. 2000
Cleveland, Ohio 44114
(216) 621-0200
plewis@bakerlaw.com

Erika Dackin Prouty*
Robert J. Tucker*
**BAKERHOSTETLER LLP**
200 Civic Center Dr., Ste. 1200
Columbus, Ohio 43215
(614) 228-1541
eprouty@bakerlaw.com
rtucker@bakerlaw.com

* *Admitted pro hac vice*

*Counsel for Legislative Intervenors, Phillip DeVillier, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Cameron Henry in his Official Capacity as President of the Louisiana Senate*

*/s/ Michael W. Mengis*
Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**
811 Main Street, Suite 1100
Houston, Texas 77002
Phone: (713) 751-1600
Fax: (713) 751-1717
Email: mmengis@bakerlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I certify that on March 13, 2024, this document was filed electronically on the Court's electronic case filing system. Notice of the filing will be served on all counsel of record through the Court's system. Copies of the filing are available on the Court's system.

/s/ Michael W. Mengis
Michael W. Mengis, LA Bar No. 17994
**BAKERHOSTETLER LLP**

*Counsel for Legislative Intervenors, Phillip DeVillier, in his Official Capacity as Speaker of the Louisiana House of Representatives, and of Cameron Henry, in his Official Capacity as President of the Louisiana Senate*