UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA


DR. DOROTHY NAIRNE, ET AL.,

       Plaintiffs,

v.                         CIVIL ACTION NO.
                          3:22-cv-00178 SDD-SDJ
R. KYLE ARDOIN, in his
official capacity as
Secretary of State of
Louisiana,

       Defendant.



* * * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF THE 30(B)(6) DEPOSITION

BY VIDEOCONFERENCE OF:

LOUISIANA SECRETARY OF STATE

BY AND THROUGH:

SHERRI WHARTON HADSKEY

TAKEN ON BEHALF OF PLAINTIFFS, REPORTED IN THE ABOVE

ENTITLED AND NUMBERED CAUSE BY YOLANDA J. PENA,

CERTIFIED COURT REPORTER FOR THE STATE OF LOUISIANA.

* * * * * * * * * * * * * * * * * * * * * * * * * * *



COMMENCING AT 9:09 A.M. CST, ON AUGUST 19, 2023

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4        T. ALORA THOMAS-LUNDBORG, ESQ.
          Election Law Clinic
 5        Harvard Law School
          6 Everett Street, Suite 4105
 6        Cambridge, MA 02138
          tthomaslundborg@law.harvard.edu
 7
          SARAH BRANNON, ESQ.
 8        MEGAN C. KEENAN, ESQ.
          American Civil Liberties Union Foundation
 9        915 15th Street NW
          Washington, DC 20005
10        sbrannon@aclu.org
          mkeenan@aclu.org
11
          LUIS MANUEL RICO ROMÁN, ESQ.
12        American Civil Liberties Union Foundation
          125 Broad Street, 18th Floor
13        New York, NY 10004
          lroman@aclu.org
14
          STUART NAIFEH, ESQ.
15        VICTORIA WENGER, ESQ.
          NAACP Legal Defense & Educational Fund
16        40 Rector Street, 5th Floor
          New York, NY 10006
17        vwenger@naacpldf.org

18        I. SARA ROHANI, ESQ.
          NAACP Legal Defense & Educational Fund
19        700 14th Street, Suite 600
          Washington, DC 20005
20        srohani@naacpldf.org

21        JOHN ADCOCK, ESQ.
          Adcock Law LLC
22        3110 Canal Street
          New Orleans, LA 70119
23        jnadcock@gmail.com

24

25
```

```
 1              A P P E A R A N C E S (Continued)

 2

 3   FOR LOUISIANA SECRETARY OF STATE:

 4        PHILLIP STRACH, ESQ.
          TOM FAR, ESQ.
 5        Nelson Mullins
          301 Hillsborough Street, Suite 1400
 6        Raleigh, NC 27603
          phil.strach@nelsonmullins.com
 7        tom.farr@nelsonmullins.com

 8        JOHN C. WALSH, ESQ.
          Shows, Cali & Walsh, LLP
 9        628 St. Louis St
          Baton Rouge, LA 70802
10        john@scwllp.com

11

12   FOR THE LEGISLATIVE INTERVENORS, SENATE PRESIDENT
     PATRICK PAGE CORTEZ AND SPEAKER CLAY SCHEXNAYDER,
13   IN THEIR OFFICIAL CAPACITIES:

14        ERIKA DACKIN PROUTY, ESQ.
          Baker Hostetler
15        200 Civic Center Drive, Suite 1200
          Columbus, OH 43215-4138
16        eprouty@bakerlaw.com

17   ALSO PRESENT:

18        JEFFREY WALE, ESQ.
          Office of Attorney General Jeff Landry
19
          JENNIFER BOLLINGER, ESQ.
20        Louisiana Secretary of State

21        MOLLY GARYANTES

22

23   REPORTED BY:

24        YOLANDA J. PENA
          CCR NO. 2017002, RPR
25        STATE OF LOUISIANA
```

1                        I N D E X

2

3                                                    PAGE

STIPULATION.........................................7

4

EXAMINATION BY:

5

     MS. THOMAS-LUNDBORG.............................8

6

REPORTER'S PAGE...................................172

7

REPORTER'S CERTIFICATE............................173

8

9

10                        LIST OF EXHIBITS

11

12   Exhibit No. 1.......................................10
        (Notice of Deposition Under
13       Fed.R.Civ.P. 30(b)(6))

14   Exhibit No. 2.......................................33
        (Plaintiffs' First Request
15       for Production of Documents
         of the Secretary of State)

16   Exhibit No. 3.......................................49
        (SOS_000520, Email chain, Top
17       email from Mr. Everson,
         12/10/21, Subject:
18       Demographers)

19   Exhibit No. 4.......................................51
        (SOS_000527, Ms. Meyers email,
20       9/27/21, Subject: Letter
         Regarding Reapportionment)

21

     Exhibit No. 5.......................................51
22       (SOS_000528, Mr. Schedler
         letter, 2/10/11, Re: 2011
23       Reapportionment)

24   Exhibit No. 6.......................................54
        (SOS_000692, PowerPoint,
25       Events Timeline)

```
 1                    LIST OF EXHIBITS (Continued)

 2

 3     Exhibit No. 7....................................62
           (SOS_000927, Email chain, Top
 4          email from Ms. Hadskey,
            2/17/22, Subject: Presentation
 5          from 2-15-2022)

 6     Exhibit No. 8....................................62
           (SOS_000929, PowerPoint,
 7          "Redistricting in ERIN")

 8     Exhibit No. 9....................................72
           (SOS_000538, Ms. Hadskey email,
 9          8/21/21, Subject: Redistricting
            Document)

10     Exhibit No. 10...................................72
11         (SOS_000539, PowerPoint,
            "Redistricting Fundamentals
12          2020")

13     Exhibit No. 11...................................77
           (SOS_000524, "ROV Redistricting
14          Certification-Municipality")

15     Exhibit No. 12...................................79
           ("2019 Elections," Schedule of
16          deadlines)

17     Exhibit No. 13...................................93
           (SOS_000554, Email chain, Top
18          email from Ms. Hadskey, 8/21/21,
            Subject: Summer Workshop
19          Presentations)

20     Exhibit No. 14...................................93
           (SOS_000556, PowerPoint, "2021
21          Election Code Changes")

22     Exhibit No. 15..................................113
           ("2024 Elections," Schedule of
23          deadlines)

24     Exhibit No. 16..................................114
           ("2023 Elections," Schedule of
25          deadlines)
```

SHERRI HADSKEY

1                    LIST OF EXHIBITS (Continued)

2

3   Exhibit No. 17....................................121
        ("Measures Utilized to Keep
4        Absentee Voting Safe")

5   Exhibit No. 18....................................131
        ("Measures Utilized to Keep
6        Early Voting Safe")

7   Exhibit No. 19....................................137
        (SOS_000426, "Chronological
8        Table: Special Elections for
         House District 29")

9

    Exhibit No. 20....................................139
10       (SOS_000430, "Chronological
         Table: Special Elections for
11       House District 85")

12  Exhibit No. 21....................................146
        ("Measures Utilized to Keep
13       Election Day Voting Safe")

14  Exhibit No. 22....................................157
        (SOS_000948, PowerPoint,
15       "Voting Systems in Louisiana")

16  Exhibit No. 23....................................161
        (SOS_000996, PowerPoint,
17       "Reapportionment/Redistricting")

18  Exhibit No. 24.................................... 165
        (Defendant's Fact Witness List)

19

20

21

22

23

24

25

SHERRI HADSKEY

```
1              S T I P U L A T I O N

2

3              IT IS STIPULATED AND AGREED by and among the

4    parties that this deposition is hereby being taken

5    pursuant to the Federal Rules of Civil Procedure.

6              All formalities, excluding the reading and

7    signing of the transcript by the witness, are hereby

8    waived.

9              All objections, except as to the form of the

10   question and responsiveness of the answer, are

11   considered reserved until trial or other use of the

12   deposition.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SHERRI HADSKEY

```
 1                    SHERRI WHARTON HADSKEY,
 2    having been first duly sworn, was examined and
 3    testified as follows:
 4                         EXAMINATION
 5    BY MS. THOMAS-LUNDBORG:
 6         Q.   Good morning, Ms. Hadskey.  Could you please
 7    state your full name for the record?
 8         A.   Sure.  Sherri Wharton Hadskey.
 9         Q.   And your address, please.  It could be your
10    business address.
11         A.   8585 Archives Avenue, Suite 110, Baton Rouge,
12    Louisiana 70809.
13         Q.   And you understand that today you're under
14    oath, correct?
15         A.   Yes.
16         Q.   And that's the same oath that you would take
17    in a court of law if you were doing this in person,
18    correct?
19         A.   Correct.
20         Q.   My name is Alora Thomas.  I work at the
21    Election Law Clinic at Harvard Law School.  I'm one of
22    the attorneys for the plaintiff in the case Nairne v.
23    Ardoin.  Thank you for taking time to talk with me
24    today.  I'm going to ask you some preliminary
25    questions.
```

```
 1          Have you ever been deposed before?
 2     A.   No.  This is my first time.
 3     Q.   So I'm going to go through a few ground rules
 4  for depositions.  So we talked about this a little bit
 5  before we got on the record, but so that the record is
 6  clear, it's really important for us not to talk over
 7  one another.  So please let me finish my questions, and
 8  I will let you finish your answers.  Okay?
 9     A.   Okay.
10     Q.   If you don't hear a question or you don't hear
11  all of the question, you may ask me to repeat it.
12          Do you understand that?
13     A.   Yes.
14     Q.   If you don't understand a question, you hear
15  it but it's not clear to you what I mean, you can
16  always ask me to rephrase the question and make it
17  clear that you did not understand the question that I
18  asked.
19     A.   Okay.
20     Q.   We will be taking periodic breaks throughout
21  the day.  If you need a break, just let me know.  I may
22  ask for us not to take a break when a question is
23  pending, and if I'm near an end of a section, I may ask
24  you to wait.  You can always let us know if you need to
25  take a break.
```

1      A.   Okay.

2      Q.   If you need a break to consult with counsel

3  regarding disclosure of privileged information, please

4  state that on the record, and then we can allow a break

5  for that consultation.

6           Do you understand that?

7      A.   Yes.

8      Q.   Okay.  Your counsel or other counsel on the

9  line may object to a certain question that I ask you

10  today.  Unless your counsel instructs you not to answer

11  the question, you still answer the question after the

12  objection.

13      A.   Okay.

14      Q.   Is there anything -- we talked a little bit

15  about you being under oath.  Is there anything that

16  would prevent you from answering my questions honestly

17  and accurately today?

18      A.   No, ma'am.

19      Q.   Are you taking any medication that might

20  impede your ability to answer my questions truthfully?

21      A.   No.

22      Q.   So I'm first going to go over some terms of

23  art with you that I'll be using throughout the

24  deposition.  And again, if I use one of these terms and

25  it's unclear to you what I mean, you can always ask me.

1           But throughout the deposition, I'm going to be

2    using the term "special election."  When I refer to

3    "special election," I'm referring to an election that

4    occurs when there's a vacancy in elected office that

5    needs to be filled outside of the regular election

6    schedule.

7           A.   Okay.

8           Q.   I will also be using the term "regular

9    election," and by that, I'm primarily meaning elections

10   that occur on the election schedule and in the case of

11   the Louisiana State House and Louisiana State

12   Legislature, those elections that occur every four

13   years.  Do you understand that?

14          A.   Yes.

15          Q.   Okay.  I may sometimes just refer to

16   "the House" or "House election."  If I do that, unless

17   I specify otherwise, I'm referring to the Louisiana

18   State House election.  Okay?

19          A.   The Louisiana State House of Representative

20   elections?

21          Q.   Exactly.

22          A.   Okay.  Okay.

23          Q.   I may also refer to "the Senate."  When I

24   refer to "the Senate," unless I specify otherwise, I'm

25   referring to the Louisiana Senate?

1      A.    Okay.

2      Q.    And then in contrast, I may sometimes refer

3   to "congressional elections."  When I refer to

4   "congressional elections," I'm referring to the U.S.

5   House of Representatives elections.

6      A.    Okay.

7      Q.    And at any point if it's confusing which type

8   of election I'm referring to and it's important to your

9   answer, please let me know, and we can make sure the

10  record is clear.

11     A.    Okay.

12     (Exhibit No. 1 was marked for identification.)

13  BY MS. THOMAS-LUNDBORG:

14     Q.    I'm going to -- I've already premarked what

15  has been premarked as Exhibit 1.  It is the 30(b)(6)

16  notice.  So if we could, pull that up.  And it should

17  be a marked exhibit folder.

18     A.    It's loading.  I'm sorry.  Okay.  It's up.

19  Okay.

20     Q.    All right.  You can take a minute to scroll

21  through this document.

22     A.    Okay.  Okay.

23     Q.    Do you recognize this document?

24     A.    I do.

25     Q.    And if we look at the first page of this

1   document, what is this document titled?

2       A.   "Notice of Deposition Under Fed. R. Civ. P.

3   30(b)(6)."

4       Q.   Correct.  Thank you.

5       A.   You're welcome.

6       Q.   And do you know what a 30(b)(6) deposition is?

7       A.   No, I do not.

8       Q.   A 30(b)(6) deposition is a deposition on

9   behalf of the entity represented in the notice.  In

10  this case, it is the Secretary of State's office.

11           Do you understand that?

12      A.   I do.

13      Q.   And does that comport with what you thought

14  today's deposition was going to be?

15      A.   Yes, it does.

16      Q.   And what was your understanding of what was

17  required for today's deposition?

18      A.   For me to answer the questions that are in

19  this notice to the best of my knowledge and to -- well,

20  yeah, that's it.  Just to answer to the best of my

21  knowledge.

22      Q.   Did you do anything to prepare for today's

23  deposition?

24      A.   Yes.  I reviewed election dates, and I

25  reviewed the election schedules and things like that.

1    Q.   Did you review any other documents?

2    A.   The election schedules.  And then I -- a few

3    of our timelines for calendar years of election cycles

4    and what we have during those times during the election

5    cycle and then between the election cycles.

6    Q.   And did you review any documents other than

7    this notice that's been provided to you by counsel?

8    A.   No.

9    Q.   Do you have any documents in the room with you

10   today that you intend to reference?

11   A.   No, I do not.

12   Q.   And I think we saw that Mr. Strach is in the

13   room with you.  Is there anyone else in the room with

14   you-all today?

15   A.   Yes.  So John Walsh and Jennifer Bollinger.

16   Do you need me to spell her last name?

17   Q.   I would assume the court reporter might want

18   that.

19   A.   It's B-o-l-l-i-n-g-e-r.

20   Q.   And I believe Mr. Walsh is counsel.  Is

21   Ms. Bollinger also counsel in the case?

22   A.   She's executive counsel for the Secretary of

23   State.

24   Q.   Is anyone else in the room?

25   A.   No, ma'am.

SHERRI HADSKEY

1    Q.    Did you meet with anyone to prepare for
2    today's deposition?
3        A.    I spoke with my administrative managers over
4    the business and service area of elections and the
5    operations area of elections.
6        Q.    I may ask you some more questions about that
7    later.  And if I --
8        A.    Sure.
9        Q.    -- get the designation wrong, you can always
10   correct me.
11            Did you meet with anyone else to prepare for
12   today's deposition?
13       A.    No.
14       Q.    Did you have any meetings with counsel?
15       A.    Yes.
16       Q.    And how many meetings did you have?  Don't
17   tell me --
18       A.    Two.
19       Q.    -- what you said.  I just want to know kind of
20   when, how long.
21       A.    Okay.  Two meetings.  One was -- I'd have to
22   get you the exact date, but it was a week ago, and one
23   yesterday.  And the one that was a week ago was
24   approximately three hours, and the one that was
25   yesterday was approximately three hours.

1    Q.   And the meetings that you had with folks in

2  your office, the manager of business services and

3  operations, how long were those meetings?

4    A.   The business service meeting was two hours,

5  approximately.  And the operations meeting was an hour.

6    Q.   Was counsel present at those meetings?

7    A.   No.

8    Q.   What did you discuss at the administrative

9  business -- what is the title of that group?

10    A.   It's Business and Services.

11    Q.   Okay.  What was the discussed at the Business

12  and Services meeting?

13    A.   So I understand their procedures and how the

14  operation works as far as implementing redistricting

15  plans.  What I did not know was the time frames that

16  included -- so there's different portions of entering

17  redistricting information, and there's a portion where

18  you are creating spreadsheets, you are proofing

19  spreadsheets.  Then you're getting changes and proofing

20  more spreadsheets, and then there's the part where you

21  actually are physically doing the implementation; and I

22  needed the time frame that it took for both.

23    Q.   I think we'll discuss that some more later.

24  That's very helpful.

25         What did you discuss with the operations

1   folks?

2       A.   We looked at the ballot building process,

3   especially for UOCAVA.  I -- for -- prior to 2017 --

4   I'm the -- I've been the commissioner of elections

5   since 2017.  But prior to 2017, I was the elections

6   operations manager.  And it's been a while since I've

7   had my hands in the actual -- in the weeds of the

8   process, so I needed them to tell me what had changed

9   or been effected, if there was anything to make a

10  difference in my testimony today, because I would have

11  been basing it off of my information from five years

12  ago rather than the information currently at hand.

13      **Q.   Thank you.  We will also get back to the**

14  **question of ballot, ballot design, timelines, but I'd**

15  **like to move to something that you just touched on,**

16  **which is your background.  So if we could start your**

17  **educational background.**

18          **What is your educational background?**

19      A.   I went to Louisiana State University, and I

20  studied special education.  And while I was studying

21  special education, I took a student job at the

22  Department of Elections.  At that time, the Department

23  of Elections was a separate entity than the Louisiana

24  Secretary of State.  It was two separate offices.

25          And the elections division was in charge of

 1   all of the machines and the tabulation and the early

 2   voting tabulation, et cetera.  And the Secretary of

 3   State's office was in charge of the ballot building and

 4   assembling of the ballots to provide to the elections

 5   division that did the balloting.

 6        **Q.   And when -- do you recall when those two**

 7   **things were joined?**

 8        A.   Yes.  In the year 2002, we began the process

 9   of merging those offices into one office.  So they did

10   away with the elections commissioner as an elected

11   official.  It used to be the elections commissioner

12   was elected and the secretary of state was elected.

13   They merged the offices together, and the elections

14   commissioner became appointed by the secretary of

15   state.  And that merger took approximately a year to

16   complete.

17        **Q.   Just going back to your background, you said**

18   **that you started as a student working in the elections**

19   **office.  Can you just walk through, then, your**

20   **progression in your -- to your current position?**

21        A.   Sure.  So when I was a student worker, I

22   wanted to learn as much as I could about the job, so as

23   a student, I worked in answering the phones, doing the

24   mail, things like that.  Then I went into elections

25   purchasing, and I worked as a student for the

1   administrator there.

2           I worked in elections registration for a

3   period of time, worked for the administrator there.  I

4   worked in elections accounting for a span of time and

5   learned about elections accounting.  And then my title

6   changed from student to part-time employee because I

7   was still in school.  And when I became a part-time

8   employee, I went to work in elections balloting and

9   worked in that area for a while.

10          And once the departments merged, I became the

11  elections director over balloting, absentee balloting.

12  And at that point in time, the state was migrating over

13  to electronic voting machines.  The electronic voting

14  machines first came into the state in 1991, but it took

15  until 2005 until every single parish -- 2006, I'm

16  sorry -- until every single parish in the state had

17  migrated over to an electronic voting machine rather

18  than the lever machines.  And that process was

19  finalized in 2006 -- middle of 2006, and I remained the

20  elections director at that time until approximately

21  2008 or 2009.

22          At that point, the secretary of state, who was

23  Fox McKeithen, he assigned me to be over elections

24  operations and elections field operations, so

25  programming of all of the voting systems and

1  administering the elections in the parishes, training

2  the parish board members and the registrars and the

3  clerks, the movement of the voting machines, the

4  storage of the voting machines, that type of work.

5  And I remained in that position until 2017 when I

6  became commissioner of elections.

7       Q.   Thank you.  Very helpful.

8       A.   Sure.

9       Q.   So your current position is as commissioner of

10 elections.  Does this position have a term?

11      A.   I know I have to be -- if a new secretary of

12 state comes in, they have to reappoint me, if they so

13 choose.  And then I go through a confirmation hearing

14 with the Senate in order to be confirmed for the

15 position.

16      Q.   And if the secretary of state stays the same,

17 then you would be able to stay on in your position?

18      A.   That's correct, if he -- if he chooses.

19      Q.   Okay.

20      A.   Or she.  I'm sorry.

21      Q.   Would it be necessary for you to go through

22 the Senate confirmation process again?

23      A.   No.

24      Q.   So if you could now tell us, what are the

25 responsibilities of the commissioner of elections?

1       A.    So as commissioner of elections with the

2   State, what I told you before when I was managing with

3   elections operations and field operations, that end of

4   it is all about the physical aspects of the election,

5   election day, early voting, the conduct of the

6   election, that type of thing.

7             As commissioner of elections, I gained the

8   ballot -- I'm sorry, I gained the business and service

9   area as well.  The business and service area is the

10  group that does more of the qualifying for the

11  elections, redistricting for the elections, a lot of

12  the legal matters.  They manage the hotline for calls

13  that come in with people questioning their

14  registration.  Registration actually falls in that

15  area as well.

16            And then, of course, I offer my input to

17  executive on all elections matters.  It also involves

18  the warehouse and drainage contracts, management of

19  that.  And then, of course, the State of Louisiana

20  currently is looking at a new voting system.  So

21  advising the secretary on matters with the RFP process

22  and the search for a new voting system for the State of

23  Louisiana overall.

24            We also have an outreach division, and that

25  outreach division conducts private elections around the

1    state to educate voters and to work with not only

2    elementary and secondary education elections, but also

3    unions, et cetera, to try and get as many people to get

4    hands on with the equipment and the elections process,

5    encouraging people to vote.

6            Now, one of the divisions that was under the

7    previous commissioner that is no longer under me is the

8    Elections Compliance Unit.  Our Elections Compliance

9    Unit falls under executive now.  It doesn't fall under

10   my leadership.

11       **Q.   I think you used the term "executive" twice in**

12   **your answer.  By "executive," do you mean the secretary**

13   **of state, or are you referring to something else?**

14       A.   I'm referring to the secretary of state first

15   assistant and the chief financial officer for

16   management and finance and the secretary's confidential

17   assistant.

18       **Q.   And then --**

19       A.   And I also work -- I'm so sorry.

20       **Q.   Go ahead.**

21       A.   I also work with executive counsel.

22       **Q.   So you mean the lawyers for the secretary and**

23   **the other folks in the kind of executive wing of the**

24   **office?**

25       A.   Correct.

1      Q.   And what is your relationship, generally, with

2    the secretary and the other members of the executive?

