## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

DR. DOROTHY NAIRNE, *et al.,*

               *Plaintiffs,*

   v.

R. KYLE ARDOIN, in his official capacity as Secretary of State of Louisiana,[1] *et al.,*

             *Defendants.*

Civil Action No. 3:22-cv-00178

Chief Judge Shelly D. Dick

Magistrate Judge Scott D. Johnson

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, FOR JUDGMENT ON THE PLEADINGS

---

[1] The Secretary of State is now Nancy Landry, and the caption should be updated accordingly.

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .............................................................................................iii

INTRODUCTION ........................................................................................................ 1

BACKGROUND........................................................................................................... 1

ARGUMENT ................................................................................................................ 2

I. THE COMPLAINT FAILS TO STATE A § 2 CLAIM AND SHOULD BE DISMISSED, OR
ALTERNATIVELY, THE COURT SHOULD GRANT JUDGMENT ON THE PLEADINGS IN
DEFENDANTS' FAVOR. ........................................................................................ 2

    A. The Complaint Does Not Allege a Strong Inference of Intentional
       Discrimination....................................................................................... 5

    B. Plaintiffs Fail the Updated *Gingles* Preconditions....................................... 6

    C. Dismissal Should Be with Prejudice. .......................................................... 10

II. PLAINTIFFS' CLAIMS CHALLENGING THE STATE'S SENATE DISTRICTS ARE
MOOT AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER
JURISDICTION. ..................................................................................................... 11

CONCLUSION................................................................................................................ 13

# TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ............................................................................... 2

*Alexander v. S.C. State Conf. of the NAACP,*
  602 U.S. 1 (2024) .................................................................................. 4

*Allen v. Milligan,*
  599 U.S. 1 (2023) .................................................................................. 7

*Already, LLC v. Nike, Inc.,*
  568 U.S. 85 (2013) ........................................................................... 11, 12

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................ 2, 6

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) .............................................................................. 2

*Bradley v. Sch. Bd. of City of Richmond,*
  416 U.S. 696 (1974) .............................................................................. 2

*Davis v. Abbott,*
  781 F.3d 207 (5th Cir. 2015) ............................................................... 12

*Jacquez v. Procunier,*
  801 F.2d 789 (5th Cir. 1986) ............................................................... 11

*Louisiana v. Callais,*
  146 S. Ct. 1131 (2026) ................................................................... passim

*Nairne v. Ardoin,*
  715 F. Supp. 3d 808 (M.D. La. 2024) .................................................... 7

*Nairne v. Landry,*
  151 F.4th 666 (5th Cir. 2025) ............................................................... 7

*Robinson v. Ardoin,*
  731 F. Supp. 3d 711 (M.D. La. 2024) .................................................. 12

*Shelby County v. Holder,*
  570 U.S. 529 (2013) ............................................................................ 4, 5

iii

*Thornburg v. Gingles,*
  478 U.S. 30 (1986) ................................................................................................... 1, 2

## INTRODUCTION

Plaintiffs' Complaint was drafted under a legal framework that no longer exists. In *Louisiana v. Callais*, 146 S. Ct. 1131 (2026), the Supreme Court changed the legal standards for vote-dilution claims under § 2 of the Voting Rights Act. Because the Complaint does not—and could not—attempt to state a claim under the new *Callais* framework, the Complaint no longer states a viable claim for relief and should be dismissed under Rule 12(b)(6).

Alternatively, and for these same reasons, the Court should grant judgment on the pleadings in Defendants' favor. Either way, this case should be over.

Underscoring that outcome is the fact that Plaintiffs' § 2 claims challenging the State's senate districts are now moot since the Legislature has changed those districts. At minimum, those claims should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).

## BACKGROUND

In 2022, Plaintiffs filed their Amended Complaint claiming violations of § 2 of the Voting Rights Act because, they said, Louisiana's State Legislative Maps (HB14 and SB1) unlawfully diluted the votes of black voters. ECF 14 at 1−2. The case was tried in November 2023, and the Court ruled in Plaintiffs' favor. ECF 233 at 1, 91. Defendants (the "State") appealed to the Fifth Circuit. ECF 242, 250. The Fifth Circuit eventually held this case in abeyance pending the Supreme Court's decision in *Louisiana v. Callais*. ECF 350. In April 2026, the Supreme Court decided *Callais*. In that decision, it "update[d]" the framework established by *Thornburg v. Gingles*, 478 U.S. 30 (1986) to assess claims under §2—an update that fundamentally

1

transforms the §2 framework so that §2 "imposes liability only when the evidence supports a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S. Ct. at 1157. The Fifth Circuit then vacated this Court's judgment (as well as its own prior judgment affirming that judgment) and remanded the case for consideration in light of *Callais*. ECF 355. At a recent status conference, the State indicated it would be moving to dismiss the Complaint.

