**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

DR. DOROTHY NAIRNE, JARRETT
LOFTON, REV. CLEE EARNEST LOWE, DR.
ALICE WASHINGTON, STEVEN HARRIS,
ALEXIS CALHOUN, BLACK VOTERS
MATTER CAPACITY BUILDING
INSTITUTE, and THE LOUISIANA STATE
CONFERENCE OF THE NAACP,

      *Plaintiffs*,

  v.

NANCY LANDRY, in her official capacity as
Secretary of State of Louisiana,

      *Defendant*.

CIVIL ACTION NO. 3:22-cv-00178
-SDD-SDJ


Chief Judge Shelly D. Dick


Magistrate Judge Scott D. Johnson

**MEMORANDUM OF LAW IN OPPOSITION TO JOINT MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT OR, IN THE ALTERNATIVE, GRANT
JUDGMENT ON THE PLEADINGS**

Defendants' Motion to Dismiss is premised on intervening changes of law to the Section 2

standard, as articulated by the Supreme Court in its recent decision, *Louisiana v. Callais*, 146 S.

Ct. 1131, *judgment entered*, 146 S. Ct. 1111 (2026). But Defendants misapply federal pleadings

standards and disregard the many factual allegations that meet the updated *Callais* standard for

claims under Section 2 of the Voting Rights Act ("VRA"). Even if the Court disagrees, Defendants

provide no basis for dismissal with prejudice, and case after case provides for the opportunity to

amend after a change in controlling law. Their request for dismissal—or judgment on the pleadings

in the alternative—should be denied in full.

In *Callais*, the Supreme Court "update[d] the Gingles framework" while also reaffirming

the constitutionality of Section 2 of the Voting Rights Act of 1965, as amended, 52 U.S.C. § 10301

("Section 2"). *Callais*, 146 S. Ct. at 1159. The Supreme Court squarely held that it was not

1

abandoning the long-standing *Gingles* framework as the accepted method for proving a Section 2 vote-dilution claim, nor was it holding that Section 2 "demand[ed] a finding of intentional discrimination." *Id.* at 1156–57. The challenged allegations in the Amended Complaint were presented under that *Gingles* framework. While Plaintiffs must now satisfy the updated *Gingles* framework articulated in *Callais*, the Amended Complaint contains significant factual allegations that amply plead a Section 2 violation under the updated framework. This is confirmed by the extensive trial record in this case, which already proves most aspects of the updated *Gingles* test, as established during the nearly two-week trial held before this Court. Thus, to the extent that the Court finds the facts pled in the Amended Complaint insufficient but the claims supported by the trial record, the Court should grant Plaintiffs leave to amend their Amended Complaint to conform to the evidence presented at trial. *See* Fed. R. Civ. P. 15(b)(2).

But even if the Amended Complaint and the trial record were not sufficient to satisfy the newly updated *Gingles* factors (which they are), dismissal with prejudice would be improper. When a case is remanded for further proceedings following an intervening change in the law, as here, it is well-settled that the trial courts may allow parties to replead and re-open the trial record. *See, e.g., Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983); *see also Franklin v. Regions Bank*, 125 F.4th 613, 630 (5th Cir. 2025). Given this posture, should the Court find any deficiency in Plaintiffs' allegations in light of *Callais*, Plaintiffs should be granted leave to amend their Amended Complaint to conform with *Callais* and provided an opportunity to present additional evidence relevant to the updated *Gingles* standard.

Defendants' Motion should be denied.

2

**ARGUMENT**

Plaintiffs' Amended Complaint contains specific factual allegations that satisfy Rule 12's pleading requirements, including the Section 2 pleading standard after *Callais*. The Amended Complaint contains sufficient allegations to satisfy the *Gingles* framework for the totality of circumstances standard, preconditions II and III, and precondition I even after these elements have been updated by *Callais*. However, if the Court disagrees then granting Plaintiffs leave to amend is proper. Finally, Plaintiffs' Senate claims are not moot because Act 955, ECF No. 365-2, did not change the challenged districts.

**I.    Plaintiffs' Amended Complaint Amply Satisfies the Pleading Standard.**

Plaintiffs have met their pleading burden, and Defendants' suggestion otherwise is based on a misapprehension of what Rule 12(b)(6) requires. A complaint "need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 768 (5th Cir. 2019). In evaluating 12(b)(6) motions, the "court accepts all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff." *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 205 (5th Cir. 2007) (quotation marks omitted).

Defendants' central argument is that Plaintiffs' Amended Complaint should be dismissed under Rule 12(b)(6) because it does not specifically state a claim under the new *Callais* framework. They mistake Plaintiffs' obligation to plead *facts* sufficient to plausibly plead a claim with a need to also plead the resulting *legal conclusions*, including all the elements of the updated *Gingles* standard set out in *Callais*. But Plaintiffs need not provide the "formulaic recitation of the elements of a cause of action" that Defendants appear to demand. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, what matters is that Plaintiffs plead facts that, taken as true, plausibly "establish all the elements of" Plaintiffs' Section 2 claim. *Norsworthy v. Houston Indep. Sch. Dist.*,

3

70 F.4th 332, 336 (5th Cir. 2023). Contrary to Defendants' position, "conclusory allegations" or "legal conclusions" are "not accept[ed] as true" in deciding a motion to dismiss, so they cannot be essential to *defeating* a motion to dismiss. *Arnold v. Williams*, 979 F.3d 262, 266 (5th Cir. 2020) (quoting *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010)).