3      A.   So the secretary of state ultimately makes the

4    decisions that are brought to his attention that need

5    to have an answer right away.  It needs to fall under

6    what he would like to be done.  So, for example, if a

7    parish is asking for a new early voting site, I would

8    do all the research on, you know, how many voters are

9    in the area, where they're looking for that, is it

10   close to another voting site, or is it way far away,

11   does it help the voters to be able to not have to drive

12   so far, et cetera, et cetera.

13         So I would bring that information to him and

14   to the executive staff, and then based on that

15   information, they would ask me questions, but

16   ultimately, he would make the decision.  So that's a

17   good example of the relationship.

18     Q.   And are there things -- what types of things

19   are in his purview where you need to get his signoff,

20   and what types of things do you have the ability to

21   sign off on on your own?

22     A.   So I am able to -- if he designates me as his

23   representative, I am able to approve the elections

24   requests coming from the parishes, such as, if they

25   need deputies to work early voting, I'm able to approve

1   the work -- the pay that they're going to receive and

2   the hours that they're going to work.

3          I am able to sign off on elections matters

4   that are related to the number of commissioners

5   somebody may want to have, decisions that are made by

6   the locals that have to be approved that involve the

7   actual function of the election.

8          And then we do a lot of printed materials,

9   such as the ballot box and various guides and

10  informational pamphlet for the commissioners and things

11  like that.  I am able to sign off on those, but I

12  absolutely run everything through executive to confirm

13  that they agree before signing off.

14     **Q.   Thank you.**

15          **And what is your relationship like between**

16  **your office and the secretary of state's office in**

17  **general and local parish government?**

18     A.   So we're a top-down state, and every parish in

19  the state uses the same voting equipment, voting

20  procedures, the same registration procedures.  Each

21  parish has the same guidelines that they follow.  So

22  the locals that are trained -- my staff trains the

23  clerks of court, the registrar of voters.  They train

24  the parish board members.  The technicians are

25  certified by our current vendor, and we work with --

1    hand in hand with the trainings involved in that.  And

2    so basically, the locals look to us for that type of

3    training.

4           Now, we are not the legal advisers to the

5    registrar or to the parish board.  That falls under the

6    attorney general's office.  So if they have a legal

7    question, they have to go to the AG's office to get

8    legal advisement, or they have to request an opinion,

9    something like that.

10       **Q.    And --**

11       A.    That's it.

12       **Q.    Okay.  I wanted to make sure you had finished**

13   **your answer before I ask another question.**

14       A.    Yeah.  Yeah.

15       **Q.    And does your relationship with the parish**

16   **government change depending on whether you're dealing**

17   **with a clerk of court, a registrar of voters, or parish**

18   **president?**

19       A.    We don't have -- it's very limited interaction

20   that we have with the parish president.  The parish

21   governing authorities are their own entity, and we just

22   don't have -- there's -- I can only think of one or two

23   things that we do with the parish governing authority.

24          The clerks of court and the registrar of

25   voters, our interaction with them is primarily the same

1  in that the clerks manage qualifying, so we train them

2  on qualifying, and we help them with the qualifying

3  process.  The registrars work in registration, and

4  so -- and in early voting, which is real-time.  And

5  they're involved in -- so we work training them on

6  their processes.  When it comes to the early voting

7  tabulation process, we train them on that, and they

8  understand the equipment, and we support them each

9  election with having a support team for a group of

10  parishes.

11          And as you know, the -- or I'm sorry.  You may

12  not know.  The parish board of election supervisors

13  consists of the clerk, the registrar, a Republican

14  member, a Democratic member, and a governor's

15  appointee.  And so that training for those procedures

16  is the same because they're working on the same

17  process.  The clerks of court read cartridges for

18  election night.  That's a separate training.  But all

19  in all, what we're doing with them is training and

20  supporting for the elections process.

21      **Q.   And we talked a little bit about the different**

22  **subgroups under your supervision.  How many folks do**

23  **you supervise?**

24      A.   So in the elections division at the Secretary

25  of State's office right now, there's 259 employees.

1    What that consists of is each parish in the state has a

2    voting machine warehouse.  And in those warehouses, if

3    it's a small parish -- let's say it's Tensas, and

4    there's 18 machines, and it's a smaller area.  There

5    may be one warehouse employee.  But if you're in a

6    larger parish, such as East Baton Rouge or Orleans or

7    St. Tammany, of course you're going to have more.

8    You're going to have 15 employees or more.  It just

9    depends on the layout of the parish.

10           And so what I mean by that is I think -- if

11   you're familiar with Louisiana, St. Tammany Parish has

12   Covington, Slidell, Madisonville.  If you have machines

13   in all of those areas, you have to have the staff

14   members to be able to support that.  So of course you

15   can't do that with one warehouse employee.

16           In-house, we have the programming division,

17   and that division actually is tasked with supporting

18   all of the parishes.  They are the ones that are boots

19   on the ground in the parishes to support the elections.

20   The programming, the paper ballots, the ICX early

21   voting ballots, the ABC ballots, they manage that

22   information and getting the information onto the

23   machines and then tabulating after the election is

24   over.

25           The field operations section that's in-house,

1    they are managing all 64 warehouses and the tasks that

2    they have.  So they program in a laptop the cartridges

3    that go into the voting machines.  They're responsible

4    for working with the drayman who delivers and picks up

5    the machines.  They're responsible for, as far as the

6    field goes, the warehousing.  Are there problems with

7    the warehouse?  Do they not have enough space?  Did the

8    person sell the warehouse and the lease is up,

9    et cetera.

10            The operations section is divided into two,

11   programming and field operations, but they work in

12   unison.  And many of their job descriptions have --

13   they share similar components.  The business and

14   service division is more about the front end of the

15   election, so they're qualifying processes and

16   procedures are completed for the clerks, and they work

17   with the clerks to support them on that process.

18            And they also work with the registration.

19   They're responsible for all the legislative changes

20   that come about, meaning forms or informational

21   pamphlets or a change in -- in something that's on one

22   of the forms.  We have quite a number of forms that

23   they have to keep up with that are legal forms required

24   to operate an election.

25            And then, of course, they have the

1  registration end of it.  And that group, the business

2  and service division, works hand in hand with our legal

3  division a lot on the front end of the election.  The

4  operations group works with the legal division more on

5  the back end of the elections process.

6         **Q.    So focusing on the in-house folks, it sounds**

7  **like there's three primary groups.  There's the**

8  **programming folks, the operations folks, and Business**

9  **and Services folks.  Correct?**

10        A.    That's correct.

11        **Q.    And how many folks work in the programming**

12  **division?**

13        A.    In the programming division currently, there

14  are, I believe, 45.  That includes --

15        **Q.    And how many folks work --**

16        A.    I'm sorry.  The in-house operations and field

17  operations is considered one.  There's 45 total in

18  those two groups.  And then the business and service

19  division, there's 15.

20             Now, we have some positions that we are

21  currently filling because either people have retired,

22  they've moved away.  But we had some new positions

23  created to help us with -- with management of the

24  elections process because we're getting ready to go

25  into having to manage two separate systems at the same

1    time.  And so right now, I believe we have 18 positions

2    that are about to be filled.

3         **Q.   And those would be in the Business and**

4    **Services division?**

5         A.   Two of them will be in business service.  The

6    rest of them will be operations and field operations.

7         **Q.   And so of the 269 overall employees in the**

8    **elections division, it sounds like around 60 of them**

9    **are in-house.  And are the rest of them in the**

10   **warehouses, or do the 199 work somewhere else?**

11        A.   They're in the -- they're in the warehouses.

12   And I should mention that 100 of the employees are full

13   time.  The 139 -- or 159, I'm sorry.  100 are full

14   time; 159 are considered part-time WAEs.

15        **Q.   Of the folks who are in-house -- so the**

16   **operations and the business services folks -- are the**

17   **majority of them full time or part time?**

18        A.   I believe there are currently 14 part time.

19   All the rest, full time.  But that is going to change

20   within the next month or so because the -- a lot of

21   those employees are going to move into those full-time

22   positions.  If they apply and they are interviewed and

23   they are able to take the position, then they'll move

24   into a full-time position.

25        **Q.   All right.  I want to ask you some questions**

1    just generally related to this litigation and your

2    knowledge of the litigation, and then we're going to

3    get into some more specifics in the notice.  Okay?

4            When did you first learn about this particular

5    litigation?

6       A.   When I was contacted by the attorneys about

7    doing the deposition.

8       Q.   And I think you've mentioned a number of

9    policies and procedures and trainings that you-all are

10   responsible for.  Is that correct?

11      A.   That's correct.

12      Q.   And are those saved as written documents?

13      A.   Yes.  We have policies and procedures that are

14   in writing.

15      Q.   And do you save your trainings?  Do those

16   include PowerPoint?

17      A.   More like elections binders that include

18   everything that they would work on from end to end,

19   let's say, for tabulation.  It's an elections binder.

20   It talks about their credentials.  It has a lot of

21   confidential information in it because it's related to

22   our ERIN system, or it's related to our voting system.

23   And it steps them -- walks them through the entire

24   process of how to set all of the equipment up, how to

25   tabulate the election, how to put the elections results

SHERRI HADSKEY

1   together, whether it's an UOCAVA tally or a fax tally

2   or that type of thing.

3           In the front, we have -- for business

4   services, the informational pamphlet is put together

5   for the commissioners to use on election day.  That

6   is a manual.  It's a pamphlet.  And it's updated

7   legislatively every year, and we have copies of that

8   for the commissioner trainings, which are conducted by

9   the clerks of court.

10          So we're responsible to advise them of any

11  changes that the legislature decides to make to the

12  informational pamphlet or the ballot box or any of the

13  other guideline documents that are offered.  And of

14  course, there's an ERIN manual.  The ERIN manual is our

15  elections and registration information network manual

16  that tells them how to enter a registrant, how to enter

17  a mail ballot once it comes in, how to -- it -- it's

18  everything about the entire system.

19      **Q.   I wanted to follow up on something that you**

20  **mentioned a few times.  I think you referred to the**

21  **ERIN system.  And I did see that in the few documents**

22  **that we received from the Secretary of State.**

23          **What is ERIN?**

24      A.   ERIN is the elections and registration

25  information network.  When I first started with the

1   Department of Elections, the ERIN system was a green

2   screen, old computer database system that was specific

3   to parishes, so it wasn't a statewide system in that

4   it -- you had just a database for Acadia and just a

5   database for Allen, et cetera, et cetera.

6           So in 2008, they moved it to a different -- or

7   IT division moved it to a different platform where it

8   would be statewide.  And it's utilized by everyone that

9   is involved in the elections process, so the clerks use

10  it.  You qualify candidates in ERIN.  The registrar of

11  voters register people in ERIN.  You're giving -- you

12  give credit to voters for voting in ERIN.

13          Most of the tasks that are involved in

14  elections are all in the ERIN document.  And each

15  individual that works in ERIN -- if it's a clerk or a

16  clerk staff member, a registrar or register staff

17  member, et cetera -- they are required to sign a

18  nondisclosure agreement, and they are provided with

19  credentials and security information for them to be

20  able to do their job in this overall process.  Most

21  states do not have a statewide system.  It's county to

22  county.  Our state is statewide.

23      **Q.   You mentioned that ERIN is confidential and**

24  **that you have to sign an NDA to see it.  What is your**

25  **understanding of why ERIN is confidential, or what**

1    about ERIN is particularly confidential?

2        A.    When you are in voter registration or you're

3    qualifying somebody or anything like that, when you

4    pull the screens up to work in the screen in the

5    database, your name, your address, your mother's maiden

6    name, your date of birth, your phone number, your email

7    address, there's a lot of confidential information that

8    the Louisiana legislature recognizes as PII, private

9    information, and so under no circumstances would you

10   ever want that information shared.

11            And then on top of that, in this day and time

12   where you have to worry about hacking and scams and

13   that type of thing, you would never want anyone to have

14   the procedure of how to remove a registrant or how to

15   add a registrant or how to tabulate, you know, the

16   process or -- you can't afford to have the security

17   breached by just letting anybody have access to that.

18   I consider it similar to banking.  Your banking

19   information is very confidential, and you just wouldn't

20   want anybody having that.

21       Q.    That's helpful.  Thank you.

22            MS. THOMAS-LUNDBORG:  I'm going to

23            have -- mark a new exhibit.  And we hopefully

24            have -- Molly, here is going to help me.

25            Molly, could you pull up exhibit --

```
 1              what's marked in my files Exhibit B that we're
 2              going to have marked as Exhibit 2.
 3                    MS. GARYANTES:  Absolutely.  It should
 4              be introduced.
 5         (Exhibit No. 2 was marked for identification.)
 6                    MS. THOMAS-LUNDBORG:  Okay.  I see it.
 7              I had to refresh my -- my browser, so if you
 8              don't see it, try refreshing.
 9                    THE WITNESS:  Okay.
10   BY MS. THOMAS-LUNDBORG:
11         Q.   Can you read the --
12                    MR. STRACH:  It's trying to -- it's
13              trying to load, Alora.
14                    THE WITNESS:  It says, "Generating file
15              preview."  May take a while.  Okay.  It just
16              came up.
17                    MS. THOMAS-LUNDBORG:  I'm glad "it may
18              take a while" was not correct.
19                    THE WITNESS:  Yeah.
20   BY MS. THOMAS-LUNDBORG:
21         Q.   I also have marked as Exhibit 2 a document
22   titled "Plaintiffs' First Request for Production of
23   Documents of the Secretary of State."
24              Do you see that?
25         A.   I'm looking at Exhibit 2.
```

1      Q.   And do you see the title is "Plaintiffs' First

2  Request for Production of Documents of the Secretary of

3  State"?

4      A.   "Plaintiffs' First Request for Production of

5  Documents of the Secretary of State."  Yes, I see that.

6      Q.   Okay.  And you can just take a minute to

7  scroll through this document.

8      A.   Okay.  Okay.

9      Q.   And once you scroll through it, you can just

10  let me know.  I'm not going to ask too many questions

11  about this.  I just want to get some general

12  information.

13      A.   Okay.  I was trying to read it word for word.

14  I'm sorry.

15      Q.   No, no, no, not necessary.  I just want you to

16  scroll through.  And my question, I'll tell you as

17  you're scrolling through, is whether you've seen this

18  document before or whether you're aware that plaintiffs

19  had sent a document request to the Secretary of State.

20      A.   No, I have never seen this document before,

21  and no, I did not know.  Usually requests such as this

22  go through our legal division, and if it requires files

23  or information, that's pulled by our IT division.

24      Q.   I'd like to go back to what has been marked as

25  Exhibit 1 already.

 1        A.    Okay.  Okay.  I'm here.

 2        Q.    And this document you said you have seen

 3   before, correct?

 4        A.    Yes, absolutely.

 5        Q.    And I'm going to ask now a series of questions

 6   related to this document.

 7        A.    Okay.

 8        Q.    When I wrote my outline, some of the kind of

 9   areas are -- some of the subareas are now combined, so

10   it won't be in this exact order, but it will be

11   questions related to this document.

12        A.    Okay.

13        Q.    So the first question here is about all steps

14   or activities required by you and steps or activities

15   required of other state officials related to

16   redistricting.  I'm not going to read it verbatim, but

17   it's generally about the redistricting process.

18             And you've mentioned some work that you-all

19   are engaged in with the redistricting process, and I'd

20   like to walk through kind of step by step what your

21   office involvement is with redistricting.  Okay?

22        A.    Okay.

23        Q.    When did you start thinking about the

24   redistricting process?  And let's focus our discussion

25   on the most recent redistricting process that happened

1    in the 2019 through 2021 period.  When did you start
2    thinking about that process?
3        A.    So just before the census information was
4    about to come out, the Business and Service division
5    began looking at all of the procedures necessary for
6    redistricting in our office.
7            So basically, our office is ministerial when
8    it comes to parts of the redistricting process, meaning
9    that we have legal deadlines that the parish governing
10   authority, the demographers, the House and Senate,
11   et cetera, have to meet.  They have to provide
12   information to our office by a certain date.  And the
13   reason for that is that if they don't meet those legal
14   deadlines, then the registrar of voters or the Business
15   and Service division cannot, in the ERIN system, make
16   the changes necessary for the voters to get the correct
17   ballots.
18           So the process of redistricting is on the
19   parish itself, whether it's school board redistricting,
20   council redistricting.  Any type of redistricting
21   locally, the parish governing authority works with the
22   demographer, and those two entities approve ordinances
23   and submit them for the information to be updated in
24   ERIN to allow those voters to be in the districts that
25   they selected, they approved, et cetera.

1          Then as far as the House and Senate, they

2    provide the information to us.  And as they provide

3    that information to us, of course HV14 had to pass, and

4    then our Business and Service division creates a

5    spreadsheet for the House and a spreadsheet for the

6    Senate.  And they begin, parish by parish, going

7    through the changes that are made and trying to make

8    certain that the information is accurate.

9          In 2019 through 2023, all precincts are

10   frozen, meaning that the -- when we run canvass every

11   year, the parishes are required to -- if you have a

12   precinct under 300, you have to merge it with another

13   precinct.  Or if you have a precinct that's over 2,200,

14   you may have to split that.  And for those three years,

15   those -- those processes are frozen until January 1st

16   of 2023.

17          So this year, in January 1st, it opened up

18   the ability for all of them to go ahead and start

19   correcting all of their precincts.  And what happens

20   with that is you may have precinct 16 and precinct 15,

21   and precinct 15 has 200-something voters, so they merge

22   those two.  And then they rename it precinct 17, and it

23   may have different boundaries, et cetera.  That's what

24   they're tasked with doing after the freeze is

25   completed.

1      So our department, we are -- the registrar of

2   voters for all the local information, they're trying to

3   put the voters into the right precincts, whether it's a

4   new precinct or not, and proof and make certain

5   everything is okay.  And then from our office, if it is

6   whole precincts -- if all that you're moving is whole

7   precincts, then our department is able to move the

8   voters into those whole precincts.  But if the parishes

9   are renumbering and splitting and merging, it makes it

10  very complicated.

11      And so it takes quite a bit of time for them

12  to look at all of the changes.  It goes through a

13  three-level proofing process, and then after that

14  process, when we don't have an election -- so it can't

15  be in the middle of a election cycle because you can't

16  move voters during an election cycle.  So that is --

17  basically when we do that process, the Business and

18  Service division proofs it, makes sure it's okay,

19  you're not in an election cycle, and you are completing

20  the process for the voters.

21      And the importance for that is that you never

22  in a million years want to provide a voter with an

23  incorrect ballot.  That -- in other words, you don't

24  want them to be in the wrong council district or the

25  wrong rep district or anything like that.  It's quite a

1    bit a proofing.

2        Q.    So I think I want to ask you some follow-up

3    questions about your answer.  And if I get anything

4    wrong, please feel free to correct me.

5            So focusing now on the House and Senate

6    proofing process, what does that involve exactly?  You

7    said that they're looking at Excel spreadsheets.  Are

8    they making sure that voters are in the right districts

9    and precincts?

10       A.    They are lining out the precincts, looking at

11   are there any precinct changes, and then they are

12   trying to confirm that the right voters are in the

13   right areas.

14       Q.    And how long does that process take?

15       A.    The proofing process and the implementation

16   process both takes anywhere from four -- about four to

17   four and a half months.

18       Q.    So it takes four to four and a half months to

19   line folks up to make sure folks are in the right

20   precincts and districts just for the Louisiana State

21   House and Senate?

22       A.    That's correct.

23       Q.    And how many folks are doing that process over

24   the four months, and how many hours a day are they

25   involved in that process?

1      A.   So they work eight-hour days, and our Business

2   and Service division is not -- they have to keep their

3   business going.  They have to answer the hotlines.

4   They have to conduct the elections.  They have to, you

5   know, conduct qualifying, et cetera.  So they have six

6   people trained to be able to do that process.

7      **Q.   And do you have any sense of over that**

8   **four-month period, how much time folks are spending**

9   **specifically on the proofing the Senate House and the**

10  **Senate -- the House and Senate districts?**

11     A.   It's my understanding that those six people --

12  once they start the process, they dedicate their time

13  to that unless we have something that is --

14  emergency-wise that pulls them away.  And when I say

15  "emergency-wise," that would mean election days.  I

16  mean, priority-wise, election day takes priority over

17  anything.  That's the whole purpose for our division.

18     **Q.   And so your testimony is that in 2021, it took**

19  **those six folks four and a half months to proof the**

20  **Senate and House districts?**

21     A.   In 2021?  The Senate and House districts were

22  given to them in 2022.

23     **Q.   I'm sorry, 2022.**

24     A.   Yeah, there wasn't anything submitted in '21

25  with that.  Now, there was local redistricting going on

1   but not the House and Senate.

2       **Q.   Okay.  And in 2022, it took them four and a**

3   **half months to proof the House and Senate districts?**

4       A.   Yes, and conduct elections.

5           MR. STRACH:  Alora, whenever you're

6           ready, it might be a good time to take a

7           break.

8           MS. THOMAS-LUNDBORG:  Yeah, if you can

9           just give me a few more minutes.

10          MR. STRACH:  Sure.

11          MS. THOMAS-LUNDBORG:  I want to ask some

12          questions about her previous answer, and once

13          we're done, we can then take a break.

14          MR. STRACH:  Sure thing.

15  BY MS. THOMAS-LUNDBORG:

16      **Q.   Okay.**

17      A.   And I do -- I'm sorry.

18      **Q.   Yes.  Go ahead.**

19      A.   I just wanted to add one thing to that.  If --

20  for House and Senate, four and a half months, and I

21  said unless something else is in play.  So I think you

22  brought it up in the beginning.  If we do have special

23  elections that are put into that time frame, that

24  affects that as well.  I didn't want you to think it

25  was only regularly scheduled elections.  It's whatever

1    the legislature puts into play with an elections

2    process.

3         Q.   Okay.  And you also mentioned in your previous

4    answer that the precincts are frozen from 2019 to 2023.

5    Is that correct?

6         A.   That's correct.

7         Q.   Okay.  Do you know if there is a law or is it

8    policy and procedure that requires the precinct lines

9    to be frozen from 2019 to 2023?

10        A.   It's a law.  I believe it's 531.1, but I can't

11   swear to that.  I'd have to look it up for you.  Or

12   531.2.

13        Q.   And do you have any understanding behind why

14   precincts are frozen in this period?

15        A.   I don't know why --

16        Q.   If you know.

17        A.   -- the legislature -- the -- I can only make

18   an assumption.

19             MS. THOMAS-LUNDBORG:  Okay.  I think

20        that those are all the questions that I have

21        around that answer.  I'm going to come back

22        and have more questions about redistricting

23        when we get off the break.

24             (Recess taken.)

25   BY MS. THOMAS-LUNDBORG:

1     Q.    So starting from where we left off, I think

2     you mentioned before that some of your work -- well,

3     strike that.  I'd like to ask another question.