## ARGUMENT

**I.     THE COMPLAINT FAILS TO STATE A § 2 CLAIM AND SHOULD BE DISMISSED, OR ALTERNATIVELY, THE COURT SHOULD GRANT JUDGMENT ON THE PLEADINGS IN DEFENDANTS' FAVOR.**

"[A] court is to apply the law in effect at the time it renders its decision." *Bradley v. Sch. Bd. of City of Richmond*, 416 U.S. 696, 711 (1974). And that law here is *Callais*. Under *Callais*, the Complaint lacks "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), and fails to "plead[] factual content that allows the [C]ourt to draw the reasonable inference that the [State] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal is warranted.

The Complaint (ECF 14, ¶ 2) alleges a § 2 vote-dilution claim under the old framework established by *Thornburg v. Gingles*, 478 U.S. 30 (1986), which used to require only that "district lines dilute the votes of the members of the minority group." *Abbott v. Perez*, 585 U.S. 579, 614 (2018). Before *Callais*, a plaintiff could prevail on a § 2 claim by showing: (1) the minority group in question was sufficiently large and geographically compact to constitute a majority in a reasonably configured district;

2

(2) the group was politically cohesive; and (3) the white majority votes sufficiently acted as a bloc to enable it to defeat the minority group's preferred candidate. *Louisiana v. Callais*, 146 S. Ct. 1131, 1150 (2026). If plaintiffs established those former "preconditions," they could prevail by showing that, based on the "totality of circumstances," the political process was not equally open to minority voters. *Id.*

But *Callais* "update[d]" § 2 to "realign[] it with the text of § 2 and constitutional principles." *Id.* 1141. Now, § 2 "imposes liability only when the evidence supports a strong inference that the State *intentionally* drew its districts to afford minority voters less opportunity *because of their race*." *Id.* at 1140 (emphasis added). That intent requirement, in turn, changed the *Gingles* framework every step of the way.

Under *Callais*, the first *Gingles* precondition requires that Plaintiffs' illustrative maps "meet all the State's legitimate districting objectives, including traditional districting criteria and the State's specific political goals." *Id.* at 1141. And because it would be unlawful for the State to intentionally draw legislative districts based on race, Plaintiffs cannot use race as a criterion in their illustrative maps either. *Id.* Plaintiffs thus must show not just that an additional majority-minority district *could* exist, but that one could be drawn *without using race as a criterion* while also satisfying *all* the State's legitimate political objectives—including partisan goals and incumbency protection.

Similarly, the second and third *Gingles* preconditions now require Plaintiffs to show racial block voting that cannot be explained by partisanship. Plaintiffs must "disentangl[e] race from politics" by showing voters engaged in racial bloc voting "that

3

cannot be explained by partisan affiliation." *Id.* at 1155. This is because "simply pointing to *inter*-party racial polarization proves nothing, as 'a jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact.'" *Id.* at 1160. (quoting *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 9 (2024)). So Plaintiffs must demonstrate *intra*-party racial-bloc voting patterns—as in *Gingles* itself, where "black and white voters had dramatically different voting patterns *within* the Democratic party." *Id.* This requirement is critical here where "both parties have substantial support and where race is often correlated with party preference," because in such jurisdictions "a litigant can easily exploit §2 for partisan purposes by 'repackag[ing] a partisan-gerrymandering claim as a racial-gerrymandering claim.'" *Id.* at 1158.

As for the totality-of-the-circumstances test, *Callais* refocused that test to look at "present-day intentional racial discrimination regarding voting." *Id.* at 1160. The inquiry "must focus on evidence that has more than a remote bearing on what the Fifteenth Amendment prohibits." *Id.* "Discrimination that occurred some time ago, as well as present-day disparities that are characterized as the ongoing 'effects of societal discrimination,' are entitled to much less weight." *Id.* at 1160–61. "Far more germane are 'current data' and 'current political conditions' that shed light on current intentional discrimination." *Id.* at 1161 (quoting *Shelby County v. Holder*, 570 U.S. 529, 552–553 (2013)). The Court has noted that "[i]n large part *because of* the Voting Rights Act[,] ... our Nation has made great strides in eliminating racial discrimination

4

in voting." *Shelby County*, 570 U.S. at 548–549. "And if, as a result of this progress, it is hard to find pertinent evidence relating to intentional present-day voting discrimination, that is cause for celebration." *Callais*, 146 S. Ct. at 1161. Evidence of past racial discrimination alone thus no longer supports a § 2 claim. Plaintiffs' Complaint wholly fails these requirements.