Defendants also appear to demand that Plaintiffs set forth their entire proof in their pleading, but that argument also fails. "[A] claim is plausible if it is supported by enough facts to raise a reasonable expectation that discovery will reveal evidence of the alleged misconduct.'" *Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 645 (M.D. La. 2025) (cleaned up). Thus, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" to support the claim—just "more than labels and conclusions." *Twombly*, 550 U.S. at 555; *see also Hernandez v. W. Tex. Treasures Estate Sale, L.L.C.*, 79 F.4th 464, 469 (5th Cir. 2023) ("To survive a Rule 12(b)(6) motion to dismiss, a complaint 'does not need detailed factual allegations,' but must prove the plaintiff's grounds for entitlement to relief—including factual allegations in a complaint that when assumed to be true 'raise a right to relief above the speculative level.'" (citation omitted)). As detailed below, even under *Callais*' update to the *Gingles* standard, Plaintiffs have offered sufficient factual allegations and evidence that would meet each element of the test.

Nonetheless, should the Court find that Plaintiffs' Amended Complaint does not meet the pleading burden after the *Callais* updates, Defendants' request for outright dismissal with prejudice must be rejected. When a case is remanded for further proceedings following an intervening change in the law, the trial court retains full discretion to re-open the trial record. *See Jones & Laughlin Steel Corp.*, 462 U.S. at 551. And, as the Fifth Circuit has explained, when the "law changes in unanticipated ways during an appeal," it is appropriate to give the parties the

4

opportunity "to present evidence relevant to that new standard." *See, e.g.*, *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 188 F.3d 278, 282 (5th Cir. 1999). The "motivation of this rule is fairness: to prevent injustice to a party who had no reason to expect a changed rule at the time of trial." *Id.* For the same reasons, the party should be given the "chance to plead the facts relevant to [the updated legal] standard." *U.S. ex rel. Rafizadeh v. Cont'l Common, Inc.*, 553 F.3d 869, 874 (5th Cir. 2008).

Defendants also provide no basis for dismissal with prejudice. Their argument hinges on their view that the current facts pled do not meet the updated standard, not that no such facts (including those later established at trial beyond the Amended Complaint's allegations) possibly exist and make amendment futile. *See Legate v. Livingston*, 822 F.3d 207, 211 (5th Cir. 2016) ("[A]n amendment is considered futile if it would fail to state a claim upon which relief could be granted."). Indeed, where courts have dismissed complaints on futility grounds despite an intervening change to the legal standard, the Fifth Circuit has remanded "to the district court to reconsider its ruling . . . on futility in light of" the new case law. *United States v. Clark*, 260 F.3d 382 (Mem.) (5th Cir. 2001).

## II. Plaintiffs' Amended Complaint Sufficiently Pleads a Section 2 Vote Dilution Claim Even with *Callais v. Louisiana*'s Updates.

### A. *Callais*'s updates to Section 2 jurisprudence.

Defendants describe *Callais*'s updates to the *Gingles* framework in broad terms but fail to engage beyond cherry-picking quotations from the decision. It is important to clarify what *Callais* did and did not change about Section 2 jurisprudence.

The first two updates to the *Gingles* framework concern the first precondition: whether plaintiffs can show that "a community of minority voters" are "sufficiently numerous and compact to constitute a majority in a reasonably configured district." *Callais*, 146 S. Ct. at 1159. *Callais* set

5

out two additional parameters to this precondition. First, the Court explained that "plaintiffs cannot use race as a districting criterion," which means that a map-drawer must not employ race in a manner that "would be unconstitutional if a State engaged in such mapmaking." *Id*. In setting out this principle, the Court relied on its recent decision in *Alexander v. South Carolina State Conference of the NAACP*, 602 U.S. 1 (2024). There, the Court found that a state's map-drawer did not use race in an unconstitutional manner when he "viewed racial data" at times "during the redistricting process" and "considered the relevant racial data" after, rather than while, drafting the map. *Id*. at 22.

Defendants present this change in the articulation of the requirements for illustrative maps as meaning that Plaintiffs merely referencing that they met their *Gingles* I burden of drawing additional majority-Black districts is itself an improper use of race forbidden by *Callais*. Mot. 6–7. Defendants conflate two issues. The first is *whether Gingles* I can be satisfied by creating districts where the minority population is "sufficiently numerous and compact to constitute a majority" as required by *Gingles*. The second is *how Gingles* I is satisfied—that is, what factors can be used in drawing an illustrative map. It is in the *how* that the Supreme Court changed the law by requiring maps be drawn in a race-neutral manner in line with the state's legitimate interests and goals. Nothing in Plaintiffs' Amended Complaint implied that their illustrative maps under *Gingles* I improperly rely on race as a districting criterion.