4           Related to the answer that you gave me just

5     before we went on break, you said that your office

6     received the Excel files from the State House and State

7     Senate after the map had been implemented; is that

8     correct -- or enacted?  Not implemented.

9     A.    Meaning -- meaning House Bill 14?

10    Q.    Yes.

11    A.    Okay.  I believe -- so they didn't get an

12    Excel file; we created an Excel file.  But they

13    provided the information sometime prior to it -- the

14    act coming in through with the other acts of

15    legislation.  It was sometime within the months right

16    prior to that, I believe, but I'd have to confirm that

17    on the date.

18    Q.    Okay.  Other than receiving information about

19    the enacted -- the enacted Senate and House map, are

20    there any other communications between anyone in the

21    Secretary of State's office and anyone in the State

22    Legislature about the map?

23          And I see Ms. Prouty has come on.  I'm

24    assuming she's going to object.

25                MS. PROUTY:  And I -- I just want to

1          object to the extent that this question would

2          call for information that's protected by the

3          legislative privilege of members who have not

4          waived that privilege here.  I'm not sure of

5          the extent of Ms. Hadskey's answer, but I did

6          want to raise that issue.

7               MS. THOMAS-LUNDBORG:  And my short

8          response would be that Ms. Hadskey does not

9          fit in the legislature.  So any communication

10         between her and that body are not covered in

11         the legislative privilege.  That applies to

12         conversations within the legislature.

13              MS. PROUTY:  Alora, actually, under the

14         Fifth Circuit's recent decision, I think we

15         referenced this extensively with counsel for

16         plaintiffs.  But it's not necessarily just

17         within the legislature.  So again, I don't

18         know the scope of Ms. Hadskey's answer, but I

19         do want to raise that.

20    BY MS. THOMAS-LUNDBORG:

21         Q.   **You may respond, Ms. Hadskey.**

22         A.   Okay.  I can only speak for myself.  I had no

23    communications or interaction.  And my staff, other

24    than receiving the files, had no communications and

25    interactions.

1    Q.   And did you see as part of the topics of the

2    30(b)(6) -- or actually, I will -- if we can, go back

3    to Exhibit 1.

4         A.   Okay.

5         Q.   And if you scroll down to page 7 and 8,

6    Number 3, knowledge and communications between your

7    office and any members of the State House or State

8    Senate about the maps for the State House or the State

9    Senate.

10             Do you see that?

11        A.   Yes.

12        Q.   Okay.   Did you do anything to respond and

13   prepare to respond to this set of questions?

14        A.   No.   No, because I don't have -- I did not

15   have any knowledge or anything on that.   I don't -- I

16   didn't communicate with them at all.

17        Q.   But you do understand that you're sitting here

18   today not just on behalf of yourself but on behalf of

19   the Secretary of State and his office?

20        A.   Okay.   To my knowledge, there was not any

21   information back and forth regarding how they drew the

22   maps or what they did.

23        Q.   And did you do anything to figure out, for

24   example, if anyone in the executive had had any

25   discussions?

1    A.   I -- I talked to my staff.  They did not have

2  any interaction.

3    Q.   And earlier in the deposition, we discussed

4  the -- what you referred to as the executive, which is

5  the secretary himself and some other members of his

6  staff.  Did you do anything to apprise yourself of

7  whether any members of the executive had any

8  conversations?

9    A.   No.  I didn't talk to them about this.

10   Q.   Okay.  So I'd now like to move to another

11 topic,?

12             MS. THOMAS-LUNDBORG:  So I have no

13             more questions on this, Ms. Prouty, about

14             whether -- about the role of demographers.

15 BY MS. THOMAS-LUNDBORG:

16   Q.   And I think you mentioned in an earlier answer

17 that one of the things that your office does as part of

18 the redistricting process is work with demographers,

19 and I'd just like to ask you some question about that.

20   A.   Okay.  So we don't work with them.  What we do

21 is we accept what they submit to us.  So working with

22 them, meaning we accept what's provided to us by the

23 parish council and the demographer as how they want the

24 districts laid out.

25   Q.   And are the demographers -- let me start that.

1    Let me just ask.  Actually, this might be helpful.

2                MS. THOMAS-LUNDBORG:  If we could mark

3          what is Exhibit H, Molly, as -- mark it as

4          Exhibit 3.

5        (Exhibit No. 3 was marked for identification.)

6                MS. GARYANTES:  Absolutely.

7                THE WITNESS:  Is that going to be

8          posted?

9                MS. THOMAS-LUNDBORG:  It will be.  It

10          just takes a minute to post it.

11                THE WITNESS:  Oh, okay.

12                MS. GARYANTES:  You said Exhibit A or 8?

13                MS. THOMAS-LUNDBORG:  H.  H, as in

14          "Harry."

15                MS. GARYANTES:  Oh, got it.  It should

16          be introduced now.

17                MS. THOMAS-LUNDBORG:  Do you have that

18          in front of you?

19                MR. STRACH:  It's loading.

20                THE WITNESS:  Okay.  It's up.

21    BY MS. THOMAS-LUNDBORG:

22        Q.    Great.  I'm not going to ask you too many

23    questions about this document.  I think it might just

24    help us as we're discussing the work of demographers.

25        A.    Right.

1        Q.    I put in an email from December 10, 2021, from

2   a Jeff Everson to your email address.

3            Do you see that?

4        A.    I do.

5        Q.    Okay.  And do you recognize this email?

6        A.    I do, absolutely.

7        Q.    Okay.  And what is the general context of this

8   email?

9        A.    We had a few parishes who were asking -- they

10  didn't know how to hire or who to hire, and there was

11  no list available of who all is a demographer.  So we

12  got a map of what demographers had been selected for

13  parishes and shared it among the parishes so that they

14  would have a reference to go to if they needed a

15  demographer.

16       **Q.    And what is your understanding of what**

17  **demographers were doing in early 2022 since this email**

18  **is from December of 2021, as far as the work that**

19  **demographers were doing for parishes?**

20       A.    So some demographers were working on parish

21  BC districts, and other demographers were working on

22  parish council districts, and other demographers were

23  working on school board districts.  And I don't know

24  exactly what they do.  I don't -- I have no concept of

25  how they do their job or what they're trying to do.

```
 1            But I do know there's a limited number in --
 2    what -- most of the parish councils are not familiar
 3    with the demographer information.  There is no
 4    www.demographer.com.  And so if you know that there's
 5    somebody that's listed as a demographer and another
 6    parish could contact them to see if they would do the
 7    work, then great.
 8                  MS. THOMAS-LUNDBORG:  I'm going to
 9                  introduce another exhibit.  I'm going to
10                  introduce two exhibits.  As far as I can tell,
11                  they are an email and an attachment.
12                  So, Molly, if we could, bring up what I
13                  have in my notes as Exhibit C and mark that as
14                  Exhibit 4 and then Exhibit D and mark that as
15                  Exhibit 5.
16                  MS. GARYANTES:  Okay.
17                  (Exhibit Nos. 4 and 5 were marked for
18                  identification.)
19                  MS. GARYANTES:  They should both be
20                  introduced.
21                  MS. THOMAS-LUNDBORG:  Great.
22    BY MS. THOMAS-LUNDBORG:
23        Q.   Ms. Hadskey, I am going to take these in
24    turns, but since they're an email and an attachment, if
25    you want to quickly scroll through both to familiarize
```

1  yourself, and then I'll start asking you questions

2  about Exhibit 4 and then Exhibit 5.

3       A.   Okay.  Okay.  Okay.  And then let me look at

4  the attachment.  Hold on.  Okay.

5       Q.   Okay.

6       A.   Okay.

7       Q.   I'm going to start with the -- with the email.

8  That's Exhibit 4.

9       A.   Okay.

10      Q.   And so looking at Exhibit 4, who's this email

11 from?

12      A.   It's from Heather Meyers.  She's the director

13 of Business and Services.

14      Q.   And who is the email to?

15      A.   It's to me.

16      Q.   And what's the date of this email?

17      A.   Sorry.  I closed it out.  Okay.  9/27/21.

18      Q.   And the title of the email?

19      A.   "Letter Regarding Reapportionment."

20      Q.   And then does there appear to be attachments

21 to this email?

22      A.   Yes.  The attachment is a copy of a letter

23 done by a previous secretary of state and a previous

24 commissioner of elections.

25      Q.   Do you recall this email?

1      A.   No.  I'm sorry.  I'm trying to remember, but

2  it doesn't ring a bell with me.  I -- I know that if it

3  was done by a previous secretary of state and a

4  previous commissioner, I would imagine that this went

5  to executive to discuss whether that's something that

6  they would want to do again or they wouldn't want to do

7  again.

8      Q.   **You don't have any recollection of why this**

9  **letter was sent to you?**

10      A.   I'm sure she sent it to me because she's

11  asking me if this is something that this administration

12  would want to repeat as it was done in a previous

13  census and redistricting process.  But that would not

14  have been a call for me, as the letter came from the

15  previous secretary of state.

16      Q.   **And then let's just look at Exhibit 5.**

17      A.   Okay.

18      Q.   **Do you recall seeing this letter before?**

19      A.   Vaguely.

20      Q.   **So let's -- this letter has a number of dates**

21  **from the old redistricting cycle.  Were you working at**

22  **the Secretary of State's office during the 2011 -- I**

23  **guess this timeline is from 2009 to 2013?**

24      A.   Yes.  I was the director of elections

25  operations.  I didn't have anything at all to do with

1  redistricting or census or anything.  That wasn't under

2  my division.

3       Q.   All right.  We can move on.

4            MS. THOMAS-LUNDBORG:  I'd like to mark

5            now what, Molly, I have labeled as Exhibit E,

6            as in "Edward."  And I'd like to mark it as

7            Exhibit 6.

8       (Exhibit No. 6 was marked for identification.)

9            MS. GARYANTES:  It should be introduced.

10  BY MS. THOMAS-LUNDBORG:

11       Q.   Let me know when you have that up,

12  Ms. Hadskey.

13       A.   Okay.  Events timeline, it just came up.

14       Q.   And then if you could, just take a moment

15  to scroll through the document and refresh your

16  recollection.

17       A.   Okay.  Okay.

18       Q.   This is a document -- oh, if you could just

19  read -- there's a number underneath the exhibit

20  sticker.  Do you see that?

21       A.   SOS 30(b) --

22       Q.   At the bottom of the --

23       A.   Yeah.  SOS 30(b)(6)?

24       Q.   No, not that.  There's another -- there's a

25  number actually on the page.

1          A.    Oh, okay.  Hold on.  SOS_000692.

2          Q.    **This is the convention used by the secretary**

3    **when documents were turned over to plaintiffs' counsel.**

4    **So this is a document that we received from the**

5    **secretary's office.**

6                **Have you seen this document before?**

7          A.    Seems like I have.  I'm thinking that this is

8    something that was done -- a presentation done by

9    Heather Meyers to try and help the parishes get a good

10   idea of a timeline for the clerks or for the

11   registrars.

12         Q.    **And then looking at page -- if you could just**

13   **scroll what is page 3 of 8, and it's SOS_00694.**

14         A.    Okay.  I'm there.

15         Q.    **Okay.  And if you read the -- the events that**

16   **are set to occur in 2019 -- and let us know if this**

17   **comports with your understanding of what happened as**

18   **part of the redistricting process.**

19         A.    "Opportunity for parish governments to create

20   precincts for the 2020 census and redistricting plans

21   to follow.  Opportunity to use visible features or

22   boundary lines that no longer exist or needed

23   clarification.  Opportunity to consolidate small

24   precincts."

25         Q.    **Does this comport with your understanding of**

1    what happened in 2019 -- or what could happen in 2019

2    as part of the redistricting process?

3         A.   I -- no.  I'm confused.  Because --

4         Q.   And --

5         A.   The reason I'm confused is because it says

6    "consolidate small precincts," and in 2019, precincts

7    were frozen.  So I don't understand that, but...

8         Q.   Let's move on to -- is it -- let me ask you a

9    related question.  Are precincts frozen in 2019 for the

10   whole year, or is there a period in 2019 where

11   precincts can change and then they're frozen after a

12   certain point?

13        A.   I'd have to ask that question.  I'm not

14   positive.  That was what went through my mind as well

15   when I saw that.

16        Q.   Okay.  If you could, look at the event for

17   July of 2021 and read them, and let us know if that

18   comports with your understanding of what happened in

19   the --

20        A.   Okay.  Here's --

21        Q.   -- redistricting process.  You may proceed.

22        A.   Okay.

23        Q.   You can read it aloud.

24        A.   Oh, okay.  I just finished reading it.  Okay.

25   Okay.  The -- so I believe, if I'm not mistaken -- but

 1   I would have to confirm this -- there is a statute that

 2   is an exception to the freeze, and this may be dealing

 3   with that, but I would have to find out if it did.  And

 4   I'd have to find the statute.

 5            Can you hear me?  Okay.

 6       Q.   **Sorry, I was on mute.**

 7       A.   Okay.

 8       Q.   **If you could, read the page that goes from**

 9   **2022 to 2024 and see if it comports with your**

10   **understanding of what has happened and is going to**

11   **happen during that period.**

12       A.   Okay.  Yes, that is -- that is what I believe

13   to be going on right now.  I've seen some of the plans

14   that have been received by Business and Services, and

15   they are working on those right now.  Or they worked on

16   some this summer, and then they are working on some

17   right now for the 2024 elections.

18            You're talking, and I can't hear you.  I'm

19   sorry.

20       Q.   **Sorry, I was muted again.**

21            **The first bullet is "District plans based by**

22   **governing authorities and implemented by ROV."**

23            **What is ROV?  I've seen that a few places.**

24       A.   Yes.  District plans passed by parish

25   governing authority and implemented by registrar of

1    voters.  So whatever the demographer and the parish

2    governing authorities passed in an ordinance is what

3    the registrar of voters has to comply with to move the

4    voters into the districts.

5            **Q.   If you could, then scroll to the next page.**

6            A.   Okay.

7            **Q.   If you could, read this page, and let us know**

8    **if it comports with your understanding of what's**

9    **happened and will continue to happen in 2022 and 2024.**

10           A.   Okay.  And yes, that is.  That's a

11   recommendation.  So during the redistricting process,

12   the parish governing authorities and the demographers

13   are making decisions, but the registrar of voters and

14   the clerks of court need to be involved.  So this

15   recommendation is saying create a relationship with the

16   department or people who are responsible.

17           So the clerk and the registrar need to be

18   communicating with the parish governing authority and

19   the demographers, and it's recommending everything that

20   they would need to do that process.  But ultimately,

21   it's theirs to do.

22           I can't hear you.  I'm sorry.

23           **Q.   Can you read the following page and tell me if**

24   **that comports with your understanding of what happened?**

25           A.   Okay.  Yeah, that is exactly what they would

1    be doing.

2        Q.   Could you read the second bullet for the

3    record?

4        A.   "Plans may be challenged in court.  We still

5    have to prepare."  So preparing --

6        Q.   And does that -- yes.

7        A.   Preparing either way -- so if a plan is

8    challenged in court and you have things prepared, if

9    the judge says we're not doing it, then of course you

10   have to start from scratch.  But if the judge would say

11   it's holding up and you are going to do it, then you

12   would be ready to go.

13       Q.   And would you be starting completely from

14   scratch, or would some of the work that you've done be

15   able to be carried over to a new map?

16       A.   It would completely depend on what was being

17   challenged and why.

18       Q.   Okay.  And how so?

19       A.   And what now?

20       Q.   How so?  How -- if you could, explain that

21   answer a little more.  What kind of factors would go

22   into whether you would start from scratch or be able to

23   use some of your prior work?

24       A.   So if you ever have a parish governing

25   authority that passes a plan for redistricting for

1    council members and in that plan, they attempted to

2    change lines for school board or attempted to change

3    lines for House and Senate or something like that, the

4    legislative demographer would not approve that.  And so

5    that -- the plan would not work.  It couldn't be

6    implemented.

7         Q.   All right.  And what about changes to the

8    state legislative plan?  Would any of your work or any

9    of the state legislative plan be able to be used, or

10   would you be starting the process in your office of

11   implementation over again?

12        A.   It depends if it was one parish that was

13   changed or two parishes that were changed or if it was

14   35 parishes that were changed.  It all depends on what

15   was -- what the magnitude of the change is.  And it

16   depends on whether the parish itself made a great deal

17   of changes to the boundary lines of their precincts for

18   council or for anything else that they had moved around

19   or mergers and consolidations.

20        Q.   So let's focus on the state legislative map.

21   Assuming that the precinct lines that are now in

22   place -- let me ask you a question before I ask that

23   question.  Strike that previous question.

24             Is the process of setting precinct lines at

25   the parish level finished, or is it ongoing?

1      A.   Currently, it's ongoing.  They're still

2  submitting to our department.

3      **Q.   And when will that process be over?**

4      A.   I'm not -- I don't know the legal deadline

5  for every single parish.  I believe there are three

6  parishes next year that still have to go through

7  redistricting, but I'd have to confirm that.

8      **Q.   So assuming that the state legislative -- the**

9  **state legislative lines changed and by the time they**

10  **changed, only three parishes were left to change their**

11  **districts, how much work would your office need to do**

12  **to reconcile the new maps to the work that you've done**

13  **in the past on the enacted map?**

14      A.   There's no way I can estimate that.  I would

15  not have any idea.  I'd have to -- the Business and

16  Service division would have to look at it.  That would

17  take assessment.

18      **Q.   Okay.  I'm just going to pull up (inaudible)**

19  **again.  I'll come back to this.  Let me just go and ask**

20  **another question.**

21           MS. THOMAS-LUNDBORG:  If we could mark

22           Exhibit F -- what I have in my notes as F, as

23           in "Frank," as Exhibit 7 and then Exhibit G,

24           as in "Gary," as Exhibit 8.  This is another

25           email attachment.

1          (Exhibit Nos. 7 and 8 were marked for

2          identification.)

3               MS. GARYANTES:  Can you repeat that one

4          more time?

5               MS. THOMAS-LUNDBORG:  It's Exhibit F, as

6          in "Frank," as Exhibit 7 and Exhibit G, as in

7          "Gary," as Exhibit 8.

8               MS. GARYANTES:  Thank you.  They're both

9          introduced.

10               MS. THOMAS-LUNDBORG:  Great.

11  BY MS. THOMAS-LUNDBORG:

12      Q.   Ms. Hadskey, if you want take time to just

13  look at both exhibits quickly, and then we'll spend

14  some time talking about them.

15      A.   Okay.  Okay.  Let me go back to 8.  Sorry,

16  it's still loading.

17      Q.   That's fine.  Things are always a little bit

18  slower over the internet.

19      A.   Okay.  Okay.  Okay.

20      Q.   So let's go -- did you get a chance to review

21  both documents?

22      A.   Yes.

23      Q.   So let's go back to Exhibit 7, and then we'll

24  go back to Exhibit 8.  It's just easier --

25      A.   Okay.

1    Q.    -- to put in an email and attachment at the

2  same time.

3    A.    Okay.  Okay.  I'm ready.  I'm sorry.

4    Q.    Okay.  No, that's fine.

5          Who was this email from?

6    A.    The top email is from me.  And the -- I was

7  telling Bryce, who is the operations director, to print

8  the attachment and bring it to me in the parking lot

9  because I needed it.  I needed to look at it.  And

10  Alise -- the second email is from Alise.  She attached

11  the PowerPoint from her presentation on Tuesday, and

12  then she sent it via email to show the pictures and put

13  it on LASOSnet for the registrar of voters.  So it's a

14  document for the registrar of voters.

15    Q.    And what's the date of this email?

16    A.    Date is 2/17/2022.

17    Q.    Let's go now to the attachment.

18    A.    Okay.  Okay.  All right.  I'm there.

19    Q.    Do you recognize this document?  Do you

20  recognize this --

21    A.    I believe I -- I believe I do, yes.  I mean,

22  it looks familiar to me.  We -- we do presentations for

23  the registrars to try and assist them with what they're

24  responsible for.

25    Q.    And that's in this ERIN system that we were

1    talking about earlier today, correct?

2         A.   That's exactly right.

3         Q.   **And could you read just the title?  And it**

4    **looks like there's -- the writing is quite small, and I**

5    **have very bad eyes.**

6         A.   Oh, no.

7         Q.   **It'll help you reading that too.**

8         A.   Sure.  "Redistricting in ERIN.  Changing

9    Districts Based on Ordinances, Congress Rep, Senate,

10   Police Jury, School Board, Etc."

11        So the registrar of voters is responsible

12   to move the voters into the right districts in ERIN

13   after the parish governing authorities or -- or after

14   the information is submitted to our department.

15        Q.   **And that would be -- it says "Congress Rep,**

16   **Senate" -- so this would cover elections from U.S.**

17   **congressional elections, the state legislative**

18   **elections to local elections; is that correct?  The**

19   **process that would then be in this PowerPoint?**

20        A.   So for two separate processes.  For the

21   ordinances for local elections, the registrar of voters

22   are responsible to do all of the movement of the

23   individuals because it is split precincts.  Some

24   people -- they are the only ones that would know their

25   area.  So some people live in this area, and they would

1   be in this district and -- et cetera.

2              For rep and Senate, they're responsible to

3   proof the work.  If a whole precinct is moved, they're

4   responsible to proof that work, make sure that the

5   precinct lines didn't change, and know that the voters

6   are in the right place so that they'll get the right

7   ballot.

8         Q.   And based on this parenthetical that

9   references congress rep, Senate, police jury,

10  et cetera, this PowerPoint would involve the

11  processes -- those two different processes, the proof

12  processes and the movement processes, just looking at

13  the cover page --

14        A.   Yes.

15        Q.   -- of what your understanding is?

16        A.   Yes.

17        Q.   Okay.  If you could then scroll to the next

18  page, please.

19        A.   Okay.  I'm there.

20        Q.   And could you read the -- could you read the

21  first bullet that's all in bold?

22        A.   "All changes must be made in ERIN five

23  business days before qualifying."

24              That is a statute.  That's a legal deadline.

25        Q.   So five business days --

1    A.    The way that it reads in the statute is that

2  the jurisdictions must be set, meaning the registrars

3  have to have all of the people in the right places in

4  order to meet that deadline.

5    **Q.    And then there's an example given here in the**

6  **next two paragraphs.  Could you read that?**

7    A.    "The dates for qualifying for the fall 2022

8  election are July 20th through the 22nd.  The deadline

9  to have your changes completed in ERIN is July 13th."

10   **Q.    And that seems like that's a little bit more**

11 **than five days.  Is that -- oh, five business days.**

12 **Okay.  All right.  Let's move on.**

13       **Can you change to the -- scroll to the next**

14 **page and read the first bullet.**

15   A.    "The deadline for redistricting plans to be

16 received by our office is 4:30 on June 22nd, four weeks

17 prior to qualifying."