## A. The Complaint Does Not Allege a Strong Inference of Intentional Discrimination.

Plaintiffs do not allege that Louisiana *intentionally* drew SB1 or HB14 to afford minority voters less opportunity because of their race. This fact alone requires dismissal of the Complaint. Nor do they plausibly allege that the State drew the challenged maps to accomplish legitimate political goals rather than to discriminate based on race.

*First,* Plaintiffs disclaim that they must plead intentionality at all. ECF 14 ¶ 48 ("[A] Section 2 claim may be established by discriminatory results and does not require ... any particular intent on the part of the lawmakers[.]") Instead, Plaintiffs effectively raise a disparate-impact theory—that the maps "dilut[e] the voting strength of Black voters." *Id.* ¶ 3. For that reason, their evidence (including their illustrative maps) does not "support[] a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S.Ct. at 1157.

*Second,* the Complaint itself indicates a legitimate political explanation, not a racial one, for the State's maps. Plaintiffs assert only that Louisiana *could* have added more majority-black districts. ECF 14 ¶ 8. They do not allege that the State

dismantled any majority-black district, deliberately fragmented any black population, or used racial data to suppress black electoral influence. The Legislature simply declined to create as many new majority-black districts as Plaintiffs want, which is more plausibly explained by the State's partisan and political objectives than by racial animus. To be blunt: Plaintiffs' complaint that a Republican legislature did not draw districts that likely would have caused the loss of Republican seats makes no sense—that is a natural product of politics and legitimate political objectives, not racial animus. Because the factual allegations are "not only compatible with, but indeed [are] more likely explained by, lawful ... behavior," Plaintiffs have failed to state a plausible claim. *Iqbal*, 556 U.S. at 680.

For these reasons, the Complaint does not allege facts that raise *any* inference of intentional racial discrimination—let alone the "strong inference" *Callais* requires. *Callais*, 146 S. Ct. at 1157.

### B. Plaintiffs Fail the Updated *Gingles* Preconditions.

More granularly, Plaintiffs' Complaint does not—and could not—even attempt to satisfy each of the updated *Gingles* preconditions.

**1.** At step one, Plaintiffs' illustrative maps are wholly inadequate. Plaintiffs allege that Louisiana's black population is "sufficiently numerous and geographically compact to comprise the majority of the voting age population ... in three new Black majority-minority opportunity districts in the State Senate ... and in between six and nine additional Black opportunity House districts that the State failed to draw." ECF 14 ¶¶ 58–59, 101. Plaintiffs' maps fail under *Callais* because they use race as a

districting criterion and do not define—much less satisfy—all the State's legitimate districting objectives.

*First*, Plaintiffs' illustrative maps use race as a districting criterion. Plaintiffs allege: "As the Black population in Louisiana is of sufficient size and geographic compactness to *create more majority-Black districts* than the enacted map, the first *Gingles* precondition is satisfied," and they attach "[i]llustrative Louisiana State Senate and Louisiana State House maps that *accomplish this goal.*" ECF 14 ¶¶ 100–01 (emphasis added). Plaintiffs consistently reference how their maps create more "majority-Black districts." *Id.* ¶¶ 100–116. And in fact, both this Court and the Fifth Circuit panel previously acknowledged that the illustrative maps are based on race, concluding that the Supreme Court's decision in *Allen v. Milligan*, 599 U.S. 1 (2023), permitted this move. *See, e.g.*, *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 855–56 (M.D. La. 2024) (declining to penalize Plaintiffs for "[i]llustrative maps [which] are 'created with an express [racial] target in mind'" because "[t]here is no state action"); *Nairne v. Landry*, 151 F.4th 666, 694–95 (5th Cir. 2025) (affirming this Court's determination).