The additional update to the first *Gingles* precondition calls for Plaintiffs' illustrative maps to meet "all the State's legitimate districting objectives," which the Court classified as: (i) "traditional districting criteria"; and (ii) "the State's *specified* political goals." *Callais*, 146 S. Ct. at 1159 (emphasis added). The former aspect is similar to what courts already required. *See Allen v. Milligan*, 599 U.S. 1, 20 (2023). The latter aspect requires illustrative maps to account for factors

that some legislatures already specify, such as partisan advantage or incumbent protection. But the Court was clear that if the legislature fails to cite such principles and the evidence does not show that map-drawers pursued "partisan goals" or the like, then courts need not account for those factors. *Callais*, 146 S. Ct. at 1161. Nothing in *Callais* changes the longstanding principle that courts (and plaintiffs) must rely on "the actual considerations that provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality did not." *Bethune-Hill v. Va. State Bd. of Elections*, 580 U.S. 178, 189–90 (2017). Plaintiffs met this standard in their Amended Complaint and with the evidence presented at trial.

In addition to these changes to the first precondition, *Callai*s also clarifies that Plaintiffs must prove as part of the second and third preconditions not only "politically cohesive voting by the minority and racial-bloc voting by the majority," but also "provide an analysis that controls for party affiliation" to "show that voters engage in racial bloc voting that cannot be explained by partisan affiliation." *Callais*, 146 S. Ct. at 1159. The Court named evidence of "intra-party [racial] disparities" as a category of relevant evidence but nowhere did it state that this was the only type of acceptable evidence of true racially polarized voting. *Id*.

Finally, as to the totality of the circumstances, the Court instructed that plaintiffs should present "current data" and evidence of "'current political conditions' that shed light on current intentional discrimination" rather than focusing only on "[d]iscrimination that occurred some time ago." *Id*. at 1160. The former type of evidence supports "a strong inference that the State intentionally drew its districts to afford minority voters less opportunity because of their race." *Id*. at 1157. Notably, the *Callais* majority rejected the dissent's view that it had imposed a discriminatory intent requirement in Section 2—rather, it emphasized that a "§ 2 plaintiff in a vote dilution case must show that a districting scheme denies members of a racial group the same

7

'opportunity' as other voters to elect the candidates they prefer." *Id*. at 1162. Meeting *that* standard, not an actual intent standard, will "give rise to [the] strong inference of racial discrimination" needed to prevail. *Id*.

> **B.    Plaintiffs allege specific facts raising the inference of intentional discrimination.**

Defendants argue that *Callais* requires a finding of intentional discrimination to prevail on a Section 2 claim, and that the Amended Complaint does not properly plead as such. But the Supreme Court directly foreclosed that reading: *Callais* "*does not* demand a finding of intentional discrimination." *Id*. at 1156 (emphasis added). Therefore, Defendants' argument that Plaintiffs failed to specifically allege intentional discrimination fails. Mot. at 5.

Instead, Plaintiffs need only plead "circumstances [that] give rise to a strong inference" of intentional discrimination, as reflected in the updated *Gingles* framework. *Callais*, 146 S. Ct. at 1156. Plaintiffs have done just that here. The phrase "intentional discrimination" is purely descriptive: these are not magic words that must be uttered to survive a motion to dismiss, and if they were, the appropriate action would be to allow Plaintiffs leave to amend the Amended Complaint to invoke them. Indeed, the Supreme Court has long made clear that the Senate Factors themselves provide circumstantial evidence of intentional discrimination. *See League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399, 439–441 (2006); *Rogers v. Lodge*, 458 U.S. 613, 618–627 (1982). The factual allegations are what matter, and those sufficiently meet Plaintiffs' burden for several reasons.

First, Plaintiffs alleged facts showing that legislators were aware of the impact their map would have on Black voters. *Callais* did not overturn long-standing precedent that courts may consider "indirect circumstantial evidence, including the normal inferences to be drawn from the foreseeability of defendant's actions" when analyzing vote dilution claims. *United States v. Brown*,

561 F.3d 420, 433 (5th Cir. 2009); *accord Veasey v. Abbott*, 830 F.3d 216, 235 (5th Cir. 2016) (en banc). Plaintiffs specifically alleged that the Legislature was "well aware that the State Map[s] pack[] Black voters." ECF No. 14 ¶ 92. In Jefferson Parish, for instance, Plaintiffs alleged that legislators "were aware that in enacting S.B. 1, they would exacerbate the dilution of Black voters" "and harm their ability to elect candidates responsive to their interests." *Id*. In the Baton Rouge area, Plaintiffs alleged that "Legislators were also aware that S.B. 1 would exacerbate the dilution of Black voters" and "turned down th[e] option" to "create two minority-majority opportunity districts in the West Baton Rouge area by unpacking adjacent districts." *Id*. at ¶ 93. And Plaintiffs pled that legislators were aware of their maps' dilutive and discriminatory effects on Black voters throughout the State, including in Bossier, Caddo, and DeSoto Parishes in the northwest of the state. *See id*. at ¶¶ 94–95.