18       So that is the ordinances and the -- the --

19 any information from the parish governing authority to

20 be submitted to us.

21   **Q.    And does this deadline apply to all maps or**

22 **just to local parish maps?**

23   A.    I'd have to read the statute.

24   **Q.    Do you know which statute that is?**

25   A.    Not off the top of my head.

1      Q.   Do you know why your office would need

2    redistricting plans four weeks before qualifying?

3      A.   Because the legislature set that.  I don't

4    know why they picked the deadlines they do, but that's

5    what their legal deadline is in the elections code.

6      Q.   If you could, scroll to what is page 7 of 18.

7    And the Bates stamp is SOS_00935.

8      A.   00935.  936, 935 -- okay.  I'm there.

9      Q.   Now, this is a -- well, could you read what

10   the top of the document says?

11     A.   "Useful reports in ERIN."

12     Q.   And then there's a bunch of redacted text.

13   Do you have any recollection of what was stated in this

14   text?

15     A.   Yes.  It would tell you the reports in the

16   ERIN system that they can use to assist in completing

17   their plans and the movement of voters.  But it does

18   contain the elections registration information network,

19   confidential information as well.

20     Q.   Okay.  And then if you could, scroll to the

21   next page.

22     A.   Okay.

23     Q.   And does this page also say "Useful reports in

24   ERIN"?

25     A.   Yes, it does.

1       Q.      And has this page also been redacted?

2       A.      Yes, it has.

3       Q.      And if you could, scroll to the next page.

4       A.      Okay.

5       Q.      And what is the title of this page?

6       A.      "How to change the districts."  This page

7   would actually give instructions of how to go into the

8   ERIN system and change someone's district from one

9   district to another, how to proof it, that type of

10  thing.

11      Q.      And this page has also been redacted?

12      A.      Yes.

13      Q.      And then if you could, scroll to the next

14  page.

15      A.      Okay.

16      Q.      And what's the title of this page?

17      A.      "Option 1."

18      Q.      And then even the title part appears redacted.

19  Do you have any thoughts on what this page would have

20  shown?

21      A.      I don't remember what Option 1 would be.  No,

22  I don't.

23      Q.      And then if you could, scroll to the next

24  page.

25      A.      "Option 2."

SHERRI HADSKEY

1        Q.    Do you have any recollection of what this page

2    would have shown?

3        A.    No.

4        Q.    Okay.  If you could, scroll to the next page.

5        A.    Okay.  "My precinct does not have the

6    available district."

7        Q.    Okay.  Some of the text on this page is

8    redacted.  Based on what is not redacted, do you have

9    any understanding of what this page shows?

10       A.    No.  I would -- I can only assume.

11       Q.    Can you scroll to the next page?

12       A.    Sure.  Okay.

13       Q.    What's the title on this page?

14       A.    "What happens when Alise adds your new

15   districts."

16       Q.    And what is Alise?

17       A.    Alise is the administrative staff assistant to

18   Heather Meyers in the Business and Service division.

19   And she -- she opens the plans in ERIN in order for the

20   individuals to work in the plans moving the voters.

21   And so this is saying that if Alise has to add a new

22   district, that means that the ordinance came in and the

23   district wasn't added yet.

24       Q.    So if the plan changes, is it Alise who would

25   then put in the new plan into ERIN, or would that be

1    done by someone else?

2         A.   Alise is the person right now that introduces

3    the plans into ERIN.

4         Q.   And do you have any other knowledge of what

5    else would have been on this page about the process of

6    introducing new plans into ERIN?

7         A.   No.

8         Q.   If you could, scroll to the next page.

9         A.   Okay.  I'm there.

10        Q.   What's the title of this page?

11        A.   "District Exceptions Report."

12        Q.   Do you have any understanding of what a

13   district exceptions report is?

14        A.   Yes.  A district exceptions report would

15   reflect if the voters were moved into an area, and it

16   potentially could be a wrong area.  In the ERIN system,

17   it highlights them in a specific color, and it would

18   show on a report telling the registrar that they

19   probably need to go back and look at it again, that

20   they may have made errors.

21        Q.   And do you have any other understanding of

22   what would've went on this page?

23        A.   No.

24        Q.   If you could, scroll to the next page.

25        A.   Okay.

1        Q.   What's the title of this page?

2        A.   "Unassigned District Report."

3        Q.   And what's that?  Oh, wait.  No, I think we

4    skipped one.  There is what is labeled SOS_00493.  It's

5    going to have the same title as the one we were just

6    on.

7        A.   Okay.  943?

8        Q.   Uh-huh.

9        A.   "District Exceptions Report."

10       Q.   Okay.

11       A.   That would be additional -- okay.  That would

12   be additional reports.  And unassigned district report,

13   I can only assume it means that they unassigned the

14   particular district, and those are the ERIN system

15   reports to run to review that.

16       Q.   And that page is also redacted, correct?

17       A.   That's correct.  It contains confidential

18   information.

19       Q.   And then there is two additional pages, which

20   have closing notes.  And I thank you.  We don't have to

21   spend time on those today.  I'm going to move on.

22       A.   Okay.

23       Q.   Okay.  We're going to introduce two more

24   documents.  And depending on how much time those take,

25   we can take a break after that, or I may introduce one

1   more document.  Okay?

2        A.   Okay.

3             MS. THOMAS-LUNDBORG:  Molly, can we

4        introduce what I have marked as Exhibit J,

5        as in "job," and K, as in "Karen."  And J will

6        be Exhibit 9, and K will be Exhibit 10.

7   (Exhibit Nos. 9 and 10 were marked for

8        identification.)

9             MS. GARYANTES:  All right.  Those have

10       been introduced.

11            THE WITNESS:  Okay.  Okay.  Okay.  Let

12       me look at the attached letter.  Hold on.  Oh,

13       wait.  Okay.  Let's see.  Okay.  I looked at

14       both.  I can't hear you.

15  BY MS. THOMAS-LUNDBORG:

16       Q.   Let's start with what's Exhibit 9.

17       A.   Start with what?  I'm sorry.

18       Q.   Exhibit 9.

19       A.   Exhibit 9, okay.  All right.  I'm there.

20       Q.   And what is this document?

21       A.   This is a document -- this is an email

22  regarding one of the demographers, and he did a

23  presentation at a registrar of voters conference.  And

24  the demographer -- if the demographer is trying to give

25  instructions to the registrars -- no other demographer

 1   did that.  But if he's trying to give instructions to

 2   the registrars, including legal deadlines that our

 3   department is supposed to receive information by, and

 4   anything in it is inaccurate, that can be problematic

 5   for the whole process.

 6           So I asked staff to go through his

 7   presentation that -- his presentation was given to me

 8   by another registrar.  I asked the staff to go through

 9   it and make sure that what he is saying in that

10   presentation is correct because you wouldn't want

11   conflicting information going to the registrar of

12   voters.

13       **Q.   And just to establish kind of the basis of the**

14   **email, this is an email from you, correct?**

15       A.   That's correct.

16       **Q.   And it's to Alise and Heather; is that**

17   **correct?**

18       A.   That's correct.

19       **Q.   Okay.  Do you recall what the outcome of this**

20   **email was?**

21       A.   I don't.  I don't know that they found

22   anything or they didn't.  But I do know if they did

23   find something, it would have had to have been

24   corrected before it would go to the registrars and give

25   them inaccurate information.  And if he had given it to

1   any of the registrars, then it would have been

2   corrected via making sure they know, calling them and

3   making sure they understand that something in there was

4   not correct.

5        Q.   And I don't want to spend too much time on

6   this document, given what you just said.  But if you

7   could, take some time scrolling through, and let me

8   know if anything jumps out at you as incorrect.  And

9   even to make this even simpler, I'm concerned with

10  general deadlines and deadlines related to the State

11  and -- the State legislative maps and not local maps.

12       A.   Okay.  So in order for me to confirm if what

13  he's saying in here is accurate or not accurate, I'd

14  have to look at calendars, and I'd have to go back and

15  look at dates and just make sure that what he said was

16  correct.

17       Q.   Let me ask you a question about page

18  SOS_ 00549, "Best Practices."

19       A.   SOS_00549.  Okay.  Okay.  I'm there.

20       Q.   There's a list of best practices here, and

21  let's just go through them one by one.

22            "The demographer should make sure the adopted

23  plan meets all requirements of Section 2 of the VRA."

24            Do you see that?

25       A.   I do.

1          THE REPORTER:  I'm sorry.  I didn't get

2          the question.

3          MS. THOMAS-LUNDBORG:  The question was

4          whether she saw the bullet that reads,

5          "Demographer should make sure the adopted plan

6          meets all the requirements of Section 2 of the

7          VRA."

8   BY MS. THOMAS-LUNDBORG:

9       Q.   **Do you agree with this bullet point?**

10          MR. STRACH:  Objection.

11      A.   I -- this is Mike Hefner's recommendations and

12   best practices.  Not all -- in fact, I don't know of

13   any other demographer that turned in anything like this

14   or tried to give guidelines.  So I -- in my opinion,

15   yes, they -- it should meet Section 2 of the Voting

16   Rights Act.  But I don't know -- if Mike Hefner is the

17   only demographer that provided this information, then

18   he's only got -- he only has certain parishes.

19   BY MS. THOMAS-LUNDBORG:

20      Q.   **Understood.  I'm just asking in your opinion,**

21   **whether you're in agreement with this bullet point or**

22   **not.  Okay.**

23      A.   Okay.  I agree with bullet point 1.

24      Q.   **Okay.  The next bullet point is, "Demographer**

25   **should produce detailed maps of the new plan(s) in**

1    hardcopy or electronic format for the Registrar of

2    Voters and shapefiles for the Secretary of State."

3          Do you see that?

4      A.   I see that.

5      Q.   Do you agree with that bullet point?

6      A.   No.  Because he's -- he's saying that that's

7    what he feels should be done.  But not all demographers

8    do that, not all parish governing authorities do that.

9      Q.   Okay.

10     A.   It's his recommendation.

11     Q.   So for the new precinct files, how are those

12   sent to the Secretary of State's office?  In what

13   format?

14     A.   I would have to ask the Business and Service

15   division what types of formats they're getting them in.

16     Q.   Okay.  And then there's another bullet, which

17   I will not read verbatim, about demographers working

18   closely with the Secretary of State's office and the

19   parish registrar to have an accurate implementation of

20   the plan.  Do you generally agree with that bullet?

21     A.   Demographers don't work with the Secretary of

22   State's office.  They work with -- they're hired by the

23   parish councils and the parish governing authorities.

24   And so I -- I'm confused by that.  I mean --

25     Q.   Okay.

1     A.   -- they would work with the registrar of

2  voters.

3     Q.   **Okay.  Just looking at this document again,**

4  **but I think that's it.  Let's move on.  I'm just going**

5  **to ask a quick question about this document, and then**

6  **we can move on.  I'm going to introduce a new document.**

7              MS. THOMAS-LUNDBORG:  Can we introduce

8              as Exhibit 11 what has been -- what I have --

9              I have labeled Exhibit T, T as in "Tiffany."

10    (Exhibit No. 11 was marked for identification.)

11             MS. GARYANTES:  It's introduced.

12  BY MS. THOMAS-LUNDBORG:

13    Q.   **If you could, take a minute to open**

14  **Exhibit 11.  First, just look at it.**

15    A.   Okay.

16    Q.   **Do you recognize this document?**

17    A.   I do.  The registrar of voters are evaluated

18  every year.  It's a -- whether or not they're going to

19  get their merit increase.  And they're responsible to

20  check every item on this box and sign it if they

21  completed what they were supposed to do, and their

22  evaluation reflects that.  And then they -- after

23  they've completed it, a copy of this goes with their

24  evaluation.

25    Q.   **Okay.**

1        A.   Basically holding them accountable for the

2    process that they're supposed to be doing.

3        **Q.   And so just going through that process.  As**

4    **part of that process, it looks like -- the first**

5    **bullet -- they're supposed to upload documentation to**

6    **ERIN.  Is that correct?**

7        A.   "Parish has received all necessary

8    documentation for the application of the plan."

9            I have -- so they received the documentation

10   from their parish governing authority for application

11   of the implementation of their plan.

12       **Q.   You know, I think for the most part, the**

13   **document speaks for itself, so we can move on.  So I'm**

14   **going to move to election calendars.  But before I do**

15   **that, is your office involved in any other processes**

16   **regarding the implementation of enacted State**

17   **legislative maps?**

18       A.   No.  Outside of -- outside of entering them --

19   ministerially, we enter the information into the

20   database so that the voters are assigned to the right

21   places, they get the right ballots, they're voting on

22   the right races, they're qualifying in the right

23   offices, et cetera.

24            MS. THOMAS-LUNDBORG:  So I'm suggesting

25            that we maybe go for 15 minutes more or so and

```
 1                    then just take an early lunch, if that's works
 2                    on your end.
 3                         THE WITNESS:  Yeah, that works great.
 4                         MS. THOMAS-LUNDBORG:  So let's mark as
 5                    Exhibit 12 what I have labeled as Exhibit L,
 6                    as in "Larry," Molly.
 7              (Exhibit No. 12 was marked for identification.)
 8                         MS. GARYANTES:  It's introduced.
 9    BY MS. THOMAS-LUNDBORG:
10         Q.   And let me know when you have that pulled up.
11         A.   Okay.  Okay.  It's up.
12         Q.   Okay.  This is something that I pulled from
13    the Secretary of State's website.
14              Do you recognize this document?
15         A.   Absolutely, yes.
16         Q.   Okay.  And what is this document?
17         A.   This document is out of our ballot box, and it
18    shows the election dates and all of the deadlines of
19    the elections processed for the year 2019.
20         Q.   Now, on this document, there's a row that says
21    "Date of the election" with certain dates in it.
22              Do you see that?
23         A.   I do.
24         Q.   Okay.  And then the following row is "Type of
25    election."  Do you see that?
```

1    A.   Yes.

2    Q.   Okay.  And I want to just focus on the type of

3  election being gubernatorial primary and gubernatorial

4  general.  Do you see that?

5    A.   I do.

6    Q.   On this document, there's -- I do not see the

7  words "State" -- or "Louisiana State Senate" or

8  "Louisiana State House."

9         Does the Louisiana State Senate and the

10 Louisiana State House share dates with the

11 gubernatorial primary?

12   A.   Yes.

13   Q.   Do you know -- just because I'm curious -- why

14 only gubernatorial primary appears on this document?

15   A.   Because that's the title of the election.  The

16 gubernatorial primary and the gubernatorial general is

17 the title of the election.  It doesn't list out

18 everything that's running.  It wouldn't say, "State

19 rep, State Senate, BESE, PSC."  It's one title.

20   Q.   Okay.  And how many different offices are

21 included under this one title?  Do you know?

22   A.   I could get that information for you, but I'm

23 not -- off the top of my head, no, I don't.  It would

24 include the -- it would include the regularly called

25 scheduled elections, any special elections that the

1  governor has called, prompts and constitutional

2  amendments.

3       Q.   But do you recall in 2019, how many elections

4  were on the ballot in October -- on October 12th and

5  November 16th -- well, let's just -- let's take it

6  separately -- on October 12th?

7       A.   No.  I'd have to go back and look at that

8  information.

9       Q.   Let's talk a little bit about the qualifying

10  dates.  And I'm going to ask a kind of pre-question,

11  which is, is there a nominating period before

12  qualifying dates, or are there just qualifying dates?

13  And let's use this October 12, 2019, election example.

14       A.   Okay.  So the October 12th date, there's a --

15  you can qualify by nominating petition, and you would

16  have to have gotten that nominating petition 120 days

17  prior to qualifying.

18       Q.   Are there other ways to qualify?

19       A.   You can qualify in person.  You can qualify by

20  agent affidavit.  And that's it.

21       Q.   And what is involved in the in-person

22  qualifying procedure?

23       A.   You have to go to the clerk of court's office

24  if it's a local race, or you go to the Secretary of

25  State's office if it's a state race.  You're required

 1   to complete the qualifying form.  They do this in the

 2   ERIN system, and then you'd have to pay your qualifying

 3   fee.  It's notarized, and you're provided with an

 4   ethics packet.  And you're basically qualifying for --

 5   to be a candidate in the election.

 6        **Q.   And what is required of the agent affidavit**

 7   **qualifying procedure?**

 8        A.   The -- if you qualify by agent affidavit, you

 9   are basically signing off that you're allowing somebody

10   to bring in the information for you, and it's

11   notarized, and they're able to submit your qualifying

12   form.

13        **Q.   And do you know how many folks you see**

14   **nominating petition for -- to qualify versus the**

15   **in-person or agent affidavit option for state**

16   **elections?**

17        A.   Off the top of my head, no.  I only -- what I

18   can speak to is I've received calls asking how to get

19   the nominating form and what date is the deadline to

20   turn it back in.  But I wouldn't be able to tell you

21   who all has done it and which parishes have it, that

22   type of thing.  I'd have to research that.

23        **Q.   And is there any difference between who can**

24   **qualify by nominating petition and who can qualify in**

25   **person or by agent affidavit?**

SHERRI HADSKEY

1        A.    I don't understand the question.

2        **Q.    So if someone wanted to run for state office,**

3   **can they decide that they want to run by nominating**

4   **petition or in person and agent affidavit, or can only**

5   **certain folks use the in-person and agent affidavit**

6   **method?**

7        A.    No.  Anybody can request the nominating

8   petition.

9        **Q.    And can anyone qualify in person?**

10       A.    Sure.  Sure.  If you want to qualify for a

11   race, you can go in in person.

12       **Q.    And anyone can qualify by agent affidavit?**

13       A.    If they have the right documentation, they can

14   submit the agent affidavit.

15       **Q.    And what type of documentation would someone**

16   **need?**

17       A.    For the agent affidavit?  They'd have to have

18   a notarized --

19       **Q.    Yes, ma'am.**

20       A.    -- form that's from the Secretary of

21   State's -- there's one on the Secretary of State's

22   website.

23       **Q.    And it's a notarized form authorizing an**

24   **agent?**

25       A.    Yes.

1 Q. On what type of form would someone need to

2 fill out to qualify in person, not via an agent?

3 A. So the form is actually in ERIN.  They go into

4 ERIN, and they qualify in ERIN.  There is a manual copy

5 of the form in the event of power outages or something

6 like that.  But the process is entered into the ERIN

7 system, and then they're provided with a certified copy

8 of their qualifying form, certified and notarized.

9 Q. And do you know what type of information

10 someone would need to qualify via the in-person process

11 in ERIN?

12 A. They have to have their name, their

13 domiciliary address, their mailing address, their

14 email, their phone number.  It has their board and

15 precinct.  It's basically information for qualifying

16 for the race.

17 Q. And then you said that qualifying for state

18 races occurs at your office; is that correct?

19 A. Qualifying for state -- for statewide races

20 occurs at our office or --

21 Q. Statewide, okay.

22 A. Right.  Reps and senators are local.

23 Q. That is helpful.

24 And do you know -- are you aware of what

25 information is done to verify the qualifying

1  information of reps and senators?

2      A.    So we are ministerial only, and the clerks of

3  court are ministerial only.  We do not determine

4  whether you meet any qualifications or guidelines or

5  anything like that.  If you come in and you want to

6  qualify for a race, we accept your qualifying fee, and

7  we accept your entry of your form, and you are

8  officially qualified.  It's not up to us to determine

9  whether you actually meet the guidelines of that

10  office.

11      **Q.    Does anyone do that check, that you're aware**

12  **of?**

13      A.    To my knowledge, nobody does that check.  But

14  when you qualify for an office and you -- you don't

15  live in the district or you don't meet the guidelines

16  or you owe ethics fees, then people file for objection

17  to candidacy generally.

18      **Q.    And when does the objection-to-candidacy**

19  **period occur?  Because I don't see it on this --**

20      A.    No.  That's a legal --

21      **Q.    -- on this calendar.**

22      A.    Right.  That's a legal process, and it's -- it

23  starts the day after qualifying, and it goes through --

24  it's seven days after.  So the deadline to object, I

25  believe, is seven days following qualifying.

1    Q.   Do you know how the qualifying deadline is
2    set?

3    A.   I have no idea.  The legislature sets it.

4    Q.   And do you have any understanding of why the
5    qualifying deadline is set at a certain date?

6    A.   I don't know why they set it at that date.
7    I know what we have to accomplish in the time frame
8    between qualifying and the actual election, but that
9    doesn't necessarily mean that's how they set that date.
10   I have no idea how they set that date.

11   Q.   Just generally -- and then I think we can take
12   our lunch break.  I think you mentioned that -- what do
13   you have to do between the qualifying period and the
14   election?

15   A.   Between the qualifying period and the
16   elections, we go through objections to candidacy, we go
17   through a withdrawal deadline for the race, we begin
18   programming, and that's programming for three separate
19   systems, your absentee by mail, your early voting in
20   person, and your election day ballots.  You also have
21   the ranking ballots for military and overseas.

22        And then after you go through the programming
23   in the process, you are also testing all of the
24   programming databases, making sure that they work.  You
25   are uploading the information to the state's printer,

1   who has to have the time to print the absentee and

2   election day ballots.  And you are screenshotting every

3   ballot for an early voting machine, and then once

4   they're certified, you are releasing the ballots to the

5   parishes.  That is what the State does.

6            There is a completely separate list of

7   things that the registrar of voters are doing after

8   qualifying, the clerks of court are doing after

9   qualifying, the warehouse staff after qualifying.

10   It's -- there's a lot of procedures.  The parish board

11   of election supervisors has procedures that they have

12   to follow.  But for the State, that was what we do.

13   And we conduct early voting.  We conduct election day

14   as part of the process.

15            MS. THOMAS-LUNDBORG:  All right.  I

16            think we're going to get into some of that

17            after our lunch break.

18                 (Recess taken.)

19   BY MS. THOMAS-LUNDBORG:

20   Q.   I just want to go back to a few questions

21   about changes in districts.

22            So if there's no changes to the precinct, how

23   long does it take to update a voter's voting district

24   in the ERIN system if the district has changed?

25   A.   I would need to ask my Business and Service

1    division that question because I don't know what would

2    be involved in the proofing process if there's no

3    change in the lines but the district itself changed.  I

4    do know that they would do their portion and the

5    registrar would do their portion, but I'd need to ask

6    that question.

7        **Q.   Once the change is inputted, do you know how**

8    **long it takes to provide voters notice of this change?**

9        A.   Yes.  So once it's put into the ERIN system

10   and then the proofing following your input of data into

11   the ERIN system is completed and then confirming

12   there's no election cycle in process or anything that's

13   going on that would prevent the cards from going out,

14   they -- the information is uploaded to State Printing,

15   and USPS gives us an average of 15 days for delivery.

16   That came from our regional Washington manager at USPS.

17       **Q.   So just taking the process from changes put in**

18   **and then it goes to USPS, how long does that take?**

19       A.   That's what I'll have to check.  If there was

20   no changes to the lines or anything, I'd have to find

21   that out.