But the maps' intentional use of race renders them worthless after *Callais*: "[A]n illustrative map in which race was used has no value in proving a §2 plaintiff's case." *Callais*, 146 S. Ct. at 1158. Maps that "produce an additional majority-minority district only by using race … shed[] no light on whether the State acted unconstitutionally by *not* adopting such a map." *Id.* Plaintiffs thus cannot prove that

the State violated § 2 by failing to adopt a map that "would be unconstitutional if [the] State engaged in such mapmaking." *Id.*

*Second*, Plaintiffs do not allege that their illustrative maps satisfy all the State's legitimate districting objectives. Their maps must show that the State's failure to create additional majority-black districts was "driven by racial considerations rather than permissible aims." *Callais*, 146 S. Ct. at 1159. But Plaintiffs neither describe the State's permissible districting goals nor allege that their illustrative maps achieve those goals.

**2.** Plaintiffs also fail to disentangle race from politics as required to satisfy *Gingles* preconditions 2 and 3. Plaintiffs allege that "voting in Louisiana is highly polarized along racial lines" and that "Black voters in Louisiana are politically cohesive in their support of the same candidates." ECF 14 ¶¶ 3, 117. Specifically, Plaintiffs allege that, in recent statewide elections, around 95% of black voters supported certain candidates while around 80% of white voters supported opposing candidates. *Id.* ¶ 122. That is not enough. To satisfy the second and third *Gingles* preconditions, Plaintiffs must "control[] for party affiliation" and "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159–60. Plaintiffs have failed to make that showing. They do not even mention the party affiliations of the black- and white-supported candidates in their cited elections. *See* ECF 14 ¶ 122. Nor do they allege that the observed "racial" polarization persists after controlling for partisan preference. Accordingly, neither

8

their Complaint nor their illustrative maps "disentangle race from politics." *Callais*, 146 S. Ct. at 1158.

**3.** Nor do they plausibly allege present-day intentional discrimination of any kind, much less present evidence of "intentional present-day *voting* discrimination." *Id.* at 1160 (emphasis). Their allegations of "[d]iscrimination that occurred some time ago" are not enough to state a § 2 claim. *Id.* at 1160–61.

The Complaint devotes extensive attention to past racial discrimination. ECF 14 ¶¶ 125–39. That evidence is "entitled to much less weight." *Callais*, 146 S. Ct. at 1160. What matters are "'current data' and 'current political conditions' that shed light on current intentional discrimination." *Id.* at 1161. Plaintiffs offer none.

The nearest they come to present-day evidence are the "effects" of past discrimination in the form of depressed income, unemployment, educational achievement gaps, and health disparities. ECF 14 ¶¶ 143–149. Present-day "effects" of past intentional discrimination in voting in non-voting areas are not enough to state a § 2 claim. *See Callais*, S. Ct. at 1156–57. Socioeconomic disparities do not constitute evidence of intentional discrimination in the design of legislative districts. They are, at best, the lingering "effects of societal discrimination," which are, like historical discrimination, entitled to "much less weight." *Id.* at1160. That Plaintiffs have turned to such evidence demonstrates the absence of a present-day intentional effort by the State to deny black voters equal opportunity in voting—and that plainly requires dismissal.

## C. Dismissal Should Be with Prejudice.

The Complaint should be dismissed with prejudice because its deficiencies identified are not technical defects amenable to artful repleading. They reflect a fundamental mismatch between the Complaint's theory of the case (and so also Plaintiffs' illustrative maps) and the now-governing law. The Complaint's vote-dilution theory—that the State's maps "dilute" Black voting strength because additional majority-minority districts are demographically possible—is not viable. The Complaint does not allege—and the factual allegations (including the illustrative maps) do not support—a "strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Callais*, 146 S. Ct. at 1157. No amount of re-drafting can transform a pre-*Callais* vote-dilution theory into a strong-inference-of-intentional-discrimination claim where the underlying facts do not support one.

Indeed, the Complaint's factual allegations affirmatively undermine any inference of intentional discrimination. The Complaint acknowledges that the existing maps happen to contain the same number of majority-black districts that have previously existed. ECF 14 ¶ 8. And Plaintiffs' own illustrative maps demonstrate that the only way to create additional majority-black districts is to dismantle numerous existing districts to the detriment of the political party in control of the Legislature—suggesting that the current configuration reflects legitimate political choices rather than racial animus. The Complaint presents Plaintiffs' best case under the prior legal framework, which was far more forgiving for Plaintiffs than the post-*Callais* framework. *Callais*, 146 S. Ct. at 1157–61. Under the new

10

framework, therefore, Plaintiffs' "best case" necessarily fails, and dismissal with prejudice is appropriate. *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986).