Additionally, Plaintiffs provided facts about how the Legislature cracked then-existing majority-Black District 23 in "all different directions" that diluted the voting power of Black voters. *Id*. at ¶ 95. Indeed, "where a State has split (or lumped) minority neighborhoods that would have been grouped into a single district (or spread among several)," this can "be significant evidence of a § 2 violation," *Johnson v. De Grandy*, 512 U.S. 997, 1015 (1994), and evidence that "a State intentionally drew district lines in order to destroy otherwise effective" districts "would raise serious questions under both the Fourteenth and Fifteenth Amendments." *Bartlett v. Strickland*, 556 U.S. 1, 24 (2009). Defendants seemingly agree with this position, arguing Plaintiffs did not sufficiently plead intentional racial discrimination because they failed to allege, among other things, that the Legislature "dismantled any majority-black district." Mot. at 5–6. Yet they ignore that factual allegations in the Amended Complaint lay out such a scenario. *See* ECF No. 14 ¶ 95.

The *Callais* opinion also clarified the legal framework by instructing Section 2 plaintiffs to "focus on evidence that has more than a remote bearing on" intentional racial discrimination in voting such as "current data and current political conditions that shed light on current intentional discrimination." 146 S. Ct. at 1160 (cleaned up). Plaintiffs' Amended Complaint is replete with just this sort of contemporary evidence of intentional discrimination in Louisiana's political process. For example, Plaintiffs alleged that courts have "repeatedly struck down efforts in Louisiana to dilute, limit, or otherwise adversely impact minority voting access and strength, including as recently as in 2021." ECF No. 14 ¶ 133 (citing *United States v. City of West Monroe*, No. 21-cv-0988 (W.D. La. Apr. 14, 2021)). Plaintiffs also alleged that "Louisiana has . . . failed in recent years to comply with public assistance agency voter registration requirements under the National Voter Registration Act (NVRA), a failure that disproportionately impacts minorities." *Id*. at ¶ 139 (citing *Scott v. Schedler*, No. 11–926, 2013 WL 264603, at *18 (E.D. La. Jan. 23, 2013) *aff'd in part, vacated in part on other grounds*, 771 F.3d 831 (5th Cir. 2014)).

Additionally, Plaintiffs alleged repeated instances of Louisiana politicians using racial appeals in recent campaigns, which are another factor that "raises an inference that racial discrimination is responsible for minority plaintiffs' unequal opportunity to participate in the political process." *LULAC, Council No. 4434 v. Clements*, 986 F.2d 728, 738 (5th Cir. 1993). For example, Plaintiffs alleged that "[i]n 2019, Gary Landrieu, an independent candidate running for Governor in Louisiana, used a racial slur in a radio interview when detailing how he had been called a 'n*****- lover[].'" ECF No. 14 ¶ 155. Plaintiffs also alleged that in "2012, a candidate for Louisiana Supreme Court District 5, Justice Jeff Hughes, darkened the image of his Black opponent John Guidry in some of his campaign materials, and referred to Guidry as an 'affirmative

action Democrat.'" *Id.* at ¶ 153. These allegations satisfy, at the pleading stage, Plaintiffs' burden to plausibly allege an inference of intentional racial discrimination.

Defendants are incorrect that this evidence can only support a "disparate impact" theory and is insufficient to demonstrate an inference of intentional discrimination. Mot. at 5. Even under the intentional-discrimination framework articulated in *Arlington Heights*—which is not the applicable standard here—"'discriminatory intent need not be prove[n] by direct evidence.'" *Veasey*, 830 F.3d at 235 (quoting *Rogers*, 458 U.S. at 618); *see also Brown*, 561 F.3d at 433. "[A]ll a party must show in order to rely on disparate impact as circumstantial evidence of discriminatory intent is that" the challenged policy "reduced one racial group's" opportunities and "increased [those of] another racial group[]." *Bos. Parent Coal. for Acad. Excellence Corp. v. Sch. Comm. for City of Bos.*, 145 S. Ct. 15, 17 (2024) (Alito, J., dissenting from the denial of certiorari). Plaintiffs' evidence under the totality of circumstances test plausibly alleges facts that could support a reasonable inference of intentional racial discrimination under Section 2 in light of *Callais*. That is enough to survive a motion to dismiss.

**C.     Plaintiffs have already presented evidence to satisfy the new post-*Callais* requirement of disentangling race and party.**

It is true that *Callais* requires that plaintiffs ultimately prove that racial polarization under the *Gingles* II and III preconditions is driven by race and not merely party affiliation. *See Callais*, 146 S. Ct. at 1159. The Supreme Court noted that one way to accomplish this goal is through presenting evidence of "intra-party racial-bloc voting." *Id*. Defendants assert that this case should be dismissed because the Amended Complaint does not attempt to disentangle race from politics, on the basis that Plaintiffs did not include "the party affiliations of the black- and white-supported candidates in their cited elections." Mot. at 8–9 (citing ECF No. 14 ¶ 122). The pre-*Callais* Amended Complaint may not contain many specific allegations about disentangling race from

politics, but this was an issue tried without objection—and, indeed, first raised by Defendants. Under Federal Rule of Civil Procedure 15(b)(2), "[w]hen an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings." There can be no dispute that evidence of "intra-party racial-bloc voting" was presented during trial and accepted by this Court—and thus, any claimed deficiency in the pleadings was already cured. Of course, Plaintiffs "may move—at any time, even after judgment—to amend the pleadings to conform them to the evidence." Fed. R. Civ. P. 15(b)(2). To the extent necessary, Plaintiffs would make that motion and seek leave to file an amended complaint.