22       **Q.   Do you recall that -- whether your office sent**

23   **notices to voters about congressional districts in**

24   **2022?**

25       A.   Yes.  Anybody that had a district change was

1    notified by -- the ERIN system automatically generates

2    the cards -- I mean, generates the notice to State

3    Printing, who print the cards to have them shipped.

4        **Q.   And do you recall, with the congressional map**

5    **in 2022, how long it took from getting the new map to**

6    **mailing voters?**

7        A.   In 2022, I believe that the voters were

8    notified by June or July, but I'd need to go back and

9    refresh my memory.

10       **Q.   And then for the upcoming election, the 2023**

11   **election, have voters been notified yet?**

12       A.   Yes, absolutely.

13       **Q.   And when did that take place?**

14       A.   The cards went out over the summer.  Specific

15   parishes that were later -- later in the process of

16   submitting their ordinances -- so of course, if you

17   submitted your ordinance in April, then your cards went

18   out beginning of, you know, May, end of May, somewhere

19   around there depending on how extensive it was.  It

20   depends on exactly what type of changes were made.

21           But -- and those -- those ordinances -- if

22   Acadia submitted an ordinance and they only changed

23   one district, of course it makes a difference in the

24   amount of time.  So as far as the State and Senate

25   cards going out, I believe that everyone was notified

 1   by July 13.

 2        **Q.   And you said everyone was notified by**

 3   **July 13th.   Why do you think it was by July 13th?**

 4        A.   Because two of the parishes were really upset

 5   over the United States Postal Service delay.  They knew

 6   that everything had been completed, but yet their

 7   voters were calling, saying, "We haven't received

 8   anything by the end of June."  We contacted the USPS

 9   representative, and we sent them a list of all of the

10   problems that we were having.  And from what I

11   understand, we delayed canvass until July 13th, and

12   the voters had been notified by that point.

13        **Q.   And you just said "we delayed canvass."  What**

14   **do you mean by "canvass"?**

15        A.   Each year, the State conducts a canvass

16   process.  It has to be done by a specific date.

17   Basically, we were -- for our canvass process, we were

18   comparing your voter information to the USPS change of

19   address, NCOA, and voters are mailed cards in that

20   process to confirm if they -- if they're not

21   NCOA-verified, if you're not verified at the address,

22   then they're mailed their card saying, "You have been

23   identified as someone who potentially has moved in

24   parish or out of state," et cetera, and they're tasked

25   with returning the information to the registrar of

1    voters.

2        Q.    I'd like to go back to Exhibit -- Exhibit 12.

3        A.    Hold on.  I'm sorry.  I went the other way.

4    Okay.  I'm there.

5        Q.    Okay.  The canvass deadline is not on -- in

6    this calendar, correct?

7        A.    That's right.  Because this calendar is an

8    elections calendar.  It's not -- it's not a task of

9    everything that the department is required to do.

10        Q.    I have a -- oh, I have another question.  I

11    have -- I wanted to ask you just one more follow-up

12    question about the qualifying procedures.

13            For folks who qualify or attempt to qualify

14    via nomination, would that be recorded in ERIN?

15        A.    A nominating petition?  I don't believe so.

16    I believe that'd be -- would be recorded with the

17    registrar of voters and the legal division, but I'm not

18    positive.  I would need to get you the answer for that

19    question.

20        Q.    Would your office at any point receive

21    information regarding who had nominated for State

22    Senate or State House of Representatives through

23    nominating petition?

24        A.    The registrar of voters is tasked with

25    confirming the signatures on the nominating petition.

1   So some petitions require 100 signatures.  Some require

2   1,000 signatures.  Some require 500 signatures or 400

3   signatures.  So that being said, once the registrar

4   completes their verification process, then they would

5   have to submit that as something to be qualified for.

6   I'm not sure if they submit it to the clerk or if it's

7   a local office because the clerk does that qualifying

8   for the local office or for a statewide office, the

9   State.

10       Q.    But for the State House and State Senate, it

11  sounds like it would go to the clerk.  But once that

12  process was done, would you -- would your office

13  receive a record of that process?

14       A.    I can ask.  I can ask our legal division.  I

15  don't know that.

16       Q.    I have another just question about the

17  qualifying period.  What if the qualifying period is

18  closed?  Do you know if it can be reopened?

19       A.    The only way a qualifying period would be

20  reopened is in instances of emergencies.  So let's say

21  you qualified on the 8th, 9th, and 10th, but Hurricane

22  Katrina hit on the 10th.  Well, then the governor -- we

23  have a statute that allows the secretary of state to

24  work with the governor on an emergency certification

25  that would allow for qualifying to be open for one

1  additional day if the day was interfered with that was

2  at the original time.

3       Q.   I have a question.  I'm going to introduce two

4  exhibits.  It's going to be a lot of exhibit work for a

5  simple question, but let's go through the process.

6  This is the only way this legally thing works.

7                 MS. THOMAS-LUNDBORG:  So I'm going to

8            have marked as Exhibit 13 what I have labeled

9            as Exhibit R, as in "Rick," Molly, and then as

10           Exhibit 14, S as in "Sam."

11       (Exhibits No. 13 and 14 were marked for

12           identification.)

13                 MS. GARYANTES:  Thirteen and 14 have

14           been introduced.

15                 MS. THOMAS-LUNDBORG:  Great.  Thank you.

16  BY MS. THOMAS-LUNDBORG:

17       Q.   Ms. Hadskey, if you could, just take a second

18  to look over those two.

19       A.   Okay.

20       Q.   I'm going to just ask you about -- in 14, just

21  one slide.  You don't have to spend all that time on

22  it.  You just have to kind of look at it, scroll

23  through, see if it --

24       A.   It still -- it still hasn't come up yet.  It

25  says, "Generating file."  May take a while.

SHERRI HADSKEY

1    Q.    Okay.

2    A.    Sorry.

3    Q.    That one is a long one, so I'm not surprised.

4  While -- well, let's let that generate.

5    A.    It's still loading.

6    Q.    That's fine.  I have a five-year-old and

7  almost two-year-old.  I've learned patience.

8    A.    Okay.  For some reason on my -- the first

9  document shows up fine, the email.  The second document

10 completed loading, and it says, "Page 1 of 115," but

11 it's completely black.  And when I scroll down, it's

12 all black.  And then I tried to go out and come back

13 in, and I tried to refresh, and it's still black.  Let

14 me see.  Let me try -- let me try double-clicking on it

15 one more time.  Let's see what happens.

16   Q.    Okay.

17   A.    That's not it.  Okay.  Page 1, page 2.  Nope,

18 it's solid black.  It's not coming through.

19   Q.    Interesting.  Let's --

20   A.    Could it be --

21   Q.    I'm going to email -- I can see it fine on my

22 end, and I do not have a great computer.  So I will --

23 why don't we put a pin in this set of questions.  I'm

24 going to email the Veritext folks, see if they -- they

25 can help us with what's going on.

```
 1        A.    Okay.  Try one more time.

 2              MS. THOMAS-LUNDBORG:  Actually, Molly,

 3        could you email them about this issue?

 4              MS. GARYANTES:  Absolutely.

 5              MS. THOMAS-LUNDBORG:  Thank you.

 6              THE WITNESS:  It's really strange

 7        because every other thing came through fine,

 8        and this one shows page 1 of 115, but the

 9        screen is absolutely black.

10              MS. THOMAS-LUNDBORG:  We will circle

11        back to it.

12              THE WITNESS:  Okay.

13   BY MS. THOMAS-LUNDBORG:

14        Q.    I like looking at things when I ask questions,

15   so it's just a follow-up.  I'm reopening the qualifying

16   period, and if we don't get to it today, it's not the

17   end of the world.

18              I have a -- I have another question, though,

19   about the qualifying period, and maybe it'll kind of

20   help us in the meantime.  When there's a special

21   election, do you know who is responsible for setting

22   the candidate qualifying deadline?

23        A.    Yes.  The legislature, the speaker of the

24   House or the president of the Senate.

25        Q.    And do you have any involvement in the setting
```

1   of the qualifying candidate deadline --

2       A.   We try --

3       Q.   -- for --

4       A.   We try and make recommendations to them for a

5   date -- a proposed date, but they don't always take the

6   recommendation.  And sometimes there's things that --

7   they're responsible for calling the election, so

8   sometimes there's things that we're not privy to about

9   the election that they need it done by a specific date.

10  So we follow whatever it is that they would like done.

11      **Q.   Do you know if -- if you are aware of whether**

12  **they have any policies or procedures around setting the**

13  **qualifying deadline for a special election?**

14      A.   No.  I don't know what their -- I don't know

15  why it's listed as three days.  I mean, it's a statute.

16  The legislature determined that.

17      **Q.   And then as far as during the candidate**

18  **qualifying period when -- when candidates come to**

19  **qualify, do you know what staff time is needed for that**

20  **period?**

21      A.   "Staff time" meaning to do each one, or staff

22  time for the day?  It's -- we --

23      **Q.   Staff time to -- devoted to candidate**

24  **qualifying?**

25      A.   So it all depends on how many candidates come

1    in to qualify.  For the PPP election last time in 2020,

2    New Orleans had 296 people qualify in those three days.

3    You're busy, busy, busy, busy, as opposed to an

4    election where there's maybe only 20 parishes that have

5    an election, and of those, nine have candidate races.

6    Well, then those nine parishes will be busy, but it

7    wouldn't be as busy as a presidential or a

8    gubernatorial.  So it depends on the election and

9    depends on the number of candidates.

10        Q.   If we could, go back to exhibit -- if we

11   could, go back to what is Exhibit 12.

12        A.   Okay.  I'm there.

13        Q.   I have, when I look at Exhibit 12, a big arrow

14   over a piece of text I want to ask you about.  Let's

15   see if I can -- oh, here we go.  Now we're cooking.

16   All right.  So -- I'm going to ask this question.

17   Okay.

18            So I think you -- earlier today, you testified

19   that you spoke to the folks in business services about

20   ballot design.  Is that correct?  Those are the folks

21   that handle ballot design?

22        A.   Business and services handles the ballot

23   information, such as the candidates, their candidate

24   numbers, the races, the order the races appear.

25   Operations does the ballot design, except for.  So we

1   design -- operations designs the ballots for paper, and

2   they design the ballots for the early voting machines.

3   The AVC election day machines, which have been in our

4   state since 1991, that ballot overlay is done by

5   Business and Services and sent to the printer.

6       **Q.   So I'm going to try to get these various**

7   **types -- so AVC would be what I would think of as the**

8   **election day paper ballot?**

9       A.   Election day voting machine with a big, huge

10  oversized poster board paper ballot that's put on the

11  face of the machine and covered by a mylar.

12      **Q.   Yes.  Okay.  And familiar with that type of**

13  **ballot, so it's the election day ballot.  I might say**

14  **"election day."  You might say "AVC."  But we're**

15  **talking about the same thing?**

16      A.   That's correct.

17      **Q.   And then in addition to that, there is the**

18  **absentee ballot.  And does the absentee ballot -- is it**

19  **different depending on whether it's military and**

20  **overseas, which sometimes was referred to as the**

21  **UOCAVA, or not?  Or do they get the same absentee**

22  **ballot as at-home -- other absentee folks?**

23      A.   So both and all.  So if you are a military and

24  overseas person, you receive a paper A ballot.  That is

25  an absentee ballot, and it likes exactly like everybody

1    else's ballot.  But your second ballot that you get is

2    a ranking ballot because there's not enough time

3    between a primary and a general for you to be mailed

4    another ballot and get it back by the deadline.  So

5    you're given an A ballot and an R ballot, R for

6    "ranking."  And those ballots -- your ranking ballot

7    is the one that's tabulated for the general election

8    if you're military and overseas.

9            There's also a -- there's also the ability to

10   get, if you're military and overseas, a ballot out of

11   the ERIN system to try and get it to the military

12   timely and back.  And that ballot looks more like the

13   ranking ballot.  It does not look like the A ballot

14   that -- that you would receive.  If you're a regular

15   voter, your absentee ballot for the general election

16   looks just like your primary.

17       Q.   Okay.

18       A.   For federal elections, there's a provisional

19   ballot.

20       Q.   And then the AVC election day ballot, is that

21   the same for election day and the early voting period?

22       A.   No.  The early voting machine is a touchscreen

23   machine.

24       Q.   And is there any kind of paper form that goes

25   with the early voting --

1      A.   No.

2      Q.   -- balloting process?  Okay.

3           So I'm going to try to just take these in

4  turn, get the timeline.  Let's start with -- let's

5  start with the UOCAVA military/overseas ballot.  By

6  what date do those ballots need to be designed to be

7  sent to the printer?

8      A.   If they are -- if it is a federal election,

9  then we're required to meet the 45-day federal

10  deadline.  And in order to meet that deadline,

11  immediately after qualifying and after the withdrawal

12  period, the ballots are -- the candidates are uploaded

13  into the ballot information, and then the ballots are

14  designed, and they are proofed.  And then they are

15  printed and/or uploaded into ERIN, and then they are

16  sent by that 45-day deadline.  They have to, prior to

17  that.

18           And then if it's not a federal election and

19  it's a state election, we're still required to get

20  those out as quickly as possible.  The 30-day close of

21  books is the last time you can register for the

22  election, and -- in person.  And so by that point, the

23  ballots have to be on -- be mailed.

24      Q.   And then -- so in the period before these

25  ballots are sent off, how much time does your office

SHERRI HADSKEY

1   spend in designing and printing the military/overseas
2   ballots?

3       A.   So once qualifying is complete, we try to get
4   that process done in a three-week time frame.  If it's
5   a massively big election, we don't always make that
6   deadline.  Or if there are any type of problems, we
7   don't always make that deadline.  Problem being like
8   one that we have right now where an objection to
9   candidacy has been filed on the governor's race.  Well,
10  we can't design the ballot until the courts determine
11  what the answer is to that situation.  So it pushes our
12  whole schedule back because the judge can order the
13  name to be on the ballot, and the judge could order the
14  name to be off the ballot.  And that particular person
15  can actually file in the appellate court, and then they
16  can file in the supreme court.

17      Q.   Okay.  And so I'm going to ask a similar
18  question about the nonmilitary/overseas absentee
19  ballots.  When do those get sent out?

20      A.   So those are -- we program and we design and
21  we proof, and then we send them to the printer.  The
22  printer only prints a test deck and folded samples.
23  And what that means is the military and overseas
24  ballots are hand tabulated.  The absentee ballots,
25  which there's a massive number, those are scanned.

1          So the printer prints the test deck.  When the
2    test deck comes back to the secretary of state, it has
3    to be test scanned to know that it's counting and
4    tabulating correctly.  If everything is great and it
5    works and it's approved, then the printer get a release
6    notification that they can send the ballots to the
7    registrar of voters for that parish.  If there's a
8    problem with the ballot, if there's a print problem or
9    any other type of problem, then it has to be
10   reprogrammed and resent, and a new test deck comes
11   back, and the process starts over.
12        **Q.   So in 2022, the most kind of recent general**
13   **election cycle, when were the absentee ballots printed?**
14        A.   Depends on the parish.  So if I program Acadia
15   and Allen, then the printer would print Acadia and
16   Allen.  And then the next day, if I had Caldwell,
17   Calcasieu, and Winn, then the printer would do those.
18   So the mailing process is over an extended period of
19   time.
20        **Q.   And give us a ballpark.  How long is that time**
21   **so that I can better understand?  UOCAVA's process is**
22   **obviously very regimented in that it's -- you're trying**
23   **to get them out 45 days in federal and 30 days for**
24   **nonfederal elections.  Is there a similar cutoff or**
25   **timeline for the non-overseas absentee ballots?**

1      A.   Absolutely.   We're doing everything we can to

2  get them out as quickly as possible because you don't

3  want to give anybody a short window of time to vote and

4  return their ballot to meet the deadline of returning

5  it.  So in general, from the time that qualifying ends

6  and then the withdrawal period ends to the time -- to

7  the week before early voting, that is the window of

8  time that we're doing everything we can to get the

9  ballots out.

10     **Q.   Okay.  So the goal is to get all of the**

11 **ballots out the week -- at least the week before early**

12 **voting?**

13     A.   All parishes, right.  But they may go out

14 earlier depending on when the parish was programmed.

15     **Q.   And generally, are you working on the absentee**

16 **ballot printing and designing in the whole period from**

17 **qualifying to the week before early voting?**

18     A.   Yes.  We're working on that along with many

19 other elections tasks.

20     **Q.   Okay.  Now let's switch to the design of the**

21 **ballot for early voting.  Those are not printed,**

22 **correct?  It's programmed into a machine, I believe was**

23 **your earlier testimony.  If I've got it wrong --**

24     A.   No.

25     **Q.   -- feel free to correct me.**

1    A.   That's right.  It's -- the programming is in

2  the machine.  It -- the screenshot of the ballot looks

3  similar to the absentee ballot, but you're looking at

4  it on a screen.

5    **Q.   Okay.  And what is the timeline like for that**

6  **early voting reading the ballot?**

7    A.   That -- they start programming those, again,

8  right after the deadline to withdraw.  And the only

9  thing that holds you up is your objections to

10  candidacy, so you're trying to wait for those courts to

11  resolve that issue.  And the absolute last date that

12  the ballots -- the early voting machine ballots should

13  go out is the week before early voting begins.  That

14  week is called test and seal.  That's when the ballots

15  are loaded onto the parish machines.

16    So they're -- they're programmed and tested on

17  machines in the office, and then they're sent to the

18  parishes.  And they are tested and uploaded with the

19  parish board of election supervisors in a sealing

20  process, and then early voting begins directly

21  following.

22    **Q.   So the test-and-seal process happens the week**

23  **before early voting, and then early voting happens?**

24    A.   That's correct.

25    **Q.   And then I'm going to ask the same questions**

SHERRI HADSKEY

1    about actual election day, the AVC ballots.  What is

2    the process like for those?

3        A.    That's a little more complicated.  The ballots

4    are designed, and then our staff programs it.  Once

5    it's programmed, the more -- our printer, Morans, sends

6    us the ballots to begin proofing.  And that is an

7    overlay sheet.  It's a plastic sheet that goes over the

8    ballot, and you're looked to be sure that the buttons

9    are in the right place and the names are in the right

10   place and everything is spelled correctly, the

11   certifications on it, et cetera.

12           Once that's completed and the profiting of

13   that is done, then the printer is given the go-ahead to

14   print the ballots for the parish voting machines.

15   They're also printed for the supply packs because

16   you're required by law to post a ballot on the wall for

17   the voter to review prior to going into the machine.

18   So they're printing those.  Those have to be proofed.

19   And then they're stuffed into precinct envelopes.

20           And the goal for that is to also try and

21   get that done the week before early voting, I guess.

22   Because once those are completed, then they're all

23   delivered to each warehouse in the state,

24   hand-delivered, and the programming is delivered.  And

25   the warehouse staff begins putting all of the ballots

1    onto the machines, creating the cartridges, doing the

2    vote sends, telling us if there's an audio ballot

3    problem, telling us any kind of problems.  You correct

4    the problems if you find any, but you have to be ready

5    to seal the machines the week of the election.

6         Q.    What do you mean by "seal the machines"?

7         A.    Parish board of elections' supervisors,

8    candidates, and media meet at the warehouse.  Each

9    machine is looked at, reviewed, the public and

10   protective count number is confirmed.  Your public

11   count is the number of times the machine has been voted

12   for that election.  The protective count is the number

13   of times the machine has been voted in its lifetime.

14   Parish board is tasked with looking at that on each

15   ballot, making sure all the information is correct, and

16   then signing off on it.

17        Q.    And that happens prior to the election?

18        A.    Yes, it does.

19        Q.    I have a follow-up question about the --

20   well, it's more than four, but let's say the four

21   buckets of ballots that we've talked about, so the

22   overseas/military, the regular absentee, the early

23   voting, and the election day ballots.

24              Other than the difference between the 45 and

25   30 days for federal elections and nonfederal elections,

1    are there any differences in the policies or procedures

2    around ballot design and printing for federal elections

3    and state elections?

4        A.   No.  It's the same process.

5        Q.   And have you ever had ballots that included

6    both federal and state elections?

7        A.   Only when a special circumstance caused that

8    to happen, like the death of a candidate and a special

9    election has to be called in order for the person to be

10   seated.  Also, one other difference with the federal

11   election is the -- we are required by law to provide

12   provisional ballots.  Provisional ballot is similar to

13   an absentee ballot, but it only includes the federal

14   races, no state races.  So the design and proofing and

15   printing of that is an additional task.

16       Q.   But you have had circumstances in which there

17   has been a special state election of any state office

18   and federal election?

19       A.   I would have to go back and look.  I do know

20   that circumstance could arise.  There's no question

21   that it -- it couldn't, but I don't know if I have a

22   ballot where that occurred.  I'd have to go back and

23   look through all the old elections.

24       Q.   I may have some examples, but we'll get there

25   when we get there.

1        A.   I do know there were two federal specials for

2   Cedric Richmond, I believe, and Letlow after the

3   gentleman died of COVID.  But they weren't -- there was

4   nothing else on the ballot except for those races.

5        Q.   I want to circle back to voter mailing.  And I

6   was trying to do this sequentially, but now I'm

7   thinking, after we've talked for a while, voter mailing

8   happens before the ballots go out.  When do -- so that

9   is my thought, and I want to ask you the actual

10  question since you're the expert here and not me.

11           Do you send out any -- and it sounds like you

12  do.  But do you send out any voter mailing prior to the

13  start of the voting period?

14       A.   We send out the -- you mean the mail ballots,

15  are they sent prior to the --

16       Q.   Other --

17       A.   No?

18       Q.   Other mailings to the voters.  Not ballots but

19  just other mailings to the voters.  Like, for example,

20  you're talking about their districts, their voter

21  cards.  Are there mailings sent to voters prior to the

22  start of the voting period?

23       A.   No.  We -- once qualifying is complete, no

24  district cards would be going out at all.  The only

25  cards that would go out after qualifying would be for

1    people that registered to vote or people that moved.

2    They would get information in the mail regarding that.

3    That would be your -- your general mailings, not

4    district mailings.

5        **Q.   So in general, most of the mailings to voters**

6    **happen before the qualifying period, but under certain**

7    **circumstances, voter mailings go out after the voter**

8    **qualifying period?**

9        A.   Yes.  Because you can register to vote all the

10   way up until the 30-day close of books.  So those

11   people would have to get a voter registration card.

12   The only other card that may go out during that time

13   would be an emergency polling location change.  So if a

14   tree goes through the polling location and the voters

15   are going to have to go to a different polling

16   location, they're going to get a notification that

17   their polling place changed.