To sum up, Plaintiffs allege a § 2 claim that is not viable and seek to prove facts that are now legally meaningless. If they wish to press their claims, therefore, Plaintiffs must start from zero with a new complaint, new illustrative maps, and new evidence that they have standing to challenge the new senate districts (among others). *See* Section II *infra.* That is a new lawsuit (if Plaintiffs wish to pursue one). This lawsuit, however, should be dismissed with prejudice for failure to state a claim, or, alternatively, the Court should grant judgment on the pleadings in Defendants' favor.

In the event the Court determines that leave to amend the Complaint is appropriate, such leave should be conditioned on filing a new complaint that, on its face, alleges facts satisfying each element required by *Callais*—including specific, non-conclusory allegations regarding race-neutral illustrative maps and analysis controlling for partisan affiliation, present-day intentional discrimination, and a strong inference of racial motivation.

## II.    PLAINTIFFS' CLAIMS CHALLENGING THE STATE'S SENATE DISTRICTS ARE MOOT AND SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION.

Independent of Plaintiffs' pleading deficiencies detailed above, Plaintiffs' claims challenging the State's senate districts should be dismissed as moot. "A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)

11

(cleaned up). In the redistricting context, when a State enacts a new map that supersedes the challenged map and the challenged map will not be used in future elections, any holding that the prior map violated the law has no effect and thus the relevant claims should be dismissed as moot. *See Davis v. Abbott*, 781 F.3d 207, 216–17 (5th Cir. 2015) (dismissing as moot under those circumstances); *Robinson v. Ardoin*, 731 F. Supp. 3d 711, 723 (M.D. La. 2024) (same).

That precedent requires dismissal here. Plaintiffs' Complaint seeks a declaration that SB1 and HB14 violate § 2, an injunction against elections under those maps, and a remedial map. *See* ECF 14 at 58. But Act 955 superseded SB1 by changing senate districts 33, 34, and 35. *See* Ex. A at 7–10 (Act 955). And those changes now govern all appointments and elections: Any position or office filled by appointment or election based on a senate district "shall be appointed or elected based upon the district as it is described in Section 2 of this Act." *Id.* at 10. Those superseding districts, not the senate districts challenged in the Complaint, thus govern all future elections. So no injunction is necessary to prevent elections under the challenged senate districts. And because those challenged districts will not be used in future elections, there is no need for a remedial map to replace them. The Court, therefore, cannot grant any form of effective relief as to the superseded senate districts, and Plaintiffs' challenge to those districts is moot. *See Already, LLC*, 568 U.S. at 91. The Court thus lacks subject matter jurisdiction over Plaintiffs' challenge to former SB1's senate districts, and those claims should be dismissed for that reason.

12

## CONCLUSION

The Court should grant this motion and dismiss the Complaint with prejudice for failure to state a claim or, alternatively, grant judgment on the pleadings in Defendants' favor. In the event the Court allows Plaintiffs to amend their Complaint, the Court should require that any new complaint satisfy the requirements of *Callais* before any further proceedings occur. At minimum, the Court should dismiss all claims against former SB1's senate districts as moot.

Dated: July 17, 2026

Respectfully submitted,

*/s/ Jennifer Bollinger*
Jennifer Bollinger
La. Bar Roll No. 32349
Executive Counsel
Secretary of State Nancy Landry
8585 Archives Ave.
Baton Rouge, LA 70809
Telephone: (225) 362-5101
Jennifer.bollinger@sos.la.gov

John C. Walsh
Louisiana Bar Roll No. 24903
SHOWS, CALI & WALSH, L.L.P.
628 St. Louis St.,
P.O. Box 4225
Baton Rouge, LA 70821
Telephone: (225) 346-1461
Facsimile: (225) 346-5561
john@scwllp.com

*Counsel for the Secretary of State*

ELIZABETH B. MURRILL
Attorney General of Louisiana

MORGAN BRUNGARD (LA 40298)
Deputy Solicitor General

CAREY TOM JONES (LA 07474)
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
Louisiana Department of Justice
1885 N. Third St.
Baton Rouge, LA 70802
(225) 324-9866
BrungardM@ag.louisiana.gov

*/s/ Jason B. Torchinsky*
JASON B. TORCHINSKY*
Holtzman Vogel Baran
Torchinsky & Josefiak PLLC
2300 N. Street NW, Suite 643
Washington, DC 20037
(540) 341-8808
jtorchinsky@holtzmanvogel.com
**Admitted pro hac vice*

*Counsel for the State of Louisiana*

13