In fact, at trial, Plaintiffs presented the exact intra-party evidence that *Callais* deemed satisfactory to demonstrate that race can be disentangled from party when evaluating racially polarized voting. *See Callais*, 146 S. Ct. at 1159. Plaintiffs' expert, Dr. Lisa Handley, evaluated voting patterns evidence presented by Defendants' own expert and, as this Court found, "Dr. Handley concluded that 'very consistently . . .white voters gave more support to white Democrats than the Black Democrats" *Nairne v. Ardoin*, 715 F. Supp. 3d 808, 868 (M.D. La. 2024), *vacated and remanded sub nom. Nairne v. Landry*, No. 24-30115, 2026 WL 1255781 (5th Cir. May 7, 2026). The Court also noted that "Dr. Handley found no examples of an election where White voters who were voting for a Democrat supported Black and White Democrats equally." *Id*. at 870. Additionally, Plaintiffs presented, and this Court accepted, evidence from two experts who performed the accepted *Gingles* ecological inference ("EI") analysis[1] on three different elections and specifically proved that there are different voting patterns of registered Democrats in Louisiana

---

[1]*See, e.g.*, *Petteway v. Galveston Cnty.*, 698 F. Supp. 3d 952, 1009 (S.D. Tex. Oct. 13, 2023), *rev'd and rem'd*, 111 F.4th 596 (5th Cir. 2024) (en banc) (noting that all experts in the case agreed that "RxC ecological inference is an appropriate method for analyzing the voting patterns of different demographic groups.").

based solely on race. *Id*. at 870–71. Analyzing the voting patterns of the 2022 U.S. Senate race in Louisiana, Dr. King found that white registered Democrats were likely to vote for the White Democratic candidate over the Black Democratic candidate by a 2:1 ratio. *Id*. at 871. Dr. King found that racial polarization "exists even among copartisans." *Id*.; *see also Nairne v. Landry*, 151 F.4th 666, 702–03 (5th Cir. 2025), *vac'd and rem'd*, 2026 WL 1255781 (5th Cir. May 7, 2026).[2]

Additionally, Plaintiffs presented Dr. Handley's EI analysis evidencing voting patterns in the 2015 and 2019 Governor's race in Louisiana, when there were both Black and White Democratic candidates on the run-off ballots. *See* Dr. Handley Rebuttal Report, ECF No. 152-15 (Table 3). Dr. Handley found that "while Black Democrats supported both the White and the Black Democrats candidates approximately equally in both the 2015 and 2019 runoff elections, White Democrats strongly and consistently favored the White Democratic candidate over the Black Democratic candidate in both the 2015 and 2019 runoff elections." *See id*. at p.11. The impact of racially polarized voting present in Louisiana among registered Democratic voters was clearly reflected in the 2015 and 2019 Governor's contests. This continues a pattern of Black underrepresentation in statewide office that has lasted since Reconstruction, which as the Court noted was the last time Louisiana had a Black governor or U.S. Senator. *See Nairne*, 715 F. Supp. 3d at 874; *see also* ECF No. 14 ¶ 157.

---

[2] This evidence was presented at trial because disentangling race and party to prove racially polarized voting, though new to the Supreme Court's Section 2 jurisprudence, has long been required under Senate Factor 2 in the Fifth Circuit. *See Teague v. Attala Cnty.*, 92 F.3d 283, 292 (5th Cir. 1996) ("A defendant may try to rebut plaintiffs' claim of vote dilution via evidence of objective, nonracial factors under the totality of the circumstances standard.") (cleaned up). *Callais* incorporated this requirement into the *Gingles* II and III preconditions. *See* 146 S. Ct. at 1159. Consistent with Fifth Circuit precedent, Plaintiffs presented this evidence in line with Senate Factor 2. *Nairne*, 715 F. Supp. 3d at 870–71. That difference in presentation is immaterial. While the legal framework may have changed, the factual evidence necessary to meet that framework—whether under Senate Factor 2 or *Gingles* II and III—remained the same and is already in the record. And the EI evidence from Dr. King and Dr. Handley was also affirmative evidence disentangling race and party in Louisiana elections.

**D.**      **Plaintiffs alleged specific facts satisfying the first *Gingles* precondition under the new post-C*allais r*equirements.**

Defendants raise several arguments for why Plaintiffs' specific facts satisfying the *Gingles* I precondition are insufficient, none of which carry weight. *First*, Defendants mistake the maps attached as Exhibits A and C in the Original Complaint and addressed in the Amended Complaint, for Plaintiffs' illustrative maps submitted at trial. Mot. at 11–12. But Plaintiffs' expert, William Cooper, did not prepare the maps attached as exhibits to the Original Complaint, nor do they mirror the illustrative maps he produced in this case. *Compare* William Cooper's Rep., ECF No. 198-102, *with* ECF Nos. 1-1, 1-2, 1-3, 1-4. Regardless, neither the Amended Complaint nor exhibits themselves suggest that race was used as a criterion when drawing either of these illustrative maps with majority-BVAP districts. Instead, the Amended Complaint merely outlined "two possible ways of many to draw the Senate and House maps that follow traditional redistricting principles" while "expand[ing] the number of majority-minority opportunity districts." ECF No. 14 ¶ 101. Defendants cannot rely upon facts not alleged in the Amended Complaint at the pleadings stage.