18       **Q.   And then when voter mailings get sent out --**

19   **I'm just talking now about the kind of pre-qualifying**

20   **mailings.  What exactly is sent to voters?**

21       A.   I believe there are about 12 or 13 different

22   types of mailers that the secretary of state and the

23   registrar of voters deal with.  Of course,

24   redistricting cards, canvass cards, challenge cards,

25   felon cards.  So there's a -- various types of cards

1    that are mailed out to make sure that everyone's voter

2    registration is correct.

3    **Q.   And are those cards always sent out as a**

4    **package, or have they been sent out separately?**

5    A.    They can't be sent as a package.   When you do

6    a process in ERIN, you make a change, you're spending

7    that information that you changed.

8    **Q.   And is there any overlap in the policies and**

9    **procedures around sending out mailings for regular**

10   **state elections and special state elections?**

11   A.    No.   We're sending out the same cards

12   regardless.   If you have a special election, there's

13   going to be a 30-day close of books; there's going to

14   be a 23-day online close of books.   And the people that

15   registered in that time should get a voter registration

16   card regardless of whether it's a federal election or a

17   state election.

18   **Q.   Okay.   And when are these -- when you're**

19   **sending out mailings to voters, do you know when**

20   **they're sent to the printers?**

21   A.    Yes.   They're uploaded to the printer, and the

22   printer -- it's State Printing under the Division of

23   Administration, and they have a log of everything

24   that's uploaded.

25   **Q.   What staff time is needed for voter mailings?**

1    A.   State Printing would have to answer that

2    question on their end, what the task is and how they

3    have to do it.  On our end, the information is entered

4    into ERIN and then uploaded to State Printing.  So it

5    depends on -- it also depends greatly on the number of

6    cards you're sending.  For the last redistricting for

7    state and rep, U.S. -- not U.S. -- regular state and

8    Senate and rep, there was 1.3 million cards mailed.

9    And when that occurred, State Printing got extremely

10   overloaded, and the post office got extremely

11   overloaded, and it caused delays.

12   **Q.   But that many cards were sent because it was a**

13   **federal election?**

14        A.   No.   That many cards were sent because

15   redistricting occurred and we had to notify the voters

16   of the new districts.

17   **Q.   And how many -- so, for example, do you know**

18   **how many voter mailings were sent out in 2020?**

19        A.   No.   I would have to ask State Printing to

20   give me that information.

21   **Q.   I know you said you don't know how many were**

22   **sent out in 2019.**

23        A.   No, uh-uh.

24   **Q.   Going back to the early voting period.  When**

25   **does that begin?**

1      A.   The early voting begin date is for a state

2   election.  So for like October 12th, early voting

3   begins on 9/28, two weeks prior to election da, and it

4   ends the Saturday before election day.

5           For the November 16th, it starts on 11/2,

6   which is a Friday.  The reason that that happened is

7   because there's a law in place that allows you to start

8   one day early when a holiday falls in the early voting

9   period.  So it starts on Friday, and it ends on the

10  next Saturday, but you are not voting on Veteran's Day,

11  the Friday -- the observed holiday.  Presidential is

12  different.  There's a state law in place that allows

13  ten days for early voting.

14      Q.   Ten business days or just ten days?

15      A.   Ten days.  The only exception is Sunday.  So

16  it's -- it includes all of the days of the week except

17  for Sunday.

18      Q.   And that's only for -- did you say

19  presidential or for all federal elections?

20      A.   Only presidential.  That's the way the statute

21  was passed.

22      Q.   So in the projected elections -- and I pulled

23  up the calendar, so we can probably just mark that.

24  Let's mark it -- give me one second, and I will get it

25  up on our screen.

1              MS. THOMAS-LUNDBORG:  Molly, are you

2         still there?  It's okay if she's not.  Molly

3         was going to leave us.

4              MS. GARYANTES:  I'm here.

5              MS. THOMAS-LUNDBORG:  But we're going to

6         figure out what's going on.  Okay.  Great.

7              Could you pull up Exhibit Q, as in

8         "Quaker," and it'll be marked as Exhibit 15.

9              MS. GARYANTES:  Got it.

10    (Exhibit No. 15 was marked for identification.)

11              MS. GARYANTES:  It's introduced.

12              THE WITNESS:  Okay.  It's up.

13              MS. THOMAS-LUNDBORG:  Okay.

14    BY MS. THOMAS-LUNDBORG:

15         Q.   So we were talking about the early voting

16    period, and I think you mentioned that for

17    presidential, by statute, it's ten days.  So looking

18    here, it seems as if the presidential period is --

19    it's going to be longer in 2024 than the ten days?

20         A.   No.  There's two asterisks there.  "Early

21    voting --

22         Q.   Okay.

23         A.   -- extended due to ACT 365 of the 2021 regular

24    session."  So it's ten days, but you --

25         Q.   So what does that mean?

1      A.   Qualifying date -- I'm sorry.  Early voting

2   dates extended due to the act, so it's ten days.  But

3   10/18 through 10/29 includes the Sunday, and we don't

4   vote on Sunday.

5      **Q.   Let's move on.  Okay.  I'm going to mark**

6   **something else.**

7           MS. THOMAS-LUNDBORG:  Molly, if you

8           could, pull up what is Exhibit M, as in

9           "Mary," that I'd like to mark as Exhibit 16.

10          MS. GARYANTES:  Okay.

11   (Exhibit No. 16 was marked for identification.)

12          MS. GARYANTES:  Sixteen is introduced.

13          THE WITNESS:  Okay.  I have it up.

14   BY MS. THOMAS-LUNDBORG:

15     **Q.   Great.  Do you recognize this document?**

16     A.   Yes.

17     **Q.   What is it?**

18     A.   It's the calendar, the elections calendar for

19   the year 2023.

20     **Q.   And this is something that I pulled up, the**

21   **Secretary of State website.  What is the primary date**

22   **for the upcoming 2023 election?**

23     A.   October the 14th.

24     **Q.   And do you know how that primary date was set?**

25     A.   No, I do not.  It's set in statute.  The

1  election dates and the procedure to determine the dates

2  are set in statute.

3       **Q.   And do you know if there are going to be any**

4  **special elections on the ballot this year?**

5       A.   For the October 14th election, the governor

6  called several special elections on the actual

7  October 14th day.

8       **Q.   And did you have any involvement in the**

9  **calling of special elections for this upcoming -- this**

10 **upcoming election?**

11      A.   Absolutely not.  The governor is the person

12 that calls them.  The parish -- the parish has

13 vacancies that occur.  Somebody steps out of a seat to

14 take another job, somebody passes away, that type of

15 thing.  And depending on the laws that govern the

16 parish, they may have a home rule charter or something

17 that gets involved.  But a determination is made based

18 on dates in the statute as to where the special will

19 occur.

20      **Q.   I think I want to go through just a couple**

21 **more elections.  So looking here -- sorry.  Before we**

22 **leave this election calendar, it looks like this -- for**

23 **the primary, the early vote period is seven days?**

24      A.   9/30 to 10/7 without Sunday.  So that's

25 correct, seven days.  It's Saturday, skip Sunday,

1   Monday, Tuesday, Wednesday, Thursday, Friday, Saturday.

2       Q.   And do you know who sets how long the early

3   voting period will last?

4       A.   The legislature.

5       Q.   And then do you know who sets the period

6   between the end of early voting and election day?

7       A.   The end of early voting and election day?

8   That's set in statute as well.

9       Q.   And do you have any knowledge of why there's a

10  week between the end of early voting and election day?

11      A.   I don't know why they set that.  I don't know

12  what the reasoning was behind that.  I know the tasks

13  that we accomplish during that time, but we're forced

14  to because of the dates that were established in

15  statute.

16      Q.   And what tasks do you accomplish between early

17  voting and election day?

18      A.   You bill the precinct registerers.  You are

19  still receiving absentee ballots.  You are selecting

20  absentee commissioners for the tabulation process.

21  You are delivering the books to the warehouses and

22  sealing the machines.  And there's many other

23  ministerial things that the registrars and clerks do

24  during that time prior to election day, in that week.

25      Q.   And do you have any knowledge of what those

1   tasks are that the clerks and registrars are doing at

2   that time?

3        A.   I can tell you some of them, but I would -- I

4   wouldn't want to say I'm the end-all on that.  They

5   would need to provide that information.

6        Q.   Which ones are you aware of?

7        A.   So I do know that they seal the machines at

8   the voting machine warehouses.  And during that time

9   frame, they're also trying to fill commissioner slots

10  where people can't work, and they've already drawn them

11  to work, so they've got to have somebody in their

12  place.

13             For early voting, there's tabulation.  There's

14  a process called preparation and verification, and that

15  is where they identify every mail ballot, check it off

16  of a list in ERIN, and confirm that they have all mail

17  ballots present and accounted for before they start the

18  tabulation process on Saturday.

19             Also, clerks are delivering supplemental

20  lists.  So if your mail ballot was accepted on Tuesday

21  and the books are printed the Saturday night, Sunday

22  before, then they have a supplemental list so that your

23  name will appear on election day to prevent anybody

24  from trying to fraudulently vote.

25             Also, on the Friday before the election, the

1   clerks of court are tasked with confirming that every

2   voting machine is delivered to every precinct, every

3   polling location.  And then, of course, there's state

4   laws around if you want to file a challenge.  It's

5   called a pre-file challenge.  You can file it four days

6   prior to the election.  They're accepting that.  So

7   that's just some of them.

8                    MS. THOMAS-LUNDBORG:  Was someone coming

9            in?

10                   THE WITNESS:  I coughed.  I'm so sorry.

11                   MS. THOMAS-LUNDBORG:  Running on little

12           sleep and young people.  I can't tell if it

13           was a cough or another noise.  Okay.

14  BY MS. THOMAS-LUNDBORG:

15       Q.   I want to get back to the mailing of ballots.

16  I'm sorry.  We're kind of moving back and forth,

17  inevitably happens at a deposition.

18           Before the UOCAVA or the overseas/military

19  ballots, we talked a little bit about the process for

20  printing them and sending them out.  What staff time is

21  needed to work on the UOCAVA ballots?

22       A.   So the UOCAVA ballots are going to the

23  registrar of voters, and they are tasked with

24  assembling the ballots, putting in all of the

25  instructions, going through and making sure that they

1   have the right address for the person that they're

2   sending them to.  They enter the information into ERIN,

3   the date that the ballot was mailed and who it is to

4   and the way that it was mailed.

5          And then when the ballot comes back in after

6   it's been voted, they have to document that information

7   in ERIN as well.  The date that the ballot was

8   returned, how it was returned, was it hand-delivered,

9   or was it received in mail, all of that is in ERIN.  So

10  for a larger parish, you may be dealing with 26,000

11  ballots in that two-week time frame to get all of that

12  entered.  It's quite tasking.  And for the absentee

13  ballots, it's the same.

14       **Q.   For entering information into ERIN about the**

15  **ballots, does it -- is there any difference depending**

16  **on the number of elections on the ballot, or does that**

17  **not matter for the ERIN process?**

18       A.   So the ERIN process -- the entering into ERIN,

19  it doesn't matter.  The assembling of the ballots, it

20  matters.

21       **Q.   Okay.**

22       A.   The larger number of pages in an absentee

23  ballot, the easier it is to have human error when

24  you're trying to assemble them with all of the other

25  documents that go into the envelope to get it out.

1      Q.   Okay.  And so moving on to regular absentee.

2   What is the staff time needed to put together and mail

3   regular absentee ballots?

4      A.   Regular absentee ballots, it depends on the

5   parish, and it depends on the number that you're trying

6   to mail.  For East Baton Rouge, Orleans, Jefferson,

7   Caddo, the larger parishes, it can take a week.  Some

8   parishes, it's taken three weeks depending on the

9   number of requests.  And that's working all of your

10  absentee commissioners.  That's working your -- all of

11  your registrar of voters employees, and Secretary of

12  State staff jumps in and helps when necessary, trying

13  to get them out.

14     Q.   And does the staff time differ depending on

15  the number of elections on the ballot?

16     A.   Yes, because you may be assembling another

17  page.  The ballots that are delivered to the parishes

18  are not assembled.  The state printer has already

19  stated that they don't have enough time to do that, nor

20  do they have the manpower.  It's an extensive process.

21     Q.   So other than assembling an additional page,

22  is there any other way with having additional elections

23  on a ballot would increase staff time?

24     A.   No.

25     Q.   Now moving...

 1          A.    I do want to say that the more -- the larger

 2     the ballot -- the larger the ballot, the more costly it

 3     is.  It costs more to mail them.  It costs more to make

 4     the screenshots for the larger ballots for the ICX

 5     early voting machines.  It is more expensive if you

 6     have a larger ballot.

 7          **Q.    Okay.  So I want to -- Molly might still be**

 8     **here.**

 9               MS. GARYANTES:  Yep, I'm here.

10               MS. THOMAS-LUNDBORG:  I did not

11               introduce 17.  I would like to introduce U,

12               as in "umbrella," as 17.

13               MS. GARYANTES:  Okay.

14          (Exhibit No. 17 was marked for identification.)

15               MS. GARYANTES:  It's introduced.

16               MS. THOMAS-LUNDBORG:  Thank you.

17               THE WITNESS:  Okay.  It just came up.

18     BY MS. THOMAS-LUNDBORG:

19          **Q.    Great.  Do you recognize this document?**

20          A.    I do.  It's a -- it was recently provided for

21     our -- on our website as a security document.

22          **Q.    Okay.  And I think you've gone through**

23     **additional tasks that happened related to absentee**

24     **ballots.  So I would like to just go through some of**

25     **the tasks here in this document, and I'm just going to**

1    ask you one question about it.

2        A.    Okay.

3        Q.    So one of the things it says that registrars

4    do is track the number of sent and received ballots,

5    verify they're pulling one ballot per voter, and

6    clearly mark any replacement ballots.

7            Do you see that?

8        A.    I do.

9        Q.    Does the number of elections on the ballot

10   affect this part of task work, just the one in this

11   bullet point?

12       A.    Okay.  So what's confusing about this bullet

13   point is that a ballot can be ten pages.  A ballot can

14   be one page, front and back.  A ballot can be four

15   pages front and back.  So when you say "a ballot,"

16   you're talking about the complete and entire ballot no

17   matter how many pages it is.  So the longer the ballot,

18   the more difficult it is to assemble, proof, make sure

19   that they did only get -- they didn't get two page 2s;

20   they only got one page 2 of the assembled ballot.

21   And making --

22       Q.    Right.  But I -- and I'm sorry to cut you off,

23   but I really would like to focus on the task just in

24   this bullet.  I know we talked about additional tasks.

25            But the tracking of the number of ballots sent

1    and received, does that -- does staff time depend on

2    how many elections are on the ballot to track the

3    number of ballots sent and received?

4         A.   Yes, because as you're doing your daily tasks,

5    you are voting people, you are conducting nursing home

6    voting, you are working early voting.  The mail ballots

7    are coming in, so you know what you mailed out because

8    you entered it into ERIN.

9              But as the ballots are coming in that day in

10   trays and you may receive seven trays, which would be

11   close to 3- or 4,000 ballots, each one of those has to

12   be entered into ERIN.  And you had to have a request to

13   match the one that was returned, the information has to

14   match, and it takes a lot more time.

15        Q.   And why does it take more time?  If I'm

16   entering -- just looking at a document and it's one

17   versus like a stack of documents, why would it take

18   more time to enter just -- if you're putting in the

19   voter information and not the election information into

20   ERIN?

21        A.   In general, the larger -- the larger

22   elections, the larger number of ballots, the larger

23   number of races that pull out voters and have -- we

24   have more requests, then the more time it's going to

25   take to process them.  Does that make sense?

1    Q.   Okay.  Could you quantity how much more time

2    that would take?

3    A.   No.  I'd have to -- I'd have to look into --

4    and not only could I not quantify it, it depends on the

5    staff that you have.  If you're in a registrar's office

6    with ten seasoned staff members, of course it's going

7    to take you a little bit less time than if your in a

8    registrar's office that has four new people and two

9    people out on FMLA.  I mean, it just depends.

10    Q.   Verifying there's only one ballot per voter.

11    Would the number of elections on the ballot affect this

12    task, how much time it takes to do this task?

13    A.   Again, you're simply dealing with pages.  So

14    if I'm going to send a ballot to somebody and I have to

15    have four pages, because the ballot is longer, because

16    there's more candidates, then I've got to make certain

17    that I'm assembling the correct four pages together to

18    send that voter only one ballot, whereas on a smaller

19    ballot with fewer races and it's only one page and it's

20    front and back or it's only two pages and it's front,

21    back, front, you're not -- your risk for error is not

22    there as much.

23    Q.   Okay.  And could you quantify how much time --

24    how much more time it would take to do -- verifying

25    that there's only one ballot per voter?

1    A.    That's a case-by-case basis on the registrar

2    of voters office.

3    **Q.    And then I'm going to ask the same two**

4    **questions about clearly mark any replacement ballots.**

5    **Would it take more time to do that depending on the**

6    **number of elections?**

7    A.    So replacement ballots are complicated.  The

8    replacement ballot -- the individuals that are

9    requesting a replacement ballot for the cure process,

10   they have to come in in person, and they have to cure

11   their ballot in order to have that work.  As far as,

12   like, the replacement process in ERIN, if you spoil

13   your ballot and you request another ballot as a

14   replacement, the documentation in ERIN has to be put

15   in for that particular voter.

16   **Q.    And would the work change based on how many**

17   **elections are on the ballot for them to mark any**

18   **replacement ballots?**

19   A.    The larger the election, the more people that

20   are involved.  And the better turnout is, the more that

21   you have to do.

22   **Q.    And could you quantify how much more you would**

23   **have to do?**

24   A.    Again, that's on the registrar of voters and

25   their staff.

SHERRI HADSKEY

1    Q.    And I want to circle back to something that
2   you testified about a bit ago, that it'd be more costly
3   with a larger ballot.  Can you quantify how much more
4   costly that would be?
5    A.    Yes.  Recently, a few of the registrar voters
6   were telling me that if you only -- they were weighing
7   it for postage purposes, and they took two previous
8   ballots and put it into an envelope, and then they took
9   three previous ballots and put them into an envelope.
10   They tried the letter-sized ballots and the legal-sized
11   ballots, and when you got to the -- to the additional
12   page, the postage went up by $0.27.
13        So on the average, if you're mailing ballots
14   and the initial cost is $0.55, then it's going to go
15   up $0.27 more.  And the cost to mail the ballots would
16   be -- for the last presidential, I want to say there
17   was 170,000.  That's an approximate.  I'd have to go
18   back and look.  But 170,000 mailed ballots.  And if
19   they're three pages long, you're looking at
20   70-something cents a piece to mail them.
21    Q.    And when is it determined that an additional
22   page is needed?  Would adding two elections to a ballot
23   require an additional page?
24    A.    It just depends on how it's -- how the layout
25   comes out and what else is on the ballot.  So I can

1    give you a good example of that.  In St. Tammany

2    Parish, in one election, they called for 12 parish-wide

3    props.  So if you have a lot of parish-wide props, you

4    have constitutional amendments, and you have quite a

5    large number of candidate races, it makes a difference.

6        **Q.   But would it necessarily be the case that if**

7    **you added two elections to a ballot, then the ballot**

8    **would need an additional page?**

9        A.   It just depends on where it falls on the

10   ballot.  It depends on -- there's a lot of factors

11   involved about that, how the ballot is built.  There's

12   a legal order that the races have to appear on the

13   ballot.

14       **Q.   I'd like to ask, going back to the exhibit,**

15   **about bullet two.  It says, "The Secretary of State**

16   **staff perform logic and accuracy testing on the vote**

17   **tally equipment in a public meeting."**

18            **Do you see that?**

19       A.   That's correct.  Yes.

20       **Q.   Okay.  And does the performance of logic and**

21   **accuracy testing depend on how many elections are on**

22   **the ballot?**

23       A.   How many candidate races?

24       **Q.   Yes.**

25       A.   Yes.  So yes, you're -- when you're creating

1    the logic and accuracy test, if it's an absentee

2    ballot, you're hand marking those ballots for each race

3    and each candidate.  And then you're scanning them, and

4    you're proofing to make sure that it tabulated

5    correctly.  If you're doing an ICX machine, a

6    touchscreen machine, you are hand voting or vote

7    simulation voting these races.  The more races you

8    have, the additional amount of time it takes to -- to

9    run those tests and to confirm that everything is

10    accurate.

11        Q.    And can you quantify how much more time that

12    would take?

13        A.    I can give you an estimate.  I did -- I tested

14    and sealed a parish last year myself, and it was a

15    fairly sizable ballot compared to another parish.  And

16    it took -- for the machines that were involved, it took

17    about an hour longer for that process.  That was for

18    early voting machine.  For absentee test decks, it's

19    going to be much longer because you have to hand mark

20    those.

21        Q.    You said it took you an hour more to do

22    testing of a parish with more elections on its ballot.

23    How many more elections did it have?  What do you mean

24    when you say it's kind of sizable --

25        A.    Okay.  So for example --

1     Q.    -- the ballot?

2     A.    For example, this election coming up, in East

3  Baton Rouge Parish, they've got mayors, chief of

4  police.  They've got local races, sheriff, that type of

5  stuff.  But Orleans Parish doesn't have that this time.

6  Orleans municipals run on a different cycle.  They run

7  on a different year.

8          So Orleans' ballot, although they do have more

9  reps and senators, wouldn't have as big of a ballot as

10  East Baton Rouge, but that swaps on a different

11  election.  And it just depends on the parish, and it

12  depends on what's running, and it depends on what the

13  governor called as a special, et cetera.

14     Q.    The next bullet says, "Rejected ballots are

15  tracked and the tallied turnout is compared to the

16  expected total of ballots after all ballots have been

17  scanned.  If the numbers do not much, the parish board

18  of election supervisors works diligently to resolve the

19  matter."

20          Do you see that?

21     A.    I do.

22     Q.    Okay.  I think you can guess what I'm going to

23  ask.  Does this bullet -- does this depend on how many

24  elections are on the ballot?

25     A.    It absolutely can.  Because when you say

1   rejected ballots are tracked and the total turnout is

2   compared to the expected turnout of ballots, would have

3   been scanned.  If the numbers don't match, the parish

4   board is working to resolve it.  If part of that

5   process in resolving it is that seven of the ballots

6   were torn and the scanner won't accept them and four of

7   the ballots had some sort of marking in the timing mark

8   area, then they're tasked with hand counting those

9   ballots.  If you have to hand count a ballot that has

10  more races on it, it definitely takes more time.

11       **Q.   And can you quantify that amount of time?**

12       A.   Depends on how big the ballot is, and it

13  depends on the people that are doing the hand count --

14  the hand count process, you may have -- you may have a

15  group of people who are a little bit faster at that

16  process than another group of people of parish board

17  members that are not.