*Second,* Defendants conflate Plaintiffs pleading that they Plaintiffs *could* meet *Gingles* I in the Complaint with how Plaintiffs *can* meet *Gingles* I. Defendants argue that references to "majority-Black districts" in the Amended Complaint indicates that the illustrative maps were likely drawn with race as districting criterion, and thus fail the updated *Gingles* I standard. However, pleading that majority-minority districts were created is merely the outcome of the map drawing process; it says nothing about whether race was used as a districting criterion to draw the map. The Supreme Court in *Callais* maintained the need, in "drawing illustrative maps," to "produce an additional majority-minority district." *Callais*, 146 S. Ct. at 1159.[3]

---

[3] In so doing, the Supreme Court suggested that *Bartlett v. Strickland* remains good law. *Id*. (satisfying the first *Gingles* precondition requires the "community of minority voters must be sufficiently numerous and

Plaintiffs' allegations in the Amended Complaint about producing additional "majority-Black districts" do not conflict with the relevant caselaw. Of course, Plaintiffs must continue to demonstrate that a district is "sufficiently numerous and geographically compact." ECF No. 14 ¶ 108. And Plaintiffs pled that in several parts of the state—Jefferson Parish, the Shreveport area, the Baton Rouge area, the Natchitoches area, among others—"sufficiently numerous and geographically compact" majority-Black districts could be created. ECF No. 14 ¶¶ 105–13. That majority-minority districts are the outcome of the redistricting process says nothing about how the manner in which districts were drawn. It does not equate to race being used as a redistricting criterion.

*Third*, Defendants posit that the Amended Complaint should be dismissed for supposedly failing to plead that all of the State's legitimate redistricting objectives can be achieved. Mot. at 12. Yet the Amended Complaint does plead specific facts showing that there are multiple ways to satisfy—and improve upon—the State's traditional redistricting criteria and add additional majority-Black districts. ECF No. 14 ¶¶ 62, 101. And the Amended Complaint specifically asserts that these additional districts can be drawn while considering the state's redistricting guidelines under Joint Rule 21—which does not include partisan goals—and traditional redistricting principles. *Id*. While Defendants hypothesize about other goals the Legislature may have had, such as potential partisan objectives, these are not articulated in Joint Rule 21. Nor have Defendants identified any actual evidence of such additional redistricting goals that were not met by the illustrative maps referenced in the Amended Complaint. *Cf. Bethune-Hill*, 580 U.S. at 189–90 (explaining that, in redistricting cases, the "inquiry concerns the actual considerations that

---

compact to constitute a majority in a reasonably configured district"); *see also Barlett*, 556 U.S. 1, 12-13 (2009) (resolving the "minimum-size question" of the "minority group"). Under *Bartlett*, Plaintiffs can only satisfy *Gingles* I by producing majority-minority districts where "a minority group composes a numerical, working majority of the voting-age population." 556 U.S. at 13.

15

provided the essential basis for the lines drawn, not *post hoc* justifications the legislature in theory could have used but in reality, did not.").

The Amended Complaint, therefore, provides sufficient allegations that it is possible to draw illustrative maps that satisfy the Legislature's legitimate goals and traditional redistricting principles. These allegations are sufficient to satisfy the updated *Gingles* I standard. And to the extent that there is any factual dispute about whether Plaintiffs' illustrative maps comply with all the Legislature's legitimate goals, that is a question of fact for adjudication and not a basis for dismissal under Rule 12(b)(6). *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996) ("In considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the district court must accept all well-pleaded facts as true and view them in the light most favorable to the plaintiff.").

However, should the Court determine that the Amended Complaint does not sufficiently plead allegations necessary to satisfy the *Gingles* I requirement after *Callais*, Plaintiffs are prepared to file a Second Amended Complaint with specific allegations that Plaintiffs can and will provide new illustrative maps drawn without race as a districting criterion and meet all of the Legislature's legitimate districting goals. Fairness requires that Plaintiffs be given an opportunity to address the way the "law changes in unanticipated ways during an appeal." *Deffenbaugh-Williams*, 188 F.3d at 282. Plaintiffs, therefore, respectfully request that they be given leave to file a new Amended Complaint if the Court finds that the current Amended Complaint is not sufficient.

### III.    Dismissal with Prejudice is Improper.

Defendants have not met the bar for dismissal with prejudice. Even if the current pleadings were inadequate (and they are not), Plaintiffs would be entitled to leave to amend their Amended Complaint. Nothing requires this Court to dismiss the case with prejudice. Indeed, as Defendants concede, any issues with the Amended Complaint stem from an intervening change in law that

Plaintiffs could not have predicted or accounted for when drafting the pleading. Therefore, Plaintiffs have good cause to amend due to the unforeseen change in the governing legal standard and to do so would allow the full presentation of issues before this Court.