18       **Q.   And could you quantify how much time it would**

19  **take to count two additional candidates on a ballot?**

20       A.   I can't do that without knowing what else is

21  on the ballot and who it is that's actually doing the

22  process.

23       **Q.   All right.  The next bullet reads that**

24  **"Ballots must be returned by 4:30 p.m. the day before**

25  **the election."**

1          Is there anything about this bullet that is

2    dependent on the number of elections --

3        A.   No.

4        Q.   -- on the ballot?

5        A.   No.  It's just a hard deadline for when they

6    have to be returned.

7        Q.   I think we can do one more exhibit similar to

8    this one, then take a break.  And then hopefully we

9    have just another two hours.  Maybe we take another

10   short break, and then we wrap it up.  But I am getting

11   closer to the end.  But let's try to work through this

12   next exhibit before taking our afternoon break.

13             MS. THOMAS-LUNDBORG:  Can -- Molly is

14        there.  She's ready.

15             MS. GARYANTES:  I'm here.

16             MS. THOMAS-LUNDBORG:  Can we do as

17        Exhibit 18 what I'd like to mark as

18        Exhibit V -- or sorry, reverse that.  I would

19        like to mark as Exhibit 18 what I have as V,

20        as "Victoria."

21   (Exhibit No. 18 was marked for identification.)

22             MS. GARYANTES:  Eighteen is introduced.

23             MS. THOMAS-LUNDBORG:  Great.

24             THE WITNESS:  Okay.  I can see it.

25   BY MS. THOMAS-LUNDBORG:

1      Q.   Do you recognize this document?

2      A.   Yes, yes.

3      Q.   And what is this document?

4      A.   This is the measures to keep early voting

5  safe.

6      Q.   Okay.  So I know that you can guess where

7  we're going.  I'm going to try to do this quickly

8  because I know it's towards the end of the day.

9          We're actually not going to go through all

10 these bullets.  I would like to skip to the middle of

11 the page.  There's a bullet that starts with "At the

12 end of each day of early voting."

13     A.   Okay.

14     Q.   Are you there?  The first --

15     A.   Yes.

16     Q.   -- there are a couple of bullets that say

17 that, but the first one.  Okay.  So I will just read

18 the bullet and then ask you questions about it.

19          "At the end of the day of early voting,

20 registrars of voters' employees verify that the number

21 of signatures in the poll book match the number of

22 voters that were checked in."

23     A.   Correct.

24     Q.   Okay.  Does the work related to this bullet

25 depend on the number of elections on the ballot?

1      A.   It depends on the number of people that turned

2   out to vote on those elections.

3      Q.   Okay.  And then the next bullet also begins

4   with "At the end of each day of early voting, Registrar

5   of Voters employees verify that the number of

6   signatures in the poll book and the public and

7   protective equipment counters match."

8           Do you see that?

9      A.   Yes.

10      Q.   And does this work depend on the number of

11   elections on the ballot?

12      A.   It depends on the number of people that turned

13   out to vote on those elections.

14      Q.   And then the next bullet reads, "Every morning

15   of early voting, Registrar of Voter employees again

16   verify the public and protective counters and analyze

17   each tamper evidence seal for any tampering or breaks."

18           Do you see that?

19      A.   Yes.

20      Q.   And does that depend on the number of

21   elections on the ballot?

22      A.   No, it does not.

23      Q.   And then the next bullet reads, "On the night

24   of the election after early voting has concluded, the

25   Parish Board of Election supervisors verify early

1  voting equipment, public and protective counters, and

2  verify that the seals have not been tampered with.

3  They then verify the seal numbers."

4          Does that depend on the number of elections on

5  the ballot?

6      A.   No.   That's a verification process by the

7  Parish Board of Election supervisors.  And they're not

8  looking at the races; they're only looking at the

9  public and protective counters.

10                 MS. THOMAS-LUNDBORG:  All right.  I

11                 think we can take our afternoon break and come

12                 back at 3:00 my time, 2:00 your time.

13                     (Recess taken.)

14  BY MS. THOMAS-LUNDBORG:

15      Q.   And I'd like to start with Exhibit 14.  So

16  when you're ready, if you could, go to the page -- so

17  before we do that, just do you recall our discussion

18  about Exhibit 14 as an attachment to an email that you

19  were on?  And maybe we should actually -- before we get

20  into Exhibit 14, let's just go back to Exhibit 13.

21      A.   Okay.  Okay.  Yes, I see that.

22      Q.   Okay.  And there are a number of attachments

23  to this exhibit -- I mean, to this email, and one of

24  them is what we're going to look at as 14.  This is

25  just to kind of lay the foundation of what we're

1    looking at.

2          A.    Okay.

3          Q.    The question is -- this is a "refresh your

4    recollection" question.  So now if you move to the page

5    that has SOS_00561.

6          A.    Okay.  I'm there.

7          Q.    Okay.  And my question was about reopening

8    candidate qualifying period.  And I believe your

9    previous testimony was the candidate qualifying period

10   could only be open for one day -- one additional day.

11   And I want to understand, at least, if you know how

12   this provision relates to that.  Because my --

13         A.    I do.

14         Q.    Yes?

15         A.    I do.  So first of all, in an emergency, if --

16   when I use that example, if one day was shut down due

17   to bad weather, then they could do an emergency

18   certification to open it back up.  But if two days were

19   shut down due to bad weather -- let's say an ice storm

20   comes through and two of the days of qualifying

21   couldn't be utilized because roads were closed or

22   whatever.  Certification would say we're going to add

23   two days.  In other words, it's a three-day period, and

24   you get three days.  So if anything emergency-wise

25   closed it, you could have the additional days based on

1    the emergency certification, so that's one thing.

2         The second thing, this reopening of

3    qualifying -- so if everyone qualifies during the

4    qualifying period and you are midstream of the election

5    or you're -- it's the week of the election and a

6    candidate dies in the race, it automatically reopens

7    qualifying for that one race.  And if anyone qualifies,

8    the race is canceled for that primary election, and

9    your general becomes a primary, and a date five weeks

10   after that becomes the general.  That's a death of a

11   candidate.

12        Q.   So if a candidate --

13        A.   So that's why --

14        Q.   -- dies after the ballots had been printed, it

15   then moves to the general?

16        A.   If the candidate dies after the ballots have

17   been printed -- well, even if the candidate died before

18   the ballots had been printed, they're going to reopen

19   qualifying.  And if one person qualifies, then it's --

20   it would depend on the time frame as to whether it

21   would become the primary or the general.  But nine

22   times out of ten, the candidate's death happens in the

23   middle of the election cycle, and the primary is

24   canceled, the general becomes the primary, and a new

25   general date is selected.

1    Q.   Okay.  I'm going to pull up -- we lost Molly,

2    so now I'm going to be the exhibit person, so you're

3    going to have to give me a minute.  I want to do just

4    one more election calendar, or maybe two.

5                MS. GARYANTES:  (Indiscernible.)

6                MS. THOMAS-LUNDBORG:  That's okay.  I

7          started it.  I thought you had left.

8                MS. GARYANTES:  Okay.  Sounds good.

9                MS. THOMAS-LUNDBORG:  All right.  I have

10         now uploaded what is going to be marked

11         Exhibit 19.

12    (Exhibit No. 19 was marked for identification.)

13   BY MS. THOMAS-LUNDBORG:

14    Q.   Let me know when you have it.

15    A.   Okay.  It's spinning.  Okay.  It's up.

16    Q.   If you look at the bottom corner below the

17   exhibit stamp, there's another SOS number.

18         Do you see that?

19    A.   Yes.  SOS_000427.

20    Q.   Yes, 427 and 426.  This is another document

21   that was produced to us by the Secretary of State.  So

22   if you -- now just scroll through this document, and

23   if you could, tell me if you are familiar with the

24   document.

25    A.   I know what type of document it is, but I

1    notice that it's dated for 2016, the election in 2016.

2        Q.    Okay.  And what type of election was this in

3    2016, according to the document?

4        A.    Chronological table for a special election for

5    House District 29, part of EBR and WBR, East Baton

6    Rouge and West Baton Rouge.

7        Q.    And what do you understand this to be an

8    election for?

9        A.    For one of the House seats, House of

10    Representative District 29.

11        Q.    And that's a Louisiana State House?

12        A.    Yes, that's the way I read it.

13        Q.    Okay.  And this would be -- and it says it's a

14    special election.  So I'm just going to ask you a

15    couple of questions about the timeline in this

16    document.  It looks like --

17        A.    Okay.

18        Q.    -- according to the document, the qualifying

19    period was three days, as we discussed, March 7th, 8th,

20    9th of 2016.  Does that appear to be correct?

21        A.    Yes, that's what this document says.

22        Q.    And then the primary was a month after the

23    close of -- the close of the qualifying period on

24    April 9, 2016?

25        A.    Yes.

1      Q.   And then the general was just a little over a

2   month after that?

3      A.   That's correct for these two parishes.

4      Q.   Yeah.  And are you --

5      A.   And I don't know --

6      Q.   Go ahead.

7      A.   I would have to look at this to see if there

8   was anything else running at that time or not.  I'm not

9   familiar with this particular election.

10               MS. THOMAS-LUNDBORG:  Molly, if you are

11               still on, I have one more to introduce.  Could

12               we introduce Exhibit --

13               MS. GARYANTES:  Absolutely.  Which one

14               is it?

15               MS. THOMAS-LUNDBORG:  Exhibit O.

16               MS. GARYANTES:  Okay.

17               MS. THOMAS-LUNDBORG:  And that will be

18               Exhibit No. 20.

19        (Exhibit No. 20 was marked for identification.)

20               MS. GARYANTES:  Exhibit 20 has been

21               introduced.

22               MS. THOMAS-LUNDBORG:  Thank you.

23               THE WITNESS:  Okay.  It's up.

24   BY MS. THOMAS-LUNDBORG:

25      Q.   Okay.  If you look at the kind of bottom

1    corner, it has another SOS number.

2         Do you see that?

3    A.   Yes, 000432.

4    Q.   I believe the first page is 430 and then it

5    goes to 431, 432, 433, and 434.

6         A.   Hold on.  My -- wait.  My first page is 432,

7    and then the next one is 433, and the last one is 434.

8    Q.   Interesting.  Could you look at it on

9    Mr. Walsh's computer?

10        A.   Sure, sure.  Exhibit 20.  Okay.  All right.

11   Let's see.  Exhibit 20.  Okay.  On Mr. Walsh's

12   computer, it starts with 430, 431, 432, et cetera.  So

13   this one, it did not start that way.

14   Q.   Okay.  So we're now on the same page.  So

15   maybe just look at Mr. Walsh's computer --

16        A.   His computer, yeah.

17   Q.   -- to make sure we're looking at the same

18   version of the document.

19        A.   Okay.

20   Q.   At the top of the first page here, can you

21   read what the -- what the title is?

22        A.   "Chronological Table Special Election House

23   District 58 for Jefferson."

24   Q.   I believe it's 85.  I have the same -- exact

25   same tendency as you do.

1          A.    Oh, sorry, yeah.  Yes.  Yes, 85.  Sorry.

2          Q.    Okay.  And what do you understand this

3    document to reflect?

4          A.    This is the chronological table for a special

5    election called by the legislature in 2016.

6          Q.    And that's for a House legislative district?

7          A.    Correct.  One parish.

8          Q.    Okay.  And looking at the qualifying date,

9    those are June -- again three dates, June 29th,

10   June 30th, and July 1st?

11         A.    Right.

12         Q.    And a little less than a month later, it's the

13   primary date of August 6, 2016?

14         A.    Yes.  But I believe, if I'm not mistaken --

15   and I would have to get the statute for you.  The time

16   frame between the elections went from four weeks to

17   five weeks legislatively.  And I'm not sure what year

18   that occurred, but I know now it is that way.  And I'm

19   not sure if that adjusted the qualifying time between

20   the primary as well, so we would need to look at that

21   statute.

22         Q.    But here it looks like, then, the general

23   election was a little more than a month later in

24   September 10, 2016?

25         A.    Right.  And the reason for extending the time

1   period between the elections in that statute, I do

2   remember that.  It was because when it was only

3   30 days, they ran into a problem with holidays during

4   test and seal where the machines were sealed from the

5   primary, but they were needed for the test and seal

6   process for the general.  And we don't have two sets of

7   machines to attempt to seal another set, so we couldn't

8   conduct the election.  And when that occurred, they

9   adjusted the time frame between.  But I don't remember

10  what --

11       **Q.   Wait.  Between the primary and the general**

12  **election.  Do you recall if there's any rationale for**

13  **changing the period between qualifying and the primary?**

14       A.   If it was a federal election, you could not do

15  this election because there's not 45 days between

16  qualifying and August 6th.

17       **Q.   Right.  But for this election, which is a**

18  **state legislative election, would there be any reason**

19  **to have changed qualifying to primary period?**

20       A.   No.  What I'm saying is -- I agree.  For this

21  particular one, I don't see the reason.  But when they

22  adjusted the other law to add the additional week, I

23  don't know if they took that into consideration as well

24  that this time frame won't work for a federal election

25  and adjusted that also.  That would require research.

1   I'd have to look into that.

2       Q.   Okay.  Now, I believe that we have looked at

3   Exhibit Q, the election calendar for 2024.  Has any

4   work gone into the election calendar for 2027?

5       A.   No.  I don't believe we even have that one on

6   our website.  I could look and see, but I don't believe

7   so.

8       Q.   I looked yesterday, and the only advanced

9   election I saw was 2024.  But if y'all have one that is

10   not public yet, I was just curious.

11       A.   No.  If it's not on the website, then we don't

12   have it.

13       Q.   Have you done any work or planning around the

14   2027 election?

15       A.   No.

16       Q.   All right.  I'm going to shift gears somewhat

17   to polling place designations.  Who is responsible for

18   designating polling places?

19       A.   The parish governing authority of each parish

20   in the state.

21       Q.   And do you have any involvement in that

22   process?

23       A.   Only when an emergency occurs.

24       Q.   And what do you mean by "emergency"?

25       A.   Hurricane.  So Hurricane Ida hit, and it

1   knocked down hundreds and hundreds of polling

2   locations.  The only thing we did was assist by driving

3   around, identifying the ones that were blown off the

4   map, telling the parish people where there's a parking

5   lot maybe available that they could put a tent up.

6           But ultimately, they have to go look at that.

7   They have to make the assessment, and they have to make

8   the decision, and they have to do an ordinance.  So

9   it's their decision to make.  But in a devastating time

10  like that when their own houses and their mother's

11  houses and et cetera are all blown off, we try and

12  identify places that they may could use if they wanted

13  to consider it.

14      **Q.   And in nonemergency circumstances, do parishes**

15  **then report to you which polling places have been**

16  **designated?**

17      A.   The only thing that they do is submit an

18  ordinance, and it's our ministerial duty to put the

19  information they submit into ERIN, which then goes to

20  two different directions.  The first direction it goes

21  is to mail the cards to the voters notifying them of a

22  new polling place.

23          And the second direction that it goes is to

24  the website so that the GeauxVote app and the other

25  portals are updated with the correct information so

1    that if you were a registered voter and you wanted to

2    find your polling location, you could go to the

3    GeauxVote app, and it would be updated.  But it's

4    strictly a ministerial process.

5        Q.   Do you know whether the same polling places

6    are used for state elections and federal elections?

7        A.   Polling places change every single election.

8    You have precincts that are rented.  You have churches

9    that are used that may have a wedding that's a conflict

10   on an election date, and they make a move.  So as long

11   as private buildings are being used -- you also have

12   circumstances where precincts are merged and you

13   don't -- or consolidated, and they have additional

14   voters, and the space that the parish governing

15   authority selected is not big enough, so they have to

16   move it.  So it's a constant moving target.  It's not

17   specific to a state election or a federal election;

18   it's specific to the election.

19       Q.   Okay.

20       A.   Are you talking, or are you writing?

21       Q.   I was writing and looking at my outline.

22       A.   Okay.  I'm so sorry.

23       Q.   I printed my outline.  No, it's fine.  I found

24   where I want to go next, so we're ready.

25                   MS. THOMAS-LUNDBORG:  Molly, could I

```
 1            mark as Exhibit 21 what I have labeled Exhibit
 2            X, as in "xylophone"?
 3                 I think we lost Molly again.  Okay.  I'm
 4            going to mark it.  Give me one second.
 5            Exhibit 21 is now up for you.
 6       (Exhibit No. 21 was marked for identification.)
 7                 THE WITNESS:  Okay.  Okay.  It's up.
 8  BY MS. THOMAS-LUNDBORG:
 9       Q.    Do you recognize this exhibit?
10       A.    I do.  It's security measures for election day
11  voting.
12       Q.    And this is another document that was taken
13  from the Secretary of State's website.  And so we're
14  going to talk a little bit about this document and then
15  election day in general.  I think we've talked some
16  about election day.
17            But what activities is your office engaged in
18  on election day?
19       A.    On election day, we are supporting the
20  state's elections process.  The opening of the polls is
21  conducted by the clerks with their commissioners, but
22  our technicians are working the precincts in the event
23  of any kind of problem with the voting machine, the
24  paper roll is stuck, it won't print, the power button
25  is broken, anything like that.  Our technicians are on
```

1  call for all 64 parishes, working.  For the secretary

2  of state's staff, we take service calls, and then we

3  support the early voting and absentee tabulation

4  process, and we support the clerk of court transmission

5  process.

6      **Q.   Okay.  Focusing on the work that's done by --**

7  **at your office, does that work increase depending on**

8  **the number of elections on the ballot?**

9      A.   You broke up.  Can you say it again?

10     **Q.   Yes.  Is the work that your office does, does**

11 **it all depend on the number of elections on the ballot?**

12     A.   No, it does not.

13     **Q.   And are you aware of the work that the -- that**

14 **the local parish authorities do on election day?**

15     A.   I am.

16     **Q.   And what types of activities are they doing?**

17     A.   The registrar of voters are answering calls

18 all day long from people that have nowhere to go vote

19 or they have a problem with their ballot or they can't

20 find their voter registration card or they're

21 concerned.

22         Then they are also taking phone calls of

23 anyone that says that it's an error, like they

24 registered to vote at OMV, DMV, and their registration

25 didn't seem to go through, so they're trying to resolve

1    any issues like that that they may have.  They also are

2    tasked with tabulating the early voting absentee

3    ballots and UOCAVA ballots that day, and it has to be

4    done in one day.  And they finish that out and transmit

5    it to the clerk, who transmits it to our ERIN system.

6            The clerks of court are managing the

7    commissioners and all of the calls or problems that

8    they may have at any polling location or precinct.

9    They are also answering voter calls from anyone that's

10   got any type of elections problem to report.  And then

11   they are tasked with, as a member of the parish board,

12   tabulating the early voting and absentee ballots and

13   also reading the cartridges on election night.

14           **Q.   And does that work depend on the number of**

15   **elections on the ballot?**

16           A.   The only process that would depend on the

17   number of elections on the ballot is when they're

18   tabulating the ballots.  For all of the ballots that

19   would not scan or would not read, they would be hand

20   tabulating each race on the ballot, so that would

21   potentially give them additional time to complete that

22   process.

23           **Q.   And can you quantify how much additional time**

24   **that would take?**

25           A.   It would depend on the number of races that

1   are on that ballot and the people that are doing it.

2       Q.   Going back to what has been marked as

3   Exhibit X.

4                THE REPORTER:  I'm sorry?

5                MS. THOMAS-LUNDBORG:  I'm sorry, not X.

6           It's not X.  It's Exhibit 21.

7                THE WITNESS:  Okay.

8   BY MS. THOMAS-LUNDBORG:

9       Q.   Now I'm having difficulty pulling it up.

10  Okay.  I'm not going to spend too much time on this

11  document, but I do want to ask you some questions.

12           The only one related to election day is there

13  is a bullet in the middle that says, "Trained

14  commissioners keep watch at each polling stations."

15      A.   That's correct.

16      Q.   Okay.  And are those folks Secretary of State

17  staff, or are those local parish staff?

18      A.   That's the commissioners that are hired by the

19  clerk of court to work the elections.  They're paid by

20  the Secretary of State, but they are trained and work

21  by the clerk of court.

22      Q.   And was this work that the commissioners do on

23  election day -- would that all -- would that all be

24  affected by the number of elections on the ballot?

25      A.   No.

1    Q.    Now, moving away from election day, what

2    involvement does your office have in election results?

3    A.    The results are tabulated.   Our staff supports

4    the equipment.   And by supporting the equipment,

5    they're in every parish of the state trying to make

6    sure that there's no problems.

7                      (Brief interruption.)

8                 THE WITNESS:   I'm sorry?

9                 MS. THOMAS-LUNDBORG:   Sorry.   Someone is

10                off of mute.   I don't know where that came

11                from.   It wasn't from me.

12                THE WITNESS:   Oh, okay.

13    A.    So they are -- they are tabulating for that

14    process, and those results are uploaded into the

15    Secretary of State system.   Election night, we're

16    supporting as well.   Any problems, we jump in and

17    assist.   The clerks submit the votes into the ERIN

18    system, also, and once that's all submitted and

19    transmitted to the Secretary of State, it's on the

20    website as well for people to view.

21    BY MS. THOMAS-LUNDBORG:

22    Q.    And I believe there are a couple of bullets

23    that get to this, so let's just read them.   There's a

24    bullet that begins with "Results are transferred"?

25    A.    Yeah.

1        Q.    Do you see that?

2             We're almost done.  I think we have an hour,

3     if that.

4        A.    Okay.

5        Q.    "Results are transferred" --

6        A.    -- "over a secure private monitored network

7     to the Secretary of State's office."  That's correct.

8     They're uploaded into our system.  And that is the ERIN

9     system.

10       Q.    And when does that occur?

11       A.    Election night after the polls close at

12    8:00 p.m.

13       Q.    And then the bullet goes on to say -- sorry,

14    not that bullet but another bullet right after that

15    that says, "After each transfer of results, the clerk

16    of court verifies the correct results were posted to

17    the Secretary of State's website."

18            Do you see that?

19       A.    Yes.

20       Q.    And when does that occur?

21       A.    So each time you have cartridges that are

22    brought into the clerk of court's office, there may be

23    a section of time where you stop reading cartridges and

24    you upload into the Secretary of State's system.  You

25    look at your results.  You compare them to the results

1    that you uploaded in the offline laptop.  It's not

2    connected to the internet.  It's not connected to

3    anything.

4            You make sure that the results match, and you

5    make sure the precincts match, and then you continue

6    reading cartridges for the other precincts.  Some

7    parishes will do as many as eight to ten submissions.

8    Some of them do three submissions, but you're proofing

9    throughout the whole process.

10   **Q.   And how long does that process take?**

11        A.   Polls close at 8:00 o'clock.  Big massive

12   elections, the presidential, we may be done by

13   1:00 o'clock in the morning.  Gubernatorials, between

14   11:00 and 1:00, I would say, depending on the types of

15   problems we may have.  And just small elections, it

16   generally can be done by 10:30.