A party may amend its complaint for good cause after the deadline to amend pleadings established by a court's scheduling order has passed. *See Jackson v. Gray*, 345 F.R.D. 597, 606 (E.D. La. 2024). The good-cause standard under Federal Rule of Civil Procedure 16(b)(4) "'requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension.'" *Id*. at 606–07 (quoting *S&W Enters., LLC v. SouthTrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir. 2003)). The Fifth Circuit has explained that at least four factors are relevant to good cause: "(1) the explanation for the failure to timely move for leave to amend; (2) the importance of the amendment; (3) potential prejudice in allowing the amendment; and (4) the availability of a continuance to cure such prejudice." *Fahim v. Marriott Hotel Servs., Inc.*, 551 F.3d 344, 348 (5th Cir. 2008) (quoting *S&W Enters., LLC*, 315 F.3d at 536).

The announcement of a new legal standard by the Supreme Court supplies good cause to extend the deadline to amend pleadings. Courts routinely find good cause to modify a scheduling order in the event of an intervening, controlling legal development. "The good cause standard requires the 'party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension,'" which is necessarily the case when an intervening change to long-standing law occurs. *See S&W Enters., L.L.C.*, 315 F.3d at 535 (citation omitted). In applying the good cause standard, the Fifth Circuit has emphasized that mere "inattention to law" or a legal error by counsel about then-existing law cannot constitute good cause because "inadvertence … is tantamount to no explanation at all." *Banks v. Spence*, 114 F.4th 369, 372 (5th Cir. 2024) (quoting *S&W Enters., L.L.C.*, 315 F.3d at 536). This is exactly the opposite case:

17

counsel was not inattentive, but rather the Supreme Court fundamentally changed the law by updating the *Gingles* framework in *Callais*. No amount of diligence could have permitted counsel to predict that future. *See, e.g.*, *Callahan v. Cnty. of Suffolk*, 96 F.4th 362, 370 (2d Cir. 2024) ("[A] change in controlling law may provide good cause to amend."); *Weiss v. Nat'l Westminster Bank PLC*, 381 F. Supp. 3d 223, 237 (E.D.N.Y. 2019) ("The enactment of an explicitly retroactive statute after a scheduling deadline constitutes sufficient good cause."); *Shank v. Carleton Coll.*, 329 F.R.D. 610, 615 (D. Minn. 2019) ("a 'change in the law' may form the basis for good cause" to amend, particularly where relevant law was "in flux around the time of the original motion-to-amend deadline"); *Pumpco, Inc. v. Schenker Int'l, Inc.*, 204 F.R.D. 667, 668 (D. Colo. 2001) ("a change in the law—if occurring after the deadline to amend contained in the Scheduling Order constitutes good cause to justify an extension of that deadline"). For example, in *Callahan*, the Second Circuit held that plaintiffs did not have good cause to amend their complaint only because the intervening change in law did not "impact[] plaintiffs' ability to raise their proposed claim at the start of this litigation." 96 F.4th at 370. But, here, Defendants are arguing that the Supreme Court's decision in *Callais* rewrote the relevant law in a way dispositive of Plaintiffs' claims as pled. If Defendants' motion is granted on that theory, Plaintiffs should have an opportunity to address that change in law, which could not have been anticipated at the start of this case.

Analogously, an intervening change in law also justifies a new trial to prevent injustice. *See Deffenbaugh-Williams*, 188 F.3d at 278, 282 (purpose of "remand[ing] for a new trial" after an unanticipated change in law is to "prevent injustice to a party who had no reason to expect a changed rule at the time of trial"); *accord Carter v. Local 556, Transp. Workers Union of Am.*, 156 F.4th 459, 488 (5th Cir. 2025); *Vicknair v. Formosa Plastics Corp., La.*, 98 F.3d 837, 839 (5th Cir. 1996). The same reasoning applies here, where the intervening decision in *Callais* is the basis for

18

Defendants' motion—though, here, given that much of the trial record remains relevant after *Callais*, reopening the trial record would be far more efficient than ordering an entirely new trial.

All four factors for assessing good cause favor the same result. *See Fahim*, 551 F.3d at 348. An intervening, controlling change in law is one of the strongest possible explanations for failing to amend before the deadline. Defendants articulate no cognizable prejudice, particularly because they suggest that Plaintiffs could simply file another lawsuit. *See* Mot. at 11. It would waste significant judicial and party resources to restart this case, particularly given the extensive trial record already developed. Nor are continuances a relevant issue at this point because no schedule for the next phase of the case has been set yet. All parties remain free to argue for their preferred schedule at a later time. The least prejudicial approach would be to allow Plaintiffs to make the limited amendments necessary to cure any deficiency in their current Amended Complaint that have arisen because of *Callais*.

Any dismissal should be with leave to amend.

### IV.    Senate Claims Remain Live Notwithstanding Act 955

In a last-ditch effort to secure a dismissal, Defendants claim that the Legislature enacted a completely new State Senate map, purportedly mooting at least part of this case. Defendants greatly overstate the effects of Act 955.

Plaintiffs' claims challenging certain enacted Senate Districts are not moot because Act 955 did not change the challenged districts. Its unrelated changes thus do not undermine the controversy before the Court here. "[A] case becomes moot 'when it is impossible for a court to grant 'any effectual relief whatever to the prevailing party.''" *Crocker v. Austin*, 115 F.4th 660, 667 (5th Cir. 2024) (quoting *Abbott v. Biden*, 70 F.4th 817, 824 (5th Cir. 2023)). "Post-filing events do not moot a case '[a]s long as the parties have a concrete interest, however small, in the outcome

of the litigation.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 636 (5th Cir. 2023).