17   **Q.   Okay.  The next bullet says, [As read]:  "The**

18   **unofficial results that are posted to the Secretary of**

19   **State's website is replicated to present" -- no, sorry.**

20   **Well, is that what I read?  Yes -- "to present -- to**

21   **prevent the manipulation of the original unofficial**

22   **results."**

23           **Do you see that?**

24        A.   I do.

25   **Q.   Okay.  So I'd like to focus on the publishing**

1    to the Secretary of State's website.  Was this public?

2    What's being discussed in the bullet that I just read,

3    is this a public posting on the Secretary of State's

4    website, or is this posting in ERIN?

5         A.   So the unofficial results are posted in ERIN,

6    and then it's posted to the Secretary of State's

7    website, and it's replicated so you can't manipulate it

8    off of the original unofficial results.  And then

9    there's an audit process and a review process for the

10   unofficial results to be compared to what was

11   officially done in the parish, and we confirm all of

12   that data matches as well.

13        Q.   And how long does the audit and review process

14   take?

15        A.   The audit starts the night of the election,

16   and the next day there's a -- there are three levels of

17   audit that are completed.  There's a statewide audit

18   that is a document where we audit up against what was

19   posted to the website and also what was uploaded into

20   the laptop.

21             There's a precinct-by-precinct audit where

22   each precinct is looked at, the numbers, the public

23   protective count, and the number of voters that get

24   history -- their history gets updated saying that they

25   did vote in the election.  And then last but not least,

1    a final audit where we are looking for the turnout

2    tally for each precinct to be sure that every cartridge

3    did read accurately, correctly, and if there were

4    multiple machines, all machine cartridges were read.

5         That entire process takes up to a week and a

6    half to two weeks depending on the size of the

7    election.  Occasionally, it's gone over that, and I'll

8    give you an example as to why.  In one of the

9    presidential elections, East Baton Rouge Parish had

10   140,000 people that voted.  Each one of those people

11   gets wanded -- a bar code is wanded next to their name

12   if they signed the book to give them credit for voting,

13   and that information has to be proofed.

14        Generally, the registrar of voters do not have

15   space nor do they have funding to hire more than 10 to

16   15 people to try and do that process.  So you can

17   imagine attempting to wand 140,000 people in that short

18   amount of time is not easy, and that's why it takes

19   that long.

20   **Q.   Okay.  And is it only after the audit is**

21   **completed that then the results become public?**

22        A.   The results are promulgated after the audit is

23   completed on a specific legal deadline.

24   **Q.   Do you know what that deadline is?**

25        A.   It's a certain number of days following the

1    election.  The statute says it.  I want to say it's

2    14 days after the election, but I would have to confirm

3    that.  And the -- the elections results are unofficial

4    until the parish board of election supervisors signs

5    off that they are complete, the recount process is

6    done, and it's officially certified.  If an elections

7    contest suit is filed, that can delay it.

8         **Q.   I have one question related to staffing and a**

9    **couple of other follow-up questions, two more exhibits**

10   **for us to look at -- I have three more exhibits for us**

11   **to look at.  Then I think I'm going to be able to send**

12   **you on your way to enjoy the rest of the afternoon.**

13        **Related to staffing, when you think about**

14   **staffing in your office, do you staff based on the**

15   **number of elections on a ballot that are coming up?**

16   **Or how do you determine staffing that you'll need?**

17        A.   There are many factors that go into our

18   staffing needs.  So if we are -- as we are about to do,

19   implementing a new system while still trying to manage

20   an old system, I have to have enough people to be able

21   to do that.  And that includes programming, tabulation,

22   support, all of the statutes, all of the laws.  It

23   includes the ceiling, everything, end to end, so that

24   matters.

25        As far as the programming process, the size of

1    the election matters as to how many people need to

2    work.  Generally, we work nights and weekends to

3    attempt to pull everything off.  And again, it depends

4    on the size of the election and the number of races

5    that will be running.

6            And as far as the registrar's staff goes and

7    the commissioners they hire and the clerk of court

8    staff and the commissioners that they hire, sometimes

9    in the middle of early voting, if they start early

10   voting and they realize the turnout is so massive,

11   they're understaffed, they try and find people to work

12   as quickly as they can that are certified and add them

13   to the list.

14           So as you can imagine, COVID was a disaster

15   for us during that time frame, trying to fill positions

16   and trying to keep up with the amount of work.  So

17   anyway.  But that's basically how staffing needs are

18   assessed.

19       Q.   Okay.

20           MS. THOMAS-LUNDBORG:  I'm going to

21           introduce two more exhibits.  They're going to

22           be -- I'll take them one at a time.  This is

23           going to be Exhibit 21.  I've introduced what

24           has been marked as exhibit -- sorry.  It

25           should be Exhibit 22, I think.

SHERRI HADSKEY

```
 1      (Exhibit No. 22 was marked for identification.)
 2  BY MS. THOMAS-LUNDBORG:
 3      Q.   And just take a minute to scroll through the
 4  exhibit.
 5      A.   Is it Exhibit 22?
 6      Q.   Yes.  Exhibit 22, please.
 7      A.   Okay.  I'm familiar with this document.
 8      Q.   Okay.  What is this document?
 9      A.   This document was created for the voting
10  system commission, and it was created by my staff
11  member Nick Meyers to present at the voting system
12  commission where we were discussing technology for
13  future use in the state of Louisiana.
14      Q.   And you see that this exhibit has a -- at the
15  bottom -- and this will actually be a good check that
16  we're looking at the same document or the same
17  version -- it says SOS_00948, as the first page?
18      A.   Yes.
19      Q.   Okay.  So this is another document that was
20  produced to us by the Secretary of State's office.
21  It looks like on the very first page, it says,
22  "Understanding the voter experience."
23           Do you see that?
24      A.   I do.
25      Q.   And it looks like there's a black box here of
```

1   redacted text.  Do you have any understanding of what

2   that could have been?

3        A.   I would imagine it has something to do with

4   the -- with the ERIN system information or our actual

5   current voting system information.  That's --

6        Q.   And what is -- what is your current system?

7        A.   So the current voting system information, it

8   would be PII, something directional that would include

9   links to documents and manuals that have PII on them or

10  anything like that.

11       Q.   If you scroll to the next page, it says, "By

12  now, we all know that Act 480 required the production

13  of voter-verified paper records."

14            Do you see that?

15       A.   Yes, I do.

16       Q.   And there appears to be another redaction box.

17  Do you have any understanding of what would have been

18  in that box?

19       A.   I can't remember what was in that box, but I

20  know that they wouldn't have redacted something unless

21  it had PII in it in regards to the current voting

22  system or in regards to ERIN.

23       Q.   Same question on the following page.

24       A.   Okay.  All right.  Yeah, I mean, the only

25  thing that I can confirm is that I know if it had any

1    type of reporting information for the ERIN system or

2    any type of reporting information for our voting system

3    currently, that would be redacted.

4        **Q.    Okay.  And would challenges of paper -- which**

5    **is the title of this -- of this particular screen -- be**

6    **recorded in ERIN or your current voting system?**

7        A.    So if somebody was challenged that turned in a

8    ballot, the -- so what he means by this, challenges of

9    paper, he's saying that if we have to store the paper,

10   the humidity is a major issue in the state of

11   Louisiana.  Our paper jams through printers if you

12   leave it in an un-air-conditioned warehouse, which 63

13   of our 64 warehouses currently are un-air-conditioned.

14   So that's a challenge to us if we try to go to a paper

15   system.  The paper cost is expensive.  The storage cost

16   is expensive.

17            So as I was saying before, 140,000 people in

18   East Baton Rouge voted in one of the presidential

19   elections.  Well, if they each got a three-page ballot,

20   three pages of paper times 140,000 -- and that's one

21   election, and you're having to store that.  State

22   elections have to be stored for six months, but federal

23   elections are stored for 22 months.  So you're talking

24   about quite a bit of space that would be needed to

25   store all of these records.  And then the auditing --

1      Q.   And -- I'm sorry.

2      A.   Oh, no.  I'm sorry.  The auditing window being

3  too light -- to try and audit paper is very, very

4  complicated in a short amount of time.  You run the

5  risk of human error.

6      **Q.   And you mentioned that you-all are moving from**

7  **a current voting system to another voting system.  Is**

8  **your new voting system going to involve as much paper**

9  **balloting?**

10     A.   So the new voting system is going to have --

11 has written into the law a paper audit trail.  So one

12 way or the other, if you go and vote on a machine, that

13 machine is going to print out some sort of piece of

14 paper that your going to review, and then you're going

15 to submit it into a scanning device and a box so -- so

16 that the voter can audit what they voted on.

17     **Q.   Okay.  And will there be paper only at the**

18 **back end or at the front end?**

19     A.   No.  The paper would be -- well, there are

20 some systems out there that we'll be looking at that do

21 print a ballot on demand, and you would scan that and

22 send that through.  So I can't say.  We're in an RFP

23 process, and I don't know what system is going to be

24 selected.  I know that we're going to look at all

25 systems out there.

1      Q.    Okay.  And when do you imagine that you would

2  have started transitioning to the new system?

3      A.    We're writing the standards right now.  And

4  moving forward, we still have to do an RFP; we have to

5  draft it.  Then we have to have a committee that works

6  with the Division of Administration to select it, and

7  then after it's selected, we go into contract

8  negotiations.  After that, we go into implementation,

9  and we estimated an implementation of the state to take

10  approximately three years to complete all 64 parishes.

11         So my best guess, if I was really, really

12  encouraged and feel certain that things would go

13  smoothly, we may be able to begin that process with one

14  parish in 2024 or two parishes.  But 2025, I believe

15  for certain, we will see -- or at least I hope that we

16  will see the implementation of several parishes.

17      Q.    I think we are done with Exhibit 22.  I'm

18  going to show you a new exhibit, Exhibit 23.

19  (Exhibit No. 23 was marked for identification.)

20  BY MS. THOMAS-LUNDBORG:

21      Q.    Exhibit 23 should be introduced on your end.

22      A.    Okay.  Okay.

23      Q.    If you could, take a minute to look through

24  this exhibit.

25      A.    It's still spinning.  It should be up any

1    second.

2        Q.    Okay.

3        A.    Okay.  (Reading indistinctly.)  Okay.  Okay.

4        Q.    Do you recognize this exhibit?

5        A.    It's one of the training exhibits.  For the

6    past three years, we do -- well, in the past, actually,

7    for many years, we do an elections academy in the

8    spring/summertime for the registrar of voters, and then

9    the clerks of court have an institute.  So each year,

10   we try and provide reminders and just general

11   information to be helpful.  This is one of those

12   documents from one of those years.

13       Q.    Okay.  And then at the bottom -- again, to

14   make sure we're looking at the same version and also

15   identifying the record -- the first page I have is

16   SOS_00996.

17       A.    Yes.

18       Q.    Okay.  And so this was another document

19   produced to us by the Secretary of State's office.

20             I just want to skip ahead.  On page ending

21   with SOS_000999 -- do you see that page?

22       A.    I do.

23       Q.    Okay.  And there's a -- the title of this page

24   is "Keys to Success."  Do you see that?

25       A.    Correct.

1      Q.   And then there are four bullets that are

2   shown.  And then it looks like the rest of the page is

3   redacted.  Do you have any understanding of what might

4   be in the redacted text?

5      A.   When it starts talking about "remember the

6   legal descriptions and the legal boundaries," I would

7   imagine the information below that was how to enter

8   information into ERIN.

9      Q.   And then voter count report, if you look at --

10  which is the following page.  Do you have any

11  understanding of what would have been on this page?

12     A.   Yeah.  The voter count report, it probably

13  would be showing our public and protective counter logs

14  out of our elections voting system manual, which has

15  PII in it.

16     Q.   And PII is personal --

17     A.   It's -- yes.  It's information that cannot be

18  produced.  It's protected.

19     Q.   What does the acronym stand for, PII?

20     A.   PII?

21          THE WITNESS:  Do y'all know?

22     A.   I can't remember.  I'm sorry.  I don't.

23  BY MS. THOMAS-LUNDBORG:

24     Q.   Do you know what type of information is

25  considered PII?

1    A.    I do.   The mother's maiden name.   Your full

2  social security number.   Your date of birth.   Your

3  phone number is considered PII.   Your email address.

4  Whether or not you are in -- you require disabled

5  accessibility is PII.   Any of the credentials or any

6  of the information on how to use our ERIN system or how

7  to use our voting system is considered PII.   I know

8  it's -- it's -- I'm sorry.   I don't know the full

9  acronym, but it's protected information.

10    **Q.    The next page is another voter count report,**

11  **and then the following -- which is also redacted.   And**

12  **then there's "Split District Address Cross Reference**

13  **Report."  Do you see that?**

14    A.    Yes.

15    **Q.    What is a split district address cross**

16  **reference report?**

17    A.    So that is in the ERIN system, and there is a

18  report that shows split districts that the registrar of

19  voters completed.   And in that cross reference report,

20  it's trying to show them where they moved people from

21  and where they moved people to to help them identify if

22  there are problems.

23    **Q.    And that text has been redacted in this**

24  **document?**

25    A.    Yes.   I know that that report, for sure,

 1   has information in it.  The split district report shows

 2   individual voters' information.

 3        Q.   And then the following page is also about the

 4   split --

 5        A.   Same thing.

 6        Q.   -- split district address cross reference

 7   report.  Same thing.  And also redacted?

 8        A.   Yes.

 9        Q.   Do you have any understanding of what other

10   reports and navigation might have been included in the

11   presentation on the following page?

12        A.   I know that they would be ERIN system reports.

13        Q.   And those have been redacted?

14        A.   That's correct.  There's a statute that does

15   not allow us to give the instructions out of how to use

16   our system or reports in the system that would allow

17   somebody to make our system not be secure.

18        Q.   I have one more exhibit to introduce.  It's a

19   close-up question.  Then we can take a five-minute

20   break for me to just check with counsel to see if I

21   have any additional questions.

22             MS. THOMAS-LUNDBORG:  I am now

23             marking -- it's going to be Exhibit No. 24.

24        (Exhibit No. 24 was marked for identification.)

25             THE WITNESS:  Okay.

```
 1  BY MS. THOMAS-LUNDBORG:
 2       Q.   It should be in the system now.
 3       A.   It's spinning.
 4       Q.   Okay.
 5       A.   Okay.  It just came up.
 6       Q.   Okay.  So this is defendant's fact witness
 7  list with the Secretary of State.  And you've been
 8  identified as a fact witness in the litigation.
 9            Do you see that?
10       A.   I do.
11       Q.   Okay.  And I would like to be efficient.  I
12  really appreciate the fact that you have taken so much
13  of your day with me today.  I know it's been a long
14  day.  I appreciate that.  This was sent to us after we
15  noticed your deposition, and so I just want to ask you
16  one, maybe two follow-up questions depending on your
17  answers, which is were you aware that you were going to
18  be a fact witness in this case?
19       A.   Yes.
20       Q.   Okay.  And do you have any sense, as you sit
21  here today, what your testimony -- what testimony you
22  intend to give for the case?
23       A.   I don't have any idea what questions are going
24  to be asked.  So I'll testify, and I'll answer to the
25  best of my knowledge on our state's elections process.
```

SHERRI HADSKEY

 1   But I guess it depends on the questions that are asked

 2   of me.

 3        Q.   But it's your understanding that you'll be

 4   testifying on the state's elections processes?

 5        A.   Yes.  To the best of my knowledge, absolutely.

 6        Q.   Are there any processes which we have not

 7   discussed today that you think are relevant to the

 8   implementation of a new State House and State Senate

 9   map?

10                MR. STRACH:  Objection.

11        A.   No, I don't know of anything else.

12                MS. THOMAS-LUNDBORG:  All right.  I

13            think we can just take a five-minute break.

14                   (Recess taken.)

15   BY MS. THOMAS-LUNDBORG:

16        Q.   Are you aware of whether the Secretary of

17   State's office regulates activities of candidates or

18   campaigns?

19        A.   No, they do not.

20        Q.   Does the office of the Secretary of State

21   monitor campaign materials, messages, or expenditures

22   from entities other than candidates or campaigns?

23        A.   Expenditures like commissioner pay?  Or

24   expenditures like involved in a campaign, like campaign

25   finance?

```
 1        Q.    Like campaign finance, like local action
 2   committees.
 3        A.    No.
 4        Q.    Does the Secretary of State's office track a
 5   race of candidates?
 6        A.    Track what now?
 7        Q.    The race of candidates?
 8        A.    What do you mean by that?
 9        Q.    Their -- so voter race is tracked, for
10   example.  If a voter identifies as a certain race --
11        A.    Right.
12        Q.    -- does the Secretary of State's office track
13   the race --
14        A.    The race.
15        Q.    -- of candidates?
16        A.    I'm so sorry.  When you were saying "race," I
17   was thinking you meant the race that was running, and I
18   was confused.  So we do -- it is on the form that --
19   whether you're Hispanic or whatever you identify as.
20   And then in the statistics for -- as you mentioned, for
21   voter registration, it lists whether you're male,
22   female, or your race is there.  So even if it wasn't
23   listed on the form, a voter registration list that --
24   we have commercial lists that are available, and it
25   would show on that if you chose to know.
```

1      Q.   And how long has the Secretary of State's

2  office been tracking this information?

3      A.   The -- I started working in the elections

4  field as a student worker in 1986, and they had the

5  statistical reports out of green screen ERIN at that

6  time that were provided to the legislature.  But they

7  didn't -- they weren't -- they were very -- what's the

8  best way to say?  They're old as dirt, I guess is the

9  best way to say it.

10         The ones now are very -- they're in great

11  files and Excel and user friendly and that type of

12  thing.  These were the kind with the -- with the holes

13  on the side where it went through the printer, the dot

14  matrix, you know what I'm saying.

15      Q.   And is this information on candidates publicly

16  available?

17      A.   Candidates are on the Secretary of State's

18  website, so you can look at the website under the

19  candidate database and see that information.  I don't

20  know if it's publicly available in a public records

21  request.  But I believe it is if you asked for a copy

22  of somebody's qualifying form or something like that.

23  I believe that's a public records request, but I'm not

24  a lawyer, so I don't know.

25      Q.   And does your office use this information

1   other than tracking or having the ability to keep a

2   record of it?

3        A.   Not to my knowledge.

4        Q.   And this is the -- I believe this is the last

5   question.  Does the Secretary of State's office provide

6   positions on elections or voting related policies to

7   the legislature?

8        A.   Do they provide positions?  Meaning like they

9   take a stance on --

10       Q.   Yes.

11       A.   -- on -- we --

12       Q.   On bills that are pending related to elections

13  or voting?

14       A.   Yes.  Yes, we do -- we do go to the House and

15  Senate with an omnibus bill every year that makes

16  technical changes to laws that are in place trying to

17  help make the system work more efficiently.

18       Q.   And does the Secretary of State's office take

19  any position on bills that are outside of the omnibus

20  bill?

21       A.   Only if it will affect the elections in a

22  manner that we are unable to -- to conduct the

23  election.  So if somebody came up in February of this

24  year and said, "We want to have all vote centers.  We

25  don't want to have precincts anymore.  We just want to

1   do away with all precincts and have vote centers,"

2   well, that's not only a financial impossibility, but

3   it's also a logistical nightmare in the fact that we

4   couldn't do that upon governor's signature.  There's no

5   physical way possible to do that.

6               MS. THOMAS-LUNDBORG:  All right.  I

7          think that is it.  Thank you for so much of

8          your time today, again.  I hope you can enjoy

9          the rest of your afternoon.

10               THE WITNESS:  You too.

11               MS. THOMAS-LUNDBORG:  Oh, I should ask

12          if any other counsel has questions before

13          going off the record.  But I'm done.

14               MR. STRACH:  We don't.  We don't -- this

15          is Phil Strach.  We don't have any questions

16          for Sherri.

17               MS. PROUTY:  On behalf of legislative

18          interveners, we don't have any questions.

19   (This proceeding was concluded at 3:21 p.m. CST on

20   August 18, 2023.)

21

22

23

24

25

1                    REPORTER'S PAGE

2      I, YOLANDA J. PENA, Certified Court Reporter in

3  and for the State of Louisiana, (CCR #2017002),

4  Registered Professional Reporter (RPR #970346), the

5  officer, as defined in Rule 28 of the Federal Rules of

6  Civil Procedure and/or Article 1434(B) of the

7  Louisiana Code of Civil Procedure, do hereby state on

8  the record:

9      That due to the interaction in the spontaneous

10  discourse of the proceeding, double dashes (--) have

11  been used to indicate pauses, changes in thought,

12  and/or talkovers; that same is the proper method for a

13  transcription of proceedings, and that the double

14  dashes (--) do not indicate that words or phrases have

15  been left out of this transcript;

16      That any spelling of words and/or names which

17  could not be verified through reference material have

18  been denoted with the parenthetical "(phonetic)";

19      That the parenthetical "(sic)" is used to denote

20  when a witness stated a word or phrase that appears

21  odd or erroneous to show that it was quoted exactly as

22  it stands.

23

24                        YOLANDA PENA, CCR, RPR

25

```
 1                     REPORTER'S CERTIFICATE

 2         I, YOLANDA J. PENA, Certified Court Reporter in
      and for the State of Louisiana, Registered
 3    Professional Reporter, and as the officer before whom
      this testimony was taken, do hereby certify that
 4    SHERRI WHARTON HADSKEY, after having been duly sworn
      by me upon authority of R.S. 37:2554, did testify as
 5    set forth in the foregoing 172 pages.
           I further certify that said testimony was reported
 6    by me in the Stenotype reporting method, was prepared
      and transcribed by me or under my direction and
 7    supervision, and is a true and correct transcript to
      the best of my ability and understanding.
 8         I further certify that the transcript has been
      prepared in compliance with transcript format
 9    guidelines required by statute or by rules of the
      board and that I have been informed about the complete
10    arrangement, financial or otherwise, with the person
      or entity making arrangements for deposition services.
11         I further certify that I have acted in compliance
      with the prohibition on contractual relationships, as
12    defined by Louisiana Code of Civil Procedure Article
      1434, and in rules and advisory opinions of the board.
13         I further certify that I am not an attorney or
      counsel for any of the parties, that I am neither
14    related to nor employed by any attorney or counsel
      connected with this action, and that I have no
15    financial interest in the outcome of this matter.
           This certificate is valid only for this
16    transcript, accompanied by my original signature and
      original raised seal on this page.
17
           Prairieville, Louisiana, this 21st day of August,
18    2023.

19

20

21

22                                    _____
                                      YOLANDA J. PENA, CCR, RPR
23                                    CCR NO. 2017002, RPR NO. 907346

24

25
```

VERITEXT LEGAL SOLUTIONS