That a challenged law "is amended" during the pendency of litigation "does not alone moot the underlying claim unless the law has been sufficiently altered so as to present a substantially different controversy." *Perez v. Texas*, 970 F. Supp. 2d 593, 602 (W.D. Tex. 2013) (citing *Ne. Fla. Chapter of the Assoc. Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 & n.3 (1993)). As the Fifth Circuit has explained:

> When a challenged rule is replaced with a new rule, the case is moot so long as the change gives the precise relief that petitioners requested. *The change will not moot the case if the government repeals the challenged action and replaces it with something substantially similar.*

*Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374 (5th Cir. 2022) (citation modified) (emphasis added).

For example, in *Perez*, the court held that plaintiffs' Voting Rights Act claims were not mooted by the fact that the at-issue map was repealed and a new map was adopted because the new map was "heavily derived" from the previously at-issue map, and plaintiffs contended that alleged violations persisted in the new map, even if to a lesser degree. 970 F. Supp. 2d at 602–03.

This case is even clearer than *Perez* because Act 955 did not change *any* of the challenged districts *at all*. Act 955 only "chang[es] senate districts 33, 34, and 35," as Defendants readily admit. Mot. at 12. But Plaintiffs are not challenging Senate Districts 33, 34, and 35. *See id.* (challenging, at most, Senate Districts 2, 5, 7, 8, 10, 14, 15, 17, 19, 31, 36, 38, and 39); *see also* ECF No. 233 at 29. Just as in *Perez*, Plaintiffs' claims are not moot because the substance of the dispute persists even after subsequent legislation amended the at-issue legislation. 970 F. Supp. 2d at 602–03. Indeed, Defendants never explain how minor changes to precincts and voting tabulation districts in Senate Districts *other* than those at issue in this lawsuit could present this Court with a

20

"substantially different controversy," *id*. at 602, or impact this Court's ability to "grant 'any effectual relief'" to Plaintiffs. *Crocker*, 115 F.4th at 667.

Both *Davis v. Abbott*, 781 F.3d 207 (5th Cir. 2015), and *Robinson v. Ardoin*, 731 F. Supp. 3d 711 (M.D. La. 2024), are readily distinguishable as involving changes to the challenged districts, an amended map that granted the exact relief sought by Plaintiffs, or both. *See Davis*, 781 F.3d at 212–13, 217 (challenged map replaced by subsequent map that "[p]laintiffs agreed" did not violate the Voting Rights Act or the Constitution); *Robinson*, 731 F. Supp. 3d at 716–17 (legislature adopted new map with additional majority-Black district, providing the specific relief sought by plaintiffs, unlike here).

For all these reasons, Plaintiffs' Senate claims are not moot and continue to present a live controversy within this Court's jurisdiction. Defendants' Motion should be denied.

## CONCLUSION

For the reasons above, this Court should deny Defendants' Motion and request for judgment on the pleadings, and adopt Plaintiffs' Proposed Schedule. In the alternative, this Court should grant Plaintiffs leave to amend their Amended Complaint.

Per the Court's minute order on June 25, 2026, Plaintiffs include an addendum, Exhibit 1, with Plaintiffs' Proposed Schedule for moving forward with this matter if the Motion to Dismiss is denied.

DATED: July 30, 2026                          Respectfully submitted,


                                              */s/ John Adcock*
Nora Ahmed                                    John Adcock
ACLU FOUNDATION OF LOUISIANA                  ADCOCK LAW LLC
1340 Poydras St., Ste. 2160                   3110 Canal Street
New Orleans, LA 70112                         New Orleans, LA 70119
(504) 522-0628                                Tel: (504) 233-3125

nahmed@laaclu.org

T. Alora Thomas-Lundborg*
RACE AND JUSTICE LAW CLINIC
HARVARD LAW SCHOOL
6 Everett Street, Ste. 4105
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu

Stuart Naifeh*
Victoria Wenger*
Colin Burke*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
snaifeh@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

I. Sara Rohani*
NAACP LEGAL DEFENSE AND
EDUCATIONAL FUND, INC.
700 14th Street N.W. Ste. 600
Washington, DC 20005
(202) 682-1300
srohani@naacpldf.org

Fax: (504) 308-1266
jnadcock@gmail.com

*/s/ Dayton Campbell-Harris*
Dayton Campbell-Harris*†
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
dcampbellharris@aclu.org
slakin@aclu.org

Sarah Brannon*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
915 15th St., NW
Washington, DC 20005
(740) 632-0671
sbrannon@aclu.org

Michael de Leeuw*
Amanda Giglio*
Robert Clark
COZEN O'CONNOR
3 WTC, 175 Greenwich St., 55th Floor
New York, NY 10007
MdeLeeuw@cozen.com
AGiglio@cozen.com

Josephine Bahn*
COZEN O'CONNOR
1200 19th Street NW
Washington, D.C. 20036
JBahn@cozen.com

*Admitted Pro Hac Vice*
† *practice limited to federal court*